# No. 26-11527

# United States Court of Appeals
*for the*
# Eleventh Circuit

GOOD SAMARITAN MEDICAL CENTER, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

THE LEAPFROG GROUP,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA,
NO. 25-CV-80526-MIDDLEBROOKS

## DEFENDANT-APPELLANT THE LEAPFROG GROUP'S OPENING BRIEF

JASON D. STERNBERG
DAVID A. NABORS
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2601 Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
jasonsternberg@quinnemanuel.com
davidnabors@quinnemanuel.com

DEREK L. SHAFFER
*Counsel of Record*
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th Street NW
Washington, D.C. 20004
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for The Leapfrog Group*

September 10, 2026

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

## Certificate of Interested Persons

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, the undersigned counsel hereby certify that, to the best of their knowledge, the following is a complete list, in alphabetical order, of interested persons:

1. Batista, Robert (counsel for Plaintiffs-Appellees)
2. Biggs, Shawna Corrine (counsel for The Leapfrog Group)
3. Billek, Maxwell L. (counsel for The Leapfrog Group)
4. Blair, Kimberly E. (counsel for The Leapfrog Group)
5. Buzzard, Christine M. (counsel for Plaintiffs-Appellees)
6. Cardone, Emily (counsel for Plaintiffs-Appellees)
7. Chung, Daniel P. (counsel for Plaintiffs-Appellees)
8. Crain, Lee R. (counsel for Plaintiffs-Appellees)
9. Delray Medical Center, Inc.
10. Duff, Thomas K. (counsel for The Leapfrog Group)
11. Floch, Brandon Scott (counsel for Plaintiffs-Appellees)
12. Gibson, Dunn & Crutcher LLP (counsel for Plaintiffs-Appellees)
13. Good Samaritan Medical Center, Inc.
14. Hvidt, Scott K. (counsel for Plaintiffs-Appellees)

15. Leapfrog Group, The
16. Lustbader, Zachary J. (former counsel for The Leapfrog Group)
17. Maloney, Mary Beth (counsel for Plaintiffs-Appellees)
18. Marcus, Jeffrey Eldridge (counsel for Plaintiffs-Appellees)
19. Marcus Neiman & Rashbaum LLP (counsel for Plaintiffs-Appellees)
20. Marcus Rashbaum Pineiro & Meyers, LLP (counsel for Plaintiffs-Appellees)
21. Matthewman, William (U.S. Magistrate Judge, Southern District of Florida)
22. Middlebrooks, Donald M. (U.S. District Judge, Southern District of Florida)
23. Modi, Kavi V. (counsel for The Leapfrog Group)
24. Nabors, David Andrew (counsel for The Leapfrog Group)
25. Neiman Mays Floch & Almeida PLLC (counsel for Plaintiffs-Appellees)
26. Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center
27. Parks, Allyson E. (counsel for Plaintiffs-Appellees)
28. Pineiro, Michael Anthony (counsel for Plaintiffs-Appellees)

29. Quinn Emanuel Urquhart & Sullivan, LLP (counsel for The Leapfrog Group)
30. Rashbaum, Daniel Lawrence (counsel for Plaintiffs-Appellees)
31. Reilly, Kevin (counsel for Plaintiffs-Appellees)
32. Scott, Sydney A. (counsel for Plaintiffs-Appellees)
33. Shaffer, Derek L. (counsel for The Leapfrog Group)
34. Simmons, Kevin (counsel for Plaintiffs-Appellees)
35. St. Mary's Medical Center, Inc.
36. Sternberg, Jason D. (counsel for The Leapfrog Group)
37. Takagaki, Marc Aaron (counsel for Plaintiffs-Appellees)
38. Walker, Helgard C. (counsel for Plaintiffs-Appellees)
39. West Boca Medical Center, Inc.
40. Wilson Elser Moskowitz Edelman & Dicker LLP (counsel for The Leapfrog Group)
41. Wood, Courtney (counsel for The Leapfrog Group)
42. Yang, Betty X. (counsel for Plaintiffs-Appellees)
43. Zibias Jura Christine (counsel for The Leapfrog Group)

**Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2, the undersigned counsel certifies that no publicly held corporation has a 10% or greater ownership interest in Defendant-Appellant The Leapfrog Group.

* * *

The undersigned will enter all updated information into the Court's web-based CIP contemporaneously with this Certificate of Interested Persons and Corporate Disclosure Statement.

*/s/ Derek L. Shaffer*
Derek L. Shaffer

## STATEMENT REGARDING ORAL ARGUMENT

Under Federal Rule of Appellate Procedure 34(a)(1), Defendant-Appellant The Leapfrog Group (Leapfrog) respectfully requests oral argument. This appeal presents important questions under the First Amendment and Florida statutory law arising from an injunction that permanently restrains—under color of a state consumer-protection statute—a nonprofit watchdog's free, candid expression on matters of intense public concern. Oral argument would illuminate not only the correct answers but also their constitutional and practical import.

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION....................................................................4

STATEMENT OF THE ISSUES.........................................................................5

STATEMENT OF THE CASE............................................................................5

A. Leapfrog Provides Its Expert Opinions On Patient Safety To The Public By Publishing Hospital Safety Grades ...............................5

B. The District Court's Motion To Dismiss Order Holds That The First Amendment Is "Inapplicable" To Plaintiffs' FDUTPA Claims.......................................................................................9

C. The District Court Enters A Sweeping Injunction Against Leapfrog's Speech.......................................................................10

D. Tenet-Owned Hospitals Springboard Atop The Injunction In Seeking To Chill And Silence Leapfrog ...........................................14

E. The District Court Refuses To Reconsider The Judgment And Injunction Based On First Amendment Concerns ..............................16

SUMMARY OF THE ARGUMENT ...................................................................17

STANDARDS OF REVIEW ..............................................................................19

ARGUMENT ..................................................................................................20

I. PENALIZING LEAPFROG'S SPEECH VIOLATES THE FIRST AMENDMENT ....................................................................................20

A. The Judgment Imposes Liability For Protected Opinion ....................21

1. The Safety Grades Are Protected Opinion ...............................22

2. In All Events, The Grades Were Opinion Because Leapfrog's Grading Methodology Was Fully Disclosed..........29

3. The District Court's Contrary Reasoning Is Unjustifiable .......32

4. Even If The Methodology's Placement On Leapfrog's Website Were Relevant, The District Court's Findings On That Placement Are Clearly Erroneous ..............................36

B. Even If The Grades Were Not Opinion, They Would Not Fall Under Any Recognized Category Of Unprotected Speech.................40

1. The Judgment Punishes And Censors Speech, Not "Conduct" ....41

2. The Judgment Unlawfully Imposes Liability For Reputational Harm Without Proof Of Actual Malice ....44

3. The District Court's Contrary Reasoning Fails ....46

4. To The Extent That The Judgment Is Premised On Dr. Romano's Email, It Is Erroneous ....50

II. THE PERMANENT INJUNCTION ITSELF VIOLATES THE FIRST AMENDMENT BECAUSE IT IS AN OVERBROAD PRIOR RESTRAINT ....52

A. The First Amendment Flatly Prohibits Prior Restraints On Publication ....52

B. The Injunction Is An Impermissible Content-Based Prior Restraint ....54

C. Even If Some Speech Injunction Were Permissible, This Injunction Is Unconstitutionally Overbroad ....55

III. FDUTPA DOES NOT ENCOMPASS THE SPEECH AT ISSUE ....57

CONCLUSION ....59

CERTIFICATE OF COMPLIANCE ....61

CERTIFICATE OF SERVICE ....62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. United States*,
509 U.S. 544 (1993)........................................................................................53

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)........................................................................................31

*Basulto v. Netflix, Inc.*,
2023 WL 7129970 (S.D. Fla. Sept. 20, 2023) ..................................................53

*Berisha v. Lawson*,
973 F.3d 1304 (11th Cir. 2020) ...................................................................45, 50

*Brito v. Salas*,
434 So. 3d 39 (Fla. 2025) ................................................................................57

*Bull Motors L.L.C. v. Brown*,
152 So. 3d 32 (Fla. Dist. Ct. App. 2014)...........................................................56

*Carroll v. President & Comm'rs of Princess Anne*,
393 U.S. 175 (1968).....................................................................................55, 56

*Cheng v. Neumann*,
51 F.4th 438 (1st Cir. 2022)..............................................................................31

*Chevaldina v. R.K./FL Mgmt., Inc.*,
133 So. 3d 1086 (Fla. Dist. Ct. App. 2014)..................................................54, 55

*Chiles v. Salazar*,
607 U.S. 627 (2026)........................................................................................34

*Curtis Pub. Co. v. Butts*,
388 U.S. 130 (1967)........................................................................................45

*Dershowitz v. Cable News Network, Inc.*,
153 F.4th 1189 (11th Cir. 2025) .......................................................................46

*Dupree v. Younger*,
598 U.S. 729 (2023)........................................................................................47

*Fla. Gulf Coast Bldg. & Constr. Trades Council v. NLRB*,
796 F.2d 1328 (11th Cir. 1986) ....................................................................42

*From v. Tallahassee Democrat, Inc.*,
400 So. 2d 52 (Fla. Dist. Ct. App. 1981)....................................................31, 34

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)..........................................................................................21

*Hay v. Independent Newspapers, Inc.*,
450 So. 2d 293 (Fla. Dist. Ct. App. 1984).........................................................29

*Home Performance Alliance, Inc. v. Better Bus. Bureau of W. Fla., Inc.*,
354 So. 3d 1165 (Fla. Dist. Ct. App. 2023)...............................................23, 34

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995)..........................................................................................56

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988)......................................................................................44, 45

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*,
175 F.3d 848 (10th Cir. 1999) ..........................................................................43

*Krapacs v. Bacchus*,
301 So. 3d 976 (Fla. Dist. Ct. App. 2020).........................................................54

*Lane v. Random House, Inc.*,
985 F. Supp. 141 (D.D.C. 1995).......................................................................27

*Lax v. APP of N.M. ED, PLLC*,
2022 WL 715735 (D.N.M. Mar. 10, 2022) .......................................................25

*Masson v. New Yorker Magazine*,
501 U.S. 496 (1991)..........................................................................................27

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)..........................................................................................30

*Moldea v. New York Times Co.*,
22 F.3d 310 (D.C. Cir. 1994)............................................................................27

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................................................................................35

*Moore v. Cecil*,
174 F.4th 862 (11th Cir. 2026) ...................................................................45, 46

*N.Y. Times v. Sullivan*,
376 U.S. 254 (1964)....................................................................................45

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)....................................................................................42

*Near v. Minnesota ex rel. Olson*,
283 U.S. 697 (1931)....................................................................................52

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976)....................................................................................52

*New York Times Co. v. United States*,
403 U.S. 713 (1971)....................................................................................52

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013) .....................................................................30, 34

*Org. for a Better Austin v. Keefe*,
402 U.S. 415 (1971).......................................................................42, 43, 50, 54

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ...................................................................41, 42

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) ...............................................................25, 27, 29

*Phantom Touring, Inc. v. Affiliated Publications*,
953 F.2d 724 (1st Cir. 1992)........................................................................30

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018)........................................................................49, 53

*Stansell v. Revolutionary Armed Forces of Colombia*,
771 F.3d 713 (11th Cir. 2014) .......................................................................19

*Torrey v. Infectious Diseases Soc'y of Am.*,
86 F.4th 701 (5th Cir. 2023) ............................................................................34

