NO. 26-11527

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,
PLAINTIFFS-APPELLEES,

v.

THE LEAPFROG GROUP,

DEFENDANT-APPELLANT.

On Appeal from the United States District Court for the
Southern District of Florida
Case No. 9:25-cv-80526
Honorable Donald M. Middlebrooks, U.S. District Judge

# BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF FLORIDA, CATO INSTITUTE, INSTITUTE FOR FREE SPEECH, AND PATIENT SAFETY ACTION NETWORK IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

Daniel Tilley
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA
Florida Bar No. 102882
4343 W. Flagler St., Suite 400
Miami, FL 33134
Email: dtilley@aclufl.org
Tel.: (786) 363-2714

Cody Venzke
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
Email: cvenzke@aclu.org
Tel.: (202) 715-0816

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, *amici curiae* American Civil Liberties Union, American Civil Liberties Union of Florida, Cato Institute, Institute for Free Speech, and Patient Safety Action Network state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

*Amici* also file this Certificate of Interested Persons, pursuant to Eleventh Circuit Rule 26.1-1, 28-1, and 29-2:

1. American Civil Liberties Union (*Amicus Curiae*)
2. American Civil Liberties Union of Florida (*Amicus Curiae*)
3. Cato Institute (*Amicus Curiae*)
4. Institute for Free speech (*Amicus Curiae*)
5. Patient Safety Action Network (*Amicus Curiae*)
6. Tilley, Daniel (Counsel for *Amicus Curiae*)
7. Venzke, Cody (Counsel for *Amicus Curiae*)

Pursuant to Eleventh Circuit Rule 26.1-1(a)(2), this certificate includes only persons and entities omitted from the Certificate contained in Appellants' Opening Brief.

Dated: September 17, 2026

By: /s/ Cody Venzke
Cody Venzke
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ 2

TABLE OF AUTHORITIES ........ iii

STATEMENT OF INTEREST ........ 10

STATEMENT OF THE CASE ........ 12

ARGUMENT ........ 17

I. ON MATTERS OF PUBLIC INTEREST OR INVOLVING PUBLIC FIGURES, THE FIRST AMENDMENT DEMANDS HIGHER STANDARDS OF LIABILITY TO GIVE FREEDOM OF EXPRESSION ADEQUATE "BREATHING SPACE." ........ 17

A. On Matters Regarding Public Figures or Matters of Public Interest, Plaintiffs Bringing Defamation Claims Carry the Burden to Prove Actual Malice or Falsity, Respectively. ........ 17

B. Courts Have Extended These Protections for Freedom of Expression to Other Torts Besides Defamation, and Their Reasoning Is Applicable Here ........ 18

C. The *O'Brien* Standard for Incidental Impact on Speech Is Inapplicable Where Speech Is the Target of the Regulation ........ 22

II. HOSPITAL SAFETY RATINGS CONSTITUTE MATTERS OF PUBLIC INTEREST, AND THE HOSPITALS CONSTITUTE AT LEAST LIMITED PUBLIC FIGURES ........ 24

A. Leapfrog's Ratings Are Speech on Matters of Public Interest ........ 24

B. Leapfrog's Speech Regarded Public Figures ........ 27

III. THIS COURT SHOULD HOLD THE INJUNCTION WAS IMPROPERLY GRANTED AND REMAND FOR APPLICATION OF *SULLIVAN*. ........ 30

A. On Remand, The District Court Should Account for the Context of and Interpretative Decisions Inherent in Leapfrog's Speech ........ 30

B. The District Court's Conception of the Case as an Ordinary Business Dispute Led It to Apply the Incorrect Standard. ....32

CONCLUSION ....35

CERTIFICATE OF COMPLIANCE ....36

## TABLE OF AUTHORITIES

**Cases**

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Loc. 655*,
39 F.3d 191 (8th Cir. 1994) ....................9, 15

*Blatty v. New York Times Co.*,
728 P.2d 1177 (Cal. 1986) ....................9, 10, 13, 15, 16

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) ....................9, 27

*Carey v. Brown*,
447 U.S. 455 (1980) ....................19, 29

*Century Hudson Gas & Electric Corporation v. Public Service Commision of New York*,
447 U.S. 557 (1980) ....................28

*Chiles v. Salazar*,
607 U.S. 627 (2026) ....................18

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991) ....................13, 14

*Compuware Corporation v. Moody's Investors Services, Inc.*,
499 F.3d 520 (6th Cir. 2006) ....................17

*Cranberg v. Consumers Union of U.S., Inc.*,
756 F.2d 382 (5th Cir. 1985) ....................9, 16

*Dun & Bradstreet v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ....................20

*F.T.C. v. Peoples Credit First, LLC*,
244 F. App'x 942 (11th Cir. 2007) ....................28

*Federal Trade Commission v. Agora Financial, LLC*,
447 F. Supp. 3d 350 (D. Md. 2020) ....................18

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
194 F.3d 505 (4th Cir. 1999) ....................9, 14, 15

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
887 F. Supp. 811 (M.D.N.C. 1995) ....................................................................9, 14

*Free Speech Coalition, Inc. v. Paxton*,
145 S. Ct. 2291 (2025) ............................................................................................5

*Friedgood v. Peters Publishing Co.*,
521 So.2d 236 (Fla. 4th Dist. Ct. App. 1988) ........................................................23

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)..............................................................................12, 22, 23, 29

*Good Samaritan et al., v. Leapfrog Group*,
No. 25-cv-80526 (Aug. 28, 2025)..............................................................................8

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)....................................................................................................18

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988).........................................................................................9, 13, 14

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003)..............................................................................................8, 17

*IMDb.com Inc. v. Becerra*,
962 F.3d 1111 (9th Cir. 2020) ..................................................................................21

*J&D Dental v. Hou*,
26 N.W.3d 491 (Minn. Ct. App. 2025)......................................................................21

