No. 26-11527

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,
*Plaintiffs-Appellees*,

v.

LEAPFROG GROUP,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Florida, No. 9:25-cv-80526-DMM

# AMICUS BRIEF OF PATIENTSRIGHTSADVOCATE.ORG, INC. AND PATIENTS FOR PATIENT SAFETY US IN SUPPORT OF APPELLANT LEAPFROG GROUP AND IN SUPPORT OF REVERSAL


Thomas E. Patterson
PATTERSON LAW FIRM, LLC
200 W. Monroe Street, Ste 2025
Chicago, IL 60606
(312) 223-1699
tpatterson@pattersonlawfirm.com

*Counsel for Patients for Patient Safety US*

Jeffrey M. Harris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for PatientRightsAdvocate.org*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

As required by Eleventh Circuit Rules 26.1-1, 28-1, and 29-2, I certify that in addition to the individuals listed in the Appellant's Opening Brief (Dkt. 25), the following persons and entities have an interest in the outcome of this matter:

- Harris, Jeffrey – Counsel for Amicus Curiae PatientRightsAdvocate.org
- PatientRightsAdvocate.org - Amicus Curiae
- Patients for Patient Safety US – Amicus Curiae
- Patterson, Thomas – Counsel for Amicus Curiae Patients for Patient Safety US

Per Rule 26.1 and Circuit Rule 26.1, PatientRightsAdvocate.org declares that it is a nonprofit corporation. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Per Rule 26.1 and Circuit Rule 26.1, Patients for Patients Safety US declares that it is a nonprofit corporation. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Dated: September 17, 2026 *_/s/ Jeffrey M. Harris____*

## TABLE OF CONTENTS


TABLE OF CITATIONS ........ III

INTEREST OF AMICI CURIAE ........ 1

STATEMENT OF THE ISSUES ........ 3

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 3

ARGUMENT ........ 6

I. The healthcare system depends on independent research and analysis from outside third-party groups. ........ 6

  A. Consumers benefit from accountability and transparency in the notoriously opaque healthcare industry. ........ 7

  B. The Leapfrog-Tenet dispute is a paradigmatic example of where the public would benefit from open and robust debate rather than a speech-suppressing prior restraint. ........ 11

II. Plaintiffs cannot evade the First Amendment by styling their claim as "unfair" or "deceptive" practices rather than defamation. ........ 16

CONCLUSION ........ 23

CERTIFICATE OF COMPLIANCE ........ 24

CERTIFICATE OF SERVICE ........ 25

Table of CITATIONS

**Cases**

*Abrams v. United States*,
250 U.S. 616 (1919) ........ 14

*Alexander v. United States*,
509 U.S. 544 (1993) ........ 13

*Am. Hosp. Ass'n v. Azar*,
468 F. Supp. 3d 372 (D.D.C. 2020) ........ 1

*Am. Hosp. Ass'n v. Azar*,
983 F.3d 528 (D.C. Cir. 2020) ........ 1

*Aviation Charter, Inc. v. Aviation Research Group/US*,
416 F.3d 864 (8th Cir. 2005) ........ 21

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) ........ 19

*Browne v. Avvo, Inc.*,
525 F. Supp. 2d 1249 (W.D. Wash. 2007) ........ 19, 21, 22

*Citizens United v. FEC*,
558 U.S. 310 (2010) ........ 14

*Connaughton v. Harte Hanks Commc'ns, Inc.*,
842 F.2d 825 (6th Cir. 1988) ........ 9

*Connick v. Myers*,
461 U.S. 138 (1983) ........ 4

*Davis v. Avvo, Inc.*,
345 F. Supp. 3d 534 (S.D.N.Y. 2018) ........ 19

*Dershowitz v. Cable News Network, Inc.*,
153 F.4th 1189 (11th Cir. 2025) ........ 18, 20

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
194 F.3d 505 (4th Cir. 1999) ........ 17, 20

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ........ 14, 17

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) ........ 5

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988) ........ 6

*Johnson v. Greater Se. Cmty. Hosp. Corp.*,
951 F.2d 1268 (D.C. Cir. 1991) ........ 7

*Kirkland v. Northside Indep. Sch. Dist.*,
890 F.2d 794 (5th Cir. 1989) ........ 12

*Linmark Assocs. v. Willingboro Township*,
431 U.S. 85 (1977) ........ 13, 14

*Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*,
66 F.4th 307 (1st Cir. 2023) ........ 2

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ........ 22

*Mile Marker, Inc. v. Petersen Publ'g, LLC*,
811 So. 2d 841 (Fla. Dist. Ct. App. 2002) ........ 19

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) ........ 5

*Morrison v. Olson*,
487 U.S. 654 (1988) ........ 3

*Near v. Minnesota ex rel. Olson*,
283 U.S. 697 (1931) ........ 14

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976) ........ 13, 14, 15

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ........ 5

*New York Times Co. v. United States*,
403 U.S. 713 (1971) ........ 14

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969) ........ 13

*Silvester v. Am. Broad. CompaniesCos., Inc.*,
839 F.2d 1491 (11th Cir. 1988) ........ 5, 18

