# No. 26-11527

# United States Court of Appeals
*for the*
# Eleventh Circuit

GOOD SAMARITAN MEDICAL CENTER, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

THE LEAPFROG GROUP,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA,
NO. 25-CV-80526-MIDDLEBROOKS

## AMICUS BRIEF ON BEHALF OF CALPERS, PURCHASER GROUPS, FORMER PUBLIC OFFICIALS, AND HEALTH POLICY SCHOLARS IN SUPPORT OF APPELLANT THE LEAPFROG GROUP

Jamie Crooks
Michael Lieberman
Yinka Onayemi
FAIRMARK PARTNERS, LLP
400 7th Street, NW, Ste. 304
Washington, D.C. 20004
(619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com
yinka@fairmarklaw.com

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

## Certificate of Interested Persons

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, the undersigned counsel hereby certify that, to the best of their knowledge, the following is a complete list, in alphabetical order, of interested persons:

1. Batista, Robert (counsel for Plaintiffs-Appellees)
2. Better Healthcare Policy Group, The (*amicus curiae*)
3. Berwick, Donald M. (*amicus curiae*)
4. Biggs, Shawna Corrine (counsel for The Leapfrog Group)
5. Billek, Maxwell L. (counsel for The Leapfrog Group)
6. Blair, Kimberly E. (counsel for The Leapfrog Group)
7. Buzzard, Christine M. (counsel for Plaintiffs-Appellees)
8. California Public Employees' Retirement System (*amicus curiae*)
9. Cannon, Michael F. (*amicus curiae*)
10. Cardone, Emily (counsel for Plaintiffs-Appellees)
11. Catalyst for Payment Reform (*amicus curiae*)
12. Chung, Daniel P. (counsel for Plaintiffs-Appellees)
13. Clancy, Carolyn (*amicus curiae*)
14. Coye, Molly Joel (*amicus curiae*)

15. Crain, Lee R. (counsel for Plaintiffs-Appellees)

16. Crooks, Jamie (counsel for *amici curiae*)

17. Delray Medical Center, Inc.

18. Duff, Thomas K. (counsel for The Leapfrog Group)

19. Fairmark Partners, LLP (counsel for *amici curiae*)

20. Families USA (*amicus curiae*)

21. Floch, Brandon Scott (counsel for Plaintiffs-Appellees)

22. Fendrick, Mark (*amicus curiae*)

23. Gibson, Dunn & Crutcher LLP (counsel for Plaintiffs-Appellees)

24. Ginieczki, Boyce (*amicus curiae*)

25. Goins, Jenny (*amicus curiae*)

26. Good Samaritan Medical Center, Inc.

27. Herman, Roberta (*amicus curiae*)

28. Hooker Odem, Carmen (*amicus curiae*)

29. Hvidt, Scott K. (counsel for Plaintiffs-Appellees)

30. Kaplan, Robert M. (*amicus curiae*)

31. Laws, Margaret (*amicus curiae*)

32. Leapfrog Group, The

33. Lee, Peter V. (*amicus curiae*)

34. Lieberman, Michael (counsel for *amici curiae*)

35. Lustbader, Zachary J. (former counsel for The Leapfrog Group)

36. Massachusetts Group Insurance Commission (*amicus curiae*)

37. Maloney, Mary Beth (counsel for Plaintiffs-Appellees)

38. Marcus, Jeffrey Eldridge (counsel for Plaintiffs-Appellees)

39. Marcus Neiman & Rashbaum LLP (counsel for Plaintiffs-Appellees)

40. Marcus Rashbaum Pineiro & Meyers, LLP (counsel for Plaintiffs-Appellees)

41. Matthewman, William (U.S. Magistrate Judge, Southern District of Florida)

42. Middlebrooks, Donald M. (U.S. District Judge, Southern District of Florida)

43. Modi, Kavi V. (counsel for The Leapfrog Group)

44. Nabors, David Andrew (counsel for The Leapfrog Group)

45. National Alliance of Healthcare Purchaser Coalitions (*amicus curiae*)

46. National Partnership for Women & Families (*amicus curiae*)

47. Neiman Mays Floch & Almeida PLLC (counsel for Plaintiffs-Appellees)

48. O'Kane, Peggy (*amicus curiae*)

49. Onayemi, Yinka E. (counsel for *amici curiae*)

50. Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center
51. Parks, Allyson E. (counsel for Plaintiffs-Appellees)
52. Pineiro, Michael Anthony (counsel for Plaintiffs-Appellees)
53. Pittman, Mary (*amicus curiae*)
54. Purchasers Business Group on Health (*amicus curiae*)
55. Quinn Emanuel Urquhart & Sullivan, LLP (counsel for The Leapfrog Group)
56. Rashbaum, Daniel Lawrence (counsel for Plaintiffs-Appellees)
57. Reilly, Kevin (counsel for Plaintiffs-Appellees)
58. Richman, Barak (*amicus curiae*)
59. Right Doctor, LLC (*amicus curiae*)
60. Safran, Dana Gelb (*amicus curiae*)
61. Scheffler, Richard M. (*amicus curiae*)
62. Schlichting, Nancy (*amicus curiae*)
63. Schwartz, Allyson Y. (*amicus curiae*)
64. Scott, Sydney A. (counsel for Plaintiffs-Appellees)
65. Shaffer, Derek L. (counsel for The Leapfrog Group)
66. Shortell, Stephen M. (*amicus curiae*)
67. Simmons, Kevin (counsel for Plaintiffs-Appellees)

68. St. Mary's Medical Center, Inc.

69. Sternberg, Jason D. (counsel for The Leapfrog Group)

70. Takagaki, Marc Aaron (counsel for Plaintiffs-Appellees)

71. UNITE HERE HEALTH (*amicus curiae*)

72. Valdez, Robert (*amicus curiae*)

73. Volpp, Kevin (*amicus curiae*)

74. Walker, Helgard C. (counsel for Plaintiffs-Appellees)

75. West Boca Medical Center, Inc.

76. Wilson Elser Moskowitz Edelman & Dicker LLP (counsel for The Leapfrog Group)

77. Wood, Courtney (counsel for The Leapfrog Group)

78. Yang, Betty X. (counsel for Plaintiffs-Appellees)

79. Yeh, Charlotte S. (*amicus curiae*)

80. Zibias Jura Christine (counsel for The Leapfrog Group)

*/s/Michael Lieberman*

Michael Lieberman

## TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..... i

TABLE OF AUTHORITIES ..... viii

INTEREST OF *AMICI CURIAE* ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 3

ARGUMENT ..... 7

I. LEAPFROG PROVIDES A UNIQUE, RIGOROUS, AND WIDELY RELIED-UPON PUBLIC BENEFIT ..... 7

A. Hospital quality varies widely, and poor quality has fatal consequences ..... 7

B. Reliable hospital quality data is scarce, and Leapfrog fills that gap ..... 11

C. Leapfrog does this at a scale that no other entity matches ..... 13

D. The public relies on Leapfrog ..... 15

II. THE INJUNCTION THREATENS LEAPFROG'S ABILITY TO PROVIDE ITS IMPORTANT PUBLIC BENEFIT ..... 20

A. The district court's injunction treats Leapfrog's use of statistical imputation as if it were a misrepresentation ..... 20

