No. 26-11527

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

GOOD SAMARITAN MEDICAL CENTER, INC., ET AL,
*Plaintiffs-Appellees*,
v.

THE LEAPFROG GROUP,
*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of Florida, No. 9:25-cv-80526
(Hon. Donald M. Middlebrooks)

# BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, CONSUMER REPORTS, THE NEW YORK TIMES COMPANY, AND YELP, INC. IN SUPPORT OF APPELLANT THE LEAPFROG GROUP

Gabriel Rottman
*Counsel of Record*
Lisa Zycherman*
Marietta Catsambas*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
grottman@rcfp.org

* *Of counsel*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, the undersigned certifies that, in addition to the persons listed in the Certificate of Interested Persons filed by the parties, the following persons (amici curiae, their parent corporations, publicly held corporations that own 10% or more of the stock, and their counsel) are known to have an interest in the outcome of this case:

1. BlackRock, Inc. (BLK)
2. Catsambas, Marietta
3. Consumer Reports
4. The New York Times Company (NYT)
5. Reporters Committee for Freedom of the Press
6. Rottman, Gabriel
7. Yelp, Inc. (YELP)
8. Zycherman, Lisa

Dated: September 17, 2026

*/s/ Gabriel Rottman*
Gabriel Rottman

*Counsel of Record*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS

## TABLE OF CONTENTS

**Page:**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .......... C-1

TABLE OF CITATIONS .......... ii

IDENTITY AND INTEREST OF AMICI CURIAE .......... 1

SOURCE OF AUTHORITY TO FILE .......... 4

FED. R. APP. P. 29(a)(4)(E) STATEMENT .......... 4

STATEMENT OF THE ISSUES ADDRESSED BY AMICI CURIAE .......... 5

SUMMARY OF ARGUMENT .......... 5

ARGUMENT .......... 7

I. Ratings and rankings receive full First Amendment protection, just like any opinion journalism .......... 7

II. Improperly leveraging consumer protection laws to target constitutionally protected opinion risks an overall chilling of public discourse .......... 11

III. The broad scope of the injunction underscores the imperative that courts carefully analyze and apply First Amendment principles in consumer protection claims based on ratings or reviews .......... 16

A. Prior restraint .......... 16

B. Compelled speech .......... 19

CONCLUSION .......... 20

CERTIFICATE OF COMPLIANCE WITH RULE 32(g) .......... 22

CERTIFICATE OF SERVICE .......... 23

## TABLE OF CITATIONS

**Page(s):**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......... 19

*Abbas v. Foreign Pol'y Grp., LLC*,
783 F.3d 1328 (D.C. Cir. 2015) .......... 15

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .......... 17

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) .......... 13

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) .......... 12

**Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) .......... 7

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......... 15

*Bull Motors, LLC v. Brown*,
152 So. 3d 32 (Fla. Dist. Ct. App. 2014) .......... 20

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*,
169 So. 3d 164 (Fla. Dist. Ct. App. 2015) .......... 15

*Carroll v. President & Comm'rs of Princess Anne*,
393 U.S. 175 (1968) .......... 19

*CBS Inc. v. Davis*,
510 U.S. 1315 (1994) .......... 18

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
412 U.S. 94 (1973) .......... 8

*Consortium for Indep. Journalism, Inc. v. United States*,
No. 23 CIV. 7088 (KPF), 2025 WL 919504 (S.D.N.Y. Mar. 26, 2025),
*appeal dismissed*, No. 25-1376 (2d Cir. 2025) .......... 13

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) .......... 9

*Dex Media W., Inc. v. City of Seattle*,
696 F.3d 952 (9th Cir. 2012) .......... 9

*Donnelly v. Des Moines Reg. & Trib. Co.*,
829 F. Supp. 3d 682 (S.D. Iowa 2025) .......... 13

