# No. 26-11527

# United States Court of Appeals
*for the*
# Eleventh Circuit

GOOD SAMARITAN MEDICAL CENTER, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

THE LEAPFROG GROUP,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA,
NO. 25-CV-80526-MIDDLEBROOKS

## Defendant-Appellant The Leapfrog Group's Appendix, Volume 1

JASON D. STERNBERG
DAVID A. NABORS
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
2601 Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
jasonsternberg@quinnemanuel.com
davidnabors@quinnemanuel.com

DEREK L. SHAFFER
*Counsel of Record*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 SW 13th Street NW
Washington, D.C. 20004
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for The Leapfrog Group*

September 17, 2026

## INDEX OF APPENDIX


| | Docket/ Tab No. | Page No. |
|---|---|---|
| Complaint | 1 | A0008 |
| Motion to Dismiss | 39 | A00066 |
| Order on Motion to Dismiss | 41 | A00090 |
| Amended Complaint | 74 | A00099 |
| Leapfrog Answer Amended Complaint | 75 | A000142 |
| Leapfrog Motion for Summary Judgment | 99 | A000194 |
| Motion for Summary Judgment | 115 | A000219 |
| Leapfrog's Proposed Findings of Fact and Conclusions of Law | 135 | A000248 |
| Order on Cross Motions for Summary Judgment | 139 | A000290 |
| Certificate of Compliance re Admitted Evidence | 188 | A000302 |
| Exhibit DX-931 of Certificate of Compliance re Admitted Evidence | 188-94 | A000305 |
| Index of Filed Exhibits Joint Exhibits | 189 | A000321 |

Dated: September 17, 2026

Respectfully submitted,

*<u>/s/ Derek L. Shaffer</u>*

DEREK L. SHAFFER
*Counsel of Record*
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 SW 13th Street NW
Washington, D.C. 20004
(202) 538-8000
derekshaffer@quinnemanuel.com

JASON D. STERNBERG
DAVID A. NABORS
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2601 Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
jasonsternberg@quinnemanuel.com
davidnabors@quinnemanuel.com

*Counsel for The Leapfrog Group*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2026, the foregoing was filed electronically with the Clerk of the Court using the Court's CM/ECF system. Service will be effectuated to all parties and counsel of record in this matter who are registered with the Court's CM/ECF system.

Dated: September 17, 2026

*/s/ Derek L. Shaffer*
Derek L. Shaffer

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-cv-80526

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,

PLAINTIFFS,

v.

THE LEAPFROG GROUP,

DEFENDANT.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Good Samaritan Medical Center, Inc. ("Good Samaritan"), Delray Medical Center, Inc. ("Delray Medical Center"), Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center ("Palm Beach Gardens Medical Center"), St. Mary's Medical Center, Inc. ("St. Mary's"), and West Boca Medical Center, Inc. ("West Boca Medical Center") (collectively, "Plaintiffs" or "the Plaintiff Hospitals"), by and through their attorneys for their Complaint against The Leapfrog Group ("TLG"), allege as follows:

**PRELIMINARY STATEMENT**

Hospitals are trusted pillars of their communities, responsible for safeguarding the lives of patients in their most vulnerable moments. The integrity of information guiding patients' healthcare decisions must be beyond reproach. Yet Defendant TLG, under the guise of public service, has corrupted that trust—weaponizing fear, distorting facts, and misleading the public to

serve its own craven financial interests. Through a brazen pay-to-play scheme, TLG pressures hospitals to participate and pay, or else suffer devastating and misleading public "safety" grades. Plaintiffs bring this action not because they fear evaluation, but because TLG's false and reckless conduct endangers patients, undermines public health, and cannot go unchallenged.

## INTRODUCTION

1. Defendant TLG holds itself out as an honest and credible public service organization devoted to hospital safety. In reality, it operates a brazen pay-to-play scheme that distorts the truth, misleads patients, and inflicts serious harm on hospitals and the communities they serve. Hospital participation drives TLG's revenue and enriches this so-called "non-profit" to the tune of many millions of dollars—including exorbitant compensation for its Chief Executive Officer. Through its "Hospital Safety Grades," TLG assigns A, B, C, D, and F letter grades to hospitals nationwide and prominently displays them on its website, www.hospitalsafetygrade.org. These "grades" are based, in material part, on easily manipulatable, self-reported data submitted by hospitals that choose to dedicate the time and resources to respond to TLG's sprawling 100+ page data requests. TLG then aggressively broadcasts these so-called grades directly to patients, caregivers, and healthcare workers, orchestrating a sweeping media campaign—including by embargoing grades with reporters nationwide—to maximize public exposure. The message TLG pushes is alarmist and clear: Patients must "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than at an 'A' hospital." (emphasis added). But TLG's "safety grades" are a fraud. Far from protecting patients, they present a clear and present danger to public health across Palm Beach County and beyond.

2. Four years ago, the five Plaintiff Hospitals made a deliberate choice to stop responding to TLG's excessive data requests. During the height of the COVID-19 pandemic,

Plaintiffs prioritized their administrative resources toward achieving specialty-specific accreditations and certifications that directly respond to patient needs. Until last year, TLG continued to assign grades to Plaintiffs based on how similarly situated participating hospitals performed on standard metrics, and notably, Plaintiffs were never assigned F grades under that system.

3. That changed in 2024. Facing declining hospital participation, escalating expenses, and intensifying pressure to drive up revenue—including hefty consulting and advertising fees from participating hospitals along with revenue from insurers—TLG abruptly rigged its methodology. Under its new policy, any hospital declining to provide data would automatically fail on the affected metrics, leading to inevitable Ds and Fs for Plaintiffs for the first time. TLG openly admitted the change was designed to punish non-participating hospitals and ensure they would not "inadvertently benefit" from positive scores—regardless of the truth. Tomorrow's anticipated release of new grades continues TLG's reckless campaign. Instead of simply choosing not to grade Plaintiffs, TLG will deliberately misrepresent these trusted hospitals as dangerous facilities, undermining the doctors, nurses, and healthcare workers on whom the community depends.

4. The reality could not be further from TLG's false narrative. Plaintiffs' five hospitals form the backbone of urgent and critical healthcare services in the Palm Beach community. They serve vulnerable populations—especially children and the elderly—with award-winning care. St. Mary's, for example, is the only children's hospital between Fort Lauderdale and Orlando, providing critical care to high-risk pregnancies and fragile newborns in a low-income community where infant mortality risks are tragically high. Plaintiffs' collective

impact is enormous: Together, they treated approximately 470,000 patients in 2024 through emergency, critical care, and outpatient services.

5. TLG's misinformative "Safety Grades" have been repeatedly condemned by leading healthcare organizations and academic researchers for precisely the dangers they pose. The American Hospital Association ("AHA") has warned that "no one should use [TLG's Hospital Safety Grades] to guide their choice of hospitals," because they are "neither fair nor accurate."[1] Academic studies have confirmed that TLG's methodology consistently misrepresents hospital quality nationwide, misleading patients into healthcare decisions that increase mortality risks and worsen outcomes.[2] TLG has even awarded its highest possible safety grades to a facility the federal government determined in a 384-page report had "quality of care . . . so bad that it had 'caused—or is likely to cause—serious injury, harm, impairment, or death to a patient.'" Multiple patients died at that facility, despite its pristine TLG ranking. For nearly a decade, healthcare professionals and scholars have sounded the alarm about TLG's dangerous practices. Those practices are even worse today as a result of TLG's 2024 move to punish non-participating hospitals.[3] But TLG refuses to fix its reckless model. So long as hospitals are willing to pay to

---

[1] Rich Umbdenstock, *Letter to Leah Binder (The Leapfrog Group)* (June 22, 2012), https://www.leapfroggroup.org/sites/default/files/Files/AHALettertoLeah.pdf.

[2] *See, e.g.*, Joe Nicholl et al., *The Relationship Between Distance to Hospital and Patient Mortality in Emergencies: An Observational Study*, Emerg. Med. J. (Aug. 21, 2007), https://pubmed.ncbi.nlm.nih.gov/17711952/; Julia C. Prentice, *Delayed Access to Health Care and Mortality*, Health Serv. Res. (Apr. 2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1955366/pdf/hesr0042-0644.pdf.

[3] *See, e.g.*, J. Matthew Austin et al., *National Hospital Ratings Systems Share Few Common Scores and May Generate Confusion Instead of Clarity*, 34 Health Affs. 423 (Mar. 2015); Shawna N. Smith et al., *Dissecting Leapfrog: How Well Do Leapfrog Safe Practices Scores Correlate With Hospital Compare Ratings and Penalties, and How Much Do They Matter?*, 55(6) Med. Care 606, 611-12 (June 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5517312/pdf/nihms851990.pdf.

escape failing grades, TLG has no incentive to reform—and every incentive to perpetuate its deceptive scheme.

6. Plaintiffs do not fear scrutiny. Their healthcare leaders and frontline providers have devoted their lives to advancing patient safety and clinical excellence. Several of Plaintiffs' Chief Executive Officers began their careers as bedside nurses, rising through the ranks through hard work, dedication, and an unwavering commitment to quality care. Plaintiffs welcome evaluations based on objective, accurate, and verifiable standards applied fairly across the healthcare industry. They embrace real accountability and rigorous performance measurement. And like all hospitals, they are continuously working to improve the patient experience and achieve the highest possible quality of care. What they will not accept—and what no patient should accept—are reckless, misleading, and commercially motivated "safety grades" that endanger public trust and patient lives.

7. Plaintiffs did not bring this action lightly. Before commencing this case, Plaintiffs asked TLG to cease and desist its deceptive grading practices. Plaintiffs made clear that TLG's conduct was not only wrong, but dangerously harmful—driving patients away from some of the region's safest hospitals and toward objectively riskier facilities. TLG refused. Hiding behind a self-serving and legally unsupportable invocation of the First Amendment, TLG claimed a "free speech right" to deceive the public. It then doubled down: embargoing its false grades with the press, orchestrating a media blitz, and further misleading patients in Plaintiffs' communities—all while knowing the devastating consequences of its campaign.

8. There is no First Amendment protection for deceptive practices. That is exactly why the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") exists: to protect consumers from modern-day snake oil salesmen like TLG. TLG's supposed "mission" is a sham.

Its true mission is self-enrichment. A material percentage of TLG's "non-profit" budget goes directly to compensating its Chief Executive Officer, who has pocketed many millions of dollars in recent years at the expense of the very patients TLG claims to serve. TLG's business model is as simple as it is sinister: prey on public fear, distort the truth, and profit from deception. Enough is enough. This lawsuit seeks to put an end to TLG's dangerous practices and to protect the patients and communities who deserve honest, reliable information about their healthcare choices.

## PARTIES

9. Plaintiff Delray Medical Center is an accredited hospital with 536 licensed beds. Delray Medical Center is incorporated in Florida, and its principal place of business is at 5352 Linton Blvd., Delray Beach, Florida 33484. As both a general hospital and a Level I Trauma Center for both pediatric and adult patients, Delray Medical Center provides a variety of high-quality, specialized services to the community.

10. Plaintiff Good Samaritan is the first hospital built in Palm Beach County. It has served the community for over 100 years. Good Samaritan is incorporated in Florida, and Good Samaritan's principal place of business is 1309 N. Flagler Dr., West Palm Beach, Florida 33401. It has 333 licensed beds. Good Samaritan is an accredited acute care hospital that is focused on offering premier and comprehensive oncology services with its robust medical and surgical programs.

11. Plaintiff Palm Beach Gardens Medical Center is an acute care hospital with 199 licensed beds. Palm Beach Gardens Medical Center is incorporated in Florida, and its principal place of business is 3360 Burns Road, Palm Beach Gardens, Florida 33410. Palm Beach Gardens Medical Center focuses on providing comprehensive cardiovascular care, including open heart surgeries and structural heart procedures. It also provides the community with access to a broad

range of other important medical services, including 24-hour emergency care, general surgery, various orthopedic surgery services, and specialty services such as urology.

12. Plaintiff St. Mary's houses the only children's hospital between Orlando and Fort Lauderdale. St. Mary's is incorporated in Florida, and its principal place of business is 901 45th St., West Palm Beach, Florida 33407. St. Mary's is an accredited acute care hospital that is a Level I adult and pediatric Trauma Center, certified Comprehensive Stroke Center, and has a Level III neonatal intensive care unit ("NICU"). St. Mary's has 413 licensed beds of which 45 are in the NICU. St. Mary's is a Centers for Medicare & Medicaid Services ("CMS") designated Regional Perinatal Intensive Care Center ("RPICC")—one of only 11 RPICC hospitals in Florida.

13. Plaintiff West Boca Medical Center is an accredited hospital with 195 licensed beds and primarily serves women and children. West Boca Medical Center is incorporated in Florida, and its principal place of business is 21644 State Road 7, Boca Raton, Florida 33428. West Boca Medical Center is the only Level III NICU in southern Palm Beach County.

14. Defendant The Leapfrog Group is a not-for-profit corporation incorporated in the District of Columbia, with its principal place of business at 1775 K Street, NW, Suite 400, Washington, D.C. 20006.

**JURISDICTION AND VENUE**

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs are all citizens of Palm Beach County, Florida, and TLG is a citizen of Washington, D.C. The amount in controversy is in excess of $75,000 given Plaintiffs seek greater than $75,000 in damages and seek to recover injunctive and declaratory relief valued in excess of $75,000.

16. This Court has personal jurisdiction over TLG pursuant to Fla. Stat. Ann. § 48.193(1)(a)(2) because TLG "submit[ted itself] . . . to the jurisdiction of the courts of this state for any cause of action arising from [TLG] . . . [c]ommitting a tortious act within this state." TLG

is also subject to this Court's jurisdiction as TLG is operating, conducting, engaging in, or carrying on a business or business venture in this state. To the extent the alleged injury to persons in this state arises out of an act or omission by TLG outside of this state, this Court has jurisdiction over TLG because it engaged in solicitation or service activities within Florida.

17. Plaintiffs' claims arise out of TLG's contacts with and purposeful availment of Florida—including but not limited to its misleading "Hospital Safety Grades" of Plaintiffs on its website. TLG's false and misleading "Hospital Safety Grades" were directed at residents of Florida, accessed by residents of Florida, pertained to Plaintiffs (all residents of Florida), harmed Plaintiffs in Florida, and harmed consumers in Florida. TLG has publicly commented on its Hospital Safety Grades for Plaintiffs with Florida publications like Stet News Palm Beach County designed to drive more attention to the Safety Grades in Florida. TLG has also affirmatively "embargoed" its "Safety Grades" about Plaintiffs with members of the press, including members of the press in Florida, confirming TLG has knowingly and intentionally targeted the Florida healthcare market and Florida healthcare consumers with its "Safety Grades" about Plaintiffs.

18. This Court also has personal jurisdiction over TLG pursuant to Fla. Stat. Ann. § 48.193(2) because TLG is "engaged in substantial and not isolated activity within [Florida]" and Plaintiffs' claims arise out of that substantial, not isolated, activity. For example, for its Fall 2024 Survey, TLG solicited data from 621 health facilities in Florida, embargoed safety grades as to 192 of them with the media in Florida, and widely publicized the safety grades of those 192 Florida facilities to patients in Florida.

19. Venue in the Southern District of Florida is appropriate under 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the actions giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

### A. The Plaintiff Hospitals Are High-Performing Florida Hospitals.

20. Plaintiffs are five hospitals in the Palm Beach region. Collectively, they have 1,676 licensed beds and treated approximately 470,000 patients in 2024. Plaintiffs have reputations for being high-quality healthcare systems that put patient care first. Many well-regarded industry commentators that compare hospitals consistently rank Plaintiffs' performance well above their peers'. The quality of Plaintiffs' care has been confirmed, validated, and acclaimed by objective third parties following rigorous vetting and assessment from accreditors, commercial insurers, and experts like the American College of Surgeons.

21. ***Delray Medical Center*** has received numerous awards and accolades. For example, Delray Medical Center was awarded the Resuscitation Center of Excellence award for 2025, becoming the first hospital in Palm Beach County to be named a Florida Resuscitation Center of Excellence. To achieve that accolade, Delray Medical Center met approximately 15 criteria for patient care that were established by the Florida Resuscitation Center Committee, including intensive neurological monitoring, strong collaboration with Emergency Medical Services partners, and community outreach programs to promote health and lifestyle modifications to decrease the prevalence of cardiac disease. Additionally, the American College of Surgeons awarded Delray the Metabolic and Bariatric Surgery Accreditation and Quality Improvement Program ("MBSAQIP") Surgery Center of Excellence award, which is dedicated to enhancing the safety and quality of care for bariatric patients in the United States and Canada. MBSAQIP accreditation promotes uniform standards and continuous quality improvement.

22. Delray Medical Center also earned a DNV GL Comprehensive Stroke certification, which means Delray Medical Center gives the highest quality of care to most complete patient cases and offers evidence-based treatments with cutting-edge research protocols. Delray Medical

Center earned the VQI (Vascular Quality Initiative) Carotid Care Champion this year, which honors participants that are dedicated to improving the safety and effectiveness of vascular care. Delray Medical Center also earned a Certification for the American Association of Cardiovascular and Pulmonary Rehabilitation ("AACVPR") Program. Delray Medical Center is also accredited by the Joint Commission, the nation's largest hospital accreditor that evaluates hospitals' quality performance standards through an objective evaluation process. This accreditation is peer-reviewed and designed to review individual facilities.

23. The American Heart Association honored Delray Medical Center with "Get with the Guidelines" Gold Plus awards in three specializations. First, Delray Medical Center earned the Target Stroke Honor Roll Elite, meaning Delray Medical Center is able to achieve door-to-needle times of within 60 minutes for at least 85% of applicable patients. Second, Delray Medical Center earned the Target Stroke Honor Roll Advanced Therapy, meaning that 50% of applicable patients are able to achieve door-to-device times of 90 minutes or less in the case of directly arriving patients, and 60 minutes or less for transfer patients. Third, Delray Medical Center earned the Target Type II Diabetes Honor Roll, meaning that Delray Medical Center met numerous requirements, including qualifying for a Silver level or higher Achievement Award in the "Get with the Guidelines-Heart Failure, Stroke, and/or Coronary Artery Disease" modules.

24. Earlier this year, Delray Medical Center was named "one of the best 250 hospitals in the country" by Healthgrades, one of the top sites Americans use when searching for a doctor or hospital.[4] In total, Delray Medical Center earned 25 accolades from Healthgrades, including the 2025 Critical Care Excellence Award and the 2025 Pulmonary Care Excellence Award. Delray

---

[4] To assess and evaluate hospitals, Healthgrades relies on data from Medicare medical claims records and states' data on Medicare and commercially insured patient outcomes to determine patients' actual clinical outcomes when visiting a given hospital.

Medical Center has received countless five-star awards from Healthgrades, including Five-Star Recipient for Valve Surgery for two years in a row (2024-2025), Five-Star Recipient for Treatment of Heart Attack for two years in a row (2024-2025), Five-Star Recipient for Treatment of Heart Failure for twenty-three years in a row (2003-2025), Five-Star Recipient for Defibrillator Procedures for three years in a row (2024-2025), Five-Star Recipient for Treatment of Stroke for eighteen years in a row (2008-2025), Five-Star Recipient for Coronary Interventional Procedures (2024), Five-Star Recipient for Treatment of Pneumonia for two years in a row (2024-2025), Five-Star Recipient for Treatment of Sepsis for twenty-two years in a row (2004-2025), Five-Star Recipient for Treatment of Respiratory Failure for three years in a row (2023-2025), Five-Star Recipient for Upper Gastrointestinal Surgery for three years in a row (2022-2024), Five-Star Recipient for Small Intestine Surgeries for five years in a row (2017-2021, 2024), and Five-Star Recipient for Cranial Neurosurgery (2024).

25. ***Good Samaritan*** has received numerous awards and accolades, including many that are directly relevant to patient care for the community it serves. As a full-service cancer hospital, it is important to Good Samaritan that it is accredited by the Commission on Cancer ("CoC"). In order to be accredited, Good Samaritan has to undergo an on-site visit on a triennial basis, in which a trained CoC reviewer visits Good Samaritan and reviews its required cancer program activity documentation to ensure compliance with the standards.

26. The American College of Surgeons has designated Good Samaritan a National Accreditation Program for Breast Centers ("NAPBC") for 13 years in a row. The American College of Radiology designated Good Samaritan a Breast Imaging Center of Excellence, which it received only after accomplishing the highest level of care in breast imaging, including being committed to patients, providers, and payers. Good Samaritan has been recognized as an

Accredited Comprehensive Center by the Metabolic and Bariatric Surgery Accreditation and Quality Improvement Program ("MBSAQIP®"), a joint Quality Program of the American College of Surgeons ("ACS") and the American Society for Metabolic and Bariatric Surgery ("ASMBS").

27. Good Samaritan is accredited by the Joint Commission. Good Samaritan has been accredited by Joint Commission for specialization certifications for Gold Seal of Approval for Total Hip and Knee Replacement, Shoulder Replacement and Spine Surgery—these certifications are designed for hospitals providing the critical elements to achieve long-term success in improving critical medical outcomes—which signifies its services have delivered evidence-based proof of clinical quality sought by patients and payers alike. The entities that award and assign these accreditations and certifications visit the healthcare facility and perform regular periodic in-person reviews, surveys and assessments of the facility.

28. Good Samaritan has also recently been awarded the Florida Department of Health and Florida Agency for Health Care Administration Excellence for Maternal Care Award, which highlights hospitals that surpass Florida Department of Health's goal of reducing the rate of C-sections among first-time mothers with low-risk pregnancies. Good Samaritan was recognized by BlueCross BlueShield as a Blue Distinction Center for Bariatric Surgery designation, as part of the Blue Distinction Specialty Care program. Good Samaritan earned this recognition by providing a full range of bariatric surgical care services, including inpatient care, postoperative care, follow-up, and patient education that operate to standards set by BlueCross BlueShield, in partnership with physician experts and medical organizations. Good Samaritan is also recognized as a Blue Distinction Center for Knee and Hip Replacement. Aetna has also designated Good Samaritan as an Aetna Institute of Quality orthopedic facility for total joint replacement and spine surgery, which it earned by consistently delivering safe and effective orthopedic care.

29. Good Samaritan was the only hospital in South Florida to earn recognition as one of "America's 100 Best for Spine and Outpatient Orthopedic Excellence Award" in 2025. Good Samaritan has also received countless five-star awards from Healthgrades, including Five-Star Recipient for C-Section Delivery for four years in a row (2022-2025), Five-Star Recipient for Vaginal Delivery for twelve years in a row (2014-2025), Five-Star Recipient for Outpatient Back and Neck Surgery (except Spinal Fusion) (2025), Five-Star Recipient for Spinal Fusion (2025), and Five-Star Recipient for Treatment of Gastrointestinal Bleed (2024).

30. ***Palm Beach Gardens Medical Center*** has received numerous awards and accolades, including many that are especially relevant to patient care for the over-65 patient community that makes up over half of the patients Palm Beach Gardens Medical Center serves. Palm Beach Gardens Medical Center is accredited by Joint Commission as an Advanced Primary Stroke Center—a certification designed for hospitals providing the critical elements to achieve long-term success in improving stroke outcomes—and Total Joint Hip/Knee Certification—which signifies its services have delivered evidence-based proof of clinical quality sought by patients and payers alike. Additionally, it has a lab accreditation from the College of American Pathologists—a requirement to perform testing on specimens from human beings—and was selected as a certified program with the AACVPR—the only peer-reviewed accreditation process designed to review individual facilities for adherence to standards and guidelines developed and published by the AACVPR. These accreditations and certifications are only awarded after in-person visits to Palm Beach Gardens Medical Center where its health care professionals are interviewed and patient care is reviewed firsthand. Palm Beach Gardens Medical Center is also subject to regular periodic in-person reviews, surveys, and assessments of the facility.

31. Palm Beach Gardens Medical Center has also received numerous awards that exemplify its quality such as Blue Distinction Center+ Designation for Quality and Cost-Efficiency in Knee and Hip Replacement Surgeries by BlueCross BlueShield, the Joint Commission's Gold Seal of Approval for Hip and Knee Replacement, an Aetna Institute of Quality Orthopedic Facility for Total Joint Replacement and Spine Surgery, Get with the Guidelines Gold Plus Stroke Recognition Award from the American Heart Association for 10 years straight, and the Gold Plus Diabetes Recognition Award for the last three years, among several other awards.

32. Healthgrades named Palm Beach Gardens Medical Center among the nation's top 10% for pulmonary services. It has also been awarded five stars by Healthgrades for many services, including Five-Star Recipient for Valve Surgery (2023, 2025), Five-Star Recipient for Treatment of Heart Failure for three years in a row (2023-2025), Five-Star Recipient for Carotid Procedures for three years in a row (2023-2025), Five-Star Recipient for Respiratory Failure for two years in a row (2024-2025), Five-Star Recipient for Colorectal Surgeries (2025), Five-Star Recipient for Treatment of GI Bleed (2024), Five-Star Recipient for Treatment of Stroke (2025), Five-Star Recipient for Treatment of Pneumonia for three years in a row (2023-2025), and Five-Star Recipient for Treatment of Chronic Obstructive Pulmonary Disease (2024).

33. ***St. Mary's*** has several accreditations that demonstrate the high quality of care it provides to pregnant women and children in the community. For example, it is an accredited acute care hospital that is a Level I adult and pediatric Trauma Center. A Level I Trauma Center is a healthcare facility that is central to the trauma system and capable of providing the highest level of care for every aspect of injury for both adults and children. St. Mary's is also a Level III NICU, meaning it provides lifesaving care for babies born before 32 weeks' gestation and / or weighing less than 1,500 grams (approximately 3.3 pounds) or babies with specific medical conditions that

require surgery or specialized pediatric care. Additionally, St. Mary's is one of only 11 designated hospitals by the Florida Department of Health as a RPICC that provide obstetrical services to women who have a high-risk pregnancy and care for newborns with special health needs, such as critical illness or low birth weight. St. Mary's is also certified by the American College of Surgeons for the Verified Pediatric Surgery Program, which recognizes hospitals that properly address the surgical care of infants and children.

34. St. Mary's is also a Commission on Accreditation of Rehabilitation Facilities ("CARF") accredited facility for its stroke, brain injury and amputation specialty services. Achieving CARF accreditation means that St. Mary's meets CARF's standards and has demonstrated a commitment to being among the best available to patients. St. Mary's is also a Certified Comprehensive Stroke Center, which signifies its dedication to raising the bar for evaluating and evolving the care of patient at every part of the stroke care continuum.

35. St. Mary's is accredited by the Joint Commission. St. Mary's has been accredited by the Joint Commission for specialization certifications for Spine Surgery and Total Joint Replacement for Hip and Knee—a certification designed for hospitals providing the critical elements to achieve long-term success in improving critical medical outcomes—which signifies its services have delivered evidence-based proof of clinical quality sought by patients and payers alike.

36. These accreditations and certifications are particularly important given St. Mary's patient population. With its accreditation and specialties, St. Mary's provides patients care they are not able to receive at other facilities. St. Mary's sees more transfers to its facility from nearby hospitals who are unable to provide patients with the care they need than any other Palm Beach County hospital. Also, due to its location in a low-income community, St. Mary's treats a

significant number of high-risk pregnancies in which infant mortality is a serious risk and heartbreaking reality.

37. St. Mary's has also received numerous awards. St. Mary's has been awarded multiple Get with the Guidelines awards, including Stroke Gold Plus Award 2024 (13th Consecutive Year); Stroke Elite Plus Honor Roll; Stroke Advance Therapy Honor Roll; and Type 2 Diabetes Honor Roll. The Get with the Guidelines Stroke program is designed to improve stroke care by promoting consistent adherence to the latest scientific treatment guidelines.

38. Additionally, St. Mary's has been recognized by BlueCross BlueShield with a Blue Distinction Centers for Knee, Hip Replacements, Spine Surgery and Maternity Care designation, as part of the Blue Distinction Specialty Care program. The Blue Distinction Specialty Care is a national designation program that recognizes health providers that demonstrate expertise in quality and affordable health care to meet consumers' specialty care needs.

39. St. Mary's has also received numerous awards that recognize the high-quality care it provides to pregnant women and children in particular. For example, it has recently been awarded the Florida Department of Health and Florida Agency for Health Care Administration Excellence for Maternal Care Award, which highlights hospitals that surpass Florida Department of Health's goal of reducing the rate of C-sections among first-time mothers with low-risk pregnancies. Similarly, the Florida Hospital Association also recently awarded St. Mary's the Excellence in Maternity Care designation, which is awarded to a hospital that demonstrates exceptional dedication to maternal health care.

40. *The Palm Beach Post* has awarded St. Mary's with Community Choice Awards for Best Hospital, Best Orthopedic/Sports Medicine 2024 and Best Maternity and Childbirth Center

2024 & 2025. The Palm Beach County Community Choice Awards celebrate the best business and organizations in the area, with people in the community voting on these designations.

41. St. Mary's has been awarded several five-star awards from Healthgrades, including for its spinal fusion surgery and hip fracture treatment for five years in a row; knee replacement surgery; and, for the eleventh year in a row, for both vaginal and C-section delivery.

42. ***West Boca Medical Center*** has received numerous awards and accolades, including many that are directly relevant to patient care for children and women that it serves. For example, West Boca Medical Center is the only Level III NICU facility in southern Palm Beach County. Level III NICUs provide lifesaving care for babies born before 32 weeks' gestation and / or weighing less than 1,500 grams (approximately 3.3 pounds) or babies with specific medical conditions that require surgery or specialized pediatric care. The American College of Radiology accredited West Boca Medical Center for Imaging Modalities including Nuclear Medicine, Ultrasound, MRI, CT—which provides it the ability to care for the Level III NICU children and at-risk pregnancy mothers that it treats and ensures it is using best practices. Relatedly, West Boca Medical Center has an accredited education program in radiology through Joint Review Committee on Education and Radiologic Technology ("JCERT"), which is the only agency recognized by the United States Department of Education ("USDE") and the Council for Higher Education Accreditation ("CHEA") for the accreditation of traditional and distance delivery educational programs in radiography, radiation therapy, magnetic resonance, and medical dosimetry. This program provides West Boca Medical Center's clinical staff with the educational opportunities to ensure its patients receive quality care.

43. West Boca Medical Center is accredited by the Joint Commission. West Boca Medical Center has also been accredited by Joint Commission for specialization certifications for

Joint-Replacement – Hip, Joint Replacement – Shoulder, and Joint Replacement – Knee—a certification designed for hospitals providing the critical elements to achieve long-term success in improving critical medical outcomes—which signifies its services have delivered evidence-based proof of clinical quality sought by patients and payers alike.

44. West Boca Medical Center has also received numerous awards that exemplify its quality such as Get with the Guidelines Silver Plus Stroke Recognition Award and Diabetes Honor Roll. In addition, as a facility that primarily treats mothers and children, it is important to it that it implements the American Academy of Pediatrics ("AAP") best practices and have been recognized for doing so by receiving the Silver designation from the Cribs for Kids' National Safe Sleep Hospital Certification program, which signifies its facility's commitment to infant safe sleep to reduce the risk of Sudden Unexpected Infant Death ("SUID"), Accidental Suffocation and Strangulation in Bed ("ASSB"), SIDS, and unsafe sleep injuries.

45. West Boca Medical Center earned two Healthgrades Excellence Awards, one for gastrointestinal care and the other for gastrointestinal surgery, and it placed in the top 10% of hospitals in the nation for overall GI services and gastrointestinal surgery. West Boca Medical Center has also received many five-star awards, including Five-Star Recipient for Treatment of Sepsis for four years in a row (2022-2025), Five-Star Recipient for Colorectal Surgeries for three years in a row (2023-2025), Five-Star Recipient for Treatment of Bowel Obstruction (2025), Five-Star Recipient for C-Section Delivery for eleven years in a row (2015-2025), Five-Star Recipient for Vaginal Delivery for eleven years in a row (2015-2025), and Five-Star Recipient for Treatment of Respiratory Failure for three years in a row (2023-2025).

**B. TLG's Safety Grade Methodology Punishes Non-Participating Hospitals Like Plaintiffs And Conceals that Penalty From Consumers.**

46. TLG conducts an annual "Hospital Survey" in which TLG "asks hospitals to report quality and safety data and then publicly reports that information by hospital." In connection with the Hospital Survey, TLG assigns a "Hospital Safety Grade" to nearly 3,000 general acute-care hospitals across the nation every spring and fall. TLG posts its safety grade on one of its websites, www.hospitalsafetygrade.org, and it markets, references and links to the Hospital Safety Grade website on another website, www.leapfroggroup.org.

47. TLG admits it assigns hospitals Safety Grades to influence where consumers and patients decide to receive care. TLG explicitly tells consumers, "Patients should *always* decide on where to receive care based on a hospital's current Safety Grade." (emphasis added). TLG even tells consumers that choosing a hospital "could be a life or death decision" and amplifies this threat by misleading consumers into thinking they're "twice as likely to die of a preventable problem at a C, D, or F hospital than at an A hospital."

48. The Safety Grade uses CMS data, TLG's Hospital Survey responses, and information from other supplemental data sources to produce a single letter grade that purports to represent a hospital's "overall performance in keeping patients safe from preventable harm and medical errors." "A" represents the best TLG Hospital Safety Grade, followed in order by "B," "C," "D," and "F." The Safety Grade aggregates up to 22 national patient safety measures. For hospitals who participate in TLG's Hospital Survey, TLG uses the hospitals' answers to TLG's Hospital Survey for 12 of the 22 measures. In other words, a majority of the grade for participating hospitals is based on their self-reported survey responses.

49. When a hospital does not participate in TLG's Hospital Survey, TLG uses other sources for those 12 measures. For five measures, TLG uses government data. TLG abandons three measures entirely. And for the last four measures, TLG uses its "imputation model."

50. According to TLG, that "imputation model" is how it assigns a value for a measure when it lacks any data pertaining to it. If a hospital does not provide TLG data, TLG assigns an "imputed" value. Prior to Fall 2024, TLG's imputation model assigned hospitals that did not participate in its survey a score based on the average score applicable to similarly situated hospitals. Beginning in Fall 2024, however, TLG modified its imputation model. It now assigns the lowest possible score to non-participating hospitals. In other words, TLG now punishes non-participants for their lack of participation. TLG has admitted its new model imposes a penalty. It specifically explained its 2024 change was designed to prevent non-participating hospitals from "inadvertently benefit[ing]" compared to hospitals that self-report, even though TLG has no data to show how non-participation could benefit a hospital.

51. The four measures for which TLG "imputes" scores are: Computerized Physician Order Entry ("CPOE"), Bar Code Medication Administration ("BCMA"), ICU Physician Staffing ("IPS"), and Hand Hygiene Score. CPOE measures whether a hospital has implemented a system to record medication prescriptions via computer. BCMA measures whether a hospital confirms medication via bar code process. IPS measures a hospital's use of intensivists in an intensive care unit. A Hand Hygiene score measures hospitals' policies for monitoring hand washing and glove usage.

52. TLG's imputation model deceives consumers by inventing negative data about hospitals that TLG wishes to punish for declining to participate in its survey. For the four imputed measures (CPOE, BCMA, IPS, and Hand Hygiene), if a hospital does not participate in TLG's

survey, TLG assigns "a point value that is equivalent to receiving 'Limited Achievement' for this measure"—its lowest possible score—without any factual basis. The result is that hospitals who elect not to participate in TLG's survey receive only 60 out of 400 possible points in these four categories—resulting in artificially deflated overall grades with no basis in fact and no correlation to a hospital's actual safety performance. For example, TLG assigns a hospital the lowest possible value for the Hand Hygiene measure even if it has the best possible Hand Hygiene policy just because the hospital doesn't participate in TLG's Hospital Survey. TLG has no basis to assign that low value.

53. TLG's "imputation" model for ranking non-participating hospitals directly conflicts with TLG's own National Expert Panel's guidance. As TLG explains, "not all hospitals have enough data publicly available to be eligible for a grade." "As per the National Expert Panel guidance, [TLG] has requirements for the minimum amount of data [it] need[s] to issue an accurate grade." Accordingly, "[h]ospitals missing more than **six** process measures" are "not graded." Non-participating hospitals should fall easily into that "not graded" bucket, because their decision not to participate in TLG's survey necessarily means TLG is missing ***seven*** process measures that rely on voluntary submission of hospital data.[5] The responsible thing to do based on TLG's own Expert Panel guidance, therefore, would be to *not* provide a safety grade for a non-participating hospital. But TLG cooks the books. Of those seven missing measures, TLG "imputes"—or gins up—scores for four of them, using those concocted scores to justify ranking non-participating hospitals.

[5] Those seven include CPOE, BCMA, IPS, Safe Practice 1: Culture of Leadership Structures and Systems; Safe Practice 2: Culture Measurement, Feedback & Intervention; Total Nursing Care Hours per Patient Day; and Hand Hygiene.

54. TLG's statements about its imputation model mislead consumers and misrepresent its own model. One Frequently Asked Question on its website asks whether "a hospital get[s] a better Safety Grade if it reports to the [TLG] Hospital Survey." In response, TLG falsely states, "The Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the [TLG] Hospital Survey." Given the nature of TLG's imputation model, which involves inventing data with no objective source, that's a clear lie. TLG relies on invented data for some hospitals but not others, and it applies a different methodology to determine Hospital Safety Grades for non-participating hospitals as compared to participating ones—all despite its claims that it meaningfully compares all hospitals regardless of participation.

55. Another way TLG's deceptive methods punish non-participating hospitals is by rewarding participating hospitals with grade inflation. The data provided by hospitals that do participate in the TLG Hospital Survey is self-reported, biased, and subject to manipulation. Median responses for hospitals that report their own scores show that those hospitals inflate their performance. TLG lacks appropriate auditing mechanisms to ensure self-reported data is accurate, and it factors measures into its grading methodology that are unverifiable. TLG assumes the data it relies on is accurate without adequately verifying it.

56. Participating hospitals are not receiving strong TLG grades because they are achieving better results on an objective basis. In one illustrative example, TLG assigned a grade of "A" or "B"—its highest possible safety scores—to Mission Hospital in Asheville, North Carolina, for seven consecutive review cycles between Spring 2021 and Spring 2024. During this same time period, investigators with the North Carolina Department of Health and Human Services conducted a survey at Mission Hospital to evaluate its compliance with Medicare standards. On February 1, 2024, CMS designated Mission Hospital as in "immediate jeopardy [of losing federal

funding]"—the most severe sanction possible—because the investigators "determin[ed] that the quality of care at Mission was so bad that it had 'caused – or is likely to cause – serious injury, harm, impairment or death to a patient.'"[6] According to the 384-page report from CMS, at least three patients died in 2022 and 2023 following "significant delays and lapses of care in the emergency department and other areas"[7]—two years in which TLG awarded Mission Hospital four consecutive "A" Hospital Safety Grades.

57. Hospitals in Florida that have participated in TLG's survey are similarly receiving high TLG grades that do not reflect their performance, which damages their higher-performing but non-participating competitors. Participating hospitals have received high grades (A's and B's) in recent years despite investigative reports that a participating hospital had cockroaches in operating rooms, dirty and broken medical equipment, inadequate monitoring of ICU patients, an overcrowded emergency department, staffing deficiencies of telemetry technicians—those responsible for monitoring changes in vital signs in patients with electronic devices—that resulted in deaths related to telemetry, patients attacking nurses, and even a misplaced patient who died after staff was unable to locate him or her.

58. The flaws in TLG's methodology reveal themselves through a simple comparison between TLG's rankings and CMS data. CMS provides its own hospital safety rankings—rankings that are the product of data hospitals are required to submit to the federal agency in order

---

[6] Andrew R. Jones, *Mission Hospital's Leapfrog, Healthgrade scores and rankings don't tell the whole story, draft report says*, Asheville Watchdog (Feb. 12, 2024), https://avlwatchdog.org/mission-hospitals-leapfrog-healthgrade-scores-and-rankings-dont-tell-the-whole-story-draft-report-says/.

[7] Andrew R. Jones, *'The patient was subsequently found unresponsive in a hallway bed': CMS report on Mission Hospital details deaths of patients, significant delays in care*, ASHEVILLE WATCHDOG (Feb. 17, 2024), https://www.northcarolinahealthnews.org/2024/02/17/plan-of-correction-report-mission-hospital/.

to qualify for the Centers for Disease Control's National Healthcare Safety Network incentive programs. There are numerous examples throughout the country where TLG's grade for a hospital is two grades removed from the rating CMS provides—for example, where CMS considers a hospital a 5-star (the highest CMS rating) and TLG assigns the hospital a C, and where CMS considers a hospital a 2-star (the second lowest) and TLG assigns the hospital an A.

| **Examples of Leapfrog Advantaging Hospitals Who Provide It Free Data and Disadvantaging Hospitals Who Don't** | | | |
|---|---|---|---|
| **Hospital** | **Participates in Leapfrog Survey?** | **Leapfrog Safety Grade (Fall 2024)** | **CMS Overall Star Rating** |
| **Examples of Grade Deflation for Non-Participating Hospitals** | | | |
| Uintah Basin Medical Center | No | C | 5 |
| University of Utah Hospital and Clinics | No | C | 5 |
| **Examples of Grade Inflation for Participating Hospitals** | | | |
| UVA Health Culpeper | Yes | A | 1 |
| Twin County Regional | Yes | A | 2 |
| Sentara Northern Virginia | Yes | A | 2 |
| Iredell Memorial Hospital | Yes | A | 2 |
| Maria Parham Medical Center | Yes | A | 2 |
| Vidant/ECU Health Edgecombe | Yes | A | 2 |

59. Similarly, in 2023, TLG awarded nine hospitals who participated in its survey passing grades (A–C) when the government had assigned them "immediate jeopardy" warnings because the hospitals' "noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death[.]" In other words, TLG assigned failing hospitals an A and directed patients to go there at the same time the government was concerned with patients' safety at that hospital.

60. These discrepancies exist because TLG rewards participating hospitals and penalizes non-participating hospitals.

### C. TLG Has Been Subject To Significant Industry And Academic Criticism.

61. For more than a decade, industry experts and academics have been sounding the alarm that TLG's methodologies are inaccurate, misleading, or inconsistent based on who participates in the surveys and who does not.

62. The Journal of the American Medical Association ("JAMA") published an article in 2009 titled *Association Between Hospital-Reported Leapfrog Safe Practices Scores and Inpatient Mortality*. That article concluded that in the "sample of . . . hospitals . . . that completed the [2006] Safe Practices Leap" survey, "survey scores were not significantly associated with risk-adjusted inpatient mortality."

63. On June 22, 2012, Richard J. Umbdenstock, President and CEO of the American Hospital Association ("AHA") sent a letter to Leapfrog declaring that the Leapfrog Hospital Safety Grade "was neither fair nor accurate," and he outlined "several methodological shortcomings in the survey." The flaws included "an unfair bias toward responding to the survey, the use of unreliable measures, significant variation in the weights applied to measures for different groups of hospitals, and significant errors in the data." Umbdenstock's letter detailed three major criticisms of TLG's hospital safety score: (1) a minority of U.S. hospitals participate in TLG's voluntary reporting program, while those that do not receive lower imputed scores; (2) more than 80% of the outcome measures have been shown to be unreliable; and (3) there are errors in the TLG data. AHA expressed its "disappointment that the [TLG] scorecard's assessment was neither fair nor accurate"—leading AHA to conclude that "no one should use [TLG's Hospital Safety Grades] to guide their choice of hospitals, unless and until, a more accurate assessment method is used."

64. In 2017, the peer reviewed journal Medical Care published an article titled: *Dissecting Leapfrog: How Well Do Leapfrog Safe Practices Scores Correlate with Hospital Compare Ratings and Penalties, and How Much Do They Matter?* The authors, a team of researchers from the University of Michigan, concluded that participation in TLG's survey consistently inflated the participant's TLG Hospital Safety Score because self-reported information overwhelmingly "skew[ed] towards positive self-report." For example, over 50% of participating hospitals reported perfect scores in their surveys for all but one safe practice measure, and nearly 20% reported perfect scores for all safe practices.

65. The University of Michigan study further found that TLG's heavy reliance on self-reported data had the effect of "artificially deflating the mean of the distribution" to which non-reporting hospitals were compared. In other words, non-participating hospitals are subject to "large grade penalties for less-than-perfect self-reported Safe Practices compliance" because they are graded on the same curve as participating hospitals with inflated self-reported data.

66. The authors determined that "Leapfrog's current methodologies, in combination with strongly positively skewed self-reports of [Safe Practices Scores ('SPS')] measures, punish low SPS reports substantially more than they reward high SPS. These concerns cast doubt on the utility of SPS and, more generally, the [Hospital Safety Score] and grades." In addition, the TLG Hospital Safety Scores were not positively associated with patient outcomes reported by Hospital Compare or Medicare penalties for readmissions or complications.

67. Jennifer Meddings, M.D., M.Sc.—the senior author of the Michigan study—said the Hospital Safety Grade is "based on whether a hospital self-reports that it has adopted certain protocols, and not whether those protocols are actually followed"—meaning the Hospital Safety Grades offer little indication of a hospital's actual safety metrics in practice. Indeed, participating

hospitals that reported high levels of self-compliance for TLG's safe practices did not have correspondingly lower hospital-acquired infection rates or lower federal penalties for readmissions, demonstrating the ineffectiveness and misleading nature of TLG's methodology.

68. In 2019, The New England Journal of Medicine Catalyst ("NEJM") published a peer reviewed article criticizing the methodology used by rating agencies, including Leapfrog. The authors said "[t]he greatest concerns were with [TLG's] internally developed and modified Safety Survey." The NEJM authors noted that TLG "had only done a formal audit for approximately five hospitals of about 2,600 in the past year, and only 72 hospitals underwent an electronic audit." In addition, the authors also reported concerns that the survey "may not truly reflect patient safety efforts or be currently meaningful to stakeholders (e.g., computerized physician order entry)." And "[a]nother major area of concern was how Leapfrog assesses hospitals that do not answer their Safety Survey. When hospitals do not report the survey, the missing data are filled in from other secondary sources. However, hospitals that answer the survey and those that do not are assessed in the same way despite not having the same measures upon which to base the ratings. Approximately 50% of hospitals answer their survey, so a good deal of the rankings are based on missing or inconsistent data."

**D. TLG Reaps Substantial Rewards From Its Pay-to-Play Scheme.**

69. TLG heavily tilts its grading in favor of hospitals that participate in TLG's scheme in a quid-pro-quo arrangement: Hospitals provide TLG free data, which it can then monetize, and in return hospitals receive better TLG grades while their competitors are penalized for not supplying TLG free data. And though it pretends to be a non-profit, TLG also rakes in millions of dollars from the data it obtains from participating hospitals incentivized to keep TLG happy, so it keeps inflating grades.

70. Between 2019 and 2023, TLG collected millions in revenue from hospitals that it later rewarded with inflated grades. TLG also has collected troves of data from hospitals who complete its survey so it can financially benefit from such data. Participants in the TLG survey are specifically required to sign an acknowledgment that "[t]he Leapfrog Group may use this information in a commercial manner for profit":

*2025 Leapfrog Hospital Survey – Hard Copy* *Section 1: Patient Rights and Ethics*

**Affirmation of Accuracy**

As the hospital CEO or as an employee of the hospital to whom the hospital CEO has delegated responsibility, I have reviewed this information pertaining to the Patient Rights and Ethics Section at our hospital, and I hereby certify that this information is true, accurate, and reflects the current, normal operating circumstances at our hospital. I am authorized to make this certification on behalf of our hospital.

The hospital and I understand that The Leapfrog Group, its members, the public and entities and persons who contract or have other business dealings with The Leapfrog Group are relying on the truth and accuracy of this information. The hospital and I also understand that The Leapfrog Group will make this information and/or analyses of this information public through the Survey Results public reporting website, The Leapfrog Group's Hospital Safety Grade, and/or other Leapfrog Group products and services. This information and/or analyses and all intellectual property rights therein shall be and remain the sole and exclusive property of The Leapfrog Group in which The Leapfrog Group retains exclusive ownership. This information does not infringe upon any third-party intellectual property rights or any other third-party rights whatsoever and is free and clear of all encumbrances and liens of any kind. The hospital and I acknowledge that The Leapfrog Group may use this information in a commercial manner for profit. The hospital shall be liable for and shall hold harmless and indemnify The Leapfrog Group from any and all damages, demands, costs, or causes of action resulting from any inaccuracies in the information or any misrepresentations in this Affirmation of Accuracy. The Leapfrog Group and its members and entities and persons who contract or have other business dealings with The Leapfrog Group reserve the right to omit or disclaim information that is not current, accurate or truthful.

Affirmed by ____________________, the hospital's __________________________.
*(first name and last name)* *(title)*
on ______________________.
*(date)*

71. TLG collects revenue from participating hospitals in multiple ways. For instance, TLG charges hospitals—including ones TLG rates—over $25,000 annually to join its Partners Advisory Committee to influence the TLG Board of Directors four times a year. TLG thereby creates a structure for hospitals to pay for access to its decision-makers and curry favor with them

to ensure TLG's system benefits hospitals who participate in TLG's scheme and punishes those who do not. Some of TLG's paying members own some of its highest-rated hospitals.[8]

72. TLG also charges hospitals between $6,700 and $29,900 per year to advertise their TLG safety grade. That creates an incentive for TLG to rate higher the hospitals willing to pay, as opposed to those who do not. No hospital would pay $29,900 to advertise a failing grade.

73. TLG also encourages hospitals to sponsor its annual meetings and awards ceremony. In 2024, TLG's platinum executive sponsorship required $44,750—yet another way TLG reaps financial rewards from its scheme.

74. TLG monetizes the data it receives from hospitals who participate in its Hospital Survey. TLG is therefore incentivized to set up its methodology to reward participating hospitals, so that it gets more data, which it can use to make more revenue. TLG has used the tens of millions of dollars of revenue it has collected from participating hospitals and other sponsors in its pay-to-play system to pay exorbitant salaries to its owner and executives. Between 2019 and 2023, TLG has paid over three million dollars in salary and benefits to Leah Binder—its CEO.

75. TLG also licenses its safety grades to insurers, which integrate TLG's grades into websites patients use to determine whether particular healthcare facilities are covered. Insurers are even able to use TLG's logos and intellectual property—displayed prominently in a drop-down called "Hospital Safety & Accreditation":

[8] Gretchen Morgenson et al., *Roaches in the operating room: Doctors at HCA hospital in Florida say patient care has suffered from cost cutting*, NBS News (Feb. 15, 2023), https://www.nbcnews.com/health/health-care/roaches-operating-room-hca-hospital-florida-rcna69563.




TLG receives compensation from insurers to allow those insurers to use TLG's safety grades and logos. That means TLG has yet another incentive to rank as many hospitals as possible so as to convince insurers TLG's ratings have value and to drive even more revenue to TLG through penalizing non-participating hospitals and trying to coerce them into providing data.

**E. TLG's Websites Confirm TLG Is Knowingly Deceiving Patients.**

76. TLG has two websites for its hospital safety rankings—www.leapfroggroup.org and www.hospitalsafetygrade.org. They each reference TLG's safety grades, but they do so in inconsistent ways that confirm not only that TLG knows it is misleading patients but also that it intends to do so.

77. When a potential patient or even an existing patient Googles "hospital safety rankings," the top two results are TLG's websites, www.hospitalsafetygrade.org and www.leapfroggroup.org:




78. Each website, however, depicts information about Plaintiffs differently. Consider the consumer experience looking for safety grades on the first Google hit—www.hospitalsafetygrade.org. Clicking that link brings a patient to TLG's Hospital Safety Grade website, where TLG encourages users to search for their local hospital by asking, "How Safe is Your Hospital?"



79. Once a patient searches her hospital's name, she is immediately confronted with the following image—a disturbing "F" grade, the meaning of which even an elementary school student would understand:




80. When a patient clicks on "View the full Score" she sees a plethora of inaccurate and misleading information about the hospital (explained *infra* Section F):




81. Only at the bottom of the page—in a small font and in footnotes consumers won't read—does TLG disclose that the hospital did not provide data to TLG.

82. TLG's approach on www.hospitalsafetygrade.org is inconsistent with how it depicts information about Plaintiffs on its other website, www.leapfroggroup.org. On leapfroggroup.org, searching for Good Samaritan Medical Center, for example, does *not* result in

any grade at all. Instead, on *that* website, TLG states that the hospital did not provide data to TLG sufficient to rate the hospital:




83. TLG's leapfroggroup.org rating website also accurately discloses that TLG has inadequate information to rate the hospital as to every metric:



**Preventing Patient Harm**

| Measure name | Leapfrog's Standard | Hospital's Progress |
|---|---|---|
| Nursing and Bedside Care for Patients | Hospitals should have nurse staffing plans in place that ensure there are enough nurses of all types (i.e., registered nurses, licensed practical nurses, or unlicensed assistive personnel) to provide direct care to patients in medical, surgical, or med-surg units each day. | DECLINED TO RESPOND |
| Nursing Care for Patients | Hospitals should have nurse staffing plans in place that ensure there are enough registered nurses (RNs) to provide direct care to patients in medical, surgical, or med-surg units each day. | DECLINED TO RESPOND |

84. The differences in TLG's websites confirm TLG knows exactly what message it is communicating to consumers. TLG clearly understands how to tell patients that it can't grade Plaintiffs because it lacks data. TLG decided not to do that, though, on www.hospitalsafetygrade.org: Even after admitting on www.leapfroggroup.org that it *can't* rate Plaintiffs, it purports to fail Plaintiffs with a big, bold "F" on www.hospitalsafetygrade.org.

**F. TLG Assigned Plaintiffs Misleading And Deceptive Low Grades.**

85. Plaintiffs are among the many hundreds of hospitals across the country who choose not to participate in TLG's Survey. Given that non-participation, TLG could easily have told consumers—as it does on www.leapfroggroup.org—it lacks sufficient data to provide safety grades for Plaintiffs. Instead, it "imputed" scores to Plaintiffs and gave them failing or near-failing grades on www.hospitalsafetygrade.org. As a result, TLG has intentionally and recklessly released misleading and deceptive information about Plaintiffs' health safety performance.

86. TLG assigned Plaintiffs "Limited Achievement" scores, and corresponding low Safety Grades just as it did with other non-participating hospitals.

87. ***Delray Medical Center.*** TLG assigned Delray Medical Center an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Delray Medical Center the lowest possible score on multiple criteria for which TLG had no information—including "Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

88. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Delray Medical Center performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly reflect that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to say so:



This Hospital's Grade

F

FALL 2024

**Delray Medical Center**

5352 Linton Boulevard
Delray Beach, FL 33484-6580
Map and Directions

View this hospital's Leapfrog Hospital Survey Results

► Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade

Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff

Doctors order medications through a computer

Safe medication administration

Handwashing

Communication about Medicines

Communication about Discharge

Declined to Report[1]
Staff work together to prevent errors

**Hospital Performs:**
Worse Than Average — Better Than Average

**This Hospital's Score:**
15 *

**Best Hospital's Score:**
100

**Average Hospital's Score:**
79.04

**Worst Hospital's Score:**
15

**Doctors order medications through a computer**

Hospitals can use Computerized Physician Order Entry (CPOE) systems to order medications for patients in the hospital, instead of writing out prescriptions by hand. Good CPOE systems alert the doctor if they try to order a medication that could cause harm, such as prescribing an adult dosage for a child. CPOE systems help to reduce medication errors in the hospital.

*Hospitals can earn up to 100 points for using a well-functioning CPOE system in most areas of the hospital.* For details on sources, click here.

**What safer hospitals do:**

Hospitals use CPOE systems in all areas of the hospital and regularly test those systems to ensure they are alerting doctors to potential ordering errors.

**Notes and Definitions**

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. *** The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**

89. In other words, TLG is deceptively communicating to consumers that Delray Medical Center doctors and nurses don't adequately wash their hands, among other false statements—with no data whatsoever to support that conclusion.

90. TLG's F grade for Delray Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

91. ***Good Samaritan.*** TLG also assigned Good Samaritan an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Good Samaritan the lowest possible score on the same criteria for which TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

92. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Good Samaritan performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:



This Hospital's Grade

F

FALL 2024

**Good Samaritan Medical Center**

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499
Map and Directions

View this hospital's Leapfrog Hospital Survey Results

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade

Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff

Doctors order medications through a computer
Safe medication administration
Handwashing
Communication about Medicines
Communication about Discharge
Declined to Report[1] Staff work together to prevent errors

Hospital Performs:
Worse Than Average — Better Than Average

**This Hospital's Score:**
15 *

**Best Hospital's Score:**
100

**Average Hospital's Score:**
79.04

**Worst Hospital's Score:**
15

**Doctors order medications through a computer**

Hospitals can use Computerized Physician Order Entry (CPOE) systems to order medications for patients in the hospital, instead of writing out prescriptions by hand. Good CPOE systems alert the doctor if they try to order a medication that could cause harm, such as prescribing an adult dosage for a child. CPOE systems help to reduce medication errors in the hospital.

*Hospitals can earn up to 100 points for using a well-functioning CPOE system in most areas of the hospital. For details on sources, click here.*

**What safer hospitals do:**

Hospitals use CPOE systems in all areas of the hospital and regularly test those systems to ensure they are alerting doctors to potential ordering errors.

Notes and Definitions

1. Declined to Report: The hospital was asked to provide this information to the public, but did not.

2. Not Available: "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. * The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.

93. TLG's "F" grade for Good Samaritan is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

94. ***Palm Beach Gardens Medical Center.*** TLG also assigned Palm Beach Gardens Medical Center an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Palm Beach Gardens Medical Center the lowest possible score on the same criteria for which TLG had

no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

95. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Palm Beach Gardens Medical Center performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:




96. TLG's F grade for Palm Beach Gardens Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

97. ***St. Mary's.*** TLG assigned St. Mary's a "D" grade for Fall 2024. Under its flawed methodology, TLG assigned St. Mary's the lowest possible score on the same criteria for which

TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

98. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that St. Mary's performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:




99. TLG's "D" grade for St. Mary's is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

100. ***West Boca Medical Center.*** TLG also assigned West Boca Medical Center a "D" grade for Fall 2024. Under its flawed methodology, TLG assigned West Boca Medical Center the lowest possible score on the same criteria for which TLG had no information—"Handwashing,"

"Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

101. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that West Boca Medical Center performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:



This Hospital's Grade

D

FALL 2024

West Boca Medical Center

21644 State Road 7
Boca Raton, FL 33428-1899
Map and Directions

View this hospital's Leapfrog Hospital Survey Results

► Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade

Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff

Doctors order medications through a computer
Safe medication administration
Handwashing
Communication about Medicines
Communication about Discharge
Declined to Report[1] Staff work together to prevent errors

Hospital Performs:
Worse Than Average — Better Than Average

This Hospital's Score:
15 *

Best Hospital's Score:
100

Average Hospital's Score:
79.04

Worst Hospital's Score:
15

**Doctors order medications through a computer**

Hospitals can use Computerized Physician Order Entry (CPOE) systems to order medications for patients in the hospital, instead of writing out prescriptions by hand. Good CPOE systems alert the doctor if they try to order a medication that could cause harm, such as prescribing an adult dosage for a child. CPOE systems help to reduce medication errors in the hospital.

*Hospitals can earn up to 100 points for using a well-functioning CPOE system in most areas of the hospital. For details on sources, click here.*

**What safer hospitals do:**

Hospitals use CPOE systems in all areas of the hospital and regularly test those systems to ensure they are alerting doctors to potential ordering errors.

Notes and Definitions

1. Declined to Report: The hospital was asked to provide this information to the public, but did not.

2. Not Available: "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. * The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.

102. TLG's "D" grade for West Boca Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

**G. TLG's Deceptive And Misleading "Safety" Grades Have Severely Harmed Plaintiffs, Their Patients, And The Public.**

103. TLG's misleading safety grades have caused severe, ongoing, and irreparable harm to Plaintiffs, their patients, and the public. The grades have caused Plaintiffs' patients to move their procedures from Plaintiffs to Plaintiffs' competitors, damaged the goodwill that Plaintiffs worked hard to build with their patients over the years, harmed Plaintiffs' relationships with key business partners, and risked serious consumer harm. Plaintiffs' elective patient admissions dropped following TLG's release of its Fall 2024 Hospital Safety Grades. The harm has been significant and widespread, given TLG's efforts to encourage the media to report on the misleading and deceptive grades TLG assigned Plaintiffs. Indeed, TLG has specifically admitted that it embargoed Plaintiffs' safety grades with the press weeks before those scores went public specifically to generate broad public attention to those false and misleading scores. TLG's safety grades are even available on insurer websites for patients to rely on when they look up whether certain hospitals fall under insurance coverage.

104. Each Plaintiff has suffered harm from TLG's deceptive practices. Plaintiff Delray Medical Center's Medical Executive Committee, which is comprised of the medical leadership that oversees each department within the hospital, has received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. Physicians were approached by patients who expressed that they did not want to go to Delray Medical Center for surgeries after seeing TLG's grade and associated reports. Plaintiff Delray Medical Center has also received reports from patients and from doctors that patients have planned to drive past Delray Medical Center to a more distant medical facility due to the grade TLG gave to Delray Medical Center.

105. Plaintiff Good Samaritan's Medical Executive Committee has also received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. TLG's grades are even impacting Good Samaritan's hiring efforts. Plaintiff Good Samaritan's Chief Nursing Officer reported that a nursing candidate questioned the quality of care of the hospital in her interview for a job opening. Good Samaritan has also received reports from patients that they decided not to use its facility because of TLG's misleading grades.

106. Plaintiff Palm Beach Gardens Medical Center has received reports from patients that they decided not to use the Medical Center due to the misleading grade TLG assigned the hospital. This is particularly harmful to the Palm Beach Gardens community given that the majority of patients are 65 years old and older, and travel time risks exacerbating their health issues before receiving care, particularly if they are stroke victims. The Palm Beach Gardens Medical Center's Medical Executive Committee has also received direct inquiries from patients regarding their concerns about TLG's grades and related public reports.

107. Plaintiff St. Mary's medical leadership has received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. As a Level I adult and pediatric Trauma Center, Joint Commission Comprehensive Stroke Center, Level III NICU, and RPICC—among other certifications—St. Mary's is a facility people need to go to receive specialized medical care. TLG's safety grades misleadingly make patients think that they should go to "A" hospitals even though those hospitals do not have the objective accreditation, certification, and facilities—like St. Mary's—needed to treat certain high-risk patients.

108. When TLG assigns a hospital an A, patients think that facility is where they should receive care. Objective data debunks that impression. As just one example, another hospital in the Palm Beach County area that TLG has graded an "A" regularly transfers patients to St. Mary's

for critical, higher-level care services—despite St. Mary's purported TLG "D" safety grade. In 2024, that A-ranked hospital transferred 600 patients to St. Mary's. Since 2022, that A-ranked hospital transferred 1,800 patients to St. Mary's. Why? Because only St. Mary's had the right specialists, technology, accreditations, and certifications necessary to provide the required care. Whether a hospital can or should treat a given patient depends on far more than TLG's superficial and misleading marks, but TLG intentionally deceives consumers into thinking otherwise.

109. Plaintiff West Boca Medical Center's Medical Executive Committee has also received direct inquiries from patients regarding their concerns with TLG's grades and related public reports. TLG's inaccurate grades have also harmed West Boca Medical Center's relationships with physicians and patients who have chosen alternative options as reflected through West Boca's drop in patient encounters since Fall 2024.

110. TLG's Hospital Safety Grades have also harmed Plaintiffs' relationships with physicians. Medical professionals have expressed concern about working with Plaintiffs due to the grades assigned by TLG, especially when patients have requested to schedule their surgeries at alternative facilities.

111. Attempting to counteract the inaccurate, negative picture created by TLG in the community has required Plaintiffs to devote time and resources that could have otherwise been spent continuing to improve patient care. The harm is particularly pronounced given that negative safety ratings are particularly "sticky" with consumers—*i.e.*, once a consumer sees a failing safety ranking it is exceedingly difficult to convince them the grade is wrong.

112. The deceptive Hospital Safety Grades TLG releases about Plaintiffs—and other non-reporting hospitals—mislead consumers to make commercial decisions to purchase healthcare

services that are not in their best interest. By putting hospitals on unequal footing in its evaluation just to make more money for itself and for its "partners," TLG achieves the opposite of its purported non-profit objective: It risks patient harm and causes potential patients to make unsafe decisions with potentially life-or-death implications.

113. TLG's misleading safety grades have resulted in patients delaying medical care. That's a material public safety problem. Increased time to get to a hospital following an acute health incident materially increases the risk of mortality for emergency patients. Increased time from incident to the hospital also materially increases the risk of worse outcomes, infection, and other dangerous and harmful health outcomes. It is for this reason that Florida law requires ambulances to drive emergency patients to the closest hospital. *See* Fl. Code § 395.1041(3)(e) ("Except as otherwise provided by law, **all medically necessary transfers shall be made to the geographically closest hospital** with the service capability, unless another prior arrangement is in place or the geographically closest hospital is at service capacity." (emphasis added)).

114. TLG's methodology and public statements contradict this public health principle engrained in Florida law by deceiving patients into thinking they are better off driving longer distances to hospitals based on TLG's misleading grades. The vast majority (~80%) of emergency patients are transported to emergency rooms by non-ambulatory vehicles. TLG is putting emergency patients' lives at risk by undermining their trust in local hospitals and encouraging them to delay the care they need based on deceptive information TLG is releasing. TLG's Hospital Safety Grades cause patients to make commercial decisions to drive past deceptively graded hospitals to another hospital farther away. This is a dangerous result particularly because the low grade by TLG is false and misleading.

115. TLG intends these results to encourage non-participating hospitals to participate in its deceptive scheme by warning patients they are "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a C, D, F hospital than at an A hospital." (emphasis added).

116. This has directly caused Plaintiffs loss of revenue and harm to their reputation and goodwill.

## CLAIMS FOR RELIEF

### COUNT I
### (FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

117. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

118. By virtue of its solicitation of information from Florida healthcare facilities, publication of information and Hospital Safety Grades for Florida hospitals, and commission of deceptive acts and unfair practices against Plaintiffs and the residents of Florida, TLG is subject to the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. § 501.201 et seq.

119. TLG's actions described herein constitute unfair or deceptive trade practices substantially affecting trade or commerce in the state of Florida in violation of FDUTPA.

120. In the course of its business, TLG releases its Hospital Safety Grades, which contain deceptive and misleading statements about hospital quality and patient safety.

121. TLG has made misleading representations about how its scheme penalizes non-participating hospitals, including, but not limited to, its representation that non-participating hospitals are not disadvantaged compared to hospitals who participate in its deceptive scheme.

122. TLG's entire grading system, including its imputation model, misleads Florida consumers—and national consumers—into thinking that healthcare decisions should be made by looking to an oversimplified letter grade and by penalizing non-participating hospitals.

123. TLG abuses the trust of the consumer by intentionally jiggering its Hospital Safety Grades to benefit the hospitals that fund it (through donation and the provision of valuable data), participate in its surveys, and serve on its committees. TLG's Hospital Safety Grades have harmed Florida consumers by causing them to make dangerous decisions to forego the nearest hospital based on misleading information. This harm to consumers has harmed Plaintiffs through loss of goodwill, reputation, and revenue.

124. TLG's misrepresentations are knowing and intentional. TLG on www.theleapfroggroup.org accurately describes when hospitals have declined to participate in TLG's survey, making clear that TLG has insufficient data with which to assign a safety grade. At the same time, TLG purports to assign "safety grades" based on that same inadequate data on www.hospitalsafetygrade.org.

125. TLG intends that patients, purchasers, consumers, regional and national health plans, insurers, and researchers will rely on its oversimplified grading system and representations regarding the Plaintiff Hospitals' safety and the safety of all hospitals reported on throughout Florida and the country. TLG specifically tells patients to "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a C, D, F hospital than at an A hospital." (emphasis added).

126. The representations made by TLG to consumers and the methodology TLG employs to calculate the Hospital Safety Grades constitute a deceptive act or practice in trade, and both Plaintiffs and patients have been aggrieved by the deceptive act or practice.

127. TLG's deceptive acts and practices cause harm to consumers by misleading consumers regarding the quality and safety of the hospitals it grades, including Plaintiffs.

128. TLG's deceptive acts and practices mislead consumers, causing them to make decisions about their healthcare that are not in their best interests. These deceptive acts and practices cause actual damages to Florida consumers, including by increasing the incident-to-hospital time for misled patients and causing patients to choose hospitals that do not provide the types of critical care the Plaintiff Hospitals provide.

129. As a result of TLG's deceptive acts and practices, Plaintiffs suffered damages far in excess of $75,000.

130. Pursuant to FDUTPA, Plaintiffs demand damages, injunctive relief, declaratory relief, and attorneys' fees and costs.

**COUNT II**
**(DECLARATORY JUDGMENT)**

131. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

132. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, a court may declare the rights and other legal relations of any interested party in the case of an actual controversy within its jurisdiction.

133. There exists a substantial justiciable controversy between the parties as to whether TLG's grading of Plaintiffs violates FDUTPA. More specifically, Plaintiffs believe that TLG's grading of Plaintiffs constitutes a deceptive practice under FDUTPA, and TLG disagrees and refuses to abate the deceptive practice. This Court is thus vested with the power to declare the rights and liabilities of the parties and to grant such other and further relief as may be necessary. Declaration of the parties' rights in these regards will clarify the rights and interests of the parties.

134. Given the prior and ongoing harm caused by TLG's deceptive practice, the controversy between the parties is actual and of sufficient immediacy to warrant the issuance of a declaratory judgment. As alleged in the preceding paragraphs, TLG's continued grading of Plaintiffs causes substantial harm to Plaintiffs, patients, and the community such that there is a bona fide, actual, present need for the declaration.

135. Declaratory relief will resolve the legal issues between the parties regarding whether TLG's grading of Plaintiffs constitutes a deceptive practice under FDUTPA.

136. Plaintiffs have attempted to engage with TLG as to the issues with its recently-adopted methodology, including explaining in writing that the methodology results in grades that are deceptive and harmful to patients, but TLG has nevertheless continued to assign its harmful, inaccurate grades.

137. Therefore, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiffs request a judgment declaring that TLG's grading methodology and its application to Plaintiffs, in both the Fall 2024 grading cycle and forthcoming Spring 2025 grading cycle, is a deceptive practice under FDUTPA.

138. Given that the Fall 2024 Hospital Safety Grades present ongoing harm to Plaintiffs and to each future potential patient who is misled by those grades, pursuant to Federal Rule of Civil Procedure 57, Plaintiffs request a speedy hearing of this claim.

**JURY TRIAL DEMAND**

139. Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a) Preliminarily enjoin TLG from purporting to safety grade Plaintiffs during the pendency of this case and requiring TLG to remove Plaintiffs from its recent Hospital Safety Grades;

b) Permanently enjoin TLG from including Plaintiffs in its Hospital Safety Grades;

c) Speedily declare pursuant to Federal Rule of Civil Procedure 57 that TLG's grading methodology and its application to Plaintiffs, in both the current Spring 2025 grading cycle and in recent prior cycles, violates FDUTPA;

d) Award Plaintiffs damages in an amount to be proven but in excess of $75,000;

e) Award Plaintiffs their attorneys' fees and costs;

f) Grant such other and further relief as it may deem just and equitable.

Dated: April 30, 2025

Respectfully submitted,

By: /s Michael Pineiro

MARCUS NEIMAN RASHBAUM & PINEIRO LLP

Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
Brandon S. Floch, Bar # 125218
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131
Telephone: 305-400-4268
Facsimile: 954-688-2492
mpineiro@mnrlawfirm.com
drashbaum@mnrlawfirm.com
bfloch@mnrlawfirm.com

GIBSON, DUNN & CRUTCHER LLP

Mary Beth Maloney (*pro hac vice* forthcoming)
Lee R. Crain (*pro hac vice* forthcoming)
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: mmaloney@gibsondunn.com
Email: lcrain@gibsondunn.com

Betty X. Yang (*pro hac vice* forthcoming)
Scott K. Hvidt (*pro hac vice* forthcoming)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
Email: byang@gibsondunn.com
Email: shvidt@gibsondunn.com

*Attorneys for Plaintiffs*

JS 44 (Rev. 04/21) FLSD Revised 12/02/2022

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS** Good Samaritan Medical Center, Inc., Delray Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center, St. Mary's Medical Center, Inc., and West Boca Medical Center, Inc.

**DEFENDANTS** The Leapfrog Group

**(b)** County of Residence of First Listed Plaintiff Palm Beach County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Washington, D.C.
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michael A. Pineiro, Marcus Neiman Rashbaum & Pineiro LLP
2 South Biscayne Boulevard, Suite 2530, Miami, Florida 33131; 305-400-4268

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ■ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ■ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ■ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee – Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Acts
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent – Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act (TCPA)
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
■ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

■ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed (See VI below) ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district *(specify)* ☐ 6 Multidistrict Litigation Transfer ☐ 7 Appeal to District Judge from Magistrate Judgment ☐ 8 Multidistrict Litigation – Direct File ☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

(See instructions): a) Re-filed Case ☐YES ■NO b) Related Cases ☐YES ☐ NO
JUDGE: DOCKET NUMBER:

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause ***(Do not cite jurisdictional statutes unless diversity)***:
28 U.S.C. § 1332; Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. § 501.201; 28 U.S.C. § 2201
LENGTH OF TRIAL via 10 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
**DEMAND $** > $75,000
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ■ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE: April 30, 2025
SIGNATURE OF ATTORNEY OF RECORD: /s/ Michael A. Pineiro

**FOR OFFICE USE ONLY : RECEIPT #** AMOUNT IFP JUDGE MAG JUDGE

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

Good Samaritan Medical Center, Inc., Delray Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center, St. Mary's Medical Center, Inc., and West Boca Medical Center, Inc.,

*Plaintiff(s)*

v.

The Leapfrog Group,

*Defendant(s)*

Civil Action No. 9:25-cv-80526

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* The Leapfrog Group
1775 K Street, NW, Suite 400
Washington, DC 20006

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Michael A. Pineiro
Marcus Neiman Rashbaum & Pineiro LLP
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ____________________

____________________________________
*Signature of Clerk or Deputy Clerk*

Civil Action No. 9:25-cv-80526

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________
was received by me on *(date)* ______________ .

❐ I personally served the summons on the individual at *(place)* ______________________
______________________ on *(date)* ______________ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* ______________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________ on *(date)* ______________ ; or

❐ I returned the summons unexecuted because ______________________ ; or

❐ Other *(specify)*:

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________ ______________________

*Server's signature*

______________________

*Printed name and title*

______________________

*Server's address*

Additional information regarding attempted service, etc:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | | |
|---|---|---|
| GOOD SAMARITAN MEDICAL CENTER, INC., et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No.: 9:25-cv-80526-DMM |
| THE LEAPFROG GROUP, | ) | |
| Defendant. | ) | |

**DEFENDANT THE LEAPFROG GROUP'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2) AND 12(b)(6) AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT OF THE SAME**

NOW COMES Defendant, The Leapfrog Group ("Leapfrog") by and through its attorneys, Kimberly E. Blair and Thomas K. Duff of Wilson Elser Moskowitz Edelman & Dicker LLP, and for its Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6) and incorporated memorandum of law in support of the same, states as follows.

## INTRODUCTION

Leapfrog is an independent national nonprofit driving a movement for giant leaps in patient safety. Among its initiatives is the biannual "Leapfrog Hospital Safety Grade" which assigns letter grades to hospitals based on its assessment of their ability to protect patients from avoidable harm and errors. The current dispute arises from Plaintiffs' dissatisfaction with the Safety Grades they received in Leapfrog's Fall 2024 and, now, Spring 2025 publications. In an attempt to impermissibly interfere with Leapfrog's free speech, stifle Leapfrog's opinion of their hospitals, and prevent future publication of their grades, Plaintiffs now claim that Leapfrog's publication of Safety Grades for their hospitals violates the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). This Court can swiftly dismiss this case with prejudice for any of three reasons: (1) Leapfrog's opinions are protected under the free speech clause of the First Amendment; (2) this Court lacks personal jurisdiction over Leapfrog; and (3) Plaintiffs' Complaint fails to state a claim for relief under the FDUTPA.

***First,*** with regard to the First Amendment, Plaintiffs' claims in this lawsuit are incompatible with an avalanche of case law in which courts have upheld the free speech right of ratings organizations to publish their ratings opining on topics such as quality and safety. Leapfrog's Hospital Safety Grades and related representations are protected opinion under the First Amendment because they are not readily provable as true or false. They are also protected as "pure opinion" in light of Leapfrog's publication of the full grading methodology and data that form the basis for the Hospital Safety Grades and Leapfrog's representations related thereto.

***Second,*** Leapfrog is not subject to personal jurisdiction in Florida. Leapfrog is incorporated and headquartered in Washington, D.C. Although Leapfrog publishes its Safety Grades (including those for Florida hospitals) online, Plaintiffs' claims do not arise out of Leapfrog's purchase or sale

of products or services in Florida or any other significant contacts Leapfrog has within Florida.

***Third,*** the FDUTPA does not apply to Leapfrog's conduct due to the non-commercial nature of Leapfrog's Safety Grades and their lack of a commercial nexus to Florida. Leapfrog does not compete with these hospitals in any way. The Complaint also fails to sufficiently allege how Leapfrog's Safety Grades or related representations qualify as a "deceptive act" or "unfair practice" under the FDUTPA. There is nothing deceptive about the Safety Grades, which – it bears repeating – are supported by Leapfrog's publication of the full grading methodology and data upon which they are based, information that most ratings organizations do not disclose. Even regardless of this, Plaintiffs fail to plead the requirement of "actual damages" incurred by their hospitals or consumers.

The reality is that Plaintiffs have filed this lawsuit in an attempt to suppress Leapfrog's publication of its opinion on patient safety in hospitals – a vitally important matter of public concern – rather than confront the patient safety issues in their hospitals. This meritless lawsuit violates Florida's "Anti-SLAPP" statute prohibiting Strategic Lawsuits Against Public Participation ("SLAPP"). In the event this Court grants this Motion, Leapfrog respectfully requests leave to seek its fees and costs incurred defending this meritless litigation pursuant to the statute.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of a claim when the court lacks personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2). The plaintiff "has the burden of establishing a prima facie case of personal jurisdiction." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). To satisfy the pleading standard of Rule 8(a)(2), a complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 580 (2007)). Dismissal is therefore permitted "when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006).

On a Rule 12(b)(6) motion to dismiss, the Court must consider the complaint in its entirety, as well as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Under the "incorporation by reference" doctrine adopted by the Eleventh Circuit, the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is: (1) central to the plaintiff's claim; and (2) of undisputed authenticity. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

## FACTUAL BACKGROUND

### I. Preliminary note on incorporation by reference of Leapfrog's websites:

Leapfrog respectfully requests that this Court consider certain webpages from its two websites, www.hospitalsafetygrade.org and www.leapfroggroup.org, as incorporated by reference in the Complaint. (See Webpages attached hereto as **Exhibits 3-38**). These websites are central to Plaintiffs' claims because Leapfrog publishes its Hospital Safety Grades on www.hospitalsafetygrade.org and "references and links" to the Hospital Safety Grades on www.leapfroggroup.org. (*See* Complaint (**Ex. 1**) at ¶46). These two websites are discussed by Plaintiffs throughout the Complaint. (*See, e.g.*, *id.* at ¶¶1, 46, 76-84, 85-102).

The webpages attached hereto as Exhibits 3-38 are of undisputed authenticity because each of them has previously been filed by Plaintiffs in this case along with an affidavit specifically attesting to the authenticity of each one. (See Affidavit of Lee Crain (**Ex. 2** (ECF No. 21)) at ¶¶3-

25, 33-37, 45, 60-65, 67; and Webpages (**Ex's 3-38** (ECF Nos. 21-1 through 21-23, 21-31 through 21-35, 21-43, 21-58 through 21-63, and 21-65)). These webpages are therefore properly considered as incorporated by reference in the Complaint. *See Horsley*, *supra*, 304 F.3d at 1134.

## II. Background on The Leapfrog Group:

Leapfrog is an independent national 501(c)(3) nonprofit driving a movement for giant leaps in patient safety. Leapfrog is incorporated and headquartered in the District of Columbia. (**Ex. 1** at ¶14). Among its initiatives is the biannual "Leapfrog Hospital Safety Grade" which uses publicly available data from the federal Centers for Medicare and Medicaid Services ("CMS") as well as self-reported data from the Leapfrog Hospital Survey, when available, to assign letter grades to general acute care hospitals.[1] Hospital Safety Grades provide informed analysis of the safety of individual hospitals as a public service at no cost to patients, potential patients, or hospitals themselves. (*See id.* at ¶47; FAQ Webpage (**Ex. 3** at pp. 1-2)). Leapfrog's "How to Use the Grade" webpage on www.hospitalsafetygrade.org summarizes proper use of the Safety Grade: "You should never refuse care in an emergency because of a hospital's Safety Grade, but use this website as a guide for planned events and a research tool for potential emergencies." (**Ex. 17** at p. 4).

## III. Leapfrog's Hospital Safety Grades:

Leapfrog assigns A, B, C, D, and F letter grades to nearly 3,000 hospitals nationwide every spring and fall, and publishes these Hospital Safety Grades on its website, www.hospitalsafetygrade.org. (**Ex. 1** at ¶¶1, 46). Leapfrog also references and links to its Hospital Safety Grades on www.leapfroggroup.org. (*Id.* at ¶46). The format of the Hospital Safety Grade is "a single letter grade" that "represent[s] a hospital's 'overall performance in keeping patients safe

[1] This Court may properly take judicial notice of Leapfrog's nonprofit designation which is available as a public record on the District of Columbia's corponline.dcra.dc.gov website at https://corponline.dcra.dc.gov/BizEntity.aspx/ViewEntityData?entityId=2668442. *See Tecnoglass, LLC v. RC Home Showcase, Inc.*, 301 F. Supp. 3d 1267, 1270 n.1 (S.D. Fla. 2017).

from preventable harm and medical errors.'" (*Id.* at ¶48). Leapfrog awards an "A" to hospitals that it assesses as among the highest performing, followed in order by "B", "C", "D", and "F". (*Id.*).

These Safety Grades are the product of Leapfrog's own grading methodology, the current version of which Leapfrog makes publicly available on its www.hospitalsafetygrade.org website. (*See* Spring 2025 Methodology (**Ex. 5**); Fall 2025 Methodology (**Ex. 31**)).

Leapfrog's methodology considers up to 31 patient safety measures in determining a Safety Grade for each hospital graded. (**Ex. 5** at 6-10; **Ex. 31** at 6-9). In assessing a hospital's performance on these measures, the methodology considers publicly available data from CMS as well as quality and safety data from hospitals submitted through Leapfrog's own annual "Leapfrog Hospital Survey". (**Ex. 1** at ¶48). The Hospital Survey is free for hospitals to complete. (*Id.* at ¶46; *see* 2025 Leapfrog Hospital Survey (**Ex. 21**); **Ex. 5** at 17; **Ex. 31** at 16). All data submitted undergoes thorough review and verification. (*See* **Ex. 21** at 18-19). Leapfrog's grading methodology provides Hospital Safety Grades for all general acute care hospitals regardless of their participation in its Survey. (*See* **Ex. 1** at ¶49).

Leapfrog receives responses to its Survey from hospitals nationwide including hospitals located in Florida. (*See* **Ex. 1** at ¶¶17-18). Leapfrog also publishes Hospital Safety Grades on its website for hospitals nationwide including hospitals in Florida. (*See id.*). Leapfrog shares Hospital Safety Grades and provides public comments regarding the Safety Grades to media publications, including publications in Florida. (*See id.*).

Like any grading or rating system, Leapfrog's methodology includes instruction on how to score missing data. (*See, e.g.*, **Ex. 5** at 25; **Ex. 31** at 23). For instance, if a hospital does not have an Intensive Care Unit ("ICU"), some measures that assess ICU safety do not apply to that hospital. (*Id.*; **Ex. 1** at ¶¶80, 88, 92, 95, 98, 101). For hospitals that participate in Leapfrog's Hospital Survey,

Leapfrog's methodology uses the hospitals' answers to the Survey for 12 of the 31 measures. (**Ex. 1** at ¶48). Due to the voluntary nature of the Survey, however, data for these 12 out of 31 measures may be unavailable for hospitals that choose not to submit a Survey. (**Ex. 5** at 17; **Ex. 31** at 16). Where data is unavailable for more than six of these 12 measures (known as "Process/Structural measures") due to a hospital's inability to report such data, Leapfrog does not issue a Safety Grade for that hospital. (**Ex. 5** at 5, 27; **Ex. 31** at 5, 24). Otherwise, to address this gap in available data, Leapfrog's grading methodology relies on alternate publicly available CMS data for five of those measures. (**Ex. 5** at 17; **Ex. 31** at 16). For three of the 31 measures, the methodology reassigns the weight of those measures to other measures and thus removes them from consideration. (**Ex. 1** at ¶49; **Ex. 5** at 25-26; **Ex. 31** at 23).

Plaintiffs' lawsuit revolves around their disagreement with how Leapfrog's grading methodology deals with missing data for the remaining four out of 31 measures, which are: Computerized Physician Order Entry ("CPOE"), Bar Code Medication Administration ("BCMA"), ICU Physician Staffing ("IPS"), and Hand Hygiene Score. (**Ex. 1** at ¶51). For missing data for these four measures, the methodology uses a hospital's most recent score from the past two rounds of grades. (**Ex. 5** at 17; **Ex. 31** at 16). Where there is no such historical data from the past two rounds of grades, the methodology assigns a point value equivalent to receiving "Limited Achievement" for that measure as a conservative methodological approach to avoid overstating performance. (*See* **Ex. 1** at ¶¶50, 52; **Ex. 1** at 17; **Ex. 31** at 16). Leapfrog has updated its grading methodology in consultation with researchers at Johns Hopkins Medicine and an internal team of experts over the course of its 25-year history to yield more accurate, informative grades that favor the needs of patients making profound decisions about hospital care. (*See* Fall 2024 Methodology Updates (**Ex. 38**) at 3). Leapfrog releases planned changes months in advance to seek public comment, which

typically yields many comments from hospitals and the public. (*See id.* at 2, 4-5). These are often helpful to Leapfrog in revising or fine-tuning its methodology. (*See id.*).

**IV. Publicly Accessible Data and Grading Methodology on Leapfrog's Websites:**

Leapfrog maintains two public websites related to the publication of its Hospital Safety Grades: www.hospitalsafetygrade.org and www.leapfroggroup.org. (**Ex. 1** at ¶76). These websites encourage users to view its full grading methodology as well as the data and analysis used to grade each hospital. Leapfrog's mission is to improve patient safety through full transparency, and that mission is only achieved when there is full transparency in its ratings programs. (*See* **Ex. 3** at 8-9). Leapfrog's www.hospitalsafetygrade.org website reflects that Safety Grades are "100% transparent and free to the public" (*Id.* at pp. 2-3)); provides links to the full grading methodology in multiple places. (*See id.* at pp. 5-6; "About the Grade" Webpage (**Ex. 4**) at p. 4 (see "Quick Links"); **Ex. 5**; **Ex. 31**); and explains the Fall 2024 methodology update and the preceding public comment period. (*See* **Ex. 38**).

On www.hospitalsafetygrade.org, searching a hospital's name brings up that hospital's Safety Grade for the most recent grading period. (**Ex. 1** at ¶79). From here, clicking on a link entitled "View the full Score" displays further information detailing Leapfrog's basis for the hospital's letter grade, including the scores that Leapfrog's grading methodology has assigned to the hospital for each of the 31 measures considered and a description of each measure. (*Id.* at ¶¶80, 88, 92, 95, 98, 101).

Importantly, this webpage includes a section entitled in bold text, "Notes and Definitions", which explains how and why Leapfrog would assign a score for designated measures where data is unavailable, as is the case for the four out of 31 measures upon which Plaintiffs base their claims. (*Id.*). The first such entry explains in bold, red text that "Declined to Report" means: "The hospital

was asked to provide this information to the public, but did not." (*Id.*). The second such entry explains in bold, red text that an asterisk ("*") means: "The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." (*Id.*). Notations for these designations appear throughout the webpage. (*Id.*). The "Notes and Definitions" section also clarifies the methodological distinction between data that a hospital has "Declined to Report" compared to data that is "Not Available" because the hospital itself does not have data for this measure. (*Id.*; *see also* **Ex. 5** at 27; **Ex. 31** at 24).

This webpage highlights the sources relied on by Leapfrog's methodology. The webpage features a bright green hyperlink entitled, "For details on sources, click here.", a hyperlink offering a "Detailed table view" for the scoring behind a hospital's Hospital Safety Grade, and a hyperlink entitled "View this hospital's Leapfrog Hospital Survey Results". (**Ex. 1** at ¶¶80, 88, 92, 95, 98, 101).

Following this third hyperlink for a hospital that chose not to participate in Leapfrog's Survey leads to a message on www.leapfroggroup.org which states in relevant part, "[This hospital] has DECLINED TO RESPOND". (*See* **Ex. 1** at ¶¶82-84; Hospital Results Landing Pages (**Ex's 22-25, 37**); Hospital Survey Results (**Ex's 32-36**)). The same message appears next to each measure where the hospital declined to respond to the Survey. (*See id.*). Although Plaintiffs allege that this webpage states that "[Leapfrog] states that the hospital did not provide data to [Leapfrog] sufficient to rate the hospital", "discloses that TLG has inadequate information to rate the hospital as to every metric", and "admits" that "[Leapfrog] can't rate Plaintiffs", the webpage includes no such language. (*See id.*).

**V. Plaintiffs' Hospital Safety Grades:**

Plaintiffs are five hospitals in the Palm Beach, Florida region. (**Ex. 1** at ¶20). Plaintiffs' hospitals decline to submit data to Leapfrog via its Survey. (*See id.* at ¶¶2, 85). Plaintiffs' Hospital Safety Grades are poor. In Fall 2024, Delray Medical Center, Good Samaritan, and Palm Beach Gardens each earned an "F" (*id.* at ¶¶87, 91, 94), while St. Mary's and West Boca Medical Center each earned a "D" (*id.* at ¶¶97, 100). In Spring 2025, Delray Medical Center, Palm Beach Gardens, and West Boca Medical Center each earned an "F" (**Ex's 27, 29-30**), while Good Samaritan and St. Mary's each earned a "D" (**Ex's 26, 28**).

**VI. Plaintiffs' Claims in this Case:**

Plaintiffs' 54-page Complaint presents its allegations in the form of unsupported, sensationalistic rhetoric. (*See, e.g.*, **Ex. 1** at pp. 1-2, ¶¶1, 8). Leapfrog does not profit from the fact these hospitals decline to participate in its Survey and gains nothing financially from the hospitals' poor grades. Of course, however, the Court need not consider the falsity of these allegations for purposes of this Motion.

In any event, the thrust of Plaintiffs' case is identifiable: they allege that Leapfrog's Safety Grade for each of their hospitals "is a false and misleading statement" about their patient safety performance because they choose not to submit data to Leapfrog via its Survey. (*Id.* at ¶¶85, 90, 93, 96, 99, 102). Plaintiffs argue that the Safety Grades violate the FDUTPA as a result. Specifically, Plaintiffs disagree with Leapfrog's grading methodology insofar as it imputes conservative scores on four of the 31 measures discussed above (CPOE, BCMA, IPS, and Hand Hygiene) where self-reported data for these measures is not made available by the hospital. (*Id.* at ¶52). Plaintiffs assert that because of this methodological approach, Safety Grades for hospitals with imputed scores on these four measures are deceptive to patients. (*See id.*). Plaintiffs further imply that the First

Amendment does not protect Leapfrog because its motivation is financial gain. (*Id.* at ¶8). That is not the case.

Plaintiffs allege that their poor Safety Grades have harmed their reputation with patients, physicians, and business partners. (*Id.* at ¶¶103-09, 110-11, 116, 123). Plaintiffs allege that their poor Safety Grades have harmed patients by motivating them to choose to receive emergency care at hospitals located further away from them than Plaintiffs' hospitals. (*Id.* at ¶¶111-15, 123, 128).

**VII. Procedural History:**

Plaintiffs filed their Complaint on April 30, 2025. (**Ex. 1**). Count I alleges that Leapfrog's Safety Grades violate the FDUTPA. (*Id.* at ¶¶117-30). Count II seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Leapfrog's Safety Grades violate the FDUTPA. (*Id.* at ¶¶131-38). Plaintiffs seek to permanently enjoin Leapfrog from publishing its Safety Grades for Plaintiffs. (*Id.* at p. 53). Plaintiffs also filed a motion for preliminary injunction on May 17, 2025 seeking to suppress Leapfrog's publication of Fall 2025 Safety Grades for their hospitals. (ECF No. 20). However, Plaintiffs withdrew this motion on May 27, 2025. (ECF No. 34).

## ARGUMENT

**I. Leapfrog's Hospital Safety Grades are protected opinion under the First Amendment of the U.S. Constitution and Article I, Section 4 of the Florida State Constitution.[2]**

**A. Statements are protected under the First Amendment if they are either unverifiable or statements of "pure opinion".**

Federal constitutional law is clear that in addition to true statements, the First Amendment protects "statements that are not readily capable of being proven false" and "statements of pure opinion". *See Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). Courts universally

[2] "The scope of the protection accorded to freedom of expression in Florida under article I, section 4 of the Florida State Constitution is the same as is required under the First Amendment." *Department of Education v. Lewis*, 416 So. 2d 455, 461 (Fla. 1982).

acknowledge that a letter grade rating based on the subjective weighting of objective data – like Leapfrog's Hospital Safety Grades – cannot be proven true or false. In *Home Performance Alliance v. Better Business Bureau of West Florida*, 354 So. 3d 1165 (Fla. Dist. Ct. App. 2023), the Florida Second District Court of Appeal affirmed the dismissal of plaintiff's claims of tortious interference, libel, and defamation where all of the plaintiff's claims were based on the BBB's "D+" rating of plaintiff, which the court held was "a nonactionable opinion of the BBB". *Id.* at 1166-67.

In so holding, the Second District cited a slew of case law in which courts have protected letter grade ratings under the First Amendment, including: *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 242-43 (Mo. Ct. App. 2011) (holding that the BBB's "C" rating of the plaintiff was a protected opinion because it was "based on 'an evaluating process' and 'subjective opinion'" and was "not sufficiently factual to be susceptible of being proved true or false"); *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 357 (Tex. Ct. App. 2013) (holding that the BBB's "F" rating of a company could not be defamatory "because it [was] the Bureau's self-described 'opinion' of the quality of [plaintiff's] services, which lacks a high degree of verifiability"); and *U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, 524 F. Supp. 3d 1320, 1334 (S.D. Fla. 2021) (explaining that business ratings are nonactionable "subjective assessments by third-party entities").

Consistent with this principle, the Circuit Court of Cook County, Illinois in the similar case of *Saint Anthony Hospital v. The Leapfrog Group*, Case No. 2017CH14420 (Ill. Cir. Ct. June 25, 2018), granted Leapfrog's motion to dismiss on the basis of Leapfrog's First Amendment right to publish its Hospital Safety Grades. That the First Amendment demands the same result in this case is underscored by additional similar cases including *Perfect Choice Exteriors v. Better Bus. Bureau of Central Ill.*, 2018 IL App (3d) 150864; *Browne v. Avvo, Inc.*, 525 F. Supp. 2d 1249, 1252 (W.D.

Wash. 2007); and *Aviation Charter, Inc. v. Aviation Research Group*, 416 F.3d 864, 870-71 (8th Cir. 2005). As discussed below, this wealth of case law makes clear that Leapfrog's Hospital Safety Grades and related statements are protected opinion because they cannot be proven true or false.

A statement may alternatively be protected as "pure opinion" when the defendant "makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Turner*, 879 F.3d at 1262. "Whether a particular statement constitutes fact or opinion 'is a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean.'" *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 695 (11th Cir. 2016). "In addition, the court must give weight to cautionary terms used by the person publishing the statement." *Morse v. Ripken*, 707 So. 2d 921, 922 (Fla. Dist. Ct. App. 1998). "Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Id.*

**B. Leapfrog's representations are protected opinion.**

Leapfrog's Hospital Safety Grades and its related representations are protected opinion under the First Amendment. As an initial matter, Plaintiffs' FDUTPA claim (*see* **Ex. 1** at ¶¶117-30) is "wholly derivative of the uncontested fact that [Leapfrog] assigned [Plaintiffs] an unfavorable safety rating". *See Aviation Charter*, 416 F.3d at 869. Related representations complained of by Plaintiffs are, therefore, "subsumed by [Plaintiffs'] challenge to [Leapfrog's] rating[s]". *See id.*

Plaintiffs frame their attack on their poor Hospital Safety Grades around four related representations by Leapfrog; however, each of these constitutes Leapfrog's protected opinion. **First,** Plaintiffs assert that Leapfrog's Hospital Safety Grades are deceptive because they are the product of an imperfect grading methodology. They contend that the methodology's imputation of scores for four of the 31 measures used in the Grade (CPOE, BCMA, IPS, and Hand Hygiene) is

deceptive because it "result[s] in artificially deflated overall grades with no basis in fact and no correlation to a hospital's actual safety performance." (**Ex. 1** at ¶52). Plaintiffs also assert that the methodology produces deceptive Safety Grades due to a lack of adequate auditing mechanisms to ensure the accuracy of self-reported data from hospitals. (*Id.* at ¶¶55, 58-60).[3] While Plaintiffs allege that the methodology is geared to produce profit for Leapfrog, nothing about the methodology or Plaintiffs' allegations supports that conclusion. (*See id.* at ¶¶60, 69-75; *see generally* **Ex. 5**; **Ex. 31**).

But regardless of Plaintiffs' methodological disagreements, their "D" and "F" Safety Grades simply cannot be proven true or false. *See, e.g.*, *Home Performance*, 354 So. 3d at 1166-67. Moreover, the Safety Grades are pure opinion because Leapfrog publishes on its websites all of the information relied upon in producing the Safety Grades, including: its updated grading methodology (**Ex. 3** at 5-6; **Ex. 4** at 4; **Ex's 5**; **Ex. 31**; **Ex. 38**); the basis for each Safety Grade and links to data sources including the hospital's Survey results (**Ex. 1** at ¶¶80, 88, 92, 95, 98, 101); clear indications where hospitals declined to respond to Leapfrog's Survey (*see id.* at ¶82; **Ex's 22-25; Ex's 32-37**); and the fact that all of this information is "100% transparent and free to the public" (**Ex. 3** at 2-3). Leapfrog's Hospital Safety Grade webpages also include specific notes, designations, and disclaimers aimed at clarifying the Safety Grade and data sources for each hospital. (*See* **Ex. 1** at ¶¶80, 88, 92, 95, 98, 101; **Ex's 26-30**)).

**Second,** Plaintiffs argue that Leapfrog's Safety Grades are deceptive because Leapfrog does not adhere to its own grading methodology. Plaintiffs contend that by grading hospitals by imputing

---

[3] Although Plaintiffs allege that "discrepancies exist" between Leapfrog's Safety Grades and CMS's hospital safety ratings for certain hospitals, they notably do not assert that any discrepancies exist between Leapfrog's Safety Grades and CMS hospital safety ratings ***for their hospitals***. Nor could they; Plaintiffs' poor Hospital Safety Grades from Leapfrog are wholly consistent with Plaintiffs' poor "Star Ratings" from CMS (*see* CMS Star Ratings for Good Samaritan, Delray, West Boca, Palm Beach Gardens, and St. Mary's on the CMS website), of which this Court can properly take judicial notice. *See Tecnoglass*, *supra*, 301 F. Supp. 3d at 1270, n.1.

scores for four of 12 identified "Process/Structural" measures where data is unavailable for seven of those measures, Leapfrog's methodology conflicts with its own requirement to not grade hospitals missing data for more than six "Process/Structural" measures. (**Ex. 1** at ¶53). This contention fails for two reasons. First, this ignores Leapfrog's published methodological distinction between data that a hospital has "Declined to Report" compared to data that is "Not Available" because the hospital itself does not have data for this measure. (*See* **Ex. 5** at 27; **Ex. 31** at 24; *see also* **Ex. 1** at ¶¶80, 88, 92, 95, 98, 101 ("Notes and Definitions")). Second, Leapfrog's published grading methodology fully explains its approach to missing data, including when scores are imputed for certain measures; in other words, the methodology must be considered as a whole and cannot conflict with itself. (*See id.*; **Ex. 5** at 17-18; **Ex. 31** at 16). Leapfrog's published methodology represents its opinion of how Safety Grades should be determined and cannot be proven true or false. And since this methodological approach is explained extensively by the published materials referenced above, it must be protected as pure opinion.

**Third,** Plaintiffs argue that Leapfrog has made deceptive statements reflecting that its Safety Grades represent a hospital's patient safety performance rather than whether a hospital participates in Leapfrog's Survey. (**Ex. 1** at ¶¶54, 121). However, Leapfrog's opinion of a hospital's performance on patient safety, though based on verifiable data and a transparent methodology, is nonetheless ultimately an opinion on the significance and weight of each element of data used in the calculation of a grade. For instance, "Process/Structural Measures" and "Outcome Measures" each account for 50 percent of the Safety Grade, and this is based on a consensus opinion among Leapfrog patient safety experts that this weighting is the best way to characterize safety performance. (*See* **Ex. 4** at 2-6; **Ex. 5** at 6; **Ex. 31** at 6). Others may certainly disagree with this opinion about weighting of measures, which is why Leapfrog discloses its full grading methodology

and the hospital's performance on each measure so that a viewers can form her own opinion of what an "A" or an "F" Safety Grade rating (as the case may be) represents.

**Finally,** Plaintiffs argue that Leapfrog's Safety Grades are misleading to patients because Leapfrog's www.hospitalsafetygrade.org and www.leapfroggroup.org websites provide inconsistent messaging relating to the Safety Grades. (**Ex. 1** at ¶¶76, 82). As noted, although Plaintiffs allege that www.leapfroggroup.org states that "[Leapfrog] states that the hospital did not provide data to [Leapfrog] sufficient to rate the hospital" and "admits" that "[Leapfrog] can't rate Plaintiffs" (¶84), the webpage does not include any such language. (*See id.* at ¶¶82-83; **Ex's 22-25**, **Ex's 32-37**). And regardless, as discussed, Leapfrog's websites highlight the basis for each Safety Grade, link to data sources including the hospital's Survey results, clearly indicate where a hospital declined to respond to the Survey, and feature specific notes, designations, and disclaimers aimed at clarifying the Safety Grade and its data sources. This level of transparency is exceptional for ratings organizations and is anything but "deceptive." As such, Leapfrog's Safety Grades are protected opinion and Plaintiffs' claims must be dismissed.

## II. Leapfrog is not subject to personal jurisdiction in the Southern District of Florida.

A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1275 (11th Cir. 2009). The Eleventh Circuit applies the due process test for specific personal jurisdiction, examining: (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and

(3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013).

In *Louis Vuitton*, purposeful availment existed where the defendant "purposefully solicited business from Florida residents" through its "interactive, commercial website", received orders from multiple Florida residents to ship goods into Florida, and shipped those goods into Florida. *Id.* at 1357. By contrast, in *Toll v. Levi North*, 644 F. Supp. 3d 1050 (S.D. Fla. 2022), the Court held that there was no purposeful availment where "[t]he sole relevant contact" between the defendant and Florida was "his alleged online activity visible in Florida". *Id.* at 1055-56 (citing *DCS Real Estate Invs., LLC v. Bella Collina Events, LLC*, No. 5:14-678-CIV, 2015 U.S. Dist. LEXIS 17282, at *3 (M.D. Fla. Feb. 12, 2015)).

Plaintiffs' claims in this case do not arise from Leapfrog's purposeful availment of itself of the privileges of doing business in Florida. *See Louis Vuitton*, 736 F.3d at 1357. Leapfrog's Safety Grades and related statements are published on its websites (**Ex. 1** at ¶46) and thus are accessible in Florida just as they are anywhere with Internet access. But these publications do not serve any commercial purpose, as the Safety Grades and the Survey are both freely accessible to the public. (*See id.* at ¶46; **Ex. 5** at 17; **Ex. 21**; **Ex. 31** at 16).

Although Plaintiffs assert that Leapfrog's Safety Grades are a "pay-for-play scheme" (**Ex. 1** at ¶1), the Complaint fails to allege any "commercial purpose" for Leapfrog's issuance of their "D" and "F" Safety Grades such as "advertising, selling, [or] distributing" goods or services in Florida or to Florida residents. *See Louis Vuitton*, 736 F.3d at 1356; *Toll*, 644 F. Supp. 3d at 1055-56. Nor do Hospital Survey participation or poor Safety Grades benefit Leapfrog financially. Rather, Leapfrog would incur added costs if the five Plaintiff hospitals participated in the Survey as Leapfrog would need to review their Survey responses, and hospitals that earn poor grades do

not license the right to advertise their Grade. The result is that personal jurisdiction does not exist as to Leapfrog in Florida and dismissal is required.

## III. Plaintiffs' Complaint fails to state a claim upon which relief can be granted based on the Florida Deceptive and Unfair Trade Practices Act.[4]

The three elements of a consumer claim under FDUTPA are: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021). Plaintiffs' claim that Leapfrog's Safety Grades and related representations constitute unfair or deceptive trade practices fails for the following reasons.

### A. Leapfrog's Hospital Safety Grades are not subject to the FDUTPA.

#### i. Leapfrog's alleged conduct lacks a sufficient nexus with Florida for FDUTPA to apply.

The FDUTPA applies only to actions that occur within Florida. *Five for Entertainment S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012); *W.W. Sports Importadora Exportadora E Comercial LTDA v. BPI Sports, Ltd. liability Co.*, No. 0:16-cv-60147-WPD, 2016 U.S. Dist. LEXIS 192427, at *16 (S.D. Fla. Aug. 10, 2016). Here, the Complaint fails to plead any conduct by Leapfrog in Florida. Despite its receipt of Survey responses from Florida hospitals, online publication of Safety Grades, and communications with Florida media publications, Leapfrog operates in Washington, D.C. (**Ex. 1** at ¶¶14, 17-18). The result is a lack of a nexus to Florida.

#### ii. The Complaint fails to plead commercial speech.

For the FDUTPA to apply, the alleged violation must also have taken place "in the conduct of any trade or commerce," which is defined as "the advertising, soliciting, providing, offering, or distributing" of goods, services, property, "or any other article, commodity, or thing of value." *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020). Where the action

---

[4] This argument section addresses the Complaint's failure to state claim in Count I and II as Count II as both counts are premised entirely on Leapfrog's alleged liability under the FDUTPA.

at issue is the publication of information, the statute applies only to "expression related solely to the economic interests of the speaker and its audience." *Id.* at 1321. Leapfrog's publication of its Safety Grades is not made "in the conduct of any trade or commerce" because the Safety Grades and the Survey are both free to the public. (*See* **Ex. 1** at ¶46; **Ex. 5** at 17; **Ex. 21**; **Ex. 31** at 16). As stated, Leapfrog has no economic interest in awarding Plaintiffs' poor grades, and if anything has more of an economic interest in awarding these hospitals with excellent grades. Accordingly, Plaintiffs' FDUTPA claims fail on this basis alone.

**B. The Complaint fails to plead a "deceptive act" or an "unfair practice".**

To violate the FDUTPA, an act or practice must be "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Marrache*, 17 F.4th at 1098. The plaintiff must show that the practice "was likely to deceive a consumer acting reasonably in the same circumstances." *Id.* at 1098.

The holding in *Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 166-67 (Fla. Dist. Ct. App. 2015) is instructive here. In *Caribbean Cruise*, the plaintiff received an "F" grade from the Better Business Bureau of Palm Beach County. *Id.* at 166. The trial court dismissed plaintiff's causes of action for defamation and under the FDUTPA, and the appellate court summarily affirmed dismissal of the defamation claim. *Id.* But the appellate court reversed with respect to the FDUTPA claim and, in doing so, clarified the type of allegations necessary to state a statutory claim and the context. *Id.* The Court's opinion reflects that a letter grade and a speaker's related opinions cannot be deceptive under the FDUTPA. The Court in *Caribbean Cruise* emphasized that there, the plaintiff's claim was not based on the defendant's opinion. *Id.* at 167. Instead, the Court emphasized that its holding was based on the fact that the plaintiff alleged that BBB concealed information about the basis for the grade from the public. *Id.*

Here, by contrast, Plaintiffs do not allege that Leapfrog conceals its grading methodology from the public. Nor are Leapfrog's Safety Grades or related representations because, as discussed above, they are accompanied by a thorough publication of the basis for Safety Grades. (*See, e.g.*, **Ex. 1** at ¶¶80, 88, 92, 95, 98, 101; **Ex. 5**; **Ex. 31**). *See Marrache*, 17 F.4th at 1098. Indeed, Leapfrog's commitment to full transparency precludes any deception in the grading process since any deception would be easily identifiable by hospitals and viewers alike. Notably, Leapfrog's commitment to full transparency extends beyond the calculation of the Safety Grades themselves. Prior to each update of the Safety Grade, hospitals may review the data and methodology used to calculate their grade. (*See* **Ex. 21** at 17-20). This allows hospitals ample opportunity to raise any disputes or discrepancies with Leapfrog's team. Leapfrog also publishes any planned changes to its methodology months in advance and welcomes public comments which are considered in refining the changes. (*See generally* **Ex. 38**). Finally, Plaintiffs' position that Leapfrog's imputation of scores on four out of the 31 measures used to calculate Plaintiffs' Safety Grades is a deceptive practice readily fails in light of the fact that government entities implement a similar methodological approach to missing data.[5]

**C. The Complaint fails to plead "actual damages" as required under the FDUTPA.**

"Lost profits, competitive harm, lost sales, and harm to goodwill or reputation are deemed consequential damages which are ineligible to establish actual damages under a FDUTPA claim." *Casa Dimitri Corp. v. Invicta Watch Co. of Am.*, 270 F. Supp. 3d 1340, 1344 (S.D. Fla 2017). While "[a] plaintiff need not be a consumer to assert a FDUTPA claim", the plaintiff must still prove "an injury or detriment to consumers." *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 860 (11th Cir. 2023).

[5] See, e.g., data imputation models implemented by the U.S. Census Bureau, the U.S. Bureau of Labor Statistics, and the U.S. Bureau of Justice Statistics ("Guidelines for Data Transparency, Analysis, and Processing")); each of which this Court can properly take judicial notice. *See Tecnoglass*, *supra*, 301 F. Supp. 3d at 1270, n.1.

While Plaintiffs allege that Leapfrog's Safety Grades have harmed their reputation with patients (**Ex. 1** at ¶¶103-09, 111, 116, 123), this fails to establish actual damages for an FDUTPA claim. *See Casa Dimitri*, 270 F. Supp. 3d at 1344. Plaintiffs also fail to plead "an injury or detriment to consumers", claiming only – and without support – that their poor Safety Grades have harmed patients by motivating them to choose to receive emergency care at hospitals located further away from them than Plaintiffs' hospitals. (*Id.* at ¶¶113-14, 123, 128). Critically, while patients may seek care wherever they choose, Leapfrog expressly warns viewers that "***[y]ou should never refuse care in an emergency because of a hospital's Safety Grade***". (**Ex. 17** at 4). Accordingly, the Complaint is properly dismissed with prejudice for its failure to state a claim under the FDUTPA.

## IV. Dismissal is further required (and fees and costs may be awarded) under Florida's Anti-SLAPP statute.

Florida law prohibits Strategic Lawsuits Against Public Participation ("SLAPP") lawsuits, which are suits filed "without merit" and "primarily" because the person against whom the suit was filed "exercised the constitutional right of free speech in connection with a public issue". *Bongino*, 477 F. Supp. 3d at 1321 (citing Fla. Stat. § 768.295(3)). The statute awards a defendant fees and costs if a plaintiff files a forbidden suit. *Id.* (citing Fla. Stat. § 768.295(4)). The fee-shifting provision may apply in a federal court exercising diversity jurisdiction. *Id.* at 1324.

Plaintiffs' claims arise entirely from Leapfrog's Hospital Safety Grades – online, public commentary on the matter of patient safety in hospitals – which is undeniably a matter of public concern. For the reasons set forth above, Plaintiffs' claims constitute precisely the type of meritless, retaliatory action the Anti-SLAPP statute seeks to deter. Accordingly, to the extent this Court grants its Motion, Leapfrog requests leave of Court to move for its fees and costs pursuant to Fla. Stat. § 768.295(4), which mandates an award to prevailing defendants in Anti-SLAPP proceedings.

## CONCLUSION

WHEREFORE, Defendant The Leapfrog Group respectfully requests that this Court (1) grant its Motion; (2) dismiss Plaintiffs' Complaint in its entirety, with prejudice; (3) grant Leapfrog leave to file a motion for recovery of attorneys' fees and costs pursuant to Fla. Stat. § 768.295(4); and (4) for such further relief as this Court deems just and proper.

Date: June 27, 2025

Respectfully submitted,

*Kimberly E. Blair*

**Kimberly E. Blair**
kimberly.blair@wilsonelser.com
Illinois Bar ID # 6272934
**Thomas K. Duff**
thomas.duff@wilsonelser.com
Illinois Bar ID # 6343056
Wilson Elser Moskowitz Edelman & Dicker LLP
161 N. Clark, Ste. 4500
Chicago, IL 60601
312.821.6139 (Direct)
312.704.0550 (Main)
(312) 259-6414 (Cell)
*Attorneys for Defendant, The Leapfrog Group*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2025, a true and correct copy of the foregoing was served via CM/ECF on all counsel or parties of record.

By: /s/ *Thomas K. Duff*
THOMAS DUFF, ESQ.

**UNITED STATES DISTRIC COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 25-80526-CV-MIDDLEBROOKS

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,

Plaintiffs,

v.

THE LEAPFROG GROUP,

Defendant.
_______________________________/

**ORDER ON MOTION TO DISMISS**

**THIS CAUSE** is before the Court on Defendant's Motion to Dismiss,[1] filed on June 27, 2025. (DE 39). Plaintiffs filed a Response on July 11, 2025. (DE 40). No Reply has been filed, but I find no Reply to be necessary. For the following reasons, the Motion is denied.

**BACKGROUND**

This matter arises from numerous claims of false and deceptive trade practices in hospital safety ratings. (DE 1). Because this cause comes before the Court on a Motion to Dismiss, I accept all facts in the Plaintiff's Amended Complaint as true and construe them in the light most favorable to the Plaintiff. *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004).

[1] I note that for purposes of this Order, I do not consider the exhibits attached to the instant Motion or the Response, as both Parties have attempted to interject documents that fall outside the four corners of the Complaint. *See Boyd v. Peet*, 249 F. App'x 115, 157 (11th Cir. 2007). The Parties' efforts effectively seek to transform this matter from one of dismissal to one of summary judgment, and I decline at this stage to parse through the voluminous exhibits submitted on that basis.

Plaintiffs are a coalition of hospitals operating in south Florida (the "Hospitals"). They claim that Defendant The Leapfrog Group ("Leapfrog" or "TLG"), a registered non-profit with its headquarters in Washington, D.C., operates a "brazen pay-to play scheme that distorts the truth, misleads patients, and inflicts serious harm on hospitals and the communities they serve." (DE 1 at 2). The core allegations involve Leapfrog's online "Hospital Safety Grades," which it publishes on its website www.hospitalsafetygrade.org, and advertises through a secondary website www.leapfroggroup.org. (*Id.* ¶ 46). The safety grades, which include standard assignments of "A," "B," "C," "D," and "F" distinguish hospitals from best to worst care quality, using an aggregate of 22 national patient safety measures. (*Id.* ¶ 48). For at least 12 of these measures, Leapfrog relies on hospitals' self-reported answers to a hospital survey, which involves a lengthy questionnaire spanning over 100 pages. (*Id.* ¶¶ 1, 48).

The trouble underlying Plaintiffs' claims concerns what happens when a hospital fails to participate in Leapfrog's hospital survey. According to Plaintiffs, in the absence of self-reported information from hospitals, Leapfrog finds alternative methods to calculate the values of the 12 safety measures that ordinarily rely on survey data. Leapfrog uses government data for 5 measures, and discards 3 measures entirely from its overall grading. (*Id.* ¶ 49). The crux of Plaintiffs' Complaint focuses on the remaining 4 measures, for which Leapfrog employs an "imputational model" to assign values. Prior to Fall 2024, Plaintiffs assert this "imputational model" relied on an "average score applicable to similarly situated hospitals." (*Id.* ¶ 50). Beginning in Fall 2024 however, Leapfrog allegedly began automatically assigning the lowest possible value to non-participating hospitals in its imputational model, deflating scores across the 4 metrics. (*Id.*). Plaintiffs claim this change was designed to punish hospitals for not participating in TLG's survey, from which it collects and monetizes data for a substantial profit. (*Id.* ¶¶ 70-75).

Plaintiffs filed their Complaint on April 30, 2025, asserting two counts for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et seq. (Count I) and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, (Count II).

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the allegations in a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing legal sufficiency, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must … contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cty. Bd. of Educ. V. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and assume the truth of the plaintiff's factual allegations. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," *Iqbal*, 556 U.S. at 678; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (stating that an unwarranted deduction of fact is not considered true for purposes of determining

whether a claim is legally sufficient). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Separately, a motion to dismiss brought under Rule 12(b)(2) challenges the court's personal jurisdiction over a party. The plaintiff ordinarily has the burden of establishing a *prima facie* case of personal jurisdiction over a nonresident defendant. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002).[2] "A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). Sometimes, a court need not analyze both steps, as each step may prove dispositive. *See id.*; *Lawson Cattle & Equipment, Inc. v. Pasture Renovators LLC*, 139 F. App'x 140, 142 (11th Cir. 2005).

Under the first prong of the analysis, "it must be determined that the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of" Florida's long-arm statute. *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 502 (Fla. 1989). "Florida's long-arm statute is to be strictly construed." *Sculptchair, Inc. v. Century Arts., Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (citing *Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 891 (11th Cir. 1983)). "When a defendant raises through affidavits, documents or testimony a meritorious challenge to personal jurisdiction, the burden shifts to the plaintiff to prove jurisdiction by

---

[2] "A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1999). If a plaintiff submits evidence supporting his jurisdictional position, the Court must still accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. *Meier*, 288 F.3d at 1269 ("Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.").

affidavits, testimony or documents." *Id.* (quoting *Jet Charter Serv., Inc. v. Koeck*, 907 F.2d 1110, 1112 (11th Cir. 1990)). Florida's long-arm statute provides in relevant part:

> (1) (a) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself ... to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>
> 1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
>
> 2. Committing a tortious act within this state. . . .

Fla. Stat. § 48.193. Under the statute's plain terms, each enumerated action constitutes a sufficient basis for the exercise of jurisdiction, subject to demands of constitutional due process.

## DISCUSSION

Defendant seeks dismissal of the Complaint on three general grounds: (1) that its online grading and methodology are protected by the First Amendment, (2) that it is not subject to personal jurisdiction in Florida, and (3) that Plaintiffs have failed to state a claim under FDUTPA. I find none of these contentions persuasive.

First, Defendant claims its online grades and methods are protected as unfalsifiable, purely opinionated speech. The First Amendment protects "statements that are not readily capable of being proven false" and "statements of pure opinion." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). Some courts have recognized that these principles extend to online grading services, which often rely on a subjective weighing of objective data. *See, e.g.*, *Home Performance Alliance v. Better Business Bureau of West Florida*, 354 So. 3d 1165, 1166 (Fla. 2nd DCA 2023) (finding a D+ rating of plaintiff's business to be a nonactionable opinion). However, as is evident in several of the cases Defendant cites, a claim brought pursuant to the FDUTPA is not barred by the First Amendment when it involves a challenge to false or misleading statements made about the rating

process itself. *See id.* at 1167 ("In addition to disputing its rating, Home Performance also alleges that the BBB makes false statements about its ratings process."); *see also Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 167 (Fla. 4th DCA 2015) ("These are not disputes with opinions issued by BBB, but instead, are disputes with the representations that BBB makes, and the methods it employs, in conducting its own business." (citing *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 57 (Fla. 1st DCA 1981))). Here, Plaintiffs' action arises from a challenge to Defendant's representations about its methodology, which they claim mislead consumers by failing to distinguish between absent data and damning data, and professing that grades are not influenced by a hospital's lack of survey participation. (*Id.* ¶¶ 49–54, 55, 63). Defendant's First Amendment defenses are thereby inapplicable.

Second, Defendant contends this Court lacks personal jurisdiction under both Florida's long-arm statute and the Constitution's "minimum contacts" test, as its website is a national publication, and its primary business activities occur within the District of Columbia. This argument is also unavailing. Subsection (1)(a)(2) of Florida's long-arm statute creates specific jurisdiction over actions arising out of tortious acts committed in Florida, which extends to allegations that a Florida resident suffered injury from violations of the FDUTPA. *See Execu-Tech Business Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 585 (2000) (holding that violation of FDUTPA is a tortious act for purposes of Fla. Stat. § 48.193(1)(b)); *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1217 (11th Cir. 1999); *Becker v. Hooshmand*, 841 So. 2d 561, 562 (Fla. 4th DCA 2003). Because Plaintiffs have alleged harm to Florida consumers, the statute is plainly satisfied. Further, this finding comports with the demands of due process, as the Complaint establishes minimum contacts between Leapfrog and Florida. Beyond the mere publication of its website, Leapfrog solicits data from Florida hospitals, markets itself through Florida media, and

communicates with Florida consumers. (DE 1 ¶¶ 17–18, 46). As such, there are sufficient contacts between Leapfrog and Florida, from which this action arises, to conclude that Leapfrog has availed itself of the privilege of conducting activities within Florida, thereby invoking the benefit of its laws. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013).

Third and finally, Defendant insists Plaintiffs have failed to state a claim under FDUTPA. To state a claim of deceptive or misleading trade practices, a plaintiff must allege "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021). Defendant challenges the Complaint in several ways, including by asserting that the FDUTPA only applies to actions that occur in Florida, that the violation must have taken place "in the conduct of any trade or commerce," that the practice must be likely to deceive a consumer acting reasonably in the same circumstances, and that actual damages of lost profits or sales are required. (DE 39 at 18-20). Defendant contends that the Complaint fails on one or all of these grounds. I am not convinced.

The Florida legislature has instructed that "unfair" or "deceptive" conduct under the FDUTPA is to be "liberally construed." Fla. Stat. § 501.202(2). Here, Plaintiffs have alleged that Defendant arbitrarily assigned poor safety ratings to hospitals, then lied to consumers about how it calculates overall grades. (DE 1 ¶¶ 49–54, 87–101). At this stage, taking all allegations as true, this qualifies as a deceptive act or unfair practice. *See Caribbean Cruise*, 169 So. 3d at 167. Moreover, this conduct was directed at Florida consumers and involved Florida hospitals, plainly falling within the ambit of the FDUTPA. Defendant's actions also implicate "trade or commerce," in that Plaintiffs allege Defendant provides a clear service from the publication of safety grades. *See* Fla. Stat. § 501.203(8) (defining "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any *good or service*, or any

property, whether tangible or intangible, or any other article, commodity, or thing of value," including "any non-profit or not-for-profit person or activity" (emphasis added)). Finally, Plaintiffs have pled actual damages in the form of reputational harm. *See Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 214 (11th Cir. 2009). This amounts to a full claim.

## CONCLUSION

Having fully considered the three grounds cited in Defendant's Motion to Dismiss, I find that none compel dismissal under Federal Rules 12(b)(6) or 12(b)(2). Accordingly, it is **ORDERED AND ADJUDGED** that the Motion to Dismiss (DE 39) is **DENIED**.

**SIGNED** in Chambers at West Palm Beach, Florida, this the 15th day of July, 2025.

Donald M. Middlebrooks
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-cv-80526

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,

PLAINTIFFS,

v.

THE LEAPFROG GROUP,

DEFENDANT.

**AMENDED COMPLAINT**

Plaintiffs Good Samaritan Medical Center, Inc. ("Good Samaritan"), Delray Medical Center, Inc. ("Delray Medical Center"), Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center ("Palm Beach Gardens Medical Center"), St. Mary's Medical Center, Inc. ("St. Mary's"), and West Boca Medical Center, Inc. ("West Boca Medical Center") (collectively, "Plaintiffs" or "the Plaintiff Hospitals"), by and through their attorneys for their Complaint against The Leapfrog Group ("TLG"), allege as follows:

**PRELIMINARY STATEMENT**

Hospitals are trusted pillars of their communities, responsible for safeguarding the lives of patients in their most vulnerable moments. The integrity of information guiding patients' healthcare decisions must be beyond reproach. Yet Defendant TLG, under the guise of public service, has corrupted that trust—weaponizing fear, distorting facts, and misleading the public to

serve its own craven financial interests. Through a brazen pay-to-play scheme, TLG pressures hospitals to participate and pay, or else suffer devastating and misleading public "safety" grades. Plaintiffs bring this action not because they fear evaluation, but because TLG's false and reckless conduct endangers patients, undermines public health, and cannot go unchallenged.

## INTRODUCTION

1. Defendant TLG holds itself out as an honest and credible public service organization devoted to hospital safety. In reality, it operates a brazen pay-to-play scheme that distorts the truth, misleads patients, and inflicts serious harm on hospitals and the communities they serve. Hospital participation drives TLG's revenue and enriches this so-called "non-profit" to the tune of many millions of dollars—including exorbitant compensation for its Chief Executive Officer. Through its "Hospital Safety Grades," TLG assigns A, B, C, D, and F letter grades to hospitals nationwide and prominently displays them on its website, www.hospitalsafetygrade.org. These "grades" are based, in material part, on easily manipulatable, self-reported data submitted by hospitals that choose to dedicate the time and resources to respond to TLG's sprawling 100+ page data requests. TLG then aggressively broadcasts these so-called grades directly to patients, caregivers, and healthcare workers, orchestrating a sweeping media campaign—including by embargoing grades with reporters nationwide—to maximize public exposure. The message TLG pushes is alarmist and clear: Patients must "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than at an 'A' hospital." (emphasis added). But TLG's "safety grades" are a fraud. Far from protecting patients, they present a clear and present danger to public health across Palm Beach County and beyond.

2. Four years ago, the five Plaintiff Hospitals made a deliberate choice to stop responding to TLG's excessive data requests. During the height of the COVID-19 pandemic,

Plaintiffs prioritized their administrative resources toward achieving specialty-specific accreditations and certifications that directly respond to patient needs. Until last year, TLG continued to assign grades to Plaintiffs based on how similarly situated participating hospitals performed on standard metrics, and notably, Plaintiffs were never assigned F grades under that system.

3. That changed in 2024. Facing declining hospital participation, escalating expenses, and intensifying pressure to drive up revenue—including hefty consulting and advertising fees from participating hospitals along with revenue from insurers—TLG abruptly rigged its methodology. Under its new policy, any hospital declining to provide data would automatically fail on the affected metrics, leading to inevitable Ds and Fs for Plaintiffs for the first time. TLG openly admitted the change was designed to punish non-participating hospitals and ensure they would not "inadvertently benefit" from positive scores—regardless of the truth. Tomorrow's anticipated release of new grades continues TLG's reckless campaign. Instead of simply choosing not to grade Plaintiffs, TLG will deliberately misrepresent these trusted hospitals as dangerous facilities, undermining the doctors, nurses, and healthcare workers on whom the community depends.

4. TLG's misinformative "Safety Grades" have been repeatedly condemned by leading healthcare organizations and academic researchers for precisely the dangers they pose. The American Hospital Association ("AHA") has warned that "no one should use [TLG's Hospital Safety Grades] to guide their choice of hospitals," because they are "neither fair nor accurate."[1] Academic studies have confirmed that TLG's methodology consistently misrepresents hospital

---

[1] Rich Umbdenstock, *Letter to Leah Binder (The Leapfrog Group)* (June 22, 2012), https://www.leapfroggroup.org/sites/default/files/Files/AHALettertoLeah.pdf.

quality nationwide, misleading patients into healthcare decisions that increase mortality risks and worsen outcomes.[2] TLG has even awarded its highest possible safety grades to a facility the federal government determined in a 384-page report had "quality of care . . . so bad that it had 'caused—or is likely to cause—serious injury, harm, impairment, or death to a patient.'" Multiple patients died at that facility, despite its pristine TLG ranking. For nearly a decade, healthcare professionals and scholars have sounded the alarm about TLG's dangerous practices. Those practices are even worse today as a result of TLG's 2024 move to punish non-participating hospitals.[3] But TLG refuses to fix its reckless model. So long as hospitals are willing to pay to escape failing grades, TLG has no incentive to reform—and every incentive to perpetuate its deceptive scheme.

5. Plaintiffs did not bring this action lightly. Before commencing this case, Plaintiffs asked TLG to cease and desist its deceptive grading practices. Plaintiffs made clear that TLG's conduct was not only wrong, but dangerously harmful—driving patients away from some of the region's safest hospitals and toward objectively riskier facilities. TLG refused. Hiding behind a self-serving and legally unsupportable invocation of the First Amendment, TLG claimed a "free speech right" to deceive the public. It then doubled down: embargoing its false grades with the

---

[2] *See, e.g.*, Joe Nicholl et al., *The Relationship Between Distance to Hospital and Patient Mortality in Emergencies: An Observational Study*, Emerg. Med. J. (Aug. 21, 2007), https://pubmed.ncbi.nlm.nih.gov/17711952/; Julia C. Prentice, *Delayed Access to Health Care and Mortality*, Health Serv. Res. (Apr. 2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1955366/pdf/hesr0042-0644.pdf.

[3] *See, e.g.*, J. Matthew Austin et al., *National Hospital Ratings Systems Share Few Common Scores and May Generate Confusion Instead of Clarity*, 34 Health Affs. 423 (Mar. 2015); Shawna N. Smith et al., *Dissecting Leapfrog: How Well Do Leapfrog Safe Practices Scores Correlate With Hospital Compare Ratings and Penalties, and How Much Do They Matter?*, 55(6) Med. Care 606, 611-12 (June 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5517312/pdf/nihms851990.pdf.

press, orchestrating a media blitz, and further misleading patients in Plaintiffs' communities—all while knowing the devastating consequences of its campaign.

6. There is no First Amendment protection for deceptive practices. That is exactly why the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") exists: to protect consumers from modern-day snake oil salesmen like TLG. TLG's supposed "mission" is a sham. Its true mission is self-enrichment. A material percentage of TLG's "non-profit" budget goes directly to compensating its Chief Executive Officer, who has pocketed many millions of dollars in recent years at the expense of the very patients TLG claims to serve. TLG's business model is as simple as it is sinister: prey on public fear, distort the truth, and profit from deception. Enough is enough. This lawsuit seeks to put an end to TLG's dangerous practices and to protect the patients and communities who deserve honest, reliable information about their healthcare choices.

**PARTIES**

7. Plaintiff Delray Medical Center is an accredited hospital with 536 licensed beds. Delray Medical Center is incorporated in Florida, and its principal place of business is at 5352 Linton Blvd., Delray Beach, Florida 33484. As both a general hospital and a Level I Trauma Center for both pediatric and adult patients, Delray Medical Center provides a variety of high-quality, specialized services to the community.

8. Plaintiff Good Samaritan is the first hospital built in Palm Beach County. It has served the community for over 100 years. Good Samaritan is incorporated in Florida, and Good Samaritan's principal place of business is 1309 N. Flagler Dr., West Palm Beach, Florida 33401. It has 333 licensed beds. Good Samaritan is an accredited acute care hospital that is focused on offering premier and comprehensive oncology services with its robust medical and surgical programs.

9. Plaintiff Palm Beach Gardens Medical Center is an acute care hospital with 199 licensed beds. Palm Beach Gardens Medical Center is incorporated in Florida, and its principal place of business is 3360 Burns Road, Palm Beach Gardens, Florida 33410. Palm Beach Gardens Medical Center focuses on providing comprehensive cardiovascular care, including open heart surgeries and structural heart procedures. It also provides the community with access to a broad range of other important medical services, including 24-hour emergency care, general surgery, various orthopedic surgery services, and specialty services such as urology.

10. Plaintiff St. Mary's houses the only children's hospital between Orlando and Fort Lauderdale. St. Mary's is incorporated in Florida, and its principal place of business is 901 45th St., West Palm Beach, Florida 33407. St. Mary's is an accredited acute care hospital that is a Level I adult and pediatric Trauma Center, certified Comprehensive Stroke Center, and has a Level III neonatal intensive care unit ("NICU"). St. Mary's has 413 licensed beds of which 45 are in the NICU. St. Mary's is a Centers for Medicare & Medicaid Services ("CMS") designated Regional Perinatal Intensive Care Center ("RPICC")—one of only 11 RPICC hospitals in Florida.

11. Plaintiff West Boca Medical Center is an accredited hospital with 195 licensed beds and primarily serves women and children. West Boca Medical Center is incorporated in Florida, and its principal place of business is 21644 State Road 7, Boca Raton, Florida 33428. West Boca Medical Center is the only Level III NICU in southern Palm Beach County.

12. Defendant The Leapfrog Group is a not-for-profit corporation incorporated in the District of Columbia, with its principal place of business at 1775 K Street, NW, Suite 400, Washington, D.C. 20006.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs are all citizens of Palm Beach County, Florida, and TLG is a citizen of Washington, D.C. The

amount in controversy is in excess of $75,000 given Plaintiffs seek injunctive and declaratory relief valued in excess of $75,000.

14. This Court has personal jurisdiction over TLG pursuant to Fla. Stat. Ann. § 48.193(1)(a)(2) because TLG "submit[ted itself] . . . to the jurisdiction of the courts of this state for any cause of action arising from [TLG] . . . [c]ommitting a tortious act within this state." TLG is also subject to this Court's jurisdiction as TLG is operating, conducting, engaging in, or carrying on a business or business venture in this state. To the extent the alleged injury to persons in this state arises out of an act or omission by TLG outside of this state, this Court has jurisdiction over TLG because it engaged in solicitation or service activities within Florida.

15. Plaintiffs' claims arise out of TLG's contacts with and purposeful availment of Florida—including but not limited to its misleading "Hospital Safety Grades" of Plaintiffs on its website. TLG's false and misleading "Hospital Safety Grades" were directed at residents of Florida, accessed by residents of Florida, pertained to Plaintiffs (all residents of Florida), harmed Plaintiffs in Florida, and harmed consumers in Florida. TLG has publicly commented on its Hospital Safety Grades for Plaintiffs with Florida publications like Stet News Palm Beach County designed to drive more attention to the Safety Grades in Florida. TLG has also affirmatively "embargoed" its "Safety Grades" about Plaintiffs with members of the press, including members of the press in Florida, confirming TLG has knowingly and intentionally targeted the Florida healthcare market and Florida healthcare consumers with its "Safety Grades" about Plaintiffs.

16. This Court also has personal jurisdiction over TLG pursuant to Fla. Stat. Ann. § 48.193(2) because TLG is "engaged in substantial and not isolated activity within [Florida]" and Plaintiffs' claims arise out of that substantial, not isolated, activity. For example, for its Fall 2024 Survey, TLG solicited data from 621 health facilities in Florida, embargoed safety grades as to

192 of them with the media in Florida, and widely publicized the safety grades of those 192 Florida facilities to patients in Florida.

17. Venue in the Southern District of Florida is appropriate under 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the actions giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

### A. TLG's Safety Grade Methodology Punishes Non-Participating Hospitals Like Plaintiffs And Conceals that Penalty From Consumers.

18. TLG conducts an annual "Hospital Survey" in which TLG "asks hospitals to report quality and safety data and then publicly reports that information by hospital." In connection with the Hospital Survey, TLG assigns a "Hospital Safety Grade" to nearly 3,000 general acute-care hospitals across the nation every spring and fall. TLG posts its safety grade on one of its websites, www.hospitalsafetygrade.org, and it markets, references and links to the Hospital Safety Grade website on another website, www.leapfroggroup.org.

19. TLG admits it assigns hospitals Safety Grades to influence where consumers and patients decide to receive care. TLG explicitly tells consumers, "Patients should *always* decide on where to receive care based on a hospital's current Safety Grade." (emphasis added). TLG even tells consumers that choosing a hospital "could be a life or death decision" and amplifies this threat by misleading consumers into thinking they're "twice as likely to die of a preventable problem at a C, D, or F hospital than at an A hospital."

20. The Safety Grade uses CMS data, TLG's Hospital Survey responses, and information from other supplemental data sources to produce a single letter grade that purports to represent a hospital's "overall performance in keeping patients safe from preventable harm and medical errors." "A" represents the best TLG Hospital Safety Grade, followed in order by "B," "C," "D," and "F." The Safety Grade aggregates up to 22 national patient safety measures. For

hospitals who participate in TLG's Hospital Survey, TLG uses the hospitals' answers to TLG's Hospital Survey for 12 of the 22 measures. In other words, a majority of the grade for participating hospitals is based on their self-reported survey responses.

21. When a hospital does not participate in TLG's Hospital Survey, TLG uses other sources for those 12 measures. For five measures, TLG uses government data. TLG abandons three measures entirely. And for the last four measures, TLG uses its "imputation model."

22. According to TLG, that "imputation model" is how it assigns a value for a measure when it lacks any data pertaining to it. If a hospital does not provide TLG data, TLG assigns an "imputed" value. Prior to Fall 2024, TLG's imputation model assigned hospitals that did not participate in its survey a score based on the average score applicable to similarly situated hospitals. Beginning in Fall 2024, however, TLG modified its imputation model. It now assigns the lowest possible score to non-participating hospitals. In other words, TLG now punishes non-participants for their lack of participation. TLG has admitted its new model imposes a penalty. It specifically explained its 2024 change was designed to prevent non-participating hospitals from "inadvertently benefit[ing]" compared to hospitals that self-report, even though TLG has no data to show how non-participation could benefit a hospital.

23. The four measures for which TLG "imputes" scores are: Computerized Physician Order Entry ("CPOE"), Bar Code Medication Administration ("BCMA"), ICU Physician Staffing ("IPS"), and Hand Hygiene Score. CPOE measures whether a hospital has implemented a system to record medication prescriptions via computer. BCMA measures whether a hospital confirms medication via bar code process. IPS measures a hospital's use of intensivists in an intensive care unit. A Hand Hygiene score measures hospitals' policies for monitoring hand washing and glove usage.

24. TLG's imputation model deceives consumers by inventing negative data about hospitals that TLG wishes to punish for declining to participate in its survey. For the four imputed measures (CPOE, BCMA, IPS, and Hand Hygiene), if a hospital does not participate in TLG's survey, TLG assigns "a point value that is equivalent to receiving 'Limited Achievement' for this measure"—its lowest possible score—without any factual basis. The result is that hospitals who elect not to participate in TLG's survey receive only 60 out of 400 possible points in these four categories—resulting in artificially deflated overall grades with no basis in fact and no correlation to a hospital's actual safety performance. For example, TLG assigns a hospital the lowest possible value for the Hand Hygiene measure even if it has the best possible Hand Hygiene policy just because the hospital doesn't participate in TLG's Hospital Survey. TLG has no basis to assign that low value.

25. TLG's "imputation" model for ranking non-participating hospitals directly conflicts with TLG's own National Expert Panel's guidance. As TLG explains, "not all hospitals have enough data publicly available to be eligible for a grade." "As per the National Expert Panel guidance, [TLG] has requirements for the minimum amount of data [it] need[s] to issue an accurate grade." Accordingly, "[h]ospitals missing more than **six** process measures" are "not graded." Non-participating hospitals should fall easily into that "not graded" bucket, because their decision not to participate in TLG's survey necessarily means TLG is missing ***seven*** process measures that rely on voluntary submission of hospital data.[4] The responsible thing to do based on TLG's own Expert Panel guidance, therefore, would be to *not* provide a safety grade for a non-participating hospital. But TLG cooks the books. Of those seven missing measures, TLG "imputes"—or gins

[4] Those seven include CPOE, BCMA, IPS, Safe Practice 1: Culture of Leadership Structures and Systems; Safe Practice 2: Culture Measurement, Feedback & Intervention; Total Nursing Care Hours per Patient Day; and Hand Hygiene.

up—scores for four of them, using those concocted scores to justify ranking non-participating hospitals.

26. TLG's statements about its imputation model mislead consumers and misrepresent its own model. One Frequently Asked Question on its website asks whether "a hospital get[s] a better Safety Grade if it reports to the [TLG] Hospital Survey." In response, TLG falsely states, "The Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the [TLG] Hospital Survey." Given the nature of TLG's imputation model, which involves inventing data with no objective source, that's a clear lie. TLG relies on invented data for some hospitals but not others, and it applies a different methodology to determine Hospital Safety Grades for non-participating hospitals as compared to participating ones—all despite its claims that it meaningfully compares all hospitals regardless of participation.

27. Another way TLG's deceptive methods punish non-participating hospitals is by rewarding participating hospitals with grade inflation. The data provided by hospitals that do participate in the TLG Hospital Survey is self-reported, biased, and subject to manipulation. Median responses for hospitals that report their own scores show that those hospitals inflate their performance. TLG lacks appropriate auditing mechanisms to ensure self-reported data is accurate, and it factors measures into its grading methodology that are unverifiable. TLG assumes the data it relies on is accurate without adequately verifying it.

28. Participating hospitals are not receiving strong TLG grades because they are achieving better results on an objective basis. In one illustrative example, TLG assigned a grade of "A" or "B"—its highest possible safety scores—to Mission Hospital in Asheville, North Carolina, for seven consecutive review cycles between Spring 2021 and Spring 2024. During this same time period, investigators with the North Carolina Department of Health and Human Services

conducted a survey at Mission Hospital to evaluate its compliance with Medicare standards. On February 1, 2024, CMS designated Mission Hospital as in "immediate jeopardy [of losing federal funding]"—the most severe sanction possible—because the investigators "determin[ed] that the quality of care at Mission was so bad that it had 'caused – or is likely to cause – serious injury, harm, impairment or death to a patient.'"[5] According to the 384-page report from CMS, at least three patients died in 2022 and 2023 following "significant delays and lapses of care in the emergency department and other areas"[6]—two years in which TLG awarded Mission Hospital four consecutive "A" Hospital Safety Grades.

29. Hospitals in Florida that have participated in TLG's survey are similarly receiving high TLG grades that do not reflect their performance, which damages their higher-performing but non-participating competitors. Participating hospitals have received high grades (A's and B's) in recent years despite investigative reports that a participating hospital had cockroaches in operating rooms, dirty and broken medical equipment, inadequate monitoring of ICU patients, an overcrowded emergency department, staffing deficiencies of telemetry technicians—those responsible for monitoring changes in vital signs in patients with electronic devices—that resulted in deaths related to telemetry, patients attacking nurses, and even a misplaced patient who died after staff was unable to locate him or her.

---

[5] Andrew R. Jones, *Mission Hospital's Leapfrog, Healthgrade scores and rankings don't tell the whole story, draft report says*, Asheville Watchdog (Feb. 12, 2024), https://avlwatchdog.org/mission-hospitals-leapfrog-healthgrade-scores-and-rankings-dont-tell-the-whole-story-draft-report-says/.

[6] Andrew R. Jones, *'The patient was subsequently found unresponsive in a hallway bed': CMS report on Mission Hospital details deaths of patients, significant delays in care*, ASHEVILLE WATCHDOG (Feb. 17, 2024), https://www.northcarolinahealthnews.org/2024/02/17/plan-of-correction-report-mission-hospital/.

30. The flaws in TLG's methodology reveal themselves through a simple comparison between TLG's rankings and CMS data. CMS provides its own hospital safety rankings—rankings that are the product of data hospitals are required to submit to the federal agency in order to qualify for the Centers for Disease Control's National Healthcare Safety Network incentive programs. There are numerous examples throughout the country where TLG's grade for a hospital is two grades removed from the rating CMS provides—for example, where CMS considers a hospital a 5-star (the highest CMS rating) and TLG assigns the hospital a C, and where CMS considers a hospital a 2-star (the second lowest) and TLG assigns the hospital an A.

| **Examples of Leapfrog Advantaging Hospitals Who Provide It Free Data and Disadvantaging Hospitals Who Don't** | | | |
|---|---|---|---|
| **Hospital** | **Participates in Leapfrog Survey?** | **Leapfrog Safety Grade (Fall 2024)** | **CMS Overall Star Rating** |
| **Examples of Grade Deflation for Non-Participating Hospitals** | | | |
| Uintah Basin Medical Center | No | C | 5 |
| University of Utah Hospital and Clinics | No | C | 5 |
| **Examples of Grade Inflation for Participating Hospitals** | | | |
| UVA Health Culpeper | Yes | A | 1 |
| Twin County Regional | Yes | A | 2 |
| Sentara Northern Virginia | Yes | A | 2 |
| Iredell Memorial Hospital | Yes | A | 2 |
| Maria Parham Medical Center | Yes | A | 2 |
| Vidant/ECU Health Edgecombe | Yes | A | 2 |

31. Similarly, in 2023, TLG awarded nine hospitals who participated in its survey passing grades (A–C) when the government had assigned them "immediate jeopardy" warnings because the hospitals' "noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death[.]" In other words, TLG assigned

failing hospitals an A and directed patients to go there at the same time the government was concerned with patients' safety at that hospital.

32. These discrepancies exist because TLG rewards participating hospitals and penalizes non-participating hospitals.

**B. TLG Has Been Subject To Significant Industry And Academic Criticism.**

33. For more than a decade, industry experts and academics have been sounding the alarm that TLG's methodologies are inaccurate, misleading, or inconsistent based on who participates in the surveys and who does not.

34. The Journal of the American Medical Association ("JAMA") published an article in 2009 titled *Association Between Hospital-Reported Leapfrog Safe Practices Scores and Inpatient Mortality*. That article concluded that in the "sample of . . . hospitals . . . that completed the [2006] Safe Practices Leap" survey, "survey scores were not significantly associated with risk-adjusted inpatient mortality."

35. On June 22, 2012, Richard J. Umbdenstock, President and CEO of the American Hospital Association ("AHA") sent a letter to Leapfrog declaring that the Leapfrog Hospital Safety Grade "was neither fair nor accurate," and he outlined "several methodological shortcomings in the survey." The flaws included "an unfair bias toward responding to the survey, the use of unreliable measures, significant variation in the weights applied to measures for different groups of hospitals, and significant errors in the data." Umbdenstock's letter detailed three major criticisms of TLG's hospital safety score: (1) a minority of U.S. hospitals participate in TLG's voluntary reporting program, while those that do not receive lower imputed scores; (2) more than 80% of the outcome measures have been shown to be unreliable; and (3) there are errors in the TLG data. AHA expressed its "disappointment that the [TLG] scorecard's assessment was neither

fair nor accurate"—leading AHA to conclude that "no one should use [TLG's Hospital Safety Grades] to guide their choice of hospitals, unless and until, a more accurate assessment method is used."

36. In 2017, the peer reviewed journal Medical Care published an article titled: *Dissecting Leapfrog: How Well Do Leapfrog Safe Practices Scores Correlate with Hospital Compare Ratings and Penalties, and How Much Do They Matter?* The authors, a team of researchers from the University of Michigan, concluded that participation in TLG's survey consistently inflated the participant's TLG Hospital Safety Score because self-reported information overwhelmingly "skew[ed] towards positive self-report." For example, over 50% of participating hospitals reported perfect scores in their surveys for all but one safe practice measure, and nearly 20% reported perfect scores for all safe practices.

37. The University of Michigan study further found that TLG's heavy reliance on self-reported data had the effect of "artificially deflating the mean of the distribution" to which non-reporting hospitals were compared. In other words, non-participating hospitals are subject to "large grade penalties for less-than-perfect self-reported Safe Practices compliance" because they are graded on the same curve as participating hospitals with inflated self-reported data.

38. The authors determined that "Leapfrog's current methodologies, in combination with strongly positively skewed self-reports of [Safe Practices Scores ('SPS')] measures, punish low SPS reports substantially more than they reward high SPS. These concerns cast doubt on the utility of SPS and, more generally, the [Hospital Safety Score] and grades." In addition, the TLG Hospital Safety Scores were not positively associated with patient outcomes reported by Hospital Compare or Medicare penalties for readmissions or complications.

39. Jennifer Meddings, M.D., M.Sc.—the senior author of the Michigan study—said the Hospital Safety Grade is "based on whether a hospital self-reports that it has adopted certain protocols, and not whether those protocols are actually followed"—meaning the Hospital Safety Grades offer little indication of a hospital's actual safety metrics in practice. Indeed, participating hospitals that reported high levels of self-compliance for TLG's safe practices did not have correspondingly lower hospital-acquired infection rates or lower federal penalties for readmissions, demonstrating the ineffectiveness and misleading nature of TLG's methodology.

40. In 2019, The New England Journal of Medicine Catalyst ("NEJM") published a peer reviewed article criticizing the methodology used by rating agencies, including Leapfrog. The authors said "[t]he greatest concerns were with [TLG's] internally developed and modified Safety Survey." The NEJM authors noted that TLG "had only done a formal audit for approximately five hospitals of about 2,600 in the past year, and only 72 hospitals underwent an electronic audit." In addition, the authors also reported concerns that the survey "may not truly reflect patient safety efforts or be currently meaningful to stakeholders (e.g., computerized physician order entry)." And "[a]nother major area of concern was how Leapfrog assesses hospitals that do not answer their Safety Survey. When hospitals do not report the survey, the missing data are filled in from other secondary sources. However, hospitals that answer the survey and those that do not are assessed in the same way despite not having the same measures upon which to base the ratings. Approximately 50% of hospitals answer their survey, so a good deal of the rankings are based on missing or inconsistent data."

**C. TLG Reaps Substantial Rewards From Its Pay-to-Play Scheme.**

41. TLG heavily tilts its grading in favor of hospitals that participate in TLG's scheme in a quid-pro-quo arrangement: Hospitals provide TLG free data, which it can then monetize, and in return hospitals receive better TLG grades while their competitors are penalized for not

supplying TLG free data. And though it pretends to be a non-profit, TLG also rakes in millions of dollars from the data it obtains from participating hospitals incentivized to keep TLG happy, so it keeps inflating grades.

42. Between 2019 and 2023, TLG collected millions in revenue from hospitals that it later rewarded with inflated grades. TLG also has collected troves of data from hospitals who complete its survey so it can financially benefit from such data. Participants in the TLG survey are specifically required to sign an acknowledgment that "[t]he Leapfrog Group may use this information in a commercial manner for profit":

*2025 Leapfrog Hospital Survey – Hard Copy* *Section 1: Patient Rights and Ethics*

**Affirmation of Accuracy**

As the hospital CEO or as an employee of the hospital to whom the hospital CEO has delegated responsibility, I have reviewed this information pertaining to the Patient Rights and Ethics Section at our hospital, and I hereby certify that this information is true, accurate, and reflects the current, normal operating circumstances at our hospital. I am authorized to make this certification on behalf of our hospital.

The hospital and I understand that The Leapfrog Group, its members, the public and entities and persons who contract or have other business dealings with The Leapfrog Group are relying on the truth and accuracy of this information. The hospital and I also understand that The Leapfrog Group will make this information and/or analyses of this information public through the Survey Results public reporting website, The Leapfrog Group's Hospital Safety Grade, and/or other Leapfrog Group products and services. This information and/or analyses and all intellectual property rights therein shall be and remain the sole and exclusive property of The Leapfrog Group in which The Leapfrog Group retains exclusive ownership. This information does not infringe upon any third-party intellectual property rights or any other third-party rights whatsoever and is free and clear of all encumbrances and liens of any kind. The hospital and I acknowledge that The Leapfrog Group may use this information in a commercial manner for profit. The hospital shall be liable for and shall hold harmless and indemnify The Leapfrog Group from any and all damages, demands, costs, or causes of action resulting from any inaccuracies in the information or any misrepresentations in this Affirmation of Accuracy. The Leapfrog Group and its members and entities and persons who contract or have other business dealings with The Leapfrog Group reserve the right to omit or disclaim information that is not current, accurate or truthful.

Affirmed by ____________________, the hospital's ________________________.
*(first name and last name)* *(title)*
on ____________________.
*(date)*

43. TLG collects revenue from participating hospitals in multiple ways. For instance, TLG charges hospitals—including ones TLG rates—over $25,000 annually to join its Partners Advisory Committee to influence the TLG Board of Directors four times a year. TLG thereby creates a structure for hospitals to pay for access to its decision-makers and curry favor with them

to ensure TLG's system benefits hospitals who participate in TLG's scheme and punishes those who do not. Some of TLG's paying members own some of its highest-rated hospitals.[7]

44. TLG also charges hospitals between $6,700 and $29,900 per year to advertise their TLG safety grade. That creates an incentive for TLG to rate higher the hospitals willing to pay, as opposed to those who do not. No hospital would pay $29,900 to advertise a failing grade.

45. TLG also encourages hospitals to sponsor its annual meetings and awards ceremony. In 2024, TLG's platinum executive sponsorship required $44,750—yet another way TLG reaps financial rewards from its scheme.

46. TLG monetizes the data it receives from hospitals who participate in its Hospital Survey. TLG is therefore incentivized to set up its methodology to reward participating hospitals, so that it gets more data, which it can use to make more revenue. TLG has used the tens of millions of dollars of revenue it has collected from participating hospitals and other sponsors in its pay-to-play system to pay exorbitant salaries to its owner and executives. Between 2019 and 2023, TLG has paid over three million dollars in salary and benefits to Leah Binder—its CEO.

47. TLG also licenses its safety grades to insurers, which integrate TLG's grades into websites patients use to determine whether particular healthcare facilities are covered. Insurers are even able to use TLG's logos and intellectual property—displayed prominently in a drop-down called "Hospital Safety & Accreditation":

---

[7] Gretchen Morgenson et al., *Roaches in the operating room: Doctors at HCA hospital in Florida say patient care has suffered from cost cutting*, NBS News (Feb. 15, 2023), https://www.nbcnews.com/health/health-care/roaches-operating-room-hca-hospital-florida-rcna69563.




TLG receives compensation from insurers to allow those insurers to use TLG's safety grades and logos. That means TLG has yet another incentive to rank as many hospitals as possible so as to convince insurers TLG's ratings have value and to drive even more revenue to TLG through penalizing non-participating hospitals and trying to coerce them into providing data.

**D. TLG's Websites Confirm TLG Is Knowingly Deceiving Patients.**

48. TLG has two websites for its hospital safety rankings—www.leapfroggroup.org and www.hospitalsafetygrade.org. They each reference TLG's safety grades, but they do so in inconsistent ways that confirm not only that TLG knows it is misleading patients but also that it intends to do so.

49. When a potential patient or even an existing patient Googles "hospital safety rankings," the top two results are TLG's websites, www.hospitalsafetygrade.org and www.leapfroggroup.org:




50. Each website, however, depicts information about Plaintiffs differently. Consider the consumer experience looking for safety grades on the first Google hit—www.hospitalsafetygrade.org. Clicking that link brings a patient to TLG's Hospital Safety Grade website, where TLG encourages users to search for their local hospital by asking, "How Safe is Your Hospital?"



51. Once a patient searches her hospital's name, she is immediately confronted with the following image—a disturbing "F" grade, the meaning of which even an elementary school student would understand:




52. When a patient clicks on "View the full Score" she sees a plethora of inaccurate and misleading information about the hospital (explained *infra* Section E):




53. Only at the bottom of the page—in a small font and in footnotes consumers won't read—does TLG disclose that the hospital did not provide data to TLG.

54. TLG's approach on www.hospitalsafetygrade.org is inconsistent with how it depicts information about Plaintiffs on its other website, www.leapfroggroup.org. On leapfroggroup.org, searching for Good Samaritan Medical Center, for example, does *not* result in

any grade at all. Instead, on *that* website, TLG states that the hospital did not provide data to TLG sufficient to rate the hospital:




55. TLG's leapfroggroup.org rating website also accurately discloses that TLG has inadequate information to rate the hospital as to every metric:

**Preventing Patient Harm**

| Measure name | Leapfrog's Standard | Hospital's Progress |
|---|---|---|
| Nursing and Bedside Care for Patients | Hospitals should have nurse staffing plans in place that ensure there are enough nurses of all types (i.e., registered nurses, licensed practical nurses, or unlicensed assistive personnel) to provide direct care to patients in medical, surgical, or med-surg units each day. | DECLINED TO RESPOND |
| Nursing Care for Patients | Hospitals should have nurse staffing plans in place that ensure there are enough registered nurses (RNs) to provide direct care to patients in medical, surgical, or med-surg units each day. | DECLINED TO RESPOND |

56. The differences in TLG's websites confirm TLG knows exactly what message it is communicating to consumers. TLG clearly understands how to tell patients that it can't grade Plaintiffs because it lacks data. TLG decided not to do that, though, on www.hospitalsafetygrade.org: Even after admitting on www.leapfroggroup.org that it *can't* rate Plaintiffs, it purports to fail Plaintiffs with a big, bold "F" on www.hospitalsafetygrade.org.

**E. TLG Assigned Plaintiffs Misleading And Deceptive Low Grades.**

57. Plaintiffs are among the many hundreds of hospitals across the country who choose not to participate in TLG's Survey. Given that non-participation, TLG could easily have told consumers—as it does on www.leapfroggroup.org—it lacks sufficient data to provide safety grades for Plaintiffs. Instead, it "imputed" scores to Plaintiffs and gave them failing or near-failing grades on www.hospitalsafetygrade.org. As a result, TLG has intentionally and recklessly released misleading and deceptive information about Plaintiffs' health safety performance.

58. TLG assigned Plaintiffs "Limited Achievement" scores, and corresponding low Safety Grades just as it did with other non-participating hospitals.

59. ***Delray Medical Center.*** TLG assigned Delray Medical Center an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Delray Medical Center the lowest possible score on multiple criteria for which TLG had no information—including "Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

60. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Delray Medical Center performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly reflect that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to say so:


This Hospital's Grade

F

FALL 2024

**Delray Medical Center**

5352 Linton Boulevard
Delray Beach, FL 33484-6580
Map and Directions

View this hospital's Leapfrog Hospital Survey Results

► Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade

Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff

Doctors order medications through a computer
Safe medication administration
Handwashing
Communication about Medicines
Communication about Discharge
Declined to Report[1] Staff work together to prevent errors

Hospital Performs:
Worse Than Average — Better Than Average

**This Hospital's Score:**
15 *

**Best Hospital's Score:**
100

**Average Hospital's Score:**
79.04

**Worst Hospital's Score:**
15

**Doctors order medications through a computer**

Hospitals can use Computerized Physician Order Entry (CPOE) systems to order medications for patients in the hospital, instead of writing out prescriptions by hand. Good CPOE systems alert the doctor if they try to order a medication that could cause harm, such as prescribing an adult dosage for a child. CPOE systems help to reduce medication errors in the hospital.

*Hospitals can earn up to 100 points for using a well-functioning CPOE system in most areas of the hospital.* For details on sources, click here.

**What safer hospitals do:**

Hospitals use CPOE systems in all areas of the hospital and regularly test those systems to ensure they are alerting doctors to potential ordering errors.

**Notes and Definitions**

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. *** The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**

61. In other words, TLG is deceptively communicating to consumers that Delray Medical Center doctors and nurses don't adequately wash their hands, among other false statements—with no data whatsoever to support that conclusion.

62. TLG's F grade for Delray Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

63. ***Good Samaritan.*** TLG also assigned Good Samaritan an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Good Samaritan the lowest possible score on the same criteria for which TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

64. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Good Samaritan performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:




65. TLG's "F" grade for Good Samaritan is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

66. ***Palm Beach Gardens Medical Center.*** TLG also assigned Palm Beach Gardens Medical Center an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Palm Beach Gardens Medical Center the lowest possible score on the same criteria for which TLG had

no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

67. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Palm Beach Gardens Medical Center performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:


This Hospital's Grade

F

FALL 2024

Palm Beach Gardens Medical Center

3360 Burns Road
Palm Beach Gardens, FL 33410-4304
Map and Directions

View this hospital's Leapfrog Hospital Survey Results

► Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade

Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff

Doctors order medications through a computer

Safe medication administration

Handwashing

Communication about Medicines

Communication about Discharge

Declined to Report[1]
Staff work together to prevent errors

Hospital Performs:
Worse Than Average — Better Than Average

This Hospital's Score:
15 *

Best Hospital's Score:
100

Average Hospital's Score:
79.04

Worst Hospital's Score:
15

Doctors order medications through a computer

Hospitals can use Computerized Physician Order Entry (CPOE) systems to order medications for patients in the hospital, instead of writing out prescriptions by hand. Good CPOE systems alert the doctor if they try to order a medication that could cause harm, such as prescribing an adult dosage for a child. CPOE systems help to reduce medication errors in the hospital.

*Hospitals can earn up to 100 points for using a well-functioning CPOE system in most areas of the hospital.* For details on sources, click here.

What safer hospitals do:

Hospitals use CPOE systems in all areas of the hospital and regularly test those systems to ensure they are alerting doctors to potential ordering errors.

Notes and Definitions

1. Declined to Report: The hospital was asked to provide this information to the public, but did not.

2. Not Available: "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. * The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.

68. TLG's F grade for Palm Beach Gardens Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

69. ***St. Mary's.*** TLG assigned St. Mary's a "D" grade for Fall 2024. Under its flawed methodology, TLG assigned St. Mary's the lowest possible score on the same criteria for which

TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

70. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that St. Mary's performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:




71. TLG's "D" grade for St. Mary's is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

72. ***West Boca Medical Center.*** TLG also assigned West Boca Medical Center a "D" grade for Fall 2024. Under its flawed methodology, TLG assigned West Boca Medical Center the lowest possible score on the same criteria for which TLG had no information—"Handwashing,"

"Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

73. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that West Boca Medical Center performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements:




74. TLG's "D" grade for West Boca Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

**F. TLG's Deceptive And Misleading "Safety" Grades Have Severely Harmed Plaintiffs, Their Patients, And The Public.**

75. TLG's misleading safety grades have caused severe, ongoing, and irreparable harm to Plaintiffs, their patients, and the public. The grades have caused Plaintiffs' patients to move their procedures from Plaintiffs to Plaintiffs' competitors, damaged the goodwill that Plaintiffs worked hard to build with their patients over the years, harmed Plaintiffs' relationships with key business partners, and risked serious consumer harm. Plaintiffs' elective patient admissions dropped following TLG's release of its Fall 2024 Hospital Safety Grades. The harm has been significant and widespread, given TLG's efforts to encourage the media to report on the misleading and deceptive grades TLG assigned Plaintiffs. Indeed, TLG has specifically admitted that it embargoed Plaintiffs' safety grades with the press weeks before those scores went public specifically to generate broad public attention to those false and misleading scores. TLG's safety grades are even available on insurer websites for patients to rely on when they look up whether certain hospitals fall under insurance coverage.

76. Each Plaintiff has suffered harm from TLG's deceptive practices. Plaintiff Delray Medical Center's Medical Executive Committee, which is comprised of the medical leadership that oversees each department within the hospital, has received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. Physicians were approached by patients who expressed that they did not want to go to Delray Medical Center for surgeries after seeing TLG's grade and associated reports. Plaintiff Delray Medical Center has also received reports from patients and from doctors that patients have planned to drive past Delray Medical Center to a more distant medical facility due to the grade TLG gave to Delray Medical Center.

77. Plaintiff Good Samaritan's Medical Executive Committee has also received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. TLG's grades are even impacting Good Samaritan's hiring efforts. Plaintiff Good Samaritan's Chief Nursing Officer reported that a nursing candidate questioned the quality of care of the hospital in her interview for a job opening. Good Samaritan has also received reports from patients that they decided not to use its facility because of TLG's misleading grades.

78. Plaintiff Palm Beach Gardens Medical Center has received reports from patients that they decided not to use the Medical Center due to the misleading grade TLG assigned the hospital. This is particularly harmful to the Palm Beach Gardens community given that the majority of patients are 65 years old and older, and travel time risks exacerbating their health issues before receiving care, particularly if they are stroke victims. The Palm Beach Gardens Medical Center's Medical Executive Committee has also received direct inquiries from patients regarding their concerns about TLG's grades and related public reports.

79. Plaintiff St. Mary's medical leadership has received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. As a Level I adult and pediatric Trauma Center, Joint Commission Comprehensive Stroke Center, Level III NICU, and RPICC—among other certifications—St. Mary's is a facility people need to go to receive specialized medical care. TLG's safety grades misleadingly make patients think that they should go to "A" hospitals even though those hospitals do not have the objective accreditation, certification, and facilities—like St. Mary's—needed to treat certain high-risk patients.

80. When TLG assigns a hospital an A, patients think that facility is where they should receive care. Objective data debunks that impression. As just one example, another hospital in the Palm Beach County area that TLG has graded an "A" regularly transfers patients to St. Mary's

for critical, higher-level care services—despite St. Mary's purported TLG "D" safety grade. In 2024, that A-ranked hospital transferred 600 patients to St. Mary's. Since 2022, that A-ranked hospital transferred 1,800 patients to St. Mary's. Why? Because only St. Mary's had the right specialists, technology, accreditations, and certifications necessary to provide the required care. Whether a hospital can or should treat a given patient depends on far more than TLG's superficial and misleading marks, but TLG intentionally deceives consumers into thinking otherwise.

81. Plaintiff West Boca Medical Center's Medical Executive Committee has also received direct inquiries from patients regarding their concerns with TLG's grades and related public reports. TLG's inaccurate grades have also harmed West Boca Medical Center's relationships with physicians and patients who have chosen alternative options as reflected through West Boca's drop in patient encounters since Fall 2024.

82. TLG's Hospital Safety Grades have also harmed Plaintiffs' relationships with physicians. Medical professionals have expressed concern about working with Plaintiffs due to the grades assigned by TLG, especially when patients have requested to schedule their surgeries at alternative facilities.

83. Attempting to counteract the inaccurate, negative picture created by TLG in the community has required Plaintiffs to devote time and resources that could have otherwise been spent continuing to improve patient care. The harm is particularly pronounced given that negative safety ratings are particularly "sticky" with consumers—*i.e.*, once a consumer sees a failing safety ranking it is exceedingly difficult to convince them the grade is wrong.

84. The deceptive Hospital Safety Grades TLG releases about Plaintiffs—and other non-reporting hospitals—mislead consumers to make commercial decisions to purchase healthcare

services that are not in their best interest. By putting hospitals on unequal footing in its evaluation just to make more money for itself and for its "partners," TLG achieves the opposite of its purported non-profit objective: It risks patient harm and causes potential patients to make unsafe decisions with potentially life-or-death implications.

85. TLG's misleading safety grades have resulted in patients delaying medical care. That's a material public safety problem. Increased time to get to a hospital following an acute health incident materially increases the risk of mortality for emergency patients. Increased time from incident to the hospital also materially increases the risk of worse outcomes, infection, and other dangerous and harmful health outcomes. It is for this reason that Florida law requires ambulances to drive emergency patients to the closest hospital. *See* Fl. Code § 395.1041(3)(e) ("Except as otherwise provided by law, **all medically necessary transfers shall be made to the geographically closest hospital** with the service capability, unless another prior arrangement is in place or the geographically closest hospital is at service capacity." (emphasis added)).

86. TLG's methodology and public statements contradict this public health principle engrained in Florida law by deceiving patients into thinking they are better off driving longer distances to hospitals based on TLG's misleading grades. The vast majority (~80%) of emergency patients are transported to emergency rooms by non-ambulatory vehicles. TLG is putting emergency patients' lives at risk by undermining their trust in local hospitals and encouraging them to delay the care they need based on deceptive information TLG is releasing. TLG's Hospital Safety Grades cause patients to make commercial decisions to drive past deceptively graded hospitals to another hospital farther away. This is a dangerous result particularly because the low grade by TLG is false and misleading.

87. TLG intends these results to encourage non-participating hospitals to participate in its deceptive scheme by warning patients they are "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a C, D, F hospital than at an A hospital." (emphasis added).

88. This has directly caused Plaintiffs harm to their reputation and goodwill.

## CLAIMS FOR RELIEF

### COUNT I
### (DECLARATORY AND INJUNCTIVE RELIEF UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

89. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

90. By virtue of its solicitation of information from Florida healthcare facilities, publication of information and Hospital Safety Grades for Florida hospitals, and commission of deceptive acts and unfair practices against Plaintiffs and the residents of Florida, TLG is subject to the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. § 501.201 et seq.

91. TLG's actions described herein constitute unfair or deceptive trade practices substantially affecting trade or commerce in the state of Florida in violation of FDUTPA.

92. In the course of its business, TLG releases its Hospital Safety Grades, which contain deceptive and misleading statements about hospital quality and patient safety.

93. TLG has made misleading representations about how its scheme penalizes non-participating hospitals, including, but not limited to, its representation that non-participating hospitals are not disadvantaged compared to hospitals who participate in its deceptive scheme.

94. TLG's entire grading system, including its imputation model, misleads Florida consumers—and national consumers—into thinking that healthcare decisions should be made by looking to an oversimplified letter grade and by penalizing non-participating hospitals.

95. TLG abuses the trust of the consumer by intentionally jiggering its Hospital Safety Grades to benefit the hospitals that fund it (through donation and the provision of valuable data), participate in its surveys, and serve on its committees. TLG's Hospital Safety Grades have harmed Florida consumers by causing them to make dangerous decisions to forego the nearest hospital based on misleading information. This harm to consumers has harmed Plaintiffs through loss of goodwill and reputation.

96. TLG's misrepresentations are knowing and intentional. TLG on www.theleapfroggroup.org accurately describes when hospitals have declined to participate in TLG's survey, making clear that TLG has insufficient data with which to assign a safety grade. At the same time, TLG purports to assign "safety grades" based on that same inadequate data on www.hospitalsafetygrade.org.

97. TLG intends that patients, purchasers, consumers, regional and national health plans, insurers, and researchers will rely on its oversimplified grading system and representations regarding the Plaintiff Hospitals' safety and the safety of all hospitals reported on throughout Florida and the country. TLG specifically tells patients to "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a C, D, F hospital than at an A hospital." (emphasis added).

98. The representations made by TLG to consumers and the methodology TLG employs to calculate the Hospital Safety Grades constitute a deceptive act or practice in trade, and both Plaintiffs and patients have been aggrieved by the deceptive act or practice.

99. TLG's deceptive acts and practices cause harm to consumers by misleading consumers regarding the quality and safety of the hospitals it grades, including Plaintiffs.

100. TLG's deceptive acts and practices mislead consumers, causing them to make decisions about their healthcare that are not in their best interests. These deceptive acts and practices cause harm to Florida consumers, including by increasing the incident-to-hospital time for misled patients and causing patients to choose hospitals that do not provide the types of critical care the Plaintiff Hospitals provide.

101. As a result of TLG's deceptive acts and practices, Plaintiffs seek injunctive and declaratory relief valued in excess of $75,000.

102. Pursuant to FDUTPA, Plaintiffs demand injunctive relief, declaratory relief, and attorneys' fees and costs.

**COUNT II**
**(DECLARATORY JUDGMENT)**

103. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

104. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, a court may declare the rights and other legal relations of any interested party in the case of an actual controversy within its jurisdiction.

105. There exists a substantial justiciable controversy between the parties as to whether TLG's grading of Plaintiffs violates FDUTPA. More specifically, Plaintiffs believe that TLG's grading of Plaintiffs constitutes a deceptive practice under FDUTPA, and TLG disagrees and refuses to abate the deceptive practice. This Court is thus vested with the power to declare the rights and liabilities of the parties and to grant such other and further relief as may be necessary. Declaration of the parties' rights in these regards will clarify the rights and interests of the parties.

106. Given the prior and ongoing harm caused by TLG's deceptive practice, the controversy between the parties is actual and of sufficient immediacy to warrant the issuance of a

declaratory judgment. As alleged in the preceding paragraphs, TLG's continued grading of Plaintiffs causes substantial harm to Plaintiffs, patients, and the community such that there is a bona fide, actual, present need for the declaration.

107. Declaratory relief will resolve the legal issues between the parties regarding whether TLG's grading of Plaintiffs constitutes a deceptive practice under FDUTPA.

108. Plaintiffs have attempted to engage with TLG as to the issues with its recently-adopted methodology, including explaining in writing that the methodology results in grades that are deceptive and harmful to patients, but TLG has nevertheless continued to assign its harmful, inaccurate grades.

109. Therefore, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiffs request a judgment declaring that TLG's grading methodology and its application to Plaintiffs, in both the Fall 2024 grading cycle and forthcoming Spring 2025 grading cycle, is a deceptive practice under FDUTPA.

110. Given that the Fall 2024 Hospital Safety Grades present ongoing harm to Plaintiffs and to each future potential patient who is misled by those grades, pursuant to Federal Rule of Civil Procedure 57, Plaintiffs request a speedy hearing of this claim.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a) Permanently enjoin TLG from including Plaintiffs in its Hospital Safety Grades;

b) Speedily declare pursuant to Federal Rule of Civil Procedure 57 that TLG's grading methodology and its application to Plaintiffs, in both the current Spring 2025 grading cycle and in recent prior cycles, violates FDUTPA;

c) Award Plaintiffs their attorneys' fees and costs;

d) Grant such other and further relief as it may deem just and equitable.

Dated: August 28, 2025

Respectfully submitted,

By: */s Michael Pineiro*

MARCUS RASHBAUM PINEIRO & MEYERS LLP

Jeffrey Marcus, Bar #310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar #75084
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131
Telephone: 305-400-4268
Facsimile: 954-688-2492
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

NEIMAN MAYS FLOCH & ALMEIDA PLLC

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
100 SE 3rd Ave, Suite 805
Fort Lauderdale, FL 33394
Telephone: 954-462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

GIBSON, DUNN & CRUTCHER LLP

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: mmaloney@gibsondunn.com
Email: lcrain@gibsondunn.com

Betty X. Yang (*pro hac vice*)
Scott K. Hvidt (*pro hac vice*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
Email: byang@gibsondunn.com
Email: shvidt@gibsondunn.com

*Attorneys for the Plaintiff Hospitals*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | | |
|---|---|---|
| GOOD SAMARITAN MEDICAL CENTER, INC., et al., | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.: 9:25-cv-80526-DMM |
| v. | ) | |
| THE LEAPFROG GROUP, | ) | |
| Defendant. | ) | |

**DEFENDANT THE LEAPFROG GROUP'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT**

Defendant, The Leapfrog Group ("Leapfrog") by and through its attorneys, Wilson Elser Moskowitz Edelman & Dicker LLP, and for its Answer to Plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 12, states as follows:

**PRELIMINARY STATEMENT**

Hospitals are trusted pillars of their communities, responsible for safeguarding the lives of patients in their most vulnerable moments. The integrity of information guiding patients' healthcare decisions must be beyond reproach. Yet Defendant TLG, under the guise of public service, has corrupted that trust—weaponizing fear, distorting facts, and misleading the public to serve its own craven financial interests. Through a brazen pay-to-play scheme, TLG pressures hospitals to participate and pay, or else suffer devastating and misleading public "safety" grades. Plaintiffs bring this action not because they fear evaluation, but because TLG's false and reckless conduct endangers patients, undermines public health, and cannot go unchallenged.

**ANSWER: Leapfrog denies all allegations contained in Plaintiffs' preliminary statement.**

**INTRODUCTION**

1. Defendant TLG holds itself out as an honest and credible public service organization devoted to hospital safety. In reality, it operates a brazen pay-to-play scheme that distorts the truth, misleads patients, and inflicts serious harm on hospitals and the communities they serve. Hospital participation drives TLG's revenue and enriches this so-called "non-profit" to the tune of many millions of dollars—including exorbitant compensation for its Chief Executive Officer. Through its "Hospital Safety Grades," TLG assigns A, B, C, D, and F letter grades to hospitals nationwide and prominently displays them on its website, www.hospitalsafetygrade.org. These "grades" are based, in material part, on easily manipulatable, self-reported data submitted by hospitals that choose to dedicate the time and resources to respond to TLG's sprawling 100+ page data requests. TLG then aggressively broadcasts these so-called grades directly to patients, caregivers, and healthcare workers, orchestrating a sweeping media campaign—including by embargoing grades with reporters nationwide—to maximize public exposure. The message TLG pushes is alarmist and clear: Patients must "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than at an 'A' hospital." (emphasis added). But TLG's "safety grades" are a fraud. Far from protecting patients, they present a clear and present danger to public health across Palm Beach County and beyond.

**ANSWER: Leapfrog admits that it "holds itself out as an honest and credible public service organization devoted to hospital safety." Further, Leapfrog admits that "[t]hrough its 'Hospital Safety Grades,' TLG assigns A, B, C, D, and F letter grades to hospitals nationwide and prominently displays them on its website, www.hospitalsafetygrade.org." Leapfrog denies all remaining allegations contained in Paragraph 1 of the Amended Complaint that are otherwise not expressly admitted.**

2. Four years ago, the five Plaintiff Hospitals made a deliberate choice to stop responding to TLG's excessive data requests. During the height of the COVID-19 pandemic, Plaintiffs prioritized their administrative resources toward achieving specialty-specific accreditations and certifications that directly respond to patient needs. Until last year, TLG continued to assign grades to Plaintiffs based on how similarly situated participating hospitals performed on standard metrics, and notably, Plaintiffs were never assigned F grades under that system.

**ANSWER: Leapfrog admits only that it never published an F grade to any of the five Plaintiff Hospitals prior to the year 2024. Leapfrog denies the allegations that "[u]ntil last year, TLG continued to assign grades to Plaintiffs based on how similarly situated participating hospitals performed on standard metrics." As to the remaining allegations contained in Paragraph 2, Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies the same.**

3. That changed in 2024. Facing declining hospital participation, escalating expenses, and intensifying pressure to drive up revenue—including hefty consulting and advertising fees from participating hospitals along with revenue from insurers—TLG abruptly rigged its methodology. Under its new policy, any hospital declining to provide data would automatically fail on the affected metrics, leading to inevitable Ds and Fs for Plaintiffs for the first time. TLG openly admitted the change was designed to punish non-participating hospitals and ensure they would not "inadvertently benefit" from positive scores—regardless of the truth. Tomorrow's anticipated release of new grades continues TLG's reckless campaign. Instead of simply choosing not to grade Plaintiffs, TLG will deliberately misrepresent these trusted hospitals as dangerous

facilities, undermining the doctors, nurses, and healthcare workers on whom the community depends.

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 3 of the Amended Complaint.**

4. TLG's misinformative "Safety Grades" have been repeatedly condemned by leading healthcare organizations and academic researchers for precisely the dangers they pose. The American Hospital Association ("AHA") has warned that "no one should use [TLG's Hospital Safety Grades] to guide their choice of hospitals," because they are "neither fair nor accurate."[1]Academic studies have confirmed that TLG's methodology consistently misrepresents hospital quality nationwide, misleading patients into healthcare decisions that increase mortality risks and worsen outcomes.[2] TLG has even awarded its highest possible safety grades to a facility the federal government determined in a 384-page report had "quality of care . . . so bad that it had 'caused—or is likely to cause—serious injury, harm, impairment, or death to a patient.'" Multiple patients died at that facility, despite its pristine TLG ranking. For nearly a decade, healthcare professionals and scholars have sounded the alarm about TLG's dangerous practices. Those practices are even worse today as a result of TLG's 2024 move to punish non-participating hospitals.[3]But TLG refuses to fix its reckless model. So long as hospitals are willing to pay to

---

[1] Rich Umbdenstock, *Letter to Leah Binder (The Leapfrog Group)* (June 22, 2012), https://www.leapfroggroup.org/sites/default/files/Files/AHALettertoLeah.pdf.
[2] *See, e.g.*, Joe Nicholl et al., *The Relationship Between Distance to Hospital and Patient Mortality in Emergencies: An Observational Study*, Emerg. Med. J. (Aug. 21, 2007), https://pubmed.ncbi.nlm.nih.gov/17711952/; Julia C. Prentice, *Delayed Access to Health Care and Mortality*, Health Serv. Res. (Apr. 2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1955366/pdf/hesr0042-0644.pdf.
[3] *See, e.g.*, J. Matthew Austin et al., *National Hospital Ratings Systems Share Few Common Scores and May Generate Confusion Instead of Clarity*, 34 Health Affs. 423 (Mar. 2015); Shawna N. Smith et al., *Dissecting Leapfrog: How Well Do Leapfrog Safe Practices Scores Correlate With Hospital Compare Ratings and Penalties, and How Much Do They Matter?*, 55(6) Med. Care 606, 611-12 (June 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5517312/pdf/nihms851990.pdf.

escape failing grades, TLG has no incentive to reform—and every incentive to perpetuate its deceptive scheme.

**<u>ANSWER:</u> To the extent Plaintiffs' have pled accurate recitations of the documents referenced in Paragraph 4 of the Amended Complaint, Leapfrog asserts that those documents speak for themselves. To the extent Plaintiffs' have not pled accurate recitations of the documents referenced in Paragraph 4 of the Amended Complaint, Leapfrog denies all allegations that refer to each respective document. Leapfrog denies the remaining allegations contained in Paragraph 4 of the Amended Complaint.**

5. Plaintiffs did not bring this action lightly. Before commencing this case, Plaintiffs asked TLG to cease and desist its deceptive grading practices. Plaintiffs made clear that TLG's conduct was not only wrong, but dangerously harmful—driving patients away from some of the region's safest hospitals and toward objectively riskier facilities. TLG refused. Hiding behind a self-serving and legally unsupportable invocation of the First Amendment, TLG claimed a "free speech right" to deceive the public. It then doubled down: embargoing its false grades with the press, orchestrating a media blitz, and further misleading patients in Plaintiffs' communities—all while knowing the devastating consequences of its campaign.

**<u>ANSWER:</u> With respect to the allegations contained in Paragraph 5, Leapfrog admits Plaintiffs sent a cease-and-desist correspondence, and Leapfrog did not agree to refrain from publishing Plaintiffs' grades. Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations that "Plaintiffs did not bring this action lightly," and on that basis denies this allegation contained in Paragraph 5. Leapfrog denies the remaining allegations contained in Paragraph 5 of the Amended Complaint.**

6. There is no First Amendment protection for deceptive practices. That is exactly why the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") exists: to protect consumers from modern-day snake oil salesmen like TLG. TLG's supposed "mission" is a sham. Its true mission is self-enrichment. A material percentage of TLG's "non-profit" budget goes directly to compensating its Chief Executive Officer, who has pocketed many millions of dollars in recent years at the expense of the very patients TLG claims to serve. TLG's business model is as simple as it is sinister: prey on public fear, distort the truth, and profit from deception. Enough is enough. This lawsuit seeks to put an end to TLG's dangerous practices and to protect the patients and communities who deserve honest, reliable information about their healthcare choices.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 6 of the Amended Complaint.**

**PARTIES**

7. Plaintiff Delray Medical Center is an accredited hospital with 536 licensed beds. Delray Medical Center is incorporated in Florida, and its principal place of business is at 5352 Linton Blvd., Delray Beach, Florida 33484. As both a general hospital and a Level I Trauma Center for both pediatric and adult patients, Delray Medical Center provides a variety of high-quality, specialized services to the community.

**ANSWER: Upon information and belief, Leapfrog admits to the allegations that "Plaintiff Delray Medical Center is an accredited hospital with 536 licensed beds. Delray Medical Center is incorporated in Florida, and its principal place of business is at 5352 Linton Blvd., Delray Beach, Florida 33484." Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 7 of the Amended Complaint, and on that basis denies the allegations contained therein.**

8. Plaintiff Good Samaritan is the first hospital built in Palm Beach County. It has served the community for over 100 years. Good Samaritan is incorporated in Florida, and Good Samaritan's principal place of business is 1309 N. Flagler Dr., West Palm Beach, Florida 33401. It has 333 licensed beds. Good Samaritan is an accredited acute care hospital that is focused on offering premier and comprehensive oncology services with its robust medical and surgical programs.

**ANSWER: As for the allegations that "Plaintiff Good Samaritan is the first hospital built in Palm Beach County" and "Good Samaritan is an accredited acute care hospital that is focused on offering premier and comprehensive oncology services with its robust medical and surgical programs," Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of these allegations contained in Paragraph 8 of the Amended Complaint, and on that basis denies the allegations contained therein. Upon information and belief, Leapfrog admits to the remaining allegations contained in Paragraph 8 of the Amended Complaint.**

9. Plaintiff Palm Beach Gardens Medical Center is an acute care hospital with 199 licensed beds. Palm Beach Gardens Medical Center is incorporated in Florida, and its principal place of business is 3360 Burns Road, Palm Beach Gardens, Florida 33410. Palm Beach Gardens Medical Center focuses on providing comprehensive cardiovascular care, including open heart surgeries and structural heart procedures. It also provides the community with access to a broad range of other important medical services, including 24-hour emergency care, general surgery, various orthopedic surgery services, and specialty services such as urology.

**ANSWER: Upon information and belief, Leapfrog admits to the allegations that "Plaintiff Palm Beach Gardens Medical Center is an acute care hospital with 199 licensed beds. Palm Beach Gardens Medical Center is incorporated in Florida, and its principal place of business**

**is 3360 Burns Road, Palm Beach Gardens, Florida 33410. Palm Beach Gardens Medical Center focuses on providing comprehensive cardiovascular care, including open heart surgeries and structural heart procedures." Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 9 of the Amended Complaint, and on that basis denies the allegations contained therein.**

10. Plaintiff St. Mary's houses the only children's hospital between Orlando and Fort Lauderdale. St. Mary's is incorporated in Florida, and its principal place of business is 901 45th St., West Palm Beach, Florida 33407. St. Mary's is an accredited acute care hospital that is a Level I adult and pediatric Trauma Center, certified Comprehensive Stroke Center, and has a Level III neonatal intensive care unit ("NICU"). St. Mary's has 413 licensed beds of which 45 are in the NICU. St. Mary's is a Centers for Medicare & Medicaid Services ("CMS") designated Regional Perinatal Intensive Care Center ("RPICC")—one of only 11 RPICC hospitals in Florida.

**ANSWER: Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10 of the Amended Complaint that state, "St. Mary's is a Centers for Medicare & Medicaid Services ('CMS') designated Regional Perinatal Intensive Care Center ('RPICC')—one of only 11 RPICC hospitals in Florida," and "Plaintiff St. Mary's houses the only children's hospital between Orlando and Fort Lauderdale," and on that basis denies those allegation contained therein. Upon information and belief, Leapfrog admits to the remaining allegations contained in Paragraph 10.**

11. Plaintiff West Boca Medical Center is an accredited hospital with 195 licensed beds and primarily serves women and children. West Boca Medical Center is incorporated in Florida, and its principal place of business is 21644 State Road 7, Boca Raton, Florida 33428. West Boca Medical Center is the only Level III NICU in southern Palm Beach County.

**ANSWER: Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 of the Amended Complaint that states, "West Boca Medical Center is the only Level III NICU in southern Palm Beach County," and on that basis denies that allegation contained therein. Upon information and belief, Leapfrog admits to the remaining allegations contained in Paragraph 11.**

12. Defendant The Leapfrog Group is a not-for-profit corporation incorporated in the District of Columbia, with its principal place of business at 1775 K Street, NW, Suite 400, Washington, D.C. 20006.

**ANSWER: Leapfrog admits to the allegations contained in Paragraph 12 of the Amended Complaint.**

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs are all citizens of Palm Beach County, Florida, and TLG is a citizen of Washington, D.C. The amount in controversy is in excess of $75,000 given Plaintiffs seek injunctive and declaratory relief valued in excess of $75,000.

**ANSWER: With respect to the allegations contained in Paragraph 13 of the Amended Complaint which set forth conclusions of law, no response is required. To the extent a response is deemed required, Leapfrog admits that the cited federal statutes confer subject matter jurisdiction and respectfully refers all questions of law to this Honorable Court. All allegations not expressly admitted are denied.**

14. This Court has personal jurisdiction over TLG pursuant to Fla. Stat. Ann. § 48.193(1)(a)(2) because TLG "submit[ted itself] . . . to the jurisdiction of the courts of this state for any cause of action arising from [TLG] . . . [c]ommitting a tortious act within this state." TLG

is also subject to this Court's jurisdiction as TLG is operating, conducting, engaging in, or carrying on a business or business venture in this state. To the extent the alleged injury to persons in this state arises out of an act or omission by TLG outside of this state, this Court has jurisdiction over TLG because it engaged in solicitation or service activities within Florida.

**<u>ANSWER:</u> With respect to the allegations contained in Paragraph 14, Leapfrog admits that the Court's July 15, 2025 Order (Dkt. #41), *inter alia,* found that Florida's long-arm statute creates specific jurisdiction over the allegations contained in Plaintiffs' Amended Complaint. As to the remaining allegations of Paragraph 14 which set forth conclusions of law, no response is required. Leapfrog denies all allegations not expressly admitted contained in Paragraph 14 of the Amended Complaint.**

15. Plaintiffs' claims arise out of TLG's contacts with and purposeful availment of Florida—including but not limited to its misleading "Hospital Safety Grades" of Plaintiffs on its website. TLG's false and misleading "Hospital Safety Grades" were directed at residents of Florida, accessed by residents of Florida, pertained to Plaintiffs (all residents of Florida), harmed Plaintiffs in Florida, and harmed consumers in Florida. TLG has publicly commented on its Hospital Safety Grades for Plaintiffs with Florida publications like Stet News Palm Beach County designed to drive more attention to the Safety Grades in Florida. TLG has also affirmatively "embargoed" its "Safety Grades" about Plaintiffs with members of the press, including members of the press in Florida, confirming TLG has knowingly and intentionally targeted the Florida healthcare market and Florida healthcare consumers with its "Safety Grades" about Plaintiffs.

**<u>ANSWER:</u> Leapfrog admits to the allegations that "TLG has publicly commented on its Hospital Safety Grades for Plaintiffs with Florida publications like Stet News Palm Beach County." Leapfrog further admits that it "embargoed" its "Safety Grades" about Plaintiffs**

**with members of the press, including members of the press in Florida. Leapfrog denies the remaining allegations contained in Paragraph 15 of the Amended Complaint.**

16. This Court also has personal jurisdiction over TLG pursuant to Fla. Stat. Ann. § 48.193(2) because TLG is "engaged in substantial and not isolated activity within [Florida]" and Plaintiffs' claims arise out of that substantial, not isolated, activity. For example, for its Fall 2024 Survey, TLG solicited data from 621 health facilities in Florida, embargoed safety grades as to 192 of them with the media in Florida, and widely publicized the safety grades of those 192 Florida facilities to patients in Florida.

**ANSWER:** **With respect to the allegations contained in Paragraph 16, Leapfrog admits that the Court's July 15, 2025 Order (Dkt. #41),** ***inter alia,*** **found that Florida's long-arm statute creates specific jurisdiction over the allegations contained in Plaintiffs' Amended Complaint. As to the remaining allegations of Paragraph 16 which set forth conclusions of law, no response is required. Further answering, Leapfrog admits it requests participation from health care facilities in Florida, embargos safety grades, and publicizes safety grade in Florida. Leapfrog denies all allegations not expressly admitted contained in Paragraph 16 of the Amended Complaint.**

17. Venue in the Southern District of Florida is appropriate under 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the actions giving rise to the claims occurred.

**ANSWER:** **With respect to the allegations contained in Paragraph 17 which set forth conclusions of law, no response is required. To the extent a response is deemed required, Leapfrog admits that the cited federal statutes relate to venue, and Leapfrog respectfully refers all questions of law to this Honorable Court. All allegations not expressly admitted are denied.**

## FACTUAL ALLEGATIONS

### A. TLG's Safety Grade Methodology Punishes Non-Participating Hospitals Like Plaintiffs And Conceals that Penalty From Consumers.

18. TLG conducts an annual "Hospital Survey" in which TLG "asks hospitals to report quality and safety data and then publicly reports that information by hospital." In connection with the Hospital Survey, TLG assigns a "Hospital Safety Grade" to nearly 3,000 general acute-care hospitals across the nation every spring and fall. TLG posts its safety grade on one of its websites, www.hospitalsafetygrade.org, and it markets, references and links to the Hospital Safety Grade website on another website, www.leapfroggroup.org.

**ANSWER: Leapfrog admits to the allegations contained in Paragraph 18 of the Amended Complaint. Leapfrog denies allegations contained in the headlined titled, "B. TLG's Safety Grade Methodology Punishes Non-Participating Hospitals Like Plaintiffs And Conceals that Penalty From Consumers."**

19. TLG admits it assigns hospitals Safety Grades to influence where consumers and patients decide to receive care. TLG explicitly tells consumers, "Patients should *always* decide on where to receive care based on a hospital's current Safety Grade." (emphasis added). TLG even tells consumers that choosing a hospital "could be a life or death decision" and amplifies this threat by misleading consumers into thinking they're "twice as likely to die of a preventable problem at a C, D, or F hospital than at an A hospital."

**ANSWER: With respect to the allegations contained in Paragraph 19 of the Amended Complaint, Leapfrog asserts that its website speaks for itself. Leapfrog denies the allegations contained in Paragraph 19 as it fails to provide a full and accurate recitation of its website. All allegations not expressly admitted in Paragraph 19 of the Amended Complaint are denied.**

20. The Safety Grade uses CMS data, TLG's Hospital Survey responses, and information from other supplemental data sources to produce a single letter grade that purports to represent a hospital's "overall performance in keeping patients safe from preventable harm and medical errors." "A" represents the best TLG Hospital Safety Grade, followed in order by "B," "C," "D," and "F." The Safety Grade aggregates up to 22 national patient safety measures. For hospitals who participate in TLG's Hospital Survey, TLG uses the hospitals' answers to TLG's Hospital Survey for 12 of the 22 measures. In other words, a majority of the grade for participating hospitals is based on their self-reported survey responses.

**ANSWER: With respect to the allegations contained in Paragraph 20 of the Amended Complaint, Leapfrog asserts that its methodology considers up to 31 patient safety measures in determining a Safety Grade for each hospital, and Leapfrog's methodology uses the hospitals' answers to the Survey for 12 of the 31 measures. Leapfrog admits to the allegations that the Safety Grade uses CMS data and Hospital Survey responses to produce a letter grade. Leapfrog denies the remaining allegations contained in Paragraph 20 of the Amended Complaint.**

21. When a hospital does not participate in TLG's Hospital Survey, TLG uses other sources for those 12 measures. For five measures, TLG uses government data. TLG abandons three measures entirely. And for the last four measures, TLG uses its "imputation model."

**ANSWER: Leapfrog admits to the allegations contained in Paragraph 21 of the Amended Complaint.**

22. According to TLG, that "imputation model" is how it assigns a value for a measure when it lacks any data pertaining to it. If a hospital does not provide TLG data, TLG assigns an "imputed" value. Prior to Fall 2024, TLG's imputation model assigned hospitals that did not

participate in its survey a score based on the average score applicable to similarly situated hospitals. Beginning in Fall 2024, however, TLG modified its imputation model. It now assigns the lowest possible score to non-participating hospitals. In other words, TLG now punishes non-participants for their lack of participation. TLG has admitted its new model imposes a penalty. It specifically explained its 2024 change was designed to prevent non-participating hospitals from "inadvertently benefit[ing]" compared to hospitals that self-report, even though TLG has no data to show how non-participation could benefit a hospital.

**ANSWER: Leapfrog admits that for the four measures set forth in Paragraph 22 above, the allegation that "[a]ccording to TLG, that 'imputation model' is how it assigns a value for a measure when it lacks any data pertaining to it. If a hospital does not provide TLG data, TLG assigns an 'imputed' value." Defendants further admit that "[b]eginning in Fall 2024, however, TLG modified its imputation model." Leapfrog denies the remaining allegations contained in Paragraph 22 of the Amended Complaint.**

23. The four measures for which TLG "imputes" scores are: Computerized Physician Order Entry ("CPOE"), Bar Code Medication Administration ("BCMA"), ICU Physician Staffing ("IPS"), and Hand Hygiene Score. CPOE measures whether a hospital has implemented a system to record medication prescriptions via computer. BCMA measures whether a hospital confirms medication via bar code process. IPS measures a hospital's use of intensivists in an intensive care unit. A Hand Hygiene score measures hospitals' policies for monitoring hand washing and glove usage.

**ANSWER: Leapfrog admits to the allegations contained in Paragraph 23 of the Amended Complaint.**

24. TLG's imputation model deceives consumers by inventing negative data about hospitals that TLG wishes to punish for declining to participate in its survey. For the four imputed measures (CPOE, BCMA, IPS, and Hand Hygiene), if a hospital does not participate in TLG's survey, TLG assigns "a point value that is equivalent to receiving 'Limited Achievement' for this measure"—its lowest possible score—without any factual basis. The result is that hospitals who elect not to participate in TLG's survey receive only 60 out of 400 possible points in these four categories—resulting in artificially deflated overall grades with no basis in fact and no correlation to a hospital's actual safety performance. For example, TLG assigns a hospital the lowest possible value for the Hand Hygiene measure even if it has the best possible Hand Hygiene policy just because the hospital doesn't participate in TLG's Hospital Survey. TLG has no basis to assign that low value.

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 24 of the Amended Complaint.**

25. TLG's "imputation" model for ranking non-participating hospitals directly conflicts with TLG's own National Expert Panel's guidance. As TLG explains, "not all hospitals have enough data publicly available to be eligible for a grade." "As per the National Expert Panel guidance, [TLG] has requirements for the minimum amount of data [it] need[s] to issue an accurate grade." Accordingly, "[h]ospitals missing more than **six** process measures" are "not graded." Non-participating hospitals should fall easily into that "not graded" bucket, because their decision not to participate in TLG's survey necessarily means TLG is missing ***seven*** process measures that rely on voluntary submission of hospital data.[4] The responsible thing to do based on TLG's own Expert Panel guidance, therefore, would be to *not* provide a safety grade for a non-participating hospital.

[4] Those seven include CPOE, BCMA, IPS, Safe Practice 1: Culture of Leadership Structures and Systems; Safe Practice 2: Culture Measurement, Feedback & Intervention; Total Nursing Care Hours per Patient Day; and Hand Hygiene.

But TLG cooks the books. Of those seven missing measures, TLG "imputes"—or gins up—scores for four of them, using those concocted scores to justify ranking non-participating hospitals.

**ANSWER: Leapfrog admits to the allegations contained in Paragraph 25 that state "[a]s TLG explains, 'not all hospitals have enough data publicly available to be eligible for a grade'" and "'[a]s per the National Expert Panel guidance, [TLG] has requirements for the minimum amount of data [it] need[s] to issue an accurate grade.' Accordingly, '[h]ospitals missing more than six process measures' are 'not graded.'" Leapfrog denies the remaining allegations contained in Paragraph 25.**

26. TLG's statements about its imputation model mislead consumers and misrepresent its own model. One Frequently Asked Question on its website asks whether "a hospital get[s] a better Safety Grade if it reports to the [TLG] Hospital Survey." In response, TLG falsely states, "The Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the [TLG] Hospital Survey." Given the nature of TLG's imputation model, which involves inventing data with no objective source, that's a clear lie. TLG relies on invented data for some hospitals but not others, and it applies a different methodology to determine Hospital Safety Grades for non-participating hospitals as compared to participating ones—all despite its claims that it meaningfully compares all hospitals regardless of participation.

**ANSWER: Leapfrog admits to the allegation contained in Paragraph 26 that states, "One Frequently Asked Question on its website asks whether 'a hospital get[s] a better Safety Grade if it reports to the [TLG] Hospital Survey.'" Leapfrog denies the remaining allegations contained in Paragraph 26 of the Amended Complaint.**

27. Another way TLG's deceptive methods punish non-participating hospitals is by rewarding participating hospitals with grade inflation. The data provided by hospitals that do

participate in the TLG Hospital Survey is self-reported, biased, and subject to manipulation. Median responses for hospitals that report their own scores show that those hospitals inflate their performance. TLG lacks appropriate auditing mechanisms to ensure self-reported data is accurate, and it factors measures into its grading methodology that are unverifiable. TLG assumes the data it relies on is accurate without adequately verifying it.

**ANSWER: Leapfrog denies all the allegations contained in Paragraph 27 of the Amended Complaint.**

28. Participating hospitals are not receiving strong TLG grades because they are achieving better results on an objective basis. In one illustrative example, TLG assigned a grade of "A" or "B"—its highest possible safety scores—to Mission Hospital in Asheville, North Carolina, for seven consecutive review cycles between Spring 2021 and Spring 2024. During this same time period, investigators with the North Carolina Department of Health and Human Services conducted a survey at Mission Hospital to evaluate its compliance with Medicare standards. On February 1, 2024, CMS designated Mission Hospital as in "immediate jeopardy [of losing federal funding]"—the most severe sanction possible—because the investigators "determin[ed] that the quality of care at Mission was so bad that it had 'caused – or is likely to cause – serious injury, harm, impairment or death to a patient.'"[5] According to the 384-page report from CMS, at least three patients died in 2022 and 2023 following "significant delays and lapses of care in the emergency department and other areas"[6]—two years in which TLG awarded Mission Hospital four consecutive "A" Hospital Safety Grades.

[5] Andrew R. Jones, *Mission Hospital's Leapfrog, Healthgrade scores and rankings don't tell the whole story, draft report says*, Asheville Watchdog (Feb. 12, 2024), https://avlwatchdog.org/mission-hospitals-leapfrog-healthgrade-scores-and-rankings-dont-tell-the-whole-story-draft-report-says/.

[6] Andrew R. Jones, *'The patient was subsequently found unresponsive in a hallway bed': CMS report on Mission Hospital details deaths of patients, significant delays in care*, ASHEVILLE WATCHDOG (Feb. 17, 2024), https://www.northcarolinahealthnews.org/2024/02/17/plan-of-correction-report-mission-hospital/.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 28 of the Amended Complaint. In further answering, Leapfrog asserts that the illustration above fails to take into account the lag in available CMS data.**

29. Hospitals in Florida that have participated in TLG's survey are similarly receiving high TLG grades that do not reflect their performance, which damages their higher-performing but non-participating competitors. Participating hospitals have received high grades (A's and B's) in recent years despite investigative reports that a participating hospital had cockroaches in operating rooms, dirty and broken medical equipment, inadequate monitoring of ICU patients, an overcrowded emergency department, staffing deficiencies of telemetry technicians—those responsible for monitoring changes in vital signs in patients with electronic devices—that resulted in deaths related to telemetry, patients attacking nurses, and even a misplaced patient who died after staff was unable to locate him or her.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 29 of the Amended Complaint.**

30. The flaws in TLG's methodology reveal themselves through a simple comparison between TLG's rankings and CMS data. CMS provides its own hospital safety rankings— rankings that are the product of data hospitals are required to submit to the federal agency in order to qualify for the Centers for Disease Control's National Healthcare Safety Network incentive programs. There are numerous examples throughout the country where TLG's grade for a hospital is two grades removed from the rating CMS provides—for example, where CMS considers a hospital a 5-star (the highest CMS rating) and TLG assigns the hospital a C, and where CMS considers a hospital a 2-star (the second lowest) and TLG assigns the hospital an A. [Omits Photo]

**ANSWER: Leapfrog admits to the allegations contained in Paragraph 30 that states "CMS provides its own hospital safety rankings— rankings that are the product of data hospitals are required to submit to the federal agency in order to qualify for the Centers for Disease Control's National Healthcare Safety Network incentive programs." Leapfrog denies to all remaining allegations contained in Paragraph 30 of the Amended Complaint.**

31. Similarly, in 2023, TLG awarded nine hospitals who participated in its survey passing grades (A–C) when the government had assigned them "immediate jeopardy" warnings because the hospitals' "noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death[.]" In other words, TLG assigned failing hospitals an A and directed patients to go there at the same time the government was concerned with patients' safety at that hospital.

**ANSWER: Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 of the Amended Complaint, and on that basis denies the allegations contained therein.**

**B. TLG Has Been Subject To Significant Industry And Academic Criticism.**

32. These discrepancies exist because TLG rewards participating hospitals and penalizes non-participating hospitals.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 32 of the Amended Complaint, including the heading titled "C. TLG Has Been Subject To Significant Industry And Academic Criticism."**

33. For more than a decade, industry experts and academics have been sounding the alarm that TLG's methodologies are inaccurate, misleading, or inconsistent based on who participates in the surveys and who does not.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 33 of the Amended Complaint.**

34. The Journal of the American Medical Association ("JAMA") published an article in 2009 titled *Association Between Hospital-Reported Leapfrog Safe Practices Scores and Inpatient Mortality*. That article concluded that in the "sample of . . . hospitals . . . that completed the [2006] Safe Practices Leap" survey, "survey scores were not significantly associated with risk-adjusted inpatient mortality."

**ANSWER: With respect to the allegations contained in Paragraph 34 of the Amended Complaint, Leapfrog asserts that the article referenced therein speaks for itself to which no response is required. To the extent a response is deemed required, Leapfrog denies the allegations contained in Paragraph 34 to the extent it is not an accurate recitation of the article referenced therein. All allegations not expressly admitted are denied.**

35. On June 22, 2012, Richard J. Umbdenstock, President and CEO of the American Hospital Association ("AHA") sent a letter to Leapfrog declaring that the Leapfrog Hospital Safety Grade "was neither fair nor accurate," and he outlined "several methodological shortcomings in the survey." The flaws included "an unfair bias toward responding to the survey, the use of unreliable measures, significant variation in the weights applied to measures for different groups of hospitals, and significant errors in the data." Umbdenstock's letter detailed three major criticisms of TLG's hospital safety score: (1) a minority of U.S. hospitals participate in TLG's voluntary reporting program, while those that do not receive lower imputed scores; (2) more than 80% of the outcome measures have been shown to be unreliable; and (3) there are errors in the TLG data. AHA expressed its "disappointment that the [TLG] scorecard's assessment was neither fair nor

accurate"—leading AHA to conclude that "no one should use [TLG's Hospital Safety Grades] to guide their choice of hospitals, unless and until, a more accurate assessment method is used."

**ANSWER: With respect to the allegations contained in Paragraph 35 of the Amended Complaint, Leapfrog asserts that the article referenced therein speaks for itself to which no response is required. To the extent a response is deemed required, Leapfrog denies the allegations contained in Paragraph 35 to the extent it is not an accurate recitation of the article referenced therein. All allegations not expressly admitted are denied.**

36. In 2017, the peer reviewed journal Medical Care published an article titled: *Dissecting Leapfrog: How Well Do Leapfrog Safe Practices Scores Correlate with Hospital Compare Ratings and Penalties, and How Much Do They Matter?* The authors, a team of researchers from the University of Michigan, concluded that participation in TLG's survey consistently inflated the participant's TLG Hospital Safety Score because self-reported information overwhelmingly "skew[ed] towards positive self-report." For example, over 50% of participating hospitals reported perfect scores in their surveys for all but one safe practice measure, and nearly 20% reported perfect scores for all safe practices.

**ANSWER: With respect to the allegations contained in Paragraph 36 of the Amended Complaint, Leapfrog asserts that the article referenced therein speaks for itself to which no response is required. To the extent a response is deemed required, Leapfrog denies the allegations contained in Paragraph 36 to the extent it is not an accurate recitation of the article referenced therein. All allegations not expressly admitted are denied.**

37. The University of Michigan study further found that TLG's heavy reliance on self-reported data had the effect of "artificially deflating the mean of the distribution" to which non-reporting hospitals were compared. In other words, non-participating hospitals are subject to "large

grade penalties for less-than-perfect self-reported Safe Practices compliance" because they are graded on the same curve as participating hospitals with inflated self-reported data.

**ANSWER: With respect to the allegations contained in Paragraph 37 of the Amended Complaint, Leapfrog asserts that the article referenced therein speaks for itself to which no response is required. To the extent a response is deemed required, Leapfrog denies the allegations contained in Paragraph 37 to the extent it is not an accurate recitation of the article referenced therein. All allegations not expressly admitted are denied.**

38. The authors determined that "Leapfrog's current methodologies, in combination with strongly positively skewed self-reports of [Safe Practices Scores ('SPS')] measures, punish low SPS reports substantially more than they reward high SPS. These concerns cast doubt on the utility of SPS and, more generally, the [Hospital Safety Score] and grades." In addition, the TLG Hospital Safety Scores were not positively associated with patient outcomes reported by Hospital Compare or Medicare penalties for readmissions or complications.

**ANSWER: With respect to the allegations contained in Paragraph 38 of the Amended Complaint, Leapfrog asserts that the article referenced therein speaks for itself to which no response is required. To the extent a response is deemed required, Leapfrog denies the allegations contained in Paragraph 38 to the extent it is not an accurate recitation of the article referenced therein. All allegations not expressly admitted are denied.**

39. Jennifer Meddings, M.D., M.Sc.—the senior author of the Michigan study—said the Hospital Safety Grade is "based on whether a hospital self-reports that it has adopted certain protocols, and not whether those protocols are actually followed"—meaning the Hospital Safety Grades offer little indication of a hospital's actual safety metrics in practice. Indeed, participating hospitals that reported high levels of self-compliance for TLG's safe practices did not have

correspondingly lower hospital-acquired infection rates or lower federal penalties for readmissions, demonstrating the ineffectiveness and misleading nature of TLG's methodology.

**ANSWER: With respect to the allegations contained in Paragraph 39 of the Amended Complaint, Leapfrog asserts that the article referenced therein speaks for itself to which no response is required. To the extent a response is deemed required, Leapfrog denies the allegations contained in Paragraph 39 to the extent it is not an accurate recitation of the article referenced therein. All allegations not expressly admitted are denied.**

40. In 2019, The New England Journal of Medicine Catalyst ("NEJM") published a peer reviewed article criticizing the methodology used by rating agencies, including Leapfrog. The authors said "[t]he greatest concerns were with [TLG's] internally developed and modified Safety Survey." The NEJM authors noted that TLG "had only done a formal audit for approximately five hospitals of about 2,600 in the past year, and only 72 hospitals underwent an electronic audit." In addition, the authors also reported concerns that the survey "may not truly reflect patient safety efforts or be currently meaningful to stakeholders (e.g., computerized physician order entry)."And "[a]nother major area of concern was how Leapfrog assesses hospitals that do not answer their Safety Survey. When hospitals do not report the survey, the missing data are filled in from other secondary sources. However, hospitals that answer the survey and those that do not are assessed in the same way despite not having the same measures upon which to base the ratings. Approximately 50% of hospitals answer their survey, so a good deal of the rankings are based on missing or inconsistent data."

**ANSWER: With respect to the allegations contained in Paragraph 40 of the Amended Complaint, Leapfrog asserts that the article referenced therein speaks for itself to which no response is required. To the extent a response is deemed required, Leapfrog denies the**

**allegations contained in Paragraph 40 to the extent it is not an accurate recitation of the article referenced therein. All allegations not expressly admitted are denied.**

**C. TLG Reaps Substantial Rewards From Its Pay-to-Play Scheme.**

41. TLG heavily tilts its grading in favor of hospitals that participate in TLG's scheme in a quid-pro-quo arrangement: Hospitals provide TLG free data, which it can then monetize, and in return hospitals receive better TLG grades while their competitors are penalized for not supplying TLG free data. And though it pretends to be a non-profit, TLG also rakes in millions of dollars from the data it obtains from participating hospitals incentivized to keep TLG happy, so it keeps inflating grades.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 41 of the Amended Complaint, including the heading titled "D. TLG Reaps Substantial Rewards From Its Pay-to-Play Scheme."**

42. Between 2019 and 2023, TLG collected millions in revenue from hospitals that it later rewarded with inflated grades. TLG also has collected troves of data from hospitals who complete its survey so it can financially benefit from such data. Participants in the TLG survey are specifically required to sign an acknowledgment that "[t]he Leapfrog Group may use this information in a commercial manner for profit": [Omits Photo].

**ANSWER: With respect to the allegations contained in Paragraph 42 of the Amended Complaint, Leapfrog admits participants sign an "Affirmation of Accuracy" which speaks for itself. All allegations not expressly admitted are denied.**

43. TLG collects revenue from participating hospitals in multiple ways. For instance, TLG charges hospitals—including ones TLG rates—over $25,000 annually to join its Partners Advisory Committee to influence the TLG Board of Directors four times a year. TLG thereby

creates a structure for hospitals to pay for access to its decision-makers and curry favor with them to ensure TLG's system benefits hospitals who participate in TLG's scheme and punishes those who do not. Some of TLG's paying members own some of its highest-rated hospitals.[7]

**ANSWER: With respect to the allegations contained in Paragraph 43 of the Amended Complaint, Leapfrog admits it has a Partners Advisory Committee open to any hospital who wishes to participate. Leapfrog denies the remaining allegations contained in Paragraph 43 of the Amended Complaint.**

44. TLG also charges hospitals between $6,700 and $29,900 per year to advertise their TLG safety grade. That creates an incentive for TLG to rate higher the hospitals willing to pay, as opposed to those who do not. No hospital would pay $29,900 to advertise a failing grade.

**ANSWER: Leapfrog admits it "charges hospitals between $6,700 and $29,900 per year to advertise their TLG safety grade." Leapfrog denies the remaining allegations contained in Paragraph 44.**

45. TLG also encourages hospitals to sponsor its annual meetings and awards ceremony. In 2024, TLG's platinum executive sponsorship required $44,750—yet another way TLG reaps financial rewards from its scheme.

**ANSWER: With respect to the allegations contained in Paragraph 45 of the Amended Complaint, Leapfrog admits "TLG also encourages hospitals to sponsor its annual meetings and awards ceremony. In 2024, TLG's platinum executive sponsorship required $44,750." Leapfrog denies the remaining allegations contained in Paragraph 45 of the Amended Complaint.**

[7] Gretchen Morgenson et al., *Roaches in the operating room: Doctors at HCA hospital in Florida say patient care has suffered from cost cutting*, NBS News (Feb. 15, 2023), https://www.nbcnews.com/health/health-care/roaches-operating-room-hca-hospital-florida-rcna69563.

46. TLG monetizes the data it receives from hospitals who participate in its Hospital Survey. TLG is therefore incentivized to set up its methodology to reward participating hospitals, so that it gets more data, which it can use to make more revenue. TLG has used the tens of millions of dollars of revenue it has collected from participating hospitals and other sponsors in its pay-to-play system to pay exorbitant salaries to its owner and executives. Between 2019 and 2023, TLG has paid over three million dollars in salary and benefits to Leah Binder—its CEO.

**ANSWER: With respect to the allegations contained in Paragraph 46 of the Amended Complaint, Leapfrog admits that Leah Binder's salary and benefits are publicly available as she is the CEO of a not-for-profit company and therefore Leapfrog denies any allegations of Paragraph 46 inconsistent with that public information. Leapfrog denies the remaining allegations contained in Paragraph 46 of the Amended Complaint.**

47. TLG also licenses its safety grades to insurers, which integrate TLG's grades into websites patients use to determine whether particular healthcare facilities are covered. Insurers are even able to use TLG's logos and intellectual property—displayed prominently in a drop-down called "Hospital Safety & Accreditation": [Omits Photo]. TLG receives compensation from insurers to allow those insurers to use TLG's safety grades and logos. That means TLG has yet another incentive to rank as many hospitals as possible so as to convince insurers TLG's ratings have value and to drive even more revenue to TLG through penalizing non-participating hospitals and trying to coerce them into providing data.

**ANSWER: With respect to the allegations contained in Paragraph 47 of the Amended Complaint, Leapfrog admits "TLG also licenses its safety grades to insurers" and that "TLG receives compensation from insurers to allow those insurers to use TLG's safety grades and logos." Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of**

**the allegations that the insurers "integrate TLG's grades into websites patients use to determine whether particular healthcare facilities are covered," and that "[i]nsurers are even able to use TLG's logos and intellectual property—displayed prominently in a drop-down called "Hospital Safety & Accreditation," which is pled in Paragraph 47 of the Amended Complaint, and on that basis denies the remaining allegations contained therein. Leapfrog denies the remaining allegations contained in Paragraph 47.**

**D. TLG's Websites Confirm TLG Is Knowingly Deceiving Patients.**

48. TLG has two websites for its hospital safety rankings—www.leapfroggroup.org and www.hospitalsafetygrade.org. They each reference TLG's safety grades, but they do so in inconsistent ways that confirm not only that TLG knows it is misleading patients but also that it intends to do so.

**ANSWER: With respect to the allegations contained in Paragraph 48 of the Amended Complaint, Leapfrog admits it "has two websites for its hospital safety rankings—www.leapfroggroup.org and www.hospitalsafetygrade.org." Leapfrog denies the remaining allegations contained in Paragraph 48 of the Amended Complaint, including header titled "E. TLG's Websites Confirm LTG Is Knowingly Deceiving Patients."**

49. When a potential patient or even an existing patient Googles "hospital safety rankings," the top two results are TLG's websites, www.hospitalsafetygrade.org and www.leapfroggroup.org: [Omits Photos].

**ANSWER: Upon information and belief, Leapfrog admits to the allegations contained in Paragraph 49 of the Amended Complaint.**

50. Each website, however, depicts information about Plaintiffs differently. Consider the consumer experience looking for safety grades on the first Google hit—

www.hospitalsafetygrade.org. Clicking that link brings a patient to TLG's Hospital Safety Grade website, where TLG encourages users to search for their local hospital by asking, "How Safe is Your Hospital?"

**ANSWER: To the extent Plaintiffs' have pled accurate recitations of the website referenced in Paragraph 50 of the Amended Complaint, Leapfrog asserts that the websites speak for themselves. To the extent Plaintiffs' have not pled accurate recitations of the websites referenced in Paragraph 50 of the Amended Complaint, Leapfrog denies all allegations that refer to each respective document. Leapfrog denies the remaining allegations contained in Paragraph 50 of the Amended Complaint.**

51. Once a patient searches her hospital's name, she is immediately confronted with the following image—a disturbing "F" grade, the meaning of which even an elementary school student would understand: [Omits Photo].

**ANSWER: Leapfrog denies the allegations contained in Paragraph 51 of the Amended Complaint.**

52. When a patient clicks on "View the full Score" she sees a plethora of inaccurate and misleading information about the hospital (explained *infra* Section E): [Omits Photo].

**ANSWER: Leapfrog denies the allegations contained in Paragraph 52 of the Amended Complaint.**

53. Only at the bottom of the page—in a small font and in footnotes consumers won't read—does TLG disclose that the hospital did not provide data to TLG.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 53 of the Amended Complaint.**

54. TLG's approach on www.hospitalsafetygrade.org is inconsistent with how it depicts information about Plaintiffs on its other website, www.leapfroggroup.org. On leapfroggroup.org, searching for Good Samaritan Medical Center, for example, does *not* result in any grade at all. Instead, on *that* website, TLG states that the hospital did not provide data to TLG sufficient to rate the hospital: [Omits Photo].

**ANSWER: Leapfrog denies the allegations contained in Paragraph 54 of the Amended Complaint.**

55. TLG's leapfroggroup.org rating website also accurately discloses that TLG has inadequate information to rate the hospital as to every metric: [Omits Photo].

**ANSWER: With respect to the allegations contained in Paragraph 55 of the Amended Complaint, Leapfrog admits the website indicates "Decline to Respond" when applicable. Leapfrog denies the remaining allegations contained in Paragraph 55 of the Amended Complaint.**

56. The differences in TLG's websites confirm TLG knows exactly what message it is communicating to consumers. TLG clearly understands how to tell patients that it can't grade Plaintiffs because it lacks data. TLG decided not to do that, though, on www.hospitalsafetygrade.org: Even after admitting on www.leapfroggroup.org that it *can't* rate Plaintiffs, it purports to fail Plaintiffs with a big, bold, "F" on www.hospitalsafetygrade.org.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 56 of the Amended Complaint.**

### E. TLG Assigned Plaintiffs Misleading And Deceptive Low Grades.

57. Plaintiffs are among the many hundreds of hospitals across the country who choose not to participate in TLG's Survey. Given that non-participation, TLG could easily have told

consumers—as it does on www.leapfroggroup.org—it lacks sufficient data to provide safety grades for Plaintiffs. Instead, it "imputed" scores to Plaintiffs and gave them failing or near-failing grades on www.hospitalsafetygrade.org. As a result, TLG has intentionally and recklessly released misleading and deceptive information about Plaintiffs' health safety performance.

**ANSWER: Leapfrog admits that "Plaintiffs are among the many hundreds of hospitals across the country who choose not to participate in TLG's Survey." Leapfrog denies the remaining allegations contained in Paragraph 57 of the Amended Complaint, including the headline titled "F. TLG Assigned Plaintiffs Misleading And Deceptive Low Grades."**

58. TLG assigned Plaintiffs "Limited Achievement" scores, and corresponding low Safety Grades just as it did with other non-participating hospitals.

**ANSWER: Leapfrog admits that it "assigned Plaintiffs 'Limited Achievement' scores, and corresponding low Safety Grades." Leapfrog denies the remaining allegations contained in Paragraph 58 of the Amended Complaint.**

59. ***Delray Medical Center.*** TLG assigned Delray Medical Center an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Delray Medical Center the lowest possible score on multiple criteria for which TLG had no information—including "Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

**ANSWER: Leapfrog admits that it "assigned Delray Medical Center an 'F' grade for Fall 2024." Leapfrog denies the remaining allegations contained in Paragraph 59 of the Amended Complaint.**

60. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Delray Medical Center performed poorly on each of these categories. Although the "Staff work

together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly reflect that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to say so: [Omits Photo].

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 60 of the Amended Complaint.**

61. In other words, TLG is deceptively communicating to consumers that Delray Medical Center doctors and nurses don't adequately wash their hands, among other false statements—with no data whatsoever to support that conclusion.

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 61 of the Amended Complaint.**

62. TLG's F grade for Delray Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 62 of the Amended Complaint.**

63. ***Good Samaritan.*** TLG also assigned Good Samaritan an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Good Samaritan the lowest possible score on the same criteria for which TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

**<u>ANSWER:</u> Leapfrog admits that it "assigned Good Samaritan an 'F' grade for Fall 2024." Leapfrog denies the remaining allegations contained in Paragraph 63 of the Amended Complaint.**

64. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Good Samaritan performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements: [Omits Photo].

**ANSWER: Leapfrog denies the allegations contained in Paragraph 64 of the Amended Complaint.**

65. TLG's "F" grade for Good Samaritan is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 65 of the Amended Complaint.**

66. ***Palm Beach Gardens Medical Center.*** TLG also assigned Palm Beach Gardens Medical Center an "F" grade for Fall 2024. Under its flawed methodology, TLG assigned Palm Beach Gardens Medical Center the lowest possible score on the same criteria for which TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

**ANSWER: Leapfrog admits that it "assigned Palm Beach Gardens Medical Center an 'F' grade for Fall 2024." Leapfrog denies the remaining allegations contained in Paragraph 66 of the Amended Complaint.**

67. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that Palm Beach Gardens Medical Center performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining

categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements: [Omits Photo].

**ANSWER: Leapfrog denies the allegations contained in Paragraph 67 of the Amended Complaint.**

68. TLG's F grade for Palm Beach Gardens Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 68 of the Amended Complaint.**

69. ***St. Mary's.*** TLG assigned St. Mary's a "D" grade for Fall 2024. Under its flawed methodology, TLG assigned St. Mary's the lowest possible score on the same criteria for which TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

**ANSWER: Leapfrog admits that it "assigned St. Mary's a 'D' grade for Fall 2024." Leapfrog denies the remaining allegations contained in Paragraph 69 of the Amended Complaint.**

70. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that St. Mary's performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements: [Omits Photo].

**ANSWER: Leapfrog denies the allegations contained in Paragraph 70 of the Amended Complaint.**

71. TLG's "D" grade for St. Mary's is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 71 of the Amended Complaint.**

72. ***West Boca Medical Center.*** TLG also assigned West Boca Medical Center a "D" grade for Fall 2024. Under its flawed methodology, TLG assigned West Boca Medical Center the lowest possible score on the same criteria for which TLG had no information—"Handwashing," "Doctors order medications through a computer," "Safe medication administration," and "Specially trained doctors care for ICU patients."

**<u>ANSWER:</u> Leapfrog admits that it "assigned West Boca Medical Center a 'D' grade for Fall 2024." Leapfrog denies the remaining allegations contained in Paragraph 72 of the Amended Complaint.**

73. TLG's consumer-facing Hospital Safety Grade pages misleadingly suggest that West Boca Medical Center performed poorly on each of these categories. Although the "Staff work together to prevent errors" category is labeled with "Declined to Report," the remaining categories all misleadingly indicate that the "Hospital Performs" "Worse Than Average"—even though TLG has no basis to make these deceptive statements: [Omits Photo].

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 73 of the Amended Complaint.**

74. TLG's "D" grade for West Boca Medical Center is a false and misleading statement that TLG intentionally and recklessly released—and refused to pull down.

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 74 of the Amended Complaint.**

**F. TLG's Deceptive And Misleading "Safety" Grades Have Severely Harmed Plaintiffs, Their Patients, And The Public.**

75. TLG's misleading safety grades have caused severe, ongoing, and irreparable harm to Plaintiffs, their patients, and the public. The grades have caused Plaintiffs' patients to move their procedures from Plaintiffs to Plaintiffs' competitors, damaged the goodwill that Plaintiffs worked hard to build with their patients over the years, harmed Plaintiffs' relationships with key business partners, and risked serious consumer harm. Plaintiffs' elective patient admissions dropped following TLG's release of its Fall 2024 Hospital Safety Grades. The harm has been significant and widespread, given TLG's efforts to encourage the media to report on the misleading and deceptive grades TLG assigned Plaintiffs. Indeed, TLG has specifically admitted that it embargoed Plaintiffs' safety grades with the press weeks before those scores went public specifically to generate broad public attention to those false and misleading scores. TLG's safety grades are even available on insurer websites for patients to rely on when they look up whether certain hospitals fall under insurance coverage.

**ANSWER: Leapfrog admits only that its safety grades are available on insurer websites. Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations that patients rely on safety grades that are available on insurer websites when they look up whether certain hospitals fall under insurance coverage and therefore deny the same. Leapfrog denies the remaining allegations contained in Paragraph 75 of the Amended Complaint, including the headline titled "G. TLG's Deceptive And Misleading 'Safety' Grades Have Severely Harmed Plaintiffs, Their Patients, And The Public."**

76. Each Plaintiff has suffered harm from TLG's deceptive practices. Plaintiff Delray Medical Center's Medical Executive Committee, which is comprised of the medical leadership that oversees each department within the hospital, has received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. Physicians were

approached by patients who expressed that they did not want to go to Delray Medical Center for surgeries after seeing TLG's grade and associated reports. Plaintiff Delray Medical Center has also received reports from patients and from doctors that patients have planned to drive past Delray Medical Center to a more distant medical facility due to the grade TLG gave to Delray Medical Center.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 76 of the Amended Complaint, which states "[e]ach Plaintiff has suffered harm from TLG's deceptive practices." Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 76 of the Amended Complaint, and on that basis denies those remaining allegation contained therein.**

77. Plaintiff Good Samaritan's Medical Executive Committee has also received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. TLG's grades are even impacting Good Samaritan's hiring efforts. Plaintiff Good Samaritan's Chief Nursing Officer reported that a nursing candidate questioned the quality of care of the hospital in her interview for a job opening. Good Samaritan has also received reports from patients that they decided not to use its facility because of TLG's misleading grades.

**ANSWER: Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77 of the Amended Complaint, and on that basis denies the allegation contained therein.**

78. Plaintiff Palm Beach Gardens Medical Center has received reports from patients that they decided not to use the Medical Center due to the misleading grade TLG assigned the hospital. This is particularly harmful to the Palm Beach Gardens community given that the majority of patients are 65 years old and older, and travel time risks exacerbating their health issues

before receiving care, particularly if they are stroke victims. The Palm Beach Gardens Medical Center's Medical Executive Committee has also received direct inquiries from patients regarding their concerns about TLG's grades and related public reports.

**ANSWER: Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 of the Amended Complaint, and on that basis denies the allegation contained therein.**

79. Plaintiff St. Mary's medical leadership has received direct inquiries from patients regarding their concerns about TLG's grades and related public reports. As a Level I adult and pediatric Trauma Center, Joint Commission Comprehensive Stroke Center, Level III NICU, and RPICC—among other certifications—St. Mary's is a facility people need to go to receive specialized medical care. TLG's safety grades misleadingly make patients think that they should go to "A" hospitals even though those hospitals do not have the objective accreditation, certification, and facilities—like St. Mary's—needed to treat certain high-risk patients.

**ANSWER: Leapfrog denies the allegations that its "safety grades misleadingly make patients think that they should go to 'A' hospitals even though those hospitals do not have the objective accreditation, certification, and facilities—like St. Mary's—needed to treat certain high-risk patients." Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 79 of the Amended Complaint, and on that basis denies the allegation contained therein.**

80. When TLG assigns a hospital an A, patients think that facility is where they should receive care. Objective data debunks that impression. As just one example, another hospital in the Palm Beach County area that TLG has graded an "A" regularly transfers patients to St. Mary's for critical, higher-level care services—despite St. Mary's purported TLG "D" safety grade. In 2024, that

A-ranked hospital transferred 600 patients to St. Mary's. Since 2022, that A-ranked hospital transferred 1,800 patients to St. Mary's. Why? Because only St. Mary's had the right specialists, technology, accreditations, and certifications necessary to provide the required care. Whether a hospital can or should treat a given patient depends on far more than TLG's superficial and misleading marks, but TLG intentionally deceives consumers into thinking otherwise.

**ANSWER: Leapfrog denies the allegations that "[w]hether a hospital can or should treat a given patient depends on far more than TLG's superficial and misleading marks, but TLG intentionally deceives consumers into thinking otherwise." Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 80 of the Amended Complaint, and on that basis denies the allegation contained therein.**

81. Plaintiff West Boca Medical Center's Medical Executive Committee has also received direct inquiries from patients regarding their concerns with TLG's grades and related public reports. TLG's inaccurate grades have also harmed West Boca Medical Center's relationships with physicians and patients who have chosen alternative options as reflected through West Boca's drop in patient encounters since Fall 2024.

**ANSWER: Leapfrog denies that its grades are inaccurate or that they have harmed West Boca Medical Center's relationships. Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81 of the Amended Complaint, and on that basis denies the allegation contained therein.**

82. TLG's Hospital Safety Grades have also harmed Plaintiffs' relationships with physicians. Medical professionals have expressed concern about working with Plaintiffs due to the

grades assigned by TLG, especially when patients have requested to schedule their surgeries at alternative facilities.

**<u>ANSWER:</u> Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82 of the Amended Complaint, and on that basis denies the allegation contained therein.**

83. Attempting to counteract the inaccurate, negative picture created by TLG in the community has required Plaintiffs to devote time and resources that could have otherwise been spent continuing to improve patient care. The harm is particularly pronounced given that negative safety ratings are particularly "sticky" with consumers—*i.e.*, once a consumer sees a failing safety ranking it is exceedingly difficult to convince them the grade is wrong.

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 83 of the Amended Complaint.**

84. The deceptive Hospital Safety Grades TLG releases about Plaintiffs—and other non-reporting hospitals—mislead consumers to make commercial decisions to purchase healthcare services that are not in their best interest. By putting hospitals on unequal footing in its evaluation just to make more money for itself and for its "partners," TLG achieves the opposite of its purported non-profit objective: It risks patient harm and causes potential patients to make unsafe decisions with potentially life-or-death implications.

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 84 of the Amended Complaint.**

85. TLG's misleading safety grades have resulted in patients delaying medical care. That's a material public safety problem. Increased time to get to a hospital following an acute health incident materially increases the risk of mortality for emergency patients. Increased time from

incident to the hospital also materially increases the risk of worse outcomes, infection, and other dangerous and harmful health outcomes. It is for this reason that Florida law requires ambulances to drive emergency patients to the closest hospital. *See* Fl. Code § 395.1041(3)(e) ("Except as otherwise provided by law, **all medically necessary transfers shall be made to the geographically closest hospital** with the service capability, unless another prior arrangement is in place or the geographically closest hospital is at service capacity." (emphasis added)).

**ANSWER: With respect to the allegations contained in Paragraph 85 which set forth conclusions of law, no response is requires. To the extent a response is deemed required, Leapfrog admits that it cites to Fl. Code § 395.1041(3)(e), and Leapfrog respectfully refers all questions of law to this Honorable Court. Leapfrog denies the remaining allegations contained in Paragraph 85 of the Amended Complaint.**

86. TLG's methodology and public statements contradict this public health principle engrained in Florida law by deceiving patients into thinking they are better off driving longer distances to hospitals based on TLG's misleading grades. The vast majority (~80%) of emergency patients are transported to emergency rooms by non-ambulatory vehicles. TLG is putting emergency patients' lives at risk by undermining their trust in local hospitals and encouraging them to delay the care they need based on deceptive information TLG is releasing. TLG's Hospital Safety Grades cause patients to make commercial decisions to drive past deceptively graded hospitals to another hospital farther away. This is a dangerous result particularly because the low grade by TLG is false and misleading.

**ANSWER: As to Plaintiffs' allegations that "[t]he vast majority (~80%) of emergency patients are transported to emergency rooms by non-ambulatory vehicles," Leapfrog lacks knowledge or information sufficient to form a belief as to the truth of these allegations contained in Paragraph 86 of the Amended Complaint and therefore denies the same.**

**Leapfrog denies the remaining allegations contained in Paragraph 86 of the Amended Complaint.**

87. TLG intends these results to encourage non-participating hospitals to participate in its deceptive scheme by warning patients they are "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a C, D, F hospital than at an A hospital." (emphasis added).

**ANSWER: Leapfrog denies the allegations contained in Paragraph 87 of the Amended Complaint.**

88. This has directly caused Plaintiffs harm to their reputation and goodwill.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 88 of the Amended Complaint.**

## CLAIMS FOR RELIEF

### COUNT I
### (DECLARATORY AND INJUNCTIVE RELIEF UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

89. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

**ANSWER: Leapfrog realleges and incorporates its answers as fully set forth herein.**

90. By virtue of its solicitation of information from Florida healthcare facilities, publication of information and Hospital Safety Grades for Florida hospitals, and commission of deceptive acts and unfair practices against Plaintiffs and the residents of Florida, TLG is subject to the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. § 501.201 et seq.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 90 of the Amended Complaint.**

91. TLG's actions described herein constitute unfair or deceptive trade practices substantially affecting trade or commerce in the state of Florida in violation of FDUTPA.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 91 of the Amended Complaint.**

92. In the course of its business, TLG releases its Hospital Safety Grades, which contain deceptive and misleading statements about hospital quality and patient safety.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 92 of the Amended Complaint.**

93. TLG has made misleading representations about how its scheme penalizes non-participating hospitals, including, but not limited to, its representation that non-participating hospitals are not disadvantaged compared to hospitals who participate in its deceptive scheme.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 93 of the Amended Complaint.**

94. TLG's entire grading system, including its imputation model, misleads Florida consumers—and national consumers—into thinking that healthcare decisions should be made by looking to an oversimplified letter grade and by penalizing non-participating hospitals.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 94 of the Amended Complaint.**

95. TLG abuses the trust of the consumer by intentionally jiggering its Hospital Safety Grades to benefit the hospitals that fund it (through donation and the provision of valuable data), participate in its surveys, and serve on its committees. TLG's Hospital Safety Grades have harmed Florida consumers by causing them to make dangerous decisions to forego the nearest hospital based

on misleading information. This harm to consumers has harmed Plaintiffs through loss of goodwill and reputation.

**<u>ANSWER:</u> Leapfrog denies the allegations contained in Paragraph 95 of the Amended Complaint.**

96. TLG's misrepresentations are knowing and intentional. TLG on www.theleapfroggroup.org accurately describes when hospitals have declined to participate in TLG's survey, making clear that TLG has insufficient data with which to assign a safety grade. At the same time, TLG purports to assign "safety grades" based on that same inadequate data on www.hospitalsafetygrade.org.

**<u>ANSWER:</u> Leapfrog admits to the allegations that "TLG on www.theleapfroggroup.org accurately describes when hospitals have declined to participate in TLG's survey." Leapfrog denies the remaining allegations contained in Paragraph 96 of the Amended Complaint.**

97. TLG intends that patients, purchasers, consumers, regional and national health plans, insurers, and researchers will rely on its oversimplified grading system and representations regarding the Plaintiff Hospitals' safety and the safety of all hospitals reported on throughout Florida and the country. TLG specifically tells patients to "*always* decide on where to receive care based on a hospital's current Safety Grade," because they are "twice as likely to die of a preventable problem at a C, D, F hospital than at an A hospital." (emphasis added).

**<u>ANSWER:</u> With respect to the allegations contained in Paragraph 97 of the Amended Complaint, Leapfrog asserts that its website speaks for itself to which no response is required. To the extent a response is deemed required, Leapfrog denies the allegations contained in Paragraph 97 to the extent it is not an accurate recitation of Leapfrog's website. All allegations not expressly admitted are denied.**

98. The representations made by TLG to consumers and the methodology TLG employs to calculate the Hospital Safety Grades constitute a deceptive act or practice in trade, and both Plaintiffs and patients have been aggrieved by the deceptive act or practice.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 98 of the Amended Complaint.**

99. TLG's deceptive acts and practices cause harm to consumers by misleading consumers regarding the quality and safety of the hospitals it grades, including Plaintiffs.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 99 of the Amended Complaint.**

100. TLG's deceptive acts and practices mislead consumers, causing them to make decisions about their healthcare that are not in their best interests. These deceptive acts and practices cause harm to Florida consumers, including by increasing the incident-to-hospital time for misled patients and causing patients to choose hospitals that do not provide the types of critical care the Plaintiff Hospitals provide.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 100 of the Amended Complaint.**

101. As a result of TLG's deceptive acts and practices, Plaintiffs seek injunctive and declaratory relief valued in excess of $75,000.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 101of the Amended Complaint.**

102. Pursuant to FDUTPA, Plaintiffs demand injunctive relief, declaratory relief, and attorneys' fees and costs.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 102 of the Amended Complaint.**

**COUNT II**
**(DECLARATORY JUDGMENT)**

103. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

**ANSWER: Leapfrog realleges and incorporates its answers as fully set forth herein.**

104. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, a court may declare the rights and other legal relations of any interested party in the case of an actual controversy within its jurisdiction.

**ANSWER: With respect to the allegations contained in Paragraph 104 which set forth conclusions of law, no response is required. To the extent a response is deemed required, Leapfrog admits that the Plaintiffs cite the Declaratory Judgment Act, 28 U.S.C. § 2201, and Leapfrog respectfully refers all questions of law to this Honorable Court. All allegations not expressly admitted are denied.**

105. There exists a substantial justiciable controversy between the parties as to whether TLG's grading of Plaintiffs violates FDUTPA. More specifically, Plaintiffs believe that TLG's grading of Plaintiffs constitutes a deceptive practice under FDUTPA, and TLG disagrees and refuses to abate the deceptive practice. This Court is thus vested with the power to declare the rights and liabilities of the parties and to grant such other and further relief as may be necessary. Declaration of the parties' rights in these regards will clarify the rights and interests of the parties.

**ANSWER: Leapfrog admits "[t]here exists a substantial justiciable controversy between the parties as to whether TLG's grading of Plaintiffs violates FDUTPA" and Leapfrog generally denies the allegations contained in the Amended Complaint and in support of Plaintiffs'**

**claims. With respect to the allegations contained in Paragraph 105 which set forth conclusions of law, no response is required. To the extent a response is deemed required, Leapfrog admits that Paragraph 105 in short pleads Plaintiffs' position in support of Count II, and Leapfrog respectfully refers all questions of law to this Honorable Court. All allegations not expressly admitted are denied.**

106. Given the prior and ongoing harm caused by TLG's deceptive practice, the controversy between the parties is actual and of sufficient immediacy to warrant the issuance of a declaratory judgment. As alleged in the preceding paragraphs, TLG's continued grading of Plaintiffs causes substantial harm to Plaintiffs, patients, and the community such that there is a bona fide, actual, present need for the declaration.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 106 of the Amended Complaint.**

107. Declaratory relief will resolve the legal issues between the parties regarding whether TLG's grading of Plaintiffs constitutes a deceptive practice under FDUTPA.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 107 of the Amended Complaint.**

108. Plaintiffs have attempted to engage with TLG as to the issues with its recently-adopted methodology, including explaining in writing that the methodology results in grades that are deceptive and harmful to patients, but TLG has nevertheless continued to assign its harmful, inaccurate grades.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 108 of the Amended Complaint.**

109. Therefore, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiffs request a judgment declaring that TLG's grading methodology and its application to Plaintiffs, in both the Fall 2024 grading cycle and forthcoming Spring 2025 grading cycle, is a deceptive practice under FDUTPA.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 109 of the Amended Complaint.**

110. Given that the Fall 2024 Hospital Safety Grades present ongoing harm to Plaintiffs and to each future potential patient who is misled by those grades, pursuant to Federal Rule of Civil Procedure 57, Plaintiffs request a speedy hearing of this claim.

**ANSWER: Leapfrog denies the allegations contained in Paragraph 110 of the Amended Complaint.**

## AFFIRMATIVE DEFENSES

Defendant, The Leapfrog Group ("Leapfrog") by and through its attorneys, Wilson Elser Moskowitz Edelman & Dicker LLP, and for its Affirmative Defenses to Plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 8, states as follows:

### FIRST AFFIRMATIVE DEFENSE
### (Anti-SLAPP)

1. Florida Statute Section 768.295, Florida's Anti-SLAPP statute, prohibits such suits and "protect[s] the right in Florida to exercise the rights of free speech in connection with public issues." Fla. Stat. § 768.295(1).

2. The withdrawal of Plaintiffs' claim for monetary damages crystalizes the fact that the Amended Complaint is directed solely at silencing Leapfrog's free speech in connection with a public issue.

3. The Amended Complaint is a classic strategic lawsuit against public participation, or SLAPP suit.

4. Thus, the Amended Complaint is barred under Florida's Anti-SLAPP statute.

**SECOND AFFIRMATIVE DEFENSE**
**(Avoidable Consequences)**

5. Plaintiffs' claims are barred, in whole or in part, or, at a minimum, recovery should be reduced pursuant to the doctrine of avoidable consequences.

6. Plaintiffs' own actions, inactions, or otherwise Plaintiffs' own misconduct is an avoidable consequence.

7. For example, if Plaintiffs' improved their own patient safety, then each Plaintiff Hospital would receive higher scores with regard to each measure Leapfrog uses to calculate Plaintiffs' Safety Grades; thus, Plaintiffs would have incurred any of their alleged damages.

8. Plaintiffs safety grades are a result of their own conduct, which is an avoidable consequence and to the extent Plaintiffs have not attempted to improve their own patient safety, they have failed to mitigate the very damages alleged in this lawsuit.

**THIRD AFFIRMATIVE DEFENSE**
**(Good Faith)**

9. Plaintiffs' claims are barred in whole or in part by the good faith conduct by Leapfrog.

10. Leapfrog consults with a world-renowned expert panel to review and provide guidance on the methodology leading to the hospital Safety Grades.

11. Leapfrog transparently requested public comment with respect to the changes to be made to the fall 2024 methodology as approved by the expert safety grade panel.

12. Furthermore, Leapfrog transparently publishes its methodology including but not limited to a breakdown on the various measures included in the hospital Safety Grade's methodology.

13. In addition, Leapfrog developed its consumer facing website taking into account the digital literacy of its reasonable consumers to ensure consumer comprehension.

14. As such Leapfrog's conduct was made in good faith thereby wholly barring Plaintiffs' claims.

Leapfrog reserves the right to assert such additional affirmative defenses as may be necessary based on its ongoing investigation of the Amended Complaint and the claims asserted by Plaintiffs therein.

WHEREFORE, Defendant, The Leapfrog Group respectfully requests that this Court (1) dismiss Plaintiffs' Amended Complaint in its entirety, with prejudice; (2) grant Leapfrog leave to file a motion for recovery of attorneys' fees and costs pursuant to Fla. Stat. § 768.295; and (3) for such further relief as this Court deems just and proper.

Dated: September 3, 2025

Respectfully submitted,

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP.

By: /s Jura C. Zibas
Jura C. Zibas, Esq.
Florida Bar No.: 124571
2063 Main Street - Suite 100
Sarasota FL 34237
Telephone: 941-866-8561
Fax: 941-210-5979
Jura.Zibas@wilsonelser.com
Cheryl.Kujawski@wilsonelser.com

*Kimberly E. Blair*
Kimberly E. Blair (pro hac vice)
kimberly.blair@wilsonelser.com
Illinois Bar ID # 6272934
161 N. Clark, Ste. 4500
Chicago, IL 60601
312.821.6139 (Direct)

*Attorneys for Defendant, The Leapfrog Group*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2025 I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send an electronic notification of such filing to all counsel of record in the Court's ECF filing system.

*s/Jura C. Zibas*
Jura C. Zibas

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 9:25-CV-80526-DMM**

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITALS, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,

*Plaintiffs,*

v.

THE LEAPFROG GROUP,

*Defendant.*

**THE LEAPFROG GROUP'S MOTION FOR SUMMARY JUDGMENT**

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

Jura C. Zibas (Bar #124571)
jura.zibas@wilsonelser.com
2063 Main Street, Suite 100
Sarasota, Florida 34237
(941) 866-8561 (Main)
(212) 915-5756 (Direct)

Kimberly E. Blair (*pro hac vice*)
Illinois Bar No.: 6272934
Courtney L. Wood (*pro hac vice*)
Illinois Bar No.: 6344385
161 N. Clark St., Suite 4500
Direct: (312) 821-6139
Main: (312) 704-0550
Mobile: (312) 259-6414
Kimberly.blair@wilsonelser.com

*Attorneys for The Leapfrog Group*

# TABLE OF CONTENTS

I. **INTRODUCTION** ..... 1
II. **FACTUAL BACKGROUND** ..... 2
A. Brief History of Leapfrog & Its Mission ..... 2
1. The Hospital Safety Grade & Methodology ..... 2
2. Leapfrog's Transparency ..... 4
B. The Plaintiff Hospitals' Grades and Relevant Allegations ..... 5
1. The Plaintiff Hospitals Track Their Safety Grades ..... 5
2. The Plaintiff Hospitals' Safety Grades & Underlying CMS Data ..... 5
3. There is No Evidence of Consumer Harm ..... 5
III. **ARGUMENT** ..... 6
A. Summary Judgment Standard. ..... 6
B. The Tenet Hospitals' Claim Fails as a Matter of Law. ..... 6
1. There is No Evidence of Any Consumer Injury, Harm, or Detriment. ..... 6
a. *Novo Nordisk v. Brooksville* is Particularly Instructive. ..... 8
2. Leapfrog's Purported Conduct was *Not* Deceptive. ..... 10
3. Leapfrog Does Not Engage in "Unfair" Practices. ..... 13
4. The Tenet Hospitals Cannot Prove That They Were "Aggrieved" ..... 16
C. The Plaintiff Hospitals Lack Article III Standing. ..... 17
D. Summary Judgment on the Anti-SLAPP Defense is Warranted. ..... 18



324099588v.2

# Table of Authorities

## Cases

*Alhassid v. Nationstar Mortg.* LLC, 771 Fed. Appx. 965 (11th Cir. 2019) ... 15
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ... 6, 7
*Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310 (S.D. Fla. Aug. 6, 2020) ... 19
*Caribbean Cruise Line, Ind. v. Better Bus. Bureau of Palm Beach County, Inc.*, 169 So. 3d 164 (Fla. 4th DCA 2015) ... 7, 10
*CMR Constr. & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298 (11th Cir. 2022) ... 7
*Cmty. Health Ctrs., Inc. v. DiamondDog Servs., Inc.*,2024 WL 3278579 (M.D. Fla. July 2, 2024) ... 14
*Cravens v. Garda CL Se., Inc.*, 2024 WL 5058304 ... 17
*Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109 (S.D.N.Y. 2019) ... 12
*Donoff v. Delta Air Lines, Inc.*, 2020 WL 1226975 (S.D. Fla. Mar. 6, 2020) ... 16
*Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176 (M.D. Fla. Jan. 25, 2022) ... 17
*Flynn v. Wilson*, 398 So. 3d 1103 (Fla. 2d DCA 2024) ... 19
*Freeman v. Time Inc.*, 68 F. 3d 285, 289-90 (9th Cir. 1995) ... 11
*Garside v. Osco Drug, Inc.*, 895 F. 2d 46 (1st Cir. 1990) ... 8
*Harrod v. Express Scripts, Inc.*, 2019 WL 8273650 (M.D. Fla. Aug. 16, 2019) ... 8
*Macias v. HBC of Fla., Inc.*, 694 So. 2d 88 (Fla. 3d DCA 1997) ... 17
*Macuba v. DeBoer*, 193 F.3d 1316 (11th Cir. 1999) ... 8
*Medmoun v. Home Depot U.S.A., Inc.*, (M.D. Fla. May 7, 2022 ... 16
*Moore v. Trader Joe's Co.*, 4 F. 4th 874 (9th Cir. 2021) ... 11, 12
*Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*, 785 F. Supp. 3d 1123 (M.D. Fla. May 12, 2025) ... 6, 9, 10, 18
*Piescik v. CVS Pharm., Inc.*, 576 F. Supp. 3d 1125, 1132 (S.D. Fla. 2021) ... 10, 11, 12
*PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773 (Fla. 2003) ... 13
*Qunjian v. Globoforce, Inc.*, 89 F. 4th 852 (11th Cir. 2023) ... 7, 11
*Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001 ... 18
*SMS Audio, LLC v. Belson*, 2017 WL 11631378 (S.D. Fla. April 24, 2017) ... 14
*Snyder v. Phelps*, 562 U.S. 443 (2011). ... 20
*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ... 18
*State Farm Mut. Auto Ins. Co. v. At Home Auto Glass LLC*, 2024 WL 4349246 *12-13 (M.D. Fla. Sep. 30, 2024) ... 6, 7, 8
*Stewart Agency, Inc. v. Arrigo Enters.*, 266 So. 3d 207 (Fla. Dist. Ct. App. 2019) ... 7, 16, 17
*Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2017 WL 2834783 (M.D. Fla. June 30, 2017) ... 17
*Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275 (S.D. Fla. 2021) .. 6, 8

## Statutes

Fla. Stat. § 768.295(2)(a) ... 20
Fla. Stat. §758.295(3) ... 19

## I. INTRODUCTION

The five (5) Plaintiff hospitals, owned by multiple billion-dollar corporation Tenet Healthcare, brought this case under the guise of protecting the public. But, the record reveals the Plaintiffs' true purpose: Preventing the public from exposure to fair, honest speech with which the plaintiffs disagree. The Leapfrog Group is a non-profit that meticulously – and transparently – provides the consuming public with its data-driven assessment of the safety of hospitals across the Country. That assessment is well respected and used not only by consumers, but also by hospitals – including the Plaintiff Hospitals – to benchmark their performance against peers and set goals for improvement.

Displeased with the grades assigned to them through Leapfrog's Safety Grade methodology (which is disclosed in its entirety online, and provided directly to the Plaintiffs months before the grades become public), the Plaintiff Hospitals have chosen meritless litigation intended to silence Leapfrog rather than addressing their poor patient safety. Specfically, the Plaintiff Hospitals seek to "[p]ermanently enjoin TLG from including Plaintiffs in its Hospital Safety Grades." (ECF Doc. No. 74, p. 41). In other words, the Plaintiffs Hospitals argue that the communities they serve should never see Leapfrog's assessment of their safety.

Beneath the Plaintiffs' obfuscations and lip service is the reality that the Plaintiffs are plainly unconcerned about the public and instead seek only to protect *themselves*. Here, too, lies a fatal problem with the Plaintiffs' case: the Plaintiffs have not – and cannot – present this Court with a shred of evidence that Florida *consumers* have been harmed by Leapfrog's purported conduct. If the Plaintiffs were truly advancing this case to protect the consuming public consistent with FDUTPA's legislative intent, then it would stand to reason that *consumers* would be at the forefront of the Plaintiffs' case. But, they are not. Instead, the Plaintiffs try to sidestep this fatal flaw in their FDUTPA case through table-pounding, legal acrobatics, and speculation that consumers are "likely" to be deceived by Leapfrog's Safety Grades. However, tactics are not evidence, and only evidence can defeat summary judgment.

Indeed, summary judgment for Leapfrog is warranted here. First, Plaintiffs cannot identify a single instance of actual consumer injury, as FDUTPA requires; conjecture and hearsay cannot defeat summary judgment. Second, Leapfrog's methodology and disclosures are transparent, publicly available, and prominently explained, foreclosing any claim of deception under an objective reasonable-consumer standard. Third, Plaintiffs cannot prove an "unfair" practice

because there is no consumer injury, let alone one that outweighs the substantial public benefits of Leapfrog's ratings. Fourth, Plaintiffs are not "aggrieved;" their alleged harms are speculative, contradicted by their own admissions, and untethered to any actionable conduct. Fifth, Plaintiffs lack Article III standing, having failed to show a concrete, particularized injury fairly traceable to Leapfrog and redressable by the requested relief. Finally, because this retaliatory suit targets speech on a matter of public concern, summary judgment is likewise warranted on Leapfrog's Anti-SLAPP defense. This Motion should be granted.

## II. FACTUAL BACKGROUND

### A. Brief History of Leapfrog & Its Mission

In 1998, a group of employers came together to address a critical, complex public safety issue – medical errors, accidents, injuries, and infections causing preventable harm and death to thousands of patients every year. (SOF ¶1). A report by the Institute of Medicine (now the National Academy of Medicine) estimated that nearly 100,000 people died annually from these problems. (SOF ¶2). Leapfrog was founded to address this by advocating for more transparency to allow consumers to compare hospitals' safety records before choosing where to treat. (*Id.*). By fostering a transparent market, employers aimed to see "giant leaps forward in patient safety." (SOF ¶3).

One of Leapfrog's first steps in its mission was the launch of its Hospital Survey in 2001. (SOF ¶5). The Hospital Survey is a free, voluntary benchmarking tool developed by Leapfrog in consultation with leading researchers and clinicians, and more than 2,400 hospitals participate regardless of their eligibility for a Hospital Safety Grade. (SOF ¶6). Indeed, hospitals and other medical service providers nationwide use the Hospital Survey to assist and guide their patient-safety operations. (SOF ¶14). In 2012, a separate and distinct program was launched – the Leapfrog's Hospital Safety Grade, an A, B, C, D, or F grade assigned to every general hospital in the United States regardless of whether they voluntarily participated in the Leapfrog Hospital Survey. (SOF ¶15). The Plaintiff Hospitals in this case take issue with Leapfrog's Hospital Safety Grades. (ECF Doc. No. 74).

#### 1. The Hospital Safety Grade & Methodology

Leapfrog's Hospital Safety Grade ("Hospital Safety Grade") provides consumers with patient safety information in a consumable format specifically designed to be used by patients and potential patients. (SOF, ¶16-17). Despite receiving grades twice annually for years, it was not until Leapfrog changed its Hospital Safety Grade methodology (the "Methodology") in 2024 that



324099588v.2

the Plaintiff Hospitals took issue with the Methodology and the Safety Grades. (SOF ¶18-19). It is notable that the Fall 2024 methodology change is not the first. (SOF ¶21). Rather, Leapfrog reviews its methodology annually based on new developments in clinical science, measurement science, and publicly available data; announces changes well in advance; and solicits public comment before putting them in place. (SOF ¶22).

In Fall 2024, Leapfrog made a change to its Safety Grade Methodology, in consultation with its renowned Safety Grade Expert Panelists. (SOF ¶20). Before the Fall 2024 Methodology change, Leapfrog utilized a 2-step imputation model for four (4) of the 22 measures used to calculate the Safety Grade – Computerized Physician Order Entry (CPOE), Bar Code Medication Administration (BCMA), ICU Physician Staffing (IPS) and Hand Hygiene (HH) – for hospitals that did not complete the Survey. (SOF ¶23). The pre-fall 2024 imputation method used historical data for the hospital if the hospital had participated in a Survey within the last 4 rounds (Step 1) and if no historical data was available for that hospital, the hospital would be assigned the mean score for those measures achieved by similar, "cohort" hospitals (Step 2). (SOF ¶23, 27). Over time, the pre-fall 2024 imputation model became biased in that it conferred a benefit on non-participating hospitals by raising the "cohort mean" scores as participating hospitals improved. (SOF ¶28). Thus, Leapfrog met with its Hospital Safety Grade expert panel to discuss proposed changes to the imputation model, and with the panel's guidance the 2024 Methodology change was published and circulated for public comment and input (including to the Plaintiff Hospitals), and implemented. (SOF ¶20, 29).

The fall 2024 Methodology change addressed the unintended consequences of prior Step 2 "cohort" method by proscribing that if a hospital "does not have historical data from the last two rounds…of the safety grade, the hospital is assigned a point value that is equivalent to receiving 'Limited Achievement' for this measure on the Leapfrog Hospital Survey." (SOF ¶29). "Limited Achievement" scores vary by measure, but they are the lowest scores available for each measure. (*Id.*). Imputation is a well-settled and reliable methodology in such circumstances (*i.e.*, where a hospital does not provide the data itself *via* the Hospital Survey) and is consistently applied. (SOF ¶31).

Besides the foregoing adjustment to the imputation model, the scoring Methodology remained the same. (SOF ¶32). The Methodology continued to include the same performance categories ("Achieved the Standard," "Considerable Achievement," "Some Achievement," and

"Limited Achievement") and the associated measure scores for those performance categories[1] (*e.g.*, measure score of 15 for "Limited Achievement"), which were determine by the Safety Grade Expert Panel relying on peer-reviewed literature and subject matter expertise. (SOF ¶33, 34).

Months in advance of the implementation of the fall 2024 Methodology change, the Plaintiff Hospitals were aware and informed of the proposed Methodology change and the impact, if any, the proposed Methodology change could have on their grades. (SOF ¶22, 46, 35). Plaintiffs knew of their forthcoming Safety Grades prior to Nov. 15, 2024 release, understood impact of Survey participation, and requested authority to participate from Tenet's Home Office. (*Id.*).

2. Leapfrog's Transparency

Contrary to the Plaintiff Hospitals' allegations, Leapfrog's thoroughly discloses its Methodology and other material information, for free, on its websites. (SOF ¶8, 10, 12, 13, 14, 22, 25-26, 36-46). Leapfrog maintains its website (www.leapfroggroup.org), and a site specifically for the Safety Grades (hospitalsafetygrade.org). (SOF ¶42). Leapfrog prominently disclosed its proposed fall 2024 changes months in advance, and invited comment. (SOF ¶45-46). The Hospital Safety Grade website allows users to search for specific hospital, and detailed explanations of the Safety Grades is contained on the landing page for each hospital. (SOF ¶36). The approach for handling Safety Grades for Hospitals that do not participate in the Hospital Survey is prominently explained. (SOF ¶38-40). In fact, the *entire* 29-page methodology is accessible on the same page as the Safety Grade, and contains the Dealing With Missing Data" section how non-reporting hospitals Grades are determined, including, *inter alia*, an explanation of the Four Imputed Measures, imputation, and scoring methodology. (SOF ¶40). Leapfrog further explains this, among other things, on its "About the Grade" page and in all materials shared with hospitals. (SOF ¶43).

Leapfrog's FAQ page also explains how Leapfrog handles Safety Grades for non-participating hospitals. (SOF ¶45). The Safety Grade pages include a link to a "Detailed table view" providing a measure-by-measure breakdown of a given hospital's data underlying the Safety Grade, and also includes red, bolded statements: "**Declined to Report: The hospital was asked to provide this information to the public, but did not**," and "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available**," followed by a legal disclaimer. (SOF ¶38).

[1] The measures scores associated with each performance category (both of which were unchanged) re determined by an expert panel in consideration of peer-reviewed literation and subject matter expertise. (SOF ¶34).

### B. <u>The Plaintiff Hospitals' Grades and Relevant Allegations</u>

1. <u>The Plaintiff Hospitals Track Their Safety Grades</u>

The Plaintiff Hospitals complain that the Hospital Safety Grade is deceptive, and that the methodology is unfair (*see generally,* ECF Doc. No. 74). Yet, the Plaintiff Hospitals understand Leapfrog's scoring methodology, and the Methodology is available online for all to view. (SOF ¶35). The Plaintiff Hospitals track their own Hospital Safety Grades and in discussed what grades they could earn if they responded to the Hospital Survey. (*Id.*). Indeed, as discussed, Leapfrog goes to extraordinary lengths to publish for the public and hospitals the detail about calculating its Grades. Despite this extraordinary transparency, the Plaintiff Hospitals claim "deception."

2. <u>The Plaintiff Hospitals' Safety Grades & Underlying CMS Data</u>

For years, the Plaintiff Hospitals have received Safety Grades. (SOF, ¶35, 49). West Boca's Safety Grade did not change after the revised Methodology was implemented for the fall 2024 Safety Grades (it remained a "D"). (SOF ¶18, 49). For the others, from spring 2024 to fall 2024: Palm Beach went from a C to an F; Delray went from a D to an F; Good Samaritan went from a C to an F and St. Mary's went from a C to a D. (*Id.*).

Prior years' Safety Grades reflect that the Plaintiff Hospitals' Grades were declining even before 2024; however, they only complain about post-fall-2024 Safety Grades, ostensibly using the methodology change as pretext to sue. (SOF ¶18; citing Ex. 27 (Historical Safety Grades)).

Leapfrog's assessment of the Plaintiff Hospitals' performance is consistent with other reputable ratings publicly available. In the CMS five-star rating program assessing quality and safety, each of the Plaintiff Hospitals receive one- or two-stars. (SOF ¶50-52). Only West Boca receives a two-star overall rating from CMS; the rest receive one-star. (*Id.*) The Mayo Clinic recently began comparatively rating hospitals across the nation. (SOF ¶53). According to the Mayo Clinic, the Plaintiff Hospitals' "overall hospital score[s]" as compared to all hospitals are as follows: (i) Palm Beach - bottom 1%; (ii) Delray - bottom 6%; (iii) Good Samaritan - bottom 6%; (iv) St. Mary's - bottom 15%; and (v) West Boca - bottom 29%. (*Id.*).

Despite lower ratings from other services and despite no other reputable ratings program being as transparent as Leapfrog in revealing the performance of hospitals on each of the measures used in their assessment and in the precise methodology, the Plaintiffs Hospitals complain of deception and unfairness as it relates only to Leapfrog.

3. <u>There is No Evidence of Consumer Harm</u>

The Amended Complaint alleges, in conclusory fashion, that Leapfrog's purported conduct harmed consumers. (ECF Doc. No. 74, ¶¶15, 75, 84, 95, 99-100). In the Plaintiff Hospitals' Statement of Facts ("PSOF," at ECF No.: 87, Nos.: 56-61), the Plaintiff Hospitals purport to identify evidence of consumer harm. (*See,* Resp. to PSOF, #56-61); (*see also*, SOF ¶54-82).

"Consumer harm" for purposes of a FDUTPA claim "parallels consumer harm under the Sherman Act, which requires 'specific damage done to consumers in the market.'" *State Farm Mut. Auto Ins. Co. v. At Home Auto Glass LLC*, 2024 WL 4349246 *12-13 (M.D. Fla. Sep. 30, 2024); citing, *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1289 (S.D. Fla. 2021). The purported evidence of consumer harm on which Plaintiff Hospitals rely is plainly not evidence of consumer harm, and the PSOF uses misleading citations to depositions and documents containing wholly irrelevant testimony and statements that are inadmissible hearsay. The testimony often even reflects the *opposite* of consumer harm. (*See, e.g.*, Haverciak and McCauley testimony, *infra*, about patients purportedly being "pleasantly surprised" with care quality at SOF ¶61, 79).

## III. ARGUMENT

### A. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*, 785 F. Supp. 3d 1123, 1132 (M.D. Fla. May 12, 2025); quoting, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable factfinder to find for the non-moving party. *Id.*

### B. THE TENET HOSPITALS' CLAIM FAILS AS A MATTER OF LAW.

#### 1. There is No Evidence of Any Consumer Injury, Harm, or Detriment.

"While a Plaintiff need not be a 'consumer" under FDUTPA to file suit ***, 'Florida case law requires a plaintiff to **prove harm to a consumer or consumers**.'" *Id.*; citing, *State Farm Mut. Auto Ins. Co.*, 2024 WL 4349246, *4 (M.D. Fla. Sep. 30, 2024) (emphasis added); *see also, Qunjian v. Globoforce, Inc.*, 89 F. 4th 852, 860 (11th Cir. 2023) (finding that plaintiff brining a FDUTPA claim must "prove there was an injury or detriment to consumers"); quoting, *Caribbean Cruise Line, Ind. v. Better Bus. Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 169 (Fla. 4th

DCA 2015); *CMR Constr. & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, *3 (11th Cir. 2022) ("[I]n order to satisfy the first element for a claim for both damages and injunctive relief under FDUTPA…the plaintiff must allege that the relevant act or practice was **harmful to a consumer**"); *see also, Stewart Agency, Inc. v. Arrigo Enters.*, 266 So. 3d 207, 214 (Fla. Dist. Ct. App. 2019) (FDUTPA claim for injunctive relief requires showing of injury to both claimant and Florida consumers) (emphasis added).

The Plaintiff Hospitals' conclusory assertions that Leapfrog's purported conduct has "harmed consumers in Florida" is insincere and without factual support. (*See, e.g.*, ECF No. 74, ¶95) ("[Leapfrog's] Hospital Safety Grades have harmed Florida consumers by causing them to make dangerous decisions to forego the nearest hospital based on misleading information"). The Plaintiffs have not identified a single consumer, let alone a specific instance where Leapfrog's purported conduct harmed a consumer (*i.e.*, a patient or prospective patient). (SOF ¶57, 61, 69, 71, 73-74, 79-82). This is representative of the Plaintiffs' true motivation here: They are not concerned with harm to Florida consumers, they are concerned with bad press and are using this lawsuit as a pretext to silence Leapfrog and stifle the service that Leapfrog provides to consumers. Summary judgment on this issue proper.

The Plaintiff Hospitals have identified only a smattering of hearsay statements and documents wherein their CEOs (and Rule 30(b)(6) representatives, *see*, SOF ¶80-81, citing NOD Riders at 1, 13-14) state that patients reported complaints to doctors, or expressed to doctors and to others that they were disinclined to use the Plaintiff Hospitals as a result of the Safety Grades. (*See, supra*; citing, ECF No. 87, ¶¶57-62). The Tenet Hospitals even cite instances where patients express *pleasure* with their experiences at the Plaintiff Hospitals. (*Id*. at ¶¶57, 60); (SOF, ¶61,79).

But, this purported "evidence" does not reflect consumer injury or harm. None of the foregoing, inadmissible statements supports Plaintiffs' conclusion that "[Leapfrog's] deceptive acts and practices mislead consumers, causing them to make decisions about their healthcare that are not in their best interests," nor is it proof that "[Leapfrog's] Hospital Safety Grades have harmed Florida consumers by causing them to make dangerous decisions to forego the nearest hospital based on misleading information." (ECF No. 74, ¶¶95, 100).

For one, all of the foregoing is plainly hearsay (out of court statements offered for the truth of the assertion). *Macuba v. DeBoer*, 193 F.3d 1316, 1322 (11th Cir. 1999); quoting, *Garside v. Osco Drug, Inc.*, 895 F. 2d 46, 50 (1st Cir. 1990) ("[I]nadmissible hearsay 'cannot be considered

on a motion for summary judgment'"). Next, the Plaintiffs have never identified any of these purported consumers (let alone obtained their testimony or disclosed any consumer as a trial witness), nor have the Plaintiffs alleged that these mystery "patients" ever even encountered Leapfrog's website. *See, Harrod v. Express Scripts, Inc.*, 2019 WL 8273650, *13-14 (M.D. Fla. Aug. 16, 2019) (FDUTPA claim failed where there was no proof that the consumer encountered the purported misrepresentation and, thus, no proof the consumer suffered a loss as a result of the alleged violation). Finally, none of the foregoing (nor anything else in the record) is evidence of "'**specific damage done to consumers** in the market.'" *State Farm Mut. Auto Ins. Co.*, 2024 WL 4349246 *12-13[2]; citing, *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d at 1289 (noting that consumer harm under FDUTPA parallels consumer harm under the Sherman Act, which requires "specific damage done to consumers in the market").

Therefore, summary judgment on this issue is proper; there is no genuine dispute of material fact that the Tenet Hospitals' claim fails for lack of consumer injury.

a. *Novo Nordisk v. Brooksville is Particularly Instructive.*

*Novo Nordisk* is instructive on this issue. In *Novo Nordisk*, the plaintiff (Novo), a Dutch pharmaceutical company that produces semaglutide drugs such as Ozempic®, sued defendant Brooksville Pharmacy (Brooksville) under FDUTPA. *Novo Nordisk*, 785 F. Supp. 3d at 1129, 1131.[3] Brooksville sells compounded drugs containing semaglutide. *Id.* at 1129. As in this case, Novo's operative amended pleading contained a FDUTPA claim seeking only injunctive relief. *Id.*, 1132. Novo alleged that Brooksville's sale of "adulterated and misbranded drugs" violated

[2] In *State Farm Mut. Auto Ins. Co. v. At Home Auto Glass LLC*, State Farm sued defendant (an auto glass repair company) alleged that the defendant's representations to consumers that it would replace windshield damage at no cost to the consumer (the defendant would obtain assignments of insurance reimbursement rights from the car-owners and seek reimbursement from State Farm) violated FDUTPA. 2024 WL 4348246, *4-6. Defendant was granted summary judgment on the "harm to consumer" element of State Farm's FDUTPA claim because there was no evidence that: (i) defendant did not honor the "at no cost" promise; nor that (ii) any consumer had any problem with defendant's service. *Id.*, *13-14, 16. The Middle District also rejected State Farm's alternative argument on this issue that the defendant's having the car owners sign contracts that made them responsible if their insurer did not pay satisfied the consumer-harm element, explaining that absent any actual proof of defendant not honoring its "no cost" promise or some other "actual harm [inflicted] on at least one consumer," this argument was a "purely hypothetical possibility of some kind of injury in the future based on possible future actions…" which was insufficient. *Id.* at *14.

[3] After the decision discussed herein, the Middle District of Florida granted Novo's Rule 59(e) motion and amended the judgment to be a dismissal of Novo's amended complaint without prejudice for lack of subject matter jurisdiction, finding that its prior finding of mootness/implied preemption of Novo's FDUTPA claim should have been its only finding. *Novo Nordisk, Inc. v. Brooksville Pharms. Inc.*, 2025 WL 2306505, *2-4 (M.D. Fla. June 30, 2025). However, the Middle District did not state that its merits-based findings on Novo's FDUTPA claims (which are discussed herein) were erroneous, and noted that the Eleventh Circuit may consider those findings on the merits in the event the Eleventh Circuit disagreed with the subject matter jurisdiction holding. *Id.*, *4, 6, 9.

FDUTPA, citing Novo's analyses showing Brooksville's products were less potent than advertised and contained impurities. *Id.* 1130-32. Novo alleged Brooksville caused Novo "to suffer injury, including economic harm due to lost sales and 'harm to [Novo's] goodwill and reputation.'" *Id.*, 1132. The Middle District of Florida granted Brooksville's motion for summary judgment on the merits of the FDUTPA claim. *Id.*, 1144.

Relevant here, Brooksville argued that Novo had "failed to establish the consumer injury element of FDUTPA since [Novo] cannot identify 'a single instance in which a patient was injured from the use of Brooksville's compounded semaglutide.'" *Id.*, 1145. In response, Novo "point[ed] to **a handful of email complaints** from Brooksville customers who reported that their prescriptions were 'ineffective.'" *Id.* (emphasis added). Novo further argued that it was "required to prove only that Brooksville's actions are 'likely to cause consumer harm.'" *Id.* The Court rejected both of Novo's arguments. *Id.*

As to the first argument, the Court rejected Novo's position that it should not bear the burden of providing of consumer injury, stating "[t]hat's why parties in a lawsuit conduct discovery." *Id.*, 1146. The Court further held that Novo's presentation of some "hypothetical possibility of some future injury to Florida consumers" was insufficient to survive summary judgment, and that Novo's identification of 5 Brooksville-customer complaints (out of 24,000 customers) about "ineffective" prescriptions did not constitute "evidence that a Florida consumer suffered actual harm from Brooksville's misbranded semaglutide." *Id.*, 1146; *see also, Id.*, 1147 ("After extensive discovery and exhaustive briefing, [Novo's] failure to provide any evidence of consumer harm entitles [Brooksville] to summary judgment on [Novo's] FDUTPA claim"). Similarly, here, "after extensive discovery," the Plaintiff Hospitals can only identify second- and third-hand hearsay accounts of purported complaints from a few purported consumers (patients), despite the Plaintiff Hospitals having thousands of patients. As explained, a consumer who expresses concern about a hospital's Safety Grade is not complaining about being harmed. To show harm, Plaintiffs would need evidence that consumers experienced adverse health outcomes or were charged an inflated fee because they erroneously relied on the Safety Grades. No such evidence exists even though "**actual patient harm is the proper standard at the summary judgment stage**." *Id.*, 1145 (emphasis added). Thus, summary judgment is proper.

As to Novo's second argument, the Court rejected the assertion that "likely" harm to consumers was the relevant inquiry. *Id.* Again, "actual patient harm is the proper standard at the

summary judgment stage," not "likely" consumer harm. Since the Plaintiff Hospitals have no evidence of actual consumer harm, there is no genuine dispute of material fact on this issue.

2. Leapfrog's Purported Conduct was *Not* Deceptive.

Leapfrog reiterates that for a dispute of fact to be a *genuine* dispute, the evidence must be capable of leading a reasonable juror to find for the non-moving party. *Novo Nordisk*, 785 F. Supp. 3d at 1132 (collecting cases). Considering the comprehensive, publicly available, and easily understood disclosures and explanations of, *inter alia*, Leapfrog's Methodology, the Plaintiff Hospitals cannot set forth a *genuine* dispute that Leapfrog's purported conduct was deceptive. Moreover, the fall 2024 Methodology adjustment about which that Plaintiffs complain is not deceptive and, in fact, the purportedly "deceptive" portions thereof were in place *before* the fall 2024 Methodology adjustment. (*See, supra*). Indeed, the fall 2024 Methodology adjustment is simply the pretext upon which the Hospital Plaintiffs have brought this action.

To establish a deceptive practice, plaintiffs must establish that the act or practice is "likely to mislead the consumer acting reasonably in the circumstances, to the *consumer's detriment*." *See Caribbean Cruise Line*, 169 So. 3d at 169 (emphasis in original). Thus, this is a two-part inquiry. As discussed, the "to the consumer's detriment" part cannot be satisfied, and summary judgment on this basis alone is warranted.

There is no genuine dispute of material fact on the "likely to mislead the consumer acting reasonably in the circumstances" inquiry, either. Plaintiffs are required to show "'probable, not possible, deception' that is 'likely to cause injury to a reasonable relying consumer.'" *Piescik v. CVS Pharm., Inc.,* 576 F. Supp. 3d 1125, 1132 (S.D. Fla. 2021) (internal citation omitted). Courts use an objective test to "determine whether 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Id.* (citation omitted).

*Piescik* is instructive. In *Piescik*, a putative class action alleged that the defendant's hand sanitizer's claim that it kills "99.99% of germs" violated FDUTPA as misleading and deceptive because a reasonable consumer would take that as fact. *Id.*, 1128, 1132. The amended FDUTPA claim sought injunctive relief, seeking "'…to prevent Defendant from continuing to lie to its customers in the future.'" *Id.*, 1130.

The defendant (CVS) moved to dismiss, arguing that the plaintiff's belief that a reasonable consumer would take the "99.99%" claim as fact was objectively unreasonable based on common knowledge, and also because of the asterisk next to the 99.99% claim led to a disclosure on the

back label. *Id.*, 1132. Relying on *Moore v. Trader Joe's Co.*[4], the Southern District granted the motion to dismiss. *Id.* at 1132-34. The Court held that all the information available to consumers and the context in which that information is provided must be considered, and that claims of deception resting on unreasonable or fanciful interpretations of labels or other advertising fail. *Id.* at 1132-33 (collecting cases). The Court explained that the "information available" to consumers informing the reasonable-consumer inquiry is not limited to the label itself, and that "true information or a disclaimer can rebut a claim of deception." *Id.* at 1133; citing *Freeman v. Time Inc.*, 68 F. 3d 285, 289-90 (9th Cir. 1995). The Court held that a reasonable consumer would not assume that a hand sanitizer product with such a label encompassed "all conceivable disease-causing microorganisms, regardless of whether they are commonly found on the hands," and noted "the asterisk on the back of the hand sanitizer clearly discloses to the consumer that it does not kill 99.99% of *all* germs, and a reasonable consumer would not be expected to ignore the asterisk and the information it leads to." *Id.* at 1133. The claim was dismissed with prejudice. *Id.*, 1133-36.

The *Piescik* Court cited numerous authorities on the above propositions, finding *Moore v. Trader Joe's Co.* instructive. *Id.* at 1132-33; citing, 4 F. 4th 874, 882 (9th Cir. 2021). *Moore* is relevant here as well. There, the Ninth Circuit affirmed dismissal of the plaintiff's charge that Trader Joe's labeling of honey as "100% New Zealand Manuka Honey" and listing "Manuka Honey" as the sole ingredient was misleading to a reasonable consumer. *Moore*, 4 F. 4th. at 876-77, 879-80. The Ninth Circuit explained that a reasonable consumer of a niche product like the Trader Joe's honey would know that it is impossible to produce "pure" batches of honey derived solely from the Manuka flower, and that the relatively cheap price would further signal a **reasonable consumer of that honey** that the jar does not contain 100% Manuka honey. *Id.* at 881 (emphasis added). Indeed, the inquiry is whether a reasonable consumer of the *subject product* would be misled considering all the information available to him or her. *See, Id.* at 884 (consumers of "a niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care").

Here, Leapfrog's provides substantial transparent, free, readily accessible, and comprehensive information and explanations to consumers related to its Hospital Safety Grade produc. (SOF ¶8, 12-13, 14, 22, 25-26, 36-46). Indeed, it is far more than the information available to the consumers in *Piescek* and *Trader Joe's* and, thus, the undisputed facts here present *even stronger* grounds to hold that Leapfrog's purported conduct was not deceptive to a reasonable

[4] *Moore v. Trader Joe's Co.*, 4 F. 4th 874, 882 (9th Cir. 2021).

consumer of its products. Leapfrog reiterates and incorporates by reference its detailed disclosures discussed *supra* and in the SOF, including that: (i) the imputed score for non-participating hospitals is shown as equivalent to the worst score; (ii) Navigation of the Grades and measure-by-measure scores leads to a link allowing access to the full, 29-page Methodology; and (iii) Non-reporting hospitals' Grades feature, *inter alia*, bold and red disclosures with an asterisk. (SOF ¶38).

As in *Piescik*, any potential to deceive a reasonable consumer of Leapfrog's products is ameliorated by additional information denoted by an asterisk, and by the substantial additional material provided. A reasonable consumer is not expected to ignore this asterisk. *Piescik*, 576 F. Supp. 3d at 1133. Whether a reasonable consumer would be deceived is a totality-of-the-information inquiry, and must account for the type of consumer. A reasonable consumer of health care information such as the Hospital Safety Grade would exhibit a higher standard of care and awareness when choosing where to receive their medical treatment, and Leapfrog's provision of substantial and transparent information (including delineating between absent data and imputed data) allows these consumers to fully and comprehensively inquire and educate themselves about the material that they are consuming. *Moore*, 4 F. 4th at 884; quoting, *Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 123 (S.D.N.Y. 2019) ("Consumers of Manuka honey, a niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care than 'a parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow,' who is 'not likely to study with great diligence the contents of a complicated product package'").

Consumers of health care are presumed reasonable and aware that many considerations go into choosing where to receive medical treatment. To this point, red, bold disclaimers (among other things) clearly identify to a consumer that a score is *assigned* for certain measures because of a lack of information. (SOF ¶38). Further, among other disclosures, Leapfrog distinguishes between absent data and imputed data. (Motion to Dismiss Ruling, ECF No. 41, p. 6); (SOF ¶36-43). Indeed, Leapfrog's grading system is intentional. (SOF ¶8, 12-13, 42).

In this era, rating systems are common across all consumer interests. Consumers use Yelp to rate restaurants, Google Reviews to rate businesses, TripAdvisor to rate experiences, and so on. Likewise, rating healthcare providers is not unique to Leapfrog. Many similar organizations rank healthcare providers on various measures – CMS, Healthgrades, HealthLocator (SOF ¶53), Lown Institute, U.S. News & World Report, to name a few. Consequently, consumers are (and, for purposes of this inquiry, presumed to be) familiar with rating websites, and considering all the

information available, reasonable consumers of rating systems are aware that each system only considers certain criteria. Thus, a consumer of Leapfrog *Safety* Grades can reasonably conclude that the grade itself measures aspects of patient *safety* and *not* whether the hospital has, for example, a highly ranked, top performing NICU. Interestingly, the Tenet Hospitals publicly highlight their "Healthgrades," but filed this instant lawsuit against Leapfrog alleging deceptive Safety Grades. (SOF ¶83). Plaintiffs ulterior purpose is blatant.

There can be no genuine dispute that – considering the vast world of detailed, transparent information that Leapfrog provides to a particularized consumer base – the alleged conduct is not deceptive. The Plaintiff Hospitals' conclusory, false, and unreasonable assumption that it *is* deceptive, and that the Methodology is not based on real data, does not suffice for this inquiry. *Moore*, 4 F.4th at 882. Summary judgment is proper on the claim of deceptive practices.

3. <u>Leapfrog Does Not Engage in "Unfair" Practices.</u>

The Florida Supreme Court defines an unfair practice as "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious ***to consumers***." *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003) (citation omitted; emphasis added). To establish an unfair act or practice, plaintiffs must establish that the act or practice inflicts "***consumer injury*** that is: (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) that consumers could not reasonably have avoided." *SMS Audio, LLC v. Belson*, 2017 WL 11631378, *10 (S.D. Fla. April 24, 2017). (emphasis added). Plaintiffs fail to offer any evidence to prove the three elements of unfairness. *Id.*

***First***, as discussed, the Plaintiffs have no proof of *any* consumer injury; let alone one that is "substantial." The Plaintiffs have never identified a single consumer injured by a Leapfrog practice that is allegedly unfair. Further on the point of "substantial consumer injury," there is an obvious flaw in the Plaintiffs' premise. Even if patients were refusing to treat at an "F" hospital, like Good Samaraitan, the Plaintiffs fail to show how a patient treating at an "A" hospital harms the consumer in any way. Notably, the Plaintiff Hospitals do not allege or otherwise provide proof showing that patients are refusing to treat at the Plaintiff Hospitals because of the Safety Grades, nor any evidence that those patients are then harmed when treated at a competitor hospital. Simply alleging that patients choose to treat at a competitor hospital rather than one of the Plaintiffs is not enough to show consumer injury. *See Cmty. Health Ctrs., Inc. v. DiamondDog Servs., Inc.*,2024

WL 3278579, *10 (M.D. Fla. July 2, 2024) (dismissal of plaintiff's FDUTPA claim after determining that plaintiff only alleged harm to *plaintiff* that the defendant caused, but failed to plead consumer injury); *see also, SMS Audio,* *10 (defendant granted judgment as a matter of law because plaintiffs did not prove detriment or injury to consumers).

***Second*** and ignoring (for purposes of this argument) that the Plaintiffs cannot establish consumer injury, any purported injury is outweighed by the substantial benefit that Leapfrog provides to consumers navigating the labyrinthian American healthcare system. In fact, as just discussed, patients would *benefit* from treating at a competitor hospital (at bottom, Plaintiffs offer no proof that treating at a competitor hospital would cause a detriment to consumers).

Plaintiffs have no evidence on the requirement that the injury "not be outweighed by any countervailing benefits to consumers or competition that the practice produces." *Id.* at *3. The purpose of the Safety Grade is to "educate and encourage consumers to consider safety when selecting a hospital for themselves or their families." (SOF, Ex. 20 (Methodology) p. 3). Further, the Safety Grade fosters market incentives for hospitals to prioritize safety. (SOF ¶1, 6, 14, 28). Next, Leapfrog has received feedback over the years from hospitals advising that they use the Hospital Survey as a benchmarking tool on how to improve on their patient safety measures. (SOF ¶14). In fact, the Plaintiff Hospitals themselves used the Survey as an internal tool to benchmark their patient safety progress. (SOF ¶14, 18, 35). Next, the fact that year-over-year improvements to mean "cohort" scores for Survey-participant hospitals occurred also proves the benefit that Leapfrog's purported conduct conferred. (SOF ¶28). Thus, not only do patients benefit from receiving access to hospital's patient safety data, but the Hospital Survey also provides a free tool for hospitals to improve patient safety. (SOF ¶6). Stated differently, "unfair practices" generally offend public policy and are immoral, unethical, oppressive and unscrupulous. *Alhassid v. Nationstar Mortg*. LLC, 771 Fed. Appx. 965, 969 (11th Cir. 2019). The Plaintiff Hospitals cannot set forth a genuine dispute of material fact that Leapfrog, a non-profit providing substantial information to the public about healthcare facilities' safety, engaged in conduct fitting any of those categories. The Plaintiff Hospitals have not provided any evidence of any consumer injury, let alone how any such consumer injury outweighs the benefits that Leapfrog's conduct confers on the public. Summary judgment is thus warranted.

***Third*,** there is no genuine dispute of material fact that any purported injury could be reasonably avoided. For one, it bears repeating that no actual consumer injury can be identified.

Regardless, to the extent the Plaintiffs stand by their unsupported conclusion that consumers have been injured because Leapfrog has "caus[ed] them to make dangerous decisions to forego the nearest hospital based on misleading information," (ECF No. 74, ¶95), the Plaintiffs offer no explanation nor evidence as to how or why the consumers could not avoid this purported "injury."

As shown, consumers (*e.g.*, prospective patients) could easily avoid this purported injury by navigating Leapfrog's various webpages and explanations of its Methodology contained therein. More specifically, at the bottom of each page of its websites, Leapfrog expressly states, *inter alia*, "Individuals are solely responsible for any and all decisions with respect to their medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs that may be incurred with respect to use of this site. **Never disregard, avoid or delay in obtaining medical advice from a doctor or other health care professional because of material on this site, as the site is not intended to be a substitute for professional medical advice**." (SOF, ¶44 (full disclaimers) (*see also*, full terms of use at SOF, Ex. 39) (emphasis added). Further, Leapfrog is clear that when deciding on where to receive health care, "people should consider other aspects of hospital performance in the decision-making process, such as whether the hospital delivers a high level of care for the health concern the patient has, i.e., if the hospital has high-quality obstetrics or orthopedics." (SOF ¶45; citing, Ex. 10 (FAQ page))[5]. Finally, the Complaint does not identify what purported conduct was "unfair" to consumers; it merely cites a purported warning from the American Hospital Association stating that the Safety Grades are not fair *to hospitals*. (*See, e.g.*, ECF Doc. No. 74, ¶35). This alone is grounds for summary judgment.

As shown, there is no genuine dispute of material fact that Leapfrog did not engage in "unfair" conduct because any purported injury can be reasonably avoided. Leapfrog's transparent disclosure of its methods cannot be genuinely described as "unfair." *See, e.g., Medmoun v. Home Depot U.S.A., Inc.*, *14-15 (M.D. Fla. May 7, 2022) (where documents that Home Depot provided to the consumer informed the consumer of the very information that was allegedly unfair under the FDUTPA, dismissal was proper as the harm could have been reasonably avoided); *see also*, *Donoff v. Delta Air Lines, Inc.*, 2020 WL 1226975, *22-24 (S.D. Fla. Mar. 6, 2020) (summary

[5] Leapfrog further acknowledges that in "some cases, the only hospitals available in a community are not highly rated." (SOF ¶43). Further, Leapfrog "offers guidance and resources on [its] website for patients and family members to protect themselves during a hospital stay, which is important no matter the hospital's grade." (SOF, Ex. 10 (FAQ)). Leapfrog's website contains a dedicated "Resources and Tools" page for patients, wherein numerous additional resources and information centers are provided, including a section dedicated to a discussion of, and materials related to, digital care. [https://www.leapfroggroup.org/hospital-choice/resources-and-tools].

judgment for defendant granted on plaintiff's claim that Delta's website violated FDUTPA because Delta does not expressly disclose that it is not licensed to sell insurance because: (i) Delta's website advised that terms and conditions related to travel insurance applied; and (ii) that advisement was followed by a link to Allianz's website and, therefore, "Delta's identification of Allianz as the licensed producer and link to the Allianz website is not only true, but desirable and necessary…," and finding that "[t]he notion that truthfully telling the consumer that Allianz is the licensed producer and administrator and providing a link to its website is somehow deceptive is just sophistry"). Summary judgment on the "unfair practices" claim is proper.

4. The Tenet Hospitals Cannot Prove That They Were "Aggrieved"

Assuming, *arguendo*, the Plaintiff Hospitals could show a "deceptive or unfair act or practice," each Plaintiff fails to prove that they were "aggrieved" by the Safety Grade. "[T]o state a claim for equitable relief, an entity must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc.*, 266 So. 3d at 214.

To be aggrieved, "'the injury claimed to have been suffered cannot be merely speculative.'" *Id.*; citing *Ahearn,* 180 So. 3d at 173; *see also Macias v. HBC of Fla., Inc.*, 694 So. 2d 88, 90 (Fla. 3d DCA 1997) ("The clear intent of [FDUTPA] as expressed by its plain language is to provide both equitable and legal remedies to private consumers who are aggrieved parties and/or have sustained **actual losses** because of a violation(s) under FDUTPA") (emphasis added). Because the Tenet Hospitals are business entities and do not "share the characteristics of humans, such as being 'angry or sad'" the following definition of "aggrieved" applies: "'having [their] legal rights [] adversely affected; having been harmed by an infringement of legal rights.'" *Stewart Agency, Inc.*, 266 So. 3d at 213-14. "[A] plaintiff is 'aggrieved' under FDUTPA when the deceptive conduct alleged has caused a **non-speculative injury** that has affected the plaintiff beyond a general interest in curbing deceptive or unfair conduct.'" *Cravens v. Garda CL Se., Inc.*, 2024 WL 5058304, *36; quoting, *Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1190 (M.D. Fla. Jan. 25, 2022); *Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2017 WL 2834783, * (M.D. Fla. June 30, 2017) (emphasis added). In other words, the Plaintiffs must show that they were suffered a direct, non-speculative and actual harm as a result of the alleged conduct. They cannot do so.

In *Stewart Agency, Inc.*, Florida's Fourth District of Appeals affirmed summary judgment for the defendant on the plaintiff-entity's FDUTPA claim. *Stewart Agency*, 266 So. 3d at 215. Both

the plaintiff (Stewart) and defendant (Arrigo) were car dealers. *Id*. at 210. Both accepted vehicles containing defective airbags from the manufacturer, but Stewart did not sell those vehicles and alleged that Arrigo did. *Id*. at 211. Stewart claimed that Arrigo's purported "bait and switch" tactics toward consumers in selling those cars violated FDUTPA. *Id*. However, Stewart admitted that his decision not to sell those cars was not impacted by Arrigo's contrary decision, and that Stewart would not have sold those cars regardless of whether Arrigo sold them. *Id*. Therefore, Stewart could not show that it was adversely affected (*i.e*., aggrieved) by Arrigo's alleged conduct, and summary judgment for Arrigo was affirmed. *Id*. at 214-15. The Fourth District rejected Stewart's argument that he was aggrieved because Arrigo's sales equated to sales that Stewart could not make. *Id*. The Court explained that it "would be entirely speculative [to hold this equated to being "aggrieved"] and require building an inference upon an inference." *Id*. at 214.

Likewise, here, the Plaintiff Hospitals' allegations that they were aggrieved are wholly conclusory (*see, e.g*., ECF Doc. No. 74, ¶95), and the "evidence" that the Plaintiffs were aggrieved is, at best, speculative. The Plaintiffs' conclusory and often contradictory claims of adverse impacts do not suffice and would require this Court to engage in an impermissible level of speculation. All five of the Plaintiff Hospitals' CEO's signed declarations early in this litigation, averring that the Safety Grades have harmed their Hospital's reputation and goodwill, but at their depositions none of them could identify any non-speculative or admissible evidence in support. (SOF ¶53-81). Likewise, none of these CEOs (who are the Plaintiffs' Rule 30(b)(6) representatives) could identify any actual financial harm suffered beyond a speculative level. In fact, Delray and West Boca have seen increased revenue, and Palm Beach has seen increased patient admissions during the relevant timeframe. Similarly, St. Mary's and Good Samaritan could not verify any revenue loss. (*Id*.). West Boca's Safety Grades did not change after the new, purportedly deceptive/unfair Methodology was implemented. (SOF, ¶49; citing Ex. 27 (historical Grades)). All five Plaintiff Hospitals understand that they can participate in the Hospital Survey, but do not do so. (SOF ¶35). Plainly, the Plaintiffs' conclusory, speculative, often contradictory and plainly self-serving claims of being "aggrieved" are insufficient to create a genuine dispute of material fact on this issue and summary judgment is warranted.

### C. <u>The Plaintiff Hospitals Lack Article III Standing.</u>

Article III standing requires plaintiffs to demonstrate that: (1) they suffered an "injury-in-fact," (2) there is a causal connection between the asserted injury-in-fact and the challenged action

of the defendant, and (3) "the injury will be redressed by a favorable decision." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (citation omitted). Injury-in-fact is established when a plaintiff "shows that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation and quotations omitted). A concrete injury is "real, and not abstract." *Id.* at 340. A particularized injury "affect[s] [a] plaintiff in a personal and individual way." *Id.* at 339. Claims for injunctive relief, moreover, require a "real and immediate…threat of *future* injury." *Shotz*, 256 F.3d at 1081 (emphasis in original) (citation omitted). In response to a summary judgment motion challenging Article III standing, "'the plaintiff…must 'set forth' by affidavit or other evidence specific facts' showing that the defendant injured [them]." *Novo Nordisk*, 786 F. Supp. 3d at 1133; citing, *Ga. Republican Party v. Secs. & Exch. Comm'n*, 888 F.3d 1198, 1201 (11th Cir. 2018); quoting *Lujan*, 504 U.S. at 561.

First, for the reasons discussed above and in the SOF, the Plaintiff Hospitals cannot show any concrete injury that is fairly traceable to Leapfrog that would be redressed by a favorable judicial outcome. Second, given the Plaintiff Hospitals' lack of testimony and failure to produce any documents showing financial harm, they cannot show that there is an amount in controversy in excess of $75,000. (SOF ¶54-82). Third, as set forth *supra*, the Plaintiff Hospitals have failed to identify a single lost patient or physician who dissociated with them, proving: a lack of: (i) concrete and particularized (as opposed to conjectural or hypothetical) invasion of a legally protected interest; (ii) a real and immediate threat of future injury; and (iii) sufficient amount-in-controversy. Finally, especially in light of the Plaintiffs' acknowledgement and understanding that participating in the Hospital Survey would offer them control over the Four Imputed Measures, and given that the Plaintiff Hospitals have failed to articulate how a favorable ruling in this matter would redress their (speculative and undefined) harm, there is no genuine dispute of material fact as to the third requirement of Article III standing. Indeed, summary judgment is proper.

### D. Summary Judgment on the Anti-SLAPP Defense is Warranted.

Florida's Anti-SLAPP statute prohibits "fil[ing]…any lawsuit… against another person or entity [1] without merit and [2] primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue…as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution." Fla. Stat. §758.295(3). Leapfrog pleads anti-SLAPP as an affirmative defense. (ECF Doc. No. 43, p. 47).

A cause of action is "without merit" if it fails to state a claim or if the defendant(s) prevail on a motion for summary judgment. *See, e.g., Flynn v. Wilson*, 398 So. 3d 1103, 1115 (Fla. 2d DCA 2024) (affirming grant of defendant's motions for summary judgment on both the merits of plaintiff's defamation claim and anti-SLAPP; the anti-SLAPP summary judgment grant was warranted because the plaintiff's claim "lacked merit" as shown by the merits failing in the face of summary judgment and upon demonstration that the case was brought "primarily" because of defendant's exercise of his free-speech rights); *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1322 (S.D. Fla. Aug. 6, 2020) (suit was without merit because it failed to state a claim, and because the suit also arose out of an exercise of free-speech, the anti-SLAPP motion was granted).

Florida's anti-SLAPP statute broadly defines "free speech in connection with public issues" to include "any written or oral statement that is protected under applicable law and . . . is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." Fla. Stat. § 768.295(2)(a). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

Leapfrog's mission is premised on free speech in connection with a public issue; it is intended to assist the public in assessing their healthcare options and healthcare safety. Thus, if this Court grants Leapfrog's Motion, summary judgment on its anti-SLAPP defense is also warranted because both requirements of the statute will be satisfied. Indeed, this case is nothing more than a deep-pocketed hospital system trying to silence a non-profit in retaliation for what they perceive as negative press; it is the Plaintiffs Hospitals' filing of this case, which amounts to prior restraint on free-speech, that harms the public, not Leapfrog's alleged conduct.

WHEREFORE, Defendant, The Leapfrog Group, respectfully requests that this Honorable Court enter an ORDER granting this Motion and Judgment in its favor as set forth in the Proposed Order, and award any and all other appropriate relief.

Date: November 12, 2025

Respectfully submitted,

*/s/ Kimberly E. Blair*

**Kimberly E. Blair** (*pro hac vice*)

kimberly.blair@wilsonelser.com
Illinois Bar ID # 6272934
**Courtney L. Wood** (*pro hac vice*)
courtney.wood@wilsonelser.com
Illinois Bar ID #6344385
Wilson Elser Moskowitz Edelman & Dicker LLP
161 N. Clark, Ste. 4500
Chicago, IL 60601
312.821.6139 (Direct)
312.704.0550 (Main)
(312) 259-6414 (Cell)

Jura C. Zibas (Bar #124571)
Wilson Elser Moskowitz Edelman & Dicker LLP
jura.zibas@wilsonelser.com
2063 Main Street, Suite 100
Sarasota, Florida 34237
(941) 866-8561 (Main)
(212) 915-5756 (Direct)

*Attorneys for Defendant, The Leapfrog Group*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2025, a true and correct copy of the foregoing was served on all counsel or parties of record via the ECF system.

By: */s/ Courtney L. Wood*
COURTNEY L. WOOD

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**THE COMMUNITY HOSPITALS' OPPOSITION**
**TO LEAPFROG'S MOTION FOR SUMMARY JUDGMENT**

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice* pending)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Betty X. Yang (*pro hac vice*)
Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
byang@gibsondunn.com
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

## TABLE OF CONTENTS

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

A. Leapfrog Urges Consumers To Rely On Its Hospital Safety Grades ..... 2

B. The Fall 2024 Grade Methodology Was Designed To Penalize And Coerce Nonparticipants, Not Measure Safety ..... 4

C. Leapfrog's Public Messaging Misleads Consumers ..... 5

D. Leapfrog's False Safety Grades Cause Concrete And Ongoing Harm ..... 6

E. After This Suit Was Filed, Leapfrog Quietly Edits Its Website To Remove Some Deceptive Claims, Yet Replaces Them With Other Evasive Language ..... 7

ARGUMENT ..... 8

I. THE SAFETY GRADES ARE INDISPUTABLY DECEPTIVE AND ARBITRARY ..... 8

A. The Record Establishes Consumer Deception Beyond Any Genuine Dispute ..... 8

B. Leapfrog's Arbitrary Penalties Are Unequivocally Unfair ..... 14

C. The Community Hospitals' Injuries Put Aggrievement Beyond Dispute ..... 16

II. LEAPFROG'S JURISDICTIONAL AND CONSTITUTIONAL DEFENSES FAIL ..... 17

A. The Community Hospitals' Standing Is Self-Evident ..... 17

B. The Amount-In-Controversy Requirement Is Plainly Satisfied ..... 18

C. Leapfrog's Repackaged First Amendment Defense Fails ..... 19

D. Leapfrog's Post-Litigation Website Edits Do Not Affect Jurisdiction—And Only Further Confirm The Need For Relief ..... 20

CONCLUSION ..... 20

## TABLE OF AUTHORITIES

### Cases

*Ahearn v. Mayo Clinic*,
180 So. 3d 165 (Fla. 1st DCA 2015) ....16

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau*,
169 So. 3d 164 (Fla. 4th DCA 2015) ....12, 19

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ....12

*In re Cassell*,
688 F.3d 1291 (11th Cir. 2012) ....11

*CMR Constr. & Roofing, LLC v. UCMS, LLC*,
2022 WL 3012298 (11th Cir. July 29, 2022) ....12

*Cohen v. Off. Depot, Inc.*,
204 F.3d 1069 (11th Cir. 2000) ....18

*Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC*,
2020 WL 6700449 (S.D. Fla. Oct. 20, 2020) ....16

*Common Cause/Georgia v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ....18

*Cooper v. Meridian Yachts, Ltd.*,
575 F.3d 1151 (11th Cir. 2009) ....9

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*,
122 F.3d 895 (11th Cir. 1997) ....20

*FEC v. Cruz*,
596 U.S. 289 (2022) ....18

*Ferrero v. Associated Materials, Inc.*,
923 F.2d 1441 (11th Cir. 1991) ....18

*Fonte v. AT&T Wireless Servs., Inc.*,
903 So. 2d 1019 (Fla. 4th DCA 2005) ....11

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
11 F.4th 1266 (11th Cir. 2001) ....17

*Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC)*,
528 U.S. 167 (2000) ....20

*FTC v. Pointbreak Media, LLC*,
376 F. Supp. 3d 1257 (S.D. Fla. 2019) ....11

*FTC v. Vylah Tec LLC*,
2018 WL 3656474 (M.D. Fla. Aug. 2, 2018) ....11

*FTC v. World Patent Mktg., Inc.*,
2017 WL 3508639 (S.D. Fla. Aug. 16, 2017) ....15

*Ghostbed, Inc. v. Casper Sleep, Inc.*,
2016 WL 4145909 (S.D. Fla. July 19, 2016) ....11

*Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983) ....19

*Jeter v. Credit Bureau, Inc.*,
760 F.2d 1168 (11th Cir. 1985) ....15

*Latman v. Costa Cruise Lines, N.V.*,
758 So. 2d 699 (Fla. 3d DCA 2000) ....13

*Lincare Holdings Inc. v. Doxo, Inc.*,
2024 WL 865881 (M.D. Fla. Feb. 29, 2024) ....13

*Lucero v. Trosch*,
121 F.3d 591 (11th Cir. 1997) ....20

*Marco Island Cable v. Comcast Cablevision of S., Inc.*,
312 F. App'x 211 (11th Cir. 2009) ....14

*Millennium Commc'ns & Fulfillment, Inc. v. Off. of the Att'y Gen.*,
761 So. 2d 1256 (Fla. 3d DCA 2000) ....11

*Moore v. Trader Joe's Co.*,
4 F.4th 874 (9th Cir. 2021) ....10

*Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*,
785 F. Supp. 3d 1123 (M.D. Fla. 2025) ....12

*Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*,
2025 WL 2306505 (M.D. Fla. June 30, 2025) ....12

*Ounjian v. Globoforce, Inc.*,
89 F.4th 852 (11th Cir. 2023) ....12

*Pals Grp., Inc. v. Quiskeya Trading Corp.*,
2017 WL 5598721 (S.D. Fla. Nov. 20, 2017) ....17

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007)....................20

*Piescik v. CVS Pharmacy, Inc.*,
576 F. Supp. 3d 1125 (S.D. Fla. 2021)....................10

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
413 U.S. 376 (1973)....................20

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
842 So. 2d 773 (Fla. 2003)....................11, 14

*Porsche Cars N. Am., Inc. v. Diamond*,
140 So. 3d 1090 (Fla. 3d DCA 2014)....................15

*Pretka v. Kolter City Plaza II, Inc.*,
608 F.3d 744 (11th Cir. 2010)....................18

*PTA-FLA, Inc. v. ZTE USA, Inc.*,
844 F.3d 1299 (11th Cir. 2016)....................18

*SMS Audio, LLC v. Belson*,
2017 WL 1533941 (S.D. Fla. Mar. 9, 2017)....................2, 14, 15

*In re Stand 'N Seal Prods. Liab. Litig.*,
623 F. Supp. 2d 1355 (N.D. Ga. 2009)....................13

*State Farm Mut. Auto. Ins. Co. v. At Home Auto Glass, LLC*,
2024 WL 4349246 (M.D. Fla. Sept. 30, 2024)....................12, 13

*Stewart Agency, Inc. v. Arrigo Enters., Inc.*,
266 So. 3d 207 (Fla. 4th DCA 2019)....................12, 17

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................17

*Turner Greenberg Assocs., Inc. v. Pathman*,
885 So. 2d 1004 (Fla. 4th DCA 2004)....................11

*United States v. Sigma Int'l, Inc.*,
300 F.3d 1278 (11th Cir. 2002)....................12

*Webber v. Esquire Deposition Servs., LLC*,
439 F. App'x 849 (11th Cir. 2011)....................14

*Williams v. Albemarle City Bd. of Educ.*,
508 F.2d 1242 (4th Cir. 1974)....................18

*Wood v. Morbark Indus., Inc.*,
70 F.3d 1201 (11th Cir. 1995) ....20

*World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*,
586 F.3d 950 (11th Cir. 2009) ....14

*Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*,
2024 WL 5703196 (M.D. Fla. Aug. 14, 2024) ....17

*Wyndham Vacation Ownership, Inc. v. Square One Dev. Grp., Inc.*,
2022 WL 21374382 (M.D. Fla. Feb. 2, 2022) ....19

*Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*,
123 So. 3d 1149 (Fla. 5th DCA 2012) ....16

**Statutes**

Fla. Stat. § 501.203(7) ....13

Fla. Stat. § 501.204(1) ....15

Fla. Stat. § 501.211(1) ....11

Fla. Stat. § 768.295(3) ....19

**Rules**

Fed. R. Civ. P. 56 ....2

Fed. R. Evid. 801(c)(2) ....13

**Other Authorities**

*In re Figgie Int'l, Inc.*,
107 F.T.C. 313 (1986) ....15

# GLOSSARY

| | | |
|---|---|---|
| **SOF** | Community Hospitals' Rule 56.1 Statement of Material Facts in Support of Motion for Summary Judgment | ECF 87 |
| **LF-SOF** | Defendant's Rule 56.1 Statement of Material Facts in Support of Motion for Summary Judgment | ECF 100 |
| **R-PSOF** | Defendant's Opposing Statement of Material Facts in Response to Plaintiffs' Motion for Summary Judgment | ECF 103 |
| **ASOF** | Defendant's Additional Facts in Response to Plaintiffs' Statement of Material Facts | ECF 104 |
| **RSOF** | Community Hospitals' Response to Defendant's Additional Facts in Response to Plaintiffs' Statement of Material Facts | ECF 108 |
| **OSOF** | Community Hospitals' Response to Defendant's Statement of Material Facts | ECF 116 |
| **CH-ASOF** | Community Hospitals' Additional Facts in Response to Defendant's Statement of Material Facts | ECF 116 |

## INTRODUCTION

Leapfrog's business rests on a promise of "honest[y]." ECF 99 at 1 ("Mot."). It publicly professes that its mission is to promote "transparency and accountability in health care," ECF 102 at 2, and calls itself a "watchdog" for patients, claiming to help them decide which hospitals are safe and which are not, SOF ¶¶ 2-3. Its "Hospital Safety Grades"—the A-through-F scores that Leapfrog promotes nationwide—are marketed as peer-reviewed, data-driven assessments of patient safety. In reality, they are none of those things.

The record indisputably shows that in 2024, Leapfrog rewrote its grading formula to punish hospitals that decline to fill out its proprietary, 350+ page Hospital Survey. Those hospitals are automatically assigned the lowest possible scores on critical measures, *regardless of actual safety performance*. Leapfrog's own witnesses admitted the new methodology is "arbitrar[y]," its purpose is "not accuracy," and its effect is to "penalize" non-participants. SOF ¶¶ 34, 38-39; OSOF ¶¶ 20, 29. And the "Expert Panel" that Leapfrog touts to the public never approved the change.

Leapfrog's motive was simple: money. Survey participation is the lifeblood of Leapfrog's revenue, so low participation in recent years presented a concern. Internally, a member of Leapfrog's Expert Panel called the Fall 2024 methodology change a "simple business decision." SOF ¶ 38. By assigning failing Grades to nonparticipating hospitals, Leapfrog pressured them to comply—threatening reputational ruin to those that resisted. SOF ¶¶ 37, 39. In short, Leapfrog redesigned its grading system not to inform consumers, but to drive participation and boost revenue.

But Leapfrog carried on as usual, pretending it was all about the public interest, and never alerted consumers to the consequences of the "[d]rastic [c]hange" in its methodology. SOF ¶ 29. It falsely asserted that participation does not affect Grades, that hospitals lacking sufficient data "are not graded," and that its methodology is "peer reviewed" and data-based. SOF ¶¶ 17, 45; OSOF ¶¶ 15, 22. Leapfrog then amplified those falsehoods by proclaiming that "patients are twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than an 'A' hospital"—a claim that Leapfrog admittedly has no basis to assert under its current methodology. SOF ¶¶ 10, 48.

Floridians justifiably took Leapfrog at its word, saw failing Safety Grades, and concluded their local Community Hospitals were unsafe. Patients canceled surgeries, diverted to other facilities, and even left the emergency room "against medical advice" after seeing Leapfrog's ratings. SOF ¶ 60. This was deception by design, and its impact is undeniable. Leapfrog's deception denigrated the Community Hospitals' hard-won reputations. Patients and physicians questioned the

Hospitals' safety. An insurer raised concerns. And the Hospitals were forced to devote significant time and resources to correcting misinformation and reassuring their patients. These are not speculative injuries; they are the intended outcome of Leapfrog's deception.

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") analysis is straightforward. To prevail, a plaintiff must show that: (1) the defendant engaged in a deceptive or unfair act or practice; and (2) the plaintiff was aggrieved. *SMS Audio, LLC v. Belson*, 2017 WL 1533941, at *4 n.6 (S.D. Fla. Mar. 9, 2017) (Middlebrooks, J.). And to defeat summary judgment, a party must demonstrate only a genuine dispute of material fact. *See* Fed. R. Civ. P. 56. Here, however, the undisputed record shows that deception and unfairness permeated Leapfrog's operation—and that concrete reputational and operational harm to the Community Hospitals was its direct result.

In support of its Motion for Summary Judgment, Leapfrog argues that there is no genuine issue of material fact regarding the absence of deception, unfairness, or harm, and that the Community Hospitals, despite being the direct objects of negative Safety Grades, lack standing. All of these arguments depend on the factual premise that no one was affected by Leapfrog's conduct. But Leapfrog was *created* to influence consumer behavior. It tells consumers that its Safety Grades are "trusted," "transparent," the "gold standard measure of patient safety," used by millions, and that consumers should "always decide" which hospital to visit based on those Grades—since if consumers ignore the Grades and visit a low-scoring facility, they are "twice as likely to die." Yet with its veneer of expert credibility stripped away, Leapfrog now glibly compares its "gold standard" Safety Grades to Yelp restaurant reviews and says no one actually takes Leapfrog at its word. That is not a credible position. In reality, Leapfrog robs patients of the ability to make properly informed choices regarding where to seek essential care. Removing safe choices from the marketplace, in a context as deadly serious as healthcare, is the very definition of consumer harm.

Leapfrog cannot have it both ways. It cannot maintain that its Safety Grades are essential to making vital healthcare choices, yet then insist, after the Grades' façade of legitimacy has collapsed, that no one ever relies on them for their stated purpose. The undisputed record not only precludes judgment for Leapfrog; it compels judgment for the Community Hospitals.

## FACTUAL BACKGROUND

### A. Leapfrog Urges Consumers To Rely On Its Hospital Safety Grades

Leapfrog presents itself as a nonprofit organization devoted to leveraging "transparency" to "support informed [consumer] health care decisions." SOF ¶ 3. It tells consumers they "should

*always* decide on where to receive care based on a hospital's current Safety Grade"—displayed on its website hospitalsafetygrade.org and measured grade-school-style from "A" to "F." SOF ¶ 8 (emphasis added). And it maintains that patients are "*twice as likely to die* of a preventable problem" at hospitals rated "C," "D," or "F," than those with an "A" rating. SOF ¶ 10 (emphasis added).

Consumers take Leapfrog at its word. Leapfrog trumpets the story of a patient who drove 400 miles—a distance nearly as long as the north-south length of the State of Florida—to reach an "A" hospital after seeing poor local Grades. SOF ¶ 43. And its internal materials assert that its Safety Grades are "widely used" "by the public [and] insurance companies," including in "transparency tools used by employers and purchasers reaching virtually all Americans." ECF 88-36 at 518. As Leapfrog's CEO Leah Binder has noted, "millions of people have used Leapfrog to make decisions about health care." CH-ASOF ¶ 84.

But contemporaneous internal documents and deposition testimony show that Leapfrog's professed "transparency" is a smokescreen. Leapfrog is not a public-spirited watchdog for hospital safety; rather, it operates as a commercial ratings vendor focused on raising revenues by maximizing participation in its "burdensome," "resource intensive," 350+ page Hospital Survey. SOF ¶¶ 4, 6, 19-21. As one hospital noted, hospitals feel compelled to participate "to avoid taking the blackmail-like reputational hits" that result from the artificially depressed Safety Grades Leapfrog otherwise assigns. SOF ¶ 39. Hospitals then must grant Leapfrog permission to use the data from their Survey responses "in a commercial manner for profit." SOF ¶ 20. Leapfrog conducts on-site audits at only *four or five* hospitals annually. CH-ASOF ¶ 85. Nonetheless, it licenses that data to insurers and employers and markets data products to third-party purchasers. SOF ¶ 19-20. Thus, when Survey participation declined in 2023, Leapfrog's licensing revenue did too. SOF ¶ 25.

Leapfrog's own records show it recognized the decline in Survey participation as a serious business problem. A December 2024 "Long Range Strategic Intent" document described increasing Survey participation as a critical strategy to grow revenues. SOF ¶ 22; OSOF ¶ 28-29. And a 2024 Board update candidly identified Leapfrog's focus as "growing revenues," explaining that "improving patient safety [wa]s not central" at that time. SOF ¶ 23. Expert Panel member Dr. Patrick Romano confirmed that penalizing hospitals that decline to participate was "a simple business decision," because "Leapfrog's data are not valuable if participation is low." SOF ¶¶ 20, 38; OSOF ¶ 29. CEO Binder likewise recognized that the methodology change would provide "a major incentive" for hospitals to respond to the Survey. SOF ¶ 39.

**B. The Fall 2024 Grade Methodology Was Designed To Penalize And Coerce Nonparticipants, Not Measure Safety**

In early 2024, after revenue dropped, Leapfrog internally adopted a "strategic objective" to "penaliz[e] [Survey] nonparticipants." SOF ¶ 30; OSOF ¶ 29. Leapfrog says each Safety Grade uses "up to 22 national patient safety measures," derived from participating hospitals' Survey responses, Centers for Medicare and Medicaid Services ("CMS") data, and other "supplemental data source[s]." OSOF ¶¶ 25, 43. Twelve of these measures depend on data self-reported by the hospital through the Hospital Survey. For non-participants in the Survey (592 hospitals in Spring 2025), Leapfrog uses alternative methods for those measures: it substitutes CMS data for five, throws out three, and applies its "imputation model" to assign values to the remaining four: Computerized Physician Order Entry, Bar-Code Medication Administration, ICU Physician Staffing, and Hand Hygiene (the "Four Measures"). SOF ¶ 13-15. Leapfrog's methodology *automatically* assigns the *lowest score* available on the Four Measures to non-participating hospitals like the Community Hospitals. SOF ¶ 15; OSOF ¶ 29. Yet Leapfrog has continued to tell the public that its Safety Grades reflect "how well a hospital does on safety"—omitting that many such Grades are arbitrarily and punitively assigned to support Leapfrog's own commercial purposes. SOF ¶¶ 45-47.

In prior years, Leapfrog had imputed values for missing measures by drawing on alternative data sources, historical Survey results, or peer averages—external data sources it believed offered a reliable proxy for the hospitals' true safety. OSOF ¶ 23. The new methodology, by contrast, automatically and punitively assigns the lowest possible score on the Four Measures to every hospital that declines to complete the Survey, regardless of actual performance. OSOF ¶¶ 29. These low scores resulted in artificially low overall Safety Grades for nonparticipating hospitals.

Leapfrog's full Expert Panel never approved that change: The slideshow presentation, video recording, transcript, and draft minutes from the relevant April 2024 meeting all confirm no discussion or vote occurred. SOF ¶¶ 28, 46; ECF 88-84 (Austin) at 144:8-145:1. *After* the meeting, Leapfrog staff internally proposed the "drastic" idea of assigning nonparticipating hospitals the lowest scores on key measures. CH-ASOF ¶ 87; *see also* SOF ¶ 29. Only a month later did a member of the team run by Leapfrog science advisor Dr. Matthew Austin circulate notes stating—contrary to every contemporaneous record—that the Expert Panel had discussed and supported the change at the April 2024 meeting. *See* CH-ASOF ¶¶ 88-89. Meanwhile, Leapfrog's witnesses internally acknowledged the "[d]rastic" methodology change was "arbitrar[y]," "random," and "not accuracy" driven. SOF ¶¶ 29, 34, 38. And Dr. Austin admitted that the "imputation model" was

never peer-reviewed. SOF ¶ 45; ECF 88-84 (Austin) at 306:15-17. Externally, though, Leapfrog continued telling the public that its Safety Grades are based on a "peer-reviewed" methodology "calculated" by "top patient safety experts under the guidance of a National Expert Panel," and reflect "how well a hospital does on safety." SOF ¶¶ 45-47.

Leapfrog's internal communications confirm the redesign was about revenue, not rigor. Dr. Romano testified that the changes "achieve[d] [the] strategic objective of penalizing nonparticipants." SOF ¶ 30. And Alexandra Campione, the program analyst who helped implement the change, "completely agree[d]." SOF ¶ 30. Leapfrog achieved that objective: Each Community Hospital, for example, saw its Safety Grade fall by at least one letter by Spring 2025—some from "B" or "C" to "D" or "F"—despite no change in actual safety performance. SOF ¶¶ 49-50.

### C. Leapfrog's Public Messaging Misleads Consumers

From the homepage of Leapfrog's website, consumers can navigate directly to an "About the Grades" webpage describing the methodology. That page includes several unqualified representations about the Grades. *First*, Leapfrog claims that a "Safety Grade is the gold standard measure of patient safety" and "represent[s] a hospital's overall performance in keeping patients safe from preventable harm and medical errors." SOF ¶ 48. But Leapfrog's chief science advisor, Dr. Austin, admitted that Leapfrog has not "conducted any analysis" supporting this statement. SOF ¶ 48. *Second*, Leapfrog claims that "where a hospital's information is not available for a certain measure, Leapfrog uses a supplemental data source." But Leapfrog uses no "supplemental data source[s]" for non-participants lacking recent historical scores. OSOF ¶ 43. *Third*, Leapfrog says "[a] hospital must have enough safety data available to our experts to issue them a letter grade. Hospitals missing more than **six** process measures … are not graded." SOF ¶ 17. But Leapfrog graded the Community Hospitals despite missing data for seven measures—filling the gaps with the lowest-possible "imputed" scores on the Four Measures. SOF ¶¶ 11-16, 34-36. *Fourth*, Leapfrog says its "Safety Grade methodology has been peer reviewed," which is false. SOF ¶ 45.

Leapfrog's webpage for each specific hospital amplifies these representations. It displays the hospital's overall letter grade and, below, depicts the hospital's score on the different measures. SOF ¶ 40. For each measure, Leapfrog includes a "gas-gauge" graphic indicating hospital performance. *Id.* There, Leapfrog displays red bars and "Worse Than Average" indicators for three of the imputed measures for each of the Community Hospitals, visually implying real safety data where none exists. SOF ¶¶ 14-16, 40-42, 44. The site shows these red, low-score bars in parallel

with a measure labeled "Declined to Report"—falsely suggesting hospitals declined to report data for only one measure and performed poorly on the other "imputed" measures depicted. SOF ¶ 40.




SOF ¶ 40. (red circle emphases added). But the Community Hospitals did not provide data for *any* circled measure. *E.g.*, SOF ¶¶ 14-16, 44, 49. A footnote—visible only after scrolling—further states "a score was assigned to reflect the lack of information available." SOF ¶ 42; OSOF ¶¶ 30, 38. Leapfrog's own staff recognized "the public may misinterpret the assigned measure scores" and believe they reflect estimated or neutral calculations, not an automatic penalty. SOF ¶ 33. Nevertheless, Leapfrog never amended the disclaimer to reveal that nonparticipants automatically receive *the lowest possible score*. To the contrary, another disclaimer on the same pages falsely says Leapfrog "scores hospitals on their overall performance in keeping patients safe." RSOF ¶ 6.

The only place on its website that Leapfrog hints at the consequence of nonparticipation on Grades is a 28-page "Scoring Methodology" document. To view the imputation discussion, users must click through two small hyperlinks on separate pages, then scroll to page 15 of that document. SOF ¶ 11; CH-ASOF ¶¶ 90-92. Only about *three percent* of those who have visited the Community Hospitals' Safety Grade pages even downloaded that document, and CEO Binder conceded that it "is not that accessible to the average layman." RSOF ¶ 7.

### D. Leapfrog's False Safety Grades Cause Concrete And Ongoing Harm

Leapfrog's false Safety Grades have inflicted serious reputational harms upon the Community Hospitals. Each Hospital's CEO testified that patients, physicians, and insurers reacted immediately to the failing Grades. Patients canceled surgeries and diverted to competitors. SOF ¶¶ 56-61. Physicians sought privileges elsewhere, and an insurer questioned the Hospitals' safety. SOF ¶¶ 56-61. Births at St. Mary's fell roughly 2 percent, elective and emergency visits at Good Samaritan declined 5 percent, Palm Beach Gardens' emergency-room visits dropped 6 percent, West Boca's emergency-room volume decreased 17 percent year-over-year, and Delay experienced "a significant dip in admissions" when a viral video emerged recounting Leapfrog's Safety

Grades. SOF ¶ 57-60. The resulting economic harms have been substantial, given that the Community Hospitals typically generate nearly $2 billion of net revenue annually. CH-ASOF ¶ 98-99.

Behind the scenes, Leapfrog activated its media machine to maximize the impact of its Safety Grades. Leapfrog's Director of Communications, Lauren Bailey, confirmed that Leapfrog sought one "negative" story "at minimum every three days about Tenet [the Community Hospitals' parent company] or one of the plaintiff hospitals." CH-ASOF ¶ 100. Leapfrog's goal was to "hurt Tenet." SOF ¶ 53. Leapfrog even purchased ads ensuring that the Community Hospitals' failing Safety Grades appeared any time web users searched those Hospitals. CH-ASOF ¶ 101. The Safety Grades generated national and local headlines—including "Tenet Gets an F." SOF ¶ 52; ECF 88-32 at 5138. The amplified publicity reached more than a million consumers. SOF ¶¶ 51-53. In fact, Leapfrog continues to blast its Safety Grades to Florida consumers, most recently in support of its Fall 2025 Safety Grades released on November 13, 2025. CH-ASOF ¶ 102.

**E. After This Suit Was Filed, Leapfrog Quietly Edits Its Website To Remove Some Deceptive Claims, Yet Replaces Them With Other Evasive Language**

In the wake of this suit, Leapfrog has continued to disseminate its false Safety Grades. Leapfrog has also quietly edited its website to remove some of the statements challenged here, only to replace them with other evasive and misleading language. Specifically, some time after October 24, 2025, Leapfrog altered its "FAQ" page to remove the statement that a "Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey." SOF ¶ 47; CH-ASOF ¶¶ 103-105. The page now says that "[r]eporting to the Leapfrog Hospital Survey doesn't automatically improve a hospital's Safety Grade"—which still deceptively omits the critical fact that nonparticipation *harms* Safety Grades. CH-ASOF ¶ 105. The FAQ page also no longer states that "if a hospital does not report to the Leapfrog Hospital Survey, other sources of data are used to calculate a Grade." SOF ¶ 44. Instead, it represents that "[m]ost of the data used to calculate the Grade comes from the Centers for Medicare and Medicaid Services (CMS), the federal agency that runs Medicare. If a hospital voluntarily reports to the Leapfrog Hospital Survey, some of that data is used to calculate a Safety Grade." CH-ASOF ¶¶ 106-108. Again, however, this text does not disclose that Leapfrog simply assigns low scores to nonparticipants based on no data. Leapfrog also removed its claim that "patients are twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than an 'A' hospital," SOF ¶ 10, though its site elsewhere still claims that a 2019 Johns Hopkins analysis "found that D and F hospitals carry nearly twice the risk of mortality of A hospitals," CH-ASOF ¶ 111. To the Community Hospitals'

knowledge, Leapfrog has never informed the Court of these changes, which the Community Hospitals discovered only recently. Despite those changes, Leapfrog admitted (apparently incorrectly) in its statement of facts opposing the Community Hospitals' summary-judgment motion that each of the statements above continues to appear on Leapfrog's website. *See* R-PSOF ¶¶ 10, 44, 47.[1]

## ARGUMENT

## I. THE SAFETY GRADES ARE INDISPUTABLY DECEPTIVE AND ARBITRARY

The undisputed record shows that (1) Leapfrog's Safety Grades and associated representations are deceptive and misleading; (2) Leapfrog's "imputation" model is arbitrary, punitive, and unfair; (3) Leapfrog's deceptive and unfair practices have imposed concrete harm on consumers; and (4) Leapfrog has now engaged in selective post-litigation edits to its website, destroying any pretense that Leapfrog's status quo disclosures are "comprehensive," Mot. 10, 11, and "as transparent as possible," ECF 88-91 (Danforth) at 540:3-4. Because nothing in Leapfrog's own opposition, ECF 102, or its squabbles about expert testimony, ECF 111, creates a genuine dispute, it is the Community Hospitals—not Leapfrog—that are entitled to summary judgment.[2]

### A. The Record Establishes Consumer Deception Beyond Any Genuine Dispute

Leapfrog cites *no* evidence disputing the falsity of its public statements about how its Safety Grades are calculated and what they represent; its lack of data for the Four Measures; the absence of Expert Panel approval of the new methodology; the lack of peer review of that methodology; or the concrete harms that Leapfrog's practices are inflicting on consumers.

#### 1. Leapfrog Deceives Consumers Through Multiple False Claims

Leapfrog's effort to show that its representations are non-deceptive addresses everything *but* those representations. Mot. 10-13. The reason why is obvious: The concessions of Leapfrog and its witnesses inescapably show that Leapfrog's practices are deceptive as a matter of law.

*First*, Leapfrog falsely represents that "[t]he Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey." SOF ¶ 47. Leapfrog's brief ignores this representation and does not defend it as true. In fact, uncontroverted evidence has proven it false as a matter of law, given that Leapfrog undisputedly assigns the lowest

---

[1] On November 24, the Community Hospitals received a generic email from a Leapfrog "help desk" email account discussing various changes to Leapfrog's *Survey*, none of which are relevant to this litigation. CH-ASOF ¶¶ 112-114.

[2] Leapfrog's Statement of Material Facts is replete with statements that are unsupported, *see* LF-SOF ¶¶ 6, 9, 15, 20, 23-24, 28, 31, 34-35, 38, 40-41, 43-46, 48, 50, 53, 58, 62, 69, 71-72, 78, 81, dependent on inadmissible hearsay, ¶¶ 1-7, 9-10, 14, 20, 34, 47, and/or vague or confusing, ¶¶ 4, 15, 17-20, 22, 28-32, 39.

score to non-participating hospitals on the Four Measures simply because they do not participate. SOF ¶ 15; OSOF ¶ 29. Indeed, Leapfrog has conceded that "[s]ome hospital[s'] Safety Grades *may feel negative effects* from receiving limited achievement scores"—*i.e.*, the scores assigned to non-participants. ECF 102 at 9 (emphasis added). And it is uncontroverted that each Community Hospital's Grade dropped by a full letter from Spring 2024 to Spring 2025. SOF ¶¶ 49-50.

*Second*, Leapfrog falsely claims that "[a] hospital must have enough safety data available for our experts to issue [it] a letter grade," so "[h]ospitals missing more than six process measures … are not graded." SOF ¶ 17. In reality, Leapfrog grades nonparticipants despite lacking data on *seven* measures. Leapfrog witnesses admitted as much. *See* SOF ¶ 13; ECF 88-88 (Campione) at 72:15-19 (agreeing "Leapfrog has no data for any of those seven measures if a hospital does not participate"). Leapfrog's *own Answer* admits the same—that Leapfrog "abandons three measures," uses imputation for four, and that imputation is how Leapfrog assigns "a value for a measure when [Leapfrog] *lacks any data pertaining to it*." Answer ¶¶ 21-22 (emphasis added). That judicial admission is "beyond the power of evidence to controvert," *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1178 (11th Cir. 2009), and thus places Leapfrog's deception beyond debate.

*Third*, Leapfrog falsely asserts that "[t]he Hospital Safety Grade uses a public, peer-reviewed methodology." R-PSOF ¶ 46. That is false, because the new imputation methodology implemented in Fall 2024 has *never been* peer-reviewed. Leapfrog's science advisor, Dr. Matthew Austin, admitted this. ECF 88-84 (Austin) at 306:15-17 ([Q:] "The imputation model, has that been peer reviewed?" [A:] "No."). Leapfrog elsewhere has admitted that concession. ECF 102 at 11. Unable to defend its actual representation to the public (that its Safety Grades use a peer-reviewed methodology), Leapfrog's motion now shifts to the claim that its Safety Grades are based on "peer-reviewed literation [*sic*] and subject matter expertise." Mot. 4 n.1. That is irrelevant. Leapfrog tells the public that its operative *methodology* is peer-reviewed—not that the methodology is based on *other* literature that purportedly was peer-reviewed.

*Fourth*, Leapfrog falsely claims through its "gas gauge" graphics that a "Hospital Performs … Worse Than Average" on the Four Measures. SOF ¶ 40. Leapfrog does this even though it is now uncontroverted that the failing gas-gauge visuals are based solely on imputation, SOF ¶¶ 35, 40, which rests on no underlying data, SOF ¶ 16. Leapfrog's Motion ignores the gauges, other than to mention two disclaimers found on the same pages (that a "hospital was asked to provide this information to the public, but did not," and that a "score was assigned to reflect the lack of

information available"). Mot. 4. Yet those disclaimers nowhere explain *how* Leapfrog "assigned" the scores—that it arbitrarily awarded "Limited Achievement" even though it has no supporting data. SOF ¶ 16; OSOF ¶¶ 38, 43. Moreover, Leapfrog's own Motion mentions (at 4), but then deceptively omits, the third relevant disclaimer on those webpages—which falsely asserts that Leapfrog "scores hospitals on their overall performance in keeping patients safe." RSOF ¶ 6.

Leapfrog's caselaw discussion (Mot. 10-12) is irrelevant. Leapfrog's website is not akin to a bottle of hand sanitizer that "clearly discloses" on the back which germs it kills. *Piescik v. CVS Pharmacy, Inc.*, 576 F. Supp. 3d 1125, 1133 (S.D. Fla. 2021). The one place Leapfrog purports to describe how its Safety Grades work (the Scoring Methodology document) requires clicking through various links; only about *three percent* of those who view the Community Hospitals' Safety Grades download the document; and that document concededly is "not that accessible to the average layman." RSOF ¶ 7. Nor is this a case about a "niche, specialty product" where users "would likely know more" than typical consumers about why Leapfrog's unqualified representations are false. *Moore v. Trader Joe's Co.*, 4 F.4th 874, 884 (9th Cir. 2021). Leapfrog markets its Grades as a way to "quickly assess" hospital safety, urges "[p]atients [to] always" rely on them, and indiscriminately blasts those Grades to the public. SOF ¶¶ 8-9, 51; *see also* SOF ¶ 52. Finally, this case has nothing to do with Yelp reviews—where unvetted third parties blow off steam about poor service. Leapfrog portrays itself as a singularly "trusted" and "transparent" source about where to receive care. SOF ¶ 5; OSOF ¶ 7. The notion that consumers treat Safety Grades like Yelp reviews is unevidenced and baseless. Thus, Leapfrog has not even attempted to identify evidence refuting its deception, and its cases simply confirm that Leapfrog *perpetrates* deception.

### 2. Leapfrog Misleads Patients, Physicians, Insurers, And Hospitals

**a.** Leapfrog's "consumer harm" argument is also wrong as a matter of law and, even if it were correct, is factually baseless. Leapfrog says FDUTPA embraces a "two-part" inquiry for deception claims, Mot. 10, so that a plaintiff must show a challenged practice is "likely to mislead" a reasonable consumer, but then must *also* show that the deception actually worked to some specific consumer's "detriment"—that is, a particular consumer "erroneously relied on the Safety Grades," and then suffered "specific damage," which Leapfrog defines as "adverse health outcomes" or being "charged an inflated fee," *id.* at 8, 9. Leapfrog further suggests that even if FDUTPA embraces a "likelihood" standard at the *pleading* stage, the burden shifts to demonstrate *actual* consumer reliance and harm whenever it comes to obtaining an injunction. *See id.* at 9-10.

Those assertions have no basis in FDUTPA's plain text or Florida precedent. Section 501.211(1) of the statute specifically provides that a plaintiff can enjoin a defendant who is "likely to violate" FDUTPA. Fla. Stat. § 501.211(1). That language would be meaningless if plaintiffs were required to show that individual consumers *already* had actually relied on, and been injured by, a deceptive representation; the violation by then would be consummated, not merely "likely." Leapfrog's contrary reading makes no practical sense and would neuter FDUTPA's "remedial" scheme "to protect consumers." *Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA 2005). If Leapfrog were correct, courts could never enjoin new misrepresentations, no matter how harmful, until an individual consumer actually suffered injury. For example, a snake-oil salesman could offer free samples of a "life extending elixir" in fact filled with poison, yet no one (according to Leapfrog) could enjoin that misrepresentation until a consumer dropped dead. Leapfrog never explains why the Florida Legislature would have drafted the statute to contain that remedial loophole—presumably because the Legislature in fact wrote the opposite.

That is also why the Florida Supreme Court, the "true and final arbiter" of Florida law, *In re Cassell*, 688 F.3d 1291, 1292 (11th Cir. 2012), adopted the *opposite* reading of Leapfrog's in *PNR, Inc. v. Beacon Property Management, Inc.*, 842 So. 2d 773, 777 (Fla. 2003). There—after a full-blown jury trial, not merely a decision on the pleadings—that court expressly endorsed the legal standard set out in *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000). *Millennium Communications*, in turn, made clear that FDUTPA's standard is the "Federal Trade Commission standard for deceptive advertising," 761 So. 2d at 1263, which merely requires "probable, not possible, deception," and "deceptions *that are likely to cause injury* to a reasonable relying consumer," *id.* (emphasis added). For that reason, *actual* "reliance by an individual consumer is not necessary in the context of FDUTPA," *Turner Greenberg Assocs., Inc. v. Pathman*, 885 So. 2d 1004, 1009 (Fla. 4th DCA 2004), and thus "[a] likelihood of consumer confusion is a sufficient basis for injunctive relief" under the statute, *Ghostbed, Inc. v. Casper Sleep, Inc.*, 2016 WL 4145909, at *3 (S.D. Fla. July 19, 2016). That is exactly how the FTC Act (which FDUTPA tracks) also functions: There is no requirement to show *actual* individualized reliance and harm.[3]

[3] *See, e.g.*, *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1282 (S.D. Fla. 2019) ("[T]he FTC need only show that the representation had 'a tendency to deceive,' as 'proof of actual consumer deception is unnecessary.'"); *FTC v. Vylah Tec LLC*, 2018 WL 3656474, at *7 (M.D. Fla. Aug. 2, 2018) ("[I]t is not necessary for the FTC to show actual reliance by each individual consumer.").

Leapfrog's principal response is to cite *Novo Nordisk, Inc. v. Brooksville Pharmaceuticals, Inc.*, 785 F. Supp. 3d 1123 (M.D. Fla. 2025), but that decision is much too flimsy a basis on which to overhaul Florida's entire consumer-protection regime. The decision's FDUTPA analysis is vacated, "*dicta*," and never confronted the Community Hospitals' arguments above. *Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*, 2025 WL 2306505, at *2, *4 (M.D. Fla. June 30, 2025); *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (vacated decisions "are officially gone" and "have no legal effect whatever"). And the decision is wholly inapposite. There, Novo Nordisk (the maker of a brand-name drug) sued Brooksville (the maker of a generic version) on the theory that the generic was impure—even though sales of the generic were FDA-authorized and the purported "impurities" in the generic were "within Novo Nordisk's own drug product specifications." *Novo Nordisk, Inc.*, 785 F. Supp. 3d at 1129, 1131. Novo Nordisk's claim thus hinged entirely on the "hypothetical possibility of some future injury to Florida consumers based on [the] impurities," *id.* at 1146—not a practice inflicting deception upon consumers in the here-and-now. It thus has nothing to do with Leapfrog's *ongoing* deception of consumers.

Leapfrog's other cases are similarly misdescribed. Leapfrog selectively quotes the Eleventh Circuit's decision in *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 861 (11th Cir. 2023), but ignores its clear statement that liability turns on whether there were "deceptive or unfair actions in the conduct of trade or commerce that injured *or were likely to injure* consumers." *Id.* (emphasis added). That accords with the Eleventh Circuit's recognition that FDUTPA liability does "not" hinge on whether consumers "actually relied on the illegal misrepresentation." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016). Leapfrog also plucks stray lines from other cases that, in context, are not supportive. *Caribbean Cruise Line, Inc. v. Better Business Bureau*, for example, says plaintiffs must show "an injury or detriment to consumers," but does not purport to require individualized reliance or harm (beyond the deception itself). 169 So. 3d 164, 169 (Fla. 4th DCA 2015). Indeed, the opinion cited *PNR* for the controlling standard, *id.*, and *PNR*'s test asks whether deception is "likely to injure" consumers. *Supra* 11. *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019), did not (and had no reason to) examine whether individualized actual reliance and harm are required because it simply found "no evidence" of "any misrepresentations." Finally, *CMR Construction & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, at *5 (11th Cir. July 29, 2022), and *State Farm Mutual Automobile Insurance Co. v. At Home Auto Glass, LLC*, 2024 WL 4349246, at *5 (M.D. Fla. Sept. 30, 2024), also do not

purport to require individualized evidence of actual reliance and harm. The claims in those cases failed because the plaintiffs alleged only that *they* (a roofing company and an insurer, respectively) were "consumers," but failed to show that *they* consumed roofing and insurance services.

**b.** In any event, Leapfrog's argument is factually baseless even under its preferred standard. FDUTPA protects "consumers," a term that broadly includes any "individual," "business," "corporation," "or any other group or combination," Fla. Stat. § 501.203(7), at least when those entities are not themselves the "provider" of the challenged service (*i.e.*, the Grades), *State Farm Mut. Auto. Ins. Co.*, 2024 WL 4349246, at *5. Under that standard, the Community Hospitals have established (and at minimum have shown genuine disputes as to) multiple categories of consumers. Leapfrog's only response is to call (some of) that evidence "hearsay," Mot. 7, which is false.

*First*, patients were deceived into switching hospitals. The Community Hospitals' CEOs consistently testified to declining admissions in multiple categories of care shortly after Leapfrog disseminated the Grades throughout Florida. *See, e.g.*, OSOF ¶¶ 74, 77. That "temporal" proximity itself is "'powerful evidence'" of causation. *In re Stand 'N Seal Prods. Liab. Litig.*, 623 F. Supp. 2d 1355, 1374 (N.D. Ga. 2009). The Hospitals also put on evidence that "patients" were "voicing complaints about the hospital's low safety score." ECF 88-90 (Cazares) at 89:20-21. Those patient complaints are not offered for "the truth of the matter asserted," Fed. R. Evid. 801(c)(2) (*i.e.*, that the Hospitals in fact are unsafe), but instead show that Leapfrog deceived consumers into believing the Hospitals are unsafe. Thus, those patient complaints "are not hearsay." *Lincare Holdings Inc. v. Doxo, Inc.*, 2024 WL 865881, at *2 (M.D. Fla. Feb. 29, 2024) (collecting cases). And Leapfrog's assertion that the Community Hospitals must *also* show that those patients suffered "adverse health outcomes" at competitor institutions (Mot. 9) is false. Deceiving consumers into using a service violates FDUTPA even when consumers ultimately "were happy with" the service. *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 702 (Fla. 3d DCA 2000). *Second*, physicians were also harmed, as they chose to sign up with competitors after the Grades were released. SOF ¶¶ 57, 60. *Third*, a prominent insurer (Humana) was deceived into believing the Hospitals are unsafe, and thus sent letters to two Hospitals imploring them to address their "performance on safety measures." SOF ¶ 56, 60. Those letters likewise are not offered for the truth of the statements therein (that the Hospitals *in fact* need to address purportedly failing safety performance), but to show that Leapfrog deceived Humana into believing the Hospitals are unsafe. *Finally*, the Hospitals are themselves injured consumers of Leapfrog's Safety Grades. *See infra* 14. Despite

Leapfrog's claim that only patients are "consumers," Mot. 9, Leapfrog itself argues that hospitals likewise consume its products, *id.* at 14 (asserting that "hospitals," including "the [Community] Hospitals," use its "Survey"). That the Hospitals were not themselves deceived about their own quality of care is irrelevant, since "subjective reliance" is not required under FDUTPA. *Webber v. Esquire Deposition Servs., LLC*, 439 F. App'x 849, 851 (11th Cir. 2011) (per curiam).

### B. Leapfrog's Arbitrary Penalties Are Unequivocally Unfair

Leapfrog's conduct is also indisputably unfair. Leapfrog's witnesses admitted that the new imputation methodology is an "arbitrar[y]" and "random" "penalty" imposed on non-participants—intended to "sound" "legitimate" despite lacking support in either data or peer review—the "purpose" of which is "not accuracy" but to provide "a major incentive to report to the Survey." SOF ¶¶ 16, 34, 38, 39. As Dr. Romano summed up Leapfrog's ploy, "It's just business, folks!" SOF ¶ 38. If *that* conduct is not unfair under FDUTPA, nothing is.

Leapfrog responds first by mischaracterizing the relevant legal inquiry. It claims that the newer, three-factor unfairness test is how unfairness is shown under the older test described in *PNR, Inc.*, 842 So. 2d at 777. *See* Mot. 13. That is false. The *PNR* test and the three-factor test are *two different tests* promulgated years apart by the FTC. *PNR*'s test derives from the FTC's 1964 policy statement—which is framed in the disjunctive ("… *or* [is] substantially injurious to consumers") and thus does not "definitively requir[e] consumer injury." *See SMS Audio, LLC*, 2017 WL 11631378, at *4. By contrast, the three-factor test is a "newer definition" from the FTC's 1980 policy statement. *Id.* Because *PNR*'s endorsement of the 1964 approach is "the latest statement of state law by the state supreme court," *World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009), it controls. In any event, Leapfrog's conduct violates both tests.

Under *PNR*'s 1964 test, Leapfrog's conduct "offends established public policy" and is "oppressive" and "unscrupulous." *PNR, Inc.*, 842 So. 2d at 777. Leapfrog witnesses' own admissions establish that the Safety Grades are an "arbitrarily assign[ed]" "penalty" "based on a lack of data," the "purpose" of which "is not accuracy." SOF ¶¶ 16, 34, 38. Arbitrarily penalizing hospitals without supporting data to create "a major incentive to report to the Survey," SOF ¶ 39, is the sort of "deceptive and bullying conduct" that violates Florida public policy. *Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 214 (11th Cir. 2009). That conduct is also "oppressive" because it imposes an illegitimate penalty for non-participation—particularly because it is tied to Leapfrog's own revenues. *See* R-PSOF ¶ 21 (conceding that "more organizations … using"

Leapfrog's data results in "increased revenues"). And it is "unscrupulous" because Leapfrog dishonestly represents how it calculates its Safety Grades and what they represent—publicly claiming that participation does not affect Grades, that Grades measure real-world performance, that the methodology is peer-reviewed, and that Leapfrog does not grade hospitals when it lacks sufficient data, SOF ¶¶ 17, 45, 47-48, 51, even though none of that is true.

For those reasons, Leapfrog's undisputed conduct is "unfair" as a matter of law under the Florida Supreme Court's test. That conclusion accords with a vast body of law applying the FTC Act, which FDUTPA tracks. The FTC has long held that "deceptive practices are always unfair." *In re Figgie Int'l, Inc.*, 107 F.T.C. 313, 373 n.5 (1986), *aff'd*, 817 F.2d 102 (4th Cir. 1987). And the Eleventh Circuit has recognized the same point. *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1172 (11th Cir. 1985) ("An act or practice is … unfair … if it has the tendency or capacity to deceive."). Thus, the Community Hospitals—not Leapfrog—merit summary judgment.

Leapfrog's conduct is also unfair as a matter of law under the 1980 three-factor test.

*First*, Leapfrog claims there is no evidence of consumer injury, which is factually false, *see supra* 13-14, and that even if there were, those injuries are not "substantial," which is legally erroneous. Mot. 13. The reference to "substantial" injuries in the FTC's 1980 policy statement is merely intended to weed out "trivial" or "speculative" claims; for example, based on "[e]motional impact" or allegations that "the tastes or social beliefs" of "some viewers" were offended. *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1101 (Fla. 3d DCA 2014). By contrast, the same policy statement makes clear that businesses may *not* "withhol[d] … performance data" so as to leave consumers "with insufficient information for informed comparisons"—a tactic "properly banned as an unfair practice." *Id.* at 1102. Because Leapfrog deprives consumers of precisely those "informed comparisons," the deception it inflicts upon consumers is plainly "substantial."

*Second*, Leapfrog's claim that its practices have countervailing benefits is unsubstantiated. The relevant question is not whether Leapfrog's *Survey* in the abstract has some beneficial use, but whether its "unfair or deceptive *acts or practices*" *themselves*, Fla. Stat. § 501.204(1) (emphasis added), "produc[e]" the countervailing benefit, *SMS Audio, LLC*, 2017 WL 1163137, at *3. There is "no countervailing benefi[t]" to "intimidating, threatening, and coercing consumers." *FTC v. World Patent Mktg., Inc.*, 2017 WL 3508639, at *16 (S.D. Fla. Aug. 16, 2017). The closest Leapfrog comes to suggesting that its coercive *practices* pose a benefit is to suggest that hospitals actually "improve patient safety" and patients gain greater access to "patient safety data" from

increased participation. Mot. 14. But Leapfrog *does not even audit* virtually all of the data it receives, SOF ¶ 12; CH-ASOF ¶¶ 85-86, so has no way to say with confidence whether safety *actually* is improving, or whether, instead, hospitals are simply *reporting* better outcomes. Leapfrog thus failed to meet its burden to identify evidence showing a countervailing benefit.

*Third*, Leapfrog offers no evidence that consumers could reasonably avoid its practices. It simply ignores that hospitals are "consumers" under FDUTPA, *see supra* 13-14, and thus never explains how hospitals could reasonably avoid Survey participation when Leapfrog imposes a "penalty" for non-participation. SOF ¶ 38. Leapfrog instead claims that *patients* could reasonably avoid its deceptive practices, which is also false. Leapfrog runs a sophisticated media operation to ensure that its Safety Grades are widely publicized throughout Florida, SOF ¶ 51, and even purchases ads to "hurt" the Community Hospitals by ensuring their failing Grades appear whenever they are searched, SOF ¶ 53. All Leapfrog offers in response are disclaimers found in small print at the bottom of the Safety Grade pages or elsewhere on its site. Mot. 15. But Leapfrog cites no evidence showing that patients read or understand those inconspicuous disclaimers. And the disclaimers are irrelevant on their face. For example, if a patient were choosing between two equidistant hospitals (one an "A" and the other an "F"), she would not be "avoid[ing]" or "delay[ing]" medical care by visiting the "A" hospital—but she *would* have been deceived into believing the "F" hospital is an unsafe option. Mot. 15. Thus, the FTC's 1980 unfairness test is satisfied as well.

**C. The Community Hospitals' Injuries Put Aggrievement Beyond Dispute**

The Community Hospitals also satisfy FDUTPA's capacious "aggrieve[ment]" requirement. A plaintiff seeking injunctive relief need only show an identifiable, non-speculative injury, *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 173 (Fla. 1st DCA 2015), which may include reputational harm and damage to "good will," ECF 41 at 8; *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012); operational disruption; and "consumer confusion" regarding the "quality of service," *Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC*, 2020 WL 6700449, at *4 (S.D. Fla. Oct. 20, 2020).

The Community Hospitals' evidence easily clears that threshold. All Community Hospitals were subject to a media firestorm ignited by their "failing" Safety Grades. SOF ¶¶ 51-52. And all five CEOs testified to the same ensuing pattern: patient confusion, diverted procedures, insurer concern, and reputational injury amplified to over a million Florida consumers. *See* ECF 88-90 (Cazares) at 89:19-21 (Palm Beach CEO Cazares testifying that "patients" were "complaining

about the hospital's low safety score"); SOF ¶ 56 & OSOF ¶ 61 (Delray CEO Havericak testifying to reputational injury); ECF 88-53 (letter from Humana to Delray imploring hospital to address "performance on safety measures"); SOF ¶ 60 (decline in emergency-room admissions at West Boca after Grades were released); ECF 88-52 (similar Humana letter sent to West Boca); SOF ¶ 57 & OSOF ¶¶ 55-56 (noting Good Samaritan's declines in admissions, observation cases, and emergency-room visits; top surgeons got on staff at competitor); SOF ¶ 59 & OSOF ¶ 77 (decline in number of births, outpatient surgeries, and emergency admissions at St. Mary's).

Leapfrog's legal objections are baseless. None of that evidence is "hearsay"; it relies either on objective evidence within the CEOs' own knowledge or consists of statements showing confusion, not the truth of the matter asserted. *See supra* 13. Leapfrog's citation of *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d at 207, is similarly misplaced. The *Stewart* plaintiff admitted the defendant's sales of defective airbags had *no impact* on its own sales. *Id.* at 211. Here, by contrast, operational impact is uncontroverted. Leapfrog also objects that the Community Hospitals' revenue did not decline, Mot. 17, which is irrelevant. Injunctions by definition do not require proof of damages, *see supra* 16, and a general increase in revenues does not negate the existence of discrete, cognizable harms like falling admissions for *some* procedures or resource diversion to handle complaints. Indeed, that a plaintiff "generated a net profit" "does not demonstrate that [it] suffered no harm." *Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, 2024 WL 5703196, at *11 (M.D. Fla. Aug. 14, 2024); *Pals Grp., Inc. v. Quiskeya Trading Corp.*, 2017 WL 5598721, at *4 (S.D. Fla. Nov. 20, 2017) (no "contradiction" that plaintiff was "profitable" when it could "have earned *more* profits" absent defendant's wrongdoing).

## II. LEAPFROG'S JURISDICTIONAL AND CONSTITUTIONAL DEFENSES FAIL

### A. The Community Hospitals' Standing Is Self-Evident

Leapfrog's belated challenges to standing and the amount-in-controversy requirement each fail. "If there is a genuine issue of material fact as to whether the [Community Hospitals] have standing, summary judgment against them on standing grounds is inappropriate." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1286 (11th Cir. 2001).

Leapfrog has not come close to *disproving* a genuine issue, and the undisputed record in fact *confirms* the Community Hospitals' standing. *First*, reputational harms, diversion of resources, and loss of customers are all well-recognized injuries-in-fact—all of which will continue as Leapfrog continues to disseminate its false Safety Grades to the public. *TransUnion LLC v.*

*Ramirez*, 594 U.S. 413, 425 (2021); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009); *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). *Second*, the undisputed record precludes any challenge to traceability. Insurer letters raising concerns specifically due to Leapfrog's Safety Grades, resource diversion to address complaints based on those Safety Grades, and newfound declines in admissions closely corresponding to the release of the Safety Grades are all harms directly traceable to Leapfrog. *Third*, redressability is easily established as well. An order providing that the Community Hospitals no longer may be included in Leapfrog's deceptive Safety Grades plainly would redress injuries flowing from those Grades.

Aside from its baseless "no harm" argument on injury-in-fact, Leapfrog appears to assert that the Community Hospitals' injury is self-inflicted because they could submit to the Survey and thus gain "control over the Four Imputed Measures." Mot. 18. But the Supreme Court has "never recognized a rule of this kind under Article III," *FEC v. Cruz*, 596 U.S. 289, 297 (2022), instead explaining that injuries "remai[n] fairly traceable" to unlawful conduct "even if the injury [is] in some sense … willingly incurred," *id.* Here, the Community Hospitals did not "willingly" embrace Leapfrog's deceptive aspersions, so the case for traceability is even stronger than it was in *Cruz*. Indeed, it is incoherent to say that a plaintiff lacks standing to challenge a practice as coercive simply because he could "submit to the very [act]" that "he complains" is coercive. *Williams v. Albemarle City Bd. of Educ.*, 508 F.2d 1242, 1244 (4th Cir. 1974).

### B. The Amount-In-Controversy Requirement Is Plainly Satisfied

Leapfrog's objection to the amount-in-controversy requirement is also baseless. The amount in controversy is assessed when a suit is *filed*—not thereafter. *See PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1306 (11th Cir. 2016). Here, the Community Hospitals plausibly pleaded over $75,000 in damages, ECF 1, which Leapfrog never questioned, ECF 39, so the content of later "testimony" and "documents," Mot. 18, is irrelevant. In any event, the "value" of injunctive relief here well exceeds $75,000. *See Cohen v. Off. Depot, Inc.*, 204 F.3d 1069, 1077 (11th Cir. 2000). The Community Hospitals typically earn around $2 *billion* in net revenue per year. CH-ASOF ¶ 98. It is thus a "reasonable inferenc[e]" that halting Leapfrog's deception would save them at least $75,000 in lost admissions and resource diversion. *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 754 (11th Cir. 2010). A hospital that typically earns $250 million annually, for example, plainly suffered at least a $75,000 loss from a *17% decline* in emergency admissions, CH-ASOF ¶¶ 96, 99, and such losses will continue until Leapfrog's deceptive and unfair conduct

is halted. Thus, even if the Court entertained Leapfrog's improper request to assess the amount in controversy based on the state of the case after its inception, that argument would fail anyway.

**C. Leapfrog's Repackaged First Amendment Defense Fails**

Leapfrog's purported "affirmative defense" of anti-SLAPP should also be rejected. Mot. 18. Leapfrog has established *none* of the elements of that defense: that the Community Hospitals' claims are "[1] without merit and [2] primarily because such person or entity has exercised [3] the constitutional right of free speech in connection with a public issue." Fla. Stat. § 768.295(3).

*First*, this suit is not "without merit," Fla. Stat. § 768.295(3), because the Community Hospitals are entitled to summary judgment, *see* ECF 86, 107, and because at minimum Leapfrog itself is *not* entitled to summary judgment. What in fact is without merit is Leapfrog's purported "affirmative defense" of anti-SLAPP, which is procedurally improper. "An affirmative defense is established only when a defendant *admits the essential facts* of a complaint and sets up other facts in justification or avoidance." *Wyndham Vacation Ownership, Inc. v. Square One Dev. Grp., Inc.*, 2022 WL 21374382, at *1, *4 (M.D. Fla. Feb. 2, 2022) (striking anti-SLAPP "affirmative defense"). Here Leapfrog at least purports to *dispute*—not admit—the essential facts of the Community Hospitals' case. *See* ECF 102. Leapfrog thus seeks summary judgment on a supposed "affirmative defense," Mot. 18, that was improperly asserted in the first place.

*Second*, Leapfrog does not even *attempt* to show that the Community Hospitals filed suit "primarily" to retaliate against Leapfrog's exercise of purported constitutional rights. Fla. Stat. § 768.295(3). The reason is obvious: The Community Hospitals filed this suit "primarily" (indeed, exclusively) in response to the operational and reputational harms Leapfrog's unlawful conduct is inflicting. Leapfrog musters *no* evidence showing a different (much less primary) purpose.

*Third*, this case does not implicate Leapfrog's asserted "right of free speech." Fla. Stat. § 768.295(3). Leapfrog says its statements implicate "matters of public concern," and thus the First Amendment. Mot. 19. That is wrong, as this Court has recognized. Leapfrog has no right to "mislead consumers" "about its methodology." ECF 41 at 6; *accord Caribbean Cruise Line, Inc.*, 169 So. 3d at 167 (false "representations" about "the methods [a company] employs, in conducting its own business," are not protected). Leapfrog's argument also fails on its own terms. Addressing a matter of purported "public concern" does not bar liability—it simply would require clear evidence that Leapfrog knew its representations are "false" or "reckless[ly] disregarded" the risk of falsity. *Hunt v. Liberty Lobby*, 720 F.2d 631, 642 (11th Cir. 1983); *see id.* at 645-46 (publisher "knowingly

chose language" open to false interpretation, despite "sufficient time" to confirm assertion's accuracy). Here, the Community Hospitals have shown that Leapfrog's personnel *admittedly* knew its methodology is "arbitrar[]y," "random," a "penalty," not peer-reviewed, and based on no data—readily establishing subjective knowledge of falsity. SOF ¶ 34, 38; *see also* OSOF ¶ 29. Leapfrog's claim that this suit would impose a "prior restraint," Mot. 19, is equally baseless. There is no constitutional prohibition on restricting future speech already adjudicated to be unlawful—which would be the case if the Community Hospitals are granted judgment. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973); *Lucero v. Trosch*, 121 F.3d 591, 601 (11th Cir. 1997). The First Amendment is thus no bar to relief.

### D. Leapfrog's Post-Litigation Website Edits Do Not Affect Jurisdiction—And Only Further Confirm The Need For Relief

Finally, Leapfrog's last-minute effort to surgically alter its website only confirms the deceptive nature of its practices. While Leapfrog and its witnesses were boasting to this Court that Leapfrog's extant disclosures are "comprehensive," show "extraordinary transparency," Mot. 5, 10, and are "as transparent as possible," ECF 88-91 (Danforth) at 540:3, Leapfrog was quietly modifying some of the *same* representations. Those stealth edits squarely "impeac[h]" Leapfrog's "superlative" assessment of its pre-litigation disclosures—showing that Leapfrog in fact was *not* exhibiting the transparency it claimed. *Wood v. Morbark Indus., Inc.*, 70 F.3d 1201, 1208 (11th Cir. 1995). And those revisions pose no mootness obstacle to relief. Leapfrog's new language is equally slippery and avoids the real problems with the methodology; Leapfrog's *other* deceptive misstatements remain; the false Safety Grades themselves are still being propagated and imposing harm; and Leapfrog has not shown it is "absolutely clear" it will not reinstate the specific representations it modified. *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC)*, 528 U.S. 167, 189 (2000). To the contrary, it "vigorously defends" those same misrepresentations as lawful. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). In any event, it also admitted (inexplicably) that its withdrawn statements continue to be present on its website—which is binding for jurisdictional purposes. *See Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 905 (11th Cir. 1997). Leapfrog's new and similarly evasive disclaimers merely confirm that Leapfrog will continue deceiving consumers while failing to address the core issue: a fabricated, punitive methodology and the alarmist "Safety Grades" it produces.

## CONCLUSION

The Court should deny Leapfrog's motion for summary judgment.

Dated: November 26, 2025

Respectfully submitted,

By: */s/ Jeffrey Marcus*

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

By: */s/ Mary Beth Maloney*

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice* pending)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Betty X. Yang (*pro hac vice*)
Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
byang@gibsondunn.com
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 9:25-CV-80526-DMM**

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITALS, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,

*Plaintiffs,*

v.

THE LEAPFROG GROUP,

*Defendant.*

**LEAPFROG'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

Jura C. Zibas (Bar #124571)
jura.zibas@wilsonelser.com
2063 Main Street, Suite 100
Sarasota, Florida 34237
(941) 866-8561 (Main)
(212) 915-5756 (Direct)

Kimberly E. Blair (*pro hac vice*)
Illinois Bar No.: 6272934
Courtney L. Wood (*pro hac vice*)
Illinois Bar No.: 6344385
161 N. Clark St., Suite 4500
Direct: (312) 821-6139
Main: (312) 704-0550
Mobile: (312) 259-6414
Kimberly.blair@wilsonelser.com
*Attorneys for The Leapfrog Group*

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter is set to come before the Court for bench trial on January 12, 2026 on Count I of Plaintiffs' Amended Complaint alleging violations of the Florida Deceptive Unfair Trade Practices Act ("FDUTPA") and Count II for Declaratory Judgment. (ECF No. 74). Defendant, The Leapfrog Group ("Leapfrog"), answered the Amended Complaint and served affirmative defenses, including but not limited to, Anti-SLAPP. (ECF No. 75).

Pursuant to this Court's scheduling order, Defendant hereby submits its Proposed Findings of Fact and Conclusions of Law. (ECF No. 36, ¶10). The Court hereby makes the following findings of fact and conclusions of law as to Count I and II of the Amended Complaint and Defendant's affirmative defense of Anti-SLAPP.

## I. SUMMARY OF FINDINGS

1. The Court finds in favor of Defendant, The Leapfrog Group, on Count I.

2. The Court finds that there is no evidence of consumer harm, injury, or detriment caused by Leapfrog, its conduct or practices.

3. The Court also finds that Leapfrog's alleged acts and practices are not deceptive because the website provides transparent information and emphasized disclosures that eliminate the likelihood that a reasonable consumer acting under the circumstances would be deceived.

4. The Court also finds that Leapfrog's alleged acts and practices are not unfair because there is no evidence of substantial consumer harm, the public benefit outweighs any purported consumer harm, and the alleged consumer harm can otherwise be reasonably avoided.

5. The Court also finds that in light of Leapfrog publishing all of its information to the public, including but not limited to its Safety Grades, underlying scored data and methodology, free Survey and other fee tools, Leapfrog's acts and practices do not offend public policy and are not immoral, unethical, oppressive, unscrupulous nor substantially injurious to consumers.

6. The Court also finds that there is no evidence that Plaintiffs were, are or will be aggrieved by Leapfrog, its conduct or practices.

7. Good Samaritan Medical Center is not entitled to injunctive nor declaratory relief.

8. Delray Medical Center is not entitled to injunctive nor declaratory relief.

9. Palm Beach Gardens Medical Center is not entitled to injunctive nor declaratory relief.

10. St. Mary's Medical Center is not entitled to injunctive nor declaratory relief.

11. West Boca Medical Center is not entitled to injunctive nor declaratory relief.

12. The Court finds in favor of Defendant, The Leapfrog Group, on Count II.

13. The Court finds in favor of Defendant, The Leapfrog Group, on its affirmative defense under Florida's Anti-SLAPP statute.

14. Defendant, The Leapfrog Group, is awarded reasonable attorney's fees as the prevailing party on Count I. Fla. Stat. § 501.2105(1).

15. Defendant, The Leapfrog Group, is awarded reasonable attorney's fees as the prevailing party on its affirmative defense for Anti-SLAPP. Fla. Stat. Ann. § 768.295(4).

## II. FINDINGS OF FACT

### A. PARTIES

16. The Leapfrog Group is an independent, national not-for-profit organization that files annual 1099 tax forms.

17. Leapfrog is incorporated in the District of Columbia, with its principal place of business at 1775 K Street, NW, Suite 400, Washington, D.C. 20006.

18. Delray is incorporated in Florida, with its principal place of business at 5352 Linton Blvd., Delray Beach, Florida 33484. (ECF No. 74 at ¶7).

19. Delray is an accredited hospital with 536 licensed beds. (ECF No. 129 at ¶2).

20. Good Samaritan is incorporated in Florida, with its principal place of business at 1309 N. Flagler Dr., West Palm Beach, Florida 33401. (ECF No. 74 at ¶8).

21. Good Samaritan is an accredited hospital with 333 licensed beds. (ECF No. 129 at ¶6).

22. Palm Beach Gardens is incorporated in Florida, with its principal place of business at 3360 Burns Road, Palm Beach Gardens, Florida 33410. (ECF No. 74 at ¶9).

23. Palm Beach Gardens is an accredited hospital with 199 licensed beds. (ECF No. 129 at ¶9).

24. St. Mary's is incorporated in Florida, with its principal place of business at 901 45th St., West Palm Beach, Florida 33407. (ECF No. 74 at ¶10).

25. St. Mary's is an accredited hospital with 413 licensed beds. (ECF No. 129 at ¶12).

26. West Boca is incorporated in Florida, with its principal place of business at 21644 State Road 7, Boca Raton, Florida 33428. (ECF No. 74 at ¶11).

27. West Boca is an accredited hospital with 195 licensed beds. (ECF No. 129 at ¶15).

**B. JURISDICTION**

28. The Court has jurisdiction under 28 U.S.C. § 1332. (ECF No. 75 at ¶13).

**C. SUMMARY OF ALLEGATIONS**

29. Plaintiffs allege Leapfrog solicits healthcare information and then publishes it to consumers while commissioning "deceptive acts and unfair practices against Plaintiffs and the residents of Florida." (ECF No. 74 at ¶90).

30. Specifically, Plaintiffs claim Leapfrog made misleading representations about its Hospital Safety Grades and underlying scoring methodology. (*Id.* at ¶91).

31. Plaintiffs allege Leapfrog accepts money in exchange for "intentionally jiggering its Hospital Safety Grades to benefit the hospitals." (*Id.* at ¶92).

32. Plaintiffs allege Florida consumers harmed by being misled regarding the quality and safety of the hospitals because consumers make decisions about their healthcare that are against their best interests. (*Id.* at ¶99-100).

33. Florida consumers are allegedly harmed by "increasing the incident-to-hospital time" and "causing patients to choose hospitals that do not provide the types of critical care the Plaintiff Hospitals provide." (*Id.* at ¶100).

34. Plaintiffs are allegedly aggrieved due to weakened relationships with physicians, drop in-patient admissions, and complaints from patients. (*Id.* at ¶59-82).

**D. FACTUAL BACKGROUND OF LEAPFROG**

i. Leapfrog History

35. Leapfrog is a is a not-for-profit organization that was founded in 2000 by a group of employers who came together to address critical, complex public safety issue "severe dysfunction in the health care marketplace." (*See,* Leapfrog History webpage, https://www.leapfroggroup.org/about/history); (Joint Pre-Trial Stipulation, ECF No. 129 at ¶ 19); (ECF No. 101-3, Binder, at 29:2-31:1, 34:9-34:17); (ECF No. 101-4, Danforth, at 35:1-36:1).

36. It is Leapfrog's mission to "trigger giant leaps forward in the safety, quality and affordability of U.S. health care by using transparency to support informed health care decisions and promote high-value care." (*See,* Leapfrog "Mission and Vision" webpage, https://www.leapfroggroup.org/about/mission-and-vision ).

37. Leapfrog utilizes 13 separate and distinct expert panels to review and provide guidance on respective sections of the Leapfrog Hospital Survey ("Survey") and a separate expert

panel presides over Leapfrog's Hospital Safety Grades ("Safety Grades"). (*See,* Leapfrog Expert Panelist webpage, https://www.leapfroggroup.org/about/expert-panelists); (Joint Pre-Trial Stipulation, ECF No. 129 at ¶ 19); (ECF No. 101-3, Binder, at 29:2-31:1, 34:9-34:17); (ECF No. 101-4, Danforth, at 35:1-36:1).

38. Dr. Matt Austin of the Armstrong Institute at Johns Hopkins works with Leapfrog through a grant to assist in developing the Survey and Safety Grades. (ECF No. 133-2, Dr. Austin Dep., at 39:7-42:15).

ii. Leapfrog Hospital Survey

39. In 2001, Leapfrog launched its Survey. (*See,* Joint Pre-Trial Stipulation, ECF No. 129 at ¶30).

40. The Survey was developed in consultation with leading researchers and clinicians, and more than 2,400 hospitals participate in the Survey regardless of their eligibility to receive a Safety Grade. (ECF No. 101-3, Binder, at 74:2-4, 287:1-5, 415:15-19); (ECF No. 101-4, Danforth, at 190:1-13, 513:9-14, 550:3-6).

41. The Survey is free, publicly available on Leapfrog's website, and hospital participation is voluntary. (ECF No. 129 at ¶30); (JX-042.0, Survey).

42. The Leapfrog Survey was created to "collect and transparently report hospital and ASC performance, empowering purchasers to find the highest-value care and giving consumers the lifesaving information they need to make informed decisions." (*See,* "Innovators for Leapfrog" Launching webpage, https://www.leapfroggroup.org/news-events/%E2%80%9Cinnovators-leapfrog%E2%80%9D-launching-fuel-investment-patient-safety).

43. Leapfrog reviews its Survey annually and publishes proposed changes to the Survey on its website for public comment before the change is finalized. (ECF No. 101-4, Danforth, at 193:15-195:6, 365:6-365:13); ECF No. 101-3, Binder, at 368:368:2-16).

44. The Survey consists of the following nine sections: Patient Rights and Ethics; Medication Safety; Adult and Pediatric Complex Surgery; Maternity Care; Physician and Nurse Staffing; Patient Safety Practices; Managing Serious Errors; Pediatric Care; and Outpatient Procedures. (ECF No. 101-4, Danforth at 190:4-13); (ECF No. 129, Schedule C, JX-042 at PBHN000002652-PBHN000002658).

45. Each section of the Survey includes various measures that are scored individually, but the Survey, as a whole, is not given an overall composite score. (*See e.g.*, https://ratings.leapfroggroup.org/facility/details/10-0253/jupiter-medical-center-jupiter-fl).

46. Leapfrog's scoring methodology for the Hospital Survey is published on its website for consumers to view and download as a pdf. (ECF No. 129 at ¶71); (ECF No. 129, Schedule C, JX-034.0; JX-041.1).

47. Consumers can access published findings from the Leapfrog Hospital Survey by hospital, location or other guided searches on https://ratings.leapfroggroup.org/. (*See*, Amended Complaint, ECF No. 74 at ¶54-55).

48. Hospitals, including the Plaintiffs, use the Survey as a benchmarking tool to monitor and improve performance on various measures. (ECF No. 129 at DX-557, DX-559, DX-564, DX-644).

iii. Leapfrog Hospital Safety Grade

49. In 2012, Leapfrog launched its Hospital Safety Grades, a separate and distinct program from the Survey. (ECF No. 101-4, Danforth, 55:6-8).

50. Safety Grades are assigned to eligible general acute-care hospitals across the United States by using a Scoring Methodology. (JX-014.1 at LEAPFROG00036147); (ECF No. 101-3, Binder, at 381:5-20).

51. Leapfrog's Safety Grade methodology is focused on providing a Safety Grade to all eligible hospitals, regardless of whether the hospital voluntarily reports to the Leapfrog Survey.

52. Leapfrog's rationale for grading all hospitals is two-fold: (1) the mission of Leapfrog is to provide a public service in make hospital safety performance data publicly available to all purchasers regardless of whether a hospital refuses to voluntarily provide that data; and (2) the use of Leapfrog's Safety Grade z-score methodology. (ECF No. 101-4, Danforth, at 354:22-355:5).

53. Pursuant to Leapfrog's eligibility requirements, hospitals that are ineligible for Safety Grades include, but are not limited to, critical access hospitals, rural emergency hospitals, long term care and rehab facilities, mental health facilities, federal hospitals, some specialty hospitals, free standing pediatric hospitals, hospitals in U.S. territories, and hospitals that are missing scores for more than six (6) process/structural measures, or more than five (5) outcome measures or missing PSI 90. (ECF No. 129 at JX-014.1 at LEAPFROG00036146).

54. Eligible hospitals receive either an A, B, C, D, or F Safety Grade twice a year, once in the spring and fall. (ECF No. 129 at ¶40).

55. The Safety Grades, measure scores, and the underlying Scoring Methodology are all publicly available for consumers on Leapfrog's website hospitalsafetygrade.org. (ECF No. 129 at ¶¶ 37, 51-54, 67-71).

56. Leapfrog reviews its Scoring Methodology annually and publishes proposed changes to the Scoring Methodology/Safety Grades on its website before the change is finalized.

57. Leapfrog's Scoring Methodology inevitable changes as measures are either developed or retired from CMS and as the healthcare field evolves. (ECF No. 101-4, Danforth at 190:9-13, 300:9-301:22).

58. All hospitals are assigned Safety Grades by using the most recent Scoring Methodology. (ECF No. 129 at ¶ 35).

59. Since Fall 2021, the Safety Grade is made up of 22 measures in total, 12 process/structural measures and 10 outcome measures. (ECF No. 129 at ¶¶ 73-76).

60. The 12 process and 10 outcome measures each make up 50% of the Safety Grade composite score. (ECF No. 129 at JX-014.1 at LEAPFROG00036147).

61. Since the inception of the Safety Grades, the underlying Scoring Methodology uses "primary" and "secondary" data sources. (ECF No. 129 at ¶¶ 76, 78); (ECF No. 101-4, Danforth at 89:2-20).

62. Secondary data sources are used if a hospital chooses not to respond to the Leapfrog Survey. (ECF No. 101-4, Danforth, at 97:21:98-4).

63. Secondary data is sources have changed over time as Leapfrog has either gained or lost access to publicly available data for hospitals. (ECF No. 101-4, Danforth at 98:5-100:8, 101:1-18, 105:20-106:12).

64. Since the inception of the Safety Grade in 2012, Leapfrog has discussed and considered utilizing an imputation method in its Scoring Methodology to solve for missing data. (*See generally*, ECF No. 129 at DX-401); (ECF 88-97, Romano, at 45:13-46:6); (ECF No. 129 at JX-001 at LEAPFROG3088994- LEAPFROG3088995).

65. Leapfrog has historically used an imputation method in the Scoring Methodology to solve for missing data, but the cause of "missing data" has changed over time as Leapfrog either gained or lost access to publicly available data for hospitals. (ECF No. 129, JX-001 at

LEAPFROG3088994- LEAPFROG3088995); (Leapfrog's Deposition Designations, ECF No. 133-2, Dr. Matt Austin at 81:10-83:16, 115:6-121:5, 86:19-87:19); (ECF No. 129, PX-202.0 at LEAPFROG3100668); (ECF No. 101-4, Danforth at 236:18-237:15).

66. For example, from 2012 to 2020, if a hospital chose not to respond to the Survey, Leapfrog used American Hospital Association ("AHA") data as its secondary source to impute a score based on an analysis comparing hospital performance on the Leapfrog Survey and AHA surveys. (ECF No. 129, PX-202.0 at LEAPFROG3100668, LEAPFROG3100670); (DX-401 at LEAPFROG3046954).

67. However, in 2020, Leapfrog lost access to AHA data and explored alternative imputation methods for secondary data sources on the applicable measures. (ECF No. 101-4, Danforth at 236:18-237:15).

68. In Spring 2021, Leapfrog implemented a two-step imputation method as its secondary data source for three of the 22 process/structural measures: Computerized Physician Order Entry ("CPOE"), Bar Code Medication Administration ("BCMA"), and ICU Physician Staffing ("IPS"). (ECF No. 129, Schedule C, DX-427).

69. In Fall 2022, Leapfrog implemented the same two-step imputation method as its secondary data source for the Hand Hygiene measure.

70. Thus, Leapfrog has used a two-step imputation method as its secondary data source for four of the 22 process/structural measures from Fall 2022 to the present: CPOE, BCMA, IPS, and Hand Hygiene (collectively, the "Four Imputed Measures").

1. Spring 2024 Methodology

71. The Spring 2024 Scoring Methodology used 22 measures (12 process/structural and 10 outcome) to calculate the Spring 2024 Safety Grades. (ECF 129, JX-014.1 at LEAPFROG00036147- LEAPFROG00036149).

72. Ten of the 22 measures used data a hospital submitted to the Centers for Medicare & Medicaid Services ("CMS") as the primary data source. (*Id.* at LEAPFROG00036148- LEAPFROG00036149).

73. Twelve of the 22 measures used a hospital's most recent Leapfrog Survey data as the primary data source; however, five of those 12 measures is a hospital's most up to date National Healthcare Safety Network ("NHSN") data that is otherwise publicly available through CMS. (*Id.* at LEAPFROG00036155, LEAPFROG00036157).

74. Thus, only 7 of the 22 measures used in the Spring 2024 Safety Grade relied on Survey data ("Survey Measures") and the other 15 measures used publicly available CMS data. (*Id.* at LEAPFROG00036147- LEAPFROG00036149).

75. The seven "Survey Measures" were: (1) CPOE, (2) BCMA, (3) IPS, (4) Hand Hygiene, (5) Safe Practice 1, (6) Safe Practice 2, and (7) Total Nursing Care Hours per Patient Day. (*Id.* at LEAPFROG00036147- LEAPFROG00036148).

76. If a hospital did not respond to the Survey, then Leapfrog did not consider three of the seven "Survey Measures" when calculating the Spring 2024 Safety Grade—Safe Practice 1: Culture of Leadership Structures and Systems, Safe Practice 2: Culture Measurement, Feedback & Intervention, and Total Nursing Care Hours per Patient Day—and historically Leapfrog has never imputed scores for these three "Survey Measures." *Id.* at LEAPFROG00036147-LEAPFROG00036148, LEAPFROG00036153- LEAPFROG00036154; (Plaintiffs' Deposition Designations, ECF No. 134-1, Matt Austin at 253:13-255:10).

77. Leapfrog used the two-step imputation model for the remaining four "Survey measures," which are the Four Imputed Measures: CPOE, BCMA, IPS, and Hand Hygiene. (ECF No. 129 at JX-014.1 at LEAPFROG00036157- LEAPFROG0003615160).

78. The Four Imputed Measures were scored by using performance categories ("Achieved the Standard," "Considerable Achievement," "Some Achievement," and "Limited Achievement"). (*Id.* at LEAPFROG00036151- LEAPFROG00036152, LEAPFROG00036154).

79. Each performance category is associated with a measure score. (*Id.*).

80. Since the inception of the Safety Grade, the measure scores associated with each performance category have not changed. (ECF No. 101-4, Danforth Dep., at 412:11-20).

81. The performance categories and associated measure scores were determined by an expert panel in consideration of peer-reviewed literation and subject matter expertise. (ECF No. 101-4, Danforth Dep., at 257:15-259:21).

82. Under the Spring 2024 Scoring Methodology, in Step 1, if a non-responding hospital had a score assigned by Leapfrog in the previous four rounds of grades for CPOE, BMCA, IPS, and Hand Hygiene, excluding imputed scores, the hospital was assigned the most recent score on that measure in their current Safety Grade. (ECF No. 129 at ¶88).

83. If Step 1 was inapplicable, then in Step 2 for CPOE, BCMA, and Hand Hygiene, Leapfrog assigned the hospital to a cohort of similar hospitals using three or four hospital

characteristics obtained from the most recent CMS Impact File and the previous year's Survey. (ECF No. 129 at ¶89).

84. Under Step 2, Leapfrog then assigned the non-responding hospital the lower of the two possible mean scores based on the hospital's cohort's performance for CPOE, BCMA and Hand Hygiene. (ECF No. 129 at ¶89).

85. Under Step 2 for IPS, Leapfrog used the CMS Cost Report to determine whether a hospital had one or more medical, surgical, and/or pediatric ICU beds, and if so, the hospital was assigned the associated "Limited Achievement" score. (ECF No. 129 at ¶90).

2. The Proposed Fall 2024 Methodology Change

86. By Spring 2024, Leapfrog's monitoring and analysis of the cohort means indicated that hospitals who participated in the Survey were improving on the Four Imputed Measures.

87. Prior to Spring 2024, Hospitals that participated in the Survey complained to Leapfrog that hospitals who did not respond to the Survey were receiving an undeserved benefit by imputing the cohort means of hospitals who showed a commitment to patient safety and transparency by participating in the Survey for CPOE, BCMA, and Hand Hygiene. (ECF No. 101-4, Danforth at 315:1-316:4); (ECF No. 129, JX-008, at PBHN000018001).

88. Most of the cohort mean scores had crept up so high that hospitals who received Step 2 for CPOE, BCMA, and Hand Hygiene were receiving scores equivalent to "Achieved the Standard" or 100 out of 100 points. (*See generally*, ECF No. 129 at PX-204); (ECF No. 101-4, Danforth at 361:1-362:17); (ECF No. 133-2, Dr. Matt Austin at 117:17-118:21).

89. On April 12, 2024, Leapfrog went to its Hospital Safety Grade Expert Panel to propose and develop a solution to solve for this inequity. (ECF No. 129 at ¶ 91).

90. The Expert Panel confirmed there was no evidence to support imputing perfect or nearly perfect scores on the Four Imputed Measures for hospitals that do not respond to the Survey. (ECF No. 133-2, Austin Dep., at 192:17-193:12); (ECF No. 101-4, Danforth Dep., at 361:1-7).

91. Under the guidance of the Expert Panel, Leapfrog published the proposed changes to the Fall 2024 Scoring Methodology for public comment. (ECF No. 101-41).

92. Leapfrog received both positive and negative feedback regarding the change. (ECF No. 129 at JX-032).

93. Leapfrog published its final changes to the Fall 2024 Scoring Methodology, which included addressing the most common public comments or inquiries. (*See generally*, ECF No. 129 at PX-319); (PX-520.0).

94. Leapfrog extended the time for hospitals to submit a 2024 Survey in light of the changes. (ECF No. 129 at DX-464).

95. Under the guidance of the expert panel, Leapfrog implemented its Fall 2024 Scoring Methodology. (ECF No. 129 at DX-464).

96. No expert panelist contested the final changes to the Fall 2024 Scoring Methodology. (ECF No. 101-4, Danforth, at 69:20-70:15, 244:13-15).

97. The purpose of the Fall 2024 Scoring Methodology change was not to drive revenue nor to penalize hospitals. (ECF No. 101-4, Danforth, at 458:1-21, 568:1-20, 569:3-571:11).

3. <u>Fall 2024 Scoring Methodology</u>

98. The Fall 2024 Scoring Methodology encompassed two thoughtful, targeted changes.

99. First, under Step 1, if a non-responding hospital had a score assigned by Leapfrog in the previous two (rather than four) rounds of grades for CPOE, BMCA, IPS, and Hand Hygiene, excluding imputed scores, the hospital was assigned the most recent score on that measure in their current Safety Grade. (ECF No. 129 at ¶ 82).

100. Second, if Step 1 was inapplicable, then in Step 2 for CPOE, BCMA, and Hand Hygiene, hospitals were assigned the associated "Limited Achievement" score (like IPS under the Spring 2024 Scoring Methodology). (ECF No. 129 at ¶ 85).

101. Aside from these two targeted changes, eligibility, weighting, measures, and performance categories remained unchanged.

102. Leapfrog imputes "Limited Achievement" for the Four Imputed Measures because they are considered structural measures for which Leapfrog can determine the hospital has the structure in place, but is purposefully choosing not to be transparent with its data. (ECF 88-97, Romano Dep., at 120:17-121:22).

103. "Limited Achievement" scores account for and give credit to hospitals for having a CPOE and BCMA system, Hand Hygiene Policy, and ICU. (ECF No. 101-4, Danforth, at 256:1-257:20).

iv. <u>Leapfrog Survey Website</u>

104. Leapfrog owns and operates the website leapfroggroup.org. (ECF No. 129 at ¶45).

105. Consumers can navigate through https://www.leapfroggroup.org/ to access a hospital's Survey scores at https://ratings.leapfroggroup.org/ ("Survey Website).

106. On the Survey Website a consumer can search for a hospital by facility name, location, or a more targeted and guided search. (*See*, https://ratings.leapfroggroup.org/).

107. The Survey Website reflects a "hospital's progress" on "Leapfrog's standard" for each measure in its respective category, including patient safety, specialty care, and surgery. (*See e.g.*, https://ratings.leapfroggroup.org/facility/details/10-0253/jupiter-medical-center-jupiter-fl).

108. Every measure on the Survey Website provides a description of "Leapfrog's Standard." (*Id.*).

109. If a consumer searches for a hospital that did not respond to the Survey, the consumer is greeted with a red pop-up that indicates that hospital "DECLINED TO RESPOND" and an explanation stating "Thousands of hospitals nationwide report to the Leapfrog Hospital Survey to help patients and purchasers make better health care decisions. This hospital did not participate." (ECF No. 74 at ¶54); (*See e.g.*, https://ratings.leapfroggroup.org/facility/details/10-0268/west-boca-medical-center-boca-raton-fl).

110. After dismissing the pop up, the consumer can view each of the measures, but under "Hospital's Progress" it states "DECLINED TO RESPOND" in red. (ECF No. 74 at ¶55); (*See e.g.*, https://ratings.leapfroggroup.org/facility/details/10-0268/west-boca-medical-center-boca-raton-fl).

111. The Survey Website does not "rate" hospitals. (https://ratings.leapfroggroup.org/).

112. The Survey Website does not display Safety Grades. (ECF No. 129 at ¶48).

113. The Survey Website reflects a "hospital's progress" on "Leapfrog's standards" for measures that are not included in the Safety Grades. (*Id.*).

v. Leapfrog Hospital Safety Grade Website

114. Leapfrog owns and operates hospitalsafetygrade.org. (ECF No. 129 at ¶45).

115. Leapfrog publishes its Safety Grades on https://www.hospitalsafetygrade.org/ ("Safety Grade Website).

116. On the Safety Grade Website, consumers can search for a hospital by city, state, zip code, or hospital name. (*Id.* at ¶49); (ECF No. 129, Schedule B- Leapfrog Trial Exhibits at DX-300).

117. After searching a hospital, a consumer is greeted with a "Terms of Use" pop up that notifies a consumer that the data available is for personal use only. (*See e.g.*, https://www.hospitalsafetygrade.org/search?findBy=hospital&zip_code=&city=&state_prov=&hospital=West+Boca+Medical+Center).

118. After dismissing the pop up the consumer is shown that hospital's Safety Grade with a hyperlink to "view the full score." (ECF No. 74 at ¶51); (*See e.g.*, https://www.hospitalsafetygrade.org/search?findBy=hospital&zip_code=&city=&state_prov=&hospital=West+Boca+Medical+Center).

119. If a consumer clicks or taps on a hospital's name, assigned Safety Grade, or "View the fully score," the consumer is brought to that hospital's profile webpage. (ECF No. 129 at ¶51 and DX-300).

120. A hospital's profile webpage on the Safety Grade Website displays the hospital's most recent Safety Grade at the top of the page. (*Id.* at ¶52 and DX-300).

121. When a consumer clicks or taps on "Show Recent Past Grades" at the top of a hospital's profile webpage, the last seven rounds of that hospital's Safety Grades (Spring 2022 to Spring 2025) appear. (*Id.* at ¶53 and DX-300).

122. When a consumer clicks or taps on "View this hospital's Leapfrog Hospital Survey Results" at the top of a hospital's profile webpage, a new webpage opens up bringing the user to that hospital's Survey scores on ratings.leapfroggoup.org. (*Id.* at ¶54).

123. On the hospital profile webpage, there are five tabs titled "Infections," "Problems with Surgery," "Safety Problems," "Practices to Prevent Errors," and "Doctors, Nurses & Hospital Staff." (*Id.* at ¶55 and DX-300).

124. When a consumer clicks or taps on one of the five tabs, they are shown measures included in the tab category and a corresponding red, yellow, and green "gas gauge" for each measure. (*Id.* at ¶56 and DX-300).

125. The "gas gauge" visually represents how Leapfrog has scored a hospital's performance on a measure. (*Id.* at ¶57 and DX-300).

126. Red conveys that Leapfrog has scored a hospital "Worse Than Average" performance; yellow conveys that Leapfrog has scored a hospital average performance; green conveys that Leapfrog has scored a hospital "Better Than Average" performance. (*Id.* and DX-300).

127. Beneath the "gas gauges" is a legend that states the gas gauges depict how the "Hospital Performs" on the Leapfrog standards based on a scale of "Worse Than Average" to "Better Than Average." (*Id.* at ¶58 and DX-300).

128. A consumer can view a hospital's measure score by clicking or tapping the corresponding "gas gauge" graphic. (*Id.* at ¶59 and DX-300).

129. Each measure webpage shows "This Hospital's Score," "Best Hospital's Score," "Average Hospital's Score," and "Worst Hospital Score"; describes the measure; and includes "Notes and Definitions" footnotes beneath the measure descriptions. (*Id.* at ¶60 and DX-300).

130. The scores for the Four Imputed Measures, CPOE, BCMA, Hand Hygiene, and IPS, can be found by clicking or tapping into the respective measures "Doctors order medications through a computer," "Safe medication administration," "Handwashing," and "Specially trained doctors care for ICU patients." (*Id.* at ¶61 and DX-300).

131. If a hospital does not respond to the Leapfrog Survey but is still assigned a Safety Grade, every measure webpage for a non-responding hospital includes a red, bolded footnote under "Notes and Definitions," stating that hospital "**Declined to Report: The hospital was asked to provide this information to the public, but did not.**" (*Id.* at ¶62 and DX-300).

132. When a user clicks or taps on one of the Four Measures for a non-participating hospital, an asterisk (*) appears next to the measure score underneath "This Hospital's Score." (*Id.* at ¶63 and DX-300).

133. The asterisk (*) is associated with a red, bolded footnote stating, "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available**" that is reflected in the "Notes and Definitions." (*Id.* at ¶64 and DX-300).

134. The additional footnote stating "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available**" does not appear for any measure for which the imputation method was not used. (*See e.g.*, https://www.hospitalsafetygrade.org/h/west-boca-medical-center?findBy=hospital&hospital=West+Boca+Medical+Center&rPos=0&rSort=grade).

135. If a hospital does not respond to the Survey, measures "Effective leadership to prevent errors," "Nursing and Bedside Care for Patients," and "Staff work together to prevent

errors," show a question mark displayed with "Declined to Report" over the respective gas gauge on these measures for that hospital. (ECF No. 129 at ¶66 and DX-300).

136. Clicking a link at the top of a hospital's profile webpage that says "Detailed table view" takes a consumer to a new webpage that contains two tables displaying the hospital's most recent numerical score on each measure. (*Id.* at ¶67).

137. Each table has seven columns: "Measure," "The Hospital's Score." "Worst Performing Hospital," "Avg. Performing Hospital," "Best Performing Hospital," "Data Source," and "Time Period Covered." (*Id.* at ¶68 and DX-300).

138. Each "Measure" listed in the table includes a tooltip titled "What's This?" that provides a description of that specific measure when a user hovers over the tooltip. (*Id.* at ¶69 and DX-300).

139. Under the second table (process measures) of a hospital's "Detailed table view" webpage, there is a hyperlinked text that reads, "For a full description of the methodology, click here." (*Id.* at ¶70 and DX-300).

140. Clicking or tapping the link takes the consumer to a PDF version of Leapfrog's current "Scoring Methodology" document. (*Id.* at ¶71 and DX-300).

141. Consumers can read the publicly available methodology document to see the measure scores associated with each of the performance categories for the Four Imputed Measures. (ECF No. 129, Schedule C-The Parties Joint Exhibits, at JX-034.0; JX-041.1).

vi. Statements on Leapfrog's Safety Grade Website

142. Access to Leapfrog's websites is free for all consumers.

143. Leapfrog explains to consumers the difference between the Survey and the Safety Grade. (*See*, https://www.hospitalsafetygrade.org/frequently-asked-questions).

144. Leapfrog explains to consumers that reporting to the Leapfrog Survey "doesn't automatically improve a hospital's Safety Grade. If a hospital does well on the Leapfrog Hospital Survey that can improve their Grade, but if they do poorly it can hurt their Grade." (*Id.*).

145. Leapfrog explains to consumers that the "Hospital Safety Grade website gives people free access to all the information used to evaluate each hospital, so people should study the Grade as well as other ratings and information and decide for themselves where to seek care." (*Id.*).

146. Leapfrog explains to consumers that some hospitals do not receive a Safety Grade because there is not enough data publicly available to be eligible for a Safety Grade, but the "absence of a Grade does not mean a hospital is unsafe." (*Id.*).

147. Leapfrog explains to consumers that "[m]ost of the data Leapfrog uses comes from CMS, and in some cases, CMS does not publish adequate safety data on an individual hospital. Sometimes the hospital is too small to issue reliable numbers, or the hospital does not offer services relevant to the safety data. For instance, a hospital without an Intensive Care Unit (ICU) cannot report ICU safety measures." (*Id.*).

148. Leapfrog's website explains to consumers "How to Use the Grade." (*See e.g.*, https://www.hospitalsafetygrade.org/how-to-use-the-grade); (ECF No. 129 at p. 71, DX-305).

149. Leapfrog advises consumers that instead of relying on past grades, "[p]atients should always decide on where to receive care based on a hospital's current Safety Grade. However, past grades can tell you a lot about that hospital's track record in keeping its patients safe from errors, injuries, accidents and infections." (*Id.*).

150. Leapfrog explains to consumers "About the Grade" including how it was developed. (*See e.g.*, https://www.hospitalsafetygrade.org/about-the-grade); (ECF No. 129 at p. 71, DX-304).

151. Leapfrog explains to consumers "How the Leapfrog Hospital Safety Grade is produced" including descriptions of the domains, eligibility requirements, and where data comes from. (*Id.*).

152. Leapfrog encourages consumers to look at both the Safety Grades on hospitalsafetygrade.org and the Survey scores on leapfroggroup.org. (ECF No. 129 at p. 71, DX-306); (*See e.g.*, https://www.hospitalsafetygrade.org/choosing-the-best-hospital).

153. Leapfrog provides consumers links for helpful resources, contacts for Leapfrog, the scoring methodology, explanation of grades, planned changes, and a key for the measures. (*See e.g.*, https://www.hospitalsafetygrade.org/for-hospitals); (ECF No. 129 at p. 71, DX-307).

154. Leapfrog explains to consumers that the "Safety Grade provides data and research to help you make informed decisions about a critical aspect of your hospital stay – safety" and that the "goal of the Leapfrog Hospital Safety Grade is to reduce preventable deaths from hospital errors and injuries by publicly recognizing safety and exposing harm." (ECF No. 129 at p. 71, DX-308); (*See*, https://www.hospitalsafetygrade.org/why-the-hospital-safety-grade-works).

155. In effort to explain the Safety Grades, Leapfrog publishes its cut points for each grading cycle. (ECF No. 129 at p. 71, DX-310); (*See*, https://www.hospitalsafetygrade.org/media/file/ExplanationofSafetyGrades_Spring2025.pdf).

156. Leapfrog explains its "Licensure" and "Permissions" for data users. (ECF No. 129 at p. 71, DX-309); (*See*, https://www.hospitalsafetygrade.org/Licensure).

157. Leapfrog's website references a white paper written by Johns Hopkins. (*See e.g.*, https://www.hospitalsafetygrade.org/LivesLost).

158. To date, Dr. Matt Austin stands by the findings in the white paper. (ECF No. 133-2, Austin Dep., at 106:2-107:1).

vii. Leapfrog Revenue

159. Leapfrog's two main revenue sources are data and accolade licensing. (ECF No. 101-3, Binder Dep., at p. 32:16-33:1); (ECF No. 88-68, Banerjee Dep., at p. 82:1-6).

160. Accolade licensing allows a hospital to purchase the right to use a Leapfrog trademark to promote their Safety Grade, Diabetes Recognition, or Top Hospital Award. (ECF No. 129 at DX-309).

161. Data licensing allows a purchaser access to the most recent available data that is available on the each of Leapfrog's respective websites, hospitalsafetygrade.org and/or the ratings on leapfroggroup.org. (ECF No. 129 at DX-309); (ECF No. 101-3, Binder Dep, at 272:16-273:3).

162. Data licensing does not provide or allow the licensee access to any hospital's raw data that was provided in response to the Leapfrog Survey. (ECF No. 88-86, Banerjee Dep., at 54:11-21; 211:4-16).

163. Datasets are not priced by the number of hospitals that participate in the Survey nor by the number of Safety Grades published by Leapfrog. (ECF No. 88-86, Banerjee Dep. at 82:4-20).

164. Leapfrog's value-based purchasing program reports are a series of reports that reflect a zero to 100 composite score for facilities using the Survey. (ECF No. 88-86, Banerjee Dep. at 209:5-18).

165. Leapfrog currently has one customer in the value-based purchasing program. (ECF No. 88-86, Banerjee Dep., at 236:2-8).

166. Leapfrog encourages hospitals to promote their Safety Grades by providing hospitals with free tools like template ads, announcements, and press releases. (ECF No. 88-86, Banerjee Dep., at 34:3-34:13).

167. A hospital need only pay for an accolade license if it wishes to use Leapfrog's intellectual property, i.e. logos, in connection with its advertising of its Hospital Safety Grade. (ECF No. 88-86, Kush Dep., at 34:3-34:13).

168. Leapfrog data sets are free for regional leaders, the partner advisory committee members, and academic researchers. (ECF No. 88-86, Banerjee Dep. at 68:3-13; 216:10-17).

169. Leapfrog is a not a "pay for play."

170. There was no evidence presented that hospitals pay money to Leapfrog in exchange for better grades.

171. Leapfrog does not provide or charge money for consulting services. (ECF No. 101-3, Binder Dep, at 87:11-21).

172. Leapfrog does not accept money in exchange for better Safety Grades.

viii. Hospitals Use Leapfrog

173. All Plaintiff hospitals historically participated in the Leapfrog Survey. (ECF No. 129 at ¶ 93).

174. In 2021, all Plaintiff hospitals made a conscious, informed business decision to stop participating in the Survey.

175. The Plaintiff hospitals' participation in the Leapfrog Survey is not allowed by Tenet Corporate office. (Leapfrog's Deposition Designations, ECF No. 133-1, Gina West at 157:5-22, 224:4-16).

176. After the Plaintiff hospitals stopped responding to the Survey, they still used the Survey and the Safety Grade measures to benchmark themselves internally. (ECF No. 129 at DX-557, DX-559, DX-564, DX-644).

177. The Plaintiff hospitals use the Safety Grade calculator to project grades based on improving or declining on different measures. (ECF No. 129 at DX-526; DX-524; DX-527).

178. The Plaintiff hospitals communicated to staff and boards what their grades will be or could be if they participated in the Survey. (ECF No. 129 at DX-624).

179. Despite the use of the Survey for benchmarking purposes, all five of the Plaintiff hospitals testified they receive no benefit from the Leapfrog Survey. (ECF No. 88-95, McCauley

Dep, at 136:22-137); (ECF No. 88-96, Montgomery Dep. at 202:19-24); (ECF No. 88-93, Havericak Dep., at 90:18-24).

ix. Leapfrog Safety Grade Statistics

180. In Spring 2025, Leapfrog assigned 2,829 hospitals Safety Grades and of those hospitals that received a grade only 592 of them did not respond to the Survey. (PX-426 at p. 2).

181. In Spring 2025, only 8.09% of graded hospitals received either a "D" or "F" Safety Grade. (*Id.*).

182. In Spring 2025, only 19 of 2,829 graded hospitals received an "F" Safety Grade. (*Id.* at p. 3) and three of those 19 were the Plaintiffs (Delray, Palm Beach, and West Boca). (X-Grades).

183. When comparing Fall 2024 and Spring 2025 scores, the overall means improved on 17 measures. (PX-426 at p. 8).

184. In Spring 2025, Leapfrog graded 191 Florida hospitals and 70 of those hospitals received an "A" Safety Grade. (*Id.* at p. 13).

185. Florida has one of the highest Survey participation rates in the country. (Missy)

186. Of the 191 hospitals in Florida that received a Spring 2025 Safety Grade, only 10 did not submit a Survey and five of those are the Plaintiffs. (ECF No. 129, Schedule C, DX-101; PX-426).

187. Of the 10 that did not submit the Survey, all 5 non-plaintiff hospitals received a C and all used Step 2 imputation. (ECF No. 129, Schedule C, DX-101; PX-426).

188. The non-plaintiff Florida hospitals that did not submit a Survey had the same scores imputed for the Four Imputed Measures as the Plaintiff hospitals, but the non-plaintiff hospitals received "C" Safety Grades rather than "D" or "F" Safety Grades like each of the Plaintiff hospitals. (ECF No. 129, Schedule C, DX-101; PX-426).

**E. THE PLAINTIFF HOSPITALS ARE POOR PERFORMERS**

**i. DELRAY MEDICAL CENTER**

189. In Spring 2024, Delray Medical Center received a "D" Safety Grade. (ECF No. 129 at DX-314).

190. In Fall 2024, Delray Medical Center received a "F" Safety Grade. (ECF No. 129 at DX-314).

191. Delray had a failing Safety Grade before the Fall 2024 Methodology change.

192. In 2025, Delray Medical Center received a 1 Star (out of 5) CMS rating overall. (ECF No. 129 at DX-203).

193. In 2025, the Mayo Clinic rated Delray Medical Center in the bottom 5% when compared to all hospitals. (ECF No. 129 at DX-707).

194. In April 2023, Delray was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-803).

195. In April 2024, Delray was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-813).

196. Delray Medical Center did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures.

197. Delray Medical Center did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

198. Delray Medical Center admits Leapfrog provides it no benefit or anything of value. (ECF 88-93, Havericak Dep., at 90:18-24).

**ii. <u>West Boca Medical Center</u>**

199. In Spring 2024, West Boca Medical Center received a "D" Safety Grade. (ECF No. 129 at DX-312).

200. In Fall 2024, West Boca Medical Center received a "D" Safety Grade. (ECF No. 129 at DX-312).

201. The Fall 2024 Methodology Change had no impact on West Boca's Hospital Safety Grade. (ECF No. 129 at DX-312).

202. In 2025, West Boca Medical Center received a 2 Star (out of 5) CMS rating overall. (ECF No. 129 at DX-203).

203. In 2025, the Mayo Clinic rated West Boca Medical Center in the bottom 25% when compared to all hospitals. (ECF No. 129 at DX-705).

204. In April 2023, West Boca was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-803).

205. In April 2024, West Boca was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-813).

206. West Boca Medical Center did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures.

207. West Boca Medical Center did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

208. West Boca Medical Center admits Leapfrog provides it no benefit or anything of value.

### iii. St. Mary's Medical Center

209. In Spring 2024, St. Mary's Medical Center received a "C" Safety Grade. (ECF No. 129 at DX-316).

210. In Fall 2024, St. Mary's Medical Center received a "D" Safety Grade. (ECF No. 129 at DX-316).

211. In 2025, St. Mary's Medical Center received a 1 Star (out of 5) CMS rating overall. (ECF No. 129 at DX-203).

212. In 2025, the Mayo Clinic rated St. Mary's Medical Center in the bottom 11% when compared to all hospitals. (ECF No. 129 at DX-709).

213. St. Mary's Medical Center did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures.

214. In April 2023, St. Mary's was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-803).

215. In April 2024, St. Mary's was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-813).

216. St. Mary's Medical Center did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

217. St. Mary's Medical Center admits Leapfrog provides it no benefit or anything of value. (ECF No. 88-95, McCauley Dep., at 136:22-137).

### iv. Palm Beach Gardens Medical Center

218. In Spring 2024, Palm Beach Gardens received a "C" Safety Grade. (ECF No. 129 at DX-315).

219. In Fall 2024, Palm Beach Gardens received a "F" Safety Grade. (ECF No. 129 at DX-315).

220. In 2025, Palm Beach Gardens received a 1 Star (out of 5) CMS rating overall. (ECF No. 129 at DX-203).

221. In 2025, the Mayo Clinic rated Palm Beach Gardens in the bottom 4% when compared to all hospitals. (ECF No. 129 at DX-708).

222. In April 2023, Palm Beach Gardens was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-803).

223. In April 2024, Palm Beach Gardens was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-813).

224. Palm Beach Gardens did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures.

225. Palm Beach Gardens did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

226. Palm Beach Gardens admits Leapfrog provides it no benefit or anything of value.

**v. <u>Good Samaritan Medical Center</u>**

227. In Spring 2024, Good Samaritan received a "C" Safety Grade. (ECF No. 129 at DX-313).

228. In Fall 2024, Good Samaritan received a "F" Safety Grade. (ECF No. 129 at DX-313).

229. In 2025, Good Samaritan received a 1 Star (out of 5) CMS rating overall. (ECF No. 129 at DX-203).

230. In 2025, the Mayo Clinic rated Good Samaritan in the bottom 12% when compared to all hospitals. (ECF No. 129 at DX-706).

231. In April 2023, Good Samaritan was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-803).

232. In April 2024, Good Samaritan was below the national average on, including but not limited to, several PSI measures, HAI outcomes, and Patient Experience data. (ECF No. 129 at DX-813).

233. Good Samaritan did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures.

234. Good Samaritan did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

235. Good Samaritan admits Leapfrog provides it no benefit or anything of value. (ECF 88-96, Montgomery Dep., at 202:19-24).

### F. No Evidence of Consumer Harm

236. Delray Medical Center did not present evidence of a single consumer or patient that was deceived by its Safety Grades. (ECF No. 129 at pp.103-104).

237. Delray Medical Center did not present evidence of a single consumer or patient that was harmed by its Safety Grades. (ECF No. 129 at pp.103-104).

238. West Boca Medical Center did not present evidence of a single consumer or patient that was deceived by its Safety Grades. (ECF No. 129 at pp.103-104).

239. West Boca Medical Center did not present evidence of a single consumer or patient that was harmed by its Safety Grades. (ECF No. 129 at pp.103-104).

240. St. Mary's Medical Center did not present evidence of a single consumer or patient that was deceived by its Safety Grades. (ECF No. 129 at pp.103-104).

241. St. Mary's Medical Center did not present evidence of a single consumer or patient that was harmed by its Safety Grades. (ECF No. 129 at pp.103-104).

242. Palm Beach Gardens did not present evidence of a single consumer or patient that was deceived by its Safety Grades. (ECF No. 129 at pp.103-104).

243. Palm Beach Gardens did not present evidence of a single consumer or patient that was harmed by its Safety Grades. (ECF No. 129 at pp.103-104).

244. Good Samaritan did not present evidence of a single consumer or patient that was deceived by its Safety Grades. (ECF No. 129 at pp.103-104).

245. Good Samaritan did not present evidence of a single consumer or patient that was harmed by its Safety Grades. (ECF No. 129 at pp.103-104).

### G. No Evidence of Plaintiff Harm

246. The market share for these five hospitals has increased since the Fall 2024 Leapfrog Hospital Safety Grades was released in November 2024. (ECF No. 129 at DX921).

i. **<u>Delray Medical Center</u>**

247. Delray Medical Center did not lose any physicians because of its Safety Grades. (ECF No. 88-93, Havericak Dep, at 254: 10-12; 261:14-17).

248. Delray Medical Center did not identify any patient who refused to treat at Dleray because of its Safety Grades. (ECF No. 88-93, Havericak Dep, at 253:1-15).

249. Delray's revenue has increased. (ECF No. 88-93, Havericak Dep, at 66:5-7).

250. Nursing retention has not declined at Delray due to its Safety Grades. (ECF No. 88-93, Havericak Dep, at 38:3-19; 51:3-13; 261:18-21).

251. Transfer rates from other hospitals to Delray have been consistent since January 2024. (ECF No. 88-93, Havericak Dep, at 61:2-62:9).

252. Delray has had no issues recruiting board members as a result of its Safety Grades. (ECF No. 88-93, Havericak Dep, at 41:2-4).

253. Delray's Google Reviews have increased from 1.7 stars in September 2024 to 4.5 stars as of September 2025. (ECF No. 88-93, Havericak Dep, at 49:4-12.

254. The Delray brand has increased since January 2024. (ECF No. 88-93, Havericak Dep, at 51-15:53-16.

255. Admissions at Delray are up in all areas. (ECF No. 129 at PX-466); (ECF No. 88-93, Havericak Dep, at 257:22-25).

ii. **<u>West Boca Medical Center</u>**

256. West Boca Medical Center did not lose any physicians because of its Safety Grades. (ECF No. 88-92, Hanlon Dep., at 88:9-18).

257. West Boca Medical Center did not identify the name any patient who refused to treat at Dleray because of its Safety Grades.

258. West Boca Medical Center's revenue has increased. (ECF No. 88-92, Hanlon Dep., at 87:16-19).

259. West Boca Medical Center's Google Reviews have increased. (ECF No. 88-92, Hanlon Dep., at 116:9-11).

260. The West Boca Medical Center brand has increased since January 2024. (ECF No. 88-92, Hanlon Dep., at 116:2-16).

iii. ST. MARY'S MEDICAL CENTER

261. St. Mary's Medical Center did not lose any physicians because of its Safety Grades.

262. St. Mary's Medical Center did not identify any patient who refused to treat at Dleray because of its Safety Grades. (ECF No. 88-95, McCauley Dep., at 231:13-233:5).

263. St. Mary's revenue has increased. (ECF No. 88-95, McCauley Dep., at 105:10-12).

264. Nursing retention has not declined at St. Mary's due to its Safety Grades. (ECF No. 88-95, McCauley Dep., at 74:11-24).

265. St. Mary's has had no issues recruiting board members as a result of its Safety Grades. (ECF No. 88-95, McCauley Dep., at 56:4-6).

iv. GOOD SAMARITAN MEDICAL CENTER

266. Good Samaritan did not lose any physicians because of its Safety Grades. (ECF 88-96, Montgomery Dep., at 297:16-18; 299:23-300:7).

267. Good Samaritan did not identify any patient who refused to treat at Good Samaritan because of its Safety Grades. (ECF 88-96, Montgomery Dep., at 296:9-14; 296:15-23; 299:9-14).

268. Good Samaritan's revenue is not down as a result of its Safety Grades. (ECF 88-96, Montgomery Dep., at 66:13-18).

269. Good Samaritan's EBITDA was not down from 2024 to 2025. (ECF 88-96, Montgomery Dep., at 66:13-18).

270. Nursing retention has not declined at Good Samaritan due to its Safety Grades. (ECF 88-96, Montgomery Dep., at 67:24-68:5).

271. Good Samaritan has had no issues recruiting board members as a result of its Safety Grades. (ECF 88-96, Montgomery Dep., at 80:19-85:7).

272. Good Samaritan's Google Reviews have not been impacted by its Safety Grades. (ECF 88-96, Montgomery Dep., at 95:11-13).

v. PALM BEACH GARDENS MEDICAL CENTER

273. Palm Beach Gardens Medical Center did not lose any physicians because of its Safety Grades. (ECF 88-90, Cazeres Dep. at p. 56:2-4).

274. Palm Beach Gardens Medical Center did not identify any patient who refused to treat at Palm Beach Gardens because of its Safety Grades. (ECF 88-90, Cazeres Dep. at p. 34:10-35:11).

275. Palm Beach Gardens Medical Center revenue is not down as a result of its Safety Grades. (ECF 88-90, Cazeres Dep., at 56:2-4).

276. Nursing retention has not declined at Palm Beach Gardens Medical Center due to its Safety Grades. (ECF 88-90, Cazeres Dep. at p.58:16-21).

## III. CONCLUSIONS OF LAW

### A. Count I, FDUTPA, Elements of the Claim and Burden of Proof

277. The Florida Deceptive Unfair Trade Practices Act ("FDUTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

278. Through FDUTPA, the Florida legislature intends to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

279. Florida Courts have held that "an entity does not have to be a consumer in order to have standing to bring a FDUTPA claim." *Caribbean Cruise Line, Ind. v. Better Bus. Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015). "[I]n order to satisfy the first element for a claim for both damages and injunctive relief under FDUTPA…the plaintiff must allege that the relevant act or practice was **harmful to a consumer**." *CMR Constr. & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, *3 (11th Cir. 2022) (emphasis added); *see also, Stewart Agency, Inc. v. Arrigo Enters.,* 266 So. 3d 207, 214 (Fla. Dist. Ct. App. 2019) (FDUTPA claim for injunctive relief requires showing of injury to both claimant and Florida consumers).

280. To establish a deceptive practice, plaintiffs must establish that the act or practice is "likely to mislead the consumer acting reasonably in the circumstances, to the *consumer's detriment*." *See Caribbean Cruise Line*, 169 So. 3d at 169 (emphasis in original).

281. Plaintiffs must "prove that *there was an injury or detriment to consumers* in order to satisfy all elements of a FDUTPA claim." *Id.* (emphasis in original).

282. Plaintiffs are required to show "'probable, not possible, deception' that is 'likely to cause injury to a reasonable relying consumer.'" *Piescik v. CVS Pharm., Inc.,* 576 F. Supp. 3d 1125, 1132 (S.D. Fla. 2021) (internal citation omitted).

283. Courts use an objective test to "determine whether 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Id.* (citation omitted).

284. The Florida Supreme Court defines an unfair practice as "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious ***to consumers***." *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003) (citation omitted; emphasis added).

285. To establish an unfair act or practice, plaintiffs must establish that the act or practice inflicts "***consumer injury*** that is: (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) that consumers could not reasonably have avoided." *SMS Audio, LLC v. Belson,* 2017 WL 11631378, *10 (S.D. Fla. April 24, 2017). (emphasis added).

286. Although FDUTPA does not require an entity to be a consumer to have standing to sue, "all claimants must 'prove…an injury or detriment to consumers in order to satisfy all of the elements of a FDUTPA claim.'" *S. Broward Hosp. Dist. V. ELAP Servs., LLP,* 2023 U.S. Dist. LEXIS 177407 (S.D. Fla. September 29, 2023); quoting *Caribbean Cruise Line,* 169 So. 3d at 169 (citation omitted).

287. "[I]n order to satisfy the first element for a claim for both damages and injunctive relief under FDUTPA…the plaintiff must allege that the relevant act or practice was harmful to a consumer." *CMR Constr. & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, *3 (11th Cir. 2022).

288. "[T]o state a claim for equitable relief, an entity must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc.*, 266 So. 3d at 214.

289. To be aggrieved, "'the injury claimed to have been suffered cannot be merely speculative.'" *Id.*; citing *Ahearn,* 180 So. 3d at 173; *see also Macias v. HBC of Fla., Inc.*, 694 So. 2d 88, 90 (Fla. 3d DCA 1997) ("The clear intent of [FDUTPA] as expressed by its plain language is to provide both equitable and legal remedies to private consumers who are aggrieved parties and/or have sustained **actual losses** because of a violation(s) under FDUTPA") (emphasis added).

290. The following definition of "aggrieved" applies to companies: "'having [their] legal rights [] adversely affected; having been harmed by an infringement of legal rights.'" *Stewart Agency, Inc.*, 266 So. 3d at 213-14.

291. "[A] plaintiff is 'aggrieved' under FDUTPA when the deceptive conduct alleged has caused a **non-speculative injury** that has affected the plaintiff beyond a general interest in

curbing deceptive or unfair conduct.'" *Cravens v. Garda CL Se., Inc.*, 2024 WL 5058304, *36; quoting, *Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1190 (M.D. Fla. Jan. 25, 2022); *Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2017 WL 2834783, * (M.D. Fla. June 30, 2017) (emphasis added).

292. "The FDUTPA 'is designed to protect not only the rights of litigants, but also the rights of the consuming public at large.'" *Gastaldi v. Sunvest Cmtys. USA, LLC,* 657 F. Supp. 2d 1045, 1057 (S.D. Fla. 2009).

293. Plaintiffs who are "*aggrieved by a violation of FDUTPA* may seek declaratory and/or injunctive relief under the statute." *Id.* (emphasis added).

### B. Plaintiffs are Not Consumers of Leapfrog and Plaintiffs Fail to Demonstrate Consumer Harm.

294. The Plaintiff hospitals are neither a reasonable consumer of the Safety Grades nor a consumer of the Safety Grades at all. *See, e.g., S. Broward Hosp.* at *29-31 (finding the plaintiff hospital not to be a consumer of defendant's services after plaintiff's corporate representative testified that plaintiff "received no 'benefit or anything of value' from defendants").

295. Likewise, here, every one of the Plaintiff hospital's corporate representatives (CEOs) testified that Leapfrog does not provide a benefit or provide value to the hospital.

296. The Court therefore concludes that each Plaintiff is not a consumer of Leapfrog.

297. "Plaintiff has standing to pursue FDUTPA claims so long as it can demonstrate 'an injury or detriment to consumers.'" *S. Boward Hosp.*, at *30 (quoting *Caribbean Cruise Line,* 169 So. 3d at 169).

298. Plaintiffs have otherwise not established consumer harm or substantial likelihood of consumer harm to reasonable consumers of Leapfrog's Safety Grades. *Id.* at *31.

299. Plaintiffs' inability to show actual or likely consumer harm is fatal to its FDUTPA claim. *See*, *Tymar Distribution LLC v. Mitchell Grp. USA, LLC,* 558 F. Supp. 3d 1275, 1289 (S.D. Fla. 2021) ("plaintiffs must point to specific damages done to consumers in the market" to allege consumer harm under FDUTPA) (cleaned up); *see also, Qunjian v. Globoforce, Inc.*, 89 F. 4th 852, 860 (11th Cir. 2023) (finding that plaintiff brining a FDUTPA claim must "prove there was an injury or detriment to consumers"); quoting, *Caribbean Cruise Line, Ind. v. Better Bus. Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015).

300. Since Plaintiffs are non-consumers, they must demonstrate actual consumer harm but have not.

301. Plaintiffs evidence of consumer harm is not convincing. *See e.g., S. Broward Hosp.* at *32 (evidence of billing members and emails showing that the defendant "could" or "would" bill patients but did not is inadequate to prove consumer harm); *see also, Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*, 785 F. Supp. 3d 1123, 1132 (M.D. Fla. May 12, 2025) (the Court held that plaintiffs handful of email complaints were insufficient to prove actual consumer harm and that plaintiffs are required to show more than a hypothetical that the purported conduct is "likely to cause consumer harm," which is the motion to dismiss standard).

302. In *Novo,* the Court further held that Novo's presentation of some "hypothetical possibility of some future injury to Florida consumers" was insufficient to survive summary judgment, and that Novo's identification of 5 Brooksville-customer complaints (out of 24,000 customers) about "ineffective" prescriptions did not constitute "evidence that a Florida consumer suffered actual harm from Brooksville's misbranded semaglutide." *Id.*, 1146; *see also, Id.*, 1147 ("After extensive discovery and exhaustive briefing, [Novo's] failure to provide any evidence of consumer harm entitles [Brooksville] to summary judgment on [Novo's] FDUTPA claim").

303. The Plaintiff Hospitals have identified only a smattering of hearsay statements and documents wherein their CEOs state that patients reported complaints to doctors or expressed to doctors and to others that they were disinclined to use the Plaintiff Hospitals as a result of the Safety Grades.

304. The Plaintiff Hospitals even cite instances where patients express pleasure with their experiences at the Plaintiff Hospitals.

305. The Court therefore concludes that Plaintiffs cannot prove this Court's first inquiry on element one, consumer injury or detriment, and a judgment for Leapfrog is warranted on this basis.

### C. LEAPFROG'S ACTS AND PRACTICES ARE NOT DECEPTIVE.

306. Leapfrog's acts and practices are not deceptive because it provides substantial transparent, free, readily accessible, and comprehensive information and explanations to reasonable consumers as it relates to Leapfrog's Hospital Safety Grades.

307. Judgment for Leapfrog on Count I, FDUTPA, is therefore warranted on element two, a deceptive practice is "likely to mislead the consumer acting reasonably in the circumstances, to the *consumer's detriment*." *See Caribbean Cruise Line*, 169 So. 3d at 169 (emphasis in original).

308. Element two, deception, is a two-party inquiry for which Plaintiffs cannot prove either (1) likely to mislead a consumer acting reasonably; and (2) consumer detriment.

309. In *Piescik,* the Southern District held that all the information available to consumers and the context in which that information is provided must be considered, and that claims of deception resting on unreasonable or fanciful interpretations of labels or other advertising fail. 576 F. Supp. 3d at 1132-33 (collecting cases).

310. In *Piescik,* the defendant (CVS) moved to dismiss, arguing that the plaintiff's belief that a reasonable consumer of hand sanitizer would take the "99.99% of germs" claim as fact was objectively unreasonable based on common knowledge, and also because of the asterisk next to the 99.99% claim led to a disclosure on the back label. *Id.* at 1132.

311. The Court further explained that the "information available" to consumers informing the reasonable-consumer inquiry is not limited to the label itself, and that "true information or a disclaimer can rebut a claim of deception." *Id.* at 1133; citing *Freeman v. Time Inc.,* 68 F. 3d 285, 289-90 (9th Cir. 1995).

312. The Court held that a reasonable consumer would not assume that a hand sanitizer product with such a label encompassed "all conceivable disease-causing microorganisms, regardless of whether they are commonly found on the hands," and noted "the asterisk on the back of the hand sanitizer clearly discloses to the consumer that it does not kill 99.99% of *all* germs, and a reasonable consumer would not be expected to ignore the asterisk and the information it leads to." *Id.* at 1133. The claim was dismissed with prejudice. *Id.*, 1133-36.

313. Since the *Piescik* case was dismissed with prejudice, a judgment for Leapfrog is warranted.

314. Leapfrog provides far more than the information available to the consumers in *Piescek* and, thus, the undisputed facts here present *even stronger* grounds to hold that Leapfrog's purported conduct was not deceptive to a reasonable consumer of its products.

315. Leapfrog's hospitalsafatygrade.org website that publishes the Safety Grades included, *inter alia,* that: (i) the imputed score for non-participating hospitals is shown as equivalent to the worst score; (ii) non-reporting hospitals' Grades feature, *inter alia*, bold and red

disclosures with an asterisk stating "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**"; (iii) a detailed table view of all the underlying scores that go into the Safety Grade for that hospital, comparison to other hospitals, the data source, and the time period covered; (iv) navigation of the Grades and measure-by-measure scores leads to a link allowing access to the full, 29-page Methodology; and (v) various other tools that show "how to use the Leapfrog Hospital Safety Grade," frequently asked questions, and "About the Grade."

316. As in *Piescik*, any potential to deceive a reasonable consumer of Leapfrog's products is ameliorated by additional information denoted by an asterisk, and by the substantial additional material provided. A reasonable consumer is not expected to ignore this asterisk. *Piescik*, 576 F. Supp. 3d at 1133.

317. Whether a reasonable consumer would be deceived is a totality-of-the-information inquiry, and must account for the type of consumer.

318. Thus, Leapfrog uses various pages on its website for varying comprehension levels, including the "gas gauge" pages for reasonable lay consumers, detailed table view for an intellectually curious consumer, and the detailed methodology page for an advanced consumer.

319. The *Piescik* court relied on *Moore v. Trader Joe's Co.,* wherein the Ninth Circuit affirmed dismissal of the plaintiff's charge that Trader Joe's labeling of honey as "100% New Zealand Manuka Honey" and listing "Manuka Honey" as the sole ingredient was misleading to a reasonable consumer. 4 F. 4th 874 at 876-77, 879-80 (9th Cir. 2021).

320. The Ninth Circuit explained that a reasonable consumer of a niche product like the Trader Joe's honey would know that it is impossible to produce "pure" batches of honey derived solely from the Manuka flower, and that the relatively cheap price would further signal a **reasonable consumer of that honey** that the jar does not contain 100% Manuka honey. *Id.* at 881 (emphasis added).

321. Indeed, the inquiry is whether a reasonable consumer of the *subject product* would be misled considering all the information available to him or her. *See, Id.* at 884 (consumers of "a niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care").

322. A reasonable consumer of health care information such as the Safety Grades would exhibit a higher standard of care and awareness when choosing where to receive their medical treatment, and Leapfrog's provision of substantial and transparent information (including

delineating between absent data, damning data, and imputed data) allows these consumers to fully and comprehensively inquire and educate themselves about the material that they are consuming. *Moore*, 4 F. 4th at 884; quoting, *Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 123 (S.D.N.Y. 2019) ("Consumers of Manuka honey, a niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care than 'a parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow,' who is 'not likely to study with great diligence the contents of a complicated product package'").

323. Consumers are familiar with rating websites, and considering all the information available, reasonable consumers of rating systems are aware that each system only considers certain criteria.

324. The Court finds the qualifications of Michael Vredenburgh sufficient to qualify him as an expert in the field of website design, digital low literacy and user experience. (ECF No. 96-5).

325. The Court finds that Michael Vredenburgh's expert opinion that the Leapfrog Hospital Safety Grade Website (www.hopsitalsafetygrades.org) ensures high clarity and transparency for reasonable consumers to be reliable, persuasive and unrebutted. (ECF No. 96-5).

326. The Court finds that Michael Vredenburgh's expert opinion that the scores for BCMA, CPOE, Hand Hygiene and ICU Physician Staffing are readily clear to users with basic reading comprehension to be reliable, persuasive and unrebutted. (ECF No. 96-5).

327. The Court finds that Michael Vredenburgh's expert opinion that in evaluating the clarity, transparency, and usability of the Leapfrog Hospital Safety Grade website, a reasonable consumer with at least an 8th-grade reading level would understand from reviewing the BCMA, CPOE, Hand Hygiene and ICU Physician Staffing measures that a minimum value was assigned when hospitals declined to provide data to Leapfrog. (ECF No. 96-5).

328. Thus, a consumer of Leapfrog *Safety* Grades can reasonably conclude that the grade itself measures aspects of patient *safety*.

329. The Court therefore concludes that Plaintiffs cannot prove this Court's first inquiry on element two (deception), likely to mislead a consumer acting reasonably in the circumstances and a judgment for Leapfrog on Count I should therefore be entered on this basis.

330. Plaintiffs are otherwise not a consumer of Leapfrog and there is no evidence of this Court's second inquiry on element two (deception), consumer detriment.

331. Plaintiffs have not offered evidence of a single consumer (or patient) that considered or relied on their Safety Grades to their detriment or caused consumer harm.

332. The Court therefore concludes that Plaintiffs cannot prove this Court's second inquiry on element two (deception), consumer detriment, and a judgment for Leapfrog on Count I should therefore be entered on this basis.

**D. <u>LEAPFROG'S ACTS AND PRACTICES ARE NOT UNFAIR.</u>**

333. Leapfrog's acts and practice are not unfair because the underlying Scoring Methodology treats all hospitals the same based on the informed business decision the hospital makes and consumers are otherwise fully informed on how the Safety Grades are calculated.

334. Leapfrog's practices are transparent and far from "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious ***to consumers***." *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003) (citation omitted; emphasis added).

335. Leapfrog's practices likewise have not caused any substantial consumer injury and even if any consumer injury were demonstrated, it would be outweighed by any countervailing benefits to consumers or competition that the practice produces, which can otherwise be reasonably avoided by consumers.

336. Judgment for Leapfrog on Count I, FDUTPA, is therefore warranted on element three, an unfair act or practice inflicts "***consumer injury*** that is: (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) that consumers could not reasonably have avoided." *SMS Audio, LLC v. Belson*, 2017 WL 11631378, *10 (S.D. Fla. April 24, 2017). (emphasis added).

337. First, Plaintiffs have never identified a single consumer injured by a Leapfrog practice that is allegedly unfair.

338. Even if patients were refusing to treat at an "F" hospital, like Delray Medical Center, the Plaintiffs fail to show how a patient treating at an "A" hospital, like Jupiter Medical Center, harms the consumer in any way.

339. The Plaintiff Hospitals do not allege or otherwise provide proof showing that patients are refusing to treat at the Tenet Hospitals because of the Safety Grades, nor any evidence that those patients are then harmed when treated at a competitor hospital.

340. Simply alleging that patients choose to treat at a competitor hospital rather than one of the Plaintiff Hospitals is not enough to show consumer injury. *See Cmty. Health Ctrs., Inc. v. DiamondDog Servs., Inc.*,2024 WL 3278579, *10 (M.D. Fla. July 2, 2024) (dismissal of plaintiff's FDUTPA claim after determining that plaintiff only alleged harm the defendant caused the *plaintiff* but failed to plead consumer injury).

341. The Court therefore concludes that Plaintiffs cannot prove this Court's first inquiry on element thee (unfair), substantial consumer injury, and a judgment for Leapfrog on Count I should therefore be entered on this basis.

342. Second, Plaintiffs have no evidence on the requirement that the injury "not be outweighed by any countervailing benefits to consumers or competition that the practice produces." *SMS Audio* at *3.

343. The purpose of the Safety Grade is to "educate and encourage consumers to consider safety when selecting a hospital for themselves or their families." (ECF No. 129 at JX-041.1).

344. Safety Grade fosters market incentives for hospitals to prioritize safety. (ECF No. 101-4, Danforth Dep., at 61:21-62:7); (ECF No. 88-97, Romano Dep., at 29:1-7, 235:14-25).

345. Leapfrog has received feedback over the years from hospitals advising that they use the Hospital Survey as a benchmarking tool on how to improve on their patient safety measures. (ECF No. 133-2, Dr. Matt Austin, at 387:4-15. 390:7-21); (ECF No. 101-3, Binder, at 369:1-370:13).

346. The Plaintiff Hospitals themselves used the Survey as an internal tool to benchmark their patient safety progress. (ECF No. 129 at DX-557, DX-559, DX-564, DX-644).

347. The mere fact that year-over-year improvements to mean "cohort" scores for Survey-participant hospitals occurred also proves the benefit that Leapfrog's purported conduct conferred.

348. Thus, not only do patients benefit from receiving access to hospital's patient safety data, but the Hospital Survey also provides a free tool for hospitals to improve patient safety. (SOF ¶6).

349. "Unfair practices" generally offend public policy and are immoral, unethical, oppressive and unscrupulous. *Alhassid v. Nationstar Mortg.* LLC, 771 Fed. Appx. 965, 969 (11th Cir. 2019).

350. But the Plaintiff Hospitals cannot set forth a single fact that Leapfrog, a non-profit providing substantial information to the public about healthcare facilities' safety, engaged in conduct fitting any of those categories.

351. The Court therefore concludes that Plaintiffs cannot prove this Court's second inquiry on element thee (unfair), consumer injury is not outweighed by any countervailing benefit to consumers, and a judgment for Leapfrog on Count I should therefore be entered on this basis.

352. Third, Consumers (*e.g.*, prospective patients) could easily avoid this purported injury by navigating Leapfrog's various webpages and explanations of its Methodology contained therein.

353. More specifically, at the bottom of each page of its websites, Leapfrog expressly states, *inter alia*, "Individuals are solely responsible for any and all decisions with respect to their medical treatment.

354. Disclosures note that neither Leapfrog nor its affiliates are responsible for any damages or costs that may be incurred with respect to use of this site.

355. Leapfrog advises consumers to "never disregard, avoid or delay in obtaining medical advice from a doctor or other health care professional because of material on this site, as the site is not intended to be a substitute for professional medical advice."

356. Leapfrog is clear that when deciding on where to receive health care, "people should consider other aspects of hospital performance in the decision-making process, such as whether the hospital delivers a high level of care for the health concern the patient has, i.e., if the hospital has high-quality obstetrics or orthopedics."

357. Leapfrog's transparent disclosure of its methods cannot be genuinely described as "unfair." *See, e.g.*, *Medmoun v. Home Depot U.S.A., Inc.*, *14-15 (M.D. Fla. May 7, 2022) (where documents that Home Depot provided to the consumer informed the consumer of the very information that was allegedly unfair under the FDUTPA, dismissal was proper as the harm could have been reasonably avoided).

358. The Court therefore concludes that Plaintiffs cannot prove this Court's third inquiry on element thee (unfair), consumer injury could not be reasonably avoided, and a judgment for Leapfrog on Count I should therefore be entered on this basis.

**E. PLAINTIFFS ARE NOT AGGRIEVED.**

359. Each Plaintiff fails to prove that they were "aggrieved" by the Safety Grade.

360. Judgment for Leapfrog on Count I, FDUTPA, is therefore warranted on element four, Plaintiffs were not "aggrieved by" the Safety Grades.

361. "[T]o state a claim for equitable relief, an entity must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc.*, 266 So. 3d at 214.

362. Because the Tenet Hospitals are business entities and do not "share the characteristics of humans, such as being 'angry or sad'" the following definition of "aggrieved" applies: "'having [their] legal rights [] adversely affected; having been harmed by an infringement of legal rights.'" *Id.* at 213-14.

363. Plaintiffs must show that they were suffered a direct, non-speculative and actual harm as a result of the alleged conduct but have not. *See e.g., Cravens v. Garda CL Se., Inc.*, 2024 WL 5058304, *36 (finding that an "aggrieved" plaintiff must prove non-speculative injury).

364. The Court may look no further than Delray Medical Center and West Boca Medical Center who both received a failing "D" Safety Grade *before* and *after* the alleged "unfair" Fall 2024 Scoring Methodology change.

365. All five of the Plaintiff Hospitals' CEO's signed declarations early in this litigation, averring that the Safety Grades have harmed their hospital's reputation and goodwill, but then could identify any non-speculative or admissible evidence in support.

366. None of the Plaintiffs' CEOs (who are the corporate representatives) could identify any actual financial harm suffered beyond a speculative level and all even admit revenue is up.

367. Plaintiffs' complaints of lost goodwill and/or reputational harm is wholly unsupported by evidence of a loss of business value.

368. The Court finds the qualifications of Mark Rule sufficient to qualify him as an expert in the field of economics, specifically regarding what must be shown by a corporation to substantiate lost good will or reputational harm. (ECF No. 96-4).

369. The Court finds that Plaintiffs have failed to perform any necessary causal analysis between purportedly lost business value and TLG's actions and thus Plaintiffs have failed to demonstrate that they have suffered any injury as a result of the alleged actions of TLG. (ECF No. 96-4).

370. Four of the five Plaintiff hospitals received a 1 Star overall CMS rating with only one Plaintiff hospital receiving a 2 Star overall CMS rating.

371. According to the Mayo Clinic, not a single Plaintiff hospital is rated above the bottom 29% overall when compared to all hospitals with some of the Plaintiff hospitals not even achieving above the bottom 7% overall.

372. Since Plaintiffs fail to offer any evidence that they were aggrieved *by* a violation of FDUTPA, Plaintiffs are not entitled to injunctive relief. *Gastaldi,* 657 F. Supp. 2d at 1057.

373. Since the "FDUTPA 'is designed to protect not only the rights of litigants, but also the rights of the consuming public at large,'" there is no evidence of any consumer harm, and Leapfrog's practices outweigh any purported consumer harm, Plaintiffs claim for injunctive and declaratory relief is unwarranted. *Gastaldi,* 657 F. Supp. 2d at 1057.

374. The Court therefore concludes that Plaintiffs cannot prove this Court's inquiry on element four, whether each Plaintiff is "aggrieved", and a judgment for Leapfrog on Count I should therefore be entered on this basis.

375. West Boca Medical Center is not entitled to injunctive relief.

376. Delray Medical Center is not entitled to injunctive relief.

377. Good Samaritan Medical Center is not entitled to injunctive relief.

378. St. Mary's Medical Center is not entitled to injunctive relief.

379. Palm Beach Gardens Medical Center is not entitled to injunctive relief.

### F. COUNT II, DECLARATORY JUDGMENT, ELEMENTS OF THE CLAIM AND BURDEN OF PROOF.

380. Pursuant to Declaratory Judgment Act, 28 U.S.C. § 2201, a court may declare the rights and other legal relations of any interested party in a case of an actual controversy within its jurisdiction. (FAC, ¶104).

381. Since Plaintiffs fail to offer any evidence that they were aggrieved *by* a violation of FDUTPA, Plaintiffs are not entitled to declaratory relief. *Gastaldi,* 657 F. Supp. 2d at 1057.

382. Since Plaintiffs failed to prove Count I, FDUTPA, a judgment for Leapfrog on Count II should therefore be entered on this basis.

### G. AFFIRMATIVE DEFENSE, ANTI-SLAPP, ELEMENTS OF THE CLAIM AND BURDEN OF PROOF.

383. Florida's Anti-SLAPP statute prohibits "fil[ing]…any lawsuit… against another person or entity [1] without merit and [2] primarily because such person or entity has exercised

the constitutional right of free speech in connection with a public issue…as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution." Fla. Stat. §758.295(3).

384. A cause of action is "without merit" if it fails to state a claim or if the defendant(s) prevail on the claim at trial. *See, e.g., Flynn v. Wilson*, 398 So. 3d 1103, 1115 (Fla. 2d DCA 2024).

385. Florida's anti-SLAPP statute broadly defines "free speech in connection with public issues" to include "any written or oral statement that is protected under applicable law and . . . is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." Fla. Stat. § 768.295(2)(a).

386. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Martin*, at *3, 8; citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

387. A judgment for Leapfrog on Count I, FDUTPA, proves Plaintiffs cause of action is "without merit;" therefore, the Court finds element one of Leapfrog's Anti-SLAPP affirmative defense is satisfied.

388. The evidence shows that Leapfrog's mission is premised on free speech in connection with a public issue, is intended to assist the public in assessing their healthcare options and healthcare safety and provides a public benefit; therefore, the Court finds element two of Leapfrog's Anti-SLAPP affirmative defense satisfied.

389. Leapfrog first raised its Anti-SLAPP defense in its motion to dismiss, which was not ruled on by the Court. (*See,* motion at ECF No. 39, p. 21; and Cout Order on the motion at ECF No. 41).

390. After Plaintiffs withdrew its claim for monetary damages through the operative Amended Complaint, Leapfrog renewed its Anti-SLAPP defense in its Answer. (ECF No. 75 at pp. 47-48).

391. The Court therefore concludes that Leapfrog proved its Anti-SLAPP affirmative defense and a judgment for Leapfrog should therefore be entered on this basis.

392. The Court awards Leapfrog its attorney's fees. Fla. Stat. §758.295(4).

**ENTERED:**

DATE: ________________

______________________________
Hon. Donald M. Middlebrooks
United States District Judge

Respectfully submitted,

*Kimberly E. Blair*

**Kimberly E. Blair**
kimberly.blair@wilsonelser.com
Illinois Bar ID # 6272934
**Courtney L. Wood**
courtney.wood@wilsonelser.com
Illinois Bar ID #6344385
Wilson Elser Moskowitz Edelman & Dicker LLP
161 N. Clark, Ste. 4500
Chicago, IL 60601
312.821.6139 (Direct)
312.704.0550 (Main)
(312) 259-6414 (Cell)
*Attorneys for Defendant, The Leapfrog Group*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2026, a true and correct copy of the foregoing was served on all counsel or parties of record via the ECF filing system.

By: /s/ *Kimberly E. Blair*
KIMBERLY E. BLAIR

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 25-CV-80526-MIDDLEBROOKS

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,

Plaintiff,

v.

THE LEAPFROG GROUP,

Defendant.
_______________________________________/

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

THIS CAUSE comes before me on the Parties' respective Motions for Summary Judgment. (DE 86; DE 99). The Motions are fully briefed. For the following reasons, I will deny both Motions.

## I. UNDISPUTED FACTS[1]

Plaintiffs—Good Samaritan Medical Center, Inc., Delray Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc., St. Mary's Medical Center, Inc., and West Boca Medical Center, Inc.—are five South Florida hospitals (the "Community Hospitals"). Defendant The Leapfrog Group ("Leapfrog") is a non-profit hospital ratings "watchdog" based in Washington, DC. As Leapfrog claims, it was founded to address what it views as severe dysfunction in the healthcare marketplace by advocating for more transparency to allow consumers to compare

[1] The facts here are derived from the Parties' respective Statement of Material Facts, as well as their attached exhibits. The facts provided here are undisputed unless otherwise indicated.

among hospitals their safety record before choosing where to seek care. (DE 100 at ¶ 1, 2). In support of its mission, Defendant established the Hospital Survey in 2001. (DE 100 at ¶ 5). Defendant characterizes this Survey as a "free, voluntary benchmarking tool" whereas Plaintiffs suggest that although hospitals do not pay a fee to Defendant to submit the Survey, it nevertheless requires hospitals to expend significant financial resources and personnel time to complete it, sign over rights to their data, and face marketing blackmail. (DE 116 at ¶ 6). Meanwhile, in 2012, the Defendant introduced a Hospital Safety Grade program, assigning an A, B, C, D, or F grade to hospitals—regardless of whether they participated in the Defendant's Survey. (DE 100 at ¶ 15). Among other hospitals, Plaintiff Hospitals had been receiving Safety Grades for multiple years. (*Id.* at ¶ 18).

At issue in this case is Defendant's hospital grading system, specifically following a change to the methodology in Fall 2024. (DE 116 at ¶ 19). The methodology change involves the two-step imputation model implemented when scoring a non-reporting hospital. (DE 100 at ¶ 23).[2] To be sure, Defendant utilized the model both before and after the Fall 2024 change—the significant difference, however, is whether a non-reporting hospital would be assigned a score that mirrored partner hospitals or otherwise gave a static score purely based on non-response. As described by the Defendant, when a hospital did not complete the survey, the model would "impute" a score to four of the 22 measures used to calculate the safety grades. (*Id.*). The measures were Computerized Physician Order Entry, Bar Code Medication Administration, ICU Physician Staffing, and Hand

[2] A central dispute here is whether imputation is a well-settled and reliable methodology in circumstances where the Hospital does not provide data itself through the Survey. (DE 100 at ¶ 31, DE 116 at ¶ 31).

Hygiene. (*Id.*).[3] Before the Fall 2024 change, Defendant describes the methodology as Step 1, using the hospital's historical data if it had participated in a Survey within the last 4 rounds; where no historical data was available for that hospital, Defendant applied Step 2, assigning the mean score for those measures achieved by similar "cohort" hospitals. (*Id.*). Plaintiffs dispute that the hospitals were assigned "the mean score" of similar, cohort hospitals under Step 2, clarifying instead that hospitals were "assigned the lower of two possible mean scores." (DE 116 at ¶ 23; DE 101-30 at 16).

Defendant, however, claims that Step 2 – imputing cohort scores – "incentivized hospitals to not report to the [S]urvey, and instead, to take the imputed score." (DE 100 at ¶ 28 (internal quotation and citation omitted)). To address this concern, the Defendant introduced a new two-step methodology. (*Id.* at ¶ 29). Defendant describes this model as follows:

> Step (1) if a (non-reporting) hospital "had a score assigned by Leapfrog in the previous two rounds of grades…excluding imputed scores…the hospital is assigned the most recent score on that measure in the current Hospital Safety Grade," and if Step 1 is not applicable, the: Step (2) proscribes that if a hospital "does not have historical data from the last two rounds…of the safety grade, the hospital is assigned a point value that is equivalent to receiving Limited Achievement for this measure on the Leapfrog Hospital Survey."

(*Id.*). "Limited Achievement" is the lowest score available for each measure. (DE 100 at ¶ 29).

With regards to transparency, the change in methodology was disclosed to both the public and hospitals. Defendant's scoring methodology document is publicly available online. (DE 30). The Plaintiffs also were aware of and informed of the proposed Fall 2024 Grade methodology change. (DE 116 at ¶ 35). Moreover, when viewing a score under the relevant categories, the tab includes the following language "Declined to Report" with a large question mark and a footnote.

---

[3] Plaintiffs dispute whether the two-step imputation applied to the ICU Physician Staffing measure. (DE 116 at ¶ 23).

(DE 100 at ¶ 38; DE 101-38 at 2). The footnote, in red bolded text, states "Declined to Report: The hospital was asked to provide this information to the public, but did not." (DE 100 at ¶ 38; DE 101-38 at 3). Once one of the scores' sub-categories is selected, for example Computerized Physician Order Entry, additional text indicated with an asterisk – also in red bolded text – appears, stating "[t]he hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." (DE 116 at ¶ 38; DE 101-38 at 3). On the Defendant's website, there is also an "About the Grade" page which explains that "[i]n some cases where a hospital's information is not available for a certain measure, Leapfrog uses a supplemental data source. In cases where a hospital's information is not available from any data source, Leapfrog has outlined a methodology for dealing with the missing data." (DE 100 at ¶ 43).

Following this change to the Methodology, Plaintiffs represented that they have suffered various harms. One of Plaintiffs' CEOs attested that the "Medical Center has received reports from patients that they decided to not use our facility because of [Defendant's] misleading grades" and that Defendant's grades "have also damage[d] the Medical Center's relationships with physicians." (DE 100 at ¶ 55). The same CEO, however, did not identify those patients by name. (*Id.* at ¶ 57; DE 116 at ¶ 57). Several other representatives of the Plaintiffs similarly attested that they have fielded concerns from patients and physicians and have experienced reputational damage and loss of goodwill, and will further lose patients, practices, revenue, and other business opportunities. (DE 100 at ¶¶ 60-73).

Thus, on April 30, 2025, Plaintiffs filed suit against Defendant in this Court, bringing two counts. Count I alleges a violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA). Fla. Stat. § 501.201 *et seq*. Count II requests relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. (DE 1 at 49, 51). Plaintiffs request that I enjoin the Defendant from including Plaintiffs in

its Hospital Safety Grades and award damages. On August 28, 2025, Plaintiffs filed an Amended Complaint, removing their request for damages and incorporating a request for equitable relief under FDUTPA. (DE 74).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material for the purposes of summary judgment only if it 'might affect the outcome of the suit under the governing law.'" *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1325–26 (11th Cir. 2005) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, [the Court] do[es] not determine the truth of the matter, but instead decide[s] only whether there is a genuine issue for trial." *Barnett v. PA Consulting Group, Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted).

Under the summary judgment standard, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Id.* at 324. If the non-moving party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" summary judgment is warranted. *Id.* at 322. The party moving for summary judgment bears the burden of establishing that there is insufficient evidence to support the non-moving party's case. *Id.* at 325. Moreover, "[t]he court must view all evidence in the light most favorable to the non-movant and must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1557–58 (11th Cir. 1990) (citation omitted).

## III. DISCUSSION

FDUTPA prohibits "[u]nfair competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Fla. Stat. 501.211 sets out the individual remedies available against a party that has been shown to violate FDUTPA. The remedies include actual damages and equitable relief, albeit requiring different elements.

Fla. Stat. 501.211(2) permits any person "who has suffered a loss" to recover actual damages. The Eleventh Circuit has explained that to obtain damages under FDUTPA, a plaintiff must prove "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."[4] *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016); *accord Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). Relevant for purposes of this Order is the third element, actual damages, and under applicable caselaw, the requirement has been explicit: "to satisfy all of the elements of a FDUPTA claim [for actual damages] it must show that a consumer was injured

[4] "Actual damages" under the FDUTPA is a term of art meaning "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016) (citing *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. Dist. Ct. App. 1984)).

or suffered a detriment." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164 (Fla. Dist. Ct. App. 2015). It is therefore a fairly straightforward proposition that consumers are the ones who must be harmed, and that harm must have already occurred.

Fla. Stat. 501.211(1), on the other hand, permits "anyone aggrieved" to seek injunctive relief against "a person who has violated, is violating, or is otherwise likely to violate this part." Caselaw expounding the requirements for equitable relief explains that an entity must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers. Further, "for someone to be aggrieved, the injury claimed to have been suffered cannot be merely speculative." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207 (Fla. 4th DCA 2019). For our purposes, the relevant inquiry to obtain equitable relief is two-fold, and in my view less straightforward than to obtain actual damages or than the Parties seem to suggest. The inquiry here is whether a consumer must nevertheless be harmed, and, if so, whether that injury may be not yet have occurred.

The Parties propose different answers. Defendant primarily relies upon *Novo Nordisk, Inc. v. Brooksville Pharmaceuticals Inc.*, for the proposition that actual patient harm – rather than likely harm - is the proper standard at summary judgment. 785 F.Supp.3d 1123, 1145 (2025). Plaintiffs argue that the Defendant's practices are "unfair" as a matter of law, and critically, do not "definitively requir[e] consumer injury." (DE 115 at 21). Both are incorrect.

To begin, it is important to assess the terms "unfair" and "deceptive" as analytically distinct concepts. Relevant caselaw has offered distinct definitions of "unfair practice" and "deception" in conjunction with a FDUTPA claim. The Florida Supreme Court has defined "unfair practice" as "one that offends established public policy and one that is immoral, unethical, oppressive,

unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla.2003) (emphasis added) (citations omitted) (internal quotation marks omitted). Conversely, it has defined "deception" as "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the *consumer's detriment." Id.* (emphasis added).

Defendant's reliance on *Novo Nordisk* is misplaced. To be sure *Novo Nordisk* does make reference to the distinction between an "unfair" practice and a "deceptive" practice. 785 F.Supp.3d at 1145-46. But as I see it, *Novo Nordisk* simultaneously quashes the significance of that distinction. An "unfair" practice requires substantial injury to consumers—i.e., actual patient harm. A "deceptive" act, on the other hand, incorporates the "likely to mislead" standard. *Novo Nordisk* does away with this distinction and finds that the plaintiffs in that case failed to advance a FDUPTA claim because under either an unfair practice or deception claim, the plaintiff failed to "show[] any evidence that a Florida consumer suffered actual harm from Brooksville's misbranded semaglutide." It is for that same reason that I find the argument that summary judgment requires actual harm unavailing. *See Novo Nordisk*, 785 F.Supp.3d at 1145. (stating that "while Plaintiff is correct that under a *motion to dismiss* standard, a plaintiff only needs to allege that the conduct in question is 'likely to cause consumer harm,' under a *motion for summary judgment* standard, Florida law requires" proof of actual harm "on at least one Florida consumer, that is, committed an unfair or deceptive trade practice that injured a consumer").

In a similar vein, Defendant's broader argument that Florida law requires proof of harm to a consumer is misguided. Defendant relies on *State Farm Mut. Auto. Ins. Co. v. At Home Auto Glass LLC*, 2024 WL 4349246 at *4 (M.D. Fla. Sept. 30, 2024) for the following statement: "While a plaintiff need not be a consumer to pursue a claim under FDUTPA, Florida case law requires a

plaintiff to prove harm to a consumer or consumers." This language is taken from *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 860 (11th Cir. 2023), which draws on *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015). The key issue with this principle is that, across all of the cited cases, it is applied in the context of actual damages, rendering its applicability questionable in the context of equitable relief under FDUTPA. To hold otherwise would diminish the significance between the two remedies.

Altogether, a deception claim under FDUTPA need not require actual harm and instead requires "deceptions that are likely to cause injury to a reasonable relying consumer." *Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000).

As it relates to an "unfair" practice, Plaintiffs advance a similarly problematic interpretation. Plaintiffs argue that an "unfair" practice need not require consumer injury because of the disjunctive: "or substantially injurious to consumers." (DE 115 at 21) (*contra SMS Audio, LLC v. Belson*, 2017 WL 11631378 at *3 (S.D. Fla. Apr. 25, 2017) (adopting the newer definition of an "unfair practice," issued by the FTC in its 1980 policy statement, which more definitively requires consumer injury). Plaintiffs misread my opinion in *SMS Audio*. In saying that the newer definition definitively requires consumer injury, that does not lead to a conclusion that the definition adopted in *PNR* therefore does not require consumer injury. The plain text of the *PNR* definition still includes "or substantially injurious to consumers" and I decline to read this "disjunctive" as creating a standard where consumer harm is a supplemental showing rather than a required one to advance a FDUTPA claim.[5]

---

[5] On this point, it is unclear how they intend to present evidence to support an unfair practice, given the dearth of evidence of actual consumer harm. I also see potential hearsay issues underlying some of the proffered testimony. (DE 115 at ¶ 13; DE 116 at ¶ 57). Plaintiffs argue that "the CEOs

Plaintiff also advances the argument that "hospitals are 'consumers' under FDUTPA" because the term broadly includes any "individual," "business," "corporation," "or any other group or combination." (DE 115 at 20, 23) (citing Fla. Stat. 501.203(7)). This argument is misplaced given the facts of the case. Of course, any of these entities *can* be consumers for purposes of FDUTPA, but that determination is dependent on who the unfair practice or deception is aimed at misleading. Given Defendant's patient-facing Hospital Safety Grades, it is not clear to me that the hospitals would be "consumers" of the Safety Grades; nor does it seem that insurers who may have implored Plaintiffs to address the safety grades can be considered "consumers" of the grades.[6]

Taking this preliminary understanding of the law, it becomes evident that the factual disputes at hand are material and, consequently, summary judgment is not warranted for either party. First, the Parties' factual disputes about the reliability of the methodology are, alone, enough to warrant denial of their cross motions for summary judgment. The Parties disagree about whether imputation is a well-settled and reliable methodology, the relevant measures in dispute, the free nature of the Survey, the scope of public comment, the accessibility of the scoring methodology, whether the methodology change constituted a penalty or an incentive, the existence of consumer harm, among others. Each of these material issues animate the relevant inquiries under a FDUTPA claim. On the record before me, I cannot decide the truth of these matters or the weight to ascribe to any piece of evidence in favor of the Plaintiff or the Defendant.

---

also directly testified that … patients were voicing complaints about the hospital's low safety score," and this testimony does not go towards the truth of the matter asserted that the hospital actually performs poorly on patient safety. (DE 107 at 12) (internal quotations omitted). But a statement can be offered for multiple assertions, and the key assertion here is that it is being offered for the truth of the matter that patients were voicing complaints or cancelling appointments.

[6] I need not reach a determinative finding here, as the facts asserted at trial may color the nature of the insurer's claims.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1) Plaintiffs' Motion for Summary Judgement (DE 86) is **DENIED.**

2) Defendant, The Leapfrog Group's Motion for Summary Judgment (DE 99) is **DENIED.**

**SIGNED** in Chambers in West Palm Beach, Florida, this 6th day of January, 2026.

Donald M. Middlebrooks
United States District Judge

cc.

Counsel of Record

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 9:25-CV-80526-DMM**

**GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITALS, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,**

***Plaintiffs,***

**v.**

**THE LEAPFROG GROUP,**

***Defendant.***

## CERTIFICATE OF COMPLIANCE RE ADMITTED EVIDENCE

I, Jura C. Zibas, as counsel for the Defendant, The Leapfrog Group, hereby certify the following:

Check the applicable sections:

☒ ALL EXHIBITS E-FILED: All documentary exhibits and photographs of non-documentary physical exhibits offered or introduced into evidence have been electronically filed in CM/ECF.

☒ EXHIBITS NOT E-FILED: The following is an itemized list of exhibits that are exempt from mandatory electronic filing pursuant to Local Rule 5.3(b)(3):

1. The Leapfrog Group's Designated Portions of Matt Austin's Deposition Testimony from his Deposition on September 25th, 2025

2. The Leapfrog Group's Designated Portions of Lauren Bailey's Deposition Testimony from her Deposition on September 10th, 2025

329239743v.1

Any original exhibits that have been returned to or retained by the filing party after electronic filing shall be kept for safe keeping until the conclusion of any appeals. Upon order of court, the filing party agrees to return the original exhibits to the Clerk of Court.

This Certificate shall be filed within ten (10) days of the conclusion of a hearing or trial. Failure to timely comply with the requirements of Local Rule 5.3(b) may result in the imposition of sanctions.

DocuSigned by:
Signature: Jura Zibas
BFB833BBA9C7470 Date: 2/2/2026

# EXHIBIT
# DX- 931

GIBSON DUNN

Mary Beth Maloney
Partner
T: +1 212.351.2315
M: +1 310.806.3737
mmaloney@gibsondunn.com

January 3, 2025

VIA E-MAIL

Leah Binder
President and CEO
The Leapfrog Group
1775 K Street, NW, Suite 400
Washington, DC 20006
lbinder@leapfrog-group.org

Kimberly Blair
Legal Counsel
The Leapfrog Group
1775 K Street, NW, Suite 400
Washington, DC 20006
kimberly.blair@wilsonelser.com

Re: Tenet Healthcare Corporation Cease and Desist

Dear Ms. Binder and Ms. Blair:

We represent Tenet Healthcare Corporation ("Tenet"), a leading health system and services platform that provides high-quality, compassionate care for patients in its hospitals and other medical facilities throughout the United States. It has come to our attention that The Leapfrog Group ("Leapfrog") has published false and misleading information about a number of Tenet facilities on its website, including on the Leapfrog Ratings list and its Hospital Safety Grade list. We write to demand that Leapfrog immediately remove all Tenet hospitals from these lists and cease and desist further publication of false and misleading information about Tenet hospitals on its website.

As you are undoubtedly aware, Tenet is among the more than 20% of hospitals ranked by Leapfrog that have declined to participate. As a result, Tenet has provided Leapfrog with no information regarding the performance of its facilities—a fact that Leapfrog admits.[1] Although Tenet fully supports the goals of patient transparency and informed decision-making, it declines to participate in Leapfrog's pay-to-play rankings.

Leapfrog nevertheless has published false statements about Tenet hospitals to its websites based on incomplete and incorrect information. The Leapfrog Ratings pages, for example, misleadingly depict four empty bars for the "Hospital's Progress" of many Tenet hospitals—suggesting poor performance, when in fact Tenet has simply elected not to participate in Leapfrog's rankings. Even more egregiously, Leapfrog's Hospital Safety Grade website purports to publish safety data

---

[1] *See, e.g.* https://ratings.leapfroggroup.org/facility/details/10-0287/good-samaritan-medical-center-west-palm-beach-fl (Leapfrog Ratings page for Good Samaritan Medical Center in West Palm Beach, noting that the facility "Declined to Respond").

DX 931

GIBSON DUNN



regarding the performance of Tenet hospitals and assigns them safety grades—even though Leapfrog admits that it does not have data from these hospitals to substantiate those grades. The result is that Leapfrog's ratings are false, wildly inaccurate, and defamatory. For example, Leapfrog assigned an "F" to Good Samaritan Medical Center—a facility that has consistently received national recognition for its superior patient outcomes, ranking as a "High Performing" facility for Procedures/Conditions, and receiving the "America's 100 Best Hospitals for Spine Surgery Award" and "Outpatient Orthopedic Surgery Excellence Award."

Leapfrog holds itself out as a "watchdog organization that serves as a voice for health care consumers and purchasers." But its apparent practice of smearing medical facilities that decline to participate in Leapfrog's rankings and pay fees to Leapfrog is both disturbing and actionable. In fact, we are aware that other hospitals have been forced to pursue legal action to redress Leapfrog's unsavory practices.[2] And Leapfrog's misconduct here has already caused harm to Tenet's business and goodwill—including negative (and erroneous) press coverage and other negative impacts to the operations of Tenet's hospitals. Tenet therefore demands that Leapfrog immediately, and by no later than January 13, 2025, remove from its website all references to Tenet hospitals—including in the Leapfrog Ratings and its Hospital Safety Grade List.[3]

Our investigation of the facts is ongoing, and Tenet reserves all rights to take appropriate legal action against Leapfrog, including seeking damages and other relief. These include potential claims for defamation, business disparagement, unfair and deceptive business practices, and any other causes of action available in law or equity. In addition, if we were to engage in any formal dispute related to this matter, please be advised that any and all documents and records, including emails, text messages, letters, calendars, voicemails and other electronic or hard copy documents that relate in any way to your Leapfrog Ratings page, Hospital Safety Grade list, published statements about Tenet hospitals, and the subject matter of this letter may be subject to discovery. Please consider this letter formal notice of your obligation to retain all such documents.

Sincerely,

[signature]

Mary Beth Maloney

Attachment

cc: Sue Monaco, SVP General Counsel Operations, Tenet Healthcare
Betty X. Yang, Gibson, Dunn & Crutcher LLP

---

[2] *See, e.g. Saint Anthony Hospital v. The Leapfrog Group*, Case No. 2017-CH-14420 (Ill. Cir. Ct. Oct. 30, 2017).

[3] A full list of Tenet hospitals is attached as Exhibit A.

# EXHIBIT A




73 Facilities

Acute Care Hospitals

### Abrazo Arizona Heart Hospital

1930 E. Thomas Rd.
Phoenix, AZ 85016

(602) 532-1000

Facility Website

Directions

Acute Care Hospitals

### Abrazo Arrowhead Campus

18701 N. 67th Ave.
Glendale, AZ 85308

(623) 561-1000

Facility Website

Directions

Acute Care Hospitals

### Abrazo Central Campus

2000 W. Bethany Home Road
Phoenix, AZ 85015

(602) 249-0212

Acute Care Hospitals

### Abrazo Scottsdale Campus

3929 E. Bell Rd.
Phoenix, AZ 85032

(602) 923-5000

Directions

Directions

Acute Care Hospitals

## Abrazo West Campus

13677 W. McDowell Rd.
Goodyear, AZ 85395

(623) 882-1500

Facility Website

Directions

Acute Care Hospitals

## Baptist Medical Center

111 Dallas Street
San Antonio, TX 78205

(210) 297-7000

Facility Website

Directions

Acute Care Hospitals

## Children's Hospital of Michigan - Main Campus

3901 Beaubien Boulevard
Detroit, MI 48201

(313) 745-KIDS

Facility Website

Directions

Acute Care Hospitals

## Delray Medical Center

5352 Linton Boulevard
Delray Beach, FL 33484

(561) 498-4440

Facility Website

Directions

Acute Care Hospitals

## Desert Regional Medical Center

1150 N. Indian Canyon Dr.
Palm Springs, CA 92262

(760) 323-6511

Facility Website

Directions

Acute Care Hospitals

## DMC Detroit Receiving Hospital

4201 St. Antoine Boulevard
Detroit, MI 48201

(313) 745-3000

Facility Website

Directions

Acute Care Hospitals

## DMC Harper University

Acute Care Hospitals

## DMC Huron Valley-Sinai

Facility Website

Directions

Facility Website

Directions

Acute Care Hospitals

DMC Hutzel Women's Hospital

3990 John R Street
Detroit, MI 48201

(313) 745-8040

Facility Website

Directions

Acute Care Hospitals

DMC Rehabilitation Institute of Michigan

261 Mack Boulevard
Detroit, MI 48201

(313) 745-1203

Facility Website

Directions

Acute Care Hospitals

DMC Sinai-Grace Hospital

6071 W. Outer Drive
Detroit, MI 48235

(313) 966-3300

Facility Website

Directions

Acute Care Hospitals

Doctors Hospital of Manteca

1205 East North Street
Manteca, CA 95336

(209) 823-3111

Facility Website

Directions

Acute Care Hospitals

Doctors Medical Center Modesto

1441 Florida Avenue
Modesto, CA 95350

(209) 578-1211

Facility Website

Directions

Acute Care Hospitals

Emanuel Medical Center

825 Delbon Ave.
Turlock, CA 95382

(209) 667-4200

Facility Website

Directions

Framingham Union Hospital
115 Lincoln Street
Framingham, MA 01702
(508) 383-1000

Facility Website

Directions

Good Samaritan Medical Center
1309 North Flagler Drive
West Palm Beach, FL 33401
(561) 655-5511

Facility Website

Directions

Acute Care Hospitals

## Hi-Desert Medical Center

6601 White Feather Road
Joshua Tree, CA 92252
(760) 366-3711

Facility Website

Directions

Acute Care Hospitals

## Holy Cross Hospital

1171 W Target Range Rd
Nogales, AZ 85621
(520) 285-3000

Facility Website

Directions

Acute Care Hospitals

## JFK Memorial Hospital

47111 Monroe St
Indio, CA 92201
(760) 347-6191

Facility Website

Directions

Acute Care Hospitals

## Leonard Morse Hospital

67 Union Street
Natick, MA 01760
(508) 650-7000

Facility Website

Directions

Acute Care Hospitals

## Mission Trail Baptist Hospital

3333 Research Plaza
San Antonio, TX 78235
(210) 297-3000

Facility Website

Acute Care Hospitals

## Nacogdoches Medical Center

4920 NE Stallings Dr
Nacogdoches, TX 75965
(866) 697-5864

Facility Website

Acute Care Hospitals

### North Central Baptist Hospital

520 Madison Oak Dr.
San Antonio, TX 78258

(210) 297-4000

Facility Website

Directions

Acute Care Hospitals

### Northeast Baptist Hospital

8811 Village Dr.
San Antonio, TX 78217

(210) 297-2000

Facility Website

Directions

Acute Care Hospitals

### Palm Beach Children's Hospital

901 45th Street
West Palm Beach, FL 33407

(561) 844-6300

Facility Website

Directions

Acute Care Hospitals

### Palm Beach Gardens Medical Center

3360 Burns Road
Palm Beach Gardens, FL 33410

(561) 622-1411

Facility Website

Directions

Acute Care Hospitals

### Piedmont Medical Center

222 South Herlong Avenue
Rock Hill, SC 29732

(803) 329-1234

Facility Website

Directions

Acute Care Hospitals

### Piedmont Medical Center - Fort Mill

1000 Wellness Way
Fort Mill, SC 29715

Facility Website

Directions

Acute Care Hospitals

### Resolute Baptist Hospital

555 Creekside Crossing
New Braunfels, TX 78130

Acute Care Hospitals

### Saint Francis Hospital - Memphis

5959 Park Avenue

Facility Website

Directions

Facility Website

Directions

Acute Care Hospitals

## Saint Francis Hospital-Bartlett

2986 Kate Bond Rd
Bartlett, TN 38133

(901) 820-7000

Facility Website

Directions

Acute Care Hospitals

## Saint Vincent Hospital

123 Summer Street
Worcester, MA 01608

(508) 363-5000

Facility Website

Directions

Acute Care Hospitals

## San Ramon Regional Medical Center

6001 Norris Canyon Road
San Ramon, CA 94583

(925) 275-9200

Facility Website

Directions

Acute Care Hospitals

## St. Joseph's Hospital

350 N. Wilmot Road
Tucson, AZ 85711

(520) 873-3000

Facility Website

Directions

Acute Care Hospitals

## St. Luke's Baptist Hospital

7930 Floyd Curl Dr
San Antonio, TX 78229

(210) 297-5000

Facility Website

Directions

Acute Care Hospitals

## St. Mary's Hospital

1601 W. St. Mary's Road
Tucson, AZ 85745

(520) 872-3000

Facility Website

Directions

901 45th St
(561) 844-6300

3280 Joe Battle Blvd.
(915) 832-2000, (915) 832-2731

Facility Website

Directions

Facility Website

Directions

Acute Care Hospitals

### The Hospitals of Providence - Memorial Campus

2001 N. Oregon. St.
El Paso, TX 79902

915-577-6011

Facility Website

Directions

Acute Care Hospitals

### The Hospitals of Providence - Sierra Campus

1625 Medical Center Drive
El Paso, TX 79902

915-747-4000

Facility Website

Directions

Acute Care Hospitals

### The Hospitals of Providence - Transmountain Campus

2000 Transmountain Road
El Paso, TX 79911

915-877-8136

Facility Website

Directions

Acute Care Hospitals

### VBMC – Brownsville

1040 West Jefferson St.
Brownsville, TX 78520

(956) 698-5400

Facility Website

Directions

Acute Care Hospitals

### VBMC – Harlingen

2101 Pease Street
Harlingen, TX 78550

(956) 389-1100

Facility Website

Acute Care Hospitals

### West Boca Medical Center

21644 State Road 7
Boca Raton, FL 33428

(561) 488-8000

Facility Website

Surgical Hospitals

### Arizona Specialty Hospital

750 N 40th St
Phoenix, AZ 85008

602-797-7700

Facility Website

Directions

Surgical Hospitals

### Arizona Spine & Joint Hospital

4620 E Baseline Rd
Mesa, AZ 85206

(480) 832-4770

Facility Website

Directions

Surgical Hospitals

### Baylor Medical Center at Trophy Club

2850 East Highway 114
Trophy Club, TX 76262

817-837-4600

Facility Website

Directions

Surgical Hospitals

### Baylor Scott & White Medical Center - Frisco

5601 Warren Parkway
Frisco, TX 75034

214-407-5000

Facility Website

Directions

Surgical Hospitals

### Baylor Scott & White Medical Center at Uptown

2727 East Lemmon Ave
Dallas, TX 75204

214-443-3000

Facility Website

Directions

Surgical Hospitals

### Baylor Scott & White Medical Center Sunnyvale

231 South Collins Rd
Sunnyvale, TX 75182

(972) 892-3000

Facility Website

Directions

Surgical Hospitals

### Baylor Scott & White Orthopedic and Spine Hospital at Arlington

707 Highlander Blvd

Surgical Hospitals

### Baylor Scott & White Surgical Hospital at Fort Worth

1800 Park Place Ave

817-583-7100

Facility Website

Directions

(682) 703-5600

Facility Website

Directions

Surgical Hospitals

### Baylor Scott & White Surgical Hospital at Sherman

3601 N Calais St
Sherman, TX 75090

903-870-0999

Facility Website

Directions

Surgical Hospitals

### Baylor Surgical Hospital at Los Colinas

400 West I 635
Irving, TX 75063

972-868-4000

Facility Website

Directions

Surgical Hospitals

### Dunes Surgical Hospital

600 Sioux Point Rd
Dakota Dunes, SD 57049

605-232-3332

Facility Website

Directions

Surgical Hospitals

### Foundation Surgical Hospital of San Antonio

9522 Huebner Road
San Antonio, TX 78240

(210) 478-5400

Facility Website

Directions

Surgical Hospitals

### Fresno Surgical Hospital

6125 N. Fresno Street
Fresno, CA 93720

(559) 431-8000

Facility Website

Directions

Surgical Hospitals

### HPI - Community Hospital North

9800 Broadway Extension
Oklahoma City, OK 73114

405-419-2980

Facility Website

Directions

HPI - Community Hospital South

3100 SW 89th Street
Oklahoma City, OK 73159

(405) 602-8100

Facility Website

Directions

HPI - Northwest Surgical Hospital

9024 N May Ave
Oklahoma City, OK 73120

405-848-1918

Facility Website

Directions

Surgical Hospitals

Memorial Hermann Surgical Hospital First Colony

16906 Southwest Freeway
Sugar Land, TX 77479

281-231-1000

Facility Website

Directions

Surgical Hospitals

Memorial Hermann Surgical Hospital Kingwood

300 Kingwood Medical Dr
Kingwood, TX 77339

281-312-4000

Facility Website

Directions

Surgical Hospitals

North Central Surgical Center

9301 North Central Expressway
Dallas, TX 75231

214-265-2810

Facility Website

Directions

Surgical Hospitals

Oklahoma Center for Orthopaedic & Multi-Specialty Surgery

8100 South Walker Ave
Oklahoma City, OK 73139

405-602-6500

Facility Website

Directions

Surgical Hospitals

St Thomas Hospital for Specialty Surgery

2011 Murphy Ave
Nashville, TN 37203

615-341-7500

Surgical Hospitals

Surgical Institute of Reading

2752 Century Blvd
Wyomissing, PA 19610

610-378-8800

Facility Website

Directions

Facility Website

Directions

Surgical Hospitals

## Texas Spine & Joint Hospital

1814 Roseland Blvd, Suite 100
Tyler, TX 75701

903-525-3300

Facility Website

Directions

Surgical Hospitals

## TOPS Surgical Specialty Hospital

17080 Red Oak Dr
Houston, TX 77090

281-539-2900

Facility Website

Directions

Surgical Hospitals

## West Boca Outpatient Surgical Center

9970 Central Park Blvd.
Boca Raton, FL 33428

(561) 488-8000

Facility Website

Directions

Tenet Health · CONIFER HEALTH SOLUTIONS

About Locations Careers Investors Employees Contact

Legal • Accessibility Statement • Privacy Policy • Sitemap • Notice of Privacy Practices

©2016-2024 TH Medical. All Rights Reserved. On this Web site, the terms "Tenet," "the company," "we," "us" or "our" refer to Tenet Healthcare Corporation and/or its subsidiaries or affiliates. The hospitals and hospital programs described on this Web site are owned and/or operated by subsidiaries or affiliates of Tenet Healthcare Corporation.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**INDEX OF FILED EXHIBITS**
**JOINT EXHIBITS**

| JOINT NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 001.0 | Board Update: Progress on Safety Score (9/20/2011) |
| 001.1 | Board Update: Progress on Safety Score (9/20/2011) |
| 002.0 | Email from Matt Austin to self re: Notes for Today's Call with Patrick Romano (4/12/2019) |
| 002.1 | Email from Matt Austin to himself re: Notes for Today's Call with Patrick Romano (4/12/2019) |
| 003.0 | Email from Missy Danforth to Sara Singer, et al. re: Update on Leapfrog Hospital Safety Grade New Imputation Approach (3/16/2021) |
| 003.1 | Email from Missy Danforth to Sara Singer, et al. re: Update on Leapfrog Hospital Safety Grade New Imputation Approach (3/16/2021) |
| 003.2 | Email from Missy Danforth to Sara Singer, et al. re: Update on Leapfrog Hospital Safety Grade New Imputation Approach (3/16/2021) |
| 004.0 | Email from Missy Danforth to Matt Austin, Andrew Card, and Emma Domico re: HSG Expert Panel Call Agenda (9/2/2021) |
| 004.1 | Email from Missy Danforth to Matt Austin, Andrew Card, and Emma Domico re: HSG Expert Panel Call Agenda (9/2/2021) |
| 004.2 | Email from Missy Danforth to Matt Austin, Andrew Card, and Emma Domico re: HSG Expert Panel Call Agenda (9/2/2021) |
| 005.0 | Email from Emma Domico to Arnold Milstein, Peter Pronovost, et al. re: Leapfrog HSG Expert Panel Follow-Up (11/30/2021) |
| 006.0 | Email from Leah Binder to Missy Danforth re: Final changes to fall 2022 Safety Grade Methodology with responses to public comments; attaching edits to responses to public comment (8/23/2022) |

| JOINT NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 006.1 | Email from Leah Binder to Missy Danforth re: Final changes to fall 2022 Safety Grade Methodology with responses to public comments (8/23/2022) |
| 006.2 | Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2022 with redline revisions and comments |
| 007.0 | Email from Missy Danforth to Ratings Team re: Imputation Model for Fall 2024 Safety Grades (2/26/2024) |
| 007.1 | Email from Missy Danforth to Ratings Team re: Imputation Model for Fall 2024 safety Grades (2/26/2024) |
| 008.0 | Certified transcript of recording of April 12, 2024 Leapfrog Hospital Safety Grade Expert Panel Meeting (4/12/2024) |
| 008.1 | Certified transcript of recording of April 12, 2024 Leapfrog Hospital Safety Grade Expert Panel Meeting (4/12/2024) |
| 008.2 | Certified transcript of recording of April 12, 2024 Leapfrog Hospital Safety Grade Expert Panel Meeting (4/12/2024) |
| 009.0 | Email from Alexandra Campione to Matt Austin, Missy Danforth, Preeti Joshi re: SG Panel Agenda Planning (4/12/2024) |
| 009.1 | Email from Alexandra Campione to Matt Austin, Missy Danforth, Preeti Joshi re: SG Panel Agenda Planning (4/12/2024) |
| 010.0 | Appointment invite from Matt Austin to Arnold Milstein, Peter Provost, Sara Singer, et al. re: Leapfrog Hospital Safety Grade Expert Panel Call (4/12/2024) |
| 010.1 | Appointment invite from Matt Austin to Arnold Milstein, Peter Pronovost, Sara Singer, et al. re: Leapfrog Hospital Safety Grade Expert Panel Call (4/12/2024) |
| 010.2 | Appointment invite from Matt Austin to Arnold Milstein, Peter Pronovost, Sara Singer, et al. re: Leapfrog Hospital Safety Grade Expert Panel Call (4/12/2024) |
| 010.3 | Appointment invite from Matt Austin to Arnold Milstein, Peter Pronovost, Sara Singer, et al. re: Leapfrog Hospital Safety Grade Expert Panel Call (4/12/2024) |
| 010.4 | Appointment invite from Matt Austin to Arnold Milstein, Peter Pronovost, Sara Singer, et al. re: Leapfrog Hospital Safety Grade Expert Panel Call (4/12/2024) |
| 010.5 | Appointment invite from Matt Austin to Arnold Milstein, Peter Pronovost, Sara Singer, et al. re: Leapfrog Hospital Safety Grade Expert Panel Call (4/12/2024) |
| 011.0 | Messages between Missy Danforth and Alexandra Campione (4/12/2024) |
| 011.1 | Slack messages between Missy Danforth and Alexandra Campione (4/12/2024) |
| 011.2 | Messages between Missy Danforth and Alexandra Campione (4/12/2024) |
| 012.0 | Email from Matt Austin to self re: notes from hgs expert panel meeting (4/12/2024) |
| 012.1 | Email from Matt Austin to himself re: notes from hgs expert panel meeting (4/12/2024) |
| 013.0 | Email from Preeti Joshi to Matt Austin re: Leapfrog HSG Expert Panel Meeting Notes (4/16/2024) |
| 013.1 | Email from Preeti Joshi to Matt Austin re: Leapfrog HSG Expert Panel Meeting Notes (4/16/2024) |
| 014.0 | Please update CCN #102552 (4/18/2024) |
| 014.1 | Leapfrog Deck: Scoring Methodology, Spring 2024 Safety Guide (4/22/2024) |

| JOINT NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 015.0 | Appointment invite from Alexandra Campione to Missy Danforth, Matt Austin, Preeti Joshi, and Leah Binder re: Safety Grade Imputation Changes (4/22/2024) |
| 015.1 | Appointment invite from Alexandra Campione to Missy Danforth, Matt Austin, Preeti Joshi, and Leah Binder re: Safety Grade Imputation Changes (4/22/2024) |
| 016.0 | Email from Matt Austin to Alexandra Campione, Missy Danforth, Preeti Joshi re: Imputation Changes (4/22/2024) |
| 016.1 | Email from Matt Austin to Alexandra Campione, Missy Danforth, Preeti Joshi re: Imputation Changes (4/22/2024) |
| 016.2 | Email from Matt Austin to Alexandra Campione, Missy Danforth, Preeti Joshi re: Imputation Changes (4/22/2024) |
| 018.0 | Email from Missy Danforth to Matt Austin, Alexandra Campione, and Preeti Joshi re: Step 2 Imputation Scores (4/25/2024) |
| 018.1 | Email from Missy Danforth to Matt Austin, Alexandra Campione, and Preeti Joshi re: Step 2 Imputation Scores (4/25/2024) |
| 018.2 | Email from Missy Danforth to Matt Austin, Alexandra Campione, and Preeti Joshi re: Step 2 Imputation Scores (4/25/2024) |
| 019.0 | Email from Patrick Romano to Matt Austin re: Leapfrog: Proposed Text for Imputation Change (5/14/2024) |
| 019.1 | Email from Patrick Romano to Matt Austin re: Leapfrog: Proposed Text for Imputation Change (5/14/2024) |
| 019.2 | Email from Patrick Romano to Matt Austin re: Leapfrog: Proposed Text for Imputation Change (5/14/2024) |
| 020.0 | Email from Matt Austin to Preeti Joshi re: Leapfrog HSG Expert Panel Meeting Notes (5/14/2024) |
| 020.1 | Email from Matt Austin to Preeti Joshi re: Leapfrog HSG Expert Panel Meeting Notes (5/14/2024) |
| 021.0 | Email from Peter Pronovost to Matt Austin re: Leapfrog: Proposed Text for Imputation Change (5/14/2024) |
| 021.1 | Email from Peter Pronovost to Matt Austin, Missy Danforth, and Alexandra Campione re: Leapfrog: Proposed Text for Imputation Change (5/14/2024) |
| 022.0 | Email from Alexandra Campione to Patrick Romano re: Leapfrog: Proposed Text for Imputation Change (5/15/2024) |
| 022.1 | Email from Alexandra Campione to Patrick Romano re: Leapfrog: Proposed Text for Imputation Change (5/15/2024) |
| 022.2 | Email from Alexandra Campione to Patrick Romano re: Leapfrog: Proposed Text for Imputation Change (5/15/2024) |
| 022.3 | Email from Alexandra Campione to Patrick Romano re: Leapfrog: Proposed Text for Imputation Change (5/15/2024) |
| 023.0 | Email from Preeti Joshi to Arnold Milstein, et al. re: Meeting Notes: Leapfrog Hospital Safety Grade Expert Panel Call (5/15/2024) |
| 023.1 | Leapfrog Hospital Safety Grade Expert Panel Meeting Notes 041224.docx (5/15/2024) |
| 024.0 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |

| JOINT NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 024.1 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 024.2 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 024.3 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 024.4 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 025.0 | Email from Matt Austin to Missy Danforth re: FOR REVIEW: Final Safety Grade Changes (5/20/2024) |
| 025.1 | Email from Matt Austin to Missy Danforth re: FOR REVIEW: Final Safety Grade Changes (5/20/2024) |
| 025.2 | Email from Matt Austin to Missy Danforth re: FOR REVIEW: Final Safety Grade Changes (5/20/2024) |
| 025.3 | Email from Matt Austin to Missy Danforth re: FOR REVIEW: Final Safety Grade Changes (5/20/2024) |
| 026.0 | Email from Leapfrog Help Desk to Alexandra Campione re: 103566 (5/21/2024) |
| 026.1 | Email from Leapfrog Help Desk to Alexandra Campione re: 103566 (5/21/2024) |
| 026.2 | Email from Leapfrog Help Desk to Alexandra Campione re: 103566 (5/21/2024) |
| 026.3 | Email from Leapfrog Help Desk to Alexandra Campione re: 103566 (5/21/2024) |
| 027.0 | Email from Missy Danforth to Alexandra Campione re: Meeting Notes: Leapfrog Hospital Safety Grade Expert Panel Call (5/23/2024) |
| 027.1 | Email from Missy Danforth to Alexandra Campione re: Meeting Notes: Leapfrog Hospital Safety Grade Expert Panel Call (5/23/2024) |
| 027.2 | Email from Missy Danforth to Alexandra Campione re: Meeting Notes: Leapfrog Hospital Safety Grade Expert Panel Call (5/23/2024) |
| 028.0 | Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 #104036 (6/6/2024) |
| 028.1 | Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 #104036 (6/6/2024) |
| 028.2 | Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 #104036 (6/6/2024) |
| 028.3 | Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 #104036 (6/6/2024) |
| 029.0 | Imputation Model Updates #104051 (6/7/2024) |
| 029.1 | Imputation Model #104051 (6/7/2024) |
| 029.2 | Imputation Model #104051 (6/7/2024) |
| 030.0 | Proposed Fall 2024 Imputation Method #104088 (6/8/2024) |
| 030.1 | Proposed Fall 2024 Imputation Method #104088 (6/8/2024) |
| 030.2 | Proposed Fall 2024 Imputation Method #104088 (6/8/2024) |
| 031.0 | Email from Paulina Litter to Alexandra Campione re: New imputation denotation (6/18/2024) |
| 031.1 | New imputation denotation (6/18/2024) |

| JOINT NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 031.2 | New imputation denotation (6/18/2024) |
| 031.3 | New imputation denotation (6/18/2024) |
| 032.0 | Email from Alexandra Campione to Missy Danforth re: Final Fall 2024 Methodology Changes- public comments draft (6/24/2024) |
| 032.1 | Email from Alexandra Campione to Missy Danforth re: Final Fall 2024 Methodology Changes- public comments draft (6/24/2024) |
| 032.2 | Email from Alexandra Campione to Missy Danforth re: Final Fall 2024 Methodology Changes- public comments draft (6/24/2024) |
| 033.0 | Email from Matt Austin to Arnold Milstein, et al. re: Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 (6/26/2024) |
| 033.1 | Email from Matt Austin to Arnold Milstein, et al. re: Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 (6/26/2024) |
| 033.2 | Email from Matt Austin to Arnold Milstein, et al. re: Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 (6/26/2024) |
| 034.0 | Leapfrog Hospital Safety Grade Scoring Methdology, Fall 2024 Safety Grade (11/4/2024) |
| 035.0 | Email from Ricardo Ramirez to Cynthia McCauley re: Leapfrog Letter Grades (11/4/2024) |
| 036.0 | Email from Stehphany Johnson to Heather Havericak and Jennifer Shoemaker re: Leapfrog Score Update (11/4/2024) |
| 038.0 | Email from Sheri Montgomery to Patrick Franklin and Dennis Grady re: How scary is THIS? (12/10/2024) |
| 039.0 | Email from Heather Havericak to Jennifer Shoemaker and Nicole Jackson re: leapfrog standards (12/11/2024) |
| 040.0 | Email from Maggie Gill to Cynthia McCauley, et al. re: Leapfrog (12/13/2024) |
| 041.0 | Email from Alexandra Campione to M. Danforth, et al with subject "Staged Spring 2025 Safety Grade Data Platform Update" (4/17/2025) |
| 041.1 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 041.2 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 041.3 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 041.4 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 041.5 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 042.0 | Leapfrog Hospital Survey Hard Copy: Questions & Reporting Periods, Endnotes, Measure Specifications, FAQs (5/2/2025) |
| 043.0 | Palm Beach Health Network, Key Indicators, FY 2024 and YTD March 2025 (5/7/2025) |
| 044.1 | Leapfrog Hospital Safety Grade Expert Panel In-Person Meeting Agenda (6/14/2017) |
| 044.2 | Leapfrog Hospital Safety Grade Expert Panel In-Person Meeting Agenda (6/14/2017) |
| 044.3 | Leapfrog Hospital Safety Grade Expert Panel In-Person Meeting Agenda (6/14/2017) |

| JOINT NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 046.0 | Defendant The Leapfrog Group's Answer to Plaintiffs' Amended Complaint (Dkt. 75) (9/3/2025) |
| 047.0 | Redline revisions to proposed changes on The Leapfrog Group |
| 047.1 | Redline revisions to proposed changes (Romano Dep. Ex. No. 15) |