# No. 26-11527

# United States Court of Appeals

*for the*

# Eleventh Circuit

GOOD SAMARITAN MEDICAL CENTER, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

THE LEAPFROG GROUP,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA,
NO. 25-CV-80526-MIDDLEBROOKS

## Defendant-Appellant The Leapfrog Group's Appendix, Volume 2

JASON D. STERNBERG
DAVID A. NABORS
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
2601 Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
jasonsternberg@quinnemanuel.com
davidnabors@quinnemanuel.com

DEREK L. SHAFFER
*Counsel of Record*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 SW 13th Street NW
Washington, D.C. 20004
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for The Leapfrog Group*

September 17, 2026

## INDEX OF APPENDIX


| | Docket/ Tab No. | Page No. |
|---|---|---|
| Hospital Safety Grade Scoring Methodology (JX-034.0) | 189-94 | A000328 |
| Hospital Safety Grade Scoring Methodology (JX-041.0) | 189-101 | A000355 |
| Index of Filed Exhibits – Plaintiffs' Exhibits - PX-500s | 191 | A000385 |
| Exhibit 3 of Index of Filed Exhibits PX-500s | 191-3 | A000389 |
| Index of Filed Exhibits – Plaintiffs' Exhibits - PX-400s | 192 | A000404 |
| Exhibit 94 of Index of Filed Exhibits PX-400s | 192-94 | A000411 |
| Index of Filed Exhibits – Plaintiffs' Exhibits - PX-300s | 193 | A000413 |
| Exhibit 42 of Index of Filed Exhibits PX-300s | 193-42 | A000419 |
| Index of Filed Exhibits – Plaintiffs' Exhibits - PX-000s | 195 | A000429 |
| Exhibit 42 of Index of Filed Exhibits PX-000s | 195-42 | A000435 |
| Exhibit 45 of Index of Filed Exhibits PX-000s | 195-45 | A000454 |
| The Community Hospitals' Revised Proposed Findings of Fact and Conclusions of Law | 203 | A000473 |
| Leapfrog's Amended Proposed Findings of Fact and Conclusion of Law | 204 | A000559 |
| Exhibit 1 Trial Transcript Volume 1 | 204-1 | A000635 |
| Exhibit 1 Trial Transcript Volume 2 | 204-2 | A000962 |
| Exhibit 1 Trial Transcript Volume 3 | 204-3 | A0001307 |
| Exhibit 1 Trial Transcript Volume 4 | 204-4 | A0001616 |
| Exhibit 1 Trial Transcript Volume 5 | 204-5 | A0001793 |
| Order Following Bench Trial | 212 | A0001918 |
| Order Final Judgment | 214 | A0001960 |
| Declaration of the Leapfrog Group | 215 | A0001963 |

| | | |
|---|---|---|
| The Community Hospital's Notice in Response to Leapfrog's Declaration Regarding Injunction Compliance | 219 | A0002000 |
| Exhibit A to The Community Hospital's Notice in Response to Leapfrog's Declaration Regarding Injunction Compliance | 219-1 | A0002005 |
| Exhibit B to The Community Hospital's Notice in Response to Leapfrog's Declaration Regarding In unction Compliance | 219-2 | A0002016 |
| Exhibit C to The Community Hospital's Notice in Response to Leapfrog's Declaration Regarding Injunction Compliance | 219-2 | A0002024 |
| Motion for Reconsideration | 220 | A0002028 |
| Notice of Appeal | 221 | A0002057 |
| Opposition to Motion for Reconsideration | 223 | A0002061 |
| Motion for Attorneys' Fees | 225 | A0002090 |
| Affidavit of Sydney Scott ISO The Community Hospitals Verified Mtn for Atty Fees & Costs | 226 | A0002120 |

Dated: September 17, 2026

Respectfully submitted,

*/s/ Derek L. Shaffer*

JASON D. STERNBERG
DAVID A. NABORS
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2601 Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
jasonsternberg@quinnemanuel.com
davidnabors@quinnemanuel.com

DEREK L. SHAFFER
*Counsel of Record*
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 SW 13th Street NW
Washington, D.C. 20004
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for The Leapfrog Group*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2026, the foregoing was filed electronically with the Clerk of the Court using the Court's CM/ECF system. Service will be effectuated to all parties and counsel of record in this matter who are registered with the Court's CM/ECF system.

Dated: September 17, 2026

*/s/ Derek L. Shaffer*
Derek L. Shaffer

LEAPFROG
# HOSPITAL
SAFETY GRADE

# Scoring Methodology

FALL 2024 SAFETY GRADE

©The Leapfrog Group
11/4/2024

JX-034.0

CONTENTS

What is the Hospital Safety Grade? .... 4
Eligible Hospitals .... 4
Measures .... 5
Measure & Scoring Descriptions .... 9
Process/Structural Measures .... 9
Computerized Physician Order Entry (CPOE) .... 9
Bar Code Medication Administration (BCMA) .... 10
ICU Physician Staffing (IPS) .... 10
National Quality Forum (NQF) Safe Practices .... 11
Total Nursing Care Hours per Patient Day .... 11
Hand Hygiene .... 12
Hospital Consumer Assessment of Healthcare Providers and Systems (HCAHPS) Composites .... 12
Outcome Measures .... 13
Hospital-Acquired Conditions .... 13
Healthcare-Associated Infections .... 13
AHRQ Patient Safety Indicators (PSI) .... 14
Using Secondary Data Sources .... 15
Imputation Method for CPOE, BCMA, IPS, and Hand Hygiene .... 15
Step 1: Use a Hospital's Most Recent Score on the Measure (Applies to CPOE, IPS, and Hand Hygiene Only) .... 15
Step 2: Use Imputation Point Assignment (Applies to CPOE, BCMA, IPS and Hand Hygiene) .... 15
CMS Data For HAIs .... 16
Scoring Methodology .... 17
Weighting Individual Measures .... 17
Evidence .... 17
Opportunity .... 17
Impact .... 17
Number of Component Measures .... 18
Standard Measure Weights .... 19
Calculating Z-Scores .... 20

A Note About Extreme Values ..... 21
Dealing With Missing Data ..... 22
Calculating Weighted Measure Scores ..... 22
Additional Scoring Information ..... 23
Terms Used in Scoring and Public Reporting ..... 23
Shared CMS Certification Numbers ..... 23
Updates to Data Used in the Leapfrog Hospital Safety Grade ..... 24
Data From the Leapfrog Hospital Survey ..... 24
How Hospitals Can Review Leapfrog Hospital Survey Results Prior to the Data Snapshot Date ..... 24
Data From the Centers for Medicare & Medicaid Services (CMS) ..... 25
CMS Footnote 23 Policy ..... 25
How Hospitals Can Review CMS Data Prior to the Data Snapshot Date ..... 25
How to Participate in the Leapfrog Hospital Survey ..... 26
Leapfrog Help Desk ..... 26

## WHAT IS THE HOSPITAL SAFETY GRADE?

Leapfrog Hospital Safety Grades are assigned to nearly 3,000 general acute-care hospitals across the nation twice annually. The Safety Grade uses up to 22 national patient safety measures from the Centers for Medicare & Medicaid Services (CMS) and the Leapfrog Hospital Survey, and information from other supplemental data sources, to produce a single letter grade representing a hospital's overall performance in keeping patients safe from preventable harm and medical errors. The Safety Grade methodology has been peer reviewed and published in the Journal of Patient Safety.[1]

With the Safety Grade, The Leapfrog Group aims to educate and encourage consumers to consider safety when selecting a hospital for themselves or their families. In addition, we believe the Safety Grade will foster strong market incentives for hospitals to make safety a priority. Safety Grades are publicly reported at www.HospitalSafetyGrade.org.

## ELIGIBLE HOSPITALS

Due to the limited availability of public data, Leapfrog is not able to calculate a Safety Grade for every hospital in the U.S., including the following types of hospitals:

- Critical access hospitals (CAH)
- Rural emergency hospitals (REH)
- Long-term care and rehabilitation facilities
- Mental health facilities
- Federal hospitals (e.g., Veterans Affairs, Indian Health Services, etc.)
- Some specialty hospitals, such as surgery centers and cancer hospitals
- Free-standing pediatric hospitals
- Hospitals in U.S. territories
- Hospitals that are missing scores for **more than six** (6) process/structural measures, or **more than five** (5) outcome measures, or **missing PSI 90**

[1] The Leapfrog Hospital Safety Grade uses the below-described data and reflects expert opinion as to the relative importance of each category.

HOSPITAL SAFETY GRADE

## MEASURES

The Safety Grade utilizes up to 22 national patient safety measures from the Centers for Medicare & Medicaid Services (CMS) and the Leapfrog Hospital Survey, and information from other supplemental data sources.

The measure set is divided into two domains: (1) Process/Structural Measures and (2) Outcome Measures. Each domain represents 50% of the Safety Grade. The following table lists the 22 measures included in the Safety Grade, as well as the data source and reporting period for each measure. In some cases where a hospital's information is not available for a certain measure, Leapfrog uses a secondary data source (as indicated in the table). In cases where a hospital's information is not available from any data source, Leapfrog has outlined a methodology for dealing with the missing data.

**PROCESS/STRUCTURAL MEASURES (12)**

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| **Computerized Physician Order Entry (CPOE)** | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied* | N/A |
| **Bar Code Medication Administration (BCMA)** | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied* | N/A |
| **ICU Physician Staffing (IPS)** | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied* | N/A |
| **Safe Practice 1: Culture of Leadership Structures and Systems** | 2024 Leapfrog Hospital Survey | 2024 | N/A | N/A |
| **Safe Practice 2: Culture Measurement, Feedback & Intervention** | 2024 Leapfrog Hospital Survey | 2024 | N/A | N/A |

LEAPFROG HOSPITAL SAFETY GRADE

**PROCESS/STRUCTURAL MEASURES (12)**

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| **Total Nursing Care Hours per Patient Day** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | N/A | N/A |
| **Hand Hygiene** | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied* | N/A |
| **H-COMP-1: Nurse Communication** | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |
| **H-COMP-2: Doctor Communication** | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |
| **H-COMP-3: Staff Responsiveness** | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |
| **H-COMP-5: Communication about Medicines** | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |
| **H-COMP-6: Discharge Information** | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |

*See Leapfrog's Imputation Method for CPOE, BCMA, IPS and Hand Hygiene for more information on the imputation methodology used for hospitals that did not submit a Leapfrog Hospital Survey by the Data Snapshot Date (August 31, 2024).

HOSPITAL SAFETY GRADE

**OUTCOME MEASURES (10)**

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| **Foreign Object Retained** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **Air Embolism** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **Falls and Trauma** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **CLABSI** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **CAUTI** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **SSI: Colon** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **MRSA** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **C. Diff.** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **PSI 4: Death rate among surgical inpatients with serious treatable complications** | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| **CMS Medicare PSI 90: Patient safety and adverse events composite*** | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |

* CMS calculates PSI 90 using the ten (10) component PSIs. While scores for each of the 10 component PSIs are not used to calculate fall 2024 Hospital Safety Grades, they will be publicly reported on the Hospital Safety Grade website.

**COMPONENT PSIs (SCORES NOT USED TO CALCULATE THE HOSPITAL SAFETY GRADE)

| Component PSI | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| PSI 3: Pressure ulcer rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| PSI 6: Iatrogenic pneumothorax rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| PSI 8: In-hospital fall with hip fracture rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| PSI 9: Postoperative hemorrhage or hematoma rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| PSI 10: Postoperative acute kidney injury requiring dialysis rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| PSI 11: Postoperative respiratory failure rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| PSI 12: Perioperative pulmonary embolism or deep vein thrombosis rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| PSI 13: Postoperative sepsis rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| PSI 14: Postoperative wound dehiscence rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| PSI 15: Abdominopelvic accidental puncture or laceration rate | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |

Note: CMS calculates PSI 90 using the ten (10) component PSIs listed above. While scores for each of the 10 component PSIs are not used to calculate fall 2024 Hospital Safety Grades, they will be publicly reported on the Hospital Safety Grade website.

# MEASURE & SCORING DESCRIPTIONS

## PROCESS/STRUCTURAL MEASURES

For Process/Structural Measures, a higher score is always better because these are measures of compliance with best practices in patient care.

### COMPUTERIZED PHYSICIAN ORDER ENTRY (CPOE)

The CPOE measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures a hospital's progress toward implementing a CPOE system to reduce medication ordering errors. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement," or "Unable to Calculate Score." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| **Achieved the Standard** | 100 |
| **Considerable Achievement** | 70 |
| **Some Achievement** | 40 |
| **Limited Achievement** | 15 |
| **Unable to Calculate Score** | Not Available (See Scoring Terms) |

For hospitals that did not submit a 2024 Leapfrog Hospital Survey by August 31, see Using Secondary Data Sources for more information on Leapfrog's imputation methodology.

## BAR CODE MEDICATION ADMINISTRATION (BCMA)

The BCMA measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures a hospital's progress toward 1) implementation of BCMA throughout the hospital, 2) compliance with patient and medication scans during administration, 3) use of decision support, and 4) structures to monitor and reduce workarounds. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement," or "Does Not Apply." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| **Achieved the Standard** | 100 |
| **Considerable Achievement** | 75 |
| **Some Achievement** | 50 |
| **Limited Achievement** | 25 |
| **Does Not Apply** | Not Available (See Scoring Terms) |

For hospitals that did not submit a 2024 Leapfrog Hospital Survey by August 31, see Using Secondary Data Sources for more information on Leapfrog's imputation methodology.

## ICU PHYSICIAN STAFFING (IPS)

The IPS measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures a hospital's use of intensivists in ICUs. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement," or "Does Not Apply." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| **Achieved the Standard** | 100 |
| **Considerable Achievement** | 50 |
| **Some Achievement** | 15 |
| **Limited Achievement** | 5 |
| **Does Not Apply** | Not Available (See Scoring Terms) |

For hospitals that did not submit a 2024 Leapfrog Hospital Survey by August 31, see Using Secondary Data Sources for detailed information on Leapfrog's imputation methodology.

## NATIONAL QUALITY FORUM (NQF) SAFE PRACTICES

Two (2) NQF Safe Practice measures are collected by The Leapfrog Group on the Leapfrog Hospital Survey. They measure a hospital's progress toward implementing endorsed processes and protocols to reduce and prevent adverse events. Through participation in the Leapfrog Hospital Survey, hospitals can earn up to 120 points for each Safe Practice. For the purposes of calculating the Safety Grade, individual scores for each Safe Practice are used:

| NQF Safe Practice | Possible Measure Score |
|---|---|
| **Safe Practice 1: Culture of Safety Leadership Structures and Systems** | 0 - 120 |
| **Safe Practice 2: Culture Measurement, Feedback and Intervention** | 0 - 120 |

There is no secondary data source for the NQF Safe Practices. Therefore, hospitals that did not submit a 2024 Leapfrog Hospital Survey by August 31 will not have these measures included in their Safety Grade and the measure will be reported as "Declined to Report." See Dealing with Missing Data for more information.

## TOTAL NURSING CARE HOURS PER PATIENT DAY

The Total Nursing Care Hours per Patient Day measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures the hospital's total number of productive hours worked by employee or contract nursing staff (i.e., RNs, LPNs, and UAPs) with direct patient care responsibilities per patient day across three unit types: medical, surgical, and med/surg. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement," or "Does Not Apply." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| **Achieved the Standard** | 100 |
| **Considerable Achievement** | 70 |
| **Some Achievement** | 40 |
| **Limited Achievement** | 15 |
| **Does Not Apply** | Not Available (See Scoring Terms) |

There is no secondary data source for the Total Nursing Care Hours per Patient Day measure. Therefore, hospitals that did not submit a 2024 Leapfrog Hospital Survey by August 31 will not have this measure included in their Safety Grade and the measure will be reported as "Declined to Report." See Dealing with Missing Data for more information.

## HAND HYGIENE

The Hand Hygiene measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures processes and protocols that hospitals have in place regarding monitoring hand hygiene practices, fostering a culture of good hand hygiene, offering training and education, and providing equipment. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| **Achieved the Standard** | 100 |
| **Considerable Achievement** | 70 |
| **Some Achievement** | 40 |
| **Limited Achievement** | 15 |

For hospitals that did not submit a 2024 Leapfrog Hospital Survey by August 31, see Using Secondary Data Sources for detailed information on Leapfrog's imputation methodology.

## HOSPITAL CONSUMER ASSESSMENT OF HEALTHCARE PROVIDERS AND SYSTEMS (HCAHPS) COMPOSITES

The Hospital HCAHPS survey responses are collected by CMS via the Inpatient Quality Reporting Program. Linear mean scores calculated by CMS incorporate the full range of survey response categories into a single metric for each HCAHPS composite. Five of the six composites are used in the Safety Grade. For the purposes of calculating the Safety Grade, a hospital's linear mean score for each of the five composites is used:

| HCAHP Composite | Possible Measure Score |
|---|---|
| **H-COMP-1: Nurse Communication** | 0 - 100 |
| **H-COMP-2: Doctor Communication** | 0 - 100 |
| **H-COMP-3: Staff Responsiveness** | 0 - 100 |
| **H-COMP-5: Communication about Medicines** | 0 - 100 |
| **H-COMP-6: Discharge Information** | 0 - 100 |

## OUTCOME MEASURES

For Outcome Measures, a lower score is always better because these are measures of harm experienced by patients (e.g., central line-associated blood stream infections).

### HOSPITAL-ACQUIRED CONDITIONS

Three hospital-acquired condition measures are calculated by CMS through the DRA HAC Reporting Program: Foreign Object Retained after Surgery, Air Embolism, and Falls and Trauma. Hospital-acquired condition rates are calculated by CMS based on Part A Medicare Fee-for-service (FFS) claims and publicly reported as a rate per 1,000 Part A Medicare FFS discharges. No age restrictions are applied. For the purposes of calculating the Safety Grade, the rate is used. More information is available in the DRA HAC methodology.

### HEALTHCARE-ASSOCIATED INFECTIONS

Five healthcare-associated infection measures are collected by The Leapfrog Group on the Leapfrog Hospital Survey: Central line-associated bloodstream infections (CLABSI) in ICUs and select wards, Catheter-associated urinary tract infections (CAUTI) in ICUs and select wards, Surgical site infections from colon surgery (SSI: Colon), Facility-wide inpatient MRSA Blood Laboratory-identified Events, and Facility-wide inpatient C.diff. Laboratory-identified Events. Through participation in the Leapfrog Hospital Survey, hospitals were required to 1) join Leapfrog's NHSN group, 2) provide an accurate NHSN ID in the Profile section of the Online Survey Tool, and 3) submit a Survey by August 31. For the purposes of calculating the Safety Grade, the standardized infection ratio (SIR) is used:

| As Reported by Leapfrog | Measure Score | Notes |
|---|---|---|
| **Standardized Infection Ratio (SIR)** | SIR | Measure is **included** in calculating the Safety Grade |
| **Does Not Apply** | Not Available (See Scoring Terms) | Measure is **not included** in calculating the Safety Grade. No use of Secondary Data. |
| **Unable to Calculate Score** | Not Available (See Scoring Terms) | Measure is **not included** in calculating the Safety Grade. No use of Secondary Data. |
| **Declined to Respond** | See Using Secondary Data | Secondary Data source is used. |

For hospitals that did not join Leapfrog's NHSN group, provide an accurate NHSN ID, or submit a 2024 Leapfrog Hospital Survey by August 31, see Using Secondary Data Sources for more information on Leapfrog's use of CMS data.

## AHRQ PATIENT SAFETY INDICATORS (PSI)

Two AHRQ Patient Safety Indicators are calculated by CMS through the Inpatient Quality Reporting Program and the HAC Reduction Program: PSI 4 Death Rate among Surgical Inpatients with Serious Treatable Conditions and PSI 90 Patient Safety and Adverse Events Composite. PSI rates are calculated by CMS based on Medicare Fee-for-Service claims and publicly reported as a rate per 1,000 inpatient discharges. CMS only includes claims from patients 18 years or older. For the purpose of calculating the Safety Grade, the smoothed rate is used for both measures. More information on calculating PSIs is available on the Patient Safety Indicators (PSI) 2024 Resources website.

Note: CMS calculates PSI 90 using the ten (10) component PSIs that are listed in the PSI 90 Components table above. While scores for each of the 10 component PSIs are NOT used to calculate fall 2024 Hospital Safety Grades, they will be publicly reported on the Hospital Safety Grade website. Additional information about the PSI 90 measure and how it is calculated by CMS can be found here.

## USING SECONDARY DATA SOURCES

Twelve (12) of the 22 measures included in the Safety Grade are derived from the Leapfrog Hospital Survey. The Leapfrog Hospital Survey is voluntary, and as such, hospitals may choose not to submit a Survey. To address this gap in available data, the Safety Grade methodology utilizes secondary data when available. For information on how to complete a free Leapfrog Hospital Survey, visit www.leapfroggroup.org/survey.

## IMPUTATION METHOD FOR CPOE, BCMA, IPS, AND HAND HYGIENE

Leapfrog has worked closely with statisticians at Mathematica, Leapfrog's National Expert Panel, and our scientific partners at Johns Hopkins Armstrong Institute for Patient Safety and Quality to develop a new two-step imputation approach for determining scores for CPOE, BCMA, IPS, and Hand Hygiene if they are missing from our publicly reported Survey Results.

### STEP 1: USE A HOSPITAL'S MOST RECENT SCORE ON THE MEASURE (APPLIES TO CPOE, IPS, AND HAND HYGIENE ONLY)

If the hospital had a score assigned by Leapfrog in the previous two rounds of grades (i.e., spring 2024, fall 2023), excluding imputed scores, the hospital is assigned the most recent score on that measure in the current Hospital Safety Grade (i.e., fall 2024).

### STEP 2: USE IMPUTATION POINT ASSIGNMENT (APPLIES TO CPOE, BCMA, IPS AND HAND HYGIENE)

If the hospital does not have historical data from the last two rounds (i.e., spring 2024, fall 2023) of the Safety Grade, the hospital is assigned a point value that is equivalent to receiving "Limited Achievement" for this measure on the Leapfrog Hospital Survey:

| Measure | Leapfrog Hospital Survey Performance Category | Corresponding Safety Grade Measure Score |
|---|---|---|
| **CPOE** | Limited Achievement | 15 |
| **BCMA** | Limited Achievement | 25 |
| **IPS** | Limited Achievement | 5 |
| **Hand Hygiene** | Limited Achievement | 15 |

Note about IPS: Only hospitals that operate an adult or pediatric medical and/or surgical ICU or neuro ICU are eligible for Step 2 Imputation of the IPS measure. A hospital's ICU designation (i.e., operating a medical ICU, surgical ICU, or pediatric ICU) is determined from the number of medical, surgical and/or pediatric ICU beds reported in Worksheet S-3 Part 1 of the hospital's most recent CMS Cost Report. If your hospital does not operate an ICU, but shares a CMS Certification Number with a hospital that does, please contact the Help Desk immediately if an IPS score was imputed.

## CMS DATA FOR HAIS

CMS is **the secondary data** source for healthcare-associated infections. For the purposes of calculating the Safety Grade, the standardized infection ratio (SIR) published by CMS is used:

Hospitals That Did Not Join Leapfrog's NHSN Group and Submit Section 7: Managing Serious Errors of the 2024 Leapfrog Hospital Survey by August 31

| As Reported by CMS | Measure Score | Notes |
|---|---|---|
| **Not Available (no locations or low volume)** | Not Available (See Scoring Terms) | Measure is **not included** in calculating the Leapfrog Hospital Safety Grade. |
| **Standard Infection Ratio (SIR)** | SIR | Measure is **included** in calculating the Leapfrog Hospital Safety Grade. |

If a hospital does not have available data from the Leapfrog Hospital Survey or CMS (e.g., no locations or low volume), the hospital is reported as "Not Available." See Dealing with Missing Data for more information.

# SCORING METHODOLOGY

## WEIGHTING INDIVIDUAL MEASURES

Each measure included in the Leapfrog Hospital Safety Grade is assigned a standard weight. The methodology to assign standard weights includes four criteria: (1) Impact, (2) Evidence, (3) Opportunity, and (4) Number of Component Measures. These four criteria are then combined using the equation below, which results in a standard weight for each measure that represents the measure's relative importance within the Hospital Safety Grade.

**[Evidence + (Impact x Opportunity x Number of Component Measures)]**

### EVIDENCE

The Evidence Score for each individual measure is assigned a value of one (1) or two (2) using the following criteria:

- 1 = Supported by either suggestive clinical or epidemiological studies or theoretical rationale
- 2 = Supported by experimental, clinical, or epidemiological studies and strong theoretical rationale

### OPPORTUNITY

The Opportunity Score for each individual measure is based on the Coefficient of Variation (Standard Deviation/Mean) of that measure, using the following formula: **[1 + (Standard Deviation/Mean)]**. The Opportunity Score is on a continuous scale that is capped at three (3). Any measure with an Opportunity Score above three (3) is assigned a three (3).

### IMPACT

The Impact Score for each individual measure is comprised of two (2) parts, each of which is assigned a value from one (1) to three (3):

1. Number of patients affected
2. Severity of harm

The *number of patients affected* score is determined by the following:

- 0 = Extremely rare event (e.g., Air Embolism)
- 1 = Rare event (e.g., Foreign Object Retained After Surgery)

- 2 = Some patients in hospital affected (e.g., ICU Physician Staffing)
- 3 = All patients in hospital affected (e.g., Hand Hygiene)

The *severity of harm* score is determined by the following:

- 1 = No direct evidence of harm or harm reduction (e.g., Patient Experience)
- 2 = Clear documentation of harm or harm reduction; adverse events (e.g., Foreign Object Retained After Surgery)
- 3 = Significant mortality reduction (more than 1,000 deaths or a 10% reduction in hospital wide mortality) (e.g., ICU Physician Staffing)

The values from each part are then added together to arrive at the overall Impact Score using the following criteria:

- 1 = Score of 2 (Low Impact) (e.g., Air Embolism)
- 2 = Score of 3-4 (Medium Impact) (e.g., Patient Experience)
- 3 = Score of 5-6 (High Impact) (e.g., ICU Physician Staffing)

## NUMBER OF COMPONENT MEASURES

The number of component measures refers to how many measures are included within the measure. For PSI 90, the number of component measures is 10 (PSI 3, PSI 6, PSI 8, PSI 9, PSI 10, PSI 11, PSI 12, PSI 13, PSI 14, and PSI 15). For all other measures included in the Hospital Safety Grade, the number of component measures within the measure is one (1).

LEAPFROG HOSPITAL SAFETY GRADE

## STANDARD MEASURE WEIGHTS

| Measure | Evidence Score | Opportunity Score | Impact Score | Number of Component Measures | Standard Measure Weight |
|---|---|---|---|---|---|
| **Process/Structural Measure Domain (50%)** | | | | | |
| CPOE | 2 | 1.44 | 3 | 1 | 6.2% |
| BCMA | 2 | 1.39 | 3 | 1 | 6.0% |
| IPS | 2 | 1.68 | 3 | 1 | 6.9% |
| SP 1 | 1 | 1.06 | 2 | 1 | 3.0% |
| SP 2 | 1 | 1.13 | 2 | 1 | 3.2% |
| Total Nursing Care Hours per Patient Day | 2 | 1.42 | 2 | 1 | 4.7% |
| Hand Hygiene | 2 | 1.51 | 2 | 1 | 4.9% |
| H-COMP-1 | 1 | 1.03 | 2 | 1 | 3.0% |
| H-COMP-2 | 1 | 1.03 | 2 | 1 | 3.0% |
| H-COMP-3 | 1 | 1.05 | 2 | 1 | 3.0% |
| H-COMP-5 | 1 | 1.06 | 2 | 1 | 3.0% |
| H-COMP-6 | 1 | 1.04 | 2 | 1 | 3.0% |
| **Outcome Measure Domain (50%)** | | | | | |
| Foreign Object Retained | 1 | 3.00 | 2 | 1 | 4.2% |
| Air Embolism | 1 | 3.00 | 1 | 1 | 2.4% |
| Falls and Trauma | 2 | 2.05 | 3 | 1 | 4.9% |
| CLABSI | 2 | 1.82 | 3 | 1 | 4.5% |
| CAUTI | 2 | 1.88 | 3 | 1 | 4.6% |
| SSI: Colon | 2 | 1.85 | 2 | 1 | 3.4% |
| MRSA | 2 | 1.79 | 3 | 1 | 4.5% |
| C. Diff. | 2 | 1.79 | 3 | 1 | 4.5% |
| PSI 4 | 1 | 1.13 | 2 | 1 | 2.0% |
| PSI 90 | 1 | 1.19 | 2 | 10 | 15.0% |

## CALCULATING Z-SCORES

Z-Scores are used to standardize data from measures with different performance scales and allow for comparisons (e.g., a linear mean score of 90 on H-COMP-1: Nurse Communication and a CLABSI SIR of 0.870). In addition, Z-Scores can indicate to a hospital whether their measure score is above, below, or equal to the average hospital.

In the Scoring Methodology, a Z-Score is calculated for each available measure score. A Z-Score is calculated using a hospital's actual measure score, the national mean for that measure, and the standard deviation for that measure. The Z-Score for each measure is calculated using the following formulas:

- **For Process/Structural Measures: [Hospital Score – Mean) / Standard Deviation]**
- **For Outcome Measures: [(Mean – Hospital Score) / Standard Deviation]**

The following table includes the national mean and standard deviation for each measure used to calculate a hospital's Z-Score. For display, means and standard deviations are displayed rounded to two or three decimal places. For scoring, these values are not rounded.

| Process and Structural Measures | Mean | Standard Deviation |
|---|---|---|
| CPOE | 79.04 | 34.62 |
| BMCA | 80.51 | 31.02 |
| IPS | 64.45 | 43.96 |
| SP 1 | 117.40 | 6.66 |
| SP 2 | 116.60 | 15.20 |
| Total Nursing Care Hours per Patient Day | 76.10 | 31.78 |
| Hand Hygiene | 72.43 | 36.61 |
| H-COMP-1 | 90.04 | 2.56 |
| H-COMP-2 | 89.80 | 2.48 |
| H-COMP-3 | 81.48 | 4.41 |
| H-COMP-5 | 74.33 | 4.16 |
| H-COMP-6 | 85.14 | 3.78 |

| Outcome Measures | Mean | Standard Deviation |
|---|---|---|
| Foreign Object Retained | 0.014 | 0.050 |
| Air Embolism | 0.002 | 0.055 |
| Falls and Trauma | 0.385 | 0.404 |
| CLABSI | 0.687 | 0.566 |
| CAUTI | 0.577 | 0.505 |
| SSI: Colon | 0.852 | 0.722 |
| MRSA | 0.746 | 0.588 |
| C. Diff. | 0.418 | 0.330 |
| PSI 4 | 168.34 | 21.85 |
| PSI 90 | 1.01 | 0.19 |

## A NOTE ABOUT EXTREME VALUES

For hospitals that have an "extreme" value for a particular measure (i.e., a value that exceeds the 99th percentile) Leapfrog "trims" the reported value to the 99th percentile. For example, a rate of 0.500 per 1,000 patient discharges for Foreign Object Retained after Surgery is "trimmed" to 0.327 (e.g., the 99th percentile). Only "trimmed" rates are displayed on the Leapfrog Hospital Safety Grade website. The table below includes the "trim" values for the fall 2024 Leapfrog Hospital Safety Grade. The PSI 90 measure score represents an observed to expected ratio that has already been risk adjusted at both the component PSI level and at the composite level; therefore, the measure is not "trimmed" by Leapfrog.

| Measure | 99th Percentile |
|---|---|
| **Foreign Object Retained** | 0.327 |
| **Air Embolism** | 2.890 |
| **Falls and Trauma** | 1.942 |
| **CLABSI** | 2.534 |
| **CAUTI** | 2.550 |
| **SSI: Colon** | 3.534 |
| **MRSA** | 2.696 |
| **C. Diff.** | 1.699 |
| **PSI 4** | 222.68 |

Note: Percentiles are rounded to reflect the precision of the raw data.

## DEALING WITH MISSING DATA

Due to a variety of reasons, a hospital may not have a measure score for all 22 measures. If a hospital is missing a measure score for any measure (except PSI 90; hospitals missing PSI 90 are not graded), the standard weight of that measure is redistributed to the other measures in the same measure domain. The new weight for each measure within the domain is calculated by re-apportioning the standard weight assigned to the measure with the missing score to other measures within the same domain. For example, if a hospital is missing a measure score for ICU Physician Staffing because the hospital does not operate an adult or pediatric medical and/or surgical ICU, the standard weight of 6.9% will be re-apportioned to the remaining 11 measures within the process/structural measure domain.

To calculate the new weight of each of the remaining 11 measures in the process/structural measure domain, hospitals can use the formula below or use the Leapfrog Hospital Safety Grade Calculator©, which can be found on the Safety Grade Review Website. Note that each domain contributes to 50% of the overall letter grade.

***[Standard measure weight / (sum of standard weights for the remaining 11 measures in the process/structural measure domain)]*50% = updated measure weight***

For more information about how the measure weight redistribution is calculated and affects the overall score, please see the Leapfrog Hospital Safety Grade Calculator, which can be found on the last page of the Safety Grade Review Website.

## CALCULATING WEIGHTED MEASURE SCORES

To calculate a hospital's numerical safety score, multiply the Z-Score of each process/structural measure by the standard weight assigned to that measure to get the weighted process/structural measure score. If a hospital is missing any process/structural measure scores, see Dealing with Missing Data to determine the updated measure weight. Then, sum all weighted process/structural measure scores. This is the hospital's overall weighted process/structural measures score.

Multiply the Z-Score of each outcome measure by the standard weight assigned to that measure to get the weighted outcome measure score. If a hospital is missing any outcome measure scores, see Dealing with Missing Data to determine the updated measure weight. Then, sum all weighted outcome measure scores. This is the hospital's overall weighted outcome measures score.

To calculate the overall Safety Grade for a hospital, add the overall weighted process/structural measures score and the overall weighted outcome measures score. Add 3.0 to your score; this is done to normalize scores to a positive distribution. This final numerical score (typically between 1.0 and 4.0) is then assigned to a letter grade. To assist hospitals in calculating their numerical score, a calculator is available on the Safety Grade Review Website. Letter grade cut-points are published during the Letter Grade Embargo Period.

## ADDITIONAL SCORING INFORMATION

### TERMS USED IN SCORING AND PUBLIC REPORTING

**"Not Available"** means that the hospital does not have a score for this measure. This could be because the measure is related to a service the hospital does not provide or because the hospital had too few patients or cases to report data for a condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

In the case of healthcare-associated infections, a SIR is reported as "Not Available" if one of the following applies:

- The number of predicted infections is less than 1.
- The number of observed infections present on admission (community-onset prevalence) was above a pre-determined cut-point.

For more information about NHSN's SIR models, please visit https://www.cdc.gov/nhsn/pdfs/ps-analysis-resources/nhsn-sir-guide.pdf.

**"Declined to Report"** means that a hospital did not voluntarily provide information to the Leapfrog Hospital Survey. Measures scored as "Declined to Report" will not be used in calculating the overall score (see Dealing with Missing Data).

### SHARED CMS CERTIFICATION NUMBERS

All hospitals that share a CMS Certification Number (CCN) will be assigned the same source data as reported by CMS. Affected measures include the HCAHPS, Hospital-Acquired Conditions, Healthcare-Associated Infections (if secondary data source is used), and Patient Safety Indicators.

LEAPFROG HOSPITAL SAFETY GRADE

## UPDATES TO DATA USED IN THE LEAPFROG HOSPITAL SAFETY GRADE

The Leapfrog Hospital Safety Grade relies on publicly available data that hospitals have had the opportunity to review for accuracy. Therefore, Leapfrog does not allow hospitals to make updates to their data following the Data Snapshot Date. In January of each year, Leapfrog publishes the Data Snapshot Dates for each of the two Leapfrog Hospital Safety Grade public releases at https://www.hospitalsafetygrade.org/for-hospitals/key-dates-and-information. Leapfrog publishes these dates to give hospitals and other stakeholders advance notice so they can be prepared to submit a Leapfrog Hospital Survey and monitor their performance on CMS measures used in the Safety Grade.

In addition, Leapfrog holds a Courtesy Review Period to give hospitals an additional opportunity to review the data that will be used to calculate their hospital's Safety Grade. The Review Period is an opportunity for hospitals to review the data for accuracy (i.e., identify recording errors, hospital name and address changes, etc.) on a secure website and review changes to the scoring algorithm.

### DATA FROM THE LEAPFROG HOSPITAL SURVEY

During the Safety Grade Review Period (September 25 – October 15), Leapfrog will only make corrections to a hospital's data from the 2024 Leapfrog Hospital Survey if a recording error is identified (i.e., we have recorded a different measure score than what is posted on our Survey Results website) or a scoring error is identified (i.e., Leapfrog has calculated an incorrect measure score based on the submitted responses and Leapfrog's published scoring algorithms). Updates to Leapfrog Hospital Survey data that are submitted after the Data Snapshot Date will **not** be included in the current Leapfrog Hospital Safety Grade. Hospitals submitting a Leapfrog Hospital Survey are urged to take advantage of the opportunity to review their Survey Results for accuracy and completeness prior to each of the two published Data Snapshot Dates.

### HOW HOSPITALS CAN REVIEW LEAPFROG HOSPITAL SURVEY RESULTS PRIOR TO THE DATA SNAPSHOT DATE

The Leapfrog Hospital Survey is open from April 1 to November 30 of each year. Following the Submission Deadline (June 30), Survey Results are published monthly on a secure 'Hospital Details' page and a public website (ratings.leapfroggroup.org). Hospitals are urged to review their Survey Results immediately. Hospitals that identify any reporting errors are instructed to log back into the Survey to submit a correction. Hospitals can correct and re-submit a previously submitted Survey until the Survey closes for the year. Note that corrections submitted after the Data Snapshot Date (August 31 for the fall Safety Grade and January 31 for the spring Safety Grade) are not included in the current Leapfrog Hospital Safety Grade. Leapfrog has several automated processes in place to prevent hospitals from making data entry errors in the Online Survey Tool and to enhance the overall accuracy of the Survey Results. Learn more at http://www.leapfroggroup.org/survey-materials/data-accuracy.

## DATA FROM THE CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS)

During the Safety Grade Review Period (September 25 – October 15), Leapfrog will only make corrections to a hospital's data from CMS if the correction is issued by CMS and posted to the Data.CMS.Gov website. If a hospital has identified an error with a measure score published by CMS, and CMS cannot post a correction within the review period, the measure score will not be used in calculating the hospital's Safety Grade, provided that the hospital can document that CMS has agreed to publicly issue a correction or remove the measure score from public reporting. Hospitals participating with CMS are urged to take advantage of the opportunity to participate in the CMS 30-day review periods.

### CMS FOOTNOTE 23 POLICY

Leapfrog will notify hospitals that have CMS footnote 23 present for one or more claims-based measure scores (e.g., DRA HAC Rate, PSI 4 rate, or PSI 90 rate) at the start of the Courtesy Review Period. Footnote 23 indicates that "The data are based on claims that the hospital or facility submitted to CMS. The hospital or facility has reported discrepancies in their claims data." Hospital CEOs can request that Leapfrog use the measure score that is accompanied by the footnote. Written requests must be received prior to the close of the Safety Grade Review Period. If written requests are not received by the close of the Review Period, the measure will not be used to calculate the Hospital Safety Grade.

For hospitals that submit a Leapfrog Hospital Survey by the Data Snapshot Date, the CEO, Primary Survey Contact, and Secondary Survey Contact will be notified at the email addresses included in the Hospital's Survey Profile. For hospitals that do not submit a Leapfrog Hospital Survey by the Data Snapshot Date, the CEO will be contacted by certified letter.

### HOW HOSPITALS CAN REVIEW CMS DATA PRIOR TO THE DATA SNAPSHOT DATE

CMS administers several hospital-based reporting and payment programs including the Inpatient Quality Reporting Program, HAC Reduction Program, and Value-based Purchasing Program. Several measures collected and calculated by CMS via its various hospital-based programs are used in the Leapfrog Hospital Safety Grade. CMS provides hospitals with a 30-day preview period before publishing measure scores on the Data.Medicare.Gov website and the Data.CMS.Gov website. More information is available at https://qualitynet.org.

## HOW TO PARTICIPATE IN THE LEAPFROG HOSPITAL SURVEY

If a hospital did **not** complete a 2024 Leapfrog Hospital Survey by August 31, Survey Results were not used to calculate the fall 2024 Leapfrog Hospital Safety Grade. Hospitals that would like Survey Results included in the spring 2025 Hospital Safety Grade must submit a 2024 Leapfrog Hospital Survey (including the CPOE Evaluation) by November 30, 2024. Hospitals will be able to review their publicly reported Survey Results in December and respond to any issues identified by Leapfrog's Extensive Monthly Data Verification before the Data Snapshot Date for the spring 2025 Safety Grade of January 31. More information is available at https://leapfroggroup.org/survey.

## LEAPFROG HELP DESK

If you have any questions regarding the scoring methodology, please contact the Help Desk at https://leapfroghelpdesk.zendesk.com.

LEAPFROG
# HOSPITAL
SAFETY GRADE

# Scoring Methodology

SPRING 2025 SAFETY GRADE

©The Leapfrog Group
4/21/2025

JX-041.1

EXHIBIT
BAILEY
2
cn 9/10/25
PENGAD 800-631-6989



LEAPFROG00217511
LEAPFROG00217511

LEAPFROG HOSPITAL SAFETY GRADE

CONTENTS

What is the Hospital Safety Grade? ... 3
Eligible Hospitals ... 3
Measures ... 4
Measure & Scoring Descriptions ... 9
Process/Structural Measures ... 9
- Computerized Physician Order Entry (CPOE) ... 9
- Bar Code Medication Administration (BCMA) ... 9
- ICU Physician Staffing (IPS) ... 10
- National Quality Forum (NQF) Safe Practices ... 11
- Total Nursing Care Hours per Patient Day ... 11
- Hand Hygiene ... 12
- Hospital Consumer Assessment of Healthcare Providers and Systems (HCAHPS) Composites ... 12

Outcome Measures ... 13
- Hospital-Acquired Conditions ... 13
- Healthcare-Associated Infections ... 13
- AHRQ Patient Safety Indicators (PSI) ... 14

Using Secondary Data Sources ... 15
Imputation Method for CPOE, BCMA, IPS, and Hand Hygiene ... 15
- Step 1: Use a Hospital's Most Recent Score on the Measure (Applies to CPOE, IPS, and Hand Hygiene Only) ... 15
- Step 2: Use Imputation Point Assignment (Applies to CPOE, BCMA, IPS and Hand Hygiene) ... 16
- CMS Data For HAIs ... 17

Scoring Methodology ... 18
Weighting Individual Measures ... 18
- Evidence ... 18
- Opportunity ... 18
- Impact ... 18

Number of Component Measures ........ 19
Standard Measure Weights ........ 20
Calculating Z-Scores ........ 21
A Note About Extreme Values ........ 23
Dealing With Missing Data ........ 23
Calculating Weighted Measure Scores ........ 24
Additional Scoring Information ........ 25
Terms Used in Scoring and Public Reporting ........ 25
Shared CMS Certification Numbers ........ 25
Updates to Data Used in the Leapfrog Hospital Safety Grade ........ 26
Data From the Leapfrog Hospital Survey ........ 26
How Hospitals Can Review Leapfrog Hospital Survey Results Prior to the Data Snapshot Date ........ 26
Data From the Centers for Medicare & Medicaid Services (CMS) ........ 27
CMS Footnote 23 Policy ........ 27
How Hospitals Can Review CMS Data Prior to the Data Snapshot Date ........ 27
How to Participate in the Leapfrog Hospital Survey ........ 28
Leapfrog Help Desk ........ 28

LEAPFROG HOSPITAL SAFETY GRADE

## WHAT IS THE HOSPITAL SAFETY GRADE?

Leapfrog Hospital Safety Grades are assigned to nearly 3,000 general acute-care hospitals across the nation twice annually. The Safety Grade uses up to 22 national patient safety measures from the Centers for Medicare & Medicaid Services (CMS) and the Leapfrog Hospital Survey, and information from other supplemental data sources, to produce a single letter grade representing a hospital's overall performance in keeping patients safe from preventable harm and medical errors. The Safety Grade methodology has been peer reviewed and published in the Journal of Patient Safety.[1]

With the Safety Grade, The Leapfrog Group aims to educate and encourage consumers to consider safety when selecting a hospital for themselves or their families. In addition, we believe the Safety Grade will foster strong market incentives for hospitals to make safety a priority. Safety Grades are publicly reported at www.HospitalSafetyGrade.org.

### ELIGIBLE HOSPITALS

Due to the limited availability of public data, Leapfrog is not able to calculate a Safety Grade for every hospital in the U.S., including the following types of hospitals:

- Critical access hospitals (CAH)
- Rural emergency hospitals (REH)
- Long-term care and rehabilitation facilities
- Mental health facilities
- Federal hospitals (e.g., Veterans Affairs, Indian Health Services, etc.)
- Some specialty hospitals, such as surgery centers and cancer hospitals
- Free-standing pediatric hospitals
- Hospitals in U.S. territories
- Hospitals that are missing scores for **more than six** (6) process/structural measures, or **more than five** (5) outcome measures, or **missing PSI 90**

[1] The Leapfrog Hospital Safety Grade uses the below-described data and reflects expert opinion as to the relative importance of each category.

LEAPFROG HOSPITAL SAFETY GRADE

## MEASURES

The Safety Grade utilizes up to 22 national patient safety measures from the Centers for Medicare & Medicaid Services (CMS) and the Leapfrog Hospital Survey, and information from other supplemental data sources.

The measure set is divided into two domains: (1) Process/Structural Measures and (2) Outcome Measures. Each domain represents 50% of the Safety Grade. The following table lists the 22 measures included in the Safety Grade, as well as the data source and reporting period for each measure. In some cases where a hospital's information is not available for a certain measure, Leapfrog uses a secondary data source (as indicated in the table). In cases where a hospital's information is not available from any data source, Leapfrog has outlined a methodology for dealing with the missing data.

**PROCESS/STRUCTURAL MEASURES (12)**

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| **Computerized Physician Order Entry (CPOE)** | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied* | N/A |
| **Bar Code Medication Administration (BCMA)** | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied* | N/A |
| **ICU Physician Staffing (IPS)** | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied* | N/A |
| **Safe Practice 1: Culture of Leadership Structures and Systems** | 2024 Leapfrog Hospital Survey | 2024 | N/A | N/A |
| **Safe Practice 2: Culture Measurement, Feedback & Intervention** | 2024 Leapfrog Hospital Survey | 2024 | N/A | N/A |

LEAPFROG
HOSPITAL
SAFETY GRADE

PROCESS/STRUCTURAL MEASURES (12)

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| **Total Nursing Care Hours per Patient Day** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 or 07/01/2023 - 06/30/2024 | N/A | N/A |
| **Hand Hygiene** | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied* | N/A |
| **H-COMP-1: Nurse Communication** | CMS | 01/01/2023 - 12/31/2023 | N/A | N/A |
| **H-COMP-2: Doctor Communication** | CMS | 01/01/2023 - 12/31/2023 | N/A | N/A |
| **H-COMP-3: Staff Responsiveness** | CMS | 01/01/2023 - 12/31/2023 | N/A | N/A |
| **H-COMP-5: Communication about Medicines** | CMS | 01/01/2023 - 12/31/2023 | N/A | N/A |
| **H-COMP-6: Discharge Information** | CMS | 01/01/2023 - 12/31/2023 | N/A | N/A |

*See Leapfrog's Imputation Method for CPOE, BCMA, IPS and Hand Hygiene for more information on the imputation methodology used for hospitals that did not submit a Leapfrog Hospital Survey by November 30, 2024.

LEAPFROG
HOSPITAL
SAFETY GRADE

OUTCOME MEASURES (10)

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| **Foreign Object Retained** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **Air Embolism** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **Falls and Trauma** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **CLABSI** | 2024 Leapfrog Hospital Survey | 07/01/2023 - 06/30/2024 | CMS | 01/01/2023 - 12/31/2023 |
| **CAUTI** | 2024 Leapfrog Hospital Survey | 07/01/2023 - 06/30/2024 | CMS | 01/01/2023 - 12/31/2023 |
| **SSI: Colon** | 2024 Leapfrog Hospital Survey | 07/01/2023 - 06/30/2024 | CMS | 01/01/2023 - 12/31/2023 |
| **MRSA** | 2024 Leapfrog Hospital Survey | 07/01/2023 - 06/30/2024 | CMS | 01/01/2023 - 12/31/2023 |
| **C. Diff.** | 2024 Leapfrog Hospital Survey | 07/01/2023 - 06/30/2024 | CMS | 01/01/2023 - 12/31/2023 |

LEAPFROG
HOSPITAL
SAFETY GRADE

| OUTCOME MEASURES (10) | | | | |
|---|---|---|---|---|
| PSI 4: Death rate among surgical inpatients with serious treatable complications | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **Measure Name** | **Primary Data Source** | **Reporting Period** | **Secondary Data Source** | **Reporting Period** |
| CMS Medicare PSI 90: Patient safety and adverse events composite* | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |

* CMS calculates PSI 90 using the ten (10) component PSIs. While scores for each of the 10 component PSIs are not used to calculate spring 2025 Hospital Safety Grades, they will be publicly reported on the Hospital Safety Grade website.

****COMPONENT PSIs (SCORES NOT USED TO CALCULATE THE HOSPITAL SAFETY GRADE)**

| Component PSI | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| **PSI 3: Pressure ulcer rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **PSI 6: Iatrogenic pneumothorax rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **PSI 8: In-hospital fall with hip fracture rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **PSI 9: Postoperative hemorrhage or hematoma rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **PSI 10: Postoperative acute kidney injury requiring dialysis rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **PSI 11: Postoperative respiratory failure rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **PSI 12: Perioperative pulmonary embolism or deep vein thrombosis rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **PSI 13: Postoperative sepsis rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **PSI 14: Postoperative wound dehiscence rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **PSI 15: Abdominopelvic accidental puncture or laceration rate** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |

Note: CMS calculates PSI 90 using the ten (10) component PSIs listed above. While scores for each of the 10 component PSIs are not used to calculate spring 2025 Hospital Safety Grades, they will be publicly reported on the Hospital Safety Grade website.

## MEASURE & SCORING DESCRIPTIONS

### PROCESS/STRUCTURAL MEASURES

For Process/Structural Measures, a higher score is always better because these are measures of compliance with best practices in patient care.

### COMPUTERIZED PHYSICIAN ORDER ENTRY (CPOE)

The CPOE measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures a hospital's progress toward implementing a CPOE system to reduce medication ordering errors. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement," or "Unable to Calculate Score." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| Achieved the Standard | 100 |
| Considerable Achievement | 70 |
| Some Achievement | 40 |
| Limited Achievement | 15 |
| Unable to Calculate Score | Not Available (See Scoring Terms) |

For hospitals that did not submit a 2024 Leapfrog Hospital Survey by November 30, see Using Secondary Data Sources for more information on Leapfrog's imputation methodology.

### BAR CODE MEDICATION ADMINISTRATION (BCMA)

The BCMA measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures a hospital's progress toward 1) implementation of BCMA throughout the hospital, 2) compliance with patient and medication scans during administration, 3) use of decision support, and 4) structures to monitor and reduce workarounds. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement," or "Does Not Apply." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| Achieved the Standard | 100 |
| Considerable Achievement | 75 |
| Some Achievement | 50 |
| Limited Achievement | 25 |
| Does Not Apply | Not Available (See Scoring Terms) |

For hospitals that did not submit a 2024 Leapfrog Hospital Survey by November 30, see Using Secondary Data Sources for more information on Leapfrog's imputation methodology.

## ICU PHYSICIAN STAFFING (IPS)

The IPS measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures a hospital's use of intensivists in ICUs. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement," or "Does Not Apply." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| Achieved the Standard | 100 |
| Considerable Achievement | 50 |
| Some Achievement | 15 |
| Limited Achievement | 5 |
| Does Not Apply | Not Available (See Scoring Terms) |

For hospitals that did not submit a 2024 Leapfrog Hospital Survey by November 30, see Using Secondary Data Sources for detailed information on Leapfrog's imputation methodology.

## NATIONAL QUALITY FORUM (NQF) SAFE PRACTICES

Two (2) NQF Safe Practice measures are collected by The Leapfrog Group on the Leapfrog Hospital Survey. They measure a hospital's progress toward implementing endorsed processes and protocols to reduce and prevent adverse events. Through participation in the Leapfrog Hospital Survey, hospitals can earn up to 120 points for each Safe Practice. For the purposes of calculating the Safety Grade, individual scores for each Safe Practice are used:

| NQF Safe Practice | Possible Measure Score |
|---|---|
| **Safe Practice 1: Culture of Safety Leadership Structures and Systems** | 0 - 120 |
| **Safe Practice 2: Culture Measurement, Feedback and Intervention** | 0 - 120 |

There is no secondary data source for the NQF Safe Practices. Therefore, hospitals that did not submit a 2024 Leapfrog Hospital Survey by November 30 will not have these measures included in their Safety Grade and the measure will be reported as "Declined to Report." See Dealing with Missing Data for more information.

## TOTAL NURSING CARE HOURS PER PATIENT DAY

The Total Nursing Care Hours per Patient Day measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures the hospital's total number of productive hours worked by employee or contract nursing staff (i.e., RNs, LPNs, and UAPs) with direct patient care responsibilities per patient day across three unit types: medical, surgical, and med/surg. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement," or "Does Not Apply." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| **Achieved the Standard** | 100 |
| **Considerable Achievement** | 70 |
| **Some Achievement** | 40 |
| **Limited Achievement** | 15 |
| **Does Not Apply** | Not Available (See Scoring Terms) |

There is no secondary data source for the Total Nursing Care Hours per Patient Day measure. Therefore, hospitals that did not submit a 2024 Leapfrog Hospital Survey by November 30 will not have these measures included in their Safety Grade and the measure will be reported as "Declined to Report." See Dealing with Missing Data for more information.

## HAND HYGIENE

The Hand Hygiene measure is collected by The Leapfrog Group on the Leapfrog Hospital Survey. It measures processes and protocols that hospitals have in place regarding monitoring hand hygiene practices, fostering a culture of good hand hygiene, offering training and education, and providing equipment. Through participation in the Leapfrog Hospital Survey, hospitals are placed in one of several performance categories: "Achieved the Standard," "Considerable Achievement," "Some Achievement," "Limited Achievement." For the purposes of calculating the Safety Grade, a numerical score is assigned to each performance category:

| Leapfrog Performance Category | Measure Score |
|---|---|
| Achieved the Standard | 100 |
| Considerable Achievement | 70 |
| Some Achievement | 40 |
| Limited Achievement | 15 |

For hospitals that did not submit a 2024 Leapfrog Hospital Survey by November 30, see Using Secondary Data Sources for detailed information on Leapfrog's imputation methodology.

## HOSPITAL CONSUMER ASSESSMENT OF HEALTHCARE PROVIDERS AND SYSTEMS (HCAHPS) COMPOSITES

The Hospital HCAHPS survey responses are collected by CMS via the Inpatient Quality Reporting Program. Linear mean scores calculated by CMS incorporate the full range of survey response categories into a single metric for each HCAHPS composite. Five of the six composites are used in the Safety Grade. For the purposes of calculating the Safety Grade, a hospital's linear mean score for each of the five composites is used:

| HCAHP Composite | Possible Measure Score |
|---|---|
| H-COMP-1: Nurse Communication | 0 - 100 |
| H-COMP-2: Doctor Communication | 0 - 100 |
| H-COMP-3: Staff Responsiveness | 0 - 100 |
| H-COMP-5: Communication about Medicines | 0 - 100 |
| H-COMP-6: Discharge Information | 0 - 100 |

LEAPFROG
HOSPITAL
SAFETY GRADE

## OUTCOME MEASURES

For Outcome Measures, a lower score is always better because these are measures of harm experienced by patients (e.g., central line-associated blood stream infections).

### HOSPITAL-ACQUIRED CONDITIONS

Three hospital-acquired condition measures are calculated by CMS through the DRA HAC Reporting Program: Foreign Object Retained after Surgery, Air Embolism, and Falls and Trauma. Hospital-acquired condition rates are calculated by CMS based on Part A Medicare Fee-for-service (FFS) claims and publicly reported as a rate per 1,000 Part A Medicare FFS discharges. No age restrictions are applied. For the purposes of calculating the Safety Grade, the rate is used. More information is available in the DRA HAC methodology.

### HEALTHCARE-ASSOCIATED INFECTIONS

Five healthcare-associated infection measures are collected by The Leapfrog Group on the Leapfrog Hospital Survey: Central line-associated bloodstream infections (CLABSI) in ICUs and select wards, Catheter-associated urinary tract infections (CAUTI) in ICUs and select wards, Surgical site infections from colon surgery (SSI: Colon), Facility-wide inpatient MRSA Blood Laboratory-identified Events, and Facility-wide inpatient C.diff. Laboratory-identified Events. Through participation in the Leapfrog Hospital Survey, hospitals were required to 1) join Leapfrog's NHSN group, 2) provide an accurate NHSN ID in the Profile section of the Online Survey Tool, and 3) submit a Survey by November 30. For the purposes of calculating the Safety Grade, the standardized infection ratio (SIR) is used:

| As Reported by Leapfrog | Measure Score | Notes |
|---|---|---|
| **Standardized Infection Ratio (SIR)** | SIR | Measure is **included** in calculating the Safety Grade |
| **Does Not Apply** | Not Available (See Scoring Terms) | Measure is **not included** in calculating the Safety Grade. No use of Secondary Data. |
| **Unable to Calculate Score** | Not Available (See Scoring Terms) | Measure is **not included** in calculating the Safety Grade. No use of Secondary Data. |
| **Declined to Respond** | See Using Secondary Data | Secondary Data source is used. |

LEAPFROG
HOSPITAL
SAFETY GRADE

For hospitals that did not join Leapfrog's NHSN group, provide an accurate NHSN ID, or submit a 2024 Leapfrog Hospital Survey by November 30, see Using Secondary Data Sources for more information on Leapfrog's use of CMS data.

## AHRQ PATIENT SAFETY INDICATORS (PSI)

Two AHRQ Patient Safety Indicators are calculated by CMS through the Inpatient Quality Reporting Program and the HAC Reduction Program: PSI 4 Death Rate among Surgical Inpatients with Serious Treatable Conditions and PSI 90 Patient Safety and Adverse Events Composite. PSI rates are calculated by CMS based on Medicare Fee-for-Service claims and publicly reported as a rate per 1,000 inpatient discharges. CMS only includes claims from patients 18 years or older. For the purpose of calculating the Safety Grade, the smoothed rate is used for both measures. More information on calculating PSIs is available on the Patient Safety Indicators (PSI) 2024 Resources website.

Note: CMS calculates PSI 90 using the ten (10) component PSIs that are listed in the PSI 90 Components table above. While scores for each of the 10 component PSIs are NOT used to calculate spring 2025 Hospital Safety Grades, they will be publicly reported on the Hospital Safety Grade website. Additional information about the PSI 90 measure and how it is calculated by CMS can be found here.

LEAPFROG
HOSPITAL
SAFETY GRADE

## USING SECONDARY DATA SOURCES

Twelve (12) of the 22 measures included in the Safety Grade are derived from the Leapfrog Hospital Survey. The Leapfrog Hospital Survey is voluntary, and as such, hospitals may choose not to submit a Survey. To address this gap in available data, the Safety Grade methodology utilizes secondary data when available. For information on how to complete a free Leapfrog Hospital Survey, visit www.leapfroggroup.org/survey.

### IMPUTATION METHOD FOR CPOE, BCMA, IPS, AND HAND HYGIENE

Leapfrog has worked closely with statisticians at Mathematica, Leapfrog's National Expert Panel, and our scientific partners at Johns Hopkins Medicine to develop a new two-step imputation approach for determining scores for CPOE, BCMA, IPS, and Hand Hygiene if they are missing from our publicly reported Survey Results.

#### STEP 1: USE A HOSPITAL'S MOST RECENT SCORE ON THE MEASURE (APPLIES TO CPOE, IPS, AND HAND HYGIENE ONLY)

If the hospital had a score assigned by Leapfrog in the previous two rounds of grades (i.e., fall 2024, spring 2024), excluding imputed scores, the hospital is assigned the most recent score on that measure in the current Hospital Safety Grade (i.e., spring 2025).

LEAPFROG
HOSPITAL
SAFETY GRADE

## STEP 2: USE IMPUTATION POINT ASSIGNMENT (APPLIES TO CPOE, BCMA, IPS AND HAND HYGIENE)

If the hospital does not have historical data from the last two rounds (i.e., fall 2024, spring 2024) of the Safety Grade, the hospital is assigned a point value that is equivalent to receiving "Limited Achievement" for this measure on the Leapfrog Hospital Survey.

Note about IPS: Only hospitals that operate an adult or pediatric medical and/or surgical ICU or neuro ICU are eligible for Step 2 Imputation of the IPS measure. A hospital's ICU designation (i.e., operating a medical ICU, surgical ICU, or pediatric ICU) is determined from the number of medical, surgical and/or pediatric ICU beds reported in Worksheet S-3 Part 1 of the hospital's most recent CMS Cost Report. If your hospital does not operate an ICU, but shares a CMS Certification Number with a hospital that does, please contact the Help Desk immediately if an IPS score was imputed.

Step 2 Imputation Point Assignments

| Measure | Leapfrog Hospital Survey Performance Category | Corresponding Safety Grade Measure Score |
|---|---|---|
| **CPOE** | Limited Achievement | 15 |
| **BCMA** | Limited Achievement | 25 |
| **IPS** | Limited Achievement | 5 |
| **Hand Hygiene** | Limited Achievement | 15 |

LEAPFROG
HOSPITAL
SAFETY GRADE

## CMS DATA FOR HAIS

CMS is **the secondary data** source for healthcare-associated infections. For the purposes of calculating the Safety Grade, the standardized infection ratio (SIR) published by CMS is used:

Hospitals That Did Not Join Leapfrog's NHSN Group and Submit Section 7: Managing Serious Errors of the 2024 Leapfrog Hospital Survey by November 30

| As Reported by CMS | Measure Score | Notes |
|---|---|---|
| **Not Available (no locations or low volume)** | Not Available (See Scoring Terms) | Measure is **not included** in calculating the Leapfrog Hospital Safety Grade. |
| **Standard Infection Ratio (SIR)** | SIR | Measure is **included** in calculating the Leapfrog Hospital Safety Grade. |

If a hospital does not have available data from the Leapfrog Hospital Survey or CMS (e.g., no locations or low volume), the hospital is reported as Not Available "Not Available." See Dealing with Missing Data for more information.

LEAPFROG
HOSPITAL
SAFETY GRADE

## SCORING METHODOLOGY

### WEIGHTING INDIVIDUAL MEASURES

Each measure included in the Leapfrog Hospital Safety Grade is assigned a standard weight. The methodology to assign standard weights includes four criteria: (1) Impact, (2) Evidence, (3) Opportunity, and (4) Number of Component Measures. These four criteria are then combined using the equation below, which results in a standard weight for each measure that represents the measure's relative importance within the Hospital Safety Grade.

**[Evidence + (Impact x Opportunity x Number of Component Measures)]**

### EVIDENCE

The Evidence Score for each individual measure is assigned a value of one (1) or two (2) using the following criteria:

- 1 = Supported by either suggestive clinical or epidemiological studies or theoretical rationale
- 2 = Supported by experimental, clinical, or epidemiological studies and strong theoretical rationale

### OPPORTUNITY

The Opportunity Score for each individual measure is based on the Coefficient of Variation (Standard Deviation/Mean) of that measure, using the following formula: **[1 + (Standard Deviation/Mean)]**. The Opportunity Score is on a continuous scale that is capped at three (3). Any measure with an Opportunity Score above three (3) is assigned a three (3).

### IMPACT

The Impact Score for each individual measure is comprised of two (2) parts, each of which is assigned a value from one (1) to three (3):

1. Number of patients affected

LEAPFROG HOSPITAL SAFETY GRADE

2. Severity of harm

The *number of patients affected* score is determined by the following:

- 0 = Extremely rare event (e.g., Air Embolism)
- 1 = Rare event (e.g., Foreign Object Retained After Surgery)
- 2 = Some patients in hospital affected (e.g., ICU Physician Staffing)
- 3 = All patients in hospital affected (e.g., Hand Hygiene)

The *severity of harm* score is determined by the following:

- 1 = No direct evidence of harm or harm reduction (e.g., Patient Experience)
- 2 = Clear documentation of harm or harm reduction; adverse events (e.g., Foreign Object Retained After Surgery)
- 3 = Significant mortality reduction (more than 1,000 deaths or a 10% reduction in hospital wide mortality) (e.g., ICU Physician Staffing)

The values from each part are then added together to arrive at the overall Impact Score using the following criteria:

- 1 = Score of 2 (Low Impact) (e.g., Air Embolism)
- 2 = Score of 3-4 (Medium Impact) (e.g., Patient Experience)
- 3 = Score of 5-6 (High Impact) (e.g., ICU Physician Staffing)

## NUMBER OF COMPONENT MEASURES

The number of component measures refers to how many measures are included within the measure. For PSI 90, the number of component measures is 10 (PSI 3, PSI 6, PSI 8, PSI 9, PSI 10, PSI 11, PSI 12, PSI 13, PSI 14, and PSI 15). For all other measures included in the Hospital Safety Grade, the number of component measures within the measure is one (1).

LEAPFROG
HOSPITAL
SAFETY GRADE

STANDARD MEASURE WEIGHTS

| Measure | Evidence Score | Opportunity Score | Impact Score | Number of Component Measures | Standard Measure Weight |
|---|---|---|---|---|---|
| **Process/Structural Measure Domain (50%)** | | | | | |
| CPOE | 2 | 1.43 | 3 | 1 | 6.2% |
| BCMA | 2 | 1.37 | 3 | 1 | 6.0% |
| IPS | 2 | 1.67 | 3 | 1 | 6.9% |
| SP 1 | 1 | 1.06 | 2 | 1 | 3.1% |
| SP 2 | 1 | 1.12 | 2 | 1 | 3.2% |
| Total Nursing Care Hours per Patient Day | 2 | 1.41 | 2 | 1 | 4.7% |
| Hand Hygiene | 2 | 1.49 | 2 | 1 | 4.9% |
| H-COMP-1 | 1 | 1.03 | 2 | 1 | 3.0% |
| H-COMP-2 | 1 | 1.03 | 2 | 1 | 3.0% |
| H-COMP-3 | 1 | 1.05 | 2 | 1 | 3.0% |
| H-COMP-5 | 1 | 1.06 | 2 | 1 | 3.1% |
| H-COMP-6 | 1 | 1.04 | 2 | 1 | 3.0% |
| **Outcome Measure Domain (50%)** | | | | | |
| Foreign Object Retained | 1 | 3.00 | 2 | 1 | 4.2% |
| Air Embolism | 1 | 3.00 | 1 | 1 | 2.4% |
| Falls and Trauma | 2 | 2.05 | 3 | 1 | 4.9% |
| CLABSI | 2 | 1.85 | 3 | 1 | 4.5% |
| CAUTI | 2 | 1.91 | 3 | 1 | 4.7% |
| SSI: Colon | 2 | 1.83 | 2 | 1 | 3.4% |
| MRSA | 2 | 1.82 | 3 | 1 | 4.5% |
| C. Diff. | 2 | 1.81 | 3 | 1 | 4.5% |
| PSI 4 | 1 | 1.14 | 2 | 1 | 2.0% |
| PSI 90 | 1 | 1.20 | 2 | 10 | 15.0% |

LEAPFROG
HOSPITAL
SAFETY GRADE

## CALCULATING Z-SCORES

Z-Scores are used to standardize data from measures with different performance scales and allow for comparisons (e.g., a linear mean score of 90 on H-COMP-1: Nurse Communication and a CLABSI SIR of 0.870). In addition, Z-Scores can indicate to a hospital whether their measure score is above, below, or equal to the average hospital.

In the Scoring Methodology, a Z-Score is calculated for each available measure score. A Z-Score is calculated using a hospital's actual measure score, the national mean for that measure, and the standard deviation for that measure. The Z-Score for each measure is calculated using the following formulas:

- **For Process/Structural Measures: [Hospital Score – Mean) / Standard Deviation]**
- **For Outcome Measures: [(Mean – Hospital Score) / Standard Deviation]**

LEAPFROG
HOSPITAL
SAFETY GRADE

The following table includes the national mean and standard deviation for each measure used to calculate a hospital's Z-Score. For display, means and standard deviations are displayed rounded to two or three decimal places. For scoring, these values are not rounded.

| Process and Structural Measures | Mean | Standard Deviation |
|---|---|---|
| CPOE | 80.23 | 34.14 |
| BMCA | 81.87 | 30.45 |
| IPS | 65.15 | 43.73 |
| SP 1 | 117.49 | 6.79 |
| SP 2 | 116.85 | 13.98 |
| Total Nursing Care Hours per Patient Day | 77.07 | 31.61 |
| Hand Hygiene | 74.40 | 36.14 |
| H-COMP-1 | 90.19 | 2.51 |
| H-COMP-2 | 89.91 | 2.48 |
| H-COMP-3 | 81.63 | 4.36 |
| H-COMP-5 | 74.42 | 4.13 |
| H-COMP-6 | 85.25 | 3.70 |

| Outcome Measures | Mean | Standard Deviation |
|---|---|---|
| Foreign Object Retained | 0.014 | 0.050 |
| Air Embolism | 0.002 | 0.055 |
| Falls and Trauma | 0.384 | 0.402 |
| CLABSI | 0.651 | 0.552 |
| CAUTI | 0.540 | 0.494 |
| SSI: Colon | 0.831 | 0.689 |
| MRSA | 0.719 | 0.591 |
| C. Diff. | 0.401 | 0.326 |
| PSI 4 | 177.452 | 24.020 |
| PSI 90 | 1.002 | 0.196 |

LEAPFROG
HOSPITAL
SAFETY GRADE

## A NOTE ABOUT EXTREME VALUES

For hospitals that have an "extreme" value for a particular measure (i.e., a value that exceeds the 99th percentile) Leapfrog "trims" the reported value to the 99th percentile. For example, a rate of 0.500 per 1,000 patient discharges for Foreign Object Retained after Surgery is "trimmed" to 0.327 (e.g., the 99th percentile). Only "trimmed" rates are displayed on the Leapfrog Hospital Safety Grade website. The table below includes the "trimmed" values for the spring 2025 Leapfrog Hospital Safety Grade. The PSI 90 measure score represents an observed to expected ratio that has already been risk adjusted at both the component PSI level and at the composite level; therefore, the measure is not "trimmed" by Leapfrog.

| Measure | 99th Percentile |
|---|---|
| Foreign Object Retained | 0.327 |
| Air Embolism | 2.89 |
| Falls and Trauma | 1.926 |
| CLABSI | 2.782 |
| CAUTI | 2.512 |
| SSI: Colon | 3.094 |
| MRSA | 2.85 |
| C. Diff. | 1.607 |
| PSI 4 | 235.51 |

Note: Percentiles are rounded to reflect the precision of the raw data.

## DEALING WITH MISSING DATA

Due to a variety of reasons, a hospital may not have a measure score for all 22 measures. If a hospital is missing a measure score for any measure (except PSI 90; hospitals missing PSI 90 are not graded), the standard weight of that measure is redistributed to the other measures in the same measure domain. The new weight for each measure within the domain is calculated by re-apportioning the standard weight assigned to the measure with the missing score to other measures within the same domain.

For example, if a hospital is missing a measure score for ICU Physician Staffing because the hospital does not operate an adult or pediatric medical and/or surgical ICU, the standard weight of 6.9% will be re-apportioned to the remaining 11 measures within the process/structural measure domain.

LEAPFROG
HOSPITAL
SAFETY GRADE

To calculate the new weight of each of the remaining 11 measures in the process/structural measure domain, hospitals can use the formula below or use the Leapfrog Hospital Safety Grade Calculator©, which can be found on the Safety Grade Review Website. Note that each domain contributes to 50% of the overall letter grade.

*[Standard measure weight / (sum of standard weights for the remaining 11 measures in the process/structural measure domain)]*50% = updated measure weight*

For more information about how the measure weight redistribution is calculated and affects the overall score, please see the Leapfrog Hospital Safety Grade Calculator, which can be found on the last page of the Safety Grade Review Website.

## CALCULATING WEIGHTED MEASURE SCORES

To calculate a hospital's numerical safety score, multiply the Z-Score of each process/structural measure by the standard weight assigned to that measure to get the weighted process/structural measure score. If a hospital is missing any process/structural measure scores, see Dealing with Missing Data to determine the updated measure weight. Then, sum all weighted process/structural measure scores. This is the hospital's overall weighted process/structural measures score.

Multiply the Z-Score of each outcome measure by the standard weight assigned to that measure to get the weighted outcome measure score. If a hospital is missing any outcome measure scores, see Dealing with Missing Data to determine the updated measure weight. Then, sum all weighted outcome measure scores. This is the hospital's overall weighted outcome measures score.

To calculate the overall Safety Grade for a hospital, add the overall weighted process/structural measure score and the overall weighted outcome measures score. Add 3.0 to your score; this is done to normalize scores to a positive distribution. This final numerical score (typically between 1.0 and 4.0) is then assigned to a letter grade. To assist hospitals in calculating their numerical score, a calculator is available on the Safety Grade Review Website. Letter grade cut-points are published during the Letter Grade Embargo Period.

LEAPFROG
HOSPITAL
SAFETY GRADE

## ADDITIONAL SCORING INFORMATION

### TERMS USED IN SCORING AND PUBLIC REPORTING

"**Not Available**" means that the hospital does not have a score for this measure. This could be because the measure is related to a service the hospital does not provide or because the hospital had too few patients or cases to report data for a condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

In the case of healthcare-associated infections, a SIR is reported as "Not Available" if one of the following applies:

- The number of predicted infections is less than 1.
- The number of observed infections present on admission (community-onset prevalence) was above a pre-determined cut-point.

For more information about NHSN's SIR models, please visit https://www.cdc.gov/nhsn/pdfs/ps-analysis-resources/nhsn-sir-guide.pdf.

"**Declined to Report**" means that a hospital did not voluntarily provide information to the Leapfrog Hospital Survey. Measures scored as "Declined to Report" will not be used in calculating the overall score (see Dealing with Missing Data).

### SHARED CMS CERTIFICATION NUMBERS

All hospitals that share a CMS Certification Number (CCN) will be assigned the same source data as reported by CMS. Affected measures include the HCAHPS, Hospital-Acquired Conditions, Healthcare-Associated Infections (if secondary data source is used), and Patient Safety Indicators.

LEAPFROG
HOSPITAL
SAFETY GRADE

## UPDATES TO DATA USED IN THE LEAPFROG HOSPITAL SAFETY GRADE

The Leapfrog Hospital Safety Grade relies on publicly available data that hospitals have had the opportunity to review for accuracy. Therefore, Leapfrog does not allow hospitals to make updates to their data following the Data Snapshot Date. In January of each year, Leapfrog publishes the Data Snapshot Dates for each of the two Leapfrog Hospital Safety Grade public releases at https://www.hospitalsafetygrade.org/for-hospitals/key-dates-and-information. Leapfrog publishes these dates to give hospitals and other stakeholders advance notice so they can be prepared to submit a Leapfrog Hospital Survey and monitor their performance on CMS measures used in the Safety Grade.

In addition, Leapfrog holds a Courtesy Review Period to give hospitals an additional opportunity to review the data that will be used to calculate their hospital's Safety Grade. The Review Period is an opportunity for hospitals to review the data for accuracy (i.e., identify recording errors, hospital name and address changes, etc.) on a secure website and review changes to the scoring algorithm.

### DATA FROM THE LEAPFROG HOSPITAL SURVEY

During the Safety Grade Review Period (February 24 – March 14), Leapfrog will only make corrections to a hospital's data from the 2024 Leapfrog Hospital Survey if a recording error is identified (i.e., we have recorded a different measure score than what is posted on our Survey Results website) or a scoring error is identified (i.e., Leapfrog has calculated an incorrect measure score based on the submitted responses and Leapfrog's published scoring algorithms). Updates to Leapfrog Hospital Survey data that are submitted after the Data Snapshot Date will **not** be included in the current Leapfrog Hospital Safety Grade. Hospitals submitting a Leapfrog Hospital Survey are urged to take advantage of the opportunity to review their Survey Results for accuracy and completeness prior to each of the two published Data Snapshot Dates.

### HOW HOSPITALS CAN REVIEW LEAPFROG HOSPITAL SURVEY RESULTS PRIOR TO THE DATA SNAPSHOT DATE

The Leapfrog Hospital Survey is open from April 1 to November 30 of each year. Following the Submission Deadline (June 30), Survey Results are published monthly on a secure 'Hospital Details' page and a public website (ratings.leapfroggroup.org). Hospitals are urged to review their Survey Results immediately. Hospitals that identify any reporting errors are instructed to log back into the Survey to submit a correction. Hospitals can correct and re-submit a previously submitted Survey until the Survey closes for the year. Note that corrections submitted after the Data Snapshot Date are not included in the current Leapfrog Hospital Safety Grade. Leapfrog has several automated processes in place to prevent hospitals from making data entry errors in the Online Survey Tool and to enhance the overall accuracy of the Survey Results. Learn more at http://www.leapfroggroup.org/survey-materials/data-accuracy.

LEAPFROG
HOSPITAL
SAFETY GRADE

## DATA FROM THE CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS)

During the Safety Grade Review Period (February 24 – March 14), Leapfrog will only make corrections to a hospital's data from CMS if the correction is issued by CMS and posted to the Data.CMS.Gov website. If a hospital has identified an error with a measure score published by CMS, and CMS cannot post a correction within the review period, the measure score will not be used in calculating the hospital's Safety Grade, provided that the hospital can document that CMS has agreed to publicly issue a correction or remove the measure score from public reporting. Hospitals participating with CMS are urged to take advantage of the opportunity to participate in the CMS 30-day review periods.

## CMS FOOTNOTE 23 POLICY

Leapfrog will notify hospitals that have CMS footnote 23 present for one or more claims-based measure scores (e.g., DRA HAC Rate, PSI 4 rate, or PSI 90 rate) at the start of the Courtesy Review Period. Footnote 23 indicates that "The data are based on claims that the hospital or facility submitted to CMS. The hospital or facility has reported discrepancies in their claims data." Hospital CEOs can request that Leapfrog use the measure score that is accompanied by the footnote. Written requests must be received prior to the close of the Safety Grade Review Period. If written requests are not received by the close of the Review Period, the measure will not be used to calculate the Hospital Safety Grade.

For hospitals that submit a Leapfrog Hospital Survey by the Data Snapshot Date, the CEO, Primary Survey Contact, and Secondary Survey Contact will be notified at the email addresses included in the Hospital's Survey Profile. For hospitals that do not submit a Leapfrog Hospital Survey by the Data Snapshot Date, the CEO will be contacted by certified letter.

## HOW HOSPITALS CAN REVIEW CMS DATA PRIOR TO THE DATA SNAPSHOT DATE

CMS administers several hospital-based reporting and payment programs including the Inpatient Quality Reporting Program, HAC Reduction Program, and Value-based Purchasing Program. Several measures collected and calculated by CMS via its various hospital-based programs are used in the Leapfrog Hospital Safety Grade. CMS provides hospitals with a 30-day preview period before publishing measure scores on the Data.Medicare.Gov website and the Data.CMS.Gov website. More information is available at https://qualitynet.org.

LEAPFROG
HOSPITAL
SAFETY GRADE

## HOW TO PARTICIPATE IN THE LEAPFROG HOSPITAL SURVEY

If a hospital did **not** complete a 2024 Leapfrog Hospital Survey by November 30, Survey Results were not used to calculate the spring 2025 Leapfrog Hospital Safety Grade. Hospitals that would like Survey Results included in the fall 2025 Hospital Safety Grade must submit a 2025 Leapfrog Hospital Survey (including the CPOE Evaluation) by June 30, 2025. Hospitals will be able to review their publicly reported Survey Results in July and respond to any issues identified by Leapfrog's Extensive Monthly Data Verification before the Data Snapshot Date for the fall 2025 Safety Grade of August 31. More information is available at https://leapfroggroup.org/survey.

## LEAPFROG HELP DESK

If you have any questions regarding the scoring methodology, please contact the Help Desk at https://leapfroghelpdesk.zendesk.com.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**INDEX OF FILED EXHIBITS**
**PLAINTIFFS' EXHIBITS — PX-500s**

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 500.0 | Email from Patrick Romano to Kimberly Blair re: Leapfrog Safety Grade Methodology (8/14/2025) |
| 500.1 | Email from Patrick Romano to Kimberly Blair and Courtney Wood re: Leapfrog Safety Grade Methodology (8/14/2025) |
| 501.1 | Email from Patrick Romano to Kimberly Blair and Courtney Wood re: Leapfrog confidential attorney-client privilege - internal communications #3 (8/26/2025) |
| 502.0 | "The Leapfrog Group Announces Its Fall 2025 Hospital Safety Grades (11/13/2025) |
| 503.0 | WPBF 25 News at 6:00 Video, available at https://iqmediacorp.com/ExternalIframeMedia?mediaID=ff39991f-ee34-4bb0-9e72-b65aa0d32bb3&isRM=false&rawMediaType=TV (11/19/2025) |
| 503.1 | WPBF 25 News at 6:00 Video Webpage, available at https://iqmediacorp.com/ExternalIframeMedia?mediaID=ff39991f-ee34-4bb0-9e72-b65aa0d32bb3&isRM=false&rawMediaType=TV (11/19/2025) |
| 505.0 | Email from helpdesk@leapfrog-group.org to Ricardo Ramirez, Chief Nursing Officer at West Boca Medical Center, with the subject "Update to Proposed Changes to 2026 Leapfrog Surveys - Comments Accepted until 12/18." (11/24/2025) |
| 507.0 | Leapfrog Group, Florida Alliance for Healthcare Value (12/5/2025) |
| 507.1 | Leapfrog Group, Florida Alliance for Healthcare Value (8/6/2025) |
| 508.0 | Promote Your Designation_Leapfrog Licensing (12/3/2025) |
| 508.1 | A Template Release - FINAL (12/3/2025) |
| 508.3 | Straight A Press Release Template Fall 2025 - FINAL (12/3/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 508.5 | B Template Release Spreadsheet (12/3/2025) |
| 510.0 | Redline revisions to proposed changes on The Leapfrog Group |
| 510.1 | Redline revisions to proposed changes (Romano Dep. Ex. No. 15) |
| 511.0 | Your Hospital's Safety Grade Transcript |
| 511.1 | The Leapfrog Group.mp4 |
| 515.0 | Email from Ben Choi to Missy Danforth re: [Caution External Sender] Revised FY24 Forecast |
| 515.1 | Spreadsheet: Revenue T-3Months to EOY |
| 520.0 | Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 |
| 522.0 | Expert Panel's Guiding Principles on the Development of the Composite Leapfrog Hospital Safety Grade for U.S. Hospitals |
| 528.0 | CPOE & BCMA.docx |
| 530.0 | December 2024 Board Meeting Minutes (12/16/2024) |
| 531.0 | Pages_and_screens_Page_path_and_screen_class (19).csv (8/8/2025) |
| 532.0 | Pages_and_screens_Page_path_and_screen_class (2).csv (8/8/2025) |
| 533.0 | Pages_and_screens_Page_path_and_screen_class.csv (8/8/2025) |
| 534.0 | Pages_and_screens_Page_path_and_screen_class (1).csv (8/8/2025) |
| 535.0 | Pages_and_screens_Page_path_and_screen_class (3).csv (8/8/2025) |
| 536.0 | Pages_and_screens_Page_path_and_screen_class (5).csv (8/8/2025) |
| 537.0 | Events_Event_name.csv (8/8/2025) |
| 538.0 | File_Downloads.csv (8/8/2025) |
| 539.0 | File_Downloads (2023-2024).csv (8/8/2025) |
| 540.0 | Pages_and_screens_Page_path_and_screen_class (4).csv (8/8/2025) |
| 544.0 | Google Analytics Inspection Recording (8/4/2025) |
| 545.0 | Google Analytics Inspection Recording, Part 1 (8/5/2025) |
| 546.0 | Google Analytics Inspection Recording, Part 2 (8/5/2025) |
| 547.0 | Google Analytics Inspection Recording, Part 3 (8/5/2025) |
| 548.0 | Newspaper clipping received by S. Montgomery regarding Leapfrog and Jupiter Medical Center (12/16/2025) |
| 549.0 | Letter from Humana Military to Delray Medical Center Regarding Leapfrog Hospital Safety Grade (12/30/2025) |
| 550.0 | Tenet Total Emergent Encounters in Palm Beach Market (1/5/2026) |
| 552.0 | Admission Transfer Discharge Record, RLDatix (8/24/2025) |
| 553.0 | Letter from Humana Military to West Boca Medical Center Regarding Leapfrog Hospital Safety Grade (12/31/2025) |
| 554.0 | Letter from Humana Military to Good Samaritan Medical Center Regarding Leapfrog Hospital Safety Grade (1/7/2026) |
| 560.0 | Email from I. Levine to J. Basso-Kestner, copying N. Seymour re Previous Week OR Cance/Reschedule (11/3/2025) |
| 560.1 | PBG Cancels Week Oct 26.xlsx (11/3/2025) |
| 560.2 | PDF Printout of PBG Cancels Week Oct 26.xlsx (11/3/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 561.0 | Letter from Hospital for Special Surgery to Good Samaritan Medical Center (3/25/2025) |
| 562.0 | Letter from M.B. Maloney to Leapfrog (4/17/2025) |

**Wood, Courtney L.**

| | |
|---|---|
| **From:** | Patrick S Romano <psromano@health.ucdavis.edu> |
| **Sent:** | Tuesday, August 26, 2025 1:01 AM |
| **To:** | Blair, Kimberly E.; Wood, Courtney L. |
| **Subject:** | FW: Leapfrog confidential attorney-client privilege - internal communications #3 |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**EXTERNAL EMAIL** This email originated from outside the organization.

[redacted]

Patrick S. Romano, MD MPH
Professor of Internal Medicine and Pediatrics
UC Davis Division of General Internal Medicine and Bioethics
4150 V Street, PSSB Suite 2400
Sacramento, CA 95817
Telephone: (916) 734-7237 or -7005
Email: psromano@health.ucdavis.edu (please note new email domain)
Web: https://health.ucdavis.edu/chpr/research/healthcare-quality-and-safety/
LinkedIn: https://www.linkedin.com/in/patrick-romano-aa1b2622/

**From:** Patrick S Romano
**Sent:** Wednesday, December 11, 2024 2:47 PM
**To:** Bruce Hall <blhall@ucdavis.edu>; Gregory A Maynard <gmaynard@UCDAVIS.EDU>; Brenda L Inman <bdelarosa@UCDAVIS.EDU>; Joseph M Galante <jmgalante@ucdavis.edu>
**Subject:** RE: Leapfrog Announcements for Hospitals - December 2024

LOL, thank you Bruce, I appreciate your clinical leadership as well...

Re Leapfrog, methinks you folks are too critical... their decision to increase the penalty for nonparticipation was a simple business decision, just like our decision not to participate. It's just business, folks!
Their business model, as you know, depends on producing data that add value for health plans and employers... and the data are not valuable if participation is low.

Patrick S. Romano, MD MPH FAAP FACP
Professor of Medicine and Pediatrics, UC Davis Division of General Medicine
Co-Editor in Chief, AHRQ *Patient Safety Network* (PSNet and WebM&M)
4150 V Street, PSSB Suite 2400
Sacramento, CA 95817
Telephone: (916) 734-7005 or -7237
E-mail: psromano@ucdavis.edu
Website: https://health.ucdavis.edu/team/pediatrics/122/patrick-romano---internal-medicine---pediatrics-general-sacramento

PX-501.1

**From:** Bruce Hall <blhall@ucdavis.edu>
**Sent:** Wednesday, December 11, 2024 2:33 PM
**To:** Patrick S Romano <psromano@ucdavis.edu>; Gregory A Maynard <gmaynard@UCDAVIS.EDU>; Brenda L Inman



EXHIBIT
Romano
23

<bdelarosa@UCDAVIS.EDU>; Joseph M Galante <jmgalante@ucdavis.edu>
**Subject:** Re: Leapfrog Announcements for Hospitals - December 2024

Thank you Patrick- this is very helpful information. I'm copying in CMO Galante as well.
Let me again express my appreciation for all that you have accomplished in your career advancing the cause of measuring quality and safety for our profession. You have been an important thought leader for a long time.

With respect to Leapfrog specifically, I think it is irresponsible and reckless of them to deliver incomplete assessments to the public. Despite that personal sense, I am asking Greg and Brenda to assemble more information on what the resource burden would be if we chose to participate (we had planned to do this for Jan 2025 anyway).

Thank you- I hope you have a wonderful holiday!- Bruce

---

**From:** Patrick S Romano <psromano@ucdavis.edu>
**Date:** Wednesday, December 11, 2024 at 10:45 AM
**To:** Bruce Hall <blhall@ucdavis.edu>, Gregory A Maynard <gmaynard@UCDAVIS.EDU>, Brenda L Inman <bdelarosa@UCDAVIS.EDU>
**Subject:** RE: Leapfrog Announcements for Hospitals - December 2024

Well, friends, we can now see the consequences of our nonparticipation... a D grade, in the same league with Oroville and Manteca, which is embarrassing for an organization that claims to be high-quality...
https://www.sacbee.com/news/local/health-and-medicine/article295787714.html

Although our HAI rates were high (hospital score 1.338 versus average 0.746), and our PSI rates were a bit above average (1.36 versus 1.01), the real killer for us was nonparticipation (15/100 points on safety practices, 0/120 on staffing).
https://www.hospitalsafetygrade.org/h/university-of-california-davis-medical-center
https://www.hospitalsafetygrade.org/table-details/university-of-california-davis-medical-center

According to Google AI,

**AI Overview**

Yes, the University of California Davis Medical Center (UC Davis Medical Center) received a D grade for hospital safety from the Leapfrog Group:

**Reason**

UC Davis Medical Center received a D grade for issues with staph infection control, sepsis infection prevention after surgery, and patient falls and injuries.

**How the Leapfrog Group rates hospitals**

The Leapfrog Group uses a numerical score based on up to 27 measures of patient safety, including rates of infections, injuries, and preventable errors. The numerical score is then converted into a letter grade, with A being the best and F being the worst.

**What the grades mean**

The numerical score cut-points for the letter grades are:

- **A**: 3.159 or higher
- **B**: 2.972 or higher
- **C**: 2.506 or higher
- **D**: 2.040 or higher
- **F**: Less than 2.040

The Leapfrog Group is an independent, not-for-profit organization founded by private health care experts and employers.

Always happy to meet with anyone to discuss Leapfrog's approach (since I serve on their Expert Panel, https://www.hospitalsafetygrade.org/about-the-grade ) or to facilitate UCDH participation 😊

Patrick S. Romano, MD MPH FAAP FACP
Professor of Medicine and Pediatrics, UC Davis Division of General Medicine
Co-Editor in Chief, AHRQ *Patient Safety Network* (PSNet and WebM&M)
4150 V Street, PSSB Suite 2400
Sacramento, CA 95817
Telephone: (916) 734-7005 or -7237
E-mail: psromano@ucdavis.edu
Website: https://health.ucdavis.edu/team/pediatrics/122/patrick-romano---internal-medicine---pediatrics-general-sacramento

**From:** Bruce Hall <blhall@ucdavis.edu>
**Sent:** Wednesday, May 15, 2024 3:20 PM
**To:** Gregory A Maynard <gmaynard@UCDAVIS.EDU>; Patrick Romano <psromano@ucdavis.edu>; Brenda L Inman <bdelarosa@UCDAVIS.EDU>
**Subject:** Re: Leapfrog Announcements for Hospitals - May 2024

Thanks Patrick,

I agree with Greg and wouldn't change course on this today. Can we ask ourselves this question again in January 2025?
Bruce

---

**From:** Gregory A Maynard <gmaynard@UCDAVIS.EDU>
**Date:** Wednesday, May 15, 2024 at 1:42 PM
**To:** Patrick Romano <psromano@ucdavis.edu>, Brenda L Inman <bdelarosa@UCDAVIS.EDU>
**Cc:** Bruce Hall <blhall@ucdavis.edu>
**Subject:** RE: Leapfrog Announcements for Hospitals - May 2024

Patrick,

I have brought this up with Dr. Hall. We are both ambivalent about the value of Leapfrog. And I think that ambivalence tilts even more negative when our lack of participation guarantees a lower grade which they still publish, effectively blackmailing centers to participate.

I coped Dr. Hall. Given our competing priorities and staff shortages, I am not sure we should take this on given short timeline for this year's submission, but Dr. Hall, please weigh in, we can follow your guidance.

GM

---

**From:** Patrick Romano <psromano@ucdavis.edu>
**Sent:** Wednesday, May 15, 2024 9:27 AM
**To:** Brenda L Inman <bdelarosa@UCDAVIS.EDU>; Gregory A Maynard <gmaynard@UCDAVIS.EDU>
**Subject:** Fwd: Leapfrog Announcements for Hospitals - May 2024

Your opportunity to reconsider... they are changing their imputation approach so hospitals can get away with responding in alternate years, but if you skip more than one year, you will never get above a C... might even drop to D.

Patrick S. Romano, MD MPH
Co-Editor in Chief, AHRQ Patient Safety Network (PSNet and WebM&M)
Professor of Internal Medicine and Pediatrics
UC Davis Division of General Medicine
4150 V Street, PSSB Suite 2400
Sacramento, CA 95817
Telephone (916) 734-7005 or -7237
Psromano@ucdavis.edu

---

**From:** The Leapfrog Group <helpdesk@leapfrog-group.org>
**Sent:** Wednesday, May 15, 2024 8:24 AM
**To:** Patrick Romano <psromano@ucdavis.edu>
**Subject:** Leapfrog Announcements for Hospitals - May 2024

Informational Updates for Hospitals

View this email in your browser

2024 Hospital Survey is Open

## GET STARTED ON THE 2024 HOSPITAL SURVEY

The 2024 Leapfrog Hospital Survey opened on April 1. Download a hard copy of the Survey and scoring algorithms, request a 1:1 orientation call, and review deadlines on our website at www.leapfroggroup.org/hospital.

## CHANGE SUMMARY ISSUED MAY 14

**Section 9C Volume of Procedures**: Added four CPT Codes to the Outpatient Procedure CPT Code workbook for Adult General Surgery - Lumpectomy or Quadrantectomy of Breast Procedures. Hospitals are not required to make updates to data already collected and/or reported but have the option to include these additional CPT Codes in their volume if they wish. As a reminder, these data are not used in scoring, but volume of procedures are publicly reported.

You can download an updated copy of the Outpatient Procedure CPT Code workbook from the Survey Dashboard. Instructions for downloading the workbook are available on page 297 of the Survey.

Educational Opportunities

## MONTHLY SUPPORT AND GUIDANCE FOR HOSPITAL SURVEY PARTICIPATION

The 2024 Leapfrog Hospital Survey Webinar Series, which is held monthly from March to December, is designed for hospitals that would benefit from more regular support and an interactive presentation of Survey materials and information.

Hospitals that join the Webinar Series will have access to:

- **Monthly office hours with Leapfrog's subject matter experts:** 30-minute sessions to get real-time technical assistance, answers to your questions and help staying on top of upcoming deadlines. Staffed by Leapfrog's subject matter experts.
- **Monthly webinars**: Timely and focused presentations on Survey measures and specifications, scoring information, frequently asked questions and public reporting. Each webinar focuses on a specific topic (e.g., nurse staffing and workforce, barcode medication administration, preparing for data verification,etc.) and concludes with a 20-minute open Q&A session.
- **Archive library**: Slides and recordings from each webinar are archived in an online portal that participants can access from March to January.

Review the 2024 Webinar Series schedule and register now.

In addition to the Webinar Series, Leapfrog offers **free** technical and content-related support to all participating facilities via our electronic Help Desk, which is staffed by dedicated subject matter experts.

Important Dates

## JUNE 30 SUBMISSION DEADLINE

The 2024 Leapfrog Hospital Survey Submission Deadline is June 30. Hospitals submitting by June 30 will be able to preview their results on their Hospital Details Page starting July 12 and will have results publicly reported on July 25. Hospitals will also receive a free Competitive Benchmarking Summary Report.

**Review key deadlines.**

## HELP DESK HOLIDAY SCHEDULE

The Leapfrog Help Desk is staffed from 9:00 a.m. to 5:00 p.m. ET on all regular business days. The Help Desk is not staffed on federal holidays. Please take note of the following upcoming closures.

**Staff Training**
May 22 - closed

**Memorial Day**
May 24 - closing at 2 pm ET
May 27 - closed

**Juneteenth**
June 19 - closed

**Independence Day**
July 4 - closed

Other Announcements

## RECOGNIZED LEADER APPLICATION OPENS JULY 1

Look out for the next round of applications for the Recognized Leader in Caring for People Living with Diabetes program! The application to be a 2025 Recognized Leader opens July 1, 2024, to all hospitals who have submitted a 2024 Leapfrog Hospital Survey. Details on updates to the program will be available in late June. Applications will be open until November 30, 2024, with Recognized Leaders announced in Spring 2025.

A joint effort from The Leapfrog Group and the American Diabetes Association, this first-ever national inpatient diabetes recognition program honors hospitals providing safe and high-quality health care for people living with diabetes, taking steps such as:

- Making it a policy to work with patients to safely self-manage their diabetes medications
- Implementing blood glucose testing and hypoglycemia protocols as well as additional testing and monitoring before and during inpatient surgeries
- Supporting patients with education they need to manage their care, and connecting them with health care providers after they leave the hospital

Find more information here.



## LEARN FROM OTHER LEAPFROG REPORTING HOSPITALS

Earlier this month Leapfrog held a webinar with the Michigan Health Improvement Alliance (MiHIA). MiHIA partnered with The Leapfrog Group and used Leapfrog data to identify hospitals

with sustained highest performance in CLABSI, CAUTI, and Falls/Trauma. Leaders at MiHIA and participants in their consortium shared four best practices based on the shared learnings from a collaboration formed between these high performing hospitals and a team of regional safety and quality experts.

View the recording here.
Download a Summary of the Findings here.

## SURVEY SUPPORT FOR HEALTH SYSTEMS

Are you responsible for coordinating the Leapfrog Hospital Survey submission for all the hospitals in your health system? Want to make it easier to track submission status, review responses and scored results, and track performance from year to year?

Subscribe to Health System Support and receive all your hospital's 16-digit security codes, Survey responses, and scored Survey Results in an Excel file three times a year: following the June 30 deadline, following August 31 (the deadline for Top Hospital and the Snapshot Date for the fall 2024 Hospital Safety Grade), and following the January 31 year-end deadline.

Subscribers also receive a free registration for Leapfrog's monthly webinar series.

Find more information here.

## STRENGTHEN YOUR ORGANIZATION'S CRP WITH THE PACT COLLABORATIVE

Communication and Resolution Programs (CRPs) are gaining support and traction on the national stage. Ensure your organization is ready for the changing health care landscape by joining the PACT Collaborative, a groundbreaking learning community supporting the implementation of highly reliable CRPs founded by Ariadne Labs, the Collaborative for Accountability & Improvement, and the Institute for Healthcare Improvement.

Learn more here.

## COME SEE US AT APIC 2024!

The Leapfrog Group will be at booth 638 at the Association for Professionals in Infection Control and Epidemiology (APIC) conference June 5-8. The conference brings together health care professionals, researchers, educators, and industry leaders to connect, collaborate, and shape the future of infection prevention.

Visit us at APIC.

Panelists from two large healthcare systems will discuss how their organizations have aligned employee experience to patient safety culture. They'll discuss internal research demonstrating a link between the two and the steps each organization took to demonstrate this link in a practical way for front-line leaders. They'll also share how they've used new tools and technology to measure, understand, and drive a culture of safety.

*This webinar is a program of the Partners Advisory Committee and is sponsored by Microsoft. While The Leapfrog Group does not endorse the products, services, and/or technology showcased on this webinar, we encourage you to explore these offerings that support Leapfrog's work.*

**Register Now**

Exploring the benefits of standardization of chemicals, surveillance for transmittible infections, staff education, and infection prevention basis that apply to all areas to reduce the risk of infections. Reviewing the methods of cleaning and disinfection throughout healthcare, to include acute care, ambulatory surgical centers, long-term acute care, skill nursing, rehab, and senior facilities. Discussing the role of surveillance and changes in regulatory requirements for prevention of healthcare and community-based infection and the importance of communication between staff and care sites. Explore common themes of patient safety and staff engagement to drive better satisfaction results.

*This webinar is a program of the Partners Advisory Committee and is sponsored by Steriliz, LLC. While The Leapfrog Group does not endorse the products, services, and/or technology showcased on this webinar, we encourage you to explore these offerings that support Leapfrog's work.*

Register Now

STAY CONNECTED WITH THE LEAPFROG GROUP

SUBSCRIBE FOR UPDATES

*Copyright © 2024 The Leapfrog Group, All rights reserved.*

The Leapfrog Group
1775 K St NW
Suite 400
Washington, DC 20006

Add us to your address book

update your preferences or unsubscribe from this list

**CONFIDENTIALITY NOTICE** This e-mail communication and any attachments are for the sole use of the intended recipient and may contain information that is confidential and privileged under state and

federal privacy laws. If you received this e-mail in error, be aware that any unauthorized use, disclosure, copying, or distribution is strictly prohibited. If you received this e-mail in error, please contact the sender immediately and destroy/delete all copies of this message.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**INDEX OF FILED EXHIBITS**
**PLAINTIFFS' EXHIBITS — PX-400s**

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 400.0 | Florida Alliance for Healthcare Value Deck: 41st Annual Meeting of the Board of Directors (3/4/2025) |
| 400.1 | Florida Alliance for Healthcare Value Deck: 41st Annual Meeting of the Board of Directors (3/4/2025) |
| 401.0 | Messages between Alex Campione and Missy Danforth (3/5/2025) |
| 402.0 | Amendment 1 CONTRACT FOR CONSULTING SERVICES: METASTAR & THE LEAPFROG GROUP - ON-SITE VERIFICATION FOR HOSPITALS AND AMBULATORY SURGERY CENTERS (3/5/2025) |
| 403.0 | Leapfrog Quarterly Media Report, December 2, 2024 – March 3, 2025 (3/7/2025) |
| 404.0 | Email from Jill Berger to Regional Leaders re: Regional Leader Agenda and Patient Safety Awareness Week 2025 Social Content (3/11/2025) |
| 405.0 | FY25 Performance & Budget Reprojection (3/18/2025) |
| 406.0 | 2025 Regional Leader Communications Toolkit: Launching Leapfrog Surveys (3/19/2025) |
| 406.1 | 2025 Regional Leader Communications Toolkit: Launching Leapfrog Surveys (3/19/2025) |
| 406.2 | 2025 Regional Leader Communications Toolkit: Launching Leapfrog Surveys (3/19/2025) |
| 406.3 | 2025 Regional Leader Communications Toolkit: Launching Leapfrog Surveys (3/19/2025) |
| 407.0 | Email from Licensing to K. Banerjee, et al with subject "Thank you!" (3/26/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 410.0 | Spring 2025 Accolade Letter of Agreement & Exhibit A.pdf (3/31/2025) |
| 411.0 | Email from N. Cantacuzene to Leah Binder with subject "Leapfrog Annual Meeting and Awards Dinner 2025 Sponsorship Prospectus" (4/14/2025) |
| 411.1 | Leapfrog Annual Meeting and Awards Dinner 2025 Sponsorship Prospectus (4/14/2025) |
| 412.0 | SPRING_25_RG.xlsx (4/18/2025) |
| 413.0 | Email from Alexandra Campione to M. Danforth, et al with subject "Staged Spring 2025 Safety Grade Data Platform Update" (4/17/2025) |
| 413.1 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 413.2 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 413.3 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 413.4 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 413.5 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 413.6 | Scoring Methodology, Spring 2025 Safety Grade (4/21/2025) |
| 414.0 | Email from L. Bailey to L. Binder, et al. with subject "Leapfrog 101 Slides for Board - for Leah's Review" (4/22/2025) |
| 415.0 | Florida Alliance for Healthcare Value Letter to Jerad Hanlon re: 2025 Leapfrog Hospital Survey (4/23/2025) |
| 415.1 | Florida Alliance for Healthcare Value Letter to Jerad Hanlon re: 2025 Leapfrog Hospital Survey (4/23/2025) |
| 416.0 | Email from Kathleen McDonald to Erik Cazares, et al. with subject "Accreditations and Awards" (4/23/2025) |
| 417.0 | PBGMC Accreditation, Certifications and Awards as of 4-24-25.pdf (4/24/2025) |
| 418.0 | Awards SMMC.pdf (4/25/2025) |
| 419.0 | Email from Karen Jupiter to Lauren Bailey re: changes to the LFG 101 slides (4/28/2025) |
| 419.1 | Email from Karen Jupiter to Lauren Bailey re: changes to the LFG 101 slides (4/28/2025) |
| 419.2 | Email from Karen Jupiter to Lauren Bailey re: changes to the LFG 101 slides (4/28/2025) |
| 420.0 | Leapfrog Board of Directors Deck: Leapfrog 101: Messaging & Common Objections (4/28/2025) |
| 420.1 | Leapfrog Board of Directors Deck: Leapfrog 101: Messaging & Common Objections (4/28/2025) |
| 420.2 | Leapfrog Board of Directors Deck: Leapfrog 101: Messaging & Common Objections (4/28/2025) |
| 421.1 | Leapfrog Board of Directors Deck: Leapfrog 101: Messaging & Common Objections (4/28/2025) |
| 422.0 | Email from Licensing to K. Banerjee, et al. with subject "Thank you!" (4/28/2025) |
| 423.0 | Messages between Karen Jupiter and Lauren Bailey (5/1/2025) |
| 423.1 | Messages between Karen Jupiter and Lauren Bailey (5/1/2025) |
| 423.2 | Messages between Karen Jupiter and Lauren Bailey (5/1/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 424.0 | Email from S. Weiss to M. Gill, et al. with subject "CBS 12 Leapfrog Story" (5/1/2025) |
| 425.0 | Email from L. Binder to B. Galvin, et al with subject "FYI" (5/1/2025) |
| 426.0 | Email from L. Hailesilassie to L. Bailey, et al. with subject "Approval to Share FInal Stat Document with Fierce" (5/1/2025) |
| 427.0 | Email from Chris Skisak to Leah Binder, Regional Leaders, Board Members re: Spring Safety Grade Lawsuit (5/1/2025) |
| 427.1 | Email from Chris Skisak to Leah Binder, Regional Leaders, Board Members, Missy Danforth, Karen Jupiter, and Lauren Bailey re: Spring Safety Grade Lawsuit (5/1/2025) |
| 429.0 | Email from Matt Austin to Missy Danforth re: Important Information about Leapfrog's Hospital Safety Grade (5/1/2025) |
| 429.1 | Email from Matt Austin to Missy Danforth re: Important Information about Leapfrog's Hospital Safety Grade (5/1/2025) |
| 430.0 | Talking Points for Regional Leaders about Leapfrog Lawsuit (5/2/2025) |
| 430.1 | Talking Points for Regional Leaders about Leapfrog Lawsuit (5/13/2025) |
| 430.2 | Talking Points for Regional Leaders about Leapfrog Lawsuit (5/13/2025) |
| 431.0 | Email from Leah Binder to Kush Banerjee re: Spring sales update (5/5/2025) |
| 431.1 | Email from Leah Binder to Kush Banerjee and Missy Danforth re: Spring sales update (5/5/2025) |
| 433.0 | Email from Lauren Bailey to Karen Jupiter re: Leapfrog Spring 2025 HSG Coverage Report - Day 1 (5/6/2025) |
| 433.1 | Email from Lauren Bailey to Karen Jupiter re: Leapfrog Spring 2025 HSG Coverage Report - Day 1 (5/6/2025) |
| 433.2 | Email from Lauren Bailey to Karen Jupiter re: Leapfrog Spring 2025 HSG Coverage Report - Day 1 (5/6/2025) |
| 433.3 | Email from Lauren Bailey to Karen Jupiter re: Leapfrog Spring 2025 HSG Coverage Report - Day 1 (5/6/2025) |
| 436.0 | Palm Beach Health Network, Key Indicators, FY 2024 and YTD March 2025 (5/7/2025) |
| 437.0 | Email from L. Hailesilassie to L. Bailey, et al. with subject "Leapfrog Spring 2025 HSG Coverage Report - 1 Week" (5/8/2025) |
| 438.0 | Florida Alliance for Healthcare Value Weekly Bulletin (5/9/2025) |
| 438.1 | Florida Alliance for Healthcare Value Weekly Bulletin (5/9/2025) |
| 439.0 | Messages between Karen Jupiter, Nate Longmore, and Lauren Bailey re: Google ads reflecting Community Hospitals safety grades (5/12/2025) |
| 441.0 | Email from Missy Danforth to Ralph Johnson re: Outstanding invoice (5/13/2025) |
| 442.0 | Email from Matt Austin to Alexandra Campione, Missy Danforth, and Lauren Bailey re: Review JHU HSG Lives Saved Analysis (5/15/2025) |
| 442.1 | Email from Matt Austin to Alexandra Campione, Missy Danforth, Lauren Bailey, and Preeti Joshi re: Review JHU HSG Lives Saved Analysis (5/15/2025) |
| 445.0 | Email from A. Campione to Matt Austin, et al re:Review JHU HSG Lives Saved Analysis (5/16/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 447.0 | Email from Karen van Caulil to Ashley Tait-Dinger re: Jupiter Medical center (5/28/2025) |
| 447.1 | Email from Karen van Caulil to Ashley Tait-Dinger re: Jupiter Medical center (5/28/2025) |
| 450.0 | Email from Leah Binder to Ealph Johnson re: Rescheduling our Leapfrog Finance Prep Meeting (6/6/2025) |
| 452.0 | Email from A. Campione to S. Farinelli (Cura), L. Bailey, N. Longmore, K. Jupiter, and Leapfrog PR re: AL.com Inquiry re: Huntsville Hospital (6/5/2025) |
| 453.0 | Email from Sarah Farinelli to Alexandra Campione re: For Leapfrog - AL.com Inquiry Re: Huntsville Hospital (6/9/2025) |
| 453.1 | Email from Sarah Farinelli to Alexandra Campione, Lauren Bailey, Nate Longmore, and Karen Jupiter re: For Leapfrog - AL.com Inquiry Re: Huntsville Hospital (6/9/2025) |
| 454.1 | Email from Noah Shelgren to Nate Longmore re: Collaboration Call: Nonprofit Megaphone + The Leapfrog Group (6/12/2025) |
| 454.2 | Email from Noah Shelgren to Nate Longmore re: Collaboration Call: Nonprofit Megaphone + The Leapfrog Group (6/12/2025) |
| 455.0 | Leapfrog June 2025 Board Report.pdf (6/10/2025) |
| 457.0 | Email from Leah Binder to Angela Hopkins re: CEO Report (6/18/2025) |
| 457.1 | Email from Leah Binder to Angela Hopkins re: CEO Report (6/18/2025) |
| 458.0 | Email from Leah Binder to Angela Hopkins re:Finance Audit Com Report to the Board Final.pptx (6/18/2025) |
| 459.0 | Email from Lauren Bailey to Karen van Caulil, et al. re: Jupiter Medical center (6/20/2025) |
| 459.1 | Email from Lauren Bailey to Karen van Caulil, et al. re: Jupiter Medical center (6/20/2025) |
| 460.0 | Lauren Bailey Board Notes (6/24/2025) |
| 460.1 | Lauren Bailey Board Presentation Notes (6/24/2025) |
| 460.2 | Lauren Bailey Board Presentation Notes (6/24/2025) |
| 461.0 | Patients deserve to be able to trust Delray Medical Center with their healthcare, Palm Beach Post (6/30/2025) |
| 462.0 | The Palm Beach Post article: Patients deserve to be able to trust Delray Medical Center with their healthcare (6/30/2025) |
| 463.0 | West Boca Medical Center Awards and Recognitions Presentation_General Presentation_July 2025.pdf (7/10/2025) |
| 464.0 | Humana Military letter regarding Leapfrog (7/16/2025) |
| 465.0 | Humana Military letter regarding Leapfrog (7/16/2025) |
| 466.1 | F2094964F-official_jformula-Instagram-video.mp4 (8/1/2025) |
| 470.0 | Awards & Distinctions for Palm Beach Health Network.pdf (8/5/2025) |
| 471.0 | West Boca Grade Page and Detail Table (8/5/2025) |
| 472.0 | Webpage: Analytics Leapfrog Hospital Safety Grade for St. Marys Grade Page (8/5/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 472.1 | Webpage: Google Analytics Leapfrog Hospital Safety Grade for St. Marys Grade Page (8/5/2025) |
| 473.0 | St Marys Funnel webpage (8/5/2025) |
| 474.0 | Palm Beach Garden Funnel webpage (8/5/2025) |
| 475.0 | Palm Beach Garden Funnel (8/5/2025) |
| 476.0 | Good Samaritan Funnel Grade Page (8/5/2025) |
| 477.0 | Delray Funnel Grade Page (8/5/2025) |
| 478.0 | Delray Funnel 2 Grade Page (8/5/2025) |
| 479.0 | West Boca Funnel 3 Grade Page (8/5/2025) |
| 480.0 | Good Samaritan Funnel Grade Page (8/5/2025) |
| 481.0 | Leapfrog's Spring 2025 Safety Grades Are In — New Trend Data Shows One in Eight Hospitals Sustained an "A" for More Than Two Years _ Leapfrog.pdf (5/1/2025) |
| 482.0 | Fall 2024 Leapfrog Hospital Safety Grade Shows Significant Progress in Patient Safety Nationwide _ Leapfrog.pdf (11/15/2024) |
| 483.0 | In Conversation With… Leah Binder, MA, MGA Article (4/1/2014) |
| 485.0 | Pages_and_screens_Page_path_and_screen_class - # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 486.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 487.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 488.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 489.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 490.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 491.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 492.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 493.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 494.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 495.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 496.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 497.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 498.0 | Pages_and_screens_Page_path_and_screen_class # Property: Leapfrog Hospital Safety Grade - GA4 (8/8/2025) |
| 499.0 | Email from Patrick Romano to Kimberly Blair re: Leapfrog Safety Grade Methodology (8/13/2025) |
| 499.1 | Email from Patrick Romano to Kimberly Blair and Courtney Wood re: Leapfrog Safety Grade Methodology (8/13/2025) |

Analytics | Leapfrog Hospital Safety Grade - GA4 Leapfrog Hospital Safety Gra... | Funnel | Go to report

Date
Nov 15, 2024 - Aug 4, 2025

Funnel explor...




| Step | Active users (% of Step 1) | Completion rate | Abandonments | Abandonment rate |
|---|---|---|---|---|
| 1. St. Marys Grade Page | 547 (100%) | 2.93% | 531 | 97.07% |
| 2. St. Marys Methodology Downloads | 16 (2.93%) | - | - | - |

LEAPFROG02864718

PX-472.0

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**INDEX OF FILED EXHIBITS**
**PLAINTIFFS' EXHIBITS — PX-300s**

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 300.0 | Email from Alexandra Campione to Leah Binder re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 301.0 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 301.1 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 301.2 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 301.3 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 301.4 | Email from Leah Binder to Alexandra Campione re: FOR REVIEW: Final Safety Grade Changes (5/17/2024) |
| 302.0 | Email from Leapfrog Help Desk to Alexandra Campione re: 103566 (5/21/2024) |
| 302.1 | Email from Leapfrog Help Desk to Alexandra Campione re: 103566 (5/21/2024) |
| 302.2 | Email from Leapfrog Help Desk to Alexandra Campione re: 103566 (5/21/2024) |
| 302.3 | Email from Leapfrog Help Desk to Alexandra Campione re: 103566 (5/21/2024) |
| 303.0 | Email from Missy Danforth to Alexandra Campione re: Meeting Notes: Leapfrog Hospital Safety Grade Expert Panel Call (5/23/2024) |
| 303.1 | Email from Missy Danforth to Alexandra Campione re: Meeting Notes: Leapfrog Hospital Safety Grade Expert Panel Call (5/23/2024) |
| 303.2 | Email from Missy Danforth to Alexandra Campione re: Meeting Notes: Leapfrog Hospital Safety Grade Expert Panel Call (5/23/2024) |
| 304.0 | The Leapfrog Group Board of Directors, CEO Report (6/1/2024) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 304.1 | The Leapfrog Group Board of Directors, CEO Report (6/1/2024) |
| 305.0 | Not for public release yet, but some good news (6/3/2024) |
| 306.0 | Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 #104036 (6/6/2024) |
| 306.1 | Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 #104036 (6/6/2024) |
| 306.2 | Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 #104036 (6/6/2024) |
| 306.3 | Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 #104036 (6/6/2024) |
| 307.0 | Leapfrog Media Report, March 1, 2024-May 28, 2024 (5/28/2024) |
| 308.0 | Request for Public Comments: Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 Methodology for Fall 2024 #104084 (6/7/2024) |
| 308.1 | RE: Request for Public Comments: Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 (6/7/2024) |
| 308.2 | RE: Request for Public Comments: Planned Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 (6/7/2024) |
| 309.0 | Imputation Model Updates #104051 (6/7/2024) |
| 309.1 | Imputation Model #104051 (6/7/2024) |
| 309.2 | Imputation Model #104051 (6/7/2024) |
| 310.2 | Proposed Fall 2024 Imputation Method #104088 (6/8/2024) |
| 311.0 | Leapfrog Group Board Meeting Agenda (6/11/2024) |
| 312.0 | Email from Leah Binder to Tilithia McBride re: Slides: Leah Binder (6/11/2024) |
| 313.0 | Minutes, The Leapfrog Group, Board of Directors (6/11/2024) |
| 314.0 | Email from Jill Berger to Regional Leaders re: Leapfrog Regional Leader Meeting Recap (6/14/2024) |
| 315.0 | Email from Paulina Litter to Alexandra Campione re: New imputation denotation (6/18/2024) |
| 315.1 | New imputation denotation (6/18/2024) |
| 315.2 | New imputation denotation (6/18/2024) |
| 315.3 | New imputation denotation (6/18/2024) |
| 316.0 | Redline of Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 (6/24/2024) |
| 317.0 | Email from Alexandra Campione to Missy Danforth re: Final Fall 2024 Methodology Changes- public comments draft (6/24/2024) |
| 317.1 | Email from Alexandra Campione to Missy Danforth re: Final Fall 2024 Methodology Changes- public comments draft (6/24/2024) |
| 317.2 | Email from Alexandra Campione to Missy Danforth re: Final Fall 2024 Methodology Changes- public comments draft (6/24/2024) |
| 319.0 | Email from Matt Austin to Arnold Milstein, et al. re: Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 (6/26/2024) |
| 319.1 | Email from Matt Austin to Arnold Milstein, et al. re: Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 (6/26/2024) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 319.2 | Email from Matt Austin to Arnold Milstein, et al. re: Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024 (6/26/2024) |
| 320.0 | Email from Karen Jupiter to Lauren Bailey re: Fall2024HospitalSafetyGrade_FinalMethodologyChanges - v1 (6/26/2024) |
| 320.1 | Email from Karen Jupiter to Lauren Bailey re: Fall2024HospitalSafetyGrade_FinalMethodologyChanges - v1 (6/26/2024) |
| 321.0 | Email from Lila Leno to Karen Jupiter to Carolyn Skinner re: Leapfrog audit _ 2024 Audit final (6/30/2024) |
| 321.1 | The Leapfrog Group and Affiliate Consolidated Financial Statements (6/30/2024) |
| 321.2 | The Leapfrog Group and Affiliate Consolidated Financial Statements (6/30/2024) |
| 321.3 | The Leapfrog Group and Affiliate Consolidated Financial Statements (6/30/2024) |
| 322.2 | Key Elements of Requested Changes to the CEO Employment Contract (7/12/2024) |
| 323.2 | FINAL SLIDES FOR AHE TALK - DUE TO BE SUBMITTED TOMORROW FOR ANY FINAL COMMENT/SUGGESTIONS LEAH! THANKS! (7/15/2024) |
| 324.0 | Email from Kush Banerjee to Mallory Fries re: DL and accolades files and updates (8/5/2024) |
| 324.1 | Email from Kush Banerjee to Mallory Fries re: DL and accolades files and updates (8/5/2024) |
| 325.0 | Email from Karen Jupiter to Missy Danforth re: CEO Report (8/27/2024) |
| 326.0 | Joint Finance & Audit Committee Presentation (9/1/2024) |
| 328.0 | DRAFT: FY2024 Financials October 2024 Board Meeting (9/3/2024) |
| 330.0 | SPRING 2024 LEAPFROG GROUP HOSPITAL SAFETY GRADE CAMPAIGN RECAP (9/11/2024) |
| 331.0 | Leapfrog Group Board Meeting Agenda (9/25/2024) |
| 332.0 | The Leapfrog Group Board of Directors CEO Report (9/25/2024) |
| 333.0 | Minutes, The Leapfrog Group, Board of Directors (9/25/2024) |
| 334.0 | Email from Colleen Thielk to Sheri Montgomery re: Leapfrog (9/27/2024) |
| 338.0 | Email from Leah Binder to Alan Langerman re: Updated Cash Flow Foreast (10/17/2024) |
| 339.0 | About Delray Medical Center (10/18/2024) |
| 340.0 | Cash Flow Situation Actions (10/24/2024) |
| 341.0 | Email from Leah Binder to Nate Longmore re: For Review: HSG Messaging and FAQs docs (10/29/2024) |
| 341.1 | Email from Leah Binder to Nate Longmore, Lauren Bailey, and Karen Jupiter re: For Review: HSG Messaging and FAQs docs (10/29/2024) |
| 341.2 | Email from Leah Binder to Nate Longmore, Lauren Bailey, and Karen Jupiter re: For Review: HSG Messaging and FAQs docs (10/29/2024) |
| 342.0 | Email from Ricardo Ramirez to Cynthia McCauley re: Leapfrog Letter Grades (11/4/2024) |
| 343.0 | Email from Stehphany Johnson to Heather Havericak and Jennifer Shoemaker re: Leapfrog Score Update (11/4/2024) |
| 344.0 | Messages between kstewart and Lauren Bailey (11/15/2024) |
| 344.1 | Slack messages between K. Stewart (Leapfrog) and Lauren Bailey (11/15/2024) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 345.0 | Email from Sarah Farinelli to Lauren Bailey, et al. re: Fall 2024 Hospital Safety Grade Media Coverage Report, Day 1 (11/15/2024) |
| 346.0 | Where are Leapfrog's 13 'F' hospitals, Becker's Hospital Review (11/15/2024) |
| 347.0 | Email from Karen Jupiter to Lauren Bailey re: Invoice 2645 from CURA Strategies, LLC (11/18/2024) |
| 350.0 | Email from Sarah Farinelli to Lauren Bailey, et al. re: For Leapfrog Team: Hospital Safety Grade Coverage Report - Week 1 (11/22/2024) |
| 351.0 | Email from Lauren Bailey to Kush Banerjee, et al. re: For Leapfrog Team: Hospital Safety Grade Coverage Report - Week 1 (11/25/2024) |
| 352.0 | Florida Hospitals Receive 'F' Grades for Patient Safety, 97X Radio Station (11/26/2024) |
| 353.0 | Final Draft Leapfrog Long Range Strategic Intent FY2026-2032 (12/1/2024) |
| 353.1 | FINAL DRAFT LEAPFROG LONG RANGE STRATEGIC INTENT FY2026-2032 - December 2024 (12/12/2024) |
| 354.0 | LEAPFROG LONG RANGE STRATEGIC INTENT FY2026-2032 - Board Approved December 2024 (4/29/2025) |
| 355.0 | Email from Regina West to Sheri Montgomery re: Leapfrog Scores (12/6/2024) |
| 356.0 | Email from Regina West to Sheri Montgomery re: Leapfrog Scores (12/6/2024) |
| 357.0 | Tenet hospitals at bottom of local safety grades, Stet News (12/9/2024) |
| 358.0 | Email from Sheri Montgomery to Patrick Franklin and Dennis Grady re: How scary is THIS? (12/10/2024) |
| 364.0 | Email from Maggie Gill to Sheri Montgomery, Shelly Weiss, and Regina West re: How scary is THIS? (12/10/2024) |
| 366.1 | Email from Gregory Maynard to Patrick Romano, Bruce Hall, and Brenda Inman re: Leapfrog Announcements for Hospitals - December 2024 (12/11/2024) |
| 367.0 | Email from Heather Havericak to Jennifer Shoemaker and Nicole Jackson re: leapfrog standards (12/11/2024) |
| 370.0 | Email from Shelly Weiss to Maggie Gill and Andrew Lofholm re: Leapfrog (12/11/2024) |
| 371.0 | Email from Shelly Weiss to Sheri Montgomery, et al. re: Possible Leapfrog Community Letter (12/11/2024) |
| 372.0 | Email from Shelly Weiss to Nancy Morales and Andrew Lofholm re: Social Media: Leapfrog - graphic/statement (12/11/2024) |
| 373.0 | Email from Sheri Montgomery to Judy Goodman re: Your request (12/11/2024) |
| 375.0 | Five of Palm Beach County's largest hospitals at bottom of local safety grades, Stet News (12/11/2024) |
| 376.0 | Email from Andrew Lofholm to Maggie Gill, et al. re: CBS 12 News coverage of Leapfrog ratings (12/11/2024) |
| 377.0 | Email from Lisa Cook to Nancy Morales, et al. re: IMPORTANT TO POST TODAY (12/12/2024) |
| 378.0 | Email from Kush Banerjee to Missy Danforth re: Data plans for 2025 (12/12/2024) |
| 378.1 | Email from Kush Banerjee to Missy Danforth re: Data plans for 2025 (12/12/2024) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 379.0 | Leapfrog Quarterly Media Report September 1, 2024 – December 1, 2024 (12/12/2024) |
| 380.0 | Email from Maggie Gill to Cynthia McCauley, et al. re: Leapfrog (12/13/2024) |
| 382.0 | Leapfrog Group Board Meeting Agenda (12/16/2024) |
| 383.0 | The Leapfrog Group Executive Committee CEO Report (12/16/2024) |
| 384.0 | FY2025 Financial Update (12/16/2024) |
| 386.1 | Email from Robert Kucejko to Gregory Maynard and Brenda Inman re: Responding to patient questions about rankings (12/19/2024) |
| 390.0 | What are the best and worst south florida hospitals for patient safety, Miami Herald (1/16/2025) |
| 391.0 | IDEAS FOR GOALS AND METRICS FOR THE LONG RANGE STRATEGIC INTENT (1/17/2025) |
| 392.0 | Email from Katie Burggraf Stewart to Missy Danforth re: Safety Grade Responses to Public Comments (1/23/2025) |
| 395.0 | Palm Beach Health Network Fact Sheet (2/12/2025) |
| 396.0 | Email from Alex Campione to Lauren Bailey re: D035QQ850C8 (2/26/2025) |
| 397.0 | Safety Grade Biweekly Meeting (2/27/2025) |
| 398.0 | THE LEAPFROG GROUP FALL 2024 ACCOLADES CAMPAIGN RECAP (3/3/2025) |
| 398.1 | THE LEAPFROG GROUP FALL 2024 ACCOLADES CAMPAIGN RECAP (3/3/2025) |
| 399.0 | Email from Lauren Bailey to Karen Jupiter re: Follow-up Research (3/3/2025) |
| 399.1 | Email from Lauren Bailey to Karen Jupiter re: Follow-up research (3/3/2025) |

Message

**From:** Matt Austin [jausti17@jhmi.edu]
**Sent:** 6/26/2024 3:09:19 PM
**To:** Arnold Milstein [amilstein@stanford.edu]; peter.pronovost@uhhospitals.org; Sara Singer [sara.singer@stanford.edu]; psromano@ucdavis.edu; timothy.vogus@owen.vanderbilt.edu; mchughm@gmail.com; Srinivasan, Arjun (CDC/DDID/NCEZID/DHQP) [beu8@cdc.gov]; dbates@bwh.harvard.edu; Kathy McDonald [kmcdonald@jhu.edu]; doris.l.peter@gmail.com; Vogus, Timothy [timothy.j.vogus@Vanderbilt.Edu]
**CC:** Missy Danforth [mdanforth@leapfrog-group.org]; Alexandra Campione [ACampione@leapfrog-group.org]; Preeti Joshi [pjoshi23@jh.edu]
**Subject:** Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024
**Attachments:** Fall2024HospitalSafetyGrade_FinalMethodologyChanges.pdf

External Email - Use Caution

Based on the expert panel's thoughtful input and guidance, Leapfrog has decided to move forward with updates to imputation methodology used in the Hospital Safety Grade, effective fall 2024.

Attached is a summary of the methodology changes and responses to public comments received on the proposed changes.

Please reach out with any questions or concerns.

We so appreciate your continued support of this work.
Wishing you all a safe (and restful!) summer.

Best,
Matt

---

**From:** Preeti Joshi <pjoshi23@jh.edu>
**Sent:** Wednesday, May 15, 2024 4:40 PM
**To:** amilstein@stanford.edu; peter.pronovost@uhhospitals.org; Sara Singer <sara.singer@stanford.edu>; psromano@ucdavis.edu; timothy.vogus@owen.vanderbilt.edu; mchughm@gmail.com; Srinivasan, Arjun (CDC/DDID/NCEZID/DHQP) <beu8@cdc.gov>; dbates@bwh.harvard.edu; Kathy McDonald <kmcdonald@jhu.edu>; doris.l.peter@gmail.com; Missy Danforth <mdanforth@leapfrog-group.org>; Alexandra Campione <ACampione@leapfrog-group.org>
**Cc:** Vogus, Timothy <timothy.j.vogus@Vanderbilt.Edu>; Matt Austin <jausti17@jhmi.edu>
**Subject:** Meeting Notes: Leapfrog Hospital Safety Grade Expert Panel Call

Hi all,

Apologies for the delay in sharing the meeting notes from the Leapfrog Hospital Safety Grade expert panel call. If you notice any glaring errors or omissions with the attached notes, please let us know.

Thanks so much for your continued service on the expert panel; your input is always very much appreciated. We're lucky to have all of you help guide this work.

Best,
Preeti Joshi, MPH

PX-319.0

Research Data Analyst
Armstrong Institute for Patient Safety and Quality
750 E Pratt St, 15th Floor
Baltimore, MD 21202
pjoshi23@jh.edu

JOHNS HOPKINS MEDICINE

---

-----Original Appointment-----
**From:** Matt Austin <jausti17@jhmi.edu>
**Sent:** Thursday, April 4, 2024 2:09 PM
**To:** Matt Austin; amilstein@stanford.edu; peter.pronovost@uhhospitals.org; sara.singer@stanford.edu; psromano@ucdavis.edu; timothy.vogus@owen.vanderbilt.edu; mchughm@gmail.com; Srinivasan, Arjun (CDC/DDID/NCEZID/DHQP); dbates@bwh.harvard.edu; Kathy McDonald; doris.l.peter@gmail.com; Missy Danforth; Alexandra Campione; Preeti Joshi
**Cc:** Vogus, Timothy
**Subject:** Leapfrog Hospital Safety Grade Expert Panel Call
**When:** Friday, April 12, 2024 4:00 PM-5:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Zoom link: https://leapfroggroup.zoom.us/j/83658572446?pwd=AfezDiAVhywaqGtKPbYDpapQo6ffBe.1

Join Zoom Meeting
https://leapfroggroup.zoom.us/j/83658572446?pwd=AfezDiAVhywaqGtKPbYDpapQo6ffBe.1

Meeting ID: 836 5857 2446
Passcode: 958512

---

One tap mobile
+13092053325,,83658572446# US
+13126266799,,83658572446# US (Chicago)

---

Dial by your location
• +1 309 205 3325 US
• +1 312 626 6799 US (Chicago)
• +1 646 931 3860 US
• +1 929 436 2866 US (New York)
• +1 301 715 8592 US (Washington DC)
• +1 305 224 1968 US
• +1 346 248 7799 US (Houston)
• +1 360 209 5623 US
• +1 386 347 5053 US
• +1 507 473 4847 US
• +1 564 217 2000 US
• +1 669 444 9171 US
• +1 669 900 6833 US (San Jose)

- +1 689 278 1000 US
- +1 719 359 4580 US
- +1 253 205 0468 US
- +1 253 215 8782 US (Tacoma)
- 877 853 5247 US Toll-free
- 888 788 0099 US Toll-free

Meeting ID: 836 5857 2446

Find your local number: https://leapfroggroup.zoom.us/u/kcicFXsG2Q

LEAPFROG HOSPITAL SAFETY GRADE A B C D F

# Final Updates to the Leapfrog Hospital Safety Grade Methodology for Fall 2024

On May 21, 2024, Leapfrog published planned updates to the Hospital Safety Grade methodology and held a public comment period through June 7, 2024. We received a variety of thoughtful comments with different perspectives, which were helpful in finalizing the methodology. We thank all the commenters for their insights.

This document includes the final updates to the methodology as well as responses to the comments received. Additionally, Table 2 on pages 5-6 includes a summary of data sources and anticipated reporting periods for the fall 2024 Hospital Safety Grades. More information can be found on the Hospital Safety Grade website at https://www.hospitalsafetygrade.org/for-hospitals/key-dates-and-information.

## SUMMARY OF CHANGES

Starting with the fall 2024 Hospital Safety Grade update, **Leapfrog will update the Imputation Methodology for CPOE, BCMA, IPS, and Hand Hygiene measures for hospitals that do not submit a 2024 Leapfrog Hospital Survey by August 31, 2024.** The methodology change comes under the guidance of Leapfrog's national expert panel, the research team at Johns Hopkins Medicine, and in response to stakeholder feedback.

## FINAL UPDATE TO IMPUTATION METHOD FOR CPOE, BCMA, IPS, AND HAND HYGIENE

### BACKGROUND

The Leapfrog Group aims to ensure that the public has timely, transparent, and trustworthy information about a hospital's patient safety performance. Leapfrog's always commits to using the best and most recent data publicly available to calculate Hospital Safety Grades.

To ensure the Hospital Safety Grade methodology continues to support these goals, Leapfrog's blue-ribbon Expert Panel, researchers at Johns Hopkins Medicine, and our internal team of experts annually review measures and methodology. The review includes research on current evidence and available data, as well as analysis of hospital performance trends and variables. As a result of this, the panel advised that Leapfrog modify the current imputation method, which is used to fill in missing data among hospitals that did not complete the most recent Leapfrog Survey.

Leapfrog published the planned imputation revisions and solicited public comments. After review of comments, Leapfrog is now finalizing the methodology changes effective for the fall 2024 release of the Hospital Safety Grade.

### CHANGES TO IMPUTATION METHOD FOR CPOE, BCMA, IPS, AND HAND HYGIENE

**1) New Step 1 Imputation (Does not apply to BCMA)**

If the hospital had a score assigned by Leapfrog in the previous two rounds of grades (i.e., spring 2024, fall 2023), the hospital is assigned the most recent score on that measure in the current Hospital Safety Grade (i.e., fall 2024). This is a reduction from the previous methodology, which imputed scores from up to four previous rounds of grades. This will help ensure any historical data used in calculating the Safety Grade is reflective of hospital protocols within the past 2 years (e.g., the reporting periods for CPOE IPS, and Hand Hygiene on the 2023 Leapfrog Hospital Survey was 2023).

Note that Step 1 imputation will be temporarily paused for the BCMA measure. In 2024, Leapfrog expanded the BCMA Standard to include pre-operative and post-anesthesia care units in addition to med-surg units, critical care units, and labor and delivery units. Due to these changes, scores from the 2023 Leapfrog Hospital Survey are not an accurate representation of performance on the current measure and thus not suitable for Step 1 imputation.

**2) New Step 2 Imputation**

For hospitals that do not have historical data from the last two rounds of the Safety Grade (Step 2 imputation then applies), instead of imputing a score based on the cohort mean, hospitals will be assigned a point value that is equivalent to receiving "Limited Achievement" for that measure on the Leapfrog Hospital Survey (Table 1). This category assignment would reflect hospital commitment to transparency as a sign of genuine momentum for improvement. Hospitals that decline to complete the Survey should not inadvertently benefit when compared to hospitals that demonstrate, through transparency, they are on a pathway to achieve Leapfrog's high standards for patient safety.

Step 2 imputation for the IPS measure will only apply to hospitals that operate an adult or pediatric medical and/or surgical ICU or neuro ICU. A hospital's ICU designation will be determined using the most recently available CMS Cost Report. Hospitals that report operating one or more medical, surgical and/or pediatric ICU beds in Worksheet S-3 Part 1 will be eligible for Step 2 Imputation.

**Table 1.** Step 2 Imputation Point Assignments Beginning Fall 2024

| | Leapfrog Hospital Survey Performance Category | Corresponding Safety Grade Measure Score |
|---|---|---|
| CPOE | Limited Achievement | **15** |
| BCMA | Limited Achievement | **25** |
| IPS | Limited Achievement | **5** |
| Hand Hygiene | Limited Achievement | **15** |

## PUBLIC REPORTING OF IMPUTED MEASURE SCORES

Leapfrog will denote imputed measure scores, when applicable, on each hospital's Safety Grade page of the public reporting website (https://www.hospitalsafetygrade.org/). Website users will be able to easily identify scores that were imputed.

## RESPONSES TO PUBLIC COMMENTS

**Four commenters supported the change to the imputation methodology.**
We appreciate the feedback and agree that hospital commitment to transparency should be acknowledged as a sign of genuine momentum for improvement. Hospitals that decline to complete the Survey should not inadvertently benefit when compared to hospitals that transparently demonstrate they are on a clear pathway to achieve Leapfrog's high standards for patient safety.

**One commenter expressed concerns about the public not realizing a score was imputed on the Hospital Safety Grade website (www.HospitalSafetyGrade.org).**
We appreciate this feedback and in response, will add a new denotation to the Hospital Safety Grade website to clearly indicate when a score for a measure has been imputed.

**Two commentors expressed concerns about Step 2 Imputation misrepresenting the current procedures or infrastructure of the hospital to the public.**
Hospitals eligible for Step 2 Imputation may or may not score higher if they complete a Leapfrog Hospital Survey, but without the data, Leapfrog will lean toward caution. Our analyses have shown that performance among hospitals that intermittently complete the annual Survey is lower than those hospitals that complete the Survey on an annual basis. The expert panel recognized that hospitals with a drop in performance may be incentivized to not report via the Leapfrog Hospital Survey and scores calculated using participating hospitals would misrepresent their true performance.

We encourage hospitals to complete the Leapfrog Hospital Survey so they can receive credit for implementing processes that protect patients and save lives. The Survey continues to be free and open from April 1 to November 30, with substantial technical assistance available from Leapfrog's dedicated Help Desk.

**Two commentors requested that the proposed changes be delayed until spring 2025 to allow hospitals time to complete the Leapfrog Hospital Survey.**
While we do strongly encourage hospitals to submit their Survey by the Submission Deadline of June 30, 2024, hospitals that wish to have 2024 Leapfrog Hospital Survey data used in their fall 2024 Safety Grade will have until August 31 to submit or resubmit their Survey. Hospitals that wish to have 2024 Leapfrog Hospital Survey data used in their spring 2025 Safety Grade will have until November 30 to submit their Survey. Meanwhile, hospitals that completed a 2023 Leapfrog Hospital Survey will be eligible for Step 1 Imputation.

**Four commenters opposed penalizing hospitals that choose not to devote resources to completing a voluntary Survey each year and suggested that they be allowed to opt out of the Hospital Safety Grade.**
The Expert Panel noted that participation in the Leapfrog Hospital Survey has grown exponentially in recent years, with 78% of inpatient beds, at Safety Grade eligible hospitals, represented in recent Leapfrog Survey data. As such, a hospital's choice to decline participation in the Survey is itself a data point. A key element of the Hospital Safety Grade is that all eligible hospitals are compared to hospitals nationwide, and non-reporting hospitals exempt themselves from this peer benchmarking and from the responsibility and recognition in the community that comes with full transparency. Without providing the information their peer hospitals do through Survey submission, evidence does not justify awarding that hospital additional points when calculating the Hospital Safety Grade.

Regarding the suggestion that Leapfrog allow hospitals to opt out of earning a Hospital Safety Grade, this would be contrary to Leapfrog's nonprofit mission. As long as patients entrust their lives to American hospitals, Leapfrog will provide the information patients and families need to get the safe care they deserve.

Table 2. Planned Fall 2024 Leapfrog Safety Grade Measures, Data Sources, And Anticipated Reporting Periods

PROCESS/STRUCTURAL MEASURES (12)

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| Computerized Physician Order Entry (CPOE) | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied | N/A |
| Bar Code Medication Administration (BCMA) | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied | N/A |
| ICU Physician Staffing (IPS) | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied | N/A |
| Safe Practice 1: Culture of Leadership Structures and Systems | 2024 Leapfrog Hospital Survey | 2024 | N/A | N/A |
| Safe Practice 2: Culture Measurement, Feedback & Intervention | 2024 Leapfrog Hospital Survey | 2024 | N/A | N/A |
| Total Nursing Care Hours per Patient Day | 2024 Leapfrog Hospital Survey | 2024 | N/A | N/A |
| Hand Hygiene | 2024 Leapfrog Hospital Survey | 2024 | Imputation Model Applied | N/A |
| H-COMP-1: Nurse Communication | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |
| H-COMP-2: Doctor Communication | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |
| H-COMP-3: Staff Responsiveness | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |
| H-COMP-5: Communication about Medicines | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |
| H-COMP-6: Discharge Information | CMS | 10/01/2022 - 09/30/2023 | N/A | N/A |

**OUTCOME MEASURES (10)**

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| **Foreign Object Retained** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **Air Embolism** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **Falls and Trauma** | CMS | 07/01/2021 - 06/30/2023 | N/A | N/A |
| **CLABSI** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **CAUTI** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **SSI: Colon** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **MRSA** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **C. Diff.** | 2024 Leapfrog Hospital Survey | 01/01/2023 - 12/31/2023 | CMS | 10/01/2022 - 09/30/2023 |
| **PSI 4: Death rate among surgical inpatients with serious treatable conditions** | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |
| **CMS Medicare PSI 90: Patient safety and adverse events composite*** | CMS | 07/01/2020 - 06/30/2022 | N/A | N/A |

*Note: CMS calculates PSI 90 using the ten (10) component PSIs listed above. While scores for each of the 10 component PSIs will NOT be used to calculate fall 2024 Hospital Safety Grades, they will be publicly reported on the Hospital Safety Grade website.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**INDEX OF FILED EXHIBITS**
**PLAINTIFFS' EXHIBITS — PX-000s**

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 001.0 | Leapfrog Hospital Safety Grade Scoring Methodology, Spring 2023 Safety Grade (4/10/2023) |
| 002.0 | Leapfrog Hospital Safety Grade Scoring Methdology, Fall 2024 Safety Grade (11/4/2024) |
| 003.0 | Leapfrog Certified Coaches Training: Leapfrog Hospital Survey (1/1/2025) |
| 004.0 | Leapfrog Hospital Survey Hard Copy: Questions & Reporting Periods, Endnotes, Measure Specifications, FAQs (5/2/2025) |
| 005.0 | Defendant The Leapfrog Group's Answer to Plaintiffs' Amended Complaint (Dkt. 75) (9/3/2025) |
| 006.0 | Leapfrog Hospital Survey Hard Copy: Questions & Reporting Periods, Endnotes, Measure Specifications, FAQs (5/2/2025) |
| 007.0 | Recognition from Leapfrog is Significant. And Sharing Your News is Essential, The Leapfrog Group Homepage (8/5/2025) |
| 008.0 | Lives Lost and Lives Saved, The Leapfrog Group (8/5/2025) |
| 008.1 | Lives Lost and Lives Saved, https://www.hospitalsafetygrade.org/LivesLost (8/5/2025) |
| 009.0 | See How Hospitals and Surgery Centers Are Sharing Their News, The Leapfrog Group (8/5/2025) |
| 010.0 | How to License Your Designated Logo, The Leapfrog Group (8/5/2025) |
| 011.0 | Why the Hospital Safety Grade Works, The Leapfrog Group (8/5/2025) |
| 011.1 | Why the Hospital Safety Grade Works (8/5/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 012.0 | Press Resources: Spring 2025 Leapfrog Hospital Safety Grade, The Leapfrog Group (8/6/2025) |
| 013.0 | About Leapfrog Group, Driving Healthcare Transparency (8/6/2025) |
| 014.0 | Your Hospital's Safety Grade, The Leapfrog Group (7/31/2025) |
| 015.0 | Regional Leaders, The Leapfrog Group (8/6/2025) |
| 016.0 | Why Leapfrog (8/6/2025) |
| 018.0 | How Health Plans Can Use Leapfrog Data, The Leapfrog Group (8/6/2025) |
| 019.0 | Leapfrog Hospital Safety Grade, The Leapfrog Group (8/7/2025) |
| 020.0 | Internet Archive archival of https://www.hospitalsafetygrade.org/LivesLost on August 19, 2025 (8/19/2025) |
| 021.0 | Frequently Asked Questions About the Leapfrog Hospital Safety Grade, The Leapfrog Group (8/6/2025) |
| 021.1 | Webpage: Frequently Asked Questions About the Leapfrog Hospital Safety Grade, Leapfrog Hospital Safety Grade (9/3/2025) |
| 021.2 | Webpage: Frequently Asked Questions About the Leapfrog Hospital Safety Grade, Leapfrog Hospital Safety Grade (9/3/2025) |
| 021.3 | Webpage: Frequently Asked Questions About the Leapfrog Hospital Safety Grade, Leapfrog Hospital Safety Grade (9/3/2025) |
| 021.4 | Webpage: Frequently Asked Questions About the Leapfrog Hospital Safety Grade, Leapfrog Hospital Safety Grade (9/3/2025) |
| 022.0 | Choosing the Best Hospital, The Leapfrog Group (8/5/2025) |
| 022.1 | Webpage: Choosing the Best Hospital, Leapfrog Hospital Safety Grade (9/3/2025) |
| 022.2 | Webpage: Choosing the Best Hospital, Leapfrog Hospital Safety Grade (9/3/2025) |
| 023.0 | How to Use the Grade, The Leapfrog Group (8/5/2025) |
| 023.1 | Webpage: How to Use the Grade, Leapfrog Hospital Safety Grade (9/3/2025) |
| 023.2 | Webpage: How to Use the Grade, Leapfrog Hospital Safety Grade (9/3/2025) |
| 023.3 | Webpage: How to Use the Grade, Leapfrog Hospital Safety Grade (9/3/2025) |
| 026.0 | Become a Leapfrog Certified Coach (9/25/2025) |
| 027.0 | About The Leapfrog Group, https://www.hospitalsafetygrade.org/about-our-movement/about-the-leapfrog-group (10/23/2025) |
| 028.0 | Welcome to the 2025 Leapfrog Hospital Survey, https://www.leapfroggroup.org/survey-materials/survey-login-and-materials (10/24/2025) |
| 029.0 | Leapfrog's Website Indicating media/file/Expert_Panel_Guiding_Principles_Nov12_updated.pdf is Not Found (10/26/2025) |
| 030.0 | "Frequently Asked Questions About The Leapfrog Hospital Safety Grade" webpage (11/26/2025) |
| 033.0 | Good Samaritan Medical Center on Leapfrog's Website, Home Page (12/5/2025) |
| 033.1 | Good Samaritan Medical Center on Leapfrog's Website, Search Results (12/3/2025) |
| 033.2 | Good Samaritan Medical Center on Leapfrog's Website, Infections (12/3/2025) |
| 033.3 | Good Samaritan Medical Center on Leapfrog's Website, Problems with Surgery (12/3/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 033.4 | Good Samaritan Medical Center on Leapfrog's Website, Safety Problems (12/3/2025) |
| 033.5 | Good Samaritan Medical Center on Leapfrog's Website, Practices to Prevent Errors (12/3/2025) |
| 033.6 | Good Samaritan Medical Center on Leapfrog's Website, Doctors, Nurses & Hospital Staff (12/3/2025) |
| 033.7 | Good Samaritan Medical Center on Leapfrog's Website, Hospital Details Page (12/5/2025) |
| 034.0 | Delray Medical Center on Leapfrog's Website, Home Page (12/5/2025) |
| 034.1 | Delray Medical Center on Leapfrog's Website, Search Results (12/3/2025) |
| 034.2 | Delray Medical Center on Leapfrog's Website, Infections (12/3/2025) |
| 034.3 | Delray Medical Center on Leapfrog's Website, Problems with Surgery (12/3/2025) |
| 034.4 | Delray Medical Center on Leapfrog's Website, Safety Problems (12/3/2025) |
| 034.5 | Delray Medical Center on Leapfrog's Website, Practices to Prevent Errors (12/3/2025) |
| 034.6 | Delray Medical Center on Leapfrog's Website, Doctors, Nurses & Hospital Staff (12/3/2025) |
| 034.7 | Delray Medical Center on Leapfrog's Website, Hospital Details Page (12/5/2025) |
| 035.0 | Palm Beach Gardens Medical Center on Leapfrog's Website, Home Page (12/5/2025) |
| 035.1 | Palm Beach Gardens Medical Center on Leapfrog's Website, Search Results (12/3/2025) |
| 035.2 | Palm Beach Gardens Medical Center on Leapfrog's Website, Infections (12/3/2025) |
| 035.3 | Palm Beach Gardens Medical Center on Leapfrog's Website, Problems with Surgery (12/3/2025) |
| 035.4 | Palm Beach Gardens Medical Center on Leapfrog's Website, Safety Problems (12/3/2025) |
| 035.5 | Palm Beach Gardens Medical Center on Leapfrog's Website, Practices to Prevent Errors (12/3/2025) |
| 035.6 | Palm Beach Gardens Medical Center on Leapfrog's Website, Doctors, Nurses & Hospital Staff (12/3/2025) |
| 035.7 | Palm Beach Gardens Medical Center on Leapfrog's Website, Hospital Details Page (12/5/2025) |
| 036.0 | St. Mary's Medical Center on Leapfrog's Website, Home Page (12/5/2025) |
| 036.1 | St. Mary's Medical Center on Leapfrog's Website, Search Results (12/3/2025) |
| 036.2 | St. Mary's Medical Center on Leapfrog's Website, Infections (12/3/2025) |
| 036.3 | St. Mary's Medical Center on Leapfrog's Website, Problems with Surgery (12/3/2025) |
| 036.4 | St. Mary's Medical Center on Leapfrog's Website, Safety Problems (12/3/2025) |
| 036.5 | St. Mary's Medical Center on Leapfrog's Website, Practices to Prevent Errors (12/3/2025) |
| 036.6 | St. Mary's Medical Center on Leapfrog's Website, Doctors, Nurses & Hospital Staff (12/3/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 036.7 | St. Mary's Medical Center on Leapfrog's Website, Hospital Details Page (12/5/2025) |
| 037.0 | West Boca Medical Center on Leapfrog's Website, Home Page (12/5/2025) |
| 037.1 | West Boca Medical Center on Leapfrog's Website, Search Results (12/3/2025) |
| 037.2 | West Boca Medical Center on Leapfrog's Website, Infections (12/3/2025) |
| 037.3 | West Boca Medical Center on Leapfrog's Website, Problems with Surgery (12/3/2025) |
| 037.4 | West Boca Medical Center on Leapfrog's Website, Safety Problems (12/3/2025) |
| 037.5 | West Boca Medical Center on Leapfrog's Website, Practices to Prevent Errors (12/3/2025) |
| 037.6 | West Boca Medical Center on Leapfrog's Website, Doctors, Nurses & Hospital Staff (12/3/2025) |
| 037.7 | West Boca Medical Center on Leapfrog's Website, Hospital Details Page (12/5/2025) |
| 038.0 | West Boca Medical Center, Ratings, Leapfrog Group (8/5/2025) |
| 039.0 | Delray Medical Center, Ratings, Leapfrog Group - Delray Medical Center has Declined to Respond (9/2/2025) |
| 040.0 | Delray Medical Center, Ratings, Leapfrog Group (9/2/2025) |
| 041.0 | Delray Medical Center, Ratings, Leapfrog Group - Delray Medical Center has Declined to Respond (9/2/2025) |
| 042.0 | Delray Medical Center, Ratings, Leapfrog Group (9/2/2025) |
| 043.0 | Delray Medical Center, Ratings, Leapfrog Group - Delray Medical Center has Declined to Respond (9/2/2025) |
| 044.0 | Delray Medical Center, Ratings, Leapfrog Group (9/2/2025) |
| 045.0 | Delray Medical Center - FL - Hospital Safety Grade (9/11/2025) |
| 046.0 | Delray Medical Center, Hospital Details Table (9/11/2025) |
| 047.0 | Delray Medical Center, Ratings, Leapfrog Group (9/11/2025) |
| 048.0 | Delray Medical Center, Ratings, Leapfrog Group (9/11/2025) |
| 049.0 | Delray Medical Center, Hospital Details Table (9/11/2025) |
| 050.0 | West Boca Medical Center - FL - Hospital Safety Grade (9/19/2025) |
| 051.0 | West Boca Medical Center, Ratings, Leapfrog Group |
| 053.0 | St Marys - FL - Hospital Safety Grade - Show recent past grades.pdf (8/7/2025) |
| 055.0 | Palm Beach Gardens Medical Center - FL - Hospital Safety Grade - Show recent past grades.pdf (8/7/2025) |
| 056.0 | Delray Medical Center - FL - Hospital Safety Grade - Show recent past grades.pdf (8/7/2025) |
| 057.0 | Delray Medical Center - FL - Spring 2025 Hospital Safety Grade.pdf (8/5/2025) |
| 057.1 | Webpage: Delray Medical Center - FL - Hospital Safety Grade (9/2/2025) |
| 058.0 | Palm Beach Gardens Medical Center - FL - Spring 2025 Hospital Safety Grade.pdf (8/5/2025) |
| 059.0 | West Boca Medical Center - FL - Hospital Safety Grade - Show recent past grades.pdf (8/7/2025) |
| 060.0 | Delray, Hospital Matches Delray Beach Search Results.pdf (8/6/2025) |

| PX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 061.0 | Good Samaritan Medical Center - FL - Hospital Safety Grade - Show recent past grades.pdf (8/7/2025) |
| 062.0 | Good Samaritan Medical Center - FL - Spring 2025 Hospital Safety Grade.pdf (8/5/2025) |
| 063.0 | Palm Beach Gardens Medical Center Hospital Safety Grade Measures Packet.pdf (8/7/2025) |
| 064.0 | St. Mary's Medical Center - FL - Spring 2025 Hospital Safety Grade.pdf (8/5/2025) |
| 065.0 | 2025.08.05 Flowchart Screenrecording Backup.mp4 (8/6/2025) |
| 066.0 | Leapfrog Website, About the Grade (12/5/2025) |
| 066.1 | About the Grade, https://www.hospitalsafetygrade.org/about-the-grade (8/6/2025) |
| 066.2 | About the Grade, https://www.hospitalsafetygrade.org/about-the-grade (8/6/2025) |
| 066.3 | About the Grade, https://www.hospitalsafetygrade.org/about-the-grade (8/6/2025) |

LEAPFROG HOSPITAL SAFETY GRADE

A program of THELEAPFROGGROUP

# Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

This Hospital's Grade

D

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff

MRSA Infection

C. diff Infection

Infection in the blood

Infection in the urinary tract

Surgical site infection after colon surgery

Sepsis infection after surgery

**Hospital Performs:**

Worse Than Average — Better Than Average

PX-033.2

**This Hospital's Score:**

0.348

**Best Hospital's Score:**

0.000

**Average Hospital's Score:**

0.689

**Worst Hospital's Score:**

2.685

**MRSA infection**

Staph bacteria are common in hospitals, but Methicillin-resistant Staphylococcus aureus (MRSA) is a type of staph bacteria that is resistant to (cannot be killed by) many antibiotics. MRSA can be found in bed linens or medical equipment and can be spread if providers do not properly wash their hands between patients. MRSA can cause life-threatening bloodstream infections, pneumonia and surgical site infections.

*This number represents a comparison of the number of infections that actually happened at this hospital to the number of infections expected for this hospital, given the number of patients they care for on a daily basis and how widespread MRSA infection is in their local community. A number lower than one means fewer infections than expected; a number more than one means more infections than expected.* For details on sources, click here.

**What safer hospitals do:**

Doctors and nurses should clean their hands after caring for every patient. Hospital rooms and medical equipment should be thoroughly cleaned often. Safer hospitals will also keep MRSA patients separate from other patients and require providers and visitors to wear gloves and gowns around these patients.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to [illegible] evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

THE LEAPFROG GROUP

## The Leapfrog Hospital Safety Grade

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.

© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG HOSPITAL SAFETY GRADE

A program of THE LEAPFROG GROUP

# Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

**This Hospital's Grade**

D

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



**Infections** | **Problems with Surgery** | **Safety Problems** | **Practices to Prevent Errors** | **Doctors, Nurses & Hospital Staff**

- MRSA Infection
- C. diff Infection
- Infection in the blood
- Infection in the urinary tract
- Surgical site infection after colon surgery
- Sepsis infection after surgery

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

0.423

**Best Hospital's Score:**

0.000

**Average Hospital's Score:**

0.370

**Worst Hospital's Score:**

1.486

**C. diff infection**

Clostridium difficile (C. diff) is a bacterium that can cause diarrhea, abdominal pain, loss of appetite, and fever. Most C. diff cases occur in patients taking or having recently taken antibiotics, and fully killing the bacteria in an infected patient can be very difficult. C. diff can spread via contaminated equipment or by providers who fail to properly wash their hands between patients.

*This number represents a comparison of the number of infections that actually happened at this hospital to the number of infections expected for this hospital, given the number of patients they care for on a daily basis and how widespread C. diff infection is in their local community. A number lower than one means fewer infections than expected; a number more than one means more infections than expected.* For details on sources, click here.

**What safer hospitals do:**

Doctors and nurses should clean their hands after caring for every patient. Hospital rooms and medical equipment should be thoroughly cleaned often. Safer hospitals will also keep C. diff patients separate from other patients, and require providers and visitors to wear gloves and gowns around these patients.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be

liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without the expressed written permission of The Leapfrog Group.

THE LEAPFROG GROUP

## The Leapfrog Hospital Safety Grade

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.

© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG HOSPITAL SAFETY GRADE

A program of THELEAPFROGGROUP

# Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

**This Hospital's Grade**

**D**

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



| Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff |
|---|---|---|---|---|

MRSA Infection

C. diff Infection

Infection in the blood

Infection in the urinary tract

Surgical site infection after colon surgery

Sepsis infection after surgery

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

0.000

**Best Hospital's Score:**

0.000

**Average Hospital's Score:**

0.586

**Worst Hospital's Score:**

2.362

**Infection in the blood**

If a patient is in the hospital, he or she may be given a central line (a tube inserted into the body to deliver medication and other treatments). Patients with a central line are at high risk for developing a dangerous infection in the blood. These serious infections can lead to other complications, increase recovery time, and can often lead to death.

*This number represents a comparison of the number of central line-associated infections in the blood that actually happened at this hospital to the number of infections expected for this hospital, given the number of central lines used and other factors like facility type and size. A number lower than one means fewer infections than expected; a number more than one means more infections than expected.* For details on sources, click here.

**What safer hospitals do:**

Hospital staff follows special guidelines when inserting central lines, often including a checklist of steps to follow. They properly maintain a patient's central line to prevent infection.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

THELEAPFROGGROUP

## The Leapfrog Hospital Safety Grade

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG HOSPITAL SAFETY GRADE

A program of THE LEAPFROG GROUP

# Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

This Hospital's Grade

D

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff

- MRSA Infection
- C. diff Infection
- Infection in the blood
- Infection in the urinary tract
- Surgical site infection after colon surgery
- Sepsis infection after surgery

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

0.987

**Best Hospital's Score:**

0.000

**Average Hospital's Score:**

0.522

**Worst Hospital's Score:**

2.399

**Infection in the urinary tract**

If a patient is in the hospital, he or she may require a urinary catheter. Patients with catheters are at risk for developing a dangerous infection in the urinary tract. These serious infections can lead to other complications, increase recovery time, and can often lead to death.

*This number represents a comparison of the number of catheter-associated infections in the urinary tract that actually happened at this hospital to the number of infections expected for this hospital, given the number of catheters used and other factors like facility type and size. A number lower than one means fewer infections than expected; a number more than one means more infections than expected.* For details on sources, click here.

**What safer hospitals do:**

Hospital staff regularly clean and maintain urinary catheters to prevent infection. They also know when and how to safely remove a catheter.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

**The Leapfrog Hospital Safety Grade**

THE LEAPFROG GROUP

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG HOSPITAL SAFETY GRADE

A program of THE LEAPFROG GROUP

# Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

**This Hospital's Grade**

**D**

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



**Infections** | **Problems with Surgery** | **Safety Problems** | **Practices to Prevent Errors** | **Doctors, Nurses & Hospital Staff**

- MRSA Infection
- C. diff Infection
- Infection in the blood
- Infection in the urinary tract
- Surgical site infection after colon surgery
- Sepsis infection after surgery

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

1.408

**Best Hospital's Score:**

0.000

**Average Hospital's Score:**

0.856

**Worst Hospital's Score:**

3.229

**Surgical site infection after colon surgery**

This infection happens after surgery in the part of the colon where the surgery took place. These infections can be very serious, and may spread throughout the body. A patient with this type of infection often faces a long recovery in the ICU. Some people even die from the infection.

*This number represents a comparison of the number of infections after colon surgery that actually happened at this hospital to the number of infections expected for this hospital, given the types of patients they care for and other factors like a patient's age and type of surgery. A number lower than one means fewer infections than expected; a number more than one means more infections than expected.* For details on sources, click here.

**What safer hospitals do:**

The hospital team uses appropriate antibiotics before surgery, cleans the skin with a special soap that kills germs, and closely watches patients during and after major colon surgeries.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

THE LEAPFROG GROUP

## The Leapfrog Hospital Safety Grade

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG HOSPITAL SAFETY GRADE

A program of THELEAPFROGGROUP

# Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

**This Hospital's Grade**

D

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



**Infections** | **Problems with Surgery** | **Safety Problems** | **Practices to Prevent Errors** | **Doctors, Nurses & Hospital Staff**

- MRSA Infection
- C. diff Infection
- Infection in the blood
- Infection in the urinary tract
- Surgical site infection after colon surgery
- Sepsis infection after surgery

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

5.51

**Best Hospital's Score:**

1.95

**Average Hospital's Score:**

5.62

**Worst Hospital's Score:**

12.56

**Sepsis infection after surgery**

Sepsis is your body's extreme reaction to an infection. All types of surgeries can put a patient at risk of infection that can lead to sepsis. This could be infection where the skin was cut, or an infection that develops after the surgery, like pneumonia. Sepsis requires immediate treatment or the patient may experience lifelong complications including organ failure. Some patients may die if sepsis is not treated quickly.

*This number represents the number of surgical patients that experienced a sepsis infection for every 1,000 people who had surgery.* For details on sources, click here.

**What safer hospitals do:**

Hospital staff closely monitor patients for signs of sepsis following surgical procedures, including a high heart rate, low blood pressure, fatigue, confusion, and severe pain.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

**The Leapfrog Hospital Safety Grade**

THE LEAPFROG GROUP

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG
HOSPITAL
SAFETY GRADE

A program of
THE LEAPFROG GROUP

# Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

This Hospital's Grade

D

FALL 2025

► Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



PX-033.5

| Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff |
|---|---|---|---|---|

- Doctors order medications through a computer
- Safe medication administratio
- Handwashing
- Communicati about Medicines
- Communicati about Discharge
- Declined to Report[1] Staff work together to prevent errors

**Hospital Performs:**
Worse Than Average — Better Than Average

**This Hospital's Score:**

15 *

**Best Hospital's Score:**

100

**Average Hospital's Score:**

82.22

**Worst Hospital's Score:**

15

**Doctors order medications through a computer**

Hospitals can use Computerized Physician Order Entry (CPOE) systems to order medications for patients in the hospital, instead of writing out prescriptions by hand. Good CPOE systems alert the doctor if they try to order a medication that could cause harm, such as prescribing an adult dosage for a child. CPOE systems help to reduce medication errors in the hospital.

*Hospitals can earn up to 100 points for using a well-functioning CPOE system in most areas of the hospital.* For details on sources, click here.

**What safer hospitals do:**

Hospitals use CPOE systems in all areas of the hospital and regularly test those systems to ensure they are alerting doctors to potential ordering errors.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

4. *** The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

The Leapfrog Hospital Safety Grade

THE LEAPFROG GROUP

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG HOSPITAL SAFETY GRADE

A program of THELEAPFROGGROUP

## Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

**This Hospital's Grade**

**D**

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



| Infections | Problems with Surgery | Safety Problems | **Practices to Prevent Errors** | Doctors, Nurses & Hospital Staff |
|---|---|---|---|---|

- Doctors order medications through a computer
- Safe medication administratio
- Handwashing
- Communicati about Medicines
- Communicati about Discharge
- Declined to Report[1] Staff work together to prevent errors

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

25 *

**Best Hospital's Score:**

100

**Average Hospital's Score:**

85.20

**Worst Hospital's Score:**

25

**Safe medication administration**

Using barcodes on medications, nurses can scan the medication and then the patient's ID bracelet to make sure the patient is receiving the right medications. If the bar codes do not match, this signals there is an error, giving nurses and doctors the chance to confirm they have the right patient, right medication, and right dose. Bar code medication administration (BCMA) systems are proven to reduce the risk that a hospital accidentally gives the wrong medication to a patient.

*Hospitals earn up to 100 points for using a well-functioning bar coding system for all medication orders, and making sure it is used properly to keep patients safe.* For details on sources, click here.

**What safer hospitals do:**

When hospitals use bar coding technology effectively for all orders, medication errors happen far less frequently.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

4. *** The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

THE LEAPFROG GROUP

## The Leapfrog Hospital Safety Grade

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG HOSPITAL SAFETY GRADE

A program of THELEAPFROGGROUP

# Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

This Hospital's Grade

D

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff

- Doctors order medications through a computer
- Safe medication administratio
- Handwashing
- Communicati about Medicines
- Communicati about Discharge
- Declined to Report[1] Staff work together to prevent errors

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

15 *

**Best Hospital's Score:**

100

**Average Hospital's Score:**

76.81

**Worst Hospital's Score:**

15

**Handwashing**

Healthcare workers can help stop infection and illness by carefully cleaning their hands. When hospital staff does not carefully wash their hands, they can spread germs from one patient to another and cause someone to become seriously ill.

*Hospitals can earn up to 100 points for having a handwashing policy and evaluating how hospital workers follow that policy. For details on sources, click here.*

**What safer hospitals do:**

Hospitals provide training and implement policies to make sure that all hospital staff cleans their hands before touching a patient.

## Notes and Definitions

**1. Declined to Report: The hospital was asked to provide this information to the public, but did not.**

**2. Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

**3. Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

**4. * The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

THELEAPFROGGROUP

**The Leapfrog Hospital Safety Grade**

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an

independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG HOSPITAL SAFETY GRADE

A program of THE LEAPFROG GROUP

## Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

**This Hospital's Grade**

D

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



Infections | Problems with Surgery | Safety Problems | **Practices to Prevent Errors** | Doctors, Nurses & Hospital Staff

- Doctors order medications through a computer
- Safe medication administratio
- Handwashing
- Communicati about Medicines
- Communicati about Discharge
- Declined to Report[1] Staff work together to prevent errors

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

66

**Best Hospital's Score:**

88

**Average Hospital's Score:**

74.64

**Worst Hospital's Score:**

59

**Communication about medicines**

Patients' perspectives of care are an important part of patient safety. The Communication about Medicines measure reflects patients' feedback on how often hospital staff explained the purpose of any new medicine and what side effects that medicine might have. Effective communication about medicine prevents misunderstandings that could lead to serious problems for a patient.

*Based on a scale of zero-100, this number represents a comparison of patients' perspectives of how effectively this hospital communicated with patients about their medications relative to patients' perspectives of how effectively other hospitals communicated with their patients. Higher scores indicate more effective communication than lower scores. For details on sources, click here.*

**What safer hospitals do:**

Hospitals that score well on this measure take time to speak with every patient to ensure that the patient understands the purpose of any new medication they are given, how to take the medication, and the risk of any possible side effects.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

THE LEAPFROG GROUP

## The Leapfrog Hospital Safety Grade

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG HOSPITAL SAFETY GRADE

A program of THE LEAPFROG GROUP

## Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

**This Hospital's Grade**

D

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



Infections | Problems with Surgery | Safety Problems | **Practices to Prevent Errors** | Doctors, Nurses & Hospital Staff

- Doctors order medications through a computer
- Safe medication administratio
- Handwashing
- Communicati about Medicines
- Communicati about Discharge
- Declined to Report[†] Staff work together to prevent errors

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

78

**Best Hospital's Score:**

94

**Average Hospital's Score:**

85.48

**Worst Hospital's Score:**

67

**Communication about discharge**

Patients' perspectives of care are an important part of patient safety. The Communication about Discharge measure summarizes how well the hospital staff communicated with patients about the help they would need at home after leaving the hospital. The measure also summarizes how often patients reported that they were given written information about symptoms or health problems to watch for during their recovery. Educating patients on the steps they need to take during their recovery at home reduces the chances that a patient will need to be readmitted to the hospital.

*Based on a scale of zero-100, this number represents a comparison of patients' perspectives of how effectively this hospital communicated with patients about the help they would need after discharge relative to patients' perspectives of how effectively other hospitals communicated with their patients. Higher scores indicate more effective communication than lower scores.*
*For details on sources, click here.*

**What safer hospitals do:**

Hospitals that score well on this measure take time with every patient to clarify the patient's responsibilities during her recovery at home, clarify the responsibilities of caregivers at home, and educate the patient on any symptoms that could point to problems in the recovery process.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be

able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

**3. Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

THE LEAPFROG GROUP

## The Leapfrog Hospital Safety Grade

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

LEAPFROG
HOSPITAL
SAFETY GRADE

A program of
THELEAPFROGGROUP

## Good Samaritan Medical Center

1309 N. Flagler Drive
West Palm Beach, FL 33401-3499

View this hospital's Leapfrog Hospital Survey Results

**This Hospital's Grade**

D

FALL 2025

▶ Show Recent Past Grades

Detailed table view

NEW Order 2½ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



Infections | Problems with Surgery | Safety Problems | **Practices to Prevent Errors** | Doctors, Nurses & Hospital Staff

- Doctors order medications through a computer
- Safe medication administratio
- Handwashing
- Communicati about Medicines
- Communicati about Discharge
- Declined to Report[1] Staff work together to prevent errors

**Hospital Performs:**

Worse Than Average — Better Than Average

**This Hospital's Score:**

Declined to Report

**Best Hospital's Score:**

120.00

**Average Hospital's Score:**

117.27

**Worst Hospital's Score:**

0.00

**Staff work together to prevent errors**

A hospital that has a strong culture of safety has a well-functioning team with good leaders who catch errors before they can harm a patient. Patients are less likely to experience mistakes if hospital staff works together. Staff should also be comfortable speaking up when they sense an error might happen.

*Hospitals can earn up to 120 points for measuring culture of safety, providing feedback to staff, and creating new plans to prevent errors.* For details on sources, click here.

**What safer hospitals do:**

Hospitals regularly survey their physicians, nurses, and other staff on the culture of safety to measure how well staff works together to keep patients safe. Then, hospitals provide feedback on the results to leaders and hospital staff and create plans to improve.

## Notes and Definitions

1. **Declined to Report: The hospital was asked to provide this information to the public, but did not.**

2. **Not Available:** "Not Available" means that the hospital does not have data for this measure. This could be because the measure is related to a service the hospital does not provide. For example, a hospital that does not have an ICU would not be able to report data about ICUs. It could also be because the hospital had too few patients or cases to report data for a particular condition or procedure. A "Not Available" result does not mean that the hospital withheld information from the public.

3. **Straight A:** The hospital has earned an 'A' Grade for five consecutive grading rounds or more, qualifying it for recognition as a "Straight A" hospital.

LEGAL DISCLAIMER: The Leapfrog Hospital Safety Grade scores hospitals on their overall performance in keeping patients safe from preventable harm and medical errors. The grades are derived from expert analysis of publicly available data using up to 31 evidence-based, national measures of hospital safety. No specific representation is made, nor shall be implied, nor shall The Leapfrog Group be liable with respect to any individual patient's potential or actual outcome as a result of receiving services performed at any of these hospitals. Leapfrog Hospital Safety Grades cannot be republished without expressed written permission from The Leapfrog Group.

**The Leapfrog Hospital Safety Grade**

THE LEAPFROG GROUP

The Leapfrog Hospital Safety Grade is a public service provided by The Leapfrog Group, an independent nonprofit organization committed to driving quality, safety, and transparency in the U.S. health system.

By viewing this website you are agreeing to our TERMS OF USE. The information viewed on this site is not intended to be the only or primary means for evaluating hospital quality nor is it intended to be relied upon as advice or a recommendation or an endorsement about which hospitals to use or the quality of the medical treatment that you receive from a hospital or other health care provider. You are solely responsible for any and all decisions with respect to your medical treatment. Neither Leapfrog nor its affiliates are responsible for any damages or costs you might incur with respect to your use of this site. Never disregard, avoid or delay in obtaining medical advice from your doctor or other health care professional because of something that you have read on this site as the site is not intended to be a substitute for professional medical advice.
© Copyright 2025, The Leapfrog Group. Updated November 13, 2025.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

# THE COMMUNITY HOSPITALS' REVISED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

PROPOSED FINDINGS OF FACT .......... 4

I. BACKGROUND .......... 4

A. The Parties .......... 4

B. Leapfrog's Safety Grades And Survey .......... 5

II. THE REALITY OF LEAPFROG'S GRADING PRACTICES .......... 9

A. The Non-Participation Penalty .......... 9

B. The "Double Whammy": Automatic Failing Scores Plus Increased Weighting .......... 13

C. The Impact The Fall 2024 Penalty Scoring Had On The Community Hospitals' Safety Grades .......... 15

D. Lack Of Actual Safety Performance Data .......... 16

III. WHAT LEAPFROG LEADS THE PUBLIC TO BELIEVE ABOUT ITS SAFETY GRADES .......... 19

A. Leapfrog Leads The Public To Believe The Safety Grades Are Supported By Real Data .......... 19

B. Leapfrog Leads The Public To Believe The Safety Grades Reflect Actual Safety Performance—Not Survey Participation .......... 20

C. Leapfrog Leads The Public To Believe The Safety Grades Are Peer-Reviewed And Expert-Approved .......... 24

IV. LEAPFROG'S PURPORTED DISCLOSURES: HIDDEN FOOTNOTES AND BURIED DOCUMENTS .......... 24

V. LEAPFROG'S WIDESPREAD DISSEMINATION AND AMPLIFICATION OF THE COMMUNITY HOSPITALS' SAFETY GRADES .......... 27

VI. LEAPFROG'S MOTIVE: USE THE SAFETY GRADE TO COERCE PARTICIPATION AND INCREASE REVENUE .......... 30

A. Leapfrog Adopted the Non-Participation Penalty to Increase Revenue .......... 30

B. Leapfrog's Explanation For The Non-Participation Penalty Was Not Supported ... 33

VII. LEAPFROG'S SAFETY GRADES HAVE CAUSED REAL AND ONGOING HARM ... 35

A. Delray Medical Center ... 35

B. Palm Beach Gardens Medical Center ... 38

C. St. Mary's Medical Center ... 40

D. West Boca Medical Center ... 42

E. Good Samaritan Medical Center ... 45

F. Leapfrog Witnesses ... 49

G. Expert Testimony ... 50

PROPOSED CONCLUSIONS OF LAW ... 51

I. THIS COURT HAS JURISDICTION OVER THIS ACTION ... 51

II. THE COMMUNITY HOSPITALS HAVE ESTABLISHED THAT LEAPFROG VIOLATED FDUTPA ... 52

A. Leapfrog's "Safety Grades," Safety Grade Methodology, And Surrounding Misrepresentations Are Deceptive Under FDUTPA ... 53

B. Leapfrog's Safety Grades, Safety Grade Methodology, And Associated Coercive Practices Are Unfair Under FDUTPA ... 57

C. The Community Hospitals Are Aggrieved By Leapfrog's Unlawful Practices ... 66

III. LEAPFROG'S CONDUCT OCCURS IN TRADE OR COMMERCE IN FLORIDA ... 69

IV. LEAPFROG'S AFFIRMATIVE DEFENSES FAIL ... 69

V. INJUNCTIVE AND DECLARATORY RELIEF ARE APPROPRIATE ... 70

A. A Permanent Injunction Is Warranted ... 70

B. A Declaratory Judgment Is Also Warranted ... 75

VI. THE COMMUNITY HOSPITALS ARE ENTITLED TO ATTORNEYS' FEES ... 76

# TABLE OF AUTHORITIES

## Cases

*Ahearn v. Mayo Clinic*,
180 So. 3d 165 (Fla. 1st DCA 2015) ....................53, 66

*Alderwoods Grp., Inc. v. Garcia*,
682 F.3d 958 (11th Cir. 2012) ....................75

*Alley v. U.S. Dep't of Health & Hum. Servs.*,
590 F.3d 1195 (11th Cir. 2009) ....................75

*AmBrit, Inc. v. Kraft, Inc.*,
812 F.2d 1531 (11th Cir. 1986) ....................75

*Armstrong v. U.S. Bank Nat'l Ass'n*,
729 F. Supp. 3d 1291 (M.D. Fla. 2024)....................70

*Bluegreen Vacations Unlimited Inc. v. Timeshare Lawyers P.A.*,
2024 WL 3738890 (S.D. Fla. July 18, 2024)....................76

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....................71, 72

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau*,
169 So. 3d 164 (Fla. 4th DCA 2015)....................53

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ....................53

*Chow v. Chak Yam Chau*,
640 F. App'x 834 (11th Cir. 2015) ....................76

*CMR Construction & Roofing, LLC v. UCMS, LLC*,
2022 WL 3012298 (11th Cir. July 29, 2022)....................59

*Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC*,
2020 WL 6700449 (S.D. Fla. Oct. 20, 2020)....................67

*Common Cause/Georgia v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ....................67

*Cox v. Adm'r U.S. Steel & Carnegie*,
17 F.3d 1386 (11th Cir. 1994) ....................69

*Davis v. Powertel, Inc.*,
776 So. 2d 971 (Fla. 1st DCA 2000) ....................58, 59

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*,
752 So. 2d 582 (Fla. 2000)....52

*Ferrero v. Associated Materials, Inc.*,
923 F.2d 1441 (11th Cir. 1991)....71

*Fla. Med. Ass'n v. Dep't of Health, Educ., & Welfare*,
947 F. Supp. 2d 1325 (M.D. Fla. 2013)....73

*Florida Virtual School v. K12, Inc.*,
2026 WL 127063 (11th Cir. Jan. 15, 2026)....36

*Fonte v. AT&T Wireless Servs., Inc.*,
903 So. 2d 1019 (Fla. 4th DCA 2005)....58

*FTC v. Corpay, Inc.*,
164 F.4th 807 (11th Cir. 2026)....57, 58, 72, 74

*FTC v. Hispanic Global Way, Corp.*,
2014 WL 12531538 (S.D. Fla. July 1, 2014)....71

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)....61

*FTC v. World Patent Mktg., Inc.*,
2017 WL 3508639 (S.D. Fla. Aug. 16, 2017)....65

*Healthcare Res. Mgmt. Grp., LLC v. EcoNatura All Healthy World, LLC*,
2022 WL 1537757 (S.D. Fla. May 12, 2022)....77

*Hodge v. Dep't of Housing & Urban Dev.*,
862 F.2d 859 (11th Cir. 1989)....73

*Houston v. Marod Supermarkets, Inc.*,
733 F.3d 1323 (11th Cir. 2013)....52

*Humane Soc'y of Broward Cnty., Inc. v. Fla. Humane Soc'y*,
951 So. 2d 966 (Fla. 4th DCA 2007)....76

*Jeter v. Credit Bureau, Inc.*,
760 F.2d 1168 (11th Cir. 1985)....61

*Klay v. United Healthgroup, Inc.*,
376 F.3d 1092 (11th Cir. 2004)....70

*LabMD Inc. v. FTC*,
894 F.3d 1221 (11th Cir. 2018)....59

*Lincare Holdings Inc. v. Doxo, Inc.*,
2024 WL 865881 (M.D. Fla. Feb. 29, 2024) ....................36

*Lucero v. Trosch*,
121 F.3d 591 (11th Cir. 1997) ....................73, 74

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
243 F.3d 789 (4th Cir. 2001) ....................36

*MacuHealth, LP v. Vision Elements, Inc.*,
2024 WL 3738489 (M.D. Fla. Aug. 9, 2024) ....................74

*Marco Island Cable v. Comcast Cablevision of S., Inc.*,
312 F. App'x 211 (11th Cir. 2009) ....................53, 66

*Marrache v. Bacardi U.S.A., Inc.*,
17 F.4th 1084 (11th Cir. 2021) ....................66

*Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen.*,
761 So. 2d 1256 (Fla. 3d DCA 2000) ....................53, 57, 58

*Osmose, Inc. v. Viance, LLC*,
2009 WL 10665750 (N.D. Ga. Mar. 20, 2009) ....................65

*PBM Prods., LLC v. Mead Johnson & Co.*,
639 F.3d 111 (4th Cir. 2011) ....................74

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
842 So. 2d 773 (Fla. 2003) ....................53, 58, 60, 66

*Popular Bank of Fla. v. Banco Popular de P.R.*,
9 F. Supp. 2d 1347 (S.D. Fla. 1998) ....................71

*Porsche Cars N. Am., Inc. v. Diamond*,
140 So. 3d 1090 (Fla. 3d DCA 2014) ....................59, 60, 65

*PTA-FLA, Inc. v. ZTE USA, Inc.*,
844 F.3d 1299 (11th Cir. 2016) ....................52

*Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*,
10 F.3d 1563 (11th Cir. 1994) ....................69

*In re Schurtenberger*,
2014 WL 92828 (Bankr. S.D. Fla. Jan. 9, 2014) ....................69

*SMS Audio, LLC v. Belson*,
2017 WL 1533941 (S.D. Fla. Mar. 9, 2017) ....................53, 60, 65, 66

*In re Stand 'N Seal*,
623 F. Supp. 2d (N.D. Ga. 2009) ....................62

*State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*,
278 F. Supp. 3d 1307 (S.D. Fla. 2017) ....................53

*Stewart Agency, Inc. v. Arrigo Enters., Inc.*,
266 So. 3d 207 (Fla. 4th DCA 2019) ....................59, 66

*Sys. Fed'n No. 91 v. Wright*,
364 U.S. 642 (1961) ....................73

*Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*,
558 F. Supp. 3d 1275 (S.D. Fla. 2021) ....................61

*United States v. Kent*,
93 F.4th 1213 (11th Cir. 2024) ....................36

*United States v. Rivera*,
780 F.3d 1084 (11th Cir. 2015) ....................36

*United States v. Starr*,
159 F.4th 901 (11th Cir. 2025) ....................36

*Univ. of S. Ala. v. Am. Tobacco Co.*,
168 F.3d 405 (11th Cir. 1999) ....................51

*Waste Pro USA v. Vision Constr. ENT, Inc.*,
282 So. 3d 911 (Fla. 1st DCA 2019) ....................53

*World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*,
586 F.3d 950 (11th Cir. 2009) ....................66

*Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*,
2024 WL 5703196 (M.D. Fla. Aug. 14, 2024) ....................69

*Wyndham Vacation Ownership, Inc. v. Square One Dev. Grp., Inc.*,
2022 WL 21374382 (M.D. Fla. Feb. 2, 2022) ....................70

*Zamber v. Am. Airlines, Inc.*,
282 F. Supp. 3d 1289 (S.D. Fla. 2017) ....................53

**Statutes**

15 U.S.C. § 45(n) ....................58, 60

28 U.S.C. § 1332 ....................52

28 U.S.C. § 2201(a) ....................75

Pub. L. 103-312, 108 Stat. 1691 (Aug. 26, 1994)....59

Fla. Stat. § 48.193....52

Fla. Stat. § 501.202....53, 58, 63, 71

Fla. Stat. § 501.203....58, 61

Fla. Stat. § 501.204....3, 52, 53, 57, 58, 69

Fla. Stat. § 501.211....3, 53, 71, 72, 74

Fla. Stat. § 501.2105....76

Fla. Stat. § 768.295(3)....70

**Rules**

Fed. R. Evid. 801(c)(2)....36

Fed. R. Evid. 803(3)....36

Fed. R. Evid. 803(6)....43

**Other Authorities**

*Matter of Figgie Int'l, Inc.*,
107 F.T.C. 313, 1986 WL 722111 (1986)....61

*Matter of International Harvester Co.*,
104 F.T.C. 949 (1984)....59, 60, 61

## PRELIMINARY STATEMENT

1. This case concerns whether the "D" and "F" hospital "Safety Grades" assigned by Defendant The Leapfrog Group ("Leapfrog") to the five plaintiff hospitals are deceptive to consumers—including patients choosing where to seek care, physicians deciding where to practice and refer patients, and insurers and employers that use hospital safety information in contracting and network decisions. These failing, so-called "Safety Grades" purport to reflect hospitals' measured safety performance. In fact, Leapfrog arbitrarily assigned failing safety scores on key safety measures, even though it had no data measuring actual performance in those areas. The five plaintiff hospitals, Good Samaritan Medical Center, Delray Medical Center, Palm Beach Gardens Medical Center, St. Mary's Medical Center, and West Boca Medical Center (the "Community Hospitals"), are long-standing community institutions that provide essential emergency and inpatient care, including high-acuity and specialty services for medically complex and vulnerable patient populations. *See* Proposed Findings of Fact ("Findings") I ("Background"), VII ("Leapfrog's Safety Grades Have Caused Real and Ongoing Harm").

2. Leapfrog holds itself out as a hospital-safety "watchdog." Twice each year, in May and November, Leapfrog disseminates "Hospital Safety Grades," assigning report-card-style letter grades ranging from "A" to "F" to hospitals and urges consumers to "always" rely on the Safety Grades when choosing where to seek care, warning that it can be a "life or death decision." Leapfrog represents that its Grades reflect hospital performance on "process measures"—including basic safety practices such as hand hygiene (i.e., handwashing)—and presents the resulting letter grade as a safety judgment consumers should trust. *See* Findings I.B ("Leapfrog's Safety Grades And Survey"), III.B ("Leapfrog Leads the Public to Believe the Safety Grades Reflect Actual Safety Performance—Not Survey Participation").

3. Leapfrog repeatedly leads consumers to believe (i) that its Safety Grades are supported by sufficient data and that hospitals lacking sufficient data are not graded; (ii) that its Safety Grades reflect how well a hospital performs on safety—not whether it completed Leapfrog's Hospital Survey; and (iii) that its grading methodology is objective, peer-reviewed, and expert-approved. Those representations frame the net impression consumers take away from a "D" or "F" Grade: that Leapfrog measured safety performance and found the hospital to be unsafe. Leapfrog also represents that hospitals missing data—including more than six process measures—are not

graded. But for non-participating hospitals, Leapfrog nevertheless issued Safety Grades while lacking data for seven measures. *See* Findings II.D, III.A–III.C.

4. The proposed Findings below set forth how Leapfrog's Fall 2024 methodology change for non-participating hospitals broke Leapfrog's promises. For participating hospitals, Leapfrog relies heavily on its Hospital Survey (the "Survey")—an annual questionnaire exceeding 350 pages. For hospitals that choose not to complete the Survey, Leapfrog assigned fixed failing scores on four Survey-dependent measures, despite lacking data to measure those hospitals' actual performance on those measures. Leapfrog assigned the lowest possible values in the absence of data—characterizing this practice as "imputation"—and then re-weighted those assigned failing scores so they counted more heavily in the hospital's overall Safety Grade, a "double-whammy" effect that materially drove down the final assigned letter Grade. Leapfrog's own witnesses acknowledged that this approach functioned as a "non-participation penalty" that "goes away" when a hospital resumes participation—confirming that the Safety Grades were materially driven by participation status rather than measured safety performance on the no-data measures. Because non-participation in Leapfrog's Survey does not prevent dissemination of a Safety Grade, hospitals cannot avoid or self-cure the severe reputational effects once the misleading letter Safety Grade is issued. *See* Findings II.A–II.D, VI.

5. Leapfrog did not assign the Safety Grades to the Community Hospitals quietly. The evidence shows that Leapfrog amplified and disseminated the "D" and "F" letter Grades it had assigned to them widely through a coordinated media strategy, including through advertising and third-party channels, such as targeted Google advertising in Florida-specific zip codes that displayed the Community Hospitals' letter Grades when consumers searched hospital names. The letter Safety Grade is what travels: the "D" and the "F." The limited, opaque disclosures Leapfrog points to related to the four artificially assigned safety measures—in buried footnotes and a dense methodology document—do not accompany the media blitz and are not reasonably accessible or understandable to lay consumers in any event. The Findings also show that, even within Leapfrog's website, disclosures are internally inconsistent and confusing: a "Declined to Report" footnote appears across virtually all hospitals' Safety Grade webpages (*including* for participating hospitals) without tying that label to any specific measure or score. At the same time, the Safety Grade webpages for non-participating hospitals include "gas gauge" graphics purporting to signal the hospitals' performance on key measures for which Leapfrog has no data. In that environment, the

evidence showed that consumers encounter and act on the letter Safety Grade as a safety judgment. It also confirms that buried disclosures do not realistically cure the net impression once the Grade is broadcast into the market. *See* Findings IV ("Leapfrog's Purported Disclosures: Hidden Footnotes And Buried Documents"), V ("Leapfrog's Widespread Dissemination And Amplification Of The Community Hospitals' Safety Grades").

6. The record of harm is concrete and consistent. The credible testimony of the Community Hospitals' CEOs as well as contemporaneous business records show reputational and operational injury following dissemination of the Fall 2024 and later Safety Grades: patients declined or delayed care, some left against medical advice, walk-in volumes declined relative to EMS admissions, procedures were canceled, physicians and staff confronted sustained reputational fallout, and insurers and employers referenced Leapfrog's Safety Grades in communications urging responses detailing remedial action. Expert testimony confirms that letter grades—especially "D" and "F"—operate as heuristics in difficult healthcare decisions and are likely to distort consumer choice and cause the types of harm reflected in the record. The evidence also showed that these injuries persist and compound over time and cannot be corrected by the hospitals through their own efforts while Leapfrog continues to disseminate its false and misleading Safety Grades. *See* Findings VII, VIII.

7. FDUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). In seeking injunctive and declaratory relief, the Community Hospitals must show that Leapfrog's challenged practices are deceptive or unfair and that the Community Hospitals are "aggrieved by" those practices. Fla. Stat. § 501.211(1); *see* Proposed Conclusions of Law ("Conclusions") II.

8. The Proposed Findings of Fact and Conclusions of Law below provide a reliable basis to resolve liability and to enter tailored equitable relief consistent with controlling precedent. They address (i) the mechanics of the Fall 2024 approach for grading non-participating hospitals, including assigned made-up component scores for no-data measures (Findings II.A–II.D); (ii) the consumer-facing representations and net impression created by the Safety Grades (Findings III.A–III.C); (iii) why disclosures do not cure the misleading impression once the Grade travels (Findings IV–V); and (iv) concrete, corroborated harm supporting both likely and actual consumer injury (Findings VII). To the extent any evidence describes third-party reactions, it is offered for admissible purposes (including effect on the listener and state of mind) and is corroborated by

contemporaneous business records, insurer/employer communications, and objective volume data. Even if limited weight is accorded to such testimony, the record independently establishes at least likely consumer harm through Leapfrog's consumer-facing "D" and "F" Safety Grade messaging, widespread dissemination without accompanying methodology, and expert testimony on consumer reliance and predicted market effects—confirmed by objective indicators such as walk-in volume declines and insurer/employer communications. Because Leapfrog's Safety Grades travel without context, disclosure is not a practical cure. Removal and corrective disclosures are necessary to provide complete relief. *See* Findings IV–VII; Conclusions II.A–II.B.

9. The relief requested is tailored to the proven violation and the ongoing nature of the harm, as the law requires. The Community Hospitals seek an injunction requiring Leapfrog to (i) cease assigning Safety Grades to the Community Hospitals under the current methodology or any similar methodology that assigns failing component scores for measures where Leapfrog lacks data to measure actual performance or otherwise reduces Safety Grades due to non-participation; (ii) withdraw from its websites and cease promoting the Fall 2024, Spring 2025, and Fall 2025 Safety Grades as applied to the Community Hospitals; (iii) issue corrective disclosures to entities that licensed those Safety Grades and include targeted, forward-looking disclosures in future licensing materials to address continuing marketplace confusion. The Community Hospitals also seek a corresponding declaratory judgment. *See* Conclusions V.

10. For these reasons, the Community Hospitals respectfully request that the Court adopt the proposed Findings of Fact and Conclusions of Law below, which are grounded in the trial record and provide a tailored, enforceable basis for injunctive and declaratory relief.

## PROPOSED FINDINGS OF FACT

### I. BACKGROUND

#### A. The Parties

11. Plaintiffs—Good Samaritan Medical Center, Delray Medical Center, Palm Beach Gardens Medical Center, St. Mary's Medical Center, and West Boca Medical Center—are five Community Hospitals that have provided life-saving and essential care to Palm Beach County and the surrounding area for more than 300 years collectively. *See* ECF 129 ¶¶ 1–17. The Community Hospitals have delivered critical care across diverse service lines, including cardiology, pediatrics, geriatrics, obstetrics, oncology, orthopedics, and emergency care. *See* PX-395.0 at 2. Each Community Hospital is accredited by the Joint Commission and other accrediting bodies, and has

received awards and recognition for patient care. *See id.* The Community Hospitals serve many patients with urgent and acute healthcare needs and significant comorbidities, including older and underserved populations. *See, e.g.*, Day 1 Trial Tr. 54:2–24 (Havericak), 140:2–11 (Cazares).[1] The Community Hospitals are part of the Palm Beach Health Network ("PBHN"), the largest healthcare network in Palm Beach County. *See* PX-395.0 at 2.

12. Defendant Leapfrog is a 501(c)(3) corporation based in Washington, D.C., whose stated "mission" is to "us[e] transparency to support informed health care decisions." PX-824.0 at 2; *see also* ECF 129 ¶ 18. Leapfrog was originally founded by "employers and other purchasers" who decide where to direct members of their health plans for care. Day 3 Trial Tr. 85:11–12 (Binder). Leapfrog's 2024 IRS Form 990 reports annual revenue of nearly $8.4 million. PX-824.0 at 9.

**B. Leapfrog's Safety Grades And Survey**

13. Leapfrog assigns "Safety Grades"—"A," "B," "C," "D," or "F"—to general acute-care hospitals across the United States twice a year: once in the Spring and once in the Fall. *See* ECF 129 ¶¶ 38–40. Leapfrog typically releases the Spring Safety Grades in early May and the Fall Safety Grades in mid-November, releasing them on an embargoed basis to the press and hospitals in April and October. *See, e.g.*, PX-330.0 at 25 (Spring 2024); PX-398.0 at 3 (Fall 2024); PX-410.0 at 1 (Spring 2025).

14. Leapfrog created a Survey, consisting of a questionnaire exceeding 350 pages that it uses to collect data annually from participating hospitals. *See* JX-042.0 at 1–8.

15. The Survey covers a broad array of measures and requires that hospitals compile and submit extensive information concerning their policies, technologies, clinical processes, reporting mechanisms, leadership structures, staffing models, and other operational areas. *See id.* at 36–314.

16. In addition, Leapfrog requires hospitals participating in the Survey to affirm—nine different times—that Leapfrog may use the hospital's submitted information "in a commercial manner for profit." *Id.* at 46, 68, 99, 158, 194, 232, 265, 278, 315. These authorizations permit Leapfrog to incorporate Survey data into revenue-generating products marketed and sold to third parties. *See infra* ¶ 121.

---

[1] Citations to the trial transcripts correspond to the respective transcripts for each day of trial: Day 1 is January 16; Day 2 is January 20; Day 3 is January 21; Day 4 is January 22; and Day 5 is January 23.

17. Leapfrog conveys to the public that it calculates the Safety Grades using twenty-two measures that rely on data obtained through the Survey, as well as other data sources Leapfrog selects, and results in a single letter Safety Grade. *See* ECF 129 ¶¶ 73–76; JX-041.1 at 5.

18. Leapfrog assigns Safety Grades to hospitals regardless of whether a hospital elects to participate in the Survey. *See* ECF 129 ¶ 36; JX-041.1 at 16; *see also, e.g.*, PX-034.2 (assigning a Safety Grade to non-participating hospital Delray Medical Center).

19. Leapfrog developed the Safety Grade in or around 2011 with the assistance of an Expert Panel convened to design a composite measure of hospital safety. *See* PX-202.0 at 1–2; Day 3 Trial Tr. 177:14–19 (Danforth); Day 3 Trial Tr. 110:1–3 (Binder). The Expert Panel's work, including its approach to handling missing data, was memorialized in a 2013 peer-reviewed publication. *See* PX-202.0. That publication reflected the Expert Panel's judgment that Safety Grades should be based on "the available data," such that "the composite scores were based on what was known about the hospital's performance, with no penalties for missing data" and "to avoid creating a structural bias in favor of Leapfrog-reporting hospitals." *Id.* at 4.

20. Leapfrog materially departed from that framework in Fall 2024 by adopting a new approach that penalizes hospitals that do not complete the Survey. *See infra* ¶¶ 30–68. This revised methodology was not peer reviewed, approved by Leapfrog's Expert Panel, or voted on by its Board of Directors. ECF 163-1 (Austin Tr.) 90:15–17 (testifying the new approach "has not" been peer reviewed), 285:7–15 ("We did not query the [E]xpert [P]anel about whether they approved [the methodology] or not.";[2] Day 3 Trial Tr. 193:22–194:1 (Danforth) (the methodology implemented was "not the imputation model" that was "brought to the [P]anel in 2024"); ECF No. 163-2 (van Caulil Tr.) 105:18–22 ("[T]here was no board vote in June 2024 on whether LeapFrog should change its safety grade methodology.").

21. Leapfrog has a consumer-facing website, hospitalsafetygrade.org, dedicated to Safety Grades. *See* PX-033.0. Each hospital's Safety Grade is prominently displayed on various webpages across the website. *See, e.g.*, PX-033.1 at 1–7; PX-034.2 at 1. The home page of that website invites consumers to search for their hospital by name or location and features a centrally placed search bar to facilitate that process below the question, "How Safe is Your Hospital?" *See* PX-033.0 at 1.

[2] All deposition testimony cited herein was received and played at trial.




PX-033.0 at 1.

22. After consumers enter identifying information relevant to their search, the website displays search results listing hospitals that match the query, each accompanied by a prominently displayed Safety Grade. *See, e.g.*, PX-033.1.




PDX-3.9.

23. When a consumer selects a hospital from the search results, the website navigates to a dedicated Safety Grade webpage for that hospital. At the top of that webpage, Leapfrog prominently displays the hospital's Safety Grade and presents it as a categorization of the hospital's overall safety. *See, e.g.*, PX-034.2 at 1.




PX-034.2 at 1.

24. Leapfrog expects and intends consumers to rely on the Safety Grades. Leapfrog's Vice President of Development, Ms. Jupiter, confirmed that Leapfrog *wants* consumers to rely on the Safety Grades when choosing hospitals. Day 3 Trial Tr. 7:6–11 (Jupiter).

25. Leapfrog's consumer-facing materials make that objective clear. On its website, Leapfrog tells consumers that they should "always" rely on the Safety Grades when making healthcare decisions, PX-023.0 at 4, and describes the Safety Grades as the "first tool patients should use to select a hospital," PX-021.0 at 3.

26. Leapfrog further encourages consumers to rely on the Safety Grades. For example, Leapfrog tells consumers on its website that choosing a hospital can be a "life or death decision," PX-022.0 at 1, and that they are "twice as likely to die" at a "D" or "F" hospital than at an "A" hospital, PX-021.0 at 1; *see also* Day 3 Trial Tr. 8:17–9:16 (Jupiter) (confirming "Leapfrog wants consumers to think that visiting a hospital with an F grade could seriously injure or even kill them"). The Community Hospitals' marketing and consumer choice expert, Dr. Jonah Berger, testified that this type of messaging would "concern" consumers and "shape" their hospital choices accordingly. Day 2 Trial Tr. 33:4–5 (Berger).

27. Consistent with this testimony, Leapfrog's CEO, Leah Binder, confirmed that "millions" of consumers have used Leapfrog's Safety Grades to make healthcare decisions. Day 3 Trial Tr. 63:17–25 (Binder).[3]

28. Leapfrog itself highlights the story of a patient who "needed a hospital" and drove 400 miles to the nearest "A" hospital after realizing "the hospitals closest to him did not perform well" on the Safety Grades. PX-221.0 at 4.

* * *

29. Leapfrog's Safety Grades are understood as measures of hospital safety performance, and Leapfrog expressly instructs consumers to rely on those Grades when making healthcare decisions. For hospitals that do not participate in Leapfrog's Survey, however, Leapfrog assigns Safety Grades using assumed or "imputed" failing scores for key Survey-dependent measures despite lacking hospital-provided performance data for those measures. As a result, the Grades issued to non-participating hospitals reflect Survey non-participation and a non-participation penalty imposed through made-up scores for those no-data measures. Because the Safety Grades are disseminated and relied upon as measures of safety performance, assigning failing scores without hospital-specific data creates a predictable mismatch between what the Grade conveys to consumers about hospital safety and what Leapfrog actually measured.

## II. THE REALITY OF LEAPFROG'S GRADING PRACTICES

30. In Fall 2024, Leapfrog adopted a "drastic" new methodology applicable to hospitals that do not participate in its lengthy Survey. JX-011.0 at 3. Under this revised approach, Leapfrog assigns non-participating hospitals the lowest possible scores on four Survey-dependent measures for which it lacks hospital-provided performance data, and re-weights those measures so that they collectively account for nearly one-third of the hospital's overall Safety Grade.

### A. The Non-Participation Penalty

31. Under the revised methodology, Leapfrog automatically assigns non-participating hospitals the lowest possible score on four of the measures its uses to assign a Safety Grade (the "Four Measures"). *See* JX-034.0 at 15. The Four Measures are:

a. Computerized Physician Order Entry ("CPOE"), which measures whether a hospital uses an electronic system to record physician orders. *See* PX-034.5 at

[3] The Community Hospitals respectfully submit that the trial transcript incorrectly states Ms. Binder testified that this is "not" something she would have said.

1–2. On its consumer-facing website, Leapfrog describes CPOE as "Doctors order medications through a computer." *See, e.g.*, *id.* at 2.

b. Bar Code Medication Administration ("BCMA"), which measures whether staff confirm medication through bar code scanning. *See id.* at 3–4. On its consumer-facing website, Leapfrog describes BCMA as "Safe medication administration." *See, e.g.*, *id.* at 4.

c. ICU Physician Staffing ("IPS"), which measures intensivist staffing at the ICU. *See* PX-034.6 at 7–8. On its consumer-facing website, Leapfrog describes IPS as "Specially trained doctors care for ICU patients." *See, e.g.*, *id.* at 8.

d. Hand Hygiene Score ("Hand Hygiene"), which measures the policies and training for hand hygiene. *See* PX-034.5 at 7–8. On its consumer-facing website, Leapfrog describes this measure as "Handwashing." *See, e.g.*, *id.* at 8.

32. For hospitals participating in the Survey, the scores on the Four Measures are based on the Survey data they submit. JX-034.0 at 5–6, 9 (CPOE), 10 (BCMA and IPS), 12 (Hand Hygiene).

33. For non-participating hospitals, Leapfrog lacks hospital-provided performance data for these Survey-dependent measures and assigns fixed "Limited Achievement" values instead. *See* JX-034.0 at 15. "Limited Achievement" corresponds to numerical scores of 15 of 100 for CPOE; 25 of 100 for BCMA; 5 of 100 for IPS; and 15 of 100 for Hand Hygiene:

| Measure | Leapfrog Hospital Survey Performance Category | Corresponding Safety Grade Measure Score |
|---|---|---|
| **CPOE** | Limited Achievement | 15 |
| **BCMA** | Limited Achievement | 25 |
| **IPS** | Limited Achievement | 5 |
| **Hand Hygiene** | Limited Achievement | 15 |

*Id.*

34. These "Limited Achievement" values are fixed defaults applied based on Survey non-participation, not hospital-specific measurement or estimation. *See infra* ¶¶ 35–41, 117–40.

35. As Leapfrog witnesses confirmed, the assignment of these scores did not involve any actual measurement of hospital performance. Alexandra Campione, a program manager at Leapfrog, wrote contemporaneously that this new approach involved "arbitrarily assigning" non-participating hospitals the worst possible scores on the Four Measures. JX-031.0 at 1. At trial, Ms. Campione confirmed that the assignment of "Limited Achievement" for non-participating

hospitals is "mathematically arbitrary." Day 2 Trial Tr. 289:13–15 (Campione). Leapfrog personnel discussed how to describe these assigned values on its website, reflecting internal recognition that the values were assigned rather than measured. *See* JX-031.0 at 1–6; *see also infra* ¶¶ 55–64.

36. Contemporaneous documents and witness testimony make clear that this arbitrary assignment was intended as a penalty for non-participation. Dr. Patrick Romano, a member of Leapfrog's Expert Panel, wrote at the time that the purpose of the revised approach was to "penalize nonparticipants" and that the "consequences of nonresponse will become readily apparent." JX-022.3 at 1. He further warned Leapfrog against a "backdoor approach to penalizing nonparticipation": "[I]f you want to penalize nonparticipants, then don't pretend you are imputing missing values in a statistically optimal way. Just be honest about your goal." *Id.* (discussing Leapfrog's "strategic objective of penalizing nonparticipants" and stating that "if the goal is to penalize nonparticipants, you might as well do so in a clear and unmistakable manner").

37. Dr. Romano's statement would prove prescient, including with respect to his own hospital, UC Davis Medical Center. UC Davis made a "business decision" to stop participating in Leapfrog's Survey prior to Fall 2024. Day 2 Trial Tr. 166:24–167:3 (Romano); *see also* PX-501.0 at 1. After Leapfrog implemented the non-participation penalty, Dr. Romano wrote to his colleagues at UC Davis explaining "the consequences of [their] nonparticipation": UC Davis received a "D" Safety Grade—a grade that Dr. Romano called "embarrassing." PX-501.0 at 2. As Dr. Romano explained, the "real killer" of the hospital's Safety Grade was only one thing: its "nonparticipation." *Id.*

38. Dr. Romano confirmed at trial that the revised approach amounted to a penalty for non-participation. As he explained, the approach imposed a "predictable, a temporary, and a specific consequence" for non-participation, and that "as soon as a hospital chooses to participate in the survey program again, the penalty goes away." Day 2 Trial Tr. 180:2–17 (Romano). Dr. Romano further testified "it is very clear that there is a benefit to participation." Day 2 Trial Tr. 156:10–11 (Romano). The consequence is therefore avoidable through Survey participation and turns on participation status, not measured safety performance.

39. The numerical effect of the revised approach functions as a non-participation penalty. Under Leapfrog's methodology, non-participating hospitals automatically receive a total of 60 out of 400 possible points across the Four Measures—the lowest available score on the Four Measures. *See* JX-034.0 at 9–12; JX-041.1 at 10–13; Day 1 Trial Tr. 184:18–25 (Nicholson). By

contrast, in Spring 2025, the bottom one percent of participating hospitals received an average of 282 out of 400 points on those same Four Measures—more than a 400 percent difference based solely on Survey participation. *See* PX-412.0; DX-101; *see also* Day 1 Trial Tr. 188:14–25 (Nicholson) ("This means this nonparticipation penalty gives nonparticipating hospitals literally a worse score than the worst performing participating hospitals"). Moreover, not a single participating hospital has received 60 out of 400 points across the Four Measures, PX-412.0—confirming Leapfrog's "imputation" of "Limited Achievement" for the Four Measures has no connection to actual performance at any hospital nationwide. Day 1 Trial Tr. 187:16–188:2, 188:14–16 (Nicholson). The record evidence showed that the combination of "Limited Achievement" across all Four Measures is unique to non-participating hospitals. *See* PX-412.0; Day 1 Trial Tr. 187:16–188:2, 188:14–16 (Nicholson).

40. Indeed, when the Community Hospitals last participated in the Survey, they averaged 370 out of 400 points across the Four Measures, underscoring the difference between their Survey-based scores and the fixed "Limited Achievement" values automatically assigned to non-participating hospitals. *See* PX-412.0; *see also* Day 1 Trial Tr. 186:16–21 (Nicholson).




PDX-6.39 (citing JX-041.1; PX-412.0; DX-101).

41. Leapfrog's own expert, the epidemiologist Dr. Anthony Harris, admitted that this disparity is "bizarre" and agreed with the Court that "it seems illogical statistically that [the score] would be that low." Day 4 Trial Tr. 99:17–19 (Harris) ("You are saying is [sic] it seems illogical statistically that it would be that low. I agree with you, that it seems bizarre it would be less than one percent[.]"). As the Community Hospitals' health economics expert, Dr. Sean Nicholson,

summarized at trial, the penalty Leapfrog imposes on non-participating hospitals is "severe and substantial." Day 1 Trial Tr. 187:23–24 (Nicholson).

**B. The "Double Whammy": Automatic Failing Scores Plus Increased Weighting**

42. The non-participation penalty is further magnified by the weight assigned to the Four Measures.

43. Under Leapfrog's Safety Grade methodology, individual measures are assigned weights that determine how much each measure contributes to the composite Safety Grade. *See* JX-034.0 at 19. Participating hospitals are graded using twenty-two total Safety Grade measures. *See id.* at 5–7.

44. For non-participating hospitals, Leapfrog removes three measures[4] from the calculation (reducing the measure set from 22 to 19), and redistributes the weight of the removed measures across the remaining measures. *See id.* at 5–6, 19, 22; Day 1 Trial Tr. 182:20–183:8, 216:18–25 (Nicholson). As a result, the Four Measures for which non-participating hospitals receive automatic and fixed failing scores collectively account for 30.6 percent of the overall Safety Grade (or approximately one-third). *See* JX-034.0 at 19, 22; Day 1 Trial Tr. 182:20–183:8 (Nicholson); Day 4 Trial Tr. 85:25–87:19 (Harris).

45. Expert witnesses agreed that, under the revised approach, the Four Measures collectively account for approximately 31 percent of a non-participating hospital's overall Safety Grade, compared to approximately 24 percent for a participating hospital. *See* Day 1 Trial Tr. 182:20–183:8 (Nicholson); Day 4 Trial Tr. 85:25–87:19 (Harris); Harris Demonstrative at 6.

---

[4] The three eliminated measures are: (1) "Safe Practice 1: Culture of Leadership Structures and Systems"; (2) "Safe Practice 2: Culture Measurement, Feedback & Intervention"; and (3) "Total Nursing Care Hours per Patient Day." JX-034.0 at 11. For hospitals participating in the Survey, the scores on each of these three measures are based on Survey data. *See id.* at 5–6, 11.




PDX-6.40 (citing JX-034.0).

46. The combined effect of assigning automatic and fixed failing component scores on the Four Measures and increasing their weight for non-participating hospitals is substantial. *See* Day 1 Trial Tr. 198:11–12 (Nicholson) ("There is an enormous difference that comes from the nonparticipation penalty."), 188:17–19 ("[N]onparticipating hospitals literally receive a worse score than the worst performing participating hospital."), 198:7–8 ("96 percent of non-participating hospitals are receiving grades of C, D, or F from Leapfrog."), 198:9–12 (without the non-participation penalty, "71 percent" of non-participating hospitals "get an A or B"), 198:13–17 (the Community Hospitals would have each received at least a "C" without the non-participation penalty).

47. Since Fall 2024, not a single non-participating hospital has received an "A" Safety Grade while subject to the non-participation penalty on all Four Measures. *See* Day 1 Trial Tr. 189:3–5 (Nicholson). By contrast, in Spring 2025, not a single *participating* hospital received an "F" Safety Grade, demonstrating starkly divergent outcomes depending on Survey participation. Day 1 Trial Tr. 189:5–6 (Nicholson).

48. The effect of the non-participation penalty is also reflected in the Community Hospitals' Safety Grade history. Prior to 2021, the Community Hospitals consistently received Safety Grades of "A," "B," or "C." *See* PX-239.0.

### C. The Impact The Fall 2024 Penalty Scoring Had On The Community Hospitals' Safety Grades

49. In 2021, during the COVID-19 pandemic, the Community Hospitals stopped participating in the Survey to reallocate staff and resources to patient care and quality initiatives during that period of operational strain. *See, e.g.,* Day 1 Trial Tr. 92:3–9 (Havericak).

50. Since Leapfrog imposed the non-participation penalty in Fall 2024, the Community Hospitals' Safety Grades have dropped to "D" or "F." *See* PX-239.0; PX-412.0. These declines followed Leapfrog assigning fixed "Limited Achievement" scores for the Four Measures and reweighting those measures for non-participating hospitals. *See supra* ¶¶ 30–48; JX-034.0 at 15, 19, 22.

51. By Spring 2025, each Community Hospital's Safety Grade had dropped by at least one letter from its Grade in Spring 2024—the last grading cycle before Leapfrog imposed the non-participation penalty. ECF 129 ¶ 151; PX-412.0. In Spring 2024, before Leapfrog imposed the non-participation penalty, Delray received a "D"; Good Samaritan received a "C"; Palm Beach Gardens received a "C"; St. Mary's received a "C"; and West Boca received a "D." *Id.* In Spring 2025, after the non-participation penalty was imposed, Delray received a "F"; Good Samaritan received a "D"; Palm Beach Gardens received a "F"; St. Mary's received a "D"; and West Boca received a "F." ECF 129 ¶ 151; PX-412.0.

52. The Community Hospitals' CEOs each testified that this drop was directly attributable to non-participation in the Survey. *See* Day 1 Trial Tr. 89:22–24, 110:8–13 (Havericak); Day 1 Trial Tr. 142:21–25, 146:1–11 (Cazares); Day 1 Trial Tr. 242:16–20 (McCauley); Day 2 Trial Tr. 98:1–4, 103:7–10 (Hanlon); Day 2 Trial Tr. 213:14–15 (Montgomery).

53. That testimony is supported by contemporaneous documents, expert testimony, and Leapfrog's own witnesses. In Fall 2024, Regina West, Quality Director of PBHN, used Leapfrog's own score calculator and assumptions (e.g., Leapfrog's own tool) to generate a "What If" analysis showing that all the Community Hospitals would have received a "C" Safety Grade had they participated in the Survey. *See* DX-634 at 2.

54. Dr. Nicholson's counterfactual analysis corroborates Ms. West's contemporaneous calculations. Dr. Nicholson testified that, had the Community Hospitals participated in the Survey, their Safety Grades would have increased by one or two full letter Grades—all to "C" Grades—as reflected in the demonstrative below. Day 1 Trial Tr. 198:13–17 (Nicholson). Dr. Nicholson applied a conservative approach grounded in peer-reviewed principles and Leapfrog's own

methodology materials to test the effect of participation on the Community Hospitals' Grades. *See* Day 1 Trial Tr. 196:18–200:16 (Nicholson). Dr. Nicholson testified that his counterfactual analysis was conservative because participating hospitals commonly receive very high scores on the Four Measures and the Community Hospitals received higher than average Survey-based scores on those measures when they last participated in 2021. *See id.*




PDX-6.50 (citing PX-937.0; PX-412.0).

**D. Lack Of Actual Safety Performance Data**

55. Under the Fall 2024 approach, Leapfrog's witnesses and experts testified that Leapfrog has no performance data—whether from the hospitals or any other sources—measuring non-participating hospitals' actual performance on the Four Measures. *See* ECF 163-1 (Austin Tr.) 239:19–240:7 (handwashing score "is based on a lack of data"); Day 2 Trial Tr. 261:2–25 (Campione) (confirming that Leapfrog lacks data for non-participating hospitals); Day 3 Trial Tr. 228:7–229:1 (Danforth) (agreeing that Leapfrog "has no data for nonparticipating hospitals measuring the actual performance" on the Four Measures); Day 4 Trial Tr. 103:18–25 (Harris) (agreeing that Leapfrog "has no data" from non-participating hospitals "on hand hygiene performance").

56. Witnesses for both parties also agreed that Leapfrog lacks data for the three Survey-dependent measures it removes from the Safety Grade calculation for non-participating hospitals (i.e., "Safe Practice 1: Culture of Leadership Structures and Systems," "Safe Practice 2: Culture Measurement, Feedback & Intervention," and "Total Nursing Care Hours per Patient Day"), such that Leapfrog lacks data for seven measures in total when it assigns Safety Grades to non-participating hospitals. *See* JX-034.0 at 11.

57. Dr. Romano testified that "[t]here are seven missing measures" and that Leapfrog lacks "underlying data to support those seven measures" while still assigning Safety Grades to non-participating hospitals. Day 2 Trial Tr. 172:21–174:4 (Romano). Dr. Nicholson similarly

testified that because "Leapfrog is missing seven [measures], which is more than six" yet still assigns non-participating hospitals a Safety Grade, Leapfrog is "not adhering to one of their own principles." Day 1 Trial Tr. 195:22–196:17 (Nicholson).

58. Leapfrog's witnesses testified that the Fall 2024 non-participation penalty was not designed to measure or approximate actual hospital performance on the Four Measures. Dr. Romano testified that the purpose "was *not* to improve accuracy" and that the automatically assigned lowest score his hospital received "is not an accurate reflection" of performance but a "natural consequence[]" of non-participation. Day 2 Trial Tr. 154:16–19 (Romano) (emphasis added), 166:17–167:3. Dr. Matthew Austin, who provides strategic guidance on Leapfrog's Survey and Safety Grades, testified the revised approach attempts to "guess" hospital performance on the Four Measures. ECF 163-1 (Austin Tr.) 238:7–9. Ms. Campione testified it rests on an "assumption" that non-participating hospitals perform poorly on the Four Measures. Day 2 Trial Tr. 263:3–9 (Campione). Leapfrog's Senior Vice President of Health Care Ratings, Melissa "Missy" Danforth, confirmed that "the determination that the five hospitals should receive five, 15, 25, five is based on the belief that those hospitals must be hiding something." Day 3 Trial Tr. 226:17–21 (Danforth). Ms. Binder testified that she is "assuming" non-participating hospitals "are in the lowest category." Day 3 Trial Tr. 36:4–8 (Binder). Dr. Nicholson testified that the non-participation penalty does not—and cannot—reliably predict patient safety outcomes at non-participating hospitals. *See* Day 1 Trial Tr. 193:3–21 (Nicholson). He testified that the approach departs from foundational principles of hospital quality measurement because it does not grade participating and non-participating hospitals using the same data sources or measures (i.e., not apples to apples); constitutes a "scientifically [in]defensible" non-participation penalty that lacks "any scientific basis"; does not verify performance through sufficient in-person audits; introduces bias by assigning Safety Grades despite missing the minimum amount of data needed to grade reliably—including for nearly a quarter of the hospitals it grades; and produces unreliable Safety Grades disconnected from actual safety performance and patient outcomes. Day 1 Trial Tr. 189:9–193:21 (Nicholson), 192:7–11 (testifying that in 2019 Leapfrog conducted in-person audits of only ".2 percent of hospitals").

59. Leapfrog witnesses conceded that Leapfrog has no way of knowing how non-participating hospitals—including the Community Hospitals—perform on the Four Measures. Dr. Austin testified that "we don't have any empirical evidence on what a hospital's performance would be when they don't report because we don't actually have those data." ECF 163-1 (Austin

Tr.) 193:18–20. Ms. Danforth confirmed Leapfrog has no data measuring actual performance on the Four Measures for non-participating hospitals. *See* Day 3 Trial Tr. 228:7–229:1 (Danforth). Ms. Campione confirmed that where the "data is missing," "you don't know either way" and "if you don't have the data, you don't have the data" and there is "no evidence." Day 2 Trial Tr. 261:2–25, 263:2–9 (Campione).

60. The Hand Hygiene measure is illustrative. Leapfrog tells consumers Hand Hygiene is among the "most important" measures to assess hospital safety, PX-023.0 at 3, yet Leapfrog witnesses testified that Leapfrog has no way of knowing hand hygiene practices at a non-participating hospital. *See* Day 2 Trial Tr. 261:2–25 (Campione); Day 3 Trial Tr. 33:19–24, 39:15–18 (Binder); Day 3 Trial Tr. 228:20–229:1 (Danforth); Day 4 Trial Tr. 103:18–25 (Harris).

61. By contrast, Dr. Harris testified that hospital leadership "know their data," including how their hospitals perform on key safety practices and whether they are conducting hand hygiene observations. *See* Day 4 Trial Tr. 57:25–58:1, 94:6, 94:13–20, 99:16 (Harris).

62. Each Community Hospital CEO testified that they "know" their hospitals' hand hygiene practices and that their hospitals implement the practices Leapfrog describes as those that "safer hospitals do." *See* Day 1 Trial Tr. 66:6–9 (Havericak); Day 1 Trial Tr. 154:2–15 (Cazares): Day 1 Trial Tr. 241:14–242:9 (McCauley); Day 2 Trial Tr. 78:25–79:18 (Hanlon); Day 2 Trial Tr. 198:1–17 (Montgomery).

63. The evidence also showed that when the Community Hospitals last participated in the Survey they received high (often perfect) scores on the Four Measures—including on Hand Hygiene. *See* PX-412; *see also supra* ¶¶ 39–41. But under the Fall 2024 approach, Leapfrog assigns them the lowest possible values for the Four Measures, placing them below even the worst-performing *participating* hospitals on those measures. Under the Fall 2024 approach, non-participating hospitals receive the lowest possible scores (*400% lower* than the Four Measures totals received by even the *bottom 1%* of participating hospitals) across the Four Measures. *See* PX-412; JX-034.0 at 15; Day 1 Trial Tr. 188:14–25 (Nicholson); Day 2 Trial Tr. 148:24–149:5, 154:16–19 (Romano); Day 4 Trial Tr. 85:12–86:19 (Harris); *see also supra* ¶¶ 39–41.

64. Leapfrog's expert Dr. Harris testified he would have "no bases" to doubt the Community Hospitals' CEOs. Day 4 Trial Tr. 82:21–23 (Harris). Nevertheless, Leapfrog assigns non-participating hospitals the lowest possible scores on the Four Measures in the absence of any data measuring performance on those measures.

* * *

65. Taken together, the record demonstrates that under the Fall 2024 approach, Leapfrog assigns failing measure scores for key Survey-dependent measures about which it has no data measuring actual hospital performance, and re-weights those assigned scores in the Safety Grades for non-participating hospitals.

## III. WHAT LEAPFROG LEADS THE PUBLIC TO BELIEVE ABOUT ITS SAFETY GRADES

66. Leapfrog makes extensive representations to the public about what its Hospital Safety Grades mean, how they are derived, and why consumers should trust and rely on them.

67. Leapfrog communicates these representations through its consumer-facing website, including its Frequently Asked Questions ("FAQ") and "About the Grade" webpages, which are directed to consumers, including patients, healthcare workers, employers, hospitals, and others making healthcare decisions.

68. Through these materials, Leapfrog conveys three central messages designed to reassure consumers that the Safety Grades are reliable, data-driven indicators of hospital safety.

### A. Leapfrog Leads The Public To Believe The Safety Grades Are Supported By Real Data

69. Leapfrog represents to consumers that its Safety Grades are based on actual hospital data, including data submitted through the Survey and other external data sources Leapfrog selects.

70. On its "About the Grade" webpage, Leapfrog explains that it uses measures of patient safety drawn from CMS data, hospital-reported data from the Survey, and "supplemental data source[s]." PX-066.0 at 3. Leapfrog reinforces this message in its 29-page Safety Grade methodology document, which states "Leapfrog uses a secondary data source" where a hospital's information is unavailable. JX-041.1 at 5; *see also* JX-034.0 at 5 (same).

71. Leapfrog also represents that hospitals lacking sufficient data are not graded. On its "About the Grade" webpage, Leapfrog states that "[h]ospitals missing more than six process measures … are not graded." PX-066.0 at 5; *see also* JX-034.0 at 4 (methodology document) (same). Leapfrog's "Expert Panel Guiding Principles," which were linked on its consumer-facing website until recently, similarly state that "no grade should be issued" when data is missing for a large number of measures. PX-203.0 at 3.

72. These representations convey to consumers that if a hospital receives a Safety Grade, Leapfrog has sufficient data to support that Grade—otherwise, Leapfrog does not issue a Grade.

73. Leapfrog nevertheless issued Safety Grades to non-participating hospitals despite lacking data for seven measures. *See* Day 2 Trial Tr. 172:21–174:4 (Romano); Day 1 Trial Tr. 195:22–196:17 (Nicholson); Day 2 Trial Tr. 29:2–14 (Berger); *see also* ECF 43 (Leapfrog's Answer) ¶¶ 49–50 (admitting that for non-participating hospitals, Leapfrog "abandons *three* measures entirely" and uses "its 'imputation model'" for "*four* measures"—and the "imputation model is how it assigns a value for a measure when it *lacks any data pertaining to it*" (emphases added)).

**B. Leapfrog Leads The Public To Believe The Safety Grades Reflect Actual Safety Performance—Not Survey Participation**

74. Leapfrog expressly tells consumers that its Safety Grades reflect hospital safety performance, rather than participation in its Survey.

75. On its "Frequently Asked Questions" webpage, Leapfrog states unambiguously: "The Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey." PX-021.0 at 2.[5] Leapfrog further represents on its "About the Grade" webpage that the Safety Grade summarizes a hospital's "overall performance in keeping patients safe from preventable harm and medical errors." PX-066.0 at 1.

76. Leapfrog reinforces its performance-based message through visual design elements on each hospital's Safety Grade webpage. *See, e.g.*, PX-034.5. Directly below the letter Grade, Leapfrog displays "gas gauge" graphics for each individual safety measure, ranging from "Worse Than Average"—displayed in red—to "Better than Average"—displayed in green. *See id.*

[5] Leapfrog's webpage was changed during the course of this litigation and now states, "Reporting to the Leapfrog Hospital Survey doesn't automatically improve a hospital's Safety Grade." PX-506.0 at 6. This statement omits the key point that non-participation dramatically affects a hospital's scores. As Dr. Romano explained, "it is very clear that there is a benefit to participation" and that "[r]eward and penalty are two sides of the same coin[.]" Day 2 Trial Tr. 156:10–12.




*Id.* at 1.

77. Experts for both parties testified that the gas gauges convey information about hospital safety performance. Leapfrog's user experience and low literacy expert, Michael Vredenburgh, testified that the "gas gauge convey[s] something about performance" and "shows a low score" when displayed in red. ECF 180-1 (Vredenburgh Tr.) 167:24–168:3. Dr. Berger testified that a reasonable consumer would likely understand the gas gauge graphics to reflect actual hospital performance data. Day 2 Trial Tr. 13:17–15:2, 18:4–19:8 (Berger).

78. This performance-based message is reinforced by how Leapfrog presents certain measures when data is missing. When Leapfrog lacks data for certain measures, it does not display a gas gauge graphic and instead uses a "Declined to Report" designation accompanied by a prominent question mark. *See, e.g.*, PX-034.6.




PDX-3.16 (citing PX-034.6).

79. Mr. Vredenburgh testified that this question mark presentation is a "good practice" because it clearly communicates to consumers that data is missing and avoids conveying

information about a hospital's performance on a measure where none has been measured. ECF 180-1 (Vredenburgh Tr.) 166:4–10.

80. Leapfrog does not apply this same "Declined to Report" question mark presentation to the Four Measures for non-participating hospitals. Instead, Leapfrog displays them with full gas gauge graphics:




PX-34.5 at 1 (showing gas gauges for three of the Four Measures).

81. Leapfrog's expert Mr. Vredenburgh testified that using the "Declined to Report" question mark presentation for those measures would likewise be a "good practice." ECF 180-1 (Vredenburgh Tr.) 167:4–168:21. Both experts agreed that the use of gas gauge graphics signals to consumers that the measure reflects actual assessed safety performance rather than missing or unavailable data. *See* Day 2 Trial Tr. 18:17–20 (Berger) ("[C]onsumers would be likely to infer there is no decline to report for hand washing, [so] that is based on real data that indicates performance."); ECF 180-1 (Vredenburgh Tr.) 167:24–168:3 (testifying that the "gas gauge convey[s] something about performance").

82. In addition to the gas gauge graphics, Leapfrog displays a numerical score for each specific measure and directly compares the hospital's score to the scores of the "Best Hospital" and the "Worst Hospital" for that same measure. *See, e.g.*, PX-034.5 at 7–8. As an example, for the handwashing measure—one of the Four Measures—Leapfrog displays a score of 15 for each of the Community Hospitals, which is the same score Leapfrog identifies on the webpage as the "Worst Hospital's Score" for that measure. *See id.* at 8. Leapfrog then juxtaposes that score with a section titled "What safer hospitals do," describing hand hygiene practices associated with higher-scoring hospitals. *See id.*




PX-034.5 at 7–8.

83. Leapfrog's user-experience expert, Mr. Vredenburgh, testified that this presentation would lead consumers to understand that the Community Hospitals perform at the lowest end of the safety spectrum for that measure and to infer that they do the "opposite" of what the best hospitals do. ECF 180-1 (Vredenburgh Tr.) 171:5–172:3.

84. Leapfrog further entrenches this performance-based message by stating on the Safety Grade webpage that "[h]ospitals can *earn* up to 100 points for having a handwashing policy and evaluating how hospital workers follow that policy." PX-034.5 at 8 (emphasis added). Ms. Binder confirmed at trial that Leapfrog conveys to the consumer that the Hand Hygiene score is, in fact, "earned" through performance. Day 3 Trial Tr. 38:15–21 (Binder).

85. Taken together, Leapfrog's statements and its presentation of the Safety Grades—through gas gauge graphics, numerical scores, and "best" and "worst" hospital comparisons—communicate to consumers that the Safety Grades reflect measured safety performance, and not Survey participation. For non-participating hospitals, however, Leapfrog assigns failing component scores on key Survey-dependent measures despite having no data measuring actual performance on those measures. *See* ECF 163-1 (Austin Tr.) 193:18–20 ("We don't have any empirical evidence on what a hospital's performance would be … because we don't actually have those data."), 239:19–240:7 (handwashing score "is based on a lack of data"), 415:16–19 ("We are

currently not using secondary data as part of the imputation models."); Day 2 Trial Tr. 261:2–25 (Campione) (confirming that Leapfrog lacks data for non-participating hospitals); Day 3 Trial Tr. 228:7–229:1 (Danforth) (agreeing that Leapfrog "has no data for nonparticipating hospitals measuring the actual performance" on the Four Measures); Day 4 Trial Tr. 103:18–25 (Harris) (agreeing that Leapfrog "has no data" from non-participating hospitals "on hand hygiene performance").

### C. Leapfrog Leads The Public To Believe The Safety Grades Are Peer-Reviewed And Expert-Approved

86. Leapfrog represents to the public that the methodology underlying its Safety Grades has been peer reviewed and approved by experts.

87. On its consumer-facing FAQ webpage, Leapfrog states that the Safety Grade "uses a public, peer-reviewed methodology, calculated by top patient safety experts under the guidance of a National Expert Panel." PX-021.0 at 1.

88. On its "About the Grade" webpage, Leapfrog likewise states that the methodology "has been peer reviewed" and that Leapfrog works "under the guidance of an Expert Panel to select appropriate measures and develop a scoring methodology." PX-066.0 at 1-2.

89. Leapfrog presents these statements without qualification. However, Leapfrog's Fall 2024 non-participation approach was not peer reviewed and was not approved by its Expert Panel. *See supra* ¶ 20; *see also* ECF 163-1 (Austin Tr.) 90:15–17 (testifying the Fall 2024 methodology "has not" been peer reviewed), 285:7–15 (testifying that "[w]e did not query the [E]xpert [P]anel about whether they approved [the Fall 2024 methodology] or not"); Day 3 Trial Tr. 193:22-194:1 (Danforth) (testifying that the Fall 2024 methodology "is not the imputation model" that was "brought to the [P]anel in 2024"), 199:16–20 ("It is not [the Expert Panel's] job to then work out all of the detail, that is our job.").

* * *

90. Collectively, these three representations lead consumers to believe that the Community Hospitals' "D" and "F" Safety Grades are supported by data, reflect actual safety performance, and are the derived from expert-approved, peer-reviewed methodology.

## IV. LEAPFROG'S PURPORTED DISCLOSURES: HIDDEN FOOTNOTES AND BURIED DOCUMENTS

91. These affirmative representations shape how consumers understand the Safety Grades. Whether consumers learn that Grades for non-participating hospitals are calculated differently depends on what Leapfrog discloses on its website. The trial evidence showed that

Leapfrog's website does not provide consumers with a clear explanation that, as a consequence of Survey non-participation, Leapfrog assigns fixed failing component scores on key Survey-dependent measures despite having no data measuring actual performance on those measures.

92. After Leapfrog adopted the non-participation penalty, Leapfrog employees discussed how to explain it on Leapfrog's website. *See, e.g.*, JX-031.0. While they agreed to include a new footnote, they debated how substantive the language should be. *See id.* For example, Ms. Campione rejected one suggestion because Ms. Binder "wanted us to make it sound like the expert panel approved it and the assigning of these points was legitimate." *Id.* at 1.

93. In the end, Leapfrog added Footnote 4, which states: "*The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." *See, e.g.*, PX-034.5 at 8.

94. Dr. Berger testified that Footnote 4 is accessible only after a consumer navigates to one of the Four Measures (by clicking through more than 20 other measures) and then scrolls down to where the footnote is displayed—steps a consumer would not take when viewing the letter Grade. Day 2 Trial Tr. 16:3–17:15 (Berger).

95. Even if a consumer accesses Footnote 4, it does not explain the basis for the score that was assigned. Dr. Berger explained that it "says nothing about the score that was assigned," including "why that score was assigned." Day 2 Trial Tr. 21:1–19 (Berger). Mr. Vredenburgh likewise testified that Footnote 4 does not show a consumer "under the hood" of how a score was assigned and does not allow a consumer to determine whether Leapfrog used actual performance data or a default assumption to "assign" the score. ECF 180-1 (Vredenburgh Tr.) 169:5–10, 183:18–184:1.[6] Indeed, Leapfrog's Director of Communications, Lauren Bailey, testified that informing consumers about *how* the score was assigned was "not the purpose" of the footnote. ECF 163-4 (Bailey Tr.) 180:10–17.

96. Leapfrog's Safety Grade webpage contains another footnote—Footnote 1—which states: "Declined to Report: The Hospital was asked to provide this information to the public, but did not." *See, e.g.*, PX-034.2 at 2.

[6] When shown Safety Grade webpages for two different non-participating hospitals, one scored using historical performance data and another that assigned the lowest possible score, Mr. Vredenburgh testified that Footnote 4 did not explain how the lowest score was assigned. ECF 180-1 (Vredenburgh Tr.) 180:14–184:1. He agreed the two webpages were "totally indistinguishable" from each other, and a "typical user will have no idea which is which." *Id.* 183:5–14.

97. Dr. Berger testified that Footnote 1 appears across all Safety Grade webpages, including webpages for participating hospitals, and is not tied to any specific measure or score. *See* Day 2 Trial Tr. 12:19–13:16 (Berger). Footnote 1 also appears across all measures, including those for which Leapfrog does have data; it does not identify what data was missing, what assumption was made, or how any particular score was calculated. *See, e.g.*, PX-034.2 at 2, 5, 8, 11, 14, 17.

98. In addition to the footnotes, Leapfrog includes on its website a document that explains the Safety Grade methodology. *See* JX-034.0 (Fall 2024); JX-041.1 (Spring 2025). After adopting the non-participation penalty, Ms. Campione suggested placing a direct link to the methodology document. *See* JX-031.0 at 1. Ms. Campione explained, however, that neither Ms. Binder nor Ms. Danforth "cared to do so." *Id.*

99. Instead of linking the methodology document directly from the Safety Grade webpage, Leapfrog made the document accessible only through multiple navigation steps requiring a user to click through numerous webpages and scroll through extensive content. *See* Day 2 Trial Tr. 22:2–23:21 (Berger).

100. Leapfrog's website analytics data confirms that very few consumers access the methodology document as a result. Dr. Berger testified that Leapfrog's analytics show that only approximately three percent of visitors to the Community Hospitals' Safety Grade webpages viewed the methodology document. *See* Day 2 Trial Tr. 24:18–25 (Berger). Dr. Berger further testified that the methodology document spans 28 pages and does not explain how Leapfrog scores nonparticipating hospitals on the Four Measures until page 15. *See* Day 2 Trial Tr. 27:4–8 (Berger). Dr. Berger concluded that it is thus likely that fewer than three percent of the visitors that accessed the methodology document actually viewed Leapfrog's description of the non-participation penalty. *See* Day 2 Trial Tr. 24:18–25, 38:11–14 (Berger); *see also* JX-026.0 at 1 (warning Leapfrog that the public "will not understand nor dig into the methodology" after seeing Safety Grades).

101. Even if users did access the methodology document, multiple Leapfrog witnesses testified that it is not designed for a typical consumer audience. Ms. Binder and Leapfrog's user-experience expert, Mr. Vredenburgh, both testified that the methodology document is dense, technical, and not intended to be understood by ordinary consumers. Day 3 Trial Tr. 70:11–18 (Binder) (testifying that the document "is not meant to be used by the average lay person," but is instead for "researchers, hospitals, [and] anyone who has a deep interest in the topic"); ECF 180-1

(Vredenburgh Tr.) 173:15–25 (testifying that the document is "dense" and would not be read by a "typical user").

102. At trial, Ms. Binder testified extensively about the "low literacy" and "user experience" testing that Leapfrog conducted on its consumer-facing website. *See* Day 3 Trial Tr. 110:3–117:14 (Binder). Ms. Binder further testified that this testing focused on whether information on the website was written at approximately an "eighth grade reading level for the consuming public." Day 3 Trial Tr. 117:9–14 (Binder). Ms. Binder explained, however, that this testing occurred between 2013 and 2014 and thus predated the Fall 2024 methodology change by about a decade. *See* Day 3 Trial Tr. 112:25–113:4 (Binder). As a result, it did not—and could not—analyze Footnote 4, the updated gas gauge graphics for the measures for which Leapfrog lacks data, or the current Safety Grade methodology document. Indeed, Ms. Binder testified that she does not know and "can't answer" whether there was any low literacy review conducted "in connection with the fall [] 2024 methodology change," and she confirmed that the 29-page methodology document has not been subjected to any low literacy review. Day 3 Trial Tr. 124:22–125:16 (Binder).

103. In sum, the trial evidence showed that consumers encountering a Safety Grade are not provided a clear disclosure that failing component scores for key Survey-dependent measures are assigned to non-participating hospitals without performance data for those measures.

104. Mr. Vredenburgh, Leapfrog's paid expert, testified that he spent approximately "two hours" browsing Leapfrog's Safety Grade website in what he described as a "fairly deep dive," yet he *still* did not understand how the imputation methodology functioned. ECF 180-1 (Vredenburgh Tr.) 50:18–51:1, 179:3–19. Thus, as presented, the Safety Grade appears as a standalone letter Grade reflecting hospital safety, without explanation of the methodology applied to non-participating hospitals.

## V. LEAPFROG'S WIDESPREAD DISSEMINATION AND AMPLIFICATION OF THE COMMUNITY HOSPITALS' SAFETY GRADES

105. Leapfrog's dissemination practices amplify the consumer impact of its Safety Grades. Millions of consumers visit Leapfrog's website (www.hospitalsafetygrade.org) each year, but the website is only the starting point. *See* ECF 163-4 (Bailey Tr.) 104:8–14; PX-420.1 at 11. Once posted on the website, the letter Safety Grade travels widely through media coverage, social media, search results, advertisements, and other third-party channels, reaching consumers without any accompanying explanation of Leapfrog's methodology.

106. Leapfrog pays a press relations firm, CURA Strategies, as well as radio and broadcast televisions vendors, to "get the safety grade out" to a wide audience. ECF 163-4 (Bailey Tr.) 187:8–22. According to Ms. Bailey, a "really important" part of Leapfrog's dissemination strategy is "to get the safety grades out to … local publications" in particular. ECF 163-4 (Bailey Tr.) 198:19–199:4.

107. These outreach efforts generate extensive media coverage. The Fall 2024 Safety Grades alone generated "772 online articles from 435 different publications with a reach of 11.2 billion." PX-350.0 at 2; *see also* Day 3 Trial Tr. 11:7–10 (Jupiter) (confirming "reach of 11.2 billion people").

108. Ms. Jupiter testified that Florida is "always" one of the markets that generates the most media coverage of the Safety Grades, including specifically for the Fall 2024 grading cycle. Day 3 Trial Tr. 12:23–13:3 (Jupiter).

109. Following the release of the Fall 2024 Safety Grades, the Community Hospitals' "D" and "F" Grades were widely disseminated across news, radio, and online media. *See, e.g.*, PX-466.1; PX-467.0; PX-468.0; PX-469.0; PX-390.0; PX-503.0; PX-357.0; PX-346.0; PX-352.0; PX-388.0.

110. For example, the Community Hospitals' Grades were featured in numerous news articles with headlines such as "dangers lurking near you" and "bottom" and "worst South Florida hospitals for patient safety." PX-388.0; PX-390.0; PX-357.0. The Grades were also highlighted in a viral TikTok video that received more than one million views and listed the Community Hospitals alongside their Leapfrog Safety Grades, describing them as among the "worst" hospitals in Florida. *See, e.g.*, PX-466.0; PX-469.0.

111. When Safety Grades are disseminated through channels beyond Leapfrog's website, consumers typically see the letter Grade without accompanying explanation of how it was calculated or what hospital data was available. Dr. Berger testified that the failing Safety Grades are "traveling" alone—without methodology or context. Day 2 Trial Tr. 35:2–11 (Berger). Consumers are exposed only to the single letter signifying whether a hospital is dangerous and unsafe. *See* Day 2 Trial Tr. 8:24–11:2 (Berger).

112. Leapfrog took additional steps to target the Community Hospitals and amplify their Safety Grades after this lawsuit was filed. Leapfrog witnesses admitted that Leapfrog purchased Google advertisements using funds from a non-profit grant from Google to specifically target the

Community Hospitals so that consumers in designated Florida zip codes searching for the Community Hospitals would be shown the failing Safety Grades. *See* Day 3 Trial Tr. 18:25–19:10 (Jupiter); ECF 163-4 (Bailey Tr.) 291:21–292:2, 292:4–292:18; *see also* PX-454.0 at 3 ("We'd also like to set it up so that when someone searches for any of the five specific hospitals, it shows an ad displaying their Hospital Safety Grade.").

113. Internal Leapfrog communications confirm that this advertising strategy was intended to apply pressure to the Community Hospitals. As Ms. Jupiter wrote at the time, Ms. Binder wanted to "harass" the Community Hospitals with this media strategy, with another employee saying, "the strategy is to become a disney villain." PX-439.0 at 3; *see also* PX-454.0 at 1, 3; Day 3 Trial Tr. 17:16–24 (Jupiter).

114. Leapfrog also sought to draw direct comparisons between the Community Hospitals and Jupiter Medical Center—one of their main competitors—"in the media and with employers." ECF 163-2 (van Caulil Tr.) 149:9–12.

115. Leapfrog was founded by employer groups. *See* Day 3 Trial Tr. 86:22–87:7, 90:9–11 (Binder). And Leapfrog Board member Ms. van Caulil testified that, through the Florida Alliance for Healthcare Value ("Florida Alliance"), Leapfrog's Regional Leader in Florida, of which she is CEO, Leapfrog circulated the Safety Grades directly to employers—entities that purchase healthcare and influence patient choice. ECF 163-2 (van Caulil Tr.) 61:3–8, 149:9–12; *see also* Day 3 Trial Tr. 121:7–16 (Binder) (testifying that employers consider Safety Grades and may rely on them when making purchasing decisions); *see also* PX-824.0 at 2 (Leapfrog federal tax forms noting that it "works with *employers* and purchasers of health care to encourage transparency from the health care community" and "to educate" those employers' "employees on the safest and highest quality providers" (emphasis added)). The Florida Alliance also sent letters to hospitals—including West Boca Medical Center—to pressure them into participating in the Survey. *See* PX-415.0.

116. Taken together, Leapfrog disseminates and amplifies the Community Hospitals' Safety Grades through its website, paid advertising, media outreach, and employer communications, increasing the likelihood that consumers will encounter its letter Grades without accompanying methodological context.

## VI. LEAPFROG'S MOTIVE: USE THE SAFETY GRADE TO COERCE PARTICIPATION AND INCREASE REVENUE

117. Leapfrog assigns Safety Grades to hospitals regardless of whether they participate in the Survey. Despite Leapfrog claiming that the Survey is "voluntary," hospitals cannot opt out of being graded, cannot prevent being compared to other hospitals, and cannot avoid dissemination of a Safety Grade even when they choose not to participate in the Survey. *See* ECF 163-1 (Austin Tr.) 243:16–245:16; Day 3 Trial Tr. 215:20–216:2 (Danforth). As Dr. Austin testified, Leapfrog's grading system is "nonvoluntary" by design. ECF 163-1 (Austin Tr.) 247:3–8.

118. Under the Fall 2024 approach, Survey participation is the means by which a hospital avoids the non-participation penalty. *See* Day 2 Trial Tr. 151:4–9, 180:2–17 (Romano) (the "penalty goes away" once a hospital resumes participation).

119. The trial evidence showed that Leapfrog adopted the Fall 2024 non-participation "penalty" to increase Survey participation and thereby protect and expand revenue from Survey-based data licensure and related products, rather than to measure and report hospitals' actual safety performance. *See* PX-205.0 at 2; PX-501.1 at 1; Day 3 Trial Tr. 53:18–20 (Binder); PX-323.2 at 1; Day 2 Trial Tr. 154:16–19, 180:2–17 (Romano). Increased revenue would, in turn, increase compensation of Leapfrog's CEO, Ms. Binder. *See* Day 3 Trial Tr. 61:1–3 (Binder) (agreeing that "the more revenues, the higher percentage bonus" she would receive); *see also* PX-248.0 at 3–4; PX-322.2 at 1.

### A. Leapfrog Adopted the Non-Participation Penalty to Increase Revenue

120. Leapfrog's marketing materials urge "your hospital or surgery center" to license "designated logos" from Leapfrog to "promote" their Leapfrog Safety Grades to their "employees" and "community." PX-007.0 at 6–7; *see also* PX-508.0. Leapfrog calls these Safety Grade logos "accolades" and markets them as a "remarkable" opportunity for hospitals to show that their "staff upholds the most rigorous standards," which promotes "recognition" in your "community" and helps hospitals "attract healthcare professionals." PX-508.0 at 4, 6. Indeed, Leapfrog suggests that hospitals specifically should share their "designated logo[s]" on "[j]ob listing websites" and in "[s]ocial media recruitment campaigns" to attract and impress "job candidates." *Id.* at 6; *see also* PX-222.0 at 32 (Safety Grade license would assist with "[r]ecruitment of better doctors and medical professionals," enhance "[j]ob satisfaction," and facilitate "[e]mployee retention"). Under Leapfrog's terms, "hospitals and surgery centers are *not permitted* to create their own version of

Leapfrog's designated logos" and are instead "required" to obtain a "license" from Leapfrog to display the Safety Grades. PX-508.0 at 5. As one example, Leapfrog's marketing materials feature a large mockup of the lobby of a direct competitor of the Community Hospitals (Jupiter Medical Center) with a licensed banner from Leapfrog prominently displaying Jupiter's "A" Safety Grade. *Id.* at 2. Hospitals pay Leapfrog thousands of dollars to license their Safety Grades. PX-407.0 at 1, 3; *see also* Day 3 Trial Tr. 211:15–212:15 (Danforth).

121. Leapfrog also generates significant revenue by selling access to data derived from hospital data collected through the Survey to third parties, including insurers, researchers, and others interested in proprietary hospital data. *See* PX-205.0 at 5; PX-275.0; PX-324.0 at 15–22; *see also* Day 3 Trial Tr. 53:18–22 (Binder) (testifying that data licensing "is "one of the largest sources" of Leapfrog's revenue). Leapfrog states insurers should "[p]artner with Leapfrog" because the "Hospital Safety Grade" provides "proven value." PX-232.0 at 21. Leapfrog's internal records show Leapfrog *licenses* the Safety Grades for use by numerous insurers, sometimes for $30,000 to $125,000. PX-324.0 at 15. Leapfrog also creates price incentives to induce insurers to license and rely on the Safety Grades; for example, when an insurer licenses the Survey *and* the Safety Grades, that insurer can receive a 5% discount on the purchase. *Id.* at 17. And insurers can secure a further "10–20%" discount when they sign a "multi-year contract" to license Leapfrog's data. *Id.* Leapfrog has also explored avenues to induce insurers to purchase the Safety Grades more quickly—for example, by imposing a "30-day quote expiration to speed up contracting time" and offering "[i]ntroductory discounts" that expire if the insurer does not license the Safety Grades within Leapfrog's preferred timeframe. PX-324.0 at 24. As a result of these marketing efforts, Leapfrog's internal records reflect that numerous insurers have elected to license its Safety Grades. *See* PX-225.0 at 8 (listing numerous insurers that licensed the Safety Grades).

122. Internal Leapfrog documents reflect concern that declining Survey participation threatens Leapfrog's ability to market a complete dataset and sustain its revenue model. *See* PX-205.0 at 2 ("To maximize the value of The Leapfrog's Group Data for licensing purposes the level of participation should continue to be increased so it can be perceived as the most complete data set and thus allowing defense of our pricing model and its price points."); PX-501.1 at 1 ("[Leapfrog's] business model … depends on producing data that add value for health plans and employers … and the data are not valuable if participation is low.").

123. As Survey participation declined between 2022 and 2024, Leapfrog employees discussed the need to focus on increasing participation to drive revenues. Ms. Binder wrote during the decline in participation that Leapfrog should focus on revenue "24/7" and made clear that she "want[ed] managers focused on [] areas where they can generate bookable revenues." PX-275.4 at 1. The top priority in Leapfrog's long-term strategic plan for this period was to "expand revenues," including from "data licensure." PX-354.0 at 2; *see also* Day 3 Trial Tr. 4:12–6:21 (Jupiter). Leapfrog also sought to increase hospital participation in the Survey. PX-354.0 at 4.

124. Against that backdrop, Leapfrog employees decided to adopt what they acknowledged at the time was a "drastic" approach by imposing the non-participation penalty. JX-011.0 at 3; Day 2 Trial Tr. (Campione) 270:23–25. Ms. Danforth testified that the decision was a product of "group think," referring to a collective decision-making process in which alternative approaches were not fully explored. Day 3 Trial Tr. 203:6–10 (Danforth).

125. Ms. Binder wrote during this period that the revised grading approach was intended to serve as a "major incentive" for hospitals to participate in the Survey. PX-323.2 at 1.

126. Dr. Romano characterized Leapfrog's adoption of the Fall 2024 changes as a "simple business decision," aptly summarizing that the non-participation penalty was "just business, folks!" PX-501.1 at 1.

127. Following implementation of the Fall 2024 non-participation penalty, Survey participation increased substantially. Leapfrog's internal data reflected a rise of 10 percent in participation in the cycle after the grading changes took effect. PX-397.0 at 2–3; PX-426.0 at 2–3.

128. Hundreds of hospitals resumed Survey participation following implementation of the non-participation penalty. Dr. Romano testified that UC Davis Medical Center restarted participation to avoid the "natural consequences" of non-participation and that he expects the hospital's Safety Grades "will go up in 2025 and 2026" as a result. Day 2 Trial Tr. 166:24–167:3 (Romano).

129. Under the revised Fall 2024 approach, hospitals are graded regardless of participation, but non-participation triggers the scoring and re-weighting penalty across numerous measures. Dr. Romano wrote that the resulting pressure to participate could be described as "blackmail." PX-293.1 at 1.

### B. Leapfrog's Explanation For The Non-Participation Penalty Was Not Supported

130. Leapfrog's witnesses and experts repeatedly suggested at trial that the non-participation penalty is warranted because hospitals decline to participate in the Survey to avoid disclosure of poor safety performance—what Leapfrog describes as the "non-response bias." Day 2 Trial Tr. 263:3–9 (Campione) (testifying that "the assumption" is that non-participating hospitals "have something to hide"); Day 2 Trial Tr. 173:8–11 (Romano) (testifying that non-participating hospitals "chose not to participate and therefore they are hiding something"); Day 3 Trial Tr. 35:19–25 (Binder) ("We are assuming that the hospital has a reason for not reporting"); Day 3 Trial Tr. 226:17–21 (Danforth) (confirming that the methodology was "based on the belief that [non-participating] hospitals must be hiding something"); Day 4 Trial Tr. 99:17–25 (Harris) (testifying that non-participating hospitals "are not filling out the survey because they know they are going to be scored poorly").

131. The trial evidence did not support that speculative explanation.

132. Leapfrog's own witnesses acknowledged that the non-participation penalty was not intended to "improve accuracy" of the Safety Grades and that Leapfrog lacks actual performance data for non-participating hospitals. Day 3 Trial Tr. 154:16–19 (Romano); *see also supra* ¶¶ 55–60. Dr. Harris claimed that the 60 out of 400 score on the Four Measures—400% worse than the worst one percent of participating hospitals—was "closest to the truth" simply due to his non-response bias theory but then agreed with the Court that the score "seems illogical statistically that it would be that low." Day 4 Trial Tr. 98:5–99:25 (Harris).

133. As set forth above, unrebutted expert and documentary evidence further established that, had the Community Hospitals participated in the Survey, they would have received higher Safety Grades. *See supra* ¶¶ 62–64. In fact, the evidence showed that the Community Hospitals performed well (370 out of 400 on average) when they last participated in the Survey and they continue to follow the practices addressed by the measures—undermining Dr. Harris's testimony that Survey non-participation indicates poor performance on the Four Measures. Day 4 Trial Tr. 103:18–25, 96:1–5 (Harris); *see supra* ¶¶ 62–64.

134. Further, Dr. Nicholson testified that Leapfrog provided zero "scientific basis for the penalty associated with nonparticipation." Day 1 Tr. 189: 9–13 (Nicholson). Dr. Harris agreed that neither he nor Leapfrog performed any analysis to support the notion that Survey non-participation

or performance on CMS metrics indicates that nonparticipating hospitals perform worse on the Four Measures. Day 4 Trial Tr. 102:4–8, 102:21–24 (Harris).

135. Moreover, the evidence established that hospitals have legitimate reasons for declining to participate in the Survey that are unrelated to safety performance.

136. Hospital executives and quality leaders testified that completing the Survey is extremely burdensome, requiring hundreds of hours of staff time, coordination across departments, and significant involvement from clinical leadership. *See* Day 1 Trial Tr. 59:10–14 (Havericak) ("It would take us about a thousand hours, and there are six or seven people that have to work on that to make sure everything is accurate and complete."); Day 1 Trial Tr. 142:7–11 (Cazares) (the Survey is not "free" because "it takes time [and] resources"); Day 1 Trial Tr. 240:10–13 (McCauley) ("In the post COVID period we diverted our resources."); ECF 163-3 (West Tr.) 88:7–21 ("For myself, just me, between 40 and 60 hours" and for others "it could have taken up to two days").

137. Leapfrog's witnesses acknowledged similar resource burdens. Despite testifying at trial that non-participating hospitals do not complete the Survey because "they are hiding something," Day 2 Trial Tr. 173:8–11 (Romano), Dr. Romano expressly rejected that theory in written communications in May 2024, *see* JX-022.3 at 1. Instead, as he explained, "most hospitals stop reporting because it is too burdensome." *Id.* Ms. Campione testified that completing the Survey demands "a tremendous amount of resources." Day 2 Trial Tr. 254:12–18 (Campione). Ms. Binder testified that the Survey requires "two weeks of staff time." Day 3 Trial Tr. 96:24–97:5 (Binder). Dr. Harris likewise testified that hospitals operate under substantial resource constraints and must make tradeoffs when deciding whether to participate in voluntary reporting programs. Day 4 Trial Tr. 61:11–22, 100:1–8 (Harris).

138. The Community Hospitals' CEOs further testified that participation in the Survey requires hospitals to disclose extensive internal safety and operational data and to agree that Leapfrog may use that data "in a commercial manner for profit," including licensing it to third parties. JX-042.0 at 46; *see also* Day 1 Trial Tr. 142:9–11 (Cazares) ("[W]e [are] providing valuable data to Leapfrog, all that comes at a price."); Day 2 Trial Tr. 73:21–24 (Hanlon) (testifying that Leapfrog attempts to "bully us into submitting data so they could monetize off that data.").

139. The Community Hospitals' CEOs testified that they did not participate in the Survey because it did not provide meaningful value relative to the resources required to complete it.

*See* Day 1 Trial Tr. 156:9–14 (Cazares) ("We don't find value in the Leapfrog survey and we are not going to shift our resources to participate in a survey we just don't find valuable."); *See* Day 1 Trial Tr. 92:3–9 (Havericak) ("There wasn't a large amount of value in the survey and we wanted to take those resources that were limited."); Day 1 Trial Tr. 251:18–24 (McCauley) (agreeing that the Survey "provides no benefit whatsoever"); Day 2 Trial Tr. 196:23–197:6 (Montgomery) (testifying that she "determined there wasn't any value in the Leapfrog survey"); Day 2 Trial Tr. 104:17–19 (Hanlon) ("I don't believe there is value to the Leapfrog survey.").

140. Taken together, the testimony established that these burdens, data-use concerns, and lack of value—not poor safety performance—were the primary reasons the Community Hospitals declined to participate in the Survey during the relevant period.

## VII. LEAPFROG'S SAFETY GRADES HAVE CAUSED REAL AND ONGOING HARM

141. The Court heard extensive testimony and admitted contemporaneous documents showing the harm suffered by the Community Hospitals and the patients they serve following the dissemination of Leapfrog's Fall 2024 Safety Grades. The evidence showed the decline in the Community Hospitals' Safety Grades resulting from the non-participation penalty caused reputational and operational harm, including patients declining and delaying care, physician concerns, inquiries from insurers, and declines in patient volume. ECF 163-3 (West Tr.) 199:9–12 (testifying that the Community Hospitals lost patients "because of" Leapfrog's Fall 2024 methodology change). The evidence also showed that consumers often encountered the letter grades, "D" and "F," through dissemination beyond Leapfrog's website, without accompanying explanation of Leapfrog's methodology, and that the resulting reputational harm persisted despite efforts by the Community Hospitals to address consumer concerns. The Court credits the testimony of the Community Hospitals' CEOs regarding these reputational and operational impacts, which were corroborated by contemporaneous business records and third-party communications admitted at trial (including volume data and insurer letters).

### A. Delray Medical Center

142. Leapfrog's Safety Grades caused reputational and operational harm to Delray Medical Center ("Delray").

#### 1. *Dissemination and Consumer Response*

143. Delray CEO Ms. Havericak testified that Delray's drop to an "F" Safety Grade in Fall 2024 (and the ensuing cycles) prompted concerns from patients, physicians, and community

members. She testified that a TikTok video discussing four of the Community Hospitals' Fall 2024 Safety Grades, including Delray's, was shown to her on "numerous" occasions by physicians, patients, and members of the community, many of whom voiced "concern[]" about "what [was] happening at [her] hospital." Day 1 Trial Tr. 72:17–73:19 (Havericak).[7] Ms. Havericak testified that the Fall 2024 "F" was the only "F" Delray ever received. Day 1 Trial Tr. 73:10–19 (Havericak).

144. Ms. Havericak testified that the Safety Grade caused "confusion" among patients and community members and undermined confidence in Delray. She testified that she performs rounds in the hospital daily and speaks with patients in that process. Those conversations confirmed the negative impact of the Safety Grade on Delray's reputation. *See* Day 1 Trial Tr. 84:10–12 (Havericak).

145. She described an encounter with an elderly patient who was "nervous" after seeing the TikTok video and Delray's Safety Grade and later expressed surprise at the quality of care she received, including staff professionalism and hand hygiene practices. Day 1 Trial Tr. 87:2–25 (Havericak).

146. Ms. Havericak also testified regarding a patient who initially declined surgery at Delray because she was concerned about the Safety Grade and feared that she would "die" at the

---

[7] Leapfrog objected to the Community Hospitals' testimony on patient concern and confusion at trial on hearsay grounds. The Court overruled those objections. Out-of-court statements constitute "hearsay" only when offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). It thus follows that "an out of court statement that is offered for a purpose other than proving the truth of the matter … is not hearsay and not subject to exclusion on that basis." *United States v. Kent*, 93 F.4th 1213, 1218 (11th Cir. 2024). For example, a statement may be "offered to show its effect on the listener," in which case it is "not offered 'to prove the truth of the matter asserted.'" *United States v. Starr*, 159 F.4th 901, 909 (11th Cir. 2025). Similarly, "questions … are not 'assertive'" statements, and thus "are not hearsay" because they "are simply incapable of being true or false." *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015). And statements that are hearsay may be admissible if they are subject to an exception, such as where they reflect a declarant's "then-existing state of mind." Fed. R. Evid. 803(3). Courts thus routinely admit statements made and questions asked by consumers that "exhibi[t] confusion" and are offered to "sho[w] the speaker's confusion" on the grounds that they either are "not hearsay" (because they are not offered for their truth) or because they are "subject to the state of mind exception to hearsay." *Lincare Holdings Inc. v. Doxo, Inc.*, 2024 WL 865881, at *2 (M.D. Fla. Feb. 29, 2024) (collecting cases). At trial the Court ruled that the testimony at issue is admissible under at least Federal Rule of Evidence 803(3) as "statements by members of the public indicating their confusion." Day 1 Trial Tr. 86:4–15, 88:14–15. The Community Hospitals later cited the Court to *Lincare Holdings*, discussed above, in support of its ruling. Leapfrog relied on *Florida Virtual School v. K12, Inc.*, 2026 WL 127063 (11th Cir. Jan. 15, 2026). But *Florida Virtual School* does not feature a hearsay determination. *Id.* at *10 (noting the district court had "expressed hearsay *concerns*" with "twenty-one emails" but "did *not* exclude them on that basis" (emphases added)). Rather, the district court determined that the objected to evidence was not "reliable evidence" under the particular circumstances in that case. *Id.* at *4, *10. The Eleventh Circuit affirmed. *Id.* at *10. The case thus supports the proposition that consumer confusion evidence is not hearsay and may be considered in proper context by the trial court. Subsequent research confirms the point. *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (cited by the Eleventh Circuit in *Florida Virtual School* and determining that "actual confusion evidence" was "not hearsay").

hospital. Day 1 Trial Tr. 88:22–89:17 (Havericak). After Ms. Havericak explained that the Safety Grade resulted from Delray's non-participation in the Survey and provided updated information regarding Delray's surgical outcomes, the patient "was grateful for the call and clarification of the information," and she ultimately chose to proceed with the surgery and had a "fantastic outcome." Day 1 Trial Tr. 88:22–89:17 (Havericak).

**2. *Operational and Ongoing Impacts***

147. Ms. Havericak testified that she monitors Delray's patient/admissions volumes "daily," including emergency department walk-in volumes and patients transported by emergency medical services ("EMS"). Day 1 Trial Tr. 73:20–74:9 (Havericak). She testified that, "from 2024 through last year," Delray's EMS volume increased by about six percent, while walk-in emergency department volume *decreased* by approximately seven to eight percent. Day 1 Trial Tr. 74:25–75:6 (Havericak); PX-550.0.

148. Ms. Havericak testified that it is part of her responsibilities as CEO to understand the reasons for—and impacts of—declines in admissions. She testified that the population continued to grow and that she was not aware of any new urgent care centers or freestanding emergency facilities during that period, and that she "didn't find anything except the disparaging grade," to explain the decline. Day 1 Trial Tr. 75:17–23 (Havericak). Based on that review, she concluded that the decline was attributable to the Safety Grade Leapfrog "assigned," explaining that walk-in patients "are people that have choices." Day 1 Trial Tr. 75:7–23 (Havericak). Leapfrog did not present empirical or quantified evidence attributing Delray's walk in decline to a specific alternative cause. Ms. Havericak testified that she had not received comparable patient/community feedback about Delray's CMS rating and was not aware of the 'health locator' grade except through this litigation. Day 1 Trial Tr. 132:16–23 (Havericak).

149. Ms. Havericak testified that the reduction in walk-in volume adversely affected Delray's revenues and inpatient admissions. She explained that Delray operates high-acuity service lines and that decreased revenue limits the hospital's ability to invest in complex tertiary services, which, in turn, affects the availability of those services to the surrounding community. *See* Day 1 Trial Tr. 78:24–79:6 (Havericak).

150. Ms. Havericak testified that patients with serious or emergent conditions face increased health risks when they delay treatment or travel farther to seek care because "they are afraid to come to [Delray] because they feel it is unsafe" due to the Safety Grade. Day 1 Trial Tr.

80:2–8 (Havericak). She testified that "minutes matter" and "a delay in care could be life or death" for Delray's aging patient population. Day 1 Trial Tr. 70:19–22; 79:7–80:8 (Havericak).

151. Delray received letters from Humana Military in July and December 2025 referencing Leapfrog's Safety Grade. The letters stated, among other things, "we are providing you this information to encourage your facility to review your Leapfrog hospital safety grade to identify any factors that may have contributed to your performance on safety measures," requested a response "within 30 days," and directed the hospitals to Leapfrog's website and scoring methodology. Day 1 Trial Tr. 80:15–84:5 (Havericak); PX-465.0; PX-549.0. Ms. Havericak testified that approximately 30 percent of Delray's patient population is covered by Humana. Day 1 Trial Tr. 80:10-12 (Havericak). Ms. Havericak testified that the Safety Grade is "impacting [Delray's] reputation that [it] built in the community," and that there is "no way to correct" the public perception created by the Grade "on our own." Day 1 Trial Tr. 89:20–90:2 (Havericak).

**B. Palm Beach Gardens Medical Center**

152. Leapfrog's Safety Grades caused reputational and operational harm to Palm Beach Gardens Medical Center ("Palm Beach Gardens").

***1. Dissemination and Consumer Response***

153. Palm Beach Gardens' CEO Erik Cazares testified that it is his "responsibility" as CEO to address the impacts of the Safety Grade to the hospital. Day 1 Trial Tr. 144:11 (Cazares). He was "surprised" and "shocked" by the Fall 2024 "F" grade and was concerned about the implications for perceptions among physicians, patients, the community, and governing board members. Day 1 Trial Tr. 142:23–25, 143:1–3 (Cazares). He testified that, after the Fall 2024 Safety Grade was released, he began receiving complaints and concerns from physicians, staff, and governing board members. Day 1 Trial Tr. 143:9–11, 143:22–144:10 (Cazares). He testified that concerns "came from everybody." Day 1 Trial Tr. 143:22–144:1 (Cazares). And he testified that there was no explanation "other than the Leapfrog negative publicity." Day 1 Trial Tr. 169:1–12 (Cazares).

154. He also testified that multiple doctors—at least five across various specialties—reported that their patients voiced concerns about receiving treatment at Palm Beach Gardens. *See* Day 1 Trial Tr. 173:24–175:5 (Cazares).

155. Mr. Cazares further testified that, prior to the release of the Fall 2024 Safety Grade, physicians did not raise any concerns to him about Leapfrog Safety Grades. *See* Day 1 Trial Tr. 152:21–152:23 (Cazares).

156. Mr. Cazares testified that patients voiced concerns about Palm Beach Gardens' Safety Grade. He described a cardiac-surgery patient who "didn't want to have [] surgery at Palm Beach Gardens because of the failing Safety Grade he had seen from Leapfrog." Day 1 Trial Tr. 145:19–22 (Cazares). He was "scared to go there" and "wanted an explanation as to why the hospital was being highlighted as an unsafe hospital." Day 1 Trial Tr. 145:19–146:7 (Cazares). Mr. Cazares explained Palm Beach Gardens' safety practices and experience and offered to arrange a hospital tour, but Mr. Cazares "never heard back" from the patient, who did not proceed with surgery at Palm Beach Gardens. Day 1 Trial Tr. 145:19–146:7 (Cazares).

157. Mr. Cazares testified that he is frequently approached by individuals asking about Palm Beach Gardens' Safety Grade and that the reputational impact has persisted. He explained that "[t]he damage came on pretty strong when the 'F' came out" and that "it is still there and continues." Day 1 Trial Tr. 153:8–15 (Cazares). He testified that Leapfrog has continued to grade Palm Beach Gardens after Fall 2024 and that the hospital's current grade is a "D." Day 1 Trial Tr. 153:3–7 (Cazares). He testified that he is still approached by individuals (including new individuals) asking about the hospital's Grades, that "it has not eased up." Day 1 Trial Tr. 153:8–15 (Cazares).

### 2. *Operational and Ongoing Impacts*

158. Mr. Cazares testified that Palm Beach Gardens is widely known in the community for high-quality cardiac care and serves as a comprehensive hospital providing open-heart surgery; advanced emergency services; one of two specialized life support programs in the county; and additional advanced service lines, including orthopedics, neurology, general surgery, and robotic technology. *See* Day 1 Trial Tr. 137:6–17 (Cazares). Palm Beach Gardens' cardiac surgery program has received national recognition, including being named one of the top 50 hospitals in the nation for cardiac surgery and ranking in the top ten percent nationally for performance outcomes. *See* Day 1 Trial Tr. 137:21–138:3 (Cazares). Palm Beach Gardens has also been recognized as a Comprehensive Resuscitation Center of Excellence in Florida, which recognizes hospitals that have the proper infrastructure to care for patients whose hearts stop functioning during a cardiac arrest. *See* Day 1 Trial Tr. 138:4–22 (Cazares). While the national average for survival is 15 percent and the state of Florida's average is below that, Palm Beach Gardens' is at 24 percent. *See* Day 1 Trial Tr. 137:15–22 (Cazares). According to Mr. Cazares, patients experiencing cardiac

arrest are more likely to survive that arrest at Palm Beach Gardens than at any other hospital in Florida. *See* Day 1 Trial Tr. 137:15–22 (Cazares).

159. Mr. Cazares testified that Palm Beach Gardens experienced a decline in walk-in emergency department volume following the release of the Fall 2024 Safety Grades. He testified that Palm Beach Gardens experienced a decline in walk-in emergency patients "despite a lot of efforts" and "extra efforts" to promote the hospital's quality back to the community. Day 1 Trial Tr. 144:21–145:1 (Cazares). He testified that, despite efforts to highlight the hospital's quality to the community, Palm Beach Gardens could not identify any explanation for the decline in walk-in volume other than the negative publicity associated with the Safety Grade. *See* Day 1 Trial Tr. 144:21–145:1, 169:8–10 (Cazares). He further testified that overall hospital revenue increased, but emergency revenue did not. *See* Day 1 Trial Tr. 167:3–9 (Cazares).

160. Mr. Cazares testified that Palm Beach Gardens tracks cancellations of medical procedures and that, when patients decline or delay care, it can adversely affect patient outcomes. He explained that delays in urgent treatment "could have detrimental consequences" for patient recovery. Day 1 Trial Tr. 146:12–13, 152:7–19 (Cazares); *see also* PX-560.0–560.2.[8]

161. Mr. Cazares testified that the Safety Grade also negatively affected staff morale at Palm Beach Gardens because, for people who "spend a majority of [their] time working with patients," "[being] rated a fail on safety … is a huge hit to their morale." Day 1 Trial Tr. 144:2–7 (Cazares). He testified that because the hospital was "rated a fail on safety," leadership had to respond to employees, physicians, and governing board members, and to "give faith" to the community. Day 1 Trial Tr. 144:2–10 (Cazares).

**C. St. Mary's Medical Center**

162. Leapfrog's Safety Grades caused reputational and operational harm to St. Mary's Medical Center ("St. Mary's").

***1. Dissemination and Consumer Response***

163. St. Mary's CEO, Cynthia McCauley, testified that, following the release of the Fall 2024 Safety Grade, which was a "D," physicians at St. Mary's reacted with "disbelief" and even

[8] PX-560.0–560.2 consists of a cover email and an internal Palm Beach Gardens spreadsheet titled "PBG Cancels Weeks Oct 26," created in the ordinary course of business to track scheduled procedure cancellations during the week of October 26–31, 2025. The spreadsheet reflects that, on October 22, 2025 (after discovery closed in this matter on September 25, 2025), a patient canceled an upcoming scheduled procedure at Palm Beach Gardens Medical Center, with the stated reason recorded as the hospital's "F GRADE." *See* PX-560.1–560.2. The Court admits the document into evidence for the reasons set forth in the Community Hospitals' submission at ECF 168.

"indignation," stating that the Grade did not align with their clinical experience or with the outcomes St. Mary's achieves for patients. Day 1 Trial Tr. 243:8–16 (McCauley). She testified that since the grading changed down to a "D," she discussed the Safety Grade every month with St. Mary's medical executive committee and governing board. *See* Day 1 Trial Tr. 243:4–7 (McCauley).

164. Ms. McCauley further testified that, as a result of the Safety Grade, she has been required to spend substantial time educating physicians, patients, and community members about St. Mary's quality of care and explaining that the Grade resulted from non-participation rather than measured safety performance. Day 1 Trial Tr. 244:2–13 (McCauley).

165. Ms. McCauley testified that public confidence in St. Mary's has been "shaken." Day 1 Trial Tr. 244:19–22 (McCauley). That decline in confidence was measurable. According to a brand analysis that measured the public's perception of St. Mary's from the fourth quarter of 2024 to the second quarter of 2025, the percentage of patients that would choose St. Mary's fell from 78 percent to 55 percent; "the only thing that changed in a year was the Leapfrog rating." Day 1 Trial Tr. 246:25–247:14, 261:2–263:25 (McCauley).

### 2. *Operational and Ongoing Impacts*

166. Ms. McCauley also testified that the hospital experienced declines in emergency-department walk-in volume and certain elective procedures following the Fall 2024 Safety Grade. *See* Day 1 Trial Tr. 244:19–247:21 (McCauley); PX-550.0. She testified that her elective walk-in volume and elective physical-therapy volume were down and that outpatient volumes were down, particularly on the pediatric side. *See* Day 1 Trial Tr. 246:25–247:7 (McCauley). She testified that pediatric emergency walk-ins declined by approximately ten patients per day and general emergency walk-ins declined by approximately three to four patients per day. *See* Day 1 Trial Tr. 247:16–21 (McCauley); PX-550.0.

167. Ms. McCauley further testified that, during the same period, emergency department walk-in volume decreased by approximately five percent even as EMS admissions increased by approximately two percent. *See* Day 1 Trial Tr. 251:4–12 (McCauley). She testified that she performed a similar investigation as her peers, including whether any new emergency rooms or free-standing facilities could have redirected patients, and that she was not aware of any such provider. *See* Day 1 Trial Tr. 247:8–14 (McCauley). She stated that "[t]he only thing that changed in a year was the Leapfrog rating." Day 1 Trial Tr. 247:8–14 (McCauley). She further testified that these

declines occurred despite rapid population growth in the West Palm Beach area and that, absent the Safety Grade, she would have expected walk-in emergency-department volume—particularly pediatric walk-ins—to increase. *See* Day 1 Trial Tr. 251:4–12 (McCauley).

168. Ms. McCauley testified that, during the same period in which walk-in emergency department volume declined, the number of patients transferred to St. Mary's increased significantly, particularly from Jupiter Medical Center, a competing hospital. She testified that in her career at St. Mary's she has never seen transfers so high: In 2025, Jupiter Medical Center made 568 requests to transfer patients to St. Mary's, meaning patients are "choosing somewhere else first." Day 1 Trial Tr. 248:17–249:9, 268:18–25 (McCauley).

169. Ms. McCauley further testified that many of these patients initially presented to Jupiter Medical Center, which lacked the capability to treat them, so they had to be subsequently transferred to St. Mary's for care. She explained that approximately half of the transfer requests involved pediatric patients, for whom St. Mary's serves as the region's only children's hospital and maintains 30 to 40 pediatric specialists. *See* Day 1 Trial Tr. 248:17–249:9; 268:18–25 (McCauley).

170. Ms. McCauley explained that such transfers can harm patients by creating the "risk of … delay" in care and by requiring them to incur costs at more than one facility. Day 1 Trial Tr. 238:11–12, 249:10–19 (McCauley). She further testified that delays in care—particularly for emergency or pediatric patients—can increase medical risks, adversely affect patient outcomes, and, in some cases, "result in death." Day 1 Trial Tr. 238:12, 248:13–249:19 (McCauley).

**D. West Boca Medical Center**

171. Leapfrog's Safety Grades caused reputational and operational harm to West Boca Medical Center ("West Boca").

***1. Dissemination and Consumer Response***

172. West Boca's CEO, Mr. Hanlon, testified that, following the release of West Boca's "D" Safety Grade in Fall 2024, patients began leaving West Boca against medical advice "based on what they [had] read and seen about the Leapfrog grades." Day 2 Trial Tr. 84:2–4, 123:1–2, 130:2–4 (Hanlon).

173. Mr. Hanlon described a patient identified as J.D. who presented to West Boca with a compound fracture of the finger—an open fracture carrying risks of infection and serious complications, including "loss of limb or life." Day 2 Trial Tr. 86:12–88:6 (Hanlon). Mr. Hanlon

testified that West Boca was well-equipped to treat the injury—it is "one of the few hospitals in the county that [has] a dedicated hand surgery" unit, has "specialized physicians," and "perform[s] better than average" on surgical site infection metrics. Day 2 Trial Tr. 88:8–15 (Hanlon). This patient was initially admitted to West Boca Medical Center for urgent surgery but, as reflected in the contemporaneous record, he then "verbalized" that he "wanted to go to" a different hospital "against medical advice" "due to the leap frog reviews." PX-552.0 at 1. Despite being advised by physicians and nursing staff of the risks of leaving against medical advice, the patient left West Boca after his daughter viewed the Leapfrog Safety Grade. *See* Day 2 Trial Tr. 86:11–88:15 (Hanlon); PX-552.0 at 1. The Court overruled Leapfrog's hearsay objection and admitted PX-552.0 as a business record, and Mr. Hanlon testified that, when a patient leaves "AMA" (against medical advice), the hospital is required to advise the patient of the risks of leaving, but the patient may still choose to leave. Day 2 Trial Tr. 84:5–7, 85:1–24, 86:6–11 (Hanlon).[9]

174. Mr. Hanlon testified that J.D. incurred financial harm as a result of leaving West Boca against medical advice, including receiving a bill for the intake and treatment provided prior to his departure—cost that he would likely incur again at his subsequent treatment facility. *See* Day 2 Trial Tr. 88:16–17 (Hanlon); PX-552.0.

175. Mr. Hanlon testified regarding another patient, identified as F.W., who was admitted and scheduled for surgery at West Boca for an underarm infection but left against medical advice in the early morning hours after seeing media coverage related to West Boca's Safety Grade. *See* Day 2 Trial Tr. 89:15–21 (Hanlon). Mr. Hanlon testified that F.W. also received a bill for care at West Boca, and, like J.D., would likely have been double-billed at a subsequent treatment facility. *See* Day 2 Trial Tr. 89:25–90:1 (Hanlon).

176. Mr. Hanlon testified that, following the Fall 2024 Safety Grade, members of the medical staff and governing board expressed immediate concern. He testified that members of the Medical Executive Committee, including physicians and medical leadership, were "very frustrated," and that members of West Boca's governing board—comprised of physician providers and community representatives—were also concerned. Day 2 Trial Tr. 82:1–83:5 (Hanlon). Mr.

---

[9] Records of a regularly conducted activity are subject to a hearsay exception under Federal Rule of Evidence 803(6). *See* Fed. R. Evid. 803(6). Thus, the record itself is admissible. Statements within the record are likewise admissible as evidence of consumer confusion. *See supra* note 8.

Hanlon further testified that staff were likewise "frustrated" because the Safety Grade did not "accurately reflect" the quality of care provided at West Boca. Day 2 Trial Tr. 83:6–12 (Hanlon).

177. Mr. Hanlon testified about patient concerns arising from the Safety Grade as well. In particular, he described patients who questioned whether they should seek care at West Boca because of the Leapfrog Safety Grades. *See* Day 2 Trial Tr. 83:24–84:4 (Hanlon).

178. Mr. Hanlon also testified that West Boca monitors Google reviews and that one star-reviews are routed to leadership, and he testified that he has seen negative reviews that mention Leapfrog. *See* Day 2 Trial Tr. 130:16–25 (Hanlon). He testified that he reviewed a July 2025 Google review that "goes on to talk about the Leapfrog D safety grade" and urged readers to "drive out of your way and go[] to Boca Regional or any other hospital." Day 2 Trial Tr. 131:16–24, 132:10–13 (Hanlon).

### 2. *Operational and Ongoing Impacts*

179. Mr. Hanlon testified that West Boca's emergency-department walk-in volume declined by approximately 15 percent from 2024 to 2025. *See* Day 2 Trial Tr. 90:14–16 (Hanlon). By contrast, EMS volume was down by just three percent. *See* PX-550.0. Mr. Hanlon testified that patients explicitly stated that they were leaving or avoiding West Boca's emergency department because of the Leapfrog Safety Grade. *See* Day 2 Trial Tr. 90:8–91:12, 115:18–21, 121:10–12 (Hanlon). Mr. Hanlon also testified that West Boca had invested $3 million to expand the emergency room to accommodate a forecasted increase in emergency volumes, an increase that was not realized in part because of the Leapfrog Safety Grades. *See* Day 2 Trial Tr. 143:14–17 (Hanlon).[10]

180. The evidence further established that payors expressed concern about West Boca's Safety Grade. Mr. Hanlon testified that West Boca received letters in July 2025 and December 2025 from Humana Military referencing the hospital's Grade. The letters stated, among other things, "we are providing you this information to encourage your facility to review your Leapfrog hospital safety grade to identify any factors that may have contributed to your performance on safety measures," requested a response, "within 30 days" and directed the hospital to Leapfrog's website and scoring methodology. PX-464.0; PX-553.0. As Mr. Hanlon explained, approximately 12 to 14 percent of West Boca's patients use Humana insurance. *See* Day 2 Trial Tr. 92:7–94:11 (Hanlon). Mr. Hanlon also testified that West Boca received a letter from the Florida Alliance

[10] Mr. Hanlon testified that, although there were "variations" in other volumes, he saw a "decrease" in emergency room volume "due to the Leapfrog grade." Day 2 Trial Tr. 120:17–121:12 (Hanlon).

community organization, which "strongly encourage[d]" West Boca to participate in the Leapfrog Survey. Day 2 Trial Tr. 95:1–96:17 (Hanlon). The letter stated that both "[e]mployers and purchasers" consider participation "vital" and that performance metrics would be shared with employees and used as part of purchasers' "value strategies." PX-415.0 at 1.

181. Mr. Hanlon testified that, prior to Fall 2024, he did not recall patients or community members raising concerns about West Boca's Leapfrog Safety Grade. *See* Day 2 Trial Tr. 96:18–97:1 (Hanlon).

182. Mr. Hanlon testified that the harm to West Boca caused by the Safety Grade is ongoing. He testified that West Boca has devoted substantial time and resources to addressing staff concerns, responding to community members, and investing in advertising, like television commercials, to counteract negative public perceptions created by the Safety Grade. *See* Day 2 Trial Tr. 97:5–17 (Hanlon).

183. Mr. Hanlon testified that, if Leapfrog continues to assign Safety Grades to West Boca, the hospital will continue to suffer reputational harm, reduced patient volumes, and increased risk to patients who leave against medical advice. *See* Day 2 Trial Tr. 97:18–23 (Hanlon). He further testified that, Leapfrog is "grading based on information they don't have," and that West Boca is "being penalized until we submit it." Day 2 Trial Tr. 98:1–4 (Hanlon).

184. Mr. Hanlon testified that the Safety Grades "absolutely" harmed West Boca: "We've suffered reputational harm [and] loss of goodwill in the community." Day 2 Trial Tr. 83:22–84:4 (Hanlon).

**E. Good Samaritan Medical Center**

185. Leapfrog's Safety Grades caused reputational and operational harm to Good Samaritan Medical Center ("Good Samaritan").

***1. Dissemination and Consumer Response***

186. Good Samaritan's CEO, Ms. Montgomery, testified that the Fall 2024 Safety Grade generated immediate and widespread negative attention—a "fire storm." Day 2 Trial Tr. 199:25–200:4 (Montgomery). She testified that media outlets repeatedly reported on the Grade, including during evening news broadcasts, and that coverage extended across newspapers and social media platforms, including Instagram and TikTok. *See* Day 2 Trial Tr. 199:25–200:4 (Montgomery). Ms. Montgomery testified that when Good Samaritan was participating it typically received a "C","

and that in Fall 2024 the Safety Grade changed and the hospital "should not have received an F." Day 2 Trial Tr. 199:1–3, 201:16–202:2 (Montgomery).

187. Ms. Montgomery testified that the media coverage and dissemination of the Safety Grade immediately affected Good Samaritan's reputation. She testified that physicians began receiving complaints from patients, including one cancer patient who declined to undergo surgery at Good Samaritan—complaining that she believed Good Samaritan was "inept"—a week or two after the Grade came out. Day 2 Trial Tr. 231:23–25 (Montgomery). Ms. Montgomery testified that she explained the Survey process to the patient, but the patient instead sought care at Jupiter Medical Center, a competitor of the Community Hospitals and an "A" rated hospital as determined by Leapfrog. Day 2 Trial Tr. 200:8–17, 231:16–232:5 (Montgomery). She testified that the physician wanted to know "what we are doing about this" and when they were "putting a statement out," and she explained the Survey process to him as well. Day 2 Trial Tr. 200:8–14 (Montgomery).

188. Ms. Montgomery testified regarding a menacing anonymous letter she received that enclosed a newspaper article highlighting Jupiter Medical Center's "A" Safety Grade. The letter contained handwritten comments disparaging Good Samaritan and stating that "Your despicable staff needs to take notes from [Leapfrog "A" graded Jupiter Medical Center]." Day 2 Trial Tr. 209:20–211:19 (Montgomery); PX-548.0. The Court overruled Leapfrog's objection and admitted PX-548. *See* Day 2 Trial Tr. 210:6–14. Ms. Montgomery testified that the envelope holding the letter was made out to her as CEO and appeared to have been sent on December 2 from West Palm Beach, Florida. *See* Day 2 Trial Tr. 210:16–24 (Montgomery).

189. Ms. Montgomery testified that the letter was "clearly very upsetting" because it reflected a belief that Good Samaritan was unsafe and that Jupiter Medical Center was safer, and that the sender did not understand that Good Samaritan's Leapfrog Safety Grade resulted from non-participation in the Leapfrog Survey. Day 2 Trial Tr. 211:20–212:6 (Montgomery). She also testified about the continued dissemination of the Safety Grade—the "fire storm … continues" to foster and exacerbate fear among consumers. Day 2 Trial Tr. 211:20–212:6 (Montgomery); PX-548.0. She testified that the "fire storm keeps going" and that Leapfrog "keeps putting this punitive grading out," which "continues" to "put[] fear into consumers." Day 2 Trial Tr. 211:20–212:6 (Montgomery).

### 2. *Operational and Ongoing Impacts*

190. Ms. Montgomery testified that as CEO it was part of her role to understand the change in Good Samaritan's Leapfrog Safety Grade, and she investigated the reasons for the change by undertaking a process to "uncover[] what occurred," including speaking with quality leadership and reviewing calculators. Day 2 Trial Tr. 199:13–17 (Montgomery).

191. Ms. Montgomery testified that Good Samaritan experienced a significant decline in emergency-department walk-in volume following the Fall 2024 Safety Grade. She testified that walk-in volume declined by approximately four percent, representing approximately 1,300 patients. *See* Day 2 Trial Tr. 205:9–13 (Montgomery). Ms. Montgomery investigated potential explanations for the decline, including community outreach, meetings with business development personnel, and consideration of new competing facilities, and testified that based on that review, she concluded the decline was attributable to the Safety Grade. She explained that walk-in patients make an elective choice regarding where to seek emergency care, so it was "telling" that "they are not making that choice any longer." Day 2 Trial Tr. 205:9–206:8 (Montgomery); PX-550.0. She testified that EMS is a separate category reflecting ambulance rides into the hospital and is "mandatory," and that for the same period EMS increased by three percent. Day 2 Trial Tr. 205:14–22. She testified that she reviews admissions data "daily." Day 2 Trial Tr. 205:23–24 (Montgomery). She testified that in trying to understand the drop she went out into the community and looked for free-standing emergency rooms in the area, and "there is not really any underlying thing other than walk-ins are elective." Day 2 Trial Tr. 206:1–8 (Montgomery).

192. Ms. Montgomery further testified that Good Samaritan experienced declines in elective procedures in 2025, following the Fall 2024 Safety Grade. She testified that breast imaging volume declined by approximately eight percent and that admissions plus observations declined by approximately 4.2 percent, representing nearly 600 patients. *See* Day 2 Trial Tr. 206:9–207:11 (Montgomery). She testified that Good Samaritan performs approximately 5,000 breast imaging procedures per year. *See* Day 2 Trial Tr. 206:11–12 (Montgomery).

193. Ms. Montgomery testified that these declines occurred despite rapid population growth in downtown West Palm Beach, where Good Samaritan is located. Day 2 Trial Tr. 207:9–11 (Montgomery).

194. Ms. Montgomery testified that Good Samaritan, like Delray and West Boca, received a letter from Humana referencing the hospital's Leapfrog Safety Grade. *See* PX-554.0. The

Court overruled Leapfrog's objection and admitted PX-554.0. *See* Day 2 Trial Tr. 208:1–4. The letter stated, among other things, "we are providing you this information to encourage your facility to review your Leapfrog Hospital Safety Grade to identify any factors that may have contributed to your performance on safety measures," requested a response "within 30 days," and directed the hospital to Leapfrog's website and scoring methodology. PX-554.0. Ms. Montgomery testified that approximately eighteen percent of Good Samaritan's patients are insured by Humana and that the letter caused concern because loss of a Humana contract would be "devastating to the patients," as it would narrow their access to care. Day 2 Trial Tr. 207:12–208:23 (Montgomery). She testified that Humana "does not understand that we are not a D or an F hospital" and that Humana was "just going by what Leapfrog published." Day 2 Trial Tr. 208:16–23 (Montgomery).

195. Ms. Montgomery testified that the Humana letter did not reflect any understanding that Good Samaritan did not participate in the Survey or that the Safety Grade resulted from non-participation, and did not reference Leapfrog's methodology. *See* Day 2 Trial Tr. 209:5–15 (Montgomery). She testified that the letter contained no language reflecting that Humana believed Good Samaritan did not submit data and was penalized for non-participation. *See* Day 2 Trial Tr. 209:5–11 (Montgomery). She testified there was no discussion of the Fall 2024 change in methodology in the letter. *See* Day 2 Trial Tr. 209:13–15 (Montgomery).

196. Ms. Montgomery testified that Good Samaritan's relationship with Hospital for Special Surgery ("HSS") was adversely affected following the Fall 2024 Safety Grade. She testified that HSS physicians obtained privileges at Jupiter Medical Center after release of the Grade and that eight HSS surgeons had performed approximately 1,300 surgeries per year at Good Samaritan and generated approximately $8 million in annual revenue. She testified that HSS and Good Samaritan had maintained a "collaborative agreement" since 2020, and that HSS ultimately canceled that agreement. Day 2 Trial Tr. 200:20–201:18.

197. Ms. Montgomery investigated why HSS physicians were obtaining privileges at Jupiter, and she testified that she understood the contract developments to be related to the Fall 2024 Safety Grade. She testified that she spoke with Good Samaritan's orthopedic medical director, Dr. Sama, who is also an HSS physician, and that he reported HSS patients were "upset" and asked "what is going on" with the Leapfrog Safety Grade. Day 2 Trial Tr. 201:15–202:2, 203:3–5 (Montgomery). Ms. Montgomery testified that she had to undertake "the whole process" of explaining to the HSS physicians that Good Samaritan did not participate in the Survey and that the

grade did not reflect measured safety performance. Day 2 Trial Tr. 201:15–202:2 (Montgomery).[11] In March 2025, several months after issuance of the Fall 2024 Safety Grade, HSS provided notice of contract cancellation, effective October 31, 2025. PX-561.0. Ms. Montgomery testified that she had not received complaints from HSS physicians regarding Leapfrog Safety Grades prior to Fall 2024, but the physicians were "directed by their employer to get privileges at Jupiter Medical," even though "they didn't want to." Day 2 Trial Tr. 202:16–203:23 (Montgomery).

198. Ms. Montgomery further testified that the impact of the Safety Grade extended to individual physicians. She testified that Dr. Sama resigned from Good Samaritan's governing board and from his role as orthopedic medical director and subsequently began providing services in the community associated with Good Samaritan's competitor Jupiter Medical Center. *See* Day 2 Trial Tr. 203:3–10 (Montgomery). Ms. Montgomery testified that Dr. Sama informed her that he was directed by HSS to take those actions. *See* Day 2 Trial Tr. 203:11–13 (Montgomery). Ms. Montgomery also testified that another physician, Dr. Wang, was directed to obtain privileges at Jupiter Medical Center despite not wanting to leave Good Samaritan. *See* Day 2 Trial Tr. 204:5–24 (Montgomery).

199. Ms. Montgomery testified that if Leapfrog continues to assign Safety Grades to Good Samaritan, "[t]hings will just continue to get worse": the hospital's reputational harm will continue unabated, and the notion that Good Samaritan is a "failing hospital" will become more and more entrenched. Day 2 Trial Tr. 212:12–16 (Montgomery). She testified that the Grades come out "every six months" and that consumers will "believe the story" year after year if the hospital is repeatedly characterized as failing. Day 2 Trial Tr. 212:12–16 (Montgomery).

**F. Leapfrog Witnesses**

200. Leapfrog's own witnesses agree that its Safety Grades can damage hospitals. Dr. Romano testified that poor Leapfrog Safety Grades could "of course" harm a hospital's reputation. Day 2 Trial Tr. 169:18–20 (Romano). He also agreed that if a hospital is assigned an "F," that could harm the hospital's reputation. *See* Day 2 Trial Tr. 169:21–23 (Romano). Dr. Zambrana,

[11] Leapfrog objected to these statements as hearsay at trial. The statements are not hearsay, however, because they contextualize the effect on the listener (the efforts Ms. Montgomery took in response to HSS's concerns), and because they are evidence of confusion. *See supra* note 8. The Court also finds that it is reasonable to attribute HSS's contract cancellation to Leapfrog's Safety Grades based on several indicia of reliability, including: the statements by HSS physicians expressing concern about the failing Safety Grade, the fact that HSS's orthopedic medical director had served on Good Samaritan's governing board, and the timing of the cancellation (after the Fall 2024 Safety Grades were released).

Vice President and Chief Quality Officer for Jackson Health System, similarly testified that patients "want to go to hospitals with good reputations of quality" and that doctors "want to work with hospitals with good reputations for quality." Day 4 Trial Tr. 132:10–15 (Zambrana).

### G. Expert Testimony

201. Expert testimony from Dr. Nicholson and Dr. Berger supports the conclusion that the Community Hospitals and their patients were harmed by the Leapfrog Safety Grades—and that the harm will continue if Leapfrog is allowed to continue grading the Community Hospitals.

202. Relying on health care economics and peer-reviewed literature, Dr. Nicholson testified that Leapfrog's Safety Grades likely distort patient choices and are widely used and relied upon in the industry by insurers, employers, hospitals, and patients alike. *See* Day 1 Trial Tr. 186:4–21, 200:17–204:20 (Nicholson) ("substantial literature" "show[s] that patients are relying on hospital ratings when making decisions"). He testified that the harms reflected in the record—including reduced walk-in volume and damages to reputation and physician relationships—are consistent with what the literature predicts when consumers rely on negative quality signals. *See* Day 1 Trial Tr. 202:16–19, 203:21–204:2 (Nicholson).

203. Dr. Nicholson also testified that quality and safety ratings like the Leapfrog Safety Grades affect where patients seek treatment and that unreliable ratings can distort patient choice and cause patient harm. Day 1 Trial Tr. 180:1–5 (Nicholson).

204. Dr. Berger testified that "D" and "F" grades "likely negatively impact consumer perceptions of the [C]ommunity [H]ospitals as well as deter consumers from choosing to receive care from the [Community H]ospitals." Day 2 Trial Tr. 6:22–25 (Berger). He testified that "D" and "F" Safety Grades "suggest[] negative things about [a] hospital's safety" and "likely negatively impact consumer perception" of such hospitals. Day 2 Trial Tr. 10:2–6 (Berger). Dr. Berger further testified that, in a grading system, an "F" signifies "bad performance" and that he was "not aware of anything lower than an F." Day 2 Trial Tr. 71:10–16 (Berger).

205. Dr. Berger also testified that "consumers often use heuristics" like the Leapfrog Safety Grades "to simplify decision making," especially "[w]hen decisions are difficult" or the consumer lacks knowledge. Day 2 Trial Tr. 9:14–18 (Berger). He testified that "negative information" about a hospital's safety—such as a "D" or "F" Safety Grade—causes consumers to "feel betrayed" and would likely "deter them from choosing the graded hospitals." Day 2 Trial Tr. 10:10–20, 30:19–31:1 (Berger).

206. Dr. Nicholson testified that Leapfrog positions itself as an authoritative source for patients and self-insured employers and frames hospital choice as a "life or death" decision, which increases the likelihood that consumers will rely on the Safety Grades. *See* Day 1 Trial Tr. 202:5–15 (Nicholson).

207. Dr. Nicholson testified, "there is ample evidence" that "consumers are using the Leapfrog Group ratings" in that manner and that the Community Hospitals' harms are consistent with what he would expect, including decreases in elective walk-in volume and damage to reputation and physician relationships. Day 1 Trial Tr. 202:16–19, 203:21–204:2 (Nicholson).

208. He also testified that the record reflects patient confusion about the ratings and patients denying recommended care based on what they learned from the Leapfrog rating. *See* Day 1 Trial Tr. 204:3–7 (Nicholson).

209. Dr. Nicholson further testified that other types of consumers in the healthcare ecosystem are affected by the Leapfrog Safety Grades, including "self-insured employers who are using Leapfrog information to determine which … hospitals should be available to the employees" and "private insurers [who] are using the Leapfrog grades in part to run their pay for performance programs," that can affect hospital payments. Day 1 Trial Tr. 202:20–203:6 (Nicholson).

210. Dr. Berger testified that future publication of the Safety Grades will have a "long-term negative impact on these hospitals' perceptions and consumer choice." Day 2 Trial Tr. 35:24–36:5 (Berger); *see also* Day 2 Trial Tr. 7:1–3 (Berger) ("future repeated publication of such grades are likely to have ongoing and further detrimental impacts on the Community Hospitals").

**PROPOSED CONCLUSIONS OF LAW**

211. Having made these Findings of Fact, the Court turns to its Conclusions of Law. The trial record establishes that Leapfrog's Safety Grades, grading methodology, and related representations satisfy FDUTPA's standards for deceptive and unfair conduct.

## I. THIS COURT HAS JURISDICTION OVER THIS ACTION

212. This Court must assure itself of its subject-matter jurisdiction. *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409–10 (11th Cir. 1999). The Court concludes that the Community Hospitals have standing to seek injunctive and declaratory relief, that diversity jurisdiction is satisfied, and that the Court has personal jurisdiction over Leapfrog. The Court therefore rejects Leapfrog's jurisdictional arguments.

213. *Standing.* Plaintiffs seeking prospective relief must demonstrate "a real and

immediate threat of future injury" that is concrete and particularized, fairly traceable to the defendant's conduct, and redressable by the requested relief. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328–29 (11th Cir. 2013). The Findings establish ongoing reputational and operational injuries caused by Leapfrog's conduct that will continue absent relief. *See, e.g.*, Findings ¶ 165 (McCauley) (noting that brand satisfaction for St. Mary's fell from 78 to 55 percent during the relevant period and attributing the decline to "the Leapfrog rating"). Injunctive and declaratory relief would redress these injuries by stopping Leapfrog from issuing and promoting the challenged Safety Grades for the Community Hospitals, requiring the removal of the Fall 2024 through Fall 2025 Grades, and requiring corrective disclosures to counteract ongoing marketplace confusion. *See infra* ¶¶ 281–95. Indeed, judicial relief would be necessary to redress those injuries, given that Leapfrog's grading system is "nonvoluntary" by design, hospitals cannot opt out, and the non-participation "penalty goes away" only upon participation in Leapfrog's Survey. Findings ¶¶ 117–18.

214. *Diversity Jurisdiction.* This Court has jurisdiction pursuant to 28 U.S.C. § 1332. The Community Hospitals are citizens of Florida, and Leapfrog is a citizen of Washington, D.C. The parties are completely diverse. And the amount-in-controversy requirement is satisfied, as Leapfrog has stipulated. *See* ECF 129 ¶ 168; *see also PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1306 (11th Cir. 2016).

215. *Personal Jurisdiction.* This Court previously held that it has personal jurisdiction over Leapfrog. *See* ECF 41 at 6–7. Florida's long-arm statute is satisfied, Fla. Stat. § 48.193(1)(a)(1)–(2), because Leapfrog engaged in Florida trade or commerce, *see, e.g.*, Findings ¶ 120 (accolade sales materials featuring a Florida hospital), and committed tortious acts in this State by violating FDUTPA, *see infra* ¶¶ 218–75; *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 585 (Fla. 2000). The "minimum contacts" requirement is also met: Leapfrog purposely directed its conduct toward Florida by soliciting data from Florida hospitals and marketing and disseminating Safety Grades to Florida consumers. *See, e.g.*, Findings ¶¶ 21–26, 105–16.

## II. THE COMMUNITY HOSPITALS HAVE ESTABLISHED THAT LEAPFROG VIOLATED FDUTPA

216. FDUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). A plaintiff may establish a violation by proving either

deception or unfairness. In an action for injunctive or declaratory relief, a plaintiff also must show that it is "aggrieved by" the practice. Fla. Stat. § 501.211(1); *see also SMS Audio, LLC v. Belson*, 2017 WL 1533941, at *4 n.6 (S.D. Fla. Mar. 9, 2017) (Middlebrooks, J.) (citing *Caribbean Cruise Line, Inc. v. Better Bus. Bureau*, 169 So. 3d 164, 166–67 (Fla. 4th DCA 2015)). No proof of damages is required. *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 172 (Fla. 1st DCA 2015). The Community Hospitals must establish their FDUTPA claim by a preponderance of the evidence. *Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 213 (11th Cir. 2009). For deceptive practices, FDUTPA considers whether the practice is likely to mislead reasonable consumers; proof of actual injury to consumers is not required for injunctive or declaratory relief. For unfair practices, as the Court discusses further below, the record similarly must show at least likely consumer injury from the challenged conduct. *See infra* ¶¶ 235–41.

217. As set forth below and in the Findings, the Court concludes that: (1) Leapfrog's challenged practices are deceptive; (2) those practices are also unfair; (3) the record establishes both likely and actual consumer harm; and (4) the Community Hospitals are aggrieved by Leapfrog's conduct.

### A. Leapfrog's "Safety Grades," Safety Grade Methodology, And Surrounding Misrepresentations Are Deceptive Under FDUTPA

218. The Community Hospitals have proven by a preponderance of the evidence that Leapfrog's Safety Grades, Safety Grade methodology, and related misrepresentations are "deceptive … practices" under FDUTPA. Fla. Stat. § 501.204(1).

219. A practice is deceptive when it is "likely to mislead the consumer acting reasonably in the circumstances." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quoting *Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000)); *see also Waste Pro USA v. Vision Constr. ENT, Inc.*, 282 So. 3d 911, 917 (Fla. 1st DCA 2019); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–84 (11th Cir. 2016). Deception is "construed liberally," Fla. Stat. § 501.202, and encompasses not only "outright false statements" but also "omissions," *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1327 (S.D. Fla. 2017), and representations that convey a misleading "net impression," *Zamber v. Am. Airlines, Inc.*, 282 F. Supp. 3d 1289, 1299 (S.D. Fla. 2017). Deception claims for injunctive relief do "not require actual harm" to consumers; rather, deceptions simply must be "'likely to cause injury to a reasonable relying consumer.'" ECF139 at 9 (quoting *Millennium Commc'ns & Fulfillment, Inc.*, 761 So. 2d at 1263).

### 1. *The Fall 2024 Methodology Produced Safety Grades Likely to Mislead Reasonable Consumers*

220. The Community Hospitals have demonstrated that Leapfrog's use of the Fall 2024 methodology to generate "Safety Grades" for non-participating hospitals is deceptive. The Community Hospitals also demonstrated that Leapfrog made related misrepresentations that obscured the nature of the Fall 2024 approach. The Court addresses each in turn.

221. Leapfrog's Fall 2024 methodology is deceptive because the "Safety Grades" it generates do not—and were not meant to—reflect actual safety performance for non-participating hospitals on key Survey-dependent measures for which Leapfrog has no data measuring performance. *See* Findings ¶ 58 (the purpose of the Fall 2024 approach was "not to improve accuracy," and it was "not an accurate reflection" of safety).

222. The Fall 2024 approach was intended to "penalize" non-participation. Findings ¶ 36. Leapfrog adopted a "drastic" change that "arbitrarily assign[s]" fixed failing component scores for non-participating hospitals on the Four Measures and then re-weights those measures to account for approximately one-third of the Safety Grade, despite the absence of data measuring performance on those measures. *See* Findings ¶¶ 124, 31–38, 42–46, 58, 62. Leapfrog attributed the invention of this arbitrary penalty to "group think," rather than any rigorous vetting process. Findings ¶ 124. And documents reveal that Leapfrog ignored Dr. Romano's contemporaneous warning that it could not simply "pretend" to be "imputing missing values in a statistically optimal way" under the Fall 2024 approach. Findings ¶ 36.

223. The record establishes that the Fall 2024 approach was "a simple business decision" designed to increase Survey participation, including through a non-participation penalty that "goes away" when a hospital resumes participation and was tied to Leapfrog's participation-driven business model. *See* Findings ¶¶ 38, 118, 126, 129.

224. Dr. Nicholson's testimony confirms that the Fall 2024 approach constitutes a "scientifically indefensible" non-participation penalty that is unsupported by empirical documentation, deviates from foundational principles of quality measurements, and produces unreliable Safety Grades disconnected from actual safety performance and patient outcomes. *See* Findings ¶ 58 (Nicholson testimony). In fact, Leapfrog's own Guiding Principles indicate that no Safety Grade should issue when data are missing for a large number of measures, and Leapfrog's About the Grade webpage states that "[h]ospitals missing more than six process measures … are not graded. *See* Findings ¶ 71. A reasonable relying consumer would be unlikely to understand the true

meaning of the Leapfrog Safety Grades as applied to non-participating hospitals, as one hospital system warned when commenting on the proposed Fall 2024 methodology. *See* Findings ¶ 100; JX-026.0 at -030 (warning Leapfrog that the public "will not understand nor dig into the methodology").

225. The Findings thus amply support the conclusion that Leapfrog's Safety Grades and associated methodology are likely to mislead reasonable consumers. Indeed, the Findings establish that the Safety Grades and methodology *did* produce evidence of consumer confusion and harm, thus establishing not only likely but actual consumer injury, as discussed more fully below with respect to the unfairness inquiry. *See infra* ¶¶ 246–61.

### 2. *Leapfrog's Related Representations Were Likely to Mislead Reasonable Consumers*

226. Leapfrog also made a series of representations that obscured the arbitrary and punitive nature of the Fall 2024 non-participation approach—underscoring that consumers were likely to be (and were) misled.

227. *First*, Leapfrog represented that Safety Grades are calculated using Survey responses, CMS data, and "supplemental" or "secondary" data sources. *See* Findings ¶ 70 ("About the Grade" webpage). But the Findings establish that Leapfrog has no data measuring actual performance on key Survey-dependent measures for non-participating hospitals, and that Leapfrog did not use supplemental or secondary data to measure those hospitals' performance on those measures. *See, e.g.*, Findings ¶¶ 59, 85.

228. *Second*, Leapfrog represented that "[h]ospitals missing more than six process measures … are not graded." Findings ¶ 71. This representation clearly implies to consumers that, if a hospital does receive a Safety Grade, then Leapfrog had sufficient data to award that Safety Grade. Findings ¶¶ 71–72. But the Findings establish that Leapfrog in fact issues Safety Grades to non-participating hospitals despite lacking data for *seven* measures. *See, e.g.*, Findings ¶¶ 73, 85. Indeed, for non-participating hospitals, Leapfrog simply discards three measures ("Safe Practice 1: Culture of Leadership Structures and Systems," "Safe Practice 2: Culture Measurement, Feedback & Intervention," and "Total Nursing Care Hours per Patient Day"), and then assigns the lowest-available score on the other Four Measures for which it similarly lacks data. Findings ¶¶ 44 n.4, 73.

229. *Third*, Leapfrog represented that a Safety Grade reflects "overall performance" and "how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey."

*See* Findings ¶ 75 ("About the Grade" webpage). The Findings establish that non-participating hospitals were assigned fixed failing component scores on the Four Measures and that those measures were re-weighted to account for approximately one-third of the Safety Grade, producing materially worse Safety Grades as a result of non-participation. *See* Findings ¶¶ 42–48.

230. *Fourth*, the Findings establish that Leapfrog's website presentation—including "gas gauge" graphics showing a needle in the red-zone, best/worst hospital comparisons, and "earned" scores—conveyed to consumers that non-participating hospitals performed worse than average on the Four Measures, even though Leapfrog has no data measuring actual performance on those measures for nonparticipating hospitals. *See* Findings ¶¶ 59, 74–84.

231. *Fifth*, Leapfrog represented that its methodology was peer-reviewed and expert approved, but the Findings establish that the Fall 2024 non-participation penalty was not peer reviewed and was not approved by the Expert Panel (it was developed through "group think"), and that Leapfrog personnel discussed how to present the change to make it "sound" legitimate. *See* Findings ¶¶ 86, 89, 92, 124.

232. Each of these representations is independently sufficient to establish deception under FDUTPA; considered together, their misleading net impression is clear, well beyond a preponderance of the evidence.

233. Leapfrog's buried methodology materials do not cure the deception. The Findings establish that the methodology document was not presented with the Safety Grade webpages, was difficult for consumers to locate, was accessed only by 3 percent or less of visitors, and was dense and not consumer-readable. *See, e.g.*, Findings ¶¶ 98–101. Additionally, Leapfrog's footnotes and webpage presentation did not disclose how assigned scores were generated or allow consumers to distinguish assigned scores from measured performance. *See, e.g.*, Findings ¶¶ 91–96. Two footnotes that appear at the bottom of the Safety Grade webpages do not dispel (and in fact aggravate) the deception. The first footnote reads, "Declined to Report: The hospital was asked to provide this information to the public, but did not," and misleadingly appears on the webpages for non-participating *and* participating hospitals. Findings ¶ 96. The same footnote also applies to all measures—incongruously, even those for which Leapfrog has data—and otherwise fails to explain the missing data, assumptions made, or how scores were calculated. Findings ¶ 97. The second reads, "The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." Findings ¶ 93. This statement clarifies nothing, as

Leapfrog's Director of Communications and its own expert witness acknowledged. *See* Findings ¶ 95. Indeed, when presented with the Leapfrog webpages for two nonparticipating hospitals—one whose scores were based on available historical data and one whose scores were automatically assigned—Leapfrog's retained expert conceded that the webpages were "totally indistinguishable," and that the footnotes do not show a consumer "under the hood" of *how* the scores were assigned. Findings ¶¶ 95 & n.6, 104.

234. Accordingly, the Community Hospitals have proven that Leapfrog's Safety Grades, methodology, and related representations are deceptive under FDUTPA. *See* Fla. Stat. § 501.204(1).

**B. Leapfrog's Safety Grades, Safety Grade Methodology, And Associated Coercive Practices Are Unfair Under FDUTPA**

235. While the Community Hospitals need not also prove that Leapfrog's conduct is "unfair," given FDUTPA's disjunctive test, the Court nonetheless also finds that the Community Hospitals have proven by a preponderance of the evidence that Leapfrog's Safety Grades, grading methodology, and grading practices are "unfair" under FDUTPA. Fla. Stat. § 501.204(1). The Court begins its analysis by discussing a threshold dispute between the parties—the standard for substantial injury to consumers for unfairness claims—and then proceeds to analyze the Community Hospitals' unfairness argument under the two unfairness tests courts construing FDUTPA have traditionally applied. For the reasons explained below, the Court finds that the Community Hospitals have established that Leapfrog's challenged practices are unfair under either of those tests.

**1. *Unfairness Claims Do Not Require Actual, Only Likely, Consumer Harm***

236. As the Court explained above, deception claims under FDUTPA do not require proof of actual consumer harm. Rather, it is sufficient that "'deceptions … are likely to cause injury to a reasonable relying consumer.'" ECF 139 at 9 (quoting *Millennium Commc'ns & Fulfillment, Inc.*, 761 So. 2d at 1263). The parties disputed whether unfairness claims require actual consumer harm or whether a likelihood of harm suffices. Leapfrog contended that actual consumer harm is required for unfairness claims. *See, e.g.*, ECF 99 at 9–10. The Community Hospitals supplied authority that likely consumer injury suffices for unfairness claims. ECF 152. After further consideration, including in light of further guidance from the Eleventh Circuit, *see FTC v. Corpay, Inc.*, 164 F.4th 807 (11th Cir. 2026), the Court agrees that a likelihood of substantial injury to

consumers suffices for unfairness claims. *See* 15 U.S.C. § 45(n); *Davis v. Powertel, Inc.*, 776 So. 2d 971, 975 (Fla. 1st DCA 2000).

237. The necessary starting point is FDUTPA's text and structure. FDUTPA's purpose is "[t]o make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3). FDUTPA defines a "'[v]iolation of this part'" to mean a violation of any of the following, as they existed as of July 1, 2017: "[a]ny rules promulgated pursuant to the Federal Trade Commission [FTC] Act," "the standards of unfairness and deception set forth and interpreted by the [FTC] or the federal courts," and "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(a)–(c). And FDUTPA reminds courts that "due consideration and great weight shall be given to the interpretations of the [FTC] and the federal courts" relating to the FTC Act "as of July 1, 2017." Fla. Stat. § 501.204(2). These provisions reflect that the analysis of deception and unfairness claims is designed to track the pre-2017 FTC Act and pre-2017 interpretations of that statute promulgated by the FTC and federal courts. FDUTPA is thus a "little FTC Act," *Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA 2005), "patterned after" the FTC Act, *Millennium Commc'ns & Fulfillment, Inc.*, 761 So. 2d at 1260. The Florida Supreme Court's decision in *PNR, Inc. v. Beacon Property Management, Inc.*, 842 So. 2d 773 (Fla. 2003), likewise reflects this incorporation: its description of FDUTPA's deception and unfairness standards tracks the FTC Act's framework, even copying language from cases explaining the standard under the FTC Act. *Id.* at 777.

238. The FTC Act, in turn, does not require proof of actual consumer harm for unfairness claims. Indeed, the Act's "[s]tandard of proof" section for unfairness claims expressly provides that no "act or practice is unfair unless the act or practice causes *or is likely to cause* substantial injury to consumers[.]" 15 U.S.C. § 45(n) (emphasis added). As *FTC v. Corpay* explains, "the proper standard for evaluating 'unfair' practices" is the FTC Act's "statutory text." 164 F.4th 807, 839–40 (11th Cir. 2026).[12] Because the FTC Act has contained the "cause or likely to cause"

[12] Leapfrog suggested that the Court should not consider the Eleventh Circuit's decision in *Corpay* because it was rendered after July 1, 2017, and thus is not incorporated into FDUTPA. *See* ECF 165 at 2–3. The Court finds this argument misplaced. The Community Hospitals' argument was not that *Corpay* changed how the FTC Act directs courts to assess consumer injury. *See* ECF 166 at 1. The decision instead clarifies and reinforces that the standard for unfairness claims derives from the FTC Act's statutory text, which Leapfrog itself concedes is "[l]ongstanding" and was in place well before July 1, 2017. *See* ECF 165 at 4. Accordingly, that federal statutory standard was incorporated into FDUTPA under the latter statute's plain terms. *See infra* ¶ 239.

language since 1994—well before FDUTPA's 2017 cut-off date—*see* Pub. L. 103-312, 108 Stat. 1691, 1695 (Aug. 26, 1994), it falls within FDUTPA's July 1, 2017 incorporation framework, *see Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1097 (Fla. 3d DCA 2014).

239. FTC interpretations of the unfairness standard point in the same direction. The FTC Act's "likely to cause injury" language was designed to codify then-existing FTC opinions and policy statements, *see LabMD Inc. v. FTC*, 894 F.3d 1221, 1229 (11th Cir. 2018), which had long made clear that likely injury suffices. In *Matter of International Harvester Co.*, 104 F.T.C. 949 (1984), for example, the FTC explained that "unfairness cases may also be brought *on the basis of likely rather than actual injury*," including unwarranted health and safety risks. *Id.* at 1061 n.45 (emphasis added) (examining the 1980 Policy Statement).[13] As pre-2017 explanations of the standard for unfairness claims, the 1980 Policy Statement and *International Harvester* likewise were "incorporated into Florida law" under FDUTPA. *Porsche Cars N. Am., Inc.*, 140 So. 3d at 1097. Consistent with that approach, courts applying FDUTPA have recognized that "an aggrieved party may pursue a claim for declaratory or injunctive relief under the Act, even if the effect of those remedies would be limited to the protection of *consumers who have not yet been harmed* by the unlawful trade practice." *Davis*, 776 So. 2d at 975 (emphasis added).

240. Leapfrog's contrary arguments are unpersuasive. Leapfrog does not dispute that the FTC Act has included a "likely to injure" standard since 1994 or that FDUTPA directs courts to give great weight to FTC Act standards and federal interrelations as of July 1, 2017. *See* ECF 165 at 3–4. Leapfrog instead relies on cases that do not decide whether *actual* harm is required (as distinct from *likely* harm), and that do not engage with FDUTPA's incorporation of the FTC Act's statutory unfairness standard. *See, e.g.*, *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 214–15 (Fla. 4th DCA 2019) (expressing no view on whether actual versus likely injury is required); *CMR Construction & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, at *3 (11th Cir. July 29, 2022) (same).

241. For those reasons, the Court concludes that likely consumer injury suffices for FDUTPA unfairness claims. The Court also concludes that this legal issue is not outcome-determinative here: the Community Hospitals established likely injury to consumers from Leapfrog's

[13] The FTC's opinion noted that it is "not the usual practice" to bring an unfairness claim based on likely rather than actual injury, *Matter of Int'l Harvester Co.*, 104 F.T.C. at 1061 n.45, but this observation is beside the point. While most unfairness cases may happen to involve actual consumer harm, this showing is not legally required for an unfairness claim, as the FTC made clear.

challenged grading practices and dissemination (e.g., by depriving them of information necessary to make informed choices about medical care), but they also established *actual* consumer harm at trial, as discussed below.

### 2. *Leapfrog's Challenged Practices Are Unfair Under the Modern, Three-Factor Test*

242. Courts analyzing unfairness claims under FDUTPA apply either of two tests. Courts sometimes apply the modern, three-factor unfairness test deriving from the FTC's 1980 Policy Statement, which is codified into Section 45(n) of the FTC Act as discussed above. *See* 15 U.S.C. § 45(n). Alternatively, courts sometimes use the older test from the FTC's 1964 Policy Statement on unfairness, which asks whether the challenged practice "offends established public policy" and is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc.*, 842 So. 2d at 777. Because the Court finds that the choice of tests is not outcome-determinative here, it will apply both tests.

243. Conduct under the modern three-factor test is "unfair" when it inflicts "consumer injury that is: (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) … that consumers could not reasonably have avoided." *SMS Audio*, 2017 WL 11631378, at *3 (citing *Porsche Cars N. Am., Inc.*, 140 So. 3d at 1096–97). Here, the Community Hospitals have proved that Leapfrog's practices are "unfair" under this standard.

244. *First*, the Community Hospitals proved substantial consumer injury—both likely and actual. *See SMS Audio*, 2017 WL 11631378, at *3. The Court rejects Leapfrog's attempt to narrow "substantial consumer injury" to "adverse health outcomes" or "inflated fee[s]," ECF 99 at 9, and its attempt to limit "consumers" to patients alone, ECF 102 at 14. As explained below, both positions are inconsistent with FDUTPA's incorporation of the FCT Act's unfairness standard, and the record developed at trial.

245. *Substantial Injury*. Leapfrog's claim that only "adverse health outcomes" or the payment of an inflated fee suffice for substantial injury finds no support in the FTC's 1980 Policy Statement, which is incorporated into FDUTPA, and on which the modern three-factor unfairness test is based. The central premise of the 1980 Policy Statement is that "a well-functioning market" requires "a free and informed consumer transaction." *Matter of Int'l Harvester Co.*, 104 F.T.C. at 1074. The FTC explained that it is "properly banned as an unfair practice" for a defendant to "withhold or fail to generate critical price or performance data," "leaving buyers with insufficient

information for informed comparisons." *Id.* The FTC contrasted that distortion of consumer choice—which is squarely actionable as an unfair practice—with non-actionable "trivial" harms, such as allegations that an advertisement merely "offends … tastes or social beliefs." *Id.* at 1073. Thus, the substantial-injury requirement weeds out trifling claims but captures conduct that deprives consumers of critical performance information and distorts consumer choice.[14] For that reason, the FTC and federal courts applying the FTC Act have routinely recognized that "deceptive practices are always unfair." *Matter of Figgie Int'l, Inc.*, 107 F.T.C. 313, 1986 WL 722111, at *50 n.5 (1986); *accord Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1172 (11th Cir. 1985). Withholding or obscuring material information is itself a form of substantial consumer injury; it is not necessary to prove second-order injuries of the type Leapfrog posits, such as adverse health outcomes or an inflated fee. Here, the Findings establish that Leapfrog presented "D" and "F" Safety Grades as measures of safety performance while assigning failing component scores on no-data measures for non-participating hospitals, and that consumers encountered and acted on Leapfrog's Safety Grades in the marketplace. *See* Findings ¶¶ 55–59, 105–10, 201–10.

246. *Scope of Consumer Harm.* "Consumers" under FDUTPA include any "'individual,'" "'business,'" or "'corporation'" at whom the "unfair practice or deception is aimed." ECF 139 at 10 (quoting Fla. Stat. § 501.203(7)). The Findings establish that Leapfrog aims its Safety Grades at patients, employers, insurers, hospitals, and healthcare staff through consumer-facing messaging, paid dissemination, and licensing and marketing practices. *See* Findings ¶¶ 21–28, 115, 120–121.

247. ***Patients.*** The parties agree that patients are consumers of the Safety Grades, *see, e.g.*, ECF 102 at 14, and the Findings establish both likely and actual patient harm. As the Community Hospitals' experts explained, Leapfrog's failing "D" and "F" Safety Grades are likely to impact consumers perceptions of hospital quality and to distort healthcare choices. Findings ¶ 205 (Dr. Berger); *see also* Findings ¶ 203 (Dr. Nicholson). The Findings further establish that consumers encountered "D" and "F" Safety Grades as safety judgments and altered medical

---

[14] Leapfrog contended the Court should apply consumer-injury principles from Sherman Act precedents. *See* ECF 99 at 6, 8; ECF 102 at 6; ECF 124 at 6. The Court is not persuaded those precedents are informative here. Leapfrog's key case, *Tymar Distribution LLC v. Mitchell Group USA, LLC*, 558 F. Supp. 3d 1275, 1279-80, 1289 (S.D. Fla. 2021), applied antitrust-like principles "in a competition case" involving intrabrand competition. This is not a competition case: Leapfrog does not compete with the Community Hospitals in providing healthcare. In any event, even under antitrust principles, consumer injury is not limited to higher prices. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461–62 (1986) (withholding "information desired by consumers" to make informed comparisons "may be condemned *even absent proof that it resulted in higher prices*" (emphasis added)).

decisions as a result, including declining or delaying medical care; leaving against medical advice; and bypassing the Community Hospitals. Findings ¶¶ 144–46, 150, 156, 166–70, 172–75, 187.

248. After seeing the post-Fall 2024 approach Safety Grades for the Community Hospitals, patients were "afraid" to receive care at the Community Hospitals, postponing needed procedures and even leaving against medical advice. For example, one patient left despite an open fracture and the attendant infection risks after he "verbalized" that he "wanted to go to" a different hospital "against medical advice" "due to the leap frog reviews." Findings ¶ 173. Hospital CEO Mr. Cazares gave another particularly illustrative example at trial when explaining the actions he was forced to take in response to negative publicity from Leapfrog's Safety Grades. After a patient demanded an explanation of Palm Beach Gardens' failing Safety Grade, Mr. Cazares called him to reassure him about the hospital's safety—yet he never heard back from that patient. Findings ¶ 156.

249. Additionally, walk-ins declined at every hospital and the CEOs attributed those declines to the Safety Grades, after investigating other potential causes. Findings ¶¶ 147, 159, 166, 179, 191; *see also* Findings ¶¶ 141, 154. The Findings also establish that patients presented to other hospitals "first" and were later transferred when those hospitals could not provide needed care, creating risks of delay in treatment. Findings ¶¶ 168–70. Meanwhile, patients frequently were transferred to St. Mary's from Jupiter Medical Center, as Jupiter proved unable to care for patients in medical emergencies. Findings ¶ 168 (transfers increased "significantly"). That transfer process resulted in inflated fees due to duplicative bills as well as delays in treatment. Findings ¶ 170 (delays and fees). These patient statements and diversion evidence, together with the timing of the Fall 2024 Safety Grades and the objective admissions indicators, support a causal link between the challenged Safety Grades and consumer deception. *In re Stand 'N Seal*, 623 F. Supp. 2d, 1355, 1374 (N.D. Ga. 2009).

250. ***Hospitals.*** The evidence at trial established that Leapfrog "aim[s]" its Safety Grades at hospitals, rendering them consumers of the Safety Grades under FDUTPA as well. ECF 139 at 10. Leapfrog urges hospitals to pay to license "Designated Logos" prominently featuring the Safety Grades. Findings ¶ 120. Leapfrog markets the Safety Grades to hospitals as a way to "showcase" their commitment to safety, touting that hospital licensure of the Safety Grades, and corresponding placement of the Safety Grades in hospital banners, brochures, and other materials can produce "recognition" of a hospital by its "team and community." Findings ¶ 120. A

competing hospital, Jupiter Medical Center, for example, is prominently featured as a licensee in Leapfrog's marketing materials, which feature a mockup of Jupiter's lobby with a large banner displaying Jupiter's "A" Safety Grade. Findings ¶ 120. This evidence shows Leapfrog expects hospitals to license, rely upon, and consume its Safety Grades.

251. FDUTPA is designed to protect not only members of the public (like patients) from unfair acts, but also "legitimate business enterprises" like hospitals from "unfair methods of competition." Fla. Stat. § 501.202(2). The Findings establish that Leapfrog's Safety Grades create an unfair method of competition for participating hospitals and non-participating hospitals. Leapfrog pressures hospitals into participating in its Survey with its non-participation penalty (thereby generating data that Leapfrog can market and monetize), resulting in higher Safety Grades that those hospitals in turn can use to bolster their reputations in the community. Conversely, non-participating hospitals (like the Community Hospitals) that resist Leapfrog's Survey are tagged with lower Safety Grades that misleadingly imply those hospitals are unsafe, resulting in patient distrust. Hospitals are the direct object of this coercive practice, which is tied to Leapfrog's participation-driven revenue model. *See* Findings ¶¶ 16, 109–12.

252. The trial evidence also establishes that hospitals' reliance on the Safety Grades caused actual deception, and thus harm, to the New York-based Hospital for Special Surgery ("HSS"). HSS relied on the Safety Grades when asking Good Samaritan's CEO to explain why Good Samaritan was awarded an "F" and, notwithstanding the explanation, in canceling its surgical contract with Good Samaritan shortly thereafter. Findings ¶¶ 196–97. Thus, hospitals likewise consume—and are deceived and unfairly injured by—Leapfrog's Safety Grades.

253. ***Insurers and Health Plans.*** The Community Hospitals further showed that Leapfrog's Safety Grades are "aim[ed]" at insurers and other healthcare payors as a supposedly valuable and reliable way for those entities to determine where beneficiaries should obtain medical care. Leapfrog's marketing materials target insurers and urge them to "[p]artner with Leapfrog," touting the Safety Grades as providing "proven value" to insurers. Findings ¶ 121. Leapfrog also designs pricing and discount structures to incentivize insurers to license the Safety Grades, including discounts tied to bundling and multi-year commitments and time-limited pricing; as a result, numerous insurers license Leapfrog's Safety Grades. Findings ¶ 121.

254. Leapfrog's targeting of insurers produced actual deception and resulted in consumer harm. For example, Humana sent concerned letters to Good Samaritan, Delray, and West

Boca referencing Leapfrog's Safety Grades and urging the hospitals to address "their performance on safety measures"—reflecting the misimpression that Leapfrog's Safety Grades measured the Community Hospitals' actual safety performance. *See* Findings ¶¶ 151, 180, 194–95. Thus, insurers likewise consume, and were deceived by, Leapfrog's Safety Grades.

255. ***Employers.*** The evidence at trial establishes that Leapfrog "aim[s]" its Safety Grades at employers, including specifically in Florida. ECF 139 at 10. Leapfrog was founded by employer and purchaser groups and continues to market and disseminate the Safety Grades to Florida employers to influence healthcare purchasing decisions, including through its partnership with the Florida Alliance for Healthcare Value. Findings ¶¶ 12, 115. Leapfrog's CEO Ms. Binder confirmed that employers reference Leapfrog's Safety Grades when making decisions about where employees should seek medical care. Findings ¶ 115. This employer targeting reinforces the participation pressure created by the non-participation penalty: the more employers rely on Safety Grades, the stronger the incentive for hospitals to participate and avoid the penalty, thereby increasing the Survey data Leapfrog is authorized to use "in a commercial manner for profit." Findings ¶ 16, 117–19, 122. Leapfrog therefore distorted Florida employers' choices through the dissemination of false information as well.

256. ***Doctors, Nurses, and Other Healthcare Staff.*** The evidence at trial establishes that Leapfrog "aim[s]" its Safety Grades at doctors, nurses, and other healthcare staff in connection with its licensing and marketing efforts. ECF 139 at 10. Leapfrog's marketing materials tout the Safety Grades' impact on staff recruitment and retention, and even suggest that hospitals should share their Leapfrog accolades on job listing websites and in social media recruitment campaigns. Findings ¶ 120. This evidence shows Leapfrog expects medical staff to encounter and rely on the Safety Grades in making employment decisions, confirming the healthcare staff are consumers of the Safety Grades for FDUTPA purposes.

257. Leapfrog's targeting of medical professionals also produced concrete effects. For example, following the Fall 2024 "F" Safety Grade and ensuing reputational fallout, eight of Good Samaritan's top orthopedic surgeons elected to obtain privileges at Jupiter Medical Center and Good Samaritan lost the HSS relationship. Findings ¶¶ 196–98.

258. Accordingly, these facts satisfy the "substantial consumer injury" prong of the modern three-factor test.

259. *Second*, these injuries are "not outweighed by any countervailing benefits to

consumers." Leapfrog argued that the non-participation penalty increases participation and thereby improves safety, but the Findings establish that Leapfrog conducts virtually no meaningful auditing and offered no record support that the penalty improves safety outcomes. *See* Findings ¶¶ 55–59. Consumer deception and coercion are not "countervailing benefits" under the three-factor test, *FTC v. World Patent Mktg., Inc.*, 2017 WL 3508639, at *16 (S.D. Fla. Aug. 16, 2017), and "'[c]onsumer deception, by its very nature, is against the public interest,'" *Osmose, Inc. v. Viance, LLC*, 2009 WL 10665750, at *10 (N.D. Ga. Mar. 20, 2009) (citation omitted).

260. *Third*, consumers could not "reasonably have avoided" these injuries. *SMS Audio*, 2017 WL 11631378, at *3. Hospitals cannot opt out of being graded; non-participation does not prevent publication, dissemination, or comparison, and the penalty "goes away" only if the hospital participates. *See* Findings ¶¶ 105–13, 118 (Leapfrog widely disseminates Safety Grades through media, purchases targeted ads to "harass" hospitals with low Safety Grades). The record also showed that some viewed the consequences of non-participation as "blackmail" and that Leapfrog amplified its Safety Grades through widespread dissemination, including targeted advertising. *See* Findings ¶ 129 ("penalty" for nonparticipation equivalent to "blackmail"), ¶¶ 105–13. Nor could patients, medical staff, employers, and insurers reasonably avoid the Safety Grades, which reach them through media coverage, employer dissemination, and search-driven targeted advertising, without an accompanying explanation of the methodology. Findings ¶¶ 105–16. Leapfrog points to website disclosures, but the Findings establish those disclosures do not explain how scores were assigned for no-data measures and are not reasonably accessible or consumer-readable for typical consumers. Findings ¶¶ 91–104. Leapfrog also conducted no testing after its methodology change to determine whether average consumers can even understand those disclosures, much less its dense methodology document purportedly explaining the non-participation penalty. *See* Findings ¶ 101. And even if such disclosures were relevant, the record does not show that reasonable consumers broadly read or understood them. *See* Findings ¶¶ 93–97, 100–01.

261. For these reasons, the Court finds that Leapfrog's challenged practices are "unfair" under the modern three-factor test. *See SMS Audio*, 2017 WL 11631378, at *3 (citing *Porsche Cars N. Am., Inc.*, 140 So. 3d at 1096–97).

### 3. *Leapfrog's Challenged Practices Are Also Unfair Under The 1964 Test*

262. The Community Hospitals have likewise demonstrated that Leapfrog's Safety Grades, Safety Grade methodology, and associated conduct are "unfair" under the alternative 1964

test, which looks to whether conduct "'offends established public policy'" and "is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *PNR, Inc.*, 842 So. 2d at 777). This definition, which was adopted from the FTC's 1964 Policy Statement and has been embraced by the Florida Supreme Court, is the "latest statement of state law by the state supreme court," *World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009).

263. *First*, these practices evince the kind of "deceptive and bullying conduct" that offends Florida public policy, *Marco Island Cable*, 312 F. App'x at 214, for all the reasons stated above in connection with the "deceptive" prong of FDUTPA. *See supra* ¶¶ 218–34.

264. *Second*, these practices qualify, at minimum, as "oppressive" or "unscrupulous." *Marrache*, 17 F.4th at 1098. They are oppressive because the record shows that Leapfrog uses the threat of arbitrarily assigned Safety Grades to coerce participation in the Survey among hospitals that are unwilling or unable to endure what one member of Leapfrog's Expert Panel described as "blackmail" designed to increase participation. Findings ¶ 129. The Survey is thus effectively involuntary. And these same practices are unscrupulous because the record shows that Leapfrog is not forthcoming to the public about how it calculates its Safety Grades or what they represent. *See supra* ¶¶ 226–34.

265. *Third*, these practices are "substantially injurious to consumers," *Marrache*, 17 F.4th at 1098, for the same reasons as discussed above with respect to the modern three-factor test, *see SMS Audio*, 2017 WL 11631378, at *3; *supra* ¶¶ 242–61.

266. In sum, the Court finds that the Community Hospitals have established that Leapfrog has engaged in "unfair" practices relating to its "Safety Grades" and associated coercive conduct, regardless of whether one applies the modern three-factor test or the older test deriving from the FTC's 1964 Policy Statement.

### C. The Community Hospitals Are Aggrieved By Leapfrog's Unlawful Practices

267. The Court concludes that the Community Hospitals have proven by a preponderance of the evidence they satisfy FDUTPA's "aggrievement" requirement.

268. "[A]ggrieve[ment]" under FDUTPA is "expansive," requires merely some "specific … grievance," and, for injunctions and corresponding declaratory judgments, does not require showing economic harm. *Ahearn*, 180 So. 3d at 172–73. A plaintiff seeking injunctive and declaratory relief need only show an identifiable injury that is not "merely speculative." *Stewart*

*Agency, Inc.*, 266 So. 3d at 214. Such injury may include reputational harm and damage to goodwill, ECF 41 at 8; operational disruption, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009); and "consumer confusion," *Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC*, 2020 WL 6700449, at *4 (S.D. Fla. Oct. 20, 2020). Aggrievement is a low bar and concerns merely whether Leapfrog's deception has caused, and continues to cause, actual or threatened injury to the Community Hospitals. The Findings establish Leapfrog's challenged practices cause and continue to threaten reputational and operational injury to the Community Hospitals. *See* Findings ¶¶ 141–210.

269. Leapfrog intends its Safety Grades to influence consumer choice and hospital reputation, and the Findings establish wide dissemination of the "D" and "F" Safety Grades through media, advertising, employer channels and search-driven advertising. *See* Findings ¶ 110 ("Tenet Hospitals at Bottom of Local Safety Grades" article), ¶ 25 (website directing consumers to "always" use the Safety Grade when deciding which hospital to visit); ¶¶ 105–07 (Safety Grades covered in hundreds of articles with a reach of over 11 billion); ¶¶ 112–13 (Google ads targeting the Community Hospitals). The reach of the Safety Grades was magnified by a TikTok video that received more than one million views and listed four of the Community Hospitals alongside their Leapfrog Safety Grades, describing them as among the "worst" hospitals in Florida. Findings ¶ 110. Expert testimony and Leapfrog's own witnesses confirmed that poor Safety Grades can harm hospital reputation and drive consumer choice. *See* Findings ¶¶ 202–04 ("substantial literature" supports "that patients are relying on hospital ratings," that "unreliable grades" cause reputational harm, and that Leapfrog's Safety Grades "likely negatively impact consumer perceptions of the Community Hospitals" and "deter consumers" from seeking care there); ¶ 200 (Romano agreeing that "of course" poor Safety Grades can harm reputation).

270. The Findings also establish concrete harms and ongoing effects from Leapfrog's Safety Grades.

271. The Court credits the Community Hospital CEOs' testimony—corroborated by contemporaneous records and objective indicators—of identifiable, non-speculative reputational harm, patient diversion and delay of care, reduced walk-in volumes relative to EMS admissions, insurer inquires, and sustained operational disruption. *See* Findings ¶¶ 141–99.

a. *Delray*. Ms. Havericak, CEO of Delray, testified to numerous harms, including patient confusion and erosion of community confidence caused by the Safety

Grades. *See* Findings ¶¶ 143, 144.

b. *Palm Beach Gardens*. Mr. Cazares, CEO of Palm Beach Gardens, testified to similar harms, including numerous complaints and concerns from physicians, staff, governing board members, and community members in response to Safety Grade. Findings ¶¶ 153–54, 157 ("The damage came on pretty strong when the 'F' came out" and is "still there and continues"). He also testified about a cardiac patient who declined to have a procedure performed at Palm Beach Gardens—despite the hospital's specialty in cardiac care—because of the failing Leapfrog Grade. Findings ¶ 156.

c. *St. Mary's*. Ms. McCauley, CEO of St. Mary's, likewise explained several resulting harms, including patients diverting to other hospitals only to be transferred to St. Mary's when the other hospital could not provide the needed care. Findings ¶¶ 168, 169. She further testified to erosion of St. Mary's brand in the community. Findings ¶ 165 (brand analysis showing that after the Safety Grade came out, the percentage of patients that would choose St. Mary's fell from 78 to 55 percent).

d. *West Boca*. Mr. Hanlon, CEO of West Boca, also testified to reputational injury and patient diversion. *See* Findings ¶ 176. He noted that a patient with a compound fracture left against medical advice in response to West Boca's "F" Safety Grade, and a patient with scheduled underarm surgery left against medical advice after seeing media coverage of the "F" Safety Grade. Findings ¶¶ 173–75.

e. *Good Samaritan*. Finally, Ms. Montgomery, CEO of Good Samaritan, testified to the same reputational and operational harms, explaining that the Safety Grade had caused a "fire storm" and numerous patient and community member complaints. Findings ¶¶ 186, 188, 189. In particular, the HSS orthopedic group "was upset about" the Safety Grade and canceled an $8 million surgery contract, eliminating eight surgeons performing 1,300 surgeries a year. Findings ¶ 196–97.

272. Insurer communications referencing Leapfrog's Safety Grades and urging "performance" responses further corroborate reputational harm and ongoing injury due to the

Grades. *See* Findings ¶¶ 151 (letter directed to Delray), 180 (letter directed to West Boca), 194–95 (letter directed to Good Samaritan).

273. Objective volume evidence—including walk-in declines relative to EMS admissions—corroborates the operational impact of the challenged Safety Grades. *See* Findings ¶¶ 147, 159, 166, 179, 191.

274. Leapfrog's counterarguments do not defeat aggrievement. Leapfrog's contention that the Community Hospitals were not harmed because certain overall metrics remained positive is logically and legally irrelevant. A plaintiff's having "generated a net profit … does not demonstrate that [it] suffered no harm." *Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, 2024 WL 5703196, at *11 (M.D. Fla. Aug. 14, 2024). Nor does it matter if other factors (such as CMS star ratings) "also contributed" to these injuries, because "proximate cause" does not require Leapfrog to be the "sole cause" of the Community Hospitals' injuries. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994).

275. Accordingly, the Court concludes that the Community Hospitals are aggrieved by Leapfrog's actions.

## III. LEAPFROG'S CONDUCT OCCURS IN TRADE OR COMMERCE IN FLORIDA

276. The Community Hospitals have proven by a preponderance of the evidence that Leapfrog's conduct to solicit Survey responses, distribute its Safety Grades, and advertise those Grades occurs in "trade or commerce" in Florida. Fla. Stat. § 501.204(1). Leapfrog does not dispute that it operates in Florida "trade or commerce," *id.*, and it has stipulated to this effect, ECF 129 ¶ 174.

## IV. LEAPFROG'S AFFIRMATIVE DEFENSES FAIL

277. The Court finds that Leapfrog failed to meet its burden on its asserted affirmative defenses: its alleged "good faith conduct," the avoidance-of-consequences doctrine, and anti-SLAPP. *See* ECF 75 at 47–49. Leapfrog did not pursue, or even reference, any of these affirmative defenses at trial.

278. *Good faith.* Leapfrog abandoned its good-faith defense by failing to respond to the Community Hospitals' motion for summary judgment on it. *Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994). Even if the defense is not forfeited, good faith is no defense under FDUTPA. *See In re Schurtenberger*, 2014 WL 92828, at *5 (Bankr. S.D. Fla. Jan. 9, 2014). And even if it were, the Court finds it unsatisfied on the facts

here, which undermine the notion that Leapfrog undertook its deceptive and unfair practices in good faith. *See, e.g.*, Findings ¶¶ 109 (disseminating the Safety Grades in social and traditional media), 112 (targeting the Community Hospitals with ads).

279. *Avoidable consequences.* The doctrine of avoidable consequences is "inapplicable" where the plaintiff is "not seeking damages," *Armstrong v. U.S. Bank Nat'l Ass'n*, 729 F. Supp. 3d 1291, 1307 (M.D. Fla. 2024), like here, ECF 74 (Amended Complaint) at ¶¶ 102, 104, 109, 110. And the undisputed record shows the Community Hospitals acted reasonably to mitigate reputational harm, including by counseling patients concerned about the Leapfrog Safety Grade. *See, e.g.*, Findings ¶¶ 143–45 (Delray), 156–57 (Palm Beach Gardens), 164 (St. Mary's), 172 (West Boca), 187 (Good Samaritan).

280. *Anti-SLAPP*. None of the evidence at trial changes this Court's prior determination that the Community Hospitals' claim does not offend Leapfrog's asserted First Amendment rights. ECF 41 at 6 (motion to dismiss order). Moreover, Leapfrog's anti-SLAPP argument is procedurally foreclosed because it is "not an affirmative defense," but rather a procedural mechanism to seek early resolution of a claim. *Wyndham Vacation Ownership, Inc. v. Square One Dev. Grp., Inc.*, 2022 WL 21374382, at *4 (M.D. Fla. Feb. 2, 2022). And, regardless, Leapfrog failed to establish *any* of the elements of an anti-SLAPP defense at trial. Fla. Stat. § 768.295(3).

## V. INJUNCTIVE AND DECLARATORY RELIEF ARE APPROPRIATE

281. The Court now turns to the appropriate remedies for Leapfrog's FDUTPA violation. For the reasons discussed below, permanent injunctive relief and declaratory relief are warranted.

### A. A Permanent Injunction Is Warranted

282. The Community Hospitals are entitled to a permanent injunction in response to Leapfrog's past, ongoing, and likely future violations of FDUTPA. A permanent injunction requires (1) actual success on the merits, (2) irreparable injury, (3) a balance of the equities that favors the plaintiff, and (4) consistency with the public interest. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004). Each element of this test is satisfied here.

283. *First*, the Community Hospitals have established actual success on the merits. The Findings establish that Leapfrog's Safety Grades, methodology, and associated representations are deceptive (by misleading consumers about how Leapfrog calculates its Safety Grades) and unfair (by distorting consumer choice and attempting to coerce hospital participation in Leapfrog's

Survey through threatened reputational injuries). *See, e.g.*, Findings ¶¶ 66–90, 117–40.

284. *Second*, the Community Hospitals have established both ongoing and future irreparable injuries. Irreparable injuries are those that "cannot be undone through monetary remedies." *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). The "loss of customers and goodwill" has long been considered "irreparable." *Id.* The Findings establish reputational and operational harm, including patient diversion and delay of care, physician concerns, insurer inquiries, and declines in patient volume. *See* Findings ¶¶ 141–210. Absent judicial relief, these injuries are likely to continue and compound. *See, e.g.*, Findings ¶¶ 155, 199, 210.

285. *Third*, the balance of the equities strongly favors the Community Hospitals. Leapfrog has "no legitimate interest in continuing to engage in unlawful acts and practices." *FTC v. Hispanic Global Way, Corp.*, 2014 WL 12531538, at *4 (S.D. Fla. July 1, 2014). These practices have harmed the Community Hospitals by misinforming the public at large—including patients, physicians, employers, and insurers—about hospital safety, thereby distorting healthcare decision-making and undermining trust in publicly disseminated safety information. Conversely, the Community Hospitals have a pressing need for injunctive relief so that they can provide healthcare in their communities without suffering reputational and operational injuries from Leapfrog's unlawful conduct.

286. *Finally*, relief for the Community Hospitals is clearly in the public interest. There is a "strong public interest in preventing the deception of consumers." *Popular Bank of Fla. v. Banco Popular de P.R.*, 9 F. Supp. 2d 1347, 1364 (S.D. Fla. 1998). FDUTPA likewise recognizes the strong need "[t]o protect the consuming public and legitimate business enterprises" from "deceptive" and "unfair acts." Fla. Stat. § 501.202(2). An injunction will ensure that patients and other consumers will receive non-misleading and truthful information about the safety of the Community Hospitals.

287. Having determined that an injunction is warranted, the Court now turns to the appropriate scope of relief. FDUTPA authorizes courts "to enjoin" a practice that "is violating, or is otherwise likely to violate," the statute. Fla. Stat. § 501.211(1). Any such injunction should be broad enough to ensure that the Community Hospitals are afforded "complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). As a result, courts in the consumer-protection context have authorized broad, multifaceted injunctions where necessary "to ensure future compliance" and that

consumers are treated "fairly." *Corpay, Inc.*, 164 F.4th at 849 (affirming injunction compelling multiple disclosures and business reforms). At the same time, the Court is mindful that the injunction should be "no more burdensome to [Leapfrog] than necessary" to achieve those goals. *Califano*, 442 U.S. at 702. With those principles in mind, the Court finds that the following injunctive provisions are necessary and appropriate in light of the violation established here.

288. *First*, Leapfrog must cease assigning a Safety Grade to the Community Hospitals under the current methodology or any similar methodology that: (i) assigns assumed or imputed values to calculate Safety Grades due to the lack of hospital-provided performance data; (ii) scores non-participating hospitals differently than participating hospitals by using different values or using differently weighted values to calculate Safety Grades; or (iii) that otherwise reduces a hospital's Safety Grade due to the failure to provide performance data.

289. Removing the Community Hospitals from Leapfrog's Safety Grades is expressly authorized by FDUTPA's language permitting the injunction of violative practices. Fla. Stat. § 501.211(1). Including the Community Hospitals in Leapfrog's unlawful Safety Grades is such a practice. Removing them is thus "properly tailored … to the wrong" being remedied. *Corpay, Inc.*, 164 F.4th at 846. Moreover, removal is necessary because enhanced disclosures alone are insufficient to provide complete relief to the Community Hospitals for several reasons. Most fundamentally, Leapfrog's practice of subjecting hospitals to artificially low Safety Grades in the absence of data—indeed, *because of* the absence of data—is itself deceptive and unfair. That differential treatment of participating and non-participating hospitals simply because of the fact of participation represents a core aspect of the violation here. Merely increasing disclosures would not remedy the harm the Community Hospitals suffer from being involuntarily subjected to a deceptive and unfair penalty that they otherwise could avoid only through participation in Leapfrog's Survey. *See* Findings ¶¶ 117–18. Nor would disclosures alone prevent further targeting and "harass[ment]" by Leapfrog through ads designed to highlight the Community Hospitals' failing Safety Grades. Findings ¶¶ 112–13. In addition, the evidence at trial established that few consumers actually read or understand Leapfrog's disclosures, *see* Findings ¶¶ 91–104, and that Leapfrog apparently undertook no low-literacy testing after the Fall 2024 methodology change to discern whether average consumers can understand the company's representations about its new methodology, *see* Findings ¶ 102. And even if Leapfrog instituted enhanced disclosures, it is unclear that consumers would fully appreciate their import. Leapfrog markets its scores as "Safety

Grades," inherently communicating that they measure real-world safety rather than Survey responsiveness. It is thus unlikely that even with further disclosures, reasonable consumers would understand that the so-called "Safety Grades" do not measure safety. And those disclosures would not necessarily accompany redistribution of the Safety Grades by other outlets, such as newspapers and social-media posts. Indeed, as the evidence showed at trial, the Safety Grades are nonvoluntary, travel widely, and often travel alone—without any additional disclosures or context. *See* Findings ¶¶ 105, 107, 111, 117. For those reasons, reputational injuries to the Community Hospitals would likely continue absent removal from the Safety Grades *and* corrective disclosures.

290. The Court rejects Leapfrog's suggestion that removal of the Community Hospitals from the Safety Grades constitutes a "prior restraint on free-speech." ECF 99 at 19. An injunction is squarely "remedial"—not a prior restraint—when it is based on "a judicial determination that the defendant['s] past conduct was … unlawful" and restrains the defendant from continuing to subject the plaintiff to that same unlawful conduct. *Lucero v. Trosch*, 121 F.3d 591, 600–01 (11th Cir. 1997) (rejecting prior-restraint argument). That is precisely what the injunction here does. There is no constitutional issue with restraining the continuation of a practice that this Court has finally adjudicated as unfair and deceptive.

291. The Court also notes that it need not consider at this time whether or how Leapfrog could revise its Safety Grade methodology to cure the violations found here based on the record adduced at trial. Leapfrog has failed to show that it has implemented (or even conceptualized) any modifications to its current methodology, which largely depends on data provided by hospitals. Nothing prohibits Leapfrog from seeking future "modification of the terms of [the Court's] injunctive decree" if Leapfrog can show that "the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647 (1961). Leapfrog would "bea[r] the burden of establishing that a significant change in circumstances warrants revision of the decree," *Fla. Med. Ass'n v. Dep't of Health, Educ., & Welfare*, 947 F. Supp. 2d 1325, 1338 (M.D. Fla. 2013), and the Court would have to be "convinced … that existing conditions differ so substantially from those which precipitated the decree as to warrant judicial adjustment," *Hodge v. Dep't of Housing & Urban Dev.*, 862 F.2d 859, 862 (11th Cir. 1989). The Court declines to opine, on a hypothetical state of facts, whether Leapfrog could satisfy that showing.

292. *Second*, within 5 business days of judgment, Leapfrog must withdraw from its

websites and cease promoting the deceptive and unfair Safety Grades assigned to the Community Hospitals for Fall 2024, Spring 2025, and Fall 2025. Requiring Leapfrog to remove the Safety Grades adjudicated to be deceptive and unfair in this action is expressly authorized by FDUTPA, Fla. Stat. § 501.211, and is necessary to remedy the Community Hospitals' ongoing injuries from Leapfrog's deceptive and unfair Safety Grades. Indeed, deception of consumers and harms to the Community Hospitals will continue for as long as Leapfrog's deceptive and unfair Safety Grades remain on its website and in related materials. Leapfrog "'has no equitable interest in perpetuating the false and misleading claims'" it previously has made. *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011). Moreover, this form of targeted relief clearly presents no overbreadth concern. It simply requires Leapfrog to cease promoting precisely the same representations finally adjudicated to be unlawful in this action. *See Lucero*, 121 F.3d at 600–01.

293. *Third*, within 30 days of judgment, Leapfrog must send corrective disclosures to all entities that paid to license the Fall 2024, Spring 2025, and Fall 2025 Safety Grades, disclosing that those Safety Grades were found to be deceptive and unfair in this action. Leapfrog must file a declaration documenting the reasonable and diligent efforts it has undertaken to accomplish this directive within 45 days of judgment. These corrective disclosures are likewise critical to remedying Leapfrog's deception of consumers (such as insurers) who paid to license the Safety Grades, as well as the reputational injuries that ensued to the Community Hospitals after those consumers were deceived into believing the Safety Grades are the product of a legitimate methodology. *See* Findings ¶¶ 105–16; *see also, e.g.*, Findings ¶¶ 151, 180, 194–95 (discussing letters from insurer Humana). Numerous courts have recognized the need for remedial disclosures in similar cases. *See, e.g.*, *Corpay, Inc.*, 164 F.4th at 849–50 (affirming permanent injunction requiring defendant "to make disclosures 'unavoidable,'" so that "customers" would be treated "fairly"); *MacuHealth, LP v. Vision Elements, Inc.*, 2024 WL 3738489, at *8 (M.D. Fla. Aug. 9, 2024) (finding, in a FDUTPA case, that "a corrective statement is appropriate to remedy lingering confusion caused by Defendants' past and ongoing deception" (internal quotation marks omitted)).

294. *Fourth*, Leapfrog must be required to place the same corrective disclosures in future contracts, print and electronic advertising materials, and other print and electronic documents that promote paid licensure of the next six cycles of Safety Grades accessible to or in the following five zip codes: 33401, 33407, 33410, 33428, and 33484. These targeted, additional disclosures are likewise necessary "to remedy lingering confusion" from Leapfrog's past conduct. *MacuHealth*,

*LP*, 2024 WL 3738489, at *8. Indeed, Leapfrog targeted consumers in these same zip codes, diverting grant money it received to ensure that consumers "search[ing] for any of the five specific" Community Hospitals would see a Google "ad displaying their Hospital Safety Grade." Findings ¶¶ 112–13 (describing the targeted ads). Absent forward-looking disclosures, consumers in these areas may be further deceived into believing that Leapfrog's deceptive and unfair practices were limited to the Fall 2024, Spring 2025, and Fall 2025 Safety Grades. And such disclosures are necessary to redress the Community Hospitals' ongoing reputational injuries. Without these disclosures, future consumers such as insurers and employers may not understand that the reason the Community Hospitals no longer appear in the Safety Grades is not because of a safety issue or other negative information, but because they prevailed in this action. And, again, if Leapfrog can establish that the disclosures are no longer necessary, it can seek to modify the injunction. *See supra* ¶ 291.[15]

295. *Fifth*, Leapfrog must refrain from taking any action to circumvent the relief set out above. It is well-established that it is "impermissible for the defendant to circumvent an injunction," whether through overt acts in defiance of the decree or through "overly narrow interpretations," *Alley v. U.S. Dep't of Health & Hum. Servs.*, 590 F.3d 1195, 1205 (11th Cir. 2009), and "literal and hypertechnical reading[s]," *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1548 n.89 (11th Cir. 1986). To ensure that the injunction affords effective and complete relief, the Court makes clear that its scope "is not limited to the precise method[ology]" and practices confronted here, but extends to any similar conduct Leapfrog may take to "achiev[e] the same end[s]" of deceptive or unfair treatment of the Community Hospitals. *Alley*, 590 F.3d at 1206–07.

296. Finally, the Court retains jurisdiction to enforce compliance with the injunction. *See Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 970 (11th Cir. 2012).

**B. A Declaratory Judgment Is Also Warranted**

297. For similar reasons, the Court also concludes in its discretion that the Community Hospitals are entitled to a declaratory judgment. *See* 28 U.S.C. § 2201(a) (court may declare "the

---

[15] The Court notes that in light of FDUTPA's disjunctive test, it would impose the same injunction even if Leapfrog's conduct only were deceptive or only were unfair. The Court also would impose the same injunction even if it were to disregard the objected-to statements by patients reflecting confusion and distrust of the Community Hospitals, given that the Community Hospitals independently adduced evidence of patient harm through credible testimony by their CEOs about their own impressions of actual patient confusion, in additional to evidence of actual harm to other types of consumers, such as employers, insurers and health plans, and medical staff. *See supra* ¶¶ 246–59; *see also* Findings ¶¶ 141–210. That evidence of actual harm also renders irrelevant whether FDUTPA requires actual or only likely harm.

rights and other legal relations of any interested party" in any "case of actual controversy within [the court's] jurisdiction"). There is plainly an actual controversy between the parties, this case falls within the Court's jurisdiction, *see supra* ¶¶ 212–15, and a declaratory judgment would usefully clarify the parties' rights by making clear that Leapfrog's practices are deceptive and unfair.

298. Accordingly, the Court will also enter a declaratory judgment that Leapfrog's Fall 2024, Spring 2025, and Fall 2025 Safety Grades as applied to the Community Hospitals, the public representations Leapfrog makes about how it calculates those Safety Grades, and Leapfrog's punitive grading methodology assigning failing "safety" scores in the absence of actual data are deceptive and unfair under FDUTPA.

## VI. THE COMMUNITY HOSPITALS ARE ENTITLED TO ATTORNEYS' FEES

299. The Community Hospitals as prevailing parties under FDUTPA are entitled to recover their reasonable attorneys' fees and taxable costs, in an amount to be determined after further proceedings. Fla. Stat. § 501.2105.

300. Once a party prevails under FDUTPA, the Court may award reasonable attorneys' fees and costs after considering the applicable equitable factors. *Chow v. Chak Yam Chau*, 640 F. App'x 834, 838–39 (11th Cir. 2015) (citing *Humane Soc'y of Broward Cnty., Inc. v. Fla. Humane Soc'y*, 951 So. 2d 966, 971–72 (Fla. 4th DCA 2007)).

301. The Court finds those factors strongly counsel in favor of awarding fees and costs to the Community Hospitals. *First*, the litigation was extensive and expedited—commenced and completed in less than ten months. *Second*, based on its annual multi-million dollar revenue, and the multi-million dollar compensation awarded its CEO over the last few years, Leapfrog has the ability to pay a fee award, especially as there is no claim for monetary relief in this action. *See* Findings ¶ 12. *Third*, a fee award is necessary to deter similar FDUTPA violations where plaintiffs obtain only injunctive and declaratory relief. *Fourth*, Leapfrog's conduct was culpable (including post-suit amplification of the Community Hospitals' failing Grades through Google ads to "harass" the five plaintiffs). *See, e.g.*, Findings ¶ 112–13. *Fifth*, the Community Hospitals' claim is meritorious and was brought in good faith. *See Bluegreen Vacations Unlimited Inc. v. Timeshare Lawyers P.A.*, 2024 WL 3738890, at *9 (S.D. Fla. July 18, 2024). *Sixth*, Leapfrog advanced baseless dilatory positions and advanced false accusations that increased litigation burden and cost. *See* ECF 136 ¶ 160 (listing baseless arguments). *Seventh*, this case presented a straightforward

application of FDUTPA such that the "significant legal question," factor is neutral. *See Healthcare Res. Mgmt. Grp., LLC v. EcoNatura All Healthy World, LLC*, 2022 WL 1537757, at *10 (S.D. Fla. May 12, 2022).

302. The Court finds these factors support an award here. The amount of fees and costs will be determined upon a subsequent motion with supporting evidence and briefing.

Dated: February 6, 2026

Respectfully submitted,

By: */s/ Jeffrey Marcus*

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

By: */s/ Mary Beth Maloney*

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 9:25-CV-80526-DMM**

| | |
|---|---|
| GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITALS, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC., | ) |
| *Plaintiffs,* | ) |
| v. | ) |
| THE LEAPFROG GROUP, | ) |
| *Defendant.* | ) |

**<u>LEAPFROG'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

Jura C. Zibas (Bar #124571)
jura.zibas@wilsonelser.com
2063 Main Street, Suite 100
Sarasota, Florida 34237
(941) 866-8561 (Main)
(212) 915-5756 (Direct)

Kimberly E. Blair (*pro hac vice*)
Illinois Bar No.: 6272934
Courtney L. Wood (*pro hac vice*)
Illinois Bar No.: 6344385
161 N. Clark St., Suite 4500
Direct: (312) 821-6139
Main: (312) 704-0550
Mobile: (312) 259-6414
Kimberly.blair@wilsonelser.com
*Attorneys for The Leapfrog Group*

## AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court presided over a five-day bench trial beginning on Friday, January 16, 2026 and concluding on Friday, January 23, 2026[1]on Count I of Plaintiffs' Amended Complaint alleging violations of the Florida Deceptive Unfair Trade Practices Act ("FDUTPA") and Count II for Declaratory Judgment. (ECF No. 74). Defendant, The Leapfrog Group ("Leapfrog"), answered the Amended Complaint and served affirmative defenses, including but not limited to, Anti-SLAPP. (ECF No. 75).

Pursuant to this Court's request at the conclusion of trial on Friday, January 23, 2026, Defendant hereby submits its Amended Proposed Findings of Fact and Conclusions of Law. . The Court hereby makes the following findings of fact and conclusions of law as to Count I and II of the Amended Complaint and Defendant's affirmative defense of Anti-SLAPP.

### I. SUMMARY OF FINDINGS

1. The Court finds in favor of Defendant, The Leapfrog Group, on Count I.

2. The Court finds that there is no evidence of consumer harm, injury, or detriment caused by Leapfrog, its conduct or practices.

3. The Court also finds that Leapfrog's alleged acts and practices are not deceptive because the website provides transparent information and emphasized disclosures that eliminate the likelihood that a reasonable consumer acting under the circumstances would be deceived.

4. The Court also finds that Leapfrog's alleged acts and practices are not unfair because there is no evidence of substantial consumer harm, the public benefit outweighs any purported consumer harm, and the alleged consumer harm can otherwise be reasonably avoided.

5. The Court also finds that in light of Leapfrog publishing all of its information to the public, including but not limited to its Safety Grades, underlying scored data and methodology, free Survey and other fee tools, Leapfrog's acts and practices do not offend public policy and are not immoral, unethical, oppressive, unscrupulous nor substantially injurious to consumers.

---

[1] "Tr. Vol. 1" references will refer to trial transcripts from Friday, January 16, 2026, "Tr. Vol. 2" references will refer to trial transcripts from Tuesday, January 20, 2026. "Tr. Vol. 3" reference will refer to transcripts from Wednesday, January 21, 2026. "Tr. Vol. 4" references are to transcripts from Thursday, January 22, 2026. "Tr. Vol 5" are references to transcripts from Friday, January 23, 2026.

6. The Court also finds that there is no evidence that Plaintiffs were, are or will be aggrieved by Leapfrog, its conduct or practices.

7. Good Samaritan Medical Center is not entitled to injunctive nor declaratory relief.

8. Delray Medical Center is not entitled to injunctive nor declaratory relief.

9. Palm Beach Gardens Medical Center is not entitled to injunctive nor declaratory relief.

10. St. Mary's Medical Center is not entitled to injunctive nor declaratory relief.

11. West Boca Medical Center is not entitled to injunctive nor declaratory relief.

12. The Court finds in favor of Defendant, The Leapfrog Group, on Count II.

13. The Court finds in favor of Defendant, The Leapfrog Group, on its affirmative defense under Florida's Anti-SLAPP statute.

14. Defendant, The Leapfrog Group, is awarded reasonable attorney's fees as the prevailing party on Count I. Fla. Stat. § 501.2105(1).

15. Defendant, The Leapfrog Group, is awarded reasonable attorney's fees as the prevailing party on its affirmative defense for Anti-SLAPP. Fla. Stat. Ann. § 768.295(4).

## II. FINDINGS OF FACT

### A. THE PARTIES AND JURISDICTION

16. The Leapfrog Group is an independent, national not-for-profit organization that files annual 1099 tax forms.

17. Leapfrog is incorporated in the District of Columbia, with its principal place of business at 1775 K Street, NW, Suite 400, Washington, D.C. 20006.

18. Delray is incorporated in Florida, with its principal place of business at 5352 Linton Blvd., Delray Beach, Florida 33484. (ECF No. 74 at ¶7).

19. Delray is an accredited hospital with 536 licensed beds. (ECF No. 129 at ¶2).

20. Good Samaritan is incorporated in Florida, with its principal place of business at 1309 N. Flagler Dr., West Palm Beach, Florida 33401. (ECF No. 74 at ¶8).

21. Good Samaritan is an accredited hospital with 333 licensed beds. (ECF No. 129 at ¶6).

22. Palm Beach Gardens is incorporated in Florida, with its principal place of business at 3360 Burns Road, Palm Beach Gardens, Florida 33410. (ECF No. 74 at ¶9).

23. Palm Beach Gardens is an accredited hospital with 199 licensed beds. (ECF No. 129 at ¶9).

24. St. Mary's is incorporated in Florida, with its principal place of business at 901 45th St., West Palm Beach, Florida 33407. (ECF No. 74 at ¶10).

25. St. Mary's is an accredited hospital with 413 licensed beds. (ECF No. 129 at ¶12).

26. West Boca is incorporated in Florida, with its principal place of business at 21644 State Road 7, Boca Raton, Florida 33428. (ECF No. 74 at ¶11).

27. West Boca is an accredited hospital with 195 licensed beds. (ECF No. 129 at ¶15).

28. The Court has jurisdiction under 28 U.S.C. § 1332. (ECF No. 75 at ¶13).

### B. SUMMARY OF ALLEGATIONS

29. Plaintiffs allege Leapfrog solicits healthcare information and then publishes it to consumers while commissioning "deceptive acts and unfair practices against Plaintiffs and the residents of Florida." (ECF No. 74 at ¶90).

30. Specifically, Plaintiffs claim Leapfrog made misleading representations about its Hospital Safety Grades and underlying scoring methodology. (*Id.* at ¶91).

31. Plaintiffs allege Leapfrog accepts money in exchange for "intentionally jiggering its Hospital Safety Grades to benefit the hospitals." (*Id.* at ¶92).

32. Plaintiffs allege Florida consumers harmed by being misled regarding the quality and safety of the hospitals because consumers make decisions about their healthcare that are against their best interests. (*Id.* at ¶99-100).

33. Florida consumers are allegedly harmed by "increasing the incident-to-hospital time" and "causing patients to choose hospitals that do not provide the types of critical care the Plaintiff Hospitals provide." (*Id.* at ¶100).

34. Plaintiffs are allegedly aggrieved due to weakened relationships with physicians, drop in-patient admissions, and complaints from patients. (*Id.* at ¶59-82).

### C. THE HISTORY OF LEAPFROG

35. Leapfrog is a is a not-for-profit organization that was founded in 2000 by a group of employers (e.g., Boeing, Marriott, and several auto makers) who came together to address a critical, complex public safety issue – public reporting on hospital safety and quality. (Tr. Vol. 3, Binder, 86:5-87:7).

36. Leapfrog was founded to bring transparency to the safety and quality of hospital care which is achieved through administering the Leapfrog hospital survey. (Tr. Vol. 3, Danforth, 170:4-7).

37. In 2001, the Leapfrog Survey was conceived to solve for the lack of publicly reported hospital data and to embrace transparency in hospital culture. (Tr. Vol. 3, Binder, 89:20-90:11); (*Id.*, Danforth, 170:4).

38. When Leapfrog was founded in 2000, there was no publicly reported quality and safety data for hospitals, including no publicly reported Centers for Medicare and Medicaid Services ("CMS") data. (Tr. Vol. 3, Binder, 85:25-86:11).

39. At or around 2008, the CEO of Leapfrog, Leah Binder, testified before Congress to advocate for mandatory public reporting requirements by hospitals on critical issues like hospital-acquired infections ("HAI"), which was subsequently required just two years thereafter. (Tr. Vol. 3, Binder, 85:8-24; 28:13-14).

40. Leapfrog is and always has been a voice for transparency and a key catalyst in the public reporting of patient quality and safety data that is available to consumers today, including CMS. (Tr. Vol. 3, Binder, 86:12-21).

41. In 2012, Leapfrog created its Hospital Safety Grade for consumers: patients, caregivers, potential patients, and community members. (Tr. Vol. 3, Danforth, 180:6-11); (Tr. Vol. 3, Binder, 89:15-17); (ECF No. 186-1, Austin Dep., at 40:3-7, 244:8-245:10).

42. The Hospital Safety Grade is "a composite utilizing as many publicly available measures focused on patient safety as possible to give patients a better understanding specifically of the concept of freedom from harm, keeping them safe from preventable harm that they could use to make informed decisions." (Tr. Vol. 3, Danforth, 180:19-24).

43. Leapfrog assigns Safety Grades to nearly 3,000 general acute-care hospitals across the nation, twice annually, based on its underlying scoring methodology and eligibility requirements. (JX-041.1, p. 2); (ECF No. 186-108, at 2).

44. The Leapfrog Survey is separate and distinct from the Hospital Safety Grade. (Tr. Vol. 3, Danforth, 170:2-171:21); (Tr. Vol. 3, Binder, 90:22-91:2).

45. Some of the notable differences between the Survey and Safety Grade are frequency, participants, measures, number of measures, and purpose. (Tr. Vol. 3, Danforth 170:1-171:21).

46. Leapfrog utilizes 13 separate and distinct expert panels to review and provide guidance on respective sections of the Leapfrog Hospital Survey ("Survey") and a separate expert panel presides over Leapfrog's Hospital Safety Grades ("Safety Grades"). (Tr. Vol. 3, Binder, 88:17-24; 90:12-21).

47. Leapfrog has a Patient and Family Expert Panel, made up of individuals who have experienced or been affected by medical errors, that advises on quality and safety measures that Leapfrog should consider and standards they should be setting from a patient's perspective. (Tr. Vol. 3, Binder, 89:4-14); (Tr. Vol. 3, Danforth, 193:17-21).

48. The expert panels are advisory by nature and do not vote. (Tr. Vol. 3, Danforth, 186:21-187:9); (Tr. Vol. 2, Romano, 182:25-183:1; 184:20-24).

49. Dr. Matt Austin of the Armstrong Institute at Johns Hopkins works with Leapfrog through a grant to assist in developing the Survey and Safety Grades. (ECF No. 186-1, Leapfrog's Designations of Dr. Matt Austin, at 61:2-62:18; 64:15-65:10).

## D. THE LEAPFROG HOSPITAL SURVEY

### i. What is the Leapfrog Hospital Survey

50. In 2001, Leapfrog launched its Survey. (*See*, Joint Pre-Trial Stipulation, ECF No. 129 at ¶30).

51. The Survey is free, publicly available on Leapfrog's website, and hospital participation is voluntary. (ECF No. 186-106, JX-042.0, Leapfrog Hospital Survey); (Tr. Vol. 3, Danforth, 170:8-9); (Tr. Vol. 3, Binder, 91:3-6).

52. The Survey includes "a broad range of measures covering various aspects" including but not limited to "maternity care, C sections, impatient and outpatient surgery, billing ethics, and health care equity." (Tr. Vol. 3, Danforth, 170:14-17).

53. Any hospital in the United States can participate in the Leapfrog Survey including free-standing pediatric hospitals, critical access hospitals, rural hospitals, surgical specialty hospitals, cancer hospitals, women and children's hospitals. (Tr. Vol. 3, Danforth, 170:24-171:1-7).

54. Some hospitals that participate in the Survey are not eligible for a Safety Grade because they do not have enough publicly available data from CMS. (*See e.g.*, Tr. Vol. 3, Danforth, 171:15-21) (explaining the Safety Grade is made up of mostly CMS data and some hospitals, for example cancer hospitals, do not participate in CMS in the same way so publicly available CMS data for cancer hospitals is too limited to assign a Safety Grade).

55. The Survey was developed in consultation with leading researchers and clinicians, and more than 2,400 hospitals participate in the Survey regardless of their eligibility to receive a Safety Grade. (ECF No. 101-3, Binder, at 74:2-4, 287:1-5, 415:15-19); (ECF No. 101-4, Danforth, at 190:1-13, 513:9-14, 550:3-6).

56. Leapfrog's Survey scoring methodology for the Hospital Survey is published on its website for consumers to view and download as a pdf, and it is accessible from the home page. (Tr. Vol. 2, Berger, 37:2-25).

57. Consumers can access published findings from the Leapfrog Hospital Survey by hospital, location or other guided searches on https://ratings.leapfroggroup.org/. (*See*, Amended Complaint, ECF No. 74 at ¶54-55).

58. Hospitals, including the Plaintiffs, use the Survey as a benchmarking tool to monitor and improve performance on various measures. (ECF No. 188-51, DX-554; ECF No. 185-1, Leapfrog's Revised Regina West Designations, 173:11-175:3; ECF No. 188-85, DX 813, at 1;).

59. Leapfrog provides various free tools to help assist hospitals in efficiently and accurately reporting to the Survey including but not limited to data collection tools, calculators, hard copies, free orientation calls, helpdesk, one on one hospital calls, regional leaders, and free annual town hall calls hosted by Leapfrog staff and partners at Johns Hopkins. (Tr. Vol. 3, Danforth, 177:22-178:23); (Tr. Vol. 3, Binder, 91:9-12).

ii. Leapfrog Hospital Survey Measures

60. The Survey consists of "about 50 measures covering major aspects of hospital care" and includes the following nine sections: Patient Rights and Ethics; Medication Safety; Adult and Pediatric Complex Surgery; Maternity Care; Physician and Nurse Staffing; Patient Safety Practices; Managing Serious Errors; Pediatric Care; and Outpatient Procedures. (Tr. Vol. 3, Danforth, 172:16-18); (*See also*, JX-042, ECF No. 186-106, Leapfrog Hospital Survey).

61. Leapfrog has the right to set its own standards, and not fulfilling all of Leapfrog's requirements means that a hospital may not achieve the Leapfrog standard. (Austin Dep., ECF No. 186-1 at 181:2-20); (*see e.g.*, JX-042.0, ECF No. 189-106 at 180).

62. The Survey includes high standards and complex questions for each of the four imputed measures: Hand Hygiene, CPOE, BCMA, and IPS. (JX-042, ECF No. 186-106); (DX-471, ECF No. 188-44, Leapfrog's Factsheet on Barcode Medication Administration; DX-472, ECF No. 188-45, Leapfrog's Factsheet on Computerized Physician Order Entry; DX-473, ECF No. 188-46, Leapfrog's Factsheet on ICU Physician Staffing).

63. For example, Leapfrog's hand hygiene standard was developed by an independent voluntary national expert panel who considered the World Health Organization ("WHO") guidelines and national academic research when developing the five different evidence-based domains that reduce the spread of infections in hospitals. (Tr. Vol. 3, Danforth, 173:1-16).

64. Leapfrog's hand hygiene standard includes the following five domains: (1) "education" and "demonstration" of proper hand hygiene; (2) "monitoring" observations to determine whether proper the hand hygiene technique is utilized – soap and water, gloves or alcohol based hand sanitizer – in the right situation; (3) "feedback" which focuses on implementing real time coaching and collecting data to develop an information quality improvement program; (4) "infrastructure," including whether the hospital units have sinks and alcohol based hand sanitizer in every room; and (5) "culture" to determine if hospital staff are open to patients who may ask them to wash their hands and if executives are held accountable for their performance on hand hygiene. (Tr. Vol. 3, Danforth, 173:13-174:19).

65. Leapfrog's hand hygiene standard does not only apply to doctors and nurses, but to "anyone who touches patients or touches equipment that will touch patients," including food service workers. (Id., 174:20-175:1).

66. Leapfrog's hand hygiene standard is high and there are only two opportunities for hospitals to earn "achieved the standard." (*See e.g.,* Tr. Vol. 3, Danforth, 175:5-19) (Danforth explains one way is to perform 200 hand hygiene observations per unit per month and use that data as outlined in the "feedback" and "monitoring" domain sections or the second way is to perform one hundred hand hygiene opportunities per unit per month); (*see also* JX-042.0, ECF No. 189-106, at 221-222).

iii. Scoring the Leapfrog Hospital Survey Measures

67. Leapfrog uses five (5) steps to verify hospital Survey data: (1) CEO attestation on the Survey; (2) online warnings built into the survey tool to alert responses that do not make sense; (3) monthly extensive data review comparing highs and lows, previous year responses, and external data sources when available; (4) monthly documentation requests to randomly selected hospitals; and (5) on-site verification. (Tr. Vol. 3, Danforth, 179:7-25); (Tr. Vol. 3, Binder, 92:17-93:23; 94:7-21); (Tr. Vol. 4, Zambrana, 126:18).

68. Each section of the Survey includes various measures that are scored by performance categories: achieved the standard, considerable achievement, some achievement, and limited achievement. (JX-042.0, ECF No. 186-106, Leapfrog Hospital Survey).

69. However, in 2006-2007, Leapfrog developed its "validating participating program" to turn the performance categories into numerical scores that could be useful for health plans. (Tr. Vol. 3, Danforth, 176:8-13).

70. During that process, a health care consulting firm convened "a national independent expert panel specifically for the purpose of developing a methodology to assign numerical scores to the text based performance categories" used in Leapfrog's public survey reporting. (Tr. Vol. 3, Danforth, 176:22-177:3).

71. That same independent expert panel used a scientific process to determine the various numerical scores assigned to each performance category (*e.g.*, measure score 15 for "limited achievement"). (Tr. Vol. 3, Danforth, 177:4-6).

72. The performance categories and associated numerical scores are not arbitrary and rather each is based on evidence of the measure in terms of actual patient harm, impact to a patient, how many patients could possibly be harmed, and opportunities. (*Id.* at 177:7-15).

73. In 2011, under the guidance of its Hospital Safety Grade Expert Panel, Leapfrog adopted the same methodology used in determining the Survey performance category measure scores and applied it to measures used in the Safety Grade. (Tr. Vol. 3, Danforth, 177:14-19).

## E. LEAPFROG HOSPITAL SAFETY GRADE

i. The Purpose of the Hospital Safety Grade.

74. When developing the Hospital Safety Grade, the expert panel had an intellectual debate on how to define patient safety for the composite, which ultimately focused on "freedom from harm…accidents, errors, injuries, infections." (Tr. Vol. 3, Danforth, 184:15-25).

75. The Hospital Safety Grade Expert Panel then concluded that since patient safety applies to all hospitals, none should be exempted from the composite Safety Grade. (Tr. Vol. 3, Danforth, 185:2-12).

76. The Expert Panel created the Hospital Safety Grade with the understanding that the "grade will evolve as the science of performance measurement improve" and "the composite grade will be revisited on a regular basis, with structed processes to reassess the current measures and to identify new measures that could be added and/or replace the current measures." (ECF No. 194-6, PX-203, Expert Panel Guiding Principles, p. 3).

77. The composite Safety Grade is intended to be a "'living laboratory' to help push forward the science of patient safety performance measurement." (PX-203, ECF No. 194-6, p. 3); (Tr. Vol. 2, Romano, 178:8-21; 182:14-24).

ii. <u>The Hospital Safety Grade is a Composite.</u>

78. The Leapfrog Hospital Safety Grade is a composite score made up of 22 national patient safety measures that uses a scoring methodology to combine those measures into a singular numerical score that gets translated into a letter grade. (Tr. Vol. 3, Danforth, 181:3-7); (JX-041.1, ECF No. 189-101, Spring 2025 Scoring Methodology).

79. Safety Grades are assigned to eligible general acute-care hospitals across the United States by using Leapfrog's Scoring Methodology. (JX-041.1, ECF No. 189-101, Spring 2025 Scoring Methodology, p. 3).

80. The Safety Grade is made up of 22 measures that are divided into two domains that each represent 50% of the grade: 12 process/structural measures and 10 outcome measures – most of which come from CMS. (JX-041.1, pp. 5-9); (Tr. Vol. 3, Danforth, 183:13-21); (Tr. Vol. 3, Binder, 74:15-19).

81. To calculate a Safety Grade, Leapfrog uses the individual measure scores, z-scores, and weighting methodology to calculate an overall numerical score that is then analyzed at specific cut points (standardization above the means) to determine grades. (Tr. Vol. 3, Danforth, 181:16-182:1).

82. The composite nature and functionality of Leapfrog's Safety Grades was peer reviewed and published in the Journal of Patient Safety in 2013 by several of Leapfrog's expert panelist who still voluntarily serve on the panel today (Dr. Matt Austin, PhD, Dr. Arnold Milstein, M.D., Dr. Peter Pronovost, M.D., PhD, Dr. Patrick Romano, M.D., Dr. Sara Singer, MBA, PhD, and Dr. Timothy Vogus, PhD). (PX-202.0, ECF No. 194-3); (Austin Dep., ECF No. 186-1 at 85:6-21); (JX-010.0, ECF No. 189-22, at p. 1).

83. Because of the nature of the composite, hospitals do not automatically receive failing grades if they do not participate in the Survey. (Tr. Vol. 3, Danforth, 182:25-183:12).

84. For example, a hospital could have perfect process and structural measure scores, but if the outcome measure scores are well below average, that would be reflected in the overall composite grade. (*See e.g.,* PX-429.0, ECF No. 192-47, at 1) (showing 43 participating hospitals received a "D" Safety Grade in Spring 2025); (Tr. Vol. 3, Danforth, 183:16-21).

85. The composite nature of the Safety Grade allows for so many combinations of measure scores so that no few measures can drive the ultimate final grade. (*See e.g.,* PX-429.0, ECF No. 192-47) (showing two non-participating hospitals earned an "A" Safety Grade in the Spring of 2025 under Step-2 imputation, receiving limited achievement on all four imputed measures); (Tr. Vol. 3, Danforth, 182:16-18).

86. Leapfrog's expert, Mark Rule, undertook this analysis by removing the Four Imputed Measure scores from each of the Plaintiff hospitals' grades, redistributed the weights to the remaining CMS measures, and found the Plaintiffs' grades to be the same; thus, Mr. Rule concluded that the "four imputed inputs are not what is driving the grades ultimately." (Tr. Vol. 4, Rule, 14:4-15:17).

87. And, for these reasons, I find that Dr. Nicholson's opinion that Leapfrog's imputation method is a nonparticipation penalty to be of no consequence and rather, a "natural consequence" of the Plaintiffs choice not to participate. (Tr. Vol. 1, Nicholson, 179:17-20); (Tr. Vol. 2, Romano, 166:25-167:3); (Tr. Vol. 3, Danforth, 182:16-183:12).

iii. <u>The History of the Hospital Safety Grade: Solving for Missing Data.</u>

88. Since the inception of the Safety Grades, the underlying Scoring Methodology uses "primary" data sources and "secondary" data sources, when applicable to solve for missing data. (DX 402, ECF No. 188-16, Technical Overview of Hospital Safety Score Fall 2012, at p. 9).

89. Thus, since 2012, Leapfrog has discussed and considered utilizing an imputation method in its Scoring Methodology to solve for missing data. (DX-406, HSG's 2012 Call Notes); (JX-001.0, ECF No. 189-1, Leapfrog 2011 Board Update: Progress on Safety Score, pp. 18-19); (PX-204.0, ECF No. 194-7, 2017 Johns Hopkins slide deck "Unintended Consequences of How We Currently Treat Missing Data, p. 3-6); (Tr. Vol. 3, Romano, 181:18-25); (PX-202.0, ECF No. 194-3, p.4); (Tr. Vol. 2, Campione, 261:8-10).

90. Plaintiffs' expert, Dr. Sean Nicholson, agrees imputation is a scientific methodology that is used when data is missing and admits that "[t]here are different ways to do it." (Tr. Vol. 1, Nicholson, 205:21-25).

91. In 2017, internal expert panel meeting notes reflect Dr. Matt Austin "explained that there are circumstances where there is a disincentive for hospitals to report to the Leapfrog Hospital Survey. This is a function of how the weights are redistributed when there are missing measures." (JX-044.1, ECF No. 189-108, p. 1).

92. In 2019, the expert panel considered assigning non-participating hospitals zero credit and in fact, Dr. Arjun Srinivasan "brought that suggestion several times to the panel." (Tr. Vol. 2, Romano, 185:14-23); (DX-406, ECF No. 188-17, p. 3).

93. Leapfrog and its expert panel have grappled with ideas on how to solve for missing data since the inception of the safety grade. (Tr. Vol. 3, Danforth, 185:17-20; 186:15-18).

94. Leapfrog knew it would face a missingness problem on the outcome measures domain because all of that data came from either CMS or the CDC and both sources have minimum sample size requirements that would create the inability to calculate measure scores for some hospitals. (Tr. Vol. 3, Danforth, 185:20-186:6).

95. Since CMS and the CDC developers require specific sample sizes to affirm confidence in calculating outcome measure scores, Leapfrog's Hospital Safety Grade expert panel followed that guidance and decided not to impute or assign zeros for outcome measures when data is missing. (Tr. Vol. 3, Danforth, 188:1-189:11).

96. For the process and structural measure domains, Leapfrog also anticipated encountering missing data due to the voluntary nature of the Survey. (Tr. Vol. 3, Danforth, 186:10-14).

97. However, peer reviewed literature confirms that the presence of process/structural measures, like CPOE, BCMA, and Hand Hygiene, are ubiquitous – all hospitals have them. (Tr. Vol. 3, Danforth 189:19-190:5).

98. Thus, Leapfrog is able to assign limited achievement scores based on the sole fact that it knows hospitals have these processes or structures or in place (*e.g.*, limited achievement is assigned to reporting hospitals if the use a CPOE system and provide the number of medications ordered). (Tr. Vol. 3, Danforth, 190:1-5).

99. Participating hospitals have the ability to earn a higher score by providing information on how they track or measure the data to confirm whether the systems functionality is proper (*e.g.*, taking Leapfrog's CPOE test shows whether the system alerts staff properly). (Tr. Vol. 3, Danforth 190:1-191:15); (Tr. Vol. 3, Binder, 75:20-76:4).

100. Limited achievement is assigned for CPOE, BCMA, Hand Hygiene and IPS to reflect the hospitals have and use these systems, but since Leapfrog does not know whether the hospitals actually measure or properly use the systems, it cannot, in good faith, impute a higher score that would reflect some level of measurement (*e.g.*, all hospitals have hand hygiene policies, but whether the hospital properly implements that policy and internally measures hand hygiene observations to limit infections is unknown). (*Id.*); (Tr. Vol. 2, Campione, 260:6-13).

101. Under the guidance of its expert panel, Leapfrog first started imputing limited achievement in step-two of the imputation method in Spring 2024 (pre-Fall 2024 methodology change) for the IPS measure by using the CMS Cost Report to determine whether a hospital had one or more medical, surgical, and/or pediatric ICU beds, and if so, the hospital was assigned the associated "Limited Achievement" score. (Tr. Vol. 2, Campione, 275:16-276:6); (JX-014.1, ECF No. 189-36, Spring 2024 Scoring Methodology, pp.15-18).

102. Secondary data sources are used to solve for missing data if a hospital chooses not to respond to the Leapfrog Survey. (JX-041.1, ECF No. 189-101, Spring 2025 Scoring Methodology, pp. 5-9).

103. Secondary data sources have changed over time as Leapfrog has either gained or lost access to publicly available data for hospitals, like American Hospital Association ("AHA") data. (JX-010.0, ECF No. 189-22, p. 7); (DX- 406, ECF No. 188-17, p. 2); (Leapfrog's Deposition Designations of Dr. Matt Austin, ECF No. 186-1, at 115:6-121:5).

104. For example, from 2012 to 2020, if a hospital chose not to respond to the Survey, Leapfrog used American Hospital Association ("AHA") data as its secondary source to impute a score based on an analysis comparing hospital performance on the Leapfrog Survey and AHA surveys. (ECF No. 194-3, PX-202.0 at 4, 6).

105. However, in 2020, Leapfrog lost access to AHA data and explored alternative imputation methods for secondary data sources on the applicable measures. (ECF No. 101-4, Danforth at 236:18-237:15); (JX-003.0, ECF No. 189-5, at 8-10).

iv. Pre-Imputation Change: Spring 2024 Methodology

106. Currently and in the Spring 2024, Leapfrog's Scoring Methodology used 22 measures (12 process/structural and 10 outcome) to calculate the Spring 2024 Safety Grades. (JX-014.1, Spring 2024 Scoring Methodology, pp. 4-8).

107. Ten of the 22 measures used data a hospital submitted to the Centers for Medicare & Medicaid Services ("CMS") as the primary data source. (*Id.*).

108. Twelve of the 22 measures used a hospital's most recent Leapfrog Survey data as the primary data source; however, five of those 12 measures is a hospital's most up to date National Healthcare Safety Network ("NHSN") data that is otherwise publicly available through CMS. (*Id.* at pp.13-15).

109. Thus, only 7 of the 22 measures used in the Spring 2024 Safety Grade relied on Survey data ("Survey Measures") and the other 15 measures used publicly available CMS data. (*Id.* at pp. 5-7).

110. The seven "Survey Measures" were and still are: (1) CPOE, (2) BCMA, (3) IPS, (4) Hand Hygiene, (5) Safe Practice 1, (6) Safe Practice 2, and (7) Total Nursing Care Hours per Patient Day. (*Id.*).

111. Currently and in the Spring of 2024, if a hospital did not respond to the Survey, then Leapfrog did not consider three of the seven "Survey Measures" when calculating the Spring 2024 Safety Grade—Safe Practice 1: Culture of Leadership Structures and Systems, Safe Practice 2: Culture Measurement, Feedback & Intervention, and Total Nursing Care Hours per Patient Day—and historically Leapfrog has never imputed scores for these three "Survey Measures." (*Id.* at pp. 5-6; pp. 11-12).

112. Leapfrog used the two-step imputation model for the remaining four "Survey measures," which are the Four Imputed Measures (CPOE, BCMA, IPS, and Hand Hygiene) and score them by using the performance categories. ECF No. 189-36, pp. 15-18; 10-13).

113. Under the Spring 2024 Scoring Methodology, in Step 1, if a non-responding hospital had a score assigned by Leapfrog in the previous four rounds of grades for CPOE, BMCA, IPS, and Hand Hygiene, excluding imputed scores, the hospital was assigned the most recent score on that measure in their current Safety Grade. (*Id.*, pp.15-18).

114. If Step 1 was inapplicable, then in Step 2 for CPOE, BCMA, and Hand Hygiene, Leapfrog assigned the hospital to a cohort of similar hospitals using three or four hospital characteristics obtained from the most recent CMS Impact File and the previous year's Survey. (*Id.*).

115. Under Step 2, Leapfrog then assigned the non-responding hospital the lower of the two possible mean scores based on the hospital's cohort's performance for CPOE, BCMA and Hand Hygiene. (*Id.*).

116. The cohort means were calculated by grouping the participating hospitals by characteristics (urban/rural, safety net, number of beds, teaching status) to create "cohorts" and then calculating the survey score mean for the hospitals in each cohort. (*Id.*, pp.17-18); (Tr. Vol. 3, Danforth, 196:9-25).

117. Under Step 2 for IPS, Leapfrog used the CMS Cost Report to determine whether a hospital had one or more medical, surgical, and/or pediatric ICU beds, and if so, the hospital was assigned the associated "Limited Achievement" score. (*Id.*).

v. <u>The Proposed Fall 2024 Methodology Change</u>

118. Prior to Spring 2024, hospitals that participated in the Survey complained to Leapfrog that hospitals who did not respond to the Survey were receiving an undeserved benefit by imputing the cohort means of hospitals who showed a commitment to patient safety and transparency by participating in the Survey for CPOE, BCMA, and Hand Hygiene. (JX-032.1, ECF No. 189-89, public comments in favor of the Fall 2024 methodology change, p. 2); (JX-008, ECF No. 189-17, April 12, 2024 HSG expert panel meeting transcript, pp. 22-23); (JX-010, ECF No. 189-22, April 12, 2024 HSG expert panel meeting slides, p. 7).

119. By way of example, at that time, one large national health system was experiencing major patient safety issues that were nationally reported in the media (eventually resulting in bankruptcy) and under to the prior step-one imputation, these hospitals were imputed old survey data that was drastically inaccurate to how that hospital was currently performing. (Tr. Vol. 3, Danforth, 191:19-193:10); (Tr. Vol. 2, Campione, 276:16-277:1, 279:9-25).

120. This particular incident prompted Leapfrog's Senior VP of Ratings, Missy Danforth, to become seriously concerned about the reliability and trustworthiness of imputing scores from a reporting hospitals previous four rounds of grades (spring 2024 Step 1 imputation method). (Tr. Vol. 3, Danforth, 192:22-10); (JX-014.1, ECF No. 189-36, p. 15).

121. For years prior, Leapfrog had also recognized that the cohort mean scores had crept up so high that hospitals who received Step 2 for CPOE, BCMA, and Hand Hygiene were receiving scores equivalent to "Achieved the Standard" or 100 out of 100 points, which was de-incentivizing true transparency of performance. (Tr. Vol. 2, Camione, 277:7-23); (Tr. Vol. 3, Danforth, 200:14-201:1); (JX-010.0, ECF No. 189-22, p. 19); (JX-010.0, ECF No. 189-22, p. 7).

122. On April 12, 2024, Leapfrog convened its Hospital Safety Grade Expert Panel to propose and develop a solution to solve for the disincentive of true transparent performance as it related to both Step 1 and Step 2 imputation. (JX-008.0, ECF No. 189-17, p. 14:5-21); (JX-010, ECF No. 189-22, at pp. 7); (PX-261.1, video recording of the April 12, 2024 expert panel meeting).

123. Plaintiffs' expert, Dr. Sean Nicholson does not question the qualifications of the experts who serve on Leapfrog's Hospital Safety Grade Expert Panel. (Tr. Vol. 1, Nicholson, 220:8-11).

124. VP of Ratings, Missy Danforth was "focus[ed] on retiring step one, not allowing hospitals to have the older data imputed [and] calculated in the hospital safety grade." (Tr. Vol. 3, Danforth, 194:18-22).

125. Expert panelist, Dr. Patrick Romano, only objected to Leapfrog's proposal to completely retire Step 1 imputation because he wanted hospitals to have the opportunity to complete the survey every other year, as opposed to annually. (Tr. Vol. 2, Campione, 270:8-12, 278:8-18); Tr. Vol. 3, Danforth, 195:11-15).

126. During the expert panel meeting, several other members expressed various concerns, for example, Dr. Peter Pronovost reported hospital Chief Medical Officers ("CMO") had

determined their hospitals would score better under step 1 or step 2 imputation, so they were choosing not to report to the Survey and others were concerned about slippage in performance. (JX-008.0, ECF No. 189-17, p. 19, 25); (Tr. Vol 3, Danforth, 198:3-199:9).

127. Dr. Arjun Srinivasan expressed concerns that there is a bias for hospitals that perform below average and suggested assigning these hospitals to the "bottom quartile" based on the assumption that the reason hospitals are not filling out the survey is because they are below average performers who want to use the imputation method to actually boost their scores. (JX-008.0, ECF No. 189-17, p. 25); (Tr. Vol. 3, Danforth, 199:10-20).

128. The purpose of the Fall 2024 Scoring Methodology change was not to drive revenue nor to penalize hospitals. (JX-008.0, ECF No. 189-17, 458:1-21, 568:1-20, 569:3-571:11); (Tr. Vol. 2, Romano, 150:15-20); (*Id.*, Campione, 279:9-15); (Tr. Vol. 3, Binder, 118:15-22, Leapfrog's Designations of Dr. Matt Austin, ECF No. 186-1, at 212:5-17).

129. The expert panel meeting concluded in a positive direction of not giving hospitals points that were not earned and rather assigning non-participating hospitals to the bottom performance category. (Tr. Vol. 2, Campione, 280:3-5, 282:4-11).

130. Leapfrog previously had access to other data for when hospitals did not report on the survey, but the loss of AHA data caused Leapfrog to reevaluate its approach to non-participating hospitals in order to incentivize them to report and provide more information to the public. (Leapfrog's Designations of Dr. Matt Austin, ECF No. 186-1, at 214:10-215:12).

131. Another purpose of the Fall 2024 change was for Leapfrog to feel more confident in its reporting of the data. (Leapfrog's Designations of Dr. Matt Austin, ECF No. 186-1, at 215:14-216:2).

132. Following the meeting, Leapfrog data analyst, Alex Campione (in addition to others) analyzed comments from the expert panel meeting, distilled the overall takeaways and consensus, and presented a compromise to the panel. (Tr. Vol. 2, Campione, 270:10-17, 278:23-279:8); (JX-015, ECF No. 189-37, at 1).

133. On April 22, 2024, Leapfrog met with Dr. Matt Austin to further discuss the proposed changes and ultimately decided to adopt the "small change" for Step 1 and the "large change" for Step 2. (JX-015, ECF No. 189-37, at 1); (Tr. Vol. 3, Danforth, 204:25-207:8).

134. The proposed change kept Step 1 based on feedback from Dr. Romano but limited the time period to account for community complaints and addressed the expert panel's concerns regarding rising means and de-incentivization of true transparency in performance through Step 2. (Tr. Vol. 3, Danforth, 204:2-15); (Tr. Vol. 2, Campione, 270:10-12).

135. Under the guidance of the Expert Panel, Leapfrog published the proposed changes to the Fall 2024 Scoring Methodology for public comment in May 2024. (Tr. Vol. 3, Danforth, 202:1-12, 202:22-24); (DX-463, ECF No. 188-39); (Tr. Vol. 2, Romano, 186:14-18).

136. Leapfrog received both positive and negative feedback regarding the change. (JX-032, ECF No. 189-90, at pp. 2-3); (Tr. Vol. 2, Campione, 283:17-284:8).

137. When considering one of the negative public comments, Senior VP of Ratings, Missy Danforth, proposed adding a symbol next to the gas gauges or scores to indicate to consumers that the score is imputed, which is how footnote 4 was conceived. (JX-026.0, ECF No. 189-67); (PX-034.5).

138. Leapfrog drafted the Fall 2024 proposed methodology changes in conjunction with expert panelist, Dr. Patrick Romano, M.D., and Dr. Peter Pronovost, M.D., PhD, and Dr. Matt Austin, PhD. (JX-047.1, ECF No. 189-114); (JX-021.0, ECF No. 189-50, at 1-3); (Tr. Vol. 2, Campione, 284:9-17); (Tr. Vol. 3, Danforth, 202:13-21; 207:9-14).

139. In June 2024, under the guidance of the expert panel and in consideration of public comments, Leapfrog published its final changes to the Fall 2024 Scoring Methodology, which included responses to public comments. (PX-319, ECF No. 193-42); (PX-520.0, ECF No. 191-19, at pp. 1-2).

140. Leapfrog's Hospital Safety Grade Expert Panel did not vote on the methodology change as that is not a part of this panel's process or generally any expert panel's process at all. (Tr. Vol. 3, Danforth, 186:21-187:9); (Tr. Vol. 2, Romano, 182:25-183:1; 184:20-24).

141. No expert panelist contested the final changes to the Fall 2024 Scoring Methodology and, in fact, Dr. Patrick Romano defends it[2]. (Tr. Vol. 3, Danforth, 207:15-18); (Tr. Vol. 2, Romano, 176:25-177:7).

[2] This Court ruled that all email communications between Dr. Romano and his colleagues at UC Davis may only be used for a limited purpose and none of the comments made by UC Davis individuals may be used for the truth of the matters asserted in their statements. (Tr. Vol 2, 159:6-9); (PX-293.1; PX-293; PX-501; PX-366.1; PX-386).

142. While Plaintiffs heavily rely on emails from Dr. Romano when asserting that the purpose of the methodology change was to punish non-participating hospitals, I find Dr. Romano's testimony that a penalty "is a predictable, a temporary, and a specific consequence to a particular action or choice," which is not synonymous with punishment. (Tr. Vol. 2, Romano, 180:5-21).

143. Dr. Romano's testimony that assigning limited achievement is "only a penalty for the hospitals that would otherwise have received a higher score if they had completed the survey" is likewise credible. (Tr. Vol. 2, Romano, 150:2-4; 151:6-9; 156:10-13).

144. Dr. Romano further explains that when a hospital makes a voluntary business decision not to participate in the Leapfrog Survey, there are "natural consequences," and I find this testimony to be credible. (Tr. Vol. 2, Romano, 166:25-167:3).

vi. <u>Fall 2024 Scoring Methodology</u>

145. Currently and in the Fall 2024 Scoring Methodology, under Step 1, if a non-responding hospital had a score assigned by Leapfrog in the previous two (rather than four) rounds of grades for CPOE, BMCA, IPS, and Hand Hygiene, excluding imputed scores, the hospital was assigned the most recent score on that measure in their current Safety Grade. (JX-034.0, Fall 2024 Scoring Methodology, p. 15).

146. If Step 1 was inapplicable, then in Step 2 for CPOE, BCMA, and Hand Hygiene, hospitals were assigned the associated "Limited Achievement" score (like IPS under the Spring 2024 Scoring Methodology). (*Id.*).

147. Aside from these two targeted changes, eligibility requirements, weighting, measures, and performance categories remained unchanged. (*Compare*, JX-034.0, ECF No. 189-94, Fall 2024 Methodology, and JX-014.1, ECF No. 189-36, Spring 2024 Methodology).

148. The Plaintiff hospitals are not missing seven (more than six) process or structural measures because the imputation method is applied for the Four Imputed Measures and thus, the Plaintiffs are eligible for Safety Grades under Leapfrog's Fall 2024 Methodology. (Tr. Vol. 2, Romano, 172:14-17); (JX-034.0, ECF No. 189-94, p. 15); (PX-053, ECF No. 195-94; PX-055.0, ECF No. 195-95; PX-057.0, ECF No. 195-97; PX-059.0, ECF No. 195-100; PX-061.0, ECF No. 195-102).

### F. THE EXISTENCE OF NON-RESPONSE BIAS IS UNDISPUTED[3]

149. Leapfrog's expert, Dr. Anthony Harris opined that Leapfrog was correct in using imputation to overcome non-response bias. (Tr. Vol. 4, Harris, 57:7-58:18).

150. Dr. Harris explained that non-response bias and imputation is taught in medical school and graduate programs to show students and practitioners how biases affect patient outcomes. (Tr. Vol. 4, Harris, 56:20-58:1; 110:9-21).

151. Imputation is scientifically acceptable and regularly used to solve for missing data by researchers and scientific authors. (Tr. Vol. 4, Harris, 58:13-23; 64:12-17; 109:6-110:8).

152. Dr. Harris further explained that there are different types of missing data: missing completely at random, missing not at random, and missing at random. (Tr. Vol. 4, Harris, 58:24-59:21); (Tr. Vol. 2, Romano, 187:20-189:4).

153. Here, the Plaintiff Hospitals' data is missing not at random because they were making the choice of not completing the survey despite the fact that they admit that they track the data, review it, and could submit the data with "minimal effort and no cost." (Tr. Vol. 4, Harris, 59:10-21, 60:8-14); (DX-618, p. 1, internal email "with minimal effort and no cost, we can submit our data); (Tr. Vol. 1, Havericak, 113:16-21); (Tr. Vol. 1, Cazares, 161:14-162:10); (Tr. Vol. 1, McCauley, 241:19-242:12); (Tr. Vol. 2, Hanlon, 79:3-80:22); (Tr. Vol. 2, Montgomery, 198:12-25); (ECF 188-85, DX-813, Plaintiffs' compiled data).

154. Based on Dr. Harris' experience sitting in meetings with his Hospital CEOs and CMOs, he fully understands that an increase in the burden on the Survey may require cost-benefit analyses. (Tr. Vol. 4, Harris, 100:1-8). Yet, that does not negate the fact that the Plaintiff Hospitals surely know their metrics and how they may score. (Tr. Vol. 4, Harris, 99:10-100:11, 104:4-24).

155. Internal Plaintiff hospital documents confirm that their quality coordinators analyze balanced scorecards ("BSC") and kaleidoscope reports when preparing monthly reports for their Quality Improvement and Patient Safety Committees ("QIPSC") and their leaders "review the data, analyze the data, determine opportunities for improvement, initiate PI teams and report to QIPSC as scheduled." (ECF 158-88, DX-610, p. 4).

[3] The parties do not dispute the existence of non-response bias in epidemiology and other appliable sciences. (Tr. Vol. 5, 16:7-17).

156. Dr. Harris' explanation of non-response bias not only perfectly aligns with the testimony of each Plaintiff CEO, but also with Dr. Peter Pronovost's report to the expert panel that he too had spoken with CMOs who admitted their hospitals would score better under the imputation method, so they were choosing not to report to the Survey. (ECF 189-17, JX-008.0, p. 19, 25).

157. Each of these Plaintiff hospitals are a quintessential example of non-response bias in real time and the evidence in this case only confirms that Leapfrog's reasoning for changing the imputation model had merit.

### G. LEAPFROG'S METHODOLOGY IS FAIR AND NOT DECEPTIVE

158. Plaintiffs' expert, Dr. Nicholson, opines that there is "no documentation in the record that provides any scientific justification for the penalty of 60," but I do not agree for all the reasons stated *supra*. (*See,* section E(v), "The Proposed Fall 2024 Methodology Change"); (*see also,* section F, "The Existence of Non-response Bias is Undisputed); (Tr. Vol. 1, Nicholson, 186:4-9).

159. Dr. Nicholson's opinion that Leapfrog's grading approach deviates from the foundational principles that underlie proper quality measurement and quality reporting is completely debunked by the fact that "The Development of Leapfrog's Composite Patient Safety Score" is peer reviewed by many of Leapfrog's own expert panelist and published in the Journal of Patient Safety. (Tr. Vol. 1, Nicholson, 179:21-24); (ECF No. 194-3, PX-202.0).

160. Dr. Nicholson admits that Leapfrog's Safety Grade composite follows the primary principles of the Donabedian model insofar as it uses three components: outcome, structure and process measures. (Tr. Vol. 1, Nicholson, 214:4-9).

161. Dr. Nicholson's opinion that Leapfrog's data is unreliable because Leapfrog does not conduct many in-person audits is baseless and disproven by the trial evidence. (Tr. Vol. 3, Danforth, 179:7-25); (Tr. Vol. 3, Binder, 92:17-93:23; 94:7-21).

162. The fact that Dr. Nicholson created his own counterfactual by assigning the mean value from the participants to nonparticipants only furthers his own point that "[t]here are different ways to do" imputation, but regardless imputation is a scientific methodology used when data is missing. (Tr. Vol. 1, Nicholson, 197:11-23; 205:21-25).

163. And Leapfrog's expert, Dr. Harris, opined that Dr. Nicholson's sensitivity analysis is flawed because during his recalculation, he imputes the mean on seven measures when Leapfrog only imputes on four measures. (Tr. Vol. 4, Harris, 65:13-23; 66:21-67:7).

164. Dr. Harris even describes Dr. Nicholson's method is the "least logical" and farthest from the truth. (Tr. Vol. 4, Harris, 65:19-23, 93:9-19). And Dr. Nicholson admits that his counterfactual is not based on the actual data from the Plaintiff hospitals. (Tr. Vol. 1, Nicholson 211:1-6). For this reason, I find Dr. Nicholson's counterfactual to be unreliable.

165. Dr. Harris reviewed how the hospitals performed on various CMS measures, which comprise the majority of the Safety Grade measures and concluded that based on his knowledge of statistics and standardized incident ratios for hospital infections, that the Plaintiffs were worse performers than other non-participating hospitals in Florida. (Tr. Vol. 4, Harris, 68:19-70:15).

166. Outside of infections, the Plaintiff Hospitals also all have much lower patient experience and patient satisfaction scores. (Tr. Vol. 4, Harris, at 75:13-21).

167. Additionally, Dr. Harris testified that the patient satisfaction metrics are structural measures which give a voice to the patient, and Plaintiffs simply do poorly on patient satisfaction. (Tr. Vol. 4, Harris, 112:4-21).

168. Moreover, Dr. Harris's testimony isolates the fact that Plaintiff Hospitals perform poorly on their own and not because of the patients they serve. During cross-examination, he testified that even though a patient may be more vulnerable to infections due to having cancer, CMS adjusts the data to reflect those kinds of outcomes – *CMS already accounts for that bias*. (Tr. Vol. 4, Harris, 74:21-75:7).

169. Leapfrog's expert, Mr. Rule also reviewed Dr. Nicholson's analysis, noting that even without imputing the average value for the four imputed measures, the four imputed measures do not drive the Safety Grade. (Tr. Vol. 4, Rule, 14:8-24).

170. Dr. Nicholson's analysis assumed that the Plaintiff Hospitals received average scores on measures they did not report on, and that assumption was made without ever seeing the Plaintiff Hospitals' actual data, that he never even asked for. (Tr. Vol. 1, Nicholson, 15:3-17; 210:7-212:4). For this reason, I find Dr. Nicholson's counterfactual to be unreliable and likely further evidence of non-response bias.

171. Further, Mr. Rule points out that Dr. Nicholson did not account for the cut points Leapfrog uses to determine whether a numeric score translates to an "A," "B," "C," "D," or "F," which directly impacts the Safety Grade that hospitals receive. (Tr. Vol. 4, Rule, 16:1-7); (DX-603, ECF No. 188-55, at 4). For this reason, I find Dr. Nicholson's counterfactual to be unreliable.

172. I find Mark Rule's analysis and ultimate finding that the "four imputed inputs are not what is driving the grades ultimately" to be credible and for that reason, Dr. Nicholson's opinion that the imputation method is a "nonparticipation penalty" is of no consequence. (Tr. Vol. 4, Rule, 14:4-15:17).

173. For the first time at trial, Dr. Nicholson asserted the following three new opinions[4] that were not previously disclosed in discovery: (1) no participating hospital received limited achievement across all four imputed measures; (2) no nonparticipating hospital has received an A since the new Step-2 imputation process was instituted; and (3) no participating hospital received an F in the Spring 2025 grade cycle. (Tr. Vol. 1, Nicholson, 187:25-188:2; 189:3-5).

174. First, whether or not a participating hospital received limited achievement across all four imputed measures is not evidence that the Step-2 imputation is unfair or unreliable, but rather it furthers Leapfrog's reasoning behind the imputation change. (Tr. Vol. 2, Romano, 173:8-11). Nonetheless, some reporting hospitals did receive limited achievement. (Austin Dep, ECF No. 186-1 at 298:2-8).

175. Second, Dr. Nicholson's new opinion that no participating hospital has received an "A" since the new Step-2 imputation model was implemented is disproven by evidence put forth at trial. (*See*, PX-429.0, ECF No. 192-47, snippet below); (PX-412, ECF No. 192-16).

| Step 2 Imputation | | Step 1 Imputation | | Survey Submitted | |
|---|---|---|---|---|---|
| A | 2 | A | 4 | A | 902 |
| B | 15 | B | 5 | B | 670 |
| C | 363 | C | 17 | C | 622 |
| D | 155 | D | 12 | D | 43 |
| F | 19 | F | 0 | F | 0 |

[4] Counsel for Leapfrog objected at trial noting it filed a Motion to Bar these new opinions in light of Plaintiffs' counsel confirming, on the record during his deposition, that Dr. Nicholson was not offering any new opinions. (Tr. Vol. 1, Nicholson, 188:3-11); (*see*, Leapfrog's Motion to Exclude at ECF No. 143). Leapfrog's Motion was not ruled on prior to trial.

176. Third, whether or not a participating hospital received an "F" grade in the Spring of 2025 is not evidence that the Step-2 imputation is unfair or unreliable but rather points out the obvious benefit of participating in the Survey. (Tr. Vol. 2, Romano, 156:10-13).

177. Dr. Nicholson's assertion that there is no "scientific basis for the penalty associated with nonparticipation" is completely undermined by the testimony of expert, Dr. Anthony Harris, M.D. who is both a clinician and a professor of epidemiology who explained how non-response bias is taught to students in medical school. (Tr. Vol. 1, Nicholson, 189:11-13); (Tr. Vol. 4, Harris, 42:2-11; 56:20-58:1; 110:9-21).

178. I decline to consider Dr. Nicholson's opinions.

179. In light of finding that Leapfrog's methodology is fair and not deceptive, I decline to consider Dr. Berger's opinion that D" and "F" "hospital grades likely negatively impact consumer perception of the community hospitals." (Tr. Vol. 2, Berger, 6:22-25).

180. In light of finding that Leapfrog's methodology is fair and not deceptive, I decline to consider Dr. Berger's opinion that the Safety Grades will likely cause detrimental impact, which is further unsupported due to the fact that Dr. Berger did not perform a causal analysis as to whether or not the Leapfrog Safety Grade had any impact on the reputation of the Plaintiff hospitals, including for those Plaintiff hospitals that had failing grades *both before and after* the Fall 2024 methodology change. (Tr. Vol. 2, Berger, 7:1-3; 51:3-6; 53:6-13).

### H. LEAPFROG SURVEY WEBSITE

181. Leapfrog owns and operates the website leapfroggroup.org. (Leapfrog's Deposition Designations of Lauren Bailey, ECF No. 183-1 at 157:10-158:7).

182. Consumers can navigate through https://www.leapfroggroup.org/ to access a hospital's Survey scores at https://ratings.leapfroggroup.org/ ("Survey Website). (*Id.*).

183. On the Survey Website a consumer can search for a hospital by facility name, location, or a more targeted and guided search. (*Id.*); (Leapfrog's Deposition Designations of Lauren Bailey, ECF No. 183-1, at 157:19-158:7).

184. The Survey Website does not "rate" hospitals. (https://ratings.leapfroggroup.org/).

185. The Survey Website does not display Safety Grades. (Leapfrog's Deposition Designations of Lauren Bailey, ECF No. 183-1, at 157:17-158:3).

186. The Survey Website reflects a "hospital's progress" on "Leapfrog's standards" for measures that are not included in the Safety Grades. (*Id.*).

**I. LEAPFROG HOSPITAL SAFETY GRADE WEBSITE**

187. Leapfrog owns and operates hospitalsafetygrade.org. (Tr. Vol. 3, Binder, 109:20-24).

188. Leapfrog publishes its Safety Grades on https://www.hospitalsafetygrade.org/ ("Safety Grade Website), for consumers – patients. (*Id.*); (Tr. Vol. 3, Danforth, 218:4-6); (Leapfrog's Deposition Designations of Lauren Bailey, ECF No. 183-1, at 157:17-158:3).

189. Leapfrog aims for its website to be "[a]s transparent and accurate as possible" but they are always updating the website. (Tr. Vol. 3, Binder, 64:8-13).

190. CEO Leah Binder, describes Leapfrog as "always on an improvement journey." (Tr. Vol. 3, Binder, 64:12-13).

191. Lauren Bailey serves as Leapfrog's Director of Communications, and she oversees communications, public relations, and the content of the Safety Grade website. (*See*, ECF 183-1, Deposition Designation of Lauren Bailey, at 15:11-16:15).

192. Leapfrog's ratings team provides assistance on communications and messaging surrounding Safety Grade changes. (*Id.* at 159:7-160:2).

193. Other parts of the Safety Grade website are updated more frequently. (*Id.* at 160:3-161:13; 206:19-207:18).

194. The Frequently Asked Questions webpage is always updated prior to the release of a Safety Grade. (*Id.* at 206:19-207:18).

i. History of Leapfrog's Website

195. In 2012, Leapfrog listened to consumer feedback and sought to improve its website. (Tr. Vol. 3, Binder, 110:3-10).

196. Leapfrog received a $200,000 grant from the Robert Wood Johnson Foundation to improve its website. (Tr. Vol. 3, Binder, 110:10-18).

197. Leapfrog hired Dr. Christina Zarcadoolas, PhD, an expert in health communication and public understand of health and science, to provide her expertise in health literacy and public understanding of complexity, as well as qualitative research and readability and usability

methodology. (ECF 188-14, DX-318, Biographical Sketch of Dr. Zarcadoolas); (ECF 188-13, DX-317, UX testing contract).

198. Leapfrog worked with Dr. Zarcadoolas to complete considerable user experience ("UX") testing when developing Leapfrog's website. (Tr. Vol. 3, Binder, 112:20-22).

199. The UX testing findings were prepared in a Final Narrative Report to the Robert Wood Johnson Foundation. (ECF 188-15, DX-319, Final Report).

200. Without performing any UX testing, Dr. Berger opined that consumers "don't know which one to collect more information about, but one has a C and one has an F" so they "won't look further," but Ms. Binder testified that Leapfrog's UX testing actually revealed that consumers were not satisfied with just looking at the grades and rather, they wanted a lot more detail. (Tr. Vol. 2, Berger, 9:20-23); (Tr. Vol. 3, Binder, 116:18-25).

201. Before the UX testing, Leapfrog considered only presenting the grades, but based on this feedback the gas gauges were born. (Tr. Vol. 3, Binder, 116:18-25); (ECF 188-15, DX-319, p. 6).

202. The report included three goals: (1) "conduct research on strategies to best communicate to the public about patient safety in a way that is most usable, recognizing diverse levels of health literacy;" (2) "strategically deploy internet communications to exchange awareness of the issue;" and (3) "engage purchasers in patient safety." (ECF 188-15, DX-319, p. 2). And Leapfrog reported it anticipates meeting and exceeding all three goals. (*Id.*).

203. Leapfrog's Patient and Family Expert Panel reviews and advises Leapfrog on the readability of the website. (Tr. Vol. 3, Binder, 127:1-7).

204. Unlike Dr. Zarcadoolas, Plaintiffs' expert, Dr. Berger did not perform a digital low literacy readability analysis on Leapfrog's website to determine whether a reasonable consumer may be able to understand it. (Tr. Vol. 2, Berger, 50:7-10); (ECF 188-13, DX-317); (ECF 188-14, DX-318); (ECF 188-15, DX-319).

205. Unlike Dr. Zacradoolas, Dr. Berger is not an expert in determining how websites should be designed in order to properly provide information to low literacy consumers. (Tr. Vol. 2, Berger, 42:22-43:2); (ECF 188-13, DX-317); (ECF 188-14, DX-318).

206. The only evidence of any consumer or UX testing on Leapfrog's website is by Dr. Zarcadoolas who assisted in the creation of Leapfrog's website as it is currently displayed today. (ECF 188-13, DX-317); (ECF 188-14, DX-318); (ECF 188-15, DX-319).

ii. Leapfrog's Website Display

207. The display of Leapfrog hospitalsafetygrade.org has substantively not changed since working with Dr. Zarcadoolas in its initial development. (*See*, gas gauges in original report, ECF 188-15, DX-319, p. 6).

208. On the Safety Grade Website, consumers can search for a hospital by city, state, zip code, or hospital name. *See e.g.* (PX-034.0, ECF 195-48); (PX-034.1, ECF 195-49).

209. If a consumer clicks or taps on a hospital's name, assigned Safety Grade, or "View the fully score," the consumer is brought to that hospital's profile webpage. (*See e.g.*, ECF No. 195-42, PX-033.2).

210. A hospital's profile webpage on the Safety Grade Website displays the hospital's most recent Safety Grade at the top of the page. (*Id.*).

211. When a consumer clicks or taps on "Show Recent Past Grades" at the top of a hospital's profile webpage, the last seven rounds of that hospital's Safety Grades (Spring 2022 to Spring 2025) appear. (ECF No. 195-94, PX-053).

212. On the hospital profile webpage, there are five tabs titled "Infections," "Problems with Surgery," "Safety Problems," "Practices to Prevent Errors," and "Doctors, Nurses & Hospital Staff." (ECF No. 195-42, PX-033.2, p. 1).

213. When a consumer clicks or taps on one of the five tabs, they are shown measures included in the tab category and a corresponding red, yellow, and green "gas gauge" for each measure. (*Id.* at pp. 1-2).

214. The "gas gauge" visually represents how well a hospital scored on Leapfrog's standards for that measure. (*Id.*).

215. Red conveys that Leapfrog has scored a hospital "Worse Than Average" performance; yellow conveys that Leapfrog has scored a hospital average performance; green conveys that Leapfrog has scored a hospital "Better Than Average" performance. (*Id.*).

216. Beneath the "gas gauges" is a legend that states the gas gauges depict how the "Hospital Performs" on the Leapfrog standards based on a scale of "Worse Than Average" to "Better Than Average." (*Id.*).

217. A consumer can view a hospital's measure score by clicking or tapping the corresponding "gas gauge" graphic. (*Id.*).

218. Each measure webpage shows "This Hospital's Score," "Best Hospital's Score," "Average Hospital's Score," and "Worst Hospital Score"; describes the measure; and includes "Notes and Definitions" footnotes beneath the measure descriptions. (*Id.* at 1-2).

219. The scores for the Four Imputed Measures, CPOE, BCMA, Hand Hygiene, and IPS, can be found by clicking or tapping into the respective measures "Doctors order medications through a computer," "Safe medication administration," "Handwashing," and "Specially trained doctors care for ICU patients." (ECF No. 195-45, PX-033.5 at 1); (ECF No. 195-46, PX-033.6, at 1).

220. If a hospital does not respond to the Leapfrog Survey but is still assigned a Safety Grade, every measure webpage for a non-responding hospital includes a red, bolded footnote under "Notes and Definitions," stating that hospital "**Declined to Report: The hospital was asked to provide this information to the public, but did not.**" (*See e.g.*, ECF No. 195-45, PX-033.5 at 1, at 1-2).

221. When a user clicks or taps on one of the Four Measures for a non-participating hospital, an asterisk (*) appears next to the measure score underneath "This Hospital's Score." (*Id.*).

222. The asterisk (*) is associated with a red, bolded footnote stating, "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available**" that is reflected in the "Notes and Definitions." (*Id.*).

223. The additional footnote stating "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available**" does not appear for any measure for which the imputation method was not used. (*See e.g.*, ECF-189-92, PX-033.1, 1-2).

224. Leapfrog created the "asterisk" to minimize consumer confusion. (ECF No. 183-1, Leapfrog's Designations of Lauren Bailey, 179:7-180:1).

225. Creating the asterisk and bolded text was how Leapfrog sought to clearly disclose to consumers how the data was being assigned. (ECF No. 183-1, Leapfrog's Designations of Lauren Bailey, 179:7-180:1).

226. If a hospital does not respond to the Survey, measures "Effective leadership to prevent errors," "Nursing and Bedside Care for Patients," and "Staff work together to prevent errors," show a question mark displayed with "Declined to Report" over the respective gas gauge on these measures for that hospital. (ECF No. 195-45, PX-033.5, p. 1); (ECF No. 195-46, PX-033.6, p. 1).

227. Clicking a link at the top of a hospital's profile webpage that says "Detailed table view" takes a consumer to a new webpage that contains two tables displaying the hospital's most recent numerical score on each measure. (ECF No. 195-47, PX-033.7, pp. 1-3).

228. Each table has seven columns: "Measure," "The Hospital's Score." "Worst Performing Hospital," "Avg. Performing Hospital," "Best Performing Hospital," "Data Source," and "Time Period Covered." (*Id.*).

229. Under the second table (process measures) of a hospital's "Detailed table view" webpage, there is a hyperlinked text that reads, "For a full description of the methodology, click here," which is one of the many ways to access the methodology. (*Id.*).

230. Clicking or tapping the link takes the consumer to a PDF version of Leapfrog's current "Scoring Methodology" document. (*Id.*).

231. Consumers can read the publicly available methodology document to see the measure scores associated with each of the performance categories for the Four Imputed Measures. (ECF No. 189-94, JX-034.0); (ECF No. 189-101, JX-041.1).

232. Consumers can also access the Scoring Methodology from the Safety Grade Website home page. (Tr. Vol. 2, Berger, 37:2-25).

**J. <u>STATEMENTS ON LEAPFROG'S SAFETY GRADE WEBSITE</u>**

233. Leapfrog is "the only hospital ratings program focused exclusively on preventing medical errors and patient harm. It is fully transparent, free to the public and updated biannually in the fall and spring." (ECF 188-88, DX-913, p. 6).

234. Leapfrog's goal is to always be transparent with hospitals and consumers. (Tr. Vol. 3, Binder, 100:18-21). Thus, Leapfrog uses a series of communications routinely (monthly new letters, press releases, educational programs) that are all free to the public. (*Id.*, 101:5-14).

235. Leapfrog explains to consumers the difference between the Survey and the Safety Grade. (*See*, ECF No. 195-39, PX-030.0, 1-2).

236. Leapfrog explains to consumers that reporting to the Leapfrog Survey "doesn't automatically improve a hospital's Safety Grade. If a hospital does well on the Leapfrog Hospital Survey that can improve their Grade, but if they do poorly it can hurt their grade." (*Id.*).

237. Leapfrog explains to consumers that some hospitals do not receive a Safety Grade because there is not enough data publicly available to be eligible for a Safety Grade, but the "absence of a Grade does not mean a hospital is unsafe; it means Leapfrog does not have enough data to assign a Grade" (*Id.* at 4).

238. Leapfrog explains to consumers that "[m]ost of the data Leapfrog uses comes from CMS, and in some cases, CMS does not publish adequate safety data on an individual hospital. Sometimes the hospital is too small to issue reliable numbers, or the hospital does not offer services relevant to the safety data. For instance, a hospital without an Intensive Care Unit (ICU) cannot report ICU safety measures." (*Id.*).

239. Leapfrog's website explains to consumers "How to Use the Grade." (*See e.g.*, https://www.hospitalsafetygrade.org/how-to-use-the-grade); (ECF No. 195-31, PX-023.0).

240. Leapfrog advises consumers that instead of relying on past grades, "[p]atients should always decide on where to receive care based on a hospital's current Safety Grade. However, past grades can tell you a lot about that hospital's track record in keeping its patients safe from errors, injuries, accidents and infections." (*Id.* at p. 4).

241. Leapfrog explains to consumers "About the Grade" including how it was developed. (ECF No. 195-107, PX-066.0).

242. Leapfrog explains to consumers "How the Leapfrog Hospital Safety Grade is produced" including descriptions of the domains, eligibility requirements, and where data comes from. (*Id.* at p. 3).

243. Leapfrog provides consumers links for helpful resources, contacts for Leapfrog, the scoring methodology and an explanation of grades. (*Id.* at 3).

244. Leapfrog explains to consumers that the "Safety Grade provides data and research to help you make informed decisions about a critical aspect of your hospital stay – safety" and that the "goal of the Leapfrog Hospital Safety Grade is to reduce preventable deaths from hospital errors and injuries by publicly recognizing safety and exposing harm." (ECF 195-11, PX-011.0,).

245. Leapfrog's website references a white paper written by Johns Hopkins. (*See e.g.*, ECF No. 195-8, PX-008.0).

246. To date, Dr. Matt Austin stands by the findings in the white paper. (ECF No. 186-1, Leapfrog's Designations of Dr. Matt Austin, at 106:16-107:14, 353:11-20).

**K. <u>NO EVIDENCE OF CONSUMER DECEPTION</u>**

247. I find Dr, Berger's opinion that "it is unlikely that consumer either understand the specific methodology used, so the minimum score was applied, or the impact of that impact of the that minimum score application on the hospital grades and nonparticipating hospitals" to be uncredible. (Tr. Vol. 2, Berger, 6:17-21).

248. Over Leapfrog's objection, Dr. Berger's relies on Leapfrog's google analytics in coming to the conclusion that consumers are "unlikely…to understand," but he also admits that "Google analytics is a well-used methodology for analyzing *website traffic* and *behavior* on websites," which in turn admittedly does not show what consumers may or may not *understand*. (Tr. Vol. 2, Berger, 47:1-2).

249. To be sure, Dr. Berger testified that Google analytics data "is not measure of what people remember or what they thought they would do." (Tr. Vol. 2, Berger, 68:4-7).

250. When asked how trustworthy the google analytics data is in telling what type of people viewed the methodology, Dr. Berger opined "I don't know, it just shows the number of individuals." (Tr. Vol. 2, Berger, 56:19-22).

251. Google analytics data is used to see "whether or not people are exposed to certain types of information, whether or not they went to a particular page" but neither is evidence of whether a consumer understood the information or not. (Tr. Vol. 2, Berger, 47:13:16).

252. When asked whether any of the Google analytics data confirmed the clicks were made by consumers, Dr. Berger testified "I have not seen data that speak to it one way or the other." (Tr. Vol. 2, Berger, 49:11-13).

253. Dr. Berger does not know whether any of the clicks were bots or repeat users. (Tr. Vol. 2, Berger, 57:1-4; 58:15-18).

254. The only thing Dr. Berger did confirm about the alleged users and Google analytics data is that it "is anonymous." (Tr. Vol. 2, Berger, 50:3-6).

255. For all the reasons stated *supra*, I find the Google analytics data to be unreliable and not evidence of whether a reasonable consumer understood Leapfrog's website or whether any consumer was deceived by it or not.

256. Moreover, Dr. Berger's opinions are inconclusive as all are qualified with "likely," some are qualified with what "consumers may do" and others are supported by "I guess it is possible." (Tr. Vol. 2, Berger, 6:17-21; 70:11-13; 11:13-15). The mere possibility of something that could or may happen is an insufficient to prove consumer confusion or deception.

257. Dr. Berger admittedly does not provide an opinion on whether consumers are likely to be deceived to their detriment by the Leapfrog methodology or how Leapfrog displays it on the website. (Tr. Vol. 2, Berger, 41:22-42:2).

258. Since Dr. Berger's opinions are unsupported by any actual evidence of consumer understanding, I decline to consider any of his conclusions related to Leapfrog's website display or the Google analytics data itself. (ECF 192-93 through ECF 192-103, PX-471-480).

259. Dr. Berger opines that consumers are unlikely to make it to the methodology document, but yet also admits that he does not know whether consumers would even understand the methodology document if they did get there. (Tr. Vol. 2, Berger, 22:10-11; 27:11-12).

260. Dr. Berger did not do a consumer survey to determine what any consumer thought, understood or actually considered. (Tr. Vol. 2, Berger, 45:7-15).

261. Despite citing 59 articles in his expert report, Dr. Berger was unable to name a single article that relied on google analytics data in coming to its conclusions. (Tr. Vol. 2, Berger, 46:13-24).

262. Dr. Berger did not perform a digital low literacy readability analysis on Leapfrog's website to determine whether a reasonable consumer may be able to understand it. (Tr. Vol. 2, Berger, 50:7-10).

263. Dr. Berger is not an expert in determining how websites should be designed in order to properly provide information to low literacy consumers. (Tr. Vol. 2, Berger, 42:22-43:2).

264. Dr. Berger has no experience in consulting with companies about meeting FTC standards for websites. (Tr. Vol. 2, Berger, 42:19-21).

265. I decline to consider all of Dr. Berger's opinions regarding footnote 4, "what safer hospitals do," the detailed table view, and the gas gauges as there is no credible or trustworthy evidence of what a consumer saw or did not see, believe or did not believe, considered or did not consider, relied on, or did not rely on – there is no evidence of consumers at all.

266. Rather, the only evidence that confirmed anything about Leapfrog's website is Dr. Nicholson's opinion that he considers Leapfrog's imputation method "to be an assignment," which is exactly how Leapfrog displays the imputation method to consumers on its website: "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**" (Tr. Vol. 1, Nicholson, 226:14-16); (*see e.g,* PX-034.5, p. 2).

267. When considering one of the public comments, Senior VP of Ratings, Missy Danforth, proposed adding a symbol next to the gas gauges or scores to indicate to consumers that the score is imputed, which is how footnote 4 was conceived. (JX-026.0).

268. Dr. Romano also encouraged Leapfrog "to use the word assign instead of impute with respect to step two B, and they followed that suggestion." (Tr. Vol. 2, Romano, 161:2-4).

269. Leapfrog's data analyst, Alex Campione, worked with a member of Leapfrog's communication team to carefully and thoughtfully craft the language of footnote 4 because Ms. Campione "wanted it to be as accurate as possible while also being understandable to a lay person." (Tr. Vol. 2, Campione, 286:6-8); (ECF 189-67, JX-31.1).

270. Aligning with Dr. Nicholson's opinion, footnote 4 was drafted specifically to reflect that "imputation is the assigning of points." (Tr. Vol. 2, Campione, 286:4-5).

271. The footnote 4 "asterisk refers to a clearly articulated line that explains that the score was assigned," and the intention was for consumers "to understand that the 15 was assigned." (Tr. Vol. 3, Binder, 38:5-6; 38:24).

### L. LEAPFROG'S OPERATIONS

#### i. Leapfrog Board of Directors

272. Leapfrog's bylaws delegate responsibilities of approving the methodology to the CEO, Leah Binder. (Tr. Vol. 3, Binder, 46:18-47:2).

273. Leapfrog's Board "[e]xpressly does not get involved in approving methodology issues, and only one time they [were] involved in [the] methodology and that was when [Leapfrog] launched the hospital safety grade." (Tr. Vol. 3, Binder, 146:14-17).

274. If Leapfrog's Board wanted to be more involved in the methodology, they would express the same. (Tr. Vol. 3, Binder, 47:7-18).

275. Leapfrog's Board is fully aware of the Fall 2024 methodology change and has never expressed any issues with the change. (Tr. Vol. 3, Binder, 73:5-15).

276. Leapfrog's CEO, Leah Binder, went six years without a raise because she wanted to "reserve the funding that is available for [Leapfrog's] executives." (Tr. Vol. 3, Binder, 119:14-19).

ii. Leapfrog's Revenue Sources

277. The survey is Leapfrog's "most expensive asset." (Tr. Vol. 3, Binder, 91:21-23).

278. It is important to Leapfrog to put a lot of resources into the survey because "hospitals use the survey as…a checklist" for improving on patient safety. (Tr. Vol. 3, Binder, 91:21-92:9).

279. Leapfrog's revenue is likewise used to pay for the resources used to publish free products to hospitals and consumers. (Tr. Vol. 3, Binder, 92:10-12).

280. Leapfrog's revenue streams consist of "standard non-profit fundraising," which includes sponsorships, donations and registrations. (Tr. Vol. 3, Binder, 107:2-5).

281. Leapfrog licenses its accolades, which simply allows a hospital to purchase the right to use a Leapfrog trademark to promote their Safety Grade, Diabetes Recognition, or Top Hospital Award. (Tr. Vol. 2, Binder, 107:13-23); (ECF 195-11, PX-010.0).

282. Leapfrog encourages hospitals "take pride in improving their safety" by promoting their Safety Grades regardless of whether they purchase accolades by providing hospitals with free tools like template ads, announcements, and press releases. (Tr. Vol. 3, Binder, 108:1-3); (PX-508.0); (PX-508.1).

283. Leapfrog licenses its "proprietary interpretation" of a hospital's data – its scores. (Tr. Vol. 3, Binder, 54:6-7; 107:6-12).

284. Data licensing does not provide or allow the licensee access to any hospital's raw data that was provided in response to the Leapfrog Survey. (Tr. Vol. 3, Binder, 81:1-2).

285. Data licensing allows a purchaser access to the most recent available data that is available on the each of Leapfrog's websites. (ECF 194-73, PX-247.1); (ECF 191-9, PX-324.1).

286. Datasets are not priced by the number of hospitals that participate in the Survey nor by the number of Safety Grades published by Leapfrog. (Tr. Vol. 3, Binder, 57:22-24).

287. In fact, between 2023 and 2024, survey participation increased by 10%, but the price of licensing a data set did not increase. (Tr. Vol. 3, Binder, 81:9-20). "The only price increases have been inflation." (*Id.*, 81:25).

288. A hospital need only pay for an accolade license if it wishes to use Leapfrog's intellectual property – logos in connection with its advertising of its Hospital Safety Grade. (Tr. Vol. 3, Binder, 108:1-3); (ECF 191-9, PX-508.0); (ECF 191-10, PX-508.1).

289. Leapfrog has never generated revenue from selling consulting services. (Tr. Vol. 3, Binder, 108:20-23).

290. There is no evidence that Leapfrog is a "pay for play."

291. There is no evidence that hospitals pay money to Leapfrog in exchange for better grades.

292. Leapfrog does not accept money in exchange for better Safety Grades.

293. Leapfrog has heard Plaintiffs' tropes throughout time, but none are true. (Tr. Vol. 3, Binder, 101:24-102:15); (ECF 188-16, DX-402, p. 25-38).

### M. <u>LEAPFROG SAFETY GRADE STATISTICS</u>

294. In Spring 2025, Leapfrog assigned 2,829 hospitals Safety Grades and of those hospitals that received a grade only 592 of them did not respond to the Survey. (ECF 188-31, PX-426 at p. 2).

295. In Spring 2025, only 8.09% of graded hospitals received either a "D" or "F" Safety Grade. (*Id.*).

296. In Spring 2025, only 19 of 2,829 graded hospitals received an "F" Safety Grade. (*Id.* at p. 3) and three of those 19 were the Plaintiffs (Delray, Palm Beach, and West Boca). (ECF 188-31, PX-412).

297. When comparing Fall 2024 and Spring 2025 scores, the overall means improved on 17 measures. (ECF 188-31, PX-426 at p. 8).

298. In Spring 2025, Leapfrog graded 191 Florida hospitals and 70 of those hospitals received an "A" Safety Grade. (*Id.* at p. 13).

299. Florida has one of the highest Survey participation rates in the country. (ECF 188-31, PX-426); (ECF 192-16, PX-412).

300. Of the 191 hospitals in Florida that received a Spring 2025 Safety Grade, only 10 did not submit a Survey and five of those are the Plaintiffs. (ECF 188-31, PX-426); (ECF 192-16, PX-412).

301. Of the 10 that did not submit the Survey, all 5 non-plaintiff hospitals received a C and all used Step 2 imputation. (ECF 188-31, PX-426); (ECF 192-16, PX-412).

302. The non-plaintiff Florida hospitals that did not submit a Survey had the same scores imputed for the Four Imputed Measures as the Plaintiff hospitals, but the non-plaintiff hospitals received "C" Safety Grades rather than "D" or "F" Safety Grades like each of the Plaintiff hospitals. (ECF 188-31, PX-426); (ECF 192-16, PX-412).

## L. <u>THE PLAINTIFF HOSPITALS ARE POOR PERFORMERS</u>

### i. <u>DELRAY MEDICAL CENTER</u>

303. Delray's patient population is "very elderly" with an average age of "78 to 82 years old." (Tr. Vol. 1, Havericak, 54:18-21). Delray serves "a little less than 116,000" patients a year. (*Id.* at 55:2). About 30% of Delray's patient population consists of Humana insureds and "[a] lot of Medicare and Medicare Advantage patients." (Tr. Vol. 1, Havericak, 80:10-14).

304. In Spring 2024 under the pre-existing safety grade methodology wherein Delray was receiving an imputed score of 100/100 for all 4 of the imputed measures, Delray Medical Center received a failing grade of "D". (Tr. Vol. 1, Havericak, 91:1-2).

305. In Fall 2024 under the Fall 2024 Methodology Change, Delray Medical Center received a "F" Safety Grade. (Tr. Vol. 1, Havericak, 73:7-9).

306. Delray had a failing Safety Grade before the Fall 2024 Methodology change.

307. Delray admits its Fall 2024 CMS data, specifically HCAP and HAI scores, were significantly lower than the national average. (Tr. Vol. 1, Havericak, 103:14-18).

308. While the CEO of Delray attempted to downplay the accuracy of Delray's CMS data by qualifying it as "a snapshot of some of [Delray's] population," Havericak likewise testified that Delray's patient population is "very elderly" with an average age of "78 to 82 years old" and

consists of "[a] lot of Medicare and Medicare Advantage patients." (Tr. Vol. 1, Havericak, 104:3-6; 54:18-21; 80:10-14). In other words, Delray's own self-reported CMS data is admittedly an accurate reflection of its patient population.

309. In addition, Delray tracks its internal data as compared to national averages. (ECF 188-85, DX-813).

310. Delray's own internal documents confirm that in 2024 Delray performed below the national average on the following measures for which it collects data, and which go in to the composite Leapfrog Hospital Safety Grade:

- Below the national average on 4 of 8 "Safety of Care" measures; notably, PSI-90, SSI Colon and MRSA
- Below the national average on 8 of 9 "Readmission & Unplanned Visits" measures.
- Below the national average on all 9 "Patient Experience" measures (HCAHPS) 5 of these used by Leapfrog.
- Below the national average on 5 of 8 "Timely & Effective Care" measures.

(ECF 188-85, DX-813).

311. With respect to the four imputed measures at issue in this litigation, the CEO for Delray admits it regularly tests its CPOE system to ensure it alerts doctors to potential ordering errors. (Tr. Vol. 1, Havericak, 62:17-23). In fact, Delray keeps "score cards and metrics with the physician providers and that is shared [] in [] monthly meetings." (Tr. Vol. 1, Havericak, 63:6-10). Yet, despite the CEO testifying that these documents exist, no documentary evidence of CPOE policies or tracking was produced as evidence at trial.

312. Havericak admits DX-813 does not report Delray's performance on CPOE. (Tr. Vol. 1, Havericak, 109:2-12). Notably, Havericak admits Delray does not "do the Leapfrog testing" for CPOE and thus she does not know how Delray would have done on Leapfrog's standards. (Tr. Vol. 1, Havericak, 109:22-110:3).

313. Delray further admits all of its "nurses and staff members that administer medication" utilize a BCMA system that is "tracked by [] the chief nursing officer for all of the nursing staff and respiratory therapists to make sure everyone is in compliance." (Tr. Vol. 1, Havericak, 65:1-7). Yet, despite the CEO testifying that these documents exists, no documentary evidence of BCMA policies or tracking was produced as evidence at trial. Havericak admits DX-813 does not report Delray's performance on BCMA. (Tr. Vol. 1, Havericak, 109:2-12).

314. With respect to the Hand Hygiene measure, Delray admits it tracks handing washing and submits internal surveys to the quality department every month. (Tr. Vol. 1, Havericak, 66:10-18). Ms. Havericak, the CEO testified that Delray also uses a surveillance tool to monitor hand washing and that "information is share in [] monthly infection control or prevention meeting[s]" that is then further discussed at monthly quality meetings. (Tr. Vol. 1, Havericak, 66:19-25). Yet, despite the CEO testifying that these documents exists, no documentary evidence of hand hygiene policies or tracking was produced as evidence at trial. Havericak admits DX-813 does not report Delray's performance on hand hygiene. (Tr. Vol. 1, Havericak, 109:2-12).

315. With respect to the IPS measure, Delray has three intensive care units, a trauma ICU, neuro ICU, and cardiac ICU that is allegedly staffed 24/7. (Tr. Vol. 1, Havericak, 68:5-17). Yet, despite the CEO testifying that these documents exist, no documentary evidence of ICU Staffing policies or tracking was produced as evidence at trial. Havericak admits DX-813 (ECF 188-85) does not report Delray's performance on ICU physician staffing. (Tr. Vol. 1, Havericak, 109:2-12).

316. Delray did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures. In fact, Havericak admits she did not personally investigate Delray's Leapfrog scores for Fall 2024. (*Id.* at 61:12-15).

317. Delray pays both the Joint Commission for accreditation and Health Grades to promote its accolades. (Tr. Vol. 1, Havericak, 128:17-129:5). But the underlying data that is submitted to both the Joint Commission and Health Grades is not publicly available. (*Id.*).

318. In 2025, Delray Medical Center received a 1 Star (out of 5) CMS rating overall and a 1 star for patient experience. (Tr. Vol. 1, Havericak, 104:13-18).

319. West Boca Medical Center did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

320. Ms. Havericak admits Delray finds no "value in the survey," does not use "Leapfrog as a benchmarking foundation," and receives no benefit from Leapfrog. (Tr. Vol. 1, Havericak, 92:3-13; 92:25-93:2).

321. In fact, Ms. Havericak confirmed that Delray made a voluntary "business decision" to stop participating in the Leapfrog Survey in 2021. (Tr. Vol. 1, Havericak, 93:3-11).

322. Ms. Havericak likewise admits she is aware that Delray will be assigned a published Safety Grade by Leapfrog regardless of whether it participates in the Survey. (Tr. Vol. 1, Havericak, 111:1-8).

### ii. WEST BOCA MEDICAL CENTER

323. In Spring 2024 under the pre-existing safety grade methodology, West Boca Medical Center received a "D" Safety Grade. (Tr. Vol. 2, Hanlon, 98:13-16).

324. In Fall 2024 under the Fall 2024 Methodology Change, West Boca Medical Center remained at a "D" Safety Grade. (Tr. Vol. 2, Hanlon, 98:20-99:1).

325. The Fall 2024 Methodology Change had no impact on West Boca's Hospital Safety Grade. (Tr. Vol. 2, Hanlon, 99:13-15).

326. Mr. Hanlon testified incredibly that no patient ever inquired about West Boca's Spring 2024 "D" Safety Grade and only complained after West Boca received a "D" Safety Grade in Fall 2024. (Tr. Vol. 2, Hanlon, 99:18-100:2).

327. West Boca tracks its internal data as compared to national averages. (ECF 188-85, DX-813). In fact, internal Delray documents show that Delray's quality coordinator analyzes balanced scorecards ("BSC") and kaleidoscope reports when preparing monthly reports for Delray's Quality Improvement and Patient Safety Committee ("QIPSC"). (ECF 188-58, DX-610, p. 4). Delray leaders "review the data, analyze the data, determine opportunities for improvement, initiate PI teams and report to QIPSC as scheduled." (*Id.*).

328. Internal documents confirm that in 2024 West Boca performed below the national average on the following measures for which it collects data:

- Below the national average on 2 of 8 "Safety of Care" measures.
- Below the national average on 4 of 9 "Readmission & Unplanned Visits" measures.
- Below the national average on all 9 "Patient Experience" measures, 5 of which are used in the Leapfrog composite score
- Below the national average on 4 of 8 "Timely & Effective Care" measures.

(ECF 188-85, DX-813).

329. With respect to the four imputed measures at the center of this litigation, the CEO of West Boca testified that West Boca has a hand washing policy, collects and monitors hand washing data, audits the data, and reviews the data in various meetings. (Tr. Vol. 2, Hanlon, 79:3-

12). Yet, despite the CEO testifying that these documents exist, no evidence of hand hygiene policies or tracking was produced as evidence at trial.

330. Similarly, the CEO of West Boca testified that West Boca has a CPOE policy, collects and monitors the CPOE data, audits the data, and reviews it. (Tr. Vol. 2, Hanlon, 79:19-80:3). Joint Commission requires the tracking of CPOE data, which is not publicly reported. (Tr. Vol. 2, Hanlon, 106:8-19) Yet, despite the CEO testifying that these documents exist, no documentary evidence of hand hygiene policies or tracking was produced as evidence at trial.

331. West Boca's CEO also testified that West Boca collects and monitors its BCMA data, audits the data, and reviews it. (Tr. Vol. 2, Hanlon, 80:7-15). Joint Commission requires the tracking of CPOE data, which is not publicly reported. (Tr. Vol. 2, Hanlon, 106:8-19). Yet, no evidence of BCMA tracking was produced in discovery despite Leapfrog's request. However, contrary to Mr. Hanlon's testimony that West Boca would not have scored Limited Achievement on BCMA, the evidence presented shows that West Boca's own Director of Quality confirmed that West Boca's BCMA score placed West Boca "in the category with the lowest score." (ECF 188-48, DX-509; Tr. Vol. 2, Hanlon, 125:24-126:18).

332. Mr. Hanlon also testified that West Boca allegedly has a staffed ICU. (Tr. Vol. 2, Hanlon, 80:20-22). Yes, despite the CEO testifying that these documents exist, no documentary evidence of IPS staffing was produced as evidence at trial. Rather, Hanlon only admits that West Boca has an ICU, which is the very answer that Leapfrog awards limited achievement for. (Tr. Vol. 2, Campione, 275:9-19)

333. In 2025, West Boca Medical Center received a 1 Star (out of 5) for Patient Satisfaction from CMS and 2 Star (out of 5) CMS rating overall. (Tr. Vol. 2, Hanlon,112:24-113:6).

334. West Boca Medical Center did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures.

335. West Boca Medical Center did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

336. Hanlon confirmed West Boca does not "believe there is value to the Leapfrog survey." (Tr. Vol. 2, Hanlon, 104:17-19).

337. Hanlon admits that it was a conscious and voluntary business decision not to participate in Leapfrog because he did not see the value in it. (Tr. Vol. 2, Hanlon, 106:1-3).

iii. **ST. MARY'S MEDICAL CENTER**

338. St. Mary's serves a patient population is "underserved" so they "treat a lot of Medicaid" patients. (Tr. Vol 1, McCauley, 238:15-18). St. Mary's treats approximately 80,000 patients a year. (Tr. Vol 1, McCauley, 238:23-239:1).

339. While St. Mary's also runs a pediatric hospital, Leapfrog does not grade pediatric hospitals and therefore the pediatric data associated with St. Mary's is not relevant to the Leapfrog Hospital Safety Grade. (Tr. Vol. 3, Danforth, 171:12-21)

340. St. Mary's tracks its internal data as compared to national averages. (ECF 188-85, DX-813).

341. Internal documents confirm that in 2024 St. Mary's performed below the national average on the following measures for which it collects data:

- Below the national average on all 9 "Patient Experience" measures of which 5 are used in the Leapfrog Hospital Safety Grade.
- Below the national average on 2 of 4 "Timely & Effective Care" measures.

(ECF 188-85, DX-813)

342. With respect to the four imputed measures at the center of this litigation, the CEO of St. Mary's testified that St. Mary's tracks hand washing observations. (Tr. Vol. 1, McCauley, 242:6-9). Yet, despite the CEO testifying that these documents exist, no evidence of hand hygiene policies or tracking was produced as evidence at trial.

343. Similarly, the CEO of St. Mary's testified that St. Mary's tracks its CPOE data. (Tr. Vol. 1, McCauley, 241:19-25). Yet, despite testimony that these documents exist no evidence of CPOE tracking was produced as evidence at trial.

344. Likewise, St. Mary's CEO testified that St. Mary's tracks its BCMA data. (Tr. Vol. 1, McCauley, 241:25-242:5). Yet, despite testimony that these documents exist no evidence of BCMA tracking was produced as evidence at trial.

345. Furthermore, St. Mary's CEO testified that St. Mary's has a fully staffed ICU. (Tr. Vol. 1, McCauley, 155:18-22). Yet, despite testimony that these documents exist no evidence of ICU Staffing was produced as evidence at trial. Rather, Ms. McCauley only admits that St. Mary's

has an ICU, which is the very answer that Leapfrog awards limited achievement for. (Tr. Vol. 2, Campione, 275:9-19)

346. St. Mary's Medical Center did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures.

347. In 2025, St. Mary's Medical Center received a 1 Star (out of 5) CMS rating overall. (Tr. Vol. 1, McCauley, 258:1-3).

348. St. Mary's Medical Center did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

349. Ms. McCauley, the CEO of St. Mary's, specifically admits that St. Mary's is not a consumer of Leapfrog. (Tr. Vol. 1, McCauley, 251:25-252:2).

350. St. Mary's does not find value in Leapfrog and believe it provides no benefit whatsoever. (Tr. Vol. 1, McCauley, 251:20-24).

351. McCauley admits it was a voluntary decision to stop participating in the Leapfrog Survey in 2021. (Tr. Vol. 1, McCauley, 252:3-5).

### iv. PALM BEACH GARDENS MEDICAL CENTER

352. Palm Beach Gardens serves a patient population with a "median age [of] 62 and a half years old, and more than 50 percent of [] patients are 65 and older." (Tr. Vol. 1, Cazares, 140:2-6). The hospital treats "approximately 60,000" patients a year. (Tr. Vol. 1, Cazares, 140:2-6140:12-14). Thus, PBG's CMS data is an accurate reflection of its patient population.

353. PBG tracks its internal data as compared to national averages. (ECF 188-85, DX-813).

354. Internal documents confirm that in 2024 PBG performed below the national average on the following measures for which it collects data:

- Below the national average on 5 of 8 "Safety of Care" measures; notably, PSI-90, SSI Colon and MRSA
- Below the national average on 6 of 9 "Readmission & Unplanned Visits" measures.
- Below the national average on all 9 "Patient Experience" measures, of which 5 are used in the composite Safety Grade.
- Below the national average on 5 of 8 "Timely & Effective Care" measures.

(ECF 188-85, DX-813).

355. Mr. Cazares admitted that the best place to see the hospitals up to date CMS data would be to look on the April 5 Star Market Analysis in evidence at ECF 188-85, DX-813. (Tr. Vol. 1, Cazares, 160:8-10).

356. Mr. Cazares, CEO of PBG, testified that PBG has a hand washing policy, collects and monitors hand washing data, audits the data, and reviews the data in various meetings. (Tr. Vol. 1, Cazares, 154:32-12). Yet, despite the CEO testifying that these documents exist, no evidence of hand hygiene policies or tracking was produced as evidence at trial.

357. Similarly, the CEO of PBG testified that PBG has a CPOE policy, collects and monitors the CPOE data, audits the data, and reviews it. (Tr. Vol. 1, Cazares, 154:18-155:1). Yet, despite the CEO testifying that these documents exist, no evidence of CPOE tracking or monitoring was produced as evidence at trial.

358. Mr. Cazares also testified that PBG BCMA policy, collects and monitors its BCMA data, audits the data, and reviews it. (Tr. Vol. 1, Cazares, 155:5-13). Yet, despite the CEO testifying that these documents exists, no evidence of BCMA policies or tracking was produced as evidence at trial.

359. Likewise, Mr. Cazares testified that PGB allegedly has a staffed ICU. (Tr. Vol. 1, Cazares, 155:18-22). Yet, despite the CEO testifying that these documents exists, no evidence of hand hygiene policies or tracking was produced as evidence at trial. Rather, Cazares only admits that PBG has an ICU, which is the very answer that Leapfrog awards limited achievement for. (Tr. Vol. 2, Campione, 275:9-19)

360. Palm Beach Gardens did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures.

361. In fact, when asked Mr. Cazares admitted that PBG has never taken PBG data for the four imputed measures and actually answered the Leapfrog Survey to see how PBG would have scored on the Leapfrog standards for IPS, BCMA, CPOE or HH. (Tr. Vol. 1, Cazares, 161:4-8). Thus, it is speculation that PBG would have scored better than "Limited Achievement" on the four measures.

362. In 2025, Palm Beach Gardens received a 1 Star (out of 5) CMS rating overall. ((Tr. Vol. 1, Cazares, 160:21-24).

363. Palm Beach Gardens did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

364. Cazares confirmed that PBG does not participate in Leapfrog's Survey because it does not "find value in [] Leapfrog and we are not going to shift our resources to participate in a survey we just don't find valuable." (Tr. Vol. 1, Cazares, 156:9-14).

365. Cazares admits that in 2021 PBG made a voluntary business decision to stop participating in the Leapfrog Survey. (Tr. Vol. 1, Cazares, 158:1-8). But, Cazares admits Tenet has a directive that none of its hospitals may participate in the Leapfrog Survey. (Tr. Vol. 1, Cazares, 158:20-159:1).

### v. GOOD SAMARITAN MEDICAL CENTER

366. Good Samaritan treats approximately 73,000 patients a year. (Tr. Vol 2, Montgomery, 194:17-19). Good Samaritan's patient population has an average age of 62 years old. (Tr. Vol 2, Montgomery, 194:22-23).

367. Good Samaritan tracks its internal data as compared to national averages. (ECF 188-85, DX-813).

368. Internal documents confirm that in 2024 Good Samaritan performed below the national average on the following measures for which it collects data:

- Below the national average on 4 of 8 "Safety of Care" measures.
- Below the national average on 8 of 8 "Readmission & Unplanned Visits" measures.
- Below the national average on all 9 "Patient Experience" measures, of which 5 are used in the Leapfrog Hospital Safety Grade
- Below the national average on 5 of 8 "Timely & Effective Care" measures.

(ECF 188-85, DX-813).

369. Sheri Montgomery, CEO of Good Samaritan, testified that Good Samaritan monitors its hand washing data. (Tr. Vol 2, Montgomery, 198:12-17). Yet, despite the CEO testifying that these documents exist, no evidence of hand hygiene policies or tracking was produced as evidence at trial. To the contrary, in February 2025, internal emails show Good Samaritan has not "met the requirement for the month of January…majority of the units have 0 tracers entered." (ECF 188-86, DX-823). Montgomery admits Leapfrog's hand hygiene standard

is 200 observations, which is the very standard Good Samaritan internally tracks for. (Tr. Vol 2, Montgomery, 216:13-15; ECF 188-85, DX-823).

370. Similarly, the CEO of Good Samaritan testified that Good Samaritan collects and monitors its CPOE data. (Tr. Vol 2, Montgomery, 198:18-19). Yet, despite the CEO testifying that these documents exist, no evidence of CPOE policies or tracking was produced as evidence at trial.

371. Likewise, Ms. Montgomery testified that Good Samaritan collects and monitors its BCMA data. (Tr. Vol 2, Montgomery, 198:20-21). Yet, despite the CEO testifying that these documents exist, no evidence of BCMA policies or tracking was produced as evidence at trial.

372. Furthermore, Good Samaritan's CEO testified that Good Samaritan has a fully staffed ICU. (Tr. Vol 2, Montgomery, 198:22-25). Yet, despite the CEO testifying that these documents exist, no evidence of ICU Staffing policies or tracking was produced as evidence at trial. Rather, Montgomery only admits that Good Samaritan has an ICU, which is the very answer that Leapfrog awards limited achievement for. (Tr. Vol. 2, Campione, 275:9-19).

373. In short, Good Samaritan did not present any evidence that it would have scored higher than "Limited Achievement" on the Four Imputed Measures.

374. In fact, Ms. Montgomery testified that she has never done the Leapfrog Survey to determine how Good Samaritan would have scored on the Four Imputed Measures with Good Samaritan's actual data. (Tr. Vol 2, Montgomery, 220:12-19)

375. Interestingly, evidence was presented that under the pre-Fall 2024 imputation model Good Samaritan was receiving higher grades than participating hospitals by virtue of benefitting from the imputation of the cohort mean. Specifically, in 2024, Good Samaritan did not participate in the Leapfrog Survey, and it received a C. (ECF 188-53, DX-565, p. 2). Yet, one of Good Samaritan's competitors, JFK hospital, did report to the Leapfrog Survey and received a D. (ECF 188-85, DX-565, p. 2).

376. Moreover, other ratings organizations like CMS rate Good Samaritan low on patient safety and quality. Good Samaritan is a CMS 1 star overall and 2-star patient experience. (ECF 188-85, DX-565, p. 2).

377. Good Samaritan did not present any evidence that its Safety Grades are undeserved or otherwise unfair.

378. Good Samaritan admits Leapfrog provides it no benefit or anything of value. (Tr. Vol 2, Montgomery, 196:24-197:4).

**N. NO EVIDENCE OF CONSUMER HARM OR CONSUMER DECEPTION/CONFUSION**

379. For the first time at trial, Plaintiffs attempted to offer new documents and new anecdotes regarding alleged consumer harm to patients. In fact, the evidence at trial established that despite written discovery requests, both requests for production and interrogatories (ECF 188-1-5, DX-205-209), the Plaintiffs never disclosed any names of patients, doctors or nurses who were allegedly involved in giving and/or receiving any information that patients were misled, confused or deceived by the Leapfrog Hospital Safety Grade or Methodology.

380. With respect to several of the documents produced for the first time days prior to trail, counsel for Plaintiff's admitted that it did not produce documents in discovery and "leading up to trial, particularly in light of the Court's ruling on of [sic] summary judgment on the unfairness prong, but leading up to trial we discovered" and produced it to defendants on January 9, just 3 days before trial was set to begin in this matter. (Tr. Vol 1, 147:5 – 151:2) Plaintiffs' counsel further admitted on the record that Plaintiffs did not even search for this type of consumer harm documents during discovery. (*Id.*)

381. With respect to this evidence, Plaintiffs' counsel admitted on the record "We are not offering it for the truth of the statement." Plaintiffs' counsel admitted that the testimony was "limited testimony. It is not coming in for the truth of the statements. It is coming in to show the patient has heard something, this has been published and what is the state of mind at the time, and how they are acting and what does the hospital do in response." (Tr. Vol 1, 85:24-86:3) In other words, the Plaintiffs offered the evidence only show the state of mind of the declarants…confusion evidence." (Tr. Vol 1, 85:2-86:15). Leapfrog's counsel objected to this evidence as both hearsay and lacking foundation and had a standing objection throughout trial on this basis. If this evidence is not coming in for the truth of the matter asserted, there is no evidence of consumer harm. Furthermore, even if the evidence is coming under the "state of mind" hearsay exception (Rule 803(3)), the Court finds the evidence unreliable and untrustworthy and therefore the Court disregards the evidence.

382. Despite the foregoing, the consumer harm evidence presented by the various plaintiffs is outlined below.

**(1) <u>Delray's Purported Evidence of Consumer Harm</u>**

383. Ms. Havericak revealed for the first time at trial, a story regarding about an unidentified "elderly woman with red hair sitting up eating her lunch" who allegedly expressed that she was nervous to come to Delray because she had "seen that video and…the grade." (Tr. Vol 1, Havericak, 87:2-18). But Havericak admits this alleged patient did not show her the Tiktok video or the "grade" that she was referring to. (Tr. Vol 1, Havericak, 87:12-13). Conveniently, Havericak alleged the patient told her "how wonderful the nursing staff was, people washed their hands." (Tr. Vol 1, Havericak, 87:20-21).

384. Delray did not provide any patient names or stories, including the allegedly story Havericak testified to, in its amended answers to interrogatories. (ECF 188-1, DX-205, ROG 14).

385. Ms. Havericak also testified at trial, although it was not disclosed previously in interrogatory answers, about an unidentified doctor who told her about an unidentified patient who "was concerned about the video she had seen, [and] the failing grade." (Tr. Vol. 1, Havericak, 88:4-8; 88:22-2). (Standing objection, 88:9-18). Ms. Havericak testified she spoke with the unidentified patient who allegedly said "I am afraid that I am going to die at your hospital," but eventually received "a fantastic outcome" at Delray. (Tr. Vol 1, Havericak, 89:3-17). No documents were produced or moved into evidence to support this hearsay testimony. The alleged doctor and patient remain unidentified as well as the purported treatment and outcome. Nonetheless, taking Havericak's testimony as true, the patient was allegedly not harmed and rather had a "fantastic outcome." (Tr. Vol. 1, Havericak, 89:15-17).

386. As noted above, despite Interrogatories propounded on Delary (ECF 188-1, DX-205), Ms. Havericak did not disclose any of the above instances in response to Interrogatory No. 8, No. 14 or No. 22. Based on the failure to disclose these anecdotes in discovery, I find the testimony for the first time at trial to be unreliable and untrustworthy.

387. Based on the forgoing, Delray Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was deceived by its Safety Grades.

388. Delray Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was harmed by its Safety Grades.

**(2) <u>Palm Beach Gardens Purported Evidence of Consumer Harm</u>**

389. Mr. Cazares, CEO of Palm Beach Gardens testified for the first time at trial that an unidentified cardiac surgeon complained that an unidentified patient did not want to have surgery at PBG "because of the failing grade he had seen from Leapfrog." (Tr. Vol 1, Cazares, 145:18-22). Cazares testified that called the unidentified patient and explained the grade, but ultimately the patient never treated at PBG. (Tr. Vol 1, Cazares, 145:23-146:11).

390. Like Delray, PBG did not identify a single patient or describe a single patient complaint in its amended interrogatory answers. (Tr. Vol 1, Cazares, 171:1-20; ECF 188-5, DX-209 at ROG 14). In fact, PBG's answer to interrogatories stated "numerous" patients complained, but yet Cazares only testified to one unidentified patient. PBG did not identify a single physician or physician complaint in its amended interrogatory answers. (Tr. Vol 1, Cazares, 170: 23-25; ECF 188-5, DX-209 at ROG Nos. 8, 14, 22).

391. Like Delray, despite Interrogatories propounded on Palm Beach Gardens (ECF 188-5, DX-209), Mr. Cazares did not disclose the above instance in response to Interrogatory No. 8, No. 14 or No. 22. Based on the failure to disclose these anecdotes in discovery, I find the testimony for the first time at trial to be unreliable and untrustworthy.

392. Based on the forgoing, Palm Beach Gardens Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was deceived by its Safety Grades.

393. Palm Beach Gardens Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was harmed by its Safety Grades.

**(3) <u>St. Mary's Purported Evidence of Consumer Harm</u>**

394. Unlike the other CEOs, Ms. McCauley did not attempt to provide any evidence of specific encounters with patients or doctors regarding references to Leapfrog. She provided no specific patient names or described any incidents where patients declined care at St. Mary's due to the Leapfrog grades. (Tr. Vol 1, McCauley, 254:25-255:19); (ECF 188-4, DX-208 at Rog 8, 14, 22).

395. McCauley admits her interrogatory answers provide no names of board members, doctors, or nurses who allegedly complained about Leapfrog. (Tr. Vol 1, McCauley, 253:22-254:21); (ECF 188-4, DX-208 at Rog 8).

396. McCauley did not provide any doctors, nurses, or patient names. (Tr. Vol 1, McCauley, 265:5-10).

397. Ms. McCauley only generally testified that McCauley generally testified that unidentified physicians were unhappy about St. Mary's grades. (Tr. Vol 1, McCauley, 243:11-16).

398. Based on the forgoing, St. Mary's Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was deceived by its Safety Grades.

399. St. Mary's Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was harmed by its Safety Grades.

**(4) <u>West Boca's Purported Evidence of Consumer Harm</u>**

400. Plaintiff submitted PX-552 (ECF 191-36), which was an August 22, 2025 patient record involving a compound finger fracture of J.D. The note, states that : "PT daughters did not want their faither to have surgery in West Boca Medical Center due to Leapfrog reviews that they read online. Patient was advised by the physician and this nurse at separate times of the risk of infection with an open frature and leaving against medical advice, patient verbalized he understood and wanted to go to Broward." (ECF 189-36, DX-552). The note does not mention the doctor's name or the nurse's name involved in the incident.

401. Mr. Hanlon, CEO of West Boca, testified that the doctor involved in the incident was Dr. Hernandez; however, Mr. Hanlon admits he does not know what the patient's daughter said, what the patient's reaction was, or whether Dr. Hernandez had any additional notes regarding this alleged patient. (Tr. Vol. 2, Hanlon, 135:4-12).

402. Just one month earlier, on July 22, 2025, a member of Tenet's marketing team emailed West Boca advising of a 1-star google review provided by "Tom Daly" who wrote "[if] anything below 1 star was possible that is what this place would be getting." (ECF 188-91, DX-917). Mr. Daley continued to note that West Boca's Leapfrog grades have been dropping since 2021 and U.S. News rates them a 1-star patient experience. (ECF 188-91, DX-917). Mr. Daley further references the fact that West Boca has had 116 malpractice claims filed against it since 1999, 28 involving deaths and 19 over $1 million. (ECF 188-91, DX-917).

403. Mr. Hanlon admits he does not know whether the reference in DX-552 (ECF 189-36) in the "JD" note to "reviews that they read online" was the Tom Daily review that referenced their Leapfrog grade (and various other failures). (Tr. Vol. 2, Hanlon, 134:9-11).

404. For the first time at trial, Hanlon testified that an unidentified patient "F.W." left against medical advice "because of some of the media and things [he] had seen about Boca." (Tr. Vol. 2, Hanlon, 89:17-21). F.W. allegedly received a medical bill from West Boca, but no other information was testified to and the document was not produced in discovery. (89:25-90:1). FW allegedly first came to West Boca in October 2025. (Tr. Vol. 2, Hanlon, 130:5-8). Hanlon does not know what nurse allegedly treated this patient. (Tr. Vol. 2, Hanlon, 136:17-18).

405. During continued questioning Hanlon testified he provided a risk management report that discussed F.W. to his counsel. (Tr. Vol. 2, Hanlon, 136:19-137:1). Halon could otherwise not provide any information about this purported risk management report that was allegedly provided to counsel. (Tr. Vol. 2, Hanlon, 137:10-24). Hanlon likewise knew no information about the alleged bills to these unidentified patients. (Tr. Vol. 2, Hanlon, 138:22-25).

406. Mr. Hanlon also testified that Dr. Quedo allegedly complained that patients asked whether they should go to West Boca. (Tr. Vol. 2, Hanlon, 91:19-21). Hanlon testified he texted with Dr. Quedo about this incident and turned over the texts to counsel, but none were produced. (Tr. Vol. 2, Hanlon, 139:2-11). Hanlon could not provide any additional information regarding these text messages including the date. (Tr. Vol. 2, Hanlon, 139:12-20).

407. Mr. Hanlon also testified that Dr. Campo had "similar concerns." (Tr. Vol. 2, Hanlon, 91:23-25). This interaction was allegedly a phone call and no further information was testified to. (Tr. Vol. 2, Hanlon, 139:21-140:3).

408. West Boca did not list a single specific physician complaint in its amended interrogatory answers. (ECF 188-3, DX-207, ROG 8). When asked why he did not supplement his answer with information related to Dr. Hernandez, Hanlon testified "I gave all of the information to my counsel…timely…I immediately reported it to our counsel" (Tr. Vol. 2, Hanlon, 128:24-129:4).

409. Incredibly, Mr. Hanlon testified that prior to the Fall 2024 Safety Grade release, no patients or community members ever raised concerns about West Boca's "D" Leapfrog Grade, even though West Boca had a "D" both before and after the methodology change. (Tr. Vol. 2, Hanlon, 96:21-97:1; 99:13-15).

410. Like the other CEOs, West Boca did not list a single specific story of a patient who declined medical advice. (ECF 188-3, DX-207, ROG 8, 14, 22).

411. Based on the forgoing, West Boca Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was deceived by its Safety Grades.

412. West Boca Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was harmed by its Safety Grades.

**(5) Good Samaritan's West Boca's Purported Evidence of Consumer Harm**

413. Sheri Montgomery testified that Dr. Goodman told her that an unidentified patient was allegedly refusing to treat at Good Samaritan. (Tr. Vol 1, Montgomery, 200:8-14). Montgomery has no documents to support this story, and she admits that she does not recall how it the conversation was communicated. (Tr. Vol 1, Montgomery, 225:15-17). Montgomery does not know who the allegedly patient was. (Tr. Vol 1, Montgomery, 231:20-21). Montgomery has no evidence of this interaction other than "mentally." (Tr. Vol 1, Montgomery, 232:6-8).

414. Like the other CEO's, Good Samaritan did not list a single specific story of a patient who declined medical advice. (ECF 188-2, DX-206 ROG 8, 14, 22).

415. Based on the forgoing, Good Samaritan Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was deceived by its Safety Grades.

416. Good Samaritan Medical Center did not present credible, reliable or trustworthy evidence of a single consumer or patient that was harmed by its Safety Grades.

**O. TENET HEALTHCARE CORP'S REFUSAL TO ALLOW THE HOSPITALS TO PARTICIPATE IN THE LEAPFROG SURVEY**

417. In December 2024, PBHN CEO internally requested to "re-introduce Leapfrog reporting." (ECF 189-99, JX-040, p. 2).

418. On December 12, 2024, PBHN's Chief Nursing Officer emailed PBHN's CEO stating "PBHN would like to resume Leapfrog reporting. Rationale: With minimal effort and no cost, we can submit our data." (ECF 188-61, DX-618, p. 1).

419. However, three days later PBHN CEO notified the Plaintiff CEOs that she has "spoken with several members of ELT about this issue" and "[t]here are efforts underway to address Leapfrog's ability to score us even though we don't participate." (ECF 189-99, JX-040, p. 1). In January 2025, Tenet Healthcare, through counsel, sent a cease-and-desist letter to Leapfrog demanding it stop grading all 73 Tenet hospitals across the country or legal action will be pursued.

(ECF 188-94, DX-931). The cease-and-desist was not authorized by, at least, CEO Havericak. (Jan. 16, 2026 trial trans., 123:15-19). (ECF 188-90, DX-915, Press Release).

### P. NO EVIDENCE OF PLAINTIFF HARM OR CAUSAL CONNECTION TO LEAPFROG

#### i. DELRAY MEDICAL CENTER

420. Revenue is not down at Delray Medical Center. (Tr. Vol. 1, Havericak, 115:2-3).

421. PBHN market share has not declined since the Fall 2024 methodology change. (Tr. Vol. 1, Havericak, 115:22-25).

422. PBHN's net promoter score is up as well as the brand relevance. (Tr. Vol. 1, Havericak, DX-923, p. 6-7).

423. Delray's google star reviews have increased. (Tr. Vol. 1, Havericak, 118:15-20).

424. Delray's nursing retention is unaffected and, in fact, Delray has "the best retention in the whole company." (Tr. Vol. 1, Havericak, 118:21-24).

425. No physicians have left Delray because of the Safety Grades. (Tr. Vol. 1, Havericak, 118:25-119:1). Transfers and admission rates are up. (Tr. Vol. 1, Havericak, 119:2-5).

426. Delray has admittedly not performed any survey or commissioned an investigation to determine whether admission are down. (Tr. Vol. 1, Havericak, 119:8-14).

427. Plaintiffs did not elicit any expert testimony causally linking Delray's Leapfrog Safety Grade to any harm to Delray.

428. Ms. Havericak testified that various physicians" sent her the Tiktok "video via text," but yet no text messages or emails were produced to support his hearsay assertion. (Tr. Vol. 1, Havericak, 72:16-19).

429. Plaintiffs attempted to move the Tik Tok video (ECF 192-91, PX-466.1) into evidence; however, per the Court's ruling at trial the TikTok video cannot be used for the truth of the matter asserted. (Tr. Vol. 1, Havericak, 72:8-10). Moreover, the Court notes that upon review of the Tik Tok video there is no reliability or trustworthiness to the video. The video lacks any hallmarks of authentication or foundation. Furthermore, the Tik Tok video does not mention Leapfrog at any point. Therefore, the Court does not rely on the Tik Tok video as evidence of consumer harm or harm to Plaintiffs.

430. Importantly, as well, is the fact that Ms. Havericak admits the statements made about Delray are true. (Tr. Vol. 1, Havericak, 108:16-108:18). The TikTok video states Delray has

"high surgical infections, sepsis post surgery, and low patient satisfaction," which is confirmed accurate when reviewing Delray's own internal data records. (ECF 192-91, PX-466.1, TikTok; ECF 188-85,DX-813, Delray data as compared to the national average).

### ii. West Boca Medical Center

431. Mr. Hanlon testified general of "reputational harm and loss of goodwill." (Tr. Vol. 2, Hanlon, 84:1-4).

432. However, Mr. Hanlon admitted that West Boca's "total revenue is up." (Tr. Vol. 2, Hanlon, 114:6).

433. West Boca's EBITDA is up. (Tr. Vol. 2, Hanlon, 114:7-8).

434. West Boca has no nurse retention issues because of the Leapfrog grade. (Tr. Vol. 2, Hanlon, 114:22-25).

435. No physicians have left because of the Leapfrog grades. (Tr. Vol. 2, Hanlon, 115:2-4).

436. Transfers are up at West Boca. (Tr. Vol. 2, Hanlon, 115:8-9).

437. West Boca's google reviews have gone up since the Fall 2024 grade release. (Tr. Vol. 2, Hanlon, 115:5-7).

438. Mr. Hanlon testified that West Boca's ER volumes are down, relying on the summary document PX-550 (ECF 191-35).

439. However, West Boca internal documents show that in November 2024, when the Fall 2024 Safety Grades were released, West Boca had "barriers to meeting target(s)" including "[l]imited number of ORs in the Main OR suite; currently utilized approximately at 68.4%." (ECF 188-62, DX-623, p. 3). The same document does not refer to Leapfrog as a "barrier to meeting targets." (ECF 188-62, DX-623, p. 7).

440. In January 2025, internal meeting minutes show West Boca "is working on shifting volume to other locations as WBMC is tapped out with space. No ability to expand due to infrastructure issue." (ECF 188-76, DX-656, p. 8). West Boca was not only "[m]oving patients and volume, but also internal services to other locations including Outpatient physical therapy, Occupation Therapy and Speech." (ECF 188-76, DX-656, p. 9). West Boca was experiencing decreases in surgeries "due to retirement of two high volume surgeons, closure of OP diagnostic

center, and decease in cosmetic surgical volume due to increase in rates." (ECF 188-76, DX-656, p. 3).

441. In April 2025, West Boca was internally discussing upcoming OR expansion "on major infrastructure." (ECF 188-80, DX-671, p. 10).

442. Hanlon admits that internal meeting minutes reflected that he "advised it will be a tough summer with more seasonal people going back north." (Tr. Vol. 2, Hanlon, 120:12-15).

443. The Court finds that while Mr. Hanlon testified that admissions were down, Mr. Hanlon's testimony is belied by the documentary record explaining the infrastructure and seasonal reasons for a downturn in admissions.

444. Moreover, Mr. Hanlon admitted that West Boca did not conduct a study to determine the cause of the downward admissions. (Tr. Vol. 2, Hanlon, 123:17-25).

445. Mr. Hanlon further testified about a letter received from Humana (ECF 192- 89, PX-464) which he testified was "concerning". (Tr. Vol. 2, Hanlon, 141:16-18) : Mr. Hanlon further testified that between "12 to 14 percent" of West Boca's patients are insured by Humana, which Hanlon describes as "significant." (Tr. Vol. 2, Hanlon, 140:17-24). Hanlon does not recall when he received this letter, and it is otherwise not dated. (Tr. Vol. 2, Hanlon, 140:14-16). Regardless, West Boca did not respond to the letter despite it being "concerning" and representative of a "significant" portion of West Boca's patient population. (Tr. Vol. 2, Hanlon, 141:16-25). There was no evidence presented at trial that any negative consequence occurred as a result of the Humana letter.

446. In addition, the Court finds it notable that West Boca engaged Press Ganey to assist in improving its CMS HCHAP scores. (Tr. Vol. 2, Hanlon, 108:10-15). During a presentation to West Boca, Press Ganey referred to Leapfrog as "the only hospital ratings program focused exclusively on preventing medical errors and patient harm. It is fully transparent, free to the public and updated biannually in the fall and spring. The majority of data used to calculate the Safety Grade comes from CMS publicly reported data." (ECF 188-88, DX-913, p. 6). Hanlon refused to answer whether or not West Boca's executives or board members expressed concerns about working with a company that touts Leapfrog. (Tr. Vol. 2, Hanlon, 112:3-18).

**iii. <u>ST. MARY'S MEDICAL CENTER</u>**

447. "Revenues are up" at St. Mary's Medical Center. (Tr. Vol. 1, McCauley, 266:2).

448. St. Mary's has no nurse retention issues and has not lost any physicians. (Tr. Vol. 1, McCauley, 266:11-13).

449. McCauley admits that "the number of patients that are being transferred in from Jupiter Medical Center has continue to rise significantly." (Tr. Vol. 1, McCauley, 248:19-21). When asked whether patients were going to Jupiter first because of the Leapfrog grades McCauley testified that she has "not had conversation with the 569 patients," but she knows those patients "declined to come to St. Mary's under patient preference, what that means." (Tr. Vol. 1, McCauley, 263:19-23).

450. Despite document showing that the brand recognition of the hospitals (PBHN) is increasing quarter after quarter, McCauley conveniently testified that "[b]y coincidence" she was provided a brand document the day before her testimony. (Tr. Vol. 1, McCauley, 261:10-12; 244:19-22). Despite the meeting occurring the day before, McCauley did not know the name of the person who provided the document. (Tr. Vol. 1, McCauley, 261:10-12). McCauley admits it was "very opportune" because she had never been that document before. (Tr. Vol. 1, McCauley, 261:17-19). When asked what the score was, she could not recall the number but described is as "how do [patients] feel. (Tr. Vol. 1, McCauley, 262:13-14). McCauley's evidence of brand recognition being down is simply that it decreased by percentage in an unknown category. (Tr. Vol. 1, McCauley, 266:6-8). None of these alleged documents or emails were produced or moved into evidence and therefore the Court disregards Ms. McCauley's statements.

451. McCauley testified her ER walk-ins are down 3-4 patients a day. (Tr. Vol. 1, McCauley, 247:19-21); however, no study was commissioned to draw any causal link between St. Mary's ER admissions and the Leapfrog Safety Grade.

452. Likewise, internal emails confirm that St. Mary's grade is not driven by the imputed measures, but rather St. Mary's "largest area of opportunity remains in the patient experience category." (ECF 188-52, DX-562). If St. Mary's improved its self-reported CMS HCHAP scores, it "would move [them] to an 'A.'" (*Id.*).

453. McCauley presented no evidence that patients were not going to St. Mary's because of the Leapfrog grade and rather she confirmed that all she knows is "ten patients who needed medical care who when given the option of coming to St. Mary's said no." (Tr. Vol. 1, McCauley, 264:13-16). In 2023, St. Mary's grade was already fell to "a 'C' from a 'B.'" (ECF 188-52, DX-

526). PBHN's Quality Director even urged St. Mary's to "talk about Patient Experience as a market soon." (*Id.*).

**iv. GOOD SAMARITAN MEDICAL CENTER**

454. As purported evidence of harm to Good Samaritan, Good Samaritan relies on PX-561(ECF 191-42) which is a letter dated March 2025 terminating HSS's contract with Good Samaritan. PX-561(ECF 191-42) was never produced in discovery, but Ms. Montgomery testified that she provided PX-561 (ECF 191-42) to her counsel who did not produce in discovery, did not list DX-561 ( on their trial exhibit list and only produced PX-561 (ECF 191-42) to opposing counsel on January 13, 2026 – one day *after* this trial was set to begin.

455. Ms. Montgomery testified that based on PX-561 (ECF 191-42) "pretty much the whole orthopedic program" obtained privileges at Jupiter Medical Center. (Tr. Vol. 1, Montgomery, 200:18-23). Montgomery testified eight surgeons left resulting in $8M is lost revenue. (Tr. Vol. 1, Montgomery, 201:1-12).

456. Not only was PX-561 (ECF 191-42) not produced in discovery and only produced to Defendants days before trial, DX-561 does not mention Leapfrog and was produced on January 13, 2026.

457. Ms. Montgomery further testified for the first time in this litigation that she texted and spoke with Dr. Nick Soma about why HSS was terminating the contract with Good Samaritan. Ms. Montgomery testified, over Defendants' hearsay objection, that Dr. Soma was resigning from Good Samaritan's governing board because "he was told by HSS that he had to." (Tr. Vol. 1, Montgomery, 203:11-13). Montgomery admits she "probably" texted Dr. Soma about this but no messages were produced. (Tr. Vol. 1, Montgomery, 226:18-22).

458. Ms. Montgomery also testified for the first time in this litigation at trial, over Defendant's hearsay objection, that she also had conversations with Dr. Wayne of HSS who told her that the HSS contract was cancelled because of Leapfrog. (Tr. Vol. 1, Montgomery, 204:2-8). Montgomery has no proof of this conversation. (Tr. Vol. 1, Montgomery, 227:2-7).

459. Despite testifying to an $8M lost contract with HSS in March of 2025 (prior to this lawsuit being filed) as a result of Leapfrog, Good Samaritan never disclosed anything about this issue in their interrogatory answers (ECF 188-2, DX-206, Rogs 8, 14, 22).

460. Ms. Montgomery also testified that she received a form letter from Humana (ECF 191-38, PX-554) requesting a response from Good Samaritan about steps the hospital is taking to improve its Leapfrog grade. Ms. Montgomery testified that 18% of Good Samaritan's patients are insured with Humana (Tr. Vol. 1, Montgomery, 227:16-20). Yet, Good Samaritan never responded to the Humana letter and thus Ms. Montgomery has no information regarding what Humana understood or didn't understand about Leapfrog's grading methodology. (Tr. Vol. 1, Montgomery, 227:21-25).

461. Ms. Montgomery testified that elective admissions are down 8%. (Tr. Vol. 1, Montgomery, 206:9-16). Ms. Montgomery provided no evidence to substantiate the reason for a decrease in elective admissions was the Leapfrog Safety Grade.

462. Good Samaritan also offered, over Defendant's objection, a newspaper clipping that was sent to Ms. Montgomery anonymously that stated Good Samaritan should be more like Jupiter. (Tr. Vol. 1, Montgomery, 230:18-22; ECF 191-33, PX-548). However, Ms. Montgomery conceded that PX-548 says nothing about Good Samaritan's Leapfrog Safety Grade, she does not know the identity of the individual who sent the letter. (Tr. Vol. 1, Montgomery, 231:12-15)

463. Like the other Plaintiff hospitals, Good Samaritan likewise never provided any of this information in discovery to Defendants and only came to these epiphanies of harm on the eve of trial after the Court's summary judgment ruling. (ECF 188-2, DX-206, Rogs 8, 14, 22; Tr. Vol. 1, Montgomery, 232:21-233:22)

**v. <u>PALM BEACH GARDENS MEDICAL CENTER</u>**

464. Revue is up at Palm Beach Gardens. (Tr. Vol 1, Cazares, 167:8-9).

465. Market share and brand recognition is up. (ECF 188-93, DX-923; Tr. Vol. 1, Havericak, 115:22-25)).

466. PBG has no nurse retention issue due to the Leapfrog grades. (Tr. Vol 1, Cazares, 168:17-20).

467. No physicians have left PBG because of the Leapfrog grade. (Tr. Vol 1, Cazares, 168:20-23).

468. Cazares testified in general that after the Fall 2024 Leapfrog Safety Grade was published he received complaints physicians, staff, and board members who "wanted an explanation of why the hospital had received an F." (Tr. Vol 1, Cazares, 143:22-144:10).

469. Cazares testified that Palm Beach Gardens experienced a decline in admissions for walk-in patients. (Tr. Vol 1, Cazares, 144:19-22); however, Mr. Cazares admits that he does not know what the cause of the decrease for walk-in patients is nor has the hospital has not conducted a causal study. but it is his opinion that Leapfrog is the reason for the downturn in walk ins. (Tr. Vol 1, Cazares, 169:1-14)

## III. CONCLUSIONS OF LAW

### A. RELIABILITY OF EVIDENCE

470. Under Fed. R. Evid. 1006, the court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, but the proponent of the summary "**must** make the underlying originals or duplicates available for examination or copying." Fed. R. Evid. 1006(b) (emphasis added).

471. On January 6, 2026, just ten days before trial, Plaintiffs produced PX-550 for the very first time and Plaintiffs have never produced the underlying originals thereby directly violating the Federal Rules. Fed. R. Evid. 1006(b).

472. At trial, counsel for Plaintiffs stated that PX-550 should be admitted because Plaintiffs "did produce this information but it didn't go through the end of the year," but counsel for Leapfrog denied Plaintiffs assertion. (Tr. Vol. 1 at 76: 23-24; 78:5-6).

473. The only other

474. As testified by Ms. Havericak, the CEO of Delray Medical Center, her hospital has a variety of programs to monitor admissions, but PX-550 only represents a "snapshot." (Tr. Vol. 1, Havericak, 73:20-74:4).

475. In some cases, a witness providing summary testimony of documents that were admitted was proper under Rule 1006 even when the witness only reviewed a subset of the admitted documents. *United States v. Markovich*, 95 F.4th 1367, 1374, 1378 (11th Cir. 2024).

476. However, here, the "snapshot" to which Ms. Havericak testified does not suffice to show the underlying data, making it impossible for the Court to determine the document's accuracy and reliability.

477. Plaintiffs have only ever produced summaries of the data and not the underlying data and therefore, the Court should find PX-550 to be unreliable and inadmissible. *See, CE N. Am., LLC v. Certain Underwriters at Lloyds'*, 2023 U.S. Dist. LEXIS 55440, at *14-16, 22 (S.D.

Fla. Mar. 30, 2023) (finding that a spreadsheet is inadmissible "because it is impossible to verify the source, accuracy, and validity of the amounts stated therein, and the absence of any underlying documents" under Fed. R. Evid. 1006).

### B. Plaintiffs Failed to Produce, Requiring an Adverse Inference

478. "[W]hen a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *See, Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir. 1986) (*citing, International Union (UAW) v. NLRB*, 148 U.S. App. D.C. 305, 459 F.2d 1329, 1336 (D.C.Cir.1972)).

479. To that end, Plaintiffs failed to offer evidence within their control related including but not limited to the following: (1) consumer harm to patients; (2) actual patient safety performance on the four imputed measures; and (3) purported reputational harm or loss of goodwill; thus, this lack of evidence shall give rise to an adverse inference unfavorable to each Plaintiff hospital.

### C. Count I, FDUTPA, Elements of the Claim and Burden of Proof

480. The Florida Deceptive Unfair Trade Practices Act ("FDUTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

481. Through FDUTPA, the Florida legislature intends to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

482. Florida Courts have held that "an entity does not have to be a consumer in order to have standing to bring a FDUTPA claim." *Caribbean Cruise Line, Ind. v. Better Bus. Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015). "[I]n order to satisfy the first element for a claim for both damages **and injunctive relief** under FDUTPA…the plaintiff must allege that the relevant act or practice was **harmful to a consumer**." *CMR Constr. & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, *3 (11th Cir. 2022) (emphasis added); *see also, Stewart Agency, Inc. v. Arrigo Enters.*, 266 So. 3d 207, 214 (Fla. Dist. Ct. App. 2019) (FDUTPA claim for injunctive relief requires showing of injury to both claimant and Florida consumers).

483. To establish a deceptive practice, plaintiffs must establish that the act or practice is "likely to mislead the consumer acting reasonably in the circumstances, to the *consumer's detriment*." *See Caribbean Cruise Line*, 169 So. 3d at 169 (emphasis in original).

484. To establish a deceptive practice, plaintiffs must establish that the act or practice is "likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *See, Caribbean Cruise Line, 169 So. 3d at 169; see also, Millennium Commc'ns & Fulfillment, Inc. v. Off. Of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000).

485. The Plaintiffs must show probable, not possible, deception ("likely to mislead," not "tendency and capacity to mislead"). Second, the Plaintiffs must show potential deception of "consumers acting reasonably in the circumstances, not just and consumers. Third, the new standard considers as material only deceptions that are likely to cause injury to a reasonable relying consumer. *Millennium Communs. & Fulfillment, Inc. v. Office of the AG, Dep't of Legal Affairs*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000)

486. Courts use an objective test to "determine whether 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Id.* (citation omitted).

487. The Florida Supreme Court defines an unfair practice as "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious ***to consumers***." *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003) (citation omitted; emphasis added).

488. To establish an unfair act or practice, plaintiffs must establish that the act or practice inflicts "***consumer injury*** that is: (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) that consumers could not reasonably have avoided." *SMS Audio, LLC v. Belson*, 2017 WL 11631378, *10 (S.D. Fla. April 24, 2017). (emphasis added).

489. Although FDUTPA does not require an entity to be a consumer to have standing to sue, "all claimants must 'prove…an injury or detriment to consumers in order to satisfy all of the elements of a FDUTPA claim.'" *S. Broward Hosp. Dist. V. ELAP Servs., LLP*, 2023 U.S. Dist. LEXIS 177407 (S.D. Fla. September 29, 2023); quoting *Caribbean Cruise Line*, 169 So. 3d at 169 (citation omitted).

490. "[T]o state a claim for equitable relief, an entity must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc.*, 266 So. 3d at 214.

491. To be aggrieved, "'the injury claimed to have been suffered cannot be merely speculative.'" *Id.*; citing *Ahearn*, 180 So. 3d at 173; *see also Macias v. HBC of Fla., Inc.*, 694 So. 2d 88, 90 (Fla. 3d DCA 1997) ("The clear intent of [FDUTPA] as expressed by its plain language is to provide both equitable and legal remedies to private consumers who are aggrieved parties and/or have sustained **actual losses** because of a violation(s) under FDUTPA") (emphasis added).

492. The following definition of "aggrieved" applies to companies: "'having [their] legal rights [] adversely affected; having been harmed by an infringement of legal rights.'" *Stewart Agency, Inc.*, 266 So. 3d at 213-14.

493. "[A] plaintiff is 'aggrieved' under FDUTPA when the deceptive conduct alleged has caused a **non-speculative injury** that has affected the plaintiff beyond a general interest in curbing deceptive or unfair conduct.'" *Cravens v. Garda CL Se., Inc.*, 2024 WL 5058304, *36; quoting, *Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1190 (M.D. Fla. Jan. 25, 2022); *Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2017 WL 2834783, * (M.D. Fla. June 30, 2017) (emphasis added).

494. "The FDUTPA 'is designed to protect not only the rights of litigants, but also the rights of the consuming public at large.'" *Gastaldi v. Sunvest Cmtys. USA, LLC*, 657 F. Supp. 2d 1045, 1057 (S.D. Fla. 2009).

495. Plaintiffs who are "*aggrieved by a violation of FDUTPA* may seek declaratory and/or injunctive relief under the statute." *Id.* (emphasis added).

### D. PLAINTIFFS ARE NOT CONSUMERS OF LEAPFROG AND PLAINTIFFS FAIL TO DEMONSTRATE CONSUMER HARM.

496. The Plaintiff hospitals are neither a reasonable consumer of the Safety Grades nor a consumer of the Safety Grades at all. *See, e.g., S. Broward Hosp.* at *29-31 (finding the plaintiff hospital not to be a consumer of defendant's services after plaintiff's corporate representative testified that plaintiff "received no 'benefit or anything of value' from defendants").

497. Likewise, here, every one of the Plaintiff hospital's corporate representatives (CEOs) testified that Leapfrog does not provide a benefit or provide value to the hospital.

498. The Court therefore concludes that each Plaintiff is not a consumer of Leapfrog.

499. "Plaintiff has standing to pursue FDUTPA claims so long as it can demonstrate 'an injury or detriment to consumers.'" *S. Boward Hosp.*, at *30 (quoting *Caribbean Cruise Line*, 169 So. 3d at 169).

500. Plaintiffs have otherwise not established consumer harm or substantial likelihood of consumer harm to reasonable consumers of Leapfrog's Safety Grades. *Id.* at *31.

501. Plaintiffs' inability to show actual or likely consumer harm is fatal to its FDUTPA claim. *See*, *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1289 (S.D. Fla. 2021) ("plaintiffs must point to specific damages done to consumers in the market" to allege consumer harm under FDUTPA) (cleaned up); *see also*, *Qunjian v. Globoforce, Inc.*, 89 F. 4th 852, 860 (11th Cir. 2023) (finding that plaintiff brining a FDUTPA claim must "prove there was an injury or detriment to consumers"); quoting, *Caribbean Cruise Line*, *Ind. v. Better Bus. Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015).

502. The Eleventh Circuit's recent decision in *Florida Virtual School v. K12, Inc.*, should inform the Court that the CEOs' testimony about their supposed conversations with patients and physicians about their Leapfrog Safety Grades is wholly unreliable. *Fla. Virtual Sch. v. K12, Inc.*, No. 24-10449, 2026 LX 38586, at *29-30 (11th Cir. Jan. 15, 2026).

503. First, if this Court considers the CEOs' hearsay testimony, this Court can and should afford that testimony little weight. The Eleventh Circuit recognized that the District Court acted properly discounted evidence of actual confusion due to its unreliability. *Id.* As some of the Plaintiff CEOs testified, patients spoke to doctors and the CEO then later learned of the patient's statements. This chain of discussion approximates to a game of telephone and is unreliable.

504. Eleventh Circuit caselaw preceding *Florida Virtual* also reinforces that this Court should disregard Plaintiffs' hearsay testimony. In *Florida Intentional University Board of Trustees*, Judge Williams did not give any weight to the "consumer confusion" testimony of Plaintiffs' 30(b)(6) witness, who recounted that some its employees were confused. *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1264 (11th Cir. 2016). The Eleventh Circuit

affirmed the District Court's finding that the corporate representative's testimony was hearsay evidence and not persuasive. *Id.*

505. Plaintiffs' citations to the caselaw of this District and other the Middle District of Florida are inapposite. *See Canes Bar & Grill of S. Fla., Inc. v. Sandbar Bay, LLC*, 343 F. Supp. 3d 1236, 1246 (S.D. Fla. 2018) (qualifying that the Court may rely on hearsay evidence at a preliminary injunction proceeding but would not be admissible as evidence at the permanent injunction stage); *see also* ECF No. 74 at 41 (showing that Plaintiffs seek to permanently enjoin Leapfrog's grading of the Plaintiff hospitals).

506. In *Popular Bank of Florida*, Judge Gold acted consistently with *Florida Virtual*. He allowed plaintiff's employee to testify about evidence purporting to show consumer confusion, but that testimony was ***not given substantial weight***. *See Popular Bank of Fla. v. Banco Popular de P.R.*, 9 F. Supp. 2d 1347, 1362 (S.D. Fla. 1998) (emphasis added).

507. Since Plaintiffs are non-consumers, they must demonstrate actual consumer harm but have not.

508. Plaintiffs evidence of consumer harm is not convincing. *See e.g., S. Broward Hosp.* at *32 (evidence of billing members and emails showing that the defendant "could" or "would" bill patients but did not is inadequate to prove consumer harm).

509. The Plaintiff Hospitals have identified only a smattering of hearsay statements and documents wherein their CEOs state that patients reported complaints to doctors or expressed to doctors and to others that they were disinclined to use the Plaintiff Hospitals as a result of the Safety Grades.

510. The Plaintiff Hospitals even cite instances where patients express pleasure with their experiences at the Plaintiff Hospitals.

511. The Court therefore concludes that Plaintiffs cannot prove this Court's first inquiry on element one, consumer injury or detriment, and a judgment for Leapfrog is warranted on this basis.

### E. LEAPFROG'S ACTS AND PRACTICES ARE NOT DECEPTIVE.

512. Leapfrog's acts and practices are not deceptive because it provides substantial transparent, free, readily accessible, and comprehensive information and explanations to reasonable consumers as it relates to Leapfrog's Hospital Safety Grades.

513. Judgment for Leapfrog on Count I, FDUTPA, is therefore warranted on element two, a deceptive practice is "likely to mislead the consumer acting reasonably in the circumstances, to the *consumer's detriment*." *See Caribbean Cruise Line*, 169 So. 3d at 169 (emphasis in original).

514. Element two, deception, is a two-party inquiry for which Plaintiffs cannot prove either (1) likely to mislead a consumer acting reasonably; and (2) consumer detriment. *Millennium Commc'ns & Fulfillment, Inc.*, 761 So. 2d 1256.

515. The Plaintiffs must prove and have not proven: (1) probable, not possible, deception ("likely to mislead," not "tendency and capacity to mislead"); (2) the Plaintiffs must show potential deception of "consumers acting reasonably in the circumstances, not just and consumers; *and* (3) the new standard considers as material only deceptions that are likely to cause injury to a reasonable relying consumer. *Millennium Communs. & Fulfillment, Inc. v. Office of the AG, Dep't of Legal Affairs*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000).

516. In *Piescik*, the Southern District held that all the information available to consumers and the context in which that information is provided must be considered, and that claims of deception resting on unreasonable or fanciful interpretations of labels or other advertising fail. 576 F. Supp. 3d at 1132-33 (collecting cases).

517. In *Piescik*, the defendant (CVS) moved to dismiss, arguing that the plaintiff's belief that a reasonable consumer of hand sanitizer would take the "99.99% of germs" claim as fact was objectively unreasonable based on common knowledge, and also because of the asterisk next to the 99.99% claim led to a disclosure on the back label. *Id.* at 1132.

518. The Court further explained that the "information available" to consumers informing the reasonable-consumer inquiry is not limited to the label itself, and that "true information or a disclaimer can rebut a claim of deception." *Id.* at 1133; citing *Freeman v. Time Inc.*, 68 F. 3d 285, 289-90 (9th Cir. 1995).

519. The Court held that a reasonable consumer would not assume that a hand sanitizer product with such a label encompassed "all conceivable disease-causing microorganisms, regardless of whether they are commonly found on the hands," and noted "the asterisk on the back of the hand sanitizer clearly discloses to the consumer that it does not kill 99.99% of *all* germs, and a reasonable consumer would not be expected to ignore the asterisk and the information it leads to." *Id.* at 1133. The claim was dismissed with prejudice. *Id.*, 1133-36.

520. Since the *Piescik* case was dismissed with prejudice, a judgment for Leapfrog is warranted.

521. Leapfrog provides far more than the information available to the consumers in *Piescek* and, thus, the undisputed facts here present *even stronger* grounds to hold that Leapfrog's purported conduct was not deceptive to a reasonable consumer of its products.

522. Leapfrog's hospitalsafatygrade.org website that publishes the Safety Grades included, *inter alia*, that: (i) the imputed score for non-participating hospitals is shown as equivalent to the worst score; (ii) non-reporting hospitals' Grades feature, *inter alia*, bold and red disclosures with an asterisk stating "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**"; (iii) a detailed table view of all the underlying scores that go into the Safety Grade for that hospital, comparison to other hospitals, the data source, and the time period covered; (iv) navigation of the Grades and measure-by-measure scores leads to a link allowing access to the full, 29-page Methodology; and (v) various other tools that show "how to use the Leapfrog Hospital Safety Grade," frequently asked questions, and "About the Grade."

523. As in *Piescik*, any potential to deceive a reasonable consumer of Leapfrog's products is ameliorated by additional information denoted by an asterisk, and by the substantial additional material provided. A reasonable consumer is not expected to ignore this asterisk. *Piescik*, 576 F. Supp. 3d at 1133.

524. Whether a reasonable consumer would be deceived is a totality-of-the-information inquiry, and must account for the type of consumer.

525. Thus, Leapfrog uses various pages on its website for varying comprehension levels, including the "gas gauge" pages for reasonable lay consumers, detailed table view for an intellectually curious consumer, and the detailed methodology page for an advanced consumer.

526. The *Piescik* court relied on *Moore v. Trader Joe's Co.*, wherein the Ninth Circuit affirmed dismissal of the plaintiff's charge that Trader Joe's labeling of honey as "100% New Zealand Manuka Honey" and listing "Manuka Honey" as the sole ingredient was misleading to a reasonable consumer. 4 F. 4th 874 at 876-77, 879-80 (9th Cir. 2021).

527. The Ninth Circuit explained that a reasonable consumer of a niche product like the Trader Joe's honey would know that it is impossible to produce "pure" batches of honey derived

solely from the Manuka flower, and that the relatively cheap price would further signal a **reasonable consumer of that honey** that the jar does not contain 100% Manuka honey. *Id*. at 881 (emphasis added).

528. Indeed, the inquiry is whether a reasonable consumer of the *subject product* would be misled considering all the information available to him or her. *See, Id.* at 884 (consumers of "a niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care").

529. A reasonable consumer of health care information such as the Safety Grades would exhibit a higher standard of care and awareness when choosing where to receive their medical treatment, and Leapfrog's provision of substantial and transparent information (including delineating between absent data, damning data, and imputed data) allows these consumers to fully and comprehensively inquire and educate themselves about the material that they are consuming. *Moore*, 4 F. 4th at 884; quoting, *Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 123 (S.D.N.Y. 2019) ("Consumers of Manuka honey, a niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care than 'a parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow,' who is 'not likely to study with great diligence the contents of a complicated product package'").

530. Consumers are familiar with rating websites, and considering all the information available, reasonable consumers of rating systems are aware that each system only considers certain criteria.

531. The consumer of Leapfrog Safety Grades can reasonably conclude that the grade itself measures aspects of patient safety.

532. The Court therefore concludes that Plaintiffs cannot prove this Court's first inquiry on element two (deception), likely to mislead a consumer acting reasonably in the circumstances and a judgment for Leapfrog on Count I should therefore be entered on this basis.

533. Plaintiffs are otherwise not a consumer of Leapfrog and there is no evidence of this Court's second inquiry on element two (deception), consumer detriment.

534. Plaintiffs have not offered evidence of a single consumer (or patient) that considered or relied on their Safety Grades to their detriment or caused consumer harm.

535. The Court therefore concludes that Plaintiffs cannot prove this Court's second inquiry on element two (deception), consumer detriment, and a judgment for Leapfrog on Count I should therefore be entered on this basis.

**F. <u>LEAPFROG'S ACTS AND PRACTICES ARE NOT UNFAIR.</u>**

536. Leapfrog's acts and practice are not unfair because the underlying Scoring Methodology treats all hospitals the same based on the informed business decision the hospital makes and consumers are otherwise fully informed on how the Safety Grades are calculated.

537. Leapfrog's practices are transparent and far from "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious ***to consumers***." *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003) (citation omitted; emphasis added).

538. Leapfrog's practices likewise have not caused any substantial consumer injury and even if any consumer injury were demonstrated, it would be outweighed by any countervailing benefits to consumers or competition that the practice produces, which can otherwise be reasonably avoided by consumers.

539. Judgment for Leapfrog on Count I, FDUTPA, is therefore warranted on element three, an unfair act or practice inflicts "***consumer injury*** that is: (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) that consumers could not reasonably have avoided." *SMS Audio, LLC v. Belson,* 2017 WL 11631378, *10 (S.D. Fla. April 24, 2017). (emphasis added).

540. First, Plaintiffs have never identified a single consumer injured by a Leapfrog practice that is allegedly unfair.

541. Even if patients were refusing to treat at an "F" hospital, like Delray Medical Center, the Plaintiffs fail to show how a patient treating at an "A" hospital, like Jupiter Medical Center, harms the consumer in any way.

542. The Plaintiff Hospitals do not allege or otherwise provide proof showing that patients are refusing to treat at the Tenet Hospitals because of the Safety Grades, nor any evidence that those patients are then harmed when treated at a competitor hospital.

543. Simply alleging that patients choose to treat at a competitor hospital rather than one of the Plaintiff Hospitals is not enough to show consumer injury. *See Cmty. Health Ctrs., Inc. v.*

*DiamondDog Servs., Inc.,*2024 WL 3278579, *10 (M.D. Fla. July 2, 2024) (dismissal of plaintiff's FDUTPA claim after determining that plaintiff only alleged harm the defendant caused the *plaintiff* but failed to plead consumer injury).

544. The Court therefore concludes that Plaintiffs cannot prove this Court's first inquiry on element thee (unfair), substantial consumer injury, and a judgment for Leapfrog on Count I should therefore be entered on this basis.

545. Second, Plaintiffs have no evidence on the requirement that the injury "not be outweighed by any countervailing benefits to consumers or competition that the practice produces." *SMS Audio* at *3.

546. The purpose of the Safety Grade is to "educate and encourage consumers to consider safety when selecting a hospital for themselves or their families." (JX-041.1, ECF No. 189-101).

547. Leapfrog has received feedback over the years from hospitals advising that they use the Hospital Survey as a benchmarking tool on how to improve on their patient safety measures. (Leapfrog's Designations of Dr. Matt Austin, ECF No. 186-1, at 390:7-21); (Tr. Vol. 4, Zambrana, at 119:1-1).

548. The Plaintiff Hospitals themselves used the Survey as an internal tool to benchmark their patient safety progress.

549. The mere fact that year-over-year improvements to mean "cohort" scores for Survey-participant hospitals occurred also proves the benefit that Leapfrog's purported conduct conferred.

550. Thus, not only do patients benefit from receiving access to hospital's patient safety data, but the Hospital Survey also provides a free tool for hospitals to improve patient safety. (SOF ¶6).

551. "Unfair practices" generally offend public policy and are immoral, unethical, oppressive and unscrupulous. *Alhassid v. Nationstar Mortg.* LLC, 771 Fed. Appx. 965, 969 (11th Cir. 2019).

552. But the Plaintiff Hospitals cannot set forth a single fact that Leapfrog, a non-profit providing substantial information to the public about healthcare facilities' safety, engaged in conduct fitting any of those categories.

553. The Court therefore concludes that Plaintiffs cannot prove this Court's second inquiry on element thee (unfair), consumer injury is not outweighed by any countervailing benefit to consumers, and a judgment for Leapfrog on Count I should therefore be entered on this basis.

554. Third, Consumers (*e.g.*, prospective patients) could easily avoid this purported injury by navigating Leapfrog's various webpages and explanations of its Methodology contained therein.

555. More specifically, at the bottom of each page of its websites, Leapfrog expressly states, *inter alia*, "Individuals are solely responsible for any and all decisions with respect to their medical treatment.

556. Disclosures note that neither Leapfrog nor its affiliates are responsible for any damages or costs that may be incurred with respect to use of this site.

557. Leapfrog advises consumers to "never disregard, avoid or delay in obtaining medical advice from a doctor or other health care professional because of material on this site, as the site is not intended to be a substitute for professional medical advice."

558. Leapfrog is clear that when deciding on where to receive health care, "people should consider other aspects of hospital performance in the decision-making process, such as whether the hospital delivers a high level of care for the health concern the patient has, i.e., if the hospital has high-quality obstetrics or orthopedics."

559. Leapfrog's transparent disclosure of its methods cannot be genuinely described as "unfair." *See, e.g., Medmoun v. Home Depot U.S.A., Inc.*, *14-15 (M.D. Fla. May 7, 2022) (where documents that Home Depot provided to the consumer informed the consumer of the very information that was allegedly unfair under the FDUTPA, dismissal was proper as the harm could have been reasonably avoided).

560. The Court therefore concludes that Plaintiffs cannot prove this Court's third inquiry on element thee (unfair), consumer injury could not be reasonably avoided, and a judgment for Leapfrog on Count I should therefore be entered on this basis.

**G. <u>Plaintiffs Are Not Aggrieved.</u>**

561. Each Plaintiff fails to prove that they were "aggrieved" by the Safety Grade.

562. Judgment for Leapfrog on Count I, FDUTPA, is therefore warranted on element four, Plaintiffs were not "aggrieved by" the Safety Grades.

563. "[T]o state a claim for equitable relief, an entity must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc.*, 266 So. 3d at 214.

564. Because the Tenet Hospitals are business entities and do not "share the characteristics of humans, such as being 'angry or sad'" the following definition of "aggrieved" applies: "'having [their] legal rights [] adversely affected; having been harmed by an infringement of legal rights.'" *Id.* at 213-14.

565. Plaintiffs must show that they were suffered a direct, non-speculative and actual harm as a result of the alleged conduct but have not. *See e.g., Cravens v. Garda CL Se., Inc.*, 2024 WL 5058304, *36 (finding that an "aggrieved" plaintiff must prove non-speculative injury).

566. The Court may look no further than Delray Medical Center and West Boca Medical Center who both received a failing "D" Safety Grade *before* and *after* the alleged "unfair" Fall 2024 Scoring Methodology change.

567. All five of the Plaintiff Hospitals' CEO's signed declarations early in this litigation, averring that the Safety Grades have harmed their hospital's reputation and goodwill, but then could not identify any non-speculative or admissible evidence in support.

568. None of the Plaintiffs' CEOs (who are the corporate representatives) could identify any actual financial harm suffered beyond a speculative level and all even admit revenue is up.

569. Plaintiffs' complaints of lost goodwill and/or reputational harm is wholly unsupported by evidence of a loss of business value.

570. The Court finds the qualifications of Mark Rule sufficient to qualify him as an expert in the field of economics, specifically regarding what must be shown by a corporation to substantiate lost good will or reputational harm. (ECF No. 96-4). The Court also finds convincing Mr. Rule's experience conducting damages and harm analysis for hospital systems and healthcare entities. (Tr. Vol. 4, Rule, 7:7-8:4).

571. The Court finds that Plaintiffs have failed to perform any necessary causal analysis between purportedly lost business value and TLG's actions and thus Plaintiffs have failed to demonstrate that they have suffered any injury as a result of the alleged actions of TLG. (Tr. Vol. 4, Rule, 5:20-7:1).

572. The Court finds credible Mr. Rule's expert testimony regarding the evidence a corporation must present to quantify harm. Specifically, the Court finds that Plaintiffs have not been shown to be *aggrieved*, notwithstanding harmed.

573. Specifically, the Court finds that the Plaintiff Hospitals have not presented documents showing historical financials, financial projections, industry-specific data related to competition, or macro-statistics related to demographics of the area to conduct a "but-for" analysis, which would show harm. (Tr. Vol. 4, Rule, 5:20-7:1).

574. Because Plaintiffs have not shown a credible baseline, this Court cannot determine whether Plaintiffs' financial performance declined due to factors unrelated to their Leapfrog Safety Grades. (Tr. Vol. 4, Rule, 10:3-18).

575. This Court also finds uncredible Plaintiffs' claims of loss of goodwill.

576. Plaintiffs have not completed an analysis showing harm to goodwill, even though a corporation typically measures the value "goodwill" provides on a yearly basis. (Tr. Vol. 4, Rule, 12:22-13:20).

577. Plaintiffs only presented unpersuasive, hearsay evidence, which purported to show their reputational harm. *See e.g.* (Tr. Vol. 1, Havericak, 88:3-17); (PX-552, ECF No. 199-36). These documents are not the type of support these Plaintiffs would need to show to support their claim of loss of goodwill. *See* (Tr. Vol. 4, Rule, 12:22-13:20); *cf.* ECF No. 74, ¶ 75 (claiming Leapfrog has harmed the goodwill that "Plaintiffs worked hard to build with their patients over the years").

578. Since Plaintiffs fail to offer any evidence that they were aggrieved *by* a violation of FDUTPA, Plaintiffs are not entitled to injunctive relief. *Gastaldi,* 657 F. Supp. 2d at 1057.

579. Since the "FDUTPA 'is designed to protect not only the rights of litigants, but also the rights of the consuming public at large,'" there is no evidence of any consumer harm, and Leapfrog's practices outweigh any purported consumer harm, Plaintiffs claim for injunctive and declaratory relief is unwarranted. *Gastaldi,* 657 F. Supp. 2d at 1057.

580. The Court therefore concludes that Plaintiffs cannot prove this Court's inquiry on element four, whether each Plaintiff is "aggrieved", and a judgment for Leapfrog on Count I should therefore be entered on this basis.

581. West Boca Medical Center is not entitled to injunctive relief.

582. Delray Medical Center is not entitled to injunctive relief.

583. Good Samaritan Medical Center is not entitled to injunctive relief.

584. St. Mary's Medical Center is not entitled to injunctive relief.

585. Palm Beach Gardens Medical Center is not entitled to injunctive relief.

### H. COUNT II, DECLARATORY JUDGMENT, ELEMENTS OF THE CLAIM AND BURDEN OF PROOF.

586. Pursuant to Declaratory Judgment Act, 28 U.S.C. § 2201, a court may declare the rights and other legal relations of any interested party in a case of an actual controversy within its jurisdiction. (FAC, ¶104).

587. Since Plaintiffs fail to offer any evidence that they were aggrieved *by* a violation of FDUTPA, Plaintiffs are not entitled to declaratory relief. *Gastaldi*, 657 F. Supp. 2d at 1057.

588. Since Plaintiffs failed to prove Count I, FDUTPA, a judgment for Leapfrog on Count II should therefore be entered on this basis.

### I. AFFIRMATIVE DEFENSE, ANTI-SLAPP, ELEMENTS OF THE CLAIM AND BURDEN OF PROOF.

589. Florida's Anti-SLAPP statute prohibits "fil[ing]…any lawsuit… against another person or entity [1] without merit and [2] primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue…as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution." Fla. Stat. §758.295(3).

590. A cause of action is "without merit" if it fails to state a claim or if the defendant(s) prevail on the claim at trial. *See, e.g., Flynn v. Wilson*, 398 So. 3d 1103, 1115 (Fla. 2d DCA 2024).

591. Florida's anti-SLAPP statute broadly defines "free speech in connection with public issues" to include "any written or oral statement that is protected under applicable law and . . . is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." Fla. Stat. § 768.295(2)(a).

592. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Martin*, at *3, 8; citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

593. A judgment for Leapfrog on Count I, FDUTPA, proves Plaintiffs cause of action is "without merit;" therefore, the Court finds element one of Leapfrog's Anti-SLAPP affirmative defense is satisfied.

594. The evidence shows that Leapfrog's mission is premised on free speech in connection with a public issue, is intended to assist the public in assessing their healthcare options and healthcare safety and provides a public benefit; therefore, the Court finds element two of Leapfrog's Anti-SLAPP affirmative defense satisfied.

595. Leapfrog first raised its Anti-SLAPP defense in its motion to dismiss, which was not ruled on by the Court. (*See*, motion at ECF No. 39, p. 21; and Cout Order on the motion at ECF No. 41).

596. After Plaintiffs withdrew its claim for monetary damages through the operative Amended Complaint, Leapfrog renewed its Anti-SLAPP defense in its Answer. (ECF No. 75 at pp. 47-48).

597. The Court therefore concludes that Leapfrog proved its Anti-SLAPP affirmative defense and a judgment for Leapfrog should therefore be entered on this basis.

598. The Court awards Leapfrog its attorney's fees. Fla. Stat. §758.295(4).

**ENTERED:**

DATE: ____________________

___________________________________
Hon. Donald M. Middlebrooks
United States District Judge

Respectfully submitted,

*Kimberly E. Blair*

**Kimberly E. Blair**
kimberly.blair@wilsonelser.com
Illinois Bar ID # 6272934
**Courtney L. Wood**
courtney.wood@wilsonelser.com
Illinois Bar ID #6344385
Wilson Elser Moskowitz Edelman & Dicker LLP
161 N. Clark, Ste. 4500
Chicago, IL 60601
312.821.6139 (Direct)
312.704.0550 (Main)
(312) 259-6414 (Cell)
*Attorneys for Defendant, The Leapfrog Group*

# CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2026, a true and correct copy of the foregoing was served on all counsel or parties of record via the ECF filing system.

By: /s/ *Kimberly E. Blair*
KIMBERLY E. BLAIR

# TRIAL TRANSCRIPT
# VOLUME 1

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-CV-80526-MIDDLEBROOKS

| | | |
|---|---|---|
| **GOOD SAMARITAN MEDICAL CENTER, INC. et al,** | . | |
| **Plaintiffs,** | . | |
| | . | |
| vs. | . | |
| | . | |
| **THE LEAPFROG GROUP,** | . | West Palm Beach, FL |
| | . | January 16, 2026 |
| **Defendant.** | . | |

BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

FOR THE PLAINTIFFS:

**MARY BETH MALONEY, ESQ.**
**KEVIN SIMMONS, ESQ.**
**SYDNEY A. SCOTT, ESQ.**
**LEE R. CRAIN, ESQ.**
**SCOTT K. HVIDT, ESQ.**
**Gibson, Dunn & Crutcher LLP**
**1700 M Street NW**
**Washington, DC 20036**
202-887-3729

**JEFFREY E. MARCUS, ESQ.**
**Marcus Rashbaum Pineiro & Meyers LLP**
**2 S Biscayne Boulevard**
**Suite 250**
**Miami, FL 33131**
**305-400-4260**

**FOR THE DEFENDANT:** **KIMBERLY E. BLAIR, ESQ.**
**COURTNEY WOOD, ESQ.**
**JURA ZIBAS, ESQ.**
**MAXWELL BILLEK, ESQ.**
**Wilson Elser Moskowitz**
**Edelman & Dicker LLP**
**161 N Clark Street**
Suite 4500
**Chicago, IL 60601**
312-704-0550

**Official Court Reporter:** **Pauline A. Stipes**
West Palm Beach/Ft. Pierce, FL
HON. DONALD M. MIDDLEBROOKS
561-803-3434

THE COURT: Good morning, please be seated.

This is the case of Good Samaritan Medical Center Inc., et al. versus the Leapfrog Group, case number 25-80526. Could we please have appearances.

MS. MALONEY: Yes, your Honor, Mary Beth Maloney on behalf of the five Plaintiff hospitals. I have with me here today as well Jeff Marcus on behalf of Delray Medical Center, Sidney Scott on behalf of Palm Beach Gardens Medical Center, Lee Crain on behalf of West Boca Medical Center, Kevin Simmons on behalf of St. Mary's Medical Center, and Scott Hvidt behind me on behalf of Good Samaritan Medical Center.

THE COURT: Thank you. Good morning.

MS. BLAIR: Good morning, your Honor, Kimberly Blair from Wilson Elser on behalf of the Defendant Leapfrog Group. With me is Leah Binder, the CEO and President of Leapfrog. I will let my colleagues introduce themselves.

MS. WOOD: Good morning, your Honor, Courtney Wood from Wilson Elser on behalf of Leapfrog Group.

MS. ZIVAS: Jura Zivas, Z-I-V-A-S.

MR. BILLEK: Maxwell Billek on behalf of Defendant Leapfrog.

THE COURT: Good morning.

MS. MALONEY: I'm sorry, your Honor, I was just giving my appearances. We have the five CEOs from each of the five Plaintiffs who are sitting right behind me there. I am happy

to introduce them later on the record at the appropriate time.

THE COURT: Thank you. Well, thanks for being here. We gave you as much notice as we could. As I indicated, things changed in terms of scheduling. The Defendant chose not to present a case. They had initially indicated they were going to need a couple days to do that, but they didn't, and the jury came back yesterday afternoon at 4:00 o'clock, so here we are.

Okay, let's start. I think we are going to start with openings. There were a couple of ripe motions, motions to exclude experts. We will enter orders today denying both sides' motions to exclude experts. We will be happy to hear them, and I think cross-examination can deal with any deficiencies both sides pointed out in the motions.

There was a motion to seal. I don't want to seal documents that are introduced into evidence.

I think if it is medical information you ought to be able to redact the names, or if you need to refer to names in testimony, just use initials. If we need to, we can have a one-page document that explains who the initials relate to, but I don't want to seal documents or testimony introduced into evidence.

It is hard for me to understand without more of a showing why it is necessary in this case. I wouldn't think we would get too deeply into anybody's personal medical information.

Sealing presents particular problems and they are becoming more difficult as time goes on. We now have a policy, the sealed documents can't go into the electronic filing systems because of some hacking that took place. It is hard even for judges and their staff to see these documents, so I think we ought to avoid that to every extent possible.

MS. MALONEY: May I just -- it was our motion for sealing so may I offer a point of clarification. No disagreement with your Honor's order. It was only as to the names of the individual patients we were asking for sealing, and those documents had been fully -- the names had been fully redacted because of HIPAA concerns and we have a protective order that was entered with the other side in this case with respect to -- that includes addressing HIPAA issues.

So, when your Honor issued his decision last week in which it noted that the -- a couple of the Plaintiff CEOs had not provided the names of patients at their deposition testimony, we wanted to make sure you knew we have the names, that was a intentional choice, just as it was an intentional choice not to put the names in the public record because of HIPAA concerns.

I think that is an excellent solution, your Honor, to have a doe one, doe two type list. If that is acceptable to the other side, we could come up with -- we could make reference to documents and testimony and then have Doe One, Doe

Two, Doe Three, etc., so that there is no concern that these names don't exist, but only that we are not identifying them both because of the HIPAA issues and because of the challenges of administratively with dealing with sealing.

Does that sound appropriate?

THE COURT: You all can talk about it, perhaps initials. We tried a case not long ago, it was basically the United States versus State of Florida dealing with the challenges of children who had unusual diseases and infirmities. They were able to refer to those throughout by initial without any problem, and -- so let's try to avoid sealing.

MS. BLAIR: Your Honor, I don't disagree with that, but our motion went a little deeper. As your Honor may recall, there were issues of hearsay raised, and these documents they are now seeking to unseal were never provided to us. We had interrogatories to them asking for names, or initials, or information regarding the patients they allege -- the consumers that they allege were harmed by the conduct of my client.

None of that information was ever provided despite answers to interrogatories, despite amended answers, despite depositions. At a bench trial, we are here to get to the core of the truth. We have had no opportunity to see these patients, to know who they were, to depose them, and that is really at the heart of the issue of the motion to seal.

At the 11th hour, after you issued your summary judgment motion, they now want to tell you names of patients that were never provided to us, initials or anyone, never disclosed. We have never had time to depose them or take any discovery about them.

THE COURT: We will take anything like that up on an individual basis as we proceed.

It is time to try the case. Both sides have filed a flurry of things that aren't ripe. There was a motion for reconsideration based on an Eleventh Circuit case, there are some other filings that have taken place. I think we can try the case and let's start with -- I think you wanted to do opening statements.

MS. MALONEY: Thank you so much, your Honor. Yes, we have an opening statement and we have -- if your Honor will consider it, we have hard copies and hard copies of the slides we will be presenting to the Court.

THE COURT: All right.

MS. MALONEY: Would you like me to hand the hard copies up?

THE COURT: Certainly.

MS. MALONEY: Would you like two or three copies?

THE COURTROOM DEPUTY: I believe two.

THE COURT: Ramzy is the law clerk assigned to this case, the Court Reporter is Pauline, and you probably dealt

with Genevieve Wilner, the courtroom deputy. She will be in and out. We expect you all to deal with exhibits. We don't introduce them through the courtroom deputy, she is usually not in the courtroom.

Okay.

MS. MALONEY: Good morning, your Honor, Mary Beth Maloney for the five Plaintiff community hospitals. This case is not whether hospital safety should be measured; it should. It is not about whether patients deserve transparency; they do.

This case is about something more fundamental, whether an organization that claims to protect patients should be allowed to publish hospital safety data that are not based on real safety information.

The evidence will show Leapfrog has designed safety grades to mislead the public and fracture trust at the precise moment patients and families are frightened, rushed, and desperate for clear and honest information about where to seek care and whom to trust.

As the Court has recognized, the questions here are factual.

Your Honor, one moment, I just want to get my bottle of water.

What Leapfrog actually does is in question, what it tells consumers, how consumers understand it, and how that conduct harms not just the five community hospitals, but also

the patients and communities in which they live.

The Plaintiffs are five hospitals that have served Palm Beach County for decades. You can see them here on the screen. They are essential full service hospitals. They provide level one trauma services, neonatal care otherwise unavailable within hundreds of miles, cardiac and pediatric programs, and each have emergency departments relied upon when minutes matter and where choices are limited.

This case is about Leapfrog's misconduct, an organization that claims to protect patients, but instead publishes safety grades that its own evidence shows are driven by fabricated penalty scores and designed to influence the public.

When you see an F, you know exactly what it means. In school an F means failure. You may not know the details, whether you were sick that day or you missed an exam, but the letter itself dominates. That feeling, the one you get when you see an F grade, never goes away. When people see an F they don't scroll for explanations or footnotes, they just move on. Why waste time learning more when a single letter says so much.

Consider what the reaction means in health care. When patients or families see an F for a hospital where they plan to birth their child, take their sick son, or go themselves in the event of an asthma attack or an injury to their eye, they do not assume there is a technical information buried somewhere to

explain the F. They assume the hospital is unsafe, so they move on. They find another hospital, a hospital they believe is safer simply because Leapfrog granted them a higher grade.

That is the issue before the Court, this F, and how Leapfrog manufactured our hospitals' Fs and Ds by assigning made-up scores that would be weighed more heavily and presented as if they were real safety scores.

They did it to hurt the hospitals and the community, and we are here to defend the community and their patients, and whether that practice was deceptive to reasonable consumers and unfair in its effects on the real world is the question before your Honor.

The evidence will show that patients did exactly what Leapfrog expected them to do when they saw that grade, they just stopped coming, and in some cases they went elsewhere, and to their detriment because, as the evidence will show, this community, these patients, they needed the exceptional services and care that our clients, and oftentimes only our clients can provide.

Now, Plaintiffs have participated in the Leapfrog survey in the past, most recently in 2021. When they participated Leapfrog did not claim they were failing hospitals, which they weren't, and they still aren't, but you will hear that participating in Leapfrog is not without cost. You will hear evidence that the survey was extremely

burdensome, it was hundreds of pages long.

You will hear from Regina West, who was the quality director overseeing all five Plaintiff hospitals. Ms. West, a nurse with decades of experience in patient care, in 2021, the last time the hospitals participated, was also the quality director at Good Samaritan Medical Center.

She will explain that when she compiled the Leapfrog survey in 2021 at least six people were involved, including physicians, infection control, finance, and others. She personally spent 40 to 60 hours compiling that survey, and she will explain that this time had a real cost because it pulled physicians and staff away from patient care.

That is why in 2021 the Plaintiffs' hospitals made a choice to devote their limited resources to patients, not paperwork. The Plaintiffs' hospitals were not alone in deciding not to participate in the Leapfrog survey around this time. I think we all remember 2021 as an exceedingly challenging time in this country and in Florida given the demands on hospitals from COVID.

You will hear about that from our Plaintiffs' CEOs, including one registered nurse who was a CEO during COVID who worked directly with patients.

You will hear that between 2021 and 2023, hospital participation in the Leapfrog survey stagnated, and that is reflected on the chart before you. By 2023, 36 percent of

hospitals were not participating in Leapfrog's survey, choosing, like our hospitals, to use their limited staff and physician resources for patient care rather than survey compliance.

You will learn that it was against that backdrop, declining participation and hospitals choosing to devote their limited staff and physician resources to patient care rather than surveys, that in fall 2024 Leapfrog changed its grading methodology.

You will learn that in May 2024, Leapfrog invented a penalty so draconian that it effectively punishes and turns even good hospitals into hospitals with that ugly F and D grade. In the fall of 2024, Leapfrog made what two Leapfrog employees, Ms. Danforth and Ms. Campione, called "a drastic change" to its grading system.

You will hear from them on the stand, but this is a transcript of a slack conversation between Missy Danforth and Ms. Campione. I will read part of it here. Ms. Campione says, "What if we use step one, assign them to the bottom performance category?" Missy: "That would be drastic, but let's talk about it, LOL." Ms. Campione gives a thumbs up and then responds, "It would be drastic."

The evidence will show you that drastic is an understatement. Instead of simply not grading the hospitals, Leapfrog came up with the idea to fill in information with

made-up scores as a penalty for non-participation, what they euphemistically call, quote, limited achievement, without any hospital specific performance data.

This drastic change involved fabricating scores for four measures which you see on the screen. The 15, 25, 5, and 15 are the lowest possible scores on the four measures, but in an odd twist they don't go to zero. It is as if to suggest to patients looking at these scores they could have been zero, but we gave them something, I don't know. For hand washing maybe 15 means you washed one hand.

Instead, Leapfrog arbitrarily assigned 15, 25, 5, and 15, and I'd appreciate if you'd keep that in mind as you hear lowest possible score that there is just no way to do worse, so why not use zero. We'll get at that.

These four measures alone account for up to 400 points of the total scored used to calculate a safety grade. Enough by themselves, if you score 15, 25, 5, and 15 together and only get 60, to replace the weight of the other scores.

Now, what this slide shows is the lowest scores of fall 2024, that is the 15, 25, 5 and 15 on the left-hand side of the screen. Those are the fabricated scores that were created as a penalty on the four measures.

On the other side it shows that you can hit 100, that is if you participate. Let's put up what average participating hospitals received in the spring of 2025 on those measures. So

their average totals 362 points, pretty good.

For hospitals like our clients who choose not to participate the result was swift and merciless, there it is, 15, 25, 5, and 15.

Here, for our five community hospitals you can compare what they were getting before the change. They were getting an average of 370, actually doing better on average than all of the other participating hospitals in 2021.

But after this change and the arbitrary 15, 25, 5, and 15, look what we are getting now, 60, and we can't do any better because we don't participate.

This penalty would be bad enough, but Leapfrog didn't stop there. As the evidence will show, to make the fabricated scores even more impactful on the final grade they redistributed the value of the made-up scores so that they are counted more heavily in the final grade. You will see on the left participating hospitals have the four measures counting 24 percent. Those are the four measures that they could get up to 400 points on.

On the right-hand side they have removed the three measures, those are the NA that are discussed in summary judgment motion and in the findings of fact and conclusions of law, the three measures they provide NA for get removed, and so for non-participating hospitals the weight of those 60 points is actually significantly higher than it is for the

participating hospitals who have the weight of up to 400.

You will hear from Dr. Sean Nicholson, a health economist from the Wharton School of Business. Dr. Nicholson is going to testify that based on his analysis, had the hospitals participated in the spring of 2025, they would have received no less than a C grade, and the only difference is the draconian double whammy nonparticipation penalty that no consumer, a we will show, knows about.

You will hear Leapfrogs -- from Leapfrog's own witnesses that this non-participation penalty was not based on any scientific judgment. You will hear from Leapfrog's own scientific adviser through video testimony, Dr. Matthew Austin from Johns Hopkins University. He will confirm that Leapfrog did no analysis to assess whether hospitals who did not participate in Leapfrog's survey were actually less safe. He says that. He swears to it.

He will also confirm in his sworn testimony that Leapfrog was trying to estimate or guess an answer to what grade non-participating hospitals would have received on their performance, would have received on the scores for which Leapfrog uses the misleading term impute a score.

Dr. Austin will further admit Leapfrog had no data to support the scores for hand washing. Remember, that was the 15 we saw. Those penalties Dr. Austin admits were based on a lack of data. And that is coming from someone Leapfrog is paying 40

percent of his salary. That will come out, too. Leapfrog did no analysis. They had no data. The scores they imposed, as Dr. Austin admits, were just a yes.

You will hear from Ms. Alexandra Campione that the values assigned to the four measures, that 15, 5, ten, 25, were assigned arbitrarily. As she said, Leapfrog could not accurately say that it relied on external data sources because it was assigning the bottom score without any scientific or actual basis.

She says they were arbitrarily assigning them, and that is with respect to limited achievement, and as she notes here, they were being carefully crafted. "Leah wanted us to make it sound like the expert panel approved it, and the assigning of these points was legitimate."

The scores were made up, and all the Leapfrog insiders knew it. They also knew that for nonparticipating hospitals they were missing seven data points on seven scores. Based on what Leapfrog tells consumers, that means these hospitals shouldn't be graded at all. This is from Leapfrog's website.

Every time I show you something from the website you will see the url numbers so you will know it was from the website, at least it is from the website at the time we pulled it down. You will hear later some things have been changed since the close of fact discovery by Plaintiffs.

Leapfrog tells consumers that hospitals are not rated

if Leapfrog does not have enough data for that hospital. They say if it is missing more than six measures it will not grade that hospital. They make this commitment based on what Leapfrog's experts have recommended. Leapfrog admits they did not have data for seven measures for our hospitals, which under the guidance it shows consumers means Leapfrog should not have assigned a grade at all, but they did. That is why we are here.

We are here because Leapfrog cooked up a plan to penalize nonparticipants circumventing its own rules to grade them anyway by cooking up scores for four of the seven measures.

We have talked a little bit about what they have done, and we will talk more about that in a few minutes. Now let's talk a little bit about why we think they did it and what we believe the evidence will show.

Why did Leapfrog abandon an acceptable rating practice in favor of made-up scores process? Why not just leave non-participating hospitals off the website?

The evidence will show the answer lies in Leapfrog's business model. Survey participation increases the value of the data Leapfrog licenses and sells. While Leapfrog is registered as a 501(c)(3), a not for profit for tax purposes, you will see Leapfrog's leader pushed staff to focus on increasing revenue 24/7, that is this document, and she knew

that participation, which meant access to hospital data that could then be sold was essential to increasing revenue.

So, Leapfrog chose a pressure campaign rather than an alternative fact based and scientifically supported approach.

In 2018 Leapfrog hired an outside consultant whose report makes clear Leapfrog's IP value depends on participation. As he reports, the scope of his report is on his assessment of opportunities to monetize Leapfrog's intellectual property. And he writes -- this is from the first page of the report -- "to maximize the value of the Leapfrog Group's data for licensing purposes the level of participation should continue to be increased so it can be perceived as the most complete data set and thus allowing defense of our pricing model and our price points."

You will see when a hospital participates in Leapfrog's survey it isn't just filling in and submitting hundreds of pages of questions. When a hospital participates, when it affirmatively chooses to be publicly graded, it also chooses to turn over its data to be used in a commercial manner for profit.

That is the last page you have to sign as a hospital after you have filled in the survey and it requires you to attest, to affirm that you would allow the information provided to be used in a commercial manner for profit.

Now, you will hear testimony that this -- what is

given to Leapfrog isn't just this static survey, they are actually given access to data that is consistently updated and that is how they can rightly claim that for participating hospitals they have current up-to-date information. They don't have that for non-participating hospitals.

So, hospitals were originally free to choose whether to participate or not, and Leapfrog is going to claim they still are, but the evidence will show that Leapfrog's new plan was instigated to force participation and contribution to Leapfrog's dataset to prop up its bottom line.

Let's look at what Leapfrog does with its contracts to sell its data.

It sells the data it collects from participating hospitals to insurers and others. In fact, these sales, you will hear, are among the main drivers of Leapfrog's revenue. The evidence will show that is what Leapfrog is actually focused on, not patient safety, but penalizing hospitals, scaring their patients away so they have no choice but to participate in Leapfrog's survey and they have no choice but to give over their data for Leapfrog to sell and profit from.

Dr. Patrick Romano, a Leapfrog insider and member of Leapfrog's own expert panel, will testify in the coming week and he will explain why Leapfrog made this choice. He described the methodology as creating pressure, and he agreed with his colleagues, you can call it blackmail.

He is the one who used the term penalizing nonparticipants. At least -- and after all, it is just business for Leapfrog. That is how Dr. Romano describes it. He explains the fall 2024 change to his colleagues at UC Davis Medical Center, it is just business and its purpose wasn't accuracy.

He will testify that at his own hospital the pressure worked. UC Davis decided it could not withstand it and it ultimately participated rather than taking the hit from the false scores.

You will hear that after Leapfrog imposed the nonparticipation penalty in fall 2024 assigning failing grades by default participation increased by approximately 15 percent. That is at 64 percent and then the upper trajectory to 79 percent. Hospitals didn't suddenly gain resources to spend hours and hours on these survey responses, they responded to pressure.

Dr. Sean Nicholson, who I mentioned earlier, will explain just how these fabricated scores materially drove down the safety grades for these five hospitals causing full letter grades declines, as you can see, over the past three grading cycles.

If you could show the past three grading cycles that would be great.

Those falsely depicted these hospitals as being

deserving of Ds and F. In other words, Leapfrog flunked the five community hospitals because they didn't complete Leapfrog's survey and they didn't grant them the right to their data.

Following issuance of the fall 2024 grades of Plaintiffs' hospitals, they asked not to be graded. Their response, Leapfrog unequivocally refused, and since has issued two more rounds of grades. Those are the spring 2025 and fall 2025 grades.

Along with the grades, since the filing of this litigation, you will hear from Leapfrog's director of communication, Lauren Bailey, she is also by video, that our hospital's failing grades have been intentionally amplified by Leapfrog through a coordinated media campaign of Google ads.

I am going to read this. Google ads directly linking to hospital survey results or safety grade results. We had five of those running towards the Plaintiffs' hospitals.

You will see that Leapfrog's media machine has been effective. As Ms. Bailey will tell you, Leapfrog gets millions of visitors to its website to see that F grade and that D grade. You will see the promotion of Leapfrog's grades.

Well, it has been so effective it inspired a Tiktok video that specifically calls out four of the five hospitals by name and their so-called failing grades. That video alone has generated more than one million views. You will hear from some

of the hospital CEOs that it is being raised to them by the patients in their hospital beds.

The hospitals represented by the women and men and sitting behind me here today have refused to cower in the face of this targeted the campaign, and that brings us before your Honor.

Leapfrog will say consumers should and they will look past the failing grades. Leapfrog itself is the one who tells consumers how to use the grade in what they tell them in the section entitled About the Grade, again from the website. It ensures consumers will look to and rely on a single grade, that easy to understand F or D.

They tell consumers that single letter grade, it represents overall performance in keeping patients safe, preventing harm and medical errors. They are trying to scare our patients, our physicians, our communities referring to harm and errors, saying that only the worst of the worst get an F or a D. In fact, they report that only the worst of the worst get an F.

Look at that, less than one percent of hospitals in the United States receive an F grade, not only the hospitals that don't participate in the Leapfrog survey, but only the worst hospitals, and that is less than one percent.

So, they also go further. As if being in the bottom one percent wasn't enough, Leapfrog tells patients that they

are twice as likely to die at an F or a D or C hospital, scaring anyone who wants to go to these hospitals.

And in its FAQ, Leapfrog poses the question about the safety grade. Does a hospital get a better safety grade if it reports to the Leapfrog hospital survey? Leapfrog's response: The hospital safety grade reflects how well a hospital does on safety, not whether they complete the Leapfrog hospital survey.

The evidence will show the opposite.

After being confronted with this website in our motion for summary judgment and after the motion was fully briefed, Leapfrog changed this language, removing part of it. I think that speaks volumes.

Leapfrog tells us to use the safety grade as the first tool in choosing a hospital because it actually -- reflects actual safety. Again, after being confronted with this website in our motion for summary judgment after that motion was fully briefed Leapfrog took this language off their website as well.

Leapfrog's website tells consumers, including insurers, doctors, for the benefit of consumers, patients, and referring physicians that they should use the grades to make decisions about where to seek care and where to direct patients. You will hear evidence that that is exactly what patients and doctors are doing.

So, let's take a look at what a consumer will see if she searches for a hospital on the Leapfrog website.

Let's start with Google search. Hospital ranking Florida, and let's click on Delray Beach. The link to hospital safety grade, that is one of the Leapfrog websites, primary website with the grades, that appears, and then we go to the search, and let's search for Delray. There we go, search.

Okay. So, Baptist Health comes up first. We passed Delray. There is West Boca with a C and there is Delray Medical Center, so they are immediately met with the F grade for Delray. In contrast to the hospitals around it, Delray failed. It is sitting right below a different C graded hospital.

Seeing this grade, why would any daughter waiting with their father to be treated in the ER for his compound fracture do anything other than walk right out the door and drive to a hospital that Leapfrog says is safer, maybe that C graded hospital that we have right there? You will see hear evidence from one hospital that that is exactly what happened.

The damage is done when you see the F or the D grade. It is no defense at all to say that if you just took 50 more clicks and scrolls you would see the explanation.

You cannot click enough to undo the damage of the F or the D grade and that is what you will hear from our experts if it wasn't already obvious.

Leapfrog will argue that despite telling consumers that F grades are the worst hospitals in America, that

consumers will investigate further to fully understand what that F grade means.

So, let's see what would happen if the daughter with her father clicked on the ER clicked on the F for in Delray. All you see is the F grade. So she would then have to scroll down to the next screen, okay, and what we have here are all of these what are called gas gauges. At the top you've got infections, problems with surgery, safety problems, practices to prevent errors.

Now, I want to stop here. Obviously if this hypothetical consumer were interested enough and digging deeper to understand what I will call it the missing days and the failed quizzes, what the equivalence of those were for the hospital, they would have spent time looking through the infections and the problems with surgery and the safety problems, and then they get to this tab, practices to prevent errors.

It is in this tab that three of the four measures, those 15, 25, and 15 and 5 appear. Let's focus on hand washing. Delray scores right there 15 with an asterisk.

Now, recall, the 15 stands for zero because there is no lower score you can get, and if you don't participate in the Leapfrog survey, you also can't get a higher score than 15.

I am not sure what 15 is trying to indicate here, and how you view as other than really not good.

Let's see that footnote, I like to think of it -- I think Leapfrog refers to it as a cleans go footnote.

They say it explains it all. The footnote says the hospital declined to report their performance on this measure so a score was assigned to reflect the lack of information available.

That is just wacky. If there isn't any information, why wouldn't you give a zero? Why would you give a 15? On its face we will show that is deceptive. If it is not clear from reading it, we have expert testimony from Dr. Jonah Berger, a consumer behavior expert from the Wharton School of Business, explaining how a reasonable consumer would work its way through the website and finally get to and understand these various statements that you have to click and scroll to.

In reality, Leapfrog had no data for hand washing. Evidence will show that in fall of 2021 when Leapfrog -- when Delray participated it received one hundred out of one hundred for hand washing.

You are going to hear from Regina West that they did hand washing audits and she will walk through some of that, so it isn't surprising. You will hear that nothing changed with this hospital between 2021 and fall of 2024 when they got the 15. It is not like they stopped washing their hands, and what would 15 mean anyway.

Leapfrog's methodology changed, that is what it means,

and Delray went from a C in 2021 to an F.

Now, this is from the website, and we saw before how to use the grade on the website, but this one tells you what measures are most important, doubling down on the deception, hand washing. Does your hospital have a hand washing policy to ensure all staff members are washing their hands before and after patient contact.

You will hear from the CEOs that that is absurd. They are medical providers, they are in a hospital, there is obviously a hand washing policy. That is not what the 15 conveys.

You will hear from each of the hospital CEOs and they will tell you the effect of the grades on their hospitals, and that in 2025, following the issuance and decline of Leapfrog's safety grades and the media push that followed their hospitals experienced a measurable decline in walk-in emergency department visits. That is for all of them.

That is not because care changed, but because patient perception changed. The grades themselves had real world effects and that is what Leapfrog intended. The grades change where patients went for care. Patients were diverted to hospitals that could not provide the services they needed triggering transfers that delayed care.

Those delays occurred at precisely the moment when time matters most and they impose duplicative costs on patients

who paid once for a hospital visit that couldn't help them, then to get to the hospital that could help them, one of our hospitals, and again for the return to that hospital at a later time and extra cost.

The CEOs will further testify about patient cancellations and avoidance, about physician and physician group decisions tied directly to the safety grades. In hospitals after hospital patients choose to go elsewhere after seeing these grades even though the services and staffing at these hospitals had not changed.

The evidence shows that the grading practice, and will show, that it did more than shape performance and perception, it reshaped patient behavior, it delayed and care and increased costs. Those harms fall hardest on the various patients you will hear our community hospitals serve.

I will rap up shortly. I would appreciate it if I could tell you what you are going to hear and introduce you to our CEOs.

You will hear first from Heather Havericak, the CEO of Delray Medical Center. She worked her way up over two decades from a bedside nurse in Miami to a hospital CEO. Delray serves patients across southern Palm Beach County and they provide critical access points for acute and emergency care.

She will testify that since Delray received its failing safety grades patients have been apprehensive and

anxious and afraid to come to Delray. That is based on her experience as a medical professional recognizing the state of mind of these patients.

Admissions declined as fewer patients arrived through the emergency department on foot, and we have the data to back that up, and fewer physicians choose to perform procedures there.

She will also describe how Delray received a letter from Humana, a major insurer for veterans in the United States, urging the hospitals to address "performance on safety measures."

And that shows that insurers, like patients, were misled into believing that hospitals were unsafe based on the grade. I am not here to defend insurance companies, but I am here to try to stop this unfair practice and the tentacles it reaches are not just heart hospitals and patients, it is the entire health care community, and the entire health care ecosystem.

You will hear from Eric Cazares, the CEO of Palm Beach Gardens Medical Center. He began his career as a nurse in 2001. He now leads a hospital providing acute inpatient care to a rapidly growing suburban community. Palm Beach Gardens is particularly known for its cardiovascular service. You will hear about some of the incredible accreditations it has earned through audited reviews, not just filling out surveys,

and it performs tens of thousands of open heart surgeries each year. Many patients rely on it as their most practical option when an emergency arises.

He will testify that after his hospital received an F safety grade it immediately generated new complaints and concerns from physicians, from patients, community members, board members. I want to pause for a second here.

We call these community hospitals because they are. Their board members are not the fancy CEO of Amazon, they are people like the Chief of the Fire Department. These are community people who are on their board.

Despite no change in services and care, he will describe how a cardiac patient left Palm Beach Gardens, a hospital known for that care, to seek treatment at a facility that has no specialty in cardiac services.

Your will hear from Jarod Hanlon, the CEO of West Boca Medical Center which serves families in western Boca Raton. West Boca provides emergency and inpatient services, and it places emphasis on care for women and children, it has a state of the art NICU. And he will testify that following the issuance and later decline of the Leapfrog safety grades emergency room walk-in volume declined a patients raised concerns about the grade.

He will describe a patient who left West Boca against medical advice and show you the documents that that patient had

to sign in order to acknowledge that he was leaving against medical advice and risking infection because he didn't want to stay because his daughter was so afraid of our score.

Like Delray, West Boca also received a letter from Humana reinforcing that insurers as well as patients were influenced by the grades.

Fourth, you will hear from Cynthia McCauley. She is a long-time health care executive who has led St. Mary's through multiple changes and challenge. St. Mary's is an all-comer hospital. It means the poorest of the poor and the richest of the rich, the dignitaries and politicians, and then a woman who is 16 years old, has diabetes, is pregnant and is definitely going to have a premature baby who will have the use of their incredible children's NICU unit, pediatric care services.

I think she has approximately 30 pediatric specialists on staff at this hospital to deal with patients just like that. It is the only children's hospital between Orlando and Fort Lauderdale.

I have been enjoying my time here in Florida, but I am not from here so I don't know how long it takes to drive between Orlando and Fort Lauderdale, but I know it is not a quick trip when you are pregnant and your child is in danger.

It is the only level one trauma center in Palm Beach County. Let me emphasize that. That means it was found by the United States Government through its accreditation program to

have the level of services necessary for the most acute dramatic emergencies. That would be someone getting shot, for example, or a knife wound that couldn't be handled at another hospital.

She will testify, Ms. McCauley, that she experienced declines in walk-in emergency room volume. Again, services and staffing didn't change. And she will describe something else, which is an increase in patient transfers from a competitor hospital, Jupiter Medical Center.

Jupiter doesn't have the trauma unit. St. Mary's is the only one in Palm Beach County. It doesn't have the pediatric services, it doesn't have the neonatal services. When Jupiter got patients that it couldn't care for it transferred them back to St. Mary's. She will testify and the documents show that they have never seen this level of transfer back from Jupiter.

The transfers delayed definitive care, it increased costs as patients first incurred charges at Jupiter, which got an A, but a hospital unable to meet their needs and then had to be transferred to St. Mary's for treatment.

Finally, you will hear from Sheri Montgomery. She is the CEO of Good Samaritan Medical Center. It is the oldest hospital in Palm Beach County and it has been around for more than a century. They provide emergency, cardiac, specialty services to a densely populated urban community and they have

significant population that relies on Medicare and Medicaid.

She will testify that after Good Samaritan received a failing Leapfrog safety grade those emergency walk-ins declined, admissions declined, and she will explain that several physicians left Good Samaritan to join Jupiter Medical Center in part because their patients were concerned about Good Samaritan's F grade, further demonstrating how the grade disrupted trust and care relationships.

Your Honor, the community hospitals, we don't seek immunity from critique, we seek to stop a practice that assigns failing grades without real data and presents these grades as so-called, quote, safety warnings. The evidence will show that Leapfrog chose leverage over accuracy, chose pressure over transparency and they chose marketing over patient understanding.

The so-called safety grades were made up, 15, 15, 25, 5, made up, but the consequences are real. The community hospitals have chosen patient care as their highest priority. The evidence will show each of these five hospitals, their patients and their physicians were harmed and continue to be harmed by the Leapfrog conduct.

Leapfrog publishes safety grades every six months purporting to update the public on the most current information even when they have no data for our hospitals. Each publication renews fear and compounds harm. There is nothing

these hospitals can do to stop the repeated assaults. They tried, that is why we are here.

We ask for targeted and imminently reasonable relief happen to these five hospitals right here in Palm Beach. If we don't submit a survey and sign Leapfrog's attestation we shouldn't be graded. It is that simple.

If your Honor finds Leapfrog's practices to have been deceptive, there should be redress. I am not asking for money damages, money can't make up for the harm suffered here. Leapfrog should not be permitted to continue promoting old false grades without consequence. They must be taken to task to own up on their website with its millions of views to their deception.

Absent the injunction we are seeking irreparable harm will fall on the hospitals, their patients, and the communities we serve.

Thank you, your Honor.

THE COURT: Thank you.

MS. BLAIR: May it please the Court, I want to first thank your Honor and Pauline and Ramzy and Ginny for all the time you have spent on this case. My client certainly appreciates this. This is a very important matter for Leapfrog, as your Honor noted last week when we were here.

This case is about transparency and accountability as Ms. Maloney said, and it is about what happens when a 20

billion dollar publicly traded hospital system is asked to live with accountability and transparency.

Simply put, the Tenet hospitals want to create credibility of transparency without the responsibility of accountability. The irony at the heart of this case is that these hospitals operate under a banner of Palm Beach Health Network, and that banner, Palm Beach Health Network, is owned and operated by Tenet Heath Care.

Their mission statement, these five hospitals, is results is delivered through accountability and transparency, but nothing about this lawsuit is transparent and nothing about what these Plaintiffs have done has been in the name of accountability. Contrary to that statement, this entire case is hiding their data and blaming the messenger how they are doing it and gas lighting that they are doing it in the name of public safety for their patients.

They filed a single count for FDUTPA, that is why we are here. The focus of this case had never been about the consumers, it has always been about protecting Tenet Health Care Corporation of which these five hospitals are a part of.

In fact, the lawyers in this very courtroom put on their bios that they are here in this courtroom not for these five hospitals, but Tenet Health Care Corporation. They are here representing Tenet Health Care Corporation in a deceptive and unfair trade practice litigation with Leapfrog. That is

why they are here.

It is important to understand that this did not begin with the five hospitals. These five hospitals did not ask us to take their grades out, Tenet did. They served a cease and desist letter asking us to stop grading 76 of their hospitals. It was a bully tactic and that is how it started, and it is ending here with your Honor next week.

Make no mistake about it -- they are not community hospitals, this is a 20 billion dollar publicly traded health care system with an army of lawyers, who spent $10 million not in the name of patients, but in the name of answering for their own safety record.

While they stand here and say it is about accountability and transparency a bench trial allows us to focus on what really matters. What really matters in a FDUTPA case is conspicuously missing. You will not see any transparency, you will not hear from a single patient that was deceived, misled, confused by the Leapfrog grades. You will not see a single one of their experts having communicated with a single consumer.

These stories that Ms. Maloney just told, none of that is in evidence and none will come into evidence. You will not see a single consumer survey having been performed to prove the FDUTPA claim.

You will from Dr. Jonah Berger that he has conducted

thousands of consumer surveys, but he didn't feel like a consumer survey would provide any information about whether or not Leapfrog deceives its customers. You won't see any focus groups, any testing by the Plaintiffs on our websites, none of that in evidence. You won't see any evidence that any patient was harmed, none.

All the stories Ms. Maloney told, none of that is evidence in this case. In spite of all of this -- the other thing you won't see is any of their actual safety data, despite coming to this Court and alleging the limited achievement assignment on the four measures does not reflect how they do on patient safety. That is in the complaint, that is an allegation. The fact that we assign limited achievement on only four of 32 measures, we will talk about it in a second, they say they doesn't accurately reflect how they do.

What is important there is, the easiest way to prove whether or not we are accurately rating them would have been to provide the actual data. They didn't provide it to Leapfrog in survey, which was their choice. They didn't provide it to us in discovery. They didn't provide it to their own experts and they are not going to provide it in this trial. Why? Because it is not good.

The Center for Medicare and Medicaid Services, which is a public company that grades hospitals with publicly available data, that data coming from the hospitals rates each

of the hospitals, four of them as a one star hospital, and only one of the five hospitals is a two star, with five stars being the best.

That is their own data, this is not our data, and 75 percent of the composite health safety grade that is at issue before your court, 75 percent of that comes from that CMS data. That is undisputed.

Contrary to Ms. Maloney's statement that we arbitrarily give them limited achievement on the four measures, it will be clear that limited achievement is the lowest score that a participating hospital gets. We say transparency is important. If you don't want to be transparent, that is your business decision. If you do that, we will score you at the same score that a participating hospital receives. That is what that is.

They talk about Dr. Nicholson a lot. These hospitals didn't share their data with Dr. Nicholson. That is why the counter factual that he will present later today is based on complete speculation that these hospitals would have scored at the national average. He is an economist, he is not a patient safety expert. He runs the math and goes, if they took the survey, guess what? Their grades would be better. That is speculation, that is not an expert opinion. Dr. Nicholson said that is how he ran his counter factual.

You won't see any of their experts even having talked

to a single patient -- I am sorry, to a single CEO. They didn't talk to anybody at this hospital to come to their conclusion that patients were actually harmed. They relied on a declaration filed at the beginning of this case. They didn't do anything to verify that in fact any patient was ever harmed.

Dr. Berger didn't do a consumer survey. Dr. Nicholson will talk about harm, didn't do a single survey. Tom Chakurda will come in and talk about reputational damage. He didn't do a single survey. They are not transparent, not even with their own experts.

Ms. Maloney talked to you how they had the governing boards and they are firemen and police chiefs. That is true, and these people are dedicating themselves to these hospital boards. They didn't even tell their boards they were filing this lawsuit. Why? As I told you at the top of this, it is not about these five hospitals, it is about Tenet Health Care Corporation trying to silence Leapfrog. That is what the case is about.

You will see no evidence that the hospital were aggrieved, which is one of the elements they have to prove. They are not here on a defamation claim, they are on a FDUTPA claim. Revenues are up at every hospital, market share is up, brand recognition is up. They have no nurse or physician retention issues. They are being asked by patients and doctors questions, that is it, somebody asked them a question.

Interestingly, their own expert, Tom Chakurda, is going to tell you what I just said, revenue, brand, market share. Those are the barometers that this Court should look at to determine whether there has been any impact to the five hospitals. Those are their own expert's barometers. They fail on every barometer because nothing has happened to them. That is not aggrievement.

You will see no evidence of causal link. The only thing they have is a couple of the hospitals have admissions that fluctuate. You will hear from Jarod Hamlin that West Boca's operating room was under construction. In board minutes he talks about the fact that because of the seasonal nature of where we are at in South Florida admissions, elective procedures fluctuate, and significant competition.

You will hear from Isa Sambruna, a third party, who is the vice president of quality at Jackson Memorial, a huge Leapfrog supporter and believer in the survey, and she will talk to you about the saturated market of South Florida in health care. In fact, there are 191 hospitals in Florida that are graded by Leapfrog, only ten don't participate in the survey, which is their right. These are five of them. The other five score much better. Why? Because what I told you, 75 percent of their grade is publicly available CMS data.

You will not see any transparency from these hospitals as we go through the trial or accountability. You will see

excuse after excuse after excuse as to why they don't do better for the patients of South Florida. These excuses have been features prominently in their complaint, the news media and press releases, lawyers on TV. These are the excuses they give, and this is what Leapfrog has heard since 2012. They are recycled lies. The first one you will hear is that responding hospitals simply assign themselves the best scores on survey measures and so they do better.

There is no evidence of that. In fact, these five CEOs all testified when they did the survey they didn't over inflate their survey answers. Dr. Nicholson sits on the board of Atlantic Health. His hospitals don't do it. You will hear from Tom Chakurda, the chief of a hospital, they didn't inflate scores. They tell this lie, they repeat it because they are not taking accountability for their own actions.

They will tell the lie that non-participating hospitals automatically receive failing grades, that has been in the media, in their complaint, everywhere? Ms. Maloney told you one percent, one percent of hospitals get an F.

If every hospital received a failing grade it would be a lot more than one percent, that is just math. 21 percent do not do the survey, how could it be one percent? Mr. Chakurda will tell you he bases his opinions on that assumption. Why? Because the lawyers told him that.

In addition, they will tell a lie that hospitals pay

for better grades. There is no evidence that that is true. That is what they say in the news about Leapfrog, and it is simply not true. There will be no evidence presented at this trial as to that lie.

They say Leapfrog charges for consulting fees in exchange for better grades. Again, lie, not true. You won't see any evidence, another excuse why they are failing the patients of South Florida, and you will hear the lie that Leapfrog has no certification process, that is why the hospitals who take the survey can lie about their data, even though there is no evidence about that either.

Last but not least, their favorite, that Leapfrog is a brazen pay to play scheme. That has been said time and time again in this litigation, but there will be no evidence of it. When that lie started to fail they pivoted and now the brazen pay to play is that you have to take this onerous, burdensome survey and it costs them so much money and time and resources, and that is the pay to play. That is what they are going to say on the stand.

But, your Honor, Exhibit DX 618 is in evidence, and that document is from the director of quality, Regina West, to -- I am sorry, Regina West, the director of quality from Palm Beach Health Network, as well as Ricky Ramirez, the chief nursing officer of Palm Beach Health Network, to the president, when they are asking to retake the survey, and they say to the

president, with minimal resources and no cost we can do this survey.

That is their own document, it is in evidence. So this trope that the brazen pay to play is how much it cost them is untrue, it doesn't exist, and they are all supported by fact.

Heather Havericak will testify that they did no investigation into whether or not the allegations in the complaints were true about all these excuses, but rather, they relied on counsel, the same counsel on TV and up here today, telling the lies with no support. That is the answer.

This was a generated lawsuit by lawyers on January 3, 2025, and now we're standing at trial with no evidence of it.

By contrast, when we talk about accountability and transparency what you will see, your Honor, is you will see transparency and accountability on behalf of Leapfrog.

Leapfrog was born out of the necessity of transparency. In 2001 a group of large employers like Boeing and Marriott had a dinner and they were discussing the fact they knew more about the safety of the company cars they were buying than they did about the health care they were purchasing for the thousands of employees that were in their care, and from that Leapfrog was born. Leapfrog mission is simple, transparency saves lives, not only transparency from Leapfrog that you will see in this trial, but transparency from

hospitals.

In 2001, Leapfrog launched is survey. The survey is separate and distinct from the safety grade. There are 51 different measures in the survey that a hospital filled out, a hospital will do the survey, and those results will be published on the website.

At that time, in 2001, expert panels, volunteer expert panels were created for each one of the survey measures. These are people from Harvard and Stamford, the CDC, they volunteered their time to be a think tank. They are not the decision makers, but a think tank. This is a serious issue in this country, and later, 2001 the survey starts.

Later -- well, I should say the transparency you will see about the survey, it is transparent. Everything about the survey is on leapfrog.org, every hospital, every measure, how we score it, everything. If a hospital does not participate in the survey, we tell consumers this hospital didn't do the survey. We don't lie about it, we tell everybody what is going on. It is right there, even in their complaint.

So everything is free and available to the public, on our website about the survey, and the same is true about the hospital safety grade.

In 2012, Leapfrog launched the hospital safety grade for the benefit of the patients. We all agree to that. The safety grade is a composite score, a composite score.

It consists of 32 measures, the vast majority of which come from the publicly reported CMS data that these hospitals publicly report to the Government. That is where the vast majority comes from.

Everything about the hospital safety grade is transparent, all displayed in our website, the methodology, the scoring, the cutoff points, every measure. Ms. Maloney took you through it. You can see it every measure, and it is a measure we had to put the model in effect, the four measures. We conspicuously, concisely, clearly tell the consumer on the website this hospital declined to report this data so a score was assigned.

We don't tell anybody in the public this is some sort of scientific calculation. We give the hospital a fully functional calculator, we offer a free help desk, we offer free town halls, we put methodology changes out for public comment. The 2024 methodology change, totally transparent. In May '24 when Leapfrog decided to change its imputation the methodology, it didn't happen in a single meeting. She showed the drastic measure, that is not how it happened. The imputation model -- Leapfrog had been using am imputation model since 2017, and it had to change over time as different information became less reliable or unavailable.

A discussion -- so that hospital safety grade has an expert panel as well, 79 members, volunteers from the most

prestigious places in America. They are not expert economists, they are clinicians at the CDC, at teaching institutions, medical doctors, nurses, and Phd.s in public health and they volunteer their time.

They have had meetings for years where they noticed the following: Up until the change in methodology in 2024 we had been reporting to non-reporting hospitals the average of their cohort, teaching hospital, 200 beds, we give you that measure. It became clear -- two things became clear at that point in time. The mean was creeping up so high because the hospitals committed to transparency were doing so much better that it was a false statement to patients to say the non-responding hospitals were doing as well as responding hospitals.

The other thing we saw was that certain hospitals participating in the survey were being incentivized to stop participating because they were figuring out, if I don't participate, I will get a better score because my cohort is getting better. That is what you are going to hear.

What the evidence is going to show is why the change occurred, that is it. It wasn't unscrupulous, it wasn't to make money. We are a non-profit institution, you will see our 990s, that is again transparent. They are all going to come into evidence and you will see, last year Leapfrog made revenue of $8 million, less than what these hospitals are asking in

fees. All of this goes back into its mission.

Going back to the methodology change, you will see evidence that the hospitals saw. They figured out what their grade was going to be and they made a knowing business decision not to participate.

And I say they, there is going to be evidence that Tenet Health Care Corporation told them they couldn't participate. You will see that each of these hospitals wanted them to come back and Tenet Health Care said no, no from home office. Home office only supports the Leapfrog survey if it is tied to payment, contract, or local regulatory requirement.

Tenet Health Care to make this decision to file this lawsuit and stop participating in the survey.

I want to talk briefly about the website.

Our website was designed in 2012 with the assistance of a low literacy user experienced expert, you will hear that evidence, and it was designed to be readable for a reasonable consumer.

Plaintiffs don't even have a low digital literacy expert to come in and inform you about whether or not this website complies with a concise, conspicuous, and clear presentation of Leapfrog's information. We do, they don't. They didn't bother because it is not about the consumer in this case, not about whether the consumer is being misled, it is about them hiding their data.

I want to go back to the finances. We heard a lot about how we sell these hospitals data. That is not true. You will hear what Leapfrog sells is its own intellectual property, we sell our logo. If a hospital gets an A, and they want to use our logo to advertise it they have to pay a fee, just like U.S. News and World Report. We have to do that to keep our IP intact, and we do it, nothing wrong about that, but I will tell your Honor that if a hospital wants to promote its safety grade they can do so for free as long as they don't use our logo. We provide them a free tool kit to do that, again, all on the website.

That is another trope, we are not transparent about our revenue, our data. All we sell to data licensee is what you see on the website, that is what we sell them. We put it in a useable spreadsheet. We don't sell hospital raw data to anyone, that is clear as day in this litigation, yet we are hearing it in opening statement.

Last, your Honor, Leapfrog, they are accountable, their people are accountable. Plaintiffs have called one-third of the Leapfrog staff, approximately one-third to come and testify before your Honor. These are people who have flown in from various parts of the country, and they are here to give to your Honor truthful and credible testimony about what they do and how they do it. You will assess their credibility on that. They give a hundred percent of their time to the mission of

Leapfrog, which is to prevent harm, preventable harm to patients.

The other thing you will see about accountability, is that Leapfrog follow the signs.

Again, they want to create a story in your mind, Your Honor, as we go through this trial that in a 20 minute expert panel meeting on April 12, 2024, this new methodology was born out of apparently a slack message between Missy Danforth and Ms. Campione, that is not true.

You will see minutes from 2017 onward where this issue about what do we do about non-reporting hospitals and the fact that we are assigning them scores that are most likely inconsistent with their actual performance.

Ms. Maloney is right, the only way to know how they actually performed is to provide data. They didn't provide it to Leapfrog, they didn't provide it in discovery, they didn't provide it to their experts and will not provide it in this trial.

Leapfrog is accountable for its mission, unlike the Plaintiffs in this case who profess what they are doing here, $10 million, army of lawyers, they profess they are all doing that for patient safety and the people in South Florida, despite the fact that they didn't speak to a single consumer survey.

Leapfrog is to demonstrate the mission is to stand up

for those same people. That is what they are doing, they do it fully and transparently and they are accountable for it, which is why they are here in the courtroom today.

At its core this case is not about ratings, methodologies, not about a 20 billion dollar corporation suffering at the hands of a 20 employee not for profit.

It is not about asterisks, and it's not about clear and concise disclaimers on web pages. From the Plaintiffs' perspective, it is not even about the patients because we are not going to hear anything about them. It is about accountability, their accountability for a safety record, which CMS, the Government, says is poor.

Accountability to the public and their own accountability for their knowing business decision in choosing, which is their right, not to participate in our methodology, and we tell them up front, we tell the patients, the hospital what happens if you don't participate. To reward hospitals for not being transparent would be contrary to our mission.

We are here because Tenet Corporation wants the credibility of transparency without the responsibility of accountability, and they want this courthouse and this FDUTPA statute to insulate them from that accountability.

We know this because the relief they seek is not a better website for patients, better communication to patients, something that has to do with consumers, that is not the relief

they seek. The relief they seek is that they never be graded so they can compete in the shadows. They don't like the fact that Leapfrog shine a light on their patient safety. They don't like that, and they hope this Court will offer them the opportunity to slide back into the shadows.

That is why we are here. This whole case is nothing more than the bully playing the victim. Leapfrog did exactly what it said it would do, it provided patients with a clear, concise way of looking at patient safety.

And so, in this courtroom it is all about the facts, you can't hide from them. That is the same thing that Leapfrog is doing with what they are doing. It is about transparency, it is about accountability to the patients.

I thank you for your time. I will pass on to the Plaintiffs. Thank you.

THE COURT: Thank you. Why don't we take 15 minutes, and come back at 20 minutes till to start hearing witnesses.

(Thereupon, a short recess was taken.)

THE COURT: Okay, please have a seat.

Okay, what is next?

MR. MARCUS: Your Honor, the Plaintiffs call Heather Havericak.

HEATHER HAVERICAK, PLAINTIFFS' WITNESS, SWORN

THE WITNESS: My name is Heather Havericak, H-E-A-T-H-E-R, H-A-V-E-R-I-C-A-K.

DIRECT EXAMINATION

BY MR. MARCUS:

Q. Ms. Havericak, can you please tell the Court why you began a career in health care?

A. Absolutely. When I was growing up, at the age of 12 my mom was diagnosed with head and neck cancer, and that really sparked my interest in becoming a registered nurse.

Q. Could you give the Court a brief description of your background in health care?

A. I started as a registered nurse at Miami Children's Hospital in 2002, which is now Nicklaus Children's Hospital. I worked there for about five years taking care of children with blood disorders and cancers and bone marrow transplants, and then I went on to work in the pediatric emergency department and trauma center.

After that I transitioned to Broward Health Medical Center where I started as a registered nurse, and really thereafter, for a span of 16 and a half years I was in a variety of positions, moving into the clinical nurse manager of the pediatric -- the clinical manager of the pediatric hematology oncology unit and the pediatric palliative care program. I went on to be the oncology service line director and then the director of all product lines at the facility.

I then moved into associate vice-president of strategy and planning and then chief operating officer, and then chief

Executive Officer at Broward Health Medical Center prior to coming to Delray Medical Center.

I came to Delray Medical Center in January of 2024, where I served as the chief operating officer for a couple months. I became the interim Chief Executive Officer in Delray Medical Center in May 2024, and became the permanent Chief Executive Officer in July 2024.

Q. Do you still hold an active nursing license?

A. I do.

Q. Do you have occasion to still do clinical care directly?

A. I do, in my daily hospital today I round on patients every day to check on the staff members and check on the patients' quality of care.

During COVID, while I was serving as the Chief Medical Officer at Broward Health Medical Center, there were many scarce resources we were all facing because we had had so many patients come in, so I would help in our COVID intensive care unit where I would help turn the patients and we needed to turn the patients. I would also come in quite frequently to help the staff on the units with anything that they needed and did help with postmortem care when we were seeing a high number of patients who were losing their life during the COVID pandemic.

Q. How would you describe your responsibilities as the CEO?

A. I am responsible for the overall patient safety, quality, the financial performance, the strategic planning and the

business development.
Q. Can you tell the Court about your hospital and the community it serves?
A. Absolutely. Delray Medical Center has been a trusted partner for the Delray Beach community for over 40 years. We serve a very much elderly population. If you look at the surrounding area, we have a lot of 55 and over community, so it is definitely a medically complex patient population.
We are one of two level one centers in Palm Beach County, Delray is a level one adult and pediatric trauma center. We are a comprehensive stroke center, so we take of care of the sickest patients that have stroke. We have an advanced additional neuroscience service line. We have a robust spine and orthopedics program and we have a wonderful robotics program as well. On our campus, we also provide behavioral health services in our Fair Oaks Pavilion, and we also have a proton beam center on our campus.
Q. How would you describe your patient population?
A. We serve an very elderly population, our average age is from 78 to 82 years old, so they have a multitude of co-morbidities, meaning they have multiple medical conditions.
Many of the patients in our area are a little bit sicker than some of the other surrounding areas that would be to the south of us.
Q. On average, how many patients a year come to Delray Medical

Center?
A. A little less than 116,000.
Q. How many employees work for Delray Medical?
A. We have about 1600 employees.
Q. We heard about something called about the Palm Beach Health Network. Could you explain that?
A. It is the system or network that all of our facilities belong to, so we have Delray Medical Center in the south, West Boca Medical Center in the south community, and as you move north throughout the community, you have Good Samaritan medical Center, Palm Beach Gardens Medical Center, St. Mary's Medical Center and we just opened another hospital in September, Florida Coast Medical Center.
Q. And what is the purpose of the network?
A. The network is all of our Tenet facilities that are within this area, but it is really important because each of our facilities has different clinical services that they provide.
When we work together as the Palm Beach Health Network we are able to provide for the whole community. Where one hospital may not have those advanced services, we can provide the services within the Palm Beach Health Network so patients do not have to leave the community for their care. We do have a centralized patient transfer center to allow us to keep them in Palm Beach County.
Q. Is Delray Medical an accredited hospital?

A. We are, yes.
Q. Could you explain to the Court what it means to be an accredited hospital?
A. Hospitals are accredited by either the Joint Commission or DNV.

We are credited by the Joint Commission, so the Joint Commission accredits hospitals, they come in every three years for something called a triannual survey. They could come in at any time unannounced during that triannual period, but they come in to look at all of your policies, procedures. They look at all of your quality data and they come in and actually do what we call tracers throughout the hospital.

So they actually follow our teams with surveyors to ensure that the quality of care we are delivering is appropriate and consistent with our policies, procedures, and then the outcomes that we have provided.

Every three years when they come on site, they are there because we are a larger hospital, we are 536 beds. They are on site for four days. We will have anywhere from four to eight surveyors that will be with us throughout that duration. During that duration, when they are out talking to staff members, to physicians, they interview patients as well.
Q. Do the surveyors in the Joint Commission provide the hospital with feedback during their visits?
A. They do provide feedback. Throughout the course each day

typically they will do surveys from eight to nine hours a day. At the end of that day they do something called a summation, that is where all the surveyors come together because each of them are covering a different part of the hospital. That will give the whole team an idea what they have seen for the day, what kind of best practices they may have seen and what they may need to get clarification or more information on.

After that fourth day is done, there is a larger more in depth summation that takes place. It gives us all the findings, applies it on a safer matrix, which tells us if the finding has a higher safety risk and what the priority is going to be. And that report goes to the Joint Commission's home office that is in Chicago, and we typically get the final report within about 14 business days.

Q. Besides from the Joint Commission, does Delray Medical have other accreditations?

A. We have a variety of accreditations. For our the comprehensive stroke program we are accredited by the DND. There were three surveyors that came on site for that visit. All of three of them were advanced practitioners in the neuroscience phase. We are accredited through the Department of Health for our trauma services, so they come on site every three to seven years.

We are accredited through the Surgical Review Corporation for robotic center and an endoscopic robotic center as well.

We just earned that designation, we were the first in the country. And we also have accreditation with the American College of Surgeons as a bariatric center of excellence.
Q. Is the accreditation process for these organizations you mentioned similar to what you described?
A. Yes, each of the bodies come in for site evaluation visits.
Q. During the opening we saw a slide about some of the awards that Delray Medical has won. Are there a few that are significant to you?
A. Yes, for 2024 and 2025 we have continued to earn additional designations. Last year we were one of the 250 best hospitals, this year one of the best surgery hospital, and we won awards in cardiac services, in GI, pulmonary and critical care which we are proud of.
Q. Prior to coming to Delray Medical were you familiar with the Leapfrog Group?
A. I was.
Q. Can you tell the Court how you were familiar?
A. I became familiar when I was in my chief operating officer role and then in my chief executive officer role.
Q. At that time was Broward Health you participating in the survey?
A. We did, yes.
Q. Can you describe what your role was in that participation?
A. I was more involved when I was interim CEO and then CEO.

My responsibility was to ensure that everything being submitted was accurate, the data was accurate. We would match it up to be looking year to year to make sure we didn't have data entry errors.
Q. How lengthy was that survey packet?
A. It is large. It is not the just about filling out the survey, there are multiple people on a team that are filling out components of the survey and ensuring the process and programs are in place.
Q. How many hours did it take Broward Health collectively to complete that?
A. It would take us about a thousand hours, and there are six or seven people that have to work on that to make sure everything is accurate and complete.
Q. Is part of the work to verify the data you are submitting?
A. Yes.
Q. Is that very important for the hospital to do?
A. It is very important. When I was at Broward, I wasn't the CEO yet, one of our team members had an error in what they submitted.
MS. BLAIR: Objection, your Honor, hearsay.
THE COURT: Overruled.
BY MR. MARCUS:
Q. You may answer.
A. There was a data submission error, it was either with the

bar code medication scanning or the entry. That number wasn't correct, and we tried to get that changed during the embargo period because that pulled the score down to a D, and we were not able to get that change.

Q. What effort did you make?

A. Our quality director was trying to get that changed.

Q. And were you successful?

A. We were not.

Q. Did it affect your score?

A. It did, we got a D as in dog.

Q. You came to Delray Medical, when did you first become aware of the Leapfrog survey as it pertains to Delray?

A. My role changed throughout that year, so I became more integrated in what was going on with Leapfrog in the latter part of 2024.

Q. And you became a permanent CEO in July?

A. July 14, 2024.

Q. I want to bring up an exhibit that has been admitted by stipulation, I think it is PX 34.5.

We saw this in the opening slides. Do you recognize this screen?

A. I do.

Q. And this is the grade for Delray Medical from Leapfrog Group?

A. That is the grade.

Q. This is as of the fall of last year?
A. Yes.
Q. It shows an F?
A. Yes.
Q. Could you move down to the gas gauge measures.
Did you become aware after you became CEO of Delray of a change in the methodology for the scoring of this Leapfrog grade?
A. I recall becoming aware of it closer to the time when the grades were going to be released, so that would be sometime in November '24.
Q. Did you do anything to investigate what the scoring was or what it was based on?
A. I didn't personally do a lot of work on that, my quality director did.
Q. As a hospital collectively, did you come to learn anything?
A. Yes. Historically these measures had had a numerical value that was given for non-participating hospitals, but now we would be assigned the lowest performing of all hospitals because we were not going to be submitting data. There was another measure.
Q. There are four measures that were treated that way in the new methodology?
A. Correct.
Q. This screen is showing three of them?

A. Yes.
Q. Let's look at the first one, the doctor's orders.
Do you see this?
A. Yes, computerized order entry.
Q. Justin, can we scan down.
This is the CPO measure. Have you heard of that?
A. Yes.
Q. This was the score Delray was assigned last year?
A. That is correct.
Q. The 15?
A. Uh-hum.
Q. That is the worst score that any hospital achieved on this survey?
A. That is correct, but again, we did not submit data.
Q. The best hospital score is a hundred. Do you see that?
A. I do.
Q. Under the section what safer hospitals do, it says hospitals use CPO systems in all areas of the hospital and regularly test those systems to ensure they are alerting doctors to potential ordering errors. Do you see that?
A. I do.
Q. Does Delray Medical have a system like that?
A. We do.
Q. Has it been in operation since you have been CEO?
A. It has.

Q. Was it in operation before you became CEO?
A. Yes.
Q. Have there been any changes to the system going back to say 2020?
A. Not that I am aware of.
Q. Does Delray Medical take steps to regularly test the system to make sure it is being complied with?
A. We do. We did ongoing testing, and then I have score cards and metrics with the physician providers and that is shared with them in our monthly meetings. We had a meeting yesterday with all our hospitalists, and they have the score for CPOE, and they have to be performing at a specific threshold that is within our medication administration record policy and procedure, and CPOE compliance is noted in the rules and regulations of Delray Medical Center.
Q. And just turning your attention while we have it on the screen, do you see there is a question mark circled? Do you see that?
A. Yes.
Q. That is a different measure, is it not?
A. Yes, it is a different measure.
Q. It is staff working together to prevent errors. Do you see where it says decline to report?
A. I do.
Q. For this fall 2025 year, did Delray Medical provide any

data to Leapfrog Group for that measure?
A. No.
Q. Let's look back at the CPO measure we are discussing. Did Delray Medical provide any data for this measure?
A. We did not.
Q. Did you provide data to Leapfrog Group for any measure?
A. We did not.
Q. Do you know why you received a question mark in this category, but a score in the three to the left of the screen?
A. I don't know why. It doesn't really make any sense. You would think the question mark would be on the others that we didn't submit data on either.
Q. Justin, can we go down to the second measure, safe medication.
Is this measure commonly referred to as the BCMA measure?
A. Yes, the bar code medication scanning.
Q. And you received a 25 in this survey?
A. Yes.
Q. Which was the worst score of any hospital in the country?
A. That is correct.
Q. For this survey, the average score was 85.2?
A. Yes.
Q. And just going down again to what safer hospitals do, when hospitals use bar coding technology effectively for all orders medication errors have been far less frequent.

Does Delray Medical have employees in the BCMA system?
A. We do, and it used for all of our nurses and staff members that administer medication, and it is included in the medication administration policy and procedure, and it is tracked by our the chief nursing officer for all of the nursing staff and respiratory therapists to make sure everyone is in compliance. If they are not, those staff members do go on an action plan or we dig deeper into the areas to ensure the tools and equipment are working properly.
Q. And to your knowledge, you know, through the present day, through today, what is the compliance like for this measure?
A. Our compliance is greater than 90 percent.
Q. You don't have physicians in a regular practice writing prescriptions by hand anymore, do you?
A. No.
Q. Has that been true for many years?
A. Yes.
Q. Justin, could we go to the third measure, the hand washing measure.
Let's look at this one. Again, you received a 15, which was the worst score of any hospital in the country; is that right?
A. That is correct.
Q. The average for hospitals was 76.1?
A. Correct.

Q. Just turning to what it describes for what safer hospitals do, it says hospitals provide training and implement policies to make sure that all hospital staff cleans their hands before touching a patient. Do you see that?
A. I do.
Q. Does your hospital provide training and implement policies to make sure your hospital staff washes their hands before touching patients?
A. We do.
Q. Can you describe your policy and the processes you use to ensure compliance?
A. There is an infection protection compliance policy that incorporates our hand washing guidelines programs. Every new staff member, no matter what part of the hospital, has a training on hand washing. We do hand washing in each nursing unit and those surveys must be turned into quality every month, and those are calculated by unit, by discipline so we can understand trends if people are not washing their hands.
The surveillance tool will show did the person fall in using waterless hand soap or did they use soap and water because different patient conditions might require you to use a different method of hand washing.
That information is shared in our monthly infection control or prevention meeting, and that information rolls up into our monthly quality meeting.

If there are fallouts, meaning people are not having good hand hygiene compliance, they are coached on the spot in a very professional way telling them they missed a moment of hand hygiene.

If there is different disciplines, say people who passed the food trays, if they had trends of not washing their hands properly we do tailored education with hands on where they have to do return demonstrations for us so we make sure that compliance trends upward.

Q. What is your hospital's compliance with this?

A. Right now or our hand hygiene compliance is at 82 percent.

Q. I want to pull up to Plaintiff's 34.6, and I want to direct your attention to the third column, the third measure starting from the left. Do you see that, specialty trained doctors care for ICU patients?

A. I do.

Q. Is that the ICU staffing, the fourth measure?

A. It is the ICU staffing measure.

Q. Okay. Again, next to it, these two measures with question marks that say declined to report, those are also measures for which your hospital did not submit any data to Leapfrog?

A. That is correct.

Q. Justin, could we move down to the description of the ICU measure.

Again, your hospital got a 5, which was the worst score of

any hospital in the country, right?
A. We did.
Q. The average was 67.86 this time?
A. Yes.
Q. Under what safer hospitals do, hospital staff, ICU, have training in critical care medicine. Does your hospital have physicians trained in critical care medicine?
A. We do.
Q. Would you explain it?
A. We have three intensive care units, one is trauma ICU, that is staffed 24/7 by trauma medical care medicine physicians and nurse practitioners that are there on site 24/7. Our neuro ICU, our cardiac ICU are also staffed by critical care board certified physicians 24/7. There are two ICU physicians on site throughout the day and two on night, so they are always on site and they each have a health professional that supports them as well.
Q. You mentioned earlier you are a level one trauma center?
A. Yes.
Q. Is it required for being a level one trauma center to have ICU dedicated staff?
A. It is.
Q. What would happen if your hospital failed in having the requisite ICU staffing?
A. We would be at risk of losing our trauma designation.

Q. Has anything like that ever happened?
A. It has not.
Q. Justin, can you bring up PX 8. This is another exhibit from the Leapfrog website admitted by stipulation.
Ms. Havericak, I want to direct your attention to the sentence starting with -- the last sentence.
Do you see where it says the analysis also found that D and F hospitals carry nearly twice the risk of mortality of A hospitals. Do you see that?
A. I do.
Q. Does your hospital carry twice the risk of mortality of A rated hospitals?
MS. BLAIR: Objection, calls for speculation.
THE COURT: Overruled.
THE WITNESS: It does not.
BY MR. MARCUS:
Q. Is there publicly available data you have been able to look at for that?
A. There is.
Q. Can you describe that?
A. It shows overall that we are 16 percent better than the national average.
THE COURT: You are what better?
THE WITNESS: 16 percent.
THE COURT: Better than?

THE WITNESS: The national average. And that would be in cabbage, pneumonia, and AMI, just to name a few.

BY MR. MARCUS:

Q. Let's go back to November 2024, when you first learned about the failing grade that was coming out from your hospital.

How did you learn about it?

A. Well, I knew the grade was going to be coming out because our quality director had circulated it to us.

Q. And what was the reaction within your hospital?

A. I was very concerned as the CEO that we were going to have a published failing grade.

Q. What actions did you and your hospital take in response?

A. So I personally, I sent an email when Stephanie, my quality director, sent me an email that my grades were going to be published, it would be an F, I said this is unfortunate, and I said, do we have a PR plan in place. I was very concerned about the damage this was going to have on our patients and the community.

Q. What kind of damage were you concerned about?

A. Patients delaying care. We serve a very elderly population, they have a variety of health care issues, and a delay in care could be life or death for them.

It didn't seem fair that we were being assigned this false grade and we needed to do something to offset that and to give the public clarity.

Q. Was there publicity that ensued for this failing Leapfrog grade?
A. There was. There was things on the news stations which we saw this morning, op eds that came out citing our hospital and what it was like in 2014. There were other social media targets, and some things came out later after that as well.
Q. You mentioned social media. Was there any publication on TikTok about your hospital?
MS. BLAIR: I object to hearsay. We previewed this in our motion in limine that there is no foundation or authentication of this TikTok video the Plaintiffs want to offer into evidence.
THE COURT: How do you seek to use it?
MR. MARCUS: Your Honor, it comes in for the significance of the publication and the impact on the community and her hospital. She personally has seen this video, it has been shown to her. We plan to show it to you, it is about 90 seconds.
THE COURT: It doesn't seem they are using it for the truth of the matter asserted.
MS. BLAIR: They are, they using it to say that Leapfrog's grades are what is at issue and Leapfrog is not mentioned in this --
THE COURT: That would be more of a relevance objection.

MS. BLAIR: That is a relevance objection, but there is an authenticity and foundation issue. The TikTok video for which they want to enter how many views the TikTok video had, there have no information about how many AI bots clicked on this and who generated this and for what purpose it was generated for, and it is also prejudicial. So I would say foundation, hearsay and relevance, your Honor.

THE COURT: All right. I am going to overrule the objection with respect to hearsay. I think it is not being introduced for the matter asserted.

It seems relevant. I probably need to see it to have any kind of sense of authenticity, or some description of where she saw it.

BY MR. MARCUS:

Q. I will do that.

How did you become aware of this TikTok video?

A. I had various physicians saying, have you seen the video, sending me the video via text, and they would show it to me when I was in the hallways of the hospital. I was out to dinner with friends and they showed me the TikTok video, they said what is happening at your hospital, it is concerning. You are a level one hospital --

MS. BLAIR: Objection to what the members of the community said to her.

THE COURT: Overruled.

BY MR. MARCUS:
Q. Did anyone show you the video?
A. They did, numerous people.
MR. MARCUS: Can you play it for the Court.
(Video played.)
BY MR. MARCUS:
Q. Ms. Havericak, the video referenced an F grade that your hospital received in the fall of 2024; is that correct?
A. That is correct.
Q. Did you receive an F in the fall of 2024 from the Leapfrog survey?
A. We did.
Q. Has Delray Medical received an F score from any other institution to your knowledge?
A. We did not.
Q. That is the only F grade you received at that time?
A. Correct.
Q. In fact ever; is that right?
A. Correct.
Q. Have you seen any -- as CEO, do you look at admissions data on a regular basis?
A. I look at it every day.
Q. How does your hospital track admissions?
A. We have a variety of different programs. There is one called kaleidoscope and we get a snapshot through that through

the daily admissions portal, so we can see admissions, the type of admissions, inpatient, out patient surgery, what we are doing in the cath lab, all our length of stay and key indicators.

Q. You say you check it daily?

A. I do.

Q. Does it reflect walk-in data to your emergency rooms?

A. It does. It will have ED admissions, and ED or emergency department what we call treated and released patients.

Q. Does it track patients brought to your emergency room by ambulance?

A. That particular data set doesn't the track that, but we track that on a monthly basis to see how many patients are being brought in from our fire rescue partners.

Q. What are the rules with respect to where an ambulance takes a patient in Florida?

A. There is a variety of different municipalities that come to us for fire rescue, most of those are standardized. If it is trauma, they have to go to the closest trauma center. If there is a Plaintiff having a heart attack, they have to have a stable facility, which we are. The same would hold true if they see a stroke patient having a stroke in the field, they are able to bypass a primary center to bring them to the higher level of care.

Q. And from 2024 through last year, was there a decline in

your walk-in admissions data?
A. Our treated release walk in had a seven to eight percent decline.
Q. In that same time period, was there any decline with respect to the ambulance population?
A. There was not. We went up about 6 percent or 1100 runs.
Q. As CEO, is it your responsibility to understand the impact of declines in admissions in the hospital?
A. Yes.
Q. Is it your responsibility to try to understand the reasons why it may be down?
A. Yes, that is an important part of my responsibilities.
Q. What did you find in terms of the reasons that the walk-ins would be down while the ambulance would be up?
A. We didn't find anything except the disparaging grade that we were assigned.
I go out, I meet with all the community physicians that send their patients there, the population growth in our community continued to be very stable and growing. So, really there is no other indication or reason besides the failing grades. Those are people that have choices that can walk in. There were not any other competitors that added urgent care or free-standing emergency departments, so that was not the cause.
Q. What about the population, has that decreased or increased?
A. It has continued to increase.

MR. MARCUS: I would like to introduce at this time Plaintiff's Exhibit 550.

THE COURT: And just in terms of our procedure, when you are introducing these and referring to numbers they are by agreement; is that right?

MS. BLAIR: This document was produced on January 6th to us, so we have not agreed to this document. We don't have any indication of who prepared it, how it was prepared, where it came from, why it wasn't provided to us during the course of discovery or at least supplemented to us. This is an issue with many of the documents we are going to see throughout this trial.

MR. MARCUS: It is a summary of the testimony you just heard about the data for Delray Medical between walk-ins and EMS ambulance admits. I believe Ms. Havericak said this is something that is tracked, kept in the regular course of business, tested for accuracy.

THE COURT: A summary, you have to give notice, and a summary has to represent underlying documents that have been produced or they have some knowledge of. Isn't that the case?

I mean, I heard her testify as to her perception. Did they ask for this before?

MR. MARCUS: We did produce this information, but it didn't go through the end of the year. This is simply updated through the end of 2025, so it was produced in the beginning of

January, but it goes through December 2025. It had similar admissions data through a good part of 2025 that was produced.

THE COURT: The underlying data was produced except for --

MR. MARCUS: The last couple of months.

MS. BLAIR: Your Honor, we have no such data that shows this percentage change.

THE COURT: How about the admission data? Percentage is math.

MS. BLAIR: We received some admissions data, but we were informed recently that they are no longer looking to put it into evidence in this trial. It was on this document.

We have some admissions data, what they pick and choose to attach to various motions they filed. No, I don't have all of the underlying data for all of these hospitals. If I am wrong, I would love to see the backup data, but no, your Honor. I have been working on this case tirelessly for seven months, I don't have this.

THE COURT: You are saying you don't have any data or only --

MS. BLAIR: I have some data, but I do not believe it goes back to 2023, and it certainly does not show the change, and the data we have looks significantly different. They have data that talks about elective surgical and documents, so I don't have anything like this prior to January 6th. It is a

cumulative document that I believe they prepared for this litigation.

THE COURT: A summary is often that.

MS. BLAIR: I don't have the backup.

THE COURT: My question is: Have you seen the underlying data? Have they except for a month or two or not?

MR. MARCUS: The numbers certainly for 2024 and 2025, again. It stopped, they had it as we produced it. We updated it in January for end of year numbers. To your point, the percentage change is simply math.

THE COURT: I am going to overrule the objection. Point to any -- I am not sure it adds that much to her testimony. I will overrule the objection. It sounds like you had at least some of the underlying data. A summary looks like it is largely math at this point.

MS. BLAIR: Your Honor, I want to put on the record that we have never been able to test any of this data, so over my objection. I understand, your Honor.

THE COURT: All right. Go ahead. 550 is admitted.

(Whereupon Plaintiff Exhibit 550 was marked for evidence.)

BY MR. MARCUS:

Q. What impact does this have on your hospital if walk-in admissions to the ER decline?

A. It is going to have an impact on revenues, on our admissions. When the revenues start to decline in a profound

way it becomes very difficult to continue to invest in our complex tertiary services. We have very high level service lines at Delray, and if those revenues go down it is difficult to invest in those things, and that has an impact on the community because those services wouldn't be able to be offered.

Q. The ambulance you talked about earlier, what is the reason why EMS requires ambulances to take an emergent patient to the nearest hospital?

A. For the services offered and the time frame. If it is a patient having a heart attack, they need to be -- minutes matter. They need to be taken to place that has a cath lab to do interventions, get them on the table so we can get the catheter into the patient and help save the patient from a heart attack.

The other thing is stroke. If you don't go to the right hospital that has the capabilities to take care of people with strokes you are going to have bad outcomes and that is not going to be good for patients. We can save the brain, we can get them into interventional radiology because we have all the teams and the services that need to be available to treat the very critical patients.

The same holds true with a trauma, you have to be able to get those patients to a level one trauma center and we know that those patients do far better when they are triaged in the

field by EMS and brought to the appropriate place.

Q. Are those risks magnified? So for patients that live near Delray Medical, if they are afraid come to your hospital because they feel it is unsafe and go to a hospital further away, are those risks that you just described magnified?

MS. BLAIR: Objection.

THE COURT: Overruled.

THE WITNESS: They are.

BY MR. MARCUS:

Q. What about Humana; how much of your patient population have Humana insurance?

A. About 30 percent.

Q. Do you have a lot of Medicare patients?

A. A lot of Medicare and Medicare Advantage patients, yes.

Q. Did you receive a letter from Humana at your hospital based on the grade that was assigned to you?

MS. BLAIR: Objection, hearsay. This is another document we were not provided until January 6th, and it was available in discovery, and it is addressed to whom it may concern.

We object to it as not being produced to us, and we did not have an opportunity to test it.

MR. MARCUS: Your Honor, there are two letters, one was sent to them in the summer, in July 2025, that has been produced. It was timely produced in discovery.

There was a recent letter in December, very similar to the first, that was sent to Delray Medical. That is the one we turned over in January because it was just given to us in December.

It's two different documents, I was going to offer both. We are not offering the letters for the truth of what is in the letter, it is for the fact that Humana has written to them, it is significant. It goes to the state of mind or the belief of the declarant, which would be Humana. It is not being offered for the truth of what is in the letter.

THE COURT: You got the first one, but not the second one?

MS. BLAIR: I got the first one. It is being offered for the truth of the matter asserted because they are trying to offer it to say that Humana is telling them based on Leapfrog's scores basically they need to do better with patient safety. It is certainly being offered for the truth of the matter asserted.

THE COURT: I will overrule the objection. What is this number?

MR. MARCUS: Your Honor, the first one is PX 465.

THE COURT: 465 is admitted over objection.

MR. MARCUS: The second is PX 549.

THE COURT: Also admitted over objection.

(Whereupon Plaintiff Exhibits 465, 549 were marked for

evidence.)

MR. MARCUS: Justin, can we look at the first letter. Can we make it bigger.

BY MR. MARCUS:

Q. You and your hospital received this letter July 15th of last summer?

A. That is correct.

Q. And just looking at the first sentence of the second, Humana wrote to you, "We strive to ensure TriCare beneficiaries receive health care at facilities that provide care in a manner that meets or exceeds the safety measures used in the system."

Do you see that?

A. I do.

Q. The next sentence, "Consequently, we are providing you this information to encourage your facility to review your Leapfrog hospital safety grade to identify any factors that may have contributed to your performance on safety measures."

Do you see that?

A. Yes.

Q. "We ask you to respond to this letter within 30 days of receipt regarding your strategy to improve performance."

What did you do in response to receiving this letter in July?

A. We didn't take action because we were already working on process improvement in our hospital. We didn't participate in

the Leapfrog survey and we were working on the things in the CMS star rating that we had opportunities on. There wasn't anything to provide for them.
Q. In the next paragraph, "If you don't currently have a plan in place to address your performance measures you should consider reviewing the Leapfrog Group's information regarding the Leapfrog hospital safety grade and scoring methodology used on their website."
Do you see that?
A. I do.
Q. Did you receive a second letter late last year?
A. We did. I think the last week of December that one came through.
Q. Okay. And when they tell you, "We look forward to hearing about your improvement strategy," did you take this as a reprimand from Humana?
A. A little bit.
Q. Did you think this was a fair representation of your hospital's safety or quality?
A. No.
Q. Justin, can you pull up the second letter.
This is the more recent letter that came in December?
A. Yes.
Q. It is very similar to the first letter, is it not?
A. It is almost identical, yes.

Q. Again, have you taken specific action since you received the second letter?
A. No, because we already have process improvement and safety plans in place. There is not anything else we need to address with them.
Q. What has been the impact on your hospital -- aside from the admission data, the Humana letter, what other impacts have you identified to your hospital as a result of the publication and publicity surrounding this safety grade?
A. It has caused confusion and has caused our community's confidence to be shaken. I go and I round every day in our hospital, I go to see three to four patients every day. I can tell you in my rounds about two months ago, I was in the med tele unit and --
MS. BLAIR: Objection, your Honor, eliciting hearsay. She is going to talk about patients that she allegedly spoke to. They have never been disclosed, and she is going to talk about conversations she had with patients specifically related to Leapfrog.
We asked interrogatories, we asked for requests for production of patients' names. All of this -- none of the interrogatories were ever disclosed and what she is going to testify is absolute hearsay that we have not been able to test.
THE COURT: What is your response, Mr. Marcus, as to introduction, I guess, of her testimony about when she does

rounds and talks to people?

MR. MARCUS: We are not offering it for the truth of the statement. Again, it is coming in to show the state of mind of the declarants. There are lots of cases. We cited some in other briefing before you. Again, confusion evidence, state of mind of a speaker is an admissible non-hearsay purpose.

So it is not being offered for the truth, but this is their state of mind, they heard something and acting on it and it is being communicated to the hospital. Some of it is in the course of deciding their medical care and treatment, so it would come in under the patient care treatment exception, again, there will be different iterations, again, not being offered for the truth.

With respect to the production, that is really a mischaracterization. Yes, there was discovery served. There were objections lodged by us. There was never a motion to compel before your Honor on this issue.

Obviously, we are not allowed to disclose patient names under HIPAA without a court order, nor are we allowed to troll or try to recruit them to be witnesses in a third party litigation like this. That is the HIPAA, but there is never a motion brought by Ms. Blair to tee this up.

It is limited testimony. It is not coming in for the truth of the statements. It is coming in to show the patient

has heard something, this has been publicized, and what is the state of mind at the time, and how are they acting and what does the hospital try to do in response.

THE COURT: Looking at 803(3), any existing mental, emotional, or physical condition -- I don't have -- my handbook on Federal evidence doesn't have an Eleventh Circuit case, but they point as admissible in a trademark infringement statements by members of the public indicating their confusion as to source of product were admissible. Also, in an antitrust statements by customers of Plaintiffs as to why they were purchasing instead from Defendants is identified as admissible.

That is a Third Circuit case, the other one is Seventh Circuit. Based on that authority, in the absence of researching the Eleventh Circuit, I am going to overrule the objection.

MS. BLAIR: Your Honor, I am going to have a standing objection. Would you like me to object to all --

THE COURT: You can have a standing objection to any discussion with hospital executives or doctors as to what people told them as to their concerns.

BY MR. MARCUS:

Q. Go ahead, you may answer.

A. In one of my rounding days I was on the med tele unit, a 48 bed unit in our hospital has a high turnover of patients because they are there for a short amount of time, so I happen

to go into three or four rooms that day.

The first one I went into there was a nice elderly woman with red hair sitting up eating her lunch. I introduced myself as I am the chief Executive Officer, I am coming around to talk about your hospital experience. I wanted to know how the team was doing taking care of you, how the physicians were communicating, was everyone working together to get you better.

Immediately she said, oh my gosh, I am glad you are here, you are the chief executive officer, you have to do something about your letter grade. I said, what do you mean? She said there is a video that talks about your letter grade. She was elderly, she had her cell phone, she was trying to show me the letter grade, but she wasn't able to pull it up. So I talked with her for a little bit.

She lived in the adjacent community, which was Kings Point, right next to our hospital. She said I had to come by ambulance and I was nervous because I have seen that video and I have seen the grade, and I wasn't sure that I would have a good experience. And she said everyone has done a wonderful job taking care of me. She talked about how wonderful the nursing staff was, people washed their hands. She said the food was really, really good.

So I thanked her and she said, if I have to come back to the hospital this is where I want to come. I am glad the ambulance took me here.

Q. Have you ever had occasion to counsel a patient that was weighing whether to seek medical care at your facility but had reluctance because of the grade?

A. Yes. Over the summer we had onboarded a physician that had privileges at three facilities in our community, and we were excited to bring her over to Delray. She had extensive training in upper extremity and shoulder replacement, so she was going to be moving her cases over to Delray Medical Center.

MS. BLAIR: Your Honor, same objection on hearsay. I understand your ruling previously was with respect to patients and how they reviewed the services. There is no indication in this case that doctors would have the same level as a consumer as your Honor pointed out with your trademark cases.

THE COURT: All right. I am going, at least at this point, overrule the objection.

I will look at more precise argument on this point as you go forward, particularly if anyone can find anything in the Eleventh Circuit.

MS. BLAIR: I appreciate it, your Honor, as it goes to the heart of this case.

THE COURT: All right.

THE WITNESS: She had reached out because was having a hard time talking that patient into having surgery at Delray Medical Center, and she asked me if I could call the patient, but this particular patient was a savvy health care consumer,

and she was concerned about the video she had seen, the failing grade.

I did call this patient. She was a little defensive and upset, rightfully so, when I first started talking to her. She said, no, I am not going to come here. She told me about the letter grade. She said, Heather, I am afraid that I am going to die at your hospital. So I went on to explain the letter grade, where it generated from, that we didn't participate in the survey.

I explained to her our joint replacement program, that is another accreditation we have. I gave her up to date information on our surgical site infections which were greatly improved in the year 2025, and really talked to her about the whole team, and then I did have our navigator followup with her. She went on to have surgery with us. She was grateful for the call and clarification of the information, and she had a fantastic outcome.

Q. In your words, Ms. Havericak, why has Delray Medical filed this lawsuit?

A. Because, as I think it was said earlier, there were attempts made to have these letter grades retracted. That did not happen. We choose not to participate in the survey and we are being inappropriately assigned a failing grade, and it is impacting our reputation that we built in the community.

We have been here to serve our community and it is not

fair. It is false, it is misleading, and shouldn't be happening, and there is no way to correct this on our own.

MR. MARCUS: Your Honor, we pass the witness.

THE COURT: Cross-examination.

MS. BLAIR: Thank you, your Honor.

CROSS-EXAMINATION

BY MS. BLAIR:

Q. Ms. Havericak, for purposes of sort of orienting the Court to where we are, Delray -- well, you consider these five hospitals for purposes of this litigation a failing grade of D or F from Leapfrog, correct?

A. Correct.

Q. So everyone is clear, the methodology change that this lawsuit is about occurred in the fall of 2024, correct?

A. Yes.

Q. Delray received a Leapfrog grade in the spring of 2024, correct?

A. Yes.

Q. That spring of 2024 Leapfrog grade was a different imputation model, correct?

A. Correct.

Q. In the spring of 2024 Delray was given the same grades for BCMA, CBOE and hygiene that the cohort was receiving as a mean, correct?

A. That is correct.

Q. Delray was a D under that old model, correct?
A. Correct.
Q. So you had a failing grade before the methodology change and a failing grade after the methodology change, right?
A. Correct.
Q. But it is your testimony here today that everything bad that has happened to your hospital is a result of the methodology change that occurred at Leapfrog in the fall of 2024?
A. That is not correct.
Q. Aren't you suing Leapfrog because of the methodology change?
A. We are.
Q. Aren't you saying that methodology change caused reputational harm to Delray?
A. It did and it continues to.
Q. Even though you had a failing grade before, right?
A. That is correct.
Q. All right. I just want to make sure we are all on the same page. Delray stopped participating in the Leapfrog survey as a market in 2021, correct?
A. Yes.
Q. And you weren't at Delray in 2021, were you?
A. I was not.
Q. Did you do an investigation as to why Delray stopped

participating in 2021?
A. I talked to my colleagues, yes.
Q. What is your understanding of why Delray stopped participating in the Leapfrog hospital survey in July 2021?
A. Because there wasn't a large amount of value in the survey and we wanted to take those resources that were limited, that was right during the COVID period, and put those resources front and center for patient care and into improving our own quality and safety in our organization.
Q. You weren't receiving any value from Leapfrog because it wasn't helping you benchmark your outcomes?
A. We don't look at Leapfrog as a benchmarking foundation for us.
Q. What do you mean, it was not providing any value to Delray in 2021.
A. Well, I wasn't there in '21. I came in 2024, and when I talked to colleagues their response was there was not any value in it and we wanted to take those resources and put them in places of value.
So we wanted to pursue accreditations where there were validation and verification visits, which we continued to do with our stroke services, our trauma services, with our bariatric center of excellence. Those are the things we wanted to focus on because those provide more value.
Q. Would it be fair to say that Delray received no benefit

from the Leapfrog survey when it participated?
A. In my perspective, I don't think it did. No.
Q. Would you agree with me that Delray made a voluntary business decision to stop participating in the survey in 2001?
A. I don't know what happened in 2001.
Q. I'm sorry, 2021.
A. That is the business decision that was made from my understanding, but I was not there.
Q. To your understanding, it was a voluntary decision made by the hospital?
A. Correct.
Q. All right. And do you have any understanding as to whether or not Delray had any issues with the methodology that Leapfrog was employing in 2021?
A. Not that I am aware.
Q. Do you recall in this litigation you signed a declaration in this case?
A. Yes.
Q. Do you recall you signed that under oath?
A. Yes.
Q. You signed it in connection with a motion for preliminary injunction, correct?
A. Yes.
Q. The hospitals never went through with the preliminary injunction motion, correct?

A. Correct.

Q. If we could look at that, that is DX 12, and I will show you paragraph 13.

You signed this affidavit -- if you can scroll --

THE COURT: Again, I want to make sure I am confirming the way we are going to do it. If things are by agreement, if lawyers say you can show it, it is admissible, fine. If you think there is some debate about it, let me know.

As far as the Court Reporter is concerned, as long as you tell me we are going with Exhibit 4, for example, if you believe that 4 is unobjected to, that is enough. We won't go through anything more than that. If either side thinks there is a debate over it, let me know.

MS. MALONEY: Kim, if it is a JX, we should not have any discussion about it.

THE COURT: You all know those things, I don't. I rely on lawyers as good as you all are to make sure if it is unobjected just refer to it by exhibit number, and we will assume it is in.

MS. BLAIR: Excellent, thank you.

BY MS. BLAIR:

Q. You told me that you had no knowledge if back in 2021 nobody had a problem with Leapfrog?

A. Not that I know of.

Q. You signed this, paragraph 13, and you say under oath,

during the height of the pandemic we concluded TLG's terminology is not reliable. Do you agree with that?
A. No.
Q. All right. Right here, I highlighted it for you, during the height of the pandemic -- you said, "during the height of the pandemic we concluded TLG's methodology, which does not include a facilities visit or any effort to speak directly with patients or providers is not reliable and generates inaccurate and misleading results."
Do you see that?
A. I do. The methodology this is referring to in this statement is similar to what I talked about in site validation. The Leapfrog Group does not come in and do facility assessments, they don't speak with patients and families similar to what the Joint Commission does.
When this is referencing methodology, it is not referencing the four imputed measures.
Q. It says, TLG's methodology was not reliable, generated inaccurate and misleading results that harm our hospital.
You said that, right?
A. I did.
Q. You said that under oath?
A. Yes.
Q. Even though you weren't at Delray in 2021, you signed an affidavit that in 2021 TLG's methodology was not reliable,

generated inaccurate and misleading results that harm our hospital?

You said that, correct?

A. Yes, because that is what I gathered from all of the colleagues. When you come in as a health care executive you have to gather that historical perspective.

Q. I asked you these questions at your deposition and you just testified on the stand that the decision back in 2021 to not participate in the survey had nothing to do with methodology, but you signed a document that it did.

A. You are confusing the methodology in the questions.

Q. I don't think I am. Does that not say during the height of the pandemic you stopped taking the survey, correct?

A. The hospital stopped taking the survey during that time, yes.

Q. All right. So it is your position now, having seen this, that in fact Delray suffered harm from the Leapfrog methodology back in 2021?

A. I can't opine on the exact harm that was suffered in 2021 because I wasn't there.

Q. You signed an affidavit saying your hospital was harmed, correct? I am looking at it.

A. We are being harmed since the fall of '24, and you have to put it all in context and not just pick out pieces.

Q. Am I not reading that sentence in full?

A. You are, but we have to look at the whole document.
Q. Okay. At some point after Palm Beach Health Network made the voluntary decision to stop participating in the survey are you aware that Tenet Health Care gave a directive to all Tenet hospitals that new participation in the Leapfrog survey would not be supported?
A. I learned of that during the discovery process in preparing for this case.
Q. Okay.
MS. BLAIR: If we could pull up -- this is a confidential document, so I don't know how you want to deal with this.
THE COURT: Determinations of confidentiality during discovery don't carry over to trial.
If you wanted to make such an argument as to any of these documents you need to make them now or make them when it comes up. The fact that something was confidential during discovery carries no weight with me at this point.
MS. MALONEY: I am standing because I am the document nerd here. I am sorry, I don't mean to take over from counsel. But I don't know -- she hasn't said what document --
MS. BLAIR: I said 610.
MS. MALONEY: Do you have a copy of it?
MS. BLAIR: I have an electronic copy of it.
MS. MALONEY: Your Honor, this document we

de-designated previously, and we have no objections on confidentiality grounds. Your Honor, at the appropriate time we can address a couple of remaining documents for which I am understanding there is still some confidentiality dispute. I am hoping we can resolve that, but this particular document is not subject to any confidentiality assertion at trial. Thank you.

MS. BLAIR: Just A housekeeping matter, there are several documents that I believe are still marked confidential I understand your Honor's directive. Would you like me to point out --

THE COURT: Why don't you all talk first and see if you can work out the remaining ones that have not been de-designated as confidential.

It is my inclination not to respect those early designations and require a showing at this time if something is going to be introduced into evidence during the trial.

MS. BLAIR: Thank you, your Honor.

BY MS. BLAIR:

Q. If we could look at this. This is quality program management transition and handoff 10/18/2024. Have you seen this document?

A. I have seen it in getting ready for trial.

Q. Did you see it at the time?

A. Not that I recall.

Q. You would have been CEO at Delray Medical the time?
A. Correct.
Q. Who was your quality director?
A. Heather Waymeyer and then it transitioned in the beginning of October to Stephanie Johnson.
Q. Okay. And this would have been part of that transition, correct, between Heather and Stephanie?
A. I would assume so because it looks like those dates line up.
Q. Do you have any reason to believe this is not a business record that you produced to me in this litigation?
A. No.
Q. Do you have any reason to believe that this was not something that was produced for your quality program management?
A. No.
Q. And if we scroll down, we will see -- we will see here that in fact this document your staff knew in October of 2024 that -- that Tenet does not support completing the survey.
My apologies. Courtney is struggling over here, my apologies. She will find it.
Do you have any reason to believe that in October 2024 your quality director was discussing the fact that Leapfrog was not being supported by Tenet home office?
A. She didn't share that with me.

Q. And if we look at Exhibit 612, please. This is an email from -- she will pull it up here -- an email from Stephanie Johnson to you, and Stephanie Johnson was your director of quality, correct?
A. I have to look at the email to see the timing. I don't know if she was at that time or not. It is not up yet.
Q. That is fine. Exhibit 612 is in evidence. We will move on. I don't want to waste time. Here it is, 612. If you scroll down here, this is an email I think you are referring to your counsel, correct?
A. Correct.
Q. If you look Stephanie Johnson says to you, all scores have fallen as we were instructed by corporation not to participate in data participation. All scores across the market have fallen as we were instructed by corporate not to participate in data submission for the rating.
Do you see that?
A. I do.
Q. That is from Stephanie Johnson, November 4, 2024, to you, correct?
A. Correct.
Q. Is this correct that Tenet instructed all Tenet hospitals not to participate in the Leapfrog survey?
A. It appears that way in the email.
Q. Do you have any recollection around this time whether

Delray wanted to participate in the Leapfrog survey going forward?
A. It wasn't a question of wanting to. I needed to look at it with my team because the result of not participating and penalizing us with the imputed model and numbers, I needed to figure out what it would look like. As the CEO I am responsible for the quality of my hospital and the reputation, so I needed to look at what the ultimate measures would be.
Q. Leapfrog provides hospitals with a free calculator to figure that out, correct?
A. They do.
Q. If we go to Exhibit 618, this is an email from Regina West to Ricardo Ramirez.
Regina West at this time was the director of quality for Palm Beach Health Network, correct?
A. Yes.
Q. She is gone?
A. She no longer works there, yes.
Q. Ricky Ramirez was the director -- the chief nursing officer for the Palm Beach Health Network, correct?
A. Yes, as well as the chief nursing officer at West Boca Medical Center.
Q. If we scroll down, you see Maggie Gill writes thanks.
Do you see that?
A. Yes, she writes thank you.

Q. Maggie Gill is the president of Palm Beach Health Network, correct?
A. That is one of the regions that she is responsible for.
Q. Scroll down, Ricky Ramirez sends an email to Maggie Gill that says, PBHN, so that he is all five hospitals, would like to resume Leapfrog reporting.
Do you see that?
A. Yes.
Q. And it says, with minimal effort and no cost.
Do you see that?
A. I do see it.
Q. Do you have any reason to dispute Ricky Ramirez' statement here?
A. I don't agree with his statement here that it would take little resources and little cost.
Q. Do you dispute that he sent this?
A. It looks like it was sent here. I am not on them so I can't opine on them.
Q. We will talk about your outcome data, CMS outcome data. When I say your, I mean Delray.
You track hospital acquired infection data, do you not?
A. We do.
Q. For all of 2025 without any central line blood stream infections is pretty tremendous.
A. It is.

Q. Great. You report that to the Center for Medicaid Services?
A. Correct.
Q. We are going to talk about CMS data as Leapfrog processes it. Do you understand that CMS is publicly reported data from your hospital?
A. I do.
Q. And you also track HCAP information?
A. Yes.
Q. HCAPs are patient surveys that get submitted to CMS?
A. Correct.
Q. CMS gives you a score based on patient surveys?
A. Yes. Right.
Q. I want to focus on the fall of 2024. Your HCAP scores were significantly lower than the national average, were they not?
A. They were.
Q. The same with your hospital acquired infection rates?
A. They had opportunities.
Q. The Leapfrog safety grade uses ten -- tracks ten outcome matters based on CMS data, correct?
A. Correct.
Q. And it also tracks your HCAP scores?
A. Yes.
Q. That is CMS data, right?
A. Yes.

Q. The CMS data that Leapfrog uses is risk adjusted, correct?
A. That is correct.
Q. Do you have any reason to believe that the CMS data that Leapfrog uses in its grades are inaccurate for Delray?
A. I wouldn't say it is inaccurate. It is a snapshot of some of our population, just like HCAP has about a ten percent response rate that we have at the hospital. So it does not demonstrate an accurate reflection of everything we do. We had opportunities in 2024 in those measures that you pointed out.
Q. In fact, CMS, just like Leapfrog provides ratings to hospitals based on patient safety and quality, correct?
A. That is correct.
Q. In 2024, what was Delray's overall CMS rating?
A. It was a one star.
Q. What was Delray's overall CMS rating for patient experience?
A. Also a one star.
Q. It was also a one star.
Internally you track, you being Delray and the other four hospitals that make up Palm Beach Health Network, you track your CMS data in what is called a five star market analysis, correct?
A. I believe that is what it is called, an Excel spreadsheet.
Q. That is a business record that the quality department keeps, correct?

A. Yes.
MS. BLAIR: If we can pull up 18. This is also marked confidential.
MR. MARCUS: No objection.
BY MS. BLAIR:
Q. This email is from Regina West, March 26, 2024. On that date Regina West was the director of quality for the network?
A. She was.
Q. And she signs it here, you can see her signature.
A. Yes. I want to clarify, at this moment in time, 3/26/24, when this was being introduced, I was the chief operating officer, so I wouldn't have been at group meetings evenings and part of this panel.
Q. Understood, but you agree this document is kept in the regular course of business for all five hospitals?
A. Correct.
Q. If we scroll down we could see the spreadsheet here that is attached?
A. Yes.
Q. Is this the spreadsheet you know as the five star analysis?
A. It is very similar to this. We added some additional components to have a predictor model to it to show us how our performance is going to look.
Q. If we scroll down we see PBHN. Do you see that PBHN?
A. Yes.

Q. I submit this document was produced by your hospitals to us and if --

MS. BLAIR: Your Honor, this was objected to. I would like to have this document admitted into evidence. The objection was hearsay previously.

MR. MARCUS: Your Honor, I believe this is one of the confidential documents we haven't --

MS. MALONEY: I waived that. We objected to admissibility.

MR. MARCUS: We have a foundational objection, your Honor, to this witness. She doesn't have personal knowledge as to how the document was prepared and didn't participate in the discussion because she wasn't CEO yet.

THE COURT: She said there are some modifications, but this is something she is familiar with as I understand her testimony.

If that is the objection, it is overruled. What number is this?

MS. BLAIR: This, your Honor, is DX 813.

THE COURT: It is admitted over objection.

BY MS. BLAIR:

Q. Do you see the first column there is Delray?

A. Correct.

Q. If we look over to the right, there is a column that says included in Leapfrog. Do you see that?

A. Yes.
Q. All five of the hospitals in the market, they take notice, correct, of what is going to be included in a Leapfrog hospital survey, correct?
A. I don't believe our tool we have today has anything about Leapfrog in it. This particular one looks like it has it.
Q. If we look at the different measures, right, you see mortality, safety of care, and if we scroll down, you've got patient experience, timely and effective care.
Do you see that?
A. Yes.
Q. If we look at Delray on this page, it is almost all red, correct?
A. Those are, and I will point out that that data runs from April 1, 2021 to March 31, 2022.
Q. Understood. This is the only publicly available data -- forget about Leapfrog. If a member of the public wanted to look at what your patient experience scores were in March of 2024, this is the only thing the public would see, correct?
A. That is correct.
Q. If we scroll up to the outcome measures, you have several below average for HAISS colon, correct?
A. That would be reflective of 20 -- this time period, 2019 to 2021. It doesn't illustrate performance that we have today.
Q. Sure, but it is what would have been available to anybody

in March 2024 that wanted to look at the publicly recorded data for your hospital?
A. That is correct.
Q. If we look at accept sees. Where is sepsis post surgical? Do you see the sepsis bundle compliance?
A. I do.
Q. For Delray, only 36 percent?
A. Yes. Again, that was in 2021 to 2022, yes.
Q. Counsel showed you that TikTok video. Remember that?
A. I do.
Q. In the TikTok video when it is talking about Delray, it noted high surgical infections, sepsis post surgery, low patient satisfaction. That is what that said?
A. It had those elements in it, yes.
Q. Those are the only elements it had for Delray?
A. It did.
Q. If I look at your actual CMS data it is true, right?
A. That is what the performance was during that time, yes.
Q. You talked to your counsel about how you track hand hygiene, CPOE, and BCMA, but there is nothing the five star analysis that would tell me that you are actually tracking it; isn't that right?
A. I don't agree with that.
Q. Did you think it is in this?
A. Hand hygiene is not one of the CMS measures, CPOE is not,

neither is BCMA, so I don't understand your question.
Q. Thank you for the clarification. There is nothing on this document that we are looking at where it tracks all five of the hospitals' hand hygiene performance; is that correct?
A. Correct.
Q. The same question with respect to CPOE, correct?
A. Yes.
Q. Same question with respect to BCMA, correct?
A. That is correct.
Q. Nothing tells you how Delray does on ICU physician staffing, right?
A. It does not.
Q. You talked about CPOB. Do you recall that discussion?
A. Yes.
Q. And you participated in a survey when you were the CEO of Broward, right?
A. Correct.
Q. Do you recall that in order to score higher than limited achievement on the Leapfrog CPOE standard the hospital has to undergo a verified CPOE test of their system?
A. Yes.
Q. Okay. And you don't do the Leapfrog's verified testing; isn't that true?
A. We don't do the Leapfrog testing, but we do our own internal testing with our IT team.

Q. You don't know sitting here today how Delray would have done on Leapfrog's standards for CPOE; isn't that true?
A. We didn't do the testing.
Q. You can take that document down.
Do you agree that the Leapfrog survey is free, no cost to participate?
A. I would agree there is no cost to participate.
Q. It is voluntary, right, you don't have to participate?
A. I would disagree with it being voluntary because we get penalized for not participating.
Q. All right. And that penalty would be the grade that you get, correct?
A. Correct.
Q. And that grade that you get, which is based on in large part this CMS data that we just saw, correct?
A. A portion of it is based on that, yes.
Q. All right. But you are not required to do a Leapfrog survey; is that true?
A. We are not required.
Q. Have you -- strike that.
Before you came here today to testify, you did not review the Leapfrog hospital survey to determine how you would have scored with your actual performance numbers, have you?
A. I haven't personally gone through to do that. My team members have done that.

Q. And you understand that if a hospital chooses voluntarily not to participate in the Leapfrog survey, that Leapfrog still calculates a grade for that hospital, correct?
A. I understand.
Q. You understand that Leapfrog puts that on its website, that they grade all hospitals whether they participate in the survey or not?
A. I do.
Q. That was always known to you not only as the CEO of Delray, but when you were the CEO of Broward, right?
A. Yes.
Q. You talked about limited achievement, that limited achievement score you get for the four measures?
A. Yes.
Q. Do you understand the limited achievement score is the lowest score that a participating hospital received?
A. Correct.
Q. I want to show you document DX 607, Exhibit DX 607.
Ms. Havericak, I will tell you that you are not on the email stream I am about to show you.
If you look again, this is from Regina West to Ricky Ramirez, and we talked previously Regina West was the director of quality for all five hospitals?
A. She was.
Q. And Ricky Ramirez was the chief nursing officer?

A. Yes.
Q. Regina is reporting, "looping you in, HO is not allowing participation in Leapfrog, but they continue to ask for our scores." Do you see that?
A. I do.
Q. Do you have any reason to dispute that Regina sent this email to Ricky Ramirez in her capacity as the PBHN market quality director?
A. I do not.
Q. Do you have any reason to believe the statement Regina West made to Ricky Ramirez was unreliable when she made it in or around September 27, 2024?
MR. MARCUS: Your Honor, I object to that. The witness wasn't sent the email and didn't have a conversation --
THE COURT: Sustained.
MS. BLAIR: I am trying to lay a party opponent exception to hearsay.
THE COURT: I thought this was agreed to be admissible.
MS. BLAIR: It is not.
THE COURT: I think our practice is to let me know that. I don't know how she can answer that question, so the objection is sustained.
BY MS. BLAIR:
Q. Do you have any reason to believe that this document is not

authentic?
A. No.
Q. Moving on. You can take that down.
Palm Beach Health Network could have submitted the data -- well, strike that.
You just talked to your counsel about the fact that you do collect the data for CPOE and hand hygiene and IBS, correct?
A. We don't collect data for ICU staffing. Either you have it or you don't per your contracts. You can look at different timeliness, but our people are on site, it is not like we are using people remote, so there really is not a lot that you have to monitor on ICU staffing.
Q. You have to have documentation that a technician was on site?
A. Yes.
Q. Do you disagree because you collect it, you could have submitted the data to Leapfrog with minimal effort?
A. We made the decision not to submit the data.
Q. Could you have done it with minimal effort since you were tracking it anyway?
A. We could have. But the decision was made that we were not going to.
Q. You could have collected it with minimal effort?
A. I don't agree with minimal effort. It is not just about the data, it is what I talked about before, it takes time to

validate everything and make sure there is accuracy. So it is not minimal time, so I don't agree with what you said.
Q. Okay. Again, we saw Exhibit 618 in evidence where your director of Palm Beach Health Network and the chief nursing officer advised the president of Palm Beach Health Network that they could participate in the Leapfrog survey with minimal resources and no cost, right?
A. I saw that. That is what their perspective is, not mine.
Q. I appreciate that.
As the CEO of Delray, have you ever looked at your health locator ranking?
A. No. I learned about the health locator during our mediation.
Q. Do you have any understanding as you sit here today what Delray's health locator score is?
A. No. I did look at it after the mediation so I could understand what it is.
Q. What do you understand it is?
A. It has a bunch of the same CMS measures, some of the HCAP ratings, some of the similar scores, and a different percentage rating overall, but I am not an expert on it. I haven't spent time on it.
Q. Do you recall what Delray's overall rating was?
A. I don't remember.
Q. There was some discussion during your direct examination

that I found a bit confusing. You said that -- strike that.
The revenues are not down at Delray, are they?
A. No. I said if we continue to have patient visits being down that revenues could go down.
Q. They are not down?
A. They are not.
Q. You said you assumed the low Leapfrog rating must be the reason for the decline in emergency department walk-ins, correct?
A. Correct.
Q. You didn't perform any survey in the community to test your assumption, did you?
A. We did not.
Q. You didn't appoint a commission at the hospital to study why there was a decline in the emergency department walk-ins, correct?
A. I did not.
Q. Delray was a D grade under the old methodology?
A. Correct.
Q. Had a failing grade even then?
A. That is correct.
Q. Would you agree with me that the market share for Palm Beach Health Network has not declined since the fall 2024 methodology came out?
A. I would agree.

Q. Okay. Would you agree with me that brand recognition for Palm Beach Health Network is at its highest?
A. I can't say that it is at its highest. I would need to look at reports to see that.
Q. Well, we'll look at some. Do you know whether or not Palm Beach Health Network tracks its brand recognition?
A. There are some reports that go out, but they go to the group strategy officer and our marketing team.
Q. You don't look at them?
A. They are sometimes brought to some of our CEO meetings.
Q. They are brought to your CEO meetings?
A. On occasion.
Q. Do you understand the -- these brand recognition documents that are provided in your CEO meetings, are those CEO meetings among all five CEOs at the Palm Beach Health Network level?
A. Yes, we have a group CEO meeting.
Q. What do you recall those documents look like?
A. I feel like they are PowerPoints or something.
Q. I am going to pull up DX 923.
Ms. Havericak, I am showing you a document produced by Palm Beach Health Network in this litigation. It says 2Q 225 Tenet brand health tracker. Do you see that?
A. I do.
Q. Would you say this is the thing that you see regarding your brand?

A. I don't know if this is the exact one.
MR. MARCUS: I would interrupt. This is not admitted into evidence. We have objection to it.
THE COURT: Is there an objection?
MR. MARCUS: Yes.
THE COURT: What is the objection?
MR. MARCUS: First, foundation of this witness, she doesn't have personal knowledge of this.
THE COURT: Is this a business record? It seems like it is a business record. Is there some other problem with it?
MR. MARCUS: She can try to lay a foundation. I don't think this witness knows --
THE COURT: It is apparently a type of documents that she sometimes sees at meetings, that is what we know, and it appears to be a business record. I don't think there is an authenticity issue. Why is it not admissible?
MR. MARCUS: We are not making an authenticity objection, simply a lack of foundation with this witness.
THE COURT: The objection is overruled. Let's move on. Whatever this number is, it is admitted over objection.
BY MS. BLAIR:
Q. If we look at this document, I want to go to the executive summary. If we go to the executive summary, you see a net promoter score of 34. Do you see that?
A. I do.

Q. On the next page, right here it says executive summary, and I have highlighted here the brand relevance. Do you see that?
A. I do.
Q. You can see the brand is increasing, correct, each quarter? Quarter over quarter?
A. Yes.
Q. I asked you the question, do you know whether or not the brand of Palm Beach Health Network has increased since the grades came out? You didn't recall. Does this refresh your recollection in any way?
A. I haven't gotten this particular PowerPoint.
Q. Do you have any reason to dispute this?
A. No.
Q. Well, it is in evidence. We will put it in evidence.
Your Google reviews for Delray, do you recall at the time I took your deposition they increased from 1.7 stars in September 2024 to 4.5 stars in September 2025?
A. Yes, correct.
Q. Have those Google review stars decreased in any way?
A. No. They continue to be at 4.5.
Q. Do you recall you testified that nursing retention has not declined?
A. We have not. We have the best retention in the whole company.
Q. No physicians have left the hospital because of the grades?

A. They have not.
Q. Transfer rates are not down because of the grades, right?
A. Not to my knowledge.
Q. And admissions at Delray are in fact up, right?
A. They have been up year to date, but we saw some significant declines in September, October, and November, and they rebounded in December.
Q. Just like we talked about your rates decreasing in the walk-ins, the emergency department walk-ins, you didn't do a survey or have a commission done to determine whether or not that is right, correct?
A. As a CEO I go out and you talk to the CEOs and I did what I needed to do to understand the market, but there was no survey done.
Q. Thank you.
Now, do you have any evidence that the other hospitals that participate in the Leapfrog survey manipulate their data?
A. I do not.
Q. In fact, when you were the CEO at Broward, you testified on direct that you verified your data and you submitted only accurate data, correct?
A. Correct.
Q. And you don't have any evidence that hospitals pay money to Leapfrog in exchange for better grades, do you?
A. I do not.

Q. You don't have any direct evidence that Leapfrog offers consulting services for money to hospitals in exchange for better grades; isn't that true?
A. I have only heard that through my health care leaders which I talked to you about in my deposition.
Q. You have no direct evidence of that?
A. I have no direct evidence.
Q. Is it your belief that non-participating hospitals automatically receive failing grades if they don't engage in Leapfrog's survey under the new methodology?
A. It becomes almost impossible to be not a D or an F when you do not participate.
Q. Would you agree with me that around 2800 hospitals are graded every year?
A. I don't know the exact number.
Q. Do you know the number or the percentage of hospitals that don't participate?
A. I don't know that off the top of my head.
Q. You were here for counsel's opening statement, correct?
THE COURT: Whether she remembers that or not, we are not having a memory test.
BY MS. BLAIR:
Q. Would you agree that one percent of the hospitals receive F's from Leapfrog?
A. That was illustrated today.

Q. Do you have any reason to believe that is not true?
A. No.
Q. Do you have any reason to believe that only one percent of the hospitals don't participate in the survey?
A. No.
Q. Okay. I want to talk a little bit about Exhibit DX 630, JX 640, a joint exhibit dated December 13, 2024.
Do you recall -- before I get there, while she is pulling it up, do you recall after the safety grade came out there were discussions at the Palm Beach Health Network level about participating in the Leapfrog survey?
A. Yes.
Q. Do you agree that Maggie Gill went to Tenet Health Care Corporation about Palm Beach Health Network's Leapfrog grade?
A. I recall she did in December.
Q. In December. This document I am showing is in evidence. Maggie Gill, she is the president of Palm Beach Health Network?
A. She is.
Q. She is sending it to all five of the CEOs and others?
A. Yes.
Q. She says, "All, I have spoken with several members of ELT about the issue. There are efforts underway to address Leapfrog's ability to score us even though we don't participate." Do you see that?
A. I do.

Q. You testified to me at your deposition you didn't have any discussions with the other CEOs about this email, correct?
A. Correct, I didn't.
Q. And you also testified -- strike that.
Then later -- take that down, Courtney.
You are aware there was a cease and desist letter sent on January 3, 2025, correct?
A. Correct.
Q. You have reviewed that cease and desist letter?
A. Yes.
MS. BLAIR: And I am going to pull that up for you. That is Exhibit DX 7931, there is an objection to this document.
THE COURT: There is or isn't?
MR. MARCUS: There is an objection, your Honor.
THE COURT: There is? What is it?
MR. MARCUS: It is not a complete document, that is the first objection.
THE COURT: You mean attachments or what do you mean by that?
MR. MARCUS: Yes, your Honor. It is a laundered document. It is a multi-page document.
MS. BLAIR: I am showing it on the screen, it is a multi-page document.
MR. MARCUS: This was not done by Delray Medical or

Ms. --

THE COURT: It is apparently by the lawyers. I think it is authorized, it is a letter by the lawyers who would be agents.

Is there any real issue? She knows it was sent. I guess they want to ask about it. She didn't write it. What is the issue here?

MR. MARCUS: That is fine, your Honor.

THE COURT: All right. I will admit it over objection.

I wouldn't think there are many questions to ask her.

BY MS. BLAIR:

Q. I want it admitted that she -- you have seen this document?

A. I have.

Q. You authorized it to be sent from on behalf of your hospital?

A. I didn't necessarily authorize it to be sent.

Q. Do you know who authorized it?

A. I don't.

Q. You are aware that at the time this lawsuit was filed in May 2025 a press release was sent out on behalf of all five hospitals?

A. Yes.

Q. Did you see the press release before it went out?

A. I do believe it came around to us to look at it.

Q. Did you have to approve the press release to go out?
A. No, because it was going out on behalf of the Palm Beach Health Network.

MS. BLAIR: I want to pull up DX 915.

MS. MALONEY: Can we see the top of the document, please?

MR. MARCUS: Your Honor, again, just looking at the people copied and sent, I don't see any connection to Ms. Havericak or her hospital.

THE COURT: I think she said something was circulated before it was sent. She didn't approve it because it was sent on behalf of the network.

Is there some issue as to it? Let's argue about things that make a difference. I am going to overrule the objection.

It is 12:30. Apart from this witness, in a normal jury trial we stop around 12:30. We modify that some if we can finish a witness. We usually take an hour. I am not wedded to that. I don't know what you plan to do or want to do in terms of breaking for lunch. It is to everyone's benefit to move as promptly as possible.

What do you want to do? Do you want to talk about this? What do you want to do? What do you want to do as far as lunch generally?

MS. MALONEY: As long as 30 minutes to an hour, I am

happy to do that. We are happy to have it whenever it works for the Court and the Court's staff needs, whatever works.

THE COURT: Today we will break now because I have that half hour meeting.

I think Pauline can work with a half hour next week.

Tell me your thoughts when you want to finish in the afternoon. Everyone is from out-of-town, so talk to each other and let me know what you want to do. We will be back in session at 1:30.

(Thereupon, a short recess was taken.)

THE COURT: Okay, please have a seat. If the witness can take the stand, let's continue.

MS. MALONEY: Your Honor, the witness is in the -- in the doorway.

THE COURT: Have a seat. Welcome back.

THE WITNESS: Thank you.

BY MS. BLAIR:

Q. Ms. Havericak, there is one document I wanted to show you for purposes of getting it in the record. We were talking before the break about market share for the Palm Beach Health Network, correct?

A. Yes.

Q. You testified that it was copied?

A. Yes.

Q. I want to show you what is marked as DX 921. It is a

document produced by Palm Beach Health Network, this was related to Tenet Health market share. Do you see this document?
A. I do.
Q. In your capacity as the CEO of Delray Hospital are you privy to these types of documents?
A. I haven't seen this document.
Q. Do you know who in your organization would have seen this?
A. It looks like it was pulled from the data source of Trillion, so that would have been our strategy team.
Q. You haven't seen this document before?
A. No, I haven't.
Q. If you can show the next page. It is commercial payer market share by hospital system. Do you see that?
A. I do.
Q. Do you see Tenet Health Care here? I have that line highlighted.
A. Yes.
Q. I want to make sure for the record, you have no knowledge of -- do you have any reason to dispute that the 2025 Q2 market share for Palm Beach Health Network is 15.11 percent as compared to 14.27 for the quarter before?
MR. MARCUS: Objection, your Honor.
THE COURT: Sustained.
MS. BLAIR: Your Honor, she testified she knew market

share was up.
THE COURT: I ruled. Sustained.
BY MS. BLAIR:
Q. The Humana letter, PX 459 that was just sent to you in December, that was sent via FedEx, correct?
A. Correct.
Q. Priority overnight mail?
A. I don't remember what the mailing piece looked like.
Q. Let me show you PX 459. Did this come to you?
A. It came to the administrative suite.
Q. It is priority overnight mail?
A. Yes.
Q. Is that how the other Humana letter came to you?
A. I don't know because my assistant had already opened it.
Q. Are you aware that you can order through the Humana Military website this exact letter?
If you can show the letter, Courtney.
You can order this exact letter priority overnight mail. Are you aware of that?
A. No.
Q. You did not respond to this letter, correct?
A. Correct.
Q. So you were not transparent with Humana Military regarding what you were doing to improve, correct?
A. The letter says if you do not have a process improvement in

place, and we did.
Q. You didn't respond to them?
A. We did not.
Q. And you didn't respond to the earlier letter either?
A. Correct.
Q. The CMS star, Delray had one star, correct?
A. Correct.
Q. Has Delray commissioned any studies to determine whether or not the CMS one star rating has impacted at all your admissions?
A. We have not.
Q. We talked about accreditations, the Joint Commission. Do you recall that?
A. Yes.
Q. Delray pays for that on-site visit?
A. Yes.
Q. Do you know how much the fee is?
A. I don't remember off the top of my head. I'd have to see the invoices.
Q. The data collected by the Joint Commission, that is not made public?
A. It is not.
Q. The only thing the public knows is that you are accredited?
A. Yes.
Q. And the same thing with Health Grades, you have to pay for

the logo?
A. Once you are given the accolade you have to pay for it, it is a trademark.
Q. Just like Leapfrog?
A. Correct.
Q. All of the data that Health Grades collect to award you the awards, that specific data isn't made public, is it?
A. It is claims data from all payers.
Q. Can patients, like can I go and see what your claims data is?
A. I don't think so.
Q. I want to talk quickly, you gave some testimony to your lawyers about the woman you met in the bed with the red hair --
A. She was in a chair.
Q. She showed you the TikTok video?
A. Yes.
Q. She had services at Delray, correct?
A. Yes, she was hospitalized.
Q. If I could show you quickly Exhibit 205, your sworn amended interrogatory answers in this case.
Interrogatory number -- let's go to the back. I think these are in evidence, I apologize. If we can go to number 14.
Do you recall signing these interrogatories on behalf of Delray Medical Center?
A. Yes.

Q. Do you recall number 14, Leapfrog asks: State whether you are aware of any specific patients who relied on Leapfrog's grading declining to receive health care services at your hospital. I asked you to identify the patient, why they declined, the date, the type of service they were there for. Your original answer was simply that you received reports.
Do you see that?
A. I do. The patient I am telling you about, I rounded on her two months ago. What is the date on this document?
Q. Your amended answer: Since the release of the TLG false and misleading grades Plaintiff has received numerous reports from doctors that patients considered and decided not to use Plaintiff's facility due to concerns related TLG's misleading grades, correct?
A. Correct.
Q. You didn't provide any patient names with respect to that, did you?
A. I did not at that time.
Q. And you couldn't have because that happened after you signed these interrogatories potentially, correct?
A. What is the date on this?
Q. The date of this document is September 8, 2025.
A. Yes. So the patient I told you about was after this, that is two months ago.
Q. When you signed these on September 8, 2025, according to

your answer to interrogatory number 14 you knew of patients who had declined?

A. Right, but we didn't keep an inventory of a list of names.

Q. You still don't have a list of names?

A. I don't have a list of names for those prior. We do have names of patients.

Q. You never supplemented this interrogatory to give me those names, did you?

A. No.

MS. BLAIR: I have no further questions, your Honor.

THE COURT: Is there redirect?

MR. MARCUS: Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. MARCUS:

Q. Ms. Havericak, you were asked some questions about Delray's sliding grade over time. Do you recall those questions?

A. Yes.

Q. The last year that Delray Medical provided any data at all to Leapfrog was in 2021?

A. Correct.

Q. What grades was Delray receiving when it was participating in the survey generally?

A. They had a C.

Q. Within the county and other hospitals in your area, what does a C signify?

A. Everyone was performing around that level, so there wasn't a big significance to it.
Q. The measures in dispute in this case, the four imputed measures, do you recall?
A. Yes.
Q. When you were participating in the survey in 2021, what grade did your hospital receive for the CPA?
A. I don't recall that.
Q. Would that be the same for all those four measures?
A. Yes.
Q. You don't recall whether it was a high score?
A. I don't for '21.
Q. Okay. You were asked some questions about your CMS rating; is that right?
A. Correct.
Q. Have you received any -- do patients or anyone in the community, have they ever provided you feedback about your CMS rating?
A. They have not.
Q. What about the health locator grade, have you received any publicity or feedback on that?
A. No. I was not even aware of that until the mediation. Nobody ever talked to me about a health locator grade.
Q. The TikTok video which ranked Delray as the worst possible in Florida, do you recall how many people saw that?

A. From the opening statements, I think it was a million, a million views.
Q. You were asked some questions in terms of the amount of time it takes to complete the survey. When you were in charge of the Broward Health Leapfrog survey, how long did it take your staff collectively?
A. The same as I said before, about a thousand hours, six to seven people worked on that, it is laborious.
Q. As the CEO do you have to make decisions about how you allocate your resources?
A. You do.
Q. You were asked about Health Grades and the ranking you get for that. Does that require the level of effort that the Leapfrog survey requires of the hospital?
A. No, because you are not submitting data to them. They are pulling data from your claims, from your Medicare and Medicaid and all payers' data. You are not submitting it or opting in, they are just pulling the data and assigning the accreditations or awards.
Q. And sitting here today, if you were making the decision about Delray, if you were deciding now, today, whether your hospital should participate in the Leapfrog survey, would that be a good use of the hospital's resources?
A. That would not be.
Q. Why is that?

A. It doesn't add value for us. We have other ways to focus on patients and outcomes and we want to focus on the accreditations that we have been part of. We have more that we are going to be adding to our line of accreditations.

MR. MARCUS: Justin, pull up PX 562. It is the cease and desist letter that is a few months after the one put into evidence during cross.

MS. BLAIR: We don't object.

MR. MARCUS: Can you zoom in.

BY MR. MARCUS:

Q. This was April 17, 2025?

A. Correct.

Q. This was a letter that was sent on behalf of the five hospitals in the Palm Beach Health network?

A. That is correct.

Q. Can you just scroll down.

Have you seen this letter before?

A. I have.

Q. What were you asking the Leapfrog to do on behalf of your hospital in this letter?

A. We are asking them not to publish grades on behalf of our hospitals for the spring ranking because we didn't participate.

Q. You didn't provide any data to them?

A. Correct.

Q. You haven't provided any data since 1921?

A. Right.

MR. MARCUS: Nothing further, your Honor.

THE COURT: Thank you.

MS. SCOTT: Your Honor, the Plaintiffs call Erik Cazares.

ERIK CAZARES, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. SCOTT:

Q. Good afternoon. Please introduce yourself to the Court.

A. My name is Erik Cazares, I am the CEO of Palm Beach Gardens Medical Center.

Q. When did you become CEO of Palm Beach Gardens?

A. In July 2024.

Q. I want to provide a road map of time, first I want to talk about your background in health care, and I want to talk about the hospital, Palm Beach Gardens, and I want to talk about why you are in court today.

Let's start with your professional background. Could you tell us about where you went to school?

A. Absolutely. I graduated from the University of Texas, El Paso, this was in 2000, and I started working as a registered nurse. I worked as a registered nurse for the first eight years of my career at the bedside. Started off in a department, kidney transplant unit, telemetry floors, recovery room, intensive care unit as well.

In 2008, I transitioned into my first leadership position as the telemetry director, did that for a few years, went back to school. I received my Master's Degree in nursing administration from Texas Tech University. A few years later I transitioned to the role of chief nursing officer, did that for a few years. Then I transitioned to chief operating office, four more years as a chief operating officer, and then transitioned into my first CEO role in El Paso, Texas.
Q. Are you still a licensed nurse?
A. I am.
Q. From time to time, do you ever return to the bedside despite being in hospital administration?
A. I am a nurse, I retained my license. I like to interact with patients, family members, physicians, and everything that has to do with health care. I have been doing that my whole life. I have been in hospitals since I was 18 years old.
Q. Why did you choose a career in health care?
A. It is a rewarding area, that is the first thing. I wanted to do something that has a sense of purpose in my life. Health care checks that box. It is rewarding to be able to work with individuals in their most vulnerable moments, patients, family that come to the hospital and put themselves in our hands, and it is a privilege, but it is also a great responsibility. So it is a very rewarding career, we get to save lives, improve the health and life of many patients and family members.

Even to this day as a CEO, I interact with patients at the bedside, continuously rounding, making sure everybody has the resources they need to be able to deliver high quality care.

Q. Let's talk about the hospital. Can you tell us about Palm Beach Gardens?

A. Sure. Palm Beach Gardens Medical Center was established in 1968, it was one of the first hospitals in the area, and because of that it has been one of the first hospitals to bring all kinds of services, technology, traditionally known for high quality cardiac care. To this day, I consider us to be the leader in the community when it comes to cardiac care. We are a full comprehensive hospital, form open heart surgery, excellent emergency services, one of two eco programs in the county. Cardiology is what we are known for, but we have a very strong orthopedics program, neurology, general surgery, and we are pretty advanced when it comes to technology and robotics as well.

Q. You mentioned a lot of service lines in your background at the hospital. Have any of the service lines received any special recognition?

A. Yes. Specifically in cardiology we have multiple recognitions. One of the most recent ones we are proud of, we were named one of the top 50 hospitals in the nation for cardiac surgery, top ten percent on performance outcomes. We are accredited through the Joint Commission for total hip and

total knee and joint center, and we have recognition for cardiac and pulmonary rehab clinic through the American Association of Cardiac and Pulmonary Rehab.

One we are particularly proud of we recently reserved, comprehensive resuscitation center of excellence in Florida. What this does is acknowledges and recognizes the facility that has the proper infrastructure to be able to care for patients who have cardiac arrest where the heart stops functioning, and we have everything from our partnership with EMS, emergency room services, intensive care, specialists available on call 24/7. So we have that. That is how we received the certification. The certification is important, but what is more important is the outcome of that.

Q. If you could tell us about the outcome?

A. To be a comprehensive center for excellence, we have the infrastructure, but when you look at cardiac arrest, it is a tragic event for the patient to have. National average for cardiac arrest survival is 15 percent, in the state of Florida slightly under that. At our hospital it is 24 percent, which means a patient brought in with a cardiac arrest is more likely to survive that arrest than in any other hospital in the State of Florida.

Q. You mentioned that Gardens is accredited by the Joint Commission for total knee and hip. Is it also accredited by a Joint Commission for overall.

A. Yes, the mandatory mandate, as Heather mentioned, you could use Joint Commission or DNV, that is the main accrediting body. We go through it every three years, and they show up with a team of four to five surveyors. We have 199 beds, medium facility. That team consisted of nurses, physicians, lifesaving technician, and they check the physical infrastructure, emergency response systems, policies, procedures. They talk to patients, they observe surgeries, they follow patients throughout their hospital stay, they talk to staff. They validate we are following all of the rules. It is a strict survey, and that is what drives the majority of our quality programs.

Q. We have heard a little bit about the process.

Can you tell us how does Palm Beach Gardens prepare for such an extensive process, validation and data review?

A. There is no like one-time preparation, that is what drives our day-to-day work. We want to be survey ready so any time survey walks in the community -- Joint Commission is one. They can walk in any moment. Our labs are accredited by the College of American Pathologists, a rigorous survey.

Our goal is to be survey ready. This is an ongoing day-to-day, week in, week out, month in, month out process. We have a continuing process and validation checkpoints to make sure we are meeting all those requirements. In our last survey we did really well, we didn't have any major findings or

conditional findings.
Q. Can you tell us about the patient population that Gardens serves?
A. The majority of our patients are elderly. The median age is 62 and a half years old, and more than 50 percent of our patients are 65 and older. That is the population we see. We do not have a labor and delivery unit or a pediatric wing. We don't deal with the younger population.
Our population is older, multiple comorbidities, and we tend to have our services toward that, cardiac, neurology, orthopedics, emergency services.
Q. How many patients does Gardens serve in a typical year?
A. Through admissions, surgeries, diagnostic testing, emergency room visits, approximately 60,000 or so.
Q. We heard the term community hospital early during openings. What does that term mean to you?
A. Well, a community hospital, you are that institution that the community comes to trust to go for their health care. Like I mentioned earlier, the most vulnerable times, people don't go to the hospital just for fun, they are experiencing trauma, pain, illness that forces them to go to that facility, and at that point they are in the most vulnerable moments, a lot of anxiety.
So a community hospital is that institution they are going to make that better, trust the people to take care of them to

get them back to their normal life, their well-being, and that community has also been there for more than 50 -- the hospital has been in that community more than 50 years.

Throughout all of those years many of the patients that have been there had their parents there, their grandparents there, their children have gone there. That is what a community hospital is. We are he embedded into all the community events that take place. I am out in the community in a public speaking event, sponsoring event or engaging with family members and community members as well.

Q. Can you tell us about what are your roles and responsibilities as a CEO?

A. As CEO I am responsible for everything that happens in that hospital, first and foremost is quality, safety, patient experience. We are responsible for everything that helps our teams deliver on that, which is the operations, regulatory compliance, facility maintenance, making sure we have the proper spaces and tools and equipment for our providers to be able to care of anybody that comes into our hospital.

Q. Let's talk about the Leapfrog survey.

Were you familiar with the survey before joining the Gardens?

A. I was.

Q. And what was your impression of the survey based on your experience?

A. I have never been a big fan of Leapfrog. It's -- we used to participate in other organizations, in other hospitals I have been in. I didn't find it very valuable. Hospitals are surveyed by many different agencies, and I thought it was just another survey we are filling out and checking the box. So that was my take on Leapfrog, still is, I believe.
Q. We heard in opening that it is free to complete the survey. Do you completely agree with that?
A. I don't. I don't think it is free, it takes time, resources, and we providing valuable data to Leapfrog, all that comes at a price. No, I don't believe that it is free.
Q. Let's talk about the grades Leapfrog has assigned to Gardens.
Do you know what grade Gardens received prior to you joining in 2024?
A. I believe it was a C.
Q. And when did that change?
A. In the fall of 2024.
Q. What grade did Leapfrog assign Gardens in the fall of '24?
A. An F.
Q. How did you react when you first learned that Leapfrog assigned Gardens an F grade?
A. I was surprised, I was shocked that a hospital that is not participating in Leapfrog would get nailed with incomplete data. That was my initial reaction, and my following reaction

was what kind of implications this was going to have on the organization, the perception from our physicians, patients, community, governing board members.

So I was extremely concerned about that, and all that came to reality shortly after grades were made public and word got around that we were graded an F on patient safety.

Q. What happened -- what did happen when the grades were actually released?

A. I started receiving a lot of complaints from physicians. They wanted an explanation of why the hospital had received an F on --

MS. BLAIR: Your Honor, if I can renew my standing objection.

THE COURT: Right. It is overruled.

THE WITNESS: They wanted to know why the hospital received an F. I explained to them, we didn't participate, we were disappointed that they were giving us an F, and we wanted to know if we could respond to Leapfrog or are we going to have to start participating again, that would be implications in the hospital.

BY MS. SCOTT:

Q. Were there other people in the hospital that raised concerns?

A. Yes, came from everybody, physicians, and of course our staff, Gardens employees, 900 directly, and a few more

contracted.

As you can imagine, if you work for an organization that is rated a fail on safety, and this is where you spend a majority of your time working with patients, that is a huge hit to their morale. We have to answer to our employees, we have to give them the details of what happened, that we weren't participating.

So, we had to respond to our employees, I have to respond to physicians, governing board members, I have to give faith to the community as well as to why we were being rated as an F.

Q. In your capacity as the CEO of gardens responsible for patient care, is it your responsibility to address impacts on those areas in your hospital?

A. Absolutely it is my responsibility to do that.

Q. Since the fall '24 grade was released, have you observed any other impacts on the operations of the hospital?

A. Yes. I mean, can you elaborate on impact to the operations?

Q. Ms. Havericak mentioned a decline in emergency volume. Did you experience a similar decline?

A. We experienced a decline, specifically for walk-in patients, that was quite effort, despite a lot of efforts we put out there to highlight our quality back to the community. We had to go on extra efforts to promote the hospital, the high quality we deliver. Despite that, we still did see a decrease

in the emergency walk-in volume.
Q. You also -- have you heard any complaints from patients?
A. I have.
Q. And have you had any conversations with patients about their concerns?
A. I have.
Q. Could you provide us an example of a patient who expressed concerns to you?
A. Yes, I can.
So, as physicians would approach me to complain about the Leapfrog grade, I explained the situation. They wanted to know what we were going to do about it. They didn't agree with Leapfrog giving us that failing grade. I told them we were working on a response. In the meantime, if there were any patients that they needed me to talk to, I would be happy to talk to them and reassure them of the care that we deliver at the hospital.
Q. Did any of the doctors give you that information many?
A. Yes, a cardiac surgeon, he had a patient needed surgery. The patient told him he didn't want to have the surgery at Palm Beach Gardens because of the failing grade he had seen from Leapfrog. He was scared to go there.
Q. What was the result of that conversation?
A. He shared that information with me. I called the patient and I explained to him what had happened with the Leapfrog

grades. He wanted an explanation as to why the hospital was being highlighted as an unsafe hospital, and I said we did not participate in Leapfrog, but I reassured him that our hospital has great safety measures when it comes to cardiac surgery. We do a lot of surgeries every day. The hospital has performed more than 20,000 open heart procedures, we have very experienced teams.

I reassured him that it was a good place. I offered to give him a tour of the hospital and meet the staff. He was very appreciative of my call, but I never heard back from him and neither did the cardiac surgeon.

Q. Does the hospital track cancellations?

A. We do.

Q. Do you review that cancellation data?

A. Yes.

Q. How often do you review that data?

A. I look at it at least once a month.

Q (By Ms. Scott) Could you pull up 560, which has not been admitted.

MS. BLAIR: Your Honor, this is a new document that was produced to us on January 9th, just days ago. We never had this document, we didn't have an opportunity to question Mr. Cazares at his deposition. We object to it as late in time being produced having been asked for it in discovery.

In addition to it being hearsay, it comes from people

who have never been identified in this litigation ever before, so we never have had the opportunity to take this discovery.

THE COURT: Can you explain why it was not produced previously?

MS. SCOTT: Yes, your Honor. This is dated November 3, 2025, and the data that is attached to the email which I would like to go over is from October -- the week of October 26th to the 31st 2025. Discovery closed in September of 2025.

So, this is one of those documents, one of the cases where leading up to trial, particularly in light of the Court's ruling on of summary judgment on the unfairness prong, but leading up to trial we discovered, quickly produced to the other side, I believe within 36 hours of finding it, and made them known -- made this known to them.

The idea that there had been cancellations is not new as the CEOs testified to the number of patients that had canceled or declined to have services at their various hospitals as a result of the grade.

I can address the hearsay, your Honor.

THE COURT: What is this? Is this a list of names? All I see is a single email.

MS. SCOTT: Could we go to 560.1. This is the cancellation data that the hospital maintains in the regular course of business. That is attached to the email I would like

to go over with Mr. Cazares. It is not hearsay, it is a business record, something I think the other side acknowledged in their papers. And so --

THE COURT: So, this is just simply cancellation data. Does it explain why they canceled?

MS. SCOTT: It does, and that is going to be in the comments. If we could expand row four, column N.

You can see, your Honor, that there is a comment inputted into this business record reflecting the reason that the patient declined the procedure at the hospital.

THE COURT: Did he refer to the stay, this grade?

MS. SCOTT: The comment states that the patient declined procedure due to the hospital's F grade for infections, wishes to cancel.

THE COURT: Why was it that you didn't know to look -- was this within the scope of their discovery demand?

MS. SCOTT: Your Honor, this document we discovered leading up to trial, and it would not come into our search protocol because discovery had closed. This is why, since this existed well after we had run our search protocol, it did not show up.

THE COURT: What was their request?

What was your request?

MS. BLAIR: We asked for all documents related to harm suffered by these hospitals.

If I could, your Honor, they have a duty to seasonably supplement. This cancellation occurred in October, we heard nothing about it. Mr. Cazares just testified that they regularly track this. We don't have any of this data. They did not produce it pursuant to the ESI protocol. We don't have the metadata as to when this was created, and they just said the only reason they produced it late is exactly why we are hearing a lot of new things, is because of your Honor's ruling on the 7th.

If this is a document that they keep in the ordinary course of business, where was it? We have never seen any document like this in the last seven months. This is the problem we have with a lot of these documents, your Honor.

THE COURT: The question you asked in discovery was what?

MS. BLAIR: Any and all documents referencing the harm to these hospitals.

THE COURT: That is a pretty broad request. You deposed this witness?

MS. BLAIR: We deposed this witness, we had no documents ever about these cancellations. There was no reason to ask him. Interrogatory 14 that we talked about with Ms. Havericak specifically asked about patients declining services. They did not provide an answer. They filed a protective order before Judge Matthewman saying this type of information was

irrelevant to the FDUTPA claim because they didn't have to prove consumer harm.

They filed a motion against us to protect their own data. Judge Matthewman made them produce that data and we didn't see this. This is trial by ambush.

MS. SCOTT: Your Honor, the protective order was about random patient complaints, not complaints about Leapfrog. Besides the point, your Honor, this document arose after the close of discovery. Again, it came out as we were preparing for trial, and really, your Honor, it goes to show the ongoing nature of the harm that these hospitals are confronting on a day-to-day basis.

THE COURT: If it does that, then why wasn't it produced previously when they asked about documents showing harm?

MS. SCOTT: Because, your Honor, it is the time period.

THE COURT: There is a duty to supplement.

MS. SCOTT: There is, your Honor, but we did not find this document until we were preparing for trial. As soon as we became aware of it, we produced it to the other side.

THE COURT: I am going to sustain the objection to this document given that it seems like it squarely fell within the earlier discovery. It should have been supplemented, and also -- discovery doesn't depend on my ruling on summary

judgment as to whether or not a document should have been produced. The objection to -- this one is what number?

MS. SCOTT: 560.2.

THE COURT: -- 560.2 is sustained.

MS. MALONEY: Your Honor, would you permit an extremely short briefing? Ms. Scott was in another trial during discovery, and I think that if the history -- as you pointed out, that was a very broad request. There was a lengthy history of narrowing this request.

It is our position that this document did not hit on any search term within the protocol prior to close of discovery. After the close of discovery we did keep looking and this hit. The words that it hit on up until this were not within the protocol.

I would greatly appreciate -- there have been some statements made about lies being made, that I made during opening. I kept my mouth shut, and I won't dispute that on the record, but I just want to --

THE COURT: All right. If you want to file something in writing, that is fine with me. I will consider -- reconsider it based on those writings if necessary, but it seems to me, at this point at least, I don't think it is admissible.

MS. MALONEY: Thank you, your Honor.

MS. SCOTT: Your Honor, can we reserve our right to

recall Mr. Cazares?

THE COURT: We will see. Apart from the document you can continue to examine him. I am not cutting off your examination.

MS. SCOTT: Understood, your Honor.

BY MS. SCOTT:

Q. When a patient declines to have a procedure at the hospital, could that cause a delay in care?

A. Yes.

Q. How can a delay in care impact a patient's outcomes?

MS. BLAIR: Objection, calls for speculation.

THE COURT: Overruled.

THE WITNESS: Well, it depends on the patient's condition. There are many factors, but if a treatment is needed in an urgent manner and is delayed, that patient could suffer further down, have detrimental consequences in their recovery.

Yes, there is definitely -- the longer you delay care the more likely that patient could have poorer outcomes.

BY MS. SCOTT:

Q. Prior to the release of the 2024 grade, had you heard doctors raise any concern about the Leapfrog rating?

A. No.

Q. What about patients?

A. No.

Q. What about community members?
A. No.
Q. Since fall 2024, has Leapfrog continued to grade the hospital?
A. Yes.
Q. What is the grade now?
A. D.
Q. Despite going from an F to a D, have you continued to see impacts related to the Leapfrog rating?
A. Yes, it has continued. I still get approached from all of the different individuals I mentioned before, especially new individuals I haven't talked to, they are asking me what the status is with the hospital in regards to our grades. It has not eased up. The damage came on pretty strong when the F came out and it is still there and continues.
Q. Can we pull up Plaintiffs' Exhibit 35.5, which has been preadmitted. Thank you.
We did this exercise with Ms. Havericak, so I don't want to belabor the point. I do want to ask you a couple questions about some of the measures that are reflected here on Palm Beach Gardens web page on the Leapfrog website. Do you see that?
A. Yes.
Q. And if we go to practices to prevent errors, we see three of the four imputed metrics, correct?

A. That is correct.
Q. Can we look at -- let's look at the hand washing gas gauge. Does Palm Beach Gardens have a hand washing policy?
A. Yes.
Q. Is it similar to the one Ms. Havericak described?
A. Very similar.
Q. Is data collected and monitored to ensure compliance?
A. Yes.
Q. Is that data audited?
A. Yes.
Q. Do you review that data?
A. I see it in reports and different meetings.
Q. If we look at the gas gauge for hand washing, does that accurately reflect the data that you review?
A. It does not.
Q. What about doctors -- computerized physician order entry?
A. Absolutely not.
Q. Does the hospital have -- does the hospital have a policy on CPOE?
A. Yes.
Q. Is data collected and monitored to ensure compliance?
A. Yes.
Q. Is that data audited?
A. Yes.
Q. Do you review that data as well?

A. I review that as well.
Q. Does the gas gauge on Leapfrog's website accurately reflect the data that you regularly review?
A. Absolutely not.
Q. Let's look at BCMA. Does the hospital collect data -- does the hospital have a policy on using bar code medication?
A. Yes.
Q. Is data collected and monitored to ensure compliance?
A. Yes.
Q. Is that data audited?
A. Yes.
Q. Do you review that data regularly?
A. Yes, I see it in the reports as well.
Q. Does the gas gauge for this metric accurately reflect the data that you regularly review?
A. No.
Q. Can we pull up Plaintiffs' Exhibit 35.6.
If you look here, there is a measure for specially trained doctors caring for ICU patients.
A. Yes.
Q. Does Gardens have doctors staffed in its ICU?
A. We absolutely do.
Q. Does this gas gauge accurately reflect that?
A. No.
Q. Did you submit data to Leapfrog to report on these

measures?
A. No.
Q. Do you know where Leapfrog would have gotten this?
A. No. Nowhere.
Q. There has been a suggestion that community hospitals don't want to be transparent, that they hide their data. Is that true?
A. No.
Q. Why doesn't the hospital just participate in the survey?
A. Well, as I mentioned earlier, the hospital already participates in other surveys that we find more meaningful. We don't find value in the Leapfrog and we are not going to shift our resources to participate in a survey we just don't find valuable.
Q. Has the hospital continued to see impacts to its operations and the patients that it serves?
A. Yes.
MS. SCOTT: I pass the witness.

CROSS-EXAMINATION

BY MS. BLAIR:
Q. Mr. Cazares, I just have a few questions.
You came to Palm Beach Gardens in July of 2024, correct?
A. That is correct.
Q. And I won't torture everybody with a long cross-exam.
You also filed a declaration in this case, correct?

A. I did.
Q. It is admitted into evidence. Do you recall you signed a sworn affidavit as to the reason why Palm Beach Gardens stopped participating in the Leapfrog survey?
A. I do.
Q. Do you recall what you put in that?
A. Yes. We didn't find the data valuable, and we didn't find Leapfrog was an organization worth participating in because of the way that they go about collecting the data. They don't survey the hospital. It is not a true evaluation in my opinion.
Q. Okay. And you signed that declaration under oath, correct?
A. Yes.
Q. You stated that during the height of the pandemic -- exactly like the one I read word for word?
A. Yes.
Q. During the height of the pandemic you concluded that TLG's methodology is not reliable and generates inaccurate and misleading results?
A. Correct.
Q. You signed that?
A. I did.
Q. That goes on to say, misleading results that harm our hospital, correct?
A. Correct.

Q. Okay. So, is it your testimony that in 2021, Palm Beach Gardens stopped participating in the Leapfrog survey because the methodology was harming Palm Beach Gardens?
A. So, I wasn't at Gardens in 2021, but based on my understanding, that is why they stopped.
Q. Do you agree that they stopped because it was a voluntary business decision by the hospital to stop?
A. Yes.
Q. You said Palm Beach Gardens was not receiving any benefit from Leapfrog?
A. Not that I am aware of.
Q. And to this day, receives no benefit?
A. None that I can think of.
Q. Are you aware that at some point after Palm Beach Gardens made the voluntary business decision to stop participating, that Tenet Health Care Corporation had a directive that none of the Tenet Health Care corporation hospitals would participate in the Leapfrog survey?
A. Repeat that.
Q. Are you aware that sometime after your hospital made the decision not to participate in Leapfrog that Tenet Health Care Corporation as an entity made the decision that its 76 hospitals would no longer participate in the Leapfrog survey?
A. Am I aware of that?
Q. Are you aware of that?

A. Yes.
Q. Okay. I think you said you track your CPO, BCMA, IPS and hand hygiene metrics, correct?
A. Yes.
Q. And those are the four metrics for which your hospital is receiving limited achievement scores in the hospital grade?
A. Correct.
Q. You understand the hospital safety grade that Leapfrog puts out is a composite score. Do you understand that?
A. Yes.
Q. Do you understand that in addition to those four measures, Leapfrog pulls your CMS data?
A. Yes.
Q. And I think you testified earlier about who the population of your hospital is, and it is generally an elderly population?
A. That is correct.
Q. Your CMS data is a pretty accurate representation of your patient population. Is that fair?
A. I wouldn't be able to say how accurate it is at this point.
Q. Okay. You were here in the courtroom when I showed Ms. Havericak the five star analysis?
A. Yes.
Q. That is Exhibit DX 18 moved into evidence.
A. Yes.
Q. Do you regularly get that report?

A. I don't regularly get that report. I have seen it once or twice.
Q. Do you agree looking at that report, the one for April 2024, if we look at the report, the hospital acquired infection data is lower than the national average?
A. There are some categories that are slightly below, others above and others on the spot.
Q. The best to see what those were in April 2024 would be that Exhibit 813, correct?
A. I suppose so, yes.
Q. And I can like to show you the document.
A. Yes.
Q. The HCAP scores, that is CMS data as well, correct?
A. Yes.
Q. Are you aware of what your HCAP scores are now?
A. Yes.
Q. What are your HCAP scores?
A. They are a little bit under the national average.
Q. We talked about the CMS star rating. Do you recall that?
A. Yes.
Q. What is Palm Beach Gardens' overall CMS star rating?
A. One star.
Q. What is the CMS patient satisfaction rating from CMS?
A. I believe it is two star.
Q. That is based on your HCAPs, correct?

A. Yes.
Q. For the record, five stars is the best?
A. Right.
Q. In looking at -- excuse me. In preparing for this case, did you ever, as CEO of Palm Beach Gardens, take your data for these four imputed metrics and actually answer the Leapfrog survey to see how you would have done?
A. No.
Q. You talked about Joint Commission. Do you recall that?
A. Yes.
Q. About all the things that happened for, you know, when Joint Commission comes to your hospital. Do you recall that?
A. Yes.
Q. You say you are always survey ready, right?
A. Yes.
Q. Does the Joint Commission collect data on BCMA?
A. They don't collect data, but they see our guide, which has happened.
Q. What about CPOE?
A. Same thing.
Q. And hand hygiene?
A. Absolutely.
Q. ICU physician staffing?
A. They look at all kinds of staffing, including ICU.
Q. If you stand every day to be survey ready for the Joint

Commission, you are monitoring and gathering that data all the time, correct?
A. That is correct.
Q. So, if you had to provide information to Leapfrog on those four measures, you could do that today, couldn't you?
A. We could put a team together to collect it and gather it, yes. If we had to, we would. If we didn't have to, we wouldn't.
Q. You are gathering it every day anyway, right?
A. Yes.
Q. You weren't at Palm Beach Gardens before HCAP?
A. That is correct.
Q. Do you understand as the executive of a hospital system that Leapfrog grades all adult acute care hospitals whether they participate in the survey or not?
A. I do.
Q. And your director -- who was your director of quality at Palm Beach Gardens in or around July of 2024?
A. Kathleen McDonald.
Q. Do you recall that Kathleen McDonald was aware that Leapfrog had put out for public comment the methodology changes they were proposing?
A. I don't know if she was aware or not.
Q. You don't know if she came to you about it?
A. She didn't come to me about it. No.

Q. When was the first time you found out about the methodology change?
A. When the preliminary score came out.
Q. How did you find out about that?
A. She brought it to me.
Q. Kathleen McDonald?
A. Yes.
Q. Do you recall whether or not that was the first time she knew about it?
A. I don't know.
Q. Do you know whether or not Palm Beach Health Network knew in May 2024 that Leapfrog had put out for public comment the changes that were going to occur to the methodology?
A. I don't know.
Q. You never had conversations with anybody about that?
A. Leapfrog didn't come up until that score came out.
Q. And going back -- going back to the CMS star ratings.
A. Yes.
Q. Did anybody ever ask you any questions of you about the fact that you had a one star overall CMS rating?
A. No.
Q. Why not?
A. That is not something they asked me. I don't think it is something that everybody is out there talking about right now.
Q. CMS doesn't publicize its star ratings, right?

A. I don't know. There is a website.
Q. Have you ever had a patient ask you about your CMS star rating?
A. No.
Q. You maintain that one star overall CMS rating?
A. Today, yes.
Q. In a population mostly elderly, do you have any understanding whether or not they know what the CMS star ratings are?
A. I don't know what the patients know or don't know. I would assume some do know.
Q. And you recall that Palm Beach Health Network in or around December 2024 was asking Tenet home office for permission to start participating in Leapfrog's survey again?
A. I did become aware of that.
Q. You did not want to participate in Leapfrog. Is that fair?
A. That is a correct statement.
Q. So, your decision about not participating in the Leapfrog survey, you made the decision even knowing the impact of the new methodology on your grade, correct?
A. Not necessarily. When the Leapfrog grade came out we had to take action, and it is either we participate again or we fight it, we contest the grade. So, I was more on the side of contesting the grade than being forced to participate again.
Q. So you were looking already to file this litigation?

A. Not litigation, but at least ask Leapfrog to stop producing that grade. Don't grade us. We are not participating, we are not giving you all of our data, so why grade us? That is the part I couldn't comprehend.
Q. You don't want to give them the data because it is not good?
A. No, it is not that. I told you why we didn't want to give the data. That is the common sense answer, why are we graded on something that we are not participating in.
Q. Do you recall what your scores were in the spring of 2024 -- before the fall 2024 methodology came out, do you recall how many points you were getting for CPOE, BCMA, hand hygiene and IBS?
A. I don't know the details, but I am sure it was more than what we got in the fall.
Q. It was perfect, a hundred out of a hundred points for all four of those measures.
A. Okay.
Q. You weren't submitting any data to Leapfrog then?
A. Correct.
Q. Did you understand you were getting a hundred out of a hundred points because your hospital cohort was performing at that level?
A. I didn't know how many points was awarded to each of us.
Q. When you had that C rating in the spring of 2024, you were

getting a hundred out of a hundred points for all of those measures even though you were not submitting data to Leapfrog, correct?
A. Yes.
Q. So that C grade was based on a methodology that was being applied to you as well, correct?
A. That is correct.
Q. Not on your actual data?
A. No, but it wasn't detrimental, it wasn't a failing grade, which brings everything to everyone's attention. Nobody cared about a C.
Q. You didn't care about a C?
A. It wasn't relevant because we weren't participating.
Q. Did you care about a C, yes or no?
A. No.
Q. I want to talk about -- we talked about health locator, your counsel did. Have you ever looked at your health locator score?
A. No.
Q. Do you have an understanding what health locator is?
A. No.
Q. You don't know that you score in the bottom one percent of hospitals nationwide?
A. I never looked at it.
Q. In terms of revenue, Palm Beach Gardens has not lost any

revenue, correct?
A. Has not lost any revenue?
Q. Since fall of 2024.
A. I wouldn't say it has not lost any revenue. We have grown our revenue despite some of the challenges, but that is a lot of other work that we put into our organization to continue to grow revenue.
Q. Revenue is up?
A. Overall, yes, not emergency room.
Q. We will talk about that. You were shown the documents, Exhibit 921. Your market share remains stable, doesn't it?
A. Market share for my area he is not as stable as others.
Q. Do you have market share data for Palm Beach Gardens itself?
A. I could tell if my volumes are up or down. That gives me an idea how I am doing.
Q. Do you track that data?
A. My volumes, yes.
Q. Have you produced that data in this litigation?
A. We have.
Q. Oh. And what is your market --
A. You saw some of it.
Q. I am not talking about admissions or --
A. That is data. That is volume.
Q. You are talking about volume?

A. Yes.
Q. Okay. What about brand recognition for Palm Beach Health Network, do you know what that is?
A. I know what it is.
Q. You saw the document I showed Ms. Havericak in the courtroom?
A. Yes.
Q. You saw that it is steadily increasing?
A. I have not analyzed that in detail, but I saw the report you put out there.
Q. Do you have any reason to dispute that?
A. No.
Q. You don't believe that nursing hiring is any more difficult for Palm Beach Gardens than any other hospital, correct?
A. Do I believe it is more difficult? It is extremely challenging.
Q. Sure. You testified in your deposition that you didn't believe you had any nursing retention issues due to the Leapfrog grades, correct?
A. I agree.
Q. No physicians have left your hospital because of the Leapfrog grades, correct?
A. Correct.
Q. You testified earlier about admissions being down?
A. Not admissions, walk-in volume.

Q. Walk-in volume. Have you ever done a survey to determine why your walk-in volume is down?
A. We are always looking to see if we can find out why our volumes are down, absolutely.
Q. Did you do a survey?
A. Me, myself?
Q. Your hospital.
A. We are always looking to see if we can identify trends. We couldn't identify anything other than the Leapfrog negative publicity.
Q. So you couldn't identify anything?
A. With the exception of Leapfrog.
Q. Do you have a study?
A. I don't have a survey study, no.
Q. When you say we identified, who is we?
A. Me, my team. We are looking at data, what can cause our volumes to go down.
Q. You don't know what causes it, but you assume it is the Leapfrog grade?
A. It is a high level assumption. This is what I do every day. I am in the hospital talking to family members, community members. Yes, it is my opinion it has had an impact on my walk-in volumes. I don't have a visual report to --
Q. You don't have a report --
MS. SCOTT: Your Honor, for the benefit of our court

reporter and also common courtesy, I would ask that the witness be able to complete his answers.

MS. BLAIR: That's fine. I am trying to move on.

BY MS. BLAIR:

Q. I would ask you to look at Exhibit DX 209. You testified in response to your counsel's questioning that you know of several different patients that you have spoken to that have expressed concern about the Leapfrog grades, correct?

A. I talked about the one patient I mentioned earlier.

Q. One patient?

A. Yes.

Q. Do you recall answering these interrogatories?

A. Yes.

Q. Put up number 8.

If we look at interrogatory number 8, the question we asked was: Identify any and all persons, whether internal or external, with whom you communicated in any way with respect to the safety grade or the survey.

Go to your first answer, which was communications occurred, you say Plaintiff communicated with the following categories of people, governing board, department directors, physicians and nurses when asked about it.

You didn't list any physicians by name in this answer, correct?

A. I didn't.

Q. And if we go to 14 of these interrogatories I asked: State whether you are aware of specific patients who relied -- state whether you are aware of specific patients who have relied on the Leapfrog safety grade in declining to receive health care services at your hospital. Do you see that?
A. I do.
Q. I asked identify the name, why they declined service. Do you see that? Your answer was, Plaintiff has received reports that patients considered or decided not to use Plaintiff's facilities because of TLG's misleading grades.
Do you see that?
A. Yes.
Q. And you amended your answer and said, Plaintiffs have received numerous reports from doctors that patients decided not to use Plaintiffs. Do you see that?
A. I do.
Q. Again, I asked you for specific information, correct?
A. Correct.
Q. You didn't provide any; is that right?
A. That is right.
Q. You just testified to one?
A. Yes.
Q. This says numerous, and now you are saying there is one, right?
A. That I received reports from physicians that had received

complaints and concerns from their patients. You've got to understand that is the first contact for the patients is going to be their physicians or surgeons, and they come to me. This is an accurate statement because there are multiple reports of different patients from the physicians.
Q. And you didn't tell me -- in the two interrogatories you didn't tell me any of the doctors' names or any of the patients' name?
A. I know the doctors' names, I could give them to you.
Q. No, I don't want them. You didn't give me the names here, correct?
A. I didn't give you the names.
Q. Go to interrogatory 2. I asked you, like I asked all of your colleagues, the following question which is: Identify and describe any complaints, concerns, or comments from patients, community members, or referring physicians that relates to the hospital's reputation or comparisons to other hospitals in the region.
Do you see that?
A. I do.
Q. Your original answerer was Plaintiff has -- it's the same answer. Plaintiffs have received reports that patients or physicians considered not to use the Plaintiff's facility. You go on, but you don't give me any patients' names, doctors' names, nurses' names, governing board members' names, no actual

names?
A. They are not written on this paper, no.
Q. And not until preparing for this trial did you decide that you were going to provide information related to patients and doctors who had issues with the Leapfrog grade, correct?
A. That --
Q. You never supplemented the answers, did you?
A. Did I what?
Q. You never supplemented these answers, did you?
A. I did not.
MS. BLAIR: I have no further questions, your Honor.
THE COURT: Do you have redirect?

REDIRECT EXAMINATION

BY MS. SCOTT:
Q. Very briefly, Mr. Cazares, you were asked questions about doctors' names. Do you recall that?
A. Yes.
Q. You gave a deposition in this case, correct?
A. I did.
Q. Were you asked about doctors' names during the deposition?
A. I was.
Q. Did you provide doctors' names during the deposition?
A. I believe I provided a few names at that time.
Q. Could you just tell us some of the doctors with whom you -- who raised patient concerns after the release of the Leapfrog

grade?
A. Sure, Dr. Patel, a cardiovascular surgeon, Dr. Mascal, a cardiologist, Dr. Richard Price, also a cardiologist, Dr. Suarez, an infectious disease doctor, Dr. Delazabul, he is a pulmonologist. Those are some that come to mind right now.
Q. You were asked questions about your CMS data. Is there a connection between CMS and Joint Commission?
A. Not that I am aware of.
Q. Well, let me ask it differently.
A. Oh, I see what you are saying. So, the connection for us is in order for the hospital to be able to bill for Medicare or Medicaid patients we have to be accredited by either the Joint Commission or by DMV, so it is one of their accrediting models.
Q. Does Joint Commission review some of the same infections data that your hospital reports at CMS?
A. Yes.
Q. And despite this infections data, Joint Commission still accredits the hospital, correct?
A. That is correct.
MS. SCOTT: That is all I have.
THE COURT: Thank you, sir.
MS. MALONEY: We call our next witness, Dr. Sean Nicholson.
MS. BLAIR: Your Honor, I'd like to note that he was sitting in the courtroom. I don't know if your Honor has any

sort of order about witnesses sitting in the room while others were testifying.

THE COURT: No one invoked the rule. If someone invokes the rule I will apply it. I thought you all were happy with people sitting in the courtroom.

MS. MALONEY: We conferred before the trial about trial sequence. This did not come up, so -- thank you.

SEAN NICHOLSON, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. HVIDT:

Q. Good morning, Dr. Nicholson. Please introduce yourself to the Court.

A. Yes, I am Sean Nicholson.

Q. Did you prepare slides for your testimony today?

A. Yes, I did.

Q. Did you prepare a slide that summarizes your qualifications?

A. Yes, I did.

Q. Is that slide 2 shown on the screen here?

A. Yes, that is correct.

Q. Could you please describe your educational background?

A. Yes. I received an AB in economics, an undergraduate degree, from Dartmouth College, in 1986, and then a Ph.D. in economics from the University of Wisconsin Madison in 1977.

Q. Are you currently employed?
A. I am a professor at Cornell University in the Department of Economics and also the School of Public Policy. I am also a research associate at the National Bureau of Economic Research, which is a coalition of health economists studying health care market policy.
Q. How long have you been a professor at Cornell?
A. I have been on the faculty for 22 years. Prior to joining Cornell I was an assistant professor in the Health Care Systems Department at the Wharton School, University of Pennsylvania.
Q. What are your responsibilities at Cornell?
A. I teach, conduct research, and for ten years I had administrative responsibilities. I was directing the Sloan program in health administration from 2014 to 2024. This is a two-year professional graduate degree that trains health care managers and I focused on that program for ten years.
Q. What would you say is your field of academic research?
A. I am a health economist, so I focus on the economics of health care, and within that I focus on quality measurement and quality improvement.
Q. Have you published any articles on that?
A. I have probably published 60 or 70 peer reviewed articles across all topics, and five or ten of those would be focused on quality improvement.
Q. Do you have any recent publications related to health care

quality measurement and improvement?

A. I do. Last year some coauthors and I published an article in the American Journal of Managed Care, it is a peer reviewed journal, and we developed a novel method of evaluating the quality of medical care received by lower income individuals in the U.S. relative to higher income individuals.

Q. Do you teach any courses at Cornell in health care quality measurement and improvement?

A. I teach a U.S. health care system class and I devote several lectures to the state of quality of medical care in the U.S., how that has changed over time, how quality is measured, the importance of public information on patients' choices.

I developed an assignment in that class where I ask students to consider themselves to be a prospective surgical patient and decide which of two hospitals in New Hampshire to have that and they have to use state and federal information to try to learn what they can about quality.

Q. Do you have any other experience in health care quality management?

A. I do. I currently am a trustee on one hospital board and one health system board.

Since 2009, I have been a trustee on Robert Packer Hospital in Pennsylvania. I also sit on the quality subcommittee of the board. Since 2018 have been a trustees of Atlantic Health System, a six hospital health system in Morristown, New Jersey.

He have a sum of the subcommittees there, and they specifically recruited me because they have a competency based board and they were looking for a health economist with a national reputation.

Q. As a hospital board member and on these committees that you were discussing, do you have any interaction with hospital quality measures and ratings?

A. Yes, absolutely. So, as an example, the quality subcommittee of the Robert Packer board meets monthly, and before each of the meetings the trustees on that ask us to do a dashboard, so we see dozens of different quality measures. We can see what the hospital's goal is for that year and the performance month by month against those goals.

Q. Have you previously served as an expert in other litigation?

A. I have. I have been admitted as a health economics expert in about 20 cases where I testified either at trial or arbitration and I have been deposed about 50 times. All of those cases involved health care organizations, many involved hospitals or health systems.

Q. Given your experience, do you consider yourself an expert on the economics of health care?

A. I do.

Q. Given your experience, do you consider yourself an expert on the economics of health care quality measurement?

A. Yes, I do.

MR. HVIDT: At this point, your Honor, I move to have Dr. Nicholson qualified as an expert.

MS. BLAIR: Your Honor, we submitted Daubert motions, I am not going to voir dire this witness. We'll stand on our papers.

THE COURT: To the degree that was the objection, I overrule the objection. I am not sure we have sent our written order out to you today, but there is one in the works.

MR. HVIDT: I was not aware of it before approaching. Thank you, your Honor.

BY MR. HVIDT:

Q. Dr. Nicholson, have you formed opinions that you are offering in this matter?

A. Yes, I have.

Q. Could you summarize your opinions?

A. I have three opinions. The first is that the Leapfrog Group's grading approach penalizes hospitals like the five community hospitals that choose not to participate in the Leapfrog Group survey.

The second opinion is that Leapfrog Group's grading approach deviates from the foundational principles that underlie proper quality measurement and quality reporting system.

And the third is that there is substantial empirical

research that shows that hospital quality ratings and safety ratings matter, that they affect patient decisions about where they want to be treated. What that means is a grading systems like Leapfrog's that has unreliable grades can distort patient decisions and cause patient harm.
Q. What information did you rely upon in reaching these opinions?
A. I relied on my experience teaching about quality and safety, and my research on those topics. In addition, I had access to the data and the documents disclosed as part of this case, including the Leapfrog Group's underlying raw data, underlying the grades that they assign.
Also, I used publicly available information such as academic literature and such.
Q. And did you submit a report in this litigation?
A. I did.
Q. And did you agree to be deposed in this litigation?
A. Yes.
Q. Did you review any documents and data, any testimony of any witnesses and expert that occurred after you submitted your report and after you were deposed in this litigation?
A. Yes, I did.
Q. Did any of the material you reviewed after you submitted your report or after you were deposed change your opinion?
A. It didn't change my opinions; it strengthened and confirmed

my opinions.

Q. Dr. Nicholson, can you explain your understanding of Leapfrog's current hospital grading approach for the Court?

A. Sure. The Leapfrog Group surveys hospitals, they collect information on quality and safety. They also collect data from the Center for Medicare and Medicaid services, CMS. They develop 22 quality safety metrics which underlie a letter grade from A to F that Leapfrog Group assigns to hospitals twice a year.

There are 22 variables, as I mentioned. Ten of those 22 variables are outcome measures and collectively they account for 50 percent of the Leapfrog rate. An outcome's measure would be a measure of a patient's health, such as whether a patient falls in the hospital or acquires an infection while they are hospitalized. Those ten outcome measures generate 50 percent of the letter grade.

The 12 structural and process measures constitute the other 50 percent of the letter grade. A process measure would be something like physician communication. A structural measure would be an indicator of a hospital's capability of providing safe and high quality care such as whether they use computerized physician medication entry.

So, other than the 50/50 split, the way that the Leapfrog Group determines a grade depends on -- or differs for participating hospitals, those who respond to the survey

relative to nonparticipating hospitals.

For a participating hospital you have the ten outcomes measures that constitute 50 percent of the grade. I will focus more time on the right-hand side of the pie chart here.

For a participating hospital, the Leapfrog Group has five process and structural measures that they obtain from the Center for Medicare and Medicaid Services. Those are the patient survey measures we just heard about.

In red and green here you can see there are seven structural and process measures that for a participating hospital the Leapfrog Group would obtain those variables from the survey.

The numbers here represent the weight, so the five HF scores constitute 15 percent of the letter grade. For a participating hospital, the four structure and process measures in red account for 24 percent of the grade, and the three in green 11. The reason I distinguished the red and the green is because the Leapfrog handles those differently for nonparticipating hospitals.

Q. How does the Leapfrog Group grade nonparticipating hospitals?

A. From the outcomes measures perspective it is not identical, but similar. Focusing on the right-hand side of the pie on the right, they have access to the HCAP scores. What the Leapfrog Group does is, the 11 percent, the three structure and process

measures in green on the left, they exclude those entirely from determining grade for a nonparticipating hospital and reassign that 11 percent weight to the remaining two categories on the structure and process side.

What that means is the four measures remaining that are obtained from the survey for participating hospitals have a weight of 31 percent, the ones in red on the right for a non-participating hospital.

Q. For the nonparticipating hospitals, does Leapfrog have any data from them?

A. They don't because the participating hospitals chose not to complete the voluntary survey.

Q. What are the steps that Leapfrog uses for its current grading approach to assign a score for the four measures for a hospital that does not respond to the Leapfrog hospital survey?

A. The Leapfrog Group proceeds in two steps. The first step in a case where they don't have the data is to see whether that hospital did participate in the prior year.

So, if they did participate in the prior year, the Leapfrog Group would use that prior score for the four structure process measures as the measure for that year, for that grade. That is step one.

If the hospital had not participated in the prior year, Leapfrog Group moves to step two, and what they do in step two is they assign the lowest possible score to a non-participating

hospital for each of those four structure and process measures.

So I refer to this as a nonparticipation penalty, and sometimes refer to it as 60 out of 400, because the lowest possible score across the four quality metrics is 60, and the maximum score is one hundred for each of them, or 400 total.

Q. Can a hospital score zero on these four measures?

A. A nonparticipating hospital can't score a zero because that is not an available score. It is very close to zero.

What you can see are the four structure and process measures that are at issue here or partly at issue here. So doctors order medications through a computer is one of those four, CPOE.

If you look at the right for a participating hospital, they will provide information for Leapfrog Group, and Leapfrog Group with see if they achieved the standard, if so they assign a hundred points, considerable achievement 70, some achievement 40, limited achievement 15.

For the nonparticipating hospitals, what Leapfrog does is to assign 15 points for the CPOE, that is consistent with limited achievement, 25 points for the bar code medication administration, five for the intensive care unit staffing, and 15 for the hand washing -- hand hygiene protocols.

If you sum those lowest possible scores you get a total of 60, 15 plus 25 plus 5 plus 15, and that is therefore the genesis of the 60 out of 400 penalty.

Q. You keep referring to it as a penalty. What is your support for the notion that this assignment is a penalty for nonparticipants?

A. As I mentioned, one of the things I relied on in forming my opinions was data produced in the course of this case, and that includes the underlying data that the Leapfrog Group collects from hospitals.

So, using that data set, what I did was look at for the participating hospitals, for the hospitals that did participate in the survey, what was the average score that they received across all four of these structure and process measures.

What you can see is they are close to, not exactly a hundred, very close to a hundred.

So, on the computerized position or entry, the average score received by the participating hospitals is 96.4, very close to the maximum value of a hundred. For the safe medication administration, for the participating hospitals you average across all of them on that metric it is 96.9, and you can see similarly for the latter two.

If you add up those four, again this is the participating hospitals, you get a total point value of 362 out of 400, which is vastly different than the lowest possible score which is assigned to the non-participating hospitals.

So, instead of a total of 362 for the average participating, the nonparticipants get 60 points. It is a 302

point difference between the average of the participating hospitals and that penalty associated with nonparticipation of 60.

Q. Have you seen anything in the data that Leapfrog has produced to support the notion that the nonparticipation penalty in the red is appropriate for the five community hospitals?

A. No, I haven't seen any documentation in the record that provides any scientific justification for the penalty of 60.

In the data set I have been analyzing, that I cite in my report, and I continue to analyze that data set, in that data set you can see -- when the five community hospitals last participated in the Leapfrog survey, you can see what their average response is, the average across the five community hospitals for each of these four structure measures.

You can see the average is 2021, the last time the five community hospitals participated in the Leapfrog Group survey, were a little bit higher than the overall average for all participants, that 362 that I showed previously.

So the 370 is well above the current nonparticipation penalty that Leapfrog Group is assigning the number of 60.

Q. Have you seen any other evidence in the record consistent with your opinion that Leapfrog's current grading approach penalizes nonparticipating hospitals, like the community hospitals?

A. Yes. The other evidence I saw confirmed what the quantitative analysis showed. For example, Patrick Romano, who is a member of the Leapfrog Group national expert panel, he characterizes the step two penalty as a penalty for non-response. Professor Austin at Johns Hopkins University, at his deposition acknowledged that the step two process is a penalty for nonparticipation.

In a forum where Leapfrog Group was soliciting comments from hospitals nationally, many hospitals characterized this new step two process as a penalty for not participating.

MS. BLAIR: I would object for the record that that mischaracterizes the testimony of those witnesses.

THE COURT: The objection is overruled. You will have cross-examination.

BY MR. HVIDT:

Q. In reviewing Leapfrog's hospital grading data, did you observed whether Leapfrog's grading was affecting non-participating hospitals?

A. Yes. So far I have shown two averages, the average of the participating hospitals and the average of the community hospitals when they last participated.

If you look in the same data set that I used in my expert report and continue to analyze, you can see this penalty is quite severe and substantial.

So, there is not a single participating hospital that

received a limited achievement across all of four of these measures.

MS. BLAIR: Your Honor, these are opinions and analyses not in Dr. Nicholson's original report. They were demonstratives shown at the deposition of our rebuttal witness, Dr. Harris. They go to what Dr. Nicholson is about to testify, and we asked on the record if he would supplement his report t the deposition. Counsel said no, and we filed a motion to bar these new analyses we never heard of and didn't have time to review or analyze with our expert.

THE COURT: The objection is overruled.

BY MR. HVIDT:

Q. Dr. Nicholson, you may continue with your answer.

A. Yes. So, in that data set there isn't a single participating hospital that received limited achievement on all four of the structure and process measures, didn't receive 60.

So, what that means is this nonparticipation penalty gives nonparticipating hospitals literally a worse score than the worst performing participating hospital.

Another way to look at it is, if you take the participating hospitals, look at the bottom one percent, so the one percent that is the poorest performing on the four process measures, one percent, the average score is 282. So that is four times higher than the 60 that is associated with this nonparticipation penalty.

So it just shows the magnitude of the penalty that is being imposed.

Moreover, there is not a single nonparticipating hospital that received an A since the new step two process was instituted, and in the spring of 2025, there was not a single participating hospital that received an F.

So all of these things, I think, highlight the magnitude of the nonparticipation penalty.

Q. And in your expert opinion, is Leap Frog's current grading approach scientifically defensible?

A. No, certainly not on this dimension. There isn't, that i am aware of, any scientific basis for the penalty associated with nonparticipation.

Q. You mentioned that you had a second opinion in this matter. Can you state your second opinion?

A. Yes. The second opinion is that Leapfrog Group's grading approach deviates from the foundational principles that underlie a proper quality measurement system.

What I mean by that is, this field of quality measurement in some sense started in 1966 when a professor at the University of Michigan published an article. He laid out a number of facts and principles. First, he talked about the different ways you could measure quality and safety. It could be outcomes measures, processes measure, structure measures, as we talked about.

He also emphasized the importance of having standardized consistent approaches that were applied across all organizations that were being rated.

And finally, most importantly, he emphasized that a proper quality measurement system should reliably predict patient outcomes. That is really the point of a quality measurement system, trying to direct patients to providers where they have the higher ability receiving excellent care.

In an effort to achieve those goals, there are four principles. The first is to use the same data sources to collect quality measurements across all the organizations, clearly a way to increase the consistency and the fairness.

The second is to apply the method in a consistent way with those data across all the organizations that are being evaluated or rated. You have apples an apples measuring system, you have a level the playing field.

The third is to increase the reliability and confidence in the data by verifying the data with meaningful audits.

And fourth is to collect as much information as possible, ideally complete information on all the entities being evaluated so that you don't create any potential bias from missing data.

The statistics literature considers that if you are missing more than ten percent of data you are likely to have an unreliable and biased measurement system.

Those are the four principles that is the spirit of that article.

Q. In your expert opinion, does Leapfrog's grading system deviate from these principles?

A. In my opinion, they deviate across all four and depart from all four of the principles.

The first is that the Leapfrog Group uses different resources and time periods for participating hospitals versus nonparticipating hospitals. An example of that is the standardized infection rate is one of the five variables that count for 22 percent of the Leapfrog Group's letter grade.

Leapfrog Group collects those data from a different source for the participating versus nonparticipating hospitals. For participating Leapfrog Group collects that data from the National Health Care Safety Network. The data are for a relatively recent time period, and the hospitals have an ability to retroactively edit the underlying data.

By contrast, the nonparticipating hospitals, Leapfrog obtains that data from the Center for Medicare and Medicaid Services for an older time period, and the nonparticipating hospitals, because the data are frozen by CMS, they don't have the ability to retroactively edit the underlying data.

There is literature that demonstrates that the different data sources provide favorable data for the participating hospitals relative to the nonparticipating hospitals, so in

that first foundational principle there is a departure.

In terms of utilizing apples to apples grading methods, I went through the method for missing differs for participating and nonparticipating hospitals. So that is an inconsistency of methods for different types of organization that are being evaluated.

The Leapfrog Group does not conduct many, if at all, in-person audits to ensure the reliability of the data. In 2019 the Leapfrog Group audited in person five out of the 2,500 hospitals. This is well under one percent, .2 percent of hospitals. That is particularly important because, as I show in my report, a majority of hospitals are receiving a perfect one hundred out of one hundred on those seven structure and process measures that come from the Leapfrog Group survey. So that is a situation that would seem to demand more auditing than what is occurring. So, another deviation on that principle.

And finally, remember, when I was describing this I said statistics literature threshold is that if you are missing more than ten percent of a variable it is likely to be unreliable. What you are trying to infer from the remaining 89 percent is likely to be unreliable.

In Leapfrog's case the nonparticipating hospitals are about 23 percent of the total. The Leapfrog Group is missing well over ten percent, 23 percent of the data over those process

measures. That calls into question the reliability of those data.

Q. In your expert opinion, do the deviations you have identified affect the reliability of the grading outputs?

A. Yes, they do.

Remember the goal of a proper quality measurement system is to predict patient outcomes so that a patient looking at the ratings can be confident if they go to a higher rated one, there is a higher probability they will have a better outcome.

What has been shown in the literature in an article by Smith in 2017 and Gonzalez in 2013, is that the Leapfrog Group grades don't reliably predict patient outcomes, and I using the Leapfrog Group's own data conducted similar analyses that corroborated those peer reviewed literature results.

Specifically I took the ten Leapfrog Group outcomes measures and determined statistically does a hospital with a B grade have a statistically better health outcome than a hospital with a C grade, or does a hospital with a C grade have a consistently statistically better health outcome than a D or F, and the answer is not consistently. 50 percent of the time it does and 50 percent of the time it does not.

Q. Does Leapfrog's current grading approach stack up against its founding expert's safety principles?

A. Not in my opinion, no.

One way to see that is to look at the national expert

panel's elaboration of method that was chosen for the Leapfrog Group early on in the Leapfrog Group's organization.

So, what you see on this slide, you start with the upper left, is the 2013 article in the Journal of Patient Safety, and it is authored by Matthew Austin, a professor at Johns Hopkins, and some other members of the Leapfrog Group's national expert panel.

If you move to the right, in this part of the article the expert panel is describing how they determined the best approach to deal with missing data, such as when the Leapfrog Group doesn't have responses from particular hospitals.

The national expert panel considered five different approaches of dealing with missing data. And for the 2010 to 2020 period, the expert panel, the guiding principle shows approach number two, so impute the hospital's performance on the missing measures using other available data. Specifically the other data set was the American Hospital Association survey.

So, if a hospital didn't participate didn't provide a response, they would research that secondary source.

And I should maybe then point out the first highlighted text on the upper left. "In this way we avoid making questionable assumptions about the performance of hospitals with messing data."

I should point out that between 2021 and 2024, Leapfrog's

approach to missing data was the first potential method and that is going to be similar to the way I conduct a counter factual analysis.

In this article the expert panel, if you look at the second highlighted section said, "finally the third and fourth approaches were rejected." The third approach I would consider to be a maybe somewhat light penalty for a nonresponse, so assigning a nonrespondent a score that is one deviation worse than the average for the participants.

The fourth method that was considered and rejected is essentially the current step two approach to missing date, which is to give the hospital zero credit for the measure when the hospital chose not to report data.

So, limited achievement isn't literally zero, but is the lowest possible score.

If you go back to the text, the third and fourth approaches, penalties for non-response, were rejected for creating a structure bias by Leapfrog, and skipping down, no penalties for missing data.

So, in that way, the current approach is at odds with those guiding principles, the founding principles.

Q. Does Leapfrog's current grading approach stack up against its current methodology rules?

A. No. This slide is taken from the Leapfrog Group methodology document, and also a section on the website which

is called About the Grade. So, in reading the yellow here, Leapfrog is not able to calculate a safety grade for every hospital in the U.S., including -- and then there is a number of bullet points for types of specialty hospitals that aren't given a letter grade.

And at the very bottom bullet point in yellow, hospitals that are missing scores for more than six process structural measures, Leapfrog is apparently not able to calculate the safety grade for those hospitals.

For a nonparticipating hospital, from my prior slides you can see Leapfrog is missing seven, which is more than six. They don't have data on more than six of the processing structural measures, yet they are still assigning a grade.

Q. In your expert opinion, should Leapfrog Group grade nonparticipating hospitals?

A. In my opinion they should not. They are not adhering to one of their own principles.

Q. Did you do anything to test the significance of your observations of Leapfrog's safety grade data that it produced in this litigation?

A. Yes. What I did in my report is I conducted a counter factual analysis where I asked the following question: What if the non-participating hospitals in fact decided to participate, and they behaved in a way consistent, similar, identical to the participating hospitals?

This is a way of -- I am not coming up with a new recommended approach, I am just testing the extent to which the current Leapfrog Group method or grading approach, does it penalize nonparticipants and to what extent.

If the nonparticipants in fact participated, what I do in the counter factual is, I give the nonparticipants the mean score for the seven structure and process measures that are not available for the Leapfrog Group for the nonparticipants. I score the every use assign the mean score of the participants. That is the only change I am making.

This has been done in peer reviewed literature, so there is a scientific basis. A study by Wang did something similar, taking the nonparticipants and assigning the mean value of the participants.

It is in fact, if you recall from two slides ago, assigning the mean value from the participants to the nonparticipants, was that step two approach that the Leapfrog Group used between 2021 to 2024, this is consistent with that prior approach.

In fact, I think I am being conservative because I am assigning a mean of the participants to the nonparticipants when in fact a majority of the participants are getting a perfect one hundred. So using the mean is actually conservative.

As I showed, the last time the five community hospitals did participate, their scores across the four process measures were

higher than the overall. So, for all of those reasons, I believe my approach is conservative.

So, I conducted this counter factual for all non-participating hospitals and determined that the grades change substantially for almost all of the hospitals. Nationally, before I show this slide, nationally, currently the non -- 96 percent of the non-participating hospitals are receiving grades of C, D, or F from Leapfrog.

In the counter factual, nationally 71 percent, when I am assigning them the value that is the mean for the participating hospital, 71 percent get an A or B. There is an enormous difference that comes from the nonparticipation penalty.

For the five community hospitals, you can see the letter grade from spring of 2025 for the five community hospitals. They all in the counter factual analysis would have received a C had they participated and behaved in a way similar to the participants.

So it shows the extent, the magnitude of the nonparticipation penalty that is baked into that step two approach.

Q. Dr. Nicholson, opposing counsel called this speculative in her opening. Do you have any reaction to that?

A. I completely disagree. As a start, counter factual analyses are very common in litigation and other types of matters.

The reason that I uses the mean is very defensible, it has been used in peer literature, the Leapfrog Group methodology, had used it before. It is conservative because the majority of hospitals get a perfect score, and I show that the last time that the five community hospitals did participate their scores were above the mean, so that is an indication of being conservative.

For all those reasons, I don't think this is speculative at all. This is the kind of analysis that I do routinely in terms of trying to isolate change that is coming from just changing one factor, nonparticipation to participation, holding everything else constant.

Q. Did Leapfrog's proposed expert have a view on your counter factual?

A. Yes, Dr. Harris, I believe, had two critiques.

The first critique of this counter factual analysis is, he took issue with my assigning the mean value from the participants to the nonparticipants for the seven structure and process measures, arguing that instead I should have done it for the four because three of those that are in green are excluded entirely. I don't think he understood the exercise.

If a nonparticipating hospital is going to participate they are going to behave like the participating hospitals, and the participating hospitals provide information on all seven of those measures. So I stand by my decision to look at all

seven.

His second critique stems from his hypothesis that there is non-response bias, that the hospitals that aren't participating are not being transparent and that transparency indicates that they are somehow worse performers, less safe, lower quality.

I haven't seen any evidence in -- any evidence in this case that has been consistent with that. There have been studies by Smith in 2017, by Wang in 2014, that look at this and don't find that there are differences in outcomes between the participants and the nonparticipants on various important outcome patient measures.

Q. In your expert opinion, does Leapfrog's current grading approach affect the letter grade that the community hospitals receive?

A. Yes, I think you can see it here in the changes from the Ds to the Fs to the C.

Q. In your expert opinion, can the Leapfrog safety grade issue that you have identified have any impact on the market?

A. Yes. If you have unreliable grades, as I believe Leapfrog Group has, that can distort patient decisions, and that can lead to patient harm.

I base that on three different sets of evidence.

The first is, there is substantial literature that shows hospital ratings matter, they matter to patient decisions and they matter to hospitals.

So, for example, Chondra and colleagues published an article in the American Economic Review, and they show that when the hospital's CMS scores improve they subsequently receive more patient volume, and similarly in the other direction. Importantly, they find this is particularly the case in electives, where patients have the ability to review information before they actually select the hospital as opposed to an emergent case.

There is another study by David Cupper and colleagues in the same journal and they are looking at the New York State cardiology hospital ratings, which are public, and they show that when the hospital's rating go down, that hospital loses cardiology volume. And then there is a study by Deven Pope in U.S. News and World Report, and he is looking at specialty specific ratings like obstetrics, or cardiology or rheumatology.

When a hospital's U.S. News and World Report rating goes up it gets more volume as well.

Those are all three showing that patients are relying on hospital ratings when making decisions.

The final one that is important to mention is an article by Hibbard, and what they look at is what happens to hospitals when the hospital ratings worsen, and what Hibbard and colleagues find is that hospital reputation suffers, relationships with patients and doctors and nurses become

strained and it makes it more difficult for hospitals to raise funds through philanthropy.

That is the first set of evidence that hospital ratings affect physicians and hospitals.

The second is, again, the opinion related to destroying patient decisions -- the second has to do with the way in which the Leapfrog Group positions itself on the website as the gold standard for educating patients and self-insured employers regarding hospital safety and quality.

The Leapfrog Group is clearly attempting to -- and they characterize the choice of hospital as something that could affect life or death. You are twice as likely to die at a D or an F versus an A.

It is not just posting information, but positioning it in a way that can influence decisions.

And third set of evidence -- and some of this is based on my experience as a hospital board member, but it goes beyond that -- is there is ample evidence that consumers are using the Leapfrog Group ratings.

So, as a board member, hospital administration will indicate to us how they are fairing on the Leapfrog Group grades. Some hospitals are basing executive compensation in part on the Leapfrog grades. You have self-insured employers who are using Leapfrog information to determine which hospital should be in the network, which hospitals should be available

to the employees.

Private insurers are using the Leapfrog grades in part to run their pay for performance programs, so getting a higher grade might get a higher payment from the health insurers and conversely, one that gets a lower grade might receive a lower payment.

So, all of those, all of that literature and evidence indicates that unreliable grades can distort patient decisions and cause patient harm.

Q. And have you seen any documents or evidence or testimony in this case of harm that is consistent with what you would expect in your expert opinion as possible reputational harm caused by the Leapfrog safety grades here?

A. Yes. So, I did hear one of the two community hospital's CEOs testimony, but I also read their declarations and read some of the other court documents.

I think the evidence on what is occurring at community hospitals is consistent with what one would expect based on the literature I just described, the way the Leapfrog Group is positioning itself, and also the way consumers are using it.

There is evidence that walk-in volume is decreasing. That is elective, that is the type of patient response that is predicted by the literature that I just reviewed. The CEOs are talking about damage to their reputation, strained relationships with physicians and nurses. That is consistent

with the Hibbard article about how low ratings can affect hospitals.

You also -- there is evidence, you heard a little bit about it earlier this afternoon, and I think this morning, patients who were confused about the ratings, who don't want to be treated the way the physicians wanted to treat them based on what they are learning about Leapfrog Group rating.

So, you can see on this slide, if a patient is using a Leapfrog Group grade to seek out care at a C rated hospital versus an F rated hospital under the belief that the C rated hospital will have better patient outcomes, well they may not. Or the true quality and safety might be identical, but patients are traveling further in search of a higher grade hospital, and there is literature that shows that additional travel can be harmful for patients.

I haven't conducted a formal causal analysis, but the evidence that I have seen on what is occurring at the five community hospitals is consistent with and is what would be predicted to occur based on the literature that I have reviewed.

MR. HVIDT: Pass the witness and reserve time.

THE COURT: All right. Let's take our afternoon break and return in 15 minutes. That will take us until five minutes to 4:00.

(Thereupon, a short recess was taken.)

THE COURT: Okay, we are ready to go.

CROSS-EXAMINATION

BY MS. BLAIR:

Q. Dr. Nicholson, my name is Kim Blair. Nice to see you again.

I wanted to go over a few of your qualifications to make sure I understand about the literature that you authored. You never authored any article specifically on patient safety ratings, correct?

A. Nothing where that is the sole focus, but certainly some of my research includes patient safety metrics.

Q. What about articles regarding imputation modeling, you haven't authored any articles specifically on that; is that fair?

A. That is right, I haven't written something in the statistical literature on that.

Q. And you never conducted any research on the propriety of using imputing data in an analysis, correct?

A. Correct. I routinely consider imputation, but I haven't written a peer reviewed article on that topic.

Q. Would you agree with me that imputation is a scientific methodology that is used when data is missing?

A. Yes, it can be. There are different ways to do it, but it is a general method that is accepted.

THE COURT: What is the word you are using?

MS. BLAIR: Imputation.
BY MS. BLAIR:
Q. I am using that word because we have been referring to the four metrics as imputed, imputed metrics. Do you understand we are using it that way in this litigation?
A. Yes, I do.
Q. In terms of your qualifications, you sit on a hospital board, correct?
A. One hospital board, one health system board.
Q. Atlantic Health, correct?
A. Yes.
Q. You have never served as a hospital administrator, correct?
A. Correct. I have consulted two hospitals for four years, but never served as an administrator.
Q. You have never been involved in gathering data to respond to Leapfrog's survey, correct?
A. Correct.
Q. As I understand your opinions in this case, you worked alongside the Cornerstone Group in preparing those opinions, correct?
A. Members of Cornerstone Research formed my team who conducted analyses under my direction.
Q. Do you know how many hours the Cornerstone team put in working with you?
A. I don't know.

Q. You testified in your deposition that Cornerstone staffed the research related to your opinions in this matter?
A. I don't think I would have worded it that way, staffed my team. They did analyses that underlie my opinions.
Q. And they performed the analysis underlying your opinions?
A. Under my direction.
Q. And you have eight workbooks attached to your opinion, correct?
A. To my report, I believe that is correct.
Q. To your report, yes. Cornerstone would have been involved with all of those?
A. Yes.
Q. Did I ask this, do you know how many hours Cornerstone spent?
A. I do not know, no.
Q. Do you know how much money Cornerstone billed for their work on this matter?
A. No, I don't know that.
Q. And do you get any part of -- does any part of your fee come from the work they are doing?
A. So, I bill my client separately from Cornerstone, but I do retain a percentage of what Cornerstone collects for the cases on which they staff my research team.
Q. Do you have any expectation of how much you will collect from Cornerstone in this case?

A. I don't know.
Q. Your rate is 1200 an hour?
A. I think might be 1250.
Q. I want to make sure you are getting paid right. How many hours do you have in this case thus far?
A. I don't know exactly how many.
Q. More than a hundred?
A. Yes, probably close to -- maybe a little under 150. I don't know exactly.
Q. Okay. And you have never spoken to any of the CEOs from any of the five hospitals in putting your opinions together. Is that fair?
A. That is correct. It was not necessary for me to complete my assignment.
Q. Are you aware that in March or April 2025 Cornerstone had a meeting with the five CEOs from the hospitals?
A. I don't know if they did or didn't.
Q. So, if they did, you weren't aware of that?
A. I wasn't -- I certainly wasn't at that meeting.
Q. Did anybody at Cornerstone tell you, well, we spoke to the CEOs and here is data from your opinions.
A. So, no, I have not met with any of the community hospital CEOs. I wasn't aware of that meeting.
Q. Okay. So you didn't give Cornerstone any questions to ask the CEOs in connection with your opinion?

A. On that particular meeting, no, I didn't give them any questions.
Q. What about ever, did you ever give Cornerstone any questions to ask the CEOs?
A. No. I certainly, I do this in all of my cases, once I understand my assignment, I determine the analyses I want to conduct and I direct my research team to conduct those analyses and I review the analyses and the outlook with my team.
Q. I want to make sure you are not aware of Cornerstone speaking to the CEOs?
A. I am not aware --
Q. Are you aware that Cornerstone conducted an analysis of Leapfrog reports in this case?
A. Analyses in this case has been ongoing, so that wouldn't surprise me.
Q. Did they do that at your request?
A. So, certainly I have been working with my Cornerstone research team as I continue to analyze the data that was available to me when I produced the report. I didn't specifically direct them to download a specific number of documents, but they have been working with me to prepare for the testimony that I provided today.
Q. Did you receive archival reports from January 13, 2025 or after?
A. I didn't receive them personally, no. Nobody sent those is

to me, but it wouldn't surprise me. The analyses in this case is ongoing.

Q. Were any of your opinions you offered on your direct examination based on the archival reports that were ordered two days ago?

A. No. No.

Q. And just to close out, and we are going to talk about your counter factual very soon, but your counter factual is not based on the actual data from these five hospitals on the seven measures, correct?

A. Correct. At the time of my report, the time of my deposition, the Leapfrog Group didn't have those -- that information available nor did I have that information available.

Q. That is a good point.

In this litigation in preparing your opinions, you did not receive the actual CPO BCMA, hand hygiene or IBS data from the hospitals to determine whether or not they were really scoring at limited achievement, correct?

A. My understanding is, and I don't know the timing, but my understanding is the Leapfrog Group requested from the five community hospitals for information on how the hospitals would have responded had they responded.

I have seen some of those data, but that was subsequent to filing the report.

Q. So I am clear for the Judge, your counter factual was not based on any empirical data from the five hospitals for those measures, correct?
A. It wasn't because those data were not available to me nor to the Leapfrog Group, which is why one has to address missing data.
Q. Did you ask for the actual data?
A. I didn't or direct my research team to ask for it. It's my understanding it came into the records through the discovery process.
Q. You have not seen it, correct?
A. I have seen the summary of the information that the five community hospitals would have reported had they -- would have provided had they participated.
Q. You have seen that, you have seen empirical data for each of the five hospitals on their hand hygiene models?
A. I have seen the raw inputs that would have go into that survey had they participated.
Q. You never saw the empirical data, for example, you have never seen than hand hygiene logs which show the hospitals were doing 200 hand hygiene observations?
A. No. I had seen what at the level at which it would be reported to the Leapfrog Group. My understanding of that is it generally would have resulted in scores consistent -- similar to the overall average of the participants.

Q. Did you ever take the raw data from the hospitals and fill out the survey for them on these seven measures to see how they actually would have scored if we used their actual data?
A. No. I didn't take that step.
Q. You rely on your -- in your opinions on the 1966 article by Donavedian as the foundational principles, correct?
A. Yes, that is one of them I use.
Q. Would you agree with me that in 1966, when Mr. Donavedian wrote that article, there were no hospital ratings in place at that time?
A. I think that is correct.
Q. And would you agree the title of that article is Evaluating the Quality of Medical Care?
A. Yes, and I consider safety to be a subset of quality.
Q. In fact, you and I had a long discussion about that at your deposition. Do you remember that?
A. Yes.
Q. The article that Donavedian wrote was focused on quality, and not specifically patient safety, correct?
A. Yes. The principles that he articulated are safety as a component of quality.
Q. You saw Leapfrog's expert panel guiding principles in this matter, in connection with this matter, correct?
A. Yes.
Q. Do you recall those guiding principles -- we can pull it

up, I guess, 203. I think it is in evidence.
While we are waiting for that, do you recall the guiding principles were written by the Leapfrog expert panel in 2012?
A. I can't recall the year.
Q. And if we look at this article, and I will find it for you, it talks about the focus of this composite score is patient safety. Right here, yes.
Do you see this?
A. Yes.
Q. All right. It says the focus of this composite score is patient safety, which is being defined as freedom from harm, and we recognize patient safety is a different and narrower construct than hospital quality. Do you see that?
A. Yes.
Q. Do you have any reason to dispute that, unlike other ratings that maybe we do in quality, that Leapfrog rate is reviewing safety? Do you understand that distinction?
A. I agree that safety is narrower than quality. I don't think the principles underlying a proper safety measurement system would be any different than the principles that underlie a proper quality system.
I also see aspects of Leapfrog Group variables that I would put inside the quality sphere, but outside the patient safety sphere. It might focus on that, it has measures I think of as being quality, but broader than patient safety.

Q. You don't disagree with me, this is Leapfrog -- this is how Leapfrog used what they are doing?
A. I am not disagreeing with the words on that page.
Q. Donavedian talks about three components, outcome, structure and process, correct?
A. Yes, this is part of this.
Q. Would you agree with me the measurements that go into it are outcome structure and process, correct?
A. Yes, I would agree with that.
Q. You were talking about an issue that Leapfrog does not have a bold enough verifications process. That is one of your positions, correct?
A. Yes, they don't conduct many in-person audits.
Q. CMS does in-person audits?
A. Correct.
Q. And Leapfrog has the ability to conduct in-person audits?
A. Yes, that is my understanding.
Q. Do you know what percentage of hospitals CMS audits every year?
A. I don't know the percent. I do know Robert Packer was audited from some billing perspective. I don't know how common that is.
Q. So, your criticism of Leapfrog is that they don't go on site and audit enough hospitals, but you don't have a criticism of CMS's auditing or how many audits they perform. Is that

fair?
A. I do know as a board member the last thing you want is CMS to come in and be auditing. There is a lot of revenue and billing wrapped up with CMS payments.
Q. Do you agree the Leapfrog survey is voluntary?
A. Yes.
Q. Do you agree it is free, no payment, no monetary payment?
A. My understanding is there is no out-of-pocket. We heard from one of the CEOs that from an economic perspective, it is a real cost.
Q. You agree Leapfrog does not charge to participate in the survey?
A. Yes, I do.
Q. The Joint Commission does, correct?
A. That is my understanding.
Q. And we talked about the different measures, and there are ten Alpha measures. You agree they all based on CMS data, correct?
A. For a safety matter, technically source --
Q. You have an issue with had -- you agree with me the NHSN data is CMS data?
A. Yes, in terms of how the Leapfrog Group uses it, in terms of what the hospitals can and can't do, but at the end of the day it is both CMS.
Q. The patient experience scores, they also come from CMS,

correct?
A. Yes.
Q. And CMS is data that is risk adjusted, correct?
A. Certainly some of the measures, I don't think all of the CMS measures are.
Q. You don't think they are all at risk adjusted?
A. No. Readmission rates would be, mortality rates would be. I am not sure the infection rates would be. I am not aware of any risk adjustment.
Q. Okay. Your talked with Mr. Hvidt about limited achievement. You agree that it is the lowest score that a participating hospital earned, correct?
A. It is the lowest score a participating hospital could earn based on the response, not for all four.
Q. Hospitals -- participating hospitals do get limited achievement for some of the four measures, correct?
A. That is my recollection, but not for all four, yes.
Q. And you talked about the weights, your pie chart, right. I want to talk about that, the pie chart and how the weights changed depending on whether you are a participating hospital or not.
The reason you can do the math on the weights is because the scoring methodology is right there on the website, right?
A. Yes, part of the methodology document describes how the weights get altered when there is missing value.

Q. Do you agree that Leapfrog makes the scoring methodology transparent to the public if they wanted to read it?
A. I agree they would make it accessible. I don't know the extent to which your typical patient would be able to process it. I agree it is accessible.
Q. Accessible. I want to talk briefly about your counter factual. What you did is you said, I am going to assume all nonparticipating hospitals for the spring of 2025 are now participating and I am going to assume they are all are achieving the national median for all seven measures, right?
A. The mean of the participating hospitals.
Q. One assumption you made is that participating hospitals assign themselves the best score for those seven measures, right?
A. I didn't assume that. First of all, the participating hospitals provide information, Leapfrog converts that information into scores and points at least for some structure process measures.
What I believe I said a majority of participating hospitals get a hundred out of one hundred on all seven of the structure process measures. I am not saying they give themselves a hundred. The response they provide is assignment of one hundred by the Leapfrog Group.
Q. Your report says they assign themselves the highest score. That is what your report says. I am making sure, is that an

assumption you made or you know that for sure?
A. We had a conversation about that in my deposition. If there was any confusion in the text, I apologize, but in the deposition I think I was very clear that I understand the participants provide information. From that information Leapfrog Group produces numeric scores for each variable.
Q. Do you believe participating hospitals over inflate their survey responses?
A. I think there are incentives for participating hospitals to provide information that results in high scores. I think there isn't -- there aren't enough in-person audits to check those incentives.
I do think when you have a situation where 89 percent of participating hospitals end up with a hundred, that is very odd distribution. For an economist, you don't see 89 percent of the observations at the maximum value.
Q. Do you have any empirical data that is true, hospitals over inflate their data the survey?
A. No. I wouldn't go that far. I think the conditions are such that it might happen.
Q. Okay. In fact, you sit on the board of Atlantic Health System, correct?
A. Yes.
Q. I think you are on the quality committee of that health system.

A. That is for the Robert Packer.
Q. All of the hospitals in the Atlantic Health system participate in the Leapfrog survey?
A. I believe that is true.
Q. Several of those hospitals are A hospitals, correct?
A. I believe that is true.
Q. You have no reason to believe as you sit here today that the hospitals for which you are on the board misrepresent their information on the Leapfrog survey, do you?
A. I certainly hope not.
Q. Are you aware Atlantic Hospital put out press releases touting Leapfrog as a peer reviewed rating system?
A. I think I have read some of those.
Q. Have you ever gone to the board of Atlantic Health and told them that you believe their A grade is not accurate because of methodology?
A. No, I have not taken that specific step.
Q. And we talked about the non-response bias that Dr. Harris is going to testify to next week.
In coming to your conclusion that the expert panel never discussed the non-response bias, did you read all of the notes from the expert panel meetings going back to 2012 to come to that conclusion?
A. No. Certainly not.
I certainly recall reading the notes to the meeting, I want

to say in the spring of 2024, where the new step two approach was discussed.
Q. And have you had a chance to look at the members that sit on the hospital safety grade expert panel and their credentials?
A. I believe in Dr. Harris' report he discusses some of the credentials.
Q. Do you have any reason to believe that the nine members of the hospital safety expert panel are not qualified to provide guidance as a think tank for Leapfrog?
A. I am not questioning their qualifications. I am questioning whether they are based on the foundational principles that I believe they should be based on.
Q. Have you looked at the 12 separate and distinct expert panels, and the members of those panels that underlie or that provide guidance to Leapfrog on the survey measures?
A. No. I don't believe I have seen them.
Q. And you didn't review any minutes or notes or anything about how the BCMA expert panel comes to its conclusions, correct?
A. I don't recall reading those notes, in.
Q. You have opinions how hospital ratings can influence patient decisions, right?
A. Yes.
Q. You criticize Leapfrog -- you criticize the fact that

Leapfrog talks about Matt Austin's 2019 white paper, correct?

A. I don't think I am criticizing that the website talks about him, critical of some components of the content.

Q. Are you aware that Matt Austin has testified in this trial through his designated deposition testimony that he stands by that preliminary research and in fact his current findings is that it is perhaps two and a half time more likely a patient would die in a D or F hospital? Are you aware of that testimony.

MR. HVIDT: Your Honor, I object to this. This is outside the scope of the direct testimony. Dr. Nicholson did not talk about the --

MS. BLAIR: I will withdraw the question.

THE COURT: All right.

MS. BLAIR: Sure, fine.

BY MS. BLAIR:

Q. In coming to your conclusions that D and F grades can harm the patients, did you speak to any patients at these five hospitals?

A. No. That wasn't necessary for me to evaluate the Leapfrog Group method.

Q. I am not talking about the method.

I am talking about your opinion that the F and D grades -- hospital ratings influence patient decisions about medical care and misleading hospital grades can distort patient choices

causing substantial harm.

I am talking about your second opinion. In coming to that conclusion, did you perform any consumer surveys to determine whether that was true?

A. No, I am not an expert on consumer surveys. What I did do is to review literature which I described in my testimony associated with how empirically ratings do affect patient decisions.

Q. Your conclusions are based on literature that you have read and applying that literature to these five hospitals in the Leapfrog rating system. Is that fair?

A. Well, first, it is based on whether I believe the Leapfrog Group ratings are reliable or not, and I don't think they are reliable, and combined with three sets of evidence, the literature that you just described, patient choices, as well as how ratings affect hospitals' reputation, and also the way the Leapfrog is positioning the grades, and evidence on how the grades are actually being used.

Q. Okay. Evidence on how the grades are actually being used by consumers?

A. Yes. For example, information about private health insurers and how they use it to pay for performance, how hospitals are using it for executive compensation.

Q. You have not conducted any consumer surveys here in South Florida about whether or not these grades are actually

impacting consumer decisions for these five hospitals?
A. What I am doing is looking at what evidence -- how the five community hospitals are being affected, whether that is consistent with what he would expect. I am coming to the conclusion it is consistent, but I haven't done a causal analysis, but it is consistent.
Q. You have done no causal analysis?
A. That is correct, whether the answer --
Q. The answer to the consumer question is no, you didn't perform a consumer survey?
A. Correct.
Q. You don't have any evidence that any patient has been harmed by the Leapfrog hospital safety grades, correct?
A. Certainly I am not a clinician, I don't have the ability to say clinically whether it is true.
I think some of the descriptions of what occurred from the community hospital CEOs, again, is consistent with what one would expect, and certainly in terms of traveling further, it is consistent with the mechanism by which they can be harmed, but I haven't determined any particular patient was harmed.
Q. Sitting here you can't say Mr. Jones left Delray and went to Jupiter and got an infection and died, actual consumer harm?
A. That is correct. I looked to whether the evidence is consistent with what one would expect.
Q. You talk about the traveling. If you look at these

hospitals and look at a 5 mile radius, these people only had the option to go to a D or F hospital. If you expand that to ten miles, would you agree with me that there is a plethora of hospitals surrounding each of these community hospitals that have a much better grade than D or F, or did you not perform that analysis?

A. I may have performed it. Sitting here I don't know the answers, but inherent in that is traveling more than just traveling five miles. I do cite to two studies in my report about the negative patient consequences associated with travel, both for elective and for emergent care.

Q. And those articles, I read them, don't make a distinction between five and ten miles, do they?

A. I can't recall. It is possible, I can't recall.

Q. I want to make sure the Smith article that you relied on heavily, that was from 2014, correct?

A. I believe 2017.

Q. You are right, 2017.

That article was reviewing a completely different Leapfrog methodology, was it not?

A. I don't know about completely different, but different than what is in place now, yes.

Q. In 2017, Leapfrog was imputing data from AHA sources and that is what the Smith article was looking at?

A. Well, in my testimony I indicated the AHA as an alternate

source. That wasn't the narrow focus of the Smith study. They looked at other things, respondents and nonrespondents in four different patient outcomes and whether letter grades predicted a patient outcome. It wasn't just looking at the AHA issue.
Q. It was looking at the Leapfrog methodology?
A. Yes.
Q. And looking at the grades that resulted from the methodology that was in place at that time?
A. Yes.
Q. That was different from the methodology in place in 2024?
A. I used it in a way that is appropriate.
Q. While I have you here, is it your testimony that all nonparticipating hospitals receive a D or F?
A. No.
Q. Okay. One last thing. You talked about Matt Austin, and I thought you said Matt Austin agrees that the current methodology is penalizing. Did you testify to that? I want to make sure I understood your testimony.
A. Yes. There is a sentence in his deposition is pretty clear on that point.
Q. Matt Austin's testimony, and the Judge will have the benefit of it, was that "the goal of the methodology change was not to assess a penalty; the goal was to improve the accuracy of the data and incentivize survey participation."
Do you recall that?

A. I can't recall that verbatim. That is different than what Patrick Romano was saying.
Q. I am not asking about Patrick Romano, the Judge will hear from him. Do you recall reading that testimony?
A. Sitting here, I don't recall those exact words.
MS. BLAIR: Thank you. I don't have any further questions, your Honor.
THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. HVIDT:
Q. Dr. Nicholson, during opposing counsel's examination do you recall the questions she asked you about imputation?
A. Yes.
Q. Do you consider the assignment of the 60 out of 400 to be considered an imputation?
A. I consider it to be an assignment, and it is not anything that one would find in conventional literature about appropriate methods of imputation.
Q. And counsel asked a question you about whether actual data was produced in the litigation relating to how they would have answered questions in a Leapfrog survey about the four measures. Do you recall that?
A. Yes.
Q. And you described you had seen some document since your deposition and report. Do you recall that?

A. Yes.
Q. Can you describe for us what you observed in that document?
A. Yes. So, again, my understanding is the Leapfrog Group requested as part of the disclosure process that the five community hospitals indicate how they would have responded on the survey, and maybe it was the four measures, I can't remember, maybe it was for seven, how they responded had they -- how they would have responded had they in fact participated.

What I recall seeing is a series of calculations with numerators and denominators that would determine the input into the survey, so like the number of medication orders done through the computer entry relative to those that aren't. There were similar things for hand hygiene and intensive care unit, staffing and the like.

MR. HVIDT: Justin, can you blow up PX 528. If we could please remove the pink circle?

THE COURT: You can touch it in a way that does it.

BY MR. HVIDT:
Q. Dr. Nicholson, is this a document that is consistent to what you were testifying to?
A. Yes. So, I think what I was referring to, you can see that CPOE, inpatient medications, NUM, numerator, DEN, denominator. Delray is indicating 34,953 of medications that were entered electronically, and I think the denominator would be the total

number of medications. You are getting a percentage to the extent Delray in 2024 was using CPOE to enter medications electronically.

My understanding is that is the input that would go to Leapfrog Group to determine a standard substantial achievement and the like.

Q. After you saw this material produced, did that change your opinions in this matter?

A. No. This is consistent with the 370 that I showed and the 362. The scores that would result from the inputs would be similar to the overall mean that I used in my counter factual analysis.

Q. Thank you. You can pull that one down. Thank you.

If we could -- do you recall during opposing counsel's examination she asked you about the number of audits that CMS conducts?

A. Yes.

Q. Does CMS have any relationships with accreditation groups?

A. Certainly hospitals need to be JCHO certified to participate in Medicare and Medicaid, I think that is true. So I don't know the full nature of that relationship, but that is my understanding.

Q. Do you have an understanding if one of those agencies conducted in-person visits?

A. Yes, my hospitals are always on the ready for a JCHO

in-person audit.
Q. During opposing counsel's examination do you recall her description -- use of the term best score when describing your counter factual?
A. I actually don't recall that. Maybe I misheard something.
Q. In your counter factual, what was the number that you used to estimate the performance of what the community hospitals or nonparticipating hospitals across the country would have received had they participated?
A. So, hopefully I was clear, not jut for the five community hospitals, but all of the participating hospitals, I was using the mean of the participating hospitals which is lower than one hundred, and I think I shared had a slide where, you know, the mean was 96.4 which is lower than a hundred. I was not entering in the best possible score in that counter factual, I was entering in the overall average of participants.
Q. During opposing counsel's examination she talked about non-response bias. Do you recall that?
A. Yes.
Q. Do you recall seeing any documents in this case, emails from experts, safety panels, whether they considered non-response bias to be consistent with what Leap Frog was doing or not?
A. Yes, at least one, there could have been more, one was Patrick Romano in an email with Dr. Austin was saying that

Patrick Romano's was not biased, it is the burden of the survey, that is the reason hospitals are not participating. It is not that the poorer hospitals are not participating, just that some were finding that burden to be too much to handle.

Q. And Justin, if we could pull up DX 298, please.

Doctor, looking in here, do you see PX 298 on your screen?

A. Yes.

Q. Zoom in so we can see the substance. Right there is perfect.

Can you direct us to where you -- where Dr. Romano is writing in the manner which you described?

A. Yes. I believe if you start with the underlying hypothesis in the paragraph that starts, the underlying hypothesis beyond your, Dr. Austin's, the two step approach because the true performance deteriorated relative to the cohort. My hypothesis by comparison was that most hospitals stopped reporting because it is too burdensome, and it goes on.

If my hypothesis is correct then the current two step approach, meaning using the national average, would be more accurate than the penalizing nonparticipants.

Q. Is Dr. Romano saying using --

MS. BLAIR: Objection, calls for speculation, it calls for speculation. Dr. Romano will be testifying.

THE COURT: We didn't quite hear the full question. Go ahead and finish the question.

MR. HVIDT: Absolutely.

BY MR. HVIDT:

Q. Dr. Nicholson, you referenced how Dr. Romano is referring to the prior approach in his email. Do you recall that?

A. Yes.

Q. Does his reference to that prior approach yielding more. Accurate imputations have any impact on your opinion on that matter?

MS. BLAIR: Objection, outside the scope and not in his original opinion.

THE COURT: Overruled.

THE WITNESS: Shall I answer?

BY MR. HVIDT:

Q. Yes.

A. Well, I would agree with Dr. Romano's position that assigning the lowest possible score is worsening the accuracy. I think that is what Patrick Romano is saying, but it is a nonparticipation penalty, which is what Patrick Romano is saying. Again, he is not embracing --

MS. BLAIR: Objection, calls for speculation, your Honor.

THE COURT: Overruled.

MR. HVIDT: You can pull that one down, thank you.

BY MR. HVIDT:

Q. Dr. Romano, (sic) during prior examination, opposing

counsel discussed your reliance on the Smith study for 2017. Do you recall that?
A. Yes.
Q. And you testified that it was appropriate to rely on it. Do you recall that?
A. Yes.
Q. And can you elaborate on why and how you relied on the literature that predated the methodology change?
A. Sure. So, one of the things I do in my report is I examine whether the Leapfrog grades can reliably predict patient outcomes. Using data disclosed, the underlying Leapfrog data, I do my own analysis with the current methodology that Leapfrog group was using and conclude that the grades do not reliably predict patient outcomes.
I reference Smith because I want to know historically was that also the case. So what Smith in part does, because they do several things, is also show that in 2017, using that methodology, the Leapfrog Group grades also did not reliably predict patient outcomes.
I do an analysis using the current method and current data, but I think it is important to understand when it is possible what the trends were in that relationship, and I used the Smith article for that purpose.
Q. Do you recall during your examination how opposing counsel discussed the testimony of Dr. Matt Austin?

A. Yes.
Q. Do you recall any specific testimony that he had that supports your reference to his testimony as being consistent with there being a penalty?
A. I won't get it verbatim, but something to the effect of when asked he, Dr. Austin, didn't disagree that, I don't know if he used the step two method, he didn't disagree that was penalizing, something to that effect.
MR. HVIDT: Thank you, your Honor.
THE COURT: Thank you, sir.
MR. HVIDT: I would like to reserve time for possible rebuttal to bring this witness back. I don't know that we would need to at this time, but we would like to reserve the right.
THE COURT: All right. Thank you, Dr. Nicholson, have a good evening.
It is quarter to 5:00, what would you like to do?
MS. MALONEY: Your Honor, I can play Dr. Austin's video designation. It is about ten minutes.
(There was a discussion off the record.)
THE COURT: Let's call a witness.
MS. MALONEY: Okay. Can you give me two minutes?
THE COURT: Yes.
MS. MALONEY: My colleague Kevin Simmons will be taking the examination of Cynthia McCauley.

Your Honor, is it okay if we do just go until 5:00 because your Honor, when we spoke afterwards during the break about the end of the day, we talk about ending at 5:00, and I must admit I set a appointment I need to get to. Your Honor, I will send a message to cancel it.

THE COURT: Can you push it off a little? Let's try to go to about 5:30, and maybe you can finish with her.

CYNTHIA MCCAULEY, PLAINTIFF'S WITNESS, SWORN

THE WITNESS: Cynthia Albach McCauley. C-Y-N-T-H-I-A, A-L-B-A-C-H, M-C-C-A-U-L-E-Y.

DIRECT EXAMINATION

BY MR. SIMMONS:

Q. Ms. McCauley, could you introduce yourself to the Court?

A. Sure, Cynthia McCauley, the CEO at St. Mary's Medical Center.

Q. Why are we in court today?

A. We are in court today because we object to the misleading grades that are assigned to St. Mary's Medical Center and my sister hospitals.

THE COURT: Pull that microphone closer to you.

BY MR. SIMMONS:

Q. Just to provide a road map, we are going to talk about your time in the health care industry, and then we'll hear about St. Mary's place in the community, and then talk about Leapfrog and more why you are in court today. Does that sound good?

A. Yes.
Q. Let's start with your professional background. Could you tell us about your educational background?
A. I have a Bachelor's Degree from Adelphi University in New York, and an MBA from C.W. post with a specialty in fiance.
Q. How long have you been in the health care industry?
A. Since 1988.
Q. And back in 1988, why did you choose health care?
A. I moved to Florida and I had an opportunity to join the North Broward Hospital District, which is in Broward County. I joined in the finance arena, I was a financial analyst and worked my way up to be the chief financial officer.
Q. What has kept you in the health care industry since 1988?
A. I love the ability to assist patients, to make a difference in our community, and particularly where I serve today and for the past six years at St. Mary's Medical Center. We are in a particularly underserved community, so the care that St. Mary's and the Palm Beach Children's Hospital provides to our community is an invaluable resource. We provide services that they otherwise would not get.
Q. You serve as CEO of St. Mary's?
A. I do.
Q. As CEO, what are your primary responsibilities?
A. Basically quality, safety, finance, strategic vision, business development, that we have a secure medical staff that

are able to be there for our patients at our community.

Q. Taking a brief step back, outside of serving as CEO of St. Mary's, do you serve any other roles in the community?

A. Health care or currently?

Q. Currently.

A. I serve on two different boards. I serve as a community board member of the Quantum House, which is a hospitality house, and I serve on the board for the Boys and Girls Club.

Q. So, let's turn to talking about the background of St. Mary's.

St. Mary's has been in the community a long time. Would you tell us about its history?

A. Absolutely. St. Mary's was founded by the Franciscan Sisters of Allegheny, so we have a long Catholic based mission. The hospital was originally staffed and run by nuns.

Today we are -- we still continue that tradition, we have pastoral care, we have a chapel on site. They used to have a convent on the campus which we no longer have. We do have pastoral care, and we have been known more as a safety net for the uninsured population.

Q. What is a safety net hospital?

A. What a safety net hospital means is that the patients otherwise -- they are the underserved. We are the seventh largest provider of Medicare in the state. Ahead of us are children's hospitals, so children, pediatrics receive Medicaid

so the top Medicaid hospitals in Florida are children's hospitals. But our larger population that we treat, that is why we are number seven in the state.

Q. What are some of St. Mary's main service lines?

A. We are, as I mentioned earlier, a level one adult and pediatric trauma program. We are one of 12 designated par I natal intensive care centers, otherwise known as ripic, one in 12 of the state to provide services to low income high risk maternity patients. We have a level three NICU, so we have a very big OB NICU population. We have the only children's hospital between Orlando and Fort Lauderdale, we have a comprehensive service center and an orthopedic program.

Q. Of than those service lines, what sets St. Mary's apart from some of the other area hospitals?

A. I mean, clearly being one of two trauma programs, we are a critical resource in our county. We treated this past year close to 3500 traumas that happened in Palm Beach County. We will handle the patients in northern Palm Beach County. We have a 45 bed level three NICU where we treat, micro premies, babies that weigh a pound, pound a half, 24 weekers, babies that previously would not have survived and thrived. So that uniquely sets us apart, the children's hospital sets us apart from the community.

Q. And you mentioned trauma a couple times?

A. Uh-hum.

Q. For the Court's benefit, what are some examples that the hospital treats?
A. Motor vehicle accidents. Our interstate here, since you are not from Florida, is quite speedy, so there are a lot of motor vehicle accidents that find their way to St. Mary's. Also a lot of penetrating, say, knife wounds and they are patients presented with this is. Equally, given our geography with a town west of us that is an equestrian, we get a lot of equestrian injuries, so if a person is thrown from a horse or stepped on by a horse.
Q. What is the risk to patients to delay of those treatments?
A. Risk being of delay could result in death.
Q. Could you tell us a little bit about the patients St. Mary's serves?
A. Sure. As I mentioned, we are in an underserved area, so that means the patients in our community are very hard working, but their employment is on the lower earning of the wage scale, so we do treat a lot of Medicaid. It is not a robust payer. We have a very low percentage of Medicare, so our Medicare percentage is ten, we have a unique payer mix that we are serving those who otherwise would have no way to receive care.
Q. How many patients does St. Mary's serve?
A. On the admission side we can do about 18,000 admissions a year, over 55,000 emergency room visits, 7,000 or so surgical visits, and I am trying to think of outpatient visits, maybe

35, 40.

Q. One last question on St. Mary's, what makes you most proud of serving as the CEO?

A. I love our patients. I love that we reach out to the community to patients who really look to us to provide care for them. I am particularly proud of our obstetrical program. We were approached by the state to further our reach out into areas outside of our immediate geography to help the high risk moms to reduce infant mortality.

When you see this is back nice our NICU, because they end up in the NICU, and you watch them discharge or graduate, as we call it, that is super rewarding.

Q. So, turning to the accreditation process, St. Mary's is accredited by the Joint Commission, right?

A. We are.

Q. You recently had the Joint Commission come and evaluate the hospital?

A. Yes, January of last year.

Q. Do you have anything that you would like to add to Mr. Cazares' testimony?

A. It is very intensive, there are thousands of criteria that they investigate. They come on site, four to eight persons, clinical person, live safety, administrator, they divide and conquer and go on the floors, speak to patients, doctors. They test the process to evidence that you are maintaining the

standards that we live by every day.
Q. Standing new to the Leapfrog hospital survey, are you familiar with the survey?
A. Yes.
Q. About how long is that?
A. It is about 300 or so pages.
Q. You were a part of the hospital when St. Mary's decided against continuing to participate in the survey, correct?
A. Yes.
Q. Why did the community hospitals stop participating?
A. In the post COVID period we diverted our resources to those that we felt added more value and those that were required for either a regulatory or payer perspective.
Q. Are there any -- are there any surveys or awards that St. Mary's doesn't participate in beyond Leapfrog?
A. When we get surveys from the Florida Hospital Association, or any other associations, if it is not required, we do not participate.
Q. Okay. Let's turn to the grades that Leapfrog has assigned to St. Mary's.
From 2021 to fall of '24, do you know what St. Mary's grades Leapfrog assigned?
A. We had been a B, and then a C, and then, as we have seen earlier, we are now a D.
Q. What did you think happened when you stop participating in

the survey?
A. It was my impression that if we didn't participate we wouldn't get a grade.
Q. Why is that?
A. Because I don't understand how you apply a grade to a survey or a test you didn't take.
Q. Okay. If we could pull up PX 039.5. I am sorry, 36.5. Right here, Leapfrog's web page.
You saw us go through this with Ms. Havericak and Mr. Cazares?
A. Yes.
Q. Can we highlight the doctor's order medication through a computer, hand washing, those three.
When you see the red dials here, what does that tell you about St. Mary's doctors order medication through computer status?
A. It would leave me as a consumer to think doctors don't order medications through a computer.
Q. At St. Mary's you track whether doctors order medications through a computer?
A. We certainly do.
Q. Do the doctors at St. Mary's order medications through a computer?
A. I believe -- it is somewhere in the 90th percentile.
Q. And safe medication administration, that is BCMA?

A. Yes. We have a computer system, so the orders go to the computer system, the nurse scans the patient. Yes, we safely administer medications through the bar code system. That is transported to therapeutics, what our compliance is to make sure we do it safely.
Q. To complete that, St. Mary's tracks hand washing and hygiene?
A. Same thing with rounds, observation and education, multiple steps.
Q. If we were to go to 35.6 to look at the ICU physician staffing, St. Mary's has full-time ICU staffing, doesn't it?
A. Correct. We have full time board certified critical care, intensive care, and full-time board certified intensivists and we have round the clock neuro critical care, bordered neuro vascular for our neuro ICU.
Q. When did you first learn that Leapfrog had assigned St. Mary's a D?
A. It was sometime in late 2024.
Q. What was your reaction?
A. I was surprised because we hadn't taken the survey.
Q. And did you discuss the grade with your team at St. Mary's?
A. I recall discussing it with my quality director.
Q. Did you discuss it with anyone else?
A. I don't recall, it was a long time ago, but I do recall having a conversation. I would imagine, knowing how we

operate, it was probably also discussed with my NCNO.

Q. Would you have discussed it with your medical executive board or governing board?

A. Absolutely, every month. Even when we did participate we would present that at MEC and the governing board, but certainly every month since the grading changed I discussed it at every meeting.

Q. Did the members of the medical executive board have particular reactions to the news that Leapfrog was assigning you a D?

A. The physicians couldn't correlate the D grade to their experience at St. Mary's with the clinical outcomes we perform.

There was some disbelief and perhaps indignation, and they felt that it was wrong, that it was a false -- they felt it was misleading, they felt it was unfair to patients because they didn't feel -- because we didn't participate.

They, too, didn't understand how we got that grade, but they felt particularly with the imputed grades they couldn't understand how we could score 60 points when we meet those metrics.

Q. So you spoke with the quality director, the executive board, the governing board. Anybody else?

A. Any employee who came by upset --

MS. BLAIR: I renew my standing objection to the hearsay comments.

THE COURT: Overruled.

THE WITNESS: I did a lot of education outwardly. I learned a lot about Leapfrog honestly during this. Yes, anyone who came with a question we provided education, and I continued to provide education. I had to provide education because particularly with the governing board it is important to explain when they get asked a question, so that they can -- so they have been educated and can reiterate and explain the Leapfrog methodology and scoring.

BY MR. SIMMONS:

Q. Do you believe the D grade accurately reflects the quality of care that the patients receive at St. Mary's?

A. Absolutely not.

Q. Do you believe the D grade has harmed St. Mary's reputation?

A. I know that it has.

Q. Okay. How do you believe it has harmed St. Mary's reputation?

A. I believe public confidence has been shaken. As recently as yesterday I had a call with a person who had done that brand marketing that has been presented here before which, honestly, I don't ever remember seeing.

My marketing person put a call on my calendar with them yesterday which I thought was wonderful because I got to ask them lots of questions. I asked that they go back and refine

the data. That data is --

MS. BLAIR: Objection to hearsay. Now we are talking about a conversation that happened yesterday, and obviously it is hearsay.

THE COURT: All right. Overruled. Go ahead.

THE WITNESS: So the data we saw earlier about the brand, which I also validated was never sent to the CEO. I was surprised to see it in the -- during the course of this investigation or this trial.

So, anyway, that data is high level market, we are a very big market in Palm Beach. I asked if they could go and extrapolate data specifically for my primary and secondary zip codes because my experience is that our volume, as my colleagues have said, has decreased so significantly by elective, walk-in volumes, outpatient volumes, particularly on the pediatric side, and late yesterday they sent me the data.

MS. BLAIR: Your Honor, she is going to testify about data --

THE COURT: Isn't she talking about a chart you asked -- she is talking about the brand data chart, you introduced it, and asked the first CEO about it, and she had seen it and apparently she never saw it and now has looked at it.

MS. BLAIR: I thought she was testifying to a different document.

THE WITNESS: It was the same document, but that was

for the network, the one in evidence.

BY MR. SIMMONS:

Q. The one we looked at earlier?

A. The one we looked at earlier, that was for the whole Palm Beach network. I asked for my data, if there was a way they could extrapolate it for St. Mary's.

Q. Is this data you look at as a CEO?

A. I had never seen that report, but I was curious so I could understand that to my volume decrease.

MS. BLAIR: I object to the whole line of questioning about documents in -- they are specific to single hospitals that have never been introduced in the investigation. Clearly I asked for them.

THE COURT: All right. I am going to overrule the objection.

You began this by asking the other CEO about that document. You took the position that that data showed that the brand recognition for the network had improved.

MS. BLAIR: Correct.

THE COURT: She disagrees with that.

MS. BLAIR: She has some document she is looking at that I have not seen.

THE COURT: The objection is overruled. You will get a chance to cross-examine her.

THE WITNESS: Late yesterday I asked them to skinny

the scope so it could be to the patients that come to St. Mary's. That is how I look at the area. So I did receive that, and that data showed that in 2024 our -- the brand -- the brand satisfaction was at 78 percent and by December 2025 it was 75, there is a brief that correlates -- I, like my colleagues, have been trying to find out why is my elective walk-in volume down, elective physical therapy volume down.

I did a similar investigation as to any new emergency rooms, free standing, so there is no provider that would have redirected patients. There had to be reason. The only thing that changed in a year was the Leapfrog rating and the new information that I asked for not as a result of this just so I could understand that report that I had seen made a lot more sense to me.

BY MR. SIMMONS:

Q. So, in that -- in your testimony you mentioned walk-ins to the ER are down. Do you know about how much it is down?

A. On the ped side, about ten patients a day.

Q. You know for the general ER?

A. I recall the decrease was so great in pediatrics, but on the adult side it is three or four a day.

Q. Could you bring up PX 550.

As we are bringing that up, do you remember seeing the Excel from earlier today where it listed EMS volume and walk-ins?

A. Yes.

MS. BLAIR: I object to this document, and you did not bring it into evidence. You sustained my the objection.

THE COURT: That is the case. I believe I sustained the objection to this document, and I think -- if you are going to brief it further, but at this point the objection was sustained.

BY MR. SIMMONS:

Q. Ms. McCauley, a little while ago you mentioned -- you talked about patients being harmed by delay.

Generally, why do you think patients have been harmed by the Leapfrog Group?

A. My opinion is that -- or my observation is that over the past year we have seen, as I mentioned, a decrease in our volume through the emergency room, patients who need medical care but are not coming to our emergency room.

The data would also show the number of patients who are being transferred in to St. Mary's, to our emergency room, is on the rise. Particularly in our service area, the number of patients that are being transferred in from Jupiter Medical Center has continued to rise significantly.

For the year ended in 2025, there were 568 requests from Jupiter Medical Center through our transfer center we have a centralized transfer center, so we had 568 request for transfer from Jupiter.

We are in the same primary service area, so they could have chosen St. Mary's first. They have presented to Jupiter, they don't have the capability to treat those patients. 50 percent of those patient requests were pediatric patients, we are the children's hospital and we have 30 or 40 pediatric specialists. Those patients went to Jupiter, were seen, medically screened. They established they couldn't care for the patients, medical emergency, called our transfer center and arranged for the patients to come to us.

Those patients have two impacts, one economic because they are going to have to pay --

MS. BLAIR: Objection, hearsay, speculation, standing objection.

THE COURT: Overruled.

THE WITNESS: You are going to get a bill from there, and St. Mary's. We have to work you up fully and you will get a bill from St. Mary's. Depending on the injury, if you have to go to the OR, any delay in surgery could potentially be adverse to the patient.

BY MR. SIMMONS:

Q. So, a few more questions wrapping up. As St. Mary's CEO protecting patients' safety was one of your core responsibilities?

A. Absolutely.

Q. You take that seriously?

A. Absolutely.
Q. Do you believe your patients will be safe when they come to St. Mary's?
A. Absolutely.
MR. SIMMONS: Your Honor, may I consult with cocounsel?
THE COURT: Yes. Which one did I sustain? He doesn't think I sustained the objection to 560.
MS. MALONEY: 560.2 and you granted my request for further, but PX 560 you did allow it in.
MS. BLAIR: That is not what my notes say.
MS. MALONEY: I have notes from my colleague here. I don't know if your law clerk knows.
THE COURT: All right. Let me see it again, maybe I -- Ramzy doesn't think I sustained the objection.
MR. MARCUS: There was a supplement at the end of the year.
THE COURT: All right. Let's see it again.
MS. MALONEY: I think he just wants to ask her --
THE COURT: This one I did admit. We had the discussion about summaries and all of that. Go ahead if you want to ask a question about it.
BY MR. SIMMONS:
Q. Ms. McCauley, are you able to read this?
A. Yes.

Q. Do you see St. Mary's Medical Center there, walk-ins and EMS s?
A. Yes.
Q. And in the last two rows you see how your walk-in volume is down 5 percent for the past year and EMS s is up 2 percent?
A. Right 2 percent, it is fairly flat. Walk-in is down, and aside from the raw numbers being down, our population here in West Palm is exploding. You would anticipate, given the population growth here in South Florida, particularly in this area, if all things stayed flat, you would still expect it to increase because of the number of families with children living here continues to grow.
MR. SIMMONS: Thank you, your Honor, pass the witness.
THE COURT: All right. Cross-examination.
MS. BLAIR: Yes, your Honor.

CROSS-EXAMINATION

BY MS. BLAIR:
Q. Ms. McCauley, I just want to run through a few things with you regarding your testimony.
Am I correct that you do not -- as CEO of St. Mary's, you do not find any value in the Leapfrog survey?
A. That is correct.
Q. It provides no benefit whatsoever?
A. That is correct.
Q. You don't consider yourself a consumer of the Leapfrog

survey?
A. Correct, especially now that I understand it.
Q. There was a voluntary decision to stop participating in the survey in 2021, correct?
A. Yes.
Q. You testified earlier that you believed you would stop being graded when you stopped participating. Do you remember that?
A. Yes.
Q. What was that based on?
A. That was based on my understanding that if you do not turn in the paper, the survey, someone can't give you a score on information they don't have.
Q. That was not based on some reading of the Leapfrog website that was confusing to you?
A. No.
Q. You would agree that in fact hospitals that don't participate in the survey do get graded?
A. Yes.
Q. When you stopped in 2021, you got graded up until now?
A. That is correct.
Q. At some point when you stopped the survey in 2021 and today you understood that that wasn't true, that hospitals get graded even if they don't participate?
A. I understand that. It became problematic when Leapfrog

changed its methodology.
Q. You mentioned about the numbers of patients, doctors, community members that have come to you and voiced their concerns about your Leapfrog grade, correct?
A. Yes.
Q. You testified to that on direct examination?
A. Okay.
Q. You also answered interrogatories in this case on behalf of St. Mary's, correct?
A. Yes.
Q. I don't want to go through this again, but do you recall you provided the same answers to interrogatory 8. You have been sitting in courtroom today listening to your colleagues testify?
A. Yes.
Q. I showed each of them the interrogatory answers?
A. Yes.
Q. I could show you yours. Pull up the interrogatory answers.
Again, if we start with -- you don't dispute that you signed those interrogatories under oath, correct?
A. Correct.
Q. If we start with number 8, like all the other CEOs, I asked you to identify all persons with whom you communicated, and I asked to you state the date of the communications, and your answer -- if we scroll up, this is your original answer, no

names, no dates, no communication?
A. Right. It explains the groups I spoke to.
Q. Just groups?
A. Correct.
Q. Then you have an amended answer, and your amended answer is here?
A. I see that.
Q. You don't list of any names of any individuals, what they said, how they said it, when they said it, whether it was on the phone or an email. You didn't provide any of that information, did you?
A. My governing board is on my website, their pictures are in my lobby, we clearly can identify who they are.
Q. What about the physicians, can I identify those clearly from documents you produced?
A. You cannot identify specific physicians, but the governing board.
Q. Nurses, can I figure that out from this answer?
A. No, you cannot.
Q. What about patients, can I figure that out?
A. No, you cannot.
Q. It wasn't until you got on the stand today that we heard about these new patients, right?
A. It is not in this answer.
Q. It is not in this answer. Look at number 14. It says:

State whether you are a specific patients in declining -- do you see that?
A. Yes, I do.
Q. I asked you for detail. Here is your answer and you were asked to amend that answer. Did you provide any of that in your sworn interrogatories?
A. The interrogatories state whether you are aware of specific patients. It doesn't say state the name.
Q. It does. Identify patient, the date, the type of service. Did you provide that answer to interrogatory number 14?
A. I did not.
Q. Interrogatory number 22, I asked you a similar question, identify and describe any complaints, concerns, comments from patients, community members, or referring physicians. Do you see that?
A. Yes.
Q. I asked you to identify and describe it. You identified it on the stand today?
A. Yes.
Q. In your first answer you said you received reports, and in your amended answer you cited to some document. Do you see that down there?
A. Yes.
Q. Do you know those documents don't contain any patient name?
A. Nor should they contain patient names because that would be

HIPAA protected. It does say our board of directors have let me know they have spoken with people. I have said twice my board of directors. You could go to my website and see them. I believe in my deposition I named all of the people that sit on my governing board.

Q. And you testified on direct that every month you discussed Leapfrog with your governing board; is that right?

A. Yes, and my Medi group.

Q. Did you tell the board that one of the reasons you have an F is because hospitals that do not participate have an F?

A. I didn't tell the board that.

Q. Did you tell them you have an F is because competitor hospitals manipulate their grade?

A. I don't believe I said that.

Q. What did you tell them?

A. I said the what you are pulling from is old. My colleague, Ms. Havericak, didn't have a HMI for over a year. My metadata, if you pull it today would be seeing any file can't lie improved, our survey, which was explained earlier by the doctor, our sure rate is better than what CMS puts out there, but it lags. Honestly, next year it may change a little, it will be two years for that to catch up with Medicare.

If I pull the surveys, which I believe my colleague, Ms. Havericak, referenced, we get them, we can see them every day. Like Ms. Havericak, my response rate is particularly low,

between seven and 9 percent. So, if you recall the numbers I gave for how many patients come through St. Mary's, it is an extremely low percentage.

So we are working on trying to get more patients who understand the importance of returning the survey, and with that we have seen a marked increase in our patient satisfaction scores, which again, due to the lag won't be evidenced in CMS for a year and a half or two years.

Q. And that lag in the CMS data, that is data available to the public, correct?

A. Correct.

Q. You are talking about your patient satisfaction score, those are HCAPs?

A. Correct.

Q. That is CMS collected data?

A. Correct.

Q. If you could pull up DX 562 Courtney.

Did you listen to Dr. Nicholson's testimony?

A. A little bit.

Q. He said that for participating -- for nonparticipating hospitals the HCAP scores make up 20 percent of the hospital safety grade. That was his testimony, I'm not saying I agree with it, but 20 percent.

A. Okay.

Q. Do you know what your HCAP scores are?

A. It is a one star currently for the lag data you say.
Q. What is your overall CMS score?
A. It also a one star.
Q. I pulled up Exhibit 526. This is Regina West. Did you see that?
A. Regina West to Andrea Nunez.
Q. She says St. Mary's fell from a C to a D. Do you see that?
A. Yes.
Q. So, in 2023 your score was declining. Do you see that?
A. I see that.
Q. She says, let's talk about patient experience as a market spoon?
A. I see that.
Q. Regna West is not only the director of Palm Beach network, she is for St. Mary's as well at this time?
A. At that time, she was.
Q. Does this refresh your recollection, were you a one star CMS hospital in October 2023?
A. We may have been.
Q. If we pull up DX 562. This is a large part of your Leapfrog safety grade?
A. HCAP is part of the safety grade.
Q. That is not Leapfrog?
A. Correct, but it is significantly less.
Q. This is from Regina West, quality director, and this is

April 2024, so this is before the methodology change we are all here about today. She says to you we remain a C, our largest area of opportunity remains in the patient experience category. Do you see that?

A. Yes.

Q. Does this refresh your recollection that part of the reason ear right is not good is because your HCAP scores are not good?

A. Part of the reason why our patient stat scores are not good is our rate is between seven and 9 percent. I can tell you mathematically, finance is my background, if you have a low rate of return, you do not get a higher grade. That is why our focus has been on encouraging patients to complete that survey, and return it within the time frame. They get up to six weeks by which they have to return the written survey, which I am sure you have seen, fill in the bubbles. We are encouraging them to take that to get the feedback.

Q. This is an exhibit that was objected to. If we go to the top, is this your email address around this time.

MS. MALONEY: We withdraw our objection to this document.

MS. BLAIR: I ask this document be moved into evidence, your Honor.

THE COURT: The number?

MS. BLAIR: DX 562.

THE COURT: That is admitted.

BY MS. BLAIR:
Q. If we look at this grid chart on this page --
A. Can you make it bigger?
Q. Can you make it bigger?
Do you understand what this grid is?
A. The top part looks like the CMS categories.
Q. Do you understand this to be the Leapfrog calculator that Leapfrog freely provides to hospitals?
A. I didn't know that.
Q. If I look at CPOE, do you see your hospital score is one hundred?
A. Yes.
Q. The mean is 91.81?
A. Yes.
Q. At this point in time, April 2024, you are not providing any data to Leapfrog?
A. Correct.
Q. You have not participated since 2021?
A. Correct.
Q. Hospitals that didn't participate were getting one hundred points for CPOE and hand hygiene, correct?
A. Yes.
Q. Do you recall you were getting a hundred out of a hundred points for those four categories on the Leapfrog survey in April 2024, even though you didn't provide any data whatsoever?

A. Yes.
Q. The brand document that you just saw, that was related just to St. Mary's, correct?
A. Correct.
Q. If I understand your testimony, you saw the brand document at this trial and you went and called somebody to get a brand document specific to St. Mary's?
A. No.
Q. How did you get this document?
A. By coincidence truly there was a call with CMRC who produces the brand document. I don't know their name, but I have seen it on the documents.
There was a meeting on my calendar. Often times meetings get put on my calendar not at my request. We will call them MARC because it is close to it.
Q. I think it is MARC?
A. I said to them this is very opportune because I have seen a document I have never seen before, so I want to understand it better. We went through the slide deck because the documents presented might have been Q 225 I had seen her and they had the Q 4225 data.
That is not shared with CEOs, I confirm that I said I have never seen this data. So when we went through and got to the slide deck, I was trying to reconcile in my head the math between the decreases I have seen, forget about birth in

population, with what that document -- what story that document would have presented.

So, at my request, I asked could they just do one extrapolation, not create the whole document, it is pretty long if I remember correctly, and I wanted to know from my TSA what was the perception of St. Mary's specifically as related to. So, they said it would take time. That was yesterday morning.

Last night he sent me an email, there was no graph. He said, here's your numbers. Yes, in 2024 you were 78 percent confidence, and by a year later, Q 425, it was 55 percent.

Q. Is that the net promoter score?

A. That is not the net promoter score.

Q. What score is it?

A. It is on what is patients -- how do they feel. My net promoter score is -- that net promoter score is a sentiment of how patients feel about your hospital. That number improved. I don't have the number because he didn't email it to me. This other number for perception of the brand for St. Mary's had gone down.

That number was an indicator of are the patients who went to St. Mary's are happy, would a patient choose St. Mary's or would they choose Jupiter.

We looked at Jupiter and St. Mary's. For St. Mary's it demonstrated that 78 percent last year would have chosen St. Mary's, that is down to 55, and conversely Jupiter was up.

Q. You all talk about Jupiter a lot. Is that one of your competitors?
A. Probably my competitor.
Q. Jupiter is an A Leapfrog hospital, correct?
A. Yes.
Q. And they are A in the media?
A. They are.
Q. It is a 4 star CMS hospital?
A. I don't know.
Q. They are Leapfrog rated?
A. Yes.
Q. Did you know the Leapfrog rating before the lawsuit?
A. I don't know.
Q. You talk about the patients transferring from Jupiter to your hospital?
A. Correct.
Q. Had any of the transferred patients tell you they went to Jupiter first because of the Leapfrog rate?
A. I have not had conversation with the 569 patients. I do know factually they presented first to Jupiter. I know that ten of those patients who went to Jupiter called to transfer to St. Mary's declined to come to St. Mary's under patient preference, whatever that means. I don't want to go to St. Mary's. I asked if they could get me transcript on those, why those ten patients said, no, I will stay here.

Q. What time frame?
A. I looked at 2025.
Q. A whole year, 2025?
A. Correct.
Q. You believe documents exist that patients didn't want to come to St. Mary's because of the Leapfrog score?
A. I don't think that is what I said.
Q. What did you say?
A. A patient, if you want to transfer me from Jupiter to St. Mary's, if you say I don't want to go to St. Mary's, that is documented. I have not read the notes, but it is a patient preference.
Q. You are not trying to tell this Court that patient didn't come to St. Mary's because of the Leapfrog rate?
A. I am saying it is ten patients who needed medical care who when given the option of coming to St. Mary's said no.
Q. Maybe they liked Jupiter better?
A. Jupiter couldn't provide the care.
Q. It is wholly speculation on your part about why any patient didn't want to be transferred to St. Mary's?
A. I don't think I speculated on why they didn't want to be transferred. I said that was the number of patients documented said I don't want you to transfer me to St. Mary's.
Q. So I am clear, you have information about patients and nurses, doctors who spoke to you about the Leapfrog rating?

A. Yes.
Q. None of it was put into an interrogatory answer, correct?
A. I mentioned it to the board of governors and those define who they are.
Q. You didn't tell me any nurses' names?
A. Correct.
Q. You didn't tell me any doctors' names.
A. Correct.
Q. Patients' names?
A. Correct.
Q. With respect to the ten pediatric -- I think you said ten peds a day that don't come to St. Mary's. Did I understand that correctly?
A. Our emergency room pediatric elective walk-in volume is down approximately ten patients a day.
Q. From when to went?
A. '24 to '25.
Q. Have you produced that information in this case?
A. I note that we just had this -- so the data that previously had volume data was only through whatever time period, might have been April or so. This data that we just had on the screen ten minutes ago was a full year, full calendar year, but the earlier data was presented to the best of my knowledge, but it was through whatever period of time, whether it was through April or Q 1. I don't remember.

Q. Revenues are up at St. Mary's?
A. Revenues are up, but revenues come from many different sources.
Q. And we talked about brand recognition?
A. Yes.
Q. You got this document that said you went from a 78 percent in some category to a 55 percent in another category?
A. Yes.
Q. Your nursing retention has not declined, right?
A. We work very hard on our nursing retention.
Q. And no physicians have left the hospital because of the Leapfrog grade. You didn't testify about that, correct?
A. Correct.
Q. Transfer rates are not down. In fact, we are talking about the fact that they are up?
A. Correct, which means they are choosing somewhere else first.
MS. BLAIR: No further questions, your Honor.
THE COURT: Is there redirect?
MR. SIMMONS: Just a few points, your Honor.

REDIRECT EXAMINATION

BY MR. SIMMONS:
Q. Ms. McCauley, do you recall when you were asked about CMS data?
A. Yes.

Q. You gave an answer that it would take two years to catch up with Medicare?

A. Yes.

Q. You explain CMS data is two years --

A. In arrears a year and a half or so. The current data is '22, '23.

Q. Do you recall your testimony about the HCAP survey?

A. Yes.

Q. Why is that survey data low?

A. So, a couple of reasons. We do get, I don't recall the percentage of return mail because we serve the underserved population. Some of our patients may not get address, they may not have a real address, and we do send the survey out in Spanish and English. We do have a population that only speaks Creole, so they would not understand Spanish or English.

I personally have received the survey, I felt it is burdensome. I can share that I have spoken to people who have been patients, can you please take the survey, and they will apologize, it is all --

MS. BLAIR: Objection, hearsay, your Honor.

THE COURT: Overruled. She is explaining the problems with the survey. Let's finish up.

THE WITNESS: Like the scan tron, you bubble in the circle.

BY MR. SIMMONS:
Q. A few more questions. You were asked about the patient experience. The HCAP survey is patient experience, correct?
A. Correct.
Q. What does patient experience include?
A. Likelihood to recommend, communication with doctors, people work as a team.
Q. Does it include safety?
A. On the patient experience side?
Q. Poor question.
A. I am sorry.
Q. What is included in safety in your experience in the health care field?
A. Safety would be HHI possible infections.
Q. Are there other things that might be included in safety, infections?
A. Infections is a major focus for us.
Q. You testified about patient transfers from Jupiter.
In your experience, have you ever seen transfers at such a high level?
A. They continue to increase. So, to answer your question, they have not been at this level in the past.
Q. So, in all of your experience with seeing transfer data have you ever seen transfer data so high?
A. I have never seen it as high.

Q. The last question: Do you recall being asked about your St. Mary's revenue being higher than the previous year?
A. Correct.
Q. In your experience in finance, could it be even higher but for Leapfrog's grading?
A. Yes, absolutely. Had we not lost the volume through the emergency room, the outpatient physical therapy, outpatient surgery. It depends on the mix of the patients you have. We have worked hard to grow our medical tourism, and that has grown our revenue more so than perhaps and obstetrics patient.

THE COURT: All right. I hope you have a good weekend. We will not be in session Monday, as you remember.

One thing, let's on the exhibit list do some work. Let's have the ones you have agree to admit identified. So before we seek to admit one that hasn't been agreed, somebody tells me that ahead of time.

In terms of witnesses, where are we? Are you going to call everyone on the witness list?

MS. MALONEY: No. We are going to scale some of this back, and we will work on it this weekend and advise our colleagues before we get in to you on Tuesday.

I believe we will be able to drop off one of our experts as well as one -- at least one of our witnesses who are examining. We really have CEOs, the experts, and Regina West who we will be calling in our case by video.

MS. BLAIR: We object to their calling Regina West, she was not listed. They designated her just two days ago. They now want to call her. Obviously, she was their witness. We called her in our case in chief, so we do object to them adding her late, two days ago, to their witness list.

THE COURT: You say you are going to call Regina West.

MS. BLAIR: I was going to call Regina West.

MS. MALONEY: She is by video and we would like to play the designations of her in our case. We reserved the right on December 29th when we filed the pretrial stip, any testimony that has --

THE COURT: Okay. If you are calling her in your case, you can't claim surprise.

They can do it, I need the same thing from you, I need to understand which witnesses and which exhibits if you would. So that we were a little disorganized today. A lot of it is my fault, I jumped into this not using my usual care on the exhibit list. I am relying on you all. If you have agreed on an exhibit, identify the exhibit number, you can use it. If it is not agreed, tell me at the outset.

MS. BLAIR: One question on the Regina West. Is it your position that they can designate additional testimony that was not designated previously?

THE COURT: I haven't looked at any of the designations.

MS. BLAIR: That is my objection, now we will see --

MS. MALONEY: We have 14 minutes of Regina West designations. To contrast that, they have an hour and 50.

THE COURT: Who is she?

MS. MALONEY: Quality manager for the Palm Beach Hospital Network, and she was also the quality person for St. Mary's.

Ms. McCauley just testified about her, and counsel has put up documents about her. We would like to play it in our case in chief, and it sounds like they have about two hours to play that for you. That is how we would like to do it for Ms. West.

THE COURT: All right. I will look forward to hearing from Ms. West by video. Have a good weekend. See you Tuesday at nine o'clock, tell me what you want to do about lunch, and things like that.

MS. MALONEY: Those CEOs, we appreciate you making the point earlier. If they don't have to be here next week as Plaintiffs, they can go back to work. We'll send them back, thank you.

THE COURT: All right. Good. There may be on Wednesday a couple of interruptions. Jeannie will tell you about that.

(Thereupon, the Court was recessed.)

* * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date: January 19, 2026

/s/ Pauline A. Stipes, Official Federal Reporter

Signature of Court Reporter

**MR. BILLEK: [1]** 3/19
**MR. HVIDT: [9]** 179/1 179/9 204/20 221/9 227/15 230/25 231/22 233/8 233/10
**MR. MARCUS: [35]** 51/20 71/13 73/3 75/25 76/12 76/22 77/4 78/6 80/22 81/20 81/22 82/1 85/1 90/2 105/3 106/5 106/9 112/12 117/1 117/4 117/6 117/10 117/16 122/14 122/16 122/20 122/24 123/7 124/6 126/22 131/11 134/4 134/8 135/1 250/15
**MR. SIMMONS: [3]** 250/4 251/12 266/19
**MS. BLAIR: [78]** 3/12 6/12 34/18 59/20 69/12 71/8 71/20 71/25 72/22 76/5 77/5 77/9 77/20 78/3 78/15 80/5 80/16 81/12 84/14 86/15 88/8 88/18 90/4 94/19 97/9 97/21 97/23 98/7 98/17 105/1 106/2 106/18 112/15 112/19 122/10 122/22 124/3 126/24 131/9 134/7 143/11 146/19 148/23 149/15 149/19 152/10 170/2 173/10 174/23 179/3 187/10 188/2 205/25 221/12 221/14 226/5 230/21 231/8 231/19 243/23 245/1 245/16 245/22 246/9 246/18 246/20 248/1 249/11 250/10 251/14 259/20 259/23 266/17 267/19 269/25 270/6 270/20 270/25
**MS. MALONEY: [31]** 3/4 3/22 5/6 7/13 7/18 7/21 8/5 94/13 97/18 97/22 97/24 106/7 124/4 124/24 125/12 151/4 151/23 174/21 175/5 233/17 233/21 233/23 250/8 250/11 250/18 259/18 269/18 270/7 271/1 271/4 271/16
**MS. SCOTT: [15]** 135/3 147/4 147/22 148/5 148/11 148/16 150/5 150/15 150/18 151/2 151/24 152/4 156/17 169/24 174/19
**MS. WOOD: [1]** 3/16
**MS. ZIVAS: [1]** 3/18
**THE COURT: [130]** 2/8 3/11 3/21 4/1 6/5 7/5 7/17 7/20 7/23 34/17 51/15 51/18 59/21 69/13 69/22 69/24 71/12 71/18 71/23 72/7 72/24 76/2 76/17 77/2 77/7 77/18 78/2 78/4 78/10 78/18 80/6 81/10 81/18 81/21 81/23 84/23 86/3 86/17 88/13 88/20 90/3 94/4 94/15 97/12 98/11 106/13 106/19 112/14 112/17 112/20 117/3 117/5 117/8 117/12 117/18 120/19 122/13 122/15 122/18 123/1 123/8 124/9 125/2 125/10 125/14 126/23 127/1 131/10 135/2 143/13 147/2 147/20 148/3 148/10 148/14 148/21 149/13 149/17 150/12 150/17 150/21 151/3 151/18 152/1 152/11 173/11 174/20 175/2 179/6 187/12 188/10 204/21 204/25 205/24 221/13 226/7 227/17 230/23 231/10 231/21 233/9 233/14 233/20 233/22 234/5 234/19 243/25 245/4 245/18 246/13 246/19 246/22 248/3 249/13 250/6 250/13 250/17 250/19 251/13 259/22 259/24 266/18 267/20 269/10 270/5 270/11 270/23 271/3 271/12 271/20
**THE COURTROOM DEPUTY: [1]** 7/22
**THE WITNESS: [17]** 51/23 69/14 69/23 69/25 80/7 88/21 125/15 143/14 152/12 231/11 234/8 244/1 245/5 245/24 246/24 249/14 267/22

**$**

**$10 [2]** 36/10 49/21
**$10 million [2]** 36/10 49/21
**$8 [1]** 46/25
**$8 million [1]** 46/25

**'**

**'21 [2]** 92/16 132/12
**'22 [1]** 267/6
**'23 [1]** 267/6
**'24 [7]** 45/17 61/11 96/23 142/19 144/15 240/21 265/17
**'25 [1]** 265/17

**.**

**.2 [1]** 192/10
**.2 percent [1]** 192/10

**/**

**/s [1]** 272/5

**0**

**039.5 [1]** 241/7
**0550 [1]** 2/5

**1**

**1.7 [1]** 118/16
**10/18/2024 [1]** 98/21
**100 [1]** 13/23
**11 [1]** 182/17
**11 percent [2]** 182/25 183/3
**1100 [1]** 75/6
**116,000 [1]** 55/2
**11th [1]** 7/1
**12 [7]** 49/7 52/5 94/2 181/17 220/14 237/6 237/8
**1200 [1]** 208/2
**1250 [1]** 208/3
**12:30 [2]** 124/16 124/17
**13 [4]** 94/3 94/25 121/7 209/23
**14 [10]** 57/14 60/17 129/22 130/1 131/1 149/22 171/1 254/25 255/10 271/2
**14.27 [1]** 126/22
**15 [37]** 13/5 13/6 13/10 13/11 13/12 13/17 13/17 13/20 13/20 14/4 14/4 14/9 14/10 15/23 16/5 25/19 25/19 25/20 25/21 25/23 25/24 26/8 26/23 26/24 27/10 33/16 33/16 51/16 62/10 65/20 182/14 184/17 184/19 184/22 184/24 184/24 204/23
**15 percent [2]** 20/13 138/18
**15.11 percent [1]** 126/21
**150 [1]** 208/8
**15th [1]** 82/5
**16 [3]** 1/9 31/12 52/18
**16 percent [2]** 69/21 69/24
**1600 [1]** 55/4
**161 [1]** 2/4
**17 [1]** 134/11
**1700 [1]** 1/18
**18 [3]** 105/2 136/16 159/23
**18,000 [1]** 238/23
**19 [1]** 272/4
**191 [1]** 40/19
**1921 [1]** 134/25
**1966 [3]** 189/20 212/5 212/8
**1968 [1]** 137/7
**1977 [1]** 175/25
**1986 [1]** 175/24
**1988 [3]** 235/7 235/8 235/13
**199 [1]** 139/4
**1:30 [1]** 125/9

**2**

**2 percent [2]** 251/5 251/6
**2,500 [1]** 192/9
**20 [8]** 34/25 36/9 49/6 50/5 50/6 51/17 107/23 178/17
**20 percent [2]** 257/21 257/23
**20,000 [1]** 146/6
**200 [2]** 46/8 211/21
**2000 [1]** 135/21
**2001 [7]** 29/21 43/18 44/2 44/7 44/12 93/4 93/5
**2002 [1]** 52/11
**20036 [1]** 1/19
**2008 [1]** 136/1
**2009 [1]** 177/22
**2010 [1]** 194/13
**2012 [5]** 41/5 44/23 47/15 213/3 219/22
**2013 [2]** 193/11 194/4
**2014 [4]** 71/5 176/14 200/8 224/16
**2017 [9]** 45/21 49/10 193/11 200/8 224/17 224/18 224/23 232/1 232/17
**2018 [2]** 18/5 177/24
**2019 [3]** 107/23 192/9 221/1
**202-887-3729 [1]** 1/19
**2020 [2]** 63/4 194/14
**2021 [38]** 10/21 11/4 11/8 11/13 11/17 11/23 14/8 26/16 26/22 27/1 91/21 91/23 92/1 92/4 92/15 93/6 93/14 94/22 95/24 95/25 96/8 96/18 96/19 107/15 107/24 108/8 131/19 132/6 158/1 158/4 186/16 194/25 197/18 240/21 252/4 252/20 252/22 260/18

Case 9:25-cv-80526-DMM Document 204-1 Entered on FLSD Docket 02/06/2026 Page 275 of 326
USCA11 Case: 26-11527 Document: 35 Date Filed: 09/17/2026 Page: 587 of 1817



**2**

**2022 [2]** 107/15 108/8
**2023 [5]** 11/23 11/25 77/22 258/9 258/18
**2024 [69]** 12/8 12/10 12/13 13/20 20/4 20/12 21/5 26/22 45/17 46/6 49/7 53/3 53/6 53/7 58/10 60/15 60/17 70/4 73/8 73/10 74/25 78/7 90/14 90/16 90/19 90/22 91/9 92/16 98/21 99/18 99/22 100/19 103/14 104/9 104/13 105/6 107/19 108/1 112/12 115/23 118/17 121/7 135/13 142/15 142/18 152/21 153/3 156/22 160/4 160/8 162/18 163/12 164/13 165/11 165/11 165/25 167/3 176/14 194/25 197/18 220/1 225/10 228/2 242/18 247/3 259/1 260/15 260/25 262/9
**2025 [34]** 13/25 15/5 21/8 21/9 27/14 43/13 58/10 63/25 76/25 77/1 77/2 78/7 80/24 89/13 102/23 118/17 122/7 123/21 126/20 130/22 130/25 134/11 147/6 147/8 147/9 189/5 198/14 208/15 209/23 217/8 247/4 248/22 264/2 264/3
**2026 [2]** 1/9 272/4
**203 [1]** 213/1
**205 [1]** 129/19
**209 [1]** 170/5
**21 percent [1]** 41/21
**22 [6]** 176/8 181/7 181/10 181/10 191/11 255/12
**225 [2]** 116/21 261/20
**23 [1]** 192/25
**23 percent [1]** 192/24
**24 [2]** 105/10 237/20
**24 percent [3]** 14/18 138/19 182/16
**24/7 [5]** 17/25 68/11 68/12 68/14 138/11
**25 [12]** 13/5 13/11 13/17 13/20 14/4 14/9 16/5 25/19 33/16 64/17 184/20 184/24
**25-80526 [1]** 3/3
**25-CV-80526-MIDDLEBROOKS [1]** 1/3
**250 [2]** 1/22 58/11
**26 [1]** 105/6
**26th [1]** 147/8
**27 [1]** 112/12
**2800 [1]** 120/13
**282 [1]** 188/23
**298 [2]** 230/5 230/6
**29th [1]** 270/10
**2Q [1]** 116/21

**3**

**3/26/24 [1]** 105/10
**30 [4]** 31/15 82/20 124/25 249/5
**30 percent [1]** 80/12
**300 [1]** 240/6
**302 [1]** 185/25
**305-400-4260 [1]** 1/23
**31 [1]** 107/15
**31 percent [1]** 183/7
**312-704-0550 [1]** 2/5
**31st [1]** 147/8
**32 [2]** 37/14 45/1
**33131 [1]** 1/23
**34 [1]** 117/24
**34,953 [1]** 227/24
**34.5 [1]** 60/19
**34.6 [1]** 67/12
**3434 [1]** 2/8
**35 [1]** 239/1
**35.5 [1]** 153/16
**35.6 [2]** 155/17 242/10
**3500 [1]** 237/17
**36 [1]** 147/14
**36 percent [2]** 11/25 108/7
**36.5 [1]** 241/7
**362 [5]** 14/1 185/21 185/24 186/19 228/10
**370 [3]** 14/7 186/20 228/9
**3729 [1]** 1/19

**4**

**4.5 [2]** 118/17 118/20
**40 [6]** 11/10 15/25 54/5 184/17 239/1 249/5
**400 [8]** 13/15 14/19 15/1 184/3 184/5 184/25 185/21 226/14
**4225 [1]** 261/21
**425 [1]** 262/10
**4260 [1]** 1/23
**45 [1]** 237/19
**4500 [1]** 2/4
**459 [2]** 127/4 127/9
**465 [3]** 81/21 81/22 81/25
**48 [1]** 86/23
**4:00 [1]** 204/24
**4:00 o'clock [1]** 4/7

**5**

**5 mile [1]** 224/1
**5 percent [1]** 251/5
**50 [7]** 24/19 137/23 141/2 141/3 178/18 181/23 271/3
**50 percent [8]** 140/5 181/12 181/16 181/18 182/3 193/20 193/21 249/3
**50/50 [1]** 181/23
**501 [1]** 17/23
**51 [1]** 44/3
**526 [1]** 258/4
**528 [1]** 227/16
**536 [1]** 56/18
**549 [2]** 81/23 81/25
**55 [3]** 54/7 262/25 266/7
**55 percent [1]** 262/10
**55,000 [1]** 238/24
**550 [4]** 76/2 78/19 78/20 247/22
**560 [3]** 146/18 250/8 250/10
**560.1 [1]** 147/23
**560.2 [3]** 151/3 151/4 250/9
**561-803-3434 [1]** 2/8
**562 [4]** 134/5 257/17 258/20 256/24
**568 [2]** 248/22 248/24
**569 [1]** 263/19
**5:00 [3]** 233/17 234/1 234/3
**5:30 [1]** 234/7

**6**

**6 percent [1]** 75/6
**60 [17]** 11/10 13/18 14/10 14/24 176/22 184/3 184/4 184/24 184/25 185/25 186/3 186/9 186/21 188/16 188/24 226/14 243/19
**60,000 [1]** 140/14
**60601 [1]** 2/5
**607 [2]** 111/18 111/18
**610 [1]** 97/22
**612 [3]** 100/1 100/7 100/8
**618 [3]** 42/20 101/12 114/3
**62 [1]** 140/5
**630 [1]** 121/6
**64 percent [1]** 20/14
**640 [1]** 121/7
**65 [1]** 140/6
**67.86 [1]** 68/3
**6th [3]** 76/6 77/25 80/18

**7**

**7,000 [1]** 238/24
**70 [2]** 176/22 184/16
**71 [1]** 198/11
**71 percent [1]** 198/9
**75 [2]** 38/6 247/5
**75 percent [2]** 38/5 40/23
**76 [2]** 36/5 158/22
**76.1 [1]** 65/24
**78 [2]** 54/20 247/4
**78 percent [3]** 262/9 262/24 266/6
**79 [2]** 20/14 45/25
**7931 [1]** 122/12
**7th [1]** 149/9

**8**

**803 [1]** 86/4
**80526 [1]** 3/3
**813 [2]** 106/19 160/9
**82 [1]** 54/20
**82 percent [1]** 67/11
**85.2 [1]** 64/21
**89 percent [3]** 192/21 218/13 218/15

**9**

**9 percent [2]** 257/1 259/9
**90 [1]** 71/17
**90 percent [1]** 65/12
**900 [1]** 143/25
**90th [1]** 241/24
**91.81 [1]** 260/13
**915 [1]** 124/4
**921 [2]** 125/25 167/11
**923 [1]** 116/19
**96 percent [1]** 198/7
**96.4 [2]** 185/15 229/14
**96.9 [1]** 185/18
**990s [1]** 46/23
**9th [1]** 146/21

A

**a survey [1]** 119/10
**a trademark [1]** 86/7
**A-L-B-A-C-H [1]** 234/10
**AB [1]** 175/23
**abandon [1]** 17/17
**ability [8]** 121/23 190/8 191/17 191/22 201/6 214/16 223/14 235/14
**able [24]** 4/17 6/10 55/19 60/4 69/17 74/23 78/17 79/5 79/23 84/23 87/13 136/20 137/3 138/7 141/19 159/19 170/2 174/11 196/2 196/8 217/4 236/1 250/24 269/22
**about [324]**
**about patient [1]** 28/5
**above [4]** 160/7 186/20 199/6 272/2
**absence [1]** 86/13
**Absent [1]** 34/14
**absolute [1]** 84/23
**absolutely [18]** 52/5 54/4 135/20 144/14 154/17 155/4 155/22 161/22 169/4 178/8 231/1 236/13 243/4 244/13 249/24 250/1 250/4 269/6
**absurd [1]** 27/8
**academic [2]** 176/17 180/14
**accept [1]** 108/4
**acceptable [2]** 5/23 17/17
**accepted [1]** 205/24
**access [5]** 18/1 19/2 28/23 180/10 182/24
**accessible [3]** 217/3 217/5 217/6
**accidents [2]** 238/3 238/5
**accolade [1]** 129/2
**according [1]** 130/25
**account [3]** 13/15 181/11 182/16
**accountability [18]** 34/24 35/2 35/5 35/10 35/13 36/14 40/25 41/15 43/14 43/16 49/3 50/11 50/11 50/13 50/14 50/21 50/22 51/13
**accountable [4]** 48/18 48/19 49/19 50/2
**accreditation [6]** 31/25 58/2 58/4 89/11 228/18 239/13
**accreditations [8]** 29/24 57/16 57/17 92/20 128/12 133/18 134/3 134/4
**accredited [13]** 55/25 56/3 56/4 57/18 57/21 57/24 128/23 137/25 138/23 138/24 139/19 174/12 239/14
**accrediting [2]** 139/2 174/13
**accredits [2]** 56/7 174/18
**accuracy [6]** 20/6 33/13 76/17 114/1 225/23 231/16
**accurate [11]** 59/2 59/2 59/14 104/8 119/21 159/17 159/19 172/4 219/15 230/20 231/7
**accurately [8]** 16/7 37/15 37/17 154/14 155/2 155/14 155/23 254/7
**achieve [1]** 190/9
**achieved [2]** 62/12 184/15
**achievement [22]** 13/2 16/11 37/10 37/13 38/9 38/10 109/19 111/12 111/13 111/15 159/6 184/16 184/16 184/17 184/20 188/1 188/15 195/14 210/19 216/11 216/16 228/5
**achieving [1]** 217/10
**acknowledge [1]** 31/1
**acknowledged [2]** 148/2 187/6
**acknowledges [1]** 138/6
**acquired [3]** 102/21 103/17 160/4
**acquires [1]** 181/14
**across [14]** 28/22 100/14 176/23 184/4 185/11 185/18 186/14 188/1 190/2 190/11 190/14 191/5 197/25 229/8
**acting [2]** 85/9 86/2
**action [4]** 65/8 82/24 84/1 164/22
**actions [2]** 41/15 70/12
**active [1]** 53/8
**actual [15]** 16/9 23/15 37/9 37/18 49/13 108/17 110/23 166/8 172/25 210/9 210/17 211/7 212/3 223/22 226/19
**actually [21]** 8/23 14/7 14/25 15/15 19/2 19/16 23/14 39/3 49/15 56/11 56/13 108/21 143/8 161/6 197/22 201/7 212/3 222/18 222/19 222/25 229/5
**acute [4]** 28/23 29/21 32/1 162/14
**add [3]** 134/1 185/20 239/19
**added [3]** 75/22 105/21 240/12
**adding [2]** 134/4 270/5
**addition [4]** 41/25 146/25 159/11 180/9
**additional [5]** 54/13 58/10 105/21 204/14 270/22
**address [11]** 29/10 83/5 84/4 98/3 121/22 144/12 147/20 211/5 259/18 267/12 267/13
**addressed [1]** 80/19
**addressing [1]** 5/14
**adds [1]** 78/12
**Adelphi [1]** 235/4
**adhering [1]** 196/16
**adjacent [1]** 87/15
**adjusted [3]** 104/1 216/3 216/6
**adjustment [1]** 216/9
**administer [2]** 65/3 242/3
**administration [9]** 63/13 65/4 136/4 136/12 176/14 184/21 185/17 202/20 241/25
**administrative [2]** 127/10 176/13
**administratively [1]** 6/4
**administrator [3]** 206/12 206/14 239/23
**admissibility [1]** 106/9
**admissible [8]** 85/6 86/7 86/9 86/11 95/8 112/19 117/16 151/23
**admission [3]** 77/8 84/7 238/23
**admissions [24]** 29/4 33/4 40/9 40/13 73/20 73/23 74/1 74/1 74/2 74/8 75/1 75/8 77/2 77/10 77/13 78/23 78/25 119/4 128/10 140/13 167/23 168/24 168/25 238/23
**admit [6]** 15/22 123/9 234/4 250/20 269/14 269/15
**admits [4]** 15/24 16/3 17/4 76/15
**admitted [14]** 60/18 69/4 78/19 81/22 81/24 106/4 106/20 117/2 117/20 123/13 146/19 157/2 178/16 259/25
**ads [2]** 21/14 21/15
**adult [4]** 54/10 162/14 237/5 247/21
**advanced [4]** 54/12 55/20 57/20 137/16
**Advantage [1]** 80/14
**adverse [1]** 249/19
**advertise [1]** 48/5
**advice [2]** 30/25 31/2
**advise [1]** 269/20
**advised [1]** 114/5
**adviser [1]** 15/12
**affect [9]** 60/9 180/2 193/4 200/13 202/4 202/12 204/1 222/7 222/16
**affected [1]** 223/3
**affecting [1]** 187/17
**affidavit [4]** 94/4 95/25 96/21 157/3
**affirm [1]** 18/23
**affirmatively [1]** 18/18
**afraid [4]** 29/1 31/3 80/3 89/6
**after [40]** 7/1 14/9 18/22 20/2 20/11 23/9 23/10 23/15 23/16 27/7 28/8 28/8 30/4 33/2 41/1 41/1 52/16 57/8 61/6 71/6 91/4 97/2 114/16 121/9 130/19 130/23 134/6 143/5 148/20 150/8 151/12 158/14 158/20 173/25 180/20 180/21 180/23 180/24 209/24 228/7
**afternoon [5]** 4/7 125/7 135/9 204/4 204/22
**afterwards [1]** 234/2
**again [42]** 22/10 23/15 28/3 32/6 42/6 42/14 46/23 48/10 49/5 62/14 64/23 65/20 67/19 67/25 78/8 84/1 85/3 85/5 85/13 85/13 94/5 108/8 111/21 114/3 124/7 143/19 150/9 164/14 164/22 164/24 171/17 185/20 202/5 205/5 223/17 227/3 231/19 250/14 250/18 253/11 253/19 257/7
**against [8]** 12/5 30/24 31/1 150/3 178/13 193/22 195/22 240/8
**age [3]** 52/5 54/19 140/4

**A**

**agencies [2]** 142/4 228/23
**agents [1]** 123/4
**aggrieved [1]** 39/20
**aggrievement [1]** 40/7
**ago [12]** 6/7 84/13 130/9 130/24 146/21 197/15 210/5 242/24 248/9 265/22 270/2 270/5
**agree [42]** 44/24 93/3 95/2 102/14 105/14 108/23 110/5 110/7 113/24 114/2 115/22 115/25 116/1 120/13 120/23 121/13 142/8 145/12 158/6 160/3 168/20 180/17 205/21 212/8 212/12 213/18 214/7 214/9 215/5 215/7 215/11 215/17 215/20 216/11 217/1 217/3 217/5 224/3 231/15 252/17 257/22 269/14
**agreed [6]** 19/24 76/7 112/18 269/15 270/18 270/20
**agreement [2]** 76/5 94/6
**agrees [1]** 225/16
**AHA [3]** 224/23 224/25 225/4
**ahead [7]** 78/19 86/22 230/25 236/24 245/5 250/21 269/16
**AI [1]** 72/4
**al [2]** 1/5 3/3
**Albach [1]** 234/9
**alerting [1]** 62/19
**Alexandra [1]** 16/4
**all [180]** 6/6 7/18 8/2 11/3 11/17 14/7 16/15 16/19 17/7 20/2 24/19 25/5 25/6 26/3 27/6 27/17 31/9 34/20 37/7 37/8 41/10 43/5 43/9 44/24 45/6 46/23 47/1 48/10 48/13 49/21 51/10 52/23 53/16 55/7 55/15 56/10 56/11 57/3 57/9 57/20 61/19 62/18 63/11 64/24 65/2 65/5 66/3 72/8 74/3 75/17 77/15 77/15 78/19 79/20 84/21 86/17 88/14 88/21 91/19 91/19 93/12 94/16 94/17 95/4 96/4 96/16 96/24 97/4 98/12 100/12 100/14 100/22 102/5 102/23 105/15 107/2 107/12 109/3 110/11 110/17 111/6 111/23 116/15 121/19 121/21 123/9 123/21 128/9 129/6 129/8 131/18 132/9 133/17 137/9 139/10 139/24 141/4 141/7 142/10 143/4 147/22 148/24 149/16 151/19 153/10 161/11 161/24 162/1 162/14 165/3 165/16 166/1 170/16 172/13 174/20 175/4 176/23 178/18 185/11 185/18 186/18 188/1 188/15 189/7 190/2 190/11 190/14 190/20 191/5 191/6 192/7 198/1 198/3 198/5 198/15 199/8 199/9 199/24 199/25 201/19 203/7 203/7 204/22 207/11 209/5 213/10 215/17 216/4 216/6 216/14 216/17 217/7 217/9 217/10 217/15 217/20 219/2 219/21 221/14 225/12 229/11 233/15 245/5 246/14 250/14 250/18 250/21 251/10 251/14 253/22 253/23 256/4 259/1 263/1 267/19 268/23 269/11 270/18 271/13 271/21
**all-comer [1]** 31/9
**allegation [1]** 37/13
**allegations [1]** 43/8
**allege [2]** 6/18 6/19
**allegedly [1]** 84/16
**Allegheny [1]** 236/14
**alleging [1]** 37/10
**allocate [1]** 133/10
**allow [3]** 18/23 55/23 250/10
**allowed [3]** 8/12 85/19 85/20
**allowing [2]** 18/13 112/2
**allows [1]** 36/14
**almost [4]** 83/25 107/12 120/11 198/5
**alone [3]** 11/15 13/15 21/24
**alone account [1]** 13/15
**Along [1]** 21/10
**alongside [1]** 206/19
**Alpha [1]** 215/17
**already [6]** 24/23 82/24 84/3 127/14 156/10 164/25
**also [57]** 8/25 11/5 15/17 16/16 18/18 21/12 22/24 25/23 29/8 31/4 53/19 54/15 54/16 58/2 67/20 68/13 69/7 72/6 81/24 86/9 103/8 103/22 104/17 104/18 105/2 122/4 136/23 138/24 141/2 145/2 150/25 156/25 170/1 174/3 176/3 176/3 177/23 180/13 181/5 190/1 195/25 203/15 203/20 204/3 213/22 215/25 222/16 232/16 232/17 232/18 238/6 243/1 245/7 248/17 253/8 258/3 271/6
**altered [1]** 216/25
**alternate [1]** 224/25
**alternative [1]** 18/4
**always [7]** 35/19 68/15 111/9 161/14 169/3 169/8 228/25
**am [110]** 3/25 21/15 25/24 29/14 29/14 31/19 34/8 39/1 42/22 45/21 53/24 63/5 72/8 77/16 78/11 78/12 86/14 86/16 87/4 87/4 87/8 87/24 88/14 89/5 89/6 89/6 93/15 94/5 96/12 96/22 96/25 97/19 97/19 97/20 98/3 98/5 101/6 102/17 111/20 112/16 114/21 116/19 116/20 121/16 122/11 122/23 124/14 124/18 124/25 130/8 135/10 136/10 136/13 141/8 141/13 150/22 152/3 158/11 158/24 165/14 167/16 167/23 169/21 170/3 174/8 175/14 176/2 176/3 176/18 177/20 179/5 179/8 189/12 197/1 197/2 197/10 197/19 197/19 198/9 206/3 209/11 211/1 214/3 216/8 216/8 216/7 217/9 217/21 217/25 220/11 220/11 221/2 221/22 221/23 222/2 222/5 223/2 223/4 223/14 226/3 238/25 239/6 241/7 246/14 251/20 259/14 264/15 264/24 268/11 270/18
**Amazon [1]** 30/9
**ambulance [8]** 74/11 74/15 75/5 75/14 76/15 79/7 87/17 87/25
**ambulances [1]** 79/8
**ambush [1]** 150/5
**amend [1]** 255/5
**amended [7]** 6/21 129/19 130/10 171/13 254/5 254/5 255/21
**America [2]** 24/25 46/1
**American [6]** 58/2 138/2 139/20 177/3 194/17 201/2
**AMI [1]** 70/2
**among [2]** 19/15 116/15
**amount [3]** 86/25 92/5 133/3
**ample [1]** 202/18
**amplified [1]** 21/13
**amplified by [1]** 21/13
**analyses [11]** 188/4 188/9 193/13 198/24 206/22 207/4 209/6 209/7 209/8 209/14 210/1
**analysis [24]** 15/4 15/14 16/2 69/7 104/21 105/20 108/21 159/21 187/2 195/3 196/22 198/15 199/9 199/16 204/16 205/18 207/5 209/12 223/6 223/7 224/6 228/12 232/12 232/20
**analyst [1]** 235/11
**analyze [4]** 186/11 187/23 188/10 209/18
**analyzed [1]** 168/9
**analyzing [1]** 186/10
**and an [1]** 235/5
**and hand [1]** 113/7
**and hygiene [1]** 242/7
**and now [1]** 245/22
**and said [1]** 171/13
**and she [1]** 33/4
**Andrea [1]** 258/6
**another [15]** 10/2 32/3 42/7 48/12 55/12 61/21 69/3 80/17 89/11 142/5 151/6 188/20 192/16 201/9 266/7
**another trope [1]** 48/12
**answer [38]** 15/18 17/20 43/11 59/24 86/22 112/22 130/6 130/10 131/1 144/5 149/24 161/6 165/8 170/19 170/23 171/8 171/13 172/22 188/13 193/20 223/8 223/9 231/12 253/25 253/25 254/5 254/5 254/18 254/24 254/25 255/4 255/5 255/10 255/20 255/21 265/2 267/1 268/21
**answered [2]** 226/21 253/8
**answerer [1]** 172/21
**answering [2]** 36/11 170/12
**answers [11]** 6/21 6/21 41/11

A

**answers... [8]** 129/20 170/2 173/7 173/9 224/8 253/12 253/16 253/18
**anticipate [1]** 251/8
**antitrust [1]** 86/9
**anxiety [1]** 140/23
**anxious [1]** 29/1
**any [197]** 4/12 6/11 7/4 13/2 14/10 15/11 16/8 24/12 26/7 36/16 37/2 37/3 37/4 37/5 37/5 37/9 38/25 39/5 40/4 40/24 42/7 56/9 62/12 63/3 63/25 64/4 64/6 64/10 64/19 65/21 67/21 68/1 71/7 72/12 73/13 73/20 75/4 75/22 76/8 77/19 78/12 78/17 82/16 86/4 86/18 92/10 92/14 92/17 93/12 93/13 94/15 95/7 97/15 98/6 99/10 99/13 99/22 100/25 102/12 102/23 104/3 112/6 112/10 112/25 114/14 115/11 118/10 118/12 118/19 119/16 119/23 120/1 121/1 121/3 122/1 123/5 124/8 126/20 128/8 130/2 130/16 131/18 132/16 132/20 134/23 134/25 137/19 137/19 138/21 139/17 139/19 139/25 144/16 145/2 145/4 145/14 145/18 149/4 149/11 149/16 151/11 152/22 158/9 163/19 164/7 165/19 166/25 167/2 167/4 168/11 168/13 168/14 168/18 170/16 170/17 170/23 171/19 172/7 172/7 172/15 172/24 174/25 176/21 176/25 177/7 177/18 178/6 180/19 180/19 180/19 180/23 183/9 186/8 186/9 186/22 189/12 190/21 198/22 200/6 200/6 200/18 203/10 205/8 205/13 205/17 207/19 207/19 207/24 208/10 208/11 208/22 208/24 209/1 209/3 210/3 211/2 213/15 213/20 216/9 218/3 218/17 220/8 220/18 221/18 222/3 222/24 223/12 223/12 223/20 226/6 228/18 229/20 231/7 233/2 236/3 240/14 240/14 240/17 243/23 247/8 249/18 251/21 254/8 254/8 254/10 255/5 255/13 255/24 256/18 260/16 260/25 263/17 264/19 265/5 265/7 270/10 270/24
**anybody [8]** 39/2 45/13 107/25 141/19 163/15 163/19 208/20 243/22
**anybody's [1]** 4/24
**anymore [1]** 65/14
**anyone [8]** 7/3 23/2 48/16 73/2 88/17 132/16 242/23 244/3
**anything [22]** 7/6 24/14 39/5 50/10 53/20 61/12 61/16 69/1 75/15 77/25 83/3 84/4 88/17 94/12 107/5 169/9 169/11
186/4 196/7 198/18 220/18 226/16 239/19
**anyway [5]** 17/11 26/24 113/20 162/9 245/10
**anywhere [1]** 56/19
**apart [5]** 124/16 152/2 237/13 237/22 237/22
**apologies [2]** 99/20 99/21
**apologize [3]** 129/22 218/3 267/19
**apparently [5]** 49/8 117/13 123/2 196/8 245/22
**appear [1]** 25/19
**appearances [3]** 1/14 3/4 3/24
**appears [3]** 24/4 100/24 117/15
**apples [4]** 190/15 190/15 192/2 192/2
**applied [2]** 166/6 190/2
**applies [1]** 57/10
**apply [3]** 175/4 190/13 241/5
**applying [1]** 222/10
**appoint [1]** 115/14
**appointment [1]** 234/4
**appreciate [6]** 13/12 28/16 88/19 114/9 151/15 271/17
**appreciates [1]** 34/22
**appreciative [1]** 146/10
**apprehensive [1]** 28/25
**approach [29]** 18/4 145/10 179/18 179/22 181/3 183/14 186/23 189/10 189/17 193/22 194/10 194/15 195/1 195/6 195/11 195/20 195/22 197/2 197/3 197/17 197/18 198/2 198/20 200/13 220/1 230/14 230/19 231/4 231/6
**approach penalizes [1]** 179/18
**approached [2]** 153/10 239/7
**approaches [4]** 190/2 194/13 195/6 195/17
**approaching [1]** 179/10
**appropriate [9]** 4/1 6/5 56/14 80/1 98/2 186/6 225/11 226/18 232/4
**approve [2]** 124/1 124/11
**approved [1]** 16/13
**approximately [5]** 20/13 31/15 48/20 140/14 265/15
**April [11]** 49/7 107/15 134/11 160/3 160/8 208/15 259/1 260/15 260/25 265/21 265/25
**April 12 [1]** 49/7
**April 17 [1]** 134/11
**April 2024 [3]** 259/1 260/15 260/25
**April 2025 [1]** 208/15
**arbitrarily [4]** 13/11 16/6 16/10 38/9
**arbitrary [1]** 14/9
**arbitration [1]** 178/18
**archival [2]** 209/23 210/4
**are [487]**
**area [14]** 54/7 54/22 55/16 131/24 136/18 137/7 167/12
236/14 238/15 247/2 248/19 249/1 251/10 259/3
**areas [5]** 54/23 62/18 65/8 144/13 239/8
**aren't [8]** 7/9 10/23 91/11 91/14 196/4 200/3 218/11 227/13
**arena [1]** 235/11
**argue [2]** 24/24 124/13
**arguing [1]** 199/19
**argument [2]** 88/16 97/15
**arises [1]** 30/3
**army [2]** 36/10 49/21
**arose [1]** 150/8
**around [14]** 11/16 24/9 32/23 87/4 100/25 112/12 120/13 123/25 124/17 132/1 143/6 162/18 164/12 259/18
**arranged [1]** 249/8
**arrears [1]** 267/5
**arrest [5]** 138/8 138/16 138/18 138/20 138/21
**arrived [1]** 29/4
**art [1]** 30/20
**article [21]** 177/2 189/21 191/2 193/10 194/4 194/8 195/4 201/2 201/21 204/1 205/8 205/20 212/5 212/9 212/12 212/18 213/5 224/15 224/19 224/24 232/23
**articles [5]** 176/21 176/22 205/12 205/13 224/12
**articulated [1]** 212/20
**as [263]** 3/7 4/3 4/3 4/3 5/2 5/9 5/19 6/14 7/7 8/19 10/7 10/16 11/17 13/1 13/7 13/12 13/22 14/13 16/2 16/6 16/11 17/23 18/7 18/12 18/21 19/24 20/21 20/25 21/19 22/24 23/1 23/13 23/17 25/25 26/2 29/2 29/4 29/20 30/2 31/5 31/5 32/18 33/11 33/18 34/23 34/24 38/1 39/15 40/25 41/1 42/4 42/23 42/23 45/22 45/25 46/13 46/13 48/9 48/9 48/16 49/6 52/10 52/17 53/4 53/14 53/23 54/15 55/9 55/18 56/22 57/25 58/3 60/10 60/12 61/1 61/16 64/15 68/17 70/10 71/6 73/20 75/7 76/21 78/8 80/21 83/15 84/8 84/24 86/7 86/8 86/10 86/11 86/19 86/20 87/4 88/12 88/13 88/16 88/19 89/20 90/23 91/20 91/25 92/12 93/12 94/9 94/9 94/9 94/9 94/17 94/17 96/5 97/15 98/14 100/13 100/15 101/6 101/21 101/21 103/4 105/20 106/11 106/15 111/9 112/7 114/10 114/14 119/12 124/13 124/20 124/21 124/23 124/24 124/25 124/25 125/25 126/5 126/22 132/24 133/7 133/9 135/21 135/22 135/25 136/2 136/7 137/1 137/17 139/1 141/10 141/12 141/13 144/2 144/10 144/10 144/10 144/11 145/10 146/1 146/2 146/23

A

**as... [102]** 147/17 147/19 149/6 150/9 150/20 150/20 151/1 151/7 154/25 155/1 155/13 156/10 157/3 158/22 160/13 161/5 162/13 166/6 167/12 167/12 178/5 178/8 178/14 178/16 179/3 180/10 180/13 181/10 181/13 181/21 183/21 184/2 184/3 185/1 185/4 187/4 187/10 189/24 190/19 190/19 192/11 194/10 197/24 198/23 200/19 201/7 201/18 202/7 202/11 202/12 202/17 202/20 203/12 206/4 206/12 206/14 206/18 209/18 212/6 212/20 213/11 213/24 215/2 219/7 219/12 220/10 222/15 222/15 224/25 227/4 233/3 235/21 235/23 236/2 236/6 236/19 237/5 237/7 238/15 239/3 239/11 240/23 241/17 244/19 244/20 245/13 246/7 247/8 247/12 247/23 248/14 249/21 251/20 258/11 258/15 262/6 268/7 268/25 269/12 269/23 269/23 271/18
**aside [2]** 84/6 251/7
**ask [26]** 34/3 36/3 76/22 82/20 112/3 123/6 123/11 149/22 153/19 163/19 164/2 165/1 170/1 170/5 174/9 177/13 178/10 207/13 208/24 209/4 211/7 211/8 244/24 250/19 250/22 259/21
**asked [56]** 21/6 35/1 39/24 39/25 84/20 84/20 88/24 96/7 118/7 130/4 131/15 132/13 133/3 133/12 146/24 148/24 149/14 149/23 150/14 163/23 170/15 170/22 171/1 171/7 171/17 172/13 172/13 173/15 173/20 174/6 188/7 196/22 226/12 226/19 228/15 233/6 244/7 244/25 245/11 245/19 245/21 246/5 246/13 246/25 247/12 253/22 253/24 255/4 255/5 255/12 255/17 262/3 263/24 266/23 268/2 269/1
**asking [12]** 5/10 6/17 34/8 36/5 42/25 46/25 134/19 134/21 153/12 164/13 226/3 246/16
**asks [1]** 130/1
**aspects [1]** 213/22
**assaults [1]** 34/1
**asserted [4]** 71/20 72/10 81/14 81/18
**assertion [1]** 98/6
**assess [3]** 15/14 48/24 225/23
**assessment [1]** 18/8
**assessments [1]** 95/14
**assign [12]** 12/19 37/13 41/7 142/19 180/12 183/14 183/25 184/15 184/19 197/9 217/13 217/24
**assigned [20]** 7/24 10/11 16/5 16/6 17/7 26/5 45/12 61/19 62/8 70/23 75/16 80/16 89/23 142/12 142/22 185/23 234/18 240/19 240/22 242/16
**assigning [17]** 10/5 16/8 16/10 16/14 20/12 49/12 133/18 186/21 195/8 196/13 197/13 197/15 197/20 198/10 199/17 231/16 243/9
**assignment [8]** 37/11 177/13 185/2 208/14 209/6 217/22 226/14 226/16
**assigns [2]** 33/10 181/8
**assist [1]** 235/14
**assistance [1]** 47/15
**assistant [2]** 127/14 176/9
**associate [2]** 52/24 176/4
**associated [5]** 186/2 188/24 189/12 222/7 224/10
**Association [3]** 138/3 194/17 240/16
**associations [1]** 240/17
**assume [9]** 9/25 10/1 94/19 99/8 164/11 169/18 217/7 217/9 217/15
**assumed [1]** 115/7
**assumption [5]** 41/23 115/12 169/20 217/12 218/1
**assumptions [1]** 194/23
**asterisk [1]** 25/20
**asterisks [1]** 50/7
**asthma [1]** 9/24
**Atlantic [7]** 41/12 177/24 206/10 218/21 219/2 219/11 219/14
**attach [1]** 77/14
**attached [4]** 105/18 147/6 147/25 207/7
**attachments [1]** 122/19
**attack [4]** 9/24 74/20 79/11 79/15
**attempting [1]** 202/10
**attempts [1]** 89/21
**attention [4]** 63/16 67/13 69/5 166/10
**attest [1]** 18/23
**attestation [1]** 34/5
**audit [2]** 214/24 229/1
**audited [6]** 29/25 154/9 154/23 155/10 192/9 214/21
**auditing [3]** 192/15 214/25 215/3
**audits [10]** 26/20 190/18 192/8 214/13 214/14 214/16 214/18 214/25 218/11 228/15
**Austin [12]** 15/12 15/22 15/24 16/3 187/5 194/5 221/4 225/15 225/16 229/25 232/25 233/6
**Austin's [4]** 221/1 225/21 230/14 233/18
**authentic [1]** 113/1
**authentication [1]** 71/11
**authenticity [4]** 72/2 72/12 117/16 117/17
**authored [4]** 194/5 205/7 205/8 205/13
**authority [1]** 86/13
**authorize [1]** 123/17
**authorized [3]** 123/3 123/15 123/18
**automatically [2]** 41/17 120/9
**available [20]** 26/6 37/25 40/23 44/20 69/17 79/21 80/19 107/16 107/25 138/10 180/13 184/8 194/16 197/8 202/25 209/19 210/13 210/14 211/4 257/9
**average [34]** 13/24 14/1 14/7 14/7 38/20 46/7 54/19 54/25 64/21 65/24 68/3 69/22 70/1 103/15 107/22 138/17 160/5 160/18 185/10 185/14 185/18 185/24 186/1 186/14 186/14 186/16 186/18 187/19 187/20 188/23 195/9 211/25 229/16 230/19
**average participating [1]** 13/24
**averages [1]** 187/19
**avoid [3]** 5/6 6/11 194/22
**avoidance [1]** 28/6
**award [1]** 129/6
**awarded [1]** 165/24
**awards [5]** 58/7 58/12 129/7 133/19 240/14
**aware [39]** 60/11 61/6 61/9 63/5 72/16 93/15 97/4 122/6 123/20 127/15 127/19 130/2 132/22 150/21 158/11 158/14 158/20 158/24 158/25 160/15 162/20 162/23 164/15 171/2 171/3 174/8 179/10 189/12 208/15 208/18 208/23 209/9 209/11 209/12 216/8 219/11 221/4 221/8 255/7
**away [4]** 9/18 11/12 19/18 80/5

B

**babies [2]** 237/20 237/20
**baby [1]** 31/13
**Bachelor's [1]** 235/4
**back [37]** 4/7 29/5 32/14 32/16 47/1 47/2 47/9 48/1 51/5 51/17 63/3 64/3 70/4 77/22 87/23 94/22 96/8 96/18 125/8 125/15 129/21 136/2 141/1 144/23 146/10 163/17 163/17 195/16 219/22 233/12 235/8 236/2 239/10 244/25 269/20 271/19 271/19
**backdrop [1]** 12/5
**background [9]** 52/9 135/15 135/18 137/18 175/22 235/2 235/3 236/9 259/10
**backup [2]** 77/16 78/4
**bad [3]** 14/12 79/18 91/6
**Bailey [2]** 21/12 21/19
**baked [1]** 198/19
**banner [2]** 35/6 35/7
**Baptist [1]** 24/6
**bar [7]** 60/1 64/16 64/24 155/6 184/20 188/8 242/3

B

**bariatric [2]** 58/3 92/23
**barometer [1]** 40/6
**barometers [2]** 40/3 40/5
**base [1]** 200/22
**based [43]** 7/10 8/12 15/4 15/10 15/24 16/17 17/3 18/4 29/1 29/13 38/18 61/13 80/15 81/15 86/13 103/12 103/20 104/11 110/14 110/16 141/24 151/21 158/4 160/25 166/5 178/2 202/16 203/18 204/6 204/19 210/4 210/9 211/2 215/17 216/14 220/12 220/13 222/9 222/12 236/14 252/10 252/11 252/14
**bases [1]** 41/23
**basically [3]** 6/7 81/16 235/24
**basing [1]** 202/22
**basis [7]** 7/7 16/9 73/21 74/13 150/12 189/12 197/12
**BCMA [13]** 64/15 65/1 90/23 108/20 109/1 109/8 155/5 159/2 161/16 165/12 210/17 220/19 241/25
**be [182]** 3/1 4/11 4/16 7/17 8/1 8/8 8/11 10/6 12/20 12/22 14/12 16/19 18/2 18/12 18/12 18/18 18/19 18/24 20/24 21/6 24/13 32/2 32/3 32/20 33/20 34/6 34/8 34/10 34/11 38/10 38/12 38/22 41/20 41/22 42/3 42/14 44/5 44/10 47/4 47/6 47/17 50/18 51/1 52/22 54/23 56/2 56/20 57/12 59/3 61/10 61/10 61/19 61/20 63/12 64/11 66/16 68/25 70/1 70/7 70/14 70/15 70/22 71/24 75/11 75/14 75/14 75/19 79/5 79/5 79/11 79/12 79/19 79/21 79/23 81/9 84/11 85/13 85/21 88/8 90/1 92/25 97/6 98/17 101/8 107/3 107/23 110/11 112/18 115/7 117/15 118/20 120/11 123/3 123/15 123/17 125/8 132/9 133/23 133/24 134/4 136/20 137/3 137/10 138/7 138/15 139/17 139/21 141/18 143/19 145/15 148/6 156/6 159/19 160/8 161/25 170/2 172/3 174/11 174/12 176/23 177/14 180/3 180/17 181/13 181/18 181/20 189/24 192/20 192/22 193/8 195/2 195/7 202/25 202/25 204/5 204/12 204/14 204/18 205/23 208/3 211/22 212/14 213/20 215/3 216/7 216/7 216/8 217/4 220/13 223/19 226/14 226/16 227/25 228/10 228/19 229/22 230/4 230/19 230/23 233/24 235/12 236/1 247/1 247/10 249/18 250/2 255/25 256/18 256/22 257/7 259/21 260/7 264/20 264/21 268/14 268/15 269/4 269/12 269/22 269/25 270/18 271/21
**be one [1]** 41/22
**be the [1]** 115/7
**BEACH [79]** 1/2 1/8 2/7 3/8 9/3 24/2 28/22 29/19 29/22 30/13 31/23 32/11 32/23 34/4 35/6 35/7 42/23 42/24 54/5 54/9 55/5 55/11 55/18 55/21 55/24 97/2 101/15 101/20 102/1 104/20 113/4 114/4 114/5 115/23 116/2 116/6 116/15 116/21 118/8 121/10 121/14 121/17 124/2 125/20 126/1 126/21 134/14 135/10 135/12 135/16 137/5 137/6 139/14 145/21 153/21 154/3 156/22 157/3 158/1 158/3 158/9 158/14 160/21 161/5 162/11 162/18 163/11 164/12 166/25 167/13 168/2 168/14 235/18 237/17 237/18 245/11 246/5 258/14 271/5
**Beach Health [1]** 42/23
**Beach/Ft [1]** 2/7
**beam [1]** 54/17
**became [12]** 45/22 46/9 46/9 53/5 53/6 58/19 60/13 60/16 61/6 63/1 150/21 252/25
**because [132]** 5/4 5/12 5/20 6/3 6/3 10/3 10/16 11/11 14/11 16/7 17/9 21/2 23/14 25/21 27/18 27/18 30/8 31/2 31/3 33/6 37/21 40/6 40/12 40/22 41/14 41/24 46/10 46/17 46/18 47/23 50/9 50/19 50/23 53/16 55/16 56/18 57/3 60/3 61/20 66/21 70/7 79/5 79/20 80/4 81/3 81/14 82/24 84/3 86/25 87/17 88/3 88/22 89/20 91/11 92/5 92/10 92/24 96/4 96/20 97/19 99/8 101/4 106/13 110/9 113/16 118/25 119/2 124/2 124/11 125/3 127/14 130/19 133/15 134/22 137/8 145/21 148/19 149/8 150/1 150/16 157/8 158/2 158/6 165/5 165/22 166/13 168/21 171/10 172/4 178/2 182/18 183/11 184/3 184/7 191/21 192/11 197/19 199/3 199/20 206/3 211/4 216/22 219/15 230/14 230/16 232/15 232/16 234/2 234/17 239/10 241/5 242/20 243/15 243/16 244/5 244/24 245/13 249/10 251/11 255/25 256/10 256/12 259/7 261/15 261/17 261/19 262/17 263/18 264/6 264/14 266/11 267/11
**become [6]** 60/11 61/6 72/16 135/12 164/15 201/25
**becomes [2]** 79/1 120/11
**becoming [3]** 5/2 52/7 61/9
**bed [3]** 86/24 129/13 237/19
**beds [4]** 22/2 46/8 56/18 139/4
**bedside [4]** 28/21 135/23 136/11 137/2
**been [103]** 5/11 5/11 13/8 16/23 21/13 21/18 21/22 28/25 31/19 32/23 34/7 35/12 35/18 35/19 36/23 37/17 40/4 41/2 41/17 42/13 45/21 46/7 54/4 60/18 62/24 62/24 63/3 64/25 65/16 69/17 71/17 76/19 77/17 78/17 80/24 84/6 84/17 84/23 86/1 89/25 98/13 99/1 99/6 105/12 107/25 119/5 126/10 134/3 136/15 136/16 137/8 141/2 141/3 141/5 142/1 142/3 146/18 146/24 147/1 147/16 150/24 151/1 151/15 153/16 156/5 176/7 176/8 177/22 177/24 178/16 178/18 186/10 193/10 197/11 199/2 200/7 200/7 206/3 206/15 207/10 209/14 209/17 209/21 223/12 229/24 235/6 236/11 236/19 240/23 244/8 244/19 244/21 246/12 247/6 248/11 253/13 258/19 259/12 261/20 265/21 267/18 268/22 269/15
**before [46]** 1/11 10/4 10/11 11/25 14/6 22/5 27/2 27/6 38/6 48/21 63/1 66/4 66/7 76/22 85/5 85/18 91/3 91/17 110/21 113/25 121/8 123/24 124/11 125/20 126/11 126/22 133/7 134/17 141/21 147/1 149/25 153/11 162/11 165/11 175/6 178/10 179/10 198/6 199/3 201/7 244/21 259/1 261/18 263/12 269/15 269/21
**began [3]** 29/20 52/3 246/16
**begin [1]** 36/2
**beginning [3]** 39/4 76/25 99/4
**behalf [19]** 3/6 3/7 3/8 3/9 3/10 3/11 3/14 3/18 3/20 43/16 123/15 123/21 124/2 124/12 129/23 134/13 134/19 134/21 253/8
**behave [1]** 199/23
**behaved [2]** 196/24 198/16
**behavior [2]** 26/11 28/13
**behavioral [1]** 54/15
**behind [3]** 3/10 3/25 22/4
**being [66]** 4/2 16/12 20/25 22/1 22/24 23/9 23/15 38/2 39/24 46/16 47/24 50/18 59/1 63/7 68/20 70/23 72/9 74/14 80/21 81/10 81/13 81/17 85/8 85/10 85/13 89/23 96/23 99/24 104/19 105/11 110/9 115/3 136/12 141/1 144/10 146/2 146/24 146/25 151/16 164/24 166/5 168/24 189/1 190/3 190/14 190/20 192/5 197/19 199/6 200/4 213/11 213/25 222/18 222/19 223/3 233/3 233/4 237/15 238/12 248/10 248/18 248/20 251/7 252/7 269/1 269/2
**belabor [1]** 153/19

B

**belief [3]** 81/9 120/8 204/10
**believe [58]** 7/23 10/2 17/16 76/15 77/21 78/1 94/11 98/9 99/10 99/13 99/22 104/3 104/23 106/6 107/5 112/10 112/25 121/1 121/3 123/25 142/6 142/11 142/16 147/14 160/24 168/13 168/15 168/18 173/23 198/2 199/15 200/19 207/9 217/19 218/7 219/4 219/6 219/7 219/15 220/6 220/8 220/13 220/17 222/12 224/17 230/12 241/24 244/11 244/14 244/17 244/19 248/4 250/2 256/4 256/14 256/23 264/5 269/22
**believed [1]** 252/6
**believer [1]** 40/17
**believing [1]** 29/13
**belong [1]** 55/8
**below [3]** 24/10 107/22 160/6
**bench [3]** 1/11 6/22 36/14
**benchmark [1]** 92/11
**benchmarking [1]** 92/12
**beneficiaries [1]** 82/9
**benefit [10]** 23/19 44/24 92/25 124/20 158/9 158/12 169/25 225/22 238/1 251/23
**Berger [3]** 26/10 36/25 39/6
**besides [3]** 57/15 75/20 150/8
**best [14]** 38/3 41/7 57/6 58/11 58/12 62/15 118/23 160/8 161/2 194/9 217/13 229/3 229/15 265/23
**BETH [3]** 1/15 3/5 8/6
**better [31]** 14/7 14/11 23/4 38/22 40/22 41/1 41/8 42/1 42/6 46/11 46/18 46/19 50/24 50/24 69/21 69/23 69/25 79/25 81/16 87/7 119/24 120/3 140/25 193/9 193/17 193/19 204/11 224/5 256/20 261/19 264/17
**between [18]** 11/23 12/17 26/22 31/17 31/21 49/8 76/14 99/7 174/7 186/1 194/25 197/17 200/9 224/13 237/11 257/1 259/9 261/25
**beyond [3]** 202/17 230/13 240/15
**bias [7]** 190/21 195/18 200/3 219/18 219/21 229/18 229/22
**biased [2]** 190/25 230/1
**big [4]** 132/2 142/1 237/10 245/11
**bigger [3]** 82/3 260/3 260/4
**bill [4]** 174/11 207/21 249/15 249/17
**billed [1]** 207/16
**BILLEK [2]** 2/2 3/20
**billing [2]** 214/21 215/4
**billion [3]** 35/1 36/9 50/5
**Binder [1]** 3/15
**bios [1]** 35/22
**birth [2]** 9/23 261/25
**Biscayne [1]** 1/22
**bit [13]** 17/13 17/15 54/22 83/17 87/14 115/1 121/6 139/13 160/18 186/18 204/3 238/13 257/19
**blackmail [1]** 19/25
**BLAIR [4]** 2/1 3/13 85/23 205/4
**blaming [1]** 35/14
**blood [2]** 52/13 102/23
**blow [1]** 227/16
**board [45]** 30/7 30/9 30/11 40/11 41/11 68/13 143/3 144/9 170/21 172/25 177/20 177/21 177/24 178/2 178/5 178/9 202/17 202/20 206/8 206/9 206/9 215/2 218/21 219/8 219/14 236/7 236/8 242/12 242/13 243/3 243/3 243/5 243/8 243/22 243/22 244/6 254/12 254/17 256/1 256/3 256/5 256/7 256/9 256/11 265/3
**boards [4]** 39/12 39/14 39/14 236/6
**Boca [9]** 3/9 24/7 30/16 30/17 30/18 30/24 31/4 55/9 101/21
**Boca's [1]** 40/11
**bodies [1]** 58/6
**body [1]** 139/2
**Boeing [1]** 43/18
**bold [1]** 214/11
**bone [1]** 52/13
**bordered [1]** 242/14
**born [3]** 43/17 43/23 49/7
**both [7]** 4/10 4/13 6/3 7/8 81/6 215/24 224/11
**bother [1]** 47/23
**bots [1]** 72/4
**bottle [1]** 8/21
**bottom [7]** 12/19 16/8 19/10 22/24 166/22 188/21 196/6
**Boulevard [1]** 1/22
**box [2]** 136/20 142/5
**Boys [1]** 236/8
**brain [1]** 79/19
**brand [23]** 39/23 40/2 116/1 116/6 116/13 116/22 116/25 118/2 118/4 118/8 168/2 244/20 245/7 245/20 246/18 247/3 247/4 261/2 261/5 261/6 261/11 262/18 266/4
**brazen [3]** 42/13 42/15 43/4
**break [4]** 125/3 125/20 204/22 234/2
**breaking [1]** 124/20
**brief [4]** 52/8 236/2 247/5 248/6
**briefed [2]** 23/10 23/17
**briefing [2]** 85/5 151/6
**briefly [4]** 47/14 131/12 173/15 217/6
**bring [8]** 60/18 69/3 74/23 88/6 137/8 233/12 247/22 248/3
**bringing [1]** 247/23
**brings [2]** 22/5 166/10
**broad [2]** 145/13 151/8
**broader [1]** 213/25
**brought [8]** 74/10 74/14 80/1 85/23 116/10 116/11 138/20 163/5
**Broward [12]** 52/16 53/1 53/15 58/21 59/10 59/18 109/16 111/10 119/19 133/5 235/10 235/10
**bubble [1]** 267/23
**bubbles [1]** 259/15
**built [1]** 89/24
**bullet [2]** 196/4 196/6
**bully [2]** 36/6 51/7
**bunch [1]** 114/19
**bundle [1]** 108/5
**burden [2]** 230/1 230/4
**burdensome [4]** 11/1 42/16 230/17 267/17
**Bureau [1]** 176/4
**buried [1]** 9/25
**business [26]** 15/3 17/21 20/3 20/5 26/11 38/13 47/4 50/14 54/1 57/14 76/17 93/4 93/7 99/10 104/24 105/15 117/9 117/10 117/15 147/25 148/2 148/9 149/11 158/7 158/15 235/25
**buying [1]** 43/21
**by David [1]** 201/9
**by Delray [1]** 122/25
**by the [1]** 213/3
**bypass [1]** 74/23

C

**C-Y-N-T-H-I-A [1]** 234/9
**C.W [1]** 235/5
**cabbage [1]** 70/2
**calculate [3]** 13/16 196/2 196/8
**calculated [1]** 66/17
**calculates [1]** 111/3
**calculation [1]** 45/14
**calculations [1]** 227/10
**calculator [3]** 45/15 101/9 260/7
**calendar [4]** 244/23 261/13 261/14 265/22
**call [24]** 13/2 19/25 25/12 30/8 51/21 56/12 74/9 88/24 89/3 89/16 135/4 138/10 146/10 174/22 233/21 239/12 244/20 244/23 261/10 261/14 269/18 270/3 270/6 270/7
**called [19]** 12/14 21/24 25/7 33/12 33/16 48/19 55/5 56/8 57/2 73/25 104/21 104/23 145/24 196/1 198/21 249/8 261/6 263/21 270/4
**calling [3]** 269/25 270/1 270/12
**calls [7]** 21/23 69/13 152/11 193/1 230/22 230/22 231/20
**came [32]** 4/7 12/25 53/3 57/19 60/11 71/4 71/6 76/9 83/12 83/22 92/16 110/21 115/24 118/9 121/9 123/25 127/10 127/13 143/4 143/24

C

**came... [12]** 150/9 153/14 153/14 156/22 162/24 163/3 163/16 164/21 165/11 211/9 243/23 244/4
**campaign [3]** 18/3 21/14 22/5
**Campione [6]** 12/14 12/18 12/18 12/21 16/4 49/9
**campus [3]** 54/15 54/17 236/18
**can [157]** 4/12 4/18 6/6 7/11 9/3 10/18 13/23 14/5 18/12 19/3 19/25 20/21 25/22 34/1 42/10 43/1 45/8 48/9 51/2 52/3 54/2 55/20 58/18 58/24 62/5 64/13 66/10 66/17 69/3 69/20 73/4 74/1 75/21 79/13 79/19 79/19 82/2 82/3 83/21 84/12 86/18 88/17 94/4 94/7 98/3 98/5 98/13 105/2 105/9 110/4 112/22 113/3 113/9 117/11 118/4 124/5 124/17 125/5 125/12 126/13 127/15 127/17 127/18 129/9 129/9 129/22 134/9 134/16 137/4 139/14 139/19 140/2 141/11 143/12 144/2 144/17 145/9 147/3 147/20 148/8 151/25 152/3 152/10 153/16 154/2 155/17 158/13 160/11 169/3 169/8 169/16 177/17 178/12 180/4 181/2 182/9 184/6 184/9 185/12 185/19 186/12 186/13 186/16 187/23 189/15 193/8 196/11 198/13 200/15 200/17 200/20 200/20 202/15 203/8 204/1 204/8 204/14 205/23 212/25 215/23 216/22 220/22 221/17 221/25 223/19 227/2 227/16 227/18 227/22 228/13 230/8 230/10 231/23 232/7 232/10 233/18 233/22 234/6 234/7 238/23 241/12 244/7 244/8 254/13 254/14 254/18 254/20 256/24 259/9 260/3 260/4 267/17 267/18 270/14 270/19 270/22 271/19
**can't [19]** 5/3 14/10 25/23 34/9 51/11 96/19 102/18 116/3 184/7 213/4 215/23 223/21 224/14 224/14 226/1 227/6 252/12 256/18 270/13
**cancel [2]** 148/14 234/5
**canceled [2]** 147/18 148/5
**cancellation [4]** 146/14 147/24 148/4 149/2
**cancellations [4]** 28/6 146/12 147/16 149/21
**cancer [1]** 52/6
**cancers [1]** 52/13
**cannot [4]** 24/21 254/16 254/19 254/21
**capabilities [1]** 79/17
**capability [2]** 181/20 249/3
**capacity [3]** 112/7 126/5 144/11
**cardiac [19]** 9/6 30/13 30/15 32/24 35/13 68/13 137/10 137/11 137/24 138/2 138/3 138/8 138/16 138/18 138/20 140/10 145/19 146/4 146/11
**cardiologist [2]** 174/3 174/3
**cardiology [5]** 137/14 137/21 201/11 201/13 201/15
**cardiovascular [2]** 29/23 174/2
**cards [1]** 63/8
**care [148]** 8/18 9/5 9/21 10/18 11/4 11/12 12/3 12/7 23/21 27/18 27/21 27/23 28/13 28/23 29/17 29/17 29/21 30/12 30/14 30/19 31/8 31/14 32/13 32/17 33/8 33/18 35/8 35/20 35/23 35/24 36/10 39/16 40/19 43/21 43/22 47/7 47/9 47/12 52/4 52/9 52/12 52/21 53/10 53/13 53/17 53/21 54/11 55/22 56/14 58/13 67/14 68/6 68/7 68/10 68/11 68/13 70/20 70/21 70/22 74/24 75/22 79/17 82/10 82/10 85/11 85/12 87/6 87/20 88/2 88/25 92/8 96/5 97/4 107/8 107/9 120/4 121/13 126/16 130/3 135/15 135/25 136/15 136/17 136/20 137/3 137/10 137/11 138/7 138/10 140/18 140/25 141/19 144/12 145/16 152/8 152/10 152/18 158/16 158/17 158/21 162/14 166/12 166/14 171/4 176/5 176/9 176/15 176/19 176/25 177/3 177/5 177/7 177/9 177/10 177/18 178/19 178/22 178/25 181/21 184/21 190/8 191/15 204/9 212/13 221/24 224/11 227/14 234/23 235/6 235/8 235/13 235/17 236/4 236/17 236/19 237/7 238/21 239/5 242/12 242/13 242/14 244/12 248/16 249/7 264/15 264/18 268/13 270/17
**cared [1]** 166/10
**career [5]** 29/20 52/4 135/23 136/17 136/24
**carefully [1]** 16/12
**caring [1]** 155/19
**carries [1]** 97/18
**carry [3]** 69/8 69/11 97/14
**cars [1]** 43/20
**case [64]** 1/3 3/2 3/3 4/5 4/23 5/13 6/7 7/8 7/10 7/12 7/25 8/7 8/10 9/9 34/21 34/24 35/5 35/13 35/18 36/16 37/8 39/4 39/17 47/24 49/20 50/4 51/6 76/20 77/17 86/6 86/12 88/12 88/20 93/17 97/8 129/20 132/3 156/25 161/4 173/18 180/11 183/17 185/5 192/23 200/6 201/6 201/8 203/11 206/18 207/25 208/5 209/13 209/14 210/1 229/20 232/16 248/4 253/8 265/18 269/25 270/4 270/9 270/13 271/10
**cases [9]** 10/16 85/4 88/8 88/13 147/10 178/17 178/19 207/22 209/5
**catch [2]** 256/22 267/1
**categories [5]** 160/6 170/20 183/3 260/6 260/24
**category [5]** 12/20 64/9 259/3 266/7 266/7
**cath [2]** 74/3 79/12
**catheter [1]** 79/14
**Catholic [1]** 236/14
**causal [4]** 40/8 204/16 223/5 223/7
**cause [5]** 75/23 152/8 169/16 180/5 203/9
**caused [4]** 84/10 84/10 91/15 203/12
**caused reputational [1]** 91/15
**causes [1]** 169/18
**causing [2]** 20/20 222/1
**Cazares [11]** 29/19 135/5 135/6 135/10 146/23 148/1 149/3 152/1 156/21 173/15 241/10
**Cazares' [1]** 239/20
**CBOE [1]** 90/23
**CDC [2]** 44/9 46/2
**cease [4]** 36/4 122/6 122/9 134/5
**cell [1]** 87/12
**center [71]** 1/5 3/2 3/7 3/8 3/9 3/10 3/11 11/6 20/5 24/8 28/20 29/20 30/17 31/23 32/9 32/22 33/6 37/23 52/15 52/16 53/1 53/2 53/3 53/6 53/15 54/4 54/10 54/11 54/17 55/1 55/8 55/9 55/11 55/11 55/12 55/13 55/23 57/25 57/25 58/3 63/15 68/18 68/20 74/19 74/23 79/24 88/8 88/24 92/8 92/23 101/22 103/1 129/24 135/11 137/6 138/1 138/5 138/15 181/6 182/7 191/19 234/15 234/18 235/16 237/12 248/21 248/23 248/23 248/24 249/8 251/1
**centers [2]** 54/9 237/7
**central [1]** 102/23
**centralized [2]** 55/23 248/24
**century [1]** 32/24
**CEO [55]** 3/15 11/21 28/19 28/21 29/19 30/9 30/16 32/22 39/1 53/23 58/25 58/25 59/19 60/16 61/6 62/24 63/1 70/10 73/20 75/7 99/1 101/6 106/13 109/15 111/9 111/10 114/10 116/10 116/11 116/14 116/14 116/16 119/12 119/19 126/5 133/9 135/10 135/12 136/8 137/1 141/12 141/13 144/11 161/5 234/14 235/21 235/23 236/2 239/3 245/7 245/21 246/7 246/16 249/21 251/20
**CEOs [29]** 3/24 5/16 11/20 22/1 27/8 27/12 28/5 28/18 41/10 116/15 119/12 121/19 122/2 147/17 203/15 203/23

C

**CEOs... [13]** 208/10 208/16 208/21 208/23 208/25 209/4 209/10 215/9 223/17 253/22 261/22 269/24 271/17
**certain [1]** 46/15
**certainly [19]** 7/21 34/21 77/22 78/7 81/17 189/11 205/10 208/19 209/5 209/17 216/4 219/10 219/24 219/25 223/14 223/18 228/19 241/21 243/6
**certification [3]** 42/9 138/12 138/12
**certified [4]** 68/14 228/19 242/12 242/13
**certify [1]** 272/1
**chair [1]** 129/14
**Chakurda [4]** 39/7 40/1 41/13 41/22
**challenge [1]** 31/9
**challenges [3]** 6/3 6/9 167/5
**challenging [2]** 11/18 168/16
**chance [2]** 220/3 246/24
**change [37]** 12/15 13/4 14/6 14/9 20/4 27/20 30/12 32/7 45/17 45/18 45/22 46/6 46/20 47/2 60/4 61/7 77/7 77/22 78/10 90/13 91/3 91/4 91/8 91/12 91/14 142/17 163/2 180/24 180/25 197/10 198/5 199/10 225/22 228/7 232/8 256/21 259/1
**changed [17]** 4/4 12/8 16/23 23/11 26/21 26/25 27/18 27/19 28/10 60/2 60/6 60/13 177/11 216/20 243/6 247/11 253/1
**changes [6]** 31/9 45/16 63/3 162/21 163/13 200/15
**changing [1]** 199/10
**chapel [1]** 236/17
**characterize [1]** 202/11
**characterized [1]** 187/9
**characterizes [1]** 187/4
**charge [2]** 133/4 215/11
**charges [2]** 32/18 42/5
**chart [7]** 11/25 182/4 216/18 216/19 245/19 245/20 260/2
**check [5]** 53/12 53/12 74/5 139/6 218/11
**checking [1]** 142/5
**checkpoints [1]** 139/23
**checks [1]** 136/20
**Chicago [2]** 2/5 57/13
**chief [25]** 30/10 41/13 42/23 52/25 52/25 53/4 53/5 53/6 53/14 58/19 58/20 65/5 87/4 87/9 101/19 101/21 105/11 111/25 114/4 136/5 136/6 136/7 235/12 270/4 271/10
**chiefs [1]** 39/12
**child [2]** 9/23 31/22
**children [6]** 6/9 30/19 52/12 141/6 236/25 251/11
**children's [10]** 31/14 31/17 52/10 52/11 235/18 236/25
237/1 237/10 237/22 249/5
**choice [8]** 5/19 5/20 11/14 19/18 19/19 19/23 37/19 202/11
**choices [5]** 9/8 75/21 177/12 221/25 222/15
**Chondra [1]** 201/1
**choose [11]** 14/2 19/6 28/8 29/6 77/14 89/22 136/17 179/19 235/8 262/21 262/22
**chooses [3]** 18/18 18/19 111/1
**choosing [5]** 12/2 12/6 23/14 50/14 266/16
**chose [7]** 4/4 18/3 33/13 33/13 33/14 183/11 195/13
**chosen [4]** 33/18 194/1 249/2 262/24
**circle [2]** 227/17 267/24
**circled [1]** 63/17
**Circuit [6]** 7/10 86/6 86/12 86/13 86/14 88/18
**circulated [2]** 70/8 124/10
**circumventing [1]** 17/10
**cite [2]** 186/10 224/9
**cited [2]** 85/4 255/21
**citing [1]** 71/4
**claim [8]** 10/22 19/3 19/7 36/24 39/21 39/22 150/1 270/13
**claims [5]** 8/11 9/10 129/8 129/9 133/16
**clarification [4]** 5/8 57/7 89/16 109/2
**clarify [1]** 105/10
**clarity [1]** 70/25
**Clark [1]** 2/4
**class [2]** 177/9 177/13
**cleans [2]** 26/2 66/3
**clear [16]** 8/17 18/6 26/9 38/10 46/9 46/9 47/21 48/16 50/7 51/8 90/13 211/1 218/4 225/19 229/10 264/24
**clearly [7]** 45/10 190/12 202/10 237/15 246/12 254/13 254/14
**clerk [2]** 7/24 250/13
**click [3]** 24/2 24/21 26/14
**clicked [3]** 25/4 25/4 72/4
**clicks [1]** 24/20
**client [3]** 6/19 34/21 207/21
**clients [3]** 10/18 10/18 14/2
**clinic [1]** 138/2
**clinical [6]** 52/19 52/20 53/10 55/17 239/23 243/12
**clinically [1]** 223/15
**clinician [1]** 223/14
**clinicians [1]** 46/2
**clock [1]** 242/14
**close [12]** 16/24 150/9 151/11 151/12 184/8 185/12 185/13 185/16 208/8 210/7 237/17 261/15
**closed [2]** 147/8 148/19
**closer [2]** 61/9 234/20
**closest [1]** 74/19
**Club [1]** 236/8
**CMRC [1]** 261/10
**CMS [67]** 38/5 40/23 45/2 50/12 83/2 102/19 103/4 103/5 103/10 103/12 103/20 103/24 104/1 104/3 104/10 104/13 104/15 104/21 108/17 108/25 110/15 114/19 128/6 128/9 132/13 132/17 159/12 159/17 160/13 160/19 160/21 160/23 160/23 163/17 163/20 163/25 164/2 164/5 164/8 174/6 174/7 174/15 181/6 191/21 201/3 214/14 214/18 215/2 215/4 215/17 215/21 215/24 215/25 216/3 216/5 228/15 228/18 256/20 257/7 257/9 257/15 258/2 258/18 260/6 263/8 266/23 267/4
**CMS's [1]** 214/25
**co [1]** 54/21
**co-morbidities [1]** 54/21
**coached [1]** 67/2
**coalition [1]** 176/5
**Coast [1]** 55/13
**coauthors [1]** 177/2
**cocounsel [1]** 250/6
**code [5]** 60/1 64/16 155/6 184/20 242/3
**codes [1]** 245/13
**coding [1]** 64/24
**cohort [5]** 46/8 46/18 90/23 165/22 230/15
**coincidence [1]** 261/10
**colleague [4]** 233/24 250/12 256/16 256/23
**colleagues [14]** 3/16 19/25 20/4 92/2 92/17 96/5 172/14 201/1 201/9 201/24 245/14 247/6 253/13 269/21
**collect [13]** 113/7 113/8 113/16 129/6 155/5 161/16 161/17 162/6 181/4 181/5 190/11 190/19 207/24
**collected [6]** 113/23 128/20 154/7 154/21 155/8 257/15
**collecting [1]** 157/9
**collectively [4]** 59/10 61/16 133/6 181/11
**collects [5]** 19/13 185/6 191/12 191/14 207/22
**College [3]** 58/3 139/19 175/24
**colon [1]** 107/22
**column [4]** 67/13 106/22 106/24 148/7
**combined [1]** 222/14
**come [58]** 5/24 16/1 29/1 36/22 39/2 39/8 45/2 46/23 47/9 47/20 48/20 51/17 53/17 53/19 54/25 56/7 56/8 56/10 56/11 56/17 57/3 57/22 58/6 61/16 74/17 80/3 85/12 87/16 87/23 87/24 89/5 95/13 96/5 127/9 136/22 148/18 162/25 163/16 172/3 174/5 175/7 192/14 207/20 215/3 215/25 219/22 239/16 239/22 247/1 249/9 250/2 253/3 257/2 263/22 264/6 264/14 265/12

C

**come... [1]** 266/2
**comer [1]** 31/9
**comes [15]** 24/6 38/6 45/4 71/14 97/17 137/11 137/16 140/18 141/19 142/11 146/4 146/25 161/12 198/12 220/19
**coming [21]** 10/15 15/25 19/22 37/10 37/25 53/2 58/15 70/5 70/7 85/3 85/24 85/25 87/4 197/1 199/10 219/20 221/17 222/2 223/4 248/16 264/16
**comment [5]** 45/16 148/8 148/12 162/21 163/12
**comments [5]** 148/7 172/15 187/8 243/25 255/13
**commercial [3]** 18/19 18/24 126/13
**commission [26]** 56/4 56/6 56/7 56/23 57/15 95/15 115/14 119/10 128/12 128/20 137/25 138/24 138/25 139/2 139/18 161/9 161/12 161/16 162/1 174/7 174/13 174/14 174/17 215/14 239/14 239/16
**Commission's [1]** 57/12
**commissioned [1]** 128/8
**commitment [1]** 17/3
**committed [1]** 46/11
**committee [1]** 218/24
**committees [1]** 178/5
**common [4]** 165/8 170/1 198/24 214/21
**commonly [1]** 64/15
**communicated [5]** 36/19 85/10 170/17 170/20 253/23
**communicating [1]** 87/7
**communication [5]** 21/12 50/24 181/19 254/1 268/6
**communications [2]** 170/19 253/24
**communities [3]** 9/1 22/16 34/15
**community [93]** 8/7 8/25 10/8 10/9 10/17 14/5 21/2 28/15 29/17 29/22 30/6 30/8 30/11 32/25 33/9 33/17 36/8 54/3 54/5 54/7 55/9 55/10 55/19 55/22 70/18 71/15 72/24 75/17 75/19 79/5 87/15 88/5 89/24 89/25 115/11 132/17 137/11 139/18 140/15 140/17 140/18 140/24 141/2 141/3 141/7 141/8 141/8 141/10 143/3 144/10 144/23 153/1 156/5 169/21 172/16 179/19 186/6 186/12 186/14 186/17 186/24 187/20 197/24 198/13 198/14 199/5 200/13 203/14 203/17 204/18 208/22 210/22 211/13 223/3 223/17 224/4 227/5 229/7 229/10 234/24 235/15 235/17 235/19 236/1 236/3 236/6 236/11 237/23 238/16 239/5 240/10 253/3 255/14
**community events [1]** 141/8
**community's [1]** 84/10
**comorbidities [1]** 140/9
**companies [1]** 29/14
**company [3]** 37/24 43/20 118/24
**compare [1]** 14/5
**compared [1]** 126/22
**comparison [1]** 230/16
**comparisons [1]** 172/17
**compel [1]** 85/18
**compensation [2]** 202/22 222/23
**compete [1]** 51/2
**competency [1]** 178/2
**competition [1]** 40/14
**competitor [3]** 32/8 256/12 263/3
**competitors [2]** 75/22 263/2
**compiled [1]** 11/7
**compiling [1]** 11/10
**complain [1]** 145/10
**complaint [4]** 37/12 41/3 41/18 44/19
**complaints [9]** 30/5 43/9 143/9 145/2 150/7 150/7 172/1 172/15 255/13
**complete [15]** 18/13 21/2 23/7 38/19 59/11 59/14 122/17 133/4 142/7 170/2 183/12 190/20 208/13 242/6 259/12
**completely [4]** 142/8 198/23 224/19 224/21
**completing [1]** 99/19
**complex [2]** 54/8 79/2
**compliance [17]** 12/4 63/14 65/7 65/11 65/12 66/11 66/12 67/2 67/9 67/10 67/11 108/5 141/17 154/7 154/21 155/8 242/4
**complied [1]** 63/7
**complies [1]** 47/21
**component [1]** 212/21
**components [4]** 59/8 105/22 214/4 221/3
**composite [6]** 38/5 44/25 44/25 159/9 213/6 213/10
**compound [1]** 24/13
**compounds [1]** 33/25
**comprehend [1]** 165/4
**comprehensive [6]** 54/11 57/18 137/12 138/5 138/15 237/12
**computer [9]** 184/11 227/13 241/13 241/15 241/18 241/20 241/23 242/1 242/2
**computerized [4]** 62/4 154/16 181/22 185/14
**concern [4]** 6/1 80/20 152/22 170/8
**concerned [7]** 33/6 70/10 70/16 70/19 89/1 94/9 143/4
**concerning [1]** 72/21
**concerns [14]** 5/12 5/21 30/6 30/23 86/20 130/13 143/23 145/5 145/8 172/1 172/15 173/25 253/4 255/13
**concise [3]** 47/21 50/8 51/9
**concisely [1]** 45/10
**conclude [1]** 232/13
**concluded [3]** 95/1 95/6 157/17
**conclusion [5]** 39/3 219/20 219/23 222/3 223/5
**conclusions [4]** 14/22 220/19 221/17 222/9
**condition [2]** 86/5 152/14
**conditional [1]** 140/1
**conditions [3]** 54/21 66/21 218/19
**conduct [10]** 6/19 8/25 33/21 176/12 192/7 195/2 209/7 209/7 214/13 214/16
**conducted [10]** 36/25 193/13 196/21 198/3 204/16 205/17 206/22 209/12 222/24 228/24
**conducts [1]** 228/16
**conferred [1]** 175/6
**confidence [4]** 84/11 190/17 244/19 262/10
**confident [1]** 193/8
**confidential [6]** 97/11 97/17 98/9 98/14 105/3 106/7
**confidentiality [4]** 97/13 98/2 98/4 98/6
**confirm [3]** 15/13 15/17 261/22
**confirmed [2]** 180/25 187/1
**confirming [1]** 94/5
**confronted [2]** 23/9 23/15
**confronting [1]** 150/11
**confused [2]** 36/18 204/5
**confusing [3]** 96/11 115/1 252/15
**confusion [4]** 84/10 85/5 86/8 218/3
**connection [6]** 93/21 124/8 174/7 174/10 208/25 212/23
**conquer [1]** 239/24
**consequence [1]** 34/11
**consequences [3]** 33/17 152/16 224/10
**Consequently [1]** 82/14
**conservative [5]** 197/19 197/23 198/2 199/3 199/7
**consider [15]** 7/16 9/21 83/6 90/9 137/10 151/20 177/14 178/21 178/24 195/6 205/19 212/14 226/14 226/16 251/25
**considerable [1]** 184/16
**considered [7]** 130/12 171/9 172/23 194/12 195/10 226/15 229/21
**considers [1]** 190/23
**consisted [1]** 139/5
**consistency [1]** 190/12
**consistent [23]** 56/15 184/19 186/22 190/2 190/13 196/24 197/18 200/7 203/11 203/18 203/25 204/18 211/24 223/4 223/5 223/6 223/17 223/19 223/24 227/20 228/9 229/22 233/3
**consistently [3]** 19/2 193/19 193/20

C


**consists [1]** 45/1
**conspicuous [1]** 47/21
**conspicuously [2]** 36/16 45/10
**constant [1]** 199/12
**constitute [3]** 181/17 182/3 182/14
**construct [1]** 213/13
**construction [1]** 40/11
**consult [1]** 250/5
**consultant [1]** 18/5
**consulted [1]** 206/13
**consulting [2]** 42/5 120/2
**consumer [27]** 15/8 23/24 25/11 26/11 26/12 36/20 36/23 37/1 37/2 39/6 45/10 47/18 47/23 47/24 49/23 88/12 88/25 150/2 222/3 222/5 222/24 223/1 223/9 223/10 223/22 241/17 251/25
**consumers [21]** 6/18 8/24 8/24 10/10 16/18 16/25 17/6 22/7 22/9 22/11 22/13 23/18 23/19 24/24 25/1 35/19 44/17 50/25 202/18 203/20 222/20
**contact [2]** 27/7 172/2
**contain [2]** 255/24 255/25
**content [1]** 221/3
**contest [1]** 164/23
**contesting [1]** 164/24
**context [1]** 96/24
**continue [16]** 18/12 33/20 34/10 79/1 112/3 115/3 118/20 125/12 152/3 167/6 186/11 187/23 188/13 209/18 236/16 268/21
**continued [10]** 58/10 75/19 75/25 92/21 153/3 153/8 153/10 156/15 244/4 248/21
**continues [3]** 91/16 153/15 251/12
**continuing [2]** 139/23 240/8
**continuously [1]** 137/2
**contract [1]** 47/11
**contracted [1]** 144/1
**contracts [2]** 19/11 113/9
**contrary [3]** 35/13 38/8 50/18
**contrast [4]** 24/9 43/14 191/18 271/3
**contributed [1]** 82/17
**contribution [1]** 19/9
**control [2]** 11/9 66/23
**convent [1]** 236/18
**conventional [1]** 226/17
**conversation [7]** 12/17 112/14 145/23 218/2 242/25 245/3 263/19
**conversations [3]** 84/18 145/4 163/15
**conversely [2]** 203/5 262/25
**converts [1]** 217/16
**conveys [1]** 27/11
**cooked [1]** 17/9
**cooking [1]** 17/11
**coordinated [1]** 21/14
**copied [2]** 124/8 125/23
**copies [4]** 7/16 7/16 7/20 7/22
**copy [2]** 97/23 97/24
**core [3]** 6/22 50/4 249/22
**Cornell [5]** 176/2 176/7 176/9 176/11 177/7
**Cornerstone [17]** 206/19 206/21 206/23 207/1 207/10 207/13 207/16 207/21 207/22 207/25 208/15 208/20 208/24 209/3 209/9 209/12 209/17
**corporate [1]** 100/15
**corporation [13]** 35/20 35/23 35/24 39/17 47/7 50/5 50/19 57/24 100/13 121/14 158/16 158/17 158/22
**correct [231]** 60/2 61/24 62/9 62/14 64/20 65/23 65/25 67/22 73/8 73/9 73/17 73/19 82/7 90/2 90/11 90/12 90/14 90/17 90/20 90/21 90/24 90/25 91/1 91/2 91/5 91/10 91/18 91/21 93/11 93/22 93/25 94/1 96/3 96/13 96/22 99/2 99/7 100/4 100/10 100/11 100/20 100/21 100/22 101/10 101/15 101/20 102/2 103/3 103/11 103/20 103/21 104/1 104/2 104/11 104/12 104/22 104/25 105/16 106/23 107/3 107/4 107/13 107/19 107/20 107/22 108/3 109/4 109/5 109/6 109/8 109/9 109/17 110/12 110/13 110/15 111/3 111/17 113/7 115/9 115/10 115/16 115/19 115/21 118/4 118/18 119/11 119/21 119/22 120/19 122/2 122/3 122/7 122/8 125/21 127/5 127/6 127/21 127/22 127/24 128/5 128/6 128/7 129/5 129/17 130/14 130/15 130/20 131/20 132/15 134/12 134/15 134/24 153/25 154/1 156/22 156/23 156/25 157/12 157/20 157/24 157/25 159/3 159/7 159/16 160/9 160/13 160/25 162/2 162/3 162/12 164/17 164/20 165/20 166/3 166/6 166/7 167/1 168/14 168/19 168/22 168/23 170/8 170/24 171/17 171/18 172/11 173/5 173/18 174/18 174/19 175/21 205/9 205/18 205/19 206/8 206/10 206/12 206/13 206/16 206/17 206/20 207/8 207/9 208/13 210/10 210/11 210/19 211/3 211/11 212/6 212/11 212/19 212/23 214/5 214/8 214/12 214/15 215/14 215/18 216/1 216/3 216/12 216/16 218/22 219/5 220/20 221/1 223/8 223/11 223/13 223/23 224/16 230/18 240/8 242/12 246/19 251/20 251/22 251/24 252/2 252/4 252/21 253/4 253/9 253/20 253/21 254/4 256/10 256/15 257/14 257/16 258/24 260/17 260/19 260/21 261/3 261/4 263/4 263/16 264/4 265/2 265/6 265/8 265/10 266/12 266/13 266/16 268/3 268/4 269/3 272/1
**correct then [1]** 230/18
**correctly [2]** 262/5 265/13
**correlate [1]** 243/11
**correlates [1]** 247/5
**corroborated [1]** 193/14
**cost [11]** 10/24 11/11 28/4 43/1 43/4 102/9 102/15 110/5 110/7 114/7 215/10
**costs [4]** 27/25 28/14 32/18 42/17
**could [83]** 3/4 4/3 5/24 5/24 13/8 14/18 16/6 18/2 20/8 20/23 27/22 28/2 28/17 41/22 52/8 55/6 56/2 56/8 61/5 65/18 67/23 70/22 88/24 94/2 97/10 98/20 105/17 113/4 113/16 113/19 113/21 113/23 114/6 114/16 115/4 129/19 135/18 138/14 139/1 143/18 145/7 146/18 147/23 148/7 149/1 152/8 152/15 152/19 162/5 162/6 167/15 172/9 173/24 175/22 179/16 189/23 189/23 202/11 216/13 227/17 228/14 229/24 230/5 234/13 235/2 238/12 238/13 241/7 243/19 245/11 246/6 246/8 247/1 247/13 247/22 249/1 249/18 253/18 256/3 257/17 262/3 263/24 269/4
**couldn't [13]** 28/1 32/3 32/13 47/7 130/19 162/5 165/4 169/9 169/11 243/11 243/18 249/7 264/18
**counsel [15]** 43/10 43/10 88/1 97/20 100/10 108/9 108/19 113/6 166/17 188/8 198/21 226/19 232/1 232/24 271/8
**counsel's [6]** 120/19 170/6 226/11 228/14 229/2 229/17
**count [2]** 35/17 191/11
**counted [1]** 14/16
**counter [19]** 38/18 38/24 195/2 196/21 197/6 198/3 198/9 198/15 198/23 199/13 199/16 210/8 210/8 211/1 217/6 228/11 229/4 229/6 229/15
**counting [1]** 14/17
**country [8]** 11/18 44/12 48/22 58/2 64/19 65/21 68/1 229/8
**county [13]** 9/3 28/22 31/24 32/11 32/23 54/9 55/24 131/24 137/14 235/10 237/16 237/17 237/18
**couple [11]** 4/6 4/9 5/16 40/9 53/4 77/5 98/3 153/19 237/24 267/10 271/22
**course [10]** 56/25 76/9 76/16 85/11 105/15 143/24 147/25

**C**

**course... [3]** 149/11 185/5 245/8
**courses [1]** 177/7
**court [34]** 1/1 2/7 7/17 7/25 8/19 10/4 34/19 37/10 38/6 40/3 51/4 52/3 52/8 54/2 56/2 58/18 73/4 85/20 90/8 94/9 125/2 135/9 135/17 169/25 175/13 181/3 203/16 234/13 234/16 234/17 234/25 264/13 271/24 272/6
**Court's [3]** 125/2 147/11 238/1
**courtesy [1]** 170/1
**courthouse [1]** 50/21
**COURTNEY [6]** 2/1 3/17 99/20 122/5 127/17 257/17
**courtroom [12]** 8/1 8/3 8/4 35/21 35/22 50/3 51/10 159/20 168/6 174/25 175/5 253/13
**covering [1]** 57/4
**COVID [7]** 11/19 11/21 53/14 53/17 53/22 92/7 240/11
**cower [1]** 22/4
**CPA [1]** 132/7
**CPO [5]** 62/6 62/18 64/3 159/2 210/17
**CPOB [1]** 109/13
**CPOE [18]** 63/11 63/14 108/20 108/25 109/6 109/19 109/20 110/2 113/7 154/19 161/19 165/12 184/12 184/19 227/23 228/2 260/10 260/21
**crafted [1]** 16/12
**CRAIN [2]** 1/17 3/9
**create [4]** 35/3 49/5 190/21 262/4
**created [3]** 13/22 44/8 149/6
**creating [2]** 19/24 195/18
**credentials [2]** 220/5 220/7
**credibility [3]** 35/4 48/24 50/20
**credible [1]** 48/23
**credit [1]** 195/12
**credited [1]** 56/6
**creeping [1]** 46/10
**Creole [1]** 267/15
**criteria [1]** 239/21
**critical [10]** 28/23 58/13 68/6 68/7 68/13 79/22 221/3 237/16 242/12 242/14
**criticism [2]** 214/23 214/24
**criticize [2]** 220/25 220/25
**criticizing [1]** 221/2
**critique [3]** 33/10 199/16 200/2
**critiques [1]** 199/15
**cross [11]** 4/12 90/4 90/6 134/7 156/19 156/24 187/14 205/2 246/24 251/14 251/16
**cross-exam [1]** 156/24
**cross-examination [8]** 4/12 90/4 90/6 156/19 187/14 205/2 251/14 251/16
**cross-examine [1]** 246/24
**Crutcher [1]** 1/18
**cumulative [1]** 78/1
**Cupper [1]** 201/9
**curious [1]** 246/8
**current [21]** 19/4 33/23 181/3 183/13 186/20 186/23 189/9 193/22 195/11 195/20 195/22 195/23 197/3 200/12 221/6 225/16 230/18 232/12 232/20 232/20 267/5
**currently [7]** 83/4 176/1 177/20 198/6 236/4 236/5 258/1
**customers [2]** 37/3 86/10
**cutoff [1]** 45/7
**cutting [1]** 152/3
**CV [1]** 1/3
**cycles [2]** 20/22 20/23
**Cynthia [5]** 31/7 233/25 234/8 234/9 234/14

**D**

**daily [3]** 53/11 74/1 74/5
**damage [7]** 24/18 24/21 39/8 70/17 70/19 153/14 203/24
**damages [1]** 34/9
**Danforth [3]** 12/14 12/17 49/8
**danger [1]** 31/22
**Dartmouth [1]** 175/24
**dashboard [1]** 178/11
**data [269]** 8/12 13/3 15/22 15/25 16/2 16/7 16/17 17/1 17/5 17/22 18/1 18/11 18/13 18/19 19/2 19/12 19/13 19/20 21/4 26/15 29/5 33/11 33/24 35/14 37/9 37/18 37/25 37/25 38/4 38/4 38/7 38/17 40/23 42/10 45/2 45/11 47/25 48/2 48/13 48/13 48/15 49/15 56/11 59/2 59/3 59/15 59/25 61/20 62/14 64/1 64/4 64/6 64/12 67/21 69/17 73/20 74/7 74/12 75/1 76/14 77/2 77/3 77/6 77/8 77/10 77/13 77/15 77/16 77/19 77/21 77/23 77/24 78/6 78/14 78/17 84/7 100/14 100/16 102/19 102/19 102/21 103/4 103/5 103/20 103/24 104/1 104/3 104/21 107/14 107/16 108/1 108/17 110/15 113/4 113/7 113/8 113/17 113/18 113/25 119/17 119/20 119/21 126/9 128/20 129/6 129/7 129/8 129/9 131/18 133/15 133/16 133/17 133/18 134/23 134/25 139/15 142/10 142/25 146/14 146/16 147/6 147/24 148/4 149/4 150/4 150/4 154/7 154/9 154/11 154/14 154/21 154/23 154/25 155/3 155/5 155/8 155/10 155/12 155/15 155/25 156/6 157/7 157/9 159/12 159/17 160/5 160/13 161/5 161/16 161/17 162/1 165/3 165/5 165/8 165/19 166/2 166/8 167/13 167/17 167/19 167/24 169/15 174/6 174/15 174/17 180/10 180/11 180/19 181/5 183/10 183/17 185/5 185/6 185/8 186/4 186/10 186/11 186/11 187/16 187/22 188/14 190/10 190/14 190/18 190/18 190/22 190/24 191/12 191/14 191/15 191/17 191/19 191/21 191/22 191/24 191/24 192/8 192/25 193/2 193/13 194/10 194/13 194/16 194/17 194/24 195/1 195/13 195/19 196/12 196/19 205/18 205/22 206/15 208/21 209/18 210/9 210/17 210/24 211/2 211/4 211/6 211/7 211/15 211/19 212/1 212/3 215/17 215/21 215/21 216/3 218/17 218/18 224/23 225/24 226/19 232/11 232/11 232/20 245/1 245/1 245/6 245/10 245/12 245/16 245/18 245/20 246/5 246/7 246/17 247/3 248/17 257/9 257/9 257/15 258/1 260/16 260/25 261/21 261/23 265/19 265/20 265/21 265/23 266/24 267/4 267/5 267/9 268/23 268/24
**dataset [1]** 19/10
**date [12]** 19/4 89/11 105/7 119/5 130/5 130/9 130/21 130/22 195/11 253/24 255/9 272/4
**dated [2]** 121/7 147/5
**dates [2]** 99/8 254/1
**Daubert [1]** 179/4
**daughter [3]** 24/12 25/3 31/3
**David [1]** 201/9
**Davis [2]** 20/4 20/8
**day [35]** 9/16 48/16 53/12 56/25 57/1 57/2 57/5 57/8 65/10 68/15 73/22 84/11 84/12 87/1 137/1 137/10 139/17 139/17 139/22 139/22 146/5 150/12 150/12 158/12 161/25 162/9 169/21 215/24 234/3 240/1 247/18 247/21 256/24 265/12 265/15
**day-to-day [3]** 139/17 139/22 150/12
**days [10]** 4/6 25/12 56/19 57/14 82/20 86/23 146/21 210/5 270/2 270/5
**days of [1]** 82/20
**DC [1]** 1/19
**de [2]** 98/1 98/14
**de-designated [2]** 98/1 98/14
**deal [6]** 4/12 8/2 31/16 97/11 140/8 194/10
**dealing [3]** 6/4 6/8 194/13
**dealt [1]** 7/25
**death [3]** 70/22 202/12 238/12
**debate [2]** 94/8 94/13
**decades [3]** 9/3 11/4 28/20
**deceived [1]** 36/18
**deceives [1]** 37/3
**December [13]** 77/1 81/1 81/4

**December... [10]** 83/12 83/22 119/7 121/7 121/15 121/16 127/5 164/13 247/4 270/10
**December 13 [1]** 121/7
**December 2024 [1]** 164/13
**December 2025 [2]** 77/1 247/4
**December 29th [1]** 270/10
**deception [2]** 27/4 34/13
**deceptive [4]** 10/10 26/9 34/8 35/24
**decide [2]** 173/3 177/15
**decided [7]** 20/8 45/18 130/12 171/9 171/14 196/23 240/7
**deciding [3]** 11/16 85/11 133/21
**decision [22]** 5/15 38/13 44/10 47/4 47/12 50/14 93/4 93/7 93/9 96/8 97/3 113/18 113/21 133/20 158/7 158/15 158/21 158/22 164/18 164/19 199/25 252/3
**decisions [15]** 23/21 28/7 133/9 180/2 180/5 200/20 200/24 201/20 202/6 202/15 203/8 220/23 221/24 222/8 223/1
**deck [2]** 261/19 261/24
**declarant [1]** 81/9
**declarants [1]** 85/4
**declaration [4]** 39/4 93/16 156/25 157/12
**declarations [1]** 203/15
**decline [14]** 27/14 27/16 30/21 63/23 74/25 75/3 75/4 78/23 78/25 115/8 115/15 144/19 144/20 144/21
**declined [17]** 26/4 29/4 30/22 33/4 33/4 45/11 67/20 115/23 118/22 130/5 131/2 147/18 148/10 148/13 171/7 263/22 266/9
**declines [5]** 20/21 32/6 75/8 119/6 152/7
**declining [6]** 12/6 130/3 149/23 171/4 255/1 258/9
**decrease [4]** 144/25 246/9 247/20 248/14
**decreased [3]** 75/24 118/19 245/14
**decreases [1]** 261/25
**decreasing [2]** 119/8 203/21
**dedicated [1]** 68/21
**dedicating [1]** 39/13
**deeper [3]** 6/14 25/11 65/8
**deeply [1]** 4/24
**defamation [1]** 39/21
**default [1]** 20/13
**defend [2]** 10/9 29/14
**Defendant [5]** 1/10 2/1 3/14 3/20 4/4
**Defendants [1]** 86/11
**defense [2]** 18/13 24/19
**defensible [2]** 189/10 199/1
**defensive [1]** 89/3
**deficiencies [1]** 4/13
**define [1]** 25/13
**defined [1]** 213/11
**definitely [3]** 31/12 54/8 152/18
**definitive [1]** 32/17
**degree [5]** 136/3 175/24 176/15 179/7 235/4
**delay [8]** 70/22 152/8 152/10 152/18 238/11 238/12 248/10 249/18
**delayed [4]** 27/23 28/13 32/17 152/15
**delaying [1]** 70/20
**delays [1]** 27/24
**Delazabul [1]** 174/4
**deliver [4]** 137/3 141/16 144/25 145/16
**delivered [1]** 35/10
**delivering [1]** 56/14
**delivery [1]** 140/7
**Delray [97]** 3/7 24/2 24/5 24/7 24/7 24/9 24/9 25/4 25/20 26/17 27/1 28/20 28/21 28/24 29/1 29/8 31/4 53/2 53/3 53/5 54/4 54/5 54/10 54/25 55/3 55/8 55/25 57/15 58/8 58/15 60/11 60/12 60/23 61/6 62/8 62/22 63/6 63/15 63/25 64/4 65/1 73/13 76/14 79/3 80/3 81/2 88/6 88/8 88/23 89/18 90/9 90/16 90/22 91/1 91/15 91/20 91/23 91/25 92/3 92/14 92/25 93/3 93/13 95/24 96/17 99/1 101/1 102/20 104/4 104/19 106/22 107/12 108/7 108/11 108/15 109/10 110/1 111/9 114/10 115/2 115/18 118/15 119/4 122/25 126/5 128/6 128/8 128/15 129/17 129/24 131/18 131/21 132/24 133/21 223/21 227/24 228/2
**Delray's [5]** 104/13 104/15 114/15 114/23 131/15
**demand [2]** 148/16 192/15
**demands [1]** 11/19
**demonstrate [2]** 49/25 104/8
**demonstrated [1]** 262/24
**demonstrates [1]** 191/23
**demonstrating [1]** 33/7
**demonstrations [1]** 67/8
**demonstratives [1]** 188/5
**DEN [1]** 227/23
**denominator [2]** 227/23 227/25
**denominators [1]** 227/11
**densely [1]** 32/25
**denying [1]** 4/10
**depart [1]** 191/5
**department [14]** 27/17 29/5 30/10 52/14 57/21 74/9 104/24 115/8 115/15 119/9 135/24 170/21 176/2 176/10
**departments [2]** 9/7 75/23
**departure [1]** 192/1
**depend [1]** 150/25
**depending [2]** 216/20 249/17
**depends [4]** 18/6 152/13 186/24 269/8
**depicted [1]** 20/25
**depose [2]** 6/24 7/4
**deposed [6]** 149/19 149/20 178/18 180/17 180/21 180/24
**deposition [22]** 5/17 96/7 118/16 120/5 122/1 146/23 168/17 173/18 173/20 173/22 187/6 188/5 188/8 207/1 210/12 212/16 218/2 218/4 221/5 225/19 226/25 256/4
**depositions [1]** 6/22
**depth [1]** 57/9
**deputy [2]** 8/1 8/3
**describe [14]** 29/8 30/13 30/24 32/7 53/23 54/18 58/24 66/10 69/20 172/15 175/22 227/2 255/13 255/17
**described [9]** 19/24 58/5 80/5 154/5 203/19 222/6 222/15 226/24 230/11
**describes [3]** 20/3 66/1 216/24
**describing [3]** 192/18 194/9 229/3
**description [4]** 52/8 67/23 72/12 229/3
**descriptions [1]** 223/16
**deserve [1]** 8/9
**deserving [1]** 21/1
**designate [1]** 270/22
**designated [6]** 98/1 98/14 221/5 237/6 270/2 270/23
**designation [3]** 58/1 68/25 233/19
**designations [5]** 58/11 98/16 270/9 270/25 271/3
**designed [4]** 8/14 9/12 47/15 47/17
**desist [4]** 36/5 122/6 122/9 134/6
**desk [1]** 45/15
**desperate [1]** 8/17
**despite [13]** 6/20 6/21 6/21 24/24 30/12 37/9 49/23 136/12 144/22 144/25 153/8 167/5 174/17
**destroying [1]** 202/5
**detail [2]** 168/9 255/4
**details [3]** 9/15 144/6 165/14
**deteriorated [1]** 230/15
**Determinations [1]** 97/13
**determine [11]** 40/4 110/22 119/10 128/8 169/1 202/24 209/6 210/18 222/3 227/11 228/5
**determined [4]** 193/16 194/9 198/4 223/20
**determines [1]** 181/24
**determining [1]** 183/2
**detriment [1]** 10/16
**detrimental [2]** 152/16 166/9
**develop [1]** 181/7
**developed [2]** 177/4 177/13
**development [2]** 54/1 235/25
**Deven [1]** 201/13
**deviate [2]** 191/4 191/5

D

**deviates [2]** 179/22 189/17
**deviation [2]** 192/16 195/8
**deviations [1]** 193/3
**devote [3]** 11/14 12/6 177/9
**diabetes [1]** 31/12
**diagnosed [1]** 52/6
**diagnostic [1]** 140/13
**dials [1]** 241/14
**Dicker [1]** 2/3
**did [203]** 10/8 10/13 10/22 15/14 15/14 16/1 17/4 17/7 17/15 17/17 26/19 28/12 36/2 36/3 36/4 41/10 43/7 43/21 51/7 53/20 58/23 59/10 60/5 60/9 60/10 60/11 61/6 61/12 61/15 61/16 62/14 63/8 63/25 64/3 64/5 64/6 64/7 66/19 66/20 67/21 68/2 70/6 70/12 72/16 73/2 73/3 73/10 73/12 73/15 75/13 76/21 76/23 80/15 80/22 82/22 83/11 83/12 83/15 83/18 89/3 89/14 89/21 91/16 91/25 93/2 95/21 96/10 98/24 108/16 108/24 110/21 114/16 115/12 115/13 115/17 119/12 121/15 123/24 124/1 127/9 127/21 128/1 128/3 130/17 130/18 131/8 132/7 133/5 135/12 136/2 136/5 136/17 139/25 142/17 142/19 142/21 143/7 144/19 144/25 145/18 146/2 146/11 148/11 148/20 149/5 149/24 150/19 151/10 151/12 153/18 155/25 157/1 157/22 161/5 163/4 163/19 164/15 164/16 165/21 166/14 166/17 169/5 173/3 173/7 173/8 173/9 173/10 173/19 173/22 175/7 175/15 175/16 175/17 175/19 180/6 180/15 180/16 180/17 180/19 180/22 180/23 183/18 183/19 185/8 185/9 187/16 196/18 196/21 197/12 197/24 199/5 199/13 203/14 207/4 207/13 208/17 208/18 208/20 209/3 209/16 209/23 210/13 210/16 211/7 212/1 217/7 219/21 221/11 221/18 222/3 222/5 224/5 225/17 228/7 232/18 235/8 240/10 240/25 242/16 242/21 242/23 243/4 243/8 244/2 247/2 247/8 248/2 250/7 250/10 250/20 254/11 255/5 255/10 255/11 256/9 256/12 256/15 257/18 258/4 261/9 263/12 264/8 265/12
**didn't [118]** 4/6 14/12 20/15 21/2 21/3 31/2 32/7 37/1 37/18 37/19 37/20 38/17 39/2 39/4 39/6 39/7 39/8 39/14 41/10 41/13 44/17 45/19 47/23 49/15 49/16 49/16 49/23 59/3 61/14 64/12 70/23 75/15 76/24 82/24 82/25 89/8 99/25 106/12 110/3 112/14 115/11 115/14 118/9 119/9 122/1 122/3 123/6 123/17 124/11 128/2 128/4 130/16 131/3 134/22 134/23 139/25 142/3 143/16 145/12 145/20 146/22 148/15 150/1 150/5 157/7 157/7 162/7 162/25 163/16 165/7 165/24 166/12 168/17 170/23 170/25 171/19 172/6 172/7 172/10 172/12 180/25 188/9 188/16 194/19 194/19 208/17 208/24 209/1 209/19 209/25 210/12 211/8 212/4 217/15 220/18 223/9 230/24 233/6 233/7 241/2 241/6 243/16 243/16 243/17 254/10 256/11 256/17 260/9 260/20 260/25 262/17 264/5 264/13 264/20 264/21 265/5 265/7 266/12
**die [4]** 23/1 89/7 202/12 221/8
**died [1]** 223/22
**difference [5]** 15/6 124/14 186/1 198/12 235/14
**differences [1]** 200/9
**different [46]** 24/10 44/4 45/22 55/17 57/4 63/20 63/21 66/21 66/22 67/5 73/24 74/17 77/23 81/5 85/13 90/19 107/7 113/9 114/20 142/4 153/11 154/12 170/7 172/5 178/11 185/22 189/23 191/7 191/12 191/23 192/5 194/12 200/22 205/23 213/12 213/20 215/16 224/19 224/21 224/21 225/3 225/10 226/1 236/6 245/24 266/2
**differently [2]** 174/9 182/18
**differs [2]** 181/24 192/3
**difficult [6]** 5/2 79/1 79/3 168/13 168/15 202/1
**dig [1]** 65/8
**digging [1]** 25/11
**digital [1]** 47/19
**dignitaries [1]** 31/11
**dimension [1]** 189/11
**dinner [2]** 43/19 72/20
**dire [1]** 179/5
**direct [21]** 23/21 52/1 67/12 69/5 114/25 119/20 120/1 120/6 120/7 135/7 175/10 190/7 209/7 209/20 210/3 211/8 221/11 230/10 234/11 253/6 256/6
**directing [1]** 176/13
**direction [3]** 201/5 206/22 207/6
**directive [3]** 97/4 98/10 158/16
**directly [6]** 11/22 21/15 28/7 53/10 95/7 143/25
**director [27]** 11/3 11/6 21/11 42/21 42/22 52/22 52/23 60/6 61/15 70/8 70/14 99/3 99/23 100/3 101/14 101/19 105/7 111/22 112/8 126/4 136/2 160/17 182/17 242/22 243/21 258/14 258/25
**directors [3]** 170/21 256/1 256/3
**disagree [7]** 6/13 110/9 113/16 198/23 214/1 233/6 233/7
**disagreeing [1]** 214/3
**disagreement [1]** 5/9
**disagrees [1]** 246/20
**disappointed [1]** 143/17
**disbelief [1]** 243/13
**discharge [1]** 239/11
**discipline [1]** 66/17
**disciplines [1]** 67/5
**disclaimers [1]** 50/8
**disclose [1]** 85/19
**disclosed [5]** 7/4 84/17 84/22 180/10 232/11
**disclosure [1]** 227/4
**discovered [2]** 147/13 148/17
**discovery [24]** 7/5 16/24 37/20 49/16 76/10 80/19 80/25 85/16 97/7 97/14 97/18 146/24 147/2 147/8 148/16 148/19 149/14 150/9 150/24 150/25 151/7 151/12 151/12 211/9
**discuss [2]** 242/21 242/23
**discussed [9]** 14/21 219/21 220/2 232/1 232/25 243/1 243/2 243/6 256/6
**discusses [1]** 220/6
**discussing [5]** 43/19 64/3 99/23 178/6 242/22
**discussion [9]** 45/24 86/19 94/15 106/13 109/13 114/25 212/15 233/20 250/21
**discussions [2]** 121/10 122/2
**disease [1]** 174/4
**diseases [1]** 6/9
**disorders [1]** 52/13
**disorganized [1]** 270/16
**disparaging [1]** 75/15
**displayed [1]** 45/6
**dispute [11]** 98/4 102/12 102/16 112/6 118/12 126/20 132/3 151/17 168/11 213/15 253/19
**disrupted [1]** 33/8
**distinct [2]** 44/3 220/14
**distinction [2]** 213/17 224/12
**distinguished [1]** 182/17
**distort [4]** 180/4 200/20 203/8 221/25
**distribution [1]** 218/15
**DISTRICT [4]** 1/1 1/1 1/12 235/10
**diverted [2]** 27/21 240/11
**divide [1]** 239/23
**DIVISION [1]** 1/2
**DMV [1]** 174/13
**DND [1]** 57/18
**DNV [2]** 56/5 139/2
**do [427]**
**do hand [1]** 66/15
**doctor [3]** 174/4 230/6

D

**doctor... [1]** 256/20
**doctor's [2]** 62/2 241/12
**doctors [27]** 23/19 23/23 39/24 46/3 62/20 67/14 86/19 88/12 130/12 145/18 152/22 154/16 155/19 155/21 171/14 173/5 173/24 184/11 201/25 239/24 241/15 241/17 241/19 241/22 253/2 264/25 268/6
**doctors care [1]** 67/14
**doctors' [7]** 172/7 172/9 172/24 173/16 173/20 173/22 265/7
**document [80]** 4/19 17/25 42/21 43/3 76/6 76/7 77/12 78/1 80/18 96/10 97/1 97/11 97/19 97/21 97/25 98/5 98/22 99/18 105/14 106/1 106/4 106/12 109/3 110/4 111/18 112/25 116/20 117/22 121/16 122/13 122/17 122/22 122/22 122/24 123/13 124/5 125/18 126/1 126/3 126/7 126/11 130/9 130/22 146/20 146/22 148/17 149/10 149/12 150/8 150/20 150/23 151/1 151/10 152/2 160/11 168/5 195/25 216/24 226/24 227/2 227/20 245/24 245/25 246/17 246/21 248/2 248/5 255/21 259/20 259/21 261/2 261/5 261/7 261/9 261/11 261/18 262/1 262/1 262/4 266/6
**documentation [2]** 113/13 186/8
**documented [2]** 264/11 264/22
**documents [41]** 4/15 4/20 5/3 5/5 5/11 5/25 6/15 30/25 32/15 76/11 76/19 77/24 81/5 97/16 98/3 98/9 106/7 116/13 116/17 117/13 126/6 147/10 148/24 149/13 149/16 149/21 150/14 167/10 180/10 180/19 203/10 203/16 209/21 229/20 246/11 254/15 255/24 261/12 261/19 264/5 271/9
**doe [5]** 5/23 5/23 5/25 5/25 6/1
**does [90]** 6/5 8/23 17/1 19/11 23/4 23/6 27/5 37/11 44/16 57/15 62/22 63/6 65/1 66/6 68/6 69/11 69/15 73/23 74/7 74/8 74/10 77/22 78/22 84/25 86/3 95/6 95/13 95/15 96/12 99/19 104/7 109/10 109/12 118/9 131/25 133/13 138/6 139/14 140/12 140/16 146/12 148/5 148/6 150/13 154/3 154/13 154/15 154/18 154/18 155/2 155/5 155/5 155/14 155/21 155/23 161/16 174/14 182/20 182/25 183/9 183/15 184/18 191/3 192/7 193/16 193/18 193/21 193/21 193/22 195/22 197/3 200/12 207/19 214/10 214/14 215/11 215/14 225/18 228/18 231/6 232/16 234/25 238/22 241/14 255/9 256/1 258/17 259/6 268/5 268/8
**doesn't [23]** 32/10 32/11 32/12 37/15 43/5 64/10 71/19 74/12 86/6 106/11 107/24 117/8 134/1 150/25 156/9 163/25 167/11 194/11 240/15 242/11 250/7 250/15 255/8
**dog [1]** 60/10
**doing [21]** 14/7 23/23 35/15 35/15 46/11 46/13 49/20 49/21 50/1 51/12 51/12 74/3 87/6 127/24 136/15 167/16 207/20 211/21 214/2 223/2 229/23
**dollar [3]** 35/1 36/9 50/5
**dominates [1]** 9/17
**don't [200]** 4/14 4/20 6/2 6/13 8/2 9/19 13/7 13/9 14/11 19/4 22/22 25/22 31/20 33/9 34/5 38/12 40/20 41/1 41/12 44/18 45/13 46/17 47/19 47/22 48/9 48/15 50/17 51/2 51/4 51/16 64/10 65/13 76/7 77/14 77/18 77/19 77/25 78/4 79/16 83/4 86/5 92/12 93/2 93/5 94/16 95/14 96/12 97/11 97/14 97/20 97/21 98/12 100/5 100/8 102/14 107/5 108/23 109/1 109/22 109/24 110/1 110/8 112/22 113/8 113/9 113/24 114/2 114/24 116/9 117/1 117/11 117/15 119/23 120/1 120/9 120/15 120/17 120/18 121/4 121/23 123/19 124/8 124/19 127/8 127/14 128/18 129/11 131/4 131/5 132/8 132/11 132/12 134/8 140/8 140/19 142/9 142/9 142/11 149/4 149/5 151/22 153/18 156/5 156/12 156/13 157/9 160/1 161/17 162/23 162/24 163/10 163/14 163/23 164/1 164/10 164/10 165/2 165/5 165/14 166/22 168/13 169/14 169/18 169/23 169/24 172/10 172/24 174/25 183/11 183/17 190/21 191/21 193/12 196/12 199/8 199/21 200/8 204/5 206/25 207/3 207/18 208/1 208/6 208/9 208/17 210/20 213/18 214/1 214/13 214/20 214/21 214/23 214/24 216/4 216/6 217/3 218/15 220/17 220/21 221/2 222/13 223/12 223/14 224/7 224/12 224/21 226/5 226/6 228/21 229/5 233/6 233/12 241/5 241/17 242/24 244/22 249/3 250/13 251/25 252/13 252/17 252/24 253/11 253/19 254/8 255/24 256/14 261/11 262/17 263/9 263/13 263/23 264/7 264/10 264/21 264/23 265/12 265/25 267/10 271/18
**don't engage [1]** 120/9
**don't look [1]** 92/12
**DONALD [2]** 1/11 2/8
**Donavedian [4]** 212/6 212/8 212/18 214/4
**done [19]** 17/13 24/18 35/12 57/8 87/19 110/2 110/25 113/19 119/10 119/14 122/25 161/7 169/1 197/11 199/19 223/5 223/7 227/12 244/20
**door [1]** 24/14
**doorway [1]** 125/14
**double [1]** 15/7
**doubling [1]** 27/4
**down [51]** 16/23 20/19 25/6 27/4 60/3 61/5 62/5 64/13 64/23 67/23 75/11 75/14 79/3 99/17 100/9 101/23 102/4 105/17 105/24 107/8 110/4 113/3 115/2 115/4 115/4 115/5 119/2 122/5 134/16 152/16 167/15 168/24 169/2 169/4 169/17 195/18 201/12 228/13 231/23 247/7 247/7 247/17 247/17 251/5 251/6 251/7 255/22 262/19 262/25 265/15 266/14
**down we [1]** 105/24
**download [1]** 209/20
**dozens [1]** 178/11
**Dr [53]** 15/2 15/3 15/12 15/22 15/24 16/3 19/21 20/3 20/18 26/10 36/25 38/16 38/17 38/23 39/6 39/6 41/11 174/2 174/2 174/3 174/3 174/4 174/22 175/12 179/3 179/13 181/2 188/4 188/6 188/6 188/13 198/21 199/15 205/4 219/18 220/6 221/11 226/11 227/20 229/25 230/10 230/14 230/21 230/23 231/3 231/3 231/15 231/25 232/25 233/6 233/15 233/18 257/18
**draconian [2]** 12/11 15/7
**dramatic [1]** 32/2
**drastic [6]** 12/14 12/20 12/22 12/23 13/4 45/19
**drive [2]** 24/14 31/20
**driven [1]** 9/11
**drivers [1]** 19/15
**drives [2]** 139/11 139/16
**drop [1]** 269/22
**drove [1]** 20/19
**Ds [3]** 10/5 21/1 200/15
**Ds by [1]** 10/5
**due [4]** 130/13 148/13 168/18 257/7
**Dunn [1]** 1/18
**duplicative [1]** 27/25
**duration [2]** 56/20 56/21
**during [39]** 11/21 53/14 53/22 56/9 56/21 56/24 58/7 60/2 76/9 92/7 95/1 95/4 95/5 96/12 96/14 97/7 97/13 97/17 98/17 108/18 114/12 114/25 134/7 140/15 151/7 151/16 157/14 157/17 173/20 173/22 226/11 228/14 229/2

**D**

**during... [6]** 229/17 231/25 232/24 234/2 244/3 245/8
**duty [2]** 149/1 150/18
**DX [16]** 42/20 94/2 106/19 111/18 111/18 116/19 121/6 122/12 124/4 125/25 159/23 170/5 230/5 257/17 258/20 259/24

**E**

**each [26]** 3/24 9/7 27/12 30/1 33/19 33/24 37/25 44/8 47/8 55/16 56/25 57/3 58/6 66/15 68/16 118/4 125/7 165/24 178/10 184/1 184/5 186/15 211/15 218/6 224/4 253/16
**ear [1]** 259/7
**earlier [22]** 20/18 68/18 79/7 89/20 128/4 140/19 150/24 156/10 159/14 168/24 170/9 204/4 237/5 240/24 245/6 246/3 246/4 247/24 252/6 256/19 265/23 271/18
**early [3]** 98/15 140/15 194/2
**earn [2]** 58/10 216/13
**earned [3]** 29/25 58/1 216/12
**earned through [1]** 29/25
**earning [1]** 238/17
**eased [1]** 153/14
**easiest [1]** 37/16
**easy [1]** 22/12
**eating [1]** 87/3
**eco [1]** 137/13
**economic [4]** 176/4 201/2 215/9 249/10
**economics [7]** 175/23 175/25 176/3 176/18 178/16 178/22 178/25
**economist [5]** 15/3 38/20 176/18 178/3 218/15
**economists [2]** 46/1 176/5
**ecosystem [1]** 29/18
**ED [2]** 74/8 74/8
**Edelman [1]** 2/3
**edit [2]** 191/17 191/22
**eds [1]** 71/4
**educated [1]** 244/8
**educating [1]** 202/8
**education [6]** 67/7 242/8 244/2 244/4 244/5 244/5
**educational [2]** 175/22 235/3
**effect [4]** 27/13 45/9 233/5 233/8
**effective [3]** 21/19 21/22 107/9
**effectively [2]** 12/11 64/24
**effects [2]** 10/11 27/20
**effort [10]** 60/5 95/7 102/9 113/17 113/19 113/23 113/24 133/13 144/22 190/9
**efforts [3]** 121/22 144/22 144/24
**eight [6]** 56/19 57/1 75/2 135/22 207/7 239/22
**either [11]** 42/11 56/4 59/25 64/12 95/12 113/8 128/4 164/22 174/12 178/17 240/13
**El [2]** 135/20 136/8
**elaborate [2]** 144/17 232/7
**elaboration [1]** 194/1
**elderly [8]** 54/6 54/19 70/20 87/2 87/12 140/4 159/15 164/7
**elective [8]** 40/13 77/24 203/22 224/11 245/15 247/6 247/7 265/14
**electives [1]** 201/6
**electronic [2]** 5/3 97/24
**electronically [2]** 227/25 228/3
**elements [3]** 39/20 108/14 108/15
**Eleventh [4]** 7/10 86/6 86/14 88/18
**eliciting [1]** 84/15
**else [6]** 32/7 84/4 199/12 242/23 243/22 266/16
**Elser [3]** 2/3 3/14 3/18
**elsewhere [2]** 10/15 28/8
**ELT [1]** 121/21
**email [23]** 70/13 70/14 100/1 100/2 100/5 100/9 100/24 101/12 102/4 105/6 111/20 112/7 112/14 122/2 147/6 147/22 147/25 229/25 231/4 254/10 259/18 262/8 262/17
**emails [1]** 229/20
**embargo [1]** 60/2
**embedded [1]** 141/7
**embracing [1]** 231/19
**emergencies [1]** 32/2
**emergency [34]** 9/7 27/16 28/23 29/5 30/3 30/18 30/22 32/6 32/24 33/3 52/14 74/7 74/8 74/10 75/23 115/8 115/15 119/9 137/13 138/9 139/7 140/11 140/14 144/19 145/1 167/9 238/24 247/8 248/15 248/16 248/18 249/8 265/14 269/7
**emergent [3]** 79/8 201/8 224/11
**emotional [1]** 86/5
**emphasis [1]** 30/19
**emphasize [1]** 31/24
**emphasized [2]** 190/1 190/4
**empirical [5]** 179/25 211/2 211/15 211/19 218/17
**empirically [1]** 222/7
**employed [1]** 176/1
**employee [2]** 50/6 243/23
**employees [9]** 12/14 43/22 55/3 55/4 65/1 143/25 144/5 144/8 203/1
**employers [3]** 43/18 202/8 202/23
**employing [1]** 93/14
**employment [1]** 238/17
**EMS [7]** 76/15 79/8 80/1 138/9 247/24 251/2 251/5
**encourage [1]** 82/15
**encouraging [2]** 259/12 259/15
**end [9]** 57/2 76/24 78/25 78/9 215/23 218/14 234/3 239/10 250/16
**ended [1]** 248/22
**ending [2]** 36/7 234/3
**endoscopic [1]** 57/25
**engage [1]** 120/9
**engaging [1]** 141/9
**English [2]** 267/14 267/15
**enjoying [1]** 31/19
**enormous [1]** 198/11
**enough [10]** 13/16 14/12 17/1 22/25 24/21 25/11 94/11 214/11 214/24 218/11
**ensued [1]** 71/1
**ensure [11]** 27/6 56/13 59/1 62/19 65/8 66/11 82/9 154/7 154/21 155/8 192/8
**ensures [1]** 22/11
**ensuring [1]** 59/8
**enter [3]** 4/10 72/3 228/2
**entered [2]** 5/13 227/24
**entering [2]** 229/15 229/16
**entire [3]** 29/17 29/17 35/13
**entirely [2]** 183/1 199/21
**entities [1]** 190/20
**entitled [1]** 22/10
**entity [1]** 158/22
**entry [7]** 59/3 60/1 62/4 154/16 181/22 185/14 227/13
**Equally [1]** 238/7
**equestrian [2]** 238/8 238/9
**equipment [2]** 65/9 141/18
**equivalence [1]** 25/13
**ER [5]** 24/13 25/4 78/23 247/17 247/19
**Eric [1]** 29/19
**Erik [3]** 135/4 135/6 135/10
**error [2]** 59/19 59/25
**errors [9]** 22/15 22/17 25/9 25/17 59/4 62/20 63/22 64/25 153/24
**ESI [1]** 149/5
**especially [2]** 153/11 252/2
**ESQ [10]** 1/15 1/16 1/16 1/17 1/17 1/20 2/1 2/1 2/2 2/2
**essential [2]** 9/4 18/2
**essentially [1]** 195/11
**established [2]** 137/6 249/7
**estimate [2]** 15/18 229/7
**et [2]** 1/5 3/3
**etc [1]** 6/1
**euphemistically [1]** 13/2
**evaluate [2]** 221/20 239/16
**evaluated [3]** 190/15 190/21 192/6
**evaluating [2]** 177/4 212/12
**evaluation [2]** 58/6 157/10
**even [24]** 5/5 12/12 14/14 28/9 33/24 38/25 39/9 39/14 42/10 44/19 47/19 50/9 91/17 95/24 115/20 121/23 132/22 137/1 164/19 166/2 243/4 252/24 260/25 269/4
**evening [1]** 233/16
**evenings [1]** 105/12
**event [4]** 9/24 138/17 141/9 141/9

E


**events [1]** 141/8
**ever [24]** 6/20 39/5 69/1 73/18 84/22 88/1 114/10 132/17 132/23 136/11 147/1 149/21 161/5 163/19 164/2 166/17 169/1 209/3 209/3 212/1 219/14 244/22 268/19 268/24
**every [34]** 5/6 16/20 33/22 39/22 40/6 41/20 44/15 44/15 45/7 45/8 53/11 56/7 56/17 57/22 66/13 66/16 73/22 84/11 84/12 120/14 139/3 146/5 161/25 162/9 169/20 196/2 197/9 214/18 240/1 243/4 243/6 243/7 256/6 256/24
**everybody [5]** 44/18 137/2 143/24 156/24 163/24
**everyone [7]** 65/6 87/7 87/19 90/13 125/7 132/1 269/18
**everyone's [2]** 124/20 166/10
**everything [15]** 44/14 44/16 44/20 45/5 59/1 59/14 91/6 104/8 114/1 136/14 138/9 141/13 141/15 166/10 199/12
**everywhere [1]** 41/18
**evidence [89]** 4/15 4/21 8/14 9/11 10/13 10/16 10/25 12/23 14/13 17/16 17/20 19/8 19/16 23/8 23/22 24/16 26/16 28/11 33/12 33/19 36/22 36/22 37/5 37/5 37/8 39/19 40/8 41/9 42/1 42/3 42/7 42/11 42/14 42/20 43/3 43/13 46/20 46/24 47/3 47/6 47/17 71/12 77/12 78/20 82/1 85/5 86/6 98/17 100/7 106/4 114/3 117/3 118/14 118/14 119/16 119/23 120/1 120/6 120/7 121/16 129/22 134/7 157/2 159/23 186/22 187/1 200/6 200/6 200/22 202/3 202/16 202/18 203/7 203/10 203/17 203/21 204/3 204/17 213/1 222/14 222/17 222/19 223/2 223/12 223/23 239/25 246/1 248/3 259/22
**evidenced [1]** 257/7
**exact [6]** 96/19 117/1 120/15 127/16 127/18 226/5
**exactly [10]** 9/14 10/13 23/22 24/17 51/7 149/7 157/15 185/12 208/6 208/9
**exam [2]** 9/16 156/24
**examination [27]** 4/12 52/1 90/4 90/6 114/25 131/13 135/7 152/4 156/19 173/13 175/10 187/14 205/2 210/4 226/9 226/11 228/15 229/2 229/17 231/25 232/24 233/25 234/11 251/14 251/16 253/6 266/21
**examine [3]** 152/3 232/9 246/24
**examining [1]** 269/24
**example [9]** 5/23 94/10 145/7 178/8 187/2 191/9 201/1 211/19 222/21
**examples [1]** 238/1
**exceedingly [1]** 11/17
**exceeds [1]** 82/11
**Excel [2]** 104/23 247/24
**excellence [4]** 58/3 92/23 138/5 138/15
**excellent [4]** 5/22 94/20 137/13 190/8
**except [3]** 75/15 77/3 78/6
**exception [3]** 85/12 112/17 169/12
**exceptional [1]** 10/17
**exchange [3]** 42/6 119/24 120/2
**excited [1]** 88/6
**exclude [3]** 4/10 4/11 183/1
**excluded [1]** 199/21
**excuse [5]** 41/1 41/1 41/1 42/7 161/4
**excuses [3]** 41/2 41/4 43/9
**executive [17]** 31/8 53/1 53/5 53/6 58/20 87/4 87/9 96/5 117/22 117/23 118/1 162/13 202/22 222/23 243/2 243/8 243/21
**executives [1]** 86/19
**exercise [2]** 153/18 199/21
**exhibit [28]** 42/20 60/18 69/3 76/2 78/20 94/10 94/18 100/1 100/7 101/12 111/18 114/3 121/6 121/7 122/12 129/19 153/16 155/17 159/23 160/9 167/11 170/5 258/4 259/17 269/13 270/18 270/19 270/19
**Exhibit DX [1]** 170/5
**exhibits [3]** 8/2 81/25 270/15
**exist [3]** 6/2 43/5 264/5
**existed [1]** 148/20
**existing [1]** 86/4
**expand [2]** 148/7 224/2
**expect [7]** 8/2 203/11 203/18 223/4 223/18 223/24 251/10
**expectation [1]** 207/24
**expected [1]** 10/14
**experience [28]** 11/4 29/2 87/5 87/19 104/16 107/9 107/18 141/15 141/25 144/20 177/18 178/21 178/24 180/8 202/17 215/25 243/12 245/13 258/11 259/3 268/3 268/3 268/5 268/9 268/12 268/19 268/23 269/4
**experienced [5]** 27/16 32/5 47/16 144/21 146/7
**experiencing [1]** 140/20
**expert [47]** 16/13 19/22 26/10 26/11 38/21 38/23 40/1 44/7 44/7 45/25 46/1 47/16 47/20 49/6 114/21 178/14 178/16 178/21 178/24 179/3 180/20 187/3 187/22 188/10 189/9 191/3 193/3 193/25 194/6 194/9 194/12 194/14 195/4 196/14 199/13 200/12 200/17 203/12 212/22 213/3 219/20 219/22 220/4 220/9 220/14 220/19 222/5
**expert's [2]** 40/5 193/23
**experts [12]** 4/10 4/11 17/4 24/22 36/19 37/20 38/25 39/10 49/17 229/21 269/23 269/24
**explain [16]** 10/1 11/7 11/11 19/23 20/19 33/4 55/6 56/2 68/9 89/7 147/3 148/5 181/2 244/7 244/8 267/4
**explained [5]** 89/10 143/16 145/11 145/25 256/19
**explaining [2]** 26/12 267/21
**explains [4]** 4/19 20/4 26/3 254/2
**explanation [3]** 24/20 143/10 146/1
**explanations [1]** 9/19
**exploding [1]** 251/8
**expressed [2]** 145/7 170/8
**extensive [2]** 88/6 139/15
**extent [6]** 5/6 197/2 197/4 198/18 217/4 228/2
**external [2]** 16/7 170/17
**extra [2]** 28/4 144/24
**extrapolate [2]** 245/12 246/6
**extrapolation [1]** 262/4
**extremely [5]** 10/25 143/4 151/6 168/15 257/3
**extremity [1]** 88/7
**eye [1]** 9/24


F


**F on [1]** 143/11
**F's [1]** 120/24
**fabricated [4]** 9/12 13/21 14/13 20/19
**fabricating [1]** 13/4
**face [2]** 22/4 26/9
**facilities [7]** 55/7 55/15 55/17 82/10 88/5 95/7 171/10
**facility [12]** 30/14 52/23 74/21 82/15 88/2 95/14 130/13 138/6 139/5 140/21 141/17 172/23
**facility assessments [1]** 95/14
**facing [1]** 53/16
**fact [40]** 14/22 16/24 18/4 19/14 22/18 35/21 37/13 39/5 40/12 40/19 41/9 43/6 43/19 49/11 49/23 51/2 73/18 81/7 96/17 97/17 99/18 99/23 104/10 113/6 119/4 119/19 163/20 196/23 197/5 197/15 197/19 197/21 212/15 218/21 220/25 221/6 227/8 252/17 266/14 266/15
**factor [1]** 199/11
**factors [2]** 82/16 152/14
**facts [2]** 51/10 189/22
**factual [20]** 8/20 38/18 38/24 195/3 196/22 197/6 198/3 198/9 198/15 198/23 199/14 199/16 210/8 210/8

F


**factual... [6]** 211/1 217/7 228/11 229/4 229/6 229/15
**factually [1]** 263/20
**faculty [1]** 176/8
**fail [3]** 40/5 42/15 144/3
**failed [3]** 24/10 25/13 68/23
**failing [26]** 10/22 20/12 21/13 21/24 22/8 28/25 33/3 33/11 41/17 41/20 42/7 70/5 70/11 71/1 75/20 89/1 89/23 90/10 91/3 91/4 91/17 115/20 120/9 145/13 145/21 166/9
**failure [1]** 9/15
**fair [11]** 54/16 70/23 83/18 90/1 92/25 159/18 164/16 205/14 208/12 215/1 222/11
**fairing [1]** 202/21
**fairly [1]** 251/6
**fairness [1]** 190/12
**faith [1]** 144/9
**fall [29]** 12/8 12/13 13/20 20/4 20/12 21/5 21/8 26/16 26/22 28/14 34/15 61/1 63/25 66/19 73/8 73/10 90/14 91/8 96/23 103/14 115/23 142/18 142/19 144/15 153/3 165/11 165/15 167/3 240/21
**fallen [2]** 100/13 100/15
**fallouts [1]** 67/1
**falls [1]** 181/14
**false [7]** 20/10 34/11 46/12 70/23 90/1 130/10 243/14
**falsely [1]** 20/25
**familiar [6]** 58/15 58/18 58/19 106/15 141/21 240/3
**families [5]** 8/16 9/22 30/17 95/15 251/11
**family [5]** 136/14 136/21 136/25 141/10 169/21
**fan [1]** 142/1
**fancy [1]** 30/9
**fantastic [1]** 89/17
**FAQ [1]** 23/3
**far [7]** 64/25 79/25 94/9 124/23 187/19 208/5 218/19
**father [2]** 24/13 25/4
**fault [1]** 270/17
**favor [1]** 17/18
**favorable [1]** 191/24
**favorite [1]** 42/12
**FDUTPA [6]** 35/17 36/15 36/24 39/21 50/21 150/1
**fear [1]** 33/25
**features [1]** 41/3
**federal [3]** 86/6 177/16 272/5
**FedEx [1]** 127/5
**fee [3]** 48/5 128/17 207/19
**feedback [5]** 56/24 56/25 132/17 132/21 259/16
**feel [6]** 37/1 80/4 116/18 243/16 262/14 262/16
**feeling [1]** 9/17
**fees [2]** 42/5 47/1
**fell [2]** 150/23 258/7
**felt [6]** 240/12 243/14 242/14 243/15 243/18 269/16
**few [15]** 17/14 58/8 70/2 134/6 136/2 136/4 136/6 143/25 156/21 173/23 205/6 249/21 251/18 266/20 268/2
**fewer [2]** 29/4 29/6
**fiance [1]** 235/5
**field [6]** 74/22 80/1 176/17 189/19 190/16 268/13
**fight [1]** 164/23
**figure [4]** 101/6 101/10 254/18 254/20
**figured [1]** 47/3
**figuring [1]** 46/17
**file [4]** 47/12 151/19 164/25 256/18
**filed [11]** 7/8 35/17 39/4 77/14 89/18 123/20 149/24 150/3 156/25 188/8 270/10
**filing [4]** 5/3 21/10 39/14 210/25
**filings [1]** 7/11
**fill [3]** 12/25 212/1 259/15
**filled [2]** 18/22 44/4
**filling [5]** 18/16 29/25 59/6 59/7 142/5
**final [4]** 14/14 14/16 57/13 201/21
**finally [5]** 26/13 32/21 190/4 192/18 195/5
**finance [5]** 11/9 235/11 235/24 259/10 269/4
**finances [1]** 48/1
**financial [3]** 53/25 235/11 235/12
**find [22]** 10/2 75/13 75/15 88/17 99/21 142/3 150/19 156/11 156/12 156/13 157/7 157/7 163/4 169/3 200/9 201/5 201/24 213/5 226/17 238/5 247/6 251/21
**finding [3]** 57/11 147/14 230/4
**findings [5]** 14/22 57/10 139/25 140/1 221/6
**finds [1]** 34/7
**fine [6]** 94/7 100/7 123/8 151/20 170/3 221/15
**finish [5]** 124/18 125/6 230/25 234/7 267/22
**fire [3]** 30/10 74/14 74/18
**firemen [1]** 39/12
**first [57]** 18/9 23/13 24/6 28/19 32/18 34/19 41/6 58/1 60/11 62/2 70/4 81/2 81/11 81/13 81/21 82/2 82/8 83/24 87/2 89/4 98/12 106/22 117/7 122/18 135/14 135/22 136/1 136/8 136/18 137/7 137/8 141/14 142/21 163/1 163/8 170/19 172/2 179/17 183/16 189/22 190/10 191/7 192/1 194/21 195/1 199/16 200/23 202/3 217/15 222/12 242/16 245/21 249/2 255/20 263/18 263/20 266/17
**five [76]** 3/6 3/24 3/24 8/7 8/25 9/2 11/3 14/5 20/20 22/2 22/17 26/23 33/19 34/4 35/9 35/20 35/23 36/3 36/3 38/2 38/2 39/16 40/4 40/21 40/22 41/9 52/12 90/9 102/5 104/21 105/15 105/20 107/2 108/20 109/3 111/23 116/15 121/19 123/21 134/13 139/4 159/21 161/2 176/23 179/18 182/5 182/13 184/21 186/6 186/12 186/14 186/16 191/10 192/9 194/12 197/24 198/13 198/14 199/5 204/17 204/23 208/11 208/16 210/9 210/21 211/2 211/12 211/16 221/18 222/10 223/1 223/2 224/9 224/13 227/4 229/10
**FL [3]** 1/8 1/23 2/7
**flat [2]** 251/6 251/10
**floors [2]** 135/24 239/24
**FLORIDA [23]** 1/1 6/8 11/18 24/2 31/19 40/13 40/18 40/19 41/2 42/8 49/22 55/13 74/16 132/25 138/5 138/18 138/22 222/25 235/9 237/1 238/4 240/16 251/9
**Florida about [1]** 222/25
**flown [1]** 48/21
**fluctuate [2]** 40/10 40/14
**flunked [1]** 21/1
**flurry [1]** 7/9
**focus [19]** 17/24 25/19 35/18 36/15 37/3 92/24 103/14 134/1 134/2 176/18 176/19 182/3 205/10 213/6 213/10 213/24 225/1 259/12 268/17
**focused [4]** 19/17 176/16 176/23 212/18
**Focusing [1]** 182/23
**follow [3]** 49/4 56/13 139/9
**followed [1]** 27/15
**following [9]** 21/5 27/14 30/20 46/6 139/10 142/25 170/20 172/14 196/22
**followup [1]** 89/14
**food [2]** 67/6 87/22
**foot [1]** 29/5
**footnote [3]** 26/1 26/2 26/3
**footnotes [1]** 9/19
**for BCMA [1]** 90/23
**force [1]** 19/9
**forced [1]** 164/24
**forces [1]** 140/21
**foregoing [1]** 272/1
**foremost [1]** 141/14
**forget [2]** 107/17 261/25
**form [1]** 137/12
**formal [1]** 204/16
**formed [2]** 179/13 206/21
**forming [1]** 185/4
**Fort [3]** 31/17 31/21 237/11
**forum [1]** 187/8
**forward [4]** 83/14 88/17 101/2 271/13
**found [4]** 31/24 69/7 115/1 163/1
**foundation [7]** 71/10 72/2 72/7 92/12 117/7 117/11 117/18

F

**foundational [6]** 106/10 179/22 189/17 192/1 212/6 220/12
**founded [1]** 236/13
**founding [2]** 193/23 195/21
**four [67]** 13/5 13/6 13/15 13/22 14/17 14/18 16/5 17/11 21/23 25/18 37/11 37/14 38/1 38/9 45/9 56/19 56/19 61/22 84/12 87/1 95/17 104/19 111/13 132/3 132/9 136/7 139/4 148/7 153/25 159/5 159/11 161/6 162/5 165/17 182/15 183/5 183/14 183/20 184/1 184/4 184/6 184/9 184/12 185/11 185/20 186/15 188/1 188/16 188/22 188/23 190/9 191/1 191/5 191/6 197/25 199/20 206/4 206/13 216/14 216/16 216/17 225/2 226/21 227/6 239/22 247/21 260/24
**four metrics [1]** 206/4
**fourth [7]** 31/7 57/8 67/17 190/19 195/5 195/10 195/16
**fracture [2]** 8/15 24/13
**frame [3]** 79/10 259/13 264/1
**Franciscan [1]** 236/13
**free [14]** 19/6 44/20 45/15 45/15 48/9 48/10 75/23 101/9 110/5 142/7 142/9 142/11 215/7 247/9
**free-standing [1]** 75/23
**freedom [1]** 213/11
**freely [1]** 260/8
**frequent [1]** 64/25
**frequently [1]** 53/19
**friends [1]** 72/20
**frightened [1]** 8/16
**Frog [1]** 229/22
**Frog's [1]** 189/9
**front [2]** 50/16 92/8
**frozen [1]** 191/21
**Fs [2]** 10/5 200/16
**Ft [2]** 2/7 2/7
**full [11]** 9/4 20/20 96/25 137/12 228/21 230/24 242/11 242/12 242/13 265/22 265/22
**full-time [2]** 242/11 242/13
**fully [8]** 5/11 5/11 23/10 23/16 25/1 45/14 50/2 249/16
**fun [1]** 140/20
**functional [1]** 45/15
**functioning [1]** 138/8
**fundamental [1]** 8/10
**funds [1]** 202/2
**further [17]** 15/22 22/24 25/1 28/5 33/7 80/4 131/10 135/2 152/16 173/11 204/13 223/18 226/6 239/7 248/6 250/10 266/18

G

**gain [1]** 20/15
**gardens [38]** 3/8 29/20 29/22 30/13 55/11 135/10 135/12 135/16 137/5 137/6 138/23 139/14 140/2 140/12 141/22 142/13 142/14 142/19 142/22 143/25 144/11 145/21 153/21 154/3 155/21 156/22 157/3 158/2 158/3 158/4 158/9 158/14 161/5 162/11 162/18 166/25 167/13 168/14
**Gardens' [1]** 160/21
**gas [8]** 25/7 35/15 61/5 154/2 154/13 155/2 155/14 155/23
**gather [2]** 96/6 162/6
**gathered [1]** 96/4
**gathering [3]** 162/1 162/9 206/15
**gauge [6]** 61/5 154/2 154/13 155/2 155/14 155/23
**gauges [1]** 25/7
**gave [8]** 4/3 13/9 89/11 97/4 129/12 173/18 257/2 267/1
**general [3]** 137/15 205/24 247/19
**generally [5]** 124/24 131/22 159/15 211/24 248/11
**generate [1]** 181/15
**generated [8]** 21/25 30/5 43/12 72/5 72/6 89/8 95/18 96/1
**generates [2]** 95/8 157/18
**genesis [1]** 184/25
**Genevieve [1]** 8/1
**geography [2]** 238/7 239/8
**get [76]** 4/24 6/22 8/21 9/17 13/14 13/18 14/18 14/23 22/17 22/18 23/4 25/16 25/22 25/23 26/13 28/2 41/19 46/18 57/7 57/13 60/2 60/4 60/6 73/25 79/13 79/13 79/20 79/24 87/7 103/10 110/9 110/12 110/14 111/13 121/8 133/12 136/24 141/1 142/24 153/10 159/25 160/1 184/23 185/21 185/25 198/11 199/4 203/4 207/19 216/15 216/25 217/20 233/5 234/4 235/20 238/8 240/16 241/3 244/7 246/23 249/15 249/16 252/18 252/23 256/24 257/4 259/11 259/13 259/16 261/6 261/9 261/14 263/24 267/10 267/12 269/21
**gets [5]** 21/19 38/11 48/4 201/18 203/5
**getting [16]** 14/6 14/6 14/10 32/2 46/19 98/23 125/19 165/12 165/21 166/1 197/21 203/3 208/4 228/1 260/20 260/23
**GI [1]** 58/13
**Gibson [1]** 1/18
**Gill [5]** 101/23 102/1 102/4 121/13 121/17
**Ginny [1]** 34/20
**Girls [1]** 236/8
**give [32]** 19/20 26/8 26/8 38/9 41/5 45/14 46/8 48/22 48/25 52/8 57/5 70/24 76/18 136/7 144/5 144/9 145/18 146/9 165/5 165/7 172/9 172/10 172/12 172/24 195/12 197/6 208/24 209/1 209/3 217/21 233/22 252/12
**given [14]** 11/18 19/1 19/2 61/18 81/3 90/22 129/2 150/23 178/21 178/24 196/5 238/7 251/8 264/16
**gives [5]** 12/21 57/9 103/12 167/15 188/17
**giving [4]** 3/23 143/17 145/13 165/3
**glad [2]** 87/8 87/24
**go [86]** 5/3 9/23 13/7 22/24 23/2 24/4 24/5 26/2 28/8 40/25 48/1 49/6 64/13 65/7 65/18 70/4 74/19 75/17 76/24 78/19 79/3 79/16 80/4 84/11 84/12 86/22 87/1 88/17 94/11 101/12 115/4 116/7 116/7 117/22 117/23 119/12 124/1 129/9 129/21 129/22 139/3 140/18 140/19 140/21 144/24 145/22 147/7 147/23 148/1 153/24 157/9 169/17 170/19 171/1 172/13 172/24 188/6 193/8 195/16 201/12 205/1 205/6 211/17 214/7 214/23 218/19 224/2 228/4 230/25 234/1 234/7 239/24 241/9 242/1 242/10 244/25 245/5 245/11 249/18 250/21 253/11 256/3 259/17 263/23 264/10 271/19
**goal [5]** 139/21 178/12 193/6 225/22 225/23
**goals [2]** 178/13 190/9
**goes [14]** 5/2 9/18 38/21 47/1 57/12 77/1 77/22 81/8 88/19 150/10 157/23 201/17 202/17 230/17
**going [90]** 4/5 4/8 15/4 19/7 21/15 26/19 28/17 31/13 37/21 40/2 42/18 44/18 46/19 46/20 46/23 47/2 47/4 47/6 50/10 57/11 60/14 61/10 61/20 63/3 64/23 70/7 70/10 70/14 70/17 72/8 76/11 78/11 78/24 79/18 79/19 81/5 84/16 84/17 84/22 86/14 86/16 88/8 88/14 89/5 89/7 94/6 94/10 98/17 101/1 103/4 105/23 107/3 113/22 116/19 122/11 124/2 124/14 134/4 140/24 143/1 143/18 145/12 148/6 150/22 153/8 156/12 163/13 163/17 163/17 172/2 173/4 179/5 195/2 199/22 199/23 210/7 217/7 217/9 219/19 219/22 234/22 245/17 246/14 248/5 249/11 249/15 269/17 269/19 270/6 270/7
**gold [1]** 202/7
**gone [5]** 101/17 110/24 141/6 219/14 262/19
**Gonzalez [1]** 193/11
**good [39]** 1/4 3/1 3/2 3/11

**G**

**good... [35]** 3/12 3/13 3/17 3/22 8/6 11/6 12/12 14/1 25/25 32/22 33/2 33/5 33/6 37/22 55/10 67/1 77/2 79/19 87/19 87/22 94/17 133/23 135/9 146/8 165/6 175/12 210/15 233/16 234/25 259/7 259/7 259/8 269/11 271/14 271/21
**Google [5]** 21/14 21/15 24/1 118/15 118/19
**gosh [1]** 87/8
**got [19]** 25/7 26/22 32/13 32/18 60/10 67/25 81/11 81/13 107/8 143/5 165/15 172/1 223/22 243/17 244/24 252/20 254/22 261/23 266/6
**gotten [2]** 118/11 156/3
**governing [13]** 39/11 143/3 144/9 170/21 172/25 243/3 243/5 243/22 244/6 254/12 254/16 256/5 256/7
**Government [3]** 31/25 45/3 50/12
**governors [1]** 265/3
**grade [166]** 9/18 10/3 10/14 12/13 13/16 14/14 14/16 15/6 15/19 17/2 17/7 17/10 21/16 21/20 21/21 22/9 22/10 22/11 22/13 22/21 23/4 23/4 23/6 23/13 24/3 24/8 24/12 24/18 24/22 25/2 25/5 27/3 29/14 30/5 30/23 33/3 33/7 33/7 38/5 40/23 41/20 44/3 44/22 44/23 44/25 45/5 45/24 47/4 48/8 60/23 60/25 61/8 70/5 70/7 70/11 70/24 71/2 73/7 73/16 75/15 80/16 82/16 83/7 84/9 87/10 87/11 87/13 87/18 88/3 89/2 89/6 89/8 89/23 90/10 90/16 90/19 91/3 91/4 91/17 103/19 110/11 110/14 111/3 111/6 115/18 115/20 121/9 121/14 131/16 132/7 132/20 132/23 142/14 142/19 142/22 144/15 145/11 145/13 145/21 147/19 148/11 148/13 152/21 153/3 153/6 159/6 159/8 164/20 164/21 164/23 164/24 165/2 165/2 165/3 166/5 166/9 169/19 170/18 171/4 173/5 174/1 181/7 181/16 181/18 181/24 182/3 182/14 182/16 182/20 183/2 183/21 191/11 193/17 193/18 193/18 196/1 196/2 196/5 196/9 196/13 196/14 196/19 198/14 200/13 200/17 203/4 203/5 204/9 204/13 219/15 220/4 224/5 241/3 241/5 242/21 243/11 243/17 244/11 244/14 253/4 256/13 257/22 258/21 258/22 259/11 266/12
**graded [15]** 16/19 18/18 21/6 24/10 24/15 34/6 40/20 51/1 120/14 143/6 165/8 252/7 252/18 252/22 252/23
**grades [95]** 8/15 9/11 20/12 20/20 20/21 21/5 21/8 21/9 21/10 21/13 21/21 21/24 22/8 23/20 24/4 24/25 27/13 27/15 27/19 27/20 28/7 28/9 28/25 30/21 31/6 33/11 33/11 33/16 33/22 34/11 36/4 36/18 37/24 38/22 41/17 42/1 42/6 61/10 70/14 71/22 75/21 89/21 90/22 104/4 118/9 118/25 119/2 119/24 120/3 120/9 128/25 129/6 130/11 130/14 131/21 133/12 134/21 142/12 143/5 143/7 146/1 153/13 162/14 168/19 168/22 170/8 171/10 180/4 180/12 193/12 198/4 198/8 200/19 202/22 202/23 203/2 203/8 203/13 221/17 221/23 221/25 222/17 222/18 222/19 222/25 223/13 225/3 225/7 232/10 232/13 232/18 234/18 240/19 240/22 243/18
**grading [27]** 12/8 12/15 12/24 20/21 20/23 28/11 36/5 130/3 179/18 179/21 180/3 181/3 183/14 186/23 187/16 187/17 189/9 189/16 191/3 192/2 193/4 193/22 195/22 197/3 200/12 243/6 269/5
**graduate [2]** 176/15 239/11
**graduated [1]** 135/20
**grandparents [1]** 141/5
**grant [1]** 21/3
**granted [2]** 10/3 250/9
**graph [1]** 262/8
**grateful [1]** 89/15
**great [5]** 20/24 103/1 136/23 146/4 247/20
**greater [1]** 65/12
**greatly [2]** 89/12 151/15
**green [5]** 182/9 182/17 182/17 183/1 199/20
**grid [2]** 260/2 260/5
**grounds [1]** 98/2
**group [74]** 1/8 3/3 3/14 3/18 28/7 43/18 58/16 60/24 64/1 64/6 95/13 105/12 116/8 116/16 179/20 181/4 181/8 181/24 182/5 182/11 182/20 182/25 183/16 183/20 183/24 184/14 184/14 185/6 186/17 186/21 187/3 187/8 191/7 191/12 191/14 192/7 192/9 192/14 192/24 193/11 193/15 194/2 194/11 195/24 196/14 197/3 197/8 197/17 199/2 200/20 202/7 202/10 202/19 202/21 203/19 204/7 204/9 206/19 210/12 210/21 211/5 211/23 213/22 215/22 217/23 218/6 221/21 222/13 227/3 228/5 232/13 232/18 248/12 256/8
**Group's [10]** 18/11 83/6 179/18 179/21 180/11 189/16 191/11 193/13 194/2 194/6
**groups [4]** 36/4 228/18 254/2 254/3
**grow [3]** 167/7 251/12 269/9
**growing [3]** 29/22 52/5 75/19
**grown [2]** 167/4 269/10
**growth [2]** 75/18 251/9
**guess [5]** 15/18 38/22 84/25 123/6 213/1
**guidance [3]** 17/6 220/10 220/16
**guidance it [1]** 17/6
**guide [1]** 161/17
**guidelines [1]** 66/13
**guiding [5]** 194/14 195/21 212/22 212/25 213/2

**H**

**H-A-V-E-R-I-C-A-K [1]** 51/25
**H-E-A-T-H-E-R [1]** 51/25
**hacking [1]** 5/4
**had [145]** 4/5 5/11 5/11 5/16 6/9 6/16 6/23 7/4 11/11 15/4 15/22 16/2 21/16 26/15 27/19 28/10 30/25 32/19 35/18 39/11 43/19 45/9 45/21 45/22 46/5 46/7 53/16 53/16 59/19 61/17 61/17 63/10 67/6 70/8 72/3 72/17 75/2 77/1 78/8 78/14 83/2 84/18 87/12 87/16 88/1 88/2 88/4 88/4 88/6 88/22 89/1 89/16 91/3 91/17 93/13 94/22 94/23 96/9 103/18 104/8 108/14 108/15 115/20 127/14 128/6 129/17 131/2 131/23 141/5 143/10 144/8 144/24 145/4 145/19 145/21 145/25 146/21 147/2 147/16 147/17 148/19 148/20 149/20 152/21 158/16 162/4 162/7 162/21 163/12 163/15 163/20 164/2 164/21 165/25 168/18 169/22 171/25 173/5 176/12 180/9 183/23 189/14 198/16 199/3 199/15 208/15 210/23 211/13 211/14 211/18 211/22 212/15 215/20 218/2 220/3 224/2 226/24 227/7 227/8 229/9 229/13 233/2 235/9 239/16 240/23 242/16 244/5 244/20 244/20 245/21 246/8 246/18 247/10 247/13 248/24 250/20 261/20 261/20 262/18 263/17 263/19 265/19 265/20 265/21 269/6
**had the [1]** 224/2
**hadn't [1]** 242/20
**hair [2]** 87/3 129/13
**HAISS [1]** 107/22
**half [8]** 52/18 125/4 125/5 140/5 221/7 237/20 257/8 267/5
**halls [1]** 45/16
**hallways [1]** 72/19
**Hamlin [1]** 40/10
**Hampshire [1]** 177/15
**hand [45]** 7/19 13/9 13/10 13/20 14/20 15/23 25/19 26/15 26/18 26/20 27/5 27/5

H

**hand... [33]** 27/10 65/14 65/18 66/13 66/15 66/15 66/20 66/22 67/2 67/3 67/11 108/19 108/25 109/4 113/7 154/2 154/3 154/13 159/3 161/21 165/12 182/4 182/23 184/22 184/22 210/17 211/16 211/20 211/21 227/14 241/13 242/6 260/21
**handbook [1]** 86/5
**handle [2]** 230/4 237/18
**handled [1]** 32/3
**handles [1]** 182/18
**handoff [1]** 98/21
**hands [10]** 26/23 27/6 50/6 66/4 66/7 66/18 67/6 67/7 87/21 136/22
**Hanlon [1]** 30/16
**happen [8]** 25/3 34/4 45/19 68/23 86/25 89/22 143/7 218/20
**happened [15]** 24/17 40/6 45/20 69/1 91/7 93/5 130/19 143/7 144/6 145/25 161/11 161/18 237/17 240/25 245/3
**happening [2]** 72/21 90/2
**happens [4]** 34/25 50/17 141/13 201/22
**happy [7]** 3/25 4/11 125/1 125/1 145/15 175/4 262/21
**hard [9]** 4/22 5/4 7/16 7/16 7/19 88/23 238/16 266/10 269/9
**hardest [1]** 28/14
**harm [28]** 22/15 22/16 33/25 34/9 34/14 39/7 49/1 49/1 91/15 95/19 96/1 96/17 96/19 148/24 149/16 150/2 150/11 150/15 157/23 180/5 200/21 203/9 203/11 203/12 213/11 221/17 222/1 223/22
**harmed [15]** 6/19 33/20 33/21 37/6 39/3 39/5 96/21 96/23 223/13 223/19 223/20 244/14 244/17 248/10 248/11
**harmful [1]** 204/15
**harming [1]** 158/3
**harms [2]** 8/25 28/14
**Harris [3]** 188/6 199/15 219/18
**Harris' [1]** 220/6
**Harvard [1]** 44/9
**has [125]** 8/14 8/19 21/7 21/18 21/22 21/24 29/24 30/15 30/19 31/8 31/12 31/15 32/23 35/12 35/19 36/25 40/4 40/6 41/5 41/17 42/9 42/13 45/24 50/25 54/4 55/17 57/11 58/8 60/18 62/24 62/25 65/16 66/14 69/1 69/2 71/16 71/16 73/13 75/24 75/25 76/19 79/4 79/12 79/17 80/24 81/7 84/6 84/10 84/10 86/1 86/1 86/24 87/19 89/18 91/7 104/6 107/5 107/6 109/19 114/19 115/23 118/8 118/21 128/8 128/9 130/11 136/15 136/19 137/2 137/8 138/7 141/2 141/3 142/12 146/4 146/5 146/18 153/3 153/10 153/13 153/16 156/5 156/15 161/17 166/25 167/2 167/4 169/22 171/8 172/21 174/25 177/11 180/4 182/5 186/4 193/10 197/11 199/1 200/7 200/20 202/6 209/14 211/5 213/24 214/16 221/4 223/12 235/13 236/11 240/19 242/11 244/14 244/16 244/17 244/19 244/21 245/14 245/22 246/21 248/21 259/12 266/9 269/9 270/11 271/8
**hasn't [2]** 97/21 269/15
**have [601]**
**haven't [18]** 106/7 110/24 114/21 118/11 126/7 126/11 126/12 134/25 153/12 186/8 200/6 204/16 205/13 205/15 205/19 223/5 223/20 270/24
**Havericak [26]** 28/19 43/7 51/22 51/23 51/24 52/3 69/5 73/7 76/15 89/18 90/8 111/19 116/20 124/9 125/18 131/15 144/19 149/23 153/18 154/5 159/21 168/5 241/9 256/17 256/24 256/25
**having [15]** 36/19 36/23 38/25 67/1 68/23 74/20 74/22 79/11 88/22 88/23 96/16 120/21 146/24 190/1 242/25
**HCAP [16]** 103/8 103/14 103/22 104/6 114/19 160/13 160/15 160/17 162/11 182/24 257/21 257/25 258/22 259/7 267/7 268/3
**HCAPs [3]** 103/10 160/25 257/13
**he [69]** 15/13 15/15 15/16 15/17 18/7 18/9 19/23 19/23 19/24 20/1 20/4 20/7 29/20 29/21 30/4 30/12 30/20 30/24 31/1 31/2 36/25 37/1 38/18 38/20 38/20 38/21 38/24 39/8 40/12 41/23 102/5 102/16 141/7 145/19 145/20 145/21 145/22 145/24 146/1 146/9 148/11 167/12 174/4 174/24 178/1 187/3 188/7 189/21 189/22 190/1 190/4 199/16 199/21 201/14 212/20 220/6 221/5 223/4 231/19 233/2 233/6 233/7 233/7 250/7 250/19 257/20 262/8 262/8 262/17
**head [4]** 52/6 120/18 128/18 261/24
**health [132]** 9/21 15/2 24/6 29/17 29/17 31/8 35/6 35/7 35/19 35/23 35/24 36/9 38/5 39/16 40/19 41/12 42/23 42/24 43/21 46/3 47/7 47/9 47/12 52/4 52/9 52/16 53/1 53/15 54/16 55/5 55/18 55/21 57/22 58/21 59/10 68/16 70/21 82/10 88/25 96/5 97/2 97/4 101/15 101/20 102/1 104/20 113/4 114/4 114/5 114/10 114/12 114/15 115/23 116/2 116/6 116/15 116/21 116/22 118/8 120/4 121/10 121/13 121/14 121/17 124/3 125/20 126/1 126/2 126/16 126/21 128/25 129/6 130/3 132/20 132/23 133/5 133/12 134/14 135/15 136/15 136/17 136/19 136/25 140/18 158/16 158/17 158/21 163/11 164/12 166/16 166/17 166/20 168/2 171/4 176/5 176/5 176/9 176/14 176/15 176/18 176/19 176/25 177/7 177/9 177/18 177/21 177/24 177/25 178/3 178/16 178/19 178/20 178/22 178/25 181/13 191/15 193/17 193/19 203/4 206/9 206/10 218/21 218/24 219/2 219/14 222/21 234/23 235/6 235/8 235/13 236/4 268/12
**health systems [1]** 178/20
**hear [47]** 4/11 10/24 10/25 11/2 11/20 11/23 12/16 13/12 15/2 15/9 15/11 16/4 16/23 18/25 19/15 20/11 21/11 21/25 23/22 24/16 24/22 26/19 26/21 27/8 27/12 28/15 28/17 28/19 29/19 29/24 30/16 31/7 32/21 36/17 40/10 40/15 41/6 41/12 42/8 46/19 47/16 48/3 50/10 203/14 226/3 230/24 234/23
**heard [21]** 41/5 48/1 55/5 62/6 76/14 76/21 85/9 86/1 120/4 139/13 140/15 142/7 145/2 146/10 149/2 152/21 182/8 188/9 204/3 215/8 254/22
**hearing [5]** 48/17 51/17 83/14 149/8 271/13
**hearsay [20]** 6/15 59/21 71/9 72/7 72/9 80/17 84/15 84/23 85/6 88/9 106/5 112/17 146/25 147/20 148/1 243/25 245/2 245/4 249/12 267/20
**heart [11]** 6/25 29/16 30/1 35/5 74/20 79/11 79/15 88/20 137/12 138/8 146/6
**Heath [1]** 35/8
**Heather [9]** 28/19 43/7 51/21 51/23 51/24 89/6 99/4 99/7 139/1
**heavily [3]** 10/6 14/16 224/16
**height [6]** 95/1 95/5 95/5 96/12 157/14 157/17
**help [9]** 28/1 28/2 45/15 53/17 53/18 53/19 53/21 79/14 239/8
**helping [1]** 92/11
**helps [1]** 141/15
**hematology [1]** 52/20
**her [41]** 25/4 28/20 29/1 71/16 71/17 72/24 76/21 76/21 78/12 84/25 87/3 87/12

H

**her... [29]** 87/14 87/23 88/6 88/8 89/4 89/10 89/11 89/13 89/15 105/9 106/15 112/7 123/11 124/9 130/8 198/22 229/2 234/7 246/24 250/19 261/20 270/2 270/3 270/4 270/5 270/9 270/12 271/8 271/9
**here [99]** 3/6 4/2 4/7 6/22 8/19 9/3 10/9 12/18 14/5 16/12 17/8 17/9 22/4 25/6 25/10 25/24 29/14 29/15 30/7 31/19 31/20 34/2 34/4 34/9 34/23 35/18 35/22 35/24 36/1 36/7 36/13 39/21 43/10 48/22 49/20 50/3 50/19 51/6 87/8 87/25 89/5 89/25 91/6 95/4 97/20 99/17 99/20 100/2 100/8 100/9 102/13 102/14 102/17 105/9 105/17 110/1 110/21 114/14 118/1 118/2 120/19 123/7 126/16 133/20 153/20 155/18 159/20 172/10 175/20 182/4 182/9 182/13 184/10 184/10 196/1 200/15 203/13 208/21 213/7 219/7 222/24 223/21 224/7 225/12 226/5 230/6 238/3 241/8 241/14 244/21 250/12 251/7 251/9 251/12 254/6 255/4 259/2 263/25 271/18
**here's [1]** 262/9
**HF [1]** 182/13
**HHI [1]** 268/14
**Hibbard [3]** 201/22 201/23 204/1
**hide [2]** 51/11 156/6
**hiding [2]** 35/14 47/25
**high [18]** 46/10 53/21 79/2 86/24 108/12 132/11 137/3 137/9 144/24 169/20 181/21 218/10 237/8 239/8 245/10 268/20 268/24 268/25
**higher [19]** 10/3 14/25 25/23 57/11 74/23 109/18 177/6 186/18 188/24 190/8 193/8 193/9 198/1 203/3 203/4 204/13 259/11 269/2 269/4
**highest [4]** 33/18 116/2 116/3 217/24
**highlight [3]** 144/23 189/7 241/12
**highlighted [6]** 95/4 118/2 126/17 146/2 194/21 195/5
**him [11]** 41/24 145/20 145/25 146/3 146/8 146/9 146/10 149/22 152/3 221/3 226/4
**hip [2]** 137/25 138/24
**HIPAA [7]** 5/12 5/14 5/21 6/3 85/20 85/22 256/1
**HIPAA protected [1]** 256/1
**hired [1]** 18/5
**hiring [1]** 168/13
**his [31]** 5/15 15/4 15/17 16/1 18/7 18/8 19/25 20/4 20/7 24/13 29/20 30/4 31/3 38/24 41/12 41/23 100/14 146/23 170/2 187/6 188/7 200/2 200/2 221/5 221/6 225/19 231/4 231/6 231/10 233/3 257/22
**historical [1]** 96/6
**historically [2]** 61/17 232/15
**history [3]** 151/7 151/9 236/12
**hit [6]** 13/23 20/9 144/4 151/10 151/13 151/13
**HMI [1]** 256/17
**HO [1]** 112/2
**hold [2]** 53/8 74/21
**holding [1]** 199/11
**holds [1]** 79/23
**home [5]** 47/9 47/10 57/12 99/24 164/13
**HON [1]** 2/8
**honest [1]** 8/17
**honestly [3]** 244/3 244/21 256/21
**Honor [105]** 3/5 3/13 3/17 3/23 5/15 5/22 6/13 6/14 7/14 7/15 8/6 8/21 10/12 22/6 33/9 34/7 34/17 34/20 34/23 36/7 42/20 43/15 48/8 48/18 48/21 48/23 49/6 51/21 59/21 71/14 72/7 77/6 77/17 78/16 78/18 80/23 81/21 84/15 85/18 86/16 88/9 88/13 88/19 90/3 90/5 97/25 98/2 98/18 106/3 106/6 106/11 106/19 112/13 122/15 122/21 123/8 124/7 125/13 126/23 126/25 131/10 131/12 135/2 135/4 143/12 146/20 147/5 147/20 148/8 148/17 149/1 149/13 150/6 150/8 150/10 150/16 150/19 151/5 151/24 151/25 152/5 169/25 173/11 174/24 174/25 179/2 179/4 179/11 188/3 221/10 226/7 231/21 233/9 233/18 234/1 234/2 234/4 245/17 250/5 251/13 251/15 259/22 266/18 266/20 267/20
**Honor's [3]** 5/9 98/10 149/8
**HONORABLE [1]** 1/11
**hope [3]** 51/4 219/10 269/11
**hopefully [1]** 229/10
**hoping [1]** 98/5
**Hopkins [3]** 15/13 187/5 194/5
**horse [2]** 238/9 238/10
**hospital [334]**
**hospital have [1]** 154/18
**hospital's [13]** 21/13 67/10 83/19 133/23 148/13 172/17 178/12 181/20 194/15 201/3 201/12 201/17 203/14
**hospitalists [1]** 63/11
**hospitality [1]** 236/7
**hospitalized [2]** 129/18 181/15
**hospitals [308]**
**hospitals are [1]** 46/25
**hospitals do [1]** 66/8
**hospitals provide [1]** 199/24
**hospitals' [3]** 10/5 109/4 222/16
**hour [7]** 7/1 124/18 124/25 125/4 125/5 208/2 271/3
**hours [12]** 11/10 20/16 20/16 57/1 59/10 59/12 133/7 147/14 206/23 207/13 208/5 271/10
**house [2]** 236/7 236/8
**housekeeping [1]** 98/8
**how [129]** 8/24 8/24 10/4 19/3 20/3 20/19 22/9 23/6 25/25 26/12 27/2 29/8 30/13 31/20 33/7 35/14 36/6 37/11 37/15 38/24 39/11 41/22 43/4 44/15 45/20 48/2 48/24 49/14 53/23 54/18 54/25 55/3 58/18 59/5 59/10 70/6 71/13 72/3 72/4 72/16 73/23 74/13 76/8 77/8 80/10 86/2 87/5 87/6 87/20 88/11 97/11 105/22 106/12 108/19 109/10 110/1 110/22 112/22 127/13 128/17 132/25 133/5 133/9 138/11 139/14 140/12 142/21 146/16 152/10 159/19 161/7 163/4 165/12 165/24 167/16 176/7 177/11 177/11 182/20 194/9 202/21 204/1 206/23 207/13 207/16 207/24 208/4 208/6 210/22 212/2 214/1 214/21 214/25 215/22 216/19 216/24 220/19 220/22 222/7 222/16 222/17 222/19 222/22 222/22 223/2 226/20 227/5 227/7 227/8 231/3 232/7 232/24 235/6 238/22 240/5 241/5 242/25 243/17 243/19 244/17 247/2 247/17 251/4 254/9 257/2 261/9 262/14 262/16 271/11
**huge [2]** 40/16 144/4
**hum [2]** 62/11 237/25
**Humana [15]** 29/9 31/5 80/10 80/11 80/15 81/7 81/9 81/15 82/9 83/16 84/7 127/4 127/13 127/15 127/23
**hundred [30]** 26/17 26/17 48/25 62/15 165/16 165/16 165/21 165/22 166/1 166/1 184/5 184/16 185/13 185/13 185/16 192/13 192/13 197/22 208/7 217/20 217/20 217/22 217/23 218/14 229/13 229/14 260/11 260/20 260/23 260/23
**hundreds [3]** 9/6 11/1 18/17
**hurt [1]** 10/8
**HVIDT [3]** 1/17 3/10 216/10
**hygiene [19]** 67/2 67/4 67/11 90/23 108/20 108/25 109/4 113/7 159/3 161/21 165/13 184/22 210/17 211/16 211/20 211/21 227/14 242/7 260/21
**hygiene and [1]** 165/13
**hypothesis [5]** 200/2 230/12 230/13 230/15 230/18

H

hypothetical [1] 25/11

I

I sustained [1] 250/15
I transitioned [1] 136/5
I'd [3] 13/12 128/18 174/24
I'm [3] 3/23 93/6 257/22
IBS [3] 113/7 165/13 210/17
ICU [21] 67/15 67/17 67/18 67/23 68/5 68/10 68/13 68/13 68/14 68/21 68/24 109/10 113/8 113/12 155/19 155/21 161/23 161/24 242/10 242/11 242/15
idea [4] 12/25 57/5 147/16 167/16
ideally [1] 190/20
identical [4] 83/25 182/22 196/24 204/12
identified [8] 84/8 86/11 147/1 169/15 193/4 200/18 255/17 269/14
identify [16] 82/16 130/4 169/8 169/9 169/11 170/16 171/7 172/14 253/23 254/13 254/14 254/16 255/9 255/13 255/17 270/19
identifying [1] 6/2
IL [1] 2/5
illness [1] 140/21
illustrate [1] 107/24
illustrated [1] 120/25
imagine [2] 144/2 242/25
immediate [1] 239/8
immediately [3] 24/8 30/5 87/8
imminently [1] 34/3
immunity [1] 33/10
impact [13] 40/4 71/15 75/7 78/22 78/24 79/4 84/6 144/17 152/10 164/19 169/22 200/18 231/7
impacted [1] 128/9
impactful [1] 14/14
impacting [2] 89/24 223/1
impacts [6] 84/7 144/12 144/16 153/9 156/15 249/10
implement [2] 66/2 66/6
implications [2] 143/1 143/19
importance [3] 177/12 190/1 257/5
important [16] 27/4 34/22 36/2 37/16 38/12 55/16 59/17 59/18 75/12 138/12 138/13 192/11 200/10 201/21 232/21 244/6
importantly [2] 190/4 201/5
impose [1] 27/25
imposed [3] 16/2 20/11 189/2
impossible [1] 120/11
impression [2] 141/24 241/2
improve [5] 82/21 127/24 136/24 201/3 225/23
improved [4] 89/13 246/18 256/19 262/16
improvement [8] 82/25 83/15 84/3 127/25 176/20 176/24 177/1 177/8
improving [1] 92/8
imputation [11] 45/18 45/20 45/21 90/20 205/12 205/19 205/21 206/1 226/12 226/15 226/18
imputations [1] 231/7
impute [2] 15/21 194/15
imputed [8] 95/17 101/5 132/3 153/25 161/6 206/4 206/4 243/18
imputing [2] 205/18 224/23
in-person [7] 192/8 214/13 214/14 214/16 218/11 228/24 229/1
inaccurate [6] 95/9 95/19 96/1 104/4 104/5 157/18
inappropriately [1] 89/23
INC [2] 1/5 3/3
incentives [2] 218/9 218/12
incentivize [1] 225/24
incentivize survey [1] 225/24
incentivized [1] 46/16
inclination [1] 98/15
include [3] 95/7 268/5 268/8
included [5] 65/3 106/25 107/3 268/12 268/15
includes [3] 5/14 185/6 205/11
including [6] 11/8 11/21 23/18 161/24 180/11 196/3
income [3] 177/5 177/6 237/8
incomplete [1] 142/24
inconsistency [1] 192/4
inconsistent [1] 49/13
incorporates [1] 66/13
increase [7] 32/8 75/25 190/12 190/17 251/11 257/6 268/21
increased [7] 18/12 20/13 28/13 32/17 75/24 118/8 118/16
increases [1] 17/21
increasing [4] 17/25 18/2 118/4 168/8
incredible [2] 29/24 31/14
incurred [1] 32/18
indicate [3] 25/24 202/21 227/5
indicated [3] 4/3 4/5 224/25
indicates [2] 200/4 203/8
indicating [2] 86/8 227/24
indication [4] 75/20 76/8 88/11 199/6
indicator [2] 181/20 262/20
indicators [1] 74/4
indignation [1] 243/13
individual [2] 5/10 7/7
individuals [6] 136/21 153/11 153/12 177/5 177/6 254/8
industry [3] 234/23 235/6 235/13
infant [1] 239/9
infection [11] 11/9 31/2 66/12 66/23 102/21 133/17 160/4 181/14 191/10 216/8 223/22
infections [11] 25/8 25/15 89/12 102/24 108/12 148/14 174/14 174/17 268/14 268/16 268/17
infectious [1] 174/4
infer [1] 192/21
infirmities [1] 6/10
inflate [4] 41/11 41/13 218/7 218/18
influence [4] 9/12 202/15 220/22 221/24
influenced [1] 31/6
inform [1] 47/20
information [60] 4/16 4/25 6/18 6/20 8/13 8/17 9/25 12/25 18/23 19/4 26/5 26/7 33/23 37/2 45/22 47/22 57/7 66/23 66/24 72/4 76/23 82/15 83/6 89/12 89/16 103/8 145/18 145/24 149/25 162/4 171/17 173/4 177/12 177/16 180/6 180/13 181/5 184/14 190/19 190/20 199/24 201/7 202/14 202/24 210/13 210/13 210/22 211/12 217/16 217/17 218/5 218/5 218/10 219/9 222/21 247/12 252/13 254/11 264/24 265/18
informed [1] 77/11
infrastructure [3] 138/7 138/16 139/7
infringement [1] 86/7
inherent [1] 224/8
initial [2] 6/11 142/25
initially [1] 4/5
initials [5] 4/18 4/19 6/7 6/17 7/3
injunction [3] 34/14 93/22 93/25
injuries [1] 238/9
injury [2] 9/24 249/17
inpatient [4] 29/21 30/18 74/2 227/23
input [2] 227/11 228/4
inputs [2] 211/17 228/10
inputted [1] 148/9
ins [10] 33/3 75/13 76/14 115/8 115/15 119/9 119/9 247/16 247/25 251/1
inside [1] 213/23
insider [1] 19/21
insiders [1] 16/15
inspired [1] 21/22
instead [6] 9/10 12/24 13/11 86/11 185/24 199/19
instigated [1] 19/9
instituted [1] 189/5
institution [4] 46/22 73/14 140/17 140/24
institutions [1] 46/2
instructed [3] 100/13 100/15 100/22
insulate [1] 50/22
insurance [2] 29/14 80/11
insured [2] 202/8 202/23

**I**

**insurer [1]** 29/9
**insurers [7]** 19/14 23/19 29/12 31/5 203/2 203/4 222/22
**intact [1]** 48/7
**integrated [1]** 60/14
**intellectual [2]** 18/9 48/3
**intended [1]** 27/20
**intensive [9]** 53/17 68/10 135/25 138/10 184/21 227/14 237/7 239/21 242/13
**intensivists [1]** 242/13
**intentional [2]** 5/19 5/19
**intentionally [1]** 21/13
**interact [2]** 136/13 137/1
**interaction [1]** 178/6
**interest [1]** 52/7
**interested [1]** 25/11
**Interestingly [1]** 40/1
**interim [2]** 53/5 58/25
**internal [2]** 109/25 170/16
**Internally [1]** 104/19
**interrogatories [13]** 6/17 6/21 84/20 84/22 129/23 130/20 170/12 171/1 172/6 253/8 253/20 255/6 255/7
**interrogatory [13]** 129/20 129/21 131/1 131/7 149/22 170/15 172/13 253/12 253/16 253/18 255/10 255/12 265/2
**interrupt [1]** 117/2
**interruptions [1]** 271/22
**interstate [1]** 238/3
**interventional [1]** 79/20
**interventions [1]** 79/13
**interview [1]** 56/22
**into its [1]** 47/1
**introduce [8]** 3/16 4/1 8/3 28/17 76/1 135/9 175/12 234/13
**introduced [8]** 4/15 4/20 72/10 87/3 98/17 105/11 245/20 246/12
**introducing [1]** 76/4
**introduction [1]** 84/25
**invaluable [1]** 235/19
**invented [1]** 12/10
**inventory [1]** 131/3
**invest [2]** 79/1 79/4
**investigate [3]** 25/1 61/12 239/22
**investigation [5]** 43/8 91/25 245/9 246/12 247/8
**invoices [1]** 128/19
**invoked [1]** 175/3
**invokes [1]** 175/4
**involved [7]** 11/8 13/4 58/25 178/19 178/19 206/15 207/10
**IP [2]** 18/6 48/6
**IPS [1]** 159/2
**irony [1]** 35/5
**irrelevant [1]** 150/1
**irreparable [1]** 34/14
**is [1200]**
**Isa [1]** 40/15
**isn't [16]** 18/16 19/1 26/7 26/21 35/20 108/22 109/23 110/2 120/3 122/14 129/7 188/14 189/11 195/14 218/11 245/19
**isolate [1]** 199/10
**issuance [3]** 21/5 27/14 30/21
**issue [21]** 6/25 10/4 38/6 44/11 49/10 71/22 72/2 76/10 85/18 117/16 121/22 123/5 123/7 124/13 184/10 184/10 199/17 200/17 214/10 215/20 225/4
**issued [3]** 5/15 7/1 21/7
**issues [8]** 5/14 6/3 6/15 39/24 70/21 93/13 168/18 173/5
**it [818]**
**it performs [1]** 30/1
**it's [5]** 50/7 81/5 142/1 172/21 211/8
**iterations [1]** 85/13
**its [40]** 9/11 10/11 12/8 12/15 17/10 18/19 19/10 19/11 19/12 20/5 21/20 23/3 26/8 26/12 28/24 29/23 31/25 34/12 37/3 45/18 47/1 48/3 48/8 49/19 50/4 104/4 111/5 116/2 116/3 116/6 155/21 156/15 158/22 163/25 183/13 193/23 195/23 220/19 236/12 253/1
**itself [5]** 9/17 22/8 167/14 202/7 203/20

**J**

**Jackson [1]** 40/16
**January [14]** 1/9 43/12 53/3 76/6 77/1 77/25 78/9 80/18 81/3 122/7 146/21 209/23 239/18 272/4
**January 13 [1]** 209/23
**January 6th [3]** 76/6 77/25 80/18
**January 9th [1]** 146/21
**Jarod [2]** 30/16 40/10
**JCHO [2]** 228/19 228/25
**Jeannie [1]** 271/22
**Jeff [1]** 3/7
**JEFFREY [1]** 1/20
**Jersey [1]** 177/25
**job [1]** 87/20
**Johns [3]** 15/13 187/5 194/5
**Johnson [5]** 99/5 100/3 100/3 100/12 100/19
**join [2]** 33/5 235/9
**joined [1]** 235/11
**joining [3]** 141/21 142/15 176/8
**joint [28]** 56/4 56/6 56/6 56/23 57/12 57/15 89/10 95/15 121/7 128/12 128/20 137/25 138/1 138/23 138/25 139/2 139/18 161/9 161/12 161/16 161/25 174/7 174/12 174/14 174/17 215/14 239/14 239/16
**Jonah [2]** 26/10 36/25
**Jones [1]** 226/21
**journal [4]** 177/3 177/4 194/4 201/10
**JUDGE [6]** 1/12 149/25 150/4 211/1 225/21 226/3
**judges [1]** 5/5
**judgment [7]** 7/2 14/22 15/11 23/10 23/16 147/12 151/1
**July [10]** 53/7 60/16 60/17 80/24 82/5 82/23 92/4 135/13 156/22 162/18
**July 14 [1]** 60/17
**July 15th [1]** 82/5
**July 2021 [1]** 92/4
**July 2024 [1]** 53/7
**July 2025 [1]** 80/24
**jumped [1]** 270/17
**Jupiter [25]** 32/9 32/10 32/13 32/16 32/18 33/5 223/22 248/20 248/23 248/25 249/2 249/6 262/22 262/23 262/25 263/1 263/4 263/14 263/18 263/20 263/21 264/9 264/17 264/18 268/18
**JURA [2]** 2/2 3/19
**jury [2]** 4/6 124/17
**just [91]** 3/23 4/18 5/7 5/19 8/21 8/25 9/19 10/15 13/13 16/3 17/18 18/16 19/1 20/2 20/5 20/19 24/19 26/7 29/16 29/25 31/16 36/21 40/2 41/21 48/5 55/12 58/1 59/6 63/16 64/23 66/1 70/2 76/3 76/13 80/5 81/3 82/8 91/19 94/18 96/7 96/24 98/8 104/6 104/10 110/15 113/6 113/24 119/8 124/7 127/4 129/4 133/18 134/16 140/20 142/4 146/21 148/4 149/3 149/6 151/18 156/9 156/13 156/21 171/21 173/24 182/8 189/1 197/2 199/10 202/14 203/19 203/23 210/7 222/15 224/8 225/4 230/3 234/1 234/22 247/12 250/19 251/18 254/3 261/2 261/2 262/3 265/19 265/21 266/20 270/2 271/8
**justification [1]** 186/9
**Justin [10]** 62/5 64/13 65/18 67/23 69/3 82/2 83/21 134/5 227/16 230/5
**jut [1]** 229/10
**JX [2]** 94/14 121/6

**K**

**kaleidoscope [1]** 73/25
**Kathleen [3]** 162/19 162/20 163/6
**keep [7]** 13/12 48/6 55/23 131/3 149/10 151/12 185/1
**keeping [1]** 22/14
**keeps [1]** 104/25
**kept [4]** 76/16 105/14 151/17 235/13
**KEVIN [3]** 1/16 3/9 233/24
**key [1]** 74/3
**kidney [1]** 135/24
**Kim [2]** 94/14 205/4

**K**


**KIMBERLY [2]** 2/1 3/13
**kind [5]** 57/6 70/19 72/12 143/1 199/9
**kinds [2]** 137/9 161/24
**Kings [1]** 87/15
**kit [1]** 48/10
**knee [2]** 138/1 138/24
**knew [11]** 5/18 16/16 16/16 17/25 43/20 70/7 99/18 126/25 131/1 163/9 163/11
**knife [2]** 32/3 238/6
**know [107]** 6/24 9/14 9/15 13/9 16/21 31/20 31/21 49/14 50/23 64/8 64/10 65/10 79/24 87/5 93/5 94/8 94/13 94/16 94/24 97/11 97/21 100/6 105/20 110/1 112/21 112/22 116/5 117/1 117/14 118/7 120/15 120/16 120/18 123/18 124/19 125/8 126/8 127/14 128/17 142/14 143/15 143/18 145/11 148/15 156/3 161/11 162/23 162/24 163/10 163/11 163/14 164/1 164/8 164/10 164/10 164/10 164/11 165/14 165/24 166/22 168/3 168/4 169/18 170/6 172/9 174/25 206/23 206/25 207/13 207/15 207/16 207/18 208/1 208/6 208/9 208/17 210/20 214/18 214/20 214/20 214/21 215/2 217/3 218/1 224/7 224/21 228/21 229/13 232/15 233/6 233/12 240/21 244/16 247/17 247/19 250/13 255/24 256/2 257/25 260/9 261/11 262/5 263/9 263/12 263/13 263/20 263/20
**knowing [4]** 47/4 50/14 164/19 242/25
**knowledge [9]** 65/10 73/14 76/20 94/22 106/11 117/8 119/3 126/20 265/23
**knowledge of [1]** 126/20
**known [9]** 29/23 30/14 111/9 137/9 137/14 147/15 147/15 236/19 237/7
**knows [5]** 15/8 117/12 123/5 128/23 250/13


**L**


**lab [2]** 74/3 79/13
**labor [1]** 140/7
**laborious [1]** 133/8
**labs [1]** 139/19
**lack [3]** 15/24 26/5 117/18
**lag [3]** 257/7 257/9 258/1
**lags [1]** 256/21
**laid [1]** 189/21
**language [2]** 23/11 23/17
**large [5]** 43/18 59/6 92/5 110/14 258/20
**largely [1]** 78/15
**larger [3]** 56/18 57/8 237/2
**largest [2]** 236/24 259/2
**last [33]** 5/15 11/5 18/21 34/23 35/12 46/24 48/18 58/11 61/1 62/8 69/6 74/25 77/5 82/6 83/11 83/12 131/18 139/24 149/12 177/2 186/12 186/16 187/21 197/24 199/4 215/2 225/15 239/2 239/18 251/4 262/8 262/24 269/1
**late [7]** 83/11 146/23 149/7 242/18 245/16 246/25 270/5
**later [11]** 4/1 16/23 28/3 30/21 38/18 44/12 44/13 71/6 122/5 136/4 262/10
**latter [2]** 60/14 185/19
**Lauderdale [3]** 31/18 31/21 237/11
**launched [2]** 44/2 44/23
**laundered [1]** 122/21
**Lauren [1]** 21/12
**law [3]** 7/24 14/23 250/13
**lawsuit [8]** 35/11 39/15 43/12 47/13 89/19 90/14 123/20 263/12
**lawyers [11]** 35/21 36/10 41/4 41/24 43/12 49/21 94/7 94/17 123/2 123/3 129/13
**lay [2]** 112/16 117/11
**lead [1]** 200/21
**leader [2]** 17/24 137/11
**leaders [1]** 120/4
**leadership [1]** 136/1
**leading [3]** 147/11 147/13 148/18
**leads [1]** 29/21
**Leah [2]** 3/15 16/12
**Leap [2]** 189/9 229/22
**LEAPFROG [383]**
**Leapfrog cooked [1]** 17/9
**Leapfrog provides [1]** 104/10
**Leapfrog's [54]** 9/9 12/1 15/9 15/11 15/15 16/19 17/4 17/20 17/24 18/6 18/8 18/16 19/8 19/10 19/15 19/19 19/22 21/3 21/11 21/18 21/21 23/5 23/18 26/25 27/14 34/5 34/7 47/22 71/22 81/15 109/22 110/2 120/10 121/23 130/2 155/2 164/14 180/4 181/3 186/23 187/16 187/17 191/3 192/23 193/22 194/25 195/22 196/19 199/13 200/12 206/16 212/22 241/8 269/5
**Leapfrog's director [1]** 21/11
**leapfrog.org [1]** 44/15
**Leapfrogs [1]** 15/9
**learn [6]** 12/5 12/10 61/16 70/6 177/17 242/16
**learned [5]** 70/4 97/7 114/12 142/21 244/3
**learning [2]** 9/20 204/7
**least [13]** 11/8 16/22 20/2 42/12 76/10 78/14 88/14 146/17 151/22 165/1 217/17 229/24 269/23
**leave [3]** 17/18 55/22 241/17
**leaving [1]** 31/1
**lectures [1]** 177/10
**led [1]** 31/8
**LEE [2]** 1/17 3/19
**left [14]** 13/20 14/17 30/13 30/24 33/5 64/9 67/14 118/25 168/21 183/1 194/4 194/22 223/21 266/11
**left-hand [1]** 13/20
**legitimate [1]** 16/14
**length [1]** 74/3
**lengthy [2]** 59/5 151/9
**less [10]** 15/6 15/15 22/20 22/23 45/22 46/25 55/2 64/25 200/5 258/24
**let [10]** 3/16 31/24 94/8 94/13 112/21 125/8 127/9 174/9 250/14 256/1
**let's [39]** 4/8 6/11 7/12 12/20 13/24 17/14 19/11 23/24 24/1 24/2 24/5 25/3 25/19 26/1 62/2 64/3 65/20 70/4 117/19 124/13 125/12 129/21 135/18 137/4 141/20 142/12 154/2 155/5 204/22 233/21 234/6 235/2 236/9 240/19 250/18 258/11 267/22 269/13 269/14
**letter [51]** 9/17 9/20 20/20 22/13 29/8 31/4 36/5 80/15 81/1 81/7 81/10 82/2 82/5 82/20 82/22 83/11 83/21 83/22 83/24 84/2 84/7 87/10 87/11 87/13 89/6 89/8 89/21 122/6 122/9 123/3 127/4 127/13 127/16 127/17 127/18 127/21 127/25 128/4 134/6 134/13 134/17 134/20 181/7 181/16 181/18 182/14 191/11 196/5 198/13 200/13 225/3
**letters [2]** 80/23 81/6
**level [28]** 9/5 18/11 31/23 32/1 32/15 54/9 54/10 68/18 68/20 72/22 74/24 79/2 79/24 88/12 116/15 121/10 132/1 133/13 165/23 169/20 190/16 211/22 237/5 237/9 237/19 245/10 268/20 268/22
**leverage [1]** 33/13
**license [2]** 53/8 136/13
**licensed [1]** 136/9
**licensee [1]** 48/13
**licenses [1]** 17/22
**licensing [1]** 18/11
**lie [10]** 41/14 41/16 41/25 42/4 42/6 42/8 42/10 42/15 44/18 256/18
**lies [4]** 17/20 41/6 43/11 151/16
**life [7]** 53/22 70/22 136/16 136/19 136/25 141/1 202/12
**lifesaving [1]** 139/6
**light [3]** 51/3 147/11 195/7
**lighting [1]** 35/15
**like [79]** 7/6 7/19 7/22 12/2 14/2 16/13 26/1 26/23 29/12 30/10 31/4 31/16 37/1 43/18 48/5 51/2 51/4 62/22 65/11 69/1 71/5 76/1 77/25 78/13 78/14 85/22 86/17 98/10 99/8 101/6 102/5 102/17 104/6

L

**like... [46]** 104/10 106/4 107/6 113/10 116/17 116/18 117/9 119/8 126/9 127/8 129/4 129/9 136/13 139/16 140/18 147/7 147/25 149/12 150/23 157/15 160/11 172/13 174/24 179/18 180/4 181/19 186/24 199/23 201/15 227/12 227/15 228/6 233/11 233/13 233/17 239/19 247/5 253/22 256/25 260/6 267/23 270/8 271/9 271/10 271/11 271/16
**liked [1]** 264/17
**Likelihood [1]** 268/6
**likely [9]** 23/1 49/12 138/20 152/19 190/24 192/20 192/22 202/12 221/7
**limine [1]** 71/10
**limited [25]** 9/8 11/14 12/2 12/7 13/2 16/11 37/10 37/13 38/9 38/10 85/24 92/6 109/18 111/12 111/12 111/15 159/6 184/17 184/20 188/1 188/15 195/14 210/19 216/10 216/15
**line [8]** 19/10 52/22 54/13 99/8 102/23 126/16 134/4 246/10
**lines [6]** 52/23 79/3 137/18 137/19 237/4 237/13
**link [2]** 24/2 40/8
**linking [1]** 21/15
**list [11]** 5/23 131/3 131/4 131/5 147/21 170/23 254/8 269/13 269/18 270/5 270/18
**listed [2]** 247/24 270/2
**listen [1]** 257/18
**listening [1]** 253/13
**literacy [2]** 47/16 47/19
**literally [2]** 188/18 195/14
**literature [22]** 180/14 190/23 191/23 192/19 193/10 193/14 197/11 199/2 200/23 203/7 203/19 203/23 204/14 204/19 205/7 205/16 222/6 222/9 222/10 222/15 226/17 232/8
**litigation [23]** 21/11 35/25 42/14 48/16 78/2 85/22 90/10 93/16 99/11 116/21 147/1 164/25 165/1 167/19 178/15 180/15 180/17 180/21 196/20 198/24 206/5 210/16 226/20
**little [22]** 6/14 17/13 17/15 54/22 55/2 83/17 87/14 89/3 102/15 102/15 121/6 139/13 160/18 186/18 204/3 208/8 234/6 238/13 248/9 256/21 257/19 270/16
**live [5]** 9/1 35/1 80/2 239/23 240/1
**lived [1]** 87/15
**lives [2]** 43/24 136/24
**living [1]** 251/11
**LLP [3]** 1/18 1/21 2/3
**lobby [1]** 254/13
**local [1]** 47/11
**locator [8]** 114/11 114/12 114/15 132/20 132/23 166/16 166/17 166/20
**lodged [1]** 85/17
**logo [4]** 48/4 48/5 48/9 129/1
**logs [1]** 211/20
**LOL [1]** 12/21
**long [17]** 6/7 11/1 31/8 31/20 48/9 94/9 124/25 133/5 156/24 176/7 212/15 235/6 236/11 236/14 240/5 242/24 262/4
**long-time [1]** 31/8
**longer [5]** 77/11 101/18 152/18 158/23 236/18
**look [80]** 14/10 19/11 22/7 22/11 22/20 23/24 40/3 54/6 56/10 56/10 62/2 64/3 65/20 69/17 73/20 73/22 82/2 83/14 88/16 92/12 94/2 97/1 98/20 100/1 100/5 100/12 101/3 101/6 101/8 105/23 106/24 107/7 107/12 107/18 108/1 108/4 108/17 111/21 113/9 114/16 116/4 116/5 116/9 116/17 117/22 123/25 138/16 146/17 148/15 154/2 154/2 154/13 155/5 155/18 160/4 161/24 170/5 170/15 184/13 185/8 187/22 188/20 188/21 193/25 195/4 199/25 200/8 201/22 213/5 220/3 223/25 224/1 239/5 242/10 246/7 247/2 254/25 260/2 260/10 271/13
**looked [13]** 114/10 127/8 166/17 166/24 220/14 223/23 225/2 245/22 246/3 246/4 262/23 264/2 270/24
**looking [28]** 13/8 25/14 51/9 59/3 77/11 82/8 86/4 96/22 109/3 124/7 151/12 160/3 161/4 164/25 169/3 169/8 169/16 178/3 193/7 201/10 201/14 223/2 224/24 225/4 225/5 225/7 230/6 246/21
**looks [7]** 77/23 78/14 99/8 102/17 107/6 126/9 260/6
**looping [1]** 112/2
**loses [1]** 201/12
**losing [2]** 53/22 68/25
**lost [4]** 166/25 167/2 167/4 269/6
**lot [26]** 38/16 41/21 48/1 54/7 61/14 80/13 80/14 113/11 137/18 140/22 143/9 144/22 146/5 149/8 149/13 167/5 215/3 238/4 238/6 238/8 238/18 244/2 244/3 247/13 263/1 270/16
**lots [2]** 85/4 244/25
**love [4]** 77/16 235/14 239/4 239/4
**low [11]** 47/16 47/19 108/12 115/7 204/1 237/8 238/19 256/25 257/3 259/10 267/9
**lower [10]** 25/22 103/15 166/5 177/5 200/5 208/5 203/5 229/12 229/14 238/17
**lowest [14]** 13/6 13/13 13/19 38/10 61/19 111/16 183/25 184/3 184/23 185/22 195/15 216/11 216/13 231/16
**lunch [4]** 87/3 124/20 124/24 271/15

M

**M-C-C-A-U-L-E-Y [1]** 234/10
**machine [1]** 21/18
**made [37]** 10/6 11/13 12/13 13/1 14/15 16/15 17/18 19/23 33/16 33/17 46/24 47/4 89/21 93/3 93/7 93/9 97/2 112/11 112/11 113/18 113/21 128/21 129/7 143/5 147/14 147/15 150/4 151/16 151/16 151/16 158/15 158/20 158/22 164/19 217/12 218/1 247/13
**made-up [4]** 10/6 13/1 14/15 17/18
**Madison [1]** 175/25
**Maggie [5]** 101/23 102/1 102/4 121/13 121/17
**magnified [2]** 80/2 80/5
**magnitude [3]** 189/1 189/7 198/18
**mail [4]** 127/7 127/11 127/18 267/11
**mailing [1]** 127/8
**main [3]** 19/15 139/2 237/4
**maintain [1]** 164/5
**maintaining [1]** 239/25
**maintains [1]** 147/24
**maintenance [1]** 141/17
**major [3]** 29/9 139/25 268/17
**majority [9]** 45/1 45/4 139/11 140/4 144/3 192/12 197/21 199/3 217/19
**make [45]** 5/18 5/24 14/13 16/13 17/3 23/20 34/9 36/8 46/22 47/12 59/3 59/13 60/5 63/7 64/10 65/6 66/3 66/7 67/8 82/3 91/19 94/5 94/17 97/15 97/16 97/16 104/20 114/1 124/14 126/19 133/9 139/23 140/25 205/6 208/4 209/9 217/3 224/12 224/15 225/18 235/14 242/4 257/21 260/3 260/4
**makers [1]** 44/11
**makes [4]** 18/6 202/1 217/1 239/2
**making [9]** 117/17 133/20 137/2 141/17 194/22 197/10 201/20 217/25 271/17
**MALONEY [10]** 1/15 3/5 8/7 34/25 36/21 37/7 39/11 41/18 45/7 49/14
**Maloney's [1]** 38/8
**Managed [1]** 177/3
**management [3]** 98/21 99/15 177/19
**manager [3]** 52/19 52/20 271/5
**managers [1]** 176/16

M
**mandate [1]** 139/1
**mandatory [1]** 139/1
**manipulate [2]** 119/17 256/13
**manner [5]** 18/19 18/24 82/10 152/15 230/11
**manufactured [1]** 10/5
**many [34]** 30/2 53/15 53/16 54/22 54/25 55/3 59/10 65/16 72/3 72/4 74/13 76/11 123/11 132/25 136/25 140/12 141/4 142/4 145/18 152/14 165/12 165/24 178/19 187/9 192/7 206/23 207/13 208/4 208/6 214/13 214/25 238/22 257/2 266/2
**map [2]** 135/14 234/22
**MARC [2]** 261/15 261/16
**March [5]** 105/6 107/15 107/18 108/1 208/15
**March 2024 [1]** 108/1
**March 31 [1]** 107/15
**MARCUS [4]** 1/20 1/21 3/7 84/24
**mark [3]** 63/17 64/8 64/11
**marked [6]** 78/20 81/25 98/9 105/2 125/25 257/6
**market [24]** 39/22 40/2 40/18 91/21 100/14 104/21 107/2 112/7 115/22 119/13 125/20 126/2 126/14 126/21 126/25 167/11 167/12 167/13 167/21 176/6 200/18 245/10 245/11 258/11
**marketing [4]** 33/14 116/8 244/21 244/23
**marks [1]** 67/20
**Marriott [1]** 43/19
**marrow [1]** 52/13
**MARY [3]** 1/15 3/5 8/6
**Mary's [76]** 3/10 31/8 31/9 32/10 32/14 32/20 55/11 234/14 234/18 234/24 235/16 235/17 235/21 236/3 236/10 236/11 236/13 237/4 237/13 238/5 238/14 238/22 239/2 239/13 240/7 240/15 240/20 240/21 241/15 241/19 241/22 242/6 242/11 242/17 242/21 243/12 244/12 244/14 244/17 246/6 247/2 248/18 249/2 249/16 249/17 249/21 250/3 251/1 251/20 253/9 257/2 258/7 258/15 261/3 261/7 262/6 262/18 262/21 262/21 262/23 262/23 262/25 263/22 263/22 263/24 264/6 264/10 264/10 264/14 264/16 264/20 264/23 265/12 266/1 269/2 271/7
**Mascal [1]** 174/2
**Master's [1]** 136/3
**match [1]** 59/2
**material [2]** 180/23 228/7
**materially [1]** 20/19
**maternity [1]** 237/9
**math [7]** 38/21 41/21 77/9 78/10 78/16 246/2 261/9
**mathematically [1]** 259/10
**matrix [1]** 57/10
**Matt [6]** 221/1 221/4 225/15 225/16 225/21 232/25
**matter [23]** 9/8 34/22 66/14 71/20 72/10 79/12 81/14 81/17 98/8 179/14 180/2 189/14 200/24 200/24 200/25 207/2 207/17 212/23 212/23 215/19 228/8 231/8 272/2
**matters [5]** 27/25 36/15 36/15 103/20 198/25
**Matthew [2]** 15/12 194/5
**Matthewman [2]** 149/25 150/4
**maximize [1]** 18/10
**maximum [3]** 184/5 185/16 218/16
**MAXWELL [2]** 2/2 3/20
**may [27]** 5/7 5/8 6/14 9/15 12/10 34/19 45/17 53/6 55/20 57/6 57/7 59/24 75/11 80/19 82/16 86/22 123/21 163/12 188/13 204/11 224/7 250/5 256/21 258/19 267/12 267/12 271/21
**maybe [13]** 13/9 24/15 194/21 195/7 208/8 213/16 227/6 227/7 229/5 234/7 238/25 250/14 264/17
**MBA [1]** 235/5
**McCauley [12]** 31/7 32/5 233/25 234/8 234/9 234/13 234/14 248/9 250/24 251/18 266/23 271/8
**McDonald [3]** 162/19 162/20 163/6
**me [88]** 3/6 3/11 3/15 3/25 4/22 7/19 22/4 31/24 70/14 72/18 72/18 72/20 86/17 87/12 87/20 87/25 88/24 89/5 93/3 94/8 94/10 94/13 94/22 97/18 98/10 99/11 99/25 108/21 112/21 115/22 116/1 120/13 122/1 125/6 125/8 127/9 131/7 132/23 145/10 145/15 145/24 151/20 151/22 153/12 161/4 162/25 163/5 163/23 167/15 169/6 169/16 172/3 172/6 172/7 172/10 172/24 174/9 178/2 205/21 208/13 209/15 209/19 209/21 210/1 210/1 211/4 212/8 214/1 214/7 215/20 221/20 224/3 233/22 241/17 245/16 247/14 250/14 256/2 262/8 262/17 263/24 264/9 264/23 265/5 265/7 269/16 270/20 271/15
**me emphasize [1]** 31/24
**mean [29]** 26/24 46/10 76/21 87/10 90/24 92/14 97/20 102/20 122/19 122/19 140/16 144/17 189/19 197/6 197/9 197/13 197/16 197/20 197/22 198/10 199/1 199/6 199/17 217/11 228/11 229/12 229/14 237/15 260/13
**meaning [3]** 64/21 67/8 230/19
**meaningful [2]** 156/11 190/18
**means [19]** 9/14 9/15 9/21 13/10 16/18 17/6 25/2 26/25 31/10 31/24 56/2 138/20 180/3 183/5 188/17 236/22 238/16 263/23 266/16
**meant [1]** 18/1
**meantime [1]** 145/14
**measurable [1]** 27/16
**measure [34]** 26/4 44/15 45/7 45/8 45/9 45/20 46/9 61/21 62/6 63/20 63/21 64/1 64/3 64/4 64/6 64/13 64/15 64/15 65/11 65/18 65/19 67/13 67/17 67/18 67/24 155/18 181/12 181/13 181/18 181/19 183/21 189/23 189/24 195/12
**measured [2]** 8/8 177/11
**measurement [12]** 176/19 177/1 177/8 178/25 179/23 189/18 189/19 190/5 190/6 190/25 193/6 213/19
**measurements [2]** 190/11 214/7
**measures [102]** 13/5 13/6 13/15 13/22 13/25 14/17 14/18 14/21 14/23 16/5 17/2 17/5 17/12 25/18 27/4 29/11 37/11 37/14 38/9 41/8 44/4 44/8 45/1 45/9 61/5 61/17 61/22 67/19 67/20 82/11 82/17 83/5 95/17 101/8 104/9 107/7 107/21 108/25 111/13 114/19 132/3 132/4 132/9 146/4 153/20 156/1 159/11 162/5 165/17 166/2 178/7 178/11 181/11 181/15 181/17 182/3 182/6 182/8 182/10 182/15 182/22 183/1 183/5 183/14 183/21 184/1 184/6 184/10 185/11 186/15 188/2 188/16 188/22 189/24 189/24 192/14 193/1 193/16 194/16 196/8 196/13 197/7 197/25 199/19 199/25 200/11 210/10 211/3 212/2 213/24 215/16 215/17 216/4 216/5 216/16 217/10 217/13 217/18 217/21 220/16 226/22 227/6
**measuring [1]** 190/15
**MEC [1]** 243/5
**mechanism [1]** 223/19
**med [2]** 84/13 86/23
**Medi [1]** 256/8
**media [8]** 21/14 21/18 27/15 41/3 41/18 71/5 71/7 263/6
**median [2]** 140/4 217/10
**mediation [3]** 114/13 114/16 132/22
**Medicaid [12]** 33/1 37/23 103/1 133/16 174/12 181/6 182/7 191/19 228/20 236/25 237/1 238/18
**medical [87]** 1/4 3/2 3/7 3/8 3/9 3/10 3/11 4/16 4/24 11/6 20/5 22/15 24/8 27/9 28/20

**M**

**medical... [72]** 29/2 29/20 30/17 30/25 31/2 32/9 32/22 33/5 46/3 52/16 53/1 53/2 53/3 53/5 53/14 53/15 54/4 54/21 54/25 55/3 55/8 55/9 55/10 55/11 55/11 55/13 55/25 57/15 58/8 58/15 60/11 60/23 62/22 63/6 63/15 63/25 64/4 65/1 68/11 73/13 76/14 80/3 81/2 85/11 88/2 88/8 88/24 89/18 99/1 101/22 122/25 129/24 131/18 135/11 137/6 177/5 177/10 212/13 221/24 234/14 234/18 235/16 235/25 243/2 243/8 248/15 248/20 248/23 249/7 251/1 264/15 269/9
**medically [2]** 54/8 249/6
**Medicare [16]** 33/1 37/23 80/13 80/14 80/14 133/16 174/11 181/6 182/7 191/19 228/20 236/24 238/19 238/19 256/22 267/2
**medication [15]** 60/1 63/13 64/14 64/16 64/25 65/3 65/4 155/6 181/22 184/20 185/17 227/12 241/12 241/15 241/25
**medications [9]** 184/11 227/23 227/24 228/1 228/2 241/18 241/19 241/22 242/3
**medicine [3]** 68/6 68/7 68/11
**medium [1]** 139/4
**meet [4]** 32/19 75/17 146/9 243/19
**meeting [15]** 45/19 49/7 63/10 66/24 66/25 116/16 125/4 139/24 208/16 208/19 208/23 209/1 219/25 243/7 261/13
**meetings [12]** 46/5 63/10 105/12 116/10 116/11 116/14 116/14 117/14 154/12 178/10 219/22 261/13
**meets [2]** 82/11 178/9
**member [9]** 19/21 66/14 107/17 178/5 187/3 202/17 202/20 215/2 236/7
**members [32]** 27/6 30/6 30/7 30/9 45/25 53/12 56/22 59/19 65/2 65/7 72/23 86/8 110/25 121/21 136/14 136/25 141/10 141/10 143/3 144/9 153/1 169/21 169/22 172/16 194/6 206/21 220/3 220/8 220/15 243/8 253/3 255/14
**members' [1]** 172/25
**Memorial [1]** 40/16
**memory [1]** 120/21
**men [1]** 22/3
**mental [1]** 86/4
**mention [1]** 201/21
**mentioned [24]** 20/18 58/5 68/18 71/7 71/23 137/18 138/23 139/1 140/19 144/19 153/11 156/10 170/9 181/10 185/4 189/14 237/5 237/24
238/15 254/15 248/9 248/14 253/2 265/3
**merciless [1]** 14/3
**message [2]** 49/8 234/5
**messenger [1]** 35/14
**messing [1]** 194/24
**met [3]** 24/8 129/13 208/22
**metadata [2]** 149/6 256/17
**method [13]** 66/22 177/4 190/13 192/3 194/1 195/1 195/10 197/3 205/24 221/21 221/22 232/20 233/7
**method and [1]** 195/1
**methodologies [1]** 50/5
**methodology [60]** 12/9 19/24 26/25 45/6 45/16 45/17 45/18 46/6 47/2 49/7 50/15 61/7 61/23 83/7 90/13 91/3 91/4 91/8 91/11 91/14 93/13 95/6 95/11 95/16 95/18 95/25 96/9 96/11 96/17 115/18 115/24 120/10 157/18 158/3 162/21 163/1 163/13 164/20 165/11 166/5 195/23 195/25 199/2 205/22 216/23 216/24 217/1 219/16 224/20 225/5 225/8 225/10 225/17 225/22 232/8 232/12 232/18 244/9 253/1 259/1
**methods [3]** 192/2 192/5 226/18
**metric [2]** 155/14 185/18
**metrics [11]** 63/9 153/25 159/3 159/5 161/6 181/7 184/4 205/11 206/4 206/4 243/20
**Meyers [1]** 1/21
**Miami [3]** 1/23 28/21 52/10
**Michigan [1]** 189/21
**micro [1]** 237/19
**microphone [1]** 234/20
**MIDDLEBROOKS [3]** 1/3 1/11 2/8
**might [10]** 66/21 203/4 203/5 204/12 208/3 213/24 218/20 261/20 265/20 268/15
**mile [1]** 224/1
**miles [4]** 9/6 224/3 224/9 224/13
**Military [2]** 127/16 127/23
**million [6]** 21/25 36/10 46/25 49/21 133/1 133/2
**millions [2]** 21/19 34/12
**mind [9]** 13/12 29/3 49/5 81/8 85/4 85/6 85/9 86/2 174/5
**mine [1]** 114/8
**minimal [8]** 43/1 102/9 113/17 113/19 113/23 113/24 114/2 114/6
**minute [1]** 49/6
**minutes [15]** 9/8 17/14 40/11 49/10 51/16 51/17 79/12 124/25 204/23 204/23 220/18 233/19 233/22 265/22 271/2
**minutes matter [1]** 79/12
**mischaracterization [1]** 85/16
**mischaracterizes [1]** 187/12
**misconduct [1]** 9/9
**misheard [1]** 229/5
**mislead [1]** 8/15
**misleading [13]** 15/21 90/1 95/9 95/19 96/1 130/11 130/13 157/19 157/23 171/10 221/25 234/17 243/15
**misled [3]** 29/13 36/18 47/24
**misrepresent [1]** 219/8
**missed [2]** 9/16 67/3
**missing [20]** 16/17 17/2 25/12 36/16 190/22 190/23 192/3 192/19 192/24 194/10 194/13 194/16 195/1 195/11 195/19 196/7 196/11 205/22 211/5 216/25
**mission [8]** 35/9 43/23 47/1 48/25 49/19 49/25 50/18 236/14
**Missy [3]** 12/17 12/20 49/8
**mistake [1]** 36/8
**mix [2]** 238/20 269/8
**model [9]** 17/21 18/14 45/9 45/20 45/21 90/20 91/1 101/5 105/22
**modeling [1]** 205/12
**models [2]** 174/13 211/16
**modifications [1]** 106/14
**modify [1]** 124/17
**mom [1]** 52/5
**moment [6]** 8/16 8/21 27/24 67/3 105/10 139/19
**moments [2]** 136/21 140/22
**moms [1]** 239/9
**Monday [1]** 269/12
**monetary [1]** 215/7
**monetize [1]** 18/8
**money [7]** 34/8 34/9 42/17 46/22 119/23 120/2 207/16
**monitor [1]** 113/12
**monitored [3]** 154/7 154/21 155/8
**monitoring [1]** 162/1
**Montgomery [1]** 32/21
**month [10]** 66/16 78/6 139/22 139/22 146/17 178/13 178/13 243/4 243/6 256/6
**monthly [5]** 63/10 66/23 66/25 74/13 178/9
**months [9]** 33/22 53/4 77/5 77/18 84/13 130/9 130/24 134/6 149/12
**morale [1]** 144/5
**morbidities [1]** 54/21
**more [65]** 4/22 5/2 8/10 9/20 10/6 14/14 14/16 17/2 17/14 21/8 21/25 24/19 28/12 32/23 41/21 43/20 51/7 57/7 57/8 58/25 60/13 71/24 83/22 88/16 92/24 94/12 134/3 136/7 138/13 138/20 140/5 141/2 141/3 143/25 146/6 152/19 156/11 164/23 165/14 168/13 168/15 182/4 190/24 192/15 192/19 196/7 196/11 196/12 201/4 201/18 202/1 208/7 221/7 224/8 229/24

M

**more... [10]** 230/19 231/6 234/25 236/19 240/12 247/13 249/21 257/4 268/2 269/10
**more meaningful [1]** 156/11
**Moreover [1]** 189/3
**morning [10]** 3/1 3/12 3/13 3/17 3/22 8/6 71/4 175/12 204/4 262/7
**Morristown [1]** 177/25
**mortality [5]** 69/8 69/11 107/8 216/7 239/9
**Moskowitz [1]** 2/3
**most [17]** 10/21 18/13 27/4 27/25 30/2 32/1 33/23 45/25 49/12 74/18 136/21 137/22 140/19 140/22 190/4 230/16 239/2
**mostly [1]** 164/7
**motion [18]** 4/14 5/7 6/14 6/25 7/2 7/9 14/22 23/9 23/10 23/16 23/16 71/10 85/17 85/23 93/21 93/25 150/3 188/8
**motions [6]** 4/9 4/9 4/11 4/13 77/14 179/4
**motor [2]** 238/3 238/5
**mouth [1]** 151/17
**move [11]** 9/19 10/2 55/9 61/5 67/23 100/7 117/19 124/20 170/3 179/2 194/8
**moved [4]** 52/24 159/23 235/9 259/21
**moves [1]** 183/24
**moving [3]** 52/19 88/8 113/3
**Mr [13]** 41/22 84/24 146/22 148/1 149/3 152/1 156/21 173/15 212/8 216/10 223/21 239/19 241/9
**Ms [48]** 11/3 12/14 12/14 12/18 12/18 12/21 16/4 21/19 32/5 34/25 36/21 37/7 38/8 39/11 41/18 45/7 49/9 49/14 52/3 69/5 73/7 76/15 89/18 90/8 111/19 116/20 123/1 124/8 131/15 144/19 149/22 151/6 153/18 154/5 159/20 168/5 234/13 241/9 248/9 250/24 251/18 256/17 256/23 256/25 266/23 271/8 271/11 271/14
**Ms. [2]** 85/23 125/18
**Ms. Blair [1]** 85/23
**Ms. Haverick [1]** 125/18
**much [17]** 4/3 7/14 9/20 40/22 42/17 43/4 46/11 54/6 78/12 80/10 128/17 190/19 207/16 207/24 224/5 230/4 247/17
**multi [2]** 122/22 122/24
**multi-page [2]** 122/22 122/24
**multiple [7]** 31/9 54/21 59/7 137/21 140/9 172/4 242/8
**multitude [1]** 54/20
**municipalities [1]** 74/17
**must [4]** 34/11 66/16 115/7 234/4
**my [169]** 3/15 3/24 6/19 8/12 31/19 34/21 46/18 51/24 52/5 52/7 53/11 58/19 58/20 59/1 60/13 61/14 70/13 70/14 75/12 78/5 78/18 84/13 86/5 86/23 87/8 92/2 93/2 93/7 98/15 99/20 99/20 101/4 101/7 110/24 119/3 120/4 120/5 120/18 127/14 128/18 135/10 135/23 136/1 136/3 136/8 136/13 136/15 136/19 142/6 142/25 142/25 143/12 144/14 146/10 150/25 151/17 157/10 158/4 167/12 167/15 167/18 169/16 169/22 169/22 180/8 180/9 180/25 181/1 185/4 186/10 187/22 191/5 192/12 193/24 196/10 196/16 196/21 198/2 199/17 199/25 202/17 205/4 205/11 206/21 206/22 207/3 207/4 207/6 207/9 207/21 207/23 208/14 209/5 209/6 209/7 209/8 209/17 210/11 210/11 210/20 210/20 211/8 211/8 211/23 214/17 215/8 215/15 216/17 218/2 222/6 224/9 224/25 227/3 228/4 228/11 228/22 228/25 230/15 230/18 232/9 232/12 233/24 234/18 235/12 241/2 242/22 243/1 243/24 244/23 244/23 245/12 245/13 245/13 246/5 246/9 247/5 247/6 248/3 248/13 248/13 250/9 250/11 250/12 252/11 254/12 254/12 254/13 256/2 256/3 256/4 256/5 256/8 256/16 256/17 256/23 256/25 259/10 261/13 261/14 261/14 261/24 262/3 262/5 262/14 263/3 265/23 270/16 270/17 271/1
**myself [2]** 87/3 169/6

N

**NA [2]** 14/21 14/23
**nailed [1]** 142/24
**name [15]** 21/24 35/12 35/15 36/11 36/11 51/24 70/2 135/10 170/23 171/7 172/8 205/4 255/8 255/24 261/11
**named [2]** 137/23 256/4
**names [38]** 4/17 4/17 5/10 5/11 5/17 5/18 5/20 6/2 6/17 7/2 84/21 85/20 130/16 131/3 131/4 131/5 131/6 131/8 147/21 172/7 172/9 172/10 172/12 172/24 172/25 172/25 172/25 173/1 173/16 173/20 173/22 173/23 254/1 254/8 255/25 265/5 265/7 265/9
**narrow [1]** 225/1
**narrow focus [1]** 225/1
**narrower [2]** 213/12 213/18
**narrowing [1]** 151/9
**natal [1]** 237/7
**nation [1]** 137/23
**national [16]** 38/20 69/22 70/1 103/15 138/17 160/5 160/18 176/4 178/3 187/3 191/15 193/25 194/6 194/12 217/10 230/19
**nationally [4]** 187/9 198/6 198/6 198/9
**nationwide [1]** 166/23
**nature [3]** 40/12 150/11 228/21
**navigator [1]** 89/14
**NCNO [1]** 243/1
**near [1]** 80/2
**nearest [1]** 79/9
**nearly [1]** 69/8
**necessarily [2]** 123/17 164/21
**necessary [5]** 4/23 32/1 151/21 208/13 221/20
**necessity [1]** 43/17
**neck [1]** 52/6
**need [19]** 4/6 4/17 4/18 57/7 72/11 79/11 79/12 79/21 81/16 84/4 97/16 116/3 137/3 228/19 233/13 234/4 248/15 270/14 270/14
**needed [13]** 10/17 27/22 53/18 53/20 70/24 101/3 101/5 101/8 119/13 145/15 145/19 152/15 264/15
**needs [2]** 32/19 125/2
**negative [2]** 169/9 224/10
**neither [2]** 109/1 146/11
**neonatal [2]** 9/5 32/12
**nerd [1]** 97/20
**nervous [1]** 87/17
**net [8]** 117/23 236/19 236/21 236/22 262/11 262/12 262/14 262/15
**network [43]** 35/7 35/7 42/23 42/24 55/6 55/7 55/14 55/15 55/18 55/21 97/2 101/15 101/20 102/1 104/20 105/7 113/4 114/4 114/5 115/23 116/2 116/6 116/15 116/21 118/8 121/10 121/17 124/3 124/12 125/21 126/1 126/21 134/14 163/11 164/12 168/3 191/15 202/25 246/1 246/5 246/18 258/14 271/6
**Network's [1]** 121/14
**neuro [4]** 68/12 242/14 242/14 242/15
**neurology [2]** 137/15 140/10
**neuroscience [2]** 54/13 57/21
**never [41]** 6/16 7/3 7/3 7/4 9/18 32/15 35/18 51/1 78/17 84/17 85/17 85/22 93/24 131/7 142/1 146/10 146/21 147/1 147/2 149/11 163/15 166/24 173/7 173/9 188/9 205/8 205/17 206/12 206/14 206/15 208/10 211/19 211/20 219/20 245/7 245/22 246/8 246/12 261/18 261/23 268/25
**new [25]** 19/8 30/5 49/7 61/23 66/13 97/5 120/10 146/20 147/16 149/8 153/11 164/20 177/15 177/25 187/10

N

**new... [10]** 188/9 189/4 197/1 201/10 220/1 235/4 240/2 247/8 247/11 254/23
**news [7]** 41/3 42/2 48/6 71/3 201/14 201/17 243/9
**next [14]** 25/6 36/7 51/20 67/19 82/14 83/4 87/16 118/1 125/5 126/13 174/22 219/19 256/21 271/18
**NHSN [1]** 215/20
**nice [3]** 87/2 205/4 239/10
**Nicholson [24]** 15/2 15/3 20/18 38/16 38/17 38/23 39/6 41/11 174/23 175/8 175/12 175/14 179/3 179/13 181/2 188/6 188/13 198/21 205/4 221/11 226/11 227/20 231/3 233/15
**Nicholson's [2]** 188/4 257/18
**Nicklaus [1]** 52/11
**NICU [7]** 30/20 31/14 237/9 237/10 237/19 239/10 239/11
**night [2]** 68/15 262/8
**nine [3]** 57/1 220/8 271/15
**no [165]** 1/3 5/8 6/1 6/23 13/13 15/6 15/7 15/14 15/22 16/2 16/2 19/18 19/19 24/19 25/22 26/15 30/12 30/15 33/24 36/8 39/19 39/23 40/8 41/9 42/1 42/3 42/9 42/11 42/14 43/1 43/7 43/11 43/13 47/9 47/9 64/2 65/15 66/14 71/10 72/4 75/20 77/6 77/11 77/14 77/16 83/20 84/3 88/11 89/5 90/2 92/25 93/2 94/22 95/3 97/18 98/1 99/12 99/16 101/18 102/9 105/4 110/5 110/7 113/2 114/7 114/12 114/16 115/3 118/13 118/20 118/25 119/13 120/6 120/7 121/2 121/5 124/2 126/12 126/19 127/20 131/9 131/10 132/22 133/15 139/16 142/11 149/20 149/21 152/23 152/25 153/2 155/16 155/24 156/2 156/4 156/8 158/12 158/23 161/8 162/25 163/21 164/4 165/7 166/9 166/14 166/15 166/19 166/21 168/12 168/21 169/14 172/10 172/25 173/2 173/11 175/3 186/8 188/8 189/11 193/24 195/18 195/24 207/15 207/18 208/22 209/1 209/5 209/25 210/6 210/6 211/22 212/4 212/9 215/7 215/7 215/8 216/7 218/19 219/7 219/17 219/24 220/17 221/20 222/5 223/7 223/9 225/14 228/9 236/18 238/21 247/9 251/23 252/16 253/25 254/1 254/1 254/19 254/21 261/8 262/8 263/25 264/16 266/11 266/18 269/19
**no benefit [1]** 158/12
**no longer [1]** 158/23
**nobody [4]** 94/23 132/23
**non [29]** 13/1 14/24 15/10 15/19 17/19 19/5 41/16 46/7 46/13 46/22 49/11 61/18 85/6 120/8 183/8 183/25 185/23 187/5 187/18 195/17 196/23 198/4 198/7 198/7 200/3 219/18 219/21 229/18 229/22
**non-hearsay [1]** 85/6
**non-participating [14]** 14/24 15/19 17/19 19/5 41/16 61/18 120/8 183/8 183/25 185/23 187/18 196/23 198/4 198/7
**non-participation [2]** 13/1 15/10
**non-profit [1]** 46/22
**non-reporting [2]** 46/7 49/11
**non-responding [1]** 46/13
**non-response [7]** 187/5 195/17 200/3 219/18 219/21 229/18 229/22
**none [10]** 6/20 36/21 36/22 37/4 37/6 37/7 84/21 158/13 158/16 265/2
**nonparticipants [14]** 17/10 20/2 185/3 185/25 197/4 197/5 197/6 197/8 197/13 197/16 197/20 199/18 200/10 230/20
**nonparticipating [25]** 16/16 182/1 182/19 182/20 183/2 183/9 184/7 184/18 186/24 188/18 189/3 191/9 191/13 191/18 191/20 191/25 192/4 192/23 196/10 196/15 199/22 217/8 225/13 229/8 257/20
**nonparticipation [15]** 15/7 20/12 184/2 186/2 186/5 186/20 187/7 188/17 188/25 189/8 189/13 198/12 198/19 199/11 231/18
**nonrespondent [1]** 195/8
**nonrespondents [1]** 225/2
**nonresponse [1]** 195/7
**normal [2]** 124/16 141/1
**north [2]** 55/10 235/10
**northern [1]** 237/18
**not [448]**
**not biased [1]** 230/1
**not include [1]** 95/7
**not reliably [1]** 232/18
**note [2]** 174/24 265/19
**noted [4]** 5/16 34/23 63/14 108/12
**notes [8]** 16/11 219/21 219/25 220/18 220/21 250/11 250/12 264/11
**nothing [14]** 26/21 33/25 35/11 35/11 40/6 48/7 51/6 96/9 108/20 109/2 109/10 135/2 149/3 205/10
**notice [3]** 4/3 76/18 107/2
**noticed [1]** 46/5
**notion [2]** 185/2 186/5
**novel [1]** 177/4
**November [5]** 61/11 70/4 100/19 119/6 147/6
**November 2024 [1]** 70/4
**now [36]** 5/2 6/16 7/2 10/20 13/19 14/10 17/14 18/25 25/10 25/21 27/2 29/21 42/15 43/13 52/11 61/18 67/11 96/16 97/16 119/16 125/3 133/21 153/6 160/15 163/24 171/23 174/5 217/8 224/22 240/24 245/2 245/22 252/2 252/20 270/3 271/1
**Nowhere [1]** 156/4
**NUM [1]** 227/23
**number [41]** 3/3 53/21 60/1 81/20 94/18 106/18 117/20 120/15 120/16 129/21 129/22 130/1 131/1 147/17 151/2 170/14 170/15 186/21 189/22 194/15 196/3 209/20 227/12 228/1 228/15 229/6 237/3 248/17 248/19 251/11 253/22 254/25 255/10 255/12 259/23 262/16 262/17 262/18 262/20 264/22 270/19
**numbers [11]** 16/21 76/4 78/7 78/9 101/5 110/23 182/13 251/7 253/2 257/1 262/9
**numerator [1]** 227/23
**numerators [1]** 227/11
**numeric [1]** 218/6
**numerical [1]** 61/17
**numerous [4]** 73/3 130/11 171/14 171/23
**Nunez [1]** 258/6
**nuns [1]** 236/15
**nurse [15]** 11/4 11/21 28/21 29/20 39/23 52/7 52/10 52/17 52/19 68/12 135/22 135/22 136/9 136/13 242/2
**nurses [8]** 46/3 65/2 139/5 170/22 201/25 203/25 254/18 264/25
**nurses' [2]** 172/25 265/5
**nursing [17]** 42/24 53/8 65/5 65/5 66/15 87/21 101/19 101/21 111/25 114/4 118/21 136/3 136/5 168/13 168/18 266/9 266/10
**NW [1]** 1/18

O

**o'clock [2]** 4/7 271/15
**Oaks [1]** 54/16
**oath [5]** 93/19 94/25 95/22 157/12 253/20
**OB [1]** 237/10
**object [13]** 71/9 80/21 86/17 112/13 134/8 146/23 187/11 221/10 234/17 246/10 248/2 270/1 270/4
**objected [3]** 106/3 106/8 259/17
**objection [63]** 59/21 69/13 71/25 72/1 72/9 72/23 78/11 78/13 78/18 80/6 80/17 81/19 81/22 81/24 84/15 86/15 86/17 86/18 88/9 88/15 105/4 106/5 106/10 106/17 106/20 112/23 117/3 117/4 117/6

O

**objection... [34]** 117/18 117/19 117/20 122/12 122/15 122/18 123/10 124/15 126/23 143/13 150/22 151/2 152/11 179/7 179/8 187/13 188/11 230/22 231/9 231/20 243/24 245/2 246/15 246/23 248/3 248/5 248/6 249/12 249/13 250/8 250/15 259/19 267/20 271/1
**objections [2]** 85/17 98/1
**observation [2]** 242/8 248/13
**observations [3]** 196/19 211/21 218/16
**observe [1]** 139/8
**observed [3]** 144/15 187/17 227/2
**obstetrical [1]** 239/6
**obstetrics [2]** 201/15 269/10
**obtain [2]** 182/6 182/11
**obtained [1]** 183/6
**obtains [1]** 191/19
**obvious [1]** 24/23
**obviously [5]** 25/10 27/10 85/19 245/3 270/3
**occasion [3]** 53/10 88/1 116/12
**occur [2]** 163/13 204/19
**occurred [8]** 27/24 46/21 90/14 91/8 149/2 170/19 180/20 223/16
**occurring [3]** 192/16 203/17 204/17
**October [8]** 99/5 99/18 99/22 119/6 147/7 147/8 149/2 258/18
**October 2024 [1]** 99/22
**October 26th [1]** 147/8
**odd [2]** 13/7 218/14
**odds [1]** 195/20
**of consumer [1]** 37/1
**of visitors [1]** 21/20
**of your [1]** 159/17
**off [9]** 17/19 23/17 120/18 128/18 135/23 152/3 233/20 234/6 269/22
**offer [7]** 5/8 45/15 45/15 51/4 71/12 81/5 81/15
**offered [9]** 79/6 79/10 81/10 81/13 81/17 85/8 85/14 146/8 210/3
**offering [3]** 81/6 85/2 179/14
**offers [1]** 120/1
**office [6]** 47/10 47/10 57/13 99/24 136/7 164/13
**officer [21]** 42/24 52/25 53/1 53/4 53/5 53/7 53/15 58/19 58/20 65/5 87/4 87/9 101/19 101/21 105/12 111/25 114/5 116/8 136/5 136/7 235/12
**Official [2]** 2/7 272/5
**offset [1]** 70/24
**often [3]** 78/3 146/16 261/13
**oftentimes [1]** 10/18

**oh [3]** 35/8 167/21 174/19
**okay [38]** 4/8 8/5 24/6 25/6 51/19 51/20 67/19 83/14 97/2 97/9 99/6 109/22 114/3 116/1 121/6 125/11 132/13 157/12 158/1 159/2 159/20 165/18 168/2 205/1 208/10 208/24 216/10 218/21 222/19 225/15 233/22 234/1 240/19 241/7 244/17 253/7 257/24 270/12
**old [8]** 31/12 34/10 54/20 91/1 115/18 136/16 140/5 256/16
**older [3]** 140/6 140/9 191/20
**oldest [1]** 32/22
**on-site [1]** 128/15
**onboarded [1]** 88/4
**once [5]** 28/1 129/2 146/17 160/1 209/5
**oncology [2]** 52/21 52/22
**one [168]** 4/19 5/23 5/25 8/21 9/5 9/17 11/21 12/19 13/10 20/1 21/25 22/8 22/20 22/23 22/25 24/3 24/17 26/17 26/17 27/3 28/2 31/23 32/11 36/19 38/1 38/2 39/20 41/6 41/19 41/19 41/21 41/22 44/8 48/19 48/20 54/9 54/9 54/10 55/19 58/11 58/12 59/19 62/2 65/20 68/10 68/18 68/20 72/22 73/24 79/24 80/23 81/2 81/11 81/12 81/13 81/21 83/12 86/12 86/23 87/2 102/3 104/14 104/17 104/18 106/6 107/6 108/25 117/1 120/23 121/3 125/18 128/6 128/9 134/6 137/7 137/8 137/13 137/22 137/23 138/4 139/16 139/18 147/10 147/10 151/2 154/5 157/15 160/3 160/22 163/20 164/5 166/22 170/9 170/10 171/21 171/23 174/13 175/3 177/20 177/21 179/9 183/22 184/5 184/11 185/4 188/21 188/21 188/23 191/10 192/10 192/13 192/13 193/8 193/25 195/8 196/17 197/22 199/11 201/21 203/5 203/14 203/18 206/9 206/9 211/5 212/7 214/11 215/9 217/12 217/20 217/22 223/17 223/24 225/15 226/17 228/13 228/23 229/12 229/24 229/24 231/23 232/9 237/5 237/6 237/7 237/15 239/2 246/1 246/3 246/4 249/10 249/22 250/7 250/20 256/9 258/1 258/3 258/17 260/10 260/20 262/3 263/1 269/13 269/15 269/22 269/23 269/23 270/21
**one-page [1]** 4/19
**one-third [2]** 48/19 48/20
**one-time [1]** 139/16
**onerous [1]** 42/16
**ones [4]** 98/13 137/22 183/7 269/14
**ongoing [5]** 63/8 139/21 150/10 209/14 210/2

**only [38]** 5/9 6/2 10/18 13/17 15/6 22/17 22/18 22/21 22/22 31/17 31/23 32/11 37/14 38/1 40/8 40/20 43/24 47/10 49/14 73/16 77/20 107/16 107/19 108/7 108/15 111/9 119/20 120/4 121/3 128/23 149/7 197/10 224/1 237/10 247/10 258/14 265/20 267/14
**onward [1]** 49/10
**op [1]** 71/4
**open [3]** 30/1 137/12 146/6
**opened [2]** 55/12 127/14
**opening [10]** 7/13 7/15 48/17 58/7 60/20 120/19 133/1 142/7 151/17 198/22
**openings [2]** 4/9 140/15
**operate [2]** 35/6 243/1
**operated [1]** 35/8
**operating [7]** 40/11 52/25 53/4 58/19 105/11 136/6 136/7
**operation [2]** 62/24 63/1
**operations [4]** 141/16 144/16 144/18 156/15
**opine [2]** 96/19 102/18
**opinion [27]** 38/23 157/11 169/22 179/21 180/24 186/23 189/9 189/14 189/15 189/16 191/3 191/5 193/3 193/24 196/14 196/16 200/12 200/17 202/5 203/12 207/7 208/25 221/23 222/2 231/7 231/10 248/13
**opinions [21]** 41/23 179/13 179/16 179/17 180/7 180/25 181/1 185/5 188/3 206/18 206/19 207/2 207/4 207/5 208/11 208/21 210/3 210/16 212/5 220/22 228/8
**opponent [1]** 112/16
**opportune [1]** 261/17
**opportunities [4]** 18/8 83/2 103/18 104/9
**opportunity [7]** 6/23 51/5 80/22 146/22 147/2 235/9 259/3
**opposed [1]** 201/7
**opposing [7]** 198/21 226/11 228/14 229/2 229/17 231/25 232/24
**opposite [1]** 23/8
**opting [1]** 133/17
**option [3]** 30/2 224/2 264/16
**or did [1]** 66/20
**order [20]** 5/9 5/13 31/1 62/4 85/20 109/18 127/15 127/18 149/24 150/6 154/16 174/11 175/1 179/9 184/11 241/12 241/15 241/18 241/19 241/22
**ordered [1]** 210/4
**ordering [1]** 62/20
**orders [5]** 4/10 62/2 64/24 227/12 242/1
**ordinary [1]** 149/10
**organization [10]** 8/11 9/10

O

**organization... [8]** 92/9 126/8 143/2 144/2 157/8 167/6 192/5 194/2
**organizations [6]** 58/4 142/2 178/19 190/3 190/11 190/14
**orienting [1]** 90/8
**original [5]** 130/6 172/21 188/4 231/10 253/25
**originally [2]** 19/6 236/15
**Orlando [3]** 31/17 31/21 237/11
**orthopedic [1]** 237/12
**orthopedics [3]** 54/14 137/15 140/11
**other [65]** 5/13 5/24 7/11 13/18 13/23 14/8 21/1 24/14 25/25 37/8 40/22 46/15 49/3 54/23 57/16 71/5 73/13 75/20 75/22 79/16 84/7 85/5 86/12 104/19 117/10 119/16 122/2 125/7 127/13 131/24 134/1 138/21 142/2 142/2 143/22 144/16 147/14 148/2 150/21 156/11 167/6 168/14 169/9 172/17 177/18 178/14 181/17 181/23 186/22 187/1 194/6 194/16 194/17 198/24 201/4 203/16 213/15 225/2 236/3 237/14 240/17 246/16 253/22 262/18 268/15
**others [8]** 11/9 19/14 64/11 121/19 160/6 160/7 167/12 175/1
**otherwise [5]** 9/5 235/20 236/23 237/7 238/21
**ought [2]** 4/16 5/6
**our [199]** 5/7 6/14 10/5 10/18 10/18 11/20 12/2 14/2 14/5 17/5 18/13 18/14 21/12 22/16 22/16 22/16 23/9 23/16 24/22 28/2 28/15 28/18 31/3 33/24 37/4 38/4 44/21 45/6 46/22 47/15 48/4 48/5 48/6 48/9 48/13 48/13 50/15 50/18 53/17 54/15 54/16 54/17 54/19 54/22 55/7 55/15 55/16 56/13 56/15 57/17 57/22 59/19 60/6 63/10 63/11 63/13 65/2 65/5 65/12 66/13 66/23 66/24 67/11 68/12 68/13 68/25 70/8 70/17 71/4 71/10 74/3 74/14 75/2 75/18 76/3 78/24 79/1 82/25 84/10 84/11 86/24 87/16 88/5 89/10 89/12 89/14 89/24 89/25 90/2 92/8 92/9 92/22 92/22 92/22 95/19 96/1 104/6 105/22 107/5 109/24 109/25 112/3 112/21 113/10 114/12 116/8 116/10 126/10 134/4 134/21 136/22 138/9 138/19 139/11 139/17 139/19 139/21 139/24 140/4 140/5 140/9 140/10 141/15 141/18 141/19 143/2 143/24 144/5 144/8 144/23 146/3 148/18 148/20 151/10 151/25 153/13 156/15 157/23 161/17 165/3 167/5 167/6 169/3 169/16 169/25 174/22 179/5 179/8 188/5 188/10 204/22 235/15 235/18 236/1 236/1 237/2 237/16 238/3 238/7 238/16 238/19 239/4 239/6 239/7 239/8 239/10 240/11 242/4 242/15 245/13 247/3 248/14 248/16 248/18 248/19 248/23 249/8 251/7 256/1 256/19 256/20 257/6 259/2 259/8 259/9 259/11 259/19 265/14 266/10 267/12 269/9 269/10 269/20 269/22 269/23 269/25 270/4 270/9 271/9
**Our quality [1]** 60/6
**out [90]** 4/13 8/2 16/1 21/23 24/14 26/17 29/25 36/4 43/17 44/4 45/16 46/17 47/3 49/8 56/21 59/6 59/8 70/5 70/7 71/4 71/6 72/19 74/2 75/17 88/13 88/22 96/24 98/11 98/13 101/6 101/10 104/9 107/14 115/24 116/7 118/9 119/12 121/9 123/21 123/24 124/1 124/2 125/7 139/22 139/22 141/8 142/5 144/23 150/9 151/8 153/15 159/9 162/21 163/1 163/3 163/4 163/12 163/16 163/24 164/21 165/11 165/16 165/21 166/1 168/10 169/3 179/9 184/3 184/25 185/21 189/21 192/9 192/13 194/21 194/25 204/9 210/7 212/2 215/8 217/20 219/11 226/14 239/4 239/7 247/6 254/18 254/20 256/20 260/23 267/13
**out-of-pocket [1]** 215/8
**out-of-town [1]** 125/7
**outcome [16]** 89/17 102/19 102/19 103/19 107/21 138/13 138/14 181/11 181/15 193/9 193/17 193/19 200/11 214/4 214/8 225/4
**outcome's [1]** 181/12
**outcomes [21]** 56/15 79/18 92/11 134/2 137/24 152/10 152/19 182/2 182/22 189/24 190/6 193/7 193/12 193/15 200/9 204/11 225/3 232/11 232/14 232/19 243/12
**outlook [1]** 209/8
**outpatient [4]** 238/25 245/15 269/7 269/7
**outputs [1]** 193/4
**outset [1]** 270/20
**outside [6]** 18/5 213/23 221/11 231/9 236/2 239/8
**outwardly [1]** 244/2
**over [39]** 18/19 19/20 20/21 28/20 33/13 33/13 33/14 41/10 45/22 54/5 54/7 78/17 81/3 81/22 81/24 88/4 88/6 88/8 94/13 97/14 97/20 99/20 106/20 106/24 117/20 118/5 123/9 131/16 147/7 148/1 177/11 192/20 192/25 205/6 218/7 218/17 238/24 248/13 256/17
**overall [18]** 22/14 53/24 69/21 104/13 104/15 114/21 114/23 138/25 160/21 163/20 164/5 167/9 186/18 198/1 211/25 228/11 229/16 258/2
**overnight [3]** 127/7 127/11 127/18
**overrule [9]** 72/8 78/11 78/13 81/19 86/14 88/15 124/14 179/8 246/14
**overruled [17]** 59/22 69/14 72/25 80/7 106/17 117/19 143/14 152/12 187/13 188/11 231/11 231/22 244/1 245/5 246/23 249/14 267/21
**overseeing [1]** 11/3
**own [24]** 9/11 15/9 15/11 17/10 19/22 20/7 34/12 36/12 37/20 38/4 39/10 40/1 40/5 41/15 43/3 48/3 50/13 90/2 92/8 109/24 150/3 193/13 196/17 232/12
**owned [1]** 35/7

P

**Packer [4]** 177/22 178/9 214/20 219/1
**packet [1]** 59/5
**page [13]** 4/19 18/10 18/21 91/20 107/12 118/1 122/22 122/24 126/13 153/21 214/3 241/8 260/2
**pages [4]** 11/1 18/17 50/8 240/6
**paid [2]** 28/1 208/4
**pain [1]** 140/21
**palliative [1]** 52/21
**PALM [78]** 1/2 1/8 2/7 3/8 9/3 28/22 29/19 29/22 30/13 31/23 32/11 32/23 34/4 35/6 35/7 42/23 42/24 54/9 55/5 55/11 55/18 55/21 55/24 97/2 101/15 101/20 102/1 104/20 113/4 114/4 114/5 115/22 116/2 116/5 116/15 116/20 118/8 121/10 121/14 121/17 124/2 125/20 126/1 126/21 134/14 135/10 135/12 135/16 137/4 137/6 139/14 145/20 153/20 154/3 156/22 157/3 158/1 158/3 158/9 158/14 160/21 161/5 162/11 162/18 163/11 164/12 166/25 167/13 168/2 168/14 235/18 237/17 237/18 245/11 246/4 251/8 258/14 271/5
**pandemic [7]** 53/22 95/1 95/5 95/6 96/13 157/14 157/17
**panel [18]** 16/13 19/22 45/25 49/7 105/13 187/3 194/7 194/9 194/12 194/14 195/4 212/22 213/3 219/20 219/22 220/4 220/9 220/19
**panel's [1]** 194/1
**panels [5]** 44/7 44/8 220/15

**P**

**panels... [2]** 220/15 229/21
**paper [3]** 173/2 221/1 252/12
**papers [2]** 148/3 179/6
**paperwork [1]** 11/15
**par [1]** 237/6
**paragraph [4]** 83/4 94/3 94/25 230/13
**paragraph that [1]** 230/13
**parents [1]** 141/5
**part [32]** 12/18 23/11 33/6 35/20 57/4 59/15 60/15 66/14 75/12 77/2 99/6 105/13 110/15 134/3 165/4 180/10 194/8 202/23 203/2 207/19 207/19 214/6 216/24 227/4 232/16 240/7 258/20 258/22 259/6 259/8 260/6 264/19
**part of [1]** 77/2
**participants [13]** 186/19 195/9 197/9 197/14 197/16 197/20 197/21 198/17 199/18 200/10 211/25 218/5 229/16
**participate [72]** 11/16 13/24 14/3 14/11 15/15 19/7 19/19 22/22 25/22 40/20 44/16 46/18 47/5 47/8 50/15 50/17 82/25 89/9 89/22 96/9 100/13 100/15 100/23 101/1 106/12 110/6 110/7 110/8 111/2 111/6 114/6 119/17 120/12 120/17 121/4 121/24 133/22 134/22 142/2 143/16 146/3 156/9 156/13 158/17 158/21 158/23 162/15 164/16 164/22 164/24 179/19 183/18 183/19 185/9 194/19 196/23 197/25 199/5 199/22 215/11 219/3 228/20 240/8 240/15 240/18 241/2 243/4 243/16 252/18 252/24 256/10 260/20
**participated [19]** 10/20 10/22 11/5 15/5 20/9 26/17 93/1 109/15 183/23 186/13 186/17 187/21 197/5 198/16 211/14 211/18 227/9 229/9 260/18
**participates [3]** 18/15 18/17 156/11
**participating [103]** 10/24 12/1 13/24 14/8 14/17 14/24 15/1 15/19 17/19 19/3 19/5 19/13 38/11 38/14 41/16 46/16 46/17 47/13 58/21 61/18 91/20 92/1 92/4 93/4 97/3 101/4 110/10 111/16 120/8 121/11 131/21 132/6 142/24 143/19 144/7 157/4 157/8 158/2 158/15 164/14 164/18 165/2 165/9 166/13 181/25 182/2 182/5 182/10 182/15 183/6 183/8 183/11 183/25 184/13 185/9 185/15 185/17 185/20 185/23 185/25 186/1 187/10 187/18 187/20 187/25 188/15 188/19 188/20 189/6 191/8 191/13 191/14 194/24 195/3 196/23 196/25 198/4 198/7 198/10 199/23 199/24 200/3 216/12 216/13 216/15 216/20 217/9 217/11 217/12 217/15 217/19 218/7 218/9 218/14 229/11 229/12 230/2 230/3 240/10 240/25 252/3 252/7 257/20
**participation [16]** 11/24 12/6 13/1 15/10 17/21 18/1 18/7 18/11 19/9 20/13 58/24 97/5 100/14 112/3 199/11 225/24
**particular [10]** 5/1 74/12 88/25 98/5 107/6 118/11 194/11 209/1 223/20 243/9
**particularly [15]** 29/23 88/17 138/4 147/11 192/11 201/5 235/15 235/17 239/6 243/18 244/6 245/15 248/19 251/9 256/25
**partly [1]** 184/10
**partner [1]** 54/5
**partners [1]** 74/14
**partnership [1]** 138/9
**parts [1]** 48/22
**party [3]** 40/15 85/21 112/16
**Paso [2]** 135/21 136/8
**pass [5]** 51/14 90/3 156/18 204/21 251/13
**passed [2]** 24/6 67/5
**past [9]** 10/21 20/21 20/23 22/8 235/16 237/16 248/14 251/5 268/22
**pastoral [2]** 236/17 236/19
**Patel [1]** 174/2
**Pathologists [1]** 139/20
**patient [151]** 11/4 11/12 12/3 12/7 19/17 27/7 27/18 28/5 28/13 30/13 30/24 30/25 32/8 33/14 33/18 36/17 37/5 37/12 38/20 39/1 39/5 49/22 51/3 51/9 53/24 54/8 54/18 55/23 66/4 66/21 74/2 74/16 74/22 79/8 79/11 79/14 79/14 80/10 81/16 85/12 85/19 85/25 88/1 88/23 88/24 88/25 89/3 92/8 103/10 103/12 104/11 104/15 107/9 107/18 108/13 115/3 130/4 130/8 130/16 130/23 138/17 138/20 140/2 141/14 143/6 144/12 145/7 145/19 145/20 145/24 148/10 148/12 150/7 152/7 152/15 152/19 159/18 160/23 164/2 170/9 170/10 173/25 177/15 180/2 180/4 180/5 181/14 182/8 190/5 193/7 193/7 193/12 194/4 200/11 200/20 200/21 200/24 201/4 202/6 203/8 203/9 203/22 204/8 204/11 205/8 205/11 212/19 213/6 213/11 213/12 213/23 213/25 215/25 217/4 220/23 221/7 221/24 221/25 222/7 222/15 223/12 223/20 224/10 225/3 225/4 232/10 232/14 232/19 242/2 249/4 246/19 255/9 255/24 257/25 257/6 257/12 258/11 259/3 259/8 262/21 263/22 264/9 264/11 264/13 264/19 268/2 268/3 268/5 268/9 268/18 269/10
**patient outcome [1]** 225/4
**patient visits [1]** 115/3
**patient's [3]** 152/10 152/13 181/13
**patients [200]** 5/10 5/17 6/18 6/24 7/2 8/9 8/11 8/16 9/1 9/10 9/22 10/9 10/13 10/17 11/14 11/22 13/8 19/18 22/2 22/14 22/16 22/25 23/19 23/22 23/23 27/21 27/21 27/25 28/8 28/14 28/22 28/25 29/3 29/4 29/12 29/16 30/2 30/6 30/22 31/5 31/16 32/13 32/18 33/6 33/20 34/15 35/16 36/11 39/3 39/24 41/2 42/8 44/24 46/12 49/2 50/9 50/16 50/24 50/24 51/8 51/13 53/11 53/17 53/18 53/19 53/22 54/12 54/22 54/25 55/21 56/22 66/8 67/15 70/17 70/20 74/9 74/10 74/13 75/18 79/19 79/22 79/24 79/25 80/2 80/13 80/14 84/12 84/16 84/18 86/24 88/10 95/8 95/14 129/9 130/2 130/12 131/1 131/6 132/16 134/2 136/14 136/21 136/25 137/1 138/7 139/8 139/9 140/4 140/6 140/12 141/4 143/2 144/4 144/22 145/2 145/4 145/15 147/17 149/23 152/24 155/19 156/16 164/10 170/7 171/2 171/3 171/9 171/14 172/1 172/2 172/5 172/15 172/22 173/4 174/12 190/7 201/6 201/19 201/25 202/8 204/4 204/12 204/15 221/18 221/18 235/14 236/1 236/22 237/9 237/18 238/7 238/11 238/13 238/16 238/22 239/4 239/5 239/24 243/15 244/12 247/1 247/10 247/18 248/10 248/11 248/15 248/17 248/20 249/3 249/4 249/6 249/7 249/9 249/10 250/2 253/2 254/20 254/23 255/1 255/8 255/14 257/2 257/4 259/12 262/14 262/16 262/20 263/14 263/17 263/19 263/21 263/25 264/5 264/15 264/22 264/24 265/15 267/12 267/18 269/8
**patients went [1]** 27/21
**patients' [7]** 53/12 84/21 172/8 172/24 177/12 249/22 265/9
**Patrick [8]** 19/21 187/2 226/2 226/3 229/25 230/1 231/17 231/18
**Pauline [5]** 2/7 7/25 34/20 125/5 272/5
**pause [1]** 30/7
**Pavilion [1]** 54/16

**pay [12]** 41/25 42/13 42/16 42/18 43/4 48/5 119/23 128/25 129/2 203/3 222/22 249/11
**payer [4]** 126/13 238/18 238/20 240/13
**payers [1]** 129/8
**payers' [1]** 133/17
**paying [1]** 15/25
**payment [5]** 47/11 203/4 203/6 215/7 215/7
**payments [1]** 215/4
**pays [1]** 128/15
**PBHN [4]** 102/5 105/24 105/24 112/7
**ped [1]** 247/18
**pediatric [16]** 9/6 31/14 31/15 32/12 52/14 52/20 52/20 52/21 54/10 140/7 237/6 245/16 249/4 249/5 265/11 265/14
**pediatrics [2]** 236/25 247/20
**peds [1]** 265/12
**peer [7]** 176/22 177/3 193/14 197/11 199/2 205/20 219/12
**penalize [2]** 17/10 197/4
**penalized [1]** 110/10
**penalizes [2]** 179/18 186/24
**penalizing [6]** 19/17 20/1 101/5 225/17 230/20 233/8
**penalties [3]** 15/24 195/17 195/19
**penalty [33]** 9/12 12/11 13/1 13/22 14/12 15/7 15/10 20/12 110/11 184/2 184/25 185/1 185/2 186/2 186/6 186/9 186/21 187/4 187/4 187/7 187/10 187/23 188/17 188/25 189/1 189/8 189/12 195/7 198/12 198/19 225/23 231/18 233/4
**penetrating [1]** 238/6
**Pennsylvania [2]** 176/10 177/23
**people [37]** 9/18 11/8 30/10 30/11 39/13 44/9 48/19 48/21 49/22 50/1 59/7 59/13 66/18 67/1 67/5 73/3 75/21 79/17 85/1 86/20 87/21 113/10 113/11 124/8 132/25 133/8 140/19 140/25 143/22 146/25 170/21 175/5 224/1 256/2 256/4 267/17 268/6
**per [1]** 113/9
**perceived [1]** 18/12
**percent [78]** 11/25 14/18 16/1 20/13 20/14 20/15 22/20 22/23 22/25 38/5 38/6 40/23 41/19 41/19 41/21 41/21 41/22 48/25 65/12 67/11 69/21 69/24 75/2 75/6 80/12 104/6 108/7 120/23 121/3 126/21 137/24 138/18 138/19 140/5 166/22 181/12 181/16 181/18 182/3 182/14 182/16 182/25 183/3 183/7 188/21 188/21 188/25 190/24 191/11 192/10 192/10 192/20 192/21 192/24 192/25 192/25 193/20 193/21 198/7 198/9 198/11 214/20 218/13 218/15 247/4 249/3 251/5 251/5 251/6 257/1 257/21 257/23 259/9 262/9 262/10 262/24 266/6 266/7
**percentage [12]** 77/7 77/8 78/10 114/20 120/16 207/22 214/18 228/1 238/19 238/20 257/3 267/11
**percentile [1]** 241/24
**perception [6]** 27/19 28/12 76/21 143/2 262/6 262/18
**perfect [5]** 165/16 192/12 197/22 199/4 230/9
**perform [7]** 29/6 115/11 214/25 222/3 223/10 224/5 243/12
**performance [25]** 12/19 13/3 15/20 22/14 26/4 28/12 29/10 49/13 53/25 82/17 82/21 83/5 105/23 107/24 108/18 109/4 110/23 137/24 178/13 194/15 194/23 203/3 222/22 229/7 230/15
**performed [5]** 36/23 49/15 146/5 207/5 224/7
**performers [1]** 200/5
**performing [6]** 61/19 63/12 132/1 165/22 188/19 188/22
**performs [1]** 30/1
**perhaps [4]** 6/6 221/7 243/13 269/10
**period [12]** 56/9 60/3 75/4 92/7 107/23 150/17 191/16 191/20 194/14 240/11 265/20 265/24
**periods [1]** 191/8
**permanent [2]** 53/6 60/16
**permission [1]** 164/13
**permit [1]** 151/5
**permitted [1]** 34/10
**person [14]** 66/19 192/8 192/9 214/13 214/14 214/16 218/11 228/24 229/1 238/9 239/23 244/20 244/23 271/6
**personal [3]** 4/24 106/11 117/8
**personally [7]** 11/10 61/14 70/13 71/16 110/24 209/25 267/16
**persons [3]** 170/16 239/22 253/23
**perspective [8]** 50/9 93/2 96/6 114/8 182/22 214/21 215/9 240/13
**pertains [1]** 60/12
**Ph.D [1]** 175/24
**phase [1]** 57/21
**Phd.s [1]** 46/3
**philanthropy [1]** 202/2
**phone [2]** 87/12 254/10
**physical [4]** 86/5 139/6 247/7 269/7
**physician [13]** 12/3 12/7 28/6 28/6 39/23 65/19 88/4 109/10 154/16 161/23 181/19 181/22 242/10
**physicians [41]** 11/9 11/12 22/16 23/20 29/6 30/6 33/5 33/20 56/22 65/13 68/7 68/11 68/14 68/14 72/17 75/17 87/6 118/25 136/14 139/5 143/2 143/9 143/24 144/9 145/10 168/21 170/21 170/23 171/25 172/3 172/5 172/16 172/23 202/4 203/25 204/6 243/11 254/14 254/16 255/14 266/11
**pick [2]** 77/13 96/24
**pictures [1]** 254/12
**pie [4]** 182/4 182/23 216/18 216/19
**piece [1]** 127/8
**pieces [1]** 96/24
**Pierce [1]** 2/7
**Pineiro [1]** 1/21
**pink [1]** 227/17
**pivoted [1]** 42/15
**place [17]** 5/4 7/11 57/9 59/9 70/16 79/12 80/1 83/5 84/4 128/1 141/8 146/8 212/9 224/22 225/8 225/10 234/24
**places [3]** 30/19 46/1 92/19
**Plaintiff [11]** 3/6 5/16 8/7 11/3 74/20 78/20 81/25 130/11 170/20 171/8 172/21
**Plaintiff's [8]** 67/12 76/2 130/13 135/6 171/9 172/23 175/8 234/8
**Plaintiffs [20]** 1/6 1/15 3/25 9/2 10/20 16/24 35/12 37/4 47/19 48/19 49/20 51/15 51/21 71/11 86/10 135/4 171/13 171/15 172/22 271/19
**Plaintiffs' [9]** 11/13 11/15 11/20 21/6 21/17 50/8 51/23 153/16 155/17
**plan [8]** 9/22 17/9 19/8 65/8 70/16 71/17 83/4 124/19
**planning [2]** 52/25 53/25
**plans [1]** 84/4
**play [9]** 42/13 42/16 42/18 43/4 73/4 233/18 270/9 271/9 271/11
**played [1]** 73/5
**playing [2]** 51/7 190/16
**please [14]** 3/1 3/4 34/19 51/19 52/3 100/1 124/6 125/11 135/9 175/12 175/22 227/17 230/5 267/18
**plethora [1]** 224/3
**plus [3]** 184/24 184/24 184/24
**pneumonia [1]** 70/2
**pocket [1]** 215/8
**point [32]** 5/8 46/10 78/9 78/12 78/15 86/7 87/15 88/15 88/16 97/2 97/18 98/11 107/14 140/22 150/8 151/22 153/19 158/14 159/19 179/2 185/21 186/1 190/6 194/21 194/25 196/6 210/15 225/20 248/6 252/22 260/15 271/18

P


**pointed [4]** 4/13 88/13 104/9 151/8
**points [24]** 13/15 14/1 14/19 14/24 16/14 16/17 18/14 28/23 45/7 165/12 165/16 165/22 165/24 166/1 184/16 184/19 184/20 185/25 196/4 217/17 243/19 260/21 260/24 266/20
**police [1]** 39/12
**policies [5]** 56/10 56/15 66/3 66/6 139/7
**policy [12]** 5/2 27/5 27/10 63/13 65/4 66/10 66/12 154/3 154/18 155/6 176/3 176/6
**politicians [1]** 31/11
**poor [3]** 31/10 50/12 268/10
**poorer [2]** 152/19 230/3
**poorest [2]** 31/10 188/22
**Pope [1]** 201/13
**populated [1]** 32/25
**population [27]** 33/1 54/6 54/8 54/18 54/19 70/21 75/5 75/18 75/24 80/10 104/6 140/2 140/6 140/8 140/9 159/14 159/15 159/18 164/7 236/20 237/2 237/10 251/7 251/9 262/1 267/12 267/14
**portal [1]** 74/1
**portion [1]** 110/16
**poses [1]** 23/3
**position [7]** 96/16 136/1 151/10 185/14 231/15 246/17 270/22
**positioning [3]** 202/14 203/20 222/17
**positions [3]** 52/19 202/7 214/12
**possible [18]** 5/6 13/6 13/13 124/21 132/24 183/25 184/4 184/23 185/22 190/19 195/15 203/12 224/14 229/15 231/16 232/21 233/11 268/14
**post [4]** 108/4 108/12 235/5 240/11
**posting [1]** 202/14
**postmortem [1]** 53/21
**potential [3]** 62/20 190/21 195/1
**potentially [2]** 130/20 249/18
**pound [2]** 237/20 237/20
**PowerPoint [1]** 118/11
**PowerPoints [1]** 116/18
**PR [1]** 70/16
**practical [1]** 30/2
**practice [8]** 10/10 17/17 28/11 29/15 33/10 35/25 65/13 112/21
**practices [5]** 25/8 25/16 34/7 57/6 153/24
**practitioners [2]** 57/20 68/12
**preadmitted [1]** 153/17
**precise [2]** 8/15 88/16
**precisely [1]** 27/24
**predated [1]** 232/8
**predict [6]** 190/5 193/7 193/12 232/10 232/14 232/19
**predicted [3]** 203/23 204/19 225/3
**predictor [1]** 105/22
**preference [2]** 263/23 264/12
**pregnant [2]** 31/12 31/22
**prejudicial [1]** 72/6
**preliminary [4]** 93/21 93/24 163/3 221/6
**premature [1]** 31/13
**premies [1]** 237/19
**preparation [1]** 139/16
**prepare [4]** 139/14 175/15 175/17 209/21
**prepared [4]** 76/8 76/8 78/1 106/12
**preparing [7]** 97/7 150/9 150/20 161/4 173/3 206/19 210/16
**prescriptions [1]** 65/14
**present [4]** 4/5 38/18 65/10 243/5
**presentation [1]** 47/22
**presented [9]** 10/6 42/3 238/7 244/21 249/2 261/20 262/2 263/20 265/23
**presenting [1]** 7/17
**presents [2]** 5/1 33/11
**president [8]** 3/15 40/16 42/24 43/1 52/24 102/1 114/5 121/17
**press [5]** 41/4 123/21 123/24 124/1 219/11
**pressure [5]** 18/3 19/24 20/7 20/17 33/13
**prestigious [1]** 46/1
**pretrial [1]** 270/10
**pretty [8]** 14/1 102/24 137/16 149/18 153/14 159/17 225/19 262/4
**prevent [5]** 25/9 25/16 49/1 63/22 153/24
**preventable [1]** 49/1
**preventing [1]** 22/15
**prevention [1]** 66/24
**previewed [1]** 71/9
**previous [1]** 269/2
**previously [11]** 88/10 98/1 106/5 111/22 147/4 150/14 178/14 186/19 237/21 265/19 270/23
**price [3]** 18/14 142/11 174/3
**pricing [1]** 18/13
**primary [5]** 24/3 74/23 235/23 245/12 249/1
**principle [3]** 192/1 192/17 194/14
**principles [19]** 179/22 189/17 189/22 190/10 191/1 191/4 191/6 193/23 195/21 195/21 196/17 212/6 212/20 212/22 212/25 213/3 213/19 213/20 220/13
**prior [17]** 53/1 58/15 77/25 131/5 142/14 151/11 152/21 176/8 183/18 183/19 183/20 183/23 196/16 197/18 231/4 231/6 231/25
**priority [5]** 33/18 57/11 127/7 127/11 127/18
**private [2]** 203/2 222/21
**privilege [1]** 136/23
**privileges [1]** 88/5
**privy [1]** 126/6
**probability [1]** 193/9
**probably [6]** 7/25 72/11 176/22 208/8 243/1 263/3
**problem [4]** 6/11 94/23 117/10 149/13
**problematic [1]** 252/25
**problems [6]** 5/1 25/8 25/8 25/15 25/16 267/21
**procedure [6]** 63/14 65/4 76/3 148/10 148/13 152/7
**procedures [6]** 29/6 40/14 56/10 56/15 139/8 146/6
**proceed [1]** 7/7
**proceedings [2]** 1/11 272/2
**proceeds [1]** 183/16
**process [44]** 17/18 42/9 58/4 59/8 82/25 84/3 97/7 127/25 139/13 139/15 139/22 139/23 181/17 181/18 182/6 182/10 182/15 182/25 183/4 183/20 184/1 184/9 185/11 187/6 187/10 188/16 188/22 189/4 192/14 192/25 196/7 197/7 197/25 199/19 211/10 214/5 214/8 214/11 217/4 217/18 217/21 227/4 239/13 239/25
**processes [3]** 66/10 103/4 189/24
**processing [1]** 196/12
**produce [3]** 76/23 149/5 150/4
**produced [31]** 76/6 76/20 76/25 77/2 77/3 78/8 80/21 80/25 80/25 99/11 99/14 106/1 116/20 126/1 146/21 146/24 147/3 147/13 149/7 150/14 150/21 151/2 167/19 185/5 186/5 196/19 209/19 226/20 228/7 254/15 265/18
**produced except [1]** 77/3
**produces [2]** 218/6 261/11
**producing [1]** 165/1
**product [2]** 52/23 86/9
**production [2]** 84/21 85/15
**profess [2]** 49/20 49/21
**professional [6]** 29/2 67/3 68/16 135/18 176/15 235/2
**professor [6]** 176/2 176/7 176/9 187/5 189/20 194/5
**profit [6]** 17/23 18/20 18/24 19/20 46/22 50/6
**profound [1]** 78/25
**program [14]** 31/25 52/21 54/14 54/15 57/18 89/10 98/20 99/14 137/15 176/14 176/16 237/6 237/12 239/6
**programs [8]** 9/7 59/9 66/13 73/24 137/13 139/12 203/3 237/15
**prominently [1]** 41/3

P

**promote [2]** 48/8 144/24
**promoter [5]** 117/24 262/11 262/12 262/15 262/15
**promoting [1]** 34/10
**promotion [1]** 21/21
**promptly [1]** 124/21
**prong [1]** 147/12
**prop [1]** 19/10
**proper [8]** 138/7 141/18 179/23 189/18 190/4 193/6 213/19 213/21
**properly [2]** 65/9 67/7
**property [2]** 18/9 48/3
**proposed [1]** 199/13
**proposing [1]** 162/22
**propriety [1]** 205/17
**prospective [1]** 177/14
**protect [3]** 8/11 9/10 150/3
**protected [1]** 256/1
**protecting [2]** 35/19 249/22
**protection [1]** 66/12
**protective [3]** 5/12 149/24 150/6
**protocol [5]** 148/19 148/20 149/5 151/11 151/14
**protocols [1]** 184/22
**proton [1]** 54/17
**proud [5]** 58/14 137/22 138/4 239/2 239/6
**prove [4]** 36/23 37/16 39/20 150/2
**provide [62]** 9/5 10/19 14/23 27/22 28/22 32/24 37/2 37/18 37/18 37/19 37/20 37/21 48/10 49/15 49/15 49/16 49/17 49/17 54/15 55/17 55/19 55/20 56/23 56/25 63/25 64/4 64/6 66/2 66/6 82/10 83/3 92/24 130/16 134/23 135/14 145/7 149/24 162/4 171/19 173/4 173/22 184/14 191/24 194/19 199/24 217/16 217/22 218/5 218/10 220/9 220/16 234/22 235/19 237/8 239/5 244/5 244/5 254/10 255/5 255/10 260/25 264/18
**provided [18]** 5/17 6/16 6/20 7/3 18/23 51/8 56/16 76/9 80/18 116/14 131/18 132/17 134/25 173/23 209/22 211/14 244/4 253/12
**provider [2]** 236/24 247/9
**providers [5]** 27/9 63/9 95/8 141/18 190/7
**provides [7]** 30/18 101/9 104/10 186/9 235/18 251/23 260/8
**providing [6]** 29/21 82/14 92/14 142/10 181/20 260/15
**providing acute [1]** 29/21
**public [28]** 5/20 8/15 9/13 33/23 35/16 37/24 44/20 45/13 45/16 46/3 50/13 70/25 86/8 107/17 107/19 128/21 128/23 129/7 141/9 143/5 162/21 163/12 176/8 177/12 201/11 217/2 244/19 257/10
**publication [4]** 33/25 71/7 71/15 84/8
**publications [1]** 176/25
**publicity [4]** 71/1 84/9 132/21 169/10
**publicize [1]** 163/25
**publicized [1]** 86/1
**publicly [12]** 18/18 35/1 36/9 37/24 40/23 45/2 45/3 69/17 103/5 107/16 108/1 180/13
**publish [2]** 8/12 134/21
**published [8]** 44/6 70/11 70/15 176/21 176/22 177/2 189/21 201/1
**publishes [2]** 9/11 33/22
**pull [24]** 67/12 83/21 87/13 97/10 100/2 105/2 116/19 122/11 124/4 134/5 146/18 153/16 155/17 212/25 228/13 230/5 231/23 234/20 241/7 253/18 256/18 256/23 257/17 258/20
**pulled [5]** 11/11 16/22 60/3 126/9 258/4
**pulling [4]** 121/8 133/16 133/18 256/16
**pulls [1]** 159/12
**pulmonary [3]** 58/13 138/2 138/3
**pulmonologist [1]** 174/5
**punishes [1]** 12/11
**purchasing [2]** 43/21 86/11
**purporting [1]** 33/23
**purpose [6]** 20/5 55/14 72/5 85/7 136/19 232/23
**purposes [5]** 17/23 18/11 90/8 90/10 125/19
**pursuant [1]** 149/5
**pursue [1]** 92/20
**push [2]** 27/15 234/6
**pushed [1]** 17/24
**put [30]** 5/20 13/24 35/3 35/21 45/9 45/16 48/14 77/11 78/16 92/7 92/18 96/24 118/14 134/6 136/22 144/23 157/6 162/6 162/21 163/12 167/6 168/10 170/14 206/23 213/23 219/11 244/23 261/14 265/2 271/9
**puts [3]** 111/5 159/8 256/20
**putting [1]** 208/11
**PX [12]** 60/19 69/3 81/21 81/23 127/4 127/9 134/5 227/16 230/6 241/7 247/22 250/10

Q

**Q2 [1]** 126/21
**qualifications [4]** 175/18 205/6 206/7 220/11
**qualified [2]** 179/3 220/9
**quality [87]** 11/2 11/5 40/16 42/21 42/22 53/13 53/24 56/11 56/14 60/6 61/14 66/16 66/25 70/8 70/13 83/19 92/9 98/20 99/8 99/14 99/23 100/4 101/7 101/14 104/11 104/24 105/7 111/23 112/8 137/3 137/10 139/12 141/14 144/23 144/25 162/17 176/19 176/20 176/24 177/1 177/5 177/7 177/10 177/11 177/17 177/18 177/23 178/7 178/8 178/11 178/25 179/23 179/23 180/1 180/8 181/5 181/7 181/21 184/4 189/18 189/19 189/23 190/5 190/6 190/11 193/6 200/5 202/9 204/12 212/13 212/14 212/18 212/21 213/13 213/16 213/18 213/21 213/23 213/25 218/24 235/24 242/22 243/21 244/11 258/25 271/5 271/6
**quantitative [1]** 187/2
**Quantum [1]** 236/7
**quarter [5]** 118/4 118/5 118/5 126/22 233/17
**question [35]** 8/23 10/11 23/3 39/25 63/17 64/8 64/11 67/19 78/5 101/3 109/1 109/6 109/8 112/22 118/7 146/22 149/14 170/15 172/14 193/1 196/22 221/13 223/9 226/19 230/24 230/25 239/2 244/4 244/7 250/22 255/12 268/10 268/21 269/1 270/21
**questionable [1]** 194/23
**questioning [4]** 170/6 220/11 220/12 246/10
**questions [27]** 8/19 18/17 39/25 96/7 96/11 123/11 131/10 131/15 131/16 132/13 133/3 153/19 156/21 163/19 173/11 173/15 174/6 208/24 209/2 209/4 226/7 226/12 226/21 244/25 249/21 266/18 268/2
**quick [1]** 31/22
**quickly [3]** 129/12 129/19 147/13
**quite [5]** 53/19 144/22 187/24 230/24 238/4
**quizzes [1]** 25/13
**quote [2]** 13/2 33/12

R

**radiology [1]** 79/20
**radius [1]** 224/1
**raise [2]** 152/22 202/1
**raised [5]** 6/15 22/1 30/22 143/22 173/25
**Ramirez [8]** 42/23 101/13 101/19 102/4 111/22 111/25 112/7 112/11
**Ramirez' [1]** 102/12
**Ramzy [3]** 7/24 34/20 250/15
**ran [1]** 38/24
**random [1]** 150/7
**ranked [1]** 132/24
**ranking [4]** 24/1 114/11 133/12 134/22
**rap [1]** 28/16
**rapidly [1]** 29/22

R


**Rashbaum [1]** 1/21
**rate [11]** 104/7 181/12 191/10 208/2 213/16 256/20 256/25 259/9 259/11 263/18 264/14
**rated [11]** 16/25 69/12 144/3 144/10 190/3 190/15 193/8 204/9 204/10 204/10 263/10
**rates [8]** 37/25 103/17 119/2 119/8 216/7 216/7 216/8 266/14
**rather [5]** 12/3 12/7 18/3 20/9 43/9
**rating [29]** 17/17 37/17 83/2 100/16 104/13 104/15 114/21 114/23 115/7 128/9 132/13 132/18 152/22 153/9 160/19 160/21 160/23 163/20 164/3 164/5 165/25 201/12 201/17 204/7 219/12 222/11 247/11 263/12 264/25
**ratings [27]** 50/4 104/10 114/20 163/17 163/25 164/9 178/7 180/1 180/2 193/8 200/24 201/11 201/15 201/20 201/23 202/3 202/19 204/1 204/5 205/9 212/9 213/16 220/22 221/24 222/7 222/13 222/16
**Raton [1]** 30/17
**raw [5]** 48/15 180/11 211/17 212/1 251/7
**reach [2]** 239/4 239/7
**reached [1]** 88/22
**reaches [1]** 29/16
**reaching [1]** 180/6
**react [1]** 142/21
**reaction [6]** 9/21 70/9 142/25 142/25 198/22 242/19
**reactions [1]** 243/9
**read [12]** 12/18 21/15 157/15 203/15 203/15 217/2 219/13 219/21 222/9 224/12 250/24 264/11
**readable [1]** 47/17
**reading [7]** 26/10 96/25 196/1 219/25 220/21 226/4 252/14
**Readmission [1]** 216/7
**ready [7]** 98/23 139/17 139/21 161/14 161/25 205/1 228/25
**real [10]** 8/13 10/7 10/11 11/11 27/19 33/11 33/17 123/5 215/10 267/13
**reality [2]** 26/15 143/5
**really [20]** 6/25 25/25 36/15 36/15 52/6 52/17 55/16 64/10 75/19 85/15 87/22 87/22 89/13 113/11 139/25 150/10 190/6 210/18 239/5 269/24
**reason [30]** 75/20 79/7 99/10 99/13 99/22 102/12 104/3 112/6 112/10 112/25 115/8 118/12 121/1 121/3 126/20 148/9 149/7 149/21 157/3 168/11 188/17 199/1 213/15 216/22 219/7 220/8 230/2 247/10 259/6 259/8
**reasonable [4]** 10/10 26/12 34/3 47/17
**reasons [6]** 75/10 75/13 198/1 199/8 256/9 267/10
**reassign [1]** 183/2
**reassure [1]** 145/16
**reassured [2]** 146/3 146/8
**rebounded [1]** 119/7
**rebuttal [2]** 188/5 233/12
**recall [74]** 6/14 25/21 61/9 93/16 93/19 98/25 109/13 109/18 114/23 116/17 118/9 118/15 118/21 121/8 121/9 121/15 128/13 129/23 130/1 131/16 132/4 132/8 132/11 132/25 152/1 157/2 157/6 160/19 161/9 161/12 162/20 163/8 164/12 165/10 165/12 170/12 173/16 197/15 212/25 213/2 213/4 219/25 220/21 224/14 224/14 225/25 226/1 226/4 226/5 226/12 226/22 226/25 227/10 228/14 229/2 229/5 229/18 229/20 231/4 232/2 232/5 232/24 233/2 242/22 242/24 242/24 247/20 253/11 257/1 260/23 266/23 267/7 267/10 269/1
**receipt [1]** 82/21
**receive [23]** 22/21 41/17 73/10 80/15 82/10 83/11 120/9 120/23 130/3 132/7 171/4 188/16 200/14 201/4 203/5 209/23 209/25 210/17 225/13 236/25 238/21 244/12 247/2
**received [50]** 13/25 15/6 15/19 15/20 26/17 28/24 29/8 30/4 31/4 33/2 41/20 64/8 64/17 65/20 73/8 73/13 73/16 77/10 82/5 84/1 90/16 92/25 111/16 130/6 130/11 132/16 132/20 136/3 137/19 138/11 142/14 143/10 143/16 171/8 171/14 171/25 171/25 172/22 175/23 177/5 185/10 185/15 188/1 188/15 189/4 189/6 198/15 229/9 255/20 267/16
**receives [2]** 38/14 158/12
**receiving [10]** 82/22 90/23 92/10 131/21 143/9 158/9 159/6 190/8 192/12 198/8
**recent [5]** 81/1 83/22 137/22 176/25 191/16
**recently [5]** 10/21 77/11 138/4 239/16 244/19
**recess [3]** 51/18 125/10 204/25
**recessed [1]** 271/24
**recognition [9]** 39/23 116/1 116/6 116/13 137/20 138/1 168/2 246/18 266/4
**recognitions [1]** 137/22
**recognize [2]** 60/20 213/12
**recognized [1]** 8/19
**recognizes [1]** 138/6
**recognizing [1]** 29/2
**recollection [5]** 100/25 118/10 216/17 258/17 259/6
**recommend [1]** 268/6
**recommended [2]** 17/4 197/2
**reconcile [1]** 261/24
**reconsider [1]** 151/21
**reconsideration [1]** 7/10
**record [23]** 4/1 5/20 36/12 50/11 63/13 78/16 99/11 104/24 117/9 117/10 117/15 125/19 126/19 148/2 148/9 151/18 161/2 186/8 186/22 187/11 188/7 233/20 272/2
**recorded [1]** 108/1
**records [1]** 211/9
**recovery [2]** 135/24 152/17
**recruit [1]** 85/21
**recruited [1]** 178/2
**recycled [1]** 41/6
**red [9]** 87/3 107/12 129/13 182/9 182/16 182/17 183/7 186/6 241/14
**redact [1]** 4/17
**redacted [1]** 5/12
**redirect [8]** 131/11 131/13 173/12 173/13 226/8 226/9 266/19 266/21
**redirected [1]** 247/10
**redistributed [1]** 14/15
**redress [1]** 34/8
**reduce [1]** 239/9
**refer [6]** 4/17 6/10 94/18 148/11 184/2 184/3
**reference [4]** 5/25 231/6 232/15 233/3
**referenced [3]** 73/7 231/3 256/24
**referencing [3]** 95/16 95/16 149/16
**referred [1]** 64/15
**referring [11]** 22/16 23/20 76/4 95/11 100/9 172/16 185/1 206/3 227/22 231/3 255/14
**refers [1]** 26/2
**refine [1]** 244/25
**reflect [8]** 26/5 37/11 37/15 74/7 154/14 155/2 155/14 155/23
**reflected [2]** 11/25 153/20
**reflecting [1]** 148/9
**reflection [1]** 104/8
**reflective [1]** 107/23
**reflects [3]** 23/6 23/14 244/11
**refresh [3]** 118/9 258/17 259/6
**refused [2]** 21/7 22/4
**regarding [8]** 6/18 82/21 83/6 116/24 127/23 202/9 205/12 251/19
**regards [1]** 153/13
**Regina [22]** 11/2 26/19 42/21 42/22 101/12 101/14 105/6 105/7 111/21 111/22 112/2 112/6 112/10 258/4 258/6

R

**Regina... [7]** 258/25 269/24 270/1 270/6 270/7 270/21 271/2
**region [1]** 172/18
**regions [1]** 102/3
**registered [7]** 11/21 17/23 52/7 52/10 52/17 135/21 135/22
**Regna [1]** 258/14
**regular [5]** 65/13 73/21 76/16 105/15 147/24
**regularly [8]** 62/19 63/6 149/4 155/3 155/12 155/15 159/25 160/1
**regulations [1]** 63/15
**regulatory [3]** 47/11 141/16 240/13
**rehab [2]** 138/2 138/3
**reinforcing [1]** 31/5
**reiterate [1]** 244/8
**rejected [3]** 195/6 195/10 195/17
**relate [1]** 4/19
**related [11]** 84/18 126/2 130/13 148/24 153/9 173/4 176/25 202/5 207/2 261/2 262/6
**relates [1]** 172/16
**relating [1]** 226/20
**relationship [2]** 228/21 232/22
**relationships [4]** 33/8 201/25 203/25 228/18
**relative [5]** 177/6 182/1 191/25 227/13 230/15
**relatively [1]** 191/16
**release [7]** 75/2 123/21 123/24 124/1 130/10 152/21 173/25
**released [4]** 61/10 74/9 143/8 144/15
**releases [2]** 41/4 219/11
**relevance [4]** 71/24 72/1 72/7 118/2
**relevant [2]** 72/11 166/13
**reliability [4]** 190/17 192/8 193/1 193/4
**reliable [8]** 45/23 95/2 95/8 95/18 95/25 157/18 222/13 222/14
**reliably [5]** 190/5 193/12 232/10 232/13 232/18
**reliance [1]** 232/1
**relied [11]** 9/7 16/7 39/3 43/10 130/2 171/2 171/3 180/8 185/4 224/15 232/7
**relief [4]** 34/3 50/23 50/25 51/1
**relies [1]** 33/1
**reluctance [1]** 88/3
**rely [6]** 22/11 30/2 94/17 180/6 212/5 232/4
**relying [2]** 201/19 270/18
**remain [1]** 259/2
**remaining [5]** 98/3 98/13 183/3 183/5 192/21
**remains [2]** 267/11 269/3
**remember [16]** 11/17 15/23 108/9 114/24 127/8 128/18 192/18 193/6 212/16 227/7 244/22 247/23 252/7 262/5 265/25 269/12
**remembers [1]** 120/20
**remote [1]** 113/11
**remove [1]** 227/17
**removed [2]** 14/20 14/23
**removing [1]** 23/11
**renew [2]** 143/12 243/24
**renews [1]** 33/25
**repeat [2]** 41/14 158/19
**repeated [1]** 34/1
**replace [1]** 13/18
**replacement [2]** 88/7 89/10
**report [46]** 18/6 18/7 18/10 22/18 26/4 45/3 45/11 48/6 57/12 57/14 63/23 67/20 103/1 155/25 159/25 160/1 160/3 160/4 168/9 169/23 169/24 180/15 180/21 180/24 186/11 187/23 188/4 188/7 192/12 195/13 196/21 201/14 201/17 207/9 207/10 209/19 210/11 210/25 217/24 217/25 220/6 224/9 226/25 232/9 246/8 247/13
**reported [4]** 45/2 103/5 211/13 211/23
**reporter [6]** 2/7 7/25 94/9 170/1 272/5 272/6
**reporting [7]** 46/7 46/7 49/11 102/6 112/2 179/23 230/16
**reports [18]** 18/7 23/5 116/4 116/7 130/6 130/11 154/12 155/13 171/8 171/14 171/25 172/4 172/22 174/15 209/13 209/23 210/4 255/20
**represent [2]** 76/19 182/13
**representation [2]** 83/18 159/17
**represented [1]** 22/3
**representing [1]** 35/24
**represents [1]** 22/14
**reprimand [1]** 83/16
**reputation [9]** 89/24 101/7 172/17 178/4 201/24 203/24 222/16 244/15 244/18
**reputational [3]** 39/8 91/15 203/12
**request [10]** 148/22 148/23 149/18 151/8 151/9 209/16 248/24 250/9 261/14 262/3
**requested [2]** 210/21 227/4
**requests [3]** 84/20 248/22 249/4
**require [3]** 66/21 98/16 133/13
**required [5]** 68/20 110/17 110/19 240/12 240/17
**requirement [1]** 47/11
**requirements [1]** 139/24
**requires [3]** 18/22 79/8 133/14
**requisite [1]** 68/24
**rescue [2]** 74/14 74/18
**research [16]** 176/4 176/4 176/12 176/17 180/1 180/9 194/20 205/11 205/17 206/21 207/2 207/23 209/7 209/18 211/8 221/6
**researching [1]** 86/14
**reserve [4]** 151/25 204/21 233/11 233/13
**reserved [2]** 138/4 270/9
**reshaped [1]** 28/13
**resolve [1]** 98/5
**resource [2]** 235/19 237/16
**resources [19]** 11/14 12/3 12/7 20/15 42/17 43/1 53/16 92/6 92/7 92/18 102/15 114/7 133/10 133/23 137/3 142/10 156/13 191/8 240/11
**respect [13]** 5/14 16/11 72/9 74/15 75/5 85/15 88/10 98/15 109/6 109/8 130/16 170/17 265/11
**respiratory [1]** 65/6
**respond [10]** 82/20 127/21 128/2 128/4 143/18 144/8 144/8 181/25 183/15 206/15
**responded [6]** 20/16 210/23 210/23 227/5 227/7 227/8
**respondents [1]** 225/2
**responding [3]** 41/6 46/13 46/13
**responds [1]** 12/22
**response [24]** 21/7 23/5 70/12 82/22 84/24 86/3 92/17 104/7 139/7 145/14 170/6 186/14 187/5 194/20 195/17 200/3 203/22 216/14 217/22 219/18 219/21 229/18 229/22 256/25
**responses [3]** 20/16 194/11 218/8
**responsibilities [7]** 53/23 75/12 141/12 176/11 176/13 235/23 249/23
**responsibility [8]** 35/4 50/20 59/1 75/7 75/10 136/23 144/12 144/14
**responsible [6]** 53/24 101/7 102/3 141/13 141/15 144/11
**result [9]** 14/3 84/8 91/7 101/4 145/23 147/19 228/10 238/12 247/12
**resulted [2]** 211/24 225/7
**results [11]** 21/16 21/16 35/10 44/5 95/9 95/19 96/1 157/19 157/23 193/14 218/10
**resume [1]** 102/6
**resuscitation [1]** 138/5
**retain [1]** 207/22
**retained [1]** 136/13
**retake [1]** 42/25
**retention [6]** 39/24 118/21 118/23 168/18 266/9 266/10
**retracted [1]** 89/21
**retroactively [2]** 191/17 191/22
**return [8]** 28/3 67/8 136/11 204/23 259/11 259/13 259/14

R


**return... [1]** 267/11
**returning [1]** 257/5
**revenue [16]** 17/25 18/2 19/15 40/2 46/24 48/13 166/25 167/1 167/2 167/4 167/5 167/7 167/8 215/3 269/2 269/10
**revenues [9]** 39/22 78/24 78/25 79/3 115/2 115/4 266/1 266/2 266/2
**review [22]** 57/24 82/15 110/21 118/19 139/15 146/14 146/16 154/11 154/14 154/25 155/1 155/3 155/12 155/15 174/14 180/19 188/10 201/2 201/6 209/8 220/18 222/6
**reviewed [11]** 88/11 122/9 176/22 177/3 180/23 193/14 197/11 203/23 204/20 205/20 219/12
**reviewing [4]** 83/6 187/16 213/17 224/19
**reviews [2]** 29/25 118/15
**reward [1]** 50/17
**rewarding [4]** 136/18 136/20 136/24 239/12
**rheumatology [1]** 201/16
**Ricardo [1]** 101/13
**rich [1]** 31/11
**Richard [1]** 174/3
**richest [1]** 31/10
**Ricky [8]** 42/23 101/19 102/4 102/12 111/21 111/25 112/7 112/11
**right [105]** 3/25 7/18 14/20 21/3 24/10 24/14 24/16 25/20 34/4 40/21 44/19 49/14 50/15 65/22 67/11 68/1 72/8 73/18 76/5 78/19 79/16 87/16 88/14 88/21 91/4 91/17 91/19 92/7 93/12 95/4 95/4 95/20 96/16 103/13 103/24 106/24 107/7 108/17 108/22 109/11 109/16 110/8 110/11 110/17 111/10 114/7 118/1 119/2 119/4 119/11 123/9 131/3 132/14 135/1 143/14 151/19 151/25 161/3 161/14 162/9 163/24 163/25 171/19 171/20 171/24 174/5 182/4 182/23 182/24 183/7 184/13 194/8 204/22 205/15 208/4 213/7 213/10 216/18 216/23 216/23 217/10 217/14 220/23 221/14 224/18 230/8 233/14 233/15 239/14 241/8 245/5 246/14 250/14 250/18 251/6 251/14 254/2 254/23 256/7 259/7 266/9 269/11 270/10 271/13 271/21
**right-hand [3]** 14/20 182/4 182/23
**rightfully [1]** 89/4
**rightly [1]** 19/3
**rigorous [1]** 139/20
**ripe [2]** 4/9 7/9
**ripic [1]** 237/7
**rise [2]** 248/19 248/21
**risk [12]** 57/11 68/25 69/8 69/11 104/1 216/3 216/6 216/9 237/8 238/11 238/12 239/8
**risking [1]** 31/2
**risks [2]** 80/2 80/5
**road [2]** 135/14 234/22
**Robert [4]** 177/22 178/9 214/20 219/1
**robotic [2]** 57/25 57/25
**robotics [2]** 54/14 137/17
**robust [2]** 54/13 238/18
**role [6]** 58/20 58/20 58/24 60/13 136/5 136/8
**roles [2]** 141/11 236/3
**rolls [1]** 66/24
**Romano [13]** 19/21 20/3 187/2 226/2 226/3 229/25 230/10 230/21 230/23 231/3 231/17 231/18 231/25
**Romano's [2]** 230/1 231/15
**room [15]** 30/22 32/6 40/11 74/10 135/25 138/10 140/14 167/9 175/1 238/24 248/15 248/16 248/18 265/14 269/7
**rooms [3]** 74/7 87/1 247/9
**round [3]** 53/11 84/11 242/14
**rounded [1]** 130/8
**rounding [2]** 86/23 137/2
**rounds [4]** 21/8 84/13 85/1 242/8
**routinely [2]** 199/9 205/19
**row [1]** 148/7
**rows [1]** 251/4
**rule [2]** 175/3 175/4
**ruled [1]** 127/2
**rules [5]** 17/10 63/14 74/15 139/10 195/23
**ruling [4]** 88/10 147/12 149/8 150/25
**run [4]** 148/20 203/3 236/15 251/18
**running [1]** 21/17
**runs [3]** 38/21 75/6 107/14
**rushed [1]** 8/16


S


**safe [8]** 15/15 22/14 64/13 181/21 185/16 200/5 241/25 250/2
**safely [2]** 242/2 242/5
**safer [7]** 10/3 24/15 57/10 62/17 64/23 66/1 68/5
**safety [115]** 8/8 8/12 8/13 8/14 9/11 10/7 13/16 19/17 20/20 21/16 23/4 23/4 23/6 23/7 23/13 23/15 24/3 25/8 25/15 27/15 28/7 28/25 29/10 30/5 30/21 33/3 33/12 33/16 33/22 35/16 36/12 37/9 37/12 38/5 38/21 43/20 44/3 44/22 44/23 44/25 45/5 45/24 48/8 49/22 50/11 51/3 51/9 53/24 57/11 81/16 82/11 82/16 82/17 83/7 83/19 84/3 84/9 92/9 103/19 104/11 107/8 121/9 141/14 143/6 144/3 146/4 159/8 170/18 171/4 180/1 180/9 181/5 181/7 189/23 191/15 193/23 194/4 196/2 196/9 196/19 200/17 202/9 203/13 204/12 205/8 205/11 212/14 212/19 212/20 213/7 213/11 213/12 213/17 213/18 213/19 213/23 213/25 215/19 220/4 220/9 223/13 229/21 235/24 236/19 236/21 236/22 239/23 249/22 257/22 258/21 258/22 268/8 268/12 268/14 268/15
**said [67]** 16/6 34/25 38/23 40/2 42/13 47/9 51/8 70/15 70/16 72/21 72/24 76/15 87/8 87/10 87/10 87/16 87/19 87/21 87/23 89/5 89/6 89/20 95/5 95/20 95/22 96/3 97/21 97/22 106/14 108/13 114/2 115/1 115/3 115/7 124/10 133/7 146/2 149/6 158/9 159/2 171/13 188/8 192/18 195/5 217/7 217/19 225/16 245/14 254/9 254/9 254/9 255/20 256/2 256/14 256/16 257/20 261/17 261/22 262/7 262/9 263/25 264/7 264/16 264/22 264/23 265/11 266/6
**salary [1]** 16/1
**sales [1]** 19/14
**SAMARITAN [8]** 1/4 3/2 3/11 11/6 32/22 33/2 33/5 55/10
**Samaritan's [1]** 33/7
**Sambruna [1]** 40/15
**same [30]** 38/14 43/10 44/21 50/1 51/11 74/21 75/4 79/23 88/9 88/12 90/22 91/19 103/17 109/6 109/8 114/19 128/25 132/9 133/7 161/20 172/21 174/14 187/22 190/10 201/10 242/8 245/25 249/1 253/12 270/14
**satisfaction [5]** 108/13 160/23 247/4 257/6 257/12
**saturated [1]** 40/18
**save [3]** 79/14 79/19 136/24
**saves [1]** 43/24
**savvy [1]** 88/25
**saw [27]** 10/14 15/24 27/2 46/15 47/3 58/7 60/20 71/4 72/13 110/15 114/3 114/8 119/5 132/25 167/22 168/5 168/8 168/9 187/1 211/19 212/22 228/7 241/9 245/6 245/22 261/2 261/5
**say [48]** 16/7 17/2 22/7 24/19 26/3 36/13 37/15 38/11 42/2 42/5 42/19 42/25 44/13 46/12 47/6 63/3 67/5 67/20 71/21 72/6 74/5 81/15 92/25 94/7 94/25 96/12 102/20 104/5 116/3 116/24 157/23 159/19 161/14 167/4 169/15 170/20 176/17 220/1 223/15 223/21 238/6 250/11 255/8 256/1 258/1 264/8 264/10 270/6

S


**saying [16]** 22/17 72/17 77/19 91/14 96/21 149/25 171/23 174/10 217/21 226/2 229/25 230/21 231/17 231/19 257/22 264/15
**says [28]** 9/20 12/18 15/16 16/10 24/15 26/3 50/12 62/17 63/23 66/2 69/7 95/18 100/12 102/5 102/9 106/24 116/21 118/1 121/21 127/25 171/23 213/10 217/24 217/25 254/25 258/7 258/11 259/2
**scale [2]** 238/17 269/19
**scan [2]** 62/5 267/23
**scanning [2]** 60/1 64/16
**scans [1]** 242/2
**scarce [1]** 53/16
**scare [1]** 22/15
**scared [1]** 145/22
**scaring [2]** 19/18 23/2
**scheduling [1]** 4/4
**scheme [1]** 42/13
**school [7]** 9/15 15/3 26/11 135/19 136/3 176/3 176/10
**scientific [8]** 15/11 15/12 16/8 45/14 186/9 189/12 197/12 205/21
**scientific calculation [1]** 45/14
**scientifically [2]** 18/4 189/10
**scope [5]** 18/7 148/16 221/11 231/9 247/1
**score [84]** 13/13 13/17 15/21 16/8 25/22 25/23 26/5 31/3 38/10 38/13 38/14 40/22 44/16 44/25 44/25 45/11 46/18 60/3 60/9 62/8 62/12 62/15 63/8 63/11 64/9 64/19 64/21 65/21 67/25 73/13 103/12 109/18 111/13 111/15 111/16 114/15 117/24 121/23 132/11 159/9 163/3 163/16 166/18 166/22 183/14 183/20 183/25 184/4 184/5 184/6 184/7 184/8 185/10 185/15 185/22 188/18 188/23 195/8 195/15 197/7 197/9 197/9 199/4 213/6 213/10 216/11 216/13 217/13 217/24 229/3 229/15 231/16 243/19 252/12 257/12 258/2 258/9 260/10 262/11 262/12 262/13 262/15 262/15 264/6
**scored [4]** 13/16 38/19 110/23 212/3
**scores [56]** 9/12 10/6 10/7 13/1 13/4 13/6 13/8 13/18 13/19 13/21 14/14 14/15 15/20 15/23 16/2 16/15 16/17 17/11 17/18 20/10 20/19 25/20 41/7 41/14 49/12 81/16 100/12 100/14 103/14 103/22 107/18 112/4 114/20 159/6 160/13 160/15 160/17 165/10 182/14 182/24 184/23 196/7 197/25 199/5 201/3 211/24 215/25 217/17 218/6 218/10 228/10 257/7 257/21 257/25 259/7 259/8
**scores improve [1]** 201/3
**scoring [8]** 45/7 61/7 61/12 83/7 210/18 216/23 217/1 244/9
**scoring methodology [1]** 83/7
**SCOTT [5]** 1/16 1/17 3/8 3/10 151/6
**screen [12]** 9/4 13/5 13/21 25/6 60/21 61/25 63/17 64/9 122/23 175/20 230/6 265/22
**screened [1]** 249/6
**scroll [14]** 9/19 25/5 26/14 94/4 99/17 100/9 101/23 102/4 105/17 105/24 107/8 107/21 134/16 253/25
**scrolls [1]** 24/20
**seal [4]** 4/14 4/14 4/20 6/25
**sealed [1]** 5/3
**sealing [5]** 5/1 5/8 5/10 6/4 6/12
**Sean [5]** 15/2 20/18 174/22 175/8 175/14
**search [8]** 24/1 24/5 24/5 24/5 148/18 148/20 151/11 204/13
**searches [1]** 23/25
**seasonably [1]** 149/1
**seasonal [1]** 40/12
**seat [3]** 51/19 125/11 125/15
**seated [1]** 3/1
**second [19]** 30/7 37/14 64/13 81/11 81/23 82/8 83/11 83/21 84/2 179/21 189/14 189/15 189/16 190/13 195/4 200/2 202/5 202/6 222/2
**secondary [2]** 194/20 245/12
**seconds [1]** 71/18
**section [4]** 22/10 62/17 195/5 195/25
**secure [1]** 235/25
**see [179]** 5/5 6/23 9/3 9/14 9/18 9/18 9/22 13/5 14/16 16/21 17/24 18/15 20/21 21/18 21/20 21/21 23/24 24/16 24/18 24/20 25/3 25/5 26/1 36/16 36/19 36/23 37/3 37/5 37/9 38/25 39/19 40/8 40/24 40/25 42/7 43/15 43/15 43/25 44/14 45/8 46/22 46/24 47/2 47/8 48/14 49/3 49/10 62/3 62/15 62/20 63/17 63/18 63/22 66/4 67/14 69/7 69/9 72/11 74/1 74/13 74/22 76/11 77/16 82/12 82/18 83/9 84/12 95/10 98/12 98/24 99/17 99/17 100/5 100/17 101/23 101/24 102/7 102/10 102/11 105/9 105/17 105/24 105/24 106/22 106/25 107/7 107/10 107/19 108/5 112/4 116/4 116/22 116/24 117/23 117/24 118/2 118/4 121/24 123/24 124/5 124/8 126/2 126/14 126/16 128/18 129/9 130/7 140/6 144/25 147/22 148/8 150/5 152/2 153/8 153/21 153/24 154/12 155/13 156/15 160/8 161/7 161/17 169/3 169/8 171/5 171/8 171/11 171/15 172/19 174/10 178/11 178/12 182/9 183/17 184/9 184/15 185/12 185/19 186/12 186/13 186/16 187/23 193/25 194/3 196/11 198/13 200/15 204/8 205/4 212/2 213/8 213/13 213/22 218/15 227/22 230/6 230/8 239/10 241/14 245/8 250/14 250/18 251/1 251/4 254/7 255/2 255/15 255/21 256/3 256/24 258/4 258/7 258/9 258/10 258/13 259/4 260/10 271/1 271/14
**seeing [9]** 24/12 28/9 53/21 227/10 229/20 244/22 247/23 256/18 268/23
**seek [12]** 8/17 23/21 30/14 33/9 33/10 50/23 51/1 51/1 71/13 88/2 204/9 269/15
**seeking [2]** 6/16 34/14
**seem [3]** 70/23 71/19 192/15
**seems [4]** 72/11 117/9 150/23 151/22
**seen [55]** 32/15 57/5 57/6 71/16 72/17 73/20 78/5 87/17 87/18 89/1 96/16 98/21 98/23 123/13 126/7 126/8 126/11 134/17 145/21 149/11 160/1 186/4 186/8 186/22 200/6 203/10 204/17 210/24 211/11 211/12 211/15 211/15 211/17 211/20 211/22 220/17 226/24 240/23 245/21 246/8 246/22 247/13 248/14 249/6 257/6 259/15 261/12 261/17 261/18 261/20 261/23 261/25 268/19 268/24 268/25
**sees [2]** 108/4 117/14
**select [1]** 201/7
**self [2]** 202/8 202/23
**self-insured [2]** 202/8 202/23
**sell [7]** 19/12 19/20 48/2 48/4 48/13 48/14 48/15
**sells [3]** 17/22 19/13 48/3
**send [4]** 75/18 234/5 267/13 271/19
**sending [2]** 72/18 121/19
**sends [1]** 102/4
**sense [6]** 64/10 72/12 136/19 165/8 189/20 247/14
**sent [24]** 70/13 70/14 80/24 81/2 102/16 102/17 112/6 112/14 122/6 123/5 123/15 123/17 123/21 124/8 124/11 124/11 127/4 127/5 134/13 179/8 209/25 245/7 245/16 262/8
**sentence [6]** 69/6 69/6 82/8 82/14 96/25 225/19
**sentiment [1]** 262/15
**separate [2]** 44/3 220/14
**separately [1]** 207/21

S


**sepsis [3]** 108/4 108/5 108/12
**September [8]** 55/12 112/12 118/16 118/17 119/6 130/22 130/25 147/8
**September 27 [1]** 112/12
**September 8 [2]** 130/22 130/25
**sequence [1]** 175/7
**series [1]** 227/10
**serious [1]** 44/11
**seriously [1]** 249/25
**serve [15]** 28/15 34/16 54/6 54/19 70/20 89/25 140/12 235/15 235/21 236/3 236/6 236/6 236/8 238/22 267/11
**served [7]** 9/2 36/4 53/4 85/16 178/14 206/12 206/14
**serves [6]** 28/21 30/17 54/3 140/3 156/16 238/14
**service [15]** 9/4 29/23 52/22 54/13 79/2 130/5 137/18 137/19 171/7 237/4 237/12 237/13 248/19 249/1 255/9
**services [44]** 9/5 10/17 27/22 28/9 30/12 30/15 30/18 31/14 32/1 32/6 32/12 32/12 32/25 37/23 54/16 55/17 55/20 55/21 57/22 58/13 79/2 79/5 79/10 79/21 88/11 92/22 92/22 103/2 120/2 129/17 130/3 137/9 137/13 138/10 140/10 140/11 147/18 149/23 171/5 181/6 182/7 191/20 235/19 237/8
**serving [4]** 53/14 236/2 238/21 239/3
**session [2]** 125/9 269/12
**set [12]** 18/13 74/12 185/8 186/10 186/11 186/12 187/22 188/14 194/17 202/3 202/16 234/4
**sets [5]** 200/22 222/14 237/13 237/22 237/22
**seven [26]** 16/17 16/17 17/5 17/11 57/23 59/13 75/2 77/17 133/8 149/12 182/9 192/13 196/11 197/7 199/18 199/24 200/1 210/9 212/2 217/10 217/13 217/20 227/7 237/3 257/1 259/9
**seventh [2]** 86/12 236/23
**several [8]** 33/5 98/9 107/21 121/21 170/7 177/10 219/5 232/17
**severe [1]** 187/24
**shadows [2]** 51/2 51/5
**shaken [2]** 84/11 244/19
**Shall [1]** 231/12
**shape [1]** 28/12
**share [14]** 38/17 39/22 40/3 99/25 115/22 125/20 126/2 126/14 126/21 127/1 167/11 167/12 167/13 267/17
**shared [5]** 63/9 66/23 145/24 229/13 261/22
**she [128]** 8/1 8/3 11/7 11/7 11/9 11/10 16/6 16/10 16/11 17/25 21/12 23/25 25/5 26/20 28/20 28/24 29/8 31/7 31/15 32/5 32/5 32/7 32/14 32/21 33/2 33/4 40/17 45/19 71/16 72/13 84/16 84/16 84/17 84/18 84/22 84/25 87/8 87/10 87/11 87/12 87/12 87/13 87/15 87/16 87/19 87/20 87/21 87/23 88/6 88/7 88/22 88/24 89/1 89/1 89/3 89/5 89/5 89/6 89/15 89/15 89/16 97/21 99/21 99/25 100/2 100/6 101/17 101/18 101/25 102/3 105/8 105/9 106/11 106/13 106/14 106/15 111/24 112/11 112/22 117/7 117/11 117/14 120/20 121/8 121/15 121/17 121/18 121/19 121/21 123/5 123/6 123/13 124/10 124/11 126/25 126/25 129/14 129/15 129/17 129/18 162/23 162/24 162/25 163/5 163/8 226/12 228/15 229/17 245/17 245/19 245/20 245/21 245/22 245/23 246/20 246/21 246/21 258/7 258/11 258/15 258/16 259/2 267/21 270/2 270/3 270/8 271/4 271/6
**Sheri [1]** 32/21
**shift [1]** 156/12
**shine [1]** 51/3
**shocked [1]** 142/23
**short [5]** 51/18 86/25 125/10 151/6 204/25
**shortly [2]** 28/16 143/5
**shot [1]** 32/2
**should [26]** 8/8 8/8 8/11 17/6 18/12 22/7 23/20 34/8 34/10 40/3 44/13 83/5 94/14 133/22 150/24 151/1 190/5 194/21 194/25 196/14 196/16 199/19 202/25 202/25 220/13 255/25
**shoulder [1]** 88/7
**shouldn't [3]** 16/19 34/6 90/1
**show [53]** 8/14 10/13 10/16 12/23 14/13 15/8 16/20 17/16 17/20 19/8 19/16 20/23 23/8 26/9 26/16 28/12 30/25 32/15 33/12 33/19 46/20 66/19 71/17 72/18 73/2 77/22 85/3 85/25 87/12 94/2 94/7 105/22 111/18 111/20 125/18 125/25 126/13 127/9 127/17 129/19 139/3 148/21 150/10 160/11 192/11 198/6 199/4 201/2 201/11 211/20 232/17 248/17 253/18
**showed [13]** 45/19 72/20 108/9 129/15 159/20 168/5 186/19 187/2 197/24 228/9 246/17 247/3 253/16
**showing [8]** 4/23 61/25 98/16 116/20 121/16 122/23 150/14 201/19
**shown [6]** 71/17 167/10 175/20 187/19 188/5 193/10
**shows [15]** 9/11 13/19 13/23 17/6 28/11 29/12 61/3 69/21 77/7 180/1 189/1 194/14 198/18 200/23 204/14
**shut [1]** 151/17
**sic [1]** 231/25
**sick [2]** 9/16 9/23
**sicker [1]** 54/22
**sickest [1]** 54/12
**side [18]** 5/13 5/24 13/20 13/23 14/20 94/12 147/14 148/2 150/21 164/23 182/4 182/23 183/4 238/23 245/16 247/18 247/21 268/9
**sides [2]** 4/13 7/8
**sides' [1]** 4/11
**Sidney [1]** 3/8
**sign [3]** 18/21 31/1 34/5
**signature [2]** 105/9 272/6
**signed [14]** 93/16 93/19 93/21 94/4 94/25 95/24 96/10 96/21 130/20 130/25 157/2 157/12 157/21 253/20
**significance [3]** 71/15 132/2 196/18
**significant [5]** 33/1 40/14 58/9 81/8 119/5
**significantly [6]** 14/25 77/23 103/15 245/14 248/21 258/24
**significantly less [1]** 258/24
**signify [1]** 131/25
**signing [1]** 129/23
**signs [2]** 49/4 105/9
**silence [1]** 39/17
**similar [22]** 58/5 77/1 81/1 83/24 95/12 95/15 105/21 114/20 144/20 154/5 154/6 182/23 193/13 195/2 196/24 197/12 198/16 211/24 227/14 228/11 247/8 255/12
**similarly [2]** 185/19 201/4
**SIMMONS [3]** 1/16 3/9 233/24
**simple [2]** 34/6 43/23
**simply [10]** 10/3 12/24 35/3 41/7 42/3 76/24 78/10 117/18 130/6 148/4
**since [28]** 16/24 21/7 21/10 28/24 41/5 45/21 62/24 84/1 96/23 113/19 115/23 118/8 130/10 134/25 136/16 144/15 148/19 153/3 167/3 177/22 177/24 189/4 226/24 235/7 235/13 238/3 243/6 260/18
**single [20]** 9/20 22/11 22/13 35/17 36/17 36/19 36/20 36/23 39/1 39/1 39/7 39/9 45/19 49/23 147/22 187/25 188/14 189/3 189/5 246/11
**sir [2]** 174/21 233/10
**sister [1]** 234/19
**Sisters [1]** 236/14
**sit [7]** 114/14 177/23 206/7 218/21 219/7 220/3 256/4
**site [16]** 56/17 56/19 57/19

**site... [13]** 57/22 58/6 68/12 68/15 68/16 89/12 95/12 113/10 113/14 128/15 214/24 236/17 239/22
**sits [1]** 41/11
**sitting [13]** 3/25 22/4 24/10 87/3 110/1 133/20 174/25 175/1 175/5 223/21 224/7 226/5 253/13
**situation [3]** 145/11 192/15 218/13
**six [11]** 11/8 17/2 33/22 59/12 133/7 177/25 196/7 196/11 196/12 235/16 259/13
**six hospital [1]** 177/25
**skinny [1]** 246/25
**skipping [1]** 195/18
**slack [2]** 12/17 49/8
**slide [12]** 13/19 51/5 58/7 175/17 175/20 194/3 195/24 198/6 204/8 229/13 261/19 261/24
**slides [5]** 7/16 60/20 175/15 196/10 197/15
**sliding [1]** 131/16
**slightly [2]** 138/19 160/6
**Sloan [1]** 176/13
**Smith [9]** 193/11 200/8 224/15 224/24 225/1 232/1 232/15 232/16 232/22
**snapshot [2]** 73/25 104/5
**so [244]** 4/7 5/5 5/8 5/15 6/1 6/11 7/14 9/20 10/1 12/11 13/13 13/25 14/15 14/23 16/21 18/3 18/12 19/6 19/18 21/22 21/24 22/24 23/24 24/6 24/8 25/3 25/5 26/5 26/20 31/3 31/20 33/12 33/16 41/8 42/17 43/3 44/20 45/11 45/24 46/10 46/11 48/9 51/2 51/10 53/16 53/17 54/7 54/11 54/20 55/8 55/21 56/6 56/13 57/22 60/13 61/10 66/17 67/8 68/15 70/13 72/6 74/1 75/19 75/23 76/7 76/25 77/24 78/17 79/13 80/2 85/8 85/11 86/25 87/13 87/23 88/7 89/4 89/7 90/13 91/3 92/20 96/16 97/11 99/8 101/8 102/5 102/17 104/7 105/12 109/1 112/22 113/11 114/1 114/2 114/16 125/7 126/10 127/23 129/11 130/23 132/1 136/23 138/11 139/17 140/14 140/24 142/5 143/4 144/8 145/10 147/2 147/10 148/3 148/4 153/18 158/1 158/4 160/10 162/4 164/18 164/23 164/25 165/3 166/5 169/11 174/10 174/13 175/7 176/18 178/8 178/11 181/23 182/13 183/19 184/2 184/10 184/15 185/8 185/14 185/24 186/20 187/19 187/25 188/14 188/17 188/21 188/23 189/1 189/7 190/21 191/25 192/4 192/14 192/16 193/7 194/3 194/15 194/19 195/7 195/14 195/20 196/1 197/11 197/22 198/1 198/3 198/18 199/6 199/25 201/1 202/20 203/3 203/7 203/14 204/8 207/21 208/18 208/22 208/24 209/14 209/17 211/1 214/23 227/3 227/12 227/22 228/20 229/10 230/8 232/9 232/16 235/17 236/9 236/14 236/25 237/1 237/9 237/21 238/4 238/9 238/15 238/18 238/19 238/24 239/13 240/6 242/1 243/21 244/7 244/7 245/6 245/10 245/14 246/8 247/1 247/2 247/9 247/12 247/16 247/20 248/24 249/1 249/21 257/1 257/4 258/9 259/1 261/18 261/23 262/3 262/7 264/24 265/19 265/21 267/5 267/10 267/15 268/21 268/23 268/24 269/10 269/14 270/4 270/16
**so let's [1]** 6/11
**so-called [3]** 21/24 33/12 33/16
**soap [2]** 66/20 66/20
**social [2]** 71/5 71/7
**sold [1]** 18/2
**sole [1]** 205/10
**soliciting [1]** 187/8
**solution [1]** 5/22
**some [80]** 5/4 7/11 10/15 16/23 21/25 26/20 29/24 45/13 54/23 58/7 71/6 72/12 76/20 77/10 77/13 77/21 78/14 85/5 85/10 94/8 97/2 98/4 104/5 105/21 106/14 114/19 114/20 114/25 116/5 116/7 116/10 117/10 119/5 124/13 124/17 129/12 131/15 132/13 133/3 151/15 153/20 158/14 160/6 164/11 167/5 167/22 173/24 174/5 174/14 177/2 184/16 189/20 194/6 202/16 202/22 203/16 205/10 210/24 214/21 216/4 216/16 217/17 219/13 220/6 221/3 223/16 226/24 230/4 237/4 237/14 238/1 243/13 246/21 252/14 252/22 255/21 266/7 267/12 269/13 269/19
**somebody [3]** 39/25 261/6 269/15
**somehow [1]** 200/5
**someone [4]** 15/25 32/2 175/3 252/12
**something [32]** 8/10 13/9 16/20 32/7 50/25 55/5 56/8 57/2 70/24 76/16 85/9 86/1 87/9 97/17 98/16 99/14 106/15 116/18 124/10 136/19 148/2 151/19 163/23 163/24 165/9 181/19 197/12 202/11 205/15 229/5 233/5 233/8
**sometime [3]** 61/10 158/20 242/18
**sometimes [3]** 116/10 117/14 186/3
**somewhat [1]** 195/7
**somewhere [3]** 9/25 241/24 266/16
**son [1]** 9/23
**soon [2]** 150/20 210/8
**sorry [7]** 3/23 39/1 42/22 93/6 97/20 241/7 268/11
**sort [3]** 45/13 90/8 175/1
**sound [3]** 6/5 16/13 234/25
**sounds [2]** 78/13 271/10
**source [6]** 86/9 126/9 191/12 194/20 215/19 225/1
**sources [5]** 16/7 190/10 191/24 224/23 266/3
**south [10]** 40/13 40/18 41/2 42/8 49/22 54/24 55/8 55/9 222/24 251/9
**southern [2]** 1/1 28/22
**spaces [1]** 141/18
**span [1]** 52/18
**Spanish [2]** 267/14 267/15
**sparked [1]** 52/7
**speak [5]** 49/23 95/7 95/14 221/18 239/24
**speaker [1]** 85/6
**speaking [2]** 141/9 209/10
**speaks [2]** 23/12 267/14
**special [1]** 137/20
**specialists [3]** 31/15 138/10 249/5
**specially [1]** 155/18
**specialty [6]** 30/15 32/24 67/14 196/4 201/14 235/5
**specific [17]** 13/3 63/12 84/1 129/7 130/2 171/2 171/3 171/17 201/15 209/20 219/17 233/2 246/11 254/16 255/1 255/7 261/7
**specifically [14]** 21/23 84/18 137/21 144/21 149/23 178/1 193/15 194/16 205/8 205/13 209/20 212/19 245/12 262/6
**speculated [1]** 264/21
**speculation [9]** 38/19 38/23 69/13 152/11 230/22 230/23 231/20 249/12 264/19
**speculative [2]** 198/21 199/8
**speedy [1]** 238/4
**spend [2]** 20/15 144/3
**spent [6]** 11/10 25/14 34/21 36/10 114/21 207/14
**sphere [2]** 213/23 213/24
**spine [1]** 54/13
**spirit [1]** 191/1
**spite [1]** 37/8
**split [1]** 181/23
**spoke [6]** 84/16 208/20 234/2 243/21 254/2 264/25
**spoken [5]** 121/21 170/7 208/10 256/2 267/17
**sponsoring [1]** 141/9
**spoon [1]** 258/12
**spot [2]** 67/2 160/7
**spreadsheet [4]** 48/15 104/23 105/17 105/20
**spring [13]** 13/25 15/5 21/8

**spring... [10]** 90/16 90/19 90/22 134/22 165/10 165/25 189/5 198/14 217/8 220/1
**squarely [1]** 150/23
**St [76]** 3/10 31/8 31/9 32/10 32/14 32/20 55/11 234/14 234/18 234/23 235/16 235/17 235/21 236/2 236/9 236/11 236/13 237/4 237/13 238/5 238/13 238/22 239/2 239/13 240/7 240/14 240/20 240/21 241/15 241/19 241/22 242/6 242/11 242/16 242/21 243/12 244/12 244/14 244/17 246/6 247/1 248/18 249/2 249/16 249/17 249/21 250/3 251/1 251/20 253/9 257/2 258/7 258/15 261/3 261/7 262/6 262/18 262/21 262/21 262/23 262/23 262/24 263/22 263/22 263/23 264/6 264/9 264/10 264/14 264/16 264/20 264/23 265/12 266/1 269/2 271/6
**stable [4]** 74/21 75/19 167/11 167/12
**stack [2]** 193/22 195/22
**staff [29]** 5/5 11/12 12/2 12/7 17/24 27/6 31/16 48/20 53/12 53/20 56/21 63/22 65/2 65/6 65/7 66/3 66/7 66/14 68/5 68/21 87/21 99/18 125/2 133/6 139/10 143/25 146/9 207/23 235/25
**staffed [6]** 68/11 68/13 155/21 207/1 207/3 236/15
**staffing [14]** 28/9 32/7 67/17 67/18 68/24 109/11 113/8 113/12 161/23 161/24 184/21 227/15 242/11 242/11
**stagnated [1]** 11/24
**Stamford [1]** 44/9
**stand [11]** 12/16 36/13 42/19 49/25 96/8 125/12 161/25 179/5 199/25 254/22 255/18
**standard [4]** 109/19 184/15 202/8 228/5
**standardized [3]** 74/18 190/1 191/10
**standards [2]** 110/2 240/1
**standing [10]** 43/13 75/23 86/16 86/18 97/19 143/12 240/2 243/24 247/9 249/12
**stands [2]** 25/21 221/5
**star [27]** 38/1 38/2 83/2 104/14 104/17 104/18 104/21 105/20 108/20 128/6 128/6 128/9 159/21 160/19 160/21 160/22 160/24 163/17 163/20 163/25 164/2 164/5 164/8 258/1 258/3 258/17 263/8
**stars [5]** 38/2 118/16 118/17 118/19 161/2
**start [15]** 4/8 4/8 7/12 24/1 51/17 78/25 135/18 143/19 164/14 194/3 198/23 230/12 235/2 253/19 253/22
**started [9]** 5/6 42/15 52/10 52/17 89/4 135/21 135/23 143/9 189/20
**starting [2]** 67/13 69/6
**starts [2]** 44/12 230/13
**stat [1]** 259/8
**state [25]** 6/8 29/2 30/19 81/8 85/3 85/6 85/9 86/2 130/1 138/18 138/21 171/1 171/2 177/10 177/16 189/15 201/10 236/24 237/3 237/8 239/7 253/24 255/1 255/7 255/8
**stated [1]** 157/14
**statement [14]** 7/15 35/9 35/13 38/8 46/12 48/17 85/3 95/12 102/12 102/14 112/10 120/19 164/17 172/4
**statements [7]** 7/13 26/14 85/25 86/7 86/10 133/1 151/16
**states [7]** 1/1 1/12 6/8 22/21 29/9 31/25 148/12
**static [1]** 19/1
**stations [1]** 71/3
**statistical [1]** 205/16
**statistically [3]** 193/16 193/17 193/19
**statistics [2]** 190/23 192/19
**status [2]** 153/13 241/16
**statute [1]** 50/22
**stay [5]** 31/3 74/3 139/9 148/11 263/25
**stayed [1]** 251/10
**steadily [1]** 168/8
**stems [1]** 200/2
**step [19]** 12/19 183/16 183/22 183/24 183/24 187/4 187/6 187/10 189/4 195/11 197/17 198/19 212/4 219/17 220/1 230/14 230/18 233/7 236/2
**Stephanie [7]** 70/13 99/5 99/7 100/2 100/3 100/12 100/19
**stepped [1]** 238/10
**steps [4]** 63/6 183/13 183/16 242/9
**still [17]** 10/23 19/8 53/8 53/10 98/4 98/9 111/2 131/4 136/9 142/6 144/25 153/10 153/15 174/17 196/13 236/16 251/10
**stip [1]** 270/10
**Stipes [2]** 2/7 272/5
**stipulation [2]** 60/19 69/4
**stop [18]** 14/13 25/10 29/15 33/10 34/1 36/5 46/16 47/13 93/4 97/3 124/17 158/7 158/15 165/1 240/10 240/25 252/3 252/6
**stopped [16]** 10/15 26/23 78/8 91/20 91/25 92/3 96/13 96/14 157/3 158/2 158/5 158/6 230/16 252/7 252/20 252/22
**stops [1]** 138/8
**stories [2]** 36/21 37/7
**story [2]** 49/5 262/1
**strained [2]** 202/1 203/24
**strategic [2]** 53/25 235/24
**strategy [5]** 52/24 82/21 83/15 116/8 126/10
**stream [2]** 102/23 111/20
**Street [2]** 1/18 2/4
**strengthened [1]** 180/25
**strict [1]** 139/11
**strike [4]** 110/20 113/5 115/1 122/4
**strive [1]** 82/9
**stroke [7]** 54/11 54/12 57/18 74/22 74/22 79/16 92/22
**strokes [1]** 79/18
**strong [2]** 137/15 153/14
**structural [6]** 181/17 181/19 182/6 182/10 196/7 196/13
**structure [18]** 182/15 182/25 183/4 183/20 184/1 184/9 185/11 186/15 188/16 189/24 192/13 195/18 197/7 199/18 214/4 214/8 217/17 217/20
**struggling [1]** 99/20
**students [1]** 177/14
**studies [3]** 128/8 200/7 224/9
**study [8]** 115/14 169/13 169/14 197/12 201/9 201/13 225/1 232/1
**studying [1]** 176/5
**Suarez [1]** 174/4
**subcommittee [2]** 177/23 178/9
**subcommittees [1]** 178/1
**subject [1]** 98/6
**submission [2]** 59/25 100/16
**submit [8]** 34/5 62/14 64/12 67/21 106/1 113/18 155/25 180/15
**submitted [9]** 59/1 59/20 103/10 113/4 113/17 119/20 179/4 180/20 180/23
**submitting [7]** 18/16 59/15 61/20 133/15 133/17 165/19 166/2
**subsequent [1]** 210/24
**subsequently [1]** 201/3
**subset [1]** 212/14
**substance [1]** 230/8
**substantial [5]** 179/25 187/24 200/23 222/1 228/5
**substantial achievement [1]** 228/5
**substantially [1]** 198/5
**suburban [1]** 29/22
**successful [1]** 60/7
**such [10]** 77/6 97/15 139/15 180/13 180/14 181/13 181/21 194/10 218/20 268/19
**suddenly [1]** 20/15
**suffer [1]** 152/16
**suffered [4]** 34/9 96/17 96/19 148/25
**suffering [1]** 50/6
**suffers [1]** 201/24
**suggest [1]** 13/7
**suggestion [1]** 156/5

**S**


**suing [1]** 91/11
**suite [3]** 1/22 2/4 127/10
**sum [2]** 178/1 184/23
**summaries [1]** 250/21
**summarize [1]** 179/16
**summarizes [1]** 175/17
**summary [15]** 7/1 14/21 23/10 23/16 76/13 76/18 76/19 78/3 78/14 117/23 117/23 118/1 147/12 150/25 211/12
**summation [2]** 57/2 57/9
**summer [3]** 80/24 82/6 88/4
**super [1]** 239/12
**supplement [4]** 149/2 150/18 188/7 250/16
**supplemented [5]** 76/10 131/7 150/24 173/7 173/9
**support [5]** 15/23 43/11 99/19 185/2 186/5
**supported [4]** 18/4 43/5 97/6 99/24
**supporter [1]** 40/17
**supports [3]** 47/10 68/16 233/3
**suppose [1]** 160/10
**sure [41]** 5/18 25/24 59/3 59/13 63/7 65/6 66/3 66/7 67/8 78/12 87/18 91/19 94/5 94/17 107/25 114/1 126/19 137/2 137/6 139/24 141/17 165/14 168/17 174/2 179/8 181/4 205/7 208/4 209/9 216/8 217/25 218/1 221/15 224/15 225/18 232/9 234/14 238/15 242/5 256/20 259/15
**surgeon [3]** 145/19 146/11 174/2
**surgeons [2]** 58/3 172/3
**surgeries [4]** 30/1 139/8 140/13 146/5
**surgery [15]** 25/8 25/15 58/12 74/2 88/23 89/15 108/12 137/12 137/15 137/24 145/19 145/20 146/4 249/18 269/8
**surgical [7]** 57/24 77/24 89/12 108/4 108/12 177/14 238/24
**surprise [3]** 209/15 210/1 270/13
**surprised [3]** 142/23 242/20 245/8
**surprising [1]** 26/21
**surrounding [4]** 54/7 54/23 84/9 224/4
**surveillance [1]** 66/19
**survey [181]** 10/21 10/25 11/8 11/10 11/16 11/24 12/1 12/3 15/15 17/21 18/16 18/22 19/1 19/19 20/16 21/3 21/16 22/22 23/5 23/7 25/23 34/5 36/23 37/2 37/19 38/22 39/6 39/7 39/9 40/17 40/21 41/7 41/10 41/11 41/22 42/10 42/17 42/25 43/2 44/2 44/2 44/4 44/5 44/8 44/12 44/14 44/15 44/17 44/18 44/21 46/16 47/10 47/13 49/24 56/8 58/22 59/5 59/7 59/8 60/12 62/13 64/17 64/21 73/11 83/1 89/9 89/22 91/20 92/4 92/5 93/1 93/4 96/9 96/13 96/14 97/3 97/5 99/19 100/23 101/1 107/4 109/15 110/5 110/18 110/22 111/2 111/6 114/6 115/11 119/10 119/13 119/17 120/10 121/4 121/11 131/22 132/6 133/4 133/5 133/14 133/22 139/11 139/17 139/18 139/20 139/21 139/24 141/20 141/21 141/24 142/5 142/7 156/9 156/13 157/4 157/10 158/2 158/18 158/23 161/7 161/14 161/25 162/15 164/14 164/19 169/1 169/5 169/14 170/18 179/20 181/25 182/8 182/12 183/6 183/12 183/15 185/10 186/13 186/17 192/14 194/18 206/16 211/18 212/2 215/5 215/12 218/8 218/18 219/3 219/9 220/16 223/10 225/24 226/21 227/6 227/12 230/2 240/2 240/3 240/8 241/1 241/6 242/20 251/21 252/1 252/4 252/12 252/18 252/22 256/19 257/5 259/12 259/14 260/24 267/7 267/9 267/13 267/16 267/18 267/22 268/3
**surveyed [1]** 142/4
**surveyors [6]** 56/13 56/20 56/23 57/3 57/19 139/4
**surveys [15]** 12/8 29/25 37/1 57/1 66/16 103/10 103/12 156/11 181/4 222/3 222/5 222/24 240/14 240/16 256/23
**survival [1]** 138/18
**survive [1]** 138/21
**survived [1]** 237/21
**sustain [2]** 150/22 250/7
**sustained [10]** 112/15 112/23 126/24 127/2 151/4 248/3 248/4 248/7 250/8 250/15
**swears [1]** 15/16
**swift [1]** 14/3
**sworn [8]** 15/17 51/23 129/19 135/6 157/3 175/8 234/8 255/6
**sworn affidavit [1]** 157/3
**SYDNEY [1]** 1/16
**system [35]** 12/15 35/1 36/10 55/7 62/22 63/3 63/6 65/1 82/11 109/20 126/14 162/13 177/9 177/21 177/25 177/25 179/24 189/18 190/5 190/7 190/16 190/25 191/3 193/6 206/9 213/20 213/21 218/22 218/25 219/2 219/12 222/11 242/1 242/2 242/3
**systems [7]** 5/4 62/18 62/19 139/7 176/9 178/20 180/3


**T**


**tab [2]** 25/16 25/18
**table [1]** 79/13
**tactic [1]** 36/6
**tailored [1]** 67/7
**take [45]** 7/4 7/6 9/23 23/24 36/4 42/10 42/16 51/16 54/11 59/10 59/12 63/6 70/12 79/8 79/17 82/24 83/15 92/6 92/18 97/20 102/14 107/2 110/4 113/3 122/5 124/18 125/12 133/5 140/25 141/8 142/6 147/2 161/5 164/22 188/20 204/22 204/23 212/1 212/4 241/6 249/25 259/16 262/7 267/1 267/18
**taken [10]** 7/11 34/11 51/18 79/12 84/1 125/10 195/24 204/25 219/17 242/20
**takes [6]** 31/20 57/9 74/15 113/25 133/4 142/9
**taking [10]** 20/9 41/15 52/12 87/6 87/20 96/13 96/14 197/13 233/25 236/2
**talk [46]** 6/6 12/20 17/14 17/15 37/14 38/16 39/2 39/7 39/8 40/18 43/14 47/14 84/16 84/17 87/4 98/12 102/19 103/4 119/12 121/6 124/22 125/7 129/12 135/14 135/15 135/16 137/4 139/8 139/9 141/20 142/12 145/15 145/16 166/16 167/10 210/7 216/19 217/6 221/12 223/25 234/3 234/22 234/24 258/11 263/1 263/14
**talked [36]** 17/13 38/25 39/11 79/7 87/13 87/20 89/13 92/2 92/17 95/12 108/19 109/13 111/12 111/22 113/6 113/25 119/8 120/5 128/12 132/23 149/22 153/12 160/19 161/9 166/16 170/9 189/22 189/25 215/16 216/10 216/18 219/18 225/15 229/17 248/10 266/4
**talking [20]** 56/21 88/23 89/4 108/11 125/19 163/24 167/23 167/25 169/21 203/24 214/10 221/22 221/23 222/2 236/9 245/2 245/19 245/20 257/12 266/14
**talks [8]** 40/12 77/24 85/1 87/11 213/6 214/4 221/1 221/2
**tank [3]** 44/10 44/11 220/10
**targeted [2]** 22/5 34/3
**targets [1]** 71/6
**task [1]** 34/11
**tax [1]** 17/23
**teach [3]** 176/12 177/7 177/9
**teaching [3]** 46/2 46/8 180/8
**team [24]** 57/5 59/7 59/19 87/5 89/14 101/4 109/25 110/24 116/8 126/10 139/4 139/5 162/6 169/16 206/21 206/23 207/4 207/23 209/7 209/8 209/18 211/8 242/21 268/7
**teams [4]** 56/13 79/21 141/16

**teams... [1]** 146/7
**Tech [1]** 136/4
**technical [1]** 9/25
**technically [1]** 215/19
**technician [2]** 113/13 139/6
**technology [3]** 64/24 137/9 137/16
**tee [1]** 85/23
**tele [2]** 84/14 86/23
**telemetry [2]** 135/24 136/2
**tell [55]** 7/2 21/19 22/9 22/13 27/13 28/17 39/14 40/2 41/14 41/16 41/23 41/25 44/17 44/18 45/10 45/13 48/7 50/16 50/16 52/3 54/2 58/18 83/14 84/13 94/10 108/21 111/19 125/6 135/19 137/4 138/14 139/14 140/2 141/11 167/15 172/6 172/7 173/24 208/20 235/3 236/12 238/13 241/14 256/9 256/11 256/12 256/15 259/9 263/17 264/13 265/5 265/7 270/20 271/15 271/22
**telling [5]** 24/24 43/11 67/3 81/15 130/8
**tells [11]** 8/24 16/18 16/25 22/8 22/25 23/13 23/18 27/3 57/10 109/10 269/16
**ten [29]** 16/5 40/20 103/19 103/19 104/6 137/24 176/12 176/16 176/23 181/10 181/15 182/2 190/24 192/20 192/25 193/15 215/17 224/3 224/13 233/19 238/20 247/18 263/21 263/25 264/15 265/11 265/11 265/15 265/22
**tend [1]** 140/10
**Tenet [26]** 35/3 35/8 35/19 35/23 35/24 36/4 39/16 47/7 47/9 47/12 50/19 55/15 97/4 97/4 99/19 99/24 100/22 100/22 116/21 121/13 126/2 126/16 158/16 158/17 158/21 164/13
**tens [1]** 30/1
**tentacles [1]** 29/15
**term [6]** 15/21 20/1 140/15 140/16 151/11 229/3
**terminology [1]** 95/2
**terms [13]** 4/4 75/13 76/3 124/19 133/3 166/25 192/2 199/9 206/7 215/22 215/22 223/18 269/17
**tertiary [1]** 79/2
**test [11]** 62/19 63/6 78/17 80/22 84/23 109/20 115/11 120/21 196/18 239/25 241/6
**tested [1]** 76/17
**testified [24]** 41/10 96/8 118/21 119/19 122/1 122/4 125/23 126/25 147/17 149/3 159/14 168/17 168/24 170/5 171/21 178/17 207/1 221/4 232/4 252/6 253/6 256/6 268/18 271/8
**testify [21]** 15/4 19/22 20/17 28/5 28/24 30/4 30/20 32/5 32/14 33/2 43/7 48/21 76/21 84/23 110/21 188/6 219/19 225/17 245/17 253/14 266/12
**testify that [2]** 15/4 28/24
**testifying [4]** 175/2 227/21 230/23 245/23
**testimony [44]** 4/18 4/20 5/18 5/25 15/12 15/17 18/25 26/10 48/23 76/13 78/13 84/25 85/24 91/6 106/16 129/12 158/1 175/15 180/19 187/12 203/10 203/15 209/22 221/5 221/9 221/11 222/6 224/25 225/12 225/18 225/21 226/4 232/25 233/2 233/3 239/20 247/16 251/19 257/18 257/22 261/5 267/7 270/11 270/22
**testimony that [1]** 18/25
**testing [8]** 37/4 63/8 109/22 109/24 109/25 110/3 140/13 197/2
**Texas [3]** 135/20 136/4 136/8
**text [4]** 72/18 194/22 195/16 218/3
**than [70]** 12/3 12/8 14/7 14/25 15/6 17/2 18/3 20/9 21/25 22/20 22/23 24/14 25/23 25/25 28/12 32/24 41/21 43/21 46/25 51/7 54/23 55/2 65/12 69/21 69/25 94/12 103/15 109/18 138/21 140/5 141/2 141/3 146/6 160/5 164/24 165/14 168/14 169/9 181/23 185/22 186/18 188/18 188/24 190/24 192/16 192/20 193/17 193/19 195/9 196/7 196/11 196/12 198/1 208/7 211/20 213/13 213/18 213/20 213/25 224/5 224/8 224/21 226/1 229/12 229/14 230/20 237/13 256/20 269/2 269/10
**thank [32]** 3/12 4/2 7/14 34/17 34/18 34/20 51/14 51/15 51/16 90/5 94/20 98/6 98/18 101/25 109/2 119/15 125/16 135/3 151/24 153/17 174/21 175/7 179/11 226/6 228/13 228/13 231/23 233/9 233/10 233/15 251/13 271/20
**thanked [1]** 87/23
**thanks [2]** 4/2 101/23
**that [1577]**
**that really [1]** 52/6
**that shows [1]** 29/12
**That's [1]** 170/3
**the CEOs [1]** 208/25
**The community [1]** 33/17
**the data [1]** 154/14
**the ER [1]** 25/4
**the Leapfrog [1]** 197/17
**the methodology [1]** 96/11
**the pediatric [1]** 52/21
**the quantitative [1]** 187/2
**the safety [1]** 258/22
**the services [1]** 27/22
**their [147]** 5/5 5/17 9/23 9/23 9/24 10/9 10/16 11/14 12/2 12/6 14/1 15/19 19/18 19/20 21/3 21/6 21/24 22/2 23/17 24/13 26/4 26/23 27/6 27/13 27/15 30/2 30/9 30/11 31/13 32/19 33/6 33/18 33/19 33/20 34/12 34/12 34/15 35/9 35/14 35/16 35/22 36/4 36/5 36/11 36/19 37/9 37/19 37/20 38/4 38/17 38/22 38/25 39/2 39/9 39/14 40/1 40/5 40/21 40/23 41/3 41/11 41/15 41/18 42/10 42/12 43/3 43/22 44/10 44/19 46/4 46/8 47/3 47/25 48/19 48/24 48/25 49/13 49/17 50/11 50/13 50/14 50/15 51/3 53/22 55/22 56/24 66/3 66/7 66/18 67/6 75/18 83/8 85/9 85/11 86/8 86/20 87/21 92/17 109/20 114/8 119/17 136/21 139/9 140/18 141/1 141/1 141/5 141/5 141/6 144/4 145/5 147/18 148/3 148/16 148/22 150/3 152/16 156/6 172/1 172/3 174/13 186/13 196/17 197/25 199/5 203/3 203/15 203/24 207/16 211/16 212/3 218/7 218/18 219/8 219/15 220/4 220/11 238/5 238/17 243/11 253/3 254/12 256/13 261/11 270/1 270/3 270/5
**them [114]** 4/1 4/12 6/2 6/17 6/24 7/4 7/5 8/3 9/3 10/3 10/14 12/16 12/19 13/9 16/10 17/11 21/3 22/1 22/9 27/17 28/1 28/2 32/14 37/17 38/1 38/9 39/25 40/6 40/21 42/17 43/4 47/7 47/9 47/25 48/10 48/14 49/12 50/10 50/16 50/22 51/4 51/11 55/23 57/4 57/20 61/25 63/10 67/3 68/17 70/22 74/23 79/13 79/20 80/24 81/8 81/15 83/3 84/5 85/21 86/20 92/18 97/16 97/16 102/17 102/18 116/9 128/2 133/15 134/21 134/23 140/21 140/25 141/1 143/16 144/6 145/13 145/16 145/16 147/15 147/15 150/4 165/5 172/9 172/10 183/10 184/5 185/18 198/10 204/6 209/1 209/20 209/25 212/2 212/7 219/15 220/17 224/12 239/6 239/11 244/23 244/25 246/13 246/25 253/16 256/3 256/12 256/15 256/24 256/24 259/16 261/14 261/17 270/4 271/19
**themselves [11]** 3/16 9/23 13/17 27/19 39/13 41/7 136/22 177/14 217/13 217/21 217/24
**then [37]** 5/25 12/21 18/2 20/14 24/4 25/5 25/16 28/2 31/11 32/19 52/14 52/22 52/24 52/25 52/25 56/15 58/20 58/25 63/8 89/14 99/4

**then... [16]** 115/20 122/5 136/6 136/7 150/13 165/19 175/24 194/21 196/3 201/13 230/18 234/23 234/24 240/23 240/23 254/5
**therapeutics [1]** 242/4
**therapists [1]** 65/6
**therapy [2]** 247/7 269/7
**there [224]** 3/25 4/9 4/14 6/1 6/15 7/9 7/10 9/25 13/13 14/3 14/13 24/5 24/7 24/7 24/16 25/20 25/21 26/7 27/9 29/7 33/25 34/8 37/16 40/4 40/19 41/9 42/1 42/3 42/11 42/14 44/3 44/19 47/6 52/12 53/15 56/17 57/8 57/19 58/8 59/7 59/12 59/25 61/20 61/22 63/3 63/17 66/12 67/1 67/5 68/12 68/14 69/17 69/19 71/1 71/3 71/3 71/5 71/7 71/10 72/1 72/4 73/24 74/17 74/19 74/25 75/4 75/6 75/18 75/20 75/22 80/23 81/1 83/2 84/4 85/4 85/13 85/16 85/16 85/17 85/22 86/25 87/2 87/11 88/11 89/20 90/2 92/5 92/16 92/17 92/20 93/8 94/8 94/12 96/20 98/4 98/8 101/18 106/14 106/22 106/24 108/20 109/2 110/7 113/11 114/1 114/25 115/15 116/7 117/4 117/10 117/15 119/13 121/8 121/9 121/22 122/6 122/12 122/14 122/15 122/16 123/5 123/11 124/13 125/18 130/5 131/11 132/1 139/16 141/2 141/5 141/5 141/6 141/6 143/22 144/23 145/14 145/22 147/16 148/8 149/21 150/18 150/19 151/8 151/15 152/14 152/18 153/15 155/18 156/5 160/6 163/24 164/1 168/10 171/23 172/4 174/6 178/1 179/9 179/25 181/10 182/9 187/25 188/14 189/3 189/5 189/11 190/9 191/23 192/1 193/9 196/3 197/11 198/11 200/2 200/7 200/9 200/23 201/9 201/13 202/18 203/21 204/3 204/14 205/23 212/9 215/3 215/8 215/16 216/23 216/25 218/3 218/9 218/10 218/11 224/3 225/19 227/14 229/24 230/8 233/4 233/20 236/1 238/4 239/21 240/14 240/14 243/13 246/5 247/5 247/9 247/10 248/22 249/15 250/16 251/1 252/3 255/22 256/20 261/10 261/13 262/8 266/19 268/15 271/21
**thereafter [1]** 52/17
**therefore [1]** 184/24
**Thereupon [4]** 51/18 125/10 204/25 271/24
**these [95]** 5/5 6/1 6/15 6/23 10/17 13/8 13/15 16/14 16/18 19/14 20/16 20/19 20/20 20/25 23/2 25/7 26/13 28/9 28/10 29/3 30/8 30/10 33/11 33/19 34/1 34/4 35/6 35/9 35/12 35/20 35/22 36/3 36/21 38/16 38/19 39/13 39/13 39/16 40/21 40/24 41/2 41/4 41/9 43/9 44/8 45/2 46/25 47/8 48/2 48/21 58/4 61/17 67/19 76/4 77/15 89/21 90/9 96/7 97/16 116/13 126/6 129/22 129/23 130/20 130/25 148/25 149/13 149/17 149/21 150/11 155/25 161/6 170/12 171/1 173/9 178/5 180/6 184/6 185/11 186/15 188/1 188/3 188/9 189/7 191/4 210/9 212/2 221/18 222/10 222/25 223/1 223/25 224/1 224/4 254/23
**they [529]**
**they all [1]** 215/17
**They filed [1]** 149/24
**they liked [1]** 264/17
**thing [18]** 37/9 40/9 46/15 49/3 51/11 79/16 107/19 116/24 128/23 128/25 136/18 161/20 215/2 225/15 242/8 247/10 269/13 270/14
**things [24]** 4/3 7/9 16/23 46/9 71/3 71/6 79/4 83/1 92/23 94/6 94/16 124/14 149/8 161/11 185/4 189/7 225/2 227/14 232/9 232/17 251/10 251/18 268/15 271/16
**think [89]** 4/8 4/12 4/16 4/23 5/6 5/22 7/11 7/12 11/17 17/15 23/11 26/1 26/2 31/15 44/10 44/11 60/19 64/11 72/9 83/12 83/18 89/20 93/2 94/8 96/12 100/9 108/24 112/21 117/12 117/15 123/2 123/11 124/10 125/5 129/11 129/21 133/1 142/9 148/2 151/7 151/22 158/13 159/2 159/14 163/23 189/7 197/19 199/8 199/21 200/15 203/17 204/4 207/3 208/3 212/11 213/1 213/19 213/24 216/4 216/6 218/4 218/9 218/10 218/13 218/19 218/24 219/13 220/10 221/2 222/13 223/16 227/22 227/25 228/20 229/13 231/17 232/21 238/25 240/25 241/17 248/5 248/11 250/8 250/15 250/19 261/16 264/7 264/21 265/11
**thinks [1]** 94/12
**third [14]** 40/15 48/19 48/20 65/18 67/13 67/13 85/21 86/12 179/25 190/17 195/5 195/6 195/16 202/16
**this [473]**
**those [138]** 5/11 6/10 13/21 13/25 14/18 14/21 14/24 15/24 20/25 21/8 21/17 25/13 25/19 27/24 28/14 33/3 40/3 40/5 44/5 50/1 55/20 62/19 65/7 66/16 66/17 67/20 74/18 75/21 79/3 79/4 79/5 79/24 79/25 80/2 80/5 92/6 92/7 92/18 92/23 92/24 94/16 98/15 99/8 104/9 107/14 108/14 108/15 116/14 116/17 118/19 131/5 131/7 131/16 132/9 139/24 141/4 144/13 147/10 151/21 159/5 159/11 160/8 162/4 165/17 166/1 174/5 176/23 178/13 178/19 180/9 181/10 181/15 181/25 182/7 182/11 182/18 183/1 184/1 184/11 184/23 185/20 187/12 190/9 190/14 191/1 191/12 192/13 192/25 193/1 193/14 195/20 196/9 198/1 199/8 199/20 199/25 201/19 203/7 206/19 207/11 209/7 209/25 210/12 210/24 211/2 211/4 212/25 217/13 218/11 219/5 219/13 220/15 220/21 224/12 226/5 227/13 228/23 237/13 238/11 238/21 240/11 240/12 241/13 243/19 249/3 249/4 249/6 249/10 253/20 254/14 255/24 257/13 260/24 263/21 263/24 263/25 265/3 271/17
**though [7]** 28/9 42/11 91/17 95/24 121/23 166/2 260/25
**thought [6]** 112/18 142/4 175/4 225/16 244/24 245/23
**thoughts [1]** 125/6
**thousand [2]** 59/12 133/7
**thousands [4]** 30/1 37/1 43/22 239/21
**three [32]** 6/1 7/22 14/20 14/23 20/21 20/23 25/18 56/7 56/17 57/19 57/20 57/23 61/25 64/9 68/10 84/12 87/1 88/5 139/3 153/24 179/17 182/16 182/25 199/20 200/22 201/19 214/4 222/14 237/9 237/19 241/13 247/21
**threshold [2]** 63/12 192/19
**thrived [1]** 237/21
**through [59]** 8/3 15/12 21/14 25/14 26/12 26/20 29/4 29/25 31/8 31/25 35/10 40/25 45/8 49/6 57/21 57/24 65/10 65/11 73/25 73/25 74/25 76/24 76/25 77/1 77/2 83/13 93/24 94/12 110/24 120/4 127/15 137/25 138/2 139/3 140/13 184/11 192/3 202/2 211/9 221/5 227/13 241/9 241/12 241/15 241/18 241/20 241/22 242/3 248/15 248/23 251/18 253/11 257/2 261/19 261/23 265/20 265/24 265/24 269/6
**throughout [10]** 6/10 55/10 56/12 56/20 56/25 60/13 68/15 76/11 139/9 141/4
**thrown [1]** 238/9
**thumbs [1]** 12/21
**thus [2]** 18/13 208/5
**tied [2]** 28/7 47/11

**Tiktok [11]** 21/22 71/8 71/11 72/2 72/3 72/16 72/20 108/9 108/11 129/15 132/24
**till [1]** 51/17
**time [106]** 4/1 5/2 7/4 7/8 9/20 11/5 11/11 11/17 11/18 16/20 16/22 25/14 27/25 28/4 31/8 31/19 34/21 42/13 42/13 42/17 44/7 44/10 45/22 46/4 46/10 48/25 51/14 56/9 58/21 61/9 68/3 73/16 75/4 76/1 79/10 86/2 86/25 88/23 96/14 98/2 98/16 98/24 99/1 100/6 100/8 100/25 101/14 105/10 107/23 108/18 113/25 114/2 114/22 118/15 123/20 130/18 131/16 133/4 135/14 136/11 136/11 139/16 139/17 142/9 144/4 146/23 150/16 162/2 163/1 163/8 173/23 177/11 182/4 186/16 188/9 191/8 191/16 191/20 193/20 193/21 197/24 199/4 204/21 210/11 210/11 212/10 221/7 225/8 233/11 233/13 234/23 236/11 242/11 242/12 242/13 242/24 258/15 258/16 259/13 259/18 260/15 262/7 264/1 265/20 265/24 269/16
**timeliness [1]** 113/10
**timely [2]** 80/25 107/9
**times [5]** 140/19 178/18 188/23 237/24 261/13
**timing [2]** 100/5 210/20
**tirelessly [1]** 77/17
**title [1]** 212/12
**TLG [1]** 130/10
**TLG's [7]** 95/1 95/6 95/18 95/25 130/13 157/17 171/10
**to hospitals [1]** 260/8
**to respond [1]** 206/15
**to Tenet [1]** 121/13
**to use [1]** 130/12
**today [38]** 3/7 4/10 22/4 38/18 43/10 50/3 53/11 65/11 91/6 107/5 107/24 110/1 110/21 114/14 120/25 125/3 133/20 133/21 135/17 162/5 164/6 175/15 179/9 209/22 219/7 234/16 234/17 234/25 235/15 236/16 247/24 252/22 253/13 254/22 255/18 256/18 259/2 270/16
**together [7]** 13/17 55/18 57/3 63/22 87/7 162/6 208/11
**told [15]** 36/21 37/7 39/15 40/22 41/18 41/24 47/7 86/20 89/5 94/22 130/23 145/13 145/20 165/7 219/14
**Tom [3]** 39/7 40/1 41/13
**too [5]** 4/24 16/1 230/4 230/17 243/17
**took [10]** 5/4 23/17 24/19 38/21 45/7 87/25 118/16 193/15 199/17 246/17
**tool [4]** 23/14 48/10 66/19
**tools [2]** 65/8 141/18
**top [10]** 25/7 39/15 120/18 124/5 128/18 137/23 137/24 237/1 259/18 260/6
**topic [1]** 205/20
**topics [2]** 176/23 180/9
**torture [1]** 156/24
**total [10]** 13/16 137/25 138/1 138/24 184/5 184/23 185/21 185/24 192/24 227/25
**totally [1]** 45/17
**totals [1]** 14/1
**touch [1]** 227/18
**touching [2]** 66/4 66/8
**tour [1]** 146/9
**tourism [1]** 269/9
**touting [1]** 219/12
**toward [1]** 140/10
**towards [1]** 21/17
**town [3]** 45/16 125/7 238/8
**tracers [1]** 56/12
**track [14]** 73/23 74/10 74/12 74/13 102/21 103/8 104/19 104/20 108/19 146/12 149/4 159/2 167/17 241/19
**tracked [2]** 65/5 76/16
**tracker [1]** 116/22
**tracking [2]** 108/21 113/20
**tracks [5]** 103/19 103/22 109/3 116/6 242/6
**trade [1]** 35/25
**traded [2]** 35/1 36/9
**trademark [3]** 86/7 88/13 129/3
**tradition [1]** 236/16
**traditionally [1]** 137/9
**tragic [1]** 138/17
**trained [3]** 67/14 68/7 155/18
**training [5]** 66/2 66/6 66/15 68/6 88/7
**trains [1]** 176/15
**trajectory [1]** 20/14
**transcript [3]** 12/17 263/24 272/1
**transfer [13]** 32/15 55/23 119/2 248/23 248/24 248/24 249/8 263/21 264/9 264/23 266/14 268/23 268/24
**transferred [7]** 32/14 32/20 248/18 248/20 263/17 264/20 264/22
**transferring [1]** 263/14
**transfers [5]** 27/23 32/8 32/17 268/18 268/19
**transition [2]** 98/21 99/6
**transitioned [6]** 52/16 99/4 136/1 136/5 136/6 136/8
**transparency [21]** 8/9 33/14 34/24 35/2 35/4 35/10 36/14 36/17 38/11 40/24 43/15 43/16 43/18 43/24 43/24 43/25 44/13 46/11 50/20 51/12 200/4
**transparent [13]** 35/11 38/12 39/9 44/14 45/6 45/17 46/23 48/12 50/18 127/23 156/6
**transparently [1]** 50/2
**transplant [1]** 135/24
**transplants [1]** 52/13
**transported [1]** 242/4
**trauma [20]** 9/5 31/23 32/10 52/15 54/10 57/22 68/10 68/11 68/18 68/20 68/25 74/19 74/19 79/23 79/24 92/22 140/20 237/6 237/15 237/24
**traumas [1]** 237/17
**travel [2]** 204/14 224/10
**traveling [5]** 204/13 223/18 223/25 224/8 224/9
**trays [1]** 67/6
**treat [6]** 79/21 204/6 237/2 237/19 238/18 249/3
**treated [7]** 24/13 61/22 74/9 75/2 180/3 204/6 237/16
**treatment [5]** 30/14 32/20 85/11 85/12 152/14
**treatments [1]** 238/11
**treats [1]** 238/2
**tremendous [1]** 102/24
**trends [5]** 66/18 67/6 67/9 169/8 232/22
**triaged [1]** 79/25
**trial [31]** 1/11 6/22 36/14 37/21 40/25 42/4 43/13 43/25 49/6 49/18 76/12 77/12 97/14 98/6 98/17 98/23 124/17 147/11 147/13 148/18 150/5 150/10 150/20 151/6 173/3 175/6 175/7 178/17 221/4 245/9 261/6
**triannual [2]** 56/8 56/9
**TriCare [1]** 82/9
**TriCare beneficiaries [1]** 82/9
**tried [3]** 6/7 34/2 60/2
**triggering [1]** 27/23
**Trillion [1]** 126/10
**trip [1]** 31/22
**troll [1]** 85/21
**tron [1]** 267/23
**trope [2]** 43/4 48/12
**true [28]** 39/12 42/1 42/3 42/6 43/9 44/21 48/2 49/9 65/16 74/21 79/23 108/17 109/23 110/2 110/18 120/3 121/1 156/7 157/10 204/12 218/17 219/4 219/6 222/4 223/15 228/20 230/14 252/23
**truly [1]** 261/10
**trust [5]** 8/15 8/18 33/8 140/18 140/25
**trusted [1]** 54/4
**trustee [2]** 177/20 177/22
**trustees [2]** 177/24 178/10
**truth [10]** 6/23 71/20 81/6 81/10 81/14 81/17 85/2 85/8 85/14 85/25
**truthful [1]** 48/23
**try [10]** 6/11 7/8 7/11 29/15 75/10 85/21 86/3 117/11 177/17 234/6
**trying [17]** 15/18 22/15

**T**

**trying... [15]** 25/24 39/17 60/6 81/14 87/12 112/16 170/3 190/7 192/21 199/10 238/25 247/6 257/4 261/24 264/13
**TSA [1]** 262/5
**Tuesday [2]** 269/21 271/14
**turn [6]** 18/19 53/18 53/18 236/9 240/19 252/11
**turned [2]** 66/16 81/3
**turning [3]** 63/16 66/1 239/13
**turnover [1]** 86/24
**turns [1]** 12/11
**TV [2]** 41/4 43/10
**twice [7]** 23/1 69/8 69/11 160/2 181/8 202/12 256/2
**twice my [1]** 256/2
**twist [1]** 13/7
**two [61]** 5/23 6/1 7/22 7/23 12/13 21/8 28/20 38/2 46/9 54/9 67/19 68/14 68/15 78/6 80/23 81/5 84/13 130/9 130/24 137/13 160/24 172/6 176/15 177/15 183/3 183/16 183/24 183/24 185/19 187/4 187/6 187/10 187/19 189/4 194/15 195/11 197/15 197/17 198/19 199/15 203/14 206/13 210/4 220/1 221/7 224/9 230/14 230/18 233/7 233/22 236/6 237/15 249/10 251/4 256/22 257/8 267/1 267/4 270/2 270/5 271/10
**two-year [1]** 176/15
**type [7]** 5/23 74/1 117/13 130/5 149/25 203/22 255/9
**types [4]** 126/6 192/5 196/4 198/24
**typical [2]** 140/12 217/4
**typically [2]** 57/1 57/13

**U**

**U.S [7]** 48/6 177/6 177/9 177/11 196/3 201/14 201/17
**UC [2]** 20/4 20/8
**ugly [1]** 12/12
**Uh [2]** 62/11 237/25
**Uh-hum [2]** 62/11 237/25
**ultimate [1]** 101/8
**ultimately [1]** 20/9
**unable [1]** 32/19
**unannounced [1]** 56/9
**unavailable [2]** 9/6 45/23
**under [23]** 17/5 35/6 40/11 62/17 68/5 85/12 85/20 91/1 93/19 94/25 95/22 115/18 120/10 138/19 157/12 160/18 192/10 204/10 206/22 207/6 208/8 253/20 263/22
**undergo [1]** 109/20
**undergraduate [1]** 175/23
**underlie [6]** 179/23 181/7 189/18 207/4 213/20 220/15
**underlying [15]** 76/19 77/3 77/15 78/6 78/14 180/11
180/12 185/6 191/17 191/22 207/5 213/19 230/12 230/13 232/11
**underserved [4]** 235/17 236/23 238/15 267/11
**understand [52]** 4/22 8/24 22/12 25/1 25/12 26/13 36/2 66/18 75/7 75/10 78/18 88/10 98/10 103/5 106/15 109/1 111/1 111/4 111/5 111/15 114/17 114/18 116/13 119/13 159/8 159/9 159/11 162/13 165/21 172/2 205/7 206/4 206/18 209/6 213/17 218/4 232/21 241/5 243/17 243/19 246/9 247/13 252/2 252/25 257/5 260/5 260/7 261/5 261/18 265/12 267/15 270/15
**understanding [23]** 33/15 92/3 93/8 93/9 93/12 98/4 114/14 158/5 164/8 166/20 181/2 210/20 210/21 211/9 211/23 214/17 215/8 215/15 227/3 228/4 228/22 228/23 252/11
**understatement [1]** 12/24
**understood [6]** 105/14 107/16 152/5 199/21 225/18 252/23
**underway [1]** 121/22
**undisputed [1]** 38/7
**undo [1]** 24/21
**unequivocally [1]** 21/7
**unfair [4]** 10/11 29/15 35/25 243/15
**unfairness [1]** 147/12
**unfortunate [1]** 70/15
**uninsured [1]** 236/20
**unique [1]** 238/20
**uniquely [1]** 237/22
**unit [14]** 31/14 32/10 52/21 53/18 66/16 66/17 84/14 86/23 86/24 135/24 135/25 140/7 184/21 227/15
**UNITED [6]** 1/1 1/12 6/8 22/21 29/9 31/25
**units [2]** 53/20 68/10
**University [9]** 15/13 135/20 136/4 175/25 176/2 176/10 187/5 189/21 235/4
**unlike [2]** 49/19 213/15
**unobjected [2]** 94/11 94/18
**unreliable [7]** 112/11 180/4 190/25 192/20 192/22 200/19 203/8
**unsafe [4]** 10/1 29/13 80/4 146/2
**unscrupulous [1]** 46/21
**unseal [1]** 6/16
**until [11]** 46/6 80/18 132/22 150/20 151/13 163/16 173/3 204/23 234/1 252/20 254/22
**untrue [1]** 43/5
**unusual [1]** 6/9
**up [112]** 5/24 7/6 7/20 10/6 12/21 12/25 13/1 13/15 13/24 14/15 14/18 15/1 16/15 17/9 17/11 17/18 19/4 19/10 24/6 28/16 28/20 29/6 33/16 33/17
34/9 34/12 36/22 39/22 39/23 43/10 46/6 46/10 49/25 50/16 52/5 59/2 60/18 66/24 67/12 69/3 75/6 75/14 83/21 85/23 87/3 87/13 89/11 97/10 97/17 99/9 100/2 100/6 104/20 105/2 107/21 116/19 119/4 119/5 121/9 122/11 124/4 127/1 134/5 139/3 146/18 147/11 147/13 148/18 148/21 151/13 153/14 153/16 155/17 163/16 167/8 167/15 170/14 175/7 185/20 193/22 195/22 197/1 201/17 213/1 215/4 218/14 227/16 230/5 235/12 239/11 241/7 247/22 247/23 249/16 249/21 251/5 252/20 253/18 253/25 256/22 257/17 257/21 258/4 258/20 259/13 262/25 266/1 266/2 266/15 267/1 267/22 271/9
**up-to-date [1]** 19/4
**update [1]** 33/23
**updated [3]** 19/2 76/24 78/8
**upon [2]** 9/7 180/6
**upper [4]** 20/14 88/7 194/3 194/22
**upset [2]** 89/4 243/23
**upward [1]** 67/9
**urban [1]** 32/25
**urgent [2]** 75/22 152/15
**urging [1]** 29/10
**url [1]** 16/21
**us [65]** 6/16 7/3 16/12 22/5 23/13 36/3 36/5 36/14 37/19 54/24 55/23 56/20 57/9 57/10 59/12 67/8 70/8 74/18 76/7 76/9 76/10 80/21 81/3 85/17 89/15 92/13 101/5 105/22 106/2 121/23 123/25 134/1 135/19 137/4 137/10 138/14 139/14 140/2 141/11 143/17 145/7 145/13 146/21 150/3 165/2 165/3 165/24 173/24 174/10 178/10 202/21 204/23 227/2 230/10 235/3 236/12 236/24 237/22 237/22 238/8 238/13 239/5 241/9 249/9 268/17
**us and [1]** 106/2
**use [32]** 4/18 12/2 12/19 13/14 22/9 23/13 23/20 27/3 31/13 48/5 48/9 62/18 64/24 66/10 66/20 66/21 71/13 130/12 133/23 139/2 171/9 171/15 172/23 177/16 181/21 183/20 190/10 197/9 212/7 222/22 229/3 270/19
**useable [1]** 48/15
**used [24]** 13/16 18/19 18/24 20/1 65/2 82/11 83/7 142/1 180/13 187/22 197/17 199/2 199/3 205/22 212/3 214/2 222/18 222/19 225/11 228/11 229/6 232/22 233/7 236/17
**user [1]** 47/16
**uses [8]** 15/21 103/19 104/1 104/4 183/13 191/7 199/1

U


**uses... [1]** 215/22
**uses ten [1]** 103/19
**using [29]** 45/21 66/20 71/19 71/21 113/11 155/6 185/8 193/12 194/16 197/22 202/18 202/24 203/2 203/20 204/8 205/18 205/25 206/3 206/5 222/23 228/2 229/11 230/19 230/21 232/11 232/13 232/17 232/20 270/17
**usual [1]** 270/17
**usually [2]** 8/3 124/18
**utilizing [1]** 192/2

**V**

**validate [2]** 114/1 139/10
**validated [1]** 245/7
**validation [4]** 92/21 95/12 139/15 139/23
**valuable [4]** 142/3 142/10 156/14 157/7
**value [23]** 14/15 17/21 18/6 18/10 61/17 92/5 92/10 92/14 92/17 92/19 92/24 134/1 156/12 185/16 185/21 197/13 197/16 198/10 199/17 216/25 218/16 240/12 251/21
**values [1]** 16/5
**variable [2]** 192/20 218/6
**variables [5]** 181/10 181/11 182/11 191/10 213/22
**variety [5]** 52/18 57/17 70/21 73/24 74/17
**various [7]** 26/13 28/14 48/22 72/17 77/14 147/18 200/10
**vascular [1]** 242/15
**vast [2]** 45/1 45/3
**vastly [1]** 185/22
**vehicle [2]** 238/3 238/5
**verbatim [2]** 226/1 233/5
**verification [1]** 92/21
**verifications [1]** 214/11
**verified [3]** 109/20 109/22 119/20
**verify [2]** 39/5 59/15
**verifying [1]** 190/18
**versus [6]** 3/3 6/8 191/8 191/13 202/13 204/10
**very [42]** 34/22 35/21 54/6 54/19 59/17 59/18 67/2 70/10 70/16 70/20 75/19 79/1 79/2 79/22 81/1 83/24 105/21 131/12 136/24 137/15 142/3 146/6 146/10 151/8 154/6 173/15 184/8 185/13 185/15 196/6 198/24 199/1 210/8 218/4 218/14 237/10 238/16 238/19 239/21 245/11 261/17 266/10
**veterans [1]** 29/9
**via [2]** 72/18 127/5
**vice [2]** 40/16 52/24
**vice-president [1]** 52/24
**victim [1]** 51/7
**video [26]** 15/12 21/12 21/23 21/24 71/11 71/16 72/2 72/13 72/16 72/17 72/18 72/20 73/2 73/5 73/7 87/11 87/17 89/1 108/9 108/11 129/15 132/24 233/19 269/25 270/8 271/14
**view [2]** 25/25 199/13
**views [4]** 21/25 34/12 72/3 133/2
**vision [1]** 235/24
**visit [4]** 28/1 57/19 95/7 128/15
**visitors [1]** 21/20
**visits [10]** 27/17 56/24 58/6 92/21 115/3 140/14 228/24 238/24 238/25 238/25
**visual [1]** 169/23
**voiced [1]** 253/3
**voir [1]** 179/5
**volume [23]** 30/22 32/6 144/19 145/1 167/24 167/25 168/25 169/1 169/2 201/4 201/13 201/18 203/21 245/13 246/9 247/7 247/7 247/24 248/15 251/4 265/14 265/20 269/6
**volumes [8]** 23/12 167/15 167/18 169/4 169/17 169/23 245/15 245/15
**voluntarily [1]** 111/1
**voluntary [10]** 93/3 93/9 97/3 110/8 110/9 158/6 158/15 183/12 215/5 252/3
**volunteer [2]** 44/7 46/4
**volunteered [1]** 44/9
**volunteers [1]** 45/25
**vulnerable [3]** 136/21 140/19 140/22

**W**

**wacky [1]** 26/7
**wage [1]** 238/17
**waiting [2]** 24/12 213/2
**waived [1]** 106/8
**walk [33]** 24/14 26/20 27/16 30/22 32/6 33/3 74/7 75/1 75/2 75/13 75/21 76/14 78/22 115/8 115/15 119/9 119/9 139/19 144/21 145/1 168/25 169/1 169/2 169/23 203/21 245/15 247/7 247/16 247/25 251/1 251/4 251/6 265/14
**walk-in [18]** 27/16 30/22 32/6 74/7 75/1 78/22 144/21 145/1 168/25 169/1 169/2 169/23 203/21 245/15 247/7 251/4 251/6 265/14
**walk-ins [10]** 33/3 75/13 76/14 115/8 115/15 119/9 119/9 247/16 247/25 251/1
**walks [1]** 139/18
**Wang [2]** 197/12 200/8
**want [87]** 4/14 4/20 7/2 8/21 25/10 30/7 31/2 34/19 35/3 38/12 47/14 48/1 48/4 49/5 50/21 60/18 67/12 67/12 69/5 71/11 72/3 78/16 87/24 91/19 94/5 97/11 100/8 103/14 105/10 111/18 117/22 121/6 123/6 123/13 124/4 124/19 124/22 124/22 124/23 124/23 125/6 125/8 125/25 126/19 129/12 134/2 135/14 135/14 135/15 135/16 139/17 145/20 151/18 151/19 153/18 153/19 156/6 164/16 165/5 165/7 166/16 172/10 180/3 204/5 208/4 209/6 209/9 215/2 216/19 217/6 219/25 224/15 225/17 232/15 250/22 251/18 253/11 261/18 263/23 264/5 264/9 264/10 264/20 264/21 264/23 270/3 271/15
**wanted [24]** 5/18 7/12 16/12 47/8 87/5 92/6 92/18 92/20 92/23 97/15 101/1 107/17 108/1 125/18 136/18 143/10 143/15 143/17 145/11 146/1 204/6 205/6 217/2 262/5
**wanting [1]** 101/3
**wants [4]** 23/2 48/8 50/19 250/19
**warnings [1]** 33/12
**was [411]**
**was instigated [1]** 19/9
**washed [2]** 13/10 87/21
**washes [1]** 66/7
**washing [24]** 13/9 15/23 25/20 26/15 26/18 26/20 26/23 27/5 27/5 27/6 27/10 65/18 66/13 66/15 66/15 66/18 66/22 67/6 154/2 154/3 154/13 184/22 241/13 242/6
**Washington [1]** 1/19
**wasn't [33]** 20/5 22/25 24/23 46/21 46/21 59/18 60/1 76/9 83/2 87/13 87/18 92/5 92/11 92/16 96/20 101/3 106/13 112/14 132/1 150/13 158/4 166/9 166/9 166/13 208/19 208/19 208/23 211/4 221/20 225/1 225/4 252/23 254/22
**waste [2]** 9/20 100/8
**watch [1]** 239/11
**water [2]** 8/22 66/20
**waterless [1]** 66/20
**way [41]** 13/13 26/12 28/20 37/16 49/14 51/9 61/22 67/3 79/1 90/2 94/6 100/24 118/10 118/19 157/9 170/17 181/23 188/20 190/12 190/13 193/25 194/22 195/2 195/20 196/24 197/1 198/16 202/6 202/15 203/19 203/20 204/6 206/5 207/3 222/16 225/11 227/18 235/12 238/5 238/21 246/5
**way of [1]** 197/1
**Waymeyer [1]** 99/4
**ways [3]** 134/1 189/23 205/23
**we [694]**
**we tend [1]** 140/10
**we were [1]** 113/21
**we'll [5]** 13/14 116/5 179/5 234/23 271/19
**we're [1]** 43/13
**web [3]** 50/8 153/21 241/8
**website [41]** 16/19 16/20

**W**

**website... [39]** 16/22 16/22 17/19 21/20 22/10 23/9 23/15 23/17 23/18 23/25 24/4 26/13 27/2 27/3 34/12 44/6 44/21 45/6 45/11 47/14 47/15 47/21 48/11 48/14 50/24 69/4 83/8 111/5 127/16 153/21 155/2 164/1 195/25 202/7 216/23 221/2 252/14 254/12 256/3
**websites [2]** 24/3 37/4
**wedded [1]** 124/18
**Wednesday [1]** 271/22
**week [11]** 5/15 19/22 34/23 36/7 83/12 125/5 139/22 139/22 147/7 219/19 271/18
**weekend [3]** 269/12 269/20 271/14
**weekers [1]** 237/20
**weeks [1]** 259/13
**weigh [1]** 237/20
**weighed [1]** 10/6
**weighing [1]** 88/2
**weight [7]** 13/18 14/24 15/1 97/18 182/13 183/3 183/7
**weights [4]** 216/18 216/19 216/22 216/25
**Welcome [1]** 125/15
**well [50]** 3/7 4/2 21/22 23/6 23/17 31/5 42/23 44/13 45/25 46/13 54/15 56/22 57/25 68/17 70/7 71/6 90/9 92/16 101/21 113/5 116/5 118/14 135/25 137/17 139/25 140/17 141/1 141/10 144/10 148/20 152/13 154/25 155/1 155/13 156/10 160/13 166/6 174/9 186/20 192/10 192/24 201/18 204/11 208/20 222/12 222/15 224/25 231/15 258/15 269/23
**well-being [1]** 141/1
**went [26]** 6/14 10/15 27/1 27/21 52/14 52/22 75/6 87/2 89/7 89/15 93/24 121/13 123/24 135/19 136/2 192/3 223/21 249/6 261/6 261/19 261/23 262/20 263/17 263/21 265/16 266/6
**were [188]** 4/5 4/9 5/10 6/10 6/15 6/16 6/19 6/24 7/3 9/16 10/7 10/22 11/8 11/15 12/1 13/21 14/6 14/6 15/15 15/24 16/3 16/5 16/10 16/12 16/15 16/17 19/6 25/11 25/13 27/21 29/12 29/13 31/5 33/6 33/16 33/20 34/23 39/3 39/14 39/19 43/9 43/19 43/20 43/21 43/22 44/8 46/11 46/13 46/16 46/17 53/15 53/16 53/21 53/22 57/19 57/20 58/1 58/11 58/15 58/18 60/3 60/7 60/8 61/10 61/20 61/22 70/10 70/14 70/19 70/23 71/5 75/16 75/22 77/11 80/18 81/25 82/24 83/1 84/22 85/17 86/9 86/10 87/6 88/5 89/12 89/20 91/23 92/6 92/20 100/13 100/15 103/14 103/15 105/15 107/8 109/15 111/10 113/19 113/21 119/19 120/19 121/9 125/19 127/23 127/24 130/5 131/15 132/6 132/13 133/3 133/4 133/12 133/20 133/21 134/19 137/23 141/21 143/5 143/6 143/7 143/17 143/17 143/22 144/10 145/12 145/13 145/14 150/9 150/20 151/13 159/20 160/8 162/22 163/13 164/25 165/10 165/12 165/21 165/25 166/2 167/10 173/4 173/15 173/20 174/6 175/2 175/4 178/3 178/6 180/21 180/24 186/18 188/4 190/2 190/3 195/6 195/17 197/25 199/6 204/5 210/3 210/4 210/18 211/4 211/20 212/9 213/3 214/10 227/14 227/21 227/24 230/4 232/22 239/7 240/7 240/12 242/10 248/22 249/4 249/6 255/4 258/17 260/20 260/23 262/9 266/23 268/2 270/16
**were actually [1]** 15/15
**weren't [9]** 10/23 91/23 92/10 95/24 144/6 162/11 165/19 166/13 208/18
**west [38]** 1/2 1/8 2/7 3/9 11/2 11/3 24/7 26/19 30/16 30/18 30/24 31/4 40/10 42/21 42/22 55/8 101/12 101/14 101/21 105/6 105/7 111/21 111/22 112/10 238/8 251/8 258/4 258/6 258/14 258/25 269/24 270/1 270/6 270/7 270/21 271/2 271/12 271/14
**western [1]** 30/17
**whammy [1]** 15/7
**Wharton [3]** 15/3 26/11 176/10
**what [326]**
**whatever [5]** 117/20 125/2 263/23 265/20 265/24
**whatsoever [2]** 251/23 260/25
**when [129]** 5/15 9/7 9/14 9/17 9/18 9/20 9/21 10/14 10/21 11/7 18/15 18/17 18/18 24/18 26/16 26/16 26/22 27/24 30/3 31/22 32/13 33/24 34/23 34/25 41/10 42/15 42/25 43/14 45/18 52/5 53/21 55/18 56/17 56/21 58/19 58/25 59/18 60/11 61/9 64/23 70/4 70/13 72/19 76/3 78/25 79/25 83/14 84/25 89/4 92/16 93/1 95/16 96/5 97/16 102/20 105/11 108/11 109/15 111/10 112/11 119/19 120/11 125/6 130/25 131/21 132/6 133/4 135/12 137/11 137/16 138/16 142/17 142/21 143/7 146/4 149/6 150/14 152/7 153/14 159/20 161/11 163/1 163/3 164/21 165/25 169/15 170/22 186/12 187/21 189/20 192/18 194/10 195/12 197/21 198/9 201/3 201/12 201/17 201/20 204/23 205/26 209/19 212/8 216/25 218/13 229/3 232/21 233/6 234/2 239/10 240/7 240/16 240/25 241/14 242/16 243/4 243/19 244/7 250/2 252/7 252/20 252/22 252/25 254/9 261/23 264/16 265/16 266/23 270/10
**whenever [1]** 125/1
**where [52]** 8/17 9/8 9/22 23/21 23/21 27/21 40/13 45/3 46/5 49/10 52/17 53/3 53/18 55/19 57/3 63/23 67/7 69/7 72/12 74/15 76/8 87/24 89/8 90/9 92/20 108/4 109/3 114/3 135/19 138/8 144/3 147/11 149/11 156/3 177/13 178/17 180/2 183/17 187/8 190/7 196/22 201/6 205/10 218/13 220/1 229/13 230/10 230/10 235/15 237/19 247/24 269/17
**Whereupon [2]** 78/20 81/25
**whether [57]** 8/8 8/9 8/10 9/16 10/10 15/14 19/6 23/7 37/2 37/17 40/4 43/8 47/20 47/24 88/2 93/12 100/25 111/6 116/5 118/7 119/10 120/20 128/8 130/1 132/11 133/21 151/1 162/14 163/8 163/11 164/8 170/16 171/2 171/3 181/13 181/21 183/17 187/17 210/18 216/20 220/12 222/4 222/12 222/25 223/3 223/8 223/15 223/23 225/3 226/19 229/21 232/10 241/19 254/9 255/1 255/7 265/24
**which [90]** 5/16 9/1 10/23 13/5 15/20 17/5 18/1 30/17 32/8 32/18 35/20 37/19 37/23 39/20 40/21 45/1 49/1 50/2 50/11 50/15 52/11 57/10 58/13 64/19 65/20 67/21 67/25 71/3 72/3 74/21 81/9 87/15 89/12 92/21 95/6 98/3 110/14 120/4 132/24 138/19 141/16 146/18 147/7 153/16 159/5 161/17 166/10 170/19 172/14 176/5 177/15 181/7 185/21 185/22 195/12 195/25 196/11 197/2 201/11 202/6 202/24 202/25 207/23 211/5 211/20 211/22 213/11 217/4 219/8 222/6 223/19 229/12 229/14 230/11 231/18 235/10 236/7 236/18 244/21 244/24 245/7 250/7 256/19 256/23 257/7 259/14 259/14 266/16 270/15 270/15
**while [11]** 17/22 36/13 53/14 63/16 75/14 121/8 175/1 181/14 213/2 225/12 248/9
**white [1]** 221/1
**who [71]** 3/25 4/19 6/9 6/24 11/2 11/21 11/21 14/2 15/1 15/14 20/1 20/18 22/8 23/2 28/1 30/11 30/24 31/8 31/11 31/13 36/10 40/15 42/10 48/21 49/20 53/22 67/5 72/5

W

**who... [43]** 76/8 99/3 123/3 123/18 126/8 130/2 131/1 138/8 145/7 147/1 159/14 162/17 169/15 171/2 171/3 173/5 173/25 181/25 187/3 202/24 204/5 204/5 206/21 238/21 239/5 243/23 244/4 244/20 248/15 248/17 254/13 257/4 261/10 262/20 263/21 264/15 264/15 264/25 265/4 267/17 269/23 269/25 271/4
**whole [11]** 51/6 55/19 57/5 89/14 97/1 118/23 136/15 246/4 246/10 262/4 264/3
**wholly [1]** 264/19
**whom [5]** 8/18 80/19 170/17 173/24 253/23
**whose [1]** 18/5
**why [80]** 4/23 9/20 11/13 13/14 17/7 17/15 17/17 17/18 19/23 24/12 26/8 26/8 34/2 35/17 36/1 37/21 38/17 39/15 40/22 41/1 41/23 42/7 42/9 46/20 50/3 51/6 51/16 52/3 64/8 64/10 75/11 76/9 79/8 86/10 89/18 91/25 92/3 98/12 115/15 117/16 130/4 133/25 135/16 136/17 143/10 143/15 144/10 146/1 147/3 148/5 148/15 148/19 149/7 150/13 156/9 157/3 158/5 163/22 165/3 165/7 165/8 169/2 169/3 171/7 211/5 232/7 234/16 234/25 235/8 237/3 240/10 241/4 247/6 248/11 259/8 259/11 263/24 264/19 264/21 267/9
**will [206]** 3/16 4/10 4/11 7/6 7/15 7/17 8/1 8/14 10/13 10/16 10/24 10/25 11/2 11/7 11/11 11/20 11/23 12/5 12/10 12/16 12/18 12/23 14/13 14/16 15/2 15/8 15/9 15/11 15/13 15/17 15/22 16/1 16/4 16/21 16/21 16/23 17/2 17/14 17/16 17/20 17/24 18/15 18/25 19/8 19/15 19/16 19/22 19/23 20/7 20/11 20/18 21/11 21/18 21/19 21/21 21/25 22/7 22/7 22/11 23/8 23/22 23/24 24/16 24/22 24/24 25/1 25/12 26/9 26/16 26/20 26/21 27/8 27/12 27/13 28/5 28/11 28/15 28/16 28/19 28/24 29/8 29/19 29/23 30/4 30/12 30/16 30/20 30/24 31/7 31/13 32/5 32/7 32/14 32/21 33/2 33/4 33/12 33/19 34/15 36/16 36/17 36/18 36/22 36/22 36/25 37/14 38/10 38/13 38/18 39/7 39/8 39/19 40/8 40/10 40/15 40/17 40/24 40/25 41/6 41/12 41/16 41/23 41/25 42/3 42/8 42/14 43/7 43/15 43/15 43/25 44/5 44/5 44/13 46/18 46/22 46/24 47/2 47/8 47/16 48/3 48/7 48/24 49/3 49/10 49/17 51/4 51/14 56/19 56/20 57/1 57/4 66/19 72/15 74/8 78/13 81/19 85/13 88/16 94/2 94/18 99/17 99/17 99/21 100/2 100/7 102/19 107/14 111/19 118/14 123/9 125/3 125/8 151/20 152/2 167/10 175/4 182/3 184/14 187/13 193/9 202/20 204/11 204/23 207/24 213/5 221/13 225/21 226/3 230/23 233/24 234/5 237/18 246/23 249/16 250/2 256/22 261/14 263/25 267/18 269/12 269/20 269/22 269/25 271/1 271/13 271/22
**will argue [1]** 24/24
**Wilner [1]** 8/1
**Wilson [3]** 2/3 3/14 3/18
**wing [1]** 140/7
**Wisconsin [1]** 175/25
**wishes [1]** 148/14
**with methodology [1]** 96/9
**withdraw [2]** 221/13 259/19
**within [15]** 9/6 55/15 55/21 57/14 63/13 70/9 82/20 131/24 147/14 148/16 150/23 151/11 151/14 176/19 259/13
**without [11]** 4/22 6/11 10/24 13/2 16/8 33/11 34/11 35/4 50/20 85/20 102/23
**withstand [1]** 20/8
**witness [28]** 51/23 90/3 106/11 112/14 117/7 117/12 117/18 124/16 124/18 125/11 125/13 135/6 149/19 149/20 156/18 170/1 174/22 175/8 179/5 188/5 204/21 233/12 233/21 234/8 251/13 269/18 270/3 270/5
**witnesses [9]** 15/10 51/17 85/21 175/1 180/20 187/12 269/17 269/23 270/15
**woman [3]** 31/11 87/2 129/13
**women [2]** 22/3 30/19
**won [2]** 58/8 58/12
**won't [10]** 37/3 37/5 37/9 38/25 42/6 94/11 151/17 156/24 233/5 257/7
**won't torture [1]** 156/24
**wonderful [4]** 54/14 87/19 87/20 244/24
**WOOD [2]** 2/1 3/17
**word [5]** 143/5 157/15 157/15 205/25 206/3
**worded [1]** 207/3
**words [5]** 21/1 89/18 151/13 214/3 226/5
**work [21]** 26/12 52/14 55/3 55/18 59/13 59/15 61/14 98/13 125/5 136/20 139/17 144/2 167/6 207/17 207/20 249/16 266/10 268/7 269/13 269/20 271/19
**workbooks [1]** 207/7
**worked [9]** 11/22 20/8 28/20 52/12 133/8 135/22 206/18 235/12 269/9
**working [14]** 63/22 65/19 77/17 82/24 83/1 87/7 135/21 144/4 145/14 206/24 209/17 209/21 238/16 257/4
**works [4]** 101/18 125/1 125/2 179/9
**world [5]** 10/11 27/19 48/6 201/14 201/17
**worse [4]** 13/13 188/18 195/8 200/5
**worsen [1]** 201/23
**worsening [1]** 231/16
**worst [12]** 22/17 22/17 22/18 22/18 22/23 24/25 62/12 64/19 65/21 67/25 132/24 188/19
**worth [1]** 157/8
**would [199]** 4/24 7/19 7/22 10/6 12/20 12/22 14/12 15/5 15/19 15/20 18/23 20/24 24/12 24/20 25/3 25/5 25/14 26/8 26/12 26/24 28/16 32/2 37/2 37/17 38/19 38/22 41/20 50/18 51/8 53/17 53/18 53/19 53/23 54/18 54/23 59/2 59/12 61/10 61/19 64/11 64/11 68/9 68/23 68/25 70/1 70/15 71/24 72/6 72/18 74/21 75/14 75/14 76/1 77/16 81/9 85/12 86/17 87/18 88/12 92/25 93/3 97/5 98/10 99/1 99/6 99/8 101/6 101/8 102/5 102/14 106/3 107/19 107/23 107/25 108/21 110/1 110/7 110/9 110/11 110/22 115/22 115/25 116/1 116/3 116/24 117/2 120/13 120/23 123/3 126/8 126/10 132/9 133/22 133/24 142/24 143/19 145/10 145/15 147/7 147/25 148/18 151/5 151/15 156/3 158/17 158/23 160/8 161/7 162/7 164/10 170/1 170/5 176/17 176/23 181/13 181/18 181/20 182/11 183/20 187/11 188/7 192/15 194/20 195/6 198/15 203/11 203/18 204/18 205/21 207/3 207/10 210/22 211/13 211/13 211/17 211/22 211/24 212/3 212/8 212/12 213/20 213/22 214/7 214/9 216/7 216/7 216/8 217/3 217/4 221/8 223/4 223/18 223/24 224/3 226/17 226/20 227/5 227/8 227/11 227/25 228/4 228/10 228/10 229/8 230/19 231/15 233/11 233/13 233/13 233/17 235/20 236/11 237/21 238/21 239/19 241/17 242/25 243/2 243/5 247/9 248/17 251/8 251/10 252/6 252/17 255/25 256/18 262/2 262/7 262/21 262/22 262/24 267/1 267/15 268/14 270/8 270/15 271/9 271/11
**wouldn't [13]** 4/23 26/8 79/5 104/5 105/12 123/11 159/19 162/8 167/4 209/14 210/1 218/19 241/3

W

**wound [1]** 32/3
**wounds [1]** 238/6
**wrapped [1]** 215/4
**wrapping [1]** 249/21
**write [1]** 123/6
**writes [3]** 18/9 101/23 101/25
**writing [3]** 65/13 151/20 230/11
**writings [1]** 151/21
**written [7]** 81/7 173/2 179/8 205/15 205/20 213/3 259/14
**wrong [3]** 48/7 77/16 243/14
**wrote [3]** 82/9 212/9 212/18

Y

**year [48]** 30/2 46/24 54/25 58/11 58/12 59/3 59/3 60/13 61/1 62/8 63/25 74/25 76/24 78/9 83/11 89/13 119/5 120/14 131/18 140/12 176/15 177/2 178/12 181/9 183/18 183/19 183/21 183/23 213/4 214/19 237/16 238/24 239/18 247/11 248/14 248/22 250/17 251/5 256/17 256/21 257/8 262/10 262/24 264/3 265/22 265/22 267/5 269/2
**years [29]** 31/12 46/5 52/12 52/18 54/5 54/20 56/7 56/17 57/23 65/16 135/23 136/2 136/4 136/6 136/7 136/16 139/3 140/5 141/3 141/4 176/8 176/12 176/16 206/13 235/16 256/22 257/8 267/1 267/4
**yellow [2]** 196/1 196/6
**yes [262]** 3/5 7/14 16/3 56/1 58/6 58/10 58/23 59/16 61/2 61/4 61/17 62/1 62/4 62/7 63/2 63/19 63/21 64/16 64/18 64/22 65/17 68/4 68/19 75/9 75/12 80/14 82/19 83/23 83/25 85/16 88/4 90/15 90/18 91/22 92/2 93/18 93/20 93/23 95/23 96/4 96/15 101/16 101/18 101/21 101/25 102/8 103/9 103/13 103/23 103/25 105/1 105/10 105/19 105/25 107/1 107/11 108/8 108/8 108/14 108/18 109/7 109/14 109/21 110/16 111/11 111/14 112/1 113/15 116/16 117/5 118/6 118/18 121/12 121/20 122/10 122/21 123/23 125/22 125/24 126/18 127/12 128/14 128/16 128/24 129/16 129/18 129/25 130/23 131/17 132/5 132/10 137/21 139/1 143/24 144/17 145/9 145/19 146/15 147/5 152/9 152/18 153/5 153/10 153/23 154/4 154/8 154/10 154/20 154/22 154/24 155/7 155/9 155/11 155/13 155/20 156/17 157/7 157/13 157/16 158/8 159/1 159/4 159/10 159/13 159/22 159/24 160/10 160/12 160/14 160/16 160/20 161/1 161/10 161/13 161/15 162/7 162/10 163/7 163/18 164/6 166/4 166/14 167/9 167/18 168/1 168/7 169/22 170/11 170/13 171/12 171/22 173/17 174/16 175/14 175/16 175/19 175/21 175/23 178/8 179/1 179/15 180/18 180/22 187/1 187/19 188/14 189/16 193/5 196/21 199/15 200/15 200/19 203/14 205/23 206/6 206/11 207/10 207/12 208/8 212/7 212/14 212/17 212/20 212/24 213/7 213/9 213/14 214/6 214/9 214/13 214/17 215/6 215/13 215/22 216/2 216/17 216/24 218/23 220/24 222/21 224/22 225/6 225/9 225/19 226/13 226/23 227/1 227/3 227/22 228/17 228/25 229/19 229/24 230/7 230/12 231/5 231/14 232/3 232/6 233/1 233/23 235/1 239/18 240/4 240/9 241/11 242/1 242/2 244/3 248/1 250/7 250/25 251/3 251/15 252/5 252/9 252/19 253/5 253/10 253/15 253/17 255/3 255/16 255/19 255/23 256/8 258/8 259/5 260/12 260/14 260/22 261/1 262/9 263/5 263/11 265/1 266/5 266/8 266/25 267/3 267/8 269/6
**yesterday [8]** 4/7 63/10 244/20 244/24 245/3 245/16 246/25 262/7
**yet [5]** 48/16 59/19 100/6 106/13 196/13
**yielding [1]** 231/6
**York [2]** 201/10 235/5
**you [1304]**
**you view [1]** 25/25
**you'd [1]** 13/12
**you've [3]** 25/7 107/8 172/1
**younger [1]** 140/8
**your [412]**
**your support [1]** 185/2
**yours [1]** 253/18
**yourself [6]** 135/9 175/12 178/21 178/24 234/13 251/25

Z

**Z-I-V-A-S [1]** 3/19
**zero [10]** 13/7 13/8 13/14 25/21 26/8 184/6 184/7 184/8 195/12 195/14
**ZIBAS [1]** 2/2
**zip [1]** 245/12
**Zivas [1]** 3/19
**zoom [2]** 134/9 230/8

# TRIAL TRANSCRIPT
# VOLUME 2

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-CV-80526-MIDDLEBROOKS

**GOOD SAMARITAN MEDICAL CENTER, INC. et al,**

**Plaintiffs,**

vs.

**THE LEAPFROG GROUP,**

**Defendant.**

West Palm Beach, FL
January 20, 2026

BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

FOR THE PLAINTIFFS:

**MARY BETH MALONEY, ESQ.**
**KEVIN SIMMONS, ESQ.**
**SYDNEY A. SCOTT, ESQ.**
**LEE R. CRAIN, ESQ.**
**SCOTT K. HVIDT, ESQ.**
**Gibson, Dunn & Crutcher LLP**
**1700 M Street NW**
**Washington, DC 20036**
202-887-3729

**JEFFREY E. MARCUS, ESQ.**
**Marcus Rashbaum Pineiro & Meyers LLP**
**2 S Biscayne Boulevard**
**Suite 250**
**Miami, FL 33131**
**305-400-4260**

**FOR THE DEFENDANT:**

**KIMBERLY E. BLAIR, ESQ.**
**COURTNEY WOOD, ESQ.**
**JURA ZIBAS, ESQ.**
**MAXWELL BILLEK, ESQ.**
**Wilson Elser Moskowitz**
**Edelman & Dicker LLP**
**161 N Clark Street**
Suite 4500
**Chicago, IL 60601**
312-704-0550

**Official Court Reporter:**

**Pauline A. Stipes**
West Palm Beach/Ft. Pierce, FL
HON. DONALD M. MIDDLEBROOKS
561-803-3434

THE COURT: Good morning.

MS. MALORY: Your Honor, we will play the video of Regina West.

(Thereupon, the video of Regina West was played.)

MS. MALORY: Your Honor, that is the end Ms. West, and those are 14 minutes of our designations and the opposing party's 42 minutes of affirmative designations. If you like, we can call our next witness.

THE COURT: Yes, please.

MS. MALORY: We will call Professor Berger. Mr. Lee Crain, who represents Good Samaritan Hospital, will be examining Mr. Berger.

JONAH BERGER, PLAINTIFFS' WITNESS, SWORN

THE COURT: That microphone will move towards you.

MR. CRAIN: Your Honor, I have a set of demonstratives and a list of exhibits contained in the demonstratives.

THE COURT: Okay.

MR. CRAIN: Your Honor, may I proceed?

THE COURT: Please.

DIRECT EXAMINATION

BY MR. CRAIN:

Q. Good morning, Dr. Berger.

A. Good morning.

Q. Can you please introduce yourself to the Court?

A. Sure. My name is Professor Jonah Berger, I am a marketing

professor at the Wharton School, University of Pennsylvania.
Q. Generally, what is your role in this case?
A. I am an expert witness for the community hospitals.
Q. Did you prepare a series of slides to assist in your testimony today?
A. Yes, I did.
Q. Can you see those slides on your screen?
A. Yes.
Q. Did you prepare a slide that summarizes your qualifications?
A. Yes.
Q. Can you introduce yourself to the Court and give him a general background of your qualifications?
A. I am a professor at the Wharton School, University of Pennsylvania. I have been there since 2007, tenured in 2013. Prior to that, I got my Ph.D. in marketing from Stanford Graduate School of Business. I also have an undergraduate degree in human judgment and decision making from Stanford University as well.
In terms of scholarship, I have published over 80 academic peer reviewed articles and publications and journals in both marketing, psychology, as well as broader science outlets. This work has been cited over 28,000 times. It focuses on issues like consumer behavior, information processing, how consumers make decisions, and how the content they consume both

online and off line shapes their judgment and decisions.

I am also an international best selling author, and at this point I have testified as an expert in a number of different cases and deposed at times and gone to trial a number of times on issues related to consumer behavior, information perception and the like.

Q. When you say you have gone to trial, have you been qualified to testify as an expert at trial?

A. Yes, I have.

MR. CRAIN: Your Honor, at this time, Plaintiffs tender Dr. Berger as an expert witness in marketing, consumer behavior and how consumers process information.

MS. BLAIR: Your Honor, to the extent that is the only area in which they are offering Dr. Berger we have no objection. We do have objections to the opinions he is about to give as they don't help the trier of fact, and we believe they are common sense, and to the extent he gives opinions related to Google analytics and how consumers are likely to understand analytics, there is no research cited in Mr. Berger's opinions anywhere that a proper method is Google analytics for that determination in this type of case.

THE COURT: To the degree I dealt with those in the order with respect to the Daubert motions the objection is overruled. If you have a specific objection as he goes forward, please identify it.

MR. CRAIN: Thank you.
BY MR. CRAIN:
Q. Dr. Berger, did you prepare written expert reports in this case?
A. Yes.
Q. Why did you submit more than one?
A. There was some data that was not available at the time I submitted my first report, and so I also submitted a supplemental report.
Q. When you say data, what data?
A. The Google analytics data that was just discussed.
Q. Did you come to certain expert opinions in this case?
A. I did, yes.
Q. Can you please give the Court a general summary of what those are?
A. Sure. So, while the Leapfrog Group purports to disclose information about the imputation methodology, it is unlikely that consumers either understand the specific methodology used, so the minimum score was applied, or the impact of that minimum score application on the hospital grades and nonparticipating hospitals.
Further, DNF hospital grades likely negatively impact consumer perceptions of the community hospitals as well as deter consumers from choosing to receive care from the hospitals.

And further, future repeated publication of such grades are likely to have ongoing and further detrimental impacts on the community hospitals.

Q. Did you prepare a series of slides to walk the Court through how the consumer would access the website?

A. Yes.

Q. Is this one of the slides?

A. Yes.

Q. Can you tell the Court what you are seeing here?

A. This is literally Google's home page, so if a consumer went to Google to look something up, this is where they might start.

Q. And why might a consumer search for health care information?

A. Hospitals are often described as credence good, which means that many consumers don't have the expertise or knowledge to infer quality on their own so they often look to outside sources for that information. In today's age one of the places is the internet, so people may go there for information to help in their decision making.

Q. Professor. What is this slide?

A. This is search results, and if you type in safe hospitals in Florida, the exact result depends on prior search history as well as other things. In this case one of the search results is hospitalsafetygrade.org, and a consumer will click on this website to learn more about the hospital safety grades that are

contained there.
Q. Professor, is this hospitalsafetygrade.org?
A. Yes.
Q. Can you explain to the Court what we are seeing here?
A. This is a website where consumers can look up information about different hospitals and their safety grades. On the right side of the screen it says, how safe is your hospital, and consumers can search below to find out. Some may go by city and state. They may type in Delray Beach, Florida, hit search.
When they do that, a set of results will come up based on that search. In this case 31 different hospitals come up in that area, sorted by distance in this case.
Q. Does this, as you said, show the results when a user searches for Delray?
A. It does, yes.
Q. Can you describe what is on the left-hand side of the screen?
A. Sure. Next to each hospital there is an associated hospital grade. These are the fall 2025 grades, most recent grades. This is the grade that Leapfrog has assigned these hospitals, and in this case Delray Medical Center has received an F grade.
Q. In your opinions, and as an expert in marketing and how consumers process information, what does an F or D convey to

consumers?

A. Sure. Many people are familiar with grades from school, obviously an F grade in school is not a good grade. More generally, these types of grades are an example of what are often called value labels. A bit of research shows that value labels, grades, A through F, colors, like a green, yellow, red, maybe a happy face, neutral face, frowned face, all of these can help consumers interpret otherwise numerical information.

Research finds that when combined with -- added to numerical information, these grades often -- things like these grades, labels impact consumer judgment, and encourage consumers to make certain inferences and drive their perception in a particular way.

I will also add that in situations like this, consumers often use heuristics to simplify decision making. When decisions are difficult or someone does not have a lot of knowledge they often simplify those decisions and apply simple rules.

In this case they may say there are a number of hospitals here, I don't know which one to collect more information about, but one has a C and one has an F, I won't look further. I will use that grade to focus on the hospitals that have better grades.

Q. Do you have an opinion about whether and how D and F grades can impact a consumer's perception of a hospital's reputation

or brand?
A. Yes. As we talked about, one of the opinions in my report is that hospital grades, D and F grades likely negatively impact consumer perceptions of hospitals, whether it is reputation or the brand, because it suggests negative things about that hospital's safety.
Q. Does negative information about a hospital such as a poor grade have a more lasting effect on consumers than positive information?
A. Negative information can do a few things the research shows. One is that it causes people not to look further or look at other options instead. If something has a lot of negative information, I will spend my time looking at something else, and they are less likely to see other positive information.

In a situation like this where the question is safety, consumers are coming because they are expecting hospitals to be safe, and they feel betrayed when there is negative information suggesting the exact opposite. That may be concerning to them and further damage perception.
Q. Is that perception, the effect you are talking about, is that true when grades are published continuously?
A. I talked about the repeated complication of such grades. There is a good deal of research showing that repeated exposure can strengthen the impact of that information. So, repeatedly

seeing the same grade or similar grades over time for a hospital can have further long-term damage on the perceptions.
Q. Thank you, Professor. Turning back to the search results, do you see the line that says, view the full score?
A. Uh-hum.
Q. Where would that take a user?
A. If we click on that, that would take you to the safety grade page. This is Delray Medical Center, and this is the page for Delray Medical Center.
Q. In your opinion as an expert in how a consumers absorb this information, is it likely a consumer seeing that F grade we saw before would click on that?
A. One thing consumers may do is say I am going to focus on the one that has better grades and ignore the ones that have F grades. So many consumers may not even make it to this page.
Q. Can you orient the Court more on what we are seeing on this page?
A. This is the top of the page, there is other information, but consumers can't necessarily see that information without scrolling further down. Some of the information includes a map of directions, address, but prominently featured with a large letter grade associated with it is that hospital grade.
Q. Professor, if we scroll down, could you describe for the Court what we are seeing?
A. We could call these gas gauges in some sense as you see in

a car. This is a label suggesting how to interpret otherwise numerical information. In this case, these are some of the measures that go into the hospital safety grade.

On the infections tab, within this are six measures and each measure is represented by a gas gauge showing whether the hospital scores better than average, worse than average, or around average.

Q. If a consumer is looking at this page, is there any indication that they should scroll down to see footnotes?

A. No. Consumers have not even seen the footnotes yet. Unless they scroll, they don't even know the footnotes are there.

Q. Are there any call letters?

A. I don't see any, no.

Q. If you scroll down, Professor, what do you see at the bottom?

A. These are the footnotes as well as some language associated with them.

Q. Is one of them Footnote 1?

A. Yes.

Q. Footnote 1 states -- do you see it at the top?

A. Yes.

Q. Number 1, declines to report, the hospital was not asked to provide -- the hospital was asked to provide the information to the public, but did not. Did I read that correctly?

A. Yes.
Q. The second time?
A. Second time.
Q. Is this the web page for Delray Medical Center?
A. It is.
Q. Does Delray Medical Center participate in the Leapfrog survey?
A. I believe they did not participate.
Q. Is this Footnote 1 only available on the hospitals that do not participate in the survey?
A. It is also available for hospitals that do participate in Leapfrog. All the participating hospitals I have viewed also have this footnote as well.
Q. With respect to Footnote 1, is there any differentiation between participating and nonparticipating hospitals?
A. Not that I could tell, it appears to be on both.
Q. Do you see a tab on the right that says, doctors, nurses and hospital staff?
A. I do. Yes.
Q. Did you consider that tab in forming your opinions?
A. I did.
Q. So, what do we see here, Professor?
A. Again, this is an example of one of the five tabs under which there are six measures. In this case, two of the measures, rather than having a gas gauge appear, say declined

to report. Not all do, but the first do have a question mark with the language declined to report.

Q. What does that convey, the distinctions between the question marks and the red gas gauge there?

A. Yeah. What is puzzling here is that none of the measures are measures for which they have data from the nonparticipating hospitals. Two are noted declined to report and one is not.

A good bit of academic research shows that in situations like this consumers don't only use information provided to evaluate something, they also use the information omitted. The fact that the third one, specially trained doctors care for ICU patients, does not have declined to report, consumers are likely to make an inference this is based on data, based on data whereas the other two, there is not available data to form an inference for those.

Q. Your opinion about the three blue boxed measures, what is that based on?

A. Based on academic research and deductive reasoning and understanding of the website and my experience in the space.

The third item is one of the imputed measures, one which Leapfrog is imputing score noting a hospital performs worse than average even though for all three of the measures they don't have data from the hospital.

Q. Did you understand from reviewing the case, whether Leapfrog has data for the first three measures?

A. I don't think they have any data for any of those three measures.
Q. Have you reviewed any evidence that has come into records after the report was rendered that may, in fact, affect your opinion?
A. Yes. I reviewed a number of depositions, for example, and they don't change my opinion. Some of the depositions probably corroborate evidence consistent with my opinions.
Q. Is some of that evidence depicted on this slide?
A. Yes, this is Defense's expert Mr. Vredenburgh.
MS. BLAIR: Your Honor, we are going to object. This is the first time we are hearing it today.
THE COURT: Overruled.
BY MR. CRAIN:
Q. You may continue.
A. Their expert, Mr. Vredenburgh, noted that my opinion would be a good practice to be used for the other gas meters as well when the data is missing.
Q. How did that affect your opinion?
A. It does not change my opinion, but it is consistent with my point that it is not clear why those are first two measures they declined to report, and the third is not given they don't have data for the hospital.
Q. Professor, did you also consider another footnote?
A. I did. Yes.

Q. Is that footnote called Footnote 4?
A. It has the number 4 next to it.
Q. Have you prepared a series of slides to demonstrate where to find Footnote 4?
A. Yes.
Q. Are they on the screen?
A. Yes. This is the infections tab, so if a consumer has done no clicking, just scrolling, this is the information they see. Anything else, to go to the other tabs requires clicking and making a choice to do that. If you look down at the bottom of the page the section where we have footnotes, a footnote does not appear on this page at the moment.

What I am going to show you here, I will go through additional measures both on this tab as well as other tabs to see if and when the footnote appears.

If you wouldn't mind slowly clicking. It does not, does not appear here, does not appear here. Click the last few times. There are six measures, for none of the six measures does Footnote 4 appear.

Go to the next tab. Seven measures here, nothing changed on the bottom of the screen, so it is not that exciting. Footnote 4 does not appear for any of the measures. We have been through 13 measure. Click on the third tab. Again, there are seven measures here, but the same thing is going to happen. In none of the seven measures does Footnote 4 appear at

anyplace on the screen.

So, it is not until you get to the fourth tab, practices to prevent errors, clicking on that would lead -- finally, as we see here, Footnote 4 shows up at the bottom of the screen.

Q. Approximately how many times have you had to click that, Professor?

A. I believe it was 23 times.

Q. Are consumers likely to click that much after seeing that?

A. As we talked about it already, consumers may not make it all the way down to the page to begin with. More steps required, would make them less likely to do it. There are multiple ways to get to this page, given the number unlike consumers make it here. To be clear, on four of the 32 measures, 32 of these gas gauge measures, only four of them, a small percentage, does that Footnote 4 appear at the bottom.

Q. On the bottom pages, is there a fourth call out somewhere?

A. No, there is not. There is no, what you want to call it, a sub script or super script, no such number appearing on the page.

Q. Is there another way to identify it?

A. I believe there is a star next to the 4. I don't see a red star, but there is a small black star next to number 15 under the hospital score.

Q. Do you have an opinion how consumers might understand what the safety grade means if they don't see a footnote?

A. Yes. I believe if we go to the next slide -- sorry, I think the slide after this -- maybe we can talk about hand washing first. If you want to go back one. Yes.
Q. So, Professor, can you tell the Court what this is conveying?
A. This is another one of the measures on the practices to prevent errors, hand washing, and it notes what safer hospitals do, provide training, implement policies to make sure that all hospital staff cleans their hands before touching a patient. It notes that hospitals can earn up to a hundred points for having a hand washing policy.
Q. Does this measures have one of the value labels?
A. It does. It uses the gas gauge and it shows Delray Medical Center performs worse than average.
Q. Does that gas gauge contrast to the question mark on the page?
A. Yes. On a different tab here is that declined to report measure again, so consumers would be likely to infer there is no decline to report for hand washing, that is based on real data that indicates performance.
Q. Professor, I want to draw your attention to the hospital score. Do you see that?
A. I do, yes.
Q. Is the score there 15?
A. It is, yes.

Q. It is not zero, right?
A. No. It is 15.
Q. What is conveyed to the consumer on this page about hand washing in your expert opinion?
A. As we talked about already, this is suggesting for this hand washing measure there is not a decline to report, so consumers are likely to infer this is based on data on nonperformance.
Q. Do you have an opinion on what consumers would perceive if they don't see the footnote?
A. Yes. Go to the next slide. This is testimony from Mr. Vredenburgh. He himself notes -- when asked, what if a user does not scroll to the footnote, he notes if the consumer didn't scroll they, the hospital, would likely receive the worst score and they would not necessarily know about the notation. They would think they, the hospital, does the opposite of what best hospitals do, right? He says yes.
He is suggesting himself that consumers would be likely to infer the hospital is not doing what best hospitals do if they don't make it down to the footnote.
Q. Who is Mr. Vredenburgh?
A. He is an expert on the other side in this case.
Q. Before we shift gears, are there other ways that a consumer can interact with the website?
A. Yes. In today's day and age consumers often look

information up on their phones, particularly when they are not at home on their desk top. Whether they are on the go, they are in a car, they may be in a hospital waiting room, a variety of places, consumers often use their phones to consume content online.

Q. Can you describe how the mobile interface differs from the desk top?

A. I have looked at the mobile interface, I don't want to say it is exactly the same, but qualitatively similar.

That F grade, for example, for Delray is prominently featured at the top of the page, they can see that grade, they cannot see the footnotes without scrolling. It requires clicking to get to additional measures, which given the phone interface is smaller, it may be difficult and research shows they may be less likely to engage in additional clicks when going through websites on their phone.

Q. You mentioned that the screen is smaller. Does the F grade take up more real estate on a phone than on a desk top?

A. A portion of the screen, yes, because the screen is smaller.

Q. Professor, I want to talk about Footnote 4 in more detail.

A. Okay.

Q. Is this Footnote 4 we saw through our journey through the website?

A. Yes.

Q. Can you read it into the record?
A. "The hospital declined to report their performance on this measure so the score was assigned to reflect the lack of information available."
Q. Did you enter an expert opinion about what this conveys to consumers?
A. This says nothing about the score that was assigned. There are various ways a score could be assigned, but Leapfrog had a choice and assigns hospitals the minimum score which it calls achievement. There is nothing in the sentence that says anything about lack of achievement or minimum score.
Consumers are unlikely to understand either the exact nature of the imputation methodology used, the score that was assigned, no information here, or the impact, and I should say or the impact on hospital safety grades.
Q. You say a score was assigned. Does the footnote convey how it was assigned?
A. No. It neither says what particular score is assigned nor why that score was assigned.
Q. What is the basis of your opinion in this regard?
A. I have read through the documents in this case. I have looked at academic literature, decades of experience both teaching and doing research on how consumers process information, what language does or does not convey I have a recent book all about the impact of language. I have a good

deal of expertise in that area.
Q. You mentioned footnotes. Footnote 4 does not explain how a score is assigned. Is there another page that explains to some degree how a score is assigned?
A. I wouldn't call it a page, but there is document that consumers may or may not get to. There is another document with more detail about the imputation methodology.
Q. Do you have an opinion about how easy it is for consumers to get to that document?
A. Yes. Most consumers are unlikely to make it to that document given the number of steps required. I have data that shows only a very small percentage make it to that document, let alone reach the page where the relevant information appears.
Q. Professor, have you prepared a series of slides that walk through the steps consumers might take?
A. Yes.
Q. Can you walk us through those.
A. This is the page we have seen, this is the information on top. The consumer has not done any work to scroll down the page.
If you click, please. This is the middle of the page. Going down to the bottom of the page. Click again.
This is a zoomed out version so we can get a sense of what the information on the whole page looks like.

If you wouldn't mind clicking again. We go to the right side, in addition to the various options here, a variety of things consumers can click on, hospital safety grade, a whole bunch of drop downs on top. If someone navigates to the right side, we see the past grades. There is a link that says detailed table view, doesn't say what the detailed table view is. If you click on that link that takes you to the detailed table view page for Delray Medical Center.

Q. Is this that detailed label here?

A. It is.

Q. Is there any link to the document we have been talking about visible here?

A. Not initially, no. It requires the consumer to scroll down a large amount, measures, scores, and if one scrolls all the way down to the bottom of the page, not everyone necessarily will engage in that action, there is a link there that says, for a full description of the methodology click here. If someone decides to scroll all the way down and click there, that would take them to the methodology document.

Q. Is it in that document, Professor?

A. It is, yes.

Q. Did you have access to any data to help form your opinion about how likely or easy it is for consumers to access this document?

A. Yes, I have data on the actual number of consumers that did

access that document.
Q. What is this?
A. This is the Google analytics data we have been talking about.
Q. Is it on the chart?
A. It is.
Q. Could you walk us through what this chart depicts?
A. There are three bars. The first bar is the number of individuals over the period that viewed a community hospital safety grade page. The Delray Medical Center page we saw, that would be counted.
That green bar next to it is the percentage of the consumers who went to a community hospital safety grade page who also then saw the detailed table. Consistent with what we talked about, not all consumers make it there, only 8 percent of individuals who viewed a community hospital safety grade page made it.
We then look at the purple bar, that is three percent of the hundred percent not only made it to the detailed table you but -- to be clear, the information relevant to the imputation, details of the imputation is not on the first page. We will get to it. It is multiple pages in, 15 pages in on a 28-page document, but only three percent of the people that viewed the safety page made it to the document at all, let alone saw the detailed methodology.

Q. How did the data affect your opinion about how easy it is for consumers to access this document?
A. This is consistent with my discussion, they are unlikely to learn from this document because most don't make it there.
MR. CRAIN: Your Honor, may I approach the witness?
THE COURT: Yes.
BY MR. CRAIN:
Q. I hand you Plaintiffs' Exhibits 471 through 480.
They have not been admitted, your Honor.
Professor, what are these documents?
A. These are printouts of the Google analytics data we talked about already. These underlie the analyses on the screen in front of us. There are ten documents, two for each of the five community hospitals. One of those two documents for each hospital shows the proportion of consumers who view that hospital safety grade page, that make it to the detailed table view. That is the green bar we talked about.
And the other document shows the percent that make it to the methodology document, that is the purple bar. Together these ten documents make up the data that underlie this.
Q. Professor, go to the bottom right corner. Do you see what is known as a Bate stamp?
A. I do, yes.
Q. Does that say Leapfrog with a series of numbers?
A. It does, yes.

Q. Do you know who produced these documents?
A. Yes, Leapfrog did.
MS. BLAIR: Your Honor, I object to that because it was a site inspection done --
MR. CRAIN: I am getting there.
BY MR. CRAIN:
Q. To counsel's question, how were these documents produced?
A. My team went on a call with Leapfrog's counsel and inspected Leapfrog's Google analytics account and the data and got this data from that as part of that interaction.
Q. Did Leapfrog's counsel then send that to the community hospital representatives?
A. Yes.
MR. CRAIN: Your Honor, we move to admit Exhibits 471 through 480. The Defendant raised a relevance and unfair prejudice objection which your Honor dealt with --
MS. BLAIR: We waive authenticity, we withdraw our objection.
THE COURT: 471 through 480 are admitted.
BY MR. CRAIN:
Q. Doctor, I would like to return to your slides.
A. Okay.
Q. Going back to this document again?
A. Yes.
Q. How many pages is this document?

A. I believe this is the fall 2025, so I believe it is 28 pages. The spring version which I used in my initial expert report had 30 pages.
Q. You mentioned there is information about imputation. Where is that located?
A. As shown in the table of contents here, there is a lot of information in this document, but the detail about the imputation method doesn't appear until slide 15.
Q. Professor, is it your position that a reasonable website user of Leapfrog would understand in this document?
A. It is not clear to me that a reasonable website consumer would understand this document. As we talked about already --
MS. BLAIR: I object, your Honor, calls for speculation.
THE COURT: Overruled.
BY MR. CRAIN:
Q. You may continue.
A. As we talked about, only a small portion of individuals make it this far to the document itself, and many of them are unclear that they would understand all of the content contained in there.
Q. Earlier we talked about how patients seeking care might come to Leapfrog's website. In your opinion what is the likelihood that a sick patient might get this far?
A. As we talked about already, particularly given the negative

grade up front, and the fact that that information might discourage consumers from collecting additional detail, that alone would make it unlikely that it would make it this far --

MS. BLAIR: Your Honor, I object to these opinions. They are not being given in any degree of likely certainty within his professional capacity. They appear to be individual opinions not based on any support or analysis in his report at this time.

THE COURT: The objection is overruled.

BY MR. CRAIN:

Q. You may continue.

A. I think I was essentially done.

Q. If you need to have it read back --

A. That is okay.

Q. Professor, you reviewed this document to come to your opinions?

A. Yes.

Q. Was there anything notable in this document that drew your attention?

A. Here, this is page four, there is a discussion that is not highlighted which talks about how Leapfrog is not able to calculate a safety grade for every hospital in the United States. One of the bullets which is here expanded to make larger notes that -- suggests that they are not able to calculate safety grades for hospitals that are missing scores

for more than six process measures.
Q. Why did this language draw your attention?
A. It is my understanding as part of this case that the community hospitals are missing seven process measures. It is not clear, based on this logic, why Leapfrog was able to calculate a safety grade.
Q. Is it because they say they cannot calculate a safety grade when they are missing six measures?
MS. BLAIR: Objection to form.
THE COURT: Overruled.
BY MR. CRAIN:
Q. Does that mean they cannot calculate a safety grade because they are missing six process measures?
A. Yes, more than six. Seven is more than six.
Q. I take you to page 15. Scroll down. Can you describe what we are seeing there?
A. Yes. Page 15 has a bunch of information about using secondary data sources as well as imputation method and they have some steps regarding imputation method.
Under step two, it notes if a hospital does not have historical data from spring and fall of 2024, the safety grade is assigned a point value that is equivalent to receiving limited achievement for its measure on the Leapfrog hospital survey.
Q. Does this describe the rationale for assigning the lowest

possible score?
A. This says limited achievement is received, but does not say why.
Q. Did you review any evidence, stepping back, that affects your opinion of how a consumer might access or review this document?
A. It doesn't change my opinion, it corroborates my opinion.
If we go to the next slide, these are further quotes from Leapfrog's own experts testifying that the methodology document is not accessible to the average consumer. Mr. Vredenburgh, when asked: If I recall, this methodology document is dense, right, he says, yeah, it appears that way. When asked: This is not a document a typical user would read, right, he said correct.
Similarly, when the Leapfrog CEO was asked: Do you think the scoring methodology is easy to understand for a layman, she answered, the document on the scoring methodology is not that accessible to the average layman.
Q. Thank you. We are coming to the home stretch.
I want to talk about the impact of Leapfrog's safety grades on consumers and hospitals. Do you have any opinions about the impact of D or F grades on consumers or hospitals?
A. Yes. As we talked about already, D and F hospital safety grades likely negatively impact consumers' perceptions of nonparticipating hospitals as well as deter them from choosing

those hospitals.
Q. Could you describe to the Court what that is based on?
A. On the facts of the case, but also decades of academic research. There are many papers over time showing the impact of things like grades, in the health care context in particular, hospital grades on consumer decision making.
In fact, there is a paper showing that grades based on Leapfrog's own hospital grades, modeled after Leapfrog's grades -- by the way, that is publicized on Leapfrog's website, at least it was -- that paper shows in situations where consumers are choosing between different hospitals, they tend to choose the hospitals that have better grades rather than worst grades even in a variety of cost scenarios.
That combined with my experience, all of that underscores my opinions on the impact of grades.
Q. Did you get access to certain documents after you issued your report that affect or contribute to your opinions?
A. They certainly corroborate those opinions.
Q. Is this one of those?
A. Yes. We talked about large academic literature showing that grades impact consumer choices. This is Leapfrog themselves touting that grades impact such choices. So they describe a gentleman named Carl being out of town for a bike race and woke up with severe back pain, knew he needed a hospital. He quickly looked at the Leapfrog safety grades and

realized that the hospitals closest to him did not perform well. The closest hospital with an A grade was 400 miles away, but he made the drive. He said, "You have to pick the hospital you go to based on competency, not convenience. Leapfrog provides invaluable data that all patients should use."

This does not change my opinion, but is consistent with my opinion.

Q. Did you review other parts of Leapfrog's hospital safety grade website that you came to rely on in forming your opinion?

A. Certainly that are consistent with my opinion. If we go to the next slide, this is Leapfrog's frequently asked questions.

One of the questions: Should patients avoid a C, D or F hospital? What should people do if the only hospital in their community is C, D or F?

The answer that gave was, "When they have a choice the hospital safety grade is the first tool patients should use to select a hospital because safety should come first."

Q. Did you review this page when you were preparing your report?

A. I did, yes.

Q. Did your review this page as well?

A. Yes. This is an info graphic where Leapfrog emphasizes the risk of harm from choosing a D or F hospital. They note your risk of dying depends on the hospital you choose. Compared to an A hospital the risk if dying increases by picking a D or F

hospital.
Q. That risk of dying, how might that impact the negative emotions that a consumer might feel?
A. A risk of dying is scary for many consumers, that would concern them, and may shape the choices accordingly.
Q. Are there other places on Leapfrog's website where it talks about this twice as likely to die concept?
A. Yes, I believe so, yes.
Q. What about this page, explanations about how the safety grade is calculated for nonparticipating hospitals?
A. This is the frequently asked questions page. Here Leapfrog is downplaying the impact of nonparticipation on a hospital safety grade.
They note if a hospital does not report other sources of data are used to calculate a grade. Further: Does the hospital get a better safety grade that reports to the Leapfrog hospital survey? The answer they provide: The hospital safety grade reflects how well the hospital does on safety, not whether they complete the Leapfrog hospital survey.
Q. Did you review each of the three pages that we saw in preparing your report in August?
A. I did, yes.
Q. Are those pages still on the website today?
A. They appear to have been taken down.
Q. Professor, I want to talk about a little bit different

topic.

Do you have any opinions about how other ways a consumer might be exposed to Leapfrog's safety grades?

A. Yes, we talked about the website, hospitalsafetygrade.org. Importantly, they are not the only place the safety grades appear.

The safety grades have gotten a good bit of media coverage, for example. There is an article here, what are Leapfrog's 13 F hospitals? What are the best South Florida hospitals for patient safety? See the rankings. I believe Leapfrog themselves note there are hundreds of these types of articles in a variety of publications that combined have a reach of something like 11 billion, is what they suggested.

In addition to mass media, there is also social media. Here on the screen is one example, a TikTok video talking about the worst hospitals in Florida, and it has over a million views for that video. This is just one example.

In addition to mass media, there are the grades on social media, as well as word of mouth that they talk about as well.

Q. You mentioned the number 11 billion. Where did that come from?

A. That is Leapfrog's own number. When talking about media coverage they note that number.

Q. What does the 11 billion signify?

A. I believe it's the potential reach of the publications in

which those articles appear.
Q. Professor, have you reviewed a number of these articles with the safety grade mentioned?
A. I have viewed some, yes.
Q. Do any of them mention Footnote 4?
A. Neither in the articles themselves nor any pieces of social media that I saw, none of them mention the footnotes, the minimum score being applied or the limited achievement designation. In these cases the grades are traveling beyond the website, but the methodology, the detailed discussion of the imputation methodology is not.
Q. Professor, before we wrap up, can you summarize your opinions for the Court, just generally what we learned here today?
A. Excuse me for the coughing.
Q. No worries.
A. Sure. As I talked about today, consumers are unlikely to understand the imputation method used, that the minimum score was applied -- actually, could I grab another bottle of water? I am getting over a cold.
Either that the minimum score is applied or the impact of that method on the grades that a number of participating hospitals receive.
Further, the fact that hospital safety grades likely negatively affect consumer perceptions of things hospital

safety. Quality, brand, those types of things, as well as deter consumers from choosing those hospitals.

Further, future publication of the grades will further have a long-term negative impact on these hospitals' perceptions and consumer choice.

MR. CRAIN: Thank, you. I pass the witness.

THE COURT: We will take our morning break and return at ten minutes after 11:00.

(Thereupon, a short recess was taken.)

THE COURT: Okay, please have a seat and proceed with cross-examination.

MS. BLAIR: Thank you, Your Honor.

CROSS-EXAMINATION.

BY MS. BLAIR:

Q. Dr. Berger, nice to see you again.

A. Nice to see you.

Q. You are not here as an advocate for the hospitals, you are here to give a fair and accurate opinion to this Court about what consumers are or not likely to experience on the Leapfrog website, correct?

A. Correct.

Q. And as I understood your testimony by Mr. Crain, you believe it takes 27 clicks for a consumer to get the methodology that we follow totally and transparently for that Leapfrog website; is that correct?

A. I don't believe I mentioned the number 27 anywhere.
Q. Okay. Are you aware that the methodology on the home page of the Leapfrog website?
A. When you say "methodology", what do you mean?
Q. You can go ahead and pull up the Leapfrog website. I just want to make sure we all understand what we are talking about here.
You did a Google search, right, and it takes you to the Leapfrog homepage where you typed in Delray Beach?
A. Uh-hum.
Q. And if you go to the top of this page, please. Right, we saw this page on the slide?
A. Yes.
Q. And if we go to the bottom of this page, right here, you see the methodology right there. Do you see that?
A. I do, yes.
Q. Okay. So it is not true that a consumer needs to go through all of the clicks that we just saw on the slides to get to the methodology; isn't that true?
A. I don't think I said anywhere in my testimony that consumers need to go through all of the clicks and all of the slides to get to the methodology.
Q. There are multiple ways a consumer can get to the methodology, correct?
A. There are multiple ways, yes.

Q. And in fact, the Google analytic that Mr. Crain talked to you about, those Google analytics didn't do any analytics for file pages of how consumers might be looking at the methodology from other ways other than going directly to these web pages; isn't that true?

A. No. The data is agnostic into how they got there. That data shows those people that went to community hospital safety grade pages, what percent of them also looked at that methodology document and the answer is three percent. So it doesn't matter how they got clicked to get there, it doesn't matter. What other things they did, as long as they did both of those things, they show up in the data and the answer is only three percent, when even downloaded that document, let alone read the content on page 59.

Q. And if it was a consumer that two weeks ago saw that methodology because it went to Boca Raton Hospital, looked at the methodology and two weeks later went and looked at Delray Beach website, you don't know if that is the same consumer that looked at methodology or not; isn't that true?

A. Websites often contain cookies and things that track users as long as the data knows that somebody went to Boca Community Hospital safety web page and downloaded that document, the methodology document, viewed that document and that is where the three percent number comes from.

Q. And you don't know who those people are; isn't that true,

who went on the website is anonymous.
A. I am not sure what you mean.
Q. Well, for all you know, we talked about this in your deposition, all the lawyers in this room were the people who clicked on analytic pages, I'm sorry, on methodology, correct?
A. As we discussed, three percent is of the people that went to this hospital safety grade page. If a whole bunch of lawyers are inflating that number higher, it is actually one or two percent or potentially less, and so I am not saying three percent are all consumers. You are suggesting that a bunch of those individuals might be lawyers and inflating that number, it's even lower, but that is suggesting an even smaller percentage of consumers that are actually going to that --
Q. Right and we will get to that in a second. In terms of your work in this case, isn't it true that you used the Cornerstone Group to aid you in your opinions, correct?
A. I say almost all of my expert matters, I worked with the team at Cornerstone, yes.
Q. And in fact, the gathering of those analytics that we saw during your direct examination, that was done by Cornerstone, correct?
A. They were on call with counsel from Leapfrog, yes.
Q. You weren't there; isn't that true?
A. I didn't need to be there, I instructed what data we were interested in and to see what might be available.

Q. And are you aware that in March of 2025, the Cornerstone Group had a meeting with the competing hospitals?
A. I am not aware of everything that Cornerstone does one way or the other.
Q. Okay. So nothing that happened at that meeting affected in any way your opinion?
A. I am not aware of the existence of that meeting one way or the other, so I can't speak to it.
Q. Okay. And did you ever meet with any of the CEOs in preparing your information?
A. No, I did not.
Q. And did you talk to a single consumer of the Leapfrog website in coming to your opinion that it likely that a consumer was confused by the Leapfrog website?
A. Which opinion are you referring to?
Q. Well, I used the word "confused" and you and I had a debate about that. You don't have an opinion that consumers are likely confused by the Leapfrog website, correct? That is not one of the opinions you are offering here?
A. That is a broad opinion, it is not clear what you are saying they would be confused about, so I don't know exactly what you are saying.
Q. Your opinion is that consumers are unlikely to understand the Leapfrog website, correct?
A. My opinion is not on the website in general, my opinion is

in regards to the method in which data is being imputed for scores for non-participating hospitals, so I discussed, for example, consumers are unlikely to understand that particular imputation methodology that was used.

Q. And you were very careful about the words that you used in your deposition. And I asked you about that and you said you do not use the word "confused", right, and unlikely to understand, not likely to be confused, right, your opinion?

A. I don't have the deposition in front of me, or my expert report in front of me, so I can't remember exactly what word that I used in my deposition, but if you are reading from my deposition, then that is what I said.

Q. And I just want to make sure, your opinion does not say that consumers are likely confused by the Leapfrog methodology, correct? You expert opinions that you put in your report in this matter?

A. My opinion is they are unlikely to understand either that the minimum score was applied and it is not stated anywhere in the footnote, one has to go to that methodology document and just talk about where can people actually go to or understanding the implication of that for a hospital.

Q. And you are not offering an opinion in this matter that consumers are likely to be deceived to their detriment by the Leapfrog methodology or how it displays it on the website, correct?

A. I don't form an opinion regarding deception one way or the other.

Q. In terms of your qualifications, you are not a website designer by training, correct?

A. As I believe we talked about in my deposition, I am not a website expert on training, but I have consulted for a variety of companies or organizations on issues on website layout.

Q. But you have not done any design work on websites yourself, right?

A. I have done content work and strategy work, how these companies think about how to say things, where to say them and such, but I am not a visual designer, no.

Q. Okay. And you are not putting yourself out as a digital loader or FTC expert, are you?

A. As I believe we've talked about before, I am not putting myself forward as a digital literacy expert, and as I believe we talked about it in deposition, I have done some consulting for organizations in that area.

Q. And you have no experience in consulting with companies about meeting FTC standards for websites; isn't that correct?

A. Yes, that is correct.

Q. And you are not putting yourself forward as an expert in determining how websites should be designed in order to properly provide information to low literacy consumers, are you?

A. I was not asked to form an opinion on that, and so I am not putting forth one in this case.
Q. And you are not putting yourself out as an expert in Google Analytics, are you?
A. I have used Google Analytics both in my academic work and consulting work and prior expert work, and so I have a good deal of expertise on Google Analytics and how it works, and is not my main area of expertise, but I do have a great deal of acknowledge about it.
Q. At this point in your career, you told me that you have done over -- I'm sorry -- you told me that you have done thousands of surveys in combination in your academic and expert work, consumer surveys; isn't that correct?
A. I doubt I put an S on the end of that. I think I said over a thousand; that is different than thousands.
Q. Okay. That is fair enough.
A. No problem.
Q. So you have done over a thousand consumer surveys in connection with your academic and expert work, correct?
A. Correct.
Q. And I looked at your papers and you have done a lot of consumers surveys across your research papers as well, correct?
A. Yes. When I said "thousand", over a thousand in combination with my academic consulting and expert work, yes.
Q. When you do one of those consumer surveys, how many

consumers do you survey at a given time?
A. Depends on what is necessary for the situation.
Q. What do you consider as an expert in the field of marketing to be a statistical leap significant example in size of consumers when doing a consumer survey?
A. It depends. There is not a magic number that I can think of, depends on the context, the particular mean we are considering, a variety of things.
Q. And you are familiar with the survey methodology or of consumer surveys, correct?
A. I'm not sure what you mean by survey methodology, I use surveys a lot, and have thought of taking classes on methods and surveys and those sorts of things.
Q. Have you ever done -- would you agree with me that a consumer survey could mean a consumer comprehension survey; are you familiar with that term?
A. That is not a term that I use in my work.
Q. Have you ever done any consumer surveys in attempting to determine whether or not a consumer can comprehend what is on a website?
A. I would need to go back and look, that is not a question I was asked prior to today, and so I'm not for sure.
Q. Well, you offered an opinion in this case that it is likely that the consumers don't understand the methodology when they go to the Leapfrog website, correct?

A. It is unlikely that the consumers understand, and part of that is we're talking about is the fact that many of the consumers are unlikely to see this information in the first place. So some of the information, if they don't see it, it can't impact them, and as we talked about, even if they do see it, there are a variety of issues as well.

Q. And you performed no survey to determine whether a regular reasonable user of the Leapfrog website went to the website and entered the Delray Beach search that you did, you have done know survey to determine whether or not consumers would have seen that, would have clicked, how they would have clicked through it, what they would have seen and whether they looked at the methodology; isn't that true, you did not do a survey in that regard?

A. So as we talked about, I did not do a survey, but that Goggle Analytics data directly speaks to whether they saw the digital software methodology document and the answer is no, very few individuals have saw the methodology.

Q. We'll get to that. Would you agree with me that a consumer perception survey when trying to understand whether consumers actually understand the content of the website would be the gold standard for somebody here advising the Court about what consumers do or do not understand?

A. No. As we talked about already, individuals have to see information for that information to potentially impact them,

and given the location of the information and data we have available in this case, consumers are not exposed, most consumers are not exposed to certain information.

Q. And did you do any Google Analytics on how many consumers across all 3,000 hospitals that are graded look at the footnote related to the four imputed measures and read that footnote; do you have any proof out there like that?

A. I am not aware that the Google Analytics that was provided has insight into that. I do know its location on page, thought, and given lots of research that I and others have done on how likely it is that individuals make it to that point of the page. We have information about how that occurs.

Q. Let's talk about the research that you have. You cite to over 60 journal articles in between the two reports that you put out in this case; is that correct. Fifty-nine to be exact.

A. I have not counted, so I am not sure.

Q. I have. Thirty-two of those articles that you rely on have consumer surveys at the heart of the research of those articles; are you aware of that?

A. I am not aware one way or the other.

Q. And are you aware that out of the 60 articles that you cite, not a single one relies on Google Analytics in coming to the conclusions, the opinions that you are coming to here in Court today; are you aware of that?

A. I don't remember offhand what different data sources that

articles use, but Google Analytics is a well-used methodology for analyzing website traffic and behavior on websites, so whether or not it appears in specific articles I cited in my reports does not speak one way or the other to whether it is useful data to address that type question available in this case.

Q. Dr. Berger, could you tell the Court as you sit here today one article that you cite in the two expert reports that you put into this case that rely in any way on Google Analytics in coming to the opinion that the consumers are unlikely to understand a website. Is there a single one that you cite to?

A. Sorry. You already said that none of them mention Google Analytics data, so I haven't gone back and looked. But Google Analytics data is used to see whether or not people are exposed to certain types of information, whether or not they went to a particular page or downloaded particular information, and so that data appears as to consumers that potentially even saw the information that the methodology document, let alone related to that marked page in the document where that information was in the document.

Q. And Dr. Berger, you are here in Court today to give your expert opinion to a reasonable degree of scientific certainty and I'm asking you is there a single article that you cite in any of these pages, and these reports are very, very long, is there a single article that you cite to in these reports that

you can show to the Court where it says that it is a scientifically acceptable method to rely Google Analytics in coming to your opinion of consumer information, just one?
A. Sorry, I have not gone back again and looked at all of the references in those reports. As I said already, Google Analytics is often used for methodology to address questions like this.
Q. And you didn't consider any consumer feedback with respect to your opinions today, correct?
A. Consumer feedback in regards to what?
Q. In regards to whether or not a consumer was likely to understand the methodology on the Leapfrog website.
A. If a consumer can't see information and they can't imagine it, so Google Analytics data speaks directly to whether individuals even had the potential to see that information. Only a small percentage of individuals did.
Q. Is it fair to say that you did not feel like data on individual consumers, actual real consumers going to the website, that you did not feel that data on an individual consumer's feedback would be the most appropriate type of data to present to this Court regarding your opinion of whether or not consumers are likely to understand the Leapfrog methodology on the website?
A. As I mentioned already, Google Analytics is for consumers, it is more than one, it is many individuals, so that data says

directly how many actual people engaged in certain actions on the website.

Q. Well, I thought you told me it might not be actual consumers, it could be all the lawyers in this room. You don't know if they are actual consumers, do you?

A. You suggested that a large portion of the three percent were lawyers and if it is, that means that it is much lower than three percent and even fewer individuals that are consumers saw it. But I have not seen any data that suggests that most of those individuals are not consumers.

Q. Have you seen any data that they were consumers?

A. I have not seen data that speaks to it one way or the other.

Q. Thank you.

A. But given the large time window over which that data was collected, I have no reason to believe that most of them would be lawyers.

Q. Do you have any reason to believe that most of them would be quality directors of the hospitals?

A. I didn't see anything to suggest that.

Q. And you don't know whether these people being on the website are physicians, do you?

A. Sorry, I'm a little confused here. Your suggestion is nobody reads the Leapfrog hospital safety grades? That would be surprising. I believe we've addressed that a decent number

of consumers do read their grades, and so the data I believe is those type of individuals.

Q. What I'm saying to you, Dr. Berger, is would you agree with me that the Google Analytics data that you looked at is anonymous?

A. It is anonymous.

Q. Thank you. And just to be clear to the Court, you did not perform a digital logo readability analysis with respect to the Leapfrog website, correct?

A. I did not do a digital logo readability analysis. But again, for an individual, the content of information matters that the individual has to be exposed to it in the first place. So if an individual didn't see something, regardless of whether it is available or not, they have no ability to process it.

Q. And the only evidence you have that a consumer didn't see something is a funnel report from Google Analytics that Mr. Crain just put into evidence as PS-471, correct?

A. That is not the evidence, no.

Q. Do you have any opinions -- well, do you have an opinion in this case that the F grades impact -- or, I'm sorry.

Your expert opinion is that the F grades are likely to impact the reputation of the hospital, correct?

A. I don't have the exact words in front of me, but it's something like hospital grades are likely to negatively impact consumer perceptions.

Q. Okay. And it is couched as likely, correct?
A. I believe that particular expert opinion is yes.
Q. Okay. And you have not performed any causal analysis as to whether or not the Leapfrog safety grade did have the impact on the reputation of these hospitals; is that correct?
A. I, myself, have not performed such an analysis given the great deal of academic literature that shows that things like hospital grades impact both consumer perceptions as well as consumer choices, I didn't feel it was necessary to do that. As I talked about it, even in this context, there is research based on grades modeled after Leapfrog's own grades that shows that those in fact were consumer choices, so I didn't feel the need to collect that information.
Q. And your opinions, just so I am clear, I want to read them from your report. The first one is that CLT deal or at hospital grades for Plaintiffs' hospital likely impact consumers' perceptions, correct?
A. Again, I don't have my report in front of me, so I can't speak to exactly every single word with precision, but here reading from my report, I believe that that is correct.
Q. I want to make sure, you don't say they do for certain, you say they likely impact, right? Is that your opinion?
A. I used whatever words are on that page.
Q. Okay. And you also say that Plaintiffs' hospitals, that the grades for Plaintiff hospital likely negatively impact

consumer perceptions, correct?
A. I believe so.
Q. Okay. And, again, that is a likely opinion, correct?
A. I used whatever word is on the page.
Q. Okay. And the next opinion is that Plaintiffs' hospitals -- the grades for Plaintiffs' hospitals also likely affect consumer choices, correct?
A. Again, whatever it says on the page is what it says.
Q. And you performed no consumer survey to ask consumers whether their choices would, in fact, be impacted having these grades? Your consumer survey for that, correct?
A. I didn't think a consumer survey was necessary given the decades of academic research that shows, many, many academic papers showing grades impact choices in the hospital context, the grades based on Leapfrog's own hospital grades almost always lead consumers to choose hospitals that have been given a better grade that shows very relevant data in this case.
Q. But we are only talking about these five hospitals, what we are in court to report today.
You can't say to any reasonable degree of scientific certainty that, in fact, these grades impacted the reputation of these hospitals, correct?
A. I disagree with that statement.
Q. Okay. And let me ask you this: Are you aware that prior to the fall 2024 methodology change, West Boca and Delray both

had failing grades, and after the fall of 2024 methodology change that we are here for, they continued to have failing grades. Are you aware of that fact?
A. I do not have today's memory of all the grades that all hospitals got at any point in time.
Q. So you performed no analysis with respect to those two hospitals how a failing grade that was calculated using the new methodology could have impacted their reputation when they had a failing grade prior; isn't that true?
A. I believe that Dr. Nicholson discussed the impact of the methodology on the grades, I'm not him, so I don't want to speak for him, but I believe he had some conclusions in regards to how the methodology may have changed the grades.
Q. And when you walk through your 60 slides, and I just want to make sure I understand, the Google search that you performed was safe hospitals in Florida, correct, in that last presentation we walked through?
A. I believe so, yes.
Q. Did you perform any other Google searches to test your theory that the first thing that would come up would be the Leapfrog hospital safe site?
A. Sorry. I am not suggesting it is the first thing that always comes up, as I said, what shows up, I believe I said this already, maybe using different words, but what exactly shows up depends on the exact search history, but in many

different searches I tried, Leapfroghospitalsafetygrade.org is one of the first things that shows up.

Q. Are you aware that if you run certain Google searches with respect to safe hospitals in Florida, CMS scores come up; are you aware of that?

A. Depending on what consumers search for, different sorts of things may come up. I am sure exactly what search stream you put in, but I'm not saying that for every search stream in Google, Leapfrog is the first result, I am merely suggesting that when you Google search for information, it's often one of the first things that comes up, and I evaluate in Court here today what would happen if someone clicked on that link to that website.

Q. And you talked about the valuative labels, correct?

A. The valuative label, yes.

Q. Would you agree with me that CMS stars a one through five is also a valuative label?

A. I'd have to go look to see exactly what CMS is doing, certainly grades and thing like the gas gauges are, but I would have to go look and see.

Q. Well, let's just talk about -- you are aware of star ratings for movie reviews or Uber reviews, correct, star ratings; are you aware of that?

A. Different websites provide star ratings in different visual forms and do different things with that information and I'm

aware of the general difference in star ratings.
Q. And I guess I am asking your expert opinion, are stars, one out of five, three out of five, is that also a valuative label?
A. Well, stars are often just what the data is, right, so there is an average number of stars and sometimes people get that average number that appears, so on Amazon, for example, I read the books when an average star number appears, and so that is not adding any additional information suggesting how someone should perceive that information, that just give the average of a whole bunch of ratings.
Q. So it's your expert opinion that if a consumer sees a one out of five star, they should not have a perception about whether that is good or bad, in your expert opinion as a marketing expert, when a consumer sees a one star out of five stars, that is not a valuative label in your opinion?
A. Sorry. I didn't say what you said I said. All that I said is I have not seen what CMS is doing, particularly with star ratings, so I hesitate to say whether or not they are using a valuative label, but there are different ways that stars could be conveyed.
Q. Just like in our page where just the F comes up, if you pull up a page and just a one star comes up, right, they are not telling you it's the average and they're not telling you how to get there, does that have a valuative label, Dr. Berger?
A. Sorry, the one star could just be the average of some line

measure, so I can't put forward an expert opinion about it.
Q. Sure. And I want to talk about the Google Analytics now.
Are you familiar with the concept of progressive disclosure on websites?
A. I think I've heard that term used in the context of this case, but that is not a term I'm deeply familiar with outside the context of this case.
Q. So you have no educational or experience background about progressive disclosures on the website, right; is that fair?
A. I don't believe so, no.
Q. All right. And you were talking about -- we talked a little bit about the Google Analytics funnel reports, correct?
A. Yes.
Q. And they only tell us the number of people who went to the methodology page from the hospital pages, right?
A. A number of individuals that went to the detailed table view page as well as the number of individuals that went to the methodology document.
Q. And how trustworthy is the Google Analytics in telling us what type of people viewed the methodology?
A. I think we talked about this already. I don't know, it just shows the number of individuals.
Q. Okay. And, so, would you agree with me that Google Analytics does not distinguish between humans or bots or accidental clicks?

A. I have not looked at the most recent data on how they deal with those sorts of things. I have not seen any data in this case that would suggest that any of the clicks were due to bots, but I can't tell you.
Q. Have you seen any evidence that they weren't due to bots?
A. Again, as we talked about, my understanding is that Leapfrog suggested many real consumers review their grades, so my belief is that the data is based on many consumers.
Q. Did you do any analysis as to whether or not any of those clicks were accidental clicks?
A. I am not sure what you mean by "accidental clicks".
Q. Well, I sometimes search a website and click on things I didn't mean to and click back out. Did you do any analysis to determine if that is what happened?
A. What happened for what?
Q. You said 3,300 people clicked on these website pages, correct?
A. Something like that.
Q. And then you say only three percent made it to methodology, correct?
A. I didn't say that, that is what the data shows.
Q. That is what the data shows. That is your opinion based on your analysis of Google Analytics data, correct?
A. That is just what the data shows.
Q. Did you do any analysis on the 3,300 original clicks to

make a determination as to how many were accidental clicks, bots, anything like that, any analysis done?
A. If the notion is that one individual made an accidental click or something, that wouldn't change the conclusions, even a small number of individuals --
Q. So the answer is no?
A. I haven't seen anything that suggests that any of them weren't accurate.
Q. You understand that Google Analytics does have filtering for bots in the data set, correct?
A. Depends on the particular type data, yeah.
Q. Do you know whether or not you filtered this Google Analytics for bots?
A. I don't know offhand.
Q. Okay. And you cannot tell from the Google Analytics data that you reviewed whether these were first time users of the Leapfrog website or repeat users, correct/
A. I don't remember offhand.
Q. Okay. And can you tell by just looking at the Google Analytics whether these users matched a reasonable consumer standard?
A. I am not sure what you mean.
Q. Okay. So you don't know, you didn't undertake that analysis, correct?
A. I'm not sure what analysis you're referring to.

Q. Well, how do you know it is a reasonable consumer that looked at this website, the 3,300 clicks?
A. All the reportings of the percentage of individuals who went to a community hospital safety grade page, the percentage of them went to a detailed page or made it to the methodology document.
Q. Would there be any way for this Court in reviewing the Google Analytics data to determine whether or not these anonymous clickers meet a reasonable consumer standard?
A. Again, I haven't seen any data to suggest that there is any problem with these individuals. My understanding is that these consumers are using the website, so that is what I understand these individuals to be.
Q. But you performed an analysis to determine whether that is true, correct?
A. Determine what's true?
Q. Whether there are actual consumers that are clicking on this website?
A. At least the data --
Q. And you did no consumer survey to figure out whether or not they were, in fact, actual consumers?
A. Who was the individuals?
Q. The clickers, the people who clicked, the 3,300 people that clicked on the website?
A. I am not sure how a survey would tell us that.

Q. Okay. And you don't know, looking at the 3,300 who clicked on these web pages, you don't know whether they were sophisticated or unsophisticated consumers by the derth of information provided in these bar graphs that we see in 471, correct?

A. Sophisticated in what way?

Q. Are they sophisticated consumers of health care services? You can't tell that by these graph bars, can you?

A. Those bars just say what percent of individuals made it to different stages.

Q. In your opinion, as somebody who does this type of marketing work, is 3,300 used as a statistically sufficient sampling?

A. I don't know what you mean.

Q. Well, there are only 3,300 views, correct? Somebody is googling Google Analytics?

A. Somewhere in that ballpark, I don't know the exact number, but ballpark is correct.

Q. If you were going to do a consumer survey, how many consumers would you need to survey in order for the results to be statistically significant?

A. Depends on the exact size you predicted in the situation.

Q. Let's talk about that. If you were to do a consumer survey on the issue that is before the Court today, whether or not consumers of health care ratings actually understand the

Leapfrog methodology when they go to the website, if you were to do that as an expert, if you were to do that consumer survey here today, what would be a statistically significant sampling size for you to do that type of survey?

A. I am not sure, I'd have to understand more about the hypothetical question that you are asking, but given we have data showing that a very small percentage of consumers make it to the place where the only information available describes the exact nature of the methodology, that data shows us that very few consumers are likely to have access to that information.

Q. Dr. Berger, how many hours do you have in putting together your expert report?

A. I am not sure offhand.

Q. What I put together, it says something like 1,600. How many hours have you billed for your expert legal opinion in this case?

A. I don't know, I'd have to guess. I don't have a running total in my head.

Q. More than 100?

A. Probably.

Q. More than 200?

A. I don't know. I'd have to look.

Q. That would include preparing for this trial, somewhere around 200 hours?

A. Again, I don't have a running total of that number, so I

can't answer without precision.
Q. I just am asking you to estimate. Surely you sent bills in this case? How many hours have you spent/
A. I don't keep a running total of the bills and number of hours in my head.
Q. You bill $1,200 an hour?
A. That's my standard rate, yes.
Q. Let's just assume it's 100 hours, $120,000.
At any time during any of those 100 hours that you put into this cases, probably more, did you ever consider doing a consumer survey with respect to the Leapfrog website and whether the methodology was understandable to the consumers?
A. I answered this question a number of times and my answer again, I didn't say that a survey was the best method to help us reach the conclusion --
Q. That is not my question, sorry. My question is: In the hundred hours that you put into your expert opinion, did you ever consider doing a consumer survey so that you could inform the Court actually what consumers understand or don't understand when they go to the Leapfrog website?
A. So I consider all methodologies when I start a project like this and I have been given the data available that speaks to the exact question you mentioned, a survey was necessary.
Q. And you talked a little bit about -- you recall that, the decline that this measure was assigned grade; do you remember

that?
A. Yes.
Q. You had 60 slides and you went through them, and you pointed out that that footnote doesn't appear on several of the first measure pages; do you remember pointing that out to the Court?
A. It's not several, it's most, and it only appears on four of the 32 measure pages.
Q. Isn't that because it only appears on the measures that it applies to?
A. That doesn't completely make sense because if we are talking about footnote one, which is about hospital did not participate in data on this measure, and it appears on hospitals that did participate, so it is not clear why footnote four only appears in certain places and not others.
Q. Do you understand that hospitals that do participate in the survey can also have a question mark decline to report for certain measures as well?
A. I believe I have that understanding, but I also looked at data which there doesn't appear that that is not the case and footnote one still appears.
Q. So your criticism is that footnote one -- but one of your criticisms is that the first footnote appears on all of the pages?
A. No. You asked me should footnote four not appear in

certain places because it's not relevant, there are a bunch of things that are not relevant all the time.
Q. In fact, footnote four in terms of the actual wording, you don't have an opinion about whether -- well you do, you have an opinion about whether that wording is accurate, right?
A. I believe I opined that the consumers are unlikely to understand the nature of the methodology in that footnote because it doesn't provide any information about limited achievement or the minimum score to be applied.
Q. Okay. And if we look at that page, and I guess we can pull that up, if we look at hand washing for Delray, it shows a score of -- we talked about that, right, if you are on the imputed methodology, you get 15 for hand washing; do you recall that?
A. Let's --
Q. Let's go to practices, scroll down just a bit, you see the 15 there, the hospital score?
A. This hospital score, I see 15, yes.
Q. If you scroll up, the other way. And you see the 15 has an asterisk associated with it, you point that out in your direct examination; is that right?
A. I do, yes.
Q. And it says the hospital declined to report this performance on this measure so a score was assigned to affect the lack of information available. You see that?

A. It doesn't say that anywhere near this hospital score, it's down at the bottom.
Q. I am asking about the footnote in reference to the asterisk. Do you see that at the bottom of the screen?
A. I do see footnote four on bottom of the screen, yes.
Q. Let me go back. This hospital score has 15, asterisk, does it not?
A. It has a little star next to the 15.
Q. Is that not an asterisk?
A. I don't actually know what is defined as an asterisk. I am trying to be careful.
Q. If we look at footnote four on the bottom, there is the asterisk. Do you see that?
A. I see a similar icon.
Q. And it does not say that there was a score calculated for this measure, does it? It says it is assigned; do you see that?
A. I do see it, it says the score is assigned, yes.
Q. If we look at, going back to this hospital score, 15, star, right, underneath that it says worst hospital score, 15; do you see that?
A. I do.
Q. So we now know when we look at this page that for hand hygiene, Delray got a 15, we note from the footnote, which is bold red, that the score was assigned to reflect the lack of

information available and a consumer can see that the score assigned is the worst hospital grade; can they not?

A. Sorry. You assume the consumer is doing a lot of scrolling back and forth on this page and finding all of these pieces of information to draw the inferences you are suggesting. And so it is not clear that most consumers would do that.

Q. Dr. Berger, you are assuming they are not doing the scrolling, aren't you?

A. I am not assuming that they are not. The data I looked at relating to this as well as data from this case, underlie my conclusions.

Q. But the best way for this Court to know whether I am right, that a consumer did this, looked at it and understood that the worst score was assigned and understood the asterisk or whether you are right, that the consumer wouldn't understand what is going on, the best way to make that determination would to have been to do a consumer survey and ask the actual consumers what they understood; isn't that true?

A. If I thought that was true, that is what I would have done, I didn't think that was true, didn't think a survey was necessary, and so I did not do it.

Q. Right. And so all of us here in the courtroom today, no one knows whether or not a consumer actually understood that; is that fair?

A. I don't believe that is true, no.

Q. You never talked to the consumer, did you?
A. I talked about it already, there are many factors contained in the data. I did not speak directly to an individual consumer 'cause we are not in this case attributed to just one individual, we used a set of individuals.
Q. Well, we are interested in what the consumers understood and didn't understand, correct?
A. Yes.
Q. It is the burden of proof for these hospitals to prove that; do you understand that?
A. I do, yes.
Q. And as their expert in this case, you thought the best method to determine that would be to not speak to a single consumer about their confusion, but rather to look at the Google Analytics data; is that fair?
A. That's not fair, no.
MS. BLAIR: I have no further questions, Your Honor.
THE COURT: Redirect.
MR. CRAIN: I do.

REDIRECT EXAMINATION

BY MR. CRAIN:
Q. You recall being asked multiple times about conducting a consumer survey in this case?
A. I do, yes.
Q. I would like to give you the opportunity to address that.

Why didn't you think a consumer survey was necessary?
A. There was a variety of data available in this case as well as literature that speak about the issues that we talked about. We already talked about the Google Analytics data that doesn't contain one individual, it contains many individuals and it is not a measure of what people remember or what they thought they would do, not what people we could survey thought, but the actual people during this period did and what many of them did, so it is very useful data. Similarly, there are decades worth of research including research based on Leapfrog hospital grades that shows the impact of those grades on choices. So given all the data in this case as well as my expertise as well as all the academic research that's been conducted on similar topics, I went ahead and used the approaches that I thought was best for this situation.
Q. You touched on it briefly, but were any of the studies that you considered in coming to your opinions specifically modeled after grades just like Leapfrog's?
A. Yes, not exactly modeled after Leapfrog, at least at some point of time, it may still be up, I'm not sure if they are taken down or not, but that was counted on their website as the example, but the grades modeled after Leapfrog's, all situations consumers picked, and the hospital had a better safety grade regardless of cost.
Q. And you were asked have you spoken to any individual

consumers. Do you recall that question?
A. I do, yes.
Q. Can consumers understand what they are not exposed to?
A. If someone hasn't seen something, they can't process that information, so it would be hard for them to speak to whether they understood it one way or the other.
Q. Professor, I want to go back to something earlier in your cross-examination. Do you recall being shown a link to the methodology on hospitalsafetygrade.org home page?
A. Far down on the page, yes.
Q. If we could put that back up on the screen and scroll down to the bottom. Counsel put it up very quickly, so I want to go back.
Do you see where that methodology link is?
A. Well, interesting, it's under the for hospital section.
Q. And why do you say it's interesting?
A. I just took it at face value given the discussion it was somehow consumer facing, and it looks like it is for hospitals, this particular document.
Q. Can you read the top three headers?
A. What is patient safety, those, is that what you are referring to?
Q. Yes.
A. Patient safety, your hospital safety grade, what you can do to stay safe.

Q. Do you have an opinion, Professor, about how likely it is that consumers will get down to the for hospitals tab despite those three hash-looking tabs --

MS. BLAIR: Objection, Your Honor, this isn't based on any previous opinions put out in this case, and it's based on speculation, he clearly is doing an analysis while sitting on the stand.

THE COURT: Overruled.

THE WITNESS: There is nothing in the for hospitals title that suggests it is for consumers. And so it suggests that this information is for hospitals. Is it possible that some consumers chose to click threw some of these, I guess it's possible, that wouldn't be the first logical place that I would think that consumers would go, even if they did go to the bottom of this page, it is not clear why they would go there.

BY MR. CRAIN:

Q. Thank you. Just a few more questions, Professor. You were asked to look again at -- do you recall that?

A. Yes.

Q. And Counsel said a hospital assigns a score; do you recall that language?

A. Scores assign, yes.

Q. And just to make sure I understand, does footnote four explain how a score is assigned?

A. I think we talked about it, neither explains what score is

assigned, it says a score is assigned, doesn't say achievement, it doesn't say new score, certainly doesn't say why that score is assigned.

Q. You were asked questions about valuative labels with respect to stars; do you recall that testimony?

A. I do, yes.

Q. We talked a lot in direct about the valuative labels and about the F, right?

A. Yes.

Q. Does F signify fail to a consumer?

MS. BLAIR: Objection, calls for speculation, not in his report.

THE COURT: Overruled.

THE WITNESS: F certainly suggests a bad grade. On a grading system, I'm not aware of anything lower than an F. That suggests bad performance.

Q. In your opinion, in your expertise in rating systems and their impact on consumers, does a one star similarly convey failure?

A. I think that might depend on the situation. I don't know what other things are out there, in some situations, the average star rating could be high, others could be low. For the purposes of today's conversation, I haven't looked at the data in enough detail to be able to speak to it correctly.

Q. And Professor, you were asked a number of questions about

the word "confusion"; do you recall that testimony?
A. I believe the word "confused", yeah, maybe confusion, I don't remember that offhand.
Q. Fair enough. I just want to clarify. Setting sort of this semantic distinction aside, do you have an opinion on whether consumers are likely to understand that Leapfrog assigns the minimum score on the score of meter measures?
A. Yes, I think as I said a few times today, my opinions are consumers are unlikely to understand the specific imputation that was used for those measures.
Q. And setting aside again the semantic difference aside, do you have an opinion about whether consumers will understand the impact of the Leapfrog's non participation penalty based on your review of Leapfrog's website?
A. Yes, my opinion is that they are unlikely to understand the impact of non participation on hospital grades.
MR. CRAIN: Nothing further.
MS. BLAIR: Your Honor, may I have a few questions.
THE COURT: I don't think it is necessary. I think both sides have had a chance.
Thank you, Professor, have a good day.
THE WITNESS: Thank you.
MS. MALONEY: Thank you, Your Honor. If the Court is prepared to hear another witness before our lunch break, we are prepared to call Mr. Hanlon from West Boca Medical Center.

THE COURT: Okay, good.

MS. MALONEY: And Mr. Hanlon will be examined by my colleague, Ms. Sydney Scott, who you heard from last Friday.

As Mr. Hanlon is taking the stand, as to the Eleventh Circuit case which I still don't have a copy of from counsel, but we were able to pull it up, Ms. Havericak's testimony, we objected on hearsay grounds --

THE COURT: Let's not breakdown -- we may get some more writing on that or I will give you both a chance for some argument, but let's not do it piecemeal.

Okay, please --

(Witness sworn.)

THE WITNESS: Good morning, my name is Jerad Hanlon, I'm the CEO of West Boca Medical Center.

DIRECT EXAMINATION

BY MS. SCOTT:

Q. Thank you, Mr. Hanlon. When did you become the CEO of West Boca?

A. In October of 2023.

Q. Why are you here in Court today, sir?

A. We feel that the false and misleading grades that have been assigned by Leapfrog, the info penalize us and in an effort to bully us into submitting data so they could monetize off that data.

Q. I want to do a little bit of a road map. The Court has

seen several of our CEOs testify before, but we will talk a little bit about your background, sir, and a little bit about your hospital and what brought you here today.

Let's start with your background. Can you walk us through your educational background?

A. Sure. So I come from a family of hospital and health care workers. My mother was a pediatric nurse for 40 some years, my sister is a nurse, my aunt is a nurse, so I was subjected and surrounded with health care at an early age, and I achieved my undergrad degree from James Madison University in health services administration and got my Masters at the Commonwealth University.

Q. Tell us, what was your first -- can you just walk us through your career in health care administration?

A. Sure. So I actually, when I was at James Madison and I volunteered in the emergency department while I was an undergrad and I got exposure to the hospital setting. After my graduate degree, I did an internship or residency and worked at a facility in Tennessee, and then proceeded to be promoted to assistant administrator position in North Carolina on up to chief operating roles, chief administrator officer roles and then ultimately to CEO here in West Boca.

Q. When did you first come down to Florida?

A. 2019.

Q. What was your first position down here in the Palm Beach

health network?

A. Sure. So I was recruited to the health network in '19 as the chief strategy officer of the group of five hospitals.

Q. What role have you had since joining in 2019? What roles have you had with the Palm Beach health networks since joining back in 2019.

A. So in late 2019, just in the first year I was there, we had some leadership turnover at St. Mary's, and I had been a chief operating officer before, so I was asked to take on a dual role on an interim basis as chief operating officer and chief strategy officer at St. Mary's. And I was in that role for about four or five months, and March 2020 happened and the pandemic hit, then my job solely focused on chief operating officer, so I became the full time chief operating officer of St. Mary's from March of 2020 until 2023.

Q. As CEO of West Boca, what are your primary responsibilities?

A. First and foremost, I am responsible for the quality and safety of our patients, staff and visitors. I am also responsible for the overall operations of the 24/7, 365 facility, I'm responsible for the financial and growth of the hospital and meeting the care and community needs.

Q. Let's talk a little bit about West Boca. Can you tell us about the hospital, please?

A. Sure. So West Boca, we are located in the southwestern

part of Palm Beach County, we have 195 beds, we are kind of claim to fame as outside of even being our community hospital, we also have a level three NICU. We are the only pediatric provider in Southern Palm Beach County. We also deliver a lot of babies, we have a very robust maternity program, do a lot of surgery, orthopedics, spine, and we, obviously, as every hospital has, we have an emergency room that handles the emergent needs of our community.

Q. We heard the other CEOs talk about accreditation by joint commission are you also -- is West Boca also accredited by the joint commission?

A. Yes.

Q. And does West Boca have other accreditations?

A. Yes.

Q. What are those?

A. There's a wide variety of accreditations. We are currently accredited by joint commission in our lab, we are going to be applying for cath accreditation, which is more stringent accreditation.

We get with the guidelines, we receive numerous awards from health grades, so we have a wide variety of accreditation and awards.

Q. Could you tell us a little bit about West Boca's patient population.

A. So our primary service area primarily tends to be more

younger population, family focused, you know. We have, as is indicated by our maternity program, we deliver a lot of babies, so we have a lot of younger families in our area.
Q. How many patients does West Boca serve in a typical year?
A. 40,000ish emergency room visits, 60,000 out-patient visits, approximately 9,000 surgeries.
Q. What are you most proud to serve as West Boca's CEO?
A. This -- it is a wonderful hospital. I think one of the things that gives me the most joy is, particularly with the NICU, as an example, we actually care for babies down to 23 weeks gestational age, we had one baby that was lovingly and affectionately referred to as our "Soda Can Baby" that was a very small baby that was able to survive and thrive, so seeing the outcome of what we're able to provide is rewarding.
Q. Let's turn briefly to the Leapfrog survey. Did West Boca stop participating in Leapfrog's survey in 2021?
A. Correct.
Q. We heard through all the trials already in opening that it was tenant directed all of the Palm Beach hospitals not to participate in the Leapfrog survey. Do you recall hearing that throughout the trial?
A. I have heard that testimony.
Q. Is there a policy that is specifically aimed at participation in the Leapfrog survey?
A. No. From what I understand, and obviously, I wasn't the

CEO at the time, but I was involved with the Palm Beach health network, post COVID and especially being the chief operating officer at St. Mary's during COVID, it was a lot of resources, and we spent a lot of money, too, on a wide variety of different accreditation and things, and so it was ultimately left up to the individual hospital. Tenant did ask that we seek approval if there was an accreditation that we wanted to go after or try to obtain, that we would seek approval for that and ultimately it was the decision of the hospital to decide.

Q. So the overall policy was a stop to accreditation and awards that were required or mandated by some sort of --

A. Correct.

Q. All right. Did Leapfrog continue to assign West Boca grades after it stopped participating after 2021?

A. They did.

Q. We heard a lot about Leapfrog's change in approach that has led us here today. When did you learn that Leapfrog had changed in its grading non-participating hospitals?

A. In 2024.

Q. What grade did Leapfrog assign to West Boca in, say, fall of 2024?

A. We received a D.

Q. Mr. Chauncey, could you please pull up Plaintiffs' 37.5? Scroll down a little bit, sir.

While that is coming up, we are -- we have done this

exercise with some of the other CEOs as well, I will make this brief. Let's talk about the four imputed measures, the first being hand washing. Does West Boca have the hand washing policy?
A. We do.
Q. Is data collected and monitored to insure compliance with that policy?
A. Yes.
Q. Is that data audited?
A. Yes.
Q. Do you review that data on a regular basis?
A. Yes.
Q. If we look at the gas gauge that has now been pulled up, hand washing, does that accurately reflect the data that you review on a regular basis?
A. The gas gauge does not.
Q. Do you know what the hand washing score was in 2021?
A. I believe we were assigned 100 in 2021.
Q. Let's talk about computerized condition entry. Does the hospital have what is called a CPO policy?
A. We do.
Q. Is data collected and monitored to insure compliance with that policy?
A. Yes.
Q. Is that data audited?

A. Yes.
Q. Do you regularly review that data?
A. Yes.
Q. As you look at the gas gauge here on the screen, does it accurately reflect the data that you regularly reviewed?
A. No.
Q. What about bar code medication administration? Does the hospital have a policy on CMA?
A. We do.
Q. Is that data monitored and collected to insure compliance?
A. We do.
Q. Is that data audited?
A. Yes.
Q. Do you regularly review that data?
A. Yes.
Q. If we look at the gas gauge for CMA, does that accurately reflect the data that you are regularly reviewing?
A. No.
Q. Finally, Mr. Chauncey, pull up PX-37.6.
We see here it has a gas gauge for specially trained doctors for patients. Does West Boca have doctor staff in ICU?
A. We do.
Q. Does this gas gauge accurately reflect that?
A. No.
Q. Did you submit data to Leapfrog for any of these measures?

A. We did not.
Q. Do you know where Leapfrog got this data if you didn't provide it to them?
A. I do not.
Q. Let's go back to fall of '24. How did you react when you learned that West Boca had been assigned a D?
A. I was concerned.
Q. What did you do when you learned Leapfrog had assigned West Boca a D?
A. I spoke with my quality director and tried to understand why we had received a D, and to understand the history of it as well.
But ultimately, it was based off data that we hadn't submitted and hadn't participated in the survey.
Q. Were there others at the hospital that you discussed the assignment of the D with in the fall of '24?
A. Yes, we had conversations with our -- with some of our leadership team staff at the hospital, with our Med executive committee as well as our board to give them the heads up that these grades would be released and we didn't feel it was accurate because we hadn't participated in the survey.
Q. Who sits on your medical executive committee?
A. It's a combination of physicians and medical leadership for all of the various departments as well as some of the chief of staff and vice chief of staff.

Q. Did members of your medical executive committee have reactions to learning about the Leapfrog rating in '24?
A. Absolutely, they were very frustrated that the quality data that they review on a monthly basis doesn't reflect the score that was being awarded to us.
Q. What about your governing board; who sits on your governing board?
A. It's a combination of -- we have three physician providers, but we also have six community liaison folks that sit on it.
Q. Is it important for West Boca to have folks from the community sit on its board?
A. Yes, absolutely.
Q. Why is that?
A. The board is responsible for overseeing the quality and safety and they act as liaison with us in the community to let us know what they are seeing, what we need to change and the feedback that they are hearing from their respective constituents as well.
Q. Did the governing board members have any reactions to leaning about the Leapfrog rating?
A. Yes.
Q. What were some of those reactions?
A. They were concerned as well. Chief Nemechek is the battalion chief for Battalion Two for Fire and EMS for Palm Beach County. He is on our board, he had expressed some

questions about it. Van Williams, who is the Palm Beach State College Provost for the Boca Raton campus, also had questions that he raised at a board meeting, and Sherry Scarborough who is a property manager in the community also had questions that she was voicing about it.

Q. You mentioned you also spoke with your staff.

What reactions did the staff at West Boca have to learning about the fall '24 Leapfrog rate?

A. Um-m-m, similar frustration just because we had seen -- well, the care that we provide on a daily basis and this grade didn't accurately reflect that quality of carry that we are providing.

Q. After 12/24, did Leapfrog continue to assign grades to West Boca?

A. They did.

Q. What grades were those?

A. We received an F in Spring of '25, and most recently we received a D in the fall of '25.

Q. Do you believe that Ds and Fs accurately reflect the quality of care that your patients receive at West Boca?

A. Absolutely not.

Q. Do you believe the grades have harmed the hospital?

A. Absolutely.

Q. How has the hospital be impacted since the release of the fall '24 grades?

A. We've suffered reputational harm, loss of goodwill in the community, and we've actually had patients that have left AMA against medical advice based off of what they read and seen about the Leapfrog grades.

MS. BLAIR: Your Honor, I would just lodge my standing objection for this based on hearsay and foundation.

THE COURT: Overruled.

BY MS. SCOTT:

Q. Mr. Hanlon, when a patient leaves the hospital AMA, is that something the hospital tracks or keeps track of?

A. Yes.

Q. Is that something that is elevated to you and that you review?

A. In most instances, yes.

Q. Was the instance that you just raised one of the instances that was raised to you?

A. Yes, it was.

Q. How was that instance raised to you?

A. Through our incident reporting system. So similar to what Ms. Gina West attested to, we have a risk management system that incidents can be reported.

Q. When that incidence was reported to you, did you read that report?

A. I did.

Q. Mr. Chauncey, could you please pull up DX-552.

MS. BLAIR: Your Honor, this is a document we have a hearsay objection to.

THE COURT: All right. I will need to see it.

MS. SCOTT: This is a business record, Your Honor, that Mr. Hanlon reviews as CEO at West Boca on a regular basis as the incidences are raised to his attention as this one was.

(Pause.)

THE COURT: So you agree it is a business record. What is your objection then?

MS. BLAIR: Your Honor, it's hearsay as to the trustworthiness. If you look at this document, it is talking about an adult daughter references the Leapfrog grade to her father who is the patient. There is no who, what, why, when or how, it is not signed by the patient. In fact, as I read the State law in the State of Florida, if you are leaving medical advise, a form would be provided to the patient to sign. Also we don't have the name of the patient in addition. So the declarant's daughter, the father of the listener, there is no exception to that, and then it is written by a woman named Jennifer White, this report is put in by her, and there is nothing to determine who she is or whether this document is reliable.

THE COURT: I will overrule the objection and admit 552.

(Whereupon Defendant's Exhibit 552 was marked

for Evidence.)

BY MS. SCOTT:

Q. Mr. Hanlon, is this the record you reviewed about the patient that left AMA?

A. It is.

Q. What does AMA -- what does that stand for?

A. Against medical advice, so obviously, patients can make their own health care decisions. If a patient does leave against medical advise, we are required to share the risk of them leaving against medical advice, and this patient subsequently decided to leave despite being told the risk.

Q. Do you know the initials for this patient?

A. We do.

Q. What are they?

A. J.D.

MS. BLAIR: Your Honor, we would just object, those initials were never provided in discovery, these initials were redacted until today.

THE COURT: Objection is overruled.

BY MS. SCOTT:

Q. Are you familiar with some of the doctors that treated Mr. J.D.?

A. Yes.

Q. And who are the doctors that you recall?

A. Dr. Hernandez is one of our hospitalists that ultimately

cared for this patient.
Q. Now, if we look at this record, does it reflect a reason why the patient left against medical advice?
A. Um-m-m, they left because of seeing the failing grade on -- the D grading on Leapfrog.
Q. That is here in the description?
A. Yes.
Q. Would you read that description for the Court?
A. "Patient's daughter did not want their father to have surgery in West Boca Medical Center due to the Leapfrog reviews that they read online. Patient was advised by the physician and this nurse at separate times the risk of infection of an open fracture and leaving against medical advice. Patient verbalized he understood and wanted to go to Broward."
Q. Do you know the details of the fracture that Mr. J.D. had?
A. It was a open wound --
MS. BLAIR: Objection, no foundation, lack of knowledge, no foundation of how he would know.
THE COURT: Overruled.
THE WITNESS: It was a compound fracture of the finger.
BY MS. SCOTT:
Q. What are some of the risks of when a patient leaves the hospital in such a condition?
A. Well, first and foremost, it is going to be pain,

suffering, up to including infection -- possible infection.

MS. BLAIR: Objection, Your Honor, calls for speculation.

THE COURT: Overruled.

THE WITNESS: Depending on how that infection goes, could be loss of limb or life.

BY MS. SCOTT:

Q. Did West Boca have the doctors and resources to address Mr. J.D.'s compound finger fracture?

A. Absolutely. In fact, West Boca is one of the few hospitals in the county that have a dedicated hand surgery call, so we have specialized physicians that perform surgery on the hand, and as you can see from some of the quality data, too, we also perform better than the average hospital in terms of surgical site infections.

Q. Did Mr. J.D. receive a bill from West Boca?

A. He did.

MS. BLAIR: Objection, assumes facts not in evidence, Your Honor, we are getting far afield.

THE COURT: Overruled.

BY MS. SCOTT:

Q. Are you aware of any other incidences of patients declining to receive care at West Boca?

A. I am.

Q. Do you recall the initials of this patient -- of these

patients who declined to have medical care at West Boca?
A. I do.
Q. What are those initials?
A. F.W.
MS. BLAIR: Objection to form, Your Honor -- I'm sorry, objection to hearsay, we have not been provided any of this information in discovery, interrogatory answers, documents, so my hearsay objection, I lodge it again.
THE COURT: All right. The objection is overruled.
BY MS. SCOTT:
Q. Do you know who brought this patient to the hospital?
A. Which patient?
Q. We can take that down.
Mr. F.W. I will refer to him.
A. Yes, this patient was admitted for am infection in the armpit.
Q. What happened with Mr. F.W.?
A. They were actually admitted and on the floor and scheduled for surgery, and the patient left against medical advice in the early morning because of some of the media and things they had seen about Boca.
Q. How did West Boca do treating infections?
A. We do better than average especially when you look at our MERSA grades, so we did exceptionally well.
Q. Did Mr. F.W. also receive a bill from West Boca?

A. He did.

MS. BLAIR: Objection, assumes facts not in evidence.

THE COURT: Overruled.

BY MS. SCOTT:

Q. We heard a couple of the CEOs talk about a decline in emergency volumes. Do you recall that testimony?

A. Yes.

Q. Have you also seen a decline in your emergency volumes?

A. We have.

Q. Mr. Chauncey, would you please pull up Plaintiff's Exhibit 550. If you scroll down to West Boca Medical Center, we see that the emergency volumes have been broken down into several categories.

In what category -- well, I want to focus your attention on the walk-ins. How much has West Boca declined walk-in volumes?

A. From '24 to '25, we were down 15 percent.

Q. We heard on Friday Dr. Nicholson talk about declines in emergency volumes. Do you recall that testimony?

A. I do.

Q. And one of the things that he says, based on academic literature, he would expect to see the impact of the Leapfrog grades in walk-in admission grades. Do you recall that testimony?

A. Can you say that again.

Q. Yes. So, one of the things that Dr. Nicholson talked about

in his testimony, he talked about emergency volumes that based on his review of the literature, he would expect to see declines in walk-in volumes related to the Leapfrog grade. Do you recall that testimony?

A. I do.

Q. Would you agree with that based on your experience?

A. Yes.

Q. And why is that?

A. I think you can see from the volume the incremental decline, plus, again, we had a patient verbatim tell us that they were leaving against medical advice from our emergency department because of the Leapfrog safety grade.

Q. I want to talk about doctors. Have you heard -- have doctors raised concerns to you following the Leapfrog grades?

A. Yes.

Q. And what has been the nature of those concerns?

A. I have heard comments from obviously medical executive committee members, but also from the community members such as Dr. Cueto, she is an OB/GYN that texted me and was like we saw the grade on Leapfrog, and I have had patients that are asking me, should I go to that facility. This isn't consistent with what we have known West Boca to provide.

Also, I heard from Dr. Marino Campo, a pediatrician with similar concerns and questions that are being raised by her patients.

Q. Are you aware of any insurance companies or payer concerns about the Leapfrog grade?
A. We have received some letters from payers, yes.
Q. Mr. Chauncey, could we pull up Plaintiffs' Exhibit 464. I think it's one of the letters that you received from a payee?
A. It is.
Q. You see this is from Humana, and directed to West Boca Medical Center; do you see that?
A. I do.
Q. Have you reviewed this letter before?
A. I have.
MS. SCOTT: Your Honor, we move to admit 464, it is similar to the letter Ms. Havericak received that the Court admitted on Friday, over objection.
MS. BLAIR: We have the same objection, no date, not addressed to anyone, and our objection is hearsay.
THE COURT: The objection is overruled, 454 is admitted.
(Thereupon, Plaintiffs' Exhibit 454 was admitted for Evidence.)
MS. SCOTT: Thank you, Your Honor.
BY MS. SCOTT:
Q. Let's look at the first paragraph of this letter. It says Humana Military strives to insure the beneficiaries we serve receive the highest quality care available, and the third

sentence says, during a recent review of the Leapfrog hospital safety grades, we have identified your facility -- you see that?

A. I do.

Q. What percentage of West Boca's patients are with Humana.

A. It varies, but somewhere between 12 and 14 percent.

Q. How did you react when you received this letter from one of your payers, Humana?

A. It is very concerning, especially given the fact that we don't agree with the rating Leapfrog assigned to us.

Q. Have you heard anything else regarding that?

A. We received another letter in the fall of '25, actually, fall of '24, after the spring of '25.

Q. Mr. Chauncey, could we pull up Plaintiffs' Exhibit 553.

MS. BLAIR: Your Honor, we have objection to this document. It was not received by us during the normal course of discovery. We first received it on January 6th, and so I understand your overruling on the objection. This is another one of the late produced documents that Mr. Hanlon just testified, he testified he had it since the Spring of 2025.

MS. SCOTT: Your Honor, this letter actually was -- we received it December 30, 2025, and sent it to them shortly thereafter. Mr. Hanlon received it the same time as Ms. Havericak, so it was very recent and we produced it in a timely manner. It is similar to the document -- the followup letter

from Humana that Ms. Havericak received that shows further evidence of the continuing harm and influence and impact that these letter grades are having on all of our community hospitals.

THE COURT: All right. To be consistent, I will overrule the objection, it was promptly provided by counsel once they received it. So 553 is admitted over objection.

(Thereupon, Plaintiffs' Exhibit 553 was admitted for Evidence.)

Also, similar to the earlier one that was produced.

MS. SCOTT: Yes, Your Honor.

MS. BLAIR: Your Honor, if I might for the record, the earlier produced document did have a Fed Ex label showing the date and time. This one is different, just for the record.

THE COURT: All right. It is 12:30. Is this a convenient place to stop?

Let's stop for lunch, one hour, 1:30.

(Thereupon, a short recess was taken.)

THE COURT: Okay, please be seated and please continue.

MS. SCOTT: Thank you, your Honor.

BY MS. SCOTT:

Q. Welcome back from the lunch break, Mr. Hanlon.

When we broke for lunch, we had just wrapped up with the two Humana letters.

I want to show you what has been previously admitted as Plaintiffs' Exhibit 415.

Will you please pull that up.

This is an April 23, 2025 letter addressed to you at West Boca Medical Center from Florida Alliance for Health Care Value. Do you see that?

A. I do.

Q. When you received this letter did you review it?

A. I did.

Q. It says: Dear Jerad, we are writing to strongly encourage you to participate in the 2025 Leapfrog hospital survey which opened on April 1st.

Then we look at the second paragraph. It says: Employers and purchasers feel that your participation is vital to our state so we can track real progress toward a safer, higher quality more transparent health system.

Do you see that?

A. Yes.

Q. This letter concluded: Employers and purchasers in Florida intend to share these results with their employees and use your performance metrics as part of their value strategy.

Do you see that?

A. I do.

Q. If we turn the page, we see there is an intent to submit a Leapfrog hospital survey for 2025, and asks whether or not West

Boca intends to participate.

If we look down in the text above the box there it says: The Florida Alliance for Health Care Value represents employers in the market. The survey is very important to them and they expressly request your participation. If you would like to discuss your decision via a phone call please call us.

Do you see all that?

A. I do.

Q. What was your reaction when you received this letter from the Florida Alliance for Health Care Value?

A. Well, initially I was obviously concerned.

I don't necessarily agree with we are looking for your hospital to commit to transparency because I do feel we participate in our CMS required reporting which publicizes much of this, but it is still concerning to see that they are going to share this with their employees, especially when we didn't feel that it is accurate or correct.

Q. Prior to fall 2024, do you recall any patients raising concerns about West Boca's Leapfrog grade?

A. Could you state that again.

Q. Sure. Prior to fall '24, do you recall any patients raising concerns about West Boca's Leapfrog grade?

A. I am not aware of any.

Q. Are you aware of any community members raising concerns about West Boca's Leapfrog grade prior to fall 2024?

A. Not that I am aware of, no.
Q. Have you continued to observe impacts to the hospital and the business it serves?
A. Yes.
Q. What has Boca West done to respond with these continuing concerns?
A. We have had to have numerous conversations with our staff, with community members. We have had to invest in commercials, for example, to try to change the public perception and to clarify the things that we do very well at our hospital to build back that reputation and good will to our community. So we have spent a lot of time trying to counteract this false narrative that the Leapfrog grades represent.
Q. When was the last time you had to have a conversation with a patient, doctor, community member about the Leapfrog grade?
A. Monthly, as recently as last Tuesday in our medical executive committee meeting.
Q. What do you think will happen if Leapfrog is allowed to continue to grade West Boca?
A. We will continue to suffer reputational harm, our volumes will be impacted, and more importantly, I think patients are going to suffer with increased risk for the patients who left without medical advice.
Q. Will West Boca ever consider participating in the Leapfrog survey?

A. No. They are grading based on information they don't have. Verbatim from one of our medical executive community members he likened it to blackmail that we are having to submit this data and we are being penalized until we submit it.

MS. SCOTT: I pass the witness.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MS. BLAIR:

Q. Mr. Hanlon, you just testified that prior to the fall of 2024 methodology change you never had any complaints about your Leapfrog grade, correct?

A. That I am aware of.

Q. Your Leapfrog grade in the spring of 2025, before the methodology change -- I am sorry, spring of 2024 was a D, correct?

A. Correct.

Q. And then Leapfrog announced in the spring, May of 2024, that it was going to change its methodology, correct?

A. Correct.

Q. Its methodology was changed for the November 2024 grade, correct?

A. The fall of 2024, yes.

Q. All right.

A. The methodology changed.

Q. Your grade was a D again?

A. It was.
Q. I want to make sure --
A. Part of -- I'm sorry to cut you off. Part of that was another example of they were imputing the scores from 2021 when we last participated in things like intensivist. We didn't have an intensivist program at the time, we have since implemented that, but they based that in part on information that they didn't have that were incorrect.
Q. We will talk about that in a minute for sure.
We are here about the fall 2024 methodology change, correct?
A. Yes.
Q. West Boca Hospital had a D before that change and a D after that change, correct?
A. We did.
Q. Thank you.
A. Correct.
Q. And it is your testimony today that there was never any complaints about their D grade in the spring of 2024, correct?
A. That I am aware of, other than concern that was raised by our medical executive committee, not from patients that I spoke directly to, but from our medical executive committee, yes.
Q. No complaints until you got the fall Leapfrog grade, correct?
A. From our medical executive committee and the board, yes,

there were concerns expressed. There weren't patient complaints, but there were -- that I am aware of.
Q. So your executive committee and the board complained about your D grade previously and they complained after the fall 2024 methodology change, correct?
A. They questioned it when we reported out what our spring release grades were going to be.
Q. You told the Judge that the spring 2024 grade was based on your actual data that you reported back in 2021?
A. No. I said that part of the reason for the lower grade was in part due to information that Leapfrog did not have from us, they were imputing it -- or using previously reported information, and the situation had changed. Because we didn't participate in the survey, they didn't have that.
Q. Previously reported data, you mean your own data?
A. Back in 2021, the last time we participated in the survey, but again, things had changed since that time.
Q. You talked about that medical executive committee members were upset about the fall 2024 grade, correct?
A. Yes.
Q. Who?
A. Dr. Varsagi, Dr. Herro, several members of the medical executive committee.
Q. What did they say exactly?
A. As I mentioned in my previous statement, Dr. Varsagi

claimed it was blackmail, that he was concerned that we are being negatively penalized because of this.
Q. When did he say this, in what medical executive meeting?
A. I can't recall off the top of my head.
Q. Do you remember what exactly it was that he had concern about, just the grade itself or the actual data?
A. The grade itself and that we were receiving grades on information that Leapfrog didn't have.
Q. Did the doctor have that same concern in spring of 2024, when you had a D?
A. I don't recall when he made that comment, so I am not sure when.
Q. He could have made that comment in the spring of 2024?
A. I don't recall which meeting he made that comment.
Q. And you said the governor board members were also concerned?
A. Yes.
Q. Were they concerned in spring 2024, before it changed?
A. The ones I cited before, that was more recent. That was when we got the F rating in spring of '25.
Q. Okay. I want to make sure, when you said the ones you cited before, I am only talking about fall 2024.
A. Those members were not members of our board at that time.
Q. Do you recall any governing board members in the fall of 2024 complaining about West Boca's D grade?

A. Yes. They weren't complaining, they were expressing concern that our grade had been higher in the past, and we discussed that in a board meeting.
Q. When you say higher in the past, you wouldn't mean spring 2024, because you got a D then?
A. Correct.
Q. Who expressed the concern in 2024?
A. Chuck Stout was our chairman of the board at the time.
Q. What did he say?
A. He mentioned that -- and I believe Dr. Newman -- I am trying to remember from a meeting that occurred several years ago. I believe it was Dr. Newman had also expressed some concerns. He said we have participated in this in the past, why were the grades -- why did it drop?
Q. Did any of the board members and medical executive members ask you questions about why West Boca was no longer participating in the survey?
A. No.
Q. When West Boca stopped participating in the survey, did you get the authority from your medical executive committee or governing board to stop participating in the survey?
A. The decision to stop participating occurred back in 2021. I wasn't there as the CEO.
Q. Let's talk about the spring 2024. Did you ever talk to your medical executive committee or the governing board about

the fact that you did not participate in the Leapfrog survey before the methodology change?

A. Yes.

Q. Did anybody on the medical executive committee or governing board express any concern about the fact that West Boca was not participating in the Leapfrog survey?

A. When I explained the reason for the grade was based in part on the fact that we didn't participate in the survey and they were assigning a grade that didn't reflect what they see on a monthly basis in our reports.

Q. Did any members of the medical executive committee or the governing board express to you as the CEO of West Boca that you should participate in the Leapfrog survey? I'm talking prior to the fall of 2024?

A. Members of the MEC or board?

Q. Correct.

A. Did not express any desire to participate in the survey.

Q. So they expressly told you they didn't want to participate in the survey?

A. I am saying they didn't expressly tell me that we should participate in the survey.

Q. Did they expressly tell you that you shouldn't?

A. No.

Q. Can you recall any discussion whatsoever prior to fall 2024 with respect to participation in the Leapfrog survey with your

medical executive committee or the governing board?
A. Prior to 2024?
Q. Yes.
A. I started in October '23, so I am not sure, other than the one or two board meetings we had at the end of October.
Q. No express recollection of that, correct?
A. No.
Q. And I think you testified on direct examination that the reason -- the reason that -- to your understanding, the reason that West Boca stopped participating in the Leapfrog survey was because the amount of resources that are needed to submit the survey are not there any more, correct?
A. The amount of resources that it takes to submit. We were evaluating all things after COVID, all accreditations, the costs, and making sure there was a value to what we were submitting and spending time and effort on.
Q. Isn't it true you don't think West Boca gets any value from the Leapfrog survey? Is that fair?
A. I don't believe there is value to the Leapfrog survey.
Q. Your counsel asked you whether or not Tenet home office had any directive to West Boca or any of the five hospitals that make up Palm Beach Health Network about participating in the Leapfrog survey. Do you recall that?
A. Could you state that again?
Q. Is it your testimony here today that Tenet corporate home

office had no directive to West Boca about whether or not you could participate in the Leapfrog survey in fall 2024?
A. The decision was up to the local hospitals to make. If they requested to participate in any survey or accreditation we had to present a value proposition to the home office to seek their approval.
Q. In 2023 West Boca went to the home office and asked for permission to engage in the Leapfrog survey; is that true?
A. I did not.
Q. You did not. Let me ask you this: Andrea Nunez was your director of quality, correct?
A. Correct.
Q. She reported to the chief nursing officer of West Boca at that time?
A. Yes.
Q. Who reported to you?
A. In part. He was also the group chief nursing officer.
Q. And that would be Ricky Ramirez, correct?
A. Correct.
Q. As you sit here today, you are unaware that in 2023 there was a request by Andrea Nunez and Ricky Ramirez for West Boca to begin reporting to the Leapfrog survey?
A. They had discussed with me at the time that they wanted to do it, and I made the decision there was no value in it and didn't want to proceed.

Q. That was a conscious and voluntary business decision you made as the CEO of West Boca in 2023?
A. Correct. I didn't see the value added to it.
Q. And West Boca has systems that track these four measures that are at issue in this litigation, CPOE, BCMA, hand hygiene and IBS, correct?
A. We do, yes.
Q. Joint Commission requires the tracking of CPOE and BCMA data. Isn't that true?
A. It is.
Q. Joint Commission does not publicly report that data?
A. They report the hospitals that they credit, which they investigate those things when they come in for the audits.
Q. My question is different. Would you agree with me that the West Boca exact performance on the measures of BCMA and CPOE are not reported to the public?
A. Through Joint Commission?
Q. Correct.
A. No.
Q. Participation in the Joint Commission is voluntary, isn't it?
A. It is.
Q. The same thing about participation in the CMS, that is voluntary?
A. CMS makes up the largest payer source and CMS does require

you to be accredited by either Joint Commission or DMV, so you have to be accredited by one or the other.

Q. You could choose not to publicly report to CMS, you just wouldn't be paid by CMS, correct?

A. I don't know the repercussions of that. I know that the CMS reporting is mandatory.

Q. What happens if you make the business decision not to report to the Joint Commission?

A. Report --

Q. That you don't -- since the joint Commission is voluntary, what if you make the decision I don't want to be part of Joint Commission, I don't want to be accredited?

A. You can choose who you want to be accredited by, either Joint Commission or DMV, if you want to participate in CMS.

Q. How much do you pay the Joint Commission to participate?

A. Participate in --

Q. In --

A. -- their accreditation?

Q. Yes.

A. I don't know the exact number off the top of my head, no.

Q. You track at the hospital, at the Palm Beach Health Network level, and we have saw this in Exhibit 813, you track your HMI at the hospital?

A. Yes.

Q. And you track HCAPs, right?

A. Of course.
Q. And would you agree with me that the HCAP scores for West Boca have historically been below the national average?
A. In terms of what time frame?
Q. Fall of 2024.
A. Fall of 2024, we have room for improvement in our patient satisfaction for HCAPs.
Q. Below the national average?
A. Yes.
Q. In fact, you hired Press Ganey to help you improve your patient satisfaction scores in 2025?
A. We engaged with Press Ganey who administers our HCAP scores to come in and help us identify best practices and tactics for us to improve that. Ultimately, we want our patients to be satisfied.
Q. CMS requires hospitals to use a CMS approved survey vendor?
A. Yes.
Q. Press Ganey is yours, correct?
A. Yes.
Q. And Press Ganey ultimately gave you an improvement plan in connection with how to improve your HCAP scores, correct?
A. They gave us some consultation on the things we could focus on, some best practices that they have seen in other hospitals to improve the satisfaction scores.
Q. And they provided you with a slide deck, correct?

A. I don't recall.
Q. Can we pull up Exhibit DX 913. This has not been admitted, your Honor.
So, Mr. Hanlon, this is a Press Ganey document for West Boca Medical Center. Do you see that patient experience overview? Do you see that?
A. I do.
Q. Yes. And it was done by Mika Joiner, the adviser from Press Ganey. Do you see that?
A. I do.
Q. Does this refresh your recollection that a patient satisfaction overview and on-site prep slide deck was provided to West Boca in connection with Press Ganey?
A. I don't recall specifically reviewing this document, but I remember we engaged with Press Ganey to come in and give us a consultation.
Q. Do you have any reason to believe this is not a business record provided to West Boca with respect to Press Ganey's visit?
A. I don't.
Q. If we scroll down, do you see Press Ganey here has a slide in the slide deck about the Leapfrog safety grade?
A. I do.
Q. And it lists a number of hospitals and their varying grades. Of course, you will see your hospital is listed under

the D grade, correct?
A. I do. I see it.
Q. And if you look at this, it says -- I have it highlighted here -- Leapfrog released its fall 2024 hospital safety grade which evaluates a hospital's ability to prevent medical errors, accidents, and infection. The Leapfrog hospital safety grade is the only hospital ratings program focused exclusively on preventing medical errors and patient harm.
Do you see that?
A. I do.
Q. Do you know of any other hospital ratings program focused exclusively on preventing medical errors and patient harm other than Leapfrog?
A. This is created by Press Ganey, so I can't --
Q. I am asking if you know of any other hospital system that focuses exclusively on preventing medical errors and patient harm?
A. You could argue that Joint Commission is focused on that. The hospitals are constantly focused on preventing medical errors and patient harm.
Q. Do you consider Joint Commission to be a ratings program?
A. An accreditation program, yes.
Q. It says Leapfrog is fully transparent, free to the public, and updated biannually in the fall and spring.
Do you see that?

A. I do.
Q. Do you have any reason to believe that Leapfrog's methodology is not fully transparent and accessible on its website?
A. I disagree with that.
Q. You don't believe the methodology is accessible?
A. I don't agree that it is fully transparent. There are several data points that we are assigned a letter grade based on information that Leapfrog does not have.
Q. Do you see it says Leapfrog is free to the public?
A. That is Press Ganey's comment.
Q. I am just asking you if you think Leapfrog is free to the public.
A. I don't know what Leapfrog charges to the public.
Q. The last sentence says, the majority of data used to calculate the safety grade comes from CMS publicly reported data. Do you see that?
A. Yes.
Q. Do you have any reason to disagree with that?
A. I would say it says the majority of the data used to calculate, but not a hundred percent.
Q. My question is: Do you have any reason to disagree with what Press Ganey, who you hired to give you this, is saying that the majority of the data used to calculate the safety grid comes from CMS publicly reported data?

A. Yes, I would say the vast majority of what Leapfrog assigns a grade is based off of publicly reported data.
Q. Have you expressed to your medical committee or governing board any concerns about working with a company that touts Leapfrog in this way?
A. Our focus on Press Ganey, involving them, was focused on the patient satisfaction, and identifying best practices from across the country that we could implement in order to improve our patient satisfaction scores.
Q. So that is a no, you never expressed any concern to your medical executive committee or governing board about paying for a company that touts Leapfrog this way?
A. Again, we engaged with Press Ganey to help us improve our patient satisfaction scores, best practices from other hospitals. We absolutely want to make sure that our patients are happy.
Q. You are still working with Press Ganey today?
A. We are.
MS. BLAIR: Your Honor, I would ask this document be moved into evidence.
MS. SCOTT: No objection, your Honor.
THE COURT: 913 is admitted.
BY MS. BLAIR:
Q. A lot has been talked about CMS star ratings. Could you tell the Court what are your current CMS star rating for West

Boca?
A. Two star.
Q. What is your patient safety?
A. Patient safety or satisfaction?
Q. Oh, patient satisfaction.
A. Patient satisfaction is one star.
Q. Have you ever had any conversations with your medical executive committee or governing board about their dissatisfaction with the CMS star ratings?
A. We have shared our CMS star ratings with our board and our plans to focus on the various parts of our CMS star rating, which is why we engaged Press Ganey to come in and give us some tidbits to help improve patient satisfaction.
Q. My question is: Have you ever gotten questions from your medical executive committee or your governing board, disappointment or questions from them about your CMS rating?
A. We have gotten questions from our board about our CMS ratings and what we are doing to improve them.
Q. I want to talk about the fact that West Boca has not lost any revenue since the fall 2024 methodology came out, correct?
A. That is not a true statement.
Q. That is not a true statement?
A. No. We have lost outpatient revenue. Our total revenue is up in spite of the reputational harm that we have suffered from this.

Q. Your total revenue is up?
A. Yes, outpatient and emergency room volume has been impacted.
Q. I will get to that. I want to make a clear record. Total revenue is not down, correct?
A. Total revenue is up.
Q. And EVANA is up?
A. Yes.
Q. Market share has not declined, correct?
A. It depends on what market share you are looking at. Certain services we are down and other services we are up.
Q. Overall are you up or down?
A. Hospital market share?
Q. Yes.
A. There is a wide variety of variables. Admission volume is down, emergency room volume is down, our surgeries and certain specialties is up. So it is across the board, there is not one single answer --
Q. You don't know whether the overall market share of the West Boca Medical Center is up or down. Is that fair?
A. It depends on your definition of overall market share.
Q. You have not had any issues with nursing retention due to the Leapfrog grades, correct?
A. I have not heard of any concerns expressed about Leapfrog that have impacted our nursing retention. I know we have

struggled to recruit nurses over the years.
Q. No physicians have left your hospital citing the Leapfrog grades as the reason, correct?
A. That they have cited to me, no.
Q. In fact, your Google star ratings have gone up since the fall of 2024 grade?
A. Absolutely. We are very, very proud of that.
Q. Your transfer rates from other hospitals are up?
A. Yes.
Q. And you talked about elective admissions, correct?
A. Correct.
Q. And emergency -- is it fair to say your position is that emergency room visits are down for West Boca?
A. They are.
Q. You attribute that to Leapfrog grades, correct?
A. In part, yes.
Q. What is the other part?
A. There are a wide variety of variables that could impact it.
When you have patients that are literally leaving AMA from your emergency department and hospital, you can only conclude, yes, it is impacting your volumes.
Q. Why don't we pull up 363.
Mr. Hanlon, I will show you -- I believe there is an objection -- meeting minutes from your medical executive committee dated November 19, 2024.

MS. BLAIR: This is also a confidential document. I understood, your Honor -- take that down for now. I understood your Honor's directive that we were not going to do confidential documents, but we will have a fight about that.

MS. MALONEY: No, we are not.

MS. SCOTT: We are withdrawing our confidentiality designation to these materials, but these are very sensitive board materials that we have tried to negotiate to find a way to balance the interest between the sensitive and confidential nature of these documents and getting in the passing references to Leapfrog that in the board materials.

We conferred with the other side for weeks to try to broker a deal. We offered to stipulate what the documents say that are specifically relevant to Leapfrog. We offered to redact sensitive information to protect. This is very sensitive hospital operational, financial, and other metrics data that are irrelevant to this case.

We would be willing to have the relevant portions of the documents related to Leapfrog, again, it is like a bullet or two that says Leapfrog.

We are happy to do that and happy to take the Court's guidance or suggestions on ways to balance the interests here, but given the sensitive nature of these documents we do not want them to be public.

MS. BLAIR: I am not using the documents for reference

to Leapfrog. I am using them for references in them that West Boca admits that the reason that their surgical volumes and ER volumes are down are for a variety of reasons, including construction in the ER, loss of surgeons.

THE COURT: Well, they went through -- what you are saying is you want to introduce this document, 623, in its entirety?

MS. BLAIR: Yes, sir. I won't show it in open court for its entirety.

THE COURT: All right. 623 is admitted over objection.

MS. BLAIR: I will only show the part of the document that I am going to use.

THE COURT: Well, if some of it is not pertinent you may agree to a redaction of whatever you don't show him.

MS. BLAIR: I believe these are redacted already in some part.

THE COURT: You all figure out how to deal with it. Once it is admitted, it is admitted. So, if you are going to admit a redacted document that is redacted except for what you're using it for, that is fine with me. You need to work that out.

MS. SCOTT: I am happy to work with Ms. Blair and her team to get these documents appropriately redacted.

THE COURT: All right.

BY MS. BLAIR:
Q. If you can show 623.
Do you see this document here, Mr. Hanlon? This is notes from a meeting that occurred 11/19/24, and it says decrease in pediatric ENT surgical volume, decrease in general breast and reconstructive surgery due to the retirement of two high volume surgeons, and goes on and on, and then it says, limited number of ORs in the maun OR suite, currently utilized at 64.8 percent, and then Tenet made a decision to not participate in Leapfrog because it does not produce a value.
First I want to talk about the decrease. Do you see that here?
A. I do.
Q. Nothing talks about a decrease due to the Leapfrog rate, correct?
A. This is focused purely on surgical volume.
Q. If we could move to the same sort of document, DX 565 -- 656, my apologies. Thank you.
These will be meeting minutes from January 28, 2024, and you are reporting to your medical executive committee that West Boca is working on shifting volume to other locations as West Boca is tapped out with space, no ability to expand due to infrastructure issues.
Do you see that?
A. I do.

Q. Was this a correct statement when you made it?
A. This is related to a certain subset of our volume. We, you know, we have had a tremendous amount of growth due in part -- like in our NICU, our NICU volume is up. Our surgical volume on the inpatient side is up because of just increased recruitment of surgeons and things. We needed to expand our infrastructure.
Q. This says that surgical volumes were down, decrease in volume, closure of OP diagnostic center. Do you recall that?
A. We did close our outpatient diagnostic center.
Q. And it goes on to say limited number of ORs.
If we pull up 671, another meeting minutes here.
MS. SCOTT: As long as we have the same agreement on all of these.
THE COURT: I couldn't hear you.
MS. SCOTT: As long as we have the same agreement regarding redactions we have no objection.
THE COURT: 656 and 671 admitted, pursuant to some redaction the parties agree to as to unrelated materials.
BY MS. BLAIR:
Q. This is again another meeting note, the date of which I don't have in my notes, I apologize. Could you scroll to the top. April 22, 2025.
This is after you have gotten the Leapfrog spring 2025 grade, and you say, WBMC to get approval for the two million OR

expansion. This will allow WBMC to better handle an increase in patient surgical volume.
Do you see that?
A. I do.
Q. Does that refresh your recollection that in April 2025 you were having issues with surgical volume as a result of infrastructure issues?
A. Yes.
Q. If we go to DX 690, governing board meeting minutes. Jerad advised West Boca has seen an impact this month on admissions. It has been slow with the emergency room and admissions being down. Jerad advised it will be a tough summer with more seasonal people going back north.
Do you see that?
A. I do see that.
Q. Take that down.
Does that refresh your recollection when you are reporting to the board and the medical executive committee all the way through spring 2025 you never once told them -- told your boards that your admissions were down because of the Leapfrog grade; is that correct?
A. No, that is not correct. All of these statements have been about our inpatient OR volume. We did see variations, we see increase in spine, we did see a decrease in our pediatric ENT, and some of our general surgery volume. A lot of that comes

through the emergency room and because our emergency room volume is down we have seen a decrease in certain subsets of our surgical volume.

The reason for the expansion was because that OR was only 353 square feet and can't accommodate the types of surgeries we are doing in such a small space. We were expanding to accommodate more complex surgery which also results in an increase in our revenue because we are doing more acute services.

But that doesn't address the fact that we have seen a decrease in our volume, in ER volume, things like that due to the Leapfrog grade.

Q. We will talk about the ER volume. If you could pull up PX 550. This was previously admitted.

These are your volumes, do you see that here, West Boca walk-ins?

A. I do.

Q. You looked at this with your counsel when she was questioning you?

A. I did.

Q. Do you see that police is down by 49 percent?

A. I do.

Q. Is it your testimony the police are bypassing West Boca Medical Center based on the Leapfrog grades?

A. The police are required to go to the trauma centers. We

don't do behavioral health, for example. They could have had to take the patients somewhere else. It depends on the mix of the patient's needs.
Q. Every category with respect to unknown, which I don't know what that is, is down, including police as it relates to your ER, correct?
A. Walk-in is down, EMS is down, and in part that could be attributed to the fact that Chief Neil Nemechek, who is a member of our board, shared that some of the paramedics had seen the TikTok video. That is what initiated questions with Chief Nemechek.
Q. Chief Nemechek, what meeting was that at?
A. That was at the board meeting that I shared with him in deposition, too, that Chief Nemechek was the one asking the questions.
Q. What date was that meeting?
A. You can see it in the minutes. I wouldn't know the exact date of the meeting that he expressed that concern.
Q. What did you say in response to that?
A. The same thing we shared with the rest of the board, that the Leapfrog ratings were based off information that Leapfrog didn't have. At that point in time it was based off an imputation model that was not accurate as well.
Q. Has West Boca done any study for the reason, causal of the reason of the downward admissions --

A. I have verbatim patients telling me they were not coming because of the Leapfrog rating.

Q. You talked about two. Has West Boca commissioned any study or survey to determine why elective admissions -- we will get to the ER -- elective admissions are down at West Boca?

A. If I have two patients that are verbatim telling me they are leaving because of Leapfrog, I don't know what other survey or analysis is needed. I have a case in point patients risking infection, increased pain, and going to another facility that could have very well been taken care of at our hospital.

Q. You were telling your governing board that volumes were going to be down because of seasonal residents going back north?

A. That is one reason.

Q. Yes.

A. So is Leapfrog, that is another reason.

Q. You never commissioned a study to actually find out what the cause was, did you?

A. I have patients telling me --

Q. It is yes or no.

A. If I have patients telling me they are going to go elsewhere because of the Leapfrog rating that I feel is inaccurate, and it is inaccurate, I don't need any more substantive information that this is impacting our volume.

Q. Okay. The answer is no.

You made statements in the declaration that Leapfrog is a pay to play organization. Do you recall that?

A. I do.

Q. Do you have any evidence as you sit here today that Leapfrog has taken any money from any hospitals in exchange for better grades?

A. It costs us money to pay the staff to collect all of this information. We are also handing over our data which has been monetized by Leapfrog. So, yes, I do feel we are having to pay to be involved in this survey.

Q. Mr. Hanlon, that is not my question.

Do you have any evidence that my client, Leapfrog, takes money from other hospitals in exchange for a better grade, yes or no?

A. That is not the question you just asked.

Q. I am asking it now.

A. Again, you asked about the pay to play. Can you repeat your question now that it has how that changed.

Q. Are you aware as you sit here today whether or not -- let me ask you this way: Do you have any factual evidence as you sit here today that my client, Leapfrog, takes money from hospitals in exchange for better grades?

A. I don't have any indication of that.

Q. Thank you.

A. Our pay to play scheme was focused on the fact that it does

cost us money and monetary data we are submitting to Leapfrog, so that is the pay to play.
Q. Sure. And you testified your medical center tracks CPOE, BCMA, hand hygiene and IVS, correct?
A. We do.
Q. As I understood your testimony, let me know if I am wrong, if you were to have engaged in a Leapfrog survey back in 2024, you would have scored a hundred out of a hundred points on your BCMA?
A. On BCMA -- I can't confirm. I know it wouldn't have been what we were imputed.
Q. You don't think it would have been limited achievement?
A. No.
Q. Who was the quality director in West Boca in 2023?
A. Who was the director of quality?
Q. Yes.
A. Andrea Nunez.
Q. She reported to Rick Ramirez, correct?
A. Yes.
Q. And he reported to you?
A. Yes, in part.
Q. If you would pull up Exhibit DX 509.
Your Honor, there is an objection to this.
Mr. Hanlon, this document is from Andrea Nunez, the quality director of West Boca in January 2023, to other members of the

West Boca staff and she says: Thank you for working on this. If we submit can we use 2023? She says, in order to achieve the maximum score we need to have less than a .119. The score above shows .25. Unfortunately, this places us in the category with the lowest score.

Do you see that?

A. Again, I wasn't a part of this email chain here.

Q. The attachment -- the subject line is Leapfrog data. Do you see that on the subject line, Leapfrog data?

A. For 2022.

Q. And the attachment says, Leapfrog 2022 gold standard workbook. Do you see that?

A. This was also sent in 2023, in January, and I hadn't started at West Boca until October of that year.

Q. Do you have any reason to believe this is not West Boca's BCMA score in 2023, which would have been the bottom category?

A. I can't speculate to this, I wasn't at this hospital or part of this email and I don't know who Michael Perry is.

MS. BLAIR: I ask to have this admitted as a party opponent admission.

THE COURT: Do you have an objection?

MS. SCOTT: Yes, your Honor, he said he wasn't there at this time, it doesn't even say West Boca.

THE COURT: What is the objection?

MS. BLAIR: This is the BCMA standard.

MS. SCOTT: Your Honor, this is not a record of West Boca. Again, I don't see where it says anything about BCMA. BCMA is not rated based on .19 or .25.

MS. BLAIR: It is right here, West Boca.

THE COURT: It seems to be a West Boca document.

MS. SCOTT: He has been questioned about BCMA, and there is nothing I see about BCMA. BCMA is not even measured as 1.119 or .25. It misrepresents because Mr. Hanlon was not shown anything about BCMA, and misrepresents the testimony. It is confusing and misleading.

THE COURT: That doesn't appear to be an authenticity objection and it is a West Boca document, so I will overrule 509.

MS. BLAIR: Thank you.

BY MS. BLAIR:

Q. You talked a lot about complaints we have from patients, that you have listed off complaints that you heard from patients either directly to you, to members of your governing board, medical executive board or doctors, correct?

A. I discussed two specific AMA.

Q. And you signed interrogatories in this case?

A. Yes.

Q. I won't belabor the Court, DX 207, you signed those interrogatories?

A. Yes.

Q. Do you recall signing interrogatories in this case?
A. Yes.
Q. I asked you all the same questions I asked the other four. If we go to number eight of my interrogatories. I asked you the question about --
A. Can you go to number 10?
Q. I want to go to 8. It's my examination. Identify any and all persons, whether internal or external, with whom you communicated to anybody about the safety grade, the date, communication, etc. Your answer is exactly the same as the others. You said the -- you never once give a patient name, do you, in this answer?
A. I discussed the various individuals and patients are protected by HIPAA.
Q. What about the physicians, are they protected?
A. They are not.
Q. You talked about Dr, Anthony Hernandez?
A. He was the physician that cared for the patient who left AMA.
Q. His name is not here?
A. That incident occurred in October of '25.
Q. Did you supplement --
A. That was post this.
Q. You never supplemented your answer, did you?
A. I gave all of the information to my counsel.

Q. They had it?
A. Timely.
Q. That is good to know.
A. I immediately reported it to our counsel.
Q. Excellent. If you go to number 14, I asked questions of you as the representative of West Boca. I asked the question whether you were aware of specific patients who relied on the Leapfrog safety grade in declining to receive health care. Do you see that? That is my question to you.
And I ask you to identify the patient, the services that were declined, the date, type of service, the median for the conversation, the content. Do you see that?
A. I do.
Q. We scroll down, that is it, since the release of the false and misleading grades we received numerous reports from doctors. You never provided any names, did you?
A. It says here, Plaintiff has have received numerous reports from doctors that patients considered or decided not to use the Plaintiff's facility due to concerns related to the TLG's misleading grades. That is an accurate statement.
Q. You never provided any specific information I requested; is that right?
A. This is an accurate statement.
Q. You are saying that tells me the patient, the type of service, the median and the content of the conversation. Is

that your testimony?
A. Again, the Plaintiffs received numerous reports. I did disclose we received numerous reports from patients who decided not to receive care at our facility because of the grades.
Q. When did FW come to the hospital?
A. October.
Q. 2025?
A. Yes.
Q. You never supplemented that answer; is that right?
A. I reported all of the information to our counsel.
Q. You reported all of the details to your counsel?
A. I reported the AMA report that we reviewed earlier today, yes.
Q. And these were never supplemented?
A. This is an accurate statement.
Q. Okay. We talked about your Google reviews being up. Do you review the Google reviews for West Boca?
A. I do.
Q. Do you review all of the bad Google reviews?
A. I don't personally review all the bad reviews. When we get a one star we do report it to the respective leader that is over that area.
Q. Have you ever seen any negative Google reviews that mention Leapfrog?
A. Yes.

Q. I bring up DX 917.
There is an objection to this, your Honor.
Mr. Hanlon, can you tell the Court who Kathleen Catley is, please?
A. I believe she is one of the individuals that works at our central business office that monitors our social media and Google reviews.
Q. Ricky Ramirez is on this document and he is the chief nursing officer for the Palm Beach Health Network market?
A. And West Boca.
Q. West Boca specifically?
A. Yes.
Q. And Lisa Cook is on here, and she is the marketing director for Palm Beach Health Network?
A. And Delray.
Q. You see Tom Daily gives us his name, and he said, if anything below one star was possible that is what this place would be getting. Do you see that?
A. I do.
Q. Did you review this Google review when it came in around July 2025?
A. We did.
Q. He goes on to talk about the Leapfrog D safety grade?
A. He does.
Q. Then he says, medical malpractice claims, since 1999 there

have been 116 malpractice claims filed against the hospital, 28 involving deaths and 19 over $1,000,000. Do you see that?
A. I do.
Q. Was that true?
A. I don't know. I was surprised where he got that information.
Q. He mentioned to U.S. News one star patient experience. Do you see that?
A. Yes.
Q. This hospital is an absolute disgrace to medicine. I would advise driving out of your way and going to Boca Regional or any other hospital. Do you see that?
A. I see that.
Q. This is July 2025.
MS. BLAIR: Your Honor, I ask this document be moved into evidence as Mr. Hanlon has testified he reviewed the document, it comes from his marketing department and it is in the regular course of business that they would gather these and review them.
MS. SCOTT: Objection, your Honor, hearsay to the statements that had been reproduced from we don't know where, reflected in this document, and also relevance to the discussion of any claims, as well as 403 for unfair prejudice, confusing the issues and misleading, and hearsay as to Tom Daily himself.

THE COURT: All right. I will overrule the objection in terms of relevance and authenticity. Hearsay, I am going to stay consistent and overrule that for both sides until you all give me some legal dissertation telling me I can't.

I am pretty sure it is admissible, but I will look forward to further illumination on that point. I will treat this as I did those that you sought to admit.

MS. BLAIR: Thank you, your Honor.

BY MS. BLAIR

Q. If we look at DX 552.

A. If I could --

Q. There is no question pending.

MS. SCOTT: Your Honor --

THE COURT: I don't think there was a question pending. You may be able to deal with that on redirect.

BY MS. BLAIR:

Q. If we could pull up DX 552.

I show you what counsel showed you on direct examination, the guy with the finger who left against medical advice.

I want to be very clear what this record said. This document is dated, or reported August 22, 2025. So, a month after the document we just saw from Tom Daily, okay.

That document we just saw was from July 2025. This document is from August 2025.

A. Correct, and we hadn't confirmed whether Tom Daily was an

actual patient. That is what I was going to state. We did review it in real time, but we didn't confirm he was a patient.
Q. On 8/22/25, if we really read this, it says the patient's daughter did not want her father to have surgery in West Boca Medical Center due to the Leapfrog reviews that they read online.
    Do you see that?
A. I do.
Q. Do you have any way of knowing what this patient, JD, what JD read? Did he read Tom Daily's review? Do you know that?
A. I don't know.
Q. And who spoke to Tom Daily to get this note put into the system?
A. Tom Daily is somebody --
Q. I am sorry, who spoke to JD?
A. The nurse that cared for the patient, and then the AMA documentation was submitted as part of the medical record.
Q. What is the name of the nurse?
A. Jennifer White was the nurse that was submitting it.
Q. Do you know Jennifer White?
A. I don't know her personally, no.
Q. Do you know her to be a nurse at West Boca?
A. I do.
Q. Do you know where this event took place between Jennifer White and JD?

A. The patient came into our free-standing emergency department and was scheduled for surgery and was transferred to the main campus and that is when they decided to leave AMA.
Q. Do you know what exactly was said by the patient's daughter other than what was in this note?
A. I do not.
Q. Do you know what the father's reaction was other than what was in the note?
A. I do not, no.
Q. Did Dr. Harris write down any other medical notes about this incident? I am sorry, Dr. Hernandez.
A. You'd have to check with Dr. Hernandez.
Q. The only information you have is what we are looking at on DX 552?
A. As part of our risk management system, yes.
Q. You don't know what the patient's adult daughter relied on when she talks about the Leapfrog online reviews?
A. The risks were shared with the patient by the physician and this was subsequently reported back to me.
As the CEO of the hospital, I am not immediately involved in every single AMA.
Q. When she says Leapfrog reviews that they read online, you don't know -- as you sit here today, you have no idea what that actually means, you never spoke to this patient?
A. This is Jennifer White's report.

Q. I am asking you if you have any knowledge.
A. I can see it from the event reporting system that that is what the patient claimed.
Q. You only know what Jennifer White wrote down?
A. Since she was the one caring for the patient, yes.
Q. You know nothing more than that?
A. Me personally, no.
Q. And then FW with the armpit infection. You talked about this patient as well, right?
A. Yes.
Q. He was admitted and left the ER against medical advice?
A. Correct.
Q. Who was the doctor treating him?
A. Dr. Hernandez.
Q. The same doctor?
A. Yes.
Q. Who was the nurse treating him?
A. I don't recall.
Q. Is there any note?
A. There was multiple staff that cared for this particular patient, so it is not one specific nurse. We had a similar report through our risk management system.
Q. There is a note that exists?
A. For the patient who left AMA, yes.
Q. Did you provide that to your counsel?

A. Yes.
Q. Do you know --
A. We provided the risk report that someone had left AMA citing the Leapfrog scores.
Q. You presented a document like 5 -- PX 552, you have another document just like that for this other patient?
A. Yes.
Q. You provided that to your counsel?
A. Yes.
Q. Do you know if that document has been provided to the other side in this litigation?
A. You'd have to ask counsel.
Q. Do you know what it says?
A. It is very similar to what we just reviewed on JD.
Q. Do you know who wrote that document?
A. The person that reported, yes.
Q. Who is that?
A. I don't remember off the top of my head.
Q. Do you know what the report says about what FW exactly said about Leapfrog?
A. Yes, it had similar comments. It was reported by the staff and the physician that had to sign the AMA paperwork expressing that they had shared the risks of leaving the hospital against medical advice.
Q. There is a document that says exactly what the patient said

allegedly that we don't have with respect to FW leaving AMA. Is that your testimony today?
A. We got a similar risk report that was raised to me because of citing the patient left due to the Leapfrog score.
Q. The gentleman who presented the finger, do you know what his outcome was of the surgery he had on his finger?
A. I don't know where he sought care.
Q. You don't know if he had a very successful surgery, and did very well as a result of that surgery?
A. He left against medical advice, so I don't know.
Q. Same issues with respect to FW with the armpit infection, do you know what the result was of his ultimate care?
A. I don't. He left against medical advice and I am not able to track where they go.
Q. You testified that he was billed at West Boca. He was billed, correct?
A. Correct.
Q. Was a bill generated?
A. Yes.
Q. Did you produce that bill to your counsel?
A. I don't recall that it was asked for, no.
Q. How much was the bill?
A. I don't know off the top of my head.
Q. Do you know if he paid the bill?
A. I don't know off the top of my head. I don't know if the

insurance paid for it or the patient was responsible for it.
Q. A few more questions. You said there were comments from community members. You specifically talked about Dr. Quedo?
A. Yes, she is one of our doctors.
Q. She sent you a text message about Leapfrog, correct?
A. Her office sent me a text message that the doctor had been approached by a patient that asked questions.
Q. Did you produce that text message?
A. I believe I did to my counsel.
Q. You gave it to your lawyers? What did it say?
A. I would have to look exactly at it so I could be honest.
Q. When did this take place?
A. It would be dated on the text messages.
Q. Ballpark, when does Dr. Quedo text you about Leapfrog?
A. I don't want to speculate.
Q. You provided that text message to your attorneys?
A. Yes.
Q. Do you know if they ever produced it to the Defendants in this case?
A. You'd ave to ask counsel.
Q. I will. You also said there were concerns by Dr. Campo?
A. Yes.
Q. Did she do that in a text message?
A. No.
Q. Email?

A. No.
Q. Any writing whatsoever about her concerns?
A. That was a phone call.
Q. Last but not least, I want to talk about the Humana letter that we have seen. West Boca received multiple Humana letters?
A. Two.
Q. One in the spring 2025, and one in the fall 2025?
A. No. One was based off of the release of the spring records and the other one was based off of the fall release. The second one was received around December 30th. I don't recall off the top of my head when the first one was received.
Q. If you'd pull up PX 464. This is a document your counsel showed you that was entered into evidence from Humana.
Do you recall what date you received this document, Mr. Hanlon?
A. I do not.
Q. And if we go down a little bit -- I think -- before we read that, did you say -- how much of Humana insurers make up your patient population?
A. Give or take, 12 to 14 percent.
Q. Is that a large percentage of your patient population?
A. That is up to interpretation. I consider it significant.
Q. Significant?
A. Yes.
Q. The significant insurer of West Boca says: Consequently,

we are providing you this information to encourage your facility to review your Leapfrog hospital safety grade to identify any factors that may have contributed to your performance on the safety measure.

And then they go on: We ask that you respond to this letter within 30 days from receipt regarding your strategic improvement performance.

Do you see that?

A. I do.

Q. Did you respond?

A. We did not.

Q. Why?

A. We were more focused on impacting inpatient care and safety than responding to Humana payers on a grade that we don't agree with and is not accurate.

Q. For the record, you testified it was "very concerning" to get this letter, correct?

A. It is concerning.

Q. Humana is a payer of your hospital?

A. Yes, they are.

Q. You didn't care enough to even respond to the letter?

A. Because of the contents of the letter, it is based off of a Leapfrog grade that we don't think is accurate. I can't respond to every single complaint with things that are related to things are not of value.

Q. Don't you think it is important to -- you called this very concerning correspondence. You didn't think that was important?
A. Not based on the Leapfrog grades. If I don't have any reason to respond to it, then I am not going to respond.
Q. You will not respond to an insurer that makes up 12 to 14 percent of your revenue for your patient population?
A. Based on a survey that we do not participate in nor find any value to.
MS. BLAIR: No further questions.
THE COURT: Do you have redirect?
MS. SCOTT: Very brief, your Honor.

REDIRECT EXAMINATION

BY MS. SCOTT:
Q. A couple of things. Early on in your cross-examination you were asked about Joint Commission. Do you recall that?
A. I do.
Q. You were asked if Joint Commission is a voluntary business decision. Do you recall that?
A. It is voluntary in that we can select as a CMS provider. They require that we have somebody, be accredited by either DMV or Joint Commission.
Q. Thank you for clearing that up.
You were also asked questions about your CMS star rating. Do you recall that?

A. I do.
Q. Has any patient declined to have care or treatment at West Boca citing your CMS scores?
A. Not that I am aware of.
Q. You were asked a couple questions about your revenue. Do you recall those questions?
A. I do.
Q. Based on your projections, did you expect your revenue would be higher for '24, '25?
MS. BLAIR: Objection, assumes facts not in evidence. There have been no projections presented in discovery or in evidence in this case.
THE COURT: Overruled.
THE WITNESS: We did, we recently invested close to $3 million in expanding our emergency department to treat more patients, and we have subsequently seen a decrease in that volume.
BY MS. SCOTT:
Q. You were also asked question about patients FW and JD, questions about billing and outcomes. Do you recall that line of questioning?
A. I do.
Q. You testified that West Boca sent both of those patients bills. Is that true?
A. Yes. In the normal course of business we do bill patients

that seek care in our facility.

Q. Do you expect that those patients were billed for the treatment they got at other facilities when they left your facility?

MS. BLAIR: Objection, speculation.

THE COURT: Sustained.

MS. SCOTT: May I have a moment, your Honor?

THE COURT: Yes.

MS. SCOTT: Nothing further, thank you.

THE COURT: Thank you, sir.

MS. MALONEY: Your Honor, we understand that Dr. Romano, who we were going to call later in the day, he has a 6:00 p.m. flight and a phone call before that. He needs to take the stand relatively quickly. My colleague will be examining him.

I have three minutes of Ms. Karen Van Caulil testimony by video, she is the CEO of the Florida Alliance for Health Care Value. My colleagues across the aisle have seven minutes of counter. We could play the ten minutes, let Ms. Scott get everything together for Mr. Romano and we will put him on the stand. Dr. Romano.

THE COURT: It's up to you, however you want to proceed. Why don't you just call Dr. Romano.

MS. SCOTT: Your Honor, I need a short break.

THE COURT: Okay.

MS. MALONEY: We will play the three minutes -- ten minutes of Karen Van Caulil.

(Thereupon the video of Karen Van Caulil was played.)

MS. MALONEY: Okay, your Honor, we next call Dr. Romano.

PATRICK ROMANO, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

BY MS. SCOTT:

Q. Good afternoon, Dr. Romano. My name is Sidney Scott. We haven't had a chance to meet before. I know you have some prior commitments, I will try to make this brief.

You are employed as a professor of internal medicine and pediatrics at the University of California Davis?

A. Correct.

Q. You have been employed had UC Davis for about 34 years?

A. Yes, almost 34.

Q. You would agree that your colleagues respect you and rely on you in your experience and advice at UC Davis, correct?

A. Generally, yes.

Q. You've also served on Leapfrog's safety grade expert panel, correct?

A. I have.

Q. And you have served on the expert panel since 2011; is that right?

A. Yes.

Q. Leapfrog also respects and -- respects you and relies on you as an expert panelist, correct?
A. I believe they do.
Q. As a member of the expert panel, you were involved in discussions about the change to Leapfrog's grading methodology relating to the fall 2024 change; true?
A. I was.
Q. Let's talk about that change.
Could we please pull up JS 22.3.
Do you see that on the screen?
A. Yes. It could be a little bit larger. That is better, thank you.
Q. Thank you. This is a May 15, 2024 email from you to Mr. Matt Austin, copying Missy Danforth and Alexandra Campione, with the subject line Leapfrog proposed text for imputation change. Do you see that?
A. Yes.
Q. Matt Austin is a paid researcher and consultant for Leapfrog that works with the expert panel; true?
A. True.
Q. And Ms. Danforth and Ms. Campione also work for Leapfrog, correct?
A. They are on Leapfrog's staff, yes.
Q. Ms. Danforth, she sort of leads the design of the safety grade scoring; is that right?

A. Yes.
Q. Ms. Campione is the lead analyst for Leapfrog's hospital safety grade; is that true?
A. Yes.
Q. If we look at page two of JX 22.3, if we go there, Mr. Austin starts out by stating, "Patrick, since our conversation with you a couple weeks ago about changing the imputation approach used in Leapfrog's hospital safety grade we met with the broader expert panel to hear their input and have drafted the attached language to share with hospitals about the proposed changes."
Do you see that?
A. Yes.
Q. It concludes by requesting your feedback on a written proposal regarding that change. Do you see that?
A. Yes.
Q. He says: "We very much value your perspective and expertise and we appreciate any concerns you might have for the proposed." Do you see that?
A. Yes.
Q. The change is assigning non-participating hospitals limited achievement scores on four measures, right?
MS. BLAIR: I object to leading. They called Patrick Romano in their case in chief. He has not been qualified as a hostile witness.

THE COURT: Do you intend him to treat him as that?

MS. SCOTT: Yes. He is a party and an affiliate of Leapfrog, he has published articles on their behalf and made public statements on their behalf, and has been controlled by Leapfrog in this litigation.

THE COURT: What does that mean?

MS. SCOTT: These lawyers represent Mr. Romano, they defended him at the deposition. We would like to speak to Mr. Romano. So he is a condition controlled witness, he is a party, he is an agent, he is an affiliated witness, and we called him adversely in our case.

THE COURT: At this point, I am going to sustain the objection. I am not clear that he is an adverse witness to you, but depending on how we proceed, I may grant you some leeway.

MS. SCOTT: Thank you, your Honor.

BY MS. SCOTT:

Q. Do you understand the change that Mr. Austin is referring to is the change in the methodology to assign non-participating hospitals limited achievement scores on four measures?

A. No, that is incorrect. Part of the change was also to rely on the previous two cycles of reporting, so-called step one imputation followed by step two.

Q. With regard to step two imputation, you understand that was assigning nonparticipating hospitals limited achievement scores

on the four measures?
A. Yes, that was the second step.
Q. Focusing in on the second step, limited achievement, is that the lowest score that a hospital can receive?
A. It is.
Q. If we look at JX 22.3 we see your response. You start off by stating, "I like the simpler and more direct approach here. If the goal is to penalize nonparticipants you might as well do so in a clear and unmistakable way" -- excuse me, "unmistakable manner."
Do you see that?
A. I see it.
Q. Do you agree, sir, that assigning hospitals low scores is a penalty?
MS. BLAIR: Objection, leading.
THE COURT: Sustained. Please restate your question.
BY MS. SCOTT:
Q. Do you believe that assigning hospitals low scores is a penalty?
MS. BLAIR: Objection, that is the same question, leading.
THE COURT: Overruled.
THE WITNESS: Ask the question again.
BY MS. SCOTT:
Q. Do you believe, sir, that assigning hospitals the lowest

score is a penalty?

A. No. It is only a penalty for the hospitals that would otherwise have received a higher score if they had completed the survey.

Q. Sir, you were deposed in this case. Do you recall that?

A. Yes, of course.

Q. When we asked you if most of the hospitals who don't participate are penalized by a low score, you said yes. Do you recall that?

A. Yes. You asked it in a different way, you used the term most. Yes, most of the hospitals do take a penalty with this mechanism, some do not.

Q. Is it Leapfrog's objective to penalize hospitals by assigning the lowest possible score?

A. I'm not a member of Leapfrog's board or a member of Leapfrog's staff, so I can't really speak to Leapfrog's objective. Nobody from Leapfrog's staff has ever said directly they want to penalize hospitals for nonparticipation. We have had discussions of that concept in the expert panel, but I never heard that from Leapfrog directly.

Q. So, we asked you about it in your deposition, and we asked you, you describe the strategic objective of penalizing nonparticipants, you responded yes. Do you recall that?

MS. BLAIR: Objection, improper impeachment.

THE COURT: Overruled.

THE WITNESS: I do not recall the context of your question. Could you restate your question, please.

BY MS. SCOTT:

Q. My question is, Dr. Romano: Do you believe that penalizing hospitals is a strategic objective of Leapfrog?

A. I believe it is appropriate for Leapfrog to encourage participation and to discourage the practice of riding on the coattails of other hospitals, so I think it is consistent with that for Leapfrog to penalize nonparticipants.

Q. Let's look back at this email. Look at the second paragraph. You state, "As I mentioned earlier, your step two B proposal would have led to lower imputed estimates, but not more accurate imputation.

"I find no reason to believe and you didn't present any evidence to suggest that a hospital's unreported data of a current year is better approximated by its cohort mean from the first year of reporting than by its current cohort mean. The underlying hypothesis behind your step two B approach was that hospitals stopped reporting because their true performance deteriorated relative to their cohort."

Do you see that?

A. Yes.

Q. You go on to disagree with that hypothesis, correct?

MS. BLAIR: Objection, leading.

THE COURT: Overruled.

THE WITNESS: I disagree with that hypothesis, yes.

BY MS. SCOTT:

Q. You stated, "My hypothesis by comparison was that most hospitals stopped reporting because it is too burdensome and because they only find market value in an A which proves impossible to attain or maintain."

Do you see that?

A. Yes.

Q. Are you aware of other hospitals stating that completing the Leapfrog survey is burdensome?

A. Yes.

Q. You go on to say, "If my hypothesis is correct, then the current step two approach, cohort would, mean more accurate imputations, but it doesn't achieve your strategic objective of penalizing nonparticipants."

Do you see that?

A. Yes.

Q. So it was Leapfrog's -- as you understand and s written here in this document, it was Leapfrog's objective to penalize non-participating hospitals, correct?

A. I want to be very clear for the record that I never heard anybody from Leapfrog say that their objective was to penalize nonparticipants.

What I heard from Leapfrog is that they were very concerned about a downturn in participation and they were concerned that

the hospitals that were hiding their data, were refusing to participate were essentially riding on the coattails of hospitals that were participating through this cohort imputation.

My understanding of Leapfrog's strategic objective was to an individual that situation, and that naturally requires penalizing nonparticipants.

Q. That is not what you said here, sir, in your email, correct? You state that if it is your strategic objective of penalizing nonparticipants -- you are referring to Leapfrog?

A. I am referring to Leapfrog, but I am also making clear that in this email I never was told by Leapfrog that they have strategic objectives of penalizing nonparticipants.

Q. Do you normally put things in writing that you don't have a basis for?

A. I think it is a common practice in email to state things perhaps a little bit more directly, a little more bluntly than what has been stated elsewhere.

Q. You've reported to others in writing that Leapfrog's staff was determined to more aggressively penalize hospitals. Do you recall writing that, sir?

A. Yes.

Q. Okay. Um-m-m, you go on, "In other words, I wasn't keen on a backdoor approach to penalizing nonparticipation. If you want to penalize nonparticipants then don't pretend you are

imputing missing values in a statistically optimal way, just be honest about your goal."

Do you see that?

A. Yes.

Q. The goal there is to penalize --

A. No. The goal is to maximize participation for the purpose of transparency, to improve patient safety and save lives. That is the goal.

Q. You agree that the purpose of this change to assign hospitals the lowest possible score was not accuracy, don't you?

MS. BLAIR: Objection, leading.

THE COURT: Overruled.

THE WITNESS: Could you ask the question again.

BY MS. SCOTT:

Q. Sure. You agree with me that the purpose of this change to assign non-participating hospitals the lowest possible score was not accuracy, was it, sir?

A. It was not to improve accuracy.

Q. Does Leapfrog tell its consumers that it is penalizing hospitals for nonparticipation?

A. It is visible on the website, as I heard in testimony this morning.

Q. Could we please pull up JX 21.

This is the document -- are you referring to Mr. Berger's

testimony, Dr. Romano?
A. Yes, along with my own review of the website, yes.
Q. This is the FAQ that Dr. Berger went over earlier. If you look at page two, does a hospital get a better safety grade if it reports to the Leapfrog hospital survey? Do you see that?
A. Yes.
Q. Leapfrog tells consumers the hospital safety grade tells consumers how well the hospital does on safety, not whether they complete the Leapfrog hospital survey, correct?
A. That is what it says, yes.
Q. That doesn't say anything about penalizing a non-participating hospital for not participating in the survey, does it?
A. Well, as we heard in testimony earlier, this is not fully in agreement with Footnotes 1 and 4 on the safety grade pages.
Q. My question, focusing here on this documenter, this doesn't tell the consumer that non-participating hospitals are being penalized for not participating in the survey, does it, sir?
A. Actually, it does. If you read lower down the paragraph it says, if a hospital performs well on certain measures, they have the opportunity to earn more points for those measures than they would if they did not report to the Leapfrog hospital survey. It is very clear.
Q. Sir, that is if a hospital participates and there is data for the measures, correct?

A. It says, again, if a hospital performs well on certain measures in the Leapfrog hospital survey, they have the option to earn more points in the hospital safety grade for those certain measures than they would if they did not report to the Leapfrog hospital survey.
Q. Nowhere in this document does it say transparently, as you have urged, that a non-participating hospital will be penalized for nonparticipation, does it, sir? You are not going to see penalized or punished anywhere in this FAQ, are you?
A. I think it is very clear that there is a benefit to participation. Reward and penalty are two sides of the same coin, as I testified previously. It's no difference, it's two sides of the same coin, the opposite of a reward is a penalty.
Q. If we look at JX 22.3, we see that Ms. Campione responds to your email. Do you see that?
A. Yes.
Q. She thanks you for your feedback and she says: "I completely agree." Do you see that?
A. Yes.
Q. We have one Leapfrog staff member who agrees with you, correct?
A. You'll have to ask her.
Q. We will take her at her word.
MS. BLAIR: Objection.
THE WITNESS: I don't understand. You will have to

ask her that question.

BY MS. SCOTT:

Q. Let's look at PX 293.1. Can we pull that up.

This is a May 15, 2024 document, email from you to a Mr. Bruce Hall and Gregory Maynard at UC Davis, with a subject line Leapfrog announcements for hospitals May 2024.

MS. BLAIR: Your Honor, there is an objection to this document for the record by our side. Certainly Mr. Romano's email, that is his word. This document has emails and statements by people who are obviously not here. They are out of court statements that Plaintiff is offering for the truth of the matter asserted from declarants who are not in court today. We object to the second half of this email as hearsay.

THE COURT: Well, I haven't seen it yet. I will rule after I have.

BY MS. SCOTT:

Q. Mr. Romano, you sent this email from your UC Davis account, correct?

A. I did.

Q. And you sent it to some of your colleagues at their UC Davis account?

A. That is correct.

Q. Dr. Bruce Hall is the chief clinical officer at UC Davis health; is that right?

A. He was the chief clinical officer at that time, yes.

Q. Dr. Maynard was the chief quality officer at that time at UC Davis; is that true?
A. Yes, he is still the chief officer.
Q. And there also is a Brenda Inman?
A. Yes.
Q. And she is the quality and safety manager for Dr. Maynard; is that true?
A. Correct.
Q. If we look at page two of this document, it kicks off with an email from you to some of your UC Davis colleagues. Do you see that?
A. Correct.
Q. You are informing these colleagues about Leapfrog's changing their imputation approach, correct?
A. Correct.
Q. You tell them that this is your opportunity to reconsider they -- that's referring to Leapfrog, correct?
A. Correct.
Q. -- are changing their imputation approach so hospitals can get away with responding in alternate years. If you skip more than one year you will never get above a C, might even drop to a D.
Do you see that?
A. Yes.
Q. And if we turn the page, we see that Dr. Maynard responds

to you. Do you see that?
A. Yes.
MS. BLAIR: Objection, hearsay, your Honor.
THE COURT: I beg your pardon?
MS. BLAIR: Hearsay.
THE COURT: I am going to overrule your objection. The comments from the others is available only to show the context of Dr. Romano's statements and aren't to be treated for the truth of the matters asserted in their statements.
BY MS. SCOTT:
Q. If you look at Dr. Maynard's response he says, "Patrick, I have brought this up with Dr. Hall. We are both ambivalent about the value of Leapfrog, and I think that ambivalence tilts even more negative when the lack of participation guarantees a lower grade which they still publish effectively blackmailing centers to participate.
Do you see that?
A. Yes. I think the Court needs to understand that all parties on this email are privy to internal information about our performance on all the other measures that go into the Leapfrog hospital safety grade.
So, that is the basis for my statement and his statement as well, that we are stuck at a C.
Q. The basis of his statement -- well, he states that they believe that a lack of participation guarantees a lower grade

which is still published, effectively blackmails centers to participate. Do you see that?

MS. BLAIR: I object, calls for speculation.

THE COURT: Overruled.

THE WITNESS: That is his view.

BY MS. SCOTT:

Q. It is also Dr. Hall's view. If we look at his response, he says, "Thanks, Patrick, I agree with Greg and wouldn't change course on this day."

Do you see that?

A. Yes.

Q. You respond to both of your colleagues. Do you see that?

A. Yes.

Q. One of the things you say in response is, "You can call it blackmail if you want." Do you see that?

A. Yes.

Q. You go on to say, "From my perspective on their expert panel I am asking them and they have agreed to be honest and transparent, that is, don't say you are imputing missing scores, just say that you are penalizing nonparticipants by assuming they have limited achievement on these domains."

Do you see that?

A. Yes.

Q. You urged Leapfrog to stop calling the methodology or the fall 2024 change imputation, and instead admit that they were

penalizing hospitals, right?
A. Yes. I encouraged them to use the word assign instead of impute with respect to step two B, and they followed that suggestion.
Q. They are not being transparent that they are penalizing hospitals for nonparticipant, are they?
A. I believe they are transparent, yes.
MS. SCOTT: Your Honor, I move to admit PX 293.
MS. BLAIR: Your Honor, we object based on your ruling with respect to hearsay issues. We just want to point that out. Thank you.
THE COURT: 293 is admitted over objection as limited as I suggested.
BY MS. SCOTT:
Q. Can we pull up PX 501.
We see at the top, Dr. Romano, we see you forwarded this email chain to Leapfrog's lawyers, correct?
MS. BLAIR: Your Honor, I object to this document. We were gathering documents to produce pursuant to a subpoena that was provided to Mr. Romano, so that is why it is on here. It is the same hearsay issues. The fact that my name is on it, I don't really care. We object to it for purposes of the hearsay situation. We wanted to be transparent about the fact that they were being forwarded to us.
THE COURT: I don't understand the objection.

MS. BLAIR: It's the same hearsay objection, it contains UC Davis internal documents.

THE COURT: The objection is overruled for the reason I stated for 293.1.

MS. SCOTT: Will this document be moved into the record?

THE COURT: Yes.

BY MS. SCOTT:

Q. Dr. Romano, page two, this chain kicks off with an email from you to Dr. Hall and Dr. Maynard, along with Ms. Inman. Do you see that?

A. Yes.

Q. Here you state, "Well, friends, we now see the consequences of our nonparticipation, a D grade in the same league with Orville and Manteca, which is embarrassing for our organization that claims to be high quality." Do you see that?

A. Manteca, yes. We dropped from a C to a D.

Q. Based on UC Davis' lack of participation it dropped a full grade, correct?

A. That was one of several contributing causes, but, yes.

Q. You mentioned those contributing causes. You talk about infection rates. Do you see that?

A. Yes.

Q. But you say, "The real killer for us was nonparticipation, 15 out of a hundred on safety practices, zero out of 120 on

staff." Do you see that?
A. Yes.
Q. If you look up, we see Dr. Hall's response.
I want to key in on it looks like the second paragraph there.
MS. BLAIR: For the record, same hearsay objection.
THE COURT: Same ruling.
BY MS. SCOTT:
Q. He says, "With respect to Leapfrog specifically, I think it is irresponsible and reckless of them to deliver incomplete assessments to the public."
Do you see that?
A. I see it. Obviously I disagree, but I see it.
Q. You respond to Dr. Hall on page one, do you see that? I will pull that up there for you.
A. Yes.
Q. You say, "Re Leapfrog: We think you folks are too critical. Their decision to increase the penalty for nonparticipation was a simple business decision."
Do you see that?
A. Yes.
Q. You go on to say, "It is just business, folks." Do you see that?
A. Yes.
Q. You say, "Their business model, as you know, depends on

producing data that add value for health plans and employers, and the data are not valuable if participation is low."

Do you see that?

A. I see that, but it needs to be clear that I am not a business professional or a marketing professional.

To me, what makes the data valuable is the fact that it provides transparency which is important to consumers and purchasers of health care. The value that I care about is the transparency of the data.

Q. We are talking about Leapfrog because -- you are talking about Leapfrog's business model?

A. For a nonprofit organization the business model is about how the organization adds social value. Leapfrog is a hundred percent committed to improving patient safety and saving lives. Yes, their business model does depend on producing hospital safety grades and data that value to the market.

Q. Leapfrog licenses its hospital data. You know that, right?

A. Yes.

Q. That is part of Leapfrog's business model, true?

A. I didn't know that before this case, but now I do.

Q. You know that?

A. Yes.

Q. Leapfrog's business model, as you write with your own words before litigation, "Leapfrog's business model depends on producing data that adds value." Do you see that?

A. Yes, but at the time I didn't know they earned revenue by licensing data. All I knew is that they have member organizations and affiliates that are very passionately concerned about improving value in health care for consumers.
Q. And you know that data, as you say here in this document, that data is not valuable if participation is low, correct?
MS. BLAIR: Objection, mischaracterizes this document.
THE COURT: Overruled.
THE WITNESS: Ask it again.
BY MS. SCOTT:
Q. Based on what you state in your own words in this document, data is not valuable if participation is low, correct?
A. Because health plans and employers depend on Leapfrog to produce reliable and valid information about hospital safety, yes.
MS. SCOTT: Let's pull up 366.1, please.
MS. BLAIR: Your Honor, I have the same objection on these emails.
MS. SCOTT: May I proceed, your Honor?
THE COURT: Yes.
BY MS. SCOTT:
Q. This is a different response on that same chain that we looked at on the previous exhibit, but this is from Dr. Maynard?
A. Yes.

Q. He says, "Personally, I think it is embarrassing to Leapfrog for nuking sites that don't participate. They should just write NA. Anything else is not an honest representation of the site in question." Do you see that?
A. Yes.
Q. You would agree that UC Davis is one of the top academic health centers in the country, correct?
A. Maybe not.
Q. I don't know if your friends at UC would like to hear you say that.
A. I am here under oath.
Q. Would you agree with me, sir, that doctors and nurses at UC Davis wash their hands?
A. Generally. We could collectively do better.
Q. You saw that the assigned value for hand washing is 15?
A. Yes.
Q. You would agree that 15 is not an accurate reflection of UC Davis' compliance with hand washing, correct?
A. Correct.
Q. Do you think it is okay for Leapfrog to tell the public that UC Davis doesn't wash their hands?
MS. BLAIR: Objection, mischaracterizes the --
THE COURT: Overruled.
THE WITNESS: Our chief clinical officer, chief medical officer made a business decision not to participate in

the Leapfrog survey. There are natural consequences to that choice that they make. They subsequently reversed that choice, so I am sure the scores will go up in 2025 and 2026.

BY MS. SCOTT:

Q. They reversed that choice because they started to see cancellations in their facilities?

MS. BLAIR: Objection, assumes facts not in evidence.

THE COURT: Overruled. The question doesn't have to assume facts in evidence. That is a repeated objection, but it is a question. If you are able to answer it, go ahead, sir.

THE WITNESS: I am not aware of any specific evidence of canceled surgery or procedures.

BY MS. SCOTT:

Q. When we asked you about that, sir, in your deposition, you were aware of cancellations at UC Davis. Do you recall that?

A. No.

Q. Let's look at PX 386. If you would pull that up.

THE COURT: If you are moving in 386.1 it is admitted for the reasons earlier stated.

BY MS. SCOTT:

Q. Mr. Romano, this is a December 19, 2024 email from a Robert --

A. Curchecko. (phon)

Q. At UC Davis emailing Dr. Maynard and also Brenda Inman. Do you see that?

MS. BLAIR: Your Honor, this doesn't even have Mr. Romano on the email, so I would object to hearsay.

THE COURT: Well, we haven't heard the question yet.

BY MS. SCOTT:

Q. Mr. Romano, we see there is an exhibit sticker on this document, it says, Romano 26. Do you see that?

A. Yes. Just to be -- I am just curious, is there a particular reason you are not referring to me as a doctor?

Q. I am sorry, Dr. Romano, no disrespect. Thank you for --

A. I was just curious.

Q. No, no disrespect. Thank you for the correction.

Dr. Romano, you were shown this document in your deposition?

A. Yes. I never saw it before my deposition.

Q. But you did see it at your deposition?

A. Correct.

Q. If we look at the kickoff email on page two of three, we see that Ms. Monit Galadi at UC Davis sends an email out to the surgery clinics at UC Davis Health. Do you see that?

A. I do.

Q. And she states, "The recent release from Leapfrog results indicated a low quality score for UCH. As a result, unfortunately we have seen some patients canceling appointments and/or procedures." Do you see that?

A. I see it. The first time I saw this was at my deposition.

I have absolutely no knowledge of this or evidence that it is true or false.

Q. Following seeing these cancelations what -- UC Davis ultimately decided to participate in the Leapfrog hospital survey, correct?

MS. BLAIR: Objection, calls for speculation. He testified to that.

THE WITNESS: I would say that, again, to my knowledge, any cancellations were just postponements, rescheduling. The more influential factor was that all of our sister campuses in the UC health system were participating.

BY MS. SCOTT:

Q. You went from knowing nothing about cancellations to now offering all sorts of explanations about cancellations; is that right?

A. I'm saying the factor that caused UC Davis to resume participating was peer pressure from other UC hospitals.

Q. You agree that a hospital's reputation could take a hit for a poor Leapfrog safety grade?

A. Yes, of course.

Q. If a hospital is assigned an F, that could harm the hospital's reputation, too, right?

A. It could.

Q. Dr. Romano, you are familiar with the expert panel's guiding principles, aren't you?

A. I had forgotten them for my deposition, but yes, I was reminded.
Q. You were involved in developing the expert panel's guiding principles, correct?
A. Yes.
Q. You wrote a paper on it?
A. I wrote a paper that mentioned those principles, yes.
Q. Could you please pull up Plaintiffs' Exhibit 203.
This is the expert panel's guiding principles for developing the safety grade, correct?
A. Yes.
Q. These principles represented the views at the time of the expert panel, correct?
A. Back in 2011, 2012, yes.
Q. Let's see what the expert panel said about missing data.
If we go to page -- thank you, sir.
It says, "If data are used from a secondary data source attempts should be made to provide a grade that is equitable to what the hospital would have earned had the data been available from the primary source."
Do you see that?
A. Yes.
Q. Leapfrog no longer considers that it needs to be equitable with missing data to nonparticipating hospitals, correct?
A. No. This highlighted sentence is no longer applicable

because the data from the secondary data source, which was the American Hospital Association, are no longer available. So this entire sentence is no longer applicable.

Q. Can we please go to the top of page three of three.

These expert -- excuse me. "These guiding principles also state that if a hospital is missing data for a large number of performance measures then a grade cannot reliably be calculated."

Do you see that?

A. Yes.

Q. "In this situation no grade should be issued for the hospital." Do you see that?

A. Yes.

Q. You were here for Dr. Berger's testimony where he talked about the six and seven, the missing measures, correct?

A. Yes.

Q. And you heard him say that non-participating hospitals are missing seven measures, right?

A. Yes.

Q. But Leapfrog tells the public in its scoring methodology that hospitals that are missing scores for more than six process or structural measures are graded, correct?

A. I am sorry?

Q. You heard Dr. Berger testify that hospitals, according to Leapfrog, hospitals that are missing scores for more than six

process measures are missing data and they are not graded, correct?
A. Yes, yes, but I guess that -- you know, I am trying to just understand because from the expert panel's perspective, we don't just count in measures. We are looking at each measure has its own weight, and so the four measures under discussion here I think collectively contribute only about 23, 24 percent of the total score.
So, that's I think not -- doesn't qualify as a large number of performance measures because it is well under half the total score.
Q. You agree that seven is more than six, right?
A. Yes, seven is more than six.
Q. Nonparticipating hospitals are missing seven measures, right?
A. Nonparticipating hospitals are not missing seven measures because of the imputation approach.
Q. There is no data to support the four measures, correct?
A. The first step of the imputation is to rely on prior data that these hospitals submitted themselves.
Q. If we focus on step two of the imputation model where step one doesn't apply, there are seven missing measures, correct?
A. There are seven missing measures -- I mean, I have to be reminded of the specific count of the measures, but I think that is correct.

Q. There is no data underlying any of those seven measures because hospitals don't participate and provide the data, right?

MS. BLAIR: Objection, calls for speculation.

THE COURT: Overruled.

THE WITNESS: Ask the question again.

BY MS. SCOTT:

Q. For those seven measures for nonparticipating hospitals, there is no underlying data for those measures, correct?

A. The only data we have is that the hospital chose not to participate and therefore they are hiding something.

Q. That was not my question. That calls for speculation.

For the seven measures, we can agree that if I don't give you my data, you don't have it. There is no underlying data to support those seven measures, right?

A. Only the absence of reporting, yes.

Q. Despite lacking data for the seven measures, Leapfrog still assigns grades to the nonparticipating hospitals, correct?

MS. BLAIR: Objection.

THE COURT: Overruled. Let me ask you, how long are you going to be?

MS. SCOTT: This is my last question, your Honor.

THE COURT: Go ahead.

BY MS. SCOTT:

Q. Despite lacking data, sir, for the seven measures, Leapfrog

continues to assign grades to non-participating hospitals, correct?

A. It is well under half the total weight of the composite, so, yes.

MS. SCOTT: I pass the witness.

THE COURT: Let me ask you, you talked about him having some time pressures. We need to take a break, are you going to be very long?

MS. BLAIR: No, I shouldn't be.

THE COURT: Let's take 12 minutes and start at ten minutes to 4:00, and hopefully you can get him on his way on time.

(Thereupon, a brief recess was taken.)

(Thereupon, trial reconvened after recess.)

THE COURT: Please have a seat and please continue with cross-examination.

MS. BLAIR: Thank you, Your Honor.

BY MS. BLAIR:

Q. Good afternoon, Dr. Romano. I just wanted to go over your background a little bit. Could you describe to the Court what it is you do for a living and specifically how it relates to patient safety management?

A. So I am a professor, I'm board certified in internal medicine. I used to practice pediatrics as well. And my job as a professor involves teaching, research, clinical care and

public service. So my research focus is in health care quality and safety, particularly measurement of quality and safety and using measurement to drive improvement.
Q. And at one point in time, you were the editor of the Health Services Research Journal, correct?
A. That is correct. I was co-editor in chief for five years of the Journal and Health Services Research which is one of the journals in my field.
Q. Do you provide any research support for any Government entity, like CMS or CDC?
A. Yes. We consistently had a series of contracts, subcontracts with the US Agency for Health, Research and Quality as well as the Centers for Medicare and Medicaid Services.
Q. And I heard some people refer to you as one of the architects of the PSI 90 CMS, right? Would you agree with that?
A. Yes, that's correct. My team led the development, testing validation and implementation of the CMS Patient Safety and Adverse Events Composite which is also known as PSI 90. It's also one of the components in the Leapfrog Hospital Safety Rating.
Q. Would it be safe to say that you dedicated your professional career to the study of patient safety and measurement?

A. I think that is a fair statement, yes.
Q. All right. And there is some discussion about your service on the hospital -- Leapfrog Hospital Safety Grade Expert Panel; do you recall that testimony?
A. Yes.
Q. And is that a volunteer position?
A. It is a volunteer position.
Q. Have you ever been paid by Leapfrog?
A. Never been paid except reimbursed for one trip to Alexandria, Virginia.
Q. We might talk about that today. And are you being paid for your testimony here today?
A. I am not.
Q. And do you believe in the mission of Leapfrog?
A. Yes, I believe very strongly of Leapfrog's mission of driving improvements in patients' safety to make health care safer for all Americans and ultimately will allow us to improve patient outcomes.
Q. And despite the fact that we saw this email that opposing counsel showed you that you sent out to Dr. Campione about penalizing, we're going to get to that word in a second, did you ever stop serving on the Leapfrog board after the fall of 2024 methodology come out?
A. No. I remained committed to Leapfrog's mission.
Q. And did you ever express to Leapfrog that as an expert in

patient safety and measurement, you disagree with the two-step imputation model that is currently being -- other than this letter we saw, after it was implemented, did you ever express to Leapfrog that you disagree with the two-step imputation methodology?

A. No, I did not. In fact, you can see in the evidence that I defended the approach with my own hospital administrators.

Q. And Ms. Scott showed you the guiding principles, do you recall that?

A. Yes.

Q. And those guiding principles were put into place in 2011 when the safety grade was coming into fruition; do you recall that?

A. Yes.

Q. And if I could pull that document up, PS-203, really quickly, Dr. Romano.

This is the last page of this document that is already in evidence. If we scroll to the very bottom, and counsel didn't show you this, but if we scroll to the very bottom of this document, I want to remind you right here, the evolution of the composite grade; do you see that?

A. Yes.

Q. Is that consistent with your understanding of what, in fact, has been happening at Leapfrog from 2011 all the way through 2025, that there is an evolution in the measurement of

patient safety?
A. Yes, that is correct. Every year, we typically meet twice over the course of the year, we discuss new measures that are becoming available, older measures that may be retiring. We discuss the rating scheme. There is an active discussion going on right now about various components of the rating scheme, so lots of things get revisited each year.
Q. Can you look at that last sentence on the evolution of the composite grading, it says the composite grade will also ideally serve as a living laboratory to help push forward designs and patient safety performance in measurement. Do you see that?
A. Yes.
Q. And would you agree with me that we have seen the evolution of this hospital safety grade over time?
A. Yes. In fact, some of the very measures that we are discussing today were not part of the original hospital safety grade, so there has been emerging recognition of the importance of bar code administration, for example, the importance of hand hygiene policies, so these have been reflected into the design of the Leapfrog survey as well as the hospital safety grade.
Q. And last but not least, the principles clearly state here the process of developing the score will be transparent to all parties that are interested. The waiting and calculation process will be transparent to hospitals, consumers and others.

Do you see that?
A. Yes.
Q. And as a member of the -- as a volunteer member of the Hospital Safety Grade Expert Panel, do you agree that Leapfrog is transparent to hospitals, consumers and others about its due process board?
A. I do. They publish every year, they publish the planned updates and certainly in 2024, they published the planned updates to the imputation and assignment methodology. A number of hospitals and other stakeholders submitted comments in response and all of that is public.
Q. And if you felt that Leapfrog wasn't transparent to consumers and hospitals, would you still voluntarily serve on the expert panel?
A. I would not because it's central to all of the work I have done. Most of that work has been with publication agencies like HRQ and CMS, and Leapfrog, of course, is a user of that information, those publication agencies as well as information that it collects through its own agency.
Q. And Ms. Scott asked you several questions about an email you had written to Alex Campione where you used the word "penalize", remember that?
A. Yes.
Q. And she used it in one of her questions synonymously with punishment. Do you recall that?

A. Yes.
Q. And as a person -- as a doctor and a person or researcher that studies these patient safety measurment, would you use the word "penalize" and what do you mean by that?
A. Well, I basically mean by penalty that there is a predictable, a temporary, and a specific consequence to a particular action or choice, right. So, the analogy that I use is like playing football, right. So if there is a false start, if somebody crosses the line at scrimmage, it is a five-yard penalty, right. But you could make it up on the next down, right. And so the idea is that this is temporary, right. So as soon as a hospital chooses to participate in the survey program again, the penalty goes away, those data are archived and the new data that comes up on the website reflects that information. So the nature of penalty is that it is predictable, it's a choice that the hospitals made to incur that penalty and it is temporary.
Q. And just to be clear, when you write, if your goal is to penalize non participating hospitals, are you using that word synonymously with punishment?
A. Absolutely not. I am using it in the sense of essentially encouraging hospitals to participate as I mentioned in previous testimony. So it is all about encouraging transparency, that is Leapfrog's mission, that's my mission as a subcontractor to HRQ and CMS and other agencies. So it is all about

transparency and encouraging transparency.
Q. And as an expert who has dedicated his professional careers in management of patients' safety, do you believe that transparency of data increases outcomes for patients?
A. Yes. I think there is a substantial amount of evidence that when markets are aware, when health care providers are aware of what is happening within health care organizations, they tend to respond, they tend to figure out ways to address the problem, just as we heard earlier today, that they tend to respond, they tend to figure out ways to address the problem, just as we heard earlier today, low patient satisfaction experience scores led to changes at one of these hospitals to bring in a consultant, and we see that on patient safety. The organizations bring in consultants to figure out how can we address this problem and how can we improve, and it is driven by transparency because if the data are secret, then there is no pressure to improve.
Q. And in fact, you have been a member of the Hospital Safety Grade Expert Panel since its inception?
A. Yes.
Q. And this idea of having to solve for missing data from, you know, an expert patient safety measurement perspective, is that something that the expert panel has always discussed, even since the beginning?
A. From the very beginning, yes.

Q. And just to orient the Court really quickly, there are other members of the expert panel, correct?
A. Yes.
Q. And is it your opinion that those other eight members of the expert panel are also experts in the field of patient safety and measurement?
A. Yes, we all are.
Q. Have you known those other members for quite some time?
A. Yes, I have.
Q. And do you know those members -- do they express their opinions back and forth? Do you kind of spar with each other?
A. We do. There is a robust discussion with lots of sharing of different perspectives and different views.
Q. And does Leapfrog provide the expert panel a platform to really discuss opinions and hypotheticals and hypotheses without any pressure by Leapfrog management for you to come to some sort of decision that would impact their business?
A. That is correct. Usually, there would be a proposal on the table that we are asked to react to that would have been developed typically by the Leapfrog staff team, and by Matt Austin's team to work together, so they might put a proposal on the table and may ask for reaction. And so we all chime in and offer different opinions and we bounce off each other and try to come towards a consensus view.
Q. There is no vote, is there, no vote?

A. That is correct, there is no vote.

Q. And you talked just a minute ago about the one time you got your plane ticket paid to an expert panel meeting in Virginia and I want to pull that up, that's JS-20, Exhibit 44.1 for the record, from June of 2017. Is this the meeting you were talking about?

A. That is the meeting, yes.

Q. And you were there, correct?

A. I was.

Q. And do you recall during this meeting there was a discussion about the fact that the use of AJ Data was potentially disincentivizing hospitals from participating in the survey because they could choose not to participate and still get some credit. Do you recall there was a discussion at that time?

A. Yes.

Q. If you could get to that part. Right here, unintentional consequences of how we currently treat missing data. Do you see that?

A. Yes.

Q. And the second bullet point there, it says Matt who I believe to be Matt Austin from Johns Hopkins Armstrong Institute explaining that there are circumstances where there is a disincentive for hospitals to report to the Leapfrog survey. Do you see that?

A. Yes.
Q. What do you recall about that discussion as early as 2017 about disincentivizing participation in the survey by signing --
A. Right. We spent a lot of time discussing that we were using this separate data source from the American Hospital Association to impute how hospitals would have performed, for example, on Kim Draw's [sic] position on the order of entry if they had completed the survey. And the questions don't lineup exactly, the Leapfrog survey frankly is more rigorous and more detailed, and so, we had a number of discussions where we tried to figure out how to use the available data in the best way that we could.
This discussion relates specifically to sort of a complex statistical issue related to C-scores and there was some efforts, I think, to cap the C-scores, I don't know all of the details.
Q. And that is kind of my question looking at this, and it is very difficult for someone like me to read.
But is it your testimony that the nine members of the expert panel go to great lengths to try to figure out what the best potential model is for both the greater good of the public and for the hospitals being scored; is that a fair assessment?
A. Yes, that's correct.
Q. And you can take that down and pull up DX-406, which is --

there is a little bit of an issue with this document, Your Honor, I don't know if there is an oversight, but the first two pages are JX-2, but for some reason, the attachment was not attached in the joint exhibit, so I don't know if that is an issue, so I will have to introduce it after I show it to you, Dr. Romano.

Dr. Romano, do you recall that there was a meeting -- I am sorry -- do you recall that in 2019, there was some discussion about a new imputation model being put in place?

A. Right, because of the loss of access to the American Hospital Association data.

Q. Okay. I am sorry, is this 406, yeah, I am sorry, I got my exhibits wrong.

If we look at these call notes, and if you could go down -- do you recall at this point in time Arjun Srinivasan [sp]-- I can't say his name, Dr. Srinivasan --

A. Srinivasan, yes.

Q. -- was discussing the panel imputing a score of zero, actual zero credit to hospitals. Do you recall that?

A. Yes, he brought that suggestion several times to the panel.

Q. Was discussing with the panel a scoring of zero, do you recall that?

A. Yes, he brought that suggestion several times to the panel.

Q. Could you scroll down a little further. We have the actual notes here.

I don't want you to take my word for it. We see impeding data. There he is, a discussion, keep going, no, keep going.

Well, this document is in evidence, I don't want to waste your time or the Court's, but --

A. Number four is to give the hospital zero credit for the measure.

Q. Right. And do you recall that was Dr. Srinivasan's idea?

A. Yes.

Q. And do you recall whether or not Leapfrog supported giving non participating hospitals a zero?

A. I think the Leapfrog staff and the majority of the members of the panel at that time were concerned about the pushback from the hospital community.

Q. Because -- is it your experience as a volunteer on the expert panel that Leapfrog does take into consideration the burden on hospitals when making a determination what measures go into the safety grade and/or the scoring?

A. Very much so, yes.

Q. You can take that down, thank you very much.

I want to talk about -- excuse me -- in 2020, you just talked to me about Leapfrog lost their access to AJ Data, correct? I got the date wrong. Do you recall at some point in time that happened?

A. Yes.

Q. And you led a subcommittee of the expert panel with Matt

Mattica [sp] to try to figure out a two-step invitation model that would make sense, correct?
A. I don't recall whether I specifically led that committee, but I did work on it, yes.
Q. Okay. And ultimately, after a lot of work, there was an invitation model that was put into place, correct?
A. Yes, but it was different from the model that was originally proposed by Matt Mattica, yes.
Q. Yes. And the model that was ultimately put into place, you referred to that as the Pre Fall 2024 Methodology, so I might refer to it as that coming up.
I want to show -- do you recall at some point in time, you started discussing the idea with respect to these four measures that the data was not missing at random? Do you know what I mean when I say that?
A. Yes.
Q. And that is some sort of patient measurement term, I am not familiar with, so could you explain to the Court what that means?
A. Sure. It is a standard term in measurement, it also provides an educational measurement for that matter, but basically, the idea is there are three types of missing, right, so you could be missing at random, and that would be like just occasionally a tube gets dropped, and it's just a random tube, and nobody, again, has any control over that and nobody can

predict which tube will get dropped, it's just totally at random. So that is missing completely at random. Then the next is missing at random, which says that the missing is random but it's conditioned on observed characteristics of the hospital or the responding entity.

So, you know that men are more likely to respond than woman, more people who have college education are more likely to respond than those who don't. So that would be missing at random because you can predict missing based on the known characteristics of the respondents. This is a problem of missing not at random which means that we have no idea why people choose not to participate, why their data is missing. And so we have to presume in this case that it's missing in part because they know things that they don't want us to know, right.

That people -- the classic example is, when you ask people about their income, who doesn't report their income, who doesn't give an honest response. People who have a very high income and people that have a very low income, they know their income and they are either embarrassed about it and don't want to reveal it. So a sense of attrition here. So when we say that the data are missing not at random, well, what we mean is that there are unobserved characteristics at those hospitals that are contributing to the missingness. Every prism, messing, it is logical to assume, that one of those

characteristics is why hospitals know themselves about their performance. They make a strategic decision not to participate because they know the consequences of what their score would look like if they did participate.

Q. Is that what you call the type of measurement non-response --

A. Yes.

MS. SCOTT: Objection, Your Honor, we have given some leeway on this, but we are getting into expert testimony in describing the scientific basis of methodologies, and speculating about what hospitals do or don't do and why they do and don't do them based on research and experience and specialized knowledge, and so I would object to this line of questioning and I would actually move to strike the preceding answer discussing why you know what hospitals do and don't do. That is not disclosed yet, and he has not been disclosed as an expert, it is an undisclosed expert. I'll leave it at that and move to strike.

MS. BLAIR: Your Honor, they called him in their case, he sits on our expert panel and the issue in this case is --

THE COURT: You could have designated him as an expert.

MS. BLAIR: I could.

THE COURT: But you didn't.

MS. BLAIR: I did not --

THE COURT: You did not provide an expert report.

MS. BLAIR: I did not.

THE COURT: Are you going to elicit opinions?

MS. BLAIR: I'm not eliciting -- I am asking him why the expert penalty and change they made to the methodology and what that was based on. Mr. Berger and Dr. Nicholson commented and said there was no --

THE COURT: They were disclosed as experts.

MS. BLAIR: They were, right.

THE COURT: I am going to overrule the objection at this point, although I may put some limits on it to the degree he describes what the panel did, he can do that.

MS. BLAIR: Excellent, thank you.

MS. SCOTT: Thank you, your Honor.

BY MS. BLAIR:

Q. And also in the meeting, Dr. Romano -- well, let me ask this really quick. Do you recall in 2023 what the expert panel -- what change the expert panel made with respect to the ICU Physician Standard?

A. Yes. In 2023, the ICU Physician Standard was changed so that non reporting hospitals that had ICU beds, according to the CMS survey, would get limited achievement scores.

Q. Okay. And then later in the fall of 2024, non-reporting hospitals who have ECMA, and hand hygiene, they also received the methodology change so that non reporting hospitals received

limited achievement for those three measures as well, correct?
A. That is correct.
Q. And I want to talk about -- you were shown a lot of documents from UC Davis. Do you recall that?
A. Yes.
Q. And UC Davis is your employer, correct?
A. Correct.
Q. And at some point in time, did you come to find out that Tenet Healthcare Corporation had contacted your employer about your service on the Leapfrog Expert Safety Panel in the context of this litigation?
MS. SCOTT: Objection, Your Honor, relevance. I don't understand what the relevance is to this line of questioning about Tenet Healthcare and what it may or may not have done.
THE COURT: Overruled.
BY MS. BLAIR:
Q. Do you recall coming to find that out that Tenet Healthcare Corporation had contacted your employer UC Davis Health about your involvement in the trial during this litigation?
A. Yes.
Q. And how did you come to find that out?
A. Well, I think various -- my employer was issued a subpoena in this case separate from my -- the subpoena that was issued to me, and I believe that in response to that subpoena, my employer produced a variety of documents, some of which were

presented at deposition, some of which were presented by counsel.

Q. I show you a document that we marked as DX-918. This is a document from Michael Condren [sp] to Lisa Foo at Tenet Healthcare Corporation, and if you could scroll down to the first email. This is from Lisa Foo, if you could scroll down, Tenet Healthcare, she is the Chief Operations Officer for Tenet Healthcare and it says here, "Our outside counsel has identified that UC Davis health physician, Dr. Romano, serves as a volunteer expert panelist of Leapfrog -- grade panel. Would you be open to connecting your counsel with ours to help understand the association with Leapfrog". Do you see that?

A. Yes.

Q. How did it make you feel when you found out that Tenet Healthcare Corporation was attempting to interfere with your employment at UC Davis?

MS. SCOTT: Objection, Your Honor.

THE COURT: Sustained.

MS. BLAIR: I have no further questions, Your Honor.

THE COURT: Is there any redirect?

MS. SCOTT: No Your Honor.

THE COURT: All right. Thank you, Doctor.

THE WITNESS: Thank you.

THE COURT: Have a good trip home.

MS. MALONEY: Your Honor, we now call Sheri

Montgomery, the CEO of Good Samaritan Medical Center.

(Witness sworn.)

BY MR. MARCUS:

Q. Good afternoon, Ms. Montgomery. Could you briefly describe your educational background for the Court?

A. Sure. I attended Florida Atlantic University for my undergrad in business administration and then went to Nova University for my Masters Degree in business administration with a concentration in finance.

Q. How long have you worked in health care?

A. Twenty-five years, thirty years.

THE COURT: Hold the microphone a little closer to you. Thank you.

THE WITNESS: Since 1994.

BY MR. MARCUS:

Q. And can you briefly describe for the Court your experience in health care management?

A. Sure. I started out in the accounting department at one of our hospitals actually as a staff accountant, and then moved to an accounting manager, controller, assistant CFO to a CFO, and then to a group CFO, and then to the CEO.

Q. When did you start working at Good Samaritan Hospital?

A. In 2020, April.

Q. At that time, what was your position?

A. I was still the group CFO for the five hospitals and then I

was interim CEO at Good Sam.
Q. Can you tell the Court briefing a little bit about Good Samaritan Hospital, the type of hospital it is?
A. Sure. Actually, it was the first hospital built in Palm Beach County in 1920, and it has been here for 106 years or so. It is really an oncology hospital, that is probably our main service line. We have a robust orthopedic service line with the spine as well. We are probably the leading robotic center for all hospitals of Palm Beach County. The last time I checked, we had the most robotic surgeries in Palm Beach County, over 14,000, I believe, to date. Of course, I mentioned robots, we have an OB program, comprehensive breast center and three imaging centers.
Q. How many beds are in your hospital, roughly?
A. 333.
Q. And on average, how many patients does your hospital treat?
A. Say admissions, probably 11,500, somewhere around there. Our emergency room, 55,000 patients, around 7,500 surgeries a year, as well.
Q. Can you briefly describe for us your patient population at Good Samaritan?
A. An average age is around 62 years of age, we serve the tale of two cities at Good Samaritan, we serve the very wealthy and the underserved. At the hospital, there are a lot of homeless population, they come into the emergency room with morbidities

and other health care.
Q. How many patients do you think are admitted to your hospital?
A. 11,500.
Q. We've heard a lot during this case about Joint Commission and them being an accredited hospital. Is Good Samaritan also accredited by the Joint Commission?
A. Yes.
Q. Does Good Samaritan have other accrediting bodies that are accredited?
A. Yes. We're accredited by the American College of Surgeons for our bariatric program, for our comprehensive breast center and for our cancer center. We also have an accreditation from Joint Commission for our orthopedic program, spine, total knee and shoulder.
Q. At first, you mentioned bariatrics. Could you describe that accreditation process? Is it very similar to the Joint Commission process, is it different in any way?
A. Yeah, I would say it is similar. You have surveyors coming to your institution and verifying your procedures and your care plans, they actually go into your operating room, they follow patients' journeys, et cetera.
Q. When they come in to accredit you, do they have full access as to your data?
A. Absolutely.

Q. Do they have full access to your staff?
A. Yes.
Q. What about patients?
A. Yes.
Q. They can ask any questions they want?
A. Yes. They can go into any patient room they want and ask them any question they want.
Q. As part of that process, do you get feedback from them on best practices?
A. Absolutely.
Q. How do they deliver that to you?
A. Particularly, at the end of the survey day, they are normally there four to five days, you will have exits, and probably an hour-long process, and we go over any findings they have, any best practices they have, what they see they really think we are doing a great job on, anywhere we have opportunities, that is the process.
Q. When did you become CEO at Good Samaritan?
A. In July, 2020.
Q. And so you were CEO at the time that Good Samaritan decided to stop participating in the Leapfrog survey in 2021?
A. I was.
Q. How did that decision come about?
A. There were just a lot of conversations about our resources and quality after COVID, things that we needed to concentrate

on, so there was a risk assessment done, the group CNO at the time, Flippo and I had conversations about where we wanted to spend our time and our resources, it was determined that there wasn't any value in the Leapfrog survey, that we wanted to spend our time on accreditations and focus our time on the hospital.

Q. You mentioned group, are you referring to (unintelligible) Health Network?

A. Correct.

Q. And that is the network for the five hospitals that are the Plaintiffs in this case?

A. Yes.

Q. In 2021, when you were still participating, do you recall what score Good Samaritan received for the hand washing that is in dispute in this case?

A. A hundred.

Q. What about for the BCNA score?

A. The same, a hundred.

Q. And what about the CPOE score?

A. A hundred.

Q. And the ICU score?

A. A hundred.

Q. And those scores were based on the actual data that Good Samaritan was submitting at the time to Leapfrog?

A. Correct.

Q. For those four measures, do you have policies in place at your hospital to insure compliance?
A. Absolutely.
Q. Okay. Did you have policies in place going back to 2020 when you became CEO?
A. We did.
Q. And what about for 2021 when you were still participating?
A. Absolutely.
Q. Are those policies, have they been continuously in place through to the present?
A. Yes. Part of our daily processes.
Q. Has anything changed at your hospital with respect to the compliance with these four measures?
A. No, it has not.
Q. Are you still excellent quality, for example, in hand washing?
A. Yes, we do surveillances every month on every unit.
Q. What about for CPO?
A. Same.
Q. BCNA?
A. Yes.
Q. ICU, are you still staffed with that specialized ICU staff?
A. Yes, critical care training, yes.
Q. And that has been in place since 2021?
A. Yes.

Q. What grade was Good Samaritan typically getting from the safety grade survey when it was participating?
A. C.
Q. In the fall of 2024, did that change?
A. It did.
Q. How did you become aware of that change?
A. I believe it was Taylor Poole [sp], my quality director informed me, either her or Gina West. I think it was Poole at that time.
Q. At that time, did you have an understanding as to why the grade was changing so suddenly?
A. I did not.
Q. Did you take efforts as CEO to understand the change?
A. Yes, I had multiple conversations with Gina West, what do you mean we are penalized for these measures, looking at the calculator, having many discussions is how I really uncovered what occurred.
Q. And that was a process?
A. Right.
Q. What about the -- was there publicity attached with the publication of the 2024 --
A. Absolutely.
Q. Could you describe for the Court what that was like for your hospital?
A. Yes, it was absolutely a fire storm, as I recall, all the

media outlets were putting it on the 5:00 o'clock news, 10:00 o'clock, 11:00 o'clock news, all these grades, and -- it was all over the newspapers, and obviously, Instagram, TikTok videos was out there about it, it was all over the place.
Q. In response to that publicity, did you see measurable effects, for example, to the patients that were declining procedures?
A. Yes. Many doctors calling me consistently talking to me about their patients complaining. One specifically, Dr. Goodman called me and told me a patient was refusing to come to our hospital for surgery and was going to Jupiter Medical. He wanted to know what are we doing about this, when are we putting a statement out. I went through and explained everything about the survey to him.
Q. Jupiter Medical, is that an A rated hospital as determined by Leapfrog?
A. Yes.
Q. Have you had any physician groups leave your hospitals as a result of this failing grade?
A. Unfortunately, we had our orthopedic, pretty much the whole orthopedic program is with hospital for special surgery doctors, and they have all gotten privileges now at Jupiter Medical Center.
Q. You mentioned this is your orthopedic service log?
A. Yes.

Q. So how many physicians are we talking about?
A. Eight.
Q. Does that include surgeons?
A. Yeah, they are all surgeons.
Q. How many cases, typically, or surgeries are performed at your hospital by this group?
A. Around 1,300.
Q. That is a year?
A. Yes.
Q. How much revenue does that hospital service line generate for your hospital?
A. Well, income is 8 million.
Q. That is annual?
A. Yes.
Q. You said they have now canceled the contract?
A. Yes. We had a collaborative agreement with HSS starting in 2020, so for five years, they ran our orthopedic service line for us, and we got -- when the fall grade come out, I got numerous calls from the director who also is an HSS physician, he is our orthopedic medical director, he said HSS New York is calling, all their patients are upset, what is going on. So I had to go through the whole process of explaining to them, this is a voluntary survey, we did not respond, we should not have received an F, et cetera. I went through the whole process with him, and then come renewal time for our -- we would be

going for the sixth year of this contract and them running our orthopedic service line, we got a cancellation notice.
Q. When did you receive that notice?
A. In March, 2025, so a few months after the grade.
Q. When did the notice become effective?
A. October was the end of our contract with them, October 31st of 2025.
Q. And you mentioned that this is a group that you had a five-year contract with at your hospital?
A. Yes.
Q. This goes back to 2020?
A. Right.
Q. In that time, from 2020, until the fall of '24 when the Leapfrog safety grade was published, did you have any complaints or problems from that service group?
A. No. I mean, we got the accreditation with them, we have a lot of awards for our orthopedic program, the doctors loved being at Good Sam, I spoke to several of them when I found out that they were getting privileges at Jupiter Medical, but they said they didn't want to get privileges at Jupiter medical, but they were being directed by their employer to get privileges at Jupiter Medical and now this recent legal act we can have unless we intercept and sign a collaboration agreement.
Q. A contract to replace the contract that they had with your hospital?

A. Yes, and it is stated all over the newspaper they previously had a collaboration agreement with Good Samaritan.
Q. You mentioned the orthopedic medical director who's part of this HSS group. What is his name?
A. Nick Soma.[sp]
Q. Does he have any other affiliations with your hospital?
A. Yes, he was on our governing board, and he resigned from our governing board, resigned from being the orthopedic medical director and he's now out in the community doing lectures for Jupiter Medical.
Q. Do you know why he resigned from your governing board and medical director?
A. He was told by HSS that he had to.
MS. BLAIR: Objection, hearsay, Your Honor.
THE COURT: Overruled.
BY MR. MARCUS:
Q. When did he tell you that?
A. I guess around the time he was resigning.
Q. Which was?
A. Probably four months ago or somewhere. He gave notice that his medical directorship would end in October 31st, and then when his renewal was up for governing board, he resigned, I think in November.
Q. Besides Dr. Soma, have you spoken with other physicians of this group?

A. Yes.
Q. Have any of those physicians told you that the reason they have now left for Jupiter Medical is because of the Leapfrog safety grade?
A. Yes, Dr. John Wayne.
Q. What did he tell you?
A. He told me that the contract was canceled between Good Samaritan and he just asked me because of the Leapfrog deal.
Q. When was that conversation; this year?
A. Yes.
Q. Do you recall when?
A. No, it was last year. It was last year.
Q. After the fall 2024 grade was published?
A. Uh-hum.
Q. Did Dr. Wayne express to you any regret that his practice was now having to leave from Good Samaritan?
A. Yeah, I had several conversations with him, you know, the first one, he was telling me that it was about the Leapfrog grade, and it really freaked New York out. He was told he was going to have to get on staff at Jupiter Medical. I have spoken to him several times since then, the same story that I don't want to leave, it just depends on what HSS is going to make us do, and now they all have privileges at Jupiter Medical. He thinks he will have to go there once a month.
Q. This just happened in terms of leaving Jupiter Medical?

A. Yes, because the contract ended October 31st, it takes probably 60 to 90 days to get on staff at another hospital, so they are on staff there now.
Q. Justin, can you pull up Exhibit 550, which is in evidence.
We've heard discussions and testimony in the trial about the declines in admission data.
A. Yes.
Q. You would Zoom in for Good Samaritan.
From the end of 2024, when the F grade, the safety grade was announced by Leapfrog through 2025 calendar year, did your hospital experience a significant decline in walk-ins to your ER?
A. Yes, four percent, or 1,300 patients.
Q. And then the bottom category, the EMS, that's the category and we talked about this, this is the category that shows ambulance rides into your hospital?
A. Correct.
Q. That are mandatory?
A. Yes.
Q. For the same period, the ambulance rides into the hospital have gone up three percent?
A. Yes.
Q. Can you think, though, as CO, you look at your admission data quite frequently?
A. Daily.

Q. Have you taken efforts to understand this drop?
A. Yes. We have gone out into the community, I met with my business development individuals and looked at, are there now, you know, free standing emergency rooms or anything in our area, which there is not, there is not really any underlying thing other than walk-ins are elective, the patient makes a choice to come to your emergency room, so that was telling me they are not making that choice any longer.
Q. Has Good Samaritan seen a decline in other types of elective choices by patients, for example, in 2025?
A. Yes. Actually, all our breast imaging, we do approximately 5,000 a year and we are down eight percent.
Q. Are those breast screenings? What's involved?
A. Breast screenings, or biopsies, breast MRIs.
Q. And you said that is down eight percent?
A. Right.
Q. Any other types of declines in elective procedures?
A. Just our admissions plus our observations are down 4.2 percent for almost like 600 patients.
Q. You mentioned the word "observation", so what is included in that?
A. Those are patients that come to your hospital and they are sick enough to stay in the night. So it's almost like an admission, but the physician thinks that that patient will not spend more than 24 to 48 hours in the hospital, therefore, it's

observation, but they are still there and getting nursing care and they are admitted into your hospital.
Q. You have seen a 4.2 percent decline this year or last year?
A. Last year.
Q. For 2025.
A. Yes.
Q. So very similar to the decline in your walk-ins to the emergency room?
A. Yes. Downtown West Palm is exploding in population, and it would not make sense declining down when we have been growing year over year for some time.
Q. What about with payers. Does Humana, we heard that name, they are a large payer, do a lot of the patients that go to Good Samaritan have Humana as a payer?
A. Eighteen percent.
Q. And we have seen some Humana letters introduced into evidence in this case. Did Good Samaritan receive a similar letter?
A. Yes, I did.
Q. Did that come to your attention?
A. It did.
Q. When did you receive that letter?
A. I would say within the last couple weeks, two weeks or something.
Q. Justin, can you bring up what we have marked as PX-554?

MS. BLAIR: Your Honor, we have the same objection to this document, hearsay exposure.

THE COURT: The objection is overruled, 554 is admitted.

BY MR. MARCUS:

Q. Is this the letter you are referring to?

A. Yes.

Q. In this letter, you are being asked on behalf of your hospital to give an improvement strategy; is that right?

A. Correct.

Q. Because you received a D or below from the Leapfrog grading?

A. That is right.

Q. Are you given any concerns about the potential future impact of this letter from Humana?

A. Yes. Humana is a large payer for us, obviously, after many patients, and for us not to have a contract with Humana would be devastating to the patients, they wouldn't be able to receive the great care we give for all of our hospitals, that would narrow the network for them, that is sure not great for patient care either, and unfortunately, Humana does not understand that we are not a D or an F hospital, they are just going by what Leapfrog published.

Q. The second paragraph, they write to you, "Consequently, we are providing you this information to encourage your facility

to review your Leapfrog Hospital Safety Grade to identify any factors that may have contributed to your performance on safety matters". Do you see that?
A. I do.
Q. Is there any language in this letter reflective that Humana is under a belief that you did not submit data to the Leapfrog Grade and as a result, you were penalized for not participating in --
MS. BLAIR: Objection, calls for speculation.
THE COURT: Overruled.
THE WITNESS: No, not at all.
BY MR. MARCUS:
Q. Is there any discussion of the imputation model in this case?
A. No.
Q. Has you responded yet or has Good Samaritan responded to this letter?
A. I sent this letter to the VP of manage care and I am just waiting for guidance.
Q. Have you received any recent anonymous letters directed to you?
A. Yes, I have.
Q. And did you receive an anonymous letter to discuss the Leapfrog grade?
A. I did, I received a newspaper article on -- that had

Jupiter Medical on it with the Leapfrog grades are now out with an A, circled some of the things in the article, told us that we needed to take lessons from Jupiter Medical and that my staff was despicable.

Q. Justin, please bring up what we have marked as PX-548.

MS. BLAIR: Your Honor, we have an objection to this document.

THE COURT: Your objection?

MS. BLAIR: It is hearsay, undated, we don't know even know who it is from, we don't even know who the declarant is, we don't know when it came, how it came.

THE COURT: 548, the objection overruled.

(Whereupon Plaintiffs' Exhibit 548 was marked for Evidence.)

BY MR. MARCUS:

Q. Ms. Montgomery, directing your attention first to the envelope at the bottom. This was made out to you personally as the CEO. You see that?

A. Yes.

Q. And we just heard about when the date was. If you look up at the top, this was sent on December 2nd of last year?

A. Yes.

Q. From somewhere in West Palm Beach, Florida?

A. Yes, that is what it looks like.

Q. Okay. Can we, Justin, can we go back and Zoom up to the

top of the article.
At the top, someone wrote "Good. A joke! Sam needs to learn from" -- and then underneath, Jupiter Medical Center is underlined. You see that?
A. Yes.
Q. This article is entitled "The Ratings Are In. Jupiter Medical Center receives A for patient safety."
As you just testified, this is an article effectively about Jupiter's grades from the safety survey; is that right?
A. That is right.
Q. There are three paragraphs that were circled by this person?
A. Yes.
Q. Can we scroll down to the bottom.
And whoever this is, says, "Your despicable staff needs to take notes from", and there's two arrows pointing to Jupiter Medical Center.
That is what you were referring to?
A. Yes.
Q. What was your reaction to receiving this letter as CEO?
A. This is clearly very upsetting. This individual obviously is believing that Good Samaritan is a failing hospital, and Jupiter Medical is an A, and it is unfortunate because they clearly do not understand and don't know that we did not respond to that survey, that we were given an F for basically a

test we never took or were required to take. They now believe that we are a failing unsafe hospital, and the fire storm keeps going, this is in December, it's all the time. Leapfrog keeps putting this punitive damage out to all of our hospitals, and this could be a potential patient or someone in the community, it just continues that they are putting fear into consumers.

Q. If Leapfrog is allowed to continue with its imputed method and Good Samaritan still doesn't participate and keeps receiving scores like this that are publicized like they have been last year, what do you think the impact is going to be on your hospital?

A. Things will just continue to get worse because as they come out every six months, and we continue to be a failing hospital, the consumers are going to believe the story and definitely believe the story if they are continuing that we are a failing hospital year over year over year.

Q. Why did Good Samaritan make the decision to bring this lawsuit?

A. Because of the damage that it is doing to all of our hospitals, what it is doing to consumers, putting fear into consumers to deter them not to come to our hospitals because they are likely to die in our hospitals, which is not true at all. It is very reckless and unfair how this has happened and it's a non-profit supposedly transparent organization, but they should not give us a grade. It is a voluntary survey here,

they are not a governing agency, they should just not give us a grade, we don't participate, that is what they should say.

MR. MARCUS: Pass the witness, Your Honor.

THE COURT: Cross-examination.

MS. BLAIR: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. BLAIR:

Q. Ms. Montgomery, do you recall sometime in -- after the fall of 2024, Leapfrog Hospital Safety Grade came out, you were working with Regina West to attempt to re-enter the Leapfrog survey?

A. Re-enter; what do you mean?

Q. To start participating again in the Leapfrog survey?

A. Yes, there was discussion, once we were being penalized, should we just participate so we don't have Fs.

Q. And did you recall that you had a conversation -- if you could pull up DX-639 -- that you had an email discussion with Maggie Gill who is the President of Palm Beach Health Network about returning to the participation?

A. Could I see --

Q. Do you recall that?

A. I briefly remember you maybe showing it to me before.

MS. BLAIR: DX-639, is there an objection to this document, Your Honor?

MR. MARCUS: Your Honor, there is no objection.

MS. BLAIR: I ask that it be admitted, Your Honor.

THE COURT: What is the number?

MS. BLAIR: DX-639.

THE COURT: 639 is admitted.

BY MS. BLAIR:

Q. And you see here, Ms. Montgomery, you say, "Thank you, I appreciate it. Also, Gina did say they could handle without adding resources as well". Do you see that?

A. I do.

Q. Previously to entering this litigation at DX-618, which is an email from Regina West to Maggie Gill, CC'g Ricky Ramirez where she says that they can restart participation in the Leapfrog survey with minimal resources and no cost. Do you recall seeing that as you sat in Court the last few days?

A. I would like to see it again if you are going to question me about it, but I do recall seeing an email about that.

Q. And you don't dispute that you told Maggie Gill about it in a Palm Beach Health Network that Good Samaritan could handle the Leapfrog survey without adding additional resources, correct?

A. That means not adding additional Fs and Ds. The resources that we have would view them in our quality department which they had in the past.

Q. And in fact, just like your colleagues on the board of hospitals were collecting CPOE, BCNA, IPS in hand hygiene

information data every day, correct?
A. We do.
Q. Are you also, like your colleagues, survey ready at any time for the Joint Commission on those four measures?
A. We are.
Q. And is it your testimony -- Mr. Marcus asked you some questions about the fact that you are currently tracking hand hygiene, correct?
A. Correct.
Q. And is it your testimony that if you had reported your hand hygiene measures in 2025, you would have been a hundred out of a hundred?
A. Yes, I believe so.
Q. If you would pull up DX-823, please. There is also an objection to this document, Your Honor.
BY MS. BLAIR:
Q. Ms. Montgomery, was Aaron Britt a quality officer with your hospital in or around February 14th, 2025?
A. Yes.
Q. If we go down, she is saying to several people from Good Samaritan, "As a reminder, the requirement for hand hygiene observations is 200 per in patient unit per month", you see that?
A. I do.
Q. If we look at the chart that she had in the middle here, we

could see that you are non-compliant in several different departments. Do you see that? That chart?
A. I do see that, yes.
Q. And if we scroll down just a little bit more in this email, it says, "Moving forward, all missing tracers must be up, which we are not seeing either. Please input your December as well as January data if you have it ASAP". Do you see that?
A. I do.
Q. The paragraph before it, she says, "Each unit should have at least 200 observations entered for the month". Do you see that?
A. I do.
Q. Are you aware that the Leapfrog standard is 200 observations per month?
A. I believe it is a hundred or 200.
Q. It says here, "Only Two South and Five South have met the requirements for the month of January". Do you see that?
A. Yes.
Q. The majority of units have zero tracers entered, correct?
A. Entered into this system, yes.
Q. And if we scroll down a little bit farther, you will see that is Good Samaritan?
A. Yes.
Q. So this is September of 2025, this is less than a year ago after the fall 2024 methodology was reported, and at least

Aaron Britt is sending a reminder to all the units about hand hygiene and the fact that you are not reporting the 200 required observations per month, correct?
A. That is what it appears to be, yes.
Q. Thank you. Please take that down.
I want to talk about -- we saw a five star marketing analysis report from Regina West in April of 2024. Do you recall that? The spreadsheet.
We can pull it up?
A. That would be helpful.
Q. This has already been entered into evidence.
If you scroll to the attachment here, so this attachment here, Ms. Montgomery, can you see that?
A. I can.
Q. This is a four star market report that lists out all of the different measures that you are tracking, correct?
A. Yes, this is the CMS star report, yes.
Q. And nowhere on this does it list CPOE, BCNA, hand hygiene or IPS, correct?
A. It does not.
Q. If we scroll down to your patients survey result here, Good Sam. Do you see that here?
A. I do.
Q. And that is all below the national average, correct?
A. Correct.

Q. Do you understand for a non-participating hospital on the Leapfrog survey, that makes up a substantial part of the scoring for the process and structural measure domain?
A. The patient experiences?
Q. Yes.
A. Yes.
Q. Do you have any reason to doubt that those were your actual scores around April of 2024?
A. I do not for the period of '21 to '22, but I believe our response rate was 16 percent out of all of our patients.
Q. Right, and do you have any reason to believe that is not also the response rate of other hospitals?
A. I would say if you probably went and looked at four star hospitals, they probably have a much higher response rate.
Q. Because they are four star hospitals?
A. I mean, statistically, whenever you have a non biased rate, when you have a low response rate, so it is not a true sample of our patients, A, it is only Medicare patients, so it is not our entire population, it's only 50 percent, and then now it is only 16 percent, and this is why we choose to push the Google reviews and talk to our patients about completing the survey, and it is a paper survey, it is 30 questions, and we are encouraging them to do it because we want them to respond.
Q. And other hospitals that also have to deal with CMS surveys also have the same issue you have, isn't that true?

A. I would say not everybody has the same issue, but we have definitely improved our patient experience scores, we hired a champion, our survey scores have gone up, it went from a one star to a two star, and that is still a lagging data.
Q. Are you using (unintelligible) as well for your patient safety improvement?
A. Yes.
Q. And we saw that (unintelligible) by Mr. Hanlon?
A. I was.
Q. Do you have a similar presentation?
A. I was not aware of one, no, I haven't seen it.
Q. Would you agree with me that your H CAP scores are very low compared to the national average?
A. Maybe several years ago they were, now they are much better.
Q. At the time of fall of 2024, methodology changed. Do you know whether or not they were exceptionally low compared to the national average?
A. What was pulled off the CMS website, is that what you are referring to?
Q. Right, the public --
A. I don't know if the score was below the national average, but obviously they were not great.
Q. In order for this litigation, in this litigation, you did not take your actual data on CPOE, BCNA, hand hygiene and IPS

and take the Leapfrog survey so we could know what your actual survey would have been under the new methodology?

A. I believe that was done in the background, I don't know if it was Gina West or someone. I saw a comparison that said what we would have been in a calculator, so what we would have been a D. but did I personally go, obviously not.

Q. And we saw the deposition testimony of Regina West via video earlier today and I discussed with her the what ifs scenario, and what if we got a hundred percent on everything. Do you recall that?

A. Yes.

Q. And so I am asking a little different question. I am not asking what if we got a hundred percent, what if our H CAP scores were better, I am asking did you ever go and look at your actual data, performance data, and the Leapfrog survey and say I know putting in our actual data for these measures, we would have been a better hospital in the fall of 2024. Did that ever occur?

A. I did not personally do that.

Q. Thank you.

If you could pull up DX-565, there is also an objection to this document, Your Honor.

This is an email, Ms. Montgomery, would you go to the top, please.

This is an email from Colleen Thielk [sp] to you, it's an

email stream and Taylor Poole, and Colleen Theilk in or around the time of the Chief Nursing Officer at Good Samaritan, correct?

A. Correct.

Q. The date of this document is July 17, 2024?

A. Yes.

Q. This is an email from you, where you say to Taylor, "Thank you", and we go down to Taylor's email, she is compiling a chart for you, and she says, "Sheri, I did a really quick breakdown of different publicly recorded scores for hospitals in Palm Beach County, see below". Do you see that?

A. I do.

Q. Did you ask Taylor to do this exercise?

A. I mean, I don't recall. I don't recall doing that, maybe I did. I am not sure.

Q. Do you have any reason to doubt that this email was sent to you and that you responded, reviewed it and respond, "Thank you" to Taylor Poole?

A. No. I just saw the email that I did respond.

Q. And in and around this time, would Taylor Poole have been the person at Good Samaritan who would have compiled this data?

A. Correct.

MS. BLAIR: Your Honor, I ask that the document DX-565 be moved into evidence.

MR. MARCUS: No objection, Your Honor.

THE COURT: 565 is admitted.
MS. BLAIR: Thank you.
BY MS. BLAIR:
Q. In looking at this, this list of different hospitals, do you consider these hospitals to be your competitors?
A. I mean, not all of them, no. Some of them.
Q. We talked a lot in this litigation about Jupiter Medical Center, correct, you have been here for those discussions?
A. I have.
Q. And, in fact, we just saw that newspaper article where somebody wrote on it, "and you should be as good as Jupiter", correct?
A. Yes.
Q. If we look at this chart that your director of quality put together, Jupiter Hospital was a four star out of five star hospital, correct?
A. Yes.
Q. It has an A in Leapfrog?
A. Yes.
Q. And it had a U.S. News ranking number high performing matters, it has nine. Do you see that?
A. I do.
Q. Do you have any reason to believe Jupiter is not an A hospital?
A. I can't say what Jupiter is, I don't work inside that

institution.

Q. Do you have any idea to believe that Taylor Poole is wrong about the number she is putting on here?

A. I have no reason to believe she would put wrong data into something and send it to me.

Q. If you look at this document and you see JFK there?

A. I do.

Q. They have a one star for CMS, correct?

A. Correct.

Q. They have a one star for patient experience, and they have a Leapfrog D, and they have three CMS ranking for high performing measures. Do you see that?

A. I do.

Q. And if we contrast them against your hospital, Good Samaritan, which is at the top, you are a one star overall CMS hospital and a two star patient for experience in Leapfrog and a two in performing measures, correct?

A. Yes.

Q. At this point in time, July 2024, your hospital was not participating in the survey, correct?

A. Correct.

Q. Do you understand that JFK Hospital was participating in the survey and receiving a D at this time?

A. Okay.

Q. And, so, at this time, if we are looking at your C grade,

you were getting a hundred out of a hundred points for all four measures even though you were not participating in the survey, correct?
A. I believe at that time it was step one that we were going through as a non voluntary hospital, I guess.
Q. That is your belief?
A. Yes, I believe so.
Q. Okay. You can take that down.
We talked a lot today about these new discussions that you had about harm that your hospital is receiving, correct?
A. Yes.
Q. And do you recall I took your deposition on September 15, 2025, correct?
A. I do.
Q. And during that deposition, you never mentioned Nick Soma, right?
A. I don't know, I'd have to go back.
Q. Do you recall if you ever mentioned to me HHS's contract terminated in March of 2025?
A. I remember bringing up HSS, I do.
Q. And in fact, that occurred in March of 2025, correct?
A. What did?
Q. The cancellation of the contract between Good Samaritan and HSS.
A. We got the letter, I think it was in March sometime, yes.

Q. And you never produced that letter in this litigation, correct?
A. I believe the letter was sent, yes, to counsel.
Q. Okay. And if counsel never produced that in this litigation, it wasn't because you didn't send it to them, correct?
A. I sent it.
Q. And in terms of that -- that was an orthopedic group that left?
A. Correct.
Q. And they now have a contact with Jupiter?
A. Yes.
Q. Do you know the terms of the contract with Jupiter?
A. I do not.
Q. Have you produced any of the communications between you and Dr. Nick Soma or Dr. John Wayne regarding HSS's decision to leave or break its contract with Good Samaritan? Have you produced any correspondence?
A. I mean, I have spoke to counsel about the correspondence.
Q. Have you produced any of that correspondence?
A. There is a conversation.
Q. Are there documents?
A. I don't know if I sent it in an email or if was an actual conversation that I had with the physician.
Q. Okay.

A. It's not like they are recorded.
Q. But as I heard your testimony on the stand just now, this was a really big deal in March when they terminated your contract, correct?
A. It was.
Q. Did you have any emails with any of the doctors or HSS about the contract being broken?
A. There were phone calls.
Q. You did send this email to HSS?
A. I sent the email to like maybe Maggie Gill. There was no reason to send it to HSS 'cause my contact is Nick Soma, he is the medical director, he is my contact and he is who I would speak to.
Q. Did you have any meetings with HSS trying to get them to come back to Good Samaritan?
A. I personally did with Nick Soma, it was a directive from New York, and that is what I was told.
Q. Do you text with Dr. Soma?
A. Yes, I do.
Q. Have you texted about this issue about that meeting with Good Samaritan?
A. Probably.
Q. Did you produce those texts in this litigation?
A. I don't recall.
Q. Do you text with Dr. Wang?

A. Not typically, no.
Q. Do you recall if you ever had any written communications with Dr. Wang regarding the fact that they were breaching a contract based on Leapfrog?
A. No. It was a meeting, in person meeting. There was an email or a text, something sensitive of that nature, it is a conversation with an individual, not an email.
Q. So, since March of 2025, when they broke the contract with Good Samaritan, and I think you said the contract expired sometime four months ago?
A. October 31st.
Q. October 31st, 2025, there are no documents produced in this litigation that you could substantiate what you just said on the phone; isn't that true?
A. We have the cancellation letter.
Q. Right, you produced it to me one or two days ago. In terms of the issue with Humana, PX-554, you testified that 18 percent of the patients at Good Samaritan have Humana as an insurer, correct?
A. Correct.
Q. You received a letter, just like you received, a form letter from Humana, correct?
A. Correct.
Q. And did you respond to that letter?
A. I personally would not respond to that letter. I sent it

to our VP of Managed Care.
Q. Do you know if VP of managed care responded to that letter?
A. No, she was pulling the contract, I don't know if she emailed me with an update, no.
Q. Looking at that letter, that Humana letter, is there any way to determine whether Humana understands the Leapfrog methodology as applied to Good Samaritan?
A. They believe that we were a D or an F, and think that we have all these problems on a survey we didn't complete. I am pretty confident they don't know. They did not complete a survey.
Q. How do you know they don't know?
A. If most people knew that all of these hospitals are getting Fs for a survey that is voluntary that they didn't complete, I don't think people would give any relevance to Leapfrog at all. Most people don't understand.
Q. You don't know what Humana does or does not know about the Leapfrog methodology that they feel confident enough about to put in a letter to hospitals to encourage them to do better for their community about patient safety, correct? You don't know?
A. Probably no one in this room probably knows unless Humana told us now and we ask, what do you think of the Leapfrog survey, do you know that we don't participate, and we were still given a failing grade. Maybe that will happen, I don't know.

Q. You understand that whether or not you participate in a Leapfrog hospital survey is fully and transparently, and I am not talking about the hospital safety grade website we have been looking at, there is a separate website, and if you could pull that up, there is a separate website, Leapfroggroup.org, it is just about the survey, and if we look at Good Samaritan, a pop up comes up, this is in your complaint, a pop up comes up and says that you don't participate in the survey. Are you aware of that?

A. On one of the websites, yes.

Q. So it's your understanding that Humana doesn't understand that you don't participate in the survey, even though that is formally and publicly transparent to an insurance company that wants to go on the website to check?

A. The insurance company is not only going to get on and just check, they will probably get a download of some or all of these people and what their grade was, so now they will have to go to the right website. There are two different websites, from my understanding, one says that and one doesn't, so you don't just load up a Leapfrog rating, it will show that Good Samaritan is an F, not necessarily this comes up.

Q. Ms. Montgomery, if you go to just the website that talks about whether or not your hospital participates in the survey, you can see right there, thousands of hospitals nationwide report to Leapfrog Hospital Survey to help patients and

purchasers make it better. This hospital did not participate. That is fully and completely transparent on the Leapfrog website, isn't it?
A. A person would have to actually go there, whatever is published in the paper, I guess.
Q. You don't believe Humana would go to that website, that is your testimony today?
A. I don't know what Humana did.
Q. I want to talk to you about your discussion about the fact that your Leapfrog scores have decreased your admissions. You gave that testimony on the stand earlier, correct?
A. Correct.
Q. And based on your supposition that a hospital with lower Leapfrog scores sees a decline in admissions, is it -- do you have any information that hospitals like Jupiter with A grades get increases in their admissions to their Leapfrog scores?
A. I don't know.
Q. And that newspaper article that we looked at, the PX-548. If you could pull that up, please. PX-548.
Nowhere in this article does it talk about your Leapfrog safety score, does it?
A. It does not.
Q. And they call you despicable, if you scroll down, they call your staff despicable, you see that?
A. I do.

Q. And you don't know if this is just a patient of Good Sam with a bad experience, correct?
A. I don't know the identity of this individual.
Q. And there is no way for you to link your Leapfrog score -- right, you don't know the identity of the individual, neither do I, but there is no way you can link your Leapfrog score to this note that you got, isn't that true? Doesn't match your Leapfrog score anywhere?
A. I am getting an article with an A, I am an F, and they are telling me I am despicable and I need to go learn from the A hospital when I am an F or a D, whatever I am today.
Q. Well that is a lot of speculation on your part when you just told me you don't know who wrote this or why they wrote it, correct?
A. I don't know who this person is.
Q. And you said earlier that Dr. Goodman called you because a patient was complaining and wanted to go to Jupiter. Do you recall that?
A. Yes.
Q. Who was the patient complaining to Dr. Goodman?
A. I don't know.
Q. What was he complaining about?
A. She was complaining about that we were inept and that she was afraid and she didn't want to come to Good Sam, she wanted to go to Jupiter Medical is what she said.

Q. What was she going to Jupiter for?
A. She was a cancer patient, I believe.
Q. When did this happen?
A. December 2024, shortly after the grades came out, like within a week or two, something of this nature.
Q. Did you in any way catalog this conversation with Dr. Goodman regarding this patient?
A. Mentally.
Q. Didn't write it down?
A. I believe I sent an email to Maggie about it.
Q. You sent an email to Maggie about it?
A. Yes.
Q. Maggie Gill being the President of PBHN, correct?
A. Correct.
Q. And Ms. Montgomery, I have asked all of your colleagues this, I sent interrogatories to you and your counsel on behalf of Good Sam asking for the very information that for the first time you got up on the stand and provided. Do you understand that?
A. I understand.
Q. Do you understand that in the interrogatories that I asked about listing all of the patients who have canceled or all the patients who have been harmed or all of the patients who you heard complaints from related to the Leapfrog grade, you didn't tell me any patient name, who they were, why they were

canceling or why they didn't want to come, isn't that true?
A. I personally did not tell you a patient name, no.
Q. In fact, I sent request for production to all five of these hospitals asking for specific documents related to these issues, none of which came, and one document I specifically sent, RFP-38, I asked for documents to support your claim that Leapfrog caused you reputational harm, nothing.
And I asked you to provide me in interrogatory number nine all instances where a party has declined to contract with you where Leapfrog grade was cited. I asked you in interrogatory nine, that is in evidence, and you did not provide anything with respect to this new issue with respect to HSS, which was canceled in May of 2025 before you filed this litigation. Are you aware of that?
A. Yes, I am.
Q. And why didn't you provide me with any information or at least a letter where HSS was canceling the contract with you if it was so important and so damaging to Good Samaritan, and you had it before you filed this lawsuit, and you never provided it. Why?
A. I am not sure why it was not provided. I can't answer your question.
MS. BLAIR: Thank you. I have no further questions, Your Honor.
THE COURT: Redirect.

MR. MARCUS: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. MARCUS:

Q. Ms. Montgomery, you were asked questions about what your actual grade would be in reference to some of these -- do you follow these questions?

A. I do.

Q. In 2021, we know what your actual grade were, don't we?

A. We do.

Q. You had perfect scores for all four?

A. Yes.

Q. That was the Leapfrog's validated measures by their own survey?

A. Correct.

Q. Those were the best grades offered, right?

A. Yes.

Q. Then you stopped participating in 2021; is that right?

A. We did.

Q. There is this two step, we heard about step one, and step two, essentially the actual data that gave you the best grades for those four measures carried over for a period of time; is that right?

A. That is right.

Q. Eventually in 2024, you got to this step two, right, where that data went away?

A. Right.
Q. And you were assigned for all four of those categories the worst score of any hospital in the country?
A. That is right.
Q. Now, Ms. Blair, she showed you an exhibit where she mentioned JFK and she showed how they had participated actually given and they got a D, right?
A. Yes.
Q. Your F in this case for those four measures is not based on your actual performance, is it?
MS. BLAIR: Objection, leading, Your Honor, all of these questions.
THE COURT: Sustained.
BY MR. MARCUS:
Q. The fall 2024 grade that was assigned to your hospital is not based on any real data, is it?
A. No, not at all.
Q. Do you know how that grade was assigned to you?
A. There were four measures that we were given the lowest score possible, the 15.5, .5 and 5, and I think it is 60 points maybe out of 360 or something of that nature, and not only that, but when you don't complete the survey, the other three measures are given an A which makes it four measures way even more than every other hospital. The patient experience is rated higher for non participating hospitals because they put

an A in these other three measures so everything else goes up.
Q. These four measures, what is the combined weight of those measures?
A. I think 35 percent or something.
Q. So that combined weight is going to be the absolute worst score of any hospital in the country?
MS. BLAIR: Objection, leading.
BY MR. MARCUS:
Q. Is it?
A. Yes.
Q. Now, you were shown some emails about hand washing. Do you recall that on cross-examination?
A. I do.
Q. You were shown an email from Aaron Britt who was a quality person at Good Samaritan?
A. Yes.
Q. In that email, she was sending it out to people at your hospital saying we are missing some data, right, we need to get the actual data?
A. Data was not entered into the system.
Q. Was her email an example of your compliance mechanisms to assure that your hospital in fact does very good hand washing?
A. Yes, they are constantly looking at it all the time, and educating and doing surveillance constantly.
Q. Was there anything in that email that suggested that people

weren't actually washing their hands at your hospital?
A. No.
Q. You were asked some questions about HSS, you recall that?
A. Yes.
Q. Just so it is clear for the record, there was a notice of cancelation in March of last year. Do you recall that?
A. Yes.
Q. That notice did not become effective, though, for many months, isn't that right?
A. Right.
Q. When was the actual cancellation?
A. October 31st.
Q. And you were asked by Ms. Blair, well, how do we know that there was actually a notice of cancelation in March, that you're making it up. Do you recall those questions?
MS. BLAIR: Objection to form.
THE COURT: What is the problem?
MS. BLAIR: I don't think I asked that question.
THE COURT: Objection is overruled.
MR. MARCUS: Can we bring up Exhibit PX-561.
MS. BLAIR: Your Honor, we have an objection to that document.
MR. MARCUS: The door has been opened.
MS. BLAIR: I did not open that door.
MR. MARCUS: She suggested that this was made up.

MS. BLAIR: I did not which is why I objected to the question.

THE COURT: Let's proceed. You have an objection to this document?

MS. BLAIR: Yes.

THE COURT: Let's see what the situation is.

MS. BLAIR: Well, Your Honor, just really quickly, this document was produced to us on January 13, just days before this trial. That is my number one objection to it, dated March 24, 2025, it has never been produced in this litigation, never produced to us, just another example of these type of documents over and over again. I specifically did not open the door.

MR. MARCUS: She did, too. This was produced to her on January 13th, today is January 21st, and she asked questions suggesting that how can we understand if this witness is being truthful about this episode. This is a corroborative document, Your Honor, as to what Ms. Montgomery testified on direct and was crossed, and so she has opened the door, we're just putting it in so you can see there is an actual notice of cancelation.

MS. BLAIR: Your Honor, he asked her questions about that, and I am well within my right to ask, it's within the scope of his direct examination to question her. He has not put the document in.

THE COURT: All right. Objection is overruled.

MR. MARCUS: We move to admit PX-561.

BY MR. MARCUS:

Q. Can you look at the top of the document. Do you see the date of March 24, 2025?

A. I do.

Q. This is sent to your attention?

A. Yes.

Q. Is this the notice of termination that you were testifying about earlier?

A. It is.

Q. And can you scroll down a little bit.

It references an agreement with the hospital for special surgery, that is HSS, the group you were testifying about?

A. Yes.

Q. This goes back. Good Samaritan has contracts going back to 2018?

A. I think so, yes. That was before I was there.

Q. And so the actual contract, the last day of the contract was September 30th, 2025; do you recall that?

A. Right, yes, I thought it was October.

Q. This is when the contract was effectively canceled, on September 30th; is that right?

A. Yes.

Q. Do you recall giving a lengthy deposition in this case?

A. I do.

Q. Do you recall when it was?
A. No.
Q. Was it summer?
A. Maybe.
Q. Did Ms. Blair take your deposition?
A. She did.
Q. Was I in attendance as your lawyer?
A. You were.
Q. Did it last most of the day?
A. It certainly did.
Q. She asked you all sorts of questions?
A. She did.
Q. Was there a single question you refused to answer at the deposition?
A. No.
Q. You were asked about HSS at that deposition, weren't you?
A. Yes, I believe I brought it up.
Q. In fact, you answered every question she asked you that day?
A. Yes.
Q. She would have asked you about patients, you would have answered her question, wouldn't you?
A. Certainly.
Q. You were asked about a separate website, not the Leapfrog website, but you recall the website that has the report, you

remember that?
A. Yes.
Q. If you could assist me, could you bring up what you showed the witness during cross-examination.
So, looking at this other website, this is not the hospitalsafetygrade.org, is it?
A. Right.
Q. You said you had never been to this website?
A. I know about the website, about this lawsuit and discussions.
Q. And this box comes up and says Good Samaritan Medical Center has declined to respond, right?
A. Yes.
Q. You see any grade, do you see your F grade for Good Samaritan anywhere on this?
A. I do not.
Q. If the main website simply had this popping up and you had no rate or not rated, would you have a problem with that?
A. If I did not have a grade and it just said --
Q. You declined to respond?
A. I would not.
MR. MARCUS: Nothing further, Your Honor.
MS. BLAIR: Could I have just one question on recross?
THE COURT: On what?
MS. BLAIR: On this new document.

THE COURT: You did ask her about it. You raised this, didn't you discuss this?

MS. BLAIR: No, I asked her about HSS which was brought up in her direct examination.

THE COURT: Isn't it this?

MS. BLAIR: Well, it is, but I didn't have this document.

THE COURT: I don't think it is necessary. I thought I heard you say you were given the document at least a couple weeks ago.

MS. BLAIR: No. The 13th of January, Your Honor.

THE COURT: All right, a week before. All right. Thank you, Ms. Montgomery.

That it for the day? Or do you have someone else you want to hear from?

MS. MALONEY: We would love to hear from Ms. Campione and we have a short examination of her, she's the project manager, it's a short cross-examination, approximately 20 minutes. But we understand --

THE COURT: Is it a video or --

MS. MALONEY: No, no, no, it's live.

THE COURT: Go ahead. We'll come back at welcome: 30.

MS. BLAIR: Your Honor, I am also calling Ms. Campione, so my examination of her will be longer than ten

minutes, and we are going to go probably at least a full hour with Ms. Campione because she is being called in my case in chief, too, and we agreed to waive scope so you wouldn't have to --

THE COURT: So you are just calling her once?

MS. BLAIR: Yes.

THE COURT: I don't think we want to spend another hour and a half.

Where are we in your case?

MS. MALONEY: In our case, we have 15 minutes of designations of Matt Austin which includes their counter designations, we have Ms. Campione, we will be calling Ms. Jupiter in our case, and they will be examining her, Ms. Jupiter is a Leapfrog witness, and then we have Ms. Leah Binder, and we have also have -- she is live, also their witness we will be taking her in our case initially, and then Ms. Bailey is the other video testimony that is at issue, and so, Your Honor, actually, there is an issue with Ms. Bailey's designations.

Sorry, I couldn't see him. So we could do argument on one of the Bailey designations if you would like to do something at the end of the day.

THE COURT: How long are you going to take?

MS. BLAIR: We may dispose of one expert, but we would have three experts --

THE COURT: Didn't you all tell me five days?

MS. MALONEY: Yeah, we will be done by Friday. I figured we would be done tomorrow and get closings on Thursday.

MS. BLAIR: We have witnesses, Your Honor.

MS. MALONEY: We are putting in a bunch of our witnesses, we should be done by noon, I would think --

THE COURT: I don't see how. Let's take five minutes and we will go ahead and hear from this other witness this evening. We need to make sure we finish this case this week and I'm not optimistic from what I'm hearing. Okay, five minute break.

(Thereupon, a short recess was taken.)

(Thereupon, trial reconvened after recess.)

THE COURT: Okay, please be seated.

MR. CRAIN: Thank you, your Honor. The Plaintiffs call Alex Campione, program manager at Leapfrog.

ALEXANDRA CAMPIONE, PLAINTIFFS' WITNESS, SWORN

MR. CRAIN: May I proceed?

THE COURT: Yes, please.

DIRECT EXAMINATION

BY MR. CRAIN:

Q. You are an employee of Leapfrog, correct?
A. Yes.
Q. Your title is program manager?
A. Yes.

Q. When you joined Leapfrog in 2022, you were immediately assigned to the hospital safety grading program, correct?
A. Yes.
Q. Leapfrog collects hospital survey results; is that right?
A. Yes.
Q. And uses the data from the surveys to assign grades to participating hospitals; is that correct?
A. We use it for a portion of the grade. We also have 17 other measures -- no, about 15 other measures that we use, and it can be from CMS, so publicly available data that is directly from the hospital. So it does make up a portion. It makes them very distinct, our survey and our safety grade.
Q. My question is: You do use the survey responses for the grade, correct?
A. We use some. The survey is not comprehensive.
Q. Employees working on the safety grade like yourself can access that data, right?
A. Yes.
Q. The data is stored in the ordinary cores of Leapfrog's business?
A. Yes.
Q. I want to show you PX 412. Please don't put it up yet, it is not admitted in evidence yet. I know there is a confidentiality objection.
MS. BLAIR: Your Honor, this is the only confidential

document we have on the exhibit list, and it is the proprietary scoring of Leapfrog for all 2800 hospitals across the country for spring of 2025, I believe it is.

So our objection is to the confidentiality of putting it into the record, every single hospital in the United States they are scoring on the Leapfrog survey. I think it is highly confidential to the other hospitals that are not parties to this litigation.

It exists, people talk about it, but we do have a confidential designation.

MR. CRAIN: Your Honor, we are just interested in moving it into evidence. That data is available for purchase as I understand it, so I don't really understand how all of it would be confidential data. We are hoping to get it in evidence as a Leapfrog produced document.

MS. BLAIR: It is not available for purchase. This has been a common misconception. What we have provided is the raw scoring data of my client. What is available for purchase is like whether a hospital gets limited achievement, not the raw Z scores in our proprietary scoring methodology.

THE COURT: Is the scoring for all the hospitals necessary or only this one?

MR. CRAIN: It is important that it is in evidence because it underlies the expert opinions. If counsel can stipulate we can move into evidence, we can move on.

THE COURT: If it is in evidence, it is a publicly available document if anyone was interested.

MR. CRAIN: We are happy to meet and confer and talk about the appropriate redactions, but it is important to get it into evidence.

THE COURT: What kind of redactions do you suggest?

MR. CRAIN: It did have underlying data of the expert opinions. It is a business record. The expert opinions discuss certain trends overall. We also would be willing to discuss stipulating to those. I think there are different ways to handle this. It is a Leapfrog produced document, a business record, we think it is wholly admissible. She testified it is stored in the ordinary course.

THE COURT: I am going to admit it. She is trying to argue for some sort of sealing, which I don't like to do. I will tentatively admit it. You discuss redaction and I will await some final decision on sealing, having expressed my reservations about that as a general rule.

All right. What is the number?

MR. CRAIN: PX 412.

THE COURT: That is admitted pursuant to the discussion we just had.

MR. CRAIN: I can move on, I don't need to publish it.

BY MR. CRAIN:

Q. Ms. Campione, I want to change topics after that exchange.

You were here for Dr. Berger's testimony this morning, correct?
A. Yes.
Q. You heard Dr. Berger testify about Footnote 4 on Leapfrog's website?
A. Yes.
Q. So we are on the same page, Footnote 4 said that the hospital declined to report their performance on this measure so a score was assigned to reflect the lack of information available, right?
A. Yes.
Q. And you heard Dr. Berger testify that it was his opinion that the footnote explains a data score was assigned, but does not explain how, right?
A. Yes.
Q. You had a role in drafting Footnote 4; is that right?
A. Yes.
THE COURT: Would you pull the microphone closer.
MR. CRAIN: Pauline, am I okay?
BY MR. CRAIN:
Q. I would like to put up JX 31.1.
This is an email chain between you and a colleague. If we go to the top. Ms. Campione, do you see that?
A. Yes, I do.
Q. I want to go to page Bates ending 868, that should be at the bottom.

If you see -- if we zoom in and highlight the text -- on May 29th, you are sending Ms. Lider what you say is a final mockup and description. Do you see that?
A. Yes.
Q. There is a draft of the footnote and it says, "The hospital declined to report data for this measure so a score was imputed for the measure." Do you see that?
A. Yes.
Q. The final footnote does not keep the word imputed, correct?
A. Correct.
Q. Later, if we go to page 865, Ms. Lider writes to you and says, "My only call out," talking about your draft, "is that the language seems a bit off to me as a lay person to know what imputed means." Do you see that?
A. Yes.
Q. If we go further up on the screen you respond, "That was the language that Missy wanted, but Leah wants something else that makes it sound like the data we imputed was not random."
Do you see that?
A. Yes.
Q. Leah refers to Ms. Binder, the CEO of Leapfrog?
A. Yes.
Q. Ms. Danforth, her title is vice-president?
A. Yes.
Q. She is your boss?

A. Vice-president of health care ratings. Senior vice-president.
Q. And she is your boss?
A. Yes.
Q. Now, you say at the end of that, so let me know LMK if you have any ideas, correct?
A. Correct.
Q. Now, your colleague then responded to you with ideas. If we could move up. Do you see that?
A. Yes.
Q. And she has five bullet points. Do you see that?
A. Yes.
Q. They are ideas, correct?
A. Yes.
Q. And two of them say -- they include the phrase, "a score was calculated with external data sources using imputation model," and two say, "a score was calculated using external data sources."
Do you see that?
A. Yes.
Q. You then reply -- go up one more, and you say, "Thanks for doing this, but we can't say external data sources." Do you see that?
A. Yes.
Q. And you explain why. "We can't say external data sources

because we are arbitrarily assigning them the points associated with the bottom scoring category, limited achievement."

Do you see this language?

A. Yes.

Q. And then you continue and say Leah -- that is Ms. Binder, correct?

A. Yes.

Q. "Leah wanted us to make it sound like the expert panel approved it and the assigning of these points was legitimate."

Do you see that language?

A. Yes.

Q. You conclude and you say at the end, "I think leaning to the methodology would be neat, but I don't think Leah or Missy care to do so. We could ask." Correct?

A. Yes, I can read.

Q. Fantastic.

I want to transition to another document.

A. Sorry, why did you show those to me if I can't respond to it?

Q. You have plenty of opportunity on redirect. I have certain documents I want to go through with you.

A. Okay.

Q. If we go to JX 26, also in evidence.

We heard a lot about Leapfrog changing its methodology in fall of 2024?

A. Yes.
Q. You know what I refer to?
A. Yes.
Q. We talked about it in your deposition?
A. Yes.
Q. Now, before Leapfrog implemented that change it issued a request for public comment, right?
A. Yes.
Q. This document shows one of those comments; is that correct?
A. Yes.
Q. And it was sent to you, your name is at the top. It says, to Ms. Campione. Do you see that?
A. Yes.
Q. I would like to go down to the comment and it says, Wenthold, Becky. Do you recall which health system Ms. Wenthold is with?
A. No, I do not.
Q. We'll come back to it.
Ms. Wenthold says, "I am disappointed with the 2024 proposed changes. These changes will penalize hospitals that do not submit a Leapfrog survey. The public will not understand or dig into the methodology of these grades and hospitals will be falsely represented with a lower grade because they choose not to complete the survey. The survey is extremely time intensive and in a time when hospitals are

barely breaking even financially they do not have the resources to commit to this survey."

Do you see that?

A. Yes.

Q. If you go to the last sentence, it says, "A hospital with excellent outcomes will no longer be able to receive an A grade because limited achievement is assigned to process measures that actually --

Do you see that?

A. Yes.

Q. Now, you read this comment; is that correct?

A. Yes.

Q. You prepared responses?

A. Yes.

Q. You were aware that at least some hospitals were expressing concerns that the changes were penalizing hospitals that don't complete the survey?

A. Yes, but a lot of the statements in here I don't agree with.

Q. All right. You were also aware there were concerns that the public would not understand or dig into the methodology, correct?

A. I'm sorry, what is the question?

Q. You were aware from this comment that there were concerns expressed by hospitals, or at least one hospital, that the

public would not understand or dig into the methodology; is that right?
A. This is Becky Wenthold's opinion. I don't know what Becky Wenthold's credentials are for evaluating that. I read this email and responded to it, yes.
Q. You also understood that hospitals had expressed concerns that they didn't have the resources to commit to the survey, correct?
A. That is a common complaint we get. Any time we make a methodology change that might result in more work for the hospital that is a common complaint.
Q. You heard Dr. Romano testify that Leapfrog, at least he thinks, factors the burden into changing the methodology, right?
A. Yes.
Q. And you agree that the hospitals that do complete the survey put a tremendous amount of resources into it, right?
A. I think so, yes.
Q. That is what you told the Philadelphia Inquirer in fall 2024, right?
A. I think time is valuable, my time is valuable, your time is valuable, the Judge's time is valuable, so, tremendous.
Q. Let's look at JX 32.1 at page three. This is the comment response we were talking about. You drafted this document, right?

A. Yes.
Q. And it was to respond to some of the comments Leapfrog was getting, correct?
A. Yes.
Q. You see there you refer to Ms. Wenthold. Do you recall now she is from Humana Health?
A. Yes.
Q. It notes, you list under Mount Sinai Health System Alana Noble, and the text says, "The survey is very resource intensive outside resisting regulatory quality operations and quality improvement efforts. Hospitals who do not have the resources to do the survey annually should not be so adversely punished, especially in the post COVID era where resources are increasingly hard to come by and retain."
Do you see that?
A. Yes.
Q. You are aware at least two hospitals responded to Leapfrog's change by referencing the burden, right?
A. Yes.
Q. Let's see how you responded. On page seven you wrote that -- at the top from you say, two commentators expressing concerns about step two imputation. Do you see that now?
A. Yes.
Q. "Misrepresenting the current procedures or infrastructure of the hospitals to the public?"

A. Yes.
Q. You wrote these steps, right?
A. Yes.
Q. And to be clear, when they talk about step two imputation, in the change that is the assignments of the limited achievement score automatically, right?
A. Yes.
Q. And what you say, I draw your attention to this language, "We recognize that hospitals eligible for step two imputation may score higher if they complete a Leapfrog hospital survey. However, we cannot ensure that this is the case. We do not have the data and our analyses have shown that performance among hospitals that intermittently complete the annual survey is lower than those hospitals that completed the most recent survey."
Do you see that?
A. Yes.
Q. Do you recall I asked you about that in your deposition?
A. Yes.
Q. I asked you whether you could verify the accuracy of that sentence. Do you recall that question?
A. Yes, but I will remind you that I am a middleman here. I draft things after hearing input from other people, so it is not necessarily that I would have seen that data.
Q. Absolutely, and you told me, I can't testify to that. I

haven't seen the analysis that backs up that sentence, right?
A. Yes, my bosses shared that information with me.
Q. And you said you trust Missy and Matt, right?
A. Yes.
Q. Are you aware that we asked Ms. Danforth and Dr. Austin about this type of analysis, right?
Have you reviewed the deposition transcripts?
A. I have not reviewed theirs.
Q. You are not aware of whether they have seen any of this analysis either, right?
A. They told me that they had.
Q. They told you during this litigation?
A. They had previously, because I wrote this, had been told that they did study this, to this effect.
Q. You would be surprised if they testified that they didn't have this analysis to support this sentence?
A. I was under the impression that they did.
Q. You heard Dr. Romano say Leapfrog takes into account -- we talked about this a second ago -- the burdens of the survey?
A. Yes.
Q. Go to the language on page seven. "Four commentators opposed penalizing hospitals that choose not to devote resources to completing a voluntary survey each year and be allowed to opt out of the hospital safety grade."
Do you see that?

A. Yes.
Q. That refers to the burden concerns we have seen in the comments?
A. Yes.
Q. What you see is, the last sentence of the paragraph -- I want to focus on that. You write, "The choice to not participate should not excuse a hospital from being graded, nor should they be given a score that unfairly awards them points."
Do you see that?
A. Yes.
Q. This is an example of what Dr. Romano said, Leapfrog taking into account the burdens, right?
A. I think this is an additional statement to that.
Q. Okay.
A. I don't think that is a direct -- this is an additional statement.
Q. Okay. All right.
Let's proceed with PX 23.1 at three, and I want to focus on the language "what measures are most important." Do you recognize this page from Leapfrog's website?
A. Yes.
Q. It says: What measures are most important. Do you see that?
A. Yes.
Q. The first one says hand washing. Do you see that?

A. Yes.
Q. It says: Does your hospital have a hand washing policy to ensure all staff members are washing their hands before and after patient contact?
A. Yes.
Q. This is the first measure on Leapfrog's website under what measures are most important; is that right?
A. This is the FAQ page?
Q. Go one page back so she can see.
A. It is one of many links.
Q. Yes.
A. It is giving consumers an idea of where to look, and it begins with, every person will have different ideas about what is most important to them.
Q. It says: What measures are most important?
A. It says, we suggest checking out these things. It is just kind of a guide so somebody doesn't spend all day looking for this stuff. I didn't write this.
Q. Leapfrog did?
A. Yes.
Q. It is Leapfrog's website, right?
A. Yes.
Q. So you are aware that Leapfrog tells patients that hospitals, like the Plaintiffs, the community hospitals, they get the worst score on these measures, right?

A. Sorry, what is your question?
Q. Are you aware that for nonparticipating hospitals that Leapfrog assigns its step two scores, it tells consumers that those hospitals get the lowest performance on hand washing, right?
A. That is not how the hand washing measure works. It says, does your hospital have a hand washing policy to ensure all staff members are washing their hands. It is asking about a policy. If you are assigned to the bottom category likely you are not measuring, you don't have a policy in place.
Yes, part of creating the imputation model was making the assumption they weren't measuring. Whether they had a policy or not, they may have been lagging.
Q. Well, you just said it signifies whether a hospital has a policy or not?
A. Yes.
Q. My client, Ms. Havericak, the CEO of Delray, she has the lowest score on hand washing for Delray. You understand that, right?
A. Yes.
Q. Do you have any idea whether Delray has a hand washing policy?
A. I think it was clear that they weren't keeping up with it.
Q. Why do you possibly think that was clear?
A. There was an exhibit that was produced, but everyone can

decide for themselves.
Q. Does Leapfrog have any data about hand washing from Delray Medical Center, I am not talking about this case, that Leapfrog scored?
A. No. That is why we have an imputation policy in place.
Q. You have no idea whether the Delray hospital workers follow the policy, right?
A. No, because that is not how imputation works. You use imputation when you don't have data, when data is missing, the definition of imputation.
Q. Do you recall when I asked you whether the lowest achievement scores are accurate depictions of performance the measures, do you recall what you said?
A. No, I don't.
Q. You said if you don't --
MS. BLAIR: Objection, improper impeachment.
THE COURT: Overruled.
BY MR. CRAIN:
Q. If you don't have data, you don't have data. Do you remember that?
A. Yes.
Q. Then I asked you, but you don't know either way, right? You agreed, correct?
A. That is correct. With imputation you don't know either way.

Q. You just told -- Ms. Campione, you just testified the lowest score communicates to consumers that Delray doesn't have a hand washing policy, correct?

MS. BLAIR: Objection, mischaracterizes her testimony.

MR. CRAIN: She can answer yes or no.

THE COURT: Do me a favor, do not respond back and forth. It is overruled.

THE WITNESS: Can you ask the question again?

BY MR. CRAIN:

Q. You just testified that the lowest score communicates to consumers that Delray doesn't have a hand washing policy, correct?

A. No, I didn't.

Q. You did not testify to that three minutes ago, right?

A. I said did not measure or does not have the policy of measuring. Did not measure is a different thing. If they don't measure, then they don't know and we don't know.

Our expert panel is saying if we don't know, then what are we going to do with that? We have to use reasoning, and in imputation you can use reasoning. Imputation is the assignment of a point value based on an inference, and that inference can be based either on evidence or reasoning.

Evidence would be perhaps past performance, so like last year, what did they do on the survey; or reasoning, and the reasoning being that if you are not reporting, you are likely

not measuring, and you may not be keeping up with that measuring.

Q. Let's break that down. You have no evidence about Delray's hand washing performance, correct?

A. Correct.

Q. In terms of reasoning, your only assumption is that they are not participating because they have something to hide, right?

A. That is the assumption.

Q. Even though Dr. Romano, who we saw two hours ago, his hypothesis at least at the time was that hospitals were not participating because of a burden, right?

A. I think --

Q. Was that his hypothesis at the time?

A. That was the hypothesis that he presented in that email.

Q. I want to talk about expert panels and meetings and talk about the development of the change.

I would like to put up PX 238.1.

This is another document we talked about together five months ago. This is a Slapchat between you and Page Lisco. Do you see that?

A. Yes.

Q. It is dated October 4, 2023. Do you see that as well?

A. Yes.

Q. And at this time, in late 2023, HCA, a large hospital

system, decided not to participate in the Leapfrog survey, correct?

A. Yes.

Q. And you testified in your deposition that Leapfrog CEO Ms. Binder was upset about that, right?

A. Yes.

Q. And let's see what you said about HCA.

If we go down to the next page, and if we look at the top there, 11:31 a.m., October 4, 2023, you say, "We were talking about changing scoring methodology to penalize HCA." Do you see that?

A. Yes.

Q. Ms. Lipsco responds --

MS. BLAIR: Objection, your Honor, hearsay to the extent he is trying to bring it in for the truth of the matter asserted.

THE COURT: Overruled.

BY MR. CRAIN:

Q. She said, "What in the world? I hate that we just don't do our thing like we manipulate everything," correct?

A. Correct what?

Q. That it is in the document, right?

A. Yes, she said that. You haven't provided any context to this conversation.

Q. I read it right, correct?

A. Yes.
Q. You respond further down, "Banana land?"
A. Yes. That is a joke.
Q. And "Leah keeps grudges," right?
A. Yes.
Q. I asked you about banana land in your deposition, right?
A. I believe we went on right after that laughing.
Q. There was a lot of laughing in that deposition.
I want to direct your attention now to PX 241, that is 605.
This is an email a number of weeks later from Ms. Danforth. Do you see that?
A. Yes.
Q. And Ms. Danforth writes to you along with one of your colleagues and says, "I would like to get a sense of the number of licenses that don't submit surveys, each facility represent the past two years last four rounds. Can the two of you work together on this?"
Do you see that?
A. Yes.
Q. She says at the end, "I would like to understand how financial risk if we make changes for display grades for hospitals that don't submit?"
A. Yes.
Q. You gathered data in response to this?
A. Yes, I probably did what she asked.

Q. And you prepared a slide show?
A. The slide show is not from this request.
Q. You testified in your deposition that it was from this request?
A. I don't think that I did.
Q. Let's look at it, PX 247.1, and you wrote this -- you testified in your deposition -- Your Honor, I am happy to refresh the witness.
A. This PowerPoint is from January, that conversation was what, November?
MR. CRAIN: Your Honor, if I may refresh the witness?
THE COURT: Sure.
BY MR. CRAIN:
Q. "Question: Did you create this deck in response to Ms. Danforth's email asking you for the licensing data and accolades that we looked at a few moments ago?
"Answer: Yes, of course."
A. I definitely misspoke then because I -- upon going through this PowerPoint, it has nothing to do with whatever the request was there. However, I would have responded to that email probably, it actually would be like a percentage, a single data point. It wouldn't have been a PowerPoint like this.
I probably didn't realize the timing of it. I trusted that if you were showing me one after another that it was related, but I really don't think it was.

Q. At other times in your deposition you said, I don't know, I think so. This time you said, yes, of course, right?
A. Yes, I guess so. But --
Q. I want to show you from this document, page 570.
This is a depiction of Leapfrog's revenue going from 2018 through the fall of 2024?
A. Yes. Well, it's --
Q. Spring of 2024?
A. Yes. That drop off there is not accurate.
Q. It reflects only half of the year, correct?
A. Yes, and I think that something is off in this display. I just want to point this out.
Q. Something is off in the display?
A. We wouldn't have how the PowerPoint looked.
Q. You are saying now something is wrong with the document?
A. I mean, I wouldn't very have one that goes all the way down, because that is not the what was happening.
Q. Let's go to 573 as well, and I want to draw your attention -- two more, 573 -- sorry, 573, there we go.
I want to draw your attention to survey participants are ten times more likely to license. Do you see that?
A. Yes.
Q. In your deposition you testified that this was written in response to Ms. Danforth's email, right?
A. I would like to amend my deposition obviously because I was

wrong.
Q. You got it wrong then?
A. She was making a lot of requests during this time because she was taking over for the first time this whole accolades program thing. The person who was running the accolades program used to be independent, on his own thing, and she was taking him under her wing around that time. She was doing sort of these exploratory things, and I am pretty sure -- I know she made a lot of requests during this time.
When looking at the PowerPoint, the point is, it is very exploratory and it was just to give a profile of the hospitals who have already received an A, and then went on to license, what did they look like, and most of them are survey participants. It is no surprise they are engaged in Leapfrog.
Q. I don't men to cut you off, but we don't have a lot of time. You will have plenty of time on direct. I want to focus you on my questions. You will have plenty of time with your counsel.
If you pull this down, I want to talk about the April 12, 2024 expert panel meeting. Do you know what I am talking about?
A. Yes.
Q. In that expert panel meeting Leapfrog presented a proposal to change the methodology, right?
A. Yes.

Q. The proposal you presented was not a proposal that Leapfrog ultimately adopted, it was based on slides, right?
A. That is correct.
Q. We talked about this in your deposition?
A. Yes.
Q. The meeting went from 4:00 o'clock to 5:00 o'clock?
A. Yes.
Q. I want to direct your attention to JX 11.1. It is in evidence, and this is another Slack thread this time between you and Ms. Danforth. Do you see that?
A. Yes.
Q. If we can go down to 5:03 p.m., and you say, "The step two means are so high, what if we use step one limited to only two round then assign them to the bottom performance category."
Do you see that?
A. Yes.
Q. At the time step one referred to the historical imputation going back four rounds, right?
A. Yes. What we presented to the expert panel was removing step one imputation and just relying on step two. In that expert panel what they were saying is, is that enough.
Q. I am not asking about what happened in the expert panel, I am asking about what you wrote.
A. I am explaining it.
Q. You presented the expert panel the option of retiring step

one and using step two, an average a approach based on other hospitals?

A. Yes.

Q. After the meeting, you come up with this idea, right? You say, "What if we use step one limited to only, say, two rounds then assign them to the bottom performance category."

Do you see that?

A. I see that. To be very clear, the expert panel had no objection to completely retiring step one imputation at all. Dr. Romano is the only one who objected to it. What I am doing is my job, which is to be an analyst, hear both sides and present a compromise.

Q. You are proposing a different solution?

A. It is not a different solution. We listened to them, they had no objections to it, and I didn't think they would object to this one based on what I heard from Dr. Romano and the others.

Q. They had no objection to you getting rid of, when you say step one, the historical approach, right?

A. Right, but Dr. Romano did.

Q. Dr. Romano did because you met with him earlier that day?

A. Yes.

Q. And Ms. Danforth responds to you and she says, "That would be drastic, but let's talk about it. LOL?"

A. Yes.

Q. LOL is laugh out loud?
A. Yes.
Q. And you give it a thumbs up, correct?
A. Yes.
Q. You agree with her, right?
A. That is the least amount of points.
Q. And you say it would be addressed, right?
A. Yes.
Q. You give it a thumbs up, you agree with her, and then you proceed to prepare what becomes the 2024 methodology change, correct?
A. I present here what ends up being the methodology change.
Q. Now, I want to shift gears and move forward ahead. Let's go to PX -- JX 22.1 in evidence and you heard Dr. Romano testify about this document. You recall this document, right?
A. Yes.
Q. And we looked at this document in your deposition?
A. Yes.
Q. Just to remind you what it says, Dr. Romano says things like, "I like the simpler and more direct approach here." Do you see that language?
A. Yes.
Q. That is referring to what became the fall 2024 methodology, correct?
A. Yes.

Q. You, Ms. Danforth, Mr. Austin and others were asking for feedback on that, correct?
A. Yes.
Q. It says, "If the goal is to penalize nonparticipants you might as well do so in a clear and unmistakable manner while allowing for hospitals to manage their burden."
Do you see that?
A. I see that.
Q. And he says that his hypothesis is that most hospitals stop reporting to Leapfrog because it is too burdensome and because they only find market value in an A grade that is impossible to obtain and maintain?
A. My hypothesis was.
Q. I messed it up.
A. You might say.
Q. The gist is there, right?
Now, he testified that no one at Leapfrog told him that the goal was punitive, right?
A. Yes.
Q. No one had to tell him, right?
A. I am sorry, I don't understand.
Q. Let's go to your response. If we go up.
You responded to his email later that day, and if you go -- Justin, before you go there, go back down one.
The original note to Dr. Romano was to you and Ms. Danforth

and Dr. Austin. Do you see that?
A. Yes.
Q. On your response, if you go back up, you drop Ms. Danforth, your boss, you drop Dr. Austin, and you have a one on one exchange with Dr. Romano?
A. I had a quick reply and sent an email. I should have articulated which points I would hit, but I didn't picture us being here today.
Q. And you said, "Patrick, thanks for your feedback. I completely agree," correct?
A. That is what that says.
MR. CRAIN: I pass the witness.
THE COURT: Cross examination. I guess cross and direct given the agreement that you have.

CROSS-EXAMINATION

BY MS. BLAIR:
Q. Ms. Campione, can you please tell the judge what your background is?
A. Sure. I went to the University of Florida, my undergraduate degree was in biology and medical geography. I worked in a spatial lab. Shortly after I moved to D.C. to receive my Master's in public health. While there I worked at the NIH in their HIV department. I then moved to Boston to work at the Massachusetts Department of Public Health as an epidemiologist before starting at Leapfrog in 2022.

Q. Is it fair to say that your entire adult career has been as a data analyst with respect to infectious disease?
A. Yes.
Q. And you serve as the director of ratings. Is that your title?
A. No.
Q. What is your title?
A. Program manager.
Q. Program manager. And there has been a lot of focus on the April 12, 2024 expert panel meeting where the methodology change was discussed, and Mr. Crain just talked to you about that.
I want to talk about your understanding of the history of imputation modeling at Leapfrog prior to the fall -- prior to April 12, 2024, okay?
Can you basically describe what --
MR. CRAIN: Objection, your Honor, this calls for speculation and hearsay. Anything she would know would be from her colleagues, which is not a party opponent, it is hearsay.
MS. BLAIR: She can testify about what she knew about an imputation methodology in 2022 while she worked there.
THE COURT: That is what you are asking her?
MS. BLAIR: Yes.
THE COURT: Go ahead.

BY MS. BLAIR:

Q. Can you explain what the imputation methodology for non-reporting hospitals was for these four measures?

A. Step one and step two. Step one used the past four rounds which equated to the past four cycles, not the current cycle because we weren't using the correct survey. And then step two we were calculating essentially the mean of the cohort, and assigned hospital space on their characteristics.

Q. In 2023, was there a change to the imputation methodology with respect to the ITS measure?

A. In 2023 there was a change. We moved -- with the phasing out of the old data we, in response to this change where we assigned hospitals to the category of limited achievement if they had an ICU, and that was reported in their CMS cost report.

Q. For clarity for the Court, that would be a nonparticipating hospital who had an ICU who wasn't reporting would automatically be assigned limited achievement?

A. Yes, and that would be about 500 hospitals or so.

Q. And were you with Leapfrog when that change was discussed with the expert panel?

A. Yes.

Q. Having participated in that expert panel meeting in 2023, did any of the expert panelists, including Dr. Romano, express any concern about assigning limited achievement for the ITS

measure in 2023?
A. No. Not at all.
Q. Was that change to the ITS measure put out for comment?
A. Yes.
Q. Were there any comments that occurred in 2023?
A. No. I don't think we heard anything.
Q. That measure change was in fact put into place in 2023, correct?
A. Yes, it was.
Q. Then we get to the spring of 2024, and there is a discussion -- well, do you have any discussions with your boss, Missy Danforth, about recommending a change to the imputation modeling around the spring of 2024?
A. Yes.
Q. Can you tell the Court what that was?
A. Going into that panel we started discussing this phasing out step one, the concern being that basically step one, hospitals were relying on this -- I should say it was overstating performance, that was our concern. We heard from several concerned individuals and hospitals --
MR. CRAIN: Objection, Your Honor, hearsay.
THE COURT: Overruled.
THE WITNESS: -- that essentially it was overstating performance, and that hospital -- actual processes that were in place at the hospital, it was no longer a reflection of those

processes.

BY MS. BLAIR:

Q. As a data analyst at Leapfrog, do you look at the statistical means of all these categories on almost a daily basis?

A. Yes, I do.

Q. Is there anything you are noticing in spring 2024 with respect to step two imputation?

A. Yes. Ever since I joined that mean was rising, getting closer and closer to a hundred, that was the cause of concern.

Q. As a data analyst, did you bring that concern to Ms. Danforth?

A. Yes. They were aware.

Q. And when -- the slide deck that Mr. Crain showed you that was presented to the expert panel, where you were going to retire step one, not use any historical data, and step two would be the imputation of the cohort going forward?

A. Yes.

Q. When that was created did you personally have concerns about keeping step two going?

A. Yes, I didn't think that it was valid and did a good job of approximating what those hospital's actual performance was on these measures.

Q. Dr. Romano couldn't be there; is that correct?

A. Yes.

Q. Did you have a pre-meeting with Dr. Romano?
A. We did. He was unable to meet with us at 4:00 o'clock, so we met earlier.
Q. Who is we?
A. Missy Danforth and Dr. Austin.
Q. What do you recall about the conversation you had with Dr. Romano?
A. Basically, he was concerned about phasing out step one. He felt that step one was the best approximation of the hospital's performance, last year's data specific to the hospital, and he had spoken with the hospital that he is affiliated with, and they expressed concerns, or they were not a fan of how long it took them to do the survey.
Q. And in that conversation that you recall with Dr. Romano, had there been any decision yet about assigning limited achievement to BCMA, CPOE, and hand hygiene in the pre call?
A. In the pre call, no. We didn't get to that because it was very focused on step one.
Q. Mr. Crain talked to you about the April 12, 2024 expert panel meeting. Did you attend that meeting?
A. Yes.
Q. In what capacity do you attend an expert panel meeting?
A. I may present a section of the meeting, some of the slides since I am familiar with the data, but I pretty much listen in and try to distill what the overall takeaways are and

consensus.
Q. Did you present at the April 12, 2024 meeting?
A. Yes.
Q. Did you present on the imputation model?
A. No, I did not.
Q. Did you make any statements during the expert panel meeting on April 12, 2024 regarding the imputation model?
A. No.
Q. At any time during the April 12, 2024 meeting, did anyone from Leapfrog mention that the purpose of changing the imputation model from the fall of 2024 was to penalize hospitals?
A. No. In fact, I believe Missy chimed in and made it clear to the expert panel that was not our intent. We were more focused on this issue of overseeing a hospital's performance.
Around that time, Stuart's hospital system was in the spotlight and a lot of the hospitals were having the step one imputation coming in, and there was a lot in the media about how terrible those hospitals were doing.
Q. Can you expand on that, what was going on at Stuart hospitals?
A. We were imputing their scores from two years ago when they completed the survey. They had stopped for financial reasons and for restraints in their hospital, and from many reports the services they were providing had greatly deteriorated.

Q. What do you recall about the general tone of the April 12, 2024 meeting?
A. The general tone was positive in the direction of assigning -- not giving any points that were not earned, and assigning these hospitals to the bottom category.
Q. And you had a chance to watch that video in preparation for trial here today of the expert panelist discussing the imputation change?
A. Yes. Previously at my deposition I had never reviewed it, but I did in preparation for this.
Q. Having worked with the expert panel for many years, what was your impression of what they wanted to do with respect to step two?
A. My impression has not changed.
Q. What is that impression?
A. That impression is that they were positive toward going the direction with step two.
Q. Mr. Crain showed you a message between yourself and Missy Danforth marked as Joint Exhibit 11. Do you recall seeing that?
A. Yes.
Q. That was the same day as the expert panel meeting?
A. Yes.
Q. When you were messaging Ms. Danforth about your ideas, the potential change, what was the impetus for you suggesting that

we do a step one with only two rounds and a score of limited achievement for step two?
A. I heard what Dr. Romano said and I heard what the panel had said, and they expressed no concerns about phasing out one -- step one. And so what I did is a compromise, I am an analyst, and suggested to her what if we did this -- went this route with it where we still brought in last year's survey through step one imputation.
Q. If you could pull up Joint Exhibit 15, please.
Ms. Campione, I am going to show you what is marked Joint Exhibit 15, brought into evidence in this case already. This is the email from yourself to Missy Danforth and Dr. Austin and Leah Binder regarding the imputation changes. Do you see that?
A. Yes.
Q. If you can scroll up. You don't just implement this change, you actually are setting forth a multitude of different potential changes, correct?
A. That is correct. At the end of the panel meeting Dr. Austin ended the discussion by saying, look, Leapfrog will consider the guidance given here today and we will put this out for public comment if they choose to go the direction you are recommending.
What we are looking at here is going in that direction, which we know is going to be controversial, and to a lesser degree what we could do.

Q. In fact, you didn't make the ultimate decision of what the methodology would look like, correct?
A. No.
Q. In all the discussions you had around what the final methodology would look like, did anybody at Leapfrog ever talk to you about the need to make a change to increase revenue?
A. Absolutely not.
Q. In all the time you have been at Leapfrog, have you ever had any discussions that you should manipulate data to increase revenue for Leapfrog?
A. No. I would not be comfortable with that. Never.
Q. And if you could pull up Joint Exhibit 22, please.
Ms. Campione, Mr. Crain showed you Exhibit 22, this is the I completely agree email that you sent to Dr. Romano, correct?
A. Yes.
Q. Mr. Crain didn't allow you to elaborate on what you by I completely agree. I would like to give you that opportunity. Mr. Romano sends an email to you, Missy Danforth, and Dr. Austin expressing his concerns, and we heard him talk about how he used the word penalizing, and you say, I completely agree.
As a data analyst, could you explain what you meant when you said, I completely agree to this email?
A. Yes, absolutely. So the definition of imputation is assigning a point value based on an inference, and that could be based on evidence or reasoning.

The overall message here, first of all, is that he likes this direction we are going, so he is agreeing with the methodology we put forth.

Second, is this like kind of justification for the direction of reasoning with step two, because I agreed what we were doing before with step two, calculating these means, was not enough of an approximation of hospital performance, and I really like what he is getting at here about being straight forward and having reasoning behind this. Saying, well, we have to make this assumption that you are not measuring or not being transparent, and ultimately our goal is transparency.

So, while I do not agree with his two statements about penalizing, I don't think that is their motivation at all, I do like the direction he is going with this, and the thought process, that is why I sent a personal email to him. I don't get to choose the terminology.

Q. And then we talked about public comment. In fact Leapfrog sends out the methodology change to the public at large so they could comment. Do you recall that?

A. Yes.

Q. Can you tell the Court, how many comments in total did you get from the 3,000 hospitals that are going to be affected by the methodology change, how many comments did you get in total?

A. In total like 13 or 14.

Q. Okay. Do you remember approximately how many were in favor

of the change versus how many were against the change?
A. Four were positive, and one was asking that we at least denote it on our website, and then I think that leaves like eight that were negative.
Q. And having been at Leapfrog for multiple methodology changes, was that an overwhelming amount of public comment?
A. No, not at all. We just released something for the 2026 methodology and we received ten.
Q. And in fact, Leapfrog provides that public comment and the responses to the expert panel, correct?
A. Yes, we do.
Q. And this all happened in May and June 2024, correct, the public comment?
A. Yes.
Q. And the methodology change is not implemented until November 2024, correct?
A. Yes.
Q. At any time between June 2024 and the implementation of the methodology change in November 2024, did any expert panelist, Dr. Romano included, reach out to you and say we disagree with this methodology change?
A. No. Not at all.
Q. And I want to talk a little bit about you just mentioned the wording of the asterisk. If you could pull up JX 31, please.

Mr. Crain talked to you about this email you may recall with Paulina Lider?
A. Uh-hum.
Q. For context, who is Paulina Lider?
A. She is a former employee who was stepping in as a comps person after as had lost our last communication person.
Q. Is she a data analyst?
A. No.
Q. Does she know anything about methodology?
A. No.
Q. If we look at -- if we can scroll down all the way to the bottom. Thank you very much.
She is working on this asterisks from the com side?
A. Yes.
Q. And you are working on the asterisks from the data analyst rating side?
A. Yes.
Q. If you could scroll up. Keep going, sorry. Keep going. Right here.
Paulina gives you a bunch of different possibilities for what the asterisk on the website should say. In each one of them Paulina, an assistant in the com department, is telling you that maybe you should use words like calculated. Each one says calculated, calculated, calculated. Do you see that?
A. Yes.

Q. If you scroll up more. To her at some point you cannot use the word calculated, correct?
A. Yes.
Q. Why did you tell her she can't use the word calculated?
A. Because imputation is the assigning of points.
Q. Were you trying to be transparent in this?
A. Yes. I wanted it to be as accurate as possible while also being understandable to a lay person.
Q. And there is some references to Ms. Binder in the email chain. Do you recall having any discussions with Ms. Binder about the wording of this?
A. Yes. So that original footnote where we use the word imputed, and Missy signed off on it -- I love the word imputed because I am a math person, and I understand not everyone understands that, and this is Ms. Binder's job to look at this and say are people going to understand it, are we hitting these points. And I use this word sound like, and I don't mean it as the expert panel didn't sign off on it, or it is random. I don't believe that at all.
I was trying to communicate to Paulina that Leah wants to hit these points. If I want to write it myself, oh, well, that is the panel approved this, and the assignment wasn't random, but I am trying to get her to put it in the words that make it easy for a lay person.
Q. The last thing I want to ask you about is PX 241, the slide

show you did on the accolades revenue. Do you recall that?
A. Yes.
Q. While he is pulling that up, you testified about this, but I want to make sure that you got to answer these questions fully.
What do you recall about what was going on staffing wise at Leapfrog in and around this time when you were asked to provide this kind of analysis on the accolade?
A. This is the first time I ever looked at any sort of accolades, data revenue type thing, and Missy, my boss, had just taken us under her wing. I was trying to understand the data.
Q. Does Leapfrog make every effort to make sure revenue is not intertwined with the data analyst and ratings team?
A. Yes. We never really discussed revenue, especially not in the context of score methodology. When I was involved in the development of that methodology, we never once mentioned revenue.
MS. BLAIR: Nothing further.
THE COURT: Redirect.
MR. MARCUS: Recross, Your Honor. Your Honor, to the extent that he said it is redirect, it is recross. He said I am going to cross-examine this witness.
THE COURT: We appreciate your help. Let's proceed.
REDIRECT EXAMINATION

BY MR. CRAIN:
Q. Would you look at 31.1. Do you recall that email?
A. Yes.
Q. You mentioned your colleague, Ms. Lipsco, was working on the come side, correct.
MS. BLAIR: No. Objection, that was Ms. Lider.
MR. CRAIN: Ms. Lider, I am sorry.
BY MR. CRAIN:
Q. You mentioned that your colleague, Ms. Lider, was working on the com side, correct?
A. She was filling in at the time, might have been a period of a few weeks or month.
Q. And her job is to communicate to the public, right?
A. She was taking on this -- I wouldn't say she does that regularly, no.
Q. So she doesn't have a coms role?
A. I said she did for a week or so, maybe as much as a month.
Q. The assignment of limited achievement for nonparticipating hospitals is not random or arbitrary because the score was assigned; is that right?
MS. BLAIR: Outside the scope of my examination, Your Honor.
THE COURT: Overruled.
THE WITNESS: It's not --

BY MR. CRAIN:

Q. The assignment of limited achievement for nonparticipating hospitals, that is step two, correct?

A. Yes.

Q. You talked about that with your counsel.

Is it your testimony that the assignment of limited achievement for nonparticipating hospitals is not random or arbitrary because the score was assigned?

A. I want to be very clear, there are two definitions of arbitrary, one is mathematical, and one is probably the one you are referring to based on your narrative. If we are using your definition of arbitrary, then no.

Q. You testified at your deposition that it was mathematically arbitrary, right?

A. Yes.

MR. CRAIN: No further questions.

THE COURT: Do you have redirect?

MS. BLAIR: I don't, I am going to let Pauline go home.

THE COURT: All right. See you tomorrow morning at nine o'clock.

(Thereupon, the Court was recessed.)

* * *

**I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.**

Date: January 22, 2026

/s/ Pauline A. Stipes, Official Federal Reporter

Signature of Court Reporter

**MR. CRAIN: [26]** 3/14 3/17 5/9 5/25 25/4 26/4 26/13 36/5 67/18 72/16 244/14 244/17 246/10 246/22 247/2 247/6 247/19 247/22 248/17 262/4 266/10 273/11 274/16 276/20 288/6 289/15
**MR. MARCUS: [11]** 213/2 213/24 221/24 233/25 237/19 237/22 237/24 238/13 238/25 241/21 287/20
**MS. BLAIR: [113]** 5/12 15/10 26/2 26/16 27/12 28/3 29/8 36/11 67/16 70/3 71/10 72/17 84/4 84/25 85/9 86/15 87/16 88/1 88/17 89/4 90/1 92/14 93/14 94/11 112/18 115/25 116/24 117/7 117/11 117/15 126/18 126/24 127/3 127/13 132/14 133/7 142/9 143/9 144/4 147/22 149/14 149/19 150/23 151/23 154/11 156/23 157/6 159/2 159/4 160/2 161/8 161/17 161/25 163/5 165/6 165/16 166/21 167/6 167/25 169/5 173/3 173/18 174/8 174/16 189/18 189/22 189/24 190/1 190/3 190/8 190/12 192/18 203/13 207/25 209/8 210/5 210/8 213/4 213/22 213/25 214/2 221/22 222/1 233/22 235/10 236/6 237/15 237/17 237/23 237/25 238/4 238/6 238/20 241/22 241/24 242/2 242/5 242/10 242/23 243/5 243/23 244/3 245/24 246/15 261/15 262/3 264/13 274/19 274/22 287/18 288/5 288/20 289/17
**MS. MALONEY: [12]** 72/22 73/1 116/4 144/10 144/25 145/3 192/24 242/15 242/20 243/9 244/1 244/4
**MS. MALORY: [3]** 3/1 3/4 3/9
**MS. SCOTT: [35]** 85/3 92/11 92/20 93/20 94/10 94/20 98/4 112/20 116/5 117/22 119/12 119/15 126/21 126/25 127/5 132/19 133/12 142/11 144/6 144/8 144/23 148/1 148/6 148/15 161/7 162/4 165/15 165/18 173/21 174/4 189/7 190/13 191/11 192/16 192/20
**THE COURT: [146]** 2/8 3/8 3/13 3/16 3/18 5/21 15/12 25/5 26/18 27/14 28/8 29/9 36/6 36/9 67/17 70/7 71/12 72/18 72/25 73/7 84/6 85/2 85/7 85/22 86/18 87/18 88/3 88/19 89/8 90/2 92/16 94/4 94/14 94/18 98/5 112/21 117/4 117/9 117/13 117/17 117/24 119/14 119/17 126/20 126/23 127/4 127/10 132/25 133/13 142/10 143/12 144/5 144/7 144/9 144/21 144/24 147/25 148/5 148/11 149/15 149/21 150/24 151/24 154/12 157/13 159/3 159/5 160/3 161/11 161/24 162/2 162/6 163/6 165/7 165/19 166/22 167/7 167/17 168/2 173/4 173/19 173/22 174/5 174/9 174/14 189/20 189/23 189/25 190/2 190/7 190/9 191/14 192/17 192/19 192/21 192/23 193/11 203/14 208/2 209/9 210/7 210/11 213/3 214/1 214/3 221/25 233/24 235/12 237/16 237/18 238/2 238/5 238/24 241/23 241/25 242/4 242/7 242/11 242/19 242/21 243/4 243/6 243/22 243/25 244/6 244/13 244/18 246/20 246/25 247/5 247/13 247/20 248/16 261/16 262/5 264/16 266/11 273/12 274/21 274/23 276/21 287/19 287/23 288/22 289/16 289/19
**THE WITNESS: [24]** 70/8 71/13 72/21 73/12 87/19 88/4 143/13 149/22 150/25 151/25 154/13 156/24 160/4 165/8 166/23 167/10 169/7 173/5 192/22 193/13 209/10 262/7 276/22 288/23

**$**

**$1,000,000 [1]** 132/2
**$1,200 [1]** 62/6
**$120,000 [1]** 62/8
**$3 [1]** 143/15
**$3 million [1]** 143/15

**'**

**'19 [1]** 75/2
**'21 [1]** 218/9
**'22 [1]** 218/9
**'23 [1]** 104/4
**'24 [10]** 81/5 81/16 82/2 83/8 83/25 90/16 93/13 96/21 143/9 202/13
**'25 [8]** 83/17 83/18 90/16 93/12 93/13 101/20 128/21 143/9
**'cause [2]** 67/4 226/11

**.**

**.119 [1]** 126/3
**.19 [1]** 127/3
**.25 [3]** 126/4 127/3 127/8
**.5 [1]** 235/20

**/**

**/s [1]** 290/5

**0**

**0550 [1]** 2/5

**1**

**1,300 [2]** 201/7 205/13
**1,600 [1]** 61/14
**1.119 [1]** 127/8
**10 [1]** 128/6
**100 [4]** 61/19 62/8 62/9 79/18
**106 [1]** 194/5
**10:00 [1]** 200/1
**11 [3]** 34/13 34/24 280/19
**11 billion [1]** 34/20
**11,500 [2]** 194/17 195/4
**11.1 [1]** 269/8
**11/19/24 [1]** 118/4
**116 [1]** 132/1
**11:00 [1]** 36/8
**11:00 o'clock [1]** 200/2
**11:31 [1]** 264/9
**12 [12]** 93/6 140/20 142/6 174/10 268/19 274/10 274/15 278/19 279/2 279/7 279/9 280/1
**12/24 [1]** 83/13
**120 [1]** 162/25
**12:30 [1]** 94/15
**13 [4]** 16/23 34/8 238/8 283/24
**13th [2]** 238/15 242/11
**14 [4]** 3/6 129/5 142/6 283/24
**14 percent [2]** 93/6 140/20
**14,000 [1]** 194/11
**14th [1]** 215/18
**15 [26]** 17/22 18/24 19/2 24/22 27/8 29/15 29/17 64/13 64/17 64/18 64/19 65/6 65/8 65/19 65/20 65/24 146/13 157/4 162/25 166/15 166/17 224/12 243/10 245/9 281/9 281/11
**15 percent [1]** 90/16
**15.5 [1]** 235/20
**16 percent [2]** 218/10 218/20
**161 [1]** 2/4
**17 [2]** 221/5 245/8
**1700 [1]** 1/18
**18 percent [1]** 227/17
**19 [3]** 115/25 132/2 167/21
**1920 [1]** 194/5
**195 [1]** 76/1
**1994 [1]** 193/14
**1999 [1]** 131/25
**1:30 [1]** 94/17
**1st [1]** 95/12

**2**

**20 [3]** 1/9 183/4 242/18
**200 [7]** 61/21 61/24 215/22 216/10 216/13 216/15 217/2
**20036 [1]** 1/19
**2007 [1]** 4/15
**2011 [4]** 145/23 170/14 177/11 177/24
**2012 [1]** 170/14
**2013 [1]** 4/15
**2017 [2]** 183/5 184/2
**2018 [2]** 239/16 267/5
**2019 [5]** 74/24 75/4 75/6 75/7 185/8
**202-887-3729 [1]** 1/19
**2020 [9]** 75/12 75/15 186/20 193/23 196/19 198/4 201/17 202/11 202/13

**2**

**2021 [14]** 77/16 78/14 79/17 79/18 99/4 100/9 100/16 102/22 196/21 197/13 198/7 198/24 234/8 234/17
**2022 [5]** 126/10 126/11 245/1 273/25 274/21
**2023 [21]** 73/19 75/15 105/7 105/20 106/2 125/14 125/25 126/2 126/13 126/16 190/17 190/20 263/23 263/25 264/9 275/9 275/11 275/23 276/1 276/5 276/7
**2024 [84]** 29/21 52/25 53/1 78/19 78/21 96/18 96/25 98/10 98/14 98/17 98/20 98/22 99/10 99/19 100/4 100/8 100/19 101/9 101/13 101/18 101/22 101/25 102/5 102/7 102/24 103/14 103/24 104/2 105/2 108/5 108/6 110/4 113/20 115/6 115/25 118/19 125/7 146/6 146/13 157/4 157/6 160/25 167/21 176/23 179/8 187/10 190/23 199/4 199/21 204/13 205/9 213/9 216/25 217/7 218/8 219/16 220/17 221/5 223/19 232/4 234/24 235/15 251/25 252/19 254/20 267/6 267/8 268/20 271/10 274/10 274/15 276/10 276/13 277/7 278/19 279/2 279/7 279/9 279/11 280/2 284/12 284/16 284/18 284/19
**2024 methodology [1]** 271/23
**2025 [42]** 8/20 27/1 40/1 93/20 93/22 95/4 95/11 95/25 98/13 108/11 119/23 119/24 120/5 120/19 130/7 131/21 132/14 133/21 133/23 133/24 140/7 140/7 167/3 177/25 202/4 202/7 205/10 206/10 207/5 215/11 215/18 216/24 224/13 224/19 224/21 227/8 227/12 233/13 238/10 239/4 239/19 246/3
**2026 [4]** 1/9 167/3 284/7 290/4
**203 [2]** 170/8 177/15
**207 [1]** 127/23
**21 [1]** 154/24
**21st [1]** 238/15
**22 [5]** 119/23 133/21 282/12 282/13 290/4
**22.1 [1]** 271/14
**22.3 [4]** 146/9 147/5 149/6 156/14
**23 [4]** 17/7 77/10 95/4 172/7
**23.1 [1]** 258/18
**238.1 [1]** 263/18
**24 [5]** 83/13 118/4 206/25 238/10 239/4
**24 percent [1]** 172/7
**24/7 [1]** 75/20
**241 [2]** 265/9 286/25
**247.1 [1]** 266/6
**25 [1]** 134/3
**25-CV-80526-MIDDLEBROOKS [1]** 1/3
**250 [1]** 1/22
**26 [2]** 168/6 251/23
**27 [2]** 36/23 37/1
**28 [3]** 27/1 118/19 132/1
**28,000 [1]** 4/23
**28-page [1]** 24/22
**2800 [1]** 246/2
**293 [2]** 161/8 161/12
**293.1 [2]** 157/3 162/4
**29th [1]** 249/2
**2nd [1]** 210/21

**3**

**3,000 [2]** 46/5 283/22
**3,300 [7]** 57/16 57/25 59/2 59/23 60/1 60/12 60/15
**30 [5]** 27/3 93/22 141/6 218/22 242/23
**305-400-4260 [1]** 1/23
**30th [3]** 140/10 239/19 239/22
**31 [2]** 8/12 284/24
**31.1 [2]** 248/20 288/2
**312-704-0550 [1]** 2/5
**31st [6]** 202/6 203/21 205/1 227/11 227/12 237/12
**32 [3]** 17/13 17/14 63/8
**32.1 [1]** 254/23
**33131 [1]** 1/23
**333 [1]** 194/15
**34 [2]** 145/15 145/16
**3434 [1]** 2/8
**35 percent [1]** 236/4
**353 [1]** 121/5
**360 [1]** 235/21
**363 [1]** 115/22
**365 [1]** 75/20
**366.1 [1]** 165/16
**37.5 [1]** 78/23
**37.6 [1]** 80/19
**3729 [1]** 1/19
**38 [1]** 233/6
**386 [1]** 167/17
**386.1 [1]** 167/18

**4**

**4.2 [1]** 207/3
**4.2 percent [1]** 206/19
**40 [1]** 74/7
**40,000ish [1]** 77/5
**400 [1]** 32/2
**403 [1]** 132/23
**406 [2]** 184/25 185/12
**412 [2]** 245/22 247/20
**415 [1]** 95/2
**42 [1]** 3/7
**4260 [1]** 1/23
**44.1 [1]** 183/4
**4500 [1]** 2/4
**454 [2]** 92/17 92/19
**464 [3]** 92/4 92/12 140/12
**471 [5]** 25/8 26/14 26/19 50/17 60/4
**48 [1]** 206/25
**480 [3]** 25/8 26/15 26/19
**49 percent [1]** 121/21
**4:00 [1]** 174/11
**4:00 o'clock [2]** 269/6 278/2

**5**

**5,000 [1]** 206/12
**50 percent [1]** 218/19
**500 [1]** 275/19
**501 [1]** 161/15
**509 [2]** 125/22 127/13
**548 [5]** 210/5 210/12 210/13 230/18 230/19
**55,000 [1]** 194/18
**550 [3]** 90/11 121/14 205/4
**552 [7]** 84/25 85/24 85/25 133/10 133/17 135/14 137/5
**553 [3]** 93/14 94/7 94/8
**554 [3]** 207/25 208/3 227/17
**561 [2]** 237/20 239/1
**561-803-3434 [1]** 2/8
**565 [4]** 118/17 220/21 221/23 222/1
**570 [1]** 267/4
**573 [3]** 267/18 267/19 267/19
**59 [1]** 38/14
**5:00 [1]** 269/6
**5:00 o'clock [1]** 200/1
**5:03 p.m [1]** 269/12

**6**

**60 [6]** 46/14 46/21 53/14 63/3 205/2 235/20
**60,000 [1]** 77/5
**600 [1]** 206/19
**605 [1]** 265/9
**60601 [1]** 2/5
**618 [1]** 214/10
**62 [1]** 194/22
**623 [3]** 117/6 117/10 118/2
**639 [4]** 213/17 213/23 214/3 214/4
**64.8 percent [1]** 118/9
**656 [2]** 118/18 119/18
**671 [2]** 119/12 119/18
**690 [1]** 120/9
**6:00 p.m [1]** 144/13
**6th [1]** 93/17

**7**

**7,500 [1]** 194/18

**8**

**8 million [1]** 201/12
**8 percent [1]** 24/15
**8/22/25 [1]** 134/3
**80 [1]** 4/20
**813 [1]** 107/22
**823 [1]** 215/14
**865 [1]** 249/11
**868 [1]** 248/24

**9**

**9,000 [1]** 77/6
**90 [3]** 175/16 175/20 205/2
**913 [2]** 109/2 112/22
**917 [1]** 131/1
**918 [1]** 192/3

A

**a.m [1]** 264/9
**Aaron [3]** 215/17 217/1 236/14
**ability [3]** 50/14 110/5 118/22
**able [12]** 28/21 28/24 29/5 71/24 73/6 77/13 77/14 133/15 138/13 167/10 208/18 253/6
**about [383]**
**about an [1]** 179/20
**above [4]** 96/2 126/4 158/21 290/2
**absence [1]** 173/16
**absolute [2]** 132/10 236/5
**absolutely [18]** 82/3 82/12 83/21 83/23 88/10 112/15 115/7 169/1 180/21 195/25 196/10 198/3 198/8 199/22 199/25 256/25 282/7 282/23
**absorb [1]** 11/10
**academic [16]** 4/20 14/8 14/18 21/22 31/3 31/20 43/5 43/12 43/19 43/24 51/7 52/13 52/13 68/13 90/20 166/6
**acceptable [1]** 48/2
**access [13]** 7/5 23/22 23/23 24/1 25/2 30/5 31/16 61/10 185/10 186/21 195/23 196/1 245/17
**accessible [4]** 30/10 30/18 111/3 111/6
**accidental [5]** 56/25 57/10 57/11 58/1 58/3
**accidents [1]** 110/6
**accolade [1]** 287/8
**accolades [5]** 266/16 268/4 268/5 287/1 287/10
**accommodate [2]** 121/5 121/7
**according [2]** 171/24 190/21
**accordingly [1]** 33/5
**account [5]** 26/9 157/17 157/21 257/18 258/12
**accountant [1]** 193/19
**accounting [2]** 193/18 193/20
**accredit [1]** 195/23
**accreditation [13]** 76/9 76/18 76/19 76/21 78/5 78/7 78/10 105/4 107/18 110/22 195/13 195/17 202/16
**accreditations [4]** 76/13 76/16 104/14 197/5
**accredited [11]** 76/10 76/17 107/1 107/2 107/12 107/13 142/21 195/6 195/7 195/10 195/11
**accredited by [1]** 142/21
**accrediting [1]** 195/9
**accuracy [4]** 154/10 154/18 154/19 256/20
**accurate [17]** 36/18 58/8 64/5 81/21 96/17 122/23 129/20 129/23 130/15 141/15 141/23 151/13 152/13 166/17 261/12 267/9 286/7
**accurately [6]** 79/14 80/5 80/16 85/23 88/11 88/19
**achieve [2]** 126/2 152/14
**achieved [1]** 74/9
**achievement [28]** 21/10 21/11 29/23 30/2 35/8 64/9 71/1 125/12 147/22 148/20 148/25 149/3 160/21 190/22 191/1 246/19 251/2 253/7 256/6 261/12 275/13 275/18 275/25 278/16 281/2 288/18 289/2 289/7
**acknowledge [1]** 43/9
**across [6]** 43/22 46/5 112/8 114/17 144/18 246/2
**act [2]** 82/15 202/22
**action [2]** 23/16 180/7
**actions [1]** 49/1
**active [1]** 178/5
**actual [32]** 23/25 48/18 49/1 49/3 49/5 59/17 59/21 64/3 66/17 68/8 100/9 101/6 134/1 185/19 185/24 197/23 218/7 219/25 220/1 220/15 220/16 225/23 234/5 234/8 234/20 235/10 236/19 237/11 238/20 239/18 276/24 277/22
**actually [31]** 35/19 39/8 39/13 41/20 45/21 60/25 62/19 65/10 66/23 74/15 77/10 84/2 89/18 93/12 93/21 123/17 135/24 155/19 189/14 193/19 194/4 195/21 206/11 230/4 235/6 237/1 237/14 243/18 253/8 266/21 281/16
**acute [1]** 121/8
**add [2]** 9/14 164/1
**added [2]** 9/9 106/3
**adding [4]** 55/8 214/8 214/19 214/21
**addition [4]** 23/2 34/14 34/18 85/17
**additional [9]** 16/14 20/13 20/15 28/2 55/8 214/19 214/21 258/13 258/15
**address [9]** 11/21 47/5 48/6 67/25 88/8 121/10 181/8 181/10 181/15
**addressed [4]** 49/25 92/16 95/4 271/7
**adds [2]** 164/13 164/25
**administers [1]** 108/12
**administration [6]** 74/11 74/14 80/7 178/19 193/7 193/8
**administrator [2]** 74/20 74/21
**administrators [1]** 177/7
**admissible [2]** 133/5 247/12
**admission [6]** 90/22 114/15 126/20 205/6 205/23 206/24
**admissions [12]** 115/10 120/10 120/11 120/20 122/25 123/4 123/5 194/17 206/18 230/10 230/14 230/16
**admit [10]** 26/14 85/23 92/12 117/20 133/7 160/25 161/8 239/1 247/14 247/16
**admits [1]** 117/2
**admitted [29]** 85/9 86/19 89/15 89/18 92/14 92/18 92/19 94/7 94/8 95/1 109/2 112/22 117/10 117/19 117/19 119/18 121/14 126/19 136/11 161/12 167/18 195/2 207/2 208/4 214/1 214/4 222/1 245/23 247/21
**adopted [1]** 269/2
**adult [3]** 85/12 135/16 274/1
**adverse [2]** 148/13 175/20
**adversely [2]** 148/11 255/12
**advice [14]** 84/3 86/7 86/10 87/3 87/13 89/19 91/11 97/23 133/19 136/11 137/24 138/10 138/13 145/18
**advise [3]** 85/16 86/9 132/11
**advised [3]** 87/11 120/10 120/12
**adviser [1]** 109/8
**advising [1]** 45/22
**advocate [1]** 36/17
**affect [7]** 15/4 15/19 25/1 31/17 35/25 52/7 64/24
**affected [2]** 40/5 283/22
**affectionately [1]** 77/12
**affects [1]** 30/4
**affiliate [1]** 148/2
**affiliated [2]** 148/10 278/11
**affiliates [1]** 165/3
**affiliations [1]** 203/6
**affirmative [1]** 3/7
**afield [1]** 88/19
**afraid [1]** 231/24
**after [44]** 15/4 17/8 18/2 31/8 31/16 36/8 51/11 53/1 68/18 68/19 68/22 74/17 78/8 78/14 78/14 83/13 93/13 99/13 100/4 104/14 119/24 133/22 157/15 174/14 176/22 177/3 185/5 187/5 196/25 202/4 204/13 208/16 213/8 216/25 232/4 244/13 247/25 256/23 259/4 265/7 266/24 270/4 273/21 285/6
**afternoon [3]** 145/9 174/19 193/4
**again [44]** 13/23 16/23 18/18 22/23 23/1 26/23 36/15 48/4 50/11 51/18 52/3 52/8 57/6 59/10 61/25 62/14 70/18 72/11 89/8 90/24 91/10 96/20 98/25 100/17 104/24 112/13 116/19 119/21 124/17 126/7 127/2 130/2 149/23 154/14 156/1 165/9 169/8 173/6 180/13 187/25 213/13 214/15 238/12 262/8
**against [16]** 84/3 86/7 86/9 86/10 87/3 87/13 89/19 91/11 132/1 133/19 136/11 137/23 138/10 138/13 223/14 284/1
**age [6]** 7/17 19/25 74/9 77/11 194/22 194/22
**agencies [3]** 179/16 179/18 180/25
**agency [3]** 175/12 179/19 213/1

**A**

**agent [1]** 148/10
**aggressively [1]** 153/20
**agnostic [1]** 38/6
**ago [16]** 38/15 102/12 147/7 183/2 203/20 216/24 219/14 227/10 227/16 242/10 257/19 262/14 263/10 263/20 266/16 279/22
**agree [41]** 44/14 45/19 50/3 54/16 56/23 85/8 91/6 93/10 96/12 106/14 108/2 111/7 117/15 119/19 141/14 145/17 149/13 154/9 154/16 156/18 160/8 166/6 166/12 166/17 169/18 172/12 173/13 175/16 178/14 179/4 219/12 253/18 254/16 271/5 271/9 273/10 282/14 282/17 282/20 282/22 283/12
**agreed [4]** 160/18 243/3 261/23 283/5
**agreeing [1]** 283/2
**agreement [8]** 119/13 119/16 155/15 201/16 202/23 203/2 239/12 273/14
**agrees [1]** 156/20
**ahead [8]** 37/5 68/14 167/10 173/23 242/22 244/8 271/13 274/24
**aid [1]** 39/16
**aimed [1]** 77/23
**aisle [1]** 144/18
**AJ [2]** 183/11 186/21
**al [1]** 1/5
**Alana [1]** 255/8
**Alex [2]** 179/21 244/16
**Alexandra [2]** 146/14 244/17
**Alexandria [1]** 176/10
**all [151]** 9/7 13/12 14/1 14/22 17/10 18/8 21/25 23/14 23/18 24/15 24/24 27/20 31/14 32/5 37/6 37/18 37/21 37/21 39/3 39/4 39/10 39/17 46/5 48/4 49/4 53/4 53/4 55/16 56/11 59/3 62/21 63/23 64/2 66/4 66/22 68/12 68/13 68/22 77/18 77/19 78/13 81/24 85/3 89/9 94/3 94/5 94/15 96/7 98/23 104/14 104/14 117/10 117/18 117/25 119/14 120/18 120/22 124/7 128/3 128/8 128/25 130/10 130/11 130/19 130/20 133/1 133/3 159/18 159/20 165/2 169/10 169/14 176/2 176/17 177/24 178/23 179/11 179/15 180/23 180/25 182/7 182/22 184/16 192/22 194/9 199/25 200/2 200/3 200/4 200/22 201/4 201/21 203/1 204/23 206/11 208/19 209/11 212/3 212/4 212/19 212/23 216/5 217/1 217/15 217/24 218/10 222/6 224/1 228/9 228/13 228/15 229/16 232/15 232/22 232/22 232/23 233/3 233/9 234/10 235/2 235/11 235/17 236/23 238/25 240/11 242/12 242/12 244/1 246/2 246/13 246/21 247/19 253/20 258/17 259/3 259/17 260/7 267/16 270/9 276/2 277/4 282/4 282/8 283/1 283/13 284/7 284/12 284/22 285/11 286/19 289/20
**allegedly [1]** 138/1
**Alliance [4]** 95/5 96/3 96/10 144/17
**allow [3]** 120/1 176/17 282/16
**allow WBMC [1]** 120/1
**allowed [3]** 97/18 212/7 257/24
**allowing [1]** 272/6
**almost [6]** 39/17 52/15 145/16 206/19 206/23 277/4
**alone [5]** 22/13 24/24 28/3 38/14 47/18
**along [3]** 155/2 162/10 265/13
**already [20]** 17/9 19/5 25/12 27/12 27/25 30/23 45/24 47/12 48/5 48/24 53/24 56/21 67/2 68/4 77/18 117/16 177/17 217/11 268/12 281/11
**also [80]** 4/17 5/2 6/8 9/14 13/11 13/12 14/10 15/24 24/14 31/3 34/14 38/8 51/24 52/6 54/17 55/3 63/17 63/19 75/19 76/3 76/4 76/10 76/10 82/9 83/2 83/4 83/6 85/16 88/13 89/25 90/8 91/18 91/23 94/10 101/15 102/12 105/17 116/1 121/7 124/8 126/13 132/22 139/21 142/24 143/19 145/20 146/1 146/21 148/21 153/11 158/4 160/7 167/24 171/5 175/20 175/21 178/9 182/5 187/20 190/16 190/24 195/6 195/13 201/19 214/7 215/3 215/14 218/12 218/24 218/25 220/21 242/24 243/15 243/15 245/8 247/9 251/23 253/20 254/6 286/7
**alternate [1]** 158/20
**although [1]** 190/11
**always [3]** 52/16 53/23 181/23
**am [126]** 3/25 4/3 4/14 5/2 11/13 16/13 26/5 35/20 39/2 39/9 40/3 40/7 42/5 42/12 42/15 43/1 46/8 46/16 46/20 51/14 53/22 54/7 54/9 55/2 57/11 58/22 59/25 61/5 61/13 62/2 65/3 65/10 66/9 66/12 75/18 75/19 88/24 89/15 96/23 97/1 98/12 98/14 99/20 100/2 101/11 101/22 102/10 103/20 104/4 110/15 111/12 116/25 117/1 117/13 117/23 124/16 125/6 133/2 133/5 134/15 135/11 135/20 136/1 138/13 142/5 143/4 148/12 148/13 153/11 153/11 159/6 160/18 164/4 166/11 167/3 167/11 168/7 168/9 171/23 172/3 174/23 176/13 180/21 185/7 185/12 185/12 187/17 190/4 190/10 209/18 220/12 220/12 220/14 221/15 228/9 229/2 231/9 231/9 231/10 231/11 231/11 233/15 233/21 238/22 242/24 247/14 248/18 252/19 256/22 261/3 266/7 268/8 268/20 269/22 269/23 269/24 270/10 272/21 278/24 281/5 281/10 286/14 286/23 287/23 288/7 289/18
**AMA [15]** 84/2 84/9 86/4 86/6 115/19 127/20 128/19 130/12 134/16 135/3 135/21 136/24 137/3 137/22 138/1
**Amazon [1]** 55/6
**ambivalence [1]** 159/13
**ambivalent [1]** 159/12
**ambulance [2]** 205/16 205/20
**amend [1]** 267/25
**American [4]** 171/2 184/6 185/10 195/11
**Americans [1]** 176/17
**among [1]** 256/13
**amount [8]** 23/14 104/11 104/13 119/3 181/5 254/17 271/6 284/6
**analogy [1]** 180/7
**analyses [2]** 25/12 256/12
**analysis [22]** 28/7 50/8 50/10 51/3 51/6 53/6 57/9 57/13 57/23 57/25 58/2 58/24 58/25 59/14 70/6 123/8 217/7 257/1 257/6 257/10 257/16 287/8
**analyst [10]** 147/2 270/11 274/2 277/3 277/11 281/5 282/21 285/7 285/15 287/14
**analytic [2]** 38/1 39/5
**analytics [40]** 5/18 5/19 5/21 6/11 24/3 25/11 26/9 38/2 38/2 39/19 43/4 43/5 43/7 45/16 46/4 46/8 46/22 47/1 47/9 47/13 47/14 48/2 48/6 48/14 48/24 50/4 50/16 56/2 56/12 56/19 56/24 57/23 58/9 58/13 58/15 58/20 59/8 60/16 67/15 68/4
**analyzing [1]** 47/2
**and because [1]** 272/10
**and/or [2]** 168/24 186/17
**Andrea [4]** 105/10 105/21 125/17 125/24
**announced [2]** 98/17 205/10
**announcements [1]** 157/6
**annual [2]** 201/13 256/14
**annually [1]** 255/12
**anonymous [6]** 39/1 50/5 50/6 59/9 209/20 209/23
**another [22]** 15/24 17/20 18/6 22/3 22/6 35/19 72/24 93/12 93/18 99/4 119/12 119/21 123/9 123/16 137/5 205/2 238/11 243/7 251/17 263/19 266/24 269/9

A

**answer [21]** 32/15 33/17 38/9 38/12 45/17 58/6 62/1 62/13 114/18 123/25 128/10 128/12 128/24 130/9 167/10 189/15 233/21 240/13 262/5 266/17 287/4
**answered [4]** 30/17 62/13 240/18 240/22
**answers [1]** 89/7
**Anthony [1]** 128/17
**any [187]** 12/8 12/13 12/14 13/14 15/1 15/1 15/3 16/22 22/20 23/11 23/22 28/5 28/7 30/4 30/21 34/2 35/5 35/6 38/2 40/6 40/9 42/8 44/18 46/4 46/7 47/9 47/24 48/8 49/9 49/11 49/18 50/19 51/3 52/20 53/5 53/19 55/8 57/2 57/3 57/5 57/9 57/9 57/13 57/25 58/2 58/7 59/7 59/10 59/10 62/9 62/9 64/8 68/16 68/25 70/5 80/25 82/19 88/22 89/6 92/1 96/18 96/21 96/23 96/24 98/10 99/18 101/24 102/15 103/5 103/11 103/17 103/24 104/12 104/17 104/21 104/21 105/4 109/17 110/11 110/15 111/2 111/19 111/22 112/4 112/10 113/7 113/20 114/22 114/24 122/24 123/3 123/23 124/4 124/5 124/5 124/12 124/20 124/23 126/15 128/7 129/16 129/21 130/23 132/12 132/23 134/9 135/10 136/1 136/19 140/2 141/3 142/4 142/9 143/2 147/18 151/14 167/11 169/9 173/1 175/9 175/9 182/16 187/25 192/20 195/18 196/5 196/6 196/7 196/14 196/15 197/4 200/18 202/14 203/6 204/2 204/15 206/5 206/8 206/17 208/14 209/1 209/5 209/13 209/20 215/3 218/7 218/11 221/16 222/23 223/2 225/15 225/18 225/20 226/6 226/6 226/14 227/2 228/5 228/15 230/15 232/6 232/25 233/16 235/3 235/16 236/6 241/14 250/6 254/9 257/9 260/21 261/2 264/23 275/24 275/25 276/5 276/11 277/16 278/15 279/6 279/9 280/4 282/9 284/18 284/19 286/10 287/9
**anybody [4]** 103/4 128/9 152/22 282/5
**anyone [3]** 92/16 247/2 279/9
**anyplace [1]** 17/1
**anything [21]** 16/9 21/11 28/18 49/20 58/2 58/7 71/15 93/11 127/2 127/9 131/17 155/11 166/3 198/12 206/4 233/11 236/25 274/18 276/6 277/7 285/9
**anywhere [9]** 5/20 37/1 37/20 41/18 65/1 156/9 196/16

231/8 241/15
**apologies [1]** 118/18
**apologize [1]** 119/22
**appear [17]** 13/25 16/12 16/17 16/17 16/19 16/22 16/25 17/15 27/8 28/6 33/24 34/6 35/1 63/4 63/20 63/25 127/11
**APPEARANCES [1]** 1/14
**appearing [1]** 17/18
**appears [15]** 13/16 16/15 22/14 30/12 47/3 47/17 55/6 55/7 63/7 63/9 63/13 63/15 63/21 63/23 217/4
**applicable [2]** 170/25 171/3
**application [1]** 6/20
**applied [7]** 6/19 35/8 35/19 35/21 41/18 64/9 228/7
**applies [1]** 63/10
**apply [2]** 9/17 172/22
**applying [1]** 76/18
**appointments [1]** 168/23
**appreciate [3]** 147/18 214/7 287/24
**approach [14]** 25/5 78/16 147/8 149/7 151/18 152/13 153/24 158/14 158/19 172/17 177/7 270/1 270/19 271/20
**approached [1]** 139/7
**approaches [1]** 68/14
**appropriate [3]** 48/20 151/6 247/4
**appropriately [1]** 117/24
**approval [4]** 78/7 78/8 105/6 119/25
**approved [3]** 108/16 251/9 286/22
**approximated [1]** 151/16
**approximately [5]** 17/5 77/6 206/11 242/18 283/25
**approximating [1]** 277/22
**approximation [2]** 278/9 283/7
**April [15]** 95/4 95/12 119/23 120/5 193/23 217/7 218/8 268/19 274/10 274/15 278/19 279/2 279/7 279/9 280/1
**April 12 [7]** 268/19 274/10 274/15 278/19 279/2 279/9 280/1
**April 2025 [1]** 120/5
**April 22 [1]** 119/23
**April 23 [1]** 95/4
**April of [2]** 217/7 218/8
**arbitrarily [1]** 251/1
**arbitrary [5]** 288/19 289/8 289/10 289/12 289/14
**architects [1]** 175/16
**archived [1]** 180/13
**are [487]**
**are an [1]** 244/22
**are offering [1]** 5/14
**area [9]** 5/14 8/13 22/1 42/18 43/8 76/25 77/3 130/22 206/5
**aren't [3]** 66/8 159/8 169/25
**argue [2]** 110/18 247/15
**argument [2]** 73/10 243/20

**Arjun [1]** 189/15
**armpit [3]** 89/16 136/8 138/11
**Armstrong [1]** 183/22
**around [18]** 12/7 61/24 131/20 140/10 194/17 194/18 194/22 201/7 203/18 215/18 218/8 221/1 221/20 268/7 276/13 279/16 282/4 287/7
**arrows [1]** 211/16
**article [13]** 34/8 47/8 47/23 47/25 209/25 210/2 211/1 211/6 211/8 222/10 230/18 230/20 231/9
**articles [12]** 4/21 34/11 35/1 35/2 35/6 46/14 46/17 46/19 46/21 47/1 47/3 148/3
**articulated [1]** 273/7
**as [280]** 4/19 4/22 4/22 5/3 5/8 5/11 5/16 5/24 6/23 6/23 7/14 7/22 7/23 8/14 8/24 10/2 10/7 11/10 11/25 12/17 12/17 13/13 15/17 16/14 16/14 17/3 17/9 19/5 25/22 26/10 27/6 27/12 27/18 27/25 29/3 29/18 29/18 30/23 30/25 30/25 32/21 33/7 34/19 34/19 34/19 35/17 36/1 36/1 36/17 36/22 38/11 38/11 38/21 38/21 39/6 42/5 42/13 42/15 42/16 42/16 42/22 43/3 43/22 44/3 45/5 45/6 45/15 45/24 47/7 47/17 48/5 48/24 50/17 51/1 51/3 51/8 51/8 51/10 53/23 55/13 56/17 56/17 57/6 57/9 58/1 60/11 60/12 61/2 63/18 65/10 66/10 66/10 67/12 68/2 68/3 68/12 68/12 68/12 68/13 68/21 72/8 73/4 73/4 75/2 75/10 75/16 76/2 76/6 77/1 77/7 77/10 77/12 79/1 80/4 81/11 81/19 81/19 81/24 81/24 82/15 82/18 82/23 85/5 85/6 85/6 85/10 85/14 88/13 91/18 93/23 95/1 95/21 97/16 97/16 100/25 102/23 103/12 105/20 106/2 115/3 118/21 119/13 119/13 119/16 119/16 119/19 120/6 122/5 122/23 124/4 124/19 124/20 125/6 126/19 127/8 128/10 129/6 132/16 132/23 132/23 132/24 133/7 134/17 135/15 135/20 135/23 136/9 138/9 142/20 145/12 146/2 146/4 147/24 148/1 149/8 151/11 152/18 154/22 155/14 156/6 156/12 157/13 159/22 161/12 161/13 163/25 164/23 165/5 168/8 168/22 172/9 174/24 174/25 175/13 175/13 175/15 175/20 176/25 178/10 178/21 178/21 179/3 179/3 179/18 179/18 180/2 180/2 180/12 180/12 180/22 180/24 181/2 181/9 181/11 184/2 184/2 186/14 187/10 187/11 189/16 189/21 190/8 191/1

A

**as... [57]** 192/3 192/10 193/19 194/8 194/19 195/24 196/8 199/10 199/13 199/25 200/15 200/18 205/23 207/14 207/25 209/7 210/5 210/17 211/8 211/20 212/12 214/8 214/14 215/21 216/6 216/7 219/5 222/11 222/11 224/5 226/2 227/18 228/7 238/18 240/7 246/13 246/15 247/18 249/13 263/23 267/18 272/5 273/24 274/1 274/4 277/3 277/11 280/19 280/22 282/21 285/5 285/6 286/7 286/7 286/17 288/17 288/17
**ASAP [1]** 216/7
**aside [3]** 72/5 72/11 72/11
**ask [36]** 52/9 52/24 66/17 78/6 102/16 105/10 112/19 124/20 126/19 129/10 132/15 137/12 139/20 141/5 149/23 154/14 156/22 157/1 165/9 173/6 173/20 174/6 182/22 188/16 190/16 196/5 196/6 214/1 221/13 221/23 228/22 238/22 242/1 251/14 262/8 286/25
**asked [69]** 12/23 12/24 19/12 30/11 30/12 30/15 32/11 33/11 41/6 43/1 44/22 63/25 67/22 68/25 70/18 71/4 71/25 75/9 104/20 105/7 124/15 124/17 128/3 128/3 128/4 129/5 129/6 138/21 139/7 142/16 142/18 142/24 143/5 143/19 150/7 150/10 150/21 150/21 167/14 179/20 182/19 204/8 208/8 215/6 232/15 232/21 233/6 233/8 233/10 234/4 237/3 237/13 237/18 238/15 238/21 240/11 240/16 240/18 240/21 240/24 242/3 256/18 256/20 257/5 261/11 261/22 265/6 265/25 287/7
**asking [25]** 47/23 55/2 61/6 62/2 65/3 91/20 110/15 111/12 122/14 124/16 136/1 160/18 190/4 220/12 220/13 220/14 232/17 233/4 260/8 266/15 269/22 269/23 272/1 274/22 284/2
**asks [1]** 95/25
**asserted [3]** 157/12 159/9 264/16
**assessment [2]** 184/23 197/1
**assessments [1]** 163/11
**assign [12]** 70/22 78/13 78/20 83/13 148/19 154/9 154/17 161/2 174/1 245/6 269/14 270/6
**assigned [44]** 8/21 21/3 21/7 21/8 21/14 21/16 21/17 21/18 21/19 22/3 22/4 29/22 62/25 64/24 65/16 65/18 65/25 66/2 66/14 70/24 71/1 71/1 71/3 73/22 79/18 81/6 81/8 93/10 111/8 166/15 169/21 235/9 235/15 235/18 245/2 248/8 248/12 253/7 260/9 275/8 275/13 275/18 288/20 289/8
**assigning [16]** 29/25 103/9 147/21 148/25 149/13 149/18 149/25 150/14 251/1 251/9 275/25 278/15 280/4 280/5 282/24 286/5
**assignment [7]** 81/16 179/9 262/20 286/22 288/18 289/2 289/6
**assignments [1]** 256/5
**assigns [6]** 21/9 70/20 72/6 112/1 173/18 260/3
**assist [2]** 4/4 241/3
**assistant [3]** 74/20 193/20 285/22
**associated [5]** 8/19 11/22 12/17 64/20 251/1
**association [4]** 171/2 184/7 185/11 192/12
**assume [4]** 62/8 66/3 167/9 188/25
**assumes [4]** 88/18 90/2 143/10 167/7
**assuming [3]** 66/7 66/9 160/21
**assumption [4]** 260/12 263/6 263/9 283/10
**assure [1]** 236/22
**asterisk [9]** 64/20 65/4 65/6 65/9 65/10 65/13 66/14 284/24 285/21
**asterisks [2]** 285/13 285/15
**Atlantic [1]** 193/6
**attached [3]** 147/10 185/4 199/20
**attachment [5]** 126/8 126/11 185/3 217/12 217/12
**attain [1]** 152/6
**attempt [1]** 213/10
**attempting [2]** 44/18 192/15
**attempts [1]** 170/18
**attend [2]** 278/20 278/22
**attendance [1]** 240/7
**attended [1]** 193/6
**attention [13]** 18/21 28/19 29/2 85/6 90/14 207/20 210/16 239/6 256/8 265/9 267/19 267/20 269/8
**attested [1]** 84/20
**attorneys [1]** 139/16
**attribute [1]** 115/15
**attributed [2]** 67/4 122/8
**attrition [1]** 188/21
**audited [3]** 79/9 79/25 80/12
**audits [1]** 106/13
**August [3]** 33/21 133/21 133/24
**August 2025 [1]** 133/24
**August 22 [1]** 133/21
**aunt [1]** 74/8
**Austin [14]** 146/14 146/18 147/6 148/18 183/22 243/11 257/5 272/1 273/1 273/4 278/5 281/12 281/19 282/19
**Austin's [1]** 182/21
**authenticity [3]** 26/17 127/11 133/2
**author [1]** 5/2
**authority [1]** 102/20
**automatically [2]** 256/6 275/18
**available [26]** 6/7 13/9 13/11 14/14 21/4 39/25 46/2 47/5 50/14 61/8 62/22 64/25 66/1 68/2 92/25 159/7 170/19 171/2 178/4 184/12 245/10 246/12 246/16 246/18 247/2 248/9
**ave [1]** 139/20
**average [25]** 12/6 12/6 12/7 14/22 18/14 30/10 30/18 55/5 55/6 55/7 55/9 55/23 55/25 71/22 88/14 89/23 108/3 108/8 194/16 194/22 217/24 219/13 219/18 219/22 270/1
**avoid [1]** 32/12
**await [1]** 247/17
**awarded [1]** 82/5
**awards [5]** 76/20 76/22 78/11 202/17 258/8
**aware [47]** 37/2 40/1 40/3 40/7 46/8 46/19 46/20 46/21 46/24 52/24 53/3 54/3 54/5 54/21 54/23 55/1 71/15 88/22 92/1 96/23 96/24 97/1 98/12 99/20 100/2 124/19 129/7 143/4 152/9 167/11 167/15 181/6 181/7 199/6 216/13 219/11 229/9 233/14 253/15 253/20 253/24 255/17 257/5 257/9 259/23 260/2 277/13
**aware of [1]** 257/9
**away [4]** 32/2 158/20 180/13 234/25

B

**babies [3]** 76/5 77/2 77/10
**baby [3]** 77/11 77/12 77/13
**back [44]** 11/3 18/3 26/23 28/13 30/4 31/24 44/21 47/13 48/4 57/13 65/6 65/19 66/4 69/7 69/11 69/13 75/6 81/5 94/23 97/11 100/9 100/16 102/22 120/13 123/12 125/7 135/19 151/10 170/14 182/11 198/4 202/11 210/25 224/17 226/15 239/15 239/15 242/22 252/18 259/9 262/6 269/18 272/24 273/3
**backdoor [1]** 153/24
**background [9]** 4/13 56/8 74/2 74/4 74/5 174/20 193/5 220/3 273/18
**backs [1]** 257/1
**bad [6]** 55/13 71/14 71/16 130/19 130/20 231/2
**Bailey [2]** 243/17 243/21
**Bailey's [1]** 243/18
**balance [2]** 116/9 116/22
**ballpark [3]** 60/17 60/18 139/14
**banana [2]** 265/2 265/6
**bar [8]** 24/8 24/12 24/18

B

**bar... [5]** 25/17 25/19 60/4 80/7 178/19
**barely [1]** 253/1
**bariatric [1]** 195/12
**bariatrics [1]** 195/16
**bars [3]** 24/8 60/8 60/9
**based [61]** 8/11 14/13 14/13 14/17 14/18 18/19 19/7 28/7 29/5 31/2 31/7 32/4 51/11 52/15 57/8 57/22 68/10 70/4 70/5 72/13 81/13 84/3 84/6 90/20 91/1 91/6 98/1 99/7 100/8 103/7 111/8 112/2 121/24 122/21 122/22 127/3 140/8 140/9 141/22 142/4 142/8 143/8 161/9 162/18 165/11 188/9 189/12 190/6 197/23 227/4 230/13 235/9 235/16 262/21 262/22 269/2 270/1 270/16 282/24 282/25 289/11
**basically [6]** 180/5 187/22 211/25 274/16 276/17 278/8
**basis [13]** 21/20 75/10 79/11 79/15 82/4 83/10 85/5 103/10 153/15 159/22 159/24 189/10 277/5
**Bate [1]** 25/22
**Bates [1]** 248/24
**battalion [2]** 82/24 82/24
**BCMA [15]** 106/5 106/8 106/15 125/4 125/9 125/10 126/16 126/25 127/2 127/3 127/6 127/7 127/7 127/9 278/16
**BCNA [5]** 197/17 198/20 214/25 217/18 219/25
**be [183]** 3/11 10/17 10/19 13/16 15/17 15/17 17/13 18/18 19/18 20/3 20/14 20/15 21/8 24/11 24/20 28/6 34/3 38/3 39/11 39/24 39/25 40/21 41/8 41/23 42/23 44/4 45/21 46/15 48/20 49/3 49/4 49/17 49/19 49/25 50/7 50/12 52/10 53/20 55/20 55/25 59/7 59/13 60/21 61/3 64/9 65/11 67/13 68/20 69/5 70/13 71/22 71/22 71/24 73/2 74/19 76/17 76/25 81/20 83/24 84/21 85/16 87/25 88/6 94/5 94/19 97/21 100/7 105/18 107/1 107/2 107/4 107/11 107/12 107/13 108/14 110/21 112/19 116/18 116/24 118/19 120/12 122/7 123/12 124/10 127/5 127/11 131/18 132/15 133/15 133/20 134/22 139/11 139/13 142/21 143/9 144/14 146/11 152/21 154/1 156/7 159/8 160/18 161/23 162/5 162/16 164/4 168/7 170/18 170/23 171/7 171/11 172/23 173/21 174/8 174/9 175/23 178/4 178/23 178/25 180/18 182/18 183/22 187/23 187/23 188/8 192/11 201/25 208/18 208/18 212/5 212/10 212/18 214/4 216/5 217/4 217/10 221/24 222/5 222/11 234/5 236/5 242/25 243/12 243/13 243/16 244/2 244/3 244/6 244/14 245/10 246/14 247/9 248/24 251/13 252/23 253/6 255/12 256/4 257/15 257/23 258/8 262/22 262/23 263/1 266/21 268/6 270/8 270/11 270/24 271/7 274/18 275/16 275/18 275/19 277/17 277/24 281/24 282/11 282/25 283/22 286/6 286/7 289/9
**be concerning [1]** 10/19
**be confused [1]** 41/8
**BEACH [26]** 1/2 1/8 2/7 8/9 37/9 38/18 45/9 74/25 75/5 76/1 76/4 77/19 78/1 82/25 83/1 104/22 107/21 131/9 131/14 194/5 194/9 194/10 210/23 213/18 214/18 221/11
**Beach/Ft [1]** 2/7
**became [3]** 75/14 198/5 271/23
**because [92]** 10/5 10/17 20/19 25/4 26/3 29/7 29/12 32/17 38/16 63/9 63/11 64/1 64/8 81/21 83/9 87/4 89/20 91/12 96/13 100/13 101/2 102/5 104/11 118/10 119/5 120/20 121/1 121/4 121/8 123/2 123/7 123/12 123/22 127/8 130/4 138/3 141/22 151/19 152/4 152/5 164/10 165/13 167/5 171/1 172/4 172/10 172/17 173/2 179/15 181/16 183/13 185/10 186/14 188/9 188/14 189/3 204/3 204/8 205/1 208/11 211/23 212/12 212/19 212/21 218/15 218/23 225/5 231/16 235/25 243/2 246/24 251/1 252/24 253/7 257/13 261/8 263/7 263/12 266/18 267/17 267/25 268/3 270/21 272/10 272/10 275/6 278/17 283/5 286/5 286/14 288/19 289/8
**Becky [3]** 252/15 254/3 254/3
**become [5]** 73/17 196/18 199/6 202/5 237/8
**becomes [1]** 271/10
**becoming [1]** 178/4
**beds [3]** 76/1 190/21 194/14
**been [80]** 4/15 4/23 5/7 16/23 23/11 24/3 25/9 33/24 52/16 62/22 66/17 68/13 73/21 75/8 79/13 81/6 89/6 90/12 91/16 95/1 102/2 108/3 109/2 112/24 114/2 120/11 120/22 123/10 124/8 125/10 125/12 126/16 127/6 132/1 132/21 137/10 139/6 143/11 145/15 147/24 148/4 153/18 170/19 176/8 176/9 177/24 178/18 178/20 179/16 181/18 182/19 189/16 194/5 198/9 198/24 207/10 212/10 215/11 216/11 220/2 220/5 220/15 220/17 221/20 222/8 229/4 232/23 237/23 238/10 241/8 246/17 257/13 260/13 266/22 274/1 274/9 278/15 282/8 284/5 288/11
**before [35]** 1/11 11/12 18/9 19/23 35/12 42/15 60/24 72/24 74/1 75/9 92/10 98/13 99/13 101/18 101/19 101/22 103/2 140/17 144/13 145/10 164/20 164/24 168/14 213/22 216/9 233/13 233/19 238/9 239/17 242/12 252/6 259/3 272/24 273/25 283/6
**beg [1]** 159/4
**begin [2]** 17/10 105/22
**beginning [2]** 181/24 181/25
**begins [1]** 259/13
**behalf [4]** 148/3 148/4 208/8 232/16
**behavior [4]** 4/24 5/5 5/12 47/2
**behavioral [1]** 122/1
**behind [2]** 151/18 283/9
**being [42]** 28/5 31/23 35/8 41/1 49/21 67/22 69/8 76/2 78/2 79/3 82/5 86/11 91/24 98/4 101/2 120/11 130/16 155/17 161/5 161/24 176/11 177/2 184/23 185/9 195/6 202/18 202/21 203/8 208/8 213/14 226/7 232/13 238/16 243/2 258/7 262/25 271/12 273/8 276/17 283/8 283/11 286/8
**belabor [1]** 127/23
**belief [3]** 57/8 209/6 224/6
**believe [83]** 5/16 13/8 17/7 17/21 18/1 27/1 27/1 33/8 34/10 34/25 36/23 37/1 42/5 42/15 42/16 49/16 49/18 49/25 50/1 51/2 51/20 52/2 53/10 53/12 53/18 53/23 56/10 63/19 64/6 66/25 72/2 79/18 83/19 83/22 102/10 102/12 104/19 109/17 111/2 111/6 115/23 117/16 126/15 131/5 139/9 146/3 149/18 149/25 151/4 151/6 151/14 159/25 161/7 176/14 176/15 181/3 183/22 191/24 194/11 199/7 212/1 212/14 212/15 215/13 216/15 218/9 218/11 220/3 222/23 223/2 223/4 224/4 224/7 225/3 228/8 230/6 232/2 232/10 240/17 246/3 265/7 279/13 286/19
**believing [1]** 211/22
**below [8]** 8/8 108/3 108/8 131/17 208/11 217/24 219/22 221/11
**BENCH [1]** 1/11
**beneficiaries [1]** 92/24
**benefit [1]** 156/10
**Berger [20]** 3/10 3/12 3/13 3/22 3/25 5/11 5/14 6/3 36/15 47/7 47/21 50/3 55/24

## B

**Berger... [7]** 61/11 66/7 155/3 171/24 190/6 248/3 248/11
**Berger's [4]** 5/20 154/25 171/14 248/1
**Besides [1]** 203/24
**best [20]** 5/2 19/17 19/19 34/9 62/14 66/12 66/16 67/12 68/15 108/13 108/23 112/7 112/14 184/12 184/22 196/9 196/15 234/15 234/20 278/9
**BETH [1]** 1/15
**betrayed [1]** 10/18
**better [22]** 9/22 11/14 12/6 31/12 33/16 52/17 68/23 88/14 89/23 120/1 124/6 124/13 124/22 146/11 151/16 155/4 166/14 219/15 220/14 220/17 228/19 230/1
**better approximated [1]** 151/16
**between [16]** 13/15 14/3 31/11 46/14 56/24 93/6 116/9 134/24 204/7 224/23 225/15 248/21 263/20 269/9 280/18 284/18
**beyond [1]** 35/9
**biannually [1]** 110/24
**biased [1]** 218/16
**big [1]** 226/3
**bike [1]** 31/23
**bill [8]** 62/6 88/16 89/25 138/18 138/20 138/22 138/24 143/25
**billed [4]** 61/15 138/15 138/16 144/2
**BILLEK [1]** 2/2
**billing [1]** 143/20
**billion [3]** 34/13 34/20 34/24
**bills [3]** 62/2 62/4 143/24
**Binder [7]** 243/15 249/21 251/5 264/5 281/13 286/9 286/10
**Binder's [1]** 286/15
**biology [1]** 273/20
**biopsies [1]** 206/14
**Biscayne [1]** 1/22
**bit [24]** 9/5 14/8 33/25 34/7 56/12 62/24 64/16 73/25 74/2 74/2 75/23 76/23 78/24 140/17 146/11 153/17 174/20 185/1 194/2 216/4 216/21 239/11 249/13 284/23
**black [1]** 17/22
**blackmail [3]** 98/3 101/1 160/15
**blackmailing [1]** 159/15
**blackmails [1]** 160/1
**BLAIR [6]** 2/1 117/23 235/5 237/13 237/21 240/5
**blue [1]** 14/16
**bluntly [1]** 153/17
**board [49]** 81/19 82/6 82/7 82/11 82/14 82/19 82/25 83/3 99/25 100/3 101/15 101/23 101/24 102/3 102/8 102/15 102/21 102/25 103/5 103/12 103/15 104/1 104/5 112/4 112/11 113/8 113/10 113/15 113/17 114/17 116/8 116/11 120/9 120/18 122/9 122/13 122/20 123/11 127/19 127/19 150/15 174/23 176/22 179/6 203/7 203/8 203/11 203/22 214/24
**boards [1]** 120/20
**Boca [97]** 38/16 38/21 52/25 72/25 73/14 73/18 74/22 75/16 75/23 75/25 76/10 76/13 77/4 77/15 78/13 78/20 79/3 80/21 81/6 81/9 82/10 83/2 83/7 83/14 83/20 85/5 87/10 88/8 88/10 88/16 88/23 89/1 89/21 89/22 89/25 90/11 90/15 91/22 92/7 95/5 96/1 97/5 97/19 97/24 99/13 102/16 102/19 103/5 103/12 104/10 104/17 104/21 105/1 105/7 105/13 105/21 106/2 106/4 106/15 108/3 109/5 109/13 109/18 113/1 113/19 114/20 115/13 117/2 118/21 118/22 120/10 121/15 121/23 122/24 123/3 123/5 125/14 125/25 126/1 126/14 126/23 127/2 127/4 127/5 127/12 129/6 130/17 131/10 131/11 132/11 134/4 134/22 138/15 140/5 140/25 143/3 143/23
**Boca's [8]** 76/23 77/7 93/5 96/19 96/22 96/25 101/25 126/15
**bodies [1]** 195/9
**bold [1]** 65/25
**book [1]** 21/25
**books [1]** 55/7
**boss [5]** 249/25 250/3 273/4 276/11 287/10
**bosses [1]** 257/2
**Boston [1]** 273/23
**both [17]** 4/21 4/25 13/16 16/14 21/22 38/11 43/5 51/8 52/25 72/20 73/9 133/3 143/23 159/12 160/12 184/22 270/11
**bots [6]** 56/24 57/4 57/5 58/2 58/10 58/13
**bottle [1]** 35/19
**bottom [29]** 12/16 16/10 16/21 17/4 17/15 17/16 22/23 23/15 25/21 37/14 65/2 65/4 65/5 65/12 69/12 70/15 126/16 177/18 177/19 205/14 210/17 211/14 248/25 251/2 260/9 269/14 270/6 280/5 285/12
**bottom performance [1]** 270/6
**Boulevard [1]** 1/22
**bounce [1]** 182/23
**box [2]** 96/2 241/11
**boxed [1]** 14/16
**brand [3]** 10/1 10/5 36/1
**breaching [1]** 227/3
**break [8]** 36/7 72/24 94/23 144/24 174/7 225/17 244/11 263/3
**breakdown [2]** 73/8 221/10
**breaking [1]** 253/1
**breast [7]** 118/5 194/12 195/12 206/11 206/13 206/14 206/14
**Brenda [2]** 158/4 167/24
**brief [4]** 79/2 142/12 145/11 174/13
**briefing [1]** 194/2
**briefly [6]** 68/16 77/15 193/4 193/16 194/20 213/22
**bring [10]** 131/1 181/13 181/14 207/25 210/5 212/17 237/20 241/3 264/15 277/11
**bringing [1]** 224/20
**Britt [3]** 215/17 217/1 236/14
**broad [1]** 40/20
**broader [2]** 4/22 147/9
**broke [2]** 94/24 227/8
**broken [2]** 90/12 226/7
**broker [1]** 116/13
**brought [9]** 74/3 89/11 159/12 185/20 185/23 240/17 242/4 281/7 281/11
**Broward [1]** 87/14
**Bruce [2]** 157/5 157/23
**build [1]** 97/11
**built [1]** 194/4
**bullet [3]** 116/19 183/21 250/11
**bullets [1]** 28/23
**bully [1]** 73/23
**bunch [8]** 23/4 29/17 39/7 39/11 55/10 64/1 244/5 285/20
**burden [7]** 67/9 186/16 254/13 255/18 258/2 263/12 272/6
**burdens [2]** 257/19 258/12
**burdensome [3]** 152/4 152/10 272/10
**burdensome and [1]** 152/4
**business [29]** 4/17 85/4 85/8 97/3 106/1 107/7 109/17 131/6 132/18 142/18 143/25 163/19 163/22 163/25 164/5 164/11 164/12 164/15 164/19 164/23 164/24 166/25 182/17 193/7 193/8 206/3 245/20 247/8 247/11
**bypassing [1]** 121/23

## C

**C-scores [2]** 184/15 184/16
**calculate [9]** 28/22 28/25 29/6 29/7 29/12 33/15 111/16 111/21 111/24
**calculated [12]** 33/10 53/7 65/15 171/8 250/16 250/17 285/23 285/24 285/24 285/24 286/2 286/4
**calculating [2]** 275/7 283/6
**calculation [1]** 178/24
**calculator [2]** 199/16 220/5

C

calendar [1] 205/10
California [1] 145/13
call [28] 3/8 3/10 11/25 12/13 17/16 17/17 22/5 26/8 39/22 72/25 88/11 96/6 96/6 140/3 144/12 144/13 144/23 145/4 160/14 185/14 189/5 192/25 230/23 230/23 244/16 249/12 278/16 278/17
called [11] 9/5 16/1 79/20 142/1 147/23 148/11 148/22 189/19 200/10 231/16 243/2
calling [6] 160/24 200/8 201/21 242/24 243/5 243/12
calls [12] 21/9 27/13 71/11 88/2 160/3 169/6 173/4 173/12 201/19 209/9 226/8 274/17
came [9] 32/9 113/20 131/20 135/1 210/11 210/11 213/9 232/4 233/5
Campione [19] 146/14 146/21 147/2 156/14 176/20 179/21 242/16 242/25 243/2 243/12 244/16 244/17 247/25 248/22 252/12 262/1 273/17 281/10 282/13
Campo [2] 91/23 139/21
campus [2] 83/2 135/3
campuses [1] 169/11
can [131] 3/8 3/24 4/7 4/12 6/14 7/9 8/4 8/5 8/8 8/17 9/8 9/25 10/10 10/25 11/2 11/16 18/2 18/4 18/10 19/24 20/6 20/11 21/1 22/18 22/24 23/3 29/15 35/12 37/5 37/23 41/20 44/6 44/19 48/1 58/19 60/8 63/17 64/10 66/1 66/2 69/3 69/20 69/24 74/4 74/13 75/23 77/12 84/21 86/7 88/13 89/13 90/24 91/9 95/15 103/24 107/13 109/2 115/20 118/2 122/17 124/17 126/2 128/6 131/3 136/2 142/20 149/4 157/3 158/19 160/14 161/15 171/4 173/13 174/11 177/6 178/8 181/14 181/15 184/25 186/19 187/25 188/9 190/12 193/16 194/2 194/20 196/5 196/6 202/22 205/4 205/23 207/25 210/25 210/25 211/14 214/12 217/9 217/13 217/14 224/8 229/24 231/6 237/20 238/16 238/20 239/3 239/11 245/10 245/16 246/24 246/25 246/25 247/23 251/15 259/9 260/25 262/5 262/8 262/20 262/21 265/16 269/12 273/17 274/16 274/20 275/2 276/15 279/20 281/15 283/21 285/11
can't [29] 11/19 40/8 41/10 45/5 48/13 48/13 51/18 52/20 56/1 57/4 60/8 62/1 69/4 101/4 110/14 121/5 125/10 126/17 133/4 141/23 150/16
185/16 222/25 233/21 250/12 250/25 251/18 256/25 286/4
cancelation [3] 237/6 237/14 238/20
cancelations [1] 169/3
canceled [6] 167/12 201/15 204/7 232/22 233/13 239/21
canceling [3] 168/23 233/1 233/17
cancellation [4] 202/2 224/23 227/15 237/11
cancellations [5] 167/6 167/15 169/9 169/13 169/14
cancer [2] 195/13 232/2
cannot [7] 20/12 29/7 29/12 58/15 171/7 256/11 286/1
cap [3] 184/16 219/12 220/13
capacity [2] 28/6 278/22
car [2] 12/1 20/3
care [53] 6/24 7/12 14/11 27/22 31/5 60/7 60/25 74/6 74/9 74/14 75/22 77/10 83/10 83/20 86/8 88/23 89/1 92/25 95/5 96/3 96/10 123/10 129/8 130/4 138/7 138/12 141/13 141/21 143/2 144/1 144/18 161/22 164/8 164/8 165/4 174/25 175/1 176/16 181/6 181/7 193/10 193/17 195/1 195/20 198/23 207/1 208/19 208/21 209/18 228/1 228/2 250/1 251/14
cared [4] 87/1 128/18 134/16 136/20
career [4] 43/10 74/14 175/24 274/1
careers [1] 181/2
careful [2] 41/5 65/11
caring [1] 136/5
Carl [1] 31/23
Carolina [1] 74/20
carried [1] 234/21
carry [1] 83/11
case [70] 1/3 4/2 5/21 6/4 6/12 7/23 8/12 8/13 8/22 9/19 12/2 13/24 14/24 19/22 21/21 29/3 31/3 39/15 43/2 44/23 46/2 46/15 47/6 47/9 50/20 52/17 56/6 56/7 57/3 61/16 62/3 63/20 66/10 67/4 67/12 67/23 68/2 68/12 70/5 73/5 116/17 123/8 127/21 128/1 139/19 143/12 147/24 148/11 150/5 164/20 188/13 189/19 189/20 191/23 195/5 197/11 197/15 207/17 209/14 235/9 239/24 243/2 243/9 243/10 243/13 243/16 244/9 256/12 261/3 281/11
cases [4] 5/4 35/9 62/10 201/5
catalog [1] 232/6
categories [3] 90/13 235/2 277/4
category [13] 90/14 122/4 126/4 126/16 205/14 205/14 205/15 251/2 260/9 269/14 270/6 275/13 280/5
catch [1] 76/18
Catley [1] 131/3
Caulil [3] 144/16 145/2 145/3
causal [2] 51/3 122/24
cause [2] 123/18 277/10
caused [2] 169/16 233/7
causes [3] 10/11 162/20 162/21
CC'g [1] 214/11
CDC [1] 175/10
center [34] 1/5 8/22 11/8 11/9 13/4 13/6 18/14 23/8 24/10 72/25 73/14 87/10 90/11 92/8 95/5 109/5 114/20 119/9 119/10 121/24 125/3 134/5 193/1 194/8 194/13 195/12 195/13 200/23 211/3 211/7 211/17 222/8 241/12 261/3
centers [6] 121/25 159/16 160/1 166/7 175/13 194/13
central [2] 131/6 179/15
CEO [25] 30/15 73/14 73/17 74/22 75/16 77/7 78/1 85/5 102/23 103/12 106/2 135/20 144/17 193/1 193/21 194/1 196/18 196/20 198/5 199/13 210/18 211/20 249/21 260/17 264/4
CEOs [5] 40/9 74/1 76/9 79/1 90/5
certain [20] 6/12 9/12 31/16 46/3 47/15 49/1 51/21 54/3 63/15 63/18 64/1 114/11 114/16 119/2 121/2 155/20 156/1 156/4 247/9 251/20
certainly [9] 31/18 32/10 54/19 71/2 71/14 157/8 179/8 240/10 240/23
certainty [3] 28/5 47/22 52/21
certified [1] 174/23
certify [1] 290/1
cetera [2] 195/22 201/24
CFO [4] 193/20 193/20 193/21 193/25
chain [6] 126/7 161/17 162/9 165/22 248/21 286/10
chairman [1] 102/8
champion [1] 219/3
chance [4] 72/20 73/9 145/10 280/6
change [65] 15/7 15/20 30/7 32/6 52/25 53/2 58/4 78/16 82/16 97/9 98/10 98/14 98/18 99/10 99/13 99/14 100/5 103/2 146/5 146/6 146/8 146/16 147/15 147/21 148/18 148/19 148/21 154/9 154/16 160/8 160/25 190/5 190/18 190/25 199/4 199/6 199/13 247/25 252/6 254/10 255/18 256/5 263/17 268/24 271/10 271/12 274/11 275/9 275/11 275/12 275/20 276/3 276/7 276/12 280/8 280/25 281/16 282/6 283/18 283/23 284/1

C

change... [4] 284/1 284/15 284/19 284/21
changed [13] 16/20 53/13 78/18 98/20 98/24 100/13 100/17 101/18 124/18 190/20 198/12 219/16 280/14
changes [9] 147/11 181/12 252/20 252/20 253/16 265/21 281/13 281/17 284/6
changing [8] 147/7 158/14 158/19 199/11 251/24 254/13 264/10 279/10
characteristics [5] 188/4 188/10 188/23 189/1 275/8
charges [1] 111/14
chart [6] 24/5 24/7 215/25 216/2 221/9 222/14
Chauncey [6] 78/23 80/19 84/25 90/10 92/4 93/14
check [3] 135/12 229/14 229/16
checked [1] 194/10
checking [1] 259/16
Chicago [1] 2/5
chief [31] 74/21 74/21 75/3 75/8 75/10 75/10 75/13 75/14 78/2 81/24 81/25 82/23 82/24 105/13 105/17 122/8 122/11 122/12 122/14 131/8 147/24 157/23 157/25 158/1 158/3 166/24 166/24 175/6 192/7 221/2 243/3
chime [1] 182/22
chimed [1] 279/13
choice [12] 16/10 21/9 32/15 36/5 167/2 167/2 167/5 180/7 180/16 206/7 206/8 258/6
choices [10] 31/21 31/22 33/5 51/9 51/12 52/7 52/10 52/14 68/11 206/10
choose [12] 31/12 32/24 52/16 107/3 107/13 183/13 188/12 218/20 252/24 257/22 281/21 283/16
chooses [1] 180/12
choosing [5] 6/24 30/25 31/11 32/23 36/2
chose [2] 70/12 173/10
Chuck [1] 102/8
circled [2] 210/2 211/11
Circuit [1] 73/5
circumstances [1] 183/23
cite [6] 46/13 46/22 47/8 47/11 47/23 47/25
cited [7] 4/23 5/19 47/3 101/19 101/22 115/4 233/10
cities [1] 194/23
citing [4] 115/2 137/4 138/4 143/3
city [1] 8/9
claim [2] 76/2 233/6
claimed [2] 101/1 136/3
claims [4] 131/25 132/1 132/23 162/16
clarify [2] 72/4 97/10
clarity [1] 275/16
Clark [1] 2/4
classes [1] 44/12
classic [1] 188/16
cleans [1] 18/9
clear [29] 15/21 17/13 24/20 27/11 29/5 40/20 50/7 51/14 63/14 66/6 70/15 114/4 133/20 148/13 149/9 152/21 153/11 155/23 156/10 164/4 180/18 237/5 256/4 260/23 260/24 270/8 272/5 279/13 289/9
clearing [1] 142/23
clearly [4] 70/6 178/22 211/21 211/24
click [17] 7/24 11/7 11/12 16/17 16/23 17/5 17/8 22/22 22/23 23/3 23/7 23/17 23/18 57/12 57/13 58/4 70/12
clicked [9] 38/10 39/5 45/11 45/11 54/12 57/16 59/23 59/24 60/1
clickers [2] 59/9 59/23
clicking [7] 16/8 16/9 16/16 17/3 20/13 23/1 59/17
clicks [12] 20/15 36/23 37/18 37/21 56/25 57/3 57/10 57/10 57/11 57/25 58/1 59/2
client [4] 124/12 124/21 246/18 260/17
clinical [4] 157/23 157/25 166/24 174/25
clinics [1] 168/19
close [2] 119/10 143/14
closer [4] 193/12 248/17 277/10 277/10
closest [2] 32/1 32/2
closings [1] 244/3
closure [1] 119/9
CLT [1] 51/15
CMA [2] 80/8 80/16
CMS [40] 54/4 54/16 54/18 55/17 96/14 106/23 106/25 106/25 107/3 107/4 107/6 107/14 108/16 108/16 111/16 111/25 112/24 112/25 113/9 113/10 113/11 113/16 113/17 142/20 142/24 143/3 175/10 175/16 175/19 179/17 180/25 190/22 217/17 218/24 219/19 223/8 223/11 223/15 245/10 275/14
CNO [1] 197/1
co [2] 175/6 205/23
co-editor [1] 175/6
coattails [2] 151/8 153/2
code [2] 80/7 178/19
code administration [1] 178/19
cohort [7] 151/16 151/17 151/20 152/13 153/3 275/7 277/17
cohort mean [1] 151/17
coin [2] 156/12 156/13
cold [1] 35/20
collaboration [2] 202/23 203/2
collaborative [1] 201/16
colleague [6] 73/3 144/14 248/21 250/8 288/4 288/9
colleagues [11] 144/18 145/17 157/20 158/10 158/13 160/12 214/24 215/3 232/15 265/14 274/19
collect [3] 9/20 51/13 124/7
collected [4] 49/16 79/6 79/22 80/10
collecting [2] 28/2 214/25
collectively [2] 166/14 172/7
collects [2] 179/19 245/4
Colleen [2] 220/25 221/1
college [3] 83/2 188/7 195/11
colors [1] 9/6
com [3] 285/13 285/22 288/10
combination [4] 43/12 43/24 81/23 82/8
combined [5] 9/9 31/14 34/12 236/2 236/5
come [42] 6/12 8/11 8/12 15/3 27/23 28/15 32/17 34/20 53/20 54/4 54/7 74/6 74/23 106/13 108/13 109/15 113/12 130/5 176/23 182/16 182/24 191/8 191/21 194/25 195/23 196/23 200/10 201/18 201/25 206/7 206/22 207/20 212/12 212/21 226/15 231/24 233/1 242/22 252/18 255/14 270/4 288/5
comes [14] 38/24 53/23 54/11 55/21 55/22 111/16 111/25 120/25 132/17 180/14 229/7 229/7 229/21 241/11
comfortable [1] 282/11
coming [15] 10/17 30/19 40/13 46/22 46/23 47/10 48/3 68/17 78/25 123/1 177/12 187/11 191/17 195/19 279/18
comment [16] 101/11 101/13 101/14 111/11 252/7 252/14 253/11 253/24 254/23 276/3 281/21 283/17 283/19 284/6 284/9 284/13
commentators [2] 255/21 257/21
commented [1] 190/6
comments [11] 91/17 137/21 139/2 159/7 179/10 252/9 255/2 258/3 276/5 283/21 283/23
commercials [1] 97/8
commission [23] 76/10 76/11 76/17 106/8 106/11 106/17 106/20 107/1 107/8 107/10 107/12 107/14 107/15 110/18 110/21 142/16 142/18 142/22 195/5 195/7 195/14 195/18 215/4
commissioned [2] 123/3 123/17
commit [3] 96/13 253/2 254/7
commitments [1] 145/11
committed [2] 164/14 176/24
committee [24] 81/19 81/22

C

**committee... [22]** 82/1 91/18 97/17 99/21 99/22 99/25 100/3 100/18 100/23 102/20 102/25 103/4 103/11 104/1 112/3 112/11 113/8 113/15 115/25 118/20 120/18 187/3
**common [5]** 5/17 153/16 246/17 254/9 254/11
**Commonwealth [1]** 74/11
**communicate [2]** 286/20 288/13
**communicated [1]** 128/9
**communicates [2]** 262/2 262/10
**communication [2]** 128/10 285/6
**communications [2]** 225/15 227/2
**community [35]** 4/3 6/23 7/3 24/9 24/13 24/16 25/14 26/11 29/4 32/14 38/7 38/21 59/4 75/22 76/2 76/8 82/9 82/11 82/15 83/4 84/2 91/18 94/3 96/24 97/8 97/11 97/15 98/2 139/3 186/13 203/9 206/2 212/5 228/20 259/24
**companies [4]** 42/7 42/11 42/19 92/1
**company [4]** 112/4 112/12 229/13 229/15
**compared [3]** 32/24 219/13 219/17
**comparison [2]** 152/3 220/4
**competency [1]** 32/4
**competing [1]** 40/2
**competitors [1]** 222/5
**compiled [1]** 221/21
**compiling [1]** 221/8
**complained [2]** 100/3 100/4
**complaining [7]** 101/25 102/1 200/9 231/17 231/20 231/22 231/23
**complaint [4]** 141/24 229/7 254/9 254/11
**complaints [8]** 98/10 99/19 99/23 100/2 127/16 127/17 202/15 232/24
**complete [11]** 33/19 155/9 228/9 228/10 228/14 235/22 252/24 253/17 254/16 256/10 256/13
**completed [4]** 150/3 184/9 256/14 279/23
**completely [10]** 63/11 156/18 188/2 230/2 270/9 273/10 282/14 282/17 282/20 282/22
**completing [3]** 152/9 218/21 257/23
**complex [2]** 121/7 184/14
**compliance [7]** 79/6 79/22 80/10 166/18 198/2 198/13 236/21
**compliant [1]** 216/1
**complication [1]** 10/23
**components [2]** 175/21 178/6
**composite [5]** 174/3 175/20 177/21 178/14 178/19
**compound [2]** 87/20 88/9
**comprehend [1]** 44/19
**comprehension [1]** 44/15
**comprehensive [3]** 194/12 195/12 245/15
**compromise [2]** 270/12 281/5
**comps [1]** 285/5
**computerized [1]** 79/19
**coms [1]** 288/16
**concentrate [1]** 196/25
**concentration [1]** 193/9
**concept [3]** 33/7 56/3 150/19
**concern [14]** 33/5 99/20 101/5 101/9 102/2 102/7 103/5 112/10 122/18 275/25 276/17 276/19 277/10 277/11
**concerned [12]** 81/7 82/23 96/11 101/1 101/16 101/18 152/24 152/25 165/4 186/12 276/20 278/8
**concerning [6]** 10/19 93/9 96/15 141/16 141/18 142/2
**concerns [27]** 91/14 91/16 91/24 92/1 96/19 96/22 96/24 97/6 100/1 102/13 112/4 114/24 129/19 139/21 140/2 147/18 208/14 253/16 253/20 253/24 254/6 255/22 258/2 277/19 278/12 281/4 282/19
**conclude [2]** 115/20 251/12
**concluded [1]** 95/19
**concludes [1]** 147/14
**conclusion [1]** 62/15
**conclusions [4]** 46/23 53/12 58/4 66/11
**condition [3]** 79/19 87/24 148/9
**conditioned [1]** 188/4
**Condren [1]** 192/4
**conducted [1]** 68/13
**conducting [1]** 67/22
**confer [1]** 247/3
**conferred [1]** 116/12
**confident [2]** 228/10 228/18
**confidential [7]** 116/1 116/4 116/9 245/25 246/7 246/10 246/14
**confidentiality [3]** 116/6 245/24 246/4
**confirm [2]** 125/10 134/2
**confirmed [1]** 133/25
**confused [9]** 40/14 40/16 40/18 40/21 41/7 41/8 41/14 49/23 72/2
**confusing [2]** 127/10 132/24
**confusion [3]** 67/14 72/1 72/2
**connecting [1]** 192/11
**connection [3]** 43/19 108/21 109/13
**conscious [1]** 106/1
**consensus [2]** 182/24 279/1
**consequence [1]** 180/6
**consequences [4]** 162/13 167/1 183/18 189/3
**Consequently [2]** 140/25 208/24
**consider [12]** 13/20 15/24 44/3 48/8 62/10 62/18 62/21 97/24 110/21 140/22 222/5 281/20
**consideration [1]** 186/15
**considered [2]** 68/17 129/18
**considering [1]** 44/8
**considers [1]** 170/23
**consistent [11]** 15/8 15/20 24/14 25/3 32/6 32/10 91/21 94/5 133/3 151/8 177/23
**consistently [2]** 175/11 200/8
**constantly [3]** 110/19 236/23 236/24
**constituents [1]** 82/18
**construction [1]** 117/4
**consultant [2]** 146/18 181/13
**consultants [1]** 181/14
**consultation [2]** 108/22 109/16
**consulted [1]** 42/6
**consulting [4]** 42/17 42/19 43/6 43/24
**consume [2]** 4/25 20/4
**consumer [85]** 4/24 5/5 5/11 6/23 7/5 7/10 7/12 7/24 9/11 10/4 11/11 12/8 16/7 19/3 19/13 19/23 22/20 23/13 27/11 30/5 30/10 31/6 31/21 33/3 34/2 35/25 36/5 36/23 37/17 37/23 38/15 38/18 40/12 40/14 43/13 43/18 43/25 44/5 44/10 44/15 44/15 44/18 44/19 45/19 46/18 48/3 48/8 48/10 48/11 48/13 50/15 50/25 51/8 51/9 51/12 52/1 52/7 52/9 52/11 52/12 55/11 55/14 58/20 59/1 59/9 59/20 60/19 60/23 61/2 62/11 62/18 66/1 66/3 66/13 66/15 66/17 66/23 67/1 67/4 67/14 67/23 68/1 69/18 71/10 155/17
**consumer's [2]** 9/25 48/20
**consumer's perception [1]** 9/25
**consumers [135]** 4/25 5/12 5/18 6/18 6/24 7/15 8/5 8/8 8/25 9/1 9/8 9/12 9/14 10/8 10/17 11/10 11/13 11/15 11/19 12/10 14/9 14/12 17/8 17/9 17/13 17/24 18/18 19/7 19/9 19/18 19/25 20/4 21/6 21/12 21/23 22/6 22/8 22/10 22/16 23/3 23/23 23/25 24/13 24/15 25/2 25/15 28/2 30/21 30/22 31/11 33/4 35/17 36/2 36/19 37/21 38/3 39/10 39/13 40/17 40/23 41/3 41/14 41/23 42/24 43/22 44/1 44/5 44/24 45/1 45/3 45/10 45/20 45/23 46/2 46/3 46/4 47/10 47/17 48/18 48/18 48/22 48/24 49/4 49/5 49/9 49/10 49/11 50/1 52/9 52/16 54/6 57/7 57/8 59/12 59/17 59/21 60/3 60/7 60/20 60/25 61/7 61/10 62/12 62/19 64/6 66/6 66/17 67/6

C

**consumers... [27]** 68/23 69/1 69/3 70/2 70/10 70/12 70/14 71/18 72/6 72/9 72/12 154/20 155/7 155/8 164/7 165/4 178/25 179/5 179/13 212/6 212/14 212/20 212/21 259/12 260/3 262/2 262/11
**consumers' [2]** 30/24 51/17
**contact [4]** 225/11 226/11 226/12 259/4
**contacted [2]** 191/9 191/18
**contain [2]** 38/20 68/5
**contained [4]** 3/16 8/1 27/20 67/2
**contains [2]** 68/5 162/2
**content [9]** 4/25 20/4 27/20 38/14 42/10 45/21 50/11 129/12 129/25
**contents [2]** 27/6 141/22
**context [12]** 31/5 44/7 51/10 52/14 56/5 56/7 151/1 159/8 191/10 264/23 285/4 287/16
**continue [13]** 15/15 27/17 28/11 78/13 83/13 94/20 97/19 97/20 174/15 212/7 212/12 212/13 251/5
**continued [2]** 53/2 97/2
**continues [2]** 174/1 212/6
**continuing [3]** 94/2 97/5 212/15
**continuously [2]** 10/22 198/9
**contract [24]** 201/15 202/1 202/6 202/9 202/24 202/24 204/7 205/1 208/17 224/18 224/23 225/13 225/17 226/4 226/7 227/4 227/8 227/9 228/3 233/9 233/17 239/18 239/18 239/21
**contracts [2]** 175/11 239/15
**contrast [2]** 18/15 223/14
**contribute [2]** 31/17 172/7
**contributed [2]** 141/3 209/2
**contributing [3]** 162/20 162/21 188/24
**control [1]** 187/25
**controlled [2]** 148/4 148/9
**controller [1]** 193/20
**controversial [1]** 281/24
**convenience [1]** 32/4
**convenient [1]** 94/16
**conversation [15]** 71/23 97/14 129/12 129/25 147/6 204/9 213/16 225/21 225/24 227/7 232/6 264/24 266/9 278/6 278/14
**conversations [7]** 81/17 97/7 113/7 196/24 197/2 199/14 204/17
**convey [5]** 8/25 14/3 21/16 21/24 71/18
**conveyed [2]** 19/3 55/20
**conveying [1]** 18/5
**conveys [1]** 21/5
**Cook [1]** 131/13
**cookies [1]** 38/20
**copy [1]** 73/5
**copying [1]** 246/14
**cores [1]** 245/19
**corner [1]** 25/21
**Cornerstone [5]** 39/16 39/18 39/20 40/1 40/3
**corporate [1]** 104/25
**Corporation [4]** 191/9 191/18 192/5 192/15
**correct [256]** 30/14 36/20 36/21 36/25 37/24 39/5 39/16 39/21 40/18 40/24 41/15 41/25 42/4 42/20 42/21 43/13 43/19 43/20 43/22 44/10 44/25 46/15 48/9 50/9 50/17 50/22 51/1 51/5 51/17 51/20 52/1 52/3 52/7 52/11 52/22 53/16 54/14 54/22 56/12 57/17 57/20 57/23 58/10 58/17 58/24 59/15 60/5 60/15 60/18 67/7 77/17 78/12 96/17 98/11 98/15 98/16 98/18 98/19 98/21 99/11 99/14 99/17 99/19 99/24 100/5 100/19 102/6 103/16 104/6 104/12 105/11 105/12 105/18 105/19 106/3 106/6 106/18 107/4 108/18 108/21 108/25 110/1 113/20 114/5 114/9 114/23 115/3 115/10 115/11 115/15 118/15 119/1 120/21 120/22 122/6 125/4 125/18 127/19 133/25 136/12 138/16 138/17 139/5 141/17 145/14 145/18 145/21 146/2 146/22 151/23 152/12 152/20 153/9 155/9 155/25 156/21 157/18 157/22 158/8 158/12 158/14 158/15 158/17 158/18 161/17 162/19 165/6 165/12 166/7 166/18 166/19 168/16 169/5 170/4 170/10 170/13 170/24 171/15 171/22 172/2 172/18 172/22 172/25 173/9 173/18 174/2 175/5 175/6 175/18 178/2 182/2 182/18 183/1 183/8 184/24 186/22 187/2 187/6 191/1 191/2 191/6 191/7 197/9 197/25 205/17 208/10 214/20 215/1 215/8 215/9 216/19 217/3 217/16 217/19 217/24 217/25 221/3 221/4 221/22 222/8 222/12 222/16 223/8 223/9 223/17 223/20 223/21 224/3 224/10 224/13 224/21 225/2 225/6 225/10 226/4 227/19 227/20 227/22 227/23 228/20 230/11 230/12 231/2 231/14 232/13 232/14 234/14 244/22 245/2 245/7 245/14 248/1 249/9 249/10 250/6 250/7 250/13 251/6 251/14 252/9 253/11 253/22 254/8 255/3 261/23 261/24 262/3 262/12 263/4 263/5 264/2 264/20 264/21 264/25 267/10 269/3 271/3 271/11 271/24 272/2 273/10 275/6 276/8 277/24 281/17 281/18 282/2 282/14 284/10 284/12 284/16 286/2 288/5 288/10 289/3 290/1
**correction [1]** 168/11
**correctly [2]** 12/25 71/24
**correspondence [4]** 142/2 225/18 225/19 225/20
**corroborate [2]** 15/8 31/18
**corroborates [1]** 30/7
**corroborative [1]** 238/17
**cost [5]** 31/13 68/24 125/1 214/13 275/14
**costs [2]** 104/15 124/7
**couched [1]** 51/1
**coughing [1]** 35/15
**could [98]** 11/23 11/25 13/16 21/8 24/7 31/2 35/19 44/15 47/7 49/4 53/8 55/19 55/25 62/18 68/7 69/11 71/22 71/22 73/23 76/23 78/23 84/25 88/6 92/4 93/14 96/20 101/13 104/24 105/2 107/3 108/22 110/18 112/8 112/24 115/18 118/17 119/22 121/13 122/1 122/7 123/10 133/11 133/17 139/11 144/19 146/9 146/11 151/2 154/14 154/24 166/14 169/18 169/21 169/23 170/8 174/20 177/15 180/10 183/13 183/17 184/13 185/14 185/24 187/18 187/23 189/21 189/23 192/5 192/6 193/4 195/16 199/23 212/5 213/17 213/20 214/7 214/18 216/1 220/1 220/21 227/13 229/4 230/19 241/3 241/3 241/23 243/20 250/9 251/14 256/20 281/9 281/25 282/12 282/21 282/24 283/19 284/24 285/18
**couldn't [3]** 119/15 243/20 277/24
**counsel [33]** 26/8 26/11 39/22 69/12 70/20 73/5 94/6 104/20 121/18 128/25 129/4 130/10 130/11 133/18 136/25 137/8 137/12 138/20 139/9 139/20 140/12 176/20 177/18 192/2 192/8 192/11 225/3 225/4 225/19 232/16 246/24 268/18 289/5
**counsel's [1]** 26/7
**count [2]** 172/5 172/24
**counted [3]** 24/11 46/16 68/21
**counter [2]** 144/19 243/11
**counteract [1]** 97/12
**country [5]** 112/8 166/7 235/3 236/6 246/2
**county [8]** 76/1 76/4 82/25 88/11 194/5 194/9 194/11 221/11
**couple [6]** 90/5 142/15 143/5 147/7 207/23 242/9
**course [14]** 93/16 108/1 109/25 132/18 143/25 150/6 160/9 169/20 178/3 179/17 194/11 247/13 266/17 267/2
**court [53]** 1/1 2/7 3/24 4/12

C

**court... [49]** 6/14 7/4 7/9 8/4 11/16 11/24 18/4 31/2 35/13 36/18 45/22 46/24 47/7 47/21 48/1 48/21 50/7 52/19 54/11 59/7 60/24 62/19 63/6 66/12 72/23 73/20 73/25 87/8 92/13 112/25 117/8 127/23 131/3 157/11 157/12 159/18 174/20 182/1 187/18 193/5 193/16 194/2 199/23 214/14 275/16 276/15 283/21 289/22 290/6
**Court what [1]** 112/25
**Court's [2]** 116/21 186/4
**COURTNEY [1]** 2/1
**courtroom [1]** 66/22
**coverage [2]** 34/7 34/23
**COVID [5]** 78/2 78/3 104/14 196/25 255/13
**CPO [2]** 79/20 198/18
**CPOE [9]** 106/5 106/8 106/15 125/3 197/19 214/25 217/18 219/25 278/16
**CRAIN [12]** 1/17 3/11 36/22 38/1 50/17 274/11 277/14 278/19 280/18 282/13 282/16 285/1
**create [1]** 266/14
**created [2]** 110/14 277/19
**creating [1]** 260/11
**credence [1]** 7/14
**credentials [1]** 254/4
**credit [4]** 106/12 183/14 185/19 186/5
**critical [2]** 163/18 198/23
**criticism [1]** 63/22
**criticisms [1]** 63/23
**cross [16]** 36/11 36/13 69/8 98/6 98/7 142/15 174/16 213/4 213/6 236/12 241/4 242/18 273/13 273/13 273/15 287/23
**cross-examination [13]** 36/11 36/13 69/8 98/6 98/7 142/15 174/16 213/4 213/6 236/12 241/4 242/18 273/15
**cross-examine [1]** 287/23
**crossed [1]** 238/19
**crosses [1]** 180/9
**Crutcher [1]** 1/18
**Cueto [1]** 91/19
**Curchecko [1]** 167/23
**curious [2]** 168/7 168/10
**current [6]** 112/25 151/16 151/17 152/13 255/24 275/5
**currently [5]** 76/16 118/8 177/2 183/18 215/7
**cut [2]** 99/3 268/15
**CV [1]** 1/3
**cycle [1]** 275/5
**cycles [2]** 148/22 275/5

D

**D.C [1]** 273/21
**daily [10]** 83/10 131/16 132/25 133/22 133/25 134/12 134/14 ... 205/25 279/4
**Daily's [1]** 134/10
**damage [4]** 10/20 11/2 212/4 212/19
**damaging [1]** 233/18
**Danforth [19]** 146/14 146/21 146/24 249/23 257/5 265/10 265/13 269/10 270/23 272/1 272/25 273/3 276/12 277/12 278/5 280/19 280/24 281/12 282/18
**Danforth's [2]** 266/15 267/24
**data [226]** 6/7 6/10 6/10 6/11 14/6 14/13 14/14 14/14 14/23 14/25 15/1 15/18 15/23 18/20 19/7 22/11 23/22 23/25 24/3 25/1 25/11 25/20 26/9 26/10 29/18 29/21 32/5 33/15 38/6 38/7 38/12 38/21 39/24 41/1 45/16 46/1 46/25 47/5 47/13 47/14 47/17 48/14 48/17 48/19 48/20 48/25 49/9 49/11 49/12 49/15 50/1 50/4 52/17 55/4 57/1 57/2 57/8 57/21 57/22 57/23 57/24 58/10 58/11 58/15 59/8 59/10 59/19 61/7 61/9 62/22 63/13 63/20 66/9 66/10 67/3 67/15 68/2 68/4 68/9 68/12 71/24 73/23 73/24 79/6 79/9 79/11 79/14 79/22 79/25 80/2 80/5 80/10 80/12 80/14 80/17 80/25 81/2 81/13 82/3 88/13 98/3 100/9 100/15 100/15 101/6 106/9 106/11 111/8 111/15 111/17 111/20 111/24 111/25 112/2 116/17 124/8 125/1 126/8 126/9 151/15 153/1 155/24 164/1 164/2 164/6 164/9 164/16 164/17 164/25 165/2 165/5 165/6 165/12 170/15 170/17 170/17 170/19 170/24 171/1 171/1 171/6 172/1 172/18 172/19 173/1 173/2 173/9 173/10 173/14 173/14 173/17 173/25 180/13 180/14 181/4 181/16 181/21 183/11 183/18 184/6 184/12 185/11 186/2 186/21 187/14 188/12 188/22 195/24 197/23 205/6 205/24 209/6 215/1 216/7 219/4 219/25 220/15 220/15 220/16 221/21 223/4 234/20 234/25 235/16 236/18 236/19 236/20 245/6 245/10 245/17 245/19 246/12 246/14 246/18 247/7 248/12 249/6 249/18 250/16 250/18 250/22 250/25 256/12 256/24 261/2 261/9 261/9 261/19 261/19 265/24 266/15 266/21 274/2 275/12 277/3 277/11 277/16 278/10 278/24 282/9 282/21 285/7 285/15 287/10 287/12 287/14
**date [14]** 92/15 94/14 119/21 122/16 122/18 128/9 129/11 140/14 186/22 194/11 210/20 226/5 239/4 240/4
**dated [5]** 115/25 133/21 139/13 238/10 263/23
**Daubert [1]** 5/23
**daughter [6]** 85/12 85/18 87/9 134/4 135/4 135/16
**Davis [24]** 145/13 145/15 145/18 157/5 157/17 157/21 157/23 158/2 158/10 162/2 166/6 166/13 166/21 167/15 167/24 168/18 168/19 169/3 169/16 191/4 191/6 191/18 192/9 192/16
**Davis' [2]** 162/18 166/18
**day [15]** 19/25 72/21 144/12 160/9 196/12 215/1 239/18 240/9 240/19 242/14 243/22 259/17 270/21 272/23 280/22
**days [7]** 141/6 196/13 205/2 214/14 227/16 238/8 244/1
**DC [1]** 1/19
**deal [13]** 10/24 22/1 43/7 43/8 51/7 51/15 57/1 116/13 117/18 133/15 204/8 218/24 226/3
**dealt [2]** 5/22 26/16
**Dear [1]** 95/10
**deaths [1]** 132/2
**debate [1]** 40/16
**decades [4]** 21/22 31/3 52/13 68/9
**deceived [1]** 41/23
**December [7]** 93/22 140/10 167/21 210/21 212/3 216/6 232/4
**December 19 [1]** 167/21
**December 2024 [1]** 232/4
**December 30 [1]** 93/22
**December 30th [1]** 140/10
**decent [1]** 49/25
**deception [1]** 42/1
**decide [2]** 78/9 261/1
**decided [7]** 86/11 129/18 130/3 135/3 169/4 196/20 264/1
**decides [1]** 23/18
**decision [25]** 4/18 7/19 9/15 31/6 78/9 96/6 102/22 105/3 105/24 106/1 107/7 107/11 118/9 142/19 163/18 163/19 166/25 182/17 189/2 196/23 212/17 225/16 247/17 278/15 282/1
**decisions [5]** 4/25 5/1 9/16 9/17 86/8
**deck [5]** 108/25 109/12 109/22 266/14 277/14
**declarant [1]** 210/10
**declarant's [1]** 85/18
**declarants [1]** 157/12
**declaration [1]** 124/1
**decline [12]** 18/19 19/6 62/25 63/17 90/5 90/8 91/10 205/11 206/9 207/3 207/7 230/14
**declined [18]** 13/25 14/2 14/7 14/12 15/22 18/17 21/2 64/23 89/1 90/15 114/9

D

**declined... [7]** 129/11 143/2 233/9 241/12 241/20 248/7 249/6
**declines [5]** 12/23 90/17 91/3 205/6 206/17
**declining [4]** 88/22 129/8 200/6 207/10
**decrease [9]** 118/4 118/5 118/11 118/14 119/8 120/24 121/2 121/11 143/16
**decreased [1]** 230/10
**dedicated [3]** 88/11 175/23 181/2
**deductive [1]** 14/18
**deeply [1]** 56/6
**Defendant [3]** 1/10 2/1 26/15
**Defendant's [1]** 85/25
**Defendants [1]** 139/18
**defended [2]** 148/8 177/7
**Defense's [1]** 15/10
**defined [1]** 65/10
**definitely [3]** 212/14 219/2 266/18
**definition [4]** 114/21 261/10 282/23 289/12
**definitions [1]** 289/9
**degree [12]** 4/18 5/22 22/4 28/5 47/22 52/20 74/10 74/18 190/11 193/8 273/20 281/25
**deliver [4]** 76/4 77/2 163/10 196/11
**Delray [25]** 8/9 8/15 8/22 11/8 11/9 13/4 13/6 18/13 20/10 23/8 24/10 37/9 38/17 45/9 52/25 64/11 65/24 131/15 260/17 260/18 260/21 261/2 261/6 262/2 262/11
**Delray's [1]** 263/3
**demonstrate [1]** 16/3
**demonstratives [2]** 3/15 3/16
**denote [1]** 284/3
**dense [1]** 30/11
**department [11]** 74/16 91/12 115/20 132/17 135/2 143/15 193/18 214/22 273/23 273/24 285/22
**departments [2]** 81/24 216/2
**depend [3]** 71/20 164/15 165/13
**depending [3]** 54/6 88/5 148/14
**depends [14]** 7/22 32/24 44/2 44/6 44/7 53/25 58/11 60/22 114/10 114/21 122/2 163/25 164/24 204/22
**depicted [1]** 15/9
**depiction [1]** 267/5
**depictions [1]** 261/12
**depicts [1]** 24/7
**deposed [2]** 5/4 150/5
**deposition [39]** 39/4 41/6 41/9 41/11 41/12 42/5 42/17 122/14 148/8 150/21 167/14 168/13 168/14 168/15 168/25 170/1 192/1 220/7 224/12 224/15 239/24 240/5 240/14 240/16 252/4 256/18 257/7 264/4 265/6 265/8 266/3 266/7 267/1 267/23 267/25 269/4 271/17 280/9 289/13
**depositions [2]** 15/6 15/7
**derth [1]** 60/3
**describe [15]** 8/17 11/23 20/6 29/15 29/25 31/2 31/23 150/22 174/20 193/4 193/16 194/20 195/16 199/23 274/16
**describe what [1]** 274/16
**described [1]** 7/14
**describes [2]** 61/8 190/12
**describing [1]** 189/10
**description [4]** 23/17 87/6 87/8 249/3
**design [3]** 42/8 146/24 178/20
**designated [1]** 189/21
**designation [3]** 35/9 116/7 246/10
**designations [6]** 3/6 3/7 243/11 243/12 243/19 243/21
**designed [1]** 42/23
**designer [2]** 42/4 42/12
**designs [1]** 178/11
**desire [1]** 103/17
**desk [3]** 20/2 20/7 20/18
**despicable [5]** 210/4 211/15 230/23 230/24 231/10
**despite [5]** 70/2 86/11 173/17 173/25 176/19
**detail [5]** 20/21 22/7 27/7 28/2 71/24
**detailed [12]** 23/6 23/6 23/7 23/9 24/14 24/19 24/25 25/16 35/10 56/16 59/5 184/11
**details [4]** 24/21 87/15 130/11 184/17
**deter [4]** 6/24 30/25 36/2 212/21
**deteriorated [2]** 151/20 279/25
**determination [4]** 5/21 58/1 66/16 186/16
**determine [11]** 44/19 45/7 45/10 57/14 59/8 59/14 59/16 67/13 85/21 123/4 228/6
**determined [3]** 153/20 197/3 200/15
**determining [1]** 42/23
**detriment [1]** 41/23
**detrimental [1]** 7/2
**devastating [1]** 208/18
**developed [1]** 182/20
**developing [3]** 170/3 170/10 178/23
**development [4]** 175/18 206/3 263/17 287/17
**devote [1]** 257/22
**diagnostic [2]** 119/9 119/10
**Dicker [1]** 2/3
**did [268]** 4/4 4/6 4/9 6/3 6/6 6/12 6/13 7/4 12/25 12/25 13/8 13/20 13/21 14/24 15/19 15/24 15/25 21/5 23/22 23/25 25/1 26/2 26/11 29/2 30/4 31/16 32/1 32/8 32/18 32/20 32/21 33/20 33/22 34/20 37/8 38/11 38/11 40/9 40/11 40/12 45/9 45/13 45/15 46/4 48/16 48/17 48/19 50/7 50/10 51/4 53/19 57/9 57/13 57/25 59/20 62/10 62/17 63/12 63/14 66/13 66/21 67/1 67/3 68/8 68/8 70/14 73/17 74/18 74/23 77/15 78/6 78/13 78/15 78/17 78/20 80/25 81/1 81/5 81/8 82/1 82/19 83/7 83/13 83/15 84/22 84/24 87/9 88/8 88/16 88/17 89/22 89/24 89/25 90/1 93/7 94/13 95/8 95/9 99/15 100/11 100/24 101/3 101/9 102/9 102/14 102/15 102/19 102/24 103/1 103/4 103/11 103/17 103/22 105/9 105/10 119/10 120/23 120/24 121/20 122/19 123/18 128/22 128/24 129/16 130/2 130/5 131/20 131/22 133/7 134/1 134/4 134/10 135/10 136/25 138/8 138/20 139/8 139/9 139/10 139/12 139/23 140/18 141/10 141/11 143/8 143/14 155/22 156/4 157/19 168/15 176/21 176/25 177/3 177/6 187/4 189/4 189/25 190/1 190/2 190/12 191/8 191/21 192/14 193/22 196/18 196/23 198/4 198/6 199/4 199/5 199/6 199/10 199/12 199/13 200/5 201/23 202/3 202/5 202/14 203/17 204/6 204/15 205/10 207/17 207/19 207/20 207/21 207/22 209/6 209/23 209/25 211/24 212/17 213/16 214/7 219/24 220/6 220/14 220/17 220/19 221/9 221/13 221/15 221/19 224/22 226/6 226/9 226/14 226/16 226/23 227/24 228/10 230/1 230/8 232/3 232/6 233/2 233/11 234/18 237/8 237/24 238/1 238/12 238/14 240/5 240/6 240/9 240/10 240/12 241/19 242/1 247/7 251/18 257/14 257/17 259/19 262/14 262/15 262/16 262/24 265/25 266/5 266/14 268/13 270/20 270/21 275/24 277/11 277/19 277/21 278/1 278/2 278/20 279/2 279/4 279/5 279/6 279/9 280/10 281/5 281/6 282/5 283/21 283/23 284/19 286/4 287/1 288/17
**didn't [67]** 19/14 38/2 39/24 48/8 49/20 50/13 50/15 51/9 51/12 52/12 55/16 57/13 57/21 58/23 62/14 66/20 66/20 67/7 68/1 81/2 81/20 83/11 96/16 99/5 99/8 100/13 100/14 101/8 103/8 103/9 103/18 103/20 105/25 106/3 122/22 134/2 141/21 142/2 151/14 164/20 165/1 177/18 189/24 202/20 225/5 228/9

D

**didn't... [21]** 228/14 231/24 232/9 232/24 233/1 233/16 242/2 242/6 244/1 254/7 257/15 259/18 262/13 266/23 270/15 273/7 277/21 278/17 282/1 282/16 286/18
**die [2]** 33/7 212/22
**difference [3]** 55/1 72/11 156/12
**different [39]** 5/3 8/6 8/12 18/17 31/11 33/25 43/15 46/25 53/24 54/1 54/6 54/24 54/24 54/25 55/19 60/10 78/5 94/14 106/14 150/10 165/22 182/13 182/13 182/23 187/7 195/18 216/1 217/16 220/12 221/10 222/4 229/18 247/10 259/13 262/16 270/13 270/14 281/16 285/20
**differentiation [1]** 13/14
**differs [1]** 20/6
**difficult [3]** 9/16 20/14 184/19
**dig [3]** 252/22 253/21 254/1
**digital [5]** 42/13 42/16 45/17 50/8 50/10
**direct [19]** 3/20 39/20 64/20 71/7 73/15 104/8 133/18 145/7 149/7 238/18 238/23 242/4 244/20 258/15 265/9 268/16 269/8 271/20 273/14
**directed [4]** 77/19 92/7 202/21 209/20
**directing [1]** 210/16
**direction [7]** 280/3 280/17 281/21 281/23 283/2 283/5 283/14
**directions [1]** 11/21
**directive [4]** 104/21 105/1 116/3 226/16
**directly [11]** 38/4 45/16 48/14 49/1 67/3 99/22 127/18 150/17 150/20 153/17 245/10
**director [15]** 81/10 105/11 125/14 125/15 125/25 131/13 199/7 201/19 201/20 203/3 203/9 203/12 222/14 226/12 274/4
**directors [1]** 49/19
**directorship [1]** 203/21
**disagree [10]** 52/23 111/5 111/19 111/22 151/23 152/1 163/13 177/1 177/4 284/20
**disappointed [1]** 252/19
**disappointment [1]** 113/16
**disclose [2]** 6/16 130/3
**disclosed [3]** 189/16 189/16 190/8
**disclosure [1]** 56/3
**disclosures [1]** 56/9
**discourage [2]** 28/2 151/7
**discovery [4]** 86/17 89/7 93/17 143/11
**discuss [9]** 96/6 178/3 178/5 182/15 209/23 242/2 247/9 247/10 247/16
**discussed [14]** 6/11 39/8 41/2 53/10 81/15 102/3 105/23 127/20 128/13 181/23 220/8 274/11 275/20 287/15
**discussing [8]** 178/17 184/5 185/18 185/21 187/13 189/15 276/16 280/7
**discussion [23]** 25/3 28/20 35/10 69/17 103/24 132/23 172/6 176/2 178/5 182/12 183/11 183/14 184/2 184/14 185/8 186/2 209/13 213/14 213/17 230/9 247/22 276/11 281/19
**discussions [12]** 146/5 150/19 184/11 199/16 205/5 222/8 224/9 241/10 276/11 282/4 282/9 286/10
**disease [1]** 274/2
**disgrace [1]** 132/10
**disincentive [1]** 183/24
**disincentivizing [2]** 183/12 184/3
**display [3]** 265/21 267/11 267/13
**displays [1]** 41/24
**dispose [1]** 243/24
**dispute [2]** 197/15 214/17
**disrespect [2]** 168/9 168/11
**dissatisfaction [1]** 113/9
**dissertation [1]** 133/4
**distance [1]** 8/13
**distill [1]** 278/25
**distinct [1]** 245/12
**distinction [1]** 72/5
**distinctions [1]** 14/3
**distinguish [1]** 56/24
**DISTRICT [3]** 1/1 1/1 1/12
**DIVISION [1]** 1/2
**DMV [3]** 107/1 107/14 142/21
**DNF [1]** 6/22
**do [557]**
**doctor [10]** 26/21 80/21 97/15 101/9 136/13 136/15 139/6 168/8 180/2 192/22
**doctors [17]** 13/17 14/11 80/21 86/21 86/24 88/8 91/13 91/14 127/19 129/16 129/18 139/4 166/12 200/8 200/22 202/17 226/6
**document [128]** 22/5 22/6 22/9 22/11 22/12 23/11 23/19 23/20 23/24 24/1 24/23 24/24 25/2 25/4 25/18 25/19 26/23 26/25 27/7 27/10 27/12 27/19 28/15 28/18 30/6 30/9 30/11 30/13 30/17 38/9 38/13 38/22 38/23 38/23 41/19 45/17 47/18 47/19 47/20 56/18 59/6 69/19 85/1 85/11 85/21 93/16 93/25 94/13 109/4 109/14 112/19 116/1 117/6 117/12 117/20 118/3 118/17 125/24 127/5 127/12 131/8 132/15 132/17 132/22 133/21 133/22 133/23 133/24 137/5 137/6 137/10 137/15 137/25 140/12 140/14 152/19 154/25 156/6 156/4 157/8 157/9 158/19 161/18 162/5 165/5 165/7 165/11 168/6 168/12 177/15 177/17 177/20 185/1 186/3 192/3 192/4 208/2 210/7 213/24 215/15 220/22 221/5 221/23 223/6 233/5 237/22 238/4 238/8 238/17 238/24 239/3 241/25 242/7 242/9 246/1 246/15 247/2 247/11 251/17 252/9 254/24 263/19 264/22 267/4 267/15 271/15 271/15 271/17
**documentation [1]** 134/17
**documenter [1]** 155/16
**documents [27]** 21/21 25/10 25/13 25/14 25/20 26/1 26/7 31/16 89/8 93/19 116/4 116/10 116/13 116/19 116/23 116/25 117/24 161/19 162/2 191/4 191/25 225/22 227/12 233/4 233/6 238/12 251/21
**does [113]** 8/14 8/16 8/25 9/16 10/7 13/6 14/3 14/12 15/20 16/11 16/16 16/16 16/17 16/19 16/22 16/25 17/15 18/12 18/13 18/15 19/13 19/16 20/17 21/16 21/24 21/24 22/2 25/24 25/25 29/12 29/20 29/25 30/2 32/6 33/14 33/15 33/18 34/24 40/3 41/13 47/4 55/24 56/24 58/9 60/11 65/6 65/15 65/16 70/23 71/10 71/18 76/13 77/4 79/3 79/14 79/16 79/19 80/4 80/7 80/16 80/21 80/23 86/6 86/6 86/8 87/2 106/11 106/25 109/11 111/9 118/10 120/5 120/17 124/25 131/24 139/14 148/6 154/20 155/4 155/8 155/13 155/18 155/19 156/6 156/8 164/15 182/14 186/15 194/16 195/9 201/3 201/10 203/6 207/12 208/21 217/18 217/20 228/17 228/17 230/20 230/21 230/22 236/22 245/11 248/12 249/9 259/2 260/7 261/2 262/15 285/9 287/13 288/14
**does footnote [1]** 70/23
**doesn't [36]** 23/6 27/8 30/7 38/10 38/10 63/4 63/11 63/20 64/8 65/1 68/4 71/1 71/2 71/2 82/4 121/10 126/23 127/11 152/14 155/11 155/16 166/21 167/8 168/1 172/9 172/22 188/17 188/18 212/8 229/11 229/19 231/7 259/17 262/2 262/11 288/16
**doesn't achieve [1]** 152/14
**doing [25]** 19/19 21/23 44/5 54/18 55/17 62/10 62/18 66/3 66/7 70/6 113/18 121/6 121/8 196/16 200/12 203/9 212/19 212/20 221/14 236/24 250/22 268/7 270/10 279/19 283/6
**domain [1]** 218/3
**domains [1]** 160/21

**D**


**don't [220]** 5/16 7/15 9/20 12/11 12/14 14/9 14/23 15/1 15/7 15/22 17/21 17/25 19/10 19/20 20/8 25/4 37/1 37/20 38/18 38/25 40/17 40/21 41/9 42/1 44/24 45/4 46/25 49/4 49/21 50/23 51/18 51/21 53/11 56/10 56/21 58/14 58/18 58/23 60/1 60/2 60/14 60/17 61/17 61/17 61/22 61/25 62/4 62/19 64/4 65/10 66/25 71/20 72/3 72/19 73/5 85/17 93/10 96/12 98/1 101/11 101/14 104/17 104/19 107/5 107/10 107/11 107/12 107/20 109/1 109/14 109/20 111/6 111/7 111/14 114/19 115/22 117/15 119/22 122/1 122/4 123/7 123/23 124/23 125/12 126/18 127/2 130/20 132/5 132/21 133/14 134/11 134/21 135/16 135/23 136/18 137/18 138/1 138/7 138/8 138/10 138/13 138/21 138/23 138/25 138/25 139/15 140/10 141/14 141/23 142/1 142/4 144/23 150/7 153/14 153/25 154/10 156/25 160/19 161/22 161/25 166/2 166/9 172/5 173/2 173/13 173/14 184/9 184/16 185/2 185/4 186/1 186/3 187/3 188/8 188/14 188/20 189/11 189/12 189/15 191/12 204/22 210/9 210/10 210/11 211/24 213/2 213/15 214/17 219/22 220/3 221/14 221/14 222/25 224/17 225/23 226/24 228/3 228/10 228/12 228/15 228/16 228/17 228/20 228/23 228/24 229/8 229/12 229/20 230/6 230/8 230/17 231/1 231/3 231/5 231/13 231/15 231/21 234/8 235/22 237/18 242/8 243/7 244/7 245/22 246/13 247/15 247/23 251/13 253/16 253/18 254/3 258/15 260/10 261/9 261/14 261/15 261/19 261/19 261/22 261/24 262/17 262/17 262/17 262/18 264/19 265/15 265/22 266/5 266/25 267/1 268/15 268/15 272/21 276/6 281/15 283/13 283/15 286/17 286/19 289/18

**DONALD [2]** 1/11 2/8

**done [29]** 16/7 22/20 26/4 28/12 39/20 42/8 42/10 42/17 43/11 43/11 43/18 43/21 44/14 44/18 45/9 46/10 58/2 66/19 78/25 97/5 109/8 122/24 179/16 191/14 197/1 220/3 244/2 244/3 244/6

**door [4]** 237/23 237/24 238/13 238/19

**doubt [3]** 43/14 218/7 221/16

**down [86]** 11/20 11/23 12/9 12/15 16/10 17/10 19/20 22/20 22/23 23/13 23/15 23/18 29/15 33/24 64/16 65/2 68/21 69/10 69/11 70/2 74/23 74/25 77/10 78/24 89/13 90/11 90/12 90/16 96/2 109/21 114/5 114/11 114/12 114/16 114/16 114/20 115/13 116/2 117/3 119/8 120/12 120/16 120/20 121/2 121/21 122/5 122/7 122/7 123/5 123/12 129/14 135/10 136/4 140/17 155/19 180/10 184/25 185/14 185/24 186/19 192/5 192/6 206/12 206/15 206/18 207/10 211/14 215/20 216/4 216/21 217/5 217/21 221/8 224/8 230/23 232/9 239/11 252/14 263/3 264/8 265/2 267/17 268/19 269/12 272/24 285/11

**download [1]** 229/16

**downloaded [3]** 38/13 38/22 47/16

**downplaying [1]** 33/12

**downs [1]** 23/4

**Downtown [1]** 207/9

**downturn [1]** 152/25

**downward [1]** 122/25

**downward admissions [1]** 122/25

**Dr [111]** 3/22 5/11 5/14 6/3 36/15 47/7 47/21 50/3 53/10 55/24 61/11 66/7 86/25 90/17 90/25 91/19 91/23 100/22 100/22 100/25 102/10 102/12 128/17 135/10 135/11 135/12 136/14 139/3 139/14 139/21 144/11 144/21 144/23 145/4 145/9 151/4 155/1 155/3 157/23 158/1 158/6 158/25 159/8 159/11 159/12 160/7 161/16 162/9 162/10 162/10 163/3 163/14 165/23 167/24 168/9 168/12 169/24 171/14 171/24 174/19 176/20 177/16 185/6 185/7 185/16 186/7 190/6 190/16 192/9 200/9 203/24 204/5 204/15 225/16 225/16 226/18 226/25 227/3 231/16 231/20 232/6 248/1 248/3 248/11 254/12 257/5 257/18 258/11 263/10 270/10 270/16 270/20 270/21 271/14 271/19 272/25 273/1 273/4 273/5 275/24 277/24 278/1 278/5 278/6 278/14 281/3 281/12 281/18 282/14 282/18 284/20

**draft [3]** 249/5 249/12 256/23

**drafted [2]** 147/9 254/24

**drafting [1]** 248/15

**drastic [1]** 270/24

**draw [6]** 18/21 29/2 66/5 256/8 267/18 267/20

**Draw's [1]** 184/8

**drew [1]** 28/18

**drive [3]** 9/12 32/3 175/3

**driven [1]** 181/15

**driving [2]** 132/11 176/16

**drop [7]** 23/4 102/14 158/21 206/1 267/9 273/3 273/4

**dropped [4]** 162/17 162/18 187/24 188/1

**Ds [2]** 83/19 214/21

**dual [1]** 75/9

**due [14]** 57/3 57/5 87/10 100/11 114/22 118/6 118/14 118/22 119/3 121/11 129/19 134/5 138/4 179/5

**Dunn [1]** 1/18

**during [16]** 39/20 62/9 68/8 78/3 93/1 93/16 183/10 191/19 195/5 224/15 241/4 257/12 268/3 268/9 279/6 279/9

**DX [19]** 84/25 109/2 118/17 120/9 125/22 127/23 131/1 133/10 133/17 135/14 184/25 192/3 213/17 213/23 214/3 214/10 215/14 220/21 221/23

**DX-406 [1]** 184/25

**DX-552 [1]** 84/25

**DX-565 [2]** 220/21 221/23

**DX-618 [1]** 214/10

**DX-639 [3]** 213/17 213/23 214/3

**DX-823 [1]** 215/14

**DX-918 [1]** 192/3

**dying [4]** 32/24 32/25 33/2 33/4


**E**


**each [14]** 8/19 12/5 25/13 25/14 33/20 172/5 178/7 182/11 182/23 216/9 257/23 265/15 285/21 285/23

**earlier [17]** 27/22 69/7 94/10 94/13 130/12 151/11 155/3 155/14 167/19 181/9 181/11 220/8 230/11 231/16 239/9 270/21 278/3

**early [4]** 74/9 89/20 142/15 184/2

**earn [3]** 18/10 155/21 156/3

**earned [3]** 165/1 170/19 280/4

**easy [5]** 22/8 23/23 25/1 30/16 286/24

**ECMA [1]** 190/24

**Edelman [1]** 2/3

**editor [2]** 175/4 175/6

**educating [1]** 236/24

**education [1]** 188/7

**educational [4]** 56/8 74/5 187/21 193/5

**effect [3]** 10/8 10/21 257/14

**effective [2]** 202/5 237/8

**effectively [4]** 159/15 160/1 211/8 239/21

**effects [1]** 200/6

**effort [3]** 73/22 104/16 287/13

**efforts [4]** 184/16 199/13 206/1 255/11

**E**


**eight [6]** 128/4 182/4 201/2 206/12 206/15 284/4
**eight percent [2]** 206/12 206/15
**Eighteen [1]** 207/15
**Eighteen percent [1]** 207/15
**either [16]** 6/18 21/12 35/21 41/17 107/1 107/13 127/18 142/21 188/20 199/8 208/21 216/6 257/10 261/22 261/24 262/22
**elaborate [1]** 282/16
**elective [6]** 115/10 123/4 123/5 206/6 206/10 206/17
**elevated [1]** 84/12
**Eleventh [1]** 73/4
**elicit [1]** 190/3
**eliciting [1]** 190/4
**eligible [1]** 256/9
**else [8]** 10/14 16/9 93/11 122/2 166/3 236/1 242/14 249/17
**Elser [1]** 2/3
**elsewhere [2]** 123/22 153/18
**email [63]** 126/7 126/18 139/25 146/13 151/10 153/8 153/12 153/16 156/15 157/4 157/9 157/13 157/17 158/10 159/19 161/17 162/9 167/21 168/2 168/17 168/18 176/19 179/20 192/6 213/17 214/11 214/16 216/4 220/23 220/25 221/1 221/7 221/8 221/16 221/19 225/23 226/9 226/10 227/6 227/7 232/10 232/11 236/14 236/17 236/21 236/25 248/21 254/5 263/15 265/10 266/15 266/20 267/24 272/23 273/6 281/12 282/14 282/18 282/22 283/15 285/1 286/9 288/2
**emailed [1]** 228/4
**emailing [1]** 167/24
**emails [4]** 157/9 165/18 226/6 236/11
**embarrassed [1]** 188/20
**embarrassing [2]** 162/15 166/1
**emergency [24]** 74/16 76/7 77/5 90/6 90/8 90/12 90/18 91/1 91/11 114/2 114/16 115/12 115/13 115/20 120/11 121/1 121/1 135/1 143/15 194/18 194/25 206/4 206/7 207/8
**emergent [1]** 76/8
**emerging [1]** 178/18
**emotions [1]** 33/3
**emphasizes [1]** 32/22
**employed [2]** 145/12 145/15
**employee [2]** 244/22 285/5
**employees [3]** 95/20 96/16 245/16
**employer [6]** 191/6 191/9 191/18 191/22 191/25 202/21
**employers [5]** 95/13 95/19 96/8 134/1 165/13
**employment [1]** 192/16
**EMS [3]** 82/24 122/7 205/14
**encourage [6]** 9/11 95/10 141/1 151/6 208/25 228/19
**encouraged [1]** 161/2
**encouraging [4]** 180/22 180/23 181/1 218/23
**end [12]** 3/5 43/14 104/5 196/12 202/6 203/21 205/9 243/22 250/5 251/12 265/20 281/18
**ended [2]** 205/1 281/19
**ending [1]** 248/24
**ends [1]** 271/12
**engage [3]** 20/15 23/16 105/8
**engaged [7]** 49/1 108/12 109/15 112/13 113/12 125/7 268/14
**enough [8]** 43/16 71/24 72/4 141/21 206/23 228/18 269/21 283/7
**ensure [3]** 256/11 259/3 260/7
**ENT [2]** 118/5 120/24
**enter [3]** 21/5 213/10 213/12
**entered [7]** 45/9 140/13 216/10 216/19 216/20 217/11 236/20
**entering [1]** 214/10
**entire [3]** 171/3 218/19 274/1
**entirety [2]** 117/7 117/9
**entitled [1]** 211/6
**entity [2]** 175/10 188/5
**entry [2]** 79/19 184/8
**envelope [1]** 210/17
**epidemiologist [1]** 273/25
**episode [1]** 238/17
**equated [1]** 275/5
**equitable [2]** 170/18 170/23
**equivalent [1]** 29/22
**ER [8]** 117/2 117/4 121/11 121/13 122/6 123/5 136/11 205/12
**era [1]** 255/13
**errors [7]** 17/3 18/7 110/5 110/8 110/12 110/16 110/20
**especially [6]** 78/2 89/23 93/9 96/16 255/13 287/15
**ESQ [10]** 1/15 1/16 1/16 1/17 1/17 1/20 2/1 2/1 2/2 2/2
**essentially [6]** 28/12 153/2 180/21 234/20 275/7 276/23
**estate [1]** 20/18
**estimate [1]** 62/2
**estimates [1]** 151/12
**et [3]** 1/5 195/22 201/24
**etc [1]** 128/10
**evaluate [2]** 14/10 54/11
**evaluates [1]** 110/5
**evaluating [2]** 104/14 254/4
**EVANA [1]** 114/7
**even [30]** 11/15 12/10 12/11 14/22 31/13 38/13 39/12 39/12 45/5 47/17 48/15 49/8 51/10 58/4 70/14 76/2 126/23 127/7 141/21 158/21 159/14 166/1 181/23 210/9 210/10 224/2 229/12 235/23 253/1 263/10
**evening [1]** 244/9
**event [2]** 134/24 136/2
**Events [1]** 175/20
**Eventually [1]** 234/24
**ever [24]** 40/9 44/14 44/18 62/10 62/18 97/24 102/24 113/7 113/14 130/23 139/18 150/17 176/8 176/22 176/25 177/3 220/14 220/18 224/18 227/2 277/9 282/5 282/8 287/9
**every [19]** 28/22 51/19 54/8 76/6 122/4 135/21 141/24 178/2 179/7 188/24 198/17 198/17 212/13 215/1 235/24 240/18 246/5 259/13 287/13
**everybody [1]** 219/1
**everyone [3]** 23/15 260/25 286/14
**everything [6]** 40/3 144/20 200/14 220/9 236/1 264/20
**evidence [52]** 15/3 15/8 15/9 30/4 50/15 50/17 50/18 57/5 86/1 88/18 90/2 92/20 94/2 94/9 112/20 124/4 124/12 124/20 132/16 140/13 143/10 143/12 151/15 167/7 167/9 167/11 169/1 177/6 177/18 181/5 186/3 205/4 207/17 210/14 217/11 221/24 233/11 245/23 246/12 246/15 246/23 246/25 247/1 247/5 251/23 262/22 262/23 263/3 269/9 271/14 281/11 282/25
**evolution [4]** 177/20 177/25 178/8 178/14
**Ex [1]** 94/13
**exact [13]** 7/22 10/19 21/12 46/15 50/23 53/25 60/17 60/22 61/9 62/23 106/15 107/20 122/17
**exactly [16]** 20/9 40/21 41/10 51/19 53/24 54/7 54/18 68/19 100/24 101/5 128/10 135/4 137/19 137/25 139/11 184/10
**examination [32]** 3/20 36/11 36/13 39/20 64/21 67/20 69/8 73/15 98/6 98/7 104/8 128/7 133/18 142/13 142/15 145/7 174/16 213/4 213/6 234/2 236/12 238/23 241/4 242/4 242/17 242/18 242/25 244/20 273/13 273/15 287/25 288/21
**examine [1]** 287/23
**examined [1]** 73/2
**examining [3]** 3/12 144/15 243/13
**example [24]** 9/4 13/23 15/6 20/10 34/8 34/15 34/17 41/3 44/4 55/6 68/22 77/10 97/9 99/4 122/1 178/19 184/8 188/16 198/15 200/6 206/10 236/21 238/11 258/11
**excellent [4]** 129/5 190/13

E

**excellent... [2]** 198/15 253/6
**except [2]** 117/20 176/9
**exception [1]** 85/19
**exceptionally [2]** 89/24 219/17
**exchange [5]** 124/5 124/13 124/22 247/25 273/5
**exciting [1]** 16/21
**exclusively [3]** 110/7 110/12 110/16
**excuse [5]** 35/15 149/9 171/5 186/20 258/7
**executive [26]** 81/18 81/22 82/1 91/17 97/17 98/2 99/21 99/22 99/25 100/3 100/18 100/23 101/3 102/15 102/20 102/25 103/4 103/11 104/1 112/11 113/8 113/15 115/24 118/20 120/18 127/19
**executive committee [1]** 100/3
**exercise [2]** 79/1 221/13
**exhibit [26]** 85/25 90/10 92/4 92/19 93/14 94/8 95/2 107/22 109/2 125/22 165/23 168/5 170/8 183/4 185/4 205/4 210/13 235/5 237/20 246/1 260/25 280/19 281/9 281/11 282/12 282/13
**exhibits [4]** 3/16 25/8 26/14 185/13
**existence [1]** 40/7
**exists [2]** 136/23 246/9
**exits [1]** 196/13
**expand [3]** 118/22 119/6 279/20
**expanded [1]** 28/23
**expanding [2]** 121/6 143/15
**expansion [2]** 120/1 121/4
**expect [4]** 90/21 91/2 143/8 144/2
**expecting [1]** 10/17
**experience [20]** 14/19 21/22 31/14 36/19 42/19 56/8 91/6 109/5 132/7 145/18 181/12 186/14 189/12 193/16 205/11 219/2 223/10 223/16 231/2 235/24
**experiences [1]** 218/4
**expert [111]** 4/3 5/3 5/8 5/11 6/3 6/12 8/24 11/10 15/10 15/16 19/4 19/22 21/5 27/2 39/17 41/9 41/15 42/6 42/14 42/16 42/22 43/3 43/6 43/12 43/19 43/24 44/3 47/8 47/22 50/21 51/2 55/2 55/11 55/13 55/14 56/1 61/2 61/12 61/15 62/17 67/12 145/20 145/23 146/2 146/4 146/19 147/9 150/19 160/17 169/24 170/3 170/9 170/13 170/15 171/5 172/4 176/3 176/25 179/4 179/14 181/2 181/19 181/22 181/23 182/2 182/5 182/14 183/3 184/21 186/15 186/25 189/9 189/17 189/17 189/20 189/22 190/1 190/5 190/17 190/18 191/10 192/10 243/24 246/24 247/7 247/8 251/8 262/18 263/16 268/20 268/23 269/19 269/21 269/22 269/25 270/8 274/10 275/21 275/23 275/24 277/15 278/19 278/22 279/6 279/14 280/7 280/11 280/22 284/10 284/19 286/18
**expertise [7]** 7/15 22/1 43/7 43/8 68/12 71/17 147/18
**experts [4]** 30/9 182/5 190/8 243/25
**expired [1]** 227/9
**explain [8]** 8/4 22/2 70/24 187/18 248/13 250/25 275/2 282/21
**explained [2]** 103/7 200/13
**explaining [3]** 183/23 201/22 269/24
**explains [3]** 22/3 70/25 248/12
**explanations [2]** 33/9 169/14
**exploding [1]** 207/9
**exploratory [2]** 268/8 268/11
**exposed [6]** 34/3 46/2 46/3 47/14 50/12 69/3
**exposure [3]** 10/24 74/17 208/2
**express [9]** 103/5 103/12 103/17 104/6 176/25 177/3 182/10 204/15 275/24
**expressed [13]** 82/25 100/1 102/7 102/12 112/3 112/10 114/24 122/18 247/17 253/25 254/6 278/12 281/4
**expressing [5]** 102/1 137/22 253/15 255/21 282/19
**expressly [4]** 96/5 103/18 103/20 103/22
**extent [4]** 5/13 5/17 264/15 287/22
**external [5]** 128/8 250/16 250/17 250/22 250/25
**extremely [1]** 252/25

F

**F.W [4]** 89/4 89/14 89/17 89/25
**face [4]** 9/7 9/7 9/7 69/17
**facilities [2]** 144/3 167/6
**facility [12]** 74/19 75/21 91/21 93/2 123/9 129/19 130/4 141/2 144/1 144/4 208/25 265/15
**facing [1]** 69/18
**fact [51]** 5/16 14/11 15/4 28/1 31/7 35/24 38/1 39/19 45/2 51/12 52/10 52/21 53/3 59/21 64/3 85/14 88/10 93/9 103/1 103/5 103/8 108/10 113/19 115/5 121/10 122/8 124/25 161/21 161/23 164/6 176/19 177/6 177/24 178/16 181/18 183/11 214/24 215/7 217/2 222/10 224/21 227/3 236/9 238/3 238/22 240/18 276/7 279/13 282/1 283/17 284/9
**factor [2]** 169/10 169/16
**factors [4]** 67/2 141/3 209/2 254/13
**facts [6]** 31/3 88/18 90/2 143/10 167/7 167/9
**factual [1]** 124/20
**fail [1]** 71/10
**failing [11]** 53/1 53/2 53/7 53/9 87/4 200/19 211/22 212/2 212/13 212/15 228/24
**failure [1]** 71/19
**fair [14]** 36/18 43/16 48/17 56/9 66/24 67/15 67/16 72/4 104/18 114/20 115/12 176/1 184/23 274/1
**fall [55]** 8/20 27/1 29/21 52/25 53/1 78/20 81/5 81/16 83/8 83/18 83/25 93/12 93/13 96/18 96/21 96/25 98/9 98/22 99/10 99/23 100/4 100/19 101/22 101/24 103/14 103/24 105/2 108/5 108/6 110/4 110/24 113/20 115/6 140/7 140/9 146/6 160/25 176/22 187/10 190/23 199/4 201/18 202/13 204/13 213/8 216/25 219/16 220/17 235/15 251/25 254/19 267/6 271/23 274/14 279/11
**false [5]** 73/21 97/12 129/14 169/2 180/8
**falsely [1]** 252/23
**fame [1]** 76/2
**familiar [9]** 9/2 44/9 44/16 56/3 56/6 86/21 169/24 187/18 278/24
**families [1]** 77/3
**family [2]** 74/6 77/1
**fan [1]** 278/12
**Fantastic [1]** 251/16
**FAQ [3]** 155/3 156/9 259/8
**far [5]** 27/19 27/24 28/3 69/10 88/19
**farther [1]** 216/21
**father [4]** 85/13 85/18 87/9 134/4
**father's [1]** 135/7
**favor [2]** 262/6 283/25
**fear [2]** 212/6 212/20
**featured [2]** 11/21 20/11
**February [1]** 215/18
**February 14th [1]** 215/18
**Fed [1]** 94/13
**Federal [1]** 290/5
**feedback [9]** 48/8 48/10 48/20 82/17 147/14 156/17 196/8 272/2 273/9
**feel [15]** 10/18 33/3 48/17 48/19 51/9 51/12 73/21 81/20 95/14 96/13 96/17 123/22 124/9 192/14 228/18
**feet [1]** 121/5
**felt [2]** 179/12 278/9
**few [13]** 10/10 16/17 45/18 61/10 70/17 72/8 72/18 88/10

F

**few... [5]** 139/2 202/4 214/14 266/16 288/12
**fewer [1]** 49/8
**field [3]** 44/3 175/8 182/5
**Fifty [1]** 46/15
**Fifty-nine [1]** 46/15
**fight [1]** 116/4
**figure [8]** 59/20 117/18 181/8 181/10 181/14 184/12 184/21 187/1
**figured [1]** 244/3
**file [1]** 38/3
**filed [3]** 132/1 233/13 233/19
**filling [1]** 288/11
**filtered [1]** 58/12
**filtering [1]** 58/9
**final [4]** 247/17 249/2 249/9 282/4
**finally [2]** 17/3 80/19
**finance [1]** 193/9
**financial [4]** 75/21 116/16 265/21 279/23
**financially [1]** 253/1
**find [11]** 8/8 16/4 116/8 123/17 142/8 151/14 152/5 191/8 191/17 191/21 272/11
**finding [1]** 66/4
**findings [1]** 196/14
**finds [1]** 9/9
**fine [1]** 117/21
**finger [5]** 87/21 88/9 133/19 138/5 138/6
**finish [1]** 244/9
**fire [3]** 82/24 199/25 212/2
**first [48]** 6/8 14/1 14/25 15/12 15/21 18/3 24/8 24/21 32/16 32/17 45/3 50/12 51/15 53/20 53/22 54/2 54/9 54/11 58/16 63/5 63/23 70/13 74/13 74/23 74/25 75/7 75/18 79/2 87/25 92/23 93/17 118/11 140/11 151/17 168/25 172/19 185/2 192/6 194/4 195/16 204/18 210/16 232/17 258/25 259/6 268/4 283/1 287/9
**five [28]** 13/23 25/13 52/18 54/16 55/3 55/3 55/12 55/14 75/3 75/12 104/21 175/6 180/9 193/11 193/25 196/13 197/10 201/17 202/9 216/16 217/6 222/15 233/3 244/1 244/7 244/10 250/11 263/19
**five-yard [1]** 180/9
**five-year [1]** 202/9
**FL [3]** 1/8 1/23 2/7
**flight [1]** 144/13
**Flippo [1]** 197/2
**floor [1]** 89/18
**FLORIDA [17]** 1/1 7/22 8/9 34/9 34/16 53/16 54/4 74/23 85/15 95/5 95/19 96/3 96/10 144/17 193/6 210/23 273/19
**focus [13]** 9/22 11/13 90/14 108/22 112/6 113/11 172/21 175/1 197/5 258/6 258/18
268/16 274/19
**focused [12]** 75/13 77/1 110/7 110/11 110/18 110/19 112/6 118/16 124/25 141/13 278/18 279/15
**focuses [2]** 4/23 110/16
**focusing [2]** 149/3 155/16
**folks [4]** 82/9 82/10 163/17 163/22
**follow [4]** 36/24 195/21 234/6 261/6
**followed [2]** 148/23 161/3
**following [2]** 91/14 169/3
**followup [1]** 93/25
**Foo [2]** 192/4 192/6
**football [1]** 180/8
**footnote [49]** 12/19 12/21 13/9 13/13 13/14 15/24 16/1 16/1 16/4 16/11 16/15 16/19 16/22 16/25 17/4 17/15 17/25 19/10 19/13 19/20 20/21 20/23 21/16 22/2 35/5 41/19 46/5 46/6 63/4 63/12 63/14 63/21 63/22 63/23 63/25 64/3 64/7 65/3 65/5 65/12 65/24 70/23 248/3 248/6 248/12 248/15 249/5 249/9 286/12
**footnotes [9]** 12/9 12/10 12/11 12/17 16/11 20/12 22/2 35/7 155/15
**for health [1]** 164/1
**foregoing [1]** 290/1
**foremost [2]** 75/18 87/25
**forgotten [1]** 170/1
**form [9]** 14/14 23/22 29/9 42/1 43/1 85/16 89/5 227/21 237/16
**formally [1]** 229/13
**former [1]** 285/5
**forming [2]** 13/20 32/9
**forms [1]** 54/25
**forth [6]** 43/2 66/4 182/11 262/7 281/16 283/3
**forward [10]** 5/25 42/16 42/22 56/1 133/6 178/10 216/5 271/13 277/17 283/9
**forwarded [2]** 161/16 161/24
**found [2]** 192/14 202/18
**foundation [3]** 84/6 87/17 87/18
**four [48]** 17/13 17/14 28/20 46/6 63/7 63/15 63/25 64/3 65/5 65/12 70/23 75/12 79/2 106/4 128/3 147/22 148/20 149/1 172/6 172/18 186/5 187/13 196/13 198/1 198/13 203/20 205/13 215/4 217/15 218/13 218/15 222/15 224/1 227/10 234/10 234/21 235/2 235/9 235/19 235/23 236/2 257/21 265/16 269/18 275/3 275/4 275/5 284/2
**four percent [1]** 205/13
**fourth [2]** 17/2 17/16
**fracture [4]** 87/13 87/15 87/20 88/9
**frame [1]** 108/4
**frankly [1]** 184/10
**freaked [1]** 204/19
**free [5]** 110/23 111/10 111/12 135/1 206/4
**free-standing [1]** 135/1
**frequently [3]** 32/11 33/11 205/24
**Friday [4]** 73/3 90/17 92/14 244/2
**friends [2]** 162/13 166/9
**front [6]** 25/13 28/1 41/9 41/10 50/23 51/18
**frowned [1]** 9/7
**fruition [1]** 177/12
**frustrated [1]** 82/3
**frustration [1]** 83/9
**Fs [4]** 83/19 213/15 214/21 228/14
**Ft [2]** 2/7 2/7
**FTC [2]** 42/14 42/20
**full [7]** 11/4 23/17 75/14 162/18 195/23 196/1 243/1
**fully [7]** 110/23 111/3 111/7 155/14 229/2 230/2 287/5
**funnel [2]** 50/16 56/12
**further [27]** 6/22 7/1 7/2 9/21 10/11 10/20 11/2 11/20 30/8 33/15 35/24 36/3 36/3 67/17 72/17 94/1 133/6 142/10 144/9 185/24 192/19 233/23 241/22 249/16 265/2 287/19 289/16
**future [3]** 7/1 36/3 208/14
**FW [6]** 130/5 136/8 137/19 138/1 138/11 143/19

G

**Galadi [1]** 168/18
**Ganey [15]** 108/10 108/12 108/18 108/20 109/4 109/9 109/13 109/15 109/21 110/14 111/23 112/6 112/13 112/17 113/12
**Ganey's [2]** 109/18 111/11
**gas [15]** 11/25 12/5 13/25 14/4 15/17 17/14 18/13 18/15 54/19 79/13 79/16 80/4 80/16 80/20 80/23
**gather [1]** 132/18
**gathered [1]** 265/24
**gathering [2]** 39/19 161/19
**gauge [12]** 12/5 13/25 14/4 17/14 18/13 18/15 79/13 79/16 80/4 80/16 80/20 80/23
**gauges [2]** 11/25 54/19
**gave [8]** 32/15 108/20 108/22 128/25 139/10 203/20 230/11 234/20
**gears [2]** 19/23 271/13
**general [9]** 4/13 6/14 40/25 55/1 118/5 120/25 247/18 280/1 280/3
**generally [5]** 4/2 9/4 35/13 145/19 166/14
**generate [1]** 201/10
**generated [1]** 138/18
**gentleman [2]** 31/23 138/5
**geography [1]** 273/20
**gestational [1]** 77/11

## G

**get [66]** 17/2 17/12 20/13 22/6 22/9 22/24 24/22 27/24 31/16 33/16 36/23 37/18 37/22 37/23 38/10 39/14 45/19 55/5 55/24 64/13 70/2 73/8 76/20 102/20 114/4 117/24 119/25 123/4 130/20 134/12 141/17 144/19 155/4 158/20 158/21 174/11 176/21 178/7 183/14 183/17 188/1 190/22 196/8 202/20 202/21 204/20 205/2 212/12 226/14 229/15 229/16 230/16 236/18 244/3 246/14 247/4 254/9 259/25 260/4 265/14 276/10 278/17 283/16 283/22 283/23 286/23
**gets [3]** 104/17 187/24 246/19
**getting [16]** 26/5 35/20 88/19 116/10 131/18 189/9 199/1 202/19 207/1 224/1 228/13 231/9 255/3 270/18 277/9 283/8
**Gibson [1]** 1/18
**Gill [5]** 213/18 214/11 214/17 226/10 232/13
**Gina [5]** 84/20 199/8 199/14 214/7 220/4
**gist [1]** 272/16
**give [27]** 4/12 5/16 6/14 36/18 47/21 55/9 67/25 73/9 81/19 109/15 111/23 113/12 128/11 133/4 140/20 173/13 186/5 188/18 208/9 208/19 212/25 213/1 228/15 268/11 271/3 271/9 282/17
**given [30]** 15/22 17/12 20/13 22/11 27/25 28/5 44/1 46/1 46/10 49/15 51/6 52/12 52/16 61/6 62/22 68/12 69/17 93/9 116/23 189/8 208/14 211/25 228/24 235/7 235/19 235/23 242/9 258/8 273/14 281/20
**gives [4]** 5/17 77/9 131/16 285/20
**giving [4]** 186/9 239/24 259/12 280/4
**go [114]** 7/18 8/8 12/3 16/9 16/13 16/20 18/1 18/3 19/11 20/2 23/1 25/21 30/8 32/4 32/10 37/5 37/11 37/14 37/17 37/21 41/19 41/20 44/21 44/25 54/18 54/20 61/1 62/20 64/16 65/6 69/7 69/12 70/14 70/14 70/15 78/8 81/5 87/14 91/21 120/9 121/25 123/21 128/4 128/6 128/7 129/5 138/14 140/17 141/5 147/5 151/23 152/12 153/23 159/20 160/17 163/22 167/3 167/10 170/16 171/4 173/23 174/19 184/21 185/14 186/17 195/21 196/6 196/14 201/22 204/24 207/13 210/25 215/20 220/6 220/14 220/23 221/8 224/17 228/14 229/18 229/22 230/4 230/6 231/10 231/17 231/25 242/22 243/1 244/8 248/22 248/24 249/11 249/16 250/21 251/21 251/23 252/14 253/5 257/21 259/9 264/8 267/18 267/19 269/12 271/14 272/22 272/22 272/23 272/24 272/24 273/3 274/24 281/21 289/18
**goal [9]** 149/8 154/2 154/5 154/6 154/8 180/18 272/4 272/18 283/11
**goes [10]** 5/24 88/5 118/7 119/11 131/23 180/13 202/11 236/1 239/15 267/16
**Goggle [1]** 45/16
**going [84]** 11/13 15/11 16/13 16/24 20/16 22/23 26/23 38/4 39/13 48/18 60/19 65/19 66/16 76/17 87/25 96/15 97/22 98/18 100/7 116/3 117/13 117/19 120/13 123/9 123/12 123/12 123/21 132/11 133/2 134/1 142/5 144/12 148/12 156/8 159/6 173/21 174/8 176/21 178/5 186/2 186/2 190/3 190/10 198/4 200/11 201/21 202/1 204/20 204/22 208/23 212/3 212/10 212/14 214/15 224/4 229/15 232/1 236/5 239/15 243/1 243/23 247/14 262/19 266/18 267/5 269/18 276/16 277/15 277/17 277/20 279/20 280/16 281/10 281/23 281/24 283/2 283/14 283/22 285/18 285/18 286/16 287/6 287/23 289/18
**gold [2]** 45/22 126/11
**gone [8]** 5/4 5/7 47/13 48/4 115/5 205/21 206/2 219/3
**good [77]** 1/4 3/1 3/11 3/22 3/23 7/14 9/3 10/24 14/8 15/17 21/25 34/7 43/6 55/13 72/21 73/1 73/13 97/11 129/3 145/9 174/19 184/22 192/24 193/1 193/4 193/22 194/1 194/2 194/21 194/23 195/6 195/9 196/18 196/20 197/14 197/23 199/1 202/18 203/2 204/7 204/16 205/8 206/9 207/14 207/17 209/16 211/2 211/22 212/8 212/17 214/18 215/20 216/22 217/21 221/2 221/21 222/11 223/14 224/23 225/17 226/15 226/21 227/9 227/18 228/7 229/6 229/20 231/1 231/24 232/17 233/18 236/15 236/22 239/15 241/11 241/14 277/21
**Goodman [4]** 200/10 231/16 231/20 232/7
**goodwill [1]** 84/1
**Google [52]** 5/18 5/20 6/11 7/11 24/3 25/11 26/9 37/8 38/1 38/2 43/3 43/5 43/7 46/4 46/8 46/22 47/1 47/9 47/12 47/13 48/2 48/5 48/14 48/24 50/4 50/16 53/15 53/19 54/3 54/9 54/10 56/2 56/12 56/19 56/23 57/23 58/9 58/12 58/15 58/19 59/8 60/16 67/15 68/4 115/5 130/16 130/17 130/19 130/23 131/7 131/20 218/20
**Google's [1]** 7/10
**googling [1]** 60/16
**got [31]** 4/16 26/10 38/6 38/10 53/5 65/24 74/11 74/17 81/2 99/23 101/20 102/5 132/5 138/3 144/3 183/2 185/12 186/22 201/18 201/18 202/2 202/16 220/9 220/13 224/25 231/7 232/18 234/24 235/7 268/2 287/4
**gotten [5]** 34/7 113/14 113/17 119/24 200/22
**governing [21]** 82/6 82/6 82/19 101/24 102/21 102/25 103/4 103/12 104/1 112/3 112/11 113/8 113/15 120/9 123/11 127/18 203/7 203/8 203/11 203/22 213/1
**Government [1]** 175/9
**governor [1]** 101/15
**grab [1]** 35/19
**grade [164]** 8/20 8/21 8/23 9/3 9/3 9/22 10/8 11/1 11/8 11/11 11/22 11/22 12/3 17/25 20/10 20/11 20/17 23/3 24/10 24/13 24/16 25/16 28/1 28/22 29/6 29/7 29/12 29/21 32/2 32/9 32/16 33/10 33/13 33/15 33/16 33/18 35/3 38/8 39/7 51/4 52/17 53/7 53/9 59/4 62/25 66/2 68/24 69/24 71/14 78/20 83/10 85/12 87/4 91/3 91/12 91/20 92/2 96/19 96/22 96/25 97/15 97/19 98/11 98/13 98/20 98/25 99/19 99/23 100/4 100/8 100/10 100/19 101/6 101/7 101/25 102/2 103/7 103/9 109/22 110/1 110/4 110/6 111/8 111/16 112/2 115/6 119/25 120/21 121/12 124/13 128/9 129/8 131/23 141/2 141/14 141/23 145/20 146/25 147/3 147/8 155/4 155/7 155/15 156/3 159/15 159/21 159/25 162/14 162/19 169/19 170/10 170/18 171/7 171/11 176/3 177/12 177/21 178/9 178/15 178/18 178/21 179/4 181/19 186/17 192/10 199/1 199/2 199/11 200/19 201/18 202/4 202/14 204/4 204/13 204/19 205/9 205/9 209/1 209/7 209/24 212/25 213/2 213/9 223/25 228/24 229/3 229/17 232/24 233/10 234/5 234/8 235/15 235/18 241/14 241/14 241/19 245/8 245/12 245/14 245/16 252/23 253/6 257/24 272/11
**graded [4]** 46/5 171/22 172/1 258/7

G
**grades [117]** 6/20 6/22 7/1 7/25 8/6 8/20 8/21 9/2 9/4 9/6 9/10 9/11 9/23 9/24 10/3 10/3 10/22 10/23 11/1 11/14 11/15 21/15 23/5 28/25 30/20 30/22 30/24 31/5 31/6 31/7 31/8 31/9 31/12 31/13 31/15 31/21 31/22 31/25 34/3 34/5 34/7 34/18 35/9 35/22 35/24 36/3 49/24 50/1 50/20 50/21 50/24 51/8 51/11 51/11 51/16 51/25 52/6 52/11 52/14 52/15 52/15 52/21 53/1 53/3 53/4 53/11 53/13 54/19 57/7 68/11 68/11 68/18 68/22 72/16 73/21 76/21 78/14 81/20 83/13 83/16 83/22 83/25 84/4 89/24 90/22 90/22 91/14 93/2 94/3 97/13 100/7 101/7 102/14 109/25 114/23 115/3 115/15 121/24 124/6 124/22 129/15 129/20 130/4 142/4 164/16 173/18 174/1 200/2 210/1 211/9 230/15 232/4 234/15 234/20 245/6 252/22 265/21
**grades that [1]** 53/4
**grading [8]** 71/15 78/18 87/5 98/1 146/5 178/9 208/12 245/2
**graduate [2]** 4/17 74/18
**grant [1]** 148/14
**graph [1]** 60/8
**graphic [1]** 32/22
**graphs [1]** 60/4
**great [7]** 43/8 51/7 184/21 196/16 208/19 208/20 219/23
**greater [1]** 184/22
**greatly [1]** 279/25
**green [3]** 9/6 24/12 25/17
**Greg [1]** 160/8
**Gregory [1]** 157/5
**Gregory Maynard [1]** 157/5
**grid [1]** 111/24
**grounds [1]** 73/7
**group [17]** 1/8 6/16 39/16 40/2 75/3 105/17 193/21 193/25 197/1 197/7 201/6 202/8 202/15 203/4 203/25 225/8 239/13
**groups [1]** 200/18
**growing [1]** 207/10
**growth [2]** 75/21 119/3
**grudges [1]** 265/4
**guarantees [2]** 159/14 159/25
**guess [10]** 55/2 61/17 64/10 70/12 172/3 203/18 224/5 230/5 267/3 273/13
**guidance [3]** 116/22 209/19 281/20
**guide [1]** 259/17
**guidelines [1]** 76/20
**guiding [6]** 169/25 170/3 170/9 171/5 177/8 177/11
**guy [1]** 133/19
**GYN [1]** 91/19

H
**had [131]** 17/5 21/8 27/3 40/2 40/16 48/15 53/1 53/8 53/12 63/3 68/23 72/20 75/4 75/5 75/7 75/8 77/11 78/17 81/6 81/8 81/11 81/17 82/25 83/2 83/4 83/9 84/2 87/15 89/20 91/10 91/20 93/20 94/24 97/7 97/8 97/14 98/10 99/13 100/13 100/17 101/5 101/10 102/2 102/12 104/5 104/20 105/1 105/5 105/23 113/7 114/22 119/3 122/1 122/9 129/1 132/21 136/21 137/3 137/21 137/22 137/23 138/6 138/8 139/6 145/10 145/15 150/3 150/19 170/1 170/19 175/11 179/21 184/9 184/11 190/21 191/9 191/18 194/10 197/2 199/14 200/18 200/20 201/16 201/22 202/8 202/24 203/2 203/13 204/17 209/25 213/16 213/17 214/23 215/10 215/25 222/20 224/10 225/24 227/2 233/19 234/10 235/6 241/8 241/17 241/17 247/22 248/15 254/6 257/11 257/13 257/13 260/12 270/8 270/15 270/18 272/20 273/6 275/14 275/17 278/6 278/11 278/15 279/23 279/25 280/6 280/9 281/3 282/4 282/9 285/6 287/10
**hadn't [5]** 81/13 81/14 81/21 126/13 133/25
**half [5]** 157/13 172/10 174/3 243/8 267/10
**Hall [5]** 157/5 157/23 159/12 162/10 163/14
**Hall's [2]** 160/7 163/3
**hand [46]** 8/17 18/2 18/7 18/11 18/19 19/3 19/6 25/8 64/11 64/13 65/23 79/3 79/3 79/14 79/17 88/11 88/12 106/5 125/4 166/15 166/18 178/19 190/24 197/14 198/15 214/25 215/7 215/10 215/21 217/1 217/18 219/25 236/11 236/22 258/25 259/2 260/4 260/6 260/7 260/18 260/21 261/2 262/3 262/11 263/4 278/16
**handing [1]** 124/8
**handle [4]** 120/1 214/7 214/18 247/11
**handles [1]** 76/7
**hands [6]** 18/9 166/13 166/21 237/1 259/3 260/8
**Hanlon [22]** 72/25 73/2 73/4 73/13 73/17 84/9 85/5 86/3 93/19 93/23 94/23 98/9 109/4 115/23 118/3 124/11 125/24 127/8 131/3 132/16 140/15 219/8
**happen [5]** 16/24 54/12 97/18 228/24 232/3
**happened [10]** 40/5 57/14 57/15 75/12 95/17 186/23 204/25 212/23 269/22 284/12
**happening [3]** 177/24 181/7 267/17
**happens [1]** 107/7
**happy [7]** 9/7 112/16 116/21 116/21 117/23 247/3 266/7
**hard [2]** 69/5 255/14
**harm [12]** 32/23 84/1 94/2 97/20 110/8 110/12 110/17 110/20 113/24 169/21 224/10 233/7
**harmed [2]** 83/22 232/23
**Harris [1]** 135/10
**has [94]** 4/23 8/21 8/22 9/21 9/21 10/12 11/14 14/25 15/3 16/2 16/7 22/20 29/17 34/16 41/19 46/9 50/12 64/19 65/6 65/8 73/25 76/7 78/16 79/13 80/20 83/24 90/15 91/16 95/1 97/5 106/4 109/2 109/21 112/24 113/19 114/2 114/9 120/10 120/11 122/24 123/3 124/5 124/8 124/18 127/6 129/17 132/16 137/10 143/2 144/12 147/24 148/3 148/4 150/17 153/18 157/9 172/6 177/24 178/18 179/16 181/2 181/23 187/25 189/16 192/8 194/5 198/12 198/14 198/24 206/9 209/16 209/16 212/23 217/11 219/1 222/18 222/21 233/9 237/23 238/10 238/19 238/23 239/15 240/25 241/12 246/17 250/11 260/14 260/17 260/21 266/19 274/1 274/9 280/14
**hash [1]** 70/3
**hash-looking [1]** 70/3
**hasn't [1]** 69/4
**hate [1]** 264/19
**have [535]**
**have 17 [1]** 245/8
**haven't [10]** 47/13 58/7 59/10 71/23 145/10 157/14 168/3 219/11 257/1 264/23
**Havericak [4]** 92/13 93/24 94/1 260/17
**Havericak's [1]** 73/6
**having [18]** 13/25 18/11 52/10 94/3 98/3 120/6 124/9 174/7 181/21 199/16 204/16 247/17 275/23 279/17 280/11 283/9 284/5 286/10
**HCA [3]** 263/25 264/7 264/10
**HCAP [3]** 108/2 108/12 108/21
**HCAPs [2]** 107/25 108/7
**he [137]** 5/15 5/17 5/24 19/12 19/13 19/17 19/18 19/22 30/12 30/13 31/24 31/25 32/3 32/3 53/12 70/6 82/25 82/25 83/3 87/14 87/18 88/17 90/1 90/20 90/21 91/1 91/2 93/20 93/20 98/2 101/1 101/3 101/5 101/11 101/13 101/14 102/9 102/10 102/13 105/17 122/18 125/20 126/22 126/22 127/6 128/18 131/8

H

**he... [90]** 131/16 131/23 131/24 131/25 132/5 132/7 132/16 134/2 134/10 136/11 138/6 138/7 138/8 138/10 138/13 138/15 138/15 138/24 144/12 144/13 147/17 147/24 148/2 148/3 148/9 148/9 148/10 148/10 148/13 157/25 158/3 159/11 159/24 160/7 163/9 166/1 169/6 171/14 185/20 185/23 186/2 189/16 189/20 190/12 190/12 200/11 201/20 201/20 203/6 203/7 203/7 203/11 203/13 203/13 203/17 203/18 203/20 203/22 204/6 204/7 204/8 204/18 204/19 204/19 204/24 204/24 226/11 226/12 226/12 231/22 238/21 238/23 254/12 263/15 264/15 272/9 272/17 278/2 278/8 278/8 278/10 278/11 282/20 283/1 283/2 283/8 283/14 287/3 287/22 287/22
**He told [1]** 204/7
**he's [1]** 203/9
**head [8]** 61/18 62/5 101/4 107/20 137/18 138/23 138/25 140/11
**headers [1]** 69/20
**heads [1]** 81/19
**health [54]** 7/12 31/5 60/7 60/25 74/6 74/9 74/10 74/14 75/1 75/2 75/5 76/21 78/1 86/8 95/5 95/16 96/3 96/10 104/22 107/21 122/1 129/8 131/9 131/14 144/17 157/24 164/1 164/8 165/4 165/13 166/7 168/19 169/11 175/1 175/4 175/7 175/12 176/16 181/6 181/7 191/18 192/9 193/10 193/17 195/1 197/8 213/18 214/18 250/1 252/15 255/6 255/8 273/22 273/24
**Healthcare [7]** 191/9 191/14 191/17 192/5 192/7 192/8 192/15
**hear [8]** 72/24 119/15 147/9 166/9 242/15 242/16 244/8 270/11
**heard [45]** 56/5 73/3 76/9 77/18 77/22 78/16 90/5 90/17 91/13 91/17 91/23 93/11 114/24 127/17 150/20 152/21 152/24 154/22 155/14 168/3 171/17 171/24 175/15 181/9 181/11 195/5 205/5 207/12 210/20 226/2 232/24 234/19 242/9 248/3 248/11 251/24 254/12 257/18 270/16 271/14 276/6 276/19 281/3 281/3 282/19
**hearing [5]** 15/12 77/20 82/17 244/10 256/23
**hearsay [26]** 73/7 84/6 85/2 85/10 89/6 89/8 92/16 132/20 132/24 133/2 157/13 159/3 159/5 161/10 161/21 161/22 162/1 163/6 168/2 203/14 208/2 210/9 264/14 274/18 274/19 276/21
**heart [1]** 46/18
**help [13]** 5/16 7/18 9/8 23/22 62/14 108/10 108/13 112/13 113/13 178/10 192/11 229/25 287/24
**helpful [1]** 217/10
**her [42]** 85/12 85/20 91/24 117/23 134/4 134/21 134/22 139/6 140/2 156/22 156/23 156/23 157/1 179/24 199/8 220/8 236/21 238/14 238/21 238/23 240/22 242/1 242/3 242/4 242/17 242/25 243/5 243/13 243/16 249/23 262/4 268/7 271/5 271/9 274/19 274/22 281/6 286/1 286/4 286/23 287/11 288/13
**here [108]** 7/9 8/4 9/20 13/22 14/5 16/13 16/17 16/17 16/20 16/24 17/4 17/13 18/17 21/14 23/2 23/9 23/12 23/17 27/6 28/20 28/23 33/11 34/8 34/15 35/13 36/17 36/18 37/7 37/14 40/19 45/22 46/23 47/7 47/21 49/23 51/19 53/2 54/11 61/3 66/22 73/20 74/3 74/22 74/25 78/17 80/4 80/20 87/6 99/10 104/25 105/20 109/21 110/4 116/22 118/3 118/12 119/12 121/15 124/4 124/19 124/21 126/7 127/4 128/20 129/17 131/13 135/23 149/7 152/19 153/8 155/16 157/10 161/20 162/13 165/5 166/11 171/14 172/7 176/12 177/20 178/22 183/17 185/25 188/21 192/8 194/5 212/25 214/6 215/25 216/16 217/12 217/13 217/21 217/22 222/8 223/3 248/1 253/18 256/22 271/12 271/20 273/8 280/7 281/20 281/23 283/1 283/8 285/19
**Hernandez [5]** 86/25 128/17 135/11 135/12 136/14
**Herro [1]** 100/22
**hesitate [1]** 55/18
**heuristics [1]** 9/15
**HHS's [1]** 224/18
**hide [1]** 263/7
**hiding [2]** 153/1 173/11
**high [7]** 71/22 118/6 162/16 188/18 222/20 223/11 269/13
**higher [9]** 39/8 95/15 102/2 102/4 143/9 150/3 218/14 235/25 256/10
**highest [1]** 92/25
**highlight [1]** 249/1
**highlighted [3]** 28/21 110/3 170/25
**highly [1]** 246/6
**him [32]** 4/12 32/1 53/11 53/12 89/14 117/15 122/13 136/13 136/17 144/15 144/20 148/1 148/1 148/8 148/11 [illegible]/17 174/6 174/11 189/19 189/21 190/4 200/14 201/25 204/17 204/21 243/20 268/7 270/21 272/17 272/20 282/19 283/15
**himself [3]** 19/12 19/18 132/25
**HIPAA [1]** 128/14
**hired [3]** 108/10 111/23 219/2
**his [33]** 28/6 28/7 71/12 85/6 91/1 91/2 128/20 131/16 132/17 138/6 138/6 138/12 157/9 159/22 159/24 160/5 160/7 174/11 181/2 185/16 203/4 203/21 203/22 204/15 238/23 248/11 263/11 263/14 268/6 272/9 272/23 282/19 283/12
**his hypothesis [1]** 263/11
**historical [4]** 29/21 269/17 270/19 277/16
**historically [1]** 108/3
**history [4]** 7/22 53/25 81/11 274/13
**hit [5]** 8/9 75/13 169/18 273/7 286/21
**hitting [1]** 286/16
**HIV [1]** 273/23
**HMI [1]** 107/22
**Hold [1]** 193/12
**home [11]** 7/10 20/2 30/19 37/2 69/9 104/20 104/25 105/5 105/7 192/24 289/19
**homeless [1]** 194/24
**homepage [1]** 37/9
**HON [1]** 2/8
**honest [5]** 139/11 154/2 160/18 166/3 188/18
**Honor [106]** 3/2 3/5 3/15 3/18 5/10 5/13 15/11 25/5 25/9 26/3 26/14 26/16 27/13 28/4 36/12 67/17 70/4 72/18 72/23 84/5 85/1 85/4 85/10 86/16 88/2 88/19 89/5 92/12 92/21 93/15 93/21 94/11 94/12 94/21 109/3 112/19 112/21 116/2 125/23 126/22 127/1 131/2 132/15 132/20 133/8 133/13 142/12 144/7 144/11 144/24 145/4 148/16 157/7 159/3 161/8 161/9 161/18 165/17 165/19 168/1 173/22 174/17 185/2 189/8 189/19 190/14 191/12 192/17 192/19 192/21 192/25 203/14 208/1 210/6 213/3 213/5 213/24 213/25 214/1 215/15 220/22 221/23 221/25 233/24 234/1 235/11 237/21 238/7 238/18 238/21 241/22 242/11 242/24 243/18 244/4 244/15 245/25 246/11 264/14 266/7 266/11 274/17 276/21 287/21 287/21 288/22
**Honor's [1]** 116/3
**HONORABLE [1]** 1/11
**hopefully [1]** 174/11

**H**

**hoping [1]** 246/14
**Hopkins [1]** 183/22
**hospital [280]** 3/11 6/20 6/22 7/25 8/7 8/19 8/20 10/3 10/7 11/2 11/22 12/3 12/6 12/23 12/24 13/18 14/21 14/23 15/23 17/23 18/9 18/21 19/14 19/16 19/19 20/3 21/2 21/15 23/3 24/9 24/13 24/16 25/15 25/16 26/12 28/22 29/20 29/23 30/23 31/6 31/8 31/25 32/2 32/3 32/8 32/13 32/13 32/16 32/17 32/23 32/24 32/25 33/1 33/12 33/14 33/16 33/17 33/17 33/18 33/19 35/24 35/25 38/7 38/16 38/22 39/7 41/21 49/24 50/22 50/24 51/8 51/16 51/16 51/25 52/14 52/15 53/21 56/15 59/4 63/12 64/17 64/18 64/23 65/1 65/6 65/19 65/20 66/2 68/10 68/23 69/15 69/24 70/20 72/16 74/3 74/6 74/17 75/22 75/24 76/2 76/7 77/8 78/6 78/9 79/20 80/8 81/15 81/18 83/22 83/24 84/9 84/10 87/24 88/14 89/11 93/1 95/11 95/25 96/13 97/2 97/10 99/13 107/21 107/23 109/25 110/4 110/6 110/7 110/11 110/15 114/13 115/2 115/20 116/16 123/10 126/17 130/5 132/1 132/10 132/12 135/20 137/23 141/2 141/19 147/2 147/8 149/4 155/4 155/5 155/7 155/8 155/9 155/12 155/20 155/22 155/24 156/1 156/2 156/3 156/5 156/7 159/21 164/15 164/17 165/14 169/4 169/21 170/19 171/2 171/6 171/12 173/10 175/21 176/3 176/3 177/7 178/15 178/17 178/21 179/4 180/12 181/18 184/6 185/11 186/5 186/13 188/5 193/22 194/3 194/3 194/4 194/6 194/14 194/16 194/24 195/3 195/6 197/6 198/2 198/12 199/24 200/11 200/15 200/21 201/6 201/10 201/11 202/9 202/25 203/6 205/2 205/11 205/16 205/20 206/22 206/25 207/2 208/9 208/22 209/1 211/22 212/2 212/11 212/13 212/16 213/9 215/18 218/1 220/17 222/15 222/16 222/24 223/14 223/16 223/19 223/22 224/5 224/10 229/2 229/3 229/23 229/25 230/1 230/13 231/11 235/3 235/15 235/24 236/6 236/18 236/22 237/1 239/12 245/2 245/4 245/11 246/5 246/19 248/7 249/6 253/5 253/25 254/11 256/11 257/24 258/7 259/2 260/7 260/14 261/6 263/25 275/8 275/17 276/24 276/25 277/10 278/11 279/16 279/24 283/7
**hospital declined [1]** 249/6
**hospital ratings [1]** 110/7
**hospital's [9]** 9/25 10/6 110/5 151/15 169/18 169/22 277/22 278/9 279/15
**hospitalists [1]** 86/25
**hospitals [211]** 4/3 6/21 6/23 6/25 7/3 7/14 7/21 8/6 8/12 8/22 9/19 9/22 10/4 10/17 13/9 13/11 13/12 13/15 14/7 18/7 18/10 19/17 19/19 21/9 25/14 28/25 29/4 30/21 30/22 30/25 31/1 31/11 31/12 32/1 33/10 34/9 34/9 34/16 35/23 36/2 36/17 40/2 41/2 46/5 49/19 51/5 51/24 52/6 52/6 52/16 52/18 52/22 53/5 53/7 53/16 54/4 63/14 63/16 67/9 69/18 70/2 70/9 70/11 75/3 77/19 78/18 88/10 94/4 104/21 105/3 106/12 108/16 108/23 109/24 110/19 112/15 115/8 124/5 124/13 124/22 147/10 147/21 148/20 148/25 149/13 149/18 149/25 150/2 150/7 150/11 150/13 150/18 151/5 151/8 151/19 152/4 152/9 152/20 153/1 153/3 153/20 154/10 154/17 154/21 155/17 157/6 158/19 161/1 161/6 169/17 170/24 171/17 171/21 171/24 171/25 172/14 172/16 172/20 173/2 173/8 173/18 174/1 178/25 179/5 179/10 179/13 180/16 180/19 180/22 181/12 183/12 183/24 184/7 184/23 185/19 186/10 186/16 188/23 189/1 189/11 189/15 190/21 190/24 190/25 193/19 193/25 194/9 197/10 200/18 208/19 212/4 212/20 212/21 212/22 214/25 218/12 218/14 218/15 218/24 221/10 222/4 222/5 228/13 228/19 229/24 230/15 233/4 235/25 245/7 246/2 246/7 246/21 252/20 252/23 252/25 253/15 253/16 253/25 254/6 254/16 255/11 255/17 255/25 256/9 256/13 256/14 257/22 259/24 259/24 260/2 260/4 263/11 265/22 268/11 270/2 272/6 272/9 275/3 275/13 275/19 276/18 276/20 279/12 279/17 279/19 279/21 280/5 283/22 288/19 289/3 289/7
**hospitals' [1]** 36/4
**hospitalsafetygrade.org [5]** 7/24 8/2 34/4 69/9 241/6
**hostile [1]** 147/25
**hour [5]** 62/6 94/17 196/14 243/1 243/8
**hour-long [1]** 196/14
**hours [10]** 61/11 61/15 61/24 62/3 62/5 62/8 62/9 62/17 206/25 263/10
**how [122]** 4/24 4/25 5/12 5/18 7/5 8/7 8/24 9/24 11/10 12/1 15/19 17/5 17/24 20/6 21/16 21/23 22/2 22/4 22/8 23/23 25/1 25/1 26/7 26/25 27/22 28/21 30/5 33/2 33/9 33/18 34/2 38/3 38/6 38/10 41/24 42/10 42/11 42/23 43/7 43/25 45/11 46/4 46/11 46/12 49/1 53/7 53/13 55/8 55/24 56/19 57/1 58/1 59/1 59/25 60/19 61/11 61/14 62/3 70/1 70/24 77/4 81/5 83/24 84/18 85/14 87/18 88/5 89/22 90/15 93/7 107/15 108/21 117/18 124/18 138/22 140/18 148/14 155/8 164/13 173/20 174/21 181/14 181/15 183/18 184/7 184/12 191/21 192/14 193/10 194/14 194/16 195/2 196/11 196/23 199/6 199/16 201/1 201/5 201/10 210/11 212/23 228/12 235/6 235/18 237/13 238/16 243/23 244/7 246/13 248/13 255/20 260/6 261/8 265/20 267/14 278/12 279/19 282/19 283/21 283/23 283/25 284/1
**however [3]** 144/22 256/11 266/20
**HRQ [2]** 179/17 180/25
**HSS [18]** 201/16 201/19 201/20 203/4 203/13 204/22 224/20 224/24 226/6 226/9 226/11 226/14 233/12 233/17 237/3 239/13 240/16 242/3
**HSS's [1]** 225/16
**hum [4]** 11/5 37/10 204/14 285/3
**human [1]** 4/18
**Humana [31]** 92/7 92/24 93/5 93/8 94/1 94/25 140/4 140/5 140/13 140/18 141/14 141/19 207/12 207/14 207/16 208/15 208/16 208/17 208/21 209/5 227/17 227/18 227/22 228/5 228/6 228/17 228/21 229/11 230/6 230/8 255/6
**humans [1]** 56/24
**hundred [20]** 18/10 24/19 62/17 111/21 125/8 125/8 162/25 164/13 197/16 197/18 197/20 197/22 215/11 215/12 216/15 220/9 220/13 224/1 224/1 277/10
**hundreds [1]** 34/11
**HVIDT [1]** 1/17
**hygiene [13]** 65/24 106/5 125/4 178/20 190/24 214/25 215/8 215/11 215/21 217/2 217/18 219/25 278/16
**hypotheses [1]** 182/15
**hypothesis [10]** 151/18 151/23 152/1 152/3 152/12 263/11 263/14 263/15 272/9 272/13
**hypothetical [1]** 61/6
**hypotheticals [1]** 182/15

I

**I could [1]** 133/11
**I talked [1]** 10/23
**I think [1]** 166/1
**I worked [1]** 273/21
**I'd [5]** 54/18 61/5 61/17 61/22 224/17
**I'll [1]** 189/17
**I'm [27]** 39/5 43/11 44/11 44/22 47/23 49/23 50/3 50/20 53/11 54/8 54/25 56/6 58/25 68/20 71/15 73/14 75/21 89/5 99/3 103/13 150/15 169/16 174/23 190/4 244/10 244/10 253/23
**I've [1]** 56/5
**IBS [1]** 106/6
**icon [1]** 65/14
**ICU [10]** 14/11 80/21 190/19 190/20 190/21 197/21 198/22 198/22 275/14 275/17
**idea [12]** 135/23 180/11 181/21 186/7 187/13 187/22 188/11 223/2 259/12 260/21 261/6 270/4
**ideally [1]** 178/10
**ideas [5]** 250/6 250/8 250/13 259/13 280/24
**identified [2]** 93/2 192/9
**identify [7]** 5/25 17/20 108/13 128/7 129/10 141/3 209/1
**identifying [1]** 112/7
**identity [2]** 231/3 231/5
**ifs [1]** 220/8
**ignore [1]** 11/14
**IL [1]** 2/5
**illumination [1]** 133/6
**imagine [1]** 48/13
**imaging [2]** 194/13 206/11
**immediately [3]** 129/4 135/20 245/1
**impact [43]** 6/19 6/22 9/11 9/25 10/4 10/25 21/14 21/15 21/25 30/20 30/22 30/24 31/4 31/15 31/21 31/22 33/2 33/12 35/21 36/4 45/5 45/25 50/20 50/22 50/24 51/4 51/8 51/16 51/22 51/25 52/14 53/10 68/11 71/18 72/13 72/16 90/21 94/2 115/18 120/10 182/17 208/15 212/10
**impacted [7]** 52/10 52/21 53/8 83/24 97/21 114/3 114/25
**impacting [3]** 115/21 123/24 141/13
**impacts [2]** 7/2 97/2
**impeachment [2]** 150/24 261/16
**impeding [1]** 186/1
**impetus [1]** 280/25
**implement [3]** 18/8 112/8 281/15
**implementation [2]** 175/19 284/18
**implemented [4]** 99/7 177/3 252/6 254/15
**implication [1]** 41/21
**importance [2]** 178/18 178/19
**important [13]** 82/10 96/4 142/1 142/3 164/7 233/18 246/23 247/4 258/19 258/22 259/7 259/14 259/15
**important to [1]** 142/1
**importantly [2]** 34/5 97/21
**impossible [2]** 152/6 272/11
**impression [5]** 257/17 280/12 280/14 280/15 280/16
**improper [2]** 150/24 261/16
**improve [13]** 108/10 108/14 108/21 108/24 112/8 112/13 113/13 113/18 154/7 154/19 176/17 181/15 181/17
**improved [1]** 219/2
**improvement [7]** 108/6 108/20 141/7 175/3 208/9 219/6 255/11
**improvements [1]** 176/16
**improving [2]** 164/14 165/4
**imputation [62]** 6/17 21/13 22/7 24/20 24/21 27/4 27/8 29/18 29/19 35/11 35/18 41/4 72/9 122/23 146/15 147/7 148/23 148/24 151/13 153/4 158/14 158/19 160/25 172/17 172/19 172/21 177/2 177/4 179/9 185/9 209/13 250/16 255/22 256/4 256/10 260/11 261/5 261/8 261/9 261/10 261/24 262/20 262/20 269/17 269/20 270/9 274/14 274/21 275/2 275/9 276/12 277/8 277/17 279/4 279/7 279/11 279/18 280/8 281/8 281/13 282/23 286/5
**imputation may [1]** 256/10
**imputations [1]** 152/14
**impute [2]** 161/3 184/7
**imputed [14]** 14/20 41/1 46/6 64/13 79/2 125/11 151/12 212/7 249/7 249/9 249/14 249/18 286/13 286/13
**imputing [7]** 14/21 99/4 100/12 154/1 160/19 185/18 279/22
**inaccurate [2]** 123/23 123/23
**INC [1]** 1/5
**inception [1]** 181/19
**incidence [1]** 84/22
**incidences [2]** 85/6 88/22
**incident [3]** 84/19 128/21 135/11
**incidents [1]** 84/21
**include [3]** 61/23 201/3 250/15
**included [2]** 206/20 284/20
**includes [2]** 11/20 243/11
**including [5]** 68/10 88/1 117/3 122/5 275/24
**income [6]** 188/17 188/17 188/19 188/19 188/20 201/12
**incomplete [1]** 163/10
**incorrect [2]** 99/8 148/21
**increase [6]** 120/1 120/24 121/8 163/18 282/6 282/9
**increased [3]** 97/22 119/5 123/9
**increases [3]** 32/25 181/4 230/16
**increasingly [1]** 255/14
**incremental [1]** 91/9
**incur [1]** 180/16
**independent [1]** 268/6
**indicated [2]** 77/2 168/22
**indicates [1]** 18/20
**indication [2]** 12/9 124/23
**individual [17]** 28/6 48/18 48/19 50/11 50/12 50/13 58/3 67/3 67/5 68/5 68/25 78/6 153/6 211/21 227/7 231/3 231/5
**individuals [28]** 24/9 24/16 27/18 39/11 45/18 45/24 46/11 48/15 48/16 48/25 49/8 49/10 50/2 56/16 56/17 56/22 58/5 59/3 59/11 59/13 59/22 60/9 67/5 68/5 128/13 131/5 206/3 276/20
**inept [1]** 231/23
**infection [10]** 87/12 88/1 88/1 88/5 89/15 110/6 123/9 136/8 138/11 162/22
**infections [4]** 12/4 16/7 88/15 89/22
**infectious [1]** 274/2
**infer [4]** 7/16 18/18 19/7 19/19
**inference [5]** 14/13 14/15 262/21 262/21 282/24
**inferences [2]** 9/12 66/5
**inflating [2]** 39/8 39/11
**influence [1]** 94/2
**influential [1]** 169/10
**info [2]** 32/22 73/22
**inform [1]** 62/18
**information [100]** 4/24 5/5 5/12 6/17 7/13 7/17 7/18 8/5 8/25 9/8 9/10 9/20 10/7 10/9 10/10 10/13 10/15 10/18 10/25 11/11 11/18 11/19 11/20 12/2 12/24 14/9 14/10 16/8 20/1 21/4 21/14 21/24 22/13 22/19 22/25 24/20 27/4 27/7 28/1 29/17 40/10 42/24 45/3 45/4 45/25 45/25 46/1 46/3 46/12 47/15 47/16 47/18 47/19 48/3 48/13 48/15 50/11 51/13 54/10 54/25 55/8 55/9 60/4 61/8 61/10 64/8 64/25 66/1 66/5 69/5 70/11 89/7 98/1 99/7 100/11 100/13 101/8 111/9 116/15 122/21 123/24 124/8 128/25 129/21 130/10 132/6 135/13 141/1 159/19 165/14 179/18 179/18 180/15 208/25 215/1 230/15 232/17 233/16 248/9 257/2
**informed [1]** 199/8
**informing [1]** 158/13
**infrastructure [4]** 118/23 119/7 120/7 255/24
**initial [1]** 27/2

I

**initially [3]** 23/13 96/11 243/16
**initials [5]** 86/12 86/17 86/17 88/25 89/3
**initiated [1]** 122/10
**Inman [3]** 158/4 162/10 167/24
**inpatient [3]** 119/5 120/23 141/13
**input [3]** 147/9 216/6 256/23
**Inquirer [1]** 254/19
**ins [5]** 90/15 121/16 205/11 206/6 207/7
**inside [1]** 222/25
**insight [1]** 46/9
**inspected [1]** 26/9
**inspection [1]** 26/4
**Instagram [1]** 200/3
**instance [2]** 84/15 84/18
**instances [3]** 84/14 84/15 233/9
**instead [3]** 10/12 160/25 161/2
**Institute [1]** 183/23
**institution [2]** 195/20 223/1
**instructed [1]** 39/24
**insurance [4]** 92/1 139/1 229/13 229/15
**insure [5]** 79/6 79/22 80/10 92/24 198/2
**insurer [3]** 140/25 142/6 227/18
**insurers [1]** 140/18
**intend [2]** 95/20 148/1
**intends [1]** 96/1
**intensive [2]** 252/25 255/10
**intensivist [2]** 99/5 99/6
**intent [2]** 95/24 279/14
**interact [1]** 19/24
**interaction [1]** 26/10
**intercept [1]** 202/23
**interest [1]** 116/9
**interested [5]** 39/25 67/6 178/24 246/11 247/2
**interesting [2]** 69/15 69/16
**interests [1]** 116/22
**interface [3]** 20/6 20/8 20/14
**interfere [1]** 192/15
**interim [2]** 75/10 194/1
**intermittently [1]** 256/13
**internal [5]** 128/8 145/12 159/19 162/2 174/23
**international [1]** 5/2
**internet [1]** 7/18
**internship [1]** 74/18
**interpret [2]** 9/8 12/1
**interpretation [1]** 140/22
**interrogatories [6]** 127/21 127/24 128/1 128/4 232/16 232/21
**interrogatory [3]** 89/7 233/8 233/10
**intertwined [1]** 287/14
**introduce [4]** 3/24 4/12 117/6 185/5
**introduced [1]** 20/...
**invaluable [1]** 32/5
**invest [1]** 97/8
**invested [1]** 143/14
**investigate [1]** 106/13
**invitation [2]** 187/1 187/6
**involved [7]** 78/1 124/10 135/20 146/4 170/3 206/13 287/16
**involvement [1]** 191/19
**involves [1]** 174/25
**involving [2]** 112/6 132/2
**IPS [3]** 214/25 217/19 219/25
**irrelevant [1]** 116/17
**irresponsible [1]** 163/10
**is [1159]**
**is a [1]** 149/13
**is that [1]** 72/15
**isn't [24]** 37/19 38/5 38/19 38/25 39/15 39/23 42/20 43/13 45/13 53/9 63/9 66/18 70/4 91/21 104/17 106/9 106/20 218/25 227/14 230/3 231/7 233/1 237/9 242/5
**issue [14]** 60/24 106/5 184/15 185/1 185/5 189/20 218/25 219/1 226/20 227/17 233/12 243/17 243/18 279/15
**issued [5]** 31/16 171/11 191/22 191/23 252/6
**issues [14]** 4/24 5/5 42/7 45/6 68/3 114/22 118/23 120/6 120/7 132/24 138/11 161/10 161/21 233/5
**it [708]**
**It is [1]** 247/8
**it's [44]** 34/25 39/12 50/23 54/10 55/11 55/23 62/8 63/7 63/7 64/1 65/1 69/15 69/16 70/5 70/12 81/23 82/8 85/10 92/5 128/7 144/22 156/12 156/12 162/1 175/20 179/15 180/16 187/24 188/1 188/4 188/13 206/23 206/25 212/3 212/24 218/19 220/25 226/1 229/11 238/22 242/18 242/21 267/7 288/24
**item [1]** 14/20
**its [26]** 29/23 46/9 78/18 82/11 98/18 98/20 110/4 111/3 117/6 117/9 151/16 151/17 154/20 164/17 171/20 172/6 179/5 179/19 181/19 212/7 225/17 251/24 260/3 275/10 275/25 276/3
**itself [3]** 27/19 101/6 101/7
**IVS [1]** 125/4

J

**J.D [4]** 86/15 86/22 87/15 88/16
**J.D.'s [1]** 88/9
**James [2]** 74/10 74/15
**James Madison [1]** 74/10
**January [13]** 1/9 93/17 118/19 125/25 126/13 216/7 216/17 238/8 238/15 238/15 242/11 266/9 290/4
**January 13 [1]** 238/15
**January 13th [1]** 238/15
**January 21st [1]** 238/15
**January 28 [1]** 118/19
**January 6th [1]** 93/17
**JD [6]** 134/9 134/10 134/15 134/25 137/14 143/19
**JEFFREY [1]** 1/20
**Jennifer [6]** 85/20 134/19 134/20 134/24 135/25 136/4
**Jerad [4]** 73/13 95/10 120/9 120/12
**JFK [3]** 223/6 223/22 235/6
**job [7]** 75/13 174/24 196/16 270/11 277/21 286/15 288/13
**John [2]** 204/5 225/16
**Johns [1]** 183/22
**joined [2]** 245/1 277/9
**Joiner [1]** 109/8
**joining [2]** 75/4 75/5
**joint [28]** 76/9 76/11 76/17 106/8 106/11 106/17 106/20 107/1 107/8 107/10 107/11 107/14 107/15 110/18 110/21 142/16 142/18 142/22 185/4 195/5 195/7 195/14 195/17 215/4 280/19 281/9 281/10 282/12
**joke [2]** 211/2 265/3
**JONAH [2]** 3/13 3/25
**journal [3]** 46/14 175/5 175/7
**journals [2]** 4/21 175/8
**journey [1]** 20/23
**journeys [1]** 195/22
**joy [1]** 77/9
**JS [2]** 146/9 183/4
**JS-20 [1]** 183/4
**judge [3]** 1/12 100/8 273/17
**Judge's [1]** 254/22
**judgment [3]** 4/18 5/1 9/11
**July [6]** 131/21 132/14 133/23 196/19 221/5 223/19
**July 2025 [3]** 131/21 132/14 133/23
**June [3]** 183/5 284/12 284/18
**June 2024 [2]** 284/12 284/18
**Jupiter [30]** 200/11 200/15 200/22 202/19 202/20 202/22 203/10 204/3 204/20 204/23 204/25 210/1 210/3 211/3 211/6 211/16 211/23 222/7 222/11 222/15 222/23 222/25 225/11 225/13 230/15 231/17 231/25 232/1 243/13 243/14
**Jupiter's [1]** 211/9
**JURA [1]** 2/2
**just [125]** 6/11 16/8 34/17 35/13 37/5 37/18 41/13 41/20 48/3 50/7 50/17 51/14 53/14 54/21 55/4 55/9 55/21 55/21 55/22 55/25 56/22 57/24 58/19 60/9 62/2 62/8 64/16 67/4 68/18 69/17 70/17 70/23 72/4 74/13 75/7 83/9 84/5 84/15 86/16 93/19 94/14 94/24 98/9 101/6 107/3 111/12 119/5 124/15 133/22

J

**just... [76]** 133/23 137/6 137/14 144/23 154/1 160/20 161/10 163/22 166/3 168/7 168/7 168/10 169/9 172/3 172/5 174/19 180/18 181/9 181/11 182/1 183/2 186/20 187/23 187/24 188/1 196/24 204/8 204/22 204/25 206/18 208/22 209/18 210/20 211/8 212/6 212/12 213/1 213/15 214/24 216/4 221/19 222/10 226/2 227/13 227/21 229/6 229/15 229/20 229/22 231/1 231/13 237/5 238/7 238/8 238/11 238/19 241/19 241/23 243/5 246/11 247/22 259/16 260/14 262/1 262/1 262/10 264/19 267/12 268/11 269/20 271/19 274/11 281/15 284/7 284/23 287/11
**just be [1]** 154/1
**justification [1]** 283/4
**Justin [5]** 205/4 207/25 210/5 210/25 272/24
**JX [11]** 147/5 149/6 154/24 156/14 185/3 248/20 251/23 254/23 269/8 271/14 284/24
**JX-2 [1]** 185/3

K

**Karen [3]** 144/16 145/2 145/3
**Kathleen [1]** 131/3
**keen [1]** 153/23
**keep [6]** 62/4 186/2 186/2 249/9 285/18 285/18
**keeping [3]** 260/23 263/1 277/20
**keeps [5]** 84/10 212/2 212/3 212/8 265/4
**KEVIN [1]** 1/16
**key [1]** 163/4
**kickoff [1]** 168/17
**kicks [2]** 158/9 162/9
**killer [1]** 162/24
**Kim [1]** 184/8
**KIMBERLY [1]** 2/1
**kind [7]** 76/1 182/11 184/18 247/6 259/17 283/4 287/8
**knee [1]** 195/14
**knew [4]** 31/24 165/2 228/13 274/20
**know [157]** 9/20 12/11 19/15 26/1 38/18 38/25 39/3 40/21 45/10 46/9 49/5 49/21 56/21 58/12 58/14 58/23 59/1 60/1 60/2 60/14 60/17 61/17 61/22 65/10 65/23 66/12 71/20 77/1 79/17 81/2 82/16 86/12 87/15 87/18 89/11 107/5 107/5 107/20 110/11 110/15 111/14 114/19 114/25 119/3 122/4 122/17 123/7 125/6 125/10 126/18 129/3 132/5 132/21 134/10 134/11 134/20 134/21 134/22 134/24 135/4 135/7 135/16 135/23 136/4 136/6 137/2 137/10 137/13 137/15 137/19 138/5 138/7 138/8 138/10 138/12 138/23 138/24 138/25 138/25 139/18 145/10 163/25 164/17 164/20 164/21 165/1 165/5 166/9 172/3 181/22 182/10 184/16 185/2 185/4 187/14 188/6 188/14 188/14 188/19 189/1 189/3 189/15 200/12 203/11 204/17 206/4 210/9 210/10 210/10 210/11 211/24 219/17 219/22 220/1 220/3 220/16 224/17 225/13 225/23 228/2 228/3 228/10 228/12 228/12 228/17 228/17 228/20 228/23 228/25 230/8 230/17 231/1 231/3 231/5 231/13 231/15 231/21 234/8 235/18 237/13 241/9 245/23 249/13 250/5 252/2 254/3 261/22 261/24 262/17 262/17 262/18 267/1 268/8 268/20 274/18 281/24 285/9
**knowing [2]** 134/9 169/13
**knowledge [7]** 7/15 9/17 87/18 136/1 169/1 169/9 189/13
**known [5]** 25/22 91/22 175/20 182/8 188/9
**knows [3]** 38/21 66/23 228/21

L

**lab [2]** 76/17 273/21
**label [9]** 12/1 23/9 54/15 54/17 55/3 55/15 55/19 55/24 94/13
**labels [7]** 9/5 9/6 9/11 18/12 54/14 71/4 71/7
**laboratory [1]** 178/10
**lack [9]** 21/3 21/11 64/25 65/25 87/17 159/14 159/25 162/18 248/8
**lacking [2]** 173/17 173/25
**lagging [2]** 219/4 260/13
**land [2]** 265/2 265/6
**language [16]** 12/17 14/2 21/24 21/25 29/2 70/21 147/10 209/5 249/13 249/17 251/3 251/10 256/8 257/21 258/19 271/21
**large [12]** 11/21 23/14 31/20 49/6 49/15 140/21 171/6 172/9 207/13 208/16 263/25 283/18
**larger [2]** 28/24 146/11
**largest [1]** 106/25
**last [33]** 16/17 53/16 73/3 97/14 97/16 99/5 100/16 111/15 140/4 173/22 177/17 178/8 178/22 194/9 204/12 204/12 207/3 207/4 207/23 210/21 212/10 214/14 237/6 239/18 240/9 253/5 258/5 262/23 265/16 278/10 281/7 285/6 286/25
**lasting [1]** 10/8
**late [3]** 75/7 93/19 263/25
**later [6]** 38/17 144/12 190/23 249/19 265/10 272/23
**laugh [1]** 271/1
**laughing [2]** 265/7 265/8
**law [1]** 85/15
**lawsuit [3]** 212/18 233/19 241/9
**lawyer [1]** 240/7
**lawyers [9]** 39/4 39/8 39/11 49/4 49/7 49/17 139/10 148/7 161/17
**lay [3]** 249/13 286/8 286/24
**layman [2]** 30/16 30/18
**layout [1]** 42/7
**lead [3]** 17/3 52/16 147/2
**leader [1]** 130/21
**leadership [3]** 75/8 81/18 81/23
**leading [8]** 147/23 149/15 149/21 151/24 154/12 194/8 235/11 236/7
**leads [1]** 146/24
**league [1]** 162/14
**Leah [9]** 243/14 249/17 249/21 251/5 251/8 251/13 265/4 281/13 286/20
**leaning [2]** 82/20 251/12
**leap [1]** 44/4
**LEAPFROG [324]**
**Leapfrog announcements [1]** 157/6
**Leapfrog grades [1]** 91/14
**Leapfrog released [1]** 110/4
**Leapfrog takes [1]** 257/18
**Leapfrog's [55]** 26/8 26/9 26/11 27/23 30/9 30/20 31/8 31/8 31/9 32/8 32/11 33/6 34/3 34/8 34/22 51/11 52/15 68/18 68/22 72/13 72/14 77/16 78/16 111/2 145/20 146/5 146/23 147/2 147/8 150/13 150/15 150/16 150/16 150/17 152/18 152/19 153/5 153/19 158/13 161/17 164/11 164/19 164/23 164/24 176/15 176/24 180/24 234/12 245/19 248/3 255/18 258/20 259/6 259/21 267/5
**Leapfrog's website [1]** 31/9
**Leapfroggroup.org [1]** 229/5
**Leapfroghospitalsafetygrade.org [1]** 54/1
**learn [5]** 7/25 25/4 78/17 211/3 231/10
**learned [3]** 35/13 81/6 81/8
**learning [2]** 82/2 83/7
**least [17]** 31/10 59/19 68/19 140/4 178/22 216/10 216/25 233/17 242/9 243/1 253/15 253/25 254/12 255/17 263/11 271/6 284/2
**leave [8]** 86/8 86/11 135/3 189/17 200/18 204/16 204/22 225/17
**leaves [3]** 84/9 87/23 284/3
**leaving [9]** 85/15 86/10 87/13 91/11 115/19 123/7 137/23 138/1 204/25
**lectures [1]** 203/9

L

**led [6]** 78/17 151/12 175/18 181/12 186/25 187/3
**LEE [2]** 1/17 3/10
**leeway [2]** 148/15 189/9
**left [20]** 8/17 78/6 84/2 86/4 87/3 87/4 89/19 97/22 115/2 128/18 133/19 136/11 136/24 137/3 138/4 138/10 138/13 144/3 204/3 225/9
**left-hand [1]** 8/17
**legal [3]** 61/15 133/4 202/22
**legitimate [1]** 251/9
**lengths [1]** 184/21
**lengthy [1]** 239/24
**less [6]** 10/14 17/11 20/15 39/9 126/3 216/24
**lesser [1]** 281/24
**lessons [1]** 210/3
**let [16]** 22/13 24/24 38/13 47/18 52/24 65/6 82/15 105/10 124/19 125/6 144/19 173/20 174/6 190/16 250/5 289/18
**let's [38]** 46/13 54/21 60/23 62/8 64/15 64/16 73/8 73/10 74/4 75/23 77/15 79/2 79/19 81/5 92/23 94/17 102/24 146/8 151/10 157/3 165/16 167/17 170/15 174/10 238/3 238/6 244/7 254/23 255/20 258/18 263/3 264/7 266/6 267/18 270/24 271/13 272/22 287/24
**letter [43]** 11/22 92/10 92/13 92/23 93/7 93/12 93/21 93/25 94/3 95/4 95/8 95/19 96/9 111/8 140/4 141/6 141/17 141/21 141/22 177/3 207/18 207/22 208/6 208/8 208/15 209/5 209/17 209/18 209/23 211/20 224/25 225/1 225/3 227/15 227/21 227/22 227/24 227/25 228/2 228/5 228/5 228/19 233/17
**letters [7]** 12/13 92/3 92/5 94/25 140/5 207/16 209/20
**level [2]** 76/3 107/22
**liaison [2]** 82/9 82/15
**license [2]** 267/21 268/12
**licenses [2]** 164/17 265/15
**licenses that [1]** 265/15
**licensing [2]** 165/2 266/15
**Lider [7]** 249/2 249/11 285/2 285/4 288/6 288/7 288/9
**life [1]** 88/6
**like [88]** 3/7 4/24 5/6 9/6 9/10 9/14 10/16 14/9 22/25 26/21 31/5 34/13 46/7 48/7 48/17 50/24 51/7 54/19 55/21 57/18 58/2 61/14 62/21 67/25 68/18 69/18 91/19 96/5 99/5 116/19 119/4 121/11 137/5 137/6 148/8 149/7 163/4 166/9 175/10 179/17 180/8 184/19 187/23 189/4 199/23 206/19 206/23 210/24 212/9 [illegible] 214/24 215/8 226/1 226/10 227/21 230/15 232/4 243/21 245/16 246/19 247/15 248/20 249/18 251/8 252/14 259/24 262/23 263/18 264/20 265/14 265/20 266/21 266/22 267/25 268/13 271/20 271/20 282/2 282/5 282/17 283/4 283/8 283/14 283/24 284/3 285/23 286/17
**likelihood [1]** 27/24
**likely [46]** 5/18 6/22 7/2 10/3 10/14 11/11 14/13 17/8 17/11 18/18 19/7 19/14 19/18 20/15 23/23 28/5 30/24 33/7 35/24 36/19 40/13 40/18 41/8 41/14 41/23 44/23 46/11 48/11 48/22 50/21 50/24 51/1 51/16 51/22 51/25 52/3 52/6 61/10 70/1 72/6 188/6 188/7 212/22 260/9 262/25 267/21
**likely to [1]** 18/18
**likened [1]** 98/3
**likes [1]** 283/1
**limb [1]** 88/6
**limited [29]** 29/23 30/2 35/8 64/8 118/7 119/11 125/12 147/21 148/20 148/25 149/3 160/21 161/12 190/22 191/1 246/19 251/2 253/7 256/5 269/13 270/5 275/13 275/18 275/25 278/15 281/2 288/18 289/2 289/6
**limited achievement [1]** 281/2
**limits [1]** 190/11
**line [16]** 5/1 11/4 55/25 126/8 126/9 143/20 146/15 157/5 180/9 189/13 191/13 194/7 194/7 201/10 201/17 202/2
**lineup [1]** 184/9
**link [9]** 23/5 23/7 23/11 23/16 54/12 69/8 69/14 231/4 231/6
**links [1]** 259/10
**Lipsco [2]** 264/13 288/4
**Lisa [3]** 131/13 192/4 192/6
**Lisco [1]** 263/20
**list [5]** 3/16 217/18 222/4 246/1 255/8
**listed [2]** 109/25 127/17
**listen [1]** 278/24
**listened [1]** 270/14
**listener [1]** 85/18
**listing [1]** 232/22
**lists [2]** 109/24 217/15
**literacy [2]** 42/16 42/24
**literally [2]** 7/10 115/19
**literature [6]** 21/22 31/20 51/7 68/3 90/21 91/2
**literature showing [1]** 31/20
**litigation [18]** 106/5 137/11 148/5 164/24 191/11 191/19 214/10 219/24 219/24 222/7 225/1 225/5 226/23 227/13 233/13 238/11 246/8 257/12
**little [25]** 33/25 49/23 56/12 [illegible] 65/8 73/25 74/2 74/2 75/23 76/23 78/24 140/17 146/11 153/17 153/17 174/20 185/1 185/24 193/12 194/2 216/4 216/21 220/12 239/11 284/23
**live [2]** 242/21 243/15
**lives [2]** 154/7 164/14
**living [2]** 174/21 178/10
**LLP [3]** 1/18 1/21 2/3
**LMK [1]** 250/5
**load [1]** 229/20
**loader [1]** 42/14
**local [1]** 105/3
**located [2]** 27/5 75/25
**location [2]** 46/1 46/9
**locations [1]** 118/21
**lodge [2]** 84/5 89/8
**log [1]** 200/24
**logic [1]** 29/5
**logical [2]** 70/13 188/25
**logo [2]** 50/8 50/10
**LOL [2]** 270/24 271/1
**long [13]** 11/2 36/4 38/11 38/21 47/24 119/13 119/16 173/20 174/8 193/10 196/14 243/23 278/12
**long-term [2]** 11/2 36/4
**longer [9]** 102/16 170/23 170/25 171/2 171/3 206/8 242/25 253/6 276/25
**longer considers [1]** 170/23
**look [70]** 7/11 7/16 8/5 9/21 10/11 10/12 16/10 19/25 24/18 44/21 46/5 54/18 54/20 61/22 64/10 64/11 65/12 65/19 65/23 67/14 70/18 79/13 80/4 80/16 85/11 87/2 89/23 92/23 95/13 96/2 110/3 133/5 133/10 139/11 147/5 149/6 151/10 151/10 155/4 156/14 157/3 158/9 159/11 160/7 163/3 167/17 168/17 178/8 185/14 189/4 205/23 210/20 215/25 220/14 222/14 223/6 229/6 239/3 254/23 259/12 264/8 266/6 268/13 277/3 281/19 282/2 282/5 285/11 286/15 288/2
**looked [27]** 20/8 21/22 31/25 38/8 38/16 38/17 38/19 43/21 45/12 47/13 48/4 50/4 57/1 59/2 63/19 66/9 66/13 71/23 121/18 165/23 206/3 218/13 230/18 266/16 267/14 271/17 287/9
**looking [21]** 10/13 12/8 38/3 58/19 60/1 70/3 96/12 114/10 135/13 172/5 184/18 199/15 222/4 223/25 228/5 229/4 236/23 241/5 259/17 268/10 281/23
**looks [4]** 22/25 69/18 163/4 210/24
**loss [4]** 84/1 88/6 117/4 185/10
**lost [4]** 113/19 113/23 186/21 285/6

L


**lot [38]** 9/16 10/12 27/6 43/21 44/12 66/3 71/7 76/4 76/5 77/2 77/3 78/3 78/4 78/16 97/12 112/24 120/25 127/16 184/5 187/5 191/3 194/24 195/5 196/24 202/17 207/13 222/7 224/9 231/12 251/24 253/18 265/8 268/3 268/9 268/15 274/9 279/17 279/18
**lots [3]** 46/10 178/7 182/12
**loud [1]** 271/1
**love [2]** 242/16 286/13
**loved [1]** 202/17
**lovingly [1]** 77/11
**low [14]** 42/24 71/22 149/13 149/18 150/8 164/2 165/6 165/12 168/22 181/11 188/19 218/17 219/12 219/17
**lower [11]** 39/12 49/7 71/15 100/10 151/12 155/19 159/15 159/25 230/13 252/23 256/14
**lowest [13]** 29/25 126/5 149/4 149/25 150/14 154/10 154/17 235/19 260/4 260/18 261/11 262/2 262/10
**lunch [4]** 72/24 94/17 94/23 94/24


M


**made [26]** 24/17 24/19 24/24 32/3 57/19 58/3 59/5 60/9 101/11 101/13 101/14 105/24 106/2 118/9 119/1 124/1 148/3 166/25 170/18 180/16 190/5 190/18 210/17 237/25 268/9 279/13
**Madison [2]** 74/10 74/15
**Maggie [7]** 213/18 214/11 214/17 226/10 232/10 232/11 232/13
**magic [1]** 44/6
**main [4]** 43/8 135/3 194/6 241/17
**maintain [2]** 152/6 272/12
**majority [6]** 111/15 111/20 111/24 112/1 186/11 216/19
**make [65]** 4/25 9/12 11/15 14/13 17/9 17/11 17/13 18/8 19/20 22/10 22/12 24/15 25/4 25/16 25/18 25/20 27/19 28/3 28/3 28/23 37/6 41/13 46/11 51/21 53/15 58/1 61/7 63/11 66/16 70/23 79/1 86/7 99/2 101/21 104/22 105/3 107/7 107/11 112/15 114/4 140/18 145/11 167/2 176/16 180/10 187/2 189/2 192/14 204/23 207/10 212/17 230/1 244/9 245/11 251/8 254/9 265/21 279/6 282/1 282/6 283/10 286/23 287/4 287/13 287/13
**makes [8]** 106/25 142/6 164/6 206/6 218/2 235/23 245/11 249/18
**making [12]** 4/18 7/19 9/15 16/11 [illegible] 104/15 156/11 186/16 206/8 237/15 260/11 268/3
**MALONEY [1]** 1/15
**malpractice [2]** 131/25 132/1
**manage [2]** 209/18 272/6
**managed [2]** 228/1 228/2
**management [7]** 84/20 135/15 136/22 174/22 181/3 182/16 193/17
**manager [8]** 83/4 158/6 193/20 242/18 244/16 244/24 274/8 274/9
**mandated [1]** 78/11
**mandatory [2]** 107/6 205/18
**manipulate [2]** 264/20 282/9
**manner [3]** 93/25 149/10 272/5
**Manteca [2]** 162/15 162/17
**many [43]** 7/15 9/2 11/15 17/5 26/25 27/19 31/4 33/4 43/25 45/2 46/4 48/25 49/1 52/13 52/13 53/25 57/7 57/8 58/1 60/19 61/11 61/15 62/3 67/2 68/5 68/8 77/4 194/14 194/16 195/2 199/16 200/8 201/1 201/5 208/16 237/8 259/10 279/24 280/11 283/21 283/23 283/25 284/1
**many hours [1]** 61/15
**map [2]** 11/20 73/25
**March [13]** 40/1 75/12 75/15 202/4 224/19 224/21 224/25 226/3 227/8 237/6 237/14 238/10 239/4
**March 24 [2]** 238/10 239/4
**March of [3]** 224/19 224/21 227/8
**MARCUS [3]** 1/20 1/21 215/6
**Marino [1]** 91/23
**mark [3]** 14/1 18/15 63/17
**marked [8]** 47/19 85/25 192/3 207/25 210/5 210/14 280/19 281/10
**market [11]** 96/4 114/9 114/10 114/13 114/19 114/21 131/9 152/5 164/16 217/15 272/11
**marketing [12]** 3/25 4/16 4/22 5/11 8/24 44/3 55/14 60/12 131/13 132/17 164/5 217/6
**markets [1]** 181/6
**marks [1]** 14/4
**MARY [1]** 1/15
**Mary's [4]** 75/8 75/11 75/15 78/3
**mass [2]** 34/14 34/18
**Massachusetts [1]** 273/24
**Master's [1]** 273/22
**Masters [2]** 74/11 193/8
**match [1]** 231/7
**matched [1]** 58/20
**materials [4]** 116/7 116/8 116/11 119/19
**maternity [2]** 76/5 77/2
**math [1]** 286/14
**mathematical [1]** 289/10
**mathematically [1]** 289/13
**Matt [9]** 146/14 146/18 182/20 183/21 183/22 186/25 187/8 243/11 257/3
**matter [8]** 38/10 38/11 41/16 41/22 157/12 187/21 264/15 290/2
**matters [5]** 39/17 50/11 159/9 209/3 222/21
**Mattica [2]** 187/1 187/8
**maun [1]** 118/8
**maximize [1]** 154/6
**maximum [1]** 126/3
**MAXWELL [1]** 2/2
**may [52]** 3/18 7/18 8/8 8/9 9/19 10/19 11/13 11/15 15/4 15/15 17/9 20/3 20/14 20/15 22/6 22/6 25/5 27/17 28/11 33/5 53/13 54/7 68/20 72/18 73/8 98/17 117/15 133/15 141/3 144/7 146/13 148/14 157/4 157/6 165/19 178/4 182/22 190/11 191/14 191/14 209/2 233/13 243/24 244/18 249/2 256/10 260/13 263/1 266/11 278/23 284/12 285/1
**maybe [14]** 9/7 18/2 53/24 72/2 166/8 213/22 219/14 221/14 226/10 228/24 235/21 240/4 285/23 288/17
**Maynard [7]** 157/5 158/1 158/6 158/25 162/10 165/24 167/24
**Maynard's [1]** 159/11
**me [85]** 27/11 35/15 41/9 41/10 43/10 43/11 44/14 45/19 49/3 50/4 50/23 51/18 52/24 54/16 56/23 63/25 65/6 77/9 91/19 91/21 103/20 105/10 105/23 106/14 108/2 115/4 117/21 123/1 123/6 123/19 123/21 124/20 125/6 129/24 133/4 133/4 135/19 136/7 138/3 139/6 149/9 154/16 164/6 166/12 168/8 171/5 173/20 174/6 178/14 184/19 186/20 186/21 190/16 191/24 199/8 200/8 200/8 200/10 200/10 204/7 204/8 204/18 206/7 213/22 214/16 219/12 223/5 224/18 227/16 228/4 231/10 231/13 232/25 233/8 233/16 241/3 244/1 249/13 250/5 251/18 256/25 257/2 257/11 262/6 266/24
**mean [32]** 29/12 37/4 39/2 44/7 44/11 44/15 57/11 57/13 58/22 60/14 100/15 102/4 148/6 151/16 151/17 152/13 172/23 180/4 180/5 187/15 188/22 199/15 202/16 213/12 218/16 221/14 222/6 225/19 267/16 275/7 277/9 286/17
**means [11]** 7/14 17/25 49/7 135/24 187/19 188/11 214/21 249/14 269/13 277/4 283/6
**meant [1]** 282/21
**measurable [1]** 200/5

M

**measure [30]** 12/5 16/23 18/18 19/6 21/3 29/23 56/1 62/25 63/5 63/8 63/13 64/24 65/16 68/6 141/4 172/5 186/6 218/3 248/8 249/6 249/7 259/6 260/6 262/15 262/16 262/17 275/10 276/1 276/3 276/7
**measure so [1]** 248/8
**measured [1]** 127/7
**measurement [12]** 175/2 175/3 175/25 177/1 177/25 178/11 181/22 182/6 187/17 187/20 187/21 189/5
**measures [104]** 12/3 12/4 13/24 13/25 14/5 14/6 14/16 14/20 14/22 14/25 15/2 15/21 16/14 16/18 16/18 16/20 16/22 16/24 16/25 17/14 17/14 18/6 18/12 20/13 23/14 29/1 29/4 29/8 29/13 46/6 63/9 63/18 72/7 72/10 79/2 80/25 106/4 106/15 147/22 148/20 149/1 155/20 155/21 155/25 156/2 156/4 159/20 171/7 171/15 171/18 171/22 172/1 172/5 172/6 172/10 172/14 172/16 172/18 172/22 172/23 172/24 173/1 173/8 173/9 173/13 173/15 173/17 173/25 178/3 178/4 178/16 186/16 187/13 191/1 198/1 198/13 199/15 215/4 215/11 217/16 220/16 223/12 223/17 224/2 234/12 234/21 235/9 235/19 235/23 235/23 236/1 236/2 236/3 245/9 245/9 253/7 258/19 258/22 259/7 259/15 259/25 261/13 275/3 277/23
**measures are [1]** 171/22
**measuring [6]** 260/10 260/12 262/16 263/1 263/2 283/10
**measurment [1]** 180/3
**MEC [1]** 103/15
**mechanism [1]** 150/12
**mechanisms [1]** 236/21
**Med [1]** 81/18
**media [11]** 34/7 34/14 34/14 34/18 34/19 34/22 35/7 89/20 131/6 200/1 279/18
**median [2]** 129/11 129/25
**Medicaid [1]** 175/13
**medical [100]** 1/4 8/22 11/8 11/9 13/4 13/6 18/13 23/8 24/10 72/25 73/14 81/22 81/23 82/1 84/3 85/15 86/7 86/9 86/10 87/3 87/10 87/13 89/1 89/19 90/11 91/11 91/17 92/8 95/5 97/16 97/23 98/2 99/21 99/22 99/25 100/18 100/22 101/3 102/15 102/20 102/25 103/4 103/11 104/1 109/5 110/5 110/8 110/12 110/16 110/19 112/3 112/11 113/7 113/15 114/20 115/24 118/20 120/18 121/24 125/3 127/19 131/25 133/19 134/5 134/17 135/10 136/11 137/24 138/10 138/13 166/25 193/1 200/11 200/15 200/23 201/20 202/19 202/20 202/22 203/3 203/8 203/10 203/12 203/21 204/3 204/20 204/24 204/25 210/1 210/3 211/3 211/7 211/17 211/23 222/7 226/12 231/25 241/11 261/3 273/20
**Medicare [2]** 175/13 218/18
**medication [1]** 80/7
**medicine [3]** 132/10 145/12 174/24
**meet [6]** 40/9 59/9 145/10 178/2 247/3 278/2
**meeting [47]** 40/2 40/5 40/7 42/20 75/22 83/3 97/17 101/3 101/14 102/3 102/11 115/24 118/4 118/19 119/12 119/21 120/9 122/12 122/13 122/16 122/18 183/3 183/5 183/7 183/10 185/7 190/16 226/20 227/5 227/5 268/20 268/23 269/6 270/4 274/10 275/23 278/1 278/20 278/20 278/22 278/23 279/2 279/6 279/9 280/2 280/22 281/18
**meetings [3]** 104/5 226/14 263/16
**member [10]** 97/15 122/9 146/4 150/15 150/15 156/20 165/2 179/3 179/3 181/18
**members [28]** 82/1 82/19 91/18 91/18 96/24 97/8 98/2 100/18 100/22 101/15 101/23 101/23 101/24 102/15 102/15 103/11 103/15 125/25 127/18 139/3 182/2 182/4 182/8 182/10 184/20 186/11 259/3 260/8
**memory [1]** 53/4
**men [2]** 188/6 268/15
**Mentally [1]** 232/8
**mention [5]** 35/5 35/7 47/12 130/23 279/10
**mention Footnote [1]** 35/5
**mentioned [30]** 20/17 22/2 27/4 34/20 35/3 37/1 48/24 62/23 83/6 100/25 102/10 132/7 151/11 162/21 170/7 180/22 194/12 195/16 197/7 200/24 202/8 203/3 206/20 224/15 224/18 235/6 284/23 287/17 288/4 288/9
**merely [1]** 54/9
**MERSA [1]** 89/24
**message [7]** 139/5 139/6 139/8 139/16 139/23 280/18 283/1
**messages [1]** 139/13
**messaging [1]** 280/24
**messed [1]** 272/14
**messing [1]** 188/25
**met [5]** 147/8 206/2 216/16 270/21 278/3
**meter [1]** 72/7
**meters [1]** 195/17
**method [11]** 5/20 27/8 29/18 29/19 35/18 35/22 41/1 48/2 62/14 67/13 212/7
**method to [1]** 62/14
**methodologies [2]** 62/21 189/10
**methodology [116]** 6/17 6/18 21/13 22/7 23/17 23/19 24/25 25/19 30/9 30/11 30/16 30/17 35/10 35/11 36/24 37/2 37/4 37/15 37/19 37/22 37/24 38/3 38/9 38/16 38/17 38/19 38/23 39/5 41/4 41/14 41/19 41/24 44/9 44/11 44/24 45/13 45/17 45/18 47/1 47/18 48/6 48/12 48/22 52/25 53/1 53/8 53/11 53/13 56/15 56/18 56/20 57/19 59/5 61/1 61/9 62/12 64/7 64/13 69/9 69/14 98/10 98/14 98/18 98/20 98/24 99/10 100/5 103/2 111/3 111/6 113/20 146/5 148/19 160/24 171/20 176/23 177/5 179/9 187/10 190/5 190/25 216/25 219/16 220/2 228/7 228/18 246/20 251/13 251/24 252/22 253/21 254/1 254/10 254/13 264/10 268/24 271/10 271/12 271/23 274/10 274/21 275/2 275/9 282/2 282/5 283/3 283/18 283/23 284/5 284/8 284/15 284/19 284/21 285/9 287/16 287/17
**methods [1]** 44/12
**metrics [2]** 95/21 116/16
**Meyers [1]** 1/21
**Miami [1]** 1/23
**Michael [2]** 126/18 192/4
**microphone [3]** 3/14 193/12 248/17
**middle [2]** 22/22 215/25
**MIDDLEBROOKS [3]** 1/3 1/11 2/8
**middleman [1]** 256/22
**might [27]** 7/11 7/12 17/24 22/16 27/22 27/24 28/1 30/5 33/2 33/3 34/3 38/3 39/11 39/25 49/3 71/20 94/12 147/18 149/8 158/21 176/11 182/21 187/10 254/10 272/5 272/15 288/11
**Mika [1]** 109/8
**miles [1]** 32/2
**Military [1]** 92/24
**million [4]** 34/16 119/25 143/15 201/12
**mind [2]** 16/16 23/1
**minimal [1]** 214/13
**minimum [10]** 6/19 6/19 21/9 21/11 35/8 35/18 35/21 41/18 64/9 72/7
**minute [3]** 99/9 183/2 244/11
**minutes [20]** 3/6 3/7 36/8 115/24 118/19 119/12 120/9 122/17 144/16 144/18 144/19 145/1 145/2 174/10 174/11 242/19 243/1 243/10 244/7

M

**minutes... [1]** 262/14
**mischaracterizes [3]** 165/7 166/22 262/4
**mischaracterizes the [1]** 166/22
**misconception [1]** 246/17
**misleading [5]** 73/21 127/10 129/15 129/20 132/24
**Misrepresenting [1]** 255/24
**Misrepresenting the [1]** 255/24
**misrepresents [2]** 127/8 127/9
**missing [36]** 15/18 28/25 29/4 29/8 29/13 154/1 160/19 170/15 170/24 171/6 171/15 171/18 171/21 171/25 172/1 172/14 172/16 172/22 172/23 181/21 183/18 187/14 187/22 187/23 188/2 188/3 188/3 188/8 188/9 188/11 188/12 188/13 188/22 216/5 236/18 261/9
**missingness [1]** 188/24
**mission [5]** 176/14 176/15 176/24 180/24 180/24
**misspoke [1]** 266/18
**Missy [12]** 146/14 249/17 251/13 257/3 276/12 278/5 279/13 280/18 281/12 282/18 286/13 287/10
**mix [1]** 122/2
**mobile [2]** 20/6 20/8
**mockup [1]** 249/3
**model [22]** 122/23 163/25 164/11 164/12 164/15 164/19 164/23 164/24 172/21 177/2 184/22 185/9 187/1 187/6 187/7 187/9 209/13 250/17 260/11 279/4 279/7 279/11
**model that [1]** 177/2
**modeled [5]** 31/8 51/11 68/17 68/19 68/22
**modeling [2]** 274/14 276/13
**moment [2]** 16/12 144/7
**moments [1]** 266/16
**monetary [1]** 125/1
**monetize [1]** 73/23
**monetized [1]** 124/9
**money [6]** 78/4 124/5 124/7 124/13 124/21 125/1
**Monit [1]** 168/18
**monitored [3]** 79/6 79/22 80/10
**monitors [1]** 131/6
**Montgomery [13]** 193/1 193/4 210/16 213/8 214/6 215/17 217/13 220/23 229/22 232/15 234/4 238/18 242/13
**month [11]** 120/10 133/21 198/17 204/24 215/22 216/10 216/14 216/17 217/3 288/12 288/17
**monthly [3]** 82/4 97/16 103/10
**months [7]** 75/12 202/4 208/10 212/13 227/10 239/9 263/20
**morbidities [1]** 194/25
**more [64]** 6/6 7/25 9/3 9/20 10/8 11/16 17/10 20/18 20/21 22/7 29/1 29/14 29/14 48/25 61/5 61/19 61/21 62/10 70/17 73/9 76/18 76/25 95/16 97/21 101/19 104/12 120/12 121/7 121/8 123/23 136/6 139/2 141/13 143/15 149/7 151/13 152/13 153/17 153/17 153/20 155/21 156/3 158/20 159/14 169/10 171/21 171/25 172/12 172/13 184/10 184/10 188/6 188/7 188/7 206/25 216/4 235/24 250/21 254/10 267/19 267/21 271/20 279/14 286/1
**morning [9]** 3/1 3/22 3/23 36/7 73/13 89/20 154/23 248/1 289/20
**Moskowitz [1]** 2/3
**most [32]** 8/20 22/10 25/4 46/2 48/20 49/10 49/16 49/18 57/1 63/7 66/6 77/7 77/9 83/17 84/14 150/7 150/11 150/11 152/3 179/16 194/10 228/13 228/16 240/9 256/15 258/19 258/22 259/7 259/14 259/15 268/13 272/9
**mother [1]** 74/7
**motions [1]** 5/23
**motivation [1]** 283/13
**Mount [1]** 255/8
**mouth [1]** 34/19
**move [13]** 3/14 26/14 92/12 118/17 161/8 189/14 189/18 239/1 246/25 246/25 247/23 250/9 271/13
**moved [8]** 112/20 132/15 162/5 193/19 221/24 273/21 273/23 275/11
**movie [1]** 54/22
**moving [3]** 167/18 216/5 246/12
**Mr [70]** 3/10 3/12 5/19 15/10 15/16 19/11 19/21 30/10 36/22 38/1 50/16 72/25 73/2 73/4 73/17 78/23 80/19 84/9 84/25 85/5 86/3 86/21 87/15 88/8 88/16 89/14 89/17 89/25 90/10 92/4 93/14 93/19 93/23 94/23 98/9 109/4 115/23 118/3 124/11 125/24 127/8 131/3 132/16 140/14 144/20 146/13 147/5 148/7 148/8 148/18 154/25 157/4 157/8 157/17 161/20 167/21 168/1 168/5 190/6 215/6 219/8 272/1 274/11 277/14 278/19 280/18 282/13 282/16 282/18 285/1
**MRIs [1]** 206/14
**Ms [81]** 3/5 73/3 73/6 84/20 92/13 93/23 94/1 117/23 144/16 144/19 146/21 146/21 146/24 147/2 156/14 162/10 168/18 177/8 179/20 193/4 210/16 213/8 214/6 215/17 217/13 220/23 229/22 232/15 234/4 235/5 237/13 237/21 238/18 240/5 242/13 242/16 242/24 243/2 243/12 243/12 243/13 243/14 243/17 243/18 247/25 248/22 249/2 249/11 249/21 249/23 251/5 252/12 252/15 252/19 255/5 257/5 260/17 262/1 264/4 264/13 265/10 265/13 266/14 267/24 269/10 270/23 272/1 272/25 273/3 273/17 277/11 280/24 281/10 282/13 286/9 286/10 286/15 288/4 288/6 288/7 288/9
**much [17]** 17/8 49/7 90/15 96/14 107/15 138/22 140/18 147/17 186/18 186/19 200/20 201/10 218/14 219/14 278/24 285/12 288/17
**multiple [9]** 17/12 24/22 37/23 37/25 67/22 136/20 140/5 199/14 284/5
**multitude [1]** 281/16
**must [1]** 216/5
**my [143]** 3/25 4/16 6/8 10/2 10/13 14/19 15/7 15/8 15/16 15/20 15/20 25/3 26/8 27/2 29/3 30/7 30/7 31/14 31/15 32/6 32/6 32/10 37/20 39/17 40/25 40/25 41/9 41/11 41/11 41/17 42/5 43/5 43/8 43/24 44/17 47/3 51/18 51/20 57/6 57/8 59/11 61/18 62/5 62/7 62/13 62/16 62/16 66/10 68/12 72/8 72/15 73/2 73/13 74/7 74/7 74/8 74/9 74/11 74/17 75/13 81/10 84/5 89/8 100/25 101/4 106/14 107/20 111/22 113/14 118/18 119/22 124/11 124/12 124/21 128/4 128/7 128/25 129/9 137/18 138/23 138/25 139/9 140/11 144/14 144/18 145/9 151/4 152/3 152/12 153/5 155/2 155/16 159/22 160/17 161/21 168/14 168/25 169/8 170/1 173/12 173/14 173/22 174/24 175/1 175/8 175/18 177/7 180/24 184/18 185/12 186/1 191/22 191/23 191/24 193/6 193/8 199/7 206/2 210/3 226/11 226/12 229/19 238/9 238/22 242/25 243/2 245/13 246/18 247/17 249/12 254/21 257/2 260/17 267/25 268/17 270/11 272/13 273/19 273/22 280/9 280/14 287/10 288/21
**my mission [1]** 180/24
**myself [3]** 42/16 51/6 286/21

N

**NA [1]** 166/3
**name [15]** 3/25 73/13 85/17 128/11 128/20 131/16 134/18 145/9 161/21 185/16 203/4 207/12 232/25 233/2 252/11

N


**named [2]** 31/23 85/19
**names [1]** 129/16
**narrative [2]** 97/13 289/11
**narrow [1]** 208/20
**national [6]** 108/3 108/8 217/24 219/13 219/18 219/22
**nationwide [1]** 229/24
**natural [1]** 167/1
**naturally [1]** 153/6
**nature [10]** 21/13 61/9 64/7 91/16 116/10 116/23 180/15 227/6 232/5 235/21
**navigates [1]** 23/4
**near [1]** 65/1
**neat [1]** 251/13
**necessarily [6]** 11/19 19/15 23/15 96/12 229/21 256/24
**necessary [9]** 44/2 51/9 52/12 62/23 66/21 68/1 72/19 242/8 246/22
**need [18]** 28/13 37/21 39/24 44/21 51/13 60/20 82/16 85/3 117/21 123/23 126/3 144/24 174/7 231/10 236/18 244/9 247/23 282/6
**needed [6]** 31/24 104/11 119/6 123/8 196/25 210/3
**needs [10]** 37/17 75/22 76/8 122/3 144/13 159/18 164/4 170/23 211/2 211/15
**negative [11]** 10/5 10/7 10/10 10/13 10/18 27/25 33/2 36/4 130/23 159/14 284/4
**negatively [7]** 6/22 10/3 30/24 35/25 50/24 51/25 101/2
**negotiate [1]** 116/8
**Neil [1]** 122/8
**neither [4]** 21/18 35/6 70/25 231/5
**neither explains [1]** 70/25
**Nemechek [5]** 82/23 122/8 122/11 122/12 122/14
**network [12]** 75/1 75/2 78/2 104/22 107/21 131/9 131/14 197/8 197/10 208/20 213/18 214/18
**networks [1]** 75/5
**neutral [1]** 9/7
**never [32]** 67/1 86/17 98/10 99/18 112/10 120/19 123/17 128/11 128/24 129/16 129/21 130/9 130/14 135/24 150/20 152/21 153/12 158/21 168/14 176/9 212/1 224/15 225/1 225/4 233/19 238/10 238/11 241/8 280/9 282/11 287/15 287/17
**never provided [1]** 129/16
**new [12]** 53/7 71/2 178/3 180/14 185/9 201/20 204/19 220/2 224/9 226/17 233/12 241/25
**Newman [2]** 102/10 102/12
**news [4]** 132/7 200/1 200/2 222/20
**newspaper [4]** 203/1 209/15 222/10 230/18
**newspapers [1]** 200/3
**next [17]** 3/8 8/19 16/2 16/20 17/21 17/22 18/1 19/11 24/12 30/8 32/11 52/5 65/8 145/4 180/10 188/3 264/8
**nice [2]** 36/15 36/16
**Nicholson [4]** 53/10 90/17 90/25 190/6
**Nick [5]** 203/5 224/15 225/16 226/11 226/16
**NICU [4]** 76/3 77/10 119/4 119/4
**night [1]** 206/23
**NIH [1]** 273/23
**nine [6]** 46/15 184/20 222/21 233/8 233/11 289/21
**no [183]** 1/3 5/14 5/19 12/10 12/14 16/8 17/17 17/17 17/18 18/19 19/2 21/14 21/18 23/13 35/16 38/6 40/11 42/12 42/19 43/17 45/7 45/17 45/24 49/16 50/14 50/18 52/9 53/6 56/8 56/10 58/6 59/20 63/25 66/22 66/25 67/16 67/17 77/25 80/6 80/18 80/24 85/13 85/18 87/17 87/18 92/15 97/1 98/1 99/23 100/10 102/16 102/18 103/23 104/6 104/7 105/1 105/24 106/19 107/20 112/10 112/21 113/23 115/2 115/4 116/5 118/22 119/17 120/22 123/20 123/25 124/14 125/13 133/12 134/21 135/9 135/23 136/7 138/21 139/24 140/1 140/8 142/10 143/11 148/21 150/2 151/14 154/6 156/12 167/16 168/9 168/11 168/11 169/1 170/23 170/25 170/25 171/2 171/3 171/11 172/18 173/1 173/9 173/14 174/9 176/24 177/6 181/17 182/25 182/25 183/1 186/2 188/11 190/7 192/19 192/21 198/14 202/16 204/12 209/11 209/15 213/25 214/13 219/11 221/19 221/25 222/6 223/4 226/10 227/1 227/5 227/12 228/3 228/4 228/21 231/4 231/6 233/2 233/23 235/17 237/2 240/2 240/15 241/18 242/3 242/11 242/21 242/21 242/21 245/9 252/17 253/6 261/5 261/6 261/8 261/14 262/5 262/13 263/3 268/14 270/8 270/15 270/18 272/17 272/20 274/6 276/2 276/6 276/25 278/17 279/5 279/8 279/13 281/4 282/3 282/11 284/7 284/22 285/8 285/10 288/6 288/15 289/12 289/16
**Noble [1]** 255/9
**nobody [4]** 49/24 150/17 187/25 187/25
**non [26]** 41/2 72/13 72/16 78/18 147/21 148/19 152/20 154/17 155/12 155/17 156/7 171/17 174/1 180/19 186/10 189/6 190/21 190/23 190/25 212/24 216/1 218/1 218/16 224/5 235/25 275/3
**non-compliant [1]** 216/1
**non-participating [12]** 41/2 78/18 147/21 148/19 152/20 154/17 155/12 155/17 156/7 171/17 174/1 218/1
**non-profit [1]** 212/24
**non-reporting [2]** 190/23 275/3
**non-response [1]** 189/6
**none [6]** 14/5 16/18 16/25 35/7 47/12 233/5
**nonparticipant [1]** 161/6
**nonparticipants [11]** 149/8 150/23 151/9 152/15 152/23 153/7 153/10 153/13 153/25 160/20 272/4
**nonparticipating [16]** 6/20 13/15 14/6 30/25 33/10 148/25 170/24 172/14 172/16 173/8 173/18 260/2 275/16 288/18 289/2 289/7
**nonparticipation [8]** 33/12 150/18 153/24 154/21 156/8 162/14 162/24 163/19
**nonperformance [1]** 19/8
**nonprofit [1]** 164/12
**noon [1]** 244/6
**normal [2]** 93/16 143/25
**normally [2]** 153/14 196/13
**north [3]** 74/20 120/13 123/13
**not [480]**
**not -- let [1]** 124/19
**not attached [1]** 185/4
**notable [1]** 28/18
**notation [1]** 19/16
**note [13]** 32/23 33/14 34/11 34/23 65/24 119/21 134/12 135/5 135/8 136/19 136/23 231/7 272/25
**note your [1]** 32/23
**noted [2]** 14/7 15/16
**notes [13]** 18/7 18/10 19/12 19/13 28/24 29/20 118/3 119/22 135/10 185/14 185/25 211/16 255/8
**nothing [16]** 16/20 21/7 21/10 40/5 70/9 72/17 85/21 118/14 127/7 136/6 144/9 169/13 233/7 241/22 266/19 287/19
**notice [9]** 202/2 202/3 202/5 203/20 237/5 237/8 237/14 238/20 239/8
**noticing [1]** 277/7
**noting [1]** 14/21
**notion [1]** 58/3
**Nova [1]** 193/7
**November [6]** 98/20 115/25 203/23 266/10 284/16 284/19
**November 2024 [1]** 98/20
**now [41]** 56/2 65/23 79/13 87/2 116/2 124/16 124/18 162/13 164/20 169/13 178/6

**N**

**now... [30]** 192/25 200/22 201/15 202/22 203/9 204/3 204/16 204/23 205/3 206/3 210/1 212/1 218/19 219/14 225/11 226/2 228/22 229/17 235/5 236/11 250/5 250/8 252/6 253/11 255/5 255/22 265/9 267/15 271/13 272/17
**nowhere [3]** 156/6 217/18 230/20
**nuking [1]** 166/2
**number [56]** 5/3 5/4 9/19 12/23 15/6 16/2 17/12 17/18 17/22 22/11 23/25 24/8 34/20 34/22 34/23 35/2 35/22 37/1 38/24 39/8 39/12 44/6 49/25 55/5 55/6 55/7 56/14 56/16 56/17 56/22 58/5 60/17 61/25 62/4 62/13 71/25 107/20 109/24 118/7 119/11 128/4 128/6 129/5 171/6 172/9 179/9 184/11 186/5 214/2 222/20 223/3 233/8 238/9 247/19 265/10 265/14
**numbers [1]** 25/24
**numerical [3]** 9/8 9/10 12/2
**numerous [7]** 76/20 97/7 129/15 129/17 130/2 130/3 201/19
**Nunez [4]** 105/10 105/21 125/17 125/24
**nurse [10]** 74/7 74/8 74/8 87/12 134/16 134/18 134/19 134/22 136/17 136/21
**nurses [3]** 13/17 115/1 166/12
**nursing [7]** 105/13 105/17 114/22 114/25 131/9 207/1 221/2
**NW [1]** 1/18

**O**

**o'clock [7]** 200/1 200/2 200/2 269/6 269/6 278/2 289/21
**oath [1]** 166/11
**OB [2]** 91/19 194/12
**OB/GYN [1]** 91/19
**object [14]** 15/11 26/3 27/13 28/4 86/16 147/23 157/13 160/3 161/9 161/18 161/22 168/2 189/13 270/15
**objected [3]** 73/7 238/1 270/10
**objection [100]** 5/15 5/23 5/24 26/16 26/18 28/9 29/9 70/4 71/11 84/6 85/2 85/9 85/23 86/19 87/17 88/2 88/18 89/5 89/6 89/8 89/9 90/2 92/14 92/15 92/16 92/17 93/15 93/18 94/6 94/7 112/21 115/24 117/11 119/17 125/23 126/21 126/24 127/12 131/2 132/20 133/1 143/10 144/5 148/13 149/15 149/20 150/24 151/24 154/12 156/24 157/7 159/3 159/6 161/12 161/25 162/1 162/3 163/6 165/7 165/17 166/22 167/7 167/9 169/6 173/4 173/19 189/8 190/10 191/12 192/17 203/14 208/1 208/3 209/9 210/6 210/8 210/12 213/23 213/25 215/15 220/21 221/25 235/11 236/7 237/16 237/19 237/21 238/3 238/9 238/25 245/24 246/4 261/16 262/4 264/14 270/9 270/18 274/17 276/21 288/6
**objections [2]** 5/15 270/15
**objective [9]** 150/13 150/17 150/22 151/5 152/14 152/19 152/22 153/5 153/9
**objectives [1]** 153/13
**observation [2]** 206/20 207/1
**observations [5]** 206/18 215/22 216/10 216/14 217/3
**observe [1]** 97/2
**observed [1]** 188/4
**obtain [2]** 78/8 272/12
**obviously [14]** 9/3 76/6 77/25 86/7 91/17 96/11 157/10 163/13 200/3 208/16 211/21 219/23 220/6 267/25
**occasionally [1]** 187/24
**occur [1]** 220/18
**occurred [7]** 102/11 102/22 118/4 128/21 199/17 224/21 276/5
**occurs [1]** 46/12
**October [16]** 73/19 104/4 104/5 126/14 128/21 130/6 202/6 202/6 203/21 205/1 227/11 227/12 237/12 239/20 263/23 264/9
**October 31st [6]** 202/6 203/21 205/1 227/11 227/12 237/12
**October 4 [2]** 263/23 264/9
**of health [1]** 250/1
**off [30]** 5/1 73/23 81/13 84/3 99/3 101/4 107/20 112/2 122/21 122/22 127/17 137/18 138/23 138/25 140/8 140/9 140/11 141/22 149/6 158/9 162/9 182/23 219/19 249/13 267/9 267/11 267/13 268/15 286/13 286/18
**offer [1]** 182/23
**offered [4]** 44/23 116/13 116/14 234/15
**offering [5]** 5/14 40/19 41/22 157/11 169/14
**offering all [1]** 169/14
**offhand [5]** 46/25 58/14 58/18 61/13 72/3
**office [6]** 104/20 105/1 105/5 105/7 131/6 139/6
**officer [20]** 74/21 75/3 75/9 75/10 75/11 75/14 75/14 78/3 105/13 105/17 131/9 157/23 157/25 158/1 158/3 166/24 166/25 192/7 215/17 221/2
**Official [2]** 2/7 290/5
**often [12]** 7/14 7/16 9/5 9/10 9/15 9/17 19/25 20/4 38/20 48/6 54/10 55/4
**oh [2]** 113/5 286/21
**okay [51]** 3/17 20/22 26/22 28/14 36/10 37/2 37/17 40/5 40/9 42/13 43/16 51/1 51/3 51/24 52/3 52/5 52/24 56/23 58/15 58/19 58/23 60/1 64/10 73/1 73/11 94/19 101/21 123/25 130/16 133/22 144/25 145/4 153/23 166/20 185/12 187/5 190/23 198/4 210/25 223/24 224/8 225/4 225/25 244/10 244/14 248/18 251/22 258/14 258/17 274/15 283/25
**old [1]** 275/12
**older [1]** 178/4
**omitted [1]** 14/10
**on academic [1]** 14/18
**on-site [1]** 109/12
**once [8]** 94/7 117/19 120/19 128/11 204/24 213/14 243/5 287/17
**oncology [1]** 194/6
**one [176]** 6/6 7/7 7/17 7/23 9/20 9/21 9/21 10/2 10/11 11/13 11/14 12/19 13/23 14/7 14/11 14/20 14/20 18/3 18/6 18/12 23/14 25/14 28/23 31/19 32/12 34/15 34/17 39/8 40/3 40/7 40/19 41/19 42/1 43/2 43/25 46/20 46/22 47/4 47/8 47/11 48/3 48/25 49/12 51/15 54/2 54/10 54/16 55/2 55/11 55/14 55/22 55/25 58/3 63/12 63/21 63/22 63/22 66/23 67/4 68/5 69/6 71/18 77/8 77/11 84/15 85/6 86/25 88/10 90/20 90/25 92/5 93/7 93/19 94/10 94/14 94/17 98/2 104/5 107/2 113/6 114/17 122/14 123/14 130/21 131/5 131/17 132/7 136/5 136/21 139/4 140/7 140/7 140/8 140/9 140/10 140/11 148/22 156/20 158/21 160/14 162/20 163/14 166/6 172/22 175/4 175/7 175/15 175/21 176/9 179/24 181/12 183/2 188/25 193/18 200/9 204/18 219/3 219/11 223/8 223/10 223/15 224/4 227/16 228/21 229/10 229/19 229/19 233/5 234/19 238/9 241/23 243/21 243/24 246/22 250/21 252/9 253/25 258/25 259/9 259/10 265/13 266/24 267/16 269/13 269/17 269/20 270/1 270/5 270/9 270/10 270/16 270/19 272/17 272/20 272/24 273/4 273/4 275/4 275/4 276/17 276/17 277/16 278/8 278/9 278/18 279/17 281/1 281/4 281/5 281/8 284/2 285/21 285/23 289/10 289/10 289/10
**one is [1]** 289/10
**ones [3]** 11/14 101/19 101/21

O

**ongoing [1]** 7/2
**online [6]** 5/1 20/5 87/11 134/6 135/17 135/22
**only [52]** 5/13 13/9 14/9 17/14 22/12 24/15 24/19 24/23 27/18 32/13 34/5 38/13 48/16 50/15 52/18 56/14 57/19 60/15 61/8 63/7 63/9 63/15 76/3 101/22 110/7 115/20 117/12 121/4 135/13 136/4 150/2 152/5 159/7 172/7 173/10 173/16 216/16 218/18 218/19 218/20 229/15 235/21 245/25 246/22 249/12 263/6 267/10 269/13 270/5 270/10 272/11 281/1
**OP [1]** 119/9
**open [6]** 87/13 87/16 117/8 192/11 237/24 238/13
**opened [3]** 95/12 237/23 238/19
**opening [1]** 77/18
**operating [7]** 74/21 75/9 75/10 75/13 75/14 78/2 195/21
**operational [1]** 116/16
**operations [3]** 75/20 192/7 255/10
**opined [1]** 64/6
**opinion [69]** 9/24 11/10 14/16 15/5 15/7 15/16 15/19 15/20 17/24 19/4 19/9 21/5 21/20 22/8 23/22 25/1 27/23 30/5 30/7 30/7 32/6 32/7 32/9 32/10 36/18 40/6 40/13 40/15 40/17 40/20 40/23 40/25 40/25 41/8 41/13 41/17 41/22 42/1 43/1 44/23 47/10 47/22 48/3 48/21 50/19 50/21 51/2 51/22 52/3 52/5 55/2 55/11 55/13 55/15 56/1 57/22 60/11 61/15 62/17 64/4 64/5 70/1 71/17 72/5 72/12 72/15 182/4 248/11 254/3
**opinions [34]** 5/15 5/17 5/20 6/12 8/24 10/2 13/20 15/8 28/4 28/7 28/16 30/21 31/15 31/17 31/18 34/2 35/13 39/16 40/19 41/15 46/23 48/9 50/19 51/14 68/17 70/5 72/8 182/11 182/15 182/23 190/3 246/24 247/8 247/8
**opponent [2]** 126/20 274/19
**opportunities [1]** 196/17
**opportunity [5]** 67/25 155/21 158/16 251/20 282/17
**opposed [1]** 257/22
**opposing [2]** 3/6 176/19
**opposite [3]** 10/19 19/17 156/13
**opt [1]** 257/24
**optimal [1]** 154/1
**optimistic [1]** 244/10
**option [2]** 156/2 269/25
**options [2]** 10/12 23/2
**or FTC [1]** 42/14
**order [7]** 5/23 42/23 60/20 112/8 126/2 184/8 219/24
**ordinary [2]** 245/19 247/13
**organization [5]** 124/2 162/16 164/12 164/13 212/24
**organizations [5]** 42/7 42/18 165/3 181/7 181/14
**orient [2]** 11/16 182/1
**original [4]** 57/25 178/17 272/25 286/12
**originally [1]** 187/8
**ORs [2]** 118/8 119/11
**orthopedic [12]** 194/7 195/14 200/20 200/21 200/24 201/17 201/20 202/2 202/17 203/3 203/8 225/8
**orthopedics [1]** 76/6
**Orville [1]** 162/15
**other [92]** 7/23 10/12 10/14 11/18 14/14 15/17 16/9 16/14 19/22 19/23 25/18 32/8 33/6 33/14 34/2 38/4 38/4 38/11 40/4 40/8 42/2 46/20 47/4 49/13 53/19 64/19 69/6 71/21 76/9 76/13 79/1 88/22 99/20 104/4 107/2 108/23 110/11 110/12 110/15 112/14 114/11 115/8 115/17 116/12 116/16 118/21 123/7 124/13 125/25 128/3 132/12 135/5 135/7 135/10 137/6 137/10 140/9 144/3 151/8 152/9 153/23 159/20 169/17 177/2 179/10 180/25 182/2 182/4 182/8 182/11 182/23 195/1 195/9 203/6 203/24 206/6 206/9 206/17 218/12 218/24 235/22 235/24 236/1 241/5 243/17 244/8 245/9 245/9 246/7 256/23 267/1 270/2
**other hospitals [1]** 270/2
**others [11]** 46/10 63/15 71/22 81/15 128/11 153/19 159/7 178/25 179/5 270/17 272/1
**otherwise [3]** 9/8 12/1 150/3
**our [158]** 3/6 3/8 20/23 26/17 36/7 55/21 72/24 74/1 75/19 76/2 76/8 76/17 76/25 77/2 77/3 77/12 81/17 81/17 81/18 81/19 82/25 84/19 86/25 89/23 91/11 92/16 94/3 95/14 96/14 97/7 97/10 97/11 97/16 97/20 98/2 99/21 99/22 99/25 100/6 101/23 102/2 102/8 103/10 108/6 108/12 108/14 112/6 112/9 112/13 112/15 113/10 113/10 113/10 113/11 113/17 113/17 113/23 114/16 114/25 116/6 119/2 119/4 119/4 119/4 119/6 119/10 120/23 120/24 120/25 121/1 121/3 121/8 121/11 122/9 123/10 123/24 124/8 124/25 129/4 130/4 130/10 131/5 131/6 135/1 135/15 136/22 139/4 143/15 144/1 147/6 148/11 157/8 159/20 166/14 [illegible] 169/10 189/20 192/8 193/19 194/6 194/18 195/12 195/12 195/13 195/14 196/24 197/3 197/3 197/5 197/5 198/11 200/11 200/20 201/17 201/20 201/25 202/1 202/6 202/17 203/7 203/8 206/4 206/11 206/18 206/18 208/19 212/4 212/19 212/21 212/22 214/22 218/9 218/10 218/18 218/19 218/21 219/2 219/3 220/13 220/16 228/1 243/10 243/13 243/16 244/5 245/12 245/12 246/4 246/20 256/12 262/18 264/20 276/19 279/14 283/11 284/3 285/6
**ours [1]** 192/11
**out [81]** 8/8 17/16 22/24 31/23 42/13 43/3 46/7 46/15 46/21 55/3 55/3 55/12 55/14 57/13 59/20 63/4 63/5 64/20 70/5 71/21 77/5 100/6 113/20 117/18 117/22 118/22 123/17 125/8 132/11 147/6 157/10 161/11 162/25 162/25 168/18 176/20 176/23 181/8 181/10 181/14 184/12 184/21 187/1 191/8 191/17 191/21 192/14 193/18 200/4 200/13 201/18 202/18 203/9 204/19 206/2 210/1 210/17 212/4 212/13 213/9 215/11 217/15 218/10 222/15 224/1 232/4 235/21 236/17 249/12 257/24 259/16 267/12 271/1 275/12 276/3 276/17 278/8 281/4 281/20 283/18 284/20
**out-patient [1]** 77/5
**outcome [2]** 77/14 138/6
**outcomes [4]** 143/20 176/18 181/4 253/6
**outlets [2]** 4/22 200/1
**outpatient [3]** 113/23 114/2 119/10
**outside [6]** 7/16 56/6 76/2 192/8 255/10 288/21
**outside resisting [1]** 255/10
**over [38]** 4/20 4/23 11/1 24/9 31/4 34/16 35/20 43/11 43/14 43/18 43/23 46/14 49/15 92/14 94/7 115/1 117/10 124/8 130/22 132/2 155/3 161/12 174/19 178/3 178/15 187/25 194/11 196/14 200/3 200/4 203/1 207/11 212/16 212/16 234/21 238/12 238/12 268/4
**overall [9]** 75/20 78/10 114/12 114/19 114/21 223/15 247/9 278/25 283/1
**overrule [7]** 85/23 94/6 127/12 133/1 133/3 159/6 190/10
**overruled [39]** 5/24 15/13 27/15 28/9 29/10 70/8 71/13 84/7 86/19 87/19 88/4 88/20 89/9 90/3 92/17 143/13

Case 9:25-cv-80526-DMM Document 204-2 Entered on FLSD Docket 02/06/2026 Page 325 of 344
USCA11 Case: 26-11527 Document: 35 Date Filed: 09/17/2026 Page: 964 of 1817


O


**overruled... [23]** 149/22 150/25 151/25 154/13 160/4 162/3 165/8 166/23 167/8 173/5 173/20 191/15 203/15 208/3 209/10 210/12 237/19 238/25 261/17 262/7 264/17 276/22 288/23
**overruling [1]** 93/18
**overseeing [2]** 82/14 279/15
**oversight [1]** 185/2
**overstating [2]** 276/19 276/23
**overview [2]** 109/6 109/12
**overwhelming [1]** 284/6
**own [16]** 7/16 30/9 31/8 34/22 51/11 52/15 86/8 100/15 155/2 164/23 165/11 172/6 177/7 179/19 234/12 268/6


P


**p.m [2]** 144/13 269/12
**page [90]** 7/10 11/8 11/9 11/15 11/17 11/18 12/8 13/4 16/11 16/12 17/10 17/12 17/19 18/16 19/3 20/11 22/3 22/5 22/13 22/19 22/21 22/22 22/23 22/25 23/8 23/15 24/10 24/10 24/13 24/17 24/21 24/22 24/24 25/16 28/20 29/15 29/17 32/18 32/21 33/9 33/11 37/2 37/11 37/12 37/14 38/14 38/22 39/7 46/9 46/12 47/16 47/19 51/23 52/4 52/8 55/21 55/22 56/15 56/17 59/4 59/5 64/10 65/23 66/4 69/9 69/10 70/15 95/24 147/5 155/4 158/9 158/25 162/9 163/14 168/17 170/16 171/4 177/17 248/6 248/24 249/11 254/23 255/20 257/21 258/20 259/8 259/9 263/20 264/8 267/4
**pages [21]** 17/16 24/22 24/22 26/25 27/2 27/3 33/20 33/23 38/3 38/4 38/8 39/5 47/24 56/15 57/16 60/2 63/5 63/8 63/24 155/15 185/3
**paid [8]** 107/4 138/24 139/1 146/18 176/8 176/9 176/11 183/3
**paid to [1]** 183/3
**pain [3]** 31/24 87/25 123/9
**PALM [23]** 1/2 1/8 2/7 74/25 75/5 76/1 76/4 77/19 78/1 82/24 83/1 104/22 107/21 131/9 131/14 194/4 194/9 194/10 207/9 210/23 213/18 214/18 221/11
**pandemic [1]** 75/13
**panel [57]** 145/20 145/23 146/4 146/19 147/9 150/19 160/18 170/13 170/15 176/3 179/4 179/14 181/19 181/23 182/2 182/5 182/14 183/3 184/21 185/18 185/20 185/21 185/23 186/12 186/15 188/15 189/20 190/12 190/18 190/18 191/10 192/10 251/8 262/18 268/20 268/23 269/19 269/21 269/22 269/25 270/8 274/10 275/21 275/23 276/16 277/15 278/20 278/22 279/6 279/14 280/11 280/22 281/3 281/18 284/10 286/18 286/22
**panel's [4]** 169/24 170/3 170/9 172/4
**panelist [4]** 146/2 192/10 280/7 284/19
**panelists [1]** 275/24
**panels [1]** 263/16
**paper [6]** 31/7 31/10 170/6 170/7 218/22 230/5
**papers [4]** 31/4 43/21 43/22 52/14
**paperwork [1]** 137/22
**paragraph [8]** 92/23 95/13 151/11 155/19 163/4 208/24 216/9 258/5
**paragraphs [1]** 211/11
**paramedics [1]** 122/9
**pardon [1]** 159/4
**part [35]** 26/10 29/3 45/1 76/1 95/21 99/3 99/3 99/7 100/10 100/11 103/7 105/17 107/11 115/16 115/17 117/12 117/17 119/3 122/7 125/21 126/7 126/18 134/17 135/15 148/21 164/19 178/17 183/17 188/14 196/8 198/11 203/3 218/2 231/12 260/11
**Part of [1]** 99/3
**participants [2]** 267/20 268/14
**participate [50]** 13/6 13/8 13/10 13/11 63/13 63/14 63/16 77/20 95/11 96/1 96/14 100/14 103/1 103/8 103/13 103/17 103/18 103/21 105/2 105/4 107/14 107/15 107/16 118/9 142/8 150/8 153/2 159/16 160/2 166/2 166/25 169/4 173/2 173/11 180/12 180/22 183/13 188/12 189/2 189/4 212/8 213/2 213/15 228/23 229/1 229/8 229/12 230/1 258/7 264/1
**participated [7]** 81/14 81/21 99/5 100/16 102/13 235/6 275/23
**participates [2]** 155/24 229/23
**participating [47]** 13/12 13/15 35/22 41/2 77/16 78/14 78/18 97/24 102/17 102/19 102/21 102/22 103/6 104/10 104/22 147/21 148/19 152/20 153/3 154/17 155/12 155/12 155/17 155/18 156/7 169/11 169/17 171/17 174/1 180/19 183/12 186/10 196/21 197/13 198/7 199/2 209/7 213/13 218/1 223/20 223/22 224/2 234/17 235/25 245/7 263/7 266/12
**participation [21]** 72/13 72/16 77/24 95/14 96/5 103/25 106/20 106/23 151/7 152/25 154/6 156/11 159/14 159/25 162/18 164/2 165/6 165/12 184/3 213/19 214/12
**particular [13]** 9/13 21/18 31/6 41/3 44/7 47/16 47/16 51/2 58/11 69/19 136/20 168/8 180/7
**particularly [6]** 20/1 27/25 55/17 77/9 175/2 196/12
**parties [4]** 119/19 159/19 178/24 246/7
**parts [2]** 32/8 113/11
**party [5]** 126/19 148/2 148/10 233/9 274/19
**party's [1]** 3/7
**pass [5]** 36/6 98/5 174/5 213/3 273/12
**passing [1]** 116/10
**passionately [1]** 165/3
**past [9]** 23/5 102/2 102/4 102/13 214/23 262/23 265/16 275/4 275/5
**patient [111]** 18/9 27/24 34/10 69/21 69/24 76/23 77/5 84/9 85/13 85/14 85/16 85/17 86/4 86/8 86/10 86/12 87/1 87/3 87/11 87/13 87/23 88/25 89/11 89/12 89/15 89/19 91/10 97/15 100/1 108/6 108/11 109/5 109/11 110/8 110/12 110/16 110/20 112/7 112/9 112/14 113/3 113/4 113/5 113/6 113/13 120/2 128/11 128/18 129/10 129/24 132/7 134/1 134/2 134/9 134/16 135/1 135/18 135/24 136/3 136/5 136/9 136/21 136/24 137/6 137/25 138/4 139/1 139/7 140/19 140/21 142/7 143/2 154/7 164/14 174/22 175/19 175/24 176/18 177/1 178/1 178/11 180/3 181/11 181/13 181/22 182/5 187/17 194/20 196/6 200/10 206/6 206/24 208/21 211/7 212/5 215/22 218/4 219/2 219/5 223/10 223/16 228/20 231/1 231/17 231/20 232/2 232/7 232/25 233/2 235/24 259/4
**patient's [5]** 87/9 122/3 134/3 135/4 135/16
**patients [69]** 14/12 27/22 32/5 32/12 32/16 75/19 77/4 80/21 83/20 84/2 86/7 88/22 89/1 91/20 91/25 93/5 96/18 96/21 97/21 97/22 99/21 108/14 112/15 115/19 122/2 123/1 123/6 123/8 123/19 123/21 127/16 127/18 128/13 129/7 129/18 130/3 143/16 143/19 143/23 143/25 144/2 168/23 181/4 194/16 194/18 195/2 196/3 200/6 200/9

P

**patients... [20]** 201/21 205/13 206/10 206/19 206/22 207/13 208/17 208/18 217/21 218/10 218/18 218/18 218/21 227/18 229/25 232/22 232/23 232/23 240/21 259/23
**patients' [3]** 176/16 181/3 195/22
**PATRICK [6]** 145/6 147/6 147/23 159/11 160/8 273/9
**Paulina [5]** 285/2 285/4 285/20 285/22 286/20
**Pauline [4]** 2/7 248/18 289/18 290/5
**Pause [1]** 85/7
**pay [7]** 107/15 124/2 124/7 124/9 124/17 124/25 125/2
**payee [1]** 92/5
**payer [6]** 92/1 106/25 141/19 207/13 207/14 208/16
**payers [4]** 92/3 93/8 141/14 207/12
**paying [1]** 112/11
**PBHN [1]** 232/13
**pediatric [4]** 74/7 76/3 118/5 120/24
**pediatrician [1]** 91/23
**pediatrics [2]** 145/13 174/24
**peer [2]** 4/21 169/17
**penalize [17]** 73/22 149/8 150/13 150/18 151/9 152/19 152/22 153/20 153/25 154/5 179/22 180/4 180/19 252/20 264/10 272/4 279/11
**penalized [9]** 98/4 101/2 150/8 155/18 156/7 156/9 199/15 209/7 213/14
**penalizing [17]** 150/22 151/4 152/15 153/7 153/10 153/13 153/24 154/20 155/11 160/20 161/1 161/5 176/21 253/16 257/22 282/20 283/13
**penalty [15]** 72/13 149/14 149/19 150/1 150/2 150/11 156/11 156/13 163/18 180/5 180/10 180/13 180/15 180/17 190/5
**pending [2]** 133/12 133/15
**Pennsylvania [2]** 4/1 4/15
**people [41]** 7/18 9/2 10/11 24/23 32/13 38/7 38/25 39/4 39/6 41/20 47/14 49/1 49/21 55/5 56/14 56/20 57/16 59/23 59/23 68/6 68/7 68/8 120/13 157/10 175/15 188/7 188/12 188/16 188/16 188/18 188/19 215/20 228/13 228/15 228/16 229/17 236/17 236/25 246/9 256/23 286/16
**per [4]** 215/22 215/22 216/14 217/3
**perceive [2]** 19/9 55/9
**percent [39]** 24/15 24/18 24/19 24/23 25/18 38/8 38/9 38/13 38/24 39/6 39/9 39/10 49/6 49/8 57/19 60/9 90/16 93/6 135/21 138/9 140/21 140/20 142/7 164/14 172/7 205/13 205/21 206/12 206/15 206/19 207/3 207/15 218/10 218/19 218/20 220/9 220/13 227/17 236/4
**percentage [11]** 17/15 22/12 24/12 39/13 48/16 59/3 59/4 61/7 93/5 140/21 266/21
**perception [8]** 5/5 9/12 9/25 10/20 10/21 45/20 55/12 97/9
**perceptions [10]** 6/23 10/4 11/2 30/24 35/25 36/4 50/25 51/8 51/17 52/1
**perfect [1]** 234/10
**perform [5]** 32/1 50/8 53/19 88/12 88/14
**performance [31]** 18/20 21/2 64/24 71/16 95/21 106/15 141/4 141/7 151/19 159/20 171/7 172/10 178/11 189/2 209/2 220/15 235/10 248/7 256/13 260/4 261/12 262/23 263/4 269/14 270/6 276/19 276/24 277/22 278/10 279/15 283/7
**performed [9]** 45/7 51/3 51/6 52/9 53/6 53/15 59/14 184/7 201/5
**performing [3]** 222/20 223/12 223/17
**performs [4]** 14/21 18/14 155/20 156/1
**perhaps [2]** 153/17 262/23
**period [6]** 24/9 68/8 205/20 218/9 234/21 288/11
**permission [1]** 105/8
**Perry [1]** 126/18
**person [17]** 137/16 180/2 180/2 211/12 221/21 227/5 230/4 231/15 236/15 249/13 259/13 268/5 285/6 285/6 286/8 286/14 286/24
**personal [1]** 283/15
**personally [11]** 130/20 134/21 136/7 166/1 210/17 220/6 220/19 226/16 227/25 233/2 277/19
**persons [1]** 128/8
**perspective [4]** 147/17 160/17 172/4 181/22
**perspectives [1]** 182/13
**pertinent [1]** 117/14
**Ph.D [1]** 4/16
**phasing [4]** 275/11 276/16 278/8 281/4
**Philadelphia [1]** 254/19
**phon [1]** 167/23
**phone [8]** 20/13 20/16 20/18 96/6 140/3 144/13 226/8 227/14
**phones [2]** 20/1 20/4
**phrase [1]** 250/15
**physician [12]** 82/8 87/11 128/18 135/18 137/22 190/19 190/20 192/9 200/18 201/19 206/24 225/24
**physicians [8]** 49/22 81/23 88/12 115/2 168/15 201/1 203/24 204/2
**pick [1]** 32/3
**picked [1]** 68/23
**picking [1]** 32/25
**picture [1]** 273/7
**piecemeal [1]** 73/10
**pieces [2]** 35/6 66/4
**Pierce [1]** 2/7
**Pineiro [1]** 1/21
**place [22]** 34/5 45/4 50/12 61/8 70/13 94/16 131/17 134/24 139/12 177/11 185/9 187/6 187/9 198/1 198/4 198/9 198/24 200/4 260/10 261/5 276/7 276/25
**places [6]** 7/17 20/4 33/6 63/15 64/1 126/4
**Plaintiff [3]** 51/25 129/17 157/11
**Plaintiff's [2]** 90/10 129/19
**Plaintiffs [7]** 1/6 1/15 5/10 130/2 197/11 244/15 259/24
**PLAINTIFFS' [16]** 3/13 25/8 51/16 51/24 52/5 52/6 78/23 92/4 92/19 93/14 94/8 95/2 145/6 170/8 210/13 244/17
**plan [1]** 108/20
**plane [1]** 183/3
**planned [2]** 179/7 179/8
**plans [4]** 113/11 164/1 165/13 195/21
**platform [1]** 182/14
**play [7]** 3/2 124/2 124/17 124/25 125/2 144/19 145/1
**played [2]** 3/4 145/3
**playing [1]** 180/8
**please [40]** 3/9 3/19 3/24 5/25 6/14 22/22 36/10 37/11 73/11 75/24 78/23 84/25 90/10 94/19 94/19 95/3 96/6 131/4 146/9 149/16 151/2 154/24 165/16 170/8 171/4 174/15 174/15 210/5 215/14 216/6 217/5 220/24 230/19 244/14 244/19 245/22 273/17 281/9 282/12 284/25
**plenty [3]** 251/20 268/16 268/17
**plus [2]** 91/10 206/18
**point [27]** 5/3 15/21 29/22 43/10 46/11 53/5 64/20 68/20 122/22 123/8 133/6 148/12 161/10 175/4 183/21 185/15 186/22 187/12 190/11 191/8 223/19 262/21 266/22 267/12 268/10 282/24 286/1
**pointed [1]** 63/4
**pointing [2]** 63/5 211/16
**points [17]** 18/10 111/8 125/8 155/21 156/3 224/1 235/20 250/11 251/1 251/9 258/8 271/6 273/7 280/4 286/5 286/17 286/21
**police [4]** 121/21 121/23 121/25 122/5
**policies [5]** 18/8 178/20 198/1 198/4 198/9

P

**policy [20]** 18/11 77/23 78/10 79/4 79/7 79/20 79/23 80/8 259/2 260/7 260/9 260/10 260/12 260/15 260/22 261/5 261/7 262/3 262/11 262/15
**Poole [6]** 199/7 199/8 221/1 221/18 221/20 223/2
**poor [2]** 10/7 169/19
**pop [2]** 229/7 229/7
**popping [1]** 241/17
**population [9]** 76/24 77/1 140/19 140/21 142/7 194/20 194/25 207/9 218/19
**portion [5]** 20/19 27/18 49/6 245/8 245/11
**portions [1]** 116/18
**position [8]** 27/9 74/20 74/25 115/12 176/6 176/7 184/8 193/24
**positive [5]** 10/8 10/14 280/3 280/16 284/2
**possibilities [1]** 285/20
**possible [10]** 30/1 70/11 70/13 88/1 131/17 150/14 154/10 154/17 235/20 286/7
**possibly [1]** 260/24
**post [3]** 78/2 128/23 255/13
**postponements [1]** 169/9
**potential [7]** 34/25 48/15 184/22 208/14 212/5 280/25 281/17
**potentially [4]** 39/9 45/25 47/17 183/12
**PowerPoint [5]** 266/9 266/19 266/22 267/14 268/10
**practice [5]** 15/17 151/7 153/16 174/24 204/15
**practices [10]** 17/2 18/6 64/16 108/13 108/23 112/7 112/14 162/25 196/9 196/15
**pre [4]** 187/10 278/1 278/16 278/17
**pre-meeting [1]** 278/1
**preceding [1]** 189/14
**precision [2]** 51/19 62/1
**predict [2]** 188/1 188/9
**predictable [2]** 180/6 180/16
**predicted [1]** 60/22
**prejudice [2]** 26/16 132/23
**prep [1]** 109/12
**preparation [2]** 280/6 280/10
**prepare [5]** 4/4 4/9 6/3 7/4 271/10
**prepared [6]** 16/3 22/15 72/24 72/25 253/13 266/1
**preparing [4]** 32/18 33/21 40/10 61/23
**present [9]** 48/21 105/5 151/14 198/10 270/12 271/12 278/23 279/2 279/4
**presentation [2]** 53/17 219/10
**presented [11]** 137/5 138/5 143/11 192/1 192/1 263/15 268/23 269/1 269/19 269/25
277/15
**president [5]** 213/18 232/13 249/23 250/1 250/2
**Press [17]** 108/10 108/12 108/18 108/20 109/4 109/9 109/13 109/15 109/18 109/21 110/14 111/11 111/23 112/6 112/13 112/17 113/12
**pressure [3]** 169/17 181/17 182/16
**pressures [1]** 174/7
**presume [1]** 188/13
**pretend [1]** 153/25
**pretty [5]** 133/5 200/20 228/10 268/8 278/24
**prevent [3]** 17/3 18/7 110/5
**preventing [4]** 110/8 110/12 110/16 110/19
**previous [5]** 70/5 100/25 148/22 165/23 180/22
**previously [10]** 95/1 100/4 100/12 100/15 121/14 156/12 203/2 214/10 257/13 280/9
**primarily [1]** 76/25
**primary [3]** 75/16 76/25 170/20
**principles [9]** 169/25 170/4 170/7 170/9 170/12 171/5 177/8 177/11 178/22
**printouts [1]** 25/11
**prior [17]** 4/16 7/22 43/6 44/22 52/24 53/9 96/18 96/21 96/25 98/9 103/13 103/24 104/2 145/11 172/19 274/14 274/14
**prism [1]** 188/24
**privileges [5]** 200/22 202/19 202/20 202/21 204/23
**privy [1]** 159/19
**probably [20]** 15/7 61/20 62/10 194/6 194/8 194/17 196/14 203/20 205/2 218/13 218/14 226/22 228/21 228/21 229/16 243/1 265/25 266/21 266/23 289/10
**problem [8]** 43/17 59/11 181/9 181/10 181/15 188/10 237/17 241/18
**problems [2]** 202/15 228/9
**procedures [6]** 167/12 168/24 195/20 200/7 206/17 255/24
**proceed [11]** 3/18 36/10 105/25 144/23 148/14 165/19 238/3 244/18 258/18 271/10 287/24
**proceeded [1]** 74/19
**proceedings [2]** 1/11 290/2
**process [24]** 5/12 8/25 21/23 29/1 29/4 29/13 50/14 69/4 171/22 172/1 178/23 178/25 179/6 195/17 195/18 196/8 196/14 196/17 199/18 201/22 201/24 218/3 253/7 283/15
**processes [3]** 198/11 276/24 277/1
**processing [1]** 4/24
**produce [6]** 118/10 138/20 139/8 161/19 165/14 226/23
**produced [22]** 26/1 28/17 93/19 93/24 94/10 94/13 139/18 191/25 225/1 225/4 225/15 225/18 225/20 227/12 227/16 238/8 238/10 238/11 238/14 246/15 247/11 260/25
**producing [3]** 164/1 164/15 164/25
**production [1]** 233/3
**professional [5]** 28/6 164/5 164/5 175/24 181/2
**professor [32]** 3/10 3/25 4/1 4/14 7/20 8/2 11/3 11/23 12/15 13/22 15/24 17/6 18/4 18/21 20/21 22/15 23/20 25/10 25/21 27/9 28/15 33/25 35/2 35/12 69/7 70/1 70/17 71/25 72/21 145/12 174/23 174/25
**profile [1]** 268/11
**profit [1]** 212/24
**program [20]** 76/5 77/2 99/6 110/7 110/11 110/21 110/22 180/13 194/12 195/12 195/14 200/21 202/17 244/16 244/24 245/2 268/5 268/6 274/8 274/9
**progress [1]** 95/15
**progressive [2]** 56/3 56/9
**project [2]** 62/21 242/17
**projections [2]** 143/8 143/11
**prominently [2]** 11/21 20/10
**promoted [1]** 74/19
**promptly [1]** 94/6
**proof [2]** 46/7 67/9
**proper [1]** 5/20
**properly [1]** 42/24
**property [1]** 83/4
**proportion [1]** 25/15
**proposal [7]** 147/15 151/12 182/18 182/21 268/23 269/1 269/1
**proposed [5]** 146/15 147/11 147/19 187/8 252/20
**proposing [1]** 270/13
**proposition [1]** 105/5
**proprietary [2]** 246/1 246/20
**protect [1]** 116/15
**protected [2]** 128/14 128/15
**proud [2]** 77/7 115/7
**prove [1]** 67/9
**proves [1]** 152/5
**provide [21]** 12/24 12/24 18/8 33/17 42/24 54/24 64/8 77/14 81/3 83/10 91/22 136/25 170/18 173/2 175/9 182/14 190/1 233/8 233/11 233/16 287/7
**provided [22]** 14/9 46/8 60/4 85/16 86/17 89/6 94/6 108/25 109/12 109/18 129/16 129/21 137/3 137/8 137/10 139/16 161/20 232/18 233/19 233/21 246/17 264/23
**provider [2]** 76/4 142/20
**providers [2]** 82/8 181/6
**provides [4]** 32/5 164/7 187/21 284/9

P

**providing [4]** 83/12 141/1 208/25 279/25
**Provost [1]** 83/2
**PS [2]** 50/17 177/15
**PS-203 [1]** 177/15
**PS-471 [1]** 50/17
**PSI [2]** 175/16 175/20
**psychology [1]** 4/22
**public [30]** 12/25 97/9 106/16 110/23 111/10 111/13 111/14 116/24 148/4 163/11 166/20 171/20 175/1 179/11 184/22 219/21 252/7 252/21 253/21 254/1 255/25 273/22 273/24 281/21 283/17 283/18 284/6 284/9 284/13 288/13
**publication [5]** 7/1 36/3 179/16 179/18 199/21
**publications [3]** 4/21 34/12 34/25
**publicity [2]** 199/20 200/5
**publicized [2]** 31/9 212/9
**publicizes [1]** 96/14
**publicly [9]** 106/11 107/3 111/16 111/25 112/2 221/10 229/13 245/10 247/1
**publish [4]** 159/15 179/7 179/7 247/23
**published [9]** 4/20 10/22 148/3 160/1 179/8 202/14 204/13 208/23 230/5
**pull [41]** 37/5 55/22 64/10 73/6 78/23 80/19 84/25 90/10 92/4 93/14 95/3 109/2 115/22 119/12 121/13 125/22 133/17 140/12 146/9 154/24 157/3 161/15 163/15 165/16 167/17 170/8 177/15 183/4 184/25 205/4 213/17 215/14 217/9 220/21 229/5 230/19 248/17 268/19 281/9 282/12 284/24
**pulled [2]** 79/13 219/19
**pulling [2]** 228/3 287/3
**punished [2]** 156/9 255/13
**punishment [2]** 179/25 180/20
**punitive [2]** 212/4 272/18
**purchase [3]** 246/12 246/16 246/18
**purchasers [4]** 95/14 95/19 164/8 230/1
**purely [1]** 118/16
**purple [2]** 24/18 25/19
**purports [1]** 6/16
**purpose [4]** 154/6 154/9 154/16 279/10
**purposes [2]** 71/23 161/22
**pursuant [3]** 119/18 161/19 247/21
**push [2]** 178/10 218/20
**pushback [1]** 186/12
**put [37]** 41/15 43/14 46/15 47/9 50/17 54/8 56/1 61/14 62/9 62/17 69/11 69/12 70/5 85/20 134/12 144/20 153/14 177/11 182/21 185/9 187/6 187/9 190/11 222/14 223/4 228/19 233/25 238/24 245/12 248/20 254/17 263/18 276/3 276/7 281/20 283/3 286/23
**putting [16]** 42/13 42/15 42/22 43/2 43/3 61/11 200/1 200/13 212/4 212/6 212/20 220/16 223/3 238/19 244/5 246/4
**puzzling [1]** 14/5
**PX [23]** 80/19 121/13 137/5 140/12 157/3 161/8 161/15 167/17 207/25 210/5 227/17 230/18 230/19 237/20 239/1 245/22 247/20 258/18 263/18 265/9 266/6 271/14 286/25
**PX 293 [1]** 161/8
**PX-37.6 [1]** 80/19
**PX-548 [3]** 210/5 230/18 230/19
**PX-554 [2]** 207/25 227/17
**PX-561 [2]** 237/20 239/1

Q

**qualifications [3]** 4/10 4/13 42/3
**qualified [2]** 5/8 147/24
**qualify [1]** 172/9
**qualitatively [1]** 20/9
**quality [32]** 7/16 36/1 49/19 75/18 81/10 82/3 82/14 83/11 83/20 88/13 92/25 95/16 105/11 125/14 125/15 125/24 158/1 158/6 162/16 168/22 175/1 175/2 175/13 196/25 198/15 199/7 214/22 215/17 222/14 236/14 255/10 255/11
**Quedo [2]** 139/3 139/14
**question [60]** 10/16 14/1 14/4 18/15 26/7 44/21 47/5 61/6 62/13 62/16 62/16 62/23 63/17 69/1 106/14 111/22 113/14 124/11 124/15 124/18 128/5 129/6 129/9 133/12 133/14 143/19 149/16 149/20 149/23 151/2 151/2 151/4 154/14 155/16 157/1 166/4 167/8 167/10 168/3 173/6 173/12 173/22 184/18 196/7 214/15 220/12 233/22 237/18 238/2 238/23 240/13 240/18 240/22 241/23 245/13 253/23 256/21 260/1 262/8 266/14
**questioned [2]** 100/6 127/6
**questioning [4]** 121/19 143/21 189/14 191/13
**questions [47]** 32/11 32/12 33/11 48/6 67/17 70/17 71/4 71/25 72/18 83/1 83/2 83/4 91/24 102/16 113/14 113/16 113/17 122/10 122/15 128/3 129/5 139/2 139/7 142/10 142/24 143/5 143/6 143/20 179/20 179/24 184/9 192/19 196/5 215/7 218/22 233/23 234/4 234/6 235/12 237/3 237/15 238/15 238/21 240/11 268/17 287/4 289/16
**quick [3]** 190/17 221/9 273/6
**quickly [6]** 31/25 69/12 144/14 177/16 182/1 238/7
**quite [2]** 182/8 205/24
**quotes [1]** 30/8

R

**race [1]** 31/24
**raised [11]** 26/15 83/3 84/15 84/16 84/18 85/6 91/14 91/24 99/20 138/3 242/1
**raised a [1]** 26/15
**raising [3]** 96/18 96/22 96/24
**raising concerns [1]** 96/24
**Ramirez [5]** 105/18 105/21 125/18 131/8 214/11
**ran [1]** 201/17
**random [15]** 187/14 187/23 187/24 188/2 188/2 188/3 188/4 188/9 188/11 188/22 249/18 286/18 286/22 288/19 289/7
**ranking [2]** 222/20 223/11
**rankings [1]** 34/10
**Rashbaum [1]** 1/21
**rate [9]** 62/7 83/8 118/14 218/10 218/12 218/14 218/16 218/17 241/18
**rated [4]** 127/3 200/15 235/25 241/18
**rates [2]** 115/8 162/22
**rather [3]** 13/25 31/12 67/14
**rating [17]** 71/17 71/22 82/2 82/20 93/10 101/20 112/25 113/11 113/16 123/2 123/22 142/24 175/22 178/5 178/6 229/20 285/16
**ratings [20]** 54/22 54/23 54/24 55/1 55/10 55/18 60/25 110/7 110/11 110/21 112/24 113/9 113/10 113/18 115/5 122/21 211/6 250/1 274/4 287/14
**rationale [1]** 29/25
**Raton [2]** 38/16 83/2
**raw [2]** 246/18 246/20
**re [3]** 163/17 213/10 213/12
**re-enter [2]** 213/10 213/12
**reach [5]** 22/13 34/12 34/25 62/15 284/20
**react [3]** 81/5 93/7 182/19
**reaction [4]** 96/9 135/7 182/22 211/20
**reactions [4]** 82/2 82/19 82/22 83/7
**read [28]** 12/25 21/1 21/21 28/13 30/13 38/14 46/6 50/1 51/14 55/7 69/20 84/3 84/22 85/14 87/8 87/11 134/3 134/5 134/10 134/10 135/22 140/17 155/19 184/19 251/15 253/11 254/4 264/25
**readability [2]** 50/8 50/10
**reading [2]** 41/11 51/20
**reads [1]** 49/24
**ready [1]** 215/3
**real [8]** 18/19 20/18 48/18 57/7 95/15 134/2 162/24

R


**real... [1]** 235/16
**realize [1]** 266/23
**realized [1]** 32/1
**really [19]** 134/3 150/16 161/22 177/15 182/1 182/15 190/17 194/6 196/15 199/16 204/19 206/5 221/9 226/3 238/7 246/13 266/25 283/8 287/15
**reason [32]** 49/16 49/18 87/2 100/10 103/7 104/9 104/9 104/9 109/17 111/2 111/19 111/22 115/3 117/2 121/4 122/24 122/25 123/14 123/16 126/15 142/5 151/14 162/3 168/8 185/3 204/2 218/7 218/11 221/16 222/23 223/4 226/11
**reason that [1]** 104/9
**reasonable [8]** 27/9 27/11 45/8 47/22 52/20 58/20 59/1 59/9
**reasoning [10]** 14/18 262/19 262/20 262/22 262/24 262/25 263/6 282/25 283/5 283/9
**reasons [3]** 117/3 167/19 279/23
**recall [107]** 30/11 62/24 64/13 67/22 69/1 69/8 70/18 70/20 71/5 72/1 77/20 86/24 88/25 90/6 90/18 90/22 91/4 96/18 96/21 101/4 101/11 101/14 101/24 103/24 104/23 109/1 109/14 119/9 124/2 128/1 136/18 138/21 140/10 140/14 142/16 142/19 142/25 143/6 143/20 150/5 150/9 150/23 151/1 153/21 167/15 176/4 177/9 177/12 179/25 183/10 183/14 184/2 185/7 185/8 185/15 185/19 185/22 186/7 186/9 186/22 187/3 187/12 190/17 191/4 191/17 197/13 199/25 204/11 213/8 213/16 213/21 214/14 214/16 217/8 220/10 221/14 221/14 224/12 224/18 226/24 227/2 231/18 236/12 237/3 237/6 237/15 239/19 239/24 240/1 240/25 252/15 255/5 256/18 256/21 261/11 261/13 271/15 278/6 278/14 280/1 280/19 283/19 285/1 286/10 287/1 287/6 288/2
**receipt [1]** 141/6
**receive [19]** 6/24 19/14 35/23 76/20 83/20 88/16 88/23 89/25 92/25 129/8 130/4 149/4 202/3 207/17 207/22 208/19 209/23 253/6 273/22
**receive a [1]** 89/25
**received [39]** 8/22 30/2 78/22 81/11 83/17 83/18 92/3 92/5 92/13 93/7 93/12 93/16 93/17 93/22 93/23 94/1 94/7 95/8 96/9 119/15 129/17 130/2 130/3 140/5 140/10 140/11 140/14 150/3 190/24 190/25 197/14 201/24 208/11 209/20 209/25 227/21 227/21 268/12 284/8
**received a [1]** 209/25
**receives [1]** 211/7
**receiving [6]** 29/22 101/7 211/20 212/9 223/23 224/10
**recent [10]** 8/20 21/25 57/1 93/1 93/24 101/19 168/21 202/22 209/20 256/15
**recently [3]** 83/17 97/16 143/14
**recess [6]** 36/9 94/18 174/13 174/14 244/12 244/13
**recessed [1]** 289/22
**reckless [2]** 163/10 212/23
**recognition [1]** 178/18
**recognize [2]** 256/9 258/20
**recollection [4]** 104/6 109/11 120/5 120/17
**recommending [2]** 276/12 281/22
**reconsider [1]** 158/16
**reconstructive [1]** 118/6
**reconvened [2]** 174/14 244/13
**record [23]** 21/1 85/4 85/8 86/3 87/2 94/12 94/14 109/18 114/4 127/1 133/20 134/17 141/16 152/21 157/8 162/6 163/6 183/5 237/5 246/5 247/8 247/12 290/2
**recorded [2]** 221/10 226/1
**records [2]** 15/3 140/8
**recross [3]** 241/23 287/21 287/22
**recruit [1]** 115/1
**recruited [1]** 75/2
**recruitment [1]** 119/6
**red [4]** 9/6 14/4 17/21 65/25
**redact [1]** 116/15
**redacted [5]** 86/18 117/16 117/20 117/20 117/24
**redaction [3]** 117/15 119/19 247/16
**redactions [3]** 119/17 247/4 247/6
**redirect [13]** 67/18 67/20 133/15 142/11 142/13 192/20 233/25 234/2 251/20 287/20 287/22 287/25 289/17
**refer [5]** 89/14 175/15 187/11 252/2 255/5
**reference [3]** 65/3 116/25 234/5
**references [6]** 48/5 85/12 116/10 117/1 239/12 286/9
**referencing [1]** 255/18
**referred [3]** 77/12 187/10 269/17
**referring [15]** 40/15 58/25 69/22 148/18 153/10 153/11 154/25 158/17 168/8 197/7 208/6 211/18 219/20 271/23 289/11
**refers [2]** 249/21 258/2
**reflect [12]** 28/3 65/25 79/14 80/5 80/17 80/23 82/4 83/11 83/19 87/2 103/9 248/8
**reflected [2]** 132/22 178/20
**reflection [2]** 166/17 276/25
**reflective [1]** 209/5
**reflects [3]** 33/18 180/14 267/10
**refresh [5]** 109/11 120/5 120/17 266/8 266/11
**refused [1]** 240/13
**refusing [2]** 153/1 200/10
**regard [3]** 21/20 45/14 148/24
**regarding [12]** 29/19 42/1 48/21 93/11 119/17 141/6 147/15 225/16 227/3 232/7 279/7 281/13
**regardless [2]** 50/13 68/24
**regards [4]** 41/1 48/10 48/11 53/12
**Regina [6]** 3/3 3/4 213/10 214/11 217/7 220/7
**Regional [1]** 132/11
**regret [1]** 204/15
**regular [5]** 45/7 79/11 79/15 85/5 132/18
**regularly [5]** 80/2 80/5 80/14 80/17 288/15
**regulatory [1]** 255/10
**reimbursed [1]** 176/9
**related [13]** 5/5 5/18 46/6 47/18 91/3 116/19 119/2 129/19 141/24 184/15 232/24 233/4 266/24
**relates [3]** 122/5 174/21 184/14
**relating [2]** 66/10 146/6
**relative [1]** 151/20
**relatively [1]** 144/14
**release [6]** 83/24 100/7 129/14 140/8 140/9 168/21
**released [3]** 81/20 110/4 284/7
**relevance [6]** 26/15 132/22 133/2 191/12 191/13 228/15
**relevant [7]** 22/13 24/20 52/17 64/1 64/2 116/14 116/18
**reliable [2]** 85/22 165/14
**reliably [1]** 171/7
**relied [2]** 129/7 135/16
**relies [2]** 46/22 146/1
**rely [7]** 32/9 46/17 47/9 48/2 145/17 148/21 172/19
**relying [2]** 269/20 276/18
**remained [1]** 176/24
**remember [17]** 41/10 46/25 58/18 62/25 63/5 68/6 72/3 101/5 102/11 109/15 137/18 179/22 213/22 224/20 241/1 261/20 283/25
**remind [3]** 177/20 256/22 271/19
**reminded [2]** 170/2 172/24
**reminder [2]** 215/21 217/1
**removing [1]** 269/19
**rendered [1]** 15/4

R

**renewal [2]** 201/25 203/22
**repeat [2]** 58/17 124/17
**repeated [4]** 7/1 10/23 10/24 167/9
**repeatedly [1]** 10/25
**repercussions [1]** 107/5
**replace [1]** 202/24
**reply [2]** 250/21 273/6
**report [58]** 6/8 6/9 10/2 12/23 14/1 14/2 14/7 14/12 15/4 15/22 18/17 18/19 19/6 21/2 27/3 28/7 31/17 32/19 33/14 33/21 41/10 41/15 50/16 51/15 51/18 51/20 52/19 61/12 63/17 64/23 71/12 84/23 85/20 106/11 106/12 107/3 107/8 107/9 130/12 130/21 135/25 136/22 137/3 137/19 138/3 155/22 156/4 183/24 188/17 190/1 217/7 217/15 217/17 229/25 240/25 248/7 249/6 275/15
**reported [26]** 84/21 84/22 100/6 100/9 100/12 100/15 105/13 105/16 106/16 111/16 111/25 112/2 125/18 125/20 129/4 130/10 130/11 130/12 133/21 135/19 137/16 137/21 153/19 215/10 216/25 275/14
**Reporter [3]** 2/7 290/5 290/6
**reporting [20]** 84/19 96/14 105/22 107/6 118/20 120/17 136/2 148/22 151/17 151/19 152/4 173/16 190/21 190/23 190/25 217/2 262/25 272/10 275/3 275/17
**reportings [1]** 59/3
**reports [16]** 6/3 33/16 46/14 47/4 47/8 47/24 47/25 48/5 56/12 103/10 129/15 129/17 130/2 130/3 155/5 279/24
**represent [3]** 97/13 148/7 265/15
**representation [1]** 166/3
**representative [1]** 129/6
**representatives [1]** 26/12
**represented [3]** 12/5 170/12 252/23
**represents [2]** 3/11 96/3
**represents employers [1]** 96/3
**reproduced [1]** 132/21
**reputation [9]** 9/25 10/5 50/22 51/5 52/21 53/8 97/11 169/18 169/22
**reputational [4]** 84/1 97/20 113/24 233/7
**request [7]** 96/5 105/21 233/3 252/7 266/2 266/4 266/19
**requested [2]** 105/4 129/21
**requesting [1]** 147/14
**requests [2]** 268/3 268/9
**require [2]** 106/25 142/21
**required [8]** 17/11 22/11 78/11 86/9 96/14 121/25

212/1 217/3
**requirement [1]** 215/21
**requirements [1]** 216/17
**requires [6]** 16/9 20/12 23/13 106/8 108/16 153/6
**rescheduling [1]** 169/10
**research [26]** 5/19 9/5 9/9 10/10 10/24 14/8 14/18 20/14 21/23 31/4 43/22 46/10 46/13 46/18 51/10 52/13 68/10 68/10 68/13 174/25 175/1 175/5 175/7 175/9 175/12 189/12
**researcher [2]** 146/18 180/2
**reservations [1]** 247/18
**residency [1]** 74/18
**residents [1]** 123/12
**resigned [4]** 203/7 203/8 203/11 203/22
**resigning [1]** 203/18
**resisting [1]** 255/10
**resource [1]** 255/9
**resources [16]** 78/3 88/8 104/11 104/13 196/24 197/3 214/8 214/13 214/19 214/21 253/1 254/7 254/17 255/12 255/13 257/23
**respect [26]** 5/23 13/14 48/8 50/8 53/6 54/4 62/11 71/5 103/25 109/18 122/4 138/1 138/11 145/17 161/3 161/10 163/9 187/13 190/18 198/12 233/12 233/12 274/2 275/10 277/8 280/12
**respective [2]** 82/17 130/21
**respects [2]** 146/1 146/1
**respond [28]** 97/5 141/5 141/10 141/21 141/24 142/5 142/5 142/6 160/12 163/14 181/8 181/10 188/6 188/8 201/23 211/25 218/23 221/17 221/19 227/24 227/25 241/12 241/20 249/16 251/18 255/2 262/6 265/2
**responded [11]** 150/23 209/16 209/16 221/17 228/2 250/8 254/5 255/17 255/20 266/20 272/23
**respondents [1]** 188/10
**responding [3]** 141/14 158/20 188/5
**responding in [1]** 158/20
**responds [4]** 156/14 158/25 264/13 270/23
**response [23]** 122/19 149/6 159/11 160/7 160/14 163/3 165/22 179/11 188/18 189/6 191/24 200/5 218/10 218/12 218/14 218/17 254/24 265/24 266/14 267/24 272/22 273/3 275/12
**responses [3]** 245/13 253/13 284/10
**responsibilities [1]** 75/17
**responsible [5]** 75/18 75/20 75/21 82/14 139/1
**rest [1]** 122/20
**restart [1]** 214/12

**restate [2]** 149/16 181/12
**restraints [1]** 279/24
**result [10]** 7/22 54/9 120/6 138/9 138/12 168/22 200/19 209/7 217/21 254/10
**results [10]** 7/21 7/23 8/11 8/14 11/3 60/20 95/20 121/7 168/21 245/4
**resume [1]** 169/16
**retain [1]** 255/14
**retention [2]** 114/22 114/25
**retire [1]** 277/16
**retirement [1]** 118/6
**retiring [3]** 178/4 269/25 270/9
**return [2]** 26/21 36/7
**returning [1]** 213/19
**reveal [1]** 188/21
**revenue [20]** 113/20 113/23 113/23 114/1 114/5 114/6 121/8 142/7 143/5 143/8 165/1 201/10 267/5 282/6 282/10 287/1 287/10 287/13 287/15 287/18
**reversed [2]** 167/2 167/5
**review [28]** 30/4 30/5 32/8 32/18 32/21 33/20 57/7 72/14 79/11 79/15 80/2 80/14 82/4 84/13 91/2 93/1 95/8 130/17 130/19 130/20 131/20 131/20 132/19 134/2 134/10 141/2 155/2 209/1
**reviewed [16]** 4/21 15/3 15/6 28/15 35/2 58/16 80/5 86/3 92/10 130/12 132/16 137/14 221/17 257/7 257/8 280/9
**reviewing [4]** 14/24 59/7 80/17 109/14
**reviews [14]** 54/22 54/22 85/5 87/10 130/16 130/17 130/19 130/20 130/23 131/7 134/5 135/17 135/22 218/21
**revisited [1]** 178/7
**reward [2]** 156/11 156/13
**rewarding [1]** 77/14
**RFP [1]** 233/6
**RFP-38 [1]** 233/6
**Rick [1]** 125/18
**Ricky [4]** 105/18 105/21 131/8 214/11
**rid [1]** 270/18
**rides [2]** 205/16 205/20
**riding [2]** 151/7 153/2
**right [165]** 8/7 13/17 19/1 19/17 23/1 23/4 25/21 30/12 30/13 37/8 37/11 37/14 37/15 39/14 41/7 41/8 42/9 51/22 55/4 55/22 56/9 56/11 56/15 64/5 64/12 64/21 65/20 66/12 66/15 66/22 71/8 78/13 85/3 89/9 94/5 94/15 98/23 107/25 117/10 117/25 127/4 129/22 130/9 133/1 136/9 145/24 146/25 147/22 157/24 161/1 164/17 169/15 169/22 171/18 172/12 172/15 173/3 173/15 175/16 176/2 177/20 178/6 180/7 180/8 180/10 180/11

R

**right... [99]** 180/11 183/17 184/5 185/10 186/7 187/22 188/15 190/9 192/22 199/19 202/12 206/16 208/9 208/13 211/9 211/10 218/11 219/21 224/16 227/16 229/18 229/24 231/5 234/15 234/17 234/22 234/23 234/24 235/1 235/4 235/7 236/18 237/9 237/10 238/22 238/25 239/20 239/22 241/7 241/12 242/12 242/12 245/4 245/17 247/19 248/9 248/13 248/15 252/7 253/20 254/2 254/14 254/17 254/20 254/25 255/18 256/2 256/6 257/1 257/3 257/6 257/10 258/12 258/17 259/7 259/21 259/25 260/5 260/19 261/7 261/22 262/14 263/8 263/12 264/5 264/22 264/25 265/4 265/6 265/7 267/2 267/24 268/24 269/2 269/18 270/4 270/19 270/20 271/5 271/7 271/15 272/16 272/18 272/20 285/19 288/13 288/20 289/14 289/20
**rigorous [1]** 184/10
**rising [1]** 277/9
**risk [16]** 32/23 32/24 32/25 33/2 33/4 84/20 86/9 86/11 87/12 97/22 135/15 136/22 137/3 138/3 197/1 265/21
**risking [1]** 123/8
**risks [3]** 87/23 135/18 137/23
**road [1]** 73/25
**Robert [1]** 167/22
**robotic [2]** 194/8 194/10
**robots [1]** 194/12
**robust [3]** 76/5 182/12 194/7
**role [6]** 4/2 75/4 75/9 75/11 248/15 288/16
**roles [3]** 74/21 74/21 75/4
**Romano [50]** 144/12 144/20 144/21 144/23 145/5 145/6 145/9 147/24 148/7 148/9 151/4 155/1 157/17 161/16 161/20 162/9 167/21 168/2 168/5 168/6 168/9 168/12 169/24 174/19 177/16 185/6 185/7 190/16 192/9 254/12 257/18 258/11 263/10 270/10 270/16 270/20 270/21 271/14 271/19 272/25 273/5 275/24 277/24 278/1 278/7 278/14 281/3 282/14 282/18 284/20
**Romano's [2]** 157/8 159/8
**room [19]** 20/3 39/4 49/4 76/7 77/5 108/6 114/2 114/16 115/13 120/11 121/1 121/1 194/18 194/25 195/21 196/6 206/7 207/8 228/21
**rooms [1]** 206/4
**roughly [1]** 194/14
**round [1]** 269/14
**rounds [5]** 265/16 269/18 270/5 275/4 281/1
**route [1]** 281/6
**rule [2]** 157/14 247/18
**rules [1]** 9/18
**ruling [2]** 161/9 163/7
**run [1]** 54/3
**running [5]** 61/17 61/25 62/4 202/1 268/5

S

**safe [8]** 7/21 8/7 10/18 53/16 53/21 54/4 69/25 175/23
**safer [3]** 18/7 95/15 176/17
**safety [124]** 7/25 8/6 10/6 10/16 11/7 12/3 17/25 21/15 23/3 24/10 24/13 24/16 24/24 25/16 28/22 28/25 29/6 29/7 29/12 29/21 30/20 30/23 31/25 32/8 32/16 32/17 33/9 33/13 33/16 33/17 33/18 34/3 34/5 34/7 34/10 35/3 35/24 36/1 38/7 38/22 39/7 49/24 51/4 59/4 68/24 69/21 69/24 69/24 75/19 82/15 91/12 93/2 109/22 110/4 110/6 111/16 111/24 113/3 113/4 128/9 129/8 131/23 141/2 141/4 141/13 145/20 146/24 147/3 147/8 154/7 155/4 155/7 155/8 155/15 156/3 158/6 159/21 162/25 164/14 164/16 165/14 169/19 170/10 174/22 175/2 175/2 175/19 175/21 175/24 176/3 176/16 177/1 177/12 178/1 178/11 178/15 178/17 178/21 179/4 180/3 181/3 181/13 181/18 181/22 182/6 186/17 191/10 199/2 202/14 204/4 205/9 209/1 209/2 211/7 211/9 213/9 219/6 228/20 229/3 230/21 245/2 245/12 245/16 257/24
**safety grade [1]** 204/4
**said [66]** 8/14 30/13 32/3 37/20 41/6 41/12 43/14 43/23 47/12 48/5 53/23 53/23 55/16 55/16 55/16 57/16 70/20 72/8 100/10 101/15 101/21 102/13 126/22 128/11 131/16 133/20 135/4 137/19 137/25 139/2 139/21 150/8 150/17 153/8 170/15 190/7 201/15 201/20 202/20 206/15 220/4 227/9 227/13 231/16 231/25 241/8 241/19 248/6 257/3 258/11 260/14 261/13 261/15 262/15 264/7 264/19 264/23 267/1 267/2 273/9 281/3 281/4 282/22 287/22 287/22 288/17
**Sam [7]** 194/1 202/18 211/2 217/22 231/1 231/24 232/17
**SAMARITAN [45]** 1/4 3/11 193/1 193/22 194/3 194/21 194/23 195/6 195/9 196/18 196/20 197/14 197/24 199/1 203/2 204/8 204/16 205/8 206/9 207/14 207/17 209/16 210/22 212/8 212/17 214/18 215/21 216/22 221/2 221/21 223/15 224/23 225/17 226/15 226/21 227/9 227/18 228/7 229/6 229/21 233/18 236/15 239/15 241/11 241/15
**same [35]** 11/1 16/24 20/9 38/18 92/15 93/23 101/9 106/23 118/17 119/13 119/16 122/20 128/3 128/10 136/15 138/11 149/20 156/11 156/13 161/21 162/1 162/14 163/6 163/7 165/17 165/22 197/18 198/19 204/21 205/20 208/1 218/25 219/1 248/6 280/22
**sample [1]** 218/17
**sampling [2]** 60/13 61/3
**sat [1]** 214/14
**satisfaction [12]** 108/7 108/11 108/24 109/12 112/7 112/9 112/14 113/4 113/5 113/6 113/13 181/11
**satisfied [1]** 108/15
**save [1]** 154/7
**saving [1]** 164/14
**saw [31]** 11/11 20/23 24/10 24/14 24/24 33/20 35/7 37/12 37/18 38/15 39/19 45/16 45/18 47/17 49/9 91/19 107/22 133/22 133/23 166/15 168/14 168/25 176/19 177/3 217/6 219/8 220/4 220/7 221/19 222/10 263/10
**say [108]** 5/7 6/10 9/19 11/13 13/25 20/8 21/14 21/16 23/6 25/24 29/7 30/2 37/4 39/17 41/13 42/11 42/11 48/17 51/21 51/22 51/24 52/20 55/16 55/18 57/19 57/21 60/9 62/14 65/1 65/15 69/16 71/1 71/2 71/2 78/20 90/24 100/24 101/3 102/4 102/9 111/20 112/1 115/12 116/13 119/11 119/25 122/19 126/23 139/10 140/18 152/12 152/22 155/11 156/6 160/14 160/17 160/19 160/20 162/24 163/17 163/22 163/25 165/5 166/10 169/8 171/17 175/23 185/16 187/15 188/21 194/17 195/19 207/23 213/2 214/6 214/7 218/13 219/1 220/16 221/7 222/25 242/9 249/2 250/5 250/15 250/17 250/21 250/22 250/25 251/5 251/12 255/21 256/8 257/18 264/9 269/12 270/5 270/5 270/18 271/7 272/15 274/1 276/18 282/20 284/20 285/21 286/16 288/14
**saying [17]** 39/9 40/21 40/22 50/3 54/8 103/20 111/23 117/6 129/24 169/16 215/20 236/18 262/18 267/15 269/21 281/19 283/9
**says [94]** 8/7 11/4 13/17 19/17 21/7 21/10 21/18 23/5 23/16 30/2 30/12 48/1 48/25

**says... [81]** 52/8 52/8 61/14 64/23 65/16 65/18 65/20 71/1 90/20 92/23 93/1 95/10 95/13 96/2 110/3 110/23 111/10 111/15 111/20 116/20 118/4 118/7 119/8 126/1 126/2 126/11 127/2 129/17 131/25 134/3 135/22 137/13 137/19 137/25 140/25 147/17 155/10 155/20 156/1 156/17 159/11 160/8 163/9 166/1 168/6 170/17 178/9 183/21 188/3 192/8 211/15 214/12 216/5 216/9 216/16 221/9 229/8 229/19 241/11 249/5 249/12 252/11 252/14 252/19 253/5 255/9 258/22 258/25 259/2 259/15 259/16 260/6 265/14 265/20 270/23 271/19 271/19 272/4 272/9 273/11 285/24
**Scarborough [1]** 83/3
**scary [1]** 33/4
**scenario [1]** 220/9
**scenarios [1]** 31/13
**scheduled [2]** 89/18 135/2
**scheme [3]** 124/25 178/5 178/6
**scholarship [1]** 4/20
**school [5]** 4/1 4/14 4/17 9/2 9/3
**science [1]** 4/22
**scientific [3]** 47/22 52/20 189/10
**scientifically [1]** 48/2
**scope [3]** 238/23 243/3 288/21
**score [94]** 6/19 6/20 11/4 14/21 17/23 18/22 18/24 19/15 21/3 21/7 21/8 21/9 21/11 21/13 21/16 21/18 21/19 22/3 22/4 30/1 35/8 35/19 35/21 41/18 64/9 64/12 64/17 64/18 64/24 65/1 65/6 65/15 65/18 65/19 65/20 65/25 66/1 66/14 70/20 70/24 70/25 71/1 71/2 71/2 72/7 72/7 79/17 82/4 126/3 126/3 126/5 126/16 138/4 149/4 150/1 150/3 150/8 150/14 154/10 154/17 168/22 172/8 172/11 178/23 185/18 189/3 197/14 197/17 197/19 197/21 219/22 230/21 231/4 231/6 231/8 235/3 235/20 236/6 248/8 248/12 249/6 250/15 250/17 256/6 256/10 258/8 259/25 260/18 262/2 262/10 281/1 287/16 288/19 289/8
**score of [1]** 64/12
**score was [1]** 35/19
**scored [3]** 125/8 184/23 261/4
**scores [45]** 12/6 23/14 28/25 41/2 54/4 70/22 99/4 108/2 108/11 108/12 108/21 108/24 112/9 112/14 137/4 143/3 147/22 148/20 148/25 149/13 149/18 160/20 167/3 171/21 171/25 181/12 184/15 184/16 190/22 197/23 212/9 218/8 219/2 219/3 219/12 220/14 221/10 230/10 230/14 230/16 234/10 246/20 260/3 261/12 279/22
**scores is [1]** 149/18
**scoring [14]** 30/16 30/17 146/25 171/20 185/21 186/17 218/3 246/2 246/6 246/18 246/20 246/21 251/2 264/10
**SCOTT [7]** 1/16 1/17 73/3 144/19 145/9 177/8 179/20
**screen [18]** 4/7 8/7 8/18 16/6 16/21 17/1 17/4 20/17 20/19 20/19 25/12 34/15 65/4 65/5 69/11 80/4 146/10 249/16
**screenings [2]** 206/13 206/14
**scrimmage [1]** 180/9
**script [2]** 17/18 17/18
**scroll [34]** 11/23 12/9 12/11 12/15 19/13 19/14 22/20 23/13 23/18 29/15 64/16 64/19 69/11 78/24 90/11 109/21 119/22 129/14 177/18 177/19 185/24 192/5 192/6 211/14 216/4 216/21 217/12 217/21 230/23 239/11 281/15 285/11 285/18 286/1
**scrolling [5]** 11/20 16/8 20/12 66/3 66/8
**scrolls [1]** 23/14
**sealing [2]** 247/15 247/17
**search [17]** 7/12 7/21 7/22 7/23 8/8 8/10 8/12 11/3 37/8 45/9 53/15 53/25 54/6 54/7 54/8 54/10 57/12
**searches [4]** 8/15 53/19 54/1 54/3
**seasonal [2]** 120/13 123/12
**seat [2]** 36/10 174/15
**seated [2]** 94/19 244/14
**second [15]** 13/2 13/3 39/14 95/13 140/10 149/2 149/3 151/10 157/13 163/4 176/21 183/21 208/24 257/19 283/4
**secondary [3]** 29/18 170/17 171/1
**secret [1]** 181/16
**section [3]** 16/11 69/15 278/23
**see [254]** 4/7 10/14 11/4 11/19 11/25 12/9 12/14 12/15 12/21 13/17 13/22 16/8 16/15 17/4 17/21 17/25 18/22 19/10 20/11 20/12 23/5 25/21 34/10 36/15 36/16 37/15 37/15 39/25 45/3 45/4 45/5 45/24 47/14 48/13 48/15 49/20 50/13 50/15 54/18 54/20 60/4 64/16 64/18 64/19 64/25 65/4 65/5 65/13 65/14 65/16 65/18 65/21 66/1 69/14 80/20 85/3 88/13 90/11 90/21 91/2 91/9 92/7 92/8 93/2 95/6 95/17 95/22 95/24 96/7 96/15 103/9 106/3 109/5 109/6 109/9 109/21 109/25 110/2 110/9 110/25 111/10 111/17 118/3 118/11 118/24 120/3 120/14 120/15 120/23 120/23 120/24 121/15 121/21 122/17 126/6 126/9 126/12 127/2 127/7 129/9 129/12 131/16 131/18 132/2 132/8 132/12 132/13 134/7 136/2 141/8 146/10 146/16 147/12 147/15 147/19 149/6 149/11 149/12 151/21 152/7 152/16 154/3 155/5 156/8 156/14 156/15 156/18 158/11 158/23 158/25 159/1 159/17 160/2 160/10 160/12 160/15 160/22 161/16 161/16 162/11 162/13 162/16 162/22 163/1 163/3 163/12 163/13 163/13 163/14 163/20 163/22 164/3 164/4 164/25 166/4 167/5 167/25 168/5 168/6 168/15 168/18 168/19 168/24 168/25 170/15 170/21 171/9 171/12 177/6 177/21 178/12 179/1 181/13 183/19 183/25 186/1 192/12 196/15 200/5 209/3 210/18 211/4 213/20 214/6 214/8 214/15 215/22 216/1 216/2 216/3 216/7 216/10 216/17 216/21 217/13 217/22 221/11 221/11 222/21 223/6 223/12 229/24 230/24 238/6 238/20 239/3 241/14 241/14 243/20 244/7 248/22 249/1 249/3 249/7 249/14 249/19 250/9 250/11 250/19 250/23 251/3 251/10 252/12 253/3 253/9 255/5 255/15 255/20 255/22 256/16 257/25 258/5 258/9 258/22 258/25 259/9 263/21 263/23 264/7 264/11 265/11 265/18 267/21 269/10 269/15 270/7 270/8 271/21 272/7 272/8 273/1 281/13 285/24 289/20
**see how [1]** 244/7
**seeing [16]** 7/9 8/4 11/1 11/11 11/16 11/24 17/8 29/16 77/13 82/16 87/4 169/3 214/14 214/16 216/6 280/19
**seek [4]** 78/7 78/8 105/5 144/1
**seeking [1]** 27/22
**seems [2]** 127/5 249/13
**seen [37]** 12/10 22/19 45/11 45/12 49/9 49/11 49/12 55/17 57/2 57/5 58/7 59/10 69/4 74/1 83/9 84/3 89/21 90/8 108/23 120/10 121/2 121/10 122/10 130/23 140/5 143/16 157/14 168/23 178/14 206/9 207/3 207/16 219/11 256/24 257/1 257/9 258/2
**sees [3]** 55/11 55/14 230/14
**select [2]** 32/17 142/20
**selling [1]** 5/2

S
semantic [2] 72/5 72/11
send [5] 26/11 223/5 225/5 226/9 226/11
sending [3] 217/1 236/17 249/2
sends [3] 168/18 282/18 283/18
Senior [1] 250/1
sense [9] 5/17 11/25 22/24 63/11 180/21 187/2 188/21 207/10 265/14
sensitive [6] 116/7 116/9 116/15 116/16 116/23 227/6
sent [27] 62/2 93/22 126/13 139/5 139/6 143/23 157/17 157/20 176/20 209/18 210/21 221/16 225/3 225/7 225/23 226/10 227/25 232/10 232/11 232/16 233/3 233/6 239/6 252/11 273/6 282/14 283/15
sentence [11] 21/10 93/1 111/15 170/25 171/3 178/8 253/5 256/21 257/1 257/16 258/5
separate [6] 87/12 184/6 191/23 229/4 229/5 240/24
September [4] 216/24 224/12 239/19 239/22
September 15 [1] 224/12
September 30th [2] 239/19 239/22
September of [1] 216/24
series [6] 4/4 7/4 16/3 22/15 25/24 175/11
serve [8] 77/4 77/7 92/24 178/10 179/13 194/22 194/23 274/4
served [2] 145/20 145/23
serves [2] 97/3 192/9
service [13] 76/25 129/11 129/25 175/1 176/2 191/10 194/7 194/7 200/24 201/10 201/17 202/2 202/15
services [10] 60/7 74/11 114/11 114/11 121/9 129/10 175/5 175/7 175/14 279/25
serving [1] 176/22
set [4] 3/15 8/11 58/10 67/5
setting [4] 72/4 72/11 74/17 281/16
seven [22] 16/20 16/24 16/25 29/4 29/14 144/18 171/15 171/18 172/12 172/13 172/14 172/16 172/22 172/23 173/1 173/8 173/13 173/15 173/17 173/25 255/20 257/21
several [18] 63/4 63/7 74/1 90/12 100/22 102/11 111/8 162/20 179/20 185/20 185/23 202/18 204/17 204/21 215/20 216/1 219/14 276/20
severe [1] 31/24
shape [1] 33/5
shapes [1] 5/1
share [9] 86/9 95/20 96/16 114/9 114/10 114/13 114/19 114/21 135/4
shared [7] 113/10 122/9 122/13 122/20 135/18 137/23 257/2
sharing [1] 182/12
she [90] 30/16 83/5 85/21 91/19 105/13 121/18 125/18 126/1 126/2 131/5 131/13 135/17 135/22 136/5 139/4 139/5 139/23 144/17 146/24 156/17 156/17 158/6 168/21 179/24 192/7 214/12 215/20 215/25 216/9 221/8 221/9 223/3 223/4 228/3 228/3 231/23 231/23 231/24 231/24 231/25 232/1 232/2 235/5 235/5 235/6 236/17 237/25 238/14 238/15 238/19 240/6 240/11 240/12 240/18 240/21 243/2 243/15 247/12 247/14 249/25 250/3 250/11 255/6 259/9 260/17 262/5 264/19 264/23 265/20 265/25 268/3 268/4 268/6 268/7 268/8 270/23 274/18 274/20 274/20 274/21 285/5 285/7 285/9 285/13 286/4 288/11 288/14 288/14 288/16 288/17
she's [1] 242/17
Sheri [2] 192/25 221/9
Sherry [1] 83/3
shift [2] 19/23 271/13
shifting [1] 118/21
short [6] 36/9 94/18 144/24 242/17 242/18 244/12
shortly [3] 93/22 232/4 273/21
should [34] 12/9 21/14 32/5 32/12 32/13 32/16 32/17 42/23 55/9 55/12 63/25 91/21 103/13 103/20 166/2 170/18 171/11 201/23 212/25 213/1 213/2 213/15 216/9 222/11 244/6 248/24 255/12 258/7 258/8 273/6 276/18 282/9 285/21 285/23
shoulder [1] 195/15
shouldn't [2] 103/22 174/9
show [24] 8/14 16/13 38/12 48/1 95/1 115/23 117/8 117/12 117/15 118/2 133/18 159/7 177/19 185/5 187/12 192/3 229/20 245/22 251/18 266/1 266/2 267/4 281/10 287/1
showed [10] 133/18 140/13 176/20 177/8 235/5 235/6 241/3 277/14 280/18 282/13
showing [10] 10/24 12/5 31/4 31/7 31/20 52/14 61/7 94/13 213/22 266/24
shown [8] 27/6 69/8 127/9 168/12 191/3 236/11 236/14 256/12
shows [29] 9/5 10/11 14/8 17/4 18/13 20/14 22/12 25/15 25/18 31/10 38/7 51/7 51/11 52/13 52/17 53/23 53/25 54/2 56/22 57/21 57/22 57/24 61/9 64/11 68/11 94/1 126/4 205/15 252/9
sic [1] 184/8
sick [2] 27/24 206/23
side [13] 8/7 8/17 19/22 23/2 23/5 116/12 119/5 137/11 157/8 285/13 285/16 288/5 288/10
sides [5] 72/20 133/3 156/11 156/13 270/11
Sidney [1] 145/9
sign [4] 85/16 137/22 202/23 286/18
Signature [1] 290/6
signed [4] 85/14 127/21 127/23 286/13
significant [7] 44/4 60/21 61/3 140/22 140/23 140/25 205/11
signifies [1] 260/14
signify [2] 34/24 71/10
signing [2] 128/1 184/4
similar [19] 11/1 20/9 65/14 68/13 83/9 84/19 91/24 92/13 93/25 94/10 136/21 137/14 137/21 138/3 195/17 195/19 207/7 207/17 219/10
similarly [3] 30/15 68/9 71/18
SIMMONS [1] 1/16
simple [2] 9/17 163/19
simpler [2] 149/7 271/20
simplify [2] 9/15 9/17
simply [1] 241/17
Sinai [1] 255/8
since [23] 4/15 75/4 75/5 83/24 93/20 99/6 100/17 107/10 113/20 115/5 129/14 131/25 136/5 145/23 147/6 181/19 181/24 193/14 198/24 204/21 227/8 277/9 278/24
single [13] 40/12 46/22 47/11 47/23 47/25 51/19 67/13 114/18 135/21 141/24 240/13 246/5 266/21
single answer [1] 114/18
sir [19] 73/20 74/2 78/24 117/8 144/10 149/13 149/25 150/5 153/8 153/21 154/18 155/18 155/24 156/8 166/12 167/10 167/14 170/16 173/25
sister [2] 74/8 169/11
sit [8] 47/7 82/9 82/11 105/20 124/4 124/19 124/21 135/23
site [5] 26/4 53/21 88/15 109/12 166/4
sites [1] 166/2
sits [3] 81/22 82/6 189/20
sitting [1] 70/6
situation [10] 10/16 44/2 60/22 68/15 71/20 100/13 153/6 161/23 171/11 238/6
situations [5] 9/14 14/8 31/10 68/23 71/21
six [16] 12/4 13/24 16/18 16/18 29/1 29/8 29/13 29/14

S

**six... [8]** 29/14 82/9 171/15 171/21 171/25 172/12 172/13 212/13
**sixth [1]** 202/1
**size [3]** 44/4 60/22 61/4
**skip [1]** 158/20
**Slack [1]** 269/9
**Slapchat [1]** 263/20
**slide [18]** 4/9 7/20 15/9 18/1 18/2 19/11 27/8 30/8 32/11 37/12 108/25 109/12 109/21 109/22 266/1 266/2 277/14 286/25
**slides [13]** 4/4 4/7 7/4 7/7 16/3 22/15 26/21 37/18 37/22 53/14 63/3 269/2 278/23
**slow [1]** 120/11
**slowly [1]** 16/16
**small [9]** 17/15 17/22 22/12 27/18 48/16 58/5 61/7 77/13 121/6
**smaller [4]** 20/14 20/17 20/20 39/12
**so [243]** 6/8 6/16 6/19 7/10 7/16 7/18 10/25 11/15 13/22 16/7 16/21 17/2 18/4 18/18 19/6 21/3 22/24 27/1 31/22 33/8 37/17 38/9 39/9 40/5 40/8 40/21 41/2 41/10 43/1 43/6 43/18 44/22 45/4 45/15 46/16 47/2 47/13 47/16 48/14 48/25 50/1 50/13 51/12 51/14 51/18 52/2 53/6 53/11 53/18 55/4 55/6 55/7 55/11 55/18 56/1 56/8 56/10 56/23 57/7 58/6 58/23 59/12 61/25 62/18 62/21 63/14 63/22 64/24 65/23 66/5 66/21 66/22 68/9 68/11 69/5 69/12 70/10 73/23 74/6 74/8 74/15 75/2 75/7 75/9 75/14 75/25 76/21 76/25 77/3 77/13 78/5 78/10 84/19 85/8 85/17 86/7 88/11 89/8 89/24 90/25 93/17 93/24 94/7 95/15 97/11 100/3 101/11 103/18 104/4 107/1 109/4 110/14 112/10 114/17 117/19 123/16 124/9 125/2 127/12 133/21 136/21 138/10 139/11 148/9 148/22 149/9 150/16 150/21 151/8 152/18 158/19 159/22 161/20 167/3 168/2 171/2 172/6 172/9 174/4 174/23 175/1 178/6 178/18 178/20 180/7 180/8 180/11 180/11 180/15 180/23 180/25 182/21 182/22 184/11 185/4 185/5 186/18 187/10 187/18 187/23 188/2 188/6 188/8 188/13 188/21 188/21 189/13 190/20 190/25 194/5 196/20 197/1 199/11 201/1 201/17 201/21 202/4 205/2 206/7 206/20 206/23 207/7 213/15 215/13 216/24 217/12 218/17 218/18 220/1 220/5 220/12 223/25 224/7 227/8 229/11 229/17 229/19 233/18 233/18 236/1 236/5 237/5 238/19 238/20 239/17 239/18 241/5 242/25 243/3 243/5 243/18 243/20 245/10 245/11 246/4 246/13 248/6 248/8 249/6 250/5 251/14 254/18 254/22 255/12 256/23 259/9 259/17 259/23 262/23 267/2 267/3 269/13 272/5 275/19 278/2 281/5 282/23 283/2 283/12 283/18 286/12 288/16 288/17
**so-called [1]** 148/22
**social [5]** 34/14 34/18 35/6 131/6 164/13
**Soda [1]** 77/12
**software [1]** 45/17
**solely [1]** 75/13
**solution [2]** 270/13 270/14
**solve [1]** 181/21
**Soma [7]** 203/5 203/24 224/15 225/16 226/11 226/16 226/18
**some [86]** 6/7 8/8 11/20 11/25 12/2 12/17 15/7 15/9 22/3 29/19 35/4 42/17 45/4 53/12 55/25 68/19 70/12 70/12 71/21 73/8 73/9 74/7 75/8 78/11 79/1 81/17 81/24 82/22 82/25 86/21 87/23 88/13 89/20 92/3 102/12 108/22 108/23 113/12 117/14 117/17 119/18 120/25 122/9 133/4 145/10 148/14 150/12 157/20 158/10 168/23 174/7 175/15 176/2 178/16 182/8 182/17 183/14 184/15 185/3 185/8 186/22 187/12 187/17 189/8 190/11 191/8 191/25 192/1 207/11 207/16 210/2 215/6 222/6 229/16 234/5 236/11 236/18 237/3 245/15 247/15 247/17 253/15 255/2 278/23 286/1 286/9
**somebody [9]** 38/21 45/22 60/11 60/15 134/14 142/21 180/9 222/11 259/17
**somehow [1]** 69/18
**someone [12]** 9/16 23/4 23/18 54/12 55/8 69/4 137/3 184/19 211/2 212/5 220/4 242/14
**something [30]** 7/11 10/12 10/13 14/10 34/13 50/13 50/16 50/24 57/18 58/4 61/14 69/4 69/7 84/10 84/12 173/11 181/23 207/24 223/5 227/6 232/5 235/21 236/4 243/22 249/17 263/7 267/11 267/13 267/15 284/7
**sometime [3]** 213/8 224/25 227/10
**sometimes [2]** 55/5 57/12
**somewhere [8]** 17/16 60/17 61/23 93/6 122/2 194/17 203/20 210/23
**soon [1]** 180/12
**sophisticated [3]** 60/3 60/6 60/7
**sorry [20]** 19/1 39/5 43/11 47/12 48/4 49/23 50/20 53/22 55/16 55/25 62/16 66/3 89/6 98/14 99/3 134/15 135/11 168/9 171/23 185/8 185/12 185/12 243/20 251/18 253/23 260/1 267/19 272/21 285/18 288/7
**sort [10]** 72/4 78/11 118/17 146/24 182/17 184/14 187/17 247/15 268/7 287/9
**sorted [1]** 8/13
**sorts [5]** 44/13 54/6 57/2 169/14 240/11
**sought [2]** 133/7 138/7
**sound [3]** 249/18 251/8 286/17
**source [5]** 106/25 170/17 170/20 171/1 184/6
**sources [8]** 7/17 29/18 33/14 46/25 250/16 250/18 250/22 250/25
**South [3]** 34/9 216/16 216/16
**SOUTHERN [2]** 1/1 76/4
**southwestern [1]** 75/25
**sp [6]** 185/15 187/1 192/4 199/7 203/5 220/25
**space [4]** 14/19 118/22 121/6 275/8
**spar [1]** 182/11
**spatial [1]** 273/21
**speak [12]** 40/8 47/4 51/19 53/12 67/3 67/13 68/3 69/5 71/24 148/8 150/16 226/13
**speaks [4]** 45/16 48/14 49/12 62/22
**special [2]** 200/21 239/12
**specialized [3]** 88/12 189/13 198/22
**specially [2]** 14/11 80/20
**specialties [1]** 114/17
**specific [13]** 5/24 6/18 47/3 72/9 127/20 129/7 129/21 136/21 167/11 172/24 180/6 233/4 278/10
**specifically [13]** 68/17 77/23 109/14 116/14 131/11 139/3 163/9 174/21 184/14 187/3 200/9 233/5 238/12
**speculate [2]** 126/17 139/15
**speculating [1]** 189/11
**speculation [12]** 27/14 70/6 71/11 88/3 144/5 160/3 169/6 173/4 173/12 209/9 231/12 274/18
**spend [6]** 10/13 197/3 197/5 206/25 243/7 259/17
**spending [1]** 104/16
**spent [4]** 62/3 78/4 97/12 184/5
**spine [4]** 76/6 120/24 194/8 195/14
**spite [1]** 113/24
**spoke [8]** 81/10 83/6 99/21 134/12 134/15 135/24 202/18 225/19
**spoken [4]** 68/25 203/24 204/21 278/11

S

**spotlight [1]** 279/17
**spreadsheet [1]** 217/8
**spring [27]** 27/2 29/21 83/17 93/13 93/20 98/13 98/14 98/17 99/19 100/6 100/8 101/9 101/13 101/18 101/20 102/4 102/24 110/24 119/24 120/19 140/7 140/8 246/3 267/8 276/10 276/13 277/7
**square [1]** 121/5
**Srinivasan [3]** 185/15 185/16 185/17
**Srinivasan's [1]** 186/7
**St [4]** 75/8 75/11 75/15 78/3
**staff [33]** 13/18 18/9 75/19 80/21 81/18 81/25 81/25 83/6 83/7 97/7 124/7 126/1 136/20 137/21 146/23 150/16 150/17 153/19 156/20 163/1 182/20 186/11 193/19 196/1 198/22 204/20 205/2 205/3 210/4 211/15 230/24 259/3 260/8
**staffed [1]** 198/22
**staffing [1]** 287/6
**stages [1]** 60/10
**stakeholders [1]** 179/10
**stamp [1]** 25/22
**stand [8]** 70/7 73/4 86/6 144/14 144/21 226/2 230/11 232/18
**standard [10]** 45/22 58/21 59/9 62/7 126/11 126/25 187/20 190/19 190/20 216/13
**standards [1]** 42/20
**standing [3]** 84/5 135/1 206/4
**Stanford [2]** 4/16 4/18
**star [42]** 17/21 17/22 17/22 54/21 54/22 54/24 55/1 55/7 55/12 55/14 55/17 55/22 55/25 65/8 65/19 71/18 71/22 112/24 112/25 113/2 113/6 113/9 113/10 113/11 115/5 130/21 131/17 132/7 142/24 217/6 217/15 217/17 218/13 218/15 219/4 219/4 222/15 222/15 223/8 223/10 223/15 223/16
**stars [7]** 54/16 55/2 55/4 55/5 55/15 55/19 71/5
**start [8]** 7/11 62/21 74/4 149/6 174/10 180/8 193/22 213/13
**started [6]** 104/4 126/14 167/5 187/13 193/18 276/16
**starting [2]** 201/16 273/25
**starts [1]** 147/6
**state [15]** 8/9 83/1 85/15 85/15 95/15 96/20 104/24 134/1 151/11 153/9 153/16 162/13 165/11 171/6 178/22
**stated [6]** 41/18 152/3 153/18 162/4 167/19 203/1
**statement [15]** 52/23 100/25 113/21 113/22 119/1 129/20 129/23 130/15 159/22 159/22 159/24 176/1 200/13 258/13 258/16
**statements [11]** 120/22 124/1 132/21 148/4 157/10 157/11 159/8 159/9 253/18 279/6 283/12
**states [7]** 1/1 1/12 12/21 28/23 159/24 168/21 246/5
**stating [3]** 147/6 149/7 152/9
**statistical [3]** 44/4 184/15 277/4
**statistically [5]** 60/12 60/21 61/3 154/1 218/16
**stay [3]** 69/25 133/3 206/23
**step [58]** 29/20 148/22 148/23 148/24 149/2 149/3 151/11 151/18 152/13 161/3 172/19 172/21 172/21 177/1 177/4 187/1 224/4 234/19 234/19 234/19 234/24 255/22 256/4 256/9 260/3 269/12 269/13 269/17 269/20 269/20 269/25 270/1 270/5 270/9 270/19 275/4 275/4 275/4 275/6 276/17 276/17 277/8 277/16 277/16 277/20 278/8 278/9 278/18 279/17 280/13 280/17 281/1 281/2 281/5 281/8 283/5 283/6 289/3
**stepping [2]** 30/4 285/5
**steps [5]** 17/10 22/11 22/16 29/19 256/2
**sticker [1]** 168/5
**still [22]** 33/23 63/21 68/20 73/5 96/15 112/17 158/3 159/15 160/1 173/17 179/13 183/14 193/25 197/13 198/7 198/15 198/22 207/1 212/8 219/4 228/24 281/7
**Stipes [2]** 2/7 290/5
**stipulate [2]** 116/13 246/25
**stipulating [1]** 247/10
**stop [10]** 77/16 78/10 94/16 94/17 102/21 102/22 160/24 176/22 196/21 272/9
**stopped [7]** 78/14 102/19 104/10 151/19 152/4 234/17 279/23
**stored [2]** 245/19 247/13
**storm [2]** 199/25 212/2
**story [3]** 204/21 212/14 212/15
**Stout [1]** 102/8
**straight [1]** 283/8
**strategic [8]** 141/6 150/22 151/5 152/14 153/5 153/9 153/13 189/2
**strategy [5]** 42/10 75/3 75/11 95/21 208/9
**stream [3]** 54/7 54/8 221/1
**Street [2]** 1/18 2/4
**strengthen [1]** 10/25
**stretch [1]** 30/19
**strike [2]** 189/14 189/18
**stringent [1]** 76/18
**strives [1]** 92/24
**strongly [2]** 95/10 176/15
**structural [2]** 171/22 218/3
**struggled [1]** 115/1
**Stuart [1]** 279/20
**Stuart's [1]** 279/16
**stuck [1]** 159/23
**studies [2]** 68/16 180/3
**study [5]** 122/24 123/3 123/17 175/24 257/14
**stuff [1]** 259/18
**sub [1]** 17/18
**subcommittee [1]** 186/25
**subcontractor [1]** 180/24
**subcontracts [1]** 175/12
**subject [4]** 126/8 126/9 146/15 157/5
**subjected [1]** 74/8
**submit [12]** 6/6 80/25 95/24 98/3 98/4 104/11 104/13 126/2 209/6 252/21 265/15 265/22
**submitted [6]** 6/8 6/8 81/14 134/17 172/20 179/10
**submitting [5]** 73/23 104/16 125/1 134/19 197/24
**subpoena [4]** 161/19 191/22 191/23 191/24
**subsequently [4]** 86/11 135/19 143/16 167/2
**subset [1]** 119/2
**subsets [1]** 121/2
**substantial [2]** 181/5 218/2
**substantiate [1]** 227/13
**substantive [1]** 123/24
**successful [1]** 138/8
**such [10]** 7/1 10/7 10/23 17/18 31/22 42/12 51/6 87/24 91/18 121/6
**suddenly [1]** 199/11
**suffer [2]** 97/20 97/22
**suffered [2]** 84/1 113/24
**suffering [1]** 88/1
**sufficient [1]** 60/12
**suggest [6]** 49/20 57/3 59/10 151/15 247/6 259/16
**suggested [7]** 34/13 49/6 57/7 161/13 236/25 237/25 281/6
**suggesting [12]** 10/19 12/1 19/5 19/18 39/10 39/12 53/22 54/9 55/8 66/5 238/16 280/25
**suggestion [4]** 49/23 161/4 185/20 185/23
**suggestions [1]** 116/22
**suggests [8]** 10/5 28/24 49/9 58/7 70/10 70/10 71/14 71/16
**suite [3]** 1/22 2/4 118/8
**summarize [1]** 35/12
**summarizes [1]** 4/9
**summary [1]** 6/14
**summer [2]** 120/12 240/3
**super [1]** 17/18
**supplement [1]** 128/22
**supplemental [1]** 6/9
**supplemented [3]** 128/24 130/9 130/14
**support [6]** 28/7 172/18 173/15 175/9 233/6 257/16
**supported [1]** 186/9

**S**

**supposedly [1]** 212/24
**supposition [1]** 230/13
**sure [53]** 3/25 6/16 8/19 9/2 18/8 35/17 37/6 39/2 41/13 44/11 44/22 46/16 51/21 53/15 54/7 56/2 57/11 58/22 58/25 59/25 61/5 61/13 68/20 70/23 74/6 74/15 75/2 75/25 96/21 99/2 99/9 101/11 101/21 104/4 104/15 112/15 125/3 133/5 154/16 167/3 187/20 193/6 193/18 194/4 208/20 221/15 233/21 244/9 266/12 268/8 273/19 287/4 287/13
**Surely [1]** 62/2
**surgeons [6]** 117/4 118/7 119/6 195/11 201/3 201/4
**surgeries [6]** 77/6 114/16 121/5 194/10 194/18 201/5
**surgery [18]** 76/6 87/10 88/11 88/12 89/19 118/6 120/25 121/7 134/4 135/2 138/6 138/8 138/9 167/12 168/19 200/11 200/21 239/13
**surgical [9]** 88/14 117/2 118/5 118/16 119/4 119/8 120/2 120/6 121/3
**surprise [1]** 268/14
**surprised [2]** 132/5 257/15
**surprising [1]** 49/25
**surrounded [1]** 74/9
**surveillance [1]** 236/24
**surveillances [1]** 198/17
**survey [157]** 13/7 13/10 29/24 33/17 33/19 44/1 44/5 44/9 44/11 44/15 44/15 45/7 45/10 45/13 45/15 45/20 52/9 52/11 52/12 59/20 59/25 60/19 60/20 60/23 61/2 61/4 62/11 62/14 62/18 62/23 63/17 66/17 66/20 67/23 68/1 68/7 77/15 77/16 77/20 77/24 81/14 81/21 95/11 95/25 96/4 97/25 100/14 100/16 102/17 102/19 102/21 103/1 103/6 103/8 103/13 103/17 103/19 103/21 103/25 104/10 104/12 104/18 104/19 104/23 105/2 105/4 105/8 105/22 108/16 123/4 123/7 124/10 125/7 142/8 150/4 152/10 155/5 155/9 155/12 155/18 155/23 156/2 156/5 167/1 169/5 178/21 180/12 183/13 183/25 184/3 184/9 184/10 190/22 196/12 196/21 197/4 199/2 200/14 201/23 211/9 211/25 212/25 213/11 213/13 214/13 214/19 215/3 217/21 218/2 218/21 218/22 219/3 220/1 220/2 220/15 223/20 223/23 224/2 228/9 228/11 228/14 228/23 229/2 229/6 229/8 229/12 229/23 229/25 234/13 235/22 245/4 245/12 245/13 245/15 246/6 252/21 252/14 252/24 253/2 253/17 254/7 254/17 255/9 255/12 256/11 256/14 256/15 257/19 257/23 262/24 264/1 267/20 268/13 275/6 278/13 279/23 281/7
**surveyors [1]** 195/19
**surveys [13]** 43/12 43/13 43/18 43/22 43/25 44/10 44/12 44/13 44/18 46/18 218/24 245/6 265/15
**survive [1]** 77/13
**sustain [1]** 148/12
**Sustained [4]** 144/6 149/16 192/18 235/13
**sworn [5]** 3/13 73/12 145/6 193/2 244/17
**SYDNEY [2]** 1/16 73/3
**synonymously [2]** 179/24 180/20
**system [16]** 71/15 84/19 84/20 95/16 110/15 134/13 135/15 136/2 136/22 169/11 216/20 236/20 252/15 255/8 264/1 279/16
**systems [2]** 71/17 106/4

**T**

**tab [10]** 12/4 13/17 13/20 16/7 16/14 16/20 16/23 17/2 18/17 70/2
**table [10]** 23/6 23/6 23/8 24/14 24/19 25/16 27/6 56/16 182/19 182/22
**tabs [4]** 13/23 16/9 16/14 70/3
**tactics [1]** 108/13
**take [36]** 11/6 11/7 20/18 22/16 23/19 29/15 36/7 75/9 89/13 116/2 116/21 120/16 122/2 139/12 140/20 144/14 150/11 156/23 169/18 174/7 174/10 184/25 186/1 186/15 186/19 199/13 210/3 211/16 212/1 217/5 219/25 220/1 224/8 240/5 243/23 244/7
**takeaways [1]** 278/25
**taken [10]** 33/24 36/9 68/21 94/18 123/10 124/5 174/13 206/1 244/12 287/11
**takes [8]** 23/7 36/23 37/8 104/13 124/12 124/21 205/1 257/18
**taking [7]** 44/12 73/4 243/16 258/11 268/4 268/7 288/14
**tale [1]** 194/22
**talk [47]** 18/2 20/21 30/20 33/25 34/19 40/12 41/20 46/13 54/21 56/2 60/23 74/1 75/23 76/9 79/2 79/19 90/5 90/17 91/13 99/9 102/24 102/24 113/19 118/11 121/13 131/23 140/4 146/8 162/21 176/11 186/20 191/3 217/6 218/21 230/9 230/20 246/9 247/3 256/4 263/16 263/16 268/19 270/24 274/13 282/5 282/19 284/23
**talked [63]** 10/2 10/23 17/9 19/5 24/15 25/11 25/17 27/12 27/18 27/22 27/25 30/23 31/20 34/4 35/17 38/1 39/3 42/5 42/15 42/17 45/5 45/15 45/24 51/10 54/14 56/11 56/21 57/6 62/24 64/12 67/1 67/2 68/3 68/4 70/25 71/7 90/25 91/1 100/18 112/24 115/10 123/3 127/16 128/17 130/16 136/8 139/3 171/14 174/6 183/2 186/21 205/15 222/7 224/9 252/4 257/19 263/19 269/4 274/11 278/19 283/17 285/1 289/5
**talking [24]** 10/21 23/11 24/3 34/15 34/22 37/6 45/2 52/18 56/11 63/12 85/11 101/22 103/13 164/10 164/10 183/6 200/8 201/1 229/3 249/12 254/24 261/3 264/9 268/20
**talks [5]** 28/21 33/6 118/14 135/17 229/22
**tapped [1]** 118/22
**Taylor [7]** 199/7 221/1 221/7 221/13 221/18 221/20 223/2
**Taylor's [1]** 221/8
**teaching [2]** 21/23 174/25
**team [8]** 26/8 39/18 81/18 117/24 175/18 182/20 182/21 287/14
**tell [33]** 7/9 13/16 18/4 47/7 56/14 57/4 58/15 58/19 59/25 60/8 74/13 75/23 76/23 91/10 103/20 103/22 112/25 131/3 154/20 155/17 158/16 166/20 194/2 203/17 204/6 232/25 233/2 244/1 272/20 273/17 276/15 283/21 286/4
**telling [13]** 55/23 55/23 56/19 123/1 123/6 123/11 123/19 123/21 133/4 204/18 206/7 231/10 285/22
**tells [6]** 129/24 155/7 155/7 171/20 259/23 260/3
**temporary [3]** 180/6 180/11 180/17
**ten [9]** 25/13 25/20 36/8 144/19 145/1 174/10 242/25 267/21 284/8
**tenant [2]** 77/19 78/6
**tend [5]** 31/11 181/8 181/8 181/9 181/10
**tender [1]** 5/11
**tends [1]** 76/25
**Tenet [10]** 104/20 104/25 118/9 191/9 191/14 191/17 192/4 192/7 192/7 192/14
**Tennessee [1]** 74/19
**tentatively [1]** 247/16
**tenured [1]** 4/15
**term [9]** 11/2 36/4 44/16 44/17 56/5 56/6 150/10 187/17 187/20
**terminated [2]** 224/19 226/3
**termination [1]** 239/8
**terminology [1]** 283/16

T


**terms [12]** 4/20 39/14 42/3 64/3 88/14 108/4 133/2 204/25 225/8 225/13 227/16 263/6
**terrible [1]** 279/19
**test [2]** 53/19 212/1
**testified [26]** 5/3 93/20 93/20 98/9 104/8 125/3 132/16 138/15 141/16 143/23 156/12 169/7 211/8 227/17 238/18 247/12 257/15 262/1 262/10 264/4 266/3 266/7 267/23 272/17 287/3 289/13
**testified at [1]** 289/13
**testify [10]** 5/8 74/1 171/24 248/3 248/11 254/12 256/25 262/14 271/15 274/20
**testifying [3]** 30/9 239/8 239/13
**testimony [41]** 4/5 19/11 36/22 37/20 71/5 72/1 73/6 77/22 90/6 90/18 90/23 91/1 91/4 99/18 104/25 121/23 125/6 127/9 130/1 138/2 144/16 154/22 155/1 155/14 171/14 176/4 176/12 180/23 184/20 189/9 205/5 215/6 215/10 220/7 226/2 230/7 230/11 243/17 248/1 262/4 289/6
**testing [1]** 175/18
**text [14]** 96/2 139/5 139/6 139/8 139/13 139/14 139/16 139/23 146/15 226/18 226/25 227/6 249/1 255/9
**texted [2]** 91/19 226/20
**texts [1]** 226/23
**than [47]** 6/6 10/8 12/6 12/6 13/25 14/22 18/14 20/18 29/1 29/14 29/14 31/12 38/4 43/15 48/25 49/8 61/19 61/21 71/15 88/14 89/23 99/20 104/4 110/13 126/3 135/5 135/7 136/6 141/14 151/17 153/17 155/22 156/4 158/21 171/21 171/25 172/12 172/13 177/2 188/6 188/8 206/6 206/25 216/24 235/24 242/25 256/14
**thank [47]** 6/1 11/3 30/19 36/6 36/12 49/14 50/7 70/17 72/21 72/22 72/23 73/17 92/21 94/21 99/16 118/18 124/24 126/1 127/14 133/8 142/23 144/9 144/10 146/12 146/13 148/16 161/11 168/9 168/11 170/16 174/17 186/19 190/13 190/14 192/22 192/23 193/13 214/6 217/5 220/20 221/7 221/17 222/2 233/23 242/13 244/15 285/12
**thanks [4]** 156/17 160/8 250/21 273/9
**that [1814]**
**that has [1]** 240/25
**that's [10]** 62/7 67/16 68/13 158/17 172/9 175/18 180/24
188/4 188/24 205/14
**the 60 [1]** 46/21
**the broader [1]** 147/9
**the chief [1]** 157/23
**the imputation [1]** 275/2
**the marketing [1]** 131/13
**the President [1]** 232/13
**Theilk [1]** 221/1
**their [84]** 5/1 7/16 7/19 8/6 9/12 15/16 18/9 20/1 20/2 20/4 20/16 21/2 32/13 41/23 50/1 52/10 53/8 57/7 67/12 67/14 68/21 71/18 82/17 86/8 87/9 95/20 95/21 96/16 99/19 105/6 107/18 109/24 113/8 117/2 147/9 147/24 148/3 148/4 151/19 151/20 152/22 153/1 157/20 158/14 158/19 159/9 160/17 163/18 163/25 164/15 166/13 166/21 167/6 182/10 182/17 186/21 188/12 188/17 188/17 188/19 189/1 189/3 189/19 200/9 201/21 202/21 228/20 229/17 230/16 230/16 234/12 237/1 243/11 243/15 248/7 259/3 260/8 272/6 273/23 275/8 275/14 279/22 279/24 283/13
**theirs [1]** 257/8
**them [73]** 10/19 12/18 12/19 17/11 17/14 23/19 27/19 30/25 33/5 35/5 35/7 38/8 42/11 45/5 45/25 47/12 49/16 49/18 51/14 58/7 59/5 63/3 68/8 69/5 81/3 81/19 86/10 93/22 96/4 112/6 113/16 113/18 116/24 117/1 117/1 120/19 132/19 158/16 160/18 161/2 163/10 170/1 189/12 195/6 196/7 196/8 201/22 202/1 202/6 202/16 202/18 208/20 212/21 214/22 218/23 218/23 222/6 222/6 223/14 225/5 226/14 228/19 245/12 250/15 251/1 258/8 259/14 268/13 269/14 270/6 270/14 278/13 285/22
**themselves [6]** 31/22 34/11 35/6 172/20 189/1 261/1
**then [58]** 24/14 24/18 26/11 41/12 57/19 74/19 74/22 75/13 85/9 85/19 95/13 98/17 102/5 118/7 118/9 131/25 134/16 136/8 141/5 142/5 152/12 153/25 171/7 181/16 188/2 190/23 193/7 193/19 193/21 193/21 193/25 201/25 203/21 204/21 205/14 211/3 218/19 234/17 243/14 243/16 250/8 250/21 251/5 261/22 262/17 262/18 266/18 268/2 268/12 269/14 270/6 271/9 273/23 275/6 276/10 283/17 284/3 289/12
**theory [1]** 53/20
**there [249]** 4/15 5/19 6/7 7/18 8/1 8/19 9/19 10/18 10/24 11/18 12/8 12/12 12/13
13/14 13/24 14/4 14/14 16/18 16/23 17/11 17/16 17/17 17/17 17/20 17/21 17/22 18/18 18/24 19/6 19/23 21/7 21/10 22/3 22/5 22/6 23/5 23/11 23/16 23/16 23/18 24/8 24/15 25/4 25/13 26/5 27/4 27/6 27/21 28/18 28/20 29/16 31/4 31/7 33/6 34/8 34/11 34/14 34/18 37/15 37/23 37/25 38/6 38/10 39/23 39/24 44/6 45/6 46/7 47/11 47/23 47/25 51/10 55/5 55/19 55/24 59/7 59/10 59/17 60/15 63/20 64/1 64/17 65/12 65/15 67/2 68/2 68/9 70/9 70/15 71/21 75/7 77/23 78/7 81/15 85/13 85/18 85/20 95/24 96/2 99/18 100/1 100/1 100/2 102/23 104/12 104/15 104/19 105/20 105/24 111/7 114/15 114/17 115/18 115/23 125/23 126/22 127/7 131/2 131/25 133/12 133/14 136/19 136/20 136/23 137/25 139/2 139/21 143/11 147/5 154/5 155/24 156/10 157/7 158/4 163/5 163/15 167/1 168/5 168/7 172/18 172/22 172/23 173/1 173/9 173/14 176/2 177/25 178/5 178/18 180/5 180/8 181/5 181/16 182/1 182/12 182/18 182/25 182/25 183/1 183/8 183/10 183/14 183/21 183/23 183/23 184/15 185/1 185/2 185/7 185/8 186/2 187/5 187/22 188/23 190/7 192/20 194/17 194/24 196/13 196/24 197/1 197/3 199/20 200/4 204/24 205/3 206/3 206/5 206/5 207/1 209/5 209/13 211/11 213/14 213/23 213/25 215/14 220/21 223/6 225/21 225/22 226/8 226/10 227/5 227/12 228/5 229/4 229/5 229/18 229/24 230/4 231/4 231/6 234/19 235/19 236/25 237/5 237/14 238/20 239/17 240/13 243/18 245/23 247/10 249/5 253/20 253/24 255/5 260/25 264/9 265/8 266/20 267/9 267/19 272/16 272/24 273/22 274/9 274/21 275/9 275/11 276/5 276/10 277/7 277/24 278/15 279/18 286/9 289/9
**there's [2]** 76/16 211/16
**thereafter [1]** 93/23
**therefore [2]** 173/11 206/25
**Thereupon [11]** 3/4 36/9 92/19 94/8 94/18 145/3 174/13 174/14 244/12 244/13 289/22
**these [112]** 8/20 8/21 9/4 9/7 9/10 9/10 11/25 12/2 12/17 17/14 25/10 25/11 25/12 25/20 26/1 26/7 28/4 30/8 34/11 35/2 35/9 36/4

**these... [90]** 38/4 42/10 47/24 47/24 47/25 49/21 51/5 52/10 52/18 52/21 52/22 57/16 58/16 58/20 59/8 59/11 59/11 59/13 60/2 60/4 60/8 66/4 67/9 70/12 80/25 81/20 86/17 88/25 94/3 95/20 97/5 106/4 116/7 116/7 116/10 116/23 117/16 117/24 118/19 119/14 120/22 121/15 130/14 132/18 148/7 158/13 160/21 165/18 169/3 170/12 171/5 171/5 172/20 178/20 180/3 181/12 185/14 187/13 198/13 199/15 200/2 220/16 222/5 224/9 228/9 228/13 229/17 233/3 233/4 234/5 234/6 235/12 236/1 236/2 238/11 251/9 252/20 252/22 256/2 259/16 259/25 268/8 275/3 277/4 277/23 280/5 283/6 286/16 286/21 287/4
**they [381]**
**they say [1]** 29/7
**they went [1]** 117/5
**they're [1]** 55/23
**Thielk [1]** 220/25
**thing [14]** 11/13 16/24 53/20 53/22 54/19 106/23 122/20 206/6 262/16 264/20 268/5 268/6 286/25 287/10
**things [51]** 7/23 9/10 10/5 10/10 23/3 31/5 35/25 36/1 38/11 38/12 38/20 42/11 44/8 44/13 51/7 54/2 54/7 54/11 54/25 57/2 57/12 64/2 71/21 77/9 78/5 89/20 90/20 90/25 97/10 99/5 100/17 104/14 106/13 108/22 119/6 121/11 141/24 141/25 142/15 153/14 153/16 160/14 178/7 188/14 196/25 210/2 212/12 256/23 259/16 268/8 271/19
**think [91]** 15/1 18/2 19/16 28/12 30/15 37/20 42/11 43/14 44/6 52/12 56/5 56/21 66/20 66/20 68/1 70/14 70/25 71/20 72/8 72/19 72/19 77/8 91/9 92/5 97/18 97/21 104/8 104/17 111/12 125/12 133/14 140/17 141/23 142/1 142/2 151/8 153/16 156/10 159/13 159/18 163/9 163/17 166/1 166/20 172/7 172/9 172/24 176/1 181/5 184/16 186/11 191/22 195/2 196/16 199/8 203/23 205/23 212/10 224/25 227/9 228/8 228/15 228/22 235/20 236/4 237/18 239/17 242/8 243/7 244/6 246/6 247/10 247/12 251/12 251/13 254/18 254/21 258/13 258/15 260/23 260/24 263/13 266/5 266/25 267/2 267/11 270/15 276/6 277/21 283/13 284/3
**think Leah [1]** 251/13
**think that [1]** 159/13
**thinks [3]** 204/24 206/24 254/13
**third [5]** 14/11 14/20 15/22 16/23 92/25
**thirty [2]** 46/17 193/11
**Thirty-two [1]** 46/17
**this [638]**
**this consumers [1]** 14/9
**those [95]** 3/6 4/7 5/22 6/15 9/17 14/15 15/1 15/21 22/18 25/14 31/1 31/18 31/19 33/23 35/1 36/1 36/2 38/2 38/7 38/12 38/25 39/11 39/19 43/25 44/13 46/17 46/18 48/5 49/10 50/2 51/12 53/6 57/2 57/9 60/9 62/9 68/11 69/21 70/3 72/10 76/15 82/22 83/16 86/16 89/3 91/16 101/23 106/13 127/23 133/7 143/6 143/23 144/2 155/21 156/3 162/21 170/7 173/1 173/8 173/9 173/15 177/11 179/18 180/13 182/4 182/8 182/10 188/8 188/23 188/25 191/1 197/23 198/1 198/9 204/2 206/13 206/22 215/4 218/7 222/8 226/23 234/15 234/21 235/2 235/9 236/2 237/15 247/10 251/18 252/9 256/14 260/4 276/25 277/22 279/19
**though [6]** 14/22 205/23 224/2 229/12 237/8 263/10
**thought [11]** 44/12 46/10 49/3 66/19 67/12 68/6 68/7 68/14 239/20 242/8 283/14
**thousand [4]** 43/15 43/18 43/23 43/23
**thousands [3]** 43/12 43/15 229/24
**thread [1]** 269/9
**three [38]** 14/16 14/22 14/25 15/1 24/8 24/18 24/23 33/20 38/9 38/13 38/24 39/6 39/10 49/6 49/8 55/3 57/19 69/20 70/3 76/3 82/8 144/16 145/1 168/17 171/4 171/4 187/22 191/1 194/13 205/21 211/11 223/11 235/22 236/1 243/25 254/23 258/18 262/14
**three percent [2]** 39/6 39/10
**three percent made [1]** 57/19
**threw [1]** 70/12
**thrive [1]** 77/13
**through [43]** 7/5 9/6 16/13 16/23 20/16 20/23 20/23 21/21 22/16 22/18 24/7 25/8 26/15 26/19 37/18 37/21 45/12 53/14 53/17 54/16 63/3 74/4 74/14 77/18 84/19 106/17 117/5 120/19 121/1 136/22 153/3 177/25 179/19 198/10 200/13 201/22 201/24 205/10 224/5 251/21 266/18 267/6 281/7
**throughout [1]** 77/21
**thumbs [2]** 271/3 271/9
**Thursday [1]** 244/3
**ticket [1]** 193/3
**tidbits [1]** 113/13
**TikTok [3]** 34/15 122/10 200/3
**tilts [1]** 159/13
**time [106]** 5/10 6/7 10/13 11/1 13/2 13/3 15/12 28/8 31/4 44/1 49/15 53/5 58/16 62/9 64/2 68/20 75/14 78/1 93/23 94/14 97/12 97/14 99/6 100/16 100/17 101/23 102/8 104/16 105/14 105/23 108/4 122/22 126/23 134/2 157/25 158/1 165/1 168/25 170/12 174/7 174/12 175/4 178/15 182/8 183/2 183/15 184/5 185/15 186/4 186/12 186/23 187/12 191/8 193/24 194/9 196/20 197/2 197/3 197/5 197/5 197/24 199/9 199/10 201/25 202/13 203/18 207/11 212/3 215/4 219/16 221/2 221/20 223/19 223/23 223/25 224/4 232/18 234/21 236/23 252/25 252/25 254/9 254/21 254/21 254/21 254/22 263/11 263/14 263/25 267/2 268/3 268/4 268/7 268/9 268/16 268/16 268/17 269/9 269/17 279/9 279/16 282/8 284/18 287/7 287/9 288/11
**timely [2]** 93/24 129/2
**times [15]** 4/23 5/4 5/4 16/18 17/5 17/7 62/13 67/22 72/8 87/12 185/20 185/23 204/21 267/1 267/21
**timing [1]** 266/23
**title [5]** 70/10 244/24 249/23 274/5 274/7
**TLG's [1]** 129/19
**to accommodate [1]** 121/7
**to improve [1]** 108/21
**to participate [1]** 95/11
**to Rick [1]** 125/18
**to understand [1]** 5/19
**to whether [1]** 45/16
**today [44]** 4/5 15/12 33/23 35/14 35/17 44/22 46/24 47/7 47/21 48/9 52/19 54/12 60/24 61/3 66/22 72/8 73/20 74/3 78/17 86/18 99/18 104/25 105/20 112/17 124/4 124/19 124/21 130/12 135/23 138/2 157/12 176/11 176/12 178/17 181/9 181/11 220/8 224/9 230/7 231/11 238/15 273/8 280/7 281/20
**today and [1]** 281/20
**today's [4]** 7/17 19/25 53/4 71/23
**together [8]** 25/19 61/11 61/14 144/20 182/21 222/15 263/19 265/17
**told [26]** 43/10 43/11 49/3 86/11 100/8 103/18 120/19 120/19 153/12 200/10 203/13 204/2 204/7 204/19 210/2 214/17 226/17 228/22 231/13

T

**told... [7]** 254/19 256/25 257/11 257/12 257/13 262/1 272/17
**Tom [7]** 131/16 132/24 133/22 133/25 134/10 134/12 134/14
**tomorrow [2]** 244/3 289/20
**tone [2]** 280/1 280/3
**too [9]** 78/4 88/13 122/14 152/4 163/17 169/22 238/14 243/3 272/10
**took [5]** 69/17 134/24 212/1 224/12 278/13
**tool [1]** 32/16
**top [30]** 11/18 12/21 20/2 20/7 20/11 20/18 22/20 23/4 37/11 69/20 101/4 107/20 119/23 137/18 138/23 138/25 140/11 161/16 166/6 171/4 210/21 211/1 211/2 220/23 223/15 239/3 248/22 252/11 255/21 264/8
**topic [1]** 34/1
**topics [2]** 68/14 247/25
**total [14]** 61/18 61/25 62/4 113/23 114/1 114/4 114/6 172/8 172/10 174/3 195/14 283/21 283/23 283/24
**totally [2]** 36/24 188/1
**touched [1]** 68/16
**touching [1]** 18/9
**tough [1]** 120/12
**touting [1]** 31/22
**touts [2]** 112/4 112/12
**toward [2]** 95/15 280/16
**towards [2]** 3/14 182/24
**town [1]** 31/23
**tracers [2]** 216/5 216/19
**track [8]** 38/20 84/10 95/15 106/4 107/21 107/22 107/25 138/14
**tracking [3]** 106/8 215/7 217/16
**tracks [2]** 84/10 125/3
**traffic [1]** 47/2
**trained [2]** 14/11 80/20
**training [4]** 18/8 42/4 42/6 198/23
**transcript [1]** 290/1
**transcripts [1]** 257/7
**transfer [1]** 115/8
**transferred [1]** 135/2
**transition [1]** 251/17
**transparency [10]** 96/13 154/7 164/7 164/9 180/23 181/1 181/1 181/4 181/16 283/11
**transparent [17]** 95/16 110/23 111/3 111/7 160/19 161/5 161/7 161/23 178/23 178/25 179/5 179/12 212/24 229/13 230/2 283/11 286/6
**transparently [3]** 36/24 156/6 229/2
**trauma [1]** 121/25
**traveling [1]** 35/9
**treat [5]** 133/6 143/15 148/1 138/18 159/16
**treated [2]** 86/21 159/8
**treating [3]** 89/22 136/13 136/17
**treatment [2]** 143/2 144/3
**tremendous [3]** 119/3 254/17 254/22
**trends [1]** 247/9
**trial [12]** 1/11 5/4 5/7 5/8 61/23 77/21 174/14 191/19 205/5 238/9 244/13 280/7
**trials [1]** 77/18
**tried [4]** 54/1 81/10 116/8 184/11
**trier [1]** 5/16
**trip [2]** 176/9 192/24
**true [38]** 10/22 37/17 37/19 38/5 38/19 38/25 39/15 39/23 45/13 53/9 59/15 59/16 66/18 66/19 66/20 66/25 104/17 105/8 106/9 113/21 113/22 132/4 143/24 146/6 146/19 146/20 147/3 151/19 158/2 158/7 164/19 169/2 212/22 218/17 218/25 227/14 231/7 233/1
**trust [1]** 257/3
**trusted [1]** 266/23
**trustworthiness [1]** 85/11
**trustworthy [1]** 56/19
**truth [3]** 157/11 159/9 264/15
**truthful [1]** 238/17
**try [8]** 78/8 97/9 116/12 145/11 182/23 184/21 187/1 278/25
**trying [12]** 45/20 65/11 97/12 102/11 172/3 226/14 247/14 264/15 286/6 286/20 286/23 287/11
**tube [3]** 187/24 187/24 188/1
**Tuesday [1]** 97/16
**turn [3]** 77/15 95/24 158/25
**Turning [1]** 11/3
**turnover [1]** 75/8
**Twenty [1]** 193/11
**Twenty-five [1]** 193/11
**twice [2]** 33/7 178/2
**two [89]** 13/24 14/7 14/14 15/21 25/13 25/14 29/20 38/15 38/17 39/9 46/14 46/17 47/8 53/6 82/24 94/25 104/5 113/2 116/20 118/6 119/25 123/3 123/6 127/20 140/6 147/5 148/22 148/23 148/24 151/11 151/18 152/13 155/4 156/11 156/12 158/9 161/3 162/9 168/17 172/21 177/1 177/4 185/2 187/1 194/23 207/23 211/16 216/16 219/4 223/16 223/17 227/16 229/18 232/5 234/19 234/20 234/24 250/15 250/17 255/17 255/21 255/22 256/4 256/9 260/3 263/10 265/16 265/16 267/19 269/12 269/13 269/20 270/1 270/5 275/4 275/6 277/8 277/16 277/20 279/22 280/13 280/17 281/1 281/2 283/5 283/6 283/12 289/3 289/9
**two percent [1]** 39/9
**two-step [3]** 177/1 177/4 187/1
**type [17]** 5/21 7/21 8/9 47/5 48/20 50/2 56/20 58/11 60/11 61/4 129/11 129/24 189/5 194/3 238/12 257/6 287/10
**typed [1]** 37/9
**types [8]** 9/4 34/11 36/1 47/15 121/5 187/22 206/9 206/17
**typical [2]** 30/13 77/4
**typically [5]** 178/2 182/20 199/1 201/5 227/1

U

**U.S [2]** 132/7 222/20
**Uber [1]** 54/22
**UC [28]** 145/15 145/18 157/5 157/17 157/20 157/23 158/2 158/10 162/2 162/18 166/6 166/9 166/12 166/17 166/21 167/15 167/24 168/18 168/19 169/3 169/11 169/16 169/17 191/4 191/6 191/18 192/9 192/16
**UCH [1]** 168/22
**Uh [4]** 11/5 37/10 204/14 285/3
**Uh-hum [4]** 11/5 37/10 204/14 285/3
**ultimate [2]** 138/12 282/1
**ultimately [13]** 74/22 78/5 78/9 81/13 86/25 108/14 108/20 169/4 176/17 187/5 187/9 269/2 283/11
**Um [3]** 83/9 87/4 153/23
**Um-m-m [3]** 83/9 87/4 153/23
**unable [1]** 278/2
**unaware [1]** 105/20
**unclear [1]** 27/20
**uncovered [1]** 199/16
**undated [1]** 210/9
**under [16]** 13/23 17/22 29/20 69/15 109/25 166/11 172/6 172/10 174/3 209/6 220/2 255/8 257/17 259/6 268/7 287/11
**undergrad [3]** 74/10 74/17 193/7
**undergraduate [2]** 4/17 273/20
**underlie [3]** 25/12 25/20 66/10
**underlies [1]** 246/24
**underlined [1]** 211/4
**underlying [6]** 151/18 173/1 173/9 173/14 206/5 247/7
**underneath [2]** 65/20 211/3
**underscores [1]** 31/14
**underserved [1]** 194/24
**understand [80]** 5/19 6/18 14/24 17/24 21/12 27/10 27/12 27/20 30/16 35/18 37/6 40/23 41/3 41/8 41/17 44/24 45/1 45/20 45/21 45/23 47/11

U

**understand... [59]** 48/12 48/22 53/15 58/9 59/12 60/25 61/5 62/19 62/20 63/16 64/7 66/15 67/7 67/10 69/3 70/23 72/6 72/9 72/12 72/15 77/25 81/10 81/11 93/18 144/11 148/18 148/24 152/18 156/25 159/18 161/25 172/4 191/13 192/12 199/13 206/1 208/22 211/24 218/1 223/22 228/16 229/1 229/11 232/18 232/20 232/21 238/16 242/19 246/13 246/13 252/22 253/21 254/1 260/18 265/20 272/21 286/14 286/16 287/11
**understandable [2]** 62/12 286/8
**understanding [13]** 14/19 29/3 41/21 57/6 59/11 63/19 104/9 153/5 177/23 199/10 229/11 229/19 274/13
**understands [2]** 228/6 286/15
**understood [12]** 36/22 66/13 66/14 66/18 66/23 67/6 69/6 87/14 116/2 116/2 125/6 254/6
**undertake [1]** 58/23
**undisclosed [1]** 189/17
**unfair [3]** 26/15 132/23 212/23
**unfairly [1]** 258/8
**unfortunate [1]** 211/23
**unfortunately [4]** 126/4 168/23 200/20 208/21
**unintelligible [3]** 197/7 219/5 219/8
**unintentional [1]** 183/17
**unit [3]** 198/17 215/22 216/9
**UNITED [4]** 1/1 1/12 28/22 246/5
**units [2]** 216/19 217/1
**University [9]** 4/1 4/14 4/19 74/10 74/12 145/13 193/6 193/8 273/19
**unknown [1]** 122/4
**unless [3]** 12/11 202/23 228/21
**unlike [1]** 17/12
**unlikely [16]** 6/17 21/12 22/10 25/3 28/3 35/17 40/23 41/3 41/7 41/17 45/1 45/3 47/10 64/6 72/9 72/15
**unmistakable [3]** 149/9 149/9 272/5
**unobserved [1]** 188/23
**unrelated [1]** 119/19
**unreported [1]** 151/15
**unsafe [1]** 212/2
**unsophisticated [1]** 60/3
**until [10]** 17/2 27/8 75/15 86/18 98/4 99/23 126/14 133/3 202/13 284/15
**up [148]** 7/11 8/5 8/11 8/12 17/4 18/10 20/1 20/18 25/20 28/1 31/24 35/12 37/5 38/12 53/20 53/23 53/23 53/25 54/2 54/4 54/7 54/11 55/21 55/22 55/22 64/11 64/19 68/20 69/11 69/12 73/6 74/20 78/6 78/23 78/25 79/13 80/19 81/19 84/25 88/1 90/10 92/4 93/14 94/24 95/3 104/22 105/3 106/25 109/2 113/24 114/1 114/6 114/7 114/11 114/12 114/17 114/20 115/5 115/8 115/22 119/4 119/5 119/12 121/13 125/22 130/16 131/1 133/17 140/12 140/18 140/22 142/6 142/23 144/22 146/9 154/24 157/3 159/12 161/15 163/3 163/15 165/16 167/3 167/17 170/8 177/15 180/10 180/14 183/4 184/25 187/11 203/22 205/4 205/21 207/25 210/5 210/20 210/25 213/17 215/14 216/5 217/9 218/2 219/3 220/21 224/20 229/5 229/7 229/7 229/7 229/7 229/20 229/21 230/19 232/18 236/1 237/15 237/20 237/25 240/17 241/3 241/11 241/17 242/4 245/11 245/22 248/20 249/16 250/9 250/21 257/1 260/23 263/1 263/18 270/4 271/3 271/9 271/12 272/14 272/22 273/3 281/9 281/15 282/12 284/24 285/18 286/1 287/3
**up more [1]** 20/18
**update [1]** 228/4
**updated [1]** 110/24
**updates [2]** 179/8 179/9
**upon [1]** 266/18
**upset [3]** 100/19 201/21 264/5
**upsetting [1]** 211/21
**urged [2]** 156/7 160/24
**us [55]** 22/18 24/7 25/13 56/14 56/19 59/25 61/9 62/15 66/22 73/22 73/23 74/4 74/13 74/13 75/23 76/23 78/17 82/5 82/15 82/16 91/10 93/10 93/16 96/6 100/11 108/13 108/14 108/22 109/15 112/13 113/12 124/7 125/1 126/4 131/16 161/24 162/24 175/12 176/17 188/14 194/20 201/18 204/23 208/16 208/17 210/2 212/25 213/1 228/22 238/8 238/11 251/8 273/7 278/2 287/11
**use [36]** 9/15 9/22 14/9 14/10 20/4 32/5 32/16 41/7 44/11 44/17 47/1 95/20 108/16 117/13 126/2 129/18 161/2 180/3 180/7 183/11 184/12 245/8 245/9 245/13 245/15 261/8 262/19 262/20 269/13 270/5 277/16 285/23 286/1 286/4 286/12 286/17
**used [34]** 6/18 15/17 21/13 27/2 33/15 35/18 39/15 40/16 41/4 41/5 41/11 43/5 47/1 47/14 48/6 51/23 52/4 56/5 60/12 67/5 69/14 72/10 111/15 111/20 111/24 147/8 150/10 170/17 174/24 179/21 179/24 268/6 275/4 282/20
**useful [2]** 47/5 68/9
**user [7]** 8/14 11/6 19/12 27/10 30/13 45/8 179/17
**users [4]** 38/20 58/16 58/17 58/20
**uses [2]** 18/13 245/6
**using [19]** 29/17 53/7 53/24 55/18 59/12 100/12 116/25 117/1 117/21 175/3 180/19 180/21 184/6 219/5 250/16 250/17 270/1 275/6 289/11
**Usually [1]** 182/18
**utilized [1]** 118/8

V

**valid [2]** 165/14 277/21
**validated [1]** 234/12
**validation [1]** 175/19
**valuable [8]** 164/2 164/6 165/6 165/12 254/21 254/21 254/22 254/22
**valuative [9]** 54/14 54/15 54/17 55/3 55/15 55/19 55/24 71/4 71/7
**value [33]** 9/5 9/5 18/12 29/22 69/17 95/6 95/21 96/3 96/10 104/15 104/17 104/19 105/5 105/24 106/3 118/10 141/25 142/9 144/18 147/17 152/5 159/13 164/1 164/8 164/13 164/16 164/25 165/4 166/15 197/4 262/21 272/11 282/24
**values [1]** 154/1
**Van [4]** 83/1 144/16 145/2 145/3
**variables [2]** 114/15 115/18
**variations [1]** 120/23
**varies [1]** 93/6
**variety [15]** 20/3 23/2 31/13 34/12 42/6 44/8 45/6 68/2 76/16 76/21 78/4 114/15 115/18 117/3 191/25
**various [7]** 21/8 23/2 81/24 113/11 128/13 178/6 191/22
**Varsagi [2]** 100/22 100/25
**varying [1]** 109/24
**vast [1]** 112/1
**vendor [1]** 108/16
**verbalized [1]** 87/14
**verbatim [4]** 91/10 98/2 123/1 123/6
**verify [1]** 256/20
**verifying [1]** 195/20
**version [2]** 22/24 27/2
**versus [1]** 284/1
**very [62]** 22/12 41/5 45/18 47/24 47/24 52/17 61/7 61/9 68/9 69/12 76/5 77/13 82/3 93/9 93/24 96/4 97/10 115/7 115/7 116/7 116/15 123/10 133/20 137/14 138/8 138/9 141/16 142/1 142/12 147/17 152/21 152/24 155/23 156/10

**V**

**very... [28]** 165/3 174/8 176/15 177/18 177/19 178/16 181/25 184/19 186/18 186/19 188/18 188/19 194/23 195/17 207/7 211/21 212/23 219/12 232/17 236/22 245/12 255/9 267/16 268/10 270/8 278/18 285/12 289/9
**via [2]** 96/6 220/7
**vice [4]** 81/25 249/23 250/1 250/2
**vice-president [3]** 249/23 250/1 250/2
**video [11]** 3/2 3/4 34/15 34/17 122/10 144/17 145/3 220/8 242/20 243/17 280/6
**videos [1]** 200/4
**view [11]** 11/4 23/6 23/6 23/8 25/15 25/17 56/17 160/5 160/7 182/24 214/22
**viewed [7]** 13/12 24/9 24/16 24/23 35/4 38/23 56/20
**views [4]** 34/16 60/15 170/12 182/13
**Virginia [2]** 176/10 183/3
**visible [2]** 23/12 154/22
**visit [1]** 109/19
**visitors [1]** 75/19
**visits [3]** 77/5 77/5 115/13
**visual [2]** 42/12 54/24
**vital [1]** 95/14
**voicing [1]** 83/5
**volume [23]** 91/9 114/2 114/15 114/16 118/5 118/6 118/16 118/21 119/2 119/4 119/4 119/9 120/2 120/6 120/23 120/25 121/2 121/3 121/11 121/11 121/13 123/24 143/17
**volumes [14]** 90/6 90/8 90/12 90/15 90/18 91/1 91/3 97/20 115/21 117/2 117/3 119/8 121/15 123/11
**voluntarily [1]** 179/13
**voluntary [11]** 106/1 106/20 106/24 107/10 142/18 142/20 201/23 212/25 224/5 228/14 257/23
**volunteer [5]** 176/6 176/7 179/3 186/14 192/10
**volunteered [1]** 74/16
**vote [3]** 182/25 182/25 183/1
**VP [3]** 209/18 228/1 228/2
**Vredenburgh [5]** 15/10 15/16 19/12 19/21 30/10

**W**

**waiting [3]** 20/3 178/24 209/19
**waive [2]** 26/17 243/3
**walk [16]** 7/4 22/15 22/18 24/7 53/14 74/4 74/13 90/15 90/15 90/22 91/3 121/16 122/7 205/11 206/6 207/7
**walk-in [4]** 90/15 90/22 91/3 122/7
**walk-ins [5]** 90/15 121/16 205/11 206/6 207/7
**walked [1]** 53/17
**Wang [2]** 226/25 227/3
**want [93]** 17/17 18/3 18/21 20/8 20/21 30/20 33/25 37/6 41/13 51/14 51/21 53/11 53/14 56/2 69/7 69/12 72/4 73/25 87/9 90/14 91/13 95/1 99/2 101/21 103/18 105/25 107/11 107/12 107/13 107/14 108/14 112/15 113/19 114/4 116/24 117/6 118/11 128/7 133/20 134/4 139/15 140/4 144/22 150/18 152/21 153/25 160/15 161/10 163/4 177/20 183/4 186/1 186/3 186/20 187/12 188/14 188/20 191/3 196/5 196/6 196/7 202/20 204/22 217/6 218/23 230/9 231/24 233/1 242/15 243/7 245/22 247/25 248/24 251/17 251/21 258/6 258/18 263/16 265/9 267/4 267/12 267/18 267/20 268/16 268/19 269/8 271/13 274/13 284/23 286/21 286/25 287/4 289/9
**want to [1]** 187/12
**wanted [14]** 78/7 87/14 105/23 161/23 174/19 197/2 197/4 200/12 231/17 231/24 249/17 251/8 280/12 286/7
**wants [3]** 229/14 249/17 286/20
**was [463]**
**wash [2]** 166/13 166/21
**washing [32]** 18/3 18/7 18/11 18/19 19/4 19/6 64/11 64/13 79/3 79/3 79/14 79/17 166/15 166/18 197/14 198/16 236/11 236/22 237/1 258/25 259/2 259/3 260/4 260/6 260/7 260/8 260/18 260/21 261/2 262/3 262/11 263/4
**Washington [1]** 1/19
**wasn't [11]** 77/25 102/23 126/7 126/17 126/22 153/23 179/12 197/4 225/5 275/17 286/22
**waste [1]** 186/3
**watch [1]** 280/6
**water [1]** 35/20
**way [44]** 9/13 17/10 17/20 23/15 23/18 30/12 31/9 40/3 40/6 40/7 42/1 46/20 47/4 47/9 49/12 59/7 60/6 64/19 66/12 66/16 69/6 112/5 112/12 116/8 120/18 124/20 132/11 134/9 149/9 150/10 154/1 174/11 177/24 184/12 195/18 228/6 231/4 231/6 232/6 235/23 261/22 261/25 267/16 285/11
**Wayne [3]** 204/5 204/15 225/16
**ways [12]** 17/12 19/23 21/8 34/2 37/23 37/25 38/4 55/19 116/22 181/8 181/10 247/10
**WBMC [2]** 119/25 120/1
**we [696]**
**We'll [3]** 45/19 242/22 252/18
**we're [5]** 45/2 77/14 176/21 195/11 238/19
**we've [6]** 42/15 49/25 84/1 84/2 195/5 205/5
**wealthy [1]** 194/23
**web [4]** 13/4 38/4 38/22 60/2
**website [83]** 7/5 7/25 8/5 14/19 19/24 20/24 27/9 27/11 27/23 31/9 32/9 33/6 33/23 34/4 35/10 36/20 36/25 37/3 37/5 38/18 39/1 40/13 40/14 40/18 40/24 40/25 41/24 42/3 42/6 42/7 44/20 44/25 45/8 45/8 45/21 47/2 47/11 48/12 48/19 48/23 49/2 49/22 50/9 54/13 56/9 57/12 57/16 58/17 59/2 59/12 59/18 59/24 61/1 62/11 62/20 68/21 72/14 111/4 154/22 155/2 180/14 219/19 229/3 229/4 229/5 229/14 229/18 229/22 230/3 230/6 240/24 240/25 240/25 241/5 241/8 241/9 241/17 248/4 258/20 259/6 259/21 284/3 285/21
**websites [10]** 20/16 38/20 42/8 42/20 42/23 47/2 54/24 56/4 229/10 229/18
**week [4]** 232/5 242/12 244/9 288/17
**weeks [10]** 38/15 38/17 77/11 116/12 147/7 207/23 207/23 242/10 265/10 288/12
**weight [4]** 172/6 174/3 236/2 236/5
**welcome [2]** 94/23 242/22
**well [99]** 4/19 4/22 6/23 7/23 12/17 13/13 15/17 16/14 29/18 30/25 32/2 32/21 33/18 34/19 34/19 36/1 39/3 40/16 43/22 44/23 45/6 47/1 49/3 50/19 51/8 54/21 55/4 56/17 57/12 59/1 60/15 63/18 64/4 66/10 67/6 68/2 68/12 68/12 69/15 79/1 81/12 81/19 81/24 82/18 82/23 83/10 87/25 89/24 90/14 96/11 97/10 117/5 117/14 122/23 123/10 132/23 136/9 138/9 149/8 155/8 155/14 155/20 156/1 157/14 159/23 159/24 162/13 168/3 172/10 174/3 174/24 175/13 178/21 179/18 180/5 186/3 188/22 190/16 191/1 191/22 194/8 194/19 201/12 214/8 216/6 219/5 231/12 237/13 238/7 238/22 242/6 260/14 263/23 267/7 267/18 272/5 276/11 283/9 286/21
**well-used [1]** 47/1
**went [33]** 7/10 24/13 26/8 38/7 38/16 38/17 38/21 39/1 39/6 45/8 47/15 56/14 56/16 56/17 59/4 59/5 63/3 68/14

**W**


**went... [15]** 105/7 117/5 155/3 169/13 193/7 200/13 201/24 218/13 219/3 234/25 265/7 268/12 269/6 273/19 281/6
**Wenthold [4]** 252/15 252/16 252/19 255/5
**Wenthold's [2]** 254/3 254/4
**were [194]** 26/7 32/18 39/4 39/22 39/24 41/5 49/7 49/11 51/12 56/11 57/3 57/10 58/1 58/16 59/21 60/2 60/19 60/23 61/1 61/2 68/16 68/25 70/17 71/4 71/25 73/6 78/11 79/18 81/15 82/3 82/22 82/23 83/16 86/17 86/17 89/18 90/16 91/11 99/4 99/8 100/1 100/2 100/7 100/12 100/19 101/7 101/15 101/18 101/23 102/1 102/14 103/9 104/13 104/15 116/3 119/8 120/6 120/20 121/6 122/21 123/1 123/11 123/11 125/7 125/11 129/7 129/11 130/14 135/18 139/2 139/21 141/13 142/16 142/18 142/24 143/5 143/19 144/2 144/12 146/4 150/5 152/24 152/25 153/1 153/1 153/2 153/3 160/25 161/19 161/24 167/15 168/12 169/9 169/11 170/3 171/14 175/4 177/11 178/17 183/5 183/8 184/5 186/12 190/8 190/9 191/3 191/25 192/1 196/20 196/24 197/13 197/23 198/7 200/1 200/6 202/19 202/21 209/7 211/11 211/18 211/25 212/1 213/9 213/14 214/25 218/7 219/14 219/17 219/23 220/14 224/1 224/2 224/4 226/8 227/3 228/8 228/23 231/23 232/25 232/25 234/4 234/8 234/15 235/2 235/19 235/19 236/11 236/14 237/3 237/13 239/8 239/13 240/8 240/16 240/24 242/9 245/1 248/1 253/15 253/15 253/16 253/20 253/20 253/24 253/24 254/24 263/11 264/9 266/24 269/21 272/1 275/7 275/20 276/5 276/18 276/24 277/13 277/15 278/12 279/14 279/17 279/19 279/22 279/25 280/4 280/16 280/24 283/6 283/25 284/1 284/2 284/4 286/6 287/7
**weren't [10]** 39/23 57/5 58/8 100/1 102/1 237/1 240/16 260/12 260/23 275/6
**WEST [116]** 1/2 1/8 2/7 3/3 3/4 3/5 52/25 72/25 73/14 73/17 74/22 75/16 75/23 75/25 76/10 76/13 76/23 77/4 77/7 77/15 78/13 78/20 79/3 80/21 81/6 81/8 82/10 83/7 83/13 83/20 84/20 85/5 87/10 88/8 88/10 88/16 88/23 89/1 89/22 89/25 90/11 90/15 91/22 92/7 93/5 95/4 95/25 96/19 96/22 96/25 97/5 97/19 97/24 99/13 101/25 102/16 102/19 103/5 103/12 104/10 104/17 104/21 105/1 105/7 105/13 105/21 106/2 106/4 106/15 108/2 109/4 109/13 109/18 112/25 113/19 114/19 115/13 117/1 118/20 118/21 120/10 121/15 121/23 122/24 123/3 123/5 125/14 125/25 126/1 126/14 126/15 126/23 127/1 127/4 127/5 127/12 129/6 130/17 131/10 131/11 134/4 134/22 138/15 140/5 140/25 143/2 143/23 199/8 199/14 207/9 210/23 213/10 214/11 217/7 220/4 220/7
**Wharton [2]** 4/1 4/14
**what [373]**
**what's [2]** 59/16 206/13
**whatever [7]** 51/23 52/4 52/8 117/15 230/4 231/11 266/19
**whatsoever [2]** 103/24 140/2
**when [139]** 5/7 6/10 8/11 8/14 9/9 9/15 10/18 10/22 15/18 16/15 19/12 20/1 20/15 29/8 30/11 30/12 30/15 32/15 32/18 34/22 37/4 38/13 43/23 43/25 44/5 44/24 45/20 53/8 53/14 54/10 55/7 55/14 61/1 62/20 62/21 65/23 73/17 74/15 74/23 78/17 81/5 81/8 84/9 84/22 85/13 87/23 89/23 93/7 94/24 95/8 96/9 96/16 97/14 99/4 100/6 101/3 101/10 101/11 101/12 101/20 101/21 102/4 102/19 103/7 106/13 115/19 119/1 120/17 121/18 130/5 130/20 131/20 135/3 135/17 135/22 139/12 139/14 140/11 144/3 150/7 159/14 167/14 177/12 180/18 181/6 181/6 186/16 187/15 188/16 188/21 192/14 193/22 195/23 196/18 197/13 198/5 198/7 199/2 200/12 201/18 202/3 202/5 202/13 202/18 203/17 203/22 204/9 204/11 205/9 207/10 207/22 210/11 210/20 218/17 226/3 227/8 231/11 231/12 232/3 235/22 237/11 239/21 240/1 245/1 252/25 256/4 261/9 261/9 261/11 268/10 270/18 275/20 277/14 277/19 279/22 280/24 282/21 287/7 287/16
**whenever [1]** 218/16
**where [50]** 7/11 8/5 10/16 11/6 16/3 16/11 22/13 27/4 31/10 32/22 33/6 34/20 37/9 38/23 41/20 42/11 47/19 48/1 55/21 61/8 69/14 81/2 127/2 132/5 132/21 134/24 138/7 138/14 171/14 172/21 179/21 183/23 184/11 197/2 214/12 221/7 222/10 233/9 233/10 236/17 234/24 235/5 243/9 255/13 259/12 274/10 275/12 277/15 281/7 286/12
**whereas [1]** 14/14
**Whereupon [2]** 85/25 210/13
**whether [68]** 9/24 10/4 12/5 14/24 20/2 33/19 44/19 45/7 45/10 45/12 45/16 45/20 47/3 47/4 47/14 47/15 48/11 48/14 48/21 49/21 50/13 51/4 52/10 55/13 55/18 57/9 58/12 58/16 58/20 59/8 59/14 59/17 59/20 60/2 60/24 62/12 64/4 64/5 66/12 66/14 66/23 69/5 72/5 72/12 85/21 95/25 104/20 105/1 114/19 124/19 128/8 129/7 133/25 155/8 186/9 187/3 219/17 228/6 229/1 229/23 246/19 256/20 257/9 260/12 260/14 260/21 261/6 261/11
**which [68]** 5/14 7/14 9/20 13/24 14/6 14/20 20/13 21/9 26/16 27/2 28/21 28/23 35/1 40/15 41/1 49/15 63/12 63/20 65/24 73/5 76/18 89/12 95/11 96/14 101/14 106/12 110/5 113/12 119/21 121/7 122/4 124/8 126/16 152/5 159/15 160/1 162/15 164/7 171/1 175/7 175/20 184/25 188/1 188/3 188/11 191/25 192/1 203/19 205/4 206/5 212/22 214/10 214/22 216/5 223/15 233/5 233/12 235/23 238/1 242/3 243/11 247/15 252/15 270/11 273/7 274/19 275/5 281/24
**while [10]** 6/16 70/6 74/16 78/25 272/5 273/22 274/21 283/12 286/7 287/3
**White [5]** 85/20 134/19 134/20 134/25 136/4
**White's [1]** 135/25
**who [88]** 3/11 19/21 24/13 24/14 24/16 25/15 26/1 38/25 39/1 39/4 56/14 59/3 59/22 59/23 60/1 60/11 73/3 81/22 82/6 83/1 83/3 85/13 85/13 85/21 86/24 89/1 89/11 97/22 100/21 102/7 105/16 107/13 108/12 111/23 122/8 125/14 125/15 126/18 128/18 129/7 130/3 131/3 133/19 134/12 134/15 136/13 136/17 136/24 137/15 137/17 138/5 144/12 150/7 156/20 157/10 157/12 181/2 183/21 188/7 188/8 188/17 188/17 188/18 190/24 201/19 210/10 210/10 213/18 221/21 226/12 231/13 231/15 231/20 232/22 232/23 232/23 232/25 236/14 255/11 263/10 268/5 268/12 270/10 275/17 275/17 278/4 285/4 285/5
**who's [1]** 203/3
**whoever [1]** 211/15
**whole [8]** 22/25 23/3 39/7

W

**whole... [5]** 55/10 200/20 201/22 201/24 268/4
**wholly [1]** 247/12
**whom [1]** 128/8
**why [50]** 6/6 7/12 15/21 21/19 29/2 29/5 30/3 63/14 68/1 69/16 70/15 71/2 73/20 81/11 82/13 85/13 87/3 91/8 102/14 102/14 102/16 113/12 115/22 123/4 141/12 144/23 161/20 188/11 188/12 189/1 189/11 189/15 190/4 199/10 203/11 212/17 218/20 231/13 232/25 233/1 233/16 233/20 233/21 238/1 250/25 251/18 260/24 261/5 283/15 286/4
**wide [5]** 76/16 76/21 78/4 114/15 115/18
**will [93]** 3/2 3/10 3/11 3/14 7/24 8/11 9/14 9/21 10/13 16/13 23/16 24/21 36/3 36/7 39/14 70/2 72/12 73/2 73/9 74/1 79/1 85/3 85/23 89/14 94/5 95/3 97/11 97/18 97/20 97/21 97/24 99/9 109/25 114/4 115/23 116/4 117/12 118/19 120/1 120/12 121/13 123/4 127/12 133/1 133/5 133/6 139/21 142/6 144/14 144/20 145/1 145/11 156/7 156/23 156/25 157/14 158/21 162/5 163/15 167/3 176/17 178/9 178/23 178/25 185/5 188/1 196/13 204/24 206/24 212/12 216/21 228/24 229/16 229/17 229/20 242/25 243/12 243/13 243/16 244/2 244/8 247/16 247/16 252/20 252/21 252/23 253/6 256/22 259/13 268/16 268/17 281/19 281/20
**Williams [1]** 83/1
**willing [2]** 116/18 247/9
**Wilson [1]** 2/3
**window [1]** 49/15
**wing [2]** 268/7 287/11
**wise [1]** 287/6
**with Orville [1]** 162/15
**with whatever [1]** 266/19
**withdraw [1]** 26/17
**withdrawing [1]** 116/6
**within [8]** 12/4 28/6 141/6 181/7 207/23 232/5 238/22 238/22
**without [7]** 11/19 20/12 62/1 97/23 182/16 214/7 214/19
**witness [27]** 3/8 3/13 4/3 5/11 25/5 36/6 72/24 73/12 98/5 145/6 147/25 148/9 148/10 148/13 174/5 193/2 213/3 238/16 241/4 243/14 243/16 244/8 244/17 266/8 266/11 273/12 287/23
**witnesses [2]** 244/4 244/6
**woke [1]** 31/24
**woman [2]** 85/19 188/7
**won't [3]** 9/21 117/8 127/23
**wonderful [1]** 77/8
**WOOD [1]** 2/1
**word [24]** 34/19 40/16 41/7 41/10 51/19 52/4 72/1 72/2 156/23 157/9 161/2 176/21 179/21 180/4 180/19 186/1 206/20 249/9 282/20 286/2 286/4 286/12 286/13 286/17
**wording [4]** 64/3 64/5 284/24 286/11
**words [9]** 41/5 50/23 51/23 53/24 153/23 164/23 165/11 285/23 286/23
**work [26]** 4/23 22/20 39/15 42/8 42/10 42/10 43/5 43/6 43/6 43/13 43/19 43/24 44/17 60/12 117/21 117/23 146/21 179/15 179/16 182/21 187/4 187/5 222/25 254/10 265/16 273/24
**workbook [1]** 126/12
**worked [7]** 39/17 74/18 193/10 273/21 273/22 274/21 280/11
**workers [2]** 74/7 261/6
**working [11]** 112/4 112/17 118/21 126/1 193/22 213/10 245/16 285/13 285/15 288/4 288/9
**works [5]** 43/7 131/5 146/19 260/6 261/8
**world [1]** 264/19
**worries [1]** 35/16
**worse [4]** 12/6 14/21 18/14 212/12
**worst [9]** 19/15 31/13 34/16 65/20 66/2 66/14 235/3 236/5 259/25
**worth [1]** 68/9
**would [193]** 7/5 11/6 11/7 11/12 15/16 17/3 17/11 18/18 19/9 19/14 19/15 19/16 19/18 23/19 24/11 26/21 27/10 27/12 27/20 28/3 28/3 30/13 33/4 40/21 44/14 44/21 45/10 45/11 45/11 45/12 45/19 45/21 48/20 49/16 49/18 49/24 50/3 52/10 53/20 53/20 54/12 54/16 54/19 56/23 57/3 59/7 59/25 60/20 61/3 61/23 66/6 66/16 66/19 67/13 67/25 68/7 69/5 70/13 70/14 70/15 78/8 81/20 84/5 85/16 86/16 87/8 87/18 90/10 90/21 91/2 91/6 96/5 105/18 106/14 108/2 111/20 112/1 112/19 116/18 125/8 125/12 125/22 126/16 131/18 132/10 132/18 139/11 139/13 143/9 145/17 148/8 150/2 151/12 152/13 155/22 156/4 166/6 166/9 166/12 166/17 167/17 168/2 169/8 170/19 175/16 175/23 178/14 179/13 179/15 180/3 182/17 182/18 182/19 184/7 187/2 187/23 188/8 189/3 189/13 189/14 190/22 192/11 195/19 201/25 203/21 205/8 206/10 207/2 208/1 208/20 214/15 214/22 215/11 215/14 217/10 218/13 219/1 219/12 220/2 220/5 220/5 220/17 220/23 221/20 221/21 223/4 226/12 227/25 228/15 230/4 230/6 234/5 240/21 240/21 241/18 241/21 242/16 243/21 243/24 244/3 244/6 246/14 247/9 248/17 248/20 251/13 252/14 253/21 254/1 256/24 257/15 262/23 263/18 265/14 265/20 266/20 266/21 267/25 270/15 270/23 271/7 273/7 274/18 274/18 275/16 275/17 275/19 277/17 282/2 282/5 282/11 282/17 288/2
**wouldn't [18]** 16/16 22/5 23/1 58/4 66/15 70/13 102/4 107/4 122/17 125/10 160/8 208/18 240/22 243/3 266/22 267/14 267/16 288/14
**wound [1]** 87/16
**wrap [1]** 35/12
**wrapped [1]** 94/24
**write [9]** 135/10 164/23 166/3 180/18 208/24 232/9 258/6 259/18 286/21
**writes [2]** 249/11 265/13
**writing [6]** 73/9 95/10 140/2 153/14 153/19 153/21
**written [7]** 6/3 85/19 147/14 152/18 179/21 227/2 267/23
**wrong [8]** 125/6 185/13 186/22 223/2 223/4 267/15 268/1 268/2
**wrote [13]** 136/4 137/15 170/6 170/7 211/2 222/11 231/13 231/13 255/20 256/2 257/13 266/6 269/23

Y

**yard [1]** 180/9
**yeah [9]** 14/5 30/12 58/11 72/2 185/12 195/19 201/4 204/17 244/2
**year [34]** 75/7 77/4 126/14 151/16 151/17 158/21 178/2 178/3 178/7 179/7 194/19 201/8 202/1 202/9 204/9 204/12 204/12 205/10 206/12 207/3 207/3 207/4 207/11 207/11 210/21 212/10 212/16 212/16 212/16 216/24 237/6 257/23 262/24 267/10
**year's [2]** 278/10 281/7
**years [15]** 74/7 102/11 115/1 145/15 158/20 175/6 193/11 193/11 194/5 194/22 201/17 219/14 265/16 279/22 280/11
**yellow [1]** 9/6
**yes [537]**
**yet [8]** 12/10 157/14 168/3 189/16 209/16 245/22 245/23 278/15
**York [3]** 201/20 204/19 226/17
**you [1646]**

**Y**

**you attend [1]** 278/22
**you getting [1]** 270/18
**you orient [1]** 11/16
**you suggest [1]** 247/6
**you'd [4]** 135/12 137/12 139/20 140/12
**You'll [1]** 156/22
**you're [3]** 58/25 117/21 237/15
**You've [2]** 145/20 153/19
**younger [2]** 77/1 77/3
**your [492]**
**yours [1]** 108/18
**yourself [9]** 3/24 4/12 42/8 42/13 42/22 43/3 245/16 280/18 281/12

**Z**

**zero [8]** 19/1 162/25 185/18 185/19 185/21 186/5 186/10 216/19
**ZIBAS [1]** 2/2
**zoom [3]** 205/8 210/25 249/1
**zoomed [1]** 22/24

# TRIAL TRANSCRIPT
# VOLUME 3

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-CV-80526-MIDDLEBROOKS

**GOOD SAMARITAN MEDICAL CENTER, INC. et al,**

**Plaintiffs,**

vs.

**THE LEAPFROG GROUP,**

**Defendant.**

West Palm Beach, FL
January 21, 2026

BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

FOR THE PLAINTIFFS:

**MARY BETH MALONEY, ESQ.**
**KEVIN SIMMONS, ESQ.**
**SYDNEY A. SCOTT, ESQ.**
**LEE R. CRAIN, ESQ.**
**SCOTT K. HVIDT, ESQ.**
**Gibson, Dunn & Crutcher LLP**
**1700 M Street NW**
**Washington, DC 20036**
202-887-3729

**JEFFREY E. MARCUS, ESQ.**
**Marcus Rashbaum Pineiro & Meyers LLP**
**2 S Biscayne Boulevard**
**Suite 250**
**Miami, FL 33131**
**305-400-4260**

**FOR THE DEFENDANT:**

**KIMBERLY E. BLAIR, ESQ.**
**COURTNEY WOOD, ESQ.**
**JURA ZIBAS, ESQ.**
**MAXWELL BILLEK, ESQ.**
**Wilson Elser Moskowitz**
**Edelman & Dicker LLP**
**161 N Clark Street**
Suite 4500
**Chicago, IL 60601**
312-704-0550

**Official Court Reporter:**

**Pauline A. Stipes**
West Palm Beach/Ft. Pierce, FL
HON. DONALD M. MIDDLEBROOKS
561-803-3434

THE COURT: Okay, please be seated.

Good evening. Let's continue.

By the way, I have a couple hearings at 11:30 and 11:45, so we will probably recess for you all from 11:30 to 12:30, so you can get an early lunch and we will be back on schedule. But let's proceed.

MS. BLAIR: Thank you, Your Honor. I would like to introduce my colleague, Kevin Riley, who will be introducing the Austin deposition designations and this is first appearance. Thank you very much.

MR. RILEY: Good morning, Your Honor.

THE COURT: Good morning.

MR. RILEY: We will start with Plaintiffs' designated testimony of Dr. Matt Austin, he is a professor at Johns Hopkins University, he serves as a grant lead for the grant between Johns Hopkins and Leapfrog Group. We have affirmatively designated ten minutes and the opposing side has counter designated with 11 minutes.

THE COURT: All right. Great.

(Video played.)

MR. RILEY: Your Honor, we call Karen Jupiter.

MS. MALONEY: That is my fault, I am so sorry.

(Witness sworn.)

MR. CHUNG: May it please the Court.

THE COURT: Please proceed.

DIRECT EXAMINATION.

BY MR. CHUNG:

Q. Good morning, Ms. Jupiter.

You have been Leapfrog's Vice President of Development since 2021; is that correct?

A. Correct.

Q. And in that role, you believe Leapfrog's primary strategy, the donor admissions, special events and overall communications; is that correct?

A. Yes, though my role in communications is pretty limited, they focus on development.

Q. Now let's start with a document. Mr. Chauncey, would you put Plaintiffs' Exhibit 354.1 which has been admitted already.

Now Mr. Jupiter, this is Leapfrog's long range strategic intent plan for fiscal year 2026 through 2032; is that correct?

A. Yes.

Q. And you and I went over this document during you deposition back on September 5, 2025; do you recall that?

A. Yes.

Q. All right. So, the document or the plan lists the most important goals for Leapfrog's long range strategy, correct?

A. Yes.

Q. Now if we turn to page two of the document, the very first goal, the first objective of the document is expand revenues, correct?

A. Yes.
Q. That is expand Leapfrog's revenues; is that right?
A. Yes.
Q. And again, based on this document, expanding revenue includes expanding revenue from existing sources, correct?
A. Yes.
Q. And among those existing sources is licensing, right?
A. Yes.
Q. Talking about Leapfrog's licensing program, correct?
A. Yes.
Q. Now if we turn to page four, again the same document, Leapfrog's long term strategic plan, Leapfrog also wants more hospitals to participate in its hospital survey, right?
A. Yes.
Q. And, so, in order to reach -- in order for Leapfrog to raise revenue, Leapfrog needs more hospitals to respond to the survey, correct?
A. No.
Q. Your answer is no today?
A. No. Hospital solicitation doesn't correlate to revenue.
Q. All right. Do you recall testifying during your deposition when I asked you in order to achieve these objectives to raise revenue, you responded yes; do you recall that?
A. No.
MR. CHUNG: Your Honor, I would like to read from

deposition transcript of Ms. Jupiter for purposes of impeachment.

THE COURT: All right.

BY MR. CHUNG:

Q. So turning to your deposition back on September of 2025, transcript pages 130, pages five to 11, I asked you:

In order to achieve these objectives, right, to raise revenue, to have purchasers and health plans tie the hospital safety grades to payment decisions and in order to achieve these objectives that Leapfrog needs more hospitals to respond to the surveys, correct? And you answered yes.

MS. BLAIR: I'm going to object to improper impeachment. This is different question than what he asked her.

THE COURT: Overruled.

THE WITNESS: Yes, I mean, that is a different question. This says in order to achieve these objectives and there is a law with said objectives. That is not what you asked me.

Q. That was your testimony, correct?

A. Yes.

Q. All right.

Now, your responsibility for overall communications, and you mentioned that, it is more limited, right?

A. Right.

Q. Includes the hospitalsafetygrade.org website, correct?
A. Yes.
Q. And that website shows the consumers the safety grades that Leapfrog assigns to hospitals, correct?
A. Yes.
Q. And Leapfrog wants consumers to check the safety grades of their hospitals; is that right?
A. Yes.
Q. And leapfrog wants consumers to use those safety grades when they choose a hospital; is that right?
A. Yes.
Q. Leapfrog also wants visitors to the website to believe that the information on that website is accurate and transparent, right?
A. Yes.
Q. The website is designed to discourage visitors or consumers from going to another hospital, correct?
A. No, not necessarily.
Q. Okay. Do you recall, again, going back to your deposition in September of last year, testifying that, when I asked you the question:
Is the method designed here to discourage consumers from going to these types of hospitals, your answer was, to going to low grade hospitals, yes. Do you remember that testimony?
A. Not specifically.

MR. CHUNG: All right. Your Honor, impeachment again, I would like to read from the deposition transcript.

THE COURT: Proceed.

BY MR. CHUNG

Q. I am going to read from, again, your deposition transcript from September 5 of last year, transcript page 252, line 18 to transcript page 253, line five.

I asked you the question: Is the message designed here to discourage consumers from going to these types of hospitals, your answer was, yes, to going to low grade hospitals, yes. Do you remember that testimony?

A. I don't, I mean, there is more to that question, that's not what you're asking me. It says, is the message designed here, I don't know what that was referring to.

Q. But that was your testimony, correct?

A. That is what you just read.

Q. Okay. Now, leapfrog wants consumers to think that visiting a hospital with an F grade could seriously injure or even kill them, right?

A. That is what the information from Johns Hopkins is, yes.

Q. Well, was that your testimony in your deposition back in September, Ms. Jupiter?

A. What is your question?

Q. The question was, does Leapfrog want consumers visiting a hospital with an F grade could seriously injure or could kill

them?
A. Visiting any hospital when you are sick is a problem.
THE COURT: Hold the microphone toward you. Thank you.
MR. CHUNG: Your Honor, again, impeachment, I am just going to read, if I may, from the transcript again.
THE COURT: All right. I am unfamiliar with you having to ask my permission. Read the question as you see fit.
BY MR. CHUNG:
Q. So, from your deposition transcript, again, from September, page 253, lines 11 to 15, I asked you: Does Leapfrog want consumers to think that visiting a hospital with a C, D or F grade could seriously injure or even kill them. And your answer on that during your testimony was yes. Do you remember that?
A. I don't know what is that part of the message here is.
Q. Let's look at another document, Plaintiffs' Exhibit 850, which has been previously admitted. Ms. Jupiter, understanding your testimony earlier that your responsibility with respect to communications might be more limited, right, but you were involved in the press campaign around the release in the fall of 2024 for safety grades, right?
A. Depends on what was involved.
Q. Okay. Well, let's look at the document here. So this is Cure Strategies is Leapfrog's public relations form, correct?

A. Yes.
Q. And we are looking at an email from November '22 to 2024, from a Sarah Farinelli, at CURA Strategies, to you, Lauren Bailey, who I understand is your communications director, right?
A. Yes.
Q. And Nate Longmore who is a communications coordinator, correct?
A. He was, he's not now.
Q. But back then, at that time, he was a communications coordinator, correct?
A. Yes.
Q. And Sarah Farinelli is at CURA Strategies, correct?
A. Yes.
Q. So turn to page two of -- CURA is updating you, Ms. Gataray [sp] and Mr. Longmore on the first week of media coverage surrounding the fall 2024 --
A. Yes.
Q. And the executive summary, you are seeing increases across the board in online articles, print placements, dry task placements and press release pickups, correct?
A. Yes.
Q. And Ms. Farinelli or CURA collected all of this information, correct?
A. Correct.

Q. All of this intelligence information from out here in the media of coverage of the release of the fall safety grades, correct?
A. Yes.
Q. Fall of 2024, correct?
A. Yes.
Q. And it shows that 722 online articles from 435 different publications with a reach of 11.2 billion people had coverage on that first week; is that right?
A. Yes.
Q. And was the 160 print placements across several media markets; do you see that?
A. Yes.
Q. And then you actually see compared to the spring of 2024 safety grade with respect to the online articles, CURA is telling you there has actually been 6.4 percent increase, right?
A. Yes.
Q. And with respect to the unique printed placements, there has been so far two percent increase from that, correct?
A. Yes.
Q. And then just going on, 239 broadcast placements including 205 television placements across 55 stations and 34 radio placements across 16 stations and that is a 39 percent increase from the last cycle, correct?

A. Yes.
Q. All right. And then 444 press release pickups with a total potential audience of 162 million people; do you see that.
A. Yes.
Q. That is a 25 percent increase with this fall safety grade release relative or versus the last cycle in the spring of 2025, correct?
A. Yes.
Q. 2024?
A. Yes, right.
Q. Thank you. So, it is clearly, Ms. Jupiter, with this fall safety -- fall 2024 safety grade release, the media coverage, at least in the first week is significantly higher and broader than what it was for the previous cycle in the spring of 2024, correct?
A. It is higher, I don't know if you define it significantly.
Q. Okay. Can we go down just a bit. And one of the key message that then picked up that is getting mentioned more than in the previous cycle is hand hygiene. Do you see that? One of the bars, it has been highlighted here, hand hygiene, correct?
A. Yes.
Q. All right. And turning to page three under the heading Reach Insights, the highest number of articles covering these fall 2024 safety grades is in the State of Florida, correct?

A. Florida is always one of our highest.
Q. Okay. But including for this particular cycle, correct?
A. Yes.
Q. All right. So we can take that down.
You were also involved in Leapfrog's communications campaign after this particular lawsuit was filed, correct?
A. Again, depends what you mean by involved.
Q. Okay. Well, why don't we look at a document just to illustrate it.
Let's look at Plaintiffs' Exhibit 439.
So, Ms. Jupiter, during the course of your work at Leapfrog, you were using a messaging service called Slack to often communicate with your Leapfrog colleagues, correct?
A. Yes.
Q. And it is somewhat of a texting, would you say?
A. Yes.
Q. And you often messaged with your Leapfrog colleagues through the Slack platform at the same time you were participating in Zoom meeting conferencing, right?
A. Sometimes.
Q. Sometimes, correct. And what we are showing here, Plaintiffs' Exhibit 439.0 is a Slack messaging conversation between you, Mr. Longmore and Ms. Bailey who you already referenced on May 12, 2025, right?
MS. BLAIR: And Your Honor, we object to hearsay of

this document only to the extent for any comments made by Nate Longmore who is not here in court today.

THE COURT: All right. I overrule the objection with the same analysis as the previous objections with respect to the conversations between people including this declarant.

MS. BLAIR: Thank you, Your Honor.

MR. CHUNG: So, Your Honor, I move to admit Plaintiffs' Exhibit 439.0 in evidence.

THE COURT: 439 is admitted over objection.

(Whereupon Plaintiffs' Exhibit was admitted for Evidence.)

BY MR. CHUNG:

Q. So just to be clear, you, Ms. Bailey and Mr. Longmore were working for Leapfrog at the time of this conversation, correct?

A. Yes.

Q. Just to set the stage some more, this is a Slack conversation you had with just Ms. Bailey and Mr. Longmore, correct?

A. Yes.

Q. At the same time you are participating in a Zoom video conference; is that right?

A. I don't know, this is all I see here.

Q. Okay. Well, why don't we toggle through. Does that kind of refresh your recollection that there is a Zoom video conference going on at the same time you were texting with these folks, right?

A. I think so.
Q. Okay. But Ms. Binder is not on this slide, correct?
A. Correct.
Q. And is Ms. Binder on the video Zoom conference that you are participating in at the same time?
A. I think so.
Q. Now, if we turn to the bottom of page two of this chat, Ms. Bailey wrote to you and Mr. Longmore, Leah says she wants to know if we can do ads where someone search those five hospitals. It shows an ad with their safety grade label, right, you see that?
A. Yes.
Q. So Leah here is Ms. Binder; is that correct?
A. Yes.
Q. The President and CEO of Leapfrog, correct?
A. Right.
Q. So Ms. Binder wanted it so that if anyone searched any of the community hospitals here, Plaintiffs' hospitals on Google an ad showing their failing safety grade would pop up, correct?
A. It's nothing that she wanted, but she wants to know if that was something that can be done.
Q. Okay. She wants to know if that is something than can be done, correct?
A. Yes.
Q. And this was because Ms. Binder wanted to publicize the

hospital safety grades, correct?
A. You have to ask Ms. Binder.
Q. Okay. And by doing this, you wanted the public to believe that the community hospitals were not safe, correct?
MS. BLAIR: Objection to form, calls for speculation as to Ms. Binder.
THE COURT: Overruled.
THE WITNESS: Yes, not that I really know.
BY MR. CHUNG:
Q. Well, I am asking you what you know. I do envision that you wanted the public to know the hospitals were not safe?
A. That is not something that I wanted to do.
Q. Well, do you remember testifying during your deposition when I asked you: What did you understand the strategy behind this to be and you answered: We wanted to publicize their F grades and I asked you: For what purpose, and you answered: Because these hospitals were not safe and we wanted the public to know that. Do you recall that testimony?
A. I don't.
Q. Now, moving to the top of page two, when you first heard about Ms. Binder's wish, right, or plan, you wondered what the point of this was, right?
A. I was trying to understand it, yes.
Q. You wrote to your colleagues again, Ms. Bailey and Mr. Longmore, "Why, what would be the point", right?

A. Correct.
Q. And then Ms. Bailey agrees, right, she writes "I don't get it", right?
A. You are putting a lot of emphasis on those words.
Q. I'm just asking you is that what she said?
A. She said that I don't get it.
Q. And then Mr. Longmore chimes in and says, "Good question". You see that?
MS. BLAIR: Objection, hearsay.
THE COURT: Overruled.
THE WITNESS: That's what it says.
BY MR. CHUNG:
Q. Okay. And you continue, "Why", again, this time with two question marks, right, and "What for", right?
A. Yes.
Q. But you knew why because you then wrote that Ms. Binder, or you asked, "So she just wants to harass them", correct?
A. I am still trying to understand.
Q. Okay. But that is what you wrote, correct?
A. I wrote a question.
Q. And then Mr. Longmore writes back, "I love the strategy is to become a Disney villian", right? That is what he wrote, correct?
A. Yes.
Q. He is telling you that by targeting the community hospitals

with this Google ads tactic, Leapfrog is no better than a Disney villain, right?

MS. BLAIR: Your Honor, this is the exact hearsay that I objected to. Mr. Longmore is not here in court today, to the extent that he is asking for the truth of the matter asserted and then asking Ms. Jupiter to interpret that, I object to that as hearsay, that comment by Mr. Longmore.

THE COURT: Overruled.

BY MR. CHUNG:

Q. Is that correct?

A. You'll have to ask him.

Q. Okay. Leapfrog actually executed on this, correct?

A. On what?

Q. On this Google ads tactic, correct?

A. I need more specifics.

Q. Well, leapfrog actually followed through on what Ms. Binder was proposing here in this chat, correct, to put up whenever someone visits, whenever someone searches for one of these hospitals on Google that a ad would automatically pop up with the D or F grade, right?

A. That is not exactly how we got it to work.

Q. I am asking you, is that Leapfrog actually executing on that, correct?

A. I don't know specifically what we executed on.

Q. Okay. Well, let's take a step back. Google gives Leapfrog

a grant, correct?
A. Correct.
Q. And that grant, Leapfrog is supposed to spend on advertising, right, supposed to promote its non-profit mission, correct?
A. Correct, it is to support our mission.
Q. And then Leapfrog spent this non-profit grant, right, at least some of it from Google to put up these ad, right, that targeted the community hospitals, right?
A. I think we did that for a short time.
Q. Right. So I am now going to show you another exhibit, Plaintiffs' Exhibit 454.1, which is preadmitted. This is an email chain from a Noah Shelldren[sp] at Non-profit Megaphone?
A. Yes.
Q. And Mr. Shelldren and Non-profit Megaphone is the vendor that you used, right, to put your ads on Google, right?
A. Correct.
Q. That is the vendor that actually manages Leapfrog's Google ads, correct?
A. Correct.
Q. Now if we turn to page three, Mr. Longmore, your former colleague, writes, again, this is on May 12, "We would also like to set it up so that when someone searches for any of the five specific hospitals, it shows an ad displaying their hopsital safety grade", right?

MS. BLAIR: Your Honor, same hearsay objection with respect to Mr. Longmore's comment coming in for the truth of the matter.

THE COURT: Overruled.

BY MR. CHUNG:

Q. Right?

A. I mean, this is an email from Nate.

Q. That is what he wrote, correct?

A. I assume this is correct.

Q. So just to be clear, Leapfrog targeted the five specific hospitals here, our community hospitals, and no others, right?

A. I don't know about and no others.

Q. All right. We can go down here --

A. And we are always --

Q. Ms. Jupiter, are there any other hospitals listed here?

A. No, but that doesn't mean that there weren't other hospitals, I mean, we have a $10,000 a month Google grants, that is what we do, we are advertising the hospitals and their safety grade.

Q. But Ms. Jupiter, in this email chain with your vendor that handles your Google ads, these are the only hospitals, the community hospitals that are listed, correct? I am not asking about other hospitals, these are the only ones identified, correct?

A. This is what you have highlighted in the email from me.

Q. All right. We can move on. On top of that, if we look at page five, Leapfrog intentionally configure these ads to insure that customers here in South Florida would see them, right?
A. I don't know, I don't know what this is.
MR. CHUNG: All right. I pass the witness.

CROSS-EXAMINATION

BY MS. BLAIR
Q. Good morning, Ms. Jupiter.
A. Hi.
Q. I want to talk just a little bit about -- your entire adult career has been in non-profit, correct?
A. Correct.
Q. And have you served as a fundraising lead for multiple not-for-profits?
A. My whole career.
Q. And all of those not-for-profits, can you tell the Court, have they had revenue raising as part of their mission?
A. Yes. We have to exist, and that is how we exist is by getting revenue.
Q. And by way of foundation, can you just briefly talk about your non-for-profit history for the Court?
A. Sure, I started actually during college. I interned at the not-for-profit William and Mary and then I went into development after that, Boston Symphony Orchestra, and then the Museum of Finance and then I worked for 13 years for a homeless

charity and then I worked for six years for a cancer charity and then I came to Leapfrog.
Q. And any of those not-for-profits that you worked for ever not raise revenue?
A. No. I worked for the Boston Symphony, we sold tickets, and that was one way of fundraising.
Q. And in all of your experience as a not-for-profit fund raising executive, have you ever been involved in an organization who did not have the goal of raising revenue?
A. No. I mean, that is literally my job forever.
Q. And why do not-for-profits raise revenue?
A. So we can perform our mission.
Q. And having served in the Vice President role at Leapfrog, in your opinion, has Leapfrog put the revenue that it's raised back into its mission?
A. Yes.
Q. And you were shown some website messaging questions that were asked at your deposition by Mr. Chung, do you recall that?
A. Yes.
Q. What is your involvement in drafting the website messaging in your role at Leapfrog?
A. I have no role in messaging.
Q. But you know what the messaging is, correct?
A. Yes, I see it.
Q. Do you believe in the messaging that Leapfrog puts out?

A. Yes, I would never work there if I didn't believe in what I do.
Q. And in your role as the Vice President of fundraising, are you involved in determining the strategy of the messaging that goes out to the public for Leapfrog?
A. I am not involved in the strategy.
Q. And who would be the determiner of that messaging strategy?
A. Lauren Bailey, our director of communications.
Q. And does she do that along with the CEO of the company?
A. Yes, she works with Leah.
Q. And there are documents shown to you about CURA. Can you tell the Court, what is CURA?
A. CURA is our public relations firm.
Q. And in your role, what do you understand CURA to be doing for Leapfrog?
A. They pitch to media about Leapfrog and hospital safety.
Q. Do you believe CURA's role in pitching to media about public safety to be consistent with the Leapfrog mission?
A. Yes. That is our mission is transparency and let the public know about patient safety.
Q. How many employees are at Leapfrog?
A. We have 20.
Q. Twenty employees. Does Leapfrog have the ability to promote patient safety in the media without CURA being involved?

A. No. That would be -- we just don't have enough people for that.
Q. And going back to the revenue that Mr. Chung asked you about, I want to make sure the Court understands your answer. You testified that the revenue goals of Leapfrog are not tied to survey participation. Can you explain what you meant by that answer?
A. Sure. I mean, we have revenue goals to -- when I work on our annual meeting sponsorships, and fundraising doesn't have anything to do with survey participation. There is a firewall of tools between survey and revenue participation. I work on revenue and it has nothing to do with survey participation.
Q. And do you understand that one of the goals of the not-for-profit mission of Leapfrog is to get every hospital in America to participate in the survey in order to publicize patient safety?
A. That is our mission is transparency.
Q. And there are some Slack messages, this is PX 439, that Mr. Chung showed you between yourself, Lauren Bailey, the director of communications and Nate Longmore; do you recall that?
A. Yes.
Q. And in or around the time would have been May or June of 2025, can you tell the Court, what was Nate Longmore's role?
A. He is our communications coordinator.
Q. And in terms of orienting everybody to where we were in the

timeline of events, what was occurring at Leapfrog in May or June of 2025?

A. That was not a great time. We were being attacked in the media, we were being called unethical, there are articles in the paper about how we were unethical and not truthful. It varies, it was a very stressful time. I also had former employees call me and told me that --

MR. CHUNG: Objection, hearsay.

MS. BLAIR: Your Honor, she is talking about what is going on at Leapfrog and the resources that are being diverted and in its contract --

THE COURT: Is that really an issue in this case?

MS. BLAIR: It is an issue in the case, the application of harm.

MR. CHUNG: That's not --

THE COURT: All right. I will overrule the objection.

MS. BLAIR: Thank you, Your Honor.

THE WITNESS: Private investigators were visiting our former employees at their home and work and asking them --

MR. CHUNG: Objection, Your Honor, it's a standing objection on hearsay, relevance, lacks foundation as well.

THE COURT: All right. Overruled.

BY MS. BLAIR:

Q. And I think you just told me there are 20 of you, right?

A. Yes.

Q. And were any resources of Leapfrog being diverted from the mission in light of the PR campaign that Tenet had put out against Leapfrog?
A. Yes, absolutely.
Q. Can you tell the Court a little bit about how resources were being diverted from Leapfrog's mission in light of the smear campaign?
A. Sure. We were on meetings trying to counteract the messages going out about Leapfrog when I should have been working on our annual meeting, and communicating with donors but instead, I was trying to overcome the messages saying we were unethical.
Q. And that Slack message we saw saying, "Why, why though, does she just want to harass them"? Do you recall Mr. Chung showed you that message?
A. Yes.
Q. Why were you so confused about what the strategy was?
A. That is just not how we work. Generally, we promote top hospitals, good grades and we want people to go to A hospitals, so it was really a different way of doing it.
Q. Was this the first time in your tenure at Leapfrog that it was necessary to sort of go on the defensive to a smear campaign of this magnitude?
A. Yes, we never had this happen.
Q. And Mr. Chung asked you about the grant from Google Ads.

Do you recall that?
A. Yes.
Q. And his PX 454.1, can you just describe for the Court to the extent you know, what the Google Ads grant is that Leapfrog has?
A. Yes. I think it is $10,000 a month from Google to put ads up to support our mission. So we put up a lot of messaging, patient safety, questions you should ask your doctor, we have a diabetes initiative telling people about ads.
Q. You do that through this company called Megaphone?
A. Correct, non-profit Megaphone.
Q. And do you recall whether Leapfrog reached out to non-profit Megaphone to ask whether or not your Google grant could be used to place these ads?
A. I don't know.
Q. And do you have an opinion about whether or not fighting the negative press that Leapfrog was experiencing was also promoting the mission of Leapfrog?
A. Yes. That is the mission of Leapfrog, we want to be transparent and trustworthy which is really important to what we do, and so we wanted to make sure consumers and patients knew that we were trustworthy.
MS. BLAIR: I have no further questions, Your Honor.
THE COURT: Redirect.
MR. CHUNG: No, Your Honor.

THE COURT: Thank you, Ms. Jupiter.

MR. CHUNG: We next call Leah Binder, President of Leapfrog Group.

(Witness sworn.)

MR. CHUNG: May it please the Court.

DIRECT EXAMINATION

BY MR. CHUNG:

Q. Good morning, Ms. Binder.

A. Good morning.

Q. So, already announced you, but you are the President and CEO of Leapfrog; is that correct?

A. That is correct.

Q. You have been the CEO since about 2008?

A. That is correct.

Q. And as president and CEO, you are the highest ranking officer or executive of Leapfrog, correct?

A. Highest ranking executive.

Q. And Leapfrog has a Board of Directors; is that right?

A. Yes.

Q. And you report to that board, correct?

A. Correct.

Q. And this is a Board of Directors that governs Leapfrog Group, correct?

A. Correct.

Q. I'm going to direct your attention to a document marked for

identification, Plaintiffs' Exhibit 323.2 and it will show up on the screen in just a moment.

A. If you would make it a little bigger.

Q. We can. This is an email dated July --

MS. BLAIR: Your Honor, we have an objection to this document per your request that we identify objections to documents before they are seen. Our objection to this document is relevance and undue prejudice. I don't know how it is relevant to this situation that she had a conversation with Paul Alva [sp] about Leapfrog.

MR. CHUNG: Paul Alva is a consultant at Leapfrog, and this conversation, if you look toward the bottom of the email, Ms. Binder describes a methodology change at issue here and describes an incentive to report to the survey which, of course, relates to the community hospitals' position that participation of hospitals safety grades.

THE COURT: I will overrule the relevance objection and the 403 objection.

MS. BLAIR: Thank you.

MR. CHUNG: Thank you, Your Honor, so I move to admit at this time PX-323.2 in evidence.

THE COURT: Admitted over objection.

(Whereupon Plaintiffs' Exhibit 323.2 was admitted for Evidence.)

BY MR. CHUNG:
Q. Rewind a little bit. This email is dated July 15, 2024 from you to Paul Alva, correct?
A. Yes.
Q. And Mr. Alva is a consultant or at least has been a consultant to Leapfrog?
A. He was, yes.
Q. So if you look at the final bullet point on page one, you inform Mr. Alva, Paul Alva about the fall 2024 change and what you call here the methodology, correct?
A. Yes.
Q. Okay. And you point out that under this change, the hospitals that don't report to the Leapfrog survey this year or last year will be imputed with the lowest score on hand hygiene, correct?
A. Um-m-m, the part highlighted doesn't say that, but it may be elsewhere. Oh, I see it now.
Q. Do you see that?
A. Yes.
Q. And you point out, just moving along in the same email, you point out further that the change is, in your words, a very big deal to hospitals, right?
A. Yes.
Q. I am sorry, you have to answer audibly otherwise our Court Reporter is going to go --

A. I know, I don't want to make your job harder.
Q. And then you tell him that this change is a major incentive for the hospitals to report to the survey, correct?
A. Yes.
Q. It is a major incentive because hospitals would be assigned the lowest score on hand hygiene if they did not report to the survey, right?
A. Could you ask the question again, please?
Q. Sure. It is a major incentive because hospitals would be assigned the lowest score on hand hygiene if they did not report to the survey, right?
A. That is not the only reason it's a major incentive to report to the survey.
Q. Well, isn't that what you told the board of directors?
A. This isn't to the board of directors.
Q. No, I understand, but isn't that something you told the board of directors that these hospitals would -- that the update here would dramatically lower imputed scores for certain measures for hospitals that declined to report to the hospital survey.
Isn't that something you --
A. I told the board --
Q. Let me finish the question. You as the CEO told the board, correct?
A. I told the board about the change in methodology, and I was

clear and blunt about what that meant.
Q. Okay. Let's go to what you told the board of directors in June of 2024. Put up PX 304.1. All right. This has been preadmitted.
A. Again -- thank you.
Q. All right. So, this is your CEO report in June 2024 to the group -- to the Leapfrog Group board of directors, correct/
A. Yes.
Q. And in that highlighted section, you write the update dramatically lowers imputed scores for certain measures for hospitals that decline to report to the hospital survey, correct?
A. I did say that, yes.
Q. Okay. We can take that down.
All right. The first email you were discussing with Mr. Alva hand hygiene, so let's go back again for hand washing those terms can be used interchangeably.
I would like to use hand washing at one of our community hospitals, Good Samaritan Medical as an example. Okay.
A. Okay.
Q. You heard testimony yesterday from Sheri Montgomery, the CEO of Good Samaritan Medical Center about the hand washing, correct?
A. Yes.
Q. You were here for that testimony?

A. Yes.
Q. And you heard Ms. Montgomery testify the last time Good Samaritan participated in the survey was in or about 2021, correct?
A. Yes.
Q. And that they scored a hundred on the hand hygiene metric or measure at that time, correct?
A. Correct.
Q. And that was based on the data with a response based on -- in response to your survey, correct?
A. Correct.
Q. And that was based on actual data and responses that Good Samaritan sent in, correct?
A. Relative to 2021, yes.
Q. Okay. And you heard Ms. Montgomery testify that in fall of 2021, and based on that submitted response, their grade was a C, correct?
A. She testified to that, yes.
Q. But then in the fall of 2024, you dropped them from a hundred to a 15, correct, on hand washing or hand hygiene, correct?
A. I believe so, yes.
Q. And that 15 is not based on actual facts, correct?
A. It's an imputation.
Q. Right. And we just heard video testimony from Dr. Austin

to that effect. He testified in his deposition that the imputed scores, right, are not based on actual facts, we just heard it maybe half an hour ago, correct?
A. They are based on a imputation --
Q. I am asking you whether you recall seeing Dr. Austin's video testimony.
A. Yes, I recall seeing Dr. Austin's testimony.
Q. Let's put it another way. This 15, again, we are focusing on 15, right, for hand washing?
A. Yes.
Q. That is an arbitrary number, correct?
A. No. I wouldn't say the word "arbitrary".
Q. Well, your own program manager, Alexandra Campione said that these scores were assigned arbitrarily, right?
MS. BLAIR: Objection to form, I know you don't like this objection, Your Honor, but it mischaracterizes Alex Campione's testimony.
THE COURT: Overruled. It is not that I don't like it, this is typical and permitted cross-examination. Go ahead.
MR. CHUNG: Thank you, Your Honor.
BY MR. CHUNG:
Q. Let's put it another way. So arbitrarily is one way. Let's put it another way. Ms. Campione testified yesterday, you were here for that, correct?
A. Yes.

Q. And she testified that this 15, the limited achievement scores is based on inference that non participating hospitals performed poorly on this and the other measures, correct?
A. You are asking if she testified to that?
Q. Yes?
A. Yes, I believe so.
Q. And that they are hiding -- these non participating hospitals are hiding that poor performance by not responding to the survey, correct?
A. Are you asking if she testified to that.
Q. Yes.
A. I believe so.
Q. That is what the inference is based on, correct, her testimony, correct?
A. I think so.
Q. So, again, this 15 is an arbitrary number where you are assuming the worst about the hospital, is that right?
A. No. It is not an arbitrary number.
Q. But, Ms. Binder, are you -- by inferring that they are not submitting a survey, submitting to your survey because they were trying to hide their poor performance, you are assuming the worst about this hospital; is that right?
A. We are assuming that the hospital has a reason for not reporting this data to Leapfrog, and with actually 25 years of experience, that's the case.

Q. And based on what you are claiming, your 25 years of experience, you are assuming that these --
A. Leapfrog's experience, I don't have 25 years experience.
Q. With Leapfrogs' experience, you are assuming the worst by not giving these responses, correct?
A. I am assuming they are in the lowest category because of the expert panel suggested that that is appropriate given the non-response bias.
Q. Let's take a look at Good Samaritan's safety grade page on Leapfrog's website. Plaintiffs' Exhibit 33.5 which is already in evidence. Okay.
Now, Ms. Binder, do you recognize this as the safety grade site for Good Samaritan Medical Center?
A. Yes.
Q. You were in the courtroom yesterday during Dr. Berger's testimony, correct?
A. Yes.
Q. You heard from his testimony that it takes more than 20 clicks for a visitor to the website from the moment she sees the D or the F to get to this footnote four that has been testified to. Do you remember that testimony?
A. That was his testimony, yes.
Q. Okay. So, for those few folks who get over the shock of seeing first the D and F for their hospital and then somehow make the journey and scrolls and clicks down to this footnote

four, your claim that this footnote four clears everything up, correct?
A. You are asking if my claim is that footnote four clears everything up?
Q. Yes.
A. I don't know if I would put it exactly that way.
Q. Okay. Well, this footnote four, let's pull up the footnote four briefly.
It has already been testified to a number of times. This is supposed to refer on this page in particular to the 15 for achievement score for hand washing, correct?
A. Yes.
Q. And we can take that down. And that is the lowest available score for hand washing, correct?
A. Right, and that is clear on this as well.
Q. And again, you assign the lowest available score without any data from the hospital itself, right?
A. It is imputed data.
Q. And nowhere in this footnote does it say that the 15 number is a penalty, right?
A. That is right because it is not.
Q. Nowhere in this footnote does it say that a 15 number is an inference that they're bad performers, right?
A. It says in the footnote and referenced by a pretty clear asterisk. And the experts didn't recognize the asterisk, I

don't know how that happened, but it is an asterisk.
Q. So you are saying that that footnote, the asterisk and the footnote says that the 15 number is an inference that this hospital has bad performance; is that what you are saying?
A. The asterisk refers to a clearly articulated line that explains that the score was assigned.
Q. So the testimony is no, we don't see that language in this footnote, correct?
A. Which language?
Q. That there is an inference here that they have bad performance? It's not in this language, right?
A. You are saying the footnote doesn't say there is an inference here of bad performance, no, it doesn't say that there is bad performance.
Q. You want consumers to believe that this hospital has earned, right, this 15 for hand washing, correct?
A. They erned the grade.
Q. And they earned this 15 score; that is what you want the website to convey, correct?
A. They've earned the grade, we talked about the grades being earned.
Q. I'm talking about the score of 15, the lowest available score?
A. We want them to understand that the 15 was assigned.
Q. Let me put it another way. Anyone reading this and seeing

this score, the 15, o lowest available score and the D or the F, right, whatever the case may be, anyone reading those would think no one washes their hands in the hospital; is that right?

MS. BLAIR: Objection, calls for speculation.

THE COURT: Overruled.

BY MR. CHUNG:

Q. I am asking you.

A. Okay. So we explained what we mean by it.

Q. So my question is, right, any consumer that sees the grade, the D and the F, and that somehow makes their way down scrolling the 20 clicks down to this score, right, the 15, anyone reading this, the average consumer, right, reading this, no one washes their hands at this hospital, right?

A. I don't think so.

Q. But that wouldn't be true, correct?

A. I have no way of knowing if any individual hospital whether or not people are washing -- how much -- the hospitals often don't know that.

Q. Ms. Binder, but you knew that if a consumer saw that the hospital flunked on hand washing, right, like we see here, there is no way they would go to that hospital?

A. That is not flunked, that is 15.

Q. Right. But when they see the score of 15, the consumer saw that, there is no way they would go to that hospital, right?

A. People go to hospitals that don't do well in hand hygiene a

lot, actually lots of hospitals have all grade levels, sometimes that poor performance is in general measure, and people go to those hospitals, and the good news is, most hospitals improve on it.

Q. Well, on top of that, we will go on the website, you say that hand washing is one of the most important factors in assessing the safety of the hospital; is that right?

A. I probably said that at one point.

Q. Let's put up PX-283.0 which is already in evidence.

You have seen this section of the website already in the trial. This he is from how to use the grade part of that page. Are you familiar with that section?

A. Yes.

Q. And this section reads: What measures are most important, right?

A. Um-m-m -- can you remove the highlighted part so I could see the context of this?

Q. It says, we're going to read here, what measures are most important is the question, right, and then we see the hand washing is the first bullet point; is that right?

A. It is the first bullet point, but I don't see the rest of the bullet point.

Q. But that is the first measure listed here, correct?

A. It is the first measure listed, yes.

Q. In the fall of 2024, did you or any member of the staff

call Good Samaritan to ask them whether they had a hand washing policy?
A. No.
Q. Did you anyone on you staff call anyone at Good Samaritan for data on hand washing?
A. We asked them to report to the survey. They could have told us about it.
Q. You didn't independently verify, you assigned the survey, right, whether they had data or a hand washing policy, right?
A. Why would I put aside the survey; that is exactly what the survey is supposed to do is to ask them formally and in a way that can be verified, you know, tell them to do scrutiny against their peers, and that's why we do the survey.
Q. Independently, putting aside the survey, a call or communication to anyone at Good Samaritan --
A. Repeated communications requesting that they participate in the survey.
Q. Okay, but not specifically with the hand washing?
A. Hand washing is part of the hospital survey.
Q. Let's go to another part of the website, Plaintiffs' Exhibit 413, already in evidence.
This is the explanation of the grade section, if we can go to page five. You recognize this section, Ms. Binder?
A. I recognize it, I'm not in the weeds.
Q. Not in the weeds, but the title is explanation of hospital

safety grades, correct?
A. Yes.
Q. We just saw that Good Samaritan received a D in the fall of 2025, correct?
A. Yes.
Q. And that puts Good Samaritan in the worst, let's say, seven to eight percent of hospitals, correct?
A. For this cycle.
Q. And you are aware that the other community hospitals, the other four, received Ds and Fs, correct?
A. Yes.
Q. So you are convincing people through the website that Plaintiff hospitals are among the worst seven to eight percent hospitals in America, correct?
A. I don't know about convincing, but we are certainly putting them in the category of Ds and Fs.
Q. And by showing the percentages here, the percentage of hospitals, F hospitals are less than one percent of the hospitals, Ds are about seven percent of the hospitals, you are communicating to the consumers who read this chart that our hospitals, community hospitals are among the worst hospitals in America, correct?
A. We are saying that they are in the lowest category on patient safety for this time period.
Q. You did this in order to force these hospitals to

eventually submit to the survey, correct?
A. No.
Q. You made it so that they could not afford not to participate, correct?
A. No. That is not the intention.
Q. Well, whatever your intention was, it worked, correct, participation in the hospital shot up from 69 to 79 percent in the fall of 2024, correct?
A. It didn't shoot up, it went up by 160 or something like 160 hospitals, which all of them were grade A hospitals.
Q. Let's put up PX 426. Go to page two. We see here, does this refresh your recollection that from the spring of 2024 to the fall of 2024, that survey participation jumped from 69 to 70 percent; do you see that?
MS. BLAIR: Your Honor, this is a document that we've objected to, and per your order, we would like to see the -- I am happy to tell you what my objections are, but hearsay, lack of foundation, this is an email from Holly Salati [sp]to Lauren Bailey, not to Leah Bailey at all --
THE COURT: At this point we have a question, we don't have a request of --
MS. BLAIR: He pulled up the document.
MR. CHUNG: My understanding is this document is pre admitted.
MS. BLAIR: No, we have an objection on foundation,

relevance, undue prejudice, hearsay and lack of knowledge, that is one of the only ones we do.

MR. CHUNG: Well, Your Honor --

MS. BLAIR: I'm sorry, my objection.

BY MR. CHUNG:

Q. So, I'm going to ask you -- my previous question was that survey participation increased or shot up from 69 to 79 percent?

A. Well, this he is participation as a percent of hospitals that are issued a hospital safety rate.

Q. Right.

A. What I typically look at with my board is the number of hospitals that participate, and that is what I was referring to just now when I said that we did see an increase of almost entirely HCA coming back into the survey. These numbers are n not ones that follow so closely.

Q. Understood. But you have no reason to doubt that these percentages are accurate, correct?

A. I really don't know. I have not seen this.

Q. In fact, hospital survey participation in the fall of 2024, the time period we are focused on when this methodology change went into effect, wasn't it?

A. It is record breaking every year. We have seen increases in participation every year with the exception of the one year when HCA decided not to participate.

Q. All right. But you told the board that this in the fall of 2024 that this was an all time record for participation, correct?
A. I tell them that pretty much every year.
Q. All right. Now after the Plaintiff hospitals filed this lawsuit, you engaged in a media campaign, right, we heard the testimony from Ms. Jupiter on this topic, correct?
A. Yes, uh-hum.
Q. Let's take a look at, again PX-439.
We can put that down for now.
In May of last year, after the lawsuit had been filed, you directed your staff, right, to look into whether if someone searches any of the five hospitals on Google, an ad will pop up with their F or D grade, right? Is that correct?
A. Yes.
Q. And just with that F or D grade --
A. I don't recall if I said pop up the F or D grade, actually. Maybe I did.
Q. So your own people said that we wonder whether you were just out to harass these hospitals. Did you see that message?
A. I saw the message, yeah. I don't blame them. We don't do things like that, normally, it is very unusual, extraordinary, I never actually had a campaign where we aimed at any kind of publicity for hospitals, we usually try to avoid that, but not this time.

Q. You don't want to act like a Disney villian, correct?
A. I didn't really understand that line. I guess I am too old to understand what Disney villain is.
Q. Now, you testified earlier, again, that you report to Leapfrog's board of directors, correct?
A. Yes.
Q. All right. And you delegated approval of changes to how Leapfrog's scores hospitals to yourself, correct?
A. What? I'm sorry, I don't understand that. I delegated to myself something.
Q. Yes. So with respect to this change in the scoring methodology, did the board -- the board did not approve the scoring methodology, correct?
A. The board expressly does not get involved in approving methodology issues, and only one time have they gotten involved in methodology and that was when we launched the hospital safety grade.
Q. Okay. You, in your deposition testimony, you testified that you delegated or the board delegated that responsibility to you; is that right?
A. They delegate all responsibilities of methodology approval to me, and I informed them when there was something major which I did in this case.
Q. And you testified in your deposition the delegation is not memorialized anywhere, correct?

A. The delegation, it is included in the by-laws that the CEOs delegate responsibilities and that is what I do.
Q. Okay. But responsibility with respect to changing the scoring methodology and the grade?
A. Methodology is the very operational core to Leapfrog's operations.
Q. All right. So it is core to Leapfrog's operation but it is not changes in those core of Leapfrog's operations, you are testifying it is not subject to approval by the board; is that right?
A. If the board wanted it to be a particular change in the methodology, they wanted that authority, they would take it.
Q. Okay. Now, the board only gets involved in decisions about the methodology when you believe it is necessary, correct?
A. No. I tell the board any changes or updates to the methodology and how those came about, and then if the board wanted to get more involved in the decisions, they would -- and they would tell me, I do not have a shy board.
Q. Okay. And isn't it true that in the spring of 2024, you chose not to inform Leapfrog's board members about how the imputation methodology changed?
A. Are you talking about the orientation?
Q. Yeah. You chose not to inform Leapfrog's new board members about how the imputation methodology changed, right?
A. They get informed of the entire thing, but the orientation

for the three new board members, a packet of 30 slides we had to do in an hour, we needed to do an overview and highlight the key issues that will then be scored while they continue their board service, this is when they were just about to start on the board.

Q. Okay. So you did not share the details or how the new methodology works with the new board members, correct?

A. I shared the important highlights of it and then -- but that is just the orientation of the new board members.

Q. Okay. And I think you testified during your deposition that these new board members would not see the forest from the trees and they would not understand what was important about that methodology; do you remember that testimony?

A. In the -- in the 30 slides --

Q. I'm asking -- I'm asking --

THE COURT REPORTER: Hold on, hold on a minute, you have to pause when, you know, when he ends the question, the you can -- it's very difficult to get both of you at the same time.

THE WITNESS: Oh, sorry about that.

BY MR. CHUNG:

Q. So let me rewind. I am asking you, do you recall your deposition testimony in this case that you did not share how the new methodology works because these new board members will not see the forest for the trees; do you recall that testimony?

A. At the orientation.
Q. Do you recall that testimony?
A. I recall that testimony was about the orientation.
Q. Okay. And do you recall the testimony that you did share how the methodology works with these new board members because --
A. I --
Q. I am asking the question.
A. Sorry, okay.
Q. All right. Do you remember at your deposition testimony that you did not share how this methodology works with the new board members because, in your words, they won't understand what is important about the methodology; do you recall that testimony?
A. At the orientation, yes, they were asking about the orientation and I did say that.
Q. Let's go back to the safety grade page for Good Samaritan Medical Center, PX-30.5.
Scroll down to page seven of the document.
You have a got a measure here that has a question mark over it; do you see that?
A. Yes.
Q. And that question mark is over the measure, staff work together to prevent errors, correct?
A. Yes.

Q. That is one of the several measures that goes into the safety grade, correct?
A. Correct.
Q. In addition to hand washing and various others, correct?
A. Yes.
Q. And you have got that question mark there because Good Samaritan did not participate in the survey, right?
A. Right.
Q. And this meant that Leapfrog did not have data from Good Samaritan or responses from Good Samaritan for purposes of this particular metric, correct?
A. Right, and we didn't feel the imputation was appropriate for this measure.
Q. That is not my question. All right. Correct. That is what the question mark is, correct?
A. It is the same practice staff put together for many years.
Q. But there is no question mark over hand washing, correct?
A. Correct.
Q. Instead, for hand washing, you have the gas gauge set all the way to the left, right?
A. Yes.
Q. You could have put NA or not available, correct, you could have?
A. We could have, but we didn't.
Q. But you did not, right?

A. Right.
Q. You are again trying to convince the consumer here that this score of 15 is based on real data, correct?
A. We are showing them the lowest performance on hand washing.
Q. So once again, you are convincing the consumer here that this 15 for hand washing, that this hospital's earned that 15, correct, that is what you are showing the consumer, correct?
A. Yes.
Q. So just to sum up, for the metric, staff work together to prevent errors, we have the question mark, and for hand washing, we have the gas gauge all the way to the left, right?
A. Yes.
Q. Now, you heard the testimony from Dr. Peter Romano from yesterday?
A. Patrick.
Q. And he is a member of Leapfrog's expert panel, correct?
A. His name is Dr. Patrick Romano.
Q. I am sorry, Dr. Patrick Romano.
And he testified yesterday that this penalty, and we saw the emails yesterday, right, where he used the word "penalty" in connection with the change in methodology, his testimony was that a penalty was a predictable temporary and specific consequence to a particular action or choice. Do you remember that testimony?
A. Yes.

Q. All right. And he also testified that this penalty is something that non participating hospitals can make up, right, if they just -- if they just submit the survey, correct?
A. I can't remember the exact wording of how he said it, but something like that.
Q. Okay. And then his words, again, his testimony, as soon as that hospital chooses to participate again, the penalty goes away. Do you remember that testimony?
A. Yes.
Q. Now, Dr. Romano, Patrick Romano, also wrote in the email to his U C Davis colleagues that this methodology change was just business, it was a simple business change. Do you remember that email?
A. I saw that email, yes.
Q. Now speaking of business, Leapfrog was going through something of a cash crunch in early 2024, right?
A. Um-m-m, I think so.
Q. Okay. Let's go to PX-275.4, which is in evidence.
Now, I understand that the font is a bit small, so we will amplify as we go through this.
So this is an email chain between you and Ben Troy [sp], from April 25, 2024, correct?
A. Yes.
Q. And Mr. Troy was a financial adviser; is that right?
A. Yes.

Q. Was he kind of operating as a temporary CFO?
A. A senior finance executive.
Q. Okay. And in this email, he is telling you that Leapfrog is forecast into falling short by about $540,000, correct?
A. Yes.
Q. All right. In fact, he tells you that the deficit that Leapfrog had to make up was about $900,000 more than what was originally budgeted, correct?
A. Yes.
Q. Yeah. And in his words, he says, "It is a very steep hole to climb out of; you see that?
A. Uh-huh.
Q. And then you respond to Mr. Troy, "Let's not lose focus on what managers should be thinking about 24/7 which is revenues"; do you see where you wrote that?
A. Yes.
Q. Okay, take down the document.
One of the biggest sources of revenue for Leapfrog is from these data licensing products; isn't that correct?
A. It's one of the largest sources, not the largest.
Q. The largest is the accolade licensing program, right?
A. Yes.
Q. And let's focus on -- I just want to ask you a few questions about the data licensing products.
That data for those type of licensing products comes from

hospitals who participate in the survey, correct?
A. No. Not all, no.
Q. Not all of it, correct, but a good portion of the data that hospitals submit to the survey, right, makes its way in some form to the data licensing products, correct?
A. What we license is Leapfrog's proprietary interpretation of the data submitted and also the hospital safety grades.
Q. Okay, perfect, thank you.
In fact, Leapfrog requires hospitals who participate in the survey to allow Leapfrog to use that information in a commercial manner for profit, right? Do you recognize that language?
A. Oh, God, yes.
Q. Yes. That language comes directly from the survey that the hospitals respond to, correct?
A. No offense, but it's --
Q. The question is: Does that language come directly from the survey?
A. Yes.
Q. All right. So let's take a look at some of the customers that are purchasing Leapfrog's data licensing products. Let's put up PX-324.1, and turn to 18. This is a presentation or a slide deck entitled Leapfrog Data Licensing Pricing and Fee Analysis from March of 2024. Now, just looking down the left-hand column, Ms. Binder, these are some of Leapfrog's data

licensing customers, at least as of 2024, correct?
A. I believe so.
Q. All right. And they are health plans, right?
A. The ones on this slide, I think so.
Q. Yes. So we are going to focus on this slide, all right?
A. Uh-hum.
Q. And these health plans are purchasing data licensing products from Leapfrog, right?
A. Yes, they are.
Q. Right. And when we look under the license column, there are a number of entries, and for the most part, we are seeing survey and HSG, correct?
A. For this group of --
Q. For this group of companies?
A. Yes.
Q. And that is licenses, this is data licenses of data that comes from the survey, that is what the survey denotes, correct?
A. That the ratings come from the survey, yes.
Q. Yes, exactly, right.
So just going down the line here, Humana's 2024 contract was for about $39,400, right? We are highlighting to kind of help it along?
A. Yes.
Q. And Health Net, another health plan, their contract was for

almost $57,000?
A. Yes.
Q. Blue Cross Blue Shield of North Carolina, almost $67,000, right?
A. Yes.
Q. Cigna is a little bigger, $79,000, right?
A. Yes.
Q. And Humana Government Business in 2024 was for -- looks like among the largest, almost $160,000, right?
A. Yes.
Q. All right. We can take that down.
Let's put up Plaintiffs' Exhibit 205.0, which is in evidence.
Now, this is a Business Development Discovery report for Leapfrog prepared by Steven Gause [sp], and Steven Gause was at the time in 2018, Leapfrog's Director of Business Development; is that correct?
A. That is correct.
Q. If we flip to page two, the very first page of the document, he writes, "To maximize the value of the Leapfrog Group's data for licensing purposes, the level of participation should continue to be increased so it can be perceived as the most complete data set and thus allowing defense of our pricing model and its price points"; do you see that?
A. Yes.

Q. All right. So the more hospitals that participated in the survey, the more complete Leapfrog's data set is, correct?
A. That is what this says.
Q. Okay. And the more complete the data set is, the more valuable Leapfrog's data is to potential data licensing customers, correct?
A. We never marketed it that way, and that is why he pointed it out in the memo.
Q. Okay. And the more valuable Leapfrog's data is to potential data licensing customers, the more you can, as Mr. Gause writes here, defend the prices you charge to those customers for data, correct?
A. No.
Q. Well -- and that allows you to sell more of your data licensing products, correct?
A. It has not been a factor in our sales process.
Q. So do you disagree with what Mr. Gause wrote here as your Director of Business Development? You disagree with that?
A. Disagree with what part of it? Are you asking me if I disagree with --
Q. The statement here?
A. Certainly having more hospitals report would be good, but good for transparency mostly. We have never marketed the data set based on how many hospitals are in the survey.
Q. I am not asking, Ms. Binder, about how you market it.

A. All right.
Q. Do you disagree with what Mr. Gause wrote here?
A. That it would be the level of participation could continue to increase to be perceived as the most -- sure.
Q. Okay. And your own expert panelist, Dr. Patrick Romano, said the data are not valuable if the participation is low, correct?
A. Doctor Romano is not involved at all in --
Q. That is not my question, Ms. Binder. Your own expert panelist, Dr. Romano, wrote in an email to his UC Davis colleagues that the data are not valuable is participation is low. Do you remember seeing that?
A. I saw that, yes.
Q. Okay. And, again, Dr. Romano said that your business model depends on producing data that add value for health plans and employers, and that data are not valuable if participation is low. Do you remember that language?
A. I remember seeing that language.
Q. Okay. And that penalizing non participating hospitals with that fall of 2024 change was, hence, a simple business decision, right?
A. I saw him write that. I don't agree with that at all.
Q. Now, Ms. Binder, we are going to put up -- we are going to use our next exhibit, Plaintiffs' Exhibit 322.2, and this is a memo on your compensation that you prepared for Leapfrog's

executive committee on July 12, 2024, correct?

MS. BLAIR: Your Honor, we did object to this document on relevance and we waive that objection.

THE COURT: 322 is admitted without objection.

MS. BLAIR: Thank you.

BY MR. CHUNG:

Q. Ms. Binder, do you remember the question?

A. No.

Q. So this document, PX-322.2, this he a memo on your compensation that you prepared for the executive committee of Leapfrog's board on July 12, 2024, correct?

A. Correct.

Q. And you testified during your deposition that you prepared this memo to give that executive committee time to think about your compensation in connection with your renewal of your contract, correct?

A. Yes.

Q. And this executive board of the committee of the board of directors determines compensation for you and any other executives, correct?

A. Me.

Q. You?

A. Uh-hum.

Q. All right. Directing your attention to paragraph two, you wrote, "Over the past decade, we have grown Leapfrog's visitor

influence while also growing our revenues by an average of ten percent per year". Do you see that?
A. Yes.
Q. All right. And you also recommended that Leapfrog set a goal in your contract that the executive committee include organizational revenues as a criteria for bonuses, correct?
A. Yes. We had --
Q. "I would recommend we set a goal in a contract that the executive committee include organizational revenues as a criteria for the bonus", that's the language you used, correct? And as such, you asked for, at least in this memo, for a compensation package with a base salary of $675,000, right? Correct?
A. Yes.
Q. And a retirement contribution of about ten percent of it, which would be another $67,500, right?
A. The salary here included the fringe.
Q. Okay. And that in terms of the bonus target, it would be 15 to 25 percent of the base, correct?
A. Yes.
Q. And that you asked, just to loop back, you recommended the executive committee for purpose of the bonus that they consider organizational revenues as one of the criteria for that bonus, correct?
A. Yes.

Q. All right. So the more revenues, the higher percentage bonus, correct?
A. Yes.
Q. Okay. So the package here in total would be as you set out here, $742,500 plus a bonus of anywhere from $100,000 to $116,750, correct?
A. Including fringe.
Q. Okay. Now, in terms of the penalizing the hospitals, this wasn't the first time, with our community hospitals, this isn't the first time that you penalized hospitals for not participating in the survey, right?
A. We don't penalize hospitals, that is not my job.
Q. Well, in fact, you hold a grudge against hospitals that's not participating in the survey, right?
A. No.
Q. You don't hold a grudge?
A. No.
Q. Okay. You are familiar with HCA, right?
A. Yes.
Q. Right. And they operate anywhere from 160 to 180 hospitals at any point in time, correct?
A. Correct.
Q. Right. And those hospitals had been participating in your survey until a certain point, correct?
A. They participated almost for the almost entire history, a

hundred percent participation.
Q. And in 2023, they notified you that they were no longer going to participate in the survey, right?
A. They said they were suspending participation for one year.
Q. And that got you upset and we heard that testimony yesterday, correct?
A. I was very unhappy with it and had a lot of conversations with them.
Q. Okay. And you recall that Slack messaging conversation between Ms. Campione and Ms. Cohn [sp] from yesterday; you remember her testimony?
A. Yes.
Q. All right. And you recall that Ms. Campione wrote in that Slack messaging, we were talking about changing the scoring methodology that penalized HCA; do you remember that message?
A. Not -- we weren't talking about penalizing.
Q. All right. But that was what they were talking about, correct, in that Slack message?
A. I wasn't a part of that Slack message, I don't know what they were talking about exactly.
Q. Okay. Well then, she wrote that Leah keeps grudges, correct?
A. She wrote that, yes.
Q. And that Leah was you, right?
A. Yes.

Q. But the HCA eventually did come back and so did your survey, right?
A. That's right.
Q. They gave in to the grudge, right.
MS. BLAIR: Objection, argumentative.
THE COURT: Sustained.
BY MR. CHUNG:
Q. Now, let's look at the University of California Davis where, again, Dr. Patrick Romano is a professor. Your own expert panelist, Dr. Romano, admitted that how you are treating hospitals that don't respond to the survey and gets blackmailed. Do you remember that email?
A. I saw the email, yes.
Q. All right. He tells his UC Davis colleagues you can call it blackmail if you want. You remember that?
A. I saw that email, yes.
Q. All right. Now, Ms. Binder, according to public statements, at least one public statement that you made, millions of people have used Leapfrog to make decisions without where they get their health care, correct?
A. Where did you see that?
Q. Yeah. Do you recall that you made a statement in connection with Leapfrog's Green Light Gala?
A. Oh, that was a long time ago. That is not something I would have said, let me put it that way.

Q. Now, Leapfroghospitalsafetygrade.org website, like the one we've seen kind of pieces of, received two and a half million views from September of 2024 to September 2025; is that right?
A. That sounds right.
Q. So fair to say, Ms. Binder, you are familiar with Leapfrog's websites, correct?
A. I am familiar, but I'm not a liaison, but I am familiar.
Q. Okay. And it has been your position throughout this case that those websites are transparent and accurate, right?
A. They are always as transparent and as accurate as possible. But we are always updating them because one never knows, so always, always getting better and better, we are always on an improvement journey.
Q. And this includes the hospitals safety grade website, correct?
A. Yes.
Q. And you are involved in changes made to that website, correct?
A. Sometimes.
Q. Well, let's put up one page of that website, PX-21.0 which is in evidence. And this is the frequently asked question section of the hospital safety grade website, correct?
A. Looks like it.
Q. And I can represent to you that this version of the website is as it existed around August 6, 2025.

I want to direct your attention to page two, okay, and you have the frequently asked question here, does a hospital get a better safety grade if it reports to the Leapfrog's hospital survey. Do you see where it says that?

A. Yes.

Q. And you told visitors to this version of the website that the hospital safety grade reflects how well a hospital does on safety, not whether they complete the Leapfrog hospital survey. Do you see that?

A. I said more than that.

Q. More than that, but that is how it starts out, correct?

A. That is the first sentence, that is not what was said.

Q. Ms. Binder, you changed this part of the website very recently, correct?

A. I don't know. We update and change our website quite frequently, but I don't know.

Q. Okay. Well, let's put up PX-30.0.

Same part of the website, right, frequently asked questions, right?

A. That looks like it.

Q. And I can represent to you that this is how the website looked as of November 26 2025, correct?

A. Okay.

Q. And now you are telling consumers, if we go back to the same question; does a hospital get a better safety grade if

they reports on a public hospital survey. The answer, has changed, correct?
A. The first sentence looks different.
Q. Okay. Are you -- were you involved in making that change?
A. No.
Q. Do you know who was?
A. It would have been someone on our communications team, probably, I don't know.
Q. And let's move on to the --
THE COURT: Find a convenient time for our break.
MR. CHUNG: Your Honor, I think I have maybe ten minutes more.
THE COURT: Are you going to have questions?
MS. BLAIR: Yes, we are calling Ms. Binder in our case in chief.
THE COURT: You want to do it now or in your case in chief as well?
MS. BLAIR: I can do it in my case in chief.
THE COURT: I am trying to figure out our break. I'm not asking you about preference.
MR. CHUNG: Your Honor, I think the agreement was we would do it all now.
THE COURT: Okay. The Court Reporter needs a break. We have other hearings, so let's take our 15-minute break and return at 11:00 o'clock.

(Thereupon, a short recess was taken.)

THE COURT: Okay, please be seated and please continue.

MR. CHUNG: Thank you, your Honor.

BY MR. CHUNG:

Q. Ms. Binder, before the break we were locking at a section of the hospital safety grade, the website, and we will put up 21 again.

Looking at another of the frequently asked questions, that question is: Should patients avoid a C, D or F hospital? What should people do if the only hospital in our community is a C, D or F hospital? Do you see that?

A. Yes.

Q. This is on the original -- or the previous version of the website.

Now, you put this on the website to discourage consumers from going to hospitals with these particular grades, correct?

A. No.

Q. The first thing you tell people is that the hospital safety grade should be the first tool to choose a hospital?

A. When they have a choice, the hospital safety grade is the first tool a patient should use to select a hospital.

Q. All right. Taking a step back from the document for a moment, isn't it true that Leapfrog rarely conducts on-site visits to verify survey responses it receives from hospitals?

A. We do on-site verifications for some hospitals, but rarely otherwise.
Q. Your testimony during the deposition was you conduct on-site visits for four or five out of the thousands of hospitals that submit survey responses, correct?
A. We have a team that we hire to do that.
Q. Okay. Four or five out of the thousands, correct?
A. Yes.
Q. Here you are telling patients that they should use Leapfrog's guidance and Leapfrog's resources to choose a hospital, right?
A. I'm sorry, can you say the question again.
Q. Yes. Here you say patients should use Leapfrog's guidance and Leapfrog's resources to choose a hospital?
A. No, we are saying they should use the hospital safety grade as a tool and go on to explain that.
Q. All right. But you -- this part of the website has changed, correct? Are you aware of that?
A. I am not specifically aware of what changes were made. We update the website a lot.
Q. Let us put up PX 30, which is the new version of the website.
I will direct you to the bottom of page five, which has the same frequently asked question: Should patients avoid a C, D or F hospital. Doo you see that?

A. Yes.
Q. You see the language there has changed, correct, at least the first sentence?
A. The question itself has slightly changed in wording, I think.
Q. How about the first sentence?
A. I am just reading this.
Q. Ms. Binder, are you aware -- let me get to the point. Are you aware that a change was made during the course of this litigation to the response of this frequently asked question?
A. I am not aware of the specific change. As I said, we update our website frequently.
Q. Let's talk about a different part of the website. Put up PX 66.3.
This is the about the grade section. Are you familiar with that section?
A. Yes.
Q. I represent to you this is the page as it existed on August 6, 2025. I want to direct your attention to the second paragraph which reads, "The Leapfrog hospital safety grade uses up to 30 national performance measures from the Centers for Medicare and Medicaid Services, CMS, the Leapfrog hospital survey and information from other supplemental data sources."
Do you see that?
A. This should have been updated. Yes.

Q. I direct your attention to the bottom of page one. You tell consumers that the Leapfrog safety grade methodology has been peer reviewed and published in the Journal of Patient Safety, at least on this version of the website, correct?
A. Yes.
Q. Speaking of the methodology, it is laid out in a 26-page document, correct?
A. I don't know the exact page number, but yes.
Q. It is very long?
A. Yes.
Q. You admitted during your deposition that this methodology document was not accessible to the average consumer, right?
A. It is not meant to be used by the average lay person who probably would not be interested in reading all 26 pages.
Q. In fact, it is really meant to be understood by hospital personnel, correct?
A. Researchers, hospitals, anyone who has a deep interest in the topic.
Q. And can understand what is in the methodology document?
A. Consumers can understand the content, they just aren't going to be interested in reading all 26 pages.
Q. Your testimony is that the average consumer can understand the content of the methodology?
A. They can understand the concept, yes, and how hospitals perform with the measures, the gas gauges, et cetera.

Q. The methodology document itself, the 26, 27-page document, is not meant for the average person?
A. Correct.
Q. I next show you Plaintiffs' Exhibit 203.
This is a document we saw earlier with Dr. Romano, the document entitled Expert Panel's Guiding Principles on the Development of Composite Leapfrog Hospital Safety Grade for U.S. Hospitals.
Do you remember seeing this document yesterday?
A. Yes, from 2011.
Q. And I can represent to you we retrieved this document from the hospital safety grade website on July 17, 2025.
This document sets out the principles that the Leapfrog safety grade expert panel follows in recommending how Leapfrog should calculate the grade, right?
A. It's principles that they laid out in the beginning of the safety grade.
Q. One of those principles is: Do not grade hospitals that are missing a large number of performance measures, right?
If we could highlight that section here.
A. It is principles that we laid out 14 years ago.
Q. And it says, if a hospital -- I am just going to read it. It says, "If a hospital is missing data for a large number of performance measures then a grade cannot be reliably calculated. In this situation no grade should be issued to the

hospital."
Do you see that?
A. Yes.
Q. Now, this document used to be accessible on the safety grade website, correct?
A. I don't know. Probably. I don't know.
Q. Is it still on the website?
A. I don't know.
Q. Okay. In fact, let's put up PX 29.0, which is in evidence.
When you look for those principles, that document on the website, now this is what shows up. Have you seen that?
A. No.
Q. Ms. Binder?
A. I don't follow every single change on the website.
Q. You are not aware that the expert panel guiding principles, this document, was removed from the website during the course of this litigation. Is that your testimony?
A. That is my testimony.
MR. CHUNG: I pass the witness.

CROSS-EXAMINATION

BY MS. BLAIR:
Q. Good morning, Ms. Binder. I want to talk about a few things that Mr. Chung went over. Mr. Chung showed you what was previously marked as PX 304.1, which was the board CEO report. Do you remember him showing you that document?

A. Yes.
Q. In that document you provide information to the board about the methodology change, correct?
A. Yes.
Q. And has the board ever expressed any issue to you as the CEO of Leapfrog about the fall 2024 methodology change?
A. No.
Q. And as you sit here today, do you believe your board members fully understand the fall 2024 methodology change?
A. Yes.
Q. And is it your testimony here today that you have fully informed your board of not only the fall 2024 methodology change, but the impact it would have on non-participating hospitals?
A. Repeatedly.
Q. If we could pull up PX 33.5, please.
And this is going to be the hospital safety page, I believe, and do you recall that Mr. Chung asked you questions about Good Samaritan, in particular Good Samaritan's hospital safety page, correct?
A. Yes.
Q. And he kept asking you about whether or not Good Samaritan earned their grade. Do you recall that?
A. Yes.
Q. Is it important to Leapfrog that this grade is a composite

score of multiple measures?
A. Very important.
Q. Can you explain to the Court what it means that this grade is a composite measure?
A. It incorporates 32 measures of patient safety and it puts them together so that we can evaluate a hospital's safety record on a whole variety of factors and no one factor would outweigh another. You have to look at the full picture of patient safety, and that is why we are careful to include the best publicly available measures that can give us the well-rounded picture.
Q. Is this grade solely reflective of the four imputed measures that we have been talking about for days now?
A. Absolutely not.
Q. What other information does Leapfrog have in order to calculate the composite score?
A. Most of what we use are measures from the Centers for Medicare and Medicaid Services, CMS. That is the majority of the measures that we look at.
Q. One other thing. Can you scroll down. If we go to hand washing, I want to emphasize this. If we go to the hand washing -- right here, okay.
We're on doctors order medications through a computer, do you see that?
A. Yes.

Q. That would be the BCMA -- no, CPOE measure.
If you scroll down to the actual numerical score, it says 15, and the worst score there is 15?
A. Correct.
Q. Mr. Chung asked you if that number was earned, if that 15 was earned, correct?
A. Correct.
Q. And is it the position of Leapfrog that how this hospital performs on hand hygiene is in relation to the Leapfrog standard for hand hygiene? Do you understand what I mean by that?
A. Right. We are evaluating whether they meet Leapfrog's standards for the measures that are here.
Q. Is it enough -- to get a hundred out of a hundred points on the Leapfrog for this measure, CPOE, is it enough to simply have a CPOE policy in place?
A. No. It is a much higher and tougher standard.
Q. In fact, is there a test that Leapfrog requires hospitals to perform in order to get more points than this 15?
A. Yes. We are very proud of the test that is on the Leapfrog hospital survey that allows hospitals to test whether or not an order entered by a physician would harm the patient.
So, there are -- medication orders are the most common error made by hospitals, and it is very easy to do, the wrong dose, the wrong medication that interacts with another

medication badly, harms the patient.

Lots of problems can happen with medications. Our test says to the physician are you properly alerted when you have ordered something that would be dangerous to the patient.

Q. And that test was developed by a separate expert panel on the CPO measure?

A. Literally --

MR. CHUNG: Your Honor, there is a fair amount of leading.

MS. BLAIR: I understand. I will cut it down, I agree. If you could take that down and pull up PX 23.

BY MS. BLAIR:

Q. This is a website page, how to use the grade. Do you see that?

A. Yes.

Q. If we scroll down, Mr. Chung showed you this portions, what measures are most important. Do you see that?

A. Yes.

Q. And your testimony -- I want to make sure that you read -- he didn't let you read that. Is there anything in the first paragraph that you would like to talk about in terms of how Leapfrog presents the hand washing factor to the public?

A. Yes. We say, does your hospital have a hand washing policy. We do not say do all of your staff wash their hands, we ask if they have a policy, and we also list other kinds of

examples of measures that could be very important.
Q. You were here for Mr. Romano's testimony?
A. Yes.
Q. He pointed out the phrase "every person will have different ideas about what is most important to them." Do you see that?
A. Yes.
Q. What do you recall about Dr. Romano's testimony on that issue?
A. Sorry, I don't recall.
Q. Do you agree with the statement that every person has different ideas about what is most important to them?
A. Absolutely. That is why we provide so much information on each hospital.
Q. If you'd pull that down, thank you. If you could pull up PX 33.5.
This is the staff works together to prevent errors. Do you see the decline to report?
A. Yes.
Q. Decline to report and a question mark?
A. Yes.
Q. We talked a lot about this icon on your website.
Do you have an understanding as to why certain measures have a question mark on the icon and then other measures like BCMA -- other structural measures like BCMA, CPOE, hand hygiene, and IVS do not?

A. Because some measures -- this measure in particular is our process measures, the other measures are structural measures. We have reason to know that the hospital has in place structural measures and that is why they are subject to imputation, but for the process measures the expert panel didn't think it was a good idea to use them.

Q. Mr. Chung asked you some questions about Dr. Romano's testimony with respect to a penalty. Do you recall that?

A. Yes.

Q. Does survey participation automatically equal an A or a B grade?

A. Absolutely not.

Q. Are there hospitals that participate in the Leapfrog survey that receive Ds and Fs?

A. Yes.

Q. Is Dr. Romano right that while it may be a penalty, it is something you could make up --

MR. CHUNG: Objection, leading.

THE COURT: I am having a hard time sorting out which part is cross and which is direct. That part is probably cross, so I will overrule the objection.

Maybe you could do it in terms of segments.

MS. BLAIR: I am trying to go through some things quickly. I apologize.

MR. CHUNG: Your Honor, I believe these questions are

direct examination.

THE COURT: I thought she was doing both.

MS. BLAIR: I will try to keep the leading to a minimum. I am trying to move this along.

THE COURT: All right.

MS. BLAIR: Thank you, your Honor.

BY MS. BLAIR:

Q. Do you believe that a hospital that earns limited achievement for nonparticipation for the four BCMA measures can still earn an A or B under the composite score development of this methodology?

A. Yes, they do.

Q. If we look at 275.4, this is the email between you and Ben Choi. Do you recall seeing this?

A. Yes.

Q. At that time, Ben Choi, what was his position with Leapfrog?

A. He was an adviser on finance, serving an executive function.

Q. If we go down to the part highlighted by Mr. Chung, you say, "We can address incremental spending, but let's not lose focus on what managers should be thinking about 24/7, which is revenues.

Do you see that?

A. Yes.

Q. What happens if a CEO of a small not for profit corporation like yourself takes its focus away from revenue?
A. The entire mission is in danger. We have a very small budget, very small staff, everybody has to be working to ensure that we are able to preserve the mission.
Q. You can take that down, thank you.
I want to pull up this document, but Mr. Chung showed you PX 324, which was the health plan licensing fees. Do you recall that?
A. Yes.
Q. It had some insurers on there. Do you recall that?
A. Yes, yes.
Q. I want to be very clear for the Court, I want you to explain to the Court what is Leapfrog selling when it sells a data license for the survey or the safety grade?
A. We are selling Leapfrog's intellectual property. We are selling our interpretation of the data we received from hospitals or the data that we have taken from CMS.
We score hospitals through this expert panel process that we talked about, and we -- but we score them and we set standards on the survey for how we expect hospitals to perform, and then we score them on how well they do at meeting those very high standards.
So, what we license are our -- our interpretation of the grades, whether they met our standards.

Q. Does Leapfrog sell a hospital's raw data to anyone?
A. No. Sorry.
Q. That's okay.
A. No.
Q. You were shown also PX 205, which is the February 13, 2018 business develop discovery report that was made by Darren Goust. Do you remember that?
A. Yes.
Q. Mr. Chung showed you a part of that which he interprets as you can increase prices for data sales based on the number of hospitals in the survey. Do you recall that?
A. I think Mr. Goust was suggesting we could do that.
Q. And Mr. Chung showed you that between 2023 and 2024 participation increased between 69 percent and 79 percent. Do you recall that?
A. Yes.
Q. Despite that increase in survey participation of ten percent between 2023 and 2024, did the price of licensing a data set increase in any way?
A. Not to my knowledge.
Q. So, to your knowledge, does the price of a data set depend on how many -- the price of the Leapfrog data, not the hospital data, that you are selling in a data set, does it depend in any way on the number of hospitals that participate in the survey?
A. No. The only price increases have been inflation, but it

has never been based on anything to do with the number of hospitals.
Q. And remember Mr. Chung talked to you about Dr. Romano's testimony where Dr. Romano talked to his UC Davis colleagues about the value of the data was in increased participation. Do you recall those questions?
A. Yes.
Q. And do you recall whether or not -- do you recall what Dr. Romano said about what he thought the value of that data was?
A. Yes.
Q. And what do you recall about that testimony?
A. The value was to our mission, and that I agree with him entirely.
Q. Do you have any reason to believe that when Dr. Romano wrote that email he even knew that data sets were being sold?
A. No. We never discussed anything like that with him.
Q. Do you recall Dr. Romano's testimony about his email where he said to his UC Davis colleagues it is a simple business decision? Do you recall him testifying to that?
A. Yes.
Q. What do you recall Dr. Romano describing as what he believed the business of Leapfrog was?
A. Transparency. He talked about transparency in the mission and that is why he is volunteering to do the work for us. He is a significant researcher in this space, we are very, very

fortunate to have his volunteerism.

Q. And Mr. Chung asked you some questions about website changes. Do you recall that?

A. Yes.

Q. If we could pull -- let me ask you this.

In PX 21, do you recall him showing you some language in the -- in response to the question, the FAQ: Does the hospital get a better safety grade if it reports the Leapfrog survey? Do you recall him calling that page up?

A. Yes.

Q. The first version of it says that people should avoid C, D or F hospitals and they should use the safety grade as a "first tool." Do you recall that?

A. I don't think it said they should avoid C, D, F.

Q. Fair enough. Do you recall it said they should use the safety grade as a first tool?

A. Yes.

Q. And then he showed you a second version, which he claims is a new version, and the new version now says that a patient -- or a consumer should use the hospital safety grade as a, quote, resource and guidance, correct? He showed that to you?

A. Yes.

Q. In your mind as the CEO of Leapfrog, is there any distinction between a tool on the one hand and a resourcing guidance on the other?

A. No.
Q. Thank you. Can you, Ms. Binder --
MS. BLAIR: Judge, I am going to get into my direct examination. I know you have something at 11:30.
THE COURT: So this is a convenient time to stop is what you're saying?
MS. BLAIR: Yes.
THE COURT: We will stop now and return at 12:30. At that table will be some in-custody people and Marshals so --
MS. BLAIR: We need to move our things. Jeannie told us.
THE COURT: I can always count on Jeannie.
(Thereupon, a luncheon recess was taken.)
THE COURT: Okay, please be seated and please continue.
MS. BLAIR: Thank you, Your Honor.
BY MS. BLAIR:
Q. Ms. Binder, how long have you been the President CEO of Leapfrog?
A. Eighteen years.
Q. When you started as the CEO of Leapfrog, was the CR in place?
A. Yes.
Q. Was the safety grade in place when you started?
A. No.

Q. Could you just sort of explain to the Court what your duties are as the CEO and what are some of the first things you did when you became CEO?
A. My responsibility is a reporting to the board to manage operations of The Leapfrog Group and carry out the strategic plan and be the strength of the organization and be the face of the organization externally as well.
When I started at Leapfrog, one of the first things that I did was testify in Congress. There was interest in the hospital-acquired infections, and I was asked to testify about Leapfrog's perspective on behalf of our founders, who were and are employers and other purchasers and how to benefit Leapfrog and what was the perspective of purchasers on hospital-acquired infections, and what I testified to as Leapfrog has done many times since then, is that we wanted those to be publicly reported by the hospital, and we wanted CMS to require that.
At the time when I testified that, it was considered -- that it was not considered something that was never going to happen. People had called for it in the past, and Leapfrog has been a consistent voice on transparency and wanted public reporting on a mandatory basis by a hospital on real critical issues like hospital-acquired infections, and so I testified and two years later, it happened, we actually did get public reporting.
Q. And so just to orient everybody, we have been talking about

CMS data here for a very long time. When you testified before Congress, was CMS publicly reporting the data that we now see in 18 of these 22 measures that we have been talking about?

A. No. They were not, it was very little.

When Leapfrog was founded in 2000, we had nothing at all that were publicly reported, virtually nothing on how hospitals were doing on safety and quality by a hospital, we had virtually nothing.

The hospitals themselves were monitoring many of those data points, but they weren't required to make it public and weren't making it public and that is why Leapfrog was founded.

Q. Do you consider CMS or do you consider Leapfrog to be a catalyst in CMS publicly reporting data?

A. Absolutely. And a lot of that happened before I started at Leapfrog. The founders of Leapfrog were instrumental in being a voice for transparency publicly by hospitals in the early 2000s. That was Leapfrog's core mission actually and was advocating for that transparency and continues to be a major advocacy point for Leapfrog. It is part of our mission, it is part of our work is to make sure transparency is primary in this country.

Q. Ask who founded Leapfrog.

A. There were a group of employers, they come from companies like Boeing, Marriott, and several auto makers were very actively involved.

And then after these individuals founded Leapfrog, they were then given funding from the business round table, which is a non-profit that represents CEOs of Fortune 500 companies and that group supported Leapfrog for its first two, three years as well as a grant from the Howard Johnson Foundation and it was -- but it continued to be driven by the purchasers of health benefits.

Q. And in your own words as the CEO of Leapfrog, why do you believe in the mission of Leapfrog?

A. Hospital care is extraordinarily important to me personally as a citizen, as a mother, it is extremely important to me. Hospitals are something that any of us could be there right now, something could happen to any of us right now and we all have an urgent need for hospital care. And if that happens, we all want the reassurance that where we go, they will treat us with dignity and they will treat us with the highest regard for our safety and quality of our life. And so it is just deeply important to me that we have excellent hospital care in this country, and I believe that Leapfrog has had an enormous influence on seeing true improvements on patients' safety in this country.

Q. So I want to talk a little bit about the structure of Leapfrog. The Court saw some video testimony of Karen Bonsolillo played in the Plaintiffs case in chief and she is part of the board of directors, correct?

A. Correct.
Q. And she is also the President of the Florida Health Alliance, correct?
A. Yes.
Q. And as the Florida Health Alliance, are they members in some way with Leapfrog?
A. We call them a regional leader. We have about 35 regional leaders, these are business coalitions on health like Libertta Covagen [sp] that are really Leapfrog and they represent us in their region. We have members who they represent us in their region on behalf of their members who are employers and other purchasers. They ask hospitals and ASCs to report to the survey and they use the data often to, for instance, give awards when hospitals do well, show improvement, you know, they really want to give feedback to hospitals and their performance.
Q. And Leapfrog has several advisory committees, correct?
A. Yes, we do.
Q. Why do you have advisory committees?
A. Because we have some many constituents with a strong interest in everything that Leapfrog is doing, and also we rely on the advice from a variety of people to make sure that we are doing what we need to be doing in terms of driving for improving patient safety.
Q. And you have a Patient and Safety Expert Panel, correct?

A. Yes, we do.
Q. What does the Patient and Safety Expert Panel do for Leapfrog?
A. That is actually the Patient and Family Expert Panel.
Q. Sorry, Patient and Family Expert Panel, my apologies.
A. Well, they advise us on quality and safety measures that we should be considering and standards that we should be setting for how patients are -- how from a patient's perspective, quality and safety are occurring in the hospital.
So they give us advice. For instance, they gave us a lot of advice on a standard we put in the survey around patient consent, and they helped us to understand from a patient perspective how best practices should be, and we consider that an expertise that patients bring to the table.
Q. And do you consider patients to be the consumers of Leapfrog products?
A. Definitely.
Q. And I just want to talk a little bit about the hospital survey that we heard about for days.
Can you just tell the Court just very briefly about how and why the survey was conceived back in 2001?
A. Well, again, back in 2001, you had virtually no information at all about how hospitals are doing on very important issues, like infections. We just didn't know how good a job they were doing, and we had nothing publicly reported, and that was done

after, I mean, I think the hospital industry traditionally has not embraced transparency, that has not been one of the cultures among hospitals.

I think Leapfrog changed that, you know, it was a very significant force in changing the culture of health care to say, consumers deserve to know how you are doing and what we have seen is leadership from hospitals and actually made that happen as well.

So, anyway, that is a result of that lack of transparency, and employers said what can we do, and that is when Leapfrog was born.

Q. And we talked a lot about a lot of expert panels over the course of the last few days. Are there separate and distinct expert panels for the survey measures that occurs in the hospitals --

A. Yes, there are.

Q. And do you know approximately how many expert panels Leapfrog puts together for those various survey numbers?

A. I think something like ten.

Q. And are those expert panel members also volunteers?

A. Yes, they are all volunteers.

Q. And do those expert panel members, and I want to talk specifically about expert panel members that oversee CMA, COE, hand hygiene, the ICU physician standard, are those volunteer expert panels independent of let's say like the Dr. Ramonos

that sit on the Safety Grade Expert Panel?
A. Yes, they are all.
Q. And what is the ultimate goal of the survey?
A. Transparency and striving for improvement.
Q. And is the survey free for hospitals?
A. Absolutely free.
Q. And does Leapfrog provide any other free services to hospitals who complete the survey?
A. It is a considerable investment to us to provide those kinds of support and services, programs, webinars, and we do offer a help desk, we offer significant resources to help them in completing the survey.
Q. And I believe you testified earlier that participation in the survey has steadily grown over time, correct?
A. Yes.
Q. And as participation in the survey has gotten larger, has Leapfrog had to add resources?
A. Absolutely.
Q. And why have you had to add resources with respect to a growing number of participants in the survey?
A. Well, the survey is our most expensive asset, it is very, very expensive, because we want to do a first class job on the survey, so we have a help desk, we have all those resources from hospitals completing the survey, so the tools of programming. We also have a lot of research that goes behind

the survey, so when hospitals go into the survey, there are a lot of resources that are evidence based, everything that we have in our survey so that hospitals become aware. Many hospitals, I have been told, many hospitals use the survey as actually kind of a checklist, you know, what are the best practices that are out there in the broader world for improving our safety. And so all of those resources, research, and education adds to the surveys itself, it is a very expensive resource and we're proud of it.

Q. And Leapfrog uses its revenue to pay for those resources to put out these free products to your hospitals and consumers?

A. Yes.

Q. And there has been a lot of discussion in this case about Leapfrog not having any verification process over survey results. You heard that as we sat here for the last few days?

A. I think I have, yes.

Q. Does Leapfrog have a verification process for its survey data?

A. Yes, it is extensive verification.

Q. And why is it important for Leapfrog to have a verification process surrounding the survey data?

A. Well, first of all, people make mistakes. Let start there. When you are submitting data to the Leapfrog survey, people make mistakes and we catch those mistakes. There has to be a whole series of processes, programming, et cetera, in place to

be able to make sure we are catching them, so there are mistakes. And sometimes there's misinterpretation of our questions. We want to make sure all hospitals are reliably interpreting questions so that it is apples to apples comparison once we rate them based on the data they have given us, so we check for a whole variety of the areas where there may have been questionable responses.

And then we look for things where it just doesn't make sense or things just don't work. And then we also get documentation. Frankly, there might be somebody who is deliberating giving us the wrong information. That can happen, and so we have extensive documentation requiring that we impose on a handful of hospitals.

Q. And you recall Mr. Chung in his examination talked to you about the attestation at the end of the survey; do you recall that?

A. Yes.

Q. Mr. Moddy, if you could hold that up, I don't have the exhibit number in front of me, we will have it in a second.

While we are waiting for that, why is it important for Leapfrog to have hospitals who participate in the survey sign an attestation?

A. We want them to stand behind what they report to us.

Q. And this is Exhibit DX-470, it has already come into evidence. Is this the attestation that Mr. Chung was asking

you about?
A. Yes, it is.
Q. And is it a fairly lengthy couple of paragraphs, correct?
A. Yes.
Q. And we will talk about the one sentence that Mr. Chung pulled out of this.
What is the intent of this attestation on the survey?
A. For the hospital to stand behind us and also to assure they are aware that the rates that we derive from the data that they give us will be used by us.
Q. And you say here, you know, it says, "As the hospital CEO, or an employee of the hospital to whom the hospital CEO has delegated responsibility, I have reviewed this information pertaining to", you see that?
A. Yes.
Q. And is this the first part of the verification process that saw?
A. Yes, this is where the CEO was actually presenting to it.
Q. And does Leapfrog expect the CEOs of hospitals to be truthful when they sign this attestation?
A. Absolutely.
Q. Now, I want to bring your attention to the sentence that Mr. Chung had, I'm trying to find it here. Buried somewhere -- would you highlight it for me Mr. Moddy, I apologize.
"The hospital and I acknowledge that the Leapfrog Group may

use this information in a commercial manner for profit". Do you see that?
A. Yes.
Q. And that is the line that Mr. Chung pointed out to you, correct?
A. Yes.
Q. Can you tell the Court, has Leapfrog ever used hospital data for -- in a commercial manner for profit?
A. No.
Q. And, in fact, Leapfrog -- is Leapfrog a not for profit organization?
A. We are not for profit, we are not doing anything for profit, this is --
Q. When is the first time you saw that sentence?
A. In this litigation is when I first noticed it.
I mean, honestly, this is in a courtroom, but this is over lawyering. We had a lawyer who over wrote this. This is not what we do. But it is in the interest of full disclosure, I'm trying to say, that the ratings that we derived from our data can be used by organizations that themselves are for profit. You saw some of those health plans that can use our ratings, but the wording of this was a little much.
Q. You can take that down, Mr. Moddy, thank you very much.
And you just talked a little bit about how your expenses increase as hospital participation in the survey increases.

And so my question is, in the fall of 2024, was Leapfrog hoping to expand hospital participation to increase revenue?

A. No. Not to increase revenue, you always want more hospital participation.

Q. Is the mission of Leapfrog to increase hospital participation?

A. Yes. We want hospitals to be fully transparent and the best tool we have for that is the Leapfrog hospital survey.

Q. And as the President and CEO of Leapfrog, what do you say to the criticism of these five hospitals that the survey is just too burdensome to complete?

A. Well, hospitals in this country are asked to do a lot of things to demonstrate and to honor their own quality of care.

We talked a lot in the last few days about the Joint Commission. All five of the hospitals in this case are Joint Commission accredited, and that is an extensive amount of work to be accredited by the Joint Commission. And they do other things, registries, all kinds of different programs that they produce and there are lots of them out there.

Leapfrog has one purpose and that is transparency. Most hospitals have no other quality or safety work they are doing directly tied to the purpose of transparency to the public they serve.

So Leapfrog is 48 hours of staff work, maybe more, maybe less, depending, but it's about two weeks of staff time once a

year for the express purpose of public reporting by hospitals, and that is why I get that that can be burdensome, but it is also the only thing they are doing for transparency. And so we stand by and congratulate and we are grateful to the hospitals that are that committed to transparency.

Q. And in 2012, after the survey had been in place for about ten, 11 years, did the board of Leapfrog decide to watch the hospital safety grade?

A. Yes, they did.

Q. And I want to talk about the board.

What can you tell the Court about the organization and the board being involved in the concept of the hospital safety grade and why it came into being?

A. In 2010, there was a lot of conversation nationally in the country about patient safety because it was the ten year anniversary of a report that had come out called "To err is human". That report broke open the patient safety movement, it was done by -- and it was front page in the New York Times that a hundred thousand people were dying of preventable -- that up to a hundred thousand people were dying of preventable medical errors in hospitals and it changed nationally around patient safety and became a major issue, it got to the White House level, actually.

And so Leapfrog was founded because of that, the call to action around patients saying how can we be better. And the

employers of Leapfrog felt that we needed to have an open marketplace so that hospitals would publicly report how they were doing that safety and their employees would be able to compare hospitals when they were making decisions about where to seek care, and then that would create a better marketplace. The founders were people like the auto makers who said, our products and services are held up to a high level of scrutiny, we are in Consumer Reports, all over the place, our products and services are compared against our competitors in a very open and transparent market and that made us better, so let's try that for hospitals. That was the whole purpose and so ten years later, we are saying, well, have we seen progress on patient safety, ten years in, ten years in into this movement around patient safety and the answer was there were several different studies done that year, again, to let us know, no, no progress at all. In fact, there was some evidence it was worse than we thought, we could measure patient safety better by then, so it was very bad, and it really was very frustrating to the members of our board, and certainly to everyone, I mean, the hospital themselves were frustrated.

And, so, Leapfrog's board really took this to heart and said are we going in the wrong direction? Is this whole idea of an open transparent market among hospitals allowing people to know how hospitals are doing, not just a failure or what, what do we need to do.

And what they concluded was, it is a process that works, an open competitive market works, but the reason it is not working in this case is because it is not mandatory to make public how you are doing on patient safety as a hospital. It is not mandatory, so that means that the hospitals that aren't willing to report to the survey aren't having to make their data public, that's its function and it is not working. At the time, we were advocating strongly for mandatory reporting by CMS and then that happened to enable us to launch the hospital safety grade.

Q. Okay. And so by the time 2012 comes around, Leapfrog has CMS data at this point, correct?

A. Yes.

Q. And we talked about it earlier, Leapfrog's Hospital safety Grade is a composite grade, correct?

A. Yes.

Q. And just briefly, very briefly, it consists of what different kind of measures?

A. Well, really two buckets. One is process structural, and then the other is outcomes. So outcomes are incidents, complications, infections, deaths from preventable problems in surgery, things like that. So really all in the bucket of safety, but things that you just don't ever want to have happen when you are in the hospital. That is half of the grade.

Then the other half are what we call process structural

measures. So those are whether or not the hospital has in place the kinds of mechanisms that are needed structurally to prevent these and to sustain any -- to sustain their performance on improving safety in the hospital, so for instance, if they have a low infection rate, we also want to know, do you have in place the mechanisms necessary to sustain that.

Q. And I skipped over this earlier, but your background, what is your background in, in terms of your former experience?

A. I have -- I work mostly in health policy, that's where I got my start, National League for Nursing, doing health policy on nursing shortage, that's a specialty, and then I worked in Government for awhile in the City of New York, and then I worked for a hospital system in a rural part of Maine. So I went from New York City to Maine, but people are people everywhere, it is amazing. And that is where I learned a lot how hospitals are run and graded.

Q. And turning back to the safety grade, was it important to the Leapfrog board that there was transparency with hospitals and consumers around the calculation of the safety grade?

A. Yes, absolutely, extremely important.

Q. And did that remain true today?

A. Yes.

Q. And what are some steps you take with the public, we've heard in testimony previously about the methodology and changes

are published, specifically the fall 2024 changes. Can you just talk very briefly about the communications that you sent out to keep transparency alive with both hospitals and patients, and employers?

A. Well, we do, we have a series of communications that we send routinely, like a monthly news letter and I do a routine as letter, things like that. So just sort of send general updates to our constituents who sign up and say they are interested. And then we also do press releases, press announcements, and we have all of our educational programs, what's called the -- education that we run.

Q. And are those things you just talked about, are those free to the public?

A. Yes.

Q. And I want to talk about some of the --

A. I should say, sometimes we charge registration for like our annual meeting for some things, yeah.

Q. I'm sorry. Thank you for that clarification.

So we heard some things said like hospitals that don't participate in the Leapfrog survey automatically get an F or it's pay to play.

I know those are in this litigation, but as President and CEO of Leapfrog, have you heard those sorts of tropes before?

A. Before this litigation, I heard them about 12 years ago when we first launched the safety grade. The first year or

maybe two years of the safety grade, we would hear it is pay to play operation, you get an A or something like that. We used to hear those kinds of things.

That stopped happening, and at first, we heard it all the time, but then they stopped. The reason they stopped is because we simply discredited those because they were not true. It is not true. Nobody pays to do a survey, and we don't get paid to give someone and A, that never happened, and we simply discredited it with the media which in turn led to some hospitals, they didn't want that with their own reporters that they had told a deliberate -- or they told something that wasn't true.

So it wasn't a good press strategy, put it that way, and eventually we stopped hearing that and then this litigation came back, and all of it came back.

Q. And if we could pull up DX-402. I believe this is already in evidence. Ms. Binder, I'm showing you the technical overview of the hospital safety score for 2012. Do you see that?

A. Yes.

Q. And fall of 2012 was the year that hospital safety grade was first launched.

MR. CHUNG: Objection, Your Honor, this is not admitted.

MS. BLAIR: I thought it was.

MR. CHUNG: If counsel can lay a foundation first.
MS. BLAIR: Sure.
BY MS. BLAIR:
Q. Ms. Binder, let me just ask this, in 2012, were you CEO and President of Leapfrog.
A. Yes.
Q. And have you ever seen this document before?
A. Yes.
Q. And do you recall that the presenter here is Missy Danforth, Senior Director; do you see that?
A. Yes.
Q. And do you have a recollection that you were involved, at least in creating part of this document, as related to these tropes that we were just discussing?
A. Yes.
Q. And in 2012, you were intimately involved with regard to the hospital safety grade and communicating to the board regarding issues surrounding the first launch of the safety grade?
A. Absolutely.
MS. BLAIR: And Your Honor, I would ask that this document, DS-402 be admitted into evidence.
MR. CHUNG: No objection.
THE COURT: 402 is admitted.
(Whereupon Defendant's Exhibit 402 was admitted

for Evidence.)

BY MS. BLAIR:

Q. And if we could go to page 25, please. Just scroll up so we can see the heading here. Questions, do you see that, answers to frequently asked questions?

A. Yes.

Q. We have seen other frequently asked questions that have been shown to you in your examination by Mr. Chung.

Clearly, this could have been frequently asked questions that Leapfrog basically just launched, correct?

A. Correct, but it is a term of art.

Q. Okay. And that was my question. So by this point in time, 2012, had you heard a lot of different things at this point regarding the safety grade survey?

A. I can't remember the exact date in 2012 when this happened, but I can say that after the original launch of the safety grade, we had so much attention to it that we definitely heard everything.

Q. Okay. And then in 2012, Leapfrog is hearing, you have to complete a hospital survey to get an A. Do you see that?

A. Yes.

Q. Was that true in 2012?

A. No. Never true.

Q. Is that true today?

A. No.

Q. And if we scroll down, Mr. Moddy, thank you very much.
Leapfrog charges thousands of dollars for its survey and/or to participate in the hospital safety score. You see that?
A. Yes.
Q. And, in fact, Leapfrog responds that surveys have always been and continues to be free of charge to participating hospitals. You see that?
A. Yes.
Q. Is that true today in 2026?
A. That has always been true.
Q. And the next bullet point: Hospitals receive hospital safety scores at no charge. Is that true today?
A. That is true and has always been true.
Q. If a hospital wants to use their safety score commercially in a paid advertisement, for example, then there is a licensing fee. Do you see that?
A. Yes.
Q. And there has been some discussion in this Court about accolades licensing? Do you recall hearing that?
A. Yes.
Q. And is the accolade licensing that we've all been discussing, did that correspond with that bullet point there?
A. Yes.
Q. And are you aware of any other health care rating, health care ratings organizations that also charge for the use of

their logos?
A. Yes, it is common practice, like Health Grades, U.S. News.
Q. And if you could scroll down, Mr. Moddy. Here's the next one. Leapfrog manipulated the data and did not allow hospitals or others to confirm the accuracy of the data. Do you see that?
A. Yes.
Q. And we heard that here today in this case, right, that hospitals who participate manipulate their data because there is no verification, correct?
A. I think they imply the thing is no good, yeah, something like that.
Q. But that wasn't true in 2012?
A. That wasn't true and isn't true now.
Q. And if we can scroll down, Mr. Moddy. And then it just say, what to expect, right? You see that?
A. Yes.
Q. You can take that down.
And so many of those same things are things that you had to defend against since 2012, correct?
A. Absolutely.
Q. I want to talk a little bit about revenue. We already covered that just a little bit.
Can you tell the Judge what the various sources of revenue are for Leapfrog that make up the eight million dollars per

year that you have in non-profit revenue?

A. Sure. We have -- some of our revenue, about three million of it comes from what I would call standard non-profit fund raising, so sponsorships, donations, registrations for our meetings, et cetera.

So those are standard practice for non profits. We also derive some income from selling reports based on what we are seeing for trends in the data and patient safety, and then we license our data, we talked about that a lot, we have health plans and others that want to incorporate our ratings, not the data we got from hospitals, but out ratings into their own report.

So for instance, a health plan that wants to put Leapfrog ratings of different hospitals into their finder tools that they did their own growing, they will pass a fee for that, and then we also -- our top source of revenue is accolade sales, so those are the A logo that hospitals would earn or other types of top hospital logo. Logo only. We also give -- they can use it for free.

So, if a hospital wants to use their top hospital designation from us, they can use that for free, we give them a press release, we give them a tool kit, if they want to use the logo, we do charge for that.

Q. Why do you allow hospitals to advertise those grades even if it is for free?

A. Because it really meets our mission. We want hospitals to take pride in improving their safety, we want a market for patients' safety, we never had that until Leapfrog came along and said, you know what, we want you to get a pat on the back if you are good in patient safety. Up until now, they have got nothing, there is no transparency and there is nothing, a hospital does a great job and puts a lot of attention to hand hygiene and anything else, there is no response from the market, they get paid the same, health community never pays attention to them, everything was tough, too bad, you did that.

And that is not how you run a functional market. So we wanted to say, we will give you accolades for that, and we want them to tap those accolades, we want them to showcase to the community they serve that they are doing a good job.

Q. Is another source of revenue for Leapfrog fund raising, and we heard from Ms. Jupiter, yeah?

A. Yes.

Q. And Leapfrog gets grants, correct?

A. Yes.

Q. And there has been an allegation in this case and I want to be very clear, does Leapfrog generate any revenue from selling consulting services to help hospitals get better grades?

A. No. Absolutely not, and we never have.

Q. Is there an incentive, financially, to Leapfrog in giving hospitals failing grades?

A. The opposite. If we really wanted to make a lot of money, which we do a lot of things that are solely at mission and not at finance, if we wanted to make a lot of money, we would never give Ds or Fs, we would only give high grades. What other rating organizations will do is go to the top performers and that's it and then you saw it on the accolade, that is how they make a lot of money, a lot of money. And we don't do that, we lists all performance category, we call it like we see it.
Q. There was some discussion with Mr. Chung about the money that Leapfrog, the revenue that Leapfrog generates from data licensure. Do you recall that?
A. Yes.
Q. The only types of data licensure that you sell survey and hospital safety grade data?
A. No. We have some other reports and analyses that we do, we have something called value base purchasing program, where we help health plans with composite scores and things like that that will help them to structure payments incentives and things like that.
Q. I want to talk about the creation of the hospital safety grade website. Very briefly. You understand that the hospital safety grades are displayed on the website called hospitalsafetygrades.org, correct?
A. Yes.
Q. And could you tell the Court how that website came into

being. What did Leapfrog do to make sure it had a fully functional useable website in or around 2012?

A. Well, when we first launched the safety grade in 2012, we prepared a website which was just what we thought internally with a very small staff would convey the grades appropriately, but we heard back from our own constituents as we do always, our constituents are very active in Leapfrog, they tell us everything. And they come back to us and said we don't think your website is understandable to the public, it is just not good enough. And so I was very fortunate to be able to get a grant from the Robert Wood Johnson Foundation for $200,000 right away because we needed to move quickly to change the website and we didn't have a lot of -- Leapfrog didn't have a lot of money and we certainly didn't have it then and we got this grant to bring in an expert on communications to help us to structure our website so it could be understood by people with a six to eighth grade reading level, and that is how we ended up developing the platform that we really still have today.

Q. And I am going to show you what has been marked as DX-317.

MS. BLAIR: I believe there is an objection to this document, Your Honor.

MR. CHUNG: Just one moment, Your Honor.

Your Honor, once counsel lays a foundation.

MS. BLAIR: Fine, Your Honor.

BY MS. BLAIR:
Q. Ms. Binder, right in front of you on the screen, is a contract for consulting services, educating the public on patient safety. Do you see that?
A. Yes.
Q. If we can scroll to the bottom, full disclosure to the Court, this document is not signed because it is 14 years old, but we tried to get what we could.
In looking at this document and preparing for your testimony for trial, do you recall signing this contract?
A. Yes, I did.
Q. Okay. If we scroll up to the top of this document, it says that the purpose was to engage the services of contractors rather than strategies for usability and navigability of the hospitals' AT score website and app. Do you see that?
A. Yes.
Q. Is that consistent with what you just testified to, to the Court, that you got a grant and used that $200,000 grant money to design a website that was user and consumer friendly?
A. Yes, with Chris Zarcadoolas, the health agency expert.
Q. And in seeing this document here today, does this document represent the contract that Leapfrog entered into with Chris Zarcadoolas?
A. Yes.
MS. BLAIR: Your Honor, I ask that DX-317 be admitted

into evidence.

MR. CHUNG: No objection. Your Honor.

THE COURT: What was the number again?

MS. BLAIR: I'm sorry, DX-317.

THE COURT: All right. 317 is admitted.

(Whereupon, Defendant's Exhibit 317 was admitted For Evidence.)

BY MS. BLAIR:

Q. With respect to this scope of work, Ms. Binder, you will see that it says, "Working under the direction of Leah Binder, the contract will perform the following": And it's a report and full analysis of website app and media messaging as it pertains to literacy load and active communication in diverse populations, correct?

A. Yes.

Q. Do you recall whether or not in respect to this contract that Ms. Zarcadoolas performed any user experience testing with respect to the website that was going to be rolled out?

A. Yes, we did considerable testing.

Q. And it does refer to an app. Do you see that, it says website app and media messaging?

A. Yes.

Q. Did Leapfrog ever have an app?

A. We had an app for awhile, but we don't anymore.

Q. Okay. And if we continue to scroll down under the scope of

work, the period of performance was October 15th, 2013, through October 2014, correct?

A. Correct.

Q. And the payment for these services, if we go down, $30,000, correct?

A. Correct.

Q. And there's the name right here, Dr. Christina Zarcadoolas, correct?

A. Yes.

Q. And in connection with this contract, do you recall Dr. Zarcadoolas provided you with her CV regarding her experience in user testing and designing a fully functional website?

A. I guess she did.

Q. And if we can pull up DX-318, excuse me.

MS. BLAIR: There is also an objection to this document, Your Honor. This is a biographical sketch that was submitted with the contract to Ms. Binder.

MR. CHUNG: Your Honor, we object on hearsay grounds.

THE COURT: This was part of the contract initially?

MS. BLAIR: It was, Your Honor.

THE COURT: Objection overruled. What is this number?

MS. BLAIR: This number, Your Honor, is DX-318.

THE COURT: 318 is admitted over objection.

(Whereupon, Defendant's Exhibit was admitted for Evidence.)

BY MS. BLAIR:
Q. And Dr. Zarcadoolas says that she is a sociolinguist with over 35 years of study in health communication and public understanding of health and science. Do you see that?
A. Yes.
Q. When you interviewed Dr. Zarcadoolas, was that your understanding of her background?
A. Yes, at the time, I was searching for the right expert, this was really important to us, and so she was a super star.
Q. And when you say "this was really important to us", can you tell the Court what was really important to you in the designing of this consumer facing website?
A. That we could communicate with the lay public, people who don't know much about health care, but certainly have an interest in it as a patient. We wanted to be able to communicate to effectively with them and explain to them and be able to show them what the safety grade really was and how they could use it.
Q. And after Dr. Zarcadoolas finished her user experience testing and created the website, is it functional and similar to what we see today?
A. Similar, yes.
Q. And were you required to provide a report to the Robert Wood Johnson Foundation regarding how you utilize their money in the creation of this website?

A. Yes.
Q. Did you, with the help of Dr. Zarcadoolas, in fact prepare a report to the Robert Wood Johnson Foundation with respect to the design of this website?
A. Yes, I worked with Chris on that.
Q. And could you pull up DX-319.
MS. BLAIR: Your Honor, there is an objection to this document --
MR. CHUNG: No objection, Your Honor.
THE COURT: 319 is admitted.
(Whereupon Defendant's Exhibit 319 was admitted for Evidence.)
BY MS. BLAIR:
Q. Ms. Binder, this is the final narrative report dated -- I don't know if it has a date, but it says the grant date was October 15th, 2013 to November 15th, 2014, and the grant amount, $199,503, correct?
A. Correct.
Q. And you'll see here on the front page, it says, the goals, the project goals were research on strategies to best communicate about safety in a way that is most useable by the public, recognizing diverse levels of health literacy. Do you see that?
A. Yes.
Q. And is that, in fact, what you did?

A. Absolutely.
Q. And, again, that was very important to Leapfrog?
A. The top priority.
Q. And if we scroll down just a little bit in this report, that second paragraph, do you see the project pivoted around Leapfrog Hospital Safety Score Website, the same website we are all talking about here this week, right, hospitalsafetyscore.org or -- no, hospitalsafetygrade.org?
A. Yes, we changed the name.
Q. Which assigns a letter grade of A, B and C, assessing how safe individual hospitals are for patients. Do you see that?
A. Yes.
Q. And this report, and I won't bore the Court with it, it will go into evidence, but do you recall anything about this report that stood out to you about discussions with consumers about how they were interacting with the website as you were writing the user testing?
A. There were a lot of surprises in user testing, but the number one surprise to all of us was that consumers that we tested with really wanted a lot of detail, that actually, they were not satisfied by just looking at the grades. We thought the grades would be enough, but you show them the grades, and a few of them might want to know, but it was the opposite. You show them the grades, they immediately wanted to dig into the grades. That was pretty surprising I think to us, but it

wasn't surprising to Chris. She said if you want to build trust, people want to see how you did it.

MR. CHUNG: Objection, Your Honor, I move to strike, hearsay.

THE COURT: Overruled.

THE WITNESS: I was in the room while this was taking place, I observed all of the tests.

BY MS. BLAIR:

Q. And at the end of the day, were you, as the CEO of Leapfrog, satisfied that the website that had been designed by Dr. Zarcadoolas with the Robert Wood Johnson Foundation grant was designed to provide the medical type of information at an eighth grade reading level for the consuming public?

A. Yes.

Q. I want to talk a little bit about the fact that you publicized the Leapfrog grades.

Why does Leapfrog embargo its grades with the media?

A. So, it is really important to us that we are not surprising anyone, and that all the constituents who have an interest in the safety grade are prepared to have a conversation with the media about their grade. So, for instance, hospitals, number one, we want to make sure hospitals know well in advance about public release of the updated grades, they know about it, they have time to gather their PR operations and strategy, whatever it is they want to be able to do in order to answer questions

that will come from the media. We never want to have the hospitals surprised by a call from a journalist about something they don't know anything about.

We want them to be aware of it and have time to -- and also have time to talk to us. We spent a lot of time before the announcement about the grade talking with hospitals and others about who are interested in understanding better about the grade so that they are prepared for the media.

Q. And other than some of the documents we've seen with respect to this lawsuit, other than this lawsuit, has Leapfrog ever made it its actual position to publicize D and F grades?

A. Never.

Q. In --

A. Oh, except for this lawsuit.

Q. Was the purpose of the methodology changed in the fall of 2024 to punish hospitals who refused to participate in the survey?

MR. CHUNG: Objection, Your Honor.

THE COURT: Basis?

MR. CHUNG: Leading.

THE COURT: Overruled.

THE WITNESS: No, it was not.

BY MS. BLAIR:

Q. Mr. Chung brought up your compensation and, in fact, he showed you PX-322.2, your CEO review. Do you recall that?

A. Yes.
Q. And he showed you a salary that you had put into that document. Do you recall that?
A. Yes.
Q. Did you get that salary?
A. No, I didn't ask for it. I had written out as per a request from my executive committee, I had written out an overview and performance, essentially, my performance and competitive analysis based on tax laws on my compensation compared to others in a similar line of work, but I did not -- I asked them not to provide me with that increase.
Q. Was there a period in time when you went six years without a raise?
A. I am currently in any sixth year without a raise.
Q. And why?
A. I wanted to reserve the funding that is available for my executives, and we, you know, we have had a lot of progress at Leapfrog, and I wanted to be able to invest our revenues in more progress, so I have not actually had a raise.
Q. Have you ever communicated with the CEO of Tenet Healthcare, Saum Sutaria?
A. I attempted to reach out to him.
MR. CHUNG: Objection, Your Honor.
THE COURT: Basis?
MR. CHUNG: Relevance.

THE COURT: Overruled.

THE WITNESS: I attempted to reach out to him because he had contacted the head of the Johns Hopkins where Matt Austin is employed, he had contacted Matt's boss to ask --

MR. CHUNG: Objection, Your Honor, hearsay, again, relevance.

THE COURT: Overruled.

THE WITNESS: And so Matt's boss had called me and said I heard from Saum and so I reached out to Saum.

BY MS. BLAIR:

Q. Did he ever respond to you?

A. No.

MS. BLAIR: Thank you, I have no further questions.

THE COURT: Cross-examination.

MR. CHUNG: Yes, Your Honor, pretty briefly.

CROSS-EXAMINATION

BY MR. CHUNG:

Q. Now, Ms. Binder, toward the beginning of your direct examination by Ms. Blair, you testified about how the regional leader organization, the regional leader groups, are principally made up of employers, right, companies in these regions, correct?

A. Most of them, yes.

Q. Yes, most of them. And one example of a regional leader group is the Florida Alliance that Ms. Van Caulil, whose video

testimony we saw, where she is a board member, a leader of that particular region, correct?
A. Correct.
Q. I think you testified that employers within these groups more generally are consumers of health care, right?
A. I don't think I testified exactly that.
Q. Okay. But employers, for purpose of their employees, are interested in, I think you said, patient safety at hospitals located in their region, correct?
A. Very interested, yes.
Q. And so the hospitals -- so these employers look at the hospital safety grades that Leapfrog gives, correct?
A. Yes.
Q. And they rely on those hospital safety grades in making purchasing decisions with respect to their employees, correct?
A. Some may, but I don't know about that.
Q. But for those that do make purchasing decisions for their employees, it would be important for the safety grades that these employers rely on for those safety grades to be accurate, correct?
A. Well, to the extent a employer relies on it, yes.
Q. It would be important for those safety grades to be accurate, correct?
A. Yes, it is always important for the safety grades to be accurate.

Q. Now, Ms. Blair asked you some questions about the sentence or the provision in the hospital survey, right, in the attestation portion, right, where the CEO or the representative of the hospital attests to the accuracy of the information that is submitted, right?
A. Right.
Q. And we have been going back and forth about that sentence or sentences about how the attestor acknowledges, right, that the information in the survey can be used by Leapfrog for commercial profit, right, you had some back and forth about that?
A. It is not the information in the survey that we say can be used for commercial profits.
Q. Okay. But you testified that your -- that that particular provision or that language, you don't agree with it; is that your testimony?
A. Well, if you want to bring up the language, we could look at it, we don't sell the information inside the survey, we sell our scores of the hospitals.
Q. And you testified that you only became aware or saw that language during the course of this litigation? That is your testimony, right?
A. Yes.
Q. Now, the hospital survey, those are under review on a regular basis, correct?

A. Yes.
Q. So it undergoes revisions annually, correct?
A. Yes.
Q. And that provision, the commercial profit language, has been in the annual survey for several years, correct?
A. I am not sure how long.
Q. But it is not -- this year is not the first time that that provision had been in the survey, correct?
A. Correct.
Q. All right. Ms. Blair also asked you about the language of "pay for play", whether you encountered or heard that language at various points in time, but you have heard the word "blackmail", right, to be used to describe the fall of 2020 methodology change, correct?
A. As part of this litigation, yes.
Q. And from your own expert panelist, Dr. Pat Romano, correct?
A. I didn't see that. I wasn't on Patrick's -- Dr. Ramono's email, so I hadn't seen that until this litigation.
Q. Why don't we put up PX-293.
We have seen this email before, but now you have seen in connection with the fall of 2024 the methodology change. Dr. Pat Romano, himself, your expert panelist has said, again, responding to this UC Davis call, "you can call it blackmail if you want, but pay for reporting or penalty for non-reporting is a common theme across many programs". You see that?

A. Yes.
Q. Now we see this language as recently as May 15, 2024 in connection with the fall of 2024; is that correct?
A. Yes, he's referring to other programs across other programs.
Q. Well, he continues to say, "Leapfrog has no choice but to use the only carrot sticks available". He's referring to Leapfrog there, correct?
A. Yes.
Q. Ms. Blair asked you questions about the low literacy of website review, that if the Dr. Zarcadoolas, I pronounced it better than Mr. Blair, went as far back as 2013, correct?
A. Correct.
Q. Low literacy review.
Now, the website, the hospitalsafetygrade.org website, and its prior iterations, I understand there was a different name for the website before, but that website has not been reviewed by Dr. Zarcadoolas or any literacy expert since then, correct?
A. As part of --
Q. Yes or no?
A. Well, yes, as part of this litigation.
Q. As part of this litigation, but before, but in connection with the fall of 2024 methodology change, was there any low literacy done of the website after the website was changed as part of the fall 2024 methodology change?

A. So --
Q. Yes or no, Ms. Binder?
A. I don't know. I can't answer that question.
Q. Okay, so you don't know whether, let's take for example, the footnote score that we have been discussing has undergone low literacy review, correct?
A. Right.
Q. You don't know whether it would be the 15 number that we focused on during the earlier cross-examination and the asterisk, and the limited achievement language has undergone a low literacy review, correct?
A. Correct.
Q. You don't know whether the 26 or 27-page methodology document that is linked somewhere on the left side has undergone a low literacy review, correct?
A. No, it has not.
Q. That has not, all right.
Now, I want to go back to the compensation memo that we discussed and Ms. Blair raised again in your direct examination.
Now, understanding that you eventually did not receive that salary, is it correct at the time, right, you put together the memo, you believed that your bonus, some part of your compensation should be tied to the revenue generated under your leadership?

A. Yes.

MR. CHUNG: Okay. No further questions, Your Honor.

THE COURT: Do you have questions on his cross?

MS. BLAIR: Very quickly.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MS. BLAIR:

Q. Ms. Binder, Mr. Chung just asked you about the Federal Health Alliance, correct?

A. Yes.

Q. And the fact that they are regional leader for Leapfrog, correct?

A. Correct.

Q. Are you familiar with the letters that the Florida Health Alliance sent out to hospitals encouraging them to interact with Leapfrog? Are you familiar with that?

A. Yes.

Q. And isn't it the case that those letters asked the hospitals to participate in the survey to get transparency for these employers' patients?

A. Yes, that is exactly what the letters say.

Q. And Mr. Chung asked you some questions about had there ever been a low literacy review of the current website. Do you recall that question?

A. Yes.

Q. And are there any expert panels that Leapfrog has that are for patients and families of patients that you ask questions to about the readability of this website?

A. Yes, we have a patient and family expert panel and they review all of our materials and we checked and I couldn't answer the question because they have experts on that panel as well.

MS. BLAIR: Thank you. No more questions, Your Honor.

THE COURT: All right. Thank you.

MS. MALONEY: Your Honor, one point of clarification on PX-426 in Mr. Chung's examination of Ms. Binder. Docket 141 at page two of nine reflects a revised joint pretrial stipulation in which PX-426 was agreed to as admitted and I think there is an outstanding question on that.

Next step, we have Lauren Bailey, she is the director of communications for The Leapfrog Group for which we designated approximately six minutes of testimony and Defendants have also designated counter designations totaling approximately four -- they have informed us that they will affirmatively designate 18 minutes. Those designations have not yet been filed, thankfully, because there are things in them that we have notified them on multiple occasions are not appropriate. Since this will be the end of our case, the playing of the Bailey designations and presumably the start of theirs, I would ask Your Honor if we may have argument, which

we have attempted to avoid, but if we may have argument on the furtive designations they intend to make in the Bailey deposition.

THE COURT: What is this issue about?

MS. MALONEY: The issue is about the statement that was made in opening statements by Defense counsel in which I was identified as spreading lies, me, Mary Beth Maloney, counsel for the five hospitals, and a partner at Gibson Dunn.

They have now decided to put in as evidence, not merely statements or arguments, but to put in as evidence Ms. Bailey's statements to the same effect, in fact, they go further.

So we would like to argue and we have asked them multiple times to withdraw this, and my partner, on behalf of the hospitals as well as my firm, our firm would appreciate the opportunity to argue this if they continue to refuse to stand down and not put this statement in the record as evidence.

THE COURT: You think this is somehow related to the case?

MS. BLAIR: It is, Your Honor. As you've heard today, there were a lot of questions to Ms. Binder and others about Leapfrog's reaction to the filing of this lawsuit and media campaign. What we're talking about is one question and one answer in a sworn deposition of Lauren Bailey and they asked her about why Leapfrog decided to take a proactive approach

against the five hospitals, and her sole answer was we saw Mary Beth Maloney on TV and we felt like we needed to defend ourselves. That's it.

MR. CRAIN: Objection, Your Honor, that is not the quote.

MS. BLAIR: Well, let's hear the quote because I don't have it in front of me.

MR. CRAIN: Your Honor, I would prefer not to have it put in the record. I believe it is so outrageous.

MS. MALONEY: You can hand it up to --

MR. CRAIN: Yeah. The quote in their designations which they have not filed is Leapfrog, quote, saw Mary Beth Maloney saying a lot of very untrue things in the press, and refers to, quote, an attack on Leapfrog, end quote, that, quote, Mary Beth Maloney did, end quote. And, Your Honor, it is a question not only of relevance, but it's also a question of decorum and inductive and ad hominem attacks and Ms. Maloney is right, I am here not only on behalf of the community hospitals, but also on behalf of my firm, and my mentor and colleague, Ms. Maloney, because this is an episode of a broader pattern that we have seen in this case. We have seen them specifically target and attack Ms. Maloney in cease and desist letters, in opening statement the other day. We have cases, we are happy to provide Your Honor, about whether it is proper and it is not, to specifically name opposing lead counsel and the

evidence for argument in trial is a question of ethics and it's a question of professional responsibility. It is totally irrelevant to this case, and Your Honor, the specific issues that they have referenced for Ms. Maloney's statements to the press are exactly the types of issues Your Honor said in a motion in limine, we clearly have evidence to support the challenge they are making, you recall, Your Honor, the pay to play motion in limine that Your Honor dispensed with at docket 151 of three, they take issue with statements that my colleague and mentor made on CBS interview of point by point in May in which Ms. Binder appeared on television on CBS, Ms. Maloney appeared simply to recount the allegations in the complaint and responds to certain questions for reporters and one of the questions that they now say is untrue is this pay to play allegation, which Your Honor dealt with when you said, quote, the Plaintiffs clearly have some form of testimony of expert evidence in the record that they intend to use to corroborate their claim.

And so we think it is to the extent they want to argue about response to allegations to the public, to the extent that they want to argue about articles, and to that extent, that to us is a separate issue, but to name lead trial counsel by name, not only in opening, but also in evidence is we believe a gross violation of rules, norms, decorum, and we can cite United States Supreme Court case law, Eleventh Circuit case law and

Southern District case law.

So we think that specific testimony should be stricken, we think counsel should be instructed to cease attacking my colleague and mentor, Ms. Maloney, and we think they should be instructed to sort of cease this effort at the risk of potential sanction.

THE COURT: All right. I'm going to overrule the objection, you need to make your own decisions about whether you think it advances your case.

MS. BLAIR: Thank you, Your Honor.

THE COURT: Both bodies have a view about that. Proceed.

MR. CRAIN: Your Honor, if we could submit briefing on the questions, we would be glad to do so.

THE COURT: I don't think it is necessary. I think it is untoward to do that. On the other hand, I don't think it rises to the level of extreme prejudice or anything of great significance.

I don't view it as a serious -- I mean, it is a comment about opposing counsel, and I don't see it as harmful or very harmful, frankly. I am always disappointed when lawyers do it, but compared to what I hear on a daily basis, it's not the worst I ever heard.

MS. BLAIR: And, Your Honor, for the record, I want to be very clear, in my opening statement, I did not use Ms.

Maloney's name, and these aren't my statements, these are sworn testimony of Lauren Bailey.

THE COURT: All right. We will take it for whatever weight I think to Ms. Bailey merits.

MR. CRAIN: Your Honor, if I could correct one point they did have Ms. Maloney's face on the slide.

MS. BLAIR: From her website.

MR. CRAIN: Incorrect, you pulled it from the CBS interview of Ms. Maloney. You pulled my other colleague's face from his -- that was slide two. Thank you.

THE COURT: All right. Let's precede.

MS. MALONEY: Thank you, Your Honor. You previously have given the opportunity for briefing, I would just appreciate it, the mind has not changed on the other side of the aisle and they'd like to continue to put in sworn testimony from a fact witness or other testimony and if you will give us the opportunity to brief because while I understand it may be relatively silly, and I did think it was silly for counsel to use my name and face and et cetera in opening, I personally don't think it is silly for sworn testimony to be given in which I am actually accused of spreading lies. In fact, I believe there is actually a name for that under the law, but we'll restrain from saying that.

Let's play Ms. Bailey's designations.

(Video of Lauren Bailey played.)

MS. MALONEY: Okay, Your Honor, our case is now closed. We reserve the right for rebuttal. Thank you.

THE COURT: All right. Thank you.

MS. BLAIR: Your Honor, at this point in time, for the record we would like to make a Rule 50(a) motion for judgment as a matter of law in this case.

MS. MALONEY: I am prepared, Your Honor, if she wants to argue.

THE COURT: Go ahead, if you'd like.

MS. BLAIR: Sure. Your Honor, briefly, as you know, this is a single FDUTPA case with an accompanied declaratory judgment matter. As Your Honor pointed out in your order on motion for summary judgment FDUTPA prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce, and in order for the Plaintiffs here to get the injunctive relief they request they must prove that all five of these Plaintiffs are aggrieved by an unfair practice or a deceptive practice. Simply put, Plaintiffs have failed to meet their burden.

I want to start with the unfair practice. As Your Honor knows and as you have pointed out with respect to the case law, a practice is unfair if it is one that offends established public policy, and one that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Per the Court's order on summary judgment, that

would be ECF 139, at page nine, you found that a showing of consumer harm is required when we are looking at the unfair practice prong.

There has simply been no evidence presented by Plaintiffs in this case that the mission or the hospital safety grade offends public policy, is immoral, unethical, oppressive, or unscrupulous. In fact, the evidence has shown just the opposite. It has shown the careful and thoughtful way in which Leapfrog has gone about putting together the Leapfrog safety grade with expert panelists, consultation, thoughtfulness.

Dr. Romano testified that the purpose of the safety grade is to protect consumers against preventable harm and is transparent to both hospitals and the public. He testified there was no intent by Leapfrog to punish hospitals. He explained clearly to this Court what he meant when he was using the word penalized in terms of looking at measurement.

You heard from Dr. Austin that the methodology was changed because the issues that Leapfrog was facing with the cohort mean creeping in a way that it was representing nonparticipating hospitals as perfectly performing on those four measures. Hospitals were telling Leapfrog that the creeping mean was deincentivizing them.

You heard from Alex Campione that at no time had Leapfrog's team ever sought to penalize nonparticipating hospitals, and she further testified that the work of the team

is in no way connected to revenues. Dr. Nicholson, their own expert, admitted that the methodology was -- none of the CEOs presented any evidence that Leapfrog takes money for better grades and unscrupulous conduct that has been alleged.

There has been no evidence that a non-responding hospital automatically receives a failing grade. There has been evidence to the contrary presented by Dr. Romano and Ms. Campione.

Those two individuals also have demonstrated that the methodology was reviewed and considered by a panel of experts in the field of patient safety measurement and the expert panel, including Dr. Romano, support the scientific nature of the current methodology.

Dr. Romano further testified that the new step two methodology is based on scientific principles, and you heard a lot about this is a composite score, not made up of only the four measures from the survey, but publicly available CMS data. There has been no evidence that the methodology is substantially interest to consumers.

In order on case law, S and S Audio versus Belson, to establish that the Plaintiffs must establish inflicts consumer injury that is substantial, consumer injury, not outweighed by any countervailing benefits to consumers or competition that the practices produced, and that consumers could not reasonably have avoided it.

The only consumers in this action are the patients.

THE COURT: Why is that? Why aren't hospitals consumers?

MS. BLAIR: Each one of the CEOs said they received no value or benefit from the Leapfrog survey. Ms. McCauley testified under oath that she does not consider St. Mary's to be a consumer of the Leapfrog group services.

Nor have hospitals demonstrated what would be a reasonable consumer in light of -- that they would be a reasonable consumer.

THE COURT: Why aren't hospitals consumers?

MS. BLAIR: The case law is such that in order to be a consumer under the statute you must receive a benefit or value.

THE COURT: The A people do, don't they? They buy all these logos and plaster these hospitals with grades. Maybe the people who didn't participate -- they would still be consumers, I would think.

MS. BLAIR: They can't be consumers of a survey they never took and from which they have no value from it.

THE COURT: Is the consumer issue only related to the Plaintiff or do you look at a consumer in a broader sense as anybody who is a consumer of a product?

MS. BLAIR: I look at it as anybody who is a consumer of the product.

THE COURT: Again, if Jupiter Hospital buys tons of

Leapfrog placards that say we are an A hospital, are they a consumer?

MS. BLAIR: That is the survey. The grade is not for the hospitals.

THE COURT: You have to be a consumer of the survey?

MS. BLAIR: You have to be a consumer of the grade, and there is a stipulated fact in this case that the purpose of the safety grade, not the survey, the safety grade is for consumers, for patients.

THE COURT: On the pages where -- I was curious about that and I don't think it has come up so far. There is something on the website that says you pay $2.95 for something.

MS. BLAIR: Yes, Cornerstone ordered thousands of those.

THE COURT: What do you get for the $2.95?

MS. BLAIR: You get a printout of the grade page, the D, and the gas gauge, the measurements.

THE COURT: Who buys those?

MS. BLAIR: Vendors, we call them solution providers, to try to figure out what hospitals need help with hand hygiene, not hospitals themselves. They are provided their grades for free.

THE COURT: Unless they want the logo.

MS. BLAIR: They pay for it. As Ms. Binder testified, they can advertise their grades for free, they are not required

to buy the logo.

THE COURT: They do, though, don't they? I think I heard maybe Jupiter has it all over.

MS. BLAIR: Jupiter does.

THE COURT: Probably a lot of the A ones do. Probably not any of the Fs buy it.

MS. BLAIR: I don't think anybody is buying an F logo.

THE COURT: Doesn't that make them consumers?

MS. BLAIR: No, not of the safety grade itself.

THE COURT: You can disconnect the two?

MS. BLAIR: Yes.

THE COURT: You can say you are only buying the logo even though it has the safety grade next to it?

MS. BLAIR: Correct, because you can advertise your grade for free. They give hospitals a free tool kit, a free press release. They are not consuming it, it is free. If you want to buy a logo, sure, but the safety grade is not for the hospitals. They are sophisticated consumers of whatever it is they do, but they are not consumers of this patient safety grade, and they have admitted as much. They don't pay for anything for it, they don't care about it, they don't report to it. They do nothing with respect to it.

We have had these arguments before in connection to the motion to dismiss and motion for summary judgment to the effect that they have standing to bring a FDUTPA claim without

being a consumer, but they are not a consumer of the hospital safety grade and they are not a consumer of the survey.

So, patients are the consumers.

And here, there has been no demonstration of what these consumers have been substantially harmed by. We have heard the CEOs' testimony over our objection about -- for the first time I heard these anecdotes about people coming in with finger lacerations or armpit infections and not wanting to stay at these hospitals allegedly because the Leapfrog grade had been cited.

There has been no evidence of consumer harm, no evidence that any of these patients had bills they had to pay. They said they sent a bill. They don't know if they paid the bill. They don't know where they went, they don't know what the outcome was.

To your point about Jupiter, if they left West Boca and they went to Jupiter, and they didn't have to pay their bill at Good Sam and they had a wonderful outcome, how is that harm? Patients have a choice of where they get their medical care. There has been no evidence of any harm to a single patient or a single consumer who reviewed the Leapfrog grade, and certainly no indication that it has been substantial, which is the requirement under the unfair prong.

The other issue is one of these needs to not only be substantial, but it needs to not be outweighed by the

countervailing benefits to consumers or competition that the practice produced. There has been lots of testimony from Dr. Romano, from Alex Campione, from Ms. Binder about the countervailing benefits to consumers of having this patient safety information, of having direct access to the publicly reported data on infections, to having direct access to HCAP scores that we talked about here today.

That clearly opens up a countervailing weight to the five hospitals not being graded. That is the relief they are seeking, no changes to the website, they just don't want to be graded.

That does not outweigh the benefit to the patients of South Florida in having easy access to see what these hospitals' outcome measures are, and whether or not these hospitals are being transparent with respect to reporting the data.

There has been no evidence that Leapfrog hides in any way that these hospitals are not participating in the survey. There is the footnote we talked about, but I showed a page where if you go to the survey results it pops up huge and says they don't do the survey. No consumer has been harmed, and the public good of what Leapfrog does far outweighs any consumer harm.

In terms of, Your Honor, the burden of deceptive practice -- so the Plaintiffs are moving on both unfair and

deceptive practice. With respect to deceptive practice, the Plaintiffs have to establish, as your Honor as set forth in your ruling on the motion summary judgment, that the active practice is likely to mislead the consumer, the patient, acting reasonably in the circumstances to the consumer's detriment.

We know these hospitals were not likely misled, they knew exactly what was going on. We are taking about patients. The hospitals all testified that in May of 2024, five months before the methodology change went into place, Regina West is doing what if calculations, the hospitals are talking about should we participate or not.

The question is whether or not the consumers were deceived by the website, by the Leapfrog website. The only testimony they proffered, at least the anecdotes we have heard, unsubstantiated by any documentation or ant reliability, as we passed the case up to your Honor earlier this week.

The only testimony is Dr. Berger, their expert, and he testified he has done a thousand consumer perception surveys as a researcher. He testified, incredibly quite frankly, that the only way to truly measure whether consumers, patients -- he wasn't talking about hospitals -- whether patients are likely to understand the Leapfrog website was anonymous Google analytics.

He does not dispute that a consumer survey could have been done. He testified he has spent between 100 to 200 hours

in this litigation, further testified that he has a bevy of research assistants at Cornerstone that help him with his opinions. Those same Cornerstone assistants asked us to open up our Google analytics website. Dr. Berger wasn't there, the Cornerstone people were. We opened up --

THE COURT: So you think consumers understand that the F grade was earned as opposed to being assigned because they didn't respond? You think consumers understand that?

MS. BLAIR: Me? No, I think the opposite.

THE COURT: Does Leapfrog think that consumers understand these grades are assigned and don't reflect the realities of the hospital's treatment, the hand washing and the others, the consumers understand that?

MS. BLAIR: We do think consumers understand that, and that was evidenced by the testimony of Alex Campione and --

THE COURT: What about the witness who said it was too much in the weeds to explain it?

MS. BLAIR: First they look at the metrics and if they want to go to the full scoring methodology, they can go there. There is nothing deceptive.

THE COURT: Only 3 percent do according to the Google analytics.

MS. BLAIR: Apparently, but we disagree with the reliability of those.

THE COURT: I thought she also said the methodology is

not important to consumers. Didn't she say that was for the hospitals?

MS. BLAIR: Ms. Binder testified to the opposite. She said that --

THE COURT: So I am supposed to pick and choose between the witnesses?

MS. BLAIR: No, I don't think she said that. I think she was talking about the asterisk, which is a bold red disclosure on the website page. It clearly says this hospital has declined to respond and therefore a grade was assigned to reflect the lack of data. It says 15 is this hospital's score, asterisk, and it says worst hospital score 15.

A consumer at an eighth grade level, which this website was designed to effect, is able to see this hospital was assigned a score and they are able to see they were assigned the worst hospital score.

What Dr. Berger testified to and what they argue is, they don't know how. You haven't told them about limited achievement, that is way too in the weeds.

That is the point of the expert, she tried to communicate very difficult medical data to a consumer at an eighth grade level. There is a bevy of cases about asterisks and disclaimers, and those cases are much, much different than the case here, and summary judgment was denied in those cases.

So this asterisk does what it is supposed to do. It

is clear, it is concise, it is conspicuous.

Does it tell the reader every single nuance of a 22 composite score? No, it doesn't.

Does it clearly tell the reader that it is not based on any data from that particular hospital? It does.

The nature of the F grade is not just these four measures, it is a composite score made up of 22 measures, CMS publicly reported data and --

THE COURT: 18 are publicly reported CMS data. These four are just made up.

MS. BLAIR: I don't think they are made up.

THE COURT: Well, they are assigned the lowest score possible. Isn't that making it up?

MS. BLAIR: No. Dr. Romano testified that just like the IPS measure that was changed in 2023, in 2024, we know from literature and from these five CEOs that these hospitals have in place bar code medicine administration, they have in place computerized physician order entry, they have in place hand hygiene policies. We know that, they are structural. The scientific expert community says, and this was Dr. Romano's testimony, that we know the missingness is not at random. We know they have these policies, we know they measure it.

What we don't know, and I am not a scientist, but what the scientists say is what we do know is that the scores at these hospitals are not missing at random.

Remember, this is Leapfrog's methodology. They are entitled to say what they think is important and why, as long as they disclose it to the consuming public, and they do. What the expert panel has said, we are an expert panel for Leapfrog, and this is what we think is important, and they think transparency is important.

THE COURT: You keep talking about transparency. It is hard for me to see how transparent it is if you hide how you give them the lowest score available because they didn't respond.

MS. BLAIR: It is not hidden.

THE COURT: Now we are going around in circles.

MS. BLAIR: No, I think it is right there on the web page.

THE COURT: That 3 percent of the people look at.

MS. BLAIR: No, it's right there, your hospital score 15, asterisk; worst hospital score, 15. This hospital declined to respond and therefore a score was assigned to reflect the lack of data.

THE COURT: But assigned, normally you would think it is based on some sort research, maybe they looked at some sort of health care information, not just made it up.

MS. BLAIR: They didn't make it up. Dr. Romano testified extensively that it wasn't made up.

THE COURT: I think he said it was because there was a

penalty at least at one point.

MS. BLAIR: He said we know these measures exist and so we know the data is not missing at random.

THE COURT: So you can assume if they didn't respond it is because they didn't have hand washing policy.

MS. BLAIR: No, no. You are assuming they do have a hand washing policy.

THE COURT: Then why not give them credit for it?

MS. BLAIR: Because the survey doesn't just ask you about the hand washing policy. The levels are limited achievement, somewhat achievement, considerable achievement, and achievement. They have to have 200 hand hygiene observations per month per unit, they have to log that data and provide it. This is the verification stuff we have been talking about.

What we are saying is if you are not willing to provide your data, that is the voluntary business decision, we get it, and we are going to give you credit for having a hand hygiene policy. There are hospitals participating, so it is scientific. We know there are hospitals in the survey that provide Leapfrog all of their data and they still get a 15.

What the experts have said is why would we give -- we have been giving -- this is what they said in the spring of 2024, we have been giving non-responding hospitals a hundred out of a hundred points because their cohort mean -- those

hospitals that do take the time to track the hand hygiene and do take the time to report it and want to be transparent with their patients, those hospitals, some of them are getting 15.

We gave them the lowest score of a participating hospital. We didn't make it up. We said let's look at how participating hospitals do. They all had hand hygiene policies. Some of them don't make enough effort to get to the next level. The expert panel said we know missingness is not at random. We now know there are actual participating hospitals that get a 15 on this measure because they have a hand hygiene policy, and they are not doing it.

So to give these hospitals a hundred out of a hundred points because they happen to be large hospitals and their cohort means are large hospitals who are doing the observations, the expert panel said we are not doing a service to the public good by telling consumers these hospitals are a hundred out of a hundred simply because that is what their cohort is doing.

And this has been going on, the testimony was, since 2017 at the expert panel level for Leapfrog and --

THE COURT: Wasn't the concern that the numbers were creeping upwards to almost a hundred for the mean?

MS. BLAIR: Correct, for the participating hospitals.

THE COURT: Doesn't that point to some sort of grade inflation? I thought that is what they were trying to solve.

MS. BLAIR: No. If you look at the exhibit, the slide deck presented to the expert panel on April 12, 2024, what they were trying to solve for was that hospitals committed to patient safety, and I will take hand hygiene for an example, and are logging a hand hygiene, they are scoring at like 88.7. If you are at 88.7 you get a hundred points out of a hundred points because they are showing a commitment to doing better for their patients.

What Leapfrog was saying before then, the way the imputation worked, we will give you the same score that those committed hospitals are getting, a hundred out of a hundred. And then it became clear, if you haven't done the survey in three, four years, these hospitals hadn't done the survey in four years, does it seem right that we should just assume that these hospitals are getting a hundred out of a hundred?

The scientific methodology allows for imputation. You have not heard anybody say that it doesn't. In fact, Dr. Nicholson said I think this is an assignment, and that is exactly what we tell consumers on the website.

You heard Alex Campione testify that imputation can either be an estimation, so this is the scientific data measurement, you can either estimate it or you can use reasoning. There are two different methods of imputation, and she said we were using the estimate. Dr. Romano said you can't estimate for nonparticipating hospitals at this point because

the cohort mean is getting too high. Now we are using reasoning and --

THE COURT: What is the reasoning? Is the reasoning if you don't participate in our survey you are not committed to hand washing?

MS. BLAIR: The scientific reasoning is non-response bias.

THE COURT: That is a fancy word for something, but is it that you are not committed to doing the survey? The reason is they didn't do the survey.

MS. BLAIR: Yes. We don't have their actual data, so we have the imputation methodology backed by science that says at this point --

THE COURT: Is there any other science other what you said that supports that? You give somebody the worst score because they don't fill out a survey, is that done anywhere else?

MS. BLAIR: Sure. I think it is.

THE COURT: Where?

MS. BLAIR: I don't know, but we have nine experts on this panel who --

THE COURT: Is there any evidence that they didn't approve this? There was evidence they didn't disagree with it, but they never did approve it.

MS. BLAIR: It is not a voting panel. That is

correct, there was no vote.

THE COURT: So the fact that they didn't object means that these experts somehow blessed this?

MS. BLAIR: Correct. They are all still on the panel today. They were provided with the public comments. The expert panel was provided with all ten of the public comments in June 2024. The methodology change went into place in November 2024. There were no objections by any of the nine to the methodology change, and the transcript shows many of the experts agreed with it on the record and ultimately the imputation methodology was put into place.

And all nine, Dr. Romano testified to it, are still on the volunteer expert panel for Leapfrog. They believe it is scientifically backed and they believe it is transparent, and so do we. That is why there is no deception here.

THE COURT: The assumption is, if you don't fill out the survey, that means that your practices are such that you should be assessed at the lowest level of any hospital in the country. That is the assumption behind your methodology.

MS. BLAIR: Correct. The assumption is that you have the data, you are choosing not to share it, and instead of imputing you the best participating hospital, that's what we were doing, we should look at the participating hospitals that are trying, what is the score they are earning, and that is what you are going to get.

That is Leapfrog, that is how they believe it should work. Different rating systems do things differently.

THE COURT: Do you know of any other entity that does that, if you don't take the test you get the lowest score of anybody that took it?

MS. BLAIR: I have a lot of education and if you took a hundred question test, or let's say a 22 question test and you didn't answer four of the questions, your teacher doesn't say, well, Bobby next to you got a hundred percent so I am giving you a hundred percent. The teacher gives you a zero. Yes, I think it is common sense, reasoning, and it is scientifically backed.

THE COURT: If you get a zero, it is pretty easy to say I got a zero because I didn't take the test.

MS. BLAIR: No, they are saying I got a zero because I didn't fill out those questions.

THE COURT: Let me see what -- your example was somebody takes the test, one person gets 20, the other one gets 16. You think the person that gets 16 gets a zero?

MS. BLAIR: No, no, it's a composite score. Say you have a 20 question test, you answer 16 of those questions, you leave four blank. Your teacher does not give you a zero. We don't give them a zero. They don't automatically fail, they don't. Your teacher takes a composite score of how you did on the 16, gives you the zero for the four and gives you a grade.

If you got a hundred out of a hundred on the first 16, you might still get an A.

THE COURT: Assuming you gave Jupiter the 15s or the 25s on those four questions, what would they end up? Would they still be an A?

MS. BLAIR: I think they are a B.

THE COURT: What would the Mayo Clinic be?

MS. BLAIR: I haven't run those numbers, but their CMS scores, we have seen charts -- if you look at the five star analysis, they have Jupiter's CMS scores on there, DX 813. You can see every one of their HCAP scores which makes up -- for non-reporting hospital makes up about 27 percent of that domain are clearly in the negative and significantly below the mean.

We heard Mr. Hanlon testify that Press Ganey -- they had to hire Press Ganey to get the HCAP scores up. On that analysis you can also see each one of these five hospitals has CMS data, infection data collected by the U.S. Government that is below the national for the most part.

So their publicly reported data on their composite score is bringing down their grade. It is just like the test you and I were taking about, 20 questions, if you get perfect scores on the 16, you might still get an A. If you get -- on the 16 questions if you do poorly --

THE COURT: On the other 18, does Leapfrog contribute anything or do they just report publicly available scores?

MS. BLAIR: Publicly available scores.

THE COURT: The four safety scores, is that the only thing Leapfrog adds to the analysis?

MS. BLAIR: We have the proprietary scoring methodology. We have a proprietary scoring methodology that takes all 22 measures into a composite score, recalculates them to grade hospitals across the entire United States. No, that is not the only thing, and for --

THE COURT: Is what you just told me, you do some sort of massaging of the 18?

MS. BLAIR: No, we do not. We calculate them in a composite score along with the other four. I didn't want you to think that is all we did.

THE COURT: In terms of the 18 that are publicly available, does Leapfrog do anything?

MS. BLAIR: We decide which of those are measures that go directly to patient safety.

THE COURT: So you pick the 18 CMS ones.

MS. BLAIR: That is right.

THE COURT: For those you use their actual data and it's only these four that you come up with your assignment system.

MS. BLAIR: I wouldn't call it assignment system. For nonparticipating hospitals, yes, it is an assessment. For participating hospitals we have data.

THE COURT: All right.

MS. BLAIR: So we believe that the website, after this long conversation, clearly tells consumers how the methodology works for the four measures. We have full and complete access on the disclosure system to the full methodology.

The hospitals even say they get a free calculator, everything is free. You can go on the website and see everything. Even the data we sell is on the website, we don't sell anything different. Everything is free, transparent, there is no deception, and we are really talking about one asterisk, one footnote, and it doesn't say we calculated that score; it says we assigned it.

With respect to Dr. Berger about whether or not the website is likely to cause injury to a reasonable consumer, because as you pointed out at ECF 139 that is the standard, Dr. Berger did not provide any comprehension test for the website to prove -- it is their burden to prove, not mine -- to prove that any consumers were deceived.

Even the patients they talk about that come into the hospitals, they don't know whether those patients understood the methodology, they have no idea. They did no consumer perception testing, none. They didn't talk to a single consumer. There is simply no reliable evidence of consumer confusion even if you look at the anecdotes we heard throughout this trial.

And we provided your Honor with Florida Virtual School versus K-12 Inc, an eleventh Circuit and District Court case, we think, while not exactly on point, we think that is informative to the Court as to what needs to be looked at.

While Your Honor noted that these kind of hearsay statements may be able to come in for consumer confusion, the Court must also look at whether those anecdotes are reasonably reliable, and there was nothing that we heard from these CEOs that was reasonably reliable that any consumer was actually confused.

And then we talk about the aggrieved, they must be aggrieved by the unfair or deceptive practice. Revenues are up, market share is up, brand recognition is up. They don't have any nurse retention problems. They all testified at their deposition no physician retention problems.

What they argue is our OR admissions are down and some of our elective admissions are down, and they have to be aggrieved by Leapfrog's alleged deceptive or unfair practices. There is no causal connection to a downturn in OR and a downturn in elective admissions. Their expert, Dr. Nicholson, testified he has not done any causal analyses.

I asked each one of the five CEOs, they did no survey, they didn't commission any survey to try to figure out why their trends were down. We saw evidence from West Boca, we saw four different med exec and governing board meeting notes where

Mr. Hanlon tells them those are down because seasonal issues as well as construction issues on his operating rooms and his OR, and talks about the fact that certain surgeons have left.

There is no causal connection and what they are saying is they are aggrieved because patients are asking them questions about their patient safety. Yet their mission is that they are transparent and accountable with their patients. I don't disagree with them. My guess is patients ask questions when they are in hospitals. That is not because of Leapfrog, it is because people don't like to be in hospitals.

There is simply no connection to the fact that any aggrievement by these hospitals -- and they are corporations, they can't just say I feel sad, hurt, angry, frustrated. These are corporations, so they have pled their aggrievement is impact to reputation and loss of goodwill. It doesn't exist. They have not put on any evidence of that.

For those reasons we would ask this Court enter an order granting judgment in favor of the Defendant at this time.

THE COURT: All right. Thank you.

MS. MALONEY: Your Honor, Christine Buzzard, my colleague, will give a brief argument on this. She told me yesterday and last night that I needed to be prepared on this. Unfortunately she is -- or fortunately she is much more prepared on this, so I would like her to handle this argument.

MS. BUZZARD: Christine Buzzard for the Plaintiff

hospitals.

Your Honor, the Defendants have moved under Rule 50(a). As you know very well, the standard is taking the evidence in the light most favorable to the Plaintiff hospitals that no reasonable fact finder could conclude that we could prevail on this action. I will check down the elements and explain why it is that we have clearly met them. I will be happy to answer any questions Your Honor has on your mind.

Among other things, Leapfrog behaves deceptively when it claims its so-called safety grades measure the actual safety of hospitals. They simply don't.

Dr. Nicholson testified that Leapfrog's safety grade methodology departs from guiding principles for measuring hospital quality, systematically penalizing nonparticipants and failing to reliably predict patient outcomes. This distorts patients' choices in a harmful manner.

Dr. Berger explained that DNF safety grades likely negatively impact consumers' perceptions of the Plaintiff hospitals' quality, and he further testified that failing safety grades likely have negative long-term effects on consumer perceptions because negative impressions can be very hard to overcome.

Voluminous documents and testimony confirm that Leapfrog's safety grades impose a nonparticipation penalty in a, quote, arbitrary, that is Ms. Campione's word, scheme that

stems from a, quote, simple business decision, not my words, Dr. Romano's words.

Leapfrog's fall 2024 methodology is not peer reviewed, and contrary to Leapfrog's representations, and it was not generated by the expert panel, as Ms. Campione admitted on the stand. Leapfrog's practice is also unfair as its safety grade methodology is entirely made up, designed to coerce participation.

False statements are always unfair, Your Honor.

THE COURT: What is wrong with the fact that you don't answer means your numbers are bad, and that they are entitled to assume that?

MS. BUZZARD: I frankly don't understand that, your Honor. They refer to non-response bias. The only testimony I heard -- there has been no expert testimony on that point. Dr. Romano mentioned it briefly, but he is not an expert witness in this case. In any event, non-response bias merely tells you that there might be something different in your survey to the people who respond and the people who do not.

Let's say I decide to host a hiking party on Superbowl Sunday and only a few people show up. I would not be right to assume that the people who didn't show up didn't do so because they don't like me, maybe they just like football.

Your Honor, that doesn't mean that Leapfrog is entitled to assume that that somehow means the nonrespondents

are poor performers. The evidence makes clear that is not the case. The Plaintiff hospitals -- I can't remember precisely which one, but one of the CEOs testified contrary to Leapfrog's representation that individuals are twice as likely to die at a poorly rated hospital, were in fact twice as likely to live at his hospital. It is simply not true that non-response bias justifies the methodology.

I believe one of the CEOs, perhaps Ms. Montgomery, testified that the methodology that Leapfrog uses is like giving you an F on a test that you didn't take. It is worse than that, Your Honor. It is like giving you an F on a test you didn't take and then your teacher goes and tells the world that you didn't know the subject and had only gotten 15 points on it. That is unfair.

Also, we heard some argument about who the consumers are in this matter. Plaintiffs' patients are consumers. You heard testimony from the CEOs at the Plaintiff hospitals that a number of the patients have experienced anxiety and reflected that anxiety --

THE COURT: Do you contend the hospitals are consumers in this case?

MS. BUZZARD: It is certainly unfair as to the hospitals. The statute --

THE COURT: The statute talks about consumers. Is it your position that the hospitals are consumers or only the

patients?

MS. BUZZARD: I believe the hospitals could be consumers, Your Honor. We discussed accolades. The hospitals purchase accolades from Leapfrog and, of course, the scheme is unfair with respect to the hospitals. The hospitals are also employers.

I would go back to the statute again, Your Honor. The statute is very -- includes businesses, and here there would be a number of segments about safety grade. There are the patients about which you heard a lot of testimony, the anxiety that they experience. You heard about an individual who left against medical advice, which is a very drastic decision to have made.

THE COURT: Wouldn't a consumer survey be better evidence?

MS. BUZZARD: No, Your Honor. Dr. Berger made very clear that he didn't think a consumer survey is the appropriate methodology here. He had real data from real people making real choices in the world about how they were going to perceive the Leapfrog safety grade. He had the Google analytics data that --

THE COURT: Google analytics only when to how many people went to the methodology page, but it didn't talk at all about the impact of these grades on consumers in South Florida or the patients of these hospitals.

MS. BUZZARD: He also relied on extensive peer reviewed literature, the fact that hospitals and health care in general can be a very difficult thing to assess. He talked about the idea of information being below the fold and the footnote is below the fold of the information that is presented, and he talked about the fact that consumers having seen an F would be very concerned that a hospital would receive an F on something that is so important to them, namely their safety.

There are also a number of other types of consumers. There are also employers. Ms. Binder testified how these safety grades are created for the use of employers. There are physicians, we had a cardiologist, I believe, whose patient didn't want to go to one of the hospitals because of the F grades. We had the surgeons for the HSS group, the orthopedic group, who were required to get on the staff at Jupiter Medical Center instead of --

THE COURT: We didn't hear from them, did we?

MS. BUZZARD: No, we did not, but we have extensive documents about that and business records.

THE COURT: We have a cancellation notice, but nothing that ties their decision to leave Good Sam and go to Jupiter due to the Leapfrog scores.

MS. BUZZARD: We have the CEO's testimony.

THE COURT: That is what someone told her.

MS. BUZZARD: And also that they did in fact move to Jupiter.

THE COURT: We know they moved. What is the tie to the Leapfrog scoring?

MS. BUZZARD: For example, the letter that was sent to the CEO of Good Samaritan.

THE COURT: It doesn't refer to Leapfrog, does it?

MS. BUZZARD: It circles the --

THE COURT: You mean the anonymous letter.

MS. BUZZARD: Yes, the scribbled letter.

THE COURT: We don't know even who that is.

MS. BUZZARD: It does reflect the sentiment of the community, and we have the CEO's testimony about the statements from I believe the doctor -- I can't recall exactly -- making clear how upset --

THE COURT: I would have to consider that for the truth of the matter asserted.

MS. BUZZARD: He was also upset that he needed to get on staff at Jupiter, so it would be state of mind, I believe.

Your Honor, we do have extensive evidence of patient harm, and patients are consumers. We have evidence of insurers being --

THE COURT: What is the evidence of patient harm?

MS. BUZZARD: The patient who left against medical advice who cited the Leapfrog safety grade.

THE COURT: You have two at West Boca and what else?

MS. BUZZARD: We also have the testimony of the CEOs on their various rounds and how the encountered several patients who were upset and concerned that they would be harmed. We have Ms. Havericak referencing a woman she had spoken with in her room who was very grateful not to have had a negative event given the negative press she had seen in light of the Leapfrog safety grade.

And there are also insurers, Your Honor. The Humana letters specifically indicate concern about potentially continuing -- about the safety at the various hospitals.

And finally the patient transfers. You heard evidence of individuals going to the wrong hospital effectively, hospitals that couldn't serve their needs, and the transfers are up from, I believe, Jupiter to the Plaintiff hospitals, that is --

THE COURT: The transfers would just be they have too many patients, right? Isn't that a reason for transfers as it was explained. Was any of it that they didn't have the resources?

MS. BUZZARD: I believe it had to do with whether or not the patient could be properly served at that hospital. If you went to a hospital that couldn't handle a level one trauma you would have to be transferred. That is why transfers occur. There is evidence of that in this case about that. The CEO

testified to that. That is evidence of patient harm.

THE COURT: Do you think you have to show actual harm or likelihood of harm?

MS. BUZZARD: Under your summary judgment order, likelihood of harm is the standard. With respect to unfairness, Your Honor indicated it might be the case that we would need to show actual consumer harm. We would ask that you reconsider that citing an Eleventh Circuit case that --

THE COURT: Should I pay attention to that case?

MS. BUZZARD: Of course, Your Honor, you should always pay attention to the Eleventh Circuit.

THE COURT: When I got that case from you I looked at the FTC Act, and the legislature occasionally amends it. The last time they amended it they said we should consider Federal law existing at 2017.

MS. BUZZARD: The Eleventh Circuit case refers to the longstanding understanding of --

THE COURT: You think it relates back to prior 2017 law.

MS. BUZZARD: Right, and it reflects an understanding of the general case law about what substantial injury should be interpreted to mean.

Moving on to the final element, your Honor, the Plaintiff hospitals seek only injunctive and declaratory relief here and therefore do not need to show actual damages and

merely that they were aggrieved. The hospitals are indisputably aggrieved.

THE COURT: What is the relief you seek?

MS. BUZZARD: We seek an injunction preventing them from putting up grades for the Plaintiff hospitals. If you don't have data don't grade.

THE COURT: What you want is that they can't publish any grade for the Plaintiff hospitals?

MS. BUZZARD: Yes, Your Honor.

THE COURT: They have 18 scores that don't depend on this type of measurement.

MS. BUZZARD: 15 out of the 22 measures, four are the ones for which they assign the failing scores and for three additional ones they marked them NA.

THE COURT: So you think there are seven?

MS. BUZZARD: Correct.

THE COURT: How many CMS measure are there?

MS. BUZZARD: 15.

THE COURT: I thought it was 18. You think there are less than that?

MS. BUZZARD: Correct.

THE COURT: In any event, you think they should not grade you at all, even on the published scores for data.

MS. BUZZARD: That is not what they are doing, your Honor. I suppose, we have to -- if they are willing to totally

overhaul their entire business model such that they are no longer conducting this deception, that might be a different matter.

We ask them to adhere to their own rule of conduct. Their expert said that if the hospital is missing more than six measures, they shouldn't be graded. Here they are missing seven, they shouldn't grade the hospitals.

THE COURT: Okay, thanks.

MS. BUZZARD: If Your Honor is at all inclined to grant the motion for the other side we ask for the option to do a briefing.

THE COURT: I will deny the motion, I think it is helpful to hear evidence.

MS. BLAIR: Thank you, Your Honor.

Do you want to take an afternoon break or would you like me to start with my case in chief?

THE COURT: We ought to take a break, we have been at it for awhile. Usually I can count on Pauline. We will take a break.

(Thereupon, a brief recess was taken.)

THE COURT: Okay, please have a seat. I look forward to hearing your case.

MS. BLAIR: Thank you, your Honor. We call Missy Danforth to the stand.

MELISSA DANFORTH, DEFENDANT'S WITNESS SWORN.

THE WITNESS: Melissa Danforth, D-A-N-F-O-R-T-H.

DIRECT EXAMINATION

BY MS. BLAIR:

Q. Good afternoon, Ms. Danforth. Can you briefly tell the Court about your qualification -- I am sorry, about your educational background?

A. Sure. I have a Bachelor's Degree from the University of Maine.

Q. In terms of your employment history, where did you start?

A. I started in Maine at a child abuse and neglect agency. My first roles were grant writing and teaching education classes for patients who couldn't afford to attend them and implementing an anti-bullying program in high school.

Q. And at some point, did you begin working with Leah Binder in Maine?

A. Yes, when working at the child abuse neglect agency I met Leah. She needed support with grant writing so I transferred from small community grants to multi-year Federal grants, mostly focused on public health, breast feeding to rural areas. While in that role, it expanded to include other special projects ranging from putting together the annual report to doing branding, actually helping to implement the network's first electronic health record.

She came to Leapfrog in 2008. She asked me to join her in 2009 and here I stay.

Q. All right. Thank you for that. We talked about the mission of Leapfrog. Well, let me step back for a minute.
What is your current role at Leapfrog after all of these years?
A. I was accidentally demoted through the testimony. I am senior vice-president of health care ratings at the Leapfrog Group.
Q. In terms of how you have you the mission of Leapfrog from the perspective of vice-president of ratings, can you tell the Court, how do you see the mission of Leapfrog?
A. We are a relatively small non-profit with a big and important mission, to reduce harm to patients, specifically death from medical errors.
Q. How do you advance the message in your role as senior vice-president of ratings?
A. I do a few things. I will keep it brief.
Q. Thank you.
A. First and foremost, I am responsible for helping to guide the strategic direction of Leapfrog. In that capacity, we expanded our mission by developing an ambulatory surgery center survey. Harm happens in hospitals, but 70 percent of surgeries are occurring on an outpatient basis, many of those in free-standing ambulatory centers, so we extended our work to that.
Additionally, I oversee our hospital and ratings programs,

that includes the Leapfrog hospital survey, the hospital safety grade, our value based purchase program, the ambulatory surgery center survey, and public reporting period, our partnership with the American Diabetes Association to recognize hospitals who provide exceptional care, and a new partnership with the American College of Surgeons to recognize hospitals who represent outstanding geriatric care, or surgery for older adults.

Q. And is it fair to say -- we have been talking a lot about hospital safety grade and the survey?

A. Yes.

Q. Is it fair to say those are not the only programs that Leapfrog does?

A. Those are not the only programs. I oversee five separate and distinct programs, and one of them focuses entirely on ambulatory surgery centers.

Q. There was some testimony from Ms. Binder that the entire staff of Leapfrog is about 20 people. Do you agree with that?

A. Yes.

Q. Of those 20, how many are on the ratings team?

A. Ten.

Q. Half of the staff?

A. Yes.

Q. I want to make a distinction between the survey and the hospital safety grade. Let's talk first about the survey.

A. Okay.
Q. Can you explain to the Court what is the survey and how is it separate and distinct from the safety grade?
A. The survey is why we were founded. As Leah Binder explained, Leapfrog was founded 25 years ago to bring transparency to the safety and quality of hospital care and we do that through administering the Leapfrog hospital survey.
What makes it distinct and separate from the safety grade is that it is annual, we ask hospitals to do it once a year, whereas the hospital safety grades are issued biannually. Hospitals have to choose to submit the survey. As we have been taking about it a lot, we issue safety grades to hospitals if we have enough publicly reported data.
The survey includes a broad range of measures covering various aspects, so things like maternity care, C sections, inpatient and outpatient surgery, billing ethics, and health care equity.
The safety grade is focused entirely on measures of preventable harm, so it has a very narrow focus. When I talk to people about the survey and the safety grade I always say survey is once a year, safety grade is twice a year, survey is very broad, safety grade is very focused.
Another distinguishing factor between them are the hospitals who participate in each of the two programs. The Leapfrog hospital survey since its inception in 2001 targets

pretty much all hospitals in the United States that provide general health care, including free-standing pediatric hospitals like Children's Hospital of Philadelphia, critical access hospitals, a special designation by the Federal Government for very small rural hospitals that have 25 beds or less, surgical specialty hospitals, women and children hospitals, cancer hospitals.

Pretty much any hospital, they can do the survey, they do the survey. The safety grade only generates grades for hospitals with CMS data that is only available for certain general acute care hospitals.

Q. And those different types of hospitals that aren't part of the grade, do they get graded in their own category? Do you have grades for pediatric hospitals?

A. No. In order to calculate the hospital safety grades, we have 12 measures, all focused on reducing preventable harm. Almost all of that data is coming from CMS. That data is not available for cancer hospitals, they don't participate in CMS in the same way. We can't calculate safety grades for certain types of hospitals because we don't have enough of that publicly available data from CMS.

Q. Have you ever talked to hospitals that don't qualify?

A. Uh-hum.

Q. Have you ever talked to the hospitals about why they do the survey if there is no grade to it?

A. I talk to lots of hospitals, especially pediatric and often rural hospitals. For two reasons in particular this comes up, first and foremost, pediatric hospitals, they would like a Leapfrog to calculate a grade, they like a single letter grade representing safety. I have to tell them, help me find the patient safety measures and we will take it to the expert panel.

Another reason we talk to them about this, for pediatric hospitals there is almost no public quality information available unless they participate in Leapfrog. For them it is the only vehicle they have to tell their community about their safety and quality. They can't tell CMS, CMS will not put on care and they value that survey.

Q. Do you know what percentage from the survey these four imputed measures make up of the survey questions?

A. Right now the hospitals has nine sections, patient ethics to outpatient surgery, about 50 measures covering the major aspects of hospital care. In the hospital safety grade only seven measures come from the Leapfrog survey, and of those seven, we only impute four. So less than ten percent used in any aspect of the safety grade. It is quite a small percentage.

Q. I want to talk about hand hygiene. I want -- you oversee the survey, right?

A. I do.

Q. In terms of the hand hygiene measure, what are the questions asked on the survey and what must the hospital do from the minimum requirement to the maximum? There have been a lot of issues about, well they have the policies, so why are they low scoring?

A. Our hand hygiene standard was developed by an independent voluntary national expert panel. I am not an epidemiologist, I did not develop the standard. They use the WHO, Word Health Organization, guidelines, as well as guidelines by other national academic research organizations, including APICS, which is the Association of Preventive Infection Control Specialists.

They developed the standard which includes five different areas of hand hygiene that is important based on the evidence to actually reduce the spread of infection in the hospitals, all different kinds of infections in hospitals.

One domain is focused on education, so making sure staff, including new and returning staff, have continuing education and that includes a physical demonstration of proper hand hygiene.

The second domain is focused on what we call monitoring, so the hospital is observing whether or not proper hand hygiene is happening. In some cases it might be soap and water. If it is a patient with CETA the hygiene technique is gloves, wear gloves. The second is alcohol based hand sanitizer.

So, it includes training, physical demonstration of those things. The monitoring includes monitoring to make sure people are doing the right thing in the right situation and monitoring environments in specific units of the hospital.

The third domain is feedback and is focused on using the collected data to develop an informed quality improvement program and also do something called real time coaching. If there's a person observing someone doing it wrong, they are not just collecting the data point, they do some real time coaching.

Two more, sorry. The third one -- the third one I gave.

The fourth one is infrastructure, and so do the hospital units have sinks in every room so people can wash their hands, and alcohol based hand sanitizer.

And the last one is culture, are hospitals making it clear and safe for patients to ask the doctors and nurses to wash their hands, and are hospital executives being held accountable for their performance on hand hygiene. I realize it is a lot because it is a lot.

Q. When you talk about hand hygiene and the Leapfrog standard, does that apply only to nurses and doctors?

A. No. It actually applies -- you will love how long this is -- to anyone who touches patients or touches equipment that will touch patients.

Q. Food services?

A. Yes.
Q. Okay. We heard a lot of testimony that these hospitals have hand hygiene policies, correct?
A. Yes.
Q. If a hospital has a hand hygiene policy and they report to the survey, and that is all they report, how would they score on the survey?
A. Depending on the elements of that policy, they would score on the bottom, which is limited achievement. There are only two opportunities to earn achievement standard. One of those is to perform 200 hand hygiene observations per unit per month and use that data in all of the ways we outline it in the feedback and monitoring section.
They have to say yes to the question on the education domain and the infrastructure domain and the culture domain.
The other option is to do one hundred hand hygiene opportunities per unit per month. You have to say yes to every single question in that subsection, so the bar is quite high.
Q. And the limited achievement, and I will stick to hand hygiene, the numerical score that is limited achievement for hygiene is 15. Are you aware of that?
A. Correct.
Q. And we saw an email in Plaintiffs' case in chief where Alex Campione is communicating with Karen Lider about what they are

going to say about the infamous footnote and Alex uses the word arbitrary to refer to the 15 points. Do you recall seeing that email?

A. I do.

Q. As the senior vice-president of ratings, is the score of 15 that is associated with limited achievement for purposes of calculating the score on a safety grade is it arbitrary?

A. It is not. When you asked me to introduce myself one of the programs was the Leapfrog validating participating program, this was developed around 2006 or 7, before Leah or myself came to Leapfrog.

The program is designed to use the measures on the Leapfrog hospital survey in a way that could be useful to health plans. We take performance category that we use to publicly fill out the results, achievement into numerical scores.

The concept of that value based purchasing was to group the various measures on the Leapfrog survey into domain. I believe today there are five maternity care measures on the survey. Through the value based purchasing program we calculate what we call maternity care domain scores. We take the five measures and calculate it in the maternity main score.

In the process of developing that in 2006 and 7, a health care consulting firm led by a health care economist was hired, at that time in Baltimore, Maryland to convene a national independent expert panel specifically for the purpose of

developing a methodology to assign numerical scores to the text based performance categories that we use in survey public reporting.

It is that independent expert panel that used a scientific process to determine the various numerical scores assigned to each category.

That is why, for example, for some of the measures like ICU staffing the second highest score is 50, whereas for a computerized entry the second highest score is 70. They took into account the evidence of the measure in terms of actual patient harm, impact to a patient, how many patients could possibly be harmed. Also opportunities, things like is there a lot of variation on the measures if everyone is doing the same.

So that expert panel for that program developed those numerical scores for those four performance categories, and when we convened the safety grade expert panel in 2011 and started exploring the development of the composite, we recalled that we already had a methodology to do so. They reviewed it and decided to adopt it into the hospital safety grade.

Q. Ms. Campione would not have been around when that occurred?
A. No. I had been at Leapfrog for 16 years.
Q. In talking about the survey, are there free tools to hospitals that Leapfrog provides so that hospitals can ease their burden in figuring out how to respond to the survey?
A. I wouldn't describe it as how to respond to the survey. I

am one of the free tools. We want hospitals to be able to report accurately and efficiently to the survey. The best way to help them do that is to make sure they know, one, where to find the information on the website, the fact that we have a hard copy, calculators, data collection tools, other publications that they can use all to make data collection more efficient and their responses more high quality and standardized.

There are the materials themselves. In addition to that, we offer free one on one orientation calls with hospitals. As I mentioned, half of the Leapfrog staff, of the team, they are offering to do so. We operate and I oversee a dedicated help desk. We use something called Zen desk where hospitals, ambulatory surgical centers, anybody could ask questions, including measure specifications, scoring algorithms.

Additionally, on an annual basis Dr. Matt Austin and I do free town hall calls talking about the changes to the survey, what is new in the survey.

In addition, through our regional leaders, I am requested to do one on one calls with the hospitals. For the help desk I do one on one calls. The last thing I did before getting on a plane to get here is was a one on one call with a health system to answer questions about the Leapfrog survey.

Q. We have discussion -- we have had some testimony that the CEOs believe Leapfrog has no verification process in place.

Have you heard that testimony in this case?
A. I believe I did.
Q. I want you to briefly tell the Court what are the steps of data verification that you oversee as the senior vice-president of ratings to make sure the survey results that Leapfrog is getting are accurate?
A. There are five, I will be brief. The first we talked about and looked at is CEO attestation, this is a reliable source of data verification. CMS uses it for several of their measures.
The second is online warnings built into the survey tool. The survey tool is almost like Turbo Tax, if you put in responses that don't make sense you get a warning.
The third is a monthly extensive data verification where we review every response submitted on line via the survey tool, compare both highs and lows, previous years responses and external data sources if available.
The fourth is monthly random documentation request. Much of the hospital survey is focused on structures they have in place. It easy for them to document whether those things are there or not there. On a monthly bases we randomly select hospitals and ask them to verify their responses by submitting documentation to us.
The final thing is on-site documentation, where we use Medistar, a 50 year old health care consulting firm, and they go on site.

These same five steps are utilized for our ambulatory surgery center survey as well.

Q. And I want to get in a little bit to the hospital safety grade which we are all here for.

A. Yes.

Q. In your opinion as the senior vice-president of ratings, who is the hospital safety grade made for?

A. Consumers.

Q. Who are the consumers?

A. Patients, caregivers, potential patients, people in the community, people who might use the hospital.

Q. And were you at Leapfrog when the hospital safety grade was developed?

A. I was.

Q. What is your understanding of the purpose of the hospital safety grade?

A. I will be brief. I won't go into the full history, Ms. Binder did that.

It was to develop a composite utilizing as many publicly available measures focused on patient safety as possible to give patients a better understanding specifically of the concept of freedom from harm, keeping them safe from preventable harm that they could use to make informed decisions.

Q. You might have been in the room when I was arguing before

the judge, but when you why the word composite, or Leapfrog uses the word composite, what does that mean?
A. I will tell you how I use it and Leapfrog. We take different kinds of measures, all with a singular focus on patient safety, and using a methodology to combine those measure into a singular numerical score which gets translated into a letter grade.
Q. Is it possible that if your CMS data is significantly above the national average and you are a non-reporting hospital, is it possible to still be an A hospital without reporting to the survey?
A. It is more than possible, it happens.
Q. When we talk about the composite nature of the grade, I want to talk about cut points. You and I have talked about cut points, but can you explain what you mean by cut points?
A. As I mentioned, as part of developing a composite we start with 22 measures, developed by Patrick Romano, that includes ten individual and distinct measures of complications.
We take those individual measure scores, and use our Z score and weighting methodology to calculate an overall numerical score. That overall numerical score has a range from say zero to four, just to simplify it. That is not perfect, but to simplify it.
Cut points are determined where if you are above a certain cut point you would be an A. If you are between that cut point

and the next cut point you be a B.
Q. To dumb it down, is this the equivalent of on a test if you get a 90 or a hundred you are A. That is where you cut it off?
A. Our ranges are pretty broad, there are only five of them. Basically hospitals went into standardization above the means, it is probably more generous than that.
Q. There is a range of Z scores that are graded an A, and a range of Z scores that are graded an F; is that correct?
A. Yes, that is correct. In the very beginning when we implemented the hospital safety grade one question we got quite a bit was whether or not hospitals were trying to game the grade, and I repeatedly would be having the conversations and explaining to various people that given the composite nature of the measure and all the things at play, it is very difficult to game a composite.
Additionally, there are so many combinations of measure scores and performance on these measures that come into play in order to get any of these grades.
Additionally, because each measure has their own weight, it is a multifactor approach, and so what I commonly say is if you are an A, that means you are better than average on more measures than you are worse than average. If you are a D or F, it means you are worse than average on more measures than you're better than average.
Q. One of the allegations in this case is that if you don't

participate in the Leapfrog survey, you automatically receive a failing grade. Are you aware of that?

A. Yes.

Q. Can you tell the Court in your own words why that is not true?

A. It is simply not true because as recent as spring 2025, when this case was first brought, I personally looked at the data, I testified to this in my deposition, I made very clear that hundreds of hospitals who had the same step two imputation applied had a grade higher than the five Plaintiff hospitals, As, Bs, and Cs. I looked at that nationwide and also specifically in Florida.

Q. And also, I want to ask about the -- is it possible to participate in the Leapfrog hospital survey and get a D or an F?

A. Yes. Because of the nature of the composite, and we haven't talked about domain weighting, but we have two buckets of measures and each is weighted at 50 percent. You could be perfect on processes and structure, but if the outcome is terrible, that would be reflected, and we have hospital surveys that perform at the D and F letter.

Additionally, we consistently have had hospitals who have a B or C, and they are under the impression that if they just fill out the survey, I am putting air quotes around that, they will get an A. That is a myth, that is not true. They can see

that by filling out the survey their grade goes down.

Those are tough calls, and I have to remind them, we never said that it is performance on this is measures as we talked about it in hygiene, if you go through the online survey and you say no, no, no, no to all of the questions you are going to be scored as limited achievement and that will be reflected in the hospital safety grade.

If you are doing all of those things, you can document all of those things and say yes to all of the questions that will also be reflected in the calculation of your hospital safety grade.

Q. One of the questions the Court had for me is, why does Leapfrog grade hospitals that don't report the survey, why is that necessary?

A. When we first formed our expert panel specifically for the hospital safety grade back in 2010, 2011, at that point it was a slightly different composition than it is now. Those leading researchers, it was their job to define patient safety. It may seem it is so simple. No, there was an intellectual debate on how are we going to define patient safety for the safety grade composite.

Finally they decided to focus on this definition of freedom from harm, they didn't vote on it, but that is how they came out of the meeting, freedom from harm, things like accidents, errors, injuries, infections. It is notable these things don't

have to happen to you if people are doing the right things.

In defining patient safety in that way, their next conclusion was patient safety applies to pretty much everything in the hospital, so we can't exempt hospitals focused on patient safety. If the composite was focused on maternity care we wouldn't include hospitals that don't perform maternity care services.

In this case every patient is at danger for having the things happen to them that we include in the grade. It might sound simplistic, but actually it was a debate, and they feel the same way today, patient safety applies to every hospital and no one should be exempted.

Q. As to the safety grade, when it was first launched is it fair to say you did not have a hundred percent hospital participation in the survey?

A. No. Of course we didn't.

Q. Was the idea that data would be missing for some hospitals who weren't reporting to the survey, was that idea discussed at the very inception of the hospital safety grade?

A. Absolutely for two distinct reasons. As I described, the safety grade is made up of process and structural measures, and outcome measures. We knew we would have a missingness problem on the outcome measures side because all of that data comes from either CMS or the CDC in the case of infections, and they have established minimum sample size requirements for each of

these measures.

They do this to protect patient privacy if it is a small hospital, and two, specifical liability, and each one has different sample size requirements. So we knew some hospitals would be missing measure scores by virtue of not meeting the sample size requirements. The decision was made for outcome measures we should not include the measure when calculating the grade. We wouldn't impute, we wouldn't give a score of a zero or a hundred if an outcome measure score was missing.

For the process and structural measures they had a different thought. Because some measures came from the Leapfrog hospital survey, and it is voluntary, they explored multiple imputation methodologies at that time to deal with that missing voluntary data.

Q. Is it fair to say that imputation that we are talking about here has been part of the Leapfrog hospital safety grade since its inception?

A. Correct.

Q. And I want to go back to the expert panel and make sure I clear a few things up.

The hospital safety grade expert panel does not vote on methodology changes?

A. No expert safety panel ever votes on the survey measures, hospital safety grade, and I failed to mention when I introduced myself because I was so focused on getting my title

right that in my role I am a participant and considered a subject matter expert on expert panels.

I participated on numerous supported panels, and most recently the use of artificial intelligence in patient safety.

Additionally, I participated on numerous other respected national measurement committees, CMS nasal measurement committing. The voting hands up yes, hand up no do not occur when I am participating on a panel our expert panels that we administer.

MS. MALONEY: Your Honor, in the event counsel is intending to qualify her on expert panels, she does have testimony that she was an observer on the panel that reviewed and did not vote on and didn't actually approve the change in methodology in 2024.

I would appreciate it if she is not used as an expert in the manner that Dr. Romano was, and I don't want to be late in objecting, which is why I stood up as she was giving the explanation of her experience on expert panels.

THE COURT: All right, let's proceed.

BY MS. BLAIR:

Q. I want to move forward in the history. Oh he this he we have now established that imputation --

THE COURT: Can I ask a question? Why would you not use imputation on the outcome measures and use it for process and structure?

THE WITNESS: That is a great question. I probably did a bad job explaining it. I am under some pressure to be fast and I have a problem deciding how to do that best.

The reason the measure score is missing, and again these are CMS measures or the Center for Disease Control, is because the hospitals didn't have a large enough sample size for either CMS or the CDC to be willing to calculate a measure score for those hospitals.

Can I give you one example?

THE COURT: Sure, although that is a reason why it is missing, but it doesn't explain why -- the fact that it is missing, does that mean you can't impute?

THE WITNESS: Correct. We don't have a good basis on what the score would have been because the measure developer, the CDC or CMS, are saying that they don't have confidence that they should calculate a measurement score.

THE COURT: Why would you impute the other because there is not confidence that it is there, the structure?

THE WITNESS: In the case of outcome measures, it is things like the number of catheters associated central line infections that a hospital had, so there are very large hospitals who probably do central lines every year, there are very small rural hospitals that might only do a hundred lines every year. Because of the way those measures are calculated it would be difficult to impute the number of infections based

on the number of central lines when that information is unknown.

We are talking about actual infection. It is not the case every time you have a central line in place you get an infection. If we had evidence to support that the panel may have been willing to impute that outcome measure. We don't have evidence that, for example, every time you have a central line placed you get an infection. If there is a large hospital that placed 10,000 central lines, we don't have enough evidence to say, well, how does -- what would we expect them to have in terms of number of infections.

Am I doing a bad job explaining it?

THE COURT: You are doing a good job of explaining why you don't do it there, but what is the difference?

Why can't you impute on number of hand washings and whether or not somebody has infrastructure? If the information is missing, it seems like it is the same, you just don't have the information.

THE WITNESS: For structural measures, how the panel has advised us is to think of it in the following way, computerized infusion order entry, the presence of that has been ubiquitous probably for the past decade.

So we know with assurity because that has been published in purity literature, all hospitals are using some sort of computerized prescriber order entry.

If you came into our survey and said we use computerized prescriber order entry, this is how many medications we ordered, this is how many medications were ordered through the CPOE system, your score would be limited achievement, exactly what we are assigning today.

The only way to get a higher score, I believe I was here when one or two of the Plaintiff CEOs testified to this, is to take what we call the CPOE test. It is a simulation that allows hospitals to enter test patients in their system and test medication orders.

They have a licensed prescriber order those test medications for those test patients and they record what advice or information the prescriber received. In some cases those test orders if they actually reached a patient would have resulted in death.

We see tremendous variation in the functionality of those systems. In some cases we know based on these results that all drug age alerts are shut off.

If someone ever tries to order a medication for an adult that is dangerous, they will never get an alert because that functionality is shut off. In some cases all drug diagnosis functionality is shut off. If you are there because you had a stroke and it would be dangerous, no one will see that alert.

That is why we have the test. It is not just are you

using CPOE for medications, sure, probably everybody is, but how well is that system working in trying to prevent those bad things from happening to patients.

Did I do a bad job explaining that?

THE COURT: No, I followed that. Why do you assume that hospitals that don't respond don't do that?

THE WITNESS: The only way to access that CPOE test today is through the Leapfrog hospital survey.

THE COURT: You mean the only way for you to get that information.

THE WITNESS: So the test was developed by a group of researchers at Brigham and Women's Hospital and the University of Utah and it is administered through the Leapfrog survey, and there wouldn't be another way for a hospital to have access to that data.

THE COURT: Thank you.

MS. BLAIR: Thank you, Your Honor.

BY MS. BLAIR:

Q. So I want to move to the methodology change that occurs in 2024. Briefly I want to ask you why did Leapfrog believe it needed to reconvene the expert panel in April 2024 to discuss the imputation for BCMA, CPOE, hand hygiene, and IVS? Can you hear me?

A. I can hear you. For this time period it actually probably would have started in the fall of 23, we met in spring 2024.

One big thing was happening in the news, and that big thing is that a large national health system was going to be filing for bankruptcy because they were having problems. Those problems were trickling down to impacting patient care, patient safety. At least one of those hospitals is here in Florida.

In this time -- prior to declaring bankruptcy, which was public, these hospitals had been annually submitting Leapfrog hospital surveys. When they ran into these troubles they stopped submitting surveys.

Due to our imputation methodology, this is fall 2023, we were still imputing four rounds back, more than two years ago at this point, of their survey data.

We were getting help desk tickets, emails from other hospitals in these communities, as well as patients basically saying, you know, these hospitals grade because you are using old data that aren't accurate.

These hospitals are in the news that they are going bankrupt, there is photos of their ORs, and other evidence coming out that where they are today is not reflective of whatever they told you in the last surveys that were submitted over two years ago.

I took this concern really seriously. One of the things I really tried to do in my role as vice president the Leapfrog is make sure we are always putting patients first. I think all at Leapfrog do that. It is difficult when you are taking about

ratings and doing all of this math and technical work. You need to try to keep the patients in mind, and I really try to do that, and I hope that comes out in my work.

I talked to Matt Austin, and I said, Matt, I am very concerned about the use of imputation allowing in this very old data, we are getting concerns from patients and hospitals in the communities. I am seeing it myself in the news. We need to talk to the expert panel about this, and we need to consider not imputing old data anymore. I don't think we can trust what was in place is frankly still in place.

Again, these are structures and processes that you do need to be monitoring in a standard formalized way to know whether it is still working or not, and if that is not habitual, we could easily see slippage, and I was very concerned about misleading patients about their potential risk.

Patients pay the highest price when something goes wrong. We talked about the patient and family care giver panel, but what Leah didn't say is it is made up of families who have either experienced medical error or lost a family member to an error. I take these things seriously and that is why I asked Matt to convene the panel.

Q. DX 436 are the panel slides that the Judge has seen. The imputation model that was implemented in the fall 2024 is not the imputation model that you as senior vice-president of ratings brought to the panel in 2024, correct?

A. Correct.
Q. A slide was added. Mr. Austin, we saw his video earlier, he added this slide, and he said, what are we solving for, what is the problem to solve. Do you see that?
A. I do.
Q. Did you work with Matt to put this together?
A. I didn't.
Q. He says part of what they are solving for is -- this is the last bullet point -- hospitals using step one imputation using historical data as a reason not to report to the current survey. Do you see that?
A. Yes.
Q. Is that consistent with what you just testified to?
A. Yes, this is the national health system that filed for bankruptcy, that is correct.
Q. Scroll down, keep going, keep going. Right there, proposed future methodology.
This is what you, Ms. Danforth, were bringing to the hospital expert panel for consideration; is that correct?
A. That is correct. My focus was on retiring step one, not allowing hospitals to have the older data imputed calculated in the hospital safety grade.
Q. Was there anything about bringing this new methodology which has nothing about limited data -- when you put this before the hospital panel in 2024, was there anything in your

mind about increasing revenues?
A. No.
Q. And we talked a lot -- basically you wanted to say, I don't want to use historical data anymore?
A. Yes.
Q. And prior to the meeting -- Patrick Romano couldn't make that expert panel meeting, correct?
A. Correct.
Q. Do you recall what Mr. Romano's issue was with this methodology that you were putting forward?
A. Only from reviewing the documents for this trial. My understanding is that he was concerned about retiring step one because he wanted hospitals who were doing the survey to have the opportunity to do the survey every other year instead of every year.
Q. Okay. You can take that down.
And the hospital --
THE COURT: Was that step two your proposal?
MS. BLAIR: Yes.
THE WITNESS: No. My proposal is to retire step one, retire step one imputation for all measures. That is when we allow hospitals to get credit for surveys they submitted in the past.
THE COURT: So, what was your proposal?
THE WITNESS: That was my proposal.

THE COURT: What was going to replace that, retiring it?

THE WITNESS: Any hospital that didn't have current Leapfrog surveys, they would be assigned what was at this time step two, which were the means of the cohort they had been assigned to based on various hospital characteristics.

THE COURT: So your step two was to impute -- what does that mean, means of the cohort?

THE WITNESS: So how we were calculating the values to impute for step two at this time is that we would take all of the hospitals and we would see are they teaching or nonteaching, urban or rural, more or less than 500 beds. The other category we looked at, are they safety hospitals. We would put all those hospitals in one of those groups, and then we would use their survey results, we would calculate a mean score.

So the mean scores were based on performance of hospitals that had submitted surveys to Leapfrog and had those various hospital characteristics.

Let's say there was a group of women under 5-foot two that had two kids, they all went in one group, and however we were performing at that time we calculate the mean value. The scores that hospitals were being assigned were at this point still based on the work that Leapfrog reporting hospitals were doing.

THE COURT: Wouldn't that be fairer than giving everybody the lowest score that didn't report?

THE WITNESS: That is what I am suggesting we do at this meeting, get rid of step one. I could live with step two. I don't love step two, but I can live with step two. I am a moderate in all things. Remove step one, we will stick with step two. I don't love it, but that is what I am proposing that we do.

It is only after the slides are presented that members of the expert panel -- we have all heard from Dr. Patrick Romano, but he is one of a much larger expert panel. There are other members including the deputy director of the CDC at that time, researchers from other institutions. They get the opportunity to weigh in on this as well, and through their deliberations -- I believe this is reflected in another exhibit, but I don't have my JX number in front of me.

Their deliberations indicate a couple things: One, they are getting concerned because of things that they are hearing. They are out in the community talking to hospital leaders, CEOs. They are hearing from the hospital leaders, CMOs, that hospitals have figured this imputation methodology out, they are figuring out that if they aren't doing a good job in one area where we have an imputation model, they can just not report to Leapfrog and they will have that mean score assigned based on Leapfrog reporting hospitals that is quite

high.

Can I give you one example I know?

THE COURT: Please do. You are saying what they would do is report on some and not others, or not report?

THE WITNESS: It is only a handful of measures, they won't do a survey.

At this time, spring 2023 -- spring 2024 -- no, spring 2023, going into this meeting, the average hospital score for CPOE from hospitals that were doing that test we talked about, but also actually had all of that clinical decision support working was something like a 93, say. The imputed score the hospitals were getting for not taking the test, having no idea how the clinical decision worked, if it worked at all, was almost identical. It was really high. From an expert panel perspective, and these are researchers in their own right, that idea these reporting hospitals have an average score of this and non-reporting hospitals have an almost identical score started to lose their face validity. There are hospitals that do the test and fail the test, and through failing the test get assigned limited achievement for CPOE and 15 points, and they are starting to hear that. That is one thing.

The other thing that is happening in the meeting as they have their independent conversation is that they start talking about in some way is this methodology disincentivizing hospitals that were otherwise transparent, submitting a survey

to stop submitting a survey. Now we are giving them a benefit of not being transparent. They are going to get the high scores no matter what, and that was concerning.

As we talked about today, we are getting current up to date data, not only on this, but the C-section rate. From an academic perspective, morally that didn't sit well with them. They are hearing hospitals have figured this out and using it to their advantage. They are starting to think through, are we disavowing transparency. That is not something we want to do.

They are having an active transparent dialogue on some things we can do, and through that conversation they suggest what if we did something different, what if we put them at the bottom, the bottom score. They are suggesting this. You will not find that language on these slides, you will not find in that transcript anyone from Leapfrog suggesting this.

What you will see is they have an organic discussion among academic intellectuals about a problem they are recognizing and talking about how we as Leapfrog and they as a panel may want to handle it. It is not their job to then work out all of the detail, that is our job.

Does that make sense?

THE COURT: Okay, thank you.

MS. BLAIR: Your Honor, for the record, this is PX -- there is a video in evidence, PX 261.1, and the transcript of this meeting that Ms. Danforth just described at DX 439.

BY MS. BLAIR:
Q. Ms. Danforth, you had an issue with step one?
A. Correct.
Q. Step two, that was the step two that was in place for spring of --
A. Yes.
Q. So these five hospitals who complained that their grade was one thing in the spring of 2024 and something different in 2025, they were getting this step two at that time, correct?
A. I haven't looked at this.
Q. This would have been step two?
A. This is step two at this time. What I am saying is I am concerned about step one, I will live with step two.
Q. Got it. Did you have a conversation with Alex Campione about what her concerns were as the data analyst seeing the data?
A. Yes. So Alex had been concerned about step two.
She does two things. She obviously calculates the mean, but we also put together the scoring methodology document that has been shown. That scoring methodology document, and in that document we publish the means every round. She is calculating the means and physically putting them into the document, and in the act of doing such, she is the first to tell me these means are getting really high. She has been doing this for two years and wherever they start they are going up and up and up, and

that has all kinds of impacts. It is complex.
I am basically thinking at that time thank you for letting me know, I really want to focus on the step one problem.
Q. You are her boss, and we can see from the slides you went out, you don't bring any issue with step two?
A. Correct.
Q. Ultimately, after listening to the expert panel, which all is in evidence, you change your mind. Is that a fair statement?
A. I don't instantly change my mind.
Q. How does that process go from you offering this to the expert panel to the imputation that we have been here a week about?
A. We offered moving all hospitals to step two. The expert panel has a lengthy detailed discussion. Through that discussion they suggest moving hospitals to bottom categories, bottom, bottom would be the theme there. We -- certainly I had not considered that, but in hearing their conversation about disincentivizing transparency, risk of misleading patients -- one in four patients are harmed in the hospital, it is not a small risk being that we are misleading them about. I start to consider the idea, but I don't immediately support the idea.
Q. And ultimately, what happens is the methodology change gets put into place that we are here for today?
A. Yes.

Q. Really quick, the public comment period, do you put those changes, the proposed fall 2024 methodology changes, do you put those out for comment?
A. Yes, of course.
Q. It is public comment?
A. Yes.
Q. What do we mean by public comment?
A. We send out newsletters, emails, we have other organizations that send them out as well. Every hospital that has ever signed up for the newsletter gets a copy of them. It is an expansive process because we benefit from receiving public comment.
Q. The expert panel, do they get that request for comment? Are they aware of it?
A. Matt Austin would send them. I don't know if he did in this case or not. I know we always send them what we call a summary of changes. So once we put out the proposal, receive the public comments, we publish a second document. That includes we said we are going to do this, you all said this, we are going to do this, here are our responses to your comment. They do always get that, correct.
Q. The time frame, you put that out, the document is in evidence, May 2024?
A. Correct.
Q. The methodology change is implemented in November 2024?

A. Correct.
Q. Did you as the senior vice president of ratings at Leapfrog get any comments that they disagreed with the methodology changes proposed?
A. No, and I haven't since.
THE COURT: You said you started to consider it, and you didn't embrace it, so whose idea was it? Was this your idea or somebody else's?
THE WITNESS: I would say it was a product of group think. I came with one piece of it and --
THE COURT: I got what you have said so far. You started to consider it.
THE WITNESS: At the panel meeting they say we don't think this is enough, we are seeing a problem of disincentivizing, we are seeing a problem with hospitals saying I am not going to be transparent. I am going to ride on the coattails. So they suggest other things.
We reviewed a number of different scenarios that were presented in an exhibit that would be potential changes to step one as well as potential changes to step two. Ultimately, we take a different approach than what I wanted to take for step one and a different approach that what I had thought about for step two.
Who decided to move forward this, I would take responsibility for that in terms of recommending it to our CEO

Leah Binder.

THE COURT: Was it your idea or something that you thought was the right way to go?

THE WITNESS: Ultimately, I did think it was the right way to go. Patrick was concerned about us completely eliminating step one. So we kept step one, but we went from imputing four rounds of data to only two. The panel was concerned with the rising means and hospitals taking away current data in order to ride on the coattails of their peers, so they wanted to put them in bottom scores and so we addressed that as well.

I do truly believe as I sit here today that what we did reflected -- followed the feedback we received from the expert panel. I have no reason to believe that is not the case as we have met with the expert panel since then.

THE COURT: Isn't step one basically your step two but only one year?

THE WITNESS: No.

THE COURT: Step one was their previous data?

THE WITNESS: Yes.

THE COURT: All right.

BY MS. BLAIR:

Q. For clarification, it might be helpful to the Court if we could pull up DX 445.

If we go down, Ms. Danforth, this is a series of emails

between yourself, Alex Campione, and Matt Austin, and there is a chart in this document. Do you see that this chart?

A. Yes, that is the chart I was referring to.

Q. At this point in time -- and the date on this email is April 22, 2024?

A. Yes.

Q. This is 12 days after --

A. Ten days.

Q. Thank you for my math. After the expert panel meeting.

If you would scroll down so we can see this chart. Can you make it smaller so it is all on one page.

Can you explain to the Court what is going on in this chart, what the discussions are, and why you are talking to Ms. Campione and Dr. Austin?

A. Because this is what we do, we bring a proposal to the expert panel and the expert panel has been meeting twice a year since 2011. We bring a proposal, they weigh in on it through their discussions, we take it back and do some work on the idea, and then we move forward putting something out for public comment.

As we have done in the past, this is the sixth methodology change we have made to the safety grade. We have been doing this for years with this panel. This chart is in the normal course of the work we would do for any change related to the aspects of the hospital safety grade.

You can see in the chart this is step one imputation, and there are options for no change, small change, moderate change, large change. The bottom of the chart is step two, and there are options for no change, small change, moderate change, large change.

Note here because it is important, ICU staffing or IPS is not included in the list of measures in the second column to the left of the step two section of the table. We had a different imputation methodology for ICU staffing that had been in place since 2023.

You can see for step two there are no change, small change, moderate change, large change.

Q. Just to orient everybody, in the no change that was what it was like in the spring of 2024, correct?

A. Correct.

Q. Step one was imputing four rounds of historical data and step two was to assign the cohort mean, correct?

A. Correct. Step one applied to a slightly different group of measures.

Q. All right. Ultimately, what is adopted is the moderate change for step one?

A. Correct.

Q. Do you recall that imputing one round, that was Patrick Romano's issue, right, he wanted historical data to still be available?

A. We actually chose the small change.
Q. I'm so sorry. Right. You adopted the small change?
A. Correct.
Q. In terms of step two, which had been the cohort mean, you adopt the large change?
A. The large change, correct.
Q. Which is imputing limited imaging?
A. Yes.
Q. And that was the result, the ultimate imputation change was the result of discussions between yourself, Ms. Campione, Dr. Matt Austin, as well as -- who else was involved in that?
A. So, ultimately, when we worked on this and drafted this, we also showed it to Dr. Romano and Dr. Piembros, (phon) who were on the expert panel, before putting it out for public comment.
Q. Do you have any doubt in your mind, Ms. Danforth, that the expert panel endorses the current fall 2024 imputation methodology?
A. I have no doubt.
MS. BLAIR: No further questions, Your Honor. We can leave this up it you'd like.
MS. MALONEY: May I take down the exhibit?

CROSS-EXAMINATION

BY MS. MALONEY:
Q. Ms. Danforth --
A. Yes.

Q. -- I don't think we met, Mary Beth Maloney.
I understand congratulations are in order on a new grandchild?
A. Yes, thank you, she is perfect. Please put that on the record.
Q. Everything is on the record, perfection and other things.
So, your responsibilities also include handling licensure and accolade sales?
A. I precede the director of licensing sales.
Q. It is accurate to say -- I want to make sure you are hearing my question. It is accurate to say that you -- your responsibilities include licensure and accolade sales?
A. Yes.
Q. You are familiar with some of the promotional materials related to the licensing of the Leapfrog safety grade, aren't you?
A. I would be familiar with them from mid fall 2023 on. This is a new responsibility for me, it started August, September, 2023.
Q. Okay. If we could put up PX 7.
Now, this is one of the promotional materials that Leapfrog has about promoting your designation. You see here it says in what I think is incredibly teeny writing below the big writing, "and the benefits to a community are maximized when an organization chooses to license their designated logo and share

the good news of their designation."

Do you see that?

A. I do see that.

Q. At the bottom of the page it says essentially, review our collection of template ads your hospital or surgery center can adapt and display proudly. Do you see that?

A. I do see that.

Q. If you'd flip to page five of seven.

"Why should you promote your designation?" Then it says in the second sentence, "Your facility will maximize the visibility of your trusted reputation in the community and enhance your ability to recruit and retain."

Do you see that?

A. I do.

Q. So, Leapfrog sells licenses for the safety grades based in part on taking the position that the grade itself enhances a hospital's reputation and enhances its ability to recruit and retain, correct?

A. Leapfrog licenses its designated logos. I want to be clear, if you go back to the original screen shot, Leapfrog licenses its designated logos to organizations that earn those designations, yes.

Q. I am so sorry. Again, I don't think you heard my question.

So, it is true that Leapfrog is of the view that its grade enhances the reputation of the hospital who receives it when it

is an A or a B, at least to the extent that they would want to license it in order to enhance that hospital's ability to recruit and retain, right?

A. That very well may be the case. To be clear, in my responsibilities that I described I don't write website content for this website. It may be the view of the hospitals who license the designated logo, and my understanding is how some of this was derived --

Q. I didn't ask that question, but I suppose you can answer that when your counsel comes up. We talked about you give lengthy answers, and we have a lot to get through, we want to get to Friday.

I still think we don't have the answer to my question, but that is okay, we can move on. It doesn't matter whether you drafted it or not. You have been at Leapfrog since you were first recruited at the beginning by Leah Binder.

What was it you said when you first got on? You have been demoted so many times you have been put in virtually everything. It is fair to say Leapfrog believes the reputation of the hospital can be enhanced, including its ability to recruit and retain by the Leapfrog grade, right?

A. It definitely can be.

Q. Okay. And then you made the comment, and your counsel did as well, that all it is is the logo, right, the designated logo that you are licensing; is that right?

A. That is right.
Q. Okay. So the logo, is that a frog or something?
A. If you bring your exhibit back up I can tell.
Q. I think we might have it here. It is something more -- it is the grade, though, it is the actual A, right? Because why with you pay money to promote something other than the A?
A. We license several designated logos.
Q. And so it is The Leapfrog Group with the A, right?
A. It is literally the image that is displayed on the website you showed me.
Q. Right.
A. This is the data licensing, this is the data accolade licensure website. Examples of the designated logos are on the website. That is what we license.
Q. Let's go to PX 407.
This is an email from March of 2025, and it is -- the top of it is a price, that the total revenue is going to be $44,600, and I guess that is for a license. And if you go to the -- if you go to the third page, third of seven, it's the Leapfrog designated logo license, and then if we look right there where it is checked, spring 2025 hospital safety grade, eg. A or B logo.
I asked you before it says Leapfrog safety grade and the grade, the actual A or the B?
A. Yes. Designated image, but --

Q. Thank you. That is all on that, we have a lot to get through.

Did you see the deposition testimony of Ms. Van Caulil the other day?

A. The video?

Q. Yes. You were in court?

A. Unfortunately I am not sitting where I can see or hear very well when the videos are played.

Q. You should move up because they are very interesting.

What she said in response to the following question: Did Leapfrog communicate to you that they were trying to portray Jupiter -- and that is the hospital that we just saw that bought that Leapfrog logo, the A grade, licensed it for $44,000.

A. Correct.

Q. -- trying to portray Jupiter in contrast with Plaintiff hospitals in the media and with employers? And she said, I would say yes.

Do you disagree with Ms. Van Caulil or do you have no knowledge?

A. I have no knowledge of that.

Q. Okay, thank you.

You talked a lot today about those comments from various hospitals in response to change in methodology. If we could pull up JX 32. I believe you may have seen this, or maybe you

were too far in the back, but it has been presented to Ms. Caulil, so it is admitted.

If we go to the third page, there is a list of comments here, right?

A. Correct.

Q. And let's see. You are responsible for responding to the comments, right?

A. I don't personally draft the responses, I review them before they go out.

Q. If a response is wrong, whose responsibility is that?

A. If the response is wrong, I would take responsibility for that.

Q. Are you responsible for responding to the comments, and the answer to that is yes, right?

MS. BLAIR: Objection, argumentative.

BY MS. MALONEY:

Q. You work with the Leapfrog team to respond to comments from the hospitals, including Ms. Binder, right?

A. Sure.

Q. Is that a yes? I don't know what sure means.

A. I don't remember if I was working with Ms. Binder in responding to comments.

Q. That wasn't my question. We are having trouble with hearing. My question was: Did you work with Ms. Binder -- do you work with Ms. Binder to prepare responses to comments from

hospitals?
A. The ones you have on the screen or in general?
Q. My question was in general.
A. I wasn't clear because you are showing me something.
Q. Understood.
A. Yes, in general, yes.
Q. You do. And so, you don't know whether or not you worked with her on these responses?
A. I wouldn't know based on the document you have up.
Q. How about your memory?
A. I don't remember.
Q. It was a pretty big deal, the change in methodology, right?
A. Responding to public comments I would have reviewed an initial draft by Alex Campione. She is responsible to get it signed off by Ms. Binder. I would not consider these comments unlike comments we have received in the past related to other areas of the survey or safety grade.
Q. That is interesting. Let's look at the comments. The second to the last commenter, Alana Noble at Mt. Sinai Health System -- God bless them, they are my health system in New York City -- says, "we strongly disagree with the proposed false 2022 imputation. If Leapfrog is going to implement this change they need to offer hospitals the option to opt out from being graded rather than penalize the hospital for not submitting the resource intensive survey."

Do you see that?
A. I do.
Q. And if we turn to the next page, page four, and if someone would be kind enough to let me know if we are not there because I can't see out of this side.
So Providence System at the bottom there, Susan Boardman --
A. Wrong slide.
Q. Thank you. Page four.
A. Yes, right slide.
Q. "The proposed changes to the imputation model would result in an inaccurate portrayal of the status of patient safety structures and processes in place for the Leapfrog grade." Ms. Boardman goes on, "Rather, if 2023 or 2024 were not submitted more accurate options would include, one, not assigning a grade for hospitals that did not submit either a 2023 or a 2024 survey, or at least allowing these hospitals to opt out of the fall 2024 Leapfrog hospital safety grade."
Do you see that?
A. Yes.
Q. You recall being asked at your deposition, why can't hospitals just opt out, right?
A. I don't recall it. I trust I was.
Q. You testified that opting out is not an option because Leapfrog believes that it should grade as many hospitals as possible.

Do you recall that testimony?
A. Yes, and I said the same thing today.
Q. If you are a hospital -- it is your view that if you are a hospital in the United States, and we'll talk about hospitals, not ambulatory centers, one of the four thousand or so hospitals in the United States, you should participate in the Leapfrog survey?
A. Yes.
Q. That is because you believe the survey is the best source of safety data available to consumers, correct?
A. It is the best source of a variety of data. I think I explained that in detail, it's safety, quality, maternity care. So, it is a very, very good source of data on a variety of aspects of hospital care not limited to safety.
Q. That is great. It is also your view and Leapfrog's view that it is the best source of safety data available to consumers, right?
A. It is not limited to safety.
Q. The question didn't say it was limited. I want to know if you think it is the best source of safety data about hospitals available to consumers?
A. I would not say the Leapfrog survey on its own is the best source of safety data for consumers.
Q. When I say consumers, I want to be clear who we are taking about.

So, Leapfrog's grades are directed to a lot of different consumers, right?
A. Are we now talking about the survey or the safety grade?
Q. I understand your testimony. Part of what goes into the survey they use for the grade, right?
A. I am asking so when you ask me your question --
Q. I asked you a question. My question was grades. Let's try it again.
When Leapfrog's -- when customers are directed toward Leapfrog's grades, there are a lot of different customers directed towards the grades to use them, right?
A. Our publicly reported safety grade website is designed for consumers, our effort to bring consumers to the website.
Q. I am not asking the question specific to the website.
I will try again. The Leapfrog safety grade, the Fs and Ds, those are directed toward consumers, right?
A. Patients and patient families, that is correct.
Q. Those are all what you consider to be consumers?
A. Yes, in this context.
Q. Do you consider hospitals themselves to be consumers of the Leapfrog safety grade?
A. I don't.
Q. Even though they license the logo with the grade; is that correct?
A. That is correct.

Q. You don't view a hospital that -- you don't view Jupiter as a consumer of the hospital safety grade?
A. No.
Q. You do view the hospital safety grade as directed to patients?
A. Yes.
Q. Whether the patient actually attended the hospital that is graded or not?
A. Any patient.
Q. Anyone who could be a patient in Florida, where we are at, is a consumer of the hospital safety grade, correct?
A. Sure.
Q. What about employers?
A. I would say that the covered lives where employers provide their insurance, those covered lives are a part of the consumer group.
Q. Ms. Van Caulil said she thought employers were consumers. Did you hear that?
A. I never considered the safety grade and use of the word consumer in that context. The safety grade was devised, developed, published for patients, family members, people who go to hospitals.
Q. It is also directed to insurers, correct?
A. The safety grades can be used by insurers, though it is designed for patients, family caregivers, people that might go

to hospitals.
Q. Okay, fair enough. It is fair to say that insurers also use the safety grades, right?
A. Some insurers use the safety grades.
Q. Some employers use the safety grades, right?
A. Some employers use the safety grade.
Q. Anybody else I am missing?
A. Researchers.
Q. Researchers, outside the scope of being patients, use the safety grades?
A. In their research.
Q. Do any Government agencies rely on the safety grades?
A. We have a group of Government hospitals called military treatment facilities, they provide care, unlike the veterans hospitals, to active duty military. They have safety grades assigned to them.
Q. A lot of those men or women who have served are covered by Humana?
A. These are active duty military.
Q. Are they covered by Humana or -- when they go into rehabilitation, for example, are they covered by the Government or are they covered by an insurer with a contract with the Government, do you know?
A. I know the Government issues contracts to various health plans to administer Tricare. Specifically some of those active

duty military would be covered by Humana on Tricare, correct.
Q. Some of them are also covered by Medicare, aren't they?
A. I am not sure that there are other health plans that cover Tricare. For example, where I live in Maryland Trinity Health administers Tricare for Maryland.
Q. You also put -- I know you like to split between the survey and the grade, but the survey information that we are interested in that has become what we believe is the reason why we now have Ds and Fs comes from the survey and then is used as part of the grade.
You look confused, but isn't it true that if I don't give you hand hygiene data in the survey, then you don't have any data for it, and you are going to give me a 15, right?
A. As I just testified, it is recently known, and that is what others testified all hospitals today have some hand hygiene policy in place. It is a requirement of the Joint Commission of which I believe all of the Plaintiffs are accredited by the Joint Commission. It is reasonably known --
Q. You are not listening to my question.
A. That is a piece of data.
Q. Let's try the question again, otherwise I am going to have to move to strike your answer.
If my hospital does not fill in the survey, and does not give you information about our hand hygiene practices, whether we have sinks, which are required by regulations, audits,

whether we do your 200 checks, all the things you have to have for hand hygiene, if my hospital does not give that information to you, you will give it the score of 15, correct?
A. Yes.
Q. Thank you. It would be much easier if you listen to the question and --
MS. BLAIR: Your Honor, objection, argumentative.
BY MS. MALONEY:
Q. You put a high value on integrity and data accuracy, correct?
A. I do.
Q. You put such a high value on it because you need to be able stand in front of a hospital CEO at the end of the day and defend all of the measures, not some of the measures, right?
A. Correct.
Q. Okay. So, Leapfrog relies on imputation to present an accurate portrait of hospital performance. Is that fair?
A. Sure.
Q. They rely on imputation to provide an accurate portrait of hospital performance of hospitals that don't participate in its survey, correct?
A. I've never said it or heard it said the way you are asking. That is why I am making a confused face.
Q. The only change to the question I made is specifically asking if it is true for nonparticipating hospitals?

A. Let's go with correct.
Q. You believe in the imputation methodology?
A. I do.
Q. You believe it is a fair and accurate portrayal of hospital safety?
A. I do.
Q. You heard Ms. Campione's testimony yesterday, and the four measures are based on assumptions, right?
A. I don't remember her saying that.
Q. Are the four measures based on assumptions?
A. I said the four measures are based on what is reasonably known.
Q. You don't recall Ms. Campione saying they are based on assumption?
A. I don't recall the exact quote.
Q. So, if you don't participate in the survey you get a five for ICU physician staffing, right?
A. If the CMS report says you operate an ICU.
Q. We will get to that. Let's try it again.
If you don't participate in the survey you get a five for ICU physician staffing?
A. The way you say it is wrong.
Q. If you don't participate in the survey you are awarded a limited achievement for ICU physician staffing and that data point is a five?

A. Still incorrect.
Q. All right.
A. Until you make the distinction between hospitals that we know operate an ICU or don't operate an ICU I can't accurately answer your question.
Q. Let's do this, your contract with respect to all hospitals is not on trial here, it is with respect to the five hospitals represented by the CEOs seated behind me. I know it seems funny to you, but this is their professional lives that are --
MS. BLAIR: Your Honor, I am going to object to the testimony by counsel and the argumentative nature of --
THE COURT: Let's just have questions, please.
BY MS. MALONEY:
Q. For the hospitals that are nonparticipating, let's stick to the five, is it accurate that they are awarded five points for ICU physician staffing?
A. Yes.
Q. That is true after the fall 2024 methodology change, correct?
A. Yes. It may have been true before.
Q. And they are awarded 15 for computerized physician order entry after the 2024 methodology change, correct?
A. Yes.
Q. And they are awarded 15 for hand hygiene, correct?
A. Yes.

Q. And a 25 for bar code medication administration, correct?
A. Yes.
Q. You testified earlier that CPOE is computerized prescription something entry?
A. Yes.
Q. And you testified that in 2026 everyone has a CPOE system, right?
A. Yes.
Q. So, what is the basis, if everyone has a CPOE system, for only awarding a 15 for CPOE?
A. As I described to His Honor, we don't know how well that system is doing in alerting prescribers to serious medication errors. We do know that there are hospitals who do the survey and take the test, they also get a 15.
Q. Have you ever audited any of the five hospitals?
A. I wouldn't know that off the top of my head.
Q. You made a reference to hiring a company who assisted with audits. Do you recall that?
A. I do.
Q. You heard Ms. Leah Binder's testimony as well?
A. Correct.
Q. She said that there are five or six hospitals that are audited of the thousands of hospitals that are graded?
A. Correct.
Q. None of the Plaintiff hospitals have been audited for ICU

physician staffing, computerized physician order entry, hand hygiene, or bar code medication administration by Leapfrog, correct?
A. Several of the measures you named are not included in on-site verification because we verify them thoroughly through the other four methods I named. I am not being difficult, but I want to be accurate.
Q. That wasn't my question. My question was: It is true that none of the five hospitals have been audited by Leapfrog for ICU physician staffing, for computerized physician order entry, for hand hygiene, or for bar code medication administration as those measures exist within Leapfrog, right?
A. Correct.
Q. Nonparticipating hospital scores are at this incredibly low level because they are based on the assumption that when a hospital is not participating it must be hiding something, right?
A. In my view, it is based on two things.
Q. What is the first thing?
A. As I described, or tried to describe earlier, if we know that a hospital has CPOE, we know they do and they came and gave us that information their score would be the same.
It is based on the fact that it is reflective of hospitals that do report to the survey and give us the base level of information. It is also based on our expert panel's view that

the missingness is not random. Both things.
Q. Dr. Romano testified that it is partly based on an assumption that when a hospital is not participating they must be hiding something. Do you remember his saying that?
A. Yes. I mentioned two things, and his is one of them.
Q. And he testified and Ms. Campione testified to the same thing, right?
MS. BLAIR: Your Honor, do you mind if I hand the witness the water?
THE COURT: Sure. Go ahead.
THE WITNESS: I don't remember Ms. Campione's testimony word for word. At this point I will say sure.
BY MS. MALONEY:
Q. Do you disagree with Dr. Romano?
A. I agree that is one of the two factors I also considered as part of the imputed score.
Q. So the second factor for making the determination that the five hospitals should receive five, 15, 25, five is based on the belief that those hospitals must be hiding something, correct?
A. Correct.
Q. You assume limited achievement, as you call it, on the four measures -- strike that.
You have no data that tells you one way or the other whether any one of the five hospitals since the time of the

methodology change actually deserves the score of 25 out of a hundred for bar code administration; is that correct?
A. Based on what you just described as our rationale for imputation, I am not sure. You said we use imputation for the two reasons I just said.
Q. No, I asked you what your reason was for using -- actually, that wasn't my question. I said: Do you agree with Dr. Romano, and I asked you -- it doesn't matter.
The point is, do you have any data that underlies the 25 out of a hundred for bar code medication administration for the five hospitals?
A. Yes.
Q. You do? Okay. So, for a non-participating hospital you now say Leapfrog has data on their actual BCMA performance?
A. The first question for BCMA is: Do you have it? If you say yes and no to the other question your score is limited achievement. Based on what you told me, they would say yes to that first question. Not knowing what they would answer to the other question that score is accurate and correct.
That is why I tried to emphasize it has always been performance, are you actually doing all of the things we ask you to do that I describe in detail for hand hygiene and CPOE. Another way to say it is, it is the answers that matter.
Q. Are you finished?
A. I am.

Q. You testified in September. Do you recall that?
A. I do.
Q. And you testified under oath. Do you recall that?
A. I do.
Q. You are testifying under oath today, correct?
A. I am.
Q. My colleague asked you in September, is it accurate to say that for nonparticipating hospitals as we just defined it Leapfrog has no data on their actual BCMA performance, and your response was correct.
Do you recall that testimony?
A. I do.
Q. Thank you. Leapfrog also has no data for nonparticipating hospitals measuring the actual performance of a hospital's CPOE; is that correct?
A. Yes, I remember that. That is what I said.
Q. Thank you. Leapfrog also has at least some missing data with respect to participating hospitals' IPS; is that correct?
A. Yes.
Q. And Leapfrog also has no data on these hospitals with respect to, at the time they grade them -- I know you have learned things in trial, but at the time you grade them and at the time you testified for nonparticipating hospitals Leapfrog doesn't have any data measuring their performance for hand hygiene; is that correct?

A. That is correct.
Q. When a hospital is missing data, the weight of the missing measures are redistributed, aren't they?
A. I don't want to argue semantics, but it is confusing to me answering these questions when you ask about data versus performance because those are two different things. Based on what I think you mean, I will say yes.
Q. When a hospital is missing information because it hasn't shared it with Leapfrog, Leapfrog chooses to reweigh the other measures for which it does have information, correct?
A. Again, your use of terms is very confusing to me. I want to answer correctly. We describe them as measure scores. When Leapfrog is missing measure scores the weight for that score is redistributed to other measures, that is correct.
Q. Your testimony in September was, due to a variety of reasons a hospital may not have a measure score for all 22 measures. If a hospital is missing a measure score for any measure the standard weight for that measure is redistributed to the other measures in the same measure domain.
That was your testimony, is that clear?
A. That is true. I used the term measure score in that testimony and was trying to make that clarification here.
Q. You actually used the term measure score, measures in the same measure domain. I will try to use your language.
For the five hospitals there are three measures for which

Leapfrog awards them an NA?
A. Correct.
Q. They then take the scores and redistribute what -- let me stop. There are 22 measures, right?
A. Yes.
Q. Yes. Right. And you've got how many that are on -- I like to think of it as a circle split down the middle and how many are on one side of the circle?
A. Twelve.
Q. How many are on the other side?
A. Ten.
Q. What is on the side that is 12?
A. Process and structural measures.
Q. And what is on the side that is ten?
A. Outcome measures.
Q. For the missing measures, the three that they give it an NA to, what side is that on?
A. Process and structural measures.
Q. Now the 12 side has gone down to nine, right?
A. Correct.
Q. And the weight has been redistributed for weighing the process measure to the remaining nine?
A. Correct.
Q. And the remaining nine are sitting there, and among the remaining nine we have the four measures, right, for which you

have no information except for the limited information you have for IVS staffing for my five hospitals, right?
A. I don't know what --
Q. You don't like that. We'll get there. There is a reason she doesn't like that, we will get to it.
MS. BLAIR: Objection, your Honor, argumentative and testifying.
BY MS. MALONEY:
Q. No, no, you used the word data as the word to describe five, 15, 15 and 25?
A. No. Those are measure scores. I used data to describe what is reasonably known, which is that hospitals have CPOE and BCMA. Yes, on that first question.
Q. Yes, it is true for the four measures, for which you will be imputing scores, their weight goes up, right, because there is three measures for which you have no information, and so the weight of those gets distributed back?
A. Correct.
Q. I don't know if you know the specifics of it. Is it fair to say the weight of the process measures goes from being 24 if you are a reporting hospital, that is, if you have any score, measure score for any of those 12 measures, and the weight goes down or the weight -- excuse me -- goes up from 24 to 31 in the circumstance of the five hospitals we don't have four measures?
A. That is close to correct.

Q. Thank you.
If the hospitals were given a zero for those four measures, that weight would get even higher, right, on the process measure side?
A. No. That zero would be weighted higher. Zero is a measure score.
Q. Zero is a measure score?
A. On the outcome side zero is preferred because those are actual incidents of harm happening to patients. You see zero as a measure score for CLABSI, and that is really good.
Q. Okay. So, is it your belief that Leapfrog is the best source of accurate data about St. Mary's even though St. Mary's doesn't provide you with information about these four measures or any -- or a lot of other information?
A. I believe they are one accurate source.
Q. What would be another accurate source?
A. CMS.
Q. CMS. Does CMS actually report on hand washing?
A. I thought you said accurate source of information.
Q. Um-hum, I did. Now I am asking: Does CMS report on hand washing?
A. They do not.
Q. They do not. So, the only source -- is it accurate to say the only source about hand washing is the Leapfrog grade and the information related to it?

A. The Leapfrog hospital survey would also be a source of information.
Q. The Leapfrog hospital survey and the grade from which hand washing data is derived is the only source of information to consumers about hand washing; is that correct?
A. Nationally that is publicly reported by hospitals, that is all I know of.
Q. St. Mary's has not provided Leapfrog with any information about its hospital since 2021, right?
A. They haven't submitted a survey since 2021.
Q. They haven't submitted any information to you even outside the survey since 2021, right?
A. They haven't submitted information, that is correct.
Q. And you still believe this is the best source of information, the Leapfrog grade and all the information that we have seen in the various, you know, exhibits, and expert reports, about St. Mary's and the hand hygiene even though they haven't provided you any information since 2021?
A. That is a very good source of information.
Q. You said it was the only source of information for hospitals in the United States?
A. Are you specifically asking just about hand hygiene?
Q. That is what you said it was the only source for.
A. Can you repeat your last question?
Q. I don't know if it is my last question. I will move on.

Limited achievement means the hospital did not achieve the standard set by Leapfrog, right?
A. Yes.
Q. And in your words, limited achievement means the hospital is working on it, they are starting, but they are not there yet?
A. Yes.
Q. But you have no information from any of the five hospitals as to whether they are working on it with respect to hand washing, that they are starting on it, or that they are not there yet in terms of your standards, right?
A. I believe that was to describe what was reasonably known, which we have been taking about, they have BCMA. That is what I consider working on it. They at least have CPOE, that is what I consider working on it.
Q. So the data you have about nonparticipating hospitals is the generalized knowledge that hospitals in the United States in 2026 have BCMA computers; is that right?
A. Yes.
Q. And something else about CPOE, what is that?
A. That is electronic order.
Q. No, what is the information that you have -- so, is your generalized knowledge about a bar code medication administration computer at the hospitals the basis for the 25 score?

A. One of two bases, yes.
Q. And the other basis is that you think they are hiding something, right?
A. Yes.
Q. And is the 15 that has been awarded for computerized physician order entry for the five hospitals also based on the fact that you just assume they must have it?
A. Yes.
Q. And then also because you think they are hiding something, right? I mean, you testified to that?
A. I testified that that is what Patrick Romano said. In the spirit of Patrick Romano's theory on nonrandom missing data that was a criteria.
Q. Now, you did testify to my colleague that the score of 15 is data. Do you recall that testimony?
A. I don't. I hope I said it was a measure score. That is the technical term we use.
Q. He said, I want to make sure I am understanding this, the 15 score, the limited achievement, you are saying that is data and you said, that is correct?
A. I misheard the question. It is a measure score.
Q. Okay. You said it is data that Leapfrog can use?
A. It is a measure score that Leapfrog can use.
Q. And you testified previously it is data?
A. I have no idea what I said. I had a very long deposition.

I am not trying to doubt Mr. Crain, we had a long day. It is a measure score that we can and do use.
Q. Now, for hand hygiene, it could be 12, right?
A. Based on the current methodology there is no measure score that is the number 12.
Q. The measure score is 15, isn't it?
A. Correct.
Q. It could be 12?
A. It couldn't be. As I described, the assignments of five, 50, a hundred, are not random. They were developed by 2006, 2007 by another expert panel. It would be 12 in 2006. We did not revisit the measure scores associated with those poor performance categories since they were originally established. So under the current methodology, it could not be 12.
Q. Mr. Crain asked you, it could be 12, it could be 20, it is still data. And you responded, an imputed score is a data point we can use, correct?
A. I have no context for what you are describing right now.
Q. Assigning 15 points for hand washing is a choice, isn't it, it is not a calculation?
A. The measure score is associated with each of the four performance categories assigned by a separate national expert panel, adopted by this expert panel to use in calculating the safety grade.
Q. Since the change in methodology no participating hospital

has received limited achievement across the board, that is five, 15, 15, 25, or 60 out of 400 from Leapfrog. You heard that from Dr. Nicholson, correct?
A. I am sorry, what day did Dr. Nicholson testify?
Q. He testified maybe Friday.
A. I wasn't here on Friday.
Q. Isn't it true that since the change no participating hospital has achieved limited achievement totals of five, 15, 25, five, that is 60 out of what could be 400 points?
A. I have never looked at that.
Q. You don't know?
A. I don't.
Q. Since the change in methodology zero nonparticipating hospitals to receive the 60 out of 400 have received an A; isn't that correct?
A. I didn't know the answer to the first question. I think the second question is based on the first question, so I also wouldn't know.
Q. Okay. Because you have been saying that nonparticipating hospitals can achieve more than limited achievement, they can achieve an A. So in the spring of 2025, zero participating hospitals received an F; isn't that right?
A. I don't know off the top of my head.
Q. Okay. Um-m-m, you have data for the five participating hospitals from 2021, don't you? When they participated in the

survey last?
A. We have survey results for the five hospitals in 2021.
Q. You have data that was put into, what did you call it, the measures?
A. Step one methodology.
Q. No, you called it the measure, the system measure?
A. No.
Q. Okay. In 2021, hospitals like Good Samaritan scored a hundred for hand hygiene?
A. I don't know.
Q. I will represent to you in 2021 Good Samaritan scored a hundred for hand hygiene, and that is based on PX 5.2, and now they score 15, right? Correct?
A. Yes.
Q. That is because they don't participate in the survey so you have no information from them, correct?
A. That is because all we know currently is what could be reasonably known.
Q. So they dropped a hundred points to 15 points. That is an 85 point drop between 2021 and 2024, based on Leapfrog's assumptions, period?
A. Based on the change to methodology, correct.
Q. Based on the change to your methodology. 85 points is a lot. It seems reasonable you would say it is a drastic change?
A. Four years ago seems like a lot. That many points. So

much changes, and I actually think some of the CEOs testified that something was not in place, ICU physician staffing, and now is in place. Yes, in four years a lot changes.
Q. You think in the four years between 2021 and 2024, that the five hospitals that received one hundreds in 2021 and received 15 after the change in methodology had such changes to their hand washing protocols that they are deserving of the 15?
A. I just don't know. If the data were available I would be happy to review that and answer that question based on our standard.
Q. Your standard is 15, but that 15 is not based on 15 percent of the folks in the hospitals washing their hands, right?
A. No. Our hand hygiene standard is the collection of the five domains and all of the components of that.
Q. The score, the measure, the 15 you give them, that is not based on awarding -- claiming that 15 percent of the folks who work in that hospital actually washed their hands?
A. The numerical score of 15 has nothing to do with the percentage of people in the hospital.
Q. It has nothing to do with the percentage of people in the hospital washing their hands, right?
A. Correct.
Q. It has nothing to do with whether by regulation they are required to have a hand washing station in every room, right?
A. I am not aware of the regulation.

Q. It is not based on anything other than what you told me, which is it is based on your new methodology, right?

MS. BLAIR: Objection, asked and answered, your Honor.

THE COURT: Can you give me a sense of your timing?

MS. MALONEY: Yes, I have about ten more minutes and I will be done.

THE COURT: And you will have questions?

MS. BLAIR: I have about three questions.

(There was a brief discussion off the record.)

BY MS. MALONEY:

Q. We heard a lot about the use of CMS scores by Leapfrog. CMS regulates all hospitals that participate in Medicare, right?

A. Yes.

Q. Am I correct that participation in CMS IPPS program, that hospitals participating in that program are required to report their infections into a data base called NHSN; is that correct?

A. It is.

Q. And you testified that -- so you can't choose to do it or not; is that right?

A. If you are participating with CMS, you have to do it, that is right.

Q. CMS gets that data directly from NHSN, correct?

A. Yes.

Q. And then CMS later publicly reports it on its Care Compare

the website, right?
A. Yes.
Q. Part of what the survey achieves is that you learned that as a national not for profit you can administer an NHSN hospital group similar to CMS, right?
A. Correct.
Q. If you participate in the survey, you are a hospital that participates in the survey, you get the data that is going to in CMS in what -- is it real time essentially?
A. No.
Q. Is it delayed by what?
A. We get the data for 2025, at least the calendar year.
Q. You said where instead of -- by administering NHSN in hospital group, instead of waiting for CMS to publish the data on their website, hospitals could give us rights to the same reports?
A. Correct.
Q. Is that correct?
A. Yes.
Q. So, you are not receiving the reports from the five hospitals, correct?
A. Correct.
Q. All you are getting from the five hospitals are CMS scores that are publicly available, correct?
A. Correct. It is the same data.

Q. One of the CEOs' testified, I believe Ms. Havericak, that there is an 18 month to 21 month delay in the publication of CMS data. Do you recall that?
A. I don't.
Q. You are getting CMS data much more quickly than it is going to the general public?
A. There is a three month difference.
Q. Between what?
A. Between the reporting period and CMS --
Q. I'm asking about your access to data and whether there is a delay in the access to data that you have from participating hospitals versus nonparticipating hospitals because the nonparticipating hospitals have not given you access to their CMS data.
A. My answer is no. CMS obtains data through the CDC on a quarterly snapshot basis. Leapfrog only gets to download the data in an aggregated once a year time. CMS is getting the data much faster than Leapfrog.
Q. And the publication by CMS is delayed by 18 to 24 months, is lagging data, and what you have to report is not lagging data or not lagging as much for the participating hospitals; is that correct?
A. That is --
Q. Isn't that correct?
A. The way you asked it, I can't answer it.

Q. You can't answer whether CMS is publicly reporting information about hospitals that is 18 to 24 months old while you have more current information for from the hospitals that participate in your --
A. That is not correct.
Q. Now, you said the bases for -- in your testimony, the basis for the imputation data points -- I will call it the five, 15, 15, 25, was -- that it was developed by a technical expert panel, right?
A. Correct.
Q. That technical expert panel was 2006?
A. I believe 2006, 2007, correct.
Q. That technical panel's recommendation for the five, 15, 15, 25, was that peer reviewed?
A. I don't know. I was not here.
Q. Do you know if the expert panel that Matt Austin serves on also reviewed that five, 15, 15, 25?
A. I'm sorry, could you repeat the question?
Q. Did the expert panel we have been discussing with Matt Austin and Mr. Romano and at which you were an observer, did they actually sit down or not, or be on the phone, or stand up and discuss five, 15, 15, 25 for changing the fall 2024 methodology?
A. The adoption of the methodology scores occurred in 2011, and they have not changed since. They have been carried

forward, so by virtue of that fact, I still do not understand your question.
Q. So, the five, 15, 15, 25 as data points for the four measures was adopted in 2011. Hand hygiene as a report -- what you are reporting for the grade, that wasn't adopted until five or six years ago?
A. That is right.
Q. Ten years after adopting the five, 15 through this technical panel, Leapfrog adapted hand hygiene as a standard?
A. Yes.
Q. Five years or so after that they adopted five, 15, 15, 25 as the standard by which nonparticipating hospitals would be graded?
A. Right.
Q. There is no discussion of five, 15, 15, 25 --
A. Because they didn't --
Q. I didn't finish my question. There is no discussion of those numbers four in the April 12th meeting, correct?
A. Correct.
Q. And there is no discussion of it in -- that it came from this technical panel back in 2006 by Mr. Austin, right?
A. Correct.
Q. And in fact, you talked a lot about a gentleman by the name Agensovasia (phon) who was on the expert panel and he suggested zero, right?

A. Not at this panel meeting.
Q. At some point he suggested zero, right?
A. Correct.
Q. There was another expert that also suggested zero?
A. Yes.
Q. Those were rejected?
A. Correct.
Q. There is no documentation that I have seen where the zeros were rejected in favor of five, 15, 15, 25?
A. It was two different meetings.
Q. There are meeting minutes reflecting the five, 15 --
A. No. The suggestion of zero was a different meeting.
Q. There are minutes reflecting the adoption of the five, 15 in connection with the fall 2024 methodology change, correct?
A. Correct.
Q. You testified that Leapfrog has never talked about penalizing hospitals that do not fill out their surveys, right?
A. I did.
Q. But you testified about the incentive to submit a survey every year?
A. I reiterated that is what the expert panel discussed.
Q. If we could go back to that exhibit with the comments. If we look at two -- at the third page, Athena Health, Becky Winhold: These changes will penalize hospitals that do not submit to a Leapfrog survey. The public will not understand

nor dig into the methodology of the grades and hospitals will be falsely represented with a lower grade because they choose to not complete a survey.

Do you see that?

A. I do.

Q. If you continue, Mr. Moman at Piedmont Health Care, on the next page, and you go down to the red: We feel like this model is unnecessarily punitive. We often skip survey submissions because the responses provided for IVS, hand hygiene, BCMA, and CPOE are largely unchanged in the two year period that was allotted before negatively impacting grades.

Do you see that?

A. I do.

Q. Do you think Piedmont Health Care is also trying to hide something if they don't participate?

A. I don't know how they know it was largely unchanged if they aren't doing the measurement identical to the survey.

Q. Do you think Cedar Sinai would be hiding things?

A. I don't know what it is.

Q. Cedar Sinai also commented on the change and said they would opt out.

A. I apologize, I can't see it. I can't comment on it.

Q. Let's talk about in 2021, if we could put up JX 4.1. This is an exchange with you and Matt Austin. You said Leapfrog does not utilize a penalty. In 2021 Matt said to you,

penalizing hospitals -- this is in regard to an HSC expert panel call and talking through the agenda items.

Go to four, penalizing hospitals that don't report, is that part of the agenda item two and is Leapfrog really open to the idea? If not, I don't want to keep asking their opinions.

Do you see that?

A. I do.

Q. The prior page, an email from Matt Austin on September 1, the last line: Do we need to provide any sort of update on the idea of penalizing hospitals that don't report?

Do you see that?

A. I do.

Q. Penalizing hospitals was a question asked by Matt Austin, one of the members of the expert panel, as far back as 2021?

A. Matt Austin is not a member of the expert panel. He is the researcher that we have a contract with providing oversight. He is not a member of Leapfrog, he is a consultant.

Q. You testified to -- with my colleague that you and Mr. Austin -- that anything related to any of the measures in any of our ratings programs would be me, Matt Austin, Leah Binder in response to the question anybody particular internally at Leapfrog making the decision whether or not we add or follow the panel's expert guidance, right?

A. I am sorry, I didn't follow all of that.

Q. Matt Austin, you, and Ms. Binder are the ones who determine

whether or not to follow the expert panel's advice, right?
A. Yes.
Q. And then we have, of course, Mr. Romano, and we don't need to necessarily look at that again, except to show -- let's look at PX 495.2. He has been copying you on this email with Alex Campione and he says, it is a goal to penalize nonparticipants, and then he says at the bottom -- go down to the last paragraph.
He has a number of ideas and he ultimately says, but it does not achieve your strategic objective of penalizing nonparticipants.
Do you see that?
A. I see the sentence.
Q. He was a member of the expert panel, right?
A. Yes.
Q. He would have known what was discussed in the expert panel, if penalizing was being discussed, right?
A. He would know.
Q. Okay. Is it fair to say that a penalty has a negative connotation?
A. It is fair to say that, yes.
Q. You don't understand a penalty as being something positive, right?
A. No.
Q. Okay. And so, what is positive about assigning five, 15,

15, 25 to nonparticipating hospitals for these measures?
A. It is better than zero.
Q. It is better than zero because zero is, in your view, a number, and if you put zero on them, then you wouldn't have enough measures to actually give them a grade, would you?
A. Zero is a measure score that was floated early on by the expert panel.
Q. Right. If it were adopted, it would be the equivalent of NA, and you wouldn't be able to --
A. Then the measure would be assigned a zero as it is in the outcome measure score.
Q. So zero you believe is different from not reporting, right?
A. Correct.
Q. When my 13 year old takes a test and doesn't even put his name on it he gets a zero, right?
A. I don't know.
Q. Well, he either didn't show up for it, and he is getting a zero, so he didn't participate in a test or he's getting a zero because he didn't participate in the test, right?
A. I'm sorry, I am losing this.
Q. Is there a difference between NA and zero?
A. Yes. The mathematical calculation, and it is transparent in the calculator, there is a big difference between a zero and NA.
Q. Now, if we go back to the comments, in the comments you

say, and this is -- go to page seven. You essentially explain that under the prior methodology, it is the last sentence, the choice to not participate should not excuse a hospital from being graded nor should they be given a score that unfairly awards them points.

Do you see that?

A. I do.

Q. That was your language, right, that it would be unfair to give a nonparticipating hospital a score that would give them points?

A. I agree with it.

Q. You agree with it. The reason you believe it is unfair is that Leapfrog had no information about what the hospitals were actually doing?

A. The reason it would be unfair is because hospitals we know change, and what we are doing here is not wanting to assure a patient something is happening that might not be happening because their risk that they are assuming is quite substantial.

Q. When you testified in September and were asked, why is it unfair, you responded, because we have no information to indicate, and just going back to the hand hygiene example, we have no reason to believe that hospitals that aren't participating in a Leapfrog hospital survey are doing those things.

Do you recall that?

A. I don't recall the context of that.
Q. Going back to the hand hygiene example, you had no information about what the nonparticipating hospitals were actually doing, they could have been best in class for hand hygiene, or not a single person in the operating room was washing their hands, but Leapfrog imputed a score that concluded it was too high, right?
A. We previously made the decision that the imputed scores from spring 2024 were too high given that we didn't know, or in some cases we did know, things had changed.
Q. That is because Leapfrog believed it unfairly rewarded what could be or could not be the absence of hand washing because Leapfrog just didn't know?
A. Leapfrog is here to protect patients, and our goal here is to protect patients.
MS. MALONEY: Move to strike as nonresponsive.
MS. BLAIR: Your Honor, she answered the question.
THE COURT: Let's finish, if we could.
BY MS. MALONEY:
Q. Under the new methodology you still have no information about what the nonparticipating hospitals are actually doing, but now you impute the lowest score, right?
A. I still know what is reasonably known.
Q. So whether what nonparticipating hospitals are doing is good or bad, the hospitals haven't changed between spring 2021

and fall 2004, right?
A. I am sorry, you said that question too fast.
Q. I will move on.
You decided in fall 2004 that it must be unfair to award higher scores to nonparticipating hospitals and you never considered whether it was also unfair to take points away, did you?
A. There was a full discussion about lowering the imputed scores by the expert panel in the transcript provided.
Q. Because the expert panel and Leapfrog wanted to replace what it thought was an unfair methodology, right?
A. They wanted to, in their words, replace a potentially misleading methodology.
Q. It is your view that the current methodology, even though it just substituted more points for less points, is actually fair?
A. It is.

REDIRECT EXAMINATION

BY MS. BLAIR:
Q. Very quickly, Ms. Maloney just went through the public comments for the fall 2024 methodology change. Do you recall that?
A. Yes.
Q. She showed you this document in JX 33. Do you remember seeing that?

A. Yes.
Q. She showed you another document with only the negative comments on it. Do you recall that?
A. Yes.
Q. Does this document refresh your recollection that Leapfrog also received positive comments from hospitals in favor of the change?
A. It also quantifies them. We received four comments supporting the change, one comment expressing concern about the public not realizing the score was imputed, six comments on the exhibit of hospitals opposing the change, and I think an important consideration here is the one commenter that expressed concerns about the public that was responded to through the placement of the asterisk.
Q. Exactly. I know you have been at Leapfrog for a long time. You have gone through the public comment methodology several times?
A. Yes.
Q. Is ten comments, four in favor, six against, significant, I think is the word that Ms. Maloney used?
A. Not in my experience.
Q. Have you had other methodology changes where you received public comment?
A. Yes.
Q. Could you describe for the Court and Pauline, briefly, when

you get a significant public comment on methodology change what does that look like in Leapfrog?
A. So, 2022, 2023, we proposed moving new nurse staffing measures, of which there were four, and that met the criteria established by the expert panel to be included into the safety grade. We met with the expert panel to review those four measures and get their feedback, and my recollection is they supported including three of the measures, but not all four.
We put that out for public comment and we got an overwhelming number of public comments, such so that it resides in my memory. One negative comment was a death threat. We had an overwhelming number of comments from hospitals about adding three nursing staffing measures to the grade. There has been some sensitivity around the nurse staffing ratios.
We reviewed that with our nursing expert panel to get from their view which of the three measures had the strongest impact on patient safety, the strongest impact to patient safety outcomes, then brought that feedback to the expert panel to review the feedback from the nursing expert panel.
Ultimately, the combination of hospital comments, consultation with the nursing staff, discussion with the expert panel led us to only a single staffing measure in the Leapfrog hospital safety grade.
Q. So Leapfrog reads these public comments?
A. Very carefully.

Q. The other question she asked was whether or not you audited these five hospitals that are Plaintiffs in this litigation with respect to the four imputed measures. Do you recall that?
A. I do, and I believe she was talking about on-site data verification. I don't believe we have done on-site data verifications for the five hospitals. I was trying to explain that we verify many of those measures through other methods, of which I explained to you since the burden of on-site data verification is considerable to hospitals, so if we can do it in a way that is accurate, valid and easy, we do often.
Q. Would you ever audit a nonparticipating hospital?
A. We don't do any kind of data verification specific to the hospital safety grade. By that point the data has already been made public. CMS or the CDC or Leapfrog has reviewed that data, publicly reported that data, and hospitals know what that data is, and then it gets moved to the safety grade.
Q. Ms. Maloney asked you about Dr. Shrinivasen, and quickly, one sentence, who is he -- what does he do for a living?
A. He was most recently the deputy director for the CDC.
Q. Ms. Maloney talked to you about the fact that he believed at some point in time that hospitals that didn't participate in the survey should receive a zero, correct?
A. Correct.
Q. And the score that you give these hospitals is not a zero, is it?

A. Correct.
Q. Leapfrog was never supportive of giving a zero score to hospitals?
A. Correct.
Q. To the extent we heard in the media campaign against Leapfrog that the assignment of a limited achievement is a zero score, is that accurate?
A. It is inaccurate.
Q. Would you pull up JX 4.
This is where Ms. Maloney showed you that Matt Austin had used the word penalizing. Bullet point four, penalizing hospitals if they don't report, and is Leapfrog really open to this idea?
Do you see that?
A. I do.
Q. Was Leapfrog ever open to that?
A. We were not. I wanted the agenda to focus on number two, how to score hospitals and looking at additional imputation methods.
Q. Was it your understanding that Matt Austin was bringing up the fact that members of the expert panel had in the past talked about assigning zero to nonparticipating hospitals, and Leapfrog is not one of them, correct?
A. I really don't know. I reviewed this document in detail in my deposition. Matt and I have worked together for years I was

basically telling him what to do. We don't talk about penalizing hospitals. It is on the record in the April 12 expert panel transcript where I stopped the conversation and say we are not taking about penalizing hospitals. I don't care about increasing survey participation.

Q. Last question. We talked about the nature of the composite score, and that the hospital safety grade is a composite score?

A. Yes.

Q. Do you understand that both Delray and West Boca received D grades in the spring of 2024, and in the fall of 2024 continued to receive failing grades? Do you understand that?

A. Yes.

Q. Can you explain whether or not you believe that is a function of the composite score, that your score can be lowered for these four measures, as Ms. Maloney pointed out, they went form 400 points down to 60, Delray did at least, but we know West Boca didn't have anything in this program.

Is that the function of the score -- I am sorry, the composite nature of the score and the grade cutoffs that your score could be lowered by that many points and your grade remain the same?

A. Yes, because the composite is a very well thought out complex mathematical calculation the opposite is also true. Your score on those measures can be, as we have discussed ad nauseam in step two, and you can do well on the other measures

that are 50 percent of the hospital safety grade and receive an A or even a B and hospitals do that.

MS. BLAIR: Thank you, your Honor. No further questions.

MS. MALONEY: I have three questions on redirect --

MS. BLAIR: Recross.

THE COURT: No questions on recross. We have covered everything.

Tell me what you plan to do.

MS. BLAIR: I am dropping an expert, we have Dr. Ferokki, he is from Seattle and he can't get here in time. I can finish tomorrow. I have three experts in the morning, two videos they previewed. Matt Austin will be played in the case in chief, as well as Loren Bailey, and late afternoon we could close, Your Honor, and I have one --

THE COURT: You think you will finish tomorrow? Do you want to present closings now or after -- what are your thoughts on closings? At the beginning you both wanted to do it.

MS. MALONEY: We are happy to do it now. I am not sure we will have time to do it at the end of the day tomorrow. We can also brief it and then close at a later date if that is better for Your Honor. We do whatever is your preference.

THE COURT: All right. If we can finish tomorrow, maybe we will have closings Friday morning. Will that work?

**MS. MALONEY: Yes.**

**THE COURT: All right. Have a good night. See you tomorrow morning.**

**(Thereupon, the Court was recessed.)**

* * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date: January 26, 2026

/s/ Pauline A. Stipes, Official Federal Reporter

Signature of Court Reporter

**MR. CHUNG: [37]** 5/24 7/25 9/4 14/6 21/4 25/7 25/14 25/19 27/24 28/1 29/10 29/19 34/19 43/22 44/2 66/10 66/20 67/3 72/18 76/7 78/17 78/24 102/22 102/25 103/22 110/22 112/1 113/17 115/8 117/2 118/17 118/19 119/22 119/24 120/4 120/14 126/1
**MR. CRAIN: [6]** 129/3 129/7 129/10 131/12 132/4 132/7
**MR. RILEY: [3]** 3/10 3/12 3/20
**MS. BLAIR: [122]** 3/6 6/11 13/24 14/5 16/4 17/8 18/2 19/25 25/8 25/12 25/16 27/22 29/4 29/18 34/14 39/3 43/14 43/21 43/24 44/3 59/1 59/4 63/4 66/13 66/17 76/9 78/22 79/2 79/5 84/2 84/6 84/9 84/15 102/24 103/1 103/20 110/20 110/24 111/24 112/3 113/14 113/19 113/21 115/6 120/12 126/3 127/7 128/19 129/5 131/9 131/23 132/6 133/3 133/9 136/3 136/11 136/17 136/22 137/2 137/5 137/12 137/15 137/18 137/23 138/3 138/6 138/8 138/10 138/13 142/8 142/13 142/17 142/22 143/2 143/6 144/10 144/13 145/10 145/12 145/15 145/22 146/1 146/5 146/8 147/22 147/25 149/5 149/10 149/17 149/19 149/24 150/3 150/19 151/5 151/14 151/19 152/5 152/7 152/25 153/3 153/10 153/15 153/18 153/22 154/1 166/13 166/22 191/16 195/18 199/22 207/18 213/14 221/6 223/9 226/7 231/5 240/2 240/7 251/16 258/2 258/5 258/9
**MS. BUZZARD: [29]** 156/24 158/12 159/21 160/1 160/15 160/25 161/18 161/23 161/25 162/4 162/7 162/9 162/11 162/17 162/23 163/1 163/20 164/3 164/9 164/15 164/19 165/3 165/8 165/11 165/15 165/17 165/20 165/23 166/8
**MS. MALONEY: [15]** 3/21 127/9 128/4 129/9 132/11 132/25 133/6 156/19 187/9 207/20 240/4 251/15 258/4 258/19 258/25
**THE COURT: [178]** 2/8 3/11 3/18 6/2 6/14 8/2 9/2 9/6 14/2 14/8 16/6 17/9 18/7 20/3 25/11 25/15 25/21 27/23 27/25 29/16 29/21 34/17 39/4 43/19 59/3 63/5 66/9 66/12 66/15 66/18 66/22 67/1 78/18 79/1 79/4 84/4 84/7 84/11 84/13 103/23 112/2 112/4 113/18 113/20 113/22 115/9 117/4 118/7 118/20 119/23 119/25 120/6 120/13 126/2 126/4 127/8 128/3 128/17 131/6 131/10 131/14 132/2 132/10 133/2 133/8 136/1 136/10 136/13 136/19 136/24 137/4 137/9 137/14 137/17 137/22 138/1 138/4 138/7 138/9 138/11 142/5 142/9 142/15 142/20 142/24 143/4 144/8 144/11 145/6 145/11 145/14 145/19 145/24 146/3 146/7 147/20 147/23 149/2 149/7 149/13 149/18 149/21 150/1 150/15 151/2 151/12 151/16 152/2 152/6 152/23 153/1 153/8 153/13 153/17 153/19 153/25 156/18 158/9 159/19 159/23 160/13 160/21 161/17 161/20 161/24 162/2 162/6 162/8 162/10 162/15 162/22 162/25 163/16 164/1 164/8 164/11 164/17 165/2 165/6 165/9 165/14 165/16 165/18 165/21 166/7 166/11 166/16 166/20 187/18 187/22 188/9 188/16 189/12 191/4 191/8 191/15 195/17 195/23 195/25 196/6 196/25 198/2 199/21 203/5 203/10 204/1 204/15 204/18 204/20 223/11 226/9 240/3 240/6 251/17 258/6 258/15 258/23 259/1
**THE WITNESS: [28]** 6/15 16/7 17/10 25/17 48/19 117/5 118/21 120/1 120/7 166/25 187/25 188/12 188/18 189/18 191/6 191/10 195/19 195/24 196/2 196/8 197/2 198/4 203/8 203/12 204/3 204/17 204/19 226/10

**$**

**$10,000 [2]** 20/17 27/6
**$100,000 [1]** 61/5
**$116,750 [1]** 61/6
**$160,000 [1]** 56/9
**$199,503 [1]** 115/17
**$2.95 [2]** 137/12 137/15
**$200,000 [2]** 110/11 111/18
**$30,000 [1]** 113/4
**$39,400 [1]** 55/22
**$44,000 [1]** 212/14
**$44,600 [1]** 211/18
**$540,000 [1]** 53/4
**$57,000 [1]** 56/1
**$67,000 [1]** 56/3
**$67,500 [1]** 60/16
**$675,000 [1]** 60/12
**$742,500 [1]** 61/5
**$79,000 [1]** 56/6
**$900,000 [1]** 53/7

**'**

**'22 [1]** 10/2

**/**

**/s [1]** 259/10

**0**

**0550 [1]** 2/5

**1**

**10,000 [1]** 189/9
**100 [1]** 141/25
**11 [4]** 3/18 6/6 9/11 97/7
**11.2 billion [1]** 11/8
**11:00 o'clock [1]** 66/25
**11:30 [3]** 3/3 3/4 84/4
**11:45 [1]** 3/4
**12 [19]** 13/24 19/22 59/1 59/11 101/24 148/2 155/2 171/16 205/7 230/12 230/19 231/22 236/3 236/5 236/8 236/11 236/14 236/15 257/2
**12:30 [2]** 3/5 84/8
**12th [1]** 244/18
**13 [3]** 21/25 81/5 249/14
**130 [1]** 6/6
**139 [2]** 134/1 154/15
**14 [2]** 71/21 111/7
**141 [1]** 127/11
**15 [90]** 9/11 30/2 33/20 33/23 34/8 34/9 35/1 35/16 37/10 37/19 37/22 38/3 38/16 38/18 38/22 38/24 39/1 39/11 39/22 39/23 51/3 51/6 51/6 60/19 75/3 75/3 75/5 75/19 124/2 125/8 143/11 143/12 145/17 145/17 146/21 147/3 147/10 159/13 165/12 165/18 175/22 176/2 176/5 198/20 220/13 221/3 223/21 223/24 224/10 224/14 226/18 231/10 231/10 235/5 235/14 235/19 236/6 236/19 237/2 237/2 237/8 238/13 238/19 239/6 239/7 239/11 239/11 239/15 239/18 243/7 243/8 243/13 243/13 243/17 243/17 243/22 243/22 244/3 244/3 244/8 244/11 244/11 244/15 244/15 245/9 245/9 245/11 245/13 248/25 249/1
**15 percent [2]** 239/11 239/16
**15-minute [1]** 66/24
**151 [1]** 130/9
**15s [1]** 152/3
**15th [3]** 113/1 115/16 115/16
**16 [9]** 11/24 151/19 151/19 151/21 151/25 152/1 152/22 152/23 177/21
**160 [4]** 11/11 43/9 43/9 61/20
**161 [1]** 2/4
**162 million [1]** 12/3
**17 [1]** 71/12
**1700 [1]** 1/18
**18 [14]** 8/6 54/22 86/3 127/20 144/9 152/24 153/10 153/14 153/18 165/10 165/19 242/2 242/19 243/2
**180 [1]** 61/20

**2**

**20 [10]** 23/22 25/24 36/18

## 2

**20... [7]** 39/11 151/18 151/21 152/21 169/18 169/20 236/15
**200 [4]** 141/25 146/12 175/11 221/1
**2000 [1]** 86/5
**2000s [1]** 86/17
**2001 [3]** 89/21 89/22 170/25
**20036 [1]** 1/19
**2004 [2]** 252/1 252/4
**2006 [7]** 176/10 176/22 236/10 236/11 243/11 243/12 244/21
**2007 [2]** 236/11 243/12
**2008 [2]** 28/13 167/24
**2009 [1]** 167/25
**2010 [2]** 97/14 184/16
**2011 [6]** 71/10 177/16 184/16 205/17 243/24 244/4
**2012 [14]** 97/6 99/11 102/18 102/21 103/4 103/16 104/13 104/15 104/19 104/22 106/13 106/20 110/2 110/3
**2013 [3]** 113/1 115/16 124/12
**2014 [2]** 113/2 115/16
**2017 [3]** 147/20 164/15 164/18
**2018 [2]** 56/16 81/5
**202-887-3729 [1]** 1/19
**2020 [1]** 123/13
**2021 [19]** 4/5 33/3 33/14 33/16 233/9 233/10 233/12 233/18 237/25 238/2 238/8 238/11 238/20 239/4 239/5 246/23 246/25 247/14 251/25
**2022 [1]** 254/3
**2022 imputation [1]** 214/22
**2023 [13]** 62/2 81/13 81/18 144/15 192/10 198/7 198/8 206/10 208/17 208/19 215/13 215/15 254/3
**2024 [79]** 9/22 10/2 10/17 11/5 11/14 12/9 12/12 12/14 12/25 30/2 30/9 32/3 32/6 33/19 40/25 43/8 43/12 43/13 44/20 45/2 47/19 52/16 52/22 54/24 55/1 55/21 56/8 58/20 59/1 59/11 64/3 73/6 73/9 73/12 81/13 81/18 96/1 101/1 118/16 123/21 124/2 124/3 124/23 124/25 141/8 144/15 146/24 148/2 150/7 150/8 158/3 187/14 191/20 191/21 191/25 193/23 193/25 194/25 198/7 200/8 202/2 202/23 202/25 205/5 206/14 207/16 215/13 215/15 215/17 223/18 223/22 238/20 239/4 243/22 245/14 251/9 252/21 257/10 257/10
**2025 [18]** 4/18 6/5 12/7 13/24 24/23 25/2 42/4 64/3 64/25 65/22 69/19 71/12 183/6 200/9 211/16 211/21 237/21 241/12
**2026 [5]** 1/9 105/9 224/6 224/18 259/9
**2026 through [1]** 4/15
**203 [1]** 71/4
**2032 [1]** 4/15
**205 [2]** 11/23 81/5
**205.0 [1]** 56/12
**21 [4]** 1/9 67/8 83/6 242/2
**21.0 [1]** 64/20
**22 [10]** 86/3 144/2 144/7 151/7 153/6 165/12 181/17 205/5 229/16 230/4
**23 [2]** 76/11 191/25
**239 [1]** 11/22
**24 [4]** 231/20 231/23 242/19 243/2
**24/7 [2]** 53/14 79/22
**25 [25]** 35/24 36/1 36/3 52/22 60/19 104/3 170/5 171/5 224/1 226/18 227/1 227/9 231/10 234/24 237/2 237/9 243/8 243/14 243/17 243/22 244/3 244/11 244/15 245/9 249/1
**25 percent [1]** 12/5
**25-CV-80526-MIDDLEBROOKS [1]** 1/3
**250 [1]** 1/22
**252 [1]** 8/6
**253 [2]** 8/7 9/11
**25s [1]** 152/4
**26 [6]** 65/22 70/14 70/21 71/1 125/13 259/9
**26-page [1]** 70/6
**261.1 [1]** 199/24
**27 percent [1]** 152/12
**27-page [2]** 71/1 125/13
**275.4 [2]** 52/18 79/13
**283.0 [1]** 40/9
**29.0 [1]** 72/9
**293 [1]** 123/19

## 3

**3 percent [2]** 142/21 145/15
**30 [4]** 48/1 48/14 68/21 69/21
**30.0 [1]** 65/17
**30.5 [1]** 49/18
**304.1 [2]** 32/3 72/24
**305-400-4260 [1]** 1/23
**31 [1]** 231/23
**312-704-0550 [1]** 2/5
**317 [5]** 110/20 111/25 112/4 112/5 112/6
**318 [3]** 113/14 113/22 113/23
**319 [3]** 115/6 115/10 115/11
**32 [2]** 74/5 212/25
**322 [1]** 59/4
**322.2 [3]** 58/24 59/9 118/25
**323.2 [3]** 29/1 29/21 29/23
**324 [1]** 80/8
**324.1 [1]** 54/22
**33 [1]** 252/24
**33.5 [3]** 36/10 73/16 77/15
**33131 [1]** 1/23
**34 [1]** 11/23
**3434 [1]** 2/8
**35 [2]** 88/7 114/3
**354.1 [1]** 4/13
**3729 [1]** 1/19
**39 [1]** 11/24

## 4

**4.1 [1]** 246/23
**400 [4]** 237/2 237/9 237/14 257/16
**402 [4]** 102/16 103/22 103/24 103/25
**403 [1]** 29/18
**407 [1]** 211/15
**413 [1]** 41/21
**426 [3]** 43/11 127/11 127/13
**4260 [1]** 1/23
**435 [1]** 11/7
**436 [1]** 193/22
**439 [5]** 13/10 14/9 24/18 45/9 199/25
**439.0 [2]** 13/22 14/8
**444 [1]** 12/2
**445 [1]** 204/24
**4500 [1]** 2/4
**454.1 [2]** 19/12 27/3
**470 [1]** 93/24
**48 [1]** 96/24
**495.2 [1]** 248/5

## 5

**5-foot [1]** 196/20
**5.2 [1]** 238/12
**50 [7]** 133/5 157/3 172/17 177/8 179/24 236/10 258/1
**50 percent [1]** 183/18
**500 [2]** 87/3 196/12
**55 [1]** 11/23
**561-803-3434 [1]** 2/8

## 6

**6.4 percent [1]** 11/16
**60 [4]** 237/2 237/9 237/14 257/16
**60601 [1]** 2/5
**66.3 [1]** 69/14
**69 [3]** 43/7 43/13 44/7
**69 percent [1]** 81/14

## 7

**70 [1]** 177/9
**70 percent [2]** 43/14 168/21
**722 [1]** 11/7
**79 percent [3]** 43/7 44/8 81/14

## 8

**813 [1]** 152/10
**85 [2]** 238/20 238/23
**850 [1]** 9/17
**88.7 [2]** 148/5 148/6

## 9

**90 [1]** 182/3
**93 [1]** 198/11

## A

**a statement [1]** 63/22
**ability [5]** 23/23 209/12 209/17 210/2 210/20
**able [14]** 80/5 93/1 98/3

**A**

**able... [11]** 110/10 114/15 114/17 117/25 119/18 143/14 143/15 155/6 178/1 221/12 249/9
**about [295]**
**about penalizing [1]** 257/4
**above [4]** 181/8 181/24 182/5 259/7
**absence [1]** 251/12
**absolutely [14]** 26/4 74/14 77/12 78/12 86/14 91/6 91/18 94/21 100/21 103/20 106/21 108/23 116/1 185/20
**abuse [2]** 167/10 167/16
**academic [3]** 173/10 199/6 199/17
**access [10]** 140/5 140/6 140/13 154/4 171/4 191/7 191/14 242/10 242/11 242/13
**accessible [2]** 70/12 72/4
**accidentally [1]** 168/5
**accidentally demoted [1]** 168/5
**accidents [1]** 184/24
**accolade [7]** 53/21 105/21 107/16 109/6 208/8 208/12 211/12
**accolades [5]** 105/19 108/12 108/13 160/3 160/4
**accompanied [1]** 133/11
**according [2]** 63/17 142/21
**account [1]** 177/10
**accountable [2]** 156/7 174/17
**accredited [3]** 96/16 96/17 220/17
**accuracy [3]** 106/5 122/4 221/9
**accurate [26]** 7/13 44/18 64/9 64/10 121/19 121/23 121/25 179/6 192/16 208/10 208/11 215/14 221/17 221/19 222/4 223/15 225/7 227/19 228/7 232/12 232/15 232/16 232/19 232/23 255/10 256/7
**accurately [2]** 178/2 223/4
**accused [1]** 132/21
**achieve [8]** 5/22 6/7 6/9 6/17 234/1 237/20 237/21 248/10
**achieved [1]** 237/8
**achievement [28]** 35/1 37/11 79/9 125/10 143/19 146/11 146/11 146/11 146/12 175/9 175/10 175/20 175/21 176/6 176/15 184/6 190/5 198/20 222/24 226/22 227/17 234/1 234/4 235/19 237/1 237/8 237/20 256/6
**achieves [1]** 241/3
**acknowledge [1]** 94/25
**acknowledges [1]** 122/8
**acquired [3]** 85/10 85/13 85/22
**across [8]** 10/19 11/11 11/23 11/24 123/25 124/4 153/7 237/1
**act [3]** 46/[illegible] 164/13 209/23
**acting [1]** 141/4
**action [4]** 51/23 97/25 136/1 157/6
**active [7]** 110/7 112/13 141/3 199/10 219/15 219/19 219/25
**actively [1]** 86/25
**acts [1]** 133/14
**actual [20]** 33/12 33/23 34/2 75/2 118/11 147/9 149/11 153/20 157/10 164/2 164/7 164/25 177/10 189/3 211/5 211/24 227/14 228/9 228/14 232/9
**actually [46]** 11/14 11/16 18/12 18/16 18/22 19/18 21/22 35/24 40/1 45/17 45/23 85/23 86/17 89/4 90/7 92/5 94/18 97/23 116/20 119/19 132/21 132/22 155/9 167/22 173/15 174/22 185/10 187/13 190/14 191/24 198/10 207/1 218/7 227/1 227/6 227/21 229/23 232/18 239/1 239/17 243/21 249/5 250/14 251/4 251/21 252/15
**acute [1]** 171/11
**ad [8]** 15/10 15/19 18/19 19/8 19/24 45/13 129/17 257/24
**adapt [1]** 209/6
**adapted [1]** 244/9
**add [4]** 58/15 91/17 91/19 247/22
**added [2]** 194/2 194/3
**adding [1]** 254/12
**addition [3]** 50/4 178/9 178/19
**additional [2]** 165/14 256/18
**Additionally [6]** 168/25 178/16 182/16 182/19 183/22 187/5
**address [1]** 79/21
**addressed [1]** 204/10
**adds [2]** 92/8 153/3
**adhere [1]** 166/4
**administer [3]** 187/9 219/25 241/4
**administered [1]** 191/13
**administering [2]** 170/7 241/13
**administers [1]** 220/5
**administration [7]** 144/17 224/1 225/2 225/11 227/2 227/10 234/24
**admissions [4]** 4/8 155/16 155/17 155/20
**admit [2]** 14/7 29/20
**admitted [26]** 4/13 9/18 14/9 14/10 29/22 29/23 43/24 59/4 63/10 70/11 102/24 103/22 103/24 103/25 111/25 112/5 112/6 113/23 113/24 115/10 115/11 127/13 135/2 138/20 158/5 213/2
**adopt [2]** 177/19 207/5
**adopted [7]** 206/20 207/2 236/23 244/4 244/5 244/11 249/8
**adopting [1]** 244/8
**adoption [2]** 243/24 245/13
**ads [13]** 15/9 18/1 18/14 19/16 19/19 20/21 21/2 26/25 27/4 27/6 27/9 27/14 209/5
**adult [2]** 21/10 190/20
**adults [1]** 169/8
**advance [2]** 117/22 168/14
**advances [1]** 131/9
**advantage [1]** 199/8
**advertise [3]** 107/24 137/25 138/14
**advertisement [1]** 105/15
**advertising [2]** 19/4 20/18
**advice [7]** 88/22 89/10 89/11 160/12 162/25 190/12 248/1
**advise [1]** 89/6
**advised [1]** 189/20
**adviser [2]** 52/24 79/18
**advisory [2]** 88/17 88/19
**advocacy [1]** 86/19
**advocating [2]** 86/18 99/8
**affirmatively [2]** 3/17 127/20
**afford [2]** 43/3 167/12
**after [22]** 13/6 21/24 45/5 45/11 87/1 90/1 97/6 104/16 114/19 124/24 154/2 168/3 197/9 201/7 205/7 205/9 223/18 223/22 239/6 244/8 244/11 258/17
**afternoon [3]** 166/15 167/4 258/14
**again [46]** 5/4 5/11 7/19 8/1 8/5 9/5 9/6 9/10 13/7 16/24 17/13 19/22 31/8 32/5 32/16 34/8 35/16 37/16 45/9 46/4 51/2 51/5 52/6 52/7 58/14 63/9 67/8 68/12 89/22 98/15 112/3 116/2 120/5 123/22 125/19 136/25 160/7 188/4 193/11 209/23 217/8 217/15 220/21 222/19 229/11 248/4
**against [11]** 26/3 41/13 61/13 98/9 106/20 129/1 134/12 160/12 162/24 253/19 256/5
**age [1]** 190/18
**agencies [1]** 219/12
**agency [3]** 111/20 167/10 167/16
**agenda [3]** 247/2 247/4 256/17
**Agensovasia [1]** 244/24
**aggregated [1]** 242/17
**aggrieved [7]** 133/17 155/11 155/12 155/18 156/5 165/1 165/2
**aggrievement [2]** 156/12 156/14
**ago [9]** 34/3 63/24 71/21 101/24 170/5 192/11 192/21 238/25 244/6
**agree [10]** 58/22 76/11 77/10 82/12 122/15 169/18 226/15 227/7 250/11 250/12

**A**

**agreed [2]** 127/13 150/10
**agreement [1]** 66/21
**agrees [1]** 17/2
**ahead [3]** 34/19 133/9 226/10
**aimed [1]** 45/23
**air [1]** 183/24
**aisle [1]** 132/15
**al [1]** 1/5
**Alana [1]** 214/19
**alcohol [2]** 173/25 174/14
**alert [2]** 190/20 190/24
**alerted [1]** 76/3
**alerting [1]** 224/12
**alerts [1]** 190/18
**Alex [12]** 34/16 134/23 140/3 142/15 148/20 175/24 176/1 200/14 200/17 205/1 214/14 248/5
**Alexandra [1]** 34/13
**algorithms [1]** 178/15
**alive [1]** 101/3
**all [174]** 3/4 3/19 4/20 5/21 6/3 6/22 8/1 9/7 10/23 11/1 12/2 12/23 13/4 14/3 14/21 20/13 21/1 21/5 21/16 22/7 25/16 25/22 32/3 32/6 32/15 40/1 43/10 43/19 45/1 45/2 45/5 46/7 46/21 47/7 49/10 50/14 50/19 51/11 52/1 53/6 54/2 54/3 54/20 55/3 55/5 56/11 57/1 58/1 58/8 58/22 59/24 60/4 61/1 62/13 62/17 63/14 63/17 66/22 67/23 68/17 70/14 70/21 76/24 79/5 86/5 87/13 87/15 89/23 90/21 91/2 91/23 92/7 92/22 93/3 96/15 96/18 98/8 98/16 99/22 101/10 102/4 102/15 105/21 109/8 112/5 116/7 116/19 117/7 117/19 123/10 125/17 127/5 127/9 131/7 132/3 132/11 133/3 133/16 136/14 138/3 141/8 146/21 147/6 150/4 150/6 150/12 153/6 153/13 154/1 155/14 156/19 160/23 165/23 166/9 168/1 168/3 171/1 171/16 171/17 173/16 175/6 175/12 178/6 180/4 181/4 182/14 184/5 184/8 184/8 184/9 185/23 187/19 189/24 190/18 190/21 192/24 193/1 195/21 196/10 196/14 196/21 197/6 197/10 198/10 198/13 199/20 201/1 201/7 201/14 202/19 204/21 205/11 206/20 210/24 212/1 217/18 220/15 220/17 221/1 221/14 223/2 223/6 227/21 229/16 233/7 233/15 238/17 239/14 240/12 241/23 247/24 254/8 258/24 259/2
**allegation [2]** 108/20 130/15
**allegations [3]** 130/12 130/20 182/25
**alleged [2]** 135/4 155/18
**allegedly [1]** 139/9
**Alliance [5]** 88/3 88/5 120/25 126/9 126/15
**allotted [1]** 246/11
**allow [4]** 54/10 106/4 107/24 195/22
**allowing [5]** 56/23 98/23 193/5 194/21 215/16
**allows [4]** 57/14 75/21 148/16 190/9
**almost [12]** 44/14 56/1 56/3 56/9 61/25 61/25 147/22 171/17 172/9 179/11 198/14 198/17
**along [6]** 23/9 30/20 55/23 79/4 108/3 153/12
**already [13]** 4/13 13/23 28/10 36/10 37/9 40/9 40/10 41/21 93/24 102/16 106/22 177/18 255/13
**also [80]** 5/12 7/12 13/5 19/22 25/6 27/17 52/1 52/10 54/7 60/1 60/4 76/25 81/5 88/2 88/21 90/20 91/25 93/9 94/8 97/3 100/5 101/9 105/25 107/6 107/16 107/18 113/15 118/4 123/10 127/18 129/16 129/19 130/23 135/9 142/25 152/16 155/7 158/6 159/15 160/5 161/1 161/10 161/11 162/1 162/18 163/2 163/9 174/7 177/12 183/11 183/13 184/10 198/10 200/19 207/13 208/7 216/15 218/23 219/2 220/2 220/6 224/14 225/25 226/15 228/13 228/17 228/20 233/1 235/6 235/9 237/17 243/17 245/4 246/14 246/20 252/6 253/6 253/8 257/23 258/22
**although [1]** 188/10
**Alva [7]** 29/10 29/11 30/3 30/5 30/9 30/9 32/16
**always [22]** 13/1 20/14 64/10 64/11 64/12 64/12 64/12 84/12 96/3 105/5 105/10 105/13 110/6 121/24 131/21 158/9 164/10 170/20 192/24 202/16 202/21 227/20
**am [87]** 3/22 8/5 9/5 9/7 16/10 17/18 18/22 19/11 20/22 23/6 30/24 34/5 36/6 39/7 43/17 46/2 48/22 49/8 51/18 57/25 64/7 64/7 66/19 68/19 69/7 69/11 71/22 78/19 78/23 79/4 84/3 110/20 119/14 123/6 129/18 131/21 132/21 133/7 143/5 144/23 151/9 167/5 168/5 168/18 173/7 178/1 178/19 183/24 187/1 187/8 188/2 189/12 193/4 193/7 197/3 197/5 197/7 200/12 200/12 201/2 203/16 203/16 209/23 212/7 217/6 217/14 219/7 220/3 220/21 221/23 223/10 225/6 227/4 227/25 228/6 232/20 235/18 236/1 237/4 239/25 240/15 247/24 249/20 252/2 257/18 258/10 258/20
**amazing [1]** 100/16
**ambulatory [7]** 168/20 168/23 169/2 169/16 178/14 180/1 216/5
**amended [1]** 164/14
**amends [1]** 164/13
**America [3]** 24/15 42/14 42/22
**American [2]** 169/4 169/6
**among [9]** 5/7 42/13 42/21 56/9 90/3 98/23 157/9 199/17 230/24
**amount [3]** 76/8 96/16 115/17
**amplify [1]** 52/20
**analyses [2]** 109/15 155/21
**analysis [7]** 14/4 54/24 112/12 119/9 152/10 152/16 153/3
**analyst [1]** 200/15
**analytics [5]** 141/23 142/4 142/22 160/20 160/22
**and BCMA [1]** 231/13
**and now [1]** 238/12
**and/or [1]** 105/2
**anecdotes [4]** 139/7 141/14 154/24 155/7
**angry [1]** 156/13
**anniversary [1]** 97/16
**announced [1]** 28/10
**announcement [1]** 118/6
**announcements [1]** 101/10
**annual [7]** 24/9 26/10 101/17 123/5 167/21 170/9 178/16
**annually [2]** 123/2 192/7
**anonymous [2]** 141/22 162/9
**another [23]** 7/17 9/17 19/11 34/8 34/22 34/23 38/25 41/20 55/25 60/16 67/9 74/8 75/25 108/15 170/23 172/8 191/14 197/15 227/23 232/16 236/11 245/4 253/2
**answer [31]** 5/19 7/23 8/10 9/14 24/4 24/7 30/24 66/1 98/14 117/25 125/3 127/6 128/24 129/1 151/8 151/21 157/8 158/11 178/23 210/9 210/13 213/14 220/22 223/5 227/18 229/12 237/16 239/9 242/15 242/25 243/1
**answered [5]** 6/11 16/15 16/16 240/3 251/17
**answering [1]** 229/5
**answers [3]** 104/5 210/11 227/23
**ant [1]** 141/15
**anti [1]** 167/13
**anti-bullying [1]** 167/13
**anxiety [3]** 159/18 159/19 160/10
**any [88]** 9/2 14/1 15/17 19/23 20/15 22/3 26/1 37/17 39/9 39/16 40/25 45/13 45/23 47/15 59/19 61/21 73/5 81/19 81/23 82/14 83/23 87/12 87/13 91/7 92/14 100/3 105/24 108/21 112/17 119/14 124/18 124/23 127/1 133/14

A

**any... [54]** 135/3 135/23 138/6 139/12 139/20 140/17 140/22 141/15 144/5 149/14 149/22 150/8 150/18 151/3 154/16 154/18 155/9 155/14 155/21 155/23 156/11 156/16 157/8 158/17 163/19 165/8 165/22 171/8 172/21 182/18 196/3 201/5 203/3 205/24 207/15 218/9 219/12 220/12 224/15 226/25 227/9 228/24 229/17 231/21 231/22 232/14 233/8 233/11 233/18 234/8 247/9 247/19 247/19 255/12
**any Government [1]** 219/12
**anybody [8]** 136/22 136/23 138/7 148/17 151/5 178/14 219/7 247/21
**anymore [3]** 112/24 193/9 195/4
**anyone [13]** 15/17 38/25 39/2 39/12 41/4 41/4 41/15 70/17 81/1 117/19 174/23 199/15 218/10
**anything [18]** 24/10 76/20 82/1 82/16 95/12 108/8 116/14 118/3 131/17 138/21 152/25 153/15 154/9 194/23 194/25 240/1 247/19 257/17
**anyway [1]** 90/9
**anywhere [4]** 46/25 61/5 61/20 149/16
**APICS [1]** 173/10
**apologies [1]** 89/5
**apologize [3]** 78/24 94/24 246/22
**app [6]** 111/15 112/12 112/20 112/21 112/23 112/24
**Apparently [1]** 142/23
**appearance [1]** 3/10
**APPEARANCES [1]** 1/14
**appeared [2]** 130/11 130/12
**apples [2]** 93/4 93/4
**application [1]** 25/14
**applied [2]** 183/10 206/18
**applies [3]** 174/22 185/3 185/11
**apply [1]** 174/21
**appreciate [3]** 128/15 132/14 187/15
**approach [4]** 128/25 182/20 203/21 203/22
**appropriate [4]** 36/7 50/12 127/23 160/17
**appropriately [1]** 110/5
**approval [3]** 46/7 46/21 47/9
**approve [4]** 46/12 149/23 149/24 187/13
**approving [1]** 46/14
**approximately [3]** 90/17 127/17 127/19
**April [6]** 52/22 148/2 191/21 205/5 244/18 257/2
**April 12 [2]** 148/2 257/2
**April 12th [1]** 244/18
**April 2024 [1]** 191/21
**April 22 [1]** 205/5
**April 25 [1]** 52/22
**arbitrarily [2]** 34/14 34/22
**arbitrary [7]** 34/11 34/12 35/16 35/18 157/25 176/2 176/7
**are [543]**
**are minutes [1]** 245/13
**area [1]** 197/23
**areas [4]** 93/6 167/19 173/14 214/17
**aren't [14]** 70/20 99/5 99/6 132/1 136/2 136/11 171/12 192/16 197/22 208/15 220/2 229/3 246/17 250/22
**argue [8]** 128/13 128/16 130/19 130/21 133/8 143/17 155/16 229/4
**arguing [1]** 180/25
**argument [6]** 127/25 128/1 130/1 156/21 156/24 159/15
**argumentative [5]** 63/5 213/15 221/7 223/11 231/6
**arguments [2]** 128/10 138/23
**armpit [1]** 139/8
**around [16]** 9/21 24/22 64/25 89/11 97/21 97/25 98/14 99/11 100/20 110/2 116/5 145/12 176/10 177/20 183/24 254/14
**art [1]** 104/11
**articles [6]** 10/20 11/7 11/15 12/24 25/4 130/21
**articulated [1]** 38/5
**artificial [1]** 187/4
**as [206]** 3/15 9/8 14/4 16/6 18/7 21/13 21/17 22/7 23/3 25/21 28/15 31/23 32/19 36/12 37/15 44/9 52/6 52/6 52/20 53/1 55/1 56/22 57/10 57/17 58/4 60/6 60/9 60/11 60/23 61/4 64/10 64/10 64/10 64/25 65/22 66/17 68/16 69/11 69/18 72/24 73/5 73/8 77/22 81/9 82/21 83/12 83/16 83/20 83/23 84/21 85/2 85/7 85/14 87/4 87/5 87/8 87/11 87/11 88/5 90/8 91/16 92/4 92/15 94/11 95/25 96/9 99/4 101/7 101/22 103/13 110/6 110/20 112/12 114/15 116/16 117/9 119/6 123/15 124/2 124/2 124/12 124/12 124/19 124/21 124/22 124/24 127/6 127/13 128/7 128/9 128/10 128/15 128/15 128/17 128/20 131/19 131/20 133/6 133/10 133/12 133/20 133/21 134/20 136/21 136/23 137/24 138/20 141/2 141/2 141/15 141/18 142/7 145/2 145/3 154/15 155/4 156/1 156/2 157/3 158/5 158/6 159/4 159/5 159/22 163/18 168/14 170/4 170/11 173/9 173/9 176/5 177/25 178/10 179/4 180/2 180/6 180/19 180/20 181/16 181/16 183/6 183/6 183/11 184/3 184/6 184/13 185/20 187/15 187/17 192/14 192/14 192/23 193/24 194/10 197/14 198/22 199/4 199/18 199/18 200/15 202/9 203/2 203/20 203/20 204/11 204/12 204/15 205/21 207/11 207/11 210/24 215/24 215/24 218/1 218/4 220/9 220/14 224/11 224/20 225/11 225/20 226/15 226/22 227/3 228/8 229/12 230/7 231/9 232/10 234/9 236/9 241/4 242/21 244/3 244/4 244/9 244/12 247/14 247/14 248/22 249/10 251/16 257/15 257/24 258/14 258/14
**ASCs [1]** 88/12
**aside [2]** 41/10 41/14
**ask [38]** 9/8 16/2 18/11 27/8 27/13 31/8 41/1 41/11 44/6 53/23 76/25 83/5 86/22 88/12 103/4 103/21 111/25 119/6 120/4 127/2 127/25 146/9 156/8 156/17 164/7 166/4 166/10 170/9 174/16 178/14 179/21 183/13 187/23 191/20 210/9 217/6 227/21 229/5
**asked [59]** 5/22 6/6 6/13 6/19 7/20 8/8 9/11 16/14 16/16 17/17 22/18 24/3 26/25 41/6 60/11 60/21 64/21 65/2 65/18 67/9 68/24 69/10 73/18 75/5 78/7 83/2 85/10 96/12 104/5 104/7 104/9 119/11 122/1 123/10 124/10 126/8 126/18 126/22 128/13 128/24 142/3 155/22 167/24 173/2 176/8 193/20 211/23 215/20 217/7 227/6 227/8 228/7 236/15 240/3 242/25 247/13 250/19 255/1 255/17
**asking [32]** 8/13 16/10 17/5 18/5 18/6 18/22 20/22 25/19 34/5 35/4 35/10 37/3 39/7 48/15 48/15 48/22 49/8 49/15 57/19 57/25 66/20 73/22 93/25 156/5 217/6 217/14 221/22 221/25 232/20 233/22 242/10 247/5
**aspect [1]** 172/21
**aspects [4]** 170/15 172/18 205/25 216/14
**asserted [2]** 18/5 162/17
**assess [1]** 161/3
**assessed [1]** 150/18
**assessing [2]** 40/7 116/10
**assessment [1]** 153/24
**asset [1]** 91/21
**assign [4]** 37/16 165/13 177/1 206/17
**assigned [24]** 31/5 31/10 34/14 38/6 38/24 41/8 142/7 142/11 143/10 143/15 143/16 144/12 145/18 145/20 154/12 177/5 196/4 196/6 196/23 197/25 198/20 219/16 236/22 249/10
**assigning [5]** 190/5 215/14

**A**

**assigning... [3]** 236/19 248/25 256/22
**assignment [4]** 148/18 153/21 153/23 256/6
**assignments [1]** 236/9
**assigns [2]** 7/4 116/10
**assistants [2]** 142/2 142/3
**assisted [1]** 224/17
**associated [4]** 176/6 188/20 236/12 236/21
**Association [2]** 169/4 173/11
**assume [9]** 20/9 146/4 148/14 158/12 158/22 158/25 191/5 226/22 235/7
**assuming [9]** 35/17 35/21 35/23 36/2 36/4 36/6 146/6 152/3 250/18
**assumption [6]** 150/16 150/19 150/20 222/14 225/15 226/3
**assumptions [3]** 222/8 222/10 238/21
**assure [2]** 94/8 250/16
**assurity [1]** 189/23
**asterisk [12]** 37/25 37/25 38/1 38/2 38/5 125/10 143/8 143/12 143/25 145/17 154/11 253/14
**asterisks [1]** 143/22
**Athena [1]** 245/23
**attack [2]** 129/14 129/22
**attacked [1]** 25/3
**attacking [1]** 131/4
**attacks [1]** 129/17
**attempted [3]** 119/22 120/2 128/1
**attend [1]** 167/12
**attended [1]** 218/7
**attention [11]** 28/25 59/24 65/1 69/19 70/1 94/22 104/17 108/7 108/10 164/9 164/11
**attestation [7]** 93/15 93/22 93/25 94/7 94/20 122/3 179/8
**attestor [1]** 122/8
**attests [1]** 122/4
**audibly [1]** 30/24
**audience [1]** 12/3
**Audio [1]** 135/20
**audit [1]** 255/11
**audited [5]** 224/15 224/23 224/25 225/9 255/1
**audits [2]** 220/25 224/18
**August [3]** 64/25 69/19 208/18
**August 6 [2]** 64/25 69/19
**Austin [25]** 3/9 3/14 33/25 120/4 134/17 178/16 193/4 194/2 202/15 205/1 205/14 207/11 243/16 243/20 244/21 246/24 247/8 247/13 247/15 247/19 247/20 247/25 256/10 256/20 258/13
**Austin's [2]** 34/5 34/7
**authority [1]** 47/12
**auto [2]** 86/24 98/6
**automatically [6]** 18/19 78/10 101/20 135/6 151/23 189/1
**available [25]** 37/14 37/16 38/22 39/1 50/22 74/10 119/16 124/7 135/17 145/9 152/25 153/1 153/15 171/10 171/18 171/21 172/10 179/16 180/20 206/25 216/10 216/16 216/21 239/8 241/24
**average [13]** 39/12 60/1 70/12 70/13 70/22 71/2 181/9 182/21 182/22 182/23 182/24 198/8 198/16
**avoid [6]** 45/24 67/10 68/24 83/11 83/14 128/1
**avoided [1]** 135/25
**award [1]** 252/4
**awarded [5]** 222/23 223/15 223/21 223/24 235/5
**awarding [2]** 224/10 239/16
**awards [3]** 88/14 230/1 250/5
**aware [16]** 42/9 68/18 68/19 69/8 69/9 69/11 72/15 92/3 94/9 105/24 118/4 122/20 175/22 183/2 202/14 239/25
**away [5]** 52/8 80/2 110/12 204/8 252/6
**awhile [3]** 100/13 112/24 166/18

**B**

**Bachelor's [1]** 167/7
**back [46]** 3/5 4/18 6/5 7/19 8/21 10/10 17/21 18/25 22/15 24/3 32/16 44/15 49/17 60/21 63/1 65/24 67/23 89/21 89/22 100/18 102/15 102/15 108/4 110/6 110/8 122/7 122/10 124/12 125/18 160/7 164/18 168/2 184/16 186/19 192/11 205/18 209/20 211/3 213/1 231/17 244/21 245/22 247/14 249/25 250/21 251/2
**backed [3]** 149/12 150/14 151/12
**background [4]** 100/8 100/9 114/7 167/6
**bad [13]** 37/23 38/4 38/10 38/13 38/14 98/18 108/10 158/11 188/2 189/12 191/2 191/4 251/25
**badly [1]** 76/1
**Bailey [19]** 10/4 13/23 14/12 14/16 15/8 16/24 17/2 23/8 24/19 43/19 43/19 127/15 127/24 128/2 128/24 132/2 132/4 132/25 258/14
**Bailey's [2]** 128/11 132/24
**Baltimore [1]** 176/24
**bankrupt [1]** 192/18
**bankruptcy [3]** 192/3 192/6 194/15
**bar [8]** 144/17 175/18 224/1 225/2 225/11 227/2 227/10 234/23
**bars [1]** 12/20
**base [5]** 60/12 60/19 109/16 225/24 240/17
**based [62]** 5/4 33/9 33/9 26/12 33/16 33/23 34/2 34/4 35/2 35/13 36/1 51/3 57/24 81/10 82/1 92/2 93/5 107/7 119/9 135/15 144/4 145/21 169/2 173/14 173/25 174/14 176/16 176/19 177/2 188/25 190/17 196/6 196/17 196/24 197/25 209/15 214/9 222/8 222/10 222/11 222/13 225/15 225/18 225/23 225/25 226/2 226/18 227/3 227/17 229/6 235/6 236/4 237/17 238/12 238/20 238/22 238/23 239/9 239/11 239/16 240/1 240/2
**bases [3]** 179/20 235/1 243/6
**basically [7]** 104/10 182/5 192/14 195/3 201/2 204/16 257/1
**basis [13]** 85/21 118/19 119/24 122/25 131/22 168/22 178/16 188/13 224/9 234/24 235/2 242/16 243/6
**BCMA [12]** 75/1 77/24 77/24 79/9 191/22 227/14 227/15 228/9 231/13 234/13 234/18 246/9
**be [241]** 3/1 3/5 3/8 9/20 14/12 15/21 15/22 16/15 16/25 20/10 23/7 23/14 23/18 24/1 27/14 27/19 30/14 30/17 31/5 31/9 32/17 39/2 39/15 41/12 47/11 48/3 53/14 56/22 56/22 57/22 58/3 58/4 60/16 60/18 61/4 67/2 67/20 70/13 70/14 70/15 70/21 71/24 71/25 72/4 73/17 75/1 76/4 77/1 78/16 79/22 80/4 80/13 84/9 84/14 85/6 85/6 85/15 86/12 86/18 87/6 87/12 88/23 89/7 89/7 89/13 89/15 92/24 93/1 93/10 94/10 94/19 95/20 96/7 96/17 97/2 97/25 98/3 103/22 105/6 108/21 110/10 110/16 111/25 112/18 114/15 114/16 116/22 117/25 118/4 119/18 121/18 121/19 121/22 121/22 121/24 122/9 122/12 123/13 125/8 125/24 127/23 131/2 131/3 131/5 131/14 131/25 132/17 132/20 134/1 136/7 136/8 136/9 136/12 136/16 136/18 137/5 137/6 139/24 139/25 140/10 147/2 147/13 148/21 150/18 152/5 152/7 155/4 155/6 155/11 155/17 156/10 156/22 157/7 157/21 158/18 158/21 160/2 160/8 160/14 161/3 161/7 162/19 163/4 163/17 163/22 163/24 164/6 164/21 166/2 166/6 173/23 176/13 177/12 178/1 179/7 180/17 181/10 181/25 182/1 182/12 183/18 183/20 184/6 184/6 184/10 185/12 185/17 186/5 187/16 188/2 188/7 188/25 190/4 190/23 191/14 192/2 193/12 196/4 197/1 201/17 203/16

B

**be... [60]** 203/19 204/23 206/24 208/17 209/19 210/4 210/4 210/6 210/20 210/22 211/17 215/4 216/24 217/18 217/20 218/10 218/24 220/1 221/5 221/12 225/7 225/16 225/22 226/4 226/19 231/15 232/5 232/16 233/1 236/3 236/8 236/9 236/11 236/14 236/15 236/15 237/9 238/17 239/8 240/6 243/21 244/12 246/2 246/18 247/20 249/8 249/9 249/10 250/4 250/8 250/15 250/17 251/12 251/12 252/4 254/5 257/14 257/20 257/24 258/13
**be 20 [1]** 236/15
**BEACH [3]** 1/2 1/8 2/7
**Beach/Ft [1]** 2/7
**became [4]** 85/3 97/22 122/20 148/12
**because [108]** 15/25 16/17 17/16 31/5 31/9 35/20 36/6 37/21 48/24 49/5 49/12 50/6 64/11 78/1 88/20 91/22 97/15 97/24 99/3 102/6 102/6 106/9 108/1 110/12 111/7 120/2 127/6 127/21 129/6 129/20 132/17 134/18 138/14 139/9 142/7 145/9 145/25 146/5 146/9 146/25 147/10 147/13 147/17 148/7 148/25 149/16 151/14 151/15 154/15 156/1 156/5 156/9 156/10 157/21 158/22 161/14 171/20 174/19 182/19 183/6 183/16 185/23 186/11 186/25 188/6 188/14 188/17 188/24 189/23 190/20 190/22 192/3 192/15 195/13 197/18 202/11 205/15 206/6 211/5 212/9 214/4 215/4 215/23 216/9 221/12 225/5 225/15 229/6 229/8 231/15 232/8 235/9 237/19 238/15 238/17 242/12 244/16 246/2 246/9 249/3 249/19 250/15 250/18 250/20 251/11 251/12 252/10 257/22
**Becky [1]** 245/23
**become [3]** 17/22 92/3 220/8
**beds [2]** 171/5 196/12
**been [113]** 4/4 4/13 9/18 11/16 11/20 12/20 21/11 22/8 24/22 26/9 28/13 30/5 32/3 36/20 37/9 45/11 57/16 61/23 64/8 66/7 69/25 70/3 74/13 81/25 82/1 84/18 85/20 85/25 86/3 90/2 92/4 92/13 93/7 97/6 104/8 104/9 105/6 105/10 105/13 105/18 105/21 108/20 110/20 117/10 122/7 123/5 123/8 124/17 125/5 126/23 127/21 134/4 135/4 135/5 135/7 135/18 139/4 139/5 139/10 139/11 139/20 139/22 140/2 140/17 140/21 141/25 146/14 146/23 146/24 147/19 158/15 166/17 169/9 170/11 173/3 177/20 177/21 180/25 186/16 188/14 189/6 189/22 189/23 192/7 196/5 200/11 200/17 200/20 200/24 201/12 205/16 205/22 206/9 207/4 210/15 210/17 210/18 213/1 223/20 224/25 225/9 227/20 230/21 234/13 235/5 237/19 243/19 243/25 248/5 251/4 253/15 254/13 255/13
**before [24]** 1/11 29/7 67/6 86/1 86/14 101/23 101/24 103/7 118/5 123/20 124/17 124/22 138/23 141/9 148/9 176/10 178/21 180/25 194/25 207/14 211/23 213/9 223/20 246/11
**begin [1]** 167/14
**beginning [5]** 71/16 120/18 182/9 210/16 258/18
**behalf [5]** 85/11 88/11 128/14 129/18 129/19
**behaves [1]** 157/9
**behind [6]** 16/14 91/25 93/23 94/8 150/19 223/8
**being [30]** 23/24 25/3 25/4 25/10 26/1 26/6 38/20 82/15 86/15 97/12 97/13 110/1 139/1 140/9 140/15 142/7 161/4 162/22 174/17 196/23 199/2 201/21 214/24 215/20 219/9 225/6 231/20 248/17 248/22 250/4
**being transparent [1]** 140/15
**belief [2]** 226/19 232/11
**believe [61]** 4/7 7/12 16/3 22/25 23/1 23/17 33/22 35/6 35/12 38/15 47/14 55/2 73/8 73/18 78/25 79/8 82/14 87/9 87/19 91/13 102/16 110/21 129/9 130/23 132/22 150/13 150/14 151/1 154/2 159/8 160/2 161/13 162/14 162/19 163/15 163/21 176/17 178/25 179/2 190/6 191/20 197/15 204/12 204/14 212/25 216/9 220/8 220/17 222/2 222/4 232/15 233/14 234/12 242/1 243/12 249/12 250/12 250/22 255/4 255/5 257/13
**believed [4]** 82/22 125/23 251/11 255/20
**believes [2]** 210/19 215/24
**below [5]** 152/13 152/18 161/4 161/5 208/23
**Belson [1]** 135/20
**Ben [3]** 52/21 79/13 79/16
**BENCH [1]** 1/11
**benefit [6]** 85/12 136/5 136/13 140/12 199/1 202/11
**benefits [5]** 87/7 135/23 140/1 140/4 208/24
**Berger [7]** 141/17 142/4 143/17 154/13 154/16 157/17 160/16
**Berger's [1]** 36/15
**best [16]** 74/25 89/18 92/5 96/8 115/20 150/22 178/2 188/3 216/9 216/11 216/16 216/20 216/22 232/11 233/14 251/4
**BETH [6]** 1/15 128/7 129/2 129/12 129/15 208/1
**better [22]** 18/1 64/12 64/12 65/3 65/25 83/8 97/25 98/5 98/10 98/17 108/22 118/7 124/12 135/3 148/7 160/14 180/21 182/21 182/24 249/2 249/3 258/23
**between [28]** 3/16 13/23 14/5 24/11 24/19 52/21 62/10 79/13 81/13 81/14 81/18 83/24 141/25 143/6 169/24 170/23 181/25 205/1 207/10 220/6 223/3 238/20 239/4 242/8 242/9 249/21 249/23 251/25
**bevy [2]** 142/1 143/22
**biannually [1]** 170/10
**bias [5]** 36/8 149/7 158/14 158/17 159/6
**big [7]** 30/21 168/11 192/1 192/1 208/23 214/12 249/23
**bigger [2]** 29/3 56/6
**biggest [1]** 53/18
**bill [3]** 139/13 139/14 139/18
**BILLEK [1]** 2/2
**billing [1]** 170/16
**billion [1]** 11/8
**bills [1]** 139/12
**Binder [61]** 15/2 15/4 15/13 15/17 15/25 16/2 16/6 17/16 18/16 28/2 28/8 29/13 35/19 36/12 39/19 41/23 54/25 57/25 58/9 58/23 59/7 63/17 64/5 65/13 66/14 67/6 69/8 72/13 72/22 84/2 84/18 102/17 103/4 111/2 112/9 112/10 113/17 115/14 120/18 125/2 126/8 127/11 128/21 130/11 137/24 140/3 143/3 161/11 167/14 169/17 170/4 180/18 204/1 210/16 213/18 213/21 213/24 213/25 214/15 247/20 247/25
**Binder's [2]** 16/21 224/20
**biographical [1]** 113/16
**Biscayne [1]** 1/22
**bit [14]** 12/17 21/10 26/5 30/2 52/19 87/22 89/18 95/24 106/22 106/23 116/4 117/15 180/3 182/11
**blackmail [3]** 63/15 123/13 123/23
**blackmailed [1]** 63/12
**BLAIR [7]** 2/1 120/19 122/1 123/10 124/10 124/12 125/19
**blame [1]** 45/21
**blank [1]** 151/22
**bless [1]** 214/20
**blessed [1]** 150/3
**Blue [2]** 56/3 56/3
**blunt [1]** 32/1

**B**

**board [56]** 10/20 28/18 28/20 28/22 31/14 31/15 31/17 31/22 31/23 31/25 32/2 32/7 44/12 45/1 46/5 46/12 46/12 46/14 46/19 47/9 47/11 47/13 47/15 47/16 47/18 47/20 47/23 48/1 48/4 48/5 48/7 48/9 48/11 48/24 49/5 49/12 59/11 59/18 59/18 72/24 73/2 73/5 73/8 73/12 85/4 87/25 97/7 97/10 97/12 98/19 98/21 100/19 103/17 121/1 155/25 237/1
**Boardman [2]** 215/6 215/13
**Bobby [1]** 151/9
**Boca [5]** 139/16 155/24 163/1 257/9 257/17
**bodies [1]** 131/11
**Boeing [1]** 86/24
**bold [1]** 143/8
**Bonsolillo [1]** 87/24
**bonus [7]** 60/10 60/18 60/22 60/23 61/2 61/5 125/23
**bonuses [1]** 60/6
**bore [1]** 116/13
**born [1]** 90/11
**boss [3]** 120/4 120/8 201/4
**Boston [2]** 21/24 22/5
**both [10]** 48/18 79/2 101/3 131/11 134/13 140/25 179/15 226/1 257/9 258/18
**bottom [16]** 15/7 29/12 68/23 70/1 111/6 175/9 199/13 199/13 201/16 201/17 201/17 204/10 206/3 209/4 215/6 248/7
**bought [1]** 212/13
**Boulevard [1]** 1/22
**brand [1]** 155/13
**branding [1]** 167/22
**break [8]** 66/10 66/19 66/23 66/24 67/6 166/15 166/17 166/19
**breaking [1]** 44/23
**breast [1]** 167/19
**brief [8]** 132/17 156/21 166/20 168/16 179/7 180/17 240/9 258/22
**briefing [3]** 131/13 132/13 166/11
**briefly [14]** 21/20 37/8 89/20 99/17 99/17 101/2 109/21 120/15 133/10 158/16 167/4 179/3 191/20 253/25
**Brigham [1]** 191/12
**bring [11]** 89/14 94/22 110/15 122/17 138/25 170/5 201/5 205/15 205/17 211/3 217/13
**bringing [4]** 152/20 194/18 194/23 256/20
**broad [3]** 170/14 170/22 182/4
**broadcast [1]** 11/22
**broader [4]** 12/13 92/6 129/20 136/21
**broke [1]** 97/17
**brought [4]** 118/24 183/7 193/25 254/18
**Bs [1]** 183/11
**bucket [1]** 99/22
**buckets [2]** 99/19 183/17
**budget [1]** 80/4
**budgeted [1]** 53/8
**build [1]** 117/1
**built [1]** 179/10
**bullet [8]** 30/8 40/20 40/21 40/22 105/11 105/22 194/9 256/11
**bullying [1]** 167/13
**burden [5]** 133/19 140/24 154/17 177/24 255/8
**burdensome [2]** 96/11 97/2
**Buried [1]** 94/23
**business [18]** 52/12 52/12 52/15 56/8 56/14 56/16 57/18 58/14 58/20 81/6 82/18 82/22 87/2 88/8 146/17 158/1 161/20 166/1
**businesses [1]** 160/8
**but it's [1]** 54/16
**buy [4]** 136/14 138/1 138/6 138/17
**buying [2]** 138/7 138/12
**buys [2]** 136/25 137/18
**Buzzard [2]** 156/20 156/25
**by-laws [1]** 47/1

**C**

**C-section [1]** 199/5
**calculate [13]** 71/15 74/16 153/11 171/15 171/19 172/4 176/19 176/21 181/20 188/7 188/16 196/15 196/22
**calculated [4]** 71/25 154/11 188/24 194/21
**calculates [1]** 200/18
**calculating [5]** 176/7 186/7 196/9 200/21 236/23
**calculation [5]** 100/20 184/10 236/20 249/22 257/23
**calculations [1]** 141/10
**calculator [2]** 154/6 249/23
**calculators [1]** 178/5
**calendar [1]** 241/12
**California [1]** 63/8
**call [28]** 3/21 25/7 28/2 30/10 41/1 41/4 41/14 63/14 88/7 97/24 99/25 107/3 109/8 118/2 123/23 123/23 137/19 153/23 166/23 173/21 176/20 178/22 190/8 202/16 226/22 238/3 243/7 247/2
**called [15]** 13/12 25/4 27/10 85/19 97/16 101/11 109/16 109/22 120/8 157/10 174/7 178/13 219/13 238/6 240/17
**calling [2]** 66/14 83/9
**calls [7]** 16/5 39/4 178/10 178/17 178/20 178/21 184/2
**came [15]** 22/2 47/16 97/13 102/15 102/15 108/3 109/25 167/24 176/10 184/23 186/11 190/1 203/10 225/21 244/20
**campaign [9]** 9/21 13/6 26/2 26/7 26/23 45/6 45/23 128/23 256/5
**Campione [20]** 34/13 34/23 62/10 62/13 134/23 135/8 140/3 142/15 148/20 158/5 175/25 177/20 200/14 205/1 205/14 207/10 214/14 222/13 226/6 248/6
**Campione's [4]** 34/17 157/25 222/7 226/11
**can [145]** 3/5 12/17 13/4 15/9 15/21 15/22 20/13 21/1 21/16 21/20 22/12 23/11 24/6 24/23 26/5 27/3 29/4 32/14 32/17 37/13 40/16 41/12 41/22 45/10 48/18 52/2 56/11 56/22 57/10 63/14 64/24 65/21 66/18 68/12 70/19 70/20 70/22 70/24 71/11 74/3 74/6 74/10 74/20 76/2 79/9 79/21 80/6 81/10 84/2 84/12 89/20 90/10 93/11 95/7 95/20 95/21 95/23 97/2 97/11 97/25 101/1 103/1 104/4 104/16 106/15 106/18 106/24 107/18 107/21 111/6 113/14 114/10 122/9 122/12 123/23 129/10 130/24 137/25 138/10 138/12 138/14 142/19 146/4 148/20 148/22 148/22 152/11 152/16 154/7 157/21 161/3 166/18 167/4 168/9 170/2 171/8 174/13 177/23 178/6 181/15 183/4 183/25 184/8 187/23 188/9 191/22 191/24 193/9 195/16 197/5 197/23 198/2 199/11 201/4 205/10 205/10 205/12 206/1 206/11 207/19 209/5 210/9 210/14 210/20 210/22 211/3 212/7 218/24 233/24 235/22 235/23 236/2 236/17 237/20 237/20 240/4 241/4 255/9 257/13 257/14 257/24 257/25 258/12 258/22 258/24
**can't [23]** 52/4 104/15 125/3 136/18 148/24 156/13 159/2 162/14 165/7 171/19 172/12 185/4 188/12 189/15 215/5 215/20 223/4 240/19 242/25 243/1 246/22 246/22 258/11
**cancellation [1]** 161/21
**cancer [3]** 22/1 171/7 171/18
**cannot [1]** 71/24
**capacity [1]** 168/19
**cardiologist [1]** 161/13
**care [41]** 63/20 87/10 87/14 87/18 90/5 96/13 98/5 105/24 105/25 114/14 121/5 138/21 139/20 145/22 161/2 168/6 169/5 169/7 170/6 170/15 170/17 171/2 171/11 172/13 172/18 176/18 176/20 176/23 176/23 179/24 185/5 185/6 192/4 193/17 216/12 216/14 219/14 240/25 246/6 246/14 257/4

C


**career [2]** 21/11 21/15
**careful [2]** 74/9 134/8
**carefully [1]** 254/25
**caregivers [2]** 180/10 218/25
**Carolina [1]** 56/3
**carried [1]** 243/25
**carrot [1]** 124/7
**carry [1]** 85/5
**case [61]** 1/3 25/12 25/13 35/25 39/2 46/23 48/23 64/8 66/14 66/16 66/18 87/24 92/13 96/15 99/3 106/8 108/20 126/18 127/23 128/19 129/21 130/3 130/25 130/25 131/1 131/9 133/1 133/6 133/11 133/22 134/5 135/20 136/12 137/7 141/16 143/24 155/2 158/17 159/2 159/21 163/25 164/6 164/8 164/9 164/12 164/16 164/21 166/16 166/22 175/24 179/1 182/25 183/7 185/8 185/24 188/19 189/4 202/16 204/14 210/4 258/13
**cases [9]** 129/23 143/22 143/23 143/24 173/23 190/13 190/17 190/21 251/10
**cash [1]** 52/16
**catalyst [1]** 86/13
**catch [1]** 92/24
**catching [1]** 93/1
**categories [5]** 177/2 177/15 201/16 236/13 236/22
**category [8]** 36/6 42/16 42/23 109/8 171/13 176/14 177/6 196/13
**catheters [1]** 188/20
**Caulil [5]** 120/25 212/3 212/19 213/2 218/17
**causal [3]** 155/19 155/21 156/4
**cause [1]** 154/14
**cause injury [1]** 154/14
**CBS [3]** 130/10 130/11 132/8
**CDC [7]** 185/24 188/7 188/15 197/12 242/15 255/14 255/19
**cease [3]** 129/22 131/3 131/5
**Cedar [2]** 246/18 246/20
**center [10]** 1/5 32/22 36/13 49/18 161/17 168/21 169/3 180/2 188/5 209/5
**center survey [1]** 168/21
**centers [6]** 69/21 74/17 168/23 169/16 178/14 216/5
**central [6]** 188/20 188/22 189/1 189/4 189/7 189/9
**CEO [32]** 15/15 23/9 28/11 28/13 28/15 31/23 32/6 32/22 72/24 73/6 80/1 83/23 84/18 84/21 85/2 85/3 87/8 94/11 94/12 94/18 96/9 101/23 103/4 117/9 118/25 119/20 122/3 162/6 163/25 179/8 203/25 221/13
**CEO's [2]** 161/24 162/13
**CEOs [17]** 47/1 87/3 94/19 125/2 136/4 141/16 155/9 155/22 159/3 159/8 159/17 163/2 178/25 190/7 197/20 223/8 239/1
**CEOs' [2]** 139/6 242/1
**certain [9]** 31/18 32/10 61/24 77/22 130/13 156/3 171/10 171/19 181/24
**certainly [8]** 42/15 57/22 98/19 110/14 114/14 139/22 159/22 201/17
**certify [1]** 259/6
**CETA [1]** 173/24
**cetera [4]** 70/25 92/25 107/5 132/19
**CFO [1]** 53/1
**chain [3]** 19/13 20/20 52/21
**challenge [1]** 130/7
**change [79]** 29/13 30/9 30/12 30/21 31/2 31/25 44/21 46/11 47/11 51/21 52/11 52/12 58/20 65/15 66/4 69/9 69/11 72/14 73/3 73/6 73/9 73/13 110/12 123/14 123/21 124/23 124/25 141/9 150/7 150/9 187/14 191/19 201/8 201/10 201/23 202/25 205/22 205/24 206/2 206/2 206/2 206/3 206/4 206/4 206/4 206/5 206/11 206/11 206/12 206/12 206/13 206/21 207/1 207/2 207/5 207/6 207/9 212/24 214/12 214/23 221/24 223/18 223/22 227/1 236/25 237/7 237/13 238/22 238/23 238/24 239/6 245/14 246/20 250/16 252/21 253/7 253/9 253/11 254/1
**changed [18]** 47/21 47/24 65/13 66/2 68/18 69/2 69/4 90/4 97/21 116/9 118/15 124/24 132/14 134/18 144/15 243/25 251/10 251/25
**changes [23]** 46/7 47/8 47/15 64/17 68/19 83/3 100/25 101/1 140/10 178/17 186/22 202/2 202/2 202/17 203/4 203/19 203/20 215/10 239/1 239/3 239/6 245/24 253/22
**changing [4]** 47/3 62/14 90/5 243/22
**characteristics [2]** 196/6 196/19
**charge [6]** 57/11 101/16 105/6 105/12 105/25 107/23
**charges [1]** 105/2
**charity [2]** 22/1 22/1
**chart [9]** 42/20 205/2 205/2 205/3 205/10 205/13 205/23 206/1 206/3
**charts [1]** 152/9
**chat [2]** 15/7 18/17
**Chauncey [1]** 4/12
**check [3]** 7/6 93/6 157/6
**checked [2]** 127/5 211/21
**checklist [1]** 92/5
**checks [1]** 221/1
**Chicago [1]** 2/5
**chief [7]** 66/15 66/17 66/18 87/24 166/16 175/24 258/14
**child [2]** 167/10 167/16
**children [1]** 171/6
**Children's [1]** 171/3
**chimes [1]** 17/7
**Choi [2]** 79/14 79/16
**choice [6]** 51/23 67/21 124/6 139/19 236/19 250/3
**choices [2]** 157/16 160/19
**choose [8]** 7/10 67/20 68/10 68/14 143/5 170/11 240/19 246/2
**chooses [3]** 52/7 208/25 229/9
**choosing [1]** 150/21
**chose [3]** 47/20 47/23 207/1
**Chris [4]** 111/20 111/22 115/5 117/1
**Christina [1]** 113/7
**Christine [2]** 156/20 156/25
**CHUNG [29]** 3/24 22/18 24/3 24/19 26/14 26/25 28/5 72/23 72/23 73/18 75/5 76/16 78/7 79/20 80/7 81/9 81/13 82/3 83/2 93/14 93/25 94/5 94/23 95/4 104/8 109/9 118/24 126/8 126/22
**Chung's [1]** 127/11
**Cigna [1]** 56/6
**circle [2]** 230/7 230/8
**circles [2]** 145/12 162/8
**Circuit [5]** 130/25 155/2 164/8 164/11 164/16
**circumstance [1]** 231/24
**circumstances [1]** 141/5
**cite [1]** 130/24
**cited [2]** 139/10 162/25
**citing [1]** 164/8
**citizen [1]** 87/11
**City [3]** 100/13 100/15 214/21
**CLABSI [1]** 232/10
**claim [4]** 37/1 37/3 130/18 138/25
**claiming [2]** 36/1 239/16
**claims [2]** 83/18 157/10
**clarification [4]** 101/18 127/10 204/23 229/22
**Clark [1]** 2/4
**class [2]** 91/22 251/4
**classes [1]** 167/11
**clear [21]** 14/12 20/10 32/1 37/15 37/24 80/13 108/21 131/25 144/1 148/12 159/1 160/17 162/15 174/15 183/8 186/20 209/20 210/4 214/4 216/24 229/20
**clearly [12]** 12/11 38/5 104/9 130/6 130/16 134/15 140/8 143/9 144/4 152/13 154/3 157/7
**clears [2]** 37/1 37/3
**clicks [3]** 36/19 36/25 39/11
**climb [1]** 53/11
**Clinic [1]** 152/7
**clinical [2]** 198/10 198/13
**close [3]** 231/25 258/15

**C**

**close... [1]** 258/22
**closed [1]** 133/2
**closely [1]** 44/16
**closings [3]** 258/17 258/18 258/25
**CMA [1]** 90/23
**CMOs [1]** 197/21
**CMS [55]** 69/22 74/18 80/18 85/16 86/1 86/2 86/12 86/13 99/9 99/12 135/17 144/7 144/9 152/8 152/10 152/17 153/18 165/17 171/10 171/17 171/18 171/21 172/12 172/12 179/9 181/8 185/24 187/6 188/5 188/7 188/15 222/18 232/17 232/18 232/18 232/20 240/11 240/12 240/15 240/21 240/23 240/25 241/5 241/9 241/14 241/23 242/3 242/5 242/9 242/14 242/15 242/17 242/19 243/1 255/14
**CMS data [1]** 152/17
**coaching [2]** 174/7 174/10
**coalitions [1]** 88/8
**coattails [2]** 203/17 204/9
**code [7]** 144/17 224/1 225/2 225/11 227/2 227/10 234/23
**COE [1]** 90/23
**coerce [1]** 158/7
**Cohn [1]** 62/10
**cohort [9]** 134/19 146/25 147/14 147/18 149/1 196/5 196/8 206/17 207/4
**colleague [9]** 3/8 19/22 129/20 130/9 131/4 156/21 228/7 235/14 247/18
**colleague's [1]** 132/9
**colleagues [8]** 13/13 13/17 16/24 52/11 58/11 63/14 82/4 82/18
**collected [3]** 10/23 152/17 174/6
**collecting [1]** 174/9
**collection [4]** 178/5 178/6 209/5 239/13
**college [2]** 21/22 169/6
**column [3]** 54/25 55/10 206/7
**combination [1]** 254/20
**combinations [1]** 182/16
**combine [1]** 181/5
**come [14]** 54/17 55/19 63/1 86/23 93/24 97/16 110/8 118/1 137/11 153/21 154/19 155/6 172/19 182/17
**comes [10]** 53/25 54/14 55/17 99/11 107/3 172/2 185/23 193/3 210/10 220/9
**coming [5]** 20/2 44/15 139/7 171/17 192/19
**comment [20]** 18/7 20/2 131/20 202/1 202/3 202/5 202/7 202/12 202/13 202/20 205/20 207/14 210/23 246/22 253/9 253/16 253/23 254/1 254/9 254/11
**commented [1]** 246/20
**commenter [2]** 214/19 259/17
**comments [29]** 14/1 150/5 150/6 202/18 203/3 212/23 213/3 213/7 213/13 213/17 213/22 213/25 214/13 214/15 214/16 214/18 245/22 249/25 249/25 252/21 253/3 253/6 253/8 253/10 253/19 254/10 254/12 254/20 254/24
**commerce [1]** 133/15
**commercial [6]** 54/11 95/1 95/8 122/10 122/13 123/4
**commercially [1]** 105/14
**commission [6]** 96/15 96/16 96/17 155/23 220/16 220/18
**commitment [1]** 148/7
**committed [5]** 97/5 148/3 148/11 149/4 149/9
**committee [8]** 59/1 59/10 59/14 59/18 60/5 60/9 60/22 119/7
**committees [3]** 88/17 88/19 187/6
**committing [1]** 187/7
**common [4]** 75/23 106/2 123/25 151/11
**commonly [1]** 182/20
**communicate [6]** 13/13 114/13 114/16 115/21 143/21 212/11
**communicated [1]** 119/20
**communicating [4]** 26/10 42/20 103/17 175/25
**communication [3]** 41/15 112/13 114/3
**communications [17]** 4/9 4/10 6/23 9/20 10/4 10/7 10/10 13/5 23/8 24/20 24/24 41/16 66/7 101/2 101/5 110/15 127/16
**communities [2]** 192/14 193/7
**community [23]** 15/18 16/4 17/25 19/9 20/11 20/22 29/15 32/18 42/9 42/21 61/9 67/11 108/9 108/14 129/18 144/20 162/13 167/18 172/11 180/11 197/19 208/24 209/11
**companies [4]** 55/14 86/23 87/3 120/21
**company [3]** 23/9 27/10 224/17
**compare [3]** 98/4 179/15 240/25
**compared [4]** 11/14 98/9 119/10 131/22
**comparison [1]** 93/5
**compensation [9]** 58/25 59/10 59/15 59/19 60/12 118/24 119/9 125/18 125/24
**competition [2]** 135/23 140/1
**competitive [2]** 99/2 119/9
**competitors [1]** 98/9
**complained [1]** 200/7
**complaint [1]** 130/12
**complete [9]** 56/23 57/2 57/4 65/8 91/8 96/11 104/20 154/4 246/3
**completely [1]** 204/5
**completing [2]** 91/12 91/24
**complex [2]** 220/1 257/23
**complications [2]** 99/21 181/18
**components [1]** 239/14
**composite [31]** 71/7 73/25 74/4 74/16 79/10 99/15 109/17 135/16 144/3 144/7 151/20 151/24 152/19 153/6 153/12 177/17 180/19 181/1 181/2 181/13 181/16 182/13 182/15 183/16 184/21 185/5 257/6 257/7 257/14 257/19 257/22
**composition [1]** 184/17
**comprehension [1]** 154/16
**computer [2]** 74/23 234/24
**computerized [10]** 144/18 177/9 189/21 189/25 190/2 223/21 224/3 225/1 225/10 235/5
**computers [1]** 234/18
**conceived [1]** 89/21
**concept [4]** 70/24 97/12 176/16 180/22
**concern [4]** 147/21 163/10 192/22 253/9
**concerned [10]** 161/7 163/4 193/5 193/14 195/12 197/18 200/13 200/17 204/5 204/8
**concerning [1]** 199/3
**concerns [3]** 193/6 200/15 253/13
**concise [1]** 144/1
**conclude [1]** 157/5
**concluded [2]** 99/1 251/7
**conclusion [1]** 185/3
**conduct [4]** 68/3 133/14 135/4 166/4
**conducting [1]** 166/2
**conducts [1]** 67/24
**conference [3]** 14/20 14/24 15/4
**conferencing [1]** 13/19
**confidence [2]** 188/15 188/18
**configure [1]** 21/2
**confirm [2]** 106/5 157/23
**confused [4]** 26/17 155/10 220/11 221/23
**confusing [2]** 229/4 229/11
**confusion [2]** 154/24 155/6
**congratulate [1]** 97/4
**congratulations [1]** 208/2
**Congress [2]** 85/9 86/2
**connected [1]** 135/1
**connection [12]** 51/21 59/15 63/23 113/10 123/21 124/3 124/22 138/23 155/19 156/4 156/11 245/14
**connotation [1]** 248/20
**consent [1]** 89/12
**consequence [1]** 51/23
**consider [17]** 60/22 86/12 86/12 89/13 89/15 136/6 162/16 164/14 193/8 201/22 203/6 203/12 214/15 217/18 217/20 234/14 234/15
**considerable [4]** 91/9 112/19 146/11 255/9

**C**


**consideration [2]** 194/19 253/12
**considered [8]** 85/17 85/18 135/10 187/1 201/18 218/19 226/15 252/6
**considering [1]** 89/7
**consistent [4]** 23/18 85/20 111/17 194/13
**consistently [1]** 183/22
**consists [1]** 99/17
**conspicuous [1]** 144/1
**constituents [5]** 88/20 101/8 110/6 110/7 117/19
**construction [1]** 156/2
**consultant [4]** 29/11 30/5 30/6 247/17
**consultation [2]** 134/10 254/21
**consulting [4]** 108/22 111/3 176/23 179/24
**consumer [53]** 39/9 39/12 39/19 39/23 51/2 51/5 51/7 70/12 70/22 83/20 98/8 111/19 114/12 134/2 135/21 135/22 136/7 136/9 136/10 136/13 136/20 136/21 136/22 136/23 137/2 137/5 137/6 139/1 139/1 139/2 139/11 139/21 140/21 140/22 141/4 141/18 141/24 143/13 143/21 154/14 154/21 154/23 154/23 155/6 155/9 157/21 160/14 160/17 164/7 218/2 218/11 218/15 218/20
**consumer's [1]** 141/5
**consumers [78]** 7/3 7/6 7/9 7/16 7/22 8/9 8/17 8/24 9/12 27/21 38/15 42/20 65/24 67/16 70/2 70/20 89/15 90/6 92/11 100/20 116/15 116/19 121/5 133/25 134/12 135/19 135/23 135/24 136/1 136/3 136/11 136/16 136/18 137/9 138/8 138/18 138/19 139/3 139/5 140/1 140/4 141/12 141/20 142/6 142/8 142/10 142/13 142/14 143/1 147/16 148/19 154/3 154/18 159/15 159/16 159/20 159/24 159/25 160/3 160/24 161/6 161/10 162/21 180/8 180/9 216/10 216/17 216/21 216/23 216/24 217/2 217/13 217/13 217/16 217/18 217/20 218/17 233/5
**consumers' [1]** 157/18
**consuming [3]** 117/13 138/16 145/3
**contacted [2]** 120/3 120/4
**contend [1]** 159/20
**content [3]** 70/20 70/23 210/5
**context [5]** 40/17 217/19 218/20 236/18 251/1
**continue [11]** 3/2 17/13 48/3 56/22 58/3 67/3 84/15 112/25 128/16 132/15 246/6
**continued [2]** 87/6 257/10
**continues [3]** 86/18 105/6 124/6
**continuing [2]** 163/11 173/18
**contract [17]** 25/11 55/21 55/25 59/16 60/5 60/8 111/3 111/10 111/22 112/11 112/16 113/10 113/17 113/19 219/22 223/6 247/16
**contractors [1]** 111/13
**contracts [1]** 219/24
**contrary [3]** 135/7 158/4 159/3
**contrast [1]** 212/16
**contribute [1]** 152/24
**contribution [1]** 60/15
**Control [2]** 173/11 188/5
**convene [2]** 176/24 193/21
**convened [1]** 177/16
**convenient [2]** 66/10 84/5
**conversation [14]** 13/22 14/13 14/16 29/9 29/12 62/9 97/14 117/20 154/3 198/23 199/11 200/14 201/18 257/3
**conversations [3]** 14/5 62/7 182/12
**convey [2]** 38/19 110/5
**convince [1]** 51/2
**convincing [3]** 42/12 42/15 51/5
**coordinator [3]** 10/7 10/11 24/24
**copy [2]** 178/5 202/10
**copying [1]** 248/5
**core [4]** 47/5 47/7 47/8 86/17
**Cornerstone [4]** 137/13 142/2 142/3 142/5
**corporation [1]** 80/1
**corporations [2]** 156/12 156/14
**correct [374]**
**correctly [1]** 229/12
**correlate [1]** 5/20
**correspond [1]** 105/22
**corroborate [1]** 130/17
**could [75]** 8/18 8/25 8/25 9/13 27/14 31/8 40/16 41/6 43/3 50/22 50/22 50/24 58/3 71/20 73/16 76/11 77/1 77/14 78/17 78/22 81/12 83/5 85/1 87/12 87/13 93/18 98/17 102/16 104/3 104/9 106/3 109/25 110/16 111/8 114/13 114/18 115/6 122/17 131/13 132/5 135/24 141/24 157/5 157/5 160/2 163/22 176/13 177/11 178/14 180/23 183/18 193/14 197/4 204/24 208/20 212/24 218/10 236/3 236/8 236/14 236/15 236/15 237/9 238/17 241/15 243/18 245/22 246/23 251/4 251/12 251/12 251/18 253/25 257/20 258/14
**could conclude [1]** 157/5
**could pull [1]** 83/5
**couldn't [6]** 127/5 163/14 163/23 167/12 195/6 236/9
**counsel [13]** 105/1 120/24 128/6 128/8 129/25 130/22 131/3 131/20 132/18 187/10 210/10 210/23 223/11
**count [2]** 84/12 166/18
**counter [2]** 3/18 127/18
**counteract [1]** 26/8
**countervailing [4]** 135/23 140/1 140/4 140/8
**country [6]** 86/21 87/19 87/21 96/12 97/15 150/19
**couple [3]** 3/3 94/3 197/17
**course [12]** 13/11 29/15 69/9 72/16 90/13 122/21 160/4 164/10 185/16 202/4 205/24 248/3
**court [49]** 1/1 2/7 3/24 3/25 14/2 18/4 21/16 21/21 23/12 24/4 24/23 26/5 27/3 28/5 30/24 48/16 66/23 74/3 80/13 80/14 85/1 87/23 89/20 95/7 97/11 105/18 109/25 111/7 111/18 114/11 116/13 130/25 134/15 155/2 155/4 155/7 156/17 167/5 168/10 170/2 179/3 183/4 184/12 204/23 205/12 212/6 253/25 259/4 259/11
**Court's [1]** 133/25
**COURTNEY [1]** 2/1
**courtroom [2]** 36/15 95/16
**Covagen [1]** 88/9
**cover [1]** 220/3
**coverage [4]** 10/16 11/2 11/8 12/12
**covered [10]** 106/23 218/14 218/15 219/17 219/20 219/21 219/22 220/1 220/2 258/7
**covering [3]** 12/24 170/14 172/17
**CPO [1]** 76/6
**CPOE [22]** 75/1 75/15 75/16 77/24 190/4 190/8 191/1 191/7 191/22 198/9 198/20 224/3 224/6 224/9 224/10 225/21 227/22 228/15 231/12 234/14 234/20 246/10
**CR [1]** 84/21
**CRAIN [3]** 1/17 236/1 236/15
**create [1]** 98/5
**created [2]** 114/20 161/12
**creating [1]** 103/13
**creation [2]** 109/20 114/25
**credit [3]** 146/8 146/18 195/22
**creeping [3]** 134/19 134/22 147/22
**criteria [5]** 60/6 60/10 60/23 235/13 254/4
**critical [2]** 85/21 171/3
**criticism [1]** 96/10
**cross [11]** 21/6 34/19 56/3 72/20 78/20 78/21 120/14 120/16 125/9 126/3 207/22
**cross-examination [7]** 21/6 34/19 72/20 120/14 120/16 125/9 207/22
**crunch [1]** 52/16

**C**

**Crutcher [1]** 1/18
**Cs [1]** 183/11
**culture [3]** 90/5 174/15 175/15
**cultures [1]** 90/3
**CURA [10]** 10/3 10/13 10/15 10/23 11/15 23/11 23/12 23/13 23/14 23/24
**CURA's [1]** 23/17
**Cure [1]** 9/25
**curious [1]** 137/10
**current [12]** 126/23 135/13 168/3 194/10 196/3 199/4 204/9 207/16 236/4 236/14 243/3 252/14
**currently [2]** 119/14 238/17
**custody [1]** 84/9
**customers [8]** 21/3 54/20 55/1 57/6 57/10 57/12 217/9 217/10
**cut [9]** 76/10 181/14 181/14 181/15 181/24 181/25 181/25 182/1 182/3
**cutoffs [1]** 257/19
**CV [2]** 1/3 113/11
**cycle [6]** 11/25 12/6 12/14 12/19 13/2 42/8

**D**

**D-A-N-F-O-R-T-H [1]** 167/1
**daily [1]** 131/22
**damages [1]** 164/25
**Danforth [11]** 103/10 166/24 166/25 167/1 167/4 194/18 199/25 200/2 204/25 207/15 207/24
**danger [2]** 80/3 185/8
**dangerous [3]** 76/4 190/20 190/23
**Darren [1]** 81/6
**data [200]** 33/9 33/12 35/24 37/17 37/18 41/5 41/9 50/9 51/3 53/19 53/24 53/25 54/3 54/5 54/7 54/21 54/23 54/25 55/7 55/16 55/16 56/21 56/23 57/2 57/4 57/5 57/5 57/9 57/10 57/12 57/14 57/23 58/6 58/11 58/15 58/16 69/23 71/23 80/15 80/17 80/18 81/1 81/10 81/19 81/21 81/22 81/23 81/23 82/5 82/9 82/15 86/1 86/2 86/9 86/13 88/13 92/18 92/21 92/23 93/5 94/9 95/8 95/19 99/6 99/12 106/4 106/5 106/9 107/8 107/9 107/11 109/11 109/13 109/14 135/17 140/6 140/16 143/11 143/21 144/5 144/8 144/9 145/19 146/3 146/13 146/17 146/21 148/21 149/11 150/21 152/17 152/17 152/19 153/20 153/25 154/8 160/18 160/20 165/6 165/23 170/13 171/10 171/17 171/17 171/21 174/6 174/9 175/12 178/5 178/6 179/4 179/9 179/13 179/16 181/8 183/8 185/17 185/23 186/14 191/15 192/12 192/16 193/6 193/9 194/10 194/21 194/24 195/4 199/5 200/15 200/16 204/7 204/9 204/19 206/16 206/24 211/12 211/12 216/10 216/11 216/13 216/16 216/20 216/23 220/12 220/13 220/20 221/9 222/24 226/24 227/9 227/14 228/9 228/13 228/17 228/20 228/24 229/2 229/5 231/9 231/11 232/12 233/4 234/16 235/12 235/15 235/19 235/22 235/24 236/16 236/16 237/24 238/3 239/8 240/17 240/23 241/8 241/12 241/14 241/25 242/3 242/5 242/10 242/11 242/14 242/15 242/17 242/18 242/20 242/21 243/7 244/3 255/4 255/5 255/8 255/12 255/13 255/15 255/15 255/16
**date [7]** 104/15 115/15 115/15 199/5 205/4 258/22 259/9
**dated [3]** 29/4 30/2 115/14
**Davis [7]** 52/11 58/10 63/8 63/14 82/4 82/18 123/23
**day [7]** 117/9 129/23 212/4 221/13 236/1 237/4 258/21
**days [7]** 74/13 89/19 90/13 92/15 96/14 205/7 205/8
**DC [1]** 1/19
**deal [3]** 30/22 186/13 214/12
**dealt [1]** 130/15
**death [3]** 168/13 190/15 254/11
**deaths [1]** 99/21
**debate [2]** 184/19 185/10
**decade [2]** 59/25 189/22
**deceived [2]** 141/13 154/18
**deception [3]** 150/15 154/10 166/2
**deceptive [8]** 133/14 133/18 140/24 141/1 141/1 142/20 155/12 155/18
**deceptively [1]** 157/9
**decide [3]** 97/7 153/16 158/20
**decided [7]** 44/25 128/9 128/25 177/19 184/22 203/24 252/4
**deciding [1]** 188/3
**decision [11]** 58/21 82/19 146/17 158/1 160/12 161/22 186/6 198/10 198/13 247/22 251/8
**decisions [9]** 6/9 47/13 47/17 63/19 98/4 121/15 121/17 131/8 180/24
**deck [2]** 54/23 148/2
**declarant [1]** 14/5
**declaratory [2]** 133/11 164/24
**declaring [1]** 192/6
**decline [3]** 32/11 77/17 77/19
**declined [3]** 31/19 143/10 245/17
**decorum [2]** 129/17 130/24
**dedicated [1]** 178/12
**deep [1]** 70/17
**deeply [1]** 87/17
**defend [4]** 57/11 106/20 129/2 221/14
**Defendant [3]** 1/10 2/1 156/18
**Defendant's [5]** 103/25 112/6 113/24 115/11 166/25
**Defendants [2]** 127/18 157/2
**defense [2]** 56/23 128/6
**defensive [1]** 26/22
**deficit [1]** 53/6
**define [3]** 12/16 184/18 184/20
**defined [1]** 228/8
**defining [1]** 185/2
**definitely [3]** 89/17 104/17 210/22
**definition [1]** 184/22
**Degree [1]** 167/7
**deincentivizing [1]** 134/22
**delay [2]** 242/2 242/11
**delayed [2]** 241/11 242/19
**delegate [2]** 46/21 47/2
**delegated [5]** 46/7 46/9 46/19 46/19 94/13
**delegation [2]** 46/24 47/1
**deliberate [1]** 102/11
**deliberating [1]** 93/11
**deliberations [2]** 197/15 197/17
**Delray [2]** 257/9 257/16
**demonstrate [1]** 96/13
**demonstrated [2]** 135/9 136/8
**demonstration [3]** 139/4 173/19 174/1
**demoted [2]** 168/5 210/18
**denied [1]** 143/24
**denotes [1]** 55/17
**deny [1]** 166/12
**departs [1]** 157/13
**depend [3]** 81/21 81/23 165/10
**depending [2]** 96/25 175/8
**depends [3]** 9/23 13/7 58/15
**deposition [29]** 3/9 4/17 5/21 6/1 6/5 7/19 8/2 8/5 8/21 9/10 16/13 22/18 34/1 46/18 46/24 48/10 48/23 49/10 59/13 68/3 70/11 128/3 128/24 155/15 183/8 212/3 215/20 235/25 256/25
**deputy [2]** 197/12 255/19
**derive [2]** 94/9 107/7
**derived [3]** 95/19 210/8 233/4
**describe [10]** 27/3 123/13 177/25 225/20 227/22 229/12 231/9 231/11 234/12 253/25
**described [7]** 185/20 199/25 210/5 224/11 225/20 227/3 236/9
**describes [2]** 29/13 29/14
**describing [2]** 82/21 236/18
**deserve [1]** 90/6

D


**deserves [1]** 227/1
**deserving [1]** 239/7
**design [2]** 111/19 115/4
**designate [1]** 127/20
**designated [14]** 3/13 3/17 3/18 127/17 127/18 208/25 209/19 209/21 210/7 210/24 211/7 211/13 211/20 211/25
**designation [5]** 107/21 171/4 208/22 209/1 209/9
**designations [8]** 3/9 127/18 127/20 127/24 128/2 129/11 132/24 209/22
**designed [11]** 7/16 7/22 8/8 8/13 117/10 117/12 143/14 158/7 176/12 217/12 218/25
**designing [2]** 113/12 114/12
**desist [1]** 129/22
**desk [6]** 91/11 91/23 178/13 178/13 178/20 192/13
**Despite [1]** 81/17
**detail [5]** 116/20 199/20 216/12 227/22 256/24
**detailed [1]** 201/15
**details [1]** 48/6
**determination [1]** 226/17
**determine [2]** 177/5 247/25
**determined [1]** 181/24
**determiner [1]** 23/7
**determines [1]** 59/19
**determining [1]** 23/4
**detriment [1]** 141/5
**develop [4]** 81/6 173/8 174/6 180/19
**developed [11]** 76/5 173/6 173/13 176/10 177/14 180/13 181/17 191/11 218/21 236/10 243/8
**developer [1]** 188/14
**developing [5]** 110/18 168/20 176/22 177/1 181/16
**development [9]** 4/4 4/11 21/24 56/14 56/16 57/18 71/7 79/10 177/17
**devised [1]** 218/20
**diabetes [2]** 27/9 169/4
**diagnosis [1]** 190/22
**diagnosis functionality [1]** 190/22
**dialogue [1]** 199/10
**Dicker [1]** 2/3
**did [99]** 16/14 19/10 22/9 31/6 31/10 32/13 40/25 41/4 42/25 44/14 45/18 45/20 46/12 46/12 46/23 48/6 48/23 49/4 49/11 49/16 50/7 50/9 50/25 59/2 63/1 63/1 63/21 81/18 85/3 85/9 85/23 97/7 97/9 100/22 105/22 106/4 107/15 108/10 110/1 111/11 112/19 112/23 113/13 115/2 115/25 117/2 119/5 119/10 120/11 125/21 129/15 131/25 132/6 132/18 149/24 151/24 153/13 154/16 154/21 155/22 161/18 161/19 162/1 167/9 167/14 173/8 178/21 179/2 180/18 185/14 187/13 188/2 191/4 191/20 194/6 199/12 200/14 202/15 203/2 204/4 204/13 210/23 212/3 212/10 213/24 215/15 218/18 232/20 234/1 235/14 236/11 237/4 238/3 243/19 243/20 245/18 251/10 252/6 257/16
**didn't [68]** 23/1 37/25 41/8 43/9 46/2 50/12 50/24 76/20 78/6 89/24 102/10 110/13 110/13 110/14 119/6 123/17 136/16 139/17 142/8 143/1 145/9 145/23 146/4 146/5 147/5 149/10 149/22 149/23 150/2 151/8 151/14 151/16 153/12 154/22 155/23 158/22 158/22 159/10 159/12 159/13 160/17 160/23 161/14 161/18 163/19 184/23 185/16 187/13 188/6 193/18 194/7 196/3 197/2 199/6 203/7 210/9 216/19 237/16 244/16 244/17 247/24 249/17 249/18 249/19 251/9 251/13 255/21 257/17
**didn't commission [1]** 155/23
**die [1]** 159/4
**difference [4]** 189/14 242/7 249/21 249/23
**different [41]** 6/13 6/16 11/7 26/20 66/3 69/13 77/4 77/11 96/18 98/15 99/18 104/13 107/14 124/16 143/23 148/23 151/2 154/9 155/25 158/18 166/2 171/12 173/13 173/16 181/4 184/17 186/4 186/11 199/12 200/8 203/18 203/21 203/22 206/9 206/18 217/1 217/10 229/6 245/10 245/12 249/12
**differently [1]** 151/2
**difficult [7]** 48/18 143/21 161/3 182/14 188/25 192/25 225/6
**dig [2]** 116/24 246/1
**dignity [1]** 87/16
**direct [15]** 4/1 28/6 28/25 65/1 68/23 69/19 70/1 78/20 79/1 84/3 120/18 125/19 140/5 140/6 167/2
**directed [7]** 45/12 217/1 217/9 217/11 217/16 218/4 218/23
**Directing [1]** 59/24
**direction [3]** 98/22 112/10 168/19
**directly [5]** 54/14 54/17 96/22 153/17 240/23
**director [10]** 10/4 23/8 24/19 56/16 57/18 103/10 127/15 197/12 208/9 255/19
**directors [10]** 28/18 28/22 31/14 31/15 31/17 32/2 32/7 46/5 59/19 87/25
**disagree [11]** 57/17 57/18 57/19 57/20 58/2 142/23 149/23 156/8 212/19 214/21 226/14
**disagreed [1]** 203/3
**disappointed [1]** 131/21
**disavowing [1]** 199/9
**disclaimers [1]** 143/23
**disclose [1]** 145/3
**disclosure [4]** 95/18 111/6 143/9 154/5
**disconnect [1]** 138/10
**discourage [4]** 7/16 7/22 8/9 67/16
**discovery [2]** 56/14 81/6
**discredited [2]** 102/6 102/9
**discuss [2]** 191/21 243/22
**discussed [8]** 82/16 125/19 160/3 185/18 245/21 248/16 248/17 257/24
**discussing [5]** 32/15 103/14 105/22 125/5 243/19
**discussion [13]** 92/13 105/18 109/9 178/24 199/16 201/15 201/16 240/9 244/15 244/17 244/20 252/8 254/21
**discussions [4]** 116/15 205/13 205/18 207/10
**Disease [1]** 188/5
**disincentivizing [3]** 198/24 201/19 203/15
**dismiss [1]** 138/24
**Disney [4]** 17/22 18/2 46/1 46/3
**dispensed [1]** 130/8
**display [1]** 209/6
**displayed [2]** 109/22 211/9
**displaying [1]** 19/24
**dispute [1]** 141/24
**distinct [6]** 90/13 169/15 170/3 170/8 181/18 185/20
**distinction [3]** 83/24 169/24 223/3
**distinguishing [1]** 170/23
**distorts [1]** 157/15
**distributed [1]** 231/17
**DISTRICT [5]** 1/1 1/1 1/12 131/1 155/2
**diverse [2]** 112/13 115/22
**diverted [3]** 25/10 26/1 26/6
**DIVISION [1]** 1/2
**DNF [1]** 157/17
**do [389]**
**docket [2]** 127/11 130/8
**doctor [3]** 27/8 58/8 162/14
**doctors [3]** 74/23 174/16 174/21
**document [66]** 4/12 4/17 4/20 4/23 4/24 5/4 5/11 9/17 9/24 13/8 14/1 28/25 29/6 29/7 43/15 43/22 43/23 49/19 53/17 56/20 59/2 59/9 67/23 70/7 70/12 70/19 71/1 71/1 71/5 71/6 71/9 71/11 71/13 72/4 72/10 72/16 72/25 73/2 80/7 103/7 103/13 103/22 110/22 111/7 111/9 111/12 111/21 111/21 113/16 115/8 119/3 125/14 179/19 184/8 200/19 200/20 200/21 200/22 202/18 202/22 205/2 214/9

D

**document... [4]** 252/24 253/2 253/5 256/24
**documentation [7]** 93/10 93/12 141/15 179/17 179/22 179/23 245/8
**documents [6]** 23/11 29/7 118/9 157/23 161/20 195/11
**does [70]** 8/24 9/11 14/22 23/9 23/23 26/14 37/19 37/22 43/11 46/14 54/17 65/2 65/7 65/25 74/15 76/23 78/10 81/1 81/21 81/23 83/7 89/2 91/7 92/17 94/19 108/7 108/21 111/21 112/20 117/17 136/6 138/4 140/12 140/22 141/24 142/10 143/25 144/2 144/4 144/5 148/14 151/3 151/22 152/24 153/15 162/7 162/12 169/13 174/21 181/2 184/12 186/21 187/11 188/12 189/10 196/8 199/21 200/18 201/11 220/23 220/23 221/2 229/10 232/18 232/20 246/25 248/10 253/5 254/2 255/18
**doesn't [24]** 5/20 20/16 24/9 30/16 38/12 38/13 93/8 138/8 144/3 146/9 147/24 148/17 151/8 154/11 156/15 158/24 162/7 188/11 210/14 227/8 228/24 231/5 232/13 249/14
**doing [53]** 16/3 23/14 26/20 79/2 86/7 88/21 88/23 88/23 89/23 89/25 90/6 95/12 96/21 97/3 98/3 98/24 99/4 100/11 108/14 141/10 147/11 147/14 147/15 147/18 148/7 149/9 150/23 165/24 167/22 174/3 174/8 177/13 184/8 185/1 189/12 189/13 193/1 195/13 196/25 197/22 198/9 200/23 200/24 205/22 224/12 227/21 246/17 250/14 250/16 250/23 251/4 251/21 251/24
**dollars [2]** 105/2 106/25
**domain [12]** 152/12 173/17 173/21 174/5 175/15 175/15 175/15 176/17 176/20 183/17 229/19 229/24
**domains [1]** 239/14
**don't [202]** 8/12 8/14 9/16 12/16 13/8 14/21 14/22 16/19 17/2 17/6 18/24 20/12 21/4 21/4 24/1 27/15 29/8 30/13 31/1 34/15 34/18 36/3 37/6 38/1 38/7 39/14 39/18 39/25 40/21 42/15 43/20 44/19 45/17 45/21 45/21 46/1 46/9 58/22 61/12 61/16 62/19 63/11 65/15 65/16 66/8 70/8 72/6 72/6 72/8 72/14 77/9 83/14 93/9 93/18 99/23 101/19 102/7 109/7 110/8 112/24 114/14 115/15 118/3 121/6 121/16 122/15 122/18 123/19 125/3 125/4 125/8 125/13 129/6 131/15 131/16 131/19 131/20 132/20 136/14 137/11 138/2 138/7 138/20 138/21 138/21 139/13 139/14 139/14 140/10 140/21 142/11 143/7 143/18 144/11 144/23 147/7 149/4 149/11 149/16 149/20 150/16 151/4 151/23 151/23 151/24 154/8 154/20 155/13 156/8 156/10 157/11 158/10 158/13 158/23 162/11 165/6 165/6 165/10 171/18 171/20 171/22 179/12 182/25 184/13 184/25 185/6 187/16 188/13 188/15 189/6 189/9 189/14 189/17 191/6 191/6 193/9 195/3 197/5 197/7 197/16 201/5 201/10 201/22 202/15 203/13 208/1 209/23 210/5 210/13 213/8 213/20 213/21 214/7 214/11 215/22 217/22 218/1 218/1 220/11 220/12 221/20 222/9 222/13 222/15 222/16 222/20 222/23 223/4 224/11 226/11 229/4 231/3 231/4 231/19 231/24 233/25 235/16 237/11 237/12 237/23 237/25 238/10 238/15 239/8 242/4 243/15 246/15 246/16 246/19 247/3 247/5 247/10 248/3 248/22 249/16 251/1 255/5 255/12 256/12 256/24 257/1 257/4
**DONALD [2]** 1/11 2/8
**donations [1]** 107/4
**done [16]** 15/21 15/23 85/14 89/25 97/18 98/15 124/24 141/18 141/25 148/12 148/13 149/16 155/21 205/21 240/6 255/5
**donor [1]** 4/8
**donors [1]** 26/10
**Doo [1]** 68/25
**dose [1]** 75/25
**doubt [4]** 44/17 207/15 207/18 236/1
**down [52]** 12/17 13/4 20/13 32/14 36/25 37/13 39/10 39/11 45/10 49/19 53/17 54/24 55/21 56/11 74/20 75/2 76/10 76/11 76/16 77/14 79/20 80/6 95/23 105/1 106/3 106/15 106/18 112/25 113/4 116/4 128/17 152/20 155/16 155/17 155/24 156/1 157/6 182/2 184/1 192/4 194/16 195/16 204/25 205/10 207/21 230/7 230/19 231/23 243/21 246/7 248/7 257/16
**download [1]** 242/16
**downturn [2]** 155/19 155/20
**Dr [75]** 3/14 33/25 34/5 34/7 36/15 51/13 51/17 51/18 52/10 58/5 58/10 58/14 63/9 63/10 71/5 77/7 78/7 78/16 82/3 82/4 82/8 82/14 82/17 82/21 90/25 113/7 113/10 114/2 114/6 114/19 115/2 117/11 123/16 123/17 123/21 124/11 124/18 134/11 134/17 135/1 135/7 135/12 135/14 140/2 141/17 142/4 143/17 144/14 144/20 145/23 148/17 148/24 150/12 154/13 154/15 155/20 157/12 157/17 158/2 158/15 160/16 178/16 187/16 197/10 205/14 207/10 207/13 207/13 226/2 226/14 227/7 237/3 237/4 255/17 258/10
**draft [2]** 213/8 214/14
**drafted [2]** 207/12 210/15
**drafting [1]** 22/20
**dramatically [2]** 31/18 32/10
**drastic [2]** 160/12 238/24
**driven [1]** 87/6
**driving [1]** 88/23
**drop [1]** 238/20
**dropped [2]** 33/19 238/19
**dropping [1]** 258/10
**drug [2]** 190/18 190/21
**dry [1]** 10/20
**Ds [8]** 42/10 42/16 42/19 78/14 103/22 109/4 217/16 220/9
**DS-402 [1]** 103/22
**due [3]** 161/23 192/10 229/15
**dumb [1]** 182/2
**Dunn [2]** 1/18 128/8
**during [15]** 4/17 5/21 9/14 13/11 16/13 21/22 36/15 48/10 59/13 68/3 69/9 70/11 72/16 122/21 125/9
**duties [1]** 85/2
**duty [3]** 219/15 219/19 220/1
**DX [12]** 93/24 102/16 110/20 111/25 112/4 113/14 113/22 115/6 152/10 193/22 199/25 204/24
**DX-317 [3]** 110/20 111/25 112/4
**DX-318 [2]** 113/14 113/22
**DX-319 [1]** 115/6
**DX-402 [1]** 102/16
**DX-470 [1]** 93/24
**dying [2]** 97/19 97/20

E

**each [11]** 77/13 136/4 152/16 155/22 170/24 177/6 182/19 183/18 185/25 186/3 236/21
**earlier [11]** 9/19 46/4 71/5 91/13 99/14 100/8 125/9 141/16 194/2 224/3 225/20
**early [4]** 3/5 52/16 86/16 249/6
**earn [4]** 79/10 107/17 175/10 209/21
**earn achievement [1]** 175/10
**earned [9]** 38/16 38/18 38/20 38/21 51/6 73/23 75/5 75/6 142/7
**earning [1]** 150/24
**earns [1]** 79/8
**ease [1]** 177/23
**easier [1]** 221/5
**easily [1]** 193/14
**easy [5]** 75/24 140/13 151/13

E


**easy... [2]** 179/19 255/10
**ECF [2]** 134/1 154/15
**economist [1]** 176/23
**Edelman [1]** 2/3
**educating [1]** 111/3
**education [7]** 92/8 101/11 151/6 167/11 173/17 173/18 175/14
**educational [2]** 101/10 167/6
**effect [5]** 34/1 44/22 128/11 138/25 143/14
**effectively [2]** 114/16 163/13
**effects [1]** 157/20
**efficient [1]** 178/7
**efficiently [1]** 178/2
**effort [3]** 131/5 147/7 217/13
**eg [1]** 211/22
**eight [3]** 42/7 42/13 106/25
**Eighteen [1]** 84/20
**eighth [4]** 110/17 117/13 143/13 143/22
**either [7]** 148/21 148/22 185/24 188/7 193/19 215/15 249/17
**elective [2]** 155/17 155/20
**electronic [2]** 167/23 234/21
**element [1]** 164/23
**elements [2]** 157/6 175/8
**eleventh [5]** 130/25 155/2 164/8 164/11 164/16
**eliminating [1]** 204/6
**else [6]** 108/8 149/17 163/1 207/11 219/7 234/20
**else's [1]** 203/8
**Elser [1]** 2/3
**elsewhere [1]** 30/17
**email [31]** 10/2 19/13 20/7 20/20 20/25 29/4 29/12 30/2 30/20 32/15 43/18 52/10 52/13 52/14 52/21 53/3 58/10 63/12 63/13 63/16 79/13 82/15 82/17 123/18 123/20 175/24 176/3 205/4 211/16 247/8 248/5
**emails [4]** 51/20 192/13 202/8 204/25
**embargo [1]** 117/17
**embrace [1]** 203/7
**embraced [1]** 90/2
**emphasis [1]** 17/4
**emphasize [2]** 74/21 227/20
**employed [1]** 120/4
**employee [1]** 94/12
**employees [8]** 23/21 23/23 25/7 25/19 98/3 121/7 121/15 121/18
**employer [1]** 121/21
**employers [21]** 58/16 85/12 86/23 88/11 90/10 98/1 101/4 120/21 121/4 121/7 121/11 121/19 160/6 161/11 161/12 212/17 218/13 218/14 218/17 219/5 219/6
**employers provide [1]** 218/14
**employers' [1]** 126/20
**employment [1]** 167/9
**enable [1]** 99/9
**encountered [2]** 123/11 163/3
**encouraging [1]** 126/15
**end [8]** 93/15 117/9 127/23 129/14 129/15 152/4 221/13 258/21
**ended [1]** 110/18
**endorses [1]** 207/16
**ends [1]** 48/17
**engage [1]** 111/13
**engaged [1]** 45/6
**enhance [2]** 209/12 210/2
**enhanced [1]** 210/20
**enhances [3]** 209/16 209/17 209/25
**enormous [1]** 87/19
**enough [15]** 24/1 75/14 75/15 83/15 110/10 116/22 147/7 170/13 171/20 188/6 189/9 203/14 215/4 219/2 249/5
**ensure [1]** 80/4
**enter [2]** 156/17 190/9
**entered [2]** 75/22 111/22
**entire [7]** 21/10 47/25 61/25 80/3 153/7 166/1 169/17
**entirely [5]** 44/15 82/13 158/7 169/15 170/18
**entitled [5]** 54/23 71/6 145/2 158/11 158/25
**entitled Expert [1]** 71/6
**entity [1]** 151/3
**entries [1]** 55/11
**entry [10]** 144/18 177/9 189/21 189/25 190/2 223/22 224/4 225/1 225/10 235/6
**environments [1]** 174/4
**envision [1]** 16/10
**epidemiologist [1]** 173/7
**episode [1]** 129/20
**equal [1]** 78/10
**equipment [1]** 174/23
**equity [1]** 170/17
**equivalent [2]** 182/2 249/8
**erned [1]** 38/17
**err [1]** 97/16
**error [3]** 75/24 193/19 193/20
**errors [7]** 49/24 51/10 77/16 97/21 168/13 184/25 224/13
**especially [1]** 172/1
**ESQ [10]** 1/15 1/16 1/16 1/17 1/17 1/20 2/1 2/1 2/2 2/2
**essentially [4]** 119/8 209/4 241/9 250/1
**establish [3]** 135/21 135/21 141/2
**established [5]** 133/23 185/25 187/22 236/13 254/5
**estimate [3]** 148/22 148/24 148/25
**estimation [1]** 148/21
**et [5]** 1/5 70/25 92/25 107/5 132/19
**ethics [3]** 130/1 170/16 172/16
**evaluate [1]** 74/6
**evaluating [1]** 195/12
**even [19]** 8/18 9/13 82/15 107/24 138/13 154/6 154/8 154/19 154/24 162/11 165/23 217/23 232/3 232/12 233/11 233/17 249/14 252/14 258/2
**evening [1]** 3/2
**event [4]** 158/17 163/7 165/22 187/10
**events [2]** 4/8 25/1
**eventually [4]** 43/1 63/1 102/14 125/21
**ever [21]** 22/3 22/8 73/5 95/7 99/23 103/7 112/23 118/11 119/20 120/11 126/22 131/23 134/24 171/22 171/24 186/23 190/19 202/10 224/15 255/11 256/16
**every [24]** 24/14 44/23 44/24 45/4 72/14 77/4 77/10 144/2 152/11 174/13 175/18 179/14 185/8 185/11 188/22 188/24 189/4 189/7 195/14 195/15 200/21 202/9 239/24 245/20
**everybody [6]** 24/25 80/4 85/25 191/1 197/2 206/13
**everyone [4]** 98/19 177/13 224/6 224/9
**everything [14]** 37/1 37/4 88/21 92/2 104/18 108/10 110/8 154/7 154/8 154/9 185/3 208/6 210/19 258/8
**everywhere [1]** 100/16
**evidence [63]** 14/8 14/10 29/21 29/24 36/11 40/9 41/21 52/18 56/13 64/21 72/9 92/2 93/25 98/16 102/17 103/22 104/1 112/1 112/7 113/25 115/12 116/14 128/9 128/10 128/17 130/1 130/6 130/17 130/23 134/4 134/7 135/3 135/5 135/7 135/18 139/11 139/12 139/20 140/17 149/22 149/23 154/23 155/24 156/16 157/4 159/1 160/15 162/20 162/21 162/23 163/12 163/25 164/1 166/13 173/14 177/10 189/5 189/7 189/9 192/18 199/24 201/8 202/23
**evidenced [1]** 142/15
**exact [5]** 18/3 52/4 70/8 104/15 222/15
**exactly [14]** 18/21 37/6 41/10 55/20 62/20 121/6 126/21 130/5 141/7 148/19 155/3 162/14 190/5 253/15
**examination [19]** 4/1 21/6 28/6 34/19 72/20 79/1 84/4 93/14 104/8 120/14 120/16 120/19 125/9 125/20 126/6 127/11 167/2 207/22 252/18
**example [15]** 32/19 105/15 120/24 125/4 148/4 151/17 162/5 177/7 188/9 189/7 198/2 219/21 220/4 250/21 251/2
**examples [2]** 77/1 211/13
**excellent [1]** 87/18

**E**

**except [3]** 118/14 231/1 248/4
**exception [1]** 44/24
**exceptional [1]** 169/5
**exchange [1]** 246/24
**excuse [3]** 113/14 231/23 250/3
**exec [1]** 155/25
**executed [2]** 18/12 18/24
**executing [1]** 18/22
**executive [14]** 10/19 22/8 28/16 28/17 53/2 59/1 59/10 59/14 59/18 60/5 60/9 60/22 79/18 119/7
**executives [3]** 59/20 119/17 174/17
**exempt [1]** 185/4
**exempted [1]** 185/12
**exhibit [29]** 4/13 9/17 13/10 13/22 14/8 14/10 19/11 19/12 29/1 29/23 36/10 41/21 56/12 58/24 58/24 71/4 93/19 93/24 103/25 112/6 113/24 115/11 148/1 197/16 203/19 207/21 211/3 245/22 253/11
**exhibits [1]** 233/16
**exist [5]** 21/18 21/18 146/2 156/15 225/12
**existed [2]** 64/25 69/18
**existing [3]** 5/5 5/7 164/15
**expand [3]** 4/24 5/2 96/2
**expanded [2]** 167/20 168/20
**expanding [2]** 5/4 5/5
**expansive [1]** 202/11
**expect [4]** 80/21 94/19 106/16 189/10
**expenses [1]** 95/24
**expensive [3]** 91/21 91/22 92/8
**experience [13]** 22/7 35/25 36/2 36/3 36/3 36/4 100/9 112/17 113/11 114/19 160/11 187/18 253/21
**experienced [2]** 159/18 193/19
**experiencing [1]** 27/17
**expert [116]** 36/7 51/16 58/5 58/9 63/10 71/6 71/14 72/15 76/5 78/5 80/19 88/25 89/2 89/4 89/5 90/12 90/14 90/17 90/20 90/22 90/23 90/25 91/1 110/15 111/20 114/8 123/16 123/22 124/18 127/1 127/4 130/16 134/10 135/2 135/11 141/17 143/20 144/20 145/4 145/4 147/8 147/15 147/20 148/2 150/6 150/13 155/20 158/5 158/15 158/16 166/5 172/6 173/7 176/25 177/4 177/14 177/16 184/15 186/19 186/21 186/23 187/2 187/2 187/8 187/11 187/15 187/18 191/21 193/8 194/19 195/7 197/10 197/11 198/14 201/7 201/12 201/14 202/13 204/14 204/15 205/9 205/16 205/16 207/14 207/16 225/25 239/16 236/11 236/22 236/23 243/8 243/11 243/16 243/19 244/24 245/4 245/21 247/1 247/14 247/15 247/23 248/1 248/14 248/16 249/7 252/9 252/10 254/5 254/6 254/15 254/18 254/19 254/21 256/21 257/3 258/10
**expert panel [1]** 195/7
**expertise [1]** 89/14
**experts [8]** 37/25 127/6 135/10 146/22 149/20 150/3 150/10 258/12
**explain [15]** 24/6 68/16 74/3 80/14 85/1 114/16 142/17 157/7 170/2 181/15 188/11 205/12 250/1 255/6 257/13
**explain why [1]** 188/11
**explained [7]** 39/8 134/15 157/17 163/19 170/5 216/12 255/8
**explaining [5]** 182/13 188/2 189/12 189/13 191/4
**explains [1]** 38/6
**explanation [3]** 41/22 41/25 187/18
**explored [1]** 186/12
**exploring [1]** 177/17
**express [1]** 97/1
**expressed [2]** 73/5 253/13
**expressing [1]** 253/9
**expressly [1]** 46/14
**extended [1]** 168/23
**extensive [7]** 92/19 93/12 96/16 161/1 161/19 162/20 179/13
**extensively [1]** 145/24
**extent [9]** 14/1 18/5 27/4 121/21 130/19 130/20 130/21 210/1 256/5
**external [1]** 179/16
**externally [1]** 85/7
**extraordinarily [1]** 87/10
**extraordinary [1]** 45/22
**extreme [1]** 131/17
**extremely [2]** 87/11 100/21

**F**

**face [6]** 85/6 132/6 132/9 132/19 198/18 221/23
**facilities [1]** 219/14
**facility [1]** 209/10
**facing [2]** 114/12 134/18
**fact [38]** 44/20 53/6 54/9 61/13 70/15 72/9 75/18 95/10 98/16 105/5 115/2 115/25 117/15 118/24 126/11 128/11 132/16 132/21 134/7 137/7 148/17 150/2 156/3 156/11 157/5 158/10 159/5 161/2 161/6 162/1 178/4 188/11 225/23 235/7 244/1 244/23 255/20 256/21
**factor [5]** 57/16 74/7 76/22 170/23 226/17
**factors [3]** 40/6 74/7 226/15
**facts [2]** 33/23 34/2
**fail [2]** 151/20 198/19
**failed [2]** 133/18 186/24
**failing [9]** 15/19 108/25 135/6 157/15 157/19 165/13 183/2 198/19 257/11
**failure [1]** 98/24
**fair [17]** 64/5 76/8 83/15 169/9 169/12 185/14 186/15 201/8 210/19 219/2 219/2 221/17 222/4 231/19 248/19 248/21 252/16
**fairer [1]** 197/1
**fairly [1]** 94/3
**fall [45]** 9/21 10/17 11/2 11/5 12/5 12/11 12/12 12/25 30/9 33/15 33/19 40/25 42/3 43/8 43/13 44/20 45/1 58/20 73/6 73/9 73/12 96/1 101/1 102/21 118/15 123/13 123/21 124/3 124/23 124/25 158/3 191/25 192/10 193/23 202/2 207/16 208/17 215/17 223/18 243/22 245/14 252/1 252/4 252/21 257/10
**falling [1]** 53/4
**false [2]** 158/9 214/22
**falsely [1]** 246/2
**familiar [10]** 40/12 61/18 64/5 64/7 64/7 69/15 126/14 126/16 208/14 208/17
**families [3]** 127/2 193/18 217/17
**family [7]** 89/4 89/5 127/4 193/17 193/19 218/21 218/25
**fancy [1]** 149/8
**FAQ [1]** 83/7
**far [7]** 11/20 124/12 137/11 140/22 203/11 213/1 247/14
**Farinelli [3]** 10/3 10/13 10/23
**fast [2]** 188/3 252/2
**faster [1]** 242/18
**fault [1]** 3/22
**favor [4]** 156/18 245/9 253/6 253/19
**favorable [1]** 157/4
**FDUTPA [3]** 133/11 133/13 138/25
**FDUTPA prohibits [1]** 133/13
**February [1]** 81/5
**Federal [5]** 126/8 164/14 167/18 171/4 259/10
**fee [3]** 54/23 105/16 107/15
**feedback [7]** 88/15 174/5 175/13 204/13 254/7 254/18 254/19
**feeding [1]** 167/19
**feel [4]** 50/12 156/13 185/10 246/7
**fees [1]** 80/8
**felt [2]** 98/1 129/2
**Ferokki [1]** 258/11
**few [10]** 36/23 53/23 72/22 90/13 92/15 96/14 116/23 158/21 168/16 186/20
**field [1]** 135/11
**fighting [1]** 27/16
**figure [3]** 66/19 137/20

F

**figure... [1]** 155/23
**figured [2]** 197/21 199/7
**figuring [2]** 177/24 197/22
**filed [6]** 13/6 45/5 45/11 127/21 129/12 194/14
**filing [2]** 128/22 192/2
**fill [7]** 149/16 150/16 151/16 176/14 183/24 220/23 245/17
**filling [1]** 184/1
**final [4]** 30/8 115/14 164/23 179/23
**finally [2]** 163/12 184/22
**finance [4]** 21/25 53/2 79/18 109/3
**financial [1]** 52/24
**financially [1]** 108/24
**find [6]** 66/10 94/23 172/5 178/4 199/14 199/14
**finder [2]** 107/14 157/5
**Fine [1]** 110/25
**finger [1]** 139/8
**finish [6]** 31/23 244/17 251/18 258/12 258/16 258/24
**finished [2]** 114/19 227/24
**firewall [1]** 24/10
**firm [6]** 23/13 128/15 128/15 129/19 176/23 179/24
**first [66]** 3/9 4/23 4/24 10/16 11/9 12/13 16/20 26/21 32/15 36/24 40/20 40/21 40/23 40/24 56/19 61/9 61/10 65/12 66/3 67/19 67/20 67/22 69/3 69/6 76/20 83/11 83/12 83/16 85/2 85/8 87/4 91/22 92/22 94/16 95/14 95/15 101/25 101/25 102/4 102/22 103/1 103/18 110/3 123/7 139/7 142/18 152/1 167/11 167/23 168/18 169/25 172/3 179/7 183/7 184/15 185/13 192/24 200/23 210/16 210/17 225/19 227/15 227/18 231/13 237/16 237/17
**fiscal [1]** 4/15
**fit [1]** 9/8
**five [78]** 6/6 8/7 15/9 19/24 20/10 21/2 41/23 45/13 68/4 68/7 68/23 96/10 96/15 128/8 129/1 133/16 140/9 141/8 144/16 152/9 152/16 155/22 169/14 173/13 176/18 176/20 179/7 180/1 182/4 183/10 200/7 209/8 222/16 222/20 222/25 223/7 223/15 223/15 224/15 224/22 225/9 226/18 226/18 226/18 226/25 227/11 229/25 231/2 231/10 231/24 234/8 235/6 236/9 237/2 237/8 237/9 237/24 238/2 239/5 239/14 241/20 241/23 243/7 243/13 243/17 243/22 244/3 244/5 244/8 244/11 244/11 244/15 245/9 245/11 245/13 248/25 255/2 255/6
**FL [3]** 1/8 1/23 2/7
**flip [2]** 56/19 209/8
**floated [1]** 249/6
**FLORIDA [14]** 1/1 12/25 13/1 21/3 88/2 88/5 120/25 126/14 140/13 155/1 160/24 183/12 192/5 218/10
**flunked [2]** 39/20 39/22
**focus [12]** 4/11 53/13 53/23 55/5 79/22 80/2 170/19 181/4 184/22 194/20 201/3 256/17
**focused [14]** 44/21 125/9 167/19 170/18 170/22 171/16 173/17 173/21 174/5 179/18 180/20 185/4 185/5 186/25
**focuses [1]** 169/15
**focusing [1]** 34/8
**fold [2]** 161/4 161/5
**folks [4]** 14/25 36/23 239/12 239/16
**follow [5]** 44/16 72/14 247/22 247/24 248/1
**followed [3]** 18/16 191/5 204/13
**following [3]** 112/11 189/20 212/10
**follows [1]** 71/14
**font [1]** 52/19
**Food [1]** 174/25
**foot [1]** 196/20
**football [1]** 158/23
**footnote [18]** 36/20 36/25 37/1 37/3 37/7 37/7 37/19 37/22 37/24 38/2 38/3 38/8 38/12 125/5 140/19 154/11 161/5 176/1
**for IVS [1]** 246/9
**force [2]** 42/25 90/5
**forecast [1]** 53/4
**foregoing [1]** 259/6
**foremost [2]** 168/18 172/3
**forest [2]** 48/11 48/25
**forever [1]** 22/10
**form [6]** 9/25 16/5 34/15 54/5 130/16 257/16
**formalized [1]** 193/12
**formally [1]** 41/11
**formed [1]** 184/15
**former [4]** 19/21 25/6 25/19 100/9
**forth [3]** 122/7 122/10 141/2
**fortunate [2]** 83/1 110/10
**fortunately [1]** 156/23
**Fortune [1]** 87/3
**forward [6]** 166/21 187/21 195/10 203/24 205/19 244/1
**found [1]** 134/1
**foundation [11]** 21/20 25/21 43/18 43/25 87/5 103/1 110/11 110/24 114/24 115/3 117/11
**founded [7]** 86/5 86/11 86/22 87/1 97/24 170/4 170/5
**founders [3]** 85/11 86/15 98/6
**four [65]** 5/11 36/20 37/1 37/1 37/3 37/7 37/8 42/10 68/4 68/7 74/12 79/9 127/19 134/21 135/17 144/6 144/10 148/13 148/14 151/8 151/22 151/25 152/4 153/2 153/12 153/21 154/4 155/25 165/12 172/14 172/20 177/15 181/22 192/11 201/20 204/7 206/16 215/3 215/8 216/5 222/7 222/10 222/11 225/6 226/22 230/25 231/14 231/24 232/2 232/13 236/21 238/25 239/3 239/4 244/3 244/18 247/3 253/8 253/19 254/4 254/6 254/8 255/3 256/11 257/15
**fourth [2]** 174/12 179/17
**frame [1]** 202/22
**frankly [5]** 93/10 131/21 141/19 158/13 193/10
**free [24]** 91/5 91/6 91/7 92/11 101/12 105/6 107/19 107/21 107/25 137/22 137/25 138/15 138/15 138/15 138/16 154/6 154/7 154/9 168/23 171/2 177/22 178/1 178/10 178/17
**free-standing [2]** 168/23 171/2
**freedom [3]** 180/22 184/22 184/24
**frequently [11]** 64/21 65/2 65/16 65/18 67/9 68/24 69/10 69/12 104/5 104/7 104/9
**Friday [4]** 210/12 237/5 237/6 258/25
**friendly [1]** 111/19
**fringe [2]** 60/17 61/7
**frog [1]** 211/2
**from his [1]** 132/10
**front [7]** 93/19 97/18 111/2 115/19 129/7 197/16 221/13
**frustrated [2]** 98/20 156/13
**frustrating [1]** 98/18
**Fs [7]** 42/10 42/16 78/14 109/4 138/6 217/15 220/9
**Ft [2]** 2/7 2/7
**FTC [1]** 164/13
**full [9]** 74/8 95/18 111/6 112/12 142/19 154/4 154/5 180/17 252/8
**full methodology [1]** 154/5
**fully [5]** 73/9 73/11 96/7 110/1 113/12
**function [4]** 79/19 99/7 257/14 257/18
**functional [4]** 108/11 110/2 113/12 114/20
**functionality [3]** 190/16 190/21 190/22
**fund [3]** 22/7 107/3 108/15
**funding [2]** 87/2 119/16
**fundraising [4]** 21/13 22/6 23/3 24/9
**funny [1]** 223/9
**further [11]** 27/23 30/21 120/13 126/2 128/12 134/25 135/14 142/1 157/19 207/19 258/3
**furtive [1]** 128/2
**future [1]** 194/17

**G**

**game [2]** 182/11 182/15
**Ganey [2]** 152/14 152/15
**gas [4]** 50/19 51/11 70/25 137/17
**Gataray [1]** 10/15
**gather [1]** 117/24
**gauge [3]** 50/19 51/11 137/17
**gauges [1]** 70/25
**Gause [5]** 56/15 56/15 57/11 57/17 58/2
**gave [6]** 63/4 89/10 147/4 152/3 174/11 225/22
**general [10]** 40/2 101/7 161/3 164/21 171/2 171/11 214/2 214/3 214/6 242/6
**generalized [2]** 234/17 234/23
**generally [2]** 26/18 121/5
**generate [1]** 108/21
**generated [2]** 125/24 158/5
**generates [2]** 109/10 171/9
**generous [1]** 182/6
**gentleman [1]** 244/23
**geriatric [1]** 169/7
**get [90]** 3/5 17/2 17/6 24/14 36/20 36/23 46/14 47/17 47/25 48/18 63/20 65/2 65/25 69/8 75/14 75/19 83/8 84/3 85/23 93/9 97/2 101/20 102/2 102/7 104/20 108/4 108/9 108/22 110/10 111/8 119/5 126/19 133/15 137/15 137/16 139/19 146/18 146/21 147/7 147/10 148/6 150/25 151/4 151/13 152/2 152/15 152/21 152/22 152/22 154/6 161/16 162/18 171/13 178/22 179/12 180/3 182/3 182/18 183/14 183/25 189/4 189/8 190/6 190/20 191/9 195/22 197/4 197/13 198/19 199/2 202/13 202/21 203/3 210/11 210/12 212/1 214/14 222/16 222/19 222/20 224/14 231/4 231/5 232/3 241/8 241/12 254/1 254/7 254/15 258/11
**gets [15]** 47/13 63/11 108/18 151/18 151/18 151/19 151/19 181/6 201/23 202/10 231/17 240/23 242/16 249/15 255/16
**getting [22]** 12/18 21/19 64/12 147/3 148/11 148/15 149/1 178/21 179/6 186/25 192/13 193/6 197/18 198/12 199/4 200/9 200/24 241/23 242/5 242/17 249/17 249/18
**Gibson [2]** 1/18 128/8
**give [44]** 59/14 74/10 88/13 88/15 89/10 94/10 102/8 107/18 107/21 107/22 108/12 109/4 109/4 132/16 138/15 145/9 146/8 146/18 146/22 147/12 148/10 149/15 151/22 151/23 156/21 180/21 186/8 188/9 198/2 210/10 220/11 220/13 220/24 221/2 221/3 225/24 230/6 239/15 249/14 241/15 249/5 250/9 250/9 255/24
**given [11]** 36/7 87/2 93/5 132/13 132/20 163/7 182/13 232/2 242/13 250/4 251/9
**giver [1]** 193/17
**gives [5]** 18/25 121/12 151/10 151/25 151/25
**giving [12]** 36/5 93/11 108/24 146/23 146/24 151/10 159/10 159/11 187/17 197/1 199/1 256/2
**glad [1]** 131/14
**gloves [2]** 173/24 173/25
**go [67]** 12/17 20/13 26/19 26/22 30/25 32/2 32/16 34/19 39/21 39/24 39/25 40/3 40/5 41/20 41/22 43/11 49/17 52/18 52/20 65/24 68/16 74/20 74/21 78/23 79/20 87/15 92/1 104/3 109/5 113/4 116/14 125/18 128/11 133/9 140/20 142/19 142/19 153/17 154/7 160/7 161/14 161/22 179/25 180/17 184/4 186/19 201/11 204/3 204/5 204/25 209/20 211/15 211/18 211/19 213/3 213/9 218/22 218/25 219/20 222/1 226/10 245/22 246/7 247/3 248/7 249/25 250/1
**goal [7]** 4/24 22/9 60/5 60/8 91/3 248/6 251/14
**goals [6]** 4/21 24/5 24/8 24/13 115/19 115/20
**God [2]** 54/13 214/20
**goes [13]** 23/5 50/1 52/7 91/25 159/12 184/1 193/16 215/13 217/4 231/15 231/20 231/22 231/23
**going [69]** 6/12 7/17 7/19 7/23 7/23 8/5 8/9 8/10 9/6 11/22 14/24 19/11 24/3 25/10 26/9 28/25 30/25 40/18 44/6 52/15 55/5 55/21 58/23 58/23 62/3 66/13 67/17 70/21 71/22 73/17 84/3 85/18 98/22 110/20 112/18 122/7 131/7 141/7 145/12 146/18 147/19 150/25 160/19 163/13 176/1 184/5 184/20 192/2 192/17 194/16 194/16 196/1 198/8 199/2 200/25 202/19 202/20 203/16 203/16 205/12 211/17 214/22 220/13 220/21 223/10 241/8 242/5 250/21 251/2
**gone [3]** 134/9 230/19 253/16
**good [57]** 1/4 3/2 3/11 3/12 4/3 17/7 21/8 26/19 28/8 28/9 32/19 32/22 33/2 33/12 36/9 36/13 40/3 41/1 41/4 41/15 42/3 42/6 49/17 50/6 50/9 50/10 54/3 57/22 57/23 72/22 73/19 73/19 73/22 78/6 89/24 102/13 106/11 108/5 108/14 110/10 139/18 140/22 147/16 161/22 162/6 167/4 188/13 189/13 197/21 209/1 216/13 232/10 233/19 238/8 238/11 251/25 259/2
**goodwill [1]** 156/15
**Google [20]** 15/18 18/1 18/14 18/19 18/25 19/8 19/16 19/18 20/17 20/21 26/25 27/4 27/6 27/13 45/13 141/22 142/4 142/21 160/20 160/22
**got [21]** 18/21 49/20 50/6 62/5 97/22 100/11 107/11 108/5 110/14 111/18 151/9 151/14 151/15 152/1 164/12 182/10 200/14 203/11 210/17 230/6 254/9
**gotten [3]** 46/15 91/16 159/13
**Goust [2]** 81/7 81/12
**governing [1]** 155/25
**Government [9]** 56/8 100/13 152/17 171/5 219/12 219/13 219/21 219/23 219/24
**governs [1]** 28/22
**grade [220]** 7/24 8/10 8/18 8/25 9/13 11/15 12/5 12/12 15/10 15/19 18/20 19/25 20/19 33/16 36/9 36/12 38/17 38/20 39/9 40/1 40/11 41/22 43/10 45/14 45/16 45/17 46/17 47/4 49/17 50/2 64/14 64/22 65/3 65/7 65/25 67/7 67/20 67/21 68/15 69/15 69/20 70/2 71/7 71/12 71/14 71/15 71/17 71/18 71/24 71/25 72/5 73/23 73/25 74/3 74/12 76/13 78/11 80/15 83/8 83/12 83/16 83/20 84/24 91/1 97/8 97/13 99/10 99/15 99/15 99/24 100/18 100/20 101/25 102/1 102/21 103/17 103/19 104/14 104/17 109/14 109/21 110/3 110/17 114/17 116/10 117/13 117/20 117/21 118/6 118/8 134/6 134/10 134/12 135/6 137/3 137/6 137/8 137/8 137/16 138/9 138/13 138/15 138/17 138/20 139/2 139/9 139/21 142/7 143/10 143/13 143/22 144/6 147/24 151/25 152/20 153/7 157/13 158/6 160/9 160/20 162/25 163/8 165/6 165/8 165/23 166/7 169/2 169/10 169/25 170/3 170/8 170/18 170/20 170/21 170/22 171/9 171/13 171/25 172/4 172/4 172/18 172/21 176/7 177/16 177/19 180/4 180/7 180/12 180/16 181/7 181/13 182/10 182/12 183/2 183/10 184/1 184/7 184/11 184/13 184/16 184/20 185/9 185/13 185/19 185/21 186/8 186/16 186/21 186/24 192/15 194/22 200/7 205/22 205/25 208/15 209/16 209/24 210/21 211/5 211/21 211/23 211/24 212/13 214/17 215/12 215/14 215/17 215/24 217/3

G

**grade... [31]** 217/5 217/12 217/15 217/21 217/23 218/2 218/4 218/11 218/19 218/20 219/6 220/7 220/10 228/21 228/22 232/24 233/3 233/15 236/24 244/5 246/2 249/5 254/6 254/13 254/23 255/13 255/16 257/7 257/19 257/20 258/1
**grade methodology [1]** 157/13
**graded [12]** 100/17 140/9 140/11 166/6 171/13 182/7 182/8 214/24 218/8 224/23 244/13 250/4
**grades [74]** 6/9 7/3 7/6 7/9 9/22 11/2 12/25 16/1 16/16 26/19 29/16 38/20 42/1 54/7 67/17 80/25 106/2 107/24 108/22 108/25 109/4 109/22 110/5 116/21 116/22 116/22 116/24 116/25 117/16 117/17 117/23 118/11 121/12 121/14 121/18 121/19 121/22 121/24 135/4 136/15 137/22 137/25 142/11 157/10 157/17 157/20 157/24 160/24 161/12 161/15 165/5 170/10 170/12 171/9 171/14 171/15 171/19 182/18 209/15 217/1 217/7 217/10 217/11 218/24 219/3 219/4 219/5 219/10 219/12 219/15 246/1 246/11 257/10 257/11
**grandchild [1]** 208/3
**grant [19]** 3/15 3/15 19/1 19/3 19/7 26/25 27/4 27/13 87/5 110/11 110/15 111/18 111/18 115/15 115/16 117/11 166/10 167/11 167/17
**granting [1]** 156/18
**grants [4]** 20/17 108/18 167/18 167/18
**grateful [2]** 97/4 163/6
**great [6]** 3/19 25/3 108/7 131/17 188/1 216/15
**Green [1]** 63/23
**gross [1]** 130/23
**grounds [1]** 113/18
**group [29]** 1/8 3/16 28/3 28/23 32/7 32/7 55/13 55/14 85/5 86/23 87/4 94/25 120/25 127/16 136/7 161/15 161/16 168/7 176/16 191/11 196/20 196/21 203/9 206/18 211/8 218/16 219/13 241/5 241/14
**Group's [1]** 56/21
**groups [3]** 120/20 121/4 196/14
**growing [3]** 60/1 91/20 107/15
**grown [2]** 59/25 91/14
**grudge [3]** 61/13 61/16 63/4
**grudges [1]** 62/21
**guess [4]** 46/2 113/13 156/8 211/18
**guidance [5]** 68/10 68/13 83/21 83/25 247/23
**guide [1]** 168/18
**guidelines [2]** 173/9 173/9
**guiding [3]** 71/6 72/15 157/13

H

**habitual [1]** 193/13
**had [100]** 11/8 14/16 21/17 25/6 26/2 26/24 29/9 41/1 41/9 45/11 45/23 48/1 53/7 60/7 61/23 62/7 80/11 85/19 86/5 86/7 87/19 89/22 89/25 91/17 91/19 94/23 95/17 97/6 97/16 102/11 104/13 104/17 106/19 108/3 110/1 112/24 117/10 119/2 119/6 119/7 119/17 119/19 120/3 120/4 120/8 122/10 123/8 126/22 134/23 138/23 139/9 139/12 139/12 139/18 147/6 152/15 159/13 160/18 160/20 161/13 161/15 163/5 163/6 163/7 163/21 177/18 177/21 178/24 183/9 183/10 183/22 184/12 186/10 188/21 189/5 190/23 192/7 196/5 196/18 196/18 196/21 198/10 200/2 200/17 201/17 203/22 206/8 206/9 207/4 235/25 236/1 239/6 250/13 251/2 251/10 253/22 254/11 254/16 256/10 256/21
**hadn't [2]** 123/18 148/13
**half [6]** 34/3 64/2 99/24 99/25 169/22 178/11
**hall [1]** 178/17
**hand [108]** 12/19 12/20 30/14 31/6 31/10 32/16 32/16 32/18 32/22 33/6 33/20 33/20 34/9 37/11 37/14 38/16 39/20 39/25 40/6 40/19 41/1 41/5 41/9 41/18 41/19 50/4 50/17 50/19 51/4 51/6 51/10 54/25 74/20 74/21 75/9 75/10 76/22 76/23 77/24 83/24 90/24 108/7 129/10 131/16 137/20 142/12 144/18 146/5 146/7 146/10 146/12 146/18 147/1 147/6 147/11 148/4 148/5 149/5 172/23 173/1 173/6 173/14 173/19 173/22 173/25 174/14 174/18 174/20 175/3 175/5 175/11 175/16 175/20 187/7 189/15 191/22 220/12 220/15 220/24 221/2 223/24 225/1 225/11 226/8 227/22 228/24 232/18 232/20 232/24 233/3 233/5 233/17 233/22 234/9 236/3 236/19 238/9 238/12 239/7 239/13 239/24 244/4 244/9 246/9 250/21 251/2 251/4 251/12
**handful [2]** 93/13 198/5
**handle [3]** 156/24 163/23 199/19
**handles [1]** 20/21
**handling [1]** 208/7
**hands [10]** 39/3 39/13 76/24 174/13 174/17 187/7 239/12 239/17 239/21 251/6
**Hanlon [2]** 152/14 156/1
**happen [10]** 26/24 76/2 85/19 87/13 90/8 93/11 99/23 147/13 185/1 185/9
**happened [6]** 38/1 85/23 86/14 99/9 102/8 104/15
**happening [8]** 102/4 173/23 191/3 192/1 198/22 232/9 250/17 250/17
**happens [5]** 80/1 87/14 168/21 181/12 201/23
**happy [5]** 43/17 129/24 157/8 239/9 258/20
**harass [3]** 17/17 26/14 45/20
**hard [4]** 78/19 145/8 157/22 178/5
**harder [1]** 31/1
**harm [25]** 25/14 75/22 134/2 134/12 139/11 139/19 139/20 140/23 162/21 162/23 164/1 164/2 164/3 164/5 164/7 168/12 168/21 170/19 171/16 177/11 180/22 180/23 184/23 184/24 232/9
**harmed [5]** 139/5 140/21 163/5 177/12 201/20
**harmful [3]** 131/20 131/21 157/16
**harms [1]** 76/1
**has [144]** 3/17 4/13 9/18 11/16 11/20 12/20 21/11 22/14 24/12 27/5 28/18 30/5 32/3 35/23 36/20 37/9 38/4 38/15 49/20 57/16 64/8 66/1 68/17 68/23 69/2 69/4 70/2 70/17 73/5 77/10 78/3 80/4 82/1 85/14 85/19 87/19 88/17 90/1 90/2 91/14 91/16 91/16 92/13 92/24 93/24 94/12 95/7 96/20 99/11 100/1 105/10 105/13 105/18 108/20 110/20 115/15 118/10 123/4 123/22 124/6 124/17 125/5 125/10 125/14 125/16 125/17 127/1 132/14 134/4 134/7 134/8 134/9 135/4 135/5 135/6 135/18 137/11 138/3 138/13 139/4 139/11 139/20 139/22 140/2 140/17 140/21 141/18 141/25 142/1 143/10 145/4 147/19 152/16 155/21 157/8 158/15 170/19 172/16 175/5 178/25 181/21 182/19 186/3 186/16 189/16 189/20 189/21 189/23 193/22 194/24 200/20 200/24 201/1 201/15 202/10 205/16 208/22 213/1 220/8 224/6 224/9 225/21 227/14 227/20 228/9 228/13 228/17 228/20 230/19 230/21 233/8 235/5 237/1 237/8 239/18 239/20 239/23 245/16 248/5 248/9 248/19 254/13 255/13 255/14
**hasn't [1]** 229/8
**have [437]**
**have current [1]** 196/3

H
**have testimony [1]** 187/12
**haven't [11]** 143/18 148/12 152/8 183/17 200/10 203/5 233/10 233/11 233/13 233/18 251/25
**Havericak [2]** 163/5 242/1
**having [18]** 9/8 22/13 57/22 78/19 92/14 99/6 140/4 140/5 140/6 140/13 146/18 161/6 182/12 185/8 192/3 198/12 199/10 213/23
**HCA [5]** 44/15 44/25 61/18 62/15 63/1
**HCAP [3]** 140/6 152/11 152/15
**he [112]** 3/14 3/15 6/13 10/9 10/10 17/22 17/25 18/5 20/8 24/24 30/7 34/1 40/11 43/22 44/9 48/17 51/16 51/19 51/20 52/1 52/4 53/1 53/3 53/6 53/10 56/20 57/7 59/9 63/14 73/22 76/20 77/4 79/18 81/9 82/9 82/15 82/18 82/21 82/23 82/24 82/24 83/18 83/18 83/21 118/24 119/2 120/3 120/4 120/11 124/6 134/13 134/14 134/15 134/15 141/17 141/18 141/19 141/20 141/24 141/25 141/25 142/1 145/25 146/2 155/21 157/19 158/16 160/17 160/18 160/20 161/1 161/3 161/6 162/18 162/18 187/21 187/21 194/3 194/3 194/8 195/12 195/13 197/11 202/15 206/24 226/6 235/18 237/5 244/24 245/2 247/15 247/17 247/17 248/5 248/6 248/7 248/9 248/9 248/14 248/16 248/18 249/15 249/17 249/17 249/18 249/19 255/18 255/18 255/19 255/20 258/11 258/11
**he's [4]** 10/9 124/4 124/7 249/18
**head [3]** 120/3 224/16 237/23
**heading [2]** 12/23 104/4
**health [54]** 6/8 55/3 55/7 55/25 55/25 58/15 63/20 80/8 87/7 88/2 88/5 88/8 90/5 95/21 100/10 100/11 105/24 105/24 106/2 107/9 107/13 108/9 109/17 111/20 114/3 114/4 114/14 115/22 121/5 126/9 126/14 145/22 161/2 167/19 167/23 168/6 170/16 171/2 173/8 176/13 176/22 176/23 178/22 179/24 192/2 194/14 214/19 214/20 219/24 220/3 220/4 245/23 246/6 246/14
**Healthcare [1]** 119/21
**hear [11]** 102/1 102/3 129/6 131/22 161/18 166/13 191/23 191/24 198/21 212/7 218/18
**heard [55]** 16/20 32/21 33/2 33/15 33/25 34/3 36/18 45/6 51/13 62/5 89/19 92/15 100/25 [illegible] 101/23 101/24 102/4 104/13 104/17 106/8 108/16 110/6 120/9 123/11 123/12 128/20 131/23 134/17 134/23 135/15 138/3 139/6 139/7 141/14 148/17 148/20 152/14 154/24 155/8 158/15 159/15 159/17 160/10 160/11 163/12 175/2 179/1 197/10 209/23 221/22 222/7 224/20 237/2 240/11 256/5
**hearing [10]** 102/14 104/19 105/19 166/22 197/19 197/20 199/7 201/18 208/11 213/24
**hearings [2]** 3/3 66/24
**hearsay [13]** 13/25 17/9 18/3 18/7 20/1 25/8 25/21 43/17 44/1 113/18 117/4 120/5 155/5
**heart [1]** 98/21
**held [2]** 98/7 174/17
**help [16]** 55/23 91/11 91/11 91/23 108/22 109/17 109/18 110/15 115/2 137/20 142/2 172/5 178/3 178/12 178/20 192/13
**helped [1]** 89/12
**helpful [2]** 166/13 204/23
**helping [2]** 167/22 168/18
**hence [1]** 58/20
**her [20]** 6/14 35/13 62/11 113/11 113/11 114/7 114/19 128/25 129/1 132/7 156/24 161/25 163/6 167/24 187/11 187/18 200/15 201/4 214/8 222/9
**here [94]** 7/22 8/8 8/13 9/16 9/24 11/1 12/20 13/21 14/2 14/21 15/13 15/18 18/4 18/17 20/11 20/13 20/15 21/3 29/13 30/10 31/18 32/25 34/24 38/10 38/13 39/20 40/18 40/23 42/17 43/11 49/20 51/2 51/5 55/21 57/11 57/17 57/21 58/2 60/17 61/4 61/5 65/2 68/9 68/13 71/20 73/8 73/11 74/22 75/13 77/2 86/1 92/15 94/11 94/23 103/9 104/4 106/8 111/21 113/7 115/19 116/7 129/18 133/15 139/4 140/7 143/24 150/15 160/8 160/18 164/25 166/6 167/25 178/22 180/4 186/16 190/7 192/5 201/12 201/24 202/20 204/12 206/6 208/22 211/4 213/4 223/7 229/22 237/6 243/15 250/16 251/14 251/14 253/12 258/11
**Here's [1]** 106/3
**Hi [1]** 21/9
**hidden [1]** 145/11
**hide [3]** 35/21 145/8 246/14
**hides [1]** 140/17
**hiding [8]** 35/7 35/8 225/16 226/4 226/19 235/2 235/9 246/18
**high [15]** 80/23 98/7 109/4 149/1 167/13 175/19 178/7 198/1 198/14 [illegible] [illegible] 221/9 221/12 251/7 251/9
**higher [9]** 12/13 12/16 61/1 75/17 183/10 190/6 232/3 232/5 252/5
**highest [8]** 12/24 13/1 28/15 28/17 87/16 177/8 177/9 193/16
**highlight [3]** 48/2 71/20 94/24
**highlighted [6]** 12/20 20/25 30/16 32/9 40/16 79/20
**highlighting [1]** 55/22
**highlights [1]** 48/8
**highs [1]** 179/15
**hiking [1]** 158/20
**him [13]** 18/11 31/2 58/22 72/25 82/12 82/16 82/19 83/6 83/9 119/22 120/2 142/2 257/1
**himself [1]** 123/22
**hire [2]** 68/6 152/15
**hired [1]** 176/23
**hiring [1]** 224/17
**his [29]** 27/3 34/1 36/18 36/22 51/17 51/21 52/6 52/6 52/11 53/10 58/10 63/14 79/16 82/4 82/17 82/18 83/1 93/14 126/3 132/10 142/2 156/2 156/2 159/6 194/2 224/11 226/4 226/5 249/14
**historical [4]** 194/10 195/4 206/16 206/24
**history [5]** 21/21 61/25 167/9 180/17 187/21
**hold [6]** 9/3 48/16 48/16 61/13 61/16 93/18
**hole [1]** 53/10
**Holly [1]** 43/18
**home [1]** 25/19
**homeless [1]** 21/25
**hominem [1]** 129/17
**HON [1]** 2/8
**honestly [1]** 95/16
**honor [114]** 3/7 3/11 3/21 5/25 8/1 9/5 13/25 14/6 14/7 18/3 20/1 25/9 25/17 25/20 27/23 27/25 29/5 29/20 34/16 34/20 43/15 44/3 59/2 66/11 66/21 67/4 76/8 78/25 79/6 84/16 96/13 102/23 103/21 110/22 110/23 110/24 110/25 111/25 112/2 113/16 113/18 113/20 113/22 115/7 115/9 117/3 118/18 119/23 120/5 120/15 126/2 127/8 127/10 127/25 128/20 129/4 129/8 129/15 129/24 130/3 130/5 130/7 130/8 130/15 131/10 131/13 131/24 132/5 132/12 133/1 133/4 133/7 133/10 133/12 133/21 140/24 141/2 141/16 155/1 155/5 156/20 157/2 157/8 158/9 158/14 158/24 159/11 160/3 160/7 160/16 162/20 163/9 164/6 164/10 164/23 165/9 165/25 166/9 166/14 166/23 187/10

**H**

**honor... [13]** 191/17 199/23 207/19 221/7 223/10 224/11 226/8 231/6 240/3 251/17 258/3 258/15 258/23
**HONORABLE [1]** 1/11
**hope [2]** 193/3 235/16
**hoping [1]** 96/1
**Hopkins [4]** 3/15 3/16 8/20 120/3
**hopsital [1]** 19/25
**hospital [270]**
**hospital's [8]** 51/6 74/6 81/1 142/12 143/11 209/17 210/2 228/14
**hospital-acquired [3]** 85/10 85/13 85/22
**hospitals [437]**
**hospitals and [1]** 256/18
**hospitals' [5]** 29/15 111/15 140/14 157/19 228/18
**hospitalsafetygrade.org [3]** 7/1 116/8 124/15
**hospitalsafetygrades.org [1]** 109/23
**hospitalsafetyscore.org [1]** 116/8
**host [1]** 158/20
**hour [2]** 34/3 48/2
**hours [2]** 96/24 141/25
**House [1]** 97/22
**how [108]** 18/21 21/18 23/21 25/5 26/5 26/18 29/8 38/1 39/17 40/11 46/7 47/16 47/20 47/24 48/6 48/23 49/5 49/11 52/4 57/24 57/25 63/10 65/7 65/11 65/21 69/6 70/24 71/14 75/8 76/13 76/21 80/21 80/22 81/22 84/18 85/12 86/6 89/8 89/8 89/13 89/20 89/23 89/24 90/6 90/17 95/24 97/25 98/2 98/24 99/3 100/17 108/11 109/6 109/25 110/17 114/17 114/24 116/10 116/16 117/2 120/19 122/8 123/6 139/18 143/18 145/8 145/8 147/5 151/1 151/24 154/3 160/19 160/22 161/11 162/15 163/3 165/17 168/8 168/10 168/14 169/20 170/2 174/22 175/6 177/11 177/24 177/25 181/3 184/20 184/23 188/3 189/10 189/19 190/2 190/3 191/2 196/9 198/13 199/18 201/11 210/7 214/10 224/11 230/6 230/7 230/10 246/16 256/18
**Howard [1]** 87/5
**however [1]** 196/21
**HSC [1]** 247/1
**HSG [1]** 55/12
**HSS [1]** 161/15
**huge [1]** 140/20
**huh [1]** 53/12
**hum [5]** 45/8 55/6 59/23 171/23 232/20
**human [1]** 97/17
**Humana [5]** 56/8 163/9 219/18 219/20 220/1
**Humana's [1]** 55/21
**hundred [36]** 33/6 33/20 62/1 75/14 75/14 97/19 97/20 146/24 146/25 147/12 147/12 147/17 147/17 147/22 148/6 148/6 148/11 148/11 148/15 148/15 151/7 151/9 151/10 152/1 152/1 175/16 182/3 185/14 186/9 188/23 227/2 227/10 236/10 238/9 238/12 238/19
**hundreds [2]** 183/9 239/5
**hurt [1]** 156/13
**HVIDT [1]** 1/17
**hygiene [61]** 12/19 12/20 30/15 31/6 31/10 32/16 33/6 33/20 39/25 75/9 75/10 77/25 90/24 108/8 137/21 144/19 146/12 146/19 147/1 147/6 147/11 148/4 148/5 172/23 173/1 173/6 173/14 173/20 173/22 173/24 174/18 174/20 175/3 175/5 175/11 175/17 175/21 175/22 184/4 191/22 220/12 220/15 220/24 221/2 223/24 225/2 225/11 227/22 228/25 233/17 233/22 236/3 238/9 238/12 239/13 244/4 244/9 246/9 250/21 251/2 251/5
**hygiene opportunities [1]** 175/17

**I**

**I'm [23]** 6/12 17/5 28/25 38/22 41/24 44/4 44/6 46/9 48/15 48/15 64/7 66/19 68/12 94/23 95/18 101/18 102/17 112/4 131/7 207/2 242/10 243/18 249/20
**I've [1]** 221/22
**icon [2]** 77/21 77/23
**ICU [14]** 90/24 177/7 206/6 206/9 222/17 222/18 222/21 222/24 223/4 223/4 223/16 224/25 225/10 239/2
**idea [18]** 78/6 98/22 154/21 161/4 185/17 185/18 198/12 198/16 201/22 201/22 203/7 203/8 204/2 205/19 235/25 247/5 247/10 256/13
**ideas [3]** 77/5 77/11 248/9
**identical [3]** 198/14 198/17 246/17
**identification [1]** 29/1
**identified [2]** 20/23 128/7
**identify [1]** 29/6
**IL [1]** 2/5
**illustrate [1]** 13/9
**image [2]** 211/9 211/25
**imaging [1]** 207/7
**immediately [2]** 116/24 201/22
**immoral [2]** 133/23 134/6
**impact [7]** 73/13 156/15 157/18 160/24 177/11 254/16 254/17
**impacting [2]** 152/4 246/11
**impacts [1]** 201/1
**impeachment [4]** 6/2 6/13 8/1 9/5
**implement [2]** 167/22 214/22
**implemented [3]** 182/10 193/23 202/25
**implementing [1]** 167/13
**imply [1]** 106/11
**important [39]** 4/21 27/20 40/6 40/14 40/19 48/8 48/12 49/13 73/25 74/2 76/17 77/1 77/5 77/11 87/10 87/11 87/18 89/23 92/20 93/20 100/18 100/21 114/9 114/10 114/11 116/2 117/18 121/18 121/22 121/24 143/1 145/2 145/5 145/6 161/8 168/12 173/14 206/6 253/12
**impose [2]** 93/12 157/24
**impression [1]** 183/23
**impressions [1]** 157/21
**improper [1]** 6/12
**improve [1]** 40/4
**improvement [4]** 64/13 88/14 91/4 174/6
**improvements [1]** 87/20
**improving [4]** 88/24 92/6 100/4 108/2
**imputation [40]** 33/24 34/4 47/21 47/24 50/12 78/5 148/10 148/16 148/20 148/23 149/12 150/11 183/9 186/13 186/15 187/22 187/24 191/22 192/10 193/5 193/23 193/24 194/9 195/21 197/21 197/23 201/12 206/1 206/9 207/9 207/16 214/22 215/10 221/16 221/19 222/2 227/4 227/4 243/7 256/18
**impute [10]** 172/20 186/8 188/12 188/17 188/25 189/6 189/15 196/7 196/10 251/22
**imputed [16]** 30/14 31/18 32/10 34/2 37/18 74/12 172/15 194/21 198/11 226/16 236/16 251/6 251/8 252/8 253/10 255/3
**imputing [8]** 150/22 192/11 193/9 204/7 206/16 206/23 207/7 231/15
**in-custody [1]** 84/9
**inaccurate [2]** 215/11 256/8
**INC [2]** 1/5 155/2
**incentive [7]** 29/14 31/2 31/5 31/9 31/12 108/24 245/19
**incentives [1]** 109/18
**inception [3]** 170/25 185/19 186/17
**incidents [2]** 99/20 232/9
**inclined [1]** 166/9
**include [10]** 60/5 60/9 74/9 167/20 185/6 185/9 186/7 208/7 208/12 215/14
**included [5]** 47/1 60/17 206/7 225/4 254/5
**includes [12]** 5/5 7/1 64/14

I

**includes... [9]** 160/8 169/1 170/14 173/13 173/19 174/1 174/2 181/17 202/19
**including [13]** 11/22 13/2 14/5 61/7 135/12 171/2 173/10 173/18 178/15 197/12 210/20 213/18 254/8
**income [1]** 107/7
**incorporate [1]** 107/10
**incorporates [1]** 74/5
**incorrect [2]** 132/8 223/1
**increase [14]** 11/16 11/20 11/24 12/5 44/14 58/4 81/10 81/17 81/19 95/25 96/2 96/3 96/5 119/11
**increased [4]** 44/7 56/22 81/14 82/5
**increases [4]** 10/19 44/23 81/25 95/25
**increasing [2]** 195/1 257/5
**incredibly [3]** 141/19 208/23 225/14
**incremental [1]** 79/21
**independent [5]** 90/25 173/6 176/25 177/4 198/23
**independently [2]** 41/8 41/14
**indicate [3]** 163/10 197/17 250/21
**indicated [1]** 164/6
**indication [1]** 139/22
**indisputably [1]** 165/2
**individual [5]** 39/16 116/11 160/11 181/18 181/19
**individuals [4]** 87/1 135/9 159/4 163/13
**inductive [1]** 129/17
**industry [1]** 90/1
**infamous [1]** 176/1
**infection [7]** 100/5 152/17 173/11 173/15 189/3 189/5 189/8
**infections [14]** 85/10 85/14 85/22 89/24 99/21 139/8 140/6 173/16 184/25 185/24 188/21 188/25 189/11 240/17
**inference [6]** 35/2 35/13 37/23 38/3 38/10 38/13
**inference that [1]** 37/23
**inferring [1]** 35/19
**inflation [2]** 81/25 147/25
**inflicts [1]** 135/21
**influence [2]** 60/1 87/20
**inform [3]** 30/9 47/20 47/23
**information [62]** 7/13 8/20 10/24 11/1 54/10 69/23 73/2 74/15 77/12 89/22 93/11 94/13 95/1 117/12 122/4 122/9 122/12 122/18 140/5 145/22 161/4 161/5 172/9 178/4 189/1 189/16 189/18 190/13 191/10 220/7 220/24 221/2 225/22 225/25 229/8 229/10 231/1 231/1 231/16 232/13 232/14 232/19 232/25 233/2 233/4 233/8 233/11 233/13 233/15 233/15 233/18 233/19 233/20 234/6 234/22 238/16 243/2 243/3 250/13 250/20 251/3 251/20
**informative [1]** 155/4
**informed [6]** 46/22 47/25 73/12 127/19 174/6 180/23
**infrastructure [3]** 174/12 175/15 189/16
**infusion [1]** 189/21
**initial [1]** 214/14
**initially [1]** 113/19
**initiative [1]** 27/9
**injunction [1]** 165/4
**injunctive [2]** 133/16 164/24
**injure [3]** 8/18 8/25 9/13
**injuries [1]** 184/25
**injurious [1]** 133/24
**injury [4]** 135/22 135/22 154/14 164/21
**inpatient [1]** 170/16
**inside [1]** 122/18
**Insights [1]** 12/24
**instance [5]** 88/13 89/10 100/5 107/13 117/21
**instantly [1]** 201/10
**instead [7]** 26/11 50/19 150/21 161/17 195/14 241/13 241/14
**institutions [1]** 197/13
**instructed [2]** 131/3 131/5
**instrumental [1]** 86/15
**insurance [1]** 218/15
**insure [1]** 21/2
**insurer [1]** 219/22
**insurers [7]** 80/11 162/21 163/9 218/23 218/24 219/2 219/4
**integrity [1]** 221/9
**intellectual [2]** 80/16 184/19
**intellectuals [1]** 199/17
**intelligence [2]** 11/1 187/4
**intend [2]** 128/2 130/17
**intending [1]** 187/11
**intensive [1]** 214/25
**intent [3]** 4/15 94/7 134/14
**intention [2]** 43/5 43/6
**intentionally [1]** 21/2
**interact [1]** 126/15
**interacting [1]** 116/16
**interacts [1]** 75/25
**interchangeably [1]** 32/17
**interest [7]** 70/17 85/9 88/21 95/18 114/15 117/19 135/19
**interested [7]** 70/14 70/21 101/9 118/7 121/8 121/10 220/8
**interesting [2]** 212/9 214/18
**internally [2]** 110/4 247/21
**interned [1]** 21/22
**interpret [1]** 18/6
**interpretation [3]** 54/6 80/17 80/24
**interpreted [1]** 164/22
**interpreting [1]** 93/4
**interprets [1]** 81/9
**interview [2]** 130/10 132/9
**interviewed [1]** 104/6
**intimately [1]** 103/16
**introduce [2]** 3/8 176/8
**introduced [1]** 186/25
**introducing [1]** 3/8
**invest [1]** 119/18
**investigators [1]** 25/18
**investment [1]** 91/9
**involved [20]** 9/21 9/23 13/5 13/7 22/8 23/4 23/6 23/25 46/14 46/15 47/13 47/17 58/8 64/17 66/4 86/25 97/12 103/12 103/16 207/11
**involvement [1]** 22/20
**IPPS [1]** 240/15
**IPS [3]** 144/15 206/6 228/18
**irrelevant [1]** 130/3
**is [1198]**
**is annual [1]** 170/9
**is preferred [1]** 232/8
**is very [1]** 160/8
**isn't [20]** 31/14 31/15 31/16 31/21 47/19 53/19 61/9 67/24 106/14 126/18 144/13 163/18 204/16 220/11 236/6 236/19 237/7 237/15 237/22 242/24
**issue [17]** 25/12 25/13 29/13 73/5 77/8 97/22 128/4 128/5 130/9 130/22 136/20 139/24 170/12 195/9 200/2 201/5 206/24
**issued [3]** 44/10 71/25 170/10
**issues [12]** 46/15 48/3 85/22 89/23 103/18 130/3 130/5 134/18 156/1 156/2 173/4 219/24
**issues that [1]** 48/3
**it [711]**
**it in [2]** 66/18 244/20
**it just [1]** 252/15
**it's [21]** 15/20 22/14 25/20 31/12 33/24 38/11 48/18 53/20 54/16 71/16 96/25 101/21 112/11 129/16 130/1 131/23 145/16 151/20 153/21 211/19 216/12
**item [1]** 247/4
**items [1]** 247/2
**iterations [1]** 124/16
**its [28]** 5/13 19/4 22/15 25/11 54/4 56/24 80/2 87/4 92/10 92/17 99/7 105/2 117/17 118/11 124/16 157/10 158/6 170/25 186/17 209/17 209/19 209/21 209/24 210/20 216/22 221/20 233/9 240/25
**itself [6]** 37/17 69/4 71/1 92/8 138/9 209/16
**IVS [4]** 77/25 191/22 231/2 246/9

J

**January [2]** 1/9 259/9
**Jeannie [2]** 84/10 84/12
**JEFFREY [1]** 1/20
**job [15]** 22/10 31/1 61/12 89/24 91/22 108/7 108/14

J

**job... [8]** 184/18 188/2 189/12 189/13 191/4 197/22 199/19 199/20
**Johns [4]** 3/14 3/16 8/20 120/3
**Johnson [5]** 87/5 110/11 114/24 115/3 117/11
**join [1]** 167/24
**joint [6]** 96/14 96/15 96/17 127/12 220/16 220/18
**Journal [1]** 70/3
**journalist [1]** 118/2
**journey [2]** 36/25 64/13
**judge [5]** 1/12 84/3 106/24 181/1 193/22
**judgment [9]** 133/5 133/12 133/13 133/25 138/24 141/3 143/24 156/18 164/4
**July [5]** 29/4 30/2 59/1 59/11 71/12
**July 12 [1]** 59/1
**July 15 [1]** 30/2
**July 17 [1]** 71/12
**jumped [1]** 43/13
**June [5]** 24/22 25/2 32/3 32/6 150/7
**June 2024 [2]** 32/6 150/7
**June of [2]** 25/2 32/3
**Jupiter [29]** 3/21 4/3 4/14 6/1 8/22 9/18 12/11 13/11 18/6 20/15 20/20 21/8 28/1 45/7 108/16 136/25 138/3 138/4 139/16 139/17 152/3 161/16 161/22 162/2 162/19 163/15 212/12 212/16 218/1
**Jupiter's [1]** 152/10
**JURA [1]** 2/2
**just [107]** 8/16 9/5 11/22 12/17 13/8 14/12 14/15 14/16 17/5 17/17 20/10 21/10 21/20 24/1 25/24 26/14 26/18 27/3 29/2 30/20 33/25 34/2 42/3 44/14 45/16 45/20 48/4 48/9 51/9 52/3 52/3 52/11 53/23 54/24 55/21 60/21 69/7 70/20 71/22 85/1 85/25 87/17 89/18 89/20 89/20 89/24 93/8 93/9 95/24 96/11 98/24 99/17 99/23 101/2 101/7 101/12 103/4 103/14 104/3 104/10 106/15 106/23 110/4 110/9 110/23 111/17 116/4 116/21 126/8 132/13 134/7 140/10 144/6 144/10 144/14 145/22 146/9 148/14 152/20 152/25 153/9 156/13 158/23 163/17 174/9 181/22 183/23 189/17 190/25 194/13 197/23 199/25 206/13 212/12 215/21 220/14 223/12 227/3 227/5 228/8 233/22 235/7 239/8 250/21 251/13 252/15 252/20
**justifies [1]** 159/7
**JX [5]** 197/16 212/25 246/23 252/24 256/9

K

**K-12 [1]** 155/2
**Karen [3]** 3/21 87/23 175/25
**keep [8]** 79/3 101/3 145/7 168/16 193/2 194/16 194/16 247/5
**keeping [1]** 180/22
**keeps [1]** 62/21
**kept [2]** 73/22 204/6
**KEVIN [2]** 1/16 3/8
**key [2]** 12/17 48/3
**kids [1]** 196/21
**kill [3]** 8/18 8/25 9/13
**KIMBERLY [1]** 2/1
**kind [10]** 14/22 45/23 53/1 55/22 64/2 92/5 99/18 155/5 215/4 255/12
**kinds [8]** 76/25 91/10 96/18 100/2 102/3 173/16 181/4 201/1
**kit [2]** 107/22 138/15
**knew [7]** 17/16 27/22 39/19 82/15 141/7 185/22 186/4
**know [144]** 8/14 9/16 12/16 14/21 15/9 15/20 15/22 16/8 16/10 16/11 16/18 18/24 20/12 21/4 21/4 22/23 23/20 27/4 27/15 29/8 31/1 34/15 37/6 38/1 39/18 41/12 42/15 44/19 48/17 62/19 65/15 65/16 66/6 66/8 70/8 72/6 72/6 72/8 78/3 84/4 88/14 89/24 90/4 90/6 90/17 92/5 94/11 98/15 98/24 100/6 101/22 108/4 114/14 115/15 116/23 117/22 117/23 118/3 119/17 121/16 125/3 125/4 125/8 125/13 133/10 139/13 139/14 139/14 141/6 143/18 144/15 144/19 144/21 144/22 144/22 144/23 144/24 146/2 146/3 146/20 147/8 147/9 149/20 151/3 154/20 157/3 159/13 162/3 162/11 172/14 178/3 189/23 190/17 192/15 193/12 198/2 201/3 202/15 202/16 213/20 214/7 214/9 215/4 216/19 219/23 219/24 220/6 223/4 223/8 224/11 224/13 224/16 225/20 225/21 228/21 231/3 231/19 231/19 233/7 233/16 233/25 237/11 237/16 237/18 237/23 238/10 238/17 239/8 243/15 243/16 246/16 246/16 246/19 248/18 249/16 250/15 251/9 251/10 251/13 251/23 253/15 255/15 256/24 257/16
**knowing [2]** 39/16 227/18
**knowledge [7]** 44/1 81/20 81/21 212/20 212/21 234/17 234/23
**known [8]** 220/14 220/18 222/12 231/12 234/12 238/18 248/16 251/23
**knows [2]** 64/11 133/21

L

**label [1]** 15/10
**lacerations [1]** 139/8
**lack [5]** 43/17 44/1 90/9 143/11 145/19
**lacks [1]** 25/21
**lagging [3]** 242/20 242/20 242/21
**laid [3]** 70/6 71/16 71/21
**language [22]** 38/7 38/9 38/11 54/12 54/14 54/17 58/17 58/18 60/10 69/2 83/6 122/15 122/17 122/21 123/4 123/10 123/11 124/2 125/10 199/14 229/24 250/8
**large [13]** 71/19 71/23 147/13 147/14 188/6 188/21 189/8 192/2 206/3 206/4 206/12 207/5 207/6
**largely [2]** 246/10 246/16
**larger [2]** 91/16 197/11
**largest [4]** 53/20 53/20 53/21 56/9
**last [24]** 7/20 8/6 11/25 12/6 30/14 33/2 45/11 90/13 92/15 96/14 156/22 164/14 174/15 178/21 192/20 194/9 214/19 233/24 233/25 238/1 247/9 248/7 250/2 257/6
**late [2]** 187/16 258/14
**later [4]** 85/23 98/12 240/25 258/22
**launch [3]** 99/9 103/18 104/16
**launched [6]** 46/16 101/25 102/22 104/10 110/3 185/13
**Lauren [8]** 10/3 23/8 24/19 43/18 127/15 128/24 132/2 132/25
**law [12]** 6/18 130/25 130/25 131/1 132/22 133/6 133/22 135/20 136/12 164/15 164/19 164/21
**laws [2]** 47/1 119/9
**lawsuit [7]** 13/6 45/6 45/11 118/10 118/10 118/14 128/22
**lawyer [1]** 95/17
**lawyering [1]** 95/17
**lawyers [1]** 131/22
**lay [3]** 70/13 103/1 114/13
**lays [1]** 110/24
**lead [4]** 3/15 21/13 129/25 130/22
**leader [6]** 88/7 120/20 120/20 120/24 121/1 126/11
**leaders [4]** 88/8 178/19 197/20 197/20
**leadership [2]** 90/7 125/25
**leading [5]** 76/9 78/18 79/3 118/20 184/17
**League [1]** 100/11
**Leah [17]** 15/8 15/13 23/10 28/2 43/19 62/21 62/24 112/10 167/14 167/17 170/4 176/10 193/18 204/1 210/16 224/20 247/20
**leapfrog [353]**

L

**Leapfrog and [1]** 147/20
**Leapfrog for [1]** 75/15
**Leapfrog's [59]** 4/4 4/7 4/14 4/21 5/2 5/9 5/12 9/25 13/5 19/18 26/6 36/3 36/10 46/5 46/8 47/5 47/7 47/8 47/20 47/23 51/16 54/6 54/21 54/25 56/16 57/2 57/5 57/9 58/25 59/11 59/25 63/23 64/6 65/3 68/10 68/10 68/13 68/14 75/12 80/16 85/11 86/17 98/21 99/14 128/22 134/24 145/1 155/18 157/12 157/24 158/3 158/4 158/6 159/3 216/15 217/1 217/9 217/10 238/20
**Leapfroghospitalsafetygrade.org [1]** 64/1
**Leapfrogs' [1]** 36/4
**learned [3]** 100/16 228/22 241/3
**least [18]** 12/13 19/8 30/5 55/1 60/11 63/18 69/2 70/4 103/13 141/14 146/1 192/5 210/1 215/16 228/17 234/14 241/12 257/16
**leave [3]** 151/22 161/22 207/20
**led [3]** 102/9 176/23 254/22
**LEE [1]** 1/17
**left [9]** 50/20 51/11 54/25 125/14 139/16 156/3 160/11 162/24 206/8
**left-hand [1]** 54/25
**legislature [1]** 164/13
**lengthy [3]** 94/3 201/15 210/11
**less [7]** 42/18 96/25 165/20 171/6 172/20 196/12 252/15
**let [16]** 23/19 31/23 38/25 48/22 63/25 68/21 69/8 76/20 83/5 92/22 98/15 103/4 151/17 168/2 215/4 230/3
**let's [59]** 3/2 3/6 4/12 9/17 9/24 13/10 18/25 32/2 32/16 34/8 34/22 34/23 36/9 37/7 40/9 41/20 42/6 43/11 45/9 49/17 52/18 53/13 53/23 54/20 54/21 56/12 63/8 64/20 65/17 66/9 66/24 69/13 72/9 79/21 90/25 98/10 125/4 129/6 132/11 132/24 147/5 151/7 158/20 169/25 187/19 196/20 211/15 213/6 214/18 217/7 220/21 222/1 222/19 223/6 223/12 223/14 246/23 248/4 251/18
**letter [9]** 101/6 101/7 116/10 162/5 162/9 162/10 172/4 181/7 183/21
**letters [5]** 126/14 126/18 126/21 129/23 163/10
**letting [1]** 201/2
**level [15]** 56/21 58/3 97/23 98/7 110/17 117/13 131/17 143/13 143/22 147/8 147/20 150/18 163/9 225/15 225/24
**levels [3]** 40/1 115/22 146/10
**liability [1]** 186/3
**liaison [1]** 64/7
**Libertta [1]** 88/8
**license [13]** 54/6 55/10 80/15 80/24 107/9 208/25 210/2 210/7 211/7 211/14 211/18 211/20 217/23
**licensed [2]** 190/11 212/13
**licenses [5]** 55/16 55/16 209/15 209/19 209/21
**licensing [24]** 5/7 5/9 53/19 53/21 53/24 53/25 54/5 54/21 54/23 55/1 55/7 56/21 57/5 57/10 57/15 80/8 81/18 105/15 105/19 105/21 208/9 208/15 210/25 211/12
**licensure [5]** 109/11 109/13 208/7 208/12 211/13
**Lider [1]** 175/25
**lies [2]** 128/7 132/21
**life [1]** 87/17
**light [6]** 26/2 26/6 63/23 136/9 157/4 163/7
**light of [1]** 136/9
**like [76]** 3/7 5/25 8/2 19/23 32/18 34/15 34/18 39/20 43/9 43/16 45/22 46/1 52/5 56/9 64/1 64/23 65/20 76/21 77/23 77/24 80/2 82/16 85/22 86/24 88/8 89/24 90/19 90/25 98/6 99/22 101/6 101/7 101/16 101/19 102/2 106/2 106/12 109/8 109/17 109/19 128/13 129/2 132/15 133/5 133/9 144/14 148/5 152/20 156/10 156/24 158/23 158/23 159/9 159/11 166/16 170/15 171/3 172/3 172/4 177/7 177/12 179/11 184/24 188/20 189/17 198/11 206/14 207/20 220/6 230/6 231/4 231/5 238/8 238/25 246/7 254/2
**likelihood [2]** 164/3 164/5
**likely [8]** 141/4 141/6 141/21 154/14 157/17 157/20 159/4 159/5
**limine [2]** 130/6 130/8
**limited [31]** 4/10 6/24 9/20 35/1 79/8 125/10 143/18 146/10 175/9 175/20 175/21 176/6 184/6 190/4 194/24 198/20 207/7 216/14 216/18 216/19 222/24 226/22 227/16 231/1 234/1 234/4 235/19 237/1 237/8 237/20 256/6
**line [12]** 8/6 8/7 38/5 46/2 55/21 95/4 119/10 179/14 188/20 189/4 189/8 247/9
**lines [5]** 9/11 188/22 188/23 189/1 189/9
**linked [1]** 125/14
**list [3]** 76/25 206/7 213/3
**listed [4]** 20/15 20/22 40/23 40/24
**listen [1]** 221/5
**listening [2]** 68/17 220/19
**lists [2]** 4/20 109/8
**literacy [10]** 112/13 115/22 124/10 124/14 124/18 124/24 125/6 125/11 125/15 126/23
**literally [3]** 22/10 76/7 211/9
**literature [3]** 144/16 161/2 189/24
**litigation [13]** 69/10 72/17 95/15 101/22 101/24 102/14 122/21 123/15 123/18 124/21 124/22 142/1 255/2
**little [15]** 21/10 26/5 29/3 30/2 56/6 86/4 87/22 89/18 95/22 95/24 106/22 106/23 116/4 117/15 180/3
**live [5]** 159/5 197/4 197/5 200/13 220/4
**lives [3]** 218/14 218/15 223/9
**living [1]** 255/18
**LLP [3]** 1/18 1/21 2/3
**load [1]** 112/13
**located [1]** 121/9
**locking [1]** 67/6
**log [1]** 146/13
**logging [1]** 148/5
**logo [18]** 107/17 107/18 107/18 107/23 137/23 138/1 138/7 138/12 138/17 208/25 210/7 210/24 210/24 211/2 211/20 211/22 212/13 217/23
**logos [6]** 106/1 136/15 209/19 209/21 211/7 211/13
**long [15]** 4/14 4/21 5/12 63/24 70/9 84/18 86/1 123/6 145/2 154/3 157/20 174/22 235/25 236/1 253/15
**long-term [1]** 157/20
**longer [2]** 62/2 166/2
**Longmore [14]** 10/7 10/16 13/23 14/2 14/12 14/16 15/8 16/25 17/7 17/21 18/4 18/7 19/21 24/20
**Longmore's [2]** 20/2 24/23
**longstanding [1]** 164/17
**look [39]** 9/17 9/24 13/8 13/10 21/1 29/12 30/8 36/9 44/12 45/9 45/12 54/20 55/10 63/8 72/10 74/8 74/19 79/13 93/8 121/11 122/17 136/21 136/23 142/18 145/15 147/5 148/1 150/23 152/9 154/24 155/7 166/21 211/20 214/18 220/11 245/23 248/4 248/4 254/2
**looked [10]** 65/22 145/21 155/4 164/12 179/8 183/7 183/11 196/13 200/10 237/10
**looking [8]** 10/2 54/24 67/9 111/9 116/21 134/2 134/16 256/18
**looks [4]** 56/8 64/23 65/20 66/3
**loop [1]** 60/21
**Loren [1]** 258/14
**lose [3]** 53/13 79/21 198/18

L

**losing [1]** 249/20
**loss [1]** 156/15
**lost [1]** 193/19
**lot [57]** 17/4 27/7 40/1 62/7 68/20 77/21 86/14 89/10 90/12 90/12 91/25 92/2 92/13 96/12 96/14 97/14 100/16 104/13 107/9 108/7 109/1 109/2 109/3 109/7 109/7 110/13 110/14 116/18 116/20 118/5 119/17 128/21 129/13 135/16 138/5 151/6 160/10 169/9 170/12 173/4 174/18 174/19 175/2 177/13 195/3 210/11 212/1 212/23 217/1 217/10 219/17 232/14 238/24 238/25 239/3 240/11 244/23
**lots [5]** 40/1 76/2 96/19 140/2 172/1
**love [4]** 17/21 174/22 197/5 197/7
**low [15]** 7/24 8/10 58/6 58/12 58/17 100/5 124/10 124/14 124/23 125/6 125/11 125/15 126/23 173/5 225/14
**lower [2]** 31/18 246/2
**lowered [2]** 257/14 257/20
**lowering [1]** 252/8
**lowers [1]** 32/10
**lowest [17]** 30/14 31/6 31/10 36/6 37/13 37/16 38/22 39/1 42/23 51/4 144/12 145/9 147/4 150/18 151/4 197/2 251/22
**lows [1]** 179/15
**lunch [1]** 3/5
**luncheon [1]** 84/13

M

**made [35]** 14/1 43/3 63/18 63/22 64/17 68/19 69/9 75/24 81/6 90/7 98/10 118/11 120/21 128/6 130/10 135/16 144/7 144/10 144/11 145/22 145/24 158/7 160/13 160/16 180/7 183/8 185/21 186/6 193/18 205/22 210/23 221/24 224/17 251/8 255/14
**magnitude [1]** 26/23
**main [1]** 176/21
**Maine [5]** 100/14 100/15 167/8 167/10 167/15
**major [8]** 31/2 31/5 31/9 31/12 46/22 86/18 97/22 172/17
**majority [1]** 74/18
**make [51]** 24/4 27/21 29/3 31/1 36/25 52/2 53/7 63/19 76/19 78/17 86/10 86/20 88/22 92/22 92/24 93/1 93/3 93/8 99/3 99/6 106/25 109/1 109/3 109/7 110/1 117/22 121/17 128/2 131/8 133/5 138/8 145/23 147/5 147/7 169/24 172/15 174/2 178/3 178/6 179/5 179/12 180/23 186/19 192/24 195/6 199/21 205/11 208/10 223/3 229/22 235/18
**makers [2]** 86/24 98/6
**makes [6]** 39/10 54/4 152/11 152/12 159/1 170/8
**making [13]** 66/4 86/11 98/4 121/14 130/7 144/13 160/18 162/14 173/17 174/15 221/23 226/17 247/22
**MALONEY [18]** 1/15 128/7 129/2 129/13 129/15 129/17 129/20 129/22 130/11 131/4 132/9 208/1 252/20 253/20 255/17 255/20 256/10 257/15
**Maloney showed [1]** 256/10
**Maloney's [3]** 130/4 132/1 132/6
**manage [1]** 85/4
**manager [1]** 34/13
**managers [2]** 53/14 79/22
**manages [1]** 19/18
**mandatory [4]** 85/21 99/3 99/5 99/8
**manipulate [1]** 106/9
**manipulated [1]** 106/4
**manner [5]** 54/11 95/1 95/8 157/16 187/16
**many [31]** 23/21 50/16 57/24 81/22 85/14 86/9 88/20 90/17 92/3 92/4 106/19 123/25 150/9 160/22 163/18 165/17 168/22 169/20 177/11 180/19 182/16 190/2 190/3 210/18 215/24 230/6 230/7 230/10 238/25 255/7 257/20
**March [2]** 54/24 211/16
**MARCUS [2]** 1/20 1/21
**mark [8]** 49/20 49/23 50/6 50/15 50/17 51/10 77/19 77/23
**marked [4]** 28/25 72/24 110/20 165/14
**market [8]** 57/25 98/10 98/23 99/2 108/2 108/9 108/11 155/13
**marketed [2]** 57/7 57/23
**marketplace [2]** 98/2 98/5
**marketplace so [1]** 98/2
**markets [1]** 11/12
**marks [1]** 17/14
**Marriott [1]** 86/24
**Marshals [1]** 84/9
**MARY [7]** 1/15 21/23 128/7 129/1 129/12 129/15 208/1
**Mary's [5]** 136/6 232/12 232/12 233/8 233/17
**Maryland [3]** 176/24 220/4 220/5
**massaging [1]** 153/10
**materials [4]** 127/5 178/9 208/14 208/21
**maternity [7]** 170/15 176/18 176/20 176/21 185/5 185/6 216/12
**math [2]** 193/1 205/9
**mathematical [2]** 249/22 257/23
**Matt [23]** 3/14 120/3 178/16 193/4 193/4 193/21 194/6 202/15 205/1 207/11 243/16 243/19 246/24 246/25 247/8 247/13 247/15 247/20 247/25 256/10 256/20 256/25 258/13
**Matt's [2]** 120/4 120/8
**matter [13]** 18/5 20/3 133/6 133/12 159/16 162/17 166/3 187/2 199/3 210/14 227/8 227/23 259/7
**maximize [2]** 56/20 209/10
**maximized [1]** 208/24
**maximum [1]** 173/3
**MAXWELL [1]** 2/2
**may [31]** 3/24 9/6 13/24 19/22 24/22 25/1 28/5 30/16 39/2 45/11 78/16 93/7 94/25 121/16 124/2 127/25 128/1 130/10 132/17 141/8 155/6 184/18 189/5 199/19 202/23 207/21 210/4 210/6 212/25 223/20 229/16
**maybe [14]** 34/3 45/18 66/11 78/22 96/24 96/24 102/1 136/15 138/3 145/21 158/23 212/25 237/5 258/25
**Mayo [1]** 152/7
**McCauley [1]** 136/5
**me [59]** 6/19 8/13 20/25 25/7 25/7 25/24 31/23 38/25 46/22 47/18 48/22 57/19 59/21 63/25 69/8 83/5 87/10 87/11 87/18 93/19 94/24 103/4 113/14 119/11 120/8 128/7 129/7 142/9 145/8 151/17 153/9 156/21 158/23 166/16 167/24 168/2 172/5 176/8 184/12 191/23 197/16 200/23 201/3 208/18 211/10 214/4 215/4 217/6 220/13 223/8 227/17 229/4 229/11 230/3 231/23 240/1 240/4 247/20 258/9
**mean [38]** 6/16 8/12 13/7 20/7 20/16 20/17 22/10 24/8 39/8 75/10 90/1 95/16 98/19 131/19 134/19 134/22 146/25 147/22 149/1 152/13 158/24 162/9 164/22 181/2 181/15 188/12 191/9 196/8 196/15 196/17 196/22 197/24 200/18 202/7 206/17 207/4 229/7 235/10
**means [19]** 74/3 99/5 147/14 150/2 150/17 158/11 158/25 182/5 182/21 182/23 196/5 196/8 200/21 200/22 200/23 204/8 213/20 234/1 234/4
**meant [7]** 24/6 32/1 50/9 70/13 70/15 71/2 134/15
**measure [66]** 33/7 40/2 40/23 40/24 49/20 49/23 50/13 74/4 75/1 75/15 76/6 78/1 98/17 141/20 144/15 144/22 147/10 157/10 165/17 173/1 177/10 178/15 181/6 181/19 182/14 182/16 182/19 186/5 186/7

M

**measure... [37]** 186/9 188/4 188/7 188/14 189/6 229/12 229/13 229/16 229/17 229/18 229/18 229/19 229/21 229/23 229/24 230/22 231/11 231/22 232/4 232/5 232/7 232/10 235/16 235/21 235/23 236/2 236/4 236/6 236/12 236/21 238/6 238/6 239/15 249/6 249/10 249/11 254/22
**measurement [8]** 134/16 135/11 148/22 165/11 187/6 187/6 188/16 246/17
**measurements [1]** 137/17
**measures [128]** 31/19 32/10 35/3 40/14 40/18 50/1 69/21 70/25 71/19 71/24 74/1 74/5 74/10 74/13 74/17 74/19 75/13 76/17 77/1 77/22 77/23 77/24 78/1 78/2 78/2 78/2 78/4 78/5 79/9 86/3 89/6 90/14 99/18 100/1 134/21 135/17 140/14 144/7 144/7 146/2 153/6 153/16 154/4 165/12 166/6 170/14 170/18 171/16 172/6 172/15 172/17 172/19 176/12 176/17 176/18 176/20 177/7 177/13 179/9 180/20 181/4 181/17 181/18 182/17 182/22 182/23 183/18 184/3 185/21 185/22 185/23 186/1 186/7 186/10 186/11 186/23 187/24 188/5 188/19 188/24 189/19 195/21 198/5 206/7 206/19 221/14 221/14 222/8 222/10 222/11 225/4 225/12 226/23 229/3 229/10 229/14 229/17 229/19 229/23 229/25 230/4 230/13 230/15 230/16 230/18 230/25 231/14 231/16 231/20 231/22 231/24 232/2 232/13 238/4 244/4 247/19 249/1 249/5 254/4 254/7 254/8 254/13 254/16 255/3 255/7 257/15 257/24 257/25
**measuring [3]** 157/13 228/14 228/24
**mechanisms [2]** 100/2 100/6
**med [1]** 155/25
**media [19]** 10/16 11/2 11/11 12/12 23/16 23/17 23/24 25/4 45/6 102/9 112/12 112/21 117/17 117/21 118/1 118/8 128/22 212/17 256/5
**Medicaid [2]** 69/22 74/18
**medical [14]** 1/4 32/19 32/22 36/13 49/18 97/20 117/12 139/19 143/21 160/12 161/16 162/24 168/13 193/19
**Medicare [4]** 69/22 74/18 220/2 240/12
**medication [11]** 75/23 75/25 76/1 190/10 190/19 224/1 224/12 225/2 225/11 227/10 234/23
**meditations [6]** 74/23 79/12 190/3 190/3 190/12 191/1
**medicine [1]** 144/17
**Medistar [1]** 179/24
**meet [2]** 75/12 133/18
**meeting [21]** 13/19 24/9 26/10 80/22 101/17 155/25 184/24 186/5 195/6 195/7 197/4 198/8 198/22 199/25 203/13 205/9 205/16 244/18 245/1 245/11 245/12
**meetings [3]** 26/8 107/5 245/10
**meets [1]** 108/1
**Megaphone [5]** 19/13 19/15 27/10 27/11 27/13
**MELISSA [2]** 166/25 167/1
**member [7]** 40/25 51/16 121/1 193/19 247/15 247/17 248/14
**members [22]** 47/20 47/23 48/1 48/7 48/9 48/11 48/24 49/5 49/12 73/9 88/5 88/10 88/11 90/20 90/22 90/23 98/19 197/9 197/12 218/21 247/14 256/21
**memo [7]** 57/8 58/25 59/9 59/14 60/11 125/18 125/23
**memorialized [1]** 46/25
**memory [2]** 214/10 254/11
**men [1]** 219/17
**mention [1]** 186/24
**mentioned [6]** 6/24 12/18 158/16 178/11 181/16 226/5
**mentor [3]** 129/19 130/10 131/4
**merely [3]** 128/10 158/17 165/1
**merits [1]** 132/4
**message [12]** 8/8 8/13 9/16 12/18 26/13 26/15 45/20 45/21 62/15 62/18 62/19 168/14
**messaged [1]** 13/17
**messages [3]** 24/18 26/9 26/11
**messaging [14]** 13/12 13/22 22/17 22/20 22/22 22/23 22/25 23/4 23/7 27/7 62/9 62/14 112/12 112/21
**met [8]** 80/25 157/7 167/16 191/25 204/15 208/1 254/4 254/6
**method [1]** 7/22
**methodologies [1]** 186/13
**methodology [121]** 29/13 30/10 31/25 44/21 46/12 46/13 46/15 46/16 46/21 47/4 47/5 47/12 47/14 47/16 47/21 47/24 48/7 48/13 48/24 49/5 49/11 49/13 51/21 52/11 62/15 70/2 70/6 70/11 70/19 70/23 71/1 73/3 73/6 73/9 73/12 79/11 100/25 118/15 123/14 123/21 124/23 124/25 125/13 134/17 135/2 135/10 135/13 135/15 135/18 141/9 142/19 142/25 145/1 148/16 149/12 150/7 150/9 150/11 150/19 153/5 153/6 154/3 154/5 154/21 157/13 158/3 158/7 159/7 159/9 160/18 160/23 177/1 177/18 181/5 181/20 186/22 187/14 191/19 192/10 194/17 194/23 195/10 197/21 198/24 200/19 200/20 201/23 202/2 202/25 203/3 205/21 206/9 207/17 212/24 214/12 222/2 223/18 223/22 227/1 236/4 236/14 236/25 237/13 238/5 238/22 238/23 239/6 240/2 243/23 243/24 245/14 246/1 250/2 251/20 252/11 252/13 252/14 252/21 253/16 253/22 254/1
**methods [4]** 148/23 225/6 255/7 256/19
**metric [3]** 33/6 50/11 51/9
**metrics [1]** 142/18
**Meyers [1]** 1/21
**Miami [1]** 1/23
**microphone [1]** 9/3
**mid [1]** 208/17
**middle [1]** 230/7
**MIDDLEBROOKS [3]** 1/3 1/11 2/8
**might [17]** 9/20 93/10 116/23 152/2 152/22 158/18 164/6 166/2 173/23 180/11 180/25 185/9 188/23 204/23 211/4 218/25 250/17
**military [4]** 219/13 219/15 219/19 220/1
**million [4]** 12/3 64/2 106/25 107/2
**millions [1]** 63/19
**mind [10]** 83/23 132/14 157/8 162/19 193/2 195/1 201/8 201/10 207/15 226/8
**mine [1]** 154/17
**minimum [3]** 79/4 173/3 185/25
**minute [3]** 48/16 66/24 168/2
**minutes [8]** 3/17 3/18 66/12 127/17 127/20 240/5 245/11 245/13
**mischaracterizes [1]** 34/16
**misheard [1]** 235/21
**misinterpretation [1]** 93/2
**mislead [1]** 141/4
**misleading [4]** 193/15 201/19 201/21 252/13
**misled [1]** 141/6
**missing [23]** 71/19 71/23 144/25 146/3 166/5 166/6 185/17 186/5 186/9 186/14 188/4 188/11 188/12 189/17 219/7 228/17 229/2 229/2 229/8 229/13 229/17 230/16 235/12
**missingness [4]** 144/21 147/8 185/22 226/1
**mission [31]** 19/4 19/6 21/17 22/12 22/15 23/18 23/19 24/14 24/17 26/2 26/6 27/7 27/18 27/19 80/3 80/5 82/12 82/23 86/17 86/19 87/9 96/5

**M**

**mission... [9]** 108/1 109/2 134/5 156/6 168/2 168/8 168/10 168/12 168/20
**Missy [2]** 103/9 166/23
**mistakes [4]** 92/22 92/24 92/24 93/2
**Moddy [6]** 93/18 94/24 95/23 105/1 106/3 106/15
**model [8]** 56/24 58/14 166/1 193/23 193/24 197/23 215/10 246/7
**moderate [5]** 197/6 206/2 206/4 206/12 206/20
**Moman [1]** 246/6
**moment [4]** 29/2 36/19 67/24 110/23
**money [10]** 109/1 109/3 109/7 109/7 109/10 110/14 111/18 114/24 135/3 211/6
**money that [1]** 109/10
**monitoring [7]** 86/9 173/21 174/2 174/2 174/3 175/13 193/12
**Montgomery [4]** 32/21 33/2 33/15 159/8
**month [8]** 20/17 27/6 146/13 175/11 175/17 242/2 242/2 242/7
**monthly [4]** 101/6 179/13 179/17 179/20
**months [3]** 141/8 242/19 243/2
**morally [1]** 199/6
**more [48]** 5/12 5/16 6/10 6/24 8/12 9/20 12/18 14/15 18/15 36/18 47/17 53/7 57/1 57/2 57/4 57/4 57/9 57/10 57/14 57/22 61/1 65/10 65/11 66/12 75/19 96/3 96/24 119/19 121/5 127/8 156/23 166/5 174/11 178/6 178/7 181/12 182/6 182/21 182/23 192/11 196/12 211/4 215/14 237/20 240/5 242/5 243/3 252/15
**morning [10]** 3/11 3/12 4/3 21/8 28/8 28/9 72/22 258/12 258/25 259/3
**Moskowitz [1]** 2/3
**most [22]** 4/20 40/3 40/6 40/14 40/18 55/11 56/23 58/4 74/17 75/23 76/17 77/5 77/11 91/21 96/20 115/21 120/23 120/24 152/18 157/4 187/3 255/19
**mostly [3]** 57/23 100/10 167/19
**mother [1]** 87/11
**motion [9]** 130/6 130/8 133/5 133/13 138/24 138/24 141/3 166/10 166/12
**move [19]** 14/7 21/1 29/20 66/9 79/4 84/10 110/12 117/3 162/1 187/21 191/19 203/24 205/19 210/14 212/9 220/22 233/25 251/16 252/3
**moved [3]** 157/2 162/3 255/16
**movement [2]** 97/17 98/13
**moving [7]** 16/20 30/20 140/25 164/23 201/14 201/16 254/3
**MR [73]** 3/24 4/12 4/14 10/16 13/23 14/12 14/16 15/8 16/24 17/7 17/21 18/4 18/7 19/15 19/21 20/2 22/18 24/3 24/18 26/14 26/25 28/5 30/5 30/9 32/15 52/24 53/13 57/10 57/17 58/2 72/23 72/23 73/18 75/5 76/16 77/2 78/7 79/20 80/7 81/9 81/12 81/13 82/3 83/2 93/14 93/18 93/25 94/5 94/23 94/24 95/4 95/23 104/8 105/1 106/3 106/15 109/9 118/24 124/12 126/8 126/22 127/11 152/14 156/1 194/2 195/9 236/1 236/15 243/20 244/21 246/6 247/18 248/3
**Ms [134]** 4/3 6/1 8/22 9/18 10/15 10/23 12/11 13/11 13/23 14/12 14/16 15/2 15/4 15/7 15/13 15/17 15/25 16/2 16/6 16/21 16/24 17/2 17/16 18/6 18/16 20/15 20/20 21/8 28/1 28/8 29/13 33/2 33/15 34/23 35/19 36/12 39/19 41/23 45/7 54/25 57/25 58/9 58/23 59/7 62/10 62/10 62/13 63/17 64/5 65/13 66/14 67/6 69/8 72/13 72/22 84/2 84/18 102/17 103/4 108/16 111/2 112/9 112/17 113/17 115/14 120/18 120/19 120/25 122/1 123/10 124/10 125/2 125/19 126/8 127/11 128/10 128/21 129/17 129/20 129/22 130/4 130/11 130/11 131/4 131/25 132/4 132/6 132/9 132/24 135/7 136/5 137/24 140/3 143/3 157/25 158/5 159/8 161/11 163/5 167/4 169/17 177/20 180/17 194/18 199/25 200/2 204/25 205/13 207/10 207/15 207/24 212/3 212/19 213/1 213/18 213/21 213/24 213/25 214/15 215/12 218/17 222/7 222/13 224/20 226/6 226/11 242/1 247/25 252/20 253/20 255/17 255/20 256/10 257/15
**Mt [1]** 214/19
**much [25]** 3/10 39/17 45/4 75/17 77/12 95/22 95/23 104/17 105/1 114/14 138/20 142/17 143/23 143/23 156/23 171/1 171/8 179/17 185/3 197/11 221/5 239/1 242/5 242/18 242/21
**multi [1]** 167/18
**multi-year [1]** 167/18
**multifactor [1]** 182/20
**multiple [5]** 21/13 74/1 127/22 128/14 186/13
**Museum [1]** 21/25
**must [11]** 133/16 135/21 136/13 155/7 175/11 187/2 225/16 226/3 226/19 235/7 252/4
**my [87]** 3/8 3/22 4/10 9/8 21/15 22/10 37/3 39/9 43/17 43/23 44/4 44/6 44/12 50/14 58/9 61/12 66/18 72/18 81/20 84/3 85/4 89/5 96/1 100/11 104/12 119/7 119/8 119/9 119/16 128/14 128/15 129/19 129/19 130/9 131/4 131/25 132/1 132/9 132/19 156/8 156/20 158/1 166/16 167/10 183/8 186/25 187/1 192/23 193/3 194/20 195/11 195/20 195/25 197/16 201/10 205/9 208/11 209/23 210/4 210/7 210/13 213/23 213/24 214/3 214/20 217/7 220/19 220/23 221/2 224/16 225/8 225/8 225/18 227/7 228/7 231/2 233/25 235/14 237/23 242/15 244/17 247/18 249/14 253/21 254/7 254/11 256/25
**myself [5]** 46/10 176/8 176/10 186/25 193/7
**myth [1]** 183/25

**N**

**NA [7]** 50/22 165/14 230/1 230/16 249/9 249/21 249/24
**name [12]** 51/17 113/7 116/9 124/16 129/25 130/22 130/22 132/1 132/19 132/22 244/23 249/15
**named [2]** 225/4 225/6
**namely [1]** 161/8
**narrative [1]** 115/14
**narrow [1]** 170/19
**nasal [1]** 187/6
**Nate [5]** 10/7 14/1 20/7 24/20 24/23
**national [12]** 69/21 100/11 152/18 173/7 173/10 176/24 181/9 187/6 192/2 194/14 236/22 241/4
**nationally [3]** 97/14 97/21 233/6
**nationwide [1]** 183/11
**nature [8]** 135/12 144/6 181/13 182/13 183/16 223/11 257/6 257/19
**nauseam [1]** 257/25
**navigability [1]** 111/14
**necessarily [2]** 7/18 248/4
**necessary [5]** 26/22 47/14 100/6 131/15 184/14
**need [17]** 18/15 84/10 87/14 88/23 98/25 131/8 137/20 164/7 164/25 193/2 193/7 193/8 193/11 214/23 221/12 247/9 248/3
**needed [9]** 48/2 98/1 100/2 110/12 129/2 156/22 162/18 167/17 191/21
**needs [7]** 5/16 6/10 66/23 139/24 139/25 155/4 163/14
**negative [9]** 27/17 152/13

**N**

**negative... [7]** 157/20 157/21 163/7 163/7 248/19 253/2 254/11
**negatively [2]** 157/18 246/11
**neglect [2]** 167/10 167/16
**Net [1]** 55/25
**network's [1]** 167/22
**never [27]** 23/1 26/24 45/23 57/7 57/23 64/11 82/1 82/16 85/18 102/8 104/23 108/3 108/9 108/23 109/3 118/1 118/12 136/19 149/24 184/2 190/20 218/19 221/22 237/10 245/16 252/5 256/2
**new [27]** 47/23 48/1 48/6 48/7 48/9 48/11 48/24 48/24 49/5 49/11 68/21 83/19 83/19 97/18 100/13 100/15 135/14 169/5 173/18 178/18 194/23 208/2 208/18 214/20 240/2 251/20 254/3
**new step [1]** 135/14
**news [7]** 40/3 101/6 106/2 192/1 192/17 193/7 209/1
**newsletter [1]** 202/10
**newsletters [1]** 202/8
**next [13]** 28/2 58/24 71/4 105/11 106/3 127/15 138/13 147/8 151/9 182/1 185/2 215/3 246/7
**NHSN [4]** 240/17 240/23 241/4 241/13
**Nicholson [6]** 135/1 148/18 155/20 157/12 237/3 237/4
**night [2]** 156/22 259/2
**nine [10]** 127/12 134/1 149/20 150/8 150/12 172/16 230/19 230/22 230/24 230/25
**no [206]** 1/3 5/18 5/19 5/20 5/24 7/18 18/1 20/11 20/12 20/16 22/5 22/10 22/22 24/1 27/23 27/25 31/16 34/12 35/18 38/7 38/13 39/3 39/13 39/16 39/21 39/24 41/3 43/2 43/5 43/25 44/17 47/15 50/17 54/2 54/2 54/16 57/13 59/8 61/15 61/17 62/2 66/5 67/18 68/15 71/25 72/12 73/7 74/7 75/1 75/17 81/2 81/4 81/25 82/16 84/1 84/25 86/4 89/22 95/9 96/3 96/21 98/15 98/15 103/23 104/23 104/25 105/12 106/10 106/11 108/6 108/8 108/23 109/15 112/2 115/9 116/8 118/22 119/6 120/12 120/13 124/6 124/20 125/2 125/16 126/2 127/8 134/4 134/14 134/23 135/1 135/5 135/18 136/4 136/19 138/9 139/4 139/11 139/11 139/20 139/22 140/10 140/17 140/21 142/9 143/7 144/3 144/14 145/13 145/16 146/6 146/6 148/1 150/1 150/8 150/15 151/15 151/20 151/20 153/7 153/11 154/10 154/21 154/21 154/23 155/5 155/19 155/22 156/4 156/11 157/5 158/15 160/16 161/19 166/1 171/15 171/25 172/9 174/22 177/21 178/25 184/5 184/5 184/5 184/5 184/19 185/12 185/16 186/23 187/7 190/23 191/5 195/2 195/20 198/7 198/12 199/3 203/5 204/14 204/18 206/2 206/4 206/11 206/13 207/18 207/19 212/19 212/21 218/3 226/24 227/6 227/16 228/9 228/13 228/20 231/1 231/9 231/9 231/11 231/16 232/5 234/8 234/22 235/25 236/4 236/18 236/25 237/7 238/6 238/7 238/16 239/13 241/10 242/15 244/15 244/17 244/20 245/8 245/12 248/24 250/13 250/20 250/22 251/2 251/20 258/3 258/7
**no evidence [1]** 140/17
**Noah [1]** 19/13
**Noble [1]** 214/19
**Nobody [1]** 102/7
**non [30]** 19/4 19/7 19/13 19/15 21/11 21/21 27/11 27/13 35/2 35/7 36/8 52/2 58/19 73/13 87/3 107/1 107/3 107/6 123/24 135/5 146/24 149/6 152/12 158/14 158/17 159/6 168/11 181/9 198/17 227/13
**non-for-profit [1]** 21/21
**non-participating [2]** 73/13 227/13
**non-profit [11]** 19/4 19/7 19/13 19/15 21/11 27/11 27/13 87/3 107/1 107/3 168/11
**non-reporting [4]** 123/24 152/12 181/9 198/17
**non-responding [2]** 135/5 146/24
**non-response [5]** 36/8 149/6 158/14 158/17 159/6
**none [4]** 135/2 154/22 224/25 225/9
**nonparticipants [3]** 157/14 248/6 248/11
**nonparticipating [24]** 134/20 134/24 148/25 153/24 221/25 223/14 225/14 228/8 228/13 228/23 234/16 237/13 237/19 242/12 242/13 244/12 249/1 250/9 251/3 251/21 251/24 252/5 255/11 256/22
**nonparticipation [2]** 79/9 157/24
**nonrandom [1]** 235/12
**nonrespondents [1]** 158/25
**nonresponsive [1]** 251/16
**nonteaching [1]** 196/12
**normal [1]** 205/23
**normally [2]** 45/22 145/20
**norms [1]** 130/24
**North [1]** 56/3
**not [379]**
**not-for-profit [2]** 21/23 22/7 24/14
**not-for-profits [4]** 21/14 21/16 22/3 22/11
**notable [1]** 184/25
**Note [1]** 206/6
**noted [1]** 155/5
**notes [1]** 155/25
**nothing [16]** 15/20 24/12 86/5 86/6 86/8 89/25 108/6 108/6 138/22 142/20 155/8 161/21 194/24 239/18 239/20 239/23
**notice [1]** 161/21
**noticed [1]** 95/15
**notified [2]** 62/2 127/22
**November [5]** 10/2 65/22 115/16 150/8 202/25
**November 15th [1]** 115/16
**November 2024 [1]** 150/8
**now [78]** 4/12 4/14 4/23 5/11 6/23 8/17 10/9 15/7 16/20 19/11 19/21 30/17 36/12 44/14 45/5 45/10 46/4 47/13 51/13 52/10 52/15 52/19 54/24 56/14 58/23 61/8 63/8 63/17 64/1 65/24 66/16 66/22 67/16 72/4 72/11 74/13 83/19 84/8 86/2 87/13 87/13 94/22 106/14 108/5 120/18 122/1 122/24 123/20 124/2 124/15 125/18 125/21 128/9 130/14 133/1 145/12 147/9 149/1 172/16 184/17 187/22 199/1 208/21 217/3 220/9 227/14 230/19 232/20 235/14 236/3 236/18 238/12 239/3 243/6 249/25 251/22 258/17 258/20
**nowhere [2]** 37/19 37/22
**nuance [1]** 144/2
**number [41]** 12/24 34/11 35/16 35/18 37/9 37/19 37/22 38/3 44/12 55/11 70/8 71/19 71/23 75/5 81/10 81/24 82/1 91/20 93/19 112/3 113/21 113/22 116/19 117/21 125/8 159/18 160/9 161/10 188/20 188/25 189/1 189/11 189/15 197/16 203/18 236/5 248/9 249/4 254/10 254/12 256/17
**numbers [6]** 44/15 90/18 147/21 152/8 158/11 244/18
**numerical [10]** 75/2 175/21 176/15 177/1 177/5 177/15 181/6 181/21 181/21 239/18
**numerous [2]** 187/3 187/5
**nurse [3]** 155/14 254/3 254/14
**nurses [2]** 174/16 174/21
**nursing [6]** 100/11 100/12 254/13 254/15 254/19 254/21
**NW [1]** 1/18

**O**

**o'clock [1]** 66/25
**oath [3]** 136/6 228/3 228/5
**object [7]** 6/12 13/25 18/6 59/2 113/18 150/2 223/10

O


**objected [2]** 18/4 43/16
**objecting [1]** 187/17
**objection [44]** 14/3 14/9 16/5 17/9 20/1 25/8 25/16 25/20 25/21 29/5 29/7 29/17 29/18 29/22 34/15 34/16 39/4 43/25 44/4 59/3 59/4 63/5 78/18 78/21 102/23 103/23 110/21 112/2 113/15 113/21 113/23 115/7 115/9 117/3 118/18 119/23 120/5 129/4 131/8 139/6 213/15 221/7 231/6 240/3
**objections [4]** 14/4 29/6 43/17 150/8
**objective [2]** 4/24 248/10
**objectives [5]** 5/22 6/7 6/10 6/17 6/18
**observations [3]** 146/13 147/15 175/11
**observed [1]** 117/7
**observer [2]** 187/12 243/20
**observing [2]** 173/22 174/8
**obtains [1]** 242/15
**obviously [1]** 200/18
**occasionally [1]** 164/13
**occasions [1]** 127/22
**occur [2]** 163/24 187/7
**occurred [2]** 177/20 243/24
**occurring [3]** 25/1 89/9 168/22
**occurs [2]** 90/14 191/19
**October [3]** 113/1 113/2 115/16
**October 15th [1]** 113/1
**October 2014 [1]** 113/2
**of ratings [1]** 203/2
**of top [1]** 107/18
**off [8]** 182/3 190/18 190/21 190/22 214/15 224/16 237/23 240/9
**offends [2]** 133/22 134/6
**offense [1]** 54/16
**offer [4]** 91/11 91/11 178/10 214/23
**offered [1]** 201/14
**offering [2]** 178/12 201/11
**officer [1]** 28/16
**Official [2]** 2/7 259/10
**often [7]** 13/13 13/17 39/17 88/13 172/1 246/8 255/10
**Oh [6]** 30/17 48/20 54/13 63/24 118/14 187/21
**okay [93]** 3/1 7/19 8/17 9/24 12/17 13/2 13/8 14/22 15/2 15/22 16/3 17/13 17/19 18/12 18/25 30/12 32/2 32/14 32/19 32/20 33/15 36/11 36/23 37/7 39/8 41/18 46/18 47/3 47/13 47/19 48/6 48/10 49/4 49/9 52/6 52/18 53/3 53/17 54/8 57/4 57/9 58/5 58/14 58/19 60/18 61/4 61/8 61/18 62/9 62/21 64/8 65/1 65/17 65/23 66/4 66/23 67/2 68/7 72/9 74/22 81/3 84/14 99/11 104/12 104/19 111/12 119/25 121/7 122/14 125/4 126/2 133/1 166/8 166/21 170/1 175/2 195/16 199/22 208/20 210/14 210/23 211/2 212/22 219/2 221/16 227/13 232/11 235/22 237/19 237/24 238/8 248/19 248/25
**old [8]** 46/2 111/7 179/24 192/16 193/5 193/9 243/2 249/14
**old health [1]** 179/24
**older [2]** 169/7 194/21
**on-site [8]** 67/24 68/1 68/4 179/23 225/5 255/4 255/5 255/8
**once [8]** 51/5 93/5 96/25 110/24 170/9 170/21 202/17 242/17
**one [146]** 12/17 12/19 13/1 18/18 22/6 24/13 30/8 32/18 34/22 39/3 39/13 40/6 40/8 42/18 44/2 44/24 46/15 50/1 53/18 53/20 60/23 62/4 63/18 64/1 64/11 64/20 70/1 71/18 74/7 74/20 83/24 85/8 90/2 94/5 96/20 99/19 106/4 110/23 116/19 117/22 120/24 127/10 128/23 128/23 130/13 132/5 133/22 133/23 136/4 139/24 146/1 151/18 151/18 152/11 152/16 154/10 154/11 155/22 159/3 159/3 159/8 161/14 163/23 169/15 173/17 174/11 174/11 174/12 174/15 175/10 175/16 176/8 178/1 178/3 178/10 178/10 178/20 178/20 178/21 178/21 178/22 178/22 182/10 182/25 184/12 185/12 186/3 188/9 190/7 190/23 192/1 192/5 192/22 194/9 194/20 195/12 195/20 195/21 196/14 196/21 197/4 197/6 197/11 197/17 197/23 198/2 198/21 200/2 200/8 200/13 201/3 201/20 203/10 203/20 203/22 204/6 204/6 204/16 204/17 204/19 205/11 206/1 206/16 206/18 206/21 206/23 208/21 215/14 216/5 226/5 226/15 226/24 226/25 230/8 232/15 235/1 238/5 239/5 242/1 247/14 253/9 253/12 254/11 255/18 256/23 258/15
**ones [10]** 20/23 44/2 44/16 55/4 138/5 153/18 165/13 165/14 214/2 247/25
**online [5]** 10/20 11/7 11/15 179/10 184/4
**only [67]** 14/1 20/21 20/23 31/12 44/2 46/15 47/13 67/11 73/12 81/25 97/3 107/18 109/4 109/13 122/20 124/7 129/16 129/18 130/23 135/16 136/1 136/20 138/12 139/24 141/13 141/17 141/20 142/21 153/2 153/8 153/21 158/14 158/21 159/13 159/25 160/22 164/24 169/12 169/14 171/9 171/10 172/11 172/18 172/20 174/21 175/9 182/4 188/23 190/6 191/7 191/9 195/11 197/9 198/5 199/5 204/7 204/17 221/24 224/10 232/23 232/24 233/4 233/20 233/23 242/16 253/2 254/22
**only generates [1]** 171/9
**open [9]** 97/17 98/1 98/10 98/23 99/2 142/3 247/4 256/12 256/16
**opened [1]** 142/5
**opening [5]** 128/6 129/23 130/23 131/25 132/19
**opens [1]** 140/8
**operate [5]** 61/20 178/12 222/18 223/4 223/4
**operating [3]** 53/1 156/2 251/5
**operation [2]** 47/7 102/2
**operational [1]** 47/5
**operations [4]** 47/6 47/8 85/5 117/24
**opinion [3]** 22/14 27/16 180/6
**opinions [2]** 142/3 247/5
**opportunities [3]** 175/10 175/17 177/12
**opportunity [5]** 128/16 132/13 132/17 195/14 197/14
**opposed [1]** 142/7
**opposing [4]** 3/17 129/25 131/20 253/11
**opposite [6]** 109/1 116/23 134/8 142/9 143/3 257/23
**oppressive [2]** 133/24 134/6
**opt [4]** 214/23 215/16 215/21 246/21
**opting [1]** 215/23
**option [4]** 166/10 175/16 214/23 215/23
**options [3]** 206/2 206/4 215/14
**Orchestra [1]** 21/24
**order [37]** 5/15 5/15 5/22 6/7 6/9 6/17 24/15 42/25 43/16 74/15 74/23 75/19 75/22 117/25 133/12 133/15 133/25 135/20 136/12 144/18 156/18 164/4 171/15 182/18 189/21 189/25 190/2 190/11 190/19 204/9 208/2 210/2 223/21 225/1 225/10 234/21 235/6
**ordered [4]** 76/4 137/13 190/3 190/4
**orders [3]** 75/23 190/10 190/14
**organic [1]** 199/16
**organization [8]** 22/9 85/6 85/7 95/11 97/11 120/20 173/9 208/25
**organizational [3]** 60/6 60/9 60/23
**organizations [6]** 95/20 105/25 109/5 173/10 202/9

O

**organizations... [1]** 209/21
**orient [2]** 85/25 206/13
**orientation [8]** 47/22 47/25 48/9 49/1 49/3 49/15 49/16 178/10
**orienting [1]** 24/25
**original [3]** 67/14 104/16 209/20
**originally [2]** 53/8 236/13
**ORs [1]** 192/18
**orthopedic [1]** 161/15
**other [82]** 20/15 20/16 20/23 35/3 42/9 42/10 59/19 66/24 69/23 74/15 74/20 76/25 77/23 77/24 78/2 83/25 85/12 88/11 91/7 96/17 96/21 99/20 99/25 104/7 105/24 107/17 109/4 109/15 118/9 118/10 124/4 124/4 129/23 131/16 132/9 132/14 132/16 139/24 149/14 149/14 151/3 151/18 152/24 153/12 157/9 161/10 166/10 167/20 173/9 175/16 178/5 187/5 188/17 192/13 192/18 195/14 196/13 197/12 197/13 198/22 202/8 203/17 208/6 211/6 212/4 214/16 220/3 225/6 226/24 227/16 227/19 229/9 229/14 229/19 230/10 232/14 235/2 240/1 253/22 255/1 255/7 257/25
**others [11]** 20/11 20/12 50/4 106/5 107/10 118/6 119/10 128/21 142/13 198/4 220/15
**otherwise [4]** 30/24 68/2 198/25 220/21
**ought [1]** 166/17
**our [104]** 13/1 19/6 20/11 22/12 23/8 23/13 23/19 24/9 24/17 24/24 25/18 26/10 27/7 29/7 30/24 32/18 42/20 56/23 57/16 58/24 60/1 61/9 65/15 66/7 66/10 66/14 66/19 66/24 67/11 69/12 76/2 78/1 80/17 80/24 80/24 80/25 82/12 84/10 85/11 86/19 86/20 87/17 87/17 91/21 92/3 92/7 93/2 95/19 95/21 98/6 98/8 98/9 98/19 101/8 101/10 101/16 107/2 107/4 107/9 107/10 107/16 108/1 110/6 110/7 110/16 119/18 122/19 127/5 127/23 128/15 133/1 139/6 142/4 149/4 155/16 155/17 168/20 168/23 168/25 169/2 169/3 173/6 178/19 180/1 181/19 182/4 184/15 187/8 190/1 192/10 199/20 202/20 203/25 209/4 217/12 217/13 220/24 225/25 227/3 239/9 239/13 247/20 251/14 254/15
**ourselves [1]** 129/3
**out [93]** 11/1 22/25 23/5 26/2 26/9 27/12 30/12 30/20 30/21 45/20 53/11 57/8 61/4 65/11 65/19 68/4 68/7 70/16 71/13 71/16 71/21 75/14 77/4 78/19 85/5 92/6 92/11 94/6 95/4 96/19 97/16 101/3 107/11 112/18 116/15 119/6 119/7 119/22 120/2 120/9 126/15 133/12 133/21 137/20 146/25 147/12 147/17 148/6 148/11 148/15 149/16 150/16 151/16 152/1 154/15 155/23 165/12 176/14 177/24 183/24 184/1 184/24 192/19 193/3 197/19 197/22 197/22 199/7 199/20 201/5 202/3 202/8 202/9 202/17 202/22 205/19 207/14 213/9 214/23 215/5 215/16 215/21 215/23 227/1 227/10 237/2 237/9 237/14 245/17 246/21 254/9 257/15 257/22
**outcome [14]** 139/15 139/18 140/14 183/19 185/22 185/23 186/6 186/9 187/24 188/19 189/6 230/15 232/8 249/11
**outcomes [4]** 99/20 99/20 157/15 254/18
**outline [1]** 175/12
**outpatient [3]** 168/22 170/16 172/17
**outrageous [1]** 129/9
**outside [2]** 219/9 233/11
**outstanding [2]** 127/14 169/7
**outweigh [2]** 74/8 140/12
**outweighed [2]** 135/22 139/25
**outweighs [1]** 140/22
**over [21]** 4/17 14/9 29/22 36/23 49/20 49/23 50/17 59/25 72/23 90/12 91/14 92/14 95/16 95/17 98/8 100/8 113/23 114/3 138/3 139/6 192/21
**overall [4]** 4/8 6/23 181/20 181/21
**overcome [2]** 26/11 157/22
**overhaul [1]** 166/1
**overrule [5]** 14/3 25/16 29/17 78/21 131/7
**overruled [13]** 6/15 16/7 17/10 18/8 20/4 25/22 34/18 39/5 113/21 117/5 118/21 120/1 120/7
**oversee [6]** 90/23 168/25 169/14 172/23 178/12 179/4
**oversight [1]** 247/16
**overview [3]** 48/2 102/18 119/8
**overwhelming [2]** 254/10 254/12
**own [20]** 34/13 45/19 58/5 58/9 63/9 87/8 96/13 102/10 107/11 107/15 110/6 123/16 131/8 135/1 166/4 171/13 182/19 183/4 198/15 216/22

P

**package [2]** 60/12 61/4
**packet [1]** 48/1
**page [56]** 4/23 5/11 8/6 8/7 9/11 10/15 12/24 15/17 16/20 19/21 21/2 30/8 36/9 37/10 40/11 41/23 43/11 49/17 49/19 56/19 56/19 64/20 65/1 68/23 69/18 70/1 70/6 70/8 71/1 73/17 73/20 76/13 83/9 97/18 104/3 115/19 125/13 127/12 134/1 137/16 140/19 143/9 145/14 160/23 205/11 209/4 209/8 211/19 213/3 215/3 215/3 215/8 245/23 246/7 247/8 250/1
**pages [5]** 6/6 6/6 70/14 70/21 137/10
**pages where [1]** 137/10
**paid [4]** 102/8 105/15 108/9 139/13
**PALM [3]** 1/2 1/8 2/7
**panel [100]** 36/7 51/16 71/14 72/15 76/5 78/5 80/19 88/25 89/2 89/4 89/5 90/20 90/22 90/23 91/1 127/4 127/6 135/10 135/12 145/4 145/4 147/8 147/15 147/20 148/2 149/21 149/25 150/4 150/6 150/13 158/5 172/7 173/7 176/25 177/4 177/14 177/16 184/15 186/19 186/21 186/23 187/8 187/12 189/5 189/19 191/21 193/8 193/17 193/21 193/22 193/25 194/19 194/25 195/7 197/10 197/11 198/14 199/19 201/7 201/12 201/15 202/13 203/13 204/7 204/14 204/15 205/9 205/16 205/16 205/23 207/14 207/16 236/11 236/23 236/23 243/9 243/11 243/16 243/19 244/9 244/21 244/24 245/1 245/21 247/2 247/14 247/15 248/14 248/16 249/7 252/9 252/10 254/5 254/6 254/15 254/18 254/19 254/22 256/21 257/3
**panel's [5]** 71/6 225/25 243/13 247/23 248/1
**panelist [5]** 58/5 58/10 63/10 123/16 123/22
**panelists [1]** 134/10
**panels [10]** 90/12 90/14 90/17 90/25 127/1 187/2 187/3 187/8 187/11 187/18
**paper [1]** 25/5
**paragraph [5]** 59/24 69/20 76/21 116/5 248/8
**paragraphs [1]** 94/3
**part [43]** 9/16 21/17 30/16 40/11 40/16 41/19 41/20 55/11 57/19 62/19 65/13 65/18 68/17 69/13 78/20 78/20 79/20 81/9 86/19 86/20 87/25 94/16 100/14 103/13 113/19 123/15 124/19 124/21 124/22 124/25 125/23 152/18 171/12 181/16 186/16 194/8 209/16 217/4 218/15 220/10 226/16 241/3 247/4
**participant [1]** 187/1
**participants [1]** 91/20

P


**participate [41]** 5/13 24/15 41/16 43/4 44/13 44/25 50/7 52/7 54/1 54/9 62/3 78/13 81/24 93/21 101/20 105/3 106/9 118/16 126/19 136/16 141/11 149/4 170/24 171/18 172/10 183/1 183/14 216/6 221/20 222/16 222/20 222/23 238/15 240/12 241/7 243/4 246/15 249/18 249/19 250/3 255/21
**participate in [1]** 240/12
**participated [6]** 33/3 57/1 61/25 187/3 187/5 237/25
**participates [1]** 241/8
**participating [36]** 13/19 14/19 15/5 35/2 35/7 52/2 58/19 61/11 61/14 61/23 73/13 105/6 140/18 146/19 147/4 147/6 147/9 147/23 150/22 150/23 153/25 176/9 187/8 225/16 226/3 227/13 228/18 236/25 237/7 237/21 237/24 240/16 240/21 242/11 242/21 250/23
**participation [33]** 24/6 24/10 24/11 24/12 29/16 43/7 43/13 44/7 44/9 44/20 44/24 45/2 56/21 58/3 58/6 58/11 58/16 62/1 62/4 78/10 81/14 81/17 82/5 91/13 91/16 95/25 96/2 96/4 96/6 158/8 185/15 240/15 257/5
**participation to [1]** 96/2
**particular [14]** 13/2 13/6 37/10 47/11 50/11 51/23 67/17 73/19 78/1 121/2 122/14 144/5 172/2 247/21
**partly [1]** 226/2
**partner [2]** 128/8 128/14
**partnership [2]** 169/3 169/5
**party [1]** 158/20
**pass [3]** 21/5 72/19 107/15
**passed [1]** 141/16
**past [7]** 59/25 85/19 189/22 195/23 205/21 214/16 256/21
**pat [3]** 108/4 123/16 123/22
**patient [77]** 23/20 23/24 24/16 27/8 42/24 67/22 70/3 74/5 74/9 75/22 76/1 76/4 83/19 88/24 88/25 89/2 89/4 89/5 89/11 89/12 97/15 97/17 97/21 98/13 98/14 98/17 99/4 107/8 108/5 111/4 114/15 121/8 127/4 135/11 138/19 139/21 140/4 141/4 148/4 153/17 156/6 157/15 161/13 162/20 162/23 162/24 163/12 163/22 164/1 172/6 172/16 173/24 177/11 177/11 180/20 181/5 184/18 184/20 185/2 185/3 185/5 185/8 185/11 186/2 187/4 190/14 192/4 192/4 193/17 215/11 217/17 218/7 218/9 218/10 250/17 254/17 254/17
**patient's [1]** 89/8
**patients [66]** 27/21 67/10 68/9 68/13 68/24 89/8 89/14 89/15 97/25 101/4 116/11 126/20 127/2 127/2 136/1 137/9 139/3 139/12 139/19 140/12 141/7 141/20 141/21 147/3 148/8 154/19 154/20 156/5 156/7 156/8 159/16 159/18 160/1 160/10 160/25 162/21 163/4 163/18 167/12 168/12 174/16 174/23 174/24 177/11 180/10 180/10 180/21 190/9 190/12 191/3 192/14 192/24 193/2 193/6 193/15 193/16 201/19 201/20 217/17 218/5 218/21 218/25 219/9 232/9 251/14 251/15
**patients' [3]** 87/20 108/3 157/16
**Patrick [13]** 51/15 51/17 51/18 52/10 58/5 63/9 181/17 195/6 197/10 204/5 206/23 235/11 235/12
**Patrick's [1]** 123/17
**pattern [1]** 129/21
**Paul [4]** 29/10 29/11 30/3 30/9
**Pauline [4]** 2/7 166/18 253/25 259/10
**pause [1]** 48/17
**pay [16]** 92/10 101/21 102/1 123/11 123/24 130/7 130/14 137/12 137/24 138/20 139/12 139/17 164/9 164/11 193/16 211/6
**payment [2]** 6/9 113/4
**payments [1]** 109/18
**pays [2]** 102/7 108/9
**pediatric [5]** 171/2 171/14 172/1 172/3 172/8
**peer [4]** 70/3 158/3 161/1 243/14
**peers [2]** 41/13 204/9
**penalize [5]** 61/12 134/24 214/24 245/24 248/6
**penalized [3]** 61/10 62/15 134/16
**penalizing [15]** 58/19 61/8 62/16 157/14 245/17 247/1 247/3 247/10 247/13 248/10 248/17 256/11 256/11 257/2 257/4
**penalty [14]** 37/20 51/19 51/20 51/22 52/1 52/7 78/8 78/16 123/24 146/1 157/24 246/25 248/19 248/22
**people [53]** 11/8 12/3 14/5 24/1 26/19 27/9 39/17 39/25 40/3 42/12 45/19 63/19 67/11 67/19 83/11 84/9 85/19 88/22 92/22 92/23 97/19 97/20 98/6 98/23 100/15 100/15 110/16 114/13 117/2 136/14 136/16 139/7 142/5 145/15 156/10 158/19 158/19 158/21 158/22 160/18 160/23 169/18 170/20 174/2 174/13 180/10 180/11
162/13 185/1 215/21 218/25 239/19 239/20
**per [12]** 29/6 43/16 60/2 106/25 119/6 133/25 146/13 146/13 175/11 175/11 175/17 175/17
**perceive [1]** 160/19
**perceived [2]** 56/22 58/4
**percent [31]** 11/16 11/20 11/24 12/5 42/7 42/13 42/18 42/19 43/7 43/14 44/8 44/9 60/2 60/15 60/19 62/1 81/14 81/14 81/18 142/21 145/15 151/9 151/10 152/12 168/21 172/20 183/18 185/14 239/11 239/16 258/1
**percentage [6]** 42/17 61/1 172/14 172/22 239/19 239/20
**percentages [2]** 42/17 44/18
**perception [2]** 141/18 154/22
**perceptions [2]** 157/18 157/21
**perfect [5]** 54/8 152/21 181/22 183/19 208/4
**perfection [1]** 208/6
**perfectly [1]** 134/20
**perform [8]** 22/12 70/25 75/19 80/21 112/11 175/11 183/21 185/6
**performance [34]** 35/8 35/21 38/4 38/11 38/13 38/14 40/2 51/4 69/21 71/19 71/24 88/16 100/4 109/8 113/1 119/8 119/8 174/18 176/14 177/2 177/15 182/17 184/3 196/17 221/17 221/20 227/14 227/21 228/9 228/14 228/24 229/6 236/13 236/22
**performed [2]** 35/3 112/17
**performers [3]** 37/23 109/5 159/1
**performing [2]** 134/20 196/22
**performs [1]** 75/9
**perhaps [1]** 159/8
**period [10]** 42/24 44/21 113/1 119/12 169/3 191/24 202/1 238/21 242/9 246/10
**permission [1]** 9/8
**permitted [1]** 34/19
**person [8]** 70/13 71/2 77/4 77/10 151/18 151/19 174/8 251/5
**personally [4]** 87/10 132/19 183/7 213/8
**personnel [1]** 70/16
**perspective [7]** 85/11 85/13 89/8 89/13 168/9 198/15 199/6
**pertaining [1]** 94/14
**pertains [1]** 112/13
**Peter [1]** 51/13
**Philadelphia [1]** 171/3
**phon [2]** 207/13 244/24
**phone [1]** 243/21
**photos [1]** 192/18
**phrase [1]** 77/4
**physical [2]** 173/19 174/1
**physically [1]** 200/22

P

physician [16] 75/22 76/3 90/24 144/18 155/15 222/17 222/21 222/24 223/16 223/21 225/1 225/1 225/10 225/10 235/6 239/2
physicians [1] 161/13
pick [2] 143/5 153/18
picked [1] 12/18
pickups [2] 10/21 12/2
picture [2] 74/8 74/11
piece [2] 203/10 220/20
pieces [1] 64/2
Piedmont [2] 246/6 246/14
Piembros [1] 207/13
Pierce [1] 2/7
Pineiro [1] 1/21
pitch [1] 23/16
pitching [1] 23/17
pivoted [1] 116/5
placards [1] 137/1
place [29] 27/14 75/16 78/3 84/22 84/24 92/25 97/6 98/8 100/2 100/6 117/7 141/9 144/17 144/17 144/18 150/7 150/11 178/25 179/19 189/4 193/10 193/10 200/4 201/24 206/10 215/12 220/16 239/2 239/3
placed [2] 189/8 189/9
placement [1] 253/14
placements [7] 10/20 10/21 11/11 11/19 11/22 11/23 11/24
Plaintiff [16] 42/13 45/5 136/21 156/25 157/4 157/18 159/2 159/17 163/15 164/24 165/5 165/8 183/10 190/7 212/16 224/25
Plaintiffs [13] 1/6 1/15 87/24 130/16 133/15 133/17 133/18 134/5 135/21 140/25 141/2 220/17 255/2
Plaintiffs' [18] 3/13 4/13 9/17 13/10 13/22 14/8 14/10 15/18 19/12 29/1 29/23 36/10 41/20 56/12 58/24 71/4 159/16 175/24
plan [9] 4/15 4/20 5/12 16/21 55/25 80/8 85/6 107/13 258/9
plane [1] 178/22
plans [10] 6/8 55/3 55/7 58/15 95/21 107/10 109/17 176/13 219/25 220/3
plaster [1] 136/15
platform [2] 13/18 110/18
play [8] 101/21 102/2 123/11 130/8 130/14 132/24 182/14 182/17
played [5] 3/20 87/24 132/25 212/8 258/13
playing [1] 127/24
please [15] 3/1 3/24 3/25 28/5 31/8 67/2 67/2 73/16 84/14 84/14 104/3 166/21 198/3 208/4 223/12
pled [1] 198/11
plus [1] 61/5
point [52] 16/22 16/25 30/8 30/12 30/20 30/21 40/8 40/20 40/21 40/22 43/20 61/21 61/24 69/8 86/19 99/12 104/12 104/13 105/11 105/22 127/10 130/10 130/10 132/5 133/4 139/16 143/20 146/1 147/24 148/25 149/13 155/3 158/15 167/14 174/9 181/25 181/25 182/1 184/16 192/12 194/9 196/23 205/4 222/25 226/12 227/9 236/17 238/20 245/2 255/13 255/21 256/11
pointed [7] 57/7 77/4 95/4 133/12 133/21 154/15 257/15
points [32] 56/24 75/14 75/19 86/10 123/12 146/25 147/13 148/6 148/7 159/13 176/2 181/14 181/15 181/15 181/24 198/20 223/15 236/19 237/9 238/19 238/19 238/23 238/25 243/7 244/3 250/5 250/10 252/6 252/15 252/15 257/16 257/20
policies [5] 144/19 144/22 147/7 173/4 175/3
policy [17] 41/2 41/9 75/16 76/24 76/25 100/10 100/11 133/23 134/6 146/5 146/7 146/10 146/19 147/11 175/5 175/8 220/16
poor [5] 35/8 35/21 40/2 159/1 236/12
poorly [3] 35/3 152/23 159/5
pop [4] 15/19 18/19 45/13 45/17
pops [1] 140/20
populations [1] 112/14
portion [2] 54/3 122/3
portions [1] 76/16
portrait [2] 221/17 221/19
portray [2] 212/11 212/16
portrayal [2] 215/11 222/4
position [7] 29/15 64/8 75/8 79/16 118/11 159/25 209/16
positive [3] 248/22 248/25 253/6
possible [8] 64/10 144/13 180/20 181/8 181/10 181/12 183/13 215/25
possibly [1] 177/12
potential [8] 12/3 57/5 57/10 131/6 180/10 193/15 203/19 203/20
potentially [2] 163/10 252/12
PR [2] 26/2 117/24
practice [15] 50/16 106/2 107/6 133/17 133/18 133/20 133/22 134/3 140/2 140/25 141/1 141/1 141/4 155/12 158/6
practices [7] 89/13 92/6 133/14 135/24 150/17 155/18 220/24
pre [1] 43/23
preadmitted [2] 10/18 32/4
precede [2] 132/11 208/9
precisely [1] 159/2
predict [1] 157/15
predictable [1] 51/22
prefer [1] 129/8
preference [2] 66/20 258/23
preferred [1] 232/8
prejudice [3] 29/8 44/1 131/17
prepare [2] 115/2 213/25
prepared [10] 56/15 58/25 59/10 59/13 110/4 117/20 118/8 133/7 156/22 156/24
preparing [1] 111/9
prescriber [4] 189/25 190/2 190/11 190/13
prescribers [1] 224/12
prescription [1] 224/4
presence [1] 189/21
present [2] 221/16 258/17
presentation [1] 54/22
presented [8] 134/4 135/3 135/7 148/2 161/6 197/9 203/19 213/1
presenter [1] 103/9
presenting [1] 94/18
presents [1] 76/22
preserve [1] 80/5
president [21] 4/4 15/15 22/13 23/3 28/2 28/10 28/15 84/18 88/2 96/9 101/22 103/5 168/6 168/9 168/15 176/5 179/4 180/6 192/23 193/24 203/2
press [14] 9/21 10/21 12/2 27/17 101/9 101/9 102/13 107/22 129/13 130/5 138/16 152/14 152/15 163/7
pressure [1] 188/2
presumably [1] 127/24
pretrial [1] 127/12
pretty [11] 4/10 37/24 45/4 116/25 120/15 151/13 171/1 171/8 182/4 185/3 214/12
prevail [1] 157/6
prevent [5] 49/24 51/10 77/16 100/3 191/2
preventable [7] 97/19 97/20 99/21 134/12 170/19 171/16 180/23
preventing [1] 165/4
Preventive [1] 173/11
previewed [1] 258/13
previous [7] 12/14 12/19 14/4 44/6 67/14 179/15 204/19
previously [6] 9/18 72/24 100/25 132/12 235/24 251/8
price [7] 56/24 81/18 81/21 81/22 81/25 193/16 211/17
prices [2] 57/11 81/10
pricing [2] 54/23 56/23
pride [1] 108/2
primary [2] 4/7 86/20
principally [1] 120/21
principles [9] 71/6 71/13 71/16 71/18 71/21 72/10

**principles... [3]** 72/15 135/15 157/13
**print [2]** 10/20 11/11
**printed [1]** 11/19
**printout [1]** 137/16
**prior [6]** 124/16 164/18 192/6 195/6 247/8 250/2
**priority [1]** 116/3
**privacy [1]** 186/2
**Private [1]** 25/18
**proactive [1]** 128/25
**probably [14]** 3/4 40/8 66/8 70/14 72/6 78/20 138/5 138/5 182/6 188/1 188/22 189/22 191/1 191/24
**problem [8]** 9/2 185/22 188/3 194/4 199/17 201/3 203/14 203/15
**problems [6]** 76/2 99/21 155/14 155/15 192/3 192/3
**proceed [5]** 3/6 3/25 8/3 131/12 187/19
**proceedings [2]** 1/11 259/7
**process [24]** 57/16 78/2 78/5 80/19 92/14 92/17 92/21 94/16 99/1 99/19 99/25 176/22 177/5 178/25 185/21 186/10 187/24 201/11 202/11 230/13 230/18 230/22 231/20 232/3
**processes [4]** 92/25 183/19 193/11 215/12
**produce [1]** 96/19
**produced [2]** 135/24 140/2
**producing [1]** 58/15
**product [3]** 136/22 136/24 203/9
**products [11]** 53/19 53/24 53/25 54/5 54/21 55/8 57/15 89/16 92/11 98/7 98/8
**professional [2]** 130/2 223/9
**professor [2]** 3/14 63/9
**proffered [1]** 141/14
**profit [26]** 19/4 19/7 19/13 19/15 21/11 21/21 21/23 22/7 24/14 27/11 27/13 54/11 80/1 87/3 95/1 95/8 95/10 95/12 95/13 95/20 107/1 107/3 122/10 123/4 168/11 241/4
**profits [6]** 21/14 21/16 22/3 22/11 107/6 122/13
**program [14]** 5/9 34/13 53/21 109/16 167/13 169/2 174/7 176/9 176/12 176/19 177/14 240/15 240/16 257/17
**programming [2]** 91/25 92/25
**programs [13]** 91/10 96/18 101/10 123/25 124/4 124/5 168/25 169/12 169/14 169/15 170/24 176/9 247/20
**progress [4]** 98/12 98/16 119/17 119/19
**prohibits [1]** 133/13
**project [2]** 115/20 116/5
**projects [1]** 167/21
**promote [5]** 19/4 23/24 26/18
**promoting [2]** 27/18 208/22
**promotional [2]** 208/14 208/21
**prong [2]** 134/3 139/23
**pronounced [1]** 124/11
**proper [3]** 129/24 173/19 173/22
**properly [2]** 76/3 163/22
**property [1]** 80/16
**proposal [7]** 195/18 195/20 195/24 195/25 202/17 205/15 205/17
**proposed [6]** 194/16 202/2 203/4 214/21 215/10 254/3
**proposing [2]** 18/17 197/7
**proprietary [3]** 54/6 153/4 153/5
**protect [4]** 134/12 186/2 251/14 251/15
**protocols [1]** 239/7
**proud [2]** 75/20 92/9
**proudly [1]** 209/6
**prove [4]** 133/16 154/17 154/17 154/17
**provide [19]** 73/2 77/12 91/7 91/9 114/23 117/12 119/11 129/24 146/14 146/17 146/21 154/16 169/5 171/1 218/14 219/14 221/19 232/13 247/9
**provide any [1]** 91/7
**provided [9]** 113/11 137/21 150/5 150/6 155/1 233/8 233/18 246/9 252/9
**Providence [1]** 215/6
**providers [1]** 137/19
**provides [1]** 177/23
**providing [1]** 247/16
**provision [4]** 122/2 122/15 123/4 123/8
**public [63]** 9/25 16/3 16/11 16/17 23/5 23/13 23/18 23/20 63/17 63/18 66/1 76/22 85/20 85/23 86/10 86/11 96/22 97/1 99/3 99/7 100/24 101/13 110/9 111/3 114/3 114/13 115/22 117/13 117/23 130/20 133/23 134/6 134/13 140/22 145/3 147/16 150/5 150/6 167/19 169/3 172/9 177/2 192/7 202/1 202/5 202/7 202/12 202/18 205/19 207/14 214/13 242/6 245/25 252/20 253/10 253/13 253/16 253/23 254/1 254/9 254/10 254/24 255/14
**publication [2]** 242/2 242/19
**publications [2]** 11/8 178/6
**publicity [1]** 45/24
**publicize [4]** 15/25 16/15 24/15 118/11
**publicized [1]** 117/16
**publicly [26]** 74/10 85/15 86/2 86/6 86/13 86/16 89/25 98/2 135/17 140/5 144/8 144/9 152/19 152/25 153/1 153/14 170/13 171/21 176/14 180/19 217/12 233/6 240/25
**publish [4]** 165/7 200/21 202/18 241/14
**published [5]** 70/3 101/1 165/23 189/24 218/21
**pull [13]** 37/7 73/16 76/11 77/14 77/14 80/7 83/5 102/16 113/14 115/6 204/24 212/25 256/9
**pulled [4]** 43/22 94/6 132/8 132/9
**punish [2]** 118/16 134/14
**punitive [1]** 246/8
**purchase [2]** 160/4 169/2
**purchasers [5]** 6/8 85/12 85/13 87/6 88/12
**purchasing [7]** 54/21 55/7 109/16 121/15 121/17 176/16 176/19
**purity [1]** 189/24
**purpose [13]** 16/16 60/22 96/20 96/22 97/1 98/11 111/13 118/15 121/7 134/11 137/7 176/25 180/15
**purposes [4]** 6/1 50/10 56/21 176/6
**put [70]** 4/13 18/17 19/8 19/16 22/14 26/2 27/6 27/7 32/3 34/8 34/22 34/23 37/6 38/25 40/9 41/10 43/11 45/10 50/16 50/22 54/22 56/12 58/23 63/25 64/20 65/17 67/7 67/16 68/21 69/13 72/9 89/11 92/11 102/13 107/13 119/2 123/19 125/22 128/9 128/10 128/17 129/9 132/15 133/18 150/11 156/16 172/12 179/11 194/6 194/24 196/14 199/12 200/19 201/24 202/1 202/2 202/17 202/22 204/10 208/4 208/20 210/18 220/6 221/9 221/12 238/3 246/23 249/4 249/14 254/9
**puts [5]** 22/25 42/6 74/5 90/18 108/7
**putting [12]** 17/4 41/14 42/15 134/9 165/5 167/21 183/24 192/24 195/10 200/22 205/19 207/14
**PX [33]** 24/18 27/3 29/21 32/3 40/9 43/11 45/9 49/18 52/18 54/22 59/9 64/20 65/17 68/21 69/14 72/9 72/24 73/16 76/11 77/15 80/8 81/5 83/6 118/25 123/19 127/11 127/13 199/23 199/24 208/20 211/15 238/12 248/5
**PX-21.0 [1]** 64/20
**PX-275.4 [1]** 52/18
**PX-283.0 [1]** 40/9
**PX-293 [1]** 123/19
**PX-30.0 [1]** 65/17
**PX-30.5 [1]** 49/18
**PX-322.2 [2]** 59/9 118/25
**PX-323.2 [1]** 29/21
**PX-324.1 [1]** 54/22
**PX-426 [2]** 127/11 127/13
**PX-439 [1]** 45/9

**Q**

**qualification [1]** 167/5
**qualify [2]** 171/22 187/11
**quality [14]** 86/7 87/17 89/6 89/9 96/13 96/21 157/14 157/19 170/6 172/9 172/12 174/6 178/7 216/12
**quantifies [1]** 253/8
**quarterly [1]** 242/16
**question [102]** 6/13 6/17 7/21 8/8 8/12 8/23 8/24 9/8 17/7 17/14 17/20 31/8 31/23 39/9 40/19 43/20 44/6 48/17 49/8 49/20 49/23 50/6 50/14 50/15 50/17 51/10 54/17 58/9 59/7 64/21 65/2 65/25 67/10 68/12 68/24 69/4 69/10 77/19 77/23 83/7 96/1 104/12 125/3 126/24 127/6 127/14 128/23 129/16 129/16 130/1 130/2 141/12 151/7 151/7 151/21 175/14 175/18 182/10 187/23 188/1 208/11 209/23 210/9 210/13 212/10 213/23 213/24 214/3 216/19 217/6 217/7 217/7 217/14 220/19 220/21 221/6 221/24 223/5 225/8 225/8 227/7 227/15 227/16 227/18 227/19 231/13 233/24 233/25 235/21 237/16 237/17 237/17 239/9 243/18 244/2 244/17 247/13 247/21 251/17 252/2 255/1 257/6
**questionable [1]** 93/7
**questions [55]** 22/17 27/8 27/23 53/24 65/19 66/13 67/9 73/18 78/7 78/25 82/6 83/2 93/3 93/4 104/4 104/5 104/7 104/9 117/25 120/13 122/1 124/10 126/2 126/3 126/22 127/2 127/8 128/21 130/13 130/14 131/14 151/8 151/16 151/21 152/4 152/21 152/23 156/6 156/8 157/8 172/15 173/2 178/14 178/23 184/5 184/9 184/12 207/19 223/12 229/5 240/7 240/8 258/4 258/5 258/7
**quick [1]** 202/1
**quickly [6]** 78/24 110/12 126/4 242/5 252/20 255/17
**quite [7]** 65/15 141/19 172/21 175/19 182/10 197/25 250/18
**quote [13]** 83/20 129/5 129/6 129/11 129/12 129/14 129/14 129/15 129/15 130/15 157/25 158/1 222/15
**quotes [1]** 183/24

**R**

**radio [1]** 11/23
**raise [8]** 5/16 5/22 6/7 22/4 22/11 119/13 119/14 119/19
**raised [2]** 22/14 125/19
**raising [5]** 21/17 22/8 22/9 107/4 108/15
**Ramono's [1]** 123/17
**Ramonos [1]** 90/25
**ran [1]** 192/8
**random [7]** 144/21 144/25 146/3 147/9 179/17 226/1 236/10
**randomly [1]** 179/20
**range [6]** 4/14 4/21 170/14 181/21 182/7 182/8
**ranges [1]** 182/4
**ranging [1]** 167/21
**ranking [2]** 28/15 28/17
**rarely [2]** 67/24 68/1
**Rashbaum [1]** 1/21
**rate [4]** 44/10 93/5 100/5 199/5
**rated [1]** 159/5
**rates [1]** 94/9
**rather [3]** 111/14 214/24 215/13
**rating [3]** 105/24 109/5 151/2
**ratings [19]** 55/19 95/19 95/21 105/25 107/10 107/11 107/14 168/6 168/9 168/15 168/25 169/20 176/5 179/5 180/6 193/1 193/25 203/2 247/20
**rationale [1]** 227/3
**ratios [1]** 254/14
**raw [1]** 81/1
**reach [5]** 5/15 11/8 12/24 119/22 120/2
**reached [3]** 27/12 120/9 190/14
**reaction [1]** 128/22
**read [11]** 5/25 8/2 8/5 8/16 9/6 9/8 40/18 42/20 71/22 76/19 76/20
**readability [1]** 127/3
**reader [2]** 144/2 144/4
**reading [9]** 38/25 39/2 39/12 39/12 69/7 70/14 70/21 110/17 117/13
**reads [3]** 40/14 69/20 254/24
**real [8]** 51/3 85/21 160/18 160/18 160/19 174/7 174/9 241/9
**realities [1]** 142/12
**realize [1]** 174/18
**realizing [1]** 253/10
**really [34]** 16/8 25/12 26/20 27/20 44/19 46/2 70/15 88/9 88/15 98/18 98/21 99/19 99/22 108/1 109/1 110/18 114/9 114/10 114/11 114/17 116/20 117/18 154/10 192/22 192/23 193/2 198/14 200/24 201/3 202/1 232/10 247/4 256/12 256/24
**reason [20]** 31/12 35/23 44/17 78/3 82/14 99/2 102/5 149/9 163/18 172/8 188/4 188/10 194/10 204/14 220/8 227/6 231/4 250/12 250/15 250/22
**reasonable [5]** 136/9 136/10 154/14 157/5 238/24
**reasonable consumer [1]** 136/10
**reasonably [10]** 135/24 141/5 155/7 155/9 220/18 222/11 231/12 234/12 238/18 251/23
**reasoning [6]** 148/23 149/2 149/3 149/3 149/6 151/11
**reasons [5]** 156/17 172/2 185/20 227/5 229/16
**reassurance [1]** 87/15
**rebuttal [1]** 133/2
**recalculates [1]** 153/6
**recall [77]** 4/18 5/21 5/23 7/19 16/18 22/18 24/20 26/14 27/1 27/12 34/5 34/7 45/17 48/22 48/25 49/2 49/3 49/4 49/13 62/9 62/13 63/22 73/18 73/23 77/7 77/9 78/8 79/14 80/9 80/11 81/11 81/15 82/6 82/8 82/8 82/11 82/17 82/19 82/21 83/3 83/6 83/9 83/13 83/15 93/14 93/15 103/9 105/19 109/11 111/10 112/16 113/10 116/14 118/25 119/3 126/24 130/7 162/14 176/2 195/9 206/23 215/20 215/22 216/1 222/13 222/15 224/18 228/1 228/3 228/11 235/15 242/3 250/25 251/1 252/21 253/3 255/3
**recalled [1]** 177/17
**receive [12]** 78/14 105/11 125/21 136/13 161/7 183/1 202/17 226/18 237/14 255/22 257/11 258/1
**received [17]** 42/3 42/10 64/2 80/17 136/4 190/13 204/13 214/16 237/1 237/14 237/22 239/5 239/5 253/6 253/8 253/22 257/9
**receives [3]** 67/25 135/6 209/25
**receiving [2]** 202/11 241/20
**recent [1]** 183/6
**recently [5]** 65/14 124/2 187/4 220/14 255/19
**recess [4]** 3/4 67/1 84/13 166/20
**recessed [1]** 259/4
**recognition [1]** 155/13
**recognize [7]** 36/12 37/25 41/23 41/24 54/11 169/4 169/6
**recognizing [2]** 115/22 199/18
**recollection [5]** 14/23 43/12 103/12 253/5 254/7
**recommend [1]** 60/8
**recommendation [1]** 243/13
**recommended [2]** 60/4 60/21
**recommending [2]** 71/14 203/25
**reconsider [1]** 164/8
**reconvene [1]** 191/21
**record [17]** 44/23 45/2 74/7 128/17 129/9 130/17 131/24 133/5 150/10 167/23 190/12 199/23 208/5 208/6 240/9

**R**

**record... [2]** 257/2 259/7
**records [1]** 161/20
**recount [1]** 130/12
**recross [2]** 258/6 258/7
**recruit [4]** 209/12 209/17 210/3 210/21
**recruited [1]** 210/16
**red [2]** 143/8 246/7
**redirect [5]** 27/24 126/5 126/6 252/18 258/5
**redistribute [1]** 230/3
**redistributed [4]** 229/3 229/14 229/18 230/21
**reduce [2]** 168/12 173/15
**reducing [1]** 171/16
**refer [5]** 37/10 112/20 158/14 162/7 176/2
**reference [1]** 224/17
**referenced [3]** 13/24 37/24 130/4
**referencing [1]** 163/5
**referring [5]** 8/14 44/13 124/4 124/7 205/3
**refers [3]** 38/5 129/14 164/16
**reflect [4]** 142/11 143/11 145/18 162/12
**reflected [6]** 159/18 183/20 184/6 184/10 197/15 204/13
**reflecting [2]** 245/11 245/13
**reflecting the [1]** 245/11
**reflective [3]** 74/12 192/19 225/23
**reflects [3]** 65/7 127/12 164/20
**refresh [3]** 14/23 43/12 253/5
**refuse [1]** 128/16
**refused [1]** 118/16
**regard [3]** 87/16 103/16 247/1
**regarding [4]** 103/18 104/14 113/11 114/24
**Regina [1]** 141/9
**region [4]** 88/10 88/11 121/2 121/9
**regional [7]** 88/7 88/7 120/19 120/20 120/24 126/11 178/19
**regions [1]** 120/22
**registration [1]** 101/16
**registrations [1]** 107/4
**registries [1]** 96/18
**regular [1]** 122/25
**regulates [1]** 240/12
**regulation [2]** 239/23 239/25
**regulations [1]** 220/25
**rehabilitation [1]** 219/21
**reiterated [1]** 245/21
**rejected [2]** 245/6 245/9
**related [8]** 103/13 128/18 136/20 205/24 208/15 214/16 232/25 247/19
**relates [2]** 29/15 164/18
**relation [1]** 75/9
**relations [2]** 9/25 23/13
**relative [2]** 12/6 33/14
**relatively [2]** 132/18 168/11
**release [9]** 9/21 10/21 11/2 12/2 12/6 12/12 107/22 117/23 138/16
**releases [1]** 101/9
**relevance [8]** 25/21 29/8 29/17 44/1 59/3 119/25 120/6 129/16
**relevant [1]** 29/9
**reliability [2]** 141/15 142/24
**reliable [4]** 154/23 155/8 155/9 179/8
**reliably [3]** 71/24 93/3 157/15
**relied [1]** 161/1
**relief [4]** 133/16 140/9 164/24 165/3
**relies [2]** 121/21 221/16
**rely [5]** 88/21 121/14 121/19 219/12 221/19
**remain [2]** 100/22 257/21
**remaining [3]** 230/22 230/24 230/25
**remember [33]** 7/24 8/11 9/14 16/13 36/21 48/13 49/10 51/23 52/4 52/8 52/12 58/12 58/17 58/18 59/7 62/11 62/15 63/12 63/15 71/9 72/25 81/7 82/3 104/15 145/1 159/2 213/21 214/11 222/9 226/4 226/11 228/16 252/24
**remind [1]** 184/2
**remove [2]** 40/16 197/6
**removed [1]** 72/16
**renewal [1]** 59/15
**repeat [2]** 233/24 243/18
**Repeated [1]** 41/16
**repeatedly [2]** 73/15 182/12
**replace [3]** 196/1 252/10 252/12
**report [55]** 28/20 29/14 30/13 31/3 31/6 31/11 31/13 31/19 32/6 32/11 41/6 46/4 56/14 57/22 72/24 77/17 77/19 81/6 88/12 93/23 97/16 97/17 98/2 99/6 107/12 112/11 114/23 115/3 115/14 116/4 116/13 116/15 138/21 147/2 152/25 167/21 175/5 175/6 178/2 184/13 194/10 197/2 197/24 198/4 198/4 222/18 225/24 232/18 232/20 240/16 242/20 244/4 247/3 247/10 256/12
**reported [11]** 85/16 86/6 89/25 140/6 144/8 144/9 152/19 170/13 217/12 233/6 255/15
**Reporter [6]** 2/7 30/25 48/16 66/23 259/10 259/11
**reporters [2]** 102/10 130/13
**reporting [26]** 35/24 85/4 85/21 85/24 86/2 86/13 97/1 99/8 123/24 123/24 140/15 152/12 169/3 177/3 181/9 181/10 185/18 196/24 197/25 198/16 198/17 231/21 242/9 243/1 244/5 249/12
**reports [10]** 65/3 66/1 83/8 98/8 107/7 109/15 233/17 240/25 241/16 241/20
**represent [9]** 64/24 65/21 69/18 71/11 88/9 88/10 111/22 169/7 238/11
**representation [1]** 159/4
**representations [1]** 158/4
**representative [1]** 122/3
**represented [2]** 223/8 246/2
**representing [2]** 134/19 172/5
**represents [1]** 87/3
**reputation [5]** 156/15 209/11 209/17 209/25 210/19
**request [6]** 29/6 43/21 119/7 133/16 179/17 202/13
**requested [1]** 178/19
**requesting [1]** 41/16
**require [1]** 85/16
**required [8]** 86/10 114/23 134/2 137/25 161/16 220/25 239/24 240/16
**requirement [3]** 139/23 173/3 220/16
**requirements [3]** 185/25 186/4 186/6
**requires [2]** 54/9 75/18
**requiring [1]** 93/12
**research [7]** 91/25 92/7 115/20 142/2 145/21 173/10 219/11
**researcher [3]** 82/25 141/19 247/16
**researchers [7]** 70/17 184/18 191/12 197/13 198/15 219/8 219/9
**reserve [2]** 119/16 133/2
**resides [1]** 254/10
**resource [3]** 83/21 92/9 214/25
**resources [13]** 25/10 26/1 26/5 68/10 68/14 91/11 91/17 91/19 91/23 92/2 92/7 92/10 163/20
**resourcing [1]** 83/24
**respect [28]** 9/19 11/15 11/19 14/4 20/2 46/11 47/3 78/8 91/19 112/9 112/16 112/18 115/3 118/10 121/15 133/21 138/22 140/15 141/1 154/13 160/5 164/5 223/6 223/7 228/18 228/21 234/9 255/3
**respected [1]** 187/5
**respond [16]** 5/16 6/10 53/13 54/15 63/11 120/11 142/8 143/10 145/10 145/18 146/4 158/19 177/24 177/25 191/6 213/17
**responded [4]** 5/23 236/16 250/20 253/13
**responding [8]** 35/8 123/23 135/5 146/24 213/6 213/13 213/22 214/13
**responds [2]** 105/5 130/13

R

**response [19]** 33/9 33/10 33/16 36/8 69/10 83/7 108/8 130/20 149/6 158/14 158/17 159/6 179/14 212/10 212/24 213/10 213/11 228/10 247/21
**responses [15]** 33/12 36/5 50/10 67/25 68/5 93/7 178/7 179/12 179/15 179/21 202/20 213/8 213/25 214/8 246/9
**responsibilities [5]** 46/21 47/2 208/7 208/12 210/5
**responsibility [11]** 6/23 9/19 46/19 47/3 85/4 94/13 130/2 203/25 208/18 213/10 213/11
**responsible [4]** 168/18 213/6 213/13 214/14
**rest [1]** 40/21
**restrain [1]** 132/23
**result [4]** 90/9 207/9 207/10 215/10
**resulted [1]** 190/15
**results [7]** 92/15 140/20 176/15 179/5 190/17 196/15 238/2
**retain [4]** 209/12 209/18 210/3 210/21
**retention [2]** 155/14 155/15
**retire [2]** 195/20 195/21
**retirement [1]** 60/15
**retiring [3]** 194/20 195/12 196/1
**retrieved [1]** 71/11
**return [2]** 66/25 84/8
**returning [1]** 173/18
**revenue [32]** 5/4 5/5 5/16 5/20 5/23 6/8 21/17 21/19 22/4 22/9 22/11 22/14 24/3 24/5 24/8 24/11 24/12 53/18 80/2 92/10 96/2 96/3 106/22 106/24 107/1 107/2 107/16 108/15 108/21 109/10 125/24 211/17
**revenues [13]** 4/24 5/2 53/14 60/1 60/6 60/9 60/23 61/1 79/23 119/18 135/1 155/12 195/1
**review [15]** 118/25 122/24 124/11 124/14 125/6 125/11 125/15 126/23 127/5 179/14 209/4 213/8 239/9 254/6 254/19
**reviewed [16]** 70/3 94/13 124/17 135/10 139/21 158/3 161/2 177/18 187/13 203/18 214/13 243/14 243/17 254/15 255/14 256/24
**reviewing [1]** 195/11
**revised [1]** 127/12
**revisions [1]** 123/2
**revisit [1]** 236/12
**rewarded [1]** 251/11
**reweigh [1]** 229/9
**rewind [2]** 30/2 48/22
**rid [1]** 197/4
**ride [2]** 203/16 204/9
**right [311]**
**rights [1]** 241/15
**Riley [1]** 3/8
**rises [1]** 131/17
**rising [1]** 204/8
**risk [5]** 131/6 193/15 201/19 201/21 250/18
**Robert [4]** 110/11 114/23 115/3 117/11
**role [14]** 4/7 4/10 22/13 22/21 22/22 23/3 23/14 23/17 24/23 167/20 168/3 168/14 187/1 192/23
**roles [1]** 167/11
**rolled [1]** 112/18
**Romano [40]** 51/13 51/17 51/18 52/10 52/10 58/5 58/8 58/10 58/14 63/9 63/10 71/5 78/16 82/4 82/9 82/14 82/21 123/16 123/22 134/11 135/7 135/12 135/14 140/3 144/14 145/23 148/24 150/12 158/16 181/17 187/16 195/6 197/11 207/13 226/2 226/14 227/8 235/11 243/20 248/3
**Romano's [10]** 77/2 77/7 78/7 82/3 82/17 144/20 158/2 195/9 206/24 235/12
**room [6]** 117/6 163/6 174/13 180/25 239/24 251/5
**rooms [1]** 156/2
**round [3]** 87/2 200/21 206/23
**rounded [1]** 74/11
**rounds [4]** 163/3 192/11 204/7 206/16
**routine [1]** 101/6
**routinely [1]** 101/6
**rule [3]** 133/5 157/2 166/4
**rules [1]** 130/24
**ruling [1]** 141/3
**run [4]** 100/17 101/11 108/11 152/8
**rural [6]** 100/14 167/19 171/5 172/2 188/23 196/12

S

**sad [1]** 156/13
**safe [6]** 16/4 16/11 16/17 116/11 174/16 180/22
**safety [244]** 6/9 7/3 7/6 7/9 9/22 11/2 11/15 12/5 12/12 12/12 12/25 15/10 15/19 16/1 19/25 20/19 23/16 23/18 23/20 23/24 24/16 27/8 29/16 36/9 36/12 40/7 42/1 42/24 44/10 46/17 49/17 50/2 54/7 64/14 64/22 65/3 65/7 65/8 65/25 67/7 67/19 67/21 68/15 69/20 70/2 70/4 71/7 71/12 71/14 71/17 72/4 73/17 73/20 74/5 74/6 74/9 80/15 83/8 83/12 83/16 83/20 84/24 86/7 87/17 87/20 88/24 88/25 89/2 89/6 89/9 91/1 92/7 96/21 97/8 97/12 97/15 97/17 97/22 98/3 98/13 98/14 98/17 99/4 99/10 99/14 99/23 100/4 100/18 100/20 101/25 102/1 102/18 102/21 103/11 103/18 104/14 104/16 105/3 105/12 105/14 107/8 108/2 108/3 108/5 109/14 109/20 109/22 110/3 111/4 114/17 115/21 116/6 117/20 121/8 121/12 121/14 121/18 121/19 121/22 121/24 134/5 134/9 134/11 135/11 137/8 137/8 138/9 138/13 138/17 138/19 139/2 140/5 148/4 153/2 153/17 156/6 157/10 157/10 157/12 157/17 157/20 157/24 158/6 160/9 160/20 161/9 161/12 162/25 163/8 163/11 169/1 169/10 169/25 170/3 170/6 170/8 170/10 170/12 170/18 170/20 170/21 170/22 171/9 171/15 171/19 172/5 172/6 172/12 172/18 172/21 176/7 177/16 177/19 180/3 180/7 180/12 180/16 180/20 181/5 182/10 184/7 184/10 184/16 184/18 184/20 184/20 185/2 185/3 185/5 185/11 185/13 185/19 185/21 186/16 186/21 186/23 186/24 187/4 192/4 194/22 196/13 205/22 205/25 208/15 209/15 211/21 211/23 214/17 215/11 215/17 216/10 216/12 216/14 216/16 216/18 216/20 216/23 217/3 217/12 217/15 217/21 218/2 218/4 218/11 218/19 218/20 218/24 219/3 219/4 219/5 219/6 219/10 219/12 219/15 222/5 236/24 254/5 254/17 254/17 254/23 255/13 255/16 257/7 258/1
**said [88]** 6/18 17/5 17/6 34/14 40/8 44/14 45/17 45/19 52/4 58/6 58/14 62/4 63/25 65/10 65/12 69/11 82/9 82/18 83/14 83/15 90/10 98/6 98/22 101/19 108/4 110/8 117/1 120/9 121/8 123/22 130/5 130/15 136/4 139/13 142/16 142/25 143/4 143/7 145/4 145/25 146/2 146/22 146/23 147/5 147/8 147/15 148/18 148/24 148/24 149/15 164/14 166/5 184/3 190/1 193/4 194/3 202/19 202/19 203/6 203/11 210/17 212/10 212/17 216/2 218/17 221/22 221/22 222/11 224/22 227/4 227/5 227/7 228/16 232/19 233/20 233/23 235/11 235/16 235/18 235/20 235/22 235/25 241/13 243/6 246/20 246/24 246/25 252/2
**said that [1]** 34/14
**salary [5]** 60/12 60/17 119/2 119/5 125/22
**Salati [1]** 43/18
**sales [6]** 57/16 81/10 107/16 208/8 208/9 208/12
**Sam [2]** 139/18 161/22

**S**

**SAMARITAN [20]** 1/4 32/19 32/22 33/3 33/13 36/13 41/1 41/4 41/15 42/3 42/6 49/17 50/7 50/10 50/10 73/19 73/22 162/6 238/8 238/11
**Samaritan's [2]** 36/9 73/19
**same [33]** 5/11 13/18 14/4 14/19 14/24 15/5 20/1 30/20 48/18 50/16 65/18 65/25 68/24 106/19 108/9 116/6 128/11 142/3 148/10 171/19 177/13 180/1 183/9 185/11 189/17 216/2 225/22 226/6 229/19 229/24 241/15 241/25 257/21
**same Cornerstone [1]** 142/3
**sample [4]** 185/25 186/4 186/6 188/6
**sanction [1]** 131/6
**sanitizer [2]** 173/25 174/14
**Sarah [2]** 10/3 10/13
**sat [1]** 92/15
**satisfied [2]** 116/21 117/10
**Saum [3]** 119/21 120/9 120/9
**saw [26]** 26/13 39/19 39/23 42/3 45/21 51/19 52/14 58/13 58/22 63/13 63/16 71/5 87/23 94/17 95/14 95/21 109/6 121/1 122/20 129/1 129/12 155/24 155/24 175/24 194/2 212/12
**say [89]** 13/15 30/16 32/13 34/12 37/19 37/22 38/12 38/13 40/5 42/6 49/16 64/5 68/12 68/13 76/23 76/24 79/21 90/6 90/25 94/11 95/19 96/9 101/8 101/16 104/16 106/16 108/12 114/10 122/12 124/6 126/21 130/14 137/1 138/12 143/1 144/24 145/2 148/17 151/7 151/9 151/14 151/20 154/6 154/11 156/13 158/20 169/9 169/12 170/20 175/14 175/17 176/1 181/22 182/20 184/5 184/9 185/14 186/15 189/10 193/18 195/3 196/20 198/11 203/9 203/13 208/10 208/11 210/19 212/18 216/19 216/22 216/24 218/14 219/2 222/22 226/12 227/14 227/16 227/17 227/23 228/8 229/7 231/20 232/23 238/24 248/19 248/21 250/1 257/4
**say that [1]** 228/8
**saying [26]** 26/11 26/13 38/2 38/4 38/12 42/23 68/15 84/6 97/25 98/12 129/13 132/23 146/16 148/9 151/15 156/4 188/15 192/15 198/3 200/12 203/15 222/9 222/13 226/4 235/19 237/19
**says [42]** 6/17 8/13 15/8 17/7 17/11 37/24 38/3 40/18 53/10 57/3 65/4 71/22 71/23 75/2 76/3 83/11 83/19 94/11 111/12 112/10 112/20 114/2
115/15 115/19 137/12 140/20 143/9 143/11 143/12 144/20 149/12 154/12 194/8 208/22 209/4 209/9 211/23 214/21 222/18 248/6 248/7 248/9
**scenarios [1]** 203/18
**schedule [1]** 3/6
**scheme [2]** 157/25 160/4
**school [2]** 155/1 167/13
**science [3]** 114/4 149/12 149/14
**scientific [8]** 135/12 135/15 144/20 146/20 148/16 148/21 149/6 177/4
**scientifically [2]** 150/14 151/12
**scientist [1]** 144/23
**scientists [1]** 144/24
**scope [3]** 112/9 112/25 219/9
**score [129]** 30/14 31/6 31/10 37/11 37/14 37/16 38/6 38/18 38/22 38/23 39/1 39/1 39/11 39/23 51/3 74/1 74/16 75/2 75/3 79/10 80/19 80/20 80/22 102/18 105/3 105/14 111/15 116/6 125/5 135/16 143/11 143/12 143/15 143/16 144/3 144/7 144/12 145/9 145/16 145/17 145/18 147/4 148/10 149/15 150/24 151/4 151/20 151/24 152/20 153/6 153/12 154/12 175/6 175/8 175/21 176/5 176/7 176/21 177/8 177/9 181/6 181/20 181/21 181/21 186/8 186/9 188/4 188/8 188/14 188/16 190/4 190/6 196/16 197/2 197/24 198/8 198/11 198/16 198/17 199/13 221/3 225/22 226/16 227/1 227/16 227/19 229/13 229/16 229/17 229/21 229/23 231/21 231/22 232/6 232/7 232/10 234/25 235/14 235/16 235/19 235/21 235/23 236/2 236/4 236/6 236/16 236/21 238/13 239/15 239/18 249/6 249/11 250/4 250/9 251/6 251/22 253/10 255/24 256/2 256/7 256/18 257/7 257/7 257/14 257/14 257/18 257/19 257/20 257/24
**scored [5]** 33/6 48/3 184/6 238/8 238/11
**scores [50]** 31/18 32/10 34/2 34/14 35/2 46/8 105/12 109/17 122/19 140/7 144/24 152/9 152/10 152/11 152/15 152/22 152/25 153/1 153/2 161/23 165/10 165/13 165/23 176/15 176/20 177/1 177/5 177/15 181/19 182/7 182/8 182/17 186/5 196/17 196/23 199/3 204/10 225/14 229/12 229/13 230/3 231/11 231/15 236/12 240/11 241/23 243/24 251/8 252/5 252/9
**scoring [13]** 46/11 46/13 47/4 62/14 142/19 148/5
153/4 153/5 168/14 178/5 178/15 200/19 200/20
**SCOTT [2]** 1/16 1/17
**screen [4]** 29/2 111/2 209/20 214/2
**scribbled [1]** 162/10
**scroll [14]** 49/19 74/20 75/2 76/16 104/3 105/1 106/3 106/15 111/6 111/12 112/25 116/4 194/16 205/10
**scrolling [1]** 39/11
**scrolls [1]** 36/25
**scrutiny [2]** 41/12 98/7
**search [1]** 15/9
**searched [1]** 15/17
**searches [3]** 18/18 19/23 45/13
**searching [1]** 114/8
**seasonal [1]** 156/1
**seat [1]** 166/21
**seated [4]** 3/1 67/2 84/14 223/8
**Seattle [1]** 258/11
**second [15]** 69/19 83/18 93/19 116/5 173/21 173/25 177/8 177/9 179/10 202/18 206/7 209/10 214/19 226/17 237/17
**section [14]** 32/9 40/10 40/12 40/14 41/22 41/23 64/22 67/6 69/15 69/16 71/20 175/13 199/5 206/8
**sections [2]** 170/15 172/16
**see [118]** 9/8 11/12 11/14 12/3 12/19 14/21 15/11 17/8 21/3 22/24 30/17 30/18 38/7 39/20 39/23 40/17 40/19 40/21 43/11 43/14 43/16 44/14 45/20 48/11 48/25 49/21 53/11 53/15 56/24 60/2 63/21 65/4 65/9 67/12 68/25 69/2 69/24 72/2 74/24 76/13 76/17 77/5 77/17 79/24 86/2 94/14 95/2 102/18 103/10 104/4 104/4 104/20 105/3 105/7 105/16 106/5 106/16 109/8 111/4 111/15 112/10 112/20 114/4 114/21 115/19 115/23 116/5 116/11 117/2 123/17 123/25 124/2 131/20 140/13 143/14 143/15 145/8 151/17 152/11 152/16 154/7 168/10 183/25 190/16 190/23 193/14 194/4 194/11 196/11 199/16 201/4 205/2 205/10 206/1 206/11 208/22 209/2 209/3 209/6 209/7 209/13 212/3 212/7 213/6 215/1 215/5 215/18 232/9 246/4 246/12 246/22 247/6 247/11 248/12 248/13 250/6 256/14 259/2
**seeing [19]** 10/19 34/5 34/7 36/24 38/25 55/11 58/12 58/18 71/9 79/14 87/20 107/8 111/21 176/2 193/7 200/15 203/14 203/15 252/25
**seek [4]** 98/5 164/24 165/3

**S**


**seek... [1]** 165/4
**seeking [1]** 140/10
**seem [2]** 148/14 184/19
**seems [4]** 189/17 223/8 238/24 238/25
**seen [23]** 29/7 40/10 44/19 44/23 64/2 72/11 90/7 98/12 103/7 104/7 118/9 123/18 123/20 123/20 129/21 129/21 152/9 161/7 163/7 193/22 212/25 233/16 245/8
**sees [2]** 36/19 39/9
**segments [2]** 78/22 160/9
**select [2]** 67/22 179/20
**sell [7]** 57/14 81/1 109/13 122/18 122/18 154/8 154/9
**selling [6]** 80/14 80/16 80/17 81/23 107/7 108/21
**sells [2]** 80/14 209/15
**semantics [1]** 229/4
**send [6]** 101/6 101/7 202/8 202/9 202/15 202/16
**senior [9]** 53/2 103/10 168/6 168/14 176/5 179/4 180/6 193/24 203/2
**sense [6]** 93/9 136/21 151/11 179/12 199/21 240/4
**sensitivity [1]** 254/14
**sent [5]** 33/13 101/2 126/15 139/13 162/5
**sentence [13]** 65/12 66/3 69/3 69/6 94/5 94/22 95/14 122/1 122/7 209/10 248/13 250/2 255/18
**sentences [1]** 122/8
**sentiment [1]** 162/12
**separate [7]** 76/5 90/13 130/22 169/14 170/3 170/8 236/22
**September [14]** 4/18 6/5 7/20 8/6 8/22 9/10 64/3 64/3 208/18 228/1 228/7 229/15 247/8 250/19
**September 2025 [1]** 64/3
**September 5 [2]** 4/18 8/6
**September of [1]** 6/5
**series [3]** 92/25 101/5 204/25
**serious [2]** 131/19 224/12
**seriously [5]** 8/18 8/25 9/13 192/22 193/20
**serve [3]** 96/23 108/14 163/14
**served [4]** 21/13 22/13 163/22 219/17
**serves [2]** 3/15 243/16
**service [3]** 13/12 48/4 147/15
**services [13]** 69/22 74/18 91/7 91/10 98/7 98/9 108/22 111/3 111/13 113/4 136/7 174/25 185/7
**serving [1]** 79/18
**set [16]** 14/15 19/23 50/19 56/23 57/2 57/4 57/24 60/4 60/8 61/4 80/20 81/19 81/21
**sets [2]** 71/13 82/15
**setting [1]** 89/7
**seven [11]** 42/6 42/13 42/19 49/19 165/15 166/7 172/19 172/20 209/8 211/19 250/1
**several [11]** 11/11 50/1 86/24 88/17 98/14 123/5 163/3 179/9 211/7 225/4 253/16
**share [7]** 48/6 48/23 49/4 49/11 150/21 155/13 208/25
**shared [2]** 48/8 229/9
**she [68]** 15/8 15/20 15/20 15/22 17/2 17/5 17/6 17/17 23/9 23/10 25/9 26/14 29/9 33/18 35/1 35/4 35/10 36/19 62/21 62/23 79/2 87/24 88/2 113/13 114/2 114/9 117/1 121/1 127/15 133/7 134/25 136/6 142/25 143/1 143/3 143/7 143/8 143/20 148/24 156/21 156/23 156/23 163/5 163/7 167/17 167/24 167/24 187/11 187/12 187/15 187/17 200/18 200/18 200/21 200/23 200/24 208/4 212/10 212/17 214/14 218/17 224/22 231/5 251/17 252/24 253/2 255/1 255/4
**Shelldren [2]** 19/13 19/15
**Sheri [1]** 32/21
**Shield [1]** 56/3
**shock [1]** 36/23
**shoot [1]** 43/9
**short [3]** 19/10 53/4 67/1
**shortage [1]** 100/12
**shot [3]** 43/7 44/7 209/20
**should [50]** 26/9 27/8 53/14 56/22 67/10 67/11 67/20 67/22 68/9 68/13 68/15 68/24 69/25 71/15 71/25 79/22 83/11 83/12 83/14 83/15 83/20 89/7 89/7 89/13 101/16 125/24 131/2 131/3 131/5 141/11 148/14 150/18 150/23 151/1 164/9 164/10 164/14 164/21 165/22 185/12 186/7 188/16 209/9 212/9 215/24 216/6 226/18 250/3 250/4 255/22
**shouldn't [2]** 166/6 166/7
**show [15]** 19/11 29/1 71/4 88/14 110/20 114/17 116/22 116/24 158/21 158/22 164/2 164/7 164/25 248/4 249/17
**showcase [1]** 108/13
**showed [17]** 24/19 26/15 72/23 76/16 80/7 81/9 81/13 83/18 83/21 118/25 119/2 140/19 207/13 211/10 252/24 253/2 256/10
**showing [11]** 13/21 15/19 42/17 51/4 51/7 72/25 83/6 102/17 134/1 148/7 214/4
**shown [7]** 22/17 23/11 81/5 104/8 134/7 134/8 200/20
**shows [6]** 7/3 11/7 15/10
**Shrinivasen [1]** 255/17
**shut [3]** 190/18 190/21 190/22
**shy [1]** 47/18
**sick [1]** 9/2
**side [14]** 3/17 125/14 132/14 166/10 185/23 215/5 230/8 230/10 230/12 230/14 230/17 230/19 232/4 232/8
**sign [3]** 93/21 94/20 101/8
**Signature [1]** 259/11
**signed [3]** 111/7 202/10 214/15
**significance [1]** 131/18
**significant [5]** 82/25 90/5 91/11 253/19 254/1
**significantly [4]** 12/13 12/16 152/13 181/8
**signing [1]** 111/10
**silly [3]** 132/18 132/18 132/20
**similar [4]** 114/20 114/22 119/10 241/5
**SIMMONS [1]** 1/16
**simple [5]** 52/12 58/20 82/18 158/1 184/19
**simplify [2]** 181/22 181/23
**simplistic [1]** 185/10
**simply [12]** 75/15 102/6 102/8 130/12 133/18 134/4 147/17 154/23 156/11 157/11 159/6 183/6
**simulation [1]** 190/8
**Sinai [3]** 214/19 246/18 246/20
**since [25]** 4/5 28/13 85/15 106/20 124/18 127/23 147/19 170/25 186/16 203/5 204/15 205/17 206/10 210/15 226/25 233/9 233/10 233/12 233/18 236/13 236/25 237/7 237/13 243/25 255/8
**single [10]** 72/14 133/11 139/20 139/21 144/2 154/22 172/4 175/18 251/5 254/22
**singular [2]** 181/4 181/6
**sinks [2]** 174/13 220/25
**sit [5]** 73/8 91/1 199/6 204/12 243/21
**site [10]** 36/13 67/24 68/1 68/4 179/23 179/25 225/5 255/4 255/5 255/8
**sitting [2]** 212/7 230/24
**situation [3]** 29/9 71/25 174/3
**six [9]** 22/1 110/17 119/12 127/17 166/5 224/22 244/6 253/10 253/19
**sixth [2]** 119/14 205/21
**size [4]** 185/25 186/4 186/6 188/6
**sketch [1]** 113/16
**skip [1]** 246/8
**skipped [1]** 100/8
**Slack [10]** 13/12 13/18 13/22 14/15 24/18 26/13 62/9 62/14 62/18 62/19

S

**slide [11]** 15/2 54/23 55/4 55/5 132/6 132/10 148/1 194/2 194/3 215/7 215/9
**slides [6]** 48/1 48/14 193/22 197/9 199/14 201/4
**slightly [3]** 69/4 184/17 206/18
**slippage [1]** 193/14
**small [17]** 52/19 80/1 80/3 80/4 110/5 167/18 168/11 171/5 172/21 186/2 188/23 201/21 206/2 206/4 206/11 207/1 207/2
**smaller [1]** 205/11
**smear [2]** 26/7 26/22
**snapshot [1]** 242/16
**so [259]** 3/4 3/5 3/22 4/20 5/15 6/5 9/10 9/24 10/15 11/20 12/11 13/4 13/11 14/7 14/12 15/1 15/6 15/13 15/17 15/17 17/17 19/11 19/23 20/10 22/12 26/17 26/20 27/7 27/21 28/10 29/20 30/8 32/6 32/16 33/22 34/22 35/6 35/12 35/15 35/16 36/23 38/2 38/7 39/8 39/9 39/14 40/16 42/12 43/3 44/6 44/16 45/19 46/11 47/7 48/6 48/22 51/5 51/9 52/17 52/19 52/21 54/20 55/2 55/4 55/5 55/21 56/22 57/1 57/17 59/9 61/1 61/4 63/1 64/5 64/11 66/24 74/6 75/23 77/12 78/21 80/24 81/21 84/5 84/9 85/22 85/25 87/17 87/22 89/10 90/9 91/23 91/24 92/1 92/3 92/7 93/1 93/4 93/6 93/12 96/1 96/24 97/3 97/24 98/2 98/10 98/11 98/18 98/21 99/5 99/11 99/20 99/22 100/1 100/4 100/14 101/7 101/19 102/13 104/3 104/12 104/17 106/19 107/4 107/6 107/13 107/16 107/20 108/11 110/10 110/16 114/9 117/18 117/21 118/8 119/19 120/8 120/9 121/11 121/11 123/2 123/18 125/1 125/4 128/13 129/9 130/19 131/2 131/14 137/11 139/3 140/25 142/6 143/5 143/25 146/3 146/4 146/19 147/12 148/21 149/11 150/2 150/15 151/9 152/19 153/18 154/2 156/14 156/24 157/10 158/22 161/8 162/19 165/15 167/17 168/23 170/15 170/19 172/20 173/4 173/17 173/21 174/1 174/12 174/13 175/18 177/14 177/18 177/23 178/12 182/16 182/20 184/19 185/4 186/4 186/25 188/21 189/23 191/11 191/19 195/24 196/7 196/9 196/17 200/7 200/17 202/17 203/7 203/11 203/17 204/6 204/10 204/10 205/10 205/11 207/2 207/12 208/7 209/15 209/23 209/24 210/18 211/2 211/8 213/2 214/7 215/6 216/5 216/13 217/1 217/6 221/16 222/16 224/9 226/17 227/13 231/16 232/11 232/23 234/16 234/22 236/14 237/17 237/21 238/15 238/19 238/25 240/19 241/20 244/1 244/3 244/11 248/25 249/12 249/18 251/24 254/3 254/10 254/24 255/9
**So Providence [1]** 215/6
**so-called [1]** 157/10
**soap [1]** 173/23
**sociolinguist [1]** 114/2
**sold [2]** 22/5 82/15
**sole [1]** 129/1
**solely [2]** 74/12 109/2
**solicitation [1]** 5/20
**solution [1]** 137/19
**solve [3]** 147/25 148/3 194/4
**solving [2]** 194/3 194/8
**some [79]** 14/15 19/8 22/17 24/18 54/4 54/20 54/25 68/1 78/1 78/7 78/23 80/11 83/2 83/6 84/9 85/2 87/23 88/6 88/20 95/21 98/16 100/24 101/15 101/17 101/19 102/9 105/18 107/2 107/7 109/9 109/15 118/9 121/16 122/1 122/10 125/23 126/22 130/16 145/21 145/21 147/3 147/7 147/24 153/9 155/16 159/15 167/14 169/17 173/23 174/9 177/7 178/24 185/17 186/4 186/11 188/2 189/24 190/13 190/17 190/21 198/4 198/24 199/10 205/18 208/14 210/7 219/4 219/5 219/6 219/25 220/2 220/15 221/14 228/17 239/1 245/2 251/10 254/14 255/21
**somebody [5]** 93/10 149/15 151/18 189/16 203/8
**somehow [5]** 36/24 39/10 128/18 150/3 158/25
**someone [11]** 15/9 18/18 18/18 19/23 45/12 66/7 102/8 161/25 174/8 190/19 215/3
**something [53]** 15/21 15/22 16/12 31/16 31/21 43/9 46/10 46/22 52/2 52/5 52/16 63/24 76/4 78/17 84/4 85/18 87/12 87/13 90/19 102/2 102/11 106/11 109/16 118/2 137/12 137/12 149/8 158/18 161/8 174/7 178/13 193/16 198/11 199/9 199/12 200/8 204/2 205/19 211/2 211/4 211/6 214/4 224/4 225/16 226/4 226/19 234/20 235/3 235/9 239/2 246/15 248/22 250/17
**something at [1]** 84/4
**sometimes [6]** 13/20 13/21 40/2 64/19 93/2 101/16
**somewhat [2]** 13/15 146/11
**somewhere [2]** 94/23 125/14
**soon [1]** 52/6
**sophisticated [1]** 138/18
**sorry [23]** 3/22 30/24 44/4 46/9 48/20 49/9 51/18 68/12 77/9 81/2 89/5 101/18 112/4 167/5 174/11 207/2 209/23 237/4 243/18 247/24 249/20 252/2 257/18
**sort [10]** 26/22 85/1 101/7 131/5 145/21 145/21 147/24 153/9 189/25 247/9
**sorting [1]** 78/19
**sorts [1]** 101/23
**sought [1]** 134/24
**sound [1]** 185/10
**sounds [1]** 64/4
**source [21]** 107/16 108/15 179/8 216/9 216/11 216/13 216/16 216/20 216/23 232/12 232/15 232/16 232/19 232/23 232/24 233/1 233/4 233/14 233/19 233/20 233/23
**sources [7]** 5/5 5/7 53/18 53/20 69/23 106/24 179/16
**South [3]** 21/3 140/13 160/24
**SOUTHERN [2]** 1/1 131/1
**sp [8]** 10/16 19/13 29/10 43/18 52/21 56/15 62/10 88/9
**space [1]** 82/25
**speaking [2]** 52/15 70/6
**special [3]** 4/8 167/20 171/4
**Specialists [1]** 173/12
**specialty [2]** 100/12 171/6
**specific [9]** 19/24 20/10 51/22 69/11 130/3 131/2 174/4 217/14 255/12
**specifical [1]** 186/3
**specifically [17]** 7/25 18/24 41/18 68/19 90/23 101/1 129/22 129/25 163/10 168/12 176/25 180/21 183/12 184/15 219/25 221/24 233/22
**specifications [1]** 178/15
**specifics [2]** 18/15 231/19
**speculation [2]** 16/5 39/4
**spend [1]** 19/3
**spending [1]** 79/21
**spent [3]** 19/7 118/5 141/25
**spirit [1]** 235/12
**split [2]** 220/6 230/7
**spoken [1]** 163/6
**sponsorships [2]** 24/9 107/4
**spread [1]** 173/15
**spreading [2]** 128/7 132/21
**spring [19]** 11/14 12/6 12/14 43/12 47/19 146/23 183/6 191/25 198/7 198/7 198/7 200/5 200/8 206/14 211/21 237/21 251/9 251/25 257/10
**St [5]** 136/6 232/12 232/12 233/8 233/17
**staff [20]** 40/25 41/4 45/12 49/23 50/16 51/9 76/24 77/16 80/4 96/24 96/25 110/5 161/16 162/19 169/18 169/22 173/17 173/18 178/11 254/21
**staffing [15]** 177/8 206/6 206/9 222/17 222/21 222/24 223/16 225/1 225/10 231/2 239/2 254/3 254/13 254/14

S

**staffing... [1]** 254/22
**stage [1]** 14/15
**stand [8]** 93/23 94/8 97/4 128/16 158/6 166/24 221/13 243/21
**standard [22]** 75/10 75/17 89/11 90/24 107/3 107/6 154/15 157/3 164/5 173/6 173/8 173/13 174/20 175/10 193/12 229/18 234/2 239/10 239/11 239/13 244/9 244/12
**standardization [1]** 182/5
**standardized [1]** 178/8
**standards [6]** 75/13 80/21 80/23 80/25 89/7 234/11
**standing [4]** 25/20 138/25 168/23 171/2
**star [2]** 114/9 152/9
**start [13]** 3/13 4/12 48/4 92/22 100/11 127/24 133/20 166/16 167/9 181/16 198/23 200/25 201/21
**started [12]** 21/22 84/21 84/24 85/8 86/14 167/10 177/17 191/25 198/18 203/6 203/12 208/18
**starting [4]** 198/21 199/8 234/5 234/10
**starts [1]** 65/11
**state [2]** 12/25 162/19
**statement [9]** 57/21 63/18 63/22 77/10 128/5 128/17 129/23 131/25 201/9
**statements [10]** 63/18 128/6 128/10 128/11 130/4 130/9 132/1 155/6 158/9 162/13
**STATES [9]** 1/1 1/12 130/25 153/7 171/1 216/4 216/6 233/21 234/17
**station [1]** 239/24
**stations [2]** 11/23 11/24
**status [1]** 215/11
**statute [5]** 136/13 159/23 159/24 160/7 160/8
**stay [2]** 139/8 167/25
**steadily [1]** 91/14
**steep [1]** 53/10
**stems [1]** 158/1
**step [53]** 18/25 67/23 127/15 135/14 168/2 183/9 194/9 194/20 195/12 195/18 195/20 195/21 196/5 196/7 196/10 197/4 197/4 197/5 197/5 197/6 197/7 200/2 200/4 200/4 200/9 200/11 200/12 200/13 200/13 200/17 201/3 201/5 201/14 203/19 203/20 203/21 203/23 204/6 204/6 204/16 204/16 204/19 206/1 206/3 206/8 206/11 206/16 206/17 206/18 206/21 207/4 238/5 257/25
**steps [3]** 100/24 179/3 180/1
**Steven [2]** 56/15 56/15
**stick [3]** 175/20 197/6 223/14
**sticks [1]** 192/7
**still [24]** 17/18 72/7 79/10 110/18 136/16 146/21 150/4 150/12 152/2 152/5 152/22 181/10 192/11 193/10 193/13 196/24 206/24 210/13 223/1 233/14 236/16 244/1 251/20 251/23
**Stipes [2]** 2/7 259/10
**stipulated [1]** 137/7
**stipulation [1]** 127/13
**stood [2]** 116/15 187/17
**stop [4]** 84/5 84/8 199/1 230/4
**stopped [6]** 102/4 102/5 102/5 102/14 192/9 257/3
**strategic [5]** 4/14 5/12 85/5 168/19 248/10
**strategies [5]** 9/25 10/3 10/13 111/14 115/20
**strategy [10]** 4/7 4/21 16/14 17/21 23/4 23/6 23/7 26/17 102/13 117/24
**Street [2]** 1/18 2/4
**strength [1]** 85/6
**stressful [1]** 25/6
**stricken [1]** 131/3
**strike [4]** 117/3 220/22 226/23 251/16
**striving [1]** 91/4
**stroke [1]** 190/23
**strong [1]** 88/20
**strongest [2]** 254/16 254/17
**strongly [2]** 99/8 214/21
**structural [11]** 77/24 78/2 78/4 99/19 99/25 144/19 185/21 186/10 189/19 230/13 230/18
**structurally [1]** 100/2
**structure [6]** 87/22 109/18 110/16 183/19 187/25 188/18
**structures [3]** 179/18 193/11 215/12
**studies [1]** 98/15
**study [1]** 114/3
**stuff [1]** 146/14
**subject [4]** 47/9 78/4 159/13 187/2
**submissions [1]** 246/8
**submit [9]** 43/1 52/3 54/4 68/5 131/13 170/11 215/15 245/19 245/25
**submitted [12]** 33/16 54/7 113/17 122/5 179/14 192/20 195/22 196/18 215/13 233/10 233/11 233/13
**submitting [9]** 35/20 35/20 92/23 179/21 192/7 192/9 198/25 199/1 214/25
**subsection [1]** 175/18
**substantial [5]** 135/22 139/22 139/25 164/21 250/18
**substantially [3]** 133/24 135/19 139/5
**substituted [1]** 252/15
**such [8]** 60/11 136/12 150/17 166/1 200/23 221/12 239/6 254/10
**suggest [3]** 198/11 201/16 203/17
**suggested [4]** 36/7 244/24 245/2 245/4
**suggesting [4]** 81/12 197/3 199/13 199/15
**suggestion [1]** 245/12
**Suite [2]** 1/22 2/4
**sum [1]** 51/9
**summary [8]** 10/19 133/13 133/25 138/24 141/3 143/24 164/4 202/17
**Sunday [1]** 158/21
**super [1]** 114/9
**Superbowl [1]** 158/20
**supplemental [1]** 69/23
**support [9]** 19/6 27/7 91/10 130/6 135/12 167/17 189/5 198/10 201/22
**supported [3]** 87/4 187/3 254/8
**supporting [1]** 253/9
**supportive [1]** 256/2
**supports [1]** 149/15
**suppose [2]** 165/25 210/9
**supposed [6]** 19/3 19/4 37/10 41/11 143/5 143/25
**Supreme [1]** 130/25
**sure [40]** 21/22 24/4 24/8 26/8 27/21 31/9 58/4 76/19 86/20 88/22 93/1 93/3 103/2 107/2 110/1 117/22 123/6 133/10 138/17 149/18 167/7 173/17 174/2 178/3 179/5 186/19 188/10 191/1 192/24 208/10 213/19 213/20 218/12 220/3 221/18 226/10 226/12 227/4 235/18 258/21
**surgeons [3]** 156/3 161/15 169/6
**surgeries [1]** 168/22
**surgery [9]** 99/22 168/20 169/2 169/7 169/16 170/16 172/17 180/2 209/5
**surgical [2]** 171/6 178/14
**surprise [1]** 116/19
**surprised [1]** 118/2
**surprises [1]** 116/18
**surprising [3]** 116/25 117/1 117/18
**surrounding [3]** 10/17 92/21 103/18
**survey [241]** 5/13 5/17 24/6 24/10 24/11 24/12 24/15 29/14 30/13 31/3 31/7 31/11 31/13 31/20 32/11 33/3 33/10 35/9 35/20 35/20 41/6 41/8 41/10 41/11 41/13 41/14 41/17 41/19 43/1 43/13 44/7 44/15 44/20 50/7 52/3 54/1 54/4 54/10 54/14 54/18 55/12 55/17 55/17 55/19 57/2 57/24 61/11 61/14 61/24 62/3 63/2 63/11 65/4 65/8 66/1 67/25 68/5 69/23 75/21 78/10 78/13 80/15 80/21 81/11 81/17 81/24 83/8 88/13 89/11 89/19 89/21 90/14 90/18 91/3 91/5

**S**

**survey... [166]** 91/8 91/12 91/14 91/16 91/20 91/21 91/23 91/24 92/1 92/1 92/3 92/4 92/14 92/17 92/21 92/23 93/15 93/21 94/7 95/25 96/8 96/10 97/6 99/6 101/20 102/7 104/14 104/20 105/2 109/13 118/17 122/2 122/9 122/12 122/18 122/24 123/5 123/8 126/19 135/17 136/5 136/18 137/3 137/5 137/8 139/2 140/18 140/20 140/21 141/24 146/9 146/20 148/12 148/13 149/4 149/9 149/10 149/16 150/17 155/22 155/23 158/18 160/14 160/17 168/21 169/1 169/3 169/10 169/24 169/25 170/2 170/4 170/7 170/11 170/14 170/20 170/21 170/21 170/25 171/8 171/9 171/25 172/13 172/14 172/15 172/19 172/24 173/2 175/6 175/7 176/13 176/17 176/18 177/2 177/22 177/24 177/25 178/2 178/17 178/18 178/23 179/5 179/10 179/11 179/14 179/18 180/2 181/11 183/1 183/14 183/24 184/1 184/4 184/13 185/15 185/18 186/12 186/23 190/1 191/8 191/13 192/12 194/11 195/13 195/14 196/15 198/6 198/25 199/1 214/17 214/25 215/16 216/7 216/9 216/22 217/3 217/5 220/6 220/7 220/9 220/12 220/23 221/21 222/16 222/20 222/23 224/13 225/24 233/1 233/3 233/10 233/12 238/1 238/2 238/15 241/3 241/7 241/8 245/19 245/25 246/3 246/8 246/17 250/23 255/22 257/5
**surveys [12]** 6/11 92/8 105/5 141/18 183/20 192/8 192/9 192/20 195/22 196/4 196/18 245/17
**Susan [1]** 215/6
**suspending [1]** 62/4
**sustain [3]** 100/3 100/3 100/6
**Sustained [1]** 63/6
**Sutaria [1]** 119/21
**sworn [7]** 3/23 28/4 128/24 132/1 132/15 132/20 166/25
**SYDNEY [1]** 1/16
**Symphony [2]** 21/24 22/5
**system [17]** 100/14 153/22 153/23 154/5 178/22 190/4 190/9 191/2 192/2 194/14 214/20 214/20 215/6 224/6 224/9 224/12 238/6
**systematically [1]** 157/14
**systems [2]** 151/2 190/17

**T**

**table [4]** 84/9 87/2 89/14 206/8
**tactic [2]** 18/1 18/14
**take [49]** 13/4 18/25 32/14 36/9 37/13 45/9 47/12 53/17 54/20 56/11 66/24 76/11 80/6 95/23 100/24 106/18 108/2 125/4 128/25 130/9 132/3 147/1 147/2 148/4 151/4 151/14 159/10 159/12 166/15 166/17 166/18 172/6 176/14 176/20 181/3 181/19 190/8 193/20 195/16 196/10 203/21 203/21 203/24 205/18 207/21 213/11 224/14 230/3 252/6
**taken [4]** 67/1 80/18 84/13 166/20
**takes [7]** 36/18 80/2 135/3 151/18 151/24 153/6 249/14
**taking [13]** 67/23 117/6 141/7 152/21 157/3 170/12 192/25 198/12 204/8 209/16 216/24 234/13 257/4
**talk [32]** 21/10 21/20 69/13 72/22 76/21 87/22 89/18 90/22 94/5 97/10 101/2 101/15 106/22 109/20 117/15 118/5 154/19 154/22 155/11 160/23 169/25 170/19 172/1 172/8 172/23 174/20 181/13 181/14 193/8 216/4 246/23 257/1
**talked [36]** 38/20 77/21 80/20 82/3 82/4 82/23 90/12 93/14 95/24 96/14 99/14 101/12 107/9 140/7 140/19 161/3 161/6 168/1 171/22 171/24 179/7 181/14 183/17 184/3 193/4 193/17 195/3 198/9 199/4 210/10 212/23 244/23 245/16 255/20 256/22 257/6
**talking [32]** 5/9 25/9 38/22 47/22 62/14 62/16 62/17 62/20 74/13 85/25 86/3 116/7 118/6 128/23 141/10 141/21 143/8 145/7 146/15 154/10 169/9 177/22 178/17 186/15 189/3 197/19 198/24 199/18 205/13 217/3 247/2 255/4
**talks [2]** 156/3 159/24
**tap [1]** 108/13
**target [2]** 60/18 129/22
**targeted [2]** 19/9 20/10
**targeting [1]** 17/25
**targets [1]** 170/25
**task [1]** 10/20
**tax [2]** 119/9 179/11
**teacher [5]** 151/8 151/10 151/22 151/24 159/12
**teaching [2]** 167/11 196/11
**team [7]** 66/7 68/6 134/24 134/25 169/20 178/11 213/17
**technical [8]** 102/17 193/1 235/17 243/8 243/11 243/13 244/9 244/21
**technique [1]** 173/24
**teeny [1]** 208/23
**television [2]** 11/23 130/11
**tell [33]** 21/16 23/12 24/23 26/5 31/2 41/18 43/17 45/4 47/15 47/18 67/19 70/2 89/20 95/7 97/11 106/24 109/25 110/7 114/11 144/2 144/4 148/19 167/4 168/9 172/5 172/11 172/12 179/3 181/3 183/4 200/23 211/3 258/9
**telling [9]** 11/16 17/25 27/9 53/3 65/24 68/9 134/21 147/16 257/1
**tells [7]** 53/6 63/14 154/3 156/1 158/17 159/12 226/24
**template [1]** 209/5
**temporary [2]** 51/22 53/1
**ten [21]** 3/17 60/1 60/15 66/11 81/17 90/19 97/7 97/15 98/11 98/13 98/13 150/6 169/21 172/20 181/18 205/8 230/11 230/14 240/5 244/8 253/19
**Tenet [2]** 26/2 119/20
**tenure [1]** 26/21
**term [6]** 5/12 104/11 157/20 229/21 229/23 235/17
**terms [20]** 24/25 32/17 60/18 61/8 76/21 78/22 88/23 100/9 134/16 140/24 153/14 167/9 168/8 173/1 177/10 189/11 203/25 207/4 229/11 234/11
**terrible [1]** 183/20
**test [34]** 75/18 75/20 75/21 76/2 76/5 151/4 151/7 151/7 151/14 151/18 151/21 152/20 154/16 159/10 159/11 182/2 190/8 190/9 190/10 190/11 190/12 190/14 190/25 191/7 191/11 198/9 198/12 198/19 198/19 198/19 224/14 249/14 249/18 249/19
**tested [1]** 116/20
**testified [76]** 24/5 33/18 34/1 34/23 35/1 35/4 35/10 36/21 37/9 46/4 46/18 46/24 48/10 51/19 52/1 59/13 85/14 85/17 85/22 86/1 91/13 111/17 120/19 121/4 121/6 122/14 122/20 134/11 134/13 134/25 135/14 136/6 137/24 141/8 141/18 141/19 141/25 142/1 143/3 143/17 144/14 145/24 150/12 155/14 155/21 157/12 157/19 159/3 159/9 161/11 164/1 183/8 190/7 194/13 215/23 220/14 220/15 224/3 224/6 226/2 226/6 226/6 228/1 228/3 228/23 235/10 235/11 235/24 237/5 239/1 240/19 242/1 245/16 245/19 247/18 250/19
**testify [8]** 33/2 33/15 85/9 85/10 148/20 152/14 235/14 237/4
**testifying [7]** 5/21 7/20 16/13 47/9 82/19 228/5 231/7
**testimony [97]** 3/14 6/20 7/24 8/11 8/15 8/21 9/14 9/19 16/18 32/21 32/25 33/25 34/6 34/7 34/17 35/14 36/16

T

**testimony... [80]** 36/18 36/21 36/22 38/7 45/7 46/18 48/13 48/23 48/25 49/2 49/3 49/4 49/10 49/14 51/13 51/21 51/24 52/6 52/8 62/5 62/11 68/3 70/22 72/17 72/18 73/11 76/19 77/2 77/7 78/8 82/4 82/11 82/17 87/23 100/25 111/10 121/1 122/16 122/22 127/17 130/16 131/2 132/2 132/15 132/16 132/20 139/6 140/2 141/14 141/17 142/15 144/21 147/19 157/23 158/14 158/15 159/17 160/10 161/24 162/13 163/2 168/5 169/17 175/2 178/24 179/1 187/12 212/3 216/1 217/4 222/7 223/11 224/20 226/12 228/11 229/15 229/20 229/22 235/15 243/6

**testing [7]** 112/17 112/19 113/12 114/20 116/17 116/18 154/22

**tests [1]** 117/7

**text [1]** 177/1

**texting [2]** 13/15 14/24

**than [43]** 6/13 12/14 12/18 15/22 18/1 36/18 42/18 53/7 65/10 65/11 75/19 98/17 111/14 118/9 118/10 124/12 143/23 159/11 165/20 166/5 172/20 181/12 182/6 182/21 182/22 182/22 182/23 182/23 182/24 183/10 184/17 192/11 196/12 197/1 203/21 211/6 214/24 237/20 240/1 242/5 242/18 249/2 249/3

**than penalize [1]** 214/24

**thank [49]** 3/7 3/10 9/3 12/11 14/6 25/17 28/1 29/19 29/20 32/5 34/20 54/8 59/5 67/4 77/14 79/6 80/6 84/2 84/16 95/23 101/18 105/1 120/13 127/8 127/9 131/10 132/10 132/12 133/2 133/3 156/19 166/14 166/23 168/1 168/17 191/16 191/17 199/22 201/2 205/9 208/4 212/1 212/22 215/8 221/5 228/13 228/17 232/1 258/3

**thankfully [1]** 127/21

**thanks [1]** 166/8

**that [1637]**

**that are [1]** 54/21

**that fall [1]** 58/20

**that the [1]** 169/17

**that's [15]** 8/12 17/11 25/15 35/25 41/13 60/10 61/13 63/3 81/3 99/7 100/10 100/12 109/6 129/3 150/22

**the asterisk [1]** 253/14

**the cohort [2]** 149/1 206/17

**the current [1]** 236/4

**The expert [1]** 202/13

**the information [1]** 234/22

**the methodology [1]** 150/9

**the survey [1]** 88/13

**their [137]** 7/7 15/10 15/19 16/15 19/24 20/18 21/17 25/19 33/16 35/21 36/24 39/3 39/10 39/13 41/13 45/14 48/3 55/25 63/20 73/23 76/24 88/10 88/10 88/11 88/15 96/13 98/3 99/6 100/3 102/10 105/14 106/1 106/9 107/11 107/14 107/15 107/20 108/2 114/24 117/21 117/24 121/7 121/9 121/15 121/17 129/11 130/18 133/19 135/1 137/21 137/25 139/17 139/19 141/17 146/21 146/25 147/3 147/13 147/17 148/8 149/11 152/8 152/11 152/19 152/19 152/20 153/20 154/17 155/14 155/20 155/24 156/6 156/6 156/7 156/14 161/8 161/22 163/3 163/14 166/1 166/4 166/5 171/13 172/11 172/11 174/13 174/17 174/18 177/24 178/7 179/9 179/21 182/19 184/1 184/18 185/2 190/9 192/12 192/18 193/15 196/15 197/14 197/17 198/15 198/18 198/23 199/8 199/19 200/7 201/18 204/9 204/19 205/18 208/25 209/1 218/15 219/11 223/9 225/22 227/14 228/9 228/24 231/15 239/6 239/12 239/17 239/21 240/17 241/15 242/13 245/17 247/5 250/18 251/6 252/12 254/7 254/16

**theirs [1]** 127/25

**them [120]** 8/19 9/1 9/13 17/17 21/3 25/19 26/14 33/19 38/24 41/1 41/6 41/11 41/12 42/16 43/10 45/4 45/21 46/22 51/4 62/8 64/11 74/6 77/5 77/11 78/6 80/20 80/22 88/7 91/11 93/1 93/5 93/23 96/19 101/24 107/21 107/22 108/10 108/13 108/13 109/18 114/16 114/16 114/17 116/22 116/23 116/24 118/4 119/11 120/23 120/24 126/15 127/22 127/22 128/13 129/21 134/22 137/19 138/8 143/18 145/9 146/8 147/3 147/4 147/7 151/23 153/6 153/11 156/1 156/5 156/8 157/7 161/8 161/18 165/4 165/14 166/4 167/12 169/15 170/23 172/5 172/8 172/10 178/3 179/19 179/21 180/22 182/4 184/2 185/9 189/10 199/1 199/6 199/12 200/22 201/21 202/9 202/10 202/15 202/16 204/10 208/17 213/8 214/20 217/11 219/16 220/2 225/5 226/5 228/21 228/22 229/12 230/1 238/16 239/15 249/4 249/5 250/5 250/9 253/8 256/23

**theme [2]** 123/25 201/17

**themselves [6]** 86/9 95/20 98/20 137/21 178/9 217/20

**then [77]** 10/18 11/14 11/22 12/2 12/18 17/2 17/7 17/16 17/21 18/6 19/7 21/23 21/24 21/25 22/1 22/2 31/2 33/19 36/24 40/19 47/16 48/3 48/8 52/6 53/13 62/21 71/24 77/23 80/22 83/18 85/15 87/1 87/2 93/8 93/9 98/5 98/18 99/9 99/20 99/25 100/12 100/13 101/9 102/5 102/14 104/19 105/15 106/15 107/8 107/16 109/6 110/14 124/18 146/8 148/9 148/12 155/11 159/12 196/14 199/19 204/15 205/19 209/9 210/23 211/20 220/9 220/12 230/3 235/9 240/25 248/3 248/7 249/4 249/10 254/18 255/16 258/22

**theory [1]** 235/12

**there [193]** 6/18 8/12 11/16 11/19 14/23 20/15 20/16 23/1 23/11 24/10 24/18 25/4 25/24 38/10 38/12 38/14 39/21 39/24 46/22 50/6 50/17 55/10 69/2 75/3 75/18 75/23 76/8 76/20 78/13 80/11 83/23 85/9 86/23 87/12 90/13 90/16 92/1 92/6 92/13 92/22 92/24 93/1 93/6 93/10 96/19 96/19 97/14 98/14 98/16 100/19 105/15 105/18 105/22 106/9 108/6 108/6 108/8 108/20 108/24 109/9 110/21 113/15 115/7 116/18 119/12 124/8 124/16 124/23 126/22 127/1 127/14 127/21 128/21 132/22 134/4 134/14 135/5 135/6 135/18 137/7 137/11 139/4 139/11 139/20 140/2 140/17 140/19 142/4 142/19 142/20 143/22 145/13 145/16 145/25 146/19 146/20 147/9 148/23 149/14 149/22 149/23 150/1 150/8 150/15 152/10 154/10 154/23 155/8 155/19 156/4 156/11 158/15 158/18 160/8 160/9 161/10 161/11 161/12 163/9 163/25 165/15 165/17 165/19 169/17 171/25 172/9 173/3 175/9 176/18 177/12 177/22 178/9 179/7 179/20 179/20 182/4 182/7 182/16 184/19 188/18 188/18 188/21 188/22 189/8 189/14 190/22 191/14 192/18 194/16 194/23 194/25 196/20 197/11 198/18 199/24 201/17 205/1 206/2 206/3 206/11 211/21 213/3 215/4 215/6 217/10 220/3 224/13 224/22 229/25 230/4 230/24 231/4 231/4 231/15 234/5 234/11 236/4 240/9 242/2 242/7 242/10 244/15 244/17 244/20 245/4 245/8 245/11 245/13 249/21 249/23 252/8 254/4 254/13

**there's [3]** 93/2 113/7 174/8

**therefore [3]** 143/10 145/18

**therefore... [1]** 164/25
**Thereupon [4]** 67/1 84/13 166/20 259/4
**these [117]** 5/22 6/7 6/10 6/17 7/23 8/9 12/24 14/25 16/17 18/18 19/8 20/21 20/23 21/2 27/14 31/17 34/14 35/7 36/2 36/5 42/25 44/15 44/17 45/20 48/11 48/24 49/5 53/19 54/25 55/7 67/17 78/25 86/3 87/1 88/8 92/11 96/10 100/3 103/13 113/4 120/21 121/4 121/11 121/19 126/20 132/1 132/1 133/17 136/15 136/15 138/23 139/5 139/7 139/9 139/12 139/24 140/13 140/14 140/18 141/6 142/11 144/6 144/9 144/16 144/16 144/22 144/25 146/2 147/12 147/16 148/13 148/15 150/3 152/16 153/21 155/5 155/8 156/12 156/13 160/24 160/25 161/11 168/3 172/14 175/2 180/1 182/17 182/18 184/25 186/1 188/5 190/17 192/7 192/8 192/14 192/15 192/17 193/11 193/20 198/15 198/16 199/14 200/7 200/23 214/8 214/15 215/16 219/19 228/20 229/5 232/13 245/24 249/1 254/24 255/2 255/24 257/15
**they [481]**
**they left [1]** 139/16
**they safety [1]** 196/13
**they'd [1]** 132/15
**they're [1]** 37/23
**They've [1]** 38/20
**thing [19]** 47/25 67/19 74/20 97/3 106/11 153/3 153/8 161/3 174/3 178/21 179/23 192/1 192/1 198/21 198/22 200/8 216/2 225/19 226/7
**things [61]** 45/22 72/23 78/23 84/10 85/2 85/8 93/8 93/9 96/13 96/18 99/22 99/23 101/7 101/12 101/17 101/19 102/3 104/13 106/19 106/19 109/2 109/17 109/18 127/21 129/13 151/2 157/9 168/16 170/15 174/2 177/12 179/19 182/14 184/8 184/9 184/24 184/25 185/1 185/9 186/20 188/20 191/3 192/22 193/20 197/6 197/17 197/18 199/11 200/18 203/17 208/6 221/1 225/18 226/1 226/5 227/21 228/22 229/6 246/18 250/24 251/10
**think [102]** 8/17 9/12 15/1 15/6 19/10 25/24 27/6 35/15 39/3 39/14 48/10 52/17 55/4 59/14 66/11 66/21 69/5 78/6 81/12 83/14 90/1 90/4 90/19 92/16 106/11 110/8 116/25 121/4 121/6 121/8 127/14 128/18 130/19 131/2 131/3 131/4 131/9 131/15 131/15 131/16 132/4 132/18 132/20 136/17 137/11 138/2 138/7 142/6 142/8 142/9 142/10 142/14 143/7 143/7 144/11 145/2 145/5 145/5 145/13 145/20 145/25 148/18 149/18 151/11 151/19 152/6 153/13 155/3 155/3 160/17 164/2 164/18 165/15 165/19 165/22 166/12 189/20 192/24 193/9 199/8 203/10 203/14 204/4 208/1 208/23 209/23 210/13 211/4 216/11 216/20 229/7 230/7 235/2 235/9 237/16 239/1 239/4 246/14 246/18 253/11 253/20 258/16
**thinking [3]** 53/14 79/22 201/2
**third [8]** 174/5 174/11 174/11 179/13 211/19 211/19 213/3 245/23
**this [456]**
**thoroughly [1]** 225/5
**those [125]** 5/7 7/9 15/9 17/4 21/16 22/3 32/17 36/23 39/2 40/3 47/8 47/16 53/25 57/11 61/23 64/9 71/18 72/10 80/22 82/6 85/15 86/9 90/18 90/20 90/22 90/24 91/9 91/23 92/7 92/10 92/24 95/21 100/1 101/12 101/12 101/22 101/23 102/3 102/6 106/19 107/6 107/17 107/24 108/13 121/14 121/17 121/19 121/22 122/24 126/18 127/20 134/20 135/9 137/14 137/18 142/3 142/24 143/23 143/24 146/25 147/3 148/10 151/16 151/21 152/4 152/8 153/16 153/20 154/20 155/7 156/1 156/17 168/22 169/12 169/14 169/20 171/12 172/19 174/1 175/10 177/14 177/15 179/19 181/5 181/19 184/2 184/8 184/9 184/17 188/8 188/24 190/11 190/12 190/13 190/17 191/2 192/3 192/5 196/14 196/14 196/18 202/1 202/3 209/21 212/23 217/16 217/18 218/15 219/17 219/25 225/12 226/19 229/6 231/11 231/17 231/22 232/2 232/8 236/12 244/18 245/6 250/23 254/6 255/7 257/24
**though [10]** 4/10 26/13 138/2 138/13 211/5 217/23 218/24 232/12 233/17 252/14
**thought [16]** 79/2 82/9 98/17 102/25 110/4 116/21 142/25 147/25 165/19 186/11 203/22 204/3 218/17 232/19 252/11 257/22
**thoughtful [1]** 134/8
**thoughtfulness [1]** 134/10
**thoughts [1]** 258/18
**thousand [4]** 97/19 97/20 141/18 216/5
**thousands [5]** 68/4 68/7 265/2 [illegible]
**threat [1]** 254/11
**three [18]** 12/23 19/21 48/1 87/4 107/2 130/9 148/13 165/13 229/25 230/16 231/16 240/8 242/7 254/8 254/13 254/16 258/5 258/12
**through [36]** 4/15 13/18 14/22 18/16 27/10 42/12 52/15 52/20 74/23 78/23 80/19 113/1 168/5 170/7 176/19 178/19 184/4 190/4 191/8 191/13 197/14 198/19 199/8 199/11 201/15 205/17 210/11 212/2 225/5 242/15 244/8 247/2 252/20 253/14 253/16 255/7
**throughout [2]** 64/8 154/24
**thus [1]** 56/23
**tickets [2]** 22/5 192/13
**tie [2]** 6/8 162/3
**tied [3]** 24/5 96/22 125/24
**ties [1]** 161/22
**time [84]** 10/10 13/18 14/13 14/19 14/24 15/5 17/13 19/10 24/22 25/3 25/6 26/21 29/21 33/2 33/7 42/24 44/21 45/2 45/25 46/15 48/19 56/16 59/14 61/9 61/10 61/21 63/24 66/10 78/19 79/16 84/5 85/17 86/1 91/14 95/14 96/25 99/8 99/11 102/5 104/12 114/8 117/24 118/4 118/5 118/5 119/12 123/7 123/12 125/22 133/4 134/23 139/7 147/1 147/2 156/18 164/14 174/7 174/9 176/24 186/13 189/4 189/7 191/24 192/6 196/4 196/10 196/22 197/13 198/7 200/9 200/12 201/2 202/22 205/4 226/25 228/21 228/22 228/23 241/9 242/17 253/15 255/21 258/11 258/21
**time had [1]** 134/23
**timeline [1]** 25/1
**times [6]** 37/9 85/15 97/18 128/14 210/18 253/17
**timing [1]** 240/4
**title [2]** 41/25 186/25
**to achieve [1]** 6/9
**to communicate [1]** 143/21
**to download [1]** 242/16
**to Lauren [1]** 43/18
**to use [1]** 78/6
**today [28]** 5/19 14/2 18/4 73/8 73/11 100/22 104/24 105/9 105/12 106/8 110/19 111/21 114/21 128/20 140/7 150/5 176/18 185/11 190/5 191/8 192/19 199/4 201/24 204/12 212/23 216/2 220/15 228/5
**together [12]** 49/24 50/16 51/9 74/6 77/16 90/18 125/22 134/9 167/21 194/6 200/19 256/25
**toggle [1]** 14/22
**told [22]** 25/7 25/24 31/14

T

**told... [19]** 31/16 31/22 31/23 31/25 32/2 41/7 45/1 65/6 84/10 92/4 102/11 102/11 143/18 153/9 156/21 161/25 192/20 227/17 240/1
**tomorrow [5]** 258/12 258/16 258/21 258/24 259/3
**tons [1]** 136/25
**too [11]** 46/2 96/11 108/10 142/16 143/19 149/1 163/17 213/1 251/7 251/9 252/2
**took [6]** 98/21 136/19 151/5 151/6 177/9 192/22
**tool [12]** 67/20 67/22 68/16 83/13 83/16 83/24 96/8 107/22 138/15 179/10 179/11 179/14
**tools [6]** 24/11 91/24 107/14 177/22 178/1 178/5
**top [13]** 16/20 21/1 26/18 40/5 107/16 107/18 107/20 109/5 111/12 116/3 211/16 224/16 237/23
**topic [2]** 45/7 70/18
**total [3]** 12/2 61/4 211/17
**totaling [1]** 127/18
**totally [2]** 130/2 165/25
**totals [1]** 237/8
**touch [1]** 174/24
**touches [2]** 174/23 174/23
**tough [2]** 108/10 184/2
**tougher [1]** 75/17
**toward [5]** 9/3 29/12 120/18 217/9 217/16
**towards [1]** 217/11
**town [1]** 178/17
**track [1]** 147/1
**trade [1]** 133/14
**traditionally [1]** 90/1
**training [1]** 174/1
**transcript [14]** 6/1 6/6 8/2 8/5 8/6 8/7 9/6 9/10 150/9 199/15 199/24 252/9 257/3 259/6
**transferred [2]** 163/24 167/17
**transfers [5]** 163/12 163/14 163/17 163/18 163/24
**translated [1]** 181/6
**transparency [25]** 23/19 24/17 57/23 82/23 82/23 85/20 86/16 86/18 86/20 90/2 90/9 91/4 96/20 96/22 97/3 97/5 100/19 101/3 108/6 126/19 145/6 145/7 170/6 199/9 201/19
**transparent [19]** 7/13 27/20 64/9 64/10 96/7 98/10 98/23 134/13 140/15 145/8 147/2 150/14 154/9 156/7 198/25 199/2 199/10 203/16 249/22
**trauma [1]** 163/23
**treat [2]** 87/15 87/16
**treating [1]** 63/10
**treatment [2]** 142/12 219/14
**trees [2]** 48/12 48/25
**tremendous [1]** 190/16
**trends [2]** 107/8 155/24
**trial [9]** 1/11 40/11 111/10 130/1 130/22 154/25 195/11 223/7 228/22
**Tricare [4]** 219/25 220/1 220/4 220/5
**trickling [1]** 192/4
**tried [5]** 111/8 143/20 192/23 225/20 227/20
**tries [1]** 190/19
**Trinity [1]** 220/4
**tropes [2]** 101/23 103/14
**trouble [1]** 213/23
**troubles [1]** 192/8
**Troy [3]** 52/21 52/24 53/13
**true [33]** 39/15 47/19 67/24 87/20 100/22 102/6 102/7 102/12 104/22 104/23 104/24 105/9 105/10 105/12 105/13 105/13 106/13 106/14 106/14 159/6 183/5 183/6 183/25 209/24 220/11 221/25 223/18 223/20 225/8 229/21 231/14 237/7 257/23
**truly [2]** 141/20 204/12
**trust [3]** 117/2 193/9 215/22
**trusted [1]** 209/11
**trustworthy [2]** 27/20 27/22
**truth [3]** 18/5 20/2 162/17
**truthful [2]** 25/5 94/20
**try [12]** 45/24 79/3 98/11 137/20 155/23 193/2 193/2 217/7 217/15 220/21 222/19 229/24
**trying [22]** 16/23 17/18 26/8 26/11 35/21 51/2 66/19 78/23 79/4 94/23 95/19 147/25 148/3 150/24 182/11 191/2 212/11 212/16 229/22 236/1 246/14 255/6
**Turbo [1]** 179/11
**turn [8]** 4/23 5/11 10/15 15/7 19/21 54/22 102/9 215/3
**turning [3]** 6/5 12/23 100/18
**TV [1]** 129/2
**Twelve [1]** 230/9
**Twenty [1]** 23/23
**twice [4]** 159/4 159/5 170/21 205/16
**two [77]** 4/23 10/15 11/20 15/7 16/20 17/13 43/11 56/19 59/24 64/2 65/1 85/23 87/4 96/25 99/19 102/1 127/12 132/10 135/9 135/14 138/10 148/23 163/1 170/24 172/2 174/11 175/10 183/9 183/17 185/20 186/3 190/7 192/11 192/21 195/18 196/5 196/7 196/10 196/20 196/21 197/4 197/5 197/5 197/7 200/4 200/4 200/9 200/11 200/12 200/13 200/17 200/18 200/24 201/5 201/14 203/20 203/23 204/7 204/16 206/3 206/8 206/11 206/17 207/4 225/18 226/5 226/15 227/5 229/6 235/1 245/10 245/23 246/10 247/4 256/17 257/25 258/12
**two but [1]** 204/16
**two percent [1]** 11/20
**type [3]** 53/25 117/12 165/11
**types [8]** 7/23 8/9 107/17 109/13 130/5 161/10 171/12 171/20
**typical [1]** 34/19
**typically [1]** 44/12

U

**U.S [3]** 71/8 106/2 152/17
**ubiquitous [1]** 189/22
**UC [5]** 58/10 63/14 82/4 82/18 123/23
**uh [5]** 45/8 53/12 55/6 59/23 171/23
**Uh-huh [1]** 53/12
**uh-hum [4]** 45/8 55/6 59/23 171/23
**ultimate [2]** 91/3 207/9
**ultimately [9]** 150/10 201/7 201/23 203/20 204/4 206/20 207/12 248/9 254/20
**Um [5]** 30/16 40/16 52/17 232/20 237/24
**Um-hum [1]** 232/20
**Um-m-m [4]** 30/16 40/16 52/17 237/24
**unchanged [2]** 246/10 246/16
**under [22]** 12/23 30/12 55/10 79/10 112/10 112/25 122/24 125/24 132/22 136/6 136/13 139/23 157/2 164/4 183/23 188/2 196/20 228/3 228/5 236/14 250/2 251/20
**undergoes [1]** 123/2
**undergone [3]** 125/5 125/10 125/15
**underlies [1]** 227/9
**understand [39]** 10/4 16/14 16/23 17/18 23/14 24/13 31/16 38/24 46/2 46/3 46/9 48/12 49/12 52/19 70/19 70/20 70/22 70/24 73/9 75/10 76/10 89/12 109/21 124/16 132/17 141/22 142/6 142/8 142/11 142/13 142/14 158/13 208/2 217/4 244/1 245/25 248/22 257/9 257/11
**understandable [1]** 110/9
**understanding [15]** 9/18 43/23 77/22 114/4 114/7 118/7 125/21 164/17 164/20 180/15 180/21 195/12 210/7 235/18 256/20
**understands [1]** 24/4
**understood [5]** 44/17 70/15 110/16 154/20 214/5
**undue [2]** 29/8 44/1
**unethical [5]** 25/4 25/5 26/12 133/23 134/6
**unfair [21]** 133/13 133/17 133/20 133/22 134/2 139/23 140/25 155/12 155/18 158/6 158/9 159/14 159/22 160/5 250/8 250/12 250/15 250/20 252/4 252/6 252/11

**U**

**unfairly [2]** 250/4 251/11
**unfairness [1]** 164/6
**unfamiliar [1]** 9/7
**Unfortunately [2]** 156/23 212/7
**unhappy [1]** 62/7
**unique [1]** 11/19
**unit [3]** 146/13 175/11 175/17
**UNITED [9]** 1/1 1/12 130/24 153/7 171/1 216/4 216/6 233/21 234/17
**units [2]** 174/4 174/13
**University [4]** 3/15 63/8 167/7 191/12
**unknown [1]** 189/2
**unless [2]** 137/23 172/10
**unlike [2]** 214/16 219/14
**unnecessarily [1]** 246/8
**unscrupulous [3]** 133/24 134/7 135/4
**unsubstantiated [1]** 141/15
**until [6]** 61/24 108/3 108/5 123/18 223/3 244/5
**untoward [1]** 131/16
**untrue [2]** 129/13 130/14
**unusual [1]** 45/22
**up [115]** 12/18 15/19 18/17 18/19 19/8 19/23 27/7 27/7 29/1 32/3 37/1 37/4 37/7 40/9 43/7 43/9 43/9 43/11 43/22 44/7 45/13 45/17 51/9 52/2 53/7 54/22 56/12 58/23 64/20 65/17 67/7 68/21 69/13 69/21 72/9 72/11 73/16 76/11 77/14 78/17 80/7 83/9 93/18 97/19 98/7 101/8 102/16 104/3 106/25 108/5 110/18 111/12 113/14 115/6 118/24 120/21 122/17 123/19 129/10 135/16 137/11 140/8 140/20 141/16 142/4 142/5 144/7 144/10 144/11 144/13 145/22 145/23 145/24 147/5 152/4 152/11 152/12 152/15 153/21 155/13 155/13 155/13 158/7 158/21 158/22 163/15 165/5 172/2 172/15 185/21 186/20 187/7 187/7 187/17 193/18 199/4 200/25 200/25 200/25 202/10 204/24 207/20 208/20 210/10 211/3 212/9 212/25 214/9 231/15 231/23 243/21 246/23 249/17 256/9 256/20
**update [6]** 31/18 32/9 65/15 68/20 69/12 247/9
**updated [2]** 69/25 117/23
**updates [2]** 47/15 101/8
**updating [2]** 10/15 64/11
**upset [4]** 62/5 162/15 162/18 163/4
**upwards [1]** 147/22
**urban [1]** 196/12
**urgent [1]** 87/14
**us [46]** 41/7 68/21 74/10 82/24 84/11 87/12 87/13 87/15 87/16 88/9 88/10 89/6 89/10 89/10 89/12 91/9 93/6 93/11 93/23 94/8 94/10 94/10 98/10 98/15 99/9 107/21 110/7 110/8 110/15 114/9 114/10 116/19 116/25 117/18 118/5 127/19 130/22 132/16 142/3 179/22 189/20 204/5 225/22 225/24 241/15 254/22
**usability [1]** 111/14
**use [70]** 7/9 32/18 40/11 54/10 58/24 67/22 68/9 68/13 68/15 74/17 76/13 78/6 83/12 83/15 83/20 88/13 92/4 95/1 95/21 105/14 105/25 107/18 107/20 107/21 107/22 114/18 124/7 130/17 131/25 132/19 148/22 153/20 161/12 173/8 175/12 176/12 176/14 177/2 178/6 178/13 179/23 180/11 180/23 181/3 181/19 187/4 187/24 187/24 190/1 193/5 195/4 196/15 217/5 217/11 218/19 219/3 219/4 219/5 219/6 219/9 227/4 229/11 229/24 235/17 235/22 235/23 236/2 236/17 236/23 240/11
**useable [2]** 110/2 115/21
**used [27]** 19/16 27/14 32/17 51/20 60/10 63/19 70/13 72/4 94/10 95/7 95/20 102/2 111/18 122/9 122/13 123/13 172/20 177/4 187/15 218/24 220/9 229/21 229/23 231/9 231/11 253/20 256/11
**useful [1]** 176/13
**user [6]** 111/19 112/17 113/12 114/19 116/17 116/18
**uses [6]** 69/20 92/10 159/9 176/1 179/9 181/2
**using [13]** 13/12 134/15 148/24 149/1 174/5 181/5 189/24 191/1 192/15 194/9 194/9 199/7 227/6
**usually [2]** 45/24 166/18
**Utah [1]** 191/13
**utilize [2]** 114/24 246/25
**utilized [1]** 180/1
**utilizing [1]** 180/19

**V**

**valid [1]** 255/10
**validating [1]** 176/9
**validity [1]** 198/18
**valuable [5]** 57/5 57/9 58/6 58/11 58/16
**value [16]** 56/20 58/15 82/5 82/9 82/12 109/16 136/5 136/13 136/19 169/2 172/13 176/16 176/19 196/22 221/9 221/12
**values [1]** 196/9
**Van [4]** 120/25 212/3 212/19 218/17
**variation [2]** 177/13 190/16
**varies [1]** 25/6
**variety [6]** 74/7 88/22 93/6 216/11 216/13 229/15
**various [15]** 58/4 91/18 106/24 123/12 163/3 163/11 170/15 176/17 177/5 182/13 196/6 196/19 212/23 219/24 233/16
**vehicle [1]** 172/11
**vendor [3]** 19/15 19/18 20/20
**Vendors [1]** 137/19
**verification [15]** 92/14 92/17 92/19 92/20 94/16 106/10 146/14 178/25 179/4 179/9 179/13 225/5 255/5 255/9 255/12
**verifications [2]** 68/1 255/6
**verified [1]** 41/12
**verify [5]** 41/8 67/25 179/21 225/5 255/7
**version [9]** 64/24 65/6 67/14 68/21 70/4 83/11 83/18 83/19 83/19
**versus [5]** 12/6 135/20 155/2 229/5 242/12
**very [82]** 3/10 4/23 25/6 30/21 45/22 47/5 48/18 53/10 56/19 62/7 65/13 70/9 74/2 75/20 75/24 77/1 80/3 80/4 80/13 80/23 82/25 82/25 86/1 86/4 86/24 89/20 89/23 90/4 91/21 91/22 92/8 95/23 98/9 98/18 98/18 99/17 101/2 105/1 108/21 109/21 110/5 110/7 110/10 116/2 121/10 126/4 129/13 131/21 131/25 143/21 157/3 157/21 160/8 160/12 160/16 161/3 161/7 163/6 170/19 170/22 170/22 171/5 182/9 182/14 183/8 185/19 188/21 188/23 193/4 193/5 193/14 210/4 212/7 212/9 216/13 216/13 229/11 233/19 235/25 252/20 254/25 257/22
**veterans [1]** 219/14
**via [1]** 179/14
**vice [12]** 4/4 22/13 23/3 168/6 168/9 168/15 176/5 179/4 180/6 192/23 193/24 203/2
**vice-president [7]** 168/6 168/9 168/15 176/5 179/4 180/6 193/24
**video [12]** 3/20 14/19 14/23 15/4 33/25 34/6 87/23 120/25 132/25 194/2 199/24 212/5
**videos [2]** 212/8 258/13
**view [15]** 131/11 131/19 209/24 210/6 216/3 216/15 216/15 218/1 218/1 218/4 225/18 225/25 249/3 252/14 254/16
**views [1]** 64/3
**villain [2]** 18/2 46/3
**villian [2]** 17/22 46/1
**violation [1]** 130/24
**Virtual [1]** 155/1
**virtually [4]** 86/6 86/8 89/22 210/18
**virtue [2]** 186/5 244/1

**V**

**visibility [1]** 209/11
**visiting [5]** 8/17 8/24 9/2 9/12 25/18
**visitor [2]** 36/19 59/25
**visitors [3]** 7/12 7/16 65/6
**visits [3]** 18/18 67/25 68/4
**voice [2]** 85/20 86/16
**Voluminous [1]** 157/23
**voluntary [4]** 146/17 173/7 186/12 186/14
**volunteer [2]** 90/24 150/13
**volunteering [1]** 82/24
**volunteerism [1]** 83/1
**volunteers [2]** 90/20 90/21
**vote [4]** 150/1 184/23 186/21 187/13
**votes [1]** 186/23
**voting [2]** 149/25 187/7

**W**

**waiting [2]** 93/20 241/14
**waive [1]** 59/3
**want [102]** 8/24 9/11 21/10 24/4 26/14 26/19 27/19 31/1 38/15 38/18 38/24 46/1 53/23 63/15 65/1 66/16 69/19 72/22 74/21 76/19 80/7 80/13 80/13 87/15 87/22 88/15 89/18 90/22 91/22 93/3 93/23 94/22 96/3 96/7 97/10 99/23 100/5 101/15 102/10 106/22 107/10 107/22 108/1 108/2 108/4 108/12 108/13 108/20 109/20 116/23 117/1 117/2 117/15 117/22 117/25 118/1 118/4 122/17 123/24 125/18 130/19 130/21 131/24 133/20 137/23 138/17 140/10 142/19 147/2 153/12 161/14 165/7 166/15 169/24 172/23 172/23 178/1 179/3 180/3 181/14 183/13 186/19 187/16 187/21 191/19 191/20 195/4 199/9 199/19 201/3 208/10 209/19 210/1 210/11 216/19 216/24 225/7 229/4 229/11 235/18 247/5 258/17
**wanted [32]** 15/17 15/20 15/25 16/3 16/11 16/12 16/15 16/17 27/21 47/11 47/12 47/17 85/15 85/16 85/20 108/12 109/1 109/3 114/15 116/20 116/24 119/16 119/18 195/3 195/13 203/21 204/10 206/24 252/10 252/12 256/17 258/18
**wanting [2]** 139/8 250/16
**wants [13]** 5/12 7/6 7/9 7/12 8/17 15/8 15/20 15/22 17/17 105/14 107/13 107/20 133/7
**warning [1]** 179/12
**warnings [1]** 179/10
**was [362]**
**was deincentivizing [1]** 134/22
**was founded [1]** 170/5
**wash [3]** 76/24 174/13 194/16
**washed [1]** 239/17
**washes [2]** 39/3 39/13
**washing [45]** 32/16 32/18 32/22 33/20 34/9 37/11 37/14 38/16 39/17 39/20 40/6 40/20 41/1 41/5 41/9 41/18 41/19 50/4 50/17 50/19 51/4 51/6 51/11 74/21 74/22 76/22 76/23 142/12 146/5 146/7 146/10 149/5 232/18 232/21 232/24 233/4 233/5 234/10 236/19 239/7 239/12 239/21 239/24 251/6 251/12
**washings [1]** 189/15
**Washington [1]** 1/19
**wasn't [19]** 44/22 61/9 62/19 102/12 102/13 106/13 106/14 117/1 123/17 141/21 142/4 145/24 147/21 213/23 214/4 225/8 227/7 237/6 244/5
**watch [1]** 97/7
**water [2]** 173/23 226/9
**way [53]** 3/3 21/20 22/6 26/20 34/8 34/22 34/22 34/23 37/6 38/25 39/10 39/16 39/21 39/24 41/11 50/20 51/11 54/4 57/7 63/25 81/19 81/24 88/6 102/13 115/21 134/8 134/19 135/1 140/18 141/20 143/19 148/9 171/19 176/13 178/2 185/2 185/11 188/24 189/20 190/6 191/7 191/9 191/14 193/12 198/24 204/3 204/5 221/22 222/22 226/24 227/23 242/25 255/10
**ways [1]** 175/12
**we [780]**
**We can [1]** 20/13
**we'll [3]** 132/23 216/4 231/4
**we're [4]** 40/18 74/23 92/9 128/23
**we've [5]** 43/15 64/2 100/24 105/21 118/9
**wear [1]** 173/24
**web [1]** 145/13
**webinars [1]** 91/10
**website [100]** 7/1 7/3 7/12 7/13 7/16 22/17 22/20 36/10 36/19 38/19 40/5 40/10 41/20 42/12 64/1 64/14 64/17 64/20 64/22 64/24 65/6 65/13 65/15 65/18 65/21 67/7 67/15 67/16 68/17 68/20 68/22 69/12 69/13 70/4 71/12 72/5 72/7 72/11 72/14 72/16 76/13 77/21 83/2 109/21 109/22 109/25 110/2 110/4 110/9 110/13 110/16 111/15 111/19 112/12 112/18 112/21 113/12 114/12 114/20 114/25 115/4 116/6 116/6 116/16 117/10 124/11 124/15 124/15 124/17 124/17 124/24 124/24 126/23 127/3 132/7 137/12 140/10 141/13 141/13 141/22 142/4 143/9 143/14 148/19 154/2 154/7 154/8 154/14 154/16 208/4 210/5 210/6 211/9 211/13 211/14 217/12 217/13 217/14 241/1 241/15
**websites [2]** 64/6 64/9
**weeds [4]** 41/24 41/25 142/17 143/19
**week [6]** 10/16 11/9 12/13 116/7 141/16 201/12
**weeks [1]** 96/25
**weigh [2]** 197/14 205/17
**weighing [1]** 230/21
**weight [13]** 132/4 140/8 182/19 229/2 229/13 229/18 230/21 231/15 231/17 231/20 231/22 231/23 232/3
**weighted [2]** 183/18 232/5
**weighting [2]** 181/20 183/17
**well [74]** 8/21 9/24 13/8 14/22 16/10 16/13 18/16 18/25 25/21 31/14 34/13 37/7 37/15 39/25 40/5 43/6 44/3 44/9 57/14 61/13 62/21 64/20 65/7 65/17 66/17 74/11 80/22 85/7 87/5 88/14 89/6 89/22 90/8 91/21 92/22 96/12 98/12 99/19 101/5 110/3 117/22 121/21 122/17 124/6 124/21 127/7 128/15 129/6 144/12 151/9 156/2 157/3 168/2 173/4 173/9 180/2 189/10 191/2 192/14 197/14 199/6 202/9 203/20 204/11 207/11 210/4 210/24 212/8 224/11 224/20 249/17 257/22 257/25 258/14
**well-rounded [1]** 74/11
**went [20]** 4/17 21/23 43/9 44/22 72/23 100/15 119/12 124/12 139/14 139/17 141/9 150/7 160/23 163/23 182/5 196/21 201/4 204/6 252/20 257/15
**were [141]** 9/20 13/5 13/12 13/18 14/12 14/24 16/4 16/11 16/17 22/17 22/18 24/25 25/3 25/4 25/5 25/18 26/1 26/6 26/8 26/12 26/17 27/22 32/15 32/25 34/14 34/24 35/21 36/15 43/10 45/19 48/4 49/15 62/2 62/4 62/14 62/17 62/20 66/4 67/6 68/19 77/2 81/5 82/15 85/11 86/4 86/6 86/7 86/9 86/15 86/23 86/24 87/2 89/24 97/19 97/20 98/3 98/4 98/6 98/14 98/20 99/8 102/6 103/4 103/12 103/14 103/16 114/23 115/20 116/16 116/16 116/18 116/21 117/9 128/21 134/21 141/6 141/12 142/5 143/15 147/21 147/25 148/3 148/24 150/5 150/8 150/23 152/21 154/18 155/24 159/5 160/19 161/16 163/4 165/1 167/11 170/4 180/12 182/11 190/3 192/3 192/4 192/11 192/13 192/20 194/18 195/10 195/13 196/5 196/9 196/17 196/22 196/23 196/23 196/24

**W**


**were... [27]** 198/9 198/12 198/25 200/9 200/15 203/18 207/13 210/15 212/6 212/11 213/1 215/13 218/17 232/2 236/10 236/13 239/8 243/20 245/6 245/9 249/8 250/13 250/19 251/3 251/9 254/4 256/17
**weren't [5]** 20/16 62/16 86/10 86/10 185/18
**WEST [9]** 1/2 1/8 2/7 139/16 141/9 155/24 163/1 257/9 257/17
**what [308]**
**what's [1]** 101/11
**whatever [7]** 39/2 43/6 117/24 132/3 138/18 192/20 258/23
**when [100]** 5/22 7/10 7/20 9/2 16/14 16/20 19/23 24/8 26/9 39/23 44/14 44/21 44/25 46/16 46/22 47/14 48/4 48/17 48/17 55/10 67/21 72/10 76/3 80/14 82/14 84/21 84/24 85/3 85/8 85/17 86/1 86/5 88/14 90/10 92/1 92/23 94/20 95/14 95/15 98/4 99/24 101/25 104/15 110/3 114/6 114/10 119/12 130/15 131/21 134/2 134/15 156/9 157/9 160/22 164/12 167/16 170/19 174/20 176/8 177/16 177/20 180/12 180/25 181/1 181/13 182/9 183/7 184/15 185/13 186/7 186/24 187/8 189/1 190/7 192/8 192/25 193/16 194/24 195/21 207/12 208/24 209/25 210/10 210/17 212/8 216/24 217/6 217/9 217/9 219/20 225/15 226/3 229/2 229/5 229/8 229/12 237/25 249/14 250/19 253/25
**whenever [2]** 18/17 18/18
**where [49]** 15/9 24/25 35/16 45/23 51/20 53/15 63/9 63/20 63/21 65/4 82/4 82/17 87/15 93/6 93/8 94/18 98/4 100/10 100/16 109/16 120/3 121/1 122/3 137/10 139/14 139/19 140/20 149/19 155/25 167/9 175/24 178/3 178/13 179/13 179/23 181/24 182/3 192/19 197/23 211/21 212/7 218/10 218/14 220/4 241/13 245/8 253/22 256/10 257/3
**whereas [2]** 170/10 177/8
**Whereupon [6]** 14/10 29/23 103/25 112/6 113/24 115/11
**wherever [1]** 200/25
**whether [52]** 27/12 27/13 27/16 34/5 39/16 41/1 41/9 45/12 45/19 65/8 73/22 75/12 75/21 80/25 82/8 100/1 112/16 123/11 125/4 125/8 125/13 129/24 131/8 140/14 141/12 141/20 141/21 154/13 154/20 155/9 163/21 173/22 179/19 182/11 189/16 193/12 210/14 214/7 218/7 220/24 221/1 226/25 234/9 239/23 242/10 243/1 247/22 248/1 251/24 252/6 255/1 257/13
**which [79]** 4/13 9/18 19/12 27/20 29/14 36/10 38/9 40/9 43/10 46/22 52/18 53/14 56/12 60/16 64/20 68/21 68/23 69/20 72/9 72/24 78/19 78/20 79/22 80/8 81/5 81/9 83/18 87/2 102/9 109/2 110/4 116/10 127/13 127/16 127/25 128/6 129/12 130/11 130/15 132/21 134/8 136/19 139/22 143/8 143/13 152/11 153/16 159/3 160/10 160/12 165/13 173/11 173/13 175/9 180/4 181/6 187/17 192/6 194/24 196/5 201/7 207/4 207/7 220/17 220/25 229/10 229/25 230/25 231/12 231/14 231/16 233/3 234/13 240/2 243/20 244/12 254/4 254/16 255/8
**while [10]** 48/3 60/1 78/16 93/20 117/6 132/17 155/3 155/5 167/20 243/2
**White [1]** 97/22
**who [79]** 3/8 10/4 10/7 13/23 14/2 22/9 23/7 36/23 42/20 54/1 54/9 66/6 70/13 70/17 85/11 86/22 88/10 88/11 91/8 93/10 93/21 95/17 98/6 101/8 106/9 114/13 117/19 118/7 118/16 136/16 136/22 136/23 137/18 139/21 142/16 147/14 149/21 158/19 158/19 158/22 159/15 160/11 161/16 162/11 162/24 162/25 163/4 163/6 167/12 169/5 169/6 170/24 173/8 174/23 180/7 180/9 180/11 183/9 183/22 185/18 188/22 193/18 195/13 200/7 203/24 207/11 207/13 209/25 210/6 216/24 218/10 218/21 219/17 224/13 224/17 239/16 244/24 247/25 255/18
**whole [6]** 21/15 74/7 92/25 93/6 98/11 98/22
**whom [1]** 94/12
**whose [4]** 120/25 161/13 203/7 213/10
**why [68]** 13/8 14/22 16/25 17/13 17/16 22/11 26/13 26/13 26/17 41/10 41/13 57/7 74/9 77/12 77/22 78/4 82/24 86/11 87/8 88/19 89/21 91/19 92/20 93/20 97/2 97/13 107/24 117/17 119/15 123/19 128/25 136/2 136/2 136/11 145/2 146/8 146/22 150/15 155/23 157/7 163/24 170/4 171/24 173/4 177/7 181/1 183/4 184/12 184/13 187/17 187/23 188/10 188/11 188/17 189/13 189/15 190/25 191/5 191/20 193/20 205/13 209/9 211/5 215/20 220/8 221/23 227/20 250/19
**Why would [1]** 188/17
**will [88]** 3/4 3/5 3/8 3/13 25/16 29/1 29/17 30/14 40/5 45/13 48/3 48/24 52/19 67/7 68/23 76/10 77/4 78/21 79/3 84/8 84/9 87/15 87/16 93/19 94/5 94/10 107/15 108/12 109/5 109/18 112/9 112/11 116/14 118/1 127/19 127/23 132/3 132/16 148/4 148/10 156/21 157/6 157/7 166/12 166/18 168/16 172/6 172/12 174/22 174/24 175/20 179/7 180/17 181/3 183/25 184/6 184/9 190/20 190/23 197/6 197/24 199/13 199/14 199/16 200/13 209/10 217/15 221/3 222/19 226/12 229/7 229/24 231/5 231/14 233/25 238/11 240/6 240/7 243/7 245/24 245/25 246/1 252/3 258/13 258/16 258/21 258/25 258/25
**William [1]** 21/23
**willing [5]** 99/5 146/16 165/25 188/7 189/6
**Wilson [1]** 2/3
**Winhold [1]** 245/24
**wish [1]** 16/21
**withdraw [1]** 128/14
**within [2]** 121/4 225/12
**without [8]** 23/24 37/16 59/4 63/19 119/12 119/14 138/25 181/10
**witness [9]** 3/23 21/5 28/4 72/19 132/16 142/16 158/16 166/25 226/9
**witnesses [1]** 143/6
**woman [1]** 163/5
**women [3]** 171/6 196/20 219/17
**Women's [1]** 191/12
**won't [4]** 49/12 116/13 180/17 198/6
**wonder [1]** 45/19
**wondered [1]** 16/21
**wonderful [1]** 139/18
**WOOD [5]** 2/1 110/11 114/24 115/3 117/11
**word [17]** 34/12 51/20 123/12 134/16 149/8 157/25 173/8 176/1 181/1 181/2 218/19 226/12 226/12 231/9 231/9 253/20 256/11
**wording [3]** 52/4 69/4 95/22
**words [11]** 17/4 30/21 49/12 52/6 53/10 87/8 158/1 158/2 183/4 234/4 252/12
**work [34]** 13/11 18/21 23/1 24/8 24/11 25/19 26/18 49/23 51/9 82/24 86/20 93/9 96/16 96/21 96/24 100/10 112/9 113/1 119/10 134/25 151/2 168/23 193/1 193/3 194/6 196/24 199/19 205/18 205/24 213/17 213/24 213/25 239/17 258/25

**W**


**worked [14]** 21/25 22/1 22/3 22/5 43/6 100/12 100/14 115/5 148/10 198/13 198/13 207/12 214/7 256/25
**working [16]** 14/13 26/10 80/4 99/2 99/7 112/10 167/14 167/16 191/2 193/13 198/11 213/21 234/5 234/9 234/14 234/15
**works [9]** 23/10 48/7 48/24 49/5 49/11 77/16 99/1 99/2 154/4
**world [3]** 92/6 159/12 160/19
**worse [4]** 98/16 159/10 182/22 182/23
**worst [12]** 35/17 35/22 36/4 42/6 42/13 42/21 75/3 131/23 143/12 143/16 145/17 149/15
**would [166]** 3/7 4/12 5/25 8/2 13/15 15/19 16/25 18/19 19/22 21/3 23/1 23/7 24/1 24/22 29/3 31/5 31/9 31/17 31/18 32/18 37/6 39/2 39/21 39/24 41/10 43/16 47/12 47/17 47/18 48/11 48/12 57/22 58/3 60/8 60/16 60/18 61/4 63/24 66/7 66/22 70/14 73/13 74/7 75/1 75/22 76/4 76/21 94/24 98/2 98/3 98/5 102/1 103/21 107/3 107/17 109/3 109/4 110/5 116/22 121/18 121/22 125/8 127/25 128/13 128/15 129/8 131/14 132/13 133/5 134/1 136/8 136/9 136/16 136/17 145/20 146/22 152/4 152/4 152/7 156/17 156/24 158/21 160/7 160/8 161/7 161/7 162/16 162/19 163/4 163/17 163/24 164/7 164/7 166/15 172/3 175/6 175/8 177/20 181/25 182/12 183/20 185/17 185/22 186/5 187/15 187/23 188/14 188/17 188/25 189/10 190/4 190/14 190/23 191/25 196/4 196/10 196/11 196/14 196/15 196/15 198/3 200/11 201/17 202/15 203/9 203/19 203/24 205/10 205/24 208/17 210/1 212/18 213/11 214/13 214/15 215/4 215/10 215/14 216/22 218/14 220/1 221/5 225/22 227/17 227/18 232/3 232/5 232/16 233/1 236/11 238/24 239/8 244/12 246/18 246/21 247/20 248/16 248/18 249/5 249/8 249/10 250/8 250/9 250/15 255/11 256/9
**wouldn't [15]** 34/12 39/15 153/23 160/14 177/25 185/6 186/8 186/8 191/14 197/1 214/9 224/16 237/18 249/4 249/9
**write [3]** 32/9 58/22 210/5
**writes [5]** 17/2 17/21 19/22 56/20 57/11
**writing [5]** 116/17 167/11 167/17 208/23 208/23
**written [2]** 119/6 119/7
**wrong [12]** 75/24 75/25 93/11 98/22 158/10 163/13 174/8 193/16 213/10 213/11 215/7 222/22
**wrong with [1]** 158/10
**wrote [18]** 15/8 16/24 17/16 17/19 17/20 17/22 20/8 52/10 53/15 57/17 58/2 58/10 59/25 62/13 62/21 62/23 82/15 95/17


**Y**


**yeah [8]** 45/21 47/23 53/10 63/22 101/17 106/11 108/16 129/11
**year [36]** 4/15 7/20 8/6 30/13 30/14 44/23 44/24 44/24 45/4 45/11 60/2 62/4 97/1 97/15 98/15 101/25 102/21 107/1 119/14 123/7 167/18 170/9 170/21 170/21 179/24 188/22 188/24 195/14 195/15 204/17 205/16 241/12 242/17 245/20 246/10 249/14
**years [37]** 21/25 22/1 35/24 36/1 36/3 50/16 71/21 84/20 85/23 87/4 97/7 98/12 98/13 98/13 101/24 102/1 111/7 114/3 119/12 123/5 148/13 148/14 168/4 170/5 177/21 179/15 192/11 192/21 200/24 205/23 238/25 239/3 239/4 244/6 244/8 244/11 256/25
**yes [380]**
**yesterday [11]** 32/21 34/23 36/15 51/14 51/19 51/20 62/6 62/10 71/9 156/22 222/7
**yet [4]** 127/21 156/6 234/6 234/11
**York [4]** 97/18 100/13 100/15 214/21
**York City [1]** 214/21
**you [1181]**
**You don't [1]** 46/1
**you got [1]** 151/9
**you write [1]** 32/9
**you'd [4]** 77/14 133/9 207/20 209/8
**you'll [2]** 18/11 115/19
**you're [3]** 8/13 84/6 182/24
**you've [2]** 128/20 230/6
**your [329]**
**your own [1]** 87/8
**yourself [5]** 24/19 46/8 80/2 205/1 207/10


**Z**


**Zarcadoolas [12]** 111/20 111/23 112/17 113/7 113/11 114/2 114/6 114/19 115/2 117/11 124/11 124/18
**Zen [1]** 178/13
**zero [39]** 151/10 151/13 151/14 151/15 151/19 151/22 151/23 151/25 181/22 186/8 232/2 232/5 232/5 232/7 232/8 232/9 237/13 237/21 244/25 245/2 245/4 245/12 249/2 249/3 249/3 249/4 249/6 249/10 249/12 249/15 249/18 249/18 249/21 249/23 255/22 255/24 256/2 256/6 256/22
**zeros [1]** 245/8
**ZIBAS [1]** 2/2
**Zoom [4]** 13/19 14/19 14/23 15/4

# TRIAL TRANSCRIPT
# VOLUME 4

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-CV-80526-MIDDLEBROOKS

| | |
|---|---|
| **GOOD SAMARITAN MEDICAL CENTER, INC. et al,** | |
| **Plaintiffs,** | |
| vs. | |
| **THE LEAPFROG GROUP,** | West Palm Beach, FL January 22, 2026 |
| **Defendant.** | |

BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

FOR THE PLAINTIFFS:

**MARY BETH MALONEY, ESQ.**
**KEVIN SIMMONS, ESQ.**
**SYDNEY A. SCOTT, ESQ.**
**LEE R. CRAIN, ESQ.**
**SCOTT K. HVIDT, ESQ.**
**Gibson, Dunn & Crutcher LLP**
**1700 M Street NW**
**Washington, DC 20036**
202-887-3729

**JEFFREY E. MARCUS, ESQ.**
**Marcus Rashbaum Pineiro & Meyers LLP**
**2 S Biscayne Boulevard**
**Suite 250**
**Miami, FL 33131**
**305-400-4260**

**FOR THE DEFENDANT:**

**KIMBERLY E. BLAIR, ESQ.**
**COURTNEY WOOD, ESQ.**
**JURA ZIBAS, ESQ.**
**MAXWELL BILLEK, ESQ.**
**Wilson Elser Moskowitz**
**Edelman & Dicker LLP**
**161 N Clark Street**
Suite 4500
**Chicago, IL 60601**
312-704-0550

**Official Court Reporter:**

**Pauline A. Stipes**
West Palm Beach/Ft. Pierce, FL
HON. DONALD M. MIDDLEBROOKS
561-803-3434

THE COURT: Good morning. Please be seated and please continue.

MS. BLAIR: Your Honor, we call Mark Rule to the stand.

MARK RULE, DEFENDANT'S WITNESS, SWORN

THE COURT: Good morning.

DIRECT EXAMINATION

BY MS. BLAIR:

Q. Good morning, Mr. Rule. Thank you for the fire drill and flying in yesterday. Could you please describe for the Court your educational background?

A. Sure. I went to -- I have a Bachelor's of Business Administration degree from the University of Notre Dame, an MBA from the University of Chicago, as well as I have a CFA and ABB and accredited business evaluation credentials.

Q. What is your current employment?

A. I am a partner and managing director at AlixPartners.

Q. Do you provide expert testimony in your capacity as a partner at AlixPartners?

A. I do.

Q. What are the type of expert assignments that you perform analysis in?

A. They could be across industries, including health care, but primarily there are five areas that I typically engage. The first is issues of corporate harm or economic damages, issues

of valuation, forensic accounting, solvency, and in some cases issues of corporate veil piercing or alter ego.

Q. How many expert retentions have you had in your career in those five areas?

A. As an expert witness and a consulting expert, hundreds.

Q. How many times have you testified at trial on those areas?

A. Over 15.

Q. All of those in an expert capacity?

A. Yes.

Q. Have you ever been qualified as an expert in court?

A. Yes.

Q. How many times have you been qualified?

A. In each one of those instances where I testified I was qualified.

MS. BLAIR: Your Honor, I read your order on the Daubert motions, and I'd ask that Mr. Rule be qualified as an expert on the topic of harm as it relates to this case.

THE COURT: Do you have objection?

MR. TAKAGAKI: No objection, your Honor.

THE COURT: Please proceed.

BY MS. BLAIR:

Q. Mr. Rule, what was the scope of the opinions that you are at trial here today to give?

A. At a high level, I was asked to review three expert reports that the Plaintiffs put in, one by Dr. Berger, one by Mr.

Chakurda, and one by Dr. Nicholson, and I was asked to provide any opinions as it related to their views on the concept of harm to the Plaintiffs.
Q. You also gave a rebuttal opinion, did you not, to Dr. Nicholson's counter factual?
A. Yes, I did.
Q. I want to stick to the opinions you have right now with respect to harm.
What were the documents that you reviewed in coming to your conclusions about whether or not these hospitals had been harmed in this matter?
A. Well, I initially reviewed the complaint and the reports and the limited information that was contained therein as it related to admissions statistics, which ultimately, if one was to quantify or demonstrate harm, one would need sufficiently more information to do so.
Q. Do you recall what information was provided in the documents, if any, about the reputational harm and harm to goodwill that the Plaintiffs are alleging in this case?
A. The only information I saw was admission statistics and maybe some revenue numbers.
Q. Can you explain to the Court in your own words what your opinions are on your but for analysis related to the harm being alleged by these Plaintiffs to their reputation and goodwill?
A. Sure. If one wants to quantify or demonstrate that the

Plaintiffs have been harmed there are standard analyses that one could undertake. You referenced the but for analysis, where one can look at certain information such as historical financials, projections of financial performance, information related to industry specific stuff such as competition, new hospitals, macro statistics such as demographics or the economy overall.

It would be all those types of information that I or someone else that would like to quantify or demonstrate harm here would apply to a standard methodology such as a but for, which is simply a comparison, if you will, of what was the financial performance or expectation of future financial performance before the alleged harm and what was it afterwards, and assuming causation, that comparison could demonstrate a negative financial impact to the Plaintiffs.

Q. Have you ever been provided with any projections of what these hospitals were projecting their admissions rates to be either from ER visits or elective surgeries?

A. I have not seen any projections.

Q. Is that seminal to the opinions you were giving -- if you needed to give an opinion about harm would you need to see what those projections were versus how it turned out?

A. Yes, and projections are the ordinary course of business documents that exist. Yes, to be able to begin to demonstrate potential harm a comparison of the expectations before and

after would be an important consideration in that effort.
Q. Would you anticipate -- let me lay some foundation here. You have some expertise in evaluating the financial impact to health care systems, correct?
A. Yes, I do.
Q. Would you explain to the Court what that is?
A. I would describe it in a couple of different buckets. The first bucket is, over the course of my career I have been engaged as part of hospital consolidations, transactions in the health care space for regulatory purposes to effectively do financial viability analyses, which is looking at the finances of the hospitals individually and on a combined basis, both on a historical basis and gong forward basis, basically tell the regulator that combining the hospital systems from a financial perspective is a good idea. That is number one.

Number two, in the course of various litigation in the hospital space there has been similar efforts to evaluate potential harm. What I mean by that is, I did a series of cases related to failed enterprise resource planning systems or software systems for hospital systems where it wasn't working correctly, so I had to quantify the harm. The types of analyses I described earlier were the types of work I did there.

In addition to that, there have been cases, also disputes, breach of contract with suppliers and hospital systems, payer

disputes. That would be the gamut, if you will, of the type of health care hospital work I have done that again the quantification of harm or looking at financials of the hospital would be important.

Q. In your experience in looking at those types of documents in the engagements that you discussed, is it your understanding that hospitals like the five for profit hospitals would keep those types of documents in their ordinary course of business?

A. Yes. These are the types of documents you need to be able to manage the business of the hospital effectively.

Q. And again, you have not seen any of those documents in this case?

A. I have not.

Q. Is it your expert opinion that it would be difficult, if not possible, to evaluate harm to these five hospitals without also evaluating those sort of financial documents you just described?

A. To be able to evaluate from a financial perspective the harm, yes, these are critical documents. If they were available, one could definitely do it, but it is my understanding those documents are not available.

Q. And you understand the Plaintiffs have dropped their demand for damages, correct?

A. That is my understanding.

Q. Do you have an understanding that the Plaintiffs are now

stating under an injunctive standard that they have been aggrieved?
A. That is my understanding.
Q. Can you describe for the Court how a for profit corporation would provide an analysis as to whether or not they have been aggrieved, corporation versus an individual?
A. From my perspective, for a corporation to be aggrieved, or harmed, or injured, it would have to be from a financial perspective, so that would be the lens through which one wold have to evaluate it.
Q. Your report talks about substantial harm -- or substantial injury, excuse me, correct?
A. Correct.
Q. Would that same analysis apply to a determination as to whether or not a corporation has been aggrieved in your opinion?
A. From my understanding, yes.
Q. I am not asking for a conclusion.
A. It would be the same type of analysis. To be able to demonstrate harm, or damages, or aggrievement, it would have to be from a financial perspective, the same type of analysis and information that I described earlier.
Q. I want to drill down on the two types of harm that these Plaintiffs allege occurred to them in their complaint.
The first is they claim that they have damage to their

reputation. Do you understand that?
A. Yes.
Q. And can you briefly describe for the Court, as an expert in the field of evaluating damages to health care corporations, what would be relevant in terms of documents to an analysis of whether or not these five for profit hospitals experienced reputational harm?
A. It would be the same type of documents and analysis I described because if there is reputational harm in theory that should have a negative impact on the finances of the hospitals.
Q. Would you still need those projections you talked about?
A. I would, in addition to historical financials, because the projections are important to establish a baseline of expectations on a go forward basis, meaning if there is a set of projections the day before the alleged harm, what were they thinking, how would they perform over the next couple of years, and then how did it change afterwards. That comparison is important.
Q. Did you find in your analyses any markers establishing loss of reputation for any of the five for profit hospitals that are Plaintiffs in this case?
A. I have not seen any.
Q. As an expert in the area of harm to health care systems, what would you expect to be able to conclude with respect to reputational harm if you had the documents that you need to do

your analysis?
A. Well, again, it is the comparison that I described, and if there is an indication of a negative financial impact, that could be an indication of harm, obviously subject to causation because there could be a variety of factors that could be attributed to a negative financial impact above and beyond the Leapfrog adjustments and methodology.
Q. Is it your opinion to a reasonable degree of professional certainty that there have been no markers for any of these five hospitals of reputational harm based on your analysis?
MR. TAKAGAKI: Objection. The scope of his report does not cover reputational harm, whether it could be quantified economically. His report simply concluded that Plaintiff's experts did not do that.
THE COURT: Ask him not to do that, but the objection is overruled.
BY MS. BLAIR:
Q. In your expert opinion, to a reasonable degree of professional certainty is it your opinion, based on what you have seen in evaluating the documents that you were provided, that none of these five hospitals have demonstrated any of the markers to establish loss of reputation in this case?
A. Yes, that is my opinion because the only information that is potentially relevant that I have seen is admissions statistics, and that is insufficient in my opinion to even

demonstrate potential reputational harm.
Q. Why is it insufficient? Why can't they just say to the Judge, look, my admissions are down?
A. It is incomplete. Admissions is just one data point, it doesn't get to revenues, expenses, cash flow, value. It is a very incomplete picture from the financial perspective. Then there are all kinds of issues with what is causing this statistics to go down. There could be a variety of factors above the and beyond the methodology of Leapfrog.
Q. What are the other factors that could be contributing to a loss in admissions?
A. It could be a number of factors. It could be competition. It could be also that the hospital expected admissions to go down even before the alleged harm. It could be a variety of factors that could be contributing to a downward trend in admissions.
Q. In the expert report that you reviewed of Mr. -- Dr. Berger, in the expert report you reviewed of Dr. Berger, did he do any such analysis of impact to the reputation of these hospitals from a financial analysis?
A. No.
Q. Very quickly, the other element that they claim they have been aggrieved by is a loss of goodwill. Maybe I will get a repetitive answer, but I will ask you, what are the markers that someone in your industry would look at to determine

whether there was a loss to goodwill?
A. It is similar to what I described. Goodwill at a high level is an asset on a balance sheet, it is the amount of the corporation's value that can't be attributed to individual assets. Reputation can be part of that goodwill.
So it is the same type of analysis to be able to understand if the goodwill has been impaired, the same type of analysis I described and the same type of documents that one would need to evaluate to understand if the goodwill has been impaired.
Q. Would you need the same sort of financial documents to make that analysis you described to the Court?
A. Yes, quite honestly, corporations undertake a goodwill testing every year, and it is the same type of documents and the same type of information they use to be able to do that.
Q. So, based on your expert -- based on your expertise in evaluating goodwill for health care companies, would you expect that these five for profit hospitals would have that type of goodwill analysis?
A. I would expect it. At minimum, they would have the information to be able to undertake that analyses.
Q. You have not seen it in this case?
A. I have not.
Q. Is it your expert opinion to a reasonable degree of professional certainty that you have seen no indication of markers from any of the five for profit hospitals that they had

an impact to their goodwill as a result of the Leapfrog grade?
A. That is correct, I have not seen sufficient information to make that determination.
Q. I want to turn to your rebuttal opinion with respect to Dr. Nicholson. Can you explain to the Court what that opinion is with respect to Dr. Nicholson's counter factual and how you come to that conclusion?
A. Yes. Dr. Nicholson took issue with, as I understand it, the four imputed inputs that go into the scoring methodology or the grading methodology, effectively saying that they are only getting credit for 60 points out of 400. He makes an adjustment and basically assumes that if they would have reported for those statistics, the average value that was reported, that those imputed amounts would be much, much higher.
And so I undertook an analysis that looked at it from the opposite view, saying that if one doesn't assign any value or weighting to the four imputed, does that really change the grading at all. I undertook an analysis where I placed no weight on the four imputed and let all the other inputs within the model get re-weighted, if you will. The grades are very, very similar.
So, the conclusion from my perspective is those four imputed inputs are not what is driving the grades ultimately.
Q. As part of your analysis, did you take into consideration

the fact that the Leapfrog hospital safety grade is a composite score? Is that what you're testifying to?
A. Yes, that is effectively what I am saying. There are 22 different inputs that are weighted different weights, so it is a mathematical model that ultimately has one composite grade.
My analysis simply said if I pull out the four imputed inputs that the Plaintiffs take issue with, does that really materially change the grading? The conclusion is it doesn't. So what does that mean? Those four imputed grades are not what is driving the overall grade.
Q. To be clear, you just did a statistical mathematical analysis, not any sort of scientific -- from a medical science health care view, just a mathematical statistical analysis?
A. That is correct. It is a very similar analysis to what Dr. Nicholson did, but instead of assuming certain grade levels, I simply said let's take those out and see if it anything materially changes.
Q. In reviewing Dr. Nicholson's report, did you see any evidence that Dr. Nicholson took into account the cut points?
In other words, Dr. Nicholson said every hospital in the United States that didn't participate, I am going to assume they all participated and they all got the national average score on all seven measures. Did you understand that was his analysis?
A. Yes, I did.

Q. Did you see any evidence in Dr. Nicholson's report that he accounted for the fact that the cut points, the grade cut points would need to be redistributed?
A. Said differently, the grade scale if you will. No, I didn't see any indication that after adjusting his calculations that he then gave further consideration to how those could impact the grading scale.
Q. And are you familiar with these -- through your work in this case, these hospitals' CMS measures?
A. I am.
Q. Are you familiar with their star ratings?
A. I am.
Q. And the analysis you undertook, since you took out all the survey, was based on solely their CMS data?
A. Yes.
Q. Are the results of your findings and expert opinions mathematically consistent with the low ratings from CMS?
A. Both before and after. With the imputed grades in there the grades are consistent with CMS and when you pull them out they are consistent with the CMS grades.
Q. Your counter opinion of Dr. Berger that the imputed values, the four values we have been here talking about, are not significant drivers of the overall grade, that opinion, is that to a reasonable degree of professional certainty?
A. Yes.

MS. BLAIR: No further questions, your Honor.
THE COURT: Cross examination.
MS. MALONEY: Your Honor, Marc Takagaki for Plaintiffs is making his first appearance before the Court.

CROSS-EXAMINATION

BY MR. TAKAGAKI:
Q. I want to be clear, the scope of your opinion is as a rebuttal expert in this case?
A. Yes. It is in response to the three expert reports that I described earlier.
Q. I believe -- first, you have two opinions in this case as we discussed, right?
A. Yes.
Q. I will refer to the first opinion as regarding damages, what you were talking about with Ms. Blair. Do you understand?
A. Yes.
Q. And I will refer to your opinion regarding the safety grade methodology calculation as your second opinion. Is that fair?
A. Yes.
Q. So, for your first opinion, it was to determine whether someone could quantify damages in this case, correct?
A. I would describe it a little differently. If one could quantify the harm or demonstrate that there is actual harm. Whether or not that issue is for damages could be a different matter, but the analysis is the same.

Q. And do you recall that you sat for a deposition in this case in early September of last year, September 2025?
A. I do.
Q. I took your deposition, right?
A. That is correct.
Q. Do you recall I asked you about your opinion one here, and do you recall answering that your opinion was if one wanted to, one could quantify the damages here. That's opinion number one. Do you recall saying that?
A. I do.
Q. And I believe your opinion number one is really focused on quantification, is that right, as opposed to qualitative analysis or any other type of analysis?
A. I think the way I described it in my report is to quantify and demonstrate, but yes, it is from my perspective that one could quantify or demonstrate from a financial perspective potential harm here or potential damages.
Q. I believe it is -- is it your opinion that in order to show any type of harm it must be quantified?
A. I don't believe I say that. My opinion is what my opinion is, that in this case it is quantifiable. In quantifying it you can demonstrate harm or damages.
Q. So your opinion is that it is quantifiable, but is your opinion that in order to show harm it must be quantified -- without quantification there can be no harm?

A. I think you might be asking me a legal conclusion. From my perspective in doing these types of cases, the quantification itself is a demonstration, assuming causation, that there is harm.

Said differently, if your expectation was you are going to have a hundred million dollars here, but afterwards you had 80, that is a quantification of the harm subject to a determination of causation.

From my perspective the quantification is the question of harm.

Q. That is not my question. Is it your opinion that in order for harm to exist it must be quantified; yes or no?

A. I will give you the same answer, yes from a financial perspective, but there is a legal determination in your question.

Q. All right. I want to talk about your second opinion regarding hospital grading, and just a little bit of background first. I don't think we got into this with Ms. Blair's questions.

You are a damages expert; is that right?

A. I am frequently asked to quantify damages, yes.

Q. In the context of litigation, correct?

A. Yes.

Q. You are not a health care economist; is that right?

A. I do a fair amount of health care work, but no, I do not

hold myself out as a health care economist.
Q. You do not have an MD?
A. I do not.
Q. You don't have a Ph.D.; is that right?
A. I do not.
Q. You never graded a hospital before; is that right?
A. I don't think I am grading one now.
Q. So you never graded a hospital.
But for your second opinion you do have a grade in the exhibits that you provided to the Court that comes out of your analysis; is that right?
A. The grade comes out of the workbook that Leapfrog uses to grade. Yes, there is a grade that is a result of my corrections or adjustments to the calculation.
Q. I see. So, I guess what you are saying is the grade that comes out of that, that is not part of your opinion, so we should disregard the grades in that?
A. That is not what I am saying. If you pull out, or assign no weight to the four imputed inputs, the grade does not materially change. What is the upshot of it or the conclusion there? Those four inputs are not what is driving the grades themselves.
Q. That wasn't my question. My question was: Have you ever graded a hospital? And you said, I am not even grading one now. And I said, I see a grade listed in the exhibits.

Is that grade not part of your opinion? You are not grading them and we should just disregard that grade?
A. That is not what I am saying. I am saying there is a grade that is an output of Leapfrog's methodology. I am adjusting the methodology, and there is sill a grade that is similar, if not the same that it is the output when you adjust the methodology. It is a Leapfrog grade that I am adjusting the methodology and the resulting grade is still the same or worse.
Q. You are not issuing them a grade?
A. It is a function of the workbook and my adjustments to the workbook to demonstrate if you pull out the four imputed the grade is similar.
Q. And you have never developed -- I assume if you haven't given a hospital grade, you have never developed a hospital grading methodology, right?
A. I have not, no.
Q. You have never advised a hospital administrator or hospital personnel on how to improve hospital quality, right?
A. I have not, no.
Q. And you have no specialized knowledge of Leapfrog's grading methodology, correct?
A. I wouldn't say that. I have studied, analyzed, and tested their methodology. Yes, I have a deep understanding of how the calculation, the algorithmic calculation works.
Q. So you took the safety grade calculator that Leapfrog sends

to hospitals that want to do the work you did, and you deleted the four scores for the four imputed numbers and you entered NA for the 50, 15, 15, 25?
A. As an initial matter, yes.
Q. And that is all you did to create the exhibits to your report, right?
A. There was more work around that, but to be able to adjust the model, that is the primary thing. We checked it to make sure that statistically it still made sense. Again, it was in response to Dr. Nicholson saying, hey, instead of assuming a grade, let's just take them out.
Q. If somebody wanted to replicate your analogy, they would take the grade calculator, open a computer, type NA and hit enter?
A. At a high level, to get the regrade, yes. There was a lot more that went into it to make sure that was a reliable result.
Q. That work was just making sure when you hit enter the formulas in Excel, the math, were correct and didn't delete themselves or go haywire?
A. Make sure the statistics, the mean, the standard deviation, the weighting, the re-weighting, that it all worked properly, yes.
Q. Did it work properly?
A. Yes. We took the efforts to make sure they did.
Q. You didn't make any modifications to the Excel?

A. No, I did not.
Q. You hit NA, you hit enter, and then you pdf'd the Excel and submitted it to the Court?
A. Subject to the qualifications I gave you, yes.
Q. You didn't provide the Excel to the Court, did you?
A. I don't believe that is true.
Q. We didn't receive it. We will move on.
My understanding is what you did, entering NA, hitting enter and then making no other changes, that is also something that hospital administrators can do, correct?
A. I suppose they could.
Q. And so, what specialized knowledge do you have about entering NA and hitting enter that you bring to this case that those administrators don't?
A. Again, it is from a harm perspective, it is in response to Dr. Nicholson. So in reviewing his report and his unsupported assumptions that they would automatically get a certain grade, I wanted to demonstrate for the Court that it is not those imputed grades that are driving the grades.
Q. My question is just what specialized knowledge do you have of the grading methodology beyond there is an Excel, enter NA, press enter and be done? What other specialized knowledge do you have of the grading methodology?
A. I think we just talked about it, I got intimately familiar with it from a statistical perspective to ensure the

information is reliable.
Q. Your specialized knowledge is, once you hit enter and the scores change you review them and make sure the math is correct. That is your specialized knowledge of the grading methodology?
A. Statistical knowledge, math, make sure the output was reliable, everything was getting re-weighted correctly, the statistics were correct such that at the end of the day the conclusions I have drawn that those four imputed inputs are not the driver of the overall grade is reliable.
Q. Do you have any specialized knowledge of the Leapfrog imputation model?
A. I am not sure I understand the question.
Q. Well, do you understand that -- do you understand what imputation is?
A. Yes.
Q. Do you understand in this case Leapfrog has what it calls an imputation method where it imputes the scores for four measures? Do you understand that?
A. Yes, I do.
Q. Do you have any specialized knowledge of the imputation model beyond what we just discussed?
A. It would be consistent with what we just discussed, my review and analysis based on my experience of the information and documents related to that model in this case.

Q. Do you recall I asked you at your deposition if you have any specialized knowledge of Leapfrog's imputation model, and your response was, I don't?
A. That is what I might have said to that question.
Q. So, how did you develop your specialized knowledge of Leapfrog's grading methodology? Isn't it true you reviewed the Excel and nothing else?
A. That is not true. I reviewed the excel and the related documents and how they arrived at it.
Q. What related documents?
A. One that comes to mind, at least one that comes to mind is a 30-page scoring methodology document that provides the description and the background of how the model works.
Q. And that is available to the public, right?
A. I don't know as I sit here right now if it is or isn't.
Q. And I want to turn back to your opinion one. The community hospitals no longer have a claim of damages in this case, right?
A. That is my understanding, they are no longer to be seeking to be compensated.
Q. You were not aware of that when you submitted your report on September 4th; is that right?
A. I don't know when I became aware of it, if it was before or after.
Q. You don't cite the notice of withdrawal of damages in your

report, correct?
A. I would have to see my report.
Q. You don't cite the amended complaint in your report where there is now no damages claim?
A. I would have to review my report.
Q. And at your deposition, which took place I believe September 29th, so a few weeks after your report, I asked if you had seen Plaintiffs' notice of withdrawal of damages. Do you recall your response was, I don't recall seeing this document?
A. I believe that was my answer.
Q. And for opinion one, you do not quantify damages in this case, correct?
A. I do not because there is insufficient information to do so.
Q. I believe your opinion was you reviewed the Plaintiff's expert reports and your opinion was that they did not quantify damages; is that right?
A. They definitely don't quantify damages or harm.
Q. You are not offering an opinion on whether the safety grades assigned to the community hospitals produced a substantial injury, correct?
A. I do not have an affirmative opinion on that.
Q. That is because substantial injury is a legal determination; is that right?

A. It's my understanding is it is part of the applicable law here.
Q. And you do not have an opinion on whether there was harm to the Plaintiffs in this case that satisfies the legal standard for substantial injury; is that right?
A. I do not have an affirmative opinion, no.
Q. I want to turn to Leapfrog's imputation model that we have been discussing.
Leapfrog uses imputation to effectively assign grades when data doesn't exist, correct?
A. That is my understanding.
Q. And it is your understanding that the scores for the four imputed metrics, 15, 15, 25 and five, are basically a default score when Leapfrog doesn't have data from the hospital; is that right?
A. I don't know if I agree with the default, but yes, it is the score they would assign if in their process, and it is a multi step process, they actually get to imputation.
Q. I asked you in your deposition, what is your knowledge of he term imputation as it is used in your report? You said, it is my understanding imputed grades is basically a default, if you will, if you don't have the data from the hospitals. Do you recall saying that?
A. I do.
Q. You don't have any knowledge for how Leapfrog developed

their grading methodology, do you?
A. When you say grading methodology, are you talking overall methodology?
Q. Let's talk about the imputation model. Specifically, they have an imputation model that we have been discussing for the four metrics. You have knowledge about how they developed that model, right?
A. I have some knowledge.
Q. And you have no opinion -- let me put it this way: Do you have an opinion as to the fairness of that grading model?
A. I do not have an opinion.
Q. You have no opinion as to which measures -- when I say measures I am referring to there is 22 measures, I believe, in Leapfrog's grading calculator that you used?
A. That is correct.
Q. You have no opinion as to which of the 22 measures should be used to grade a hospital's quality, correct?
A. I do not have a specific opinion.
Q. And Leapfrog didn't use the NA method that you used for the imputed metrics to issue an actual safety grade to hospitals?
A. They used the NA method, but not for the four imputed. That is the point of why they are imputing them. There are inputs of the 22 that are NA.
Q. There are 22 measures, and when a hospital doesn't report to the survey Leapfrog doesn't get information on seven of

those measures, correct?

MS. BLAIR: Your Honor, I think this is outside the scope of the opinion.

THE COURT: Overruled.

THE WITNESS: Could you repeat that.

BY MR. TAKAGAKI:

Q. Yes. In the past Leapfrog has used the NA to grade a hospital for three other measures, not the imputed measures, correct?

A. That is correct.

Q. There are 22 measures that Leapfrog uses, and when a hospital doesn't respond to the survey Leapfrog doesn't have data from the hospitals on seven of the 22 measures, right?

A. No. They have data from the hospital on 12 of the 22. The process is a multi-step process before they get to the imputation. They have secondary sources for some of them.

Q. Of the 22 measures, they don't have data from hospitals on 12 of the 22. I believe your testimony is on the current model for three of those they use NA?

A. That is correct.

Q. And in your analysis -- strike that.

In your calculations that you do in your opinion you leave those three NAs, and then add four additional NAs for the imputed measures; is that right?

A. That is correct.

Q. Leapfrog has never issued a grade with all seven of the NAs as you did in your report; is that right?
A. I don't know one way or the other.
Q. And Leapfrog's website tells consumers that hospitals are not graded when Leapfrog is missing data on more than six process measures. Are you aware of that?
A. I am.
Q. And that is because when a hospital is missing more than six process measures, their experts do not have enough safety data to assign that safety grade being, correct?
A. If that is what the document represents.
Q. You don't disagree with that?
A. I don't.
Q. But your method does assign a safety grade even when seven process measures are missing?
A. There is an output of a grade, yes, there is. To my earlier testimony, that is not the primary point of my analysis.
Q. I am not asking about the primary point here, I just -- strike that.
Under Leapfrog's current methodology, they also issue a safety grade even though they are missing seven process measures, correct?
A. I am sorry, I don't if I'm following you. I guess I would say no.

Q. Don't they issue a safety grade when it is missing data for seven data processing measures?
A. Again, I apologize, I am not sure I follow your question.
Q. Well, so, I think you testified that Leapfrog's current methodology, not your report, but their actual methodology, they have NA listed for three measures?
A. Correct.
Q. For four measures, in Leapfrog's imputation, they don't have data on those, right?
A. They don't have data for the hospital. That is why they use imputed scores.
Q. They issue a score despite the fact that they have three NAs for three measures and then they have four imputed measures for which they don't have data from hospitals, correct?
A. They don't have data from hospitals for five other ones as well.
Q. Understood.
Your second opinion on the grading methodology does not tell the Court whether Leapfrog should have graded the community hospitals, right, if they were missing this data?
A. The point is they have the imputation, I assume for a reason, so that is why they did issue a grade. I can't speak for how they would or wouldn't grade a hospital if they didn't impute those four scores.
Q. No, I am asking if your expert opinion in this case is

whether Leapfrog should have issued grades to the community hospitals in the case despite the data they don't have.

MS. BLAIR: Objection, outside the scope of his opinion.

THE COURT: Overruled.

THE WITNESS: I don't have an opinion on it.

BY MR. TAKAGAKI:

Q. You don't have an opinion on whether it is fair to assign default scores when no data exists, right?

A. Again, I don't have an opinion. That is outside the scope of my analysis.

Q. You don't have an opinion on whether consumers are misled by those grades, right?

A. I'll give you the same answer, outside the scope of my analysis.

Q. You don't have an opinion as to whether Leapfrog's grading practices should continue, right?

A. Same answer, no, I don't.

Q. Your second opinion, that is a hypothetical exercise, right?

A. It is a sensitivity analysis at the end of the day.

Q. It says if you change the current rules of Leapfrog's methodology you get a different result, right?

A. I would characterize it a little differently. It simply says the weights assigned to those four measures are not what

is driving the overall grade. So with them or without them the grade is basically the same.
Q. I want to turn back to opinion one, your opinion about quantification of damages. Your report was served on September 4, 2025; is that right?
A. That sounds about right.
Q. You have not submitted a supplemental report?
A. I have not been asked to, no.
Q. In your deposition I noted to you that after your report on September 4th, document productions had been made by the Plaintiffs in this case and I asked you if you had reviewed those. Do you recall that question?
A. Not specifically.
Q. Your deposition was on September 29th, right?
A. Again, that sounds correct.
Q. And I represented to you the Plaintiff hospitals had produced -- after your report on September 4th, they produced revenue data, market share data, branding data, and transfer and admissions data, and you responded that you were aware of those productions, but you have not reviewed them?
A. I said I was aware there was ongoing productions, but I don't know if I recall then or now what was in them.
Q. And I know you weren't -- I believe you weren't in the court for previous days of trial; is that correct?
A. That is correct.

Q. Are you aware that Ms. Montgomery, the CEO of Good Samaritan Hospital, testified that her hospital recently lost a contract with an orthopedic group?
A. I am not aware.
Q. She testified that eight surgeons who performed around 1300 surgeries a year at her hospital and generated about eight million dollars of income each year were not renewing their contract at the hospital. Are you aware of that?
A. I was not.
Q. She testified that those -- that whole surgeon group, those eight surgeons with the 1300 surgeries per year, were signing a contract with Good Samaritan's major competitor, Jupiter Medical Center.
Is that evidence of economic harm?
A. I'd need a lot more information to make that determination. It could be, it could not be. It could be they got a better deal somewhere else. Just based on what you told me, I can't give you an opinion one way or the other.
Q. And I believe she testified they had, those surgeons, that surgeon group had a contract with her hospital, Good Samaritan, that had been in place for the last five years, and they canceled that contract, or it terminated, and they signed a new one at Jupiter.
Would that not be the sort of historical analysis and present and future analysis that you mentioned with Ms. Blair?

A. It could be, but you need further evaluation of it. My understanding is, groups of hospitals -- physicians or surgeons move hospitals frequently. So, again, that in isolation is not necessarily, without additional information, dispositive of harm. It could be or could not be.
Q. Is your opinion that losing eight million dollars a year of income because those physicians went to your competitor not evidence of economic harm?
A. It may be, may not be. From my perspective, I would need a lot more information.
Q. I want to talk about admissions data at a hospital such as walk-ins. You believe that historical data on the number of walk-ins and current data on the number of walk-ins, that can go in a before and after an analysis for lost profits or economic harm, right?
A. It would be one of the pieces of information I'd want to evaluate.
Q. You believe that market share analysis is also an element of economic harm, right?
A. Again, not necessarily in isolation, but it would be another factor that I would want to evaluate.
Q. Right. So, if the hospital loses admissions in a certain sector, and those admissions go to a competitor, wouldn't that factor into a market share approach for economic harm?
A. Again, it could be a factor of many that go into that type

of analyses. Just in isolation alone it is not dispositive to me that that necessarily is economic harm, particularly related to the issue at hand here.

Q. Just a few final questions.

Is your methodology using the grading calculator, has that been peer reviewed?

A. It is a mathematical model, I don't know that it needs to get peer reviewed. I am simply adjusting the math behind an existing model.

Q. So it has not been peer reviewed.

A. In a similar fashion as Dr. Nicholson. I don't know why it would be peer reviewed. I believe it has given my understanding of who developed it, between the company, Johns Hopkins and all the other advisers. I don't know if that is considered peer reviewed. For the purposes of what I am doing and the conclusions I am drawing, as I testified in my direct, it is at a level of reasonable certainty.

Q. Is it your testimony that Johns Hopkins developed the safety grade Excel that you used in this case?

A. I don't -- I understand they were involved in this whole process. That's all I'm saying.

Q. You understand that Johns Hopkins was involved in creating the safety grade calculator that is used?

A. My understanding is that they were involved in the methodology.

Q. I am asking about the safety grade calculator that goes out to nurses at hospitals to see how the grades can change. Is it your testimony that Johns Hopkins developed that?
A. I think we are talking past each other.
Q. Is it your testimony that Johns Hopkins developed that Excel?
A. I am not specifically talking about the Excel. No, that is not my testimony.
Q. Is it your testimony that Mathematica developed that Excel?
A. I know they were involved in the methodology, and the calculator is a byproduct of the methodology. That is all I am saying.
Q. Aside from Johns Hopkins, Mathematica -- my question to you still is has anyone peer reviewed your methodology beyond the two entities you were involved in, has anyone peer reviewed your methodology using NA for metrics?
A. I am not aware of anybody. It is a sensitivity analysis to an existing model, that is all it is.
MR. TAKAGAKI: No further questions.
THE COURT: Redirect.
MS. BLAIR: Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. BLAIR:
Q. Mr. Rule, Mr. Takagaki asked you how you could know -- in your expert opinion can the Court determine whether a for

profit corporation is harmed if there is no basis to make that conclusion?
A. Not from a financial perspective.
Q. Thank you.
There was just a discussion about the calculation of the grades. Do you recall that?
A. Yes.
Q. And counsel just asked you whether or not your sensitivity analysis was peer reviewed. Do you recall that?
A. I do.
Q. Did you see anything in Dr. Nicholson's report that his counter factual was peer reviewed?
A. No.
Q. Is that something they do, are they usually peer reviewed?
A. No, they are not. I was wondering why it would need to be peer reviewed.
Q. In your review of Dr. Nicholson's report, did you see any mathematical support for his assumption that every non-responding hospital across America would have scored at the national median for all of the seven measures?
A. No.
Q. He just makes that assumption?
A. Yes. It is an unsupported assumption.
Q. Counsel asked you about the fact that you issued your report on September 4th, and you gave your deposition on

September 29th. Do you recall that?
A. Yes.
Q. Does the fact that the Plaintiffs made the decision halfway through this litigation to withdraw their claim for damages affect in any way the opinions that you are giving this Court today about how harm should be looked at and measured?
A. No, it does not because my opinions, whether it is demonstrating harm or actually requesting for that harm to be compensated, it is the same type of analysis to make.
Q. Thank you.
Counsel asked you some questions about imputation. Do you recall that?
A. Yes.
Q. Is imputation a mathematical concept within your regularly accepted area of expertise that is used often?
A. Yes.
Q. Do you consider imputed data to be data?
A. Yes.
Q. He asked you some questions about the testimony we heard, and you weren't here, from Ms. Montgomery and several of the CEOs that they have some evidence that their admissions have decreased. Do you recall him asking you those questions?
A. I do.
Q. In your expert opinion, what other factors should be considered in determining whether the impact to admissions was

in any way related to the Leapfrog grade?
A. A number of factors that I discussed on my direct, the historical trends, expectations. There could be an expectation that, yes, admissions overall are going down. There could be a variety of factors that one would want to consider in trying to estimate or demonstrate that there is actual financial loss.
Q. And what about the saturation of the market with competitors, would that have an impact?
A. Yes. Competition is a critical factor to consider.
Q. For example, if new hospitals or ambulatory surgical centers are being built and opened in the same areas in which these hospitals are attempting to compete, would that have an effect on admissions?
A. Yes.
Q. You see no evidence in this case and none has been provided of what their expectation was on admissions versus what they actually were after the Leapfrog grade was released, correct?
A. Correct.
MS. BLAIR: I have no further questions, your Honor, thank you.
THE COURT: All right. Thank you, sir.
THE WITNESS: Thank you.
MS. BLAIR: At this time we call Dr. Anthony Harris to the stand.
THE COURT: Let me interrupt you for a second. I need

to step out for a second. I drank too much coffee this morning. Why don't we take ten minutes. Sorry.

(Thereupon, a short recess was taken.)

THE COURT: Okay, please have a seat and please continue.

ANTHONY HARRIS, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BLAIR:

Q. Good morning, Dr. Harris. Can you describe for the Court what is your current profession?

A. I am a professor at the University of Maryland, I am a hospital infectious disease physician and an epidemiologist.

Q. How long have you worked in the field of hospital epidemiology?

A. For over 25 years.

Q. And what year did you graduate from medical school?

A. 1993.

Q. And can you briefly describe your education and training after you graduated from medical school in 1993, and where did you graduate from medical school?

A. I went to McGill University, did internal med residency from 1992 to 1996 at McGill in Montreal. Then I did an infectious disease fellowship at Harvard, and during those three years I also obtained a Master's of public health in Harvard with a focus on statistics and epidemiology, and I have

been at the University of Maryland since 1999.
Q. At the University of Maryland are you a researcher, a professor and a clinician?
A. Yes. Since I am a Canadian it is difficult for me to brag, but in this area I think I am qualified. For 25 years I have seen patients as an infectious disease physician, I see patients on a consult, and as a hospital epidemiologist, which is a fancy term for no one knows what we do, but it is very relevant to this case. I was an epidemiologist, we try to prevent patients from getting infections, central line associated bloodstream infections or CLABSI.
Q. You have to slow down.
A. Catheter associated urinary track infections, CAUDI, surgical site infections, SSI. Part of my job for 25 years has been working with quality officers, working with the CMO, working with a team of people basically to try to prevent infections and in the era of national reporting, also being cognizant how that affects Leapfrog grades, and reporting.
Q. And these infections that you just talked about, CAUDI, CLABSI and SSI, are those some of the outcome measures that go into the Leapfrog composite grade?
A. Yes.
Q. In your work in epidemiology, have you had the opportunity to concern yourself with the measurement and interpretation of health outcomes?

A. Yes. My area of research focuses on antibiotic resistance and infections and I published specifically in this area related to the infectious outcomes and reported to the CDC and National Health Safety Network and HHM, part of the CDC, and that is relevant to this case because those are some of the outcomes that are part of the 32 outcomes published on ways of making those metrics fairer in terms of better risk adjustment.

I have published on the development of new metric, HOB, that is very complimentary to CLABSI, and I sat on CDC advisory boards as they have sought to improve their methodology in terms of fairness to the hospital, to the patient, and closer to the ultimate truth, which is metrics that help hospitals improve outcomes and safety.

Q. When you talk about the CDC advisory board, is that similar to the expert panels that Leapfrog has?

A. Yes, it's very similar. The two I sat on that are parallel to infectious disease, I sat on an advisory board to what is called the CDC's HICPAC. The major area was an infection C.DIFF, where they were discussing how does it affect hospitals' rankings, what is the best way to transparently discuss the changes and how it could effect, and then I was supposed to be on the CDC HICPAC board in 2022 and 2024 before it was disbanded.

Q. One of the issues in the case is about whether or not the Leapfrog hospital safety panel voted the methodology change,

and I am going to ask a different question.

In your role on these advisory panels, like for the CDC, do you vote?

A. No. The ones I was on in the CDC, we did not vote, we gave opinions. We had a series of meetings on this and we'd give opinions. The CDC would take our opinion and make decisions, sometimes it was presented to a higher level. I don't know if there was voting at that level, but not in the advisory groups I was on.

Q. Can you briefly explain what happens in terms of the intellectual sparring, my word, on the panels on infectious disease measures with the CDC? How does it work?

A. Using your terminology, there is a lot of sparring. There are a lot of great people who are experts in the field who disagree on the best approach.

There is no perfect approach. If there were a perfect approach the meetings would be brief. In a lot of safety health care grading we are trying to get the science better and better and closer to the truth, but we are not there yet. That leads to a fair amount of opinions and discussions about what the best compromise is, or what the best incremental step forward is.

Q. In terms of your research and publications, you are an active researcher?

A. I have over 350 publications. In my field the H index is

what matters. I have an H index of 363. I published over a hundred papers on infectious disease related outcome, such as CLABSI, CAUDI, and 15 papers on risk adjustment related to improving hospital outcomes and about five on hand hygiene.

Q. You were in the courtroom when there were questions asked of Mr. Rule about peer review. Do you recall those questions?

A. Yes. Today is my first day in the courtroom.

Q. Of your articles, the hundreds of them, are they peer reviewed?

A. All of them.

Q. How many leadership roles in national professional organizations?

A. In my small world the eminent organization is the Society of Healthcare Epidemiology of America, which has 1500 members, consists of physicians. I was president of that society in 2015, and have held other -- counselor, but they are leadership roles in that organization, and I have been a member of that organization for over 20 years.

Q. In your role, did that role involve engagement with hospital performance metrics and pay for performance metrics for hospitals?

A. Yes, relevant to this case, yes, in the following way. So, for years, I am going to use the acronyms now since I defined it, CLABSI, CAUDI, and SSI, bloodstream infections, hospital epidemiologists were trying to control these for years, trying

to improve things before they were pay for performance metrics, and our SHEA membership was very much concerned and alarmed, needed understanding whether it was helping them or hurting them or what they should be doing.

Yes, as president of SHEA I responded to members' concerns routinely as part of our policy group of members concerned about changes in definitions, changes in adjustment methodology, and the organization interacted often with groups such as the CDC. We had regular meetings about what definitions were coming down the pipeline, how we could inform our members, and similar to what is relevant in this case, we had open discussion when metrics were developed.

There was an open discussion where we would get comments from our members and try to respond and summarize that information and present it to organizations like the CDC.

Q. The Society of Healthcare Epidemiology of America, that was a not for profit?

A. Yes.

Q. I want to rewind. You talked in your answer about pay for performance, and one of the phrases that has been used was pay to play.

What do you mean when you say pay for performance measures? What does pay for performance mean in your world?

A. With one caveat in Maryland, the CMS pay for performance is not applicable for the state of Maryland. Pay for performance

for epidemiology as is related to in my area, once infection rates, surgical site infections were higher than the norm you would receive penalties, or if your performance was above the norm you would receive incentives.

That exists in Maryland as well but in most states it is driven by CMS. Pay for performance gets at the idea that outcome and process measures now are driving potential hospital reimbursement and put a spotlight on hospital epidemiologists.

Q. Once this shifted to pay for performance, how were hospitals being paid prior to that?

A. I am not familiar with that.

MR. HVIDT: Objection, your Honor. Oh.

THE COURT: He didn't know, so you probably don't need to object, do you?

MS. BLAIR: Your Honor, I would like to qualify Dr. Harris as an expert in the area epidemiology, patient safety measurement and outcomes.

MR. HVIDT: Your Honor, we object, first as relates to relevance. We don't doubt that Dr. Harris is an epidemiologist and experienced in that, but lot of what you heard is focused on CMS outcome measures. There is 50 percent of the Leapfrog grade that relate to outcome measures. Those are not at issue. We are not challenging the accuracy of the scores on that side of the circle.

It is not relevant whether Leapfrog's methodology is

deceptive and harms consumers and harms the hospitals. Dr. Harris did not audit these hospitals, he did not visit them, he did not review their accreditations, review the documents that they produced in response to Leapfrog's request. He simply refers to the CMS measures that are not relevant to what the Court has to decide. That is the first objection.

The second objection is, it is not clear to us what he is being qualified as an expert to testify to beyond that that is relevant to this case.

THE COURT: His testimony as to the outcome measures may impact on whether any distortion in the process measures makes a differences, so I will permit his testimony.

MR. HVIDT: Thank you, your Honor. May I have a standing objection?

THE COURT: Sure.

BY MS. BLAIR:

Q. Dr. Harris, in the area in which you practice both as a clinician and epidemiologist and researcher, have you evaluated the strengths and weaknesses of health care methodologies previously?

A. Yes.

Q. Can you briefly describe for the Court in what way have you done that?

A. I am sorry, in which capacity?

Q. Whatever capacity you have done it.

A. So, as I alluded to on the advisory boards for the CDC I evaluate changes in metrics definitions and give opinions, basically, if that was a better way moving forward, a better solution or a worse solution, what the advantages and disadvantages of the definitions were.

As a hospital epidemiologist they would have routine metrics with the CMO and CEO where we look over our infection rates and go over where our infection rates fit in the bigger picture. They would tell me as an example, the PSI 90 accounts for this amount of our reimbursement in Maryland, and we'd run sensitivity analysis and say if you cut your infection rates by this amount, this is the amount of reimbursement you would have.

I would sit at the table with other experts in quality and we would have to decide where we allocate our resources to best improve patient outcomes, but also best drive potential reimbursement and performance on metrics, Leapfrog metrics and CDC metrics.

Q. You just heard counsel say you are not qualified to talk about the structural measures?

A. Yes.

Q. I believe you testified that you have published at least 15 peer reviewed articles on the issue of hand hygiene?

A. At least ten. In my day-to-day role as a hospital epidemiologist we consistently monitor important process and

structural metrics. A perfect example, I hope I can explain clearly, is for central line bloodstream infection, we were one of the first hospitals to endorse a structural change which is to get antibiotic coated catheters. I had to explain why that change would cut our rate. Even though process outcomes were not being recorded, I had to argue why process metrics were important.

We were reporting were the patients getting the right antibiotics before surgery to cut down the infection rate. That is a process metric that leads to an outcome improvement, but not a process metric that any of the scoring agencies require. I pushed to have those process metrics incorporated and evaluated by nurses and some of the quality team.

We would frequently have discussions, here is what is the score card, nut here is what really matters from a structural outcome point of view.

Q. Thank you.

Can you briefly tell the Court what the scope of your opinions are, what you were asked to opine on in this case?

A. Sure. I need a bit of a refresher, but I will do it a little bit.

One, I was asked to give my opinion on Dr. Nicholson's report, and specifically related to the methodology he used for the seven score imputation. I was also asked to give my opinion on the Plaintiffs' performance and under performance

related to the methodology and potential alternative methodologies.

One of the key things I am giving an opinion on is that non-response bias is real, used in epidemiology and in medical literature. It was appropriate for Leapfrog's new methodology to try to account for that.

And lastly, I had to rereview some of Leapfrog's mission statements to get the opinion that they created and ethical scoring methodology based on the strengths of the advisory panel.

MR. HVIDT: Objection to these opinions to the extent that completes the listing of the opinions. If counsel is about to list another opinion, I am happy to wait.

MS. BLAIR: I am not offering any other opinions, your Honor.

MR. HVIDT: Dr. Harris' opinions are not relevant to whether Leapfrog's methodology are harmful and deceptive to consumers. Leapfrog's witnesses and testimony show that Leapfrog did not try to estimate non-participating scores in an optimal way, instead assigned the worst possible score.

Dr. Harris' opinions one, three, four -- on the screen it is one, two, four -- contradict Leapfrog's own documents and testimony, and discussion is not based in data documents in the record. Nothing relates to the approach they use is deceptive.

And the third goes to the CMS outcome measures for

which Dr. Harris did no causal analyses to try to connect them to the four missing measures that are at issue here before the Court.

THE COURT: All right. The objection is overruled.

MS. BLAIR: Thank you, your Honor.

BY MS. BLAIR:

Q. DR. Harris, in coming to your opinions in this case, did your assignment require you to review the fall 2024 methodology that Leapfrog had in place?

A. Yes.

Q. Did you review that methodology in coming to your opinions in this case?

A. Yes. I reviewed the transcript from the April 12th meeting, the slides, and the new scoring methodology on the Leapfrog website.

Q. In coming to your opinions today, did you review the outcome measures for each of the five hospitals? I mean the CMS data with respect to the infection rates.

A. Yes, I tried to get a firm understanding of 32 outcomes, one incorporated ten, as we heard about, the seven down to the four with the three not applicable.

Q. In coming to your conclusion, did you review the five hospital Plaintiffs HCAP scores?

A. Yes, I did.

Q. Those are process structural measures in the Leapfrog's

rating system, correct?
A. Yes.
Q. Were you able to evaluate the actual data for the five hospitals for BCMA, CPOE, hand hygiene and IVS?
A. I was not.
Q. Why were you not?
A. Prior to the deposition I didn't have any of that data.
Q. And the opinions that you are going to offer today in trial, those are the same opinions that are in your report, correct?
A. Correct.
Q. Have you reviewed any additional documents since you were deposed in this case, I believe it was October 4, 2025?
A. When I was deposed there were a couple of exhibits I did not see prior to the deposition. What I tried to do between the time of the deposition and today was to review all of the exhibits in the deposition.
Q. Did you have Dr. Romano's deposition transcript?
A. I reviewed it quickly.
Q. In reviewing those documents, had it changed your opinion since you were deposed?
A. It has not.
Q. Before we get into the dispute we are here about, could you at a high level explain how hospital safety grading systems like Leapfrog's are generally developed in your opinion?

A. What do you mean by generally developed?
Q. Outcome -- let me ask it this way: Do you understand Leapfrog's hospital grading system contains outcome measures, process measures, and structural measures?
A. Yes.
Q. In reviewing the methodology of those three types of measures, do you have an opinion about whether or not including outcome, process, and structural measures are appropriate?
A. I feel moderately strongly about that and have for years. There is a focus on outcome metrics by most of the ranking systems and I argued that process and structural outcomes are also very important and complimentary to outcome measures, especially when events are rare. This is a more complicated principle, but yes, I am aware, and that is the strength of the current methodology.
Q. Are you aware in the research that you perform as part of your job that methodologies like Leapfrog's evolve over time?
A. Yes, that has been the frustration in our field, both the plus and minus. The field has come a long way in grading and it is continually evolving and improving. At times we go four steps forward and two steps back, but it is a never-ending challenge to try to get closer to the truth, which relevant to this case is which are better performing hospitals so the patients can be better informed, and more so hospitals can improve areas that they are poor performers on and they care

better for patients.
Q. If we talk about your first opinion, Leapfrog has created a reasonable and ethical scoring methodology based on the expertise of the expert panel. Do you see that?
A. Yes.
Q. What is the basis of that opinion?
A. When I had to review the members of that safety panel, it is really a who's who in this field. Some of them I knew, some I did not. When I looked up the ones I didn't, I said, wow, I should really know this person, this person is a real giant in this field. They have all aspects of physicians, nurses. These are excellent -- it is an outstanding expert panel that is helping to advise Leapfrog on difficult decisions that we have alluded to.
Q. In your expert opinion, based on what you do for a living, is it reasonable for Leapfrog to rely on at least the guidance and instructions of the expert panel as currently constituted in making changes in the methodology?
A. Yes, I completely agree with that. It is parallel to what the CDC did, you try to get people on the front line and people who are experts in the field to help advise you.
Q. One of the issues in this case, Dr. Harris, is the imputation methodology itself. Are you aware of that?
A. Yes.
Q. Are you aware of the change that took place in the fall of

2024?
A. Yes.
Q. Are you aware that five hospitals in this litigation take issue with the fact that if step one using their historical data is no longer available their imputed limited achievement for the four structural measures, BCMA, CPOE, hand hygiene, IVS?
A. Your question is, are you aware?
Q. I am trying to set the stage for what we are going to talk about.
    One of the central issues from our perspective, Dr. Romano testified this, is that the step two imputation modeling of limited achievement, that it was a reasonable methodology to include non-response bias in the step two methodology.
    Do you agree with that?
A. Yes, I agree, but I want to explain that.
Q. Please do.
A. This is the crux that is really important.
Q. Thank you.
A. When I teach medical students epidemiology and the goal is to have them understand the literature so they can be better doctors, when I teach Ph.D. students it is the same thing, we want them to design better studies to get better outcomes.
    In short, there are two major threats, okay, to the truth, and it is bias and confoundment, so we spend for Ph.D. students

hours and hours talking about bias and confoundment. For the med students it is a bit of a joke, I get all of six hours to teach them, so it is not a lot. I have to teach them statistics and epidemiology. To give you an idea how important bias is I get a half hour, I have 25 minutes to teach bias, we specifically talk about non-response bias.

The reason bias is important, is that it affects the truth. It affects you being able to conclude drug A is better than drug B if you are doing a large study, or in this case it affects your ability to say this is the truth grade that this hospital deserves.

When I reviewed the transcript and the slides, they basically were getting at the central issue that hospitals that were not responding to the survey are biased in the way that they are different. Bias just means they are different. There is a reason they are not reporting that is different than the hospitals that are reporting.

The same way if you handed out a survey to 200 people on the street and only a hundred respond, you can't say the responses of the hundred that did not respond would be the same as the hundred that responded.

So the advisory committee's transcript was dealing with the issue of those that choose not to respond to the Leapfrog survey are different, and they are different because they are choosing not to respond. They are likely choosing not to

respond because they know their data.

Hence the old methodology, which I had not reviewed extensively, imputed the meaning previously was biased. It was giving the hospitals too high a score than they deserved, that the advisory committee thought was closest to the truth.

And the series of discussions in the transcript and slides then get at how do we get closer to the truth, how do we get back, one of my favorite terms, the counter factual. How do we get back the closest to the truth what the hospitals would have scored on the four metrics if they had responded. Non-response bias is what leads to this complicated discussion of how best to overcome this non-response bias to get closest to the truth.

Q. And is imputation based on non-response bias, in your expert opinion, something that scientists like yourself use to solve for missing data regularly?

A. Yes. We use imputation all the time. Imputation is -- it is not a tangent that is applicable -- it is used most often in cohort studies, case control studies and surveys.

In large data base studies, we routinely impute numbers for data that is messing, and this is done routinely and there are thousands of scientific papers on imputation models and methodology trying to get at closer to the truth and talking about the pros and cons of the various imputation analogies.

Q. Dr. Romano testified, that you weren't here for, about the concept of missingness not at random. Is that a phrase in your

expert field of epidemiology and measurement of safety that you understand when he uses that term?

A. Yes, it's missing completely random, missing not at random, and missing at random.

Q. Do you have an opinion whether the BCMA, CPOE, hand hygiene and IVS data in the Leapfrog survey for non-responding hospitals is missing not at random?

A. I think it would be important that I not say something wrong.

If the non-responders were just -- they didn't respond by random chance, which is not what I am saying, then their data would be missing completely at random and the old method of giving them the mean would be fine.

That is clearly not the -- they are choosing not to fill out the survey, in essence the data is not missing completely at random, which gets at how do you impute the data. Then gets at do you impute the data by reasoning, which is what the advisory committee chose to do, or impute the data based on other variables which is often used -- I am not sure Dr. Romano used the terminology week, but that is used when it is missing not at random.

Q. In the fall of 2024, does the literature suggest that the hospitals have these structures in place?

A. Yes.

Q. Such that the missingness would not be at random, correct?

A. Yes, I think --

MR. HVIDT: Objection, leading. Please bring it back to non-leading questions, please.

THE WITNESS: I want to answer the question more clearly and more simplistically.

BY MS. BLAIR:

Q. Sure.

A. The answer is, if the hospitals choose not to respond by random chance, if that is the case, then the old method would have been fine. As the advisory committee correctly points out, these hospitals chose not to fill out the survey for a number of reasons likely, of which more likely than probability it is because they knew their data and they knew that the data would not help them to report it.

THE COURT: Where do you come up with that assumption?

THE WITNESS: These are the discussions we have all the time.

THE COURT: Discussion is fine. What is the basis for that assumption?

THE WITNESS: The basis for the assumption was that I was at the hospital that filled out the survey, we did not ever entertain not filling out the survey. We knew how much time it took and the personnel. In general, decisions were made by if we were performers and we had three to four months to say Leapfrog is changing their methodology, if we don't fill out

this survey we will get limited achievement, I can tell you at my hospital and hospitals I represented they would complain, but they with basically allocate resources to complete it.

As a concrete example, 200 observations and a hundred observations for hand hygiene is often the area of push back that Leapfrog gets. Most hospitals sat I get limited achievement if I don't do it, they assign the resources, if you choose not to seen the resources and fill out the survey to know you are going to get assigned a limited achievement, it is purposeful, it is cognizant of what the outcomes would be.

THE COURT: There could be other reasons. You just ignore those, maybe you don't think it is worth it?

THE WITNESS: That is an excellent point which I agree with in the following ways.

There were instances where, as a hospital epidemiologist, I have a limited amount of resources, and I can choose to allocate it to something that is not an outcome metric or use it to something more meaningful. Occasionally we would make those decisions, but I would tell you most of the time when a reimbursement changed their rules we would and reallocate our resources because it was in our best interest to do that.

THE COURT: I guess these hospitals do face that pay for play methodology, so there is an incentive now under CMS to do it.

THE WITNESS: That is my understanding. I am not familiar with Florida pay for performance, but yes.

THE COURT: If you have a student, one of those students you talked about, who doesn't show up to take your test, do you assume they couldn't have passed it?

THE WITNESS: Yes. That is an excellent example, an excellent example. If a student last minute doesn't show up for my test, and they come to me, there are multiple alternatives. One, they weren't ready for the test and they probably weren't going to do well.

Another alternative, depending on what they told me, why didn't they show up for the test, they could say I have a medical problem, this and this. My job as a teacher at that point is probably to assess -- again, I would not know the truth, definitively parallel to this, is listen to the options, figure out which option I think most likely and similar to the advisory board try to come up with a ruling on which option I thought most likely or a compromise.

I can tell you at my institution, in most cases if you miss an exam you don't get an A grade.

THE COURT: Do you get an imputed grade? They give you a grade of need achievement, and what if you determine they were sick or transferred and decided to take a different course?

I would think -- I can see your point about

non-response bias, but it seems like maybe it is capable of measurement.

THE WITNESS: Maybe it is capable of what?

THE COURT: Measurement, for some other reason, too much trouble, we are already getting accredited by accreditation boards, we don't want our information used in a commercial way.

There are other reasons. Couldn't you sort that out?

THE WITNESS: Well, this is the problem with epidemiology unfortunately is, you can never -- you can never determine exactly which with certainty is the reason the student didn't show up for the test, or the hospital didn't fill out the survey, which is exactly why you have advisory boards like this that help guide the various options.

I do strongly feel that based on my review of the Leapfrog survey, and based on hundreds of my colleagues who fill out the Leapfrog survey, that by far the highest probability reason is they knew that if they filled out the survey their scores were going to be poor. They were benefiting in the prior four years where they didn't report, meaning they were getting the mean score which was benefiting them, and to me, the most likely thing is they knew they were under performers, and they didn't want to go to the hassle for months to fill out the survey because they knew they were under performing.

That is my opinion and that is probably the highest probability causal reason.

BY MS. BLAIR:

Q. In finding the highest probable reason you discussed, is that the purpose of imputation, you don't know the data, and what are you trying to solve for?

A. It is very relevant to the Judge's point. One of the exhibits we will get to, I tried to look at alternatives to limited achievement. It is sensitivity analyses allow you to calculate alternatives and look what the scores would have been under the different alternatives.

Q. Right. And in all of the research that you do, is imputation to solve for missingness not at random based on reasoning, a scientifically acceptable method when evaluating a composite score where you have a limited amount of missing measures, but a significant amount of measures that exist?

A. Absolutely. So, what is happening -- we will get to this, it is in my report and in Mr. Nicholson's report. The four metrics account for 24 percent of the outcome. 76 percent of the outcome is based on other scores.

So imputing data for that smaller 24 percent is, yes, a scientific method that I completely agree with.

Q. And with respect to the question that was asked of you by the Judge about the taking of a test, I want to ask a different analogy.

If you are teaching a class and you give a test with 20 questions, and a student answers 16 of the questions and leaves the last four blank, as a professor, what do you assume the student knew about the last four questions?

A. It is a perfect parallel and that I would assume that those four questions more than likely that they did not know the answers to that, not that they would perform at the level that everyone else answered those four questions.

Q. Moving on slightly, you were talking about the -- you mentioned a minute ago your critique of Dr. Nicholson's recalculation. I will move there for now.

A. Yes.

Q. You have an opinion about flaws in Dr. Nicholson's counter factual, correct?

A. Yes.

Q. Can you explain to the Court what those flaws are?

A. Exactly as the Judge alluded to, there are different methods to handle these seven data points, right.

What Dr. Nicholson proposes is I think by far the least logical method, which is, he recalculates their scores, incorporates all seven of their metrics even though the Leapfrog methodology only includes four of them, and he assigns them the mean score.

So, to break it down, he is giving them a higher score than they probably have based on non-response bias, which I could

understand maybe on maybe four of the metrics, but he does it on all seven.

It leads me to conclude that was the only way he could come up with a way to make their grades look better. It would be my last imputation option. Are there multiple options? Yes, that would be by far the last one.

One of the ones I didn't do, I heard about this morning, which is a respectable one as well, you calculate the score with none of this.

Q. There is a discussion about the three measures that Leapfrog designates as decline to respond, safe practices measures?

A. I was distracted. Can you repeat the question please.

Q. You were taking about Dr. Nicholson rescoring all seven measures at the national mean?

A. Yes.

Q. We talked about the four structural measures for which imputation is used by Leapfrog because, at least in Leapfrog's opinion, the missingness is not at random, correct?

A. Yes.

Q. And Leapfrog does not assign a grade for the three measures, correct?

A. Yes.

Q. What is your understanding of why Leapfrog does not impute data like Dr. Nicholson attempted to do for the three process

measures?
A. Well, I think, based on the advisory board, they thought that was not optimal for the three process measures versus for the four because they were structural. It was closer to the truth. For the three they chose to leave out, they thought the imputation method would be more of a guesstimate or less accurate which is why they left it out.
Q. In reviewing Dr. Nicholson's opinion, did you see any scientifically reliable methodology that he relies on for assigning these five hospitals the national median for all four structural measures?
A. I don't.
Q. And your counter factual, which we see here, not only took into account those four measures, but you did a regrading, if you will, of the four measures if these hospitals had even achieved one level higher, correct?
A. Yes. Along the line of the questioning of the Judge, which was very perceptive, I tried to get to the thing, okay, we are never going to know exactly where the truth lies. One extreme is Dr. Nicholson's method where he gives them the mean on all seven, then the Leapfrog methodology, the limited, five, 15, 25, and then what I said is, let's say by -- I still think the limited achievement is the closest to the truth. I agree with the advisory board on the Leapfrog methodology.
I said let's give them some achievement, one notch up, and

so the middle category of this is we gave them some achievement, which I think gives them the benefit of the doubt.

That is why I think this exhibit makes an important point, what you see is, in my opinion, which isn't surprising because the scores only count for 24 percent, that their grades do not change much. Even if you give them a better version than Leapfrog gives them, the second column, there are still Ds and Fs, and that is because basically 74 percent of the grade is from metrics that they are not performing well on.

Q. Does that confirm your conclusion to a reasonable degree of scientific certainty, just like Mr. Rule, that the driver of the Leapfrog hospital safety grade is not the four structural measures, but the other measures?

A. I wholeheartedly agree with that based on the analysis I did, yes.

Q. You had another opinion about the performance of these hospitals independent of imputation, correct?

A. Yes.

Q. You looked at these hospitals' performance on the CMS measures that make up the largest percentage of these hospitals' grades, correct?

A. Can you show the one with the Z scores. You had that.

So, basically in my day-to-day job I look at Z scores, I look at raw rates. I was involved in the advisory panels related to SIRs, standardized incident ratios. All of these

are efforts to summarize data in easier and more understandable ways.

For the five hospitals I reviewed their raw data, their Z scores, their SRI scores, and what I did in this exhibit, I tried to do what many CMOs and CEOs like, which is a yellow, red, green dashboard, with red being you are one of the bottom third performing hospitals, green means you are a higher performer, and yellow.

What I analyze in -- the rows represent the hospitals with the first five rows being the hospitals for the Plaintiffs, the bottom five rows represent comparative hospitals in Florida also that did not complete their survey. Okay.

And then on the columns represent a number of these outcome metrics that I am familiar with, so CLABSI, CAUDI, MRSA, CBIFF, PSI 90, all of which have years and years of experience.

With that background of explaining this figure, it is obvious at a quick glance the five Plaintiff hospitals have a lot of red, very little green. The comparator hospitals that also did not fill out the survey and thus were subject to the same imputation of limited achievement have an overall score that has a lot of greens and a lot of yellows, which gets at the same conclusion that these hospitals are poor performers on the outcome metrics no matter what you impute for their four structural measures.

Q. And just one thing about this slide to orient the Judge,

why did you use these ten hospitals in the State of Florida?
A. Well, so invoking the counter factual, you are trying to get the hospitals most comparable to these, they are not in the same state and they also did not fill out the survey.
Q. I want to make sure, are you aware in the State of Florida whether there are any other hospitals other than these ten that did not fill out the Leapfrog hospital survey and were provided a grade?
A. I am not aware, I think we included all of them.
Q. So, it is your understanding there were ten hospitals in the entire State of Florida that didn't participate in the hospital survey?
A. Yes.
Q. And these would be those ten?
A. Yes.
Q. Dr. Harris, in terms of your opinions that you provided here today to the Court, are all of those opinions to a reasonable degree of scientific certainty based on your expert and professional experience?
A. Yes.
MS. BLAIR: I pass the witness, your Honor. Thank you.
THE COURT: Cross-examination. I had a question. On your last chart, did that that reflect all the non-imputed scores or just some of them?

THE WITNESS: Good question, I would have to look at it again. The last column, PSI 90X. judge, it is important to know that is a composite outcome of ten outcomes. I can't remember how many columns they have, but it is more -- that is how you get from 22 to 32.

The PSI 90 has ten outcomes, so when someone tries to look at one, that slide is very revealing, and if you look at the five hospitals we used as a comparison there were a lot of greens in the PSI 90 and very few greens in the Plaintiff hospitals in the PSI 90.

THE COURT: There are a lot of NAs in the five non-Plaintiff hospitals and it didn't look like it covered all of the CMS metrics.

THE WITNESS: It may not. I reviewed the raw data and SIRs, and the Z scores, and as was discussed this morning, I tried to get at exactly where the data source was coming from.

THE COURT: Go ahead.

MR. HVIDT: Thank you, your Honor. Justin, pull up Exhibit 6 to Dr. Berger's report, that is 570, the demonstrative on the screen. Thank you.

CROSS-EXAMINATION

BY MR. HVIDT:

Q. Dr. Harris, looking at this exhibit, it is your theory that it is okay for Leapfrog to assume that both sets of five hospitals deserve 60 out of 400 on the four measures simply

because they did not respond to the survey; is that right?
A. It is my feeling that all ten of these hospitals chose not to respond to the survey, hence there is a non-response bias, hence in a standardized way they should give each of the hospitals the same score of achievement.
Q. Set aside your theory for a second. Both sets of hospitals in spring 2025, Leapfrog is telling the public they got 60 out of 400 on four measures without survey answers to back that up; is that right?
A. Yes.
Q. Looking at the 14 boxes and CMS metrics for the five hospitals that are not the Plaintiff hospitals, that say not applicable, those boxes are not applicable because CMS does not have data for those hospitals; is that right?
A. I don't see 14.
Q. If you count up the nonapplicable, my count was 14.
A. You are counting up the nonapplicable. So, I would have to look at the exact definition, but the nonapplicable occurs -- the easiest way to explain it, what if a hospital doesn't perform colon surgery, they get a not applicable. Similarly for CLABSI and CAUDI they probably got a nonapplicable because their expected rate is so low.
The lines, the amount of foley catheters they would have would be so low that they would either have zeroes or ones. You can't calculate a rate if your expected number is so low.

Q. The expected number of instances is so low because these hospitals have less than one hundred beds; is that correct?
A. I don't know all the exclusions, but the expected number is so low, which is exactly why you need process and structural outcomes in instances where events are so low.
Q. You mentioned the SSI. These hospitals are NA because, as you said, they are small enough hospitals they don't do colon surgeries?
A. Most likely.
Q. Look back at the community hospitals, starting with CLABSI and moving towards PSI 90, do you see those six columns, Dr. Harris?
A. Yes.
Q. If you add up the boxes in yellow and green, 20 out of 30 are yellow and green for these community hospitals?
A. Say the last sentence again.
Q. 20 hospitals out of the six outcome measures for the Plaintiff hospitals are green or yellow, so they are performing at or better than the national average on those measures; is that right?
A. The last six columns for the five hospitals, that is 30 outcomes. You are saying how many are green and yellow?
Q. 20.
A. You are probably right. I got 19 on this quick calculation.

Q. At your deposition we talked about factors related to a hospital might impact CMS measures that they can get or achieve on this. For example, a trauma center can impact how a hospital performs on measures like colon SSI?
A. Yes.
Q. The fact that a hospital is a cancer specialist center can impact how it might perform on measures like CLABSI; is that right?
A. I cannot answer that question yes or no.
Q. All right. I will move on.
A. I can give an answer. Can I give an answer to that that answers his question and leads to a yes or no answer?
THE COURT: If he asks one that leads to a yes or no, start with that and then if you need more explanation go on after that.
THE WITNESS: I need more explanation. He is saying for the last six columns does a trauma status --
BY MR. HVIDT:
Q. That is not my question.
A. What is the question?
Q. The fact that a hospital is a cancer specialist center can impact how it might perform on measures like CLABSI, right?
A. Yes, it can perform it, but it is adjusted in CMS. That is the area of research I do and published on, is how do you take these outcome metrics in the last six columns and adjust for

those types of variables and the CDC and HHN already does that.

That is what they have done and evolved over the years so that their rates in this thing are adjusted for whether they are a trauma center, whether they are a cancer center, a teaching hospital, the size of their hospital. It is already adjusted for. That has been the evolution in this field for the last 15 years.

Q. CMS is not -- (inaudible)

A. That is what -- (inaudible)

Q. You agree that room sharing can affect a patient's perception of their satisfaction at a hospital, and that can be impacted by a busy trauma center; isn't that right?

A. Since we are now focusing on the first five columns, the HCAP scores, which is basically a series of questions that a random set of patients get assessing doctor communication, nurse communication, staff responsiveness, communications of meds, and discharge information, I just like to point out that there is a sea of red.

Using the same criteria we now have five times five, 25 outcome metrics of which they are in red for all of them. They are poor performing across all of their HCAP outcomes.

Yes, a double bedded room could affect that, but unlikely to affect 25 of 25 poor performing HCAP scores.

Q. But all those on the left all relate to patient experience; isn't that right?

A. It all reflects an HCAP questionnaire that a patient fills out.
Q. Those five are all related to outcome measures; is that correct?
A. Process measures.
Q. Those measures for nonparticipating hospitals account for approximately 19 percent of their grade; isn't that right?
A. I have to look back.
Q. If you take Dr. Rule's example where he excludes entirely the four measures that are at issue here and the three measures that are already removed, that means 50 percent of the grade in his scenario is all based on those HCAP scores; is that right?
A. Say that again.
Q. I apologize. Dr. Rule's analysis that you were sitting in the courtroom for, he excludes the seven measures entirely that are on the process structural side of the Leapfrog grade.
The result is that 50 percent of the hospitals that are graded on his scenario is entirely attributed to the HCAP scores; isn't that right?
A. In my opinion, the methodology that Dr. Mark Rule used is one of a standardized method of imputation. There are multiple imputation methods.
The method he uses is let's not assume anything, let's go with the data we absolutely know. That is a standardized method. Then there is an imputation method, which we are

getting at, do you impute four, do you impute seven. That is another methodology. Then there is Nicholson's method --

Q. Dr. Harris.

A. Yes, your point is correct in that his method eliminates all of them, but I want to clarify that it is a standardly accepted method.

Q. Dr. Harris, if we could focus on the questions I am asking it will go more efficiently and I won't talk over you for the sake of Pauline. You got to the answer there, but if we could do it in a more concise manner that would help.

Look at the screen, look at St. Vincent's, St. Johns County. Do you see that?

A. No. St. Vincent?

THE COURT: The third one in the second group.

THE WITNESS: I am sorry. Yep.

BY MR. HVIDT:

Q. And you are aware of what the current Leapfrog grade is, right?

A. No. I am not aware of their overall grade. You mean their letter score?

Q. Yes. Are you aware of their current Leapfrog grade?

A. No.

MR. HVIDT: Your Honor, may I approach?

THE COURT: Yes.

MR. HVIDT: Justin, if we could put on the screen the

letter grade for St. Vincent's.

MS. BLAIR: Your Honor, I would like to point out this is not their letter grade from the time frame in which Dr. Harris has provided his opinion.

THE COURT: You can point that out on redirect.

MR. HVIDT: Yes, thank you.

BY MR. HVIDT:

Q. Dr. Harris, do you see Leapfrog has not graded St. Vincent's in fall 2025?

A. Yes.

Q. They were graded a letter grade in the spring 2025; is that right?

A. I believe so. Yes.

Q. But now they are not graded. They are not graded because Leapfrog doesn't have sufficient data to grade them; is that right?

A. That would be my assumption, yes.

Q. Justin, go back to slide seven, Exhibit 6, please.

Do you see the second hospital underneath DeSoto, Keralty Hospital, Miami?

A. Yes.

Q. Do you know what their current Leapfrog grade is?

A. No.

MR. HVIDT: Your Honor, may I approach?

THE COURT: Yes.

BY MR. HVIDT:

Q. The Keralty Leapfrog grade is not graded?

A. Yes. Fall 2025.

Q. And Keralty is not graded because Leapfrog is missing sufficient data to grade them; is that right?

A. That would be my assumption, yes.

Q. Leapfrog's website tells consumers that hospitals won't be graded when Leapfrog is missing more than six process measures. Even thought Leapfrog is missing seven for the community hospital here, it still grades them; is that right?

A. Could you repeat that question.

Q. You look here it says: Due to limited availability of public data Leapfrog is not able to calculate a safety grade for every hospital in the U.S., including -- the last bullet reads, hospitals missing scores for more than six process structural measures.

Do you see that?

A. Yes, I see that, but the --

Q. No, Dr. Harris, there is not an outstanding question now. Do you see that?

A. Yes, I see that.

Q. Leapfrog grades these hospitals with a letter grade even though it is missing more than six process measures; isn't that right?

A. No, because imputed data is not missing data.

Q. Are you saying the made up data for the four measures, to get around the rule that it can't grade a hospital if it is missing more than seven measures; is that right?
A. It is not made up data. Go to the website, they say how they got those four pieces of data. It is not missing, and it is not made up.
It is imputed based on the methodology that the advisory committee thought was best to handle this voluntary non-response bias of involuntarily not filling out the survey.
Q. You have no opinion about what decisions consumers might make after seeing a failing grade based on the fact that Leapfrog is grading these hospitals even without sufficient data to grade them; is that right?
A. I was not asked to give an opinion on that.
Q. Thank you. We can pull that down.
Dr. Harris, it is your opinion that Leapfrog is trying to get closer to the truth in assigning community hospitals failing scores on four measures even though Leapfrog lacks actual survey answers on them for the four measures?
A. Yes, I definitely feel that way.
Q. There is not -- you can explain that with your counsel on redirect.
MR. HVIDT: Your Honor, we prepared demonstratives for cause to help guide this. They are using documents in evidence.

THE COURT: Sure.

BY MR. HVIDT:

Q. They will also appear on the screen. Justin, if you'd go to slide two.

Leapfrog's safety grade data produced in this litigation that has been admitted into evidence, PX 412, shows when the community hospitals last participated in the survey in 2021, they earned an average of 370 out of 400 on these four measures. Do you see that?

A. Yes.

Q. Assume that is correct for me.

It is your testimony to try to get closer to the truth to assign failing scores of 60 out of 400 when they received an average of 370 out of 400 when they last participated in 2021?

A. Absolutely because they chose not to respond for the last four years. They filled out a survey, got 370 out of 400 in 2021, then they choose not to respond the next four years.

You know your data as a hospital, so you know that you were not at 370, you were going to get a higher mean score, so you don't respond. You completely supported my nonresponse bias argument. Thank you.

Q. Dr. Harris, you recall you said that you have no basis to say that these hospitals knew what their performance was on these measures. Do you recall that testimony?

A. I have to see the wording. I do not remember saying that.

Leapfrog safety grade data Leapfrog 412 --
Q. Hold on a second.
Dr. Harris, you testified that before the change, these hospitals were getting the benefit of the cohort meeting. Do you recall that?
A. Yes.
Q. Do you understand that these hospitals were the hospitals were never assigned the cohort meeting --
A. I -- what I thought was, they didn't report for four years.
Q. You had Leapfrogs step -- step one of Leapfrog's old methodology, none -- apply for four second else after they stopped participating. The 2021 still applied for spring 2004. You understand that?
A. You are absolutely correct, I made a mistake, but it doesn't change my overall opinion that they weren't assigned a mean, they were assigned the oldest score card forward.
Q. You weren't here for the testimony from the CEOs to hear the reason why they are not responding to the survey; is that correct?
A. That is correct.
Q. You have no bases to claim the testimony they provided under oath was not truthful; is that correct?
A. That is correct.
Q. You didn't study at all or have any awareness what their data was on the measures for the years when they didn't answer

the survey; is that correct?
A. That is correct.
Q. So, looking to the next slide, Leapfrog safety data, PX 412, shows the bottom one percent of participating hospitals in spring 2025 received 280 out of 400 on the four measures.
Assume for me that is correct.
It is your testimony assigning hospitals 60 out of 400 on the scores is the closest to the truth when the bottom one percent participating hospitals receive 280 out of 400?
A. Could you repeat that question. This is the first time I have seen this data. Go ahead.
Q. You didn't study the hospital safety grade data we produced coming into this?
A. I don't understand that.
Q. Leapfrog produced the safety grade data on measures they assign for the various scores. You didn't analyze that data in coming to the opinions you are here for the Court?
A. No. I looked at the scoring methodology, I didn't look at the raw data for every hospital.
Q. Looking at this slide, barring the participating hospitals, they received scores 280 out of 400, Leapfrog assigns nonparticipating hospitals 60 out of 400 simply because they didn't respond to the Leapfrog survey; isn't that right?
A. But the only one person is people who responded to the survey, right?

Q. That is correct.
A. So, what is the question?
Q. The question is: Simply looking at this data, the effect of the penalty that Leapfrog and nonparticipating hospitals the score they receive is one fifth of the participating hospitals receive; is that right?
A. Yes, and I said --
Q. Doctor, you can do that on redirect. Right now stay focused on questions at hand so we can get through this.
You are not aware of any survey for any nonparticipating hospitals that the 60 out of 400 is actual assignment that the community hospital would receive from the survey?
A. No. If you are a hospital figuring this out, you know if you answer questions you would have gotten the lowest grade of 282, you know that.
Q. But -- you just said you have no basis to understand that these hospitals knew what they would have received on the survey measures had they answered it; isn't that right?
A. I can just tell you with my experience as an epidemiologist, they know what the answers are going to be to these questions. That is my honest answer.
Q. Did you do a survey of all of the hospitals to assess and ask them the reasons why they didn't participate in the survey?
A. No.
Q. Thank you.

Dr. Harris, given the stark difference between the bottom one percent of the hospital scores on these measures, and Leapfrog approach in nonparticipating hospitals, it is no surprise that zero nonparticipating hospitals have received an A of nonparticipation penalties since the change, correct?
A. I disagree with that reasoning because its a difference of 282 minus 60 over 24 percent of the grade.
The hospitals that didn't get an A, it is not because of those four questions, it is because of the 76 percent. That was my opinion through multiple exhibits, so I don't agree with that causal conclusion.
Q. Dr. Harris, you keep talking about 24 percent and 76 percent. I am confused by that. Can we go to slide three of your own demonstrative, please. Slide six, actually. Let's zoom in here if we can.
Dr. Harris, this is your own demonstrative?
A. Yes.
Q. This is copied from Exhibit 1 of your own report; is that correct?
A. I don't know if it is Exhibit 1. Yes, it is in my report.
Q. It says Exhibit 1.
Looking on the left-hand side, you see the blue -- royal blue part of this graph?
A. Yes.
Q. And what is the number there in the royal blue part of the

graph?
A. 31.6 percent, that is when they fill out the survey. If they don't fill out the survey they get the secondary scores from CMS and drops it down to 24 percent, which is in Dr. Nicholson's report. He says that as well.
Q. Your testimony is Leapfrog's assignment of these four measures for non-participating hospitals is 24 percent even though your report shows it is 30 percent for the community hospitals who are not participating hospitals?
A. Well, I am getting a little confused now. The 31.6 percent in this exhibit relates to a hospital that fills out the survey and then -- I'm not sure.
Q. Dr. Harris, the last of the five hospitals, those are hospitals that didn't submit the survey?
A. Right.
Q. It is putting a 34 percent after that. That is the percentage that applies to them, correct?
A. I made a mistake. The first answer to this question is correct. I am confused now to be honest. I am confused how I got from 24 percent to 30 percent.
Q. I am happy to tell you where you got confused. If you look back to the pie diagram, on the right-hand side is process measures for participating hospitals, 24 percent of the score of participating hospitals comes from the four measures. When you remove the three measures for nonparticipating hospitals,

that percentage that went to those three measures is adjusted and re-weighted to the HCAP scores and the four measures that are at issue here. Do you understand that?
A. To be honest, I am confused how we get from 24 to 30. You are saying because you eliminate the three out of seven.
Q. I am applying Leapfrog's own process here in trying to explain to you here that when Leapfrog's methodology is applied to nonparticipating hospitals it doesn't assign three measures for 50 percent of the grade and takes that 11 percent and re-weights it to the HCAP scores and to the four measures at issue.
    Do you understand that?
A. Yes.
Q. Thank you. And so the opinions in your report, when you say they might have a limited effect on the outcome, talking about it being 24 percent, it is actually 30.46 percent; isn't that right?
A. My exhibits had the proper calculations and you see the grade. It doesn't change my opinion, my overall opinion.
Q. We will get to that. We showed that nonparticipating hospitals had received limited achievement, five, 15, 15, 25, four measures since Leapfrog made the change.
    Do you understand that?
A. I do not.
Q. Leapfrog is treating nonparticipating hospitals unlike and

far worse than any hospital; is that right?
A. Based on non-response bias.
Q. And Dr. Harris, you are aware that no participating hospitals received an F in spring 2025; isn't that right?
A. In the spring of 2025, no, I haven't reviewed that data. I wasn't asked to give an opinion on it.
Q. Justin, would you pull up JX 22.
What you saw in your deposition, Dr. Harris -- I am going to focus in on the last paragraph to Missy Danforth and Alex Campione.
If you look at the last line. Dr. Romano says, if you want to penalize nonparticipants don't pretend you are imputing statistical values in an optimal way. Do you see that?
A. Yes.
Q. So, Leapfrog is assigning those scores in a statistical way; is that right?
A. Repeat that question, please.
Q. Is it your testimony the non-response bias theory means it is okay for Leapfrog to assign 60 out of 400 on the four measures to non-participating hospitals trying to get closer to the truth in your words?
What I am trying to understand is that Dr. Romano in the ordinary course told Leapfrog that it shouldn't pretend that Leapfrog assigned those scores in a statistically optimal way. That is what your testimony is; isn't that right?

A. I disagree with the sentence you highlighted and stand by my opinion of the methods we discussed now and in my report, Leapfrog chose the optimal way that is closest to the truth.

Q. And if we look up to the top of this email chain, Alex Campione replied, as she testified before the Court, to Dr. Romano, I completely agree. Do you see that?

A. She is responding to the whole email, not just to one sentence. Yes, I see what you have highlighted.

Q. Thank you. If we could move on to JX 31 now please, Justin.

If you can highlight it there. Ms. Campione's email in which she is talking about how to design the footnote that references -- that is near where the measure is that is assigned to these hospitals, she says that they can't say external data sources because Leapfrog is arbitrarily assigning the points associated with the bottom category, limited achievement.

Do you see that?

A. Yes.

Q. Similar to my last question, what I am trying to understand is Leapfrog says here 60 is arbitrarily assigned and it is your testimony that they are trying to get them closest to the truth by assigning 60 out of 400; is that right?

A. They are trying on get closest to the truth, probably where they got the outcome metrics they didn't respond on the survey,

but come from the external sources, and may not apply just for the four survey questions. You are taking this out of context of the whole email message.
Q. Dr. Harris, you copied and pasted the support safety principles into your report; is that correct?
A. Yes. I had help from my legal counsel.
Q. Did legal counsel copy and paste the support safety principles into your report?
A. They helped me draft it.
Q. Dr. Harris, you are aware, are you not, those safety principles had been removed from Leapfrog's website; is that correct?
A. I am not aware of them.
Q. You accessed them by accessing the website; isn't that right?
A. Correct.
Q. And you are not aware since you weren't here they were pulled down, Leapfrog pulled those safety principles down?
A. Correct.
Q. Dr. Harris, you referenced the expert safety panel meeting that occurred in April 2024 in your examination. Do you recall that?
A. Yes.
Q. You said you reviewed the slides for that before preparing your report. Do you recall that?

A. I reviewed the slides and the transcripts. What happened in the deposition was there was some confusion over the exhibits you gave me, and whether they were the same ones I reviewed. There were multiple conversations and it seemed to be duplicates. Yes, I had reviewed the slides and the verbal transcript.

Q. You mentioned the transcript there, so you are familiar with the transcript, the transcript of Dr. Singer. The transcript is in evidence.

Dr. Singer references how adjusting the methodology might penalize high performing organizations that choose not to participate in the survey. Do you recall reading that in the transcript?

A. I don't recall that exact sentence.

Q. Dr. Kathy McDonald had a concern about how this assigned -- how the adjusting methodology could impact safety in hospitals in the survey. Do you recall that?

A. Yes, I do.

Q. Dr. Provose (phon) in the transcript mentioned the reason for some hospitals not participating in the survey is a resource thing and explicitly cited COVID being a resource restraint.

Do you recall reading that in the transcript?

A. Yes, but you have to read the rest of what Dr. Provose wrote. He is exceedingly important.

Q. Dr. Provose referenced he didn't have any data analyses to show that the hospitals that weren't responding to the survey were poor performers. It was a hunch and an anecdote that he provided; isn't that right?
A. I don't remember that sentence. This ties into the issue, yes, imputation is the best way to deal with that. I don't remember the whole sentence, but I would be surprised if Dr. Provose wouldn't think that is not an approved method. He used it in many of the papers he published.
Q. We can turn to your opinion of Dr. Nicholson. If we could pull up Dr. Harris' last slide, please.
Do you recall that?
A. I didn't do the overall -- what is that total, please. That is relevant to the exhibit you had given me before.
Q. That is why I provided them.
If we could pull up the slide, the demonstrative that goes over Leapfrog's approach.
Dr. Harris, your opinion is that it is more appropriate to assign community hospitals 60 out of 400 -- strike that.
Your testimony is that Leapfrog is getting closest to the truth by assigning 60 out of 400; isn't that right?
A. Yes.
Q. And then you said, what if I do a counter factual where I give them some achievement, I give them 120 out of 400. Do you see that?

A. Yes.
Q. In your counter factual -- go back to Dr. Harris' last slide -- adjusting the four measures for the nonparticipating hospitals, the Plaintiffs here, it impacts three of their grades to give them a little more credit than 60 to 120, which is still 160 some-odd points less than the bottom one percent of participating hospitals. Do you see that?
A. Yes.
Q. And as you testified earlier, you didn't review Leapfrog's safety grade -- assigning 120 out of 400. You are guessing as much as Leapfrog is at what the hospitals actually would have received had they participated in the survey; is that right?
A. I did review their methodology. I disagree with that part of the statement. The purpose of imputation, which we spent the last hour and a half talking about -- I don't change my opinion, which is non-response bias is voluntary and the closest to the truth is limited achievement, or the closest to the truth is some achievement, and one person is farthest from the truth, and Dr. Nicholson is farthest from the truth.
Q. Justin, go to the next slide.
You just mentioned Dr. Nicholson's approach, Dr. Harris. Looking at these slides here, you see how the average score the community hospitals received in their last participation is here in Dr. Nicholson's approach --
A. The last row --

Q. -- correct?
A. The second to the last row?
Q. I am referring to the last row here. The last time the hospital participated in the Leapfrog survey, 370 out of 400; is that right the?
A. Right. Hospitals know their data. Why were they not reporting and get a 60 if they are going to get a 300? They know they are going to get less than 60.
Q. You testified you have no basis to explain why the hospitals chose not to participate in the survey. And you also testified you have no basis to claim they knew what they would have received had they participated?
A. I said I didn't see that data. Someone who sits in meetings like this all the time with the CMO and CEO, they know what the data shows on this. Those five hospitals know what they would have scored, which is why the closest to the truth is the Leapfrog approach.
They know whether they have bar codes, they know whether they have CPOE, they know whether they are doing hand hygiene observations. You know this as a hospital.
Q. Let's get into knowing this as a hospital for a second.
If I could bring up PX 528, please.
Now, Dr. Harris, you testified earlier you didn't review the -- Dr. Harris, you didn't review the documents that the community hospitals produced in this litigation in response to

Leapfrog's request for information that the hospital would have provided to Leapfrog had they participated in the survey, isn't that right?

A. Yes.

Q. At your deposition we walked through this document here on the slide; isn't that right?

A. Yes.

Q. And you are aware that the hospitals in this litigation, in response to their requests, undertook the enormous effort to collect information that they didn't already have put together to provide Leapfrog in discovery the answers they would have provided, the information they would have provided to Leapfrog had they answered the survey relating to these four measures. Do you understand that?

A. I am a physician epidemiologist, this is a real legal issue. I did not see this exhibit before my deposition. At the deposition I tried to point out, where is this data coming from. I have no idea where it is coming from, I have no idea of the validity of it.

After the deposition I still have no idea whether this data is accurate or not accurate, how it corresponds to what they would have done if they responded to the survey. I have no opinion on this data.

I don't understand this data, I don't. I don't know where it is coming from.

Q. At your deposition you testified that this was the actual data from the community hospitals as relates to BCMA and CPOE that might affect your opinion.
A. Yes. If this was the actual data, yes, that is what I testified.
MR. HVIDT: Your Honor, we move 528 into evidence.
MS. BLAIR: Your Honor, we have an objection to the document. To the extent he used it as a demonstrative we had no objection. There is no data to back up where these numbers come from.
It is a compilation document with no trustworthiness behind it. It is a hearsay document created in the anticipation of litigation and there is no trustworthiness of this document being entered into evidence in this case.
MR. HVIDT: In this litigation Leapfrog served discovery requests of the hospitals asking if they would take the effort to provide the information to Leapfrog that hospitals provide to Leapfrog in responding to the survey as relates to all of the scores.
There was a hearing before Magistrate Judge Middlebrooks --
THE COURT: Matthewman.
MR. HVIDT: Excuse me, Matthewman as to the request for production and community hospitals would undertake the effort, and it was an effort, to collect the information the

response they would have had to provide to Leapfrog if they answered the survey.

They undertook that effort, we produced that two weeks before Dr. Harris provided his report. Contrary to what was in opposition to the motion in limine, they have chosen to not cite it rely on it or reference it in the course of this investigation.

This was compiled in trying to be responsive to the survey, and they keep trying to reference throughout the case what the hospitals would have or would not have done if they participated in the survey. This is the information that was collected and produced to try to answer that question.

So, from a standpoint of this information is highly relevant and collected in response to the discovery request, and efforts have been made throughout to mischaracterize the actual truth. We think it is important.

THE COURT: An interrogatory comes in as an admission here you don't have that. You might have been able to do this with the CEOs and apparently chose not to.

MR. HVIDT: The CEOs were not the ones involved in doing that. We are doing this here because of the representations that were made.

THE COURT: I am going to sustain the objection. You can question the witness about it, but I don't think it comes in under any evidentiary rule I know of.

The fact that something is produced in discovery doesn't make it admissible.

MS. BLAIR: Thank you, your Honor.

BY MR. HVIDT:

Q. Now, turning to your theory unsupported by data or data analyses, your theory is that these community hospitals must be treated five times worse than the worst one percent of participating hospitals simply because they didn't participate in the survey; is that right?

A. I wouldn't phrase that it way. I disagree.

THE COURT: Let me ask you, you keep asserting that this is non-response bias, but there has to be some parameters to non-response bias. How can you assume the non-response bias would result in information worse than one percent of all participating hospitals? That seems like an irrational assumption to me.

THE WITNESS: It is not one percent of all the hospitals, it is the lowest one percent of all the participating hospitals.

THE COURT: I don't know what that number would be. In Florida it is ten. I think we saw something about 69 percent or something on one of the slides in terms of participating hospitals in the United States.

THE WITNESS: It is an excellent question, Judge. What I tried to do since the deposition, I tried to look over

the actual survey because obviously as a physician I never filled out the Leapfrog survey myself, and it is true that the survey has over 300 pages. When I looked at the questions pertaining to these four metrics, and I looked at the number of optional questions, it actually led me to conclude the survey was much less burdensome than I imagined it to be.

So the logical alternative, which I think you are getting at, is that filling out the survey is way too burdensome.

THE COURT: For whatever reason. You can dismiss the reason for not doing it. I am trying to get to the rationality of imputing a non-response bias by a big factor than the worst responding hospital, one percent in the country.

THE WITNESS: When you look at -- I can't imagine the five hospitals didn't look at the survey, didn't estimate how they would answer the questions, and they know their score.

You are saying is it seems illogical statistically that it would be that low. I agree with you, that it seems bizarre that it would be less than one percent, but I think -- it doesn't negate my overall opinion which is the hospitals know roughly what score they would get if they were to fill out the survey and hence, there is a purposeful reason. It is not random that they are not filling out the survey. They are not filling out the survey because they know they are going to be scored poorly.

I never had this discussion at my hospital about filling out the survey, but we had these trade off discussions all the time, which is like, oh my God, they are requiring a hundred observations now, they only required 50. You sit down and say, what is the burden, what are we going to score, what is the benefit of doing it. The CEOs and CMOs routinely know the pros and cons and this is the exact discussion we would have.

The implication they choose not to fill out the survey and their scores are good, but there is a reason they choose not to fill out the survey, I strongly disagree with that.

THE COURT: Okay, thank you. Go ahead.

BY MR. HVIDT:

Q. Dr. Harris, during your examination by counsel and your Honor, you were asked what would happen in a scenario where a student didn't take a test in a classroom enrolled before you. Do you recall that?

A. Yes.

Q. In that example, that student is trying to get credit for that?

A. Yes.

Q. Taking a test is a requirement and you have to get ready for that test?

A. Yes.

Q. The Leapfrog survey is voluntary; is that correct?

A. Yes.
Q. Now, going back to your CMS measures for a second, you have no actual community hospital survey answers on the four measures to claim they are poor performers on the four measures; is that right?
A. Say that again, please.
Q. You have no actual answers that you reviewed for your opinion that community hospitals would have received poor performance on the four measures?
A. The community of the five?
Q. Yes.
A. Yes, that is correct.
Q. And you did no causal analysis to connect their performance on the CMS outcome measures to how they would have performed on those four measures; isn't that right?
A. I think I understand that question, but I would like you to repeat it again, please.
Q. You did no causal analysis to link the performance metrics that are listed in the CMS outcome measures that were the six columns on the right to how the community hospitals would have performed on the four measures had they answered the survey; isn't that right?
A. Correct, but I would argue that is what Mark Rule basically did. If you exclude the four things -- you are waiting and saying, I can't use -- this is what I assume Dr. Romano may

have testified, there is a missingness at random X, a category of missingness. The best way to get at that data is take variables that we already know, for example, in the trauma --

Q. Doctor, you can explain that with your counsel on redirect. I am trying to understand, you did know causal analysis linking the CMS outcome measures to the four imputed measures; is that right?

A. I did no causal analyses.

Q. Mr. Rule did no causal analysis to see what the outcome measures -- what the hospitals would have gotten on the four measures either; is that right?

A. I don't disagree with that. You take the data you know which is the data you have, and you say here is how they would have performed with the data we know, and they are poor performers.

That is a sensitivity analysis. It may be not a causal analysis, it is a sensitivity analysis. The same way -- that is why I have exhibits showing how poorly they did on the metrics we have measured, that is how they may or may not have done on the measures you don't have using reasoning.

Q. Leapfrog did not conduct any data analyses of nonparticipating hospitals to assess whether they were less safe than the hospitals that do; is that right?

A. That is correct.

Q. A moment ago I was talking about hand hygiene. I would

like to pull up the last slide for a second.

Dr. Harris, looking at the last slide, you see the community hospital example on the screen, and the bottom shows Good Samaritan when they last participated in the survey got a hundred out of a hundred on hand hygiene. Do you see that?

A. Yes.

Q. And you have no analyses or no data or no -- nothing to say that Good Samaritan has just simply stopped washing their hands in 2021; isn't that right?

A. The one thing I would say is, you are comparing 2021 to 2024. I know for a fact Leapfrog changed its terminology on how it scored hand hygiene in that period.

Yes, I have no data that they stopped washing their hands, but I would more than likely say that the hospital knew that the criteria for how they were going to be scored on hand hygiene changed from 2021 to 2024, and that affected their decision not to fill out the survey.

Q. Leapfrog has no data from Good Samaritan or the other community hospitals on the hand washing and hand hygiene performance since 2021; isn't that right?

A. That is correct.

Q. You looked at no data, no information how the hand -- how their hand washing or hand hygiene practices, if they changed at all since 2021; isn't that right?

A. Correct. I have no data.

Q. They assume community hospitals are failing at hand washing when Leapfrog lacks the hand washing data?
A. No. I don't agree with that.
Q. Is it your testimony that the hospitals agree to be treated worse than any hospital despite no data on the score measures?
A. I don't agree with that. I looked over the specific questions for hand hygiene and there are five domains. Three of the domains require you just answering questions, okay. If that has changed, the hospital that chooses not to answer 15 questions, they know what their data is.
Does Leapfrog know what their data is? No. Do I know what their data is? No. Does the hospital know what the score would have been on this exhibit? Absolutely. They know exactly what their score is.
So the Judge knows how I know this, you don't know how many hours I heard people complaining about the number of observations and new rules that are required. We knew what responding to that would have done to our score and we chose to follow the advisory committee's rules relating to hand hygiene. We knew the impact on how to fill it out.
That is why I feel so strongly about non-responsive replies. I sat in so many meetings where they chose not to respond and it is because you don't know the data or because you absolutely know the data of your hospital.
Q. Again, Dr. Harris, just because -- you have no basis to

claim that Good Samaritan knew what the score is they would have gotten from Leapfrog on the hospital survey answers; isn't that correct?
A. I don't know what they would have had, but I know the decisions of many of my hospitals and as president of SHEA, they knew what the scores would have been when they chose not to participate in the survey or not.
Q. My question is different.
You have no evidence or testimony that you can cite to know that the community hospital Good Samaritan knew what they would have received on the survey had they participated; is that right?
A. Can you say the question again. The wording is important.
Q. You do not know if the community hospital Good Samaritan knew what they would have received on the Leapfrog survey in the years that they didn't participate?
A. I don't know that definitively.
Q. In coming to your opinions you excluded the other reasons that a hospital might choose not to respond to the survey in coming to the opinion that non-response bias is the only reason; is that right?
A. I did not exclude it. I considered all of the options.
I considered them, it ties into the reasoning. There are multiple ways to impute, I heard them all. In my opinion the Leapfrog approach is the best and closest to the truth with

perhaps the Harris being second, the Mark Rule being close and Nicholson's approach being poor.
Q. Dr. Harris, you did not consider in coming to your opinions Leapfrog's documents that show the list of common objections that hospitals have to the survey; isn't that right?
A. Are you talking about the public forum document?
Q. I am talking about a document that Leapfrog has from hospitals participating in the survey. You did not review that document, did you?
A. That is correct, I didn't review the document.
Q. If we could pull up PX 406. This is admitted into evidence, 2025 regional year, communications tool kit. Justin, go down to the comment.
MR. HVIDT: Your Honor, if I could have one minute.
(Pause.)
BY MR. HVIDT:
Q. Looking at this slide here, Dr. Harris, do you see where it says above the middle bar, common objections to participating in Leapfrog surveys? Do you see that?
A. I see that heading, yes.
Q. What I am going to do here is count through the number here. One is, we do not; two, Leapfrog data; three, our effort to promote quality; four, all the information available; five, reconcentrate our data; six, we already have performance data; seven, Leapfrog is rarely used by the public; eight, we believe

something; nine, we disagree.

Do you see those?

A. Yes.

Q. Your opinion is that despite the fact that Leapfrog labels common objections, the objection, your theory that they are not performing because they are poor performers are the only ones that should be considered; is that right?

A. No. First of all, I was not asked to give my opinion on this document. Two -- what is the last one, exclude any of these reasonings. No, I would not exclude these reasonings.

I think these comments were some of the reasons places choose not to participate. They tie into multiple themes that are accurate, but it still doesn't have an effect.

If a hospital is -- I mean, like one of the statements there is a perfect example. You say Leapfrog is rarely used by the public or insurance companies any more.

If you are a hospital that believes that, fine, you don't respond to the survey. You focus efforts on other things, you make that choice. You make that choice full well knowing what your grades are going to be on the Leapfrog survey. You know what the ramifications are.

I was trying to relate to the Judge why I think I am a semi decent expert on this. I have these discussions all the time with the CMO, CEO, chief quality officer, and we have these discussions all the time and they will say, you know we are not

reporting because we are poor performers. Isn't this -- that is the major driver. It is not that you don't know what the implications of not reporting are.

Yes, we sit with them and say this is how much time it is going take to do this, to get this thing up. You make decisions based on knowing what the implications are going to be. Yes, these are viable things, but they are still, in my opinion, less weighted than them knowing what non-response bias was going to happen to their rating.

Q. You know there are multiple reasons a hospital does not choose to take the survey?

A. Yes.

Q. You testified that you can never determine with certainty that reason; isn't that right?

A. Correct.

Q. Thank you.

THE COURT: Is there redirect?

MS. BLAIR: Yes, your Honor.

REDIRECT EXAMINATION

BY MS. BLAIR:

Q. Dr. Harris, you were shown some comment objections to the hospital survey. Is there any reason those couldn't be excuses for hospitals that are poor performers for not participating.

A. Yes, there are valid reasons in some settings and there are excuses in others. They would be excuses for not filling out

the survey.
Q. In your expert opinion and based on the science, is imputed data data?
A. Yes.
Q. Why is imputed data data?
A. Well, this case gets at some of my frustration in research over 25 years to be honest with you. I take -- there are days I wish I was a cardiologist. I would have 350 publications which the majority would be randomized trials and we wouldn't be talking about imputation because in a randomized trial you more conclusively know is this drug A better than B. In my field we never have enough money to do randomized trials, so we became experts in bias, confounding imputation.
Unfortunately over my career I read a lot, interact a lot on how to deal with bias, non-response bias, imputation as a valid method. In fact, related to the peer review publication, if you submitted a manuscript where you don't try to impute data and you have a lot of missing data, there is no way that manuscript is going to be accepted.
Whether you call it sensitivity analysis or not, you have to have those variants in your peer reviewed publication so that your peers, which would be people on that advisory committee as an example, would weigh the multiple options and come to conclusions.
So, papers in this exact area, people on the advisory

committee would come back and say, I would like you to run this additional imputation method before I accept the paper. If you submitted a paper that had no imputation and a lot of missing data there is no way it would get in a journal.

Q. Are there peer reviewed articles based on reasoning using non-response bias as an acceptable reliable scientific method for using missing not at random data?

A. Yes, absolutely.

Q. And in fact, I think you testified in your deposition that you teach non-response bias and these types of imputation to medical students, correct?

A. Yes. This is a really important point. When you have med students and doctors reading studies, often the studies can control for all of the bias, but you want them to go through this other side. You teach them non-response bias, you teach them what the plausible alternatives are, you teach them in an intellectual way to come up with the one most plausible and work through how much that affects their results.

That is basically the basis of my opinion, trying to explore all of these options and giving an opinion of what I think the closest to the truth is.

Q. Remember Mr. Hvidt showed you all of the red on these measures?

A. Yes.

Q. If you could pull up Exhibit 7.

You actually prepared a slide, Dr. Harris, if you recall on how the hospitals do on the HCAP measures against all of the hospitals in the State of Florida, right?

A. Yes.

Q. Would you agree with me if you look at the slide the HCAP scores have been decreasing year after year and below the Florida and national average; isn't that true?

A. Yes.

Q. And these CEOs testified, well, that is because we have only seven to nine response.

In your role as an epidemiologist is it typical that hospitals have low response on the HCAPs?

MR. HVIDT: Objection, it is beyond the scope of cross and not covered in direct examination.

THE COURT: Overruled.

THE WITNESS: Well, this is a difficult question for me to answer. I think what you are getting at is the methodology in how the HCAP score is administered. I am not an expert in that, but here is what I know.

They randomly take a sample of patients, and it is voluntary for the patients to fill out the 19 or 29 questions, your seven to nine. I can't -- I don't know how many people it goes out to, what percent of the hospital admissions. What percent the average completion rate is, I don't know that.

The only research I have done is to try to study the

HCAP questions, the quality and association between that.

Q. Let me ask it another way. Why was it important for you to create this exhibit in connection with your opinion?

A. It is very important, esoteric, but important in the form of the outcome measures, structural measures. As I alluded to, me and others are fans of structural metrics. We believe they -- the other thing that has changed over the last ten or 15 years is numerous people think the voice of the patient becomes more and more important.

I believe the voice of the patient is important. As a physician, I really want what is best for my patient, whether I am seeing it as a patient doing research, whether I am evaluating HCAP metrics.

What is important is the voice of the patient, how they perceive their care, right, and it is a questionnaire that this HCAP group thinks is complimentary to the outcome measures and the CDC infection measures, which is what I know, and I agree with that.

So I am not an expert on HCAP and patient experience metrics, but this is an area that is really important and it is emerging, and as you can see, their scores are poor.

As an example, my hospital when I first showed up there did not have a physician in charge of the patient experience. They have an adviser and a physician at every single one of our hospitals in charge of the patient experience because of the

HCAP scores and the increasing perspective that the patient voice matters. That is why I felt this is an important exhibit.

Q. Thank you. Mr. Hvidt asked you questions about your recollection of what occurred on your review of the transcript of the expert panel meeting where they discussed the 2004 methodology. Do you recall that?

A. Yes.

Q. He didn't let you fully answer that. What else do you remember the panel said at that meeting that informed your expert opinion here today that non-response bias and imputation based on reason was followed with respect to the ultimate methodology change?

A. I want to clarify for the Judge the exact documents I reviewed and did not review.

Q. Sure.

A. Let me explain why time chronology becomes important.

Prior to my deposition I had an attachment, which was the slides that Matt Austin sends to the advisory panel prior to the meeting. I then had a transcript of the meeting which I reviewed, which is relevant, the public comments related to the final ruling.

I am pretty certain that I did not read the email exchange between Dr. Provense and Dr. --

Q. Romano?

A. Sorry, it has been a long time -- at the deposition. I then had the email exchange, and what I did since the deposition, I reviewed those documents again and perhaps more thoroughly.

Similar to what happened today, the advisory committee starts with a review of what the old methodology is, they have a proposed methodology by Matt Austin, and exactly as counsel suggested, a fairly heated discussion and multiple opinions of where to go.

The discussion was basically we are probing, we are giving them scores they don't deserve, what is a better methodology that is closer to the truth. There is a discussion about what the methodology is.

After the meeting there is a series exchanges between the advisory group and leaders of Leapfrog to basically continue the discussion, exactly relevant to my testimony, what are the different options and where are we getting closer to the truth. That is where they get to the methodology put in place in 2024.

After that they open -- I am not going to get the term correct -- public discussions on the proposed changes. That is my understanding of how they got to this new methodology.

Q. Do you recall in reviewing the transcript -- you gave testimony today about the discussions that you have had with CMOs about participating in different surveys. Do you recall that testimony?

A. Yes.
Q. Do you recall whether or not Peter Provose stated in the transcript that he was hearing anecdotal stories about hospitals being disincentivized to be in the survey?
A. That is exactly why I tried to make the point to counsel, he was taking that one sentence of Dr. Provose out of context. My interpretation from Dr. Provose, and it was clear, more and more hospitals are not filling out the survey, they are not filling out the survey because they get a high score.
They were leading that type discussion of we are hearing that it is not in the hospitals interest to fill out the survey. I have been part of the institutions and I say the right thing to do is X, let's do X. The CMO and CEO will say, well, if we do the right thing our grade is going to go down or we are better off doing this option.
Yes, they were looking for ways to decrease the workload if they didn't get a better score.
THE COURT: You didn't like the last part. Denied.
Are you nearly finished?
BY MS. BLAIR:
Q. Your counter factual -- Dr. Nicholson gives a high median score, thinks they are one of those, or were interpreted to take into account the score would have gone up, correct?
A. Correct.
Q. Dr. Harris, if the evidence in this case shows that these

five hospitals knew about the methodology change in advance, tracked their data for all four of those measures, used the Leapfrog calculator in advance of the fall 2024 grade change to estimate their grade and have admitted they can do it with no cost and minimal effort, would that reinforce your non-response bias opinion in this case?

A. Absolutely.

MS. BLAIR: Thank you. No further questions, Doctor.

THE COURT: Thank you, Doctor. What is next?

MS. BLAIR: Would you like to take a lunch break?

THE COURT: I would like to know what is next.

MS. BLAIR: We have a live witness and then two videos to play.

THE COURT: How much more time do you think you need?

MS. BLAIR: It depends on the crosses. I think I have an hour 20 of videos and one live witness.

THE COURT: Okay. I agree with you. It is a good time to break for lunch. Let's return at 1:30.

(Thereupon, a luncheon recess was taken.)

THE COURT: Okay, please be seated, and please continue.

MS. BLAIR: Your Honor, I want to call Isis Zambrana to the stand and I want to see if she and her lawyer are out in the hallway.

THE COURT: All right.

MS. BLAIR: Your Honor, Ms. Zambrana is with her lawyer, not outside. We'll play the video of Lauren Bailey, who you have seen the testimony of.

THE COURT: All right.

MS. BLAIR: Eighteen minutes. No, I will call her to the stand.

Your Honor, we will call Isis Zambrana to the stand.

THE WITNESS: Good afternoon, Your Honor.

(Witness sworn.)

DIRECT EXAMINATION

BY MS. BLAIR:

Q. Good afternoon, Ms. Zambrana, thank you so much for coming.

Could you provide the Court with a little bit about your background and training. Who are you?

A. Good afternoon, everyone. I'm Isis Zambrana, I always like to say that my first job is being a mom, but anyway, but I serve as the Vice President and Chief Quality Officer for Jackson Health System in Miami, Florida. My official training and background is actually i nursing. I was a clinician for many years, specializing in ED and critical care and I transitioned over into policy and patient safety, and then had a career for quite sometime, 13 years, with actually Tenet Health Care, and I oversaw their quality program at two of the Tenet Hospitals in Miami County, and then I returned to Jackson 'cause I had started my nursing career at Jackson, so returned

to Jackson to serve as the corporate director in 2013.
Q. And are you still the corporate director or have you gotten promoted --
A. No, actually, in 2017, I was promoted to Associate Vice President of quality and patient safety, and in 2018, to Vice President and Chief Quality Officer which is the role I serve in now.
Q. And when you say you are Senior Vice President of quality, is that over just Jackson Memorial Hospital or the whole health system?
A. No, the health system. We are comprised of seven hospitals.
Q. And of those seven hospitals, how many are adult acute care hospitals?
A. Four of them.
Q. And do those four adult acute care hospitals participate in the Leapfrog survey?
A. They do.
Q. And do you recall when Jackson Health System started participating in the Leapfrog hospital survey?
A. I do, very well. So I got there in 2013 and I asked why we didn't participate, I came from, like I said, Tenet Health Care where all the hospitals were participating, so in 2015 was the first time that we actually participated as the Administrator of our hospital.

Q. And in your opinion, how does participating in the Leapfrog survey, and I don't want to talk about safety grade just yet, how does participating in Leapfrog's survey impact your hospital's safety performance across the system?
A. So, how is it impacted or -- for Jackson Health, it aligns with our improvement journey. So when you look at the Leapfrog framework, many of the measures or the standards that are included and measured in the survey as well as the safety grade aligns with we we're trying to improve. So you look at the reduction of infections, the reduction of complications, improvement in the patients' experience of care. When you look at the survey, it goes into depth into different maternal care outcomes. It goes into looking at CT, CT radiation in pediatric patients.
So these are things at not only Jackson Health, I would think any health system in any hospital would want to be focused on improvement. Does that answer your question?
Q. It does, thank you, I appreciate it.
And so other than the Leapfrog survey, what other tools does Jackson Health System use as a way to measure and improve hospital safety?
A. Well, there are the differentials. Obviously, the public facing tools, like the safety grade, but also CMS ratings, CMS data that is publicly reported to hospital care. We also utilize our own internal benchmarking. We utilize their

critical analytics tool called Deviance Clinical Database and it has, I don't know, 800 hospitals and they're segregated by academic medical centers, community hospital trauma one level, you know, level one trauma, we look at internal and benchmark using that. We purchase this data from multiple registries, team put for trauma, misfit for general surgery, STS for cardiovascular surgery, the American Heart Association, look at the guidelines. We have designations in a multitude of disease processes, bariatrics, stroke. There is a lot of tools out there that hospitals utilize.

Q. And why does Jackson Memorial find it important to participate in a multiple of differentials?

A. I'm sorry, can you repeat?

Q. Sure. So you just listed all these different tools, many of which I don't know. Why does Jackson Memorial find it important to participate in a multitude of different types of tools instead of just picking Joint Commission and call it a day?

A. And I'll talk about, thank you for mentioning, and we're going through commission accredited, right, so a lot of these different tools are specific to the patient population or to the program. If you look at, for example, CMS and Leapfrog, there are some measures that cross over, so it just makes sense to participate across the board.

Q. And are you tracking with all of those different tools as a

health system hand hygiene, for example?
A. Oh, absolutely.
Q. And are you tracking BCNA, bar code --
A. (Unintelligible.) Counsel and witness speaking over each other.)
Q. Yes, thank you.
And are you tracking CPOE? Do you know what I mean when I say CPOE?
A. Yes.
Q. And what about your ICU physician staffing? Is that something you track?
A. Yes, we look at all of that.
Q. And we've heard in this case and I know you haven't been here in the last couple of days, about hospitals being survey ready for the Joint Commission.
A. Correct.
Q. Did --
A. I'm sorry to interrupt you. I don't call it survey, I call it location ready, right. So we are ready all the time, and I know there's ramp up at all hospitals and health care systems for an accreditation visit, but if we are ready and meeting standard every time for every patient that walks into any of our doors, then we take the focus away from the survey and we really put it on the patient who is our true customer.
Q. And is that the same thing about Leapfrog? Are you kind o

survey ready for Leapfrog at all times?

A. Well, you know, Leapfrog was a process for us, right, so we have been doing it for ten years, and we have been submitting surveys for all of our hospitals and be on board at a new hospital, I guess now, Jackson West is going on three years.

And let me say this: For us, it has been a journey. We share a single license, a single Medicare provider number, and Jackson Memorial Hospital, like you referenced early, is our flag ship hospital, it's a level one trauma, one of the largest transplant programs in the country, a certified burn center, comprehensive stroke, so there is really nothing we don't do at Jackson Memorial Hospital.

But since we share that Medicare provider number, it is shared amongst all of our facilities. So it's not really a true representation of what that facility's performance is, which is a frustration for our hospitals, right.

So that being said, we had to really look at our internal data. We put the standards for what is asked for in a different subsection of the nine sections in the survey into practice in the way we deliver care. So it is not a ramp up when Leapfrog, you know, releases April 1st their survey, we have already if audits are required, to evidence compliance with a specific measure or standard that is ongoing. Month after month, we are collecting that data, we're looking for opportunities on how to improve it, so when Leapfrog says

provide the last three months, six months, we already have that data.

Now, that would be different and was different when we first started. When we first started submitting, we had to run reports, we had to actually look at our data, understand the patterns in our outcomes. Does that answer your question?

Q. It does. And one of the issues, and I know you are not involved in inputting information, is that Leapfrog does no verification process over its survey data. Has that been your experience?

A. Yes, there is a verification process, which I think is great, it validates what we are submitting 'cause a lot of it is voluntary data that we are submitting besides what they pull from CMS and secondary sources as well. Leapfrog has Estes to verify, and we submitted documentation to evidence the data or the outcomes that we have provided, the answers we provided.

Q. And do you recall, you told me in your deposition, there was a situation where Leapfrog actually does a CPOE audit of Jackson Memorial. Do you recall that?

A. Yes.

Q. And was, to your understanding, part of the verification process that Leapfrog goes through for the survey?

A. Yes, a hundred percent. Leapfrog, at times, even this last submission, the health desk reached out asking us to clarify a section, I don't recall exactly, but you go back and you submit

what it is, and then they say great, thank you.
Q. What would you say to an allegation, you've been doing this survey for over a decade, at least, for Jackson Memorial, what would you say to the allegation that participating hospitals are allowed to assign themselves the highest score in the Leapfrog survey?
A. Participate -- can you repeat the last part of that and see if I understand it.
Q. Yes. Participating hospitals are allowed to assign themselves high scores on the survey without any verification.
A. I don't really understand the allegation. If you are familiar with the safety grade, and tell me if I am going over time or anything.
Q. No, no, no.
A. Sections of the survey inform or are pulled from the survey into the safety grade, so it does make sense to participate because Leapfrog is going to -- Leapfrog's purpose is to be transparent, okay. Consumers and purchasers of care have a way to understand, right, because health care is complex, I mean, if any of you have navigated health care, it is a mess, right. So the reality is, it is information so that consumers can make an informed decision as to where to go to get care, right, if it an informed consumer. There are people who maybe have never heard of Leapfrog, right, there are customers or patients that have never heard of Leapfrog.

So, when I submit my hospital survey, it behooves me, as the Chief Quality Officer, to know how that is going to impact my score. And if you look at Jackson Memorial's safety grades over the years, we have been Cs, but what the public doesn't see is that that numerical score has been inching up as the data continues to improve, as we continually to move forward in this journey, and as some of these CMS data that is in arrears falls off, right. So CMS has data sometimes two years old, right, and it is not a true reflection of the current performance of your organization. Now that's not public facing, they wouldn't see that, right.

So that being said, I can't assign my letter grade, it he is what it is. Now, I'm going to know because Leapfrog is transparent in everything they do. If they are going to make a change to the scoring or to questions on the survey, they put everything out to public comment, okay. You can opine as a public person, you can opine and say yes, okay, nothing is like secret. They don't pull the rug from under you, right. It is very transparent, so if you have somebody like me at your health system, it behooves them to know, right, what your submission is going to equate and relate to that numerical score and what that numerical score is in that letter grade range. That was long answer, but you understand that. So there is no way for me to assign the letter grade.

Q. Right. And so I was talking about, let's just take a

measure score, let's just talk about ECMA.
A. Okay.
Q. Is there a way -- there is an allegation in the case that participating hospitals, like yourself, can assign themselves the highest measure score for ECMA because Leapfrog doesn't verify anything.
A. There is an honor system, there is a code, right. I think that, you know, if hospitals are truly committed to this work, they are going to be honorable, right, in what they submit. Could a hospital fudge a number, yeah, they could, I mean, but at the end of the day, I mean, they are responsible for the data they submit, and if Leapfrog does do a validation survey, they are going to have to prove that that number is truly what they submitted. Does that answer your question?
Q. It does. And you know from personal experience that Leapfrog does do validation surveys?
A. One hundred percent. It is a random, it's a random, you know, validation, right.
Q. And you talked about consumers in the last couple of answers ago, and I just want to ask you, as the Senior Vice President of Quality for Jackson Memorial Health System, who does your health system consider to be the consumers of that hospital safety grade that you worked so hard to improve year after year?
A. Our patients, our patients and families, at the end of the

day, they are our consumer. I mean, obviously, you could look at physicians, physicians are, you know, consumers, you know, they partner with you, and you have vendors, but at the end of the day, everything we do impacts our patient.

Q. And there has been some discussion in this case about the burdensomeness of filling out the survey, and your hospital is -- well, we've calling it a safety net hospital, is it not?

A. We are a safety net.

Q. And can you just very briefly tell the Judge what do you think everybody is talking about when they talk about safety net hospitals? What does that mean to you?

A. What is a safety net hospital?

Q. Yes.

A. A safety net hospital is an organization that cares for a large majority of unfunded or low insured, vulnerable patients who have limited access to health care.

Q. And even though you are a safety net hospital, with potentially limited resources, do you find there to be value in doing the Leapfrog survey year after year and committing the resources in doing that?

A. Yes, us being a safety net hospital has nothing to do with it, all patients deserve the best quality care, safe care. At the end of the day, we are focused on the prevention of harm, and whether we are safety net, private, not for profit, whomever you are, I mean, I think all hospitals strive to

provide the best care.
Q. And Ms. Zambrana, at the end of the day, why does Jackson Memorial Health System do the survey?
A. Because it aligns with our true goal, which is improving the way we deliver care.
Q. To patients?
A. One hundred percent.
Q. And would you agree with me that a hospital who has put patients at the center of how they deliver care every single day would have less of a burden in participating in a Leapfrog survey than a hospital who doesn't?
A. Yes. You know, I will expand on that a little bit because if you get to a point, right, so now you are talking about we have been submitting the survey for ten years if you get to a point that the standards that you are evidencing or you are being asked to report outcomes on are part of the way you deliver care, right, are engrained in the way the person who is closest to the patient, like is delivering and doing their job is not a burden, this is what they come to work to do, so I believe that answers the question.
Q. It does. And is it important to Jackson, your consumers, your patients, that they have access to Jackson's specific patient's safety records on ECMA, CPOE, hand hygiene, IPF?
A. One hundred percent. So besides patients or consumers having access to hospital compare, having access to the

Leapfrog safety grade and Leapfrog survey, which it is also publicly reported, we at Jackson have a quality website where we share our data. All right. So we share maternal outcomes and we share the good, bad and the ugly. I mean, we don't kind of cherry pick it. Now if the outcome is not hitting the mark, it is also on there.

It is our commitment, right, to the residents of Miami Dade County as a safety net hospital and as a county department to be transparent. So that's why I think our mission aligns very closely with Leapfrog which is bringing transparency so that consumers and patients can make informed decisions about their care.

Q. And you are committed to putting as the Senior Vice President of Quality, you are committed to putting the good, the bad and the ugly out there for you patients?

A. Yes, one hundred percent. Not only am I, I mean our whole executive team.

Q. And at one point in time, Jackson Memorial received a D even though it was participating in the survey?

A. Yes, let me tell why. You know, there are a couple of things that happened, right. When Leapfrog pulls from secondary sources, you know, and then you submit your current data, there may be a difference. And we did slide back into the D category.

Q. And as a health care system, when you received that D, what

was the reaction of the health care level in terms of your commitments to your patients?
A. Well, I knew we were going to get a D, so, I mean, there were conversations that were had explaining why we got that D, and then moving forward, right, so what is the commitment to turning this around, how quickly can we turn this around, you know, being able to explain to customers or to the media, Jackson is in the news a lot, to the media and to really our consumers and our community why we were a D, why we backslide in our commitment to improving.
Q. And when you were trying to turn that D around to increase revenue or admissions or were you trying to turn that D around for the patients that serve?
A. Yes, you know, I am not really sure that we had less admissions when we were a D as opposed to now that, you know, our safety grade for JMA, for Jackson Memorial Hospital, is a C. You know, I am committed to this work. Two of our hospitals in the fall safety grade actually were Bs, right, Jackson Memorial Hospital was very close to being a B, so we continue, you know, to focus on the work, not so much the letter grade, okay. So we focus on the work, not so much the letter grade, we never looked at the financial impact of when we were a D and now that we are a C or now that we are a B, right, because it is not about -- we are still going to open our doors as a safety net hospital and we are committed to this

work, we are still going to open our doors, so we want our patients to trust us, we want our patients to come to us, and you know, it is funny, because you wonder, okay, our -- I shouldn't get on my soap box. I will let you ask the questions.

Q. My last question is, are you aware of when you had that D, when you slipped from a C to a D, whether it had any impact on your organization in terms of patients not coming to Jackson Memorial because you had a D?

A. I am not aware of that. If anything, and I think it fueled us and motivated us, I mean, you know, the 15,000 employees that work for Jackson Health are very committed to the mission, and I think that, you know, when you talk to the hospitals, they were like, we got to fix this, you know, they were very committed to turn that D around.

MS. BLAIR: Thank you. I have no further questions, Your Honor.

THE COURT: Cross-examination.

MS. MALONEY: Your Honor, I am introducing for the record Emily Cardone who will be cross-examining.

Thank you.

CROSS-EXAMINATION

BY MS. CARDONE:

Q. Good afternoon.

A. Hi.

Q. Ms. Zambrana, you had no involvement in the change to Leapfrog's scoring methodology in the fall of 2024, correct?
A. Say again.
Q. You had no involvement in the change of Leapfrog's scoring methodology in the fall of 2024, correct?
A. Correct.
Q. You also had no involvement in the change to the Leapfrog imputation model in the fall of 2024?
A. Correct.
Q. Patients generally want to go to hospitals with good reputations of quality, correct?
A. Yes.
Q. Doctors generally want to work with hospitals with good reputations for quality, correct?
A. Yes.
Q. Ms. Zambrana, you don't know how many hospitals have been audited by Leapfrog, correct?
A. I do not know.
Q. You have not personally visited Good Samaritan Medical Center in the last five years, correct?
A. I have not.
Q. You have not personally visited West Boca Medical Center in the last five years, correct?
A. I have not.
Q. You have not personally visited any of the five community

hospitals in the last five years, correct?
A. The five community hospitals in this case?
Q. Correct.
A. Yes.
Q. You have no personal knowledge of any of the patient safety system the five hospitals in this case have in place, correct?
A. Correct.
Q. You have no personal knowledge of the patient safety policy the five hospitals in this case have in place, correct?
A. Correct.
Q. You have no idea what harm the community hospitals have suffered as a result of Leapfrog assigning them D and F safety grades, correct?
A. Correct.
MS. CARDONE: Your Honor, may I have a moment to confer with my colleague?
THE COURT: Yes.
MS. CARDONE: Ms. Zambrana, I have no further questions.
MS. BLAIR: I have no further exanimation, Your Honor.
THE COURT: All right. Thank you.
MS. BLAIR: Your Honor, at this time, we would like to play the 18-minute video of Lauren Bailey.
MS. MALONEY: (Unintelligible.)
MS. BLAIR: It will.

MS. MALONEY: Before the videos are played, I am experiencing a complication, a health complication with my eye, and I have been advised to seek immediate medical examination for it, so I respectfully ask the Court for permission to step out during the video and return tomorrow for our closing. My colleague, Lee Crain will handle any matters that arise through the rest of the trial, if that is okay.

THE COURT: Sure.

MS. BLAIR: Your Honor, I should let you know them, based on the evidence that we put in, these videos will be the end of the Defense case and we will rest.

MS. MALONEY: And one comment with respect to that. We would exercise our reservation of rights under the pretrial stipulation and our amended list of trial witnesses wherein we reserved our right to call any witness listed on the Defendant's witness list, including but not limited to if Defendant ultimately declines to call any such witness.

Now, Mr. Verndenberg [sp] when he testified had a number -- gave a number of admissions that are actually in support of our case, and so we would ask that we be allowed to designate his testimony. We would put in those designations to opposing counsel later today. She can counter designate and we can get them to Your Honor prior to closings tomorrow, but we think we would suffer prejudice if we are not allowed to examine the witness and given these reservation of rights and

should be allowed to do so.

THE COURT: Is he here?

MS. BLAIR: No, Your Honor, he is not here and he is our expert and we are not offering any of those expert opinions in this case in light of the Plaintiffs' case that came into evidence. That is our right to do. He was our retained expert, we are not calling him, we have the right to withdraw him, which we did, and I don't know how they can put in deposition evidence of our retained expert who we are not calling in trial. It is highly improper.

MS. MALONEY: It is not improper at all. We reserved the right to call, quote, the community hospitals reserve the right to call any witness listed on Defendant's witness list, including but not limited to if the Defendant ultimately declines to call any such witness.

I would say, Your honor, that yesterday was the first time at the end of Court when counsel did not raise Mr. Verndenberg's name when she said he was coming tomorrow. We then immediately sent an email when we got back, or a couple hours later, I apologize, sent an email asking if she would be culling him. We did not get a response and we just learned minutes ago he would not be called. And, again, while she has made representations that he is not relevant to the case that we have put in, his testimony is at the heart of some of the deception issues that have been raised before Your Honor with

respect to the methodology. And so we would ask to simply designate that testimony.

They also sent us demonstratives last night in which they suggested that they would be -- which certainly suggested he would be called. And so we would ask that we be allowed to put in the deposition designations, we have no need to play them, we just want to put them before Your Honor, we think it is particularly important to do so given the fact that Professor Berger made reference to Professor Vandenberg's testimony as part of his examination, including in response to questions from the lead counsel.

THE COURT: I suppose if it is proper rebuttal, you can do it, otherwise, I don't see a mechanism for that, but if it can properly come in as rebuttal, I would think you can do it. You have the deposition, you, I guess, in effect, listed hi as a witness, but it needs to be true rebuttal testimony to be able to do it.

MS. MALONEY: Fair enough, Your Honor. We will designate his testimony, keeping in mind your order --

THE COURT: How long is it?

MS. MALONEY: The designations -- I mean, the cross-exanimation would only be 20 minutes, so I would think that the designations would total no more than 12 or 15.

THE COURT: Well, if you can do it -- let's try to do it this afternoon if we are going to have -- I'm sure your

colleagues can handle it.

MS. MALONEY: Okay, yeah.

MS. BLAIR: Your Honor, for the record, I just want to object.

THE COURT: What is the basis?

MS. BLAIR: He is not a methodology expert.

THE COURT: Well, but she wants to call him in rebuttal, he is a witness that has been identified, they took his deposition, so under what -- what's your basis for an objection?

MS. BLAIR: My understanding is that I have the right to control my case and how I handle --

THE COURT: Well, you do, but they can also call somebody in rebuttal.

MS. BLAIR: And we would ask to designate the testimony of Mr. Chakurda, their expert, who was not called in this case who my experts also provided rebuttal opinions. This is going to go on and on, Your Honor. They had a case in chief to put on, they had proof, and I have the right to decide --

THE COURT: Well, they have an opportunity for rebuttal, and if it is true rebuttal testimony, they can do it. Let's try to move on.

MS. BLAIR: May I ask grace, Your Honor, with respect to Mr. Chakurda?

THE COURT: Not for rebuttal. If you want try and do

in your case, I guess you could.

MS. BLAIR: Thank you, Your Honor. We will file the proper objection.

I call Lauren Bailey by video.

(Video played.)

MR. CRAIN: Objection, Your Honor, this is playing from P.16, it is not on the designations. The designations ended 3:15.

MS. BLAIR: Well, just stop it. At this time, we call Matthew Austin by video.

(Video played.)

Your Honor, on behalf of the Defendant, we rest.

At this time, I would like to renew my motion for judgment as a matter of law that Your Honor denied at the end of the Plaintiffs' evidence, but it is our position now having seen all the evidence in the trial that there's a basis to grant that motion finding that Plaintiffs have not met their burden of proof on the elements of Unfair and Deceptive Trade Practices Act or that the five hospitals have been aggrieved by an unfair deceptive trade practice.

THE COURT: Okay. I again deny your Rule 50 motion.

MS. BLAIR: Thank you.

THE COURT: What are you all going to do?

MR. CRAIN: Your Honor, if I may be heard just first on the designations. There were certain counters that were

played that we have not countered, so we are going to work with counsel to update the filings so the record is clear, we didn't want to interrupt the flow, but I just wanted to note that.

Now that the Defense case has rested, we move for judgment under Rule 52-A. We're moving as a matter of procedure, but because closings are tomorrow, we are happy to do substantive argument tomorrow or we're happy to answer questions from Your Honor.

THE COURT: All right. I deny that as well. I would like to enjoy your closings, so are you going to put on some additional rebuttal or some aspect of this deposition we had some argument about?

MS. CRAIN: We are, Your Honor. We are finishing the cut right now, it might be a good time to take a quick break. I am told, I have not see the cut, but I'm told it is about 13 minutes.

MS. BLAIR: Your Honor, we would like the opportunity to review it and I'd like to renew my objection under --

THE COURT: All right. We will take 20 minutes. We will return at 15 minutes until 4:00.

MS. BLAIR: Are we going to allow objection, I apologize?

THE COURT: For what?

MS. BLAIR: To their counter designations as it goes, I don't even know what it is they are countering.

THE COURT: Why don't you all look at it. It is only 14 minutes.

MS. BLAIR: Thank you.

MR. CRAIN: Thank you.

(Thereupon, a recess was taken.)

MR. CRAIN: Apparently Microsoft is down, we texted the chart over, so they have had it. It is about 13 minutes, Your Honor, directly responsive testimony to Ms. Binder, Ms. Danforth as well as the video we saw about a half hour ago of Ms. Bailey goes particularly to the footnote, to the asterisk, to consumers that use the website the methodology doctrine, everything we've been talking about throughout both parties' case in chief. I also remind you, Your Honor, the testimony from Ms. Binder about the U.S. literacy issue came in their case in chief as proper rebuttal. I have Eleventh Circuit case law on the scope of rebuttal on opening the door if Your Honor would like the cites. I also have a couple documents I'd like to hand up so Your Honor can understand what the witness was looking at.

I think we are able to get the documents on the screen, but it took a little while to get that clip organized for Your Honor to see.

THE COURT: All right. You object?

MS. BLAIR: We do object, Your Honor, we have now had a chance to sort of review the written transcript and the

designations. They are designating expert opinions of our expert, it is not fact rebuttal at all. Michael Rutenberg was designated as a rebuttal expert to Mr. Berger and he is not -- none of what they are about to offer are just opinions that we have withdrawn in this case. I would also like to remind the Court that they filed a Daubert motion wherein they told the Court that Mr. Rutenberg's opinions were unqualified, unreliable, unhelpful and something I can't read -- irrelevant, I'm sorry. And at this point, he is offering nothing but opinions, he has no facts of his own, they are asking him his opinions about how he views these websites, and that is not a factual matter, it is an opinion. He has no --

THE COURT: Is there any rule that you can't elicit opinion testimony in rebuttal?

MS. BLAIR: Yes, Your Honor, I believe Federal Rule 26(e)4(a) is it's not an automatic grant to the right to call an opposing expert as a witness. 26(b)4(d) talks about it being under exceptional circumstances only, the rule protects experts retained in anticipation of litigation or trial were not called as witnesses at trial.

THE COURT: That doesn't apply to a witness who has been deposed, however, does it?

MS. BLAIR: I believe it does, Your Honor.

THE COURT: I thought that was non testifying experts which this fellow wouldn't -- doesn't sound like he would

qualify as that.

MS. BLAIR: Well, if he doesn't -- I'm sorry, Your Honor. If he is a non qualifying expert, is that what you said, Your Honor.?

THE COURT: Non testifying.

MS. BLAIR: Oh, non testifying expert. Yes, Your Honor, he is, obviously, a non testifying expert and we would want him as a trial witness, and respond to the opinion in doing so. They are not trying to offer facts in rebuttal to any of the facts that have been put on by Leapfrog, they are offering him for opinions about the website material. And we heard what Ms. Maloney aid on the record before she had to leave, she said they can have the opportunity to counter designate and we would like to do so, if that is what Your Honor is entertaining. We find it highly prejudicial to have them play at the eleventh hour alleged rebuttal evidence of our expert that we have withdrawn without the opportunity to submit -- well, one, without the opportunity to know if you are going to qualify him as an expert, and two, without the opportunity to submit counter designations. And we object to the use of his testimony as a factual counter designee.

THE COURT: All right. I am looking at Rule 26, and I think the section you related to is when an expert employed only for trial preparation. This fellow was obtained for trial, he was identified as a testifying expert, and he was

deposed by both sides.

So I think they are entitled to call him or call the portions of his deposition that they would want to utilize.

MS. BLAIR: And our objection, then, Your Honor would be he has not been qualified as an expert to offer the opinions you are about to hear and in fact the very people --

THE COURT: I overruled the Daubert motion so that he could testify.

MS. BLAIR: And that is fine, Your Honor, and my second objection then would be I would like to know what facts he is actually rebutting to your point before you left the bench if he is being an actually rebuttal expert which he doesn't appear to be.

THE COURT: The objection is overruled.

How long is it, 14 minutes?

MR. CRAIN: Thirteen minutes, Your Honor.

THE COURT: Okay.

MR. CRAIN: May I approach with just two documents that will help Your Honor.

THE COURT: Sure.

MR. CRAIN: Plaintiffs' Exhibit 31 and Plaintiffs' Exhibit 32 which are not in evidence. The objection is relevance and unfair prejudice. I think he will lay a foundation as to why it is relevant. We would normally like to get it on the screen, but I don't have time.

Your Honor, may we precede?

THE COURT: Yes.

(Video played.)

(Video of Michael Verndenberg played.)

MR. CRAIN: Your Honor, that concludes the video. Thank you.

MS. BLAIR: Your Honor, we have one designation, one question and answer I would like to read into the record. I didn't have time to pull it up on the video, but I can read the counter designation.

THE COURT: All right.

MS. BLAIR: Mr. Lee asked at page 160, lines 12 through 22.

"Would a typical user, in your opinion, come away from the language thinking that the hospital is a poor performer at hand washing or just that they didn't respond to the survey.

Answer: I think that there is different things they can think depending on the person, and again, following the gold standard of actually doing, the user experience testing and finding out from people first hand is honestly what I think should have been done for trying to settle questions like this."

Thank you, Your Honor.

THE COURT: All right.

MR. CRAIN: Your Honor, I just object to that counter

as beyond the scope.

THE COURT: All right, overruled.

MR. CRAIN: And the community hospitals rest rebuttal.

THE COURT: Okay. So 9:00 o'clock tomorrow we will have closings. How long do you want each side?

MR. CRAIN: I think we would prefer around 60 minutes.

THE COURT: How many?

MR. CRAIN: Sixty.

THE COURT: I will give you both the same amount, so if they want 60, you can have 60 unless you want more.

MS. BLAIR: No, I don't want more. Sixty is fine.

THE COURT: All right. Sixty a side, and I guess you have the burden, so you get rebuttal out of that 60.

MR. CRAIN: Thank you, Your Honor.

THE COURT: Okay, see you in the morning, have a good night.

MR. CRAIN: Thank you, Your Honor.

* * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date: January 28, 2026

/s/ Pauline A. Stipes, Official Federal Reporter

Signature of Court Reporter

**MR. CRAIN: [14]** 138/5 138/23 140/3 140/5 143/15 143/17 143/20 144/4 144/24 145/2 145/5 145/7 145/13 145/16
**MR. HVIDT: [18]** 47/11 47/17 48/12 51/10 51/15 60/1 71/17 77/22 77/24 78/5 78/23 80/22 96/5 96/14 96/22 97/19 106/13 111/12
**MR. TAKAGAKI: [3]** 4/18 11/10 37/18
**MS. BLAIR: [51]** 3/2 4/14 16/25 29/1 32/2 37/20 40/18 40/22 47/14 51/13 52/4 70/20 78/1 96/6 98/2 108/17 116/7 116/9 116/11 116/14 116/21 116/25 117/4 131/15 133/19 133/21 133/24 134/8 135/2 137/2 137/5 137/10 137/14 137/22 138/1 138/8 138/21 139/16 139/20 139/23 140/2 140/23 141/14 141/22 142/1 142/5 143/3 143/8 144/6 144/11 145/10
**MS. CARDONE: [2]** 133/14 133/17
**MS. CRAIN: [1]** 139/12
**MS. MALONEY: [9]** 17/2 131/18 133/23 133/25 134/11 135/10 136/17 136/20 137/1
**THE COURT: [87]** 2/8 3/5 4/17 4/19 11/14 17/1 29/3 32/4 37/19 40/20 40/24 41/3 47/12 48/9 48/14 52/3 60/14 60/17 61/10 61/22 62/2 62/20 63/3 70/22 71/10 71/16 74/12 77/13 77/23 78/4 78/24 80/25 96/21 97/16 97/22 98/10 98/19 99/9 100/11 108/16 111/14 115/17 116/8 116/10 116/13 116/16 116/19 116/24 117/3 131/17 133/16 133/20 134/7 135/1 136/11 136/19 136/23 137/4 137/6 137/12 137/19 137/24 138/20 138/22 139/8 139/18 139/22 139/25 140/22 141/12 141/20 141/23 142/4 142/21 143/6 143/13 143/16 143/19 144/1 144/10 144/23 145/1 145/3 145/6 145/8 145/11 145/14
**THE WITNESS: [20]** 29/4 32/5 40/21 60/3 60/15 60/19 61/12 61/25 62/5 63/2 63/8 70/25 71/13 74/15 77/14 98/16 98/23 99/13 111/15 117/7

**'**

**'cause [2]** 117/25 123/12

**/**

**/s [1]** 145/23

**0**

**0550 [1]** 2/5

**1**

**11 percent [1]** 87/9
**12 [4]** 29/14 29/18 136/23 144/12
**120 [3]** 92/24 93/5 93/10
**12th [1]** 52/13
**13 [3]** 117/22 139/15 140/7
**1300 [2]** 34/5 34/11
**14 [5]** 72/11 72/15 72/16 140/2 143/15
**15 [15]** 4/7 22/3 22/3 27/13 27/13 45/3 49/22 67/21 75/7 87/21 87/21 104/9 112/8 136/23 139/20
**15,000 [1]** 131/11
**1500 [1]** 45/14
**16 [1]** 65/2
**160 [2]** 93/6 144/12
**161 [1]** 2/4
**1700 [1]** 1/18
**18-minute [1]** 133/23
**19 [3]** 73/24 76/7 111/21
**1992 [1]** 41/22
**1993 [2]** 41/17 41/19
**1996 [1]** 41/22
**1999 [1]** 42/1
**1:30 [1]** 116/18
**1st [1]** 122/21

**2**

**20 [8]** 45/18 65/1 73/14 73/17 73/23 116/16 136/22 139/19
**200 [2]** 57/18 61/4
**20036 [1]** 1/19
**2004 [2]** 82/12 113/6
**2013 [2]** 118/1 118/21
**2015 [2]** 45/16 118/23
**2017 [1]** 118/4
**2018 [1]** 118/5
**202-887-3729 [1]** 1/19
**2021 [9]** 81/7 81/14 81/17 82/12 103/9 103/10 103/16 103/20 103/24
**2022 [1]** 43/22
**2024 [12]** 43/22 52/8 56/1 59/22 90/21 103/11 103/16 114/18 116/3 132/2 132/5 132/8
**2025 [11]** 18/2 33/5 53/13 72/7 78/9 78/11 79/3 83/5 88/4 88/5 106/12
**2026 [2]** 1/9 145/22
**22 [14]** 1/9 15/3 28/13 28/16 28/23 28/24 29/11 29/13 29/14 29/17 29/18 71/5 88/7 144/13
**24 [3]** 64/19 86/23 87/4
**24 percent [8]** 64/21 68/5 85/7 85/12 86/4 86/7 86/20 87/16
**25 [12]** 22/3 27/13 41/15 42/5 42/14 57/5 67/22 75/19 75/23 75/23 87/21 109/7
**25-CV-80526-MIDDLEBROOKS [1]** 1/3
**250 [1]** 1/22
**26 [3]** 141/16 141/17 142/22
**28 [1]** 145/22
**280 [3]** 83/5 83/9 83/21
**282 [2]** 84/15 85/7
**29 [1]** 111/21
**29th [3]** 26/7 33/14 39/1

**3**

**30 [3]** 73/14 73/21 87/4
**30 percent [2]** 86/8 86/20
**30-page [1]** 25/12
**30.46 [1]** 87/16
**300 [2]** 94/7 99/3
**305-400-4260 [1]** 1/23
**31 [2]** 89/9 143/21
**31.6 [2]** 86/2 86/10
**312-704-0550 [1]** 2/5
**32 [4]** 43/6 52/19 71/5 143/22
**33131 [1]** 1/23
**34 percent [1]** 86/16
**3434 [1]** 2/8
**350 [2]** 44/25 109/8
**363 [1]** 45/1
**370 [5]** 81/8 81/14 81/16 81/19 94/4
**3729 [1]** 1/19
**3:15 [1]** 138/8

**4**

**400 [20]** 14/11 71/25 72/8 81/8 81/13 81/14 81/16 83/5 83/7 83/9 83/21 83/22 84/11 88/19 89/23 92/19 92/21 92/24 93/10 94/4
**406 [1]** 106/11
**412 [3]** 81/6 82/1 83/4
**4260 [1]** 1/23
**4500 [1]** 2/4
**4:00 [1]** 139/20
**4th [4]** 25/22 33/10 33/17 38/25

**5**

**50 [4]** 22/3 76/11 100/4 138/21
**50 percent [3]** 47/21 76/17 87/9
**52-A [1]** 139/5
**528 [2]** 94/22 96/6
**561-803-3434 [1]** 2/8
**570 [1]** 71/19

**6**

**60 [20]** 14/11 71/25 72/7 81/13 83/7 83/22 84/11 85/7 88/19 89/21 89/23 92/19 92/21 93/5 94/7 94/8 145/6 145/10 145/10 145/13
**60601 [1]** 2/5
**69 percent [1]** 98/22

**7**

**74 percent [1]** 68/8
**76 percent [3]** 64/19 85/9 85/13

**8**

**800 [1]** 120/2

**9**

**90 [6]** 49/9 69/15 71/6 71/9 71/10 73/11
**90X [1]** 71/2
**9:00 [1]** 145/4

**A**

**a demonstrative [1]** 96/8
**a result [1]** 14/1
**ABB [1]** 3/14
**ability [1]** 57/10
**able [16]** 6/24 8/9 8/18 9/19 10/24 13/6 13/14 13/20 22/7 53/3 57/8 79/13 97/18 130/7 136/17 140/20
**about [107]** 5/10 5/18 6/21 9/11 10/11 16/22 17/15 18/6 19/16 23/12 23/24 28/4 28/6 30/19 33/3 33/6 34/6 35/11 37/1 37/7 38/5 38/24 39/6 39/11 39/19 40/7 42/19 43/14 43/24 44/20 45/4 45/6 46/7 46/9 46/19 49/20 51/13 52/20 53/23 54/7 54/9 55/2 56/10 57/1 57/6 58/23 58/24 62/4 62/25 64/24 65/4 65/9 65/13 66/7 66/10 66/14 66/17 68/16 69/25 74/1 80/10 85/12 87/16 89/12 91/15 93/15 97/24 98/21 100/1 102/25 104/16 104/21 106/6 106/7 109/10 113/4 114/12 114/23 114/24 115/3 116/1 117/13 119/2 120/19 121/10 121/14 121/25 125/25 126/1 126/19 127/5 127/10 127/10 128/13 129/11 130/24 139/12 139/15 140/7 140/9 140/12 140/14 141/4 141/11 141/17 142/11 143/6
**above [5]** 11/6 12/9 47/3 106/18 145/20
**absolutely [9]** 64/17 76/24 81/15 82/14 104/13 104/24 110/8 116/7 121/2
**academic [1]** 120/3
**accept [1]** 110/2
**acceptable [2]** 64/14 110/6
**accepted [3]** 39/15 77/6 109/19
**access [4]** 127/16 128/22 128/25 128/25
**accessed [1]** 90/14
**accessing [1]** 90/14
**account [6]** 15/19 51/6 64/19 67/14 76/6 115/23
**accounted [1]** 16/2
**accounting [1]** 4/1
**accounts [1]** 49/9
**accreditation [2]** 63/6 121/21
**accreditations [1]** 48/3
**accredited [3]** 3/15 63/5 120/20
**accuracy [1]** 47/23
**accurate [4]** 67/7 95/21 95/21 107/13
**achieve [1]** 74/2
**achieved [1]** 67/16
**achievement [17]** 56/5 56/13 61/1 61/7 61/9 62/22 64/9 67/23 67/25 68/2 69/20 72/5 87/21 89/17 92/24 93/17 93/18
**acronyms [1]** 45/23
**across [5]** 3/23 38/19 75/21 119/4 120/24
**Act [1]** 138/19
**active [1]** 44/24
**actual [13]** 17/23 28/20 31/5 40/6 53/3 80/19 84/11 96/1 96/4 97/16 99/1 101/3 101/7
**actually [19]** 27/18 39/8 40/17 85/14 87/16 93/11 99/5 111/1 117/19 117/22 118/4 118/24 123/5 123/18 130/18 134/19 143/11 143/12 144/19
**acute [2]** 118/13 118/16
**add [2]** 29/23 73/14
**addition [2]** 7/24 10/12
**additional [5]** 29/23 35/4 53/12 110/2 139/11
**adjust [3]** 21/6 22/7 74/25
**adjusted [4]** 74/23 75/3 75/6 87/1
**adjusting [7]** 16/5 21/4 21/7 36/8 91/10 91/16 93/3
**adjusting the [1]** 36/8
**adjustment [4]** 14/12 43/7 45/3 46/7
**adjustments [3]** 11/7 20/14 21/10
**administered [1]** 111/18
**Administration [1]** 3/13
**administrator [2]** 21/17 118/24
**administrators [2]** 23/10 23/14
**admissible [1]** 98/2
**admission [2]** 5/20 97/17
**admissions [21]** 5/14 6/17 11/24 12/3 12/4 12/11 12/13 12/16 33/19 35/11 35/22 35/23 39/21 39/25 40/4 40/13 40/16 111/23 130/12 130/15 134/19
**admitted [3]** 81/6 106/11 116/4
**adult [2]** 118/13 118/16
**advance [2]** 116/1 116/3
**advantages [1]** 49/4
**advise [2]** 55/13 55/21
**advised [2]** 21/17 134/3
**adviser [1]** 112/24
**advisers [1]** 36/14
**advisory [23]** 43/9 43/14 43/17 44/2 44/8 49/1 51/9 57/22 58/5 59/18 60/10 62/17 63/13 67/2 67/24 68/24 80/7 104/19 109/22 109/25 113/19 114/5 114/15
**affect [6]** 39/5 43/19 75/10 75/22 75/23 96/3
**affected [1]** 143/16
**affects [5]** 42/18 57/7 57/8 57/10 110/18
**affirmative [2]** 26/23 27/6
**after [21]** 7/1 16/5 16/18 25/24 26/7 33/9 33/17 35/14 40/17 41/19 74/15 80/11 82/11 86/16 95/20 111/6 114/14 114/19 122/24 126/24 127/19
**afternoon [5]** 117/8 117/12 117/15 131/24 136/25
**afterwards [3]** 6/13 10/17 19/6
**again [24]** 8/2 8/11 11/2 22/9 23/15 31/3 32/10 33/15 35/3 35/20 35/25 62/14 71/2 73/16 76/13 101/6 101/17 104/25 105/13 114/3 132/3 135/22 138/21 144/18
**against [1]** 111/2
**agencies [1]** 50/11
**aggrieved [6]** 9/2 9/6 9/7 9/15 12/23 138/19
**aggrievement [1]** 9/20
**ago [5]** 65/10 102/25 126/20 135/22 140/9
**agree [19]** 27/16 55/19 56/15 56/16 61/13 64/22 67/23 68/14 75/10 85/10 89/6 99/18 104/3 104/4 104/6 111/5 112/17 116/17 128/8
**ahead [3]** 71/17 83/11 100/12
**aid [1]** 142/12
**al [1]** 1/5
**alarmed [1]** 46/2
**Alex [2]** 88/9 89/4
**algorithmic [1]** 21/24
**aligns [4]** 119/5 119/9 128/4 129/9
**AlixPartners [2]** 3/17 3/19
**all [97]** 4/8 6/8 12/7 14/19 14/20 15/22 15/22 15/23 16/13 19/16 22/5 22/21 30/1 36/14 36/21 37/11 37/18 38/20 40/21 45/10 52/4 53/16 55/11 57/2 58/16 60/16 64/12 65/21 66/2 66/14 67/10 67/20 68/25 69/15 70/9 70/17 70/24 71/12 72/2 73/3 74/10 75/20 75/21 75/24 75/24 76/1 76/3 76/12 77/5 82/24 84/22 94/14 96/19 98/14 98/17 98/18 100/3 103/24 105/22 105/24 106/23 107/8 107/23 107/25 110/14 110/20 110/22 111/2 116/2 116/25 117/4 118/23 120/14 120/25 121/12 121/19 121/20 122/1 122/4 122/14 127/22 127/25 129/3 133/21 135/11 138/16 138/23 139/9 139/19 140/1 140/23 141/2 142/22 144/11 144/24 145/2 145/12
**allegation [4]** 124/2 124/4 124/11 126/3
**allege [1]** 9/24
**alleged [5]** 5/24 6/13 10/15

A

**alleged... [2]** 12/14 142/16
**alleging [1]** 5/19
**allocate [3]** 49/15 61/3 61/17
**allow [2]** 64/9 139/21
**allowed [6]** 124/5 124/9 134/20 134/24 135/1 136/5
**alluded [4]** 49/1 55/14 65/17 112/5
**alone [1]** 36/1
**Along [1]** 67/17
**already [9]** 63/5 75/1 75/5 76/11 95/10 102/3 106/24 122/22 123/1
**also [28]** 5/4 7/24 8/16 12/13 23/9 30/21 35/18 41/24 42/17 49/16 50/24 54/12 69/12 69/19 70/4 81/3 94/10 119/23 119/24 129/1 129/6 132/7 136/3 137/13 137/17 140/13 140/17 141/5
**alter [1]** 4/2
**alternative [3]** 51/1 62/11 99/7
**alternatives [5]** 62/9 64/8 64/10 64/11 110/16
**always [1]** 117/15
**am [84]** 3/17 9/18 15/3 15/21 16/10 16/12 19/21 20/7 20/18 20/24 21/3 21/3 21/4 21/7 24/13 28/13 30/7 30/19 30/24 31/3 31/25 34/4 36/8 36/15 36/16 37/1 37/7 37/11 37/17 41/11 41/11 42/4 42/5 44/1 45/23 47/11 48/24 51/3 51/13 51/14 54/14 56/9 59/11 59/19 62/1 69/14 70/9 77/7 77/15 77/19 85/13 86/10 86/19 86/19 86/21 87/4 87/6 88/8 88/22 89/20 90/13 94/3 95/15 97/23 99/11 102/5 106/7 106/21 107/22 111/18 112/12 112/12 112/19 113/23 114/19 124/12 129/16 130/14 130/17 131/10 131/19 134/1 139/15 142/22
**ambulatory [1]** 40/10
**amended [2]** 26/3 134/14
**America [3]** 38/19 45/14 46/16
**American [1]** 120/7
**amongst [1]** 122/14
**amount [11]** 13/3 19/25 44/20 49/10 49/12 49/12 61/16 64/15 64/16 72/23 145/9
**amounts [1]** 14/14
**analogies [1]** 58/23
**analogy [2]** 22/12 64/25
**analyses [13]** 6/1 7/11 7/22 10/19 13/20 36/1 52/1 64/9 92/1 98/6 102/8 102/21 103/7
**analysis [54]** 3/22 5/23 6/2 9/5 9/14 9/19 9/21 10/5 10/8 11/1 11/10 12/19 12/20 13/6 13/7 13/11 13/18 14/16 14/19 14/25 15/6 15/12 15/13 15/14 15/24 15/13 17/25 18/13 18/13 20/11 24/24 29/21 30/18 32/11 32/15 32/21 34/24 34/25 35/14 35/18 37/17 38/9 39/9 49/11 68/14 76/14 101/13 101/18 102/5 102/9 102/16 102/17 102/17 109/20
**analytics [1]** 120/1
**analyze [2]** 69/9 83/16
**analyzed [1]** 21/22
**And I [1]** 25/16
**anecdotal [1]** 115/3
**anecdote [1]** 92/3
**another [6]** 35/21 51/13 62/11 68/16 77/2 112/2
**answer [29]** 12/24 19/13 26/11 32/14 32/18 46/19 60/4 60/8 74/9 74/11 74/11 74/12 77/9 82/25 84/14 84/21 86/18 97/12 99/16 104/9 111/17 113/9 119/17 123/6 125/23 126/14 139/7 144/8 144/17
**answered [5]** 65/8 84/18 95/13 97/2 101/21
**answering [2]** 18/7 104/8
**answers [13]** 65/2 65/7 72/8 74/12 80/19 84/20 95/11 101/3 101/7 105/2 123/16 126/20 128/20
**Anthony [2]** 40/23 41/6
**antibiotic [2]** 43/1 50/4
**antibiotics [1]** 50/9
**anticipate [1]** 7/2
**anticipation [2]** 96/13 141/19
**any [61]** 5/2 5/18 6/16 6/19 8/11 10/19 10/20 10/22 11/9 11/21 12/19 13/25 14/17 15/12 15/18 16/1 16/5 18/13 18/19 22/25 24/11 24/21 25/2 27/25 38/17 39/5 40/1 48/11 50/11 51/14 53/7 53/12 67/8 70/6 82/24 84/10 84/10 88/1 92/1 97/25 102/21 104/5 107/9 107/16 108/22 119/16 119/16 121/22 124/10 124/20 131/7 132/25 133/5 134/6 134/15 134/17 135/4 135/13 135/15 141/13 142/10
**anybody [1]** 37/17
**anyone [2]** 37/14 37/15
**anything [6]** 15/16 38/11 76/23 124/13 126/6 131/10
**anyway [1]** 117/16
**apologize [4]** 31/3 76/14 135/20 139/22
**apparently [2]** 97/19 140/6
**appear [2]** 81/3 143/13
**appearance [1]** 17/4
**APPEARANCES [1]** 1/14
**applicable [7]** 27/1 46/25 52/21 58/17 72/13 72/13 72/20
**applied [2]** 82/12 87/7
**applies [1]** 86/17
**apply [5]** 6/10 9/14 82/11 90/1 141/21
**applying [1]** 48/26
**appreciate [1]** 119/18
**approach [15]** 35/24 44/15 44/16 44/17 51/24 77/23 78/24 85/3 92/17 93/21 93/24 94/17 105/25 106/2 143/18
**appropriate [3]** 51/5 54/8 92/18
**approved [1]** 92/8
**approximately [1]** 76/7
**April [3]** 52/13 90/21 122/21
**April 12th [1]** 52/13
**April 2024 [1]** 90/21
**arbitrarily [2]** 89/15 89/21
**are [327]**
**area [13]** 10/23 39/15 42/5 43/1 43/2 43/18 47/1 47/16 48/17 61/5 74/24 109/25 112/20
**areas [5]** 3/24 4/4 4/6 40/11 54/25
**argue [2]** 50/6 101/23
**argued [1]** 54/11
**argument [3]** 81/21 139/7 139/12
**arise [1]** 134/6
**around [9]** 22/7 34/5 80/2 130/6 130/6 130/11 130/12 131/15 145/6
**arrears [1]** 125/7
**arrived [1]** 25/9
**articles [3]** 45/8 49/23 110/5
**as [141]** 3/14 3/14 3/18 4/5 4/10 4/16 4/17 5/2 5/13 6/3 6/5 6/6 6/10 7/9 9/5 9/14 10/3 10/23 14/1 14/8 14/25 17/7 17/11 17/14 17/18 18/12 20/1 22/4 25/15 27/20 28/10 28/12 28/16 30/2 31/15 32/16 35/11 36/11 36/16 42/6 42/7 43/10 45/2 46/5 46/6 46/9 47/1 47/5 47/16 47/18 48/8 48/10 48/17 49/1 49/6 49/9 49/24 52/20 54/16 55/17 57/21 60/10 61/4 61/15 62/13 65/3 65/17 66/8 66/11 71/8 71/15 73/6 81/18 84/19 86/5 89/5 93/9 93/10 93/11 94/20 94/21 96/2 96/8 96/18 96/23 97/17 99/1 105/5 109/15 109/23 110/6 111/11 112/5 112/10 112/12 112/21 112/22 114/7 117/17 118/1 118/24 119/8 119/8 119/20 120/25 123/14 124/22 125/1 125/5 125/6 125/7 125/16 126/20 129/8 129/8 129/13 129/25 130/15 130/25 133/12 136/10 136/14 136/16 138/14 139/5 139/9 139/24 140/9 140/9 140/15 141/3 141/17 141/20 142/1 142/8 142/19 142/21 142/25 143/5 143/24 145/1
**aside [2]** 37/13 72/6
**ask [17]** 4/16 11/15 12/24 44/1 54/2 64/24 84/23 98/11 112/2 126/20 131/4 134/4

A

**ask... [5]** 134/20 136/1 136/5 137/15 137/23
**asked [28]** 4/24 5/1 18/6 19/21 25/1 26/7 27/19 33/8 33/11 37/24 38/8 38/24 39/11 39/19 45/5 50/19 50/22 50/24 64/23 80/14 88/6 100/15 107/8 113/4 118/21 122/18 128/16 144/12
**asking [11]** 9/18 19/1 30/19 31/25 37/1 39/22 77/7 96/16 123/24 135/20 141/10
**asks [1]** 74/13
**aspect [1]** 139/11
**aspects [1]** 55/11
**asserting [1]** 98/11
**assess [3]** 62/14 84/22 102/22
**assessing [1]** 75/15
**asset [1]** 13/3
**assets [1]** 13/5
**assign [19]** 14/17 20/18 27/9 27/17 30/10 30/14 32/8 61/7 66/21 81/13 83/16 87/8 88/19 92/19 124/5 124/9 125/12 125/24 126/4
**assigned [11]** 26/21 32/25 51/20 61/9 82/8 82/15 82/16 88/24 89/14 89/21 91/15
**assigning [9]** 67/10 80/17 83/7 88/15 89/15 89/23 92/21 93/10 133/12
**assignment [3]** 52/8 84/11 86/6
**assignments [1]** 3/21
**assigns [2]** 65/22 83/21
**Associate [1]** 118/4
**associated [3]** 42/11 42/13 89/16
**association [2]** 112/1 120/7
**assume [13]** 15/21 21/13 31/21 62/5 65/3 65/5 71/24 76/23 81/11 83/6 98/13 101/25 104/1
**assumes [1]** 14/12
**assuming [4]** 6/14 15/15 19/3 22/10
**assumption [9]** 38/18 38/22 38/23 60/15 60/19 60/20 78/17 79/6 98/16
**assumptions [1]** 23/17
**asterisk [1]** 140/10
**attachment [1]** 113/18
**attempted [1]** 66/25
**attempting [1]** 40/12
**attributed [3]** 11/6 13/4 76/18
**audit [2]** 48/2 123/18
**audited [1]** 132/17
**audits [1]** 122/22
**Austin [3]** 113/19 114/7 138/10
**automatic [1]** 141/16
**automatically [1]** 23/17
**availability [1]** 79/12
**available [5]** 8/20 8/21 25/14 55/5 106/23
**average [8]** 14/13 15/22 73/19 81/8 81/14 93/22 111/7 111/24
**aware [28]** 25/21 25/23 30/6 33/19 33/21 34/1 34/4 34/8 37/17 54/14 54/16 55/23 55/25 56/3 56/8 70/5 70/9 77/17 77/19 77/21 84/10 88/3 90/10 90/13 90/17 95/8 131/6 131/10
**awareness [1]** 82/24
**away [2]** 121/23 144/14

B

**Bachelor's [1]** 3/12
**back [19]** 25/16 33/3 54/21 58/8 58/9 60/2 61/5 72/8 73/10 76/8 78/18 86/22 93/2 96/9 101/2 110/1 123/25 129/23 135/19
**background [6]** 3/11 19/17 25/13 69/16 117/14 117/19
**backslide [1]** 130/9
**bad [2]** 129/4 129/15
**Bailey [4]** 117/2 133/23 138/4 140/10
**balance [1]** 13/3
**bar [3]** 94/18 106/18 121/3
**bariatrics [1]** 120/9
**barring [1]** 83/20
**base [1]** 58/19
**based [30]** 11/10 11/19 13/15 13/15 16/14 24/24 34/17 51/9 51/23 55/3 55/15 58/13 59/18 63/15 63/16 64/13 64/20 65/25 67/2 68/14 70/18 76/12 80/7 80/11 88/2 108/6 109/2 110/5 113/12 134/10
**baseline [1]** 10/13
**bases [1]** 82/21
**basically [16]** 7/13 14/12 27/13 27/21 33/2 42/16 49/3 57/13 61/3 68/8 68/23 75/14 101/23 110/19 114/10 114/15
**basis [17]** 7/12 7/13 7/13 10/14 38/1 55/6 60/18 60/20 81/22 84/16 94/9 94/11 104/25 110/19 137/5 137/9 138/16
**BCMA [4]** 53/4 56/6 59/5 96/2
**BCNA [1]** 121/3
**be [149]**
**be quantified [1]** 11/13
**BEACH [3]** 1/2 1/8 2/7
**Beach/Ft [1]** 2/7
**became [2]** 25/23 109/13
**because [57]** 10/9 10/12 11/5 11/23 26/14 26/24 30/8 35/7 39/7 43/5 57/24 58/1 60/13 61/21 63/24 66/18 67/4 68/4 68/8 72/1 72/13 72/21 73/1 73/6 78/14 79/4 79/25 81/15 83/22 85/6 85/8 85/9 87/5 89/15 97/21 98/8 99/1 99/24 104/23 104/23 104/25 107/6 108/1 109/10 111/9 112/25 115/9 124/17 124/19 125/13 126/5 128/4 128/12 130/24 131/3 131/9 139/6
**becomes [2]** 112/9 113/17
**bedded [1]** 75/22
**beds [1]** 73/2
**been [61]** 4/10 4/12 5/10 6/1 6/16 7/8 7/17 7/24 9/1 9/5 9/15 11/9 12/23 13/7 13/9 16/22 27/8 28/5 33/8 33/10 34/21 36/6 36/10 40/15 42/1 42/15 45/17 46/20 54/18 60/10 64/10 75/6 81/6 90/11 97/15 97/18 104/13 105/6 111/6 114/1 115/12 121/13 122/3 122/3 122/6 123/9 124/2 125/4 125/5 127/5 128/14 132/16 134/3 135/25 137/8 138/19 140/12 141/22 142/10 143/5 144/21
**before [30]** 1/11 6/13 6/25 10/15 12/14 16/18 17/4 20/6 25/23 29/15 35/14 43/22 46/1 50/9 52/2 53/23 82/3 89/5 90/24 92/14 95/16 96/20 97/4 100/16 110/2 134/1 135/25 136/7 142/12 143/11
**begin [1]** 6/24
**behalf [1]** 138/12
**behind [2]** 36/8 96/12
**behooves [2]** 125/1 125/20
**being [27]** 5/23 30/10 40/11 42/17 47/10 48/8 50/6 57/8 69/6 69/10 87/16 91/21 96/14 106/1 106/1 106/2 115/4 117/16 121/14 122/17 125/12 127/21 128/16 130/7 130/19 141/18 143/12
**believe [24]** 17/11 18/11 18/18 18/20 23/6 26/6 26/11 26/16 28/13 29/18 33/23 34/19 35/12 35/18 36/12 49/22 53/13 78/13 106/25 112/6 112/10 128/20 141/15 141/23
**believes [1]** 107/17
**below [1]** 111/6
**bench [2]** 1/11 143/12
**benchmark [1]** 120/4
**benchmarking [1]** 119/25
**benefit [3]** 68/2 82/4 100/6
**benefiting [2]** 63/20 63/21
**Berger [6]** 4/25 12/18 12/18 16/21 136/9 141/3
**Berger's [1]** 71/19
**besides [2]** 123/13 128/24
**best [15]** 43/20 44/15 44/21 44/21 49/15 49/16 58/11 61/21 80/8 92/6 102/2 105/25 112/11 127/22 128/1
**BETH [1]** 1/15
**better [20]** 34/16 43/7 44/18 44/19 49/3 49/3 54/23 54/24 55/1 56/21 56/23 56/23 57/8 66/4 68/6 73/19 109/11 114/11 115/15 115/17
**between [6]** 36/13 53/15 85/1 112/1 113/24 114/14
**beyond [8]** 11/6 12/9 23/21

**B**

**beyond... [5]** 24/22 37/14 48/8 111/13 145/1
**bias [35]** 51/4 56/14 56/25 57/1 57/5 57/5 57/6 57/7 57/15 58/11 58/12 58/13 63/1 65/25 72/3 80/9 81/20 88/2 88/18 93/16 98/12 98/13 98/13 99/12 105/20 108/8 109/13 109/15 109/15 110/6 110/10 110/14 110/15 113/11 116/6
**biased [2]** 57/14 58/3
**big [1]** 99/12
**bigger [1]** 49/8
**BILLEK [1]** 2/2
**Binder [2]** 140/8 140/14
**Biscayne [1]** 1/22
**bit [6]** 19/17 50/20 50/21 57/2 117/13 128/12
**bizarre [1]** 99/19
**BLAIR [3]** 2/1 17/15 34/25
**Blair's [1]** 19/18
**blank [1]** 65/3
**bloodstream [3]** 42/11 45/24 50/2
**blue [3]** 85/22 85/23 85/25
**board [8]** 43/14 43/17 43/22 62/17 67/2 67/24 120/24 122/4
**boards [4]** 43/10 49/1 63/6 63/14
**Boca [1]** 132/22
**both [9]** 7/12 16/18 48/17 54/18 71/24 72/6 140/12 143/1 145/9
**bottom [8]** 69/6 69/11 83/4 83/8 85/1 89/16 93/6 103/3
**Boulevard [1]** 1/22
**box [1]** 131/4
**boxes [3]** 72/11 72/13 73/14
**brag [1]** 42/4
**branding [1]** 33/18
**breach [1]** 7/25
**break [4]** 65/24 116/10 116/18 139/14
**brief [1]** 44/17
**briefly [6]** 10/3 41/18 44/10 48/22 50/18 127/9
**bring [3]** 23/13 60/2 94/22
**bringing [1]** 129/10
**Bs [1]** 130/18
**bucket [1]** 7/8
**buckets [1]** 7/7
**built [1]** 40/11
**bullet [1]** 79/14
**burden [5]** 100/5 128/10 128/19 138/18 145/13
**burdensome [2]** 99/6 99/9
**burdensomeness [1]** 127/6
**burn [1]** 122/10
**business [5]** 3/12 3/15 6/23 8/8 8/10
**busy [1]** 75/12
**byproduct [1]** 37/11

**C**

**C.DIFF [1]** 43/19
**calculate [4]** 64/10 66/8 72/25 79/13
**calculation [6]** 17/18 20/14 21/24 21/24 38/5 73/25
**calculations [3]** 16/5 29/22 87/18
**calculator [8]** 21/25 22/13 28/14 36/5 36/23 37/1 37/11 116/3
**call [21]** 3/3 40/23 109/20 116/22 117/5 117/7 120/17 121/18 121/18 134/15 134/17 135/12 135/13 135/15 137/7 137/13 138/4 138/9 141/16 143/2 143/2
**called [6]** 43/18 120/1 135/22 136/5 137/16 141/20
**calling [3]** 127/7 135/7 135/10
**calls [1]** 24/17
**came [3]** 118/22 135/5 140/14
**Campione [2]** 88/10 89/5
**Campione's [1]** 89/11
**can [83]** 5/22 6/3 9/4 10/3 13/5 14/5 18/22 18/25 23/10 35/13 37/2 37/25 41/9 41/18 44/10 48/22 50/1 50/18 54/24 54/24 56/21 61/1 61/16 62/19 62/25 63/10 63/10 65/16 66/13 68/22 74/2 74/3 74/6 74/11 74/11 74/21 74/23 75/10 75/11 78/5 80/15 80/21 84/8 84/9 84/19 85/13 85/15 89/11 92/10 97/24 98/13 99/10 102/4 105/9 105/13 108/13 110/13 112/21 116/4 120/13 124/7 124/21 125/16 125/17 126/4 127/9 129/11 130/6 134/22 134/23 135/8 136/13 136/14 136/14 136/24 137/1 137/13 137/21 140/18 142/13 144/9 144/18 145/10
**can't [15]** 12/2 13/4 31/22 34/17 57/19 71/3 72/25 80/2 89/14 99/14 101/25 111/22 125/12 141/8 141/13
**Canadian [1]** 42/4
**canceled [1]** 34/22
**cancer [3]** 74/6 74/21 75/4
**cannot [1]** 74/9
**capable [2]** 63/1 63/3
**capacity [4]** 3/18 4/8 48/24 48/25
**card [2]** 50/15 82/16
**cardiologist [1]** 109/8
**cardiovascular [1]** 120/7
**Cardone [1]** 131/20
**care [39]** 3/23 7/4 7/10 8/2 10/4 10/23 13/16 15/13 19/24 19/25 20/1 44/18 48/19 54/25 112/15 117/20 117/23 118/13 118/16 118/22 119/11 119/12 119/24 121/20 122/20 124/18 124/19 124/20 124/22 127/16 127/22 127/22 128/1 128/5 128/9 128/17 128/21 129/25 130/1
**career [5]** 4/3 7/8 109/14 117/22 117/25
**cares [1]** 127/14
**case [64]** 1/3 4/17 5/19 8/12 10/21 11/22 13/21 16/9 17/8 17/11 17/21 18/2 18/21 23/13 24/17 24/25 25/17 26/13 27/4 31/25 32/2 33/11 36/19 40/15 42/9 43/5 43/24 45/22 46/11 48/9 50/19 52/7 52/12 53/13 54/23 55/22 57/9 58/18 60/9 96/14 97/9 109/6 115/25 116/6 121/13 126/3 127/5 133/2 133/6 133/9 134/11 134/20 135/5 135/5 135/23 137/12 137/17 137/18 138/1 139/4 140/13 140/15 140/15 141/5
**cases [5]** 4/1 7/19 7/24 19/2 62/19
**cash [1]** 12/5
**category [4]** 68/1 89/16 102/1 129/24
**Catheter [1]** 42/13
**catheters [2]** 50/4 72/23
**CAUDI [6]** 42/13 42/19 45/3 45/24 69/14 72/21
**causal [9]** 52/1 64/2 85/11 101/13 101/18 102/5 102/8 102/9 102/16
**causation [4]** 6/14 11/4 19/3 19/8
**cause [1]** 80/24
**causing [1]** 12/7
**caveat [1]** 46/24
**CBIFF [1]** 69/14
**CDC [16]** 43/3 43/4 43/9 43/14 43/22 44/2 44/4 44/6 44/12 46/9 46/15 49/1 49/18 55/20 75/1 112/17
**CDC's [1]** 43/18
**center [12]** 1/5 34/13 74/3 74/6 74/21 75/4 75/4 75/12 122/10 128/9 132/20 132/22
**centers [2]** 40/11 120/3
**central [4]** 42/10 50/2 56/11 57/13
**CEO [5]** 34/1 49/7 94/14 107/24 115/13
**CEOs [7]** 39/21 69/5 82/17 97/19 97/20 100/6 111/9
**certain [6]** 6/3 15/15 23/17 35/22 113/23 138/25
**certainly [1]** 136/4
**certainty [9]** 11/9 11/19 13/24 16/24 36/17 63/11 68/11 70/18 108/13
**certified [1]** 122/10
**certify [1]** 145/19
**CFA [1]** 3/14
**chain [1]** 89/4
**Chakurda [3]** 5/1 137/16 137/24
**challenge [1]** 54/22
**challenging [1]** 47/23
**chance [3]** 59/11 60/9 140/25

C
**change [25]** 10/17 14/18 15/8 20/20 24/3 32/22 37/2 43/25 50/3 50/5 55/25 68/6 82/3 82/15 85/5 87/19 87/22 93/15 113/13 116/1 116/3 125/15 132/1 132/4 132/7
**changed [7]** 53/20 61/20 103/11 103/16 103/23 104/9 112/7
**changes [8]** 15/17 23/9 43/21 46/7 46/7 49/2 55/18 114/20
**changing [1]** 60/25
**characterize [1]** 32/24
**charge [2]** 112/23 112/25
**chart [2]** 70/24 140/7
**checked [1]** 22/8
**cherry [1]** 129/5
**Chicago [2]** 2/5 3/14
**chief [7]** 107/24 117/17 118/6 125/2 137/18 140/13 140/15
**choice [2]** 107/19 107/19
**choose [11]** 57/23 60/8 61/8 61/17 81/17 91/11 100/9 100/10 105/19 107/12 108/11
**chooses [1]** 104/9
**choosing [3]** 57/25 57/25 59/14
**chose [11]** 59/18 60/11 67/5 72/2 81/15 89/3 94/10 97/19 104/18 104/22 105/6
**chosen [1]** 97/5
**chronology [1]** 113/17
**circle [1]** 47/24
**Circuit [1]** 140/15
**circumstances [1]** 141/18
**cite [4]** 25/25 26/3 97/6 105/9
**cited [1]** 91/21
**cites [1]** 140/17
**CLABSI [10]** 42/11 42/20 43/9 45/3 45/24 69/14 72/21 73/10 74/7 74/22
**claim [9]** 9/25 12/22 25/17 26/4 39/4 82/21 94/11 101/4 105/1
**clarify [3]** 77/5 113/14 123/24
**Clark [1]** 2/4
**class [1]** 65/1
**classroom [1]** 100/16
**clear [5]** 15/11 17/7 48/7 115/7 139/2
**clearly [3]** 50/2 59/14 60/5
**Clinical [1]** 120/1
**clinician [3]** 42/3 48/18 117/19
**clip [1]** 140/21
**close [2]** 106/1 130/19
**closely [1]** 129/10
**closer [11]** 43/11 44/19 54/22 58/7 58/22 67/4 80/17 81/12 88/20 114/12 114/17
**closest [15]** 58/5 58/9 58/12 67/23 83/8 89/3 89/22 89/24 92/20 93/17 93/17 94/16
105/25 110/2 128/18
**closing [1]** 134/5
**closings [4]** 134/23 139/6 139/10 145/5
**CMO [5]** 42/15 49/7 94/14 107/24 115/13
**CMOs [3]** 69/5 100/6 114/24
**CMS [30]** 16/9 16/14 16/17 16/19 16/20 46/24 47/6 47/21 48/5 51/25 52/18 61/24 68/19 71/13 72/11 72/13 74/2 74/23 75/8 86/4 101/2 101/14 101/19 102/6 119/23 119/23 120/22 123/14 125/7 125/8
**coated [1]** 50/4
**code [2]** 121/3 126/7
**codes [1]** 94/18
**coffee [1]** 41/1
**cognizant [2]** 42/18 61/10
**cohort [3]** 58/18 82/4 82/8
**colleague [2]** 133/16 134/6
**colleagues [2]** 63/16 137/1
**collect [2]** 95/10 96/25
**collected [2]** 97/12 97/14
**collecting [1]** 122/24
**colon [3]** 72/20 73/7 74/4
**column [2]** 68/7 71/2
**columns [8]** 69/13 71/4 73/11 73/21 74/17 74/25 75/13 101/20
**combined [1]** 7/12
**combining [1]** 7/14
**come [15]** 14/7 54/19 60/15 62/8 62/17 66/3 90/1 96/10 109/24 110/1 110/17 128/19 131/2 136/14 144/14
**comes [8]** 20/10 20/12 20/16 25/11 25/11 86/24 97/17 97/24
**coming [18]** 5/9 46/10 52/7 52/11 52/16 52/22 71/16 83/13 83/17 95/17 95/18 95/25 105/18 105/20 106/3 117/12 131/8 135/18
**comment [4]** 106/13 108/21 125/16 134/12
**comments [3]** 46/13 107/11 113/21
**commercial [1]** 63/7
**commission [3]** 120/17 120/20 121/15
**commitment [3]** 129/7 130/5 130/10
**commitments [1]** 130/2
**committed [7]** 126/8 129/13 129/14 130/17 130/25 131/12 131/15
**committee [7]** 58/5 59/18 60/10 80/8 109/23 110/1 114/5
**committee's [2]** 57/22 104/19
**committing [1]** 127/19
**common [3]** 106/4 106/18 107/5
**communication [2]** 75/15 75/16
**communications [2]** 75/16 106/12
**community [33]** 25/16 26/21 31/20 32/1 73/10 73/15 79/9 80/17 81/7 84/12 86/8 92/19 93/23 94/25 96/2 96/24 98/6 101/3 101/8 101/10 101/20 103/3 103/19 104/1 105/10 105/14 120/3 130/9 132/25 133/2 133/11 135/12 145/3
**companies [2]** 13/16 107/16
**company [1]** 36/13
**comparable [1]** 70/3
**comparative [1]** 69/11
**comparator [1]** 69/18
**compare [1]** 128/25
**comparing [1]** 103/10
**comparison [6]** 6/11 6/14 6/25 10/17 11/2 71/8
**compensated [2]** 25/20 39/9
**compete [1]** 40/12
**competition [3]** 6/5 12/12 40/9
**competitor [3]** 34/12 35/7 35/23
**competitors [1]** 40/8
**compilation [1]** 96/11
**compiled [1]** 97/8
**complain [1]** 61/2
**complaining [1]** 104/16
**complaint [3]** 5/12 9/24 26/3
**complete [2]** 61/3 69/12
**completely [7]** 55/19 59/3 59/12 59/15 64/22 81/20 89/6
**completes [1]** 51/12
**completion [1]** 111/24
**complex [1]** 124/19
**compliance [1]** 122/22
**complicated [2]** 54/13 58/11
**complication [2]** 134/2 134/2
**complications [1]** 119/10
**complimentary [3]** 43/9 54/12 112/16
**composite [5]** 15/1 15/5 42/21 64/15 71/3
**comprehensive [1]** 122/11
**comprised [1]** 118/11
**compromise [2]** 44/21 62/18
**computer [1]** 22/13
**concept [3]** 5/2 39/14 58/25
**concern [2]** 42/24 91/15
**concerned [2]** 46/2 46/6
**concerns [1]** 46/5
**concise [1]** 77/10
**conclude [4]** 10/24 57/8 66/3 99/5
**concluded [1]** 11/13
**concludes [1]** 144/5
**conclusion [11]** 9/18 14/7 14/23 15/8 19/1 20/20 38/2 52/22 68/10 69/22 85/11
**conclusions [4]** 5/10 24/9 36/16 109/24
**conclusively [1]** 109/11
**concrete [1]** 61/4
**conduct [1]** 102/21
**confer [1]** 133/16
**confirm [1]** 68/10
**confounding [1]** 109/13
**confoundment [2]** 56/25 57/1

C


**confused [6]** 85/13 86/10 86/19 86/19 86/21 87/4
**confusion [1]** 91/2
**connect [2]** 52/1 101/13
**connection [1]** 112/3
**cons [2]** 58/23 100/7
**consider [5]** 39/17 40/5 40/9 106/3 126/22
**consideration [3]** 7/1 14/25 16/6
**considered [5]** 36/15 39/25 105/22 105/23 107/7
**consistent [4]** 16/17 16/19 16/20 24/23
**consistently [1]** 49/25
**consists [1]** 45/15
**consolidations [1]** 7/9
**constituted [1]** 55/17
**consult [1]** 42/7
**consulting [1]** 4/5
**consumer [2]** 124/23 127/1
**consumers [16]** 30/4 32/12 48/1 51/18 79/7 80/10 124/18 124/21 126/19 126/22 127/2 128/21 128/24 129/11 130/9 140/11
**contained [1]** 5/13
**contains [1]** 54/3
**context [3]** 19/22 90/2 115/6
**continually [2]** 54/20 125/6
**continue [6]** 3/2 32/17 41/5 114/15 116/21 130/20
**continues [1]** 125/6
**contract [6]** 7/25 34/3 34/8 34/12 34/20 34/22
**contradict [1]** 51/22
**Contrary [1]** 97/4
**contributing [2]** 12/10 12/15
**control [4]** 45/25 58/18 110/14 137/12
**conversations [2]** 91/4 130/4
**copied [2]** 85/18 90/4
**copy [1]** 90/7
**corporate [4]** 3/25 4/2 118/1 118/2
**corporation [5]** 9/4 9/6 9/7 9/15 38/1
**corporation's [1]** 13/4
**corporations [2]** 10/4 13/12
**correct [98]** 7/4 8/23 9/12 9/13 14/2 15/14 17/21 18/5 19/22 21/21 22/18 23/10 24/4 24/8 26/1 26/13 26/22 27/10 28/15 28/17 29/1 29/9 29/10 29/20 29/25 30/10 30/23 31/7 31/14 33/15 33/24 33/25 40/17 40/18 53/1 53/10 53/11 59/25 65/14 66/19 66/22 67/16 68/17 68/21 73/2 76/4 77/4 81/11 82/14 82/19 82/20 82/22 82/23 83/1 83/2 83/6 84/1 85/5 85/19 86/17 86/19 90/5 90/12 90/16 90/19 94/1 100/25 101/12 101/23 102/24 103/21 103/25 105/3 106/10 108/15 110/11 114/20 115/23 115/24 121/16 132/2 132/5 132/6 132/9 132/11 132/14 132/17 132/20 132/23 133/1 133/3 133/6 133/7 133/9 133/10 133/13 133/14 145/19
**corrections [1]** 20/14
**correctly [3]** 7/21 24/7 60/10
**corresponds [1]** 95/21
**cost [1]** 116/5
**could [61]** 3/10 3/23 6/2 6/14 8/20 11/4 11/5 11/5 11/12 12/8 12/10 12/12 12/12 12/13 12/14 12/15 16/6 17/21 17/22 17/24 18/8 18/16 23/11 29/5 34/16 34/16 34/16 35/1 35/5 35/5 35/25 37/24 40/3 40/4 43/21 46/10 53/23 61/11 62/12 65/25 66/3 75/22 77/7 77/9 77/25 79/11 83/10 89/9 91/16 92/10 92/16 94/22 106/11 106/14 110/25 117/13 126/10 126/10 127/1 138/1 143/8
**couldn't [3]** 62/5 63/8 108/22
**counsel [17]** 38/8 38/24 39/11 49/19 51/12 80/21 90/6 90/7 100/14 102/4 114/7 115/5 121/4 134/22 135/17 136/11 139/2
**counselor [1]** 45/16
**count [4]** 68/5 72/16 72/16 106/21
**counter [18]** 5/5 14/6 16/21 38/12 58/8 65/13 67/13 70/2 92/23 93/2 115/21 134/22 139/24 142/13 142/20 142/21 144/10 144/25
**countered [1]** 139/1
**countering [1]** 139/25
**counters [1]** 138/25
**counting [1]** 72/17
**country [2]** 99/13 122/10
**county [4]** 77/12 117/24 129/8 129/8
**couple [8]** 7/7 10/16 53/14 121/14 126/19 129/20 135/19 140/17
**course [7]** 6/23 7/8 7/16 8/8 62/24 88/23 97/6
**court [34]** 1/1 2/7 3/10 4/10 5/22 7/6 9/4 10/3 13/11 14/5 17/4 20/10 23/3 23/5 23/18 31/19 33/24 37/25 39/5 41/9 48/6 48/22 50/18 52/3 65/16 70/17 83/17 89/5 117/13 134/4 135/17 141/6 141/7 145/24
**COURTNEY [1]** 2/1
**courtroom [3]** 45/5 45/7 76/15
**cover [1]** 11/12
**covered [2]** 71/12 111/14
**COVID [1]** 91/21
**CPOE [9]** 53/4 56/6 59/5 94/19 96/2 121/7 121/8 123/18 128/23
**CRAIN [2]** 1/17 134/6
**create [2]** 22/5 112/3
**created [3]** 51/8 55/2 96/12
**creating [1]** 36/22
**credentials [1]** 3/15
**credit [3]** 14/11 93/5 100/19
**criteria [2]** 75/19 103/15
**critical [4]** 8/19 40/9 117/20 120/1
**critique [1]** 65/10
**cross [10]** 17/2 17/5 70/23 71/21 111/13 120/23 131/18 131/20 131/22 136/22
**CROSS-EXAMINATION [5]** 17/5 70/23 71/21 131/18 131/22
**cross-examining [1]** 131/20
**cross-exanimation [1]** 136/22
**crosses [1]** 116/15
**Crutcher [1]** 1/18
**crux [1]** 56/18
**Cs [1]** 125/4
**CT [2]** 119/13 119/13
**culling [1]** 135/21
**current [13]** 3/16 29/18 30/21 31/4 32/22 35/13 41/10 54/15 77/17 77/21 78/22 125/9 129/22
**currently [1]** 55/17
**customer [1]** 121/24
**customers [2]** 124/24 130/7
**cut [8]** 15/19 16/2 16/2 49/11 50/5 50/9 139/14 139/15
**CV [1]** 1/3


D


**Dade [1]** 129/7
**damage [1]** 9/25
**damages [21]** 3/25 8/23 9/20 10/4 17/14 17/21 17/24 18/8 18/17 18/22 19/20 19/21 25/17 25/25 26/4 26/8 26/12 26/18 26/19 33/4 39/4
**Dame [1]** 3/13
**Danforth [2]** 88/9 140/9
**dashboard [1]** 69/6
**data [134]** 12/4 16/14 27/10 27/14 27/22 29/13 29/14 29/17 30/5 30/10 31/1 31/2 31/9 31/10 31/14 31/15 31/20 32/2 32/9 33/18 33/18 33/18 33/19 35/11 35/12 35/13 39/17 39/17 51/23 52/18 53/3 53/7 56/5 58/1 58/15 58/19 58/20 59/6 59/11 59/15 59/16 59/17 59/18 60/13 60/13 64/5 64/21 65/18 66/25 69/1 69/3 71/14 71/16 72/14 76/24 78/15 79/5 79/13 79/25 79/25 80/1 80/4 80/5 80/13 81/5 81/18 82/1 82/25 83/3 83/11 83/12 83/15 83/16 83/19 84/3 88/5 89/15 92/1 94/6 94/13 94/15 95/17 95/20 95/23 95/24 96/2 96/4 96/9 98/5 98/5 102/2 102/12 102/13 102/14 102/21 103/7 103/13 103/18 103/22 103/25 104/2

D

**data... [33]** 104/5 104/10 104/11 104/12 104/23 104/24 106/22 106/24 106/24 109/3 109/3 109/5 109/5 109/18 109/18 110/4 110/7 116/2 119/24 120/5 122/18 122/24 123/2 123/5 123/9 123/13 123/15 125/6 125/7 125/8 126/12 129/3 129/22
**Database [1]** 120/1
**Date [1]** 145/22
**Daubert [3]** 4/16 141/6 143/7
**day [15]** 10/15 24/8 32/21 45/7 49/24 49/24 68/23 68/23 120/18 126/11 127/1 127/4 127/23 128/2 128/10
**day-to-day [2]** 49/24 68/23
**days [3]** 33/24 109/7 121/14
**DC [1]** 1/19
**deal [3]** 34/17 92/6 109/15
**dealing [1]** 57/22
**decade [1]** 124/3
**decent [1]** 107/23
**deception [1]** 135/25
**deceptive [5]** 48/1 51/17 51/24 138/18 138/20
**decide [3]** 48/6 49/15 137/19
**decided [1]** 62/23
**decision [3]** 39/3 103/17 124/22
**decisions [8]** 44/6 55/13 60/23 61/19 80/10 105/5 108/6 129/11
**decline [1]** 66/11
**declines [2]** 134/17 135/15
**decrease [1]** 115/16
**decreased [1]** 39/22
**decreasing [1]** 111/6
**deep [1]** 21/23
**default [4]** 27/13 27/16 27/21 32/9
**Defendant [5]** 1/10 2/1 134/17 135/14 138/12
**DEFENDANT'S [4]** 3/5 41/6 134/16 135/13
**Defense [2]** 134/11 139/4
**defined [1]** 45/23
**definitely [3]** 8/20 26/19 80/20
**definition [1]** 72/18
**definitions [4]** 46/7 46/10 49/2 49/5
**definitively [2]** 62/15 105/17
**degree [7]** 3/13 11/8 11/18 13/23 16/24 68/10 70/18
**delete [1]** 22/18
**deleted [1]** 22/1
**deliver [4]** 122/20 128/5 128/9 128/17
**delivering [1]** 128/18
**demand [1]** 8/22
**demographics [1]** 6/6
**demonstrate [14]** 5/15 5/25 6/9 6/14 6/24 9/20 12/1 17/23 18/15 18/16 18/22 21/11 35/18 40/6
**demonstrated [1]** 11/21
**demonstrating [1]** 39/8
**demonstration [1]** 19/3
**demonstrative [5]** 71/20 85/14 85/16 92/16 96/8
**demonstratives [2]** 80/23 136/3
**denied [2]** 115/18 138/14
**deny [2]** 138/21 139/9
**department [1]** 129/8
**depending [2]** 62/11 144/18
**depends [1]** 116/15
**deposed [5]** 53/13 53/14 53/21 141/22 143/1
**deposition [33]** 18/1 18/4 25/1 26/6 27/19 33/9 33/14 38/25 53/7 53/15 53/16 53/17 53/18 74/1 88/8 91/2 95/5 95/16 95/17 95/20 96/1 98/25 110/9 113/18 114/1 114/3 123/17 135/9 136/6 136/15 137/9 139/11 143/3
**depth [1]** 119/12
**describe [8]** 3/10 7/7 9/4 10/3 17/22 41/9 41/18 48/22
**described [10]** 7/22 8/17 9/22 10/9 11/2 13/2 13/8 13/11 17/10 18/14
**description [1]** 25/13
**deserve [3]** 71/25 114/11 127/22
**deserved [1]** 58/4
**deserves [1]** 57/11
**design [2]** 56/23 89/12
**designate [6]** 134/21 134/22 136/2 136/19 137/15 142/14
**designated [1]** 141/3
**designates [1]** 66/11
**designating [1]** 141/1
**designating expert [1]** 141/1
**designation [2]** 144/7 144/10
**designations [11]** 120/8 134/21 136/6 136/21 136/23 138/7 138/7 138/25 139/24 141/1 142/20
**designee [1]** 142/21
**desk [1]** 123/24
**DeSoto [1]** 78/19
**despite [4]** 31/12 32/2 104/5 107/4
**determination [6]** 9/14 14/3 19/7 19/14 26/25 34/15
**determine [6]** 12/25 17/20 37/25 62/22 63/11 108/13
**determining [1]** 39/25
**develop [1]** 25/5
**developed [12]** 21/13 21/14 27/25 28/6 36/13 36/18 37/3 37/5 37/9 46/12 53/25 54/1
**development [1]** 43/8
**Deviance [1]** 120/1
**deviation [1]** 22/20
**diagram [1]** 86/22
**Dicker [1]** 2/3
**did [87]** 5/4 5/6 7/18 7/22 10/17 10/19 11/14 12/18 14/25 15/11 15/15 15/18 15/23 15/25 16/7 21/18 22/5 22/23 22/24 23/1 23/5 23/8 25/5 26/17 30/2 31/22 38/11 38/17 41/16 41/19 41/21 41/22 44/4 45/19 48/2 48/2 48/3 51/19 52/1 52/7 52/11 52/16 52/22 52/24 53/14 53/18 55/9 55/20 57/20 60/21 65/6 67/8 67/14 68/15 69/4 69/12 69/19 70/1 70/4 70/7 70/24 72/1 84/22 90/7 93/13 95/16 101/13 101/18 101/24 102/5 102/8 102/9 102/18 102/21 105/22 106/3 106/8 106/9 112/22 113/15 113/23 114/2 121/17 129/23 135/8 135/17 135/21
**didn't [51]** 15/21 16/5 22/18 22/25 23/5 23/7 28/19 31/23 47/13 53/7 55/9 59/10 62/12 63/12 63/12 63/20 63/23 66/7 70/11 71/12 82/9 82/24 82/25 83/12 83/16 83/18 83/23 84/23 85/8 86/14 89/25 92/1 92/13 93/9 94/13 94/23 94/24 95/10 98/8 99/15 99/15 100/16 105/16 106/10 113/9 115/17 115/18 118/22 139/2 144/9 144/16
**didn't participate [1]** 70/11
**difference [3]** 85/1 85/6 129/23
**differences [1]** 48/12
**different [27]** 7/7 15/4 15/4 17/24 32/23 44/1 57/15 57/15 57/16 57/24 57/24 62/23 64/11 64/24 65/17 105/8 114/17 114/24 119/12 120/14 120/16 120/21 120/25 122/19 123/3 123/3 144/17
**differentials [2]** 119/22 120/12
**differently [4]** 16/4 17/22 19/5 32/24
**difficult [4]** 8/14 42/4 55/13 111/16
**direct [6]** 3/7 36/16 40/2 41/7 111/14 117/10
**directly [1]** 140/8
**director [3]** 3/17 118/1 118/2
**disadvantages [1]** 49/5
**disagree [9]** 30/12 44/15 85/6 89/1 93/13 98/10 100/11 102/12 107/1
**disbanded [1]** 43/23
**discharge [1]** 75/17
**discovery [4]** 95/11 96/16 97/14 98/1
**discuss [1]** 43/21
**discussed [9]** 8/6 17/12 24/22 24/23 40/2 64/4 71/15 89/2 113/6
**discussing [3]** 27/8 28/5 43/19
**discussion [15]** 38/5 46/12 46/13 51/23 58/11 60/18 66/10 100/1 100/7 114/8

**D**

**discussion... [5]** 114/10 114/12 114/16 115/10 127/5
**discussions [9]** 44/20 50/14 58/6 60/16 100/2 107/23 107/25 114/20 114/23
**disease [7]** 41/12 41/23 42/6 43/17 44/12 45/2 120/8
**disincentivized [1]** 115/4
**dismiss [1]** 99/10
**dispositive [2]** 35/4 36/1
**dispute [1]** 53/23
**disputes [2]** 7/24 8/1
**disregard [2]** 20/17 21/2
**distortion [1]** 48/11
**distracted [1]** 66/13
**DISTRICT [3]** 1/1 1/1 1/12
**DIVISION [1]** 1/2
**do [200]**
**doctor [5]** 75/15 84/8 102/4 116/8 116/9
**doctors [3]** 56/22 110/13 132/13
**doctrine [1]** 140/11
**document [14]** 25/12 26/10 30/11 33/10 95/5 96/8 96/11 96/12 96/14 106/6 106/7 106/9 106/10 107/9
**documentation [1]** 123/15
**documents [33]** 5/9 5/18 6/24 8/5 8/8 8/9 8/11 8/16 8/19 8/21 10/5 10/8 10/25 11/20 13/8 13/10 13/13 24/25 25/9 25/10 48/3 51/22 51/23 53/12 53/20 80/24 94/24 106/4 113/14 114/3 140/17 140/20 143/18
**does [45]** 11/12 14/18 15/7 15/9 20/19 30/14 31/18 39/3 39/7 43/19 44/12 46/23 59/22 66/1 66/21 66/24 68/10 72/13 74/17 75/1 104/11 104/12 108/10 119/1 119/3 119/17 119/18 119/20 120/11 120/15 123/6 123/7 123/8 123/18 124/16 126/12 126/14 126/15 126/16 126/22 127/11 128/2 128/21 141/22 141/23
**doesn't [26]** 12/5 14/17 15/8 27/10 27/14 28/24 28/25 29/12 29/12 62/4 62/7 72/19 78/15 82/15 87/8 87/19 98/2 99/20 107/13 125/4 126/5 128/11 141/21 141/25 142/2 143/13
**doing [18]** 19/2 36/15 46/4 57/9 94/19 97/21 97/21 99/11 100/6 112/12 115/15 122/3 124/2 127/19 127/20 128/18 142/9 144/19
**dollars [3]** 19/6 34/7 35/6
**domains [2]** 104/7 104/8
**don't [98]** 18/20 19/18 20/4 20/7 23/6 23/14 25/3 25/15 25/23 25/25 26/3 26/9 26/19 27/16 27/22 27/25 29/17 30/3 30/12 30/13 30/24 31/1 31/8 31/10 31/14 31/15 32/2 32/6 32/8 32/10 32/12 32/16 32/18 33/22 36/7 36/11 36/14 36/20 41/2 44/7 47/13 47/19 60/25 61/7 61/12 62/20 63/6 64/5 67/12 72/15 73/3 73/7 81/20 83/14 85/10 85/20 86/3 88/12 91/14 92/5 92/6 93/15 95/24 95/24 95/24 97/18 97/24 98/20 102/12 102/20 104/3 104/6 104/15 104/23 105/4 105/17 107/17 108/2 109/17 111/22 111/24 114/11 119/2 120/2 120/15 121/18 122/11 123/25 124/11 125/18 129/4 132/16 135/8 136/13 139/25 140/1 143/25 145/11
**don't if [1]** 30/24
**DONALD [2]** 1/11 2/8
**done [12]** 8/2 23/22 48/23 48/25 58/20 75/2 95/22 97/10 102/20 104/18 111/25 144/21
**door [1]** 140/16
**doors [3]** 121/23 130/25 131/1
**double [1]** 75/22
**doubt [2]** 47/19 68/2
**down [18]** 9/23 12/3 12/8 12/14 40/4 42/12 46/10 50/9 52/20 65/24 80/15 86/4 90/18 90/18 100/4 106/13 115/14 140/6
**downward [1]** 12/15
**Dr [102]** 4/25 5/1 5/4 12/17 12/18 14/4 14/6 14/8 15/14 15/18 15/19 15/20 16/1 16/21 22/10 23/16 36/11 38/11 38/17 40/23 41/9 47/15 47/19 48/1 48/17 50/22 51/16 51/21 52/1 52/7 53/18 55/22 56/11 58/24 59/19 65/10 65/13 65/19 66/14 66/25 67/8 67/20 70/16 71/19 71/23 73/11 76/9 76/14 76/20 77/3 77/7 78/3 78/8 79/19 80/16 81/22 82/3 85/1 85/12 85/16 86/4 86/13 88/3 88/8 88/11 88/22 89/5 90/4 90/10 90/20 91/8 91/10 91/15 91/19 91/24 92/1 92/7 92/10 92/11 92/18 93/2 93/19 93/21 93/21 93/24 94/23 94/24 97/4 100/14 101/25 103/2 104/25 106/3 106/17 108/21 111/1 113/24 113/24 115/6 115/7 115/21 115/25
**draft [1]** 90/9
**drank [1]** 41/1
**drawing [1]** 36/16
**drawn [1]** 24/9
**drill [2]** 3/9 9/23
**drive [1]** 49/16
**driven [1]** 47/6
**driver [3]** 24/10 68/11 108/2
**drivers [1]** 16/23
**driving [6]** 14/24 15/10 20/21 23/19 33/1 47/7
**dropped [1]** 8/22
**drops [1]** 86/4
**drug [3]** 57/18 57/19 103/11
**Ds [1]** 68/7
**Due [1]** 79/12
**Dunn [1]** 1/18
**duplicates [1]** 91/5
**during [3]** 41/23 100/14 134/5

**E**

**each [7]** 4/13 34/7 37/4 52/17 72/4 121/4 145/5
**earlier [6]** 7/22 9/22 17/10 30/17 93/9 94/23
**early [2]** 18/2 122/8
**earned [1]** 81/8
**easier [1]** 69/1
**easiest [1]** 72/19
**ECMA [3]** 126/1 126/5 128/23
**economic [7]** 3/25 34/14 35/8 35/15 35/19 35/24 36/2
**economically [1]** 11/13
**economist [2]** 19/24 20/1
**economy [1]** 6/6
**ED [1]** 117/20
**Edelman [1]** 2/3
**education [1]** 41/18
**educational [1]** 3/11
**effect [6]** 40/13 43/21 84/3 87/15 107/13 136/15
**effectively [5]** 7/10 8/10 14/10 15/3 27/9
**efficiently [1]** 77/8
**effort [8]** 7/1 95/9 96/17 96/25 96/25 97/3 106/22 116/5
**efforts [5]** 7/17 22/24 69/1 97/15 107/18
**ego [1]** 4/2
**eight [5]** 34/5 34/6 34/11 35/6 106/25
**Eighteen [1]** 117/5
**either [3]** 6/18 72/24 102/11
**elective [1]** 6/18
**element [2]** 12/22 35/18
**elements [1]** 138/18
**eleventh [2]** 140/15 142/16
**elicit [1]** 141/13
**eliminate [1]** 87/5
**eliminates [1]** 77/4
**else [6]** 6/9 25/7 34/17 65/8 82/11 113/9
**Elser [1]** 2/3
**email [8]** 89/4 89/7 89/11 90/3 113/23 114/2 135/19 135/20
**emerging [1]** 112/21
**Emily [1]** 131/20
**eminent [1]** 45/13
**employed [1]** 142/23
**employees [1]** 131/11
**employment [1]** 3/16
**end [10]** 24/8 32/21 126/11 126/25 127/3 127/23 128/2 134/11 135/17 138/14
**ended [1]** 138/8
**ending [1]** 54/21
**endorse [1]** 50/3
**engage [1]** 3/24

E

**engaged [1]** 7/9
**engagement [1]** 45/19
**engagements [1]** 8/6
**engrained [1]** 128/17
**enjoy [1]** 139/10
**enormous [1]** 95/9
**enough [4]** 30/9 73/7 109/12 136/18
**enrolled [1]** 100/16
**ensure [1]** 23/25
**enter [8]** 22/14 22/17 23/2 23/9 23/13 23/21 23/22 24/2
**entered [2]** 22/2 96/14
**entering [2]** 23/8 23/13
**enterprise [1]** 7/19
**entertain [1]** 60/22
**entertaining [1]** 142/15
**entire [1]** 70/11
**entirely [3]** 76/9 76/15 76/18
**entities [1]** 37/15
**entitled [1]** 143/2
**epidemiologist [11]** 41/12 42/7 42/9 47/19 48/18 49/6 49/25 61/16 84/20 95/15 111/11
**epidemiologists [2]** 45/25 47/8
**epidemiology [12]** 41/14 41/25 42/23 45/14 46/16 47/1 47/16 51/4 56/20 57/4 59/1 63/10
**equate [1]** 125/21
**ER [1]** 6/18
**era [1]** 42/17
**esoteric [1]** 112/4
**especially [1]** 54/13
**ESQ [10]** 1/15 1/16 1/16 1/17 1/17 1/20 2/1 2/1 2/2 2/2
**essence [1]** 59/15
**establish [2]** 10/13 11/22
**establishing [1]** 10/19
**Estes [1]** 123/14
**estimate [4]** 40/6 51/19 99/15 116/4
**et [1]** 1/5
**ethical [2]** 51/8 55/3
**evaluate [9]** 7/17 8/15 8/18 9/10 13/9 35/17 35/21 49/2 53/3
**evaluated [2]** 48/18 50/13
**evaluating [7]** 7/3 8/16 10/4 11/20 13/16 64/14 112/13
**evaluation [2]** 3/15 35/1
**even [18]** 11/25 12/14 20/24 30/14 30/22 50/5 65/21 67/15 68/6 79/9 79/22 80/12 80/18 86/7 123/23 127/17 129/19 139/25
**events [2]** 54/13 73/5
**ever [4]** 4/10 6/16 20/23 60/21
**every [9]** 13/13 15/20 38/18 79/14 83/19 112/24 121/22 121/22 128/9
**everybody [1]** 127/10
**everyone [2]** 65/8 117/15
**everything [5]** 24/7 125/14 125/16 127/4 140/12
**evidence [23]** 15/19 16/1 34/14 35/8 39/21 40/15 80/25 81/6 91/9 96/6 96/14 105/9 106/12 115/25 122/22 123/15 134/10 135/6 135/9 138/15 138/16 142/16 143/22
**evidencing [1]** 128/15
**evidentiary [1]** 97/25
**evolution [1]** 75/6
**evolve [1]** 54/17
**evolved [1]** 75/2
**evolving [1]** 54/20
**exact [5]** 72/18 91/14 100/7 109/25 113/14
**exactly [11]** 63/11 63/13 65/17 67/19 71/16 73/4 104/14 114/7 114/16 115/5 123/25
**exam [1]** 62/20
**examination [16]** 3/7 17/2 17/5 37/22 41/7 70/23 71/21 90/21 100/14 108/19 111/14 117/10 131/18 131/22 134/3 136/10
**examine [1]** 134/25
**examining [1]** 131/20
**example [16]** 40/10 49/9 50/1 61/4 62/6 62/7 74/3 76/9 100/19 102/3 103/3 107/15 109/23 112/22 120/22 121/1
**exanimation [2]** 133/20 136/22
**exceedingly [1]** 91/25
**excel [11]** 22/18 22/25 23/2 23/5 23/21 25/7 25/8 36/19 37/6 37/7 37/9
**excellent [5]** 55/12 61/13 62/6 62/7 98/24
**exceptional [1]** 141/18
**exchange [2]** 113/23 114/2
**exchanges [1]** 114/14
**exclude [4]** 101/24 105/22 107/9 107/10
**excluded [1]** 105/18
**excludes [2]** 76/9 76/15
**exclusions [1]** 73/3
**excuse [2]** 9/12 96/23
**excuses [3]** 108/22 108/25 108/25
**executive [1]** 129/17
**exercise [2]** 32/19 134/13
**exhibit [17]** 68/3 69/4 71/19 71/23 78/18 85/18 85/20 85/21 86/11 92/14 95/16 104/13 110/25 112/3 113/3 143/21 143/22
**exhibits [10]** 20/10 20/25 22/5 53/14 53/17 64/8 85/10 87/18 91/3 102/18
**exist [4]** 6/24 19/12 27/10 64/16
**existing [2]** 36/9 37/18
**exists [2]** 32/9 47/5
**expand [1]** 128/12
**expect [3]** 10/24 13/16 13/19
**expectation [4]** 6/12 19/5 40/3 40/16
**expectations [3]** 6/25 10/14 40/3
**expected [5]** 12/13 72/22 72/25 73/1 73/3
**expenses [1]** 12/5
**experience [13]** 8/5 24/24 69/15 70/19 75/24 84/19 112/19 112/23 112/25 119/11 123/10 126/15 144/19
**experienced [2]** 10/6 47/20
**experiencing [1]** 134/2
**expert [61]** 3/18 3/21 4/3 4/5 4/5 4/8 4/10 4/17 4/24 8/14 10/3 10/23 11/18 12/17 12/18 13/15 13/23 16/16 17/8 17/9 19/20 26/17 31/25 37/25 39/24 43/15 47/16 48/8 55/4 55/12 55/15 55/17 58/14 59/1 70/18 90/20 107/23 109/2 111/19 112/19 113/6 113/11 135/4 135/4 135/7 135/9 137/6 137/16 141/1 141/2 141/3 141/17 142/3 142/6 142/7 142/17 142/19 142/23 142/25 143/5 143/12
**expert which [1]** 143/12
**expertise [4]** 7/3 13/15 39/15 55/4
**experts [9]** 11/14 30/9 44/14 49/14 55/21 109/13 137/17 141/19 141/24
**explain [16]** 5/22 7/6 14/5 44/10 50/1 50/4 53/24 56/16 65/16 72/19 80/21 87/7 94/9 102/4 113/17 130/7
**explaining [2]** 69/16 130/4
**explanation [2]** 74/14 74/16
**explicitly [1]** 91/21
**explore [1]** 110/20
**extensively [1]** 58/3
**extent [2]** 51/11 96/8
**external [2]** 89/15 90/1
**extreme [1]** 67/19
**eye [1]** 134/2

F

**face [1]** 61/23
**facilities [1]** 122/14
**facility's [1]** 122/15
**facing [2]** 119/23 125/11
**fact [17]** 15/1 16/2 31/12 38/24 39/3 56/4 74/6 74/21 80/11 98/1 103/11 107/4 109/16 110/9 136/8 141/2 143/6
**factor [5]** 35/21 35/24 35/25 40/9 99/12
**factors [9]** 11/5 12/8 12/10 12/12 12/15 39/24 40/2 40/5 74/1
**facts [4]** 141/10 142/9 142/10 143/10
**factual [12]** 5/5 14/6 38/12 58/8 65/14 67/13 70/2 92/23 93/2 115/21 141/12 142/21
**failed [1]** 7/19

F

**failing [4]** 80/11 80/18 81/13 104/1
**fair [5]** 17/18 19/25 32/8 44/20 136/18
**fairer [1]** 43/7
**fairly [1]** 114/8
**fairness [2]** 28/10 43/11
**fall [10]** 52/8 55/25 59/22 78/9 79/3 116/3 130/18 132/2 132/5 132/8
**falls [1]** 125/8
**familiar [8]** 16/8 16/11 23/24 47/11 62/2 69/14 91/7 124/12
**families [1]** 126/25
**fancy [1]** 42/8
**fans [1]** 112/6
**far [4]** 63/17 65/19 66/6 88/1
**farthest [2]** 93/18 93/19
**fashion [1]** 36/11
**favorite [1]** 58/8
**Federal [2]** 141/15 145/23
**feel [4]** 54/9 63/15 80/20 104/21
**feeling [1]** 72/2
**fellow [2]** 141/25 142/24
**fellowship [1]** 41/23
**felt [1]** 113/2
**few [3]** 26/7 36/4 71/9
**field [12]** 10/4 41/13 44/14 44/25 54/18 54/19 55/8 55/11 55/21 59/1 75/6 109/12
**fifth [1]** 84/5
**figure [2]** 62/16 69/16
**figuring [1]** 84/13
**file [1]** 138/2
**filed [1]** 141/6
**filings [1]** 139/2
**fill [19]** 59/14 60/11 60/25 61/8 63/13 63/17 63/24 69/19 70/4 70/7 86/2 86/3 99/21 100/9 100/11 103/17 104/20 111/21 115/11
**filled [4]** 60/21 63/18 81/16 99/2
**filling [10]** 60/22 80/9 99/8 99/23 99/24 100/2 108/25 115/8 115/9 127/6
**fills [2]** 76/1 86/11
**final [2]** 36/4 113/22
**finances [2]** 7/11 10/10
**financial [21]** 6/4 6/12 6/12 6/15 7/3 7/11 7/14 8/16 8/18 9/9 9/21 11/3 11/6 12/6 12/20 13/10 18/16 19/13 38/3 40/6 130/22
**financial perspective [2]** 9/9 12/6
**financials [3]** 6/4 8/3 10/12
**find [5]** 10/19 120/11 120/15 127/18 142/15
**finding [3]** 64/4 138/17 144/20
**findings [1]** 16/16
**fine [6]** 59/13 60/10 60/18 107/17 143/9 145/11
**finished [1]** 115/19
**finishing [1]** 139/13
**fire [1]** 3/9
**firm [1]** 52/19
**first [26]** 3/25 7/8 9/25 17/4 17/11 17/14 17/20 19/18 45/7 47/18 48/6 50/3 55/2 69/10 75/13 83/10 86/18 107/8 112/22 117/16 118/24 123/4 123/4 135/16 138/24 144/20
**fit [1]** 49/8
**five [50]** 3/24 4/4 8/7 8/15 10/6 10/20 11/9 11/21 13/17 13/25 27/13 31/15 34/21 45/4 52/17 52/22 53/3 56/3 67/10 67/21 69/3 69/10 69/11 69/17 71/8 71/11 71/24 72/11 73/21 75/13 75/19 75/19 76/3 86/13 87/21 94/15 98/7 99/15 101/10 104/7 106/23 116/1 132/20 132/23 132/25 133/1 133/2 133/6 133/9 138/19
**fix [1]** 131/14
**FL [3]** 1/8 1/23 2/7
**flag [1]** 122/9
**flaws [2]** 65/13 65/16
**FLORIDA [10]** 1/1 62/2 69/11 70/1 70/5 70/11 98/21 111/3 111/7 117/18
**flow [2]** 12/5 139/3
**flying [1]** 3/10
**focus [8]** 41/25 54/10 77/7 88/9 107/18 121/23 130/20 130/21
**focused [5]** 18/11 47/20 84/9 119/17 127/23
**focuses [1]** 43/1
**focusing [1]** 75/13
**foley [1]** 72/23
**follow [2]** 31/3 104/19
**followed [1]** 113/12
**following [4]** 30/24 45/22 61/14 144/18
**footnote [2]** 89/12 140/10
**foregoing [1]** 145/19
**forensic [1]** 4/1
**form [1]** 112/4
**formulas [1]** 22/18
**forum [1]** 106/6
**forward [8]** 7/13 10/14 44/22 49/3 54/21 82/16 125/6 130/5
**foundation [2]** 7/2 143/24
**four [82]** 14/9 14/18 14/20 14/23 15/6 15/9 16/22 20/19 20/21 21/11 22/2 22/2 24/9 24/18 27/12 28/6 28/21 29/23 31/8 31/13 31/24 32/25 51/21 51/22 52/2 52/21 54/20 56/6 58/10 60/24 63/20 64/18 65/3 65/4 65/6 65/8 65/22 66/1 66/17 67/4 67/10 67/14 67/15 68/12 69/23 71/25 72/8 76/10 77/1 80/1 80/5 80/18 80/19 81/8 81/16 81/17 82/9 82/11 83/5 85/9 86/6 86/24 87/2 87/10 87/22 88/19 90/2 93/3 96/13 99/4 100/3 101/4 101/9 101/15 101/21 101/24 102/6 102/10 106/23 116/2 118/15 118/16
**four scores [1]** 22/2
**frame [1]** 78/3
**framework [1]** 119/7
**frequently [3]** 19/21 35/3 50/14
**front [1]** 55/20
**frustration [3]** 54/18 109/6 122/16
**Fs [1]** 68/8
**Ft [2]** 2/7 2/7
**fudge [1]** 126/10
**fueled [1]** 131/10
**full [1]** 107/19
**fully [1]** 113/9
**function [1]** 21/10
**funny [1]** 131/3
**further [9]** 16/6 17/1 35/1 37/19 40/19 116/8 131/16 133/18 133/20
**future [2]** 6/12 34/25

G

**gamut [1]** 8/1
**gave [9]** 5/4 16/6 23/4 38/25 44/4 68/1 91/3 114/22 134/19
**general [2]** 60/23 120/6
**generally [4]** 53/25 54/1 132/10 132/13
**generated [1]** 34/6
**get [79]** 12/5 12/23 14/21 22/15 23/17 27/18 28/25 29/15 32/23 36/8 44/18 46/13 50/4 51/8 52/19 53/23 54/22 55/20 56/23 57/2 57/5 58/7 58/7 58/7 58/9 58/12 58/22 61/1 61/6 61/9 62/20 62/21 64/8 64/17 67/18 70/3 71/5 71/16 72/20 74/2 75/15 80/2 80/17 81/12 81/19 84/9 85/8 86/3 87/4 87/20 88/20 89/22 89/24 94/7 94/7 94/8 94/21 99/11 99/21 100/19 100/22 102/2 108/5 110/4 114/18 114/19 115/9 115/17 124/22 128/13 128/14 130/3 131/4 134/23 135/21 140/20 140/21 143/25 145/13
**gets [6]** 47/6 59/16 59/16 61/6 69/21 109/6
**getting [14]** 14/11 24/7 42/10 50/8 57/13 63/5 63/21 77/1 82/4 86/10 92/20 99/8 111/17 114/17
**giant [1]** 55/10
**Gibson [1]** 1/18
**give [24]** 4/23 6/21 19/13 32/14 34/18 44/5 49/2 50/22 50/24 57/4 62/21 65/1 67/25 68/6 72/4 74/11 74/11 80/14 88/6 92/24 92/24 93/5 107/8 145/9
**given [6]** 21/14 36/12 85/1 92/14 134/25 136/8
**gives [4]** 67/20 68/2 68/7

G

**gives... [1]** 115/21
**giving [8]** 6/20 39/5 51/3 58/4 59/13 65/24 110/20 114/10
**glance [1]** 69/17
**go [32]** 10/14 12/8 12/13 14/9 22/19 35/14 35/23 35/25 42/20 49/8 54/20 63/23 71/17 74/14 76/23 77/8 78/18 80/4 81/3 83/11 85/13 93/2 93/20 100/12 106/13 110/14 114/9 115/14 123/25 124/22 132/10 137/18
**goal [2]** 56/20 128/4
**God [1]** 100/3
**goes [9]** 37/1 51/25 92/16 111/23 119/12 119/13 123/22 139/24 140/10
**going [49]** 15/21 19/5 40/4 44/1 45/23 53/8 56/9 61/9 62/10 63/19 67/19 81/19 84/20 88/8 94/7 94/8 97/23 99/24 100/5 101/2 103/15 106/21 107/20 108/5 108/6 108/9 109/19 114/19 115/14 120/20 122/5 124/12 124/17 125/2 125/13 125/14 125/21 126/9 126/13 130/3 130/24 131/1 136/25 137/18 138/23 139/1 139/10 139/21 142/19
**gold [1]** 144/19
**gold standard [1]** 144/19
**gone [1]** 115/23
**gong [1]** 7/13
**good [29]** 1/4 3/1 3/6 3/9 7/15 34/1 34/12 34/20 41/9 71/1 100/10 103/4 103/8 103/18 105/1 105/10 105/14 116/17 117/8 117/12 117/15 129/4 129/14 131/24 132/10 132/13 132/19 139/14 145/15
**goodwill [12]** 5/19 5/24 12/23 13/1 13/2 13/5 13/7 13/9 13/12 13/16 13/18 14/1
**got [19]** 15/22 19/18 23/24 34/16 72/7 72/21 73/24 77/9 80/5 81/16 86/20 86/21 89/25 103/4 114/21 118/21 130/4 131/14 135/19
**gotten [4]** 84/14 102/10 105/2 118/2
**grace [1]** 137/23
**grade [102]** 14/1 15/1 15/5 15/10 15/15 16/2 16/4 16/23 17/17 20/9 20/12 20/13 20/13 20/15 20/19 20/25 21/1 21/2 21/3 21/5 21/7 21/8 21/9 21/12 21/14 21/25 22/11 22/13 23/17 24/10 28/17 28/20 29/7 30/1 30/10 30/14 30/16 30/22 31/1 31/22 31/23 33/1 33/2 36/19 36/23 37/1 40/1 40/17 42/21 47/22 57/10 62/20 62/21 62/22 66/21 68/8 68/12 70/8 76/7 76/11 76/16 77/17 77/19 77/21 78/1 78/3 78/11 78/15 78/22 79/2 79/5 79/13 79/22 80/2 80/11 80/13 81/5 82/1 83/12 83/15 84/14 85/7 87/9 87/19 93/10 115/14 116/3 116/4 119/2 119/8 119/23 124/12 124/16 125/12 125/22 125/24 126/23 129/1 130/16 130/18 130/21 130/22
**graded [13]** 20/6 20/8 20/24 30/5 31/19 76/18 78/8 78/11 78/14 78/14 79/2 79/4 79/8
**grades [27]** 14/21 14/24 15/9 16/18 16/19 16/20 20/17 20/21 23/19 23/19 26/21 27/9 27/21 32/1 32/13 37/2 38/6 42/18 66/4 68/5 68/21 79/10 79/22 93/5 107/20 125/3 133/13
**grading [26]** 14/10 14/19 15/8 16/7 19/17 20/7 20/24 21/2 21/15 21/20 23/21 23/23 24/4 25/6 28/1 28/2 28/10 28/14 31/18 32/16 36/5 44/18 53/24 54/3 54/19 80/12
**grading and [1]** 54/19
**graduate [2]** 41/16 41/20
**graduated [1]** 41/19
**grant [2]** 138/17 141/16
**graph [2]** 85/23 86/1
**great [3]** 44/14 123/12 124/1
**green [7]** 69/6 69/7 69/18 73/14 73/15 73/18 73/22
**greens [3]** 69/21 71/9 71/9
**group [8]** 1/8 34/3 34/10 34/20 46/6 77/14 112/16 114/15
**groups [3]** 35/2 44/8 46/8
**guess [7]** 20/15 30/24 61/23 122/5 136/15 138/1 145/12
**guessing [1]** 93/10
**guesstimate [1]** 67/6
**guidance [1]** 55/16
**guide [2]** 63/14 80/24
**guidelines [1]** 120/8

H

**had [75]** 4/3 5/10 7/21 10/25 13/25 19/6 26/8 33/10 33/11 33/16 34/19 34/20 34/21 42/23 44/5 46/9 46/12 50/4 50/6 51/7 52/9 53/20 55/7 58/2 58/10 60/24 67/15 68/16 68/22 70/23 82/10 84/18 87/18 87/21 90/6 90/11 91/5 91/15 92/14 93/12 94/12 95/2 95/13 96/8 97/1 100/1 100/2 101/21 105/4 105/11 110/3 113/18 113/20 114/2 114/23 117/21 117/25 122/17 123/4 123/5 130/4 130/14 131/6 131/7 131/9 132/1 132/4 132/7 134/18 137/18 137/19 139/11 140/7 140/24 142/12
**half [3]** 57/5 93/15 140/9
**halfway [1]** 39/3
**hallway [1]** 116/24
**hand [29]** 36/3 45/4 49/23 53/4 56/6 59/5 61/5 84/9 85/22 86/22 94/19 102/25 103/5 103/12 103/15 103/19 103/19 103/22 103/23 103/23 104/1 104/2 104/7 104/19 121/1 128/23 140/18 144/16 144/20
**handed [1]** 57/18
**handle [5]** 65/18 80/8 134/6 137/1 137/12
**hands [2]** 103/8 103/13
**happen [2]** 100/15 108/9
**happened [3]** 91/1 114/5 129/21
**happening [1]** 64/17
**happens [1]** 44/10
**happy [4]** 51/13 86/21 139/6 139/7
**hard [1]** 126/23
**harm [56]** 3/25 4/17 5/3 5/8 5/15 5/18 5/18 5/23 6/9 6/13 6/21 6/25 7/18 7/21 8/3 8/15 8/19 9/11 9/20 9/23 10/7 10/9 10/15 10/23 10/25 11/4 11/10 11/12 12/1 12/14 17/23 17/23 18/17 18/19 18/22 18/24 18/25 19/4 19/7 19/10 19/12 23/15 26/19 27/3 34/14 35/5 35/8 35/15 35/19 35/24 36/2 39/6 39/8 39/8 127/23 133/11
**harmed [4]** 5/11 6/1 9/8 38/1
**harmful [1]** 51/17
**harms [2]** 48/1 48/1
**Harris [44]** 40/23 41/6 41/9 47/16 47/19 48/2 48/17 52/1 52/7 55/22 70/16 71/23 73/12 77/3 77/7 78/4 78/8 79/19 80/16 81/22 82/3 85/1 85/12 85/16 86/13 88/3 88/8 90/4 90/10 90/20 92/18 93/21 94/23 94/24 97/4 100/14 103/2 104/25 106/1 106/3 106/17 108/21 111/1 115/25
**Harris' [4]** 51/16 51/21 92/11 93/2
**Harvard [2]** 41/23 41/25
**has [53]** 7/17 9/15 13/7 13/9 15/5 24/17 29/7 30/1 36/5 36/10 36/12 37/14 37/15 40/15 42/14 43/15 45/14 46/20 48/6 53/22 54/18 54/19 55/2 69/21 71/6 75/6 78/4 78/8 81/6 98/12 99/3 103/8 103/18 104/9 106/7 112/7 114/1 120/2 122/6 123/9 123/14 125/5 125/8 127/5 127/21 128/8 135/22 137/8 139/4 141/10 141/12 141/21 143/5
**hassle [1]** 63/23
**have [330]**
**have an [1]** 116/16
**haven't [3]** 21/13 88/5 121/13
**having [3]** 128/25 128/25 138/15
**haywire [1]** 22/19
**HCAP [17]** 52/23 75/14 75/21

H

HCAP... [14] 75/23 76/1 76/12 76/18 87/2 87/10 111/2 111/5 111/18 112/1 112/13 112/16 112/19 113/1
HCAPs [1] 111/12
he [65] 12/18 14/11 16/1 16/6 27/20 38/22 39/19 47/13 48/2 48/2 48/4 48/7 50/23 59/2 65/20 65/22 65/24 66/1 66/3 67/9 67/20 74/13 74/16 76/9 76/15 76/23 86/5 91/25 92/1 92/3 92/8 92/9 96/8 113/9 115/3 115/6 125/12 134/18 135/2 135/3 135/3 135/6 135/18 135/22 135/23 136/5 137/6 137/8 141/3 141/9 141/10 141/11 141/12 141/25 142/2 142/3 142/7 142/25 142/25 143/5 143/7 143/11 143/12 143/12 143/23
heading [1] 106/20
health [40] 3/23 7/4 7/10 8/2 10/4 10/23 13/16 15/13 19/24 19/25 20/1 41/24 42/25 43/4 44/18 48/19 117/18 117/23 118/9 118/11 118/19 118/22 119/5 119/15 119/16 119/20 121/1 121/20 123/24 124/19 124/20 125/20 126/21 126/22 127/16 128/3 129/25 130/1 131/12 134/2
Healthcare [2] 45/14 46/16
hear [2] 82/17 143/6
heard [12] 39/19 47/20 49/19 52/20 66/7 104/16 105/24 121/13 124/24 124/25 138/24 142/12
hearing [3] 96/20 115/3 115/10
hearsay [1] 96/12
heart [2] 120/7 135/24
heated [1] 114/8
held [1] 45/16
help [8] 43/12 55/21 60/14 63/14 77/10 80/24 90/6 143/19
helped [1] 90/9
helping [2] 46/3 55/13
hence [4] 58/2 72/3 72/4 99/22
her [6] 34/2 34/6 34/20 116/23 117/1 117/5
here [47] 4/23 6/10 7/2 16/22 18/6 18/8 18/17 19/6 25/15 27/2 30/19 36/3 39/20 50/14 50/15 52/2 53/23 58/24 67/13 70/17 76/10 79/10 79/12 82/17 83/17 85/15 87/3 87/6 87/7 89/21 90/17 93/4 93/22 93/24 94/3 95/5 97/18 97/21 102/13 106/17 106/21 106/22 111/19 113/11 121/14 135/2 135/3
hey [1] 22/10
HHM [1] 43/4
HHN [1] 75/1
hi [2] 131/25 136/16
HICPAC [2] 43/18 43/22
high [9] 4/24 13/2 22/15 53/24 58/4 91/11 115/9 115/21 124/10
high score [1] 115/9
higher [7] 14/15 44/7 47/2 65/24 67/16 69/7 81/19
highest [5] 63/17 64/1 64/4 124/5 126/5
highlight [1] 89/11
highlighted [2] 89/1 89/8
highly [3] 97/13 135/10 142/15
highly prejudicial [1] 142/15
him [11] 11/15 39/22 135/7 135/8 135/21 137/7 141/10 142/8 142/11 142/19 143/2
his [27] 11/11 11/13 15/23 16/5 17/4 23/16 23/16 32/3 38/11 38/18 48/10 48/12 74/12 76/12 76/18 77/4 78/4 97/4 134/21 135/24 136/10 136/19 137/9 141/10 141/10 142/21 143/3
historical [7] 6/3 7/13 10/12 34/24 35/12 40/3 56/4
hit [5] 22/13 22/17 23/2 23/2 24/2
hitting [3] 23/8 23/13 129/5
HOB [1] 43/8
hold [2] 20/1 82/2
HON [1] 2/8
honest [4] 84/21 86/19 87/4 109/7
honestly [2] 13/12 144/20
honor [77] 3/3 4/15 4/19 17/1 17/3 29/2 37/21 40/19 47/12 47/15 47/18 48/13 51/15 52/5 70/21 71/18 77/23 78/2 78/24 80/23 96/6 96/7 98/3 100/15 106/14 108/18 116/22 117/1 117/7 117/8 126/7 131/17 131/19 133/15 133/20 133/22 134/9 134/23 135/3 135/16 135/25 136/7 136/18 137/3 137/18 137/23 138/2 138/6 138/12 138/14 138/24 139/8 139/13 139/17 140/8 140/13 140/16 140/18 140/22 140/24 141/15 141/23 142/3 142/4 142/7 142/15 143/4 143/9 143/16 143/19 144/1 144/5 144/7 144/23 144/25 145/14 145/17
honorable [2] 1/11 126/9
hope [1] 50/1
Hopkins [6] 36/14 36/18 36/22 37/3 37/5 37/13
hospital [132] 7/9 7/14 7/17 7/20 7/25 8/2 8/3 8/10 12/13 15/1 15/20 19/17 20/6 20/8 20/24 21/14 21/14 21/17 21/17 21/18 23/10 27/14 28/24 29/8 29/12 29/14 30/8 31/10 31/23 34/2 34/2 34/6 34/8 34/20 35/11 35/22 38/19 41/12 41/13 42/7 43/11 43/25 45/4 45/20 45/24 47/7 47/8 49/6 49/24 52/23 53/24 54/3 57/11 60/21 61/2 61/15 63/12 68/12 70/7 70/12 72/19 74/2 74/4 74/6 74/21 75/5 75/5 75/11 78/19 78/20 79/10 79/14 80/2 81/18 83/12 83/19 84/12 84/13 85/2 86/11 88/1 94/4 94/20 94/21 95/1 99/13 100/1 101/3 103/3 103/14 104/5 104/9 104/12 104/24 105/2 105/10 105/14 105/19 107/14 107/17 108/10 108/22 111/23 112/22 118/9 118/20 118/25 119/16 119/21 119/24 120/3 122/5 122/8 122/9 122/12 125/1 126/10 126/23 127/6 127/7 127/12 127/14 127/17 127/21 128/8 128/11 128/25 129/8 130/16 130/19 130/25 144/15
hospital's [2] 28/17 119/4
hospitals [204]
hospitals' [4] 16/9 43/20 68/19 68/21
hour [5] 57/5 93/15 116/16 140/9 142/16
hours [5] 57/1 57/1 57/2 104/16 135/20
how [91] 4/3 4/6 4/12 6/22 9/4 10/16 10/17 14/6 16/6 21/18 21/23 25/5 25/9 25/13 27/25 28/6 31/23 37/2 37/24 39/6 41/13 42/18 43/19 43/21 44/12 45/11 46/10 47/9 53/24 57/4 58/7 58/7 58/8 58/11 59/16 60/22 71/4 71/5 73/22 74/3 74/7 74/22 74/24 80/4 86/19 87/4 89/12 91/10 91/15 91/16 93/22 95/21 98/13 99/15 101/14 101/20 102/13 102/18 102/19 103/12 103/15 103/22 103/22 104/15 104/15 104/20 108/4 109/15 110/18 111/2 111/18 111/22 112/14 114/21 116/14 118/13 119/1 119/3 119/5 122/25 125/2 128/9 130/6 132/16 135/8 136/20 137/12 141/11 143/15 145/5 145/7
however [1] 141/22
hunch [1] 92/3
hundred [15] 19/6 45/2 57/19 57/20 57/21 61/4 73/2 100/4 103/5 103/5 123/23 126/17 128/7 128/24 129/16
hundreds [3] 4/5 45/8 63/16
hurting [1] 46/3
HVIDT [3] 1/17 110/22 113/4
hygiene [17] 45/4 49/23 53/4 56/6 59/5 61/5 94/19 102/25 103/5 103/12 103/16 103/19 103/23 104/7 104/19 121/1 128/23
hypothetical [1] 32/19

**I**

**I'll [2]** 32/14 120/19
**I'm [11]** 30/24 36/21 86/12 117/15 120/13 121/18 125/13 136/25 139/15 141/9 142/2
**ICU [1]** 121/10
**idea [7]** 7/15 47/6 57/4 95/18 95/18 95/20 133/11
**identified [2]** 137/8 142/25
**ignore [1]** 61/12
**IL [1]** 2/5
**illogical [1]** 99/17
**imagine [1]** 99/14
**imagined [1]** 99/6
**immediate [1]** 134/3
**immediately [1]** 135/19
**impact [21]** 6/15 7/3 10/10 11/3 11/6 12/19 14/1 16/7 39/25 40/8 48/11 74/2 74/3 74/7 74/22 91/16 104/20 119/3 125/2 130/22 131/7
**impacted [2]** 75/12 119/5
**impacts [2]** 93/4 127/4
**impaired [2]** 13/7 13/9
**implication [1]** 100/9
**implications [2]** 108/3 108/6
**important [30]** 7/1 8/4 10/13 10/18 49/25 50/7 54/12 56/18 57/4 57/7 59/8 68/3 71/2 91/25 97/16 105/13 110/12 112/2 112/4 112/4 112/9 112/10 112/14 112/20 113/2 113/17 120/11 120/16 128/21 136/8
**improper [2]** 135/10 135/11
**improve [11]** 21/18 43/10 43/13 46/1 49/16 54/25 119/9 119/20 122/25 125/6 126/23
**improvement [4]** 50/10 119/6 119/11 119/17
**improving [4]** 45/4 54/20 128/4 130/10
**imputation [44]** 24/12 24/15 24/18 24/21 25/2 27/7 27/9 27/18 27/20 28/4 28/5 29/16 31/8 31/21 39/11 39/14 50/24 55/23 56/12 58/13 58/16 58/16 58/21 58/23 64/5 64/13 66/5 66/18 67/6 68/17 69/20 76/21 76/22 76/25 92/6 93/14 109/10 109/13 109/15 110/2 110/3 110/10 113/11 132/8
**Imputation is [1]** 58/16
**impute [11]** 31/24 58/19 59/16 59/17 59/18 66/24 69/23 77/1 77/1 105/24 109/17
**imputed [32]** 14/9 14/14 14/18 14/20 14/24 15/6 15/9 16/18 16/21 20/19 21/11 22/2 23/19 24/9 27/13 27/21 28/20 28/21 29/8 29/24 31/11 31/13 39/17 56/5 58/3 62/21 70/24 79/25 80/7 102/6 109/2 109/5
**imputes [1]** 24/18
**imputing [4]** 28/22 64/21 88/12 99/12
**inaudible [2]** 75/8 75/9
**INC [1]** 1/5
**incentive [1]** 61/24
**incentives [1]** 47/4
**inching [1]** 125/5
**incident [1]** 68/25
**include [1]** 56/14
**included [2]** 70/9 119/8
**includes [1]** 65/22
**including [6]** 3/23 54/7 79/14 134/16 135/14 136/10
**including but [1]** 135/14
**income [2]** 34/7 35/7
**incomplete [2]** 12/4 12/6
**incorporated [2]** 50/12 52/20
**incorporates [1]** 65/21
**increase [1]** 130/11
**increasing [1]** 113/1
**incremental [1]** 44/21
**independent [1]** 68/17
**index [2]** 44/25 45/1
**indication [4]** 11/3 11/4 13/24 16/5
**individual [2]** 9/6 13/4
**individually [1]** 7/12
**industries [1]** 3/23
**industry [2]** 6/5 12/25
**infection [9]** 43/18 47/1 49/7 49/8 49/11 50/2 50/9 52/18 112/17
**infections [10]** 42/10 42/11 42/13 42/14 42/17 42/19 43/2 45/24 47/2 119/10
**infectious [7]** 41/12 41/23 42/6 43/3 43/17 44/11 45/2
**inform [2]** 46/10 124/15
**information [35]** 5/13 5/16 5/17 5/20 6/3 6/4 6/8 9/22 11/23 13/14 13/20 14/2 24/1 24/24 26/14 28/25 34/15 35/4 35/10 35/16 46/15 63/6 75/17 95/1 95/10 95/12 96/17 96/25 97/11 97/13 98/14 103/22 106/23 123/8 124/21
**informed [5]** 54/24 113/10 124/22 124/23 129/11
**initial [1]** 22/4
**initially [1]** 5/12
**injunctive [1]** 9/1
**injured [1]** 9/8
**injury [4]** 9/12 26/22 26/24 27/5
**inputs [9]** 14/9 14/20 14/24 15/4 15/7 20/19 20/21 24/9 28/23
**inputting [1]** 123/8
**ins [3]** 35/12 35/13 35/13
**instances [4]** 4/13 61/15 73/1 73/5
**instead [4]** 15/15 22/10 51/20 120/17
**institution [1]** 62/19
**institutions [1]** 115/12
**instructions [1]** 55/17
**insufficient [3]** 11/25 12/2 26/14
**insurance [1]** 107/16
**insured [1]** 127/15
**intellectual [2]** 44/11 110/17
**interact [1]** 109/14
**interacted [1]** 46/8
**interest [2]** 61/21 115/11
**internal [4]** 41/21 119/25 120/4 122/17
**interpretation [2]** 42/24 115/7
**interpreted [1]** 115/22
**interrogatory [1]** 97/17
**interrupt [3]** 40/25 121/18 139/3
**intimately [1]** 23/24
**introducing [1]** 131/19
**investigation [1]** 97/7
**invoking [1]** 70/2
**involuntarily [1]** 80/9
**involve [1]** 45/19
**involved [8]** 36/20 36/22 36/24 37/10 37/15 68/24 97/20 123/8
**involvement [3]** 132/1 132/4 132/7
**IPF [1]** 128/23
**irrational [1]** 98/15
**irrelevant [1]** 141/8
**is [784]**
**is a [1]** 26/24
**is an [1]** 141/12
**is not [1]** 80/21
**Isis [3]** 116/22 117/7 117/15
**isn't [28]** 25/6 25/15 68/4 75/12 75/25 76/7 76/19 79/23 83/23 84/18 87/16 88/4 88/25 90/14 92/4 92/21 95/2 95/6 101/15 101/22 103/9 103/20 103/24 105/2 106/5 108/1 108/14 111/7
**isolation [3]** 35/3 35/20 36/1
**issue [21]** 14/8 15/7 17/24 28/20 30/21 31/1 31/12 31/22 36/3 47/22 49/23 52/2 56/4 57/13 57/23 76/10 87/3 87/11 92/5 95/16 140/14
**issued [3]** 30/1 32/1 38/24
**issues [9]** 3/25 3/25 4/2 12/7 43/24 55/22 56/11 123/7 135/25
**issuing [1]** 21/9
**it [412]**
**it important [1]** 120/11
**it sensitivity [1]** 109/20
**it's [7]** 27/1 43/16 59/3 122/9 122/14 126/17 141/16
**its [3]** 85/6 103/11 123/9
**itself [2]** 19/3 55/23
**IVS [3]** 53/4 56/7 59/6

**J**

**Jackson [27]** 117/18 117/24 117/25 118/1 118/9 118/19 119/5 119/15 119/20 120/11 120/15 122/5 122/8 122/12 123/19 124/3 125/3 126/21 128/2 128/21 129/2 129/18 130/8 130/16 130/19 131/8

**J**

**Jackson... [1]** 131/12
**Jackson's [1]** 128/22
**January [2]** 1/9 145/22
**JEFFREY [1]** 1/20
**JMA [1]** 130/16
**job [6]** 42/14 54/17 62/13 68/23 117/16 128/18
**Johns [7]** 36/13 36/18 36/22 37/3 37/5 37/13 77/11
**Joint [2]** 120/17 121/15
**joke [1]** 57/2
**journal [1]** 110/4
**journey [3]** 119/6 122/6 125/7
**judge [13]** 1/12 12/3 64/24 65/17 67/17 69/25 71/2 96/20 98/24 104/15 107/22 113/14 127/9
**Judge's [1]** 64/7
**judgment [2]** 138/14 139/5
**Jupiter [2]** 34/12 34/23
**JURA [1]** 2/2
**just [56]** 8/16 12/2 12/4 15/11 15/13 19/17 21/2 22/11 22/17 23/20 23/24 24/22 24/23 30/19 34/17 36/1 36/4 38/5 38/8 38/22 42/19 49/19 57/15 59/10 61/11 68/11 69/25 70/25 75/17 84/16 84/19 89/7 90/1 93/21 103/8 104/8 104/25 118/9 119/2 120/14 120/17 120/23 125/25 126/1 126/20 127/9 135/21 136/7 137/3 138/9 138/24 139/3 141/4 143/18 144/16 144/25
**Justin [8]** 71/18 77/25 78/18 81/3 88/7 89/10 93/20 106/12
**JX [2]** 88/7 89/9

**K**

**Kathy [1]** 91/15
**keep [4]** 8/7 85/12 97/9 98/11
**keeping [1]** 136/19
**Keralty [3]** 78/19 79/2 79/4
**KEVIN [1]** 1/16
**key [1]** 51/3
**KIMBERLY [1]** 2/1
**kind [2]** 121/25 129/4
**kinds [1]** 12/7
**kit [1]** 106/12
**knew [20]** 55/8 60/13 60/13 60/22 63/18 63/22 63/24 65/4 81/23 84/17 94/11 103/14 104/17 104/20 105/1 105/6 105/10 105/15 116/1 130/3
**know [110]** 25/15 25/23 27/16 30/3 33/22 33/23 36/7 36/11 36/14 37/10 37/24 44/7 47/13 55/10 58/1 61/9 62/14 64/5 65/6 67/19 71/3 73/3 76/24 78/22 81/18 81/18 84/13 84/15 84/20 85/20 94/6 94/8 94/14 94/15 94/18 94/18 94/19 94/20 95/24 97/25 98/20 99/16 99/21 99/24 100/6 102/3 102/5 102/12 102/14 103/11 104/10 104/11 104/11 104/12 104/13 104/15 104/15 104/23 104/24 105/4 105/4 105/9 105/14 105/17 107/20 107/25 108/2 108/10 109/11 111/19 111/22 111/24 112/17 116/11 120/2 120/4 120/15 121/7 121/13 121/20 122/2 122/21 123/7 125/2 125/13 125/20 126/8 126/15 126/18 127/2 127/2 128/12 129/20 129/22 130/7 130/14 130/15 130/17 130/20 131/3 131/11 131/13 131/14 132/16 132/18 134/9 135/8 139/25 142/18 143/10
**knowing [4]** 94/21 107/19 108/6 108/8
**knowledge [17]** 21/20 23/12 23/20 23/22 24/2 24/4 24/6 24/11 24/21 25/2 25/5 27/19 27/25 28/6 28/8 133/5 133/8
**knows [2]** 42/8 104/15

**L**

**labels [1]** 107/4
**lacks [2]** 80/18 104/2
**language [1]** 144/15
**large [3]** 57/9 58/19 127/15
**largest [2]** 68/20 122/9
**last [46]** 18/2 34/21 62/7 65/3 65/4 66/5 66/6 70/24 71/2 73/16 73/21 74/17 74/25 75/7 79/14 81/7 81/14 81/15 86/13 88/9 88/11 89/20 92/11 93/2 93/15 93/23 93/25 94/2 94/3 94/3 103/1 103/2 103/4 107/9 112/7 115/18 121/14 123/1 123/23 124/7 126/19 131/6 132/20 132/23 133/1 136/3
**lastly [1]** 51/7
**later [2]** 134/22 135/20
**Lauren [3]** 117/2 133/23 138/4
**law [3]** 27/1 138/14 140/16
**lawyer [2]** 116/23 117/2
**lay [2]** 7/2 143/23
**lead [1]** 136/11
**leaders [1]** 114/15
**leadership [2]** 45/11 45/16
**leading [3]** 60/2 60/3 115/10
**leads [6]** 44/20 50/10 58/11 66/3 74/12 74/13
**LEAPFROG [151]**
**Leapfrog website [1]** 52/15
**Leapfrog's [39]** 21/4 21/20 25/2 25/6 27/7 28/14 30/4 30/21 31/4 31/8 32/16 32/22 47/25 48/4 51/5 51/7 51/17 51/18 51/22 52/25 53/25 54/3 54/17 66/18 79/7 81/5 82/10 86/6 87/6 87/7 90/11 92/17 93/9 95/1 106/4 119/3 124/17 132/2 132/4
**Leapfrogs [1]** 82/10
**learned [1]** 135/21
**least [7]** 25/11 49/22 49/24 55/16 65/19 66/18 124/3
**leave [3]** 29/22 67/5 142/13
**leaves [1]** 65/2
**led [1]** 99/5
**LEE [3]** 1/17 134/6 144/12
**left [4]** 67/7 75/24 85/22 143/11
**left-hand [1]** 85/22
**legal [7]** 19/1 19/14 26/24 27/4 90/6 90/7 95/15
**lens [1]** 9/9
**less [10]** 67/6 73/2 93/6 94/8 99/6 99/19 102/22 108/8 128/10 130/14
**let [13]** 7/2 14/20 28/9 40/25 54/2 98/11 112/2 113/9 113/17 122/6 129/20 131/4 134/9
**let's [15]** 15/16 22/11 28/4 67/22 67/25 76/23 76/23 85/14 94/21 115/13 116/18 125/25 126/1 136/24 137/22
**letter [10]** 77/20 78/1 78/3 78/11 79/22 125/12 125/22 125/24 130/21 130/22
**level [13]** 4/24 13/3 22/15 36/17 44/7 44/8 53/24 65/7 67/16 120/3 120/4 122/9 130/1
**levels [1]** 15/15
**license [1]** 122/7
**lies [1]** 67/19
**light [1]** 135/5
**like [52]** 6/9 8/7 44/2 46/15 47/15 53/25 54/17 58/14 63/1 63/14 66/25 68/11 69/5 71/12 74/4 74/7 74/22 75/17 78/2 94/14 98/15 100/3 101/16 103/1 107/14 110/1 115/18 116/10 116/11 117/15 118/22 119/23 122/8 125/17 125/19 126/4 128/18 131/14 133/22 138/13 139/10 139/17 139/18 140/17 140/17 141/5 141/25 142/14 143/10 143/24 144/8 144/21
**likely [9]** 57/25 60/12 60/12 62/16 62/18 63/22 65/6 73/9 103/14
**limine [1]** 97/5
**limited [21]** 5/13 56/5 56/13 61/1 61/6 61/9 61/16 64/9 64/15 67/21 67/23 69/20 79/12 87/15 87/21 89/16 93/17 127/16 127/18 134/16 135/14
**line [5]** 42/10 50/2 55/20 67/17 88/11
**lines [2]** 72/23 144/12
**link [1]** 101/18
**linking [1]** 102/5
**list [5]** 51/13 106/4 134/14 134/16 135/13
**listed [7]** 20/25 31/6 101/19 120/14 134/15 135/13 136/15
**listen [1]** 62/15

**L**

**listing [1]** 51/12
**literacy [1]** 140/14
**literature [3]** 51/5 56/21 59/22
**litigation [10]** 7/16 19/22 39/4 56/3 81/5 94/25 95/8 96/13 96/15 141/19
**little [10]** 17/22 19/17 32/24 50/21 69/18 86/10 93/5 117/13 128/12 140/21
**live [2]** 116/12 116/16
**living [1]** 55/15
**LLP [3]** 1/18 1/21 2/3
**location [1]** 121/19
**logical [2]** 65/20 99/7
**long [7]** 41/13 54/19 114/1 125/23 136/20 143/15 145/5
**longer [3]** 25/17 25/19 56/5
**look [39]** 6/3 12/3 12/25 49/7 64/8 64/10 66/4 68/23 68/24 71/1 71/7 71/7 71/12 72/18 73/10 76/8 77/11 77/11 79/12 83/18 86/21 88/11 89/4 98/25 99/14 99/15 111/5 119/6 119/9 119/11 120/4 120/7 120/22 121/12 122/17 123/5 125/3 127/1 140/1
**looked [10]** 14/16 39/6 55/9 68/19 83/18 99/3 99/4 103/22 104/6 130/22
**looking [17]** 7/11 8/3 8/5 71/23 72/11 83/3 83/20 84/3 85/22 93/22 103/2 106/17 115/16 119/13 122/24 140/19 142/22
**loses [1]** 35/22
**losing [1]** 35/6
**loss [6]** 10/19 11/22 12/11 12/23 13/1 40/6
**lost [2]** 34/2 35/14
**lot [21]** 22/15 34/15 35/10 44/13 44/14 44/17 47/20 57/3 69/18 69/21 69/21 71/8 71/11 109/14 109/14 109/18 110/3 120/9 120/20 123/12 130/8
**low [10]** 16/17 72/22 72/24 72/25 73/1 73/4 73/5 99/18 111/12 127/15
**lowest [2]** 84/14 98/18
**lunch [2]** 116/10 116/18
**luncheon [1]** 116/19

**M**

**macro [1]** 6/6
**made [14]** 22/9 33/10 39/3 60/23 80/1 80/4 80/6 82/14 86/18 87/22 97/15 97/22 135/23 136/9
**Magistrate [1]** 96/20
**major [4]** 34/12 43/18 56/24 108/2
**majority [2]** 109/9 127/15
**make [27]** 13/10 14/3 22/8 22/16 22/20 22/24 22/25 24/3 24/6 34/15 38/1 39/9 44/6 61/19 66/4 68/20 70/5 80/11 98/2 107/19 107/19 108/5 115/5 124/16 124/21 125/14 129/11
**makes [5]** 14/11 38/22 48/12 68/3 120/23
**making [5]** 17/4 22/17 23/9 43/7 55/18
**MALONEY [2]** 1/15 142/12
**manage [1]** 8/10
**managing [1]** 3/17
**manner [1]** 77/10
**manuscript [2]** 109/17 109/19
**many [19]** 4/3 4/6 4/12 35/25 45/11 69/5 71/4 73/22 92/9 104/15 104/22 105/5 111/22 117/20 118/13 119/7 120/14 132/16 145/7
**many expert [1]** 4/3
**Marc [1]** 17/3
**MARCUS [2]** 1/20 1/21
**mark [6]** 3/3 3/5 76/20 101/23 106/1 129/5
**markers [5]** 10/19 11/9 11/22 12/24 13/25
**market [4]** 33/18 35/18 35/24 40/7
**MARY [1]** 1/15
**Maryland [7]** 41/11 42/1 42/2 46/24 46/25 47/5 49/10
**Master's [1]** 41/24
**material [1]** 142/11
**materially [3]** 15/8 15/17 20/20
**maternal [2]** 119/12 129/3
**math [4]** 22/18 24/3 24/6 36/8
**Mathematica [2]** 37/9 37/13
**mathematical [6]** 15/5 15/11 15/13 36/7 38/18 39/14
**mathematically [1]** 16/17
**Matt [2]** 113/19 114/7
**matter [8]** 5/11 17/25 22/4 69/23 138/14 139/5 141/12 145/20
**matters [4]** 45/1 50/15 113/2 134/6
**Matthew [1]** 138/10
**Matthewman [2]** 96/22 96/23
**MAXWELL [1]** 2/2
**may [18]** 35/9 35/9 48/11 48/13 71/14 77/23 78/24 90/1 101/25 102/16 102/19 102/19 129/23 133/15 137/23 138/24 143/18 144/1
**maybe [8]** 5/21 12/23 61/12 63/1 63/3 66/1 66/1 124/23
**MBA [1]** 3/13
**McDonald [1]** 91/15
**McGill [2]** 41/21 41/22
**MD [1]** 20/2
**me [36]** 7/2 9/12 19/1 28/9 34/17 36/2 40/25 42/4 49/9 54/2 62/8 62/11 63/22 66/3 81/11 83/6 90/9 91/3 92/14 96/23 98/11 98/16 99/5 111/5 111/17 112/2 112/6 113/17 122/6 123/17 124/12 125/1 125/19 125/24 128/8 129/20
**mean [28]** 7/18 15/9 22/20 46/22 46/23 52/17 54/1 59/13 63/21 65/23 66/15 67/20 77/19 81/19 82/16 107/14 121/7 124/19 126/10 126/11 127/1 127/11 127/25 129/4 129/16 130/3 131/11 136/21
**meaning [3]** 10/14 58/3 63/21
**meaningful [1]** 61/18
**means [4]** 57/15 69/7 76/11 88/18
**measure [5]** 89/13 119/20 122/23 126/1 126/5
**measured [3]** 39/6 102/19 119/8
**measurement [5]** 42/24 47/17 59/1 63/2 63/4
**measures [126]** 15/23 16/9 24/19 28/12 28/13 28/13 28/16 28/24 29/1 29/8 29/8 29/11 29/13 29/17 29/24 30/6 30/9 30/15 30/23 31/2 31/6 31/8 31/13 31/13 32/25 38/20 42/20 44/12 46/22 47/7 47/21 47/22 48/5 48/10 48/11 49/20 51/25 52/2 52/17 52/25 54/3 54/4 54/4 54/7 54/8 54/12 56/6 64/16 64/16 66/10 66/12 66/15 66/17 66/22 67/1 67/3 67/11 67/14 67/15 68/13 68/13 68/20 69/24 71/25 72/8 73/17 73/19 74/2 74/4 74/7 74/22 76/3 76/5 76/6 76/10 76/10 76/15 79/8 79/16 79/23 80/1 80/3 80/18 80/19 81/9 81/24 82/25 83/5 83/15 84/18 85/2 86/7 86/23 86/24 86/25 87/1 87/2 87/8 87/10 87/22 88/20 93/3 95/13 101/2 101/4 101/5 101/9 101/14 101/15 101/19 101/21 102/6 102/6 102/10 102/11 102/20 104/5 110/23 111/2 112/5 112/5 112/16 112/17 116/2 119/7 120/23
**mechanism [1]** 136/13
**med [3]** 41/21 57/2 110/12
**media [2]** 130/7 130/8
**median [3]** 38/20 67/10 115/21
**medical [14]** 1/4 15/12 34/13 41/16 41/19 41/20 51/4 56/20 62/13 110/11 120/3 132/19 132/22 134/3
**Medicare [2]** 122/7 122/13
**meds [1]** 75/17
**meeting [10]** 52/14 82/4 82/8 90/20 113/6 113/10 113/20 113/20 114/14 121/21
**meetings [5]** 44/5 44/17 46/9 94/14 104/22
**member [1]** 45/17
**members [5]** 45/14 46/6 46/11 46/14 55/7
**members' [1]** 46/5
**membership [1]** 46/2
**Memorial [13]** 118/9 120/11 120/15 122/8 122/12 123/19

**M**

**Memorial... [7]** 124/3 126/21 128/3 129/18 130/16 130/19 131/9
**Memorial's [1]** 125/3
**mentioned [6]** 34/25 65/10 73/6 91/7 91/19 93/21
**mentioning [1]** 120/19
**mess [1]** 124/20
**message [1]** 90/3
**messing [1]** 58/20
**met [1]** 138/17
**method [22]** 24/18 28/19 28/21 30/14 59/12 60/9 64/14 64/22 65/20 67/6 67/20 76/21 76/23 76/25 76/25 77/2 77/4 77/6 92/8 109/16 110/2 110/6
**methodologies [3]** 48/19 51/2 54/17
**methodology [83]** 6/10 11/7 12/9 14/9 14/10 17/18 21/4 21/5 21/7 21/8 21/15 21/21 21/23 23/21 23/23 24/5 25/6 25/12 28/1 28/2 28/3 30/21 31/5 31/5 31/18 32/23 36/5 36/25 37/10 37/11 37/14 37/16 43/10 43/25 46/8 47/25 50/23 51/1 51/5 51/9 51/17 52/8 52/11 52/14 54/6 54/15 55/3 55/18 55/23 56/13 56/14 58/2 58/22 60/25 61/24 65/22 67/9 67/21 67/24 76/20 77/2 80/7 82/11 83/18 87/7 91/10 91/16 93/13 111/18 113/7 113/13 114/6 114/7 114/11 114/13 114/18 114/21 116/1 132/2 132/5 136/1 137/6 140/11
**methods [3]** 65/18 76/22 89/2
**metric [4]** 43/8 50/10 50/11 61/18
**metrics [37]** 27/13 28/6 28/20 37/16 43/7 43/12 45/20 45/20 46/1 46/12 49/2 49/7 49/17 49/17 49/18 50/1 50/6 50/12 54/10 58/10 64/19 65/21 66/1 68/9 69/14 69/23 71/13 72/11 74/25 75/20 89/25 99/4 101/18 102/19 112/6 112/13 112/20
**Meyers [1]** 1/21
**Miami [5]** 1/23 78/20 117/18 117/24 129/7
**Michael [2]** 141/2 144/4
**Microsoft [1]** 140/6
**middle [2]** 68/1 106/18
**MIDDLEBROOKS [4]** 1/3 1/11 2/8 96/21
**might [12]** 19/1 25/4 74/2 74/7 74/22 80/10 87/15 91/10 96/3 97/18 105/19 139/14
**million [3]** 19/6 34/7 35/6
**mind [3]** 25/11 25/11 136/19
**minimal [1]** 116/5
**minimum [1]** 13/19
**minus [2]** 54/19 85/7
**minute [4]** 62/7 65/10 106/14 122/23
**minutes [13]** 41/2 57/5 117/5 135/22 136/22 139/16 139/19 139/20 140/2 140/7 143/15 143/16 145/6
**mischaracterize [1]** 97/15
**misfit [1]** 120/6
**misled [1]** 32/12
**miss [1]** 62/20
**missing [27]** 30/5 30/8 30/15 30/22 31/1 31/20 52/2 58/15 59/3 59/3 59/4 59/7 59/12 59/15 59/20 64/15 79/4 79/8 79/9 79/15 79/23 79/25 80/3 80/5 109/18 110/3 110/7
**missingness [6]** 58/25 59/25 64/13 66/19 102/1 102/2
**mission [3]** 51/7 129/9 131/12
**Missy [1]** 88/9
**mistake [2]** 82/14 86/18
**model [18]** 14/21 15/5 22/8 24/12 24/22 24/25 25/2 25/13 27/7 28/4 28/5 28/7 28/10 29/18 36/7 36/9 37/18 132/8
**modeling [1]** 56/12
**models [1]** 58/21
**moderately [1]** 54/9
**modifications [1]** 22/25
**mom [1]** 117/16
**moment [2]** 102/25 133/15
**money [1]** 109/12
**monitor [1]** 49/25
**monitor important [1]** 49/25
**Montgomery [2]** 34/1 39/20
**month [2]** 122/23 122/24
**months [4]** 60/24 63/24 123/1 123/1
**Montreal [1]** 41/22
**more [39]** 5/16 22/7 22/16 30/5 30/8 34/15 35/10 54/13 54/24 60/4 60/5 60/12 61/18 65/6 67/6 69/1 71/4 74/14 74/16 77/8 77/10 79/8 79/15 79/23 80/3 92/18 93/5 103/14 107/16 109/11 112/9 112/9 114/3 115/7 115/8 116/14 136/23 145/10 145/11
**morning [8]** 3/1 3/6 3/9 41/2 41/9 66/7 71/15 145/15
**Moskowitz [1]** 2/3
**most [12]** 47/5 54/10 58/17 61/6 61/19 62/16 62/18 62/19 63/22 70/3 73/9 110/17
**Most hospitals [1]** 61/6
**motion [6]** 97/5 138/13 138/17 138/21 141/6 143/7
**motions [1]** 4/16
**motivated [1]** 131/11
**move [9]** 23/7 35/3 65/11 74/10 89/9 96/6 125/6 137/22 139/4
**moving [5]** 49/3 65/9 73/11 130/5 139/5
**Mr [20]** 3/9 4/16 4/22 4/25 12/17 37/24 37/24 45/6 64/18 68/11 102/9 110/22 113/4 134/18 135/17 137/16 137/24 141/3 141/7 145/12
**MRSA [1]** 69/14
**Ms [17]** 17/15 19/18 34/1 34/25 39/20 89/11 117/1 117/12 128/2 132/1 132/16 133/18 140/8 140/8 140/10 140/14 142/12
**much [15]** 14/14 14/14 41/1 46/2 60/22 63/5 68/6 93/11 99/6 108/4 110/18 116/14 117/12 130/20 130/21
**multi [2]** 27/18 29/15
**multi-step [1]** 29/15
**multiple [12]** 62/8 66/5 76/21 85/10 91/4 105/24 107/12 108/10 109/23 114/8 120/5 120/12
**multitude [2]** 120/8 120/16
**must [4]** 18/19 18/24 19/12 98/6
**my [125]** 7/8 8/20 8/24 9/3 9/7 9/17 11/23 11/25 12/3 14/23 15/6 18/14 18/15 18/20 18/20 19/1 19/9 19/11 20/13 20/23 20/23 21/10 23/8 23/20 24/23 24/24 25/19 26/2 26/5 26/11 27/1 27/11 27/21 30/16 30/17 32/11 32/14 35/1 35/9 36/12 36/16 36/24 37/8 37/13 39/7 40/2 42/14 43/1 44/11 44/25 45/7 45/13 47/1 49/24 50/22 50/24 58/8 61/2 62/1 62/8 62/13 62/19 63/15 63/16 64/1 64/18 66/4 68/4 68/23 72/2 72/16 74/19 76/20 78/17 79/6 81/20 82/15 84/19 84/21 85/10 85/20 87/18 87/19 87/19 89/2 89/2 89/20 90/6 93/15 95/16 99/20 100/1 100/3 105/5 105/8 105/24 107/8 108/7 109/6 109/11 109/14 110/19 112/11 112/22 113/18 114/16 114/21 115/7 117/16 117/18 117/25 125/1 125/3 125/12 131/4 131/6 133/16 134/2 134/5 137/11 137/12 137/17 138/13 139/18 143/9
**myself [2]** 20/1 99/2

**N**

**NA [14]** 22/2 22/13 23/2 23/8 23/13 23/21 28/19 28/21 28/23 29/7 29/19 31/6 37/16 73/6
**name [1]** 135/18
**NAs [5]** 29/23 29/23 30/1 31/13 71/11
**national [9]** 15/22 38/20 42/17 43/4 45/11 66/15 67/10 73/19 111/7
**navigated [1]** 124/20
**near [1]** 89/13
**nearly [1]** 115/19
**necessarily [3]** 35/4 35/20 36/2
**need [21]** 5/15 6/21 8/9 10/11 10/25 13/8 13/10 16/3

**N**

**need... [13]** 34/15 35/1 35/9 38/15 40/25 47/13 50/20 62/22 73/4 74/14 74/16 116/14 136/6
**needed [2]** 6/21 46/3
**needs [2]** 36/7 136/16
**negate [1]** 99/20
**negative [4]** 6/15 10/10 11/3 11/6
**net [10]** 127/7 127/8 127/11 127/12 127/14 127/17 127/21 127/24 129/8 130/25
**Network [1]** 43/4
**never [18]** 20/6 20/8 21/13 21/14 21/17 30/1 54/21 63/10 63/10 67/19 82/8 99/1 100/1 108/13 109/12 124/23 124/25 130/22
**never developed [1]** 21/14
**never-ending [1]** 54/21
**new [9]** 6/5 34/22 40/10 43/8 51/5 52/14 104/17 114/21 122/4
**news [1]** 130/8
**next [6]** 10/16 81/17 83/3 93/20 116/9 116/11
**Nicholson [15]** 5/1 14/5 14/8 15/15 15/19 15/20 22/10 23/16 36/11 65/19 66/14 66/25 92/10 93/19 115/21
**Nicholson's [17]** 5/5 14/6 15/18 16/1 38/11 38/17 50/22 64/18 65/10 65/13 67/8 67/20 77/2 86/5 93/21 93/24 106/2
**night [2]** 136/3 145/16
**nine [4]** 107/1 111/10 111/22 122/19
**no [124]** 1/3 4/19 11/9 12/21 13/24 14/19 16/4 17/1 18/25 19/12 19/25 20/19 21/16 21/19 21/20 23/1 23/9 25/17 25/19 26/4 27/6 28/9 28/12 28/16 29/14 30/25 31/25 32/9 32/18 33/8 37/7 37/19 38/1 38/13 38/15 38/21 39/7 40/15 40/19 42/8 44/4 44/16 52/1 56/5 69/23 74/9 74/12 74/13 77/13 77/19 77/22 78/23 79/19 79/25 80/10 81/22 82/21 83/18 84/13 84/16 84/24 85/3 88/3 88/5 94/9 94/11 95/18 95/18 95/20 95/22 96/9 96/9 96/11 96/13 101/3 101/7 101/13 101/18 102/8 102/9 103/7 103/7 103/7 103/13 103/18 103/22 103/22 103/25 104/3 104/5 104/11 104/12 104/25 105/9 107/8 107/10 109/18 110/3 110/4 116/4 116/8 117/5 118/4 118/11 123/8 124/14 124/14 124/14 125/24 131/16 132/1 132/4 132/7 133/5 133/8 133/11 133/18 133/20 135/3 136/6 136/23 141/10 141/12 145/11
**non [40]** 38/19 51/4 51/19 56/14 57/6 58/10 58/12 58/13 59/6 59/10 60/3 63/1 65/25 70/24 71/12 72/3 80/9 86/7 88/2 88/18 88/20 93/16 98/12 98/13 98/13 99/12 104/21 105/20 108/8 109/15 110/6 110/10 110/15 113/11 116/5 141/24 142/3 142/5 142/6 142/7
**non-imputed [1]** 70/24
**non-leading [1]** 60/3
**non-participating [3]** 51/19 86/7 88/20
**non-Plaintiff [1]** 71/12
**non-responders [1]** 59/10
**non-responding [2]** 38/19 59/6
**non-response [25]** 51/4 56/14 57/6 58/10 58/12 58/13 63/1 65/25 72/3 80/9 88/2 88/18 93/16 98/12 98/13 98/13 99/12 105/20 108/8 109/15 110/6 110/10 110/15 113/11 116/5
**non-responsive [1]** 104/21
**nonapplicable [4]** 72/16 72/17 72/18 72/21
**none [5]** 11/21 40/15 66/9 82/11 141/4
**nonparticipants [1]** 88/12
**nonparticipating [12]** 76/6 83/22 84/4 84/10 85/3 85/4 86/25 87/8 87/20 87/25 93/3 102/22
**nonparticipation [1]** 85/5
**nonresponse [1]** 81/20
**norm [2]** 47/2 47/4
**normally [1]** 143/24
**not [313]**
**not cover [1]** 11/12
**not do [1]** 11/14
**notch [1]** 67/25
**note [1]** 139/3
**noted [1]** 33/9
**nothing [7]** 25/7 51/24 103/7 122/11 125/17 127/21 141/9
**notice [2]** 25/25 26/8
**Notre [1]** 3/13
**now [39]** 5/7 8/25 20/7 20/25 25/15 26/4 33/22 45/23 47/7 61/24 65/11 75/13 75/19 78/14 79/19 84/8 86/10 86/19 89/2 89/9 94/23 98/5 100/4 101/2 118/7 122/5 123/3 125/10 125/13 128/13 129/5 130/15 130/23 130/23 134/18 138/15 139/4 139/14 140/24
**number [24]** 7/15 7/16 12/12 18/8 18/11 35/12 35/13 40/2 60/12 69/13 72/25 73/1 73/3 85/25 98/20 99/4 104/16 106/21 122/7 122/13 126/10 126/13 134/19 134/19
**numbers [4]** 5/21 22/2 58/19 96/9
**numerical [3]** 125/5 125/21 125/22
**numerous [1]** 142/8
**nurse [1]** 75/16
**nurses [3]** 37/2 50/13 55/11
**nursing [2]** 117/19 117/25
**nut [1]** 50/15
**NW [1]** 1/18

**O**

**o'clock [1]** 145/4
**oath [1]** 82/22
**object [7]** 47/14 47/18 137/4 140/23 140/24 142/20 144/25
**objection [26]** 4/18 4/19 11/11 11/15 32/3 47/12 48/6 48/7 48/14 51/11 52/4 60/2 96/7 96/9 97/23 107/5 111/13 137/10 138/3 138/6 139/18 139/21 143/4 143/10 143/14 143/22
**objections [4]** 106/4 106/18 107/5 108/21
**observations [5]** 61/4 61/5 94/20 100/4 104/17
**obtained [2]** 41/24 142/24
**obvious [1]** 69/17
**obviously [5]** 11/4 99/1 119/22 127/1 142/7
**Occasionally [1]** 61/18
**occurred [3]** 9/24 90/21 113/5
**occurs [1]** 72/18
**October [1]** 53/13
**October 4 [1]** 53/13
**odd [1]** 93/6
**of 400 [1]** 72/8
**off [3]** 100/2 115/15 125/8
**offer [4]** 53/8 141/4 142/9 143/5
**offering [5]** 26/20 51/14 135/4 141/9 142/11
**officer [4]** 107/24 117/17 118/6 125/2
**officers [1]** 42/15
**official [3]** 2/7 117/18 145/23
**often [6]** 39/15 46/8 58/17 59/19 61/5 110/13
**oh [4]** 47/12 100/3 121/2 142/6
**okay [22]** 41/4 56/24 67/18 69/12 71/24 88/19 100/12 104/8 116/17 116/20 124/18 125/16 125/17 126/2 130/21 131/3 134/7 137/2 138/21 143/17 145/4 145/15
**old [6]** 58/2 59/12 60/9 82/10 114/6 125/8
**oldest [1]** 82/16
**once [3]** 24/2 47/1 47/9
**one [106]** 4/13 4/25 4/25 5/1 5/14 5/15 5/25 6/2 6/3 7/15 8/20 9/10 12/4 13/8 14/17 15/5 17/22 18/6 18/7 18/8 18/9 18/11 18/15 20/7 20/24 25/11 25/11 25/16 26/12 30/3 33/3 34/18 34/23 35/16 40/5 42/8 43/24 46/20 46/24 50/2 50/22 51/3 51/21 51/22 52/20

O

**one... [61]** 55/22 56/4 56/11 58/8 62/3 62/9 64/7 66/6 66/7 66/8 67/16 67/19 67/25 68/22 69/6 69/25 71/7 73/2 74/13 76/21 77/14 82/10 83/4 83/8 83/24 84/5 85/2 89/7 93/6 93/18 98/7 98/14 98/17 98/18 98/22 99/13 99/19 103/10 106/14 106/22 107/9 107/14 110/17 112/24 115/6 115/22 116/16 120/3 120/4 122/9 122/9 123/7 126/17 128/7 128/24 129/16 129/18 134/12 142/18 144/7 144/7
**ones [8]** 31/15 44/4 55/9 66/7 72/24 91/3 97/20 107/6
**ongoing [2]** 33/21 122/23
**only [20]** 5/20 11/23 14/10 57/19 65/22 66/3 67/13 68/5 83/24 100/4 105/20 107/6 111/10 111/25 119/15 129/16 136/22 140/1 141/18 142/24
**open [6]** 22/13 46/12 46/13 114/19 130/24 131/1
**opened [1]** 40/11
**opening [1]** 140/16
**opine [3]** 50/19 125/16 125/17
**opinion [118]** 5/4 6/21 8/14 9/16 11/8 11/18 11/19 11/23 11/25 13/23 14/4 14/5 16/21 16/23 17/7 17/14 17/17 17/18 17/20 18/6 18/7 18/8 18/11 18/18 18/20 18/20 18/23 18/24 19/11 19/16 20/9 20/16 21/1 25/16 26/12 26/16 26/17 26/20 26/23 27/3 27/6 28/9 28/10 28/11 28/12 28/16 28/18 29/3 29/22 31/18 31/25 32/4 32/6 32/8 32/10 32/12 32/16 32/19 33/3 33/3 34/18 35/6 37/25 39/24 44/6 50/22 50/25 51/3 51/8 51/13 53/20 53/25 54/7 55/2 55/6 55/15 58/14 59/5 64/1 65/13 66/19 67/8 68/4 68/16 76/20 78/4 80/10 80/14 80/16 82/15 85/10 87/19 87/19 88/6 89/2 92/10 92/18 93/16 95/23 96/3 99/20 101/8 105/20 105/24 107/4 107/8 108/8 109/2 110/19 110/20 112/3 113/11 116/6 119/1 141/12 141/14 142/8 144/14
**opinions [40]** 4/22 5/2 5/7 5/23 6/20 16/16 17/11 39/5 39/7 44/5 44/6 44/20 49/2 50/19 51/11 51/12 51/14 51/16 51/21 52/7 52/11 52/16 53/8 53/9 70/16 70/17 83/17 87/14 105/18 106/3 114/8 135/4 137/17 141/1 141/4 141/7 141/10 141/11 142/11 143/5
**opportunities [1]** 122/25
**opportunity [7]** 42/23 137/20 139/17 142/9 142/17 142/18 142/20
**opposed [2]** 18/12 130/15
**opposing [2]** 134/22 141/17
**opposite [1]** 14/17
**opposition [1]** 97/5
**optimal [5]** 51/20 67/3 88/13 88/24 89/3
**option [4]** 62/16 62/17 66/5 115/15
**optional [1]** 99/5
**options [7]** 62/15 63/14 66/5 105/22 109/23 110/20 114/17
**order [5]** 4/15 18/18 18/24 19/11 136/19
**ordinary [3]** 6/23 8/8 88/23
**organization [7]** 45/13 45/17 45/18 46/8 125/10 127/14 131/8
**organizations [3]** 45/12 46/15 91/11
**organized [1]** 140/21
**orient [1]** 69/25
**orthopedic [1]** 34/3
**other [33]** 12/10 12/22 14/20 15/20 18/13 23/9 23/22 29/8 30/3 31/15 34/18 36/14 37/4 39/24 45/16 49/14 51/14 59/19 61/11 63/4 63/8 64/20 68/13 70/6 70/6 103/18 105/18 107/18 110/15 112/7 119/19 119/19 121/5
**others [2]** 108/25 112/6
**otherwise [1]** 136/13
**our [64]** 44/6 46/2 46/6 46/11 46/14 49/7 49/8 49/10 49/15 50/5 54/18 56/11 61/21 61/21 63/6 104/18 106/22 106/24 112/24 115/14 118/25 119/6 119/25 121/23 121/24 122/4 122/8 122/14 122/16 122/17 123/5 123/6 126/25 126/25 127/1 127/4 128/4 129/3 129/7 129/9 129/16 130/8 130/9 130/10 130/16 130/17 130/25 131/1 131/1 131/2 131/3 134/5 134/13 134/14 134/15 134/20 135/4 135/6 135/6 135/9 138/15 141/1 142/16 143/4
**out [95]** 6/22 14/11 15/6 15/16 16/13 16/20 20/1 20/10 20/12 20/16 20/18 21/11 22/11 37/1 41/1 57/18 59/15 60/11 60/11 60/21 60/22 60/25 61/8 62/16 63/8 63/13 63/17 63/18 63/24 67/5 67/7 69/19 70/4 70/7 71/25 72/7 73/14 73/17 75/17 76/2 78/2 78/5 80/9 81/8 81/13 81/14 81/16 81/16 83/5 83/7 83/9 83/21 83/22 84/11 84/13 86/2 86/3 86/11 87/5 88/19 89/23 90/2 92/19 92/21 92/24 93/10 94/4 95/17 99/2 99/8 99/21 99/23 99/24 100/2 100/9 100/11 103/5 103/17 104/20 108/25 111/21 111/23 115/6 115/8 115/9 115/11 116/23 120/9 123/24 125/16 127/6 129/15 134/5 144/20 145/13
**out they [1]** 16/20
**outcome [34]** 42/20 45/2 47/7 47/21 47/22 48/10 50/10 50/16 51/25 52/17 54/2 54/3 54/8 54/10 54/12 61/17 64/19 64/20 69/13 69/23 71/3 73/17 74/25 75/20 76/3 87/15 89/25 101/14 101/19 102/6 102/9 112/5 112/16 129/5
**outcomes [23]** 42/25 43/3 43/6 43/6 43/13 45/4 47/17 49/16 50/5 52/19 54/11 56/23 61/10 71/3 71/6 73/5 73/22 75/21 119/13 123/6 123/16 128/16 129/3
**output [4]** 21/4 21/6 24/6 30/16
**outside [5]** 29/2 32/3 32/10 32/14 117/2
**outstanding [2]** 55/12 79/19
**over [30]** 4/7 7/8 10/16 41/15 44/25 45/1 45/18 49/7 49/8 54/17 75/2 77/8 85/7 91/2 92/17 98/25 99/3 104/6 109/7 109/14 112/7 117/21 118/9 120/23 121/4 123/9 124/3 124/12 125/4 140/7
**overall [13]** 6/7 15/10 16/23 24/10 28/2 33/1 40/4 69/20 77/19 82/15 87/19 92/13 99/20
**overcome [1]** 58/12
**overruled [8]** 11/16 29/4 32/5 52/4 111/15 143/7 143/14 145/2
**oversaw [1]** 117/23
**own [8]** 5/22 51/22 85/14 85/16 85/18 87/6 119/25 141/10

P

**P.16 [1]** 138/7
**page [2]** 25/12 144/12
**pages [1]** 99/3
**paid [1]** 47/10
**PALM [3]** 1/2 1/8 2/7
**panel [10]** 43/25 51/10 55/4 55/7 55/12 55/17 90/20 113/6 113/10 113/19
**panels [4]** 43/15 44/2 44/11 68/24
**paper [2]** 110/2 110/3
**papers [5]** 45/2 45/3 58/21 92/9 109/25
**paragraph [1]** 88/9
**parallel [4]** 43/16 55/19 62/15 65/5
**parameters [1]** 98/12
**part [20]** 7/9 13/5 14/25 20/16 21/1 27/1 42/14 43/4 43/6 46/6 54/16 85/23 85/25 93/13 115/12 115/18 123/21 124/7 128/16 136/10
**participate [16]** 15/21 70/11 84/23 91/12 94/10 98/8 105/7

**P**


**participate... [9]** 105/16 107/12 118/16 118/22 120/12 120/16 120/24 124/7 124/16
**participated [11]** 15/22 81/7 81/14 93/12 94/4 94/12 95/2 97/11 103/4 105/11 118/24
**participating [31]** 51/19 82/12 83/4 83/9 83/20 84/5 86/7 86/9 86/23 86/24 88/3 88/20 91/20 93/7 98/8 98/15 98/19 98/23 106/8 106/18 108/23 114/24 118/20 118/23 119/1 119/3 124/4 124/9 126/4 128/10 129/19
**participation [1]** 93/23
**particularly [3]** 36/2 136/8 140/10
**parties' [1]** 140/12
**partner [3]** 3/17 3/19 127/3
**pass [1]** 70/21
**passed [1]** 62/5
**past [2]** 29/7 37/4
**paste [1]** 90/7
**pasted [1]** 90/4
**patient [23]** 43/11 47/16 49/16 75/24 76/1 112/8 112/10 112/11 112/12 112/14 112/19 112/23 112/25 113/1 117/21 118/5 120/21 121/22 121/24 127/4 128/18 133/5 133/8
**patient's [2]** 75/10 128/23
**patients [27]** 42/6 42/7 42/10 50/8 54/24 55/1 75/15 111/20 111/21 119/14 124/24 126/25 126/25 127/15 127/22 128/6 128/9 128/22 128/24 129/11 129/15 130/2 130/13 131/2 131/2 131/8 132/10
**patients' [1]** 119/11
**patterns [1]** 123/6
**Pauline [3]** 2/7 77/9 145/23
**Pause [1]** 106/15
**pay [12]** 45/20 46/1 46/19 46/20 46/22 46/23 46/24 46/25 47/6 47/9 61/23 62/2
**payer [1]** 7/25
**pdf'd [1]** 23/2
**pediatric [1]** 119/14
**peer [17]** 36/6 36/8 36/10 36/12 36/15 37/14 37/15 38/9 38/12 38/14 38/16 45/6 45/8 49/23 109/16 109/21 110/5
**peers [1]** 109/22
**penalize [2]** 88/12 91/11
**penalties [2]** 47/3 85/5
**penalty [1]** 84/4
**people [14]** 42/16 44/14 55/20 55/20 57/18 83/24 104/16 109/22 109/25 111/22 112/8 124/23 143/6 144/20
**per [1]** 34/11
**perceive [1]** 112/15
**percent [44]** 47/21 64/19 64/19 64/21 68/5 68/8 76/7 76/11 76/17 83/4 83/9 85/2 85/7 85/9 85/12 85/13 86/2 86/4 86/7 86/8 86/10 86/16 86/20 86/20 86/23 87/9 87/9 87/16 87/16 93/6 98/7 98/14 98/17 98/18 98/22 99/13 99/19 111/23 111/24 123/23 126/17 128/7 128/24 129/16
**percentage [3]** 68/20 86/17 87/1
**perception [1]** 75/11
**perceptive [1]** 67/18
**perfect [5]** 44/16 44/16 50/1 65/5 107/15
**perform [8]** 3/21 10/16 54/16 65/7 72/20 74/7 74/22 74/23
**performance [29]** 6/4 6/12 6/13 45/20 45/20 46/1 46/20 46/22 46/23 46/24 46/25 47/3 47/6 47/9 49/17 50/25 50/25 62/2 68/16 68/19 81/23 101/9 101/13 101/18 103/20 106/24 119/4 122/15 125/10
**performed [4]** 34/5 101/14 101/21 102/14
**performer [2]** 69/8 144/15
**performers [10]** 54/25 60/24 63/23 69/22 92/3 101/4 102/15 107/6 108/1 108/23
**performing [9]** 54/23 63/25 68/9 69/7 73/18 75/21 75/23 91/11 107/6
**performs [1]** 74/4
**perhaps [2]** 106/1 114/3
**period [1]** 103/12
**permission [1]** 134/4
**permit [1]** 48/12
**person [7]** 55/10 55/10 83/24 93/18 125/17 128/17 144/18
**personal [3]** 126/15 133/5 133/8
**personally [3]** 132/19 132/22 132/25
**personnel [2]** 21/18 60/23
**perspective [18]** 7/15 8/18 9/7 9/9 9/21 12/6 14/23 18/15 18/16 19/2 19/9 19/14 23/15 23/25 35/9 38/3 56/11 113/1
**pertaining [1]** 99/4
**Peter [1]** 115/2
**Ph.D [3]** 20/4 56/22 56/25
**phon [1]** 91/19
**phrase [2]** 58/25 98/10
**phrases [1]** 46/20
**physician [8]** 41/12 42/6 95/15 99/1 112/11 112/23 112/24 121/10
**physicians [6]** 35/2 35/7 45/15 55/11 127/2 127/2
**pick [1]** 129/5
**picking [1]** 120/17
**picture [2]** 12/6 49/9
**pie [1]** 86/22
**pieces [2]** 35/16 80/5
**Pierce [1]** 2/7
**piercing [1]** 4/2
**Pineiro [1]** 1/21
**pipeline [1]** 46/10
**place [8]** 26/4 34/21 52/9 55/25 59/23 114/18 133/6 133/9
**placed [1]** 14/19
**places [1]** 107/11
**Plaintiff [6]** 33/16 69/17 71/9 71/12 72/12 73/18
**Plaintiff's [2]** 11/14 26/16
**Plaintiffs [21]** 1/6 1/15 4/25 5/3 5/19 5/24 6/1 6/15 8/22 8/25 9/24 10/21 15/7 17/3 27/4 33/11 39/3 52/23 69/10 93/4 138/17
**Plaintiffs' [6]** 26/8 50/25 135/5 138/15 143/21 143/21
**planning [1]** 7/19
**plausible [2]** 110/16 110/17
**play [7]** 46/21 61/24 116/13 117/2 133/23 136/6 142/16
**played [6]** 134/1 138/5 138/11 139/1 144/3 144/4
**playing [1]** 138/6
**please [21]** 3/1 3/1 3/10 4/20 41/4 41/4 56/17 60/2 60/3 66/13 78/18 85/14 88/17 89/9 92/11 92/13 94/22 101/6 101/17 116/20 116/20
**plus [1]** 54/19
**point [23]** 12/4 28/22 30/17 30/19 31/21 50/16 61/13 62/14 62/25 64/7 68/3 75/17 77/4 78/2 78/5 95/17 110/12 115/5 128/13 128/15 129/18 141/9 143/11
**points [8]** 14/11 15/19 16/2 16/3 60/10 65/18 89/16 93/6
**policy [3]** 46/6 117/21 133/8
**poor [15]** 54/25 63/19 69/22 75/21 75/23 92/3 101/4 101/8 102/14 106/2 107/6 108/1 108/23 112/21 144/15
**poorly [2]** 99/25 102/18
**population [1]** 120/21
**portions [1]** 143/3
**position [1]** 138/15
**possible [2]** 8/15 51/20
**potential [8]** 6/25 7/18 12/1 18/17 18/17 47/7 49/16 51/1
**potentially [2]** 11/24 127/18
**practice [3]** 48/17 122/20 138/20
**practices [4]** 32/17 66/11 103/23 138/19
**precede [1]** 144/1
**prefer [1]** 145/6
**prejudice [2]** 134/24 143/23
**prejudicial [1]** 142/15
**preparation [1]** 142/24
**prepared [2]** 80/23 111/1
**preparing [1]** 90/24
**present [2]** 34/25 46/15
**presented [1]** 44/7
**president [9]** 45/15 46/5 105/5 117/17 118/5 118/6 118/8 126/21 129/14
**press [1]** 23/22
**pretend [2]** 88/12 88/23
**pretrial [1]** 134/13

P


**pretty [1]** 113/23
**prevent [2]** 42/10 42/16
**prevention [1]** 127/23
**previous [1]** 33/24
**previously [2]** 48/20 58/3
**primarily [1]** 3/24
**primary [3]** 22/8 30/17 30/19
**principle [1]** 54/14
**principles [4]** 90/5 90/8 90/11 90/18
**prior [7]** 47/10 53/7 53/15 63/20 113/18 113/19 134/23
**private [1]** 127/24
**probability [3]** 60/12 63/18 64/2
**probable [1]** 64/4
**probably [8]** 47/13 62/10 62/14 64/1 65/25 72/21 73/24 89/24
**probing [1]** 114/10
**problem [2]** 62/13 63/9
**procedure [1]** 139/6
**proceed [1]** 4/20
**proceedings [2]** 1/11 145/20
**process [35]** 27/17 27/18 29/15 29/15 30/6 30/9 30/15 30/22 36/21 47/7 48/11 49/25 50/5 50/6 50/10 50/11 50/12 52/25 54/4 54/8 54/11 66/25 67/3 73/4 76/5 76/16 79/8 79/15 79/23 86/22 87/6 122/2 123/9 123/11 123/22
**processes [1]** 120/9
**processing [1]** 31/2
**produced [11]** 26/21 33/17 33/17 48/4 81/5 83/12 83/15 94/25 97/3 97/12 98/1
**production [1]** 96/24
**productions [3]** 33/10 33/20 33/21
**profession [1]** 41/10
**professional [6]** 11/8 11/19 13/24 16/24 45/11 70/19
**professor [5]** 41/11 42/3 65/3 136/9 136/9
**profit [9]** 8/7 9/4 10/6 10/20 13/17 13/25 38/1 46/17 127/24
**profits [1]** 35/14
**program [2]** 117/23 120/22
**programs [1]** 122/10
**projecting [1]** 6/17
**projections [8]** 6/4 6/16 6/19 6/22 6/23 10/11 10/13 10/15
**promote [1]** 106/23
**promoted [2]** 118/3 118/4
**proof [2]** 137/19 138/18
**proper [4]** 87/18 136/12 138/3 140/15
**properly [3]** 22/21 22/23 136/14
**proposed [2]** 114/7 114/20
**proposes [1]** 65/19
**pros [2]** 58/23 100/7
**protects [1]** 141/18
**prove [1]** 126/13
**Provense [1]** 113/24
**provide [11]** 3/18 5/1 9/5 23/5 95/11 96/17 96/18 97/1 117/13 123/1 128/1
**provided [18]** 5/17 6/16 11/20 20/10 40/15 70/7 70/16 78/4 82/21 92/4 92/15 95/2 95/12 95/12 97/4 123/16 123/16 137/17
**provider [2]** 122/7 122/13
**provides [1]** 25/12
**Provose [7]** 91/19 91/24 92/1 92/8 115/2 115/6 115/7
**PSI [7]** 49/9 69/15 71/2 71/6 71/9 71/10 73/11
**public [14]** 25/14 41/24 72/7 79/13 106/6 106/25 107/16 113/21 114/20 119/22 125/4 125/10 125/16 125/17
**publication [2]** 109/16 109/21
**publications [3]** 44/23 44/25 109/8
**publicly [2]** 119/24 129/2
**published [7]** 43/2 43/6 43/8 45/1 49/22 74/24 92/9
**pull [15]** 15/6 16/19 20/18 21/11 71/18 80/15 88/7 92/11 92/16 103/1 106/11 110/25 123/13 125/18 144/9
**pulled [3]** 90/18 90/18 124/15
**pulls [1]** 129/21
**purchase [1]** 120/5
**purchasers [1]** 124/18
**purpose [3]** 64/5 93/14 124/17
**purposeful [2]** 61/10 99/22
**purposes [2]** 7/10 36/15
**push [1]** 61/5
**pushed [1]** 50/12
**put [20]** 4/25 28/9 47/8 77/25 95/10 114/18 120/6 121/24 122/18 125/15 128/8 134/10 134/21 135/8 135/24 136/6 136/7 137/19 139/10 142/10
**putting [3]** 86/16 129/13 129/14
**PX [4]** 81/6 83/3 94/22 106/11


Q


**qualifications [1]** 23/4
**qualified [8]** 4/10 4/12 4/14 4/16 42/5 48/8 49/19 143/5
**qualify [3]** 47/15 142/1 142/19
**qualifying [1]** 142/3
**qualitative [1]** 18/12
**quality [20]** 21/18 28/17 42/15 49/14 50/13 106/23 107/24 112/1 117/17 117/23 118/5 118/6 118/8 125/2 126/21 127/22 129/2 129/14 132/11 132/14
**quantifiable [2]** 18/21 18/23
**quantification [7]** 18/3 18/12 18/25 19/2 19/7 19/9 33/4
**quantified [4]** 11/13 18/19 18/24 19/12
**quantify [13]** 5/15 5/25 6/9 7/21 17/21 17/23 18/8 18/14 18/16 19/21 26/12 26/17 26/19
**quantifying [1]** 18/21
**question [43]** 19/9 19/11 19/15 20/23 20/23 23/20 24/13 25/4 31/3 33/12 37/13 44/1 56/8 60/4 64/23 66/13 70/23 71/1 74/9 74/12 74/19 74/20 79/11 79/19 83/10 84/2 84/3 86/18 88/17 89/20 97/12 97/24 98/24 101/16 105/8 105/13 111/16 119/17 123/6 126/14 128/20 131/6 144/8
**questioning [1]** 67/17
**questionnaire [2]** 76/1 112/15
**questions [40]** 17/1 19/19 36/4 37/19 39/11 39/19 39/22 40/19 45/5 45/6 60/3 65/2 65/2 65/4 65/6 65/8 75/14 77/7 84/9 84/14 84/21 85/9 90/2 99/3 99/5 99/16 104/7 104/8 104/10 111/21 112/1 113/4 116/8 125/15 131/5 131/16 133/19 136/11 139/8 144/21
**quick [3]** 69/17 73/24 139/14
**quickly [3]** 12/22 53/19 130/6
**quite [2]** 13/12 117/22
**quote [1]** 135/12


R


**radiation [1]** 119/13
**raise [1]** 135/17
**raised [1]** 135/25
**ramifications [1]** 107/21
**ramp [2]** 121/20 122/20
**random [19]** 58/25 59/3 59/3 59/4 59/7 59/11 59/12 59/16 59/21 59/25 60/9 64/13 66/19 75/15 99/23 102/1 110/7 126/17 126/17
**randomized [3]** 109/9 109/10 109/12
**randomly [1]** 111/20
**range [1]** 125/23
**ranking [1]** 54/10
**rankings [1]** 43/20
**rare [1]** 54/13
**rarely [2]** 106/25 107/15
**Rashbaum [1]** 1/21
**rate [5]** 50/5 50/9 72/22 72/25 111/24
**rates [8]** 6/17 47/2 49/8 49/8 49/11 52/18 68/24 75/3
**rating [2]** 53/1 108/9
**ratings [3]** 16/11 16/17 119/23
**rationality [1]** 99/11
**ratios [1]** 68/25
**raw [4]** 68/24 69/3 71/14

R

**raw... [1]** 83/19
**re [5]** 14/21 22/21 24/7 87/2 87/10
**re-weighted [3]** 14/21 24/7 87/2
**re-weighting [1]** 22/21
**re-weights [1]** 87/10
**reached [1]** 123/24
**reaction [1]** 130/1
**read [7]** 4/15 91/24 109/14 113/23 141/8 144/8 144/9
**reading [3]** 91/12 91/23 110/13
**reads [1]** 79/15
**ready [7]** 62/9 100/22 121/15 121/19 121/19 121/21 122/1
**real [3]** 51/4 55/10 95/15
**reality [1]** 124/21
**reallocate [1]** 61/21
**really [17]** 14/18 15/7 18/11 50/15 55/8 55/10 56/18 110/12 112/11 112/20 121/24 122/11 122/14 122/17 124/11 130/8 130/14
**reason [18]** 31/22 57/7 57/16 63/4 63/11 63/18 64/2 64/4 82/18 91/19 99/10 99/11 99/22 100/10 105/21 108/14 108/22 113/12
**reasonable [10]** 11/8 11/18 13/23 16/24 36/17 55/3 55/16 56/13 68/10 70/18
**reasoning [6]** 59/17 64/14 85/6 102/20 105/23 110/5
**reasonings [2]** 107/10 107/10
**reasons [8]** 60/12 61/11 63/8 84/23 105/18 107/11 108/10 108/24
**rebuttal [23]** 5/4 14/4 17/8 136/12 136/14 136/16 137/8 137/14 137/17 137/21 137/21 137/25 139/11 140/15 140/16 141/2 141/3 141/14 142/9 142/16 143/12 145/3 145/13
**rebutting [1]** 143/11
**recalculates [1]** 65/20
**recalculation [1]** 65/11
**recall [37]** 5/17 18/1 18/6 18/7 18/9 25/1 26/9 26/9 27/23 33/12 33/22 38/6 38/9 39/1 39/12 39/22 45/6 81/22 81/24 82/5 90/21 90/25 91/12 91/14 91/17 91/23 92/12 100/17 111/1 113/7 114/22 114/24 115/2 118/19 123/17 123/19 123/25
**receive [7]** 23/7 47/3 47/4 83/9 84/5 84/6 84/12
**received [15]** 81/13 83/5 83/21 84/17 85/4 87/21 88/4 93/12 93/23 94/12 101/8 105/11 105/15 129/18 129/25
**recently [1]** 34/2
**recess [3]** 41/3 116/19 140/5
**recollection [1]** 113/5
**reconcentrate [1]** 106/24
**record [7]** 51/24 131/20 137/3 139/2 142/12 144/8 145/20
**recorded [1]** 50/6
**records [1]** 128/23
**red [6]** 69/6 69/6 69/18 75/18 75/20 110/22
**redirect [8]** 37/20 37/22 78/5 80/22 84/8 102/4 108/17 108/19
**redistributed [1]** 16/3
**reduction [2]** 119/10 119/10
**refer [2]** 17/14 17/17
**reference [3]** 97/6 97/9 136/9
**referenced [4]** 6/2 90/20 92/1 122/8
**references [2]** 89/13 91/10
**referring [2]** 28/13 94/3
**refers [1]** 48/5
**reflect [1]** 70/24
**reflection [1]** 125/9
**reflects [1]** 76/1
**refresher [1]** 50/20
**regarding [3]** 17/14 17/17 19/17
**regional [1]** 106/12
**registries [1]** 120/5
**regrade [1]** 22/15
**regrading [1]** 67/14
**regular [1]** 46/9
**regularly [2]** 39/14 58/15
**regulator [1]** 7/14
**regulatory [1]** 7/10
**reimbursement [5]** 47/8 49/10 49/12 49/17 61/20
**reinforce [1]** 116/5
**relate [4]** 47/22 75/24 107/22 125/21
**related [22]** 5/2 5/14 5/23 6/5 7/19 24/25 25/8 25/10 36/2 40/1 43/3 45/2 45/3 47/1 50/23 51/1 68/25 74/1 76/3 109/16 113/21 142/23
**relates [6]** 4/17 47/18 51/24 86/11 96/2 96/19
**relating [2]** 95/13 104/19
**released [1]** 40/17
**releases [1]** 122/21
**relevance [2]** 47/19 143/23
**relevant [18]** 10/5 11/24 42/9 43/5 45/22 46/11 47/25 48/5 48/9 51/16 54/22 64/7 92/14 97/14 113/21 114/16 135/23 143/24
**reliable [6]** 22/16 24/1 24/7 24/10 67/9 110/6
**relies [1]** 67/9
**rely [2]** 55/16 97/6
**remember [6]** 71/4 81/25 92/5 92/7 110/22 113/10
**remind [2]** 140/13 141/5
**remove [1]** 86/25
**removed [2]** 76/11 90/11
**renew [2]** 138/13 139/18
**renewing [1]** 34/7
**repeat [8]** 29/5 66/13 79/11 83/10 88/17 101/17 120/13 124/7
**repetitive [1]** 12/24
**replicate [1]** 22/12
**replied [1]** 89/5
**replies [1]** 104/22
**report [46]** 9/11 11/11 11/13 12/17 12/18 15/18 16/1 18/14 22/6 23/16 25/21 26/1 26/2 26/3 26/5 26/7 27/20 28/24 30/2 31/5 33/4 33/7 33/9 33/17 38/11 38/17 38/25 50/23 53/9 60/14 63/20 64/18 64/18 71/19 82/9 85/18 85/20 86/5 86/8 87/14 89/2 90/5 90/8 90/25 97/4 128/16
**reported [5]** 14/13 14/14 43/3 119/24 129/2
**Reporter [3]** 2/7 145/23 145/24
**reporting [8]** 42/17 42/18 50/8 57/16 57/17 94/7 108/1 108/3
**reports [5]** 4/24 5/12 17/9 26/17 123/5
**represent [3]** 69/9 69/11 69/13
**representation [1]** 122/15
**representations [2]** 97/22 135/23
**represented [2]** 33/16 61/2
**represents [1]** 30/11
**reputation [6]** 5/24 10/1 10/20 11/22 12/19 13/5
**reputational [7]** 5/18 10/7 10/9 10/25 11/10 11/12 12/1
**reputations [2]** 132/11 132/14
**request [4]** 48/4 95/1 96/23 97/14
**requesting [1]** 39/8
**requests [2]** 95/9 96/16
**require [3]** 50/12 52/8 104/8
**required [3]** 100/4 104/17 122/22
**requirement [1]** 100/22
**requiring [1]** 100/3
**rereview [1]** 51/7
**rescoring [1]** 66/14
**research [8]** 43/1 44/23 54/16 64/12 74/24 109/6 111/25 112/12
**researcher [3]** 42/2 44/24 48/18
**reservation [2]** 134/13 134/25
**reserve [1]** 135/12
**reserved [2]** 134/15 135/11
**residency [1]** 41/21
**residents [1]** 129/7
**resistance [1]** 43/1
**resource [3]** 7/19 91/21 91/21
**resources [8]** 49/15 61/3 61/7 61/8 61/16 61/21 127/18 127/20
**respect [10]** 5/8 10/24 14/4 14/6 52/18 64/23 113/12 134/12 136/1 137/23

**R**

**respectable [1]** 66/8
**respectfully [1]** 134/4
**respond [22]** 29/12 46/14 57/19 57/20 57/23 57/25 58/1 59/10 60/8 66/11 72/1 72/3 81/15 81/17 81/20 83/23 89/25 104/23 105/19 107/18 142/8 144/16
**responded [6]** 33/19 46/5 57/21 58/10 83/24 95/22
**responders [1]** 59/10
**responding [9]** 38/19 57/14 59/6 82/18 89/7 92/2 96/18 99/13 104/18
**response [39]** 17/9 22/10 23/15 25/3 26/9 48/4 51/4 56/14 57/6 58/10 58/12 58/13 63/1 65/25 72/3 80/9 88/2 88/18 93/16 94/25 95/9 97/1 97/14 98/12 98/13 98/13 99/12 105/20 108/8 109/15 110/6 110/10 110/15 111/10 111/12 113/11 116/5 135/21 136/10
**responses [1]** 57/20
**responsible [1]** 126/11
**responsive [3]** 97/8 104/21 140/8
**responsiveness [1]** 75/16
**rest [5]** 91/24 134/7 134/11 138/12 145/3
**rested [1]** 139/4
**restraint [1]** 91/22
**result [7]** 14/1 20/13 22/16 32/23 76/17 98/14 133/12
**resulting [1]** 21/8
**results [2]** 16/16 110/18
**retained [3]** 135/6 135/9 141/19
**retentions [1]** 4/3
**return [3]** 116/18 134/5 139/20
**returned [2]** 117/24 117/25
**revealing [1]** 71/7
**revenue [3]** 5/21 33/18 130/12
**revenues [1]** 12/5
**review [27]** 4/24 24/3 24/24 26/5 38/17 45/6 48/3 48/3 52/8 52/11 52/16 52/22 53/16 55/7 63/15 93/9 93/13 94/23 94/24 106/8 106/10 109/16 113/5 113/15 114/6 139/18 140/25
**reviewed [40]** 5/9 5/12 12/17 12/18 25/6 25/8 26/16 33/11 33/20 36/6 36/8 36/10 36/12 36/15 37/14 37/15 38/9 38/12 38/14 38/16 45/9 49/23 52/13 53/12 53/19 57/12 58/2 69/3 71/14 88/5 90/24 91/1 91/4 91/5 101/7 109/21 110/5 113/15 113/21 114/3
**reviewing [6]** 15/18 23/16 53/20 54/6 67/8 114/22
**rewind [1]** 46/19
**right [350]**
**right-hand [1]** 86/22
**rights [2]** 134/13 134/25
**risk [2]** 43/7 45/3
**role [6]** 44/2 45/19 45/19 49/24 111/11 118/6
**roles [2]** 45/11 45/17
**Romano [8]** 56/11 58/24 59/19 88/11 88/22 89/6 101/25 113/25
**Romano's [1]** 53/18
**room [2]** 75/10 75/22
**roughly [1]** 99/21
**routine [1]** 49/6
**routinely [4]** 46/6 58/19 58/20 100/6
**row [3]** 93/25 94/2 94/3
**rows [3]** 69/9 69/10 69/11
**royal [2]** 85/22 85/25
**rug [1]** 125/18
**rule [20]** 3/3 3/5 3/9 4/16 4/22 37/24 45/6 68/11 76/20 80/2 97/25 101/23 102/9 106/1 138/21 139/5 141/13 141/15 141/18 142/22
**rule protects [1]** 141/18
**Rule's [2]** 76/9 76/14
**rules [4]** 32/22 61/20 104/17 104/19
**ruling [2]** 62/17 113/22
**run [3]** 49/10 110/1 123/4
**Rutenberg [1]** 141/2
**Rutenberg's [1]** 141/7

**S**

**safe [3]** 66/11 102/23 127/22
**safety [63]** 15/1 17/17 21/25 26/20 28/20 30/9 30/10 30/14 30/22 31/1 36/19 36/23 37/1 43/4 43/13 43/25 44/17 47/16 53/24 55/7 59/1 68/12 79/13 81/5 82/1 83/3 83/12 83/15 90/4 90/7 90/10 90/18 90/20 91/16 93/10 117/21 118/5 119/2 119/4 119/8 119/21 119/23 124/12 124/16 125/3 126/23 127/7 127/8 127/10 127/12 127/14 127/17 127/21 127/24 128/23 129/1 129/8 130/16 130/18 130/25 133/5 133/8 133/12
**said [27]** 15/6 15/16 15/20 16/4 19/5 20/24 20/25 25/4 27/20 33/21 55/9 67/22 67/25 73/7 81/22 84/7 84/16 90/24 92/23 94/13 113/10 118/22 122/17 125/12 135/18 142/4 142/13
**sake [1]** 77/9
**SAMARITAN [10]** 1/4 34/2 34/20 103/4 103/8 103/18 105/1 105/10 105/14 132/19
**Samaritan's [1]** 34/12
**same [32]** 9/14 9/19 9/21 10/8 13/6 13/7 13/8 13/10 13/13 13/14 17/25 19/13 21/6 21/8 32/14 32/18 33/2 39/9 40/11 53/9 56/22 57/18 57/20 26/20 69/22 70/2 72/15 75/19 91/3 102/17 121/25 145/9
**sample [1]** 111/20
**sat [6]** 18/1 43/9 43/16 43/17 61/6 104/22
**satisfaction [1]** 75/11
**satisfies [1]** 27/4
**saturation [1]** 40/7
**saw [4]** 5/20 88/8 98/21 140/9
**say [45]** 12/2 18/20 21/22 28/2 28/12 30/25 46/22 49/11 49/19 57/10 57/19 59/8 60/24 62/12 67/22 72/12 73/16 76/13 80/4 81/23 87/15 89/14 100/5 101/6 102/13 103/7 103/10 103/14 105/13 107/15 107/25 108/4 110/1 115/12 115/13 117/16 118/8 121/8 122/6 124/1 124/2 124/4 125/17 132/3 135/16
**saying [20]** 14/10 14/17 15/3 18/9 20/15 20/18 21/3 21/3 22/10 27/23 36/21 37/12 59/11 73/22 74/16 80/1 81/25 87/5 99/17 101/25
**says [10]** 32/22 32/25 79/12 85/21 86/5 88/11 89/14 89/21 106/18 122/25
**scale [2]** 16/4 16/7
**scenario [3]** 76/12 76/18 100/15
**school [3]** 41/16 41/19 41/20
**science [3]** 15/12 44/18 109/2
**scientific [6]** 15/12 58/21 64/22 68/11 70/18 110/6
**scientifically [2]** 64/14 67/9
**scientists [1]** 58/14
**scope [11]** 4/22 11/11 17/7 29/3 32/3 32/10 32/14 50/18 111/13 140/16 145/1
**score [42]** 15/2 15/23 27/14 27/17 31/12 50/15 50/24 51/20 58/4 63/21 64/15 65/23 65/24 66/8 69/20 72/5 77/20 81/19 82/16 84/5 86/23 93/22 99/16 99/21 100/5 104/5 104/12 104/14 104/18 105/1 111/18 115/9 115/17 115/22 115/23 124/5 125/3 125/5 125/22 125/22 126/1 126/5
**scored [6]** 38/19 58/10 94/16 99/25 103/12 103/15
**scores [45]** 22/2 24/3 24/18 27/12 31/11 31/24 32/9 47/23 51/19 52/23 63/19 64/10 64/20 65/20 68/5 68/22 68/23 69/4 69/4 70/25 71/15 75/14 75/23 76/12 76/19 79/15 80/18 81/13 83/8 83/16 83/21 85/2 86/3 87/2 87/10 88/15 88/24 96/19 100/10 105/6 111/6 112/21 113/1 114/11 124/10
**scoring [10]** 14/9 25/12 50/11 51/9 52/14 55/3 83/18

S

**scoring... [3]** 125/15 132/2 132/4
**SCOTT [2]** 1/16 1/17
**screen [8]** 51/21 71/20 77/11 77/25 81/3 103/3 140/21 143/25
**sea [1]** 75/18
**seat [1]** 41/4
**seated [2]** 3/1 116/20
**second [20]** 17/18 19/16 20/9 31/18 32/19 40/25 41/1 48/7 68/7 72/6 77/14 78/19 82/2 82/11 94/2 94/21 101/2 103/1 106/1 143/10
**secondary [4]** 29/16 86/3 123/14 129/21
**secret [1]** 125/18
**section [2]** 123/25 142/23
**sections [2]** 122/19 124/15
**sector [1]** 35/23
**see [57]** 6/21 15/16 15/18 16/1 16/5 20/15 20/25 26/2 37/2 38/11 38/17 40/15 42/6 53/15 55/4 62/25 67/8 67/13 68/4 72/15 73/11 77/12 78/8 78/19 79/17 79/18 79/20 79/21 81/9 81/25 85/22 87/18 88/13 89/6 89/8 89/18 92/25 93/7 93/22 94/13 95/16 102/9 103/2 103/5 106/17 106/19 106/20 107/2 112/21 116/23 124/7 125/5 125/11 136/13 139/15 140/22 145/15
**seeing [3]** 26/9 80/11 112/12
**seek [1]** 134/3
**seeking [1]** 25/19
**seemed [1]** 91/4
**seems [4]** 63/1 98/15 99/17 99/18
**seen [14]** 6/19 8/11 10/22 11/20 11/24 13/21 13/24 14/2 26/8 42/6 61/8 83/11 117/3 138/16
**segregated [1]** 120/2
**semi [1]** 107/22
**seminal [1]** 6/20
**sends [2]** 21/25 113/19
**Senior [3]** 118/8 126/20 129/13
**sense [3]** 22/9 120/23 124/16
**sensitivity [8]** 32/21 37/17 38/8 49/11 64/9 102/16 102/17 109/20
**sent [3]** 135/19 135/20 136/3
**sentence [7]** 73/16 89/1 89/8 91/14 92/5 92/7 115/6
**September [10]** 18/2 18/2 25/22 26/7 33/5 33/10 33/14 33/17 38/25 39/1
**September 2025 [1]** 18/2
**September 29th [3]** 26/7 33/14 39/1
**September 4 [1]** 33/5
**September 4th [4]** 25/22 33/10 33/17 38/25
**series [5]** 7/18 44/5 58/6 75/14 134/14
**serve [4]** 117/17 118/1 118/6 130/13
**served [2]** 33/4 96/15
**set [4]** 10/14 56/9 72/6 75/15
**sets [2]** 71/24 72/6
**settings [1]** 108/24
**settle [1]** 144/21
**seven [26]** 15/23 28/25 29/13 30/1 30/14 30/22 31/2 38/20 50/24 52/20 65/18 65/21 66/2 66/14 67/21 76/15 77/1 78/18 79/9 80/3 87/5 106/25 111/10 111/22 118/11 118/13
**several [1]** 39/20
**share [8]** 33/18 35/18 35/24 122/7 122/13 129/3 129/3 129/4
**shared [1]** 122/14
**sharing [1]** 75/10
**she [15]** 34/5 34/10 34/19 89/5 89/7 89/12 89/14 116/23 134/22 135/18 135/20 135/22 137/7 142/12 142/13
**SHEA [3]** 46/2 46/5 105/5
**sheet [1]** 13/3
**shifted [1]** 47/9
**ship [1]** 122/9
**short [2]** 41/3 56/24
**should [16]** 10/10 20/17 21/2 28/16 31/19 32/1 32/17 39/6 39/24 46/4 55/10 72/4 107/7 134/9 135/1 144/21
**shouldn't [2]** 88/23 131/4
**show [10]** 18/18 18/24 51/18 62/4 62/7 62/12 63/12 68/22 92/2 106/4
**showed [3]** 87/20 110/22 112/22
**showing [1]** 102/18
**shown [1]** 108/21
**shown some [1]** 108/21
**shows [6]** 81/6 83/4 86/8 94/15 103/3 115/25
**sick [1]** 62/23
**side [7]** 47/23 76/16 85/22 86/22 110/15 145/5 145/12
**sides [1]** 143/1
**Signature [1]** 145/24
**signed [1]** 34/22
**significant [2]** 16/23 64/16
**signing [1]** 34/11
**sill [1]** 21/5
**similar [13]** 7/17 13/2 14/22 15/14 21/5 21/12 36/11 43/14 43/16 46/11 62/16 89/20 114/5
**Similarly [1]** 72/20
**SIMMONS [1]** 1/16
**simplistically [1]** 60/5
**simply [13]** 6/11 11/13 15/6 15/16 32/24 36/8 48/4 71/25 83/22 84/3 98/8 103/8 136/1
**since [15]** 16/13 42/1 42/4 45/23 53/12 53/21 75/13 85/5 87/22 90/17 98/25 103/20 103/24 114/2 122/13
**Singer [2]** 91/6 91/10
**single [4]** 112/24 122/7 122/7 128/9
**sir [1]** 40/21
**SIRs [2]** 68/25 71/15
**sit [4]** 25/15 49/14 100/4 108/4
**site [2]** 42/14 47/2
**sits [1]** 94/13
**sitting [1]** 76/14
**situation [1]** 123/18
**six [15]** 30/5 30/9 57/2 73/11 73/17 73/21 74/17 74/25 79/8 79/15 79/23 85/14 101/19 106/24 123/1
**Sixty [3]** 145/8 145/11 145/12
**size [1]** 75/5
**slide [19]** 69/25 71/7 78/18 81/4 83/3 83/20 85/13 85/14 92/11 92/16 93/3 93/20 95/6 103/1 103/2 106/17 111/1 111/5 129/23
**slides [9]** 52/14 57/12 58/6 90/24 91/1 91/5 93/22 98/22 113/19
**slightly [1]** 65/9
**slipped [1]** 131/7
**slow [1]** 42/12
**small [2]** 45/13 73/7
**smaller [1]** 64/21
**so [136]** 5/16 7/21 9/9 13/6 13/15 14/16 14/23 15/4 15/9 17/20 18/23 20/8 20/15 20/16 21/25 23/12 23/16 25/5 26/7 26/15 31/4 31/22 33/1 35/3 35/22 36/10 45/22 47/13 48/12 49/1 54/23 54/24 56/21 56/25 57/3 57/22 61/24 64/17 64/21 65/24 68/1 68/23 69/14 70/2 70/10 71/6 72/17 72/22 72/24 72/25 73/1 73/4 73/5 73/18 75/2 78/13 81/18 81/19 83/3 84/2 84/9 85/10 87/14 88/15 91/7 97/13 99/7 104/15 104/21 104/22 109/12 109/21 109/25 112/19 117/12 117/25 118/21 118/23 119/5 119/6 119/9 119/15 119/19 120/14 120/20 120/23 121/19 122/2 122/11 122/14 122/17 122/20 122/25 124/16 124/21 124/21 125/1 125/8 125/12 125/19 125/23 125/25 126/23 128/13 128/19 128/24 129/3 129/9 129/10 130/3 130/5 130/19 130/20 130/21 130/21 131/1 134/4 134/20 135/1 136/1 136/5 136/8 136/22 137/9 139/1 139/2 139/10 140/7 140/18 142/9 142/14 143/2 143/7 145/4 145/9 145/13
**soap [1]** 131/4
**society [3]** 45/13 45/15 46/16
**software [1]** 7/20
**solely [1]** 16/14
**solution [2]** 49/4 49/4

S


**solve [3]** 58/15 64/6 64/13
**solvency [1]** 4/1
**some [36]** 4/1 5/21 7/2 7/3 28/8 29/16 39/11 39/19 39/21 42/20 43/5 50/13 51/7 55/8 55/8 63/4 67/25 68/1 70/25 91/2 91/20 92/24 93/6 93/18 98/12 107/11 108/21 108/24 109/6 120/23 125/7 127/5 135/24 139/10 139/11 139/12
**some-odd [1]** 93/6
**somebody [3]** 22/12 125/19 137/14
**someone [5]** 6/9 12/25 17/21 71/6 94/13
**something [12]** 23/9 38/14 58/14 59/8 61/17 61/18 98/1 98/21 98/22 107/1 121/11 141/8
**sometime [1]** 117/22
**sometimes [2]** 44/7 125/8
**somewhere [1]** 34/17
**sorry [9]** 30/24 41/2 48/24 77/15 114/1 120/13 121/18 141/9 142/2
**sort [6]** 8/16 13/10 15/12 34/24 63/8 140/25
**sought [1]** 43/10
**sound [1]** 141/25
**sounds [2]** 33/6 33/15
**source [1]** 71/16
**sources [5]** 29/16 89/15 90/1 123/14 129/22
**SOUTHERN [1]** 1/1
**sp [1]** 134/18
**space [2]** 7/10 7/17
**sparring [2]** 44/11 44/13
**speak [1]** 31/22
**speaking [1]** 121/4
**specialist [2]** 74/6 74/21
**specialized [10]** 21/20 23/12 23/20 23/22 24/2 24/4 24/11 24/21 25/2 25/5
**specializing [1]** 117/20
**specific [6]** 6/5 28/18 104/6 120/21 122/23 128/22
**specifically [6]** 28/4 33/13 37/7 43/2 50/23 57/6
**spend [1]** 56/25
**spent [1]** 93/14
**spotlight [1]** 47/8
**spring [6]** 72/7 78/11 82/12 83/5 88/4 88/5
**SRI [1]** 69/4
**SSI [5]** 42/14 42/20 45/24 73/6 74/4
**St [5]** 77/11 77/11 77/13 78/1 78/8
**staff [1]** 75/16
**staffing [1]** 121/10
**stage [1]** 56/9
**stand [6]** 3/4 40/24 89/1 116/23 117/6 117/7
**standard [8]** 6/1 6/10 9/1 22/20 27/4 121/22 122/23 144/19
**standardized [4]** 69/25 72/4 76/21 76/24
**standardly [1]** 77/5
**standards [3]** 119/7 122/18 128/15
**standing [1]** 48/14
**standpoint [1]** 97/13
**star [1]** 16/11
**stark [1]** 85/1
**start [1]** 74/14
**started [4]** 117/25 118/19 123/4 123/4
**starting [1]** 73/10
**starts [1]** 114/6
**state [6]** 46/25 70/1 70/4 70/5 70/11 111/3
**stated [1]** 115/2
**statement [1]** 93/14
**statements [2]** 51/8 107/14
**states [5]** 1/1 1/12 15/21 47/5 98/23
**stating [1]** 9/1
**statistical [6]** 15/11 15/13 23/25 24/6 88/13 88/15
**statistically [3]** 22/9 88/24 99/17
**statistics [10]** 5/14 5/20 6/6 11/25 12/8 14/13 22/20 24/8 41/25 57/4
**status [1]** 74/17
**stay [1]** 84/8
**step [10]** 27/18 29/15 41/1 44/21 56/4 56/12 56/14 82/10 82/10 134/4
**steps [2]** 54/21 54/21
**stick [1]** 5/7
**still [15]** 10/11 21/8 22/9 37/14 67/22 68/7 79/10 82/12 93/6 95/20 107/13 108/7 118/2 130/24 131/1
**Stipes [2]** 2/7 145/23
**stipulation [1]** 134/14
**stop [1]** 138/9
**stopped [3]** 82/12 103/8 103/13
**stories [1]** 115/3
**street [3]** 1/18 2/4 57/19
**strength [1]** 54/14
**strengths [2]** 48/19 51/9
**strike [3]** 29/21 30/20 92/19
**strive [1]** 127/25
**stroke [2]** 120/9 122/11
**strongly [4]** 54/9 63/15 100/11 104/21
**structural [19]** 49/20 50/1 50/3 50/15 52/25 54/4 54/8 54/11 56/6 66/17 67/4 67/11 68/12 69/24 73/4 76/16 79/16 112/5 112/6
**structures [1]** 59/23
**STS [1]** 120/6
**student [7]** 62/3 62/7 63/12 65/2 65/4 100/16 100/19
**students [7]** 56/20 56/22 56/25 57/2 62/4 110/11 110/13
**studied [1]** 21/22
**studies [6]** 56/23 58/18 58/18 58/19 116/13 130/13
**study [4]** 57/9 82/24 83/12 111/25
**stuff [1]** 6/5
**subject [4]** 11/4 19/7 23/4 69/19
**submission [2]** 123/24 125/21
**submit [8]** 86/14 123/25 125/1 126/9 126/12 129/22 142/18 142/20
**submitted [7]** 23/3 25/21 33/7 109/17 110/3 123/15 126/14
**submitting [5]** 122/3 123/4 123/12 123/13 128/14
**subsection [1]** 122/19
**substantial [5]** 9/11 9/11 26/22 26/24 27/5
**substantive [1]** 139/7
**such [12]** 6/3 6/5 6/6 6/10 12/19 24/8 35/11 45/2 46/9 59/25 134/17 135/15
**suffer [1]** 134/24
**suffered [1]** 133/12
**sufficient [4]** 14/2 78/15 79/5 80/12
**sufficiently [1]** 5/15
**suggest [1]** 59/22
**suggested [3]** 114/8 136/4 136/4
**Suite [2]** 1/22 2/4
**summarize [2]** 46/14 69/1
**supplemental [1]** 33/7
**suppliers [1]** 7/25
**support [4]** 38/18 90/4 90/7 134/20
**supported [1]** 81/20
**suppose [2]** 23/11 136/12
**supposed [1]** 43/22
**sure [24]** 3/12 5/25 22/9 22/16 22/17 22/20 22/24 24/3 24/6 24/13 31/3 48/15 50/20 59/19 60/7 70/5 81/1 86/12 113/16 120/14 130/14 134/8 136/25 143/20
**surgeon [2]** 34/10 34/20
**surgeons [4]** 34/5 34/11 34/19 35/2
**surgeries [4]** 6/18 34/6 34/11 73/8
**surgery [4]** 50/9 72/20 120/6 120/7
**surgical [3]** 40/10 42/14 47/2
**surprise [1]** 85/4
**surprised [1]** 92/7
**surprising [1]** 68/4
**survey [124]** 16/14 28/25 29/12 57/14 57/18 57/24 59/6 59/15 60/11 60/21 60/22 61/1 61/8 63/13 63/16 63/17 63/19 63/24 69/12 69/19 70/4 70/7 70/12 72/1 72/3 72/8 80/9 80/19 81/7 81/16 82/18 83/1 83/23 83/25 84/10 84/12 84/18 84/22 84/23 86/2 86/3 86/11 86/14 89/25 90/2 91/12 91/17 91/20 92/2 93/12 94/4

**S**

**survey... [73]** 94/10 95/2 95/13 95/22 96/18 97/2 97/9 97/11 98/9 99/1 99/2 99/3 99/5 99/8 99/15 99/22 99/23 99/24 100/2 100/9 100/11 100/25 101/3 101/21 103/4 103/17 105/2 105/7 105/11 105/15 105/19 106/5 106/8 107/18 107/20 108/11 108/22 109/1 115/4 115/8 115/9 115/12 118/17 118/20 119/2 119/3 119/8 119/12 119/19 121/14 121/18 121/23 122/1 122/19 122/21 123/9 123/22 124/3 124/6 124/10 124/15 124/15 125/1 125/15 126/12 127/6 127/19 128/3 128/11 128/14 129/1 129/19 144/16
**surveys [5]** 58/18 106/19 114/24 122/4 126/16
**sustain [1]** 97/23
**sworn [3]** 3/5 41/6 117/9
**SYDNEY [1]** 1/16
**system [17]** 53/1 54/3 117/18 118/10 118/11 118/19 119/4 119/16 119/20 121/1 125/20 126/7 126/21 126/22 128/3 129/25 133/6
**systems [10]** 7/4 7/14 7/19 7/20 7/20 7/25 10/23 53/24 54/11 121/20

**T**

**table [1]** 49/14
**Takagaki [2]** 17/3 37/24
**take [26]** 14/25 15/7 15/16 22/11 22/13 41/2 44/6 56/3 62/4 62/23 74/24 76/9 96/16 100/16 102/2 102/12 108/5 108/11 109/7 111/20 115/23 116/10 121/23 125/25 139/14 139/19
**taken [3]** 41/3 116/19 140/5
**takes [1]** 87/9
**taking [5]** 64/24 66/14 90/2 100/22 115/6
**talk [14]** 19/16 28/4 35/11 43/14 49/19 55/2 56/9 57/6 77/8 119/2 120/19 126/1 127/10 131/13
**talked [8]** 10/11 23/24 42/19 46/19 62/4 66/17 74/1 126/19
**talking [20]** 16/22 17/15 28/2 37/4 37/7 57/1 58/22 65/9 85/12 87/15 89/12 93/15 102/25 106/6 106/7 109/10 125/25 127/10 128/13 140/12
**talks [2]** 9/11 141/17
**tangent [1]** 58/17
**teach [9]** 56/20 56/22 57/3 57/3 57/5 110/10 110/15 110/15 110/16
**teacher [1]** 62/13
**teaching [2]** 65/1 75/5
**team [4]** 42/16 50/13 120/6 129/17
**tell [12]** 7/13 31/19 49/9 50/18 61/1 61/19 62/19 84/19 86/21 124/12 127/9 129/20
**telling [1]** 72/7
**tells [2]** 30/4 79/7
**ten [14]** 41/2 49/24 52/20 70/1 70/6 70/10 70/14 71/3 71/6 72/2 98/21 112/7 122/3 128/14
**Tenet [3]** 117/22 117/24 118/22
**term [4]** 27/20 42/8 59/2 114/19
**terminated [1]** 34/22
**terminology [3]** 44/13 59/20 103/11
**terms [10]** 10/5 43/7 43/11 44/10 44/23 58/8 70/16 98/22 130/1 131/8
**test [10]** 62/5 62/8 62/9 62/12 63/12 64/24 65/1 100/16 100/22 100/23
**tested [1]** 21/22
**testified [24]** 4/6 4/13 31/4 34/2 34/5 34/10 34/19 36/16 49/22 56/12 58/24 82/3 89/5 93/9 94/9 94/11 94/23 96/1 96/5 102/1 108/13 110/9 111/9 134/18
**testify [2]** 48/8 143/8
**testifying [6]** 15/2 141/24 142/5 142/6 142/7 142/25
**testimony [41]** 3/18 29/18 30/17 36/18 37/3 37/5 37/8 37/9 39/19 48/10 48/12 51/18 51/23 81/12 81/24 82/17 82/21 83/7 86/6 88/18 88/25 89/22 92/20 104/4 105/9 114/16 114/23 114/25 117/3 134/21 135/24 136/2 136/10 136/16 136/19 137/16 137/21 140/8 140/13 141/14 142/21
**testing [2]** 13/13 144/19
**texted [1]** 140/6
**than [34]** 30/5 30/8 47/2 57/8 57/16 58/4 60/12 65/6 65/24 68/6 70/6 73/2 73/19 79/8 79/15 79/23 80/3 88/1 93/5 93/6 94/8 98/7 98/14 99/6 99/12 99/19 102/23 103/14 104/5 108/8 109/11 119/19 128/11 136/23
**thank [42]** 3/9 37/21 38/4 39/10 40/20 40/21 40/22 48/13 50/17 52/5 56/19 70/21 71/18 71/20 78/6 80/15 81/21 84/25 87/14 89/9 98/3 100/12 108/16 113/4 116/8 116/9 117/12 119/18 120/19 121/6 124/1 131/16 131/21 133/21 138/2 138/22 140/3 140/4 144/6 144/23 145/14 145/17
**that [929]**
**that's [4]** 18/8 36/21 125/10 129/9
**the and [1]** 12/9
**the infection [1]** 50/9
**the personnel [1]** 60/23
**their [82]** 5/12 5/24 6/17 8/8 8/22 9/24 9/25 14/1 16/11 16/14 21/23 27/17 28/1 30/9 31/5 34/7 39/4 39/21 40/16 43/10 48/3 56/4 56/5 58/1 59/11 60/13 60/25 61/20 63/19 65/20 65/21 66/4 68/5 69/3 69/3 69/4 69/12 69/23 72/22 75/3 75/5 75/11 75/21 76/7 77/19 77/19 77/21 78/3 78/22 81/23 82/24 93/4 93/13 93/23 94/6 95/9 99/16 100/10 101/13 103/8 103/13 103/16 103/23 104/10 104/11 104/12 104/14 108/9 110/18 112/15 112/21 116/2 116/4 117/23 119/25 122/21 128/18 129/11 137/16 138/17 139/24 140/14
**them [70]** 9/24 16/19 21/2 21/9 22/11 24/3 28/22 29/16 33/1 33/1 33/20 33/22 45/8 45/10 46/3 46/4 48/2 52/1 55/8 56/21 56/23 57/3 57/3 59/13 60/14 63/22 65/22 65/23 65/24 67/20 67/25 68/1 68/2 68/6 68/7 70/9 70/25 75/20 77/5 78/15 79/5 79/10 80/13 80/19 84/23 86/17 89/22 90/13 90/14 92/15 92/24 92/24 93/5 105/23 105/24 108/4 108/8 110/14 110/15 110/16 110/16 114/11 118/15 125/20 133/12 134/9 134/23 136/7 136/7 142/16
**themes [1]** 107/12
**themselves [5]** 20/22 22/19 124/5 124/10 126/4
**then [35]** 10/17 12/6 16/6 23/2 23/9 29/23 31/13 33/22 41/22 43/21 58/7 59/11 59/16 60/9 67/21 67/22 69/13 74/14 76/25 77/2 81/17 86/12 92/23 113/20 114/2 116/12 117/21 117/24 121/23 124/1 129/22 130/5 135/19 143/4 143/10
**theory [7]** 10/9 71/23 72/6 88/18 98/5 98/6 107/5
**there [129]** 3/24 6/1 7/17 7/23 7/24 10/9 10/14 11/3 11/5 11/9 12/7 12/8 13/1 15/3 16/18 17/23 18/25 19/3 19/14 20/13 20/21 21/3 21/5 22/7 22/15 23/21 26/4 26/14 27/3 28/13 28/22 28/24 29/11 30/16 30/16 33/21 38/1 38/5 40/3 40/4 40/6 44/8 44/13 44/13 44/16 44/16 44/19 45/5 46/13 47/21 53/14 54/10 56/24 57/15 58/20 61/11 61/15 61/24 62/8 63/8 65/11 65/17 66/5 66/10 68/7 70/6 70/10 71/8 71/11 72/3 75/18 76/21 76/25 77/2 77/9 79/19 80/21 85/25 89/11 91/2 91/4 91/7 96/9 96/13 96/20 98/12 99/22 100/10 102/1 104/7 105/23 107/15 108/10 108/17 108/22 108/24 108/24 109/7

T

**there... [31]** 109/18 110/4 110/5 112/22 114/12 114/14 118/21 119/22 120/9 120/10 120/23 122/11 123/11 123/17 124/23 124/24 125/24 126/3 126/3 126/7 126/7 127/5 127/18 129/6 129/15 129/20 129/22 130/3 138/25 141/13 144/17
**there's [2]** 121/20 138/16
**therein [1]** 5/13
**Thereupon [3]** 41/3 116/19 140/5
**these [80]** 5/10 5/24 6/17 8/9 8/15 8/19 9/23 10/6 11/9 11/21 12/19 13/17 16/8 16/9 19/2 40/12 42/19 44/2 45/25 48/2 51/11 55/12 59/23 60/11 60/16 61/23 65/18 67/10 67/15 68/16 68/19 68/20 68/25 69/13 69/22 70/1 70/3 70/6 70/14 72/2 73/1 73/6 73/15 74/25 79/22 80/12 81/8 81/23 81/24 82/3 82/7 84/17 84/21 85/2 86/6 89/14 93/22 95/13 96/9 98/6 99/4 100/2 107/10 107/10 107/11 107/23 107/24 108/7 110/10 110/20 110/22 111/9 115/25 119/15 120/14 120/20 125/7 134/10 134/25 141/11
**they [326]**
**they're [1]** 120/2
**thing [13]** 22/8 56/22 63/22 67/18 69/25 75/3 91/21 103/10 108/5 112/7 115/13 115/14 121/25
**things [8]** 46/1 51/3 101/24 107/18 108/7 119/15 129/21 144/17
**think [55]** 18/14 19/1 19/18 20/7 23/24 29/2 31/4 37/4 42/5 59/8 60/1 61/12 62/16 62/25 65/19 67/2 67/22 68/2 68/3 70/9 92/8 97/16 97/24 98/21 99/7 99/19 101/16 107/11 107/22 110/9 110/21 111/17 112/8 116/14 116/15 119/16 123/11 126/7 127/10 127/25 129/9 131/10 131/13 134/24 136/7 136/14 136/22 140/20 142/23 143/2 143/23 144/17 144/18 144/20 145/6
**thinking [2]** 10/16 144/15
**thinks [2]** 112/16 115/22
**third [3]** 51/25 69/7 77/14
**Thirteen [1]** 143/16
**this [191]**
**thoroughly [1]** 114/4
**those [88]** 4/4 4/6 4/8 4/13 6/8 6/22 8/5 8/8 8/11 8/16 8/21 10/11 14/13 14/14 14/23 15/9 15/16 16/6 20/21 23/14 23/18 24/9 29/1 29/19 29/23 31/9 31/24 32/13 32/25 33/12 33/20 34/10 34/10 34/19 35/7 35/23 39/22 41/23 42/20 43/5 43/7 45/6 47/22 50/12 52/25 53/9 53/20 54/6 57/23 61/12 61/19 62/3 65/5 65/8 65/16 67/14 70/14 70/17 72/13 72/14 73/11 73/19 75/1 75/24 76/3 76/6 76/12 80/5 85/9 86/13 87/1 88/15 88/24 90/10 90/18 94/15 101/15 107/2 108/22 109/21 114/3 115/22 116/2 118/13 118/16 120/25 134/21 135/4
**though [8]** 30/22 50/5 65/21 79/23 80/18 86/8 127/17 129/19
**thought [8]** 58/5 62/18 67/2 67/5 79/9 80/8 82/9 141/24
**thousands [1]** 58/21
**threats [1]** 56/24
**three [29]** 4/24 17/9 29/8 29/19 29/23 31/6 31/12 31/13 41/24 51/21 52/21 54/6 60/24 66/10 66/21 66/25 67/3 67/5 76/10 85/13 86/25 87/1 87/5 87/8 93/4 104/7 106/22 122/5 123/1
**through [13]** 9/9 16/8 39/4 84/9 85/10 95/5 106/21 110/14 110/18 120/20 123/22 134/6 144/13
**throughout [3]** 97/9 97/15 140/12
**thus [1]** 69/19
**tie [1]** 107/12
**ties [2]** 92/5 105/23
**time [31]** 40/23 53/16 54/17 58/16 60/17 60/22 61/20 78/3 83/10 94/3 94/14 100/3 107/23 107/25 108/4 113/17 114/1 116/14 116/18 118/24 121/19 121/22 124/13 129/18 133/22 135/17 138/9 138/13 139/14 143/25 144/9
**times [7]** 4/6 4/12 54/20 75/19 98/7 122/1 123/23
**to respond [1]** 81/17
**to solve [1]** 64/6
**today [11]** 4/23 39/6 45/7 52/16 53/8 53/16 70/17 113/11 114/5 114/23 134/22
**together [1]** 95/10
**told [7]** 34/17 62/11 88/23 123/17 139/15 139/15 141/6
**tomorrow [6]** 134/5 134/23 135/18 139/6 139/7 145/4
**too [4]** 41/1 58/4 63/4 99/8
**took [12]** 14/8 15/19 16/13 18/4 21/25 22/24 26/6 55/25 60/23 67/13 137/8 140/21
**tool [2]** 106/12 120/1
**tools [7]** 119/19 119/23 120/9 120/14 120/17 120/21 120/25
**top [1]** 89/4
**topic [1]** 4/17
**total [2]** 92/13 136/23
**towards [1]** 73/11
**track [2]** 42/13 121/11
**tracked [1]** 116/2
**tracking [3]** 120/25 121/3 121/7
**trade [3]** 100/2 138/18 138/20
**training [3]** 41/18 117/14 117/18
**transactions [1]** 7/9
**transcript [19]** 52/13 53/18 57/12 57/22 58/6 91/6 91/7 91/8 91/8 91/9 91/13 91/19 91/23 113/5 113/20 114/22 115/3 140/25 145/19
**transcripts [1]** 91/1
**transfer [1]** 33/18
**transferred [1]** 62/23
**transitioned [1]** 117/21
**transparency [1]** 129/10
**transparent [4]** 124/18 125/14 125/19 129/9
**transparently [1]** 43/20
**transplant [1]** 122/10
**trauma [9]** 74/3 74/17 75/4 75/12 102/3 120/3 120/4 120/6 122/9
**treated [2]** 98/7 104/4
**treating [1]** 87/25
**trend [1]** 12/15
**trends [1]** 40/3
**trial [15]** 1/11 4/6 4/23 33/24 53/9 109/10 134/7 134/14 135/10 138/16 141/19 141/20 142/8 142/24 142/25
**trials [2]** 109/9 109/12
**tried [10]** 52/19 53/15 64/8 67/18 69/5 71/16 95/17 98/25 98/25 115/5
**tries [1]** 71/6
**trouble [1]** 63/5
**true [11]** 23/6 25/6 25/8 99/2 111/7 121/24 122/15 125/9 128/4 136/16 137/21
**truly [2]** 126/8 126/13
**trust [1]** 131/2
**trustworthiness [2]** 96/11 96/13
**truth [33]** 43/12 44/19 54/22 56/24 57/7 57/10 58/5 58/7 58/9 58/12 58/22 62/15 67/5 67/19 67/23 80/17 81/12 83/8 88/21 89/3 89/22 89/24 92/21 93/17 93/18 93/19 93/19 94/16 97/16 105/25 110/21 114/12 114/17
**truthful [1]** 82/22
**try [16]** 42/9 42/16 46/14 51/6 51/19 52/1 54/22 55/20 62/17 81/12 97/12 109/17 111/25 136/24 137/22 137/25
**trying [27]** 40/5 44/18 45/25 45/25 56/9 58/22 64/6 70/2 80/16 87/6 88/20 88/22 89/20 89/22 89/24 97/8 97/9 99/11 100/19 102/5 107/22 110/19 119/9 130/11 130/12 142/9 144/21
**turn [9]** 14/4 25/16 27/7 33/3 92/10 130/6 130/11

## T


**turn... [2]** 130/12 131/15
**turned [1]** 6/22
**turning [2]** 98/5 130/6
**two [20]** 7/16 9/23 17/11 37/15 43/16 51/22 54/21 56/12 56/14 56/24 81/4 97/3 106/22 107/9 116/12 117/23 125/8 130/17 142/19 143/18
**type [17]** 3/21 8/1 9/19 9/21 10/8 13/6 13/7 13/8 13/13 13/14 13/17 18/13 18/19 22/13 35/25 39/9 115/10
**types [12]** 6/8 7/21 7/22 8/5 8/8 8/9 9/23 19/2 54/6 75/1 110/10 120/16
**typical [2]** 111/11 144/14
**typically [1]** 3/24


## U


**U.S [2]** 79/14 140/14
**ugly [2]** 129/4 129/15
**ultimate [2]** 43/12 113/12
**ultimately [5]** 5/14 14/24 15/5 134/17 135/14
**under [15]** 9/1 30/21 50/25 61/24 63/23 63/24 64/11 82/22 97/25 125/18 134/13 137/9 139/5 139/18 141/18
**underneath [1]** 78/19
**understand [37]** 8/22 10/1 13/6 13/9 14/8 15/23 17/15 24/13 24/14 24/14 24/17 24/19 36/20 36/22 54/2 56/21 59/2 66/1 82/7 82/13 83/14 84/16 87/3 87/12 87/23 88/22 89/20 95/14 95/24 101/16 102/5 123/5 124/8 124/11 124/19 125/23 140/18
**understandable [1]** 69/1
**understanding [24]** 8/6 8/21 8/24 8/25 9/3 9/17 21/23 23/8 25/19 27/1 27/11 27/12 27/21 35/2 36/13 36/24 46/3 52/19 62/1 66/24 70/10 114/21 123/21 137/11
**Understood [1]** 31/17
**undertake [4]** 6/2 13/12 13/20 96/24
**undertook [5]** 14/16 14/19 16/13 95/9 97/3
**unfair [3]** 138/18 138/20 143/23
**unfortunately [2]** 63/10 109/14
**unfunded [1]** 127/15
**unhelpful [1]** 141/8
**Unintelligible [2]** 121/4 133/24
**UNITED [4]** 1/1 1/12 15/21 98/23
**University [6]** 3/13 3/14 41/11 41/21 42/1 42/2
**unless [1]** 145/10
**unlike [1]** 87/25
**unlikely [1]** 75/22
**unqualified [1]** 141/7
**unreliable [1]** 141/8
**unsupported [3]** 23/16 38/23 98/5
**until [1]** 139/20
**up [36]** 55/9 60/15 62/4 62/7 62/12 62/17 63/12 66/4 67/25 68/20 71/18 72/8 72/16 72/17 73/14 80/1 80/4 80/6 88/7 89/4 92/11 92/16 94/22 96/9 103/1 106/11 108/5 110/17 110/25 112/22 115/23 121/20 122/20 125/5 140/18 144/9
**update [1]** 139/2
**upshot [1]** 20/20
**urinary [1]** 42/13
**us [10]** 48/7 122/2 122/6 123/24 127/21 131/2 131/2 131/11 131/11 136/3
**use [14]** 13/14 28/19 29/19 31/11 45/23 51/24 58/14 58/16 61/18 70/1 101/25 119/20 140/11 142/21
**used [25]** 27/20 28/14 28/17 28/19 28/21 29/7 36/19 36/23 39/15 46/20 50/23 51/4 58/17 59/19 59/20 59/20 63/6 66/18 71/8 76/20 92/8 96/8 106/25 107/15 116/2
**user [2]** 144/14 144/19
**uses [5]** 20/12 27/9 29/11 59/2 76/23
**using [10]** 36/5 37/16 44/13 56/4 75/19 80/24 102/20 110/5 110/7 120/5
**usually [1]** 38/14
**utilize [4]** 119/25 119/25 120/10 143/3


## V


**valid [2]** 108/24 109/16
**validates [1]** 123/12
**validation [3]** 126/12 126/16 126/18
**validity [1]** 95/19
**valuation [1]** 4/1
**value [5]** 12/5 13/4 14/13 14/17 127/18
**values [3]** 16/21 16/22 88/13
**Vandenberg's [1]** 136/9
**variables [3]** 59/19 75/1 102/3
**variants [1]** 109/21
**variety [4]** 11/5 12/8 12/14 40/5
**various [4]** 7/16 58/23 63/14 83/16
**veil [1]** 4/2
**vendors [1]** 127/3
**verbal [1]** 91/5
**verification [4]** 123/9 123/11 123/21 124/10
**verify [2]** 123/15 126/6
**Verndenberg [2]** 134/18 144/4
**Verndenberg's [1]** 135/18
**version [1]** 68/6
**versus [4]** 6/22 9/6 40/16 67/3
**very [24]** 12/6 12/22 14/21 14/22 15/14 42/8 42/19 43/16 46/2 54/12 64/7 67/18 69/18 71/7 71/9 112/4 118/21 125/19 127/9 129/9 130/19 131/12 131/14 143/6
**viability [1]** 7/11
**viable [1]** 108/7
**Vice [6]** 117/17 118/4 118/5 118/8 126/20 129/13
**video [12]** 117/2 133/23 134/5 138/4 138/5 138/10 138/11 140/9 144/3 144/4 144/5 144/9
**videos [4]** 116/12 116/16 134/1 134/10
**view [3]** 14/17 15/13 50/16
**views [2]** 5/2 141/11
**Vincent [1]** 77/13
**Vincent's [3]** 77/11 78/1 78/9
**visit [2]** 48/2 121/21
**visited [3]** 132/19 132/22 132/25
**visits [1]** 6/18
**voice [4]** 112/8 112/10 112/14 113/2
**voluntary [5]** 80/8 93/16 100/25 111/21 123/13
**vote [2]** 44/3 44/4
**voted [1]** 43/25
**voting [1]** 44/8
**vulnerable [1]** 127/15


## W


**wait [1]** 51/13
**waiting [1]** 101/24
**walk [3]** 35/12 35/13 35/13
**walk-ins [3]** 35/12 35/13 35/13
**walked [1]** 95/5
**walks [1]** 121/22
**want [45]** 5/7 9/23 14/4 17/7 19/16 22/1 25/16 27/7 33/3 35/11 35/16 35/21 40/5 46/19 56/16 56/23 60/4 63/6 63/23 64/24 70/5 77/5 88/11 110/14 112/11 113/14 116/22 116/23 119/2 119/16 126/20 131/1 131/2 132/10 132/13 136/7 137/3 137/25 139/3 142/8 143/3 145/5 145/10 145/10 145/11
**wanted [4]** 18/7 22/12 23/18 139/3
**wants [2]** 5/25 137/7
**was [143]** 4/13 4/22 4/24 5/1 5/13 5/14 5/17 5/20 6/11 6/13 13/1 14/13 15/23 16/14 17/20 18/7 19/5 20/23 22/7 22/9 22/15 22/16 22/17 24/6 24/7 25/3 25/23 26/9 26/11 26/16 26/17 27/3 33/4 33/14 33/21 33/21 33/22 34/9 36/22 38/5 38/9 38/12 38/15 39/25 40/16 40/17 41/3 42/9 43/18 43/21 43/23 44/4 44/7 44/8 44/9 45/15 46/2 46/3 46/13 46/16 46/20 47/3 49/3 50/22

**was... [79]** 50/24 51/5 53/5 53/13 53/14 53/16 56/13 57/22 58/3 58/3 58/5 60/20 60/21 61/21 63/21 64/23 66/3 66/13 67/3 67/4 67/18 68/24 71/15 71/16 72/16 80/8 80/14 81/23 82/9 82/22 82/25 85/10 91/2 91/2 92/3 96/1 96/4 96/20 96/25 97/4 97/8 97/11 99/6 102/25 107/8 107/22 108/9 109/8 112/2 113/12 113/18 114/10 115/3 115/6 115/7 116/19 117/19 118/4 118/23 122/2 123/3 123/18 123/21 125/23 125/25 129/19 130/1 130/19 135/6 135/16 135/18 137/16 140/5 140/18 141/3 141/24 142/24 142/25 142/25
**was designated [1]** 141/3
**washing [7]** 103/8 103/13 103/19 103/23 104/1 104/2 144/16
**Washington [1]** 1/19
**wasn't [3]** 7/20 20/23 88/6
**way [42]** 18/14 28/9 30/3 34/18 39/5 40/1 43/20 45/22 48/22 49/3 51/20 54/2 54/19 57/14 57/18 63/7 66/3 66/4 72/4 72/19 80/20 88/13 88/16 88/24 89/3 92/6 98/10 99/8 102/2 102/17 109/18 110/4 110/17 112/2 119/20 122/20 124/18 125/24 126/3 128/5 128/16 128/17
**ways [5]** 43/6 61/14 69/2 105/24 115/16
**we [268]**
**we'd [2]** 44/5 49/10
**We'll [1]** 117/2
**we're [5]** 119/9 120/19 122/24 139/5 139/7
**we've [3]** 121/13 127/7 140/12
**weaknesses [1]** 48/19
**website [9]** 30/4 52/15 79/7 80/4 90/11 90/14 129/2 140/11 142/11
**websites [1]** 141/11
**week [1]** 59/20
**weeks [2]** 26/7 97/3
**weigh [1]** 109/23
**weight [2]** 14/20 20/19
**weighted [5]** 14/21 15/4 24/7 87/2 108/8
**weighting [3]** 14/18 22/21 22/21
**weights [3]** 15/4 32/25 87/10
**well [36]** 3/14 5/12 11/2 24/14 31/4 31/16 47/5 62/10 63/9 66/8 67/2 68/9 70/2 86/5 86/10 107/19 109/6 111/9 111/16 115/14 118/21 119/8 119/22 122/2 123/14 127/7 130/3 136/24 137/7 137/13 137/20 138/9 139/9
140/9 142/2 142/18
**went [5]** 3/12 22/16 35/7 41/21 87/1
**were [103]** 5/9 6/17 6/20 6/22 7/22 8/19 10/15 11/20 17/15 22/18 24/8 25/21 31/20 33/19 34/7 34/11 36/20 36/24 37/10 37/15 40/17 43/19 44/16 45/5 45/5 45/25 46/1 46/10 46/12 47/2 47/9 49/5 50/2 50/5 50/6 50/8 50/8 50/19 53/3 53/6 53/12 53/14 53/21 57/13 57/14 59/10 60/23 60/24 61/15 62/23 63/19 63/19 63/21 63/22 63/24 65/9 66/14 67/4 69/19 70/7 70/10 71/8 76/14 78/11 81/18 81/19 82/4 82/7 82/8 82/16 90/17 91/3 91/4 92/3 94/6 97/20 97/22 99/21 100/15 101/19 102/22 103/15 107/11 108/21 115/10 115/16 115/22 118/23 130/3 130/4 130/4 130/9 130/11 130/12 130/15 130/18 130/23 131/14 131/14 138/25 138/25 141/7 141/19
**weren't [10]** 33/23 33/23 39/20 58/24 62/9 62/10 82/15 82/17 90/17 92/2
**WEST [5]** 1/2 1/8 2/7 122/5 132/22
**what [219]**
**what's [1]** 137/9
**whatever [2]** 48/25 99/10
**when [73]** 16/19 21/6 22/17 25/21 25/23 27/9 27/14 28/2 28/12 28/24 29/11 30/5 30/8 30/14 31/1 32/9 43/14 45/5 46/12 46/22 53/14 54/13 55/7 55/9 56/20 56/22 57/12 59/2 59/20 61/20 64/14 71/6 79/8 81/6 81/13 81/14 82/25 83/8 86/2 86/24 87/7 87/14 99/3 99/14 103/4 104/2 105/6 110/12 112/22 118/8 118/19 119/6 119/11 121/7 122/21 122/25 123/3 123/4 125/1 127/10 129/21 129/25 130/11 130/15 130/22 131/6 131/7 131/13 134/18 135/17 135/18 135/19 142/23
**where [41]** 4/13 6/3 7/20 14/19 24/18 26/3 41/19 43/19 46/13 49/7 49/8 49/15 60/15 61/15 63/20 64/15 67/19 67/20 71/16 73/5 76/9 86/21 89/13 89/24 92/23 95/17 95/18 95/24 96/9 100/15 104/22 106/17 109/17 113/6 114/9 114/17 114/18 118/23 123/18 124/22 129/2
**wherein [2]** 134/14 141/6
**whether [41]** 5/10 9/5 9/15 10/6 11/12 13/1 17/20 17/24 26/20 27/3 31/19 32/1 32/8 32/12 32/16 37/25 38/8 39/7 39/25 43/24 46/3 47/25 48/11
51/17 54/7 59/6 70/6 75/3 75/4 91/3 94/18 94/18 94/19 95/20 102/22 109/20 112/11 112/12 115/2 127/24 131/7
**which [76]** 5/14 6/11 7/11 9/9 26/6 28/12 28/16 31/14 40/11 42/7 43/12 45/14 48/17 48/24 50/3 52/1 54/22 54/23 58/2 59/11 59/16 59/17 59/19 60/12 61/13 62/16 62/17 63/11 63/13 63/21 65/20 65/25 66/8 66/17 67/7 67/13 67/17 68/2 68/4 69/5 69/15 69/21 73/4 75/14 75/20 76/25 78/3 86/4 89/12 93/5 93/14 93/16 94/16 99/7 99/20 100/3 102/13 109/9 109/22 112/17 113/18 113/20 113/21 118/6 120/15 122/16 123/11 128/4 129/1 129/10 135/8 136/3 136/4 141/25 143/12 143/22
**while [2]** 135/22 140/21
**who [25]** 34/5 36/13 44/14 44/14 55/8 55/21 62/4 63/16 83/24 86/9 94/13 117/3 117/14 121/24 124/23 126/21 127/16 128/8 128/11 128/17 131/20 135/9 137/16 137/17 141/21
**who's [1]** 55/8
**whole [7]** 34/10 36/20 89/7 90/3 92/7 118/9 129/16
**wholeheartedly [1]** 68/14
**whomever [1]** 127/25
**why [43]** 12/2 12/2 28/22 31/10 31/22 36/11 38/15 41/2 50/4 50/6 53/6 62/12 63/13 66/24 67/7 68/3 70/1 73/4 82/18 84/23 92/15 94/6 94/9 94/16 102/18 104/21 107/22 109/5 112/2 113/2 113/17 115/5 118/21 120/11 120/15 128/2 129/9 129/20 130/4 130/9 130/9 140/1 143/24
**will [41]** 6/11 8/1 12/23 12/24 14/21 16/4 17/14 17/17 19/13 23/7 27/22 48/12 50/20 61/1 64/8 64/17 65/11 67/15 74/10 77/8 81/3 87/20 107/25 115/13 117/5 117/7 128/12 131/4 131/20 133/25 134/6 134/10 134/11 136/18 138/2 139/19 139/20 143/19 143/23 145/4 145/9
**Wilson [1]** 2/3
**wish [1]** 109/8
**withdraw [2]** 39/4 135/7
**withdrawal [2]** 25/25 26/8
**withdrawn [2]** 141/5 142/17
**within [2]** 14/20 39/14
**without [10]** 8/15 18/25 33/1 35/4 72/8 80/12 124/10 142/17 142/18 142/19
**witness [22]** 3/5 4/5 41/6 70/21 97/24 116/12 116/16 117/9 121/4 134/15 134/16 134/17 134/25 135/13 135/15 136/16 137/8 140/18

W

**witness... [3]** 141/17 141/21 142/8
**witnesses [3]** 51/18 134/14 141/20
**wold [1]** 9/10
**won't [2]** 77/8 79/7
**wonder [1]** 131/3
**wondering [1]** 38/15
**WOOD [1]** 2/1
**word [1]** 44/11
**wording [2]** 81/25 105/13
**words [3]** 5/22 15/20 88/21
**work [20]** 7/22 8/2 16/8 19/25 22/1 22/7 22/17 22/23 42/23 44/12 110/18 126/8 128/19 130/17 130/20 130/21 131/1 131/12 132/13 139/1
**workbook [3]** 20/12 21/10 21/11
**worked [3]** 22/21 41/13 126/23
**working [4]** 7/20 42/15 42/15 42/16
**workload [1]** 115/16
**works [2]** 21/24 25/13
**world [2]** 45/13 46/23
**worse [6]** 21/8 49/4 88/1 98/7 98/14 104/5
**worst [3]** 51/20 98/7 99/12
**worth [1]** 61/12
**would [196]**
**wouldn't [8]** 21/22 31/23 35/23 92/8 98/10 109/9 125/11 141/25
**wow [1]** 55/9
**written [1]** 140/25
**wrong [1]** 59/9
**wrote [1]** 91/25

Y

**yeah [2]** 126/10 137/2
**year [14]** 13/13 18/2 34/6 34/7 34/11 35/6 41/16 106/12 111/6 111/6 126/23 126/24 127/19 127/19
**years [32]** 10/16 34/21 41/15 41/24 42/5 42/14 45/18 45/23 45/25 54/9 63/20 69/15 69/15 75/2 75/7 81/16 81/17 82/9 82/25 105/16 109/7 112/8 117/20 117/22 122/3 122/5 125/4 125/8 128/14 132/20 132/23 133/1
**yellow [6]** 69/5 69/8 73/14 73/15 73/18 73/22
**yellows [1]** 69/21
**Yep [1]** 77/15
**yes [180]**
**yesterday [2]** 3/10 135/16
**yet [2]** 44/19 119/2
**you [756]**
**you provide [1]** 3/18
**you'd [1]** 81/3
**you're [1]** 15/2
**you've [1]** 124/2
**your [301]**
**yourself [3]** 42/24 58/19 126/4

Z

**Zambrana [9]** 116/22 117/1 117/7 117/12 117/15 128/2 132/1 132/16 133/18
**zero [1]** 85/4
**zeroes [1]** 72/24
**ZIBAS [1]** 2/2
**zoom [1]** 85/15

# TRIAL TRANSCRIPT
# VOLUME 5

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-CV-80526-MIDDLEBROOKS

**GOOD SAMARITAN MEDICAL CENTER, INC. et al,**

**Plaintiffs,**

vs.

**THE LEAPFROG GROUP,**

West Palm Beach, FL
January 23, 2026

**Defendant.**

BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

FOR THE PLAINTIFFS:

**MARY BETH MALONEY, ESQ.**
**KEVIN SIMMONS, ESQ.**
**SYDNEY A. SCOTT, ESQ.**
**LEE R. CRAIN, ESQ.**
**SCOTT K. HVIDT, ESQ.**
**Gibson, Dunn & Crutcher LLP**
**1700 M Street NW**
**Washington, DC 20036**
202-887-3729

**JEFFREY E. MARCUS, ESQ.**
**Marcus Rashbaum Pineiro & Meyers LLP**
**2 S Biscayne Boulevard**
**Suite 250**
**Miami, FL 33131**
**305-400-4260**

**FOR THE DEFENDANT:**

**KIMBERLY E. BLAIR, ESQ.**
**COURTNEY WOOD, ESQ.**
**JURA ZIBAS, ESQ.**
**MAXWELL BILLEK, ESQ.**
**Wilson Elser Moskowitz Edelman & Dicker LLP**
**161 N Clark Street**
Suite 4500
**Chicago, IL 60601**
312-704-0550

**Official Court Reporter:**

**Pauline A. Stipes**
West Palm Beach/Ft. Pierce, FL
HON. DONALD M. MIDDLEBROOKS
561-803-3434

THE COURT: Good morning, please be seated.

Okay, we are ready for closing arguments. I hope you are okay. Did things work out for you?

MS. MALONEY: I am here and looking forward to presenting and things will be well.

THE COURT: Okay. Don't try to be too heroic, you have excellent colleagues.

MS. MALONEY: And I have the excellent care from one of the five hospitals covering me. All right, your Honor.

Your Honor, first, thank you so much for taking the time and for your court staff for taking the time to really listen and hear all of the evidence and the testimony that we've offered over the past five days.

You know this case isn't about whether Leapfrog's mission is right or wrong. It is really not about whether transparency is good in theory either. It is about whether hospitals -- it is not about whether hospitals should be evaluated. It is about Leapfrog lying to consumers when it tells them it grades honestly and measures hospital safety honestly.

Leapfrog's mission does not excuse fabricating a method. It does not excuse inventing failing scores and it doesn't give Leapfrog the right to tell patients they are twice as likely to die based on made up numbers.

FDUTPA exists to protect consumers from exactly this

kind of deception and unfair conduct.

Leapfrog wants the Court to see his case as a disagreement about methodology, opinion, or disclosure, but the evidence has shown something else. Leapfrog assigns the most severe safety grades in the marketplace without data and it presents the grades as earned safety performance and it mandates grading even when hospitals do not participate.

This case is about Leapfrog telling the public it is doing one thing while it does something entirely different, misrepresenting what its grades actually reflect, and in doing so causing real ongoing harm.

Once those grades are disseminated to the market, to patients, physicians, employers, insurers, and hospitals that requires immediate and tailored injunctive relief.

Before turning to the evidence of what Leapfrog actually does, it is critical to understand the overall message Leapfrog conveys to consumers about what its safety grades mean. Leapfrog does not present its safety grades as tentative, conditional or incomplete. It presents them as reliable indicators of hospital safety, and in doing so -- and in doing so, it identifies three specific guarantees that frame how consumers understand and rely on the grades.

First, Leapfrog leads consumers to believe that its safety grades are supported by data, and that hospitals lacking sufficient data are not graded.

Second, Leapfrog leads consumers to believe that its safety grades reflect actual hospital safety performance, not whether a hospital completed the Leapfrog survey.

Third, Leapfrog leads consumers to believe that the methodology underlying the safety grades is expert approved, peer reviewed, data driven, and objective. Consumers see each of these guarantees clearly, repeatedly, and unambiguously on Leapfrog's consumer web pages, but each of these guarantees is made up.

Now, let's start with Leapfrog's first false guarantee, and that is that its safety grades are supported by data and that hospitals lacking sufficient data are not graded.

Now, Leapfrog conveys that message in multiple ways, reinforcing it on its consumer facing web page. The message is unmistakable, if a grade appears Leapfrog must have enough data to support it. That is a message critical to cultivating trust in Leapfrog's safety grades. On its quote about the grade page, which is on your screen, Leapfrog tells patients exactly why they should trust the safety grades, that they are using hospital survey responses, CMS data, and information from other supplemental data sources.

Leapfrog goes even further on that same page in its claims about the data it uses for its safety grades. It also tells the public that hospitals missing more than six process measures, well, they are not graded at all. It echoes this

message in its so-called expert guiding principles, which states that no grade should be issued if a hospital is missing data for a large number of performance measures.

Together Leapfrog tells consumers that nonparticipating hospital safety grades are steeped in actual performance data, and that if data is missing hospitals will not be graded.

Leapfrog doesn't stop at telling patients that the safety grades are supported by data. It also affirmatively assures the public the grades measure real world hospital performance and a D or F for a non-participating hospital reflects how safely a hospital actually operates, not whether a hospital completed the Leapfrog survey from which it derives the grade.

Leapfrog states on its consumer facing website in no uncertain terms, this is in the frequently asked question section, that the safety grade, quote, "reflects how well a hospital does on safety, not whether they complete the Leapfrog hospital survey." That statement leaves no room for ambiguity. It tells consumers that the safety grade measures actual safety performance, not survey participation.

Leapfrog repeats the same representation on the easily accessible about the grade page that we see on number one, stating that the safety grade is a single letter grade that represents the hospital's overall performance in

keeping patients safe from preventable harm and medical errors. Again Leapfrog tells patients that the grade reflects real world safety outcomes, how well a hospital protects patients from harm.

Leapfrog takes the data narrative one step further by explicitly equating the community hospitals with the worst hospitals, that is right there, that worst hospital score being 15.

On the safety grade page Leapfrog shows the community hospitals with a hand washing score of 15, the same score Leapfrog identifies as the worst hospital score, and then they contrast that with a score of what the best hospitals do, signaling that there is data showing that the community hospitals fail at basic safety practice, and in fact perform at the very bottom of the safety spectrum.

Now, we heard testimony from Dr. Nicholson that that worst hospital score, the only hospitals that received that 5, 15, 15, 25, are non-participating hospitals, those that do not fill in the survey.

We also saw evidence from prior safety grades from 2021 of these same hospitals that just three years before the methodology was changed they were in fact receiving the best hospital score.

As Michael Vredenburgh testified yesterday in our rebuttal case, consumers would likely think the hospitals do

the opposite of what is best, of what best hospitals do because it is a, quote worst hospital.

Leapfrog reinforces the same data driven narrative through gas gauge graphics. For measures labeled declined to report Leapfrog displays a large question mark accurately signaling the absence of data, but for the four imputed measures Leapfrog displays red gauges and labels the hospital, quote, worse than average on those measures. That is that limited achievement, 5, 15, 15, 25.

That visual contrast communicates to patients that data exists for the imputed measures, performance has been measured, it is red instead of yellow or green, and the hospital performed in the bottom metric. It is one of the worst.

You heard both Dr. Berger and Mr. Vredenburgh testify that reasonable consumers viewing these graphics would understand them to reflect actual measure performance, not missing data or false assumptions.

As a brief aside, cites of the trial transcript, because we have up here characterizations of what Dr. Berger and Mr. Vredenburgh said -- well, Mr. Vredenburgh, that is his actual testimony, we have quotes around it.

We have what we believe is exactly what Dr. Berger said, but we do not have exact transcript cites available as I would like to provide to your Honor in closing, however, you

should expect that every reference I make in this presentation will have a citation in our revised findings of fact and conclusions of law, and we will, of course, also include the JX numbers. The JX, PX numbers are all included on these slides which we will hand up at the end.

To drive home the veneer of scientific legitimacy Leapfrog tells consumers it is their guarantee that the methodology was both peer reviewed and approved by Leapfrog's expert panel.

Those representations were designed to reassure customers that the grades were trustworthy, reliable, validated, and on its consumer facing page, that is the FAQ page again, frequently asked questions that consumers may have, Leapfrog tells them expressly and unambiguously that the safety grade methodology has been peer reviewed and calculated, calculated by top patient safety experts under the guidance of a national expert panel.

In other words, Leapfrog conveys to consumers that the safety grades are grounded in data, reflect real world performance and vetted by experts. Those representations were designed to confer scientific legitimacy and invite consumers to trust. They are false.

That doesn't stop Leapfrog from broadcasting nonparticipating hospitals' D and F grades far and wide. To the contrary, Leapfrog, as we saw, deliberately

amplifies these safety grades, pushing them to consumers, employers, and communities before any explanation that might be available on the website can catch up with them.

You heard millions of consumers visit Leapfrog's website each year. They designed the safety grade so that the first and often the only thing the customer sees -- the consumer sees is a single letter grade reinforced by red gas gauges, and Leapfrog tells consumers to rely on that grade when deciding where to receive care. The website is only the starting point.

You heard Ms. Karen Jupiter, Leapfrog's vice president of development, testify and you saw documentary evidence confirming that Leap Frog actively promotes its grades through media outreach, paid advertising, and digital campaigns.

Ms. Jupiter made clear that this dissemination was targeted, it was not generic. Florida, right here, was the focal point of the rollout for the fall 2024 grades. That is long before the five community hospitals filed this lawsuit.

Lauren Bailey similarly testified that Leapfrog used paid Google advertising tied directly to hospital names so that when someone searched for one of the Plaintiff hospitals, what Leapfrog paid to put in front of them was the grade itself, a D or an F without explanation and without context.

That was the screen that Dr. Berger showed you and when you first do the Google search and what first pops up is a

link to the Leapfrog grade and you click on it and it shows the grade for our hospitals surrounded by better grades for other hospitals.

Even after this lawsuit was filed Leapfrog did not pause, it didn't add context, they continued and intensified, essentially doing what everybody was afraid of who buckled under the fear of the new methodology and decided to participate rather than fight. Those targeted Google ads ensured that the grade appeared first. In other words, the express goal was to use the grade to harass the community hospitals.

Indeed, you heard Karen Van Caulil, she was by video, and she is a Leapfrog board member. She testified also that the board didn't review this methodology, but in this context she explained that through the Florida Alliance for Health Care Value, Leapfrog's regional leader in Florida and the group for which Ms. Caulil is CEO, the grades were circulated directly to employers who she admitted in her testimony were consumers, entities that purchased health care and influenced patient choice, again, without methodology or explanation.

Let's go back to the consumer on the website, the one Dr. Berger testified to, and see how the grades spread in practice. Although the grades are initially pushed on Leapfrog's website once released they then travel on their own. They are picked up by local news, radio, TV, you heard Ms.

Montgomery discuss that, online and spread on social media, including platforms -- that's the radio -- including platforms like TikTok where what goes viral is not a footnote, not a methodology, it is the grade alone, the D and the F, and it is the representation that the five hospitals before you are the worst in Florida.

Leapfrog knows this, the system is built around it, the dissemination strategy depends on it. This wasn't passive publication, it was deliberate amplification, and Leapfrog didn't whisper the grades by just putting them on the website, it broadcast them in a targeted manner through its website, through paid ads, through a Florida specific media campaign and ultimately viral media knowing exactly what the public would see and act on.

That is why the consequences were unavoidable. That amplification matters because it ensured that the representations that Leapfrog made are the representations that consumers have ultimately acted upon and that is what we are seeing the hospitals testifying about.

You heard from the hospitals' expert, Dr. Sean Nicholson, consumers do rely on these grades. Indeed, these grades materially influence where consumers seek care. Consumers rely on letter grades as a proxy for safety.

This should come as no surprise. After all, Leapfrog itself tells consumers explicitly and unambiguously that they

should always rely on the safety grade, their website, when making health care decisions. You heard Leah Binder testify that millions of people, consumers have used Leapfrog's grade to make these critical medical choices.

Leapfrog in its annual report even tells the story of Carl Flatly, a patient who urgently needed a hospital, but drove 400 extra miles based solely on the false safety grade. Leapfrog is proud of this, they are proud that patients are wasting precious minutes avoiding hospitals that they claim are less safe. They tout it on their website, but this reliance is entirely undeserved and more important, it is deeply harmful to the patients Leapfrog claims it wants to protect.

The reality is that Leapfrog's representations to the public above the D and F grades that travel far and wide across airwaves and the internet rests on pseudoscience, unfounded assumptions, and arbitrary penalties.

In fall 2004 Leapfrog made a conscious, and as Leapfrog's own employees acknowledged at the time, a drastic decision.

It decided that if a hospital didn't complete its hundreds of pages of so-called voluntary survey responses Leapfrog would assign the lowest possible scores on four measures. That is the 5, 15, 15 and 25. This assignment involved no estimation, no inference, no clinical basis, no calculation.

In fact, as Ms. Danforth admitted on the stand, it was a choice, not a calculation, contrary to what their website says.

THE COURT: Well, they explain that in terms of the non-response bias. What is your response to that? Doesn't that justify the grading scores that they impute?

MS. MALONEY: No, sir, it does not and the reason it doesn't justify it is because the non-response bias is based on an assumption that has -- the non-response bias that Leapfrog assumes is that the hospitals are not participating because they are hiding something. That is what you heard from Dr. Romano in response to a question on cross-examination, and then Ms. Danforth doubled down on that and said, yes, we think they are hiding something and that is part of the imputation.

We also had Dr. Harris say the same thing, that he thought hospitals that didn't fill in the survey were hiding something.

There is no scientific basis for that. There is no data to support that. In fact, to the contrary, the most recent data Leapfrog has for the hospitals is that they did satisfy to the highest levels, at hundreds the four measures.

This is why all of the admissions about have you ever visited these hospitals, have you ever spoken to anyone at these hospitals, essentially what is the basis for you thinking that everybody is washing their hands, has a policy in place,

is doing audits, has sinks in every room, what is your basis for believing that in 2021, and three years later giving us a grade that suggests that people are washing maybe one hand every Tuesday.

There is zero basis for the non-response bias. It is a scientific theory, but here there is no basis for it.

The second piece of why the non-response bias doesn't apply is that the non-response bias assumes, and you are the one who pointed this out, assumes that kid who missed the test didn't miss it because something happened to him, or because, say, he didn't enroll in the class. It assumes there is some sort of, I don't know, evil reason for not filling it in.

You heard testimony from every single CEO, it started with Gina West, Gina West, who is the quality officer for the entire network. She explained to you that it requires -- I have this, all the specifics of this in a slide, but it requires hundreds of hours of staff time. She identified all the different types of personnel, including physicians, nurses, technical staff and then contract staff to fill in that survey.

Choices have to be made at hospitals. You heard that testimony from the CEOs, where they have focused their attention is on accreditation. You heard from Ms. Zambrana the same thing essentially. She said that they focus on accreditation. She said that there was -- one of the accreditations was the heart accreditation she mentioned which

also our CEOs mentioned because those are measurable, those are known with audits whether or not they actually do the work, and in that way they convey much more strongly and accurately that patients are being cared for in a safe manner.

So that is my view on the non-response bias, it is baseless and debunked by the sworn testimony.

THE COURT: Of course, the grades weren't great before they changed their methodology. Weren't they Cs or Ds before they moved to the Fs based on the non-response, and the decision by Tenet to quit participating.

Wouldn't you agree there is at least some value or virtue or -- I guess, non-response bias is a real thing. I don't know if you can measure it, but it is a real thing.

MS. MALONEY: Your Honor, I am not disputing the fact of the existence of a theory in epidemiology and other science -- social sciences as well of non-response bias. I do not dispute that it exists.

What I dispute is that there is any basis for claiming that the reason for not participating in this case is because of fear of somehow exposing that they aren't safe.

In fact, I think your comment that these hospitals, they weren't performing very well before the Leapfrog safety methodology changed goes to that very point. It's not like the hospitals didn't know that they need to improve in many areas related to patient satisfaction, but you heard testimony that

those HCAP scores that are heavily weighted by the Leapfrog methodology within the 22 measures, those rely on surveys. They are admissions by their own witnesses that they rely on surveys, and you heard testimony about the difficulty in trying to get the surveys filled out.

In fact, the difficulty of getting the surveys filled out is an example of non-response bias, but there is an explanation of that as well. It is not because people are afraid to fill out the survey about what happened in the hospital to them. They simply do not speak the same language or they are unable to fill it out because they didn't get access to it, because it has to be mailed and has to be a piece of paper that they physically fill in, or because they just don't want to relive the experience of being in the hospital at their most vulnerable time.

Look, yes, many of them were Cs before the change in methodology. Yes, one of them was a D at the time of the change in methodology and now has moved into the F grade.

Our point is that the change in the methodology, which is what UC Davis pointed out and is the reason why they had to buckle under the pressure and decided to fill out the survey after the change, the point is when you are at a C, doing okay as far as patients are concerned because they know that is the best NICU unit, it is the best NICU unit, and it may be in a building that is old so it is loud. It is the best trauma unit

and it may have helicopters arriving on the roof that makes the building shake a bit, and the C may reflect the fact that the windows haven't all been replaced.

It is not the most wonderful patient experience when you fill out a survey, but it saves babies, it saves mother. They may get a C on Leapfrog's survey previously, but they sure don't deserve a D or an F that, as Dr. Berger explained, signals to patients do not go there.

As they tell patients, you go to the failing hospital you are twice as likely to die. Mr. Cazares said you go to my hospital, our data shows you are twice as likely to live if you are a heart patient because of our specialty there.

Part of the problem with the non-response bias is not just that it is baseless in terms of the data, and ignores the sworn testimony of our witnesses and the documentary evidence of the real reasons why they stopped participating, part of the problem with the non-response bias, as suggested by them, is that it ignores the fact that these hospitals are actually exceptional in certain unique areas that this community needs.

That is why you had all the transfers from Jupiter. You know, Jupiter doesn't have a surgery clinic for a detached retina; one of these hospitals that got an F does.

Jupiter seems like it is an A, yes, I had a great experience there, but when I go there they can't help me, so I get sent back.

We heard testimony from St. Mary's that she has seen I believe over 500 transfers back from Jupiter, transfers from Jupiter to her hospital that she has never seen at this level. This shows non-response bias. It has nothing to do with whether the hospitals are actually safe and actually good for patients in Florida.

THE COURT: Of course, that argument is an attack on their entire grading system, not particularly their change in 2024, isn't it?

MS. MALONEY: Not just their change in 2024. Look, I think this is something we've talked about a lot as a -- my clients and I have talked about a lot.

They didn't like the grading system before, they didn't think it was fair before. Okay. They didn't think this mean cohort that they had before fall 2024 was fair. They didn't think it was fair to be graded when they didn't submit a survey. That is fundamental no matter what the methodology is.

Once that methodology changed and it became based in, as we have learned and as has been explained so much, a belief the hospitals are intentionally hiding something, and that is their justification to go to 5, 15, 15, 25, once that happened -- and you saw the UC Davis folks say this and in Dr. Nicholson's report, if you are a C hospital there is no way you are getting out of the gutter.

You are going to be a D or an F unless you blow it out

of the park on the patient CMS service reports. They can blow it out of the park on saving lives or infections, but if they don't blow it out of the park on those five or six metrics -- it was in that slide you saw from Dr. Harris, his affirmative slide where he showed all the boxes and explained it is HCAP patient experience. If you can't get those up, and those have nothing to do with whether someone's bone fracture is fixed or whether their life is saved, if you can't get those up, you are not going to get above a C. Okay.

So, we are stuck here because we are focused what is not our hospital's primary focus. Our hospital's primary focus, they are trying, but the primary focus is keeping that ER -- expanding that ER because there is so much demand, we heard tat from Mr. Hanlon, maintaining first in class treatments at St. Mary's, at Good Samaritan with NICU units, the trauma units.

That is where the focus is, and they shouldn't be penalized for focusing on the life saving measures where there is no evidence that, you know, the soft -- I will call them soft, I know they are important, I spent enough time in hospital this year.

I know it is important, but I also know there are certain hospitals in New York City where you never go to sleep at night not because the nurse is bothering you, but you can hear the sirens constantly. That is a patient experience

issue. They are also the best hospitals that is why you heard Mt. Sinai making the comment this is a penalty, this is wrong, and they asked to opt out. You heard Leapfrog say absolutely not. You heard Ms. Danforth and Dr. Austin say they can't let anybody opt out.

So, your Honor, to make sure I have answered your question, yes, I do think there is a fundamental problem personally, and I think our clients do, too, with grading hospitals when they submit no information to them. I think it is fundamentally unfair. The analogy you raised about students applies to the prior methodology and the current methodology.

There is an added element to the current methodology, and all the testimony showed it. It comes from a place of believing the hospitals without any data, without any analysis, without any firsthand knowledge, believing the hospitals are hiding something, that they are bad. It is also a penalty to drive participation.

The penalty wasn't high enough when they were getting the C, when they were being graded, they or anybody else, being graded under the old technology, so they had to drive up the penalty because they knew, they were gambling, most hospitals are not going to fight, they don't have enough resources. The whole network had to come together.

I take issue with the fact that this is Tenet Corporation. This is the five hospitals who have combined

their resources in order to bring this lawsuit.

Yes, it has cost a lot of money because it costs a lot of money to fight this and to win this, and most hospitals said not worth it, just going to participate because the penalty is just too high if we don't.

For hospitals that are on the edge because of those patient experience scores, those are the hospitals that fall in the gutter under the new methodology.

Your Honor, I am not asking for injunctive relief beyond the five hospitals. If you want to discuss injunctive relief and the scope of it, I am happy to do that.

THE COURT: I want to do that at some point. I want to know what you want in terms of relief.

Far from it being a lot of work, which was some of the testimony, I can see why someone locked into a C grade might think this isn't worth it, why participate. I was a little surprised by the Jackson lady. I think Jackson, although it is a great hospital, probably can't get out of the C based on the patient satisfaction scores, that was my guess, but they are still in it and participating.

I can see why you would make a business decision, but on the other hand, from their side Dr. Romano talks about a business decision, if they can't keep up participation the value of whatever they are doing which they believe in suffers.

So, if they explain the penalty, do you think that

would pass muster with the Florida Unfair and Deceptive Trade Practice Act?

MS. MALONEY: If they explain it to who, the hospitals --

THE COURT: On their website. If they put question marks on all these gauges -- they claim that the hospitals would get a D or F anyway based on other CMS measures. So, if they explained what they are doing, would that suffice?

MS. MALONEY: If they explained what they were doing in terms of we are penalizing hospitals and giving them a worse score because they didn't participate, would that be sufficient to solve their deceptive and unfair --

THE COURT: That is my question.

MS. MALONEY: No, because they give an F, and the F and the D are the label. They give a grade. You had Dr. Austin, I believe, giving testimony that it is a lot like the restaurant grades where it is very clear to consumers and they want that, that it is a signal, it is a clear signal. There is language in the website where they say you can rely on the single letter grade. Okay.

Your question, respectfully, your Honor, assumes that the consumer looks beyond the grade and at all the explanation on the website.

I think Dr. Berger very clearly showed that that explanation is too buried, it is not clear. There are

admissions by doctor -- excuse me, by Ms. -- by Ms. Leah Binder herself that the methodology, which is what you are talking about, the methodology is a penalty, that the methodology isn't intended for the lay reader, and it is hard to understand.

Your Honor, respectfully, I don't think they have put on any evidence to show how they could fix this with some sort of disclosures; and, two, I think the evidence we have provided through Dr. Berger, through Dr. Vredenburgh's admissions, through Dr. Harris' admissions, that those show there is an intentionality to what they have done that obscures the truth to consumers.

And we have admissions from the fact witnesses on their side that the methodology was driven by this false belief.

I don't see how you can order them to do something that is going to kind of expose their real motive and purpose when that is their purpose, and so their purpose -- they want the to drive participation and however they do that, however they think is best to do that, that is what they will do irrespective of the message it sends to consumers, and the message it sends to consumers now is single letter, an F or D.

For our hospitals, our hospitals, yes, they are Cs otherwise, but our hospitals, the way this has affected them, it has driven them down to an F or D.

Does that answer your question?

THE COURT: In part. I have two questions.

MS. MALONEY: Okay.

THE COURT: Let me start with the factual one first. They suggested, at least their experts did and some of their witnesses, that even if you took out the safety scores the hospitals would still get a D or F. Presumably, if that is the case, and I don't fully understand the weighting, the 30 percent versus the 26 percent.

MS. MALONEY: 24 percent versus 31 percent.

THE COURT: If that were the case perhaps they could remove these safety measures that they are imputing values to and come to the same conclusion. Would you have a problem if they did that?

MS. MALONEY: Yes, Your Honor, we would have a problem if they did that. What the safety grade tells consumers is that every hospital that gets a safety grade is essentially graded on the same metric, the same methodology. If you just do an NA for the seven measures -- so there are the three measures they do give us an NA for and you are proposing another four NAs for the four measures; is that right.

THE COURT: That is what one of their experts did, I think.

MS. MALONEY: That is what Mr. Rule did in his opinion, too.

First of all, I want to answer your point about they

said they would be Ds and Fs anyway. The first thing is they did say that, but I don't think they put on evidence of that.

The second is, being Ds and Fs anyway under a different methodology than how you are grading the participating hospitals is simply unacceptable.

Now, the reason is different and we have these admissions as well. They keep saying these are just CMS scores, these are just what we get from CMS scores, and they are the same for participating and nonparticipating hospitals. That has been debunked. Remember, they realized that they could become -- they could have access to the data that goes into CMS just like CMS does, and this came out through Ms. Danforth, just like CMS does if the hospitals signed over their right to essentially the data they are giving.

It starts with an H, I don't remember, and I know a bunch of you behind me are really annoyed that I can remember it. The data flows into CMS, and when you are doing the survey and signing over your data, part of what you are doing is you are saying, Leapfrog, you can access the data at the same time I am giving it to CMS.

We heard from Ms. Havericak as well as Ms. McCauley that there is an 18 to 24 month lag on the CMS data, so Leapfrog has the benefit of getting that information much more quickly. I believe Ms. Danforth said it is only a three month lag, but the record is disputed on that.

I think we can show you in our briefing that what they are actually receiving is much more timely, and you heard that testimony from the CEOs. Even if what they are reporting as their CMS scores, and I believe it was Mr. Hanlon and Mr. Cazares -- again, I appreciate the colloquy here, but because of it I don't have them in front of me, we will give them in briefing. I have the answers, I don't have the specific cite.

They explain that what appears on the website for them is lagging CMS scores and those scores have actually improved, and that is not reflected on Leapfrog's website.

It is, however, reflected, if not perfectly, pretty -- a lot better and a lot more current data for those who participate and sign over the rights to access data as it is going to CMS.

THE COURT: The Jackson lady talked about the lag. I thought she still pointed to the CMS lag.

MS. MALONEY: She did.

THE COURT: So wouldn't Jackson then be scored the same as these hospitals if you just looked at the CMS data?

MS. MALONEY: She pointed to the CMS lag, and there is a lag, and that I think is the lag of 18 to 24 months, and then there is still -- the lag is essentially -- it is not an 18 to 24 month lag for what Leapfrog reports, and there is still some lag, but it is certainly more current and that is part of what Ms. Danforth's testimony was.

THE COURT: I don't want to bog you down on that.

What is it that you think you need? You want an injunction against them grading you at all if you don't participate? Is that the request?

MS. MALONEY: Could we go to the slide where we have the injunctive relief.

We put it on a slide. The relief we are seeking is narrow. I know it looks long based on this, but this is the language that we think works and, your Honor, let me take a moment here.

I think at the end of this it would be really helpful for us to agree on a briefing schedule for the revised proposed findings of fact and conclusions of law and as part of that agree that both sides should have some specific briefing on the scope of relief. Would that be acceptable to your Honor?

THE COURT: It might be, and we will talk about it. I still want to get an understanding -- that is why we are having closings today, I want an understanding of what you want. It looks like you don't think they should be able to grade you at all.

MS. MALONEY: Yes, we want a declaration that grading the hospitals based on fabricated data violates the statute, an injunction preventing them from grading these hospitals without data, removal of the false grades already published, and a corrective disclosure regarding their deceptive and unfair

practices targeting the community hospitals.

Now, let's turn to the next slide -- wait, before you turn to that. Leapfrog -- let's give time for the Court to review that. Their old rule says hospitals missing this much data shouldn't be graded, so you put that NA on there. Their own rule says you shouldn't grade it because six out of seven are out of the picture, and they tell consumers those will not be graded. Mr. Takagaki got that admission from Mr. Rule, but he didn't need it. It is on their website.

Holding Leapfrog to its own standards would not be extraordinary relief. It is appropriate and the public interest is unmistakable. Patients deserve truthful safety information, not manufactured fear, and the injunction isn't difficult to implement.

So Leapfrog already knows how to handle hospitals that have so-called missing data. There are two straightforward options.

The first is Leapfrog can simply not grade the hospitals at all, remove them from the safety grade system entirely, exactly as its own rules contemplate when data is missing. Now let's go to the next slide.

Second, if your Honor believes Leapfrog should be allowed to keep the hospitals listed on its safety grade website, then it should be ordered to replace the letter grade with a clear NG, no grade, across the board. When you click on

prior it should also say NG, not graded, for the current grade, for all the prior grades, and have a corrected disclosure explaining the Court's findings for the basis for the NG.

This is a mockup right here. I didn't invent this, all I did is change the name of the hospital and address. This is a mockup of the same screen that you saw for Ascension when Mr. Hvidt was examining Mr. Harris, and Mr. Harris had the five hospital examples and it turned out two of them had not been graded recently, and this is what appears on the website for Ascension.

So, either approach stops the deception, corrects the record, and avoids grading hospitals without data. That is a pretty narrow practical solution and we think it is entirely consistent with Leapfrog's existing framework.

THE COURT: All right. Before I use up all your time let me ask you about harm and what the statute requires, whether there is a difference under the two prongs unfair and deceptive, and what is -- I guess what you have to show and what have you shown, is my question.

MS. MALONEY: Okay. Would it be okay if we go to that section of the presentation?

THE COURT: Sure.

MS. MALONEY: I appreciate that. That is section 7 on page 28 of what you have. Great. Yes, okay.

You heard from every hospital and they explained the

real world consequences. So, every release of the safety grade, that's fall 2024, spring 2025, fall 2025, and soon spring 2026, as the grades go down, whether they went from C to D or D to F, patient -- and then there was promotion of those grades, amplification of the F, of the D, you heard patients canceled care, they went elsewhere, they left against medical advice, they bypassed the facilities only to be transferred back.

Physicians affiliated elsewhere, or simply never wanted to work with our hospitals in the first place. Health care workers, doctors, nurses, administrative staff, they spent and continue to spend hours reassuring anxious patients frightened by the safety grade and that is when they need care most.

And insurers, and that is the Humana letters who stand for the patients they cover, they raised concerns about the safety and quality of our hospitals, not when we were Cs, and not even for Delray when it was a D, but after this change in methodology and the amplification of the scores and the other hospitals hit a D, that is when they sent the letters. That is when they showed their trust in the hospitals had been eroded.

So, that, I think, is clear deception, the reasonable consumer -- you heard from Gina West about that, losing patients and having -- she said, that is Gina West, we started losing patients because of that, we were having physicians

state that they didn't want to come to our hospitals.

You heard from Heather Havericak of Delray that there was confusion and shaken confidence. She explained that the grades have been impacting our reputation and she does not have a way to correct it on her own. She described a patient who told her she had to do something about the grade. Another patient was afraid they would die at Delray based solely on what she saw on social media about the grade. I am afraid I am going to die at your hospital.

You heard from Erik Cazares, that was Palm Beach, and he described how delayed care can lead to directly to bad outcomes. Actually it was Ms. Havericak who talked about time being brain, the delay in care affecting your brain when you have a stroke. That is part of the reason why heart health is so important and the accreditation there.

Mr. Cazares, he explained that the grade -- concerns came from everybody, families, physicians, patients, staff, community members, and he described that it was quite evident that walk-ins had declined and he didn't believe there was any explanation other than Leapfrog's grades. He, like other CEOs, explained that one of their primary jobs was to understand admission rates, and that walk-ins specifically in the ER declined at levels they had never seen before.

I have a slide on that, but I am trying to work around it because I want to get to what you have said, at least in

your summary judgment decision, and I believe we have -- I am hopeful that we have expanded your thinking on what a consumer is beyond just a patient. It is the hospitals, the insurers, the employers who act as proxies for the patient. All of them, to the extent they are deceived by this grade, are protected under the statute.

You, your Honor, you told us, at least this is what we took from it, that you thought the unfairness prong required more specificity with respect to -- with respect to an injury, an injury to individualized patients.

That is what we took from it that may have -- our reading of it may have gone too far, but I think you made a distinction between the reasonable consumer under the deception prong and the injury under the fairness prong.

So, you heard about individualized patients, you saw business records about the gentleman who had the AMA, leaving against medical advice with a bone fracture, a compound fracture that there was concern would result in infection if he left, and he left anyway, and in the notes about why he left it is a reference to Leapfrog.

Now, it is a reference to Leapfrog's grade. Whether that is the grade on the website or the grade through amplification, it is a reference to Leapfrog's grade. And you heard from others who specifically identified individual patients.

Now, I worked very hard to explain to the Court and I hope I was successful because, your Honor, it's my view -- it's my view that these patients -- these individual stories, they are not anecdotal as they have been dismissed by Defendants.

Under the statute there is no safe harbor for deception simply because harm occurs to one patient at a time. If a single patient delays care, refuses treatment, or leaves against medical advice because of a deceptive safety grade, that is one too many, especially for an organization, Leapfrog, that holds itself out as a not for profit with a mission devoted to protecting patients and saving lives.

It is our view, and I believe it is the case law's view, that the law does not tolerate a system that accepts foreseeable patient harm as collateral damage. I believe we have successfully shown that Leapfrog knows, it knows that promoting these grades and assigning these grades, it wants patients to rely on them. It is foreseeable they will rely on them.

We have shown that there is generalized evidence in the form of the change in admission rates with the walk-ins, and in the form of physicians leaving to go to another physician group, an eight million dollar contract.

THE COURT: That is the most dramatic evidence that you have, but it is also problematic in terms of the rules of evidence.

I am hard pressed to see how the HSS thing can be state of mind. It would seem you have to rely on the truth of the matter asserted in terms of the Good Sam CEO saying I was told it was because of the Leapfrog -- it came from New York, it was from Leapfrog, as I understand it. It is hard to put reliability into that just as a general rule in terms of hearsay.

You have shown that that decision was made, although apparently the cancellation came in March. That would have been before the scores, the final result was October.

MS. MALONEY: No, it came in March, I apologize, it came in March 2025. The scores had come out --

THE COURT: I was mistaken then about the dates.

So you have the event happening, but how do you tie that to causation?

MS. MALONEY: You have the notification in March 2025. She testifies about it at her deposition, and she does not say because it has not been absolutely final at that point, and her testimony in her deposition is that this is essentially in the works and, you know, they were fighting it, which is why it wasn't final, trying to convince --

THE COURT: My point is more what is the causation aspect of it. Can I consider her belief or her statement that she was told it came from New York? I am not sure she said it was the grades.

MS. MALONEY: She said that she spoke to the physician representative who said that he did not want to leave her hospital to go to Jupiter. Remember, they had not -- to go to HSS, which is a joint -- he has to get privileges at Jupiter to be part of HSS, and he did not want to do that, but he was directed to do so because in part of the Leapfrog grades.

THE COURT: If I were to accept that, why isn't that an out-of-court statement admitted for the truth? I don't see how state of mind could apply to that entire entity and their decision to leave.

I suspect there are a lot of factors that went into that, and you didn't call anyone from HSS to say, yep, we are leaving because of the Leapfrog grade. It might have been tough to get that evidence, but the -- I guess the question is, you think that fits under state of mind, and if you are going to file something -- I am not going to try to put you on the spot on this here because you both wanted to talk more about that, but before I consider that as a causation you need to have some more case law because I am not -- my inclination is I can't do that.

MS. MALONEY: So the standard that you're setting for us, your Honor, is that I've got to show --

THE COURT: I am not setting it, the hearsay rules set it.

MS. MALONEY: Separate from the hearsay rule, if we

accept the fact that they left, that there was an eight million dollar contract that ended, if we accept the timing of the end of that contract which happened -- formally occurred at the end of 2025, after you have two rounds of -- I believe those were Fs, might have been a D and an F. I will make sure the record is accurate in our filing.

And you have the amplification of those scores throughout 2025 in response to this litigation, if you accept all of that, and you accept that these physicians had been at that hospital and did not have privileges, did not have privileges at the other hospital, which I think you could accept as fact from her testimony as the CEO of the hospital, if you accept that, you accept the timing of it, you accept the fact of the grades and that from their own admissions, from their own admissions, including Ms. Zambrana, doctors don't want to work at F grade hospitals, doctors don't want to work at D grade hospitals -- there was some wonderful testimony from Dr. Harris who acknowledged that.

If you accept those facts, and you accept that we essentially have an atmosphere that these hospitals are operating under, yes, there may very well be other causes, okay, but that does not exclude Leapfrog as a cause. In fact, all of the evidence suggests that the reputation of the hospital was being harmed, physicians are actually influenced by the grades. The Fs and Ds were being promoted. Fs and Ds

specifically influence physicians' choices, not necessarily As, but Fs and Ds. The testimony from their own witnesses was that physicians don't want to work at poorly graded hospitals.

I think you can accept those facts and others, which we will put in the brief, without even getting into the hearsay issue as there is some causal link between the Leapfrog score and the end of the contract. And I would just say I appreciate the opportunity to fully brief and give you additional case law on the hearsay issue because I don't think if you are coming at this as state of mind is not sufficient to show --

THE COURT: I think state of mind -- I think it probably gets the rest of it in, but I don't know that it does that one.

MS. MALONEY: Fair enough, your Honor.

THE COURT: If you all want to talk about that in whatever filings you make.

I took a lot of your time. If you want to summarize or get back to anything -- I have taken all of your time.

MS. MALONEY: You have taken all of my time --

THE COURT: I will probably do the same to your opponent, so don't worry about it.

MS. MALONEY: If I may have a moment with Ms. Scott to make sure that I've answered -- that we have touched on everything or if there is anything specifically that we need to address before counsel addresses the Court.

THE COURT: All right. Go ahead.

MS. MALONEY: One moment, please.

There is one thing, Your Honor. I am told that I did not sufficiently address your question about the standard that you should apply for deception and unfairness. The deception standard requires likely consumer harm and I think we have shown that.

It is very important, this Eleventh Circuit case that came out on the same day as your decision, we moved for reconsideration on that. What that tells you is that the standard of likely consumer harm also applies to the unfairness standard. We ask for reconsideration, or at least -- we do not want to be disrespectful of the Court's order by briefing that Eleventh Circuit case.

THE COURT: I am happy if you do. I think it is an important case, but as I asked your colleague, the Florida Legislature hasn't updated its last statement that I look at law previous to 2017. I asked her and she thought, and she may well be right, that the new decision relates back to the earlier -- the law and it doesn't change the law.

We got bogged down in maybe some of the Florida cases, but we also have to follow them as you know.

MS. MALONEY: Yes, absolutely.

THE COURT: I appreciate anything you have to say about that. You don't have to try to do it off the top of your

head now.

MS. MALONEY: Thank you. I think the Eleventh Circuit has codified longstanding understandings of the statute through this case, and we'll brief it as you have now let us do.

It is also -- this is an injunctive case, we are seeking injunctive relief, not damages. So for remedial purposes that does not require proof of past harm. Injunctions are about the likelihood of future harm, and that is consistent with longstanding principles of remedial case law and I just -- so when you are thinking about, okay, is there sufficient evidence to tie the causation, I think you have to look at the likelihood.

You also have to look at what is going to continue to happen given the direction these scores are going, given the fact that once you are in the gutter, it is very, very, very difficult to get out, and there is ample evidence in the record of likely harm and continuing ongoing harm, and that is -- that is not just the CEOs. That is also Dr. Berger where he explains and contextualizes what we have seen to date and helps give context to what the CEOs explained you will see in the future.

Your Honor, I really appreciate the opportunity to answer your questions, and I sincerely -- you know, I hope you will give me the opportunity to respond for a couple of minutes to rebuttal questions to the extent you have them after their

argument, and then we can discuss scheduling.

I do want to reiterate the relief we are seeking as narrow and practical. It is stop grading without data, correct the public record, and it is prevent the deception from continuing. Leapfrog already knows how to do this. Its own rules say hospitals without data should not be graded.

It is our position all patients deserve truthful safety information. If even one patient is harmed as a result of this deceptive and unfair practice, and we expect more are likely to be harmed, that is enough to justify the relief we are seeking.

Thank you so much, your Honor.

THE COURT: All right. Thank you.

MS. BLAIR: May it please the Court. This case started more than a year ago, on December 10, 2024, with this email that is in evidence, JX 40, and at this point in time these five hospitals are asking Tenet home office to enter the survey.

Ms. Gill, who is the president of PBHN, tells them, I have spoken with several members of the executive leadership team at home office. There are efforts underway to address Leapfrog's ability to score our hospitals. Hold the line.

Weeks later we get a cease and desist letter, not from the five hospitals, from Tenet Healthcare, and they tell us stop grading all 73 hospitals, all 73, or we are going to sue

you for defamation and corporate disparagement. Now they want to hold themselves out as community hospitals trying to protect South Floridians from Leapfrog.

Leapfrog's mission is clearly to protect patients against preventable harm, and when you get a cease and desist letter telling you to stop grading hospitals, which is your entire mission, your entire business, the answer to that question can only be no.

We have seen Tenet Healthcare throughout this litigation contacting UC Davis' health care about Patrick Romano's involvement in Leapfrog, contacting Matt Austin's employer about his involvement in Leapfrog. This entire case is about silencing a watchdog group from doing their job and protecting patients.

I saw for the first time a slide about the relief they want because this is what their complaint says, they want to permanently enjoin us from including Plaintiffs in the hospital safety grade. that is it. Nothing about changing our website, noting about declarations on our page. They want you to speedily declare that the way that we do our methodology is unfair and they want their attorney's fees. That is what they want.

They sent a TRO letter, told us they are going to file a temporary restraining order before we put out the spring grades in April 2025, telling us not to grade their hospitals.

Then they filed a motion for preliminary injunction in front of this Court asking you to prevent us from grading the hospitals. They withdrew it and asked for damages in the case and withdrew it. Then we had a mandatory mediation with Matthewman. That slide you saw, those were not their requests.

They are trying to silence us, and that is what this is all about, and that is how it began.

But it is interesting because all of the time and the money that we have spent in the seven months of this litigation and all of the time you have spent hearing this case, the patients of these five hospitals have been an early casualty of the evidence that you heard. Where are they?

Most importantly, neither the Plaintiffs nor Tenet home office bothered to ask a single patient or a single consumer of South Florida that they allege they care so much about.

This is a FDUTPA claim, not a defamation claim, not a corporate disparagement claim. They brought this claim as a single FDUTPA claim, that was a strategic decision they made, and they have to prove consumer harm, likely consumer harm maybe, depending if they are going down the deceptive route or the unfair route, but FDUTPA cannot be a referendum on whether hospitals like their grades.

That is what this has been about for the last five days, they don't like their grades. It is not a vehicle to

insulate Tenet Healthcare from scrutiny in the marketplace, and it is not a tool to silence simple speech of a non-profit watchdog group.

That is what they are using this FDUTPA case for.

THE COURT: FDUTPA can be used for deceptive speech.

MS. BLAIR: They can. Do you want to get to that? Do you have a question?

THE COURT: Go ahead. I guess I want to understand why you think this safety grade is not deceptive. And as I understand the history, most of the hospitals were grading pretty well, including them.

I think the number was like 85 percent on the safety, came out about an 85 point something percent, and there was a belief that two things were happening, the scores were creeping up as I understand it, and so there was concern that using the mean of the scores was unfair and was causing hospitals to drop out of the participation and relying on their mean score, and so that was a concern to Leapfrog.

Now, it seems to me that -- I can understand the concern, but there are a couple of possibilities for it. One, that hospitals were kind of, I guess, getting a very positive view of their performance on the safety measures and that is why it was creeping up. That is one view.

MS. MALONEY: No evidence of that, but yes.

THE COURT: Another view would be they are doing

better. Is that your position, they are all doing better?

MS. BLAIR: Yes. Ms. Zambrana testified that hospitals that dedicate themselves to patient safety --

THE COURT: If they are getting better there would be no need to worry about this dropping out issue because then the people that dropped out would actually be harmed. The mean would be keep going up and the people that dropped out would be harmed.

MS. BLAIR: I am not following that.

THE COURT: What is the problem with using the mean score? If everybody is doing better why worry about the hospital dropping out and still getting the benefit of the mean score?

MS. BLAIR: Here is the problem with that.

The concern that you heard from Leapfrog, and you heard from Dr. Romano, Ms. Danforth, Alex Campione, Dr. Austin, the problem with that is, if your mission is to make sure you are getting information to patients about patient safety, and you are getting information that is over inflating or telling the consumer public we know that --

THE COURT: Why is it being over inflated?

MS. BLAIR: Because we don't know that they have a perfect score.

THE COURT: I am not talking about these hospitals. I am talking about the example that your experts and your people

talked about as to why we did this. The score keeps going up, so the mean didn't allow you to differentiate in terms of safety grades, and I guess you thought that it gave some hospitals -- they were free riders, they were riding on the mean.

Isn't that the reason after all this?

MS. BLAIR: Sort of. That is the whole point of imputation.

THE COURT: So you decided to use imputation.

MS. BLAIR: We have been using imputation for years.

THE COURT: Well, this was quite a remarkable imputation, isn't it?

MS. BLAIR: I don't think so, and that is what you heard from the experts.

THE COURT: Well, I heard from them the lowest one percent of hospitals across the country were getting 185 out of the 400, right?

MS. BLAIR: The lowest -- there was no evidence --

THE COURT: Lowest one percent.

MS. BLAIR: There was no evidence presented in the record of that. That was a demonstrative that they showed Dr. Harris.

THE COURT: So you disagree with that.

MS. BLAIR: Yes.

THE COURT: What do you think the numbers are?

MS. BLAIR: I think we don't know.

THE COURT: That is why you gave them 75? These hospitals went from a score of what, 385 out of 400 to 75. You think you can justify that by saying, well, they must be hiding something?

MS. BLAIR: Everybody uses that phrase.

THE COURT: Some of your witnesses did and your expert did.

MS. BLAIR: I want to be clear what that colloquial phrase means. Nobody is saying that with a hundred percent certainty every nonparticipating hospital is hiding something.

There are two ways to do imputation. This is the science and --

THE COURT: You have to explain the science. I heard it said, but I didn't see any science behind that.

MS. BLAIR: As Dr. Harris testified, this is the science they teach in medical school. Let me finish. There is two ways to do imputation, there is the estimation and the reasoning route.

The pre fall 2024 methodology was using imputation in terms of estimation looking at cohort means. These scientists, the nine panel members, got together and not at the insistence of Leapfrog, because you asked Ms. Danforth about that -- this is not the idea that Leapfrog brought to the panel, but during that, they started saying imputation based on estimation no

longer appears to be a scientifically viable theory because we have no reason to believe that nonparticipating hospitals are performing at 400 out of 400 on these four measures. Remember these are composite scores. These measures are not significant drivers of the overall grade.

What they did is said, now let's look at imputation based on reasoning because imputation based on estimation is clearly not working.

THE COURT: You don't equate reasoning with rationality?

MS. BLAIR: I do.

THE COURT: Then where are the studies that show that is a fair way to look at non-response bias?

MS.BLAIR: Dr. Harris testified that these hospitals really are the non-response bias hospitals. They have the systems in place, they track their data, they testified to that. They knew about the methodology change in advance, they testified about that. They ran what if scenarios, Regina West testified about that. They knew what the impact would be on their scores before based on their actual data, and then they made a voluntary business choice not to participate.

Dr. Harris said to Mr. Hvidt's questioning, you just proved my non-response bias.

THE COURT: You quoted part of Dr. Romano's statement. Didn't he also say, call it blackmail, if you will, it is a

business decision same as they made?

They may have made a business decision not to participate, but to assume they made a business decision because their real scores are below the bottom of all hospitals in the country, there is no basis for that.

That comes out of -- I don't see how you can justify that.

MS. BLAIR: Dr. Romano testified when he said business decision he was not meaning some revenue related business decision.

THE COURT: It doesn't make any difference.

MS. BLAIR: It does.

THE COURT: You are trying to force participation. Whether it relates to revenue or not, you are imposing a penalty on somebody that doesn't participate to force them to participate.

MS. BLAIR: They don't have to participate.

THE COURT: Let me give you an example. Say I want to start a non-profit and call it Horn Dog or Horn Frog, so I call Jupiter Medical Center and say I am going to grade hospitals and here is my survey. If you participate we will grade you, but if you don't, we'll grade below the lowest hospital in the country. Do you think that would be a problem?

MS. BLAIR: Here is the difference: We have been talking about this test analogy for awhile and Plaintiffs say

it is unfair because I didn't even sign up for this class, I am not trying to get credit for this class. That is their position.

Here is the thing, when you hold yourself out as a community hospital, that you are serving the patients of South Florida, you sign up for that scrutiny. You did, you are in the class --

THE COURT: Scrutiny is different than if you are just making it up. I don't find any scientific basis for penalizing a non-responding hospital and treating them worse than any other hospital in the country, or at least one percent.

If you don't like the one percent, I thought they had some evidence that no one else, no participating hospital got those low scores on those four safety measures. That is what one of their experts said. I don't think you put any evidence in to the contrary.

MS. BLAIR: I think what he said is no one hospital currently gets limited achievement on all four measures. He didn't say limited achievement on one, two, three, on all four measures.

THE COURT: You somehow think that is a rational approach to grading a hospital and telling consumers that's fair?

MS. BLAIR: I do, and here is why. We are grading these hospitals against Leapfrog's standards, all transparent.

We tell people what our standards are.

Let's talk about hand hygiene. When that measure came out, and Ms. Danforth testified about this, there was a lot of uproar because Leapfrog said, we want hospitals to perform at the highest level of excellence. They said in order to achieve the highest level of excellence, four out of four bars, you have to have 200 hand hygiene observations in every unit every month. That is Leapfrog's standards.

The WHO, the World Health Organization, they only say a hundred. So we think this is how these hospitals perform against our measures. We have our own opinion about what matters, what is important, and how we measure it.

And the argument, your Honor, is do we tell consumers what our standards are and what our measures are? The answer to that has been unequivocably, over and over with every witness, including the five CEOs, they know how this works. We are not hiding that these are our standards. We are not saying these are the US Government standards for hand hygiene or the World Health Organization's.

THE COURT: When you measure it against your standards they were at -- what was it, 85 out of a hundred at that point?

MS. BLAIR: Let's talk about that. For BCMA I think that is right.

THE COURT: And they decided not to do it anymore.

MS. BLAIR: In 2021, your Honor -- I want to make sure

we are all talking about their grades. In 2021 a lot of these hospitals were B hospitals because of their CMS data. These four measures are not a significant driver of the overall composite score. We see before the new measures come in they are going from Bs to Cs and Delray and West Boca were Ds, Ds before the methodology changed.

So, when we talk about the causal link -- and you remember Dr. Nicholson testified he never did a causal analysis, the Leapfrog grade versus impact.

The hollowness of their theory that the D grade aggrieved them -- you have to be aggrieved by the deceptive act and the by is the causal link.

THE COURT: So you are arguing that the Ds and Fs don't hurt them?

MS. BLAIR: There is absolutely no evidence of that. Mr. Hanlon got up and testified nobody said a word about his D in the spring of 2024, but when he got another D in the fall of 2024 people started asking questions. You are the trier of fact, not me, and you will weigh that credibility, but we don't think there has been any evidence of a causal link.

Counsel discussed a lot about what evidence I failed to put on to prove something. It is not my burden of proof. FDUTPA has a lot of elements, and as you told us on the 7th of January, it was a little squirrely.

THE COURT: I was talking about some of the -- well, I

won't even say. Some of the Florida decisions don't seem to be consistent to me.

MS. BLAIR: The fact of the matter is, there are elements they have to prove by a preponderance of the evidence, and we sat here for five days and we have seen no -- nothing about deception, we really haven't.

In fact, Dr. Nicholson testified the methodology is acceptable to everyone. That is their testimony, their expert, not mine. You heard from Isis Zambrana. I said, you do the survey, in your view is Leapfrog transparent? Her answer was, a hundred percent.

THE COURT: You explained transparent. I still don't understand how you can justify grading them all at the lowest possible score on those four measures when they didn't provide you data.

They make a point, you have a question mark on staff worked together because they didn't respond, but then you put them at the very bottom of the other measures and so -- with no explanation of why other than -- not even telling people it is because they didn't respond and you assume then they were worse than everybody else in the country.

MS. BLAIR: The footnote says they didn't respond and it does say we assigned them a grade. Dr. Nicholson testified that in fact what we do is an assignment. That is exactly what we tell people.

I want to take a brief moment to talk about the three measures that we don't score versus the four measures that we do.

Again the science. They have Dr. Nicholson, a health care economist, we have had expert after expert, doctors, patient safety experts, and I want to -- one second, your Honor. They have all testified about the difference between structural measures, which are the four we are here in court, BCMA, CPOE, hand hygiene and IVS, structural measures. We know in the year 2026, and we knew in 2024, that every adult acute care hospital has those measures in place.

Your Honor remembers the testimony, we were already doing this with the ICU physician measure. If the CMS report said that an adult acute care hospital had an ICU, we looked at that, and if you are not reporting, we said we are going to give you limited achievement.

Dr. Austin testified about willing to report and he said limited achievement is equivalent to willing to report. That's what we used to be called on the Leapfrog survey. We are saying we are going to give you credit that you would be willing to report, but we don't know what the measurement is.

There was a lot of discussion, Ms. Zambrana testified to this, Ms. Danforth testified to this extensively. On the survey it is not enough to say I have BCMA, I have bar code medication administration. That is not enough to prove on the

Leapfrog standard you are safely administering that medication. That just means that you have it in place, so we will give you limited achievement. If you want considerable achievement there are more things you have to prove and verify. If you want you achieved the standard it is even higher. We tell people that. We tell people.

Everything I know about this case, as a lawyer I can read on this website. That is not deceptive, it is simply not deceptive.

The other element of deception, your Honor, is they have to prove it is likely to deceive a reasonable consumer.

I have been in this case for seven months, I am not really sure who the alleged consumer is, right, but I think we can all agree it is patients that would be the reasonable consumer. Are the hospitals a reasonable consumer? Of course not. They are getting calculators, getting scoring methodologies. They are running what if scenarios. Are insurers reasonable consumers?

THE COURT: Well, you charge them.

MS. BLAIR: Charge who?

THE COURT: You charge the hospitals when you give them their safety grade with your logo and you charge insurers when you sell them data. Why aren't they consumers?

MS. BLAIR: They are not a reasonable consumer under the FDUTPA standard. You have seen this stuff about Humana,

the letters, some of which I saw for the first time. They showed a revenue document, Humana, for a hundred some thousand dollars in data licensing fees, which your Honor is probably talking about. Humana -- and that is Humana military by the way. Humana military, when they buy that data license, we tell them exactly all the scoring methodology, who is participating and who is not, exactly how it works.

This idea that Humana -- that is the only insurer we heard about. This idea that Humana or any insurer that licenses our data doesn't understand what is going on -- that was Ms. Montgomery's testimony that she just assumes Humana doesn't know. There is no evidence of that.

THE COURT: I am not sure what evidence there is that they know or don't know.

So you are saying what, that there is no evidence of harm?

MS. BLAIR: I am saying when we look at who has to be harmed, who the reasonable consumer is under the law, two things, they have to be reasonable, so they can't be a sophisticated consumer like these hospitals or insurers or the employers who are part of the Florida Health Alliance. They have to be a reasonable consumer, and that is the patients.

You heard from ever Leapfrog witness that the patients are the consumers. You heard from Ms. Zambrana that patients and patient families are the consumers. So the question is,

are those consumers the reasonable consumers, the patients, likely to be deceived to their detriment by the activities of Leapfrog?

The only evidence that has been put on to that is Dr. Berger, that is it, his opinions, that is it. There is no consumer survey. There is no consumer comprehension test, no user testing. There is no evidence that anyone that would be qualified as a reasonable consumer was deceived to their detriment.

Interestingly, Mr. Berger testified, this is from the transcript we have from this trial, that he has no opinion. I asked him, are you not offering an opinion in this matter that consumers are likely to be deceived to their detriment by Leapfrog? He said, I don't form an opinion regarding deception. His only opinion is that consumers are unlikely to understand.

I took his deposition and asked him, are they confused? He said, that is not the words I'd use, I am a very careful man.

THE COURT: You think your average consumer who looks at your website or reads the media about these grades understands your imputation model?

MS. BLAIR: No, I don't think they understand every nuance --

THE COURT: Do you think they understand any nuance in

the imputation model?

MS. BLAIR: I do.

THE COURT: Where do they get that from the website?

MS. BLAIR: When this website was rolled out there was extensive user experience testing done under the grant, $200,000 --

THE COURT: Right. That is to make sure it is readable and accessible and people with an eight grade education are going to be moved by it. I didn't see anything other than the Google analytics that showed that the consumers knew your imputation method.

MS. BLAIR: Ms. Binder testified, and that report is in evidence and it contains specific discussions with very specific people. This is what she testified to --

THE COURT: If I look at that I will find some understanding that that foundation said that consumers understand the imputation model?

MS. BLAIR: You will find evidence that that user testing said that consumers don't just stop at the grade, they want to dig into the metrics. That is what it says.

The standard is likely to deceive a reasonable consumer to their detriment, to their detriment. There has been absolutely no evidence of that part of the standard.

THE COURT: If they are simply mislead, you don't think that is enough?

MS. BLAIR: No.

THE COURT: If I convince someone not to go to a hospital that is near their home, why isn't that harm?

MS. BLAIR: Dr. Berger says they are unlikely to understand. I am 50 years old, this morning I took an Advil. I don't understand how it works, but I have no detriment from taking that Advil. Dr. Berger says they might not understand. It doesn't mean that they made a poor decision based on it, or there was any detriment whatsoever.

THE COURT: The label tells you a lot about Advil and its ramifications. It is right there.

MS. BLAIR: So does the website. If I really wanted to turn that bottle over and look down to read the side effects, I would do that. That is progressive disclosure, that is what we do under the FDC statute. FDUTPA talks about using the FDC standards, clear, concise, conspicuous.

THE COURT: What about the testimony that 3 percent of consumers get to that methodology?

MS. BLAIR: The Google analytics is unreliable. Dr. Berger's opinion cited 59 different articles that he relied on. Of those, 32 talked about consumer surveys being the gold standard, and not one of them talked about Google analytics. The other issue is that it is anonymous.

Again, it has to be a reasonable consumer. I am unaware, I could be wrong, of any journal article that Dr.

Berger relied on in coming to his conclusion, and he said this, the best way to inform this Court about whether a consumer was likely to understand the Leapfrog website is Google analytics. That was his testimony.

THE COURT: This is maybe not very reliable either. I asked Google, consumer expectations of an F grade. They said in AI mode: Consumer expectations for an F grade vary significantly depending on whether the grade refers to food safety, product quality, or customer relationship management. Generally an F represents a total failure to meet minimum standards prompting immediate avoidance or termination of a relationship.

If you look at food safety, which I understand Mr. Austin said you were trying to follow the food safety approach, safety warning, consumers view an F as a fair indication of an increased food safety risk often linked to a critical violation like poor hygiene or improper food handling. Most stake holders expect an F to be based on severe or repeated violations and believe these systems should communicate the specific risk of eating at that location. And it says, research shows that restaurant hygiene is a primary driver of consumer choice.

If you tell people they are getting an F and you don't explain how you got there, aren't you harming consumers?

MS. BLAIR: No. Two things, what you said in your

Google review was that the F indicates they are not meeting the standards.

THE COURT: Total failure to meet minimum standards.

These entities that you graded in 1921 (sic) as being at 85 percent on hand washing, my number may be wrong, now because of your imputation model goes to what, a 15?

MS. BLAIR: They went from a hundred points under the cohort median in --

THE COURT: The cohort is the mean of everybody.

MS. BLAIR: No.

THE COURT: When you look at their scores in '21 --

MS. BLAIR: They were at the 88.

THE COURT: They somehow stopped hand washing?

MS. BLAIR: No, no, and that is what Missy Danforth testified to. We are not saying they stopped hand washing. We are saying they stopped logging their hand washing, they stopped doing the observations necessary for the hand washing. We have no evidence that they continued to meet our 200 hand washings per unit --

THE COURT: The grade says F on the hand washing. Your gas gauge, whatever you call that, is basically at the bottom and it says under that hand washing.

MS. BLAIR: Yes.

THE COURT: You don't think that suggests to people that they do a lousy job, in fact an unacceptable job at hand

washing?

MS. BLAIR: Two things about this argument that have perplexed me for many months, your Honor, either consumers don't go to the metrics and just rely on the F grade, which has been their argument all along, so nobody gets to the hand washing to make that determination, or they do get to the hand washing metric and they found an asterisk that explains it.

THE COURT: The asterisk doesn't explain anything about the method, that you give them that score because you assume that they have something to hide.

MS. BLAIR: It actually says, and I have it up on the screen, the hospital declined to report their performance on this measure, true statement. Then it says, a score was assigned, true statement, Dr. Nicholson agreed with that, to reflect the lack of information available.

We are telling the reader at an eighth grade level, I don't have any data for this. We just assigned them a numerical value and that numerical value reflects the lack of information.

THE COURT: And that lack of information causes us to give them a grade worse than all but one percent of the hospitals.

MS. BLAIR: No. Our lack of information allows us to say we are going to assume that you have the minimum amount of -- a minimum amount of standards in place for our Leapfrog

standards limited achievement. We assume you have a hand washing policy, but they are not reporting to us whether they are implementing it, whether they are looking at it, cataloging it or logging it.

THE COURT: Why don't you just put not graded then?

MS. BLAIR: Because that wouldn't be accurate either, your Honor.

Again, this has been lost in the science of all of this, but every doctor has come in here, or patient safety expert, or public health expert has come in here and testified to your Honor credibly that imputed data is data. You heard it from Dr. Matt Austin, Dr. Romano, Dr. Harris, Alex Campione, Missy Danforth.

THE COURT: It is only reasonable data to the degree there is some science that underlies it. You can't make it up.

MS. BLAIR: Nobody is making it up. The science is non-response bias. It is taught in medical school, it is scientifically relied on because, as Dr. Harris explained, what you are trying to do is apples to apples. This is the measurement of patient safety, and no one said it is perfect. I didn't put a single witness on the stand that said we have the perfect methodology.

As we stand here today the science is if data is missing, experts, experts, experts decided is it reasonable, not Kim Blair, I don't know anything about this stuff. A panel

of nine world renowned patient safety experts got in a room and debated is it within scientific reasoning for us to impute data based on non-response bias. And the answer among that panel of nine and among Leapfrog was, yes, we believe it is under our methodology, and they are going to come back up here and say no one voted on it. There wasn't a vote on the expert panel.

THE COURT: There wasn't, was there?

MS. BLAIR: There wasn't a vote, and as Alex Campione testified in her deposition, that is not how science works. Dr. Harris testified there is never a vote. Dr. Romano testified we don't vote. But what Patrick Romano did tell you was he was involved in drafting what went out for public comment. He still sits on the voluntary board today. He believes that the imputation methodology that is in place is fair and reasonable and properly applies the non-response bias.

I am not a scientist, I spent seven months learning this, but those are the experts, Dr. Harris, Alex Campione, and they say you should ignore them. They are asking your Honor just ignore those experts because we have Dr. Nicholson, a health care economist who worked with Cornerstone and did some math and he says, based on a 1966 article from Donnabedian that says a good mathematical grading system includes outcomes, process, and structural methods, exactly what the Leapfrog methodology contains.

He says we have gone too far from these principles. I

am not sure he is qualified to even give that opinion, but that is his opinion. That article that was written in 1966, there was no hospital or patient safety grading methodology to look at, not in 1966. It doesn't come about until we started doing it in 2012.

Leah Binder said the only reason we could do it in 2012, Leapfrog went to Congress and lobbied for CMS to put their data out to the public. Dr. Romano told you until that time there was no publicly reported data for patients as to how these hospitals were doing. Dr. Harris told you that up until this time insurers paid on pay for service, instead of pay for performance. Do you remember that?

He said before we couldn't even measure their public safety data. Insurers just paid. You were in there for your colonoscopy, here is the $2,000. You got readmitted because you got an infection. I'll pay you for the readmission.

What CMS did and Leapfrog did, they convinced insurers, just like the lawyers get paid in this case, I will pay you for how well you do, not for the mere fact you are doing it. That is how contingency lawyers get paid.

Insurers said now I have the publicly reported data and I am going to hold the market accountable. Groups like Leapfrog and CMS now publishing this data, they have made this change in the world so that all of us sitting here can get better care. That is what this is about.

One of the prongs, one of the elements about --

THE COURT: CMS now does it, don't they?

As I understand from somebody, your expert, he says they now structure pay based on patient satisfaction among other things.

MS. BLAIR: CMS does, but private payers do not yet, and that is what Humana is trying to do.

THE COURT: Is do what?

MS. BLAIR: You see these Humana letters and Humana is saying, hey, you got a D -- we saw you got a D on the Leapfrog safety grade. Tell us what are you are doing, what is your patient improvement plan, how are you going to do better?

You heard from the CEOs, one of them, 18 percent of their private payer comes from Humana, seems like a lot. They don't even bother to respond, they don't bother to respond. You talk about non-response bias. They didn't bother to respond saying, hey, here is the problem with the Leapfrog grade, they are grading us on four measures out of 22, it impacts our overall grade.

If that is what they believe, they should have responded and told Humana, who gives them 18 percent of their revenue, what they were doing.

So, that is what is happening here, these 73 hospitals, not these five, these 73 hospitals, they want to put profits over patients. They want to hide the safety data, they

don't have to tell anybody about it, and the CMS -- and if you listen -- and Ms. Maloney went over some slides from Karen Jupiter's testimony. She went over a bunch of slides about how Leap Frog pushes this information into the media. She says, quote, they don't whisper it. They want us to whisper this data to patients. That is what this case is about.

Leapfrog, they don't whisper it. They don't whisper it because it is their mission to make sure you and everybody in the room can drill down on the metrics and see how well these hospitals are doing, and you can hold these hospitals accountable for their patient safety measures.

I think Mark Rule's testimony was so important because what he said is, everybody is losing sight of the fact this is a composite score. They have done a tremendous job of trying to convince everybody that this F is just based on these four measures, right, and we put into evidence just once, I didn't want to belabor the point, we put into evidence the April 5 star market report. It lists all five of the hospitals and they benchmark themselves as to how they are doing against other hospitals.

It is DX 813, and you can look at that. When you look at the composite nature of how these hospitals are performing, they are performing poorly on their CMS measures. Dr. Harris had a chart. They are performing poorly, and they are performing poorly on their HCAP measures, significantly poorly.

And they have excuses for all of that, the CMS data lags. Guess what? It lags for Jackson Memorial, too.

You heard from Missy Danforth that the NHSN data also lags and they say, well, we have an excuse from the HCAPs, they are so poor because we only get a nine percent return. Guess what? Other hospitals, and Dr. Harris had an exhibit, Exhibit 7, we pulled it up, where he monitors their HCAPs against the other hospitals in Florida.

That is what is significantly driving these grades.

THE COURT: But you are not reporting just that. If you are reporting those grades, I'd think they couldn't really argue that you are not basing it on data.

MS. BLAIR: We are reporting those grades in conjunction with the others as a composite score.

THE COURT: Maybe the conjunction part is the problem in this case.

MS. BLAIR: I don't think so. Part of our mission is to advance patient safety. We have heard that no one, not the Joint Commission, no one publicly reports how these hospitals are doing on some of the biggest measures that affect preventable harm in hospitals, medication errors, BCMA, computer physician order entries, hand hygiene, IVS. No one else publicly reports on that data.

To be clear, cannot be lost in this case, what Leapfrog does, exactly what they did at the beginning, is push

and lobby and testify in front of Congress to make the Government publicly report measures that are important --

THE COURT: I think it is great that they do that, but what I don't understand is why they give a grade based on imputing a score that is worse than any other hospital in the country.

MS. BLAIR: It is not worse --

THE COURT: There was is no other hospital that got the bottom on all four.

MS. BLAIR: On all four.

THE COURT: Isn't that remarkable that you wouldn't tell consumers, we are making up a score or giving somebody a score as a composite that is worse than any hospital that reports to us?

MS. BLAIR: I argue we do. If you look at the clear gas gauges that tell you here are 32 measures. Dr. Romano was the architect of this. Every single measure is on that website, and you can see their actual data for all of the CMS measures, all the HCAP measures. You can see that Leapfrog says, hey, we can agree on the nonstructural measures.

We don't know if you have these in place, we are not going to assume that. We know, patients, the consuming population, we know these hospitals have this data. We know it. They know it, we know it, so I am not going to tell you -- it would be deceptive to tell patients -- I am sorry, that is

my phone -- deceptive to tell patients that we don't know, NA, we don't know that these hospitals have the structures in place.

We know these exists, and you, consuming public, should also know these structures exist in all of these adult acute care hospitals. That is what we are telling patients, but we are also telling them because we are honest, make no mistake about it, they declined to report a grade -- not a grade, the score was assigned because we lacked their data.

THE COURT: When you decided to use your Google grant to publicize the scores of those hospitals, which I think you said -- somebody said was, well, we were defending ourselves from a PR campaign.

MS. BLAIR: Everyone said that.

THE COURT: So, what you sent was just the letter grades.

MS. BLAIR: It is embarrassing, and -- they had five clips. The way that would work is, when you Google Delray, they were hoping that -- and they got permission that they could use their grant in this way. I want to be clear about that. That was testified by Ms. Danforth I believe.

When you Google Delray what comes up would be, like the first Google search would be Delray safety grade, you can't see the big F. It says click here for score for Delray. They got five clicks.

An 8 million-dollar a year not for profit with 20 employees, they were trying to combat against news articles, people calling constantly. Karen Jupiter testified that they were getting calls from former Leapfrog employees that private investigators were showing up at their homes and work, and Ms. Binder made a decision that we have to defend ourselves.

I don't know if you have seen this, but the allegations are that they are brazen paid to play, that if you don't participate we automatically give you an F, that other hospitals are paying for their grade.

THE COURT: That one part is probably pretty close to right.

MS. BLAIR: Which one?

THE COURT: If you don't participate, we pretty much give you an F, either a D or an F.

MS. BLAIR: That is absolutely not true. Ms. Danforth was on the stand and told your Honor that there are hospitals, they get As, Bs, Cs that don't participate because it is a composite score. If your CMS data is good, you can get a C, you can get a B, might be hard to get an A, I don't know, I haven't done the calculations.

But there are plenty of hospitals, think about it, if we grade 27 hospitals, 20 percent of them do not participate, your Honor. 8 percent of hospitals, 8 percent of hospitals get a D or an F. That is basic math. If 20 percent aren't

participating and 8 percent get Ds and Fs, then clearly 12 percent are getting better, just basic math, and we know participating hospitals are getting Ds.

Ms. Zambrana said I participated and got a D, and we saw that as an opportunity to recommit to our patients and do better. These five hospitals said we got a D, and we see that as an opportunity to file a lawsuit to shut up Leapfrog. That is why we are today. Look at the relief they are requesting. They never once said can't you be more honest in your disclosures? Can't you be more up front about what is happening? That is why this case is bizarre.

They come in here and say this is a consumer protection statute, we are here to protect patients. We didn't hear from a single patient. Ms. Havericak got up and talked about a red-haired woman in a chair eating lunch and couldn't pull up her TikTok on the phone. And Palm Beach, there is no name of this woman, Palm Beach Network talked about a cardiac surgeon, no name, who talked with a patient, no name, who didn't want to have his surgery, and didn't come to Palm Beach for the surgery. We don't know his outcome, anything, unreliable.

St. Mary's testified patient declined to come to St. Mary's under patient preference, so that works against them. West Boca, we heard about JD with the compound fracture and FW with the armpit infection. On cross-examination Mr. Hanlon

couldn't testify about the who, what, where, when or the outcome of either of those, and most perplexing is he testified he provided documents to his lawyers with all this information, and none of this was presented to your Honor. Again, unreliable.

And Good Samaritan, this is the HSS document, this was created March of 2025, this lawsuit was filed April 30, 2025. If they were going to use that as evidence of their harm they should have produced it. They didn't. It was produced on January 13, 2025, one day after the trial was supposed to begin. Your Honor pointed out that if we look at that document -- it is in evidence, for what purpose we will see it later. If you look at the document, it doesn't excuse Leapfrog at all. What they say is no.

You should weigh that evidence heavily because Ms. Montgomery got on the stand and she talked about text messages she had with Dr. Soma, and phone conversations she had with Dr. Wayne, or Wang is what I heard, and none of that was introduced, none of it was testified to at her deposition. They did testify there was a contract and it hadn't been canceled, but there were questions about it.

She testified she is text messaging with this guy about how the reason they have to leave, and it is coming from New York, the reason they have to leave Good Samaritan is because of the Leapfrog grade. Where is that evidence? I was

never told that, and I went through each one of the CEOs painstakingly, interrogatory number 8, 14, and 18 asked them to provide all of their evidence of harm. None of it.

Your Honor has a scheduling order in the case where they are supposed to list every trial exhibit they are going to use, not on their list. Yet they come in and say you should listen to Sheri Montgomery about the text messages that never came into evidence.

That is what the consumer harm is here, that is their evidence of consumer harm. It is not enough, it is hearsay. If it comes in for some other issue, some other reason, don't know how it can come in for anything other than state of mind, no name, no who, what, where, when. It can't come in for the truth of the matter.

THE COURT: What about the evidence of the decline of walk-ins to the emergency room?

MS. BLAIR: I love that. Mr. Hanlon testified and he said on the stand that he made the determination, again from reasoning, he imputed based on reasoning that the only explanation for the down turn in his walk-ins was the Leapfrog grade. We went through four meetings, and he said in each one of them he reported to his governing board and his medical executive committee that part of the reason this was down was due to infrastructure issues, and more seasonal people going back up north.

And then you heard from Mark Rule, and he said without the projections and the actual data you can't make a determination as to whether a corporation -- they can't just have their feelings hurt, you have to have some sort of financial impact, you have to quantify it. He said you can't do it without the projections. Mr. Hanlon had some projections about how much they were going to lose in light of their construction, they were down 30 percent for walk-ins.

If you look at the emergency room visits in the document they presented to your Honor, also at West Boca, consistent with the infrastructure issues, and we asked Mr. Hanlon about this on the stand, the police, the police bringing patients to West Boca is significantly down.

I asked Mr. Hanlon, is it your testimony today that the reason the police aren't bringing patients to you is because of the Leapfrog grade, and he said no.

THE COURT: That number was something like 43 versus 5,000 -- the number of people the police brought went from 52 to 43, as opposed to the walk-ins which was like 5,000. While the percentage was significant, the number was minuscule. It didn't make any difference, is what I'm saying, what the police did.

MS.BLAIR: I see. My point is, these numbers can be down for other impacts. Mark Rule talked about the saturation of the market here in Florida, Cleveland Clinic. There is lots

of testimony in deposition, not here before you, they didn't testify about that. Mark Rule testified that could be an impact factor, but until we see what they are projecting -- because these five hospitals have the documents, they didn't produce them, but they have the documents.

I asked for them, they didn't produce them, and what those projection documents would have shown is were they expecting already a down turn in admissions, elective admissions and ORs, if they were expecting a down turn because of seasonal issues or new competitors coming to the market, that is what you look at. If you are expecting it to be down by 40 percent and it was only down by 30 percent there is no impact there.

THE COURT: You don't think F grades impact whether a doctor wants to work in a place or morale at a place, or a patient thinks if I am twice as likely to die there I might not want to go to the hospital. You don't think without some empirical data that shouldn't be considered?

MS. BLAIR: There is no evidence of that. Those are anecdotes to this Court for which no evidence has been presented.

THE COURT: Don't you think anybody that ever went to school knows the impact of an F or a D?

MS. BLAIR: Yes, maybe, but it is their burden to come in here and establish that, and they can't establish that

anybody credibly saw these grades and relied on them to their detriment. They have a lady in the chair who was scared, no name patients who wouldn't go to cardiac, they have a finger --

THE COURT: How about your guy that drove 400 miles because he was worried about surgery?

MS. BLAIR: Right, he made a standard business decision to --

THE COURT: You would acknowledge people do make that decision.

MS. BLAIR: Probably.

THE COURT: If the data that they are give is wrong, they are making that decision irrationally, aren't they?

MS. BLAIR: No, I don't think so. Here is what I think: I think if you care enough to figure out what Leapfrog is, and drill down on the data to figure out if you want to go there you have looked at the metrics.

THE COURT: What if you just look at the TikTok video or read the Palm Beach Post story that said the four worst hospitals are here in Palm Beach County; do you think you would go beyond that and go to the methodology page on the Leapfrog website and say, how did they come up with this 15 score on hand washing?

MS. BLAIR: I do. The community hospitals testified that they have been servicing these -- families for generations, Mr. Cazares gave that testimony.

If this is your hospital your grandma was treated there, your parents, and you took the kids there for ear tubes or whatever, you are going to ask why did you guys get an F? My family has been here all the time. These hospitals have testified extensively, these CEOs, that they have a commitment to patients. Their mission statement is to be transparent. Their complaint is people are asking about our patient safety. That is the complaint.

I would argue to your Honor if you hold yourself out as a community hospital dedicated to patient safety and transparency you are going to get questions. Part of your job as a CEO of a community hospital is to answer those questions. The fact that they come in here and say people are asking us questions about their safety grade, interestingly, they testified nobody ever asked them a question about their one star CMS score.

It is not evidence, but we are in oral argument at this point. In September of this year the Mayo Clinic put out a health locator score, they don't do good on that either.

This idea that patients never ask questions, their governing board never asks questions, their medical executive committee never asked questions about the fact that they were a one star overall hospital based on CMS data, which your Honor pointed out to me is a pay for performance standard, you would think from a profit perspective people would be very concerned

about that. If CMS is paying us for performance, and we have one star, nobody asked them, and most incredibly --

THE COURT: Doesn't that say your F has more impact or dramatic impact than the one star?

MS. BLAIR: No.

THE COURT: The one star, at least there is data behind it. Your F, I don't think it does.

MS. BLAIR: I think it is disingenuous the one star that is tied to payment is less impactful than a not for profit watchdog group who can't effect change in your hospital at all.

That has been the testimony, which has been eye opening, your Honor. It is incredible to believe that -- forget about people who don't care about patient safety. It is incredible to believe that a for profit hospital system doesn't care that their CMS -- or their Medicare reimbursement is being impacted by the one star rating.

THE COURT: Why do you think they don't care?

MS. BLAIR: They testified that no one ever asked them about it.

THE COURT: That is a different question than whether they care about changing it.

I don't understand. You are saying they don't care about the one star?

MS. BLAIR: They say no one ever asked questions about their patient safety and quality despite the fact they have

been one stars until the Leapfrog rate came out. I find that incredible that the governing board, who should be concerned about finance, and the medical executive committee, who should be concerned about patient safety, never asked about the one star. Nobody ever asked, that is the testimony.

You are weighing credibility here, that is what they testified to. The more important point on this is that Delray and West Boca had -- if the Leapfrog grade, as your Honor suggested, had such an impact, right, Delray and West Boca had Ds before this and they testified nobody asked any questions even of those Ds until after the fall 2024 methodology change where they stayed -- Delray went to an F, and West Boca stayed as a D.

What they want to say to your Honor is that is the catalyst, that is the causal link, look no further, I had a D before and after, and it was this imputation model change that impacted me. It makes no sense, just not credible.

At the end of the day --

THE COURT: Before you stop, if I believe that the scores are deceptive and were to be inclined to enter an injunction, what type of injunction would allow you to continue your mission, but accommodate their concern?

MS. BLAIR: Just a better footnote. What Dr. Berger testified to was that the footnote doesn't tell a consumer how we got to that grade, you remember, they really emphasized

that. It doesn't tell the consumer how we got to that grade.

The idea that we are somehow going to protect consumers by not grading five hospitals is a wild idea. If they are here to protect consumers against what they believe to be this wildly oppressive, unscrupulous, immoral watch dog group, and we are harming patients all over South Florida, that is what they believe we are doing, we are harming patients all over South Florida, if that is what they believe the relief I showed you where they simply say keep us out, keep us out. You can tell consumers whatever you want about nonparticipating hospitals, here it is, just don't grade us.

THE COURT: What is the harm to you having to reflect them not being graded? As I understand that, you do that if you have insufficient information on seven measures, you put not graded. What is the harm to Leapfrog if you had to do that?

MS. BLAIR: What you would effectively be doing is hiding how the hospitals' benchmark against their competitors.

When we look at the legislative intent of FDUTPA it is protect consumers. When somebody looks and sees Cleveland Clinic is an A, or Jupiter, I've got to go to Jupiter when this is over, Jupiter hospital is an A, then we don't have to compare ourselves against Jupiter. Jupiter could be the best in --

THE COURT: You still have one star -- I don't know if

there was evidence about Jupiter. You have one star, the accreditation bodies, all the other information sources. You would be eliminating one that might not be accurate from their standpoint.

MS. BLAIR: I disagree. These other accreditation bodies, all they put out is that you are accredited. You just get accredited, so that doesn't help the consumer.

The CMS star, they whisper it. That is what they don't like, we don't whisper it, but CMS whispers it.

THE COURT: You don't whisper, but I am not sure that what you're shouting is accurate.

MS. BLAIR: I think it is. What we are saying, Leapfrog has gone to great pains over 24 years to figure out what are the measures that Leapfrog believes and what are the standards for the measures that Leapfrog believes, and this is our opinion. We are not telling them you are not --

THE COURT: Why didn't anyone take seriously the email where Dr. romano says, if you want to penalize hospitals that don't respond why can't we be honest about it instead of doing this?

I didn't see anybody taking that seriously, or the doctor from UC Davis where he says call it blackmail if you will. Why is that not a concern to Leapfrog, that you are using a penalty to make people respond to your survey?

MS. BLAIR: Two things, I had a question like that

myself, and I represent Dr. Romano in this case, and what he told your Honor on the stand, he used a analogy, I am not saying punish, they are using it -- Dr. Romano looked at you and said, when I say penalize I mean you were getting a hundred before we didn't know whether you were getting a hundred. Now you are getting fewer points. He talked about the football analogy and false start. This is not a punishment.

The mirror they are trying to create, which there is zero proof -- Ms. Binder talked to you about it, they are trying to say that we automatically fail if we don't do these four measures, and it is simply --

THE COURT: It is pretty close to true, isn't it?

MS. BLAIR: No, that is not the evidence, that is not the evidence. Plenty of hospitals if you look at the chart --

THE COURT: But no hospital that scored at the bottom of all four got above an F.

MS. BLAIR: No, that is not the evidence.

THE COURT: It is testimony -- Dr. Nicholson claims that he reviewed the scores of every hospital, that was his testimony.

MS. BLAIR: That was Dr. Nicholson's testimony. That is not his testimony. His testimony is we give these five hospitals and all the nonparticipating hospitals limited achievement. There is not one participating hospital that gets achievement on all four.

THE COURT: Right.

MS. BLAIR: What he didn't testify to is you get some achievement on three and four? We don't know.

THE COURT: Take that one statistic that nobody else, no other participating hospital is given the bottom score on each of the four measures.

MS. BLAIR: Okay.

THE COURT: Isn't that telling that what you are doing is using this as a penalty to force hospitals to participate?

MS. BLAIR: There is no forcing hospitals to participate. Why it is not forcing anybody to participate is because they know, and they can make a conscious business decision based on what the calculator that we sent them, the months they have to prepare if they want to participate, they are making that decision. We are not forcing anybody to do anything, not at all. They are making that decision.

We see that in DX 618 where these hospitals -- Regina West, the director of quality over all four hospitals, and Ricky Ramirez, the director of quality over all four hospitals, sent a message to Maggie Deal, the president of all five hospitals, and they say they can participate in the survey with minimal resources and no cost.

How is that forcing? Each one of them said we are survey ready, we are survey ready at any time on all four measures. Mr. Cazares, I asked him, if you are forced to

participate, could you. He said yes.

THE COURT: Why isn't it a legitimate business decision to say, given the parameters they use, we have a hard time getting above a C, and it is just isn't worth it, it is just not worth it? Isn't that a reason, not that it is too much work, it is we don't see the benefit in what you are doing saying we will stick it to you if you don't participate. Isn't that what you are doing?

MS. BLAIR: No, each one of the hospitals with the exception of Delray and West Boca, so Palm Beach Gardens, St. Mary's, Good Samaritan were Cs. Even getting a hundred out of a hundred points for all four of the measures, they got perfect under the old methodology, they were still Cs.

THE COURT: That is my point.

MS. BLAIR: They said they didn't care. Mr. Cazares said that was an okay grade, we didn't care.

THE COURT: Isn't that what Jackson is saying? Jackson is getting Cs and filling out your survey. What if Jackson said, look, we don't see the benefit of it, we think it doesn't the make sense, if you use your imputation method and gave them an F -- I guess it seems to me you are using a penalty to force hospitals to participate. I think I agree with Dr. Romano.

MS. BLAIR: He didn't use the word penalty.

THE COURT: He did. He didn't use the word

punishment.

MS. BLAIR: He said I don't --

THE COURT: So you accept penalty?

MS. BLAIR: It is a reduction in points.

THE COURT: It is a penalty.

MS. BLAIR: You went from a hundred without any data, and now we are going to say we don't have any data.

THE COURT: I thought you had data then when you are getting 85, you had data in '21.

MS. BLAIR: In 2021 we had data, spring of '24, we didn't have data for four years. We didn't have data for three years, getting a hundred out of a hundred.

THE COURT: You don't think taking them from 80 to zero or one --

MS. BLAIR: I think it is a numerical error.

THE COURT: It is a penalty.

MS. BLAIR: No, it is a numerical penalty, but what it doesn't do is automatically deflate your grade. You don't have to trust me on that. We know that because West Boca went from a D to a D. There are numerical grade cutoffs. I want to make sure that message doesn't get lost.

If Ramzy takes a test and he gets 99, and you take that same test and get a 91, you both get an A. That is what the cutoff points are. Just having a reduction in points four of 22 measures which Mark Rule testified are not significant

drivers of the composite score, it doesn't automatically lower your grade, and you don't have to trust me. These hospitals were not performing well before because of the composite nature of the score, because however you do the math, 24 percent or 30 percent, right, are these four measures.

The significant majority of this grade comes from the CMS publicly reported data that each one of them testified to was their actual data, and Mark Rule said to your Honor, these four measures are not a significant driver of your grade.

It is a penalty, a reduction of points, we gave you a perfect now we are not. You are getting your test points. We are saying you answer the question, you have a hand hygiene policy, you didn't show your work. Before we were giving you a hundred points for showing your work and you weren't.

It is a numerical penalty, not a grade penalty. They have done a fantastic job of conflating these two things.

If I leave you with nothing else, that is the message. Leapfrog went to great pains from a scientific methodology to make sure this was a composite score so that no one factor would be the one and only significant driver of the overall letter grade, and that has been proven.

I went way over time.

THE COURT: You both did.

Keep any rebuttal short. You all are roughly at the same amount. The Defendants have had a little more so far. I

probably took up most of your time.

MS. MALONEY: So, I had intended to reserve ten minutes for rebuttal. I am going to try to get this done in seven and. Your Honor, I would welcome you saying Ms. Maloney or counsel move on, but I am trying to answer some of the questions you raised so just let me know. Let's go to slide 39, please.

Dr. Nicholson testified to this. He takes Leapfrog's assigned score, 60 out of a hundred, where does that score fall compared to the actual scores of participating hospitals? The answer, which Dr. Harris yesterday confirmed when he looked at the same slide, is that it falls far below the bottom one percent of participating hospitals whose actual scores, the actual scores of participating hospitals are approximately 282 out of 400.

That is more than a 4 percent increase for them just for participating, okay, and non-comparison doesn't assume for safety, it shows penalty assigning hospitals a score that is worse than the worst hospitals in the country without any data. Okay.

So the bottom one percent of participating hospitals in theory should be the worst in the country, yet because we don't participate we are 400 percent worse than they are.

Now, that is why the question is not whether nonparticipants are less safe, but whether Leapfrog had

rationally assigned a score -- that extreme from 100 to 15, from 100 to five, from 100 to 25 without evidence, without data, and to the extent Defense counsel suggests there is no evidence that F hospitals represent the bottom one percent nationally, that is simply wrong. Leapfrog's own documents show that less than one percent of the hospitals receive an F. It is at PX 97 and 428, they are both in evidence and they say that.

Your Honor also asked about when counsel alleged that there was reliable testimony in the record -- let's go to the next slide -- that this re-weighting doesn't have an effect. This came in through Nicholson, and this also was acknowledged by Dr. Harris in his testimony. You may recall that he had to correct himself regarding the 24 percent versus the 30 percent. When those three measures are taken out that is what happens, you get a re-weighting of the four measures, the five, 15, 15, 25 into the 31 percent. That is the circle I talked with -- that Missy Danforth assented to. She had made an error.

Let's be clear, if you are not imputing the four measures count for 24 percent of your score, if you are a participating hospital they count for 24 percent of your score, approximately a quarter. Once you are a non-participating hospital they account for nearly a third of your score.

Nonparticipating hospitals are hit twice, I called it the double whammy, fake failing scores and increased weight

assigned to the fake scores, and there is no evidence in the record other than what I showed you in the prior slide from Dr. Nicholson they got confirmed by Harris that this double whammy doesn't actually drive the score down from C to D and D to F. She argues this is -- I am trying to move through it quickly.

So this argument confuses outcome with impact. Dr. Nicholson addresses this question, not whether the letter changes in the one instance, but what Leapfrog's nonparticipation penalty does to the score relative to where the hospital would otherwise land.

I want to remind you -- go to the next slide. I want to remind you, yes, West Boca started at a D, it also went down to an F. When it started at that D there was not the amplification of the grades that we saw, one; and two, it is our view and Dr. Berger's view in his testimony that it is that F, the F has an enormous effect on the perception of the hospitals, and at the time -- at the time that the methodology change occurred, you had press that is in the record and I showed in the opening, some of the opening slides that promoted the F of the other Palm Beach Health Network hospitals right alongside West Boca.

Dr. Nicholson addresses the next question, not whether the letter changes, but what the penalty does to the score relative to where the hospital would otherwise land.

Nicholson runs the counter factual using Leapfrog's

own scoring system as opposed to a made up methodology that Dr. Rule used that is inconsistent with their own expert guidance on how to score hospitals. What Dr. Nicholson did, he shows when you remove the automatic scores and re-weighting penalty, the two factors, West Boca's score materially improves.

The fact that it remained at a D in one snapshot in time doesn't mean the penalty is relevant. It means it moves it deeper into the D range, keeps it there rather than allowing it for improvement. Once you are in the gutter with the double whammy and the false four measures you can't climb out without exceptional improvement that isn't required of participating hospitals.

Now, I want to get to the argument that counsel made -- go to the next slide, slide 57 -- with regard to the U.S. testing that she was defending in response to the 3 percent that Dr. Berger referenced.

So there is no evidence that that testing, the Robert Johnson Foundation testing, there is no evidence of what that testing recommended, no evidence of how it was applied, no evidence of any response, especially given that it occurred a decade ago, long before Footnote 4 ever existed. And their point rebounds on them because as Leapfrog designs a website that is easier to read, but that conveys false or misleading content, that is doubly misleading.

We are going to show you how that is the case with the

actual footnotes, but if an eighth grader can read that they are telling them they are twice as likely to die if they go to one of the hospitals, that is the problem and the analytics confirm it.

Ms. Campione suggested linking the methodology to the safety grade page. I am not sure if that would be enough. We don't know, it is not in the record. She explained that Ms. Binder and Ms. Danforth do not care to do so, okay. Instead they buried the document among multiple clicks, and then -- given the fact that only 3 percent of users ever access it, his point is, it doesn't really matter what it says, how complicated it is, nobody is looking at the methodology.

Let's talk about Footnote 4 which she relies on heavily and says solves most of the deception.

Okay. So, Dr. Berger explained, first of all, Footnote 1 is untethered to any specific score or measure. It doesn't tell a patient what data is missing, what assumption is made or hoe any score is calculated. It is meaningless and deepens the confusion. I really think you have to think about -- I want you to be reminded of this testimony, your Honor, because as you are thinking of a remedy, what this testimony and evidence shows from their own website is they are incapable of fixing this. They need to not grade us.

So this is for one of our hospitals, I did this very quickly and you can't tell which one this is, but it is one of

ours. Theirs says declined to report. Here is the crazy thing -- pull up the next slide -- this is Jupiter Medical Center. Can you scroll down.

It also has that footnote, so somehow in putting together their website they included this declined to report on both participating hospitals and nonparticipating hospitals, removing the effect of footnote one. They don't talk about footnote one because they know this is true. Let's go back to the prior one.

Footnote four appears only if the user clicks on four of 32 measures. That was where we went through all the measures, and that is the first and only time it appears, four out of 32 measures going through the gas gauges, and even then it doesn't explain the grade.

Progressive disclosure is not a remedy if there is no actual disclosure in the first place.

Footnote four is not intended, let's to go that, it is not intended to explain how or why participating hospitals are assigned a score. That is not the purpose. Mr. Vredenburgh confirmed that footnote four does not show a customer under the hood of how the score is assigned.

When confronted with a step one hospital, that is the historical performance data, and step two, he admits that he couldn't tell them apart. That matters.

So Leapfrog -- Leapfrog fought to keep him off the

stand, but as we heard in his testimony by video after two horse of browsing the website even he couldn't understand how Leapfrog grades.

THE COURT: All right. You are all at the same time, wrap up your rebuttal.

MS. MALONEY: You got it.

JX 40, which she opened her closing which relies on non-response bias, it is the community hospitals excuse participating, it under cuts their theory entirely. They wanted to important advertise pet to avoid the penalty, they ask, can we participate. Again, they know what the consequences will be. That is not hiding performance, that is a deliberate choice.

Our fighting this was a deliberate force not to cave to the pressure, instead direct resources we hope if an injunction is entered to where patient care matters. Very quickly, but I will speak slowly.

Defense counsel repeatedly suggests that Leapfrog methodology carries scientific legitimacy because it was expert approved. We have Austin, Leapfrog doesn't inquiry the panel about how to adopt the penalty. There is no evidence in the report whatsoever that five, 15, 15, 25 was ever put before the expert panel and Ms. Danforth confirmed the same point. Can we go to that slide.

It was a group thing, not peer reviewed, not

validation and in the expert approval, it is self deception. They believe these hospitals were bad, down turn in admissions they suggest hospitals were expecting a down turn. The evidence is the opposite, and at West Boca the testimony is that the hospital is expanding its emergency room department and expected an increase in patient volume. What it saw was decline in the walk-ins.

Decline does not come from market forces, and the market forces were acknowledged by the CEOs and they still said the big difference was Leapfrog based on their experience in the market.

Defendants elicited no testimony, offered no evidence that competition caused any down turn. The only thing they offered was the speculative opinion of Mr. Rule and counsel saying she had driven around and seen a lot of other hospitals. The only record evidence shows that Leapfrog actively promoted Jupiter Medical Center, who is a competitor, amplifying Jupiter's grades and positioning it against the Plaintiff hospitals.

Now, I've got to do CMS and the last thing I have to do is the business model and injunction. She questions the integrity and the credibility of the CEOs, saying it is incredible to believe it has a greater impact that one star. The record shows that is true. Why star ratings have existed for years without discussing patient care.

THE COURT: Let's wrap this up. Thank you.

MS. MALONEY: Something that wouldn't compromise their business model, it is a fair question, but under the statute and Supreme Court precedent, the legal inquiry is not how to preserve a business model for injunctive relief, it is how to fully remedy deceptive and unfair conduct. It is an equitable remedy and the Supreme Court has said an equitable remedy must provide complete redress to the injury proven, not a partial or cosmetic fix.

That is why the answer can't be a better footnote. The question is not whether an injunction is convenient for Leapfrog; the question is whether the remedy fully corrects the harm. No footnote can fully do that.

What could do it is for them to do what every CEO who testified has asked for, just stop grading us. If your Honor thinks that goes too far, and I believe the case law will show you in our briefing on the remedy that it does not, but if your Honor thinks that goes too far and wants to give Leapfrog grace by being able to claim that they have something on their website for every hospital in the United States, then they know how to do it without grading us.

They put an NG in place of the F, take down the gas gauges and tell consumers the truth, they didn't grade them. And they need to tell the consumers to redress the harm of the past grade and about what we hope will be your ruling on their

deceptive and unfair practices.

Thank you, your Honor.

THE COURT: Thank you. What do you want to do? Would you like to file something else or not?

MS. MALONEY: We think it is important to file something else, which I think we've discussed being a revision to our proposed findings of fact and conclusions of law and as well we think, given the precedent in the Eleventh Circuit, it is important to have specific briefing, even if it is acknowledging that you want specific briefing on the scope of the remedy.

We are happy to do a brief instead of findings of fact and conclusions of law. You tell us what you would prefer and counsel probably has her views as well.

MS. BLAIR: They filed a brief with respect to the case I handed you up from the Eleventh Circuit.

THE COURT: I haven't seen it yet.

MS. BLAIR: We would like a short -- I think it was three pages, and I would like the ability to draft a short reply to that.

I think at the outset of the trial we did talk about revisions to the findings of fact and it would be helpful to have the transcript to make it easier.

THE COURT: Let's do that. Include -- obviously in the conclusions of law you can include briefing, whatever law

you want to put in, put it in that. One document which is an update of your findings of fact and conclusions of law which includes any legal argument you want to make.

When do you want to do it? How long do you want to have?

MS. BLAIR: A certain amount of days after we get the last day of the transcript. Maybe 30 days?

MS. MALONEY: Two to three weeks after we get the final transcript, and the reason for that is they have safety grades coming out in the spring, in April. I am hopeful that your Honor set this trial date when he did in response to our initial complaint in April so that we can avoid more rounds if you made a finding of deception and unfairness.

It would end up being three, four weeks.

THE COURT: Fourteen days, does that work for you all? I was trying to respond to both of you.

MS. BLAIR: I thought 30 days made sense to me, but we will do it in two weeks.

THE COURT: All right.

MS. MALONEY: February 6th we will submit those, no response to theirs, and they receive no response to ours.

THE COURT: Yes.

You can start now. The transcript I guess can come in late, and you can adjust it. You all have pretty good information.

**Thank you all. You did an excellent job presenting your cases and I appreciate your skill. Thank you all.**

**(Thereupon, the proceedings concluded.)**

* * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date: January 30, 2026

/s/ Pauline A. Stipes, Official Federal Reporter

Signature of Court Reporter

**MS. BLAIR: [98]** 41/13 44/5 45/1 45/8 45/13 45/21 46/6 46/9 46/12 46/17 46/19 46/23 46/25 47/5 47/8 47/15 48/10 49/7 49/11 49/16 49/23 50/16 50/23 51/21 51/24 52/14 53/2 53/21 55/19 55/23 56/16 57/22 58/1 58/3 58/11 58/17 58/25 59/3 59/11 59/18 60/24 61/6 61/9 61/11 61/13 61/22 62/1 62/10 62/22 63/5 63/15 64/7 66/5 66/8 68/12 68/16 69/6 69/9 69/14 70/13 70/16 71/12 71/15 74/16 76/18 76/23 77/5 77/9 77/12 77/22 79/4 79/7 79/17 79/23 80/22 81/16 82/4 82/11 82/24 83/12 83/16 83/20 84/1 84/6 84/9 85/8 85/14 85/23 86/1 86/3 86/5 86/9 86/14 86/16 97/14 97/17 98/5 98/16
**MS. MALONEY: [36]** 3/3 3/7 14/6 16/13 19/9 23/2 23/8 23/13 25/1 25/8 25/13 25/22 27/16 27/19 28/4 28/20 30/19 30/22 35/10 35/15 35/25 36/20 36/24 38/13 38/18 38/21 39/1 39/22 40/1 44/23 88/1 94/5 96/1 97/4 98/7 98/19
**MS.BLAIR: [2]** 48/13 75/22
**THE COURT: [135]**

**$**

**$2,000 [1]** 65/15
**$200,000 [1]** 58/6

**'**

**'21 [2]** 61/11 86/9
**'24 [1]** 86/10

**/**

**/s [1]** 99/9

**0**

**0550 [1]** 2/5

**1**

**10 [1]** 41/15
**100 [3]** 89/1 89/2 89/2
**12 percent [1]** 72/2
**13 [1]** 73/10
**14 [1]** 74/2
**15 [17]** 7/8 7/10 7/18 7/18 8/9 8/9 13/23 13/23 19/21 19/21 61/6 77/21 89/1 89/16 89/16 94/22 94/22
**161 [1]** 2/4
**1700 [1]** 1/18
**18 [4]** 26/22 27/21 27/22 74/2
**18 percent [2]** 66/13 66/21
**185 [1]** 46/16
**1921 [1]** 61/4
**1966 [3]** 64/21 65/2 65/4

**2**

**20 [1]** 71/1
**20 percent [2]** 71/23 71/25
**200 [2]** 51/7 61/18
**20036 [1]** 1/19
**2004 [1]** 13/17
**2012 [2]** 65/5 65/7
**2017 [1]** 39/18
**202-887-3729 [1]** 1/19
**2021 [5]** 7/21 15/2 51/25 52/1 86/10
**2024 [11]** 10/17 19/9 19/10 19/15 31/2 41/15 47/20 52/17 52/18 54/10 80/11
**2025 [10]** 31/2 31/2 35/12 35/16 37/4 37/8 42/25 73/7 73/7 73/10
**2026 [4]** 1/9 31/3 54/10 99/8
**22 [3]** 17/2 66/18 86/25
**23 [1]** 1/9
**24 [4]** 26/22 27/21 27/23 82/13
**24 percent [5]** 25/9 87/4 89/14 89/20 89/21
**25 [7]** 7/18 8/9 13/23 19/21 89/2 89/17 94/22
**25-CV-80526-MIDDLEBROOKS [1]** 1/3
**250 [1]** 1/22
**26 [1]** 25/8
**27 [1]** 71/23
**28 [1]** 30/24
**282 [1]** 88/14

**3**

**3 percent [3]** 59/17 91/16 92/10
**30 [5]** 73/7 89/14 98/7 98/17 99/8
**30 percent [4]** 25/8 75/8 76/12 87/5
**305-400-4260 [1]** 1/23
**31 percent [2]** 25/9 89/17
**312-704-0550 [1]** 2/5
**32 [4]** 59/21 69/16 93/11 93/13
**33131 [1]** 1/23
**3434 [1]** 2/8
**3729 [1]** 1/19
**385 [1]** 47/3
**39 [1]** 88/7

**4**

**4 percent [1]** 88/16
**40 [2]** 41/16 94/7
**40 percent [1]** 76/12
**400 [7]** 13/7 46/17 47/3 48/3 48/3 77/4 88/15
**400 percent [1]** 88/23
**4260 [1]** 1/23
**428 [1]** 89/7
**43 [2]** 75/17 75/19
**4500 [1]** 2/4

**5**

**5,000 [2]** 75/18 75/19
**50 [1]** 59/5
**526 [1]** 19/2
**52 [1]** 75/18
**561-803-3434 [1]** 2/8
**57 [1]** 91/14
**59 [1]** 59/20

**6**

**60 [1]** 88/9
**60601 [1]** 2/5
**618 [1]** 84/17
**6th [1]** 98/20

**7**

**73 [4]** 41/25 41/25 66/23 66/24
**75 [2]** 47/2 47/3
**7th [1]** 52/23

**8**

**8 million-dollar [1]** 71/1
**8 percent [3]** 71/24 71/24 72/1
**80 [1]** 86/13
**813 [1]** 67/21
**85 [2]** 51/21 86/9
**85 percent [2]** 44/12 61/5
**85 point [1]** 44/13
**88 [1]** 61/12

**9**

**91 [1]** 86/23
**97 [1]** 89/7
**99 [1]** 86/22

**A**

**a pretty [1]** 30/13
**a reference [1]** 33/23
**ability [2]** 41/22 97/19
**able [2]** 28/19 96/19
**about [141]**
**about some [1]** 52/25
**above [5]** 13/14 20/9 83/16 85/4 99/6
**absence [1]** 8/6
**absolutely [6]** 21/3 35/18 39/23 52/15 58/23 71/16
**accept [13]** 36/7 37/1 37/2 37/8 37/9 37/12 37/13 37/13 37/13 37/19 37/19 38/4 86/3
**acceptable [2]** 28/15 53/8
**accepts [1]** 34/13
**access [5]** 17/12 26/11 26/19 27/13 92/10
**accessible [2]** 6/23 58/8
**accommodate [1]** 80/22
**account [1]** 89/23
**accountable [2]** 65/22 67/11
**accreditation [6]** 15/22 15/24 15/25 32/15 82/2 82/5
**accreditations [1]** 15/25
**accredited [2]** 82/6 82/7
**accurate [4]** 37/6 63/6 82/3 82/11
**accurately [2]** 8/5 16/3
**achieve [1]** 51/5
**achieved [1]** 55/5
**achievement [11]** 8/9 50/18 50/19 54/16 54/18 55/3 55/3

**A**


**achievement... [4]** 63/1 83/24 83/25 84/3
**acknowledge [1]** 77/8
**acknowledged [4]** 13/18 37/18 89/12 95/9
**acknowledging [1]** 97/10
**across [3]** 13/14 29/25 46/16
**act [4]** 12/14 23/2 33/4 52/11
**acted [1]** 12/18
**actively [2]** 10/13 95/16
**activities [1]** 57/2
**actual [14]** 5/2 6/5 6/20 8/17 8/22 48/20 69/18 75/2 87/8 88/10 88/13 88/14 92/1 93/16
**actually [14]** 4/10 4/16 6/12 16/2 18/18 19/5 19/5 27/2 27/9 32/12 37/24 45/6 62/11 90/4
**acute [3]** 54/10 54/14 70/6
**add [1]** 11/5
**added [1]** 21/12
**additional [1]** 38/8
**address [4]** 30/5 38/25 39/4 41/21
**addresses [3]** 38/25 90/7 90/22
**adjust [1]** 98/24
**administering [1]** 55/1
**administration [1]** 54/25
**administrative [1]** 31/11
**admission [3]** 29/8 32/22 34/20
**admissions [12]** 14/22 17/3 24/1 24/8 24/9 24/12 26/7 37/14 37/15 76/8 76/9 95/2
**admits [1]** 93/23
**admitted [3]** 11/18 14/1 36/8
**adopt [1]** 94/21
**ads [2]** 11/8 12/12
**adult [3]** 54/10 54/14 70/5
**advance [2]** 48/17 68/18
**advertise [1]** 94/10
**advertising [2]** 10/14 10/20
**advice [3]** 31/7 33/17 34/8
**Advil [3]** 59/5 59/7 59/10
**affect [1]** 68/20
**affected [1]** 24/23
**affecting [1]** 32/13
**affiliated [1]** 31/9
**affirmative [1]** 20/4
**affirmatively [1]** 6/9
**afraid [4]** 11/6 17/9 32/7 32/8
**after [14]** 11/4 12/24 17/22 31/18 37/4 40/25 46/6 54/5 73/10 80/11 80/16 94/1 98/6 98/8
**again [10]** 7/2 9/13 11/20 27/5 54/4 59/24 63/8 73/4 74/18 94/11
**against [16]** 28/3 31/6 33/17 34/8 42/5 50/25 51/11 51/20 67/19 68/7 71/2 72/23 81/4 81/18 81/23 95/18
**aggrieved [2]** 52/11 52/11
**ago [2]** 41/15 91/21
**agree [6]** 16/11 28/12 28/14 55/14 69/20 85/22
**agreed [1]** 62/14
**ahead [2]** 39/1 44/8
**AI [1]** 60/7
**airwaves [1]** 13/15
**al [1]** 1/5
**Alex [4]** 45/16 63/12 64/8 64/17
**all [86]** 3/9 3/12 5/25 9/4 12/24 14/22 15/16 15/17 18/3 18/20 20/5 21/13 23/6 23/22 25/25 28/3 28/20 29/19 30/2 30/5 30/15 30/15 33/4 37/9 37/23 38/15 38/18 38/19 39/1 41/7 41/13 41/25 41/25 43/7 43/8 43/10 45/1 46/6 49/4 50/18 50/19 50/25 52/1 53/13 54/7 55/14 56/6 62/5 62/21 63/8 65/24 67/18 68/1 69/9 69/10 69/18 69/19 70/5 73/3 73/14 74/3 78/4 79/10 81/6 81/7 82/2 82/6 83/16 83/23 83/25 84/16 84/18 84/19 84/20 84/24 85/12 87/24 92/15 93/11 94/4 94/4 98/15 98/19 98/24 99/1 99/2
**allegations [1]** 71/8
**allege [1]** 43/15
**alleged [2]** 55/13 89/9
**Alliance [2]** 11/15 56/21
**allow [2]** 46/2 80/21
**allowed [1]** 29/23
**allowing [1]** 91/8
**allows [1]** 62/23
**alone [1]** 12/4
**along [1]** 62/5
**alongside [1]** 90/21
**already [5]** 28/24 29/15 41/5 54/12 76/8
**also [26]** 5/23 6/9 7/20 9/3 11/13 14/15 16/1 20/22 21/1 21/16 30/1 34/24 39/11 39/22 40/5 40/13 40/18 48/25 68/3 70/5 70/7 75/10 89/9 89/12 90/12 93/4
**although [3]** 11/23 22/17 35/8
**always [1]** 13/1
**am [40]** 3/4 16/14 22/9 22/11 26/20 32/8 32/8 32/24 33/1 35/1 35/24 36/16 36/19 36/23 39/3 39/15 45/9 45/24 45/25 49/20 50/1 55/12 56/13 56/17 57/18 59/5 59/24 64/16 65/1 65/22 69/24 69/25 76/16 82/10 83/2 88/3 88/5 90/5 92/6 98/10
**AMA [1]** 33/16
**ambiguity [1]** 6/19
**among [4]** 64/3 64/4 66/4 92/9
**amount [4]** 62/24 62/25 87/25 98/6
**ample [1]** 40/16
**amplification [7]** 12/9 12/16 26/5 31/10 35/22 37/17 90/14
**amplifies [1]** 10/1
**amplifying [1]** 95/17
**analogy [4]** 21/10 49/25 83/2 83/7
**analysis [2]** 21/14 52/9
**analytics [5]** 58/10 59/19 59/22 60/3 92/3
**and it [1]** 4/6
**and they [1]** 68/4
**anecdotal [1]** 34/4
**anecdotes [1]** 76/20
**annoyed [1]** 26/16
**annual [1]** 13/5
**anonymous [1]** 59/23
**another [5]** 25/20 32/6 34/21 44/25 52/17
**answer [12]** 24/25 25/25 40/23 42/7 51/14 53/10 64/3 78/12 87/12 88/5 88/11 96/10
**answered [2]** 21/6 38/23
**answers [1]** 27/7
**anxious [1]** 31/12
**any [32]** 10/2 16/18 21/14 21/14 21/15 24/6 32/19 47/15 49/11 50/9 50/10 50/15 52/20 56/9 57/25 59/9 59/25 62/17 69/5 69/13 75/21 80/10 84/24 86/6 86/7 87/24 88/19 91/20 92/16 92/18 95/13 98/3
**anybody [8]** 21/5 21/19 67/1 76/22 77/1 82/21 84/11 84/15
**anymore [1]** 51/24
**anyone [4]** 14/23 36/12 57/7 82/17
**anything [9]** 38/18 38/24 39/24 58/9 62/8 63/25 72/20 74/12 84/16
**anyway [4]** 23/7 26/1 26/3 33/19
**apart [1]** 93/24
**apologize [1]** 35/11
**apparently [1]** 35/9
**APPEARANCES [1]** 1/14
**appeared [1]** 11/9
**appears [6]** 5/15 27/8 30/9 48/1 93/10 93/12
**apples [2]** 63/19 63/19
**applied [1]** 91/19
**applies [3]** 21/11 39/11 64/15
**apply [3]** 15/8 36/9 39/5
**appreciate [6]** 27/5 30/23 38/7 39/24 40/22 99/2
**approach [3]** 30/11 50/22 60/14
**appropriate [1]** 29/11
**approval [1]** 95/1
**approved [3]** 5/5 9/8 94/20
**approximately [2]** 88/14 89/22
**April [5]** 42/25 67/17 73/7 98/10 98/12
**April 30 [1]** 73/7
**April 5 [1]** 67/17
**arbitrary [1]** 13/16
**architect [1]** 69/17
**are [287]**

A
**are performing [1]** 48/3
**areas [2]** 16/24 18/19
**aren't [6]** 16/20 55/23 60/24 71/25 75/15 77/12
**argue [3]** 68/12 69/15 78/9
**argues [1]** 90/5
**arguing [1]** 52/13
**argument [9]** 19/7 41/1 51/13 62/2 62/5 78/17 90/6 91/13 98/3
**arguments [1]** 3/2
**armpit [1]** 72/25
**around [4]** 8/22 12/7 32/24 95/15
**arriving [1]** 18/1
**article [3]** 59/25 64/21 65/2
**articles [2]** 59/20 71/2
**as [95]** 3/24 4/2 4/6 4/18 4/19 7/11 7/24 8/19 8/24 9/25 12/23 12/24 13/17 14/1 16/16 17/8 17/23 17/23 18/7 18/9 18/10 18/11 18/17 19/11 19/19 19/19 26/7 26/21 26/21 27/3 27/13 27/19 28/13 29/20 31/3 33/4 34/4 34/10 34/14 35/5 35/6 36/18 37/12 37/12 37/22 38/1 38/6 38/10 39/9 39/16 39/22 40/4 41/2 41/8 42/2 43/18 44/9 44/15 46/1 47/16 49/1 50/4 52/23 55/7 57/8 60/15 61/4 63/18 63/23 64/8 65/9 66/3 67/19 68/14 69/13 71/18 72/5 72/7 73/8 75/3 75/19 76/16 78/10 78/12 80/8 80/13 81/13 84/9 91/1 91/22 92/2 92/21 94/1 97/7 97/14
**as a [1]** 19/11
**as it [1]** 27/13
**Ascension [2]** 30/6 30/10
**aside [1]** 8/19
**ask [6]** 30/16 39/12 43/14 78/3 78/20 94/11
**asked [25]** 6/16 9/13 21/3 39/16 39/18 43/3 47/23 57/12 57/17 60/6 74/2 75/11 75/14 76/6 78/15 78/22 79/2 79/18 79/24 80/4 80/5 80/10 84/25 89/9 96/15
**asking [7]** 22/9 41/17 43/2 52/18 64/18 78/7 78/13
**asks [1]** 78/21
**aspect [1]** 35/23
**assented [1]** 89/18
**asserted [1]** 35/3
**assign [1]** 13/22
**assigned [9]** 53/23 62/14 62/17 70/9 88/9 89/1 90/1 93/19 93/21
**assigning [2]** 34/16 88/18
**assignment [2]** 13/23 53/24
**assigns [1]** 4/4
**assume [7]** 49/3 53/20 62/10 62/24 63/1 69/22 88/17
**assumes [6]** 14/10 15/8 15/9 15/11 23/21 56/11
**assumption [2]** 14/9 92/17
**assumptions [2]** 8/18 13/16
**assures [1]** 6/10
**asterisk [2]** 62/7 62/8
**atmosphere [1]** 37/20
**attack [1]** 19/7
**attention [1]** 15/22
**attorney's [1]** 42/21
**audits [2]** 15/1 16/2
**Austin [7]** 21/4 23/16 45/16 54/17 60/14 63/12 94/20
**Austin's [1]** 42/11
**automatic [1]** 91/4
**automatically [4]** 71/9 83/10 86/18 87/1
**available [3]** 8/24 10/3 62/15
**average [2]** 8/8 57/20
**avoid [2]** 94/10 98/12
**avoidance [1]** 60/11
**avoiding [1]** 13/9
**avoids [1]** 30/12
**awhile [1]** 49/25

B
**babies [1]** 18/5
**back [9]** 11/21 18/25 19/2 31/8 38/18 39/19 64/5 74/25 93/8
**bad [3]** 21/16 32/11 95/2
**Bailey [1]** 10/19
**bar [1]** 54/24
**bars [1]** 51/6
**based [25]** 3/24 13/7 14/8 16/9 19/18 22/18 23/7 28/8 28/22 32/7 47/25 48/7 48/7 48/20 59/8 60/18 64/3 64/21 66/4 67/15 69/4 74/19 78/23 84/13 95/10
**baseless [2]** 16/6 18/14
**basic [3]** 7/14 71/25 72/2
**basically [1]** 61/21
**basing [1]** 68/12
**basis [10]** 13/24 14/18 14/24 15/1 15/5 15/6 16/18 30/3 49/5 50/9
**BCMA [4]** 51/22 54/9 54/24 68/21
**be [99]** 3/1 3/5 3/6 3/17 6/2 6/7 10/2 15/20 17/12 17/12 17/24 19/16 19/25 20/17 23/11 26/1 27/18 28/11 28/15 28/16 28/19 29/5 29/8 29/10 29/22 29/24 30/20 31/7 35/1 36/5 37/21 39/13 39/19 41/6 41/10 42/8 43/22 44/5 44/25 45/4 45/6 45/7 45/7 47/4 47/9 48/1 48/19 49/23 52/11 53/1 54/19 54/20 55/14 56/17 56/19 56/19 56/22 57/2 57/7 57/13 58/9 59/24 59/25 60/18 61/5 63/6 68/24 68/24 69/25 70/20 70/22 70/23 71/20 72/9 72/10 75/23 76/2 76/11 76/18 78/6 78/25 80/2 80/4 80/20 81/5 81/17 81/23 82/3 82/3 82/19 87/20 88/22 89/19 92/6 92/20 94/12 96/10 96/25 97/22
**be more [1]** 72/9
**BEACH [11]** 1/2 1/8 2/7 32/10 72/16 72/17 72/19 77/18 77/19 85/10 90/20
**Beach/Ft [1]** 2/7
**became [1]** 19/18
**because [78]** 8/1 8/20 12/16 14/8 14/10 15/10 15/10 16/1 16/19 17/8 17/11 17/12 17/13 17/23 18/12 20/10 20/13 20/24 21/21 22/2 22/4 22/6 23/11 23/14 27/5 29/6 31/25 32/25 34/2 34/6 34/8 35/4 35/18 36/6 36/13 36/17 36/19 38/9 42/16 43/8 45/5 45/22 47/23 48/1 48/7 49/4 50/1 51/4 52/2 53/17 53/20 61/6 62/9 63/6 63/18 64/19 65/15 67/8 67/12 68/5 70/7 70/9 71/18 73/15 73/25 75/16 76/4 76/9 77/5 84/12 86/19 87/3 87/4 88/22 91/22 92/21 93/8 94/19
**become [1]** 26/11
**been [33]** 8/11 9/15 18/3 19/19 26/10 30/8 31/21 32/4 34/4 35/10 35/18 36/13 37/5 37/9 43/11 43/24 46/10 49/24 51/15 52/20 55/12 57/4 58/23 62/5 63/8 73/20 76/20 77/24 78/4 79/11 79/11 80/1 87/21
**been impacting [1]** 32/4
**before [33]** 1/11 4/15 7/21 10/2 10/18 12/5 16/7 16/8 16/22 17/16 19/13 19/14 19/15 29/2 30/15 32/23 35/10 36/18 38/25 42/24 48/20 52/4 52/6 65/13 76/1 80/10 80/16 80/19 83/5 87/3 87/13 91/21 94/22
**began [1]** 43/7
**begin [1]** 73/11
**beginning [1]** 68/25
**behind [3]** 26/16 47/15 79/7
**being [18]** 7/7 16/4 17/14 21/19 21/19 22/14 26/3 32/13 37/24 37/25 45/21 59/21 61/4 79/15 81/13 96/19 97/6 98/14
**belabor [1]** 67/17
**belief [4]** 19/19 24/14 35/23 44/14
**believe [28]** 4/23 5/1 5/4 8/23 19/2 22/24 23/16 26/24 27/4 32/19 33/1 34/12 34/14 37/4 48/2 60/19 64/4 66/20 70/21 79/12 79/14 80/19 81/4 81/7 81/8 95/2 95/23 96/16
**believes [4]** 29/22 64/14 82/14 82/15
**believing [3]** 15/2 21/14 21/15
**below [3]** 49/4 49/22 88/12
**BENCH [1]** 1/11
**benchmark [2]** 67/19 81/18
**benefit [4]** 26/23 45/12 85/6 85/19
**Berger [17]** 8/15 8/20 8/23

**B**


**Berger... [14]** 10/24 11/22 18/7 23/24 24/8 40/18 57/5 57/10 59/4 59/7 60/1 80/23 91/16 92/15
**Berger's [2]** 59/20 90/15
**best [11]** 7/12 7/22 8/1 8/1 17/24 17/24 17/25 21/1 24/19 60/2 81/24
**best in [1]** 81/24
**BETH [1]** 1/15
**better [12]** 11/2 27/12 45/1 45/1 45/4 45/11 65/25 66/12 72/2 72/6 80/23 96/10
**better why [1]** 45/11
**between [3]** 33/13 38/6 54/7
**beyond [4]** 22/10 23/22 33/3 77/20
**bias [21]** 14/5 14/8 14/9 15/5 15/7 15/8 16/5 16/12 16/16 17/7 18/13 18/17 19/4 48/13 48/15 48/23 63/17 64/3 64/15 66/16 94/8
**big [2]** 70/24 95/10
**biggest [1]** 68/20
**BILLEK [1]** 2/2
**Binder [7]** 13/2 24/1 58/12 65/6 71/6 83/9 92/8
**Biscayne [1]** 1/22
**bit [1]** 18/2
**bizarre [1]** 72/11
**blackmail [2]** 48/25 82/22
**BLAIR [2]** 2/1 63/25
**blow [3]** 19/25 20/1 20/3
**board [7]** 11/13 11/14 29/25 64/13 74/22 78/21 80/2
**Boca [12]** 52/5 72/24 75/10 75/13 80/8 80/9 80/12 85/10 86/19 90/12 90/21 95/4
**Boca's [1]** 91/5
**bodies [2]** 82/2 82/6
**bog [1]** 28/1
**bogged [1]** 39/21
**bone [2]** 20/7 33/17
**both [9]** 8/15 9/8 28/14 36/17 86/23 87/23 89/7 93/6 98/16
**bother [3]** 66/15 66/15 66/16
**bothered [1]** 43/14
**bothering [1]** 20/24
**bottle [1]** 59/13
**bottom [11]** 7/15 8/13 49/4 53/18 61/22 69/9 83/15 84/5 88/12 88/21 89/4
**Boulevard [1]** 1/22
**boxes [1]** 20/5
**brain [2]** 32/13 32/13
**brazen [1]** 71/8
**brief [7]** 8/19 38/5 38/8 40/4 54/1 97/12 97/15
**briefing [9]** 27/1 27/7 28/12 28/14 39/13 96/17 97/9 97/10 97/25
**bring [1]** 22/1
**bringing [2]** 75/12 75/15
**broadcast [1]** 12/11
**broadcasting [1]** 9/24
**broadcasting nonparticipating [1]** 9/24
**brought [3]** 43/18 47/24 75/18
**browsing [1]** 94/2
**Bs [2]** 52/5 71/18
**buckle [1]** 17/21
**buckled [1]** 11/6
**building [2]** 17/25 18/2
**built [1]** 12/7
**bunch [2]** 26/16 67/3
**burden [2]** 52/22 76/24
**buried [2]** 23/25 92/9
**business [16]** 22/21 22/23 33/16 42/7 48/21 49/1 49/2 49/3 49/8 49/9 77/6 84/12 85/2 95/21 96/3 96/5
**but there [1]** 17/7
**buy [1]** 56/5
**by being [1]** 96/19
**by data [1]** 4/24
**by Ms [1]** 70/21
**by the [1]** 52/11
**bypassed [1]** 31/7
**bypassed the [1]** 31/7


**C**


**calculated [3]** 9/15 9/16 92/18
**calculation [2]** 13/25 14/2
**calculations [1]** 71/21
**calculator [1]** 84/13
**calculators [1]** 55/16
**call [7]** 20/19 36/12 48/25 49/19 49/19 61/21 82/22
**called [5]** 6/1 13/21 29/16 54/19 89/24
**calling [1]** 71/3
**calls [1]** 71/4
**came [13]** 26/12 32/17 35/4 35/9 35/11 35/12 35/24 39/9 44/13 51/2 74/8 80/1 89/12
**campaign [2]** 12/13 70/13
**campaigns [1]** 10/14
**Campione [5]** 45/16 63/12 64/8 64/17 92/5
**can [50]** 10/3 16/13 20/1 20/24 22/15 22/21 23/19 24/15 26/16 26/19 27/1 29/18 32/11 35/1 35/23 38/4 41/1 42/8 44/5 44/6 44/19 47/4 49/6 53/13 55/7 55/14 65/24 67/9 67/10 67/21 69/18 69/19 69/20 71/19 71/20 74/12 75/23 81/10 84/12 84/21 92/1 93/3 94/11 94/23 96/13 97/25 98/12 98/23 98/23 98/24
**can't [22]** 18/24 20/6 20/8 21/4 22/18 22/23 36/20 56/19 63/15 70/23 72/9 72/10 74/13 75/2 75/3 75/5 76/25 79/10 82/19 91/10 92/25 96/10
**canceled [2]** 31/6 73/21
**cancellation [1]** 35/9
**cannot [2]** 43/22 68/24
**cardiac [2]** 72/17 77/3
**care [31]** 3/8 10/9 11/15 11/19 12/22 13/2 31/6 31/11 31/13 32/11 32/13 34/17 42/10 43/15 54/5 54/11 54/14 64/20 65/25 70/6 77/14 79/13 79/15 79/17 79/21 79/22 85/15 85/16 92/8 94/16 95/25
**care hospital [1]** 54/14
**cared [1]** 16/4
**careful [1]** 57/19
**Carl [1]** 13/6
**carries [1]** 94/19
**case [34]** 1/3 3/14 4/2 4/8 7/25 16/19 25/7 25/10 34/12 36/19 38/8 39/8 39/14 39/16 40/4 40/5 40/9 41/14 42/12 43/3 43/10 44/4 55/7 55/12 65/18 67/6 68/16 68/24 72/11 74/4 83/1 91/25 96/16 97/16
**cases [2]** 39/21 99/2
**casualty [1]** 43/11
**cataloging [1]** 63/3
**catalyst [1]** 80/15
**catch [1]** 10/3
**Caulil [2]** 11/12 11/17
**causal [6]** 38/6 52/7 52/8 52/12 52/20 80/15
**causation [4]** 35/15 35/22 36/18 40/11
**cause [1]** 37/22
**caused [1]** 95/13
**causes [2]** 37/21 62/20
**causing [2]** 4/11 44/16
**cave [1]** 94/14
**Cazares [7]** 18/10 27/5 32/10 32/16 77/25 84/25 85/15
**cease [2]** 41/23 42/5
**CENTER [4]** 1/5 49/20 93/3 95/17
**CEO [6]** 11/17 15/13 35/3 37/12 78/12 96/14
**CEOs [12]** 15/21 16/1 27/3 32/20 40/18 40/20 51/16 66/13 74/1 78/5 95/9 95/22
**certain [3]** 18/19 20/23 98/6
**certainly [1]** 27/24
**certainty [1]** 47/11
**certify [1]** 99/5
**chair [2]** 72/15 77/2
**change [16]** 17/16 17/18 17/19 17/22 19/8 19/10 30/5 31/18 34/20 39/20 48/17 65/24 79/10 80/11 80/16 90/18
**changed [5]** 7/22 16/8 16/23 19/18 52/6
**changes [2]** 90/8 90/23
**changing [2]** 42/18 79/21
**characterizations [1]** 8/20
**charge [4]** 55/19 55/20 55/21 55/22
**chart [2]** 67/24 83/14
**Chicago [1]** 2/5
**choice [5]** 11/20 14/2 48/21 60/22 94/13
**choices [3]** 13/4 15/20 38/1
**circle [1]** 89/17
**Circuit [5]** 39/8 39/14 40/2 97/8 97/16
**circulated [1]** 11/17

C

**citation [1]** 9/2
**cite [1]** 27/7
**cited [1]** 59/20
**cites [2]** 8/19 8/24
**City [1]** 20/23
**claim [8]** 13/9 23/6 43/17 43/17 43/18 43/18 43/19 96/19
**claiming [1]** 16/18
**claims [3]** 5/23 13/12 83/18
**Clark [1]** 2/4
**class [5]** 15/11 20/14 50/1 50/2 50/7
**clear [12]** 10/15 23/17 23/18 23/25 29/25 31/22 47/9 59/16 68/24 69/15 70/20 89/19
**clearly [5]** 5/7 23/24 42/4 48/8 72/1
**Cleveland [2]** 75/25 81/20
**click [3]** 11/1 29/25 70/24
**clicks [3]** 70/25 92/9 93/10
**clients [2]** 19/12 21/8
**climb [1]** 91/10
**clinic [4]** 18/21 75/25 78/18 81/21
**clinical [1]** 13/24
**clips [1]** 70/18
**close [2]** 71/11 83/12
**closing [3]** 3/2 8/25 94/7
**closings [1]** 28/18
**CMS [37]** 5/20 20/1 23/7 26/7 26/8 26/12 26/12 26/13 26/17 26/20 26/22 27/4 27/9 27/14 27/16 27/19 27/20 52/2 54/13 65/7 65/17 65/23 66/2 66/6 67/1 67/23 68/1 69/18 71/19 78/16 78/23 79/1 79/15 82/8 82/9 87/7 95/20
**code [1]** 54/24
**codified [1]** 40/3
**cohort [4]** 19/15 47/21 61/8 61/9
**cohort median [1]** 61/8
**collateral [1]** 34/14
**colleague [1]** 39/16
**colleagues [1]** 3/7
**colloquial [1]** 47/9
**colloquy [1]** 27/5
**colonoscopy [1]** 65/15
**combat [1]** 71/2
**combined [1]** 21/25
**come [21]** 12/24 21/23 25/12 32/1 35/12 52/4 63/9 63/10 64/5 65/4 72/12 72/19 72/22 74/6 74/12 74/13 76/24 77/21 78/13 95/8 98/23
**comes [6]** 21/13 49/6 66/14 70/22 74/11 87/6
**coming [5]** 38/9 60/1 73/23 76/10 98/10
**comment [3]** 16/21 21/2 64/13
**Commission [1]** 68/19
**commitment [1]** 78/5
**committee [3]** 74/23 78/22 80/3
**communicate [1]** 60/19
**communicates [1]** 8/10
**communities [1]** 10/2
**community [14]** 7/6 7/9 7/13 10/18 11/10 18/19 29/1 32/18 42/2 50/5 77/23 78/10 78/12 94/8
**compare [1]** 81/23
**compared [1]** 88/10
**comparison [1]** 88/17
**competition [1]** 95/13
**competitor [1]** 95/17
**competitors [2]** 76/10 81/18
**complaint [4]** 42/16 78/7 78/8 98/12
**complete [3]** 6/18 13/20 96/8
**completed [2]** 5/3 6/13
**complicated [1]** 92/12
**composite [10]** 48/4 52/4 67/14 67/22 68/14 69/13 71/19 87/1 87/3 87/19
**compound [2]** 33/17 72/24
**comprehension [1]** 57/6
**compromise [1]** 96/2
**computer [1]** 68/22
**concern [7]** 33/18 44/15 44/18 44/20 45/15 80/22 82/23
**concerned [4]** 17/23 78/25 80/2 80/4
**concerns [2]** 31/16 32/16
**concise [1]** 59/16
**concluded [1]** 99/3
**conclusion [2]** 25/12 60/1
**conclusions [6]** 9/3 28/13 97/7 97/13 97/25 98/2
**conditional [1]** 4/19
**conduct [2]** 4/1 96/6
**confer [1]** 9/21
**confidence [1]** 32/3
**confirm [1]** 92/4
**confirmed [4]** 88/11 90/3 93/20 94/23
**confirming [1]** 10/13
**conflating [1]** 87/16
**confronted [1]** 93/22
**confused [1]** 57/18
**confuses [1]** 90/6
**confusion [2]** 32/3 92/19
**Congress [2]** 65/7 69/1
**conjunction [2]** 68/14 68/15
**conscious [2]** 13/17 84/12
**consequences [3]** 12/15 31/1 94/12
**consider [2]** 35/23 36/18
**considerable [1]** 55/3
**considered [1]** 76/18
**consistent [4]** 30/14 40/8 53/2 75/11
**conspicuous [1]** 59/16
**constantly [2]** 20/25 71/3
**construction [1]** 75/8
**consumer [41]** 5/8 5/14 6/15 9/12 10/7 11/21 23/22 31/23 33/2 33/13 39/6 39/11 43/15 43/20 43/20 45/20 55/11 55/13 55/15 55/15 55/24 56/18 56/20 56/22 57/6 57/6 57/8 57/20 58/22 59/21 59/24 60/2 60/6 60/15 60/21 72/12 74/9 74/10 80/24 81/1 82/7
**consumers [56]** 3/18 3/25 4/17 4/22 4/23 5/1 5/4 5/6 6/4 6/20 7/25 8/16 9/7 9/13 9/18 9/21 10/1 10/4 10/8 11/18 12/18 12/21 12/22 12/23 12/25 13/3 23/17 24/11 24/20 24/21 25/15 29/7 50/22 51/13 55/18 55/23 56/24 56/25 57/1 57/1 57/13 57/15 58/10 58/16 58/19 59/18 60/15 60/24 62/3 69/12 81/3 81/4 81/10 81/20 96/23 96/24
**Consumers rely [1]** 12/23
**consumers that [1]** 9/18
**consuming [2]** 69/22 70/4
**contacting [2]** 42/10 42/11
**contains [2]** 58/13 64/24
**contemplate [1]** 29/20
**content [1]** 91/24
**context [4]** 10/23 11/5 11/14 40/20
**contextualizes [1]** 40/19
**contingency [1]** 65/20
**continue [3]** 31/12 40/13 80/21
**continued [2]** 11/5 61/18
**continuing [2]** 40/17 41/5
**contract [6]** 15/19 34/22 37/2 37/3 38/7 73/20
**contrary [4]** 9/25 14/2 14/19 50/16
**contrast [2]** 7/12 8/10
**convenient [1]** 96/11
**conversations [1]** 73/17
**convey [1]** 16/3
**conveys [4]** 4/17 5/13 9/18 91/23
**convince [3]** 35/21 59/2 67/15
**convinced [1]** 65/17
**Cornerstone [1]** 64/20
**corporate [2]** 42/1 43/18
**corporation [2]** 21/25 75/3
**correct [4]** 32/5 41/3 89/14 99/5
**corrected [1]** 30/2
**corrective [1]** 28/25
**corrects [2]** 30/11 96/12
**cosmetic [1]** 96/9
**cost [2]** 22/2 84/22
**costs [1]** 22/2
**could [14]** 24/6 25/10 26/11 26/11 28/5 36/9 37/11 59/25 65/6 70/20 76/2 81/23 85/1 96/14
**couldn't [6]** 65/13 68/11 72/15 73/1 93/24 94/2
**counsel [9]** 38/25 52/21 88/5 89/3 89/9 91/13 94/18 95/14 97/14
**count [2]** 89/20 89/21
**counter [1]** 90/25
**country [8]** 46/16 49/5 49/23 50/11 53/21 69/6 88/19 88/22
**County [1]** 77/19
**couple [2]** 40/24 44/20

C

**course [4]** 9/3 16/7 19/7 55/15
**court [16]** 1/1 2/7 3/11 4/2 29/3 34/1 36/8 38/25 41/14 43/2 54/8 60/2 76/20 96/4 96/7 99/10
**Court precedent [1]** 96/4
**Court's [2]** 30/3 39/13
**COURTNEY [1]** 2/1
**cover [1]** 31/16
**covering [1]** 3/9
**CPOE [1]** 54/9
**CRAIN [1]** 1/17
**crazy [1]** 93/1
**create [1]** 83/8
**created [1]** 73/7
**credibility [3]** 52/19 80/6 95/22
**credible [1]** 80/17
**credibly [2]** 63/11 77/1
**credit [2]** 50/2 54/20
**creeping [2]** 44/14 44/23
**critical [4]** 4/16 5/16 13/4 60/16
**critical violation [1]** 60/16
**cross [2]** 14/12 72/25
**cross-examination [2]** 14/12 72/25
**Crutcher [1]** 1/18
**Cs [9]** 16/8 17/16 24/22 31/17 52/5 71/18 85/11 85/13 85/18
**cultivating [1]** 5/16
**current [5]** 21/11 21/12 27/12 27/24 30/1
**currently [1]** 50/18
**customer [3]** 10/6 60/9 93/20
**customers [1]** 9/11
**cutoff [1]** 86/24
**cutoffs [1]** 86/20
**cuts [1]** 94/9
**CV [1]** 1/3

D

**damage [1]** 34/14
**damages [2]** 40/6 43/3
**Danforth [17]** 14/1 14/13 21/4 26/13 26/24 45/16 47/23 51/3 54/23 61/14 63/13 68/3 70/21 71/16 89/18 92/8 94/23
**Danforth's [1]** 27/25
**data [91]** 4/5 4/24 4/25 5/6 5/12 5/12 5/15 5/20 5/21 5/23 6/3 6/6 6/6 6/9 7/5 7/13 8/3 8/6 8/11 8/18 9/19 14/19 14/20 18/11 18/14 21/14 26/11 26/14 26/17 26/18 26/19 26/22 27/12 27/13 27/19 28/22 28/24 29/5 29/16 29/20 30/12 41/3 41/6 48/16 48/20 52/2 53/15 55/23 56/3 56/5 56/10 62/17 63/11 63/11 63/14 63/23 64/2 65/8 65/9 65/14 65/21 65/23 66/25 67/6 68/1 68/3 68/12 68/23 69/18 69/23 70/9 71/19 75/2 76/18 77/11 77/15 78/23 79/6 86/6 86/7 86/8 86/9 86/10 86/11 86/11 87/7 87/8 88/19 89/3 92/17 93/23
**data for [1]** 65/9
**date [3]** 40/19 98/11 99/8
**dates [1]** 35/13
**Davis [3]** 17/20 19/22 82/22
**Davis' [1]** 42/10
**day [4]** 39/9 73/10 80/18 98/7
**days [7]** 3/13 43/25 53/5 98/6 98/7 98/15 98/17
**DC [1]** 1/19
**Deal [1]** 84/20
**debated [1]** 64/2
**debunked [2]** 16/6 26/10
**decade [1]** 91/21
**deceive [2]** 55/11 58/21
**deceived [4]** 33/5 57/2 57/8 57/13
**December [1]** 41/15
**December 10 [1]** 41/15
**deception [14]** 4/1 30/11 31/22 33/13 34/6 39/5 39/5 41/4 53/6 55/10 57/15 92/14 95/1 98/13
**deceptive [17]** 23/1 23/12 28/25 30/18 34/8 41/9 43/21 44/5 44/9 52/11 55/8 55/9 69/25 70/1 80/20 96/6 97/1
**decided [7]** 11/7 13/20 17/21 46/9 51/24 63/24 70/10
**deciding [1]** 10/9
**decision [24]** 13/19 16/10 22/21 22/23 33/1 35/8 36/10 39/9 39/19 43/19 49/1 49/2 49/3 49/9 49/10 59/8 71/6 77/7 77/9 77/12 84/13 84/15 84/16 85/3
**decision to [1]** 77/7
**decisions [2]** 13/2 53/1
**declaration [1]** 28/21
**declarations [1]** 42/19
**declare [1]** 42/20
**decline [3]** 74/15 95/7 95/8
**declined [8]** 8/4 32/19 32/23 62/12 70/8 72/22 93/1 93/5
**dedicate [1]** 45/3
**dedicated [1]** 78/10
**deepens [1]** 92/19
**deeper [1]** 91/8
**deeply [1]** 13/11
**defamation [2]** 42/1 43/17
**defend [1]** 71/6
**Defendant [2]** 1/10 2/1
**Defendants [3]** 34/4 87/25 95/12
**defending [2]** 70/12 91/15
**Defense [2]** 89/3 94/18
**deflate [1]** 86/18
**degree [1]** 63/14
**delay [1]** 32/13
**delayed [1]** 32/11
**delays [1]** 34/7
**deliberate [3]** 12/9 94/13 94/14
**deliberately [1]** 9/25
**Delray [12]** 31/18 32/2 32/7 52/5 70/18 70/22 70/23 70/24 80/7 80/9 80/12 85/10
**demand [1]** 20/13
**demonstrative [1]** 46/21
**department [1]** 95/5
**depending [2]** 43/21 60/8
**depends [1]** 12/8
**deposition [6]** 35/17 35/19 57/17 64/9 73/19 76/1
**derives [1]** 6/13
**described [3]** 32/5 32/11 32/18
**deserve [3]** 18/7 29/12 41/7
**designed [3]** 9/10 9/21 10/5
**designed to [1]** 9/21
**designs [1]** 91/22
**desist [2]** 41/23 42/5
**despite [1]** 79/25
**detached [1]** 18/21
**determination [3]** 62/6 74/18 75/3
**detriment [8]** 57/2 57/9 57/13 58/22 58/22 59/6 59/9 77/2
**development [1]** 10/12
**devoted [1]** 34/11
**Dicker [1]** 2/3
**did [38]** 3/3 11/4 14/20 25/4 25/13 25/15 25/21 25/23 26/2 27/17 30/5 36/2 36/5 37/10 37/10 39/3 46/1 47/7 47/8 48/6 50/6 52/8 64/11 64/20 65/17 65/17 68/25 73/20 75/22 77/21 78/3 85/25 87/23 91/3 92/24 97/21 98/11 99/1
**didn't [53]** 11/5 11/14 12/10 13/20 14/16 15/10 15/11 16/24 17/11 19/13 19/14 19/14 19/16 19/16 23/11 29/9 30/4 32/1 32/19 36/12 46/2 47/15 48/25 50/1 50/19 53/14 53/17 53/20 53/22 58/9 63/21 66/16 67/16 72/13 72/19 72/19 73/9 75/21 76/1 76/4 76/6 82/17 82/21 83/5 84/2 85/15 85/16 85/24 85/25 86/11 86/11 87/13 96/23
**die [6]** 3/24 18/10 32/7 32/9 76/16 92/2
**difference [6]** 30/17 49/11 49/24 54/7 75/21 95/10
**different [7]** 4/9 15/18 26/4 26/6 50/8 59/20 79/20
**differentiate [1]** 46/2
**difficult [2]** 29/14 40/16
**difficulty [2]** 17/4 17/6
**dig [1]** 58/20
**digital [1]** 10/14
**direct [1]** 94/15
**directed [1]** 36/6
**direction [1]** 40/14
**directly [3]** 10/20 11/17 32/11
**director [2]** 84/18 84/19
**disagree [2]** 46/23 82/5
**disagreement [1]** 4/3
**disclosure [6]** 4/3 28/25

**D**

**disclosure... [4]** 30/2 59/14 93/15 93/16
**disclosures [2]** 24/7 72/10
**discuss [3]** 12/1 22/10 41/1
**discussed [2]** 52/21 97/6
**discussing [1]** 95/25
**discussion [1]** 54/22
**discussions [1]** 58/13
**disingenuous [1]** 79/8
**dismissed [1]** 34/4
**disparagement [2]** 42/1 43/18
**displays [2]** 8/5 8/7
**dispute [2]** 16/17 16/18
**disputed [1]** 26/25
**disputing [1]** 16/14
**disrespectful [1]** 39/13
**disseminated [1]** 4/12
**dissemination [2]** 10/15 12/8
**distinction [1]** 33/13
**DISTRICT [3]** 1/1 1/1 1/12
**DIVISION [1]** 1/2
**do [98]** 4/7 7/12 7/18 7/25 8/1 8/24 10/25 12/21 16/2 16/16 17/10 18/8 19/4 20/7 21/7 21/8 22/11 22/12 22/25 24/15 24/18 24/19 24/19 25/18 25/19 32/6 35/14 36/5 36/6 36/20 38/20 39/12 39/15 39/25 40/4 41/2 41/5 42/20 44/6 44/6 46/25 47/12 47/18 48/11 49/23 50/24 51/13 51/24 53/9 53/24 54/3 57/25 58/2 58/3 59/14 59/15 61/25 62/6 63/19 65/6 65/12 65/19 66/6 66/7 66/8 66/12 69/3 69/15 71/23 72/5 75/6 77/8 77/19 77/23 78/19 79/17 81/13 81/15 83/10 84/15 86/18 87/4 92/8 92/8 95/20 95/21 96/13 96/14 96/14 96/21 97/3 97/3 97/12 97/24 98/4 98/4 98/4 98/18
**doctor [4]** 24/1 63/9 76/15 82/22
**doctors [4]** 31/11 37/15 37/16 54/5
**document [7]** 56/2 73/6 73/12 73/13 75/10 92/9 98/1
**documentary [2]** 10/12 18/15
**documents [5]** 73/3 76/4 76/5 76/7 89/5
**does [31]** 3/21 3/22 4/9 4/16 4/18 6/18 14/7 18/22 24/25 26/12 26/13 32/4 34/13 35/17 37/22 38/12 40/7 49/12 53/23 59/12 66/2 66/6 68/25 79/7 88/9 90/9 90/23 93/20 95/8 96/17 98/15
**doesn't [33]** 3/23 6/8 9/23 14/5 14/8 15/7 18/21 39/20 49/11 49/15 56/10 56/12 59/8 62/8 65/4 73/13 79/3 79/14 80/24 81/1 82/7 85/20 86/18 86/21 87/1 88/17 89/11 90/4 91/7 92/11 92/17 93/14 94/20
**doesn't stop [1]** 6/8
**dog [2]** 49/19 81/5
**doing [32]** 4/9 4/10 4/20 4/21 11/6 15/1 17/22 22/24 23/8 23/9 26/17 26/18 42/13 44/25 45/1 45/11 54/13 61/17 65/4 65/10 65/20 66/11 66/22 67/10 67/19 68/20 81/7 81/17 82/19 84/8 85/6 85/8
**dollar [3]** 34/22 37/2 71/1
**dollars [1]** 56/3
**don't [105]**
**DONALD [2]** 1/11 2/8
**done [6]** 24/10 58/5 67/14 71/21 87/16 88/3
**Donnabedian [1]** 64/21
**double [3]** 89/25 90/3 91/9
**doubled [1]** 14/13
**doubly [1]** 91/24
**down [25]** 14/13 24/24 28/1 31/3 39/21 43/21 59/13 67/9 74/20 74/23 75/8 75/13 75/24 76/8 76/9 76/11 76/12 77/15 90/4 90/12 93/3 95/2 95/3 95/13 96/22
**Dr [72]** 7/16 8/15 8/20 8/23 10/24 11/22 12/20 14/11 14/15 18/7 19/22 20/4 21/4 22/22 23/15 23/24 24/8 24/8 24/9 37/18 40/18 45/16 45/16 46/21 47/16 48/14 48/22 48/24 49/8 53/7 53/23 54/4 54/17 57/4 59/4 59/7 59/19 59/25 62/14 63/12 63/12 63/12 63/18 64/10 64/10 64/17 64/19 65/8 65/10 67/23 68/6 69/16 73/17 73/17 80/23 82/18 83/1 83/3 83/18 83/21 85/23 88/8 88/11 89/13 90/2 90/6 90/15 90/22 91/1 91/3 91/16 92/15
**Dr. [1]** 52/8
**Dr. Nicholson [1]** 52/8
**draft [1]** 97/19
**drafting [1]** 64/12
**dramatic [2]** 34/23 79/4
**drastic [1]** 13/18
**drill [2]** 67/9 77/15
**drive [5]** 9/6 21/17 21/20 24/18 90/4
**driven [5]** 5/6 8/3 24/13 24/24 95/15
**driver [4]** 52/3 60/21 87/9 87/20
**drivers [2]** 48/5 87/1
**driving [1]** 68/9
**drop [1]** 44/16
**dropped [2]** 45/6 45/7
**dropping [2]** 45/5 45/12
**drove [2]** 13/7 77/4
**Ds [13]** 16/8 26/1 26/3 37/25 37/25 38/2 52/5 52/5 52/13 72/1 72/3 80/10 80/11
**due [1]** 74/24
**Dunn [1]** 1/18
**during [1]** 47/24
**DX [2]** 67/21 84/17

**E**

**each [9]** 5/6 5/8 10/5 74/1 74/21 84/6 84/23 85/9 87/7
**ear [1]** 78/2
**earlier [1]** 39/20
**early [1]** 43/11
**earned [1]** 4/6
**easier [2]** 91/23 97/23
**easily [1]** 6/22
**eating [2]** 60/20 72/15
**echoes [1]** 5/25
**economist [2]** 54/5 64/20
**Edelman [1]** 2/3
**edge [1]** 22/6
**education [1]** 58/9
**effect [4]** 79/10 89/11 90/16 93/7
**effectively [1]** 81/17
**effects [1]** 59/14
**efforts [1]** 41/21
**eight [3]** 34/22 37/1 58/8
**eight million [1]** 37/1
**eighth [2]** 62/16 92/1
**either [8]** 3/16 30/11 60/5 62/3 63/6 71/15 73/2 78/19
**elective [1]** 76/8
**element [2]** 21/12 55/10
**elements [3]** 52/23 53/4 66/1
**elements about [1]** 66/1
**Eleventh [5]** 39/8 39/14 40/2 97/8 97/16
**elicited [1]** 95/12
**eliminating [1]** 82/3
**else [9]** 4/4 21/19 50/13 53/21 68/23 84/4 87/17 97/4 97/6
**Elser [1]** 2/3
**elsewhere [2]** 31/6 31/9
**email [2]** 41/16 82/17
**embarrassing [1]** 70/17
**emergency [3]** 74/16 75/9 95/5
**emphasized [1]** 80/25
**empirical [1]** 76/18
**employees [3]** 13/18 71/2 71/4
**employer [1]** 42/12
**employers [5]** 4/13 10/2 11/18 33/4 56/21
**end [7]** 9/5 28/11 37/2 37/3 38/7 80/18 98/14
**ended [1]** 37/2
**enjoin [1]** 42/17
**enormous [1]** 90/16
**enough [12]** 5/15 20/20 21/18 21/22 38/14 41/10 54/24 54/25 58/25 74/10 77/14 92/6
**enroll [1]** 15/11
**ensured [2]** 11/9 12/16
**enter [2]** 41/17 80/20
**entered [1]** 94/16
**entire [6]** 15/15 19/8 36/9 42/7 42/7 42/12
**entirely [5]** 4/9 13/11 29/20 30/13 94/9
**entities [2]** 11/19 61/4
**entity [1]** 36/9

**E**

**entries [1]** 68/22
**epidemiology [1]** 16/15
**equate [1]** 48/9
**equating [1]** 7/6
**equitable [2]** 96/6 96/7
**equivalent [1]** 54/18
**ER [3]** 20/13 20/13 32/22
**Erik [1]** 32/10
**eroded [1]** 31/21
**error [2]** 86/15 89/18
**errors [2]** 7/1 68/21
**especially [2]** 34/9 91/20
**ESQ [10]** 1/15 1/16 1/16 1/17 1/17 1/20 2/1 2/1 2/2 2/2
**essentially [8]** 11/6 14/24 15/23 25/16 26/14 27/22 35/19 37/20
**establish [2]** 76/25 76/25
**estimation [5]** 13/24 47/18 47/21 47/25 48/7
**et [1]** 1/5
**evaluated [1]** 3/18
**even [21]** 4/7 5/22 11/4 13/5 25/5 27/3 31/18 38/5 41/8 50/1 53/1 53/19 55/5 65/1 65/13 66/15 80/11 85/11 93/13 94/2 97/9
**event [1]** 35/14
**ever [11]** 14/22 14/23 56/23 76/22 78/15 79/18 79/24 80/5 91/21 92/10 94/22
**every [19]** 9/1 15/1 15/4 15/13 25/16 30/25 31/1 47/11 51/7 51/7 51/15 54/10 57/23 63/9 69/17 74/5 83/19 96/14 96/20
**everybody [10]** 11/6 14/25 32/17 45/11 47/6 53/21 61/9 67/8 67/13 67/15
**everyone [2]** 53/8 70/14
**everything [2]** 38/24 55/7
**evidence [67]** 3/12 4/4 4/15 7/20 10/12 18/15 20/19 24/6 24/7 26/2 34/19 34/23 34/25 36/14 37/23 40/11 40/16 41/16 43/12 44/24 46/18 46/20 50/13 50/15 52/15 52/20 52/21 53/4 56/12 56/13 56/15 57/4 57/7 58/13 58/18 58/23 61/18 67/16 67/17 73/8 73/12 73/15 73/25 74/3 74/8 74/10 74/15 76/19 76/20 78/17 82/1 83/13 83/14 83/17 89/2 89/4 89/7 90/1 91/17 91/18 91/19 91/20 92/22 94/21 95/4 95/12 95/16
**evident [1]** 32/18
**evil [1]** 15/12
**exact [1]** 8/24
**exactly [10]** 3/25 5/19 8/23 12/13 29/20 53/24 56/6 56/7 64/23 68/25
**examination [2]** 14/12 72/25
**examining [1]** 30/7
**example [3]** 17/7 45/25 49/18
**examples [1]** 30/8
**excellence [2]** 51/5 51/6
**excellent [3]** 3/7 3/8 99/1
**exception [1]** 85/10
**exceptional [2]** 18/19 91/11
**exclude [1]** 37/22
**excuse [6]** 3/21 3/22 24/1 68/4 73/13 94/8
**excuses [1]** 68/1
**executive [4]** 41/20 74/23 78/21 80/3
**exhibit [3]** 68/6 68/6 74/5
**exist [1]** 70/5
**existed [2]** 91/21 95/24
**existence [1]** 16/15
**existing [1]** 30/14
**exists [4]** 3/25 8/11 16/17 70/4
**expanded [1]** 33/2
**expanding [2]** 20/13 95/5
**expect [3]** 9/1 41/9 60/18
**expectations [2]** 60/6 60/7
**expected [1]** 95/6
**expecting [4]** 76/8 76/9 76/11 95/3
**experience [8]** 17/14 18/4 18/24 20/6 20/25 22/7 58/5 95/10
**expert [17]** 5/5 6/1 9/9 9/17 12/20 47/7 53/8 54/5 54/5 63/10 63/10 64/6 66/3 91/2 94/19 94/23 95/1
**experts [14]** 9/16 9/20 25/4 25/21 45/25 46/14 50/15 54/6 63/24 63/24 63/24 64/1 64/17 64/19
**explain [10]** 14/4 22/25 23/3 27/8 34/1 47/14 60/24 62/8 93/14 93/18
**explained [16]** 11/15 15/15 18/7 19/19 20/5 23/8 23/9 30/25 32/3 32/16 32/21 40/20 53/12 63/18 92/7 92/15
**explaining [1]** 30/3
**explains [2]** 40/19 62/7
**explanation [9]** 10/2 10/23 11/20 17/8 23/22 23/25 32/20 53/19 74/20
**explicitly [2]** 7/6 12/25
**explicitly equating [1]** 7/6
**expose [1]** 24/16
**exposing [1]** 16/20
**express [1]** 11/10
**expressly [1]** 9/14
**extensive [1]** 58/5
**extensive user [1]** 58/5
**extensively [2]** 54/23 78/5
**extent [3]** 33/5 40/25 89/3
**extra [1]** 13/7
**extraordinary [1]** 29/11
**extreme [1]** 89/1
**eye [1]** 79/11

**F**

**fabricated [1]** 28/22
**fabricating [1]** 3/21
**facilities [1]** 31/7
**facing [3]** 5/14 6/15 9/12
**fact [34]** 7/14 7/22 9/2 14/1 14/19 16/14 16/21 17/6 18/2 18/18 21/24 24/12 28/13 37/1 37/12 37/14 37/22 40/15 52/19 53/3 53/7 53/24 61/25 65/19 67/13 78/13 78/22 79/25 91/6 92/10 97/7 97/12 97/22 98/2
**factor [2]** 76/3 87/19
**factors [2]** 36/11 91/5
**facts [2]** 37/19 38/4
**factual [2]** 25/3 90/25
**fail [2]** 7/14 83/10
**failed [1]** 52/21
**failing [3]** 3/22 18/9 89/25
**failure [2]** 60/10 61/3
**fair [9]** 19/14 19/15 19/16 38/14 48/13 50/23 60/15 64/15 96/3
**fairness [1]** 33/14
**fake [2]** 89/25 90/1
**fall [10]** 10/17 13/17 19/15 22/7 31/2 31/2 47/20 52/17 80/11 88/9
**falls [1]** 88/12
**false [9]** 5/10 8/18 9/22 13/7 24/13 28/24 83/7 91/10 91/23
**families [3]** 32/17 56/25 77/24
**family [1]** 78/4
**fantastic [1]** 87/16
**FAQ [1]** 9/12
**far [10]** 9/24 13/14 17/23 22/14 33/12 64/25 87/25 88/12 96/16 96/18
**FDC [2]** 59/15 59/16
**FDUTPA [10]** 3/25 43/17 43/19 43/22 44/4 44/5 52/23 55/25 59/15 81/19
**fear [3]** 11/7 16/20 29/13
**February [1]** 98/20
**February 6th [1]** 98/20
**Federal [1]** 99/9
**feelings [1]** 75/4
**fees [2]** 42/21 56/3
**fewer [1]** 83/6
**fight [3]** 11/8 21/22 22/3
**fighting [2]** 35/20 94/14
**figure [3]** 77/14 77/15 82/13
**file [5]** 36/16 42/23 72/7 97/4 97/5
**filed [5]** 10/18 11/4 43/1 73/7 97/15
**filing [1]** 37/6
**filings [1]** 38/16
**fill [8]** 7/19 14/16 15/19 17/9 17/11 17/13 17/21 18/5
**filled [2]** 17/5 17/6
**filling [2]** 15/12 85/18
**final [4]** 35/10 35/18 35/21 98/9
**finance [1]** 80/3
**financial [1]** 75/5
**find [4]** 50/9 58/15 58/18 80/1
**finding [1]** 98/13
**findings [7]** 9/2 28/13 30/3 97/7 97/12 97/22 98/2

**F**

**finger [1]** 77/3
**finish [1]** 47/17
**first [19]** 3/10 4/23 5/10 10/6 10/25 10/25 11/9 20/14 25/3 25/25 26/1 29/18 31/10 42/15 56/1 70/23 92/15 93/12 93/16
**firsthand [1]** 21/15
**fits [1]** 36/15
**five [26]** 3/9 3/13 10/18 12/5 20/3 21/25 22/10 30/7 41/17 41/24 43/11 43/24 51/16 53/5 66/24 67/18 70/17 70/25 72/6 76/4 81/3 83/22 84/20 89/2 89/16 94/22
**fix [2]** 24/6 96/9
**fixed [1]** 20/7
**fixing [1]** 92/23
**FL [3]** 1/8 1/23 2/7
**Flatly [1]** 13/6
**FLORIDA [18]** 1/1 10/16 11/15 11/16 12/6 12/12 19/6 23/1 39/16 39/21 43/15 50/6 53/1 56/21 68/8 75/25 81/6 81/8
**Floridians [1]** 42/3
**flows [1]** 26/17
**focal [1]** 10/17
**focus [5]** 15/23 20/11 20/12 20/12 20/17
**focused [2]** 15/21 20/10
**focusing [1]** 20/18
**folks [1]** 19/22
**follow [2]** 39/22 60/14
**following [1]** 45/9
**food [5]** 60/8 60/13 60/14 60/16 60/17
**football [1]** 83/6
**footnote [15]** 12/3 53/22 80/23 80/24 91/21 92/13 92/16 93/4 93/7 93/8 93/10 93/17 93/20 96/10 96/13
**footnotes [1]** 92/1
**for the [1]** 8/11
**force [5]** 49/13 49/15 84/9 85/22 94/14
**forced [1]** 84/25
**forces [2]** 95/8 95/9
**forcing [4]** 84/10 84/11 84/15 84/23
**foregoing [1]** 99/5
**foreseeable [2]** 34/14 34/17
**forget [1]** 79/13
**form [3]** 34/20 34/21 57/14
**formally [1]** 37/3
**former [1]** 71/4
**forward [1]** 3/4
**fought [1]** 93/25
**found [1]** 62/7
**foundation [2]** 58/16 91/18
**four [43]** 8/6 13/22 14/21 25/20 25/20 48/3 50/14 50/18 50/19 51/6 51/6 52/3 53/14 54/2 54/8 66/18 67/15 69/9 69/10 74/21 77/18 83/11 83/16 83/25 84/3 84/6 84/18 84/19 84/24 85/12 86/11 86/24 87/5 87/9 89/16 89/19 91/10 93/10 93/10 93/12 93/17 93/20 98/14
**Fourteen [1]** 98/15
**fracture [4]** 20/7 33/17 33/18 72/24
**frame [1]** 4/21
**framework [1]** 30/14
**free [1]** 46/4
**frequently [2]** 6/16 9/13
**frightened [1]** 31/13
**Frog [3]** 10/13 49/19 67/4
**front [5]** 10/22 27/6 43/1 69/1 72/10
**Fs [9]** 16/9 26/1 26/3 37/5 37/25 37/25 38/2 52/13 72/1
**Ft [2]** 2/7 2/7
**fully [5]** 25/7 38/8 96/6 96/12 96/13
**fundamental [2]** 19/17 21/7
**fundamentally [1]** 21/10
**further [3]** 5/22 7/5 80/15
**future [2]** 40/8 40/21
**FW [1]** 72/24

**G**

**gambling [1]** 21/21
**Gardens [1]** 85/10
**gas [6]** 8/4 10/7 61/21 69/16 93/13 96/22
**gauge [2]** 8/4 61/21
**gauges [6]** 8/7 10/8 23/6 69/16 93/13 96/23
**gave [5]** 46/3 47/2 77/25 85/21 87/10
**general [1]** 35/6
**generalized [1]** 34/19
**Generally [1]** 60/10
**generations [1]** 77/25
**generic [1]** 10/16
**gentleman [1]** 33/16
**get [46]** 17/5 17/11 18/6 18/25 20/6 20/8 20/9 22/18 23/7 25/6 26/8 28/17 32/25 36/4 36/14 38/18 40/16 41/23 42/5 44/6 50/2 58/3 59/18 62/6 65/18 65/20 65/24 68/5 71/18 71/19 71/20 71/20 71/24 72/1 78/3 78/11 82/7 84/2 86/21 86/23 86/23 88/3 89/16 91/13 98/6 98/8
**gets [6]** 25/16 38/12 50/18 62/5 83/24 86/22
**getting [26]** 17/6 19/24 21/18 26/23 38/5 44/21 45/4 45/12 45/18 45/19 46/16 55/16 55/16 60/23 71/4 72/2 72/3 83/4 83/5 83/6 85/4 85/11 85/18 86/9 86/12 87/11
**Gibson [1]** 1/18
**Gill [1]** 41/19
**Gina [4]** 15/14 15/14 31/23 31/24
**give [23]** 3/23 23/14 23/15 25/19 27/6 29/3 38/8 40/20 40/24 49/18 54/16 54/20 55/2 55/21 62/9 62/21 65/1 69/4 71/9 71/15 77/11 83/22 96/18
**given [7]** 40/14 40/18 84/5 85/3 91/20 92/10 97/8
**gives [1]** 66/21
**giving [7]** 15/2 23/10 23/16 26/14 26/20 69/12 87/13
**go [32]** 11/21 18/8 18/9 18/10 18/24 19/21 20/23 28/5 29/21 30/20 31/3 34/21 36/3 36/3 39/1 44/8 59/2 62/4 76/17 77/3 77/15 77/20 77/20 81/21 88/6 89/10 90/11 91/14 92/2 93/8 93/17 94/24
**goal [1]** 11/10
**goes [7]** 5/22 12/3 16/23 26/11 61/6 96/16 96/18
**going [39]** 19/25 20/9 21/22 22/4 24/16 27/14 32/9 36/15 36/16 40/13 40/14 41/25 42/23 43/21 45/7 46/1 49/20 52/5 54/15 54/20 56/10 58/9 62/24 64/5 65/22 66/12 69/22 69/24 73/8 74/5 74/24 75/7 78/3 78/11 81/2 86/7 88/3 91/25 93/13
**gold [1]** 59/21
**gone [3]** 33/12 64/25 82/13
**good [13]** 1/4 3/1 3/16 19/5 20/15 35/3 64/22 71/19 73/6 73/24 78/19 85/11 98/24
**Google [13]** 10/20 10/25 11/8 58/10 59/19 59/22 60/3 60/6 61/1 70/10 70/18 70/22 70/23
**got [29]** 18/22 29/8 36/22 39/21 47/22 50/13 52/16 52/17 60/24 64/1 65/15 65/16 66/10 66/10 69/8 70/19 70/25 72/4 72/6 72/14 73/16 80/25 81/1 81/21 83/16 85/12 90/3 94/6 95/20
**governing [3]** 74/22 78/21 80/2
**Government [2]** 51/18 69/2
**grace [1]** 96/18
**grade [104]**
**graded [18]** 4/25 5/12 5/25 6/7 19/16 21/19 21/20 25/17 29/5 29/8 30/1 30/9 38/3 41/6 61/4 63/5 81/13 81/15
**grader [1]** 92/1
**grades [64]** 3/19 4/5 4/6 4/10 4/12 4/17 4/18 4/22 4/24 5/2 5/5 5/11 5/17 5/19 5/23 6/5 6/9 6/10 7/20 9/11 9/19 9/24 10/1 10/13 10/17 11/2 11/17 11/22 11/23 12/10 12/21 12/22 12/23 13/14 16/7 23/17 28/24 30/2 31/3 31/5 32/4 32/20 34/16 34/16 35/25 36/6 37/14 37/25 42/25 43/23 43/25 46/3 52/1 57/21 68/9 68/11 68/13 70/16 76/14 77/1 90/14 94/3 95/18 98/10
**grading [24]** 4/7 14/6 19/8 19/13 21/8 26/4 28/3 28/21 28/23 30/12 41/3 41/25 42/6 43/2 44/10 50/22 50/24 53/13 64/22 65/3 66/18 81/3 96/15 96/21

**G**

**grandma [1]** 78/1
**grant [3]** 58/5 70/10 70/20
**graphics [2]** 8/4 8/16
**great [7]** 16/7 18/23 22/18 30/24 69/3 82/13 87/18
**greater [1]** 95/23
**green [1]** 8/12
**grounded [1]** 9/19
**group [8]** 1/8 11/16 34/22 42/13 44/3 79/10 81/6 94/25
**Groups [1]** 65/22
**guarantee [2]** 5/11 9/7
**guarantees [3]** 4/21 5/7 5/8
**guess [11]** 16/12 22/19 30/18 36/14 44/8 44/21 46/3 68/2 68/5 85/21 98/23
**guidance [2]** 9/16 91/2
**guiding [1]** 6/1
**gutter [4]** 19/24 22/8 40/15 91/9
**guy [2]** 73/22 77/4
**guys [1]** 78/3

**H**

**had [44]** 14/15 17/20 18/20 18/23 19/15 21/20 21/23 23/15 30/7 30/8 31/21 32/6 32/19 32/23 33/16 35/12 36/3 37/9 43/4 50/12 54/5 54/14 67/24 68/6 70/17 73/17 73/17 75/6 80/8 80/9 80/9 80/15 81/15 82/25 86/8 86/9 86/10 87/25 88/2 88/25 89/13 89/18 90/18 95/15
**hadn't [1]** 73/20
**haired [1]** 72/15
**hand [23]** 7/10 9/5 15/3 22/22 51/2 51/7 51/18 54/9 61/5 61/13 61/15 61/16 61/17 61/18 61/20 61/22 61/25 62/5 62/6 63/1 68/22 77/22 87/12
**handed [1]** 97/16
**handle [1]** 29/15
**handling [1]** 60/17
**hands [1]** 14/25
**Hanlon [8]** 20/14 27/4 52/16 72/25 74/17 75/6 75/12 75/14
**happen [1]** 40/14
**happened [4]** 15/10 17/9 19/22 37/3
**happening [4]** 35/14 44/14 66/23 72/11
**happens [1]** 89/15
**happy [3]** 22/11 39/15 97/12
**harass [1]** 11/10
**harbor [1]** 34/5
**hard [6]** 24/4 34/1 35/1 35/5 71/20 85/3
**harm [26]** 4/11 7/1 7/4 30/16 34/6 34/14 39/6 39/11 40/7 40/8 40/17 40/17 42/5 43/20 43/21 56/16 59/3 68/21 73/8 74/3 74/9 74/10 81/12 81/15 96/13 96/24
**harm maybe [1]** 43/21
**harmed [6]** 37/24 41/8 41/10 45/6 45/8 45/18
**harmful [1]** 13/11
**harming [3]** 60/24 81/6 81/7
**Harris [19]** 14/15 20/4 30/7 30/7 37/18 46/22 47/16 48/14 48/22 63/12 63/18 64/10 64/17 65/10 67/23 68/6 88/11 89/13 90/3
**Harris' [1]** 24/9
**has [50]** 4/4 8/11 9/15 14/9 14/20 14/25 15/1 17/12 17/12 17/18 19/1 19/3 19/4 19/19 22/2 24/23 24/24 26/10 26/23 35/18 36/4 40/3 43/24 51/15 52/20 52/23 54/11 56/17 57/4 57/11 58/22 59/24 62/4 63/8 63/9 63/10 74/4 76/20 78/4 79/3 79/11 79/11 82/13 87/21 90/16 93/4 95/23 96/7 96/15 97/14
**hasn't [1]** 39/17
**have [186]**
**have a [1]** 77/3
**have enough [1]** 5/15
**haven't [4]** 18/3 53/6 71/21 97/17
**Havericak [4]** 26/21 32/2 32/12 72/14
**having [5]** 28/17 31/24 31/25 81/12 86/24
**HCAP [4]** 17/1 20/5 67/25 69/19
**HCAPs [2]** 68/4 68/7
**he [72]** 14/15 15/11 20/5 29/9 32/11 32/16 32/18 32/19 32/20 33/18 33/19 33/19 36/2 36/4 36/5 36/5 40/18 48/25 49/8 49/9 50/17 50/18 52/8 52/17 54/17 57/11 57/14 57/18 59/20 60/1 64/12 64/13 64/13 64/21 64/25 65/1 65/13 66/3 67/13 68/7 73/2 73/3 74/17 74/18 74/19 74/21 74/22 75/1 75/5 75/16 77/5 77/6 82/22 83/1 83/2 83/6 83/19 84/2 85/1 85/24 85/25 85/25 86/2 86/22 88/8 88/11 89/13 91/3 93/23 93/23 94/2 98/11
**head [1]** 40/1
**health [14]** 11/15 11/19 13/2 31/10 32/14 42/10 51/9 51/19 54/4 56/21 63/10 64/20 78/19 90/20
**Healthcare [3]** 41/24 42/9 44/1
**hear [3]** 3/12 20/25 72/14
**heard [46]** 7/16 8/15 10/4 10/11 11/12 11/25 12/20 13/2 14/11 15/13 15/20 15/22 16/25 17/4 19/1 20/14 21/1 21/3 21/4 26/21 27/2 30/25 31/5 31/23 32/2 32/10 33/15 33/24 43/12 45/15 45/16 46/14 46/15 47/14 53/9 56/9 56/23 56/24 63/11 66/13 68/3 68/18 72/24 73/18 75/1 94/1
**hearing [1]** 43/10
**hearsay [6]** 35/7 35/23 36/25 38/5 38/9 74/10
**heart [3]** 15/25 18/12 32/14
**Heather [1]** 32/2
**heavily [3]** 17/1 73/15 92/14
**helicopters [1]** 18/1
**help [2]** 18/24 82/7
**helpful [2]** 28/11 97/22
**helps [1]** 40/19
**her [18]** 11/18 19/3 32/5 32/6 35/17 35/18 35/19 35/23 35/23 36/2 37/12 39/18 53/10 64/9 72/16 73/19 94/7 97/14
**here [40]** 3/4 8/20 10/16 15/6 20/10 27/5 28/10 30/4 36/17 45/14 49/21 49/24 50/4 50/24 53/5 54/8 63/9 63/10 63/23 64/5 65/15 65/24 66/17 66/23 69/16 70/24 72/12 72/13 74/9 75/25 76/1 76/25 77/13 77/19 78/4 78/13 80/6 81/4 81/11 93/1
**heroic [1]** 3/6
**herself [1]** 24/2
**hey [3]** 66/10 66/17 69/20
**hide [2]** 62/10 66/25
**hiding [10]** 14/11 14/14 14/16 19/20 21/16 47/4 47/11 51/17 81/18 94/12
**high [2]** 21/18 22/5
**higher [1]** 55/5
**highest [3]** 14/21 51/5 51/6
**him [5]** 15/10 57/12 57/17 84/25 93/25
**himself [1]** 89/14
**his [25]** 4/2 8/21 20/4 25/23 42/12 52/16 57/5 57/15 57/17 60/1 60/4 65/2 72/19 72/20 73/3 74/20 74/22 74/22 83/19 83/22 83/22 89/13 90/15 92/10 94/1
**historical [1]** 93/23
**history [1]** 44/10
**hit [2]** 31/20 89/24
**hoe [1]** 92/18
**hold [6]** 41/22 42/2 50/4 65/22 67/10 78/9
**holders [1]** 60/18
**Holding [1]** 29/10
**Holding Leapfrog [1]** 29/10
**holds [1]** 34/10
**hollowness [1]** 52/10
**home [5]** 9/6 41/17 41/21 43/14 59/3
**homes [1]** 71/5
**HON [1]** 2/8
**honest [3]** 70/7 72/9 82/19
**honestly [2]** 3/19 3/20
**Honor [49]** 3/9 3/10 8/25 16/14 21/6 22/9 23/21 24/5 25/14 28/9 28/15 29/22 33/7 34/2 36/22 38/14 39/3 40/22 41/12 51/13 51/25 54/7 54/12 55/10 56/3 62/3 63/7 63/11 64/18 71/17 71/24 73/4 73/11 74/4 75/10 78/9 78/23 79/12 80/8 80/14 83/2 87/8 88/4 89/9 92/21 96/15 96/18 97/2

H

**Honor...** [1] 98/11
**HONORABLE** [1] 1/11
**hood** [1] 93/21
**hope** [5] 3/2 34/2 40/23 94/15 96/25
**hopeful** [2] 33/2 98/10
**hoping** [1] 70/19
**Horn** [2] 49/19 49/19
**horse** [1] 94/2
**hospital** [79] 3/19 4/20 5/2 5/3 5/20 6/2 6/5 6/10 6/11 6/12 6/13 6/18 6/19 7/3 7/7 7/11 7/17 7/23 8/2 8/7 8/13 10/20 13/6 13/20 17/10 17/14 18/9 18/11 19/3 19/23 20/21 22/18 25/16 30/5 30/8 30/25 32/9 36/3 37/10 37/11 37/12 37/24 42/17 45/12 47/11 49/22 50/5 50/10 50/11 50/13 50/17 50/22 54/11 54/14 59/3 62/12 65/3 69/5 69/8 69/13 76/17 78/1 78/10 78/12 78/23 79/10 79/14 81/22 83/15 83/19 83/24 84/5 89/21 89/23 90/10 90/24 93/22 95/5 96/20
**hospital based** [1] 78/23
**hospital safety** [1] 3/19
**hospital's** [3] 6/25 20/11 20/11
**hospitals** [178]
**hospitals based** [1] 28/22
**hospitals limited** [1] 83/23
**hospitals'** [3] 9/24 12/20 81/18
**hours** [2] 15/17 31/12
**how** [54] 4/22 6/12 6/17 7/3 11/22 24/6 24/15 26/4 29/15 32/11 35/1 35/14 36/9 41/5 43/7 49/6 51/10 51/12 51/16 53/13 56/7 59/6 60/24 64/9 65/9 65/19 65/20 66/12 67/3 67/9 67/19 67/22 68/19 73/23 74/12 75/7 77/4 77/21 80/24 81/1 81/18 84/23 91/3 91/19 91/25 92/11 93/18 93/21 94/2 94/21 96/4 96/5 96/21 98/4
**however** [5] 8/25 24/18 24/18 27/11 87/4
**HSS** [5] 35/1 36/4 36/5 36/12 73/6
**Humana** [14] 31/15 55/25 56/2 56/4 56/4 56/5 56/8 56/9 56/11 66/7 66/9 66/9 66/14 66/21
**hundred** [15] 47/10 51/10 51/21 53/11 56/2 61/7 83/4 83/5 85/11 85/12 86/6 86/12 86/12 87/14 88/9
**hundreds** [3] 13/21 14/21 15/17
**hurt** [2] 52/14 75/4
**HVIDT** [2] 1/17 30/7
**Hvidt's** [1] 48/22
**hygiene** [8] 51/2 51/7 51/18 54/9 60/17 60/21 68/22 87/12
**hygiene and** [1] 54/9

I

**I'd** [2] 57/18 68/11
**I'll** [1] 65/16
**I'm** [1] 75/21
**I've** [4] 36/22 38/23 81/21 95/20
**ICU** [2] 54/13 54/14
**idea** [6] 47/24 56/8 56/9 78/20 81/2 81/3
**identified** [2] 15/17 33/24
**identifies** [2] 4/21 7/11
**ignore** [2] 64/18 64/19
**ignores** [2] 18/14 18/18
**IL** [1] 2/5
**immediate** [2] 4/14 60/11
**immoral** [1] 81/5
**impact** [12] 48/19 52/9 75/5 76/3 76/13 76/14 76/23 79/3 79/4 80/9 90/6 95/23
**impacted** [2] 79/16 80/17
**impactful** [1] 79/9
**impacting** [1] 32/4
**impacts** [2] 66/19 75/24
**implement** [1] 29/14
**implementing** [1] 63/3
**important** [13] 13/11 20/20 20/22 32/15 39/8 39/16 51/12 67/12 69/2 80/7 94/10 97/5 97/9
**importantly** [1] 43/13
**imposing** [1] 49/14
**improper** [1] 60/17
**improve** [1] 16/24
**improved** [1] 27/9
**improvement** [3] 66/12 91/9 91/11
**improves** [1] 91/5
**imputation** [19] 14/14 46/8 46/9 46/10 46/12 47/12 47/18 47/20 47/25 48/6 48/7 57/22 58/1 58/11 58/17 61/6 64/14 80/16 85/20
**impute** [2] 14/6 64/2
**imputed** [4] 8/6 8/11 63/11 74/19
**imputing** [3] 25/11 69/5 89/19
**INC** [1] 1/5
**incapable** [1] 92/23
**inclination** [1] 36/19
**inclined** [1] 80/20
**include** [3] 9/3 97/24 97/25
**included** [2] 9/4 93/5
**includes** [2] 64/22 98/3
**including** [7] 12/2 12/2 15/18 37/15 42/17 44/11 51/16
**incomplete** [1] 4/19
**inconsistent** [1] 91/2
**increase** [2] 88/16 95/6
**increased** [2] 60/16 89/25
**incredible** [4] 79/12 79/14 80/2 95/23
**incredibly** [1] 79/2
**Indeed** [2] 11/12 12/21
**indicates** [1] 61/1
**indication** [1] 60/15
**indicators** [1] 4/20
**individual** [2] 33/24 34/3
**individualized** [2] 33/10 33/15
**infection** [3] 33/18 65/16 72/25
**infections** [1] 20/2
**inference** [1] 13/24
**inflated** [1] 45/21
**inflating** [1] 45/19
**influence** [2] 12/22 38/1
**influenced** [2] 11/19 37/24
**inform** [1] 60/2
**information** [16] 5/20 21/9 26/23 29/13 41/8 45/18 45/19 62/15 62/19 62/20 62/23 67/4 73/3 81/14 82/2 98/25
**infrastructure** [2] 74/24 75/11
**initial** [1] 98/12
**initially** [1] 11/23
**injunction** [9] 28/3 28/23 29/13 43/1 80/21 80/21 94/16 95/21 96/11
**Injunctions** [1] 40/7
**injunctive** [7] 4/14 22/9 22/10 28/6 40/5 40/6 96/5
**injury** [4] 33/9 33/10 33/14 96/8
**injury proven** [1] 96/8
**inquiry** [2] 94/20 96/4
**ins** [8] 32/19 32/22 34/20 74/16 74/20 75/8 75/19 95/7
**insistence** [1] 47/22
**instance** [1] 90/8
**instead** [6] 8/12 65/11 82/19 92/8 94/15 97/12
**insufficient** [1] 81/14
**insulate** [1] 44/1
**insurer** [2] 56/8 56/9
**insurers** [10] 4/13 31/15 33/3 55/18 55/23 56/20 65/11 65/14 65/18 65/21
**insurers reasonable** [1] 55/18
**insurers when** [1] 55/23
**integrity** [1] 95/22
**intended** [4] 24/4 88/2 93/17 93/18
**intensified** [1] 11/5
**intent** [1] 81/19
**intentionality** [1] 24/10
**intentionally** [1] 19/20
**interest** [1] 29/12
**interesting** [1] 43/8
**interestingly** [2] 57/10 78/14
**internet** [1] 13/15
**interrogatory** [1] 74/2
**introduced** [1] 73/19
**invent** [1] 30/4
**inventing** [1] 3/22
**investigators** [1] 71/5
**invite** [1] 9/21
**involved** [2] 13/24 64/12
**involvement** [2] 42/11 42/12
**irrationally** [1] 77/12
**irrespective** [1] 24/20

## I


**is [611]**
**is critical [1]** 4/16
**is our [1]** 82/16
**Isis [1]** 53/9
**isn't [18]** 3/14 19/9 22/16 24/3 29/13 36/7 46/6 46/12 59/3 69/11 83/12 84/8 85/2 85/4 85/5 85/7 85/17 91/11
**issue [7]** 21/1 21/24 38/6 38/9 45/5 59/23 74/11
**issued [1]** 6/2
**issues [3]** 74/24 75/11 76/10
**it [410]**
**it's [3]** 16/23 34/2 34/2
**its [24]** 4/10 4/17 4/18 4/23 5/1 5/11 5/14 5/17 5/22 5/23 6/1 6/15 9/12 10/13 12/11 13/5 13/20 29/10 29/20 29/23 39/17 41/5 59/11 95/5
**itself [3]** 10/22 12/25 34/10
**IVS [2]** 54/9 68/22


## J


**Jackson [8]** 22/17 22/17 27/15 27/18 68/2 85/17 85/18 85/19
**January [4]** 1/9 52/24 73/10 99/8
**January 13 [1]** 73/10
**JD [1]** 72/24
**JEFFREY [1]** 1/20
**job [7]** 42/13 61/25 61/25 67/14 78/11 87/16 99/1
**jobs [1]** 32/21
**Johnson [1]** 91/18
**joint [2]** 36/4 68/19
**journal [1]** 59/25
**JUDGE [1]** 1/12
**judgment [1]** 33/1
**Jupiter [19]** 10/11 10/15 18/20 18/21 18/23 19/2 19/3 36/3 36/4 49/20 71/3 81/21 81/21 81/22 81/23 81/23 82/1 93/2 95/17
**Jupiter testified [1]** 71/3
**Jupiter's [2]** 67/3 95/18
**JURA [1]** 2/2
**just [46]** 7/21 12/10 17/13 18/14 19/10 22/4 22/5 25/17 26/7 26/8 26/12 26/13 27/19 33/3 35/6 38/7 40/9 40/18 48/22 50/8 55/2 56/11 58/19 62/4 62/17 63/5 64/19 65/14 65/18 67/15 67/16 68/10 70/15 72/2 75/3 77/17 80/17 80/23 81/11 82/6 85/4 85/5 86/24 88/6 88/16 96/15
**justification [1]** 19/21
**justify [6]** 14/6 14/8 41/10 47/4 49/6 53/13
**JX [4]** 9/3 9/4 41/16 94/7


## K


**Karen [4]** 10/11 11/12 67/2 71/3
**keep [8]** 22/23 26/7 29/23 45/7 83/9 83/9 87/24 93/25
**keeping [2]** 7/1 20/12
**keeping patients [1]** 7/1
**keeps [2]** 46/1 91/8
**KEVIN [1]** 1/16
**kid [1]** 15/9
**kids [1]** 78/2
**Kim [1]** 63/25
**KIMBERLY [1]** 2/1
**kind [3]** 4/1 24/16 44/21
**knew [5]** 21/21 48/17 48/19 54/10 58/11
**know [53]** 3/14 15/12 16/13 16/24 17/23 18/21 20/19 20/20 20/22 20/22 22/13 26/15 28/8 35/20 38/12 39/22 40/23 45/20 45/22 47/1 51/16 54/9 54/21 55/7 56/12 56/14 56/14 63/25 69/21 69/22 69/23 69/23 69/24 69/24 70/1 70/2 70/4 70/5 71/7 71/20 72/2 72/20 74/12 81/25 83/5 84/3 84/12 86/19 88/6 92/7 93/8 94/11 96/20
**know that [1]** 45/20
**knowing [1]** 12/13
**knowledge [1]** 21/15
**known [1]** 16/2
**knows [6]** 12/7 29/15 34/15 34/15 41/5 76/23


## L


**label [2]** 23/15 59/10
**labeled [1]** 8/4
**labels [1]** 8/7
**lack [4]** 62/15 62/18 62/20 62/23
**lacked [1]** 70/9
**lacking [2]** 4/24 5/12
**lady [3]** 22/17 27/15 77/2
**lag [10]** 26/22 26/25 27/15 27/16 27/20 27/21 27/21 27/22 27/23 27/24
**lagging [1]** 27/9
**lags [3]** 68/1 68/2 68/4
**land [2]** 90/10 90/24
**language [3]** 17/10 23/19 28/9
**large [2]** 6/3 8/5
**large number [1]** 6/3
**last [4]** 39/17 43/24 95/20 98/7
**late [1]** 98/24
**later [3]** 15/2 41/23 73/13
**Lauren [1]** 10/19
**law [16]** 9/3 28/13 34/13 36/19 38/8 39/18 39/20 39/20 40/9 56/18 96/16 97/7 97/13 97/25 97/25 98/2
**law's [1]** 34/12
**lawsuit [5]** 10/18 11/4 22/1 72/7 73/7
**lawyer [1]** 55/7
**lawyers [3]** 65/18 65/20 73/3
**lay [1]** 24/4
**lead [1]** 32/11
**leader [1]** 11/16
**leadership [1]** 41/20
**leads [3]** 4/23 5/1 5/4
**leads consumers [2]** 5/1 5/4
**Leah [3]** 13/2 24/1 65/6
**Leap [2]** 10/13 67/4
**LEAPFROG [127]**
**Leapfrog didn't [1]** 12/10
**Leapfrog displays [1]** 8/5
**Leapfrog reinforces [1]** 8/3
**Leapfrog's [27]** 3/14 3/21 5/8 5/10 5/17 9/8 10/4 10/11 11/16 11/24 13/3 13/13 13/18 18/6 27/10 30/14 32/20 33/21 33/23 41/22 42/4 50/25 51/8 88/8 89/5 90/8 90/25
**learned [1]** 19/19
**learning [1]** 64/16
**least [7]** 16/11 25/4 32/25 33/7 39/12 50/11 79/6
**leave [5]** 36/2 36/10 73/23 73/24 87/17
**leaves [2]** 6/19 34/7
**leaving [3]** 33/16 34/21 36/13
**LEE [1]** 1/17
**left [5]** 31/6 33/19 33/19 33/19 37/1
**legal [2]** 96/4 98/3
**legislative [1]** 81/19
**Legislature [1]** 39/17
**legitimacy [3]** 9/6 9/21 94/19
**legitimacy because [1]** 94/19
**legitimate [1]** 85/2
**less [4]** 13/10 79/9 88/25 89/6
**let [8]** 21/4 25/3 28/9 30/16 40/4 47/17 49/18 88/6
**let's [16]** 5/10 11/21 29/2 29/3 29/21 48/6 51/2 51/22 88/6 89/10 89/19 92/13 93/8 93/17 96/1 97/24
**letter [13]** 6/24 10/7 12/23 23/20 24/21 29/24 41/23 42/6 42/23 70/15 87/21 90/7 90/23
**letters [4]** 31/15 31/20 56/1 66/9
**level [4]** 19/3 51/5 51/6 62/16
**levels [2]** 14/21 32/23
**license [1]** 56/5
**licenses [1]** 56/10
**licensing [1]** 56/3
**life [2]** 20/8 20/18
**light [1]** 75/7
**like [27]** 8/25 12/3 16/23 18/23 19/13 23/16 26/12 26/13 28/19 32/20 43/23 43/25 44/12 50/12 56/20 60/17 65/18 65/22 66/14 70/22 75/17 75/19 82/9 82/25 97/4 97/18 97/19
**likelihood [2]** 40/8 40/12
**likely [16]** 3/24 7/25 18/10 18/11 39/6 39/11 40/17 41/10 43/20 55/11 57/2 57/13 58/21 60/3 76/16 92/2
**limited [8]** 8/9 50/18 50/19 54/16 54/18 55/3 63/1 83/23

**L**

**limited achievement [1]** 54/16
**line [1]** 41/22
**link [6]** 11/1 38/6 52/7 52/12 52/20 80/15
**linked [1]** 60/16
**linking [1]** 92/5
**list [2]** 74/5 74/6
**listed [1]** 29/23
**listen [3]** 3/12 67/2 74/7
**lists [1]** 67/18
**litigation [3]** 37/8 42/10 43/9
**little [3]** 22/16 52/24 87/25
**live [1]** 18/11
**lives [2]** 20/2 34/11
**LLP [3]** 1/18 1/21 2/3
**lobbied [1]** 65/7
**lobby [1]** 69/1
**local [1]** 11/25
**location [1]** 60/20
**locator [1]** 78/19
**locked [1]** 22/15
**logging [2]** 61/16 63/4
**logo [1]** 55/22
**long [4]** 10/18 28/8 91/21 98/4
**longer [1]** 48/1
**longstanding [2]** 40/3 40/9
**look [26]** 17/16 19/10 39/17 40/11 40/13 48/6 48/13 56/17 58/15 59/13 60/13 61/11 65/3 67/21 67/21 69/15 72/8 73/11 73/13 75/9 76/11 77/17 80/15 81/19 83/14 85/19
**looked [5]** 27/19 54/14 77/16 83/3 88/11
**looking [4]** 3/4 47/21 63/3 92/12
**looks [5]** 23/22 28/8 28/19 57/20 81/20
**lose [1]** 75/7
**losing [3]** 31/23 31/25 67/13
**lost [3]** 63/8 68/24 86/21
**lot [18]** 19/11 19/12 22/2 22/2 22/14 23/16 27/12 27/12 36/11 38/17 51/3 52/1 52/21 52/23 54/22 59/10 66/14 95/15
**lots [1]** 75/25
**loud [1]** 17/25
**lousy [1]** 61/25
**love [1]** 74/17
**low [1]** 50/14
**lower [1]** 87/1
**lowest [6]** 13/22 46/15 46/18 46/19 49/22 53/13
**lunch [1]** 72/15
**lying [1]** 3/18

**M**

**made [24]** 3/24 5/9 10/15 12/17 13/17 15/20 33/12 35/8 43/19 48/21 49/1 49/2 49/3 59/8 65/23 71/6 74/18 77/6 89/18 91/1 91/14 92/18 98/13 98/17
**Maggie [1]** 84/20
**mailed [1]** 17/12
**maintaining [1]** 20/14
**majority [1]** 87/6
**make [27]** 9/1 13/4 21/6 22/21 37/5 38/16 38/23 45/17 49/11 51/25 53/16 58/7 62/6 63/15 67/8 69/1 70/7 75/2 75/21 77/8 82/24 84/12 85/20 86/20 87/19 97/23 98/3
**makes [2]** 18/1 80/17
**making [8]** 13/2 21/2 50/9 63/16 69/12 77/12 84/15 84/16
**MALONEY [3]** 1/15 67/2 88/4
**man [1]** 57/19
**management [1]** 60/9
**mandates [1]** 4/7
**mandatory [1]** 43/4
**manner [2]** 12/11 16/4
**manufactured [1]** 29/13
**many [4]** 16/24 17/16 34/9 62/3
**March [5]** 35/9 35/11 35/12 35/16 73/7
**March 2025 [2]** 35/12 35/16
**MARCUS [2]** 1/20 1/21
**mark [8]** 8/5 53/16 67/12 75/1 75/24 76/2 86/25 87/8
**market [8]** 4/12 65/22 67/18 75/25 76/10 95/8 95/9 95/11
**marketplace [2]** 4/5 44/1
**marks [1]** 23/6
**MARY [1]** 1/15
**Mary's [5]** 19/1 20/15 72/22 72/23 85/11
**materially [2]** 12/22 91/5
**math [4]** 64/21 71/25 72/2 87/4
**mathematical [1]** 64/22
**Matt [2]** 42/11 63/12
**matter [7]** 19/17 35/3 53/3 57/12 74/14 92/11 99/6
**matters [4]** 12/16 51/12 93/24 94/16
**Matthewman [1]** 43/4
**MAXWELL [1]** 2/2
**may [14]** 9/13 17/24 18/1 18/2 18/6 33/11 33/12 37/21 38/22 39/18 41/14 49/2 61/5 89/13
**maybe [7]** 15/3 39/21 43/21 60/5 68/15 76/24 98/7
**Mayo [1]** 78/18
**McCauley [1]** 26/21
**me [22]** 3/9 18/24 24/1 25/3 26/16 27/6 28/9 30/16 40/24 44/19 47/17 49/18 52/19 53/2 62/3 78/24 80/17 85/21 86/19 87/2 88/6 98/17
**me give [1]** 49/18
**me that [1]** 44/19
**mean [13]** 4/18 19/15 44/16 44/17 45/6 45/10 45/12 46/2 46/5 59/8 61/9 83/4 91/7
**meaning [1]** 49/9
**meaningless [1]** 92/18
**means [4]** 47/18 47/21 55/2 91/7
**measurable [1]** 16/1
**measure [11]** 6/10 8/17 16/13 51/2 51/12 51/20 54/13 62/13 65/13 69/17 92/16
**measured [1]** 8/12
**measurement [2]** 54/21 63/20
**measures [62]** 3/19 5/25 6/3 6/20 8/4 8/7 8/8 8/11 13/23 14/21 17/2 20/18 23/7 25/11 25/18 25/19 25/20 44/22 48/3 48/4 50/14 50/18 50/20 51/11 51/14 52/3 52/4 53/14 53/18 54/2 54/2 54/8 54/9 54/11 66/18 67/11 67/16 67/23 67/25 68/20 69/2 69/16 69/19 69/19 69/20 81/14 82/14 82/15 83/11 84/6 84/25 85/12 86/25 87/5 87/9 89/15 89/16 89/20 91/10 93/11 93/12 93/13
**measures labeled [1]** 8/4
**media [7]** 10/14 12/1 12/12 12/13 32/8 57/21 67/4
**median [1]** 61/8
**mediation [1]** 43/4
**medical [14]** 1/4 7/1 13/4 31/6 33/17 34/8 47/17 49/20 63/17 74/22 78/21 80/3 93/2 95/17
**Medicare [1]** 79/15
**medication [3]** 54/25 55/1 68/21
**meet [3]** 60/10 61/3 61/18
**meeting [1]** 61/1
**meetings [1]** 74/21
**member [1]** 11/13
**members [3]** 32/18 41/20 47/22
**Memorial [1]** 68/2
**mentioned [2]** 15/25 16/1
**mere [1]** 65/19
**message [10]** 4/16 5/13 5/14 5/16 6/1 24/20 24/21 84/20 86/21 87/17
**messages [2]** 73/16 74/7
**messaging [1]** 73/22
**method [4]** 3/22 58/11 62/9 85/20
**methodologies [1]** 55/17
**methodology [49]** 4/3 5/5 7/22 9/8 9/15 11/7 11/14 11/20 12/4 16/8 16/23 17/2 17/17 17/18 17/19 19/17 19/18 21/11 21/11 21/12 22/8 24/2 24/3 24/3 24/13 25/17 26/4 31/19 42/20 47/20 48/17 52/6 53/7 56/6 59/18 63/22 64/5 64/14 64/24 65/3 77/20 80/11 85/13 87/18 90/17 91/1 92/5 92/12 94/19
**methods [1]** 64/23
**metric [3]** 8/13 25/17 62/7
**metrics [5]** 20/3 58/20 62/4 67/9 77/16
**Meyers [1]** 1/21
**Miami [1]** 1/23

**M**

**Michael [1]** 7/24
**MIDDLEBROOKS [3]** 1/3 1/11 2/8
**might [9]** 10/2 22/15 28/16 36/13 37/5 59/7 71/20 76/16 82/3
**miles [2]** 13/7 77/4
**military [2]** 56/4 56/5
**million [3]** 34/22 37/1 71/1
**millions [2]** 10/4 13/3
**mind [6]** 35/2 36/9 36/15 38/10 38/11 74/12
**mine [1]** 53/9
**minimal [1]** 84/22
**minimum [4]** 60/10 61/3 62/24 62/25
**minuscule [1]** 75/20
**minutes [3]** 13/9 40/24 88/3
**mirror [1]** 83/8
**mislead [1]** 58/24
**misleading [2]** 91/23 91/24
**misrepresenting [1]** 4/10
**miss [1]** 15/10
**missed [1]** 15/9
**missing [9]** 5/24 6/2 6/6 8/18 29/4 29/16 29/21 63/24 92/17
**mission [10]** 3/15 3/21 34/10 42/4 42/7 45/17 67/8 68/17 78/6 80/22
**Missy [4]** 61/14 63/13 68/3 89/18
**mistake [1]** 70/8
**mistaken [1]** 35/13
**mockup [2]** 30/4 30/6
**mode [1]** 60/7
**model [8]** 57/22 58/1 58/17 61/6 80/16 95/21 96/3 96/5
**model for [1]** 96/5
**moment [4]** 28/10 38/22 39/2 54/1
**money [3]** 22/2 22/3 43/9
**monitors [1]** 68/7
**Montgomery [3]** 12/1 73/16 74/7
**Montgomery's [1]** 56/11
**month [4]** 26/22 26/24 27/23 51/8
**months [6]** 27/21 43/9 55/12 62/3 64/16 84/14
**morale [1]** 76/15
**more [22]** 5/24 13/11 16/3 26/23 27/2 27/12 27/24 33/9 35/22 36/17 36/19 41/9 41/15 55/4 72/9 72/10 74/24 79/3 80/7 87/25 88/16 98/12
**morning [2]** 3/1 59/5
**Moskowitz [1]** 2/3
**most [15]** 4/4 14/19 17/15 18/4 21/21 22/3 31/14 34/23 43/13 44/10 60/17 73/2 79/2 88/1 92/14
**mother [1]** 18/5
**motion [1]** 43/1
**motive [1]** 24/16
**move [2]** 88/5 90/5
**moved [4]** 16/9 17/18 39/9 58/9
**moves [1]** 91/7
**Mr [27]** 8/15 8/21 8/21 18/10 20/14 25/23 27/4 27/4 29/8 29/8 30/7 30/7 30/7 32/16 48/22 52/16 57/10 60/13 72/25 74/17 75/6 75/11 75/14 77/25 84/25 85/15 95/14
**Mr. [1]** 93/19
**Mr. Vredenburgh [1]** 93/19
**Ms [39]** 10/11 10/15 11/17 11/25 14/1 14/13 15/22 21/4 24/1 26/12 26/21 26/21 26/24 27/25 32/12 37/15 41/19 45/2 45/16 47/23 51/3 54/22 54/23 56/11 56/24 58/12 67/2 70/21 71/5 71/16 72/4 72/14 73/15 83/9 88/4 92/5 92/7 92/8 94/23
**Ms. [2]** 24/1 38/22
**Ms. Leah [1]** 24/1
**Ms. Scott [1]** 38/22
**Mt [1]** 21/2
**much [12]** 3/10 16/3 19/19 20/13 26/23 27/2 29/4 41/12 43/15 71/14 75/7 85/6
**multiple [2]** 5/13 92/9
**must [3]** 5/15 47/4 96/7
**muster [1]** 23/1
**my [19]** 16/5 18/10 19/11 22/19 23/13 30/19 34/2 34/3 35/22 36/19 38/19 48/23 49/21 52/22 61/5 70/1 75/23 78/4 85/14
**myself [1]** 83/1

**N**

**NA [4]** 25/18 25/19 29/5 70/1
**name [6]** 30/5 72/17 72/18 72/18 74/13 77/3
**names [1]** 10/20
**narrative [2]** 7/5 8/3
**narrow [3]** 28/8 30/13 41/3
**NAs [1]** 25/20
**national [1]** 9/17
**nationally [1]** 89/5
**nature [2]** 67/22 87/3
**near [1]** 59/3
**nearly [1]** 89/23
**necessarily [1]** 38/1
**necessary [1]** 61/17
**need [9]** 16/24 28/2 29/9 31/13 36/18 38/24 45/5 92/23 96/24
**needed [1]** 13/6
**needs [1]** 18/19
**neither [1]** 43/13
**network [4]** 15/15 21/23 72/17 90/20
**never [13]** 19/3 20/23 31/9 32/23 52/8 64/10 72/9 74/1 74/7 78/20 78/21 78/22 80/4
**new [9]** 11/7 20/23 22/8 35/4 35/24 39/19 52/4 73/24 76/10
**news [2]** 11/25 71/2
**next [7]** 29/2 29/21 89/11 90/11 90/22 91/14 93/2
**NG [4]** 29/25 31/1 31/3 96/22
**NHSN [1]** 68/3
**Nicholson [16]** 7/16 12/21 52/8 53/7 53/23 54/4 62/14 64/19 83/18 88/8 89/12 90/3 90/7 90/22 90/25 91/3
**Nicholson runs [1]** 90/25
**Nicholson's [2]** 19/23 83/21
**NICU [3]** 17/24 17/24 20/15
**night [1]** 20/24
**nine [4]** 47/22 64/1 64/4 68/5
**nine percent [1]** 68/5
**no [100]**
**no impact [1]** 76/13
**nobody [10]** 47/10 52/16 62/5 63/16 78/15 79/2 80/5 80/10 84/4 92/12
**non [29]** 6/11 7/18 14/5 14/8 14/9 15/5 15/7 15/8 16/5 16/9 16/12 16/16 17/7 18/13 18/17 19/4 44/2 48/13 48/15 48/23 49/19 50/10 63/17 64/3 64/15 66/16 88/17 89/22 94/8
**non-comparison [1]** 88/17
**non-participating [3]** 6/11 7/18 89/22
**non-profit [2]** 44/2 49/19
**non-responding [1]** 50/10
**non-response [22]** 14/5 14/8 14/9 15/5 15/7 15/8 16/5 16/9 16/12 16/16 17/7 18/13 18/17 19/4 48/13 48/15 48/23 63/17 64/3 64/15 66/16 94/8
**none [4]** 73/4 73/18 73/19 74/3
**nonparticipants [1]** 88/25
**nonparticipating [9]** 6/5 9/24 26/9 47/11 48/2 81/10 83/23 89/24 93/6
**nonparticipation [1]** 90/9
**nonstructural [1]** 69/20
**north [1]** 74/25
**not [201]**
**not yet [1]** 66/6
**notes [1]** 33/19
**nothing [5]** 19/4 20/7 42/18 53/5 87/17
**notification [1]** 35/16
**noting [1]** 42/19
**now [27]** 5/10 5/13 7/16 17/18 24/21 26/6 29/2 29/21 33/21 34/1 40/1 40/4 42/1 44/19 48/6 61/5 65/21 65/23 66/2 66/4 83/5 86/7 87/11 88/24 91/13 95/20 98/23
**nuance [2]** 57/24 57/25
**number [8]** 6/3 6/23 44/12 61/5 74/2 75/17 75/18 75/20
**numbers [5]** 3/24 9/4 9/4 46/25 75/23
**numerical [6]** 62/18 62/18 86/15 86/17 86/20 87/15
**nurse [1]** 20/24
**nurses [2]** 15/18 31/11
**NW [1]** 1/18

**O**

**obscures [1]** 24/10
**observations [2]** 51/7 61/17
**obviously [1]** 97/24
**occurred [3]** 37/3 90/18 91/20
**occurs [1]** 34/6
**October [1]** 35/10
**off [2]** 39/25 93/25
**offered [3]** 3/13 95/12 95/14
**offering [1]** 57/12
**office [3]** 41/17 41/21 43/14
**officer [1]** 15/14
**Official [2]** 2/7 99/9
**often [2]** 10/6 60/16
**okay [19]** 3/2 3/3 3/6 17/22 19/14 20/9 23/20 25/2 30/20 30/20 30/24 37/22 40/10 84/7 85/16 88/17 88/20 92/8 92/15
**old [5]** 17/25 21/20 29/4 59/5 85/13
**once [9]** 4/12 11/24 19/18 19/21 40/15 67/16 72/9 89/22 91/9
**one [87]** 3/8 4/9 6/23 7/5 8/13 10/21 11/21 15/3 15/9 15/24 17/17 18/22 25/3 25/21 32/21 34/6 34/9 38/13 39/2 39/3 41/8 44/20 44/23 46/15 46/19 50/11 50/12 50/13 50/15 50/17 50/19 54/6 59/22 62/21 63/20 64/6 66/1 66/1 66/13 68/18 68/19 68/22 71/11 71/13 73/10 74/1 74/21 78/15 78/23 79/2 79/4 79/6 79/8 79/16 79/18 79/23 79/24 80/1 80/4 81/25 82/1 82/3 83/24 84/4 84/23 85/9 86/14 87/7 87/19 87/20 88/12 88/21 89/4 89/6 90/8 90/14 91/6 92/3 92/24 92/25 92/25 93/7 93/8 93/9 93/22 95/23 98/1
**ongoing [2]** 4/11 40/17
**online [1]** 12/1
**only [21]** 7/17 10/6 10/9 26/24 31/7 42/8 51/9 56/8 57/4 57/15 63/14 65/6 68/5 74/19 76/12 87/20 92/10 93/10 93/12 95/13 95/16
**opened [1]** 94/7
**opening [3]** 79/12 90/19 90/19
**operates [1]** 6/12
**operating [1]** 37/21
**opinion [12]** 4/3 25/24 51/11 57/11 57/12 57/14 57/15 59/20 65/1 65/2 82/16 95/14
**opinions [1]** 57/5
**opponent [1]** 38/21
**opportunity [5]** 38/8 40/22 40/24 72/5 72/7
**opposed [2]** 75/19 91/1
**opposite [2]** 8/1 95/4
**oppressive [1]** 81/5
**opt [2]** 21/3 21/5
**options [1]** 29/17
**or improper [1]** 60/17
**oral [1]** 78/17
**order [7]** 22/1 24/15 39/13 42/24 51/5 68/22 74/4
**ordered [1]** 29/24
**organization [2]** 34/9 51/9
**Organization's [1]** 51/19
**ORs [1]** 76/9
**other [35]** 5/21 9/18 11/2 11/9 16/15 22/22 23/7 31/19 32/20 32/20 37/11 37/21 50/11 53/18 53/19 55/10 58/10 59/23 66/5 67/20 68/6 68/8 69/5 69/8 71/9 74/11 74/11 74/12 75/24 82/2 82/5 84/5 90/2 90/20 95/15
**others [3]** 33/24 38/4 68/14
**otherwise [3]** 24/23 90/10 90/24
**our [49]** 7/24 9/2 11/2 16/1 17/19 18/11 18/12 18/15 20/11 20/11 21/8 24/22 24/22 24/23 27/1 31/10 31/17 32/1 32/4 33/11 34/12 37/6 41/7 41/22 42/18 42/19 42/20 51/1 51/11 51/11 51/14 51/14 51/17 56/10 61/18 62/23 62/25 64/4 66/19 68/17 72/5 78/7 82/16 90/15 92/24 94/14 96/17 97/7 98/11
**ours [2]** 93/1 98/21
**ourselves [3]** 70/12 71/6 81/23
**out [66]** 3/3 15/9 17/5 17/7 17/9 17/11 17/20 17/21 18/5 19/24 19/25 20/2 20/3 21/3 21/5 22/18 25/5 26/12 29/6 29/7 30/8 34/10 35/12 36/8 39/9 40/16 42/2 42/24 44/13 44/17 45/5 45/6 45/7 45/12 46/16 47/3 48/3 49/6 50/4 51/3 51/6 51/21 58/4 64/12 65/8 66/18 73/11 77/14 77/15 78/9 78/18 78/24 80/1 81/9 81/9 82/6 82/13 85/11 85/18 86/12 88/9 88/15 89/15 91/10 93/13 98/10
**out-of-court [1]** 36/8
**outcome [3]** 72/20 73/2 90/6
**outcomes [3]** 7/3 32/12 64/22
**outreach [1]** 10/14
**outset [1]** 97/21
**over [20]** 3/13 19/2 26/13 26/18 27/13 45/19 45/21 51/15 51/15 59/13 66/25 67/2 67/3 81/6 81/8 81/22 82/13 84/18 84/19 87/22
**overall [7]** 4/16 6/25 48/5 52/3 66/19 78/23 87/20
**own [16]** 11/24 13/18 17/3 29/6 29/10 29/20 32/5 37/14 37/15 38/2 41/5 51/11 89/5 91/1 91/2 92/22

**P**

**page [11]** 5/14 5/18 5/22 6/23 7/9 9/12 9/13 30/24 42/19 77/20 92/6
**page Leapfrog [1]** 7/9
**pages [3]** 5/18 5/21 97/19
**paid [9]** 10/14 10/20 10/22 12/12 65/11 65/14 65/18 65/20 71/8
**pains [2]** 82/13 87/18
**painstakingly [1]** 74/2
**PALM [11]** 1/2 1/8 2/7 32/10 72/16 72/17 72/19 77/18 77/19 85/10 90/20
**panel [9]** 9/9 9/17 47/22 47/24 63/25 64/3 64/6 94/20 94/23
**paper [1]** 17/13
**parameters [1]** 85/3
**parents [1]** 78/2
**park [3]** 20/1 20/2 20/3
**part [18]** 14/14 18/13 18/16 25/1 26/18 27/24 28/13 32/14 36/5 36/6 48/24 56/21 58/23 68/15 68/17 71/11 74/23 78/11
**partial [1]** 96/8
**participate [27]** 4/7 11/8 22/4 22/16 23/11 27/13 28/4 48/21 49/3 49/15 49/16 49/17 49/21 71/9 71/14 71/18 71/23 84/9 84/11 84/11 84/14 84/21 85/1 85/7 85/22 88/23 94/11
**participated [1]** 72/4
**participating [26]** 6/11 7/18 14/10 16/10 16/19 18/16 22/20 26/5 26/9 50/13 56/6 72/1 72/3 83/24 84/5 88/10 88/13 88/14 88/17 88/21 89/21 89/22 91/11 93/6 93/18 94/9
**participation [6]** 6/21 21/17 22/23 24/18 44/17 49/13
**particularly [1]** 19/8
**pass [1]** 23/1
**passive [1]** 12/8
**past [3]** 3/13 40/7 96/25
**patient [47]** 9/16 11/19 13/6 16/25 18/4 18/12 20/1 20/6 20/25 22/7 22/19 31/4 32/5 32/7 33/3 33/4 34/6 34/7 34/14 41/8 43/14 45/3 45/18 54/6 56/25 63/9 63/20 64/1 65/3 66/4 66/12 67/11 68/18 72/14 72/18 72/22 72/23 76/16 78/7 78/10 79/13 79/25 80/4 92/17 94/16 95/6 95/25
**patients [55]** 3/23 4/13 5/18 6/8 7/1 7/2 7/3 8/10 13/8 13/12 16/4 17/23 18/8 18/9 19/6 29/12 31/5 31/12 31/16 31/24 31/25 32/17 33/10 33/15 33/25 34/3 34/11 34/17 41/7 42/4 42/14 43/11 45/18 50/5 55/14 56/22 56/23 56/24 57/1 65/9 66/25 67/6 69/22 69/25 70/1 70/6 72/5 72/13 75/13 75/15 77/3 78/6 78/20 81/6 81/7
**patients they [1]** 3/23
**patients who [1]** 77/3
**Patrick [2]** 42/10 64/11
**Pauline [2]** 2/7 99/9

P

**pause [1]** 11/5
**pay [6]** 65/11 65/11 65/16 65/19 66/4 78/24
**payer [1]** 66/14
**payers [1]** 66/6
**paying [2]** 71/10 79/1
**payment [1]** 79/9
**PBHN [1]** 41/19
**peer [4]** 5/6 9/8 9/15 94/25
**penalize [2]** 82/18 83/4
**penalized [1]** 20/18
**penalizing [2]** 23/10 50/9
**penalties [1]** 13/16
**penalty [26]** 21/2 21/16 21/18 21/21 22/4 22/25 24/3 49/15 82/24 84/9 85/22 85/24 86/3 86/5 86/16 86/17 87/10 87/15 87/15 88/18 90/9 90/23 91/4 91/7 94/10 94/21
**people [25]** 13/3 15/3 17/8 45/6 45/7 45/25 51/1 52/18 53/19 53/25 55/6 55/6 58/8 58/14 60/23 61/24 71/3 74/24 75/18 77/8 78/7 78/13 78/25 79/13 82/24
**per [1]** 61/19
**percent [42]** 25/8 25/8 25/9 25/9 44/12 44/13 46/16 46/19 47/10 50/11 50/12 53/11 59/17 61/5 62/21 66/13 66/21 68/5 71/23 71/24 71/24 71/25 72/1 72/2 75/8 76/12 76/12 87/4 87/5 88/13 88/16 88/21 88/23 89/4 89/6 89/14 89/14 89/17 89/20 89/21 91/16 92/10
**percentage [1]** 75/20
**perception [1]** 90/16
**perfect [5]** 45/23 63/20 63/22 85/12 87/11
**perfectly [1]** 27/11
**perform [3]** 7/14 51/4 51/10
**performance [17]** 4/6 5/2 6/3 6/6 6/11 6/21 6/25 8/11 8/17 9/20 44/22 62/12 65/12 78/24 79/1 93/23 94/12
**performed [1]** 8/13
**performing [7]** 16/22 48/3 67/22 67/23 67/24 67/25 87/3
**perhaps [1]** 25/10
**permanently [1]** 42/17
**permission [1]** 70/19
**perplexed [1]** 62/3
**perplexing [1]** 73/2
**personally [1]** 21/8
**personnel [1]** 15/18
**perspective [1]** 78/25
**pet [1]** 94/10
**phone [3]** 70/1 72/16 73/17
**phrase [2]** 47/6 47/10
**physically [1]** 17/13
**physician [4]** 34/22 36/1 54/13 68/22
**physicians [9]** 4/13 15/18 31/9 31/25 32/17 34/21 37/9 37/24 38/3
**physicians [1]** 38/11
**picked [1]** 11/25
**picture [1]** 29/7
**piece [2]** 15/7 17/12
**Pierce [1]** 2/7
**Pineiro [1]** 1/21
**place [14]** 14/25 21/13 31/10 48/16 54/11 55/2 62/25 64/14 69/21 70/3 76/15 76/15 93/16 96/22
**Plaintiff [2]** 10/21 95/18
**Plaintiffs [5]** 1/6 1/15 42/17 43/13 49/25
**plan [1]** 66/12
**platforms [2]** 12/2 12/2
**play [1]** 71/8
**please [4]** 3/1 39/2 41/14 88/7
**plenty [2]** 71/22 83/14
**point [22]** 10/10 10/17 16/23 17/19 17/22 22/12 25/25 35/18 35/22 41/16 44/13 46/7 51/21 53/16 67/17 75/23 78/18 80/7 85/14 91/22 92/11 94/23
**pointed [6]** 15/9 17/20 27/16 27/20 73/11 78/24
**points [9]** 61/7 83/6 85/12 86/4 86/24 86/24 87/10 87/11 87/14
**police [5]** 75/12 75/12 75/15 75/18 75/21
**policy [3]** 14/25 63/2 87/13
**poor [3]** 59/8 60/17 68/5
**poorly [5]** 38/3 67/23 67/24 67/25 67/25
**pops [1]** 10/25
**population [1]** 69/23
**position [3]** 41/7 45/1 50/3
**positioning [1]** 95/18
**positive [1]** 44/21
**possibilities [1]** 44/20
**possible [2]** 13/22 53/14
**Post [1]** 77/18
**PR [1]** 70/13
**practical [2]** 30/13 41/3
**practice [4]** 7/14 11/23 23/2 41/9
**practices [2]** 29/1 97/1
**pre [1]** 47/20
**precedent [2]** 96/4 97/8
**precious [1]** 13/9
**prefer [1]** 97/13
**preference [1]** 72/23
**preliminary [1]** 43/1
**prepare [1]** 84/14
**preponderance [1]** 53/4
**present [1]** 4/18
**presentation [2]** 9/1 30/21
**presented [4]** 46/20 73/4 75/10 76/21
**presenting [2]** 3/5 99/1
**presents [2]** 4/6 4/19
**preserve [1]** 96/5
**president [3]** 10/11 41/19 84/20
**press [1]** 90/18
**pressed [1]** 35/1
**pressure [2]** 17/21 94/15
**Presumably [1]** 25/6
**pretty [7]** 27/11 30/13 44/11 71/11 71/14 83/12 98/24
**prevent [2]** 41/4 43/2
**preventable [3]** 7/1 42/5 68/21
**preventing [1]** 28/23
**previous [1]** 39/18
**previously [1]** 18/6
**primary [5]** 20/11 20/11 20/12 32/21 60/21
**principles [3]** 6/1 40/9 64/25
**prior [6]** 7/20 21/11 30/1 30/2 90/2 93/9
**private [3]** 66/6 66/14 71/4
**privileges [3]** 36/4 37/10 37/11
**probably [8]** 22/18 38/12 38/20 56/3 71/11 77/10 88/1 97/14
**problem [12]** 18/13 18/17 21/7 25/12 25/14 45/10 45/14 45/17 49/23 66/17 68/15 92/3
**problematic [1]** 34/24
**proceedings [3]** 1/11 99/3 99/6
**process [2]** 5/24 64/23
**produce [2]** 76/5 76/6
**produced [2]** 73/9 73/9
**product [1]** 60/9
**profit [7]** 34/10 44/2 49/19 71/1 78/25 79/9 79/14
**profits [1]** 66/25
**progressive [2]** 59/14 93/15
**projecting [1]** 76/3
**projection [1]** 76/7
**projections [3]** 75/2 75/6 75/6
**promoted [3]** 37/25 90/19 95/16
**promotes [1]** 10/13
**promoting [1]** 34/16
**promotion [1]** 31/4
**prompting [1]** 60/11
**prong [3]** 33/8 33/14 33/14
**prongs [2]** 30/17 66/1
**proof [3]** 40/7 52/22 83/9
**properly [1]** 64/15
**proposed [2]** 28/12 97/7
**proposing [1]** 25/19
**protect [8]** 3/25 13/12 42/2 42/4 72/13 81/2 81/4 81/20
**protected [1]** 33/5
**protecting [2]** 34/11 42/14
**protection [1]** 72/13
**protects [1]** 7/3
**proud [2]** 13/8 13/8
**proud that [1]** 13/8
**prove [6]** 43/20 52/22 53/4 54/25 55/4 55/11
**proved [1]** 48/23
**proven [2]** 87/21 96/8
**provide [4]** 8/25 53/14 74/3 96/8
**provided [2]** 24/7 73/3
**proxies [1]** 33/4

**P**

**proxy [1]** 12/23
**pseudoscience [1]** 13/15
**public [13]** 4/8 5/24 6/10 12/14 13/14 29/11 41/4 45/20 63/10 64/12 65/8 65/13 70/4
**publication [1]** 12/9
**publicize [1]** 70/11
**publicly [6]** 65/9 65/21 68/19 68/23 69/2 87/7
**published [1]** 28/24
**publishing [1]** 65/23
**pull [2]** 72/16 93/2
**pulled [1]** 68/7
**punish [1]** 83/3
**punishment [2]** 83/7 86/1
**purchased [1]** 11/19
**purpose [5]** 24/16 24/17 24/17 73/12 93/19
**purposes [1]** 40/7
**push [1]** 68/25
**pushed [1]** 11/23
**pushes [1]** 67/4
**pushing [1]** 10/1
**put [27]** 10/22 23/5 24/5 26/2 28/7 29/5 35/5 36/16 38/5 42/24 50/15 52/22 53/17 57/4 63/5 63/21 65/7 66/24 67/16 67/17 78/18 81/14 82/6 94/22 96/22 98/1 98/1
**putting [2]** 12/10 93/4
**PX [2]** 9/4 89/7

**Q**

**qualified [2]** 57/8 65/1
**quality [6]** 15/14 31/17 60/9 79/25 84/18 84/19
**quantify [1]** 75/5
**quarter [1]** 89/22
**question [25]** 6/16 8/5 14/12 21/7 23/5 23/13 23/21 24/25 30/19 36/14 39/4 42/8 44/7 53/16 56/25 78/15 79/20 82/25 87/12 88/24 90/7 90/22 96/3 96/11 96/12
**questioning [1]** 48/22
**questions [16]** 9/13 25/1 40/23 40/25 52/18 73/21 78/11 78/12 78/14 78/20 78/21 78/22 79/24 80/10 88/6 95/21
**quickly [4]** 26/24 90/5 92/25 94/17
**quit [1]** 16/10
**quite [2]** 32/18 46/11
**quote [5]** 5/17 6/17 8/2 8/8 67/5
**quoted [1]** 48/24
**quotes [1]** 8/22

**R**

**radio [2]** 11/25 12/2
**raised [3]** 21/10 31/16 88/6
**ramifications [1]** 59/11
**Ramirez [1]** 84/19
**Ramzy [1]** 86/22
**ran [1]** 48/18
**range [1]** 91/8
**Rashbaum [1]** 1/21
**rate [1]** 80/1
**rates [2]** 32/22 34/20
**rather [2]** 11/8 91/8
**rating [1]** 79/16
**ratings [1]** 95/24
**rational [1]** 50/21
**rationality [1]** 48/10
**rationally [1]** 89/1
**re [3]** 89/11 89/16 91/4
**re-weighting [3]** 89/11 89/16 91/4
**read [5]** 55/8 59/13 77/18 91/23 92/1
**readable [1]** 58/8
**reader [2]** 24/4 62/16
**reading [1]** 33/12
**readmission [1]** 65/16
**readmitted [1]** 65/15
**reads [1]** 57/21
**ready [3]** 3/2 84/24 84/24
**real [10]** 4/11 6/10 7/2 9/19 16/12 16/13 18/16 24/16 31/1 49/4
**reality [1]** 13/13
**realized [1]** 26/10
**really [13]** 3/11 3/15 26/16 28/11 40/22 48/15 53/6 55/13 59/12 68/11 80/25 92/11 92/19
**reason [16]** 14/7 15/12 16/19 17/20 26/6 32/14 46/6 48/2 65/6 73/23 73/24 74/11 74/23 75/15 85/5 98/9
**reasonable [18]** 8/16 31/22 33/13 55/11 55/14 55/15 55/18 55/24 56/18 56/19 56/22 57/1 57/8 58/21 59/24 63/14 63/24 64/15
**reasoning [6]** 47/19 48/7 48/9 64/2 74/19 74/19
**reasons [1]** 18/16
**reassure [1]** 9/10
**reassuring [1]** 31/12
**reassuring anxious [1]** 31/12
**rebounds [1]** 91/22
**rebuttal [5]** 7/25 40/25 87/24 88/3 94/5
**recall [1]** 89/13
**receive [3]** 10/9 89/6 98/21
**received [1]** 7/17
**receiving [2]** 7/22 27/2
**recent [1]** 14/20
**recently [1]** 30/9
**recommended [1]** 91/19
**recommit [1]** 72/5
**reconsideration [2]** 39/10 39/12
**record [13]** 26/25 30/12 37/5 40/16 41/4 46/21 89/10 90/2 90/18 92/7 95/16 95/24 99/6
**records [1]** 33/16
**red [4]** 8/7 8/12 10/7 72/15
**red-haired [1]** 72/15
**redress [2]** 96/8 96/24
**reduction [3]** 86/4 86/24 87/10
**reference [4]** 8/1 33/20 33/21 33/23
**referenced [1]** 91/16
**referendum [1]** 43/22
**refers [1]** 60/8
**reflect [7]** 4/10 5/2 8/17 9/19 18/2 62/15 81/12
**reflected [2]** 27/10 27/11
**reflects [4]** 6/12 6/17 7/2 62/18
**refuses [1]** 34/7
**regard [1]** 91/14
**regarding [3]** 28/25 57/14 89/14
**regarding their [1]** 28/25
**Regina [2]** 48/18 84/17
**regional [1]** 11/16
**reimbursement [1]** 79/15
**reinforced [1]** 10/7
**reinforces [1]** 8/3
**reinforcing [1]** 5/14
**reiterate [1]** 41/2
**related [2]** 16/25 49/9
**relates [2]** 39/19 49/14
**relationship [2]** 60/9 60/12
**relative [2]** 90/9 90/24
**release [1]** 31/1
**released [1]** 11/24
**relevant [1]** 91/7
**reliability [1]** 35/6
**reliable [4]** 4/20 9/11 60/5 89/10
**reliance [1]** 13/10
**relied [4]** 59/20 60/1 63/18 77/1
**relief [15]** 4/14 22/9 22/11 22/13 28/6 28/7 28/15 29/11 40/6 41/2 41/10 42/15 72/8 81/8 96/5
**relies [2]** 92/13 94/7
**relive [1]** 17/14
**rely [12]** 4/22 10/8 12/21 12/23 13/1 17/2 17/3 23/19 34/17 34/17 35/2 62/4
**relying [1]** 44/17
**remained [1]** 91/6
**remarkable [2]** 46/11 69/11
**remedial [2]** 40/6 40/9
**remedy [8]** 92/21 93/15 96/6 96/7 96/7 96/12 96/17 97/11
**remember [8]** 26/10 26/15 26/16 36/3 48/4 52/8 65/12 80/25
**remembers [1]** 54/12
**remind [2]** 90/11 90/12
**reminded [1]** 92/20
**removal [1]** 28/24
**remove [3]** 25/11 29/19 91/4
**removing [1]** 93/7
**renowned [1]** 64/1
**repeated [1]** 60/18
**repeatedly [2]** 5/7 94/18
**repeats [1]** 6/22
**replace [1]** 29/24
**replaced [1]** 18/3
**reply [1]** 97/20
**report [15]** 8/5 13/5 19/23 54/13 54/17 54/18 54/21

R

**report... [8]** 58/12 62/12 67/18 69/2 70/8 93/1 93/5 94/22
**reported [4]** 65/9 65/21 74/22 87/7
**Reporter [3]** 2/7 99/9 99/10
**reporting [6]** 27/3 54/15 63/2 68/10 68/11 68/13
**reports [5]** 20/1 27/23 68/19 68/23 69/14
**represent [2]** 83/1 89/4
**representation [2]** 6/22 12/5
**representations [5]** 9/10 9/20 12/17 12/17 13/13
**representative [1]** 36/2
**represents [2]** 6/25 60/10
**reputation [2]** 32/4 37/23
**request [1]** 28/4
**requesting [1]** 72/8
**requests [1]** 43/5
**require [1]** 40/7
**required [2]** 33/8 91/11
**requires [5]** 4/14 15/15 15/17 30/16 39/6
**research [1]** 60/21
**reserve [1]** 88/2
**resources [4]** 21/22 22/1 84/22 94/15
**respect [3]** 33/9 33/9 97/15
**respectfully [2]** 23/21 24/5
**respond [10]** 40/24 53/17 53/20 53/22 66/15 66/15 66/17 82/19 82/24 98/16
**responded [1]** 66/21
**responding [1]** 50/10
**response [30]** 14/5 14/5 14/8 14/9 14/12 15/5 15/7 15/8 16/5 16/9 16/12 16/16 17/7 18/13 18/17 19/4 37/8 48/13 48/15 48/23 63/17 64/3 64/15 66/16 91/15 91/20 94/8 98/11 98/21 98/21
**responses [2]** 5/20 13/21
**rest [1]** 38/12
**restaurant [2]** 23/17 60/21
**restraining [1]** 42/24
**rests [1]** 13/15
**result [3]** 33/18 35/10 41/8
**retina [1]** 18/22
**return [1]** 68/5
**revenue [4]** 49/9 49/14 56/2 66/22
**review [3]** 11/14 29/4 61/1
**reviewed [5]** 5/6 9/8 9/15 83/19 94/25
**revised [2]** 9/2 28/12
**revision [1]** 97/6
**revisions [1]** 97/22
**Ricky [1]** 84/19
**riders [1]** 46/4
**riding [1]** 46/4
**right [26]** 3/9 3/15 3/23 7/7 10/16 25/20 26/14 30/4 30/15 39/1 39/19 41/13 46/17 51/23 55/13 58/7 59/11 67/16 71/12 77/6 80/9 84/1 87/5 90/20 94/4 98/19
**rights [1]** 27/13
**risk [2]** 60/16 60/20
**Robert [1]** 91/17
**rolled [1]** 58/4
**rollout [1]** 10/17
**romano [13]** 14/12 22/22 45/16 49/8 63/12 64/10 64/11 65/8 69/16 82/18 83/1 83/3 85/23
**Romano's [2]** 42/11 48/24
**roof [1]** 18/1
**room [7]** 6/19 15/1 64/1 67/9 74/16 75/9 95/5
**roughly [1]** 87/24
**rounds [2]** 37/4 98/12
**route [3]** 43/22 43/22 47/19
**rule [13]** 25/23 29/4 29/6 29/8 35/6 36/25 75/1 75/24 76/2 86/25 87/8 91/2 95/14
**Rule's [1]** 67/12
**rules [4]** 29/20 34/24 36/23 41/6
**ruling [1]** 96/25
**running [1]** 55/17
**runs [1]** 90/25

S

**safe [7]** 7/1 13/10 16/4 16/20 19/5 34/5 88/25
**safely [2]** 6/12 55/1
**safety [81]** 3/19 4/5 4/6 4/17 4/18 4/20 4/24 5/2 5/2 5/5 5/11 5/17 5/19 5/23 6/5 6/9 6/17 6/18 6/20 6/20 6/24 7/3 7/9 7/14 7/15 7/20 9/14 9/16 9/19 10/1 10/5 12/23 13/1 13/7 16/22 25/5 25/11 25/15 25/16 29/12 29/19 29/23 31/1 31/13 31/17 34/8 41/8 42/18 44/9 44/12 44/22 45/3 45/18 46/3 50/14 54/6 55/22 60/9 60/13 60/14 60/15 60/16 63/9 63/20 64/1 65/3 65/14 66/11 66/25 67/11 68/18 70/23 78/7 78/10 78/14 79/13 79/25 80/4 88/18 92/6 98/9
**said [63]** 8/21 8/24 14/13 15/23 15/24 18/10 22/3 26/1 26/24 31/24 32/25 35/24 36/1 36/2 47/15 48/6 48/22 49/8 50/15 50/17 51/4 51/5 52/16 53/9 54/14 54/15 54/18 57/14 57/18 58/16 58/19 60/1 60/6 60/14 60/25 63/20 63/21 65/6 65/13 65/21 67/13 70/12 70/12 70/14 72/4 72/6 72/9 74/18 74/21 75/1 75/5 75/16 77/18 83/4 84/23 85/1 85/15 85/16 85/19 86/2 87/8 95/9 96/7
**said we [1]** 63/21
**Sam [1]** 35/3
**SAMARITAN [5]** 1/4 20/15 73/6 73/24 85/11
**same [23]** 5/22 6/22 7/10 7/21 8/3 14/15 15/23 17/10 25/12 25/17 25/17 26/9 26/19 27/19 30/6 38/20 39/9 49/1 86/23 87/25 88/12 94/4 94/23
**sat [1]** 53/5
**satisfaction [3]** 16/25 22/19 66/4
**satisfy [1]** 14/21
**saturation [1]** 75/24
**saved [1]** 20/8
**saves [2]** 18/5 18/5
**saving [3]** 20/2 20/18 34/11
**saw [16]** 7/20 9/25 10/12 19/22 20/4 30/6 32/8 33/15 42/15 43/5 56/1 66/10 72/5 77/1 90/14 95/6
**say [41]** 14/15 15/11 19/22 21/3 21/4 23/19 26/2 30/1 35/17 36/12 38/7 39/24 41/6 48/25 49/18 49/20 49/25 50/19 51/9 53/1 53/23 54/24 62/24 64/5 64/18 68/4 72/12 73/14 74/6 77/21 78/13 79/3 79/24 80/14 81/9 83/4 83/10 84/21 85/3 86/7 89/7
**saying [24]** 26/7 26/19 35/3 47/4 47/10 47/25 51/17 54/20 56/15 56/17 61/15 61/16 66/10 66/17 75/21 79/22 82/12 83/3 85/7 85/17 87/12 88/4 95/15 95/22
**says [25]** 14/3 29/4 29/6 42/16 53/22 58/20 59/4 59/7 60/20 61/20 61/22 62/11 62/13 64/21 64/22 64/25 66/3 67/4 69/20 70/24 82/18 82/22 92/11 92/14 93/1
**scared [1]** 77/2
**scenarios [2]** 48/18 55/17
**schedule [1]** 28/12
**scheduling [2]** 41/1 74/4
**school [3]** 47/17 63/17 76/23
**science [11]** 16/16 47/13 47/14 47/15 47/17 54/4 63/8 63/15 63/16 63/23 64/9
**sciences [1]** 16/16
**scientific [8]** 9/6 9/21 14/18 15/6 50/9 64/2 87/18 94/19
**scientifically [2]** 48/1 63/18
**scientist [1]** 64/16
**scientists [1]** 47/21
**scope [3]** 22/11 28/15 97/10
**score [52]** 7/7 7/10 7/10 7/11 7/12 7/17 7/23 23/11 38/6 41/22 44/17 45/11 45/13 45/23 46/1 47/3 52/4 53/14 54/2 62/9 62/13 67/14 68/14 69/5 69/12 69/13 70/9 70/24 71/19 77/21 78/16 78/19 84/5 87/1 87/4 87/19 88/9 88/9 88/18 89/1 89/20 89/21 89/23 90/4 90/9 90/23 91/3 91/5 92/16 92/18 93/19 93/21
**scored [2]** 27/18 83/15
**scores [33]** 3/22 13/22 14/6 17/1 22/7 22/19 25/5 26/8 26/8 27/4 27/9 27/9 31/19

**S**

**scores... [20]** 35/10 35/12 37/7 40/14 44/14 44/16 48/4 48/20 49/4 50/14 61/11 70/11 80/20 83/19 88/10 88/13 88/14 89/25 90/1 91/4
**scoring [3]** 55/16 56/6 91/1
**SCOTT [3]** 1/16 1/17 38/22
**screen [4]** 5/18 10/24 30/6 62/12
**scroll [1]** 93/3
**scrutiny [3]** 44/1 50/6 50/8
**Sean [1]** 12/20
**search [2]** 10/25 70/23
**searched [1]** 10/21
**seasonal [2]** 74/24 76/10
**seasonal issues [1]** 76/10
**seated [1]** 3/1
**second [5]** 5/1 15/7 26/3 29/22 54/6
**section [3]** 6/17 30/21 30/23
**see [28]** 4/2 5/6 6/23 11/22 12/14 22/15 22/21 24/15 35/1 36/8 40/20 47/15 49/6 52/4 58/9 66/9 67/9 69/18 69/19 70/24 72/6 73/12 75/23 76/3 82/21 84/17 85/6 85/19
**seeing [1]** 12/19
**seek [1]** 12/22
**seeking [4]** 28/7 40/6 41/2 41/11
**seem [2]** 35/2 53/1
**seems [4]** 18/23 44/19 66/14 85/21
**seen [10]** 19/1 19/3 32/23 40/19 42/9 53/5 55/25 71/7 95/15 97/17
**sees [3]** 10/6 10/7 81/20
**self [1]** 95/1
**sell [1]** 55/23
**sends [2]** 24/20 24/21
**sense [3]** 80/17 85/20 98/17
**sent [6]** 18/25 31/20 42/23 70/15 84/13 84/20
**Separate [1]** 36/25
**September [1]** 78/18
**seriously [2]** 82/17 82/21
**service [2]** 20/1 65/11
**servicing [1]** 77/24
**serving [1]** 50/5
**set [2]** 36/23 98/11
**setting [2]** 36/21 36/23
**seven [7]** 25/18 29/6 43/9 55/12 64/16 81/14 88/4
**several [1]** 41/20
**severe [2]** 4/5 60/18
**shake [1]** 18/2
**shaken [1]** 32/3
**she [46]** 11/12 11/13 11/13 11/15 11/18 15/15 15/17 15/23 15/24 15/25 19/1 19/3 27/16 27/17 27/20 31/24 32/3 32/4 32/5 32/6 32/8 35/17 35/17 35/24 35/24 36/1 36/1 39/18 39/18 56/11 58/14 67/3 67/4 73/16 73/17 73/17 73/22 73/22 89/18 90/5 91/15 92/7
92/13 94/7 95/15 95/21
**Sheri [1]** 74/7
**short [3]** 87/24 97/18 97/19
**should [23]** 3/17 5/19 6/2 9/1 12/24 13/1 28/14 28/19 29/22 29/24 30/1 39/5 41/6 60/19 64/18 66/20 70/5 73/9 73/15 74/6 80/2 80/3 88/22
**shouldn't [4]** 20/17 29/5 29/6 76/18
**shouting [1]** 82/11
**show [12]** 24/6 24/9 27/1 30/18 36/22 38/10 48/12 87/13 89/6 91/25 93/20 96/16
**showed [11]** 10/24 20/5 21/13 23/24 31/21 46/21 56/2 58/10 81/9 90/2 90/19
**showing [3]** 7/13 71/5 87/14
**shown [7]** 4/4 30/19 34/15 34/19 35/8 39/7 76/7
**shows [10]** 7/9 11/1 18/11 19/4 60/21 88/18 91/3 92/22 95/16 95/24
**shut [1]** 72/7
**shut up [1]** 72/7
**sic [1]** 61/4
**side [3]** 22/22 24/13 59/13
**sides [1]** 28/14
**sight [1]** 67/13
**sign [3]** 27/13 50/1 50/6
**signal [2]** 23/18 23/18
**signaling [2]** 7/13 8/6
**signals [1]** 18/8
**Signature [1]** 99/10
**signed [1]** 26/13
**significant [7]** 48/5 52/3 75/20 86/25 87/6 87/9 87/20
**significantly [4]** 60/8 67/25 68/9 75/13
**signing [1]** 26/18
**silence [2]** 43/6 44/2
**silencing [1]** 42/13
**similarly [1]** 10/19
**SIMMONS [1]** 1/16
**simple [1]** 44/2
**simply [10]** 17/10 26/5 29/18 31/9 34/6 55/8 58/24 81/9 83/11 89/5
**Sinai [1]** 21/2
**sincerely [1]** 40/23
**single [12]** 6/24 10/7 15/13 23/20 24/21 34/7 43/14 43/14 43/19 63/21 69/17 72/14
**sinks [1]** 15/1
**sir [1]** 14/7
**sirens [1]** 20/25
**sits [1]** 64/13
**sitting [1]** 65/24
**six [3]** 5/24 20/3 29/6
**skill [1]** 99/2
**sleep [1]** 20/23
**slide [19]** 15/16 20/4 20/5 28/5 28/7 29/2 29/21 32/24 42/15 43/5 88/6 88/12 89/11 90/2 90/11 91/14 91/14 93/2 94/24
**slides [4]** 9/4 67/2 67/3 90/19
**slowly [1]** 94/17
**snapshot [1]** 91/6
**so [80]** 3/10 4/11 4/20 4/21 6/1 10/5 10/20 13/21 16/5 17/25 18/24 19/19 20/10 20/13 21/6 21/20 22/25 23/7 24/17 25/18 26/22 27/18 29/5 29/15 29/16 30/11 31/1 31/22 32/15 33/15 35/14 36/6 36/21 38/21 40/6 40/10 41/12 43/15 44/15 44/18 46/2 46/9 46/13 46/23 49/19 51/10 52/7 52/13 53/18 55/2 56/15 56/19 56/25 59/12 62/5 65/24 66/23 67/12 68/5 68/17 69/24 70/15 72/23 77/13 82/7 85/10 86/3 87/19 87/25 88/2 88/6 88/21 90/6 91/17 92/8 92/15 92/24 93/4 93/25 98/12
**so-called [3]** 6/1 13/21 29/16
**social [3]** 12/1 16/16 32/8
**soft [2]** 20/19 20/20
**solely [2]** 13/7 32/7
**solution [1]** 30/13
**solve [1]** 23/12
**solves [1]** 92/14
**Soma [1]** 73/17
**some [33]** 15/11 16/11 22/12 22/14 24/6 25/4 27/23 28/14 36/19 37/17 38/6 39/21 46/3 47/7 49/9 50/13 52/25 53/1 56/1 56/2 58/15 63/15 64/20 67/2 68/20 74/11 74/11 75/4 75/6 76/17 84/2 88/5 90/19
**somebody [5]** 49/15 66/3 69/12 70/12 81/20
**somehow [5]** 16/20 50/21 61/13 81/2 93/4
**someone [3]** 10/21 22/15 59/2
**someone's [1]** 20/7
**something [22]** 4/4 4/9 14/11 14/14 14/17 15/10 19/11 19/20 21/16 24/15 32/6 36/16 44/13 47/5 47/11 52/22 62/10 75/17 96/2 96/19 97/4 97/6
**soon [1]** 31/2
**sophisticated [1]** 56/20
**sorry [1]** 69/25
**sort [4]** 15/12 24/6 46/7 75/4
**sources [2]** 5/21 82/2
**South [5]** 42/3 43/15 50/5 81/6 81/8
**SOUTHERN [1]** 1/1
**speak [2]** 17/10 94/17
**specialty [1]** 18/12
**specific [10]** 4/21 12/12 27/7 28/14 58/13 58/14 60/20 92/16 97/9 97/10
**specifically [4]** 32/22 33/24 38/1 38/24
**specificity [1]** 33/9
**specifics [1]** 15/16
**spectrum [1]** 7/15
**speculative [1]** 95/14
**speech [2]** 44/2 44/5
**speedily [1]** 42/20

**S**

**spend [1]** 31/12
**spent [5]** 20/20 31/11 43/9 43/10 64/16
**spoke [1]** 36/1
**spoken [2]** 14/23 41/20
**spot [1]** 36/17
**spread [2]** 11/22 12/1
**spring [6]** 31/2 31/3 42/24 52/17 86/10 98/10
**squirrely [1]** 52/24
**St [5]** 19/1 20/15 72/22 72/22 85/10
**staff [7]** 3/11 15/17 15/19 15/19 31/11 32/17 53/16
**stake [1]** 60/17
**stand [10]** 14/1 31/15 63/21 63/23 71/17 73/16 74/18 75/12 83/2 94/1
**standard [13]** 36/21 39/4 39/6 39/11 39/12 55/1 55/5 55/25 58/21 58/23 59/22 77/6 78/24
**standards [15]** 29/10 50/25 51/1 51/8 51/14 51/17 51/18 51/20 59/16 60/11 61/2 61/3 62/25 63/1 82/15
**standpoint [1]** 82/4
**star [15]** 67/18 78/16 78/23 79/2 79/4 79/6 79/8 79/16 79/23 80/5 81/25 82/1 82/8 95/23 95/24
**stars [1]** 80/1
**start [5]** 5/10 25/3 49/19 83/7 98/23
**started [8]** 15/13 31/24 41/15 47/25 52/18 65/4 90/12 90/13
**starting [1]** 10/10
**starts [1]** 26/15
**state [7]** 32/1 35/2 36/9 36/15 38/10 38/11 74/12
**statement [8]** 6/19 35/23 36/8 39/17 48/24 62/13 62/14 78/6
**states [5]** 1/1 1/12 6/2 6/15 96/20
**stating [1]** 6/24
**statistic [1]** 84/4
**statute [8]** 28/22 30/16 33/6 34/5 40/3 59/15 72/13 96/3
**stayed [2]** 80/12 80/12
**steeped [1]** 6/5
**step [3]** 7/5 93/22 93/23
**stick [1]** 85/7
**still [12]** 22/20 25/6 27/16 27/22 27/23 28/17 45/12 53/12 64/13 81/25 85/13 95/9
**Stipes [2]** 2/7 99/9
**stop [8]** 6/8 9/23 41/3 41/25 42/6 58/19 80/19 96/15
**stopped [5]** 18/16 61/13 61/15 61/16 61/17
**stops [1]** 30/11
**stories [1]** 34/3
**story [2]** 13/5 77/18
**straightforward [1]** 29/16
**strategic [1]** 13/19
**strategy [1]** 12/8
**Street [2]** 1/18 2/4
**stroke [1]** 32/14
**strongly [1]** 16/3
**structural [3]** 54/8 54/9 64/23
**structure [1]** 66/4
**structures [2]** 70/2 70/5
**stuck [1]** 20/10
**students [1]** 21/10
**studies [1]** 48/12
**stuff [2]** 55/25 63/25
**submit [3]** 19/16 21/9 98/20
**successful [1]** 34/2
**successfully [1]** 34/15
**such [1]** 80/9
**sue [1]** 41/25
**suffers [1]** 22/24
**suffice [1]** 23/8
**sufficient [5]** 4/25 5/12 23/12 38/10 40/10
**sufficient to [1]** 23/12
**sufficiently [1]** 39/4
**suggest [1]** 95/3
**suggested [4]** 18/17 25/4 80/9 92/5
**suggested linking [1]** 92/5
**suggests [5]** 15/3 37/23 61/24 89/3 94/18
**Suite [2]** 1/22 2/4
**summarize [1]** 38/17
**summary [1]** 33/1
**supplemental [1]** 5/21
**support [2]** 5/16 14/19
**supported [3]** 4/24 5/11 6/9
**supposed [2]** 73/10 74/5
**Supreme [2]** 96/4 96/7
**sure [17]** 18/6 21/6 30/22 35/24 37/5 38/23 45/17 51/25 55/13 56/13 58/7 65/1 67/8 82/10 86/21 87/19 92/6
**surgeon [1]** 72/18
**surgery [4]** 18/21 72/19 72/20 77/5
**surprise [1]** 12/24
**surprised [1]** 22/17
**surrounded [1]** 11/2
**survey [26]** 5/3 5/20 6/13 6/19 6/21 7/19 13/21 14/16 15/19 17/9 17/21 18/5 18/6 19/17 26/17 41/18 49/21 53/10 54/19 54/24 57/6 82/24 84/21 84/24 84/24 85/18
**surveys [5]** 17/2 17/4 17/5 17/6 59/21
**suspect [1]** 36/11
**sworn [2]** 16/6 18/15
**SYDNEY [1]** 1/16
**system [8]** 12/7 19/8 19/13 29/19 34/13 64/22 79/14 91/1
**systems [2]** 48/16 60/19

**T**

**tailored [1]** 4/14
**Takagaki [1]** 29/8
**take [7]** 21/24 28/9 54/1 82/17 84/4 86/22 96/22
**taken [3]** 38/19 38/19 89/15
**takes [3]** 7/5 86/22 88/8
**taking [5]** 3/10 3/11 59/7 82/21 86/13
**talk [11]** 28/16 36/17 38/15 51/2 51/22 52/7 54/1 66/16 92/13 93/7 97/21
**talked [15]** 19/11 19/12 27/15 32/12 46/1 59/21 59/22 72/14 72/17 72/18 73/16 75/24 83/6 83/9 89/17
**talking [7]** 24/2 45/24 45/25 49/25 52/1 52/25 56/4
**talks [2]** 22/22 59/15
**targeted [3]** 10/16 11/8 12/11
**targeting [1]** 29/1
**tat [1]** 20/14
**taught [1]** 63/17
**teach [1]** 47/17
**team [1]** 41/21
**technical [1]** 15/19
**technology [1]** 21/20
**tell [28]** 3/23 18/9 29/7 41/24 51/1 51/13 53/25 55/5 55/6 56/5 60/23 64/11 66/11 67/1 69/12 69/16 69/24 69/25 70/1 80/24 81/1 81/10 92/17 92/25 93/24 96/23 96/24 97/13
**telling [13]** 4/8 6/8 42/6 42/25 45/19 50/22 53/19 62/16 70/6 70/7 82/16 84/8 92/2
**tells [15]** 3/19 5/18 5/24 6/4 6/20 7/2 9/7 9/14 10/8 12/25 13/5 25/15 39/10 41/19 59/10
**temporary [1]** 42/24
**ten [1]** 88/2
**Tenet [7]** 16/10 21/24 41/17 41/24 42/9 43/13 44/1
**tentative [1]** 4/19
**termination [1]** 60/11
**terms [10]** 6/16 14/4 18/14 22/13 23/10 34/24 35/3 35/6 46/2 47/21
**test [6]** 15/9 49/25 57/6 86/22 86/23 87/11
**testified [47]** 7/24 10/19 11/13 11/22 45/2 47/16 48/14 48/16 48/18 48/19 49/8 51/3 52/8 52/16 53/7 53/23 54/7 54/17 54/22 54/23 57/10 58/12 58/14 61/15 63/10 64/9 64/10 64/11 70/21 71/3 72/22 73/2 73/19 73/22 74/17 76/2 77/23 78/5 78/15 79/18 80/7 80/10 80/24 86/25 87/7 88/8 96/15
**testifies [1]** 35/17
**testify [8]** 8/15 10/12 13/2 69/1 73/1 73/20 76/2 84/2
**testifying [1]** 12/19
**testimony [45]** 3/12 7/16 8/22 11/18 15/13 15/21 16/6 16/25 17/4 18/15 19/1 21/13 22/15 23/16 27/3 27/25 35/19

**T**


**testimony... [28]** 37/12 37/17 38/2 53/8 54/12 56/11 59/17 60/4 67/3 67/12 75/14 76/1 77/25 79/11 80/5 83/18 83/20 83/21 83/22 83/22 89/10 89/13 90/15 92/20 92/22 94/1 95/4 95/12
**testing [7]** 57/7 58/5 58/19 91/15 91/17 91/18 91/19
**text [3]** 73/16 73/22 74/7
**than [24]** 5/24 8/8 11/8 26/4 32/20 41/15 50/8 50/10 53/19 53/21 58/10 62/21 69/5 69/13 74/12 79/4 79/9 79/20 88/16 88/19 88/23 89/6 90/2 91/8
**thank [9]** 3/10 40/2 41/12 41/13 96/1 97/2 97/3 99/1 99/2
**that [755]**
**that's [4]** 12/2 31/2 50/22 54/19
**the 30 [1]** 89/14
**the representations [1]** 12/17
**the veneer [1]** 9/6
**their [114]**
**theirs [2]** 93/1 98/21
**them [78]** 3/19 4/19 8/17 9/14 10/1 10/3 10/22 12/10 12/11 17/10 17/16 17/17 18/17 20/19 21/9 23/10 24/15 24/23 24/24 27/6 27/6 27/8 28/3 28/23 29/19 30/8 33/4 34/17 34/18 39/22 40/25 41/19 44/11 46/15 47/2 49/15 50/10 52/11 52/14 53/13 53/18 53/23 55/19 55/22 55/23 56/6 59/22 62/9 62/17 62/21 64/18 66/13 66/21 70/7 71/23 72/23 74/2 74/22 76/5 76/6 76/6 77/1 78/15 79/2 79/18 81/13 82/16 84/13 84/23 85/21 86/13 87/7 88/16 91/22 92/2 93/24 96/14 96/23
**them because [1]** 91/22
**themselves [3]** 42/2 45/3 67/19
**then [26]** 7/11 11/24 14/12 15/19 27/18 27/21 29/24 31/4 35/13 41/1 43/1 43/4 45/5 48/12 48/20 53/17 53/20 62/13 63/5 72/1 75/1 81/22 86/8 92/9 93/13 96/20
**theory [7]** 3/16 15/6 16/15 48/1 52/10 88/22 94/9
**there [114]**
**Thereupon [1]** 99/3
**these [81]** 5/7 5/8 7/21 8/16 9/4 10/1 12/21 12/21 13/4 14/23 14/24 16/21 18/18 18/22 23/6 25/11 26/6 26/7 26/8 27/19 28/23 34/3 34/3 34/16 34/16 37/9 37/20 40/14 41/17 43/11 45/24 47/2 47/21 48/3 48/4 48/4 48/14 50/25 51/10 51/17 51/18 52/1 52/2 56/20 57/21 60/19 61/4 64/25 65/10 66/9 66/23 66/24 66/24 67/10 67/10 67/15 67/22 68/9 68/19 69/21 69/23 70/2 70/4 70/5 70/5 72/6 75/23 76/4 77/1 77/24 78/4 78/5 82/5 83/10 83/22 84/17 87/2 87/5 87/8 87/16 95/2
**they [381]**
**they included [1]** 93/5
**they whisper [1]** 82/8
**thing [14]** 4/9 10/6 14/15 15/23 16/12 16/13 26/1 35/1 39/3 50/4 93/2 94/25 95/13 95/20
**things [10]** 3/3 3/5 44/14 55/4 56/19 60/25 62/2 66/5 82/25 87/16
**think [86]** 7/25 14/13 16/21 19/11 19/14 19/14 19/16 21/7 21/8 21/9 22/16 22/17 22/25 23/24 24/5 24/7 24/19 25/22 26/2 27/1 27/21 28/2 28/9 28/11 28/19 30/13 31/22 33/12 36/15 37/11 38/4 38/9 38/11 38/11 39/6 39/15 40/2 40/11 44/9 44/12 46/13 46/25 47/1 47/4 49/23 50/15 50/17 50/21 51/10 51/22 52/20 55/13 57/20 57/23 57/25 58/25 61/24 67/12 68/11 68/17 69/3 70/11 71/22 76/14 76/17 76/22 77/13 77/14 77/14 77/19 78/25 79/7 79/8 79/17 82/12 85/19 85/22 86/13 86/15 92/19 92/19 97/5 97/6 97/8 97/18 97/21
**think it [1]** 69/3
**thinking [4]** 14/24 33/2 40/10 92/21
**thinks [3]** 76/16 96/16 96/18
**third [2]** 5/4 89/23
**this [181]**
**those [44]** 4/12 7/18 8/8 9/10 9/20 11/8 16/1 16/1 17/1 17/2 20/3 20/6 20/6 20/8 22/6 22/7 24/9 27/9 27/12 29/7 31/4 37/4 37/7 37/19 38/4 43/5 50/14 50/14 53/14 54/11 57/1 59/21 64/17 64/19 68/11 68/13 70/11 73/2 76/7 76/19 78/12 80/11 89/15 98/20
**thought [8]** 14/16 27/16 33/8 39/18 46/3 50/12 86/8 98/17
**thousand [1]** 56/2
**three [13]** 4/21 7/21 15/2 25/18 26/24 50/19 54/1 84/3 86/11 89/15 97/19 98/8 98/14
**through [18]** 8/4 10/13 11/15 12/11 12/12 12/12 24/8 24/8 24/9 26/12 33/22 40/3 74/1 74/21 89/12 90/5 93/11 93/13
**throughout [2]** 37/8 42/9
**tie [2]** 35/14 40/11
**tied [2]** 10/20 79/9
**TikTok [3]** 12/3 72/16 77/17
**time [32]** 3/11 3/11 13/18 15/17 17/15 17/17 21/20 26/19 29/3 30/15 32/12 34/6 38/17 38/18 38/19 41/16 42/15 43/8 43/10 56/1 65/9 65/11 78/4 84/24 85/4 87/22 88/1 90/17 90/17 91/7 93/12 94/4
**timely [1]** 27/2
**timing [2]** 37/2 37/13
**to address [1]** 41/21
**to fill [1]** 17/21
**to make [1]** 82/24
**to revenue [1]** 49/14
**today [5]** 28/18 63/23 64/13 72/8 75/14
**together [5]** 6/4 21/23 47/22 53/17 93/5
**told [13]** 32/6 33/7 35/4 35/24 39/3 42/23 52/23 65/8 65/10 66/21 71/17 74/1 83/2
**tolerate [1]** 34/13
**too [12]** 3/6 21/8 22/5 23/25 25/24 33/12 34/9 64/25 68/2 85/5 96/16 96/18
**took [8]** 25/5 33/8 33/11 38/17 57/17 59/5 78/2 88/1
**tool [1]** 44/2
**top [2]** 9/16 39/25
**total [2]** 60/10 61/3
**touched [1]** 38/23
**tough [1]** 36/14
**tout [1]** 13/10
**track [1]** 48/16
**Trade [1]** 23/1
**transcript [8]** 8/19 8/24 57/11 97/23 98/7 98/9 98/23 99/5
**transferred [1]** 31/7
**transfers [3]** 18/20 19/2 19/2
**transparency [2]** 3/16 78/11
**transparent [4]** 50/25 53/10 53/12 78/6
**trauma [2]** 17/25 20/16
**travel [2]** 11/24 13/14
**treated [1]** 78/1
**treating [1]** 50/10
**treatment [1]** 34/7
**treatments [1]** 20/15
**tremendous [1]** 67/14
**trial [7]** 1/11 8/19 57/11 73/10 74/5 97/21 98/11
**trier [1]** 52/18
**TRO [1]** 42/23
**true [6]** 62/13 62/14 71/16 83/12 93/8 95/24
**trust [6]** 5/17 5/19 9/22 31/21 86/19 87/2
**trust in [1]** 5/17
**trustworthy [1]** 9/11
**truth [5]** 24/10 35/2 36/8 74/14 96/23
**truthful [2]** 29/12 41/7
**try [4]** 3/6 36/16 39/25 88/3
**trying [18]** 17/4 20/12 32/24 35/21 42/2 43/6 49/13 50/2 60/14 63/19 66/7 67/14 71/2 83/8 83/10 88/5 90/5 98/16

**T**

**tubes [1]** 78/2
**Tuesday [1]** 15/4
**turn [9]** 29/2 29/3 59/13 74/20 76/8 76/9 95/2 95/3 95/13
**turned [1]** 30/8
**turning [1]** 4/15
**TV [1]** 11/25
**twice [6]** 3/23 18/10 18/11 76/16 89/24 92/2
**two [21]** 24/7 25/1 29/16 30/8 30/17 37/4 44/14 47/12 47/18 50/19 56/18 60/25 62/2 82/25 87/16 90/14 91/5 93/23 94/1 98/8 98/18
**type [1]** 80/21
**types [1]** 15/18

**U**

**U.S [1]** 91/15
**UC [4]** 17/20 19/22 42/10 82/22
**ultimately [2]** 12/13 12/18
**unable [1]** 17/11
**unacceptable [2]** 26/5 61/25
**unambiguously [3]** 5/7 9/14 12/25
**unambiguously that [1]** 12/25
**unavoidable [1]** 12/15
**unaware [1]** 59/25
**uncertain [1]** 6/16
**under [25]** 9/16 11/7 17/21 21/20 22/8 26/3 30/17 33/6 33/13 33/14 34/5 36/15 37/21 55/24 56/18 58/5 59/15 61/7 61/22 64/4 72/23 85/13 93/20 94/9 96/3
**underlies [1]** 63/15
**underlying [1]** 5/5
**understand [27]** 4/16 4/22 8/17 24/4 25/7 32/21 35/5 44/8 44/10 44/15 44/19 53/13 56/10 57/16 57/23 57/25 58/17 59/5 59/6 59/7 60/3 60/13 66/3 69/4 79/22 81/13 94/2
**understanding [3]** 28/17 28/18 58/16
**understandings [1]** 40/3
**understands [1]** 57/22
**underway [1]** 41/21
**undeserved [1]** 13/11
**unequivocably [1]** 51/15
**unfair [13]** 4/1 21/10 23/1 23/12 28/25 30/17 41/9 42/21 43/22 44/16 50/1 96/6 97/1
**unfairness [4]** 33/8 39/5 39/11 98/13
**unfounded [1]** 13/15
**unique [1]** 18/19
**unit [5]** 17/24 17/24 17/25 51/7 61/19
**UNITED [3]** 1/1 1/12 96/20
**units [2]** 20/15 20/16
**unless [1]** 19/25
**unlikely [2]** 57/15 59/4
**unmistakable [2]** 5/15 29/12
**unreliable [3]** 59/19 72/21 73/5
**unscrupulous [1]** 81/5
**untethered [1]** 92/16
**until [6]** 65/4 65/8 65/10 76/3 80/1 80/11
**up [42]** 3/24 5/9 8/20 9/5 10/3 10/25 11/25 20/6 20/8 21/20 22/23 30/15 44/15 44/23 45/7 46/1 50/1 50/6 50/9 52/16 62/11 63/15 63/16 64/5 65/10 68/7 69/12 70/22 71/5 72/7 72/10 72/14 72/16 74/25 77/21 88/1 91/1 93/2 94/5 96/1 97/16 98/14
**update [1]** 98/2
**updated [1]** 39/17
**upon [1]** 12/18
**uproar [1]** 51/4
**urgently [1]** 13/6
**us [32]** 15/2 25/19 28/12 33/7 36/22 40/4 41/24 42/17 42/23 42/25 43/2 43/6 51/18 52/23 62/20 62/23 63/2 64/2 65/24 66/11 66/18 67/5 69/14 78/13 79/1 81/9 81/9 81/11 92/23 96/15 96/21 97/13
**use [12]** 11/10 30/15 46/9 57/18 70/10 70/20 73/8 74/6 85/3 85/20 85/24 85/25
**used [6]** 10/19 13/3 44/5 54/19 83/2 91/2
**user [4]** 57/7 58/5 58/18 93/10
**users [1]** 92/10
**uses [2]** 5/23 47/6
**using [12]** 5/20 44/4 44/15 45/10 46/10 47/20 59/15 82/24 83/3 84/9 85/21 90/25

**V**

**validated [1]** 9/12
**validation [1]** 95/1
**value [5]** 11/16 16/11 22/24 62/18 62/18
**values [1]** 25/11
**Van [1]** 11/12
**vary [1]** 60/7
**vehicle [1]** 43/25
**veneer [1]** 9/6
**verify [1]** 55/4
**versus [6]** 25/8 25/9 52/9 54/2 75/17 89/14
**very [19]** 7/15 16/22 16/23 23/17 23/24 34/1 37/21 39/8 40/15 40/15 40/15 44/21 53/18 57/18 58/13 60/5 78/25 92/24 94/16
**vetted [1]** 9/20
**viable [1]** 48/1
**vice [1]** 10/11
**video [3]** 11/12 77/17 94/1
**view [12]** 16/5 34/2 34/3 34/12 34/13 44/22 44/23 44/25 53/10 60/15 90/15 90/15
**viewing [1]** 8/16
**views [1]** 97/5
**violates [1]** 28/22
**violation [1]** 60/16
**violations [1]** 60/19
**viral [2]** 12/3 12/13
**virtue [1]** 16/12
**visit [1]** 10/4
**visited [1]** 14/23
**visits [1]** 75/9
**visual [1]** 8/10
**volume [1]** 95/6
**voluntary [3]** 13/21 48/21 64/13
**vote [4]** 64/6 64/8 64/10 64/11
**voted [1]** 64/6
**Vredenburgh [5]** 7/24 8/15 8/21 8/21 93/19
**Vredenburgh's [1]** 24/8
**vulnerable [1]** 17/15

**W**

**wait [1]** 29/2
**walk [8]** 32/19 32/22 34/20 74/16 74/20 75/8 75/19 95/7
**walk-ins [8]** 32/19 32/22 34/20 74/16 74/20 75/8 75/19 95/7
**Wang [1]** 73/18
**want [65]** 17/14 22/10 22/12 22/12 22/13 23/18 24/17 25/25 28/1 28/2 28/17 28/18 28/18 28/21 32/1 32/25 36/2 36/5 37/16 37/16 38/3 38/15 38/17 39/13 41/2 42/1 42/16 42/16 42/19 42/21 42/22 44/6 44/8 47/9 49/18 51/4 51/25 54/1 54/6 55/3 55/5 58/20 66/24 66/25 67/5 67/17 70/20 72/19 76/17 77/15 80/14 81/10 82/18 84/14 86/20 90/11 90/11 91/13 92/20 97/3 97/10 98/1 98/3 98/4 98/4
**wanted [4]** 31/10 36/17 59/12 94/10
**wants [5]** 4/2 13/12 34/16 76/15 96/18
**warning [1]** 60/15
**was [138]**
**washing [15]** 7/10 14/25 15/3 61/5 61/13 61/15 61/16 61/17 61/20 61/22 62/1 62/6 62/7 63/2 77/22
**washings [1]** 61/19
**Washington [1]** 1/19
**wasn't [6]** 12/8 21/18 35/21 64/6 64/7 64/8
**wasting [1]** 13/9
**watch [1]** 81/5
**watchdog [3]** 42/13 44/3 79/10
**way [11]** 16/3 19/23 24/23 32/5 42/20 48/13 56/5 60/2 70/18 70/20 87/22
**Wayne [1]** 73/18
**ways [3]** 5/13 47/12 47/18
**ways to [1]** 47/12
**we [246]**

W

**we'll [2]** 40/4 49/22
**we've [3]** 3/13 19/11 97/6
**web [2]** 5/8 5/14
**website [34]** 6/15 10/3 10/5 10/9 11/21 11/24 12/11 12/12 13/1 13/10 14/2 23/5 23/19 23/23 27/8 27/10 29/9 29/24 30/9 33/22 42/18 55/8 57/21 58/3 58/4 59/12 60/3 69/18 77/21 91/22 92/22 93/5 94/2 96/20
**weeks [4]** 41/23 98/8 98/14 98/18
**weigh [2]** 52/19 73/15
**weighing [1]** 80/6
**weight [1]** 89/25
**weighted [1]** 17/1
**weighting [4]** 25/7 89/11 89/16 91/4
**welcome [1]** 88/4
**well [26]** 3/5 5/25 6/17 7/3 8/21 14/4 16/16 16/22 17/8 26/7 26/21 37/21 39/19 44/11 46/11 46/15 47/4 52/25 55/19 65/19 67/9 68/4 70/12 87/3 97/8 97/14
**went [20]** 31/3 31/6 36/11 47/3 61/7 64/12 65/7 67/2 67/3 74/1 74/21 75/18 76/22 80/12 86/6 86/19 87/18 87/22 90/12 93/11
**were [60]** 7/22 9/10 9/11 9/20 11/17 11/18 12/15 14/16 17/16 21/18 21/19 21/21 23/9 25/10 31/17 31/25 35/20 36/7 37/4 37/25 43/5 44/10 44/14 44/14 44/21 46/4 46/4 46/16 51/21 52/2 52/5 53/20 54/12 60/14 61/12 65/10 65/14 66/22 70/12 70/19 71/2 71/4 71/5 73/8 73/21 75/7 75/8 76/7 76/9 78/22 80/20 83/4 83/5 85/11 85/13 87/3 87/13 95/2 95/3 95/9
**weren't [4]** 16/7 16/8 16/22 87/14
**WEST [22]** 1/2 1/8 2/7 15/14 15/14 31/23 31/24 48/18 52/5 72/24 75/10 75/13 80/8 80/9 80/12 84/18 85/10 86/19 90/12 90/21 91/5 95/4
**whammy [3]** 89/25 90/3 91/10
**what [178]**
**whatever [6]** 22/24 38/16 61/21 78/3 81/10 97/25
**whatsoever [2]** 59/9 94/22
**when [58]** 3/18 4/7 10/8 10/21 10/25 13/1 17/22 18/4 18/24 19/16 21/9 21/18 21/19 24/17 26/17 29/20 29/25 30/6 31/13 31/17 31/18 31/20 31/21 32/13 40/10 42/5 49/8 50/4 51/2 51/20 52/7 52/17 53/14 55/21 55/23 56/5 56/17 58/4 61/11 67/21 70/10 70/18 70/22 73/1 74/13 81/19 81/20 81/21 85/4 86/8 88/11 89/9 89/15 90/13 91/4 93/22 98/4 98/11
**where [30]** 10/9 12/3 12/22 15/21 20/5 20/17 20/18 20/23 23/17 23/19 28/5 40/18 43/12 48/12 58/3 68/7 73/1 73/25 74/4 74/13 80/12 81/9 82/18 82/22 84/17 88/9 90/9 90/24 93/11 94/16
**whether [30]** 3/14 3/15 3/16 3/17 5/3 6/12 6/18 16/2 19/5 20/7 20/8 30/17 31/3 33/21 43/23 49/14 60/2 60/8 63/2 63/3 75/3 76/14 79/20 83/5 88/24 88/25 90/7 90/22 96/11 96/12
**which [37]** 5/18 6/1 6/13 9/5 11/17 15/25 17/19 22/14 22/24 24/2 35/20 36/4 37/3 37/11 38/4 42/6 54/8 56/1 56/3 60/13 62/4 70/11 71/13 75/19 76/20 78/23 79/11 83/8 86/25 88/11 92/13 92/25 94/7 94/7 97/6 98/1 98/2
**while [2]** 4/9 75/19
**whisper [8]** 12/10 67/5 67/5 67/7 67/7 82/8 82/9 82/10
**whispers [1]** 82/9
**who [41]** 11/6 11/18 13/6 15/9 15/9 15/14 21/25 23/3 27/12 31/15 32/5 32/12 33/4 33/16 33/24 36/2 37/18 41/19 51/9 55/13 55/20 56/6 56/7 56/17 56/18 56/21 57/20 64/20 66/21 72/18 72/18 73/1 74/13 77/2 77/3 79/10 79/13 80/2 80/3 95/17 96/14
**whole [2]** 21/23 46/7
**whose [1]** 88/13
**why [41]** 5/19 12/15 14/22 15/7 17/20 18/16 18/20 21/1 22/15 22/16 22/21 28/17 32/14 33/19 35/20 36/7 44/9 44/23 45/11 45/21 46/1 47/2 50/24 53/19 55/23 59/3 63/5 69/4 72/8 72/11 78/3 79/17 82/17 82/19 82/23 84/11 85/2 88/24 93/18 95/24 96/10
**wide [2]** 9/25 13/14
**wild [1]** 81/3
**wildly [1]** 81/5
**will [32]** 3/5 6/6 9/2 9/3 9/5 20/19 24/19 27/6 28/16 29/7 34/17 37/5 38/5 38/20 40/20 40/24 48/25 49/21 52/19 55/2 58/15 58/18 65/18 73/12 82/23 85/7 94/12 94/17 96/16 96/25 98/18 98/20
**willing [3]** 54/17 54/18 54/21
**Wilson [1]** 2/3
**win [1]** 22/3
**windows [1]** 18/3
**withdrew [2]** 43/3 43/3
**within [2]** 17/2 64/2
**without [22]** 4/5 10/23 10/23 11/20 21/14 21/14 21/15 26/23 30/12 35/5 41/18 41/6 75/1 75/6 76/17 86/6 88/19 89/2 89/2 91/10 95/25 96/21
**witness [3]** 51/16 56/23 63/21
**witnesses [6]** 17/3 18/15 24/12 25/5 38/2 47/7
**woman [2]** 72/15 72/17
**won't [1]** 53/1
**wonderful [2]** 18/4 37/17
**WOOD [1]** 2/1
**word [3]** 52/16 85/24 85/25
**words [3]** 9/18 11/9 57/18
**work [15]** 3/3 16/2 22/14 31/10 32/24 37/16 37/16 38/3 70/18 71/5 76/15 85/6 87/13 87/14 98/15
**worked [3]** 34/1 53/17 64/20
**workers [1]** 31/11
**working [1]** 48/8
**works [7]** 28/9 35/20 51/16 56/7 59/6 64/9 72/23
**world [8]** 6/10 7/3 9/19 31/1 51/9 51/19 64/1 65/24
**worried [1]** 77/5
**worry [3]** 38/21 45/5 45/11
**worse [10]** 8/8 23/10 50/10 53/20 62/21 69/5 69/7 69/13 88/19 88/23
**worst [10]** 7/6 7/7 7/11 7/17 8/2 8/14 12/6 77/18 88/19 88/22
**worth [4]** 22/4 22/16 85/4 85/5
**would [58]** 7/25 8/16 8/25 12/14 13/22 22/21 23/1 23/7 23/8 23/11 25/6 25/12 25/14 26/1 28/11 28/15 29/10 30/20 32/7 33/18 35/2 35/9 38/7 44/25 45/4 45/6 45/7 45/7 48/19 49/23 54/20 55/14 57/7 59/14 69/25 70/18 70/22 70/23 76/7 77/8 77/19 78/9 78/24 78/25 80/21 81/17 82/3 87/20 88/4 90/10 90/24 92/6 97/3 97/13 97/18 97/19 97/22 98/14
**wouldn't [6]** 16/11 27/18 63/6 69/11 77/3 96/2
**wrap [2]** 94/5 96/1
**written [1]** 65/2
**wrong [6]** 3/15 21/2 59/25 61/5 77/11 89/5

Y

**year [6]** 10/5 20/21 41/15 54/10 71/1 78/18
**years [8]** 7/21 15/2 46/10 59/5 82/13 86/11 86/12 95/25
**yellow [1]** 8/12
**yep [1]** 36/12
**yes [21]** 14/13 17/16 17/17 18/23 21/7 22/2 24/22 25/14 28/21 30/24 37/21 39/23 44/24 45/2 46/24 61/23 64/4 76/24 85/1 90/12 98/22
**yesterday [2]** 7/24 88/11
**yet [4]** 66/6 74/6 88/22

**Y**

**yet... [1]** 97/17
**York [4]** 20/23 35/4 35/24 73/24
**you [454]**
**you're [2]** 36/21 82/11
**your [124]**
**yourself [2]** 50/4 78/9

**Z**

**Zambrana [7]** 15/22 37/15 45/2 53/9 54/22 56/24 72/4
**zero [3]** 15/5 83/9 86/14
**ZIBAS [1]** 2/2

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 25-CV-80526-MIDDLEBROOKS

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,

Plaintiffs,

v.

THE LEAPFROG GROUP,

Defendant.
_______________________________________________/

**ORDER**




A failing grade for hospital safety predictably has severe consequences for any hospital in terms of patient avoidance, doctor retention, employee morale, and community reputation.

The Leapfrog Group uses a survey, along with other publicly available data sources, to calculate patient safety scores for hospitals across the United States. Under Leapfrog's scoring

methodology, every hospital is assigned a letter grade (A, B, C, D, F) ostensibly to show where a hospital stands in safety performance. The scores are marketed and disseminated to employers, insurers, and the consuming public.

The Leapfrog survey is voluntary and many hospitals, including the Plaintiff Hospitals here, choose not to participate. For those non-participating hospitals, since survey information is not available, Leapfrog uses alternative measures to calculate the safety score. Non-participants do not fare well in these alternative measures of scoring. Even before this lawsuit, Leapfrog has previously received criticism for its methodology and its tendency to discriminate against non-participating hospitals. *See* Wenke Hwang, Jordan Derk, Michelle LaClair, Harold Paz, Hospital patient safety grades may misrepresent hospital performance. 9 J. Hosp. Med. 111 (2014).

But in 2024, Leapfrog decided to double down on its methodology for assigning scores to non-participating hospitals. Put simply, the alternative scoring measures became punishing. Assuming that "non-response bias" suggested that hospitals choosing not to participate necessarily had something to hide with respect to patient safety, Leapfrog began assigning arbitrarily low scores for several measures. Leapfrog also changed the weighting of those measures for non-participants, rendering it almost impossible for these hospitals to receive a passing grade.

Leapfrog's advisory panel of experts never voted to adopt this significant change in methodology. One of the experts suggested that if Leapfrog wanted to penalize non-participating hospitals, it should be very up front about it. And in response to a colleague at a non-participating hospital who described the change as "blackmail," the advisory panel member wrote: "their decision to increase the penalty for nonparticipation was a simple business decision… It's just business, folks!" (DE 191-3 at 1, 4).

Leapfrog's change in methodology has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety. For the reasons that follow, I find that

Leapfrog's approach constitutes an unfair and deceptive business practice in violation of the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. § 501.201 *et seq*.

**BACKGROUND**

Five South Florida Hospitals – Good Samaritan Medical Center, Inc. ("Good Samaritan"), Delray Medical Center, Inc. ("Delray Medical Center"), Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center ("Palm Beach Gardens Medical Center"), St. Mary's Medical Center, Inc. ("St. Mary's"), and West Boca Medical Center, Inc. ("West Boca Medical Center") (collectively, "the Plaintiff Hospitals") – brought suit on April 30, 2025, challenging Defendant, The Leapfrog Group's ("Leapfrog") scheme under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). Fla. Stat. § 501.201 *et seq*. (DE 1). The initial complaint sought both money damages and injunctive relief. On August 28, 2025, however, Plaintiffs filed an Amended Complaint, leaving only their request for injunctive relief. (DE 74). I held a five-day bench trial beginning on January 16, 2025, at which time documentary and testimonial evidence were presented. Based on the evidence adduced at the trial, I make the following findings of fact and conclusions of law. (DE 172).

Leapfrog is an independent, national non-for-profit organization. It was founded in 2000 with an admirable goal – to address "severe dysfunction in the health care marketplace." (DE 135 at ¶ 35). Its mission is a laudable one: to "trigger giant leaps forward in the safety, quality and affordability of U.S. health care by using transparency to support informed health care decisions and promote high-value care." (*Id.* at ¶ 36). As part of this mission, Leapfrog established the Leapfrog Hospital Survey in 2001, which "collect[s] and transparently report[s] hospital and ASC performance, empowering purchasers to find the highest-value care and giving consumers the lifesaving information they need to make informed decisions." (*Id.* at ¶ 42). Separate and distinct from the Leapfrog Hospital Survey is Leapfrog's Hospital Safety Grade ("Safety Grade"), first

launched in 2012. (*Id.* at ¶ 49). Importantly, Leapfrog's Safety Grade methodology is focused on providing a Safety Grade to all eligible hospitals, regardless of whether the hospital voluntarily reports information requested as part of the Leapfrog Survey. (*Id.* at ¶ 51). A comprehensive review of the methodology is therefore warranted.

**A. <u>The Leapfrog Hospital Grade Methodology</u>**

The Leapfrog Hospital Safety Grade is derived from a collection of various measures. The Safety Grade is the product of information from two sources: first, Leapfrog's Hospital Survey, which collects information on quality and safety from participating hospitals, and second, publicly available data from the Center for Medicare and Medicaid Services (CMS). (DAY 1 Trial Transcript at 181). From this data, Leapfrog develops 22 quality safety metrics, which underlie a letter grade from A to F that Leapfrog Group assigns to hospitals twice a year—once in the spring and once in the fall.

Broadly, these measures are split into what Leapfrog calls domains: "Outcome" measures and "Structural/Process" measures. (DE 195-1 at 5). Dr. Sean Nicholson, a health economist and expert witness for Plaintiffs, offered helpful testimony to contextualize the distinctions between these two domains. Ten of the 22 variables are "Outcome" measures. As he explained it, "[a]n Outcome measure would be a measure of a patient's health, such as whether a patient falls while in the hospital or acquires an infection while they are hospitalized." (DAY 1 at 181). The Leapfrog Hospital Safety Grade Scoring Methodology ("Methodology"), for example, describes these as "measures of harm experienced by patients (e.g., central line-associated blood stream infections)." (DE 195-1 at 13). Meanwhile, the remaining 12 measures are characterized as "Structural and Process" measures. Dr. Nicholson described these measures as "an indicator of a hospital's capability of providing safe and high-quality care such as whether they use computerized physician medication entry." (DAY 1 at 181). Likewise, the Methodology describes these as "measures of

compliance with best practices in patient care." (DE 195-1 at 13). Each domain accounts for 50% of the final Safety Grade.

At a more granular level, it is helpful to understand the data sources underlying Outcome and Structural/Procedural measures.[1] Five of the ten variables that comprise the Outcome measures are derived from CMS data. (DE 129 at ¶ 137; DE 195-1 at 7). The remaining five measures are collected from the Leapfrog Hospital Survey. For Structural/Process measures, on the other hand, five of the 12 measures are derived from CMS data, while the remaining seven are derived from the Leapfrog Hospital Survey. (DE 195-1 at 5, 6).

Leapfrog has various ways of dealing with missing data. For the five Outcome measures derived from the Leapfrog Survey, where that primary data source is unavailable, Leapfrog relies on available CMS data (DE 195-1 at 7). For the remaining five Outcome measures, where primary CMS data is unavailable, there is no secondary data source, meaning that the hospital cannot be scored on that measure. As for the Structural/Process measures, the process is slightly different. Like the Outcome measures, where Structural/Process measures relying on CMS data as the primary data source lack the requisite data, no secondary data source is available. (*Id.* at 6). For three of the remaining Outcome measures, scoring "safe practices" including culture of leadership, feedback & intervention, and the nursing workforce, when Leapfrog Hospital Survey data is unavailable, there is similarly no secondary source available. This leaves us with the final four Structural/Process measures: Computerized Physician Order Entry (CPOE), Bar Code Medication Administration (BCMA), ICU Physician Staffing (IPS), and Hand Hygiene. Each of these measures ordinarily rely on the Leapfrog Hospital Survey as the primary data source. But what distinguishes them is the "imputation" applied to these measures where no Survey data is available

[1] The following information is taken from PX-001.0, which is Leapfrog's Spring 2023 Hospital Safety Grade Scoring Methodology. The information provided is consistent with Leapfrog's 2024 Methodology for purposes of offering background.

– in these situations, the "Secondary Data Source" is simply an assignment or "imputation" of a certain score.

The core issue in the instant case involves the Fall 2024 Methodology change pertaining to this "imputation" of missing data. The Spring 2023 Methodology incorporated a "two-step" imputation approach. (DE 195-1 at 15). "Step 1" used a hospital's most recent score on the measure.[2] Where no data was available for CPOE, BCMA, and Hand Hygiene, Leapfrog would turn to "Step 2" and assign a score reflecting the mean score assigned to other similar hospitals in the U.S. (*Id.*).[3]

In Fall 2024, Leapfrog altered the imputation model to address an understandable issue: Hospitals who did not respond to the Survey were receiving what Leapfrog perceived to be an undeserved benefit by imputing the cohort means of hospitals participating in the Survey for CPOE, BCMA, and Hand Hygiene. (DE 135 at ¶ 87). Now, Step 1 assigns a hospital its most recent score for CPOE, IPS, and Hand Hygiene measures if the hospital had a score assigned by Leapfrog in the previous two rounds of grades. (DE 195-2 at 15). Where no historical data exists for the last two rounds, Step 2 assigns a point value that is equivalent to "Limited Achievement." (*Id.*). Notably, this imputed Step 2 score is not zero. "Limited Achievement" scores account for and give credit to hospitals for having a CPOE and BCMA system, Hand Hygiene Policy, and ICU. (DE 135 at ¶ 103). Instead of zero, each of CPOE, BCMA, IPS and Hand Hygiene have different, seemingly random, Limited Achievement Scores: 15, 25, 5, and 15, respectively. (*Id.*).

[2] The 2023 Methodology explains that for CPOE, BCMA, and Hand Hygiene, if the hospital had a score assigned by Leapfrog in the previous four rounds of grades (*i.e.*, fall 2022, spring 2022, fall 2021, spring 2021). For IPS, it extended to a score assigned by Leapfrog in the previous five rounds, thereby including fall 2020 as a potential data source. (DE 195-1 at 15).

[3] Under Step 2 for IPS, Leapfrog used the CMS Cost Report to determine whether a hospital had one or more medical, surgical, and/or pediatric ICU beds, and if so, the hospital was assigned the associated "Limited Achievement" score. (DE 135 at ¶ 85; DAY 2 at 190).

These scores are "assigned" based on the lowest score of a participating hospital for that measure. Importantly, testimony explained that no single participating hospital received "Limited Achievement" across all four of these measures. (DAY 1 at 187-88).

Focusing only on the 2024 Safety Grade Methodology, and particularly only on the Structural/Process measures, the weights assigned to those measures differed based on whether the hospital participated in the Survey. Drawing on Leapfrog's Methodology, Dr. Nicholson offered testimony that emphasized the weight difference between participating and non-participating hospitals. For a participating hospital, the five CMS-derived Structural/Process scores constitute 15% of the total letter grade. The four Leapfrog Survey-derived measures that would otherwise be subject to imputation account for 24% of the grade. And the three "safe practices" scores account for 11%. (DAY 1 at 182). When grading a non-participating hospital, however, these three "safe practices" scores are excluded from the grading calculation; the 11% weight is then reassigned to the remaining two categories on the structure and process side, the CMS data and Leapfrog Survey-derived data. (*Id.* at 183; DE 195-2 at 22). As a result, the four imputed low scores carried increased weight—from 24% for a participating hospital to 31% for a non-participating hospital.

In arriving at this methodology change, Leapfrog has consistently relied on their Expert Panels. Leapfrog utilizes 13 separate and distinct expert panels to review and provide guidance on respective sections of the Leapfrog Hospital Survey ("Survey Panel") and a separate expert panel presides over Leapfrog's Hospital Safety Grades ("Safety Grades Panel"). (DE 135 at ¶ 37). The Survey Panels consist of ten experts, who offer guidance on the various measures. (DAY 3 at 90); (DE 195-107 at 2, 3). This includes an expert panel that oversees the CPOE, BCMA, IPS, and Hand Hygiene measures. (*Id.*). The Safety Grades Panel is charged with providing guidance to the Leapfrog Group on its grading methodology. The Safety Grades Panel debated the various approaches to account for missing data. (DAY 1 at 194). As Dr. Patrick Romano, who has served

on the Safety Grades Panel since 2011 explained, the Panel's role was advisory in nature. The Panel did not actually vote in favor or against the methodology change. (DAY 2 at 182-83).

### B. The Plaintiff Hospitals & The Leapfrog Website

The five Plaintiff Hospitals, owned and operated by Tenet Health Care, were some of these non-participants in the Leapfrog Survey. The Plaintiff Hospitals first chose to stop participating in the Leapfrog Survey during the COVID-19 pandemic because, as one Hospital CEO explained, they chose to reallocate resources in the face of significant operational strain. (DE 203 at ¶ 49). Following the 2024 methodology change, these non-participating hospitals received imputed scores on the four metrics, accounting for 31% of their total grade. Taking each hospital in turn, and as depicted in the chart below, Good Samaritan received a "C" Safety Grade in Spring 2024, prior to the methodology change and a "D" Safety Grade in Fall 2024, after the change; Delray Medical Center received a "D" Safety Grade in Spring 2024 and an "F" Safety Grade in Fall 2024; Palm Beach Gardens Medical Center received a "C" Safety Grade in Spring 2024 and an "F Safety Grade in Fall 2024, St. Mary's received a "C" Safety Grade in Spring 2024 and an "D" Safety Grade in Fall 2024, and West Boca Medical Center received a "D" Safety Grade in Spring 2024 and an "F" Safety Grade in Fall 2024. (*Id.* at ¶¶ 51, DE 204 at 36, 39).

**Plaintiff Hospitals' Leapfrog Safety Grades**

| | Delray | Good Samaritan | Palm Beach Gardens | St. Mary's | West Boca |
|---|---|---|---|---|---|
| **Spring 2024** | D | C | C | C | D |
| **Fall 2024** | F | F | F | D | D |
| **Spring 2025** | F | D | F | D | F |
| **Fall 2025** | F | D | D | D | D |

(*See* DE 129 at 151).

These grades are readily available and apparent on the Leapfrog Hospital Safety Grade website. On the Safety Grade Website, viewers can search for a hospital by city, state, zip code, or hospital name. After entering a search, the viewer is shown that hospital's Safety Grade with a hyperlink to "view the full score." If a viewer clicks or taps on a hospital's name, assigned Safety Grade, or "view the full score," the consumer is brought to that hospital's profile webpage, where the hospital's most recent Safety Grade is displayed at the top of the page. Here, the viewer may review recent past grades, the hospital's Survey results, or the specific measures comprising the hospital Safety Grade.






(*See* DE 203 at 15, 16).

On the hospital profile webpage, there are five tabs titled “Infections,” “Problems with Surgery,” “Safety Problems,” “Practices to Prevent Errors,” and “Doctors, Nurses & Hospital Staff.” When a viewer clicks or taps on one of the five tabs, they are shown measures included in the tab category and a corresponding red, yellow, and green “gas gauge” for each measure. This gas gauge serves as an “evaluative label” by visually representing how Leapfrog has scored a hospital’s performance on a measure. (DAY 2 at 9). Red conveys that Leapfrog has scored a hospital “Worse Than Average” performance; yellow conveys that Leapfrog has scored a hospital average performance; green conveys that Leapfrog has scored a hospital “Better Than Average” performance. A consumer can view a hospital’s measure score by clicking or tapping the corresponding “gas gauge” graphic.




Each measure webpage shows “This Hospital’s Score,” “Best Hospital’s Score,” “Average Hospital’s Score,” and “Worst Hospital Score”; describes the measure; and includes “Notes and Definitions” footnotes beneath the measure descriptions. Every measure webpage for a non-responding hospital includes a red, bolded footnote under “Notes and Definitions,” stating that hospital “**Declined to Report: The hospital was asked to provide this information to the public, but did not.**”




The scores for the four imputed Measures, CPOE, BCMA, Hand Hygiene, and IPS, can be found by clicking or tapping into the respective measures "Doctors order medications through a computer," "Safe medication administration," "Handwashing," and "Specially trained doctors care for ICU patients." Unlike the other tabs, only when a user clicks or taps on one of the four measures for a non-participating hospital, an asterisk (*) appears next to the measure score underneath "This Hospital's Score." The asterisk (*) is associated with a red, bolded footnote stating, "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available**" that is reflected in the "Notes and Definitions." Meanwhile, if a hospital does not respond to the Survey, the "safe practices" measures, "Effective leadership to prevent errors," "Nursing and Bedside Care for Patients," and "Staff work together to prevent errors," show a question mark displayed with "Declined to Report" over the respective gas gauge

on these measures for that hospital.




The scoring methodology can be accessed in two ways. Clicking a link at the top of a hospital's profile webpage that says "Detailed table view" takes a consumer to a new webpage that contains two tables displaying the hospital's most recent numerical score on each measure. After scrolling to the bottom, a user will see a hyperlinked text that reads, "For a full description of the methodology, click here."[4] Clicking or tapping the link takes the consumer to a PDF version of Leapfrog's current "Scoring Methodology" document.

[4] The accompanying demonstrative was taken from the Plaintiff Hospitals' Proposed Findings of Fact and Conclusions of Law (DE 136) that was submitted to the Court before trial, and before the Parties both submitted revised filings following trial.

This Hospital's Grade

**F**

FALL 2025

**Delray Medical Center**

5352 W Linton Blvd
Delray Beach, FL 33484-6580
Map and Directions

Outcomes measures include errors, accidents, and injuries that this hospital has publicly reported.

| Measure | The Hospital's Score | Worst Performing Hospital | Avg. Performing Hospital | Best Performing Hospital | Data Source | Time Period Covered |
|---|---|---|---|---|---|---|
| Dangerous object left in patient's body What's This? | 0.000 | 0.256 | 0.011 | 0.000 | CMS | 07/01/2022 - 06/30/2024 |
| Air or gas bubble in the blood What's This? | 0.000 | 0.050 | 0.001 | 0.000 | CMS | 07/01/2022 - 06/30/2024 |
| Patient falls and injuries What's This? | 0.486 | 1.748 | 0.338 | 0.000 | CMS | 07/01/2022 - 06/30/2024 |
| Infection in the blood What's This? | 1.075 | 2.362 | 0.586 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| Infection in the urinary tract What's This? | 0.576 | 2.399 | 0.522 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| Surgical site infection after colon surgery What's This? | 3.098 | 3.229 | 0.856 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| MRSA Infection What's This? | 0.271 | 2.685 | 0.689 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| C. diff. Infection What's This? | 0.276 | 1.486 | 0.370 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| Death from treatable serious complications What's This? | 108.94 | 235.51 | 177.47 | 84.66 | CMS | 07/01/2021 - 06/30/2023 |
| Harmful Events What's This? | 1.03 | 3.10 | 1.00 | 0.53 | CMS | 07/01/2021 - 06/30/2023 |
| Dangerous bed sores What's This? * | 0.56 | 7.50 | 0.64 | 0.05 | CMS | 07/01/2021 - 06/30/2023 |
| Collapsed lung What's This? * | 0.20 | 0.65 | 0.25 | 0.10 | CMS | 07/01/2021 - 06/30/2023 |
| Falls causing broken hips What's This? * | 0.31 | 0.56 | 0.29 | 0.15 | CMS | 07/01/2021 - 06/30/2023 |
| Blood Leakage What's This? * | 2.22 | 5.53 | 2.42 | 1.01 | CMS | 07/01/2021 - 06/30/2023 |
| Kidney injury after surgery What's This? * | 1.61 | 4.60 | 1.69 | 0.74 | CMS | 07/01/2021 - 06/30/2023 |
| Serious breathing problem What's This? * | 9.54 | 57.80 | 10.52 | 1.94 | CMS | 07/01/2021 - 06/30/2023 |
| Dangerous blood clot What's This? * | 5.06 | 8.15 | 3.90 | 1.56 | CMS | 07/01/2021 - 06/30/2023 |
| Sepsis infection after surgery What's This? * | 6.71 | 12.56 | 5.62 | 1.95 | CMS | 07/01/2021 - 06/30/2023 |
| Surgical wound splits open What's This? * | 1.60 | 4.00 | 1.87 | 1.13 | CMS | 07/01/2021 - 06/30/2023 |
| Accidental cuts and tears What's This? * | 1.03 | 2.41 | 0.89 | 0.28 | CMS | 07/01/2021 - 06/30/2023 |

* This measure is a part of the Harmful Events Composite and is not used for scoring.

Process measures include the management structures and procedures a hospital has in place to protect patients from errors, accidents, and injuries.

| Measure | The Hospital's Score | Worst Performing Hospital | Avg. Performing Hospital | Best Performing Hospital | Data Source | Time Period Covered |
|---|---|---|---|---|---|---|
| Doctors order medications through a computer What's This? | 15 | 15 | 82.22 | 100 | Imputation Model Applied | Not Applicable |
| Safe medication administration What's This? | 25 | 25 | 85.20 | 100 | Imputation Model Applied | Not Applicable |
| Specially trained doctors care for ICU patients What's This? | 5 | 5 | 67.86 | 100 | Imputation Model Applied | Not Applicable |
| Effective leadership to prevent errors What's This? | Declined to Report | 46.15 | 117.60 | 120.00 | 2025 Leapfrog Hospital Survey | 2025 |
| Staff work together to prevent errors What's This? | Declined to Report | 0.00 | 117.27 | 120.00 | 2025 Leapfrog Hospital Survey | 2025 |
| Nursing and Bedside Care for Patients What's This? | Declined to Report | 15 | 79.09 | 100 | 2025 Leapfrog Hospital Survey | 01/01/2024 - 12/31/2024 |
| Handwashing What's This? | 15 | 15 | 76.81 | 100 | Imputation Model Applied | Not Applicable |
| Communication with nurses What's This? | 80 | 76 | 90.37 | 97 | CMS | 10/01/2023 - 09/30/2024 |
| Communication with doctors What's This? | 82 | 75 | 89.99 | 97 | CMS | 10/01/2023 - 09/30/2024 |
| Responsiveness of hospital staff What's This? | 67 | 62 | 81.81 | 96 | CMS | 10/01/2023 - 09/30/2024 |
| Communication about medicines What's This? | 62 | 59 | 74.64 | 88 | CMS | 10/01/2023 - 09/30/2024 |
| Communication about discharge What's This? | 74 | 67 | 85.48 | 94 | CMS | 10/01/2023 - 09/30/2024 |

For a full description of the methodology, click here.

(DE 136 at 109).

Alternatively, a viewer may also access the methodology by scrolling to the website footer, wherein a hyperlinked text reading "Methodology" is available under the header "For Hospitals."




## DISCUSSION

Plaintiffs assert one claim seeking declaratory and injunctive relief against The Leapfrog Group, alleging a violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). Fla. Stat. § 501.201 *et seq*. (DE 74).

FDUTPA prohibits "[u]nfair competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). A plaintiff may establish a violation of FDUTPA by proving either unfairness or deception. Fla. Stat. § 501.211 sets out the individual remedies available against a party that has been shown to violate FDUTPA. Notably, the requirements for damages and injunctive relief are somewhat distinct. In an action for injunctive relief, Fla. Stat. 501.211(1) permits "anyone aggrieved" to seek injunctive relief against "a person who has violated, is violating, or is otherwise likely to violate this part."

**A. The Plaintiff Hospitals are Aggrieved Parties**

As a threshold matter, any plaintiff must be "aggrieved" within the meaning of the statute. Whether the Plaintiff hospitals (as opposed to the consuming public) are "aggrieved" within the meaning of the statute is in dispute. Leapfrog seems to rely on *Macias v. HBC of Florida, Inc.*, in arguing that the Plaintiff Hospitals are not aggrieved. The court in *Macias* held:

> The clear intent of this statute as expressed by its plain language is to provide both equitable and legal remedies to private *consumers* who are aggrieved parties and/or have sustained actual losses because of a violation(s) under FDUTPA. Thus, in order for the *consumer* to be entitled to any relief under FDUTPA, the consumer must not only plead and prove that the conduct complained of was unfair and deceptive but *the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act.*

694 So.2d 88, 90 (Fla. 3rd DCA 1997) (emphasis added); (DE 204 at ¶ 491). In effect, Leapfrog attempts to narrow the scope of who might be considered an aggrieved party by requiring that the party must also be a "consumer" in order to pursue injunctive relief.

But this reads language into the statute that simply is not there and undermines the broad reach of the term "anyone aggrieved." Although the term "aggrieved" is not defined in FDUTPA, relevant caselaw has explained it broadly as "being more expansive than 'damaged' or 'suffered a loss.'" *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 172 (Fla. 1st DCA 2015). I agree that as part of this inquiry, all that is required at this step is the ability to "demonstrate some specific past, present, or future grievance." *Id.* at 173. Applicable caselaw has suggested that, just as a claimant need not be a consumer to obtain damages, a claimant seeking equitable relief similarly does not have to be a consumer so long as it may show it has been aggrieved and can establish a violation of FDUTPA. *See Stewart Agency, Inc. v. Arrigo Enters., Inc.,* 266 So. 3d 207, 214 (Fla. 4th DCA 2019) ("We [have] held … that although a claimant does not have to be a consumer to state a claim for actual damages under section 501.211(2), to satisfy all of the elements of a FDUTPA claim, it must show that a consumer was injured or suffered a detriment. Similarly, here, under section 501.211(1), an

entity may bring an equitable claim under FDUTPA, but only if it presents evidence of the required elements." (internal citations omitted)).

In any event, the Plaintiff Hospitals, not just patients, may be considered consumers of the Leapfrog's product. With the benefit of trial, it became clear that hospitals were a specific target of the information disseminated in the Leapfrog Grade. Testimony indicated that the poor scores would be used to "harass" the hospitals who chose not to participate, and that part of the general strategy was to "become a Disney villain," which at the least indicates that a central goal of the Hospital Safety Grade included shaping hospital behavior, like patient decision-making. (DE 203 at ¶ 113). For hospitals who were high performing, on the other hand, Leapfrog's marketing materials offer "designated logos" and licensing structures that enable those hospitals to promote their scores to employees, prospective employees, patients, and the broader community. (*Id.* at ¶ 120). Leapfrog's suggestion that there is a free alternative does not change the calculus here; the mere fact that hospitals may pay for licensed materials is sufficient to classify it as a consumer of that information.

And in my view, so too are various other third-parties who may have been aggrieved as a result of Leapfrog's Safety Grades Methodology. These parties would include the employees of hospitals that received non-participation assignments and the entities (e.g., insurers) who paid for and received data from the Hospital Survey. (*Id.* at ¶ 121). To illustrate why this is so, take for example, a mobile phone app for food delivery. Conceivably, the consumers of the app's functions extend beyond the customers who use the app to view restaurants and order. Various parties presumably alter their behavior in response to the changes to the app. Featured restaurants may offer deals, expedite food preparation strategies, and review their ratings to change behavior; delivery drivers may station themselves near restaurants that the app has identified as "hot spots," accept bundled orders, or operate only during peak windows. Similarly, in the hospital rating

context, changes to Leapfrog's Methodology may influence a range of actors beyond the hospitals. Ultimately, limiting the scope of *who* was a consumer of the Leapfrog Safety Grade improperly diminishes the impact the grade has on the patient and medical community, while undermining the noteworthy harms it imposes on each of them.

**B. Leapfrog's Grades for Non-Participating Hospitals are Unfair and Deceptive**

An aggrieved plaintiff is next required to prove that the defendant's practice is either "unfair" or "deceptive." Specifically, the aggrieved entity must identify a violation of FDUTPA, meaning "an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc.*, 266 So. 3d at 214. Caselaw has established that "unfair" and "deceptive" practices constitute two different concepts. The Florida Supreme Court has defined "unfair practice" as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So.2d 773, 777 (Fla.2003) (cleaned up). Alternatively, the modern, three-factor unfairness test deriving from the FTC's 1980 Policy Statement, which is codified into Section 45(n) of the FTC Act sets out a different standard. *See* 15 U.S.C. § 45(n). Conduct under the modern three-factor test is "unfair" when it inflicts "consumer injury that is: (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) … that consumers could not reasonably have avoided." *SMS Audio, LLC v. Belson, 2017 WL 1533941, at *3 (S.D. Fla. Mar. 9, 2017) (Middlebrooks, J.)* (citing *Porsche Cars N. Am., Inc.*, 140 So. 3d at 1096–97). Courts differ in which to apply, or even apply both. In the instant matter, the choice of tests is not outcome determinative, and it is therefore sufficient to apply both tests.

Separately, the Florida Supreme Court has defined "deception" as "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Id.* In my Order denying the Parties' Motions for Summary

Judgment, I had suggested that past consumer harm could be a *required* showing to demonstrate an "unfair" practice, whereas a deception claim under FDUTPA need not require past harm and instead requires "deceptions that are likely to cause injury to a reasonable relying consumer." *Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000); (DE 139).

On the same day as my decision, the Eleventh Circuit issued its opinion in *FTC v. Corpay, Inc.*, 164 F.4th 807 (11th Cir. 2026). Although "unfairness" and "deception" appear to target different acts or practices, this decision clarifies that the ultimate harm requirements to obtain injunctive relief remain identical. Specifically, the case emphasizes that a practice is "'unfair' if it '[1] causes ***or is likely to cause*** substantial injury to consumers which is [2] not reasonably avoidable by consumers themselves and [3] [is] not outweighed by countervailing benefits to consumers or to competition.'" *Id.* at 839 (quoting 15 U.S.C. § 45(n)) (emphasis added). The existing caselaw across state and federal law has sometimes conflated requirements across damages, injunctive relief, and requirements for deception as opposed to unfairness. However, this case is clear in emphasizing the proper standard for evaluating "unfair" practices. It explains that a practice cannot be "unfair unless the act or practice *causes or is likely to cause substantial injury to consumers* which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* at 840.[5] In other words, "deception" and "unfairness" analyses under FDUTPA are each satisfied for purposes of injunctive and declaratory relief by a showing that a defendant's conduct is likely to cause injury to consumers.

[5] This case, although post dating the date set forth by Fla. Stat. § 501.203(3)(b) for which based upon the July 1, 2017, the standards of unfairness and deception set forth and interpreted by the Federal Trade Commission (FTC) or the federal courts serve as the operative law, nevertheless relies on interpretations advanced by the FTC as it existed as of July 1, 2017.

In any event, Plaintiffs have brought evidence establishing both past harm and a likelihood to harm consumers in the future. The various harms of non-participation assignments come to light upon review of *why* Leapfrog opted for the non-participation grade assignment, *how* Leapfrog leads the public to interpret and rely upon its data, and the conceivable, and actual, impacts of these practices.

### 1. *Leapfrog's Motives in Opting for the Assignment Methodology*

To begin, testimony offered at trial made clear why Leapfrog opted for a methodology that would assign non-participating hospitals the lowest score possible. And in determining whether its practices are deceptive or unfair (or both), Leapfrog's intent matters. Leapfrog understood that penalizing hospitals could impact their grades, which they intended consumers to rely on as *accurate* representations of hospital safety, thereby leveraging consumer perception to force hospitals back into participating in the Leapfrog Survey. Upon review, I find that Leapfrog's assignment methodology is punitive in nature.

Leapfrog suggests that the methodology cannot be punitive because of the nature of composite scoring. (DE 204 at ¶ 83). In support, Leapfrog contends that because composite scoring allows for so many combinations of measure scores, the four measures at issue in this case cannot drive the final grade. (*Id.* at ¶ 85). With respect to the four imputed scores, Leapfrog's expert, Mark Rule, a partner and managing director at a global consulting firm, testified that if he were to "pull out the four imputed inputs that the Plaintiffs take issue with" and ask whether "that really materially change[s] the grading" his conclusion is that it does not. (DAY 4 at 15:6—10). The effect of Rule's counterfactual is that by assigning no weight to the imputed scores by assigning each N/A, and instead redistributing those weights across the data points for which Leapfrog does have access to data, the poor scores of each of these hospitals remain the same. (DAY 4 at 20:18—23). In contrast, Plaintiffs' expert, Dr. Sean Nicholson, provides a competing counterfactual, which

he described as follows: "If the non-participants in fact participated, what I do in the counter factual is, I give the nonparticipants the mean score for the seven structure and process measures that are not available for the Leapfrog Group for the nonparticipants… That is the only change I am making." (Day 1 at 197:5—10).

Remarkably, the evidence at trial did not bear out a dispositive answer to whether these four do in fact create a meaningful difference in the Safety Grades. Each expert testified to the result of their counterfactual and ultimately arrives at different conclusions. Broadly, however, a counterfactual suggesting that the hospitals were nevertheless poor performers seems outside the ambit of a FDUTPA claim. Whether the scores are "technically or materially true is not persuasive" when the material implication of Leapfrog's representations is that it constitutes a full and accurate representation of patient safety. *F.T.C. v. Peoples Credit First, LLC*, 244 F. App'x 942 at 2 (11th Cir. 2007). As a general matter, it is the deceptive nature of representations made to the consumers that drives my analysis under FDUTPA.

There are nevertheless several considerations supporting Plaintiff's contention that the low assignments do, in fact, produce worse results. First, Mr. Rule's methodology is inapplicable to this case. Leapfrog *could* have assigned the hospitals "N/A" scores, but as a result would not have been able to grade those hospitals under its own principle preventing hospitals missing more than six measures from being scored. Leapfrog did not adopt this approach. Second, the facts of the case serve as the clearest evidence that grades did decrease following the methodology change, tending to show the adverse impact of the low assignment scores. Third, the testimony at trial suggests that Leapfrog viewed this methodology as a punitive measure, suggesting that Leapfrog *intended* that lower scores would be a result. For example, Dr. Patrick Romano, contemporaneously labeled the assignment penal in nature and wrote in an email to members of Leapfrog's expert panel and Leapfrog members, that: "if the goal is to penalize nonparticipants,

you might as well do so in a clear and unmistakable manner." (DE 189-55). He later continued to state that an alternative approach would not "achieve your strategic objective of penalizing nonparticipants," before characterizing the assignment a "backdoor approach to penalizing nonparticipation." (DE 189-55). Chief Executive Officer of Leapfrog, Leah Binder, had also contemporaneously suggested "imputing… the lowest score" would be a "very big deal to hospitals (and a major incentive to report to the survey)." (DE 193-52 at 1). The incentive was clear: the hospital should participate to avoid non-participation scores that could carry significant consequences.

The nature of this methodology change was also immediately clear to the commentators who responded to Leapfrog's request for comments. Testimony at trial revealed that four commentators opposed penalizing hospitals that choose not to devote resources to completing a voluntary survey each year and, instead, be allowed to opt out of the hospital Safety Grade. (DAY 2 at 257:20—23). Additionally, take for example, Dr. Romano's email to his colleagues at the University of California Davis ("UC Davis"), which received a D-grade. There, Dr. Romano chastised the decision not to participate in the Survey, and emphasized that such nonparticipation was "the real killer." (DE 191-3 at 2). Meanwhile, Plaintiffs proffered evidence that since Fall 2024, not a single non-participating hospital has received an "A" Safety Grade while subject to the non-participation penalty on all four measures. Leapfrog puts forward conflicting evidence, in the form of an email from Dr. Matthew Austin, a scientific advisor for the Leapfrog Group, who "quickly pulled the breakdown of Spring 2025 grades by survey submission status," which indicated that two hospitals that were assigned the penalties nevertheless received "A" grades. (DE 192-47 at 1). Compare this, however, with the 902 hospitals that submitted Surveys and received an "A" Safety Grade. (*Id.*) Or compare it with the fact that in Spring 2025, not a single participating hospital received an "F" failing grade. (DAY 1 at 189:3—6; DE 192-47 at 1). Taken together, it

may not be impossible for a non-participating hospital to score an "A," but it is certainly telling of the divergent outcomes that accompany nonparticipation and participation.

Evidence suggests that Leapfrog's approach worked. Dr. Romano's UC Davis chose to continue participating in the Survey following "peer pressure from other UC hospitals." (DAY 2 Trial at 169:3-17). And they were not alone. Participation following the 2024 change jumped from 73% to 79%; meanwhile, participation in 2023 was only 64%. (DE 193-109).

In sum, the contemporaneous testimony, internal communications, industry reaction, and resulting participation data collectively demonstrate that Leapfrog's lowest-score assignment was deliberately designed to coerce participation through reputational penalty, rendering the Methodology not merely strategic but excessively punitive.

**2. *Leapfrog's Representations on How to Use the Grade***

Further deception is evident in how Leapfrog's website encourages consumers to rely on the Hospital Safety Grade both in its (1) descriptions of how to use the grade, and (2) explanations of how the data itself was collected.

On a page titled "How to Use the Grade," Leapfrog represents that it is offering users a "tool [that] can help guide your decision." (DE 195-31 at 1). It further states that "we know 'A' hospitals do a better job at preventing errors." (*Id.* at 2). In distinguishing reliance on historical grades from present grades, the website cautions consumers that patients should always decide on where to receive care based on a hospital's *current* Safety Grade. (*Id.*). It is also worth noting that Leapfrog disclaims to consumers that "[y]ou should never refuse care in an emergency because of a hospital's Safety Grade, but use this website as a guide for planned events and a research tool for potential emergencies." (*Id.*) Altogether, this section of the website clearly intends for consumers to depend on the information presented by Leapfrog in the ordinary course, and that information is based on "known" data.

A separate section of the website, titled "Frequently Asked Questions About The Leapfrog Hospital Safety Grade," explains that "Johns Hopkins Medicine researchers estimate that ***patients are twice as likely to die of a preventable problem at a "C," "D," or "F" hospital*** than an "A" hospital." (DE 195-23 at 1) (emphasis added).

When questioned on cross examination about this ominous language, Leapfrog's own Vice President of Development conceded that "Leapfrog want[s] consumers to think that visiting a hospital with a C, D or F grade could seriously injure or even kill them." (DAY 3 at 8:17—9:16). It does not strain credibility to presume that this type of warning would seriously deter a person from entrusting their health and safety, or their loved one's health and safety, to a D or F rated hospital. It may also cause concern for the various hospitals and employees involved in the health system, who face real reputational harm in the face of failing grades.

**3. *Leapfrog's False Representations that the Data was Supported by Real Data and Reflected Actual Performance.***

Next, Leapfrog seeks to persuade the public of the soundness of its methodology, emphasizing on its website that the Safety Grades are supported by real data and reflect actual safety performance, as opposed to being driven by Survey participation of the rated hospitals. However, the assignments are anything but comprised of real data. At the highest level, Leapfrog explains on its Frequently Asked Questions that "the Hospital Safety Grade uses a public, peer-reviewed methodology, calculated by top patient safety experts under the guidance of a National Expert Panel." (DE 195-23 at 1). But this methodology was *not* peer-reviewed. (DE 163-1 at 90:15—17).[6] Moreover, in its "About the Grade" section. Leapfrog represents to website visitors that:

[6] Additionally, the Fall 2024 change in methodology was not approved by Leapfrog's Expert Panel or voted on by its Board of Directors. (DE 163-1 at 285:7–15 ("We did not query the [E]xpert [P]anel about whether they approved [the methodology] or not."; DE 163-2 at 105:18—22

> In some cases where a hospital's information is not available for a certain measure, Leapfrog uses a supplemental data source. In cases where a hospital's information is not available from any data source, Leapfrog has outlined a methodology for dealing with the missing data.

Of course, the central issue here concerns the methodology for dealing with the missing data – it suggests to a reasonable consumer that the grades assigned reflect actual performance when in fact they do not; they reflect nonparticipation. Compelling evidence supports this conclusion. Take Leapfrog's use of gas gauges, for example. They distinguish between a low gauge and a gauge prominently displaying a question mark with the caption "Declined to Report." These graphics signal to consumers that a gas gauge without the question mark reflects something about *actual* performance rather than missing, unavailable, or imputed low scores. Then, Leapfrog appends a ubiquitous footnote to *all* measure webpages, not just those for non-participants, stating "**Declined to Report: The hospital was asked to provide this information to the public, but did not.**" The effect of this is to suggest that metrics not linked to this footnote are based on real data, even for non-participating hospitals. Similarly, rather than assigning a score of "zero" for a non-participating hospital – a value that would logically signal such non-participation and therefore a lack of information upon which to base a rating – Leapfrog instead chose arbitrarily low numbers (5, 10, 15 out of 100), the clear implication being that the hospital was graded based on *something,* when in truth it was based on nothing. Compounding the deceptive nature of these representations, Leapfrog also explains that Leapfrog would not grade certain hospitals missing more than six measures juxtaposed with the statement that "The Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Survey." (DE 195-23

("[T]here was no board vote in June 2024 on whether [Leapfrog] should change its safety grade methodology.")).

at 2).[7] All of this is intended to create the false impression that Leapfrog's grades reflect actual performance. Or even at least *some* performance! But the grades are not based upon performance. The grades are the result of Leapfrog's acknowledged goal of punishing nonparticipants as a means of forcing hospitals to cooperate in submitting their Surveys. Taken together, there are simply too many suggestive labels implemented by Leapfrog that create the misleading impression that the scores assigned represented real data or performance.

Leapfrog attempted to cast its methodology in different light, but I remain unconvinced. For instance, Leapfrog offered the analogy that a teacher may explain to the student that they have received an "F" because, although you have answered, correctly, the first sixteen questions of a multiple-choice exam, the remaining questions were "short answer" questions. For these questions, you were expected both to answer the question correctly and to "show your work" in arriving at that answer. Here, although you have answered the question correctly, you nevertheless failed to show your work. In Leapfrog's view, the "answer" was Leapfrog's knowledge that the hospitals had *some* system in place for each of the assignment measures. So, for example, by having a handwashing system in place, the hospital was assigned the lowest possible score. Filling out the Survey, or showing your work, could mean a higher score. At first glance, such an example may seem apt, and even fair. But consider this wrinkle: you never took the test to begin with. In fact, you were never even enrolled in the class; and yet, your "F" is broadcasted for your peers, employers, and mentees to see. Here, the Plaintiffs never "enrolled" in Leapfrog's Survey, and they were inevitably punished for that decision. In my view, even a score of "0" would improperly

[7] To be sure, this representation was available in the methodology document, which suggests that if viewers could identify this representation, they also could have identified the assignment methodology. But the great weight of the evidence that any viewer will have already encountered has likely already caused a viewer to assume that the data presented means something more than non-participation before they arrive at the complex assignment methodology.

suggest to viewers that a hospital's performance is inadequate and falls far below its peers, when in fact the simple truth is that the hospital did not participate.

Additionally, there was simply no reason to suggest that the hospitals were actually performing as poorly as suggested by the scores. Several pieces of evidence are significant here. First, past performance by the Plaintiff Hospitals, prior to any potential free riding on the means of participating hospitals, suggested scores are conceivably much higher than the scores assigned following the Methodology change. In 2021, when the Plaintiffs last participated in the Survey, their score across each of the four measures totaled 370 out of a possible 400; compare this with 60 out of a possible 400 following assignment. (DAY 1 at 14:5—8). Second, although no participating hospital was assigned the lowest possible score across *all* four measures, the non-participating hospitals were. The average participating hospital in Spring 2025 obtained a score of 362 out of a possible 400 on these four measures; compare that with the 60 out of 400 obtained by the non-participating hospitals. Third, neither Leapfrog's expert Dr. Harris, nor Leapfrog itself, performed any analysis to support the notion that Survey nonparticipation or performance on CMS metrics could be a reliable indicator of whether non-participating hospitals actually perform worse on the three measures. (DAY 4 at 102:4—8, 102: 21—24). Fourth, in Fall 2024, Regina West, Quality Director of the Palm Beach Health Network, a coalition of the Plaintiff Hospitals, conducted a "What If" analysis indicating that, had scores not been imputed, the Plaintiffs could have received C grades. (DE 188-68). Fifth and finally, each of the Plaintiff Hospital CEOs testified that their hospitals implement the practices Leapfrog describes as those that "safer hospitals do" with respect to the four imputed measures. (DAY 1 66:6—9, 154:2—15, 241:14—242:9, 78:25—799:18; 198:1-17).

One defense proffered by Leapfrog is that the assignment is warranted because hospitals decline to participate in the Survey to avoid disclosure of poor safety performance—what Leapfrog

calls the "non-response bias." (Day 2 at 188-89: 16-7).[8] It is my view that this position is evidence only of a certain hubris on Leapfrog's part. We cannot be blind to the fact that the Survey is reasonably time intensive. Leapfrog's emphasis on non-response bias de-values, against some of their own testimony, the burdens this Survey imposes. It was Dr. Romano's position that the decision not to participate stemmed from that burden. It was Ms. Alex Campione, the program manager, who although she appeared to run away from her deposition at trial, nevertheless testified that completing the Survey demands "a tremendous amount of resources." (DAY 2 at 254:16—18). Finally, Ms. Leah Binder, the Defendant's CEO, testified that the Survey would require "two weeks of staff time." (*Id.* at 96:24—25 – 97:1—5). Testimony at trial made clear that the burdens of the Survey, in conjunction with resource constraints, are more than adequate to explain a hospital's decision not to participate. Leapfrog simply failed to present persuasive evidence of any non-response bias that would operate to justify its decision to change the imputation model to remove the capability of non-participating hospitals to freeride on the scores of participating hospitals,

All of this leads to the conclusion that, although imputation may be a sound methodology as a general matter, *this* method of imputation is neither reliable nor defensible. Ultimately the testimony of Ms. Campione rings true. The assignment is "mathematically arbitrary." (DAY 2 at 289:13—15). The result is grades purporting to represent actual patient safety, when in truth they represent punishment for nonparticipation in the Leapfrog Survey.

[8] In contemporaneous messaging, two Leapfrog employees – Alex Campione and Missy Danforth, Senior Vice President of Healthcare Ratings, who lead the design of the safety grade scoring system – comment that low assignment "would be drastic" but, as Campione notes, "we have to assume at some point that hospitals not reporting likely have poor or lapse in performance." (DE 189-23 at 3).

**4. *The Inevitable Outcome of Unreliability.***

The methods used by Leapfrog, and the various representations Leapfrog made to website users, results in a foreseeable outcome: Reviewing the grade, a patient is likely to rely on that information, and this makes the "F" grade much more significant.

As a general principle, ratings matter. This is so in all sorts of contexts – we commonly are asked to submit online reviews for products and services we use on a daily basis: hotels, restaurants, salons, appliances, etc. Consumer expectations of an F-grade likely assume a total failure to meet minimum standards. In the hotel or restaurant context, perhaps a consumer may be willing to take that risk. In decisions about health care, however, the situations can involve life and death situations, thereby prompting immediate avoidance.

At trial, Plaintiff's expert, Jonah Berger, a Marketing Professor at the Wharton School of Business, added an academic lens to common sense conclusions concerning consumer behavior. As Mr. Berger explained, hospitals are recognized as a "good" that is outside the expertise and knowledge of the average consumer, who must rely on outside sources for information about the hospital's quality. (DAY 2 at 7:14—19). Mr. Berger referred to "evaluative labels," which he described as "grades, A through F, colors, like a green, yellow, red, maybe a happy face, neutral face, frowned face," all of which "can help consumers interpret otherwise numerical information." (*Id.* at 9:6—8). Given the difficulty of making decisions on health care, consumers are likely to turn to heuristics that help simplify those decisions. As a result, it stands to reason that a consumer, upon seeing an "F," promulgated by a watchdog organization committed to helping those consumers, would understandably draw nothing but negative conclusions about that hospital's safety and, expectedly, avoid that hospital.

Testimony at trial suggests that a reasonable consumer may not understand that a hospital has been assigned a score, the basis for that assignment, nor would they understand the

methodology itself. Of course, a consumer may access and view the disclaimer footnote, and she may even review the scoring methodology herself, as Leapfrog points out – it's all *technically* there on the website. But a user's ability to access the information does not automatically absolve Leapfrog of liability for deceptive or unfair practices, particularly where the information is difficult to find.

While it may be true that "[t]he presence of true information or a disclaimer can rebut a claim of deception," *Kurimski v. Shell Oil Co.*, 570 F. Supp. 3d 1228, 1246 (S.D. Fla. 2021) (citing cases), no such rebuttal occurred here. Even if true information is available to the Leapfrog user, a reasonable consumer is still deceived if the process of uncovering that truth is an impenetrable series of clicks and scrolls, only to find an obscure reference to the methodology buried in a document consisting of dozens of pages and not even labeled as being intended for consumers.

First, a consumer, upon seeing the "F" grade may not investigate further. Thus, in many cases, the deception may be complete as soon as the grade is viewed. But assuming they choose to investigate, the relevant footnote does not appear until and only when a user clicks or taps on one of the four measures for a non-participating hospital. Only then does an asterisk (*) appear next to the measure score underneath "This Hospital's Score." As mentioned above, the asterisk (*) is associated with a red, bolded footnote and states: "***The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**" ("Footnote 4"). Mr. Berger testified at trial that it required 23 clicks to arrive at Footnote 4.

Second, I find that most consumers are unlikely to ever locate Leapfrog's methodology document – the only place where a consumer could discover how Leapfrog's ratings *actually* work in terms of the tendency to cripple non-participating hospitals with failing scores. This is because the methodology document is buried within the Leapfrog website. On this issue, Plaintiffs offered

persuasive evidence in the form of Google Analytics, a service which tracks activity on websites.[9] The Google Analytics data showed that among all visitors to the Plaintiff Hospitals' Safety Grade webpages during the relevant period (between November 15, 2024 to August 4, 2025) approximately three percent accessed the Scoring Methodology document. (DE 203 at ¶ 100). From a hospital's individual Safety Grade webpage, a user must first click small, hyperlinked text located beneath individual measure descriptions stating, "For details on sources, click here," or alternatively click an inconspicuous "Detailed table view" link located at the top right of a hospital's profile webpage. (DE 187 at ¶ 335). From there, the user is met with a table replete with specific data, and to access the Scoring Methodology the user must then scroll to the bottom of the page and click a small, gray-font hyperlink stating, "For a full description of the methodology, click here." (*Id.* at ¶ 337). The Scoring Methodology reveals the imputation process on page 16. And the language describing this process is dense. Ms. Binder, for example, testified that the Scoring Methodology document "it is not meant to be used by the average lay person who would probably not be interested in reading all 26 pages." (DAY 3 at 70:11—14).

In sum, the average consumer is met with evaluative label after evaluative label and hinderance after hinderance before arriving at a complex methodology. In all likelihood, the user scrolled quickly to any non-failing hospital on the Safety Grade webpage. And all of this is what Leapfrog intended.[10] The resultant harms are foreseeable and potentially quite severe. Patient and

[9] Leapfrog argues that the Google Analytics data is unreliable and cannot serve as evidence of whether a reasonable consumer understood Defendant's website or whether any consumer was deceived. (DE 204 at ¶ 55). But this argument extends beyond the purpose of the Google Analytics data. I agree that it would not in itself serve as evidence of confusion or deception. Nevertheless, it certainly tends to show that consumers who have viewed all the initial information previously discussed are unlikely to continue on and review the methodology. In my view, it adds perspective to other testimony detailing how a consumer may access and review the methodology from the hospital's Safety Grade webpage, which requires them to take multiple steps.

[10] I am not persuaded by Leapfrog that its website is accessible to average consumers, insofar as it concerns arriving at and understanding the methodology. (DE 188-13). The UX testing report is

prospective employee views of the Plaintiff hospitals are likely adversely affected in a competitive health industry environment. Patients are likely to delay care and seek other options than the hospitals closest to them, or even the hospitals acutely equipped for the patient's particular needs or ailments. Presumably understanding the power of their ratings and the influence it could have, Leapfrog engaged in a targeted campaign against the Plaintiff Hospitals.[11] Leapfrog witnesses admitted that Leapfrog purchased Google advertisements using funds from a non-profit grant from Google to specifically target the Plaintiff Hospitals so that consumers in designated Florida zip codes searching for the Plaintiff Hospitals would be shown the failing Safety Grades. (DE 203 at ¶ 112); (*see also* DE 192-75 at 3 ("We'd also like to set it up so that when someone searches for any of the five specific hospitals, it shows an ad displaying their Hospital Safety Grade.")).[12] The actual harms faced by the Plaintiff Hospitals, therefore, come as no surprise. Each of the CEO's testified to numerous harms, including patient confusion and erosion of community confidence caused by the Safety Grades.

clearly concerned with communicating the health scores and what they mean for patient safety, and how to use that information. (*Id.* at 3). But this is different from being able to understand how those scores are derived.

[11] Even beyond the marketing efforts discussed above, Leapfrog's Safety Grades natural garner significant attention. Millions of consumers visit Leapfrog's website (www.hospitalsafetygrade.org) each year, but the website is only the starting point. (*See* DE 163-4 at 104:8–14). The Fall 2024 Safety Grades alone generated "772 online articles from 435 different publications with a reach of 11.2 billion." (DE 193-76); (*see also* DAY 3 at. 11:7–10 (confirming "reach of 11.2 billion people")). A coverage report lists the total volume of coverage, including 722 online articles, 160 unique print placements, 239 broadcast placements, 444 press release pickups, and 85 hospital-issued publications. (DE 193-77 at 2). The Plaintiff Hospitals' Grades were featured in numerous news articles with headlines such as "bottom" and "worst South Florida hospitals for patient safety." (DE 193-104 at 1).

[12] It is worth noting here that patients are not the only members of the community who are likely to be harmed as a result of these grades. So too are the doctors, nurses, and other healthcare staff who may reasonably rely on Leapfrog Data in making employment decisions. Meanwhile, insurers and health plans would foreseeably rely on Leapfrog data when determining where beneficiaries should obtain medical care.

- Delray CEO Ms. Havericak testified regarding a patient who initially declined surgery at Delray because she was concerned about the Safety Grade and feared that she would "die" at the hospital. (DE 203 at ¶ 146).
- St. Mary's CEO, Cynthia McCauley, testified According to a brand analysis that measured the public's perception of St. Mary's from the fourth quarter of 2024 to the second quarter of 2025, the percentage of patients that would choose St. Mary's fell from 78 percent to 55 percent; "the only thing that changed in a year was the Leapfrog rating." (*Id.* at ¶ 165).
- West Boca CEO Mr. Hanlon described a patient identified as J.D. who presented to West Boca with a compound fracture of the finger—an open fracture carrying risks of infection and serious complications, including "loss of limb or life." (*Id.* at ¶ 173). Mr. Hanlon testified that West Boca was well-equipped to treat the injury—it is "one of the few hospitals in the county that [has] a dedicated hand surgery" unit, has "specialized physicians," and "perform[s] better than average" on surgical site infection metrics. Yet, this patient was initially admitted to West Boca Medical Center for urgent surgery but, as reflected in the contemporaneous record, he then "verbalized" that he "wanted to go to" a different hospital "against medical advice" "due to the leap frog reviews." (DE 191-36). Despite being advised by physicians and nursing staff of the risks of leaving against medical advice, the patient left West Boca after his daughter viewed the Leapfrog Safety Grade. (DE 203 at ¶ 173). Mr. Hanlon testified that J.D. incurred financial harm as a result of leaving West Boca against medical advice, including receiving a bill for the intake and treatment provided prior to his departure—cost that he would likely incur again at his subsequent treatment facility. (*Id.* at ¶ 174).

- Mr. Hanlon also testified regarding another patient, identified as F.W., who was admitted and scheduled for surgery at West Boca for an underarm infection but left against medical advice in the early morning hours after seeing media coverage related to West Boca's Safety Grade. Mr. Hanlon testified that F.W. also received a bill for care at West Boca, and, like J.D., would likely have been "double-billed" at a subsequent treatment facility. (*Id.* at ¶ 175).
- Good Samaritan CEO Ms. Montgomery testified that she explained the Survey process to the patient, but the patient instead sought care at Jupiter Medical Center, a competitor of the Community Hospitals and an "A" rated hospital as determined by Defendant. In my view, financial obligations aside, each instance of a patient delaying care is a significant and unnecessary harm resulting from the Safety Grades.

In addition to these specific instances, general trends tend to show the detrimental effects of the Hospital Safety Grade. Walk-ins declined at every hospital and the CEOs attributed those declines to the Safety Grades, after investigating other potential causes. (DE 203 at ¶ 249). Ms. Havericak testified that from 2024 through last year, Delray's EMS volume increased by about six percent, while walk-in emergency department volume *decreased* by approximately seven to eight percent. (*Id.* at ¶ 249). Or take West Boca, where Mr. Hanlon testified that emergency-department walk-in volume declined by approximately 15 percent from 2024 to 2025 when EMS volume (measuring instances where patients do not elect which hospital treat them) was down only three percent. (DAY 2 at 90:14—16). This narrative extended across all of the Plaintiff Hospitals.

Testimony also showed that patients presented to other hospitals "first" and were later transferred when those hospitals could not provide needed care, creating risks of delay in treatment. Take, for example, Ms. McCauley's testimony that during the same period in which walk-in

emergency department volume declined, the number of patients *transferred* to St. Mary's increased significantly, particularly from Jupiter Medical Center, a competing "A"-rated hospital. She testified that in her career at St. Mary's she has never seen transfers so high: In 2025, Jupiter Medical Center made 568 requests to transfer patients to St. Mary's, meaning patients are "choosing somewhere else first." (*Id.* at ¶ 168). This is even though, as Ms. McCauley testified, approximately half of the transfer requests involved pediatric patients, for whom St. Mary's serves as the region's only children's hospital and maintains 30 to 40 pediatric specialists. (*Id.* at ¶ 169).

Extending beyond patients, other third parties in the medical community are harmed by Defendant's actions. Insurers, among others, license the Safety Grades data. For example, in 2022 several groups entered into contracts with Leapfrog to obtain data for as low as $7,500 to as high as $252,607. (DE 194-41 at 8).

To be sure, I do not fault Leapfrog for engaging in this licensing structure to support their broader mission. But it is worth noting the relationship between the value of increased Survey participation and the significance of the data Leapfrog licenses. (*See e.g.,* DE 194-11 at 2 ("To maximize the value of The Leapfrog's Group Data for licensing purposes the level of participation should continue to be increased so it can be perceived as the most complete data set and thus allowing defense of our pricing model and its price points.")). It appears that the goal to maximize revenue came at the cost of comprehensive and accurate Safety Grades. The result is that various parties – the hospitals, their employees, the insurers, and of course the patients themselves – were and are foreseeably injured.

Additionally, letters sent by Humana Military to several of the hospitals urge them to address "their performance on safety measures" indicate further confusion. *(See e.g.,* DE 192-90). The Humana letter did not reflect any understanding that these hospitals did not participate in the Survey or that the Safety Grade resulted from nonparticipation, nor did it reference Leapfrog's

methodology. Instead, the letters reflect the misimpression that Leapfrog's Safety Grades measured the Plaintiff Hospitals' actual safety performance.

The outcome of this analysis is that the Methodology in conjunction with the representations made to the viewing public render Leapfrog's practices both unfair and deceptive.

They are unfair because under either test for unfairness – the FTC's 1980 or 1964 test – the record shows that Leapfrog uses the threat of arbitrarily assigned Safety Grades to coerce participation in the Survey among hospitals that are unwilling or unable to endure what one commentator described as "blackmail" designed to increase participation. (DE 194-145 at 1).

As mentioned above, the 1980 test requires me to find substantial consumer injury not outweighed by countervailing benefits to those consumers, who could not have reasonably avoided those injuries. First, as discussed, this produced substantial harm on a wide variety of consumers and is likely to continue producing a range of detrimental outcomes. Second, these injuries are "not outweighed by any countervailing benefits to consumers." *SMS Audio*, 2017 WL 11631378, at *3.[13] In my view, the only benefit of the deceptive methodology accrues to Leapfrog. Third, I find that consumers across the spectrum could not have reasonably avoided these injuries. Hospitals were effectively coerced into participation or else suffer a significant penalty, and their grades are broadcasted to viewers. (DE 163-4 at 187:8—22). Prospective patients are left unlikely to understand the assignment and its impact, nor are they likely to arrive at that explanation. Likewise, medical staff, employers, and insurers could not reasonably avoid the Safety Grades, which reach them through media coverage, employer dissemination, and search-driven targeted advertising, without an accompanying explanation of the methodology. Although these are more

[13] Defendant argued that the non-participation assignment increases participation and thereby improves safety, but a review of the facts establishes that no record supports a contention that the penalty improves safety outcomes.

sophisticated parties, it is my view that the various harms they experience sprawl from the negative feelings patients have or are likely to have as a result of seeing a failing grade.

Under the 1964 test, these same practices offend established public policy and are otherwise unscrupulous. The outcome of these acts is that they are substantially injurious to consumers. *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *PNR, Inc.*, 842 So. 2d at 777). The record shows that Leapfrog's conduct evinces the kind of "deceptive and bullying conduct" that fits within established Florida public policy. *Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 213 (11th Cir. 2009). This bullying conduct is oppressive because non-participating hospitals face a severe penalty, and it is unscrupulous because the record shows that Leapfrog is not forthcoming to the public about how it calculates its Safety Grades or what they represent. And, once again, these practices produced real harms and those harms are likely to continue in the future.

**C. Remedy**

I now turn to the appropriate remedies for Leapfrog's FDUTPA violation. For the reasons discussed below, permanent injunctive relief and declaratory relief are warranted.

A permanent injunction requires (1) actual success on the merits, (2) irreparable injury, (3) a balance of the equities that favors the Plaintiffs, and (4) consistency with the public interest. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004). Each element of this test is satisfied here. First, the Plaintiff Hospitals have established actual success on the merits. Plaintiffs have establish that Leapfrog's Safety Grades, methodology, and associated representations are unfair (by distorting consumer choice and attempting to coerce hospital participation in Leapfrog Survey) and deceptive (by misleading consumers about how Leapfrog calculates its Safety Grades). Second, the Plaintiff Hospitals have established both ongoing and future irreparable injuries. Irreparable injuries are those that "cannot be undone through monetary remedies."

*Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). The "loss of customers and goodwill" has long been considered "irreparable." *Id.* Plaintiffs have adequately shown a range of harms including patient diversion and delay of care, physician concerns, insurer inquiries, and declines in patient volume. Third, the balance of the equities strongly favors the Plaintiff Hospitals. As discussed earlier, Leapfrog's practices harm the hospitals, insurers, employees, and patients; the only beneficiary of this methodology is the Leapfrog itself. This trade-off is simply not worth undermining trust in publicly disseminated safety information, even if it has the potential to encourage *some* hospitals to participate. Finally, relief for the Plaintiff Hospitals is in the public interest. The strong need "[t]o protect the consuming public and legitimate business enterprises" from "deceptive" and "unfair acts" emanating from the Florida Statute's description of the purpose of FDUTPA clearly supports Plaintiffs in this action. Fla. Stat. § 501.202(2).

In light of these findings, Plaintiffs request four discrete forms of injunctive relief. They first request that I enjoin Leapfrog from "assigning a Safety Grade to the [Plaintiff] Hospitals under the current methodology or any similar methodology that: (i) assigns assumed or imputed values to calculate Safety Grades due to the lack of hospital-provided performance data; (ii) scores non-participating hospitals differently than participating hospitals by using different values or using differently weighted values to calculate Safety Grades; or (iii) that otherwise reduces a hospital's Safety Grade due to the failure to provide performance data." (DE 203 at ¶ 288). They next request that I order Leapfrog, within five business days of judgment, to "withdraw from its websites and cease promoting the deceptive and unfair Safety Grades assigned to the [Plaintiff] Hospitals for Fall 2024, Spring 2025, and Fall 2025." (*Id.* at ¶ 288). *Third*, Plaintiffs ask that within 30 days of judgment, Leapfrog should be required to send "corrective disclosures to all entities that paid to license the Fall 2024, Spring 2025, and Fall 2025 Safety Grades, disclosing that those Safety

Grades were found to be deceptive and unfair in this action." (*Id.* at 293). Lastly, Plaintiffs request that Leapfrog "be required to place the same corrective disclosures in future contracts, print and electronic advertising materials, and other print and electronic documents that promote paid licensure of the next six cycles of Safety Grades accessible to or in the following five zip codes: 33401, 33407, 33410, 33428, and 33484." (*Id.* at 294).

Any such injunction should be broad enough to ensure that the Community Hospitals are afforded "complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). As a result, courts in the consumer-protection context have authorized broad, multifaceted injunctions where necessary "to ensure future compliance" and that consumers are treated "fairly." *Corpay, Inc.*, 164 F.4th at 849 (affirming injunction compelling multiple disclosures and business reforms). At the same time, the Court is mindful that the injunction should be "no more burdensome to [Defendant] than necessary" to achieve those goals. *Califano*, 442 U.S. at 702.

As a preliminary matter, it is important to identify precisely what concerns me about Leapfrog's behavior. Leapfrog is effectively a watchdog organization which serves as a voice for transparency and a key catalyst in the public reporting of patient quality and safety data that is available to consumers today. (DAY 3 at 86:12—21). But serving as a watchdog does not mean that Leapfrog gains some right to Plaintiffs' private data. Further, recognizing its power and ability to influence consumer decisions as a watchdog, under the guise of patient safety, Leapfrog cannot use this leverage to pressure and penalize hospitals into participating. In other words, Leapfrog does not have a right to the benefit of Plaintiffs' participation; conversely, it does not have the right to punish them when they have not received that benefit.

As a result, any injunctive relief must clearly prevent a framework where Leapfrog may request data from the Plaintiff Hospitals and assign them scores if those hospitals do not participate. Upon review, I find that each of the requested forms of injunctive relief are appropriate,

except for Plaintiffs' fourth request, requiring corrective disclosures for the next six cycles. Although Leapfrog should still be required to provide corrective disclosures, requiring them do so for three years is excessive.

## CONCLUSION

In 2011, Leapfrog first embarked on developing the Safety Grade with the assistance of an Expert Panel. (DE 203 at ¶ 19). The Expert Panel's work, including its approach to handling missing data, was memorialized in a 2013 peer-reviewed publication. (*Id.*). That publication reflected the Expert Panel's judgment that the Safety Grades were comprised of composite scores "based on what was known about the hospital's performance, with no penalties for missing data" and to "avoid creating a structural bias in favor of Leapfrog-reporting hospitals." (*Id.* (citing PX-202.0)). The Defendant's Mission, a valiant one, has remained consistent, but it appears as though the Defendant has strayed from these founding principles. Accordingly, it hereby **ORDERED AND ADJUDGED** that Judgment should be entered against Defendant and in favor of Plaintiffs. The declaratory judgment will be entered by separate order.

## INJUNCTIVE RELIEF

Leapfrog, and Leapfrog's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, comply with the following commands:

1. Leapfrog must cease assigning a Safety Grade to the Community Hospitals under the current methodology or any similar methodology that: (i) assigns assumed or imputed values to calculate Safety Grades due to the lack of hospital-provided performance data; (ii) scores nonparticipating hospitals differently than participating hospitals by using different values or using differently weighted values to calculate Safety Grades;

or (iii) that otherwise reduces a hospital's Safety Grade due to the failure to provide performance data.

2. Within 5 business days of judgment, Leapfrog must withdraw from its websites and cease promoting the deceptive and unfair Safety Grades assigned to the Community Hospitals for Fall 2024, Spring 2025, and Fall 2025.

3. Within 30 days of judgment, Leapfrog must send corrective disclosures to all entities that paid to license the Fall 2024, Spring 2025, and Fall 2025 Safety Grades, disclosing that those Safety Grades were found to be deceptive and unfair in this action. Leapfrog must file a declaration documenting the reasonable and diligent efforts it has undertaken to accomplish this directive within 45 days of judgment.

4. Leapfrog must place the same corrective disclosures in future contracts, print and electronic advertising materials, and other print and electronic documents that promote paid licensure of the next cycle of Safety Grades accessible to or in the following five zip codes: 33401, 33407, 33410, 33428, and 33484.

5. Leapfrog must refrain from taking any action to circumvent the relief set out above. The Court retains jurisdiction to enforce compliance with these commands. *See Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 970 (11th Cir. 2012).

**SIGNED** in Chambers, at West Palm Beach, Florida, this 6th day of March, 2026.

Donald M. Middlebrooks
United States District Judge

cc. Counsel of Record

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 25-CV-80526-MIDDLEBROOKS

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,

Plaintiffs,

v.

THE LEAPFROG GROUP,

Defendant.
_____________________________________________/

**ORDER**

On March 6, 2026, I entered an Order following Bench Trial, finding in favor of Plaintiffs as to their only Count alleging that Defendant violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). Fla. Stat. § 501.201 *et seq*. (DE 212). Final Judgment in favor of Plaintiffs is appropriate. Accordingly, it is hereby **ORDERED and ADJUDGED** that:

(1) Final Judgment is hereby **ENTERED** in favor of Plaintiffs and against Defendant as to Plaintiff's FDUTPA claim, in accordance with my Order Following Bench Trial (DE 212).

(2) Pursuant to the request for declaratory judgment, the Court finds as follows: Defendant Leapfrog's Fall 2024, Spring 2025, and Fall 2025 Safety Grades as applied to the Plaintiff Hospitals, the public representations Leapfrog makes about how it calculates those Safety Grades, and Leapfrog's punitive grading methodology assigning failing 'safety' scores in the absence of actual data are deceptive and unfair under FDUTPA.

(3) The Clerk of Court shall **CLOSE this CASE** and **DENY** all pending motions **AS MOOT.**

(4) The Court **RETAINS** jurisdiction to decide any issues with respect to attorneys fees or costs.

**SIGNED** in Chambers at West Palm Beach, Florida, this 3rd day of April, 2026.

Donald M. Middlebrooks
United States District Judge

Copies to: Counsel of Record

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:25-CV-80526-DMM**

GOOD SAMARITAN MEDICAL CENTER, INC., et al., )
)
*Plaintiffs,* )
)
v. )
)
THE LEAPFROG GROUP, )
)
*Defendant.* )

**DECLARATION OF THE LEAPFROG GROUP**

I am submitting this Declaration on behalf of the Defendant, THE LEAPFROG GROUP ("Leapfrog"), in accordance with this Court's Order (DE 212) for injunctive relief and hereby state as follows:

1. My name is Leah Binder. I am over 18 years of age, of sound mind, and capable of making this declaration. I make the statements in this declaration based on personal knowledge as a representative of The Leapfrog Group and in communications with my colleagues. If called and sworn as a witness, I could and would testify competently to the facts stated in this declaration.

2. I am the President and Chief Executive Officer of The Leapfrog Group, the Defendant in this action.

3. On March 6, 2026, this Honorable Court entered an Order granting injunctive relief against The Leapfrog Group. (DE 212). Leapfrog has fully and timely complied with this Court's Order. I submit this Declaration on behalf of The Leapfrog Group to document and demonstrate the reasonable and diligent efforts it has undertaken to comply with and accomplish the Court's directive.

4. Even as it complies in good faith and in recognition of its legal obligations, Leapfrog respectfully considers aspects of the injunction to be injurious to its mission and an impediment to providing truthful and legally protected statements that inform the public on matters of deep public concern, including the relative safety and other characteristics of various hospitals.

Nevertheless, Leapfrog understands that the injunction must be complied with so long as it remains in place and has gone to great lengths to comply, as further described below. Leapfrog respectfully reserves rights to seek appropriate relief from this Court and potentially from the United States Court of Appeals for the Eleventh Circuit on appeal.

## I. COMPLIANCE WITH PART-ONE OF THE INJUNCTIVE RELIEF.

5. First, Leapfrog was ordered to "cease assigning a Safety Grade to the Community Hospitals under the current methodology or any similar methodology that: (i) assigns assumed or imputed values to calculate Safety Grades due to the lack of hospital-provided performance data; (ii) scores nonparticipating hospitals differently than participating hospitals by using different values or using differently weighted values to calculate Safety Grades; or (iii) that otherwise reduces a hospital's Safety Grade due to the failure to provide performance data." (DE 212, pp. 40-41, ¶1).

6. In compliance with part-one of this Court's injunctive relief, Leapfrog has ceased assigning Safety Grades, under its current methodology, to each of the Plaintiff hospitals.

7. In further compliance, Leapfrog is not assigning Spring 2026 Safety Grades to any of the Plaintiff hospitals.

8. In addition, Leapfrog has gone above and beyond what this Court's order requires insomuch as Leapfrog has ceased assigning Safety Grades for all non-participating hospitals (477 in total from Fall 2025) that did not submit a Leapfrog Hospital Survey and received Step 2 imputation under Leapfrog's Safety Grade methodology. Leapfrog firmly believes that its principles and methodology should apply equally to all hospitals nationally. Following thorough review and deliberation, Leapfrog has concluded that it cannot fairly comply with the Court's injunction as to only the Plaintiff Hospitals while simultaneously rating other non-participating hospitals in ways that diverge. Accordingly, Leapfrog would be betraying its own values and inflicting even worse injury upon its mission if it continued to assign Safety Grades for non-participating hospitals other than the Plaintiff Hospitals while discontinuing any such assignment for the Plaintiffs Hospitals.

9. Likewise, Leapfrog is not assigning any Spring 2026 Safety Grades for non-participating hospitals that did not submit a Leapfrog Hospital Survey and would have received Step 2 imputation under Leapfrog's Safety Grade methodology.

10. Likewise, Leapfrog is not publishing any Fall 2026 Safety Grades to any of the Plaintiff hospitals or non-participating hospitals that did not submit a Leapfrog Hospital Survey and would have received Step 2 imputation under Leapfrog's Safety Grade methodology.

11. Absent further judicial order granting modification or other relief, which Leapfrog respectfully reserves all rights to pursue, including by way of an appeal, Leapfrog has and will continue to comply with part-one of this Court's injunctive relief. (DE 212, pp. 40-41, ¶1).

## II. COMPLIANCE WITH PART-TWO OF THE INJUNCTIVE RELIEF.

12. Second, Leapfrog was ordered to "[w]ithin 5 business days of judgment, . . . withdraw from its websites and cease promoting the deceptive and unfair Safety Grades assigned to the Community Hospitals for Fall 2024, Spring 2025, and Fall 2025." (DE 212, p. 41, ¶2).

13. In compliance with part-two of this Court's injunctive relief, on March 13, 2026, within five (5) business days of the injunction order, Leapfrog withdrew each of the Plaintiff hospital's Safety Grades from its public reporting website (www.hospitalsafetygrade.org) for Fall 2024, Spring 2025 and Fall 2025. Leapfrog does not display Safety Grades on any other website other than its public reporting website (www.hospitalsafetygrade.org).

14. When conducting a search of the Plaintiff hospitals, their previously assigned Safety Grade for Fall 2025 now reflects a symbol that states "GRADE NOT ASSIGNED." For example, on www.hospitalsafetygrade.org, a search for each of the Plaintiff hospitals shows the following:



15. Leapfrog removed all gas gauge icons depicting performance on measures used to calculate the Hospital Safety Grade for each of the Plaintiff hospitals from its public reporting website (www.hospitalsafetygrade.org).

16. Leapfrog removed all measure scores for each of the Plaintiff hospitals from its public reporting website (www.hospitalsafetygrade.org).

17. When clicking on "View the full Score" for each of the Plaintiff hospitals, their previously assigned grades for Fall 2024, Spring 2025 and Fall 2025 now reflects the following symbol that states "GRADE NOT ASSIGNED." For example, on www.hospitalsafetygrade.org, a search for each of the Plaintiff hospitals shows the following:




18. In further compliance, Leapfrog removed each of the Plaintiff hospitals from the archival report database where consumers are able to purchase PDF reports that include a hospital's previous Safety Grades and associated measure scores. Archival reports are not available for purchase for each of the Plaintiff hospitals.

19. In further compliance, each of the Plaintiff hospitals' webpages on www.hospitalsafetygrade.org will continue to be displayed consistent with ¶¶14, 17 of this Declaration, absent further judicial order granting modification or other relief from the injunction, which Leapfrog respectfully reserves all rights to pursue.

20. Out of an abundance of caution and to forestall any allegations of noncompliance, Leapfrog went above and beyond, in several respects, to account for part-two of the Court's injunction. First, on March 13, 2026, Leapfrog withdrew Safety Grades for all hospitals that did

not submit a Leapfrog Hospital Survey and received Step 2 imputation under Leapfrog's Safety Grade methodology in Fall 2024, Spring 2025, and Fall 2025 on www.hospitalsafetygrade.org.

21. Second, Leapfrog removed all gas gauge icons depicting performance on each measure included in the Hospital Safety Grade for all hospitals that did not submit a Leapfrog Hospital Survey and received Step 2 imputation under Leapfrog's Safety Grade methodology.

22. Third, Leapfrog removed all measure scores for all hospitals that did not submit a Leapfrog Hospital Survey and received Step 2 imputation under Leapfrog's Safety Grade methodology.

23. Fourth, Leapfrog has modified its website to reflect a "GRADE NOT ASSIGNED" symbol for Fall 2024, Spring 2025, and Fall 2025 for all hospitals that did not submit a Leapfrog Hospital Survey and previously received a Step 2 imputation under the Leapfrog Safety Grade methodology. Users can access the updated information by clicking on a link titled "View the full Score" for these hospitals.

24. Fifth, the webpages for all hospitals that did not submit a Leapfrog Hospital Survey and received Step 2 imputation under Leapfrog's Safety Grade methodology will continue to be displayed consistent with ¶¶14, 17 of this Declaration, absent further judicial order granting modification or other relief from the injunction, which Leapfrog respectfully reserves all rights to pursue.

25. Sixth, Leapfrog removed all hospitals that did not submit a Leapfrog Hospital Survey and received Step 2 imputation under Leapfrog's Safety Grade methodology from Leapfrog's archival report database, whereby consumers can purchase PDF reports that include a hospitals previous Safety Grades and associated scores. These archival reports are not available for purchase for any non-participating hospital who was graded using Step 2.

26. Seventh, Leapfrog sent each of the non-participating hospitals, who were assigned a Safety Grade using Step-2 imputation, a letter notifying them of the changes including but not limited to that their Fall 2024, Spring 2025 and Fall 2025 Safety Grades are withdrawn and that their Spring 2026 Safety Grades are not being assigned. (*See*, example of letter attached hereto as Exhibit A).

27. Absent further judicial order granting modification or other relief, which Leapfrog respectfully reserves all rights to pursue, including by way of appeal, Leapfrog has and will continue to comply with part-two of this Court's injunctive relief. (DE 212, p. 41, ¶2).

## III. COMPLIANCE WITH PART-THREE OF THE INJUNCTIVE RELIEF.

28. Third, Leapfrog was ordered to "[w]ithin 30 days of judgment, . . . send corrective disclosures to all entities that paid to license the Fall 2024, Spring 2025, and Fall 2025 Safety Grades, disclosing that those Safety Grades were found to be deceptive and unfair in this action. Leapfrog must file a declaration documenting the reasonable and diligent efforts it has undertaken to accomplish this directive within 45 days of judgment." (DE 212, p. 41, ¶3).

29. In compliance with part-three of this Court's injunctive relief, on March 23, 2026, Leapfrog sent corrective disclosure letters to all data licensees that license Leapfrog's Hospital Safety Grade. (*See*, example attached hereto as Exhibit B).

30. In further compliance and in addition to sending corrective disclosure letters, Leapfrog updated its data files for Fall 2024, Spring 2025 and Fall 2025 to remove all previously assigned letter grades and measure scores related to non-participating hospitals, who were assigned a Safety Grade using Step-2 imputation and included instructions on how to access the updated files via Leapfrog's data licensee portal in both the emails and letters sent to all data licensees.

31. In further compliance, Leapfrog requested and received "read receipts" and/or FedEx certified mailing receipts for each of the corrective disclosure emails and letters that were sent to all data licensees.

32. Out of an abundance of caution and to forestall any allegations of noncompliance, Leapfrog went above and beyond, insomuch as also notifying unpaid data licensees (e.g., regional leaders) the same corrective disclosures.

33. Absent further judicial order granting modification or other relief, which Leapfrog respectfully reserves all rights to pursue, including by way of appeal, Leapfrog has and will continue to comply with part-three of this Court's injunctive relief. (DE 212, p. 41, ¶3).

## IV. COMPLIANCE WITH PART-FOUR OF THE INJUNCTIVE RELIEF.

34. Fourth, Leapfrog was ordered to "place the same corrective disclosures in future contracts, print and electronic advertising materials, and other print and electronic documents that promote paid licensure of the next cycle of Safety Grades accessible to or in the following five zip codes: 33401, 33407, 33410, 33428, and 33484." (DE 212, p. 41, ¶4).

35. In compliance with part-four of this Court's injunctive relief, Leapfrog has and will continue to place the same corrective disclosures in future contracts, print and electronic advertising materials, and other print and electronic documents that promote paid licensure of the

next cycle of Safety Grades accessible to or in the following five zip codes: 33401, 33407, 33410, 33428, and 33484.

36. In further compliance, Leapfrog has already updated all data license files with the same corrective disclosures, which will remain in all data license files in the future as applicable and in compliance with this Court's injunctive order. (*See*, screenshot of corrective disclosure included in data licensee portal attached hereto as Exhibit C).

37. Absent further judicial order granting modification or other relief, which Leapfrog respectfully reserves all rights to pursue, including by way of appeal, Leapfrog has and will continue to place the same corrective disclosures in future contracts, print and electronic advertising materials, and other print and electronic documents that promote paid licensure of the next cycle of Safety Grades when applicable and in accordance with this Court's order.

38. In addition, to further show its good faith and to forestall any allegations of noncompliance, Leapfrog has gone above and beyond to take account of this this Court's order. First, on March 20, 2026, Leapfrog met with all its independent third-party regional leaders, who are business coalitions on health comprised of members (employers and purchasers) who operate in designated regions requesting hospitals to participate in Leapfrog's Hospital Survey, across the United States, to advise them of the injunction order and its effect.

39. Second, Leapfrog sent updated data files to all regional leaders, across the United States, and advised them that Leapfrog has modified its website to reflect a "GRADE NOT ASSIGNED" symbol for Fall 2024, Spring 2025, and Fall 2025 for all hospitals that did not submit a Leapfrog Hospital Survey and previously received a Step 2 imputation under the Leapfrog Safety Grade methodology.

40. Absent further judicial order granting modification or other relief, which Leapfrog respectfully reserves all rights to pursue, including by way of appeal, Leapfrog has and will continue to comply with part-four of this Court's injunctive relief. (DE 212, pp. 41, ¶4).

## V. <u>COMPLIANCE WITH PART-FIVE OF THE INJUNCTIVE RELIEF.</u>

41. Fifth, Leapfrog was ordered to "refrain from taking any action to circumvent the relief set out above. The Court retains jurisdiction to enforce compliance with these commands." (DE 212, pp. 41, ¶5).

42. Absent further judicial order granting modification or other relief, which Leapfrog respectfully reserves all rights to pursue, including by way of appeal, Leapfrog has and will

continue to abide by this Court's order in full including refraining from taking any action to circumvent the relief set forth in the order. (*Id.*).

43. Out of an abundance of caution and to forestall any allegations of noncompliance, Leapfrog has put in place measures to fully comply with the Court's judgment well in advance of the deadlines for compliance mandated by the Court.

44. On March 20, 2026, Tenet Healthcare Corporation ("Tenet") served Leapfrog with a correspondence requesting, *inter alia,* compliance with the injunction order as applicable to *all* Tenet owned hospitals. (*See,* correspondence attached hereto as Exhibit D).

45. On March 31, 2026, Leapfrog responded to Tenet, advising Tenet of its intent to fully comply with the court's injunction order. Even though Leapfrog does not understand the injunction to cover all Tenet-owned hospitals, Leapfrog notified Tenet that out of an abundance of caution, Leapfrog has withdrawn Safety Grades for all hospitals that did not submit a Leapfrog Hospital Survey and received Step-2 imputation under Leapfrog's Safety Grade methodology in Fall 2024, Spring 2025 and Fall 2025 on www.hospitalsafetygrade.org, which includes all Tenet owned hospitals.

46. On April 14, 2026, Tenet Healthcare Corporation nonetheless sent Leapfrog another correspondence asserting that Leapfrog's survey website (www.leapfroggroup.org), which does not house, or display Safety Grades violates the Court's injunction merely because the website advises consumers—truthfully—which hospitals did not participate in the Leapfrog Hospital Survey. (*See,* correspondence attached hereto as Exhibit E). The website also suggests that users write to non-participating hospitals to encourage them to provide this potentially life-saving information to the public. (*See id.*).

47. Leapfrog has gone to great lengths, incurred great expense, and suffered great pains in its efforts to comply fully and in the utmost good faith with the Court's injunction. Contrary to Tenet's accusations, Leapfrog has taken careful account of the Court's injunction order and done what it understands to be necessary to comply, then added substantial prophylaxis atop that. Leapfrog does not understand the Court's injunction as intending to prohibit Leapfrog from providing consumers with important, truthful information to the effect that non-participating hospitals in fact have not participated in its Survey. Nor does the injunction, by its terms, prohibit Leapfrog from advising patients and their loved ones as to critical facts surrounding hospitals and Leapfrog's protected opinions regarding same.

48. Citing this Court's injunction order, Tenet also demanded in its April 14 letter that Leapfrog make changes to an anticipated rating system for ambulatory surgical centers (ASCs) that it has not yet launched. (*See id.*) Specifically, Tenet demanded that Leapfrog refrain from stating that accreditation information is "Not Available" from ASCs that do not submit accreditation information and from noting that an ASC facility that does not provide an ASC Survey response "Declined to Report." (*Id.*) Again, Leapfrog is taking careful account of this Court's injunction order as it complies with its terms. And Leapfrog does not understand that it is circumventing the Court's injunction when it reports on non-party Tenet-owned ASCs, or when it provides truthful information to consumers about ASCs' accreditation information or survey responses. If anything, Leapfrog would be circumventing its values, its mission, and its consumers if it allowed the Plaintiff Hospitals to silence and censor Leapfrog's ratings going forward under auspices of this Court's injunction order.

49. Absent further judicial order granting modification or other relief, which Leapfrog respectfully reserves all rights to pursue, including by way of appeal, Leapfrog has and will continue to comply with part-five of this Court's injunctive relief. (DE 212, pp. 41, ¶5).

## VI. Additional Efforts by Leapfrog.

50. Leapfrog has gone to great lengths to comply fully with this Court's, even as it tries in all other respects to stay true to its mission of maximizing transparency for the public's benefit.

51. In short, Leapfrog believes it has gone to extraordinary lengths in order to comply with the Court's injunction order and believes it is fully compliant with that order. In the event that Leapfrog perceives there to be any doubt or persisting dispute about any specific aspect of Leapfrog's compliance, however, Leapfrog may need to seek clarification of the Court's order and it respectfully reserves the right to seek such clarification or other appropriate relief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 20, 2026

/s/ [signature]

Leah Binder

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send an electronic notification of such filing to all counsel of record in the Court's ECF filing system.

*s/Jura C. Zibas*
Jura C. Zibas

# EXHIBIT A

LEAPFROG

The Leapfrog Group
1775 K Street NW, Suite 400
Washington, DC 20006
LeapfrogGroup.org

Dear CEO,

I am writing to inform you of an important change affecting your hospital's Leapfrog Hospital Safety Grade.

Based on a federal court ruling in Florida, Leapfrog is temporarily withdrawing Safety Grades from our public reporting website (www.HospitalSafetyGrade.org) for hospitals like yours that did not submit a Leapfrog Hospital Survey and therefore received Step 2 imputation under Leapfrog's Safety Grade methodology. Although the court ruling only applied to five hospitals, Leapfrog does not apply programmatic changes to individual hospitals because the Hospital Safety Grade is a national program.

As a result, effective immediately, your hospital's Fall 2025 Leapfrog Hospital Safety Grade will be updated on our public reporting website with an icon indicating "Grade Not Assigned". All related measure scores associated with the Fall 2025 Safety Grade, including the measure "gas gauges," will be removed. The Fall 2024 and Spring 2025 grades will also be updated with the new icon, and consumers will be encouraged to find additional information about your hospital's safety and quality on the CMS Care Compare website and Mayo Clinic's HealthLocator website. Finally, your hospital will not have a Spring 2026 Safety Grade published and will no longer have access to the Safety Grade Review Website during this temporary period.

The Leapfrog Hospital Safety Grade has had a proven and demonstrable impact on improving patient safety in the United States. Our community of patient advocates, employers, purchasers, policymakers, and experts remains fully committed to advancing health care transparency and patient safety. We plan to convene our national expert panel to begin work on an updated methodology and plan to resume grading all eligible hospitals in Fall 2026 in compliance with the Florida court ruling.

If you have questions, please contact us at helpdesk@leapfrog-group.org.

Sincerely,

Leah Binder
President & CEO
The Leapfrog Group

THE LEAPFROG GROUP
Giant Leaps for Patient Safety

[redacted]

March 24, 2026

Hello [redacted]

Please be advised that the U.S. District Court for the Southern District of Florida has ruled that the Fall 2024, Spring 2025, and Fall 2025 Leapfrog Safety Grades for Good Samaritan Medical Center, Inc., Delray Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center, St. Mary's Medical Center, Inc., and West Boca Medical Center, Inc. are deceptive and unfair under the Florida Deceptive & Unfair Trade Practices Act, Florida Statutes § 501.201, *et seq*. based upon how Safety Grades are assigned to hospitals that do not participate in the Leapfrog Hospital Survey. For consistency, Leapfrog is voluntarily taking the immediate step of removing Safety Grades for any non-reporting hospital that received Step 2 imputation in Fall 2024, Spring 2025 and Fall 2025. The Court's ruling was issued in the matter titled *Good Samaritan Medical Center, et al. v. The Leapfrog Group*, No. 25-CV-80526-Middlebrooks (S.D. Fla. Mar. 6, 2026).

Please login to The Hopper to download the updated Fall 2024, Spring 2025, and Fall 2025 datasets reflecting these changes.

As a reminder, when displaying the Data via websites, Licensee or Third-Party Vendor shall update the website with the most recent Data made available by Leapfrog within fifteen (15) business days from when it becomes available. Master Terms and Conditions for Leapfrog Data (MTC) internal and external data use can be viewed on our website at https://www.leapfroggroup.org/MTC_External_Internal.

Please let us know if you have any further questions.

**Kush Banerjee**
Director of Licensing Programs
The Leapfrog Group
202.644.9414
1775 K St. NW, Suite 400
Washington, DC 20006

LeapfrogGroup.org | HospitalSafetyGrade.org | Twitter | **Donate**

*Confidentiality Notice: This email is intended only for the individual(s) named in the email above. It may contain information that is privileged, confidential, or otherwise protected from use. If you are not the intended recipient, you are hereby informed that any review, disclosure, copying, or dissemination of this transmission, or taking of any action in reliance on its contents, is strictly prohibited. If you have received this transmission in error, please reply to the sender listed above immediately and permanently delete this message. Thank you for your cooperation.*

**From:** Kush Banerjee <KBanerjee@leapfrog-group.org>
**Sent:** Monday, March 23, 2026 3:40 PM
**To:** [redacted]
**Subject:** Leapfrog Hospital Safety Grade- data file change notice

Hello [redacted]

Please be advised that the U.S. District Court for the Southern District of Florida has ruled that the Fall 2024, Spring 2025, and Fall 2025 Leapfrog Safety Grades for Good Samaritan Medical Center, Inc., Delray Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center, St. Mary's Medical Center, Inc., and West Boca Medical Center, Inc. are deceptive and unfair under the Florida Deceptive & Unfair Trade Practices Act, Florida Statutes § 501.201, *et seq*. based upon how Safety Grades are assigned to hospitals that do not participate in the Leapfrog Hospital Survey. For consistency, Leapfrog is voluntarily taking the immediate step of removing Safety Grades for any non-reporting hospital that received Step 2 imputation in Fall 2024, Spring 2025 and Fall 2025. The Court's ruling was issued in the matter titled *Good Samaritan Medical Center, et al. v. The Leapfrog Group*, No. 25-CV-80526-Middlebrooks (S.D. Fla. Mar. 6, 2026).

Please login to The Hopper to download the updated Fall 2024, Spring 2025, and Fall 2025 datasets reflecting these changes.

As a reminder, when displaying the Data via websites, Licensee or Third-Party Vendor shall update the website with the most recent Data made available by Leapfrog within fifteen (15) business days from when it becomes available. Master Terms and Conditions for Leapfrog Data (MTC) internal and external data use can be viewed on our website at https://www.leapfroggroup.org/MTC_External_Internal.

Please let us know if you have any further questions.

**Kush Banerjee**
Director of Licensing Programs
The Leapfrog Group
202.644.9414
1775 K St. NW, Suite 400
Washington, DC 20009

LeapfrogGroup.org | HospitalSafetyGrade.org | Twitter | **Donate**

*Confidentiality Notice: This email is intended only for the individual(s) named in the email above. It may contain information that is privileged, confidential, or otherwise protected from use. If you are not the intended recipient, you are hereby informed that any review, disclosure, copying, or dissemination of this transmission, or taking of any action in reliance on its contents, is strictly prohibited. If you have received*

*this transmission in error, please reply to the sender listed above immediately and permanently delete this message. Thank you for your cooperation.*

# EXHIBIT

**Exhibit C: Screenshot of Data Licensee Portal**

Hospital Survey Dataset | ASC/HOPD Survey Dataset | **Hospital Safety Grade Dataset** | Licensed Logos | Data Users Group | API Instructions | Market Insights

# Download Hospital Safety Grade Dataset

The most recent Hospital Safety Grades are now available to download using the link below. Safety Grades are updated twice per year in the spring and fall and posted in May (spring Safety Grade) and November (fall Safety Grade). Spring Safety Grades are calculated using data obtained on a January 31 Data Snapshot Date and fall Safety Grades are calculated using data obtained on an August 31 Data Snapshot Date.

Please be advised that the U.S. District Court for the Southern District of Florida has ruled that the Fall 2024, Spring 2025, and Fall 2025 Leapfrog Safety Grades for Good Samaritan Medical Center, Inc., Delray Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center, St. Mary's Medical Center, Inc., and West Boca Medical Center, Inc. are deceptive and unfair under the Florida Deceptive & Unfair Trade Practices Act, Florida Statutes § 501.201, et seq. based upon how Safety Grades are assigned to hospitals that do not participate in the Leapfrog Hospital Survey. For consistency, Leapfrog is voluntarily taking the immediate step of removing Safety Grades for any non-reporting hospital that received Step 2 imputation in Fall 2024, Spring 2025 and Fall 2025. The Court's ruling was issued in the matter titled *Good Samaritan Medical Center, et al. v. The Leapfrog Group*, No. 25-CV-80526-Middlebrooks (S.D. Fla. Mar. 6, 2026).

As a reminder, when displaying the Data via websites, Licensee or Third-Party Vendor shall update the website with the most recent Data made available by Leapfrog within fifteen (15) business days from when it becomes available. Master Terms and Conditions for Leapfrog Data (MTC) internal and external data use can be viewed on our website at https://www.leapfroggroup.org/MTC_External_Internal.

A data dictionary is included in the Hospital Safety Grade Dataset file below.

### Fall 2025 Hospital Safety Grade Dataset

**Date of Last Data Upload:** 3/20/2026
**File Reflects Data Obtained on the Following Data Snapshot Date:** 8/31/2025

Hospital Safety Grade Dataset
Includes Important Notes, Data Dictionary, Hospital Safety Grades and underlying data for all graded hospitals.

### Spring 2025 Hospital Safety Grade Dataset

**Date of Last Data Upload:** 3/20/2026
Spring 2025 Hospital Safety Grade Dataset

### Fall 2024 Hospital Safety Grade Dataset

**Date of Last Data Upload:** 3/20/2026
Fall 2024 Hospital Safety Grade Dataset

### Spring 2026 Sample File and Data Dictionary

Date of Last Date Upload: 03/23/2026
Spring 2026 Sample File and Data Dictionary

### Hospital Safety Grade Materials

Fall 2025 Scoring Methodology

Fall 2025 Explanation of Safety Grades

Contact Data Licensing with any questions.

# EXHIBIT

GIBSON DUNN

Mary Beth Maloney
Partner
T: +1 212.351.2315
M: +1 310.806.3737
mmaloney@gibsondunn.com

March 20, 2026

VIA E-MAIL

Kimberly E. Blair
Wilson Elser Moskowitz Edelman & Dicker LLP
161 N Clark
Suite 4500
Chicago, IL 60601

Re: Confirmation Regarding Withdrawal and Non-Issuance of Leapfrog Hospital Safety Grades for Non-Participating Tenet-Owned Hospitals

Counsel:

I write on behalf of Tenet Healthcare Corporation ("Tenet") to seek confirmation regarding The Leapfrog Group's ("Leapfrog") current and intended treatment of Safety Grades issued to non-participating Tenet-owned hospitals following Judge Middlebrooks's decision in *Good Samaritan Medical Center, Inc., et al. v. The Leapfrog Group*, No. 9:25-80526-DMM (S.D. Fla. Mar. 6, 2026).

Judge Middlebrooks found that Leapfrog's Safety Grade methodology for non-participating hospitals "has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety," Op. 2, and held that the methodology "constitutes an unfair and deceptive business practice in violation of" the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Op. 3.

While Judge Middlebrooks's decision focuses on the five Florida hospitals that brought the action, the methodology the Court found deceptive and unfair was not unique to those five hospitals. Leapfrog has used that same methodology for other non-participating Tenet-owned hospitals, including the hospitals listed in Appendix A to this letter. For example, the opinion details how Leapfrog's methodology—the same methodology applied elsewhere—is "punitive in nature"; that "Leapfrog understood" it was "penalizing hospitals" even though Leapfrog hoped consumers would rely on the Grades "as *accurate* representations of hospital safety"; and that Leapfrog seeks to leverage reputational harms "to force hospitals back into participating in the Leapfrog Survey." Op. 20 (emphasis in original). The decision also emphasizes Leapfrog's deceptive statements and practices concerning both "how to use the grade" and "how the data itself was collected"—making clear that while Leapfrog claims its Safety Grades "are supported by real data and reflect actual safety performance," Leapfrog in fact lacks "real data" and that its Safety Grades instead are "driven by Survey participation of the rated hospitals." Op. 23–24. The "foreseeable and potentially quite severe" harms that result from this scheme—including delayed and misdirected

care, "patient confusion," and "erosion of community confidence"—logically apply beyond the five Florida plaintiff hospitals as well. Op. 31–32.

That same challenged methodology generated the so-called "Safety Grades" assigned to the non-participating Tenet-owned hospitals listed in Appendix A. The question is now whether Leapfrog intends to continue using, republishing, storing, or replacing Grades used under a methodology the Court found deceptive and unfair. At minimum, the ruling leaves Leapfrog with no justifiable basis to continue using or republishing Grades generated under that same methodology for the non-participating Tenet-owned hospitals listed in Appendix A.

Leapfrog's public statements since the ruling only sharpen the need for confirmation. Shortly after the opinion issued, Leapfrog stated on its website that the "Spring 2026 update of the Leapfrog Hospital Safety Grade will continue as planned, with some modifications based on the injunction[.]" The Leapfrog Group, *Statement from Leapfrog President and CEO Leah Binder on the Tenet Healthcare Lawsuit Decision* (Mar. 8, 2026), https://www.leapfroggroup.org/news-events/statement-leapfrog-president-and-ceo-leah-binder-tenet-healthcare-lawsuit-decision. But on March 16, 2016, Leapfrog told Becker's that it had "recall[ed]" several Grades for U.S. hospitals that had not recently participated in its Hospital Survey, that it "does not apply programmatic changes to individual hospitals because the hospital safety grade is a national program," and that it "expect[s] to resume full grading in fall 2026." Paige Twenter, *Leapfrog Temporarily Limits Hospital Grades to Survey Participants After Court Ruling*, Becker's Hospital Review (Mar. 16, 2026), https://www.beckershospitalreview.com/legal-regulatory-issues/leapfrog-restricts-hospital-grades-to-participation-after-ruling/. These statements do not clearly answer what Leapfrog will do with respect to the non-participating Tenet-owned hospitals listed in Appendix A, whether Spring 2026 Grades will issue for those hospitals, or whether Leapfrog contends Grades now being withdrawn may later be restored or republished.

Additionally, as of the date of this letter, Leapfrog has removed from its Hospital Safety Grades website the Fall 2024, Spring 2025, and Fall 2025 Safety Grades previously issued to the five Florida plaintiff hospitals. The same appears to be true for the other non-participating Tenet-owned hospitals listed in Appendix A. But Leapfrog has not made clear whether those Grades are being permanently withdrawn or merely withheld pending later republication.

Please confirm in writing that:

(1) Leapfrog will not issue Spring 2026 Leapfrog Safety Grades to any non-participating, Tenet-owned hospital listed in Appendix A;

(2) Leapfrog has withdrawn, and will not republish, any Fall 2024, Spring 2025, or Fall 2025 Safety Grade issued to any hospital listed in Appendix A under the methodology found unlawful, and will identify the date on which each such Grade was removed from its website;

(3) Leapfrog has directed its licensees and other third parties to cease displaying or promoting any such Grades, and will identify the date on which each instruction was given;

(4) no such Grades remain available through any Leapfrog-controlled webpage, data feed, licensed asset, promotional material, or other distribution channel; and

(5) if Leapfrog contends otherwise as to any hospital listed in Appendix A with respect to the points identified above, Leapfrog will identify the hospital, the Grade cycle, and the methodology it contends permit publication, and the data sources on which it relies.

In addition, please preserve all documents, communications, website records, data feeds, internal approvals, and third-party instructions relating to the withdrawal, non-issuance, republication, or contemplated future publication of Safety Grades for any hospital listed in Appendix A, including any Spring 2026 or Fall 2026 methodology changes affecting non-participating hospitals.

We respectfully request that you respond to this letter, including the five points set forth above, within five business days. Tenet reserves all rights, including the right to pursue additional relief based on Leapfrog's response or failure to respond.

Sincerely,

GIBSON, DUNN & CRUTCHER LLP

Mary Beth Maloney
Partner

Encl.

# Appendix A

| Hospital Name | Hospital Address |
|---|---|
| Abrazo Arizona Heart Hospital | 1930 E Thomas Road<br>Phoenix, AZ 85016 |
| Abrazo Arrowhead Campus | 18701 N 67th Avenue<br>Glendale, AZ 85308 |
| Abrazo Central Campus | 2000 W Bethany Home Road<br>Phoenix, AZ 85015 |
| Abrazo Scottsdale Campus | 3929 E Bell Road<br>Phoenix, AZ 85032 |
| Abrazo West Campus | 13677 W McDowell Road<br>Goodyear, AZ 85395 |
| Arizona Specialty Hospital | 750 N 40th Street<br>Phoenix, AZ 85008 |
| Arizona Spine & Joint Hospital | 4620 E Baseline Road<br>Mesa, AZ 85206 |
| Baptist Medical Center | 111 Dallas Street<br>San Antonio, TX 78205 |
| Baylor Scott & White Medical Center - Frisco | 5601 Warren Parkway<br>Frisco, TX 75034 |
| Baylor Scott & White Medical Center - Sunnyvale | 231 S Collins Road<br>Sunnyvale, TX 75182 |
| Baylor Scott & White Medical Center - Trophy Club | 2850 E Highway 114<br>Trophy Club, TX 76262 |
| Baylor Scott & White Medical Center - Uptown | 2727 E Lemmon Avenue<br>Dallas, TX 75204 |
| Baylor Scott & White Orthopedic and Spine Hospital - Arlington | 707 Highlander Boulevard<br>Arlington, TX 76015 |
| Baylor Scott & White Surgical Hospital - Fort Worth | 1800 Park Place Avenue<br>Fort Worth, TX 76110 |
| Baylor Scott & White Surgical Hospital - Sherman | 3601 N Calais Street<br>Sherman, Texas 75090 |
| Baylor Scott & White Texas Spine and Joint Hospital | 1814 Roseland Boulevard<br>#100<br>Tyler, TX 75701 |
| Baylor Surgical Hospital at Las Colinas | 400 W I-635<br>Suite 101b<br>Irving, TX 75063 |
| Children's Hospital of Michigan - Main Campus | 3901 Beaubien Boulevard<br>Detroit, MI 48201 |
| Desert Regional Medical Center | 1150 N Indian Canyon Drive<br>Palm Springs, CA 92262 |
| DMC Detroit Receiving Hospital | 4201 Saint Antoine Street<br>Detroit, MI 48201 |

| Hospital Name | Hospital Address |
|---|---|
| DMC Harper University Hospital | 3990 John R Street<br>Detroit, MI 48201 |
| DMC Huron Valley-Sinai Hospital | 1 William Carls Drive<br>Commerce Charter Township, MI 48382 |
| DMC Hutzel Women's Hospital | 3990 John R Street<br>Detroit, MI 48201 |
| DMC Rehabilitation Institute of Michigan | 261 Mack Boulevard<br>Detroit, MI 48201 |
| DMC Sinai-Grace Hospital | 6071 W Outer Drive<br>Detroit, MI 48235 |
| Doctors Hospital of Manteca | 1205 E North Street<br>Manteca, CA 95336 |
| Doctors Medical Center of Modesto | 1441 Florida Avenue<br>Modesto, CA 95350 |
| Dunes Surgical Hospital | 600 N Sioux Point Road<br>Dakota Dunes, SD 57049 |
| Emanuel Medical Center | 825 Delbon Avenue<br>Turlock, CA 95382 |
| Florida Coastal Medical Center | 310 SE Veranda Falls Way<br>Port Street Lucie, FL 34984 |
| Foundation Surgical Hospital of San Antonio | 9522 Huebner Road<br>San Antonio, TX 78240 |
| Framingham Union Hospital | 115 Lincoln Street<br>Framingham, MA 01702 |
| Fresno Surgical Hospital | 6125 N Fresno Street<br>Fresno, CA 93710 |
| Hi-Desert Medical Center | 6601 White Feather Road<br>Joshua Tree, CA 92252 |
| Holy Cross Hospital | 1171 W Target Range Road<br>Nogales, AZ 85621 |
| HPI - Community Hospital North | 9800 Broadway Extension<br>Oklahoma City, OK 73114 |
| HPI - Community Hospital South | 3100 SW 89th Street<br>Oklahoma City, OK 73159 |
| HPI - Northwest Surgical Hospital | 9204 N May Avenue<br>Oklahoma City, OK 73120 |
| JFK Memorial Hospital | 47111 Monroe Street<br>Indio, CA 92201 |
| Leonard Morse Hospital | 67 Union Street<br>Natick, MA 01760 |
| Memorial Hermann Surgical Hospital First Colony | 16906 SW Freeway<br>Sugar Land, TX 77479 |
| Memorial Hermann Surgical Hospital Kingwood | 300 Kingwood Medical Drive<br>Kingwood, TX 77339 |

| Hospital Name | Hospital Address |
|---|---|
| Mission Trail Baptist Hospital | 3333 Research Plaza<br>San Antonio, TX 78235 |
| Nacogdoches Medical Center | 4920 NE Stallings Drive<br>Nacogdoches, TX 75965 |
| North Central Baptist Hospital | 520 Madison Oak Drive<br>San Antonio, TX 78258 |
| North Central Surgical Center | 9301 N Central Expressway<br>Suite 100<br>Dallas, TX 75231 |
| Northeast Baptist Hospital | 8811 Village Drive<br>San Antonio, TX 78217 |
| Oklahoma Center for Orthopedic & Multi-Specialty Surgery | 8100 S Walker Avenue<br>Bldg. C<br>Oklahoma City, OK 73139 |
| Palm Beach Children's Hospital | 901 45th Street<br>West Palm Beach, FL 33407 |
| Piedmont Medical Center | 222 S Herlong Avenue<br>Rock Hill, SC 29732 |
| Piedmont Medical Center – Fort Mill | 1000 Wellness Way<br>Fort Mill, SC 29715 |
| Resolute Baptist Hospital | 555 Creekside Crossing<br>New Braunfels, TX 78130 |
| Saint Francis Hospital - Bartlett | 2986 Kate Bond Road<br>Bartlett, TN 38133 |
| Saint Francis Hospital - Memphis | 5959 Park Avenue<br>Memphis, TN 38119 |
| Saint Joseph's Hospital | 350 N Wilmot Road<br>Tucson, AZ 85711 |
| Saint Luke's Baptist Hospital | 7930 Floyd Curl Drive<br>San Antonio, TX 78229 |
| Saint Mary's Hospital | 1601 W Saint Mary's Road<br>Tucson, AZ 85745 |
| Saint Thomas Hospital for Specialty Surgery | 2011 Murphy Avenue<br>Suite 400<br>Nashville, TN 37203 |
| Saint Vincent Hospital | 123 Summer Street<br>Worcester, MA 01608 |
| San Ramon Regional Medical Center | 6001 Norris Canyon Road<br>San Ramon, CA 94583 |
| South Texas Specialty Hospital | 5330 N Loop 1604 W<br>San Antonio, TX 78249 |
| Surgical Institute of Reading | 2752 Century Boulevard<br>Wyomissing, PA 19610 |
| The Hospitals of Providence - East Campus | 3280 Joe Battle Boulevard<br>El Paso, TX 79938 |

| Hospital Name | Hospital Address |
|---|---|
| The Hospitals of Providence - Memorial Campus | 2001 N Oregon Street<br>El Paso, TX 79902 |
| The Hospitals of Providence - Sierra Campus | 1625 Medical Center Drive<br>El Paso, TX 79902 |
| The Hospitals of Providence - Transmountain Campus | 2000 Transmountain Road<br>El Paso, TX 79911 |
| TOPS Surgical Specialty Hospital | 17080 Red Oak Drive<br>Houston, TX 77090 |
| Valley Baptist Medical Center - Brownsville | 1040 W Jefferson Street<br>Brownsville, TX 78520 |
| Valley Baptist Medical Center - Harlingen | 2101 Pease Street<br>Harlingen, TX 78550 |
| Westover Hills Baptist Hospital | 3011 W Loop 1604 N<br>San Antonio, TX 78251 |

# EXHIBIT E

GIBSON DUNN

Mary Beth Maloney
Partner
T: +1 212.351.2315
M: +1 310.806.3737
mmaloney@gibsondunn.com

April 14, 2026

VIA E-MAIL

Kimberly E. Blair
Wilson Elser Moskowitz Edelman & Dicker LLP
161 N Clark
Suite 4500
Chicago, IL 60601

Re: Hospital And Ambulatory Surgery Centers Ratings On Leapfroggroup.org

Counsel:

I write on behalf of the Plaintiff Hospitals in *Good Samaritan Medical Center, Inc., et al. v. The Leapfrog Group*, 25-cv-80526 (S.D. Fla.), and their parent company, Tenet Healthcare Corporation, to bring to your attention The Leapfrog Group's noncompliance with the Court's recent injunction and to serve notice that Leapfrog's contemplated "ASC Public Reporting Program"—which would mimic the same deceptive effect of Leapfrog's so-called "Safety Grades"—may result in additional liability under federal and state consumer-protection laws.

## I. The Federal District Court Enjoins Leapfrog's Deceptive And Unfair Practices

As you are aware, Judge Middlebrooks recently found that Leapfrog's Hospital Safety Grade methodology "has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety." Op. 2. The Court emphasized that Leapfrog's ratings scheme was "intended to create the false impression that Leapfrog's grades reflect actual performance," when, in fact, Leapfrog itself "acknowledged" that its real "goal [was] punishing nonparticipants as a means of forcing hospitals to cooperate in submitting their Surveys" to Leapfrog. Op. 26. The Court was particularly troubled by Leapfrog's attempts to "pressure and penalize hospitals" into handing over their "private data," even though Leapfrog "does not have a right" to such data, and likewise has no "right to punish [hospitals]" through reputational damage when hospitals refuse to surrender their data to Leapfrog for commercial purposes. Op. 39. The Court thus determined that Leapfrog's practices violate the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Op. 3, and entered a comprehensive injunction that, among other things, prohibits Leapfrog from "scor[ing] nonparticipating hospitals differently than participating hospitals by using different values or using differently weighted values," and specifically prohibits Leapfrog "from taking any action to circumvent" the injunction. Op. 40–41. The Court subsequently entered a declaratory judgment making clear that the assignment of "failing safety scores in the absence of actual data [is] deceptive and unfair under FDUTPA." Judgment 1.

These orders became operative upon entry, *see* Fed. R. Civ. P. 62(c)(1), and Leapfrog has not sought a stay. To the contrary, Leapfrog CEO Leah Binder has publicly represented that "of course" Leapfrog "will comply" with the injunction during the pendency of Leapfrog's contemplated appeal.[1]

### II. Leapfrog Violates The Court's Injunction On Leapfroggroup.org

On one of Leapfrog's websites, leapfroggroup.org, Leapfrog currently lists the "2025 Survey Results" for facilities within a 50-mile radius of Palm Beach, Florida. Several of the Plaintiff Hospitals and their affiliated institutions—Good Samaritan Medical Center, St. Mary's Medical Center, Palm Beach Children's Hospital at St. Mary's Medical Center, Palm Beach Gardens Medical Center, and Delray Medical Center—are so listed.[2] Despite the operative effect of the Court's orders and Leapfrog's public representations of compliance, Leapfrog continues to deliberately manipulate how it presents those institutions' lack of a Survey response.

At the top of the page, Leapfrog prominently places a red "hazard" symbol with an exclamation point and a warning that facilities that "declined to respond" to the Survey have deprived patients of "critical, life-saving information." The entries for nonparticipating hospitals carry a red "Declined to Respond" label—in stark contrast to the parallel green "View Hospital Ratings" label affixed to entries for participating hospitals. A Leapfrog pop-up linked to the "Declined to Respond" label recommends users "[a]sk [nonparticipating hospitals] why" they did not report to Leapfrog, implying a nefarious and unjustified lack of transparency on the hospital's part. If consumers click that link, they are taken to a boilerplate letter prepared by Leapfrog for submission to hospitals suggesting that patients have reason to doubt a hospital's "record on quality and safety" when hospitals "decline[ ] to participate" in Leapfrog's Survey.

---

[1] *See* The Leapfrog Group, *Statement from Leapfrog President and CEO Leah Binder on the Tenet Healthcare Lawsuit Decision*, YouTube at 2:09 (Mar. 9, 2026), https://www.youtube.com/watch?v=8SnSKozVlc4; The Leapfrog Group, *Statement from Leapfrog President and CEO Leah Binder on the Tenet Healthcare Lawsuit Decision* (Mar. 8, 2026), https://www.leapfroggroup.org/news-events/statement-leapfrog-president-and-ceo-leah-binder-tenet-healthcare-lawsuit-decision; *see also* Letter for Mary Beth Maloney, Counsel for Tenet, from Kimberly Blair, Counsel for Leapfrog at 1 (Mar. 31, 2026) ("Leapfrog has also taken steps to comply with the other elements of the court's order. Leapfrog has no intention of failing to comply with the Court's order now or in the future.").

[2] *See* The Leapfrog Group, *Leapfrog Ratings*, https://ratings.leapfroggroup.org/search/results?distance=50&address=Palm+Beach%2C+FL%2C+USA&coords=26.7056206%2C-80.0364297&by=distance&sort=distance&showdeclined=1 (search results for Palm Beach, FL).







This two-track depiction of participating and non-participating hospitals is clearly designed to leave consumers with the net impression that non-participating hospitals (with red warnings and fear mongering pop-ups) are less safe than participating hospitals. This practice "scores nonparticipating hospitals differently than participating hospitals by using different values or using differently weighted values." Op. 40 (injunction text). This differential treatment has the apparent purpose and obvious effect of tending to "coerce participation through reputational penalty," Op. 23, pressuring hospitals to surrender data to which Leapfrog "does not have a right," *id.* at 39. And

it is the very sort of conduct that Judge Middlebrooks recently held to constitute a core FDUTPA violation and which the injunction was meant to stop.

Leapfrog therefore is non-compliant with the plain terms of the Court's injunction, including its express directive that Leapfrog shall not engage in "*any* action to circumvent the relief" provided therein. Op. 41 (emphasis added).

Accordingly, the Plaintiff Hospitals demand that Leapfrog remove them from the relevant "Survey Results" webpages on leapfroggroup.org and identify the date on which their entries were removed. If Leapfrog refuses to do so, the Plaintiff Hospitals are prepared to pursue appropriate enforcement measures under Federal Rule of Civil Procedure 65 and other applicable law.

Tenet further demands that Leapfrog take similar action with respect to all Tenet-owned hospitals described in Appendix A and identify the date on which it did so. The Court's ruling leaves Leapfrog with no justifiable basis to continue drawing adverse inferences and inflicting reputational penalties due to the lack of a Survey response for any non-participating Tenet-owned hospital, given that the logic of the Court's order, as Leapfrog has recognized, applies nationally.[3]

## III. Leapfrog Threatens Further Violations With The ASC Public Reporting Program

In addition to perpetuating the unfair and deceptive conduct on leapfroggroup.org that already resulted in liability, Leapfrog now threatens to *expand* the scope of its deception and unfairness through its contemplated "ASC Public Reporting Program" scheduled to launch in late July. Through this initiative, Leapfrog for the first time will rate the "safety and quality" of thousands of ambulatory surgery centers ("ASC"s).[4] Precisely as with its deceptive Safety Grades, Leapfrog intends to draw on a mix of data from the U.S. Centers for Medicare & Medicaid Services and from self-reported (and presumably unaudited) accreditation and survey submissions provided by each ASC facility. Leapfrog will assign a "Not Available" score to any ASC facility that does not submit accreditation information. And it will assign a "Declined to Report" score to any ASC facility that does not provide an ASC survey response—the same score Leapfrog uses for facilities that assertedly "*suppres*[*s*] their data."[5] These scores differ from the "achievement" scores Leapfrog will assign participating ASC facilities.

---

[3] *See* Letter for Mary Beth Maloney, Counsel for Tenet, from Kimberly Blair, Counsel for Leapfrog at 1 (Mar. 31, 2026) ("Although the court ruling only applied to five hospitals, Leapfrog does not apply programmatic changes to individual hospitals because the Hospital Safety Grade is a national program.").

[4] *See* The Leapfrog Group, *New ASC Public Reporting Program*, https://www.leapfroggroup.org/asc-program/new-asc-public-reporting-program.

[5] *See* The Leapfrog Group, The Leapfrog ASC Public Reporting Program Scoring Algorithms: Scoring Details for the 2026 Leapfrog ASC Public Reporting Program at 5, https://www.leapfroggroup.org/sites/default/files/Files/2026ASCPublicReportingProgramScoringAlgorithm_202604012026_v2.0.pdf (emphasis added).

Leapfrog's suggestion that non-participating ASCs must be actively working to "suppress" negative information is a rerun of Leapfrog's discredited theory of "non-response bias." Op. 28. Judge Middlebrooks rejected this theory, deeming the same negative inference when applied in the context of Leapfrog's Hospital Safety Grades to lack any "persuasive evidence." *Id.* Accordingly, Leapfrog's contemplated "reputational penalty" for ASCs—which appears similarly designed to "coerce participation"—would be unlawful under FDUTPA and any other state or federal consumer-protection laws that employ the same standards for deception and unfairness. Op. 23.

Accordingly, Tenet demands that Leapfrog agree that it will not rate or otherwise score any Tenet-owned ASC facility under a methodology that penalizes non-participation, reweights missing information in a punitive manner, or otherwise replicates the conduct that Judge Middlebrooks found deceptive and unfair as applied to hospitals. Please confirm in writing that Leapfrog will not rate or otherwise score any Tenet-owned ASC facility in this manner.

* * *

We respectfully request that you respond to this letter within five business days. The Plaintiff Hospitals and Tenet reserve all rights, including the right to pursue additional relief based on Leapfrog's response or failure to respond. Please preserve all documents, communications, website records, data feeds, internal approvals, and third-party instructions relating to Leapfrog's ratings on leapfroggroup.org and its ASC Public Reporting Program initiative.

Sincerely,

GIBSON, DUNN & CRUTCHER LLP

Mary Beth Maloney
Partner

Encl.

# Appendix A

| Hospital Name | Hospital Address |
|---|---|
| Abrazo Arizona Heart Hospital | 1930 E Thomas Road<br>Phoenix, AZ 85016 |
| Abrazo Arrowhead Campus | 18701 N 67th Avenue<br>Glendale, AZ 85308 |
| Abrazo Central Campus | 2000 W Bethany Home Road<br>Phoenix, AZ 85015 |
| Abrazo Scottsdale Campus | 3929 E Bell Road<br>Phoenix, AZ 85032 |
| Abrazo West Campus | 13677 W McDowell Road<br>Goodyear, AZ 85395 |
| Arizona Specialty Hospital | 750 N 40th Street<br>Phoenix, AZ 85008 |
| Arizona Spine & Joint Hospital | 4620 E Baseline Road<br>Mesa, AZ 85206 |
| Baptist Medical Center | 111 Dallas Street<br>San Antonio, TX 78205 |
| Baylor Scott & White Medical Center - Frisco | 5601 Warren Parkway<br>Frisco, TX 75034 |
| Baylor Scott & White Medical Center - Sunnyvale | 231 S Collins Road<br>Sunnyvale, TX 75182 |
| Baylor Scott & White Medical Center - Trophy Club | 2850 E Highway 114<br>Trophy Club, TX 76262 |
| Baylor Scott & White Medical Center - Uptown | 2727 E Lemmon Avenue<br>Dallas, TX 75204 |
| Baylor Scott & White Orthopedic and Spine Hospital - Arlington | 707 Highlander Boulevard<br>Arlington, TX 76015 |
| Baylor Scott & White Surgical Hospital - Fort Worth | 1800 Park Place Avenue<br>Fort Worth, TX 76110 |
| Baylor Scott & White Surgical Hospital - Sherman | 3601 N Calais Street<br>Sherman, Texas 75090 |
| Baylor Scott & White Texas Spine and Joint Hospital | 1814 Roseland Boulevard<br>#100<br>Tyler, TX 75701 |
| Baylor Surgical Hospital at Las Colinas | 400 W I-635<br>Suite 101b<br>Irving, TX 75063 |
| Children's Hospital of Michigan - Main Campus | 3901 Beaubien Boulevard<br>Detroit, MI 48201 |
| Desert Regional Medical Center | 1150 N Indian Canyon Drive<br>Palm Springs, CA 92262 |
| DMC Detroit Receiving Hospital | 4201 Saint Antoine Street<br>Detroit, MI 48201 |

| Hospital Name | Hospital Address |
|---|---|
| DMC Harper University Hospital | 3990 John R Street<br>Detroit, MI 48201 |
| DMC Huron Valley-Sinai Hospital | 1 William Carls Drive<br>Commerce Charter Township, MI 48382 |
| DMC Hutzel Women's Hospital | 3990 John R Street<br>Detroit, MI 48201 |
| DMC Rehabilitation Institute of Michigan | 261 Mack Boulevard<br>Detroit, MI 48201 |
| DMC Sinai-Grace Hospital | 6071 W Outer Drive<br>Detroit, MI 48235 |
| Doctors Hospital of Manteca | 1205 E North Street<br>Manteca, CA 95336 |
| Doctors Medical Center of Modesto | 1441 Florida Avenue<br>Modesto, CA 95350 |
| Dunes Surgical Hospital | 600 N Sioux Point Road<br>Dakota Dunes, SD 57049 |
| Emanuel Medical Center | 825 Delbon Avenue<br>Turlock, CA 95382 |
| Florida Coastal Medical Center | 310 SE Veranda Falls Way<br>Port Street Lucie, FL 34984 |
| Foundation Surgical Hospital of San Antonio | 9522 Huebner Road<br>San Antonio, TX 78240 |
| Framingham Union Hospital | 115 Lincoln Street<br>Framingham, MA 01702 |
| Fresno Surgical Hospital | 6125 N Fresno Street<br>Fresno, CA 93710 |
| Hi-Desert Medical Center | 6601 White Feather Road<br>Joshua Tree, CA 92252 |
| Holy Cross Hospital | 1171 W Target Range Road<br>Nogales, AZ 85621 |
| HPI - Community Hospital North | 9800 Broadway Extension<br>Oklahoma City, OK 73114 |
| HPI - Community Hospital South | 3100 SW 89th Street<br>Oklahoma City, OK 73159 |
| HPI - Northwest Surgical Hospital | 9204 N May Avenue<br>Oklahoma City, OK 73120 |
| JFK Memorial Hospital | 47111 Monroe Street<br>Indio, CA 92201 |
| Leonard Morse Hospital | 67 Union Street<br>Natick, MA 01760 |
| Memorial Hermann Surgical Hospital First Colony | 16906 SW Freeway<br>Sugar Land, TX 77479 |
| Memorial Hermann Surgical Hospital Kingwood | 300 Kingwood Medical Drive<br>Kingwood, TX 77339 |

| Hospital Name | Hospital Address |
|---|---|
| Mission Trail Baptist Hospital | 3333 Research Plaza<br>San Antonio, TX 78235 |
| Nacogdoches Medical Center | 4920 NE Stallings Drive<br>Nacogdoches, TX 75965 |
| North Central Baptist Hospital | 520 Madison Oak Drive<br>San Antonio, TX 78258 |
| North Central Surgical Center | 9301 N Central Expressway<br>Suite 100<br>Dallas, TX 75231 |
| Northeast Baptist Hospital | 8811 Village Drive<br>San Antonio, TX 78217 |
| Oklahoma Center for Orthopedic & Multi-Specialty Surgery | 8100 S Walker Avenue<br>Bldg. C<br>Oklahoma City, OK 73139 |
| Palm Beach Children’s Hospital | 901 45th Street<br>West Palm Beach, FL 33407 |
| Piedmont Medical Center | 222 S Herlong Avenue<br>Rock Hill, SC 29732 |
| Piedmont Medical Center – Fort Mill | 1000 Wellness Way<br>Fort Mill, SC 29715 |
| Resolute Baptist Hospital | 555 Creekside Crossing<br>New Braunfels, TX 78130 |
| Saint Francis Hospital - Bartlett | 2986 Kate Bond Road<br>Bartlett, TN 38133 |
| Saint Francis Hospital - Memphis | 5959 Park Avenue<br>Memphis, TN 38119 |
| Saint Joseph’s Hospital | 350 N Wilmot Road<br>Tucson, AZ 85711 |
| Saint Luke’s Baptist Hospital | 7930 Floyd Curl Drive<br>San Antonio, TX 78229 |
| Saint Mary’s Hospital | 1601 W Saint Mary’s Road<br>Tucson, AZ 85745 |
| Saint Thomas Hospital for Specialty Surgery | 2011 Murphy Avenue<br>Suite 400<br>Nashville, TN 37203 |
| Saint Vincent Hospital | 123 Summer Street<br>Worcester, MA 01608 |
| San Ramon Regional Medical Center | 6001 Norris Canyon Road<br>San Ramon, CA 94583 |
| South Texas Specialty Hospital | 5330 N Loop 1604 W<br>San Antonio, TX 78249 |
| Surgical Institute of Reading | 2752 Century Boulevard<br>Wyomissing, PA 19610 |
| The Hospitals of Providence - East Campus | 3280 Joe Battle Boulevard<br>El Paso, TX 79938 |

| Hospital Name | Hospital Address |
|---|---|
| The Hospitals of Providence - Memorial Campus | 2001 N Oregon Street<br>El Paso, TX 79902 |
| The Hospitals of Providence - Sierra Campus | 1625 Medical Center Drive<br>El Paso, TX 79902 |
| The Hospitals of Providence - Transmountain Campus | 2000 Transmountain Road<br>El Paso, TX 79911 |
| TOPS Surgical Specialty Hospital | 17080 Red Oak Drive<br>Houston, TX 77090 |
| Valley Baptist Medical Center - Brownsville | 1040 W Jefferson Street<br>Brownsville, TX 78520 |
| Valley Baptist Medical Center - Harlingen | 2101 Pease Street<br>Harlingen, TX 78550 |
| Westover Hills Baptist Hospital | 3011 W Loop 1604 N<br>San Antonio, TX 78251 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**THE COMMUNITY HOSPITALS' NOTICE IN RESPONSE TO LEAPFROG'S DECLARATION REGARDING INJUNCTION COMPLIANCE**

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

The Community Hospitals respectfully submit this short response to the Declaration of The Leapfrog Group, ECF 215, filed on April 20, 2026. Toward the end of that declaration, *see id.* ¶¶ 46, 48, Leapfrog references a letter the Community Hospitals sent Leapfrog on April 14 pointing out that Leapfrog's (1) characterization of hospital survey results on leapfroggroup.org and (2) contemplated new grading program for Ambulatory Surgery Centers ("ASCs") violate the letter and intent of this Court's injunction. *See* Ex. A (Community Hospitals' April 14 letter). Leapfrog's declaration dramatically claims that the Community Hospitals' letter deemed Leapfrog noncompliant with "the Court's injunction merely because the website advises consumers—truthfully—which hospitals did not participate in the Leapfrog Hospital Survey." Dkt. 215, ¶ 46. Leapfrog doubled down on that claim with a yet more dramatic letter on April 24, claiming that the Community Hospitals seek "to suppress … accurate reporting of incontestable facts" and "the basic, irrefutable fact that Plaintiffs declined to respond to Leapfrog's Hospital Safety Survey"—a purported attempt "to fault, censor, and muzzle any aspect of Leapfrog's reporting." *See* Ex. B at 1–3 (Leapfrog's April 24 letter).

The Community Hospitals' letter speaks for itself. It objects to Leapfrog's "two-track depiction of participating and non-participating hospitals," which "is clearly designed to leave consumers with the net impression that non-participating hospitals (with red warnings and fear mongering pop-ups) are less safe than participating hospitals," and observes that this differential treatment "has the apparent purpose and obvious effect of tending to 'coerce participation through reputational penalty,' pressuring hospitals to surrender data to which Leapfrog 'does not have a right.'" Ex. A at 3 (quoting Op. at 23, 39) (internal citations omitted).

The Community Hospitals leave it to fair-minded readers to determine whether the letter thus seeks to "censor" the bare reporting of facts or, instead, is concerned with the specific type of misleading conduct this Court deemed deceptive and unfair. If Leapfrog believes it has a "legally unassailable" right, Ex. B at 4, to punish non-responding hospitals or ASCs by claiming that they have a defective record on "safety and quality" or have intentionally "suppressed" their data due to the mere fact of their non-participation, *see* Ex. A at 4–5, then basic aspects of this Court's injunction and the reasoning backing it appear to have escaped the organization.

The Community Hospitals will continue to exhaust all informal means of resolving this dispute before seeking Court intervention, *see* Ex. C (Community Hospitals' April 30 letter)—which the Community Hospitals remain optimistic will be unnecessary.

Dated: April 30, 2026

Respectfully submitted,

By: */s/ Jeffrey Marcus*

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Ave.
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

By: */s/ Mary Beth Maloney*

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2026, a true and correct copy of the foregoing was served on all counsel or parties of record via the ECF filing system.

By: */s/ Mary Beth Maloney*
Mary Beth Maloney

# EXHIBIT A

GIBSON DUNN

Mary Beth Maloney
Partner
T: +1 212.351.2315
M: +1 310.806.3737
mmaloney@gibsondunn.com

April 14, 2026

VIA E-MAIL

Kimberly E. Blair
Wilson Elser Moskowitz Edelman & Dicker LLP
161 N Clark
Suite 4500
Chicago, IL 60601

Re: Hospital And Ambulatory Surgery Centers Ratings On Leapfroggroup.org

Counsel:

I write on behalf of the Plaintiff Hospitals in *Good Samaritan Medical Center, Inc., et al. v. The Leapfrog Group*, 25-cv-80526 (S.D. Fla.), and their parent company, Tenet Healthcare Corporation, to bring to your attention The Leapfrog Group's noncompliance with the Court's recent injunction and to serve notice that Leapfrog's contemplated "ASC Public Reporting Program"—which would mimic the same deceptive effect of Leapfrog's so-called "Safety Grades"—may result in additional liability under federal and state consumer-protection laws.

## I. The Federal District Court Enjoins Leapfrog's Deceptive And Unfair Practices

As you are aware, Judge Middlebrooks recently found that Leapfrog's Hospital Safety Grade methodology "has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety." Op. 2. The Court emphasized that Leapfrog's ratings scheme was "intended to create the false impression that Leapfrog's grades reflect actual performance," when, in fact, Leapfrog itself "acknowledged" that its real "goal [was] punishing nonparticipants as a means of forcing hospitals to cooperate in submitting their Surveys" to Leapfrog. Op. 26. The Court was particularly troubled by Leapfrog's attempts to "pressure and penalize hospitals" into handing over their "private data," even though Leapfrog "does not have a right" to such data, and likewise has no "right to punish [hospitals]" through reputational damage when hospitals refuse to surrender their data to Leapfrog for commercial purposes. Op. 39. The Court thus determined that Leapfrog's practices violate the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Op. 3, and entered a comprehensive injunction that, among other things, prohibits Leapfrog from "scor[ing] nonparticipating hospitals differently than participating hospitals by using different values or using differently weighted values," and specifically prohibits Leapfrog "from taking any action to circumvent" the injunction. Op. 40–41. The Court subsequently entered a declaratory judgment making clear that the assignment of "failing safety scores in the absence of actual data [is] deceptive and unfair under FDUTPA." Judgment 1.

These orders became operative upon entry, *see* Fed. R. Civ. P. 62(c)(1), and Leapfrog has not sought a stay. To the contrary, Leapfrog CEO Leah Binder has publicly represented that "of course" Leapfrog "will comply" with the injunction during the pendency of Leapfrog's contemplated appeal.[1]

## II. Leapfrog Violates The Court's Injunction On Leapfroggroup.org

On one of Leapfrog's websites, leapfroggroup.org, Leapfrog currently lists the "2025 Survey Results" for facilities within a 50-mile radius of Palm Beach, Florida. Several of the Plaintiff Hospitals and their affiliated institutions—Good Samaritan Medical Center, St. Mary's Medical Center, Palm Beach Children's Hospital at St. Mary's Medical Center, Palm Beach Gardens Medical Center, and Delray Medical Center—are so listed.[2] Despite the operative effect of the Court's orders and Leapfrog's public representations of compliance, Leapfrog continues to deliberately manipulate how it presents those institutions' lack of a Survey response.

At the top of the page, Leapfrog prominently places a red "hazard" symbol with an exclamation point and a warning that facilities that "declined to respond" to the Survey have deprived patients of "critical, life-saving information." The entries for nonparticipating hospitals carry a red "Declined to Respond" label—in stark contrast to the parallel green "View Hospital Ratings" label affixed to entries for participating hospitals. A Leapfrog pop-up linked to the "Declined to Respond" label recommends users "[a]sk [nonparticipating hospitals] why" they did not report to Leapfrog, implying a nefarious and unjustified lack of transparency on the hospital's part. If consumers click that link, they are taken to a boilerplate letter prepared by Leapfrog for submission to hospitals suggesting that patients have reason to doubt a hospital's "record on quality and safety" when hospitals "decline[ ] to participate" in Leapfrog's Survey.

---

[1] *See* The Leapfrog Group, *Statement from Leapfrog President and CEO Leah Binder on the Tenet Healthcare Lawsuit Decision*, YouTube at 2:09 (Mar. 9, 2026), https://www.youtube.com/watch?v=8SnSKozVlc4; The Leapfrog Group, *Statement from Leapfrog President and CEO Leah Binder on the Tenet Healthcare Lawsuit Decision* (Mar. 8, 2026), https://www.leapfroggroup.org/news-events/statement-leapfrog-president-and-ceo-leah-binder-tenet-healthcare-lawsuit-decision; *see also* Letter for Mary Beth Maloney, Counsel for Tenet, from Kimberly Blair, Counsel for Leapfrog at 1 (Mar. 31, 2026) ("Leapfrog has also taken steps to comply with the other elements of the court's order. Leapfrog has no intention of failing to comply with the Court's order now or in the future.").

[2] *See* The Leapfrog Group, *Leapfrog Ratings*, https://ratings.leapfroggroup.org/search/results?distance=50&address=Palm+Beach%2C+FL%2C+USA&coords=26.7056206%2C-80.0364297&by=distance&sort=distance&showdeclined=1 (search results for Palm Beach, FL).







This two-track depiction of participating and non-participating hospitals is clearly designed to leave consumers with the net impression that non-participating hospitals (with red warnings and fear mongering pop-ups) are less safe than participating hospitals. This practice "scores nonparticipating hospitals differently than participating hospitals by using different values or using differently weighted values." Op. 40 (injunction text). This differential treatment has the apparent purpose and obvious effect of tending to "coerce participation through reputational penalty," Op. 23, pressuring hospitals to surrender data to which Leapfrog "does not have a right," *id.* at 39. And

it is the very sort of conduct that Judge Middlebrooks recently held to constitute a core FDUTPA violation and which the injunction was meant to stop.

Leapfrog therefore is non-compliant with the plain terms of the Court's injunction, including its express directive that Leapfrog shall not engage in "*any* action to circumvent the relief" provided therein. Op. 41 (emphasis added).

Accordingly, the Plaintiff Hospitals demand that Leapfrog remove them from the relevant "Survey Results" webpages on leapfroggroup.org and identify the date on which their entries were removed. If Leapfrog refuses to do so, the Plaintiff Hospitals are prepared to pursue appropriate enforcement measures under Federal Rule of Civil Procedure 65 and other applicable law.

Tenet further demands that Leapfrog take similar action with respect to all Tenet-owned hospitals described in Appendix A and identify the date on which it did so. The Court's ruling leaves Leapfrog with no justifiable basis to continue drawing adverse inferences and inflicting reputational penalties due to the lack of a Survey response for any non-participating Tenet-owned hospital, given that the logic of the Court's order, as Leapfrog has recognized, applies nationally.[3]

## III. Leapfrog Threatens Further Violations With The ASC Public Reporting Program

In addition to perpetuating the unfair and deceptive conduct on leapfroggroup.org that already resulted in liability, Leapfrog now threatens to *expand* the scope of its deception and unfairness through its contemplated "ASC Public Reporting Program" scheduled to launch in late July. Through this initiative, Leapfrog for the first time will rate the "safety and quality" of thousands of ambulatory surgery centers ("ASC"s).[4] Precisely as with its deceptive Safety Grades, Leapfrog intends to draw on a mix of data from the U.S. Centers for Medicare & Medicaid Services and from self-reported (and presumably unaudited) accreditation and survey submissions provided by each ASC facility. Leapfrog will assign a "Not Available" score to any ASC facility that does not submit accreditation information. And it will assign a "Declined to Report" score to any ASC facility that does not provide an ASC survey response—the same score Leapfrog uses for facilities that assertedly "*suppres*[*s*] their data."[5] These scores differ from the "achievement" scores Leapfrog will assign participating ASC facilities.

[3] *See* Letter for Mary Beth Maloney, Counsel for Tenet, from Kimberly Blair, Counsel for Leapfrog at 1 (Mar. 31, 2026) ("Although the court ruling only applied to five hospitals, Leapfrog does not apply programmatic changes to individual hospitals because the Hospital Safety Grade is a national program.").

[4] *See* The Leapfrog Group, *New ASC Public Reporting Program*, https://www.leapfroggroup.org/asc-program/new-asc-public-reporting-program.

[5] *See* The Leapfrog Group, The Leapfrog ASC Public Reporting Program Scoring Algorithms: Scoring Details for the 2026 Leapfrog ASC Public Reporting Program at 5, https://www.leapfroggroup.org/sites/default/files/Files/2026ASCPublicReportingProgramScoringAlgorithm_202604012026_v2.0.pdf (emphasis added).

Leapfrog's suggestion that non-participating ASCs must be actively working to "suppress" negative information is a rerun of Leapfrog's discredited theory of "non-response bias." Op. 28. Judge Middlebrooks rejected this theory, deeming the same negative inference when applied in the context of Leapfrog's Hospital Safety Grades to lack any "persuasive evidence." *Id.* Accordingly, Leapfrog's contemplated "reputational penalty" for ASCs—which appears similarly designed to "coerce participation"—would be unlawful under FDUTPA and any other state or federal consumer-protection laws that employ the same standards for deception and unfairness. Op. 23.

Accordingly, Tenet demands that Leapfrog agree that it will not rate or otherwise score any Tenet-owned ASC facility under a methodology that penalizes non-participation, reweights missing information in a punitive manner, or otherwise replicates the conduct that Judge Middlebrooks found deceptive and unfair as applied to hospitals. Please confirm in writing that Leapfrog will not rate or otherwise score any Tenet-owned ASC facility in this manner.

* * *

We respectfully request that you respond to this letter within five business days. The Plaintiff Hospitals and Tenet reserve all rights, including the right to pursue additional relief based on Leapfrog's response or failure to respond. Please preserve all documents, communications, website records, data feeds, internal approvals, and third-party instructions relating to Leapfrog's ratings on leapfroggroup.org and its ASC Public Reporting Program initiative.

Sincerely,

GIBSON, DUNN & CRUTCHER LLP

Mary Beth Maloney
Partner

Encl.

# Appendix A

| Hospital Name | Hospital Address |
|---|---|
| Abrazo Arizona Heart Hospital | 1930 E Thomas Road<br>Phoenix, AZ 85016 |
| Abrazo Arrowhead Campus | 18701 N 67th Avenue<br>Glendale, AZ 85308 |
| Abrazo Central Campus | 2000 W Bethany Home Road<br>Phoenix, AZ 85015 |
| Abrazo Scottsdale Campus | 3929 E Bell Road<br>Phoenix, AZ 85032 |
| Abrazo West Campus | 13677 W McDowell Road<br>Goodyear, AZ 85395 |
| Arizona Specialty Hospital | 750 N 40th Street<br>Phoenix, AZ 85008 |
| Arizona Spine & Joint Hospital | 4620 E Baseline Road<br>Mesa, AZ 85206 |
| Baptist Medical Center | 111 Dallas Street<br>San Antonio, TX 78205 |
| Baylor Scott & White Medical Center - Frisco | 5601 Warren Parkway<br>Frisco, TX 75034 |
| Baylor Scott & White Medical Center - Sunnyvale | 231 S Collins Road<br>Sunnyvale, TX 75182 |
| Baylor Scott & White Medical Center - Trophy Club | 2850 E Highway 114<br>Trophy Club, TX 76262 |
| Baylor Scott & White Medical Center - Uptown | 2727 E Lemmon Avenue<br>Dallas, TX 75204 |
| Baylor Scott & White Orthopedic and Spine Hospital - Arlington | 707 Highlander Boulevard<br>Arlington, TX 76015 |
| Baylor Scott & White Surgical Hospital - Fort Worth | 1800 Park Place Avenue<br>Fort Worth, TX 76110 |
| Baylor Scott & White Surgical Hospital - Sherman | 3601 N Calais Street<br>Sherman, Texas 75090 |
| Baylor Scott & White Texas Spine and Joint Hospital | 1814 Roseland Boulevard<br>#100<br>Tyler, TX 75701 |
| Baylor Surgical Hospital at Las Colinas | 400 W I-635<br>Suite 101b<br>Irving, TX 75063 |
| Children's Hospital of Michigan - Main Campus | 3901 Beaubien Boulevard<br>Detroit, MI 48201 |
| Desert Regional Medical Center | 1150 N Indian Canyon Drive<br>Palm Springs, CA 92262 |
| DMC Detroit Receiving Hospital | 4201 Saint Antoine Street<br>Detroit, MI 48201 |

| Hospital Name | Hospital Address |
|---|---|
| DMC Harper University Hospital | 3990 John R Street<br>Detroit, MI 48201 |
| DMC Huron Valley-Sinai Hospital | 1 William Carls Drive<br>Commerce Charter Township, MI 48382 |
| DMC Hutzel Women's Hospital | 3990 John R Street<br>Detroit, MI 48201 |
| DMC Rehabilitation Institute of Michigan | 261 Mack Boulevard<br>Detroit, MI 48201 |
| DMC Sinai-Grace Hospital | 6071 W Outer Drive<br>Detroit, MI 48235 |
| Doctors Hospital of Manteca | 1205 E North Street<br>Manteca, CA 95336 |
| Doctors Medical Center of Modesto | 1441 Florida Avenue<br>Modesto, CA 95350 |
| Dunes Surgical Hospital | 600 N Sioux Point Road<br>Dakota Dunes, SD 57049 |
| Emanuel Medical Center | 825 Delbon Avenue<br>Turlock, CA 95382 |
| Florida Coastal Medical Center | 310 SE Veranda Falls Way<br>Port Street Lucie, FL 34984 |
| Foundation Surgical Hospital of San Antonio | 9522 Huebner Road<br>San Antonio, TX 78240 |
| Framingham Union Hospital | 115 Lincoln Street<br>Framingham, MA 01702 |
| Fresno Surgical Hospital | 6125 N Fresno Street<br>Fresno, CA 93710 |
| Hi-Desert Medical Center | 6601 White Feather Road<br>Joshua Tree, CA 92252 |
| Holy Cross Hospital | 1171 W Target Range Road<br>Nogales, AZ 85621 |
| HPI - Community Hospital North | 9800 Broadway Extension<br>Oklahoma City, OK 73114 |
| HPI - Community Hospital South | 3100 SW 89th Street<br>Oklahoma City, OK 73159 |
| HPI - Northwest Surgical Hospital | 9204 N May Avenue<br>Oklahoma City, OK 73120 |
| JFK Memorial Hospital | 47111 Monroe Street<br>Indio, CA 92201 |
| Leonard Morse Hospital | 67 Union Street<br>Natick, MA 01760 |
| Memorial Hermann Surgical Hospital First Colony | 16906 SW Freeway<br>Sugar Land, TX 77479 |
| Memorial Hermann Surgical Hospital Kingwood | 300 Kingwood Medical Drive<br>Kingwood, TX 77339 |

| Hospital Name | Hospital Address |
|---|---|
| Mission Trail Baptist Hospital | 3333 Research Plaza<br>San Antonio, TX 78235 |
| Nacogdoches Medical Center | 4920 NE Stallings Drive<br>Nacogdoches, TX 75965 |
| North Central Baptist Hospital | 520 Madison Oak Drive<br>San Antonio, TX 78258 |
| North Central Surgical Center | 9301 N Central Expressway<br>Suite 100<br>Dallas, TX 75231 |
| Northeast Baptist Hospital | 8811 Village Drive<br>San Antonio, TX 78217 |
| Oklahoma Center for Orthopedic & Multi-Specialty Surgery | 8100 S Walker Avenue<br>Bldg. C<br>Oklahoma City, OK 73139 |
| Palm Beach Children's Hospital | 901 45th Street<br>West Palm Beach, FL 33407 |
| Piedmont Medical Center | 222 S Herlong Avenue<br>Rock Hill, SC 29732 |
| Piedmont Medical Center – Fort Mill | 1000 Wellness Way<br>Fort Mill, SC 29715 |
| Resolute Baptist Hospital | 555 Creekside Crossing<br>New Braunfels, TX 78130 |
| Saint Francis Hospital - Bartlett | 2986 Kate Bond Road<br>Bartlett, TN 38133 |
| Saint Francis Hospital - Memphis | 5959 Park Avenue<br>Memphis, TN 38119 |
| Saint Joseph's Hospital | 350 N Wilmot Road<br>Tucson, AZ 85711 |
| Saint Luke's Baptist Hospital | 7930 Floyd Curl Drive<br>San Antonio, TX 78229 |
| Saint Mary's Hospital | 1601 W Saint Mary's Road<br>Tucson, AZ 85745 |
| Saint Thomas Hospital for Specialty Surgery | 2011 Murphy Avenue<br>Suite 400<br>Nashville, TN 37203 |
| Saint Vincent Hospital | 123 Summer Street<br>Worcester, MA 01608 |
| San Ramon Regional Medical Center | 6001 Norris Canyon Road<br>San Ramon, CA 94583 |
| South Texas Specialty Hospital | 5330 N Loop 1604 W<br>San Antonio, TX 78249 |
| Surgical Institute of Reading | 2752 Century Boulevard<br>Wyomissing, PA 19610 |
| The Hospitals of Providence - East Campus | 3280 Joe Battle Boulevard<br>El Paso, TX 79938 |

| Hospital Name | Hospital Address |
|---|---|
| The Hospitals of Providence - Memorial Campus | 2001 N Oregon Street<br>El Paso, TX 79902 |
| The Hospitals of Providence - Sierra Campus | 1625 Medical Center Drive<br>El Paso, TX 79902 |
| The Hospitals of Providence - Transmountain Campus | 2000 Transmountain Road<br>El Paso, TX 79911 |
| TOPS Surgical Specialty Hospital | 17080 Red Oak Drive<br>Houston, TX 77090 |
| Valley Baptist Medical Center - Brownsville | 1040 W Jefferson Street<br>Brownsville, TX 78520 |
| Valley Baptist Medical Center - Harlingen | 2101 Pease Street<br>Harlingen, TX 78550 |
| Westover Hills Baptist Hospital | 3011 W Loop 1604 N<br>San Antonio, TX 78251 |

# EXHIBIT B

April 24, 2026

**VIA E-MAIL**
Mary Beth Maloney
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
mmaloney@gibsondunn.com

Re: Hospital And Ambulatory Surgery Centers Ratings On Leapfroggroup.org

Counsel:

I write on behalf of my client, Defendant The Leapfrog Group, in response to Plaintiffs' and Tenet Healthcare Corporation's April 14, 2026 letter concerning the Court's injunction in *Good Samaritan Medical Center, Inc. et al. v. The Leapfrog Group*, No. 25-cv-80526 (S.D. Fla.). The claims in the letter are worse than meritless—they reveal a litigation strategy that is designed to censor and muzzle reporting on matters of public concern. To the extent the injunction could be (mis)read as the letter suggests, it would follow inexorably that the injunction is unconstitutional.

## I. Plaintiffs May Not Wield The Court's Injunction And The Threat Of Contempt To Chill Leapfrog's Constitutionally Protected Expression Beyond What The Court Enjoined

For anyone familiar with the First Amendment, Plaintiffs' April 14 letter bids to impose a prior restraint against free expression. Although Plaintiffs style that letter as a demand that Leapfrog comply with the Court's injunction, Leapfrog's full compliance with the injunction has been documented and should be beyond doubt. *See* Decl. of L. Binder (Dkt. 215). Nevertheless, Plaintiffs' letter somehow demands, wielding the threat of contempt, that Leapfrog self-censor or discontinue its protected expression on matters of core public concern that the injunction does not cover. In particular, the letter contends that Leapfrog cannot so much as report the basic, irrefutable fact that Plaintiffs declined to respond to Leapfrog's Hospital Safety Survey. Nor, according to the letter, can Leapfrog initiate an entirely new safety reporting program for

ambulatory surgical centers (ASCs) that the Court has yet to consider, much less adjudicate. Many of the specific messages that Plaintiffs seek to suppress amount to accurate reporting of incontestable facts. Others constitute expert opinions, including ones that encourage patients to pursue their own protected expression by seeking information critical to their safety. By any fair account, every one of the messages identified in Plaintiffs' April 14 letter falls within the heartland of the First Amendment's generous protection.

The federal courts are not properly enlisted as instruments for chilling and punishing protected expression. The injunction says what it says about specific aspects of Leapfrog's reporting that have been challenged and adjudicated, and the injunction is being followed by Leapfrog, as the docket and Leapfrog's attestation reflect. But Plaintiffs' letter ventures far beyond the injunction in seeking to suppress *different* practices, to restrain speech *before* it occurs, and to paint as *contemptuous* straightforward reporting of *facts*. By Plaintiffs' latest account, Leapfrog cannot communicate about these hospitals or their decision not to participate in Leapfrog's safety survey. Such intimidation tactics are out of place and downright dangerous—both to patients and also to "the inalienable right of every individual to decide for himself 'how best to speak.'" *Chiles v. Salazar*, 607 U.S. ----, 146 S. Ct. 1010, 1021 (2026) (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 791 (1988)). No such suppression campaign will deter Leapfrog from maintaining its commitment to transparency and patient safety, even as it complies with the specific dictates of the injunction. Please know that Leapfrog will vigorously oppose any such attempt by Plaintiffs to embroil the Court in the unconstitutional enterprise of superintending speech of urgent public concern that has not been enjoined and could never lawfully be enjoined. Although the speech that Plaintiffs attempt to silence in their April 14 letter is not even arguably within the scope of the injunction, the very fact that Plaintiffs are leveraging the injunction to threaten contempt proceedings is telling—and disturbing. Indeed, if Plaintiffs sincerely read the injunction so sweepingly, then they would surely recognize that it is anathema to the First Amendment—particularly to freedom of speech and of the press as long celebrated in the United States.

## II. Leapfrog's Depiction Of Non-Participating Hospitals On Its Website Is Both Fully Compliant With The Court's Injunction And Constitutionally Protected In Its Own Right

To begin, Plaintiffs' faulting of Leapfrog's survey website, leapfroggroup.org, misapprehends both the Court's order and the factual record. What the injunction addressed was Leapfrog's assignment of imputed Safety *Grades* to non-participating hospitals under a numerical valuation methodology that ostensibly disfavored non-participation. The injunction did not, and could not, prohibit Leapfrog from truthfully informing the public that certain hospitals, like Plaintiffs, declined to respond to its voluntary survey, or from opining that such nonparticipation endangers patient safety. Nor did the Court enter an injunction applying to dozens of non-party hospitals.

Simply reading the Court's injunction order refutes Plaintiffs' account of it. The order's five enumerated commands each concern the assignment, publication, and licensing of Safety Grades derived from Leapfrog's challenged imputation methodology. Nothing in the order purports to restrict Leapfrog's separate survey website, leapfroggroup.org, which does not assign or display Safety Grades at all. As Leapfrog's representative stated under oath in a compliance declaration filed with the Court, leapfroggroup.org "does not house or display Safety Grades," and the injunction does not prohibit Leapfrog "from providing consumers with important, truthful information to the effect that non-participating hospitals in fact have not participated in its Survey." Decl. of L. Binder (Dkt. 215) ¶¶ 46–47. The inapplicability of the injunction is doubly apparent as to Leapfrog's speech about dozens of *non-party* "Tenet-owned hospitals," none of which is covered by the injunction. Pls.' Apr. 14, 2026 Ltr. at 4. Only by stretching the Court's order well beyond its express terms can Plaintiffs contend that leapfroggroup.org violates the injunction when it identifies hospitals that declined to respond and invites patients to ask those hospitals why. By no plausible reading does the Court's order impose such a sweeping, prior restraint on Leapfrog's speech about survey participation.

Nor would the First Amendment abide such an injunction, amounting to a classic prior restraint against accurate reporting of facts and expression of protected opinions on matters of intense public concern. There is no serious dispute that a nonprofit organization's truthful statements about whether a hospital responded to a voluntary public-transparency survey are constitutionally protected. Equally protected are opinions to the effect that hospitals *should* respond to that survey—and that failing to do so "deprive[s] patients of 'critical, life-saving information.'" Pls.' Apr. 14, 2026 Ltr. at 2. The Court itself recognized as much, acknowledging Leapfrog's role as a "watchdog organization" that legitimately serves as "a voice for transparency." Op. (Dkt. 212) at 39. If Plaintiffs truly believe that they have won an injunction against whatever they cast as "fear mongering" or "implying a nefarious and unjustified lack of transparency on the hospitals' part" or "pressuring hospitals" to provide safety data to Leapfrog by criticizing them for failing to do so, Pls.' Apr. 14, 2026 Ltr. at 2-3, then Plaintiffs should be confessing error, conceding that the injunction violates the First Amendment, and stipulating to vacatur as constitutionally imperative.

It is conspicuous, however, that Plaintiffs fail to point to any actual provision of the injunction that Defendants allegedly violated. Instead, they offer only a vague reference to the Court's order not to take "action to circumvent" the injunction. Pls.' Apr. 14, 2026 Ltr. at 4. But that suggests Plaintiffs now take the anti-circumvention provision as a charter to fault, censor, and muzzle any aspect of Leapfrog's reporting that may displease them, just by analogizing it to a distinct methodological practice actually adjudicated. That would transform the injunction from a targeted judicial scalpel into a roving, menacing hatchet—with freedom of speech the obvious casualty. Indeed, by demanding that Leapfrog scrub all references to non-participation from its survey website, Plaintiffs would command that Leapfrog misrepresent the factual landscape of hospital survey participation to the public; the upshot is the opposite of the transparency that Leapfrog is sworn to promote, as the Court recognized. When the Court enjoined Leapfrog from

using an imputed-value methodology, it did not require Leapfrog to equate non-participation with participation, contrary to the facts, nor did it suppress truthful information such that interested patients and purchasers must now be left in the dark.

In short, Leapfrog is in full compliance with the Court's order and will not allow Plaintiffs to censor Leapfrog's public expression or to substitute opacity for transparency.

## III. Leapfrog's Anticipated Reporting System For Ambulatory Surgical Centers Is Entirely Lawful, Constitutionally Protected, And Distinct From The Statements That Judge Middlebrooks Addressed

Plaintiffs' second demand concerning Leapfrog's anticipated Ambulatory Surgical Center (ASC) public reporting program is even farther afield. Plaintiffs contend that the new program is "[p]recisely [like]" Leapfrog's Safety Grades and demand that "Leapfrog agree that it will not rate or otherwise score any Tenet-owned ASC facility." Pls.' Apr. 14, 2026 Ltr. at 4–5. That contention is wrong at every step. The forthcoming ASC public reporting program has nothing to do with the injunction or with the trial that preceded it. Beyond that, the anticipated ASC public reporting program is constitutionally protected and legally unassailable.

Notably, Plaintiffs do not even attempt to argue that the Court's injunction applies to the ASC public reporting program. Nor could they. The injunction orders Leapfrog to "cease assigning a Safety Grade *to the Community Hospitals*;" without saying anything about ASCs. Op. (Dkt. 212) at 40–41 (emphasis added). The only plaintiffs before the Court were the five hospitals—not ASCs, "Tenet-owned" or otherwise. And the new program, which was not unveiled until April 1, 2026, was not the subject of any evidence at trial or any of the Court's analysis. Plaintiffs cannot secure additional, unwarranted relief by smuggling a demand about ASCs into a letter purportedly addressing compliance with the existing injunction. *See Trump v. CASA, Inc.*, 606 U.S. 831, 843–44 (2025) (explaining that courts have "consistently rebuffed requests for relief that extended beyond the parties").

What is more, Leapfrog's new ASC public reporting program differs in crucial respects from the aspects of Leapfrog's hospital scoring program addressed by the Court. The Court's order focused on Leapfrog's assignment of "assumed or imputed" numerical values to non-participating hospitals where the Court found Leapfrog "suggest[ed] to a reasonable consumer that the grades assigned reflect actual performance[,]" not "nonparticipation." *See* Op. (Dkt. 212) at 6–7, 24–26, 40–41. In contrast, the new ASC public reporting program will *not* impute numerical values to nonparticipation. Instead, the new program will identify ASCs that "Declined to Report" with the below symbol displaying those exact words:



**Progress towards meeting Leapfrog standards:**

| | |
|---|---|
| | Achieved the Standard |
| | Considerable Achievement |
| | Some Achievement |
| | Limited Achievement |
| DECLINED TO REPORT | Did not submit a Leapfrog Survey, did not report to CMS, or suppressed their CMS data |
| DOES NOT APPLY | This measure is not applicable to this facility |
| DID NOT MEASURE | Facility reported not collecting data on this measure |
| UNABLE TO CALCULATE | Sample size too small to calculate score |
| NOT AVAILABLE | CMS measure or surgery center accreditation status is not available for the reported facility |
| PENDING LEAPFROG VERIFICATION | This facility's responses are undergoing Leapfrog's standard data verification process |

The Leapfrog Group, The Leapfrog ASC Public Reporting Program Scoring Algorithms: Scoring Details for the 2026 Leapfrog ASC Public Reporting Program, https://www.leapfroggroup.org/sites/default/files/Files/2026ASCPublicReportingProgramScoringAlgorithm_202604012026_v2.0.pdf.

Those words, on their face, are undeniably true as applied to ASCs that decline to report. For the avoidance of doubt, Leapfrog's website transparently defines the term, explaining that the "Declined to Report" label encompasses ASCs that "[d]id not submit a Leapfrog Survey, did not report to [the Centers for Medicare and Medicaid Services (CMS)], *or* suppressed their CMS data." *Id.* There is no denying that non-reporting ASCs truthfully fall within the express ambit of this fully disclosed definition. Nevertheless, Plaintiffs claim that Leapfrog is "suggest[ing] that non-participating ASCs must be actively working to 'suppress' negative information." Pls.' Apr. 14, 2026 Ltr. at 5. But Leapfrog's disjunctive definition expressly refutes any such misconception.

Indeed, that definition reflects the same widely recognized framework for describing survey participation used by the Centers for Medicare and Medicaid Services (CMS).[1] Nothing about that straightforward (and truthful) definition "suggest[s]" the negative inference Plaintiffs are out to impute. Whatever gloss Plaintiffs may try to put on it, however, any such evaluative statement would be within Leapfrog's editorial prerogatives—prerogatives that are squarely protected by the First Amendment and beyond the scope of the Court's injunction.

***

In sum, Leapfrog respectfully declines to comply with the demands of Plaintiffs' April 14 letter, which jarringly depart from the injunction, with which Leapfrog has complied. If any dispute persists on these points, Leapfrog will be taking its cues from the Court; it will not succumb to censorship or surrender its constitutional right to speak freely unless and until a clear and definite order of the Court may so require. In the wake of Plaintiffs' threats, Leapfrog is reserving all of its rights, including to seek reconsideration or clarification of the injunction now that Plaintiffs have telegraphed their intention to wield it as a chilling, censorial device.

Very truly yours,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Derek L. Shaffer*

Derek L. Shaffer

DLS

cc: Jason D. Sternberg; Kimberly E. Blair

[1] Like Leapfrog, CMS "provide[s] information on the quality-of-care hospitals are providing to their patients" on "consumer-oriented website[s]" like Care Compare. Ctrs. for Medicare & Medicaid Services, System Requirements Specification, Hospital Downloadable Database Data Dictionary, Appendix E—Footnote Crosswalk at 97 (Dec. 16, 2025), https://data.cms.gov/provider-data/dataset/4jcv-atw7-data-dictionary. CMS maintains a "Data Dictionary" to define terms and footnotes it ascribes to certain hospitals on which it publicly reports. *Id.* The agency applies "footnote 5" when data for a hospital "are not available for [a] reporting period." *Id.* Appendix E—Footnote Crosswalk, at 97. And the agency defines "footnote 5" to reflect "[w]hen a facility elect[s] not to submit data for the entire reporting period; or [w]hen a facility ha[s] no claims data for a particular measure; or [w]hen a facility elect[s] to *suppress a measure from being publicly reported*." *Id.* (emphasis added).

# EXHIBIT C

GIBSON DUNN

Mary Beth Maloney
Partner
T: +1 212.351.2315
M: +1 310.806.3737
mmaloney@gibsondunn.com

April 30, 2026

VIA E-MAIL

Derek L. Shaffer
Quinn Emanuel Urquhart & Sullivan, LLP
555 13th Street N.W.
Suite 600
Washington, D.C. 20004

Re: Hospital And Ambulatory Surgery Centers Ratings On Leapfroggroup.org

Counsel:

I write on behalf of the Plaintiff Hospitals in *Good Samaritan Medical Center, Inc., et al. v. The Leapfrog Group*, 25-cv-80526 (S.D. Fla.), and their parent company, Tenet Healthcare Corporation, in response to your letter of April 24, 2026. Your response fails to deal with the actual problems with Leapfrog's ongoing behavior that continues to harm the Community Hospitals and with the decision that Judge Middlebrooks actually rendered, as explained in my previous letter.

In stratospheric rhetoric, your letter asserts that the Community Hospitals seek to "fault, censor, and muzzle" Leapfrog's "straightforward reporting of *facts*." You suggest that the Community Hospitals believe Leapfrog "cannot so much as report the basic, irrefutable fact that Plaintiffs declined to respond to Leapfrog's Hospital Safety Survey," may not make "truthful statements about whether a hospital responded to a voluntary public-transparency survey," and may not "truthfully infor[m] the public that certain hospitals … declined to respond to [Leapfrog's] voluntary survey." You similarly claim that the Community Hospitals seek to "suppress truthful information" and "accurate reporting of incontestable facts." And you suggest that the Community Hospitals thereby seek to make "freedom of speech" a "casualty."

That caricature of the Community Hospitals' April 14 letter bears no resemblance to its actual content. That letter never asserts that Leapfrog cannot truthfully state a hospital did not respond to Leapfrog's Survey. Instead, the letter identifies targeted conduct that renders Leapfrog's depiction of nonparticipating hospitals highly misleading in context—red hazard symbols, exclamation points, warnings, and suggestions that patients should question non-participating hospitals' "record on quality and safety" simply because of their nonparticipation; admonitions juxtaposed with inviting green labels and no similar disclaimers for participating hospitals. That is not accurate recitation of the fact of nonparticipation. It is a calculated strategy to sow doubt in the minds of patients about nonparticipating hospitals simply because they do not acquiesce to Leapfrog's commercially driven Survey. These attempts "to pressure and penalize hospitals into participating" were the "precis[e]" problem identified in Judge Middlebrooks's order. *See* Op. 39.

And it is beyond doubt that, following "a judicial determination that the defendant['s] past conduct was … unlawful," the Court may restrain the defendant from continuing that same unlawful conduct. *Lucero v. Trosch*, 121 F.3d 591, 600–01 (11th Cir. 1997) (rejecting prior-restraint argument). Tellingly, your letter does not address any of this. That omission speaks far more loudly than its pages of overwrought assault on a strawman of Leapfrog's own creation.

Your treatment of Leapfrog's forthcoming Ambulatory Surgical Center ("ASC") program rests on similar diversion. You contend that when Leapfrog claims nonparticipating facilities have "suppressed their CMS data," Leapfrog is merely acting as a faithful purveyor of CMS's own grading methodology. But CMS itself specifically *permits* hospitals to withhold such data when, for example, "external factors" (like the COVID pandemic) degrade health outcomes "not due to the care provided." *Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals*, 86 Fed. Reg. 44,774, 45,301 (Aug. 13, 2021). Indeed, CMS recognizes that "quality measurement" can be "distorted" if such measures are *not* withheld, and that hospitals should not be "penalize[d] … for performance on measures" outside of their control. *Id.*

Leapfrog's proposed ASC standards provide none of this context—presumably because of Leapfrog's long-expressed ideological disagreement with how CMS administers its own reporting standards. *See, e.g.*, Ron Southwick, *Patient Groups Oppose CMS Plan To Suppress Reporting on Some Safety Measures*, Chief Healthcare Executive (June 8, 2022), https://tinyurl.com/56zc9rcx (statement of Leapfrog CEO Leah Binder objecting to CMS's practice). Leapfrog instead apparently plans to baldly claim that ASCs "suppressed their CMS data"—falsely implying an intent to cover up poor practices—and then leave patients to wonder whether that aspect of "Leapfrog's disjunctive definition" covers the ASC in question. That is far from a "straightforward (and truthful)" approach.

Your letter regrettably betrays Leapfrog's apparent intent to continue disparaging nonparticipating hospitals in its forthcoming Safety Grade methodology. The Community Hospitals will continue to carefully monitor those developments (as well as with respect to leapfroggroup.org and the ASC program) and pursue enforcement as appropriate.

Sincerely,

GIBSON, DUNN & CRUTCHER LLP

Mary Beth Maloney
Partner

cc: Jason D. Sternberg
Kimberly E. Blair

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-CV-80526-MIDDLEBROOKS**

**GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC. AND WEST BOCA MEDICAL CENTER, INC.,**

**Plaintiffs,**

**v.**

**THE LEAPFROG GROUP,**

**Defendant.**
_______________________________________/

**DEFENDANT THE LEAPFROG GROUP'S MOTION FOR RECONSIDERATION AND TO ALTER OR AMEND THE JUDGMENT, OR FOR NEW TRIAL**

# TABLE OF CONTENTS

Page

INTRODUCTION .....1

BACKGROUND .....3

A. The Court's Motion To Dismiss Order Recognizes First Amendment Limitations On Plaintiffs' FDUTPA Claims .....3

B. The Court Enjoins Leapfrog From Publishing Safety Grades For Plaintiffs Using The Assignment Methodology And Compels Leapfrog To Publish "Corrective Disclosures" .....4

C. Plaintiffs Invoke The Court's Injunction As A Sweeping, Chilling Prior Restraint On Core Protected Speech .....6

LEGAL STANDARD .....7

ARGUMENT .....7

I. THE COURT SHOULD WITHDRAW THE INJUNCTION BECAUSE THE FIRST AMENDMENT PROTECTS LEAPFROG'S SAFETY GRADES AND THEIR UNDERLYING METHODOLOGY .....7

A. Leapfrog's Safety Grades And Their Fully Disclosed Underlying Methodology Are Protected Pure Opinion .....8

B. Even If Leapfrog's Safety Grades And Their Underlying Methodology Were Not Pure Opinion, They Are Protected Absent A Missing, Unsupported Finding Of Actual Malice .....14

II. THE COURT SHOULD WITHDRAW THE INJUNCTION BECAUSE FDUTPA DOES NOT BAR LEAPFROG'S SAFETY GRADES AND THEIR UNDERLYING METHODOLOGY AS A MATTER OF LAW .....17

III. THE COURT SHOULD WITHDRAW, DISSOLVE, OR NARROW THE INJUNCTION BECAUSE THE INJUNCTION IS AN UNCONSTITUTIONAL PRIOR RESTRAINT AND UNCONSTITUTIONALLY COMPELS SPEECH .....18

A. The Injunction Imposes An Unconstitutional And Overbroad Prior Restraint .....18

B. The Injunction Unconstitutionally Compels Speech .....20

CONCLUSION .....20

LOCAL RULE 7.1(A)(3) CERTIFICATION .....21

# TABLE OF AUTHORITIES

**Page**

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .....20

*Alexander v. United States*,
509 U.S. 544 (1993) .....18

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .....13

*Arthur v. King*,
500 F.3d 1335 (11th Cir. 2007) .....7

*Banister v. Davis*,
590 U.S. 504 (2020) .....7

*Basulto v. Netflix, Inc.*,
2023 WL 7129970 (S.D. Fla. Sept. 20, 2023) .....18

*Berisha v. Lawson*,
973 F.3d 1304 (11th Cir. 2020) .....15

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*,
39 F.3d 191 (8th Cir. 1994) .....11

*Brito v. Salas*,
2025 WL 3765686 (Fla. Dec. 30, 2025) .....17

*Bull Motors L.L.C. v. Brown*,
152 So. 3d 32 (Fla. 3d DCA 2014) .....20

*Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach Cnty., Inc.*,
169 So. 3d 164 (Fla. 4th DCA 2015) .....4

*Carroll v. President & Comm'rs of Princess Anne*,
393 U.S. 175 (1968) .....20

*Chevaldina v. R.K./FL Mgmt., Inc.*
133 So. 3d 1086 (Fla. 3d DCA 2014) .....19

*Chiles v. Salazar*,
607 U.S. ----, 146 S. Ct. 1010 (2026) .....1, 14, 16

*From v. Tallahassee Democrat, Inc.*,
400 So. 2d 52 (Fla. 1st DCA 1981) ....................8, 13

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)....................8, 17

*Hay v. Independent Newspapers, Inc.*,
450 So. 2d 293 (Fla. 2d DCA 1984) ....................12

*Hodge v. Dep't of Housing & Urban Dev., Housing Div., Dade Cnty., Fla.*,
862 F.2d 859 (11th Cir. 1989) ....................7

*Home Performance Alliance v. Better Business Bureau of West Florida*,
354 So. 3d 1165 (Fla. 2d DCA 2023) ....................3, 8, 10

*Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983) ....................15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995)....................20

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018)....................20

*Jenkins v. Anton*,
922 F.3d 1257 (11th Cir. 2019) ....................7

*Krapacs v. Bacchus*,
301 So. 3d 976 (Fla. 4th DCA 2020) ....................19

*Lane v. Random House, Inc.*,
985 F. Supp. 141 (D.D.C. 1995) ....................11

*Lewis v. Abramson*,
673 F. Supp. 3d 72 (D.N.H. 2023)....................13

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994)....................19

*Masson v. New Yorker Magazine*,
501 U.S. 496 (1971)....................11

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)....................20

*Moldea v. New York Times Co.*,
22 F.3d 310 (D.C. Cir. 1994) ....................11

*Near v. State of Minnesota ex rel. Olson*,
283 U.S. 697 (1931)....................18

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976)....................18

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................14, 16

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013)....................13

*Org. for a Better Austin v. Keefe*,
402 U.S. 415 (1971)....................15, 19

*Osterneck v. Ernst & Whitney*,
489 U.S. 169 (1989)....................7

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020)....................14

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995)....................11, 12

*Patriot Lending Servs., Inc. v. Amerifirst Fin. Corp.*,
2020 WL 758155 (M.D. Fla. Feb. 14, 2020)....................19

*Phantom Touring, Inc. v. Affiliated Publications*,
953 F.2d 724 (1st Cir. 1992)....................11, 13

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
842 So. 2d 773 (Fla. 2003)....................17

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018)....................18

*Snyder v. Phelps*,
562 U.S. 443 (2011)....................16, 17

*Town of Lantana v. Pelczynski*,
290 So.2d 566 (Fla. 4th DCA 1974)....................19

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018)....................1, 2, 8, 10, 11, 12, 13

*U.S. Structural Plywood Integrity Coalition v. PFS Corp.*,
524 F. Supp. 3d 1320 (S.D. Fla. 2021)....................9

*United States v. Alvarez*,
567 U.S. 709 (2012) ........ 14

*Vrasic v. Leibel*,
106 So. 3d 485 (Fla. 4th DCA 2013) ........ 19

*Wooley v. Maynard*,
430 U.S. 705 (1977) ........ 20

**<u>Statutes and Rules</u>**

Fed. R. Civ. P. 59 ........ 2

Fed. R. Civ. P. 59(a)(1)(B) ........ 7

Fed. R. Civ. P. 59(e) ........ 7

Fla. Stat. § 501.204(1) ........ 17

Fla. Stat. § 758.295(3) ........ 4

Fla. Stat. § 768.295(1) ........ 4, 17

**<u>Constitutional Provisions</u>**

Florida Constitution ........ 4

U.S. Const., amend. I ........ *passim*

**<u>Other Authorities</u>**

David Lat, *Yale and Harvard Law to U.S. News: Drop Dead, Original Jurisdiction* (Nov. 17, 2022), https://davidlat.substack.com/p/yale-and-harvard-law-to-us-news-drop ........ 10

## INTRODUCTION

As this Court has recognized, Defendant The Leapfrog Group is "a watchdog" nonprofit organization with a "laudable" mission that carries immense public importance—promoting the "safety, quality and affordability of U.S. health care by using transparency to support informed health care decisions" for patients nationwide. (Dkt. 212 at 3, 39.) While performing its work amidst controversy and criticism, Leapfrog relies upon the "First Amendment's jealous protections" of the "right to think and speak freely," just as others reporting on matters of public concern do. *Chiles v. Salazar*, 607 U.S. ----, 146 S. Ct. 1010, 1021 (2026).

Leapfrog now respectfully returns to this Court seeking reconsideration or clarification of the judgment based on considerations that supply compelling grounds for what is, concededly, an exceptional request. Herein, Leapfrog respectfully draws renewed attention to Leapfrog's laudable mission together with the First Amendment's hallowed protections. In addition, Leapfrog respectfully urges the Court to take account of Plaintiffs' post-judgment efforts to anoint themselves as censors who could use the Court's order as a template to warp and silence unfavorable reporting by any healthcare or press organization, even beyond Safety Grades.

In its order denying Leapfrog's motion to dismiss, this Court held that "Defendant's First Amendment defenses" are "inapplicable" to the claims Plaintiffs brought. (Dkt. 41 at 6.) In doing so, however, the Court noted that "[t]he First Amendment protects 'statements that are not readily capable of being proven false' and 'statements of pure opinion.' *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018)." (*Id.* at 5.) It also explained that courts "have recognized that these principles extend to online grading services, which often rely on a subjective weighing of objective data." (*Id.*) Accordingly, the Court ruled that "a claim brought pursuant to the FDUTPA is not *barred* by the First Amendment when it involves a challenge to *false or misleading statements made about the rating process itself*," and it permitted Plaintiffs' action to proceed to the extent "aris[ing] from a challenge to Defendant's *representations about its methodology*." *Id.* at 6 (emphases added). Far from affording Plaintiffs carte blanche and shedding First Amendment constraints, this Court allowed Plaintiffs to proceed down a constitutionally circumscribed path: Plaintiffs' case was necessarily confined to identifying and remedying any *factual misrepresentations* Leapfrog made *about* its methodology. So long as that line remains operative, the judgment cannot stand. Simply comparing the Court's judgment with its ruling denying dismissal establishes that Plaintiffs ventured astray at the trial stage and wound up trespassing on

constitutionally protected terrain. Only by granting reconsideration can this Court restore alignment with the Constitution, and, indeed, with its own prior ruling.

By the time of the Court's injunction order (Dkt. 212), no mention was made of the First Amendment. What is more, the constitutional constraints that the Court had earlier recognized ostensibly fell by the wayside. The Court held Leapfrog liable not just for misrepresentations *about* the grades, but for the grades themselves; it enjoined not only speech pertaining to how Leapfrog's grades are calculated, but also publication of Leapfrog's ultimate, bottom-line safety views themselves. Absent correction, the Court's final judgment would set a worrisome precedent and cast a lasting chill over freedom of speech and of the press for countless speakers nationwide whose missions involve reporting on matters of public concern. Moreover, supervision of the injunction threatens to embroil this Court in the unconstitutional enterprise of censoring wide-ranging, hazily-defined assessments and reports on hospital safety. In these extraordinary circumstances, relief under Rule 59 is more than well warranted—it is constitutionally imperative.

First, the Court's judgment holds Leapfrog liable for protected expression. As the Court previously recognized, the First Amendment's protection of pure opinion "extend[s] to online grading services," like Leapfrog's, that depend on the "subjective weighing" of information. (Dkt. 41 at 5.) Courts have agreed that such ratings are pure opinions, which the First Amendment protects. The same holds for subjective inputs into the grades—like Leapfrog's imputed-value methodology for evaluating certain metrics of hospital safety—none of which is "readily capable of being proven false" (*id.* (quoting *Turner*, 879 F.3d at 1262)), and all of which were indisputably "set forth" on Leapfrog's website and "known or available to the reader or listener as a member of the public," *Turner*, 879 F.3d at 1262. Yet the Court never referenced that constitutional limitation in finding Leapfrog liable for its Safety Grades and for the subjective, fully disclosed imputed-value methodology underlying it. What is more, even assuming that Leapfrog's imputed-value methodology could be deemed provably false, the Court would have had to make a finding of actual malice before imposing liability on this basis.

Second, the contours of the injunction in any event exceed anything the First Amendment could permit. Indeed, the injunction imposes an unconstitutional prior restraint on fully protected expression to the extent the speech could be dubbed "similar"—by opportunistic, self-serving Plaintiffs—to the specific statements that have been adjudicated. Such overbreadth and vagueness violate the First Amendment's historic prohibition on prior restraints, while defying the principle

that such relief cannot extend any further than necessary to remedy the precise speech found to be unlawful. Further still, the injunction compels Leapfrog to profess beliefs antithetical to its own, again in contravention of the First Amendment. Even if liability stands, therefore, the Court should narrow the injunction for the sake of conforming to the First Amendment.

To be clear, the constitutional faults noted herein are not faults of the Court. Plaintiffs veered off the constitutional path they purported to follow, without Leapfrog calling out constitutional excesses with optimal specificity and alacrity. But no one should want to see the Constitution violated, let alone violated at the expense of free expression and the free press. There is still opportunity to set things right. It is especially important and timely to correct course, after Plaintiffs wrote to Leapfrog's counsel threatening to initiate contempt proceedings if Leapfrog does not self-censor or discontinue its protected expression on matters of core public concern that the injunction by its terms does not purport to regulate. (*See* Dkt. 219.) According to Plaintiffs, Leapfrog cannot so much as report the basic, irrefutable fact that Plaintiffs declined to respond to Leapfrog's Hospital Safety Survey—or express the view that hospitals should respond to the survey. Absent the requested relief, this may become a case study in how Florida's law of "unfair trade practices" can be deployed to shut down and penalize candid, incisive public reporting—and how judicial power may be coopted by deep-pocketed, litigious, for-profit corporations so as to bring under heel a nonprofit reviewer whose ratings displease them. For the reasons elaborated below, there is ample warrant for granting reconsideration or, at a minimum, clarification of key aspects of this Court's judgment.

## BACKGROUND

### A. The Court's Motion To Dismiss Order Recognizes First Amendment Limitations On Plaintiffs' FDUTPA Claims

Early in the litigation, Leapfrog moved to dismiss on the ground that its Safety Grades constitute protected opinion under the First Amendment and therefore cannot form the basis of a FDUTPA claim. (Dkt. 39 at 11-16). The Court denied that motion, acknowledging that courts have recognized First Amendment protection for online grading services that rely on subjective weighing of objective data, but holding that a FDUTPA claim is not altogether barred "when it involves a challenge to false or misleading statements made about the rating process itself." (Dkt. 41 at 5-6.) In support, the Court cited *Home Performance Alliance v. Better Business Bureau of West Florida*, 354 So. 3d 1165, 1166 (Fla. 2d DCA 2023) and *Caribbean Cruise Line, Inc. v.*

*Better Business Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 167 (Fla. 4th DCA 2015), both of which drew the same distinction between a challenge to a rating itself, which is protected, and a challenge to false or misleading statements about how a rating is calculated, which potentially may not be. (Dkt. 41 at 5-6.) In concluding this portion of its ruling, the Court stated that "Defendant's First Amendment defenses" were "inapplicable" to Plaintiffs' claims as a matter of law, presumably subject to the Court's stated understanding of how Plaintiffs' claims were and would remain limited. (Dkt. 41 at 6.)

**B. The Court Enjoins Leapfrog From Publishing Safety Grades For Plaintiffs Using The Assignment Methodology And Compels Leapfrog To Publish "Corrective Disclosures"**

Following the ruling on the motion to dismiss, the parties continued to advance competing arguments based on the First Amendment, without further treatment by the Court. Leapfrog moved for summary judgment on the ground that Florida's anti-SLAPP statute prohibits lawsuits targeting a defendant's "exercise[]" of "the constitutional right of free speech in connection with a public issue … as protected by the First Amendment" and the Florida Constitution. (Dkt. 99 at 18 (quoting Fla. Stat. § 758.295(3)).) In opposing summary judgment on that ground, Plaintiffs maintained that this case does not implicate the First Amendment, while recognizing that, to the extent the challenged statements involved matters of public concern, the First Amendment "would require clear evidence that Leapfrog knew its representations were 'false' or 'reckless[ly] disregarded' the risk of falsity"—that is, actual malice. (Dkt. 115 at 19 (citation omitted).) When the Court denied the parties' motions for summary judgment on January 7, 2026, it did not specifically address the parties' First Amendment or anti-SLAPP arguments. (*See* Dkt. 139.)

The parties made similar arguments in their pretrial submissions. Leapfrog again argued that Plaintiffs had sued in violation of the anti-SLAPP statute's prohibition on lawsuits that violate the First Amendment. (Dkt. 135 ¶¶ 383-92.) Plaintiffs, for their part, reiterated their position that the Safety Grades do not "implicat[e] the First Amendment," but also repeated their acknowledgement that, if the First Amendment applied, it would require proof by clear and convincing evidence that Leapfrog published the at-issue grades with actual malice. (Dkt. 136 ¶ 133.) Plaintiffs likewise denied they were seeking a "prior restraint," contending that "[t]here is no constitutional prohibition on restricting future speech already adjudicated to be unlawful." (*Id.* ¶ 134.) Through five days of trial, Leapfrog never wavered from its assertion that its Safety Grades and imputed-value methodology reflected its experts' opinions on hospital safety.

Following a five-day bench trial, the Court on March 6, 2026 issued its findings of fact and conclusions of law, ultimately finding for Plaintiffs and granting injunctive relief in their favor. (Dkt. 212.) The Court determined that Leapfrog had violated FDUTPA by imputing numerical values for certain measures underlying Leapfrog's Safety Grades for hospitals that declined to participate in Leapfrog's annual hospital survey, and it enjoined Leapfrog from "assigning a Safety Grade to [Plaintiffs] under the current methodology or any similar methodology." (*Id.* at 40.) The Court acknowledged that this scoring methodology was available to the public, finding that "[t]he scoring methodology" at issue "can be accessed in two ways," both through Leapfrog's public-facing website. (*Id.* at 13-15.) But the Court nonetheless held Leapfrog liable, reasoning that the methodology was not sufficiently easy to access and that viewers would "likely … assume that the data presented means something more than non-participation before they arrive at the complex assignment methodology." (*Id.* at 26 n.7.) In explaining why and how it was finding Leapfrog liable, the Court did not address the parties' First Amendment or anti-SLAPP arguments.

Upon finding Leapfrog liable, the Court's March 6 order issued an injunction with both prohibitory and mandatory components. First, the Court ordered Leapfrog to "cease assigning a Safety Grade to [Plaintiffs] under the current methodology or any similar methodology that … assigns assumed or imputed values to calculate Safety Grades due to the lack of hospital-provided performance data … or … that otherwise reduces a hospital's Safety Grade due to the failure to provide performance data." (*Id.* at 40-41.) Second, the Court required Leapfrog to "withdraw from its websites and cease promoting the unfair Safety Grades assigned to" Plaintiffs. (*Id.* at 41.) Third, the Court ordered Leapfrog to "send corrective disclosures to all entities that paid to license" the Safety Grades, disclosing "that those Safety Grades were found to be deceptive and unfair in this action." (*Id.*) Fourth, the Court mandated that Leapfrog "place the same corrective disclosures in future contracts, print and electronic advertising materials, and other print and electronic documents that promote paid licensure of the next cycle of Safety Grades" accessible in certain zip codes. (*Id.*) And fifth, the Court ordered Leapfrog to "refrain from taking any action to circumvent" the injunction and retained jurisdiction to enforce the injunction. (*Id.*)

The injunction also required Leapfrog to file a declaration attesting to its compliance with the injunction. (*Id.*) As ordered, Leapfrog on April 24, 2026 filed a declaration by its CEO, Leah Binder. (Dkt. 215.) Ms. Binder attested that Leapfrog took several steps to comply with the injunction, as well as further steps even beyond those required by the Court "out of an abundance

of caution," "to forestall any allegations of noncompliance," and to prevent the unfairness that would result from "simultaneously rating other non-participating hospitals in ways that diverge" from how Leapfrog has been ordered to evaluate the Plaintiff hospitals. (*Id.* ¶¶ 8, 20, 32, 43, 45.)

### C. Plaintiffs Invoke The Court's Injunction As A Sweeping, Chilling Prior Restraint On Core Protected Speech

Following entry of the injunction, Plaintiffs and their parent company, Tenet Healthcare Corporation, on March 20 wrote inquiring as to Leapfrog's intent to comply. After Leapfrog responded on March 31 by providing assurance of its intent to comply with the injunction in all particulars, Plaintiffs wrote again on April 14, this time alleging "noncompliance with the Court's recent injunction" based on aspects of Leapfrog's reporting that are nowhere mentioned by the injunction. (Dkt. 219-1 at 1.) After Leapfrog responded on April 24 by calling out Plaintiffs' overreach (Dkt. 219-2), Plaintiffs responded on April 30 to reiterate their stated views and warn that they will "carefully monitor" developments in purportedly policing compliance with an eye towards operations and practices quite distinct from what has been adjudicated. (Dkt. 219-3.)

In their April 14 letter, Plaintiffs demand that Leapfrog remove certain content from its website leapfroggroup.org, specifically faulting a webpage that flags hospitals that "Declined to Respond" with those words and an accompanying symbol. (Dkt. 219-1 at 2-4.) Plaintiffs also object to a pop-up linked to the words "Declined to Respond" that states, "Thousands of hospitals nationwide report to the Leapfrog Hospital Survey to help patients and purchasers make better health care decisions. This hospital did not participate. Ask them why not." (*Id.* at 3.) The letter claims that Leapfrog violates the injunction by truthfully describing hospitals that declined to respond as having "Declined to Respond" and by inviting the public to join the conversation by asking those hospitals "why not." (*Id.* at 3.) The letter also claims that Leapfrog is violating the injunction by opining that facilities that declined to respond "have deprived patients of 'critical, life-saving information'" because that statement (according to Plaintiffs) constitutes "fear mongering," "impl[ies] a nefarious and unjustified lack of transparency on the hospitals' part," and "pressur[es] hospitals" to provide safety data to Leapfrog by criticizing them for failing to do so. (*Id.* at 2-3.) Although nothing in this Court's injunction order even purports to restrict Leapfrog's expression via leapfroggroup.org, which does not assign or display Safety Grades at all, and although the injunction covers only named Plaintiffs themselves, the letter demands relief as to leapfrouggroup.org and as to "all Tenet-owned hospitals." (*Id.* at 4.) The only specific

provision of the injunction that Plaintiffs cite to support their demand is the prohibition against Leapfrog "circumvent[ing] the relief" elsewhere specified. (*Id.* at 4.)

The letter further demands that "Leapfrog agree that it will not rate or otherwise score any Tenet-owned [Ambulatory Surgical Center (ASC)] facility" as part of Leapfrog's anticipated ASC public reporting program. (*Id.* at 5.) Of course, the Court's injunction order did not discuss ASCs because the only plaintiffs before the Court were the five hospitals. Nor could the Court have been adjudicating the new program considering that it was not unveiled until April 1, 2026—*after* the Court had adjudicated the issues before it and entered its injunction order.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) authorizes motions to alter or amend a judgment within 28 days of the judgment when a party seeks "reconsideration of matters properly encompassed in a decision on the merits." *Osterneck v. Ernst & Whitney*, 489 U.S. 169, 174 (1989). "The Rule gives a district court the chance 'to rectify its own mistakes in the period immediately following' its decision." *Banister v. Davis*, 590 U.S. 504, 508 (2020) (citation omitted). The grounds for Rule 59(e) relief include newly discovered evidence or clear errors of law or fact. *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007). Rule 59(a)(1)(B) allows for a motion for a new nonjury trial if "the verdict … will result in a miscarriage of justice" or "is against the clear weight of the evidence." *Jenkins v. Anton*, 922 F.3d 1257, 1264 & n.7 (11th Cir. 2019) (alteration in original and citation omitted). Independently, a court retains inherent authority to clarify an injunction where its scope is ambiguous or where compliance questions arise. *See, e.g.*, *Hodge v. Dep't of Housing & Urban Dev., Housing Div., Dade Cnty., Fla.*, 862 F.2d 859, 861-62 (11th Cir. 1989).

## ARGUMENT

### I. THE COURT SHOULD WITHDRAW THE INJUNCTION BECAUSE THE FIRST AMENDMENT PROTECTS LEAPFROG'S SAFETY GRADES AND THEIR UNDERLYING METHODOLOGY

The Court should reconsider or clarify the judgment because it breaks from at least two cornerstones of First Amendment law. First, it imposes liability on Leapfrog for statements of pure opinion that are not actionable. Second, even if certain statements were susceptible to proof of truth or falsity, the judgment imposes liability for purportedly misleading speech even though the Court did not make—and the record does not support—a finding of actual malice. For either

reason or both, the Court should withdraw the injunction and enter judgment for Leapfrog, order a new trial, or conduct further proceedings to revisit these constitutional premises.

### A. Leapfrog's Safety Grades And Their Fully Disclosed Underlying Methodology Are Protected Pure Opinion

As an initial matter, Leapfrog's Safety Grades and the underlying imputed-value methodology on which they are partly based are both pure opinion that is unassailable under the First Amendment. Leapfrog cannot properly be held liable for either.

The First Amendment bars the government from "abridging the freedom of speech, or of the press." U.S. Const., amend. I. To ensure the uninhibited marketplace of ideas envisioned by its Framers, the First Amendment affords absolute protection to "statements of pure opinion." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). Viewed through the lens of the United States Constitution, there is no such thing as a false idea," no matter "how pernicious it may seem." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). Accordingly, the First Amendment protects expression on matters "not readily capable of being proven true or false," *Turner*, 879 F.3d at 1264, and "comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public," *id.* at 1262.

In its motion to dismiss order, the Court correctly recognized both these principles and their application "to online grading services," like Leapfrog's, "which often rely on a subjective weighing of objective data." (Dkt. 41 at 5.) By contrast, the Court isolated claims that "challenge [the] false or misleading statements made about the rating process itself" as not necessarily facing the same First Amendment bar. (*Id.*) On that basis, the Court denied Leapfrog's motion to dismiss and allowed the case to proceed; the Court's essential, express premise was that this "action arises from a challenge to Defendant's *representations about* its methodology." (*Id.* at 6 (emphasis added).) Elucidating the constitutional line it was drawing, the Court cited several cases that applied the same line so as to protect publication of opinions—such as business ratings provided by third parties like the Better Business Bureau, *e.g.*, *Home Performance Alliance, Inc. v. Better Business Bureau of W. Fla., Inc.*, 354 So. 3d 1165, 1166 (Fla. 2d DCA 2023), and comments based on information that is fully disclosed or available to the public, *e.g.*, *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981). (Dkt. 41 at 6.)

Yet the Court's injunction order proceeded to transgress the constitutional line by faulting Leapfrog's protected opinions. The Court's analysis focused almost entirely on Leapfrog's

imputed-value methodology, not on Leapfrog's representations *about* the methodology and Grades. The injunction similarly ventures beyond merely preventing or remedying any ostensible "representations about [Leapfrog's] methodology." (*Id.*) After all, *misrepresentations* about the *methodology* could not possibly justify enjoining publication of the *grades themselves*—any more than an alleged misrepresentation by *The New York Times* about its policy for handling anonymous sources could ever justify an injunction barring *The New York Times* from publishing articles using anonymous sources. The injunction order nonetheless entirely bars Leapfrog from using the methodology itself, as well as any similar methodologies, and restrains Leapfrog from publishing Safety Grades using the methodology, now or ever, irrespective of how precisely and fulsomely Leapfrog may disclose all relevant particulars to consumers.[1] (Dkt. 212 at 40-41.) Thus, without saying so, the injunction order ostensibly transgresses the acknowledged guardrails.

The upshot is error. Leapfrog should not face liability under FDUTPA for how it chooses to evaluate hospital safety or for the gloss it puts on its evaluation. As Judge Altman has colorfully explained, when it comes to "assessments of a company's 'safety rating'" by third-party websites that review "publicly available data," "there is no *reality*—there's just everyone's opinion." *U.S. Structural Plywood Integrity Coalition v. PFS Corp.*, 524 F. Supp. 3d 1320, 1334-35 (S.D. Fla. 2021). That observation is equally apt and dispositive here. When Leapfrog formulates and conveys its Safety Grades, it is offering pure opinions that are constitutionally protected.

It should be beyond dispute that the Safety Grades themselves are protected opinion. As the Court's injunction order makes clear, evaluating hospital safety is no exact science. To determine its Safety Grades, Leapfrog uses a combination of "22 quality safety metrics," which Leapfrog identifies and must determine how to weigh in determining a hospital's Safety Grade. (Dkt. 212 at 4.) Leapfrog splits these metrics into two categories—ten "Outcome" measures and twelve "Structural/Process" measures—with each category accounting for 50% of a hospital's

[1] Factual representations about Leapfrog's methodology might have included, for example, Leapfrog's suggestion that its Safety Grades reflect "how well a hospital does on safety, not whether they complete the Leapfrog Survey" or that its methodology is peer-reviewed. (Dkt. 212 at 24-25.) But the injunction does not address those representations. Instead, it squarely outlaws the imputed-value methodology and similar methodologies for Safety Grades. That noted, Leapfrog has removed the reference to peer review and made clear that its Safety Grades reflect Leapfrog's perspective on a hospital's safety performance. Although Leapfrog respectfully contends that those statements both deserve First Amendment protection and were truthful, it suffices for purposes of this motion to note that they cannot possibly justify this injunction.

Safety Grade. (*Id.* at 5.) In addition to determining how to evaluate each of these metrics, Leapfrog draws its data from multiple sources, including its own safety survey, and must determine "ways of dealing with missing data." (*Id.*) The end result of Leapfrog's intricate and evaluative process is a letter grade ranging from A to F. As the Court's motion to dismiss order and other decisions recognize, such letter grades can only be said to amount to a "subjective assessment" not susceptible—and certainly "not *readily* capable"—"of being proven true or false." *Turner*, 879 F.3d at 1264 (emphasis added); *see Home Performance*, 354 So. 3d at 1166 (dismissing claims based on the Better Business Bureau's "D+" rating, "which is a nonactionable opinion").

The same is true of Leapfrog's imputed-value methodology. That methodology is a response to "an understandable issue"—namely, the fact that "survey information is not available" for nonparticipating hospitals, such that those hospitals cannot be evaluated for several criteria that Leapfrog deems essential to assessing their safety. (Dkt. 212 at 2, 6.) And Leapfrog's previous method of "imputing the cohort means" of participating hospitals conferred on nonparticipating hospitals "what Leapfrog perceived to be an underserved benefit." (*Id.* at 6.) Leapfrog is a nonprofit dedicated to promoting transparent patient decision-making and, accordingly, has long resolved to "provid[e] a Safety Grade to all eligible hospitals, regardless of whether the hospital voluntarily reports information" in response to Leapfrog's survey. (*Id.* at 4.) So rather than stop grading nonparticipating hospitals, Leapfrog altered its grading methodology to assign or impute numerical values for four metrics—computerized physician order entry, bar code medication administration, ICU physician staffing, and hand hygiene—that Leapfrog could not measure for those hospitals. (*Id.* at 6.) If no historical data on these metrics exists for a nonparticipating hospital, Leapfrog assigned it a score "based on the lowest score of a participating hospital for that measure"—15, 25, 5, and 15 for each of the four metrics, respectively. (*Id.* at 6-7.)

Nonparticipating hospitals might well think they are being "penalized" in the rankings if the imputed metrics do not fairly represent how well they would be scored if they disclosed all their data—dissenters from ranking systems often level just such accusations. *See, e.g.*, David Lat, *Yale and Harvard Law to U.S. News: Drop Dead*, Original Jurisdiction (Nov. 17, 2022), https://davidlat.substack.com/p/yale-and-harvard-law-to-us-news-drop ("[W]hen schools don't play ball with U.S. News, forcing the magazine to use 'placeholder values,' they tend to drop."). But any rater's imputation of numerical values for nonparticipants is ultimately a judgment call—a "subjective assessment" that is not objectively verifiable. *Turner*, 879 F.3d at 1264. Here, there

is no way to prove or disprove whether a hospital deserves a particular numerical score when implementing a subjective framework for metrics designed to measure something as qualitative as hospital safety. And that is all that matters under the First Amendment. "[T]he First Amendment protects subjective evaluations because they are not susceptible of being verified as true or false." *Partington v. Bugliosi*, 56 F.3d 1147, 1158 (9th Cir. 1995). That protection extends to unverifiable assessments of all types—from statements that a production was "fake" and "phony," *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992), to the statement that a professional football coach engaged in "homophobic taunting," *Turner*, 879 F.3d at 1264, to the claim that an employer was "unfair to black employees," *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 195-96 (8th Cir. 1994). The assessment of nonparticipating hospitals' safety across four disputed metrics is no more verifiable than any other prototypical opinion. Nor is it any more actionable under the First Amendment.

If anything, the First Amendment's protection of pure opinion applies with added force to Leapfrog's imputed-value methodology, given the incomplete information on which Leapfrog must rely. The First Amendment affords members of the press, like Leapfrog, "the interpretive license that is necessary when relying upon ambiguous sources." *Masson v. New Yorker Magazine*, 501 U.S. 496, 519 (1971); *see Moldea v. New York Times Co.*, 22 F.3d 310, 316 (D.C. Cir. 1994) ("[S]ome materials by their very nature require interpretation, and the First Amendment affords latitude to those engaged in that task."). That protection includes license to weigh the import of missing data in the context of assessing overall safety. This Court in its injunction order acknowledged the inherently evaluative nature of that determination, reasoning that Leapfrog responded to the "understandable issue" of weighing absent data differently at different times, ultimately culminating in an "[a]ssum[ption] that … hospitals choosing not to participate necessarily had something to hide with respect to patient safety." (Dkt. 212 at 2, 6.) That is the definition of an inference drawn from "inherently ambiguous materials or subject matter," and the First Amendment protects such inferences as opinions. *Moldea*, 22 F.3d at 315.

Even if the Court—or a majority of observers, for that matter—would draw a different inference from missing data, the First Amendment protects Leapfrog's imputation of scores all the same. Any "argument that another reader might come to a different conclusion upon review of the facts … does not make [Leapfrog's] assessment … anything other than opinion." *Turner*, 879 F.3d at 1264. Disagreement about how to weigh nonparticipating hospitals' performance using

missing data at most "reflects differing interpretations of the murky facts." *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995). It suffices that Leapfrog's "account of inherently ambiguous materials" falls within the "wide range of possibilities." *Partington*, 56 F.3d at 1154 (alterations adopted; quotations omitted). Indeed, that is "precisely when [courts] need and must permit a free press to ask the question." *Id.* (citation omitted). Nor could FDUTPA, consistent with the First Amendment, require Leapfrog to afford veto or opt-out power to nonparticipating hospitals. The Constitution does not abide a legal framework that leaves "no room for expressions of opinion by commentators" or "experts in a field," or where publishers "of every sort would be forced to provide only dry, colorless descriptions of facts, bereft of analysis or insight." *Id.*

But even if the Court disagrees about the verifiability of the imputed-value scores, it should still enter judgment in Leapfrog's favor because there is no dispute that Leapfrog *disclosed* its basis for imputing those scores. It is axiomatic—particularly within the Eleventh Circuit—that "a defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Turner*, 879 F.3d at 1262; *accord Partington*, 56 F.3d at 1156-57 ("[W]e join with the other courts of appeals in concluding that when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretations of those facts … , those statements are generally protected by the First Amendment."); *Hay v. Independent Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984) (holding that statements were protected as opinion because they "were based in part upon facts disclosed in [an] article" and on facts "known or available to the reader"). And Leapfrog unquestionably made its imputed-value methodology available to viewers. (Dkt. 212 at 13-15.) That fully disclosed evaluative method is beyond reproach under the First Amendment.

The Court's injunction order seems to depart from this principle. Multiple times, the order acknowledged that Leapfrog's imputed-value methodology was available on its website. (*Id.* at 13, 14, 15, 26 n.7, 30.) Yet the Court still held Leapfrog liable for the methodology on the theory that Leapfrog's explanation of the methodology was not prominent enough and visited by website users with enough frequency. (*E.g.*, *id.*)

That approach was misconceived. The imputed values reflect an inference based on a fully disclosed and indisputably *truthful* fact—that Plaintiffs and other nonparticipating hospitals had not made their data for those metrics available. For an opinion to qualify as constitutionally

protected, the facts on which it is based may be "set forth in the publication" itself or "otherwise known or available to the reader." *Turner*, 879 F.3d at 1262. Here, Leapfrog's methodology was *both*. And because Leapfrog's "rationale for [its] view … was exposed," the imputed values "reasonably could be understood only as [Leapfrog's] personal conclusion about the information presented, not as a statement of fact." *Phantom Touring*, 953 F.2d at 730; *see also, e.g.*, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497-98 (2d Cir. 2013) (holding that scientists' "conclusions reached by experiments" are protected by the First Amendment when presented with "an accurate description of the data taken into account and the methods used").

To require more from Leapfrog would expose reviewers and commentators of every stripe to civil lawsuits and injunctions of this sort. Truthful disclosure of methodologies could still be picked apart in court (through multi-day trials) as unduly subtle, obscure, or misunderstood. The inalienable right to free expression becomes alienable once made to depend on proving readers' diligence or satisfying judges' preferences for web design. An author who publishes a lengthy, scathing condemnation of a presidential administration could be sued for failing to disclose her factual sources before readers reach the endnotes hundreds of pages into the book. A controversial blogger could be held liable for her opinion because a jury determined that it took too long and too many clicks to reach a hyperlink bridging to pertinent facts. Such second-guessing of accurate factual disclosures denies the "breathing space" that "First Amendment freedoms need … to survive." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021) (citation omitted).

The same error is evident in the Court's injunction order. Notwithstanding Leapfrog's disclosure of its methodology for its imputed-value scores, the Court still holds Leapfrog liable because it took up to "23 clicks" to navigate to the methodology and viewers were "likely" to have already decided that nonparticipating hospitals' Safety Grades relied entirely on available data by the time they reached the disclosure. (*Id.* at 26 n.7, 30.) Courts widely recognize that "providing a link [to source material] can supply the factual disclosure necessary to confer constitutional protection." *Lewis v. Abramson*, 673 F. Supp. 3d 72, 93 (D.N.H. 2023) (citations omitted; collecting cases). And navigating two dozen clicks away is, if anything, easier than reviewing the entirety of a lengthy book or report—such as the 144-page report that the Eleventh Circuit in *Turner v. Wells* held contained protected pure opinion based on various disclosures of underlying facts at various turns. 879 F.3d at 1261, 1264-65. When it comes to matters of public concern like patient safety, the only question is whether the pertinent facts have been disclosed, not whether

the disclosure was prominent or approved by a court. Indeed, courts consistently excuse speakers even from disclosing the facts underlying public commentary, provided the facts are "otherwise … *available* to the reader or listener as a member of the public." *From*, 400 So. 2d at 57 (emphasis added). Needless to say, the facts that Leapfrog was going out of its way to disclose on its public-facing website were thereby "available" to any member of the public who wished to look. Because Leapfrog's imputed-value framework was a disclosed method of evaluating hospital safety under settled law, it cannot give rise to liability under the First Amendment.

### B. Even If Leapfrog's Safety Grades And Their Underlying Methodology Were Not Pure Opinion, They Are Protected Absent A Missing, Unsupported Finding Of Actual Malice

There is another, independent reason why the injunction is constitutionally infirm: The Court never made the finding of actual malice that the First Amendment requires before false speech on matters of public concern, like patient safety, may be suppressed or penalized.

Even assuming that Leapfrog's Safety Grades or its imputed-value methodology are provably or were proven false, the First Amendment protects them. The Supreme Court's decision in *United States v. Alvarez*, 567 U.S. 709 (2012), forecloses the assumption that falsity alone justifies suppression of protected speech. As a plurality of the Court explained, "falsity alone may not suffice to bring speech outside the First Amendment." *Id.* at 719.[2] Instead, citing its decision in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the plurality explained that "[t]he statement must be a knowing or reckless falsehood"—that is, made with actual malice. 567 U.S. at 719. While the plurality acknowledged that the First Amendment does not protect certain distinct categories of false speech—such as defamation, fraud, and perjury—it explained that the falsity of such speech alone was not "determinative" in assessing its constitutional status and "reject[ed] the notion that false speech should be in a general category that is presumptively unprotected." *Id.* at 719, 722. More recently, a majority of the Court emphasized that "these exceptional categories" of unprotected speech "are few and narrowly drawn, and all share a long and well-recognized historical pedigree." *Chiles*, 146 S. Ct. at 1021. The Eleventh Circuit has taken the cue, adopting as binding precedent the *Alvarez* plurality's conclusion that courts lack "freewheeling authority to declare new categories of speech outside the scope of the First

[2] Although *Alvarez* was decided by a plurality, six Justices agreed that falsity alone does not justify prohibiting speech. *See* 567 U.S. at 731-32 (Breyer, J., concurring in the judgment).

Amendment." *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020) (citation omitted). That includes speech covered by FDUTPA, an exceedingly broad 1973 state statute that has never been taken as confined to the few delimited, enumerated categories of unprotected speech.

The need to prove actual malice is so well established that Plaintiffs themselves have acknowledged it. In their proposed findings, Plaintiffs recognized that the standard for liability if the First Amendment applies (as it does) "would simply require clear evidence that Leapfrog knew its representations are 'false' or that Leapfrog 'reckless[ly] disregarded' the risk of falsity." (Dkt. 136 at 64 (citing *Hunt v. Liberty Lobby*, 720 F.2d 631, 642 (11th Cir. 1983)).) As Plaintiffs' acknowledgment confirms, actual malice must be found by clear and convincing evidence before liability can be imposed for Leapfrog's Safety Grades or methodology, even assuming their falsity.

No such finding has been made, nor would the record support one. The Court found that Leapfrog acted with "punitive" intent (Dkt. 212 at 20), apparently meaning that Leapfrog adopted the imputed-value methodology in an effort to pressure nonparticipating hospitals into agreeing to participate in Leapfrog's Hospital Safety Survey. So long as speech is not defamatory or fraudulent, however, a consumer-advocacy organization like Leapfrog is entitled under the First Amendment to "pressure" Plaintiffs into participating in its survey. "The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment," so Leapfrog is protected even if it "plainly intended to influence [Plaintiffs'] conduct by their activities; this is not fundamentally different from the function of a newspaper." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). Holding that speech was intended to be "punitive" does not equate to actual knowledge that Leapfrog's assessment of those hospitals' safety was false. Nor does it bear on whether Leapfrog recklessly disregarded the truth. The actual malice test "is subjective,"; the plaintiff must show that the defendant "*in fact* entertained serious doubts as to the truth of his publication." *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020) (citation omitted). The defendant must have published the statement "with a 'high degree of awareness' of its 'probable falsity'"—such a high degree that "[e]ven an extreme departure from professional publishing standards does not necessarily rise to the level of actual malice." *Id.* (alteration adopted; citation and internal quotation marks omitted).

This record contains no evidence that Leapfrog in fact or subjectively doubted the truth of its assessment. To the contrary, the Court's findings reflect that Leapfrog's methodology was developed with the involvement of an expert panel, that the panel debated various approaches to

handling missing data, and that Leapfrog, in response to the "understandable issue" of having to grapple with missing data, adopted a non-response-bias rationale for the Fall 2024 change. (DE 212 at 6-8.) While the Court may disagree with that decision and its rationale, a speaker's development of a methodology through expert consultation in pursuit of the legitimate goal of improving data completeness is incompatible with the notion that the speaker acted with "knowledge that [its conclusions were] false or with reckless disregard of whether [they were] false or not." *Sullivan*, 376 U.S. at 279-80. For the avoidance of doubt, Leapfrog respectfully stands behind that methodology, even today, and believes that it represents the best available way to assess safety in the absence of nonparticipating hospitals' survey data.

FDUTPA liability should not be imposed against Leapfrog before actual malice has been found, much less found by clear and convincing evidence. For this reason, too, the Court should reconsider the judgment and withdraw its injunction, or alternatively, order a new trial.

***

For all of these reasons, the Court should reconsider its implicit conclusion that the First Amendment does not protect Leapfrog's Safety Grades or imputed-value methodology. Importantly, reconsideration is warranted even if the Court does not revisit its factual findings that Leapfrog's Safety Grades and methodology caused harm. Leapfrog, to be sure, respectfully disagrees with those findings. Nonetheless, they have no bearing on whether Leapfrog's expression is constitutionally protected. "Speech," of course, "is powerful" and "can … inflict great pain." *Snyder v. Phelps*, 562 U.S. 443, 460 (2011). But courts "cannot react to that pain by punishing the speaker." *Id.* at 460-61. Nor is it plausible that speech in the healthcare context, which "can involve life or death situations" (Dkt. 212 at 29), is less protected. As the Supreme Court reaffirmed shortly after this Court's injunction order, "the dangers associated with censorship … are no less acute in the fields of medicine and public health than they are anywhere else," *Chiles*, 146 S. Ct. at 1025 (quotation marks omitted), and the urgent public importance of patient safety in the healthcare industry counsels for—not against—fully protecting robust expression and expert commentary within this vitally important realm.

Nor would withdrawing the injunction render Plaintiffs speechless or powerless. Many institutions face third-party ranking systems that they criticize. The medicine for that in our country has always been the same as the perceived disease—protected expression. *See supra*, p. 10. Nothing stops Plaintiffs from criticizing Leapfrog or from lobbying to change its approach; as

the Court's order observes, "Leapfrog has previously received criticism for its methodology" (Dkt. 212 at 2), and Plaintiffs are entirely within their rights to join and to cheer those critics. But Plaintiffs here chose a different route—marshalling their formidable resources to retain high-powered counsel, obtain a permanent injunction restraining the speech of their watchdog adversary, and wield the threat of contempt to censor and chill an even broader set of expression prospectively. That approach is anathema to the First Amendment. Plaintiffs' remedy for any harm they claim resides not in "the conscience of judges and juries but [i]n the competition of other ideas." *Gertz*, 418 US. At 339-40. Absent any injunction, Plaintiffs enjoy the same First Amendment rights as Leapfrog and can strive to prevail in the court of public opinion.

## II. THE COURT SHOULD WITHDRAW THE INJUNCTION BECAUSE FDUTPA DOES NOT BAR LEAPFROG'S SAFETY GRADES AND THEIR UNDERLYING METHODOLOGY AS A MATTER OF LAW

To avoid these constitutional questions, the Court could alternatively reconsider the judgment on statutory grounds. To be unlawful under FDUTPA, an act or practice must be "unfair or deceptive." Fla. Stat. § 501.204(1). Leapfrog's Safety Grades and fully disclosed methodology do not so qualify under longstanding Florida principles of statutory interpretation.

First, neither Leapfrog's Safety Grades nor its imputed-value methodology is unfair within the meaning of FDUTPA. As the Court's injunction order recognizes, "[t]he Florida Supreme Court has defined 'unfair practice' as 'one that offends public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." (Dkt. 212 at 18 (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)).) Leapfrog's Safety Grades and imputed-value methodology could not have violated this test. The Florida Legislature has declared "that the public policy of this state" is "to protect the right in Florida to exercise the rights of free speech in connection with public issues" and to hasten the dismissal of suits—like this one—that "are inconsistent" with those rights. Fla. Stat. § 768.295(1). That principle alone should preclude liability, but it is bolstered by the constitutional-avoidance doctrine. FDUTPA's concept of unfairness, like the "[o]utrageousness" requirement in intentional infliction of emotional distress claims, "is a highly malleable standard with an inherent subjectiveness about it which would allow a [court] to impose liability on the basis of … tastes or views.'" *Snyder*, 562 U.S. at 458. That ambiguity is doubly dangerous as applied to watchdog organizations like Leapfrog, which exercise both the freedom of speech and of the press. And in Florida, "[i]t is a well-settled principle of statutory construction that when faced with two

reasonable interpretations of a statute," courts should "adopt the one that avoids constitutional questions." *Brito v. Salas*, 2025 WL 3765686, at *9 (Fla. Dec. 30, 2025). Applying that principle here, the Court should avoid interpreting FDUTPA's prohibition on "unfair" practices to apply to a nonprofit's non-commercial, protected speech on a matter of public concern.

The Court should take a like approach to interpreting "deceptive." The Court reasoned that "deceptive" means "a representation, omission, or practice likely to mislead a consumer acting reasonably in the circumstances" and recognized that "Leapfrog's intent matters." (Dkt. 212 at 18, 20.) To avoid any serious constitutional question or unconstitutional application, the Court should interpret FDUTPA to require at least actual malice as applied to press institutions speaking on matters of public concern, and should credit Leapfrog's disclosed methodology for Safety Grades as something a reasonable consumer would review before relying on them.

## III. THE COURT SHOULD WITHDRAW, DISSOLVE, OR NARROW THE INJUNCTION BECAUSE THE INJUNCTION IS AN UNCONSTITUTIONAL PRIOR RESTRAINT AND UNCONSTITUTIONALLY COMPELS SPEECH

Even apart from the merits, the Court should reconsider the scope of the relief it ordered and withdraw or narrow the injunction. The injunction violates the First Amendment in at least two separate ways: It is an unconstitutional prior restraint and unconstitutionally compels speech.

### A. The Injunction Imposes An Unconstitutional And Overbroad Prior Restraint

The First Amendment's "chief purpose" is to "prevent previous restraints upon publication." *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Such restraints quintessentially include "judicial orders forbidding certain communications when issued in advance … such communications.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation and emphasis omitted). "Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints." *Id.* To determine whether an injunction constitutes an impermissible prior restraint, courts look first to whether the injunction is content-based or content-neutral. Content-based injunctions that proscribe speech itself are per se unconstitutional. "Courts typically refuse to grant … injunctions regarding speech in any circumstance, *even where liability … has been found*." *Basulto v. Netflix, Inc.*, 2023 WL 7129970, at *52 (S.D. Fla. Sept. 20, 2023) (emphasis in original); *see also Sindi v. El-Moslimany*, 896 F.3d 1, 30 (1st Cir. 2018) (dissolving permanent injunction against speech

adjudicated to be defamatory and published with actual malice). Although courts apply this limit on relief in defamation cases, it applies equally when the cause of action is a different tort implicating speech. *E.g., Patriot Lending Servs., Inc. v. Amerifirst Fin. Corp.*, 2020 WL 758155, at *2 (M.D. Fla. Feb. 14, 2020) (applying same rule in trade secrets case).

The injunction here is a content-based restraint against speech on particular topics and is thus unconstitutional. Its orders to "cease assigning" Safety Grades and "cease promoting" them directly command Leapfrog to abstain from future publications on the subject matter of Safety Grades as they pertain to Plaintiffs. (Dkt. 212 at 40-41.) Courts consistently deem similar injunctions enjoining defendants from publishing content—even content found to be defamatory—about plaintiffs to be "necessarily a regulation of the subject matter of that speech." *Krapacs v. Bacchus*, 301 So. 3d 976, 980 (Fla. 4th DCA 2020).

And courts specifically recognize that injunctions cannot properly restrain even "untruthful" criticism of a business. As the Supreme Court has explained, there is no justification to "support the claim that the interest of an individual in being free from public criticism of his business practices … warrants use of the injunctive power of a court." *Org. for a Better Austin*, 402 U.S. at 419. Likewise, the court in *Chevaldina v. R.K./FL Mgmt., Inc.* explained that, although a speaker criticizing a business might permissibly be enjoined from "harangu[ing] individual customers, or threaten[ing] violence," only "money damages" would be available for actionable defamation. 133 So. 3d 1086, 1092 (Fla. 3d DCA 2014). Indeed, courts consistently hold that even speech found to be entirely false cannot be subject to a prior restraint. *See Krapacs*, 301 So. 3d at 980 (injunctions "are not available to stop someone from uttering insults or falsehoods"); *Town of Lantana v. Pelczynski,* 290 So. 2d 566, 569 (Fla. 4th DCA 1974) ("Freedom from prior restraint upon speech and press extends to false, as well as true statements."); *Vrasic v. Leibel*, 106 So. 3d 485, 487 (Fla. 4th DCA 2013) (same rule even when defendant derives a commercial gain). Whatever qualms a court may have about false or misleading speech, "[i]njunctive relief to prohibit [it] is another matter altogether." *Chevaldina*, 133 So. 3d at 1090. Plaintiffs' letter threatening contempt against Leapfrog highlights the danger: If Plaintiffs have their way, the Court will become enmeshed in adjudicating, on pain of contempt, what Leapfrog can and cannot say when reviewing hospital safety.

Even if the Court were to conclude that its injunction is content-neutral, the injunction would still be subject to a standard tantamount to "strict scrutiny" that it does not meet. *Madsen*

*v. Women's Health Ctr., Inc.*, 512 U.S. 753, 767 (1994). Even content-neutral injunctions "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968). The injunction here does not answer to that description. Even if Leapfrog could be held liable for misleading about its methodology, the injunction should be narrowed to encompass at most any misleading statements about its methodology—not the methodology or Safety Grades themselves, and certainly not any distinct but "similar" methodology. (Dkt. 212 at 40); *see Bull Motors L.L.C. v. Brown*, 152 So. 3d 32, 36 (Fla. 3d DCA 2014) (narrowing injunction in FDUTPA case because "the trial court could have prohibited the conduct identified as violative of FDUTPA, without in effect dictating how this defendant should … communicate in the future").

**B. The Injunction Unconstitutionally Compels Speech**

In addition, the injunction unconstitutionally compels Leapfrog to speak contrary to its own views. Specifically, the injunction requires Leapfrog to send corrective disclosures to all entities that paid to license the Fall 2024, Spring 2025, and Fall 2025 Safety Grades, "disclosing that those Safety Grades were found to be deceptive and unfair in this action," and to place those same corrective disclosures in future contracts, advertising materials, and other documents promoting paid licensure of the next cycle of Safety Grades in five designated zip codes. (Dkt. 212 at 41.)

Whether a court considers a defendant's speech "sensible and well intentioned or deeply 'misguided,'" it "may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018). And while government may at times require the dissemination of "purely factual and uncontroversial information" in the context of commercial advertising, "outside that context it may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (citation omitted). Because Leapfrog's Safety Grades reflect its "exercise of editorial control and judgment," *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), the messaging around them should be Leapfrog's alone.

## CONCLUSION

For the foregoing reasons, the Court should alter its judgment by entering judgment for Leapfrog, or else, at a minimum, amend its injunction. Alternatively, the Court should hold a new trial or conduct further proceedings in order to account for constitutional limitations.

**LOCAL RULE 7.1(a)(3) CERTIFICATION**

Undersigned counsel certifies that on April 29, 2026, Leapfrog's counsel emailed Plaintiffs' counsel requesting Plaintiffs' position on the relief requested herein. Plaintiffs declined to provide their position over email, asked several questions about the bases for this motion over email—all of which Leapfrog's counsel answered—and requested a call to confer on April 30, 2026, which undersigned counsel agreed to. On April 30, undersigned counsel conferred via Zoom with Plaintiffs' counsel about the relief herein requested, and was unable to reach agreement.

DATED: April 30, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

By *_/s/ Jason D. Sternberg_*
Jason D. Sternberg

Derek L. Shaffer (*pro hac vice*)
**QUINN EMMANUEL URQUHART & SULLIVAN LLP**
555 13th Street NW, Suite 600
Washington, D.C. 20005
(202) 538-8123
derekshaffer@quinnemanuel.com

Jason D. Sternberg (Fla. Bar No. 72887)
**QUINN EMMANUEL URQUHART & SULLIVAN LLP**
2601 South Bayshore Drive, 15th Floor
Miami, FL 33133
jasonsternberg@quinnemanuel.com
(305) 439-5008

*Counsel for Defendant The Leapfrog Group*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of April, 2026, a true and correct copy of the foregoing document was electronically transmitted to all counsel of record via the CM/ECF system.

By: */s/ Jason D. Sternberg*
Jason D. Sternberg
Florida Bar No. 72887
jasonsternberg@quinnemanuel.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 25-CV-80526-MIDDLEBROOKS

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC. D/B/A PALM BEACH GARDENS MEDICAL CENTER, ST. MARY'S MEDICAL CENTER, INC., AND WEST BOCA MEDICAL CENTER, INC.,

Plaintiffs,

v.

THE LEAPFROG GROUP,

Defendants.

**NOTICE OF APPEAL**

Notice is hereby respectfully given that The Leapfrog Group, Defendant in the above named case, hereby appeals to the United States Court of Appeal for the Eleventh Circuit from the following orders and judgment entered in the above-captioned case:

(1) The Order on Defendant's Motion to Dismiss (Dkt. 41, entered July 15, 2025);

(2) The Order on Defendant's Motion for Summary Judgment (Dkt. 139, entered January 7, 2026); and

(3) The Order Following Bench Trial and Final Judgment (Dkt. 212 and 214, entered March 6, 2026, and April 6, 2026, respectively)

Defendant files this notice of appeal as a protective matter. Defendant understands this notice to be premature under Federal Rule of Appellate Procedure 4(a)(4)(A) because Defendant has filed a motion to alter or amend the judgment or for a new trial under Federal Rule of Civil Procedure 59, and that motion remains pending. The Court therefore retains jurisdiction to resolve that pending motion, and this notice of appeal will become effective only upon entry of an order disposing of that motion. Fed. R. of App. P. 4(a)(4)(B)(i); *see Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 745–46 (11th Cir. 2014). Defendant respectfully files this

notice of appeal now solely out of an abundance of caution to preserve all appellate rights.

Dated: April 30, 2026

*/s/ Jason D. Sternberg*
Jason D. Sternberg

Derek L. Shaffer
**QUINN EMMANUEL URQUHART & SULLIVAN LLP**
555 13th Street NW, Suite 600
Washington, D.C. 20005
(202) 538-8123
derekshaffer@quinnemanuel.com

Jason D. Sternberg (Fla. Bar No. 72887)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
jasonsternberg@quinnemanuel.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 30th day of April, 2026, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

/s/ *Jason D. Sternberg*
Jason D. Sternberg
jasonsternberg@quinnemanuel.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**THE COMMUNITY HOSPITALS' OPPOSITION TO LEAPFROG'S MOTION FOR RECONSIDERATION AND TO ALTER OR AMEND THE JUDGMENT, OR NEW TRIAL**

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

## TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

BACKGROUND .......... 2

LEGAL STANDARDS .......... 5

ARGUMENT .......... 6

I. Leapfrog's Pure-Opinion Argument Is Barred, Abandoned, And Meritless .......... 6

II. Leapfrog's Actual-Malice Argument Is Forfeited And Meritless .......... 11

III. Leapfrog's Statutory Argument Is Barred, Forfeited, And Meritless .......... 15

IV. Leapfrog's Prior-Restraint Argument Is Forfeited And Meritless .......... 16

V. Leapfrog's Compelled-Speech Argument Is Forfeited And Meritless .......... 19

CONCLUSION .......... 20

## TABLE OF AUTHORITIES

### Cases

*Allaben v. Howanitz*,
579 F. App'x 716 (11th Cir. 2014) ....7

*Arthur v. King*,
500 F.3d 1335 (11th Cir. 2007) ....11, 13

*Banister v. Davis*,
590 U.S. 504 (2020) ....5

*Basulto v. Netflix, Inc.*,
2023 WL 7129970 (S.D. Fla. Sept. 20, 2023) ....18

*Carroll v. President & Comm'rs of Princess Anne*,
393 U.S. 175 (1968) ....17

*Chevaldina v. R.K./FL Mgmt., Inc.*,
133 So. 3d 1086 (Fla. DCA 3d 2014) ....18

*Church of Am. Knights of the Ku Klux Klan v. Kerik*,
356 F.3d 197 (2d Cir. 2004) ....14

*Clement v. U.S. Att'y Gen.*,
75 F.4th 1193 (11th Cir. 2023) ....6, 13

*Cummings v. Dep't of Corr.*,
757 F.3d 1228 (11th Cir. 2014) ....5

*Deligdish v. Bender*,
2023 WL 5016547 (M.D. Fla. Aug. 7, 2023) ....18

*Ferrill v. Parker Grp., Inc.*,
168 F.3d 468 (11th Cir. 1999) ....6

*Flowers v. Comm'r, Soc. Sec. Admin.*,
97 F.4th 1300 (11th Cir. 2024) ....13

*Francois v. Wainwright*,
741 F.2d 1275 (11th Cir. 1984) ....13

*From v. Tallahassee Democrat, Inc.*,
400 So. 2d 52 (Fla. DCA 1st 1981) ....10

*FTC v. Corpay*,
164 F.4th 807 (11th Cir. 2026) ....20

*F.W. Woolworth Co. v. Seckinger*,
125 F.2d 97 (5th Cir. 1942) ....................5

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)....................12

*Gould v. Interface, Inc.*,
153 F.4th 1346 (11th Cir. 2025) ....................13

*Hay v. Indep. Newspapers, Inc.*,
450 So. 2d 293 (Fla. DCA 2d 1984)....................10

*Home Performance All. v. Better Bus. Bureau of W. Fla., Inc.*,
354 So. 3d 1165 (Fla. DCA 2d 2023)....................9

*Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983) ....................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995)....................20

*Iancu v. Brunetti*,
588 U.S. 388 (2019)....................16

*Juris v. Inamed Corp.*,
685 F.3d 1294 (11th Cir. 2012) ....................2, 12, 13

*Krapacs v. Bacchus*,
301 So. 3d 976 (Fla. DCA 4th 2020)....................18

*Lane v. Random House, Inc.*,
985 F. Supp. 141 (D.D.C. 1995)....................9

*Lewis v. Abramson*,
673 F. Supp. 3d 72 (D.N.H. 2023)....................10

*Lucero v. Trosch*,
121 F.3d 591 (11th Cir. 1997) ....................18

*MacuHealth, LP v. Vision Elements, Inc.*,
2024 WL 3738489 (M.D. Fla. Aug. 9, 2024) ....................20

*Masson v. New Yorker Mag., Inc.*,
501 U.S. 496 (1991)....................10

*McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*,
851 F.3d 1076 (11th Cir. 2017) ....................16

*McComb v. Jacksonville Paper Co.*,
336 U.S. 187 (1949)....17

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)....9

*Michael Linet, Inc. v. Village of Wellington*,
408 F.3d 757 (11th Cir. 2005)....5, 16

*Michel v. NYP Holdings*,
816 F.3d 686 (11th Cir. 2016)....9, 13, 14, 15

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990)....8

*Newman v. Alabama*,
683 F.2d 1312 (11th Cir. 1982)....19

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)....12, 14

*NLRB v. Gaylord Chem. Co., LLC*,
824 F.3d 1318 (11th Cir. 2016)....12

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013)....10

*Org. for a Better Austin v. Keefe*,
402 U.S. 415 (1971)....17

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020)....14

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995)....10

*Patriot Lending Servs., Inc. v. Amerifirst Fin. Corp.*,
2020 WL 758155 (M.D. Fla. Feb. 14, 2020)....18

*Phantom Touring, Inc. v. Affiliated Pubs.*,
953 F.2d 724 (1st Cir. 1992)....9

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rels.*,
413 U.S. 376 (1973)....18

*Regions Bank v. Commonwealth Land Title Ins. Co.*,
2012 WL 6553966 (S.D. Fla. Dec. 14, 2012)....8

*Rhodes v. Amarillo Hosp. Dist.*,
654 F.2d 1148 (5th Cir. 1981) ....................2

*In re R.M.J.*,
455 U.S. 191 (1982)....................20

*Rumsfeld v. Forum for Acad. & Institut. Rts., Inc.*,
547 U.S. 47 (2006)....................8

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018)....................19

*Snyder v. Phelps*,
562 U.S. 443 (2011)....................14

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)....................14

*Stevens v. Premier Cruises, Inc.*,
215 F.3d 1237 (11th Cir. 2000) ....................16

*Town of Lantana v. Pelczynski*,
290 So. 2d 566 (Fla. DCA 4th 1974)....................18

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018) ....................6, 7, 10

*U.S. Structural Plywood Integrity Coal. v. PFS Corp.*,
524 F. Supp. 3d 1320 (S.D. Fla. 2021) ....................9

*United States v. Alvarez*,
567 U.S. 709 (2012)....................14

*United States v. Defilippis*,
---F.4th---, 2026 WL 1067115 (11th Cir. Apr. 20, 2026)....................12

*United States v. Horn*,
129 F.4th 1275 (11th Cir. 2025) ....................17

*United States v. Irving*,
509 F.2d 1325 (5th Cir. 1975) ....................8, 14

*United States v. Love*,
449 F.3d 1154 (11th Cir. 2006) ....................17, 19

*Vrasic v. Leibel*,
106 So. 3d 485 (Fla. DCA 4th 2013)....................18

*Wilchombe v. TeeVee Toons, Inc.*,
555 F.3d 949 (11th Cir. 2009) ....................5, 11, 13, 17, 19

*Yakus v. United States*,
321 U.S. 414 (1944)....................13

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
471 U.S. 626 (1985)....................20

**Statutes**

Fla. Stat. § 501.204(1)....................14

**Rules**

Fed. R. App. P. 8....................5

Fed. R. Civ. P. 59....................5

## INTRODUCTION

The Community Hospitals brought this case to stop Leapfrog from deceiving consumers about healthcare safety and coercing hospitals into handing over their private data on pain of baseless penalties. After hundreds of pages of briefing and five days of trial, this Court entered a carefully considered, 41-page order finding that Leapfrog "inten[tionally] create[d] the false impression that Leapfrog's grades reflect actual performance," Dkt. 212 at 26, and imposed a tailored injunction to halt Leapfrog's unlawful scheme.

Leapfrog now contends that the Court's injunction should be dissolved, or a new trial ordered, under Rule 59. Those requests defy the well-established standards for Rule 59 relief. Leapfrog's Motion identifies no newly discovered evidence, no intervening change in law, and no manifest error in the Court's factual findings. Instead, Leapfrog asks the Court to decide entirely new constitutional issues that Leapfrog failed to litigate through summary judgment, trial, and post-trial briefing. Rule 59 does not permit that about-face—as Leapfrog's own cases explain.

Leapfrog frames this Court's order as an assault on free speech. But this case has never been about whether Leapfrog may express views on hospital safety. It is about whether Leapfrog may fabricate punitive scoring inputs, present the resulting "Safety Grades" as data-driven measures of actual safety performance, and use those Grades to pressure hospitals into surrendering data to which Leapfrog has no right. This Court correctly found that Leapfrog may not.

Leapfrog now says that its Safety Grades and methodology should be deemed "pure opinion" under the First Amendment. But this Court rejected Leapfrog's attempt to characterize its challenged conduct as categorically protected opinion at the motion-to-dismiss stage. And in any event, Leapfrog never preserved any argument that injunctive relief would cross whatever constitutional line Leapfrog now claims the Court recognized. To the contrary, Leapfrog abandoned its pure-opinion theory at trial, defending its methodology as a scientifically valid way to measure objective facts about hospital safety. It asked the Court to credit the methodology as evidence-based, expert-informed, and tied to actual safety performance. Because the Court rejected those arguments in detailed factual findings, Leapfrog now runs away from its position at trial. But Leapfrog cannot have it both ways.

Leapfrog's Motion next raises a series of new arguments—ranging from actual malice and constitutional avoidance to prior restraint and compelled speech. If Leapfrog wanted these arguments considered, it was required to raise them prior to the entry of judgment "'in such a way as

to afford [this] court an opportunity to recognize and rule on [them].'" *Juris v. Inamed Corp.*, 685 F.3d 1294, 1325 (11th Cir. 2012). But Leapfrog did not. Nor does Leapfrog identify any reason it could not have previously raised such arguments.

Leapfrog's post-judgment change of counsel does not justify a post-judgment change in theory. "[T]he retention of a new attorney able to perceive or draft different or more creative claims" is "no excuse" for the untimely assertion of new arguments. *Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1154 (5th Cir. 1981). Having tried the case on one theory, Leapfrog cannot use a post-judgment Rule 59 motion to litigate another.

**BACKGROUND**

From the outset, the Community Hospitals alleged that Leapfrog's so-called Safety Grades "are a fraud," that Leapfrog's new "imputation model deceives consumers" by arbitrarily penalizing safety scores when hospitals do not respond to Leapfrog's commercially driven survey, and that Leapfrog's deliberate efforts to cover up its non-participation penalty through false representations about its methodology are "clear lie[s]." Dkt. 1 ¶¶ 1, 52, 54. They thus sought an injunction to prevent Leapfrog from applying this deceptive methodology to their facilities and a declaration that Leapfrog's coercive scheme to extract hospital data violates the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). *Id.* Prayer for Relief.

Leapfrog moved to dismiss, contending that its "Safety Grades," "related statements," and "published methodology"—all purportedly "based on *verifiable data*"—nonetheless represent "'pure opinion'" that "cannot be proven true or false." Dkt. 39 at 13, 15 (emphasis added). Leapfrog's motion did not assert any additional First Amendment arguments.

This Court denied the motion to dismiss in full. Dkt. 41. The Court acknowledged Leapfrog's assertion that "its online grades and methods are protected as unfalsifiable, purely opinionated speech," but then rejected that characterization. *Id.* at 6. As it explained, a FDUTPA claim is "not barred by the First Amendment when it involves a challenge to false or misleading statements made about the rating process itself," which can "mislead consumers" about what the ratings and methodology actually measure (*e.g.*, "absent data" rather than "damning data"). *Id.* at 6–7.

Months later, the parties cross-moved for summary judgment. *See* Dkts. 86, 99. Leapfrog's motion for summary judgment focused almost entirely on the merits of Leapfrog's methodology and Leapfrog's contention that FDUTPA plaintiffs must demonstrate "actual consumer injury." Dkt. 99 at 1. The motion did *not* assert any freestanding First Amendment defense. Instead,

it claimed that summary judgment on Leapfrog's anti-SLAPP defense would be warranted "if this Court grant[ed]" the rest of Leapfrog's motion, in which case the various requirements for a statutory anti-SLAPP defense would "be satisfied." *Id.* at 19. In the course of seeking summary judgment on anti-SLAPP grounds, Leapfrog (1) included one sentence stating that its "mission is premised on free speech in connection with a public issue," and (2) mused in one clause of one sentence that "this case" itself "amounts to prior restraint." *Id.* Leapfrog did not develop any argument as to either assertion, both of which appeared in the last paragraph of its brief. *See id.* Leapfrog also did not renew its pure-opinion argument, did not contend that the Community Hospitals were required to demonstrate actual malice, did not argue that actual malice would be unsatisfied, and raised no compelled-speech concerns. Leapfrog's reply similarly omitted any objection under the First Amendment. *See generally* Dkt. 124.

Leapfrog's opposition to the Community Hospitals' own summary-judgment motion was yet more oblique. In one sentence, the motion contended that "Leapfrog is entitled to summary judgment on this front," *i.e.*, anti-SLAPP, yet presented no supporting reasoning and failed to mention the First Amendment or any related doctrine. Dkt. 102 at 18.

The parties later submitted a joint pretrial stipulation wherein they were required to state, among other things, any issues of law or fact that remained for trial. *See* Dkt. 129. Leapfrog's introduction claimed that "anti-SLAPP relief is warranted" because its Safety Grades involve a "public concern," *id.* at 8, but Leapfrog yet again made no mention of pure opinion, actual malice, constitutional avoidance, prior restraint, or compelled speech. The "issues" section of its brief also identified none of these arguments, instead simply copying the text of the Florida anti-SLAPP statute without elaboration. *See id.* ¶ 210.

In advance of trial, the parties submitted proposed findings of fact and conclusions of law ("PFFCL"). *See* Dkts. 135, 136. Leapfrog's PFFCL did not renew or elaborate on its pure-opinion theory and, indeed, did not assert any freestanding First Amendment defense. Instead, like Leapfrog's motion for summary judgment, its PFFCL suggested that Leapfrog should receive judgment on its anti-SLAPP defense. Dkt. 135 ¶¶ 383–92. In so doing, Leapfrog asserted in one sentence that the first element of an anti-SLAPP defense is satisfied because "Leapfrog's mission is premised on free speech in connection with a public issue." *Id.* ¶ 388. Leapfrog did not contend that actual malice was necessary to impose liability, did not contend that actual malice was unsatisfied, did not advance any theory of prior restraint, and did not raise compelled-speech concerns.

After this Court denied the parties' summary-judgment motions, Dkt. 139, a five-day bench trial ensued. At the close of the Community Hospitals' evidence, Leapfrog orally moved for judgment under Rule 50(a), Day 3 Tr. 133:4–6, which this Court denied, *id.* at 166:12–13. At no time during her Rule 50(a) argument did Leapfrog's counsel refer to the First Amendment, pure opinion, actual malice, prior restraint, or compelled speech. *See generally id.* 133:4–156:18.

On the last day of trial, the Community Hospitals in closing arguments extensively previewed the injunctive relief they believed would be appropriate, all while displaying a slide explaining that the Community Hospitals would seek relief against Leapfrog's methodology, Safety Grades calculated pursuant to that methodology or any similar methodology, and various corrective disclosures. Day 5 Tr. 28:5–30:14, 41:2–11. Leapfrog's counsel acknowledged that she had seen the "slide about the relief they want." *Id.* at 42:15–16. When Leapfrog's counsel delivered her own closing argument, however, she raised *no* objections related to pure opinion, actual malice, prior restraint, or compelled speech. To the contrary, Leapfrog's counsel affirmatively conceded in a colloquy with this Court that the Court could impose a requirement for Leapfrog to publish "a better footnote." *Id.* at 80:19–23.

At the end of closing arguments, the Court instructed the parties to include any and all legal arguments they wished to raise in their post-trial PFFCL: "[I]n the conclusions of law you can include briefing, whatever law you want to put in, put in that." Day 5 Tr. at 97:24–98:1. Yet Leapfrog's post-trial PFFCL did *not* develop any First Amendment argument. *See generally* Dkt. 204. It did not address pure opinion, actual malice, prior restraint, or compelled speech. And it did not object to any specific aspect of the Community Hospitals' requested relief, whether on prior restraint, compelled speech, or any other grounds. Instead, Leapfrog simply copied and pasted the same paragraphs about anti-SLAPP found in its pretrial PFFCL. *Id.* ¶¶ 589–598.

One month after the parties submitted their proposed findings, this Court entered its post-trial order imposing liability on Leapfrog under FDUTPA. *See* Dkt. 212. The Court found that "Leapfrog's change in methodology has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety." *Id.* at 2. The Court also found that Leapfrog personnel "intended to create the false impression that Leapfrog's grades reflect actual performance," *id.* at 26; that it was Leapfrog's "central goal" for "poor scores [to] be used to 'harass' the hospitals who chose not to participate," *id.* at 17; that the "decision to increase the penalty for nonparticipation was a simple business decision," *id.* at 2; that "Leapfrog understood that penalizing hospitals

could impact their grades," *id.* at 20; that Leapfrog personnel knew its "expert panel" had not approved the methodology change, *id.* at 24 n.6; and that Leapfrog personnel "want[ed] consumers to think that visiting a hospital with a C, D or F grade could seriously injure or even kill them," even though Leapfrog lacked any "real data" substantiating that claim, *id.* at 24. The Court's order awarded an injunction to the Community Hospitals, adopting the general formulation the Community Hospitals had requested while slightly narrowing the scope of relief. *Compare* Dkt. 203, ¶¶ 282–296, *with* Dkt. 212 at 40–41.

In the intervening months, Leapfrog has not sought a stay from this Court or the Eleventh Circuit. *See* Fed. R. App. P. 8(a). To the contrary, it has publicly represented that it will comply with the injunction, *see* Dkt. 219-1 & n.1, and says it has already begun to do so, *see* Dkt. 215. Paradoxically, Leapfrog now contends that the injunction violates its First Amendment rights and that it is entitled to a new trial or dissolution of the injunction under Rule 59(a) or (e). But Leapfrog premises its purported entitlement to admittedly "exceptional" relief on a mix of arguments this Court either already rejected or was never asked to consider. Dkt. 220 at 1.

**LEGAL STANDARDS**

Rule 59 of the Federal Rules of Civil Procedure governs requests for a new trial or to alter or amend the judgment. *See* Fed. R. Civ. P. 59(a), (e). Neither form of relief permits a losing party to rehash already-decided issues or to introduce new arguments that could have been previously pressed. As the Eleventh Circuit has explained, "a motion for new trial is not a vehicle for sandbagging an opposing party" after the defendant receives "an unfavorable verdict." *Cummings v. Dep't of Corr.*, 757 F.3d 1228, 1235 (11th Cir. 2014). Nor may the losing party "merely seek to relitigate old issues." *F.W. Woolworth Co. v. Seckinger*, 125 F.2d 97, 98 (5th Cir. 1942). So too with motions to alter or amend the judgment. As Leapfrog's own case explains, courts evaluating Rule 59(e) motions "will not address new arguments or evidence that the moving party could have raised before the decision issued." *Banister v. Davis*, 590 U.S. 504, 508 (2020); *accord Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005) (parties "cannot use a Rule 59(e) motion to relitigate old matters, [or] raise argument or present evidence that could have been raised prior to the entry of judgment"). Discretion to deny a motion to alter or amend the judgment "is 'especially soundly exercised' when a party gives no reason for not previously raising an issue." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009).

The failure to assert a purported constitutional right at the procedurally appropriate stage

forfeits the argument. *See Clement v. U.S. Att'y Gen.*, 75 F.4th 1193, 1202 (11th Cir. 2023) ("mere lack of diligence is sufficient to forfeit a constitutional or statutory right"). The First Amendment is no exception. *See Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 475 (11th Cir. 1999) (refusing "to consider" the issue when litigant "did not present a First Amendment argument").

## ARGUMENT

Leapfrog's Rule 59 Motion should be denied. The old arguments Leapfrog rehashes are squarely barred by the longstanding prohibition against the use of Rule 59 for relitigation. And Leapfrog's new arguments—which Leapfrog itself admits it did not previously "cal[l] out," Dkt. 220 at 3—are likewise barred by the equally basic rule that post-judgment motions may not be used to belatedly assert unpreserved allegations of error.

### I. Leapfrog's Pure-Opinion Argument Is Barred, Abandoned, And Meritless

Leapfrog's Motion principally contends that its Safety Grades and methodology constitute "statements of pure opinion" "unassailable" under the First Amendment, Dkt. 220 at 7–8, including because Leapfrog's "imputed-value scores" are not "verifiab[le]," *id.* at 12, and because Leapfrog supposedly adequately "*disclosed* its basis for imputing those scores," *id.* Having already made and lost these arguments, however, Leapfrog cannot revive them with this Court post-judgment. And those arguments are meritless in any event.

**1.** Leapfrog's primary argument—that its Safety Grades and methodology are non-actionable "pure opinion"—was already litigated at the motion-to-dismiss stage. Leapfrog's motion-to-dismiss brief contended that Leapfrog's "Safety Grades and related representations are protected under the First Amendment because they are not readily provable as true or false," and because Leapfrog allegedly publishes "the full grading methodology and data that form the basis" for the Grades, along with "Leapfrog's representations related thereto." Dkt. 39 at 2. Leapfrog continued in this vein for several pages, arguing that its Safety Grades, methodology, and "related representations" constitute "'pure opinion,'" either because they are "'subjective,'" *id.* at 11–12, or because Leapfrog's "methodological approach is explained extensively" on its website, *id.* at 15.

That framing failed to persuade the Court. The Court's order noted Leapfrog's "claim[ that] its online grades and methods are protected as unfalsifiable, purely opinionated speech." Dkt. 41 at 5. Citing the same case Leapfrog's brief now leads with, *Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018), the Court explained that those grades and methods would enjoy First Amendment protection if they were, indeed, "'not readily capable of being proven false'" or were

"'pure opinion,'" Dkt. 41 at 5 (quoting *Turner*, 879 F.3d at 1262). But, the Court explained, FDUTPA claims are not barred when they involve "false or misleading statements about the rating process itself," including false statements that "mislead consumers" about how the ratings they consume are calculated and what they represent (*e.g.*, "absent" instead of "damning data"). *Id.* at 5–6. The Court thus rejected Leapfrog's pure-opinion argument as "inapplicable." *Id.* at 6.

That spells the end for Leapfrog's Motion. By now contending that its "Safety Grades" and their "underlying imputed-value methodology" are "pure opinion that is unassailable under the First Amendment," Dkt. 220 at 8, the Motion "improperly attempt[s] to relitigate old matters by rehashing arguments" Leapfrog "previously made" and lost. *Allaben v. Howanitz*, 579 F. App'x 716, 719 (11th Cir. 2014). It is thus barred by Eleventh Circuit precedent.

To circumvent that conclusion, Leapfrog tries to recast this Court's motion-to-dismiss holding. According to Leapfrog, this Court—in calling Leapfrog's pure-opinion defense "inapplicable"—in fact imposed constitutional "guardrails" by recognizing a supposed "constitutional line" between Leapfrog's Safety Grades and methodology, on the one hand, and "Leapfrog's representations *about* the methodology and Grades," on the other. Dkt. 220 at 8–9. On Leapfrog's telling, the Court "correctly recognized" that the Grades and methodology are nonactionable opinions, even if Leapfrog's misrepresentations "*about* the methodology" enjoy no such protection. *Id.* Then, according to Leapfrog, the Court apparently forgot about this supposed constitutional holding and "transgresse[d]" the "guardrails" it "acknowledged" with an injunction that violates the First Amendment by including the Safety Grades and methodology. *Id.* at 9.

The Court's order does not support that reading. The Court instead recognized that ratings themselves can be deceptive when they falsely purport to rest on objective information like "damning data," Dkt. 41 at 6, and nowhere restricted the Community Hospitals' case solely to "representations *about* the methodology," *contra* Dkt. 220 at 9. The rest of the order confirms the point. The order recognized that the Community Hospitals' FDUTPA claim concerned not just Leapfrog's "lie[s] to consumers about how it calculates overall grades," but also that Leapfrog "arbitrarily assign[s] poor safety ratings to hospitals" through "publication of safety grades." Dkt. 41 at 7. The Court defined both aspects of "this conduct" as part of the Community Hospitals' "full claim," *id.* at 7–8—language that would not make sense had the Court just deemed assignment and issuance of Safety Grades themselves off-limits.

**2.** Tellingly, Leapfrog until now has never contended that the Community Hospitals'

evidence and arguments about the methodology and Safety Grades (whether at summary judgment, trial, or in post-trial briefing) exceeded the Court's motion-to-dismiss order. To the contrary, Leapfrog deliberately abandoned its motion-to-dismiss argument that its Safety Grades and methodology are pure opinion by offering a flatly inconsistent position at trial. There, Leapfrog portrayed the penalty for alleged non-response bias (*i.e.*, the notion that non-participating hospitals are hiding adverse information) as based on "the science they teach in medical school" and "within scientific reasoning" purportedly approved—though concededly never voted on—by Leapfrog's expert panel. Day 5 Tr. 47:16–17, 63:23–64:6. Leapfrog's post-trial PFFCL also requested findings that its Safety Grades are based on "a scientific process" and "not arbitrary," but "based on evidence" measuring numerous objective inquiries (like "actual patient harm"). Dkt. 204 ¶¶ 71–72. These arguments cannot be reconciled with Leapfrog's motion to dismiss, reflecting Leapfrog's abandonment of its earlier pure-opinion theory. Imputation cannot be a subjective opinion if, as Leapfrog maintained throughout trial, it is based on the scientifically valid measurement of falsifiable information. *See, e.g.*, *Regions Bank v. Commonwealth Land Title Ins. Co.*, 2012 WL 6553966, at *2 (S.D. Fla. Dec. 14, 2012) ("[A] party, in fairness, ought not be able to argue one thing, lose, and then take a different position later.").

**3.** Even if Leapfrog's pure-opinion argument were not forfeited, it is meritless. The core relief the injunction's first prong awarded, about which Leapfrog principally complains, *see* Dkt. 220 at 9, focused on Leapfrog's *conduct* in perpetrating a coercive scheme to extract hospital data. The "precis[e]" problem this Court identified was "Leapfrog's behavior" in using the threat of bad Safety Grades imposed pursuant to an arbitrary methodology "to pressure and penalize hospitals into participating" in Leapfrog's Survey, even though Leapfrog has no "right to Plaintiff's private data" that Leapfrog extracts through such coercion. Dkt. 212 at 39. As this Court noted, this threat is a form of "'blackmail,'" *id.* at 36—conduct that goes far beyond the mere expression of an opinion. And the "regulation of conduct does not violate the First Amendment." *Rumsfeld v. Forum for Acad. & Institut. Rts., Inc.*, 547 U.S. 47, 70 (2006); *accord United States v. Irving*, 509 F.2d 1325, 1331 n.5 (5th Cir. 1975) ("blackmail" is "properly punished every day" "without consideration of First Amendment issues").

Nor do Leapfrog's Safety Grades and methodology constitute pure opinions on their own terms. Arbitrarily calling something an "opinion" does not make it so when the statement "implies a knowledge of facts which lead to the conclusion." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18

(1990). Leapfrog's Safety Grades and methodology purport to rest on "empirical determination[s] subject to verification," *Michel v. NYP Holdings*, 816 F.3d 686, 697 (11th Cir. 2016), foreclosing their portrayal as merely "'subjective opinion'" under Leapfrog's own precedent, *Home Performance All. v. Better Bus. Bureau of W. Fla., Inc.*, 354 So. 3d 1165, 1166 (Fla. DCA 2d 2023). As this Court's order recognized, Leapfrog's Survey, on which its Grades are based, claims to "collec[t] and transparently repor[t] hospital and ASC *performance*" based on "22 quality safety metrics" that "underlie [the] letter grade" Leapfrog issues. Dkt. 212 at 3–4 (emphasis added). These metrics purport to rest on "data sources," not subjective whim. *Id.* at 5. When Leapfrog is missing data on "imputed" metrics—like whether physicians wash their hands—Leapfrog does not exclude those metrics, but arbitrarily assigns "the lowest score," supposedly reflecting "*Limited Achievement*" on that metric. *Id.* at 6–7 (emphasis added). Leapfrog then issues a "Safety Grade" as "the product of [this] information" (or the lack thereof). *Id.* at 4.

Both the Safety Grade and methodology thus claim to answer factual questions about how hospitals "actually perform" on patient safety. Dkt. 212 at 27. It is not a matter of "editorial … judgment," *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), or "differing interpretations," *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995), that physicians at the Community Hospitals do not wash their hands. That is an "empirical [claim] subject to verification." *Michel*, 816 F.3d at 697. Similarly, the Safety Grades are not "pure opinions" either, since they claim to be the final summation of those factual questions and "reflect actual safety performance," Dkt. 212 at 24—not a subjective assessment of matters of taste.

Leapfrog's caselaw is either beside the point or merely confirms that its Safety Grades and methodology are not "pure opinion." For example, a statement deeming "a musical-comedy version of 'The Phantom of the Opera'" to be "'fake'" and "'phony,'" *Phantom Touring, Inc. v. Affiliated Pubs.*, 953 F.2d 724, 725, 728 (1st Cir. 1992), *see* Dkt. 220 at 11, plainly concerns a subjective assessment of taste. Such statements have no inherent "factual connotation." *Phantom Touring, Inc.*, 953 F.2d at 727. But they bear no resemblance to Leapfrog's purportedly scientific methodology that claims to answer falsifiable questions, like whether doctors wash their hands. Leapfrog also ignores aspects of its cited cases that undermine its own theory. *Structural Plywood*, for example, did not hold that safety ratings are "just everyone's opinion." *Contra* Dkt. 220 at 9. The decision in fact recognized that by stamping lumber with ratings, the company represented it "had subjected the mills to certain quality-control processes," which "isn't subjective at all." *U.S.*

*Structural Plywood Integrity Coal. v. PFS Corp.*, 524 F. Supp. 3d 1320, 1335 (S.D. Fla. 2021). So too here: Leapfrog's Safety Grades supposedly are the product of objective factual data, even though they are not. Similarly, *Masson* recognized that whatever "interpretive license" an author otherwise might have to interpret data, that license goes out the window when the author simply "fabricate[s]" information. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 511 (1991).

Implicitly recognizing that its Safety Grades and methodology are "verifiabl[e]," Leapfrog invites the Court to nonetheless treat them as pure opinion because there is supposedly "no dispute that Leapfrog *disclosed* its basis for imputing those scores." Dkt. 220 at 12. According to Leapfrog, its Safety Grades and methodology are non-actionable because they are "based on a fully disclosed and indisputably *truthful* fact" (*i.e.*, that non-participating hospitals did not respond to the Survey). *Id.* Leapfrog then accuses this Court of violating Leapfrog's "inalienable right to free expression" because Leapfrog did not satisfy this Court's "preferences for web design" by burying its incomprehensible methodology on its website. *Id.* at 13.

Leapfrog's characterization of this Court's decision misstates the law and ignores the Court's thorough factual findings. Leapfrog cites various cases allegedly supporting its view that bare disclosure of its methodology elsewhere converts its Safety Grades into pure opinion. But those cases are not on-point. They all turned on a reader's ability to easily distinguish commentary from facts themselves, either because the author expressly made that distinction in the same publication or because the interpretive nature of the author's statements would be obvious based on a reader's existing background knowledge.[1]

Leapfrog's Safety Grades and methodology, by contrast, purport to be *conveying facts*—whether hospitals' performance reflects only "Limited Achievement" on objectively falsifiable metrics, like whether doctors use computers to order medication. Dkt. 212 at 6. There is no reason to believe that reasonable consumers of the Safety Grades already know those facts—knowledge which would make consumption of the Safety Grades unnecessary. That is why Leapfrog holds itself out (falsely) as "collect[ing] and transparently report[ing] hospital and ASC performance" in

[1] *See Lewis v. Abramson*, 673 F. Supp. 3d 72, 93 (D.N.H. 2023) ("*clear* that the statements were simply interpretations of the facts disclosed in the links" (emphasis added)); *Turner*, 879 F.3d at 1262 (facts must be "set forth in the publication" or "otherwise known or available"); *Partington v. Bugliosi*, 56 F.3d 1147, 1156–57 (9th Cir. 1995) ("*clear* that the challenged statements represent his own interpretation" (emphasis added)); *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 296 (Fla. DCA 2d 1984) (facts must be "disclosed in the article" or "known or readily available"); *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497–98 (2d Cir. 2013) (requiring "an accurate description of the data" so readers could evaluate statements' "validity" "on their face"); *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. DCA 1st 1981) ("everyone … would have known" the fact even absent article).

the first instance—because consumers do not already know those facts. *Id.* at 3.

Nor does Leapfrog's bare posting of its methodology somewhere else make it "clear," as in the above cases, that its Safety Grades and methodology are mere subjective musings. At trial—and certainly to the public—Leapfrog held out its methodology as a "scientific" depiction of "actual performance," *see supra* 8; Dkt. 212 at 2, 26, not a creative interpretation of non-existent data. And that Leapfrog's methodology baselessly extrapolates poor performance from no data was far from "clear" to consumers. As this Court found, the Community Hospitals offered "persuasive evidence in the form of Google Analytics" that only *three percent* of website visitors during the relevant period even "accessed [Leapfrog's] Scoring Methodology document." Dkt. 212 at 31. That is unsurprising: Users had to navigate "hindrance after hindrance," including "small," "inconspicuous," and "gray-font" hyperlinks, to find the methodology document—a "dense" tome that Leapfrog's own CEO conceded "'is not meant to be used by the average layperson.'" *Id.* In fact, "all of this is what Leapfrog intended"—to hide its methodology from consumers to maintain the façade "that the grades assigned reflect actual performance." *Id.* at 25, 31. Leapfrog offers no reason to think those careful factual findings are mistaken. And those findings show that the situation here is far removed from situations where reasonable readers would have readily understood the author was merely offering an opinion rather than attempting to convey objective facts.

Leapfrog plainly disagrees with the Court's factual findings. *See, e.g.*, Dkt. 220 at 14 (insisting Leapfrog went "out of its way to disclose" its methodology). But Leapfrog identifies no error, much less clear error. Thus, Leapfrog's "it's all *technically* there" defense is as wrong now as it was the last time. Dkt. 212 at 30. Simply making the methodology document "*available*," Dkt. 220 at 14, did not make it clear Leapfrog was somehow offering mere opinion, rather than conveying false statements of fact. Thus, Leapfrog's website and methodology document do not transform its Safety Grades or methodology into "pure opinion."

## II. Leapfrog's Actual-Malice Argument Is Forfeited And Meritless

In a belated attempt to shore up the record for appeal, Leapfrog also details several new arguments that "could have been raised prior to the entry of judgment." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007). Providing no "reason for not previously raising" them, *Wilchombe*, 555 F.3d at 957, Leapfrog instead admits it permitted the case to proceed "without Leapfrog calling out" these supposed "excesses," Dkt. 220 at 3. The first is Leapfrog's claim that the Court's injunction is "constitutionally infirm" because the Court made no "finding of actual malice." *Id.* at

14. This apparently is an alternative argument to Leapfrog's "pure opinion" theory; whereas opinions definitionally cannot be false, actual malice is relevant only if, as Leapfrog recognizes, statements are capable of being proven false. *Id.* Developed in the context of libel actions, the doctrine requires proof that the defendant was at least "reckless" about statements' falsity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964). "Although the erroneous statement of fact is not worthy of constitutional protection," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974), the doctrine is designed to protect "'breathing space'" for "free debate," *Sullivan*, 376 U.S. at 271–72.

**1.** Leapfrog's actual-malice argument is forfeited. Leapfrog failed even to *mention* the term "actual malice" across hundreds of pages of briefing and five days of trial, much less present an argument about why and how that standard would apply here. Its Motion suggests the argument was preserved either in Leapfrog's motion for summary judgment or its pretrial PFFCL. Dkt. 220 at 4. But neither document mentions "actual malice." The summary-judgment motion vaguely states that "Leapfrog's mission is premised on free speech in connection with a public issue," Dkt. 99 at 19, but it does not request judgment on that basis or suggest the Community Hospitals failed to establish actual malice (or had the burden to do so). To the contrary, Leapfrog phrased the argument in purely conditional terms, stating that "*if this Court grants Leapfrog's motion* [*i.e.*, for summary judgment], summary judgment on its anti-SLAPP defense is also warranted." *Id.* (emphasis added). Leapfrog's pretrial PFFCL also does not mention actual malice or contend that the Community Hospitals failed to establish it, instead simply rehashing the anti-SLAPP point from its prior brief. Dkt. 135 ¶¶ 383–92. So too with Leapfrog's pretrial stipulation, *see* Dkt. 129, which never claims the Community Hospitals had this burden at trial.

None of that suffices. "'[T]o preserve a claim, argument, theory, or defense,'" the defendant "'must first clearly present it to the district court … in such a way as to afford the district court an opportunity to recognize and rule on it.'" *Juris v. Inamed Corp.*, 685 F.3d 1294, 1325 (11th Cir. 2012). A mere "'passing referenc[e]' to an issue" is insufficient "to preserve it," *NLRB v. Gaylord Chem. Co., LLC*, 824 F.3d 1318, 1333 (11th Cir. 2016), as is the "bare invocation" of a legal concept "without any argument," *United States v. Defilippis*, ---F.4th---, 2026 WL 1067115, at *10 n.9 (11th Cir. Apr. 20, 2026). Leapfrog's conclusory references to its "mission" implicating a "public concern" thus did not present or preserve an actual-malice argument, precluding

consideration of the new defense under Rule 59. *See Arthur*, 500 F.3d at 1343.[2]

Unable to show where Leapfrog preserved its new argument, Leapfrog instead mischaracterizes the Community Hospitals' briefs, claiming that *the Community Hospitals* somehow preserved *Leapfrog's* new argument in their pretrial PFFCL. That argument is a non-starter, as the burden is on the party asserting the error to have preserved it. *See Juris*, 685 F.3d at 1325. It is also nonsensical. According to Leapfrog, the Community Hospitals "acknowledged" and "recognized" that "actual malice must be found" here. Dkt. 220 at 15. Not so. The Community Hospitals said the opposite: the standard was *inapplicable* under this Court's motion-to-dismiss order and "[e]ven if" the standard applied it would be satisfied given the clear evidence Leapfrog's personnel knew the Safety Grades were bogus. Dkt. 136 ¶ 133. Tellingly, over the course of trial and later briefing, Leapfrog never disputed or responded to this point, never mentioned "actual malice," and never contended that the Community Hospitals' actual-malice analysis ("even if" the standard were applicable) was wrong. Leapfrog's silence *even after* the Community Hospitals preemptively knocked down the argument demonstrates forfeiture, not preservation. Indeed, Leapfrog's conduct strongly suggests "a tactical decision to forego [the] objection at trial," about which Leapfrog now "cannot complain." *Francois v. Wainwright*, 741 F.2d 1275, 1282 (11th Cir. 1984).

"'[N]o procedural principle is more familiar … than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right.'" *Clement*, 75 F.4th at 1202 (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)). That principle applies with particular force here, as Leapfrog has given "no reason" why it knowingly "failed to raise this new legal theory before judgment was rendered." *Wilchombe*, 555 F.3d at 957. Leapfrog's actual-malice argument is thus forfeited and not cognizable under Rule 59.

**2.** In any event, Leapfrog's actual-malice argument is also meritless. Actual malice is irrelevant to the specific conduct this Court enjoined. And even if actual malice applied here, the Community Hospitals' evidence amply established that Leapfrog was "highly aware" its Safety Grades and methodology rested on "probably false" information. *Michel*, 816 F.3d at 703.

[2] Leapfrog also did not preserve its actual-malice theory (or any of its other new theories) by raising its pure-opinion defense at the motion-to-dismiss stage. A party does not preserve one issue by asserting a different issue "simply because both fall under the [same] broader rubric," such as the First Amendment. *Flowers v. Comm'r, Soc. Sec. Admin.*, 97 F.4th 1300, 1306 (11th Cir. 2024). Thus, a new issue is forfeited when it relies on "a wholly different legal framework" than the issue actually asserted. *Gould v. Interface, Inc.*, 153 F.4th 1346, 1357 (11th Cir. 2025).

As a threshold matter, Leapfrog's actual-malice argument rests on a false equivalence between the facts of this case and the common-law speech torts that spurred the Supreme Court to develop the actual-malice standard—likely why Leapfrog cites no cases applying actual malice to FDUTPA. The problem here is not that Leapfrog published a false statement negligently, *cf. Sullivan*, 376 U.S. at 288, or merely said something "'disagreeable,'" *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). To the contrary, Leapfrog actively leveraged the threat of intentionally false statements to extract valuable data from hospitals in advance of the publication of Safety Grades. Thus, this case does not concern "falsity alone," but Leapfrog's use of false statements "to gain a material advantage." *United States v. Alvarez*, 567 U.S. 709, 719, 713 (2012) (plurality). It is akin to a reporter demanding a payoff to withhold publication of false, damaging information. That is not a "new category" of unprotected speech, *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020), but a type of conduct that has never enjoyed protection, *see Irving*, 509 F.2d at 1331 n.5.

This Court's order emphasized this commonsense point. "[P]recisely what concern[ed]" the Court was "Leapfrog's *behavior*"—its use of "leverage" through the threat of a non-participation penalty "to pressure and penalize hospitals into participating" in Leapfrog's Survey, and thus to gain access to hospitals' "private data" to which Leapfrog has no "right," so that Leapfrog could "maximize revenue" by monetizing the information. Dkt. 212 at 35, 39 (emphasis added). The injuries here thus arose not from "'the bare fact of publication'" of speech itself, *Sullivan*, 376 U.S. at 262, but from an "unfair or deceptive ac[t] or practic[e]" to improperly extract data from hospitals for commercial gain, Fla. Stat. § 501.204(1). Stamping out unfair conduct may incidentally burden speech. But "a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment." *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004). Simply put, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

**3.** Even if actual malice *did* apply here, it would be easily satisfied by the evidence at trial and this Court's findings. That standard does not immunize false speech. Instead, it requires the plaintiff to show clear evidence that the speaker "was highly aware that the [information] was probably false." *Michel*, 816 F.3d at 703. For example, a publisher acted with actual malice when it "knowingly chose language" open to a false interpretation despite having "sufficient time" to confirm an assertion's accuracy. *Hunt v. Liberty Lobby*, 720 F.2d 631, 642, 646 (11th Cir. 1983).

This Court's order is replete with factual findings about Leapfrog personnel's subjective awareness that Leapfrog's Safety Grades and surrounding representations rested on false information. For example, Leapfrog personnel "intended to create the false impression that Leapfrog's grades reflect actual performance." Dkt. 212 at 26. But Leapfrog personnel knew the actual, "acknowledged goal" of the methodology change was "punishing nonparticipants," *id.*, by simply "imputing … the lowest score," *id.* at 22. Indeed, they "*intended* that lower scores" would serve as "a punitive measure." *Id.* at 21. Leapfrog personnel also knew that "assignment" of these artificially low scores was "mathematically arbitrary" and "chose arbitrarily low numbers" to create the impression a "hospital was graded on *something*, when in truth it was based on nothing." *Id.* at 25, 28. And they "intended" to hide Leapfrog's methodology document to conceal how Leapfrog's "ratings *actually* work," so that consumers would continue to be duped into believing the Safety Grades were reliable. *Id.* at 30–31. These repeated and extensive findings confirm Leapfrog's personnel *at minimum* were "highly aware" the Safety Grades "probably" rested on false information, *Michel*, 816 F.3d at 703, and, indeed, confirm that they actually knew of such falsity at the time. Tellingly, Leapfrog even used grant money to "specifically target" consumers in certain Florida zip codes with advertisements to ensure those searching for the Community Hospitals "would be shown the failing Safety Grades"—a tactic Leapfrog personnel characterized as "harass[ing]" and that of "a Disney villain." Dkt. 212 at 17, 32.

Given that Leapfrog apparently seeks to reverse this Court by contending that an actual-malice finding is "missing," Dkt. 220 at 14, this Court could make explicit what its findings already establish by using the magic words "actual malice" to describe its findings in its order disposing of the Motion. Regardless, however, Leapfrog's argument has no basis in this case's record.

## III. Leapfrog's Statutory Argument Is Barred, Forfeited, And Meritless

Leapfrog also urges the Court to "reconsider the judgment on statutory grounds," claiming that Leapfrog's representations and behavior do not qualify as "deceptive" or "unfair" practices under FDUTPA as a matter of "statutory interpretation," including because Leapfrog "disclosed [its] methodology." Dkt. 220 at 17. And it tacks on a "constitutional-avoidance" argument, contending that the Court should construe purported "ambiguity" in FDUTPA's text to avoid deciding Leapfrog's forfeited actual-malice defense. *Id.* at 17–18. Each argument fails.

Framed as a statutory argument, Leapfrog's contention that its conduct falls outside of FDUTPA was already rejected by this Court, and Leapfrog may not "relitigate old matters."

*Michael Linet, Inc.*, 408 F.3d at 763. At the motion-to-dismiss stage, Leapfrog argued that its "Safety Grades and related representations" do not "constitute unfair or deceptive trade practices" and accused the Community Hospitals of having failed to "plead a 'deceptive act' or 'unfair practice'" under FDUTPA, including because Leapfrog is supposedly "transparen[t]" in publishing its methodology. Dkt. 39 at 19–20. This Court disagreed. As it explained, the Community Hospitals "alleged that [Leapfrog] arbitrarily assigned poor ratings to hospitals, then lied to consumers about how it calculates overall grades." Dkt. 41 at 7. Taking those allegations as true, the Court found that they qualify "as a deceptive act or unfair practice." *Id.* Indeed, such conduct would "plainly fal[l] within the ambit of the FDUTPA" if proven. *Id.* After the Community Hospitals proved their case at trial, the Court again explained why Leapfrog's conduct falls within FDUTPA's scope as a statutory matter, analyzing text, precedent, and relevant guidance from the Federal Trade Commission. Dkt. 212 at 18, 36–37. Leapfrog offers no reason to depart from these considered holdings as a statutory matter. It simply rehashes (again) the claim that Leapfrog "disclosed" its "methodology," which supposedly should have dispelled deception for the "reasonable consumer," Dkt. 220 at 18—a proposition foreclosed by the Court's extensive factual findings, *see supra* 11.

Framed as a constitutional-avoidance theory, Leapfrog's argument is forfeited and meritless. Leapfrog never previously argued that its conduct should be construed to fall outside of FDUTPA on avoidance grounds, and its Motion does not even attempt to identify how Leapfrog preserved the argument. Constitutional avoidance also applies "only when ambiguity exists." *Iancu v. Brunetti*, 588 U.S. 388, 397 (2019). Yet Leapfrog identifies no relevant ambiguity in FDUTPA's text. "[A] statute is not vague or ambiguous just because it is broad." *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1240 (11th Cir. 2000). And there is "no constitutional violation to avoid," *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1094 (11th Cir. 2017), given that Leapfrog's constitutional arguments are forfeited and meritless.

### IV. Leapfrog's Prior-Restraint Argument Is Forfeited And Meritless

Leapfrog next attacks the "scope" of the injunction as an "unconstitutional prior restraint" on speech. Dkt. 220 at 18. In support of that argument, Leapfrog claims that injunctions "that proscribe speech itself are per se unconstitutional" and that courts may not impose "'injunctions regarding speech in any circumstance, *even where liability ... has been found*'"—an argument that, if accepted, would have truly extraordinary implications for consumer-protection regimes nationwide. Dkt. 220 at 18 (emphasis in original). This argument is forfeited and meritless.

Across all of its pretrial briefs, throughout five days of trial, and in its lengthy post-trial PFFCL, Leapfrog failed to articulate—let alone develop—any argument that an injunction here would represent an impermissible prior restraint. Leapfrog never raised the argument even after the Community Hospitals extensively detailed the relief they intended to seek at closing argument (including a slide deck spelling out the remedial request), even after counsel for Leapfrog expressly acknowledged the scope of the Community Hospitals' request in open court, *see* Day 5 Tr. 42:15–22, and even after the Court instructed the parties to include all legal arguments they wished to make in their post-trial PFFCL. *See supra* 4. This silence is deafening—and conclusive.[3]

Even if the scope of the injunction were in error (which it is not), Leapfrog in fact *invited* that error. In a colloquy with the Court about the scope of relief, Leapfrog's counsel asserted that the Community Hospitals were using FDUTPA "to silence simple speech." Day 5 Tr. 44:2. After the Court pointed out that "FDUTPA can be used for deceptive speech," *id.* at 44:5, Leapfrog's counsel responded, "They [*sic*] can," *id.* at 44:6. Having "expressly acknowledged the court could impose" relief for deceptive speech, Leapfrog is "precluded from claiming the court erred" by doing so. *United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006).

In any event, Leapfrog's prior-restraint argument is also meritless even if it were cognizable. The Court's injunction does not prevent Leapfrog from publishing speech "'of any kind,'" *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971), but zeroes in on Leapfrog's coercive *conduct* in running an unfair scheme to extract hospital data. It does not purport to dictate the content of the Community Hospitals' Safety Grades or require that the Community Hospitals be issued good Safety Grades. To the contrary, it enjoins the deceptive and unfair practice of applying different metrics to participating and non-participating hospitals, a "narrowly drawn" restriction "precisely" targeting what made Leapfrog's scheme unlawful in the first place. *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 184 (1968). That the injunction encompasses use of any "similar" unfair methodology is also appropriate and unsurprising: Injunctions would be "for naught" if they could be evaded through a "program of experimentation with disobedience of the law." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192–93 (1949).

[3] The only reference Leapfrog apparently ever made to prior restraint came in part of one sentence in its summary-judgment brief, where it contended that the "filing of this case"—not the injunction—"amounts to prior restraint on free-speech." Dkt. 99 at 19. This "'single, passing reference' to an issue 'unaccompanied by any discussion or elaboration' does not preserve an argument," *United States v. Horn*, 129 F.4th 1275, 1303 (11th Cir. 2025), particularly when Leapfrog has given "no reason for not previously raising [the] issue," *Wilchombe*, 555 F.3d at 957.

The injunction, of course, also requires Leapfrog to remove existing Safety Grades assigned to the Community Hospitals pursuant to Leapfrog's deceptive and unfair methodology. Dkt. 212 at 41. But the First Amendment does not prohibit narrowly tailored injunctive relief after a final determination that specific conduct and associated representations were deceptive and unfair. As the Supreme Court explained decades ago, it "has never held that all injunctions [affecting speech] are impermissible." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rels.*, 413 U.S. 376, 390 (1973). Rather, "[t]he special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, *before an adequate determination* that it is unprotected by the First Amendment." *Id.* (emphasis added). The Court in that case thus affirmed an injunction against speech, noting that because "no interim relief was granted," the restraint was imposed only after a "final determination" that the speech was "unprotected." *Id.* The Eleventh Circuit embraced similar reasoning in *Lucero v. Trosch*, 121 F.3d 591 (11th Cir. 1997). As it explained, an injunction against protestors did "not constitute a prior restraint" because "the trial court had made a judicial determination that the defendants' past conduct was harassing and unlawful." *Id.* at 601. In other words, the court was not dealing with "a mere threat of a future violation." *Id.* at 601 n.15; *accord Deligdish v. Bender*, 2023 WL 5016547, at *12 (M.D. Fla. Aug. 7, 2023) (courts have "'previously held that a narrowly tailored injunction prohibiting speech *already found* defamatory by the jury is not an invalid prior restraint when a judgment for monetary damages would not afford the plaintiff effective relief'" (emphasis added)).

Leapfrog's purportedly contrary cases only underscore this distinction. They involve situations where a party either requested preliminary relief absent a prior determination of illegality, or, relatedly, sought to restrain *lawful* speech. *See Basulto v. Netflix, Inc.*, 2023 WL 7129970, at *52 (S.D. Fla. Sept. 20, 2023) ("there has been no determination that the statements are false and defamatory"); *Patriot Lending Servs., Inc. v. Amerifirst Fin. Corp.*, 2020 WL 758155, at *3 (M.D. Fla. Feb. 14, 2020) (preliminary relief); *Vrasic v. Leibel*, 106 So. 3d 485, 486 (Fla. DCA 4th 2013) (preliminary relief); *Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1088 (Fla. DCA 3d 2014) (preliminary relief); *id.* at 1090 (acknowledging speech can be enjoined if "made in the furtherance of the commission of another intentional tort"); *Town of Lantana v. Pelczynski*, 290 So. 2d 566, 568 (Fla. DCA 4th 1974) (statute prohibiting core political speech); *Krapacs v. Bacchus*, 301 So. 3d 976, 980 (Fla. DCA 4th 2020) (protected speech); *id.* at 981 (acknowledging that

if speech was "not … protected," it "could be addressed through injunctive relief").[4] Similarly, the injunction in *Sindi v. El-Moslimany*, 896 F.3d 1, 34 (1st Cir. 2018), was deemed overbroad because it enjoined use of specific defamatory words that could lawfully be used in different contexts. Yet Leapfrog presents no argument about some future context in which it lawfully could deploy its methodology to extract hospitals' private data on threat of an arbitrary penalty.

**V. Leapfrog's Compelled-Speech Argument Is Forfeited And Meritless**

Last, Leapfrog briefly attacks the injunction's third and fourth prongs, claiming that they "unconstitutionally compe[l]" speech, Dkt. 220 at 20, by requiring corrective disclosures to entities that "paid to license" the Safety Grades (which Leapfrog represents it has already done, Dkt. 215 ¶¶ 28–33), and to place the same disclosures "in future contracts," "advertising materials," and other materials "that promote paid licensure" of the "next cycle of Safety Grades," Dkt. 212 at 41.

Leapfrog's new compelled-speech argument is forfeited and thus not cognizable under Rule 59. As noted, the Community Hospitals extensively presented at trial on the disclosures they sought, *see supra* 4, and the Court thereafter instructed the parties to include all legal argument—including as to the injunction—in their post-trial PFFCL. Yet Leapfrog failed to raise *any argument* regarding the scope of any eventual injunction in that briefing. *See id.* Leapfrog does not suggest its compelled-speech argument is preserved and provides "no reason for not previously raising" it. *Wilchombe*, 555 F.3d at 957. Moreover, even if there were error here (which there is not), Leapfrog itself invited the alleged error. When the Court asked "what type of injunction would allow [Leapfrog] to continue [its] mission," Day 5 Tr. 80:21–22, Leapfrog's counsel suggested "a better footnote," *id.* at 80:23. This statement is, in fact, the *only* argument Leapfrog offered (until now) regarding the scope of the Court's injunction. Because Leapfrog "expressly acknowledged the court could impose" disclosures as a remedy, Leapfrog cannot now contend that disclosures are impermissible. *Love*, 449 F.3d at 1157. And any challenge to the disclosures Leapfrog already sent is plainly moot. *See Newman v. Alabama*, 683 F.2d 1312, 1317 (11th Cir.

[4] Leapfrog also says the injunction is a prior restraint because of the Community Hospitals' recent letters pointing out that Leapfrog's characterization of Safety Grades on leapfroggroup.org and Leapfrog's contemplated program for grading ambulatory surgery centers ("ASC"s) are inconsistent with the injunction. Dkt. 220 at 3, 6, 19. Leapfrog misrepresents the Community Hospitals' letters by claiming they say "Leapfrog cannot so much as report the basic, irrefutable fact that Plaintiffs declined to respond" to the Survey. *Id.* at 3. The Community Hospitals specifically disclaimed this distortion of their letter *before* Leapfrog filed its Rule 59 Motion. *See* Dkts. 219, 219-3. Leapfrog's continued false characterization of the Community Hospitals' letters is frivolous. Moreover, the Community Hospitals' letters are irrelevant to whether the injunction itself is a "prior restraint." Whether the injunction is properly read to encompass this additional conduct is a determination to be made by this Court in any future injunction enforcement proceedings. The Community Hospitals' position at this juncture does not itself affect the scope of the injunction.

1982) (challenge "moot" when party already "perform[ed] certain discrete acts" required).

Leapfrog's compelled-speech challenge is also baseless. The injunction's disclosure requirements (which this Court carefully tailored, *see* Dkt. 212 at 39–40), target obvious commercial speech—advertisements promoting, and contracts effectuating, paid licensure of the Safety Grades. The Supreme Court for decades has recognized courts' authority to order factual, corrective disclosures in the commercial-speech context, particularly when those disclosures are tied to adjudicated deception. *See, e.g.*, *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985) ("[A]n advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."); *In re R.M.J.*, 455 U.S. 191, 201 (1982) ("warning or disclaimer" can be "appropriately required" to "dissipate the possibility of consumer confusion or deception"). Leapfrog's own case recognizes the point, noting that in the context of "'commercial advertising,'" courts may "requir[e] the dissemination of purely factual and uncontroversial information." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995). And the Eleventh Circuit recently confirmed the point in *FTC v. Corpay*, 164 F.4th 807 (11th Cir. 2026), which Leapfrog's brief ignores, but on which this Court's order expressly relied, Dkt. 212 at 39. *Corpay* affirmed an injunction requiring a company to make future disclosures "'unavoidable'" to consumers, relief warranted by the company's "'intentional'" practice of hiding important information. 164 F.4th at 849–50. This Court made the same finding here: that "Leapfrog intended" for consumers not to be able to locate or understand its methodology, Dkt. 212 at 31, to perpetuate the false belief "that Leapfrog's grades reflect actual performance," *id.* at 26.

Leapfrog's Motion also does not even *try* to object to the content of the required disclosures, which closely tracks disclosures ordered in similar cases. *See, e.g.*, *MacuHealth, LP v. Vision Elements, Inc.*, 2024 WL 3738489, at *9–10 (M.D. Fla. Aug. 9, 2024). The disclosures do not require Leapfrog to abandon its mission or express agreement with the Community Hospitals regarding hospital safety. They require disclosure of a "'purely factual and uncontroversial statement'" concerning the outcome of this litigation to entities that pay to license the challenged Grades—which Leapfrog itself recognizes is permissible, Dkt. 220 at 20.

**CONCLUSION**

The Court should deny Leapfrog's motion for reconsideration and to alter or amend the judgment, or for a new trial.

Dated: May 14, 2026

Respectfully submitted,

By: /s/ *Jeffrey Marcus*

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Ave.
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

By: /s/ *Mary Beth Maloney*

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**THE COMMUNITY HOSPITALS' VERIFIED MOTION FOR ATTORNEYS' FEES AND COSTS**

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

BACKGROUND .......... 2

LEGAL STANDARD .......... 5

ARGUMENT .......... 5

I. The Community Hospitals Are Entitled To Fees And Costs Under FDUTPA .......... 5

A. The Community Hospitals Are Prevailing Parties .......... 6

B. The Equitable Factors Strongly Support An Award Of Fees And Costs .......... 7

II. The Attorneys' Fees Sought By The Community Hospitals Are Reasonable .......... 13

A. The Hourly Billing Rates Are Reasonable .......... 13

B. The Total Hours Expended Are Reasonable .......... 17

III. The Costs Sought By The Community Hospitals Are Reasonable .......... 19

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU v. Barnes*,
168 F.3d 423 (11th Cir. 1999) ....................18

*Akai Custom Guns, LLC v. KKM Precision, Inc.*,
2025 WL 2663071 (S.D. Fla. Aug. 29, 2025)....................18

*Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*,
2020 WL 6808856 (S.D. Fla. Apr. 16, 2020) ....................20

*Berk v. Choy*,
146 S. Ct. 546 (2026)....................6

*Bluegreen Vacations Unlimited, Inc. v. Timeshare Lawyers P.A.*,
2024 WL 3738890 (S.D. Fla. July 18, 2024)....................6, 7, 11, 12, 18, 19, 20

*Cable/Home Commc'n Corp. v. Network Prods., Inc.*,
902 F.2d 829 (11th Cir. 1990) ....................13

*Chow v. Chak Yam Chau*,
640 F. App'x 834 (11th Cir. 2015) (unpublished)....................5, 6, 7, 19

*City of Riverside v. Rivera*,
477 U.S. 561 (1986)....................18

*Democratic Republic of Congo v. Air Cap. Grp.*,
2016 WL 11739606 (S.D. Fla. Sept. 29, 2016) ....................7

*Diamond Aircraft Indus., Inc. v. Horowitch*,
107 So. 3d 362 (Fla. 2013)....................5, 6

*Domond v. PeopleNetwork APS*,
750 F. App'x 844 (11th Cir. 2018) ....................19

*Environmental Manufacturing Solution, LLC. v. Peach State Labs, Inc.*,
274 F. Supp. 3d 1298 (M.D. Fla. 2017)....................20

*Epic Sys. Corp. v. Decapolis Sys., LLC*,
2024 WL 5236912 (S.D. Fla. Nov. 25, 2024)....................14

*Flexiteek Ams., Inc. v. Plasteak, Inc.*,
2016 WL 7497485 (S.D. Fla. Feb. 4, 2016) ....................18

*Fox v. Vice*,
563 U.S. 826 (2011)....................13

*FTC v. Corpay, Inc.*,
164 F.4th 807 (11th Cir. 2026) ....................12

*Glob. Digital Sols., Inc. v. Grupo Rontan Electro Metalurgica, S.A.*,
2021 WL 7630524 (S.D. Fla. Aug. 16, 2021)....................13

*Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*,
2025 WL 1644541 (M.D. Fla. May 15, 2025)....................9, 10

*Healthcare Res. Mgmt. Grp., LLC v. EcoNatura All Healthy World, LLC*,
2022 WL 1537757 (S.D. Fla. May 12, 2022)....................9, 13

*Herbst v. Am. Orthodontics Corp.*,
2025 WL 3755394 (S.D. Fla. Jan. 23, 2025)....................13

*HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*,
2018 WL 1863778 (M.D. Fla. Mar. 26, 2018)....................8

*Humane Soc. of Broward County, Inc. v. Fla. Humane Soc.*,
951 So. 2d 966 (Fla. 4th DCA 2007)....................7

*Infogroup Inc. v. Off. Depot Inc.*,
2024 WL 4110526 (S.D. Fla. Aug. 21, 2024)....................14

*Johnson v. Georgia Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974)....................14

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*,
30 F.3d 113 (11th Cir. 1994)....................6

*Mallory v. Harkness*,
923 F. Supp. 1546 (S.D. Fla. 1996)....................14

*Marjam Supply Co. of Fla., LLC v. Pliteq, Inc.*,
2021 WL 1200422 (S.D. Fla. Mar. 5, 2021)....................13

*Maxitransfers LLC v. La Casita Envios Corp.*,
2025 WL 3091153 (S.D. Fla. July 29, 2025)....................14

*Moritz v. Hoyt Enters., Inc.*,
604 So. 2d 807 (Fla. 1992)....................6

*Morrison v. Reichhold Chemicals, Inc.*
97 F.3d 460 (11th Cir. 1996)....................20

*Norman v. Hous. Auth. of Montgomery*,
836 F.2d 1292 (11th Cir. 1988)....................13, 14, 18, 19

*Procaps S.A. v. Patheon*,
2017 WL 3536917 (S.D. Fla. 2017)....................14

*Procaps S.A. v. Patheon Inc.*,
157 F. Supp. 3d 1199 (S.D. Fla. 2016) ....................6, 7

*Sprint Commc'ns, LLC v. Calabrese*,
2025 WL 713048 (S.D. Fla. Feb. 20, 2025) ....................14, 20

*Standard Guar. Ins. Co. v. Quanstrom*,
555 So. 2d 828 (Fla. 1990)....................5

*Temurian v. Piccolo*,
2021 WL 1121003 (S.D. Fla. Mar. 24, 2021)....................7

*Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*,
253 F.3d 1332 (11th Cir. 2001) ....................6

*Tropical Paradise Resorts, LLC v. JBSHBM, LLC*,
2021 WL 2269822 (S.D. Fla. Apr. 30, 2021) ....................9

*Trump v. Clinton*,
653 F. Supp. 3d 1198 (S.D. Fla. 2023) ....................14, 20

*U.S. Sugar Corp. v. Com. & Indus. Ins. Co.*,
2023 WL 4953191 (S.D. Fla. Aug. 3, 2023)....................14

*Unisource Discovery, Inc. v. Unisource Discovery, LLC*,
2023 WL 4187094 (S.D. Fla. June 9, 2023) ....................19, 20

*Warren Tech., Inc. v. UL LLC*,
2020 WL 9219127 (S.D. Fla. Dec. 17, 2020)....................11

**Statutes**

28 U.S.C. § 1920....................19

Fla. Stat. § 501.2105 ....................5

**Rules**

Federal Rule of Civil Procedure 54(d)(2)(B)....................6

S.D. Fla. L.R. 7.3 ....................6

## INTRODUCTION

This Court found that Defendant The Leapfrog Group's ("Leapfrog") challenged grading scheme "has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety" and that its Safety Grades and related public representations were deceptive and unfair under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). ECF 212 at 2–3. Each of the five prevailing community hospitals—Delray Medical Center, Good Samaritan Medical Center, Palm Beach Gardens Medical Center, St. Mary's Medical Center, and West Boca Medical Center (the "Community Hospitals")—respectfully seeks an award of approximately $2 million in reasonable attorneys' fees and costs incurred to prosecute this action. Collectively, the Community Hospitals seek an award of $10,499,880.47 in reasonable attorneys' fees and litigation costs. That figure reflects the lodestar for work reasonably required to litigate this expedited five-plaintiff FDUTPA action through discovery, expert proceedings, dispositive and evidentiary motions, a five-day bench trial, post-trial briefing, and final judgment as well as associated costs. The hospitals do not seek a multiplier, premium, or sanction-based enhancement.

An award of fees and costs is not only warranted under FDUTPA; it is necessary to effectuate the statute's purpose of deterring deceptive and unfair practices and encouraging private enforcement. The Community Hospitals brought this action to stop a grading scheme this Court held unlawful. Requiring them to absorb the full expense of doing so would undermine the statute's deterrent and remedial purposes and would leave the victims of that conduct to finance the relief the Court ordered. Fee shifting is especially appropriate here because the Community Hospitals sought only equitable relief.

The amount sought is reasonable. This was a complex case litigated on an expedited schedule—going from filing through trial in approximately eight months. Although filed in a single action, it required counsel to represent five separate plaintiff hospitals, each of which had to prove its own entitlement to relief through hospital-specific evidence, witnesses, and proof of harm, while also litigating common issues concerning Leapfrog's methodology, defenses, experts, and equitable relief. The requested amount reflects an appropriate lodestar, is supported by detailed billing records, and is consistent with prevailing market rates in this District. And the requested amount reflects the exercise of billing judgment, including through the omission of certain timekeepers and time entries.

The amount requested also reflects the burdens imposed by Leapfrog's litigation conduct. On a compressed schedule, Leapfrog served late and overbroad discovery, produced nearly one million documents without a responsiveness review, failed to timely provide an adequate privilege log, forced motion practice to secure basic discovery compliance, and shifted positions and public-facing statements while the case was pending. The resulting fees and costs were reasonably necessary to litigate this case through trial and obtain complete relief. Leapfrog's litigation ploys have continued to drive up costs even after entry of final judgment. Indeed, days before its deadline to appeal, Leapfrog filed a baseless motion for reconsideration asserting a number of barred, abandoned, forfeited, or otherwise meritless arguments that the Community Hospitals were forced to rebut. Though the Community Hospitals continue to incur fees due to Leapfrog's litigation tactics, they do not seek to recover those costs through this Motion.

The Court should therefore award each Community Hospital approximately $2 million in reasonable attorneys' fees and costs, for a total award of $10,499,880.47.

## BACKGROUND

The Community Hospitals investigated Leapfrog's methodology, then engaged in extensive correspondence with Leapfrog between January and April of 2025 seeking to avoid litigation in this matter. Leapfrog repeatedly rebuffed these efforts to avoid litigation. *See, e.g.*, PX-562; DX-931. Left with no other choice, on April 30, 2025, the Community Hospitals filed this action against Leapfrog, asserting a single claim of deceptive and unfair trade practices under FDUTPA. *See* ECF 1. The Community Hospitals challenged Leapfrog's publication of Safety Grades that purported to measure actual hospital safety, but as this Court found, relied on a methodology that "has no scientific basis, unfairly penalizes nonparticipating hospitals, and misrepresents hospital safety." ECF 212 at 2; *see also* ECF 1. The Court set an expedited schedule culminating in a January 2026 trial. *See* ECF 32.

Leapfrog moved to dismiss the Complaint, arguing that its Safety Grades and methodology were protected opinion under the First Amendment, that the Court lacked personal jurisdiction over Leapfrog, and that the Complaint failed to state a FDUTPA claim. *See* ECF 39. The Court denied the motion in full. *See* ECF 41. The Community Hospitals later amended their Complaint to withdraw any request for monetary relief and to seek only injunctive and declaratory relief, thereby narrowing the case for discovery and trial. *See* ECF 54, 74.

Extensive and expedited discovery followed. Leapfrog served belated discovery requests, requiring the Community Hospitals to begin preparing document productions before receiving Leapfrog's requests to ensure their ability to meet the discovery deadline. Then, after Leapfrog finally served its requests—on July 11, 2025, less than two weeks before the substantial completion deadline—the Community Hospitals were required to revise and substantially redo their prior work to conform the production to Leapfrog's actual requests, thereby increasing attorney time and effort. Leapfrog ultimately served 64 requests for production and 24 interrogatories on each of the five hospitals, totaling 320 RFPs and 120 interrogatories. ECF 55-4, 55-5–9, 55-10–14.

Leapfrog's discovery requests were also overbroad, seeking extensive information about the Community Hospitals' quality of care—an issue unrelated to the methodology challenged in this case. After negotiations to narrow the discovery requests failed, the Community Hospitals moved for a protective order. *See* ECF 55. The parties negotiated a solution following a hearing before Judge Matthewman. *See* ECF 70, 76.

Ultimately, the Community Hospitals produced approximately 3,300 documents after conducting a responsiveness review. Leapfrog, by contrast, produced nearly *one million* documents in response to the Community Hospitals' 36 narrowly tailored document requests. When questioned regarding the volume of the documents—hundreds of thousands of which were wholly irrelevant—Leapfrog admitted that it had not conducted a responsiveness review. Leapfrog did not offer to re-review the documents, requiring the Community Hospitals to take on the burden of that review. Nor did Leapfrog timely produce a compliant privilege log. Its belated submission included both responsive and non-responsive documents, failed to identify which listed individuals were attorneys, omitted privilege descriptions, and more.

The parties took more than twenty depositions, including both fact and expert witnesses, within less than six weeks. The accelerated schedule was driven in significant part by Leapfrog's delay in serving its requests for production and the overbroad nature of those requests, which required the parties to first resolve document-related issues before proceeding. As a result, multiple depositions had to be postponed and then rescheduled on a compressed timeline once document-production disputes were addressed. The five-plaintiff structure of the case also mattered throughout discovery: each Community Hospital had its own leadership, documents, patient and community feedback, and evidence of harm arising from Leapfrog's Safety Grades.

The case involved extensive third-party discovery as well. The Community Hospitals subpoenaed, among others, Dr. Patrick Romano, a professor at the University of California, Davis School of Medicine and member of Leapfrog's Safety Grade Expert Panel, and Dr. Matthew Austin, principal faculty member of the Armstrong Institute for Patient Safety at Johns Hopkins Medicine and Leapfrog consultant. Leapfrog issued more than a dozen third-party subpoenas of its own, further expanding the scope of discovery.

After the close of discovery, the parties filed numerous substantive motions. These included cross-motions for summary judgment, motions in limine to exclude expert testimony, and Leapfrog's omnibus motion in limine seeking to exclude broad categories of evidence—including several key pieces of evidence the Court relied upon in its post-trial opinion. *See* ECF 86, 96, 97, 98, 99, 212. The motions spanned more than 300 pages, including responses and replies. On November 13, 2025, when motion practice had just begun, the parties appeared for a mediation conference before Judge Matthewman. *See* ECF 106. Again, Leapfrog refused to compromise, and the litigation continued. *Id.* The Court subsequently denied the parties' summary judgment motions and declined to exclude the challenged evidence. *See* ECF 139, 151, 169, 176.

A five-day bench trial followed. The Community Hospitals were required to prove not only Leapfrog's common course of deceptive and unfair conduct, but also plaintiff-specific injury and entitlement to equitable relief as to each of the five Community Hospitals. To do so, the Community Hospitals prepared and presented extensive documentary and testimonial evidence concerning Leapfrog's methodology, public representations, and punitive treatment of non-participating hospitals. They also presented live testimony from the CEO of each Community Hospital, each of whom was cross-examined about the effect of Leapfrog's Grades on his or her hospital. That testimony addressed, among other things, the reputational injury, patient and community reaction and harm, physician and payer concerns, and the operational consequences experienced by each hospital as a result of the challenged Grades. The trial therefore required counsel to litigate both common issues and five separate factual records concerning harm.

Following trial and with the benefit of the parties' lengthy post-trial submissions, the Court ruled in favor of the Community Hospitals and granted injunctive relief. *See* ECF 212. In a detailed opinion, the Court found that Leapfrog's Safety Grades violated FDUTPA because they were based on a methodology that "has no scientific basis, unfairly penalizes nonparticipating hospitals, and misrepresents hospital safety." *Id.* at 2. The Court further found that Leapfrog's

grading system resulted in "the false impression that Leapfrog's grades reflect actual performance." *Id.* at 26. And it held that Leapfrog's practices "produced real harms [that] are likely to continue in the future." *Id.* at 37. Based on these findings, the Court enjoined Leapfrog from continuing the challenged conduct and, on April 6, 2026, entered judgment for the Community Hospitals on their sole claim. *See id*. at 40–41; ECF 214.

## LEGAL STANDARD

"To encourage citizens to invoke the protections of FDUTPA and file actions under that statute, the Legislature has provided that a prevailing party in a FDUTPA action may recover reasonable costs and attorney's fees from the nonprevailing party." *Chow v. Chak Yam Chau*, 640 F. App'x 834, 837 (11th Cir. 2015) (quoting *Diamond Aircraft Indus., Inc. v. Horowitch*, 107 So. 3d 362, 367 (Fla. 2013)). Specifically, "the prevailing party, after judgment in the trial court and exhaustion of all appeals, if any, may receive his or her reasonable attorney's fees and costs from the nonprevailing party." Fla. Stat. § 501.2105(1). Under FDUTPA, "[t]he trial judge may award the prevailing party the sum of reasonable costs incurred in the action plus a reasonable legal fee for the hours actually spent on the case as sworn to in an affidavit." *Id.* § 501.2105(3).

## ARGUMENT

### I. The Community Hospitals Are Entitled To Fees And Costs Under FDUTPA

FDUTPA authorizes fee awards to prevailing parties so that the price of enforcing the statute does not fall solely on those harmed by deceptive and unfair practices. *See Diamond Aircraft*, 107 So.3d at 367–68 (citing Fla. H.R. Comm. on Governmental Operations, HB 1915 (1973), Staff Analysis 3–4 (May 3, 1973); *Standard Guar. Ins. Co. v. Quanstrom*, 555 So.2d 828, 833 (Fla. 1990)); *see also Chow*, 640 F. App'x at 837 (applying the *Diamond Aircraft* framework). This case fits that purpose squarely.

After expedited proceedings and a five-day bench trial, the Court found that Leapfrog's challenged grading methodology is an unfair penalty for nonparticipation that misrepresents hospital safety. ECF 212 at 2. The Court further held that Leapfrog's challenged Safety Grades and related public representations were deceptive and unfair under FDUTPA, entered declaratory relief, and enjoined Leapfrog's continued use of the challenged methodology as to the Community Hospitals. *See id.* at 24–28, 40–41. This motion therefore does not ask the Court to impose a penalty untethered to the statute or the record. It asks the Court to apply FDUTPA's fee-shifting provision in the ordinary way after a complete victory.

An award here is warranted not only because the Community Hospitals prevailed, but because requiring them to absorb the full cost of obtaining that relief would undercut FDUTPA's deterrent and remedial purposes. The Community Hospitals sought no damages. They undertook the burden of stopping a grading scheme this Court held unlawful. FDUTPA does not require the victims of deceptive and unfair conduct to finance the litigation necessary to halt such conduct.

**A. The Community Hospitals Are Prevailing Parties**

There is no serious dispute that the Community Hospitals prevailed. Under FDUTPA, a party prevails when it succeeds on the significant issues in the litigation and obtains the benefit sought in bringing suit. *Chow*, 640 F. App'x at 839 (citing *Moritz v. Hoyt Enters., Inc.*, 604 So. 2d 807, 810 (Fla. 1992)); *Diamond Aircraft*, 107 So. 3d at 368. That is what occurred here.

Following a five-day trial, the Community Hospitals prevailed on their sole claim and obtained the declaratory and injunctive relief they sought. *See* ECF 212, 214. The Court entered judgment in their favor and declared that Leapfrog's challenged Safety Grades, public representations, and punitive grading methodology were deceptive and unfair under FDUTPA. *See* ECF 212 at 40–41. Because each of the five Community Hospitals obtained that relief, each is a prevailing party under FDUTPA. *See Bluegreen Vacations Unlimited, Inc. v. Timeshare Laws. P.A.*, 2024 WL 3738890, at *1, *5 (S.D. Fla. July 18, 2024) ("*Bluegreen Vacations I*"), *report and recommendation adopted*, 2024 WL 4297089 (S.D. Fla. Sep. 26, 2024) ("*Bluegreen Vacations II*") (finding party that prevailed on all claims at trial, including a FDUTPA claim, to be "prevailing party" under FDUTPA).

This motion is also timely. Local Rule 7.3 requires fee motions to be filed within sixty days of final judgment "regardless of the prospect or pendency of supplemental review or appellate proceedings." S.D. Fla. L.R. 7.3(a)(1). The Community Hospitals therefore advance this motion now to comply with that Rule and submit that the Motion should be heard and resolved. If the Court concludes that the Motion should await the resolution of any appeal, the Community Hospitals respectfully request that the Motion be held in abeyance rather than denied as premature.[1]

[1] Under new Supreme Court precedent, federal—and not state FDUTPA—rules apply to the timing of this motion. Earlier decisions treated FDUTPA's exhaustion-of-appeals language as controlling in federal court. *See M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 30 F.3d 113, 115 (11th Cir. 1994); *Procaps S.A. v. Patheon Inc.*, 157 F. Supp. 3d 1199, 1200 (S.D. Fla. 2016). But *Berk v. Choy* recently clarified that, when a valid Federal Rule of Civil Procedure answers the disputed timing question, it governs notwithstanding contrary state law. 607 U.S. 187, 191–97 (2026). That is the case here. Federal Rule of Civil Procedure

**B. The Equitable Factors Strongly Support An Award Of Fees And Costs**

Once a party is found to have prevailed under FDUTPA, the Court has discretion to award attorneys' fees and costs after considering the established equitable factors: "(1) the scope and history of the litigation; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing party would deter others from acting in similar circumstances; (4) the merits of the respective positions—including the degree of the opposing party's culpability or bad faith; (5) whether the claim brought was not in subjective bad faith but frivolous, unreasonable, [or] groundless; (6) whether the defense raised a defense mainly to frustrate or stall; [and] (7) whether the claim brought was to resolve a significant legal question under FDUTPA law." *Bluegreen Vacations II*, 2024 WL 4297089, at *3 (S.D. Fla. Sep. 26, 2024) (quoting *Chow*, 640 F. App'x at 838–39); *see also Humane Soc'y of Broward Cnty., Inc. v. Fla. Humane Soc'y*, 951 So. 2d 966, 971–72 (Fla. 4th DCA 2007) (articulating this test). These factors strongly support an award here.

***1. Scope and History of Litigation.*** This factor strongly favors an award. Courts adjudicating a fees motion first consider the scope and procedural history of the litigation, "focus[ing] on the parties' respective positions and litigation tactics throughout the entire case." *Bluegreen Vacations I*, 2024 WL 3738890, at *6. They assess whether the case progressed to later-stage proceedings and involved significant motion practice; the length of the litigation; whether the FDUTPA claim was an important element of the case; and whether the conduct of the nonprevailing party was unreasonable. *See, e.g., Temurian v. Piccolo*, 2021 WL 1121003, at *4 (S.D. Fla. Mar. 24, 2021); *Democratic Republic of Congo v. Air Cap. Grp.*, 2016 WL 11739606, at *5, *report and recommendation adopted,* 2016 WL 11739605 (S.D. Fla. Sept. 29, 2016); *Chow*, 640 F. App'x at 843. Each supports awarding fees and costs here.

This was a substantial, expedited, five-plaintiff FDUTPA case litigated from Complaint to trial in approximately eight months. It involved a motion to dismiss, expedited and contentious

54(d)(2)(B) supplies the default federal deadline for fee motions, and Local Rule 7.3 requires such motions to be filed within sixty days of final judgment, "regardless of the prospect or pendency of supplemental review or appellate proceedings." S.D. Fla. L.R. 7.3(a)(1); *see also Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1335 (11th Cir. 2001) (Local Rule 7.3 is an "order of the court" under Federal Rule 54(d)(2)(B)). The Community Hospitals therefore file now to comply with the governing federal rules, notwithstanding FDUTPA's state-law exhaustion language. Should the Court determine the motion is premature, the Community Hospitals request that the Court hold the motion in abeyance pending the conclusion of any appeal. *See Procaps S.A.*, 157 F. Supp. 3d at 1199.

discovery, more than twenty depositions, expert discovery, cross-motions for summary judgment, multiple evidentiary motions, and a five-day bench trial. Although filed in a single action, the case involved five separate plaintiff Community Hospitals. The Community Hospitals were required to prove both common liability and hospital-specific injury and entitlement to relief. At trial, each Community Hospital's CEO testified and was cross-examined regarding the effect of Leapfrog's Safety Grades on his or her hospital. The scope and intensity of the litigation were substantial.

Leapfrog also materially increased the burden and cost of the case. On a compressed schedule, Leapfrog served late and overbroad discovery, and it produced nearly one million documents without performing a responsiveness review, contrary to the parties' ESI Protocol. ECF 38 § 16(a). As a result, Leapfrog produced hundreds of thousands of irrelevant "junk" documents—including more than 100,000 documents outside the relevant timeframe, more than 21,000 image files consisting primarily of logos and icons, several thousand automated or mass emails, and more than 1,000 technical issue slipsheets. This deficient, overbroad production substantially increased the Community Hospitals' litigation expenses by requiring counsel to perform the responsiveness review that Leapfrog had agreed, but failed, to undertake.

Leapfrog also failed to provide a timely or adequate privilege log. Although Leapfrog's privilege log was due on August 8 under the District's Local Rules, Leapfrog did not serve its log until September 17—over a month late. When eventually produced, the log lacked basic information necessary to evaluate the privilege claims and contained numerous errors, including improper assertions of privilege over business communications, incomplete metadata, and privilege claims over third-party communications. These deficiencies required counsel for the Community Hospitals to review the log, identify errors, and confer with Leapfrog to obtain a corrected log.

Leapfrog also forced motion practice to secure basic discovery compliance and shifted positions and public-facing statements—statements central to the Community Hospitals' FDUTPA claim—while the case was pending. Just weeks before trial, Leapfrog substantially altered language on certain of its webpages, including specific language that had been quoted and relied upon in the Community Hospitals' summary judgment briefing. Those were not minor disputes and concerns. They required the Community Hospitals to spend substantial additional time to obtain the discovery and record necessary to present the case.

Taken together, Leapfrog's discovery conduct substantially increased the time and expense required to advance this case to trial and further supports an attorneys' fees and costs award under

the scope-and-history factor.[2] *See, e.g.*, *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 2018 WL 1863778, at *4 (M.D. Fla. Mar. 26, 2018) (finding that the first factor favored a fee award where nonprevailing party's conduct resulted in substantial unnecessary discovery costs); *Healthcare Res. Mgmt. Grp., LLC v. EcoNatura All Healthy World, LLC*, 2022 WL 1537757, at *7 (S.D. Fla. May 12, 2022) (same where non-prevailing party "evince[d] a lack of diligence," including during discovery) (alteration in original); *Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*, 2025 WL 1644541, at *3 (M.D. Fla. May 15, 2025) (same where non-prevailing party "failed to follow Local Rules").

***2. Ability to Pay.*** This factor favors an award. The record reflects that Leapfrog is an established national organization with substantial annual revenue, including more than $8 million in 2024 alone, PX-824.0 at 1; Leapfrog has litigation insurance providing coverage of up to $5 million for "[e]ach [e]rroneous [a]ct" during the period from May 1, 2024 through May 1, 2026, *see* Affidavit of Sydney Scott ("Scott Aff.") Ex. F; and that following entry of the Court's decision on March 6, 2026, Leapfrog commenced a national fundraising campaign led by its CEO and in direct response to this litigation. *See id.* Ex. E. It is therefore "reasonable to conclude that [Leapfrog] has the financial ability to pay a fee award." *Tropical Paradise Resorts, LLC v. JBSHBM, LLC*, 2021 WL 2269822, at *7 (S.D. Fla. Apr. 30, 2021), *report and recommendation adopted*, 2021 WL 2024424 (S.D. Fla. May 21, 2021).

The record supports the conclusion that Leapfrog has the ability to pay a reasonable fee award. To the extent that Leapfrog objects to the requested sum, it has only itself to blame. The Community Hospitals waited four months to file their Complaint, engaging in a good faith attempt to resolve their differences without the need for costly litigation. But Leapfrog declined multiple opportunities to resolve this dispute and avoid court, both before and during the litigation. The Community Hospitals offered Leapfrog a second opportunity for resolution during mediation following the close of discovery. ECF 106. And, yet again, Leapfrog refused. Nearly half of the requested fees were incurred following the unsuccessful mediation session. Because the

[2] Leapfrog's gamesmanship did not end with discovery; it continued through trial. For instance, Leapfrog delayed disclosure of Ms. Zambrana—a third party witness—until shortly before fact discovery ended, then refused to make her available for deposition until weeks before trial during the Christmas holiday. Leapfrog similarly disclosed demonstratives for its expert, Mr. Vredenburgh, the night before his testimony, only to withdraw him the next day without prior notice, requiring the Community Hospitals to prepare and present his deposition testimony in rebuttal during trial. This conduct unnecessarily complicated trial preparation and required substantial additional attorney time and resources.

Community Hospitals sought no damages, attorneys' fees and costs are the principal monetary consequence of the conduct this Court found unlawful.

***3. Deterrent Effect.*** This factor strongly favors an award. The Court found that Leapfrog's challenged conduct was deceptive and unfair, misrepresented hospital safety to the public, and caused real harm. *See* ECF 212 at 29–37. Courts have recognized that "FDUTPA depends on the encouragement of 'private enforcement,' which is possible through the imposition of attorney's fees to prevailing parties as a deterrent to violations." *Gov't Emps. Ins. Co.*, 2025 WL 1644541, at *3. A fee award ensures that entities engaging in similar conduct cannot shift the cost of stopping their unlawful conduct onto the parties that conduct harmed. That is especially important here, where the Community Hospitals sought only equitable relief. Without a fee award, Leapfrog would bear the burden of complying with the Court's injunction, but the Community Hospitals that proved the misconduct and obtained the relief would still bear the full cost of securing it. That result would undermine FDUTPA's deterrent purpose.

***4. Merits of Respective Positions.*** This factor strongly favors an award. Leapfrog lost at every stage that mattered. The Court denied Leapfrog's motion to dismiss, rejected its dispositive arguments, denied its efforts to exclude key trial evidence, and held that Leapfrog's challenged conduct violated FDUTPA. *See* ECF 41, 139, 151, 169, 176, 212.

This factor favors fees more strongly because Leapfrog repeatedly advanced meritless positions—claiming a lack of personal jurisdiction at the motion to dismiss stage while purposefully availing itself of such jurisdiction by publishing an op-ed in a South Florida newspaper; engaging in a "document dump" discovery strategy; asserting a lack of Article III jurisdiction at the summary judgment stage on the premise that the amount-in-controversy requirement was not satisfied; seeking to exclude evidence as unduly prejudicial in advance of a bench trial; and much more. *See supra* at 7–8; *infra* at 11–12.

Additionally, and as the Court found, shortly after the Complaint was filed, Leapfrog decided to "harass" the Community Hospitals, amplifying the challenged failing Safety Grades while their legality was being litigated before this Court. ECF 212 at 17, 32. At the direction of CEO Leah Binder, Leapfrog used funds from a nonprofit Google grant to purchase targeted Google advertisements designed to display the Community Hospitals' failing Safety Grades whenever users searched for the Community Hospitals online. *Id.* at 32. One Leapfrog staff member internally compared this tactic to that of a "Disney villain," revealing Leapfrog's real-time consciousness of

its bad faith actions. *Id.* at 17. During this litigation, Ms. Binder also published op-eds in local media outlets highlighting the Community Hospitals' failing Safety Grades and insinuating that the hospitals were unsafe and unsanitary. *See, e.g.*, PX-461.0. These pieces repeated claims even after evidence in this case, including Ms. Binder's own contemporaneous emails, demonstrated that Leapfrog lacked a factual basis for those assertions. *See* ECF 212 at 22 (citing CEO Binder's admission that Leapfrog's methodology would be a "very big deal to hospitals (and a major incentive to report to the survey)" as evidence that the methodology was unfairly punitive). Courts have found that the fourth factor favors fees under analogous circumstances. In *Warren Technology, Inc. v. UL LLC*, for example, the widespread distribution of communications to both competitors and consumers disparaging the safety of the prevailing party's products supported fees under this factor. *See* 2020 WL 9219127, at *4, *6 (S.D. Fla. Dec. 17, 2020).

***5. Frivolity.*** This factor is inapplicable or, at minimum, neutral, because the Community Hospitals prevailed on the merits after trial. *See Bluegreen Vacations I*, 2024 WL 3738890, at *9.

***6. Defense Raised to Frustrate or Stall.*** This factor favors an award. Leapfrog repeatedly forced the Community Hospitals to expend resources responding to weak or shifting positions, including unsupported discovery positions, meritless defenses, and last-minute changes to its public-facing statements and website content while those statements were at issue in the case. These baseless arguments and litigation tactics served to frustrate and delay the resolution of this case.

Leapfrog asserted a patently baseless personal jurisdiction argument in its motion to dismiss—an argument refuted by its own actions in publishing an op-ed in a Florida newspaper while Leapfrog's motion was pending. *See* ECF 39 (Leapfrog's motion to dismiss filed June 27, 2025); PX-461.0 (Leapfrog CEO's op-ed published June 30, 2025). It initially contested the amount-in-controversy requirement in its summary judgment motion but ignored the issue in reply and stipulated before trial that the requirement was satisfied. *See* ECF 115 at 18–19; ECF 124. Similarly, Leapfrog asserted several "affirmative defenses," each baseless. Leapfrog declined to defend its "good faith" defense when the Community Hospitals moved for summary judgment on the issue. *See* ECF 86 at 19; ECF 102. Leapfrog's "avoidable consequences" defense was entirely irrelevant to this case seeking only equitable relief. *See* ECF 86 at 18–19; ECF 102 at 17–18; ECF 107 at 10. And Leapfrog's anti-SLAPP defense was plainly foreclosed by precedent. *See* ECF 86 at 18. Leapfrog's motions in limine were also off-base, arguing for example, that evidence was unfairly prejudicial, an inapplicable objection in a bench trial. *See* ECF 98 at 14–16; ECF 118 at 3, 20.

Leapfrog also engaged in gamesmanship on the eve of trial by altering several of the challenged deceptive representations on its website—representations that had occupied dozens of pages of briefing then-pending before this Court—over the course of several days and *without notifying the Court or the Community Hospitals*. Leapfrog deleted or modified its prior statements and substituted new language, forcing the Community Hospitals to identify and track the changes, seek discovery about them, and shift trial strategy based on them. *See* ECF 136 ¶¶ 347–359. Leapfrog even temporarily removed a website footnote it had repeatedly described as central to its defense—only to restore it after the Community Hospitals sought discovery regarding the change. *See* ECF 39 at 9, 16; ECF 99 at 4; ECF 129 ¶¶ 63–64. On an expedited schedule, this conduct materially increased the work required to litigate the case to judgment.

***7. Significant Legal Question.*** This factor favors fees. This case required the Court to address important questions concerning FDUTPA's unfairness standard and the scope of who may seek protection under the statute. *See* ECF 212 at 16–20, 36–37. The Court's post-trial opinion provides meaningful guidance on both issues.

Most notably, the Court resolved the question whether it should apply the modern unfairness framework under FDUTPA in light of the Eleventh Circuit's intervening decision in *FTC v. Corpay, Inc.*, 164 F.4th 807 (11th Cir. 2026). That issue arose during the litigation and was the subject of post-summary judgment briefing, including the Community Hospitals' motion for partial reconsideration. *See* ECF 152. The Court's analysis confirmed that FDUTPA reaches conduct likely to cause substantial consumer injury—even in the absence of actual, completed, and quantified harm—and provided helpful guidance regarding how courts should evaluate FDUTPA (and even FTC Act) "unfairness" claims going forward. *See* ECF 212 at 19.

The case also required the Court to address the scope of who may qualify as a "consumer" under FDUTPA. In resolving Leapfrog's arguments, the Court confirmed that entities such as hospitals—and other market participants affected by deceptive practices—may fall within the statute's protection, and that FDUTPA is not limited to the most direct and obvious form of consumer plaintiffs. *See* ECF 212 at 17–18, 32 n.12.

Accordingly, this case required the Court to address and resolve important issues concerning both the substantive standards governing FDUTPA claims and the scope of parties entitled to relief. This factor weighs in favor of a fee award. *See Bluegreen Vacations II*, 2024 WL 4297089, at *5 (addressing "uncertainty" regarding FDUTPA's scope "qualifies as advancing [the] law").

* * *

In sum, the relevant FDUTPA factors weigh decisively in favor of awarding attorneys' fees and costs here. The Community Hospitals prevailed completely. The litigation was substantial and intensified by Leapfrog's own conduct. Leapfrog can satisfy an award. And awarding fees is necessary to vindicate FDUTPA's deterrent and remedial purposes. *See Marjam Supply Co. of Fla., LLC v. Pliteq, Inc.*, 2021 WL 1200422, at *10 (S.D. Fla. Mar. 5, 2021) (prevailing party "entitled to its attorneys' fees under FDUTPA" when "the equitable [FDUTPA] factors weigh in favor of" the prevailing party); *Healthcare Res. Mgmt. Grp.*, 2022 WL 1537757, at *10 (awarding fees where four of seven factors favored the prevailing party and remaining three were neutral).

## II. The Attorneys' Fees Sought By The Community Hospitals Are Reasonable

Once a party establishes entitlement to attorneys' fees, the remaining question is whether the amount requested is reasonable. *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 853 (11th Cir. 1990). It is. The Community Hospitals seek an attorneys' fees award of $9,903,527.50. That amount is supported by contemporaneous billing records, reflects substantial billing judgment, and corresponds to the work reasonably required to litigate and obtain excellent results in an expedited, five-plaintiff FDUTPA case through trial and final judgment. *See* Scott Aff. Exs. A, B (attaching invoices). It is not a multiplier, a premium, or a sanction. It is the reasonable cost of obtaining complete relief in this action. While the Community Hospitals seek a collective lodestar award, that total reflects approximately $2 million in reasonable fees and costs attributable to each prevailing Hospital.

Courts determine a reasonable fee by applying the lodestar method—reasonable hours multiplied by a reasonable hourly rate. *See Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988); *Herbst v. Am. Orthodontics Corp.*, 2025 WL 3755394, at *3 (S.D. Fla. Jan. 23, 2025) (Middlebrooks, J.). In doing so, courts need not achieve "auditing perfection"; they are permitted to "do rough justice." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Applying the lodestar method here, no reduction is warranted.

### A. The Hourly Billing Rates Are Reasonable

In awarding fees, a court must determine whether the requested hourly rate is reasonable. *See Glob. Digital Sols., Inc. v. Grupo Rontan Electro Metalurgica, S.A.*, 2021 WL 7630524, at *2 (S.D. Fla. Aug. 16, 2021). "A reasonable hourly rate is the prevailing market rate in the relevant

legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299.[3] The rates sought fall comfortably within that range.

The Community Hospitals seek rates of up to $975 for partners, $800 for counsel, and $675 for associates. Those rates are significantly discounted from the rates actually billed in this matter, and they are in line with rates approved by this Court and others within the Southern District of Florida in comparable complex litigation. *See, e.g.*, *Sprint Commc'ns, LLC v. Calabrese*, 2025 WL 713048, at *7 (S.D. Fla. Feb. 20, 2025), *report and recommendation adopted*, 2025 WL 708130 (S.D. Fla. Mar. 5, 2025) ($1,077 for partners, $697 for associates); *Epic Sys. Corp. v. Decapolis Sys., LLC*, 2024 WL 5236912, at *1 (S.D. Fla. Nov. 25, 2024) ($860 for partners, $415 for associates);[4] *Trump v. Clinton*, 653 F. Supp. 3d 1198, 1229–37 (S.D. Fla. 2023); *Infogroup Inc. v. Off. Depot Inc.*, 2024 WL 4110526, at *3 (S.D. Fla. Aug. 21, 2024), *report and recommendation adopted*, 2024 WL 4104029 (S.D. Fla. Sept. 6, 2024) ($1,050 for partners, $800 for associates); *U.S. Sugar Corp. v. Com. & Indus. Ins. Co.*, 2023 WL 4953191, at *5, *7 (S.D. Fla. Aug. 3, 2023) ($932 and $1,058 for partners).

The timekeepers whose fees are sought have substantial experience in complex federal litigation, discovery, motion practice, expert work, and trial. But the point is simpler than that: these are market rates for this kind of work in this District. No partner seeks more than $975 per hour. No associate seeks more than $675. Those rates are reasonable, particularly in a case that proceeded on an expedited schedule and required counsel to address complex issues concerning

[3] "[T]he going rate in the community [is] the most critical factor in setting the fee rate." *Maxitransfers LLC v. La Casita Envios Corp.*, 2025 WL 3091153, at *6 (S.D. Fla. July 29, 2025). Courts may also consider "the attorney's customary fee, the skill required to perform the legal services, the attorney's experience, reputation and ability, the time constraints involved, preclusion of other employment, contingency, the undesirability of the case, the attorney's relationship to the client, and awards in similar cases." *Mallory v. Harkness*, 923 F. Supp. 1546, 1555 (S.D. Fla. 1996) (setting forth factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)). This broader inquiry favors fees as well. The fees requested are substantially discounted from counsel's ordinary billable rates, as the submitted invoices reflect. Counsel is exceptionally qualified. *See* Scott Aff. § III. This was a complicated case, benefitting from experienced counsel specializing in complex commercial disputes. The litigation was expedited, proceeding from Complaint to trial in approximately eight months. Attorneys often worked full time on the matter, particularly during the lead up to trial, to the exclusion of other work. The litigation resulted in a complete victory for the Community Hospitals, culminating in an injunction against Leapfrog's unlawful practices. *See* ECF 212. And courts in this District have awarded fees far exceeding those requested here, including under FDUTPA. *See, e.g.*, *Procaps S.A. v. Patheon*, 2017 WL 3536917, at *2 (S.D. Fla. Aug. 17, 2017) (awarding $18,494,846 in fees and costs in a FDUTPA action).

[4] The underlying hourly fees were not included in the Court's opinion but can be found on the case docket. *See* Supp. Mot. for Att'y Fees, *Epic Sys. Corp.*, 22-cv-80173 (S.D. Fla. Aug. 9, 2024), Dkt. No. 114 at 5.

Leapfrog's methodology, expert evidence, and equitable relief. The requested rates, hours, and total fees for Gibson Dunn attorneys appear below:

| Timekeeper | Title | Hourly Rate | Hours Claimed | Total Fees |
|---|---|---|---|---|
| Mary Beth Maloney | Partner | $975.00 | 473.8 | $ 461,955.00 |
| Daniel P. Chung | Partner | $975.00 | 623.0 | $ 607,425.00 |
| Lee R. Crain | Partner | $975.00 | 847.3 | $ 826,117.50 |
| Scott K. Hvidt | Partner | $975.00 | 878.0 | $ 856,050.00 |
| Sydney Scott | Partner | $975.00 | 470.6 | $ 458,835.00 |
| Helgi C. Walker | Partner | $975.00 | 128.7 | $ 125,482.50 |
| Christine M. Buzzard | Of Counsel | $800.00 | 888.1 | $ 710,480.00 |
| Robert Batista | Associate | $675.00 | 498.8 | $ 336,690.00 |
| Emily Cardone | Associate | $675.00 | 670.2 | $ 452,385.00 |
| Alexander M. Fischer | Associate | $675.00 | 494.1 | $ 333,517.50 |
| Adam Garnick | Associate | $675.00 | 834.0 | $ 562,950.00 |
| Andrew Kuntz | Associate | $675.00 | 563.3 | $ 380,227.50 |
| Mary Otoo | Associate | $675.00 | 709.4 | $ 478,845.00 |
| Kevin Reilly | Associate | $675.00 | 663.5 | $ 447,862.50 |
| Kevin Simmons | Associate | $675.00 | 731.5 | $ 493,762.50 |
| Marc Aaron Takagaki | Associate | $675.00 | 572.8 | $ 386,640.00 |
| Iason Togias | Associate | $675.00 | 567.8 | $ 383,265.00 |
| Karsyn Archambeau | Associate | $500.00 | 714.6 | $ 357,300.00 |
| Noah Delwiche | Associate | $500.00 | 739.2 | $ 369,600.00 |
| Laura Wang | Associate | $500.00 | 354.8 | $ 177,400.00 |
| **TOTAL** | | | | **$ 9,206,790.00** |

The Gibson Dunn litigation team included highly experienced partners. Ms. Maloney served as lead trial counsel and was responsible for the case from its inception, including managing overall litigation strategy, staffing, and supervision. A *Chambers USA* ranked litigator, her practice includes extensive first-chair representation of clients in commercial litigation and government investigations, as well as representing companies, boards, and executives in multi-million-dollar disputes and high-stakes federal litigation. Mr. Chung also played a central role in discovery and

at trial, coordinating factual development and deposing and cross-examining key Leapfrog witnesses, including its CEO Leah Binder. He previously served as an Assistant U.S. Attorney in the Southern District of New York and is a nationally recognized trial lawyer recognized as a Global Elite Thought Leader by *Who's Who Legal*; his practice focuses on complex commercial litigation and defense against civil and criminal regulatory enforcement. Mr. Crain led the Community Hospitals' defensive discovery and document production, deposed and defended depositions of numerous fact, expert, and third-party witnesses, and handled several witnesses at trial. His practice focuses on high-stakes trial and appellate litigation in federal and state courts, with a specialty in First Amendment matters; in 2025, he was recognized as a finalist for Young Litigator of the Year by *American Lawyer*. Mr. Hvidt led offensive discovery, oversaw key aspects of expert discovery, and deposed and cross-examined several key Leapfrog witnesses. He maintains a broad-based trial practice, including litigation in state and federal courts and is recognized by *Best Lawyers: Ones to Watch in America*. Ms. Scott was heavily involved in discovery and trial preparation, especially in developing the factual record, preparing the Community Hospitals' witnesses for their depositions and trial, and conducting their direct examinations at trial. She has been recognized by *Benchmark Litigation* in its "40 & Under List – South" and has extensive experience representing plaintiffs and defendants at every stage of litigation. And Ms. Walker led briefing, playing a substantial role in developing legal strategy leading up to and during trial. Ms. Walker is a *Chambers USA* ranked lawyer specializing in appellate law and complex litigation matters; she has been elected as a Fellow of the American Academy of Appellate Lawyers.

Gibson Dunn's of counsel and associate team was also highly skilled. Ms. Buzzard and Mr. Batista led teams in drafting the Community Hospitals' briefing, with Ms. Buzzard arguing a key dispositive motion at trial. Mr. Takagaki oversaw fact discovery for the Community Hospitals—including managing document review, discovery responses, and factual development across the five hospitals—and took the deposition and trial testimony of Leapfrog expert Mark Rule. Ms. Cardone supported the discovery effort, with a particular focus on offensive discovery efforts. She also took the deposition and trial testimony of Leapfrog witness Isis Zambrana. And Mr. Simmons led the preparation and organization of documentary evidence and presented St. Mary's CEO Cynthia McCauley at trial. Mr. Kuntz and Mr. Reilly assisted in discovery efforts while also playing a central role in preparing the Community Hospitals' expert witnesses for trial testimony. Mr. Reilly also handled oral argument regarding key deposition designations at trial. Mr. Garnick

similarly contributed to document and expert discovery and played a key role in trial preparation, which included developing the opening statement and closing argument. Mr. Fischer, Ms. Otoo, Mr. Togias, Ms. Archambeau, Mr. Delwiche, and Ms. Wang assisted with discovery, supported deposition preparation for key fact and expert witnesses, and contributed to trial preparation.

The firms of Marcus Rashbaum Pineiro & Meyers LLP and Neiman Mays Floch & Almeida PLLC served as local counsel. Mr. Marcus was the primary local counsel on this matter and served as a full member of the trial team. He examined multiple witnesses at trial and participated in core trial preparation and strategy. He is an experienced trial lawyer with substantial experience in complex civil and white-collar litigation, and he has been ranked by *Chambers USA* in the top band for litigation and white-collar defense in Florida. Ms. Meyers, Mr. Pineiro, Mr. Rashbaum, and Mr. Floch are all experienced attorneys in the Florida market. They devoted substantial time to advising on strategy and Florida practice as well as reviewing briefs and other court submissions, essential tasks typically provided by local counsel.

The requested rates, hours, and total fees for local counsel attorneys appear below:

| **Timekeeper** | **Title** | **Hourly Rate** | **Hours Claimed** | **Total Fees** |
|---|---|---|---|---|
| Jeffrey Marcus | Partner | $975 | 498.0 | $ 485,550.00 |
| Kathryn Meyers | Partner | $975 | 4.6 | $ 4,485.00 |
| Michael Pineiro | Partner | $975 | 78.8 | $ 76,830.00 |
| Daniel Rashbaum | Partner | $975 | 36.1 | $ 35,197.50 |
| Brandon Floch | Partner | $875 | 108.2 | $ 94,675.00 |
| **TOTAL** | | | | **$ 696,737.50** |

Additional information regarding the experience and qualifications of each timekeeper for whom fees are sought in this matter appears in their firm biographies. *See* Scott Aff. Exs. C, D.

**B. The Total Hours Expended Are Reasonable**

The Court must also evaluate the reasonableness of the total hours expended by the Community Hospitals' counsel. *See Bluegreen Vacations I*, 2024 WL 3738890, at *11. The fee applicant must provide "specific and detailed evidence so that the court can determine the necessity and reasonableness of the time claimed for the task." *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 2025 WL 2663071, at *11 (S.D. Fla. Aug. 29, 2025). The party requesting fees must also exercise "billing judgment," meaning it must exclude from its application "excessive, redundant[,] or

otherwise unnecessary hours." *Norman*, 836 F.2d at 1301 (defining such hours as those "that would be unreasonable to bill to a client and therefore to one's adversary irrespective of the skill, reputation[,] or experience of counsel"). The fee applicant bears the initial burden of submitting evidence sufficient to allow the court to confirm that the requested fees are not excessive, and "'objections and proof from fee opponents' concerning hours that should be excluded must be specific and 'reasonably precise.'" *ACLU v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999) (quoting *Norman*, 836 F.2d at 1301).

The submitted hours expended by counsel for the Community Hospitals are reasonable and reflect the tremendous effort required to achieve victory. *See Flexiteek Ams., Inc. v. Plasteak, Inc.*, 2016 WL 7497485, at *28 (S.D. Fla. Feb. 4, 2016) (finding hours expended reasonable "based upon the complex and contentious nature of this litigation"); *see also City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) ("[A party] cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the [opposing party] in response.").[5] This was not a routine, single-plaintiff matter. It was an expedited case involving five prevailing hospital plaintiffs, extensive fact and expert discovery, cross-motions for summary judgment, substantial pretrial motion practice, and a five-day bench trial. Each of the five Community Hospitals has its own leadership, operations, patient population, and distinct evidence of harm arising from Leapfrog's Safety Grades. The trial record confirms that the Community Hospitals could not prevail through common proof alone; each plaintiff Hospital was required to prove hospital-specific injury through live witness testimony and cross examination, including of its CEO. Counsel had to develop and present both common proof concerning Leapfrog's methodology and five separate factual records.

As required, the Community Hospitals have submitted detailed billing records that contemporaneously record the time spent on the case and describe the subject matter of each task performed to support their reasonable request. Scott Aff. Exs. A, B. These records provide the Court with a sufficient basis to evaluate the necessity and reasonableness of the hours expended. *See Bluegreen Vacations I*, 2024 WL 3738890, at *13. As these records reflect, counsel exercised

[5] That the Community Hospitals did not succeed on every motion does not change the outcome. Indeed, courts in this Circuit routinely reject arguments that fee awards should be reduced because a prevailing party pursued unsuccessful motions or did not prevail on every contention advanced during the litigation. *See, e.g.*, *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 346 F. App'x 403, 404 (11th Cir. 2009) ("a prevailing party entitled to attorneys' fees is not to be penalized for failed motions"); *Columbus Mills, Inc. v. Freeland*, 918 F.2d 1575, 1580–81 (11th Cir. 1990) (affirming refusal to reduce fees for "completely unsuccessful" motions where the prevailing party succeeded on virtually every issue before the court).

appropriate billing judgment. All hours sought in this motion have been selected following review to reflect time reasonably necessary to litigate this case and were actually billed to the relevant client.[6] Counsel does not seek reimbursement for excessive, redundant, or unnecessary time and, where appropriate, excluded time to ensure that the requested fees reflect only indisputably reasonable work the opposing party should reimburse. *See Norman*, 836 F.2d at 1301. In fact, the Community Hospitals do not seek reimbursement for every lawyer who billed time to the matter, and certain timekeepers and time entries are excluded from the request.

Counsel also staffed the case efficiently. Associates performed the bulk of the document review, research, drafting, and trial-preparation work, while partners provided strategic oversight and handled tasks requiring partner-level judgment. *See Domond v. PeopleNetwork APS*, 750 F. App'x 844, 849 (11th Cir. 2018) (affirming a fee award without reduction where the district court "concluded that the attorneys efficiently billed work and distributed it to attorneys charging lower rates"). Where partner time became too granular or duplicative given the pace of the case, that time was excluded. This allocation further confirms that the hours sought are reasonable rather than excessive.

In short, the requested hours reflect the reality of the case litigated here: five plaintiffs, expedited proceedings, substantial discovery, expert work, and trial, all intensified by Leapfrog's own litigation conduct. No across-the-board reduction is warranted.

## III. The Costs Sought By The Community Hospitals Are Reasonable

"FDUTPA permits the recovery of litigation expenses that are reasonable and related to the litigation." *Unisource Discovery, Inc. v. Unisource Discovery, LLC*, 2023 WL 4187094, at *3 (S.D. Fla. June 9, 2023) (internal quotations omitted), *report and recommendation adopted*, 2023 WL 4188118 (S.D. Fla. June 26, 2023); *Chow*, 640 F. App'x at 836 n.4 ("FDUTPA allows for the award of non-taxable costs, *i.e.* those costs that are not taxable under federal law at 28 U.S.C. § 1920."). While the moving party "must provide supporting documentation to justify a cost award of any kind," *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 2020 WL 6808856, at *9 (S.D. Fla. Apr. 16, 2020) (internal quotation marks omitted), the opposing party "bears the

[6] The terms of Gibson Dunn's fee agreement state that it will bill the Community Hospitals for legal services and reimbursable expenses on a monthly basis at hourly rates. Gibson Dunn also provides a volume discount in some instances; that discount is not implicated here, as the requested rates fall well below the firm's discounted, effective rates. Marcus, Neiman, Rashbaum, & Pineiro as well as Marcus, Rashbaum, Pineiro & Meyers also bill monthly for legal service at hourly rates.

burden to establish that a cost item is not recoverable," *Bluegreen Vacations I*, 2024 WL 3738890, at *18 (internal quotation marks omitted). The costs sought satisfy the relevant standard.

The Community Hospitals seek only a narrow set of case-specific litigation costs, each supported by invoices and vendor records submitted with this motion. Specifically, the Community Hospitals seek recovery only for: (1) transcript and court-reporting fees for depositions, hearings, and trial; and (2) research expenses. *See* Scott Aff. Ex. A (invoices reflecting these expenses). The Community Hospitals do not seek expert expenses. They do not seek trial-support or demonstrative expenses. And they do not seek travel and lodging-related expenses.

Transcript and court-reporting costs of $137,423.52 were necessarily incurred in this case involving more than twenty depositions, expert proceedings, hearings, and a five-day bench trial. These costs are reasonable and such expenses are routinely awarded in federal cases. *See, e.g.*, *Morrison v. Reichhold Chemicals, Inc*. 97 F.3d 460, 464–65 (11th Cir. 1996).

The Community Hospitals' research costs of $458,929.45 are also reasonable and reflect expenses incurred in this action, which involved extensive briefing and accompanying legal analysis. These costs were paid by Gibson Dunn to third-party providers—largely Westlaw and PACER—and such fees are customarily charged by the firm to its clients. *See Unisource Discovery*, 2023 WL 4187094, at *3 (noting in a FDUTPA case that "courts have found that costs for computerized legal research are recoverable" and awarding research fees); *Env't Mfg. Sol., LLC. v. Peach State Labs, Inc.*, 274 F. Supp. 3d 1298, 1329 (M.D. Fla. 2017) (discussing online legal research fees); *Sprint Commc'ns, LLC*, 2025 WL 713048, at *12 (awarding recovery of Westlaw charges).[7]

The Community Hospitals seek only a narrow set of documented, case-specific expenses that were reasonably incurred to litigate this through trial. Because those expenses are reasonable and related to the litigation, the Court should award them in the amount of $596,352.97.

## CONCLUSION

The Court should award the Community Hospitals' attorneys' fees and costs in the amount of $10,499,880.47.

[7] To the extent not recoverable as expenses, the research fees are recoverable as attorneys' fees. *See Trump v. Clinton*, 653 F. Supp. 3d 1198, 1228 (S.D. Fla. 2023) (noting that "costs incurred for electronic legal research are considered a component of attorneys' fees" and considering them as such).

Dated: May 15, 2026

Respectfully submitted,

By: */s/ Jeffrey Marcus*

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Ave.
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

By: */s/ Mary Beth Maloney*

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

**LOCAL RULE 7.3 CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 7.3, I hereby certify that the Community Hospitals, by and through their undersigned counsel, provided a draft of this motion and supporting materials to Leapfrog on May 5, 2026. As contemplated and required by Rule 7.3(b), the Community Hospitals' counsel was prepared to confer in good faith with Leapfrog's counsel in an attempt to narrow any fee disputes by agreement before filing this Motion. On May 7, 2026, and May 11, 2026, undersigned counsel requested that Leapfrog's counsel provide their availability to confer in good faith on the Community Hospitals' Motion. On May 11, 2026, Leapfrog's counsel confirmed that Leapfrog refused to confer in good faith to resolve any disputes by agreement. The parties, therefore, were unable to reach any agreement regarding the Community Hospitals' request for attorneys' fees and expenses.

Date: May 15, 2026

By: */s/ Sydney Scott*
Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

**VERIFICATION PURSUANT TO LOCAL RULE 7.3**

Under penalty of perjury, I declare that I have reviewed the Community Hospitals' Verified Motion for Attorneys' Fees and that the facts alleged therein are true and correct to the best of my knowledge and belief.

Date: May 15, 2026

By: */s/ Sydney Scott*

Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, I served a copy of the foregoing motion and accompanying materials on all counsel of record via the ECF filing system. .

Date: May 15, 2026

By: */s/ Sydney Scott*
Sydney Scott (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street #3000
Houston, TX 77002
(346) 718-6600
sascott@gibsondunn.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**AFFIDAVIT OF SYDNEY SCOTT IN SUPPORT OF THE COMMUNITY HOSPITALS' VERIFIED MOTION FOR ATTORNEYS' FEES AND COSTS**

I, Sydney Scott, declare and state as follows:

1. I respectfully submit this Affidavit in support of the Community Hospitals' Verified Motion for Attorneys' Fees and Costs (the "Motion"). I am an attorney admitted to practice law in the State of Texas, and I have been granted permission by the Court to appear *pro hac vice* in this case. ECF 49. I am over the age of eighteen and make this affidavit from personal knowledge based on the information and documents referenced in this affidavit and from knowledge conveyed to me by colleagues.

2. I am a partner in the law firm Gibson, Dunn & Crutcher LLP, an international, multi-service law firm with approximately 2,200 lawyers across nearly two dozen offices worldwide, including in New York, Dallas, Houston, and Washington, D.C.

3. I served as trial counsel in this action and, along with my partner colleagues, oversaw all aspects of the case—including strategy, staffing, and supervision.

4. Plaintiffs Delray Medical Center, Good Samaritan Medical Center, Palm Beach Gardens Medical Center, St. Mary's Medical Center, and West Boca Medical Center (the "Community Hospitals") seek attorneys' fees of $9,903,527.50 plus other fees and costs of $596,352.97, for a total requested sum of $10,499,880.47. This requested sum reflects the

substantial work required to litigate this complex and expedited matter, which proceeded from initial filing through a five-day bench trial in approximately eight months and involved extensive motion practice, expansive discovery across five separate hospitals, more than twenty depositions over approximately six weeks, significant expert work, and extensive trial preparation.

5. Nothing in this affidavit, its exhibits or attachments, is intended to be a waiver of the attorney-client privilege or the work product doctrine.

**I. Gibson Dunn Invoices**

6. For this litigation, the Community Hospitals compensated Gibson Dunn based on the number of hours expended on this matter by each timekeeper at his or her hourly rate, plus out-of-pocket expenses incurred in connection with the litigation. Gibson Dunn invoiced the Community Hospitals monthly, and those invoices reflect the time spent by each attorney or staff member, recorded in tenths of an hour, along with descriptions of the work performed. These invoices also include certain expenses incurred by the Community Hospitals.

7. In recording their time, Gibson Dunn attorneys are required to specify the client and matter number, the nature of the work performed, and the amount of time expended on that task. Gibson Dunn's billing records contain all this information. These billing records also contain the standard hourly billing rates for each attorney who has worked on this matter. Attached as **Exhibit A** are true and correct copies of these invoices from the inception of the case through January 2026.

8. In preparing this fee application, the Community Hospitals, exercising billing judgment, have excluded a number of billing entries to avoid any further disputes and to bring a close to this litigation. The Community Hospitals do not seek reimbursement for those entries. In addition, redactions have been made to the invoices with respect to time entries for timekeepers not claimed in this Motion. The Community Hospitals will submit unredacted versions of any such entries to the Court for *in camera* review upon request.

9. The Community Hospitals incurred transcript and court reporting expenses in connection with depositions, hearings, and trial for this litigation. These expenses are routinely billed to clients and were reasonably necessary to prosecute this case. Transcript and court reporting expenses are reflected in Gibson Dunn's invoices.

10. The Community Hospitals incurred research expenses related to this litigation. The Westlaw and Lexis rates are based on heavily discounted fees Gibson Dunn has negotiated with those services. Research expenses are reflected in Gibson Dunn's invoices.

## II. Local Counsel Invoices

11. The Community Hospitals also paid local counsel at the firms of Marcus Rashbaum Pineiro & Meyers LLP and Neiman Mays Floch & Almeida PLLC (formerly of Marcus, Neiman, Rashbaum & Pineiro LLP) based on the number of hours expended on this matter by each timekeeper at his or her hourly rates, plus out-of-pocket expenses incurred in connection with the litigation. The monthly invoices contain descriptions of each attorney's activities for each day invoiced and the time spent by each attorney or staff member, recorded in tenths of an hour, and the standard hourly billing rate for each attorney that worked on this matter.

12. Attached as **Exhibit B** are true and correct copies of local counsel invoices from the inception of the case through January 2026. As with Gibson Dunn's invoices, the Community Hospitals have redacted entries for timekeepers not claimed in this Motion. The Community Hospitals will submit unredacted versions of any such entries to the Court for *in camera* review upon request.

## III. Timekeeper Qualifications and Roles

13. Gibson Dunn staffed this case with a team of highly experienced attorneys whose practices focus on complex commercial litigation and high-stakes trial work, including attorneys with substantial experience in multi-party federal litigation, factual development, expert analysis, sophisticated briefing, and trial presentation.

14. Due to the complexity of the issues, the expedited schedule, and the presence of five separate Community Hospitals, it was necessary to staff this case with a coordinated team of attorneys across multiple offices to ensure that the case could be prosecuted thoroughly and efficiently. As described above, this matter effectively required counsel to develop and present multiple distinct factual narratives—for five separate hospitals—within a single proceeding, while simultaneously managing extensive discovery, motion practice, and trial preparation on a compressed timeline. Each Community Hospital had its own leadership, operations, documents, patient population, and evidence of harm, and counsel was required to build and maintain five parallel factual records throughout the litigation—from initial investigation and discovery through

trial presentation—while also litigating the common issues concerning Leapfrog's methodology and defenses.

15. Nevertheless, at every phase of the litigation, the Community Hospitals made every effort to staff the case efficiently and to delegate work to attorneys with lower billing rates whenever appropriate. More labor-intensive tasks—such as legal research, initial document review, and preparation of draft materials—were primarily performed by associates and other legal professionals; while partners focused on overall strategy, supervision, and trial presentation. This allocation of work reduced costs while maintaining the quality and effectiveness of the representation.

16. In addition, the Community Hospitals exercised further billing judgment by eliminating time entries for several attorneys and other legal professionals who worked on the case in more limited capacities, including certain more senior timekeepers who are excluded entirely from the request. The requested rates are thus conservative in light of the work actually performed.

17. In sum, the Community Hospitals staffed this matter with a coordinated team of experienced partners, associates, and other legal professionals, each of whom contributed to the litigation based on their experience and role. This structure ensured that the case was prosecuted efficiently, without unnecessary duplication, while maintaining the level of expertise required to handle a complex, expedited, and high-stakes matter. The qualifications and roles of the attorneys who performed work on this case are described below.

**A. Gibson Dunn Partners**

18. The Community Hospitals staffed this case with six Gibson Dunn commercial litigation partners, including myself.

19. A number of additional Gibson Dunn partners, highly experienced in commercial litigation, billed to the matter from time to time, serving in an advisory capacity. To avoid any dispute in this regard and to ensure swift resolution of this motion, the Community Hospitals have eliminated their time from this fee request.

20. The six core Gibson Dunn partners were involved in all aspects of litigation requiring partner-level judgment, including making strategic decisions, preparing and defending witnesses and experts at depositions, taking depositions of key Leapfrog personnel and experts, drafting dispositive motions and other significant briefs, participating in court hearings, pretrial

preparations, and trial, and interacting with Leapfrog's counsel. Where partner time became too granular or duplicative in light of the pace of the case, that time was excluded.

***1. Mary Beth Maloney***

21. Mary Beth Maloney served as lead trial counsel in this matter and was responsible for the case from its inception, including managing overall litigation strategy, staffing, and supervision.

22. Ms. Maloney is a partner in Gibson Dunn's New York office, where she focuses her practice on complex commercial litigation, including high-stakes contract disputes, shareholder disputes, securities litigation, and life sciences matters. Her practice includes extensive first-chair representation of clients in commercial litigation and government investigations, as well as representing companies, boards, and executives in multi-million-dollar disputes and high-stakes federal litigation. She is ranked by *Chambers USA* in its New York Securities Litigation, listed as a "Recommended Lawyer" in *The Legal 500 US* for Securities Litigation: Defense, and recognized by *The Best Lawyers in America* for Commercial Litigation.

23. Before joining Gibson Dunn in 2008, Ms. Maloney served as a law clerk to the Honorable Alicemarie H. Stotler, then Chief Judge of the United States District Court for the Central District of California. Ms. Maloney graduated from the University of Southern California Gould School of Law in 2007. Attached as **Exhibit C** is a true and correct copy of her official firm biography, which contains a list of representative matters.

***2. Daniel P. Chung***

24. Daniel P. Chung is a partner in Gibson Dunn's Washington, D.C. office. In this matter, Mr. Chung played a central role in discovery and at trial, including coordinating factual development and deposing and cross-examining key Leapfrog witnesses, including its CEO Leah Binder.

25. Mr. Chung is a nationally recognized trial lawyer whose practice focuses on complex commercial litigation and defense against civil and criminal regulatory enforcement. He regularly advises and defends corporate executives, boards, and audit committees, and conducts sensitive internal investigations. His experience spans a broad range of industries, including healthcare, technology, media, and financial institutions. Mr. Chung has been recognized as a Global Elite Thought Leader by *Who's Who Legal*, a "Future Litigation Star" by *Benchmark Litigation*, and a "Rising Star" by the *National Law Journal*.

26. Prior to joining Gibson Dunn, Mr. Chung served for more than four years as an Assistant United States Attorney in the Southern District of New York, where he prosecuted a wide range of complex federal criminal cases and tried eight federal criminal jury trials to verdict. He also briefed and argued numerous appeals before the United States Court of Appeals for the Second Circuit.

27. Mr. Chung previously served as a law clerk to the Honorable Norman H. Stahl of the United States Court of Appeals for the First Circuit and the Honorable Michael B. Mukasey of the United States District Court for the Southern District of New York. Mr. Chung is a 2003 *cum laude* graduate of Harvard Law School. Attached as **Exhibit C** is a true and correct copy of Mr. Chung's official firm biography, which contains a list of representative matters.

***3. Lee R. Crain***

28. Lee R. Crain is a partner in Gibson Dunn's New York office and has been with the firm since 2016. In this matter, Mr. Crain led the Community Hospitals' defensive discovery and document production, deposed and defended depositions of numerous fact, expert, and third-party witnesses, and handled several witnesses at trial. Mr. Crain played a central role in developing and presenting the testimony of the Community Hospitals' expert Dr. Berger, whose opinions on consumer perception and decision-making were a significant component of the evidentiary record at trial. He further participated in briefing and legal research throughout the case—spanning from Complaint to trial briefing.

29. Mr. Crain focuses on high-stakes trial and appellate litigation in federal and state courts. He represents clients across a range of industries, including healthcare, technology, media and entertainment, energy, and financial services, in complex commercial disputes, First Amendment matters, employment litigation, and cross-border proceedings. In 2025, he was recognized as a finalist for Young Litigator of the Year by *American Lawyer*. He has also been recognized by *Benchmark Litigation* as a "Future Star" and included in its "40 & Under" list, and by *Lawdragon* as a "Global Leader in Crisis Management" and was named among the "500 Leading Global Entertainment, Sports & Media Lawyers," reflecting his experience handling complex and high-profile disputes.

30. Prior to joining Gibson Dunn, Mr. Crain served as a law clerk to the Honorable Paul J. Watford of the United States Court of Appeals for the Ninth Circuit and the Honorable Sidney H. Stein of the United States District Court for the Southern District of New York. Mr.

Crain graduated first in his class and *summa cum laude* from the University of Michigan Law School in 2014. Attached as **Exhibit C** is a true and correct copy of Mr. Crain's official firm biography, which contains a list of representative matters.

***4. Scott K. Hvidt***

31. Scott K. Hvidt is a partner in Gibson Dunn's Dallas office and has been with the firm since 2016. In this matter, Mr. Hvidt led offensive discovery, oversaw key aspects of expert discovery, and deposed and cross-examined several key Leapfrog witnesses. Mr. Hvidt also worked closely with the Community Hospitals' expert Dr. Nicholson to develop and refine his opinions and played a leading role in preparing and presenting that testimony at trial, which addressed issues at the heart of the case.

32. Mr. Hvidt maintains a broad-based trial practice, including litigation in state and federal courts, and has experience representing clients in a wide range of complex business disputes, including class actions, antitrust claims, securities litigation, contract disputes, and merger-related litigation. He has been recognized by *Best Lawyers: Ones to Watch in America* and by *D Magazine* as a Best Lawyer Under 40.

33. Prior to joining Gibson Dunn, Mr. Hvidt served as a law clerk to the Honorable A. Joe Fish of the United States District Court for the Northern District of Texas. Mr. Hvidt is a 2015 graduate of Columbia Law School, where he was a James Kent Scholar. Attached as **Exhibit C** is a true and correct copy of Mr. Hvidt's official firm biography, which contains a list of representative matters.

***5. Sydney Scott***

34. I am a partner in Gibson Dunn's Houston office. In this matter, I was heavily involved in discovery and trial preparation, especially in developing the factual record, preparing the Community Hospitals' witnesses for their depositions, and conducting their direct examinations at trial.

35. I have experience representing plaintiffs and defendants at every stage of litigation, from pre-suit demands through trial and appeal, in a wide range of white collar and complex commercial disputes, including in the energy industry. I have been recognized by *Benchmark Litigation* in its "40 & Under List – South" and by *The Best Lawyers in America* for Criminal Defense: White Collar.

36. Prior to joining Gibson Dunn in May 2022, I practiced at leading litigation firms and served as a law clerk to the Honorable Carl E. Stewart of the United States Court of Appeals for the Fifth Circuit and the Honorable James J. Brady of the United States District Court for the Middle District of Louisiana. I graduated from the University of Pennsylvania Law School in 2013. Attached as **Exhibit C** is a true and correct copy of my official firm biography, which contains a list of representative matters.

***6. Helgi C. Walker***

37. Helgi C. Walker is a partner in Gibson Dunn's Washington, D.C. office. In this matter, she led the Community Hospitals' briefing teams and played a pivotal role in developing legal strategy before and during trial.

38. Ms. Walker is Co-Chair of Gibson Dunn's global litigation practice group, a member of the firm's executive committee, and co-chair of the firm's administrative law and regulatory practice group. Her practice focuses on appellate, regulatory, and complex litigation matters, and she has extensive experience in appellate challenges to agency rulemakings and other high-stakes commercial litigation. She has argued twice before the Supreme Court, was recognized by *Chambers USA* as a leading lawyer, and was elected as a Fellow of the American Academy of Appellate Lawyers.

39. Ms. Walker served in the White House Counsel's Office as Associate Counsel from 2001 to 2003. She previously served as a law clerk to the Honorable Clarence Thomas of the United States Supreme Court and the Honorable J. Harvie Wilkinson III of the United States Court of Appeals for the Fourth Circuit. Ms. Walker is a 1994 graduate of the University of Virginia School of Law, where she was a member of the Order of the Coif. Attached as **Exhibit C** is Ms. Walker's official firm biography, which contains a list of representative matters.

**B. Gibson Dunn Of Counsel and Associates**

40. Gibson Dunn also staffed this matter with experienced of counsel and associates, who performed substantial work across all phases of litigation. These timekeepers were responsible for many of the core, labor-intensive tasks required to prosecute this case, including managing and conducting document review, preparing discovery requests and responses, coordinating with the five Community Hospitals on factual development, preparing witnesses for deposition, researching and drafting motions and briefs, analyzing expert issues, and assisting with trial preparation and presentation. Work was delegated to these timekeepers in a manner designed

to maximize efficiency and minimize cost, with more complex and high-level assignments handled by more senior associates and more hour-intensive tasks performed by junior associates at lower billing rates.

41. Several additional Gibson Dunn associates billed to the matter. To avoid any dispute in this regard and ensure swift resolution of this Motion, the Community Hospitals have eliminated their time from this fee application.

***1. Christine M. Buzzard – Of Counsel***

42. Christine M. Buzzard is an Of Counsel in Gibson Dunn's Washington, D.C. office and is a member of the firm's Litigation Department. She led the Community Hospitals' briefing, oversaw the associates in those efforts, and argued a key dispositive motion at trial. Ms. Buzzard has substantial experience representing clients in complex litigation, including challenges to federal agency action and matters involving novel constitutional and other legal issues. She regularly serves as a lead drafter on significant briefing and advises clients on their most consequential litigation and regulatory challenges.

43. Before rejoining Gibson Dunn in 2024, Ms. Buzzard served for five years as an Attorney-Advisor in the Office of Legal Counsel at the United States Department of Justice, where she advised the White House Counsel, the Attorney General, and senior officials across the executive branch on complex legal issues. In that role, she received the Attorney General's Award for Distinguished Service.

44. Ms. Buzzard also served as a law clerk to the Honorable Clarence Thomas of the United States Supreme Court, the Honorable Janice Rogers Brown of the United States Court of Appeals for the District of Columbia Circuit, and the Honorable Richard J. Sullivan, then of the United States District Court for the Southern District of New York. Ms. Buzzard is a 2013 graduate of Yale University Law School. Attached as **Exhibit C** is a true and correct copy of Ms. Buzzard's official firm biography, which includes a list of representative matters.

***2. Robert A. Batista – Associate***

45. Robert A. Batista is an associate in Gibson Dunn's Washington, D.C. office and a member of the firm's Litigation Department. In this matter, Mr. Batista led the briefing of several key motions and played a central role in trial briefing, while also contributing to broader legal strategy throughout the case.

46. Mr. Batista has experience handling complex litigation and appellate matters, including leading briefing efforts in high-stakes commercial and regulatory disputes. His practice focuses on litigation involving administrative, constitutional, and commercial issues. Prior to joining Gibson Dunn, Mr. Batista served as a law clerk to the Honorable Steven M. Colloton of the United States Court of Appeals for the Eighth Circuit and the Honorable Trevor N. McFadden of the United States District Court for the District of Columbia. Mr. Batista is a 2018 graduate, *cum laude*, from Harvard Law School, where he served as the Supervising Chair of the *Harvard Law Review*. Attached as **Exhibit C** is a true and correct copy of Mr. Batista's official firm biography.

***3. Emily Cardone – Associate***

47. Emily Cardone is an associate in Gibson Dunn's Dallas office and a member of the firm's Litigation Department. In this matter, Ms. Cardone helped lead offensive discovery efforts on behalf of the Community Hospitals, including developing discovery strategy, drafting requests, and coordinating review of Leapfrog's documents. Ms. Cardone also deposed and examined a third-party witness at trial.

48. Ms. Cardone has experience in complex commercial litigation at both the trial and appellate levels, including assisting with discovery and motion practice in high-stakes disputes.

49. Prior to joining Gibson Dunn, Ms. Cardone served as a law clerk to the Honorable Diane P. Wood of the United States Court of Appeals for the Seventh Circuit. Ms. Cardone is a 2019 graduate from the University of Texas School of Law, where she received the highest honors and served as a Featured Content Editor for the *Texas Law Review*. Attached as **Exhibit C** is a true and correct copy of Ms. Cardone's official firm biography.

***4. Alexander M. Fischer – Associate***

50. Alexander M. Fischer is an associate in Gibson Dunn's Houston office. In this matter, he assisted with fact discovery, played a key role in preparing the CEOs of the five Community Hospitals for deposition and trial, and conducted legal research and drafting efforts in motion practice.

51. Mr. Fischer's practice focuses on high-stakes litigation and arbitration, particularly matters involving complex contract interpretation and constitutional issues.

52. Prior to joining Gibson Dunn, Mr. Fischer served as a law clerk to the Honorable Wendy Beetlestone of the United States District Court for the Eastern District of Pennsylvania.

Mr. Fischer graduated in 2022 from Yale Law School. Attached as **Exhibit C** is a true and correct copy of Mr. Fischer's official firm biography.

***5. Adam J. Garnick – Associate***

53. Adam J. Garnick is an associate in Gibson Dunn's New York office and a member of the firm's Litigation Department. In this matter, Mr. Garnick helped oversee fact and document discovery, as well as expert discovery, and contributed to key aspects of trial preparation, including the development of the opening statement and closing argument.

54. Mr. Garnick has experience in complex litigation matters, including assisting with discovery, motion practice, and trial preparation in high-stakes disputes.

55. Prior to joining Gibson Dunn, Mr. Garnick served as a law clerk to the Honorable Patty Shwartz of the United States Court of Appeals for the Third Circuit and the Honorable Naomi Reice Buchwald of the United States District Court for the Southern District of New York. Mr. Garnick graduated in 2021, *magna cum laude*, from the University of Pennsylvania Law School, where he was a Senior Editor of the *University of Pennsylvania Law Review*. Attached as **Exhibit C** is a true and correct copy of Mr. Garnick's official firm biography.

***6. Andrew V. Kuntz – Associate***

56. Andrew V. Kuntz is an associate in Gibson Dunn's New York office and a member of the firm's Litigation Department. In this matter, Mr. Kuntz helped oversee fact and expert discovery and played a central role in preparing the Community Hospitals' expert Dr. Berger for trial testimony, including working closely on the development and presentation of his opinions.

57. Mr. Kuntz has experience in complex commercial litigation, including matters involving class actions, securities, and regulatory issues, and has contributed to discovery, motion practice, and trial preparation in high-stakes disputes.

58. From 2022 to 2023, Mr. Kuntz served as a law clerk to the Honorable Victor Marrero of the United States District Court for the Southern District of New York. Mr. Kuntz is a 2019 graduate of Columbia Law School, where he was a James Kent Scholar. Attached as **Exhibit C** is a true and correct copy of Mr. Kuntz's official firm biography.

***7. Mary Otoo – Associate***

59. Mary Otoo is an associate in Gibson Dunn's New York office and a member of the firm's Litigation Department. In this matter, Ms. Otoo assisted with discovery and the deposition of several key Leapfrog fact and expert witnesses, and contributed to trial preparation.

60. Ms. Otoo has experience supporting complex litigation matters, including trial preparation, discovery, and motion practice.

61. Ms. Otoo is a 2022 graduate of Columbia Law School. Attached as **Exhibit C** is a true and correct copy of Ms. Otoo's official firm biography.

***8. Kevin Reilly – Associate***

62. Kevin Reilly is an associate in Gibson Dunn's New York office and a member of the firm's Litigation Department. In this matter, Mr. Reilly helped oversee expert and third-party discovery and assisted in preparing Dr. Nicholson for trial. He also handled oral argument regarding key deposition designations at trial.

63. Mr. Reilly has substantial experience with motion practice and discovery efforts in complex commercial, securities, and regulatory litigation, and has experience supporting high-stakes matters across a range of industries.

64. Mr. Reilly is a 2020 graduate of New York University School of Law. Attached as **Exhibit C** is a true and correct copy of Mr. Reilly's official firm biography.

***9. Kevin M. Simmons – Associate***

65. Kevin M. Simmons is an associate in Gibson Dunn's Houston office and a member of the firm's Litigation Department. In this matter, Mr. Simmons led the preparation and organization of trial exhibits and documentary evidence, played a central role in preparing the CEOs of the five Community Hospitals for deposition and trial, and conducted the direct examination of one of those CEO witnesses at trial.

66. Mr. Simmons has significant experience in all phases of litigation, from initial investigation through trial and appeal, in federal and state courts across the country. His practice includes representing clients in complex commercial disputes, including matters involving antitrust, contract, and regulatory issues.

67. Prior to joining Gibson Dunn, Mr. Simmons served as a law clerk to the Honorable Eva Guzman of the Supreme Court of Texas. He is a 2018 graduate of the Duke University School of Law. Attached as **Exhibit C** is a true and correct copy of Mr. Simmons' official firm biography, which includes a list of representative matters.

***10. Marc Aaron Takagaki – Associate***

68. Marc Aaron Takagaki is an associate in Gibson Dunn's New York office and a member of the firm's Litigation Department. In this matter, Mr. Takagaki oversaw fact discovery

for the Community Hospitals, including coordinating document review, discovery responses, and factual development across the five hospitals. He also deposed and cross-examined one of Leapfrog's key expert witnesses, Mr. Rule, who offered a purported "re-grading" analysis, requiring preparation on complex methodological issues central to Leapfrog's defense.

69. Mr. Takagaki's practice focuses on high-stakes commercial, securities, class action, and white-collar litigation across a wide range of industries, including finance, technology, and life sciences. He has substantial experience in motion practice, witness examination, and civil discovery.

70. Mr. Takagaki is a 2017 graduate from the University of Michigan Law School. Attached as **Exhibit C** is a true and correct copy of Mr. Takagaki's official firm biography, which includes a list of representative matters.

***11. Iason Togias – Associate***

71. Iason Togias is an associate in Gibson Dunn's New York office and a member of the firm's Litigation Department. In this matter, Mr. Togias helped draft pleadings and briefs, assisted with discovery and the deposition of key witnesses, and assisted with trial preparation, including drafting cross-examination outlines.

72. Mr. Togias has experience in complex litigation matters at both the trial and appellate level. He has assisted with discovery, motion practice, and trial preparation in high-stakes disputes.

73. Prior to joining Gibson Dunn, Mr. Togias served as a law clerk to the Honorable Eric D. Miller of the United States Courts of Appeals for the Ninth Circuit. Mr. Togias graduated in 2022, *cum laude*, from Harvard Law School. Attached as **Exhibit C** is a true and correct copy of Mr. Togias' official firm biography, which includes a list of representative matters.

***12. Karsyn Archambeau – Associate***

74. Karsyn Archambeau is an associate in Gibson Dunn's New York office and a member of the firm's Litigation Department. In this matter, Ms. Archambeau reviewed and identified key documents for depositions and trial, supported discovery efforts, and assisted with the preparation of witnesses for deposition and trial.

75. Ms. Archambeau graduated in 2024 from Columbia Law School. Attached as **Exhibit C** is a true and correct copy of Ms. Archambeau's official firm biography.

***13. Noah J. Delwiche – Associate***

76. Noah J. Delwiche is an associate in Gibson Dunn's Washington, D.C. office and a member of the firm's Litigation Department. In this matter, Mr. Delwiche contributed to briefing and legal research and assisted with the preparation of numerous Leapfrog witnesses.

77. Mr. Delwiche's practice focuses on administrative law and regulatory practice, appellate and constitutional law, and labor and employment.

78. Mr. Delwiche graduated in 2024, *magna cum laude*, from Harvard Law School, where he served as a Notes Editor for the *Harvard Law Review*. Attached as **Exhibit C** is a true and correct copy of Mr. Delwiche's official firm biography.

***14. Laura Wang – Associate***

79. Laura Wang is an associate in Gibson Dunn's New York office and a member of the firm's Litigation Department. In this matter, Ms. Wang reviewed and identified key documents for depositions and trial, supported discovery efforts, and assisted with the preparation of witnesses for deposition and trial.

80. Ms. Wang graduated in 2024 from the University of Southern California Gould School of Law. Attached as **Exhibit C** is a true and correct copy of Ms. Wang's official firm biography.

**C. Local Counsel**

81. The Community Hospitals retained Marcus Rashbaum Pineiro & Meyers LLP and Neiman Mays Floch & Almeida PLLC as local counsel. Both are leading litigation boutiques in South Florida. To minimize duplication and maximize efficiency, the firms generally performed those tasks customarily performed by local counsel, including advising on local rules and practices, assisting with filings, and providing strategic input on matters before the Court.

***1. Jeffrey Marcus***

82. Jeffrey Marcus is a partner at Marcus Rashbaum Pineiro & Meyers LLP. Mr. Marcus was the primary local counsel on this matter and served as a full member of the trial team. He examined multiple witnesses at trial and participated in core trial preparation and strategy.

83. Mr. Marcus is an experienced trial lawyer with substantial experience in complex civil and white-collar litigation. He tried more than twenty-five cases to verdict as a federal prosecutor and has extensive experience handling high-stakes litigation, including matters

involving healthcare, securities, and government enforcement. He has been ranked by *Chambers USA* in the top band for litigation and white-collar defense in Florida.

84. Mr. Marcus served as a law clerk to the Honorable Stanley Marcus of the United States Court of Appeals for the Eleventh Circuit and the Honorable Donald M. Middlebrooks of the United States District Court for the Southern District of Florida. Mr. Marcus is a 1999 graduate of Yale Law School. Attached as **Exhibit D** is a true and correct copy of Mr. Marcus' official firm biography.

***2. Kathryn Meyers***

85. Kathryn Meyers is a partner at Marcus Rashbaum Pineiro & Meyers LLP and served as local counsel in this matter. Ms. Meyers assisted with local practice and procedure issues and coordination with lead counsel.

86. Ms. Meyers has more than two decades of experience handling sophisticated criminal, civil, and regulatory matters. Her practice focuses on white-collar criminal defense, and she has tried numerous cases to verdict. Prior to joining Marcus Rashbaum Pineiro & Meyers LLP, Ms. Meyers worked in the New York office of a global law firm and later at a litigation boutique. She has been recognized by *Chambers USA* in white-collar crime and government investigations in Florida.

87. Ms. Meyers served as a law clerk to the Honorable Thomas Platt of the United States District Court for the Eastern District of New York. Ms. Meyers graduated in 1998 from Washington University School of Law, where she was elected Order of the Coif. Attached as **Exhibit D** is a true and correct copy of Ms. Meyers' official firm biography.

***3. Michael Pineiro***

88. Michael Pineiro is a partner at Marcus Rashbaum Pineiro & Meyers LLP and served as local counsel in this matter. Mr. Pineiro advised on strategic issues and worked closely with lead counsel on motion practice, discovery, and trial-related matters during this litigation.

89. Mr. Pineiro focuses his practice on complex business litigation, securities and investor fraud, trust and estates disputes, professional negligence, and regulatory litigation. He has been recognized by *Chambers USA* as a leading commercial litigator in Florida. Prior to joining Marcus Rashbaum Pineiro & Meyers LLP, Mr. Pineiro worked at a global law firm representing clients in securities litigation, government enforcement defense, and complex

commercial litigation matters. He has been recognized by *Chambers USA* as a leading lawyer in general commercial litigation in Florida.

90. Mr. Pineiro served as a law clerk to the Honorable Adalberto Jordan of the United States District Court for the Southern District of Florida. Mr. Pineiro graduated in 2007 from Columbia Law School, where he was a Harlan Fiske Stone Scholar. Attached as **Exhibit D** is a true and correct copy of Mr. Pineiro's official firm biography.

***4. Daniel Rashbaum***

91. Daniel Rashbaum is a partner at Marcus Rashbaum Pineiro & Meyers LLP and served as local counsel in this matter. Mr. Rashbaum advised on litigation strategy and issues related to the proceedings before this Court and devoted substantial time to preparing the Community Hospitals' witnesses for deposition.

92. Mr. Rashbaum is an experienced trial lawyer with substantial experience in white-collar criminal defense, internal investigations, regulatory enforcement, and complex litigation. He served as an Assistant United States Attorney for the Southern District of Florida, where he tried more than thirty cases to verdict, all resulting in convictions, and argued multiple cases before the United States Court of Appeals for the Eleventh Circuit. Mr. Rashbaum has extensive experience handling high-stakes matters involving healthcare fraud, securities and commodities laws, the Foreign Corrupt Practices Act, anti-kickback and anti-bribery statutes, insider trading, money laundering offenses, and government enforcement proceedings. He has been ranked by *Chambers USA* in the top band for litigation and white-collar defense in Florida.

93. Mr. Rashbaum graduated *magna cum laude* from Cornell University Law School in 2000. Attached as **Exhibit D** is a true and correct copy of Mr. Rashbaum's official firm biography.

***5. Brandon Floch***

94. Brandon Floch is a partner at Neiman Mays Floch & Almeida PLLC and served as local counsel in this matter. Mr. Floch worked extensively with lead counsel throughout the litigation, including by advising on strategy, motion practice, discovery disputes, and hearing preparation.

95. Mr. Floch is an experienced trial lawyer whose practice focuses on high-stakes commercial litigation. He represents individuals, businesses, and investors in complex disputes involving business torts, antitrust, whistleblower actions, and other substantial commercial

matters. He has substantial experience litigating complex cases against sophisticated institutional parties in both federal and state courts and has tried numerous matters on behalf of both plaintiffs and defendants.

96. Mr. Floch served as a law clerk of the Honorable James J. Brady of the United States District Court for the Middle District of Louisiana. Mr. Floch graduated from the University of Pennsylvania Law School in 2016. Attached as **Exhibit D** is a true and correct copy of Mr. Floch's official firm biography.

97. The Community Hospitals seek attorneys' fees of $9,906,370.00. The Community Hospitals have calculated these fees using the lodestar method, which is determined by multiplying a reasonable hourly rate by the number of hours reasonably expended in the litigation. To avoid any dispute over its rates, Gibson Dunn has significantly discounted the standard rates it actually billed in this matter to bring them in line with prevailing rates for complex, commercial litigation within this District. Gibson Dunn has further excluded timekeepers or time entries to minimize any duplication. The rates charged by Gibson Dunn and local counsel and the hours expended were reasonable and necessary for the Community Hospitals to prevail and obtain excellent results in this litigation. The Community Hospitals' requested rates, hours, and total fees for Gibson Dunn attorneys and local counsel are provided below:

| **Gibson Dunn** | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Title** | **Hourly Rate** | **Hours Claimed** | **Total Fees** |
| Mary Beth Maloney | Partner | $975.00 | 473.8 | $ 461,955.00 |
| Daniel P. Chung | Partner | $975.00 | 623.0 | $ 607,425.00 |
| Lee R. Crain | Partner | $975.00 | 847.3 | $ 826,117.50 |
| Scott K. Hvidt | Partner | $975.00 | 878.0 | $ 856,050.00 |
| Sydney Scott | Partner | $975.00 | 470.6 | $ 458,835.00 |
| Helgi C. Walker | Partner | $975.00 | 128.7 | $ 125,482.50 |
| Christine M. Buzzard | Of Counsel | $800.00 | 888.1 | $ 710,480.00 |
| Robert Batista | Associate | $675.00 | 498.8 | $ 336,690.00 |
| Emily Cardone | Associate | $675.00 | 670.2 | $ 452,385.00 |
| Alexander M. Fischer | Associate | $675.00 | 494.1 | $ 333,517.50 |
| Adam Garnick | Associate | $675.00 | 834.0 | $ 562,950.00 |

| | | | | |
|---|---|---|---|---|
| Andrew Kuntz | Associate | $675.00 | 563.3 | $ 380,227.50 |
| Mary Otoo | Associate | $675.00 | 709.4 | $ 478,845.00 |
| Kevin Reilly | Associate | $675.00 | 663.5 | $ 447,862.50 |
| Kevin Simmons | Associate | $675.00 | 731.5 | $ 493,762.50 |
| Marc Aaron Takagaki | Associate | $675.00 | 572.8 | $ 386,640.00 |
| Iason Togias | Associate | $675.00 | 567.8 | $ 383,265.00 |
| Karsyn Archambeau | Associate | $500.00 | 714.6 | $ 357,300.00 |
| Noah Delwiche | Associate | $500.00 | 739.2 | $ 369,600.00 |
| Laura Wang | Associate | $500.00 | 354.8 | $ 177,400.00 |
| **TOTAL** | | | | **$ 9,206,790.00** |

| **Local Counsel** | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Title** | **Hourly Rate** | **Hours Claimed** | **Total Fees** |
| Jeffrey Marcus | Partner | $975 | 498.0 | $ 485,550.00 |
| Kathryn Meyers | Partner | $975 | 4.6 | $ 4,485.00 |
| Michael Pineiro | Partner | $975 | 78.8 | $ 76,830.00 |
| Daniel Rashbaum | Partner | $975 | 36.1 | $ 35,197.50 |
| Brandon Floch | Partner | $875 | 108.2 | $ 94,675.00 |
| **TOTAL** | | | | **$ 696,737.50** |

98. The Community Hospitals also seek $596,352.97 in costs incurred in connection with this case. Specifically, the Community Hospitals seek to recover: (1) transcript and court-reporting costs for depositions, hearings, and trial in the amount of $137,423.52; and (2) research expenses in the amount of $458,929.45. These costs were reasonable and necessarily incurred to litigate this case. These costs are reflected in Gibson Dunn's invoices attached as **Exhibit A**.

## IV. Leapfrog's Ability to Pay

99. Following entry of the Court's decision on March 6, 2026, Leapfrog began a national fundraising campaign urging financial contributions to help it counteract the "threat" posed by the Court's ruling in this lawsuit. The campaign, led by Leapfrog's CEO, claimed the decision "raises a serious First Amendment issue about the right to public independent information in the public interest" and called on supporters to "show [their] support with a contribution."

Attached as **Exhibit E** is a copy of Leapfrog's website housing this fundraising campaign (https://leapfroggroup.app.neoncrm.com/campaigns/leapfrog-first-amendment-fund) as it appeared on March 9, 2026; the page has since been taken down from the website.

100. As part of its initial disclosures, Leapfrog produced two declaration pages relating to insurance agreements that may "satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment." Fed. R. Civ. P. 26(a)(1)(A)(iv). Attached as **Exhibit F** is a true and correct copy of those documents. Each declaration page purports to provide coverage of up to $5 million for "[e]ach [e]rroneous [a]ct" during the periods covering May 1, 2024, through May 1, 2025, and May 1, 2025, through May 1, 2026.

**V. Leapfrog's Repeated Refusal to Confer in Good Faith on the Motion**

101. On May 5, 2026, the Community Hospitals' counsel served Leapfrog's counsel with a draft of this Motion and supporting materials pursuant to Local Rule 7.3. As contemplated and required by Rule 7.3(b), the Community Hospitals' counsel was prepared to confer in good faith with Leapfrog's counsel in an attempt to narrow any fee disputes by agreement before filing the Community Hospitals' Motion with the Court.

102. On May 7, 2026, Leapfrog's counsel took the position that the Motion should not be heard now, based on, among other things, purported "defects" in the Court's judgement.

103. Later that day, the Community Hospitals' counsel responded that the Community Hospitals intended to proceed with the Motion consistent with the Federal Rules and Local Rule 7.3 and twice requested times for the parties to confer in good faith as required by the Local Rules.

104. On May 11, 2026, Leapfrog's counsel reiterated its prior position and repeatedly confirmed that Leapfrog refused to participate in the mandatory conferral process.

105. Because Leapfrog refused to participate in good faith in the conferral process mandated by Local Rule 7.3(b), the parties were unable to resolve any outstanding fee disputes prior to filing the Motion.

106. Attached as **Exhibit G** is a true and correct copy of the email chain between counsel concerning Local Rule 7.3's mandatory meet-and-confer process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 14, 2026, in Houston, Texas.

Sydney Scott

STATE OF TEXAS §
§
COUNTY OF HARRIS §

Before me the undersigned notary public, personally appeared Sydney Scott known to me or proved to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purpose and consideration therein expressed.

Signed on this 14th day of May, 2026.

JENNIFER BASS
My Notary ID # 7925132
Expires July 2, 2029

Jennifer Bass
Notary Public in and for the State of Texas

My Commission Expires: July 2, 2029