No. 26-11527

# United States Court of Appeals for the Eleventh Circuit

GOOD SAMARITAN MEDICAL CENTER, INC., ET AL.,

*Plaintiffs-Appellees*,

v.

THE LEAPFROG GROUP,

*Defendant-Appellant*.

On Appeal From The United States District Court
For The Southern District Of Florida
No. 9:25-cv-80526 (Hon. Donald M. Middlebrooks)

**BRIEF OF PLAINTIFFS-APPELLEES THE COMMUNITY HOSPITALS**

MARY BETH MALONEY
LEE R. CRAIN
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

JEFFREY B. WALL
*Counsel of Record*
HELGI C. WALKER
CHRISTINE M. BUZZARD
ROBERT A. BATISTA
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
jwall@gibsondunn.com

*Counsel for Plaintiffs-Appellees The Community Hospitals*

*Good Samaritan Medical Center, Inc.* v. *The Leapfrog Group*, No. 26-11527

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the undersigned counsel for Plaintiffs-Appellees Good Samaritan Medical Center, Inc.; Delray Medical Center, Inc.; Palm Beach Gardens Community Hospital, Inc.; St. Mary's Medical Center, Inc.; and West Boca Medical Center, Inc. hereby certify that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

An asterisk (*) marks additions to Plaintiffs-Appellees' May 28, 2026 Certificate of Interested Persons and Corporate Disclosure Statement (Dkt. 17). A dagger (†) marks the revised description of Zachary J. Lustbader as former counsel for Defendant-Appellant following the July 14, 2026 withdrawal order (Dkt. 23). All other entries are unchanged from Plaintiffs-Appellees' May 28, 2026 Certificate.

1. ***American Civil Liberties Union**: Amicus Curiae.

2. ***American Civil Liberties Union Foundation**: Counsel for Amici Curiae.

3. ***American Civil Liberties Union Foundation of Florida**: Counsel for Amici Curiae.

4. ***American Civil Liberties Union of Florida**: Amicus Curiae.

5. **Batista, Robert A.**: Counsel for Plaintiffs-Appellees.

6. ***Berwick, Donald M.**: Amicus Curiae.

7. ***Better Healthcare Policy Group, The**: Amicus Curiae.

8. **Biggs, Shawna Corrine**: Counsel for Defendant-Appellant.

9. **Billek, Maxwell L.**: Counsel for Defendant-Appellant.

10. ***BlackRock, Inc. (BLK)**: Interested entity disclosed in the Certificate of Interested Persons filed by the Reporters Committee for Freedom of the Press and other Amici Curiae (Dkt. 33); publicly traded company, Stock (Ticker) Symbol: BLK.

11. **Blair, Kimberly E.**: Counsel for Defendant-Appellant.

12. **Buzzard, Christine M.**: Counsel for Plaintiffs-Appellees.

13. ***California Public Employees' Retirement System**: Amicus Curiae.

14. ***Cannon, Michael F.**: Amicus Curiae.

15. **Cardone, Emily**: Counsel for Plaintiffs-Appellees.

16. ***Catalyst for Payment Reform**: Amicus Curiae.

17. ***Cato Institute**: Amicus Curiae.

18. ***Catsambas, Marietta**: Counsel for Amici Curiae.

19. **Chung, Daniel P.**: Counsel for Plaintiffs-Appellees.

20. ***Clancy, Carolyn**: Amicus Curiae.

21. ***Consovoy McCarthy PLLC**: Counsel for Amici Curiae.

22. ***Consumer Reports**: Amicus Curiae.

23. ***Coye, Molly Joel**: Amicus Curiae.

24. **Crain, Lee R.**: Counsel for Plaintiffs-Appellees.

25. ***Crooks, Jamie**: Counsel for Amici Curiae.

26. **Delray Medical Center, Inc.**: Plaintiff-Appellee Delray Medical Center, Inc. is a wholly owned subsidiary of non-party Tenet Florida, Inc.; which is in turn a wholly owned subsidiary of non-party Health Services Network Hospitals, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

27. **Duff, Thomas K.**: Counsel for Defendant-Appellant.

28. ***Fairmark Partners, LLP**: Counsel for Amici Curiae.

29. ***Families USA**: Amicus Curiae.

30. ***Fendrick, Mark**: Amicus Curiae.

31. **Floch, Brandon Scott**: Counsel for Plaintiffs-Appellees.

32. **Gibson, Dunn & Crutcher LLP**: Counsel for Plaintiffs-Appellees.

33. ***Ginieczki, Boyce**: Amicus Curiae.

34. ***Goins, Jenny**: Amicus Curiae.

35. **Good Samaritan Medical Center, Inc.**: Plaintiff-Appellee Good Samaritan Medical Center, Inc. is a wholly owned subsidiary of non-party Tenet HealthSystem Medical, Inc.; which is in turn a wholly owned subsidiary of non-party Healthcare Network Holdings, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

36. ***Harris, Jeffrey M.**: Counsel for Amici Curiae.

37. **Health Services Network Hospitals, Inc.**: Non-party Health Services Network Hospitals, Inc. is the parent corporation of non-

party Tenet Florida, Inc.; which is in turn the parent corporation of Plaintiffs-Appellees Delray Medical Center, Inc. and West Boca Medical Center, Inc. Non-party Health Services Network Hospitals, Inc. is a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

38. **Healthcare Network Holdings, Inc.**: Non-party Healthcare Network Holdings, Inc. is the parent corporation of Tenet HealthSystem Medical, Inc.; which is in turn the parent corporation of Plaintiffs-Appellees Good Samaritan Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc., and St. Mary's Medical Center, Inc. Non-party Healthcare Network Holdings, Inc. is a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

39. ***Herman, Roberta**: Amicus Curiae.

40. ***Hooker Odom, Carmen**: Amicus Curiae.

41. **Hvidt, Scott K.**: Counsel for Plaintiffs-Appellees.

42. ***Institute for Free Speech**: Amicus Curiae.

43. ***Kaplan, Robert M.**: Amicus Curiae.

44. ***Laws, Margaret**: Amicus Curiae.

45. **Leapfrog Group, The**: Defendant-Appellant.

46. ***Lee, Peter V.**: Amicus Curiae.

47. ***Lieberman, Michael D.**: Counsel for Amici Curiae.

48. **†Lustbader, Zachary J.**: Former counsel for Defendant-Appellant.

49. **Maloney, Mary Beth**: Counsel for Plaintiffs-Appellees.

50. **Marcus, Jeffrey Eldridge**: Counsel for Plaintiffs-Appellees.

51. **Marcus Neiman & Rashbaum LLP**: Counsel for Plaintiffs-Appellees.

52. **Marcus Rashbaum Pineiro & Meyers LLP**: Counsel for Plaintiffs-Appellees.

53. ***Massachusetts Group Insurance Commission**: Amicus Curiae.

54. **Matthewman, HON. William**: U.S. Magistrate Judge assigned to this case.

55. **Middlebrooks, HON. Donald M.**: U.S. District Judge assigned to this case.

56. **Modi, Kavi V.**: Counsel for Defendant-Appellant.

57. **Nabors, David A.**: Counsel for Defendant-Appellant.

58. ***National Alliance of Healthcare Purchaser Coalitions**: Amicus Curiae.

59. ***National Partnership for Women & Families**: Amicus Curiae.

60. **Neiman Mays Floch & Almeida PLLC**: Counsel for Plaintiffs-Appellees.

61. ***New York Times Company, The (NYT)**: Amicus Curiae; publicly traded company, Stock (Ticker) Symbol: NYT.

62. ***O'Kane, Peggy**: Amicus Curiae.

63. ***Onayemi, Yinka E.**: Counsel for Amici Curiae.

64. **Palm Beach Gardens Community Hospital, Inc.**: Plaintiff-Appellee Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center is a wholly owned subsidiary of non-party Tenet HealthSystem Medical, Inc.; which is in turn a wholly owned subsidiary of non-party Healthcare Network Holdings, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

65. **Parks, Allyson E.**: Counsel for Plaintiffs-Appellees.

66. ***Patient Safety Action Network**: Amicus Curiae.

67. ***PatientRightsAdvocate.org, Inc.**: Amicus Curiae.

68. ***Patients for Patient Safety US**: Amicus Curiae.

69. ***Patterson Law Firm, LLC**: Counsel for Amicus Curiae.

70. ***Patterson, Thomas E.**: Counsel for Amicus Curiae.

71. **Pineiro, Michael Anthony**: Counsel for Plaintiffs-Appellees.

72. ***Pittman, Mary**: Amicus Curiae.

73. ***Purchasers Business Group on Health**: Amicus Curiae.

74. **Quinn Emanuel Urquhart & Sullivan, LLP**: Counsel for Defendant-Appellant.

75. **Rashbaum, Daniel Lawrence**: Counsel for Plaintiffs-Appellees.

76. **Reilly, Kevin**: Counsel for Plaintiffs-Appellees.

77. ***Reporters Committee for Freedom of the Press**: Amicus Curiae.

78. ***Richman, Barak**: Amicus Curiae.

79. ***Right Doctor, LLC**: Amicus Curiae.

80. ***Rottman, Gabriel**: Counsel for Amici Curiae.

81. ***Safran, Dana Gelb**: Amicus Curiae.

82. ***Scheffler, Richard M.**: Amicus Curiae.

83. ***Schlichting, Nancy**: Amicus Curiae.

84. ***Schwartz, Allyson Y.**: Amicus Curiae.

85. **Scott, Sydney A.**: Counsel for Plaintiffs-Appellees.

86. **Shaffer, Derek L.**: Counsel for Defendant-Appellant.

87. ***Shortell, Stephen M.**: Amicus Curiae.

88. **Simmons, Kevin**: Counsel for Plaintiffs-Appellees.

89. **St. Mary's Medical Center, Inc.**: Plaintiff-Appellee St. Mary's Medical Center, Inc. is a wholly owned subsidiary of non-party Tenet HealthSystem Medical, Inc.; which is in turn a wholly owned subsidiary of non-party Healthcare Network Holdings, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

90. **Sternberg, Jason D.**: Counsel for Defendant-Appellant.

91. **Takagaki, Marc Aaron**: Counsel for Plaintiffs-Appellees.

92. **Tenet Florida, Inc.**: Non-party Tenet Florida, Inc. is the parent corporation of Plaintiffs-Appellees Delray Medical Center, Inc.

and West Boca Medical Center, Inc. Non-party Tenet Florida, Inc. is a wholly owned subsidiary of non-party Health Services Network Hospitals, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

93. **Tenet Healthcare Corporation (THC)**: Non-party Tenet Healthcare Corporation is the parent corporation of non-party Healthcare Network Holdings, Inc.; which is in turn the parent corporation of non-party Tenet HealthSystem Medical, Inc.; which is in turn the parent corporation of Plaintiffs-Appellees Good Samaritan Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc., and St. Mary's Medical Center, Inc. Non-party Tenet Healthcare Corporation is also the parent corporation of non-party Health Services Network Hospitals, Inc.; which is in turn the parent corporation of non-party Tenet Florida, Inc.; which is in turn the parent corporation of Plaintiffs-Appellees Delray Medical Center, Inc. and West Boca Medical Center, Inc. Non-party Tenet Healthcare Corporation is a publicly traded company on the New York Stock Exchange, Stock (Ticker)

Symbol: THC. Non-party Tenet Healthcare Corporation does not have a parent corporation. As of the date set forth in non-party Tenet Healthcare Corporation's 2026 Proxy Statement, non-party The Vanguard Group, Inc. held more than 10% of non-party Tenet Healthcare Corporation's publicly traded stock.

94. **Tenet HealthSystem Medical, Inc.**: Non-party Tenet HealthSystem Medical, Inc. is the parent corporation of Plaintiffs-Appellees Good Samaritan Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc., and St. Mary's Medical Center, Inc. Non-party Tenet HealthSystem Medical, Inc. is a wholly owned subsidiary of non-party Healthcare Network Holdings, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

95. ***Tilley, Daniel**: Counsel for Amici Curiae.

96. ***UNITE HERE HEALTH**: Amicus Curiae.

97. ***Valdez, Robert**: Amicus Curiae.

98. **Vanguard Group, Inc., The**: As of the date set forth in non-party Tenet Healthcare Corporation's 2026 Proxy Statement, non-party

The Vanguard Group, Inc. held more than 10% of non-party Tenet Healthcare Corporation's publicly traded stock.

99. ***Venzke, Cody**: Counsel for Amici Curiae.

100. ***Volpp, Kevin**: Amicus Curiae.

101. **Walker, Helgi C.**: Counsel for Plaintiffs-Appellees.

102. ***Wall, Jeffrey B.**: Counsel for Plaintiffs-Appellees.

103. **West Boca Medical Center, Inc.**: Plaintiff-Appellee West Boca Medical Center, Inc. is a wholly owned subsidiary of non-party Tenet Florida, Inc.; which is in turn a wholly owned subsidiary of non-party Health Services Network Hospitals, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

104. **Wilson Elser Moskowitz Edelman & Dicker LLP**: Counsel for Defendant-Appellant.

105. **Wood, Courtney**: Counsel for Defendant-Appellant.

106. **Yang, Betty X.**: Counsel for Plaintiffs-Appellees.

