# No. 26-11527

## UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC., d.b.a. Palm Beach Gardens Medical Center, ST. MARY'S MEDICAL CENTER, INC., WEST BOCA MEDICAL CENTER, INC.,

*Plaintiffs-Appellees*,

v.

LEAPFROG GROUP,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Southern District of Florida, No. 9:25-cv-80526-DMM
Hon. Donald M. Middlebrooks, U.S. District Court Judge

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

Jonathan D. Urick
Katherine M. Ferazzi
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce of the United States of America*

Ashley C. Parrish
Meredith M. Pohl
Megan Michur
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

*Counsel for Amicus Curiae*

November 20, 2026

No. 26-11527
*Good Samaritan Medical Center, Inc., et al v. Leapfrog Group*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1, 28-1, and 29-2, I certify that in addition to the individuals listed in the Appellant's Corrected Opening Brief (Dkt. 44), Appellees' Response Brief (Dkt. 46), and the briefs for *Amici Curiae* (Dkts. 28, 30, 31, and 33), the following persons and entities have an interest in the outcome of this matter:

1. King and Spalding LLP (Counsel for *Amicus Curiae* The Chamber of Commerce of the United States of America)
2. Ferazzi, Katherine M. (Counsel for *Amicus Curiae* The Chamber of Commerce of the United States of America)
3. Michur, Megan (Counsel for *Amicus Curiae* The Chamber of Commerce of the United States of America)
4. Parrish, Ashley (Counsel for *Amicus Curiae* The Chamber of Commerce of the United States of America)
5. Pohl, Meredith (Counsel for *Amicus Curiae* The Chamber of Commerce of the United States of America)
6. Urick, Jonathan D. (Counsel for *Amicus Curiae* The Chamber of Commerce of the United States of America)

*Amicus curiae* states that it is a non-profit organization with no parent company and no publicly traded stock.

Date: November 20, 2026

*/s/Ashley C. Parrish*
Ashley C. Parrish
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .............................. C-1

TABLE OF AUTHORITIES ..................................................................ii

INTEREST OF *AMICUS CURIAE* ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 2

ARGUMENT ........................................................................................ 5

I. The Supreme Court's First Amendment Doctrine Carefully Balances Interests in Free Expression and Reputation .................. 5

A. Businesses have significant interests in preserving both free expression and their reputations ............................. 5

B. The Supreme Court's precedents balance interests in both free expression and reputation, including in its application of the actual-malice standard ............................ 10

II. The District Court Correctly Held That Leapfrog Forfeited Its Actual-Malice Theory ........................................................... 17

A. Leapfrog forfeited the issue by raising it for the first time after judgment ........................................................... 18

B. Requiring timely assertion of the actual-malice standard protects the orderly progression of litigation ................................................................... 21

CONCLUSION ................................................................................... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Access Now, Inc. v. Sw. Airlines Co.*,
385 F.3d 1324 (11th Cir. 2004) .................... 19, 20

*Arthur v. King*,
500 F.3d 1335 (11th Cir. 2007) .................... 19

*Bates v. State Bar of Ariz.*,
433 U.S. 350 (1977) .................... 10

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) .................... 8

*Carr v. Forbes, Inc.*,
259 F.3d 273 (4th Cir. 2001) .................... 17

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980) .................... 7

*Citizens United v. FEC*,
558 U.S. 310 (2010) .................... 6, 12

*Coleman v. MacLennan*,
98 P. 281 (Kan. 1908) .................... 8

*Counterman v. Colorado*,
600 U.S. 66 (2023) .................... 13

*Curtis Publ'g Co. v. Butts*,
388 U.S. 130 (1967) .................... 14, 16, 21

*Daker v. Jackson*,
942 F.3d 1252 (11th Cir. 2019) .................... 13

*Dershowitz v. Cable News Network, Inc.*,
153 F.4th 1189 (11th Cir. 2025) .................... 14, 20, 22, 23

