**No. 26-11527**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

GOOD SAMARITAN MEDICAL CENTER, INC., ET AL.,
Plaintiffs/Appellees,

v.

THE LEAPFROG GROUP,

Defendant/Appellant

---

Appeal from the United States District Court
for the Southern District Of Florida, No. 9:25-cv-80526
(Hon. Donald M. Middlebrooks)

---

# BRIEF OF AMICUS CURIAE ASCENSION HEALTH ALLIANCE IN SUPPORT OF PLAINTIFFS-APPELLEES & AFFIRMANCE

---

FOLEY & LARDNER LLP
Jason P. Mehta
jmehta@foley.com
Heather A. Lee
hlee@foley.com
Julia Lewis
Julia.lewis@foley.com
100 N. Tampa St., Suite 2700
Tampa, Florida 33602
(813) 229-2300

*Counsel for Amicus Curiae*
*Ascension Health Alliance*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, *amicus curiae* Ascension Health Alliance ("Ascension") states that it does not have a parent corporation, and no publicly held company owns 10% or more of its stock. The undersigned certifies that, in addition to the persons listed in the Certificates of Interested Persons filed by the parties and other *amici*, the following persons are known to have an interest in the outcome of this case:

1. Ascension Health Alliance, *amicus curiae*
2. Foley & Lardner LLP, counsel for Ascension
3. Lee, Heather A., counsel for Ascension
4. Lewis, Julia, counsel for Ascension
5. Mehta, Jason P., counsel for Ascension

## IDENTITY, INTEREST, & AUTHORITY TO FILE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and (4)(D), Ascension Health Alliance states that it is a Catholic nonprofit healthcare system dedicated to providing quality healthcare to patients regardless of their ability to pay. Ascension is interested in this case because its hospitals are graded by Defendant-Appellant The Leapfrog Group and are requested to take its survey as a part of that process. Ascension hereby confirms that all parties, through their respective counsel, have consented to the filing of this brief.

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Ascension declares that no party's counsel authored the brief in whole or in part, no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and no person other than amicus or their counsel contributed money intended to fund the preparation or submission of the brief.

# TABLE OF CONTENTS

I. INTRODUCTION....................................................................................1

II. STATEMENT OF THE ISSUES....................................................................5

III. SUMMARY OF THE ARGUMENT ..............................................................5

IV. ARGUMENT...........................................................................................7

A. Completing the Survey Imposes Substantial Burdens, and Hospitals Have Legitimate, Safety-Neutral Reasons to Decline It......................................7

1. The Survey Draws on Resources and Staff Across the Hospital. ..........7

2. Burden and Resource Constraints Explain Non-Participation, Not Hidden Poor Performance. .....................................................................9

B. Leapfrog Has Readily Available Alternatives That More Accurately Inform the Public Without Penalizing Nonparticipation...........................14

V. CONCLUSION.........................................................................................16

# TABLE OF AUTHORITIES

## Other Authorities

Am. Hosp. Ass'n, *Regulatory Overload: Assessing the Regulatory Burden on Health Systems, Hospitals and Post-acute Care Providers* (2017).........11, 12

Anirudh Saraswathula et al., *The Volume and Cost of Quality Metric Reporting*, 329(21) JAMA 1840 (2023)...................................................10, 11

Dimitrios Zikos & Mark T. Kato, *Factors Associated with Participation in the Leapfrog Group's Annual Survey Among Acute Care Hospitals in the U.S. Midwest*, 9 J. Hosp. Mgmt. & Health Pol'y (2025)................................12, 13

Lisa Rosenbaum, *Reassessing Quality Assessment—The Flawed System for Fixing a Flawed System*, 386 New Eng. J. Med. 1663 (2022)...........................11

Marjorie A. Erdmann et al., *Transparency in Hospital Safety: A Field Study of 'What It Takes' for Hospitals to Complete the Leapfrog Group Hospital Survey* (2024)...........................................................................8, 9, 10

Mark A. Schuster et al., *Measuring the Cost of Quality Measurement: A Missing Link in Quality Strategy*, 318(13) JAMA 1219 (2017).......................11, 12

# I. INTRODUCTION

Ascension Health Alliance ("Ascension"), through undersigned counsel, respectfully submits this brief as amicus curiae in support of Plaintiffs-Appellees Good Samaritan Medical Center, Inc., Delray Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc., St. Mary's Medical Center, Inc., and West Boca Medical Center, Inc.

