No. 26-11527

**IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

GOOD SAMARITAN MEDICAL CENTER, INC., DELRAY MEDICAL CENTER, INC., PALM BEACH GARDENS COMMUNITY HOSPITAL, INC., d.b.a. Palm Beach Gardens Medical Center, ST. MARY'S MEDICAL CENTER, INC., WEST BOCA MEDICAL CENTER, INC.,

*Plaintiffs-Appellees*,

v.

LEAPFROG GROUP,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Southern District of Florida, No. 9:25-cv-80526-DMM (Hon. Donald M. Middlebrooks)

# BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND FEDERATION OF AMERICAN HOSPITALS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

Norah Rast*
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
norah.rast@lw.com

**Admitted in Washington DC, only.*

Melissa Arbus Sherry
Edward N. Siskel
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

November 20, 2026

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Amici Curiae the American Hospital Association (AHA) and Federation of American Hospitals (FAH) certify that, in addition to those listed in the Leapfrog Group's opening brief (ECF No. 25), the Community Hospitals' response brief (ECF No. 46), and the amici curiae briefs for American Civil Liberties Union, American Civil Liberties Union of Florida, Cato Institute, Institute for Free Speech, and Patient Safety Action Network (ECF No. 28), for PatientRightsAdvocate.org, Inc. and Patients For Patient Safety US (ECF No. 30), for CalPERS, Purchaser Groups, Former Public Officials, and Health Policy Scholars (ECF No. 31), and for Reporters Committee for Freedom of the Press, Consumer Reports, The New York Times Company, and Yelp, Inc. (ECF No. 33), the following listed persons and parties may have an interest in the outcome of this case:

1. American Hospital Association, Amicus Curiae
2. Federation of American Hospitals, Amicus Curiae
3. Latham & Watkins LLP, Counsel for Amici Curiae
4. Rast, Norah, Counsel for Amici Curiae
5. Sherry, Melissa Arbus, Counsel for Amici Curiae

6. Siskel, Edward N., Counsel for Amici Curiae

The AHA certifies that it is a non-profit, tax-exempt membership organization incorporated in Illinois. The AHA has no parent corporation, and no publicly held company has 10% or greater ownership in the AHA.

The FAH certifies that it is a non-profit, tax-exempt membership organization incorporated in New York. The FAH has no parent corporation, and no publicly held company has 10% or greater ownership in the FAH.

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Amici Curiae American Hospital Association and Federation of American Hospitals certify that the foregoing is a full and complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Melissa Arbus Sherry*
Melissa Arbus Sherry
Edward N. Siskel
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

Norah Rast*
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
norah.rast@lw.com

**Admitted in Washington DC, only.*

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..... C-1

TABLE OF AUTHORITIES ..... ii

INTEREST OF AMICI CURIAE ..... 1

STATEMENT OF THE ISSUES ..... 2

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 3

ARGUMENT ..... 6

I. THE PUBLICATION OF CREDIBLE AND RELIABLE INFORMATION ON PATIENT SAFETY AND HOSPITAL QUALITY IS IMPORTANT ..... 6

- A. Hospitals Have Prioritized Public Reporting Of Reliable Hospital Quality And Safety Data ..... 6
- B. Hospitals Must Allocate Finite Resources Among Extensive And Growing Quality Reporting Demands ..... 9

II. HOSPITAL RATINGS UNDERMINE INFORMED PATIENT CHOICE WHEN THEY MISLEAD CONSUMERS ..... 13

- A. Hospital Ratings That Fail To Accurately Communicate What They Measure Mislead And Disserve Patients ..... 14
- B. This Case Illustrates Precisely Why Hospital Ratings That Lack Transparency Mislead Consumers ..... 19
  - 1. Leapfrog Penalized Non-Participating Hospitals While Misrepresenting What Its Safety Grades Reflect ..... 19
  - 2. Leapfrog's Deception Harms Patients And Hospitals ..... 24

CONCLUSION ..... 26

## TABLE OF AUTHORITIES

**Page(s)**

### STATUTES AND REGULATIONS

42 U.S.C. § 1395bb(a) .......... 12

42 C.F.R. § 488.1 .......... 12

42 C.F.R. § 488.4(a) .......... 12

### OTHER AUTHORITIES

AHA, *Hospital Compare Update to Include New Star Ratings, HAC Payment Penalties*, Quality Advisory (Dec. 14, 2017), https://www.aha.org/system/files/advocacy-issues/tools-resources/advisory/2017/171214-quality-adv-star-ratings.pdf .......... 15

AHA, *Task Force on Ensuring Access in Vulnerable Communities* (Nov. 29, 2016), https://www.aha.org/system/files/content/16/ensuring-access-taskforce-report.pdf .......... 6

AHA, *TrendWatch: Aligning Efforts to Improve Quality* (Oct. 2018), https://www.aha.org/system/files/2018-10/AHA_TrendWatch_Report_Quality_Healthcare%20_FINAL.pdf .......... 10, 11, 13, 14, 15, 18

Ass'n of Am. Med. Colls., *Guiding Principles for Public Reporting of Provider Performance*, https://www.chausa.org/docs/default-source/advocacy/030514-guiding-principles-for-public-performance-reporting.pdf?sfvrsn=2 (last visited Nov. 18, 2026) .......... 15

