No. 26-11527

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

GOOD SAMARITAN MEDICAL CENTER, INC., ET AL.,
Plaintiffs-Appellees,
v.
THE LEAPFROG GROUP,
Defendant-Appellant.

On Appeal from the United States District Court
for the Southern District of Florida
No. 9:25-cv-80526-DMM

**BRIEF OF TECHFREEDOM AS AMICUS CURIAE**
**IN SUPPORT OF PLAINTIFFS-APPELLEES**

November 20, 2026

Bilal Sayyed
(Counsel of Record)
Berin Szóka
TechFreedom
1500 K Street, N.W., Floor 2
Washington, D.C., 20005
703-477-2871
bsayyed@techfreedom.org
Counsel for TechFreedom, Amicus Curiae

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, counsel for Amicus Curiae TechFreedom certifies that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of a party's stock, and other identifiable legal entities related to a party:

1. **American Civil Liberties Union**: Amicus Curiae.
2. **American Civil Liberties Union Foundation**: Counsel for Amici Curiae.
3. **American Civil Liberties Union Foundation of Florida**: Counsel for Amici Curiae.
4. **American Civil Liberties Union of Florida**: Amicus Curiae.
5. **Batista, Robert A.**: Counsel for Plaintiffs-Appellees.
6. **Berwick, Donald M.**: Amicus Curiae.
7. **Better Healthcare Policy Group, The**: Amicus Curiae.
8. **Biggs, Shawna Corrine**: Counsel for Defendant-Appellant.
9. **Billek, Maxwell L.**: Counsel for Defendant-Appellant.
10. **BlackRock, Inc. (BLK)**: Interested entity disclosed in the Certificate of Interested Persons filed by the Reporters Committee for Freedom of the Press and other Amici Curiae (Dkt. 33); publicly traded company, Stock (Ticker) Symbol: BLK.
11. **Blair, Kimberly E.**: Counsel for Defendant-Appellant.

12. **Buzzard, Christine M.**: Counsel for Plaintiffs-Appellees.

13. **California Public Employees' Retirement System**: Amicus Curiae.

14. **Cannon, Michael F.**: Amicus Curiae.

15. **Cardone, Emily**: Counsel for Plaintiffs-Appellees.

16. **Catalyst for Payment Reform**: Amicus Curiae.

17. **Cato Institute**: Amicus Curiae.

18. **Catsambas, Marietta**: Counsel for Amici Curiae.

19. **Chung, Daniel P.**: Counsel for Plaintiffs-Appellees.

20. **Clancy, Carolyn**: Amicus Curiae.

21. **Consovoy McCarthy PLLC**: Counsel for Amici Curiae.

22. **Consumer Reports**: Amicus Curiae.

23. **Coye, Molly Joel**: Amicus Curiae.

24. **Crain, Lee R.**: Counsel for Plaintiffs-Appellees.

25. **Crooks, Jamie**: Counsel for Amici Curiae.

26. **Delray Medical Center, Inc.**: Plaintiff-Appellee; wholly owned subsidiary of non-party Tenet Florida, Inc.; which is in turn a wholly owned subsidiary of non-party Health Services Network Hospitals, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

27. **Dewhirst, David M.S.**: Counsel for Amicus Curiae State of Florida.

28. **Duff, Thomas K.**: Counsel for Defendant-Appellant.

29. **Fairmark Partners, LLP**: Counsel for Amici Curiae.

30. **Families USA**: Amicus Curiae.

31. **Fendrick, Mark**: Amicus Curiae.

32. **Floch, Brandon Scott**: Counsel for Plaintiffs-Appellees.

33. **Florida, State of**: Amicus Curiae.

34. **Gibson, Dunn & Crutcher LLP**: Counsel for Plaintiffs-Appellees.

35. **Ginieczki, Boyce**: Amicus Curiae.

36. **Goins, Jenny**: Amicus Curiae.

37. **Good Samaritan Medical Center, Inc.**: Plaintiff-Appellee; wholly owned subsidiary of non-party Tenet HealthSystem Medical, Inc.; which is in turn a wholly owned subsidiary of non-party Healthcare Network Holdings, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

38. **Harris, Jeffrey M.**: Counsel for Amici Curiae.

39. **Health Services Network Hospitals, Inc.**: Non-party parent corporation of non-party Tenet Florida, Inc.; wholly owned subsidiary of non-party Tenet Healthcare Corporation.

40. **Healthcare Network Holdings, Inc.**: Non-party parent corporation of non-party Tenet HealthSystem Medical, Inc.; wholly owned subsidiary of non-party Tenet Healthcare Corporation.

41. **Herman, Roberta**: Amicus Curiae.

42. **Hooker Odom, Carmen**: Amicus Curiae.

43. **Hvidt, Scott K.**: Counsel for Plaintiffs-Appellees.

44. **Institute for Free Speech**: Amicus Curiae.

45. **Kaplan, Robert M.**: Amicus Curiae.

46. **Laws, Margaret**: Amicus Curiae.

47. **Leapfrog Group, The**: Defendant-Appellant.

48. **Lee, Peter V.**: Amicus Curiae.

49. **Lieberman, Michael D.**: Counsel for Amici Curiae.

50. **Lustbader, Zachary J.**: Former counsel for Defendant-Appellant.

51. **Maloney, Mary Beth**: Counsel for Plaintiffs-Appellees.

52. **Marcus, Jeffrey Eldridge**: Counsel for Plaintiffs-Appellees.

53. **Marcus Neiman & Rashbaum LLP**: Counsel for Plaintiffs-Appellees.

54. **Marcus Rashbaum Pineiro & Meyers LLP**: Counsel for Plaintiffs-Appellees.

55. **Massachusetts Group Insurance Commission**: Amicus Curiae.

56. **Matthewman, Hon. William**: U.S. Magistrate Judge, Southern District of Florida.

57. **Middlebrooks, Hon. Donald M.**: U.S. District Judge, Southern District of Florida.

58. **Modi, Kavi V.**: Counsel for Defendant-Appellant.

59. **Muehlhoff, Jason J.**: Counsel for Amicus Curiae State of Florida.

60. **Nabors, David A.**: Counsel for Defendant-Appellant.