*Town of Lantana v. Pelczynski*,
290 So. 2d 566 (Fla. Dist. Ct. App. 1974) .......................................................54

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)............................................................................................33

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018) ........................................ 21, 22, 27, 29, 30, 31

*U.S. Structural Plywood Integrity Coalition v. PFS Corp.*,
524 F. Supp. 3d 1320 (S.D. Fla. 2021) .............................................................23

*United States v. Alvarez*,
567 U.S. 709 (2012)......................................................................................41, 44

*United States v. Browne*,
505 F.3d 1229 (11th Cir. 2007) .........................................................................20

*United States v. Hawkins*,
934 F.3d 1251 (11th Cir. 2019) .........................................................................49

*United States v. Jeffries*,
692 F.3d 473 (6th Cir. 2012) .............................................................................44

*United States v. Pendergraft*,
297 F.3d 1198 (11th Cir. 2002) .........................................................................44

*United States v. Trujillo*,
960 F.3d 1196 (10th Cir. 2020) .........................................................................49

*Utah v. Evans*,
536 U.S. 452 (2002)............................................................................................25

*Vrasic v. Leibel*,
106 So. 3d 485 (Fla. Dist. Ct. App. 2013) .........................................................54

*Weinstein v. 440 Corp.*,
146 F.4th 1046 (11th Cir. 2025) .........................................................................19

*Wu Lin v. Lynch*,
813 F.3d 122 (2d Cir. 2016) ....................................................................37

**Constitutional Provisions**

U.S. Const., amend. I ....................................................................................21

**Statutes**

28 U.S.C. § 1291 ............................................................................................4

28 U.S.C. § 1332(a) ........................................................................................4

Fla. Stat. § 501.204(1).....................................................................................57

Fla. Stat. § 501.2105(1)...................................................................................16

Fla. Stat. § 768.295(1).....................................................................................57

**Other Authorities**

3 Joseph Story, *Commentaries on the Constitution of the United States*
§ 1878 at 735 (1833).................................................................................53

*About Our Methodology*, Viewpoint Diversity Score (July 2024 - May
2025),
https://storage.googleapis.com/vds_storage/document/2025%20Me
thodology.pdf .........................................................................................28

Barak D. Richman & Robert M. Kaplan, *Suing the Scorecard Won't
Improve Hospital Safety*, Health Affairs (June 10, 2026),
https://www.healthaffairs.org/content/forefront/suing-scorecard-
won-t-improve-hospital-safety .................................................................24

Blackmail, *Black's Law Dictionary* (12th ed. 2024) ..........................................44

*Bloomberg ESG Scores* 5, Bloomberg (Dec. 2025),
https://professional.bloomberg.com/globalassets/professional/prod
ucts/bloomberg-terminal/sustainable-finance/scores/bloomberg-
esg-scores-methodology.pdf....................................................................28

*Complaints*, Better Business Bureau, https://www.bbb.org/process-of-complaints-and-reviews/complaints ....................29

David Lat, *Yale and Harvard Law to U.S. News: Drop Dead*, Original Jurisdiction (Nov. 17, 2022), https://davidlat.substack.com/p/yale-and-harvard-law-to-us-news-drop ....................28

Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157 (2007) ....................53

Ike Swetlitz, *Medical errors are third-leading cause of death in the US*, STAT News (May 3, 2016), https://www.statnews.com/2016/05/03/medical-errors-death/ ....................22

Rachel Frazin, ACLU Sends Out Mailer in South Carolina Questioning Biden's Civil Rights Stances, The Hill (Sept. 4, 2019), https://thehill.com/homenews/campaign/459922-aclu-sends-out-mailer-in-south-carolina-questioning-bidens-civil-rights/ ....................43

*Timeline*, N.Y. Times Co., https://www.nytco.com/history/timeline ....................35

*Why Does The New York Times Use Anonymous Sources?*, N.Y. Times (June 11, 2025), https://www.nytimes.com/article/why-new-york-times-anonymous-sources.html ....................34

## INTRODUCTION

The Leapfrog Group (Leapfrog) is a nonprofit watchdog organization that was founded in 2000 to fill a critical informational gap for patients and consumers navigating the healthcare industry—namely, the lack of user-friendly expert assessments of patient safety in hospitals. That gap threatens Americans' lives; indeed, some estimates identify preventable medical errors as a leading cause of death in the United States. Leapfrog's leading program, the Hospital Safety Grade, shines unique, valuable light on this hazard by publicly grading hospitals nationwide to help patients choose where to seek care. In grading hospitals, Leapfrog employs a transparent methodology that it develops under the guidance of a volunteer panel of subject-matter experts and makes widely available to hospitals and the public. Its methodology weighs each hospital's overall track record in keeping patients safe from harm across no fewer than 22 metrics that are based on publicly available data and then synthesized into a final letter grade, A through F, that Leapfrog publishes twice annually.

As with most speech on matters of public concern, there are some—particularly hospitals that receive poor grades—that fault Leapfrog's methodology and grades. Such disagreement is inevitable and healthy in a nation committed to free expression; the good news is that critics remain free to counter whatever expression may aggrieve them with *more* expression. This appeal arises from the

aberrant approach taken by five hospitals in South Florida ("Plaintiffs")—all owned by the same corporate goliath, Tenet—to countering Leapfrog's speech. In the court below, they marshalled their formidable resources to summon an army of high-powered counsel, to obtain a broad permanent injunction barring Leapfrog from publishing patient safety grades using its chosen methodology, and then to wield threats of contempt and more than $10 million in claimed attorneys' fees to further chill or silence Leapfrog, potentially for all time.

This "don't grade me or I'll sue your pants off" response to displeasing grades has no place under the First Amendment. Yet the district court endorsed it wholesale. The court below has permanently enjoined Leapfrog from grading Plaintiffs under its chosen, fully disclosed grading methodology or any "similar methodology," on the premise that the First Amendment is "inapplicable" to Plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), based on alleged reputational (*i.e.*, defamation-type) injury to the hospitals. (Dkt.41 at 6.)

So long as the First Amendment still stands, this jarring assertion of judicial power to censor and muzzle the free press cannot. In the United States, the editorial judgments of a nonprofit watchdog about how best to inform consumers are not proper grist for scorched-earth litigation and judicial second-guessing. If affirmed, the district court's decision will imperil expression that resides at the center of the

First Amendment's generous protections; it will also endanger hundreds of thousands of patients who depend on Leapfrog's expression to help make life-altering healthcare decisions. Three fatal defects render the judgment unsustainable.

*First*, the judgment holds Leapfrog liable for expression that is constitutionally immune, as a matter of law, to the instant attacks. To begin, the injunction bars Leapfrog from reporting its constitutionally protected opinions on patient safety. This was never a case about whether Leapfrog followed its stated grading methodology (it did) or disclosed that methodology on its safety grade website (it did). Plaintiffs' theory at the five-day trial instead trained on a single aspect of Leapfrog's methodology with which they disagreed: Leapfrog's chosen approach to imputing certain data that the Plaintiffs, unlike most hospitals around the nation, declined to report. A letter grade that synthesizes dozens of safety metrics necessarily reflects editorial and expert judgments regarding how certain factors, including the unavailability of complete information, should be handled and weighed. The First Amendment's twin guarantees of free expression and a free press protect those judgments as paradigmatic opinions.

The district court legally erred by enjoining the grades, despite acknowledging (elsewhere) that Plaintiffs' claims could extend at most to purely *factual* representations as to Leapfrog's *methodology*—not to bar publication of the grades themselves. Nor could the district court enjoin the grades as though they reflect

factual assertions. To the contrary, the grades do not fall within any category of historically unprotected speech, and the court *agreed* that there was no evidence that Leapfrog published its grades with actual malice relative to the truth.

*Second*, the injunction is a dreaded, content-based, prior restraint on Leapfrog's publication of grades based on its challenged imputation methodology. It is palpably overbroad, extending well beyond speech courts have considered actionable, and places Leapfrog under the specter of contempt for using *different* methodologies that Plaintiffs may brand "*similar*" to what has been enjoined. All else aside, such a judgment offends the longstanding prohibition on prior restraints.

*Third*, FDUTPA does not reach the expression targeted by Plaintiffs here—reporting by a nonprofit watchdog on issues of public concern. Otherwise, FDUTPA would raise serious constitutional concerns that Florida courts avoid. Last and not least, the court predicated its liability determination on clearly erroneous findings of fact that defy unrefuted record evidence.

For any or all of these reasons, the Court should reverse.

## STATEMENT OF JURISDICTION

Jurisdiction existed below under 28 U.S.C. § 1332(a) because there was complete diversity and the amount in controversy exceeds $75,000. (Dkt.204 at 3-4.) Appellate jurisdiction exists over the final judgment (Dkt.214) pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.** Whether Leapfrog's publication of letter grades evaluating hospitals' patient safety reflects non-actionable opinion protected by the First Amendment, where Leapfrog accurately disclosed and followed its published methodology for assigning those grades based on publicly available data; or, alternatively, whether actual malice must be found before liability can attach.

**II.** Whether the injunction barring Leapfrog's publication of grades based on the challenged methodology or "similar" methodologies imposes an unconstitutional prior restraint or otherwise violates the First Amendment.

**III.** Whether FDUTPA properly encompasses the speech at issue when the statute is construed consistent with Florida's principles of statutory interpretation, including constitutional avoidance, and once the findings are measured against the actual trial record.

## STATEMENT OF THE CASE

### A. Leapfrog Provides Its Expert Opinions On Patient Safety To The Public By Publishing Hospital Safety Grades

Leapfrog was founded in 2000 to address widespread concerns over hospital safety and quality. Ever since, Leapfrog has served as a nonprofit, "watchdog" group pursuing the "laudable" mission to "trigger giant leaps forward in the safety, quality and affordability of U.S. health care by using transparency to support

informed health care decisions and promote high-value care." (Dkt.212 at 3, 39.)[1] Leapfrog debuted its flagship Hospital Survey in 2001. (*Id.* at 3.) The Hospital Survey is a free benchmarking tool Leapfrog issues annually in consultation with leading researchers and clinicians. (Dkt.204-3 at 90:17-92:9; Dkt.204-4 at 119:1-17.) Thousands of hospitals participate. (Dkt.204-3 at 68:3-8.)

In 2012, Leapfrog launched the Hospital Safety Grade, which assigns an A-F grade to hospitals biannually. (Dkt.212 at 3-4.) Leapfrog relies on 13 expert panels to review and provide guidance on respective sections of the Leapfrog Hospital Survey, and a separate expert panel presides specifically over the safety grades. (*Id.* at 7.) The Safety Grade relies on two primary sources of data: first, publicly available data from the Centers for Medicare and Medicaid Services (CMS), and, second, Leapfrog's Hospital Survey. (*Id.* at 4.) Leapfrog uses that data to assess hospitals across no less than 22 safety metrics, which in turn inform the letter grade. (*Id.*; Dkt.204-3 at 181:16-23; Dkt.189-101 at 8.)