*Jews For Jesus, Inc. v. Rapp*,
997 So. 2d 1098 (Fla. 2008)......................................................................................26

*Johnson v. Freborg*,
995 N.W.2d 374 (Minn. 2023)..................................................................................21

*Malin v. Quad-City Times*,
964 N.W.2d 10 (Iowa Ct. App. 2021) ........................................................................9

*Marcus v. Swanson*,
515 P.3d 297 (Kan. Ct. App. 2022) ..........................................................................20

*Marcus v. Swanson*,
539 P.3d 605 (2023)..................................................................................................20

*Masson v. New Yorker Mag.*, Inc.,
501 U.S. 496 (1991) .......... 26, 27, 29

*N.A.A.C.P. v. Button*,
371 U.S. 415 (1962) .......... 8

*N.A.A.C.P. v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .......... 18, 19, 29

*Neumann v. Liles*,
369 P.3d 1117 (Or. 2016) .......... 20

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 8, 10, 12, 17

*Packingham v. North Carolina*,
582 U.S. 98 (2017) .......... 5

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986) .......... 8, 12, 19

*Puryear Law P.C. v. Fishback*,
939 N.W.2d 659 (Iowa Ct. App. 2019) .......... 20

*Reader's Digest Assciation. v. Superior Court*,
690 P.2d 610 (Cal. 1984) .......... 10, 13

*Rodgers v. Banks*,
344 F.3d 587 (6th Cir. 2003) .......... 20

*Silvester v. American Broadcasting Companies, Inc.*,
839 F.2d 1491 (11th Cir. 1988) .......... 22, 23

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 9, 13, 19, 20

*St. Amant v. Thompson*,
390 U.S. 727 (1968) .......... 29

*St. Margaret Mercy Healthcare Centers, Inc. v. Ho*,
663 N.E.2d 1220 (Ind. Ct. App. 1996) .......... 20

*Texas v. Johnson*,
491 U.S. 397 (1989) .......... 18

*Time, Inc. v. Hill*,
385 U.S. 374 (1967)....................................................................................9, 13, 17

*Time, Inc. v. Pape*,
401 U.S. 279 (1971)........................................................................................26, 27

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018) ......................................................................22, 23

*Unelko Corp. v. Rooney*,
912 F.2d 1049 (9th Cir. 1990) ...................................................................9, 16, 20

*Waldbaum v. Fairchild Publications, Inc.*,
627 F.2d 1287 (D.C. Cir. 1980)..............................................................................23

**Statutes**

Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 .........7

**Other Authorities**

*'It Could Be Seen As A Little Disingenuous:' Digging Deeper into Hospital Grades with WLRN And Reporter Jane Musgrave*, STET NEWS (Dec. 16, 2024).....................23

*7 Tenet Florida Hospitals Receive Top Scores in Patient Safety*, PALM BEACH HEALTH NETWORK (May 4, 2015) ....................................................................................24

*A National Hospital-Rating Org Failed Five Florida Hospitals. Now They're Suing.*, REDDIT (May 6, 2025 8:19:37 AM EDT).......................................................22

B. Witkin, Summary of California Law § 495 (9th ed. 1988)...........................................26

*Delray Medical Center Earns An "A" in Patient Safety from The Leapfrog Group*, PALM BEACH HEALTH NETWORK (Nov. 9, 2019)........................................................24

*Delray Medical Center Receives an 'A' for Patient Safety for the Spring 2019 Leapfrog Hospital Safety Grade*, PALM BEACH HEALTH NETWORK (May 17, 2019) ...............................................................................................................24

*Delray Medical Receives 2018 Leapfrog A Patient Safety Grade*, PALM BEACH HEALTH NETWORK (Nov. 8, 2018)...................................................................................24

*Find a Facility*, TENET HEALTH .........................................................................................23

*Good Samaritan Medical Center Achieves Healthgrades 5-Star Rating for Vaginal Delivery and C-Section Delivery*, PALM BEACH HEALTH NETWORK (Aug. 2, 2022) ....24

*Healthgrades 2020 Patient Safety Excellence Award Awarded at Time when Hospitals and the Community Are Focused on Increased Patient Safety*, SOUTH FLORIDA HOSPITAL News (June 16, 2020)....24

*Healthgrades Names Delray Medical Center One of America's Best Hospitals for Pulmonary Care*, PALM BEACH HEALTH NETWORK (Nov. 7, 2024)....24

Jane Musgrave, *Five of Palm Beach County's Largest Hospitals at Bottom of Local Safety Grades*, WLRN (Dec. 11, 2024) ....22

Jim Grimes, *Palm Beach County's Largest Health Care Provider Fires Back Over Online Rankings*, 12 NEWS (May 1, 2025)....22

Lianna Norman, *Where Are the Best Hospitals in Florida? 8 Got 'D' and 'F' Ratings on this List*, Palm Beach Post (Nov. 19, 2025)....22

Lydia Saad & Megan Brenan, *Cost Leads Americans' Top-of-Mind Healthcare Concerns*, GALLUP (Dec. 15, 2025) ....22

Lydia Saad, *Healthcare Reclaims Top Spot Among U.S. Domestic Worries*, GALLUP (Mar. 31, 2026) ....7, 21

Tenet Healthcare Corporation, SEC Form 8-K ex. 99.1 (July 23, 2026) ....23

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonpartisan, nonprofit organization. The ACLU of Florida is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including freedom of speech. They frequently advocate for First Amendment rights online. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (amicus); *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291 (2025) (counsel).

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files amicus briefs.

The Institute for Free Speech (IFS) is a nonpartisan, nonprofit organization dedicated to the protection of the First Amendment rights of speech, assembly, petition, and the press. IFS represents individuals and civil society groups in litigation securing their First

[1] *Amici* sought consent from counsel for all parties. None oppose the filing of this brief. *See* Fed. R. App. P. 29(a)(2). *Amici* declare that no party or party's counsel authored the brief in whole or in part or contributed money intended to fund preparing or submitting the brief, and that no one other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting the brief.