*Snyder v. Phelps*,
562 U.S. 443 (2011) ........ 4

*United States v. Alvarez*,
567 U.S. 709 (2012) ........ 14, 15

## Rules and Regulations

90 Fed. Reg. 53448 (Nov. 25, 2025) .......... 9

## Other Authorities

*2024 Form 990 for The Leap Frog Group*, Propublica Nonprofit Explorer (Apr. 14, 2026) .......... 15

*American Hospital Association Inc.*, ProPublica: Nonprofit Explorer, (archived Sept. 11, 2026) .......... 16

Comm. On Quality of Health Care in Am., Inst. Of Med., *To Err Is Human: Building a Safer Health System* (Linda T. Kohn et al. eds., 2000) .......... 8

David E. Newman-Toker, *Just How Many Diagnostic Errors and Harms Are Out There, Really? It Depends on How You Count*, 34 BMJ Quality & Safety 355 (2025) .......... 8

David W. Bates et al., *The Safety of Inpatient Health Care*, 388 New Eng. J. Med. 142 (2023) .......... 8

Doc. 225, *Community Hosps.' Verified Mot. for Attys.' Fees & Costs, Good Samaritan Med. Ctr., Inc. v. Leapfrog Grp.*, No. 9:25-cv-80526 (S.D. Fla. May 15, 2026) .......... 15

Doc. 37, *Lewandowski v. Johnson & Johnson*, No. 26-1107 (3d Cir. 2026) .......... 2

Ellen Peters et al., *Less is More in Presenting Quality Information to Consumers*, 64 Med. Care Res. Rev. 169 (2007) .......... 12

*Follow-Up Statement from Leapfrog President and CEO Leah Binder on Tenet Healthcare Hospitals' Lawsuit to Suppress Poor Safety Grade*, The Leapfrog Group (May 2, 2025) 12

John Stuart Mill, *On Liberty* (Batoche Books 2001) (1859) .......... 15

Khic-Houy Prang et al., *Mechanisms and Impact of Public Reporting on Physicians and Hospitals' Performance: A Systematic Review (2000–2020)*, 16 PLOS ONE art. no. e0247297 (2021) .......... 10

*NHE Fact Sheet*, Ctrs. For Medicare & Medicaid Servs., (archived Aug. 3, 2026) .......... 7

Noel Eldridge et al., *Trends in Adverse Event Rates in Hospitalized Patients, 2010-2019*, 328 JAMA 173 (2022) .......... 10

*Nurses Share Report by DPH/CMS Finding Tenet/St. Vincent Hospital Administration Placed All Patients in Immediate Jeopardy of Serious Harm Resulting in at Least Three Patient Deaths and Other Complications*, Mass. Nurses Ass'n (Aug. 11, 2025) .......... 12

Off. of Inspector Gen., U.S. Dep't of Health & Human Servs., No. OEI-06-18-00401 (2025) .......... 9

Tara Lagu et al., *Website Characteristics and Physician Reviews on Commercial Physician-Rating Websites*,
317 JAMA 766 (2017) ........................................................................................ 10

*Tenet Healthcare (THC) Q1 2026 Earnings Call Transcript*,
Fortune.com (Apr. 30, 2026)........................................................................... 11

*The Challenge of Health Care Fraud*,
Nat'l Health Care Anti-Fraud Ass'n, (archived Aug. 3, 2026) .......................................8

*Unveiling the Shadows: Obstacles, Consequences, and Challenges of Information Opacity in Healthcare Systems*,
Phil. Ethics & Human. Med., Apr. 14, 2025.........................................................4, 7, 10

## INTEREST OF AMICI CURIAE[1]

**PatientRightsAdvocate.org, Inc.** (PRA) is a 501(c)(3) nonprofit, non-partisan organization that provides a voice for consumers—patients, employees, employers, and taxpayers—to have competition, transparency, and meaningful choices in healthcare. PRA embraces free-market principles and believes that transparency restores trust and accountability to the healthcare system. PRA advocates for patients to have easy, real-time access to complete health information—not only what care costs, but how safe and how effective that care is. Reliable, publicly available information about the quality and safety of hospitals and providers is central to that mission.

PRA believes, and research has shown, that transparency and accountability drive competition on price, quality, and outcomes. Empowered with full information, consumers can select the safest and highest-quality providers and hold powerful institutions accountable for the care they deliver.

PRA has extensive experience with healthcare-related issues and has participated as *amicus curiae* in prior litigation germane to its interests, including litigation involving healthcare transparency and First Amendment issues. *See, e.g.*, *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528 (D.C. Cir. 2020); *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372 (D.D.C. 2020); *Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th

[1] No party's counsel authored this brief in whole or in part; and no party, party's counsel, or person (other than amicus or its counsel) contributed money to fund this brief's preparation or submission. Counsel for all parties were notified that amicus intended to submit this brief and have consented to the filing of this brief.