B. The district court's order jeopardizes Leapfrog's ability to keep operating ..... 22

C. If Leapfrog cannot continue rating hospital safety, nothing replaces it ..... 24

III. THE COURT'S REASONING IS NOT LIMITED TO LEAPFROG, AND OTHER RATERS WILL RESPOND TO IT ..... 26

A. Other raters perform the same public function through the same practice ..... 26

B. The district court's reasoning will predictably harm consumers on a wider scale ..... 27

IV. THE INJUNCTION SHOULD BE VACATED ..... 28

CONCLUSION ..... 29

APPENDIX A ........................................ 31
LIST OF *AMICI CURIAE* ........................................ 31
Organizational *Amici Curiae* ........................................ 31
Individual *Amici Curiae* ........................................ 33
CERTIFICATE OF COMPLIANCE ........................................ 37
CERTIFICATE OF SERVICE ........................................ 37

# TABLE OF AUTHORITIES

## Cases

*Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*,
441 S.W.3d 345 (Tex. Ct. App. 2013) .......... 26

*Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*,
354 S.W.3d 234 (Mo. Ct. App. 2011) .......... 26

*FTC v. Cmty. Health Sys., Inc.*,
736 F. Supp. 3d 335 (W.D.N.C. 2024) .......... 19

*Home Performance Alliance v. Better Bus. Bureau of W. Fla.*,
354 So.3d 1165 (Fla. Dist. Ct. App. 2023) .......... 26

*In re Mission Health Antitrust Litig.*,
2024 WL 759308 (W.D.N.C. Feb. 21, 2024) .......... 19

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Invs. Servs., Inc.*,
175 F.3d 848 (10th Cir. 1999) .......... 27

*Utah v. Evans*,
536 U.S. 452 (2002) .......... 21

## Other Authorities

Agency for Healthcare Research and Quality, Patient Safety Network,
*Hospital Safety Grade* .......... 14

AHRQ, *National Scorecard on Hospital-Acquired Conditions: Final Results for 2014 Through 2017* (Jan. 2019) .......... 9

AHRQ, *National Scorecard on Rates of Hospital-Acquired Conditions 2010 to 2015* (Dec. 2016) .......... 9, 10

Amir A. Ghaferi *et al.*, *Variation in Hospital Mortality Associated with Inpatient Surgery*, 361 N. Engl. J. Med. 1368 (2009) .......... 8, 9

Anne Snowdon *et al.*, *Digital Maturity as a Predictor of Quality and Safety Outcomes in US Hospitals: Cross-Sectional Observational Study*,
J. of Med. Internet Res. (2024) .......... 15

Centers for Medicare & Medicaid Services, *Calendar Year 2026 Hospital Outpatient Prospective Payment System and Ambulatory Surgical Center Final Rule*, Fact Sheet (Nov. 21, 2025) .......... 12

*CMS Hospital Ratings Show Performance Decline in 2024*, Periop Leader Network (2024) .......... 12

*CMS Overall Star Ratings 'Will Do More Harm Than Good to Patients,' 2 Experts Say*, Becker's Hospital Review (Nov. 15, 2016) .......... 11

*CMS Releases Controversial Overall Star Ratings on Hospital Quality*, Healthcare Finance News (July 27, 2016) .......... 11

*CMS Releases Hospital Quality Star Ratings*, Healthcare Finance News (Apr. 2021) .......... 12

Daniel I. Razick *et al.*, *Does the Chief Executive Officer's Educational Background Have an Impact on the Academic Hospital Leapfrog Safety Grades?*, Cureus (2024) .......... 16

Danielle Ferguson, *Fla. Hospitals Seek $10.5M In Fees In Safety Rating Fight*, Law360 (May 18, 2026) .......... 28

*FAQ: How and Why We Rank and Rate Hospitals*, U.S. News & World Report .......... 13

*Frequently Asked Questions About the Leapfrog Hospital Safety Grade*, Leapfrog .......... 22

FTC, *Specifications for the Special Report to Be Filed by Health Systems Party to a Certificate of Public Advantage* .......... 19

Helen See *et al.*, *Comparison of Quality Measures From US Hospitals With Physician vs Nonphysician Chief Executive Officers*, 5 JAMA Network Open e2236621 (2022) .......... 15

Institute of Medicine, *To Err Is Human: Building a Safer Health System* (Kohn, Corrigan & Donaldson eds., 1999) .......... 7

Johns Hopkins Medicine, *Study Suggests Medical Errors Now Third Leading Cause of Death in the U.S.*, Johns Hopkins Hub (May 3, 2016) .......... 7

Khic-Houy Prang et al., *Mechanisms and Impact of Public Reporting on Physicians' and Hospitals' Performance: A Systematic Review* (2000–2020) ............ 10

*Leveraging Health Care Price Transparency*, Purchasers Business Group on Health (Oct. 2025) ............ 17

Mass. Health Policy Comm'n, *Review of Partners HealthCare System's Proposed Acquisition of Massachusetts Eye and Ear Infirmary, Massachusetts Eye and Ear Associates, and Affiliates* ............ 19

N.Y. State Dep't of Health, *Vital Access Provider Assurance Program (VAPAP)* ............ 18

Paolo Campanella et al., *The Impact of Public Reporting on Clinical Outcomes: A Systematic Review and Meta-Analysis*, 16 BMC Health Servs. Res. 296 (2016) ............ 10

*PBGH Unveils Breakthrough Data Demonstration Project*, Pacific Business Group on Health ............ 16

Press Release, CMS, *CMS Proposes to Expand Quality Program for Hospital Inpatient Services (FY 2009)* ............ 20

Press Release, N.J. Dep't of Health, *Governor Murphy Signs Executive Order Authorizing Monitor for University Hospital* (July 27, 2018) ............ 18

Reed Abelson, *Go to the Wrong Hospital and You're 3 Times More Likely to Die*, N.Y. Times (Dec. 14, 2016) ............ 7

Susan Xu & Atul Grover, *CMS' Hospital Quality Star Ratings Fail To Pass The Common Sense Test*, Health Affairs Forefront (Nov. 14, 2016) ............ 11

*The Leapfrog Group Publishes Ratings for An All-Time Record Number of U.S. Hospitals and Ambulatory Surgery Centers*, Leapfrog Group (July 27, 2026) ............ 13

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are health policy leaders, physicians, economists, and purchasers with hundreds of years of collective experience designing, administering, and relying on the systems this country uses to measure and report hospital quality.[1] Among their ranks are the California Public Employees' Retirement System ("CalPERS")—the second largest individual healthcare purchaser in the country, after the federal government—a former Administrator of the Centers for Medicare & Medicaid Services, two former Directors of the federal Agency for Healthcare Research and Quality, a former Member of Congress, former state health commissioners and secretaries, former chief executives and chief medical officers of major health systems and health plans, the founder of the National Committee for Quality Assurance, and coalitions of employers and public purchasers whose members spend hundreds of billions of dollars annually on health care for tens of

[1] *Amici* file solely in their capacity as individuals and not on behalf of any institutions with which they are affiliated, unless otherwise noted. *Amici* have not been retained by any party to this action. All parties consent to the filing of this brief.

This brief was not authored in whole or in part by counsel for any party. Arnold Ventures, a philanthropic organization, provided financial support to cover some but not all of the expenses of the undersigned counsel of record in the preparation and submission of this brief. No other person besides *amici* and their counsel made a monetary contribution that was intended for the preparation or submission of this brief.

millions of Americans. A full list of *amici* and their affiliations appears in Appendix A.