*Farah v. Esquire Mag.*,
736 F.3d 528 (D.C. Cir. 2013) .......... 15

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .......... 12

*Gorran v. Atkins Nutritionals, Inc.*,
464 F. Supp. 2d 315 (S.D.N.Y. 2006) .......... 16

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) .......... 9

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988) .......... 14

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003) .......... 12, 14

*McCullen v. Coakley*,
573 U.S. 464 (2014) .......... 19

**Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) .......... 7, 8, 11, 19

**Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) .......... 11

*Mills v. Alabama*,
384 U.S. 214 (1966) .......... 9

*Moldea v. N.Y. Times Co.*,
15 F.3d 1137 (D.C. Cir. 1994) ........................................................................ 11

**Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ............................................................................. 16, 19

*Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*,
759 F.2d 219 (2d Cir. 1985) ........................................................................ 13

*Muir v. Ala. Educ. Television Comm'n*,
656 F.2d 1012 (5th Cir. 1981),
*on reh'g*, 688 F.2d 1033 (5th Cir. 1982) ................................................ 11

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ............................................................................. 17, 18

*Near v. Minnesota ex rel. Olson*,
283 U.S. 697 (1931) .................................................................................... 17

**Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976) ............................................................................. 17, 18

**Newspaper Guild of Greater Phila., Loc. 10 v. NLRB*,
636 F.2d 550 (D.C. Cir. 1980) ............................................................... 8, 14

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986) ................................................................................... 9, 19

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) ....................................................................... 12

*Passaic Daily News v. NLRB*,
736 F.2d 1543 (D.C. Cir. 1984) ..................................................................... 7

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
413 U.S. 376 (1973) .................................................................................... 18

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .................................................................................... 18

*Reno v. Am. C.L. Union*,
521 U.S. 844 (1997) ...................................................................................... 9

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980)....................................................................................9

*Riley v. Harr*,
292 F.3d 282 (1st Cir. 2002)......................................................................11

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)..................................................................................19

*Sciore v. Phung*,
No. CV 19-13775, 2022 WL 950261 (D.N.J. Mar. 30, 2022).............................13

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)..................................................................................17

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979)....................................................................................18

*Smith v. Forest River, Inc.*,
No. 19-14174-CIV, 2019 WL 8226095 (S.D. Fla. Nov. 25, 2019).....................12

*United States v. Alvarez*,
567 U.S. 709 (2012)..................................................................................12

*Wash. Post v. McManus*,
944 F.3d 506 (4th Cir. 2019).....................................................................20

**Other Authorities**

2 Zechariah Chafee, Government and Mass Communications (1947).......................8

*About Car and Driver*, Car & Driver,
https://perma.cc/H4G5-UFGY....................................................................10

*About Us*, Healthline,
https://perma.cc/982N-8W5A....................................................................10

Becca Stanek, *Does Invisalign Really Work? Here's What Experts Say*,
Forbes (Dec. 21, 2023),
https://perma.cc/3YPD-KAHY...................................................................10

Br. of Amici Curiae Reps. Comm. for Freedom of the Press & 46 News & Media Orgs. in Supp. of Defs.-Appellees, *Donnelly v. Des Moines Reg. & Trib. Co.*, No. 25-3451 (8th Cir. Apr. 22, 2026) ....................1, 2

Br. of Amici Curiae Reps. Comm. for Freedom of the Press, Am. C.L. Union, et al. in Supp. of Resp'ts in No. 22-277 & Pet'rs in No. 22-555, *Moody v. NetChoice, LLC/NetChoice, LLC v. Paxton*, Nos. 22-277/22-555 (U.S. Dec. 5, 2023) ....................1

Br. of Amici Curiae Reps. Comm. for Freedom of the Press, First Amend. Coal., Media L. Res. Ctr. & News/Media All. in Supp. of Appellant, *U.S. News & World Report, L.P. v. Chiu*, No. 24-2928 (9th Cir. July 10, 2024) ....................2