107. ***Yeh, Charlotte S.**: Amicus Curiae.

108. ***Yelp, Inc. (YELP)**: Amicus Curiae; publicly traded company, Stock (Ticker) Symbol: YELP.

109. **Zibas, Jura Christine**: Counsel for Defendant-Appellant.

110. ***Zycherman, Lisa**: Counsel for Amici Curiae.

Dated: November 13, 2026

GIBSON, DUNN & CRUTCHER LLP

By: *__/s/ Jeffrey B. Wall__*
Jeffrey B. Wall

*Counsel for Plaintiffs-Appellees*
*The Community Hospitals*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal is more straightforward than Defendant The Leapfrog Group suggests. Almost all of Leapfrog's arguments were not preserved below, and its one preserved argument lacks merit. In 2024, Leapfrog began to assign failing "Safety Grades" to hospitals—regardless of their real-world safety performance—if they refused to sign over to Leapfrog commercial rights to their private performance data. The district court found this practice violated the Florida Deceptive and Unfair Trade Practices Act. The court correctly rejected Leapfrog's argument that its Safety Grades and grading methodology are "pure opinion" under the First Amendment.

After hiring new counsel, Leapfrog filed a post-judgment reconsideration motion asserting the new defenses it now presses on appeal. The district court correctly held that those defenses had been forfeited. This Court rarely, if ever, reviews arguments that a party "failed to raise . . . before [its] motion for reconsideration." *Gould* v. *Interface, Inc.*, 153 F.4th 1346, 1358 (11th Cir. 2025). But to the extent the Court wishes to explore the merits of Leapfrog's new arguments, oral argument may aid the decisional process.

## TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

A. Factual Background ........ 5

1. The Community Hospitals ........ 5

2. Leapfrog's Survey and Safety Grades ........ 5

3. Leapfrog's Revenue-Enhancement Scheme ........ 8

B. Procedural History ........ 11

1. Pretrial Motions ........ 11

2. Trial and Judgment for the Community Hospitals ........ 13

3. Leapfrog's Motion for Reconsideration ........ 15

SUMMARY OF ARGUMENT ........ 16

STANDARD OF REVIEW ........ 19

ARGUMENT ........ 20

I. THE DISTRICT COURT DID NOT ERR IN REJECTING LEAPFROG'S "PURE OPINION" DEFENSE. ........ 21

A. The Injunction Regulates Unlawful Conduct, Not Pure Speech. ........ 22

B. The Safety Grades And Methodology Are Not Pure Opinion. ........ 28

II. THE DISTRICT COURT DID NOT PLAINLY ERR IN REJECTING LEAPFROG'S UNPRESERVED DEFENSES. ........ 41

A. Leapfrog's Actual-Malice Defense Is Unpreserved And Implicates No Plain Error....42

1. Leapfrog's actual-malice defense is waived or at least forfeited....42

2. Leapfrog's actual-malice defense does not establish plain error. ....48

B. Leapfrog's Other Constitutional Defenses Are Unpreserved And Implicate No Plain Error. ....55

III. THE DISTRICT COURT DID NOT ERR IN REJECTING LEAPFROG'S STATUTORY ARGUMENTS. ....61

CONCLUSION....64

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alley* v. *HHS*,
590 F.3d 1195 (11th Cir. 2009) .......... 60

*Angel Flight of Ga., Inc.* v. *Angel Flight Am., Inc.*,
522 F.3d 1200 (11th Cir. 2008) .......... 19

*Basulto* v. *Netflix, Inc.*,
2023 WL 7129970 (S.D. Fla. Sep. 20, 2023) .......... 59

* *Burch* v. *P.J. Cheese, Inc.*,
861 F.3d 1338 (11th Cir. 2017) .......... 19, 47, 48

*Carroll* v. *President & Comm'rs of Princess Anne*,
393 U.S. 175 (1968) .......... 58

*Castellanos* v. *Next Door Co.*,
192 So. 3d 431 (Fla. 2016) .......... 63

*Chevaldina* v. *R.K./FL Mgmt., Inc.*,
133 So. 3d 1086 (Fla. 3d DCA 2014) .......... 58

*Citadel Sec. LLC* v. *SEC*,
178 F.4th 621 (11th Cir. 2026) .......... 30

*Clement* v. *U.S. Att'y Gen.*,
75 F.4th 1193 (11th Cir. 2023) .......... 43

* *Cohen* v. *Cowles Media Co.*,
501 U.S. 663 (1991) .......... 50, 52

*Curtis Publ'g Co.* v. *Butts*,
388 U.S. 130 (1967) .......... 45

*Dershowitz* v. *Cable News Network, Inc.*,
153 F.4th 1189 (11th Cir. 2025) .......... 45

*Dupree* v. *Younger*,
598 U.S. 729 (2023) ... 46

*Ferrill* v. *Parker Grp., Inc.*,
168 F.3d 468 (11th Cir. 1999) ... 43

*Flowers* v. *Comm'r, Soc. Sec. Admin.*,
97 F.4th 1300 (11th Cir. 2024) ... 46

*Francois* v. *Wainwright*,
741 F.2d 1275 (11th Cir. 1984) ... 42

*From* v. *Tallahassee Democrat, Inc.*,
400 So. 2d 52 (Fla. 1st DCA 1981) ... 37

*FTC* v. *Corpay, Inc.*,
164 F.4th 807 (11th Cir. 2026) ... 56

*Galarneau* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*,
504 F.3d 189 (1st Cir. 2007) ... 44

*Gertz* v. *Robert Welch, Inc.*,
418 U.S. 323 (1974) ... 29, 46, 47

* *Giboney* v. *Empire Storage & Ice Co.*,
336 U.S. 490 (1949) ... 24, 49, 57

* *Gould* v. *Interface, Inc.*,
153 F.4th 1346 (11th Cir. 2025) ... i, 46, 62

*Hay* v. *Indep. Newspapers, Inc.*,
450 So. 2d 293 (Fla. 2d DCA 1984) ... 37

*Home Performance All., Inc.* v. *Better Bus. Bureau of W. Fla., Inc.*,
354 So. 3d 1165 (Fla. 2d DCA 2023) ... 62

*Juris* v. *Inamed Corp.*,
685 F.3d 1294 (11th Cir. 2012) ... 55

*Keller* v. *Miami Herald Publ'g Co.*,
778 F.2d 711 (11th Cir. 1985) ... 30

*Krapacs* v. *Bacchus*,
301 So. 3d 976 (Fla. 4th DCA 2020) ....................58

*Ledford* v. *Peeples*,
657 F.3d 1222 (11th Cir. 2011) ....................47, 48

* *Lucero* v. *Trosch*,
121 F.3d 591 (11th Cir. 1997) ....................58

*Marco Island Cable* v. *Comcast Cablevision of S., Inc.*,
312 F. App'x 211 (11th Cir. 2009) ....................62

*Masson* v. *New Yorker Mag., Inc.*,
501 U.S. 496 (1991) ....................36, 47

*McCarthan* v. *Dir. of Goodwill Indus.-Suncoast, Inc.*,
851 F.3d 1076 (11th Cir. 2017) (en banc) ....................63

*Miami Herald Publ'g Co.* v. *Tornillo*,
418 U.S. 241 (1974) ....................33

* *Michel* v. *NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) ....................29, 33, 34, 54

* *Milkovich* v. *Lorain J. Co.*,
497 U.S. 1 (1990) ....................29, 32

*Moore* v. *Cecil*,
174 F.4th 862 (11th Cir. 2026) ....................45

*NAACP* v. *Claiborne Hardware Co.*,
458 U.S. 886 (1982) ....................27

*Newman* v. *Alabama*,
683 F.2d 1312 (11th Cir. 1982) ....................57

*NLRB* v. *Gaylord Chem. Co.*,
824 F.3d 1318 (11th Cir. 2016) ....................43, 56

*ONY, Inc.* v. *Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013) ....................37

*Org. for a Better Austin* v. *Keefe*,
402 U.S. 415 (1971)....58

*Otto* v. *City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020)....26

*Partington* v. *Bugliosi*,
56 F.3d 1147 (9th Cir. 1995)....37

*Phantom Touring, Inc.* v. *Affiliated Publ'ns*,
953 F.2d 724 (1st Cir. 1992)....37

* *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Hum. Rels.*,
413 U.S. 376 (1973)....58

*Planned Parenthood Federation of America, Inc.* v. *Newman*,
51 F.4th 1125 (9th Cir. 2022)....50, 51, 52

*Sindi* v. *El-Moslimany*,
896 F.3d 1 (1st Cir. 2018)....59

*Smith* v. *Marcus & Millichap, Inc.*,
106 F.4th 1091 (11th Cir. 2024)....48, 49

*State* v. *Beach Blvd. Auto., Inc.*,
139 So. 3d 380 (Fla. 1st DCA 2014)....52

*Stevens* v. *Premier Cruises, Inc.*,
215 F.3d 1237 (11th Cir. 2000)....63

*Town of Lantana* v. *Pelczynski*,
290 So. 2d 566 (Fla. 4th DCA 1974)....58

* *Turner* v. *Wells*,
879 F.3d 1254 (11th Cir. 2018)....29, 30, 36, 37

*U.S. Structural Plywood Integrity Coal.* v. *PFS Corp.*,
524 F. Supp. 3d 1320 (S.D. Fla. 2021)....34

*United States* v. *Alvarez*,
567 U.S. 709 (2012)....26, 27

*United States* v. *Brannan*,
562 F.3d 1300 (11th Cir. 2009) ............................................................ 61

*United States* v. *Castillo*,
965 F.2d 238 (7th Cir. 1992) ............................................................ 24, 49

*United States* v. *Defilippis*,
174 F.4th 1291 (11th Cir. 2026) ............................................................ 43

* *United States* v. *Hansen*,
599 U.S. 762 (2023) ............................................................ 23, 25

*United States* v. *Hawkins*,
934 F.3d 1251 (11th Cir. 2019) ............................................................ 47

*United States* v. *Irving*,
509 F.2d 1325 (5th Cir. 1975) ............................................................ 27

*United States* v. *Love*,
449 F.3d 1154 (11th Cir. 2006) ............................................................ 57, 61

*United States* v. *Olano*,
507 U.S. 725 (1993) ............................................................ 48

*United States* v. *Pendergraft*,
297 F.3d 1198 (11th Cir. 2002) ............................................................ 25

*United States* v. *Trujillo*,
960 F.3d 1196 (10th Cir. 2020) ............................................................ 49

*Veilleux* v. *National Broadcasting Co.*,
206 F.3d 92 (1st Cir. 2000) ............................................................ 50, 52

*Vrasic* v. *Leibel*,
106 So. 3d 485 (Fla. 4th DCA 2013) ............................................................ 58

*Weatherly* v. *Ala. State Univ.*,
728 F.3d 1263 (11th Cir. 2013) ............................................................ 64

*Weinstein* v. *440 Corp.*,
146 F.4th 1046 (11th Cir. 2025) ............................................................ 19

*Wolston* v. *Reader's Dig. Ass'n*,
443 U.S. 157 (1979) .......... 44

*Zauderer* v. *Off. of Disciplinary Couns.*,
471 U.S. 626 (1985) .......... 57

**Statutes**

Fla. Stat. § 501.203(8) .......... 62, 63

* Fla. Stat. § 501.204(1) .......... 51, 61, 63

Fla. Stat. § 501.207(1)(a) .......... 52

Fla. Stat. § 501.207(1)(b) .......... 52

Fla. Stat. § 501.211(1) .......... 51

Fla. Stat. § 501.2105(1) .......... 60

Fla. Stat. § 768.295 .......... 12

Fla. Stat. § 768.295(1) .......... 63

Fla. Stat. § 768.295(2)(a) .......... 63

**Rules**

Fed. R. App. P. 4(a)(4)(B)(ii) .......... 63

Fed. R. Crim. P. 52(b) .......... 47

S.D. Fla. Loc. R. 16.1(e)(8) .......... 13

## INTRODUCTION

The Leapfrog Group bills itself as a private watchdog organization that assesses hospital safety by assigning "Hospital Safety Grades." The reality is more complicated. To calculate its Grades, Leapfrog sends a lengthy survey asking hospitals to report their data. Leapfrog requires participating hospitals to sign over commercial rights in the reported data, so that Leapfrog can license it to third parties for profit. This case originated when, faced with declining participation and revenue in 2024, Leapfrog began arbitrarily assigning low scores to nonparticipating hospitals, including the five Community Hospitals here, to pressure them into participating. Meanwhile, Leapfrog falsely assured patients—who relied on the Safety Grades for their medical decisions—that the Grades represented actual hospital performance. After a five-day bench trial, the district court found these practices unfair and deceptive in violation of Florida law and imposed a tailored injunction.

Below, Leapfrog timely raised only one First Amendment defense: that its Safety Grades and underlying methodology are "pure opinion." That defense flunks both law and facts. The basis for the Hospitals' claim and the court's injunction is Leapfrog's *conduct*, not its speech. Leapfrog assigned hospitals baseless failing scores unless they signed over commercial rights in

their performance data. The First Amendment has never protected speech that carries out an unlawful course of conduct, or false factual statements made to secure material gain. Even isolating the Safety Grades and methodology, they are not "pure opinion." The whole point of the Grades and methodology is to assess *facts* about hospitals—like whether they have a handwashing policy or whether board-certified doctors manage the intensive-care unit. Those are not opinions; they are knowable facts. The district court was therefore right to reject Leapfrog's pure-opinion defense.