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) .................... 15

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008) .......... 18, 24

*Ferrero v. Associated Materials, Inc.*,
923 F.2d 1441 (11th Cir. 1991) .......... 9

*First Nat'l Bank v. Bellotti*,
435 U.S. 765 (1978) .......... 12

*Franchini v. Bangor Publ'g Co.*,
109 F.4th 13 (1st Cir. 2024) .......... 16, 17, 22

*Frohwerk v. United States*,
249 U.S. 204 (1919) .......... 13

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .......... 2, 9, 10, 11, 13, 14, 15

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) .......... 13

*Gould v. Interface, Inc.*,
153 F.4th 1346 (11th Cir. 2025) .......... 20

*Greenlaw v. United States*,
554 U.S. 237 (2008) .......... 24

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) .......... 23

*Hormel v. Helvering*,
312 U.S. 552 (1941) .......... 23

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988) .......... 11, 14

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003) .......... 13

*Juris v. Inamed Corp.*,
685 F.3d 1294 (11th Cir. 2012) .......... 19

*Kontrick v. Ryan*,
540 U.S. 443 (2004) .......... 21

*Krauss v. Globe Int'l, Inc.*,
251 A.D.2d 191 (N.Y. App. Div. 1998) .......... 16

*Linn v. United Plant Guard Workers of Am., Loc. 114*,
383 U.S. 53 (1966) .......... 14

*Lowe v. SEC*,
472 U.S. 181 (1985) .......... 8

*Michaelis v. CBS, Inc.*,
119 F.3d 697 (8th Cir. 1997) .......... 17

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) .......... 15, 17, 18, 23

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 2, 12, 14

*NAACP v. Button*,
371 U.S. 415 (1963) .......... 12

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n*,
475 U.S. 1 (1986) .......... 12

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986) .......... 12, 15

*Puckett v. United States*,
556 U.S. 129 (2009) .......... 19, 21

*Rosenblatt v. Baer*,
383 U.S. 75 (1966) .......... 9, 10

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .......... 13

*Sheindlin v. Brady*,
597 F. Supp. 3d 607 (S.D.N.Y. 2022) .......... 16

*Singleton v. Wulff*,
428 U.S. 106 (1976) .......... 23

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 15, 22

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 6, 12

*Spiegel v. City of Houston*,
636 F.2d 997 (5th Cir. Unit A 1981) .......... 9

*Thornhill v. Alabama*,
310 U.S. 88 (1940) .......... 6

*Time, Inc. v. Hill*,
385 U.S. 374 (1967) .......... 14

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018) .......... 11, 15, 20, 22

*United States v. Alvarez*,
567 U.S. 709 (2012) .......... 11

*United States v. Campbell*,
26 F.4th 860 (11th Cir. 2022) .......... 21

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) .......... 24

*Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) .......... 7, 8, 11

*Wolston v. Reader's Dig. Ass'n*,
443 U.S. 157 (1979) .......... 16, 18

*Wyeth v. Levine*,
555 U.S. 555 (2009) .......... 6

*Yakus v. United States*,
321 U.S. 414 (1944) .......... 21

*Yee v. City of Escondido*,
503 U.S. 519 (1992) .......... 20

**Other Authorities**

Restatement (Second) of Torts § 559 (1977) .......... 9

U.S. Chamber of Com.,
*Why We're Taking Free Enterprise on the Road*
(Sept. 18, 2026), https://tinyurl.com/3kze96cf .......... 7

11 Wright & Miller,
Federal Practice and Procedure § 2810.1 (3d ed.) .......... 19

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business organization. As the nation's leading advocate for business, the Chamber represents companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber's members are frequent participants in complex commercial litigation—sometimes as plaintiffs and sometimes as defendants. Whichever side they are on, businesses depend on procedural rules that are applied predictably and evenhandedly, so that parties know early on which issues are being litigated and can make informed decisions about discovery, motions practice, and trial. Those interests are

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Counsel for all parties were notified that *amicus* intended to submit this brief and have consented to the filing of this brief.

heightened where, as here, a party seeks to undo a judgment entered after full discovery and trial on the ground that the plaintiff's claim was subject to a constitutional requirement the party never asked the District Court to apply.