Ascension is one of the nation's leading nonprofit Catholic health systems, dedicated to compassionate, personalized care for all, especially those most in need. In the 2026 fiscal year alone, Ascension provided $1.1 billion in care for people living in poverty and other community benefit programs, plus $1.5 billion in unreimbursed care for Medicare patients. Ascension's network reaches 36 states and the District of Columbia, with approximately 98,000 associates, 27,000 aligned providers, 91 wholly owned or consolidated hospitals, and ownership interests in another 27 hospitals through partnerships. Ascension also operates more than 300 ambulatory surgery centers, 22 senior living facilities, and other sites offering a range of healthcare services. Ascension's mission, rooted in the Catholic faith, calls it to serve all people, with special attention to those living in poverty and those most vulnerable.

Ascension cares deeply about providing patient-safety information that is transparent and accurate. The communities Ascension serves depend on safety

information to make some of the most consequential decisions of their lives. Providing inaccurate patient safety data can put patients at risk: data that is falsely skewed positively may result in patients trusting a hospital they would otherwise question. Just as risky is data that is falsely skewed negatively, as it may cause patients to delay or defer care, including emergency care, until they can reach another hospital perceived as "safer." As such, the *accuracy* of hospital safety data is paramount.

Every year, The Leapfrog Group ("Leapfrog") asks Ascension hospitals to complete its annual Hospital Survey (the "Survey"), and twice a year it publishes a hospital safety grade for those hospitals, whether or not they complete the Survey. Ascension's hospitals thus know the Survey from the inside. For years, they have devoted substantial resources to completing it, and they understand what that effort demands. Recently, the decision whether to divert resources from patient care to survey completion is made under a looming threat: in 2024, Leapfrog revised its safety grading methodology to arbitrarily assign hospitals who did not complete the Survey low scores in certain categories, regardless of whether those scores had any basis in reality.[1]

[1] Leapfrog's methodology is described in great detail in the parties' briefs and the District Court's Order. ECF No. 212, p. 6–7. In short, though, Leapfrog's safety grades are calculated using a two-step process revised in 2024 to shorten Leapfrog's look-back, meaning rather than reaching back as many as four grading rounds for a hospital's score on a measure, Leapfrog would reuse a score only if it came from

If this new methodology survives, any hospital that lacks the copious resources required to complete the Survey, or hospitals that are unwilling to reallocate resources away from patient care, almost certainly will be handed a failing safety grade based on inaccurate and misleading scores Leapfrog arbitrarily assigns as punishment for not completing the Survey. Even hospitals that are unable to complete the Survey because they lack the required data due to circumstances beyond their control, such as information technology downtime or third-party outages, are punished for nonparticipation. Nor do Leapfrog's scores distinguish hospitals that received poor safety grades because of poor safety data from those that received poor safety grades because they did not provide any data.

As described in the district court's Order (ECF No. 212),[2] the consequences of such a grade are real. Patients, physicians, employees, insurers, and employers all rely on Leapfrog's safety grades, and failing grades inflict lasting reputational harm. ECF No. 212, p. 1, 31–32, 34–35. But the most critical harm is to patients, who understandably are skeptical of hospitals with poor safety grades and thus delay or

---

one of the last two rounds. Hospitals with no score from the lookback period had previously received the average score of a comparison group. In 2024, if a hospital lacked a score from the prior year (i.e., the last two rounds of grading), Leapfrog began arbitrarily assigned very low "Limited Achievement" scores, bringing down the hospital's overall grade.

[2] In this brief, citations to the filings in the district court action are styled ECF No. [docket entry no.], p. [page no.].

defer care until they can reach another hospital—even if that hospital lacks the specialty care the patient requires.