J. Matthew Austin et al., *National Hospital Ratings Systems Share Few Common Scores and May Generate Confusion Instead of Clarity*, 34 Health Aff. 423 (2015) .......... 18

John D. Birkmeyer et al., *Hospital Volume and Surgical Mortality in the United States*, 346 N. Engl. J. Med. 1128 (Apr. 11, 2002), https://www.nejm.org/doi/full/10.1056/NEJMsa012337 .......... 7

Amitabh Chandra et al., *Health Care Exceptionalism? Performance and Allocation in the US Health Care Sector*, 106 Am. Econ. Rev. 2110 (2016), https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20151080 .......... 7, 16

**Page(s)**

Healthcare Ass'n of N.Y. State, *Report on Report Cards* (Nov. 2019), https://www.hanys.org/communications/publications/report_cards/docs/hanys_report_on_report_cards_2019.pdf ........ 7, 8, 9, 10, 11, 13, 17

Thomas A. LaVeist, Lydia A. Isaac & Karen Patricia Williams, *Mistrust of Health Care Organizations Is Associated with Underutilization of Health Services*, 44 Health Servs. Res. 2093 (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC2796316/pdf/hesr0044-2093.pdf ........ 16

Peter K. Lindenauer et al., *Public Reporting and Pay for Performance in Hospital Quality Improvement*, 356 N. Engl. J. Med. 486 (2007), https://www.nejm.org/doi/pdf/10.1056/NEJMsa064964 ........ 9

Gregg S. Meyer et al., *More quality measures versus measuring what matters: a call for balance and parsimony*, 21 BMJ Qual. Saf. 964 (2012), https://qualitysafety.bmj.com/content/qhc/21/11/964.full.pdf ........ 13, 17

Nat'l Quality Forum & Am. Hosp. Ass'n, *Redesigning Care: A How-To Guide For Hospitals and Health Systems Seeking to Implement, Strengthen and Sustain Telebehavioral Health* (2019), https://www.aha.org/system/files/media/file/2020/03/Telebehavioral-Health-Guide-FINAL-031919.pdf ........ 8

*Overview: Hospital Quality Alliance*, CMS.gov (updated Dec. 20, 2006), https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/HospitalQualityInits/downloads/hospitalhqafactsheet200512.pdf ........ 9

Devin G. Pope, *Reacting to rankings: Evidence from "America's Best Hospitals,"* 28 J. Health Econ. 1154 (2009), https://www.sciencedirect.com/science/article/abs/pii/S0167629609000873?via%3Dihub ........ 16

Anirudh Saraswathula et al., *The Volume and Cost of Quality Metric Reporting*, 329 JAMA 1840 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10245189/ ........ 10

**Page(s)**

Zishan K. Siddiqui et al., *Research Letter: Comparison of Services Available in 5-Star and Non-5-Star Patient Experience Hospitals*, JAMA Internal Med. Online (June 10, 2019), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2735444 .......... 7

Logan Trenaman, Mark Harrison & Jeffrey S. Hoch, *What is a star worth to Medicare beneficiaries? A discrete choice experiment of hospital quality ratings*, 2 Health Aff. Scholar 1 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC10986207/pdf/qxad085.pdf .......... 15

## INTEREST OF AMICI CURIAE[1]

The American Hospital Association (AHA) is a national organization that represents nearly 5,000 hospitals, healthcare systems, networks, and other providers of care. AHA members are committed to improving the health of communities that they serve and to helping ensure that care is available to and affordable for all Americans. The AHA provides extensive education for healthcare leaders and is a source of valuable information and data on healthcare issues and trends. It ensures that members' perspectives and needs are heard and addressed in national health-policy development, legislative and regulatory debates, and judicial matters. One way the AHA promotes the interests of its members is by participating as amicus curiae in cases with important and far-reaching consequences for its members.

The Federation of American Hospitals (FAH) is the national representative of more than 1,000 leading taxpaying hospitals and health systems throughout the United States. Members include teaching and non-teaching hospitals in urban and rural parts of America, as well as inpatient rehabilitation, psychiatric, long-term acute care, and cancer hospitals. Dedicated to a market-based philosophy, the FAH provides representation and advocacy on federal health care policy on behalf of its

[1] The parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no entity or person, aside from amici, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

members to Congress, the Executive Branch, the judiciary, media, academia, accrediting organizations, and the public.

Amici and their member-hospitals have long supported public reporting of credible, reliable information about hospital quality and safety, and they devote substantial resources to measuring and reporting that information. Patients rely on hospital ratings to inform consequential decisions about where to seek care. When a safety rating misrepresents what it measures and misleads patients, amici's member-hospitals and their patients suffer the consequences. As the nation's largest associations of hospitals, amici are uniquely positioned to provide this Court with an important practical perspective on why hospital ratings must accurately relay the data they measure, and why the Leapfrog Group failed to do so in this case.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that Leapfrog's Safety Grades, methodology, and related statements are not pure opinions.