61. **National Alliance of Healthcare Purchaser Coalitions**: Amicus Curiae.

62. **National Partnership for Women & Families**: Amicus Curiae.

63. **Neiman Mays Floch & Almeida PLLC**: Counsel for Plaintiffs-Appellees.

64. **New York Times Company, The (NYT)**: Amicus Curiae; publicly traded company, Stock (Ticker) Symbol: NYT.

65. **O'Kane, Peggy**: Amicus Curiae.

66. **Onayemi, Yinka E.**: Counsel for Amici Curiae.

67. **Palm Beach Gardens Community Hospital, Inc.**: Plaintiff-Appellee (d/b/a Palm Beach Gardens Medical Center); wholly owned subsidiary of non-party Tenet HealthSystem Medical, Inc.; which is in turn a wholly owned subsidiary of non-party Healthcare Network Holdings, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

68. **Parks, Allyson E.**: Counsel for Plaintiffs-Appellees.

69. **Patient Safety Action Network**: Amicus Curiae.

70. **PatientRightsAdvocate.org, Inc.**: Amicus Curiae.

71. **Patients for Patient Safety US**: Amicus Curiae.

72. **Patterson Law Firm, LLC**: Counsel for Amicus Curiae.

73. **Patterson, Thomas E.**: Counsel for Amicus Curiae.

74. **Pineiro, Michael Anthony**: Counsel for Plaintiffs-Appellees.

75. **Pittman, Mary**: Amicus Curiae.

76. **Purchasers Business Group on Health**: Amicus Curiae.

77. **Quinn Emanuel Urquhart & Sullivan, LLP**: Counsel for Defendant-Appellant.

78. **Rashbaum, Daniel Lawrence**: Counsel for Plaintiffs-Appellees.

79. **Reilly, Kevin**: Counsel for Plaintiffs-Appellees.

80. **Reporters Committee for Freedom of the Press**: Amicus Curiae.

81. **Richman, Barak**: Amicus Curiae.

82. **Right Doctor, LLC**: Amicus Curiae.

83. **Rottman, Gabriel**: Counsel for Amici Curiae.

84. **Safran, Dana Gelb**: Amicus Curiae.

85. **Sayyed, Bilal**: Counsel for Amicus Curiae TechFreedom.

86. **Scheffler, Richard M.**: Amicus Curiae.

87. **Schlichting, Nancy**: Amicus Curiae.

88. **Schwartz, Allyson Y.**: Amicus Curiae.

89. **Scoggin, John Paul**: Counsel for Amicus Curiae State of Florida.

90. **Scott, Sydney A.**: Counsel for Plaintiffs-Appellees.

91. **Shaffer, Derek L.**: Counsel for Defendant-Appellant.

92. **Shortell, Stephen M.**: Amicus Curiae.

93. **Simmons, Kevin**: Counsel for Plaintiffs-Appellees.

94. **St. Mary's Medical Center, Inc.**: Plaintiff-Appellee; wholly owned subsidiary of non-party Tenet HealthSystem Medical, Inc.; which is in turn a wholly owned subsidiary of non-party Healthcare Network Holdings, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

95. **Sternberg, Jason D.**: Counsel for Defendant-Appellant.

96. **Szóka, Berin**: Counsel for Amicus Curiae TechFreedom.

97. **Takagaki, Marc Aaron**: Counsel for Plaintiffs-Appellees.

98. **TechFreedom**: Amicus Curiae; has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

99. **Tenet Florida, Inc.**: Non-party parent corporation of Plaintiffs-Appellees Delray Medical Center, Inc. and West Boca Medical Center, Inc.; wholly owned subsidiary of non-party Health Services Network Hospitals, Inc.

100. **Tenet Healthcare Corporation (THC)**: Non-party ultimate parent corporation of Plaintiffs-Appellees; publicly traded on the New York Stock Exchange, Stock (Ticker) Symbol: THC; has no parent corporation.

101. **Tenet HealthSystem Medical, Inc.**: Non-party parent corporation of Plaintiffs-Appellees Good Samaritan Medical Center, Inc., Palm Beach Gardens Community Hospital, Inc., and St. Mary's Medical Center, Inc.; wholly owned subsidiary of non-party Healthcare Network Holdings, Inc.

102. **Tilley, Daniel B.**: Counsel for Amici Curiae.

103. **UNITE HERE HEALTH**: Amicus Curiae.

104. **Uthmeier, James**: Attorney General, State of Florida; Counsel for Amicus Curiae State of Florida.

105. **Valdez, Robert**: Amicus Curiae.

106. **Vanguard Group, Inc., The**: Non-party holder of more than 10% of non-party Tenet Healthcare Corporation's publicly traded stock, as of Tenet's 2026 Proxy Statement.

107. **Venzke, Cody J.**: Counsel for Amici Curiae.

108. **Volpp, Kevin**: Amicus Curiae.

109. **Walker, Helgi C.**: Counsel for Plaintiffs-Appellees.

110. **Wall, Jeffrey B.**: Counsel for Plaintiffs-Appellees.

111. **West Boca Medical Center, Inc.**: Plaintiff-Appellee; wholly owned subsidiary of non-party Tenet Florida, Inc.; which is in turn a wholly owned subsidiary of non-party Health Services Network Hospitals, Inc.; which is in turn a wholly owned subsidiary of non-party Tenet Healthcare Corporation.

112. **Wilson Elser Moskowitz Edelman & Dicker LLP**: Counsel for Defendant-Appellant.

113. **Wood, Courtney**: Counsel for Defendant-Appellant.

114. **Yang, Betty X.**: Counsel for Plaintiffs-Appellees.

115. **Yeh, Charlotte S.**: Amicus Curiae.

116. **Yelp, Inc. (YELP)**: Amicus Curiae; publicly traded company, Stock (Ticker) Symbol: YELP.

117. **Zibas, Jura Christine**: Counsel for Defendant-Appellant.

118. **Zycherman, Lisa**: Counsel for Amici Curiae.