Leapfrog strives to offer consumers a single, comprehensible grade by distilling and digesting this constellation of data points. (Dkt.204-3 at 74:3-11.) In doing so, Leapfrog confronts the problem of missing data. (Dkt.212 at 5.) For

---

[1] Except for citations to the trial transcripts (*i.e.*, Dkt.204-1 through Dkt.204-5), citations to docket entries below refer to the Electronic Court Filing (ECF) pagination.

certain measures that rely on data from the Leapfrog Hospital Survey, Leapfrog can turn to available CMS data as an alternative data source. (*Id.*) For other measures, however, there is no alternative data source. (*Id.*)

The proceedings below focused on Leapfrog's approach to evaluating four such measures—Computerized Physician Order Entry (CPOE), Bar Code Medication Administration (BCMA), ICU Physician Staffing (IPS), and Hand Hygiene—for which no CMS data or alternative data source is available. (*Id.*) Most hospitals report their relevant data in response to Leapfrog's surveys. (Dkt.204-3 at 68:3-8.) For hospitals that do not complete the survey in a particular grade cycle, however, Leapfrog developed a two-step "imputation" methodology to address the missing data. (Dkt.212 at 5-6.)

At Step 1, Leapfrog "imputes" the hospital's most recent scores on the four measures if the hospital had recently completed Leapfrog's Hospital Survey and received on-point scoring from Leapfrog in the previous two rounds of grades. (*Id.* at 6.) Because none of Plaintiffs were subject to Step 1 imputation, that approach was not adjudicated below.

If no recent data are available for these four measures, Leapfrog turns to Step 2. Before Fall 2024, Step 2 assigned hospitals a score reflecting the mean score assigned to similar hospitals. (*Id.*) But Leapfrog realized that it was thereby inviting underperforming hospitals automatically to match their cohort's mean just by

withholding their sub-par data—thus posing worrisome risk of overstating those hospitals' performance to the detriment of consumers who rely on the grades. (*Id.*) Accordingly, Leapfrog revised Step 2 in Fall 2024 so that nonparticipating hospitals for which recent data are not available would receive a score indicating "Limited Achievement." (*Id.*) "Limited Achievement" scores reflect the lowest numerical score of a participating hospital for the given measure. (*Id.* at 6-7.) Leapfrog believes that assigning "Limited Achievement" scores to nonparticipating hospitals properly accounts for "non-response bias"—reflecting an inference that hospitals eschewed participation in order to hide poor safety performance. (*Id.* at 2, 27-28; *see* Dkt.204-3 at 35:19-36:8; Dkt.204-4 at 80:16-20, 110:5-21, 113:4-114:21.) Leapfrog arrived at this view after consulting with its Safety Grade expert panel. (Dkt.212 at 7-8; *see also* Dkt.204-3 at 35:19-36:8; Dkt.204-4 at 113:4-114:21; Dkt.204-2 at 187:12-189:7.)

Leapfrog fully discloses its grading methodology on its website. The homepage of Leapfrog's website contains a hyperlink for "Methodology" that takes a viewer to Leapfrog's "Scoring Methodology" document. (Dkt.204-2 at 37:2-25.) The Scoring Methodology explains, "If the hospital does not have historical data from the last two rounds (*i.e.*, spring 2024, fall 2023) of the Safety Grade, the hospital is assigned a point value that is equivalent to receiving 'Limited Achievement' for this measure on the Leapfrog Hospital Survey." (Dkt.189-94 at

15.) The Scoring Methodology then lists the scores assigned for Limited Achievement—for CPOE, 15; for BCMA, 25; for IPS, 5; and for Hand Hygiene, 15. (*Id.* at 9-12.) On a nonparticipating hospital's safety grade page itself, Leapfrog includes—under each of the four metrics for which Leapfrog imputes scores—a red, bolded footnote. This **Footnote 4** states: "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available**." (Dkt.195-45 at 1-2; Dkt.212 at 30.)

### B. The District Court's Motion To Dismiss Order Holds That The First Amendment Is "Inapplicable" To Plaintiffs' FDUTPA Claims

Five nonparticipating hospitals owned and operated by Tenet Healthcare Corporation, one of the country's largest healthcare corporations, sued Leapfrog in the Southern District of Florida, asserting claims under FDUTPA. (Dkt.1; Dkt.188-94.) Leapfrog moved to dismiss under the First Amendment, among other grounds, arguing that its Safety Grades are protected opinion. (Dkt.39 at 11-16.) The district court denied the motion. (Dkt.41.) It acknowledged that courts have afforded First Amendment protection to online grading services but determined that a FDUTPA claim is not barred "when it involves a challenge to false or misleading statements made about the rating process itself." (*Id.* at 5-6.) While citing several cases distinguishing between a challenge to a rating itself (as protected) and a challenge to misleading statements about how a rating is calculated (as actionable), it ruled that Leapfrog's "First Amendment defenses" were "inapplicable" to Plaintiffs'

claims. (*Id.* at 6.)

Extensive discovery ensued. Plaintiffs obtained sweeping discovery over the span of 46 requests for production and 20 interrogatories; 21 depositions were taken. (Dkt.233-2 ¶ 5.) To mitigate burdens upon its small, non-profit operation, Leapfrog proposed targeted search terms. (*Id.* ¶ 6.) Yet Plaintiffs rejected Leapfrog's proposed search terms and proposed their own ever-expanding search terms, to which Leapfrog acquiesced. (*Id.*) Plaintiffs' search terms hit upon nearly a million pages of documents delving deeply into Leapfrog's deliberations over how best to grade hospital safety and promote transparency. (*Id.* ¶ 8.)

### C. The District Court Enters A Sweeping Injunction Against Leapfrog's Speech

Even after the court had seemingly decided the issue when denying dismissal, the parties heading into trial continued skirmishing over the First Amendment. Leapfrog, for its part, framed Plaintiffs' case as "retaliation for … negative press" and seeking a "prior restraint on free-speech" when moving for summary judgment on the ground, *e.g.*, that Florida's anti-SLAPP statute prohibits lawsuits targeting a defendant's "exercise[]" of "the constitutional right of free speech in connection with a public issue … as protected by the First Amendment." (Dkt.99 at 21.) Plaintiffs, for their part, opposed summary judgment on this basis. While maintaining that their claims do not implicate the First Amendment at all, Plaintiffs acknowledged that, to the extent Leapfrog was at all protected and speaking to

matters of public concern, the First Amendment "would require clear evidence that Leapfrog knew its representations [were] 'false' or 'reckless[ly] disregarded' the risk of falsity"—that is, actual malice, which Plaintiffs pledged they would "demonstrate[] by clear and convincing evidence at trial." (Dkt.115 at 26; Dkt.136 at 175.) In denying summary judgment, the court did not address those arguments. (Dkt.139.) Nonetheless, Leapfrog continued raising its anti-SLAPP argument at every opportunity, including in its pre- and post-trial briefs. (Dkt.135 ¶¶ 383-92; Dkt.204 ¶¶ 589-98.)

The parties similarly clashed in their proposed findings of fact and conclusions of law. Leapfrog again argued that Plaintiffs, in an effort to "silence Leapfrog," were targeting protected speech. (Dkt.204-1 at 39:15-18; Dkt.204-5 at 43:24-44:4.) It stressed that its "mission is premised on free speech in connection with a public issue, is intended to assist the public in assessing [its] healthcare options and … provides a public benefit." (Dkt.135 ¶ 388.) Leapfrog's trial witnesses emphasized that Leapfrog had taken pains to ensure its methodology accurately reflected its values and the information available to it. (Dkt.204-3 at 184:15-186:18, 188:1-191:15, 207:15-18.) Leapfrog walked through evidence showing how, in "developing the Hospital Safety Grade," Leapfrog's "expert panel had an intellectual debate on how to define patient safety for the composite, which ultimately focused on 'freedom from harm …, accidents, errors, injuries, [and]

infections,'" before "concluding" that hospitals should not "be exempted from the Composite Safety Grade." (Dkt.204 ¶¶ 74-75.) Leapfrog substantiated how it "and its expert panel have grappled with ideas on how to solve for missing data since the inception of the grade," ultimately determining that it "cannot, in good faith, impute a higher score" for nonparticipating hospitals absent data indicating whether the hospital "properly implements [a known] policy and internally measures" its results. (*Id.* ¶¶ 93-100.)

Plaintiffs reiterated their position that the Safety Grades do not "implicat[e] the First Amendment," but also repeated their acknowledgement that, if the First Amendment applied, it would require proof "by clear and convincing evidence," that Leapfrog published the at-issue grades with actual malice. (Dkt.136 ¶ 133.) Plaintiffs likewise denied they were seeking a "prior restraint." (*Id.* ¶ 134.)

Following a five-day bench trial, the district court granted the Plaintiffs injunctive relief, adopting their proposed injunction nearly verbatim. (*Compare* Dkt.203-1 at 2 *with* Dkt.212 at 40-41.) The court ruled that Leapfrog's Step 2 imputation methodology violated FDUTPA by assigning "Limited Achievement" scores to nonparticipating hospitals; according to the court, viewers would likely take those scores to mean "something more than non-participation before they arrive at the complex assignment methodology." (Dkt.212 at 26 n.7.) At the same time, the court acknowledged that the Step 2 methodology was publicly disclosed, finding

that "[t]he scoring methodology" at issue "can be accessed in two ways," both through Leapfrog's website. (*Id.* at 13-15.) Still, the court faulted the accessibility of the methodology, based in part on "Google Analytics data" supposedly showing that, of all visitors to Plaintiffs' individual safety grade web pages, approximately three percent accessed Leapfrog's scoring methodology. (*Id.* at 31.) The court also found that it "required 23 clicks to arrive at" Footnote 4. (*Id.* at 30.)

The court further faulted what it characterized as the intent behind Step 2 imputation, deeming imputation to be "penal in nature." (*Id.* at 21.) On this point, the court relied on emails sent by Dr. Patrick Romano (*id.* at 21-22), a member of Leapfrog's expert panel who is also affiliated with a graded hospital, to his hospital colleagues stating that "their" (meaning Leapfrog's) "decision to increase the penalty for nonparticipation was a simple business decision" that strove to increase participation. (Dkt.191-3 at 1; Dkt.204-2 at 145:12-22.)

The injunction—as scripted by Plaintiffs—contains both prohibitory and mandatory components. First, Leapfrog must "cease assigning a Safety Grade to [Plaintiffs] under the current methodology or any similar methodology that … assigns assumed or imputed values to calculate Safety Grades due to the lack of hospital-provided performance data … or … that otherwise reduces a hospital's Safety Grade due to the failure to provide performance data." (Dkt.212 at 40-41.) Second, Leapfrog must "withdraw from its websites and cease promoting the

deceptive and unfair Safety Grades assigned to" Plaintiffs' hospitals. (*Id.* at 41.) Third, Leapfrog was obligated to "send corrective disclosures to all entities that paid to license" the grades, stating "that those Safety Grades were found to be deceptive and unfair in this action." (*Id.*) Fourth, Leapfrog must "place the same corrective disclosures in … documents that promote paid licensure of the next cycle of Safety Grades" accessible in certain zip codes. (*Id.*) Fifth, Leapfrog must "refrain from taking any action to circumvent" the injunction. (*Id.*)

At no point in its 41-page order finding for the hospitals and enjoining Leapfrog did the district court mention the First Amendment.

### D. Tenet-Owned Hospitals Springboard Atop The Injunction In Seeking To Chill And Silence Leapfrog

To avoid contempt, Leapfrog scrambled to comply with the injunction. (Dkt.215.) Even as Leapfrog devoted its best efforts and careful attention to the injunction's express terms, Plaintiffs and Tenet took to waging a letter-writing offensive—threatening to initiate contempt proceedings against Leapfrog unless it acceded to their ever-expanding dictates.