Amendment liberties. IFS opposes lawsuits that chill free speech and seek to punish people who engage in discussion and debate on issues of public concern.

The Patient Safety Action Network (PSAN) is a coalition of individuals and organizations consisting of patients who were medically harmed, their loved ones, and concerned advocates. PSAN focuses solely on and with patients. Its perspective in this work comes from PSAN's first-hand experience with medical harm and its impact on individuals and their families. These experiences give PSAN a unique voice in changing policies addressing patient safety issues. PSAN raises awareness about medical harm and safer health care practices and aims to create accountability through public transparency. The accountability that PSAN seeks relies greatly on robust protections of the First Amendment, which include the right of independent watchdogs to analyze and publish metrics that are critical of hospital performance.

## STATEMENT OF THE CASE

The state of healthcare, including its quality, accessibility, and affordability, is a matter of vast public importance. Eighty-four percent of Americans "personally worry" about healthcare a "great deal" or a fair amount — surpassing inflation, terrorism, or crime and violence.[2] The Leapfrog Group is one of many organizations and individuals that weigh in on this issue, seeking to provide transparency around hospital operations and hospital safety through hospital ratings and grades.

Although Leapfrog's advocacy is focused on a matter of public interest, the district court in this case found that Leapfrog's hospital ratings reports violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 *et seq.*, without identifying any material falsity regarding the plaintiff hospitals or fault by Leapfrog, as required by the First Amendment. The hospitals' claims centered on Leapfrog's 2024 change to its scoring methodology to address missing data from hospitals that refused to respond to Leapfrog's surveys, which included the plaintiff hospitals. Leapfrog previously replaced the missing scores of non-reporting hospitals with the average reported by peer institutions; in 2024, Leapfrog began assigning the lowest score achieved by a participating hospital. The plaintiff hospitals alleged that the reports resulting from the new methodology were unfair and deceptive under FDUTPA, and that the reports caused them reputational harm and loss of good will. *Good Samaritan et al., v. Leapfrog Group*, No. 25-cv-80526,

[2] Lydia Saad, *Healthcare Reclaims Top Spot Among U.S. Domestic Worries*, GALLUP (Mar. 31, 2026), https://perma.cc/AD24-BK5P.

Am. Compl. ¶ 88, Dkt. No. 74 (Aug. 28, 2025). After a bench trial, the district court enjoined Leapfrog's publication of future ratings using similar methodologies, without deciding on its culpability or even whether its speech was false. *Good Samaritan et al., v. Leapfrog Group*, No. 25-cv-80526, Order, Dkt. No. 212 (Mar. 6, 2026) [hereinafter Order].

The Supreme Court rejected this approach more than sixty years ago: it determined that claims for reputational harm stemming from allegedly false speech cannot circumvent the First Amendment, whether framed as libel, defamation, or another cause of action. "Like . . . other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (internal citations omitted). The standards set by the First Amendment require that even "erroneous statement[s]" be tolerated to give "the freedoms of expression . . . the 'breathing space' that they 'need . . . to survive.'" *Id.* at 271–72 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1962)).

That "breathing space" is provided by "[e]xacting proof requirements." *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003). For public officials and public figures filing libel or defamation claims, that standard requires proving "'actual malice'—that is, [the alleged defamation was made] with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280. For claims premised on matters of public interest, the plaintiff bears the burden of proving falsity. *Id.* at 278–79; *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986).

The heightened protections provided by the First Amendment are not limited to claims for libel or defamation. Courts, including the Supreme Court, have since rejected efforts to plead around the protections of *Sullivan* by invoking torts other than defamation, including false light and intentional infliction of emotional distress. *Time, Inc. v. Hill*, 385 U.S. 374 (1967) (false light, misappropriation); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) (invasion of privacy, emotional distress); *Snyder v. Phelps*, 562 U.S. 443 (2011) (intentional infliction of emotional distress).

*Sullivan* likewise extends to a spectrum of business torts, including claims for unfair or deceptive acts or practices or product disparagement where the gravamen of the complaint centers on reputational harm from publication of information about the plaintiff. *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 523–24 (4th Cir. 1999) (fraud, breach of duty of loyalty, trespass, and unfair trade practices), *aff'g in relevant part*, 887 F. Supp. 811, 823 (M.D.N.C. 1995) (limiting unfair trade practices claims to non-reputational harms); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990) (product disparagement); *Cranberg v. Consumers Union of U.S., Inc.,* 756 F.2d 382, 389 (5th Cir. 1985) (product disparagement brought as statutory libel); *see also Beverly Hills Foodland, Inc. v. United Food & Com. Workers Union, Loc. 655*, 39 F.3d 191, 196 (8th Cir. 1994) (defamation and tortious interference); *Blatty v. New York Times Co.*, 728 P.2d 1177, 1179 (Cal. 1986) (tortious interference, unfair practices, and false advertising); *Malin v. Quad-City Times*, 964 N.W.2d 10 (Iowa Ct. App. 2021) (interference with employment contract); *cf. Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513 (1984) (assuming

without deciding that the "actual malice" standard applies to claims of product disparagement).

*Sullivan* and its progeny emphatically settle that a plaintiff may not circumvent the First Amendment through creative pleading. The *Sullivan* rule applies to "a civil lawsuit between private parties," and "[i]t matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute." *Sullivan*, 376 U.S. at 265. *Sullivan* likewise does not hinge on the label affixed to the claims. "Although the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement: 'that constitutional protection does not depend on the label given the stated cause of action.'" *Blatty*, 728 P.2d at 1182 (quoting *Reader's Digest Assn. v. Superior Court*, 690 P.2d 610, 624 (Cal. 1984)).