307 (1st Cir. 2023); Doc. 37 *Lewandowski v. Johnson & Johnson*, No. 26-1107 (3d Cir. 2026).

**Patients for Patient Safety US** (PFPS US) is a 501(c)(3) non-profit organization led by people who have personally experienced the devastating consequences of medical errors and missed or delayed diagnoses, either as patients or family members in close proximity to patients harmed. PFPS US is a non-partisan network of dedicated individuals and organizations united in the mission to enhance patient safety for all people in the U.S. Although led by consumers, the PFPS US nationwide network includes a wide range of stakeholders, including healthcare workers, researchers, educators, employers, systems safety experts and stakeholder organization leaders, all in pursuit of the systemic change. In addition to individual patient safety advocates, the PFPS US network includes more than 30 organizational partners who work collaboratively to advocate for safer, more transparent care in the U.S.

* * *

*Amici* submit this brief on behalf of consumers and patients to ensure that their voices are heard and their interests are represented in this critically important case. *Amici* believe that transparency in healthcare depends on the work of independent organizations who must be free to gather cost and safety data and report their research and evaluations to the public, even when—or especially when—those evaluations are critical of hospitals' practices. When a large and powerful hospital system can invoke consumer-protection law to suppress a nonprofit's safety grades and micromanage its

methodology, the flow of information that patients rely on to protect themselves is cut off. Simply put, suits like this one pose a grave threat of chilling core, First-Amendment-protected speech on matters of utmost public concern. *Amici* therefore have a direct and substantial interest in whether the First Amendment permits Plaintiffs to muzzle Leapfrog's speech.

## STATEMENT OF THE ISSUES

**I.** Whether the First Amendment protects a nonprofit watchdog group's published safety grades as opinion—or at least bars liability absent proof of actual malice when the hospital being discussed sues to suppress those evaluations.

**II.** Whether an injunction forbidding an independent watchdog group from publishing future grades under its chosen methodology, and compelling it to retract and correct past grades, violates the First Amendment.

**III.** Whether a state consumer-protection statute may be stretched to reach a healthcare watchdog group's public safety evaluations.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case asks whether one of the country's largest for-profit hospital chains may use the federal courts to muzzle a nonprofit watchdog for grading its hospitals' safety and publishing its conclusions. The answer is no. With respect to core First Amendment principles, "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

Leapfrog's Hospital Safety Grades are speech on a matter of utmost public concern—the safety of the hospitals where patients entrust their lives. Speech on issues of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Rather than respond to Leapfrog's grades with reports or speech of their own, the plaintiff hospitals sued to erase them. The district court obliged, entering an astonishing injunction that bars Leapfrog from grading these hospitals under its "current methodology or any similar methodology" and compels it to publish corrective statements repudiating its own speech. Order at 40-41. That judgment cannot be squared with the First Amendment, and this Court should reverse.

Healthcare commands an enormous share of the national economy, yet quality and price information remain stubbornly opaque. That opacity breeds waste, fraud, and abuse, as well as safety risks to patients. *See* Majid Alizadeh et al., *Unveiling the Shadows: Obstacles, Consequences, and Challenges of Information Opacity in Healthcare Systems*, Phil. Ethics & Human. Med., Apr. 14, 2025, at 1, 8. Independent advocacy and research groups help close that gap. They gather what individual patients cannot and translate their research and data into terms ordinary consumers can use.

Leapfrog does exactly that, distilling complex safety data into a single letter grade and giving it to the public for free. *Amici* take no position on the validity of Leapfrog's methodology. Like any publication, Leapfrog's grades and studies can and should be

the subject of robust public debate. But *amici* wholeheartedly agree with Leapfrog that its speech lies at the core of the First Amendment, and that this litigation poses a grave risk of chilling speech that is critical of powerful healthcare institutions.

The plaintiff hospitals are owned by Tenet Healthcare, a for-profit healthcare conglomerate with over $20 billion in annual operating revenue. If a company of that size can enjoin a small watchdog group's publications through litigation (and seek attorneys' fees large enough to bankrupt it), other nonprofits will surely think twice about their own publications. Less transparency and fewer informed choices will follow, precisely when patients need both. The First Amendment's answer to speech Tenet dislikes is more speech, not less.

At bottom, this is a thinly veiled defamation case wearing a consumer-protection label. Plaintiffs' grievance is reputational: that Leapfrog's grades wrongly portray its hospitals as unsafe. But defamation law would have booted that claim from court at the threshold. Leapfrog's grades are disclosed-methodology opinions, and a statement on a matter of public concern "must be provable as false before there can be liability." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19-20 (1990). Moreover, Tenet's hospitals—which are owned by a massive, publicly traded corporation—are public figures that could not prevail without clear and convincing proof that the false "statement was made with 'actual malice.'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 659 (1989) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964)); *Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491, 1497-98 (11th Cir. 1988).