*Amici*'s interest lies in the fact that the district court's injunction will impact far more than just parties before it because it threatens the Leapfrog Group ("Leapfrog")—an important quality and safety assessor on which *amici* rely—as a going concern. Leapfrog's Hospital Safety Grade is a tool *amici* have studied and relied on to monitor and improve patient safety across the country. Several *amici* held federal and state positions responsible for administering government hospital quality measurement programs, in which Leapfrog was a key asset. Others, including CalPERS, the Purchaser Business Group on Health ("PBGH") and the National Alliance of Healthcare Purchaser Coalitions, represent employers who pay for tens of millions of Americans' healthcare and use Leapfrog's independent quality assessments to evaluate the quality of the hospitals with which they contract.

*Amici*'s interest in this appeal is institutional. The reasoning the district court applied to Leapfrog's methodology not only threatens a specific and important quality assessment tool that *amici* use—it also threatens many other accreditation processes, quality registries, and public reporting programs *amici* and countless other Americans rely on. *Amici* file this brief both to explain Leapfrog's importance to American healthcare as well as other risks the injunction below creates.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Leapfrog is a nonprofit watchdog organization that *amici* and many other purchasers, policymakers, and researchers rely on to assess hospital safety—one of the most important, yet most opaque, aspects of healthcare. In particular, Leapfrog's flagship program, the Hospital Safety Grade, provides unbiased, empirical evaluations that businesses use to decide how to design their employees' insurance plans, and policymakers and researchers use to study the relationship between healthcare prices and quality. Since Leapfrog's founding in 2000, and its launch of the Hospital Safety Grade in 2012, Leapfrog has provided an important public service that *amici* and countless others have relied on in making vital decisions about where to go for care, how much to pay for it, and how to structure our system to better align incentives to improve quality.

Like independent ratings entities in other sectors, Leapfrog considers as part of its hospital quality rating whether the hospital system it is assessing chooses to withhold the data necessary for Leapfrog to make a more informed appraisal. This is commonplace. Rating and scoring systems routinely fill gaps left by missing data through statistical imputation, and Leapfrog is no exception: where a hospital does not submit data, Leapfrog estimates the missing values using transparent imputation methods rather than declining to score the hospital altogether. The ruling below sends a chilling warning to Leapfrog and anyone else who might dare to take one or

another approach to imputing data in the face of criticism. It held that neither Leapfrog's methodology nor any similar method of imputation may be used to enable scoring of non-participating hospitals.

The district court's injunction bars Leapfrog from applying its methodology, or any similar one, to the five Plaintiff Hospitals. *Amici* take no position with respect to those five hospitals' quality. But the district court's judgment will have—indeed, is already having—serious consequences for transparency, public policy, and, ultimately, healthcare quality. It is not an exaggeration to say that, were the injunction allowed to stand, it would be a serious blow to our country's healthcare system. Hospitals that today voluntarily report their data would have little reason to continue doing so, and the growing transparency that has driven patient choice, patient safety, network design, and hospital quality for the last two decades would begin to unravel.

First, measurement of hospital safety by an independent accrediting body is not a peripheral service. Peer-reviewed literature demonstrates that risk-adjusted mortality varies by a factor of nearly two between the best- and worst-performing U.S. hospitals—even within the same market. And public reporting of the type Leapfrog provides affects those results: National quality measurement efforts such as those Leapfrog has created have been credited with averting well over a hundred thousand deaths the past decade, and a meta-analysis of the broader literature links

public quality reporting like Leapfrog's with a statistically significant reduction in mortality risk. That is: Leapfrog's work saves lives. And there is no meaningful alternative. The federal government has tried to supply quality information through the Centers for Medicare and Medicaid Services' ("CMS") Star Ratings program, but, as explained below, that effort has fallen short and even CMS and affiliate agencies often rely on Leapfrog as a quality assessor. Leapfrog has filled that gap at a scale no comparable hospital-safety rater approaches, rating more than 2,400 hospitals—over 80% of the nation's inpatient beds—under a methodology that researchers and scholars trust, purchasers of healthcare rely on, patients use to inform their choice, and the government's own patient-safety network endorses. Leapfrog reports its ratings as a single letter grade—A through F—so that a patient with no background in statistics can understand what the grade means and choose the hospital that's right for their needs. The district court's judgment threatens the viability of an important tool that saves lives and improves quality of care for millions of Americans.

Second, the injunction below does not merely affect Leapfrog's treatment of five hospitals. It effectively forecloses Leapfrog's use of statistical imputation, treating that as if it were a factual misrepresentation rather than an industry-standard method used to address missing data. The downstream consequences of the injunction are staggering—and not speculative. Since it's been in effect, Leapfrog

has stopped grading more than 450 hospitals nationwide, including (and primarily) in states with no connection to this case, out of "an abundance of caution." (Dkt. 215 ¶¶ 8-9, 20). Insurers who paid for Leapfrog's data must now worry about their own future liability for relying on a trusted quality metric that one district court judge has deemed deceptive. *Amici* CalPERS and Purchasers Business Group on Health ("PBGH")—a nonprofit coalition of nearly forty private employers and public entities that collectively spend $350 billion annually purchasing health care on behalf of more than 21 million Americans—may lose a tool it has used to identify hospitals charging its members above-average prices for below-average safety.

These consequences are the injunction's predictable chilling effects, and they represent a significant step backward in the decades-long fight to increase transparency and accountability in health care. Since 2000, the United States has invested heavily in public reporting of hospital performance so that patients can make informed choices about their care. This injunction will allow the plaintiff hospitals to escape public scrutiny simply by declining to report their data, and will invite other hospitals to follow suit. Patients, in turn, would be propelled back to the opacity that defined our healthcare system two decades ago.

Third, the injunction not only threatens healthcare reporting—it also calls into question the legality of rating services throughout the economy. Independent organizations that rate businesses' quality—whether it's Leapfrog, Yelp, or the

Better Business Bureau—must rely on data not only from consumer surveys but also from the businesses that are being evaluated. Yet the district court's injunction threatens to treat every independent evaluator's independent methodology for calculating grades as a potential factual misrepresentation. Both in healthcare and beyond, the injunction, if left undisturbed, will frustrate the dissemination of true and accurate information about businesses across the economy.

*Amici* respectfully submit that the injunction below should be vacated.

## ARGUMENT

## I. LEAPFROG PROVIDES A UNIQUE, RIGOROUS, AND WIDELY RELIED-UPON PUBLIC BENEFIT

### A. Hospital quality varies widely, and poor quality has fatal consequences

In 1999, the Institute of Medicine reported that between 44,000 and 98,000 Americans die each year due to preventable medical errors in hospitals. At the time, this toll exceeded annual deaths from motor vehicle accidents, breast cancer, or AIDS.[2] Subsequent estimates placed the number higher.[3] A 2016 study found that patients treated at the worst-performing American hospitals were three times more

[2] Institute of Medicine, *To Err Is Human: Building a Safer Health System* (Kohn, Corrigan & Donaldson eds., 1999). https://perma.cc/BF28-LD5S.

[3] Johns Hopkins Medicine, *Study Suggests Medical Errors Now Third Leading Cause of Death in the U.S.*, Johns Hopkins Hub (May 3, 2016), https://perma.cc/R42J-DPXQ.

likely to die, and thirteen times more likely to suffer medical complications, than patients treated at the best-performing hospitals.[4] Reports like these establish two relevant facts. First, a meaningful share of patient harm in American hospitals is preventable, not an unavoidable risk of receiving care. Second, harm traces to the conduct and competence of the specific hospital providing care, not entirely to how sick the patient was to begin with. And from these facts two consequences follow: Hospitals can reduce this harm, because it is partially a function of their conduct rather than an unavoidable feature of illness itself; and differences between hospitals can be meaningfully measured and reported because hospital error traces back to identifiable differences in hospital practices.