*Buy Side*, Wall St. J., https://perma.cc/53V3-K6XP ....................10

*CNN Underscored*, CNN, https://perma.cc/KU45-AUUS ....................10

Lucas A. Powe, Jr., The Fourth Estate and the Constitution (1992) ....................7

*Meet the Editors of Popular Mechanics*, Popular Mechs., https://perma.cc/Z4UZ-F8V7 ....................10

*Policies and Standards*, Wash. Post, https://bit.ly/4hd9xAm (last updated Mar. 25, 2025) ....................14

Walter S. Mossberg, *Top Products in Two Decades of Tech Reviews*, Wall St. J. (Dec. 17, 2013), https://bit.ly/4xxgbYn ....................9

Will Tavlin, *Under Review*, Colum. Journalism Rev. (Oct. 16, 2023), https://perma.cc/ZU9R-DETT ....................9

*Wirecutter*, N.Y. Times, https://perma.cc/SE8C-7BFL ....................10

## IDENTITY AND INTEREST OF AMICI CURIAE

Lead amicus the Reporters Committee for Freedom of the Press (the "Reporters Committee") and Consumer Reports, The New York Times Company, and Yelp, Inc., through undersigned counsel, respectfully submit this brief as amici curiae in support of Defendant-Appellant.

The Reporters Committee is an unincorporated nonprofit association founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Reporters Committee often appears as amicus curiae to underline the importance of robust constitutional protections for the exercise of editorial judgment. Consumer protections statutes like the one at issue here can, if not carefully cabined to their proper scope, suppress protected speech, including valuable journalism like ratings and rankings. *See, e.g.*, Br. of Amici Curiae Reps. Comm. for Freedom of the Press, Am. C.L. Union, et al. in Supp. of Resp'ts in No. 22-277 & Pet'rs in No. 22-555, *Moody v. NetChoice, LLC/NetChoice, LLC v. Paxton*, Nos. 22-277/22-555 (U.S. Dec. 5, 2023); Br. of Amici Curiae Reps. Comm. for Freedom of the Press & 46 News & Media Orgs. in Supp. of Defs.-

Appellees, *Donnelly v. Des Moines Reg. & Trib. Co.*, No. 25-3451 (8th Cir. Apr. 22, 2026); Br. of Amici Curiae Reps. Comm. for Freedom of the Press, First Amend. Coal., Media L. Res. Ctr. & News/Media All. in Supp. of Appellant, *U.S. News & World Report, L.P. v. Chiu*, No. 24-2928 (9th Cir. July 10, 2024).

The Reporters Committee is joined here by the following amici:

Consumer Reports is an independent nonprofit organization with a mission to create a fair and just marketplace for all. It is dedicated to unbiased testing of products and services, rigorous consumer-oriented research, and investigative journalism. Consumer Reports surveys millions of consumers each year, reports extensively on marketplace issues, and advocates for consumer rights and protections around safety as well as digital rights, financial fairness, and sustainability.

The New York Times Company is the publisher of The New York Times and nytimes.com, which includes Wirecutter.

Yelp Inc. ("Yelp") operates one of the most popular and trusted online local search and discovery platforms, enabling users to share information about their communities through reviews and other consumer-oriented contributions. Yelp itself exercises editorial judgment in how that information is organized, contextualized, and presented to the public. Yelp has a strong interest in protecting the First Amendment rights on which Yelp and its users rely.

Amici have an interest in preserving legal protections for the editorial independence of journalists and news organizations, including—perhaps especially—with respect to opinion journalism, where editorial choices by private speakers that are perceived as unfavorable or biased could become the target of improper civil actions and sweeping court injunctions.

## SOURCE OF AUTHORITY TO FILE

The parties consent to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Amici declare that:

1. no party's counsel authored the brief in whole or in part;
2. no party or party's counsel contributed money intended to fund the preparation or submission of the brief; and
3. no person other than amici or their counsel contributed money intended to fund the preparation or submission of the brief.