Leapfrog then pivoted at trial to arguing that the Safety Grades and methodology were accurate and reliable. The district court saw through that effort too. As the court found, Leapfrog assigned nonparticipating hospitals "the lowest possible score[s]" on various measures "based on nothing" other than "punishment for nonparticipation in the Leapfrog Survey." Dkt. 212 (Op.) 25-28. Despite this "arbitrary" approach and lack of any "real data," Op. 25, 28, Leapfrog "deliberately" "intended to create the false impression" that its Safety Grades "reflect actual performance" for nonparticipating hospitals, Op. 23, 26, to "force hospitals back into participating in the Leapfrog Survey," Op. 20. Leapfrog's "[m]otives" were "clear": it made a "business

decision" to extract hospitals' "private data" and "maximize revenue." Op. 2, 20, 35, 39 (quotation marks omitted).

Before this Court, Leapfrog does not meaningfully challenge any of those factual findings. It does not even try to defend the accuracy of nonparticipating hospitals' failing Grades. When Leapfrog told consumers that Safety Grades "reflect[ed] how well a hospital does on safety," Op. 25; that the Grades relied on "other sources of data" in the event of nonparticipation, Dkt. 195-23 at 2; and that the Grades "use[d] a public, peer-reviewed methodology," Op. 24 & n.6, all of that was demonstrably false. As the case comes to this Court, Leapfrog was knowingly or recklessly misleading patients about hospital safety to drive its revenues. That is a straightforward example of a deceptive and unfair trade practice under Florida law. Leapfrog can claim it provides a public service, but it must adhere to the same standards of conduct as every other service provider.

With nowhere else to turn, Leapfrog tries to wrap itself in the First Amendment. It characterizes the trial proceedings as a "skirmish[] over the First Amendment" and claims the district court "forgot" about that important safeguard. Br. 10, 33. That is a complete mischaracterization of what happened below. The district court correctly rejected the lone First Amendment

argument Leapfrog timely presented. Leapfrog first raised its new defenses—actual malice, compelled speech, prior restraint, and overbreadth—in a *post-judgment* reconsideration motion. The district court correctly held they are unpreserved, so this Court should not even reach them. But if it does, none of Leapfrog's belated defenses is right, let alone plainly so. Corrective disclosures are a standard remedy for deceptive advertising, and the injunction does not prevent Leapfrog from grading or criticizing the Community Hospitals. All it prevents is assigning bogus "Safety" Grades as leverage to obtain hospitals' valuable data. The First Amendment is a guarantor of our most fundamental liberties, not a handy shield for a shakedown scheme.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that Leapfrog's Safety Grades, methodology, and related statements are not pure opinions.

2. Whether the district court plainly erred in rejecting Leapfrog's unpreserved First Amendment arguments.

3. Whether the district court erred in holding that Leapfrog's scheme violates the Florida Deceptive and Unfair Trade Practices Act.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. The Community Hospitals

The Community Hospitals are five hospitals—Good Samaritan Medical Center, Delray Medical Center, Palm Beach Gardens Medical Center, St. Mary's Medical Center, and West Boca Medical Center—in Palm Beach County. Op. 3. They include the county's only Level I trauma centers, Dkt. 236 at 59:20-23, and the "region's only children's hospital," Op. 35. The Joint Commission, a leading hospital-accreditation body, has accredited each Hospital. Dkt. 236 at 191:23-192:1; Dkt. 237 at 111:21-23. The Joint Commission's surveyors spend days on site with "full access" to data, staff, and patients—reviewing the data against "thousands of criteria," following clinical teams, observing surgeries, and interviewing patients and staff. *E.g.*, Dkt. 236 at 154:1-14, 262:3-10; Dkt. 237 at 205:2-11.

#### 2. Leapfrog's Survey and Safety Grades

Leapfrog bills itself as a "watchdog" that "us[es] transparency to support informed health care decisions." Op. 3, 39; Br. 5-6. Leapfrog generates more than $8 million in annual revenues, Dkt. 190-7 at 9, and its CEO has a generous compensation package of approximately $750,000 tied to those revenues, *id.* at 30; Dkt. 238 at 60:4-61:5. One of Leapfrog's "largest sources" of

revenue is selling the hospital data it acquires through its Survey. Dkt. 238 at 53:18-20; *see* Op. 35. Each year, Leapfrog sends a 350-page questionnaire to hospitals nationwide. Op. 22; Dkt. 189-106. This Survey requires hospitals to submit factual data about their operations. Op. 4-5. Completing the Survey demands "a tremendous amount of resources"—at least "two weeks of staff time." Op. 28. To participate, hospitals must affirm that their submitted data becomes Leapfrog's "sole and exclusive property" and that Leapfrog "may use this information in a commercial manner for profit." *E.g.*, Dkt. 189-106 at 46. Leapfrog then licenses that data to third parties who "pa[y] for" it. Op. 17, 35.

Each spring and fall, Leapfrog releases "Safety Grades" for hospitals, whether they complete the Survey or not. Op. 3-4. Leapfrog assigns these Grades—A, B, C, D, or F—"ostensibly" to "show where a hospital stands in safety performance." Op. 2. To generate those Grades, Leapfrog assesses 22 safety measures. Fifteen depend on publicly available data from the Centers for Medicare & Medicaid Services, but the remaining seven depend on Survey responses. Op. 5. So for nonparticipating hospitals, Leapfrog knows "nothing" about their performance on those seven measures. Op. 25; Dkt. 237 at 181:19-182:17.

Of the seven measures, Leapfrog excludes three from nonparticipating hospitals' Grades. But it nonetheless purports to assess hospital performance on the remaining four: (1) Computerized Physician Order Entry—whether physicians enter medication orders into a computer system; (2) Bar Code Medication Administration—whether nurses scan patients' bar codes before administering medication; (3) ICU Physician Staffing—whether board-certified physicians manage the intensive-care unit; and (4) Hand Hygiene—whether the hospital monitors staff handwashing. Op. 5; *see* Dkt. 195-53 at 1-8; Dkt. 195-54 at 7-8; Dkt. 189-106 at 345. Given the exclusion of the other three measures, these remaining four represent 31% of a nonparticipating hospital's Grade versus 24% for participating hospitals. Op. 7.

Before 2024, Leapfrog used a methodology that did "no[t] penal[ize]" nonparticipating hospitals for the lack of Survey responses on these four measures. Op. 40 (quotation marks omitted). Leapfrog imputed scores based on a hospital's Survey responses in prior rounds of Grades, or else the mean score assigned to similar hospitals on the given measure. Op. 6. But during the COVID-19 pandemic, many hospitals—including the Community Hospitals—stopped participating in Leapfrog's Survey, opting "to reallocate resources in the face of significant operational strain." Op. 2, 8. As a result,

Leapfrog staff began "talking about changing [the] scoring methodology to penalize" nonparticipation. Dkt. 237 at 273:13-17; Dkt. 194-59 at 2.

### 3. Leapfrog's Revenue-Enhancement Scheme

By "early 2024," Leapfrog was experiencing a "cash crunch." Dkt. 238 at 52:15-17. It projected a revenue shortfall of roughly $540,000—"a very steep hole to climb out of." Dkt. 194-122 at 2; Dkt. 238 at 53:3-12. Leapfrog CEO Leah Binder urged staff to "thin[k]" "24/7" about how to increase "revenues." Dkt. 194-122 at 1. Without Expert Panel approval or a Board vote, Leapfrog staff soon devised a "scheme" to increase Survey participation. Op. 3, 24 n.6. Its centerpiece was a "drastic" change to the Safety Grade methodology for nonparticipating hospitals. Dkt. 189-28 at 3; *see* Op. 28 n.8.

Starting in Fall 2024, Leapfrog "arbitrarily assigned" nonparticipating hospitals the "lowest" possible scores for the four "imputed" measures that account for 31% of their Grade. Op. 7, 36. This made it virtually "impossible" for nonparticipating hospitals to "receive a passing grade." Op. 2. By contrast, by Spring 2025, no participating hospital received an "F." Op. 22. Leapfrog's CEO internally called the penalty a "major incentive" for nonparticipating hospitals to sign over their data. *Id.* Leapfrog advisor Dr. Patrick Romano warned: "[I]f you want to penalize nonparticipants, then don't pretend that

you are imputing missing values in a statistically optimal way." "Just be honest." Dkt. 189-55 at 1-2; *see* Op. 21-22.

Of course, no one would rely on the Grades if Leapfrog made clear they were more a reflection of participation than hospital safety. So Leapfrog's CEO instructed employees "to make it sound like" the new methodology "was legitimate" rather than "random," Dkt. 189-84 at 1-2, and as though Leapfrog's advisory Expert Panel "approved" the methodology change, *id.*, even though that Panel "never voted to adopt" it, Op. 2, 8.

Leapfrog thus assured consumers the Grades were legitimate, asserting on its website that:

- The "Safety Grade" "uses" a "peer-reviewed methodology, calculated . . . under the guidance of a National Expert Panel." Op. 24.
- A hospital's "Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog [Hospital] Survey." Op. 25.
- "If a hospital does not report to the Leapfrog Hospital Survey, other sources of data are used to calculate a Grade." Dkt. 195-23 at 2.
- "Patients should always decide on where to receive care based on a hospital's current Safety Grade." Dkt. 195-31 at 4; *see* Op. 23.

Those statements were false. Leapfrog's methodology was not peer-reviewed, its Safety Grades did depend on participation, Leapfrog did not use other data sources for nonparticipating hospitals' missing measures, and nonparticipating hospitals' Grades were not a reliable guide for patients.

Hospitals' Safety Grade webpages also contained "gas gauge" graphics with needles pointing to red, yellow, or green zones. Op. 10-11. For nonparticipating hospitals, the needle pointed to red—*i.e.*, "Worse Than Average"—on the four imputed measures. Op. 10-12. Scrolling to the bottom of the page revealed a vague footnote that stated "a score was assigned to reflect the lack of information," Op. 12, 30, but failed to disclose Leapfrog had simply assigned the worst possible score solely because of Survey nonparticipation.

Leapfrog also obscured that explanation elsewhere on its website. *See* Dkt. 189-84 at 1. Only by navigating a series of "inconspicuous" links and scrolls from the Grade webpages could a consumer arrive at a 26-page document containing, on page 16, a "complex" and "dense" description of the methodology. Op. 31. Leapfrog's CEO admitted the document was "not meant to be used by the average lay person." *Id.*

In Fall 2024—the first grading cycle under the new methodology—each Community Hospital received a "D" or "F" Safety Grade, including three that had received a "C" six months earlier. Op. 8. Numerous incidents of frightened patients and cancelled procedures followed. Op. 31-34. One patient would "not g[o]" to Delray for surgery, despite her surgeon's advice, because she was "scared" she would "die" there after seeing its failing Safety Grade.

Dkt. 236 at 98:7-20; *see* Op. 33. A cardiac patient refused "needed" heart surgery at Palm Beach Gardens for the same reason. Dkt. 236 at 161:10-15.

In short, Leapfrog's scheme "worked." Op. 23. Participation in 2024 was 14 percent higher than in 2023, with a noticeable "jum[p]" after the methodology change. *Id.* When his colleagues objected that Leapfrog was "blackmailing" hospitals into participating, Dr. Romano—who sits on Leapfrog's Expert Panel—defended the change as "a simple business decision": Leapfrog's "data are not valuable if participation is low," so "[i]t's just business, folks!" Dkt. 191-3 at 1-2, 4; *see* Op. 2.

### B. Procedural History

In April 2025, the Community Hospitals sued Leapfrog under FDUTPA. Dkt. 1. They alleged that Leapfrog's new methodology "deceives consumers by inventing negative data" about nonparticipating hospitals "to coerce" them "into providing data" Leapfrog "can then monetize." Dkt. 74 ¶¶ 24, 41, 47. The Hospitals sought declaratory and injunctive relief only. *Id.* at 41-42.

#### 1. Pretrial Motions

Leapfrog moved to dismiss, contending its "Safety Grades," "methodology," and "related statements"—although purportedly "based on verifiable data"—are nonetheless "protected opinion" that "cannot be proven true or

false." Dkt. 39 at 13, 15. Leapfrog raised no other First Amendment argument. The district court denied Leapfrog's motion, explaining that pure-opinion doctrine does not apply when a ratings entity "mislead[s] consumers" through factually false statements "about its methodology"—for example, falsely claiming ratings are based on "damning data" rather than "absent data." Dkt. 41 at 6.

Both sides moved for summary judgment. Leapfrog abandoned its claim that the Grades are opinions and defended them as accurate and "data-driven." Dkt. 99 at 4. Notably, Leapfrog did not argue that the Community Hospitals' FDUTPA claim is in substance a defamation claim, and it made none of its current arguments about actual malice, prior restraint, compelled speech, or constitutional avoidance. Nor did Leapfrog develop any First Amendment argument independent of its defense that the Hospitals' claim was barred by Florida's anti-SLAPP statute—a law against meritless lawsuits designed to silence speech. Fla. Stat. § 768.295. Leapfrog merely asserted that the statutory elements of its "anti-SLAPP" defense would "be satisfied" "if th[e] [c]ourt grant[ed]" Leapfrog's summary-judgment motion. Dkt. 99 at 22.