The Chamber therefore has a substantial interest in the outcome of the parties' forfeiture dispute in this case. The Chamber takes no position on the merits of the plaintiff hospitals' claim under the Florida Deceptive and Unfair Trade Practices Act, on whether the actual-malice standard would apply to that claim, or on the merits of any First Amendment defense defendant Leapfrog Group ("Leapfrog") raises.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court has long recognized that the First Amendment implicates two interests vital to American businesses: free expression and reputation. The Court has developed a nuanced body of doctrine to balance those interests. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341–42 (1974). One feature of that doctrine is the actual-malice standard, which the Court first adopted for defamation claims brought by public officials. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Whether the actual-malice standard governs a particular claim depends

on threshold questions that, under controlling precedent, the defendant must affirmatively raise. The Chamber takes no position on whether the actual-malice standard should apply to the hospitals' claim in this case. Whatever the answer, Leapfrog was required to raise the issue in time for the District Court to address it.

Leapfrog did not satisfy that obligation. Even though the case proceeded through a motion to dismiss, extensive discovery, summary judgment, and a five-day bench trial, Leapfrog never asked the District Court to apply the actual-malice standard until after the court entered final judgment, when Leapfrog raised the issue for the first time in a post-trial motion to alter or amend the judgment. In response, the District Court correctly held that Leapfrog had forfeited the argument. As the District Court explained, "[a]t no point did Defendant raise arguments concerning actual malice," which "requires a specialized showing" that Leapfrog "did not attempt to make." Dkt. 234 at 3.

Leapfrog now asks this Court to set aside a judgment entered after a full trial based on a standard it never asked the District Court to apply. That request cannot be squared with settled preservation rules. A post-judgment motion comes too late to inject the actual-malice requirement

into a case, and the constitutional character of Leapfrog's argument does not excuse the delay. Leapfrog's actual-malice argument is not a new argument in support of a preserved issue, nor is it merely a challenge to the sufficiency of the evidence supporting an element litigated at trial; it is a new issue altogether that Leapfrog never presented to the District Court.

Allowing parties to hold back this issue until after trial would reward the type of strategic maneuvering that preservation rules are designed to discourage: waiting to see the outcome before raising an objection. It would also make complex litigation less predictable and more costly, to the detriment of plaintiffs and defendants alike. And it would prolong the expressive and reputational harms that both sides endure while a dispute over allegedly false speech remains unresolved.[2]

[2] The parties dispute whether this case concerns free speech and reputational harms or instead conduct and consumer injury. The Chamber takes no position on that issue. The Chamber also takes no position on whether the hospitals' claim and alleged injuries in this case are of the type to which the actual-malice requirement would apply had the issue not been forfeited.

Because Leapfrog did not timely raise the actual-malice issue, this Court should affirm the District Court's correct enforcement of settled preservation rules.

## ARGUMENT

### I. The Supreme Court's First Amendment Doctrine Carefully Balances Interests in Free Expression and Reputation.

The Supreme Court's First Amendment precedents protect two interests that matter to the business community: (1) the freedom to participate in robust public debate, and (2) the ability to obtain redress for false statements that inflict reputational harm. Businesses depend on both. The Supreme Court has balanced those interests through a carefully calibrated body of doctrine—including the actual-malice standard.

#### A. Businesses have significant interests in preserving both free expression and their reputations.

**1.** Businesses have a strong interest in the free exchange of information and ideas. For over a century, the Chamber has defended the free-enterprise system, which depends on the ability of businesses to communicate with customers, investors, employees, and the public—and on the public's ability to receive information about the businesses that serve customer needs. The Supreme Court has long recognized the

connection between free expression and a functioning economy. The Framers "had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread . . . economic truth." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940).