Recognizing these risks, when Leapfrog invited public comment on its planned changes to its methodology, Ascension submitted a comment letter highlighting the dangers presented in Leapfrog's new methodology. ECF No. 193-22, p. 3–4. Ascension's Executive Vice President and Chief Advocacy Officer Peter M. Leibold told Leapfrog that Ascension "cannot support Leapfrog's proposed update and strongly encourages Leapfrog to refrain from implementing it" because "not all hospitals have the information and/or capabilities to complete" the Survey, and "it is unreasonable for an optional Survey to have such a significant impact" on a hospital's safety grade.[3] *Id.* at 3. Leapfrog ignored these factors and adopted its proposed methodology anyway, with one of its safety grade expert panelists, Dr. Romano, later explaining to colleagues that Leapfrog's "decision to increase the penalty for nonparticipation was a simple business decision . . . It's just business, folks!" ECF No. 212, p. 2.

Ascension has a direct stake in this appeal. If the district court's decision is reversed, Ascension hospitals will face a difficult choice: devote substantial time

---

[3] Mount Sinai Health System and Piedmont Healthcare likewise submitted comments opposing Leagfrog's methodology change and noting the extensive burden survey completion imposes on hospital systems. ECF No. 193-41, p. 3–4.

and resources to completing Leapfrog's Survey, diverting these resources away from patient care and from Ascension's mission to serve the most vulnerable, or decline to participate and risk a low or failing safety grade. What is worse, hospitals who are unable to complete the Survey because they simply lack the required data have this choice made for them—they receive a failing grade, and patients are unable to tell whether that is actually because of poor safety practices, or simply because the hospital lacked the data needed to complete the Survey. Ascension therefore submits this brief to share its experience with the Survey and the burden it places on hospitals.

## II. STATEMENT OF THE ISSUES

Whether the district court properly enjoined Leapfrog from assigning arbitrarily low scores to hospitals as punishment for not completing Leapfrog's Survey despite legitimate, safety-neutral reasons for not completing the Survey and ready alternatives to Leapfrog's capricious methodology.

## III. SUMMARY OF THE ARGUMENT

Hospitals do not participate in Leapfrog's Survey for legitimate reasons that have nothing to do with safety, above all the Survey's substantial administrative burden. Leapfrog ignores this reality, instead assuming hospitals that do not complete the survey must elect not to do so because they have poor metrics to report. Leapfrog then arbitrarily assigns non-participating hospitals low safety scores in

certain categories, bringing down a hospital's overall safety grade and attributing safety failures to hospitals for which there is no evidence. Patients and communities are told that a hospital is unsafe when the only thing Leapfrog actually knows is that the hospital did not fill out its Survey. The district court put it precisely: the grades "purport[] to represent actual patient safety, when in truth they represent punishment for nonparticipation in the Leapfrog Survey." ECF No. 212, p. 28. The scores mislead the public, patients, and communities and cause documented harm to patients and the medical community, for example by prompting patients to leave hospitals against medical advice and to pay twice to receive care elsewhere after being admitted to a hospital with a low safety grade. *See id.* at 31–35.

Leapfrog frames this appeal as a choice between its non-participation penalty and public ignorance. It is no such thing. Leapfrog has ready alternatives that inform the public without punishing anyone or misinforming patients. Just one example of a possible alternative methodology is issuing two grades, one based solely on publicly-available data Leapfrog actually possesses for all hospitals, and one based on that data plus Survey results for hospitals who complete the survey. Thus, affirmance here does not deprive the public of public safety data, it corrects misimpressions Leapfrog creates to coerce hospitals into completing its Survey.

# IV. ARGUMENT

## A. Completing the Survey Imposes Substantial Burdens, and Hospitals Have Legitimate, Safety-Neutral Reasons to Decline It.

### 1. The Survey Draws on Resources and Staff Across the Hospital.

Leapfrog describes its Hospital Survey as "an annual voluntary survey in which Leapfrog asks hospitals to report quality and safety data and then publicly reports that information by hospital." ECF No. 117-18, p. 3 (hospitalsafetygrade.org FAQ). The Survey "is sent out to hospitals once a year," though Safety Grades are issued twice a year. ECF No. 88-94, p. 69–70 (Deposition of Karen Jupiter). These descriptors, however, understate what the Survey asks of hospitals. Running more than *350 pages*, the Survey reaches into nearly every corner of a hospital's operations.[4] Hospitals must gather and submit detailed information about, among many other things, their demographic information, billing, patient rights and ethics, "health care equity," technologies, multiple aspects of clinical processes, training across various topics, reporting mechanisms, leadership structures, and staffing models.