2. Whether the district court plainly erred in rejecting Leapfrog's unpreserved First Amendment arguments.

3. Whether the district court erred in holding that Leapfrog's scheme violates the Florida Deceptive and Unfair Trade Practices Act.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Hospital safety ratings can help patients decide where to seek care—but only if they are honest and transparent about what they purport to measure. The Leapfrog Group (Leapfrog) assigns hospitals across the country a "Hospital Safety Grade," on a scale from A to F, based on the results of its voluntary Hospital Survey and data reported to the Centers for Medicare & Medicaid Services (CMS). When a hospital declines to participate in the Hospital Survey—due to resource constraints, limited staff time, or any other reason—Leapfrog imputes artificially low scores for several missing criteria, reweights its model to magnify them, and assigns the non-participating hospital a Safety Grade based on those scores. Rather than inform patients that the resulting low grade is based on a hospital's non-participation, Leapfrog represents that the grade "reflects how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey." Doc. 195-23, pg. 2. Patients, it suggests, are "twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than an 'A' hospital." *Id.*, pg. 1.

Amici and their member-hospitals have a profound stake in the kind of transparent, candid public reporting on hospital safety that Leapfrog's treatment of non-participating hospitals has eschewed. Hospitals helped build the infrastructure of federal public reporting, seeking to offer patients meaningful information about the quality and safety of hospital care to guide their healthcare choices. And, every

year, hospitals collectively invest billions of dollars in gathering and reporting quality and safety data to government and commercial payers, accreditation agencies, professional societies, and other non-governmental organizations like U.S. News & World Report and Leapfrog itself.

Leapfrog frames a hospital's choice not to participate in its voluntary survey as the conduct of "self-interested enterprises" seeking to "hide their data from public scrutiny." Opening Brief (OB) 25. Hospitals that decline participation, Leapfrog says, do so "in order to hide poor safety performance." OB8. Leapfrog's amici, too, suggest that hospitals avoid voluntarily reporting safety information, "especially when an honest rating would cut against their own interests." CalPERS et al. as Amici Curiae Supporting Appellant Br. 11. But the opposite is true: Hospitals invest significant staff time and expense reporting safety and quality data, including mandatory federal measures Leapfrog incorporates into its own ratings. Faced with these demands, a hospital's choice to decline one private organization's voluntary survey, which takes two weeks of staff time to complete and risks diverting resources away from critical patient care, reflects a hospital's rational allocation of finite resources—not hostility to transparency or a desire to conceal poor performance.

Whatever the reason, non-participation does not equate to unsafe care, and a patient safety grade based on non-participation is deceptive because it misleads consumers about what the grade actually reflects, particularly in the absence of full

disclosure of such a counter-intuitive rating system. Ratings like Leapfrog's serve patients only when they accurately communicate what they measure. Patients rely on letter grades and stars to quickly and reliably differentiate hospitals from one another. Ratings that unjustifiably undermine confidence, for example, in a patient's local hospital may mislead patients, cause them to postpone needed healthcare, or lead them to avoid the hospital best equipped to treat them. None of this benefits patients.

This case illustrates that danger. Leapfrog once followed its own Expert Panel's peer-reviewed guidance that patient safety grades should rest on "what was known about the hospital's performance, with no penalties for missing data." Doc. 212, pg. 40 (citation omitted). In 2024, Leapfrog abandoned that principle, adopting the outlier approach of significantly decreasing safety scores for non-participating hospitals—all while communicating to patients that they should use the Hospital Safety Grade to determine where they will receive safe medical care. That change, the district court found, was "deliberately designed to coerce participation" in Leapfrog's survey, *id.*, pg. 23, in a way that would allow it to "maximize revenue," *id.*, pg. 35. Patients, who started avoiding nearby hospitals that may have been best equipped to treat them, suffered the consequences. The district court correctly enjoined Leapfrog from continuing these deceptive and harmful practices, and this Court should affirm.

# ARGUMENT

## I. THE PUBLICATION OF CREDIBLE AND RELIABLE INFORMATION ON PATIENT SAFETY AND HOSPITAL QUALITY IS IMPORTANT

Hospitals have long championed public reporting of credible, reliable information about hospital quality and safety, recognizing that patients depend on that information to make consequential decisions about where to seek care. To that end, hospitals invest substantial time and money every year collecting and reporting a growing body of quality and safety data. In that context, a hospital's decision to decline an additional private organization's separate and burdensome survey reflects a rational allocation of finite resources—not hostility to transparency.

### A. Hospitals Have Prioritized Public Reporting Of Reliable Hospital Quality And Safety Data

Few decisions are more consequential for patients than where to seek medical care. A patient facing a new diagnosis, an upcoming surgical procedure, or a sudden emergency needs timely treatment at a facility within reasonable reach.[2] She also needs high-quality care suited to her medical condition. Hospitals and health systems are not uniform. They differ substantially in the services they offer, the conditions they treat most often, and the outcomes they achieve. Some hospitals,

---

[2] *See, e.g.*, AHA, *Task Force on Ensuring Access in Vulnerable Communities* 10-11 (Nov. 29, 2016), https://www.aha.org/system/files/content/16/ensuring-access-taskforce-report.pdf.

for example, specialize in cardiology and orthopedics but do not offer neurology, obstetric, or oncology units.[3] Patients seeking certain specialized medical procedures, like pancreatic resections, may receive the highest quality care at a high-volume hospital that performs many such procedures every year.[4] Others may be best served by the generalist hospital closest to where they live.

When faced with decisions about where to seek medical treatment, patients and their families may turn to hospital rating systems to help compare hospitals, identify high-quality care, and select providers that best meet their needs.[5] Individual quality measures each have their own—often complex—methodologies for assessing hospital performance, many of which are based on a clinical understanding of care delivery and how to measure it. As a result, an average patient

---

[3] *See* Zishan K. Siddiqui et al., *Research Letter: Comparison of Services Available in 5-Star and Non-5-Star Patient Experience Hospitals*, JAMA Internal Med. Online (June 10, 2019), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2735444 (explaining that certain "elite," five-star hospitals lack generalist medical services that patients need).