TechFreedom further states, pursuant to Federal Rule of Appellate Procedure 26.1, that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ C-1

TABLE OF AUTHORITIES ........ iii

INTEREST OF TECHFREEDOM ........ 1

STATEMENT OF THE ISSUES ADDRESSED BY TECHFREEDOM ........ 3

SUMMARY OF THE ARGUMENT ........ 3

ARGUMENT ........ 6

I. The District Court's Coercion Findings Describe a Practice Long Recognized as Unfair. ........ 6

A. Leapfrog Used Assigned Grades to Coerce Participation That Supports Its Licensing Revenue, and the Resulting Injuries Satisfy Section 45(n). ........ 6

B. Leapfrog's Advocacy Cases Do Not Protect Grades Conditioned on Participation. ........ 10

C. The Commercial Character of the Challenged Practices Supplies a Limiting Principle. ........ 11

II. The Federal Trade Commission's Deception Authority Is the Standard Florida and Many Other States Have Adopted. ........ 14

A. Congress Charged the Commission with Preventing Deceptive Practices, and Florida and Other States Incorporated the Commission's Standards. ........ 14

B. The Deception Standard Is Designed to Be Proved Without Evidence of Intent, Reliance, or Actual Injury. ........ 15

C. Leapfrog's Proposed Rules Would Remove the Features That Make the Standard Enforceable. ........ 17

III. FTC Deception Law Reaches Misrepresentations About the Evidence and Procedures Supporting a Claim. ........ 19

A. A False Claim of Proof Is Independently Actionable. ........ 19

B. Deception Turns on the Net Impression, Including Whether Disclosures Correct the Message Consumers Receive. ........ 21

IV. Leapfrog's Proposed Rules Would Displace Established Consumer-Protection Standards. ....24

A. Calling a Product Evaluative Does Not Immunize Factual Representations About Its Scores or Their Basis. ....24

B. Public Importance Does Not Add an Actual-Malice Element to Deception Cases....25

CONCLUSION....27

CERTIFICATE OF COMPLIANCE....28

CERTIFICATE OF SERVICE ....29

# TABLE OF AUTHORITIES

## Cases

*Associated Press v. United States*, 326 U.S. 1 (1945) ......................................10, 12

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) .................................12

*Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County, Inc.*, 169 So. 3d 164 (Fla. 4th DCA 2015) ......................................13, 25

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991)................................................26

*FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985) ...16, 22

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965).................................14, 16, 19

*FTC v. Corpay, Inc.*, 164 F.4th 807 (11th Cir. 2026) .........................................7, 15

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ...............................23

*FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010)......................23

*FTC v. Raladam Co.*, 283 U.S. 643 (1931) ...........................................................14

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990).........................10

*Good Samaritan Med. Ctr., Inc. v. Leapfrog Grp.*, No. 9:25-cv-80526-DMM, 2026 U.S. Dist. LEXIS 210965 (S.D. Fla. Mar. 6, 2026)....................................... passim

*Home Performance Alliance, Inc. v. Better Business Bureau of West Florida, Inc.*, 354 So. 3d 1165 (Fla. 2d DCA 2023) .................................................................25

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600 (2003) .........................................................................................................27

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990).............................................24

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)....................................10

*National Commission on Egg Nutrition v. FTC*, 570 F.2d 157 (7th Cir. 1977) .............................................................................................16, 20, 25–27

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)...........................................25

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ..........................................16

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971)............................10

*Orkin Exterminating Co. v. FTC*, 849 F.2d 1354 (11th Cir. 1988) ..................8, 9, 18

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020)...............................10, 11

*PNR, Inc. v. Beacon Property Management, Inc.*, 842 So. 2d 773 (Fla. 2003) ........9

*POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015)...................16, 20, 23

*Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090 (Fla. 3d DCA 2014)..........................................................................................................8

*Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018)...................................................24

*United States v. Alvarez*, 567 U.S. 709 (2012) .............................................4, 12, 26

**Statutes**

15 U.S.C. § 44 ..........................................................................................................14

15 U.S.C. § 45(a) ...................................................................................................3, 14

15 U.S.C. § 45(n) ...........................................................................................passim

Fla. Stat. § 501.201 et seq. ..........................................................................passim

Fla. Stat. § 501.203 ...........................................................................................3, 14, 15

Fla. Stat. § 501.204 ..............................................................................................3, 14

Fla. Stat. § 501.207 ..................................................................................................26

Mass. Gen. Laws ch. 93A, § 2(b) ............................................................................15

Wash. Rev. Code § 19.86.920.................................................................................15

Wheeler-Lea Act, ch. 49, § 3, 52 Stat. 111 (1938) .................................................14

**Other authorities**

*AmeriFreight, Inc.*, No. C-4518, Complaint & Decision and Order (F.T.C. Apr. 13, 2015) ..........................................................................................................20

FTC Policy Statement on Deception, appended to *Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984) ..........................................................................15, 21, 24

FTC Policy Statement on Unfairness, appended to *International Harvester Co.*, 104 F.T.C. 949 (1984)......................................................................7, 9

FTC Policy Statement Regarding Advertising Substantiation, appended to *Thompson Medical Co.*, 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986) ........................................................................20

*True Ultimate Standards Everywhere, Inc.*, No. C-4512, Complaint & Decision and Order (F.T.C. Mar. 12, 2015) ..............................................20

## INTEREST OF TECHFREEDOM

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It regularly advocates for robust First Amendment protection of non-commercial speech, including editorial judgments, ratings, and the content-moderation decisions of online platforms. It also supports enforcement of the consumer-protection laws against deceptive and unfair acts or practices in commerce.

TechFreedom's interest in this case lies where those commitments meet. The rules Leapfrog proposes would weaken the established law of deception and unfairness. Equally, an affirmance that failed to tie liability to commercial acts or practices could invite regulation of protected speech about products, services, and public issues.

TechFreedom’s brief rests liability on the district court's findings that the challenged practices were conducted in trade or commerce, and does not ask the Court to extend consumer-protection enforcement to commentary, journalism, or advocacy that is not part of such a practice.

TechFreedom supports affirmance of the district court’s judgment, entered after a five-day bench trial, because the three constitutional rules Leapfrog proposes—on opinion, disclosure, and actual malice—are inconsistent with the enforcement of established consumer protection law. TechFreedom takes no position on record

disputes beyond the district court's findings and does not address the scope of the injunction.