Plaintiffs began their salvo by threatening to "pursue … enforcement measures under [Rule] 65"—*i.e.*, contempt. (Dkt.219-1 at 5.) Plaintiffs' thrust was not confined to specific provisions of the injunction. Their primary grievance was that Leapfrog was reporting, truthfully, that certain hospitals—including but not limited to Plaintiffs—had "Declined to Respond" to Leapfrog's survey. (*Id.* at 3-5.)

According to Plaintiffs, Leapfrog's truthful reporting together with its web design would "leave consumers with the net impression that non-participating hospitals … are less safe." (*Id.* at 4.) From there, Plaintiffs alleged that Leapfrog was violating the injunction's "directive that Leapfrog shall not engage in '*any* action to circumvent the relief' provided therein." (*Id.* at 5.) Plaintiffs also demanded that Leapfrog omit all Tenet-owned hospitals (including dozens that were not parties to the case) from all its webpages and that Leapfrog jettison a new methodology for a reporting program that it had yet to launch. (*Id.* at 5, 7-10.) Specifically, Plaintiffs deemed Leapfrog's then-impending rollout of ratings for Ambulatory Surgical Centers to be "*similar*[]" to "the conduct that Judge Middlebrooks found deceptive and unfair as applied to the hospitals," even though that program had never been at issue. (*Id.* at 5-6 (emphasis added).)

Leapfrog responded by explaining, at length, how Plaintiffs' demands vastly exceeded the scope of the injunction and could never be squared with the First Amendment. (Dkt.219-2.) At that point, Plaintiffs retreated from threatening imminently to seek contempt but still pledged to "continue to carefully monitor" Leapfrog's website content. (Dkt.219-3 at 3.)

After Leapfrog noticed its appeal, Plaintiffs moved to recover $10.5 million in attorneys' fees and litigation costs—a figure that exceeds Leapfrog's annual revenue and that would, if awarded, spell doom for the nonprofit. (Dkt.225 at 6, 14.)

According to Plaintiffs, the bill was racked up by a group of 25 lawyers, including 20 lawyers from Gibson, Dunn & Crutcher LLP, against Leapfrog's core team of just three attorneys. (Dkt.225 at 20; Dkt.226-1 at 5; Dkt.233 at 3.) Notably, the Plaintiffs insisted upon fully briefing their fee request (complete with meet and confers and expert testimony) and tried to lock in their award despite the express terms of the statute and settled caselaw specifying that no entitlement to fees can arise until the "exhaustion of all appeals," Fla. Stat. § 501.2105(1); indeed, Plaintiffs maintained that Leapfrog had waived any objection to specific fee amounts simply because Leapfrog had tried (for the sake of party and judicial economy and avoiding disputes that might be narrowed or mooted) to pose legal questions of timeliness and entitlement at the threshold. (*See* Dkt.231 at 11-13; Dkt.231-1; Dkt.232 at 12-15.) For now, the district court has denied without prejudice Plaintiffs' motion for attorneys' fees—awaiting the outcome of this appeal. (Dkt.235 at 2.)

### E. The District Court Refuses To Reconsider The Judgment And Injunction Based On First Amendment Concerns

Amidst Plaintiffs' threats to pursue contempt, Leapfrog timely moved for reconsideration and other post-trial relief under FRCP 59. (Dkt.220.) Noting that First Amendment concerns loomed larger than ever in the wake of the injunction and Plaintiffs' threats to pursue contempt, Leapfrog argued that its safety grades are fully protected as pure opinion based on a fully disclosed methodology, that a finding of actual malice would be required in any event, and that FDUTPA should not be read

to encompass speech on issues of public concern. (*Id.* at 14-20.) Leapfrog further argued that the court's injunction itself violates the First Amendment because it is an overbroad prior restraint on speech. (*Id.* at 24-26.)

The district court rejected these contentions on their merits, with the exception of Leapfrog's actual malice argument, which the court deemed "forfeited" on the ground that "actual malice … requires a specialized showing, which [Leapfrog] did not attempt to make"; by the court's account, "the obvious dearth in the record" of any evidence of actual malice was attributable to Leapfrog's forfeiture. (Dkt.234 at 3.) The district court also declined to address Leapfrog's state-law arguments at all. (*Id.*) As for Leapfrog's opinion argument, the court referenced its order denying Leapfrog's motion to dismiss, explaining that it "held then and continue[s] to hold that" the First Amendment does not bar Plaintiffs' FDUTPA claims. (*Id.*)

## SUMMARY OF THE ARGUMENT

**I.** The district court unlawfully enjoined Leapfrog from expressing constitutionally protected opinions. A letter grade that combines dozens of safety metrics based on available data necessarily reflects evaluative judgments not susceptible to being proven true or false. Were there any doubt that the grades reflect Leapfrog's protected opinions, Leapfrog's undisputed, accurate disclosure of its grading methodology resolves it. Courts nationwide have long agreed that the First Amendment protects opinions based on facts that are publicly disclosed or otherwise

publicly available. The district court erred as a matter of law in concluding otherwise, and its clearly erroneous findings of fact about the placement of Leapfrog's methodology on its website separately warrant reversal.

Even assuming arguendo that such grades qualify as factual assertions rather than opinions, however, the judgment below cannot stand. Because the First Amendment does not contain a general exception for allegedly false speech, Plaintiffs were obligated either to identify a recognized category of unprotected expression or else to satisfy the constitutional prerequisites to penalizing expression on matters of public concern based on alleged reputational harm. But Plaintiffs did neither, and any colorable claim by them here was predicated upon them proving, with clear and convincing evidence, actual malice by Leapfrog. Despite recognizing that Plaintiffs had come nowhere near making that requisite showing, the court *still* held Leapfrog liable based solely on a ruling that Leapfrog had forfeited the issue. But that forfeiture ruling cannot stand, especially considering that Plaintiffs bore the burden of proving actual malice and purported to carry it, while Leapfrog argued its good faith at every turn. Once the forfeiture ruling falls away, so does the judgment.

**II.** In any event, the injunction should be reversed even assuming Leapfrog could be held liable because it unlawfully imposes a perpetual prior restraint on speech. This permanent injunction bears all the hallmarks of a content-based prior restraint on future publication: It prohibits Leapfrog from publishing safety grades

based on a particular methodology—or on "similar" methodologies. That sweeping prohibition violates the First Amendment's bedrock prohibition against prior restraints. It is also overbroad, extending beyond any conceivably actionable statement and subjecting Leapfrog to possible contempt just for sponsoring underlying methodologies that may be deemed "similar."

**III.** If the Court prefers to avoid the First Amendment questions, it should hold that FDUTPA does not encompass Leapfrog's speech. FDUTPA, a consumer-protection statute, should not be read to convert the publication of a nonprofit watchdog's evaluative judgments into actionable conduct merely because those judgments are meant to inform consumers. At the very least, the operative interpretation of FDUTPA raises substantial constitutional questions that Florida's courts strive to avoid. And separately, the court premised its liability finding on a clearly erroneous assessment of the facts and abused its discretion in declining to even address Leapfrog's FDUTPA argument post-judgment. Reversal is warranted on these grounds, too.

## STANDARDS OF REVIEW

"Following a bench trial," this Court "review[s] a district court's conclusions of law de novo and its findings of fact for clear error." *Weinstein v. 440 Corp.*, 146 F.4th 1046, 1050 (11th Cir. 2025). This Court reviews denial of a motion brought under FRCP 59(e) for an abuse of discretion. *Stansell v. Revolutionary Armed*

*Forces of Colombia*, 771 F.3d 713, 746 (11th Cir. 2014). "[A] district court by definition abuses its discretion when it makes an error of law." *United States v. Browne*, 505 F.3d 1229, 1267 n.29 (11th Cir. 2007) (alteration adopted).

## ARGUMENT

### I. PENALIZING LEAPFROG'S SPEECH VIOLATES THE FIRST AMENDMENT

Leapfrog's safety grades are at the core of what the First Amendment protects. They express—for the benefit of the general public, free of charge—Leapfrog's views of hospitals' safety records based on all available data. And although Leapfrog was not required to disclose its grading methodology in order to receive First Amendment protection, it did disclose that methodology on its website for all to see. On these facts, it beggars belief that the First Amendment can be disregarded, as it was below.

Below, Plaintiffs twisted FDUTPA—a statute enacted to protect consumers—so as to censor, self-servingly, Leapfrog's publication of safety grades about them. On their theory, as embraced by the district court, Leapfrog's methodology falls outside of the First Amendment's protection because it allegedly skews downwards the grades assigned to hospitals that refuse to participate in Leapfrog's voluntary survey. That is how Plaintiffs cast the grades as factually "deceptive" and practically "coercive"—*deceptive* because "bad Safety Grades" are "imposed pursuant to an arbitrary methodology" that gives lower scores to nonresponding hospitals; *coercive*

because the "threat" of a nonresponse penalty is a form of "blackmail." (Dkt.223 at 1, 7-10.)

Neither of Plaintiffs' incantations dispels the First Amendment's protections. At best, Plaintiffs' theory sounds in defamation, grounded in alleged reputational harm, yet Plaintiffs proceeded below without regard for the First Amendment's well-established limitations on defamation claims for reporting on matters of public concern. Two such overreaches, in particular, compel reversal. *First*, the safety grades do not convey any objectively false or misleading facts; they are protected opinions that express Leapfrog's view of a hospital's overall safety performance. *Second*, even if the grades could be taken as factual assertions, they remain protected unless an exception applies, and none does here. At minimum, the First Amendment required actual malice that Plaintiffs failed to show.

### A. The Judgment Imposes Liability For Protected Opinion

The First Amendment bars the government from "abridging the freedom of speech, or of the press." U.S. Const., amend. I. To ensure the uninhibited marketplace of ideas envisioned by the Framers, the First Amendment affords absolute protection to "statements of pure opinion." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018); *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974) ("[T]here is no such thing as a false idea."). Accordingly, the First Amendment protects expression on matters "not readily capable of being proven true or false,"

*Turner*, 879 F.3d at 1264, and "comment or opinion based on facts which are set forth in the publication or which are otherwise known or available" to the public, *id.* at 1262.

These hospital safety grades so qualify. While Leapfrog stands behind its methodology, it has never pretended that a particular hospital's grade—say, a "B" versus a "C"—is a matter of irrefutable, objective scientific fact. Reducing a hospital's overall safety record to a single letter grade is nothing like recording the distance between the Earth and the moon or restating the eighty-fourth digit of Pi. Leapfrog publishes its safety grades precisely because hospital safety is both infamously opaque and existentially critical to pin down, given that medical errors are the third-leading cause of death nationwide. Ike Swetlitz, *Medical errors are third-leading cause of death in the US*, STAT News (May 3, 2016), https://www.statnews.com/2016/05/03/medical-errors-death/. On this subject, Leapfrog brings a distinctive contribution to the public square: a methodology, a dataset, and a view about how the two should be combined to summarize a hospital's overall safety record, thereby shining valuable light for prospective patients and their loved ones.

**1. The Safety Grades Are Protected Opinion**

To determine its safety grades ranging from A to F, Leapfrog uses a combination of no fewer than "22 quality safety metrics"; Leapfrog must decide not

only what measures are appropriate but also how each should be weighted. (Dkt.212 at 4; Dkt.204-3 at 181:16-23; Dkt.189-101 at 8.) Leapfrog must also determine which sources to draw from, including its own safety survey, and arrive at "ways of dealing with missing data." (Dkt.212 at 5.)