The district court overlooked these long-established protections. Despite describing Leapfrog's mission as "admirable" and "laudable," the district court did not assess the public interest in the ratings, hospital safety, or the "severe dysfunction in the healthcare marketplace." Order 3. It likewise did not apply the "actual malice" standard required by *Sullivan* and its progeny or find that Leapfrog's speech was false. Instead, the court found "not persuasive" the argument that the scores were "technically or materially true." *Id.* at 21. Ultimately, the district court conceived of the hospitals' suit as a quotidian business dispute, seemingly outside the protections of the Constitution. This treatment is

inconsistent with the demands of the First Amendment, and the impact is significant, with the court enjoining future speech using a "similar methodology." This chilling effect on speech in the public interest is exactly what the Supreme Court has guarded against in demanding "breathing space" via heightened burdens for civil claims premised on damage caused by such speech. This Court should hold that the injunction was improperly granted and remand for application of the *Sullivan* standard.

## ARGUMENT

### I. ON MATTERS OF PUBLIC INTEREST OR INVOLVING PUBLIC FIGURES, THE FIRST AMENDMENT DEMANDS HIGHER STANDARDS OF LIABILITY TO GIVE FREEDOM OF EXPRESSION ADEQUATE "BREATHING SPACE."

#### A. On Matters Regarding Public Figures or Matters of Public Interest, Plaintiffs Bringing Defamation Claims Carry the Burden to Prove Actual Malice or Falsity, Respectively.

The First Amendment serves to "assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Sullivan*, 376 U.S. at 269. Although defamation — false speech injurious to reputation — is a well-established exception to the First Amendment, our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open" places strict constitutional limits on the scope of defamation liability, especially where the speech concerns public officials or public figures. *Id.* at 270.

When a public official or a public figure sues for defamation, they must prove that the defendant's speech was false and that the speaker's fault rose to the level of "actual malice" — meaning the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280; *Philadelphia Newspapers, Inc.*, 475 U.S. at 773. In cases involving defamation claims by purely private individuals, but regarding matters of public interest, the plaintiff must prove both falsity and some degree of fault by the defendant. *Philadelphia Newspapers*, 475 U.S. at 776; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974).

As discussed below, *Sullivan* and its progeny are not artifacts of defamation law but have been extended to other claims premised on falsehoods injurious to the plaintiff's reputation, business, or state of mind.

**B. Courts Have Extended These Protections for Freedom of Expression to Other Torts Besides Defamation, and Their Reasoning Is Applicable Here**

Since *Sullivan*, courts have repeatedly rejected efforts to plead around the "actual malice" standard by invoking torts other than defamation, including false light and intentional infliction of emotional distress. *Hustler Magazine, Inc.* 485 U.S. 46; *Time, Inc.*, 385 U.S. 374; *Snyder*, 562 U.S. 443. "Although the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement: 'that constitutional protection does not depend on the label given the stated cause of action.'" *Blatty*, 728 P.2d at 1182 (quoting *Reader's Digest Assn.*, 690 P.2d at 624).

The "strict requirements for establishing a libel or defamation claim" under *Sullivan* apply to a plaintiff seeking redress "for injury to his reputation or his state of mind" due to publications by the defendant, regardless of the label affixed to the claim. *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991) (citing *Hustler*, 485 U.S. 46). Thus, in *Hustler Magazine,* the Court "held that the constitutional libel standards apply to a claim alleging that the publication of a parody was a state-law tort of intentional infliction of emotional distress," which were premised on injuries to the plaintiff's reputation and state of mind.

*Id.* (citing *Hustler*, 485 U.S. 46). In contrast, a claim for promissory estoppel arising from a journalist violating his promise not to reveal a source's name was *not* premised on publication — but on the broken promise — and thus not subject to *Sullivan*. *Id*

The Courts of Appeals have extended the Supreme Court's instructions to business torts, including unfair or deceptive business practice claims. In *Food Lion v. ABC*, a chain of grocery stores brought claims of "fraud, breach of duty of loyalty, trespass, and unfair trade practices" against undercover journalists and their television network for joining the chain as employees to secretly record its food safety practices and subsequently running a story on primetime news. 194 F.3d at 510. The district court concluded that, under *Hustler*, "Food Lion may not . . . under the guise of some other claim, recover publication damages for injury to its reputation without establishing the defamation requirements of actual malice and falsity." 887 F. Supp. at 824. Recovery might be permitted under the unfair trade practices claims, but only for "non-reputational damages." *Id* at 823.

The Fourth Circuit affirmed in relevant part, holding that "when a public figure plaintiff uses a law to seek damages resulting from speech covered by the First Amendment, the plaintiff must satisfy the proof standard of *New York Times*." 194 F.3d at 523. The court reasoned, "It is clear that Food Lion was not prepared to offer proof meeting the *New York Times* standard under any claim that it might assert. What Food Lion sought to do, then, was to recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim." *Id.* at 522. The court concluded that "such an end-run around First Amendment" had been

"foreclosed" by the Supreme Court, and that under *Cowles* and *Hustler* "'constitutional libel standards' apply to damage claims for reputational injury from a publication such as the one here." *Id.* at 523.[3]

The Eighth Circuit reached a similar conclusion in a labor dispute. In *Beverly Hills Foodland, Inc. v. United Food & Com. Workers Union, Loc. 655*, a union distributed a handbill criticizing a supermarket's hiring practices as discriminatory. The supermarket filed suit against the union, alleging that the handbill constituted defamation and tortious interference with its business. 39 F.3d at 193. The tortious interference claims alleged that the "Union's actions allegedly caused Foodland to lose business due to the decrease in consumer shopping." *Id.* at 196. The court noted that the National Labor Relations Act required the supermarket to demonstrate actual malice for a defamation claim, as defined by *Sullivan*, *id.* at 194, and that the same standard "must equally be met for a tortious interference claim based on the same conduct or statements," *id.* at 196. "This is only logical as a plaintiff may not avoid the protection afforded by the Constitution and federal labor law merely by the use of creative pleading." *Id.*

Similarly, the California Supreme Court held that a plaintiff alleging claims for "intentional interference with prospective economic advantage," "unfair competition," and "false and misleading advertising" could not plead around *Sullivan*. *Blatty*, 728 P.2d at

[3] Although the Fourth Circuit had dismissed the unfair trade practices claim earlier in its opinion for a lack of consumer harm, 194 F.3d at 511, its First Amendment reasoning applies here: the hospitals may not seek to recover for reputational harms stemming from publication under the guise of a non-defamation claim.