The fact that Plaintiffs proceeded under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) rather than a defamation theory does not eliminate the First Amendment constraints that govern claims alleging reputational injury from speech. A plaintiff attacking someone else's speech cannot evade the First Amendment merely by relabeling a defamation claim as something else. *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

Here, the district court openly acknowledged that there was a "dearth" of evidence on actual malice. Dkt. 234 at 3. The court nonetheless adjudicated the accuracy of Leapfrog's evaluations while declaring that whether the scores are "technically or materially true is not persuasive." Order at 21. It then enjoined Leapfrog's future grades and compelled corrective disclosures, parlaying a prior restraint and compelled speech into a single decree. The judgment below is anathema to the First Amendment and should be reversed.

## ARGUMENT

### I. The healthcare system depends on independent research and analysis from outside third-party groups.

Patients cannot protect themselves without reliable information about the quality, safety, and cost of the hospitals and providers who treat them. Healthcare is among the largest and most opaque sectors of the economy, and that opacity harms patients. Independent research and advocacy organizations and watchdog groups often supply the missing information. These groups close the gap by gathering safety data, studying the relevant issues, and distilling their research into information consumers

can actually use, keeping powerful providers like Tenet accountable to the public. Allowing Tenet to silence that speech would not only deprive patients of critical information, but set a dangerous precedent that chills independent research, analysis, and advocacy across all industries.

### A. Consumers benefit from accountability and transparency in the notoriously opaque healthcare industry.

"Speech on matters of public concern is at the heart of the First Amendment's protection." *Snyder*, 562 U.S. at 451-52 (cleaned up). Because there is "an obvious public interest in being informed about the quality of health care," *Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1278 (D.C. Cir. 1991), speech about it "is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

That special protection for speech about healthcare is well warranted. Healthcare represents a massive portion of the country's economy—around 18% of total GDP. *NHE Fact Sheet*, Ctrs. For Medicare & Medicaid Servs., perma.cc/KS77-AFL4 (archived Aug. 3, 2026). Yet, despite playing such a large role in the economy and people's lives, the healthcare industry has long been plagued by a lack of transparency. Quality and cost information is often obscure, which leads to decreased public trust, lower quality of care, and an inability of consumers to comparison-shop among providers. *See Unveiling the Shadows*, *supra*, at 8. Waste, fraud, and abuse take root in the shadows. Conservative estimates put healthcare fraud at 3% of total healthcare spending; other estimates put it at nearly 10%. *See The Challenge of Health Care Fraud*,

Nat'l Health Care Anti-Fraud Ass'n, perma.cc/64C7-XG4Q (archived Aug. 3, 2026). A lack of transparency about cost and quality leads to poor outcomes and skewed incentives across the board—both for consumers and the economy as a whole.

Moreover, preventable harm in healthcare is a leading cause of death and disability in the United States, recognized as a public health priority in 2000 by the National Academy of Science's Institute of Medicine landmark report, *To Err Is Human*. *See* Comm. On Quality of Health Care in Am., Inst. Of Med., *To Err Is Human: Building a Safer Health System* 26 (Linda T. Kohn et al. eds., 2000). Despite stunning advances in science, technology and treatment, approximately 25% of patients in the U.S. continue to experience harm in hospitals, with vulnerable populations such as older adults, birthing mothers, and people with disabilities or chronic diseases more at risk. *See*, *e.g.*, David W. Bates et al., *The Safety of Inpatient Health Care*, 388 New Eng. J. Med. 142 (2023). Additionally, missed, wrong, or delayed diagnoses contribute to the death or serious disability of 900,000 to one million people annually. *See* David E. Newman-Toker, *Just How Many Diagnostic Errors and Harms Are Out There, Really? It Depends on How You Count*, 34 BMJ Quality & Safety 355 (2025).

Unfortunately, the healthcare ecosystem continues to tolerate preventable patient harm, as evinced by wide variation in adoption of evidence- and experience-based best practices. Too often, and in too many hospitals, bad care and dangerous conditions are hidden. A 2025 analysis by the U.S. Department of Health and Human Services Office of the Inspector General found that fewer than half of preventable

patient harm events are ever reported anywhere. *See* Off. of Inspector Gen., U.S. Dep't of Health & Human Servs., No. OEI-06-18-00401 (2025), perma.cc/4FZJ-HMHL.

In short, the healthcare system desperately needs transparency and accountability. And independent research, advocacy, and watchdog groups play a critical role in promoting transparency. These groups "provid[e] a vital service … for the public," because "the exposure of wrongdoing by individuals … is one of the highest functions of the press in our society." *Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 834 n.4 (6th Cir. 1988), *aff'd*, 491 U.S. 657 (1989).