Three bodies of more recent evidence bear this out. First, hospital quality varies from one institution to the next, even after accounting for how sick patients are to begin with. A study of inpatient surgical outcomes found that risk-adjusted mortality varied by nearly a factor of two across hospitals: from 3.5% at the best-performing hospitals to 6.9% at the worst.[5] That gap was not explained by differences in how often complications occurred; complication rates were nearly

---

[4] Reed Abelson, *Go to the Wrong Hospital and You're 3 Times More Likely to Die*, N.Y. Times (Dec. 14, 2016), https://perma.cc/7JXZ-9GQV.

[5] Amir A. Ghaferi *et al.*, *Variation in Hospital Mortality Associated with Inpatient Surgery*, 361 N. Engl. J. Med. 1368 (2009), https://perma.cc/GMV7-CLMC.

identical between high- and low-mortality hospitals.[6] What differed was what happened post-complication—*i.e.*, whether the hospital recognized and responded to a complication before it became fatal—a phenomenon researchers call "failure to rescue."[7] Put simply: two patients with the same diagnosis, undergoing the same procedure, face measurably different odds of survival depending on which hospital treats them, for reasons having little to do with how sick the patients were to begin with.

Second, hospital safety improves with sustained measurement and accountability. Between 2010 and 2015, the national rate of hospital-acquired conditions declined by 21%, sparing patients an estimated 3.1 million adverse events; the Agency for Healthcare Research and Quality ("AHRQ") attributes to that decline 125,000 fewer patient deaths relative to what would have occurred had the 2010 error rate held steady, and approximately $28.2 billion in healthcare cost savings.[8] That progress continued in the years that followed: a subsequent AHRQ report, using an updated baseline for the 2014–2017 period, found a further 13% decline in hospital-acquired conditions, sparing patients 910,000 additional adverse

[6] *Id.*

[7] *Id.*

[8] AHRQ, *National Scorecard on Rates of Hospital-Acquired Conditions 2010 to 2015* (Dec. 2016), https://perma.cc/7ELP-BCFX.

events, averting an estimated 20,700 deaths, and saving approximately $7.7 billion.[9] AHRQ identifies public reporting of hospital-level results as a likely contributing cause of this improvement, alongside payment incentives and technical assistance to hospitals.[10]

Third, while AHRQ research identifies public reporting as a factor in hospital safety, independent research has proven such reporting to be a *key* factor. A meta-analysis of studies examining public reporting's effect on clinical outcomes pooled mortality data across ten studies encompassing more than five million patient events and found that public reporting was associated with a statistically significant 15% relative reduction in mortality risk.[11] A more recent review of the literature reached the same conclusion qualitatively, finding that the weight of the evidence supports a role for public reporting in stimulating quality improvement, informing consumer choice, and improving the clinical outcomes patients ultimately experience.[12]

---

[9] AHRQ, *National Scorecard on Hospital-Acquired Conditions: Final Results for 2014 Through 2017* (Jan. 2019), https://perma.cc/G98U-Q2J4.

[10] AHRQ, *National Scorecard on Rates of Hospital-Acquired Conditions 2010 to 2015* (Dec. 2016), https://perma.cc/7ELP-BCFX.

[11] Paolo Campanella *et al.*, *The Impact of Public Reporting on Clinical Outcomes: A Systematic Review and Meta-Analysis*, 16 BMC Health Servs. Res. 296 (2016), https://perma.cc/5Q9E-K3Y8.

[12] Khic-Houy Prang *et al.*, *Mechanisms and Impact of Public Reporting on Physicians' and Hospitals' Performance: A Systematic Review (2000–2020)*, https://perma.cc/SB5B-SE72.

These findings describe the real-world stakes that *amici* urge the Court to consider in adjudicating the legal questions before it. Hospital safety is neither uniform across institutions nor fixed over time, and its improvement depends on the kind of independent and public reporting that Leapfrog performs better than any other organization. Said differently: empirically, transparency saves lives, and the injunction below threatens it.

### B. Reliable hospital quality data is scarce, and Leapfrog fills that gap

Because public reporting of hospital safety information saves lives, it stands to reason that the nonreporting of that information threatens patient safety. And few entities exist that have the incentive and capacity to meticulously perform that service. Hospitals have insufficient incentive to do so—especially when an honest rating would cut against their own interests—which is why the market currently does not readily supply transparent, easy-to-understand hospital safety information. That the federal government has undertaken this work, through CMS's Overall Hospital Quality Star Ratings, is itself evidence of reporting's importance.[13]

But CMS's experience shows how difficult this work is to perform reliably. Its methodology drew sustained criticism for failing to account for differences in

[13] *CMS Releases Controversial Overall Star Ratings on Hospital Quality*, Healthcare Finance News (July 27, 2016), https://perma.cc/QN5J-D9DQ.

patient population and hospital complexity,[14] and CMS twice overhauled its methodology in response: first through a comprehensive review completed in 2021,[15] and again in 2025, to address hospitals receiving favorable ratings despite weak patient-safety performance.[16] CMS also confronts the identical problem at the heart of this case: hospitals that decline to participate. In the government's most recent ratings, roughly one in four hospitals went unrated altogether, in significant part because they declined to supply sufficient data.[17] In a world in which patients face up to twice the risk of death in certain circumstances based on which hospital treats them for the same procedure,[18] patients' lives are placed at risk when such underlying disparities go unmeasured and unreported by independent raters.

Private rating organizations exist for the same reason government measurement does, but these raters are able to operate outside the procedural,

---

[14] Susan Xu & Atul Grover, *CMS' Hospital Quality Star Ratings Fail To Pass The Common Sense Test*, Health Affairs Forefront (Nov. 14, 2016),https://perma.cc/6DLL-N2FJ; *CMS Overall Star Ratings 'Will Do More Harm Than Good to Patients,' 2 Experts Say*, Becker's Hospital Review (Nov. 15, 2016), https://perma.cc/KSS8-MBPR.

[15] *CMS Releases Hospital Quality Star Ratings*, Healthcare Finance News (Apr. 2021), https://perma.cc/YT6S-KRFC.

[16] Centers for Medicare & Medicaid Services, *Calendar Year 2026 Hospital Outpatient Prospective Payment System and Ambulatory Surgical Center Final Rule*, Fact Sheet (Nov. 21, 2025), https://perma.cc/2LQ7-7LGN.

[17] *CMS Hospital Ratings Show Performance Decline in 2024*, Periop Leader Network (2024), https://perma.cc/2YK9-CB92.

[18] *See* Ghaferi *et al.*, *supra* n.5.

bureaucratic, and often political constraints that have to date hindered the government's efforts.

### C. Leapfrog does this at a scale that no other entity matches

Leapfrog was founded in 2000, by large employers and other purchasers of health care, in response to what its founders identified as severe dysfunction in the health care marketplace: a shortage, on the buyer's side, of the kind of reliable quality information that consumers of nearly every other product or service take for granted.[19] Since its founding, Leapfrog has grown into the largest independent, safety-specific hospital rating system in the country. In 2026, Leapfrog published ratings for more than 6,000 hospitals and ambulatory surgery centers nationwide, including more than 2,400 hospitals representing over 80% of all inpatient beds in the United States—the highest level of participation in the organization's history.[20]

CMS's Star Ratings program technically covers a larger universe of hospitals, since hospital participation in Medicare is close to universal; but as discussed above, that broader coverage has not translated into a rating consumers, employers, or researchers can reliably use to compare hospital safety. Other well-known private ratings serve a different purpose. The popular U.S. News & World Report's Best

[19] Dkt. 212 (District Court Injunction) at 3 (quoting Dkt. 135 ¶¶ 35–36).