## STATEMENT OF THE ISSUES ADDRESSED BY AMICI CURIAE

Whether the district court's order and injunction properly addressed any First Amendment issues in this case.

## SUMMARY OF ARGUMENT

Twice yearly, Leapfrog assigns a "Hospital Safety Grade" on a scale from A to F to most general acute care hospitals across the country, drawing on publicly available data from the Centers for Medicare & Medicaid Services and voluntary hospital participation in its own annual Hospital Survey. The plaintiffs, hospitals that did not participate in Leapfrog's survey, sued the nonprofit, challenging under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") a new aspect of Leapfrog's grading methodology that, for certain measures of hospital safety, imputed the lowest grade given to a reporting hospital to hospitals that declined to participate in the survey. At the conclusion of a bench trial, the district court issued a permanent injunction against Leapfrog and determined that Leapfrog's methodology was deceptive. Per the terms of the injunction, Leapfrog is prohibited from assigning grades to the plaintiff hospitals under its current methodology or "any similar methodology," was required to remove the plaintiff hospitals' then-existing grades from its website, and was compelled to distribute notices to licensee customers that the grades were "found to be deceptive and unfair." ECF No. 212 at 40–41. In doing so, the district court did not address the

First Amendment at all, having found at the motion to dismiss stage that, while rankings and ratings based on a disclosed methodology may be non-actionable as pure opinion, false statements about the methodology and ranking and rating system may properly be found to be unfair or deceptive. Amici write to emphasize three concerns with how the First Amendment analysis unfolded in this litigation.

First, rankings, ratings, and reviews reflect the exercise of protected editorial judgment under the First Amendment and generally may not be actionable under a consumer protection regulation. A court reviewing a FDUTPA claim involving rankings, ratings, or reviews should address the relevant doctrine in its opinion. Second, ratings and the underlying methodology constitute protected opinion, which cannot form the basis of a civil claim. The use of civil lawsuits to target expressions of opinion would chill wide swaths of public discourse of great importance to citizens and consumers. Third, were an injunction with terms like the one in this case applied to fully protected speech, it would operate as a prior restraint and would compel a speaker to speak when it otherwise would not. A court issuing such an injunction should perform an appropriate strict scrutiny analysis. In sum, and on all fronts, it is essential that courts, in the first instance, conduct a searching First Amendment analysis in FDUTPA cases involving ratings or reviews. For that reason, amici respectfully urge the Court to reverse the judgment of the district court.

## ARGUMENT

### I. Ratings and rankings receive full First Amendment protection, just like any opinion journalism.

In 1974, the Supreme Court, in an opinion by Chief Justice Warren Burger, unanimously affirmed that the First Amendment forbids governmental interference in the editorial decision-making of the press, holding unconstitutional Florida's "right of reply" statute, which "grant[ed] a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 243 (1974). The Court found that any attempt to "[c]ompel[] editors or publishers to publish that which reason tells them should not be published" would intrude impermissibly on editorial autonomy and violate the First Amendment regardless of motive. *Id*. at 256 (internal quotation marks and citation omitted). This "virtually insurmountable barrier" shielding editorial independence, *id*. at 259 (White, J., concurring), has often been called "absolute," *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1557 (D.C. Cir. 1984); *see also* Lucas A. Powe, Jr., The Fourth Estate and the Constitution 277 (1992) ("Because editorial autonomy is indivisible, it must be absolute."). More specifically, reviews and rankings, and the methodology underlying them, are entitled to full First Amendment protection. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 488 (1984).

A publisher's freedom to articulate its views, including its own editorial standards, "lies at the core of publishing control," a reflection of a news organization's "untrammeled authority to set standards of workmanship that determine its intrinsic excellence and its quality and public character." *Newspaper Guild of Greater Phila., Loc. 10 v. NLRB*, 636 F.2d 550, 560–62, 567 (D.C. Cir. 1980) (MacKinnon, J., concurring). Or as Chief Justice Burger put it in *Tornillo*, a private publisher's power "to advance its own political, social, and economic views" is bound only by "financial success; and . . . the journalistic integrity of its editors and publishers." 418 U.S. at 255 (quoting *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm*., 412 U.S. 94, 117 (1973) (plurality opinion)).