The court denied both sides' summary-judgment motions. Dkt. 139.

### 2. Trial and Judgment for the Community Hospitals

Before trial, the parties stipulated to all "issues of law which remain for determination." S.D. Fla. Loc. R. 16.1(e)(8). In that stipulation, Leapfrog renewed its statutory anti-SLAPP argument but raised no freestanding First Amendment defenses. Dkt. 129 at 8; *id.* ¶ 210. The parties also filed proposed findings of fact and conclusions of law. Dkt. 135; Dkt. 136. Leapfrog did not mention defamation, actual malice, prior restraint, compelled speech, or constitutional avoidance. Dkt. 135 ¶¶ 277-392.

During the five-day bench trial, Leapfrog actually disclaimed the application of those doctrines. In her opening and closing statements, Leapfrog's counsel declared that the Community Hospitals have "a FDUTPA claim," "*not* . . . a defamation claim or a corporate disparagement [claim]." Dkt. 236 at 42:6-7 (emphasis added); *see* Dkt. 240 at 44:5-6. Counsel also admitted that "FDUTPA can be used for deceptive speech," Dkt. 240 at 44:18-19, and that the court could require Leapfrog to publish "a better footnote" on its website, *id.* at 81:18-25.

The district court instructed the parties to submit post-trial briefs that "include[d]" "any legal argument you want to make." Dkt. 240 at 100:6-10. Leapfrog's submission failed to develop any First Amendment argument and

did not object to any specific aspect of the Community Hospitals' requested injunction. Dkt. 204. Leapfrog instead rehashed the same anti-SLAPP paragraphs from its pretrial submission. *Id.* ¶¶ 589-598. Far from claiming that its Safety Grades and methodology were pure opinions, Leapfrog asked the court to find that they are "based on evidence," "not arbitrary," and measure objective inquiries like "actual patient harm." *Id.* ¶¶ 71-72.

The district court ruled that Leapfrog's Safety Grades and methodology were deceptive and unfair under FDUTPA. "Leapfrog's change in methodology," the court found, "has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety." Op. 2. Leapfrog assigned nonparticipating hospitals "the lowest possible score[s]" on the four measures "based on nothing" other than "punishment for nonparticipation in the Leapfrog Survey." Op. 25-28. Leapfrog thus had "no reason" to think the Grades for those hospitals were "accurate." Op. 27, 35.

Despite this "arbitrary" rating process and lack of any "real data," Op. 25, 28, Leapfrog "deliberately" "intended to create the false impression" that its Safety Grades "reflect actual performance" for nonparticipating hospitals, Op. 23, 26, to "force hospitals back into participating in the Leapfrog Survey," Op. 20. Leapfrog's "[m]otives" were "clear": it made a "business

decision" to extract hospitals' "private data" and "maximize revenue." Op. 2, 20, 35, 39 (quotation marks omitted).

The district court awarded declaratory relief (Dkt. 214) and an injunction with four discrete prongs. First, Leapfrog must "cease assigning" Grades to the Community Hospitals under the punitive methodology or a "similar" methodology that arbitrarily penalizes nonparticipation. Op. 40-41. Second, Leapfrog must stop publicizing the Community Hospitals' three sets of Grades calculated under the punitive methodology. Op. 41. Third, Leapfrog had to (and did) issue a limited corrective disclosure to entities that paid to license those Grades. *Id.* Fourth, Leapfrog must include the same disclosure in certain advertising materials promoting paid licensure of the Spring 2026 Grades. *Id.*

### 3. Leapfrog's Motion for Reconsideration

After final judgment, and represented by new counsel, Leapfrog sought reconsideration under Rule 59. Leapfrog criticized the district court's decision for making "no mention . . . of the First Amendment." Dkt. 220 at 8. But Leapfrog acknowledged this was "not" the "faul[t] of the [c]ourt," since "Leapfrog" had not "call[ed] out" supposed "constitutional excesses" "with optimal specificity and alacrity." *Id.* at 9. Leapfrog renewed its pure-opinion defense from

its motion to dismiss and advanced several new defenses. Leapfrog argued that even if the Grades *are* provably false, a "finding of actual malice" is necessary for liability. *Id.* at 20. Leapfrog also said FDUTPA should be narrowly construed under "constitutional-avoidance doctrine," *id.* at 23, and it deemed "the injunction" a "prior restraint" that unlawfully "compels speech," *id.* at 24.

The district court denied the motion. Dkt. 234 (Recon. Op.). It again rejected Leapfrog's pure-opinion defense because the trial evidence confirmed the Grades and methodology were not "subjective assessments," but were presented as "known data" and "implie[d] a knowledge of facts" about the Community Hospitals. *Id.* at 2-3 (quotation marks omitted). The court deemed Leapfrog's actual-malice defense "forfeited" because "[a]t no point" "did [Leapfrog] raise arguments concerning actual malice." *Id.* at 3. And while the court had afforded Leapfrog "adequate opportunity" to make its "prior-restraint and compelled speech arguments," Leapfrog had not done so. *Id.* at 2 (citing Dkt. 223 at 24, 26).

## SUMMARY OF ARGUMENT

I. The district court correctly rejected Leapfrog's "pure opinion" defense—the only First Amendment argument Leapfrog made before judgment.

A. The court's liability finding and injunction squarely target Leapfrog's unlawful course of *conduct*: its deceptive and unfair practice of arbitrarily assigning failing Safety Grades unless hospitals signed over commercial rights to their private data for Leapfrog to monetize. The First Amendment does not protect coercive schemes to gain property rights. Even if Leapfrog's Grades or methodology could be viewed as "speech," they were at most speech integral to that unlawful conduct, and thus likewise enjoy no protection.

B. Even if the Safety Grades and methodology are viewed as pure speech isolated from Leapfrog's unlawful conduct, they are not protected as "opinions." Whether a statement is opinion turns on whether reasonable readers would understand the statement, in context, to assert or imply verifiable facts. The district court found that reasonable consumers would understand the Grades and methodology as factual assertions, particularly because Leapfrog misrepresented that they assessed real-world safety performance. Leapfrog does not challenge those findings on appeal. That alone forecloses its "pure opinion" argument.

Nor did Leapfrog convert its Grades and methodology from factual assertions to mere opinions by supposedly disclosing its methodology. Disclosures must put a reasonable reader on notice that statements are opinions.

The district court correctly found that Leapfrog's purported disclosures came nowhere close. Leapfrog's methodology explanation was hard to find, concededly not meant for consumers, and contradicted by Leapfrog's consumer-facing assurance that participation did not affect Grades.

II. Leapfrog's remaining First Amendment arguments were debuted in a post-judgment reconsideration motion. They are forfeited and meritless.

A. Leapfrog contends that even if its Safety Grades and methodology are falsifiable, they are presumptively protected unless they reflect actual malice. This defense is squarely forfeited, as the district court noted. Leapfrog first raised the defense post-judgment—after having disclaimed during trial that the Hospitals were asserting a disguised defamation claim. This Court ordinarily does not review forfeited arguments in civil cases.

Regardless, Leapfrog fails to establish any error, much less plain error. Actual malice does not protect unlawful courses of conduct or speech integral to them. And even if Leapfrog's Grades and methodology were viewed as pure speech, actual malice would still be irrelevant. Actual malice is not a defense to speech that violates generally applicable state law for reasons other than its alleged defamatory effect. Leapfrog's Grades and methodology violate FDUTPA regardless of whether the Community Hospitals suffered reputa-

tional injury. Finally, even if an actual-malice standard applies, the district court's unchallenged findings satisfy it.

B. Leapfrog's new compelled-speech, prior-restraint, and overbreadth arguments are also forfeited and meritless. Corrective disclosures are the standard remedy for deceptive advertising. Prior-restraint doctrine is irrelevant because even if the injunction restrains pure speech, the First Amendment does not bar permanent injunctions against unprotected speech. And the injunction is not overbroad but directly tied to Leapfrog's FDUTPA violation.

III. Leapfrog's statutory and constitutional-avoidance arguments also fail. FDUTPA's unambiguous text readily covers Leapfrog's deceptive and unfair practices, and there is no constitutional violation to avoid.

## STANDARD OF REVIEW

This Court reviews legal conclusions de novo and factual findings for clear error. *Weinstein* v. *440 Corp.*, 146 F.4th 1046, 1050 (11th Cir. 2025). A permanent injunction and its scope are otherwise reviewed for abuse of discretion. *Angel Flight of Ga., Inc.* v. *Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008). Unpreserved arguments are reviewed, if at all, only for plain error. *Burch* v. *P.J. Cheese, Inc.*, 861 F.3d 1338, 1352 (11th Cir. 2017).

## ARGUMENT

This is a far more straightforward appeal than Leapfrog lets on. Leapfrog starts with the one constitutional argument it made before judgment: that its Safety Grades and methodology are protected by the First Amendment as "pure opinion." The district court correctly rejected that argument because the Grades and methodology make *factual* claims about hospitals' actual safety performance across several empirical measures. That is why Leapfrog could pivot at trial and contend the Grades and methodology are factually accurate—and why the court could explain in a lengthy post-trial decision that they are based on factually false assertions and "misrepresent[] hospital safety." Op. 2. If Leapfrog's Grades and methodology are anything other than pure opinions, that resolves the only First Amendment argument Leapfrog preserved.

Leapfrog raises a host of other First Amendment defenses that it first presented in a post-judgment reconsideration motion. The district court correctly rejected these defenses as forfeited and meritless. Given Leapfrog's forfeiture, this Court should not consider any of the defenses. But if it does, they are wrong. The First Amendment does not protect Leapfrog's *conduct* in running a deceptive scheme to compel hospitals to turn over data for Leap-

frog's profit. Even isolating the Safety Grades and methodology, and treating them as pure speech, Leapfrog's defenses still fail. The Community Hospitals are not claiming defamation (as Leapfrog itself emphasized at trial); corrective disclosures are not impermissible compelled speech; and an injunction against unprotected statements is not an unlawful prior restraint. Nor do Leapfrog's amici advance its case: none challenges the district court's factual findings or even mentions forfeiture.

## I. THE DISTRICT COURT DID NOT ERR IN REJECTING LEAPFROG'S "PURE OPINION" DEFENSE.

Leapfrog primarily contends (at 21-29) that its Safety Grades and methodology are "pure opinion." This argument fails for two reasons. First, the district court's liability finding and injunction target Leapfrog's unlawful course of *conduct*: Leapfrog's deceptive and unfair practice of assigning hospitals baseless failing scores unless they signed over commercial rights in their performance data. That "behavior" and "scheme" were what "concern[ed]" the district court and formed the basis of Leapfrog's FDUTPA violation. Op. 3, 39. To be sure, part of Leapfrog's scheme was telling consumers its "Safety" Grades reliably measured hospital safety when they did nothing of the sort. But the First Amendment has never protected speech that carries

out an unlawful course of conduct, or factually false statements made to secure material gain.

Second, even divorcing the Safety Grades and methodology from Leapfrog's broader scheme, they are not "pure opinion." The whole point of the Grades and methodology is to assess *facts* about hospitals—like whether they have a handwashing policy, whether board-certified physicians manage the intensive-care unit, or whether physicians and nurses use computer systems to order and administer medication. Leapfrog cannot develop a supposedly fact-laden assessment, tout its relevance to real-world performance, mislead consumers about its accuracy, and then claim it was nothing more than Leapfrog's "opinion" all along.

### A. The Injunction Regulates Unlawful Conduct, Not Pure Speech.

1. The district court's liability finding and injunction squarely target Leapfrog's unlawful course of conduct in compelling hospitals to disclose their data. As the court explained, "the record shows that Leapfrog uses the threat of arbitrarily assigned Safety Grades to coerce participation in the Survey among hospitals that are unwilling or unable to endure what one commentator described as 'blackmail' designed to increase participation." Op. 36. "[P]recisely what concern[ed]" the court was not Leapfrog's statements in isolation,

but its "behavior" of using Safety Grades as "leverage to pressure and penalize hospitals into participating," thereby gaining "private data" Leapfrog could sell to third parties. Op. 35, 39. It was this course of conduct—not any pure speech—that the court concluded was a deceptive and unfair practice under FDUTPA. Op. 36, 39.

The injunction is carefully tailored to address this conduct. It proscribes only the "current" methodology or relevantly "similar" methodologies that penalize nonparticipation. Op. 40-41. And it requires withdrawing (and issuing corrective disclosures about) only the specific past Safety Grades Leapfrog used as "leverage" to coerce the Community Hospitals' participation. Op. 39, 41. Leapfrog remains free to grade the Community Hospitals using any methodology that does not penalize nonparticipation. Op. 40-41; *contra* CalPERS Br. 7-20. As the district court well put it, Leapfrog may remain a "watchdog," but it cannot, "under the guise of patient safety," "use [its] leverage to pressure and penalize hospitals into participating." Op. 39. That is unlawful conduct under state law, not protected speech under the First Amendment.