Businesses frequently participate in public debate about healthcare, public safety, environmental practices, and other matters of concern to them and their customers. Their involvement furthers the public interest. As the Supreme Court has observed, businesses "possess valuable expertise" on many topics, "leaving them the best equipped to point out errors or fallacies in speech of all sorts." *Citizens United v. FEC*, 558 U.S. 310, 364 (2010). For example, in public debate about patient care, drug and device manufacturers "have superior access to information about their drugs, especially in the postmarketing phase as new risks emerge." *Wyeth v. Levine*, 555 U.S. 555, 578–79 (2009). That information matters most "in the fields of medicine and public health, where information can save lives." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). Similarly, in public debate about energy, utilities and energy producers can speak from their own operations about supply, demand, and conservation. The Supreme Court has thus recognized that "many, if

not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety," and that utilities "enjoy the full panoply of First Amendment protections for their direct comments on public issues." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 562 n.5 (1980).

The same conclusion is true across many other subjects of public concern and debate—from artificial intelligence and data privacy to supply chains, infrastructure, and employee benefits—on which businesses' practical experience can help inform public understanding. Businesses are especially well positioned to contribute to public understanding of the free-enterprise system, which "lowers costs through competition, creates jobs and opportunity, [and] turns new ideas into solutions." U.S. Chamber of Com., *Why We're Taking Free Enterprise on the Road* (Sept. 18, 2026), https://tinyurl.com/3kze96cf.

As part of that system, businesses and their customers rely on the speech of others—including commentary, reviews, and ratings—to make informed decisions about the products they buy, the partners they choose, and the markets they enter. *See Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976) (explaining

that, because resources are allocated through "numerous private economic decisions," "[i]t is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed"). In fact, entire industries frequently rely on third-party measurement and analysis, including "factual information about past transactions and market trends" and "commentary on general market conditions . . . ." *Lowe v. SEC*, 472 U.S. 181, 210 & n.58 (1985) (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513 (1984)). In short, almost every participant in the nation's economy—businesses, consumers, investors, employees, and policymakers—benefits from the "free flow" of "commercial information." *Virginia State Bd.*, 425 U.S. at 764–65.

**2.** Businesses also have a strong interest in guarding against unfair reputational harm. From "a commercial standpoint," a good reputation "is one of the most productive kinds of capital [one] can possess." *Coleman v. MacLennan*, 98 P. 281, 285 (Kan. 1908). A reputation for quality, safety, and integrity is built through years of investment, and it shapes whether customers buy, investors invest, employees join, and partners contract. Reputation is also one of the principal ways that markets reward good conduct. A business known for

reliability can attract customers, credit, and talent on better terms; a business that loses that standing may find that lenders, suppliers, and customers no longer wish to deal with it at all.

The law has long protected reputational interests. As the Supreme Court has recognized, "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation," *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966), and states have a corresponding interest in ensuring that individuals receive adequate compensation "for the harm inflicted on them by defamatory falsehood." *Gertz*, 418 U.S. at 341. Reflecting these interests, the common law treats as defamatory any communication that tends "to deter third persons from associating or dealing with" its subject. Restatement (Second) of Torts § 559 (1977). Similarly, this Court has recognized that the "loss of customers and goodwill" is the kind of injury that is "'irreparable.'" *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (quoting *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. Unit A 1981)).

Because reputation is so valuable, false statements of fact can cause significant commercial injury. False statements can negatively influence consumer decisions, investor confidence, employee recruitment, and

relationships with suppliers and business partners. The harm caused is often difficult to undo: as the Supreme Court has observed, an opportunity for rebuttal "seldom suffices to undo [the] harm of defamatory falsehood" because "the truth rarely catches up with a lie." *Gertz*, 418 U.S. at 344 n.9. Moreover, because reputational harm accrues in real time, it persists and may even expand while litigation drags on, and it may be impossible to repair even after a business prevails. *See Rosenblatt*, 383 U.S. at 92–93 (Stewart, J., concurring) ("[t]he destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem.").