Leapfrog also emphasizes that it charges nothing to participate. ECF No. 88-7, p. 36 ("[P]articipation in the Survey is completely free and always has been."). But a survey that costs no fee is not a survey that costs nothing. Leapfrog's own

---

[4] A copy of the 2026 Survey is available here: https://www.leapfroggroup.org/sites/default/files/Files/2026%20HospitalSurvey_20261020_v9.2%20%28version%202%29.pdf (last accessed November 16, 2026).

Chief Executive Officer acknowledged that it requires "two weeks of staff time." ECF No. 238, p. 97:18–24. Its program manager testified that completing it takes "a tremendous amount of resources." ECF No. 212, p. 27–28. These statements reflect Ascension's own experience. Each year, Leapfrog asks Ascension hospitals to complete the Survey, and each year doing so takes substantial resources from myriad administrative and clinical departments, including, without limitation, executive staff time and leadership attention that would otherwise go to patient care and to Ascension's mission of serving the most vulnerable. Indeed, at least two full-time Ascension employees spend most of the year working on the Survey responses for Ascension's hospitals. At the hospital level, approximately 10-15 employees from departments ranging from labor and delivery to information technology participate in responding to the Survey. If hospitals do not exactly follow the Survey's complicated specifications, Leapfrog's published grades and comparisons will not fairly represent a hospital's performance. For Ascension, and all other hospitals, the absence of a fee does not mean the Survey has no cost.

Independent research tells the same story. Researchers studying "what it takes" to complete the Survey followed a 199-bed hospital through its first attempt and supplied a dedicated project manager to help. *See* Marjorie A. Erdmann et al., *Transparency in Hospital Safety: A Field Study of 'What It Takes' for Hospitals to Complete the Leapfrog Group Hospital Survey* 2 (2024). The hospital had to marshal

a twelve-person team that reached the top of the organization—the chief executive officer, chief nursing officer, chief information officer, and five department directors—as well as several assistants and coordinators. *Id.* at 5. As the authors observed, "the survey required effort by high-level leadership." *Id.* That team logged 177 staff hours, a figure that excludes both the project manager's time and Leapfrog's technical support. *Id.* at 7. A *single section* consumed roughly *78 hours*, including 30 hours of directors' time and 40 hours of a non-manager's time for a medication reconciliation assessment. *Id.* at 7–8. The computerized provider order entry portion pulled a physician, a manager, and a non-manager into a timed exercise lasting six hours. *Id.* The authors concluded that "[t]he process takes significant time from leadership," and the hospital's chief executive estimated that meeting Leapfrog's standards year-round would require $325,000 for additional nurse positions. *Id.* at 2.

**2. Burden and Resource Constraints Explain Non-Participation, Not Hidden Poor Performance.**

For a nonprofit system that serves vulnerable populations, time is among the scarcest of resources, and every hour devoted to a voluntary private survey is an hour taken from patients. That reality exposes the flaw at the core of Leapfrog's methodology: the false premise that hospitals decline the Survey because they have "something to hide." Leapfrog's own safety grade expert panelist admitted that the lowest-score assignment rests on an "assumption" that non-participating hospitals

"are hiding something." ECF No. 237, p. 182:7–12; 272:11–14. The district court rightly dismissed that assumption as "evidence only of a certain hubris." ECF No. 212, p. 27–28. Indeed, the district court found Leapfrog's own expert conceded that neither he nor Leapfrog "performed any analysis to support the notion" that nonparticipation signals worse performance on three of the measures. *Id.* at 27.

The Survey's burden, moreover, does not fall on hospitals in isolation. Hospitals and the people who staff them are already taxed by reporting and quality-improvement obligations, and the Survey is layered on top of the reporting that hospitals already owe to multiple accrediting bodies. *See* Erdmann et al., *supra*, at 3. The scale of that existing load is staggering. A study at the Johns Hopkins Hospital found that, in a single year, preparing and reporting data on 162 quality metrics, including metrics reported to Leapfrog, consumed an estimated 108,478 person-hours and $5,038,218.28 in personnel costs, and $602,730.66 in vendor fees, all before a single dollar went to improving quality. Anirudh Saraswathula et al., *The Volume and Cost of Quality Metric Reporting*, 329(21) JAMA 1840 (2023). That work falls heavily on clinicians: of the 168 personnel whose time the researchers captured, 22 were physicians and 59 held nursing degrees, including 88% of the hospital's quality-improvement staff. *Id.* The authors concluded that "[s]ignificant resources are expended exclusively for quality reporting," noting that government and private rating organizations have pushed quality metrics in efforts that "have