[4] *See* John D. Birkmeyer et al., *Hospital Volume and Surgical Mortality in the United States*, 346 N. Engl. J. Med. 1128, 1128-29 (Apr. 11, 2002), https://www.nejm.org/doi/full/10.1056/NEJMsa012337.

[5] *See* Healthcare Ass'n of N.Y. State, *Report on Report Cards* 1 (Nov. 2019) ("*Report on Report Cards*"), https://www.hanys.org/communications/publications/report_cards/docs/hanys_report_on_report_cards_2019.pdf (noting that more consumers are using quality ratings); *see also* Amitabh Chandra et al., *Health Care Exceptionalism? Performance and Allocation in the US Health Care Sector*, 106 Am. Econ. Rev. 2110, 2110-15 (2016), https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20151080 (explaining that higher-rated hospitals generally enjoyed larger market shares and greater growth over time).

would likely find it challenging to use individual quality measures to assess performance. Many patients are thus drawn to simple heuristics—letter grades, stars, and color-coded gauges—to differentiate hospitals from each other and guide their healthcare decisions. A range of federal and state government agencies—along with non-governmental organizations like U.S. News & World Report and Leapfrog—issue those kinds of rankings and "report cards," which seek to help patients make better-informed healthcare choices.[6]

Amici and their member-hospitals have long supported making meaningful information about the quality and safety of hospital care available to the public. Indeed, hospitals and health systems led the way in developing transparent reporting of quality and patient safety data. Amici were founding members of the National Quality Forum (NQF), established in 1999 as an independent, not-for-profit, membership-based organization with the purpose of bringing healthcare stakeholders together to recommend scientifically valid, reliable, and standardized quality measures and to adopt strategies that reduce costs and improve patient care.[7]

---

[6] *Report on Report Cards*, *supra*, at 1, 22-23 (identifying 12 popular hospital report cards).

[7] Nat'l Quality Forum & Am. Hosp. Ass'n, *Redesigning Care: A How-To Guide For Hospitals and Health Systems Seeking to Implement, Strengthen and Sustain Telebehavioral Health*, at PDF pg. 2 (2019), https://www.aha.org/system/files/media/file/2020/03/Telebehavioral-Health-Guide-FINAL-031919.pdf.

In 2002, the AHA, the FAH, and the Association of American Medical Colleges launched the Hospital Quality Alliance, a public-private partnership that encouraged all acute care hospitals in the United States to collect and report data regarding the quality of patient care.[8] Hospitals began submitting data in 2003, and the results became the reporting infrastructure underlying the Department of Health and Human Services' Hospital Compare website.[9] That consumer-oriented website—now called Care Compare—continues to serve as a central repository for information about the quality of care at over 4,000 Medicare-certified hospitals across the country.[10]

### B. Hospitals Must Allocate Finite Resources Among Extensive And Growing Quality Reporting Demands

Hospitals and other healthcare providers invest significant time, money, and labor into collecting and reporting data about quality and safety. In the decades since amici helped launch the Hospital Quality Alliance, hospitals' reporting obligations have ballooned. Hospitals and other providers now face a "staggering number of

---

8 Peter K. Lindenauer et al., *Public Reporting and Pay for Performance in Hospital Quality Improvement*, 356 N. Engl. J. Med. 486, 487 (2007), https://www.nejm.org/doi/pdf/10.1056/NEJMsa064964.

9 *Id.* at 487-88; *see also Overview: Hospital Quality Alliance*, CMS.gov (updated Dec. 20, 2006), https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/HospitalQualityInits/downloads/hospitalhqafactsheet200512.pdf.

10 *Report on Report Cards*, *supra*, at 22.

demands for data from a growing number of stakeholders," including "government and commercial payers, accreditation agencies, professional societies, registries and other organizations."[11] By 2016, state and regional programs alone were using 1,367 different quality measures.[12] And, for 2019, CMS alone was requiring hospitals to report more than eighty different measures.[13]

The financial and logistical burdens associated with collecting and reporting this data are significant. One academic medical center reported 162 unique quality metrics to seven government agencies and private rating organizations—Leapfrog among them—in a single year.[14] Preparing and submitting that data consumed approximately 108,000 staff-hours, costing $5 million in personnel and $600,000 in vendor fees.[15] Extrapolating to the more than 4,100 "acute care, nongovernment hospitals in the US," these findings "suggest annual nationwide expenditures in the billions of dollars simply for reporting quality data."[16]

---

[11] *Id.* at 1.

[12] *Id.* at 4.

[13] AHA, *TrendWatch: Aligning Efforts to Improve Quality* 6 (Oct. 2018), https://www.aha.org/system/files/2018-10/AHA_TrendWatch_Report_Quality_Healthcare%20_FINAL.pdf ("*TrendWatch*").

[14] Anirudh Saraswathula et al., *The Volume and Cost of Quality Metric Reporting*, 329 JAMA 1840, 1840, 1842 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10245189/.

[15] *Id.* at 1840, 1843-44.

[16] *Id.* at 1844.