Bilal Sayyed, Senior Competition Counsel of TechFreedom, was previously the Director of the Federal Trade Commission's Office of Policy Planning (May 2018 through January 2021) and an Attorney Advisor to the Chairman of the Federal Trade Commission (June 2001 through August 2004).

Both parties to this appeal consented to TechFreedom's participation as amicus curiae. Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund its preparation or submission; and no person contributed such money. Fed. R. App. P. 29(a)(4)(E).

## STATEMENT OF THE ISSUES ADDRESSED BY TECHFREEDOM

1. Whether conditioning a hospital's grade on participation in a survey whose completeness supports the rater's licensing revenue, as the district court found, is a commercial practice long recognized as unfair that the First Amendment does not insulate as protected advocacy.

2. Whether the deception framework long established by the FTC, which Florida has incorporated, permits liability for a rating whose net impression is misleading, including misrepresentations about the evidence and procedures supporting it, notwithstanding that the rating is framed as opinion or accompanied by an inconspicuous disclosure.

3. Whether public importance adds an actual-malice element to consumer-protection liability for deceptive or unfair acts or practices in trade or commerce, and whether Leapfrog's proposed rules would weaken federal and state enforcement.

## SUMMARY OF THE ARGUMENT

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). FDUTPA incorporates "the standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts," and directs Florida courts to give those interpretations "due consideration and great weight." Fla. Stat. §§ 501.203(3)(b), 501.204(2). *See* Part II.

The district court's coercion findings describe a practice the Commission has long treated as unfair. The court found that Leapfrog's assignment of the lowest score to non-participating hospitals "was deliberately designed to coerce participation through reputational penalty." *Good Samaritan Med. Ctr., Inc. v. Leapfrog Grp.*, No. 9:25-cv-80526-DMM, ECF No. 212, 2026 U.S. Dist. LEXIS 210965 (S.D. Fla. Mar. 6, 2026) ("Op."), at 23. "It appears," the court added, "that the goal to maximize revenue came at the cost of comprehensive and accurate Safety Grades." Op. 35. The court's findings of substantial, unavoidable injury without countervailing benefit satisfy 15 U.S.C. § 45(n). Leapfrog's advocacy cases do not protect grades conditioned on participation in a survey whose completeness supports licensing revenue. *See* Part I.

Section 5 and FDUTPA apply because the district court's findings, made after a five-day bench trial, show that the challenged practices are commercial in character. The government may restrict false claims "made to effect a fraud or secure moneys or other valuable considerations." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality). Leapfrog licenses its grades data for fees, and the court quoted a record document calling for increased Survey participation to allow "defense of our pricing model and its price points." Op. 35. The participation Leapfrog coerced from hospitals thus served its revenue purposes as well as its data collection. That commercial character supplies a limiting principle: The rules TechFreedom defends

reach acts or practices in trade or commerce, not commentary, journalism, or advocacy that is not part of such a practice. *See* Part I.C.

The court's deception findings rest on the same record, beginning with the buried disclosure. Leapfrog's only explanation that a non-participating hospital's scores had been assigned rather than measured was difficult for consumers to find: The court credited testimony that reaching the relevant footnote required 23 clicks and found that approximately three percent of visitors to the Hospitals' grade pages accessed this explanation of Leapfrog's methodology. Op. 30–31. Leapfrog also represented that its methodology was peer-reviewed, although the court found the challenged methodology had not received that review, Op. 24 & n.6, and it displayed assigned scores beside benchmarks in a way that conveyed actual performance. Op. 25. Under the Commission's net-impression analysis, those are materially misleading acts or practices, whatever the medium that conveys them. Made in the course of what the court found to be a "business practice," Op. 3, those representations may be actionable notwithstanding the First Amendment. *See* Parts III–IV.

Leapfrog asks the Court to adopt three constitutional rules: that its grades and their asserted basis are protected opinion; that its claimed disclosure of its methodology "precludes liability—full stop," Opening Br. 30; and that defamation's actual-malice standard must be met "[r]egardless of the cause of action" asserted, *id.* at 45. Those rules would not be confined to nonprofits: Leapfrog itself likens its grades to

Bloomberg's ESG scores. Opening Br. 28. Each rule would remove a feature of the deception standard that makes enforcement possible. *See* Parts II.C, IV.

TechFreedom urges the Court to affirm the judgment on both unfairness and deception grounds and to decline to adopt the three rules Leapfrog proposes.

## ARGUMENT

### I. The District Court's Coercion Findings Describe a Practice Long Recognized as Unfair.

#### A. Leapfrog Used Assigned Grades to Coerce Participation That Supports Its Licensing Revenue, and the Resulting Injuries Satisfy Section 45(n).

The district court found that Leapfrog designed its treatment of non-participating hospitals to compel participation in its Survey. That participation supports Leapfrog's revenue. Insurers and others license the grades data—contracts in 2022 ranged from $7,500 to $252,607—and the court quoted a record document tying the data's price to participation: "the level of participation should continue to be increased so it can be perceived as the most complete data set and thus allowing defense of our pricing model and its price points." Op. 35 (quoting DE 194-11 at 2). "It appears," the court concluded, "that the goal to maximize revenue came at the cost of comprehensive and accurate Safety Grades." *Id.* Leapfrog's CEO had contemporaneously described imputing the lowest score as "a major incentive to report to the survey." Op. 22. The court found that the lowest-score assignment "was deliberately designed to coerce participation through reputational penalty," and that

participation rose from 73% to 79% following the 2024 change. Op. 23. On that record, the court found that Leapfrog "uses the threat of arbitrarily assigned Safety Grades to coerce participation in the Survey among hospitals that are unwilling or unable to endure what one commentator described as 'blackmail' designed to increase participation." Op. 36.

That finding describes a practice the Commission's unfairness doctrine has long recognized as unfair. The Commission's Policy Statement on Unfairness, appended to *International Harvester Co.*, 104 F.T.C. 949, 1070 (1984) ("Unfairness Statement"), explains that the Commission's unfairness cases are brought "to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision-making," and it identifies "overt coercion" as a practice found unfair on that ground. *Id.* at 1074. The doctrine concerns seller behavior, and the coercion found here served a commercial end: a Survey whose completeness supports the prices Leapfrog charges for its data. Op. 35. *See* Part I.C, *infra*.