The resulting letter grades are paradigmatic opinions. Grading of hospital safety is a subjective exercise; there is nothing false about saying that some hospitals are, in Leapfrog's view, better or worse overall at protecting patients. As courts have explained, rating systems like these—"third-party website[s]" that "draw[] on a wide variety" of data to "spit[] out a score that purports to assess" a "safety rating"—are "evaluative systems," are necessarily "*subjective*," and "convey[] mere opinions." *U.S. Structural Plywood Integrity Coalition v. PFS Corp.*, 524 F. Supp. 3d 1320, 1334-35 (S.D. Fla. 2021); *see also, e.g.*, *Home Performance Alliance, Inc. v. Better Bus. Bureau of W. Fla., Inc.*, 354 So. 3d 1165, 1166 (Fla. Dist. Ct. App. 2023) (holding Better Business Bureau's D+ rating "is a nonactionable opinion"). That apt observation applies equally here. As the district court itself recognized (Dkt.41 at 5), the grade itself is a "subjective" assessment that is insusceptible—and certainly "not *readily* capable"—of being proven true or false. *Turner*, 879 F.3d at 1264 (emphasis added).

Predictably, certain hospitals may be displeased by a "D" or "F" ranking, just as consumers concerned about hospital safety may take account of bad rankings

when choosing among options. So be it. The same phenomenon holds for all grading, or ratings, or reviews worth their salt—which may in turn spur counter-criticism. If no hospitals ever received inferior scores relative to their peers, that could happen only by "compress[ing] variation so tightly that nearly every hospital appears 'above average,' like the children of Lake Wobegon," resulting in a grade-inflation tool that is useful only to self-serving, underperforming hospitals. Barak D. Richman & Robert M. Kaplan, *Suing the Scorecard Won't Improve Hospital Safety*, Health Affairs (June 10, 2026), https://www.healthaffairs.org/content/forefront/suing-scorecard-won-t-improve-hospital-safety.

Because it is not provably false whether a given hospital deserves an "A," a "C," or an "F," Plaintiffs purported to isolate on *how* Leapfrog determines the grades. But that does not oust the First Amendment from the case. Leapfrog's challenged means of producing the grades—imputing a component score to account for a hospital's nonresponse—is a protected judgment call no less than the grades themselves. "[T]he First Amendment protects subjective evaluations because they are not susceptible of being verified as true or false." *Partington v. Bugliosi*, 56 F.3d 1147, 1158 (9th Cir. 1995). The established protection applies no less to the *subjective* choice of how to combine multiple sorts of *objective* data: which factors

to include, what weights to give them, and, as essential here, what to do when data are missing.

Dealing with missing data and survey nonresponse is a perennial problem—with no single correct answer—because surveys tend to have "non-response bias, which occurs when the nonresponses to a survey are not random, but correlate to a trait the survey is intended to measure." *Lax v. APP of N.M. ED, PLLC*, 2022 WL 715735, at *7 (D.N.M. Mar. 10, 2022). Imputation is a commonplace, sensible method of addressing that problem, especially when, as here, it "avoid[s] placing the figure 'zero' next to a [relevant metric] when it is possible to do better." *Utah v. Evans*, 536 U.S. 452, 469-70 (2002). An airline survey to customers, for instance, will be more likely to draw a response from a grieving passenger who was on his way to a funeral only to have his flight canceled than from a passenger whose flight was ho-hum.

Like most consumer advocacy organizations, Leapfrog did not want to exempt certain self-interested enterprises—effectively giving them an unearned benefit and an incentive to withhold—simply because they hide their data from public scrutiny. Accordingly, Leapfrog chose to continue grading nonresponding hospitals and to account for nonresponse bias in its grading methodology by assigning or imputing numerical values for four metrics on critical patient risks that could not be illuminated by alternative data sources. (*See* Dkt.212 at 5.)

That choice reflected careful consideration of publicly available information. If a hospital had not responded to Leapfrog's most recent survey but had responded to one of its two prior surveys, Leapfrog used non-stale data from the most recent survey. Absent recent historical data on these metrics for a nonparticipating hospital, Leapfrog assigned a score "based on the lowest score of a participating hospital for that measure"—15, 25, 5, and 15 for each of the four metrics, respectively. (*Id.* at 6-7.) That choice reflects a reasonable inference—among other possible inferences—that the relatively few hospitals that decline to respond to a free, voluntary survey were likely to have worse, rather than better, data relative to the norm. Hospitals with good safety data, after all, tend to be eager to trumpet their data publicly; hospitals with poorer records, by contrast, are likelier to want to secret those. That is Leapfrog's view, which is echoed by its experts amidst a larger, respected chorus.

Regardless of whether Plaintiffs or a judge might disagree with Leapfrog, Leapfrog's opinion about how best to deal with the non-response problem should be beyond reproach in any court of law that is bound by the First Amendment. Again, Leapfrog arrives at its ultimate grades only by prioritizing and deprioritizing factors that it deems more or less important to a hospital's overall, holistic safety record. By the same token, a newspaper might consider some votes, stances, or public acts more or less important in determining which candidate to endorse in an election. But

any "argument that another reader might come to a different conclusion upon review of the facts … does not make" the newspaper's, the market reporter's, or Leapfrog's "assessment … anything other than opinion." *Turner*, 879 F.3d at 1264. Disagreement about how to weigh nonparticipating hospitals' performance using missing data at most "reflects differing interpretations of the murky facts." *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995). That is "precisely when [courts] need and must permit a free press to ask the question." *Partington*, 56 F.3d at 1154.

If anything, the First Amendment's protection of pure opinion applies with special force to Leapfrog's imputed-value methodology, given the incomplete information on which Leapfrog must rely. The First Amendment affords members of the press, like Leapfrog, "the interpretive license that is necessary when relying upon ambiguous sources." *Masson v. New Yorker Magazine*, 501 U.S. 496, 519 (1991); *see Moldea v. New York Times Co.*, 22 F.3d 310, 316 (D.C. Cir. 1994) ("the First Amendment affords latitude to" interpretation). That is precisely why Leapfrog exists: to shine light via its opinions to patients who are otherwise in the dark about which hospitals are safer than others.

Leapfrog was entitled to express a belief that hospitals that failed to respond to the survey, other things being equal, tended to be less safe for consumers across four (out of more than 22) measures, as compared to hospitals that willingly shared

their data for public consumption. Nonparticipating hospitals might well think they are being "penalized" if the imputed metrics do not fairly represent how well they would be scored if they disclosed all their data—dissenters from ranking systems often level this familiar accusation. *See, e.g.*, David Lat, *Yale and Harvard Law to U.S. News: Drop Dead*, Original Jurisdiction (Nov. 17, 2022), https://davidlat.substack.com/p/yale-and-harvard-law-to-us-news-drop. Under the First Amendment, it is dispositive that there is no way to prove or disprove whether a hospital deserves a particular numerical score for failing to respond.

Other organizations routinely make similar assumptions across a wide range of public controversies. The Alliance Defending Freedom's "Viewpoint Diversity Score" assigns a value of 0 points for "Unresponsive" on any performance indicator when "information for a different score required a Survey response and the company did not respond," which in turn "influences [the company's] overall rating." *About Our Methodology*, Viewpoint Diversity Score (July 2024 – May 2025), https://storage.googleapis.com/vds_storage/document/2025%20Methodology.pdf. Bloomberg assigns covered entities an environmental, social, and governance (ESG) score that takes into consideration "disclosure of quantitative data as a dimension of performance." *Bloomberg ESG Scores* 5, Bloomberg (Dec. 2025), https://professional.bloomberg.com/globalassets/professional/products/bloomberg-terminal/sustainable-finance/scores/bloomberg-esg-scores-methodology.pdf. And

the Better Business Bureau provides for a "negative impact" on a rating based on "[f]ailure to respond" to a complaint filed on BBB. *Complaints*, Better Business Bureau, https://www.bbb.org/process-of-complaints-and-reviews/complaints. Plaintiffs' theory, if endorsed, would imperil all of these contributions to the marketplace of ideas, and many more.

#### 2. In All Events, The Grades Were Opinion Because Leapfrog's Grading Methodology Was Fully Disclosed

At minimum, the grades are opinion because the methodology for producing them was fully disclosed, as proved by unrefuted evidence. "[A] defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener …." *Turner*, 879 F.3d at 1262; *accord Partington*, 56 F.3d at 1156-57; *Hay v. Independent Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984).

Strikingly, the district court spurned that precept. Multiple times, it acknowledged that Leapfrog's imputed-value methodology was posted on its website. (Dkt.212 at 13, 14, 15, 26 n.7, 30.) Yet the district court *still* held Leapfrog liable for its methodology on the theory that Leapfrog's explanation of the methodology was not sufficiently prominent enough or visited by enough website users. (*Id.* at 30-32.)

That misapplies the controlling test. *Turner* requires only that the basis for the opinion be "set forth in the publication" itself or "otherwise known or available to the reader." *Turner*, 879 F.3d at 1262. And because Leapfrog's "rationale for [its] view … [was] exposed," the imputed values "reasonably could be understood only as [Leapfrog's] personal conclusion about the information presented, not as a statement of fact." *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir. 1992); *see also, e.g.*, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497-98 (2d Cir. 2013) (protecting conclusions accompanied by "an accurate description of the data taken into account and the methods used").

Per black-letter law, Leapfrog's undisputed disclosure of the challenged methodology precludes liability—full stop. Were the test otherwise, an author who publishes a lengthy condemnation of a presidential administration could be sued for failing to disclose her factual sources before readers reach the endnotes hundreds of pages into the book. A controversial blogger could be held liable for her opinion because a jury determined that it took too long and too many clicks to reach a hyperlink bridging to pertinent facts. Once courts start second-guessing the precise placement and formatting of accurate factual disclosures online, little remains for "the exercise of editorial control and judgment" guaranteed to a free press, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), or the "breathing space"

that "First Amendment freedoms need … to survive," *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021) (citation omitted).

The district court veered badly astray when it held Leapfrog liable because "consumers are unlikely to ever locate Leapfrog's methodology," even though a link to the methodology was available in multiple places on Leapfrog's website. (Dkt.212 at 26 n.7, 30; Dkt.204-2 at 37:14-38:24. Other courts have rightly recognized that "provid[ing] a link [to source material]," "enabl[ing] readers to draw their own conclusions 'based on facts accessible to everyone,'" obviates liability. *Cheng v. Neumann*, 51 F.4th 438, 447 (1st Cir. 2022). Indeed, navigating several clicks or pages away is easier than reviewing the entirety of a lengthy book or report—such as the 144-page report that this Court held in *Turner* contained protected pure opinion based on various disclosures of underlying facts at various turns. 879 F.3d at 1261, 1264-65; *see From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. Dist. Ct. App. 1981).

### 3. The District Court's Contrary Reasoning Is Unjustifiable

Post-judgment, the district court held, for two reasons, that Leapfrog nonetheless stood liable to poor-performing Plaintiff hospitals for publishing its safety grades. Each reflects legal error.[2]

*First*, the court justified its injunction on the ground that the suit concerned statements Leapfrog made *about* its methodology. In denying dismissal, the court never rejected Leapfrog's argument that the grades are opinions and, indeed, appeared to agree with it. (Dkt.41 at 5.) Nevertheless, the district court held that "statements about the rating process itself" could be actionable because they, unlike the grades, were capable of being "false or misleading." (*Id.* at 5-6.) Upon noting that "Plaintiffs' action arises from a challenge to Defendant's representations *about* its methodology," the court concluded that "Defendant's First Amendment defenses [were] thereby inapplicable." (*Id.* at 6 (emphasis added).) In its post-judgment order, the district court reiterated that it had held as much throughout the case and again confirmed that it was basing liability on "false or misleading statements about the rating process itself." (Dkt.234 at 3.)