1180. The plaintiff (an author) alleged that the New York Times had incorrectly left him off its list of best-selling books and that the Times' representations about the accuracy of the list were false and injurious to the plaintiff. *Id.* at 1178–79. The court agreed with the Times that *Sullivan* barred the plaintiff's claims. It reasoned *Sullivan* applied to "all injurious falsehood claims and not solely to those labeled 'defamation'" to "broadly protect free-expression and free-press values." *Id.* at 1183. It concluded:

> Not only does logic compel the conclusion that First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement, but so too does a very pragmatic concern. If these limitations applied only to actions denominated "defamation," they would furnish little if any protection to free-speech and free-press values: plaintiffs suing press defendants might simply affix a label other than "defamation" to their injurious-falsehood claims—a task that appears easy to accomplish as a general matter.

*Id.* at 1184. This concern that plaintiffs might seek to avoid *Sullivan* was "not mere unsupported speculation," as "plaintiffs suing press defendants have more frequently affixed labels other than defamation to injurious falsehood claims and have increasingly achieved some measure of success in their actions." *Id.* at 1184.

And still other Courts of Appeals have concluded that claims alleging product disparagement by noncompetitors "are subject to the same first amendment requirements that govern actions for defamation." *Unelko Corp.*, 912 F.2d at 1058; *cf. Cranberg,* 756 F.2d at 389 (product disparagement claims in Texas must be brought as a statutory libel claim "governed by . . . the dictates of *New York Times v. Sullivan*"). Courts have extended *Sullivan* to even breach of contract claims where the claims "amount[] to nothing more

than a backdoor attempt to recover damages for the harm allegedly caused by [the publication of] protected expression of its opinion." *Compuware Corp. v. Moody's Investors Services, Inc.*, 499 F.3d 520, 531 (6th Cir. 2006).

In each of these cases, courts demanded "exacting proof" regarding falsity and fault to "provide sufficient breathing room for protected speech." *Illinois, ex rel. Madigan*, 538 U.S. at 620. "Heightening the complainant's burden, these showings must be made by clear and convincing evidence." *Id.* "Erroneous statements about a matter of public interest . . . are inevitable, and, if innocent or merely negligent, must be protected if 'freedoms of expression are to have the breathing space' that they 'need to survive.'" *Time, Inc.*, 385 U.S. at 388 (quoting *Sullivan*, 376 U.S. at 271–72) (cleaned up).

Ultimately, these constitutional protections do not — and cannot — depend on whether plaintiffs choose to frame their claims as "defamation" or something else. The unfair trade practices claims in this case are likewise premised on injury to plaintiffs' reputations by purportedly false statements and should be subject to an equivalent standard of liability as *Sullivan*.

### C. The *O'Brien* Standard for Incidental Impact on Speech Is Inapplicable Where Speech Is the Target of the Regulation

That unfair trade practices claims are *generally* a constitutionally permissible regulation of conduct or commercial speech does not shield them from First Amendment scrutiny when applied to speech on matters of public interest. *Cf. Fed. Trade Comm'n v.*

*Agora Fin., LLC*, 447 F. Supp. 3d 350, 364 (D. Md. 2020) ("[N]on-commercial speech[] lies outside of the FTC's jurisdiction, and is subject to broad constitutional protections.").

To the contrary, generally applicable regulations of conduct must satisfy the demands of the First Amendment when they are applied to protected speech. "Just because a law may 'generally functio[n] as a regulation of conduct' . . . does not exempt it from demanding First Amendment review when a government seeks to apply that law to speech alone." *Chiles v. Salazar*, 607 U.S. 627, 648–49 (2026) (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27 (2010)). Instead, when "the conduct triggering coverage under the statute consists of communicating a message," the "less stringent standard we announced in *United States v. O'Brien*" does *not* control, and courts must instead apply "a more demanding standard." *Holder*, 561 U.S. at 28 (quoting *Texas v. Johnson*, 491 U.S. 397, 403 (1989)).

The Supreme Court has emphasized that unfair trade practices claims may not be repurposed to target protected expression. In *N.A.A.C.P. v. Claiborne Hardware Co.*, the Court affirmed the First Amendment precluded the imposition of tort liability for malicious interference with business on a civil rights boycott of white merchants. 458 U.S. 886, 894–95 (1982). The Court distinguished the tort liability targeting the boycott from legitimate applications of trade regulations. It acknowledged that there is a "strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association." *Id.* at 912. Thus, "[u]nfair trade practices may be restricted," but that does not establish "a comparable right to prohibit

peaceful political activity such as that found in the boycott." *Id.* at 912–13. "[E]xpression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *Id.* (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)). Where unfair trade practices claims are brought against fully protected speech on matters of public interest, the applicable standard is *Sullivan*, not *O'Brien.*

## II. HOSPITAL SAFETY RATINGS CONSTITUTE MATTERS OF PUBLIC INTEREST, AND THE HOSPITALS CONSTITUTE AT LEAST LIMITED PUBLIC FIGURES

The district court appears to have conceived of the case as a mere business dispute regarding access to hospitals' "private data." Order 39. But Leapfrog's speech in this case falls squarely within the protections established by *Sullivan* and its progeny, as speech on a matter of public interest and regarding public figures. Consequently, this case cannot be treated as a quotidian business dispute, divorced from the protections of the First Amendment.