Indeed, the federal government expressly anticipated that third-party outside groups would evaluate, analyze, and republish hospital price disclosures as part of keeping healthcare accountable. *See, e.g.*, 90 Fed. Reg. 53448 at 53986, 54004 (Nov. 25, 2025). As the Centers for Medicare and Medicaid Services (CMS) explained, the hospital price disclosures are "designed to be parsed and analyzed by entities including innovators, employers, researchers, and journalists who transform that structured data into products, tools, research, and reports to support patients' ability to understand and compare hospital prices, which ultimately drives competition and directly benefits patients." *Id.* at 53986. The federal government itself has thus recognized the vital role played by outside groups in analyzing complex data and translating their findings for the public.

For groups that study and analyze the healthcare industry, part of the "vital service" they provide is communicating their findings. *Connaughton*, 842 F.2d at 834 n.4.

That includes collecting data, publishing research, and giving consumers information to help them find high-quality healthcare providers that best suit their needs. The role of independent research is especially important because the information consumers often rely on for everyday purchases—customer reviews and ratings, and professional evaluations—is much harder to find for healthcare, especially on critical metrics like quality and cost. *See, e.g.*, Tara Lagu et al., *Website Characteristics and Physician Reviews on Commercial Physician-Rating Websites*, 317 JAMA 766 (2017), https://perma.cc/E6NK-SQ2T (discussing comparative scarcity and unreliability of physician reviews). That paucity of easily accessible information hurts consumers. *See Unveiling the Shadows* at 8.

Independent outside groups like Leapfrog, *amici*, and countless others help fill that void. Systematic reviews of the evidence consistently find that when transparency increases, consumer choice and quality of care do as well. *See, e.g.*, Khic-Houy Prang et al., *Mechanisms and Impact of Public Reporting on Physicians and Hospitals' Performance: A Systematic Review (2000–2020)*, 16 PLOS ONE art. no. e0247297 (2021), perma.cc/7XBL-5RG3. For example, hospital-acquired infections, adverse drug events, patient falls, and pressure ulcers have all declined in recent years because the frequency of these events is now measured and publicly reported. *See* Noel Eldridge et al., *Trends in Adverse Event Rates in Hospitalized Patients, 2010-2019*, 328 JAMA 173 (2022), https://perma.cc/EC9N-6RT7. Public-facing data empowers patients with information to consider in making choices and simultaneously motivates improvement.

And when independent research organizations use their freedom of speech to provide transparency, everyone benefits.

### B. The Leapfrog-Tenet dispute is a paradigmatic example of where the public would benefit from open and robust debate rather than a speech-suppressing prior restraint.

The Leapfrog Group is a nonprofit healthcare watchdog dedicated to informing consumers about potential safety risks at medical institutions. Leapfrog presents its research to consumers in an easily understandable format: the Hospital Safety Grade. Leapfrog does not charge consumers for its services. And it spends most of its revenue pursuing its mission—to increase transparency in the healthcare sector through public reporting.

The hospitals suing Leapfrog are each owned by Tenet Healthcare—a publicly traded, for-profit healthcare conglomerate with operating revenue of more than $20 billion per year. *See Tenet Healthcare (THC) Q1 2026 Earnings Call Transcript*, Fortune.com (Apr. 30, 2026), perma.cc/BF8V-VFGE. According to a prominent healthcare trade publication, since 2000, Tenet has racked up over $1.8 billion in penalties and settlements for fraud, labor violations, and bribery. *See* Kayser, *Tenet Nurses 'Outraged' by $1.78M Settlement to Resolve False Claim Allegations*, Becker's Hosp. Rev., perma.cc/B9WD-TXSM (archived Sept. 12, 2026). And Tenet-owned hospitals have faced criticism from other outside groups (and government agencies) over their safety record. *See, e.g.*, *Nurses Share Report by DPH/CMS Finding Tenet/St. Vincent Hospital Administration Placed All Patients in Immediate Jeopardy of Serious Harm Resulting in at Least*

*Three Patient Deaths and Other Complications*, Mass. Nurses Ass'n (Aug. 11, 2025), perma.cc/JD6C-97U3 (finding safety violations so egregious that Medicaid and Medicare funding were nearly pulled).

In this case alone, Leapfrog's research found that each of the five Tenet-owned hospitals at issue had various infection rates significantly above the national average. *See Follow-Up Statement from Leapfrog President and CEO Leah Binder on Tenet Healthcare Hospitals' Lawsuit to Suppress Poor Safety Grade*, The Leapfrog Group (May 2, 2025), perma.cc/X2DC-GJGG. Some also had significantly higher rates of bedsores, falls, and injuries. *See id.*

Leapfrog chooses to present some of the complex information it gathers as letter grades because healthcare consumers, especially low-numeracy consumers, can have trouble interpreting complex data on their own. *See*, *e.g.*, Ellen Peters et al., *Less is More in Presenting Quality Information to Consumers*, 64 Med. Care Res. Rev. 169 (2007), perma.cc/9Y7H-Y2B8 (finding that simplified rating systems for healthcare quality lead to "higher comprehension" and "better choices"). Yet Tenet has now enlisted the judicial system to micromanage and suppress Leapfrog's speech because it does not like the methodology Leapfrog uses to assign its grades.