[20] *The Leapfrog Group Publishes Ratings for An All-Time Record Number of U.S. Hospitals and Ambulatory Surgery Centers*, Leapfrog Group (July 27, 2026), https://perma.cc/TK2H-NJAD.

Hospitals rankings, for instance, are built to identify centers of excellence for complex specialty care, based on a mix of clinical outcomes and expert opinion in its fourteen specialty area of care rankings.[21] But neither CMS nor U.S. News does what Leapfrog does: rate the broader universe of general acute care hospitals specifically on patient safety and preventable patient harm. On those two vital safety metrics, Leapfrog's scale and reliability is unmatched.

Leapfrog's Hospital Safety Grade considers up to thirty-one separate patient safety measures, developed and refined in consultation with researchers at Johns Hopkins Medicine and an internal panel of safety experts.[22] Before any methodology change takes effect, Leapfrog publishes the proposed change months in advance and solicits public comment—a practice that has generated substantial feedback from hospitals and the public alike, which Leapfrog has used to revise its approach.[23] The underlying survey data is subject to its own verification process, and both the survey and the resulting ratings are provided to the public free of charge.[24]

Leapfrog's role in this landscape is well-recognized. AHRQ, a division of the Department of Health and Human Services, includes Leapfrog's Hospital Safety

---

[21] *FAQ: How and Why We Rank and Rate Hospitals*, U.S. News & World Report (last visited Sept. 9, 2026), https://perma.cc/HZM4-GVDT.

[22] Dkt. 39 (Def.'s Mot. to Dismiss) at 6–7.

[23] *Id*. at 7–8 (citing Fall 2024 Methodology Updates, Ex. 38).

[24] *Id.* at 5–6.

Grade—the product declared by the district court to violate state law—among the resources catalogued in its Patient Safety Network, the federal government's clearinghouse of patient safety information and tools.[25]

### D. The public relies on Leapfrog

Reliance on Leapfrog's ratings spans healthcare research, purchasing, and policy. Each is worth examining in turn.

#### *1. Academics rely on Leapfrog's data as an important research measure*

Empirical research on hospital safety depends on having a measure that is consistent across institutions, comparable over time, and available to researchers who need to use it. For scores of important papers, Leapfrog's Hospital Safety Grade is that measure. In a 2022 study published in JAMA Network Open—the American Medical Association's peer-reviewed journal—researchers used Leapfrog's grades to evaluate whether hospitals led by physician chief executives perform differently than those led by non-physician executives (they don't).[26] A separate peer-reviewed study of 1,026 U.S. hospitals used Leapfrog's Safety Grades and underlying safety scores to test whether a hospital's electronic health record maturity predicts patient

[25] Agency for Healthcare Research and Quality, Patient Safety Network, *Hospital Safety Grade*, https://perma.cc/3KHS-WJB2.

[26] Helen See *et al.*, *Comparison of Quality Measures From US Hospitals With Physician vs Nonphysician Chief Executive Officers*, 5 JAMA Network Open e2236621 (2022), https://perma.cc/R5F5-GHPY.

safety performance (it does).[27] A third applied the same measure to 172 academic and university-affiliated hospitals, examining whether a hospital CEO's educational background is positively associated with safety outcomes (it isn't).[28]

These studies were conducted by different researchers, published in different journals, and asked different questions—but each one needed the same thing: a trusted hospital safety measure that is both reliable and standardized enough to serve as a dependent variable for the full set of hospitals examined. The relationship between quality and price in healthcare is one of the most vexing problems in healthcare economics, and for decades, Leapfrog's singularly reliable quality rating system has been a cornerstone of this important research that *amici* and others have relied upon.

### *2. Business and purchaser groups rely on Leapfrog*

Employers and health plans spend enormous sums on hospital care without an inherent ability to tell whether that spending pays for safe medical care. *Amicus* PBGH—whose members collectively spend $350 billion annually on health care for more than 21 million Americans—and CalPERS (a PBGH member that itself spends

---

[27] Anne Snowdon *et al.*, *Digital Maturity as a Predictor of Quality and Safety Outcomes in US Hospitals: Cross-Sectional Observational Study*, J. of Med. Internet Res. (2024), https://perma.cc/HJY3-WPQV.

[28] Daniel I. Razick *et al.*, *Does the Chief Executive Officer's Educational Background Have an Impact on the Academic Hospital Leapfrog Safety Grades?*, Cureus (2024), https://perma.cc/XTK4-V6QZ.

$13.9 billion last year on its members' health care) have used Leapfrog to try to change that.[29] In a 2025 analysis, PBGH used Leapfrog Safety Grades to examine whether higher prices actually correspond to higher safety, and found they frequently do not: the hospital with the highest Leapfrog grade in one of its studied markets, EvergreenHealth Medical Center, also had the lowest negotiated rates among its peers, while hospitals with lower safety scores commanded higher prices from the same payers.[30] Without Leapfrog's independent, standardized safety measure, PBGH's members and other purchasers would have no way to know whether they were paying a premium for quality or simply paying a premium.

This is not one coalition's isolated use case. The record in this litigation confirms how deeply hospital safety data, and Leapfrog's services specifically, are embedded in purchasing and coverage decisions across the industry. Insurers license Leapfrog's data under contracts ranging from $7,500 to $252,607 each—signifying longstanding commercial commitments that reflect the data's value.[31] These insurers pay because it makes business sense: performance differs from one hospital to the next; patients and the entities paying for their care deserve to know which hospitals

---

[29] *PBGH Unveils Breakthrough Data Demonstration Project*, Pacific Business Group on Health, https://perma.cc/XA2J-U6CU.

[30] *Leveraging Health Care Price Transparency* at 23, Purchasers Business Group on Health (Oct. 2025), https://perma.cc/KAB6-94GC.

[31] Dkt. 212 at 35.

fall on which side of that difference; and trustworthy, neutral evaluation is the best way to verify that quality.

### *3. Policymakers and regulators rely on Leapfrog*

Government bodies that fund hospitals, oversee and approve mergers, and set national health policy need an independent measure of hospital safety and have converged on Leapfrog as the most trusted non-governmental rater. For instance, New York's Vital Access Provider Assurance Program directs the Department of Health to weigh an applicant's Leapfrog Grade (alongside its CMS Star Rating) before extending discretionary financial assistance to a hospital in distress.[32] New Jersey drew the same line when former Governor Phil Murphy installed an independent monitor at University Hospital in Newark: his executive order cited the hospital's Leapfrog grade, alongside a four-notch bond downgrade and an unauthorized cut to pediatric beds, as among the factors that justified intervention.[33]

Regulators also rely on Leapfrog grades when a hospital's claims about its own quality are in dispute. In its formal market impact review of the proposed Partners HealthCare–Massachusetts Eye and Ear acquisition, Massachusetts's

---

[32] N.Y. State Dep't of Health, *Vital Access Provider Assurance Program (VAPAP)*, https://perma.cc/8QRP-ACMC (last visited Sept. 15, 2026).

[33] Press Release, N.J. Dep't of Health, *Governor Murphy Signs Executive Order Authorizing Monitor for University Hospital* (July 27, 2018), https://perma.cc/6NZC-MA9E.