This muscular firewall against state intrusion in editorial decision-making reflects several crucial policy concerns. First, public discourse "would be blunted or reduced" as editors stick to "the safe course . . . to avoid controversy." *Id.* at 257. Second, government-enforced editorial restrictions would violate "the unexceptionable, but nonetheless timeless" principle "[w]oven into the fabric of the First Amendment," that "'liberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper.'" *Id*. at 261 (White, J., concurring) (quoting 2 Zechariah Chafee, Government and Mass Communications 633 (1947)). This fundamental logic—that the government may not substitute its own editorial viewpoint for a private party's—ensures that public officials, and

especially elected officials, cannot succumb to the temptation to put their thumbs on the scale of public discourse in service of their political fortunes.[1]

These protections are particularly invaluable to the press as it carries out its role in our constitutional system, gathering information and disseminating news and ideas to keep the public informed. *See, e.g.*, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490–91 (1975); *Mills v. Alabama*, 384 U.S. 214, 218 (1966). Many, if not most, news organizations offer some form of review or recommendation for products or services. *See generally* Will Tavlin, *Under Review*, Colum. Journalism Rev. (Oct. 16, 2023), https://perma.cc/ZU9R-DETT (surveying history and current state of "service journalism"). Similar to reviews of restaurants and movies, product and service reviews—including rankings—are staple parts of news organizations' coverage. *See, e.g.*, Walter S. Mossberg, *Top Products in Two Decades of Tech Reviews*, Wall St. J. (Dec. 17, 2013), https://bit.ly/4xxgbYn; Becca Stanek, *Does*

---

[1] The principle articulated in *Tornillo*—that the government has no legitimate role in displacing expressive choices that it finds "misguided"—is not "restricted to the press." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995); *see also Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 964 (9th Cir. 2012) ("That protection of newspapers was a driving force behind the adoption of the First Amendment does not limit the scope of the amendment's coverage."). The Supreme Court has since applied the First Amendment protection recognized in *Tornillo* to other forms of communication. *See Reno v. Am. C.L. Union*, 521 U.S. 844, 870 (1997) (the internet); *Hurley*, 515 U.S. at 574 (parades); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (private company's billing envelopes).

*Invisalign Really Work? Here's What Experts Say*, Forbes (Dec. 21, 2023), https://perma.cc/3YPD-KAHY. Indeed, some news outlets have become destinations for product and service reviews. *See, e.g.*, *Wirecutter*, N.Y. Times, https://perma.cc/SE8C-7BFL ("Wirecutter is the product recommendation service from The New York Times. . . . Whether it's finding great products or discovering helpful advice, we'll help you get it right (the first time)."); *Buy Side*, Wall St. J., https://perma.cc/53V3-K6XP ("Buy Side from WSJ . . . [is] committed to selecting products and services to improve your daily life with thoroughly researched recommendations[.]"); *Meet the Editors of Popular Mechanics*, Popular Mechs., https://perma.cc/Z4UZ-F8V7 (124-year-old magazine serving as a leading provider of product reviews and consumer information); *About Car and Driver*, Car & Driver, https://perma.cc/H4G5-UFGY ("a print and digital magazine covering the newest car offerings, showcasing car culture, and helping people shopping for a car by serving up our unique brand of intelligence, independence, and irreverence"); *About Us*, Healthline, https://perma.cc/982N-8W5A (popular health news website offering original content and product reviews); *CNN Underscored*, CNN, https://perma.cc/KU45-AUUS (CNN's product and service review page).