2. It does not matter that Leapfrog carried out its coercive scheme in part through language. The First Amendment does not protect "speech integral to unlawful conduct." *United States* v. *Hansen*, 599 U.S. 762, 783

(2023). Any contrary rule "would make it practically impossible ever to enforce laws" against illegal conduct, which is often "initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Here, even assuming the Safety Grades themselves and their underlying methodology are speech, Leapfrog could not deploy them as part of a broader course of conduct that pressured hospitals to sign over their proprietary data to boost Leapfrog's revenues.

Put differently, even speech that may be protected "in isolation" loses protection when used as the vehicle for unlawful conduct. *Giboney*, 336 U.S. at 498. A journalist, for example, can publish "highly critical" articles about a politician. *United States* v. *Castillo*, 965 F.2d 238, 239 (7th Cir. 1992) (Posner, J.). But she cannot condition "stop[ping] the stream of articles" on whether the politician agrees to a payoff. *Id.* at 239-240. Similarly, picketing may enjoy constitutional protection, but not when deployed "to induce" a third party to "acquiesc[e] in unlawful demands." *Giboney*, 336 U.S. at 502. Leapfrog is free to assess hospital safety, but it cannot arbitrarily assign "Safety" Grades to compel hospitals to turn over commercially valuable data.

Viewed this way, Leapfrog's First Amendment arguments are beside the point. It does not matter whether the Grades and methodology involve "editorial judgmen[t]" or "interpretive license," whether they are "evaluative" or "subjective," or whether they are provably false. Br. 2, 17, 23, 27 (quotation marks omitted). The district court found as a factual matter—and Leapfrog does not dispute—that Leapfrog changed its methodology to penalize nonparticipating hospitals and thereby induce Survey participation. Op. 20-23, 39. That penalty plan violated state law, and the First Amendment does not protect speech used to effect an unlawful course of conduct.

3. Leapfrog has no persuasive response. It says (at 40-44) the Community Hospitals are attempting to establish a new "category of unprotected speech." That is not remotely true. The First Amendment "has never" extended to speech integral to unlawful conduct. *Hansen*, 599 U.S. at 783 (quotation marks omitted). Leapfrog also argues (at 44) its conduct was not unlawful because conditioning Safety Grades on Survey participation was not "wrongful." That argument concerns the merits of Florida law, not the First Amendment—and in any event is incorrect. Leapfrog's own authority, *United States* v. *Pendergraft*, 297 F.3d 1198, 1205-1206 (11th Cir. 2002), explains that a demand is "wrongful" when the defendant has "no lawful claim" to what he

seeks. Here, the district court made an unchallenged finding that Leapfrog has no "right to [hospitals'] private data," and thus no "right to punish" hospitals for refusing to surrender it. Op. 39.

More broadly, Leapfrog accuses (at 41-42) the Community Hospitals of redefining pure speech as conduct. Leapfrog acts as if the only thing at issue were the Safety Grades themselves instead of *how Leapfrog used* those Grades and the underlying methodology. The district court found that "Leapfrog uses the threat of arbitrarily assigned Safety Grades to coerce participation in the Survey"—"what one commentator described as 'blackmail.'" Op. 36. Leapfrog's practice was no different in kind from any type of shakedown scheme: Leapfrog made its Grades arbitrary to pressure hospitals to disclose valuable data Leapfrog could sell to third parties. That scheme is *conduct*, not speech—even if speech helped effect the scheme.

Leapfrog makes two moves, neither of which works. First, Leapfrog points (at 41-42) to inapposite cases where restrictions targeted *pure* speech. In *Otto* v. *City of Boca Raton*, 981 F.3d 854, 865-866 (11th Cir. 2020), for example, the purported "'conduct' at issue"—talk therapy—consisted "*entirely* [of] speech"; it was not a deceptive scheme for material gain that speech merely carried out. Similarly, the law in *United States* v. *Alvarez* "target[ed]

falsity and nothing more." 567 U.S. 709, 719 (2012) (plurality opinion). Liability was imposed "entirely without regard to whether the lie was made for the purpose of material gain." *Id.* at 723. Here, by contrast, Leapfrog's attempt to secure material gain through the threat of failing Safety Grades was an integral part of what made the conduct unlawful. Op. 35-36, 39. The court did not hold Leapfrog liable for issuing failing Grades, but for coercing hospitals into signing over property rights.

Second, Leapfrog argues (at 42-43) that plenty of protected speech has a "coercive" impact or motive. Of course public criticism may in some sense "coerce" its target into changing practices. *See, e.g.*, *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 909-910 (1982). But cases about pamphleteering or boycotting do not address the type of compulsion relevant here: conditioning an offer to cease public criticism on the target's willingness to sign over property rights. That type of conduct, though accomplished through speech, has never been constitutionally protected, which is why, for example, blackmail may be "properly punished" "without consideration of First Amendment issues." *United States* v. *Irving*, 509 F.2d 1325, 1331 n.5 (5th Cir. 1975). Leapfrog's plan to extract property from nonparticipating hospitals distinguishes

its conduct "from longstanding, commonplace forms of vigorous advocacy." Br. 44.

The same point distinguishes the typical ratings systems that Leapfrog and its amici wrongly claim are now in peril. Br. 28-29; ACLU Br. 15-16, 25; PRA Br. 15-16; RCFP Br. 14; CalPERS Br. 6-7, 26-28. Nothing about this case implicates standard ratings by the Better Business Bureau, Moody's, S&P, or U.S. News, which remain free to rate entities, including those that decline to respond to their inquiries. *Contra* CalPERS Br. 26-27. This case covers only the unlawful conduct of (i) intentionally distorting ratings to punish entities for nonparticipation, and (ii) falsely assuring the public those distorted ratings are nonetheless reliable assessments of real-world performance, (iii) in order to compel the rated entities to surrender money or valuable property. That type of deceptive and unfair conduct has long been prohibited by state law consistent with the First Amendment. It is *Leapfrog's* contrary position—not the Hospitals'—that would do violence to the law.

### B. The Safety Grades And Methodology Are Not Pure Opinion.

Even if the injunction is viewed as a restriction on pure speech, that would not help Leapfrog because the Safety Grades and methodology are not pure opinion. As the district court found, the Grades are—and Leapfrog in-

tended them to be—false statements of fact, not expressions of opinion. Op. 25-26.

1. The Supreme Court has long drawn a constitutional line between statements of opinion and false statements of fact. "Under the First Amendment there is no such thing as a false idea" "[h]owever pernicious an opinion may seem." *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). But a statement is not opinion when it "is sufficiently factual to be susceptible of being proved true or false." *Milkovich* v. *Lorain J. Co.*, 497 U.S. 1, 21 (1990). And "[s]imply couching such statements in terms of opinion does not dispel" the conclusion that a "statement may still imply a false assertion of fact." *Id.* at 19. The constitutional question under the pure-opinion doctrine is thus whether a purported "opinion" actually asserts or implies an objectively verifiable fact that is false.

In answering that question, courts assume the perspective of "a reasonable reader," *Turner* v. *Wells*, 879 F.3d 1254, 1264 (11th Cir. 2018), and ask whether that "reasonable reader [would] conclude that the challenged statements were factual assertions" or instead "expressions of opinion," *Michel* v. *NYP Holdings, Inc.*, 816 F.3d 686, 699 (11th Cir. 2016). Courts examine "the context in which th[e] statements appeared," *id.* at 697; "the audience to which

[the statements] w[ere] published," *Keller* v. *Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985) (quotation marks omitted); and any "cautionary statements" the speaker made to "inform a reasonable reader that . . . conclusions" were opinions, *Turner*, 879 F.3d at 1264. Those "circumstances" all "play an essential role" in discerning "a reasonable interpretation." *Keller*, 778 F.2d at 715.

2. Applying that test here forecloses Leapfrog's portrayal (at 22-28) of its Safety Grades and methodology as pure opinion. The district court found that "reasonable consumer[s]" would believe "the grades assigned reflect actual performance when in fact they do not," Op. 25; they would believe "an F-grade" represents "a total failure to meet minimum standards," Op. 29; and Leapfrog intentionally "create[d] the false impression that [its] grades reflect actual performance," Op. 26. Leapfrog does not directly challenge any of those findings. That point alone disposes of Leapfrog's pure-opinion argument. *Citadel Sec. LLC* v. *SEC*, 178 F.4th 621, 643 (11th Cir. 2026) (argument "forfeited" when not raised in "opening brief").

There is a reason Leapfrog does not address the district court's findings. As the court found, Leapfrog repeatedly told consumers the Safety Grades were factual assessments of real-world safety performance unaffected by Sur-

vey participation. Far from mere "self-promotion" or puffery (Br. 35), Leapfrog told consumers they were "*twice as likely to die*" of a preventable problem at a C, D, or F hospital than an A hospital, Op. 24 (bold omitted); that Safety Grades "reflect[ed] how well a hospital does on safety," Op. 25-26; that nonparticipating hospitals' Grades relied on "other sources of data," Dkt. 195-23 at 2; and that the Grades "use[] a public, peer-reviewed methodology," Op. 24 & n.6. Those are falsifiable assertions. It is either true or false that a hospital's Grade reflects its safety performance rather than its Survey participation (false); that the Grades relied on other data for nonparticipating hospitals (false); or that the new methodology had been peer-reviewed (false). Having made a host of false statements of fact to induce consumers into relying on its Grades "to help make life-altering healthcare decisions," Br. 3, Leapfrog cannot now throw up its hands and claim those Grades are mere opinions.

3. Unsurprisingly, Leapfrog tries hard (at 27, 32-34, 55-56) to divorce its Grades and methodology from its surrounding misrepresentations. Leapfrog even asserts (at 32-33) the district court "appeared to agree" at the motion-to-dismiss stage that the Grades are opinions and that only the surrounding misrepresentations are actionable, before it "ostensibly forgot" and enjoined the Grades and methodology. Leapfrog is misconstruing what the court

said. It observed that "[s]ome courts" had protected other kinds of grading systems that "rely on a subjective weighing of objective data," before holding Leapfrog's defense "inapplicable." Dkt. 41 at 5-6. And on reconsideration, the court rejected Leapfrog's attempt at "guising [its] misleading assessments as 'pure opinion.'" Recon. Op. 2. At all stages, the district court analyzed the Grades in context—as this Court's precedent requires, *supra*, pp. 29-31—and recognized that framing them as the product of "damning data" and an "accurate representation of patient safety" would lead consumers to believe "they represent" fact, not opinion. Dkt. 41 at 6; Recon. Op. 2-3 (quotation marks omitted).[1]

In any event, Leapfrog's isolationist argument fails on its own terms, since both the Grades and methodology standing alone are falsifiable. It is black-letter law (and common sense) that statements are not "opinions" when they are "susceptible of being proved true or false . . . by comparing" those statements with "objective evidence." *Milkovich*, 497 U.S. at 21. Both the

[1] Leapfrog also faults (at 34) the district court for supposedly reasoning that an opinion becomes fact whenever its author defends it as scientifically sound. That again misreads the order, which makes clear that Leapfrog presented the Grades to consumers not as an interpretation of data but as "known data." Recon. Op. 2-3; *see* Op. 23.

Grades and methodology are capable of being—and were—empirically disproven by objective evidence.

a. The Safety Grades. Leapfrog's Safety Grades—as their name indicates—purport to assess hospitals' actual safety performance on confirmable measures like whether a hospital has a handwashing policy. *Supra*, pp. 6-7. Whether a particular hospital lacks a handwashing policy is not a matter of "editorial . . . judgment." *Miami Herald Publ'g Co.* v. *Tornillo*, 418 U.S. 241, 258 (1974). It is an "empirical [claim] subject to verification." *Michel*, 816 F.3d at 697. For example, the record shows the Community Hospitals *do*, in fact, maintain handwashing policies. Leapfrog's own witness conceded at trial that "all hospitals today have some hand hygiene policy in place" because it "is a requirement of the Joint Commission" that accredits each of the Community Hospitals. Dkt. 238 at 225:11-15. Safety Grades thus represent confirmable and "non-editorial" assertions, which even Leapfrog's amici admit lack protection as pure opinions. RCFP Br. 15.

Leapfrog's emphasis (at 22-27) on its "subjective" weighing of safety measures is thus misplaced. The Community Hospitals did not challenge Leapfrog's choice of safety measures or its judgment about their relative im-

portance. They challenged Leapfrog's practice of arbitrarily assigning low scores "based on nothing" and then holding those scores out as fact. Op. 25.

b. The Methodology. Leapfrog's punitive methodology is not an "opinion" for the same reason. Leapfrog scores nonparticipating hospitals as though they perform worse on four objective measures, like whether hospitals have a handwashing policy. *Supra*, pp. 6-7; Op. 5. Those are knowable facts, not matters of opinion or belief. Leapfrog's methodology purports to make an "empirical determination subject to verification"—that non-responding hospitals do not observe four safety practices and are accordingly less safe. *Michel*, 816 F.3d at 697. Leapfrog is left to say (at 23-24) that ratings systems are inherently subjective, but that depends entirely on how the ratings are structured and what they purport to measure. Even Leapfrog's authority (at 23) acknowledges a ratings agency "isn't offering an opinion at all" when attesting that a rated entity has satisfied "tests susceptible of *objective* examination." *U.S. Structural Plywood Integrity Coal.* v. *PFS Corp.*, 524 F. Supp. 3d 1320, 1334-1335 (S.D. Fla. 2021).