### B. The Supreme Court's precedents balance interests in both free expression and reputation, including in its application of the actual-malice standard.

The Supreme Court's First Amendment doctrine seeks to accommodate both free expression and reputation, preserving robust debate while permitting remedies for harmful falsehoods. The two interests are complementary: the "public and private benefits from commercial speech derive from confidence in its accuracy and reliability." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 383 (1977). The Supreme Court has thus recognized that the law should ensure that "the stream of

commercial information flow[s] cleanly as well as freely." *Virginia State Bd.*, 425 U.S. at 771–72. The actual-malice standard is one of the ways the Supreme Court has struck that balance, including by requiring that the party seeking to invoke that heightened standard raise the issue at an appropriate time.

**1.** The Supreme Court has long acknowledged that "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988); *see also Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) ("True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment.").

Indeed, even some false statements are protected. The Supreme Court has declined to recognize any "general exception to the First Amendment for false statements." *United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality opinion); *see Gertz*, 418 U.S. at 341 (explaining that false statements are sometimes protected "in order to protect speech that matters"); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 778

(1986) (noting that, in limited circumstances, the Supreme Court "has been willing to insulate even *demonstrably* false speech from liability"). Because "erroneous statement is inevitable in free debate," the Court has held that "it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *N.Y. Times*, 376 U.S. at 271–72 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

These speech protections extend fully to businesses. Speech does not lose its protection "simply because its source is a corporation." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 784 (1978). The "inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source . . . ." *Id.* at 777. To the contrary, businesses, like individuals, "contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." *Citizens United*, 558 U.S. at 343 (quoting *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n*, 475 U.S. 1, 8 (1986) (plurality opinion)). And "[w]hile [such] speech [may] result[] from an economic motive, so too does a great deal of vital expression." *Sorrell*, 564 U.S. at 567.

Still, the First Amendment does not confer "immunity for every possible use of language." *Frohwerk v. United States*, 249 U.S. 204, 206

(1919). Accordingly, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). Many civil wrongs and crimes—from fraud to true threats—are committed through words. *See, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) (fraud); *Counterman v. Colorado*, 600 U.S. 66, 72 (2023) (true threats). That a wrong involves speech does not, without more, place it beyond the reach of the law. *See Rumsfeld*, 547 U.S. at 62. Accordingly, in the defamation context, the Supreme Court has left the States "substantial latitude" to protect private individuals against defamatory falsehoods, while requiring more demanding proof in certain other settings. *Gertz*, 418 U.S. at 345–47; *cf. Daker v. Jackson*, 942 F.3d 1252, 1258 (11th Cir. 2019) (distinguishing between "inadvertently false speech," which is protected under the First Amendment, and permissible rules of conduct, which are not limited by the First Amendment).

**2.** Against this backdrop, the Supreme Court first held in *New York Times* that a public official may not recover damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80. The Supreme Court later extended that rule to defamation claims involving public figures. *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 162–65 (1967) (Warren, C.J., concurring in result); *Gertz*, 418 U.S. at 335–36, 342; *see also Dershowitz v. Cable News Network, Inc.*, 153 F.4th 1189, 1192–93 (11th Cir. 2025), *cert. denied*, 146 S. Ct. 2356 (2026). And it has since applied the standard to certain other claims involving allegedly false speech. *See, e.g.*, *Hustler*, 485 U.S. at 56 (intentional infliction of emotional distress claims by public figures); *Time, Inc. v. Hill*, 385 U.S. 374, 387–88 (1967) (statutory invasion-of-privacy claim based on false reports of matters of public interest); *Linn v. United Plant Guard Workers of Am., Loc. 114*, 383 U.S. 53, 65 (1966) (state-law libel claim arising from labor dispute governed by the National Labor Relations Act).