generally not been coordinated." *Id.*; *see also* Lisa Rosenbaum, *Reassessing Quality Assessment—The Flawed System for Fixing a Flawed System*, 386 New Eng. J. Med. 1663, 1663 (2022) (observing that quality measurement has itself become "a massive system," with health systems commonly employing 50 to 100 people at a cost of $3.5 million to $12 million a year to support measurement efforts).

Physician-researchers have made the same point: because collecting, processing, analyzing, and reporting quality data is "costly in time and resources," those resources "are often taken from direct patient care when these activities involve physicians and other clinicians." Mark A. Schuster et al., *Measuring the Cost of Quality Measurement: A Missing Link in Quality Strategy*, 318 JAMA 1219, 1219 (2017). As they put it, such "[m]easurement costs are likely not trivial." *Id.*

The American Hospital Association ("AHA") reached similar conclusions, finding in 2017 that an average-sized community hospital devotes 4.6 full-time equivalent employees, more than half of them clinical staff, to the administrative side of quality reporting, at a cost of roughly $709,000 a year. Am. Hosp. Ass'n, *Regulatory Overload: Assessing the Regulatory Burden on Health Systems, Hospitals and Post-acute Care Providers* 4 (2017).[5] As the AHA's report explained, "[d]uplicative and misaligned reporting requirements, many of which require

---

[5] This cost likely has increased dramatically in the nearly ten years since the AHA published its report.

manual data extraction, create inefficiencies and consume significant financial resources and clinical staff time." *Id.* at 18. Commentators agree that the current system "has created a proliferation of measures, many of which are needlessly burdensome for health care organizations." Schuster et al., *supra*, at 1220. Measures that require their own data collection, such as surveys like Leapfrog's, are among the most costly, and those costs "are usually borne by hospitals and practices." *Id.*

Studies of Survey participation reinforce the point and cut directly against the assumption on which Leapfrog's penalty rests. One direct test comes from a 2025 study of 441 acute care hospitals across Michigan, Ohio, Indiana, Illinois, and Wisconsin, 168 of which (38.1%) did not respond to Leapfrog's Fall 2024 Survey. Dimitrios Zikos & Mark T. Kato, *Factors Associated with Participation in the Leapfrog Group's Annual Survey Among Acute Care Hospitals in the U.S. Midwest*, 9 J. Hosp. Mgmt. & Health Pol'y 4–5 (2025). The authors set out to determine whether responding to the Survey, or not, "holds implications about the quality of care and patient safety." *Id.* at 3. It does not. After controlling for structural characteristics such as hospital size, staffing, and teaching status, the study found "no significant association between survey response status" and measures of patient health and safety, including length of stay, 30-day heart attack mortality, 30-day stroke mortality, or rates of in-patient septicemia. *Id.* at 6. The authors concluded

flatly that "[r]esponding/non-responding to the Leapfrog survey is not directly associated with quality-of-care metrics." *Id.* at 2.

What the study did find is that participation tracks resources. Responding hospitals had significantly more personnel, more registered nurses, more admissions, and more beds; in the authors' words, "larger hospitals, characterized by more beds, staff, and patient admissions, were more likely to respond." *Id.* at 5. The reason is the Survey itself. Completing it demands "personnel, expertise, software, and, of course, time," with quality and safety professionals working alongside IT staff to extract and validate data from electronic medical records, infection control reports, order-entry systems, staffing metrics, and billing records. *Id.* at 3. It "requires multiple leaders, health analysts, and IT professionals," and the authors found that this "labor-intensive" undertaking "can be a significant barrier for smaller or resource-constrained healthcare organizations," "particularly those operating on tight financial margins or limited staff." *Id.* at 9–10. The authors' recommendations are telling: rather than penalizing nonparticipants, they urged Leapfrog to reduce the Survey's burden by eliminating redundant questions or sections, offering a "tiered participation model," and "integrating existing CMS quality reporting data." *Id.* at 10.