And the burden is just as (and perhaps even more) substantial for smaller institutions: The average community hospital devotes 4.6 full-time-equivalent staff—more than half of them clinicians—and $709,000 annually to the administrative aspects of quality reporting.[17] Smaller health systems must navigate extensive reporting obligations with fewer supports and infrastructure and with clinicians who "frequently serve in multiple roles, including data collector, reporter, analyzer, information technology specialist and improvement coordinator."[18]

Hospitals willingly meet these reporting demands, even as the administrative burdens of extensive quality and safety reporting expand. Some reports, of course, are not optional. For any hospital that serves Medicare patients, federal reporting obligations are a condition of doing business. Federal law conditions hospitals' Medicare payments on the submission of quality data: A hospital that fails to satisfy the Inpatient Quality Reporting Program's requirements, for example, forfeits a quarter of its annual inpatient payment update.[19] Other CMS programs reduce payments based on hospitals' reported performance on readmissions and hospital-acquired conditions.[20] Most U.S. hospitals also undergo extensive and rigorous

---

[17] *TrendWatch*, *supra*, at 6-7.

[18] *Report on Report Cards*, *supra*, at 2.

[19] *TrendWatch*, *supra*, at 4.

[20] *Id.* at 4-5.

accreditation review by the Joint Commission, whose CMS-approved hospital accreditation program provides a basis for CMS to deem hospitals in compliance with applicable Medicare conditions of participation. *See* 42 U.S.C. § 1395bb(a); 42 C.F.R. §§ 488.1, 488.4(a).

Other reports, like Leapfrog's Hospital Survey, are voluntary. *See* Doc. 212, pg. 2. Leapfrog's chief executive acknowledged at trial that completing the survey requires "'about two weeks of staff time'" each year. *Id.*, pg. 28 (citation omitted). Notwithstanding that time commitment, many hospitals participate in Leapfrog's annual survey. *Id.*, pg. 23. But many others choose not to take on that additional, "voluntary" burden. In 2023, only 64% of hospitals completed Leapfrog's survey, and even after Leapfrog adopted its non-participation penalty, roughly one in five hospitals declined to participate. *See id.*

Leapfrog and its amici suggest that the hospitals that decline to participate in Leapfrog's voluntary survey are "self-interested enterprises" hiding their "poorer [safety] records" from public scrutiny. OB25-26; *see also* CalPERS Amici Br. 11 (suggesting hospitals avoid reporting safety information when not in their interest). Non-participation in one voluntary survey hardly represents a retreat from safety or transparency. Hospitals collect and report vast amounts of quality and safety data every year, much of it publicly available, and they do so precisely because they

believe patients deserve access to reliable, high-quality information to inform their healthcare decisions.

But when the measures are too numerous, data collection activities can overwhelm hospital staff and resources. As the AHA has explained, although quality measurement has helped lead to significant progress in hospital safety, the "'recent explosion' in the number of measures" means that resources are "overinvested in measurement of certain metrics . . . with little left to focus on improvement work, patient-centered health outcomes and other critical areas that are most in need of improvement."[21] Against that backdrop, a decision not to participate in one organization's voluntary survey does not reflect hostility to accountability or a desire to conceal poor performance. To the contrary, those hospitals most dedicated to improving patient safety may reasonably prioritize investing in patient care ahead of completing one voluntary survey like Leapfrog's.

## II. HOSPITAL RATINGS UNDERMINE INFORMED PATIENT CHOICE WHEN THEY MISLEAD CONSUMERS

Hospitals have invested heavily in collecting and reporting quality and safety data because they believe patients deserve reliable information about where to seek

---

[21] *TrendWatch*, *supra*, at 7 (citation omitted); *see also Report on Report Cards*, *supra*, at 1 ("Undue time spent on measurement takes caregivers away from patient care and addressing more meaningful quality and patient safety priorities."); Gregg S. Meyer et al., *More quality measures versus measuring what matters: a call for balance and parsimony*, 21 BMJ Qual. Saf. 964, 964-65 (2012), https://qualitysafety.bmj.com/content/qhc/21/11/964.full.pdf.

care. But hospital ratings disserve patients when they misrepresent what those ratings measure. Patients rely on letter grades and similar evaluative labels to make quick judgments about hospitals, and a deceptive rating risks steering them away from timely, safe, and appropriate care. Non-participation in a voluntary survey does not equate to reduced patient safety, and treating it as such without full disclosure (and while saying the opposite) undermines patient choice. This case illustrates the harms that follow from such misleading ratings.

### A. Hospital Ratings That Fail To Accurately Communicate What They Measure Mislead And Disserve Patients

Hospital ratings are only helpful to patients when they accurately communicate both what they measure and the limits of the conclusions their data support. The AHA has long taken the view that patients and families "expect and deserve accurate, meaningful information on the quality of care in hospitals"—and that public quality report cards that collect, analyze, or display inaccurate information "lead to 'more confusion than clarity.'"[22] To that end, several national hospital associations, including amici, have endorsed a set of principles developed by the Association of American Medical Colleges that calls for quality report cards to: (1) have a "clearly stated purpose, with measures selected to fit this purpose"; (2) "[d]emonstrate transparency by using a scoring methodology that can be replicated

---

[22] *TrendWatch*, *supra*, at 11 (citation omitted).

by others, clearly identifies data sources and describes limitations of quality scores"; and (3) demonstrate validity by using evidence-based and field-tested statistical methods.[23]

Those principles matter because of how patients actually use healthcare ratings. For many patients, simple heuristics like letter grades and stars allow them to quickly differentiate hospitals from each other. A 2024 *Health Affairs Scholar* study, for example, found that, on average, Medicare beneficiaries indicated a willingness to pay an additional $1,698 or travel 185 miles farther for a hospital with a one-star higher rating on CMS's clinical outcomes metric.[24] When that higher (or lower) rating does not accurately reflect a hospital's performance, the simplicity of star ratings and letter grades can be dangerous.