The prohibitions on unfair and deceptive practices protect businesses as well as individuals. The district court concluded that the Hospitals, like patients, are consumers of Leapfrog's product, Op. 17, and in *FTC v. Corpay, Inc.*, 164 F.4th 807, 839–41 (11th Cir. 2026), this Court applied Section 45(n) to injuries suffered by business purchasers, the great majority of them small and medium-sized businesses.

A hospital that can avoid an arbitrarily assigned failing grade only by participating in the Survey on Leapfrog's terms, Op. 36, suffers injury of the kind Section 45(n) addresses.

Federal and state enforcers rely on unfairness to address substantial injury under requirements distinct from deception. Under 15 U.S.C. § 45(n), which codified the Unfairness Statement's test, a practice must cause or be likely to cause substantial injury that consumers cannot reasonably avoid and that countervailing benefits to consumers or competition do not outweigh. Florida applies that federal standard under FDUTPA. *Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090, 1096–97 (Fla. 3d DCA 2014). The district court's findings satisfy that standard here.

Leapfrog contends that reversal of the deception findings would leave no substantial basis for unfairness. Opening Br. 58. That contention does not address the court's separate coercion findings or its findings on each unfairness element. Op. 36. In *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1367 (11th Cir. 1988), this Court recognized that unfairness and deception are distinct inquiries, that a practice may violate both prohibitions, and that unfairness need not involve deception.

The injuries found here are of the kind the Commission's unfairness cases address. The court identified patients leaving against medical advice after encountering the grades, including a patient awaiting urgent treatment for an open fracture. It found treatment-delay risks and described charges for initial care that patients

would likely incur again elsewhere. Op. 33–35. The Commission's policy recognizes monetary harm and unwarranted health or safety risks as substantial injury. Unfairness Statement, 104 F.T.C. at 1073.

Reasonable avoidability concerns the opportunity for informed choice. *Orkin*, 849 F.2d at 1365–66. The district court found that patients were unlikely to reach or understand the explanation of assigned scores. Op. 29–31, 36. Leapfrog's warning against refusing emergency care because of a grade did not explain that assignment. Op. 23. Nor did advice to remain for treatment necessarily dispel the apparent belief that the treating hospital was unsafe. The court found that the presentation continued to impair informed choice despite those warnings, also finding that consumers could not reasonably avoid injury. Op. 33–36.

The court also considered Leapfrog's asserted benefit: greater survey participation would improve safety. It found no record support that the nonparticipation penalty improved safety outcomes. Op. 36 & n.13. The importance of accurate hospital-safety information cuts against Leapfrog: It is why unfair and deceptive practices cannot be allowed to distort consumer choice in this field. These findings support unfairness under the modern federal standard, apart from the court's additional application of Florida's public-policy formulation. Op. 37; *PNR, Inc. v. Beacon Property Management, Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

**B. Leapfrog's Advocacy Cases Do Not Protect Grades Conditioned on Participation.**

Leapfrog argues that the coercion findings punish protected advocacy, invoking *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971), *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020). Opening Br. 41–44. Those cases do not reach the practice found here. *Keefe* involved leaflets criticizing a real-estate broker's practices, distributed to pressure him to change them. 402 U.S. at 416–19. *Claiborne Hardware* involved speech and association in support of a civil-rights boycott. 458 U.S. at 910–11. In each, the speaker's pressure operated through public advocacy about the target's own conduct.

*Claiborne Hardware* shows why purpose matters. "At times the difference between lawful and unlawful collective action may be identified easily by reference to its purpose," the Court observed, and the boycotters' "ultimate objectives were unquestionably legitimate." 458 U.S. at 933. The Court distinguished economic regulation, noting that "[u]nfair trade practices may be restricted," *id.* at 912, and later held the decision inapplicable to a boycott whose "undenied objective" was "an economic advantage for those who agreed to participate." *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990). Economic motive is one of several indications that a law is reaching a publisher's "business practices." *Associated Press v. United States*, 326 U.S. 1, 7 (1945).

Leapfrog's practice is different. The district court found that the grades assigned to non-participating hospitals did not reflect those hospitals' safety performance; they were imposed because the hospitals declined to supply data, and they were designed to induce participation that supports the value of the data Leapfrog licenses. Op. 23, 35–36. A grade that purports to measure a hospital's safety, but is actually conditioned on the hospital's participation in the Survey, is not reporting or public advocacy about the hospital's conduct. It is a commercial practice that uses a misleading representation as leverage. *Otto*, which rejected relabeling a professional's speech as conduct, 981 F.3d at 861, did not involve commercial speech, id. at 865, and does not hold that a commercial actor's use of misleading representations to extract participation, and thus revenue, from others is beyond the reach of laws regulating trade or commerce.

Nor does liability depend on whether the practice fits a criminal definition of blackmail. Opening Br. 44. The court used the term in quoting a commentator, Op. 36, and unfairness under Section 45(n) does not require proof of a wrongful threat.

### C. The Commercial Character of the Challenged Practices Supplies a Limiting Principle.

TechFreedom does not ask the Court to hold that every rating or evaluation is subject to consumer-protection enforcement, or even that coercing participation in surveys or ratings is generally actionable. Consistent with the First Amendment,

consumer protection law restricts false claims "made to effect a fraud or secure moneys or other valuable considerations." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality). And a publisher has no "peculiar constitutional sanctuary in which he can with impunity violate laws regulating his business practices." *Associated Press*, 326 U.S. at 7. The question is whether the challenged representations and practices are part of conduct in trade or commerce.

The district court's findings answer it. Leapfrog bought search advertisements displaying the Hospitals' grades; it licensed the grades data to insurers and others for fees; and a record document tied the price of that data to Survey participation. Op. 17, 32, 35. Leapfrog argues that FDUTPA does not reach "speech disseminated to the public free of charge," Opening Br. 57, but those findings—advertising form, reference to a specific service, and economic motivation—together place this case within the commercial-deception principles discussed below. *Cf. Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66–68 (1983). After a five-day bench trial, the court found Leapfrog's approach to be "an unfair and deceptive business practice," Op. 3, and its findings are reviewed for clear error. Opening Br. 19.