---

[2] Although Plaintiffs argued forfeiture below, the Court reviews these legal issues de novo. (*See generally* Dkt.223.) With one exception (actual malice, *infra*), the court declined to adopt Plaintiffs' forfeiture argument in reaching the First Amendment merits, expressly tracing its merits rationale back to its motion-to-dismiss ruling. (Dkt.234 at 3.)

To be clear, Leapfrog rejects any suggestion that it deceived anyone in describing its safety grade methodology. But that question should now be beside the point, because no such alleged misrepresentation could ever justify the judgment entered. In fashioning an injunction, the "maximum a court can provide" is "complete relief" for the asserted injury. *Trump v. CASA, Inc.*, 606 U.S. 831, 854 (2025). Were the actionable injury here limited to Leapfrog's statements about its methodology, the operative injunction could not read as it does. Likewise, the court's opinion focused almost exclusively on Leapfrog's imputed-value methodology, not on representations about it. Notably, the injunction does not even touch Leapfrog's representations about its methodology; instead, it censors the grades themselves. (Dkt.212 at 40.) In holding Leapfrog liable and muzzling it via an injunction, the court ultimately licensed itself to sit in judgment of Leapfrog's underlying methodology, quite different from any factual representations about the methodology. Along the way, the court ostensibly forgot any defensible line it might have drawn in allowing FDUTPA claims to proceed. (Dkt.234 at 3.)

Even assuming that Leapfrog made misrepresentations about its methodology—none of which the court enjoined or even clearly identified—that did not afford the court free rein to prohibit, on pain of contempt, otherwise protected speech. *The New York Times* has announced that, "[b]ecause using anonymous sources puts great strain on … readers' trust," "the reporter and at least one senior

editor is required to know the identity of the source," *Why Does The New York Times Use Anonymous Sources?*, N.Y. Times (June 11, 2025), https://www.nytimes.com/article/why-new-york-times-anonymous-sources.html, but no court could *enjoin* a story allegedly violating that representation from being printed. So too here. The injunction *altogether prohibits publication of pure protected opinions*—the grades—not just factual misrepresentations about those opinions. The court inexplicably ignored an essential distinction even while relying on authorities underscoring it. *See, e.g.*, *Home Performance*, 354 So. 3d at 1166; *From*, 400 So. 2d at 57; (Dkt.41 at 6.)

*Second*, even as it stopped short of denying that the grades are opinions, the court reasoned that Leapfrog defended itself at trial *as if* the grades' assertions of opinion were representations of fact because Leapfrog argued that its grades were grounded in "sound and objective" methods. (Dkt.234 at 2.) That defies logic and law alike. There is no contradiction in maintaining that an opinion is grounded in science or statistics. Scientific interpretations of evidence are frequently laden with subjectivity, "[a]nd the 'dangers associated with' censorship … are no less acute 'in the fields of medicine and public health' than they are anywhere else." *Chiles v. Salazar*, 607 U.S. 627, 647 (2026); *see, e.g.*, *ONY, Inc.*, 720 F.3d at 497-98; *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 704-05 (5th Cir. 2023). Ironically, the court contradicted *itself* when weighing the testimony of dueling experts, both of

whom gave their opinions on "whether [the] four" missing-data imputations "in fact create[d] a meaningful difference in the Safety Grades," reasoning that there was no "dispositive answer" because "[e]ach expert … ultimately arriv[ed] at different conclusions." (Dkt.212 at 20-21.) Just as experts may properly controvert one another over statistics, Leapfrog may part ways from critics when formulating its subjective yet scientific and expert-informed views about data imputation.

The court highlighted its misconceptions when it summarized Leapfrog's challenged representations as conveying to the public that the safety grades "constitute[] a full and accurate representation of patient safety." (Dkt.234 at 2 (citation omitted).) Leapfrog maintains its beliefs and stands by its methodology as the best one that it can offer patients, as it sees things. But *The New York Times* similarly believes, and represents, that it is publishing "All The News That's Fit to Print." *Timeline*, N.Y. Times Co., https://www.nytco.com/history/timeline, while Fox News formerly went by the tagline "fair and balanced." Representing as much does not subject any member of the free press to suits challenging "editorial choices about the mix of speech it wants to convey" based on allegations that it has failed to live up to an overall pledge. *Moody v. NetChoice, LLC*, 603 U.S. 707, 734 (2024). Such customary self-promotion by the press should never occasion an injunction forbidding or commandeering the ultimate editorial choices themselves.

#### 4. Even If The Methodology's Placement On Leapfrog's Website Were Relevant, The District Court's Findings On That Placement Are Clearly Erroneous

For the above reasons, this Court may resolve this appeal on purely legal grounds, without getting into the factual findings. Alternatively, this Court should still reverse based on errors surrounding key factual findings. Specifically, the district court's conclusion that there was deception and attendant unfairness (deriving from the former, *see infra* at 58) rests on three findings: (1) Leapfrog's grading methodology is "buried" on its website, (2) Google Analytics data established that almost no one reads the methodology, and (3) Leapfrog's disclosure of which hospitals received "Limited Achievement" imputation "required 23 clicks to arrive at." (Dkt. 212 at 30-31.) Each of those findings is clearly erroneous.

To begin, the finding that "most consumers are unlikely to ever locate Leapfrog's methodology document" because it "is buried within the Leapfrog website" ignores undisputed evidence that the document was directly linked on the website's homepage. (Dkt.212 at 30.) Plaintiffs' own expert so admitted, testifying that the website's "home page" included a link to the methodology, and that visitors need not "go through all of the clicks" to arrive at it. (Dkt.204-2 at 37:2-25.) The court's record citations confirm its error. In asserting that the methodology was "buried," the court cited Plaintiffs' proposed findings suggesting that the process of finding the methodology was elaborate, but those proposed findings were expressly

limited to users "accessing the [methodology] … from a hospital's individual Safety Grade webpage"—*not* from Leapfrog's *homepage*. (Dkt.136 at 105-06; Dkt.212 at 30.) Only by cherry-picking a relatively obscure, circuitous route to the methodology while disregarding the more natural, direct one for users could the court find that Leapfrog's methodology was "buried." No such skewing can properly justify a finding of deception, in disregard of unrebutted evidence proving the opposite. *See Wu Lin v. Lynch*, 813 F.3d 122, 127 (2d Cir. 2016).

Nor could the court properly rely on Google Analytics to find as it did. The court found it "persuasive" that "Google Analytics data showed that among all visitors to [Plaintiffs'] Safety Grade webpages during the relevant period … approximately three percent accessed" the methodology. (Dkt.212 at 31.) But that reasoning repeats the same error while adding more. Google Analytics data *bypassed* measurement of *all users* who accessed the methodology from the Leapfrog *home page*—the easier and more obvious place to access the methodology. In other words, the data designedly *omit* visitors who viewed or understood the methodology *before* viewing individual hospitals' grades. (*See, e.g.*, Dkt.192-94 (showing "abandonment rate" of visitors who started on hospitals' grade pages and ended on methodology page). Nor did the Google Analytics data exclude from its denominator clicks by repeat users or bots. (Dkt.204-2 at 56:23-57:4, 58:12-18.) More fundamentally, neither the district court nor Plaintiffs ever identified a baseline

or comparator illuminating whether three percent would be high, low, or in between relative to the norm. All told, the three-percent figure on which the court relied for its finding said nothing meaningful about any consumer misunderstanding, let alone any deception.

The court also clearly erred in finding, based on Dr. Berger's testimony, that "it required 23 clicks to arrive at Footnote 4"—the footnote disclosing whether a particular hospital had scores imputed to it. (Dkt.212 at 30.) Again, that assumes (inexplicably) a website visitor takes the most circuitous, obscure route possible. Upon navigating to a hospital's safety grade page, a visitor sees the grade above five blue tabs, each of which reflects a different category of measures that factors into a hospital's overall grade. (Dkt.195-42.) The visitor begins on the "Infections" tab on the far left:




(*Id.*) To arrive at his 23-clicks point, Dr. Berger assumed that a visitor would click individually on every metric under a tab (so for Infections, a visitor would click on "MRSA infection," then on "C. diff Infection," then on "Infection in the blood," and so on) before navigating to the next tab on the right and clicking through every metric under it. (Dkt.204-2 16:6-17:7.) But Footnote 4 appears, if at all, only under the few metrics for which values are imputed—all of which fall under the "Practices to Prevent Errors" tab. (*Id.*; *see* Dkt.195-45.) Any visitor interested in *those* metrics

would see Footnote 4—appearing in bolded, red font—*immediately* upon clicking *that* tab.

**4. * The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**

(Dkt.195-45.) This indisputable fact refutes the finding that navigating to Footnote 4 "*required* 23 clicks." (Dkt.212 at 30 (emphasis added).) Starting from a hospital's safety-grade page, only one (1) click was required.

***

In sum, the errors infecting the district court's indictment of Leapfrog begin with the foundational law and run all the way through the factual findings. This case exemplifies why a speaker's First Amendment rights should not be left to the vicissitudes of voluminous discovery, dueling experts, multi-day trials, and a judge's personal view of which approach to grading is better or worse. Certainly something went awry by the time the court below looked to web traffic and design in order to assess exactly how diligent viewers had been in reviewing a concededly accurate, accessible disclosure. If this Court digs that far in its review, however, then these findings are unfair, contrary to the record, and undeserving of affirmance.

### B. Even If The Grades Were Not Opinion, They Would Not Fall Under Any Recognized Category Of Unprotected Speech

Alternatively, this Court should reverse even assuming that the safety grades are provably false. Whatever label is applied to the safety grades, they are still

*speech*, and their publication cannot be punished unless they fall into a recognized category of constitutionally unprotected speech or were published with actual malice. Neither exception applies.

#### 1. The Judgment Punishes And Censors Speech, Not "Conduct"

Leapfrog's safety grades would be constitutionally protected even if they conveyed false facts. There is no "general exception to the First Amendment for false statements," consistent "with the common understanding that some false statements" are part and parcel of an "open and vigorous expression of views …." *United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality). Accordingly, "content-based restrictions on speech have been permitted … only when confined to the few 'historic and traditional categories of expression long familiar to the bar'"—such as defamation, true threats, and incitements to imminent law-breaking. *Id.* at 717 (alteration adopted; citation omitted). This Court, adopting the plurality opinion in *Alvarez*, has held that these categories are exhaustive. *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020).

Below, Plaintiffs endeavored to avoid this problem by urging the court to hold Leapfrog liable not for its speech, but for its "conduct." (Dkt.223 at 15.) But this Court, like others, "has already rejected the practice of relabeling controversial speech as conduct." *Otto*, 981 F.3d at 861. That "enterprise," this Court has

explained, "is unprincipled and susceptible to manipulation," as even minimal scrutiny of Plaintiffs' arguments confirms. *Id.* (citation omitted).