### A. Leapfrog's Ratings Are Speech on Matters of Public Interest

Speech on matters of public interest requires plaintiffs in defamation and related claims to prove falsity. *Philadelphia Newspapers*, 475 U.S. at 776. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (internal citations and quotation marks omitted). A court must

examine the "content, form, and context" of the speech, "as revealed by the whole record." *Id.* (quoting *Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)).

Courts have affirmed that, in general, when the content of speech consists of business ratings, the speech is a matter of public interest. *Unelko Corp.*, 912 F.2d at 1056 (reporter's statement on 60 Minutes that a product "didn't work" involved a matter of public interest, because it "was of general interest and was made available to the general public"); *Neumann v. Liles*, 369 P.3d 1117, 1125 (Or. 2016) (negative online review of a wedding planning business involved a matter of public interest); *cf. Puryear L. P.C. v. Fishback*, 939 N.W.2d 659 (Iowa Ct. App. 2019) (suggesting that a business review was a matter of public interest as it was "posted on a publicly accessible website, and the content of the review was related to matters of general interest to the public, particularly those members of the public in the market for an attorney").

Furthermore, when the business being rated is a hospital, there is an additional public interest element, because "[t]he public interest includes a wide range of considerations including health and the availability of health care." *St. Margaret Mercy Healthcare Centers, Inc. v. Ho*, 663 N.E.2d 1220, 1224 (Ind. Ct. App. 1996). Analogously, "public comments about a medical doctor's competence may sufficiently touch on matters of public concern to require proof of actual malice." *Marcus v. Swanson*, 515 P.3d 297, *5 (Kan. Ct. App. 2022) (unpublished table decision) (collecting cases), *aff'd*, 539 P.3d 605 (2023); *cf. Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003) (internal hospital report on patient privacy constituted a matter of public interest). Leapfrog endeavors to provide a

comprehensive overview of healthcare quality and hospital safety and does this by providing ratings based on empirical factors. Its speech is "not limited to a personal grievance with a particular provider but instead reached matters of broader public import." *J&D Dental v. Hou*, 26 N.W.3d 491, 500 (Minn. Ct. App. 2025).

The form of Leapfrog's speech — namely, "where" the speech took place, *J&D Dental*, 26 N.W.3d at 501 — also supports the fact it is on a matter of public interest. Leapfrog makes its ratings publicly available, with breakdowns across various metrics and details on its methodology. Order 11–15. Leapfrog's metrics include comparisons with other institutions, and it allows the public to search for and compare institutions. Leapfrog "posts the information on its website free of charge for the public to review. This fact alone imparts an inherently public character to the speech at issue." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020)

Finally, the context of Leapfrog's speech supports the fact that it addresses a matter of public interest. Context includes the speech being situated within "a legitimate social movement" and its role as a catalyst for "discussion" and "reactions" in the community. *Johnson v. Freborg*, 995 N.W.2d 374, 390–91 (Minn. 2023). Polls show that significant majorities worry about healthcare access,[4] that 23% of Americans believe that the U.S. healthcare system is "in a state of crisis," and that another 47% believe the system has

---

[4] Saad, *supra* note 2.

"major problems."[5] In 2024, a majority of respondents stated that U.S. healthcare quality was "fair" or "poor." Likewise, the ratings — and this lawsuit — prompted significant local coverage,[6] and prompted significant discussion on social media, with users posting about their own experiences at the plaintiff hospitals.[7]

All three of these factors — content, form, and context — demonstrate that Leapfrog's speech was on a matter of public interest.

### B. Leapfrog's Speech Regarded Public Figures

The *Sullivan* "actual malice" standard applies to both public official and public figures, the latter of which may be either "general" or "limited" public figures. *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1493–94 (11th Cir. 1988) (quoting *Gertz*, 418 U.S. at 345). Relevant here, "[l]imited public figures . . . are individuals who have thrust themselves forward in a particular public controversy and are therefore required to prove actual malice only in regard to certain issues." *Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018). Whether a person or entity is a limited public figure depends on two "fundamental" characteristics: First, "public figures usually have greater access to the

---

[5] Lydia Saad & Megan Brenan, *Cost Leads Americans' Top-of-Mind Healthcare Concerns*, GALLUP (Dec. 15, 2025), https://perma.cc/D6AH-735C.

[6] Lianna Norman, *Where Are the Best Hospitals in Florida? 8 Got 'D' and 'F' Ratings on this List*, Palm Beach Post (Nov. 19, 2025), https://perma.cc/S789-UDTQ; Jim Grimes, *Palm Beach County's Largest Health Care Provider Fires Back Over Online Rankings*, 12 NEWS (May 1, 2025), https://perma.cc/YBF7-AELG ; Jane Musgrave, *Five of Palm Beach County's Largest Hospitals at Bottom of Local Safety Grades*, WLRN (Dec. 11, 2024), https://perma.cc/L4XN-DR5G.

[7] *A National Hospital-Rating Org Failed Five Florida Hospitals. Now They're Suing.*, REDDIT (May 6, 2025 8:19:37 AM EDT), https://perma.cc/3DRW-ETRP .

media which gives them 'a more realistic opportunity to counteract false statements than private individuals.'" *Silvester*, 839 F.2d at 1494 (quoting *Gertz*, 418 U.S. at 344). Second, "and more importantly, 'public figures . . . voluntarily expose themselves to increased risk of injury from defamatory falsehoods.'" *Id.* (quoting *Gertz*, 418 U.S. at 345). However, someone may "become a public figure through no purposeful action of their own." *Turner*, 879 F.3d at 1273 (quoting *Friedgood v. Peters Publ'g Co.*, 521 So.2d 236, 239 (Fla. 4th Dist. Ct. App. 1988)). Ultimately, public figures "accept the risk that the press, in fulfilling its role of reporting, analyzing, and commenting on well-known persons and public controversies, will focus on them and, perhaps, cast them in an unfavorable light." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980).