But Leapfrog, like all citizens and groups, has a First Amendment right to speak about "public issues"—a category that includes healthcare. *See supra* I.B. at 11; *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 798 n.10 (5th Cir. 1989) (stating "the quality of nursing care given to any group of people … is a matter of public concern"). And

courts should be especially hesitant to penalize Leapfrog for this speech because its letter grades are disclosed-methodology *opinions*, not provably false assertions of fact. *See* Leapfrog Opening Br. 21-40.

Judicial suppression of speech is not traditionally the remedy when a multibillion-dollar corporation takes issue with a critical review of its products or services. *See Linmark Assocs. v. Willingboro Township*, 431 U.S. 85, 97 (1977). Tenet is one of the largest and wealthiest hospital systems in the country. If it believes Leapfrog is misrepresenting its hospitals' safety, or that a different methodology would be more useful for patients, then it could surely issue its own publications addressing these issues and responding to Leapfrog's reports. But what should not be on the menu is obtaining a decree from a federal court telling Leapfrog what it may or may not say or what grading methodology it is allowed to use. "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969).

The decision below is not just an unwise use of judicial power; it is a prior restraint. Prior restraints are "judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis in original). Such restraints "are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Guarding against "previous restraints

upon publication" was understood, from the Founding, to be "the chief purpose of the guaranty" enshrined in the First Amendment. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931).

For that reason, "[a]ny system of prior restraints of expression … bear[s] a heavy presumption against its constitutional validity," and the party seeking one "carries a heavy burden of showing justification for the imposition of such a restraint." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam). That skepticism is warranted. A prior restraint operates *ex ante*, imposing "an immediate and irreversible sanction." *Nebraska Press*, 427 U.S. at 559.

The Constitution's answer to alleged "falsehood and fallacies" "is more speech, not enforced silence." *Linmark*, 431 U.S. at 97. Our system entrusts the truth or falsity of ideas to public debate rather than judicial decree, on the premise that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *United States v. Alvarez*, 567 U.S. 709, 728 (2012) (plurality opinion) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)); *see also Citizens United v. FEC*, 558 U.S. 310, 361 (2010) ("[I]t is our law and our tradition that more speech, not less, is the governing rule.").

The Supreme Court has emphasized that even a "pernicious" opinion is properly addressed through the competition of other ideas rather than an injunction, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974) , because "[t]he remedy for speech that is false is speech that is true," *Alvarez*, 567 U.S. at 727. A court that enjoins disfavored

speech forecloses that competition, substituting its own judgment for the marketplace of ideas the First Amendment protects. Indeed, courts, commentators, and philosophers have understood for centuries that "the peculiar evil of silencing the expression of an opinion is, that it is robbing the human race." John Stuart Mill, *On Liberty* 19 (Batoche Books 2001) (1859). Thus where "counterspeech, of refutation, can overcome the lie," there is no warrant for silencing the speaker instead. *Alvarez*, 567 U.S. at 726.

At bottom, Tenet has used the judicial system to secure a judgment that includes "the most serious and the least tolerable infringement on [Leapfrog's] First Amendment rights" known to constitutional law. *Nebraska Press*, 427 U.S. at 559. But Tenet's attempt to suppress Leapfrog's speech did not stop there. After Tenet's hospitals won the injunction from the district court, they filed a motion for attorney's fees and costs. *See Community Hosps.' Verified Mot. for Attys.' Fees & Costs, Good Samaritan Med. Ctr., Inc. v. Leapfrog Grp.*, No. 9:25-cv-80526 (S.D. Fla. May 15, 2026), ECF No. 225. That motion requested $596,352.97 in costs, $696,737.50 in local counsel's fees—and $9,206,790.00 in outside counsel's fees. *Id.* at 15, 17, 20. Leapfrog's 2024 revenue, the most recent publicly available, totaled just under $8.8 million. *2024 Form 990 for The Leap Frog Group*, Propublica Nonprofit Explorer (Apr. 14, 2026), perma.cc/A2CS-4S56. Tenet is not just seeking to muzzle a critic—it is seeking to bankrupt it.

If the extraordinary decree entered below is allowed to stand, it poses a serious risk of chilling speech far beyond just Leapfrog. Any independent research or advocacy

group that publishes reports critical of hospitals, insurance companies, pharmacy benefit managers, or other large healthcare institutions could face ruinous litigation against some of the deepest-pocketed entities in the country.[2] And, worse still, that litigation could be premised not just on actual falsity or malice, *see infra*, but on a difference of opinion over methodology or how the data is presented. And the potential chilling effect would not be limited to commentators on healthcare, but could threaten the broader ecosystem of nonprofits, watchdog groups, academics, and media outlets that publish rankings or scorecards on a host of matters: school rankings, product reviews, investments, environmental performance, and any other matter worthy of public commentary and debate.

## II. Plaintiffs cannot evade the First Amendment by styling their claim as "unfair" or "deceptive" practices rather than defamation.