Health Policy Commission weighed the hospitals' Leapfrog ratings as part of its own quality analysis.[34] Courts, too, rely on Leapfrog when assessing the quality arguments made by hospitals seeking to undergo a merger or engage in various contracting practices.[35]

This reliance is also part of our federal regulatory framework. The FTC's standing reporting specifications for health systems under a Certificate of Public Advantage require submission of data exchanged with Leapfrog alongside CMS, CDC, AHRQ, and Joint Commission information—placing Leapfrog in the same category as the government's own agencies.[36] And for well over a decade, CMS has built policy on Leapfrog's data: when proposing to expand Medicare's hospital-acquired-condition payment provisions, CMS cited a Leapfrog Hospital Survey

---

[34] Mass. Health Policy Comm'n, *Review of Partners HealthCare System's Proposed Acquisition of Massachusetts Eye and Ear Infirmary, Massachusetts Eye and Ear Associates, and Affiliates* at 29-30, https://perma.cc/R2BW-P84A (last visited Sept. 15, 2026).

[35] *See, e.g.*, *FTC v. Cmty. Health Sys., Inc.*, 736 F. Supp. 3d 335, 358 (W.D.N.C. 2024) (relying on Leapfrog data to adjudicate competing expert claims regarding proposed transaction's impact on hospital quality); *In re Mission Health Antitrust Litig.*, No. 22-cv-00114, 2024 WL 759308, at *6 (W.D.N.C. Feb. 21, 2024) (citing Leapfrog as support for plaintiffs' claim that alleged contractual restraint reduced hospital quality).

[36] FTC, *Specifications for the Special Report to Be Filed by Health Systems Party to a Certificate of Public Advantage*, https://perma.cc/WYH6-3T2M (last visited Sept. 15, 2026).

finding that 87% of surveyed hospitals were not following recommended practices for preventing common hospital-acquired conditions.[37]

Funding decisions, gubernatorial intervention, merger enforcement, market oversight, and national payment policy have all turned on the same suite of Leapfrog grades now existentially threatened by the judgment below.

## II. THE INJUNCTION THREATENS LEAPFROG'S ABILITY TO PROVIDE ITS IMPORTANT PUBLIC BENEFIT

### A. The district court's injunction treats Leapfrog's use of statistical imputation as if it were a misrepresentation

While *amici* do not share the district court's view that Leapfrog's 2024 scoring change for non-reporting hospitals was deceptive under Florida law, they are far more concerned by the remedy: an injunction that reaches far beyond even the imputation that the district court found unlawful. The district court itself recognized that "imputation may be a sound methodology as a general matter."[38] Indeed, the Supreme Court has recognized the same distinction, holding that filling in a missing value for an identified unit using information about similar units is a fundamentally different (and permissible) exercise than extrapolating a sample's characteristics

[37] Press Release, CMS, *CMS Proposes to Expand Quality Program for Hospital Inpatient Services (FY 2009)*, https://perma.cc/YGU8-AT48 (last visited Sept. 15, 2026).

[38] Dkt. 212 at 28.

onto an unobserved population.[39] And even where a reviewing body does find a genuine defect in how a party deployed a statistical methodology, the remedy is ordinarily targeted to that defect, not a bar on the methodology itself. Yet the injunction below bars Leapfrog from assigning "assumed or imputed values" under "the current methodology or any similar methodology."[40] This language is untethered to Leapfrog's specific use of imputation, and broad enough to reach any reasonable statistical treatment of missing data, by Leapfrog or others.

As explained in Leapfrog's opening brief, this has already jeopardized Leapfrog's ability to carry out its public mission. *See* Leapfrog Opening Br., ECF 25 at 14-16 (describing measures Leapfrog had to take after the injunction's issuance to avoid potential contempt sanctions). Separate from Leapfrog's First Amendment interests in publishing truthful, accurate, and useful information to the public, as a practical matter the district court's injunction has already begun to threaten the functionality of one of the most important empirical tools used by stakeholders to assess—and improve—hospital safety and quality.

---

[39] *See Utah v. Evans*, 536 U.S. 452, 471-78 (2002).

[40] Dkt. 212 at 40.

### B. The district court's order jeopardizes Leapfrog's ability to keep operating

Since the district court entered judgment in the five hospital-plaintiffs' favor, Leapfrog has stopped grading 450 hospitals nationwide.[41] Many of these hospitals operate in states with no connection to this lawsuit, but Leapfrog's choice to stop grading them is unsurprising in light of the chilling effect of the injunction's sweeping language. (Dkt. 212 at 40). A declaration from Leapfrog's President and Chief Executive Officer, Leah Binder, explained that this decision to go above and beyond what the injunction technically required (treating just the named plaintiffs differently) was made out of "an abundance of caution" and to ensure fair treatment between the plaintiff hospitals and other nonparticipating hospitals. (Dkt. 215 ¶¶ 8-9, 20). The practical result is a loss to the public: For at least 450 hospitals—of the 2,400 Leapfrog used to evaluate—purchasers, researchers, and policymakers in those markets are deprived of a key metric they had previously used in their analyses and decision making. *See supra* Section I.D.

It bears repeating that, as discussed above, risk-adjusted surgical mortality varies nearly twofold between the best- and worst-performing hospitals in the country. Leapfrog may no longer distinguish any of these 450 hospitals from one at either end of that range. A patient, employer, or researcher checking Leapfrog's

---

[41] *Frequently Asked Questions About the Leapfrog Hospital Safety Grade*, Leapfrog, https://perma.cc/L4XL-MCX3.

website before this litigation would have seen a grade that would grant them important, and potentially lifesaving, information. Today, for at least 450 hospitals, they would find nothing.

And that number is only likely to grow. Be it through risk-adjusted exclusion on Leapfrog's part or through nonparticipation by hospitals, the number of unrated hospitals will likely increase. Every hospital deciding whether to submit next year's Leapfrog Survey will have seen what happened to the ones that did not. Per the district court's injunction, a poor-performing hospital gains nothing by reporting and loses nothing by declining to report—but by declining to report, it will gain an important benefit: invisibility. A high-performing hospital has, per the injunction, a diminished incentive to publicize its high performance against a shrinking class of competitor hospitals.

The remaining terms of the injunction compound the damage. Within five business days, Leapfrog was required to remove the challenged grades from its website entirely.[42] Within thirty days, it had to send corrective disclosures to every entity that paid to license those grades, stating that they were "found to be deceptive and unfair," and within forty-five days it had to file a declaration documenting its

---

[42] Dkt. 212 at 41.

compliance.[43] The same disclosure must appear in Leapfrog's future contracts and advertising.[44]

That disclosure requirement also reaches customers who are not litigants and never agreed to lose key access—the insurers, researchers, and purchaser coalitions described above. *See supra* Section I.D. The injunction may require Leapfrog to write to each of these institutions and tell them that what they paid for or relied upon was deceptive.

### C. If Leapfrog cannot continue rating hospital safety, nothing replaces it

The 450 hospitals that Leapfrog has stopped grading have not vanished from every rating system. They likely still appear on CMS's Star Ratings, and possibly on Healthgrades for the procedures it covers. But what's lost is a comprehensive, verified, safety grade that all patients can easily understand (part of Leapfrog's appeal is the simplicity of its straightforward A through F rating system), and that is updated twice yearly, built on a methodology developed with outside academic consultation over 26 years without industry interference. No other entity operates at Leapfrog's scale and with this level of accessibility.