Each of these rankings or ratings reflects the subjective judgment of the ranker or rater. Additionally, each will reflect a different methodology for how to determine a ranking or rating, which may be perceived as unfair. It is axiomatic

that the First Amendment protects a speaker's choice, "fair or unfair," of which perspective on "public issues" to share with their audience, *Tornillo*, 418 U.S. at 258; *see also Muir v. Ala. Educ. Television Comm'n*, 656 F.2d 1012, 1023 (5th Cir. 1981), *on reh'g*, 688 F.2d 1033 (5th Cir. 1982) ("The editorial process is inherently subjective."). Consumer protection laws like Florida's must be carefully deployed to accord with this precedent.

## II. Improperly leveraging consumer protection laws to target constitutionally protected opinion risks an overall chilling of public discourse.

In the context of editorial speech, an opinion cannot form the basis of a civil claim under any legal theory. The First Amendment protects statements that are not "provable as false," including statements of opinion that do not reasonably imply any "provably false factual connotation." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20 (1990). Therefore, statements of opinion are not actionable if they are not "susceptible of being proved true or false," *id.* at 21, or if they are supported by disclosed facts that are themselves true, *see, e.g.*, *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994) ("[W]hen a writer gives a statement of opinion that is based upon *true* facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable[.]" (emphasis in original)); *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) ("[W]hen an author outlines the facts available to him, thus making it clear that the

challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156–57 (9th Cir. 1995))); *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998) (rejecting libel claim over news article predicting future weakness for a company's stock because when "the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related" (citation omitted)). Courts have found that FDUTPA specifically does not reach "unverifiable opinion statements" such as "marketing 'puffery.'" *Smith v. Forest River, Inc.*, No. 19-14174-CIV, 2019 WL 8226095, at *3 (S.D. Fla. Nov. 25, 2019); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.").[2]

---

[2] Even if speech includes objective falsehoods, courts must evaluate whether the category of speech requires a showing of actual malice or the application of strict scrutiny for the claim at issue to survive. *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 719 (2012) (noting that "[e]ven when considering some instances of defamation and fraud," the Court has required that the statement "be a knowing or reckless falsehood"); *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003) (highlighting that plaintiff alleging fraud must show, *inter alia*, a knowing misrepresentation by "clear and convincing evidence" and observing that such "[e]xacting proof requirements[,] . . . in other contexts, have been held to provide sufficient breathing room for protected speech"); *Barr v. Am.*

Indeed, courts have frequently rejected challenges to grading systems and reviews on First Amendment grounds. *See, e.g.*, *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 223 (2d Cir. 1985) (allegedly libelous statements in restaurant review were statements of opinion, and thus constitutionally protected); *Donnelly v. Des Moines Reg. & Trib. Co*., 829 F. Supp. 3d 682, 697 (S.D. Iowa 2025) (finding plaintiff failed to make a prima facie case for a violation of the Iowa Consumer Fraud Act for inaccurate polling, but even if he had, that "such a claim would face significant resistance from the First Amendment"); *Consortium for Indep. Journalism, Inc. v. United States*, No. 23 CIV. 7088 (KPF), 2025 WL 919504, at *17 (S.D.N.Y. Mar. 26, 2025), *appeal dismissed*, No. 25-1376 (2d Cir. 2025) ("The Court finds that, in the context of its rating system, NewsGuard's rating of Plaintiff's error-correction practice is protected opinion."); *Sciore v. Phung*, No. CV 19-13775, 2022 WL 950261, at *6 (D.N.J. Mar. 30, 2022) (finding a review to be a statement of opinion and thus not defamatory).