Leapfrog argues (at 24-25) it was justified in imputing low scores to nonparticipating hospitals because of "non-response bias"—*i.e.*, the theory that hospitals were declining to participate to hide adverse safety information. But

the district court found that Leapfrog revised its methodology to punish hospitals and increase revenues, *not* to compensate for any non-response bias. Op. 28.

Leapfrog engaged in no "careful deliberations" about how "to grapple with missing data." Br. 48. Leapfrog says (at 8, 45) it "consult[ed]" its Expert Panel. But consultation is not approval, much less the "peer-revie[w]" Leapfrog advertised. Op. 24 & n.6. The Panel "never voted to adopt" the methodology change, Op. 2, 8; Leapfrog "did not query" the Panel "about whether they approved" of it, Op. 24 n.6; and one Panel member called it a "backdoor approach to penalizing nonparticipation," Op. 22. Leapfrog simply imposed "arbitrarily" low safety scores, Op. 2, 24 n.6, and then tried to make that foreordained penalty "sound . . . legitimate," Dkt. 189-84 at 1-2.

In any event, the court also found that Leapfrog's post hoc rationale for the methodology change was factually unsustainable: Leapfrog presented no "persuasive evidence of any non-response bias" that could "justify" categorically asserting nonparticipating hospitals lack the relevant safety policies. Op. 28. Rather, operational burdens imposed by Leapfrog's Survey were "more than adequate to explain a hospital's decision not to participate." *Id.* Leapfrog's related claim (at 7-8, 25) that the change was needed to keep non-

participating hospitals from "match[ing] their cohort's mean" is the same theory repackaged and similarly went unsubstantiated at trial. *See* Op. 28. And Leapfrog's protest that it uses prior Survey data where available (at 26) is irrelevant, since Leapfrog concedes (at 7) that no Community Hospital was scored that way. Having lost at trial on whether "non-response bias" was a factually justifiable assumption, Leapfrog cannot now cast it (at 24-26) as merely a "subjective choice" or "judgment call" about how to respond to missing data.

Even on its own terms, Leapfrog's non-response theory is "readily capable of being proven true or false." *Turner*, 879 F.3d at 1264. Researchers could conduct empirical inquiries into whether there is any real-world correlation between Survey participation and the presence or absence of safety policies—and could prove or disprove any such correlation. *Contra* Br. 28. Rather than conducting real-world research into nonparticipating hospitals' actual practices, Leapfrog says (at 26-27) it could use "interpretive license" in response to the absence of Survey data. But "interpretive license" does not permit an author to simply "fabricat[e]" data and claim it represents fact. *Masson* v. *New Yorker Mag., Inc.*, 501 U.S. 496, 518-519 (1991). Leapfrog can-

not have it both ways: it cannot push the Safety Grades and methodology to the public as objective, but defend them to the courts as subjective.

4. Finally, Leapfrog argues (at 29-31) that its factually false statements should be treated as opinions because Leapfrog "fully disclosed" the Safety Grade methodology on its website, which "precludes liability" under *Turner*. That is wrong on both law and fact. Starting with law, *Turner* did not say that bare disclosure, no matter how buried or incomprehensible, precludes liability. Instead, applying the reasonable-reader test, it found liability inappropriate because of the defendant's "cautionary statements" informing "reasonable reader[s] that the conclusions contained therein [we]re opinions." *Turner*, 879 F.3d at 1264. Leapfrog's other cases reflect the same principle.[2]

As a factual matter, the district court found Leapfrog's purported disclosures came nowhere close to meeting that standard. Op. 30-31. Leapfrog's

[2] *Partington* v. *Bugliosi*, 56 F.3d 1147, 1156-1157 (9th Cir. 1995) ("*clear* that the challenged statements represent his own interpretation") (emphasis added); *Hay* v. *Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984) (facts must be "disclosed in the article" or "known or readily available"); *ONY, Inc.* v. *Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013) ("an accurate description of the data" meant readers could evaluate statements' "validity" "on their face"); *Phantom Touring, Inc.* v. *Affiliated Publ'ns*, 953 F.2d 724, 730 (1st Cir. 1992) (article "exposed" "all sides of the issue" so readers could draw their own conclusions); *From* v. *Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981) ("everyone . . . would have known" the fact even absent article).

attacks on that finding (at 31, 36-40) fail. To start, consumers had no reason to even look for any disclosure about how Survey participation affected Grades, since Leapfrog's consumer-facing representations *explicitly told them participation had no effect*. Leapfrog's FAQ webpage stated: "The Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog [Hospital] Survey." Op. 25. As the court explained, that false statement would likely "caus[e] a viewer to assume that the data presented means something more than non-participation," even if consumers managed to locate Leapfrog's "complex" methodology explanation. Op. 26 n.7.

In any event, Leapfrog's methodology was *not* prominently disclosed or readily understandable to consumers, as the court further found. Op. 31. Leapfrog disputes (at 38-40) the Hospitals' expert testimony about how many clicks it took to arrive at the footnote on the Safety Grade webpages that obliquely addressed imputed scores. That factual dispute is irrelevant. The relevant footnote merely stated: "The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." Op. 30 (emphasis omitted). No matter how hard the footnote was to find, it did not tell consumers that the hospital's score was set at

the lowest possible level merely because of Survey nonparticipation. *See* Op. 20, 27.

Worse, the footnote's "obscure" text is equally consistent with Leapfrog's assigning a score based on real data from third-party sources like CMS. Op. 30. If anything, that is the *more* likely inference given Leapfrog's (false) assurance that "[i]f a hospital does not report to the Leapfrog Hospital Survey, other sources of data are used to calculate a Grade." Dkt. 195-23 at 2. The district court also correctly found that "many" consumers who viewed the prominent "'F' grade" at the top of the page would not even have scrolled down to see the footnote, meaning Leapfrog's "deception" was "complete as soon as the grade [wa]s viewed." Op. 30.

Leapfrog also challenges (at 36-38) the court's findings regarding Leapfrog's methodology document—"the only place where a consumer could discover how Leapfrog's ratings *actually* work." Op. 30. As the court correctly found, users on hospitals' Grade webpages could access that document only by clicking a link called "Detailed table view," scrolling down a lengthy page, and clicking another link. Op. 13. Leapfrog does not dispute that finding but instead claims (at 36-37) the court erred because users also could access the document from a link at the bottom of Leapfrog's homepage. The court acknowl-

edged the document theoretically could be accessed that way, Op. 13, but testimony reflected that consumers were unlikely to access it from the homepage because the link was located under a header titled "*For Hospitals*," Op. 15 (emphasis added); Dkt. 237 at 73:21-74:22. The court thus rightly credited (Op. 31) Google Analytics data showing that, of those who viewed the Community Hospitals' Safety Grade webpages, only 3% accessed the methodology document. *Contra* Br. 37-38.

Even if consumers could find the methodology document, it is undisputed that "average consumers" were not likely to "understan[d]" its "dense" and "complex" explanation. Op. 31 & n.10. Leapfrog again ignores this factual finding, perhaps because its own CEO conceded that the document "is not meant to be used by the average lay person who would probably not be interested in reading all 26 pages" of dense prose. Op. 31. As the court put it, "a reasonable consumer is still deceived if the process of uncovering that truth is an impenetrable series of clicks and scrolls, only to find an obscure reference to the methodology buried in a document consisting of dozens of pages and not even labeled as being intended for consumers." Op. 30.

* * *

In sum, Leapfrog's "pure opinion" argument—its only preserved First Amendment defense—fails. The injunction targets Leapfrog's unlawful *conduct* and speech integral to it: Leapfrog's scheme to force hospitals to sign over commercial data rights on pain of arbitrary "Safety" Grades. Even viewed as pure speech, the Grades and methodology are factually falsifiable assertions of actual safety performance, as Leapfrog itself repeatedly assured consumers, and Leapfrog's purported "disclosures" do not alter that result.

## II. THE DISTRICT COURT DID NOT PLAINLY ERR IN REJECTING LEAPFROG'S UNPRESERVED DEFENSES.

The remainder of Leapfrog's constitutional defenses—actual malice, compelled speech, prior restraint, and overbreadth—were first raised in Leapfrog's post-judgment reconsideration motion. The district court correctly held that they are unpreserved, so this Court should not reach them. If it does, none establishes error, much less the plain error Leapfrog would need to show for unpreserved issues.

### A. Leapfrog's Actual-Malice Defense Is Unpreserved And Implicates No Plain Error.

#### 1. Leapfrog's actual-malice defense is waived or at least forfeited.

a. Leapfrog contends that the Community Hospitals' FDUTPA claim "sounds in defamation" and so required showing "actual malice." Br. 21; *see* Br. 44-46; ACLU Br. 18-22. Leapfrog never raised this contention before judgment. Quite the opposite: Leapfrog argued at trial that the Hospitals "are not here on a defamation claim," Dkt. 236 at 42:6-7, and had brought "a FDUTPA claim, *not* a defamation claim," Dkt. 240 at 44:5-11 (emphasis added). That meant the Hospitals were required to prove an element—"consumer harm"—irrelevant to defamation. *Id.* Leapfrog pressed that argument because it (wrongly) believed the Hospitals could not establish consumer harm. Leapfrog thus made a "tactical decision" to waive a defamation defense and now "cannot complain" about it on appeal. *Francois* v. *Wainwright*, 741 F.2d 1275, 1282 (11th Cir. 1984). Leapfrog says (at 11) its complaint that the Hospitals were trying to "silence Leapfrog" somehow preserved the argument, but those remarks came in the same breath as Leapfrog's waiver. Dkt. 236 at 42:1-7; Dkt. 240 at 43:19-44:17.

At a minimum, the district court held that Leapfrog's actual-malice defense is "forfeited," Recon. Op. 3, as even Leapfrog recognizes, Br. 32 n.2. "At no point" during extensive briefing or five days of trial did Leapfrog "raise arguments concerning actual malice." Recon. Op. 3. At most, Leapfrog conclusorily asserted that its "mission" implicates a "public" issue in order to bolster its statutory anti-SLAPP argument—but Leapfrog never said a word about actual malice. Dkt. 99 at 22; Dkt. 129 at 8; Dkt. 135 ¶ 388; Dkt. 204 ¶ 594. Even if Leapfrog *had* flagged that doctrine, mere "passing reference to an issue" is insufficient "to preserve it," *NLRB* v. *Gaylord Chem. Co.*, 824 F.3d 1318, 1333 (11th Cir. 2016) (quotation marks and brackets omitted), as is the "bare invocation" of a legal concept "without any argument," *United States* v. *Defilippis*, 174 F.4th 1291, 1307 n.9 (11th Cir. 2026).

Those standard forfeiture principles apply equally to alleged constitutional errors. "[N]o procedural principle is more familiar" "than that a constitutional right may be forfeited." *Clement* v. *U.S. Att'y Gen.*, 75 F.4th 1193, 1202 (11th Cir. 2023) (quotation marks omitted). This Court thus "decline[s] to consider" even "a First Amendment argument" the defendant "did not present . . . in the district court." *Ferrill* v. *Parker Grp., Inc.*, 168 F.3d 468, 475 (11th Cir. 1999).

b. Leapfrog tries to duck the district court's forfeiture ruling in three ways. None withstands scrutiny.

First, Leapfrog attempts some sleight of hand. It says (at 46) the Hospitals "bore the burden of proof on actual malice." They might have—*if* Leapfrog had timely raised the defense and made the necessary threshold showing. It is the "*defendant* [who] must show" that "application of the demanding burden of *New York Times*" is justified in the first place. *Wolston* v. *Reader's Dig. Ass'n*, 443 U.S. 157, 167-168 (1979) (emphasis added). The First Amendment "impose[s] [that] special burden" "[o]nly if the defendant succeeds" in "show[ing] that the purportedly defamatory statement involved either a public official or a matter of public concern, or both." *Galarneau* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 504 F.3d 189, 199 (1st Cir. 2007).

So *if* Leapfrog had successfully argued that the Community Hospitals' claim sounded in defamation and involved a public official or matter of public concern, *then* the Hospitals would have had to prove malice. None of that happened. As the district court explained, Leapfrog failed to make the "specialized showing" necessary to put actual malice at issue. Recon. Op. 3. Indeed, Leapfrog affirmatively disclaimed at trial that the Hospitals were asserting "a defamation claim." Dkt. 236 at 42:6-7; Dkt. 240 at 44:5-7. And Leapfrog never

pressed for findings that the Hospitals are public figures or that the Safety Grades implicate matters of public concern. Its amici improperly try to supply those findings now with press materials never introduced below. *See* ACLU Br. 24-29; PRA Br. 11-13.