Significantly, even for the types of speech-related claims that potentially require proof of actual malice, whether that requirement applies in a particular case depends on two antecedent factors: (1) "whether the plaintiff is a public official or figure, or is instead a private figure," and (2) "whether the speech at issue is of public concern." *Hepps*, 475 U.S. at 775; *see Gertz*, 418 U.S. at 342–45 (plaintiff's status as a public official or public figure); *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (whether speech addresses a matter of public concern turns on its "content, form, and context"); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 757–61 (1985) (plurality opinion).

Whether a plaintiff is a public figure and whether the speech addresses a matter of public concern are "question[s] of law for the court to decide." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *see also Turner*, 879 F.3d at 1272–73 (applying two-part test for limited-public-figure status). But these inquiries also often require unique factual development—about the plaintiff's role in a public controversy, for example, or about the content and context of the challenged statements—before the court can make those threshold determinations. *See Snyder*, 562 U.S. at 453 (public-concern inquiry

requires examination of the speech "as revealed by the whole record" (quotation marks omitted)); *Franchini v. Bangor Publ'g Co.*, 109 F.4th 13, 31 (1st Cir. 2024) (public-figure inquiry is "inescapably fact-specific" (quotation marks omitted)); *see also Sheindlin v. Brady*, 597 F. Supp. 3d 607, 632 (S.D.N.Y. 2022) (treating plaintiff as a private figure because defendant "offer[ed] no argument regarding Plaintiff's status" and "'the public-figure determination . . . plac[es] the burden of proof on the defendant'" (emphasis omitted) (quoting *Krauss v. Globe Int'l, Inc.*, 251 A.D.2d 191, 192 (N.Y. App. Div. 1998))). Determining whether to apply the requirement is therefore a question the court must decide based on specific arguments and evidence presented to it.

The Supreme Court's precedents place on the defendant the responsibility for raising and establishing the applicability of the actual-malice requirement based on the relevant factors. *See, e.g.*, *Wolston v. Reader's Dig. Ass'n*, 443 U.S. 157, 167–68 (1979) ("A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*."); *Curtis Publ'g Co.*, 388 U.S. at 142–45 (opinion of Harlan, J.) (considering whether defendant had "waived its right to assert" its *New York Times* arguments "by failing to

assert them before trial"). Courts of appeals agree. *See, e.g.*, *Franchini*, 109 F.4th at 31 ("Defendants bear the burden of establishing that the plaintiff is a public figure."); *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001) (same); *Michaelis v. CBS, Inc.*, 119 F.3d 697, 702 (8th Cir. 1997) ("Defendants bear the burden on this issue." (addressing public-official status)). To be sure, when the actual-malice requirement applies, the plaintiff must plead and prove that it is satisfied. *See Michel*, 816 F.3d at 702. But that obligation presupposes a determination that the standard applies, and plaintiffs are not required to anticipate, and preemptively rebut, the possibility that it might.

## II. The District Court Correctly Held That Leapfrog Forfeited Its Actual-Malice Theory.

The District Court correctly held that Leapfrog forfeited its actual-malice argument. Leapfrog waited until after judgment to ask the court to decide whether the actual-malice standard applies, and nothing excuses that delay. In these circumstances, enforcing forfeiture protects the interests on both sides of the First Amendment balance and the orderly progression of litigation.

### A. Leapfrog forfeited the issue by raising it for the first time after judgment.

Leapfrog never asked the District Court to apply the actual-malice standard until after the court entered judgment. That delay matters. The defendant bears the initial burden to raise and establish that the actual-malice requirement applies; only if it is raised and applies must the plaintiff prove that the requirement is satisfied. *See Wolston*, 443 U.S. at 167–68; *Michel*, 816 F.3d at 702.