In sum, then, this study reflects the reality that a hospital's choice to decline the Survey is a reflection of its size and resources, not its safety.[6] Leapfrog's imputation of negative scores for nonparticipation hides this reality from patients, leaving them unable to distinguish between hospitals with legitimate safety shortcomings and those that were unable to complete the Survey, either because they lacked the resources or requisite data to do so.

### B. Leapfrog Has Readily Available Alternatives That More Accurately Inform the Public Without Penalizing Nonparticipation.

The choice Leapfrog presents, between penalizing hospitals for declining the Survey and thereby leaving the public with a false impression of hospital safety or leaving the public uninformed on safety altogether, is a false one. Myriad grading options are available to Leapfrog. For example, Leapfrog could *accurately* inform the public by grading all hospitals based on the third-party data it has for all hospitals, such as Centers for Medicare & Medicaid Services ("CMS") data, and separately grading the hospitals reporting Survey results. This two-grade system is not novel, and it provides the public with accurate safety grades based on all

---

[6] This is consistent with the district court's finding that "the burdens of the Survey, in conjunction with resource constraints, are more than adequate to explain a hospital's decision not to participate." ECF No. 212, p. 28. And, Ascension warned Leapfrog of this in its 2024 comment on the proposed methodology changing, which advised "not all hospitals have the information and/or capabilities to complete the Hospital Survey." ECF No. 193-22, p. 3.

available data without falsely suggesting hospitals who cannot report certain data must fare poorly on those metrics.

This two-grade system is just one possibility available to Leapfrog that reflects a fair, accurate grading methodology. Another option is reverting to Leapfrog's pre-2024 methodology of assigning composite grades or extended the Survey lookback period (i.e., using a hospital's older scores). Leapfrog's own Expert Panel had adopted a framework calling for composite scores "based on what was known about the hospital's performance, with no penalties for missing data," for the express purpose of "avoid[ing] creating a structural bias in favor of Leapfrog-reporting hospitals." ECF No. 212, p. 40. And the district court found that Leapfrog "*could* have assigned the hospitals 'N/A' scores." *Id.* at 21 (emphasis in original). Leapfrog abandoned these approaches not because they failed to inform the public, but because they did not pressure hospitals into completing its Survey and therefore deprived Leapfrog of hospital data that it sells to third parties, providing Leapfrog a large revenue stream. *See, e.g.,* ECF Nos. 212, p. 35 ("the goal to maximize revenue came at the cost of comprehensive and accurate Safety Grades."); 238, 53:18-20 (testimony of Leapfrog's CEO describing data licensing revenue as "one of the largest sources" of Leapfrog's revenue).

At bottom, there are myriad alternative methodologies available to Leapfrog that accurately reflect hospital safety data and therefore better serve Leapfrog's

purported goal of protecting patients. Leapfrog is free to select among them. What Leapfrog cannot do is randomly assign low scores to hospitals in an effort to coerce hospitals to respond to Leapfrog's Survey. This "simple business decision" jeopardizes, rather than advances, patient safety.

## V. CONCLUSION

Accurate public reporting on hospital safety matters, and nothing in the judgment below stands in its way. What the district court rightly forbade is something else entirely: telling the public that a hospital failed on safety when all it did was decline a voluntary survey. For the foregoing reasons, Ascension respectfully urges the Court to affirm the judgment of the district court.

Respectfully submitted,

/s/ *Heather A. Lee*

Jason P. Mehta
Primary Email: jmehta@foley.com
Secondary Email: laura.marzano@foley.com
Heather A. Lee
Primary Email: hlee@foley.com
Secondary Email: laura.marzano@foley.com
Julia Lewis
Primary Email: julia.lewis@foley.com
Secondary Email: robyn.riddell@foley.com
FOLEY & LARDNER LLP
100 N. Tampa St., Suite 2700
Tampa, FL 33602
Telephone: 813-229-2300

*Counsel for Amicus Curiae Ascension Health Alliance*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,719 words. This brief also complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and (a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2402 in Times New Roman, 14 pt font.

/s/ *Heather A. Lee*
Heather A. Lee