The consequences fall first on patients. Ratings that undermine confidence in a patient's local hospital may lead patients to postpone needed care or pursue costly

---

[23] *Id.* at 11-12 (emphasis omitted); *see also* Ass'n of Am. Med. Colls., *Guiding Principles for Public Reporting of Provider Performance* 1, https://www.chausa.org/docs/default-source/advocacy/030514-guiding-principles-for-public-performance-reporting.pdf?sfvrsn=2 (last visited Nov. 18, 2026); AHA, *Hospital Compare Update to Include New Star Ratings, HAC Payment Penalties*, Quality Advisory 8 (Dec. 14, 2017), https://www.aha.org/system/files/advocacy-issues/tools-resources/advisory/2017/171214-quality-adv-star-ratings.pdf.

[24] Logan Trenaman, Mark Harrison & Jeffrey S. Hoch, *What is a star worth to Medicare beneficiaries? A discrete choice experiment of hospital quality ratings*, 2 Health Aff. Scholar 1, 4 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC10986207/pdf/qxad085.pdf.

alternatives that yield little benefit. Sound decisions about care depend not only on quality but on access, timing, and fit—the right hospital may be the one nearby, or the one with specialists a particular condition requires. *See supra* at 6-7. A rating that misleadingly brands a hospital as unsafe—for example, because it declined to complete a voluntary survey—can drive patients away from both. Timely interventions by care teams are often critical to optimizing patient outcomes. Yet when patients do not trust their healthcare providers or the medical care system writ large, they are more likely to postpone needed care until later stages of disease progression, increasing costs and leading to worse clinical outcomes.[25]

Hospitals suffer, too. As a general matter, hospitals with higher rankings attract significantly more patients, enjoy larger market shares, and see greater growth over time.[26] Conversely, artificially deflated safety and quality scores can trigger a pernicious cycle: patient volumes fall, revenue declines, and hospitals have fewer resources to sustain access to care in their communities. And patients are not the

---

[25] *See, e.g.*, Thomas A. LaVeist, Lydia A. Isaac & Karen Patricia Williams, *Mistrust of Health Care Organizations Is Associated with Underutilization of Health Services*, 44 Health Servs. Res. 2093, 2102 (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC2796316/pdf/hesr0044-2093.pdf.

[26] Devin G. Pope, *Reacting to rankings: Evidence from "America's Best Hospitals*," 28 J. Health Econ. 1154, 1154-64 (2009), https://www.sciencedirect.com/science/article/abs/pii/S0167629609000873?via%3Dihub (hospitals improving rankings attracted significantly more patients); Chandra et al., *supra*, at 2111.

only ones who rely on ratings: Insurers and health plans may use them to steer beneficiaries, while physicians, nurses, and other staff may use them in deciding where to work. *See, e.g.*, Doc. 212, pgs. 32 n.12, 35-37. A rating that misrepresents what it measures distorts the choices of all stakeholders who rely on it.

Inaccurate ratings also undermine the broader enterprise of public reporting. Over the last two decades, the number of publicly available reports rating the quality of hospital care has skyrocketed.[27] Patients can not only navigate to the Care Compare website to identify CMS's star rating of their chosen hospital, but can also reference the hospital's rating on their state department of health website, its ranking on lists like Healthgrades' America's Best Hospitals, IBM Watson Health 100 Top Hospitals, or the U.S. News & World Report Best Hospitals List, and its Leapfrog Group Hospital Safety Grade.[28]

Confusingly for patients, these different reports often use "conflicting information and produce dramatically different ratings."[29] As the AHA has explained, differences in each report's data sources and scoring methodologies can produce contradictory results that "'lead to confusion for the public, providers, and governing boards, and impair the public's ability to make well-informed choices

---

[27] *Report on Report Cards*, *supra*, at 1; *see also* Meyer et al., *supra*, at 965-66.

[28] *See, e.g.*, *Report on Report Cards*, *supra*, at 17.

[29] *Id.* at 1.

about health care providers.'"[30] For example, a 2015 *Health Affairs* study examining hospital performance on four rating systems—Consumer Reports, Healthgrades, Leapfrog, and U.S. News & World Report—revealed that only 10% of the 844 studied hospitals "rated as a high performer by one rating system were rated as a high performer by any of the other[s]."[31]

When ratings diverge for reasons unrelated to performance, that divergence prevents patients from making informed choices. A critical safeguard is transparency about what each score does and does not reflect. And a rating that treats a hospital's decision not to submit data to a voluntary survey as though it were evidence of poor performance—especially without clearly communicating as much—threatens to mislead the very patients whose top priority is finding a hospital committed to patient safety. That danger is especially acute because nothing on the face of such a grade signals the difference: A patient who sees that her local hospital earned a strong CMS star rating but a failing safety grade from Leapfrog has no way of intuiting that the failing grade reflects the hospital's choice not to complete a voluntary survey, rather than anything about how safely it treats patients.