The representations to consumers are part of that practice. They describe what Leapfrog licenses: Insurers and others pay for the Safety Grades, Op. 35, 41, so a statement about how the grades are produced is a statement about the licensed product. And they supply the leverage: The court found that Leapfrog intended

consumers to rely on the grades "as accurate representations of hospital safety, thereby leveraging consumer perception to force hospitals back into participating in the Leapfrog Survey." Op. 20. Misleading consumers was thus the means by which Leapfrog coerced the participation that supports its licensing revenue. Misleading claims made to that end are of the kind *Alvarez* describes.

*Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County, Inc.*, 169 So. 3d 164 (Fla. 4th DCA 2015), which reinstated a FDUTPA claim against a local Better Business Bureau, involved allegations that the rater failed to disclose that its grades relied partly on whether a business had paid to become accredited. *Id.* at 167. The rating practices here are likewise tied to the rater's revenue: the district court found that Leapfrog penalized hospitals that declined to participate in a survey whose completeness supports the value of the data it licenses, Op. 35–36, and Leapfrog markets licenses that let high-scoring hospitals promote their grades, for which hospitals "may pay." Op. 17.

Affirmance on this record would reach acts or practices that the trial record shows were conducted in trade or commerce—including a rater's representations about how it produced the ratings it licenses and its use of those ratings to compel participation that supports its licensing revenue—rather than commentary, journalism, or advocacy that is not part of such a practice.

## II. The Federal Trade Commission's Deception Authority Is the Standard Florida and Many Other States Have Adopted.

### A. Congress Charged the Commission with Preventing Deceptive Practices, and Florida and Other States Incorporated the Commission's Standards.

Section 5 of the Federal Trade Commission Act directs the Commission to prevent "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1)–(2). As originally enacted, Section 5 reached only "unfair methods of competition," and in *FTC v. Raladam Co.*, 283 U.S. 643, 647–49 (1931), the Supreme Court held that the Commission could not challenge false advertising without proof of injury to a competitor. Congress closed that gap in the Commission's consumer-protection authority by adding "unfair or deceptive acts or practices." Wheeler-Lea Act, ch. 49, § 3, 52 Stat. 111 (1938). Since then, injury to consumers has been an independent basis for federal enforcement. The Supreme Court has recognized the Commission's expertise in identifying deception. *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 385 (1965).

FDUTPA directs courts to give "due consideration and great weight" to FTC and federal-court interpretations of Section 5(a)(1), Fla. Stat. § 501.204(2), and defines a violation to include conduct contrary to "the standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts," *id.* § 501.203(3)(b). Unlike the FTC Act, *see* 15 U.S.C. § 44, Florida's definition of "trade or commerce" expressly includes "any nonprofit or not-for-profit

person or activity" and reaches the distribution of any "thing of value," "whether by sale, rental, or otherwise." Fla. Stat. § 501.203(8). *See* Part I.C, *supra*.

Every state has a consumer-protection statute modeled in whole or in part on Section 5, and Massachusetts and Washington have provisions comparable to Florida's. Mass. Gen. Laws ch. 93A, § 2(b); Wash. Rev. Code § 19.86.920. The practical effect is that the Commission's interpretation of deception guides state enforcement as well as federal.

**B. The Deception Standard Is Designed to Be Proved Without Evidence of Intent, Reliance, or Actual Injury.**

Under the Commission's Policy Statement on Deception (1983), appended to *Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984) ("Deception Statement"), a practice is deceptive if it involves a representation, omission, or practice likely to mislead consumers acting reasonably in the circumstances, on a matter material to their decision. *Id.* at 174–83. This standard differs from common-law fraud in four respects that matter to enforcement against acts or practices in trade or commerce. Proof of intent is unnecessary. Proof that any particular consumer relied on the representation is unnecessary. Likelihood of deception suffices; actual injury need not be shown. And materiality is presumed for express claims and for claims concerning health or safety. *Id.* at 182 & n.47; *Corpay*, 164 F.4th at 834–36. These features

permit an enforcer to establish deception by examining what a presentation conveys to a reasonable consumer, without litigating the defendant's state of mind.

Section 5 is directed at "acts or practices." The practice—the conduct—that the Commission challenges in a deception case is the making of a material misrepresentation, whether the misrepresentation is conveyed by words, by a demonstration, by a label, or by a number. *Colgate-Palmolive*, 380 U.S. at 386–90. Defendants in the Commission's cases have sometimes asserted that the First Amendment protects the challenged representations. Where a finding of material deception has been sustained, those defenses have not defeated liability. *National Commission on Egg Nutrition v. FTC,* 570 F.2d 157, 162–64 (7th Cir. 1977); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42–47 (D.C. Cir. 1985); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 499–500 (D.C. Cir. 2015). *See* Part I.C, *supra*.

As the Supreme Court has explained, the government "does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). In Commission practice, and in the experience of TechFreedom's counsel, a former Director of the FTC's Office of Policy Planning, and advisor to the FTC Chairman, the dispositive question in a deception case is whether the representation is materially misleading. Unfairness is different: it is directed at the practice and has never required proof that anything was misstated. See 15 U.S.C. § 45(n).

**C. Leapfrog's Proposed Rules Would Remove the Features That Make the Standard Enforceable.**

Leapfrog asks this Court to hold that a rating and factual assurances about its basis are protected opinion, that disclosure of a methodology on a website defeats a deception claim, and that liability for misleading representations on a matter of public concern requires proof of actual malice. Opening Br. 21–40, 44–49. Because Leapfrog frames its proposed rules as constitutional requirements, they would apply directly to state enforcement under FDUTPA and its counterparts, and to the FTC's Section 5 actions in this Circuit whenever a defendant frames its ratings, health claims, or assurances of testing as opinion on a matter of public concern—notwithstanding their essentially commercial purpose. Leapfrog does not confine these proposed rules to nonprofits. *See* Opening Br. 28 (likening its grades to Bloomberg's ESG scores).