Start with Plaintiffs' theory that the judgment restrains conduct rather than speech, which turns on the claim that Leapfrog's safety grades were an attempt to "pressure hospitals into surrendering data." (Dkt.223 at 8.) The same could be said of much controversial speech—"peaceful pamphleteering," for example—that is intended to prompt a positive reaction. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). The Supreme Court has so explained. Addressing a closely parallel theory of coercion, the Court acknowledged that the "Petitioners plainly intended to influence respondent's conduct" in "distribut[ing] leaflets … describing respondent's activities," but rejected the idea that "expressions … intended to exercise a coercive impact" are exempt "from the reach of the First Amendment" because such speech "is not fundamentally different from the function of a newspaper." *Id.* at 417, 419 (citation omitted); *accord NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910-11 (1982). Following that teaching, this Court has emphasized that "the claim that speech is intended to exercise an ultimate coercive impact" does not "control the First Amendment analysis." *Fla. Gulf Coast Bldg. & Constr. Trades Council v. NLRB*, 796 F.2d 1328, 1335 (11th Cir. 1986). Scores of decisions have recognized that imposing liability simply because "a particular motive accompanied protected speech" would "inhibit the robust debate

that the First Amendment" protects. *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 858 (10th Cir. 1999) (citation omitted).

Plaintiffs' contrary reasoning ventures down that perilous path. According to them, lowering a score for a nonresponse is coercive because there is no obligation to respond to the survey and responding may tax resources. (Dkt.212 at 27-28; Dkt.223 at 15.) But that rule would justify censorship of advocacy-driven expression long occupying the heartland of First Amendment protection. Unions hold no right to force employers to comply with their demands, yet have every right to publicly criticize those employers for refusing. A person may "distribute[] leaflets … critical of [a plaintiff's] real estate practices" because the plaintiff "refused to sign an agreement" not to "solicit property" in a community—even though he was under no obligation to do so. *Org. for a Better Austin*, 402 U.S. at 416-17. The ACLU can run a campaign "questioning former Vice President Joe Biden's stances on civil rights issues" in a Democratic primary in order to "put pressure on the candidate[] to answer [survey] questions." Rachel Frazin, ACLU Sends Out Mailer in South Carolina Questioning Biden's Civil Rights Stances, The Hill (Sept. 4, 2019), https://thehill.com/homenews/campaign/459922-aclu-sends-out-mailer-in-south-carolina-questioning-bidens-civil-rights/. Motives to influence others' actions, even when they "are less than admirable," do not transform speech into conduct or justify

the government's intrusion into "the world of debate about public affairs." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 53 (1988).

Unable to overcome that problem, Plaintiffs retrofitted their theory below to cast Leapfrog's safety grades as "blackmail." (Dkt.223 at 15.) To the extent that "blackmail" is a constitutionally unprotected category of speech, however, it has no place here. Any constitutionally viable definition of blackmail requires proof of a bad-faith, genuine threat. *See* Blackmail, *Black's Law Dictionary* (12th ed. 2024); *United States v. Jeffries*, 692 F.3d 473, 485 (6th Cir. 2012) (Sutton, J., *dubitante*). And below, Plaintiffs did not even attempt to show that Leapfrog made any threat, let alone a wrongful one. *United States v. Pendergraft*, 297 F.3d 1198, 1207 (11th Cir. 2002) (reasoning that even threat to file suit against the government based on fabricated evidence "cannot be 'wrongful'" because of First Amendment considerations, among others). Plaintiffs' argument ultimately collapses into the claim that the grading methodology itself is "blackmail" because Leapfrog used it to "coerc[e]" survey participation. (Dkt.223 at 15.) But Leapfrog's speech is indistinguishable from longstanding, commonplace forms of vigorous advocacy, all of which the Constitution designedly protects. *See supra* pp.28-29, 42-43.

#### 2. The Judgment Unlawfully Imposes Liability For Reputational Harm Without Proof Of Actual Malice

Unable to isolate a category of unprotected speech, the judgment runs headfirst into the First Amendment's protection of allegedly false speech. *Alvarez*,

567 U.S. at 718. Regardless of the cause of action they assert, Plaintiffs cannot steer past the First Amendment without satisfying the constitutional standards for imposing liability on speech that is factually false yet still protected—particularly when they are claiming "injury upon honor and reputation through false publication." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 135 (1967); *see Moore v. Cecil*, 174 F.4th 862, 881 (11th Cir. 2026) (applying actual-malice standard to claim for "false light invasion of privacy"); *Hustler Mag.*, 485 U.S. at 56 (same for IIED claim). The applicable strictures require proof "by clear and convincing evidence …. that the defendant knew the statement was false or that the defendant acted with reckless disregard to its falsity." *Moore*, 174 F.4th at 882; *accord N.Y. Times v. Sullivan*, 376 U.S. 254, 279-80 (1964).

Plaintiffs did not make that showing below, as even the district court agreed. There was no evidence that Leapfrog "*in fact* entertained serious doubts as to the truth of his publication." *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020) (quotation omitted). To the contrary, the record reflected Leapfrog's painstaking efforts to grade Plaintiffs accurately, based on the limited information Plaintiffs chose to make available. (Dkt.204-3 at 184:15-186:18, 188:1-191:15.) Leapfrog convened an expert panel that extensively debated what methodology would best reflect Leapfrog's evaluation of hospital safety based on the information it had. (Dkt.193-42; Dkt.204-3 at 184:15-186:18, 207:15-18.) And Leapfrog consistently

maintained, at all times, that its adverse evaluation of Plaintiffs' safety was faithful to established scientific reasoning. Indeed, Leapfrog presented extensive (and unrebutted) evidence of Plaintiffs' poor safety record. (Dkt.204 ¶¶ 303-77.)

Below, the court correctly acknowledged the "dearth" of any record evidence showing that Leapfrog published the grades with actual malice but proceeded to hold Leapfrog liable anyway. (Dkt.234 at 3.) That defies decades of governing precedent. *See Moore*, 174 F.4th at 887. Reversal is therefore straightforward on the merits.

**3. The District Court's Contrary Reasoning Fails**

The court did not deny that the First Amendment's actual-malice standard applies to Plaintiffs' FDUTPA claim. (Dkt.234 at 3.) And it explicitly recognized the "obvious dearth" of any showing of actual malice below. (*Id.*) That left the court staking liability solely on the ground that Leapfrog "forfeited th[e] issue" because actual malice "requires a specialized showing" that "[Leapfrog] did not attempt to make." (*Id.*)

The court thereby got things backwards. Its forfeiture conclusion derives from the false legal premise that Leapfrog—not Plaintiffs—bore the burden of proof on actual malice. According to decades of precedent, the opposite is true. *See Moore*, 174 F.4th at 873; *Dershowitz v. Cable News Network, Inc.*, 153 F.4th 1189, 1192 (11th Cir. 2025). And not only did Plaintiffs bear the burden of proof as a

matter of settled law; they acknowledged their burden in their pretrial filings and pledged to meet it at trial, to the extent "the First Amendment applied here." (Dkt.136 at 175; *see* Dkt.223 at 20-21.)

The court's forfeiture conclusion becomes incoherent when viewed alongside its separate insistence, from the motion to dismiss onward, that the First Amendment was "inapplicable" to the action as a whole. (Dkt.41 at 6; Dkt.234 at 3.) By the court's own reading of its motion-to-dismiss order, it had taken the First Amendment issues off the table for trial as a matter of law—such that Leapfrog's actual malice argument is necessarily preserved, along with everything else. *See Dupree v. Younger*, 598 U.S. 729, 738 (2023) (preservation principles do not sanction "the loss of appellate review for unwary litigants who think it futile to relitigate an already-rejected legal argument"). Alternatively, assuming the court left the First Amendment in play, Plaintiffs themselves had acknowledged they would be bearing this very burden and purporting to meet it: in their words, "if the First Amendment applie[s] here," then the conceded fact that Leapfrog was "addressing matters of purported 'public concern' … would simply require clear evidence that Leapfrog knew its representations are 'false' or that Leapfrog 'reckless[ly] disregarded' the risk of falsity"—and Plaintiffs pledged they would be so "demonstrat[ing] by clear and convincing evidence at trial." (Dkt.136 at 175.)

Meanwhile, no fair-minded reader of the record could take Leapfrog as conceding the alleged actual malice at trial—as though it had issued the imputed scores and grades in reckless disregard of known truth. To the contrary, Leapfrog kept pointing pre-trial, post-trial, and throughout trial to its express disclosure of its precise methodology; its reliance upon world-class experts; its careful deliberations; its multi-faceted efforts to grapple with missing data, including through tiered methodologies; and other indicia of its good faith and fidelity to the ultimate interests of patients seeking insight into hospital safety. (*See, e.g.*, Dkt.75 at 48-49 (pre-trial); Dkt.204-3 185:17-20; 186:15-18 (trial); Dkt.220 at 14, 16 (post-trial).) Having pledged to show actual malice, therefore, Plaintiffs were on notice that they would need to follow through with clear and convincing proof, if they had it; they could not have misperceived that Leapfrog had somehow stipulated away any factual dispute on this point. That leaves no room for a forfeiture. Either the district court had legally erred by ruling the First Amendment categorically inapplicable at the motion-to-dismiss stage, in which case all of Leapfrog's First-Amendment-based arguments were preserved, or else Plaintiffs had acknowledged the burden they would be bearing on actual malice, even as they failed to carry that burden in the face of Leapfrog's contrary proof. By no plausible account were Plaintiffs denied notice and opportunity at trial to prove what they had expressly acknowledged they needed to prove in a world where the First Amendment applies.

Regardless, this Court should reverse even assuming there was a forfeiture. No court should be punishing, censoring and muzzling reporting on matters of public concern without a showing of actual malice. *See United States v. Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019) (even unpreserved arguments are reviewed for plain error). Indeed, the legal error here was plain and subject to correction sua sponte in light of longstanding, unequivocal jurisprudence holding that a defendant speaking to matters of public concern cannot be held liable for a speech-based tort absent clear and convincing evidence of actual malice—a showing that the court expressly found absent. (Dkt.234 at 3.) And the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings," *Hawkins*, 934 F.3d at 1267, by inverting the exacting, long-settled, and constitutionally imperative burden of proof that must be satisfied before a U.S. court can find basis to shut down free expression by the free press. Notably, a "less rigid[]" form of plain error review applies when there is "a potential constitutional error," *United States v. Trujillo*, 960 F.3d 1196, 1201 (10th Cir. 2020). Beyond that, the very fact that an ongoing injunction is at issue, is subject to correction, and is being leveraged to threaten contempt against new, unadjudicated expression by Leapfrog provides overwhelming reason to forgive any perceived forfeiture by Leapfrog and hold Plaintiffs to the actual-malice standard they had acknowledged yet failed to meet. *See, e.g.*, *Sindi v. El-Moslimany*, 896 F.3d 1, 29-30 (1st Cir. 2018).

#### 4. To The Extent That The Judgment Is Premised On Dr. Romano's Email, It Is Erroneous

Although this Court could reverse based on the district court's legal error in concluding that Leapfrog forfeited its actual-malice argument alone, it may also reverse based on the court's apparent assignment of weight to an email sent by Dr. Romano, an outside expert who volunteered for Leapfrog. The court cited this email prominently in its post-trial order, selectively quoting Dr. Romano's suggestion that Leapfrog's "decision to increase the penalty for nonparticipation was a simple business decision … It's just business folks!" (Dkt.191-3 at 1; *see* Dkt.212 at 2.) The court's reference to the email can be taken one of two ways, either of which reflects reversible error.

Most plausibly, the district court's references to Dr. Romano's email simply amplified its legal error—namely its mistaken conclusion that so-called "punitive" speech is unprotected. Even at face value, none of Dr. Romano's statements remotely suggests that Leapfrog "*in fact* entertained serious doubts as to the truth of [its] publication," *Berisha*, 973 F.3d at 1312—a showing that goes far beyond simply observing that a speaker was pursuing commercial or strategic interests. *Org. for a Better Austin*, 402 U.S. at 416-17.