The hospitals are — at minimum — limited public figures for this controversy. As an initial matter, the hospitals are a significant operation in Palm Beach County. They "are five of Palm Beach County's largest medical centers," representing "about half of all beds" in the county.[8] All five hospitals are owned by Tenet Healthcare, which operates 698 facilities nationwide,[9] with $2.226 billion in net cash flow in the first six months of 2026.[10] Moreover, Tenet and the hospitals have robust access to the media. Coverage of the hospitals' failing grades included comments from Tenet spokespeople criticizing

---

[8] *'It Could Be Seen As A Little Disingenuous:' Digging Deeper into Hospital Grades with WLRN And Reporter Jane Musgrave*, STET NEWS (Dec. 16, 2024), https://perma.cc/56FG-W32H.

[9] *Find a Facility*, TENET HEALTH, https://perma.cc/CB2D-6VZS (last visited Sept. 4, 2026).

[10] Tenet Healthcare Corporation, SEC Form 8-K ex. 99.1 at 3 (July 23, 2026), https://perma.cc/M2Q3-98LM.

Leapfrog's methodology and stating, "We are disappointed that LeapFrog [sic] still assigned a grade to us despite not having completed a survey for an optional program."[11]

Likewise, the plaintiff hospitals have previously inserted themselves into the hospital safety discussion. In 2022, Good Samaritan touted its "5-Star" grade for certain procedures;[12] similarly, in 2020 and 2024, Delray Medical Center and West Boca Medical Center promoted high ratings from Healthgrades.[13] The hospitals' celebration of high ratings extended to Leapfrog's ratings, with Tenet and the Palm Beach Health Network issuing press releases celebrating "A" grades from Leapfrog in 2019 (twice), 2018, and 2015.[14]

The hospitals may respond that their press releases and announcements reflect the quality of the underlying grades and reports. But the relevant threshold question for

---

[11] *Id.*; Musgrave, *supra* note 8.

[12] *Good Samaritan Medical Center Achieves Healthgrades 5-Star Rating for Vaginal Delivery and C-Section Delivery*, PALM BEACH HEALTH NETWORK (Aug. 2, 2022), https://perma.cc/Y6R7-WDLF.

[13] *Healthgrades 2020 Patient Safety Excellence Award Awarded at Time when Hospitals and the Community Are Focused on Increased Patient Safety*, SOUTH FLORIDA HOSPITAL News (June 16, 2020), https://perma.cc/VH7X-AZTV; *Healthgrades Names Delray Medical Center One of America's Best Hospitals for Pulmonary Care*, PALM BEACH HEALTH NETWORK (Nov. 7, 2024), https://perma.cc/ZP6S-TC7Z.

[14] *Delray Medical Center Earns An "A" in Patient Safety from The Leapfrog Group*, PALM BEACH HEALTH NETWORK (Nov. 9, 2019), https://perma.cc/6DDQ-HDKB; *Delray Medical Center Receives an 'A' for Patient Safety for the Spring 2019 Leapfrog Hospital Safety Grade*, PALM BEACH HEALTH NETWORK (May 17, 2019), https://perma.cc/X73D-78AV; *Delray Medical Receives 2018 Leapfrog A Patient Safety Grade*, PALM BEACH HEALTH NETWORK (Nov. 8, 2018), https://perma.cc/2FH5-NDRC; *7 Tenet Florida Hospitals Receive Top Scores in Patient Safety*, PALM BEACH HEALTH NETWORK (May 4, 2015), https://perma.cc/6GGL-GW29.

*Sullivan* is not the quality of the grades and reports, but whether the hospitals inserted themselves into the public light. They had done so, repeatedly, and now they are held to that decision. The hospitals simply cannot inject themselves into the public discussion of healthcare and hospital safety when the reports are favorable and then attempt to shed their status as public figures when the reports are not.

Thus, *Sullivan* and its progeny are applicable to this case, and the district court was required to examine whether the hospitals carried the burden to prove both the falsity of Leapfrog's speech and actual malice.

## III. THIS COURT SHOULD HOLD THE INJUNCTION WAS IMPROPERLY GRANTED AND REMAND FOR APPLICATION OF *SULLIVAN*.

The district court's imposition of liability did not identify a specific falsity or level of fault (much less actual malice) as required by *Sullivan* and its progeny. This Court should hold that the injunction was improperly granted and remand for application of *Sullivan*.

### A. On Remand, The District Court Should Account for the Context of and Interpretative Decisions Inherent in Leapfrog's Speech

On remand, the district court should ensure that it analyzes the alleged falsity of Leapfrog's speech in context, including the disclosures regarding its methodology and statements that hospitals had not provided data and that "a score was assigned to reflect the lack of information available." Order 30; *see also id.* at 11–12, 25. That context should also take into account that providing grades in an intensely debated matter of public interest will inherently require interpretation of ambiguities.

Those disclosures and context are significant. The Supreme Court has instructed courts to avoid an "absolute definition of falsity" but to instead assess statements in context. *Masson v. New Yorker Mag.*, Inc., 501 U.S. 496, 514 (1991). A statement is not "false" if it is the "substantial truth," even if the speaker "cannot 'justify every word of the alleged defamatory matter . . . .'" *Id.* at 516 (quoting 5 B. Witkin, Summary of California Law § 495 (9th ed. 1988)). "In making this determination, [a jury] should consider the context in which the statement is made and disregard any minor inaccuracies that do not affect the substance of the statement." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1107 (Fla. 2008) (internal quotation marks and citations omitted).