Plaintiffs' claim, in substance, turns on reputation-based harms. They take issue with a nonprofit's public-facing assessment of hospital safety and claim their business was harmed by what they characterize as misleading or inaccurate statements. Yet instead of pleading this reputation-based harm under the most logical cause of action (defamation), Plaintiffs repackaged it to allege "unfair" or "deceptive" practices under a state consumer-protection statute. The district court embraced that characterization and entered judgment and a sweeping injunction. Order at 40-41. But that approach

[2] In addition to hospitals' own resources, their primary national industry association reported more than $147 million of revenue in 2024 alone. *See American Hospital Association Inc.*, ProPublica: Nonprofit Explorer, perma.cc/SH65-TCGC (archived Sept. 11, 2026).

improperly disregards constitutional guardrails governing claims based on reputational harms.

The gravamen of this suit is reputational injury from public expression. The Plaintiff hospitals alleged that Leapfrog published hospital-safety grades and related evaluations on a public website and that Plaintiffs suffered reputational and commercial harm as a result. Order at 2-4, 9-12, 32-35. The district court embraced that characterization, finding a risk of "patient avoidance, doctor retention, employee morale, and community reputation" harms, and faulting Leapfrog's methodology as "punitive" and "misleading." Order at 1-2, 20, 26, 32-35. But, stripped of labels, those are quintessential defamation theories: that published statements (or their implications) about a subject's performance and quality injured reputation and caused economic loss. *See Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (describing publication damages as including "loss of good will and lost sales").

Claims that seek damages or injunctive relief for reputational harm resulting from someone else's speech are hard to win by design. *See Gertz*, 418 U.S. at 342-43. *Gertz* prohibits "liability without fault" and limits presumed and punitive damages in cases involving speech on matters of public concern. *Id.* at 347, 349-50. And *Milkovich v. Lorain Journal Co.* requires public-concern statements by a media defendant to be "provable as false." 497 U.S. at 19-20.

Defamation claims brought by public figures like Tenet's hospitals are harder still: "A public figure may not recover damages for a defamatory falsehood without

clear and convincing proof that the false statement was made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Harte-Hanks,* 491 U.S. at 659 (cleaned up); *see also Dershowitz v. Cable News Network, Inc.*, 153 F.4th 1189, 1190 (11th Cir. 2025). Merely "mistaken or even overwrought" belief in a statement's truth, even when the statement harms another's reputation, will not sustain a defamation claim. *Dershowitz*, 153 F.4th at 1190. These constraints operate to protect opinion, value judgments, and methodology choices where the speech "does not contain a provably false factual connotation"—especially when the subject involves reporting on matters of public interest. *Milkovich*, 497 U.S. at 20.

Even though the gravamen of this suit is reputational harm, Plaintiffs curiously did not plead a defamation claim. The obvious reason for that omission is that such a claim would have had zero chance of succeeding. Tenet Healthcare is one of the largest and most prominent hospital chains in the country. And "the public has a marked interest" in the performance and oversight of the highly regulated hospital industry. *Silvester*, 839 F.2d at 1495.

Companies like Tenet "thrust themselves into [a] position of prominence by voluntarily entering a strictly regulated, high-profile industry" and thereby "invite[] public scrutiny, discussions, and criticism." *Id.* at 1497-98. The same is equally true of companies that are unhappy with unfavorable reviews: a manufacturer that objects to an unflattering review is "a 'public figure' in the constitutional sense" and "must prove

the existence of actual malice by clear and convincing evidence." *Mile Marker, Inc. v. Petersen Publ'g, LLC*, 811 So. 2d 841, 845-46 (Fla. Dist. Ct. App. 2002).

Applying these constitutional principles, courts have repeatedly rejected challenges to reviews and ratings by targets of the speech who found them unfair. *See, e.g., Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 489-90, 513 (1984) (holding that the reviewer's inaccurate description of the loudspeaker, "though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella"); *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 540 (S.D.N.Y. 2018) (rejecting an attorney's challenge to allegedly inflated ratings because the ratings "are statements of opinion protected by the First Amendment"); *Browne v. Avvo, Inc.*, 525 F. Supp. 2d 1249, 1251, 1253 (W.D. Wash. 2007) (dismissing attorneys' challenge to "the accuracy and validity of [a] numerical rating system" because "the First Amendment precludes their cause of action").

Remarkably, the district court brushed the First Amendment aside and treated the Plaintiff hospitals' reputational grievance as an ordinary trade practice dispute. The court found that Leapfrog's grades "misrepresen[t] hospital safety" and "constitut[e] an unfair and deceptive business practice in violation of" FDUTPA, and it faulted Leapfrog for "misleading consumers about how [it] calculates its Safety Grades." Order at 2-3, 37. The court simultaneously downplayed the inquiry the First Amendment makes dispositive, declaring that "[w]hether the scores are 'technically or materially true is not persuasive.'" *Id.* at 21. It thus adjudicated the accuracy of Leapfrog's public,

evaluative, opinion-based speech—and then enjoined that speech and compelled corrective disclosures—without ever requiring proof of a false statement of fact made with actual malice. *Id.* at 40-41. Indeed, the court entered judgment for Plaintiffs despite explicitly finding a "dearth" of evidence of actual malice. Dkt. 234 at 3.