[43] *Id.*

[44] *Id.*

As noted, CMS's Star Ratings program has spent nearly a decade in continuous revision; still leaves roughly a quarter of hospitals unrated; and is undergoing yet another overhaul begun in 2025 to address hospitals receiving favorable ratings despite weak safety performance. Healthgrades draws solely from the same CMS data, for thirty-three specific procedures, not the comprehensive analysis of hundreds of procedures Leapfrog compiles. Consumer Reports comes closest, but its ratings are available only to paying subscribers.

The gap reaches beyond patients searching for a hospital. *Amicus* PBGH loses the price-versus-safety comparison described above. *See supra* Section I.D.2. Researchers who built studies on Leapfrog's grades as a consistent measure lose that consistency for every hospital that drops out, and insurers paying for Leapfrog's data lose the ability to evaluate those hospitals at all.

Leapfrog rates more than 2,400 hospitals—over 80% of the nation's inpatient beds—under one methodology, twice a year, and publishes its top-line results to the public for free. No other rating organization has the capacity to do this at that scale. If the lower court's injunction is allowed to stand, it is unlikely that this important work will be picked up by another organization, leaving patients, researchers, and the public less safe.

## III. THE COURT'S REASONING IS NOT LIMITED TO LEAPFROG, AND OTHER RATERS WILL RESPOND TO IT

### A. Other raters perform the same public function through the same practice

Every rating system built to inform the public about entities that can choose whether to participate faces the same choice Leapfrog does: rate the nonparticipating subject anyway or allow the subject to exist in a black box. Most choose to rate anyway, and courts and regulators have long accepted that choice as legitimate.

The Better Business Bureau assigns letter grades to businesses that never asked to be rated, based on complaint volume, public records, and whatever information the BBB can gather without the business's operation. Businesses have sued over unfavorable BBB grades for decades, and courts have consistently held that a rating built on a disclosed methodology is protected opinion, not an actionable claim of fact.[45] Credit rating agencies have done the same with debt issuers since 1909: Moody's and S&P routinely rate bonds the issuer never asked them to rate, using only public information, because the alternative, *i.e.*, declining to rate anyone who will not cooperate, would let the riskiest issuers opt out of scrutiny entirely.

---

[45] *See, e.g.*, *Home Performance Alliance v. Better Bus. Bureau of W. Fla.*, 354 So.3d 1165 (Fla. Dist. Ct. App. 2023); *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234 (Mo. Ct. App. 2011); *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345 (Tex. Ct. App. 2013).

When a Colorado school district sued Moody's in 1995 over an unsolicited downgrade that cost it money in the bond market, the claim was dismissed on the same ground: a disclosed, methodology-based rating is opinion, however much it costs the subject.[46] YouTubers and vloggers dedicate thousands of hours each year to grading consumer products of all types, without manufacturer input, specifically so its ratings cannot be shaped by the cooperation of the companies it reviews. None of these organizations or burgeoning ratings industries—formal or informal—would exist if their continued operation was conditioned on staying in the good graces of the entities they rate; or if continuing to issue ratings was likely to become an existential threat by inviting litigation from entities that receive subpar ratings.

### B. The district court's reasoning will predictably harm consumers on a wider scale

If affirmed, the district court's decision will engender more litigation against disinterested ratings organizations. Every organization that rates a subject who can decline to cooperate—the Better Business Bureau, US News and World Reports, Moody's and S&P, and every organization or individual like them—would then operate under a governing rule that treats this kind of judgment as deception—not industry-standard imputation, and not protected First Amendment speech. None of them would need to be sued to feel the weight of such a rule—as the ongoing fees

---

[46] *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Invs. Servs., Inc.*, 175 F.3d 848 (10th Cir. 1999).

and contempt proceeding below demonstrate, raters that do not toe the line could be subject to ruinous litigation costs.[47]

And yet we need not wait to see or guess how raters will respond on a wider scale. The rational legal response to such a holding is the one Leapfrog has already made for 450 hospitals: stop rating subjects that create financial exposure, and stop exercising the free, transparent judgment the lower court considered to be deception. The rated organization is protected, and the public is left unserved—they lose not only the health safety rating, but, down the pike too, the BBB grade, Consumer Reports' reviews, the bond rating, and the product tests as soon as these entities must face a lawsuit like this one by a rated organization unhappy with the independent evaluators' assessment.

## IV. THE INJUNCTION SHOULD BE VACATED

The harm here is neither hypothetical nor limited. 450 hospitals, treating hundreds of thousands of patients, are now ungraded by Leapfrog. Insurers who paid for Leapfrog's data have been told it was deceptive. Researchers who relied on Leapfrog for scholarship must also reckon with this new "deceptive" label, which may touch on the credibility of their work. *Amici* purchasers like CalPERS, PBGH, and National Alliance of Healthcare Purchaser Coalitions, whose members spend

[47] *See* Leapfrog Opening Br., ECF 25, at 14-16; *see also* Danielle Ferguson, *Fla. Hospitals Seek $10.5M In Fees In Safety Rating Fight*, Law360 (May 18, 2026), https://perma.cc/TD29-MU4B.

billions on healthcare, may lose a credible tool used to hold hospitals accountable for charging above-average prices for below-average safety. Every one of these losses traces to a single feature of the remedy: an injunction written broadly enough to bar the statistical treatment of missing data. If affirmed, the district court's judgment will likely be extrapolated to touch all organizations that rate a subject in this Circuit.

Vacating the injunction would restore Leapfrog's ability to do the work described in Sections I and II of this brief—measuring hospital safety, at scale, in a way no other entity currently does, and in a way that saves lives and encourages improvements in quality—and would prevent the cascading effects that Section III of this brief shows will otherwise reach far beyond this case.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court vacate the injunction entered below.

Dated: September 17, 2026

Respectfully submitted,

*/s/ Michael Lieberman*

Jamie Crooks
Michael Lieberman
Yinka Onayemi
FAIRMARK PARTNERS, LLP
400 7th Street, NW, Ste. 304
Washington, D.C. 20004

(619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com
yinka@fairmarklaw.com

*Counsel for* Amici Curiae *CalPERS, Health Care Purchaser Groups, Former Policy Officials, and Health Policy Scholars*

# APPENDIX A

## LIST OF *AMICI CURIAE*

### Organizational *Amici Curiae*

**The Better Healthcare Policy Group**

The Better Healthcare Policy Group ("BHCPG") consists of distinguished senior healthcare executives, researchers and economists who share a common interest in adapting Medicare Advantage to meet the needs of Americans under age 65.

**California Public Employees' Retirement System**

The California Public Employees' Retirement System ("CalPERS") is the largest public employer purchaser of health benefits in California and the second largest employer purchaser in the nation after the federal government—managing roughly $550 billion in assets. In 2025, CalPERS spent over $13.9 billion to purchase health benefits for active and retired members and their families.

**Catalyst for Payment Reform**

Catalyst for Payment Reform ("CPR") is an independent, nonprofit corporation with the mission to catalyze employers, public purchasers, policy makers, and others to implement strategies that produce affordable, high quality health care and improve the functioning of the health care marketplace.

**Families USA**

Families USA is a national, non-partisan advocate for health care consumers, is dedicated to uplifting the voice of patients and the public to impact and improve our health and health system, toward the goal of achieving high-quality, affordable health care and improved health for all. The organization engages in public policy analysis that is rooted in decades-long Hill and administration experience, movement-building organizing and advocacy, uplifting patient voices and stories with communications and issues campaigns, and convening coalitions and ongoing collaboration with state and national partners.