The principles above apply with equal force to news organizations' publication of their editorial standards. Such disclosures serve a range of important ends—expressing the speaker's point of view as to what good journalism is, say, or helping readers form their own views on the reliability of any given

---

*Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 621 (2020) (applying strict scrutiny to provision of Telephone Consumer Protection Act).

news item. *See Newspaper Guild of Greater Phila.*, 636 F.2d at 560. Treating them as valid targets of civil consumer protection actions poses grave First Amendment concerns. Editorial policies (and other statements about how journalism is conducted) are inherently subjective and shot through with expressive judgment. While news organizations often aspire to provide coverage that is objective, for instance, "arguments about objectivity are endless," *Policies and Standards*, Wash. Post, https://bit.ly/4hd9xAm (last updated Mar. 25, 2025), and transforming every disagreement over the meaning of "fairness" into a consumer-fraud suit would impose a crushing litigation burden on the press.

Importantly, when it comes to protected opinion, the type of claim asserted does not matter: A party cannot circumvent First Amendment protections by forcing a claim into a consumer protection framework. *Cf. Illinois ex rel. Madigan*, 538 U.S. at 617 (noting that fraud claims should be evaluated case by case and "[s]imply labeling an action one for 'fraud' . . . will not carry the day"). The First Amendment requires that courts be "particularly vigilant" in scrutinizing all content-related claims to ensure that protected speech is not punished or chilled. *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51–52 (1988) (applying heightened First Amendment review to emotional distress claim, rather than allowing plaintiff to evade protections developed under defamation law doctrine, because the Supreme Court must "ensure that individual expressions of ideas remain free from

governmentally imposed sanctions"); *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) ("[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." (citation omitted)); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 793 (2011) (rejecting attempt to "shoehorn speech about violence into obscenity"); *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1339 (D.C. Cir. 2015) (Kavanaugh, J.) (rejecting "novel defamation theory" that would "necessarily ensnare a substantial amount of speech that is essential to the marketplace of ideas and would dramatically chill the freedom of speech").

To be sure, amici do not dispute that a consumer protection statute may reach non-editorial false or misleading statements a rater or reviewer makes about its own methodology. *See, e.g.*, *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 167 (Fla. Dist. Ct. App. 2015) (opinions issued by BBB were not reachable by FDUTPA, but reversing motion to dismiss when party alleged false representations about the methods BBB employed in conducting its own business). But amici note that the injunction in this case does not target any such misrepresentation. It expressly addresses the methodology itself, prohibits Leapfrog from *applying* its methodology—and "any similar methodology"—to the plaintiff hospitals, and compels Leapfrog to reference the judgment in communications with licensees. ECF No. 212 at 2–3, 40–41; *cf.*

*Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 329 (S.D.N.Y. 2006) (defendants' statements and advice about Atkins diet protected under First Amendment and non-actionable under FDUTPA).

If any cause of action, including consumer protection claims, were stretched to suppress protected speech, it would raise serious concerns for the press and our system of free expression more broadly—leading to an increase of costly litigation and a chill on speech of great interest to consumers. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 741–42 (2024) ("On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana.").

## III. The broad scope of the injunction underscores the imperative that courts carefully analyze and apply First Amendment principles in consumer protection claims based on ratings or reviews.

Given the scope of injunctive relief available under FDUTPA, as evidenced by this case, it is imperative that courts first consider any First Amendment principles and doctrine at play. This is for two reasons.

### A. Prior restraint

First, prohibiting a defendant from deploying its ratings methodology or "any similar methodology" could not only be an impermissible prior restraint, but, as discussed above, a proscription on fully protected opinion. ECF No. 212 at 40.

"[I]t is the chief purpose of the guaranty [of the First Amendment] to prevent previous restraints upon publication." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931). Prior restraints are considered "the most serious and the least tolerable infringement on First Amendment rights," and "one of the most extraordinary remedies known to our jurisprudence." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559, 562 (1976). This is because it is "by definition . . . an immediate and irreversible sanction," not only "'chill[ing]' speech" but "'freez[ing]' it at least for the time." *Id.* at 559. There is a heavy presumption against the constitutional validity of prior restraints. *See N.Y. Times Co. v. United States* ("*Pentagon Papers*"), 403 U.S. 713, 714 (1971) (per curiam); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). In fact, "[t]he presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558–59 (1975).