Leapfrog relatedly argues (at 47-48) the Hospitals acknowledged their burden of proving actual malice in pretrial filings, but that is just more misdirection. The Hospitals said that, "even assuming for the sake of argument" they had to satisfy defamation requirements, they could do so at trial. Dkt. 136 ¶ 133. No such proof was ever needed because Leapfrog did not identify actual malice as an issue for trial and never invoked the defense before judgment. Even Leapfrog's own case (at 45) acknowledges an actual-malice defense "may be waived by a failure to raise [it] at a proper time." *Curtis Publ'g Co.* v. *Butts*, 388 U.S. 130, 143 (1967) (plurality opinion).[3]

Second, Leapfrog argues (at 47) that it "necessarily preserved" the defense because the district court "t[ook] the First Amendment issues off the table for trial" at the motion-to-dismiss stage. That is simply not true. Leap-

[3] Leapfrog's other cases (at 46) are inapposite. *Moore* v. *Cecil*, 174 F.4th 862, 872-873 (11th Cir. 2026), dealt with a preserved actual-malice defense. In *Dershowitz* v. *Cable News Network, Inc.*, 153 F.4th 1189, 1192 (11th Cir. 2025), the state legislature codified actual malice as an element of defamation claims, converting the defense into a component of the plaintiff's prima facie case.

frog raised one First Amendment defense—that the Grades and methodology are pure opinion—and the court rejected that defense. Leapfrog never argued that if the Grades and methodology are factual rather than opinion, then the Hospitals were required to show actual malice. While litigants need not "re-litigate an already-rejected legal argument," *Dupree* v. *Younger*, 598 U.S. 729, 738 (2023), Leapfrog never litigated any actual-malice defense in the first place.

Nor did invoking one First Amendment defense (pure opinion) suffice to invoke another (actual malice). Parties cannot "shif[t] into new territory" and assert preservation "simply because both [arguments] fall under the broader rubric" of the First Amendment. *Flowers* v. *Comm'r, Soc. Sec. Admin.*, 97 F.4th 1300, 1306 (11th Cir. 2024). That is especially so when the new argument "crosse[s] into a wholly different legal framework." *Gould* v. *Interface, Inc.*, 153 F.4th 1346, 1357 (11th Cir. 2025). Here, pure-opinion doctrine would provide complete immunity if the Grades and methodology are not provably false. *See Gertz*, 418 U.S. at 339-340. By contrast, actual malice is relevant only if statements *are* provably false (as Leapfrog recognizes, Br. 40), and even then provides no immunity, but instead a heightened burden of proof. *See*

*Gertz*, 418 U.S. at 342-343. Leapfrog did not preserve the latter, alternative theory by asserting the former.

Third, Leapfrog contends (at 48) that it preserved the defense by supposedly pointing to "indicia of its good faith and fidelity to the ultimate interests of patients." Even assuming Leapfrog acted in good faith—which the district court's factual findings directly refute—the actual-malice standard does not require "evil intent," "spite," or "ill will." *Masson*, 501 U.S. at 510. It instead asks whether the defendant had "knowledge of falsity or reckless disregard as to truth or falsity." *Id.* at 511. Leapfrog never said that it could be held liable only if that standard were satisfied.

c. Because Leapfrog forfeited its actual-malice defense, this Court should not consider it. Leapfrog assumes that "even unpreserved arguments are reviewed for plain error." Br. 49 (citing *United States* v. *Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019)). But *Hawkins* was a *criminal* case subject to Federal Rule of Criminal Procedure 52(b), which generally provides for plain-error review. There is no similar general analogue in the Federal Rules of *Civil* Procedure. Accordingly, "in civil cases," "the plain error doctrine 'rarely applies.'" *Burch*, 861 F.3d at 1352 (quoting *Ledford* v. *Peeples*,

657 F.3d 1222, 1258 (11th Cir. 2011)). This Court normally "decline[s] to review" unpreserved arguments in civil cases at all, even for "plain" error. *Id.*

Leapfrog fails to show this is the "exceptional civil case" that merits disregarding ordinary issue-preservation requirements. *Burch*, 861 F.3d at 1352 (quotation marks omitted). Obtaining plain-error review requires showing "a miscarriage of justice," *id.*, apart from the alleged legal error itself, *see United States* v. *Olano*, 507 U.S. 725, 736-737 (1993). Yet Leapfrog's only asserted basis (at 49) for plain-error review is that the judgment supposedly defies "unequivocal" precedent and restricts speech on an "ongoing" basis. That argument just rehashes Leapfrog's merits objections—which Leapfrog "had ample opportunity to implore the [c]ourt below" to adopt. *Burch*, 861 F.3d at 1352. This Court thus should "decline to review" Leapfrog's actual-malice argument. *Id.* Indeed, because Leapfrog's "initial brief" presents no relevant argument for why plain-error review is available, Leapfrog's plea for review is itself forfeited. *Smith* v. *Marcus & Millichap, Inc.*, 106 F.4th 1091, 1099 (11th Cir. 2024).

#### 2. Leapfrog's actual-malice defense does not establish plain error.

If this Court considers Leapfrog's belated actual-malice defense, the Court should reject it. Leapfrog identifies no legal error, much less plain er-

ror.[4] Reversing its stance at trial, Leapfrog and its amici accuse the Community Hospitals of deploying "creative pleading," ACLU Br. 15, to bring a "thinly veiled defamation case" under FDUTPA and thereby "evade" actual-malice protections, PRA Br. 5-6. That is wrong for three reasons.

a. First, like pure-opinion doctrine, actual malice is not a defense to unlawful conduct or speech integral to it. Whether Leapfrog personnel subjectively believed the methodology was valid or the failing Safety Grades were accurate is beside the point, since the Grades and methodology were how Leapfrog "carried out" its unlawful "course of conduct," *Giboney*, 336 U.S. at 502, forcing hospitals to surrender property rights in their private data, Op. 39. It is no defense to blackmail, for example, that the offender believes the damaging information is "true." *Castillo*, 965 F.2d at 241.

b. Second, even if the injunction is viewed as restricting pure speech, actual-malice doctrine does not protect speech that violates generally applicable state law for reasons other than its harmful impact on reputation. The

[4] Relying on an out-of-circuit criminal case, Leapfrog says any plain-error review need not be "rigi[d]," since Leapfrog asserts a "constitutional error." Br. 49 (quoting *United States* v. *Trujillo*, 960 F.3d 1196, 1201 (10th Cir. 2020)). Not so in this Court: demonstrating plain error in civil cases "require[s] a *greater* showing of error than in criminal appeals." *Marcus & Millichap*, 106 F.4th at 1099 (emphasis added) (quotation marks omitted).

Supreme Court made this point in *Cohen* v. *Cowles Media Co.*, 501 U.S. 663 (1991). There, a newspaper published a source's identity after promising to keep it confidential, leading a state court to impose liability under a promissory-estoppel theory. *Id.* at 665-667. Three dissenting Justices would have applied actual-malice doctrine and reversed, since the statement (the source's identity) was true. *Id.* at 675-676 (Blackmun, J., dissenting). But the majority disagreed: the speech was unlawful because it violated "a law of general applicability" against breaking promises, not because it caused "injury" to the plaintiff's "reputation or his state of mind." *Id.* at 670-672.

Following *Cohen*, courts have repeatedly declined to apply the actual-malice requirement to speech that violates generally applicable law for reasons other than reputational injury. In *Veilleux* v. *National Broadcasting Co.*, 206 F.3d 92 (2000), for example, a broadcasting company deceived the plaintiff into appearing in a news program, and the First Circuit declined to require actual malice for the state-law misrepresentation tort. *Id.* at 102-103, 128. The tort was "of general applicability," and the plaintiff merely sought damages for "pecuniary loss," not "reputational . . . damages." *Id.* at 128. Similarly, in *Planned Parenthood Federation of America, Inc.* v. *Newman*, 51 F.4th 1125 (2022), the Ninth Circuit rejected an actual-malice defense where the defend-

ants published videos obtained in violation of general trespass law, and the plaintiff sought damages to pay for increased security measures rather than for reputational injury. *Id.* at 1134. Any contrary rule would permit parties to evade general law—antitrust, contract, copyright, and so on—so long as the speech they used to violate that law was not knowingly false.

FDUTPA is likewise a generally applicable statute that prohibits "unfair or deceptive acts or practices," Fla. Stat. § 501.204(1), regardless of reputational injury. It is thus fundamentally distinct from defamation, which renders unlawful, as Leapfrog puts it (at 45), infliction of "injury upon honor and reputation." If the Community Hospitals had acceded to Leapfrog's data demand and thereby *avoided* reputational injury, it still would have been "unfair" to force them to surrender private data as a condition of avoiding the reputational penalty. Similarly, regardless of reputational impact, it was "deceptive" for Leapfrog to arbitrarily assign Safety Grades while telling consumers the Grades were based on real data. *Contra* ACLU Br. 18-22.

To be sure, the Community Hospitals pointed to reputational (and other) injuries below to show their *standing to sue* as private-enforcement plaintiffs under FDUTPA's aggrieved-party requirement. Fla. Stat. § 501.211(1). But their aggrievement is not *why* Leapfrog's practices are "unfair" and "decep-

tive" under FDUTPA. For example, Florida's Attorney General could pursue his own enforcement action under FDUTPA against the same practices without demonstrating "aggrievement" or reputational injury to anyone. *Id.* § 501.207(1)(a)-(b); *accord State* v. *Beach Blvd. Auto., Inc.*, 139 So. 3d 380, 394 (Fla. 1st DCA 2014). Moreover, to establish deception and unfairness under FDUTPA, the Hospitals had to prove an additional element irrelevant to defamation: likely injury to *consumers* from their reliance on the Safety Grades. Op. 18-19.

Finally, the Community Hospitals sought no damages, Op. 3, much less damages based on asserted reputational injuries, *contra* ACLU Br. 20 n.3; *cf. Cohen*, 501 U.S. at 671; *Planned Parenthood*, 51 F.4th at 1134; *Veilleux*, 206 F.3d at 128. They sought only declaratory and injunctive relief designed to protect consumers from Leapfrog's deceptive and unfair practices. In short, defamation and its actual-malice requirement have nothing to do with the Hospitals' claim or the relief entered.

c. Third, even assuming the actual-malice standard applies, that would not get Leapfrog to a reversal. Br. 46, 49-50. The district court's findings establish actual malice on this record, so the judgment should be affirmed.

If this Court were to conclude otherwise, the appropriate remedy would be a remand for the district court to make a finding on actual malice.

Leapfrog's contrary view (at 45-46) rests on an overreading of the district court's reconsideration order. The court did not—having just said Leapfrog's actual-malice defense was "forfeited"—implicitly hold both that the defense is applicable and that the Community Hospitals had failed to prove actual malice. Instead, the court observed that Leapfrog had "not attempt[ed] to make" the requisite "specialized showing" to trigger actual-malice protections in the first place. Recon. Op. 3; *supra*, pp. 44-45. When the court referred to a "dearth in the record as to actual malice," Recon. Op. 3, it was not saying there was a dearth of *evidence* of malice. It was saying only that it had made "no finding of actual malice . . . in [its] injunction order" because Leapfrog had never put actual malice at issue. *Id.* (quotation marks omitted).

Even Leapfrog's own amici agree that the district court did not find against actual malice and that "the evidence could ultimately support a finding of actual malice." ACLU Br. 34. It is worth pausing on that recognition: the ACLU believes Leapfrog may have known or recklessly disregarded that its Safety Grades and methodology were inaccurate. There is good reason for that view. The trial record establishes actual malice because Leapfrog per-

sonnel were at a minimum "highly aware"—and indeed actually knew—its Safety Grades for the Community Hospitals were "probably false." *Michel*, 816 F.3d at 703.

To summarize, the district court found that Leapfrog's "acknowledged goal" was "punishing nonparticipants" by "imputing" "the lowest score[s]" for measures accounting for 31% of a nonparticipating hospital's Grade. Op. 22, 26 (quotation marks omitted). Leapfrog knew its choice of "arbitrarily low numbers" would convey that a nonparticipating hospital's Grade was based "on *something*," "when in truth it was based on nothing." Op. 25, 28. And Leapfrog "intended to create the false impression that" the Grades "reflect actual performance" while concealing how its "ratings actually work." Op. 26, 30-31. These are all findings of knowing falsity (or at least reckless disregard), and Leapfrog challenges none of them.[5]

The only finding relevant to actual malice that Leapfrog does challenge is the district court's treatment of an email from Leapfrog's expert advisor, Dr. Romano. In that email, Dr. Romano called the methodology change "a

[5] Leapfrog says (at 46) that it presented "unrebutted" evidence of the Community Hospitals' supposedly "poor safety record," but that is both incorrect, *supra*, p. 33, and irrelevant to actual malice. The point is that in assigning failing Safety Grades to the Hospitals, Leapfrog had no regard for their "actual safety performance." Op. 36; *see* Op. 25.

simple business decision" and "just business, folks!" Op. 2; Dkt. 191-3 at 1. Leapfrog says (at 50-51) those comments reflected Dr. Romano's views "as an external critic," not a Leapfrog insider. Not so. Dr. Romano was *defending* Leapfrog from colleagues who objected that Leapfrog was "[e]ffectively blackmailing centers to participate" in the Survey. Dkt. 191-3 at 4. He offered "to meet with anyone to discuss Leapfrog's approach (*since I serve on their Expert Panel*[)]." *Id.* at 3 (emphasis added). Moreover, Dr. Romano's "just business" explanation accords with contemporaneous communications among Leapfrog personnel showing the change was a revenue ploy. *Supra*, pp. 8-9. The court read the evidence correctly.

### B. Leapfrog's Other Constitutional Defenses Are Unpreserved And Implicate No Plain Error.

Leapfrog's additional constitutional objections were not properly raised below and are wrong in any event.

1. Leapfrog's compelled-speech, prior-restraint, and overbreadth arguments (at 52-57) are forfeited. Leapfrog never "clearly present[ed]" those arguments before judgment. *Juris* v. *Inamed Corp.*, 685 F.3d 1294, 1325 (11th Cir. 2012) (quotation marks omitted); *supra*, pp. 11-14. Leapfrog's lone prejudgment mention of "prior restraint" was a clause in its anti-SLAPP argument asserting that the "filing of this case"—not any injunction—"amounts to

prior restraint." Dkt. 99 at 22. Leapfrog never developed the point, and a "passing reference" preserves nothing. *Gaylord Chem.*, 824 F.3d at 1333 (quotation marks omitted).

Misreading the reconsideration order, Leapfrog asserts (at 52 n.3) that the district court "considered and rejected" its new defenses (other than actual malice). That is *not* a fair reading. The court stated there was an "adequate opportunity to consider" those potential objections when it invited Leapfrog at trial "to argue its position on the scope of the injunction." Recon. Op. 2. The court then cited the Community Hospitals' brief in opposition to Leapfrog's reconsideration motion, where the Hospitals argued those defenses were forfeited. Dkt. 223 at 24, 26. The court's point was that Leapfrog could have raised its other First Amendment defenses during trial—not that Leapfrog *had* raised them.

2. If the Court reaches it, Leapfrog's compelled-speech argument does not establish plain error for four reasons. First, Leapfrog has "forfeit[ed]" the argument on appeal because its opening brief mentions compelled speech "only in a passing reference" "in a footnote." *FTC* v. *Corpay, Inc.*, 164 F.4th 807, 837 n.7 (11th Cir. 2026) (quotation marks omitted); *see* Br. 56 n.4. Second, the defense is moot as to the injunction's third prong be-

cause Leapfrog sent out the required disclosures long ago. Dkt. 215 ¶ 29; *see Newman* v. *Alabama*, 683 F.2d 1312, 1317 (11th Cir. 1982). Third, Leapfrog actually invited any error when it said that the court could order "better" disclosures, Dkt. 240 at 81:18-22, after acknowledging that FDUTPA "can be used for deceptive speech," *id.* at 44:18-19. Those "expres[s] acknowledge[ments]" "preclud[e]" Leapfrog from "claiming the court erred" in compelling speech. *United States* v. *Love*, 449 F.3d 1154, 1157 (11th Cir. 2006). Fourth, the defense is meritless. The mandated disclosures target *commercial advertising* of the Safety Grades for paid licensure, and they require disclosing only that the relevant Grades were "found to be deceptive and unfair in this action." Op. 41. Hornbook law permits courts to compel such "purely factual" disclosures in the context of commercial transactions to remedy deception. *Zauderer* v. *Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985).

3. Leapfrog's prior-restraint argument (at 52-54) also establishes no plain error. There is no prohibition on enjoining unlawful conduct and speech integral to it. *See Giboney*, 336 U.S. at 502. And prior-restraint doctrine has no relevance even if Leapfrog's scheme implicates pure speech. "The special vice of a prior restraint is that communication will be suppressed" "*before* an adequate determination that it is unprotected by the First Amendment."

*Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973) (emphasis added). Thus, prior-restraint doctrine does not prohibit injunctions issued *after* a "final determination" that the speech at issue is "unprotected." *Id.*; *accord Lucero* v. *Trosch*, 121 F.3d 591, 601 (11th Cir. 1997) (injunction "does not constitute a prior restraint" after "judicial determination that the defendants' past conduct was harassing and unlawful").

The district court hewed to that line: it imposed an injunction at final judgment only after conclusively rejecting the sole First Amendment argument Leapfrog asserted, and it tailored the injunction to precisely the violation found. Even Leapfrog's amici cannot bring themselves to say the injunction here actually is a prior restraint, only that it somehow "could" be. RCFP Br. 16, 19. Leapfrog cites (at 53-55) inapposite cases involving preliminary or ex parte restraints entered before any final adjudication,[6] restraints on *protected* speech,[7] or defamation injunctions that barred the use of specific words

---

[6] *Vrasic* v. *Leibel*, 106 So. 3d 485, 486 (Fla. 4th DCA 2013); *Chevaldina* v. *R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1090 (Fla. 3d DCA 2014); *Carroll* v. *President & Comm'rs of Princess Anne*, 393 U.S. 175, 180 (1968).

[7] *Krapacs* v. *Bacchus*, 301 So. 3d 976, 980 (Fla. 4th DCA 2020) (online posts about a lawyer); *Town of Lantana* v. *Pelczynski*, 290 So. 2d 566, 568-569 (Fla. 4th DCA 1974) (criticism of political candidates); *Org. for a Better Austin* v. *Keefe*, 402 U.S. 415, 419 (1971) (leafletting).

even in lawful, non-defamatory contexts.[8] None of those injunctions is comparable to this one.

4. Finally, Leapfrog's overbreadth arguments also do not establish plain error. Leapfrog contends (at 56) that even if it may be enjoined from further misrepresentations about its Safety Grades and methodology, it may do whatever it wants with the Grades and methodology themselves. But because Leapfrog failed to establish that either the Grades or methodology is constitutionally protected as pure opinion, there is no overbreadth problem with enjoining their use in deceptive or unfair ways. Nor would merely enjoining misrepresentations about the Grades and methodology remedy the violation. As the district court explained, "many" consumers—for example, those experiencing a medical emergency—would look only at the Safety Grades, meaning "the deception" is "complete as soon as the grade is viewed." Op. 30. And better disclosures would at most dispel *deception*—not the separate *unfairness* of arbitrarily penalizing hospitals that refuse to sign over data rights. Op. 36.

[8] *Sindi* v. *El-Moslimany*, 896 F.3d 1, 32-35 (1st Cir. 2018); *Basulto* v. *Netflix, Inc.*, 2023 WL 7129970, at *52 (S.D. Fla. Sep. 20, 2023).

Leapfrog also contends (at 55) the injunction is overbroad because it prohibits any "similar" methodology, a restriction that purportedly has "no fixed content." That contention is hard to take seriously. To fall within the injunction, any new methodology must be relevantly "similar" to the "current" methodology the court found unlawful, *i.e.*, it must penalize hospitals for refusing to surrender data. Op. 40-41. The injunction should also be read in light of "the opinion issued in tandem," *Alley* v. *HHS*, 590 F.3d 1195, 1208 (11th Cir. 2009), which identified the nonparticipation penalty as "precisely what concern[ed]" the court, Op. 39. Penalizing hospitals for not signing over data is a feature not difficult to spot and indeed quite impossible to overlook.

In fact, the injunction is quite narrow. It runs only to the five plaintiff Hospitals. Op. 40. Amici report that Leapfrog has stopped grading all nonparticipating hospitals, CalPERS Br. 5-6, but that was Leapfrog's choice. Its own compliance declaration describes this step as going "above and beyond what th[e] [c]ourt's order requires." Dkt. 215 ¶ 8. As for attorney fees (Br. 15-16; PRA Br. 15), FDUTPA allows "reasonable" fees to whichever side prevails, Fla. Stat. § 501.2105(1)—as Leapfrog recognized in requesting its

own, Dkt. 204 at 3. In the end, Leapfrog identifies no error—plain or otherwise—in the targeted injunctive relief that the district court ordered.[9]

## III. THE DISTRICT COURT DID NOT ERR IN REJECTING LEAPFROG'S STATUTORY ARGUMENTS.

Leapfrog closes (at 57-59) by arguing that FDUTPA does not reach its "speech" under either "the statute's plain text" or "constitutional-avoidance principles."

A. The Court need not reach either argument. In its motion to dismiss, Leapfrog argued that FDUTPA's prohibition on unfair "acts or practices," Fla. Stat. § 501.204(1), does not cover the Safety Grades or methodology. Dkt. 39 at 19-20. But at trial, Leapfrog conceded "FDUTPA can be used for deceptive speech." Dkt. 240 at 44:18-19. Leapfrog thus "induce[d] or invite[d]" the district court's interpretation, "preclud[ing]" review of Leapfrog's new argument, *United States* v. *Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) (quotation marks omitted), even for "plain error," *Love*, 449 F.3d at 1157 (quo-

[9] Leapfrog further contends (at 55-56) that the Community Hospitals' post-judgment letters somehow demonstrate overbreadth. In those letters, the Hospitals objected to Leapfrog's continuing, post-judgment misrepresentations that not reporting data reflects poor safety performance. Dkt. 219-1 at 3. Those objections are irrelevant here. Unresolved compliance disputes about whether conduct falls within the injunction do not affect the scope of the injunction itself.

tation marks omitted). As for constitutional avoidance, Leapfrog first raised that argument post-judgment, rendering it forfeited and reviewable (if at all) only for plain error. *See Gould*, 153 F.4th at 1358.

B. If this Court reaches the arguments, it should reject them. FDUTPA's prohibition on unfair "acts or practices" readily encompasses Leapfrog's coercive, "bullying conduct." *Marco Island Cable* v. *Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 213-214 (11th Cir. 2009). The district court did not "lum[p]" unfairness together with deception, Br. 58, but analyzed them as "two different concepts" and held that Leapfrog's unfair, coercive practices independently support the judgment, Op. 18, 36-37. And even if Leapfrog's conduct is treated as pure speech, FDUTPA's deception prong encompasses rating entities' deceptive speech that misleads consumers, as Florida courts have repeatedly held. *See, e.g.*, *Home Performance All., Inc.* v. *Better Bus. Bureau of W. Fla., Inc.*, 354 So. 3d 1165, 1166-1167 (Fla. 2d DCA 2023).

Leapfrog proposes (at 57) a novel FDUTPA exemption for information "disseminated to the public free of charge." This argument is baseless and expressly waived. FDUTPA does not require that the defendant charge money; it extends to "any nonprofit or not-for-profit person or activity," Fla.

Stat. § 501.203(8), occurring "in the conduct of any trade or commerce," *id.* § 501.204(1). And Leapfrog stipulated below that its "challenged acts or practices are conducted in 'trade or commerce,'" Dkt. 129 ¶ 174, foreclosing any contention that its gratuitous misrepresentations do not occur in commerce.

Leapfrog's avoidance argument is likewise off-base. There is no "constitutional violation to avoid," *McCarthan* v. *Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1094 (11th Cir. 2017) (en banc), because the judgment comports with the First Amendment. Regardless, as Leapfrog recognizes (at 57), the canon applies only if a statute is "ambigu[ous]." *Castellanos* v. *Next Door Co.*, 192 So. 3d 431, 442 (Fla. 2016). Leapfrog identifies no genuine ambiguity in FDUTPA, which "is not vague or ambiguous just because it is broad." *Stevens* v. *Premier Cruises, Inc.*, 215 F.3d 1237, 1240 (11th Cir. 2000). Nor is there any conflict with Florida's anti-SLAPP statute. That statute applies only when the relevant activities are "protected by the First Amendment," which Leapfrog fails to show. Fla. Stat. § 768.295(1), (2)(a).

As a final salvo, Leapfrog says (at 58-59) the district court "abused its discretion" in denying Leapfrog's Rule 59 motion by supposedly "ignor[ing]" avoidance. This argument is jurisdictionally barred because Leapfrog did not separately appeal denial of reconsideration. *See* Fed. R. App. P. 4(a)(4)(B)(ii);

*Weatherly* v. *Ala. State Univ.*, 728 F.3d 1263, 1271 (11th Cir. 2013). It is also meritless: the court "carefully considered" all of Leapfrog's arguments. Recon. Op. 3. Having correctly ruled that Leapfrog's constitutional defenses are forfeited or meritless, the court had nothing to avoid.

## CONCLUSION

The judgment should be affirmed.

Dated: November 13, 2026

Respectfully submitted,

*/s/ Jeffrey B. Wall*

MARY BETH MALONEY
LEE R. CRAIN
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

JEFFREY B. WALL
*Counsel of Record*
HELGI C. WALKER
CHRISTINE M. BUZZARD
ROBERT A. BATISTA
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
jwall@gibsondunn.com

*Counsel for Plaintiffs-Appellees The Community Hospitals*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and the typeface requirements of Rule 32(a)(5)(A) because it contains 12,997 words, excluding the portions exempted by Rule 32(f), and has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Expanded BT font.

Dated: November 13, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Jeffrey B. Wall*
Jeffrey B. Wall

*Counsel for Plaintiffs-Appellees*
*The Community Hospitals*

## CERTIFICATE OF SERVICE

I certify that on November 13, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by that system.

Dated: November 13, 2026

GIBSON, DUNN & CRUTCHER LLP

By: *__/s/ Jeffrey B. Wall__*
Jeffrey B. Wall

*Counsel for Plaintiffs-Appellees*
*The Community Hospitals*