The case proceeded through a motion to dismiss, extensive discovery, summary judgment, a five-day bench trial, and the entry of judgment before Leapfrog made any argument about actual malice. Leapfrog was silent when the hospitals suggested that the standard did not apply and that it was satisfied in any event. *See* Dkt. 115 at 19–20; Dkt. 136 ¶ 133; *see generally* Dkt. 204; *see also* Dkt. 223 at 11–15. Only after judgment did Leapfrog contend, in a post-trial motion under Federal Rule of Civil Procedure 59, that a finding of actual malice was required. *See* Dkt. 220 at 14–16. But it is well settled that a Rule 59(e) motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)

(quoting 11 Wright & Miller, Federal Practice and Procedure § 2810.1 (3d ed.)); *accord Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007). As the District Court explained, "[a]t no point did Defendant raise arguments concerning actual malice," which "requires a specialized showing, which it did not attempt to make." Dkt. 234 at 3.

Settled preservation rules foreclose raising the actual-malice requirement for the first time after trial and entry of judgment. A party must present issues to the District Court "in such a way as to afford the district court an opportunity to recognize and rule on" them. *Juris v. Inamed Corp.*, 685 F.3d 1294, 1325 (11th Cir. 2012). That requirement carries special force for "fact-bound issues" that a district court "never had a chance to examine . . . ." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). And it prevents a litigant from "'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Puckett v. United States*, 556 U.S. 129, 134 (2009).

Nothing about Leapfrog's argument warrants a departure from these basic requirements. Leapfrog does not offer a new argument for a preserved defense, or a crisper version of an argument it made below. It

instead seeks to change, after judgment, the very standard on which the case was tried—and to add to the hospitals' claim a requirement that Leapfrog never raised for the parties to litigate, or for the District Court to decide. That is a new claim, not a new argument in support of a preserved one. *Cf. Gould v. Interface, Inc.*, 153 F.4th 1346, 1354, 1356 (11th Cir. 2025) ("[P]arties can forfeit positions or issues that they fail to properly raise at the district court," even though "they can't forfeit particular arguments or authorities" supporting preserved positions or issues); *see also Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal *claim* is properly presented, a party can make any argument in support of *that claim*; parties are not limited to the precise arguments they made below." (emphasis added)).[3]

[3] This Court excuses forfeiture only in "exceptional" circumstances. *Access Now*, 385 F.3d at 1332. The principal exception covers only a "pure question of law" where "refusal to consider it would result in a miscarriage of justice." *Id.* (quotation marks omitted). It does not reach "mixed questions of fact and law," *id.* at 1333, and the broader "substantial justice" exception is almost never applied, *see id.* at 1333–34. Neither exception applies here. Whether the actual-malice standard applies and is satisfied turns on a question of fact: Leapfrog's "subjective beliefs about the truth of [its] own statements." *Dershowitz*, 153 F.4th at 1193; *see Turner*, 879 F.3d at 1273. And excusing the forfeiture would severely prejudice the hospitals. It would vacate a judgment entered after a five-day bench trial based on an issue that Leapfrog never raised for

The constitutional character of Leapfrog's argument also does not excuse its delay. "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Yakus v. United States*, 321 U.S. 414, 444 (1944); *see Puckett*, 556 U.S. at 134 (quoting *Yakus*, 321 U.S. at 444); *see also Curtis Publ'g Co.*, 388 U.S. at 143 (opinion of Harlan, J.) ("even constitutional objections may be waived by a failure to raise them at a proper time"); *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc) ("forfeiture is the failure to make the timely assertion of a right" (quoting *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004))).

### B. Requiring timely assertion of the actual-malice standard protects the orderly progression of litigation.

Given the importance of the competing interests that the actual-malice standard seeks to accommodate, it is essential that a party place the issue before the district court at an early stage of the litigation. If anything, the significance of the interests at stake makes timely

---

the parties to litigate. The Chamber takes no position on whether forfeiture occurs, or should be excused, on different facts or arguments.

assertion more important, not less. The Supreme Court's precedents balancing expression and reputation cannot operate as intended if the threshold questions on which they depend are presented for the first time only after trial and judgment.

The questions that determine whether the actual-malice standard applies and is satisfied shape the parties' discovery and trial strategy. Whether a plaintiff is a public figure, and whether the speech at issue addresses a matter of public concern, are threshold questions that can turn on record evidence the parties must have a fair opportunity to develop—about the plaintiff's role in any public controversy, for example, or the content, form, and context of the challenged statements. *See Snyder*, 562 U.S. at 453; *Franchini*, 109 F.4th at 31. Allowing Leapfrog to raise actual malice at this late stage would thus deprive the hospitals of any fair opportunity to litigate those threshold questions at all—before even reaching whether the standard is satisfied. And whether a defendant knew of or recklessly disregarded the falsity of its speech is a "subjective test," *Turner*, 879 F.3d at 1273, in which "all that matters are the speakers' subjective beliefs about the truth of their own statements," *Dershowitz*, 153 F.4th at 1193. Because the inquiry focuses on the

defendant's state of mind, it can be fact-intensive. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (court "must consider the factual record in full"). Although courts can sometimes properly resolve the issue as a matter of law, whether it is appropriate to do so depends on the record and circumstances of each case. *See, e.g.*, *Michel*, 816 F.3d at 702 (applying plausibility pleading standard to allegations of actual malice); *Dershowitz*, 153 F.4th at 1193–95 (affirming summary judgment for lack of actual malice).

By waiting until after trial to raise its actual-malice argument, Leapfrog deprived the hospitals of a fair opportunity to litigate those questions, and it deprived the District Court of the opportunity to make the necessary findings. Preservation rules exist to prevent precisely that result. Requiring parties to raise issues below "is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide." *Hormel v. Helvering*, 312 U.S. 552, 556 (1941); *see Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Those rules reflect the "principle of party presentation," under which courts "'rely on the parties to frame the issues for decision . . . .'" *United States v. Sineneng-Smith*, 590 U.S. 371, 375

(2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). Those concerns are especially acute here, where the parties and the District Court invested in extensive discovery and a multi-day bench trial focused on the issues Leapfrog had actually placed in dispute.

Enforcing forfeiture in this context also serves the broader interest in predictable, evenhanded procedural rules—an interest the business community shares regardless of which side of the "v." a business finds itself on in any given case. As the Supreme Court has explained, "the complexity of a case does not eliminate the value of waiver and forfeiture rules, which ensure that parties can determine when an issue is out of the case, and that litigation remains, to the extent possible, an orderly progression." *Exxon*, 554 U.S. at 487 n.6. Complex commercial cases move through pleadings, discovery, summary judgment, and trial over months or years. At each stage, parties make consequential decisions—about which witnesses to depose, which experts to retain, which motions to file, and whether to settle—based on their understanding of which issues the case presents. Parties cannot make those decisions intelligently if, after judgment, the ground shifts beneath them and the standards on which the case was tried are rewritten. When preservation rules are unduly

relaxed, the resulting uncertainty raises the cost and risk of litigation for businesses and their adversaries alike. Consistent enforcement of those rules lets every party know what it is litigating and plan accordingly.

Holding Leapfrog to its choice does not diminish the protections that the Supreme Court's precedents afford to speech and reputation. It ensures that, in cases where those protections are in play, the parties litigate them when it matters—before the case is tried and judgment is entered.

## CONCLUSION

The Court should affirm the district court's holding that Leapfrog forfeited its argument that the hospitals were required to prove actual malice.

Respectfully submitted,

*/s/ Ashley C. Parrish*
Ashley C. Parrish
Meredith M. Pohl
Megan Michur
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

*Counsel for Amicus Curiae*

Jonathan D. Urick
Katherine M. Ferazzi
U.S. CHAMBER
LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce of the United States of America*

November 20, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), because it contains 5,082 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: November 20, 2026

*/s/ Ashley C. Parrish*
Ashley C. Parrish

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2026, the foregoing was filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will cause a notice of electronic filing to be served on all registered counsel of record.

*/s/ Ashley C. Parrish*
Ashley C. Parrish

*Counsel for Amicus Curiae*