---

[30] *TrendWatch*, *supra*, at 7 (citation omitted).

[31] *Id.* at 11 (citing J. Matthew Austin et al., *National Hospital Ratings Systems Share Few Common Scores and May Generate Confusion Instead of Clarity*, 34 Health Aff. 423 (2015)).

### B. This Case Illustrates Precisely Why Hospital Ratings That Lack Transparency Mislead Consumers

This case reveals the harm that results when hospital safety ratings like Leapfrog's fail to transparently convey what they measure. Leapfrog changed its patient safety grades to penalize non-participation in its voluntary survey while misleading consumers about the nature of its counter-intuitive rating system. Hospitals and patients, who were misled into believing that Leapfrog's new grades reflected hospital safety, suffered the consequences.

#### 1. Leapfrog Penalized Non-Participating Hospitals While Misrepresenting What Its Safety Grades Reflect

When Leapfrog first developed its Hospital Safety Grade, it adopted the approach recommended by a panel of nine national experts who were "invited . . . to develop a composite score to evaluate patient safety in US hospitals." Doc. 194-3, pg. 2. Missing data would be excluded, and Leapfrog would "re-calibrate the weights for the affected hospital(s), using only those measures for which data are available." *Id.*, pg. 4 (peer-reviewed report elucidating Hospital Safety Grade). In that way, Leapfrog "avoided making questionable assumptions about the performance of hospitals with missing data," ensuring that "the composite scores were based on what was known about the hospital's performance, with no penalties for missing data" and no "structural bias in favor of Leapfrog-reporting hospitals." *Id.*; *see* Doc. 212, pg. 40 (referencing same).

In 2024, Leapfrog abandoned that principle, instead adopting the outlier position of penalizing hospitals for failure to respond to its Hospital Survey. It adopted that changed methodology without the approval of its Expert Panel. *See* Doc. 212, pg. 24 n.6. For four measures that ordinarily depend on data from the survey, Leapfrog began assigning non-participating hospitals scores equal to the lowest possible score of any participating hospital. *Id.*, pgs. 5-7. The assigned scores bore no relationship to the hospitals' actual performance. When the plaintiff hospitals last completed the survey, they had scored 370 out of a possible 400 on those four measures; after the change, Leapfrog assigned them a score of 60 out of 400. *Id.*, pg. 27. No participating hospital was assigned a score so low, *see id.*; in fact, the bottom 1% of participating hospitals in spring 2025 received an average score of 282 out of 400, Doc. 203, pg. 12. And Leapfrog reweighted its Safety Grade so that the four measures with artificially deflated scores count for about 31% of non-participating hospitals' grades, versus 24% of participating hospitals' grades. Doc. 212, pg. 7; Doc. 203, pg. 13.

Leapfrog's new methodology, the district court found, was "deliberately designed to coerce participation." Doc. 212, pg. 23. Leapfrog was willing to compromise "comprehensive and accurate Safety Grades" because increasing participation would allow it to "maximize revenue." *Id.*, pg. 35. Leapfrog profits when hospitals complete the survey and earn high grades—and, under its

methodology, the surest path to a high grade runs through its survey. "Leapfrog's marketing materials offer" high-performing hospitals "'designated logos' and licensing structures that enable those hospitals to promote their scores to employees, prospective employees, patients, and the broader community." *Id.*, pg. 17; *see* Doc. 203, pgs. 30-31 (noting that hospitals pay Leapfrog thousands of dollars to license their Safety Grades). Leapfrog also generates revenue by selling access to data collected through the Hospital Survey. The district court found that, in 2022, several insurance groups entered into contracts—some worth up to $252,607—with Leapfrog to obtain hospital data. Doc. 212, pg. 35; *see* Doc. 194-41, pg. 8.

For hospitals, meanwhile, the choice Leapfrog presents is stark: divert scarce staff time to complete a lengthy proprietary survey, or be publicly graded as unsafe. This case illustrates the concern. After Leapfrog changed its methodology, the safety grades of the five plaintiff hospitals plummeted. Doc. 212, pg. 8. But the consequences extend beyond the plaintiff hospitals. In spring 2025, 592 hospitals declined to participate in Leapfrog's survey. *See* Doc. 135, pg. 19 (¶ 180). None received an "A" safety grade while subject to the penalty on all four measures. *See* Doc. 236, pg. 207; Doc. 212, pg. 22. In fact, 96% of non-participating hospitals nationally received a C, D, or F Safety Grade. Doc. 236, pg. 217. For hospitals that submitted survey responses, the grade distribution looked very different: 902 of the

2,237 participating hospitals Leapfrog graded in 2025 received "A" grades, and none received a failing "F" grade. Doc. 212, pg. 22.

The legal problem is not only the change in Leapfrog's methodology. It is also that Leapfrog failed to transparently communicate that its "Safety Grades" had changed significantly based on hospitals' non-participation. *See id.*, pg. 36 (identifying deceptive nature of "the Methodology" itself "in conjunction with the representations made to the viewing public"). As the district court found, Leapfrog's only explanation that a safety score was "assigned to reflect the lack of information available" appeared in a footnote that took multiple clicks to reach, and the methodology was "buried in a document consisting of dozens of pages and not even labeled as being intended for consumers." *Id.*, pg. 30 (emphasis omitted). The court found that "a consumer, upon seeing the 'F' grade may not investigate further," so the relevant "deception may be complete as soon as the grade is viewed." *Id.*

And it was not just nondisclosure; Leapfrog affirmatively (and incorrectly) told consumers that, "[i]f a hospital does not report to the Leapfrog Hospital Survey, other sources of data are used to calculate a Grade." Doc. 195-23, pg. 2; *see* Community Hospitals' Br. 9, 31, 39. Leapfrog's website, too, represented that "[t]he Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Survey." Doc. 212, pgs. 25-26. And Leapfrog encouraged patients to use the safety grades to guide their healthcare decisions. *Id.*, pgs. 30-31;

*see* Doc. 195-31, pgs. 1-2 (Leapfrog webpage explaining "How to Use the Grade"). It cautioned that "patients should always decide where to receive care based on a hospital's *current* Safety Grade." Doc. 212, pg. 23; *see also* Doc. 195-31, pg. 4. And it told patients that its Safety Grade uses a peer-reviewed methodology "calculated by top patient safety experts under the guidance of a National Expert Panel," Doc. 195-39, pgs. 1-2, even as its methodology was not peer reviewed and was changed to punish non-participation without the endorsement of its Expert Panel, Doc. 212, pg. 24 & n.6. Most strikingly, in its "Frequently Asked Questions About The Leapfrog Hospital Safety Grade," Leapfrog's website claims that "Johns Hopkins Medicine researchers estimate that *patients are twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital* than an 'A' hospital." Doc. 212, pg. 24 (crediting concession by Leapfrog's Vice President of Development that "Leapfrog want[s] consumers to think that visiting a hospital with a C, D or F grade could seriously injure or even kill them" (citation omitted)); *see also* Doc. 195-23, pg. 1 (FAQ page).

Even as Leapfrog told consumers that the Safety Grade uses a "public, peer-reviewed methodology," Doc. 212, pg. 24 (citation omitted), Leapfrog never performed any analysis—much less a peer-reviewed analysis—to support the notion that "[s]urvey nonparticipation . . . could be a reliable indicator" of whether non-participating hospitals "actually perform worse" on the relevant safety measures, *id.*,

pg. 27. If anything, the record confirms that a hospital's decision not to complete Leapfrog's survey says nothing about how safely it treats patients. The plaintiff hospitals stopped participating in the Leapfrog Survey not because of declining patient safety, but "because . . . they chose to reallocate resources in the face of significant operational strain" during the COVID-19 pandemic. *Id.*, pg. 8; *see also id.*, pg. 28 ("Testimony at trial made clear that the burdens of the Survey, in conjunction with resource constraints, are more than adequate to explain a hospital's decision not to participate."). And the plaintiff hospitals are by no means alone in making that rational choice. *See supra* at 12-13, 21.

**2. Leapfrog's Deception Harms Patients And Hospitals**

The harms that followed from Leapfrog's lack of transparency and misleading disclosures were exactly as expected. A patient initially declined surgery at one plaintiff hospital, Delray Medical Center, because she was concerned about the Safety Grade and feared she would "die" there. Doc. 212, pg. 33. Another patient who had been admitted and scheduled for surgery at West Boca for an underarm infection left the hospital against medical advice after "seeing media coverage related to West Boca's Safety Grade," increasing the risk that the patient would be "'double-billed'" for treatment at a subsequent facility. *Id.*, pg. 34 (citation omitted). A different patient, who had been admitted for a specialized hand surgery at West Boca—one of the few hospitals in the county with a dedicated hand surgery unit—

left against medical advice "due to the leap frog reviews." *Id.*, pg. 33 (citation omitted).

The same was true on a broader scale. A survey measuring the public's perception of St. Mary's Medical Center determined that the share of surveyed patients who would choose St. Mary's fell from 78 percent to 55 percent in a single year, during which "the only thing that changed . . . was the Leapfrog rating." *Id.* Walk-in emergency department volume declined at every plaintiff hospital. *Id.*, pg. 34-35 (citation omitted). During the same time period, the number of patients *transferred* to St. Mary's increased significantly, especially from a competing "A"-rated hospital. *Id.*, pg. 35. In 2025, that hospital made 568 requests to transfer patients to St. Mary's Medical Center, including hundreds of pediatric patients, for whom St. Mary's is the region's only children's hospital. *Id.* Each of those detours carries a significant, real risk of delayed care and increased patient costs.

These are the predictable consequences of a rating system that misleads the public about the data it reports. Leapfrog's failings do not call into question the value of hospital ratings generally. Nor do they call into question Leapfrog's ratings when it comes to participating hospitals. Amici and their member-hospitals depend on public confidence in quality reporting, and that confidence depends on ratings that mean what they say. And a rating organization is, of course, free to encourage hospitals to share more data. What it may not do, consistent with the interests of the

patients these ratings are meant to serve, is coerce hospitals into participating by adopting a penalty for non-participation and misrepresenting its scores as a measure of patient safety.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Melissa Arbus Sherry*

Melissa Arbus Sherry
Edward N. Siskel
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

Norah Rast*
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
norah.rast@lw.com

**Admitted in Washington DC, only.*

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5,682 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ Melissa Arbus Sherry*
Melissa Arbus Sherry

## CERTIFICATE OF SERVICE

I certify that on November 20, 2026, the foregoing brief was electronically filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system and that all parties were served through the CM/ECF system.

*/s/ Melissa Arbus Sherry*
Melissa Arbus Sherry