*Opinion.* Leapfrog's first rule would treat a rating's asserted basis as protected opinion. Opening Br. 23–29. The Commission's deception cases have long distinguished the evaluation from verifiable assertions about how it was produced—whether a test occurred, a review was performed, or a comparison rests on like data. Treating those assertions as opinion would remove the objective inquiry into what a presentation conveys, and would reach any commercial rater that markets its methodology as a reason for trust but engineers that methodology to maximize its revenue. *See* Part IV.A, *infra*.

*Disclosure*. Leapfrog's second rule would make a claimed disclosure conclusive: In its words, disclosure "precludes liability—full stop." Opening Br. 30. That rule proves too much. The deception standard asks whether a qualification changes the message reasonable consumers receive. A rule that makes the existence of a qualification dispositive, without regard to placement, prominence, or comprehension, would permit a seller to defeat a deception claim by placing the correction where consumers will not find it. *See* Part III.B, *infra*.

*Actual malice*. Leapfrog's third rule would import defamation law's requirement of clear and convincing proof of actual malice "[r]egardless of the cause of action" asserted. Opening Br. 45. The Commission has never been required to prove scienter to establish deception in trade or commerce; an intent requirement would convert deception enforcement into litigation over the defendant's state of mind.

The Commission's unfairness cases would be affected as well. The practices challenged in those cases, including coercion, undue influence, and the unilateral breach at issue in *Orkin*, are routinely carried out through words, and the Commission's authority over them has never depended on the truth or falsity of the words used. A constitutional rule framed around opinion or actual malice would reach those cases, although the Commission has policed coercive practices for decades without reaching journalism or advocacy.

## III. FTC Deception Law Reaches Misrepresentations About the Evidence and Procedures Supporting a Claim.

Consumers credit claims of testing, certification, and independent review because they cannot verify them. For enforcers, the distinction between a product's asserted merits and the evidence represented to support them therefore has practical significance. An investigation may establish that the promised test did not occur, that the claimed independent review was not performed, or that a comparison conveys information the underlying figures do not support. Those facts can establish deception even when the enforcer cannot settle the ultimate scientific or evaluative question.

### A. A False Claim of Proof Is Independently Actionable.

*Colgate-Palmolive*, 380 U.S. at 386–90, establishes the governing distinction. The advertiser presented a simulated shaving demonstration as an actual test of its product. The Supreme Court sustained the Commission's treatment of that misrepresentation as material even if the product could perform as advertised. The supposed demonstration supplied a reason to believe the product claim. An advertiser could not substitute its assurance that the product worked for the evidence consumers had been told they were seeing. If liability instead required proof that the product could never achieve the advertised result, a seller could fabricate evidence and then force the government to litigate the product's efficacy.

The distinction also governs scientific-support claims. In *POM Wonderful*, 777 F.3d at 490–91, the court distinguished an efficacy claim, which represents that a product works, from an establishment claim, which additionally represents that evidence establishes the result. An advertiser claiming a particular level of support must possess the support represented. *See* FTC Policy Statement Regarding Advertising Substantiation, appended to *Thompson Medical Co.*, 104 F.T.C. 648, 839–40 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986).

Disagreement within a field does not eliminate that inquiry. *Egg Nutrition*, 570 F.2d at 161–64, permitted the advertiser to dispute the evidence linking egg consumption to heart disease, but sustained enforcement against denying the existence of scientific evidence that the record showed existed. The existence of the evidence and the conclusion properly drawn from it were different questions.

Commission practice applies the same principle to certification and review. The FTC's complaint against TRUSTe alleged that promised annual recertifications had not occurred in more than 1,000 instances. *True Ultimate Standards Everywhere, Inc.*, No. C-4512, Complaint ¶¶ 13–16 & Decision and Order pt. I (F.T.C. Mar. 12, 2015). The Commission's complaint against AmeriFreight challenged representations that favorable ratings rested on unbiased customer reviews when the company had supplied undisclosed incentives to reviewers. *AmeriFreight, Inc.*, No. C-4518, Complaint ¶¶ 13–16 & Decision and Order pts. I–II (F.T.C. Apr. 13, 2015).

*AmeriFreight* and TRUSTe, though settlements, demonstrate the Commission's application of established deception principles to the factual assurances that make ratings and certifications valuable.

Extending First Amendment protection to factual assurances about how a rating or certification was produced would obstruct cases involving purported testing, certification, or independent review. An enforcer could establish that the promised procedure did not occur and still be unable to proceed without disproving the rating itself. Leapfrog's peer-review assurance illustrates why that additional requirement is misplaced. The district court found the claimed review absent. Op. 24 & n.6. Indeed, the 2013 peer-reviewed publication memorializing the Expert Panel's original approach described composite scores "based on what was known about the hospital's performance, with no penalties for missing data." Op. 40. Even if the resulting grade could otherwise be defended—and the court found this method of imputation "neither reliable nor defensible," Op. 28—the practice at issue is asserting peer review that did not occur.

### B. Deception Turns on the Net Impression, Including Whether Disclosures Correct the Message Consumers Receive.

A practice is deceptive if the net impression it conveys is likely to mislead consumers acting reasonably in the circumstances. Deception Statement, 103 F.T.C. at 175–80. A representation may mislead by implication even when its individual

components are literally accurate, so enforcers need not accept the seller's preferred literal interpretation when the complete presentation conveys a different, reasonable understanding.

*Brown & Williamson*, 778 F.2d at 40–43, demonstrates the importance of this rule for numerical claims. A tar content figure derived from a testing method misled consumers because it appeared comparable to other cigarettes' ratings. The number's accuracy under the advertiser's method did not establish the accuracy of the comparison. The court also examined whether the disclaimer dispelled the misleading impression.

That distinction matters wherever a seller uses a common scale to compare products or services. If correct computation were sufficient, an enforcer confronting a misleading performance comparison would have to identify an arithmetic error even when the deception lay in comparing unlike information.

The "Declined to Report" displays illustrate that problem here. Leapfrog used that label and question marks for some missing measures, while displaying low numbers for others against best, average, and worst benchmarks. One assigned score of 15 appeared beside a best score of 100, an average of 82.22, and a worst score of 15. Op. 11–14. The district court found that the contrast indicated actual performance where the score actually reflected missing information. Op. 25. Its rejection of a "technically" true counterfactual, Op. 21, is consistent with *Brown & Williamson*:

reproducing a final letter grade does not establish the accuracy of the comparison consumers understood.

A claimed disclosure is part of the net-impression inquiry, not an automatic defense to it. In *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200–01 (9th Cir. 2006), disclosures did not necessarily cure a solicitation's misleading overall impression. *FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010), likewise rejected reliance on general disclaimers to answer specific claims. *POM Wonderful* assessed the advertisements as a whole and sustained findings that qualifications did not neutralize the claims conveyed. 777 F.3d at 491–93.

The district court's findings show why availability alone is insufficient. The court credited testimony that reaching the footnote explaining that a score had been assigned required 23 clicks; found that approximately three percent of visitors to the Hospitals' grade pages accessed the scoring methodology; and noted that the methodology reveals the imputation process only on page 16 of a 26-page document that Leapfrog's CEO testified is "not meant to be used by the average lay person." Op. 30–31. Viewers would already have received the misleading impression before reaching Leapfrog's footnotes and methodology document, Op. 12–15, 25–26 & n.7, 30, and Leapfrog's own consumer-facing statement that a grade "reflects how well a hospital does on safety, not whether they complete the Leapfrog Survey" contradicted whatever the footnote conveyed. Op. 25.

The reasonable-consumer and materiality requirements supply further limits. An enforcer must establish a misleading interpretation that is reasonable in context and matters to consumer choice. Deception Statement, 103 F.T.C. at 177–83. The statement does not impose liability for every possible misunderstanding or every omitted fact.

## IV. Leapfrog's Proposed Rules Would Displace Established Consumer-Protection Standards.

### A. Calling a Product Evaluative Does Not Immunize Factual Representations About Its Scores or Their Basis.

Section 5 and FDUTPA regulate practices in trade or commerce, and a practice is not exempt because it is carried out through words. *See* Part II.B, *supra*. Nor does an opinion label exempt it. *Milkovich v. Lorain Journal* Co., 497 U.S. 1, 18–21 (1990), rejected a "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich* also preserved the requirement that a plaintiff suing over statements on matters of public concern about public figures or officials prove actual malice, *id.* at 20–21, and TechFreedom does not suggest otherwise for defamation claims. The point here is narrower: an opinion label does not answer whether a commercial actor's verifiable representations about its own process were materially misleading. This Court likewise examines expression in context and in its totality. *Turner v. Wells*, 879 F.3d 1254, 1262–63 (11th Cir. 2018).

The assigned scores were themselves representations of fact: A numerical score displayed against best, average, and worst benchmarks communicates a measured result, and the court found that Leapfrog intended it to. Op. 25–26. Leapfrog characterizes its grades and its treatment of missing information as protected judgments. Opening Br. 23–29. Even an evaluative component does not require courts to disregard the factual meaning conveyed by the presentation as a whole. The grades, the methodology for calculating them, and the accompanying assurances must be read together.

Florida courts have likewise allowed FDUTPA claims directed at a rating entity's representations about how businesses were rated. *Caribbean Cruise Line*, 169 So. 3d at 167; *see also Home Performance Alliance, Inc. v. Better Business Bureau of West Florida, Inc.*, 354 So. 3d 1165, 1166–67 (Fla. 2d DCA 2023) (rating itself was nonactionable opinion, but plaintiff should have been given leave to plead a FDUTPA claim).

**B. Public Importance Does Not Add an Actual-Malice Element to Deception Cases.**

Deception in trade or commerce has never turned on the defendant's subjective fault, even on matters of public controversy. *Egg Nutrition* rejected the argument that a trade association's misrepresentations on a controversial public-health issue required proof of deliberate falsity or reckless disregard for truth. The association

invoked the protection afforded public-figure defamation under *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). The court declined to apply that standard to statements made to persuade readers to buy eggs. 570 F.2d at 161–63.

TechFreedom's argument here is limited to deceptive acts or practices in trade or commerce. Adding actual malice would require evidence about the defendant's subjective knowledge or serious doubts, even when the falsity or misleading impression had already been established.

Leapfrog argues that reputational injury requires clear-and-convincing proof of actual malice regardless of the cause of action pleaded, and that speech on matters of public concern cannot support the judgment without that showing. Opening Br. 44–49. But a deceptive comparison can affect a competitor's reputation while also misleading consumers about the promoted product. The FTC's enforcement interest concerns the latter deception, and *Egg Nutrition* does not make its liability standard depend on the absence of an accompanying reputational effect. Nor did the Hospitals' claim depend on reputational injury. FDUTPA is a law of general applicability, and the same practices would be actionable by the Florida Attorney General without a showing of injury to any particular person. Fla. Stat. § 501.207(1); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670–72 (1991).

The fraud decisions cited by Leapfrog do not require importing scienter into every deception case. The plurality in *Alvarez*, 567 U.S. at 723, recognized that false

statements made to effect fraud or obtain money or other valuable consideration may be restricted. *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 617–20 (2003), permitted a fraud action targeting misleading fundraising representations despite the protected character of charitable solicitation. The elements of the fraud claim in *Madigan* govern that theory; they do not displace *Egg Nutrition*'s treatment of the proposed heightened fault requirement for deception in trade or commerce. Should the Court reach the merits, TechFreedom asks the Court to preserve that distinction.

## CONCLUSION

The Court should affirm the district court's judgment that Leapfrog's practices were unfair and deceptive under FDUTPA, and should decline to adopt the three rules Leapfrog proposes.

Respectfully submitted,
*/s/Bilal Sayyed*

Bilal Sayyed
(Counsel of Record)
Berin Szóka
TechFreedom
1500 K Street, N.W., Floor 2
Washington, D.C., 20005
703-477-2871
bsayyed@techfreedom.org
Counsel for TechFreedom, Amicus Curiae
November 20, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FRAP 29(a)(5) because it contains 5864 words, excluding the parts exempted by FRAP 32(f).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/Bilal Sayyed*

Bilal Sayyed

## CERTIFICATE OF SERVICE

I certify that on November 20, 2026, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/Bilal Sayyed*

Bilal Sayyed