But if the court was instead implying that Dr. Romano's email confessed Leapfrog's bare desire to ruin nonparticipating hospitals—without any genuine belief that its safety grades faithfully reflected those hospitals' safety—that

suggestion is clearly erroneous. Dr. Romano was writing his email as an external critic of Leapfrog. He expressly assumed the perspective of *hospitals*, equating "*our* [*i.e.*, hospitals'] decision not to participate" with "their [*i.e.*, Leapfrog's] decision to increase the penalty for nonparticipation." (Dkt.191-3 at 1 (emphasis added).) His obvious bottom-line point was the opposite of the district court's takeaway: that neither Leapfrog nor the hospitals acted wrongfully in furthering their respective businesses, especially considering that "the data are not valuable if participation is low." (*Id.*)

No fair reading of this email, sent by one dissenting expert to aggrieved hospitals, converts it into evidence that Leapfrog was acting thuggishly, without regard for scientific standards or patients' best interests, or, for that matter, was operating any differently than is endorsed by countless respected observers who support imputing scores for nonparticipants. Dr. Romano made exactly these points in his trial testimony, explaining that he "never heard from anybody from Leapfrog that their objective was to penalize nonparticipants" and that Leapfrog was "very concerned" about nonparticipating hospitals "riding on the coattails" of participating ones. (Dkt.204-2 at 152:18-153:13, 163:17-164:16.) To the extent that the court meant to suggest otherwise, its finding is clearly erroneous and should be reversed.

## II. THE PERMANENT INJUNCTION ITSELF VIOLATES THE FIRST AMENDMENT BECAUSE IT IS AN OVERBROAD PRIOR RESTRAINT

Even if the judgment below were otherwise sustainable, it should still be reversed because the permanent injunction independently violates the First Amendment. The injunction is a quintessential content-based prior restraint on future publication, and, as Plaintiffs' own post-judgment conduct confirms, it is also dangerously overbroad. Either defect independently requires that the injunction be vacated or substantially narrowed.[3]

### A. The First Amendment Flatly Prohibits Prior Restraints On Publication

The rule against prior restraints is elementary and sacrosanct. The Framers understood that judicial censorship is no less menacing than that from executive licensors. *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). Indeed, the First Amendment's "chief purpose" is to "prevent previous restraints upon publication." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

[3] While noting the absence of any new evidence or change in law, the court in denying reconsideration stated that Leapfrog's prior-restraint argument was among those it "had adequate opportunity to consider when inviting the Defendant to argue its position on the scope of the injunction." (Dkt.234 at 2.) Because this constitutional challenge to the injunction's scope has been considered and rejected, it is preserved for *de novo* review.

The founding generation understood that prohibition to reach judicial orders, not merely executive censors. Justice Story, drawing on Blackstone and DeLolme, condemned *all* previous restraints on publication. 3 Joseph Story, *Commentaries on the Constitution of the United States* §§ 1878-79 (1833).

Modern doctrine stays true to that history. Injunctions, along with temporary restraining orders, "are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993). Content-based injunctions that proscribe speech itself are unconstitutional per se, and courts "typically refuse to grant injunctions regarding speech in any circumstance, *even where liability ... has been found*." *Basulto v. Netflix, Inc.*, 2023 WL 7129970, at *52 (S.D. Fla. Sept. 20, 2023) (dissolving overbroad permanent injunction against speech that had been adjudicated as defamatory) (emphasis in original); *see Sindi*, 896 F.3d at 30 (dissolving permanent injunction against speech that had been adjudicated as defamatory and published with actual malice). That "traditional rule of Anglo-American law" has been applied "with remarkable uniformity" by American courts for two centuries. Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157, 167-68 (2007). In sum, an injunction of this sort is, by definition, inimical to the First Amendment.

### B. The Injunction Is An Impermissible Content-Based Prior Restraint

It is equally clear that the injunction is content-based. It orders Leapfrog to "cease assigning" grades to Plaintiffs and to "cease promoting" the grades it has already assigned. (Dkt.212 at 40-41.) Those commands do not regulate conduct that incidentally involves speech. They command Leapfrog to abstain from future publication about a defined subject, namely safety grades as they pertain to Plaintiffs. An injunction of this kind is "necessarily a regulation of the subject matter of that speech." *Krapacs v. Bacchus*, 301 So. 3d 976, 980 (Fla. Dist. Ct. App. 2020).

That the court believed the grades to be false or misleading does not change the analysis. Even speech that has been adjudicated as entirely false cannot be subjected to a prior restraint. *See id.*; *Town of Lantana v. Pelczynski*, 290 So. 2d 566, 569 (Fla. Dist. Ct. App. 1974) ("Freedom from prior restraint upon speech and press extends to false, as well as true statements."); *Vrasic v. Leibel*, 106 So. 3d 485, 487 (Fla. Dist. Ct. App. 2013) (same rule applies even when the speaker derives commercial gain from the speech). Nor is there any exception for speech that criticizes a business. *Org. for a Better Austin*, 402 U.S. at 419. The aggrieved party's remedy, if any, is money damages, not an order silencing the speaker going forward. *Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1092 (Fla. Dist. Ct. App. 2014). Whatever concerns a court may harbor about speech it deems false or misleading, "[i]njunctive relief to prohibit [it] is another matter altogether." *Id.*

### C. Even If Some Speech Injunction Were Permissible, This Injunction Is Unconstitutionally Overbroad

Even assuming an injunction could ever reach some of Leapfrog's speech, any such injunction would need to be "couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968). This injunction flunks that essential test.

The injunction does not stop at the methodology adjudicated at trial. It puts at risk any future methodology Plaintiffs may allege to be "similar." (Dkt.212 at 40.) That word has no fixed content, and Plaintiffs have already shown how far they will stretch it. Post-judgment, Plaintiffs sent letters alleging that Leapfrog's own description of its grades on its own website, and a separate program Leapfrog was merely contemplating for grading ambulatory surgery centers, both violated the injunction. (Dkt.219-1.) To be sure, Leapfrog disputes that either falls within the injunction's actual terms. But Plaintiffs' overreach shows that the concerns surrounding prior judicial restraints are not merely hypothetical.

In fact, the reasons why the First Amendment has long prohibited prior restraints are vividly demonstrated by developments in this case. Well-heeled hospitals, controlled by a corporate behemoth, are leveraging a judicial injunction to silence and censor a nonprofit watchdog, under threat of contempt; in this posture, publishing a displeasing grade (or an imputed score) may be the last thing Leapfrog

ever does before it is wiped out of existence. *See supra* pp.14-16. If that is not the design of the injunction (as it appears to be), it is how the injunction is predictably being wielded in practice. A speaker cannot know in advance what a prohibition on "similar" speech forbids, and an injunction that forces a publisher to seek clearance before it again speaks is, palpably, a prior restraint. *See Carroll*, 393 U.S. at 183. Compounding that constitutional error, the district court compelled Leapfrog to express views antithetical to its own.[4]

At minimum, even if Leapfrog could permissibly be held liable for misleading statements about its methodology—which it could not—any injunction should be confined to that narrow target. It should reach neither the grades themselves, nor the underlying methodology, nor any "similar" future methodology. *See Bull Motors L.L.C. v. Brown*, 152 So. 3d 32, 36 (Fla. Dist. Ct. App. 2014) (narrowing a FDUTPA injunction because it "dictat[ed] how this defendant should … communicate in the future"). This injunction does not merely redress a completed wrong—it silences speech intended for future publication, on an issue of intense public concern. This

[4] By mandating that Leapfrog provide disclosures to specified actual and potential licensing entities to the effect that the safety grades were "found to be deceptive and unfair in this action" (Dkt.212 at 41), the injunction commandeered Leapfrog's editorial judgment and compelled Leapfrog to "affirm[] a belief with which [Leapfrog] disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995).

injunction is thus a textbook example of a prior restraint, the likes of which should never be entered, much less affirmed.

## III. FDUTPA DOES NOT ENCOMPASS THE SPEECH AT ISSUE

If the Court prefers not to reach the constitutional question, it can reverse by holding that the speech is not unlawful under FDUTPA, either under the statute's plain text or in light of constitutional-avoidance principles. By FDUTPA's plain terms, the statute reaches "*acts* or *practices*" in the "*conduct*" of "trade or commerce"—not speech disseminated to the public free of charge. Fla. Stat. § 501.204(1) (emphases added). But even if there is ambiguity, "[i]t is a well-settled principle of statutory construction that when faced with two reasonable interpretations of a statute," courts should "adopt the one that avoids constitutional questions." *Brito v. Salas*, 434 So. 3d 39, 51 (Fla. 2025). Applying that principle here, this Court should avoid interpreting FDUTPA to embrace a nonprofit's non-commercial, protected speech on a matter of public concern. Doing so maintains fidelity to Florida's public policy, expressed by its legislature, "to protect the right in Florida to exercise the rights of free speech in connection with public issues" and to hasten the dismissal of suits—like this one—that "are inconsistent" with those rights. Fla. Stat. § 768.295(1).

Regardless, the judgment should be reversed on FDUTPA grounds because the court premised Leapfrog's liability on multiple clearly erroneous findings.

Those erroneous findings include, at a minimum, the assignment of weight to Dr. Romano's email calling Leapfrog's Step 2 imputation methodology a "business decision," even though it is clear that the comment reflected an external perspective and was conveying Leapfrog's mission-oriented commitment to improve data availability and quality. *See supra* pp.50-51. Likewise, the erroneous findings on the accessibility of Leapfrog's grading methodology on its website should be reversed, along with the resulting finding of deception. *See supra* pp.30-32.

Nor does FDUTPA's "unfairness" prong find separate purchase. The court lumped unfairness together with deception, finding in a single breath that Leapfrog's methodology "has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety." (Dkt.212 at 2.) The only factual predicate preceding that unfairness finding is the same accessibility and false impression findings addressed above. Assuming the deception findings are reversed, nothing substantial remains of the "unfairness" reference.

Beyond its clear factual errors, the district court abused its discretion by failing to grapple with Leapfrog's FDUTPA argument when resolving Leapfrog's post-judgment motion. (Dkt.234.) By that point, Plaintiffs' own post-judgment conduct had raised new and loud constitutional alarms, particularly about the excesses and dangers of the court's anomalous application of FDUTPA and ongoing

injunction under it. It is not a sound exercise of discretion for a district court confronting such momentous constitutional concerns to, in essence, ignore them.

## CONCLUSION

This Court should reverse the judgment and injunction below.

Dated: September 10, 2026

Respectfully submitted,

*/s/ Derek L. Shaffer*
Derek L. Shaffer

JASON D. STERNBERG
DAVID A. NABORS
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2601 Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
jasonsternberg@quinnemanuel.com
davidnabors@quinnemanuel.com

DEREK L. SHAFFER
*Counsel of Record*
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th Street NW
Washington, D.C. 20004
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for The Leapfrog Group*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the length limit requirements of Fed. R. App. P. 32(a)(7) because it contains 12,974 words (based on the Microsoft Word word-count function) excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

Dated: September 10, 2026

*/s/ Derek L. Shaffer*
Derek L. Shaffer

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2026, the foregoing was filed electronically with the Clerk of the Court using the Court's CM/ECF system. Service will be effectuated to all parties and counsel of record in this matter who are registered with the Court's CM/ECF system.

Dated: September 10, 2026

*/s/ Derek L. Shaffer*
Derek L. Shaffer