In *Masson*, a psychoanalyst sued a journalist, contending that the journalist had misquoted him in stories about his falling out with the field. The Court noted that while quotation marks generally indicate that "the passage reproduces the speaker's words verbatim," context may indicate that is not the case. 501 U.S. at 511, 512–13. For example, "an acknowledgement" that an article "recreates conversations from memory, not from recordings, might indicate that the quotations should not be interpreted as the actual statements of the speaker." *Id.* at 513.

The *Masson* Court also expanded on a parallel doctrine regarding "rational interpretation" of ambiguous facts. 501 U.S. at 518–19. For example, in *Time, Inc. v. Pape*, the Court rejected that an author's failure to note that facts taken from a federal report were merely "alleged" could be deemed false. *Id.* (citing *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971)). Instead, the author's framing of the citations was one of multiple "difficult

choices" the author faced in developing "his own interpretation of an ambiguous source." *Id.* Similarly, in *Bose Corp. v. Consumers Union*, the Court again rejected that a writer's description of the peculiar sound of experimental loudspeakers could be deemed false, because such descriptions were "'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and [with] descriptive challenges for the writer." *Id.* (quoting *Bose Corp*, 466 U.S. at 512).

Both lines of reasoning in *Masson* are instructive in analyzing Leapfrog's speech. In context, Leapfrog's disclosures regarding its methodology, survey, and hospitals' participation (or lack thereof) may provide a "reasonable reader" a "clue" in understanding the ratings assigned by Leapfrog. 501 U.S. at 513. Similarly, assigning ratings is inherently an interpretative effort, involving determining which factors to include, how to weigh them, and how to address missing data.

### B. The District Court's Conception of the Case as an Ordinary Business Dispute Led It to Apply the Incorrect Standard.

Ultimately, the district court did not conceive of this case as one about speech, but business relations, and that led it to apply the incorrect standard. The district court concluded, "Leapfrog is effectively a watchdog organization which serves as a voice for transparency and a key catalyst in the public reporting of patient quality and safety data that is available to consumers today." Order 39. Although the recognition of Leapfrog's speech as regarding matters of public interest should have triggered *Sullivan*, the court instead framed the case as one in which Leapfrog unfairly "pressure[d] and penalize[d]

hospitals into" providing their "private data." *Id.* This framing led the court to apply less demanding standards than required by *Sullivan*.

For example, rather than analyzing Leapfrog's statements in context to determine their truth or falsity, the district court took the opposite approach. The district court cited a single unpublished Eleventh Circuit opinion for the proposition that whether Leapfrog's scores are "technically or materially [sic] true is not persuasive." Order 21 (quoting *F.T.C. v. Peoples Credit First, LLC*, 244 F. App'x 942, 944 (11th Cir. 2007)). But that decision involved deceptive commercial speech about the defendant's product, rather that allegedly defamatory speech about a public figure. In *Peoples Credit*, the defendants had sent millions of credit offers that implied that the recipients had been pre-approved for "a major credit card such as a platinum Visa or a platinum MasterCard," rather than the defendants' own "First Platinum card." 244 F. App'x at 943–44. Because the Federal Trade Commission Act — like the FDUTPA — required only that a misrepresentation be "*likely* to mislead reasonable consumers," the court reasoned that "[t]he fact that the words in the mail piece are technically or literally true is not persuasive." *Id.*

That reasoning is inapposite here. Offers for credit are commercial speech in that they are "proposing a commercial transaction," and commercial speech that is "more likely to deceive the public than to inform it" receives no constitutional protection. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562–63 (1980). Advocacy about hospital safety, however, *is* speech on a matter of public interest, and therefore "rest[s] on the highest rung of the hierarchy of First Amendment values."

*Claiborne Hardware*, 458 U.S. at 913 (quoting *Carey*, 447 U.S. at 467). The truth or falsity of Leapfrog's statements are not only "persuasive," but potentially decisive.

Similarly, the district court faulted Leapfrog for requiring too many "clicks" to reach its disclosures. But the court found those design choices actionable under FDUTPA's more flexible "unfairness" standard rather than the more-demanding assessment of falsity required by *Sullivan*. Order 29–30, 36–37. Under *Sullivan*, it was the hospitals' burden to prove falsity, and the district court erred in not holding the plaintiffs to their burden.

The district court also did not find that Leapfrog acted with actual malice. The district court concludd that Leapfrog's methodology was "punitive in nature." Order 20. And while evidence suggests that actors within Leapfrog and on its advisory panel viewed the methodology as "punitive" or at least as an incentive to participate in the survey, Order 21–22, that does not necessarily amount to actual malice. As the Supreme Court has emphasized, "Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson*, 501 U.S. at 510. Instead, actual malice turns on the speaker's "subjective awareness of probable falsity" and that "the defendant in fact entertained serious doubts as to the truth of his publication." *Gertz*, 418 U.S. at 334 n.6 (citation omitted). Perhaps the evidence could ultimately support a finding of actual malice, but the district court failed to engage in that assessment in the first instance.

## CONCLUSION

For the foregoing reasons, the Court should hold that the preliminary injunction was improperly denied and remand for application of *Sullivan*, as required by the First Amendment.

Dated: September 17, 2026

By: /s/ Cody Venzke
*Counsel for Amicus Curiae*

Daniel Tilley
AMERICAN CIVIL LIBERTIES
FOUNDATION UNION OF FLORIDA
Florida Bar No. 102882
4343 W. Flagler St., Suite 400
Miami, FL 33134
Email: dtilley@aclufl.org
Tel.: (786) 363-2714

Cody Venzke
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
Email: cvenzke@aclu.org
Tel.: (202) 457-0800

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief of *Amicus Curiae* complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief is printed in proportionally spaced 14-point Times New Roman font, using Microsoft Word and there are 6486 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(f)). The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6).

Dated: September 17, 2026 By: /s/ Cody Venzke
Cody Venzke
*Counsel for Amicus Curiae*