That Plaintiffs styled their claim as a consumer-protection action did not give the district court license to ignore First Amendment constraints on claims alleging reputational harm resulting from speech. A plaintiff cannot achieve through state consumer-protection law what the First Amendment forbids through defamation. Whether the claim is styled as FDUTPA, intentional infliction of emotional distress, or another tort, its label does not displace the constitutional safeguards applicable to the challenged speech. *See Hustler Mag.*, 485 U.S. at 56 (requiring public figures to establish "a false statement of fact which was made with 'actual malice'" to recover for intentional infliction of emotional distress); *see also Food Lion*, 194 F.3d at 522-24. Plaintiffs seek redress for reputational injury from Leapfrog's expression on a matter of public concern. They must therefore prove that Leapfrog published a false statement of fact with actual malice. *Harte-Hanks*, 491 U.S. at 659. Simply labeling Leapfrog's assessments "deceptive" does not let them avoid that burden. *Dershowitz*, 153 F.4th at 1190.

Nor is a desire to "penalize nonparticipants" in Leapfrog's surveys a substitute for proof of actual malice. Order at 20-23, 36. Where actual malice is required, Plaintiffs must show knowledge of falsity or reckless disregard for the truth—not merely an intent to pressure recalcitrant hospitals to respond to a survey. *See Harte-Hanks*, 491 U.S. at

665-68. And Leapfrog offered the entirely plausible argument that its handling of non-responding hospitals was not "punitive" but was designed to ensure that nonparticipants were not given higher grades than were warranted based on their safety performance. *See* Leapfrog Br. 8-9, 12, 26, 50-51. Thus, the district court's finding of a punitive purpose—even if true—cannot carry what should have been Plaintiffs' heavy burden under the First Amendment to show actual malice.

Finally, the district court also faulted Leapfrog's methodology as lacking a scientific basis and declared it "unfair and deceptive." Order at 2-3. But disagreement over the methodology a nonprofit group employs to comment on the practices of large corporations does not strip the First Amendment's protection. Quite the opposite. Speech like this about public-facing entities on matters of public concern should be subject to the *highest* levels of First Amendment protection. *See Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864, 871 (8th Cir. 2005) (protecting a safety rating as "a subjective interpretation of multiple objective data points leading to a subjective conclusion about aviation safety").

Authors, editors, researchers, and advocacy groups routinely select measures, assign weights, and address missing data. That is central to what they do. The First Amendment protects those value-laden choices—even if critics or the target of the speech deem them unfair or unwise—because the "conversion of the available information into a number involves judgment, interpretation, and assessment." *See Browne v. Avvo, Inc.*, 525 F. Supp. 2d 1249, 1252 (W.D. Wash. 2007). A judicial finding

that Leapfrog used an unsound methodology—even if true—does not substitute for what the First Amendment demands: proof that it knowingly or recklessly published a false statement about the Hospitals. *See id.* at 1252-53 (rejecting a consumer-protection challenge to ratings where "the rating itself cannot be proved true or false").

For the same reasons, the First Amendment fully protects other aspects of Leapfrog's publications, such as its website architecture, the wording and placement of its footnotes, and its "gas gauge" visuals (all of which Plaintiffs have taken issue with). Order at 25. Those choices are integral to the publication's communicative content and reflect the "exercise of editorial control and judgment." *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). The prominence of a grade, the placement of an explanatory footnote, and the use of a visual rating all shape what readers understand Leapfrog to be saying about the Plaintiff hospitals' safety and are fully protected by the First Amendment absent some showing of actual falsity and malice.

* * *

This lawsuit is a defamation-by-any-other-name challenge to a nonprofit's speech on a matter of utmost public concern. Plaintiffs sought, and the district court granted, sweeping speech-restrictive relief by relabeling reputational allegations as consumer-fraud claims and by second-guessing a speaker's editorial methodology and presentation. The First Amendment does not permit that end run around core constitutional safeguards.

## CONCLUSION

The Court should reverse the judgment of the district court.

Respectfully submitted,


*/s/ Jeffrey M. Harris*
Jeffrey M. Harris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for PatientRightsAdvocate.org*

Thomas E. Patterson
PATTERSON LAW FIRM, LLC
200 W. Monroe Street, Ste 2025
Chicago, IL 60606
(312) 223-1699
tpatterson@pattersonlawfirm.com

*Counsel for Patients for Patient Safety US*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 29(b)(5) because it contains 5,522 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

Dated: September 17, 2026 *_/s/ Jeffrey M. Harris_*

## CERTIFICATE OF SERVICE

I filed a true and correct copy of this brief with the Clerk of this Court via the CM/ECF system, which will notify all counsel.

Dated: September 17, 2026 *_/s/ Jeffrey M. Harris____*