**Massachusetts Group Insurance Commission**

The Massachusetts Group Insurance Commission ("GIC") administers health and other insurance benefits for 475,000 employees, retirees, and dependents of the state and participating local public entities.

**National Alliance of Healthcare Purchaser Coalitions**

For more than 30 years, the National Alliance of Healthcare Purchaser Coalitions ("NAHPC") has brought together business coalitions and their employer and purchaser members to drive high-quality healthcare that enhances patient experience, promotes health equity, and improves outcomes while lowering costs. Its members represent public and private sectors, nonprofits, and labor unions that provide health benefits to over 90 million Americans—more than half of the employer-sponsored insurance market—spending over $850 billion annually. Working with and through purchaser coalitions, we help employers and purchasers deliver affordable, high-quality, equitable healthcare for employees and their families. The National Alliance and its member coalitions do this by driving transparent, fair, and competitive markets; effective purchasing; and meaningful policy changes at federal, state, and local levels.

**National Partnership for Women & Families**

The National Partnership for Women & Families (NPWF) is a nonprofit, nonpartisan advocacy group that has over 55 years of experience in combating barriers to equity and opportunity for women. The National Partnership works for a just and equitable society in which all women and families can live with dignity, respect, and security; every person has the opportunity to achieve their potential; and no person is held back by discrimination or bias. NPWF advocates for health care quality reporting and transparency to inform patient choice and provider payment for better outcomes, patient experience, equity, and affordability.

**Purchasers Business Group on Health**

Purchasers Business Group on Health ("PBGH") is a nonprofit coalition representing nearly 40 private employers and public entities across the U.S. that collectively spend $350 billion annually purchasing health care services for more than 21 million Americans and their families. For over three decades,

PBGH has incubated and scaled operational programs that lower health care costs and increase quality nationwide.

**Right Doctor, LLC**

Right Doctor, LLC, is a company dedicated to connecting patients with complex medical illnesses to top-tier specialists and recognized centers of medical excellence. To serve this mission, Right Doctor uses public transparency of quality metrics for hospitals, health systems, and doctors to identify providers with the best outcomes.

**UNITE HERE HEALTH**

UNITE HERE HEALTH is a Taft-Hartley health fund covering approximately 225,000 hospitality workers and their dependents.

**Individual *Amici Curiae****

* *Note*: Organizational affiliations are listed for informational purposes only; the views expressed in the accompanying brief do not necessarily reflect the view of *amici*'s institutions.

**Donald M. Berwick, MD**

Former Administrator, Centers for Medicare & Medicaid Services; Former President & CEO, Institute for Healthcare Improvement

**Michael F. Cannon**

Director of Health Policy Studies, Cato Institute

**Carolyn Clancy, MD**

Former Director, Agency for Healthcare Research and Quality

**Molly Joel Coye, MD, MPH**

Former Commissioner of Health, State of New Jersey; Former Director, California State Department of Health Services; Chief Innovation Officer, UCLA Health

**Mark Fendrick**

Professor, Division of General Medicine, Department of Internal Medicine, and Professor, Health Management and Policy, University of Michigan; Director, University of Michigan Center for Value-Based Insurance Design; Elected Member, National Academy of Medicine

**Boyce Ginieczki**

President, Article One Consulting; Former Director of Congressional Affairs, Agency for Healthcare Research and Quality ("AHRQ")

**Jenny Goins**

Interim CEO, National Alliance of Healthcare Purchaser Coalitions

**Roberta Herman, MD**

Fellow, Harvard Advanced Leadership Initiative ("ALI"); Former President/CEO, Joslin Diabetes Center; Former Executive Director, Massachusetts Group Insurance Commission ("GIC"); Former Chief Medical Officer, Harvard Pilgrim Health Care

**Carmen Hooker Odom**

Former Secretary of Health and Human Services, North Carolina; Former Representative, Massachusetts House of Representatives; Former Group Vice President, Carolinas Health System (now Atrium Health); Former President, Milbank Memorial Fund

**Robert M. Kaplan**

Senior Scholar, Clinical Excellence Research Center, Stanford University; Former Chief Science Officer, Agency for Healthcare Research and Quality; Former NIH Associate Director for Behavioral and Social Science Research

**Margaret Laws**

Executive in Residence and Former CEO, Hopelab

**Peter V. Lee, JD**

Senior Scholar, Clinical Excellence Research Center, Stanford University; Co-Chair, Commonwealth Task Force on the Future Role of Employers in the U.S. Health Care System; Founding CEO, Covered California; Former

Director of Delivery System Reform, U.S. Department of Health and Human Services; Former CEO, Purchaser Business Group on Health

**Peggy O'Kane**

Founder and Former President and CEO, National Committee for Quality Assurance

**Mary Pittman**

Former President & CEO, Public Health Institute

**Barak Richman**

Barak Richman is the Alexander Hamilton Professor of Business Law and Co-Director of the Health Law Program at the George Washington University Law School and a Senior Scholar at the Clinical Excellence Research Center (CERC) at the Stanford University School of Medicine. He also previously served as Special Counsel for Competition Policy to the U.S. Department of Health and Human Services

**Dana Gelb Safran, ScD**

Founder & Managing Principal, Care Transformation Partners, LLC; Former President & CEO, National Quality Forum; Former Chief Performance Measurement & Improvement Officer, Blue Cross Blue Shield of Massachusetts; Former Head of Measurement, Haven (joint venture of Amazon, JPMorgan Chase & Berkshire Hathaway to transform health care)

**Richard Scheffler, PhD**

Director, Petris Center for Health Care Markets and Consumer Welfare, University of California, Berkeley; Professor of Health Economics, Graduate School of Public Health and Goldman School of Public Policy, University of California, Berkeley

**The Honorable Allyson Y. Schwartz**

Former Member of Congress (Pennsylvania, 2005–2015); Member, Executive Board, Leonard Davis Institute for Health Economics, University of Pennsylvania; Co-Chair, Advisory Board, The Parity Center, University of Pennsylvania; Member, Future of Healthcare, Bipartisan Policy Center; Fellow, College of Physicians of Philadelphia

**Nancy Schlichting**

Former President & CEO, Henry Ford Health System

**Stephen M. Shortell, PhD, MBA, MPH**

Distinguished Professor of Health Policy and Management Emeritus and Dean Emeritus, School of Public Health, University of California, Berkeley; Member, Advisory Committee to the California Office of Health Care Affordability; Member, Board of Directors, LifeLong Medical Care; Member, Board of Directors, Catalysis

**Robert Valdez, PhD**

Former Director, Agency for Healthcare Research and Quality

**Kevin Volpp, MD, PhD**

Director, Center for Health Incentives and Behavioral Economics; Mark V. Pauly President's Distinguished Professor, Perelman School of Medicine and Wharton School, University of Pennsylvania

**Charlotte S. Yeh, MD, FACEP**

Former Chief Medical Officer, AARP Services Inc.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the length limit requirements of Fed. R. App. P. 29(a)(5) because it contains 6,359 words (based on the Microsoft Word word-count function) excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

Dated: September 17, 2026

*/s/ Michael Lieberman*
Michael Lieberman

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2026, the foregoing was filed electronically with the Clerk of the Court using the Court's CM/ECF system. Service will be effectuated to all parties and counsel of record in this matter who are registered with the Court's CM/ECF system.

Dated: September 17, 2026

*/s/ Michael Lieberman*
Michael Lieberman