A district court imposing a prior restraint would thus have to find that the "heavy burden of showing justification for the imposition of such a restraint" has been met. *Pentagon Papers*, 403 U.S. at 714 (citation omitted). The Supreme Court has said that prior restraints can be justified only in exceptional cases such as those involving war or incitement of imminent violence, *see Near*, 283 U.S. at 716, but has never found a prior restraint to meet that exceptionally high bar. The Court

has struck down prior restraints in cases where the justifications claimed included the Sixth Amendment rights of criminal defendants, *Neb. Press Ass'n*, 427 U.S. at 570, and confidential or proprietary business information, *CBS Inc. v. Davis*, 510 U.S. 1315, 1318 (1994). And, in 1971, the Court rejected the government's efforts to prevent publication of the Pentagon Papers—a classified history of the Vietnam War—by *The New York Times* and *The Washington Post* despite claims that the publication of state secrets could harm national security. *See Pentagon Papers*, 403 U.S. at 714.

Even if a restraint were conceivably permissible vis-à-vis fully protected speech under a consumer protection theory, a district court would still have to engage in a strict scrutiny analysis. The restraint would be subject to "the most exacting scrutiny," *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979), because it is a content-based restriction specific to a ratings system and its underlying methodology. *See Reed v. Town of Gilbert*, 576 U.S. 155, 162–63 (2015) (content-based restrictions "appl[y] to particular speech because of the topic discussed" and are "presumptively unconstitutional"). Thus, the restraint must be narrowly tailored and may not sweep "more broadly than necessary." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973). A court may enter an order only if it is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *see*

*also Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183–84 (1968) (finding that an "order" issued in the "area of First Amendment rights[]" must be precise and narrowly tailored to achieve the "pin-pointed objective" of the "needs of the case").

**B. Compelled speech**

An injunction forcing a protected speaker to issue a corrective disclaimer could also pose concerns under compelled speech doctrine. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *Pac. Gas & Elec. Co.*, 475 U.S. at 11; *Moody*, 603 U.S. at 733 (collecting cases) ("But in case after case, the Court has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive realm."). "Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). A compelled speech provision in an injunction against a protected speaker would also be a content-based regulation subject to strict scrutiny because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Id.* at 795; *Tornillo*, 418 U.S. at 256 (holding that it is unconstitutional to "[c]ompel[] editors or publishers to publish that which reason tells them should not be published" (internal quotation marks and citation omitted)); *see also Bull Motors, LLC v.*

*Brown*, 152 So. 3d 32, 36 (Fla. Dist. Ct. App. 2014) (finding injunction mandating future behavior and specifying language that must be used with future customers overly broad under First Amendment). Further, even assuming consumer protection is a compelling state interest, under strict scrutiny, a court must still tailor an injunction to the interest asserted. *See Wash. Post v. McManus*, 944 F.3d 506, 520–21 (4th Cir. 2019) ("[T]he fact that an interest is 'important' in the abstract does not end the analysis.").

As applied to protected speech, laws like FDUTPA can be strong medicine. It is essential that courts rigorously apply longstanding First Amendment precedent to ensure that such laws do not inadvertently suppress protected expression. The principles articulated above have not yet been fully explored in this case.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to reverse the decision of the district court.

Dated: September 17, 2026

Respectfully submitted,

*/s/ Gabriel Rottman*
Gabriel Rottman
*Counsel of Record*
Lisa Zycherman*
Marietta Catsambas*
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
grottman@rcfp.org

* *Of counsel*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 4,387 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 17, 2026

*/s/ Gabriel Rottman*
Gabriel Rottman
*Counsel of Record*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS

## CERTIFICATE OF SERVICE

I certify that on September 17, 2026, I electronically filed the foregoing brief with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. All parties in this case are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.

Dated: September 17, 2026

*/s/ Gabriel Rottman*
Gabriel Rottman
*Counsel of Record*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS