No. 26-11527

# United States Court of Appeals for the Eleventh Circuit

GOOD SAMARITAN MEDICAL CENTER, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

THE LEAPFROG GROUP,

*Defendant-Appellant.*

On Appeal From The United States District Court
For The Southern District Of Florida
No. 9:25-cv-80526 (Hon. Donald M. Middlebrooks)

**PLAINTIFFS-APPELLEES' SUPPLEMENTAL APPENDIX**
**VOLUME 2 OF 4**

MARY BETH MALONEY
LEE R. CRAIN
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

JEFFREY B. WALL
*Counsel of Record*
HELGI C. WALKER
CHRISTINE M. BUZZARD
ROBERT A. BATISTA
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
jwall@gibsondunn.com

*Counsel for Plaintiffs-Appellees The Community Hospitals*

# TABLE OF CONTENTS

Docket #/Tab

## Volume 1

District Court Docket Sheet .......... A

Pretrial Stipulation .......... 129

## Volume 2

The Community Hospitals' Pretrial Proposed Findings of Fact and Conclusions of Law .......... 136

Slack Exchange between Melissa Danforth and Alexandra Campione .......... 189-28

Email Exchange between Alexandra Campione and Dr. Patrick Romano re: Proposed Text for Imputation Change .......... 189-55

Email Exchange between Alexandra Campione and Paulina Litter re: New Imputation Denotation .......... 189-84

## Volume 3

2025 Leapfrog Hospital Survey .......... 189-106

## Volume 4

2025 Leapfrog Hospital Survey (cont'd) .......... 189-106

The Leapfrog Group Form 990 .......... 190-7

Slack Exchange between Alexandra Campione and Paige Lipscomb .......... 194-59

Email Exchange between Leah Binder and Ben Choi re: Revised FY24 Forecast .......... 194-122

Webpage – Frequently Asked Questions About The Leapfrog Hospital Safety Grade .......... 195-23

Webpage – How to Use the Grade ........ 195-31

Webpage – Hospital Safety Grade Profile for Delray Medical Center, Fall 2025 (Practices to Prevent Errors) ........ 195-53

Webpage – Hospital Safety Grade Profile for Delray Medical Center, Fall 2025 (Doctors, Nurses & Hospital Staff) ........ 195-54

# TAB 136

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:25-CV-80526-DMM

GOOD SAMARITAN MEDICAL CENTER, INC., et al.,

*Plaintiffs*,

v.

THE LEAPFROG GROUP,

*Defendant*.

**THE COMMUNITY HOSPITALS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Betty X. Yang (*pro hac vice*)
Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
byang@gibsondunn.com
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT....................1

FINDINGS OF FACT....................7

I. THE PARTIES....................7

A. The Community Hospitals....................7

B. The Leapfrog Group....................8

II. THE WITNESSES....................9

A. The Community Hospitals' Witnesses....................9

B. Leapfrog's Witnesses....................11

III. LEAPFROG'S SURVEY AND SAFETY GRADE....................14

A. Leapfrog's Survey....................14

B. Leapfrog's Safety Grade....................17

C. How Leapfrog Calculates the Safety Grades....................20

IV. LEAPFROG'S MONETARY INTEREST IN SURVEY PARTICIPATION....................24

A. Leapfrog's Revenue Streams....................24

B. Leapfrog's Revenue Streams Depend on Survey Participation....................29

V. THE FALL 2024 CHANGE TO LEAPFROG'S SAFETY GRADE METHODOLOGY....................32

A. Leapfrog's Approach to Imputation Prior to 2024....................32

B. Declining Survey Participation and Leapfrog's Focus on Increasing Revenue....................34

C. Leapfrog's April 12, 2024 Expert Panel Meeting....................36

D. Leapfrog Employees Develop Its New Methodology *After* the Expert Panel Meeting Without Expert-Panel Input....................42

E. Hospitals Criticize the Proposed Methodology During Public Comment Period....................51

F. Leapfrog's Internal Deliberations on Disclosure of the Proposed Methodology ..... 53

G. Leapfrog Conceals the Punitive Nature of the Methodology ..... 55

H. Leapfrog Adopts the Proposed Methodology Despite Criticism, Resulting in Record Participation ..... 60

VI. THE SAFETY GRADE METHODOLOGY LEAPFROG ADOPTED IS UNRELIABLE AND PUNISHES NONPARTICIPATING HOSPITALS ..... 60

VII. LEAPFROG PUBLICLY MISREPRESENTS ITS METHODOLOGY AND SAFETY GRADES ..... 68

A. Overview of Leapfrog's Safety Grade Website ..... 68

B. Safety Grade Webpages Do Not Explain the "Imputation Methodology" or Clearly Indicate Non-Participation ..... 69

C. Leapfrog's Public-Facing Representations About Its Methodology ..... 84

D. Leapfrog's Sole Safety Grade Methodology Disclosure Is Difficult To Access and Comprehend and Is Itself Misleading ..... 93

E. Leapfrog's Recent, Surreptitious Changes to Its Consumer-Facing Websites and Materials After the Close of Discovery Underscore Its Deceptive Practices ..... 102

VIII. CONSEQUENCES OF THE FALL 2024 SAFETY GRADE METHODOLOGY for the COMMUNITY HOSPITALS' SAFETY GRADES ..... 106

A. The Community Hospitals' Safety Grades Following the Fall 2024 Methodology Change ..... 106

B. Leapfrog's Safety Grades Are Designed To Impact Hospital Reputations in Their Communities and Do Just That ..... 109

C. Harm to the Community Hospitals and their Patients ..... 117

D. The Damage Is So Pronounced the Community Hospitals Are Forced To Consider Participating in Leapfrog's Survey ..... 124

PROPOSED CONCLUSIONS OF LAW ..... 125

I. THIS COURT HAS JURISDICTION OVER THIS ACTION ..... 126

A. The Community Hospitals Have Article III Standing ..... 126

B. The Requirements of Diversity Jurisdiction Are Satisfied.....129

C. The Court Has Personal Jurisdiction Over Leapfrog.....130

II. THE COMMUNITY HOSPITALS HAVE ESTABLISHED THAT LEAPFROG VIOLATED FDUTPA.....132

D. Leapfrog's "Safety Grades," Safety Grade Methodology, and Surrounding Misrepresentations Are Deceptive Under FDUTPA.....133

E. Leapfrog's Safety Grades, Safety Grade Methodology, and Associated Coercive Practices Are Unfair Under FDUTPA.....142

F. The Community Hospitals Are Aggrieved by Leapfrog's Unlawful Practices.....145

G. The Community Hospitals Need Not Prove That Individual Consumers Actually Relied on, or Were Injured by, Leapfrog's Conduct.....152

H. In Any Event, the Community Hospitals Established Consumer Harm.....155

I. Evidence Regarding the Community Hospitals' Clinical Performance Is Not Relevant to Leapfrog's Deceptive and Unfair Grading Methodology or the Hospitals' Aggrievement.....158

J. Leapfrog's Conduct Occurs in Florida Trade or Commerce.....160

III. LEAPFROG'S AFFIRMATIVE DEFENSES FAIL.....160

A. Leapfrog's "Good Faith" Defense Is Meritless.....160

B. Leapfrog's "Avoidance of Consequences" Argument Is Irrelevant to Injunctive and Declaratory Relief.....162

C. Leapfrog's Anti-SLAPP Defense Is Procedurally Improper and Meritless.....163

IV. INJUNCTIVE AND DECLARATORY RELIEF ARE APPROPRIATE.....165

A. All Permanent Injunction Factors Are Satisfied.....165

B. A Declaration Is Also Warranted.....168

V. THE COMMUNITY HOSPITALS ARE ENTITLED TO ATTORNEYS' FEES.....168

# TABLE OF AUTHORITIES

## Cases

*Ahearn v. Mayo Clinic*,
180 So. 3d 165 (Fla. 1st DCA 2015) ... 132, 145, 149

*Allstate Ins. Co. v. Emp'rs Liab. Assurance Corp.*,
445 F.2d 1278 (5th Cir. 1971) ... 168

*Armstrong v. U.S. Bank Nat'l Ass'n*,
729 F. Supp. 3d 1291 (M.D. Fla. 2024) ... 162, 163

*Bluegreen Vacations Unlimited, Inc. v. Timeshare Laws. P.A.*,
2023 WL 4079381 (S.D. Fla. June 20, 2023) ... 166

*Bluegreen Vacations Unlimited, Inc. v. Timeshare Termination Team, LLC*,
2023 WL 4105529 (S.D. Fla. June 21, 2023) ... 151, 172

*Bohlke v. Shearer's Foods, Inc.*,
2015 WL 249418 (S.D. Fla. Jan. 20, 2015) ... 4, 140, 167

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ... 130

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ... 165, 167

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau*,
169 So. 3d 164 (Fla. DCA 4th 2015) ... 6, 132, 154, 161, 163

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ... 133, 152, 154, 161

*In re Cassell*,
688 F.3d 1291 (11th Cir. 2012) ... 153

*Cate v. Oldham*,
707 F.2d 1176 (11th Cir. 1983) ... 165

*Chow v. Chak Yam Chau*,
640 F. App'x 834 (11th Cir. 2015) ... 169

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*,
561 U.S. 661 (2010) ... 128

*City First Mortg. Corp. v. Barton*,
988 So. 2d 82 (Fla. 4th DCA 2008) ... 161

*CMR Construction & Roofing, LLC v. UCMS, LLC*,
2022 WL 3012298 (11th Cir. July 29, 2022) ... 155

*Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC*,
2020 WL 6700449 (S.D. Fla. Oct. 20, 2020) ....................................................145, 166, 167

*Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*,
531 F.3d 1339 (11th Cir. 2008)..........................................................................................167

*Common Cause/Georgia v. Billups*,
554 F.3d 1340 (11th Cir. 2009)..................................................................................126, 145

*Cox v. Adm'r U.S. Steel & Carnegie*,
17 F.3d 1386 (11th Cir. 1994)....................................................................................151, 159

*Custer Med. Ctr. v. United Auto. Ins. Co.*,
62 So.3d 1086 (Fla. 2010)....................................................................................................160

*Democratic Republic of Congo v. Air Cap. Grp.*,
2016 WL 11739606............................................................................................................169

*Estate of Elkins v. Pelayo*,
737 F. App'x 830 (9th Cir. 2018)...........................................................................................60

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*,
122 F.3d 895 (11th Cir. 1997)..............................................................................................128

*Engelbrecht v. JP Morgan Chase Bank, N.A.*,
2012 WL 10423236 (C.D. Cal. Feb. 23, 2012) ....................................................................159

*Erickson Beamon Ltd. v. CMG Worldwide, Inc.*,
2014 WL 3950897 (S.D.N.Y. Aug. 13, 2014)..............................................................162, 163

*Evers v. Dwyer*,
358 U.S. 202 (1958) (per curiam).........................................................................................127

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*,
752 So. 2d 582 (Fla. 2000)...................................................................................................131

*Farley v. Magnum Marine Corp., N.V.*,
1995 WL 795711 (S.D. Fla. June 9, 1995)............................................................................162

*FEC v. Cruz*,
596 U.S. 289 (2022) .............................................................................................................127

*Ferrero v. Associated Materials, Inc.*,
923 F.2d 1441 (11th Cir. 1991)..................................................................................126, 165, 166

*In re Figgie Int'l, Inc.*,
107 F.T.C. 313 (1986), *aff'd*, 817 F.2d 102 (4th Cir. 1987).............................................5, 143

*Fonte v. AT&T Wireless Servs., Inc.*,
903 So. 2d 1019 (Fla. 4th DCA 2005)..................................................................................153

*FTC v. E.M. Sys. & Servs., LLC*,
2015 WL 13709807 (M.D. Fla. June 17, 2015)......................................................................166

*FTC v. Indiana Federation of Dentists*,
476 U.S. 447 (1986) .......... 156

*FTC v. Lanier Law, LLC*,
194 F. Supp. 3d 1238 (M.D. Fla. 2016) .......... 153

*FTC v. Pointbreak Media, LLC*,
376 F. Supp. 3d 1257 (S.D. Fla. 2019) .......... 152, 154

*FTC v. USA Fin., LLC*,
415 F. App'x 970 (11th Cir. 2011) .......... 161

*FTC v. Vylah Tec LLC*,
2018 WL 3656474 (M.D. Fla. Aug. 2, 2018) .......... 153

*FTC v. World Patent Mktg., Inc.*,
2017 WL 3508639 (S.D. Fla. Aug. 16, 2017) .......... 144

*Ghostbed, Inc. v. Casper Sleep, Inc.*,
2016 WL 4145909 (S.D. Fla. July 19, 2016) .......... 152

*Harrod v. Express Scripts, Inc.*,
2019 WL 8273650 (M.D. Fla. Aug. 16, 2019) .......... 155

*Healthcare Res. Mgmt. Grp., LLC v. EcoNatura All Healthy World, LLC*,
2022 WL 1537757 (S.D. Fla. May 12, 2022) .......... 175

*Hill v. FTC*,
124 F.2d 104 (5th Cir. 1941) .......... 128, 136

*Houston v. Marod Supermarkets, Inc.*,
733 F.3d 1323 (11th Cir. 2013) .......... 126

*Humane Soc'y of Broward Cnty., Inc. v. Fla. Humane Soc'y*,
951 So. 2d 966 (Fla. 4th DCA 2007) .......... 169

*Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983) .......... 164

*Hunt v. Washington State Apple Advertising Comm'n*,
432 U.S. 333 (1977), 204 F.3d 1069 (11th Cir. 2000) .......... 130

*Jeter v. Credit Bureau, Inc.*,
760 F.2d 1168 (11th Cir. 1985) .......... 143

*Klay v. United Healthgroup, Inc.*,
376 F.3d 1092 (11th Cir. 2004) .......... 165

*Latman v. Costa Cruise Lines, N.V.*,
758 So. 2d 699 (Fla. 3d DCA 2000) .......... 134, 156

*Lewis v. Mercedes-Benz USA, LLC*,
530 F. Supp. 3d 1183 (S.D. Fla. 2021) .......... 161

*Liberty Mut. Fire Ins. Co. v. S.-Owners Ins. Co.*,
2019 WL 2103472 (S.D. Fla. Feb. 8, 2019) (Middlebrooks, J.) ........ 168

*Lincare Holdings Inc. v. Doxo, Inc.*,
2024 WL 865881 (M.D. Fla. Feb. 29, 2024) ........ 156

*Lucero v. Trosch*,
121 F.3d 591 (11th Cir. 1997) ........ 165

*M.R. v. Dreyfus*,
663 F.3d 1100 (9th Cir. 2011) ........ 159

*Marco Island Cable v. Comcast Cablevision of S., Inc.*,
312 F. App'x 211 (11th Cir. 2009) ........ 3, 132, 143, 163

*Marrache v. Bacardi U.S.A., Inc.*,
17 F.4th 1084 (11th Cir. 2021) ........ 142, 143

*Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC*,
783 F. Supp. 2d 1214 (S.D. Fla. 2011) ........ 168

*Millennium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.*,
761 So. 2d 1256 (Fla. 3d DCA 2000) ........ 143, 153, 154

*Novo Nordisk, Inc. v. Brooksville Pharmaceuticals, Inc.*,
785 F. Supp. 3d 1123 (M.D. Fla. 2025) ........ 154

*Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*,
2025 WL 2306505 (M.D. Fla. June 30, 2025) ........ 154

*Osmose, Inc. v. Viance, LLC*,
2009 WL 10665750 (N.D. Ga. Mar. 20, 2009) ........ 144

*Ounjian v. Globoforce, Inc.*,
89 F.4th 852 (11th Cir. 2023) ........ 154

*Pals Grp. v. Quiskeya Trading Corp.*,
2017 WL 5598721 (S.D. Fla. Nov. 20, 2017) ........ 151

*Parker v. Montgomery*,
529 So. 2d 1145 (Fla. 1st DCA 1988) ........ 162

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
413 U.S. 376 (1973) ........ 165

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
842 So. 2d 773 (Fla. 2003) ........ 4, 142, 152, 153, 154

*Popular Bank of Fla. v. Banco Popular de P.R.*,
9 F. Supp. 2d 1347 (S.D. Fla. 1998) ........ 166

*Porsche Cars N. Am., Inc. v. Diamond*,
140 So. 3d 1090 (Fla. 3d DCA 2014) ........ 144

*Posner v. Essex Ins. Co.*,
178 F.3d 1209 (11th Cir. 1999)....131

*Pretka v. Kolter City Plaza II, Inc.*,
608 F.3d 744 (11th Cir. 2010)....130

*PTA-FLA, Inc. v. ZTE USA, Inc.*,
844 F.3d 1299 (11th Cir. 2016).... 129, 130

*Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*,
10 F.3d 1563 (11th Cir. 1994)....161

*Rubinstein v. Yehuda*,
38 F.4th 982 (11th Cir. 2022)....162

*In re Schurtenberger*,
2014 WL 92828 (Bankr. S.D. Fla. Jan. 9, 2014)....161

*SMS Audio, LLC v. Belson*,
2017 WL 1533941 (S.D. Fla. Mar. 9, 2017) (Middlebrooks, J.).... 132, 143, 144, 161

*St. Paul Mercury Indemn. Co. v. Red Cab. Co.*,
303 U.S. 283 (1938)....129

*In re Stand 'N Seal*,
623 F. Supp. 2d (N.D. Ga. 2009)....156

*State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*,
278 F. Supp. 3d 1307 (S.D. Fla. 2017)....3, 133

*State Farm Mutual Automobile Insurance Company v. At Home Auto Glass LLC*,
2024 WL 4349246 (M.D. Fla. Sept. 30, 2024).... 155, 156

*Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*,
266 So. 3d 207 (Fla. 4th DCA 2019)....155

*Sys. Components Corp. v. Fla. Dep't of Transp.*,
14 So. 3d 967 (Fla. 2009).... 162, 163

*Temurian v. Piccolo*,
2021 WL 1121003 (S.D. Fla. Mar. 24, 2021)....169

*Toucan Partners, LLC v. Hernando Cnty.*,
571 F. App'x 737 (11th Cir. 2014)....163

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....126

*Turner Greenberg Assocs., Inc. v. Pathman*,
885 So. 2d 1004 (Fla. 4th DCA 2004)....152

*United States v. Cochran*,
682 F. App'x 828 (11th Cir. 2017)....150

*United States v. Mateos*,
623 F.3d 1350 (11th Cir. 2010) .......... 150

*United States v. Sigma Int'l, Inc.*,
300 F.3d 1278 (11th Cir. 2002) .......... 154

*United States v. Starr*,
159 F.4th 901 (11th Cir. 2025) .......... 151

*United Techs. Corp. v. Mazer*,
556 F.3d 1260 (11th Cir. 2009) .......... 130

*Univ. of S. Ala. v. Am. Tobacco Co.*,
168 F.3d 405 (11th Cir. 1999) .......... 126

*Waste Pro USA v. Vision Constr. ENT, Inc.*,
282 So. 3d 911 (Fla. 1st DCA 2019) .......... 2, 4, 133

*Webber v. Esquire Deposition Servs., LLC*,
439 F. App'x 849 (11th Cir. 2011) (per curiam) .......... 157

*Williams v. Albemarle City Bd. of Educ.*,
508 F.2d 1242 (4th Cir. 1974) .......... 127

*Wood v. Morbark Indus., Inc.*,
70 F.3d 1201 (11th Cir. 1995) .......... 140

*World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*,
586 F.3d 950 (11th Cir. 2009) .......... 142

*Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*,
2024 WL 5703196 (M.D. Fla. Aug. 14, 2024) .......... 151

*Wyndham Vacation Ownership, Inc. v. Square One Dev. Grp., Inc.*,
2022 WL 21374382 (M.D. Fla. Feb. 2, 2022) .......... 164

*Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*,
123 So. 3d 1149 (Fla. 5th DCA 2012) .......... 6, 145, 149, 165, 166

*Zamber v. Am. Airlines, Inc.*,
282 F. Supp. 3d 1289 (S.D. Fla. 2017) .......... 133

**Statutes**

28 U.S.C. § 1332 .......... 129, 130

28 U.S.C. § 2201 .......... 168

Fla. Stat. § 48.193 .......... 131

Fla. Stat. § 501.202 .......... 133, 166

Fla. Stat. § 501.203 .......... 155, 157, 160

Fla. Stat. § 501.204 .......... 132, 133, 142, 160

Fla. Stat. § 501.211 .......... 132, 152, 153, 159

Fla. Stat. § 768.295 .......... 164

**Rules**

Fed. R. Civ. P. 26 .......... 173

Fed. R. Civ. P. 30 .......... 18, 57

Fed. R. Civ. P. 33 .......... 171

Fed. R. Evid. 401 .......... 10, 158, 160

Fed. R. Evid. 402 .......... 10, 158, 160

Fed. R. Evid. 403 .......... 10, 158, 160

Fed. R. Evid. 801 .......... 150, 156

**Treatises**

25 C.J.S. Damages § 172 .......... 162

**Constitutional Provisions**

U.S. Const. amend. I .......... 163, 164

U.S. Const. amend XIV. .......... 130

U.S. Const. art. III, § 2 .......... 128

**PRELIMINARY STATEMENT**

1. This case is about the "Safety Grades" that Defendant The Leapfrog Group ("Leapfrog") assigns to hospitals. Leapfrog describes itself as a nonprofit "watchdog" whose mission is to provide the public with transparent, data-driven assessments of hospital safety. Leapfrog tells consumers that it distills data into accurate safety ratings that patients should rely on when selecting a hospital, emphasizing that this choice can be a matter of life or death. But what Leapfrog does not tell consumers is that the methodology behind its biannual Safety Grades is not based on data but on scores designed to penalize hospitals that do not participate in its annual Hospital Survey ("Survey"). In particular, Leapfrog assigns participating hospitals a Safety Grade ("A," "B," "C," "D," or "F") based on information those hospitals report to Leapfrog's 350-page, purportedly voluntary Survey. When a hospital declines to participate in that Survey, Leapfrog automatically "imputes" to that hospital the lowest possible score on four of the Survey's measures—which count for over 30% of the overall Safety Grade—for no reason other than the hospital's non-participation.

2. Applying this methodology—one its own employees admitted was "arbitrary"—Leapfrog assigned the five Plaintiff hospitals (the "Community Hospitals") failing "D" and "F" Safety Grades in Fall 2024, Spring 2025, and Fall 2025. Leapfrog then launched a press campaign to promote these Safety Grades to consumers, while falsely asserting that a hospital's Safety Grade is *not* affected by whether that hospital participates in Leapfrog's Survey. The ensuing harm has been predictable: Leapfrog's ongoing deception has caused patients, physicians, community members, and insurers to believe the Community Hospitals are unsafe and, as a result, is inflicting serious ongoing injuries on those hospitals, including reputational harms, resource diversion to address patient complaints, and declining admissions in numerous categories (such as elective procedures and emergency-room visits). The Community Hospitals are entitled to a declaration that Leapfrog's conduct is unfair and deceptive under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and an injunction to stop that unlawful conduct.

3. Leapfrog began penalizing nonparticipating hospitals via its Safety Grade methodology in Fall 2024, a move its own witness contemporaneously described as "a simple business decision." Leapfrog made this change because Survey participation drives Leapfrog's revenue and brand. Leapfrog earns most of its income from licensing the Survey data, which Survey participants must agree Leapfrog can use in a "commercial manner for profit," and from

licensing its "accolades," primarily to hospitals that received "A" Safety Grades. Both programs, and Leapfrog's brand overall, depend on hospital participation in the Survey, and Leapfrog made this clear in its internal deliberations and marketing materials. So, when hospital participation in the Survey fell in 2023, Leapfrog's board decided to "focus on growing revenues." Leapfrog elected to do so by shifting to a new arbitrary and punitive grading methodology that provides a "major incentive" for Survey participation. Leapfrog internally recognized the legitimacy problem that change created, with Leapfrog personnel deeming the new Fall 2024 Safety Grade methodology "arbitrar[]y," "[d]rastic," and "penalizing" to hospitals that decline to participate in the Survey. They worried that the methodology would appear illegitimate if its coercive purpose were disclosed. The trick, then, was to quietly implement the new, punitive, non-data-driven methodology while publicly maintaining Leapfrog's image as an objective, data-driven watchdog of hospital safety, neutrally conveying the safety assessments of leading experts.

4. Leapfrog implemented the new methodology through a complex web of deception and public misrepresentations that is highly "likely to mislead"—and in fact repeatedly did mislead—"consumer[s] acting reasonably in the circumstances." *Waste Pro USA v. Vision Constr. ENT, Inc.*, 282 So. 3d 911, 917 (Fla. 1st DCA 2019). Leapfrog's deceptive and punitive conduct violates FDUTPA in a number of key ways. *First*, Leapfrog's Safety Grade methodology is inherently deceptive because it assigns a score that is, by design, not meant to reflect actual data. *Second*, Leapfrog tells the public that a hospital's participation in the Survey does not affect that hospital's Safety Grade. But participation *does* affect the Safety Grade: For hospitals that did not complete Leapfrog's "voluntary" Survey, Leapfrog flunked them on four of its Safety Grade measures (the "Four Measures") and entirely omitted three additional measures, inflating the weights assigned to the Four Measures and automatically reducing the numeric score nonparticipating hospitals receive and often lowering their Safety Grade. *Third*, Leapfrog tells the public that it uses "other supplemental data sources" or "secondary data" to grade nonparticipating hospitals when Survey data and data from the Centers for Medicare and Medicaid Services ("CMS") are missing. But Leapfrog's own witnesses admitted that Leapfrog lacks any data for nonparticipating hospitals for the Four Measures. *Fourth*, Leapfrog says it does not assign Safety Grades to hospitals when it lacks sufficient data on six or more measures for those hospitals. But that is precisely what Leapfrog's punitive methodology does: For nonparticipating hospitals, Leapfrog drops the three discarded measures entirely, assigns flunking scores on the Four

Measures based on a *lack* of data, and then issues a grade for nonparticipating hospitals even though its own witnesses admit Leapfrog "has no data for any of those seven measures." *Fifth*, Leapfrog tells the public that its methodology is peer reviewed and that Leapfrog's Expert Panel approved the Fall 2024 change. But Leapfrog's own briefs have recognized that the opposite is true: Leapfrog's operative methodology is not peer-reviewed, and its witnesses have confirmed that the Expert Panel did not approve the change. In reality, Leapfrog later modified the Expert Panel's meeting minutes to make it *appear* as if the Expert Panel had considered and endorsed the methodology change. Yet despite Leapfrog's public representations, the record conclusively shows that approval never occurred. Leapfrog's own witness (himself a member of the Expert Panel) eventually admitted that Leapfrog's new methodology actually was a "business decision," not one compelled by scientific rigor. *Sixth*, Leapfrog publishes a series of misrepresentations on hospitals' Safety Grade webpages. "Gas gauge" graphics mislead the public into believing that nonparticipating hospitals perform "[w]orse than average" on the Four Measures when, in reality, Leapfrog lacks any data on those measures. Further, Leapfrog crafted a misleading explanatory footnote that fails to explain *how* Leapfrog automatically flunks nonparticipating hospitals on the Four Measures. As one Leapfrog witness contemporaneously noted, Leapfrog's CEO wanted that footnote to "make[] it sound like the data we imputed wasn't random" and "like the expert panel approved it and the assigning of these was legitimate." These and many other examples demonstrate that Leapfrog's conduct is both "unfair" and "deceptive" under FDUTPA. Indeed, Leapfrog's "deceptive and bullying conduct," which was plainly designed "to induce" hospitals to submit to Leapfrog's lucrative Survey, represents a core violation of the statute. *Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 214 (11th Cir. 2009).

5. Leapfrog's surreptitious pre-trial changes to its consumer-facing website hospitalsafetygrade.org have only exacerbated the deception. As this case has unfolded, Leapfrog has actively and secretly worked to modify its website. It made these modifications without informing the Community Hospitals or the Court. Leapfrog's Frequently Asked Questions webpage now states that completing the Survey does not "automatically improve a hospital's Safety Grade," yet it still omits the critical fact that Leapfrog punishes nonparticipation by *automatically* a*ssigning the lowest scores* to nonparticipating hospitals on the Four Measures without any supporting data. That superficial edit is thus futile; FDUTPA encompasses not only "outright false statements" but also "omissions," *State Farm Mut. Auto. Ins. Co. v. Performance*

*Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1327 (S.D. Fla. 2017). Likewise, Leapfrog also altered its gas gauge presentation of the three measures it discards for nonparticipating hospitals—but did not make a similar change to the gas gauges for the Four Measures, which falsely suggests they reflect nonparticipating hospitals' actual performance. And even though Leapfrog's briefing to this Court—as well as almost every Leapfrog witness and expert—defended Leapfrog's conduct by invoking the flawed and deceptive red-bold footnote Leapfrog had placed at the bottom of a nonparticipating hospital's webpage, Leapfrog inexplicably deleted it. Leapfrog only restored that footnote and its deceptive gas gauge presentation after the Community Hospitals served Leapfrog with document requests about the surreptitious website revisions.

6. Leapfrog's defenses on FDUTPA's "deception" prong uniformly fail. Leapfrog claims that it is "extraordinarily transparent" because its website contains its hyperlinked Scoring Methodology document, which tries to explain its methodology, including an opaque discussion of how Leapfrog assigns (or, in Leapfrog's words "imputes") failing scores for the Four Measures for hospitals that do not participate in its Survey. But Leapfrog's argument rests on a misunderstanding of the legal standard. FDUTPA asks if a *reasonable* consumer is *likely* to be misled, *see Waste Pro USA*, 282 So. 3d at 917—not whether highly sophisticated healthcare personnel could avoid being misled by navigating through the bowels of a website and parsing an arcane Scoring Methodology document that, according to Leapfrog's own CEO, is "not that accessible to the average layman." That admission is borne out by Leapfrog's Google Analytics data, which show that only about **three percent of visitors** to the Community Hospitals' Safety Grade webpages actually downloaded the Scoring Methodology document. And that fact only underscores Leapfrog's violation: a supposed "additional disclosur[e]" cannot render representations nondeceptive if reasonable consumers—as here—would have viewed the representations "without scrutinizing" or understanding the disclosure. *Bohlke v. Shearer's Foods, Inc.*, 2015 WL 249418, at *9 (S.D. Fla. Jan. 20, 2015). Thus, there is no doubt that Leapfrog's attempt to rely on its purported disclosures is misplaced.

7. Leapfrog's conduct is also "unfair" under FDUTPA. Leapfrog's coercive and deceptive conduct "offends established public policy" and is "oppressive" and "unscrupulous." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Leapfrog, by its own admission, penalizes hospitals with arbitrarily low Safety Grades, without supporting data, to

coerce hospitals into responding to its Survey, while it dishonestly represents those Safety Grades to the public as neutral and data-driven. That punitive bait-and-switch—what a third-party hospital aptly called "marketing blackmail"—is unfair as a matter of law. Consumers have a right to truthful information—especially when it bears on important choices that consumers struggle to reliably assess, such as where to seek lifesaving healthcare. Indeed, "deceptive practices are always unfair." *In re Figgie Int'l, Inc.*, 107 F.T.C. 313, 373 n.5 (1986), *aff'd*, 817 F.2d 102 (4th Cir. 1987). Leapfrog's deceptive practices have no redeeming benefit. And consumers could not reasonably avoid Leapfrog's unlawful practices. The only beneficiary of Leapfrog's behavior is Leapfrog's own coffers.

8. Leapfrog's unfair and deceptive conduct caused and continues to cause substantial and predictable harm to many different groups of consumers. For example, a major insurance company, Humana, has urged the Community Hospitals to address "performance on safety measures," citing the Leapfrog Safety Grades. Community members have similarly questioned the Community Hospitals' competence based on the Safety Grades. Patients have cancelled procedures and rejected emergency care in the wake of the Safety Grades—including against medical advice. Physicians have signed up with competitors citing the Safety Grades. And the Community Hospitals (themselves "consumers" under FDUTPA) suffered severe reputational and operational blowback from Leapfrog's Safety Grades and subsequent conduct aiming to weaponize them against the Community Hospitals.

9. Leapfrog cannot credibly deny that its deception has harmed consumers: Its own materials tell patients to "*always* decide on where to receive care based on a hospital's current Safety Grade" and claim that "millions" of people have done so. For example, its materials highlight a patient who drove 400 miles to reach an "A" hospital after seeing "the hospitals closest to him did not perform well" on Leapfrog's Safety Grade. Leapfrog also boasts that its ratings reach "virtually all Americans" through data licensing agreements and that publications collectively reaching billions of people amplify the Safety Grades. Further, Leapfrog's Vice President of Development admitted that the organization "want[s] consumers to think that visiting a hospital with a C, D, or F grade could seriously injure or even kill them." Yet Leapfrog now claims no one actually relies on its Safety Grades, and thus there is no evidence of harm. Leapfrog's successful public campaign to induce reliance on the Safety Grades directly undermines its made-for-litigation assertion that its deception has caused no consumer harm.

10. Leapfrog's misconduct has also aggrieved the Community Hospitals—therefore satisfying the second element of FDUTPA. The aggrievement standard is expansive and merely requires some specific, nonspeculative grievance. *See, e.g.*, *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012). The Community Hospitals have met that burden many times over. The Community Hospitals were subject to a media firestorm ignited by their "failing" Safety Grades and stoked by Leapfrog's subsequent efforts to blast them to consumers. The Community Hospitals' CEOs testified that they have been forced to divert time and resources to deal with newfound complaints after Leapfrog's Safety Grades were issued. And all five CEOs pointed to concrete operational and reputational harms resulting from the "Safety Grade" Leapfrog assigned to them. Palm Beach CEO Eric Cazares, for example, testified that "patients" were "complain[ing] about the hospital's low safety score." *Infra* ¶ 440. Likewise, all five CEOs testified about how admissions for multiple types of procedures declined. *Infra* ¶¶ 410–56. The Community Hospitals have indisputably suffered reputational harm due to Leapfrog's false Safety Grades, satisfying the statute's requirement that they show aggrievement due to Leapfrog's conduct. Nothing more is required. *See* ECF 41 at 6.

11. The evidence shows that Leapfrog does not operate as the rigorous, neutral, data-driven arbiter of hospital safety it holds itself out as. The Safety Grade methodology is driven by marketing and commercial aims, not science or the public interest. Misleading consumers about the "methods" a company "employs" despite the "factors" actually used "to determine a grade" alone represents an open violation of FDUTPA. *Caribbean Cruise Line, Inc. v. Better Bus. Bureau*, 169 So. 3d 164, 167 (Fla. DCA 4th 2015). Yet here, the deception runs even deeper: Leapfrog's internal communications confirm Leapfrog *knowingly* and *intentionally* misled the public. And the surreptitious, eve-of-trial edits to its website underscore Leapfrog's continued lack of candor with the public. From its very first substantive filing in this case, Leapfrog has told the Court that a footnote disclosure on its Hospital Safety Grade webpages was the "important[]" linchpin of its defense because that footnote purportedly told consumers "how and why Leapfrog would assign a score for designated measures where data is unavailable." ECF 39 at 8; *id.* at 14–16; *see also* ECF 99 at 12 (defending Leapfrog's conduct by invoking its "bold and red disclosures with an asterisk"). As detailed below, although that was untrue, nearly every Leapfrog witness and expert repeated it. Yet Leapfrog then deleted that footnote on the eve of trial—only reinstating it after the Community Hospitals noticed the deletion and served requests seeking evidence about the

deletions. Leapfrog's continued, undisclosed manipulation of its website underscores why this Court's intervention is needed. Leapfrog itself has demonstrated that it cannot be trusted to rectify its misrepresentations and broader deceptive scheme on its own.

12. Accordingly, the Community Hospitals have demonstrated entitlement to the following relief:

(1) A declaratory judgment that Leapfrog's Safety Grades are deceptive or unfair and therefore violate FDUTPA; and

(2) A permanent injunction (a) barring Leapfrog from grading the Community Hospitals in its Safety Grades, (b) compelling Leapfrog to remove the Safety Grades previously assigned to the Community Hospitals from all of Leapfrog's websites or similar materials within 5 business days of judgment, and (c) compelling Leapfrog to take all reasonable and diligent efforts to ensure that entities licensing Safety Grades to the Community Hospitals remove such Safety Grades from their materials within 30 days of judgment, with Leapfrog to file a declaration documenting the reasonable and diligent efforts it has undertaken within 45 days of judgment.

## FINDINGS OF FACT

## I. THE PARTIES

### A. The Community Hospitals

1. The Community Hospitals are five hospitals in South Florida that have provided life-saving and essential care collectively for more than 300 years, delivering critical services across cardiology, pediatrics, geriatrics, obstetrics, orthopedics, and emergency care. *See* ECF 129 ¶ 1. The Community Hospitals are part of the Palm Beach Health Network ("PBHN"), the largest healthcare network in Palm Beach County.

2. Plaintiff Good Samaritan Medical Center Inc. ("Good Samaritan") was built in 1920—just eight years after Palm Beach County itself was founded—and has served the community for over 100 years. It has 333 licensed beds and is an accredited acute care hospital focused on offering premier and comprehensive oncology services and features robust medical and surgical programs. *See* ECF 129 ¶ 6.

3. Plaintiff Delray Medical Center ("Delray") is an accredited hospital with 536 licensed beds. ECF 129 ¶ 3. As both a general hospital and a Level I Trauma Center for both

pediatric and adult patients, Delray provides a variety of high quality, specialized services to the community. It also operates many specialty service lines, including orthopedics, colorectal surgery, and pulmonology.

4. Plaintiff Palm Beach Gardens Medical Center ("Palm Beach Gardens") is an acute care hospital with 199 licensed beds. ECF 129 ¶ 9. It focuses on providing comprehensive cardiovascular care, including open heart surgery and structural heart procedures. It also provides the community with access to a broad range of other important medical services, including 24-hour emergency care, general surgery, various orthopedic surgery services, and specialty services such as urology. It operates one of the only machines for extracorporeal membrane oxygenation ("ECMO")—an advanced, last-line-of-treatment form of cardiopulmonary life support—in the area.

5. Plaintiff St. Mary's Medical Center ("St. Mary's") is an accredited hospital that houses the only children's hospital between Orlando and Fort Lauderdale. It also has a Level I adult and pediatric Trauma Center, certified Comprehensive Stroke Center, and a Level III neonatal intensive care unit ("NICU"). St. Mary's has 413 licensed beds, of which 45 are in the NICU. ECF 129 ¶ 12. It is a CMS designated Regional Perinatal Intensive Care Center ("RPICC")—one of only 11 RPICC hospitals in Florida.

6. Plaintiff West Boca Medical Center ("West Boca") is an accredited hospital with 195 licensed beds that primarily serves women and children. ECF 129 ¶ 15. It is the only Level IIII NICU in southern Palm Beach County, and it also provides general medical and surgical services, as well as orthopedics and robotic surgery.

7. The Community Hospitals serve a broad and diverse community of patients. They have been members of their communities for decades—some nearly half a century and one more than a century. They serve many populations with particularly urgent and acute healthcare needs and significant comorbidities, including older and lower-socioeconomic-status populations.

**B. The Leapfrog Group**

8. Defendant The Leapfrog Group ("Leapfrog") is registered as a non-profit corporation incorporated and headquartered in Washington, D.C. Leapfrog's corporate materials state that its "mission" is to "us[e] transparency to support informed health care decisions." PX-824.0 at 2; *see also* ECF 129 ¶ 18. Leapfrog further represents that it helps consumers decide "where to seek [medical] care" and "educate[s]" the public "on the safest and highest quality

providers" by "field[ing]" a "survey of hospitals" (i.e., Leapfrog's Survey), and using that data to "publicly rat[e]" hospitals in "an initiative called the Leapfrog Hospital Safety Grade." PX-824.0 at 2. Leapfrog was founded by certain employers who purchase healthcare for employees and were, at the time of Leapfrog's founding, seeking more information about healthcare costs and outcomes. PX-027.0 at 1. Employers serve as Leapfrog members, donors, and on the board of directors.

9. Leapfrog assigns hospitals nationwide purported "Safety Grades" twice annually—in the Fall and Spring—and makes these grades available through its consumer-facing website hospitalsafetygrade.org. ECF 129 ¶¶ 40, 45, 49; *see* PX-506.0 at 1. Leapfrog also distributes materials and messaging concerning its Safety Grades aimed at consumers, media outlets, insurers, employers, and healthcare purchasers. *See* PX-420.0 at -092.

10. For the fiscal year ending June 30, 2024, Leapfrog reported total revenue exceeding $8.3 million. PX-824.0 at 1.

## II. THE WITNESSES

### A. The Community Hospitals' Witnesses

11. The Court held trial in this matter for five days and heard testimony from witnesses from the Community Hospitals, including each of their Chief Executive Officers.

12. Erik Cazares is the CEO of Palm Beach Gardens. ECF 88-90 ("Cazares Tr.") 8:4–8. He has worked in the healthcare field since he was eighteen years old and has served in several capacities, including bedside nurse, nurse leader, operations, and hospital executive. *Id.* 8:15–13:15. Mr. Cazares began serving as CEO in July 2024. He remains a Registered Nurse and continues to make regular "rounds on" patients (visiting patients throughout the hospital to remain apprised of their condition, receive their feedback, and so on) to this day. *See id.* 41:11–13. At the height of the COVID pandemic, when he was Chief Operating Officer of Palm Beach Gardens, he administered vaccines in the hospital's vaccine clinic.

13. Jerad Hanlon is the CEO of West Boca. ECF 88-92 ("Hanlon Tr.") 8:9–11. Mr. Hanlon entered the healthcare field in part because he comes from a family of healthcare professionals. His first healthcare position was as a volunteer at a rural hospital in Harrisonburg, Virgina. Prior to his current role, which he assumed in October 2023, Mr. Hanlon was an executive for PBHN and St. Mary's; he served as Chief Operating Officer for both PBHN and St. Mary's simultaneously during the height of the COVID pandemic. *Id.* 10:25–11:4, 20:10–21:25. Although Mr. Hanlon's professional background is administrative, not clinical, he frequently makes "rounds

on" patients at West Boca.

14. Heather Havericak is the CEO of Delray. ECF 88-93 ("Havericak Tr.") 20:16–18. Ms. Havericak entered the healthcare field after she experienced the difference healthcare workers can make while her mother underwent cancer treatment. She has maintained her nursing license and continues to make "rounds on" patients daily. At the height of the pandemic, while she was CEO of another area hospital, she frequently volunteered to assume active nursing duties, doing patient intake, administering vaccinations, and washing the bodies of patients who had died from COVID.

15. Cynthia McCauley is the CEO of St. Mary's. Ms. McCauley has served in a variety of healthcare administrative and financial roles throughout her decades-long career, including serving as Delray's Director of Finance in 1999 and West Boca's Chief Financial Officer from 2001 to 2012. ECF 88-95 ("McCauley Tr.") 13:7–14:16; 22:2–10. Though she is not a clinician, Ms. McCauley frequently rounds on patients, visiting them during their time at the hospital to remain involved in their care, to be apprised of their status, to be visible and present, and to receive any feedback they may have. *Id.* 239:17–21. She also spends time with families of trauma patients with challenging or dire cases.

16. Sheri Montgomery is the CEO of Good Samaritan. Ms. Montgomery has served in numerous healthcare administrative roles. She started in her current role as Good Samaritan's CEO in April 2020, at the height of the COVID-19 pandemic. *See* ECF 88-96 ("Montgomery Tr.") 11:9–19:19. Though she is not a clinician, she performs "rounds on" patients" to stay apprised of their needs and concerns.

17. The Court received designated deposition testimony from Regina West, the former Director of Quality for PBHN. ECF 88-98 ("West Tr.") 17:5–10.[1] After obtaining a master's degree in healthcare administration in 2000, Ms. West served as a quality director at numerous hospitals across the country. *See id.* 14:17–15:11 Ms. West worked as PBHN's Director of Quality

[1] Ms. West was called to testify by Leapfrog. Though the Court finds Ms. West a credible witness, the Court finds much of the testimony Leapfrog designated to be irrelevant and time wasting. *See* Fed. R. Evid. 401, 402, 403. To the extent her testimony was relevant, it only confirmed Leapfrog's FDUTPA violations. *See, e.g.*, West Tr. 88:22–89:3 (testifying that the Survey "took hundreds of hours" for St. Mary's to complete), 125:4–12 ("When [the Safety Grade] changed to imputed scoring . . . that's when I became aware that we were losing patients and we were going to potentially lose surgeons . . . ."), 192:7–13 (testifying that the Safety Grades are "not an accurate representative of the services or the quality" of a nonparticipating hospital).

from 2019 until November 2025, when she left PBHN and moved to a new role in a hospital system in Virginia. *Id.* 13:6–10. During her time at PBHN, Ms. West also served as the quality director of individual hospitals, including Delray, Good Samaritan, and St. Mary's. *Id.* 13:11–20.

18. The Court also heard testimony from three expert witnesses, including Dr. Jonah Berger, Thomas Chakurda, and Dr. Sean Nicholson.

19. Dr. Nicholson is a health economics expert, who holds a Ph.D. in economics, specializing in health economics; serves as a tenured Professor in Cornell University's Department of Economics; has been a research associate at the National Bureau of Economic Research for 16 years; has served for more than two decades combined on the boards of both individual hospitals and multi-hospital systems; served as the director of a Cornell graduate program in health administration for 9 years; worked as a management consultant before obtaining his Ph.D.; and has testified in nearly 20 federal and state cases. PX-937.0 ¶¶ 1, 4–15, App. A.

20. Dr. Berger is a consumer-behavior, consumer-psychology, and digital-marketing expert, who holds a Ph.D. in marketing from Stanford University; is a tenured Professor of Marketing at the University of Pennsylvania's Wharton School; has published more than 75 academic articles on topics such as how information design, repetition, and social influence shape consumer behavior; and has frequently applied his research in commercial contexts, including within the healthcare industry. PX-945.0 ¶¶ 1–4, App. A.

21. Mr. Chakurda is a marketing and branding expert, who has over four decades of experience in hospital marketing, branding, and communications, serving as Chief Marketing and Communications Officer for a Pennsylvania health system between 2019 to 2024; Vice President for Marketing and Communications at Boca Raton Regional Hospital for a decade before that; and Vice President for Communications for other hospitals and health systems for two decades prior to that. PX-946.0 ¶¶ 3–6.

**B. Leapfrog's Witnesses**

22. The Court heard from representatives of Leapfrog, including its executives, employees, and advisors.

23. Leah Binder is Leapfrog's President and CEO, having served in that role since 2008. As CEO, Ms. Binder oversees, among other things, revenue generation, development and approval of the Survey and Safety Grade methodologies, Survey and Safety Grade operations, and Leapfrog's brand awareness. ECF 88-87 ("Binder Tr.") 60:12–63:15; 272:7–15; 418:19–419:4.

Since this litigation commenced, Ms. Binder has continuously commented on the Community Hospitals and their Safety Grades, including in published opinion pieces in local Florida newspapers; at public appearances, including Leapfrog's 2025 Annual Meeting and a healthcare industry podcast; and even in blast e-mail holiday fundraising messages concerning the Community Hospitals and their Safety Grades. *See, e.g.*, PX-461.0; PX-462.0; *see also* ECF 129 ¶ 102 (referencing Ms. Binder's December 2, 2025 op-ed in *The Palm Beach Post*).

24. Melissa "Missy" Danforth is Leapfrog's Senior Vice President of Health Care Ratings. Ms. Danforth oversees Leapfrog's various public reporting activities, including the Survey and Safety Grades. ECF 88-91 ("Danforth Tr.") 44:19–47:15. She also manages Leapfrog's relationship with the Armstrong Institute for Patient Safety and Quality at Johns Hopkins University School of Medicine (the "Armstrong Institute") and has responsibility for data licensure and accolades sales. *Id.* 46:10–48:8. Ms. Danforth reports directly to Ms. Binder. *Id.* 46:8–9.

25. Lauren Bailey is Leapfrog's Director of Communications. Ms. Bailey joined Leapfrog in January 2017 as Communications Manager before advancing to her current position, in which she "oversees[s] all strategic communications for Leapfrog including media relations, social media and content development." ECF 88-85 ("Bailey Tr.") 16:5–17:11. Ms. Bailey also "oversee[s] the content of [Leapfrog's] website" and "manage[s] [Leapfrog's] agency of record for PR, CURA Strategies." *Id.*

26. Kushagra Banerjee is Leapfrog's Director of Licensing Programs. Mr. Banerjee joined Leapfrog in 2015 and progressed from a marketing and business development coordinator to his current position in October 2024. ECF 88-86 ("Banerjee Tr.") 18:13–19:2, 23:9–26:16. In his current role, Mr. Banerjee leads Leapfrog's data licensing and accolades licensing programs, working directly with the numerous health plans, purchasers, and health care solutions providers who rely on Leapfrog's data. *Id.* 25:18–26:1, 40:3–23; *see id.* 88:3–89:13. He provides Ms. Binder with updates on Leapfrog's sales revenue—data she asks him to provide on a near-daily basis in the weeks before and after Leapfrog releases the Safety Grades. *Id.* 200:18–201:14. Mr. Banerjee reports directly to Ms. Danforth. *Id.* 146:4–8.

27. Alexandra Campione joined Leapfrog in 2022 and is a program manager at Leapfrog. ECF 88-88 ("Campione Tr.") 15:10–18:14. Ms. Campione is "the one that supports the Hospital Safety Grade program from Leapfrog's side in terms of the analytics and all that goes with that." ECF 88-84 ("Austin Tr.") 59:2–6. Ms. Campione is "very familiar" with Leapfrog's

Safety Grade methodology and has "work[ed] with it almost every day" throughout her time at Leapfrog. Campione Tr. 38:15–22; 42:11–15. Ms. Campione reports directly to Ms. Danforth. *Id.* 18:15–19.

28. Karen Jupiter is Leapfrog's Vice President of Development. ECF 88-94 ("Jupiter Tr.") 20:21–21:4. Ms. Jupiter, who joined Leapfrog in 2021, leads the organization's fundraising strategy, donor relations, special events, and overall communications. *Id.* 20:22–23:8, 24:19–25:7. In her role, Ms. Jupiter is responsible for shaping and executing Leapfrog's development efforts while also overseeing the organization's external messaging, branding, media relations, and digital communications. *Id.* 29:10–31:1.

29. The Court received designated deposition testimony from Matthew Austin, Ph.D. Dr. Austin is a research faculty member at the Armstrong Institute. Austin Tr. 41:7–16. Dr. Austin has worked with Leapfrog since 2007. *Id.* 39:17–40:2. From 2008 to 2012, Leapfrog designated Dr. Austin as the Director of the Survey. *See id.* 37:14–38:3. Since 2012, Leapfrog has contracted with the Armstrong Institute for Dr. Austin to provide strategic guidance on Leapfrog's annual Surveys and its Safety Grade. *Id.* at 40:9–41:3. Under these contracts, Dr. Austin serves as Principal Investigator (i.e., lead researcher), and in exchange, Leapfrog pays Armstrong grants that amount to approximately 40% of Dr. Austin's salary. *Id.* 45:12–46:7, 48:16–19.

30. Dr. Patrick Romano, M.D., is a physician and professor at the University of California, Davis. ECF 88-97 ("Romano Tr.") 8:18–9:1, 20:3-8. Dr. Romano is a member of Leapfrog's "Safety Grade Expert Panel," (the "Expert Panel") which advises on Leapfrog's Safety Grade methodology, among other topics. *Id.* 255:2–8; *see also* Austin Tr. 157:5–12. Dr. Romano has been working with Leapfrog for over a decade and was personally involved with the creation of the Safety Grade in 2012, as well as Leapfrog's subsequent grading methodologies. *See* Romano Tr. 68:7–70:15, 98:25–99:8. According to Dr. Austin, who oversees the Expert Panel, Dr. Romano is "an expert in quality measurements in healthcare." Austin Tr. 157:13–14, 157:16–158:2.

31. The Court received designated deposition testimony from Dr. Karen van Caulil. Dr. van Caulil is a member of Leapfrog's Board as well as the President and CEO of Florida Alliance for Healthcare Value, the entity that serves as the regional leader for Leapfrog in Florida.[2] ECF 88-89 ("van Caulil Tr.") 9:7–11, 24:18–24, 27:12–24. Leapfrog's regional leaders ensure that

---

[2] Although Dr. van Caulil is a Leapfrog Board member and Regional Leader, her testimony was designated by the Community Hospitals, not Leapfrog.

Leapfrog's employer members receive Leapfrog materials, are aware of Leapfrog's websites concerning the Survey and Safety Grades, and alert members upon the release of Safety Grades so they can review the hospitals in their local markets. *Id.* 24:25–26:22.[3]

## III. LEAPFROG'S SURVEY AND SAFETY GRADE

### A. Leapfrog's Survey

32. Leapfrog is the creator of the Survey, which is an annual questionnaire that exceeds 350 pages in length and is designed to collect detailed information from participating hospitals. JX-042.0 at -651–658.

33. Leapfrog represents that its Survey "assesses hospital safety, quality, and efficiency," and Leapfrog presents the Survey as a core component of its rating system. PX-028.0 at 1. Leapfrog's consumer-facing website, hospitalsafetygrade.org, describes the Survey as "trusted, transparent and evidence-based," and it characterizes the "Safety Grade," derived in part from the Survey results, as a "public service" purporting to assist consumers in making informed healthcare decisions. PX-027.0 at 2.

34. At the same time, however, Leapfrog requires hospitals participating in the Survey to affirm that Leapfrog may use their submitted information "in a commercial manner for profit," which allows Leapfrog to incorporate Survey data into revenue-generating datasets, analytics, and related products marketed to third parties interested in hospitals' proprietary data. JX-042.0 at -696. As discussed below, Leapfrog generates a substantial portion of its revenue from Survey data that it licenses to third-party purchasers. *See infra* ¶¶ 79–81.

[3] Although Leapfrog proffered four putative expert witnesses, the Court excluded those witnesses in an order before trial commenced, consistent with the reasons set forth in the Community Hospitals' motion *in limine* to exclude those witnesses. *See* ECF Nos. 96, 121.

*2025 Leapfrog Hospital Survey – Hard Copy* *Section 1: Patient Rights and Ethics*

**Affirmation of Accuracy**

As the hospital CEO or as an employee of the hospital to whom the hospital CEO has delegated responsibility, I have reviewed this information pertaining to the Patient Rights and Ethics Section at our hospital, and I hereby certify that this information is true, accurate, and reflects the current, normal operating circumstances at our hospital. I am authorized to make this certification on behalf of our hospital.

The hospital and I understand that The Leapfrog Group, its members, the public and entities and persons who contract or have other business dealings with The Leapfrog Group are relying on the truth and accuracy of this information. The hospital and I also understand that The Leapfrog Group will make this information and/or analyses of this information public through the Survey Results public reporting website, The Leapfrog Group's Hospital Safety Grade, and/or other Leapfrog Group products and services. This information and/or analyses and all intellectual property rights therein shall be and remain the sole and exclusive property of The Leapfrog Group in which The Leapfrog Group retains exclusive ownership. This information does not infringe upon any third-party intellectual property rights or any other third-party rights whatsoever and is free and clear of all encumbrances and liens of any kind. The hospital and I acknowledge that The Leapfrog Group may use this information in a commercial manner for profit. The hospital shall be liable for and shall hold harmless and indemnify The Leapfrog Group from any and all damages, demands, costs, or causes of action resulting from any inaccuracies in the information or any misrepresentations in this Affirmation of Accuracy. The Leapfrog Group and its members and entities and persons who contract or have other business dealings with The Leapfrog Group reserve the right to omit or disclaim information that is not current, accurate or truthful.

Affirmed by ____________________, the hospital's ________________________.
*(first name and last name)* *(title)*
on ____________________.
*(date)*

JX-042.0 at -696 (highlighting added).

35. Leapfrog's Survey covers a broad array of measures and includes questions related to clinical processes, reporting mechanisms, leadership structures, staffing models, and other operational areas. *See id.* at -687–964. Completing the Survey requires hospitals to compile and submit detailed information about their policies, procedures, technologies, and performance indicators. *See id.*

36. Leapfrog employees and individuals associated with Leapfrog acknowledge and are aware that the Survey is time- and resource-intensive for hospitals. Dr. Romano stated that the Survey is a "significant time commitment," Romano Tr. 221:4–8, and that hospitals likely view the Survey as "too burdensome," JX-019.0 at -275. Dr. Romano testified that based on his experience, including in hospital administration, the Survey can take up to "200 hours of staff time" (25 eight-hour business days) to complete. Romano Tr. 34:21–35:3. Another hospital, according to Dr. Romano, reported that the Survey required more than "1000 hours" to complete and that hospital thus viewed the Survey as an "unreasonable burden." PX-288.0 at -922. Dr. Romano has himself "suggested" that Leapfrog "should reduce the burden" of completing the Survey and testified that it is "reasonable" for hospitals to decide not to participate given how burdensome it is to complete. Romano Tr. 38:18–21, 131:15–22.

37. Ms. Campione explained that completing the Survey initially "requires around 120 hours" due to the need to "prepar[e] reports, gather[] documentation, and complet[e]" a Survey-

specific evaluation. PX-452.0 at -130. She also later testified that "hospitals that do complete the [S]urvey put in a tremendous amount of resources," estimating that the Survey requires "80 to 100 hours" to complete. Campione Tr. 51:18–52:3, 107:22–108:3.

38. Hospitals, including the Community Hospitals, have also reported, including directly to Leapfrog, that the Survey is burdensome, time-intensive to complete, and diverts resources away from hospital operations focused on patient safety.

39. One hospital administrator from Mount Sinai Health System in New York, New York reported to Leapfrog that completing the Survey is "very resource intensive outside of existing regulatory, quality operations and quality improvement efforts." JX-028.0 at -935.

40. An administrator from Allina Health, a hospital system based in Minneapolis, reported to Leapfrog that the Survey "is extremely time intensive" and that hospitals "do not have the resources to commit to [it]." JX-026.0 at -030.

41. Another administrator from Piedmont Healthcare, a hospital system located in Georgia, stated that "completion of the survey requires a great deal of coordination between various departments across the hospital including Informatics, Physicians, Pharmacy, Women's Services, Quality & Safety, and Nursing." JX-029.0 at -967. He further noted that the "time commitment to complete" a specific test required by the Survey "is extensive and requires numerous hours of high-salaried [employees]." *Id.*

42. Ascension, a faith-based non-profit healthcare organization, similarly stated that "not all hospitals have the information and/or capabilities to complete the Hospital Survey." PX-308.0 at -027.

43. Administrators from the Community Hospitals have reached similar conclusions. Ms. West, the PBHN quality director, testified that Leapfrog's Survey requires "hundreds of hours" to complete and recalled that she needed the assistance of six hospital employees or contractors to complete it. West Tr. 88:22–89:3. According to Ms. West, one hospital administrator explained the Survey was so "overwhelming" that she "couldn't complete her other duties" alongside it. *Id.* 89:24–90:4.

44. St. Mary's CEO Ms. McCauley testified that it took her hospital's quality director "more than a full calendar week" to complete the Survey. McCauley Tr. 138:13–18. As discussed below, St. Mary's and the other Community Hospitals each stopped participating in the Survey in 2021 during the height of the COVID-19 pandemic to devote their resources elsewhere. *See infra*

¶ 364; *see also* ECF 129 ¶ 93.

45. The Community Hospitals are not the only hospitals to have opted out of participating in Leapfrog's Survey. In Fall 2023, for example, more than 900 hospitals—or 32 percent of all hospitals—did not submit a response to the Survey.[4] PX-397.0 at -206. By Fall 2024, only 23 percent of hospitals that received a Safety Grade participated in the Survey. PX-937.0 at 27.

**B. Leapfrog's Safety Grade**

46. Leapfrog assigns "Safety Grades" to general acute-care hospitals across the United States twice a year, including for 191 hospitals in Florida, whether or not a hospital submits a response to Leapfrog's Survey. Each grade consists of a single letter—"A," "B," "C," "D," or "F"—which is displayed prominently at the top of the hospital's respective Safety Grade page on Leapfrog's consumer-facing website, hospitalsafetygrade.org. *See, e.g.*, PX-033.2 at 1.

47. The Leapfrog Safety Grade was created to influence consumer decision-making about where to seek medical care, thereby exerting public pressure on hospitals that receive lower letter grades. *See, e.g.*, PX-011.0 at -080; PX-019.0 at -438; PX-023.0 at -073.

48. The Safety Grades are intended to affect consumers' choices. On hospitalsafetygrade.org, Leapfrog states that "[p]atients should ***always*** decide on where to receive care based on a hospital's current Safety Grade," PX-023.0 at -073 (emphasis added), and that its "letter grade scoring system allows consumers to quickly assess the safety of their local hospital," PX-011.0 at -080. On Leapfrog's other consumer-facing website, leapfroggroup.org, Leapfrog similarly states that the Safety Grades are "a quick way for consumers to choose the safest hospital to seek care." PX-019.0 at -438.

49. Ms. Bailey, Leapfrog's Director of Communications, testified that Leapfrog's public messaging is that patients should "start" by looking at Leapfrog's Safety Grades when making healthcare decisions. Bailey Tr. 28:7–15.

50. Ms. Jupiter, Leapfrog's Vice President of Development and Ms. Bailey's supervisor for communications matters, testified that Leapfrog designed its public statements so that, "if a consumer observes . . . their particular hospital's safety grade going down over time," the consumer will interpret that decline to mean the hospital is "less safe." Jupiter Tr. 247:12–17.

---

[4] This figure dropped to 20% for Fall 2024, after Leapfrog changed its Safety Grade methodology. PX-397.0.

Ms. Jupiter further testified that Leapfrog "want[s] consumers to think that visiting a hospital with a C, D, or F grade could seriously injure or even kill them." *Id.* 253:11–15.

51. Ms. Binder, who served as Leapfrog's Rule 30(b)(6) representative to discuss the organization's website, stated that Leapfrog intends to "give consumers information so they can make a good choice for themselves and their families" and to "influence them to seek care at the safest, highest-quality" hospitals. Binder Tr. 343:2–20.

52. Leapfrog has highlighted in its Annual Report—a document intended to help solicit funds from donors and prospective donors—that a patient drove 400 miles to reach an "A" hospital after seeing "the hospitals closest to him did not perform well" on Leapfrog's Safety Grades:

**Leapfrog's Impact**

What really matters is people. Leapfrog exists to help patients and their families find access to safer health care and, in turn, help save lives. When Carl Flatley was out of town for a bike race last year, he woke up in the middle of the night with severe back pain and knew he needed a hospital. He quickly looked at the Leapfrog Hospital Safety Grades in the area he was in and realized the hospitals closest to him did not perform well. The closest hospital with an "A" grade was 400 miles away, but he made the drive because he wanted to ensure he would get the best, safest care possible. Thanks to the information provided in the Hospital Safety Grade, Carl received the treatment he needed at the hospital and recovered with no complications.

**"You have to pick the hospital you go to based on competency – not convenience. Leapfrog provides invaluable data that all patients should use." -Carl Flatley**




nearly
**1 million**
Social media impressions across Facebook, Twitter and LinkedIn for 2021

**30**
Webinars educating providers, employers and the public on health care safety

**4,500,000**
website visits in 2021

PX-221.0 at -714 (highlighting added).

53. Leapfrog's website and consumer-facing materials further emphasize the purported life-or-death significance of choosing a hospital with a higher letter grade. Leapfrog states that "patients are twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than an 'A' hospital," PX-021.0 at -423, and that, "[c]ompared to an 'A' hospital, your risk of dying increases . . . 91.8%" at a "D" or "F" hospital, PX-008.0 at -007.




54. *See id.* Leapfrog has represented to consumers that these mortality statements are supported by a white paper that Leapfrog commissioned in 2016. PX-008.0 at 1. In 2019, Leapfrog posted an updated version of that white paper on its website alongside the above graphic. *See* PX-

008.0 at -004, -007; *see also* PX-208.0. That white paper analyzed mortality rates under a Safety Grade methodology that Leapfrog retired in 2021. *See* PX-208.0; PX-216.0; PX-220.0.

55. The 2016 version of the white paper remains publicly available on Leapfrog's website. However, Leapfrog has not revised or qualified its "twice as likely to die" statements to reflect that the white paper analyzed a now-outdated version of the Safety Grade methodology.

### C. How Leapfrog Calculates the Safety Grades

#### 1. *Overview of Measures and Data Sources*

56. As of Fall 2024, Leapfrog measures its Safety Grades using up to twenty-two measures.[5] *See* PX-002.0 at -048; *see also* JX-041.1 at -515 (stating that there are "22 measures included in the Safety Grade"). Ten of these measures are classified as "outcome" measures, while the remaining twelve are "process" or "structural" measures. *See* PX-002.0 at -048–050.

57. Leapfrog represents publicly to consumers that those twenty-two measures draw on three categories of data: (1) hospital-reported information submitted through the Survey; (2) publicly available data from CMS or the Center for Disease Control and Prevention's National Healthcare Safety Network ("NHSN"); and (3) what Leapfrog describes as "other supplemental data sources." PX-002.0 at -047, -056.

#### 2. *Safety Grade Methodology*

58. Not all hospitals participate in Leapfrog's Survey, including because they elect not to devote the substantial time or resources needed to complete it. *See supra* ¶¶ 32–45.[6] As a result, Leapfrog applies different data sources and scoring methods depending on whether a hospital participates in the Survey. *See* PX-002.0 at -048–050.

59. For hospitals that participate in the Survey, Leapfrog calculates the Safety Grade using a combination of Survey responses and publicly reported data from CMS or the Centers for Disease Control's National Healthcare Safety Network ("NHSN"). *See* PX-002.0 at -047, -056.

60. Specifically, for the ten outcome measures, Leapfrog scores five using hospitals' Survey responses and five using publicly available NHSN data. *See* PX-002.0 at -050, -056.

61. For the twelve process or structural measures, Leapfrog scores seven using hospital-reported Survey responses and the remaining five using publicly available CMS data. *See*

---

[5] One of the twenty-two measures is a composite containing ten other individual measures. This forms the thirty-two measures that Leapfrog's materials reference at times.

[6] All internal citations to ¶ __ are citations to the Findings of Fact. Internal citations to CoL ¶ __ are to the Conclusions of Law.

PX-002.0 at -048–049.

62. In total, twelve measures—five outcome measures and seven process or structural measures—depend on the Survey responses when calculating participating hospitals' Safety Grades. *See* PX-002.0 at -058 ("Twelve (12) of the 22 measures included in the Safety Grade are derived from the Leapfrog Hospital Survey."). Collectively, Leapfrog weights these twelve measures to account for approximately 56.3 percent of a hospital's overall Safety Grade.

63. For hospitals that do not participate in the Survey ("nonparticipating hospitals"), Leapfrog scores the ten measures that rely on publicly available data—the five outcome measures and five process measures—in the same manner as for participating hospitals. *See* PX-002.0 at -048–050.

64. But because nonparticipating hospitals do not submit Survey responses, Leapfrog lacks hospital-reported data for the twelve Survey-dependent measures used to calculate the Safety Grade. *See infra* ¶¶ 301–14 (Leapfrog witnesses acknowledging that Leapfrog lacks nonparticipating hospitals' performance data on numerous Survey-dependent measures). Despite the absence of Survey data for twelve measures, Leapfrog nevertheless assigns Safety Grades to nonparticipating hospitals.

65. Leapfrog applies other methods to score nonparticipating hospitals on the twelve Survey-dependent measures. *See* PX-002.0 at -058; PX-033.7 (Good Samaritan's Detailed Table View).

66. For the five Survey-dependent outcome measures, Leapfrog scores nonparticipating hospitals using publicly available CMS data. *See* PX-002.0 at -050 (describing CMS as a "Secondary Data Source").

67. For the seven Survey-dependent process or structural measures, Leapfrog takes a different and problematic approach. In the absence of Survey data, Leapfrog excludes three of the seven measures—Safe Practice 1: Culture of Leadership Structures and Systems ("SP 1"), Safe Practice 2: Culture Measurement, Feedback & Intervention ("SP 2"), and Total Nursing Care Hours per Patient Day—entirely from the scoring calculation and redistributes their assigned weights to the remaining measures. *See* PX-002.0 at -048–049 (listing "N/A" for "Secondary Data Source"), -065; *see also* PX-033.7. The remaining four Survey-dependent process or structural measures (the "Four Measures") are central to this case. The Four Measures include:

1) Computerized Physician Order Entry ("CPOE"), which measures

whether a hospital uses an electronic system to record physician orders. On its consumer-facing website, Leapfrog calls CPOE "Doctors order medications through a computer." *E.g.*, PX-033.5.

2) Bar Code Medication Administration ("BCMA"), which measures whether staff confirm medication through bar code scanning. On its consumer-facing website, Leapfrog calls BCMA "Safe medication administration." *E.g.*, *id.*

3) ICU Physician Staffing ("IPS"), which measures intensivist staffing at the ICU. On its consumer-facing website, Leapfrog calls IPS "Specially trained doctors care for ICU patients." *E.g.*, PX-033.6.

4) Hand Hygiene Score ("Hand Hygiene"), which measures the policies and training for hand hygiene. On its consumer-facing website, Leapfrog calls Hand Hygiene "Handwashing." *E.g.*, PX-033.5.

68. Leapfrog places hospitals into one of four performance categories depending on the score they receive for the Four Measures:

1) "Achieved the Standard" (score of 100);
2) "Considerable Achievement" (50–75, depending on the measure);
3) "Some Achievement" (15–50, depending on the measure); and
4) "Limited Achievement" (5–25, depending on the measure).

*See* PX-002.0 at -052–055.

### 3. *Imputation Methodology Applied to the Four Measures*

69. For the Four Measures, Leapfrog applies what it describes as an "imputation methodology" to assign scores to nonparticipating hospitals. PX-002.0 at -048–049. This methodology operates in two steps. *See id.* at -058–059.

70. Under Step 1, Leapfrog assigns a nonparticipating hospital the most recent score it received on the Four Measures, meaning the assigned value may reflect the hospital's past Survey-reported performance. *See* PX-002.0 at -058; *see also* ECF 129 ¶ 82. This step applies only if the hospital has historical data from the two most recent Safety Grade cycles—once a hospital does not submit the Survey for more than one year, Leapfrog proceeds to Step 2. PX-002.0 at -058; *see also* ECF 129 ¶ 83.

71. Under Step 2, Leapfrog automatically assigns (or, as Leapfrog describes it,

"imputes") nonparticipating hospitals the lowest possible score—or "Limited Achievement"—on each of the Four Measures, regardless of the hospitals' actual performance. PX-002.0 at -058; Campione Tr. 153:6–18; *see also* ECF 129 ¶¶ 84–86.

| **Methodology for Participating vs. Nonparticipating Hospitals** | | |
|---|---|---|
| **Category** | **Participating Hospitals** | **Nonparticipating Hospitals** |
| **Outcome Measures (10)** | | |
| Survey Responses | 5 | 0 |
| Public Data | 5 | 10 |
| **Process/Structural Measures (12)** | | |
| Survey Responses | 7 | 0 |
| Public Data | 5 | 5 |
| Excluded from Scoring | 0 | 3 |
| "Imputation Methodology" (Automatically Assigned Lowest Score) | 0 | 4 |

*See* PX-002.0 at -048–050.

72. Leapfrog's "imputation methodology" materially and negatively affects the overall Safety Grades assigned to nonparticipating hospitals. For participating hospitals, the seven Survey-dependent process or structural measures (CPOE, BCMA, IPS, Hand Hygiene, SP 1, SP 2, and Total Nursing Care Hours per Patient Day) account for approximately 35 percent of a hospital's overall Safety Grade and are based on real data. JX-041.0 at -531. But for nonparticipating hospitals, Leapfrog excludes three of those measures (SP 1, SP 2, and Total Nursing Care Hours per Patient Day) and redistributes their weights to the remaining measures, such that the Four Measures together comprise nearly 31 percent of a nonparticipating hospital's overall Safety Grade. *See* JX-041.0 at -531; PX-937.0 ¶ 50. Moreover, nonparticipating hospitals subject to Step 2 "imputation" automatically receive failing-level scores on the Four Measures, despite having no Survey data to back that up. *See* PX-002.0 at -058, -062; JX-041.0 at -527.

73. Leapfrog's own internal analyses demonstrate the magnitude of this effect. As determined by Leapfrog employees in April 2024, the mean scores for participating hospitals in the bottom 25 percent of the Survey—the lowest-performing 25 percent of respondents—were 77 for CPOE, 87 for BCMA, and 49 for Hand Hygiene (IPS was not included in this analysis). JX-

018.0 at -683. By contrast, nonparticipating hospitals subject to Step 2 "imputation" are automatically assigned scores of 15 for CPOE; 25 for BCMA, and 15 for Hand Hygiene. PX-002.0 at -058. The disparity in these scores is represented in the chart below:

| | **Mean Score of Bottom Quartile of Participating Hospitals** | **Limited Achievement Score Assigned to Non-Participating Hospitals** |
|---|---|---|
| **CPOE** | 77 | 15 |
| **BCMA** | 87 | 25 |
| **Hand Hygiene** | 49 | 15 |

74. This disparity derives from Leapfrog's approach to verifying Survey responses. Leapfrog rarely verifies hospitals' Survey responses and generally relies on hospitals to self-certify the accuracy and completeness of the information they submit. According to Ms. Binder, Leapfrog conducts an on-site audit for only "four or five" of the thousands of hospitals that submit Survey responses each year, Binder Tr. 64:18–65:15—or about "0.1" or "0.2 percent of hospitals" annually, Nicholson Tr. 100:7–18. Leapfrog witnesses did not deny that low quantum of verification. Instead, Ms. Campione testified that Leapfrog requests documents from "randomly select[ed] hospitals," but she could not provide any estimate—or even a "ballpark" figure—of how many hospitals receive such requests in a given year. Campione Tr. 117:22–119:5.

75. As a result, hospitals that participate in the Survey are typically scored on the twelve Survey-dependent measures based on information they report themselves, with only minimal verification by Leapfrog. *See* Binder Tr. 64:18–65:15; Nicholson Tr. 100:7–18; Campione Tr. 117:22–119:5. And Dr. Nicholson testified that, for the seven process or structural measures scored exclusively based on Survey responses, a majority of participating hospitals assign themselves the highest possible score. *See* Nicholson Tr. 131:9–19 ("a majority of hospitals are given the top, the maximum score for those seven").

76. Accordingly, once Step 2 applies, nonparticipating hospitals automatically receive failing-level scores on all Four Measures regardless of their actual performance—scores that are drastically lower than even the lowest performing participating hospitals.

## IV. LEAPFROG'S MONETARY INTEREST IN SURVEY PARTICIPATION

### A. Leapfrog's Revenue Streams

77. Leapfrog's 2024 IRS Form 990 reports annual revenue of nearly $8.4 million.

PX-824.0 at 9. Of that, more than $5.4 million—over half of the organization's revenue—was derived from "licensing," "data licensure," and "data products" tied to its Survey and Safety Grades. PX-824.0 at 9.

78. Leapfrog's revenue is generated primarily through two channels: (1) licensing and selling Survey-derived, Safety Grade, and related data to insurers, researchers, and other third parties; and (2) charging hospitals that want to use Leapfrog's logo to promote their assigned Safety Grades and other Leapfrog ratings. *See* PX-321.0 at -789; Binder Tr. 271:16–272:1 (testifying that the accolades licensing and data licensing programs currently are Leapfrog's "two largest sources of revenue"). Leapfrog also generates additional revenue through educational and consulting programs. *See* PX-321.0 at -789, -796; PX-275.0 at -281.

**1. *Data Licensing***

79. Leapfrog monetizes data derived from the Survey submissions. It can monetize that data because it requires participating hospitals to authorize Leapfrog to use their data "in a commercial manner for profit." *See, e.g.*, JX-042.0 at -696.

80. Data licensure is Leapfrog's second largest revenue stream, a "significant source" of revenue for the organization. Banerjee Tr. 39: 9–13, 203:13–18; PX-321.0 at -789. In 2024, Leapfrog earned over $2.17 million selling Survey data, Safety Grade data, and associated products to health plans, insurers, researchers, and other third parties. PX-321.0 at -789; *see also* PX-225.0 at -898 (categorizing 2023 licensees). Leapfrog sells four primary data products: (1) the Hospital Survey dataset, which is a compilation of data derived from hospitals' Survey submissions; (2) the Hospital Outpatient Department and Ambulatory Surgical Center ("ASC") Survey dataset; (3) the Safety Grade dataset; and (4) the Value Based Purchasing program ("VBP") dataset, which generates composite scores for hospitals that complete the Survey. PX-258.0 at -448; Banerjee Tr. 209:7–14 (describing VBP program).

81. Third parties use Leapfrog's data to influence consumer choices and structure payments to hospitals. Leapfrog has represented that its data is incorporated into so many transparency tools used by employers and purchasers that Leapfrog data reaches "*virtually all Americans*." PX-406.0 at -518. For example, insurance companies display Leapfrog data in consumer-facing directories used by patients to select hospitals. *See* Banerjee Tr. 110:10–19, 111:15–112:6. Health plans use the VBP composite scores to structure payment decisions. *See* PX-016.0 at -602. Leapfrog itself has stated that "[e]mployers and purchasers use Survey results to

identify the best facilities for their employees' health care needs and work with health plans to design value-based benefits packages that reward the safest and highest quality performers. Health plans and others include Leapfrog data on plan websites and materials as well as in transparency tools." PX-406.0 at -519.

### 2. *Accolades Licensing*

82. Leapfrog charges hospitals to use Leapfrog's logos or branding in marketing materials. In 2024, Leapfrog earned about $3.29 million from accolades licensing, making it the organization's largest revenue source. PX-321.0 at -789. Revenue from the Safety Grades accolades comprises the majority of Leapfrog's total accolades licensing revenue. Banerjee Tr. 66:13–19.

83. Hospitals must pay Leapfrog anywhere from $5,700 to nearly $30,000 to market and promote their Safety Grades with Leapfrog's logo, as depicted below. PX-407.0 at -281. Without an accolades license, hospitals may issue only a plain-text press release that does not include Leapfrog's branding.




PX-508.0 at 2 (showing the Leapfrog logo that hospitals purchase to promote their Safety Grades).

84. Accolades sales are critical to Leapfrog's bottom line revenue and are closely monitored by Leapfrog leadership. During the weeks surrounding Safety Grade releases, Mr. Banerjee provides near-daily updates to Ms. Binder regarding sales performance—updates Ms. Binder personally requested. Banerjee Tr. 200:18–201:14; PX-431.1.

85. Leapfrog contracts with a Florida-based telemarketing company, TelAffects, to sell accolades licenses. Banerjee Tr. 120:15–121:11. TelAffects representatives are the first to notify hospitals that they will be receiving an "A" Safety Grade and then seek to convert those hospitals into accolades licensees. Banerjee Tr. 103:17–104:10.

86. TelAffects also contacts hospitals that use Leapfrog's logos without a license—what Mr. Banerjee calls "rogue hospitals"—and attempts to convert them into paying customers. PX-213.0 at -321; Banerjee Tr. 115:8–18.

87. Leapfrog and TelAffects jointly prepare sales scripts and talking points, and Leapfrog awards bonuses if sales targets are met by specified deadlines. Banerjee Tr. 124:5–126:9. A TelAffects presentation from June 2022 advised Leapfrog's telemarketers to tell hospitals that purchasing an accolades license can provide a "competitive edge" in the "local marketplace," resulting in increased patient traffic and revenue and "[r]ecruitment of better doctors and medical professionals." PX-222.0 at -958. Likewise, a March 2025 email from a TelAffects representative to an "A" hospital argued that purchasing an accolade would lead to "a more trusted reputation in the community and an enhanced ability to recruit and retain quality staff." PX-422.0 at -471.

88. Leapfrog's accolades licensing website, https://leapfroglicensing.org/, similarly promotes the use of accolades for recruitment and reputation enhancement. PX-508.0 at 6. This website highlights Jupiter Medical Center—a principal competitor of the Community Hospitals—as an example of a hospital using Leapfrog branding to promote its "A" Safety Grade. PX-508.0 at 2. Jupiter Medical Center paid Leapfrog nearly $12,000 for an accolades license in Spring 2025. PX-407.0 at -281.




PX-508.0 at 2 (Leapfrog's accolades licensing website shows how Jupiter Medical Center advertises its Safety Grade).

89. In fiscal year 2025, Leapfrog's accolades sales exceeded $4 million, a record level that made accolades licensing an "even greater percentage of the . . . organization's overall revenue." Banerjee Tr. 203:13-18.

### 3. *Consulting and Certification Programs*

90. Leapfrog also generates substantial revenue from selling informational sessions to hospitals, healthcare-consulting companies, and other interested parties. PX-321.0 at -789, -796; PX-275.0 at -281. Leapfrog projected that it would earn $230,000 through these types of programs in Fiscal Year 2025. PX-405.0 at -889.

91. Leapfrog charges healthcare-consulting companies nearly $1,000 to participate in its Certified Coaches program. Danforth Tr. 584:13–584:12, 589:2–17. That program trains consultants on Leapfrog's Survey and Safety Grade methodology. Binder Tr. 86:3–87:10. Ms. Binder explained that Leapfrog created the program after companies received questions from

hospital clients about improving measures on Leapfrog's Survey. *See id.*

92. Leapfrog charges hospitals approximately $400 to participate in its "Deep Dive Series," which gives hospitals information about how to complete the Survey and "more personalized attention." Danforth Tr. 589:21–591:22. Leapfrog also charges hospitals $500 to participate in a Survey webinar series that includes access to monthly office hours with Leapfrog's "Help Desk." PX-406.0 at -498.

**B. Leapfrog's Revenue Streams Depend on Survey Participation**

93. Survey participation directly affects Leapfrog's revenue streams, including data licensing and accolades licensing. The more hospitals that participate in Leapfrog's Survey, the greater revenue Leapfrog recovers—giving Leapfrog a clear monetary incentive to increase the number of hospitals that participate in its Survey.

***1. Survey Participation Drives Leapfrog's Data Products***

94. Leapfrog's contemporaneous documents confirm Leapfrog has long recognized that higher Survey participation increases the value and marketability of its data products. In 2018, Leapfrog's former Director of Business Development, Stephen Gaus, prepared a *Business Development Discovery Report* to study Leapfrog's "opportunity to monetize its IP." PX-205.0 at 484; Banerjee Tr. 70:17–71:1. The report emphasized the importance of increasing Survey participation, stating: "To maximize the value of The Leapfrog Group's Data for licensing purposes ***the level of participation should continue to be increased*** so it can be perceived as the most complete data set and thus allowing defense of our pricing model and its price points." PX-205.0 at -484 (emphasis added).

95. Testimony from Leapfrog's Director of Licensing Programs, Mr. Banerjee, confirmed that Mr. Gaus's findings remain true. Mr. Banerjee testified that Survey participation directly increases the volume and scope of the data that Leapfrog can package and sell, explaining that more participating hospitals result in a more complete data set. Banerjee Tr. 76:2–7.

96. Mr. Banerjee further testified that a more complete data set makes Leapfrog's products more attractive to prospective licensees, including insurance companies and benefits providers, and may generate increased interest from organizations operating in specific markets. Banerjee Tr. 76:8–20, 79:10–80:5, 213:18-23; *see also id.* 82:21–83:6.

97. Leapfrog Expert Panelist Dr. Romano likewise acknowledged that the organization's "business model . . . depends on producing data," and that Leapfrog's "data are not

valuable if [Survey] participation is low." PX-501.0 at -208.

98. Several Leapfrog data products are available only, or are more valuable, when hospitals complete the Survey. For example, Leapfrog's VBP program generates scores only for hospitals that complete the Survey, making the dataset more attractive to customers as participation increases. Banerjee Tr. 213:1–5, 235:11–16. Leapfrog also sells a health system support subscription, charging health systems up to $19,000 to package Survey data across system hospitals. Banerjee Tr. 59:13–60:5. Mr. Banerjee confirmed that if one or more hospitals within the health system do not complete the Survey, the resulting data package would be incomplete. Banerjee Tr. 62:11–16.

99. Leapfrog Board materials further confirm Leapfrog's focus on increasing revenues and Survey participation. Board materials from May 2024 emphasized that "leadership must focus on growing revenues," and identified as an "[i]ssue[] with" Leapfrog's then-current "approach" that "improving patient safety is not central." PX-286.0 at -727, -730.

100. In December 2024, Leapfrog's Board approved a "Long Range Strategic Intent" document listing three primary objectives for the next six years. PX-354.0 at -926. The first objective was to "[s]cale resources," and the first goal within that objective was to "[e]xpand revenue." PX-354.0 at -927. Leapfrog set goals of doubling the organization's total revenue to $18 million by 2031, increasing data licensing revenue 20 percent by 2028 and an additional 20 percent by 2031, and "increas[ing] participation" in the Hospital Survey. PX-354.0 at -927–929. The same Board-approved document also identified as a strategic objective a goal of "pressur[ing]" health plans "to tie Leapfrog ratings to payment decisions." PX-354.0 at -930.

101. Leapfrog also uses Survey participation levels to market its data to *existing licensees.* In a September 2021 email to licensees, for example, Mr. Banerjee highlighted record Survey participation as a positive development for Leapfrog's data offerings. PX-219.0 at -522.

### 2. *Survey Participation Also Drives Accolades Licensing Revenue*

102. Survey participation similarly affects Leapfrog's accolades licensing revenue. In a January 2024 "Accolades Sales Analysis" presentation prepared for Leapfrog's telemarketers, Ms. Campione calculated that "Survey Participants are 10x more likely to license" their Safety Grades. PX-247.0 at -573. The same analysis showed that only three nonparticipating hospitals eligible to purchase an accolades license in Fall 2023 did so. *Id.* at -575.




*See id.* at -573.

103. Survey participation also affects whether hospitals receive Safety Grades they consider marketable. Leapfrog's telemarketers prepare responses to "[c]ommon [o]bjections" raised by hospitals when solicited to purchase accolades licensing. PX-222.0 at -022. One such objection is that Leapfrog's brand is not "as recognized as U.S. News or Consumer Reports." PX-222.0 at -022. In response, a 2022 TelAffects presentation instructed sales representatives to emphasize that "over 2,300 hospitals" completed Leapfrog's Survey in 2020. PX-222.0 at -025. Mr. Banerjee confirmed that Leapfrog's brand strength increases as more hospitals complete the Survey and that Leapfrog is "better positioned to sell accolade licensing when it can say more hospitals have participated in the hospital survey." Banerjee Tr. 139:15–140:7.[7]

[7] During her deposition, Ms. Danforth testified that Survey participation does not confer any financial benefit on Leapfrog, stating that there is "[n]one whatsoever." Danforth Tr. 568:1–6. The Court finds by a preponderance of evidence that Ms. Danforth's testimony was not credible. The record evidence, including Leapfrog's internal documents, board presentations, sales analyses, and testimony from Mr. Banerjee and Dr. Romano overwhelmingly demonstrates that Survey participation affects both the value of Leapfrog's data products and the likelihood that hospitals will purchase accolades licenses. *See supra* ¶¶ 96–105. Ms. Danforth's own contemporaneous communication likewise reflects an understanding that Survey participation has revenue implications for Leapfrog. In a November 2023 email, Ms. Danforth questioned whether Leapfrog's then-existing imputation methodology was discouraging hospitals from participating in the Survey and expressed concern about the "financial risk" to Leapfrog "if we make changes to how we display grades for hospitals that don't submit." PX-241.0 at -605.

## V. THE FALL 2024 CHANGE TO LEAPFROG'S SAFETY GRADE METHODOLOGY

### A. Leapfrog's Approach to Imputation Prior to 2024

104. In late 2011, Leapfrog empaneled nine experts as an "Expert Panel" to "develop a composite score to evaluate patient safety in US hospitals." *See* PX-202.0 at -666. The Expert Panel's deliberations and conclusions were memorialized in a peer-reviewed article published in 2013. *See id.* The authors of that article included Dr. Austin and eight of the nine expert panelists, including Dr. Romano. *See id.*

105. A central issue the panelists addressed was how to treat hospitals with missing data. *See* PX-202.0 at -668. Their 2013 article recognized that some hospitals "had so much missing data" that "it was not possible to reliably calculate a safety score." *Id.* To balance "reliability" with the desire to grade as many hospitals as possible, the Expert Panel recommended adopting "minimum measure thresholds," concluding that Leapfrog should not assign a Safety Grade to hospitals "missing more than 9 of 15 process/structural measures or more than 3 of 11 outcome measures." *Id.* at -668–669.

106. As memorialized in the 2013 article, the Expert Panel considered five alternative approaches for assessing hospital performance when data was missing. *See* PX-202.0 at -668. The Panel expressly rejected approaches that would penalize hospitals for missing data, including one option where Leapfrog would "impute a score above or below the median/mean" and another where Leapfrog could "give hospitals zero credit for the measure when the hospital chose not to report data to Leapfrog." *Id.* The Expert Panel rejected these options "to avoid creating a structural bias in favor of Leapfrog-reporting hospitals." *Id.*

107. Instead, the Expert Panel concluded that hospitals should be scored based on available data *without* penalties for missing information, explaining that "by scoring hospitals on the available data, the composite scores were based on what was known about the hospital's performance, with no penalties for missing data." *See* PX-202.0 at -668.

108. To provide an empirical basis for estimating performance on measures with missing data, the Expert Panel identified alternative data sources to allow Leapfrog to calculate an "expected value" for how hospitals with missing Survey data would actually perform on two measures: CPOE and IPS. PX-202.0 at -668; *see also* JX-001.0 at -995.

109. From 2012 through 2021, Leapfrog implemented this empirically grounded

approach by using data hospitals submitted to the American Hospital Association ("AHA") survey to impute scores for CPOE, BMCA, and IPS. Austin Tr. 84:13–85:1; PX-216.0 at -536.

110. In 2021, however, the AHA declined to renew Leapfrog's data license to use the AHA data in Leapfrog's Safety Grade. PX-216.0 at -536; Austin Tr. 258:2–259:14 ("there was a point where AHA revoked Leapfrog's license to use the data."). Dr. Austin testified that one reason that AHA revoked the license agreement was because AHA received "complaints from their member hospitals about how those data were being used by Leapfrog." Austin Tr. 258:2–259:14. Specifically, hospitals complained about "how the data were being translated into scores for Leapfrog." *Id.*

111. After the AHA declined to renew Leapfrog's data license, Leapfrog retained statistical consultants from Mathematica to help "identify possible alternative imputation approaches." PX-216.0 at -536. From September 2020 through January 2021, Leapfrog worked with panelists Drs. Romano and Singer, along with Mathematica to develop [initially] a "3-step imputation approach for the CPOE, BCMA and IPS measures that uses publicly available data, is transparent to hospitals and is feasible for Leapfrog to implement." *Id.* Dr. Austin announced this "new imputation approach" to the expert panelists in January 2021, which included Step 1 (Use a Hospital's Most Recent Score on the Measure), Step 2 (Use the Mode of Scores Assigned to Hospitals in the Same Health System), and Step 3 (Use the Mean of the Scores Assigned to Other like Hospitals in the U.S.). *Id.* at -532–533.

112. After Leapfrog received public comments on its proposed approach, it informed the Expert Panel that it would be removing the originally proposed step 2, imputing the mode from hospitals in the same health system. PX-216.0 at -532–533. Dr. Austin expressed that under the new proposed approach, Leapfrog was "pleased to see that the imputation of the scores didn't cause a drastic shift in scoring." *Id.* at -533. In response, expert panelists including Drs. Singer, Romano, and Pronovost asked Leapfrog's Ms. Danforth and Dr. Austin for further clarification as to the "difference between the two approaches" of Step 2 and Step 3. *Id.* at -530–532. Ms. Danforth ran analyses and determined that Step 3 imputation produced scores "right around mean." *Id.* at -529. Ms. Danforth concluded explaining that Leapfrog is continuing to "look for alternative sources of data for one or more of these measurements" and asked the panelists for recommendations on "additional data sources [that] are appropriate for use in the Grade." *Id.* -528.

113. The result of this 2021 effort was a new, two-step imputation approach that no

longer required the AHA data for which Leapfrog had lost its data license. *See* PX-216.0. Under Step 1, Leapfrog used a hospital's own recent Survey data from up to four prior grading cycles. *See* PX-220.0 at -143. If no such data was available, Leapfrog proceeded to Step 2, under which it assigned the hospital a mean score based on scores applicable to a cohort of similarly situated hospitals. *Id.*

114. Leapfrog claimed it developed this two-step imputation methodology to "minimize bias." JX-006.0 at-130. It represented to the public that the imputation methodology "was tested for both validity and reliability." *Id.* Leapfrog further stated that, for Step 2 imputation, "[u]sing the mean performance, rather than the bottom quartile or decile, produced the strongest agreement between predicted and actual scores, meaning the use of the mean most accurately resembled the actual performance we could expect if the hospitals were to report to the Leapfrog Hospital Survey." *Id.*

115. Leapfrog employed this two-step, cohort-based imputation methodology through the Spring 2024 grading cycle. *E.g.,* PX-001.0 at -942–944; JX-014.0 at -157–160.

**B. Declining Survey Participation and Leapfrog's Focus on Increasing Revenue**

116. Between fiscal years 2022 and 2023, participation in Leapfrog's Survey declined by 4%. PX-426.0 at -766; JX-010.0 at -374. During this same period, Leapfrog's combined data and accolades licensing revenue also declined from about $5.41 million to $5.36 million, corresponding to the reduction in Survey participation. *Compare* JX-010.0 at -374; PX-247.0 at -570 *with* PX-275.0 at -281.

117. In 2023, HCA Healthcare decided that its 160 hospitals would not participate in the 2023 Survey after objecting to Leapfrog's measure of "the ratio of nursing hours to patient days." PX-304.0 at -073; Binder Tr. 236:15–240:8. HCA's decision displeased Binder. *See* Binder Tr. 238:7–239:8. In a private message to former Leapfrog employee Paige Lipscomb in October 2023, Ms. Campione wrote that Ms. Binder was discussing "changing [the] scoring methodology to penalize HCA." PX-238.0 at -361. Ms. Lipscomb responded that she "hate[d] that we don[']t just do our thing, like we manipulate everything." PX-238.0 at -361. Ms. Campione characterized the proposal to penalize HCA as "banana land," adding that Ms. Binder "keeps grudges." PX-238.0 at -361.

118. In November 2023, as Leapfrog was seeing its participation and licensing revenue decline, Ms. Danforth emailed Mr. Banerjee and Ms. Campione asking them to analyze "the

number of licensees that don't submit a Survey and the % of accolades revenue those facilities represent for say the past 2 years (last 4 rounds)." PX-241.0 at -605. In her email, Ms. Danforth expressed concern that Leapfrog's then-existing Safety Grade methodology risked "reducing incentive to submit a Survey EVERY year" and stated that she wanted "to understand [the] financial risk if we make changes to how we display grades for hospitals that don't submit." PX-241.0 at -605.[8]

119. In January 2024, following Ms. Danforth's request, Ms. Campione prepared a presentation analyzing the relationship between Survey participation and accolades licensing revenue. That analysis confirmed that accolades revenue declined from fiscal year 2022 to fiscal year 2023 in parallel with the decline in Survey participation. JX-010.0 at -374; PX-247.0 at -570.




PX-247.0 at -570.

120. Making things worse, Leapfrog ended fiscal year 2023 with a net loss exceeding $400,000 given rising expenses. PX-321.0 at -789. By early 2024, Leapfrog's Board and officers were prioritizing increasing revenue and Survey participation. *See, e.g.*, PX-275.0 at -278.

[8] During her deposition, Ms. Danforth was evasive in explaining what "financial risk" her email referred to. Among other things, she stated she did not "recall specifically" what she was referring to, Danforth Tr. 318:9–21, that the financial risk "might have been" the worry that declining participation would lead to declining revenues, *id.* 322:8–323:7, that she "didn't know what [she] didn't know," *id.*, and that she "was probably just, again, asking the question," *id.* 330:6–21.

121. In April 2024, for instance, Leapfrog's then-finance adviser Ben Choi warned in an email to Ms. Binder that Leapfrog would "fall short on topline revenue by ~$540k." PX-275.0 at -279. In response, Ms. Binder instructed Mr. Choi not to "lose focus on what managers should be thinking about 24/7, which is revenues." PX-275.0 at -278.

122. The compensation of Leapfrog's executive leadership team is dependent, in part, on Leapfrog's revenue. Binder Tr. 311:18–22; *see* Leapfrog's Second Am. Ans. to Pls.' Interrogs. at 16. Ms. Binder, in particular, has partly based her bonus request to Leapfrog's Executive Committee on whether Leapfrog has met revenue growth expectations or faced a financial loss. *See, e.g.*, PX-248.0 at -362–363; PX-322.0 at -942.

**C. Leapfrog's April 12, 2024 Expert Panel Meeting**

123. In Spring 2024, against the backdrop of declining Survey participation and corresponding declines in revenue, Leapfrog began evaluating potential changes to its Safety Grade methodology. Leapfrog's proposal was going to be presented at an April 12, 2024, meeting of the Expert Panel (the "Expert Panel Meeting").

124. On April 10, 2024, Ms. Campione emailed Dr. Austin, Ms. Danforth, and Preeti Joshi to share a draft of the slide deck they planned to present to the Expert Panel on April 12. PX-261.0 at -820–821. The same day, Dr. Austin responded with "an updated version of the slides," explaining that he had "added in a slide at the start of the imputation section that outlines the 'problems' we are trying to solve," *id.* at -819–820:

## Problem that We are Working to Solve

- **History**
  - Leapfrog moved to its current imputation approach in 2021, when the American Hospital Association discontinued its survey data license with Leapfrog (AHA Survey had been a long-time secondary data source)
  - Leapfrog was also seeking seek ways to grade additional hospitals
- **We are currently facing these challenges:**
  - Imputed scores have crept up, making imputation a more favorable choice for lots of hospitals and has de-incentivized true transparency of performance
  - Hospitals are using the Step 1 Imputation (using their individual hospital's historical data) as a reason to not report on the current year's survey

THELEAPFROGGROUP
Giant Leaps for Patient Safety

© The Leapfrog Group 2024 5

LEAPFROG00437367

PX-264.0 at -367.

125. On April 12, 2024, in advance of the Expert Panel Meeting, Ms. Campione circulated a meeting agenda and a final version of the slide deck to the panelists. The agenda identified three substantive discussion topics: (1) "Recent Work with Hospital Safety Grades," (2) "Re-Evaluating the Imputation Model," and (3) "Possible Measures for future Hospital Safety Grades."

**Leapfrog Hospital Safety Grade Expert Panel Call**
**Friday, April 12, 2024**
**4:00-5:00 pm ET**

| Agenda Item | Time | Lead | Materials |
|---|---|---|---|
| **Introductions & Disclosures** | 4:00-4:10 | Matt Austin | |
| **Recent Work with Hospital Safety Grade**<br><br>Grading DHA Military Treatment Facilities | 4:10-4:25 | Alex Campione | PowerPoint slides |
| **Re-Evaluating the Imputation Model** | 4:25-4:50 | Matt Austin, Missy Danforth, Alex Campione | PowerPoint slides |
| **Possible Measures for future Hospital Safety Grades**<br><br>Hospital Harm – Severe Hyperglycemia (eCQM)<br><br>Hospital Harm – Severe Hypoglycemia (eCQM) | 4:50-5:00 | Matt Austin | PowerPoint slides |

JX-010.0 at -379.

126. Consistent with Dr. Austin's draft slides, the final slide deck materials for "Re-Evaluating the Imputation Model" identified two "[p]roblem[s]" with then-current imputation methodology that Leapfrog was "[w]orking to [s]olve": (1) that "imputed scores have crept up," allegedly "making imputation a more favorable choice for lots of hospitals," JX-010.0 at -367; and (2) that "a slight dip in Survey Participation occurred this past year," *id.* at -374.

127. Slide 13 of the deck proposed a "Proposed Future Imputation Methodology" to address those concerns. JX-010.0 at -375. Under that proposal, Leapfrog would eliminate Step 1 imputation—the assignment of a hospital's most recent historical score—and instead apply a cohort-based imputation approach for CPOE, BCMA, and Hand Hygiene. For this approach, Leapfrog would group all nonparticipating hospitals into cohorts and assign them the mean score of cohort hospitals' first-year reporting under the then-current standard. *Id.*




JX-010.0 at -375.

128. On April 12, 2024, several hours before the Expert Panel Meeting, Ms. Campione, Ms. Danforth, and Dr. Austin met with Dr. Patrick Romano, who could not attend the Expert Panel Meeting scheduled for later that day. During that initial meeting, Ms. Campione, Ms. Danforth, and Dr. Austin shared with Dr. Romano the proposal reflected in Slide 13 of their deck. Campione Tr. 171:9–173:5.

129. Dr. Romano did not embrace the proposal. PX-298.0. Dr. Romano explained that retiring Step 1 would eliminate imputation of prior performance, which he viewed as the most accurate estimate of a hospital's likely performance when current Survey data is missing. PX-298.0. He also expressed concerns about the burden of making hospitals complete the Survey every year, which is what retiring Step 1's use of historical scores would require, and noted that his hospital at UC-Davis found the Survey to be time-consuming such that it did not want to have to submit the Survey each year. *See* Campione Tr. 171:13–172:7.

130. The Expert Panel Meeting occurred later that day—between approximately 4:00 and 5:00 p.m. PX-261.1. Attendees included Ms. Campione, Ms. Danforth, and Dr. Austin as well as expert panelists Arjun Srinivasan, Sara Singer, Kathy McDonald, Peter Pronovost, Tim Vogus,

and Doris Peter, and Arnold Milstein. The meeting lasted one hour, of which approximately the middle twenty minutes was devoted to discussing proposed revisions to Leapfrog's Safety Grade methodology. The video was video-recorded on Zoom, as reflected at PX-261.1. A certified transcript of the meeting was admitted as JX-008.0.

131. The video and transcript show that Dr. Austin took the lead in presenting Leapfrog's proposal. JX-008.0. Consistent with the slides he and Leapfrog had drafted, he started by describing that, while there had been an "upward trend in hospitals participating in the Leapfrog hospital survey[,] [w]e did see a little bit of a drop-off in 2023. . . . So, what we are going to propose to you all for a refinement to the imputation model." *Id.* at 17:25–18:9. Dr. Austin then proceeded to explain the proposed change to the Safety Grade methodology. He explained that the "real change" under the proposal was "the elimination or retirement of step one," *Id.* at 18:22–23, with Leapfrog moving "solely to a model of putting hospitals into cohorts and using the first-time reporting scores from that cohort," *Id.* at 21:22–24.

132. Following his presentation of Leapfrog's proposal, the Expert Panel members began to discuss what Dr. Austin had presented. They expressed pointed concerns about the potential inequity of the proposed approach.

133. Dr. Sara Singer observed that "the downside is that if there is a high performing organization that doesn't happen to want to continue doing the Leapfrog survey, they will be penalized because they'll be lumped together with a cohort that may not be performing as well as they are." JX-008.0 at 22:6–11.

134. Dr. Kathy McDonald asked if the group had "thought through any of the implications for" safety net hospitals, because she "always worr[ies] most about, you know, those hospitals" because "[t]hey're already carrying so much burden." JX-008.0 at 27:5–10.

135. Dr. Peter Pronovost cautioned that "how you message this change is going to be really critical," because hospitals might object that "you're not understanding, we just went through COVID, we don't have staffing," JX-008.0 at 28:13–18; and he also noted that, "without a doubt, there are some of those" hospitals for whom "it's a resource thing. Do they have time to complete the survey?" *Id.* at 30:11–12.

136. Dr. Austin similarly stated that he "struggle[d]" with the distinction between situations where there is "a true difference in performance" from situations where there may be "some sort of bias in the measurement against" nonparticipating hospitals. JX-008.0 at 27:16–19.

137. At no point on the call did Dr. Austin or anyone else present data demonstrating that nonparticipating hospitals perform worse on the Four Measures (or any other measure, for that matter) than participating hospitals. Dr. Pronovost noted he had heard some chief medical officers speculating, "anecdotal[ly]," as to whether their hospitals could get better scores by not completing the Survey. JX-008.0 at 19:3–10. But he cited no data or analysis to support those unidentified chief medical officers' anecdotal "hunch." *Id.* at 19:24–20:2.

138. During the discussion, panelists briefly mentioned alternative possibilities. Dr. Arjun Srinivasan stated Leapfrog could assign nonparticipating hospitals "to the bottom quartile" to "try[] to push people to fill out" the Survey, JX-008.0 at 25:9–21. In response to Dr. Srinivasan's suggestion, Ms. Danforth stated: "we've lost focus on the penalty portion of it and more focused on really not wanting to potentially assure patients they're going to a safe place that may have had some slippage." JX-008.0 at 25:24–26:2.

139. Dr. Peter Pronovost similarly suggested the possibility that if hospitals who decide not to perform on the Survey were "in the lowest quartile" when they decided to stop responding, they might "stay in that" quartile "to reduce the gaming." JX-008.0 at 27:20–22.

140. Dr. Austin concluded the discussion of the proposed Safety Grade methodology change by thanking the Expert Panel for their feedback, and stating that, "if Leapfrog decides," it would "put out for public comment . . . this proposed change." JX-008.0 at 33:8–10.

141. During the Expert Panel Meeting, the Expert Panel did not vote on whether to adopt or endorse any proposed imputation changes. Nor did the Panel approve modification to the Safety Grade methodology.

142. At no time during the Expert Panel Meeting did Leapfrog present, discuss, or seek approval for a methodology that would automatically assign nonparticipating hospitals the lowest possible score on the Four Measures. No one mentioned such a methodology change during the meeting, and the written materials presented did not refer to it in any respect.[9]

[9] During trial, Leapfrog argued that Dr. Srinivasan and Dr. Pronovost had suggested Leapfrog automatically "impute" the lowest possible "Limited Achievement" scores to nonparticipating hospitals when they in passing noted Leapfrog could assign nonparticipating hospitals to the lowest "quartile." But, as discussed below, that made-for-litigation attempt to recast the April 12, 2024 discussion conflicts with the contemporaneous record. Dr. Austin, Ms. Danforth, and Ms. Campione at the time did not understand Dr. Srinivasan or Dr. Pronovost to be proposing the automatic assignment of "limited achievement" on the Four Measures—rather, they understood

### D. Leapfrog Employees Develop Its New Methodology *After* the Expert Panel Meeting Without Expert-Panel Input

143. During the Expert Panel Meeting, Ms. Campione and Ms. Danforth were communicating separately with each other over the instant-messaging platform Slack. JX-011.0 at -559–60; Campione Tr. 254:9–13.

144. At 5:03 PM, after the Expert Panel Meeting had ended, Ms. Campione sent the following Slack message to Ms. Danforth over Slack: "[T]he step 2 means are so high. [W]hat if we used step 1 (limited to only say 2 round), then assigned them to the bottom performance category," meaning nonparticipating hospitals would automatically receive the lowest possible scores. JX-011.0 at -560. Ms. Campione's statement over Slack reflects the first mention of what would become Leapfrog's Fall 2024 Safety Grade methodology. *See* JX-011.0 at -560.

145. Ms. Danforth replied: "That would be drastic but let's talk about it lol." JX-011.0 at -560. Ms. Campione agreed "it would be drastic" but explained she was "afraid we're going to keep running into this problem of the step 2 means creeping up," and that they "ha[d] to assume at some point that hospitals not reporting likely have poor or lapse in performance." *Id.* Ms. Campione added, however, that Leapfrog "would just have to very carefully push [its] justification and messaging." *Id.*

146. During her deposition, Ms. Campione confirmed that it was in this moment—during a side Slack conversation between these two Leapfrog employees and not during deliberations of the Expert Panel—in which she generated the idea of what would become the punitive Fall 2024 Safety Grade methodology. *See* Campione Tr. 260:1–261:7.

147. Ten days later, on April 22, 2024, Ms. Campione sent an email to Ms. Danforth, Dr. Austin, and Preeti Joshi. JX-016.0 at -331–332. That email memorialized different options for the new imputation methodology.

148. The email started by stating that the "[u]nderlying [i]ssues" of the then-current imputation methodology were that "[h]ospitals are disincentivized from completing the Survey,"

---

Dr. Srinivasan and Dr. Pronovost were at most suggesting that nonparticipating hospitals be assigned the *average* score for the lowest performing participating hospitals—a score that was meaningfully higher than the one Leapfrog ultimately adopted. *See infra* ¶ 150. Ms. Campione even admitted that *she* devised the idea to automatically assign "Limited Achievement" to nonparticipating hospitals *after* the Expert Panel Meeting. Campione Tr. 270:16–271:4; JX-011.0 at -560. Ultimately, Dr. Austin, Ms. Danforth, and Ms. Campione determined Dr. Srinivasan and Dr. Pronovost's proposal was insufficiently punitive. *See infra* ¶¶ 150–55.

hypothesizing that "their imputed scores are better than what they would achieve if they did complete a Leapfrog Survey." JX-016.0 at -332. The email cited no empirical support for that supposition, nor has any Leapfrog witness identified any.[10]

149. Ms. Campione then included a table that identified various options for changing Step 1 and Step 2 of Leapfrog's imputation method. JX-016.0 at -332. The table identified options for "No Change," "Small Change, "Moderate Change," and "Drastic Change." JX-016.0 at -332.

- For Step 1 Imputation: Performance could have deteriorated since their last Survey.
- For Step 2 Imputation: Hospitals that choose not to complete the Leapfrog Survey might in fact be poor performers and not perform at the level of Leapfrog hospitals. Therefore, the Step 2 means are not reflective of their standard of care and their assigned scores are inaccurate.

| | No Change | Small Change | Moderate Change | Drastic Change |
|---|---|---|---|---|
| **Step 1:** Recent Survey Participants | Imputation using **4 past rounds** (hospitals can complete a Survey once every 3 years) | Shorten imputation to **2 past rounds** (hospitals can complete a Survey once every 2 years) | Shorten imputation to **1 past round** (hospitals have until Nov 30 to submit a Survey) | **Eliminate Step 1 Imputation** |
| **Step 2:** Non-Survey Participants | Impute with the mean of first-time scores for their cohort (many are higher than considerable achievement scores) | No change | Assign hospitals to the bottom quartile or several standard deviations below the mean | **Impute with limited achievement scores** |

*See id.*

150. The "Drastic Change" for Step 2, according to Ms. Campione's table, was to "[i]mpute with limited achievement scores." JX-016.0 at -332. Ms. Campione testified the "Drastic Change" box reflected "the idea that [she] had at the end of the Slack" message with Ms. Danforth. Campione Tr. 270:16–271:4; *see* JX-011.0. Ms. Campione's table also identified a possible "Moderate Change" for Step 2 imputation. That "Moderate Change" was to "[a]ssign hospitals to

[10] During their depositions, Leapfrog witnesses testified that such analysis had to have occurred. None of them could identify a document substantiating it—and instead they pointed the finger at each other. *See* Campione Tr. 161:7–162:6 ("I would have presented the analysis. It was either Matt Austin or me . . . Or Missy."); *see also* Danforth Tr. 339:6–341:7 ("I don't know exactly the details of how that came to be . . . It would have been myself, Matt Austin. And Alex Campione . . . I don't remember physically looking at [the analysis], no.").

the bottom quartile or several standard deviations below the mean." JX-016.0 at -322. As Ms. Campione testified, this "Moderate Change" proposal—which Leapfrog did not adopt—was what expert panelists Dr. Peter Pronovost and Dr. Srinivasan suggested at the Expert Panel Meeting. Campione Tr. 270:16–21; *see supra* ¶¶ 139, 142 n.8.

151. On April 22, 2024, Dr. Austin proposed relabeling "Drastic Change" to "Large Change," which Ms. Campione did. JX-016.0 at -331; Campione Tr. 272:6–19.

152. A few days later, on April 25, 2024, Ms. Campione sent another email laying out why Leapfrog would not adopt Dr. Pronovost's "Moderate Change." In that email to Ms. Danforth, Dr. Austin, and Ms. Joshi, Ms. Campione wrote with "some bad/good news." JX-018.0 at -683. She wrote: "[t]he step 2 scores aren't what we would like" and that it "[t]urns out the hospitals that do the Survey perform very well." *Id.* She included two tables in her email: one table showed the (then) "Current Step 2 Means" for each hospital cohort for CPOE, Hand Hygiene, and BCMA. *Id.* at -683–684. The second table showed the "25th Percentile," "Mean of Bottom Quartile," "2 Standard Deviations Below Mean, and "3 Standard Deviations Below Mean" scores for those same measures. *Id.*. As Ms. Campione testified, this was her attempt to identify the possible bottom "quartile" scores Leapfrog might assign nonparticipating hospitals under Dr. Srinivasan and Dr. Pronovost's suggestions. Campione Tr. 278:15–279:4.

153. The "bad news," as Ms. Campione described it, was that because hospitals completing the Survey performed well on those measures, it wouldn't be "valid" to assign the bottom quartile—as opposed to "Limited Achievement"—scores to nonparticipating hospitals. Campione Tr. 279:5–20. Ms. Campione identified no support for the proposition that nonparticipating hospitals would perform at even lower scores. Dr. Austin and Ms. Danforth agreed with her conclusory assertion. After reviewing the scores, Dr. Austin wrote back, "We may have to consider the option of just assigning the score for 'Limited Achievement,'" JX-018.0 at -683—i.e., the proposal Ms. Danforth (in her Slack message), JX-011.0 at -560, and Ms. Campione (in her April 22 email), JX-016.0 at -332, both characterized as "Drastic." Ms. Danforth responded, "[t]his is sort of what I was afraid of but somehow more stark seeing the actual numbers. I do think we need to at least co[nsider] going to limited achievement." JX-018.0 at -682.

154. As Ms. Campione herself acknowledges, the difference between these options was "drastic." Campione Tr. 281:22–282:2. Under the methodology Dr. Pronovost had raised during the Expert Panel Meeting—assigning nonparticipating hospitals the mean of the bottom quartile

on the Four Measures, Campione Tr. 270:16–21, 278:15–279:4—nonparticipating hospitals would have received a score of 77 on CPOE, as opposed to the "Limited Achievement" score of 15; a score of 49 on Hand Hygiene, as opposed to the "Limited Achievement" score of 15; and a score of 87 on BCMA, as opposed to the "Limited Achievement" score of 25. *See* Campione Tr. 280:22–283:7; *see also supra* ¶ 73 (chart comparison).

155. Ms. Danforth, Ms. Campione, and Dr. Austin decided to adopt the "drastic" change. But before publicly announcing it, the three of them wrote to request feedback on the draft public announcement from only two of the twelve Expert Panel members: Dr. Romano and Dr. Pronovost. JX-021.0 at -258–260; JX-022.0 at -491. On April 29, 2024, Dr. Austin sent an email to Dr. Pronovost attaching a draft of the proposed public announcement "that Leapfrog will use to communicate changes to the imputation methodology." JX-021.0 at -258.

156. On May 7, 2024, Dr. Austin sent Dr. Pronovost a follow up email asking him to review the proposed language. JX-021.0 at -258. On the same day, Dr. Austin sent a separate email to Dr. Romano regarding the "proposed text for imputation change" and attached the same proposed language. JX-022.0 at -491.

157. On May 14, Dr. Pronovost emailed Dr. Austin "small edits" to the language of the announcement, noting that "many may not know what 'imputation' means." JX-021.0 at -258. On the same afternoon, Dr. Austin forwarded Dr. Pronovost's revisions to Dr. Romano.

158. Before Dr. Romano responded, Dr. Austin separately worked to revise draft meeting minutes from the Expert Panel Meeting. PX-291.0. Dr. Austin's research assistant Ms. Joshi had sent the original meeting minutes to him a month earlier—on April 16, 2024, PX-270.0, but Dr. Austin had let them sit unfinalized as he, Ms. Danforth, and Ms. Campione debated what steps to take in revising the Safety Grade methodology.

159. Having now decided with Ms. Danforth and Ms. Campione what approach Leapfrog would take, Dr. Austin extensively revised the Expert Panel Meeting minutes. *Compare* PX-270.0 at -644–645 *with* PX-269.0 at -989. With regard to the Safety Grade methodology, his revisions surreptitiously added a discussion into the minutes that had never actually occurred. Specifically, Dr. Austin falsely wrote that the Expert Panel on April 12, 2024 *had* discussed and approved of the methodology Leapfrog was planning to impose: "the [E]xpert [P]anel were in support of having hospitals share their current performance, so liked the idea of imputing the equivalent of 'Willing to Report' to hospitals that do not submit a survey." PX-291.0. Dr. Austin

testified that "willing" did not appear in the transcript of the Expert Panel Meeting. Austin Tr. 202:5–17. And while Dr. Austin testified that "willing to report" is synonymous with "Limited Achievement," *see id.* 219:18–220:4—*i.e.*, the "drastic change" Ms. Campione originally proposed after the Expert Panel Meeting concluded, JX-016.0—both he and Ms. Campione confirmed in their depositions that—contrary to Dr. Austin's backfilled meeting minutes—this "drastic" approach was not proposed and never discussed at the Expert Panel Meeting. Campione Tr. 261:11–15, 270:16–21; Austin Tr. 202:5–17. Dr. Austin sent his revised meeting minutes to Ms. Campione, Ms. Danforth, and Ms. Joshi.

160. Less than two hours later, Dr. Romano separately sent comments on the proposed imputation change to Dr. Austin, Ms. Danforth, and Ms. Campione. Given Dr. Romano's longstanding history with Leapfrog, his involvement in the creation of the Safety Grade and all subsequent methodologies, and his admitted expertise in issues of patient safety and quality, the Court finds Dr. Romano's candid, contemporaneous email highly probative and reproduces it here in full:

Thank you for sharing.

I like the simpler and more direct approach here – if the goal is to penalize nonparticipants, you might as well do so in a clear and unmistakable manner, while allowing for hospitals to manage their burden and jump back on the wagon after a year. This approach is certainly much easier to implement and more straightforward that the step 2 imputation that you folks originally proposed, in that the consequences of nonresponse will become readily apparent.

I corrected a couple of typos in Peter's edits and suggested a rephrasing of one sentence.

As I mentioned earlier, your step 2b proposal would have led to lower imputed estimates, but NOT more ACCURATE imputation. I find no reason to believe – and you didn't present any evidence to suggest – that a hospital's unreported data from the current year is better approximated by its cohort mean from the first year of reporting than by its current cohort mean. The underlying hypothesis behind your proposed step 2b approach was that hospitals stop reporting because their true performance deteriorated, relative to their cohort. My hypothesis, by comparison, was that most hospitals stop reporting because it is too burdensome, and because they only find market value in an A grade, which proves impossible to attain or maintain. If my hypothesis is correct, then the current step 2 approach (current cohort mean) would yield more accurate imputations… but it doesn't achieve your strategic objective of penalizing nonparticipants. In other words, I wasn't keen on a backdoor approach to penalizing nonparticipation… if you want to penalize nonparticipants, then don't pretend that you are imputing missing values in a statistically optimal way. Just be honest about your goal.

Patrick S. Romano, MD MPH FAAP FACP
Professor of Medicine and Pediatrics, UC Davis Division of General Medicine
Co-Editor in Chief, AHRQ *Patient Safety Network* (PSNet and WebM&M)
4150 V Street, PSSB Suite 2400
Sacramento, CA 95817
Telephone: (916) 734-7005 or -7237
E-mail: psromano@ucdavis.edu
Website: https://health.ucdavis.edu/team/pediatrics/122/patrick-romano---internal-medicine---pediatrics-general-sacramento

PX-298.0 at -450.

161. To paraphrase, Dr. Romano's email recognized that an alternative approach "would yield more accurate imputations," but Leapfrog's proposal would "achieve your strategic objective of penalizing nonparticipants" and would do so in a "clear and unmistakable manner." PX-298.0 at -450. He further explained that the proposed methodology would make "the consequences of nonresponse" to the Survey "readily apparent." *Id.* Dr. Romano expressed approval of this approach because it avoided "pretend[ing]" that Leapfrog was "imputing missing values in a statistically optimal way" and was instead "honest" about Leapfrog's "goal" of penalizing nonparticipating hospitals. *Id.*

162. A few hours after receiving Dr. Romano's email, Ms. Campione responded stating, "I completely agree," reflecting internal Leapfrog agreement regarding the intended effect of the proposed methodology. PX-295.0 at -490. She did not include Dr. Austin or her supervisor Ms. Danforth in her response—rather, she separately conveyed her agreement *only* to Dr. Romano:

Message

**From:** Alexandra Campione [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D66D320700BE4B4985D929853FF80E30-ACAMPIONE]
**Sent:** 5/15/2024 2:06:20 PM
**To:** Patrick Romano [psromano@ucdavis.edu]
**Subject:** RE: Leapfrog: Proposed Text for Imputation Change

Patrick,

Thanks for your feedback. I completely agree.

Alex

PX-295.0 at -490.

163. Dr. Romano's comments were not the only time he conveyed his candid thoughts about Leapfrog's approach. Days before he sent his email to Ms. Danforth, Ms. Campione, and Dr. Austin, Dr. Romano wrote to his colleagues at the University of California Davis regarding Leapfrog's change.

164. Even though Dr. Romano served on the Expert Panel, the UC-Davis hospital he works for had previously declined to participate in the Survey. On May 2, 2024, UC-Davis's Director of Quality and Safety wrote him noting that when UC-Davis decided to no longer participate in Leapfrog's Survey, "I spoke with Leapfrog when we discontinued our participation. I was told over time our safety grades would experience an expected decline due to a lack of self-reported data." PX-287.0 at -635. In response, Dr. Romano disclosed Leapfrog's proposed methodology change to encourage UC-Davis to participate in Leapfrog.

Yes, this is true (about the expected decline).
In fact, Leapfrog staff are exercised about the fact that the response rate decreased in 2023 after many consistent years of increases, see slide 10 attached.
They fear that the imputed scores are "too high" in some cases, not sufficiently incentivizing continued participation. So, they are determined to more aggressively penalize nonparticipants.

They will never remove large hospitals from reporting, so unless we want to continue getting C, and potentially dropping to D, I would advise to start participating again.
At our last expert meeting, I argued for allowing facilities to skip a year, with imputation based on carrying forward results from the prior year, but longer periods of nonparticipation won't fly, as this experience demonstrates.

PX-287.0 at -635. Dr. Romano wrote that "Leapfrog staff are exercised about the fact that the response rate decreased in 2023 after many consistent years of increases," and that Leapfrog "fear[s] that the imputed scores are 'too high' in some cases, not sufficiently incentivizing

continued participation." For that reason, Dr. Romano explained, Leapfrog was now "determined to more aggressively penalize nonparticipants." *Id.*

165. On May 15, 2024, Dr. Romano conveyed his candid thoughts to his UC-Davis colleagues again. In that email, he explained that Leapfrog's proposed methodology changes were designed to operate as a carrot-and-stick system to incentivize participation—the stick being a "consequence" for non-reporting that would drive a hospital's Safety Grades down, and the carrot being a "benefit" or ability to avoid that penalty and prevent further Safety Grade declines. PX-293.0 at -683; Romano Tr. 261:3–23.

166. On May 17, 2024, Ms. Campione emailed the document announcing Leapfrog's methodology change to Ms. Binder for her approval. PX-301.0 at -811–812. Ms. Campione noted that "both Peter [Pronovost] and Patrick [Romano] have reviewed and signed off on the messaging," and she requested Ms. Binder's feedback, explaining that "[w]e want to publish it ASAP so hospitals can prepare to take the Survey if they were considering skipping." PX-301.0 at -812.

167. Ms. Binder responded with her own edits later that day. PX-301.0 at -811, -813–817. Ms. Binder substantially edited the document to remove language Dr. Pronovost and Dr. Romano had commented on—language that would have explained to the public Leapfrog's view that the then-current imputation method had "influenced hospital Survey participation and may no longer be valid." *Id.* Her edits cut language informing the public that Leapfrog intended to "modify its current imputation approach to encourage survey participation and to improve user's confidence in the data that are used to calculate scores." *Id.* at -814. A screenshot of Ms. Binder's revisions is reproduced below:

PLANNED UPDATE TO IMPUTATION METHOD FOR CPOE, BCMA, IPS, AND HAND HYGIENE

BACKGROUND

The Leapfrog Group and other national organizations have ongoing concerns with the trajectory of patient safety in US hospitals. Leapfrog wants to ensure that the public has timely, transparent, and trustworthy information about a hospital's patient safety performance. Leapfrog's long-standing commitment ~~has been~~ is to use the best and most recent data publicly available ~~in~~ to calculat~~ing~~e Hospital Safety Grades.

To ensure the Hospital Safety Grade methodology continues to support these goals, Leapfrog's ~~recently asked its~~ blue-ribbon Expert Panel and researchers at Johns Hopkins Medicine annually ~~to~~ review the ~~current~~ scoring methodology. The panel ~~recognized~~ advised that Leapfrog modify the current imputation method, which is used to fill in missing data among hospitals that did not complete the most recent Leapfrog Survey. ~~, have influenced hospital Survey participation and may no longer be valid. The collective recommendation was for Leapfrog to modify its current imputation approach to encourage survey participation and to improve user's confidence in the data that are used to calculate scores.~~

Leapfrog is proposing the following changes to its imputation approaches effective with the fall 2024 Hospital Safety Grade. ~~Note that Step 1 imputation will be temporarily paused for the BCMA measure. In 2024, Leapfrog expanded the BCMA Standard to include pre-operative and post-anesthesia care units in addition to med-surg units, critical care units, and labor and delivery units. Due to these changes, scores from the 2023 Leapfrog Hospital Survey are not an accurate representation of performance on the current measure and thus not suitable for Step 1 imputation.~~

PX-301.0 at -814.

168. Ms. Binder sent an email explaining her edits

**From:** Leah Binder [lbinder@leapfrog-group.org]
**Sent:** 5/17/2024 4:18:15 PM
**To:** Alexandra Campione [ACampione@leapfrog-group.org]
**CC:** Missy Danforth [mdanforth@leapfrog-group.org]; Matt Austin [jausti17@jhmi.edu]
**Subject:** RE: FOR REVIEW: Final Safety Grade Changes
**Attachments:** Fall2024HospitalSafetyGrade_MethodologyChanges_V2 LB.docx

**Flag:** Follow up

Hi Alex, Here it is with some tweaks, mostly moving a few things around for clarity. And a document of 2 pages doesn't need an appendix so just call it Table 2.

I don't think we need the sentence about influencing Survey participation and giving people confidence in validity. It sounds defensive, like nobody participates in the survey and our own TEP questions our validity. Actually this change affects a minority of hospitals and optimizes the Grade's already strong validity. Anyway, it's not necessary to get into the why: it's enough that the Expert Panel advised us to do the imputation in a different way, and not treat older better data in an equivalent way to new data.

I think when we respond to the public comments we can be more pointed and specific about the Survey and imputation reasoning if necessary. The comments will give us a good gauge on the extent to which we need to reveal all our reasoning and whether the expert panelists will truly stand up for it when push comes to shove.

Glad to talk more about it if necessary, but otherwise don't need to see it again. Thanks, Leah

PX-301.0 at -811.

169. Her email stated she believed the prior language she had edited "sounds defensive, like nobody participates in the survey and our own [Technical Expert Panel] questions our validity" and that "it's not necessary to get into the why; it's enough that the Expert Panel advised us to do the imputation in a different way . . . ." PX-301.0 at -814. She further suggested she might reconsider her approach after the public commented on Leapfrog's proposal: "I think when we respond to the public comments we can be more pointed and specific about the Survey and imputation reasoning if necessary. The comments will give us a good gauge on the extent to which we need to reveal all our reasoning and whether the expert panelists will truly stand up for it when push comes to shove." *Id.*

170. The same day, Ms. Danforth forwarded Ms. Binder's edits to Dr. Austin. JX-025.0 at -404. On May 20, Dr. Austin replied, "My only note is the 'why' has been edited out of the explanation. So you don't really explain why this change is being done." JX-025.0 at -404. But despite Ms. Binder having edited out the "why" of the methodology change, Dr. Austin signed off on the language of the announcement. JX-025.0 at -404.

**E. Hospitals Criticize the Proposed Methodology During Public Comment Period**

171. On May 21, 2024, Leapfrog publicly announced its proposed Safety Grade methodology and further announced a public comment period through June 7, 2024. PX-520.0; *see also* Leapfrog's Second Am. Ans. to Pls.' Interrogs. at 3. During this approximately two-week period, hospitals and other stakeholders submitted comments expressing concerns about the accuracy, fairness, and consumer comprehension of the approach to scoring nonparticipating hospitals.

172. Becky Wenthold of Allina Health commented that "[t]hese changes will penalize" hospitals that "do not have the resources to commit" to submitting the "extremely time intensive" Survey. JX-026.0 at -030. Allina further warned that hospitals with "excellent outcomes" would "no longer be able to receive an A grade" under the proposed Safety Grade methodology and cautioned that the public "will not understand nor dig into the methodology of these grades," resulting in hospitals being "falsely represented with a lower grade," simply because they chose to not complete the Survey. *Id.*[11]

[11] As Dr. Nicholson explained, Allina Health's forecast came to pass: Since Leapfrog adopted its Fall 2024 Safety Grade methodology, no nonparticipating hospital has received an "A" Safety Grade when it has been assigned "Limited Achievement" on all Four Measures under step 2 imputation. *See* PX-412.0.

173. Alana Noble of Mount Sinai Health System stated that she "strongly disagree[s] with the proposed [methodology]," explaining that hospitals "should not be so adversely punished" for choosing not to participate in the Survey, "especially in the post-Covid era where resources are increasingly hard to come by and retain." JX-028.0 at -935. Noble further stated that "[i]f Leapfrog is going to implement this change, they need to offer hospitals an option to opt out of being graded rather than penalize a hospital for not submitting the resource-intensive survey." *Id.*

174. Susan Boardman of Providence System warned that the "proposed changes to the Imputation Method would result in an inaccurate portrayal of the actual status of the patient safety structures and processes." Boardman stated that "more accurate" approaches would include "[n]ot assigning a Grade" to nonparticipating hospitals. JX-030.0 at -5044.

175. Zubin Momin of Piedmont Healthcare characterized the proposed "imputation methodology" as "unnecessarily punitive," noting that the "resource commitment to complete the [S]urvey is already significant." JX-029.0 at -967.

176. Ascension, the faith-based healthcare organization, stated that it "cannot support Leapfrog's proposed update and strongly encourages Leapfrog to refrain from implementing it" because "not all hospitals have the information and/or capabilities to complete the Hospital Survey" and "it is unreasonable for an optional Survey to have such a significant impact." PX-308.1 at -027.

177. Leapfrog responded to these comments on June 26, 2024. Specifically, Leapfrog acknowledged that only four commentors in total "supported the change to the imputation methodology." PX-520.0. In response to concerns "that the public may misinterpret the assigned measure scores," Leapfrog stated that it would "add a new denotation . . . for scores that have been imputed." *Id.*[12] Leapfrog also responded to comments that "opposed penalizing hospitals" and suggested that they "be allowed to opt out of the Hospital Safety Grade." *Id.* Specifically, Leapfrog stated "A key element of the Hospital Safety Grade is that all eligible hospitals are compared to hospitals nationwide. The choice not to participate should not excuse a hospital from being graded, nor should they be given a score that unfairly awards them points." *Id.* Leapfrog again identified

[12] As discussed below, Leapfrog added this "denotation" to its website in a form of a footnote—a footnote it surreptitiously deleted from its website on the eve of trial (and later restored without explanation). Even on its face, however, the footnote is misleading and does not disclose to consumers how Leapfrog has "imputed" failing scores. *See infra* ¶¶ 254–73.

no empirical support for the proposition that the prior imputation methodology "unfairly award[ed] [nonparticipating hospitals] points."

**F. Leapfrog's Internal Deliberations on Disclosure of the Proposed Methodology**

178. During the public comment period, Leapfrog employees proceeded to prepare revisions to Leapfrog's website purporting to explain the new methodology.

179. On May 29, 2024, Ms. Campione emailed Paulina Litter, Leapfrog's Senior Specialist of Operations and Special Projects, with a mockup of a hospital's Safety Grade page on Leapfrog's consumer-facing website that contained a new footnote explaining the "imputation methodology." *See* JX-031.0 at -868. The proposed footnote in the email stated: "*The hospital declined to report data for this measure, so a score was imputed for this measure." *Id.*

180. On June 18, 2024, Ms. Litter responded that the proposed language "seems a bit off to me as a layperson to know what imputed means," and suggested revising it to state that "a score was calculated using imputation for the measure." JX-031.0 at -865.

181. On the same day, Ms. Campione responded that the draft language she had originally proposed was what "Missy [Danforth] wanted" but noted that Ms. Binder "wants something else that makes it sound like the data we imputed wasn't random." JX-031.0 at -864. Ms. Litter responded to Ms. Campione with "[a] few thoughts on the language" and proposed five alternative versions of the footnote:

1) "This hospital declined to report data for this measure, so a score was calculated with external data sources using an imputation model." *Id.*
2) "This hospital declined to report data directly to Leapfrog for this measure, so a score was calculated using external data sources based on an imputation model." *Id.*
3) "This hospital declined to report data for this measure, so a score was calculated using an imputation model. For more information, see the Spring 2024 Safety Grade Scoring Methodology," linking to Leapfrog's 28-page document that explains its Safety Grade methodology. *Id.*
4) "This hospital declined to report for this measure, so a score was calculated with external data sources using an imputation model. For more information, see the Spring 2024 Safety Grade Scoring Methodology," linking to the same methodology document. *Id.*

5) "This hospital declined to report data directly to Leapfrog to this measure, so a score was calculated using external data sources based on an imputation model. For more information, see the Spring 2024 Safety Grade Scoring Methodology," linking to the same methodology document. *Id.*

182. Later on June 18, 2024, Ms. Campione responded to Ms. Litter and rejected the proposed alternatives. *Id.* at -863. The email is reproduced below:

> **From:** Alexandra Campione
> **Sent:** Tuesday, June 18, 2024 12:29 PM
> **To:** Paulina Litter <PLitter@leapfrog-group.org>
> **Subject:** RE: New imputation denotation
>
> Okay, great. It's working for me too. Thanks for doing this, but we can't say "external data sources" because we're arbitrarily assigning them the points associated with the bottom scoring category ("limited achievement") or old data from the previous Survey (internal data source).
>
> Leah wanted us to make it sound like the expert panel approved it and the assigning of these points was legitimate. What about this: This hospital declined to report data for this measure, so a score was calculated using an imputation model approved by patient safety experts.
>
> I think linking to the methodology would be neat, but I don't think Leah or Missy cared to do so. We could ask.
>
> LEAPFROG00427863

JX-031.0 at -863.

183. In her email, Ms. Campione explained that Leapfrog "can't say" nonparticipating hospitals' scores were based on "'external data sources'" because Leapfrog was "arbitrarily assigning them the points associated with the bottom scoring category." JX-031.0; *see also* Austin Tr. 80:10–12 (testifying that Leapfrog is "[not] using information from other supplemental data sources" if a Survey is missing), 269:18–21 (confirming "there is no secondary data source to help you inform the imputed assignment of limited achievement" for the Four Measures), 415:18–19 ("We are currently not using secondary data as part of the imputation models.").

184. In the same communication, Ms. Campione emphasized that Ms. Binder "wanted us to make it sound like the [E]xpert [P]anel approved it and the assigning of these was legitimate." JX-031.0 at -863. Ms. Campione also rejected providing a direct link on a hospital's Safety Grade webpage that would take a consumer to Leapfrog's full methodology document, stating that although doing so "would be neat," she did not "think Leah [Binder] or Missy [Danforth] cared to

do so." *Id.*

185. Ultimately, Ms. Campione proposed the following language for the footnote: "This hospital declined to report data for this measure, so a score was calculated using an imputation model approved by patient safety experts." *Id.*

186. One minute later, Ms. Campione clarified in another email that the footnote should say a score was "assigned," not "calculated." *Id.* Ms. Litter responded that "I think that works really well!" *Id.*

187. As discussed below, Leapfrog eventually adopted the following language, which omitted any mention of the "imputation model": "*The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." *See infra* ¶¶ 254–56. That language is the footnote Leapfrog deleted on the eve of trial in this case and reinstated after the Community Hospitals raised the change with Leapfrog's counsel. *See infra* ¶¶ 349–50.

**G. Leapfrog Conceals the Punitive Nature of the Methodology**

188. Over the course of this litigation, Leapfrog witnesses repeatedly testified that the revised Safety Grade methodology adopted in Fall 2024 was approved by Leapfrog's Expert Panel and was designed solely to improve the accuracy of the Safety Grades. Leapfrog witnesses further denied that the methodology was intended to penalize hospitals that do not participate in the Survey.

189. The Court finds by a preponderance of the evidence that these assertions are belied by the factual record. As set forth below, Leapfrog's witnesses gave inconsistent testimony regarding Expert Panel and Board approval, whereas contemporaneous evidence—including a recording of the Expert Panel Meeting itself—conclusively establish that the Expert Panel never considered, let alone approved, Leapfrog's new methodology change. Contemporaneous documents also clearly establishes that Leapfrog intended the revised methodology to penalize non-participation, despite concerns raised by hospitals, members of the Expert Panel, and Leapfrog's own prior methodology principles.

***1. Lack of Expert Panel Approval***

190. During her deposition, Ms. Campione initially testified that "the [E]xpert [P]anel chose . . . the current imputation model." Campione Tr. 145:13-21. Specifically, she testified that, during the Expert Panel Meeting, "a lot of [the panelists] actually thought that we should be giving

zero points to hospitals" and that that the Expert Panel ultimately "decided that the best course was the one that we ended up going with, which is reducing the number of past scores that are imputed through step 1, and with step 2 assigning hospitals to the lowest scoring category of limited achievement." *Id.* 156:19-158:9; 168:19–22. Ms. Campione's testimony followed lengthy preparation sessions with her counsel before the deposition as well as a joint meeting to prepare for her deposition with other Leapfrog employees, including Ms. Binder and Ms. Danforth. *Id.* 10:6–11:19. It is also consistent with multiple of Leapfrog's public representations providing that "the [E]xpert [P]anel chose … the current imputation model," *id.* 145:14–21, and "[t]hey decided that the best course was the one that we ended up going with, which is reducing the number of past scores that are imputed through step 1, and with step 2 assigning hospitals to the lowest scoring category of limited achievement," *id.* 158:1–9. Ms. Campione even testified that the only time the Expert Panel discussed the "imputation model" was at the Expert Panel Meeting, *id.* 158:14–16, and "there was a consensus, as [she] recall[ed], by the end of the [E]xpert [P]anel meeting," *id.* 158:10–159:2.

191. When presented with documentary evidence to the contrary, however, Ms. Campione evasively backtracked. After being shown her April 12, 2024 Slack conversation with Ms. Danforth, JX-011.0, she admitted, "based on what[] [was] in front of [her]," that she—not the Expert Panel—came up with the idea of assigning nonparticipants "Limited Achievement" *after* the Expert Panel Meeting. Campione Tr. 260:1–261:7.

192. Ms. Campione nevertheless maintained that "someone did bring up during the meeting assigning zero points" to nonparticipating hospitals but agreed the proper way to resolve the issue was "go to the tape" of the Expert Panel Meeting. Campione Tr. 242:4–7, 260:1–261:7.

193. During the deposition of Dr. Austin, counsel for the Community Hospitals introduced the transcript of the Expert Panel Meeting. Despite his having revised the notes from that meeting to say that "the [E]xpert [P]anel were in support of having hospitals share their current performance, so liked the idea of imputing the equivalent of 'Willing to Report' to hospitals that do not submit a survey," PX-291.0, Dr. Austin testified that, based on the transcript, nobody at the Expert Panel Meeting discussed assigning nonparticipating hospitals a score of "zero," a score of "Limited Achievement," or a score of "Willing to Report" (Leapfrog's prior terminology), Austin Tr. 137:21–138:3, 173:7–174:14. And Dr. Austin ultimately testified that Leapfrog "did not query the [E]xpert [P]anel about whether they approved" the new "imputation methodology." Austin Tr.

285:12–15. The Court has reviewed the relevant video evidence and finds by a preponderance of the evidence that at no time did the panel discuss the methodology that Leapfrog ultimately adopted—nor did the panel even suggest it. PX-261.3. Ms. Campione's contrary testimony is not credible.[13]

### 2. *The Revised Methodology Was Intended as a Penalty*

194. Leapfrog witnesses also denied that the revised Safety Grade methodology was punitive. Ms. Danforth testified that Leapfrog has "never talked about penalizing hospitals," that "punitive" is "not in the vernacular of how we speak at Leapfrog," and that Leapfrog is "not in the business of penalizing hospitals." Danforth Tr. 445:12–447:8. Ms. Danforth further testified that she had "no recollection of any individual expert panelist talking about penalizing hospitals through the Hospital Safety Grade methodology." *Id.* 447:1–4. The contemporaneous record flatly contradicts that testimony—not only was the new methodology intended as a penalty, but members of Leapfrog's Expert Panel have repeatedly considered (and rejected) the idea of penalizing nonparticipating hospitals in front of Ms. Danforth and in correspondence provided to her over the course of many years.

195. From the inception of the Leapfrog composite scores (now Safety Grades) through Fall 2024, Leapfrog repeatedly rejected penalizing hospitals for missing data. *See, e.g.*, PX-202.0; PX-204.0; PX-214.0; JX-004.0. In 2013, a peer-reviewed article authored by eight of nine members of the Expert Panel stated that Leapfrog's Safety Grade methodology was designed so that "composite scores were based on what was known about the hospital's performance, with no penalties for missing data." PX-202.0 at -668; *see also supra* ¶¶ 104–07.

196. In subsequent years, Leapfrog periodically considered, but declined to adopt, penalty-based approaches. In 2017, Leapfrog presented the Expert Panel with a proposal to assign a "transparency bonus/penalty" or the lowest possible score to hospitals with missing data. PX-

[13] Leapfrog's testimony about the role of its Board in approving the Fall 2024 Safety Grade methodology was similarly evasive and not credible. Ms. Binder, testifying for Leapfrog as Rule 30(b)(6) corporate representative, initially testified that the Board makes "[f]inal decisions relating to letter grade assignments and oversight of all policies that guide the hospital safety score," but later testified that the Board "delegates to [her] the authority to make these final decisions." Binder Tr. 172:22–173:15. Dr. van Caulil, a member of Leapfrog's Board, confirmed that "there wasn't board discussion or a presentation of the methodology." van Caulil Tr. 104:10–14. She further testified that she was unaware that the methodology that was ultimately adopted differed from those discussed at the Expert Panel Meeting. *See id.*

204.0 at -571, -574. The internal analysis of that penalty projected that "14% of hospitals would move down a grade." *Id.* at -577. Leapfrog did not introduce the penalty at that time. Ms. Danforth attended and participated in that meeting.

197. Similarly, minutes from a June 8, 2020 Expert Panel meeting reflect that there was "an open question of how punitive Leapfrog should be for hospitals that do not submit data." PX-214.0. Ms. Danforth attended and participated in that meeting as well.

198. On January 18, 2021, Dr. Arjun Srinivasan emailed Dr. Austin, Ms. Campione and eight other members of the Expert Panel asking whether the panelists and Dr. Austin "consider[ed] deducting points for failure to report." PX-216.0. He asked, "should we consider assigning a lower score to hospitals that are refusing to publicly share this information." Dr. Austin replied that "Leapfrog's leadership"—*i.e.*, Ms. Binder and Ms. Danforth—"and Board continue to grapple with the decision of how explicit Leapfrog wants to be with penalizing hospitals that don't report to Leapfrog Hospital Survey. I don't doubt any of them would disagree with your statement that transparency is likely a marker of a high quality health system, but I think they are trying to balance that with potential hospital pushback (i.e., statements from hospitals that Leapfrog is extorting hospitals to participate in the survey)." *Id.*

199. On August 25, 2021, Dr. Austin sent an agenda for an Expert Panel meeting. JX-004.0 at -821. In the agenda, Dr. Austin initially included two distinct agenda items for "how to score hospitals missing process/structural measures," and "penalizing hospitals if they don't report." *Id.* Next to the "penalizing hospitals" item, Dr. Austin wrote in brackets "[is Leapfrog REALLY open to this idea? If not, I don't want to keep asking their opinions]." *Id.* at -821. Two days later, Ms. Danforth responded that the "penalizing hospitals" item could be removed because it was "really covered" by the "how to score hospitals missing process/structural measures" agenda item. *Id.*[14]

200. Following adoption of the Fall 2024 Safety Grade methodology, hospitals described the change in punitive terms. A physician at UC-Davis described the methodology as "marketing blackmail," explaining that hospitals felt compelled to participate "to avoid taking the

[14] When confronted with this document in her deposition, Ms. Danforth read her response twice. Danforth Tr. 289:12–291:6. When pressed on whether the email was conveying that imputation could be used to penalize hospitals, Ms. Danforth replied that she was only trying to convey that she wanted the meeting to cover two agenda items only. Danforth Tr. 291:22–294:5.

blackmail-like reputational hits." PX-386.0 at -346. In an email to Dr. Romano, UC-Davis's Chief Quality Officer similarly questioned the "value of Leapfrog" "when our lack of participation [in the Survey] guarantees a lower grade . . . effectively blackmailing centers to participate." PX-293.0.

201. Leapfrog leadership acknowledged the same effect. Ms. Binder described the updated methodology as "a very big deal to hospitals" and "a major incentive to report to the Survey." PX-323.0 at -327.

202. Members of the Expert Panel and Leapfrog staff acknowledged that the intent of the revised methodology was to penalize non-participation, rather than to improve the accuracy of the Safety Grades. In internal correspondence, Dr. Romano described the change as a "penalty" and stated that its "purpose is not accuracy." Romano 142:12-22. He explained that adopting the new methodology "was a simple business decision" for Leapfrog because increased participation would make its Survey data more valuable to prospective buyers. PX-501.0 at -208.

203. Dr. Austin likewise testified that "the changes will penalize hospitals that don't submit a Leapfrog survey." Austin Tr. 236:21–237:5. He further acknowledged that the new "imputation methodology" did not produce the "most accurate" Safety Grades and that some hospitals' Safety Grades may simply be "inaccurate." *Id.* 250:17, 271:13–18. That is not surprising: when asked if he had "conducted any analysis to assess whether hospitals that do not participate in the Leapfrog survey are actually less safe than hospitals that do," Dr. Austin testified "[n]ot that I can think of." *Id.* 112:1–5.

204. Dr. Austin also testified that the methodology created a "structural bias against . . . nonreporting hospitals," something that could pose further challenges to "safety net hospitals," which typically are more resource constrained hospitals than larger hospitals. Austin Tr. 298:9–20; *see also id.* 151:5–10

205. Dr. Romano similarly testified that a "one-grade shift" is "[m]uch more common" under the new methodology. Romano Tr. 251:21–252:12. Ms. Binder acknowledged that "[N]onparticipants tend to not have as high a grade" as participating hospitals. Binder Tr. 329:18–19.

206. In light of the contemporaneous documentary evidence, the testimony of Leapfrog's own personnel and Expert Panel members, and the inconsistencies in Leapfrog's testimony, the Court finds by a preponderance of the evidence that the revised Safety Grade

methodology adopted in Fall 2024 was not approved by the Expert Panel or the Board and was intended to penalize hospitals that did not participate in the Survey, rather than to improve the safety-related accuracy of Leapfrog's so-called Safety Grades.

207. The Court also finds by a preponderance of the evidence that Ms. Danforth's testimony that Leapfrog has "never talked about penalizing hospitals," that "punitive" is "not in the vernacular of how we speak at Leapfrog," and that Leapfrog is "not in the business of penalizing hospitals," Danforth Tr. 445:12–447:8, was knowingly and materially false. The Court finds Ms. Danforth not credible and exercises its discretion to discard her testimony in full.[15]

### H. Leapfrog Adopts the Proposed Methodology Despite Criticism, Resulting in Record Participation

208. In Fall 2024, despite criticism from hospitals that the proposed Safety Grade methodology was "punitive" or amounted to "blackmail," Leapfrog formally adopted the revised methodology that automatically assigned the lowest possible score—or "Limited Achievement"—on each of the Four Measures to nonparticipating hospitals that lacked Survey data from the prior two rounds of Safety Grades. *See* PX-002.0; *see also* PX-005.0 ¶¶ 22-23, 58; Leapfrog's Second Am. Ans. to Pls.' Interrogs. at 3.

209. The revised methodology had its intended effect. Leapfrog internally reported that the change "drastically lower[ed] imputed scores" for nonparticipating hospitals and had resulted in "record participation" in Fall 2024. PX-325.0 at -185. Compared to the prior year, Survey participation increased by more than 10 percent after Leapfrog's Fall 2024 Safety Grade methodology change, resulting in Survey responses from hundreds more hospitals nationwide. PX-397.0. Based on the substantially increased participation, it is reasonable to conclude that Leapfrog achieved its goal of "growing revenues." PX-286.0 at -727.

## VI. THE SAFETY GRADE METHODOLOGY LEAPFROG ADOPTED IS UNRELIABLE AND PUNISHES NONPARTICIPATING HOSPITALS

210. In addition to the fact witnesses the Court heard testimony from Dr. Sean Nicholson. Dr. Nicholson is a Professor in the Department of Economics and the School of Public Policy at Cornell University with expertise in health care economics. He is a Professor in Cornell University's Department of Economics. He has been a research associate at the National Bureau

[15] *See, e.g.*, *Estate of Elkins v. Pelayo*, 737 F. App'x 830, 833 (9th Cir. 2018) (holding that a witness's "false deposition testimony" "about something important" "is sufficient to permit a reasonable jury to disregard the entirety of [their]testimony").

of Economic Research for 16 years and has served for more than two decades combined on the boards of both individual hospitals and multi-hospital systems. The Court qualified Dr. Nicholson as an expert in health care economics and the economics of health care quality measurement and finds and accepts Dr. Nicholson's expert testimony as probative and credible.

211. Dr. Nicholson opined that Leapfrog's Fall 2024 Safety Grade methodology change departs from foundational principles of measuring hospital quality ratings, Nicholson Tr. 29:17–30:10, 51:6–14, 62:21–63:6, 66:24–67:3, 73:18–74:9, 82:25–83:15, 86:1–6, 169:3–19, penalizes nonparticipating hospitals while inflating participating hospitals scores, *id.* 63:7–15, 132:1–22, 150:3–151:3, fails to reliably predict patient outcomes, *id.* 80:3–81:1, and distorts patient choices in a way that can harm patients and hospitals, PX-937.0 ¶¶ 31–38.

212. Dr. Nicholson identified that Leapfrog deviates from the Avedis Donabedian foundational principles of structure, process, and outcomes commonly relied upon in healthcare quality measurement that govern how hospital quality should be measured and compared across hospitals. Specifically, Leapfrog does not grade participating and nonparticipating hospitals based on the same data sources or based on the same grading measures. Nicholson Tr. 39:3–16. Further, Leapfrog does not verify data with meaningful audits and introduces bias into its grading system by assigning non-reporting hospitals Safety Grades despite lacking the minimum amount of requisite data to reliably grade them and lacking comprehensive data for nearly a quarter of the hospitals it grades. *Id.*

213. *Different data*: Dr. Nicholson testified to how Leapfrog uses different data sources for different hospitals, making it difficult to compare Safety Grades across hospitals. For example, Leapfrog uses NHSN data for participating hospitals—that continuously updates and captures more recent data—and CMS data for nonparticipating hospitals. Dr. Nicholson cited that academic studies that have examined Leapfrog's methodology have repeatedly identified the discrepancy between data sources for participating and nonparticipating hospitals as a long-standing issue that enables participating hospitals to benefit from more favorable data. *See* PX-937.0 ¶ 56.

214. *Not Apples to Apples*: Dr. Nicholson showed how participating hospitals benefit from being graded on Survey responses that are magnitudes higher on average than the lowest possible score assigned to nonparticipating hospitals. PX-937.0 ¶ 59, (Exs. 1–3). Hospitals self-report Survey answers warranting a perfect score the vast majority of the time. *Id.* In contrast, Leapfrog assigns nonparticipating hospitals the lowest possible scores on the same measures

creating wide disparities on how these hospitals are scored for these measures accounting for a significant percentage of the Safety Grade. *Id.* The disparity is reflected in the following demonstrative Dr. Nicholson prepared:




*Id.* ¶ 59.

215. *Not Verified*: Dr. Nicholson showed that participating hospitals benefit from receiving high scores based on their Survey answers that are not sufficiently verified. This lack of verification is shown through how over 80% of hospitals receive "perfect scores" for 5 of 7 process Survey measures. PX-937.0. Dr. Nicholson identified how Leapfrog's auditing of only three-to-five hospitals per year is grossly insufficient to ensure that hospitals are accurately answering the Surveys, particularly on the subjective measures. *Id.* ¶ 47; Nicholson 87:10–88:6. The following demonstrative Dr. Nicholson prepared illustrates how most participating hospitals self-report *perfect* scores on Leapfrog's Survey:

***Exhibit 2***
***Most Participating Hospitals Continue to Self-Report Perfect Scores as of Spring 2025***




Source: TLG Hospital Safety Grade data
Note: This figure demonstrates that on each of the seven of the total 12 measures that hospitals participating in TLG's survey self-reported in Spring 2025, the majority of participating hospitals reported a perfect score. These seven measures are the ones that for non-participating hospitals, TLG either imputes the lowest possible value (Computerized Physician Order Entry (CPOE), Bar Code Medication Administration (BCMA), ICU Physician Staffing (IPS), Hand Hygiene) or omits in the calculation of the final grade (Safe Practice 1: Culture of Safety Leadership Structures and Systems, Safe Practice 2: Culture Measurement, Feedback, and Intervention, and Total Nursing Care Hours per Patient Day). This analysis does not include non-participating hospitals that were subject to TLG's "Step 1" imputation, which uses historical data to calculate a previously participating hospital's score on a given measure.

*Id.* ¶ 47.

216. *Insufficient data*: Twenty-three percent of hospitals do not participate in Leapfrog's Survey, and Dr. Nicholson testified that such a high amount of hospitals with missing data vastly exceeds the thresholds scholars have found necessary to make valid statistical inferences. PX-937.0 ¶ 53.

217. These differences function as a penalty against nonparticipants. Leapfrog caps nonparticipating hospitals to a total of 60 out of 400 points on the Four Measures, even though majority of hospitals receive the maximum points on each of those measures. PX-937.0 ¶ 44. As a result, Dr. Nicholson showed that the Safety Grade systematically penalizes nonparticipants. *Id.* ¶ 64; Nicholson Tr. 63:7–15, 132:1–22, 150:3–151:3. To illustrate this result, Dr. Nicholson prepared a counterfactual where he simply showed what would happen if nonparticipating hospitals participated in the Survey. *Id.* ¶¶ 66–67. In this counterfactual, he conservatively assumed that nonparticipating hospitals would receive the average participating hospital score on the

Survey-scored measures. *Id.* In doing this, Dr. Nicholson showed that nonparticipating hospitals dramatically improved in the counterfactual. *Id.* In the counterfactual, each of the Community Hospitals improved by at least one Safety Grade—with three of them improving two letter grades, as depicted in the demonstrative Dr. Nicholson prepared:




*Id.* ¶ 66.

218. In fact, every nonparticipating hospital with an ICU improved at least one Safety Grade in Dr. Nicholson's counterfactual showing that where a hospital is graded on all four "imputed" scores, participation in Leapfrog's Survey will likely improve one's Safety Grade. PX-937.0, Ex. 5.

***Exhibit 5***
***TLG's Methodology Penalizes Non-Participating Hospitals (Spring 2025)***




Source: TLG Hospital Safety Grade data
Note: This figure demonstrates the impact of rescoring seven of the total 12 measures that hospitals participating in TLG's survey self-report. These seven measures are the ones that for non-participating hospitals, TLG either imputes the lowest possible value (Computerized Physician Order Entry (CPOE), Bar Code Medication Administration (BCMA), ICU Physician Staffing (IPS), Hand Hygiene) or omits in the calculation of the final grade (Safe Practice 1: Culture of Safety Leadership Structures and Systems, Safe Practice 2: Culture Measurement, Feedback, and Intervention, and Total Nursing Care Hours per Patient Day). By contrast, as shown in Exhibit 2, on each of these measures, 50% or more of participating hospitals self-report the maximum possible score. As a result, to construct the counterfactual grades that TLG would have assigned non-participating hospitals had they participated in the survey, I conservatively rescore each of the seven measures to be the average score reported by participating hospitals. This rescoring does not affect TLG's "Step 1" imputation. If TLG uses historical data to calculate a previously participating hospital's score on a given measure, this analysis does so too. TLG's "Step 1" imputation affects 38 out of 592 non-participating hospitals.

*Id.*

219. Since the Fall 2024 Safety Grade methodology change, Dr. Nicholson observed that Safety Grade outcomes have diverged sharply between participating and nonparticipating hospitals. No nonparticipating hospital has received an "A" Safety Grade when Leapfrog assigned "limited achievement" on all Four Measures under Step 2 Imputation. PX-412.0.

220. At the same time, no participating hospital has received "Limited Achievement" scores on all Four Measures, PX-412.0,—confirming Leapfrog's "imputation" of "Limited Achievement" for the Four Measures has no connection to perceived performance at *any* hospital nationwide.

221. *No Data to Support Leapfrog's Position That Its Methodology Addresses "Non-Response Bias":* Dr. Nicholson also testified that at the time of the Fall 2024 Safety Grade methodology change neither Leapfrog nor its Expert Panel presented any data supporting the

opinion of Leapfrog's proffered expert Dr. Anthony Harris that Leapfrog's methodology is justified as a response to non-response bias. PX-937.0 ¶ 68; Nicholson Tr. 81:16–82:24 ("[Dr. Harris] just asserts it. It's a theoretical general concept. He doesn't apply any particular data to it."); Harris Tr. 88:7–89:9 ("Q. Did you do any data analysis in this case to show that? A. No, but similar to most biases, you cannot."). Dr. Harris himself admitted that he had "not do[ne] any analysis" to determine whether "applying [his] nonresponse bias principles" "was appropriate as it relates to how Leapfrog made the [Fall 2024 Safety Grade methodology] change." Harris Tr. 216:11–19. And like Leapfrog, Dr. Harris had no data to support the notion that nonparticipating hospitals would receive a score of "Limited Achievement" if they participated. Harris Tr. 83:5–12. In fact, Dr. Harris did not even understand that "Limited Achievement" is the lowest possible score a hospital can receive on the Four Measures. Harris Tr. 83:14–84:2. Nor did Dr. Harris review any of the Safety Grade data Leapfrog produced for hospitals across the country to analyze whether that data showed any nonresponse bias. Harris Tr. 56:8–13.

222. Belying the non-response bias arguments and Leapfrog's methodology more generally, Dr. Nicholson found that hospitals that did not participate in the Survey in 2024 but chose to participate in 2025 after Leapfrog imposed its punitive methodology received, on average, scores far exceeding "Limited Achievement", and even above Leapfrog's "Considerable Achievement" threshold. PX-412.0. Dr. Nicholson's findings are consistent with academic literature finding "no statistically significant differences between hospitals that chose to participate in [Leapfrog's] hospital survey and those that did not, in terms of several patient health outcomes measured by CMS in its Hospital Compare program." PX-937.0 ¶ 68. Neither Leapfrog's Expert Panel nor Leapfrog considered or identified any empirical data suggesting nonparticipating hospitals would perform poorly on the Four Measures before rigging the "imputation model" to assign nonparticipants "Limited Achievement."

223. *Distortion of Patient Choice:* Relying on his health care economic principles, Dr. Nicholson showed that Leapfrog's Safety Grades can distort patient choices. Dr. Nicholson showed that the Safety Grades are widely used and relied upon in the industry by insurers, hospitals, and patients alike. PX-937 ¶¶ 18, 31–38. The Safety Grades are used to determine reimbursement rates, make staffing and hiring decisions, and select what facility to use for care. *Id.* Dr. Nicholson showed how this could harm consumers, for example, in causing patients to choose to drive longer distances to receive care. *Id.* ¶ 18. Dr. Nicholson showed that this potential

harm is all the more likely due to how Leapfrog communicates the Safety Grades and their purported significance in choosing a hospital. *Id.* ¶ 34. Dr. Nicholson testified regarding how Leapfrog improperly relies only on a terribly flawed non-peer-reviewed, Leapfrog funded white paper to tell consumers that there is nearly twice the risk of mortality" at a hospital like the Community Hospitals than an A hospital. *Id.* Dr. Nicholson showed how the white paper is biased, does not result from proper a valid causal analysis, and is outdated. *Id.*; *see infra* ¶ 225.

224. *Leapfrog's Methodology Is a Poor Predictor of Outcomes:* Lastly, Dr. Nicholson showed that the Safety Grades do not reliably predict actual patient safety outcomes. PX-937.0 ¶ 33. Relying on several peer-reviewed critiques of Leapfrog's Safety Grades and his own analysis, Dr. Nicholson showed that better Safety Grades do not correlate with any statistically significant difference in patient safety outcomes. *Id.* ¶¶66–68.

225. To illustrate this point, Dr. Nicholson analyzed a peer-reviewed 2014 article comparing patient outcomes across different Leapfrog Safety Grades. PX-937.0 ¶ 70, Exs. 8, 9. (citing Andrew A. Gonzalez and Amir A. Ghaferi, "Hospital Safety Scores: Do Grades Really Matter?" *JAMA Surgery* 149(5) (2014): pp. 413-414 ("Gonzalez et al. (2014)"). One analysis in the study identified no statistically significant difference in risk adjusted 30-day mortality between receiving "A", "B", or "C" Safety Grades from Leapfrog. *Id.* Another analysis revealed that higher graded hospitals may even have higher surgical complication rates. *Id.*

226. Dr. Nicholson tested whether these findings are consistent today. Dr. Nicholson "conducted statistical tests comparing how differently graded hospitals performed on average on each of [Leapfrog's] 10 outcome measures reported in Spring 2025." PX-937.0 ¶ 70 n.154. He found there are no statistically significant differences between hospitals assigned different Safety Grades by Leapfrog on many of the outcome measures. *Id.* There was no statistically significant difference when comparing 5 of the 10 outcome measures (CAUTI, SSI: Colon, MRSA, Air Embolism, and Foreign Object Retained) across C and B hospitals. *Id.* Similarly, when comparing the average outcomes for "C"-grade hospitals to "D/F"-grade hospitals, the difference is not statistically significant for 4 of the 10 measures (SSI: Colon, PSI 04, Air Embolism, and Foreign Object Retained).

| Measure | B - C: difference of means | B - C: t statistic | B - C: p value | B - C: reject hypothesis | C - D/F: difference of means | C - D/F: t statistic | C - D/F: p value | C - D/F: reject hypothesis | Measure Name |
|---|---|---|---|---|---|---|---|---|---|
| PSI_04_score | -6.3215 | -4.3830 | 0.0000 | Y | -4.2111 | -1.9146 | 0.0567 | N | Death among patients with serious treatable complications after surgery |
| PSI_90_score | -0.0647 | -8.3912 | 0.0000 | Y | -0.1564 | -6.9438 | 0.0000 | Y | Serious complications (this is a composite or summary measure) |
| HAI_1_SIR | -0.0980 | -3.1145 | 0.0019 | Y | -0.1304 | -2.2863 | 0.0230 | Y | Central line-associated bloodstream infections (CLABSI in ICUs and select wards |
| HAI_2_SIR | -0.0475 | -1.7252 | 0.0847 | N | -0.1397 | -2.7245 | 0.0068 | Y | Catheter-associated urinary tract infections (CAUTI in ICUs and select wards |
| HAI_3_SIR | -0.0500 | -1.1892 | 0.2346 | N | -0.1228 | -1.7033 | 0.0899 | N | Surgical Site Infection from colon surgery (SSI: Colon) |
| HAI_5_SIR | -0.0312 | -0.9020 | 0.3672 | N | -0.1542 | -2.2715 | 0.0241 | Y | blood laboratory-identified events (bloodstream infections) |
| HAI_6_SIR | -0.0785 | -4.7539 | 0.0000 | Y | -0.1524 | -4.5552 | 0.0000 | Y | Clostridium difficile (C.diff laboratory identified events (intestinal infections) |
| foreign_object | -0.0022 | -0.3535 | 0.7238 | N | -0.0031 | -0.5198 | 0.6036 | N | Foreign Object Retained |
| air_embolism | -0.0008 | -1.4082 | 0.1593 | N | 0.0006 | 0.7948 | 0.4271 | N | Air Embolism |
| falls_and_trauma | -0.0746 | -3.2612 | 0.0011 | Y | -0.1015 | -2.6609 | 0.0081 | Y | Falls and Trauma |

PX-937.0, App. E.

227. As a result, Dr. Nicholson testified that Leapfrog's Safety Grades are not reliable predictors of patient outcomes.

228. By a preponderance of evidence, the Court agrees with Dr. Nicholson's expert opinion that Leapfrog's Safety Grade methodology as changed in Fall 2024 penalizes nonparticipating hospitals when compared to participating hospitals, Leapfrog's Safety Grades distort patient choice, and that Leapfrog's Safety Grades are not reliable predictors of patient outcomes.

## VII. LEAPFROG PUBLICLY MISREPRESENTS ITS METHODOLOGY AND SAFETY GRADES

229. The Court heard extensive testimony about Leapfrog's consumer-facing website at hospitalsafetygrade.org and the many representations Leapfrog makes about the Safety Grade and its methodology on that website. The Court now addresses that evidence and finds by a preponderance of the evidence that the Safety Grade website makes multiple material misstatements and false statements about Leapfrog's methodology, what its Safety Grades reflect, and how the "imputation model" in particular works. And although Leapfrog has recently made several changes to its website, the revisions and deletions it has made exacerbate the false statements and misstatements.

### A. Overview of Leapfrog's Safety Grade Website

230. Leapfrog's website hospitalsafetygrade.org is designed to be consumer friendly and easy for consumers to use. In a 2014 grant report, CEO Binder wrote that the website was created "to appeal to consumers" and to communicate to them "in a way that is most usable, recognizing diverse levels of health literacy." DX-319.0 at -720. Ms. Bailey, who oversees the website, testified that Leapfrog aims to "ensure that [its] website is written to an eighth grade level of education."

Bailey Tr. 182:20–183:2.

231. The home page invites consumers to search for their hospital by name or location and features a prominently placed search bar to facilitate that process. *E.g.*, PX-033.0 at 1.

232. After consumers enter the identifying information relevant to their search, the website displays search results listing hospitals that match the query, each accompanied by a prominently displayed Safety Grade. *See, e.g.*, PX-033.1.




PX-033.1 at 1.

233. When a consumer selects a hospital from the search results, the website navigates to a dedicated Safety Grade webpage for that hospital. *See, e.g.*, PX-033.2.

### B. Safety Grade Webpages Do Not Explain the "Imputation Methodology" or Clearly Indicate Non-Participation

234. Each hospital's Safety Grade webpage on Leapfrog's website prominently displays its assigned letter Safety Grade at the top of the page, followed by a series of measure-level performance indicators. The Safety Grade webpage, however, does not explain that nonparticipating hospitals automatically receive the lowest possible score on the Four Measures under the Fall 2024 Safety Grade methodology. Nor do they disclose that the measure-level scores

for the Four Measures may have nothing to do with the hospital's actual performance or that, for nonparticipating hospitals, Leapfrog has no data to actually measure that hospital's performance. Instead, the Safety Grade webpage contains a series of misleading features and statements for nonparticipating hospitals that present their "imputed" scores as actual performance data and fail to fairly disclose what the Safety Grade and the scores on its various measures reflect as well as how Leapfrog assigns "imputed" scores.

**1. *"Worst Hospital's Score" and "Best Hospital's Score"***

235. In the center of each hospital's Safety Grade webpage, Leapfrog displays five clickable tabs labeled: (1) Infections; (2) Problems with Surgery; (3) Safety Problems; (4) Practices to Prevent Errors; and (5) Doctors, Nurses & Hospital Staff. Selecting any tab displays a series of color-coded "gas gauge" graphics purporting to show the hospital's performance on the measures associated with that category. *See infra* ¶¶ 245–53. For example, the Practices to Prevent Errors displays measures such as CPOE, BCMA, and Handwashing, *see, e.g.*, PX-033.5, while the Doctors, Nurses & Hospital Staff tab displays, among others, the IPS measure, *see, e.g.*, PX-033.6.




PX-033.5 at 4–5.

236. When a user selects the gas gauge graphic for any measure, Leapfrog presents a

numerical score for the hospital on that measure—labeled "This Hospital's Score"—alongside comparative benchmarks labeled "Best Hospital's Score," "Average Hospital's Score," and "Worst Hospital's Score." *See, e.g.*, PX-033.2–PX-033.6.

237. For nonparticipating hospitals, Leapfrog displays the automatically assigned "Limited Achievement" score for each of the Four Measures as equal to the "Worst Hospital's Score" for that measure. *See, e.g.*, PX-033.5; PX-033.6. For example, on BCMA, Leapfrog displays a score of "25" as both the hospital's score and the "Worst Hospital's Score," while identifying "100" as the "Best Hospital's Score." *See, e.g.*, PX-033.5 at 4–5.

238. After displaying these benchmarks, the Safety Grade webpage presents explanatory text describing each measure and the consequences of poor performance, followed by a section titled "What safer hospitals do," which describes the practices associated with higher scores. *See, e.g.*, PX-033.2–PX-033.6. The text displayed for the Four Measures is summarized below.

| | Leapfrog's Description of the Measure | "What Safer Hospitals Do" |
|---|---|---|
| **Hand Hygiene** | "When hospital staff does not carefully wash their hands, they can spread germs from one patient to another and cause someone to become seriously ill." | "Hospitals provide training and implement policies to make sure that all hospital staff cleans their hands before touching a patient." |
| **BCMA** | "If the bar codes do not match, this signals there is an error, giving nurses and doctors the chance to confirm they have the right patient, right medication, and right dose. Bar code medication administration (BCMA) systems are proven to reduce the risk that a hospital accidentally gives the wrong medication to a patient." | "When hospitals use bar coding technology effectively for all orders, medication errors happen far less frequently." |
| **CPOE** | "Good CPOE systems alert the doctor if they try to order a medication that could cause harm, such as prescribing an adult dosage for a child. CPOE systems help to reduce medication errors in the hospital." | "Hospitals use CPOE systems in all areas of the hospital and regularly test those systems to ensure they are alerting doctors to potential ordering errors." |
| **IPS** | "There are higher death rates in hospitals where ICU patients are not cared for by intensivists." | "Hospitals staff ICUs with physicians who have training in critical care medicine." |

PX-033.5 at 2, 5, 8; PX-033.6 at 8.

239. As presented on the Safety Grade webpage, a nonparticipating hospital assigned the "Worst Hospital's Score" for any of the Four Measures is portrayed as engaging in the unsafe or deficient practices described in the accompanying narrative and contrasted with the practices of the "safer hospitals," even though Leapfrog witnesses acknowledged that Leapfrog lacks any underlying performance data for those measures. *See infra* ¶¶ 301–14.

240. Leapfrog's own claimed "human factors" expert, Michael Vredenburgh, confirmed that the Safety Grade webpage is misleading in this respect. Although I find that Mr. Vredenburgh is not a qualified expert for the reasons set forth in the Community Hospitals' motion *in limine*, ECF 96 at 9–17, his factual admissions as a lay consumer are probative and usable against Leapfrog because Mr. Vredenburgh, as a retained purported expert, is an agent of Leapfrog. Mr. Vredenburgh testified that "a reasonable consumer" viewing the Safety Grade webpage would

understand that hospitals receiving the "Best Hospital's Score" are engaging in the practices described under "What safer hospitals do," and that a nonparticipating hospital assigned the "Worst Hospital's Score" would be understood to do "the opposite" of those practices. Vredenburgh Tr. 171:5–172:3.

241. By presenting automatically assigned "Limited Achievement" scores as the "Worst Hospital's Score," pairing those scores with descriptions of unsafe clinical practices, and contrasting them with what "safer hospitals do," the Safety Grade webpage conveys to consumers that nonparticipating hospitals perform as poorly as the worst-performing hospitals in the country on these measures, even though Leapfrog admits that it has no data to support that conclusion. *See supra* ¶¶ 237–39.

242. The contrast between Leapfrog's treatment of the Four Measures and its treatment of other Survey-based measures further underscores this misleading presentation.




PX-033.6 at 1–2.

243. For certain Survey-based measures that Leapfrog excludes entirely from the scoring calculation for nonparticipating hospitals—such as "Effective leadership to prevent errors" and "Nursing and bedside care for patients"—the Safety Grade webpage does not display a numerical score for the hospital and does not equate the hospital with the "Worst Hospital's Score." Instead, Leapfrog displays "This Hospital's Score" as "Declined to Report," clearly indicating that Leapfrog lacks data to assess the hospital's performance on those measures. *See, e.g.*, PX-033.6 at 1–2.

244. By contrast, for the Four Measures, Leapfrog does not use the "Declined to Report" designation for nonparticipating hospitals. Instead, Leapfrog assigns a numerical score equivalent

to the "Worst Hospital's Score" and presents it as if it reflects measured performance, despite Leapfrog's admission that it lacks underlying data regarding how nonparticipating hospitals actually perform on those measures. *See infra* ¶¶ 302–14.[16]

### 2. *Gas Gauge Graphics*

245. In addition to the text the page provides, Leapfrog's Safety Grade webpages also depict evocative color-coded "gas gauge" graphics, which visually depict Leapfrog's assigned score for each measure relative to a national benchmark. *See, e.g.*, PX-033.2–PX-033.6.

246. The gas gauge displays include zones ranging from "Better Than Average" to "Worse Than Average," and use corresponding colors—green, yellow, and red, respectively—to visually reinforce those categorizations. *See, e.g.*, PX-033.2–PX-033.6.




PX-034.2 at 1.

[16] Days before trial, Leapfrog revised this aspect of its website. As discussed below, the gas gauge for the measures Leapfrog excludes from the scoring calculation were revised to state "Measure Not Used." That revised language, however, still suggests, when paired with gas gauges for the Four Measures, that the "Limited Achievement" scores for the Four Measures reflect performance, not "arbitrary assignment" of penalizing, failing scores. *See infra* ¶¶ 247–53. This alteration was reversed after the Community Hospitals independently identified the change and served document requests on Leapfrog about it and other changes to the website.

247. The Court heard testimony from Community Hospitals' consumer choice and marketing expert, Dr. Jonah Berger, a globally renowned marketing professor at the Wharton School of Business at the University of Pennsylvania. PX-945.0 at ¶ 1. Dr. Berger, whose research has been cited more than 28,000 times in peer reviewed articles, is more than qualified to testify as an expert here, and consistent with other courts assessing his testimony, the Court qualified Dr. Berger to testify at trial as an expert in consumer behavior and decision-making. The Court accepts Dr. Berger's expert testimony as probative and credible.

248. Dr. Berger testified that the gas gauge graphics "with a red, yellow, and green color scale" are an example of "evaluative . . . labels." Berger Tr. 117:13–118:4. As Dr. Berger explained, "[a]cademic research finds that evaluative categories and labels not only help consumers make sense of information, but they also increase the influence such information has on consumer perceptions." *Id.* 117:4–12. Dr. Berger further testified that, "compared to numeric information," the "red, yellow, [and] green scales" present information in a simplified and intuitive form that that "can shape the way consumers interpret [that] information" and amplify its effect on their perceptions. *Id.* 118:5–17.

249. For certain measures where data is unavailable for nonparticipating hospitals—such as the three discarded measures—the gas gauge displays a clear "Declined to Report" label accompanied by a large question mark icon, indicating that Leapfrog lacks data for that measure. *See, e.g.*, PX-033.5; PX-033.6.



PX-033.6 at 1.

250. By contrast, this "Declined to Report" designation and question-mark icon do not appear for any of the Four Measures that are "imputed" for nonparticipating hospitals. *See, e.g.*, PX-033.5; PX-033.6. Instead, the gas gauge graphics for the Four Measures are displayed in the same manner as for the measures that are based on reported performance data, with no visual indication that the score was automatically assigned. *See, e.g.*, PX-033.5; PX-033.6; *see also* Bailey Tr. 173:7–11 (confirming there "isn't any wording in those gas gauges along the lines of decline to report . . . or not enough data").




PX-033.5 at 1.

251. As a result, the Community Hospitals' gas gauge graphics for the Four Measures appear in the red "Worse Than Average" zone, even though Leapfrog lacked underlying data for those measures and instead automatically assigned the lowest possible scores through its Fall 2024 Safety Grade methodology. *See, e.g.*, PX-033.5; PX-033.6. For example, a consumer sees that the Community Hospitals performed "Worse Than Average" on Handwashing—one of the Four Measures—even though Leapfrog lacks any data to assess the Community Hospitals' actual performance on that measure. *See, e.g.*, PX-033.5 at 7–8. By contrast, until just days before trial, a consumer saw for "Staff work together to prevent errors"—which is not one of the Four Measures—that the Community Hospitals "Declined to Report" and there is a large red question mark indicating that Leapfrog lacks any data to assess performance of that measure. *See, e.g.*, *id.* at 16–17. Leapfrog's eve-of-trial edits retained the question mark but temporarily replaced the text with the unhelpful language "Measure Not Used":




252. Dr. Berger testified that, based on his academic research, Leapfrog's inconsistent presentation would lead consumers to conclude that gas gauge graphics "showing a low score for the [Four Measures] are based on more or stronger evidence than the decline to respond [gas gauge] graphics for non-imputed measures." Berger Tr. 174:20–175:15.

253. Leapfrog's own witness, Mr. Vredenburgh, similarly testified it was a valid "criticism" that Leapfrog uses the "question mark" for certain non-reported measures but not for the Four Measures. Vredenburgh Tr. 194:16–195:1. He further testified that it would be a "better practice" and "future improvement" for Leapfrog to apply the same "Declined to Report" label and question mark icon to the Four Measures as it does for the other non-reported measures. *Id.* 186:9–13. Despite these deficiencies, Mr. Vredenburgh acknowledged that the gas gauge graphics are "part of the core" of how Leapfrog conveys hospitals' Safety Grades to consumers. *Id.* 258:10–21.

### 3. *Footnote Disclosures*

254. Leapfrog does not disclose *anywhere* on the Safety Grade webpages how the "imputation methodology" operates. The only disclosure that a nonparticipating hospital did not submit the Survey appears in one or two footnotes at the bottom of the page, depending on which measure a user selects.

255. The first footnote relates to the Survey-based measures that Leapfrog excludes entirely from the scoring calculation for nonparticipating hospitals (i.e., the "Declined to Report" measures). This footnote appears at the bottom of the page regardless of which individual measure a user selects and is referenced by a notation in the corresponding gas gauge graphic. *See, e.g.*, PX-033.5; PX-033.6. The footnote states, "Declined to Report: The hospital was asked to provide this information to the public, but did not." *See, e.g.*, PX-033.2–PX-033.6.

256. The second footnote relates to the Four Measures. Although Leapfrog deleted and then restored that footnote on the eve of trial, the footnote has been a central feature of Leapfrog's

defense. That second footnote only appeared if a user toggled to one of Four Measures. *See, e.g.*, PX-033.5 at 2, 5, 8; PX-033.6 at 8. Unlike the "Declined to Report" footnote, there was no notation in the corresponding gas gauge graphic indicating the presence of a second footnote. The only indicator was a small asterisk next to "This Hospital's Score," which itself appears only if a user toggles to one of those measures. *See, e.g.*, *id.* The footnote states: "* The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." *E.g.*, *id.* This footnote was the only disclosure on the Safety Grade webpage concerning the Four Measures or the "imputation methodology." *See* Bailey Tr. 174:10–175:2 ("There's only an asterisk . . . [that] corresponds to a footnote . . . toward the bottom of the page.").




PX-033.5 at 1–2.

257. As Dr. Berger testified, it was unlikely that consumers would read the footnote associated with the Four Measures because of "what the disclosure looks like and where it appears" on the Safety Grade webpage. Berger Tr. 50:21–52:5, 88:3–12. He explained that the footnote was



SA 244

written in small font, located at the bottom of the webpage, requires scrolling to view, and appeared only when users select one of the Four Measures. *Id.* 88:4–12, 196:6; *see also id.* 89:17–23.

258. Even if consumers were exposed to the footnote associated with the Four Measures, the footnote did not explain *how* the score was assigned. It did not disclose that the score assigned was the lowest possible value, that the score was automatically applied because the hospital did not participate in the Survey, or that the score did not reflect any underlying performance data. *See* Berger Tr. 81:17–82:2 ("And so while that footnote disclosure states that a score was assigned by [Leapfrog], it does not say anything about how that score was assigned, what that score is, or convey the fact that this assigned score was the minimum score for the imputed measure.").

259. Multiple Leapfrog witnesses confirmed that the footnote did not describe the "imputation methodology" or explain what the assigned value represents. *See, e.g.*, Bailey Tr. 176:4–7 (confirming that "the footnote . . . does not explain how that score was assigned"); Danforth Tr. 141:14–16 (same); Binder Tr. 254:10–18 ("That line [i.e., the footnote] does not describe the imputation methodology."). Mr. Vredenburgh similarly testified that the Safety Grade webpage for nonparticipating hospitals (which, except for the deleted second footnote remains materially the same as when he testified), does not "show under the hood" of "where [the] lowest score came from," and instead merely conveys that nonparticipating hospitals receive the lowest possible scores on the Four Measures. Vredenburgh Tr. 168:25–169:10, 185:23–186:2; *see also* Danforth Tr. 147:17–142:2 ("[W]e only represent that it's the worst possible score.").

260. Ms. Bailey, who oversees Leapfrog's website, acknowledged that Leapfrog added the "imputation" footnote because "there were concerns" that consumers might be confused about nonparticipating hospitals' scores on the Four Measures. Bailey Tr. 179:7–19; *see supra* ¶ 177 (discussing adding a "denotation" in response to public comments on new Fall 2024 Safety Grade methodology). She further testified that Leapfrog chose not to provide a fuller explanation of the methodology on the Safety Grade webpage due to "real estate" concerns—namely, that it would be "too much information" for consumers. Bailey Tr. 178:10–21; *see also* Campione Tr. 344:10–14 ("I mean, you can't put everything on one page. That would be very overwhelming to a consumer."); JX-031.0 at -863 (Ms. Campione explaining that Ms. Binder and Ms. Danforth did not want to link the Scoring Methodology document to the Safety Grade webpage).

261. As a result, the footnote as originally written did not meaningfully inform consumers about how scores on the Four Measures are assigned. Dr. Berger testified that "even if

consumers were exposed" to the footnote—and now that Leapfrog has deleted it, no consumer will be—they are "unlikely to understand" that a minimum score was assigned because "that's not what the footnote says." Berger Tr. 195:8–196:10.

262. Mr. Vredenburgh similarly testified that the footnote could lead users to draw different conclusions "depending on the person." Vredenburgh Tr. 160:12–17. He further testified that it is "reasonable" for users to conclude that nonparticipating hospitals received the lowest possible scores because they "actually perform[] poorly" on the Four Measures, rather than because they did not participate in the Survey. *Id.* 161:19–162:3.

263. During discovery—before Leapfrog temporarily deleted the footnote that had been the focus of its defense—Leapfrog witnesses and experts were asked extensively whether the footnote explains how the score was assigned. In response, they were evasive and not credible—far from transparent.

264. Ms. Campione initially testified that she did not understand what it meant to ask whether the footnote explains *how* the score was assigned. Campione Tr. 344:18–20. She later testified that she did not believe it mattered whether the footnote explained how Leapfrog arrived at the score, stating that was "[not] necessary" because consumers could see that the hospital's score matched the "Worst Hospital's Score." *Id.* 345:9–18.

265. Ms. Binder similarly testified that the footnote explained how the score was assigned by restating that "a score was assigned." Binder Tr. 253:22–254:7. She testified: "That is how it was assigned. That is how we got to the 15 [lowest score]. It was assigned. The hospital declined to report, so a score was assigned to reflect the lack of information available. That's how we got to 15." *Id.* Ms. Binder ultimately conceded that the footnote "does not describe the imputation methodology." *Id.* 254:10–18.

266. Ms. Danforth initially testified that she did not understand the question of whether a patient would understand how the score was assigned based on the footnote. Danforth Tr. 134:3–5. She later stated that she "would argue" the footnote "tells" consumers how the score was assigned "because it's directly associated with that specific asterisk" and "[she] can easily make that connection." *Id.* 466:1–13.

267. Dr. Austin initially testified that from the text of the footnote and the asterisk, he was "not sure" consumers would know how the score was assigned. Austin Tr. 228:14–16, 228:18–20. But when his own counsel later asked him whether the footnote conveys "how" the score was

assigned, he testified that he "personally would agree" that it does. *Id.* 381:15–21.

268. In spite of those evasive answers, Leapfrog witnesses could not deny the obvious when confronted with actual Safety Grade webpages: the purported footnote disclosure does not in any respect explain how Leapfrog selected the scores it assigned on those measures. Specifically, multiple Leapfrog witnesses were confronted during their depositions with webpages for unknown nonparticipating hospitals. They were shown the footnote disclosure providing "* The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." *See, e.g.*, PX-033.5 at 2. The witnesses were then asked to identify, based on the footnote disclosure, whether Leapfrog assigned the score via Step 1 imputation—through historical scores that arguably are indicative of performance—or Step 2 "imputation" which reflects automatic assignment of the lowest scores.

269. Faced with those unknown webpages, multiple Leapfrog witnesses admitted that they could not discern—based on the consumer-facing Safety Grade webpage—whether a nonparticipating hospital was assigned its score on the Four Measures based on Step 1 or Step 2 "imputation." Consumers certainly could not know better than Leapfrog's own employees on this exercise; a consumer could conclude based on Leapfrog's Safety Grade webpages that the "imputed" values reflect historic performance, rather than non-participation.

270. For example, Dr. Austin was shown the Safety Grade webpage for a nonparticipating hospital in Pikeville, Kentucky. *See* Austin Tr. 400:11–16. The page reflected that the hospital was "assigned" a Safety Grade as Leapfrog's footnote disclosure explained. But as Dr. Austin was forced to admit, based on the information on that hospital's page, he did "not know whether they were assigned a Step 1 or Step 2." *Id.* 403:20–404:6. His concession came in spite of his prior testimony that he "personally would agree" that the footnote tells consumers how a score was imputed. *Id.* 381:15–21.

271. Leapfrog's proffered human factors engineering expert Mr. Vredenburgh was shown the Safety Grade webpages for one nonparticipating hospital in Dallas, Texas and another in Lima, Ohio. *See* Vredenburgh Tr. 180:17–181:14. Both webpages stated that the hospitals were "assigned" a Safety Grade as Leapfrog's footnote disclosure stated. But Mr. Vredenburgh had to concede that information about how the hospitals were assigned their Safety Grade under Leapfrog's Fall 2024 Safety Grade methodology "is not displayed" anywhere on the Safety Grade webpages. *Id.* 182:23–183:1. He then confirmed that a nonparticipating hospital "that has the

historical score imputed is totally indistinguishable from the hospital that has the automatic assignment of limited achievement." *Id.* 183:5–9. He further agreed that "typical user[s] will have no idea" whether a nonparticipating hospital's Safety Grade is based on historical performance data (Step 1) or on automatic failure (Step 2). *Id.* 183:10–12.

272. For her part, Ms. Binder was shown the Safety Grade webpage of a nonparticipating hospital in Hawaii. *See* Binder Tr. 426:10–16. She agreed there was no way for a consumer looking at that webpage to know whether "step 1 or step 2 was used for the scores" for that hospital. *Id.* 427:16–21.

### C. Leapfrog's Public-Facing Representations About Its Methodology

273. Leapfrog makes numerous public statements elsewhere on its consumer-facing Safety Grade website, hospitalsafetygrade.org, describing the supposed purpose, meaning, and reliability of its Safety Grades and the methodology used to calculate them. Leapfrog's representations to consumers regarding the Safety Grade are distributed multiple ways, including through their Regional Leaders network. The representations collectively shape how consumers understand and interpret the Safety Grades. The Court addresses each of these statements and concludes, by the preponderance of the evidence, that the statements are materially misleading and untrue.

#### 1. *Leapfrog's Statements That Its Safety Grade Reflects a Hospital's Safety Performance—And Is Not Affected by Survey Participation*

274. Leapfrog repeatedly represents on its consumer-facing website, hospitalsafetygrade.org, and elsewhere in the public domain that the Safety Grade reflects a hospital's safety rather than its participation in the Survey.

275. On its "Frequently Asked Questions About The Leapfrog Hospital Safety Grade" webpage, Leapfrog states that the "Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey."[17] PX-021.0 at -424.

276. On its "About the Grade" webpage, Leapfrog similarly states that a Safety Grade "represent[s] a hospital's overall performance in keeping patients safe from preventable harm and medical errors." PX-066.0 at 1. Nothing on the page indicates or disclaims that participation in the Survey has an impact on an individual hospital's Safety Grade, which Mr. Vredenburgh conceded

[17] This language was removed after the close of discovery and after the Community Hospitals explained that the language was unfair and deceptive in their Motion for Summary Judgment. *See infra* ¶¶ 356–57; ECF 86 at 9.

is a "reasonable criticism" of this webpage. Vredenburgh Tr. 194:5–194:14.

277. In a public statement after this lawsuit was filed, Ms. Binder repeated these statements, writing that "Hospital Safety Grades are not automatically improved if a hospital participates in the Leapfrog Hospital Survey, nor are Safety Grades automatically lowered if a hospital declines to participate."

278. Leapfrog also implies elsewhere on its website that the Safety Grade is based on performance. For example, on its "Choosing the Best Hospital" webpage, Leapfrog states that "you can look at ICU staffing protocols and how the hospital uses computerized prescribing and bar-code technology to keep patients safe from medication errors." PX-022.0 at -627.

279. These representations create the impression that the Safety Grades reflect underlying hospital safety performance, even though the values assigned to nonparticipating hospitals for the Four Measures under the Fall 2024 Safety Grade methodology are not based on performance data, or any data at all.

280. As already established above, under the Fall 2024 Safety Grade methodology, Leapfrog automatically assigns nonparticipating hospitals the lowest possible score on the Four Measures if the Leapfrog lacks Survey data from the prior two grading cycles. *See supra* ¶¶ 69–76.

281. As a result, for nonparticipating hospitals, a significant portion of the Safety Grade is determined entirely by Survey nonparticipation, rather than by underlying performance data. *See supra* ¶¶ 202–06.

282. The representations that the Safety Grades reflect underlying hospital safety performance, and the treatment of nonparticipants, in the wake of the Fall 2024 methodology, are not underpinned by scientific analysis or conclusion. For example, Dr. Austin testified that he had not "conducted any analysis" comparing the actual safety of participating and nonparticipating hospitals. Austin Tr. 112:1–5.

283. Dr. Austin acknowledged that the "Lives Lost White Paper," on which that mortality claim was based and which he co-authored, was published in 2019—five years *before* Leapfrog adopted the Fall 2024 Safety Grade methodology. Austin Tr. 106:2–107:13. Ms. Campione similarly testified that "it would not be fair to extrapolate" the conclusions of the 2019 white paper study to the model used for assessing hospital Safety Grades today. Campione Tr. 423:20–424:18.

284. Mr. Vredenburgh, Leapfrog's own expert, testified that the statement the "Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey" is "inconsistent" with the current methodology and assumed that this was "written before [Leapfrog] changed the imputation to become punitive, because this [statement] seems to reflect the way that [Leapfrog] was before that point." Vredenburgh Tr. 205:12–25.

285. The Court finds by a preponderance of the evidence that Leapfrog's representations that the Safety Grade is based on performance and not Survey Participation are false.

**2. *Leapfrog's Representations About the Mortality White Paper***

286. Leapfrog has represented to consumers "patients are twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than an 'A' hospital," PX-021.0 at -423, and that, "[c]ompared to an 'A' hospital, your risk of dying increases . . . 91.8%" at a "D" or "F" hospital, PX-008.0 at -007; Leapfrog's Second Am. Ans. to Pls.' Interrogs. at 17–18. *See supra* ¶ 53.[18]

287. Leapfrog has represented to consumers that these mortality statements are supported by the white paper. As discussed above, Leapfrog commissioned the white paper in 2016. *See supra* ¶ 54. In 2019, Leapfrog posted an updated version of that white paper on its website alongside a graphic. *See id.*; PX-008.0; *see also* PX-208.0. That white paper analyzed mortality rates under a Safety Grade methodology that Leapfrog retired no later than 2021 or 2022. *See* PX-208.0.

288. The white paper drafted by Dr. Austin is not peer-reviewed or published in any academic journal, and its logic suffers from flaws laid bare by Dr. Nicholson's expert report. Principally, the white paper makes an improper causal claim. PX-937.0 ¶ 33. It claims: "If hospitals with a grade lower than an 'A' are able to achieve the safety performance of 'A' hospitals…more than 50,000 patient lives could be saved." PX-208.0. It reaches this conclusion without addressing any possible confounding factors. PX-937.0 ¶¶ 33-34. The white paper fails to address that variables associated with both Leapfrog's Safety Grades and patient outcomes could be responsible for an apparent correlation between the Safety Grades and such outcomes even in the absence of a causal relationship. *Id.*

289. Dr. Nicholson then noted that the white paper Leapfrog relied on for this

[18] Both of these representations were removed from Leapfrog's website after the close of discovery and after the Community Hospitals' motion for summary judgment explained that these reputations are deceptive and unfair under FDUPTA. *See infra* ¶¶ 354–55; ECF 87 ¶ 10.

representation is now gone and the older (2016 version) of the paper is now in its place. Dr. Nicholson explained that this change could further distort consumer decision-making. *Supra* ¶¶ 54–55.

290. Dr. Nicholson also testified to the structural biases with the calculations used in the white paper to measure lives lost versus lives saved. The white paper's calculations use all 15 outcome measures that were included in TLG's Spring 2019 Hospital Safety Grade methodology; however, the white paper incorporated only one process measure out of 13 then applicable, IPS. PX-208.0. Despite IPS representing only one of the 16 total measures in the formula, it accounts for more than four times the expected deaths than all the outcome measures combined. PX-208.0. Dr. Nicholson explained that Leapfrog over-indexes for IPS to this degree that skews the analysis. PX-209; *see also* PX-937.0 ¶¶ 33. The reliability of the white paper's calculus is further undermined by the data sources for outcome measures and IPS measures. *Id.* ¶¶ 58–64. Where the outcome measures come from audited, CMS data, *id.*, the IPS measures that influence the grades are based on subjective, self-reported answers to the Survey, *id.*

291. The Court finds by a preponderance of the evidence that Leapfrog's representations regarding the white paper are inaccurate.

### 3. *Leapfrog's Sources of Data for Its Safety Grades*

292. Leapfrog has represented publicly that the Safety Grades are calculated using Survey responses and CMS data where available as well as "information from other supplemental data sources." This statement appears on hospitalsafetygrade.org in Leapfrog's consumer-facing "About the Grade" webpage, which consumers may consult to understand how the Safety Grade is purportedly generated.[19] PX-066.3 at 1.

293. Similarly, Leapfrog elsewhere represents online that it uses "secondary data" to inform its Safety Grades. Leapfrog has stipulated in this litigation that, "[u]nder the Fall 2024 Methodology, if the data from a hospital's most recent Survey response is unavailable because that hospital did not participate in the Survey, and the information is not available from any data source, Leapfrog uses what the Methodology describes as a 'secondary data source' to determine that

[19] This statement was removed from the "About the Grade" webpage after the close of discovery. *Compare* PX-066.3 at 1 (August 6, 2025 version) *with* PX-066.0 at 1 (December 5, 2025 version). "About the Grade" still contains language claiming that Leapfrog has "a methodology for dealing with [] missing data" when "a hospital's information is not available from any data source." PX-066.0 at 3.

hospital's score for those twelve measures." ECF 129 ¶ 78; PX-002.0 at -048–049.

294. Specifically, Leapfrog tells consumers it uses "other secondary data sources"—and applies its "imputation" methodology—when Survey data are missing for the Four Measures. PX-002.0 at -048–049.

295. Leapfrog witnesses, however, admitted that no such "secondary" or "supplemental" data sources exist for the Four Measures despite those consumer-facing representations. *See, e.g.*, Austin Tr. 80:13–21 (testifying that Leapfrog uses "no other supplemental data sources" besides "data from [CMS] and from the Leapfrog Hospital Survey"), 415:18–19 ("We are currently not using secondary data as part of the imputation models."); Romano Tr. 263:15–264:1 ("But Step 2 is no longer an imputation. It's an assignment."); Danforth Tr. 498:15–18 (testifying that the only "secondary data source" for the Four Measures is the "imputed measure score"); Campione Tr. 54:7–55:13, 62:14–62:19, 145:14–146:7) (testifying that Leapfrog does not have any secondary data for the Four Measures).

296. The Court finds by a preponderance of the evidence that Leapfrog's representations regarding the use of secondary sources of data to issue a Safety Grade for nonparticipating hospitals are untrue and misleading.

#### 4. *Leapfrog's Stated Data-Sufficiency Rules Prohibit Grading Hospitals Missing Data on at Least Six Measures*

297. When Leapfrog originally designed its Safety Grade, its Expert Panel set out a requirement that it could not grade a hospital if Leapfrog did not have sufficient data. Leapfrog publicly states on its consumer-facing webpages that a hospital "must have enough safety data available" in order to receive a Safety Grade. PX-066.0 at 5.

298. Leapfrog's Expert Panel "Guiding Principles," reiterate that, "[i]f a hospital is missing data for a large number of performance measures, then a grade cannot be reliably calculated," and that "[i]n this situation, no grade should be issued for the hospital." PX-203.0 at -050. Those Guiding Principles were available on Leapfrog's publicly facing website for consumers to examine.[20]

299. Leapfrog's consumer-facing website further specifies that "[h]ospitals missing more than six process measures . . . are not graded." PX-066.3 at -623.

---

[20] The Guiding Principles were available on Leapfrog's website at the beginning of this case and during discovery. *See* PX-203.0. But after discovery closed, the Guiding Principles were surreptitiously removed from Leapfrog's website. *See* PX-029.0.

300. In the 2013 peer-reviewed article discussing a now-outdated version of Leapfrog's methodology, Dr. Austin, Dr. Romano, and other members of the Expert Panel explained that the "minimum measure thresholds were chosen" to balance "reliability" of the Safety Grade with "the number of hospitals receiving a score." PX-202.0 at -668. *See supra* ¶¶ 104–05.

301. Multiple Leapfrog witnesses, including Dr. Austin, Ms. Campione, and Senior Vice President for Healthcare Ratings, Missy Danforth, testified that the Safety Grade does not use any "supplemental data sources" for nonparticipating hospitals under the methodology adopted in Fall 2024. Austin Tr. 80:7–12, 269:18–21, 415:16–19; Campione Tr. 47:9–12; 54:7–13, 55:9–12, 55:13–19; Danforth Tr. 152:14–18, 153:10–14, 156:21–157:4, 159:18–22. Dr. Austin testified that Leapfrog uses "no other supplemental data sources" beyond CMS data and Survey responses, and that Leapfrog is "currently not using secondary data as part of the imputation models." Austin Tr. 80:13–21, 415:18–19.

302. These witnesses further testified that Leapfrog lacked any factual basis for assigning the lowest possible scores to nonparticipating hospitals for the Four Measures, because Leapfrog had no underlying performance information for those hospitals on those measures. *See* Campione Tr. 47:9–12, 54:7–13, 55:9–12, 55:14–19, 136:6–137:4 (for nonparticipating hospitals, Leapfrog has no data on the Four Measures; admitting that Leapfrog would not be able to assign a score for these measures without imputation unless they had a secondary data source, which they do not); Danforth Tr. 152:14–18, 153:10–14, 156:21–157:4, 159:18–22 (admitting that, for nonparticipating hospitals, Leapfrog does not have any data on BCMA, CPOE, or hand hygiene and does not have complete data for IPS); *see also* Harris Tr. 166:13–19, 262:19–263:2; Rule Tr. 374:9–19.

303. Contrary to its representations to consumers, Leapfrog does not adhere to its own stated criteria. Because nonparticipating hospitals do not submit Survey responses, Leapfrog lacks underlying data for at least seven process measures.

304. Specifically, Leapfrog is missing data for nonparticipating hospitals as to: (a) the three discarded measures that Leapfrog discards entirely from the scoring calculation; and (b) the Four Measures for which Leapfrog applies its imputation methodology. Yet Leapfrog still grades these hospitals anyway.

305. Leapfrog personnel acknowledged that nonparticipating hospitals are missing data for seven measures. Ms. Campione testified that Leapfrog "has no data for any of those seven

measures" and that Leapfrog is "missing scores for seven process measures." Campione Tr. 72:9–20, 146:12–17. Ms. Danforth likewise testified, "[T]hat's seven process measures missing." Danforth Tr. 516:19–22.

306. When asked whether Leapfrog will assign a Safety Grade to hospitals missing more than six process measures, Dr. Romano, despite his deep involvement in developing Leapfrog's Safety Grade methodology over several years, claimed he could not assess the statement's accuracy. Romano Tr. 119:20–122:24. Dr. Austin similarly evaded the question, drawing an arbitrary distinction between missing "values" and missing "scores." Austin Tr. 96:5–97:3.

307. By issuing Safety Grades to hospitals missing data for seven measures, Leapfrog exceeds the "more than six" threshold it publicly identifies as rendering a Safety Grade unreliable and impermissible.

308. When Leapfrog witnesses were confronted with the discrepancy between what Leapfrog tells consumers about its Safety Grades—that it does not issue a Safety Grade if a hospital is lacking data on six measures—with what it does—assigns grades to hospitals lacking data on seven measures—their testimony was evasive, circular, and not credible.

309. Dr. Austin testified that nonparticipating hospitals "have scores" for the Four Measures as a result of the imputation aspect of the Safety Grade methodology and therefore "aren't missing data." Austin Tr. 102:3–8. Ms. Binder likewise testified that Leapfrog "*count[s]* imputed data as data," Binder Tr. 382:10–11 (emphasis added), a claim repeated by Ms. Danforth, who testified that "[i]mputed measures are not *considered* missing data." Danforth Tr. 516:4–5 (emphasis added). But, according to Leapfrog's own Safety Grade expert, Dr. Romano, because Leapfrog simply assigns nonparticipating hospitals the lowest possible score on the Four Measures, it is no longer "imputing" anything at all. Romano Tr. 265:2–12 ("Q. So is it fair to say that post 2024 methodology for Leapfrog, that the values assigned for those four measures, CPOE, BCMA, IPS, and hand hygiene, are not imputed measures? Is that what you're saying? A. They're not imputed values, no. They are assigned values. Q. And they are assigned values at the lowest amount. Is that correct? A. Correct."). As a result, Ms. Binder and Ms. Danforth's pretextual excuse that the Four Measures are not missing data does not save them from their misstatement.

310. Despite these assertions, Leapfrog witnesses, including Dr. Austin, Ms. Campione, and Ms. Danforth, conceded that Leapfrog has no underlying performance data for the Four Measures. Dr. Austin testified that Leapfrog's imputation methodology is "based on a lack of

data," Austin Tr. 239:19–240:7, and that Leapfrog does not have "any information to know how" nonparticipating hospitals would perform on the Four Measures, *id.*, 277:5–10.

311. Ms. Danforth similarly acknowledged that Leapfrog is "missing data from the hospitals themselves" for the Four Measures, yet assigns them Safety Grades nonetheless. Danforth Tr. 519:20–520:3.

312. Dr. Romano likewise testified that "[i]mputations always involve assumptions" and that those "assumptions are usually wrong in various ways." Romano Tr. 179:8–25. Dr. Austin thus agreed, that "by definition, imputation is going to have an error associated with it." Austin Tr. 238:9–10.

313. Ms. Campione further confirmed that Leapfrog does not "have any data" about a nonparticipating hospital's performance on the Four Measures. Campione Tr. 47:9–12, 54:7–13, 55:9–12, 62:14–19.

314. In sum, Leapfrog witnesses claimed Leapfrog was *not* "missing" data for seven measures—even though it lacked any data for those measures as to nonparticipating hospitals—because it made up numbers to "impute" scores for four of them. No witness identified any place on Leapfrog's website where Leapfrog disclosed that obtuse reasoning to consumers—let alone transparently. As a result, Leapfrog issues Safety Grades to nonparticipating hospitals despite lacking data for seven process measures—contrary to its own stated data-sufficiency criteria—and automatically imposes failing-level scores on the Four Measures that are entirely untethered to those hospitals' actual performance. *See supra* ¶¶ 72, 76, 303–07.

315. The Court finds by a preponderance of the evidence that Leapfrog's statements that Leapfrog does not grade hospitals missing six process measures are false and misleading. Leapfrog clearly and regularly grades hospitals missing that many measures—and more. The Court also finds Leapfrog's misrepresentations in this regard are particularly pernicious because they are designed to persuade consumers that Leapfrog's Safety Grade methodology is backed by scientific rigor they can and should trust—inducing reliance and trust with falsehoods.

### 5. *Leapfrog's Representations That Its Methodology Is Peer Reviewed*

316. Leapfrog publicly represents that its Safety Grade methodology is "peer reviewed." This representation appears prominently on several webpages on Leapfrog's consumer-facing website, hospitalsafetygrade.org, including the "About the Grade" webpage and the "Frequently Asked Questions About the Leapfrog Hospital Safety Grade" webpage. PX-030.0 at 1; PX-066.0

at 1–2.

317. The Court heard testimony that the only peer-reviewed publication concerning Leapfrog's methodology is a 2013 article in the Journal of Patient Safety describing an earlier version of the methodology and the Expert Panel's early work. PX-202.0 at -665–69.

318. Dr. Austin confirmed that the 2013 paper is the sole peer-reviewed document relating to the Safety Grade. He further acknowledged that the methodology analyzed in 2013 differs materially from the methodology Leapfrog adopted in Fall 2024. Austin Tr. 90:15–17, 306:15–17.

319. When asked whether the 2013 peer review applies to the methodology in use today, Dr. Austin was evasive, offering answers like: "I could argue that" the website "does not say the current Leapfrog Hospital Safety Grade methodology" has been peer reviewed. Austin Tr. 88:12–18 80:13–21; 269:18–21.

320. Dr. Austin nonetheless admitted that the imputation methodology adopted in Fall 2024 "has not" been peer reviewed. Austin Tr. 90:15–17, 306:15–17.

321. The record establishes that imputation is a critical part of the current methodology. The seven Survey-dependent process/structural measures comprise approximately 35% of a hospital's overall Safety Grade for participants; for nonparticipants, Leapfrog drops three of those measures and reallocates weight such that the Four Measures together account for over 30% of the Safety Grade. *Supra* ¶ 72; JX-041.0 at 26, PX-937.0 ¶ 50, n.105.

322. Because the current, operative imputation mechanism has never been peer reviewed—and because Leapfrog is not using secondary or supplemental data for the Four Measures—the website's unqualified, present-tense assertion that the Safety Grade "uses" a peer-reviewed methodology is false and materially misleading as applied to the Fall 2024 methodology. PX-066.0 at 2; PX-021.0 at -423; Austin Tr. 80:13–21, 415:18–19.

323. Leapfrog's peer-review claim is especially deceptive in context. It is designed to induce consumer trust by invoking the credibility of scientific vetting while omitting that the only peer-reviewed article predates—and does not evaluate—the punitive imputation regime that is central to the current Fall 2024 Safety Grade methodology. PX-202.0 at -665–669; PX-002.0 at -047–059.

324. The Court finds by a preponderance of the evidence that Leapfrog's statements about whether and to what extent its Fall 2024 Safety Grade methodology was peer reviewed are

false.

#### 6. *Leapfrog's Statements About Its Expert Panel's Approval of the Imputation Methodology*

325. The Fall 2024 Safety Grade Methodology states that "Leapfrog has worked closely with statisticians at Mathematica, Leapfrog's National Expert Panel, and our scientific partners at Johns Hopkins Armstrong Institute for Patient Safety and Quality to develop a new two-step imputation approach for determining scores for CPOE, BCMA, IPS, and Hand Hygiene if they are missing from our publicly reported Survey Results." PX-002.0 at -058.

326. Leapfrog also publicly represents that its Safety Grade methodology is calculated by "top patient safety experts under the guidance of a National Expert Panel." PX-021.0 at -423; *see* PX-005.0 at 48. This representation appears on hospitalsafetygrade.org and conveys that the Expert Panel oversees and validates the methodology used to calculate the Safety Grades. This representation also appears on materials and in quotations originating from Leapfrog, including those generated in response to this lawsuit.

327. Meeting records, transcripts, and testimony reflect that the National Expert Panel did not review, consider, or approve the methodology adopted in Fall 2024. *See supra* ¶¶ 188–93.

328. Dr. Austin testified that the Fall 2024 Safety Grade methodology had not been presented to the Expert Panel for evaluation or endorsement before it was implemented. *See* Austin Tr. 284:21–285:21.

329. Dr. Romano similarly confirmed that the Fall 2024 Safety Grade methodology was not discussed or approved at the Expert Panel Meeting or at any subsequent Expert Panel meeting. Romano Tr. 156:17–21.

330. The Court finds by a preponderance of the evidence that Leapfrog's statements regarding the Expert Panel's role in the adoption of the Fall 2024 Safety Grade methodology are untrue and misrepresentative.

### D. Leapfrog's Sole Safety Grade Methodology Disclosure Is Difficult To Access and Comprehend and Is Itself Misleading

331. Leapfrog's Safety Grade webpages do not disclose how the Safety Grades are calculated and do not explain that nonparticipating hospitals automatically receive the lowest possible score on the Four Measures regardless of actual performance. *See supra* ¶¶ 234–72.

332. As the Community Hospitals' consumer choice and marketing expert Dr. Berger explained in his unrebutted testimony, there is only one location across Leapfrog's entire

consumer-facing website where Leapfrog actually discloses the imputation methodology: the 28-page Scoring Methodology document.[21] Berger Tr. 47:16-22, 50:21–52:5, 67:16-23. That document is not linked directly from the Safety Grade webpage—a deliberate choice Leapfrog made in designing its website because Ms. Binder and Ms. Danforth did not "care[] to do so." JX-031.0 at -863 (Ms. Campione rejecting proposal to link the Scoring Methodology document on the Safety Grade webpage because she did not "think Leah [Binder] or Missy [Danforth] cared to do so.").

333. Dr. Berger's conclusion was confirmed by Ms. Danforth, who conceded that there is no "other page" on Leapfrog's website that "explains how a score is imputed" beside the 28-page Scoring Methodology document. Danforth Tr. 142:12-143:2. Although Ms. Danforth suggested that the Fall 2024 Safety Grade methodology may be mentioned elsewhere on the website—such as in her recorded webinars—she was unable to identify those pages, nor has Leapfrog identified any evidence to suggest those webpages are consumer-facing. *See id.* 143:5-21.

334. Dr. Berger demonstrated at trial that navigating from a hospital's individual Safety Grade webpage to the Scoring Methodology document is difficult and non-intuitive. The Court finds probative the demonstrative Dr. Berger used for illustrating the steps required to reach that document:

[21] The analysis is the same for both the Fall 2024 Scoring Methodology document, PX-002.0, and the Spring 2025 Scoring Methodology document, JX-041.1, which are substantively identical. *See* Leapfrog's Second Am. Ans. to Plaintiffs' Interrogatories at 3 (stating that the Spring 2025 Safety Grade methodology had "[n]o changes from fall 2024" methodology).




PX-945.0 at 40 (Ex. 8).

335. As Dr. Berger explained, accessing the Scoring Methodology document—and specifically the portion disclosing the imputation methodology—from a hospital's individual Safety Grade webpage requires users to take multiple steps. A user must first click small, hyperlinked text located beneath individual measure descriptions stating, "For details on sources, click here," or alternatively click an inconspicuous "Detailed table view" link located at the top right of a hospital's profile webpage. These links are highlighted in red boxes in the screenshots below.

**This Hospital's Score:**
15 *

**Best Hospital's Score:**
100

**Average Hospital's Score:**
82.22

**Worst Hospital's Score:**
15

**Doctors order medications through a computer**

Hospitals can use Computerized Physician Order Entry (CPOE) systems to order medications for patients in the hospital, instead of writing out prescriptions by hand. Good CPOE systems alert the doctor if they try to order a medication that could cause harm, such as prescribing an adult dosage for a child. CPOE systems help to reduce medication errors in the hospital.

*Hospitals can earn up to 100 points for using a well-functioning CPOE system in most areas of the hospital. For details on sources, click here.*

**What safer hospitals do:**

Hospitals use CPOE systems in all areas of the hospital and regularly test those systems to ensure they are alerting doctors to potential ordering errors.

This Hospital's Grade

F
FALL 2025

**Delray Medical Center**

5352 W Linton Blvd
Delray Beach, FL 33484-6580
Map and Directions

View this hospital's Leapfrog Hospital Survey Results

► Show Recent Past Grades

Detailed table view

NEW Order 2⅓ years of detailed scoring for this hospital for $2.95

Learn how to use the Leapfrog Hospital Safety Grade



Infections | Problems with Surgery | Safety Problems | Practices to Prevent Errors | Doctors, Nurses & Hospital Staff

PX-034.5 at 1, 2 (red box emphasis added).

336. Those links direct users to a hospital's "Detailed table view" webpage. That page contains two tables displaying the hospital's most recent numerical scores for each measure. *E.g.*, PX-033.7. Each table includes seven columns: "Measure," "The Hospital's Score," "Worst Performing Hospital," "Avg. Performing Hospital," "Best Performing Hospital," "Data Source,"

and "Time Period Covered." *Id.* For each listed "Measure," the table includes a tooltip labeled "What's This?" that displays a description of that specific measure when a user hovers over the tooltip. ECF 129 ¶ 69.

337. To access the Scoring Methodology document from the "Detailed table view" webpage, a user must then scroll to the bottom of the page and click a small, gray-font hyperlink stating, "For a full description of the methodology, click here." *See* ECF 129 ¶¶ 67–71. The location and text of this hyperlink is highlighted in a red box in the screenshot below.

This Hospital's Grade

F

FALL 2025

**Delray Medical Center**

5352 W Linton Blvd
Delray Beach, FL 33484-6580
Map and Directions

Outcomes measures include errors, accidents, and injuries that this hospital has publicly reported.

| Measure | The Hospital's Score | Worst Performing Hospital | Avg. Performing Hospital | Best Performing Hospital | Data Source | Time Period Covered |
|---|---|---|---|---|---|---|
| Dangerous object left in patient's body What's This? | 0.000 | 0.256 | 0.011 | 0.000 | CMS | 07/01/2022 - 06/30/2024 |
| Air or gas bubble in the blood What's This? | 0.000 | 0.050 | 0.001 | 0.000 | CMS | 07/01/2022 - 06/30/2024 |
| Patient falls and injuries What's This? | 0.486 | 1.748 | 0.338 | 0.000 | CMS | 07/01/2022 - 06/30/2024 |
| Infection in the blood What's This? | 1.075 | 2.362 | 0.586 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| Infection in the urinary tract What's This? | 0.576 | 2.399 | 0.522 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| Surgical site infection after colon surgery What's This? | 3.098 | 3.229 | 0.856 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| MRSA Infection What's This? | 0.271 | 2.685 | 0.689 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| C. diff. Infection What's This? | 0.276 | 1.486 | 0.370 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| Death from treatable serious complications What's This? | 108.94 | 235.51 | 177.47 | 84.66 | CMS | 07/01/2021 - 06/30/2023 |
| Harmful Events What's This? | 1.03 | 3.10 | 1.00 | 0.53 | CMS | 07/01/2021 - 06/30/2023 |
| Dangerous bed sores What's This? * | 0.56 | 7.50 | 0.64 | 0.05 | CMS | 07/01/2021 - 06/30/2023 |
| Collapsed lung What's This? * | 0.20 | 0.65 | 0.25 | 0.10 | CMS | 07/01/2021 - 06/30/2023 |
| Falls causing broken hips What's This? * | 0.31 | 0.56 | 0.29 | 0.15 | CMS | 07/01/2021 - 06/30/2023 |
| Blood Leakage What's This? * | 2.22 | 5.53 | 2.42 | 1.01 | CMS | 07/01/2021 - 06/30/2023 |
| Kidney injury after surgery What's This? * | 1.61 | 4.60 | 1.69 | 0.74 | CMS | 07/01/2021 - 06/30/2023 |
| Serious breathing problem What's This? * | 9.54 | 57.80 | 10.52 | 1.94 | CMS | 07/01/2021 - 06/30/2023 |
| Dangerous blood clot What's This? * | 5.06 | 8.15 | 3.90 | 1.56 | CMS | 07/01/2021 - 06/30/2023 |
| Sepsis infection after surgery What's This? * | 6.71 | 12.56 | 5.62 | 1.95 | CMS | 07/01/2021 - 06/30/2023 |
| Surgical wound splits open What's This? * | 1.60 | 4.00 | 1.87 | 1.13 | CMS | 07/01/2021 - 06/30/2023 |
| Accidental cuts and tears What's This? * | 1.03 | 2.41 | 0.89 | 0.28 | CMS | 07/01/2021 - 06/30/2023 |

* This measure is a part of the Harmful Events Composite and is not used for scoring.

Process measures include the management structures and procedures a hospital has in place to protect patients from errors, accidents, and injuries.

| Measure | The Hospital's Score | Worst Performing Hospital | Avg. Performing Hospital | Best Performing Hospital | Data Source | Time Period Covered |
|---|---|---|---|---|---|---|
| Doctors order medications through a computer What's This? | 15 | 15 | 82.22 | 100 | Imputation Model Applied | Not Applicable |
| Safe medication administration What's This? | 25 | 25 | 85.20 | 100 | Imputation Model Applied | Not Applicable |
| Specially trained doctors care for ICU patients What's This? | 5 | 5 | 67.86 | 100 | Imputation Model Applied | Not Applicable |
| Effective leadership to prevent errors What's This? | Declined to Report | 46.15 | 117.60 | 120.00 | 2025 Leapfrog Hospital Survey | 2025 |
| Staff work together to prevent errors What's This? | Declined to Report | 0.00 | 117.27 | 120.00 | 2025 Leapfrog Hospital Survey | 2025 |
| Nursing and Bedside Care for Patients What's This? | Declined to Report | 15 | 79.09 | 100 | 2025 Leapfrog Hospital Survey | 01/01/2024 - 12/31/2024 |
| Handwashing What's This? | 15 | 15 | 76.81 | 100 | Imputation Model Applied | Not Applicable |
| Communication with nurses What's This? | 80 | 76 | 90.37 | 97 | CMS | 10/01/2023 - 09/30/2024 |
| Communication with doctors What's This? | 82 | 75 | 89.99 | 97 | CMS | 10/01/2023 - 09/30/2024 |
| Responsiveness of hospital staff What's This? | 67 | 62 | 81.81 | 96 | CMS | 10/01/2023 - 09/30/2024 |
| Communication about medicines What's This? | 62 | 59 | 74.64 | 88 | CMS | 10/01/2023 - 09/30/2024 |
| Communication about discharge What's This? | 74 | 67 | 85.48 | 94 | CMS | 10/01/2023 - 09/30/2024 |

For a full description of the methodology, click here.

338. The hyperlink directs users to the 28-page Scoring Methodology document PDF. To locate Leapfrog's actual description of the "imputation" methodology within that document, a user must scroll to page 16. *See* JX-041.1 at -527.

339. The difficulty in accessing the Scoring Methodology document—and, in particular, the portion describing imputation—is corroborated by Leapfrog's own Google Analytics data, which Leapfrog uses to track activity on hopsitalsafetygrade.org. ECF 129 ¶¶ 70–72.[22]

340. The Google Analytics data shows that, among all visitors to the Community Hospitals' Safety Grade webpages during the relevant time period, approximately three percent accessed the Scoring Methodology document. PX-471.0–480.0; PX-538.0; *see also* Berger Tr. 49:1–2. That three-precent figure reflects user activity on Leapfrog's website between November 15, 2024 to August 4, 2025—a period that included visits (likely many) by counsel and experts, indicating that the percentage of ordinary consumers accessing the Scoring Methodology document was likely even lower. *See* Berger Tr. 55:17–56:1.

341. An even smaller percentage of users likely scrolled to page 16 to view Leapfrog's description of the Fall 2024 Safety Grade methodology. Dr. Berger testified that three percent is a "generous or conservative estimate of the number of people that saw" the relevant description on page 16. *Id.* 49:12–14. He further explained that "just because 3 percent of people downloaded it doesn't mean that 3 percent of people read it" and that, at most, three percent "could even potentially have been exposed" to the description, with many individuals unlikely to read through to page 16. *Id.* 48:1–7. As Dr. Romano testified, "obviously" many consumers visiting Leapfrog's website would not "drill down to see that detail" on how the methodology functions. Romano Tr. 266:6–8.

342. Thus, an exceedingly small percentage of consumers navigates to the one page on Leapfrog's website that discloses its methodology.

343. Even if a consumer reaches that description of the Fall 2024 methodology, the

[22] At the outset of fact discovery, the Community Hospitals requested that Leapfrog produce its website analytics data for its consumer-facing website hospitalsafetygrade.org. To produce that data, Leapfrog agreed to allow the Community Hospitals to inspect Leapfrog's Google Analytics account and direct Leapfrog's counsel to download data necessary for expert analysis. On a recorded Zoom meeting attended by both parties, Leapfrog's counsel shared her screen while a member of the Community Hospitals' expert's support team instructed counsel how to download the relevant Google Analytics data. PX-545.0-547.0. Leapfrog subsequently produced that data to the Community Hospitals in discovery. PX-471.0-480.0, 485.0-498.0, 531.0-540.0.

content of the Scoring Methodology document is difficult for users to comprehend. Leapfrog witnesses consistently confirmed that the document is not intended for lay consumers. Ms. Binder testified that the Scoring Methodology document "is not that accessible to the average layman." Binder Tr. 409:12-20. Ms. Danforth likewise testified that the Scoring Methodology document is "complicated to read." Danforth Tr. 185:3-6. Mr. Vredenburgh described the document as "dense" and confirmed that it is not something a typical user would read. Vredenburgh Tr. 173:20-174:7. He further agreed that it was written at a college- or graduate-level reading standard, well above his view that health-care information should be written at approximately a sixth-grade reading level. *Id.* 212:24–213:12.

344. The Scoring Methodology document is also itself materially misleading in how it describes Leapfrog's data sources. The Scoring Methodology document represents that Leapfrog scores hospitals with both "primary" and "secondary" data sources, and states that a measure is dropped if there is no available data source. *See* JX-041.0 at -534. In presenting the Four Measures, Leapfrog specifically represents in a chart that it has a "Secondary Data Source" by virtue of its imputation measure:

**PROCESS/STRUCTURAL MEASURES (12)**

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| Computerized Physician Order Entry (CPOE) | 2025 Leapfrog Hospital Survey | 2025 | Imputation Model Applied* | N/A |
| Bar Code Medication Administration (BCMA) | 2025 Leapfrog Hospital Survey | 2025 | Imputation Model Applied* | N/A |
| ICU Physician Staffing (IPS) | 2025 Leapfrog Hospital Survey | 2025 | Imputation Model Applied* | N/A |
| Safe Practice 1: Culture of Leadership Structures and Systems | 2025 Leapfrog Hospital Survey | 2025 | N/A | N/A |
| Safe Practice 2: Culture Measurement, Feedback & Intervention | 2025 Leapfrog Hospital Survey | 2025 | N/A | N/A |
| Total Nursing Care Hours per Patient Day | 2025 Leapfrog Hospital Survey | 01/01/2024 - 12/31/2024 | N/A | N/A |
| Hand Hygiene | 2025 Leapfrog Hospital Survey | 2025 | Imputation Model Applied* | N/A |

DX-311 at 6. That representation is false. Leapfrog's imputation methodology "imputes" no secondary data at all. *See supra* ¶¶ 301–14. Leapfrog *has* no such data. *See id.* Rather, the scores are assigned by Leapfrog itself.

345. The document also misrepresents how Leapfrog deals with "missing data." The misrepresentations start with the table of contents, which lists separately the sections related to

Leapfrog's imputation method for CPOE, BCMA, IPS, and Hand Hygiene as contrasted with Leapfrog's approach for "Dealing with Missing Data." JX-041.0 at -512–13. The Scoring Methodology document then states that "in cases where a hospital's information is not available from any data source, Leapfrog has outlined a methodology for dealing with the missing data," and hyperlinks readers to a section titled "Dealing with Missing Data." *Id.* at -515. That section explains that when a hospital is missing a measure score (except PSI 90; hospitals missing PSI 90 are not graded), the standard weight of that measure is redistributed to the other measures in the same measure domain. *Id.* at -534. But the "Dealing with Missing Data" section does not disclose that no data exists for the Four Measures or explain why those measures are treated differently from other missing-data measures. *Id.* Nor does the section provide any reasoning as to why these Four Measures are not treated similarly to other measures with missing data. *Id.*

**PROCESS/STRUCTURAL MEASURES (12)**

| Measure Name | Primary Data Source | Reporting Period | Secondary Data Source | Reporting Period |
|---|---|---|---|---|
| Computerized Physician Order Entry (CPOE) | 2025 Leapfrog Hospital Survey | 2025 | Imputation Model Applied* | N/A |
| Bar Code Medication Administration (BCMA) | 2025 Leapfrog Hospital Survey | 2025 | Imputation Model Applied* | N/A |
| ICU Physician Staffing (IPS) | 2025 Leapfrog Hospital Survey | 2025 | Imputation Model Applied* | N/A |
| Safe Practice 1: Culture of Leadership Structures and Systems | 2025 Leapfrog Hospital Survey | 2025 | N/A | N/A |
| Safe Practice 2: Culture Measurement, Feedback & Intervention | 2025 Leapfrog Hospital Survey | 2025 | N/A | N/A |
| Total Nursing Care Hours per Patient Day | 2025 Leapfrog Hospital Survey | 01/01/2024 - 12/31/2024 | N/A | N/A |
| Hand Hygiene | 2025 Leapfrog Hospital Survey | 2025 | Imputation Model Applied* | N/A |

DX-311 at 6. By not addressing the Four Measures or the imputation method within the "Dealing With Missing Data" section, Leapfrog again falsely implies to consumers that it *does* have data for the Four Measures.

346. The Court finds that Leapfrog's public-facing methodology disclosures—across its website, including on the Safety Grade webpage and in the Scoring Methodology document—do not accurately or clearly explain how Safety Grades are calculated for nonparticipating hospitals, are in many respects false, and are misleading to consumers.

### E. Leapfrog's Recent, Surreptitious Changes to Its Consumer-Facing Websites and Materials After the Close of Discovery Underscore Its Deceptive Practices

347. After the filing of this action on April 30, 2025, Leapfrog altered the Safety Grade website, hospitalsafetygrade.org, that the Community Hospitals challenged in this case. The alterations include removing (and then, when challenged, reinstating) the Safety Grade-webpage footnote that Leapfrog's witnesses claimed informed consumers about Leapfrog's imputation of the Four Measures. *See* PX-033.5 (depicting the Safety Grade webpage as of December 3, 2025). Leapfrog made these and other changes both during and after the close of discovery, without notice or disclosure of these changes to the Community Hospitals or the Court. Significantly, some of Leapfrog's changes make it even more difficult for consumers to unravel Leapfrog's deceptive practices.

348. *Footnote Disclosure.* On or about December 23, 2025, Leapfrog removed the only disclosure on the Safety Grade webpage concerning the imputation of the Four Measures: the footnote stating "* The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." *See supra* ¶¶ 254–273. The corresponding asterisk that appeared next to "This Hospital's Score" when a consumer toggled one of the Four Measures on the Safety Grade webpage was also removed.

349. The removal of that footnote on the eve of trial discredits Leapfrog's defenses and the testimony of its witnesses and experts in this case. From its very first substantive filing in this case, Leapfrog argued that its purported footnote disclosure was core to its defense, stating that the footnote "explains how and why Leapfrog would assign a score for designated measures where data is unavailable." ECF 39 at 8. Two of its expert reports relied on and emphasized the footnote on Leapfrog's website in defending Leapfrog's conduct.[23] And nearly *every* Leapfrog witness was asked about this purported footnote disclosure. *See supra* ¶¶ 260, 263–67.

350. Then, in its summary judgment motion—and in its brief opposing the Community Hospitals' motion for summary judgment, Leapfrog stated that "red, bold disclaimers . . . clearly identify to a consumer that a score is *assigned* for certain measures because of a lack of

[23] *See* DX-101.0 at 14 (Expert Report of Dr. Anthony Harris) ("Comments also led to the assigned scores being clearly labeled as assigned and not the actual hospital data, which allowed transparency for the public with respect to the display of the methodology for these 4 measures."); DX-104 at 9 (Expert Report of Michael Vredenburgh) ("Visual cues, including asterisks (#*) next to imputed scores . . . conspicuously direct users to explanatory footnotes, bolded and in red.").

information," ECF 99 at 12, and because of that footnote, Leapfrog's "website is transparent for consumers," ECF 102 at 10. Those cross-motions for summary judgment remain before the Court, yet Leapfrog has *never* raised for the Court's attention its surreptitious changes. Leapfrog only reinstated the footnote after the Community Hospitals noticed its deletion and sought information about the deletion from Leapfrog's counsel. On December 29, 2025, shortly after the Community Hospitals' outreach to Leapfrog's counsel, Leapfrog's footnote re-appeared without further explanation. Leapfrog's eve-of-trial deletion has only confirmed its efforts to deceive and mislead consumers are not accidental but rather a conscious and pernicious pattern or practice that must be remedied. Leapfrog made other significant (but not helpful) changes to its website as well in the lead up to trial.

351. *Representations About Data Sources.* At some time between November 4, and November 26, 2025, Leapfrog deleted the statement "If a hospital does not report to the Leapfrog Hospital Survey, other sources of data are used to calculate a Grade" from its "Frequently Asked Questions About The Leapfrog Hospital Safety Grade" page. PX-506.0 at 5–6. Instead, hospitalsafetygrade.org now represents that "[m]ost of the data used to calculate the Grade comes from the Centers for Medicare and Medicaid Services (CMS), the federal agency that runs Medicare. *Id.* If a hospital voluntarily reports to the Leapfrog Hospital Survey, some of that data is used to calculate a Safety Grade." *Id.* In making this change, Leapfrog still masks that the *only* data it has is from its Survey and CMS—and that for nonparticipants it has CMS data alone.

352. Other statements about Leapfrog's data sources are contained within a 20+ page "Scoring Methodology" document, which requires multiple steps to access from a hospital's Safety Grade webpage. *Supra* ¶ 334. The first page of text in the Fall 2024 and Spring 2025 versions of that document both state that Safety Grades are calculated using Survey responses, CMS data, and "information from other supplemental data sources." PX-002.0 at -047; JX-041.0 at -514. "Imputation" is not mentioned in either the Fall 2024 or Spring 2025 versions until the second page of text. PX-002.0 at -048; JX-041.0 at -515. The Fall 2025 version (the current version) contains the same language, except it adds a comma and the words "including imputed scores" after the words "information from other supplemental sources.[24] The evidence suggests Leapfrog

[24] Leapfrog's "About the Grade" webpage also originally contained the "information from other supplemental data sources" language. PX-066.3 at 1. At some point between and August 6 and

added this clause to counter the Community Hospitals' allegations that an explanation of "imputation" is difficult to access, but a post-discovery passing mention of "imputed scores" on a dense document buried online does not cure Leapfrog's misrepresentations. Moreover, all three versions represent that Leapfrog has a "secondary data source" for the Four Measures. PX-002.0 at -048–049; JX-041.0 at -515–516. And all three versions have a "Dealing With Missing Data" section, but do not address the Four Measures or the imputation method in that section. PX-002.0 at -065; JX-041.0 at -534–535.

353. *Expert Guiding Principles.* At some time between September 23, and October 26, 2025, Leapfrog removed from hospitalsafetygrade.org the document titled "Expert Panel's Guiding Principles on the Development of the Composite Leapfrog Hospital Safety Grade for U.S. Hospitals." *Compare* PX-203.0 *with* PX-029.0. *See supra* ¶ 298. That document stated that "a grade cannot be reliably calculated" when "a hospital is missing data for a large number of performance measures." PX-203.0 at -050. In such situations, the document concluded that "no grade should be issued for the hospital." *Id.* Leapfrog still represents on its "About the Grade" webpage, however, that "[h]ospitals missing more than six process measures . . . are not graded." PX-066.0 at 5.

354. *Mortality Statistics.* At some time between October 26, 2025 and November 26, Leapfrog altered the content on its "Lives Lost and Lives Saved" webpage, including by the deletion of a poster graphic representing that patients had a 91.8% higher risk of dying at a "D" or "F" graded hospital compared to an "A" graded hospital, and replacing the hyperlinked 2019 white paper document with a 2016 version, under a new link. *See* PX-020.0 at 3; *supra* ¶ 53. Leapfrog still represents, however, that "D and F hospitals carry nearly twice the risk of mortality of A hospitals." *See* PX-008.0 at 1.

355. *Representations About Research.* At some time between October 24 and November 26, 2025, Leapfrog deleted the statement "Johns Hopkins Medicine researchers estimate that patients are twice as likely to die of a preventable problem at a 'C,' 'D,' or 'F' hospital than an 'A' hospital, and over 50,000 lives would be saved if all hospitals performed the way A hospitals did." PX-506.0 at 3. This statement formed part of the answer to the question "Should patients avoid a 'C,' 'D,' or 'F' hospital? What should people do if the only hospital in their community is a 'C,'

December 5, 2025, those words were deleted from the "About the Grade" webpage. PX-066.0 at 1.

'D,' ort 'F'?" PX-506.0 at 12. *See supra* ¶ 53. But Leapfrog still makes the same assertion on its "Lives Lost and Lives Saved" webpage, claiming that a Johns Hopkins "analysis also found that D and F hospitals carry nearly twice the risk of mortality of A hospitals." PX-008.0.

356. *Participation versus Performance.* At some time between October 24 and November 26, 2025, Leapfrog deleted the statement that the "Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey" from its "Frequently asked Questions About The Leapfrog Hospital Safety Grade" webpage. PX-506.0 at 6–7. This statement formed part of the answer to the question "Does a hospital get a better Safety Grade if it reports to the Leapfrog Hospital Survey?" *Id.*; *see supra* ¶ 275. Instead, Leapfrog replaced that statement with "Reporting to the Leapfrog Hospital Survey doesn't automatically improve a hospital's Safety Grade." PX-506.0 at 6–7. This is not true, as shown by Dr. Nicholson. *See supra* ¶¶ 216–20.

357. At some time between October 24 and November 26, 2025, Leapfrog deleted the statement "If a hospital does not report to the Leapfrog Hospital Survey, other sources of data are used to calculate a Grade" from its "Frequently Asked Questions About The Leapfrog Hospital Safety Grade" page. PX-506.0 at 5–6. Instead, the Safety Grade website now represents that "[m]ost of the data used to calculate the Grade comes from the Centers for Medicare and Medicaid Services (CMS), the federal agency that runs Medicare. If a hospital voluntarily reports to the Leapfrog Hospital Survey, some of that data is used to calculate a Safety Grade." *Id.* But Leapfrog still does not disclose on this webpage that *no* data is available for the Four Measures if a hospital does not participate.

358. *The Safety Grade As the "First Tool" For Consumers.* At some time between October 24 and November 26, 2025, Leapfrog deleted the statement, "When they have a choice, the Hospital Safety Grade is the first tool patients should use to select a hospital, because safety should come first. The Hospital Safety Grade is the only public rating exclusively focused on safety—how well the hospital protects patients from medical errors, accidents, injuries and infections that kill more than 200,000 people a year in the United States. Once satisfied with the hospital's record on safety, then people should consider other aspects of hospital performance in the decision-making process, such as whether the hospital delivers a high level of care for the health concern the patient has, i.e., if the hospital has high quality obstetrics or orthopedics." PX-506.0 at 12–13. This statement formed most of the answer to the question "Should patients avoid

a 'C,' 'D,' or 'F' hospital? What should people do if the only hospital in their community is a 'C,' 'D,' or 'F'?" *Id.* But Leapfrog's website still states on the "Choosing the Best Hospital" page, "Your first step in finding the best care for yourself and your family is finding a safer hospital. Use the Leapfrog Hospital Safety Grade search tool to find the safest hospital in your area, preferably one with an 'A' grade." PX-022.0 at -626–627.

359. The Court finds by a preponderance of the evidence that these changes indicate ongoing deception and are not remedial. Absent an injunction, there is nothing to prevent Leapfrog from continuing to jigger with its website in ways that further complicate and confuse consumers of the Safety Grades.

## VIII. CONSEQUENCES OF THE FALL 2024 SAFETY GRADE METHODOLOGY FOR THE COMMUNITY HOSPITALS' SAFETY GRADES

360. The Court heard extensive evidence about the harm suffered by the Community Hospitals as a result of the Leapfrog Safety Grades. The Community Hospitals provided evidence that, when their Safety Grades dropped (due to Leapfrog's misleading and deceptive "imputation" methodology), they began to experience reputational harm.

361. For instance, as described in greater detail below, the Court finds that when the Community Hospitals stopped participating in Leapfrog's Survey, the hospitals' Safety Grades fell because of their nonparticipation. As a result, their reputations in their communities were harmed: patients bypassed them to seek care elsewhere, to the Community Hospitals'—and, sometimes, those patients'—detriment, and community members' opinions of the Community Hospitals decreased. The Community Hospitals' emergency room admissions fell because patients in the community have become less trusting of the care offered by the Community Hospitals.

### A. The Community Hospitals' Safety Grades Following the Fall 2024 Methodology Change

362. The Court finds by a preponderance of the evidence that the Fall 2024 Safety Grade methodology changes had a material impact on the Safety Grades of the Community Hospitals.

363. Prior to 2021, the Community Hospitals had received "A," "B," or "C" Safety Grades, as illustrated in the below chart.

| Community Hospitals' Leapfrog Safety Grades | | | | | |
|---|---|---|---|---|---|
| | **Delray** | **Good Samaritan** | **Palm Beach Gardens** | **St. Mary's** | **West Boca** |
| **Spring 2012** | C | B | C | A | A |
| **Fall 2012** | A | A | C | B | A |
| **Spring 2013** | A | A | A | A | A |
| **Fall 2013** | A | C | A | A | A |
| **Spring 2014** | A | B | A | A | A |
| **Fall 2014** | A | A | A | A | A |
| **Spring 2015** | A | A | A | A | A |
| **Fall 2015** | A | A | A | A | A |
| **Spring 2016** | B | B | C | B | A |
| **Fall 2016** | B | C | B | B | A |
| **Spring 2017** | B | B | B | B | B |
| **Fall 2017** | B | B | A | B | B |
| **Spring 2018** | B | B | A | B | B |
| **Fall 2018** | A | B | A | B | B |
| **Spring 2019** | A | B | A | C | B |
| **Fall 2019** | A | B | A | B | C |
| **Spring 2020** | B | C | C | C | B |
| **Fall 2020** | C | C | C | C | B |
| **Spring 2021** | C | C | C | C | B |
| **Fall 2021** | C | C | C | C | C |
| **Spring 2022** | C | C | C | B | C |
| **Fall 2022** | C | C | C | B | C |
| **Spring 2023** | C | C | C | C | C |
| **Fall 2023** | C | C | C | C | C |
| **Spring 2024** | D | C | C | C | D |
| **Fall 2024** | F | F | F | D | D |
| **Spring 2025** | F | D | F | D | F |
| **Fall 2025** | F | D | D | D | D |

PX-239.0.

364. During the COVID-19 pandemic, however, the Community Hospitals stopped participating in the Survey in order to reallocate staff and resources to patient care and quality initiatives during that period of operational strain. *See supra* ¶ 44.

365. CEO of Palm Beach Gardens Erik Cazares testified that Palm Beach Gardens "does not feel participating in the survey is improving patient safety or quality" and that the resources required to complete the Survey "could be better spent elsewhere." Cazares Tr. 74:1–11, 74:21–75:4.

366. CEO of West Boca Medical Center Jerad Hanlon testified that West Boca did not

seek to resume participation in the Survey because it "wasn't worth the time or the resources that [West Boca] would have to dedicate to it to complete it." Hanlon Tr. 97:7-13.

367. CEO of Delray Medical Center Heather Havericak testified that "resources were scarce" during the pandemic and the hospital's staff "wanted to put [its] resources in driving [its] patient safety and quality and not putting those resources directly towards the Leapfrog efforts." Havericak Tr. 95:16-25.

368. CEO of St. Mary's Medical Center Cynthia McCauley testified that the Survey is "a 300-plus-page survey that takes a significant amount of time to complete, and there is no onsite validation by Leapfrog," and St. Mary's generally "do[es] not participate in elective nonregulatory surveys." McCauley Tr. 79:11–22; 81:6–9, 16–25.

369. CEO of Good Samaritan Medical Center Sheri Montgomery testified that "after COVID . . . it was talked about that [the Survey] was time-consuming" and "didn't really add much value" and the hospital "wanted to spend [its] time" on true accreditations like "Joint Commission, for example." Montgomery Tr. 208:1–10.

370. Former Quality Director Ms. West testified that in or around 2021, at the height of the pandemic, "there was a concern about the amount of time [the Survey] was taking" and that it was "taking [] away" from other areas of focus for the Community Hospitals. West Tr. 94:1–17.

371. From Spring 2022 to Spring 2024, while the Community Hospitals were not participating in the Survey but before Leapfrog implemented the Fall 2024 Safety Grade methodology change, each of the Community Hospitals continued to receive Safety Grades of "B," "C," or "D." *See supra* ¶ 363.

372. But after Leapfrog adopted the revised methodology in Fall 2024, all of the Community Hospitals received either a "D" or an "F" Safety Grade because they did not participate in the Survey. By Spring 2025, each Community Hospital's Safety Grade had dropped by at least one letter from Spring 2024. *Id.*; ECF 129 ¶ 151.

373. Ms. Montgomery, CEO of Good Samaritan Medical Center, testified that her hospital's lack of participation "produced an F." She explained, "the bottom line is [the hospital] would have been a C," but it received an F "because [it] didn't participate." Montgomery Tr. 194:19–195:21.

374. Mr. Cazares, CEO of Palm Beach Gardens Medical Center, similarly testified that the hospital "hadn't submitted data or participated in Leapfrog since 2022" and that the "Letter F

grade for patient safety" the hospital received "was based on incomplete data since we didn't participate." Cazares Tr. 18:7–19:4; *see id.* 36:19-37:5 (testifying that Palm Beach Gardens "received an F on patient safety" because it "did not participate in Leapfrog at that time").

375. Referring to her hospital Delray Medical Center, Ms. Havericak, testified that "if we had participated and put in the data, we would have had a nonfailing grade." Havericak Tr. 241:1–9.

376. In Spring 2025, Ms. West created a spreadsheet calculating what the Community Hospitals would have scored had they participated in Leapfrog's Survey: four of the five Community Hospitals would receive a "C" Safety Grade, except for one, which would improve from an "F" to a "D." West Tr. 257:8–258:2; DX-673.0 at -564.

377. This testimony is consistent with Leapfrog's own experts' admissions that the Fall 2024 Safety Grade methodology creates a structural bias against nonparticipating hospitals and is expected to reduce their Safety Grades by one full letter. *See supra* ¶ 204.

378. It is also consistent with the acknowledged purpose underlying the Fall 2024 Safety Grade methodology change: to penalize nonparticipating hospitals in order to encourage Survey participation and thereby increase the volume and commercial value of Leapfrog's data. *See supra* ¶¶ 194–207, 93.

### B. Leapfrog's Safety Grades Are Designed To Impact Hospital Reputations in Their Communities and Do Just That

379. Leapfrog's Hospital Safety Grades have meaningful real-world effects on hospitals, including effects on consumer behavior, hospital reputation, and competitive standing. *See, e.g.*, ECF 107 at 6–10; *c.f.* ECF 99 at 16–17. That is their very purpose.

380. Leapfrog's own witnesses acknowledged that Leapfrog intends for the Safety Grades to influence consumers' decisions, that failing Safety Grades can and do affect how hospitals are perceived by consumers, physicians, and payors, and that those perceptions can influence choices about where to seek care, where to practice, and how hospitals are evaluated by third parties. Those impacts are even more pronounced given that Leapfrog runs sophisticated media campaigns to publicize the Safety Grades and that data licensees, search-engine optimized Google results, and Leapfrog-affiliated regional groups further amplify the Safety Grades to hundreds of millions of consumers. The Community Hospitals felt the brunt of Leapfrog's sophisticated media apparatus when Leapfrog launched a targeted media campaign after this lawsuit was filed to highlight the Community Hospitals' Safety Grades—adopting a strategy its

own employees likened to that of a "[D]isney villain." PX-439.0 at -321.

**1. *Leapfrog Designed the Safety Grades To Influence Consumers' Decisions, and Experts Confirm the Safety Grades Have That Effect***

381. Leapfrog designed the Safety Grades to influence consumer behavior and to impose consequences on hospitals that receive lower letter Safety Grades, including by encouraging patients to avoid those hospitals and pressuring hospitals to change behavior in response to public ratings. *See supra* ¶ 47.

382. Leapfrog's own website statements repeatedly emphasize that consumers should rely on the Safety Grades and show consumers doing so. *See, e.g.*, PX-021.0 at -425 ("[T]he Hospital Safety Grade is the first tool patients should use to select a hospital."); PX-023.0 at -073 ("Patients should always decide on where to receive care based on a hospital's current Safety Grade.").

383. Leapfrog's own witnesses and scientists confirmed the Safety Grades are meant to have an effect. Dr. Austin testified that physicians "would not want to work at an 'F' hospital." Austin Tr. 397:3–398:6. Ms. Binder and Mr. Banerjee each agreed that an "F" Safety Grade could "negatively impact the reputation of [a] hospital," Binder Tr. 390:11–17; Banerjee Tr. 95:18–97:10 (testifying Leapfrog uSafety Grades "make hospitals accountable"); 129:17–130:5, and Dr. Romano explained that "it's possible" that "patients canceled appointments and/or procedures" as a result of low Safety Grades. Romano Tr. 286:8–16; *see also* Danforth Tr. 581:17-582:7 (agreeing that an "F" Safety Grade can "damage a hospital's reputation" and make it "more difficult … to repair."). Indeed, Leapfrog annually earns millions of dollars by convincing "A" hospitals that advertising their Safety Grades will help drive increased patient revenue and recruit better doctors, resulting in a "competitive edge in local marketplace[s]." PX-222.0 at -958; *see supra* ¶¶ 82, 87.

384. This understanding is consistent with the testimony of Dr. Berger, who explained that consumers meaningfully rely on information about hospital quality because healthcare is a "credence good," meaning a good or service whose quality is difficult for consumers to assess on their own. Berger Tr. 101:14–102:10. For example, a consumer may receive healthcare too infrequently or may lack the expertise needed to make a reliable assessment. *Id.* Dr. Berger further testified that negative messaging about a hospital's safety is likely to depress consumer trust and perception, and that repeated exposure to failing ratings can intensify these negative perceptions. *Id.* 138:14–139:13; 141:18–142:23.

385. The Community Hospitals' branding and hospital-marketing expert, Thomas

Chakurda, confirmed the point. Mr. Chakurda has over four decades of experience in hospital marketing, branding, and communications, including a five-year stint as the Chief Marketing and Communications Officer for a Pennsylvania health system. PX-946 ¶¶ 3–10. The Court qualified him as an expert in hospital branding and marketing. At trial, Mr. Chakurda explained that widely publicized failing Safety Grades function as powerful reputational signals that meaningfully affect how hospitals are viewed by current or future patients, their families, referring physicians, staff, and payers. He testified that Leapfrog's simple letter-grade format, combined with its coordinated media dissemination, makes D and F Safety Grades especially salient, and that hospitals receiving such grades predictably experience reputational harm that necessitates damage-control and communications responses. *See id.* ¶¶ 31–52.

### 2. *Leapfrog's Ratings Reach Virtually All Americans Through Media Campaigns, Data Licensees, Google Search Results, and Regional Employer Coalitions*

386. Leapfrog undertakes coordinated media and public-relations campaigns to widely promote the release of its Safety Grades, including those assigned to the Community Hospitals, through press releases and coverage in print, broadcast, and online media outlets.

387. Leapfrog pays its press relations firm, CURA Strategies ("CURA"), $15,000 per month to pitch stories, track analytics, and ensure the Safety Grades reach as many consumers as possible. Bailey Tr. 287:22–288:21, 381:2-22. Internal communications show that CURA and Leapfrog staff regularly prepare targeted messaging and strategies for distributing the Safety Grades to reporters, regional organizations, and other healthcare stakeholders. *See, e.g.*, PX-345.0; PX-351.0; PX-437.0. Leapfrog also hires vendors to promote its Safety Grades over radio and broadcast television. Bailey Tr. 187:8-22. A "really important" part of Leapfrog's strategy is "to get the safety grades out to . . . local publications." Bailey Tr. 198:19–199:4. Leapfrog also pre-releases the Safety Grades to journalists during an embargo period to ensure timely coverage when Leapfrog officially releases the Safety Grades. Bailey Tr. 199:5-11.

388. Leapfrog promotes the visibility of its messaging online with a Google Ads Grant. Ms. Bailey testified that Leapfrog runs about 170 Google ads linking to Safety Grade results, and "want[s] people to be searching their local hospital ratings." Bailey Tr. 292:6–18.

389. Leapfrog's media blitz strategy works. According to Leapfrog's quarterly media report for September 1 to December 1, 2024, the Fall 2024 Safety Grades generated "772 online articles from 435 different publications with a reach of 11.2 billion," including in prominent outlets

as the *Chicago Tribune*. PX-379.0 at -070–077. Leapfrog similarly publicized its Spring 2025 Safety Grades, generating "774 online articles from 486 different publications with a reach of ~59 million." PX-437.0 at -845. Leapfrog's quarterly media report for December 2, 2024 to March 3, 2025 showed a twenty-five percent increase in users of Leapfrog's websites. PX-403.0 at -120; *see also* PX-307.0 at -033 ("The number of users to visit HospitalSafetyGrade.org increased by more than 60% compared to the spring 2023 and spring 2024 Hospital Safety Grade announcements."). In all, Leapfrog's websites "receive more than 2.3 million page views per year," according to an April 2025 draft presentation to Leapfrog's Board of Directors. PX-420.0 at -096.

390. Leapfrog's data licensees further amplify the Safety Grades and Leapfrog ratings to "virtually All Americans." PX-406.0 at -518; *see also* PX-420.0 at -096 (Leapfrog "ratings and data are accessible to 200 million-plus employees, health plan members, and consumers."). "Leapfrog Safety Grades are prominently featured in numerous health plan provider directories," and 37 percent of consumers visit such directories when researching hospitals, according to a study that Leapfrog's telemarketers tout. PX-422.0 at -471; *see also* Banerjee Tr. 109:24–110:19. Leapfrog further boasts that the Safety Grades are used by "dozens of national and regional health plans . . . to educate their users on the importance of choosing a safer hospital." PX-019.0 at -438–439.




DX-309 (Leapfrog's licensing website showing a health plan's directory displaying a hospital's Safety Grade) (red circle emphasis added).

391. The Leapfrog Safety Grades also "frequently appear[] in Google search results, often directing consumers to the facilities' hospitalsafetygrade.org page or media coverage of

hospital grades," according to Leapfrog's telemarketers. PX-422.0 at -471. Ms. Jupiter, Vice President of Development, also testified that Leapfrog began paying for search engine optimization in July 2025 for leapfroggroup.org and hospitalsafetygrade.org. Jupiter Tr. 239:7–18.

392. Leapfrog also spreads the Safety Grades through 32 employer coalitions across the country that it calls "Regional Leaders." Jupiter Tr. 233:11-13. Regional Leaders are Leapfrog's "boots on the ground." Jupiter Tr. 229:24–230:5. Beyond pressuring local hospitals to complete Leapfrog's Survey, Regional Leaders encourage local employers to "use Leapfrog for payment policies, tiering, and public reporting." PX-406.0 at -489. Regionals leaders further distribute the Safety Grades to local employers and aim to steer employers towards contracting with higher graded hospitals. van Caulil Tr. 26:2-22, 50:10-16; *see* Romano Tr. 29:24–30:6 ("[Y]es, of course, we expect that [the Safety Grades] will be one source of information that consumers will use in their decision making, as well as the employers, the purchasers that are purchasing healthcare on behalf of consumers.").

### 3. *Leapfrog Launched a Targeted Media Campaign Against the Community Hospitals*

393. Following issuance of the Fall 2024 Safety Grades, and especially since the commencement of this lawsuit in April 2025, Leapfrog has attempted to focus public and media attention on the Community Hospitals' failing Safety Grades, emphasizing those ratings in communications directed at Florida audiences.

394. Leapfrog's Communications Director Ms. Bailey testified that one purpose of the organization's media strategy was to "hurt Tenet," the Community Hospitals' parent company. Ms. Bailey explained to Leapfrog's Board that the goal was to "make it painful for Tenet by drawing further attention to their very poor performance with strategic media coverage in local and national press." PX-460.0 at -156; Bailey Tr. 338:11-18; *see* van Caulil Tr. 141:10–20, 155:21–25. Elsewhere, Ms. Bailey explained that to achieve this goal, Ms. Binder aimed to "get a story out about Tenet or one of the [Community] [H]ospitals at minimum every three days." Bailey Tr. 372:7-373:1.

395. Shortly after the Community Hospitals commenced this lawsuit, Leapfrog prepared talking points for its Regional Leaders instructing them to "to focus on the very poor performance of these hospitals on patient safety first and foremost." PX-430.0 at -115.

396. Leapfrog and CURA also considered pitching a story about a patient who purportedly had a negative experience at the Community Hospitals but ultimately abandoned the

plan. Bailey Tr. 319:4-14.

397. Leapfrog employees also discussed strategies to push negative messaging directly to consumers searching online for the Community Hospitals. In a Slack exchange, Ms. Bailey wrote that Ms. Binder "wants to know if we can do ads where if someone searches those 5 hospitals, it shows an ad with their safety grade URL." PX-439.0 at -320. Ms. Jupiter responded, "so she just wants to harass them?" Leapfrog's Communications Coordinator Nate Longmore replied, "[I] love that the strategy is to become a [D]isney villain." PX-439.0 at -321.

K Karen Jupiter <kjupiter@leapfrog-group.org> 5/12/2025, 2:36 PM
so she just wants to harass them?

N Nate Longmore <nlongmore@leapfrog-group.org> 5/12/2025, 2:37 PM
i love that the strategy is to become a disney villain
1 • Karen Jupiter <kjupiter@leapfrog-group.org>

N Nate Longmore <nlongmore@leapfrog-group.org> 5/12/2025, 2:53 PM
"the only hospital in Palm Beach" (https://www.linkedin.com/posts/jupiter-medical-center_we-are-proud-to-share-that-we-r[…]m=member_desktop&rcm=ACoAAC3fE74BtfOTOW1W4Z5iWFyX7pKEJXznjuA)[https://www.linkedin.com/posts/jupiter-medical-center_we-are-proud-to-share-that-we-remain-the-activity-7327758478632972288-AFw0?utm_source=share&utm_medium=member_desktop&rcm=ACoAAC3fE74BtfOTOW1W4Z5iWFyX7pKEJXznjuA]

K Karen Jupiter <kjupiter@leapfrog-group.org> 5/12/2025, 2:54 PM
Go Jupiter!
1 • Nate Longmore <nlongmore@leapfrog-group.org>

PX-439.0 at -321.

398. Leapfrog staff executed Ms. Binder's plan, even though Ms. Bailey testified that "it's not standard practice that we publicize F grades." Bailey Tr. 265:6-19. Leapfrog directed Nonprofit Megaphone, a nonprofit digital marketing firm, to expend some of a grant designed for nonprofits so that the failing Safety Grades appeared prominently in search results for the Community Hospitals. Leapfrog geo-targeted the advertisements so they would appear for consumers in specific cities, including West Palm Beach, Delray Beach, Palm Beach Gardens, and Boca Raton, Florida. PX-454.0 at -875, -877. Although Nonprofit Megaphone initially questioned whether "Google might flag specific hospital names," the firm ultimately confirmed that the ads were purchased and delivered as requested. PX-454.0 at -874–875.

399. Leapfrog's targeted messaging toward Florida audiences was reinforced through its partnership with the Florida Alliance for Healthcare Value (the "Alliance"), one of Leapfrog's Regional Leaders that disseminates the Safety Grades throughout the State. van Caulil Tr. 24:21-24, 26:2-22. The Alliance distributed Leapfrog's Safety Grade materials to its employer members and to the public following each biannual release, amplifying public visibility of the failing Safety

Grades assigned to the Community Hospitals. *Id.* 24:25–26:22. Alliance President and CEO Dr. van Caulil testified that the organization publicizes each Safety Grade release through statewide announcements and weekly bulletins to its employer members, thereby extending the reach of Leapfrog's messaging among healthcare purchasers in Florida. *Id.* 26:2-22.

400. Internal communications show that Ms. Binder also worked with the Alliance to plan a visit to Florida to highlight that Jupiter Medical Center—a direct competitor of the Community Hospitals and a Survey participant—received an "A" Safety Grade. Bailey Tr. 372:18–373:1. Dr. van Caulil wrote in a May 28, 2025 email that "Leah wants to highlight Jupiter Medical Center's A safety grade because of the lawsuit and poor performing hospitals in Palm Beach County." PX-447.0 at -386. *See* van Caulil Tr 174:7-15.

401. Following the release of Leapfrog's Fall 2024 Safety Grades, Jupiter Medical Center publicized itself as "the only A-rated hospital in Palm Beach County." PX-389.0 at -129.

402. According to Leapfrog's own internal media reports, there was more media coverage of the Fall 2024 Safety Grades in Florida than in any other state nationwide. PX-379.0 at -070. In the Spring 2025 cycle, Leapfrog's Safety Grades were covered 46 times in Florida alone. Leapfrog's "Spring 2025 Hospital Safety Grade Media Coverage" report highlights including "targeted pre-embargo outreach to priority . . . regional/business journal reporters" and "alternate reporter contacts in South Florida from key outlets." PX-437.0 at -850–851.

403. Media reports repeated Leapfrog's messaging that patients at "D" or "F" hospitals are "twice as likely to die" as those treated at "A" hospitals, creating the impression that the Community Hospitals posed significantly higher safety risks. PX-357.0 at -572-573; PX-388.0 at -411; PX-390.0 at -311; PX-352.0 at -246, -248.

404. Leapfrog's messaging also spread widely through social media. A widely circulated TikTok video from July 2025 leveraged the Safety Grades to attack and damage the Community Hospitals' reputation. The video begins with a narrator asking, "Which is the worst hospital in Florida?" PX-469.0. With dramatic sound effects playing in the background, the narrator proceeds to "rank" the five worst hospitals in Florida, displaying four of the Community Hospitals' names, locations, and images *alongside their respective Safety Grade and the date that grade was issued.* PX-469.0. The video received more than one million views and tens of thousands of interactions (*e.g.*, 43,000 "likes," 3,000 comments, 8,000 bookmarks/saves, and 29,000 shares). PX-466.0.




PX-469.0.

405. The impact of Leapfrog's targeted campaign was magnified by sharp increases in consumer traffic to Leapfrog's consumer-facing website, hospitalsafetygrade.org, immediately following each Safety Grade release date.

406. Leapfrog's internal analytics data show spikes in views across all hospitals' Safety Grade webpages in mid-November 2024 and mid-April 2025, corresponding to release of the Fall 2024 and Spring 2025 Safety Grades, respectively.

407. Monthly views rose from baseline traffic levels of approximately 40,000-60,000 visits to peaks exceeding 200,000 visits immediately after each release.




408. This trend was also reflected in web traffic to the Community Hospitals' Safety Grade webpages. Their pages experienced sharp and immediate increases in views following the

release of their failing Safety Grades in Fall 2024 and Spring 2025, resulting in significantly greater consumer exposure to their imputed "D" and "F" Safety Grades.

**Exhibit 3 Total Monthly Views of Hospital Safety Grade Pages, Across Plaintiff Hospitals**




### C. Harm to the Community Hospitals and their Patients

409. Consistent with Leapfrog's intended use of the Hospital Safety Grades, and consistent with the testimony of Leapfrog's witnesses and the expert evidence, the Fall 2024 and Spring 2025 Safety Grades caused reputational and business harm to each of the Community Hospitals, including patient defection, physician concern, insurer inquiries, and declines in patient volume.

#### 1. *Delray Medical Center*

410. Failing Safety Grades caused reputational and business harm to Delray Medical Center.

411. Its CEO, Heather Havericak, testified that Delray has been an anchor in the community for nearly half a century and during that time has enjoyed a positive reputation in the community.

412. Ms. Havericak further testified that patients have "less[] confidence in [the] medical center" following the release of the failing Safety Grades. Havericak Tr. 249:14–19. She explained that during her daily rounds, patients told her they were initially "scared to come to Delray because of [the] Leapfrog score" but were "pleasantly surprised" by the quality of care they ultimately

received. Havericak Tr. 249:14–250:2.

413. Delray also experienced patient reluctance to undergo elective procedures due to its failing Safety Grade. Ms. Havericak testified that "patients [] don't want to come for elective procedures because they're nervous about [the Safety Grade] that they've seen." Havericak Tr. 250:4–6.

414. This is supported by the data. Ms. Havericak testified that, following the release of the viral TikTok video "that was certainly targeted at our hospitals within the Palm Beach Health Network" and their Safety Grades in July 2025, *see supra* ¶ 404, Delray experienced a "significant dip in admissions" and "a dip in people coming for . . . elective procedures." Havericak Tr. 257:22–258:9.

415. Ms. Havericak further testified that Delray's emergency-room admissions decreased significantly in the wake of the Fall 2024 Safety Grade.

416. Ms. Havericak further testified that she could recall at least three specific examples of patients who did not want to be treated at Delray because of the Leapfrog Safety Grade shortly after Leapfrog released its Fall 2024 Safety Grades:

417. *First*, a joint-replacement patient in December 2024 cancelled surgery and refused rescheduling. Ms. Havericak personally called the patient. Ms. Havericak came to understand that the patient had seen news stories about Leapfrog's failing Safety Grade and were concerned they would die or at least get an infection. Ms. Havericak explained that Delray did not participate in Leapfrog's Survey and, as a result, the Safety Grade was not an accurate representation of the hospital's quality. Ultimately, Ms. Havericak's efforts were successful, and the patient had the surgery.

418. *Second*, a shoulder-replacement patient in December 2024 preferred to have surgery at Delray but was nervous because of the Safety Grade. Ms. Havericak explained to the patient's surgeon, Dr. Vani Sabesan, that Delray did not participate in the Survey and, as a result, its Safety Grade was not an accurate representation of the hospital's quality. Ultimately, the patient was convinced and had the surgery at Delray.

419. *Third*, a hip-replacement patient in December 2024 cancelled their surgery and refused rescheduling. Ms. Havericak personally called the patient. Ms. Havericak came to understand that the patient was concerned they would not have a good outcome because of the "F" Safety Grade. Again, Ms. Havericak explained that Delray did not participate in Leapfrog's Survey

and, as a result, the Safety Grade was not an accurate representation of the hospital's quality.

420. Ms. Havericak further testified that physicians expressed concerns about working at Delray, particularly those who also held privileges at other medical centers. Havericak Tr. 249:14–250:9. These physicians reported that the failing Safety Grade created apprehension about Delray's reputation among their patients. *Id.* 253:22–254:3.

421. Community members, including a "prominent business" leader, also conveyed fear and apprehension about Delray after seeing its failing Safety Grades, according to Ms. Havericak's testimony. Havericak Tr. 250:12–21 (stating to Ms. Havericak that "[Delray] [has] our, one of our only trauma centers in the community, and it makes me nervous to have to go there with that Leapfrog score").

422. Insurers similarly expressed concern about Delray's Safety Grade. For example, Humana Military, a major insurer, sent the hospital a letter citing its Leapfrog "safety grade of D or below" and urging "improvement" in the quality of the hospital's care. PX-465.0.

423. Ms. Havericak testified that she received links to the viral TikTok video described above from more than 20 people in the immediate aftermath of its publication and has since lost count of how many people have sent it to her.

424. Ms. Havericak testified that the reputational harm caused by the failing Safety Grades was so severe that "[t]here's so much damage that we can't even quantify." Havericak Tr. 249:14–250:24. The harm is ongoing: In the course of her responsibilities as CEO, she talks to patients "on a daily basis" who have "apprehension and anxiety about coming to Delray" because of the Safety Grade. Havericak Tr. 252:6–25. She and Delray have had to increase their community outreach to counteract the reputational harm from the Safety Grade.

**2. *Good Samaritan Medical Center***

425. Failing Safety Grades caused reputational and business harm to Good Samaritan Medical Center.

426. CEO Sheri Montgomery testified that Good Samaritan experienced declines in admissions, emergency room visits, and observation cases (hospital stays of more than two days) compared to the prior year. Montgomery Tr. 63:1–19 ("Good Samaritan is down 5 percent [in] admissions and OBS year over year, year to date" and down "2 percent" in emergency room visits). She further testified that a "failing red F" is "very, very different to people" than "CMS star ratings." *Id.* 34:22-35:9.

427. Ms. Montgomery further testified that the failing Safety Grades caused physicians to seek or prioritize work at Jupiter Medical Center—Good Samaritan's direct competitor—"because their patients [were] complaining to them that [Good Samaritan was] an F" under Leapfrog's grading system. Montgomery Tr. 296:24–297:15 ("[T]he Leapfrog rating has prompted [] physicians to get on staff at [competitor] Jupiter Medical Center because their patients are complaining to them that we are an F.").

428. For example, one of Good Samaritan's doctors "had to reschedule a surgery and go to Jupiter Medical because a patient refused to come to [Good Samaritan]" because of the failing Safety Grade. Montgomery Tr. 298:4-14; PX-359.0.

429. Ms. Montgomery further testified that she could recall at least three specific examples of patients who did not want to be treated at Good Samaritan because of the Safety Grade during the period shortly after Leapfrog released its Fall 2024 Safety Grade:

430. *First*, around January 2025 a patient cancelled surgery and asked to be transferred to Jupiter. Aside from the Safety Grade, she did not offer any justification for leaving her doctor's preferred hospital. *Second* and *third*, two orthopedic-surgery patients between January and February 2025 cancelled their surgeries, citing the Safety Grade for Good Samaritan.

431. The negative reputational effects extended to other community stakeholders as well. "Many people" complained to Ms. Montgomery, including the "governing board, physicians . . . [and] people in the community." Montgomery Tr. 284:12–18. One Good Samaritan board member called the Safety Grade "scary and unacceptable," and multiple board members questioned the quality data Good Samaritan had been reporting to them in light of the Safety Grade. PX-358.0 at 2; DX-631 at -062. Another Good Samaritan board member stated that "it's hard to recruit" additional board members in light of the failing Safety Grades and resulting press coverage. PX-359.0. Ms. Montgomery also received outreach from the Urban League of Palm Beach County, a community-based organization that partners with the hospital, expressing concern about the Fall 2024 Safety Grades. PX-358.0 at 1.

432. The reputational harm caused by Leapfrog's Safety Grades is ongoing. For example, less than a month before trial, on December 16, 2025, Ms. Montgomery received, on December 16, 2025, an envelope with no return address but postmarked "WEST PALM BCH FL" containing a newspaper clipping of a Jupiter op-ed advertising its Leapfrog "A" Safety Grade. *See* PX-548.0. The op-ed is titled, "The Ratings Are In: Jupiter Medical Center Receives 'A' for Patient

Safety and prominently features a picture of Jupiter Medical Center and a large green rectangular graphic showing Jupiter's "LEAPFROG HOSPITAL SAFETY GRADE" of an "A." *Id.*

433. At the top of the clipping, in black permanent marker, is handwritten, "'Good' (a joke!) Sam Needs to Learn from"; "Jupiter Medical" is underlined. Several paragraphs of the op-ed are circled. At the bottom of the page, below the letter Safety Grade and the picture of Jupiter Medical Center, a paragraph advertises: "An 'A' rating in patient safety from the Leapfrog Group doesn't just set Jupiter Medial Center apart from other hospitals in Palm Beach and Martin Counties. It highlights our team's unwavering commitment to quality, safety, and patient experience: the foundation of everything we do. For our patients, it's the assurance that when they choose Jupiter Medical Center, they are choosing the safest possible care." Above and below that paragraph (and immediately below "LEAPFROG HOSPITAL SAFETY GRADE") written in black permanent marker is the message, "Your Despicable Staff Needs to take Notes from ["Jupiter Medical Center"]." PX-548.0.

434. Ms. Montgomery estimates that since Leapfrog released its Fall 2024 Safety Grade she has spent the equivalent of multiple full weeks of work on nothing but explaining the deceptiveness of the Safety Grade and how it fails to accurately represent Good Samaritan's quality to patients, staff, doctors, and community members. The harm is ongoing: Ms. Montgomery frequently has conversations in which she must correct misconceptions about the meaning of the Safety Grade.

### 3. *Palm Beach Gardens Medical Center*

435. Failing Safety Grades caused reputational and business harm to Palm Beach Gardens.

436. CEO Erik Cazares testified that patients were "significantly concerned about going to Gardens because of the F grade" following the release of the Fall 2024 Safety Grades, Cazares Tr. 30:3–14, concerns "which didn't exist" previously, *id.* 29:9-30:1.

437. Patients have even bypassed Palm Beach Gardens because of the Safety Grade. Mr. Cazares testified that although the hospital is "well known" for its cardiac care, a cardiac patient of Dr. Patel refused to undergo surgery at Palm Beach Gardens, citing Leapfrog as the "main reason." Cazares Tr. 32:11–23; *id.* 34:4–9.

438. Many other patients have had concerns about the quality of Palm Beach Gardens' care because of the Safety Grade. Mr. Cazares testified that the patients of at least seven physicians

had such concerns: Dr. Nishant Patel (cardiothoracic surgery), Dr. Joseph Savarese (vascular surgery), Dr. Abbas Rabiei (nephrology), Dr. Andres Suarez (infectious disease), Dr. Edward Mostel (cardiology), Dr. Robert Avino (orthopedics), and Dr. Richard Price (cardiologist).

439. Mr. Cazares testified that no other rating system has "negatively affected the reputation of [Palm Beach Gardens] the way that the Leapfrog F score has affected the reputation of the facility"; as he explained, unlike other ratings and scores, the Safety Grades have been highly "public[]" in the Palm Beach Community. Cazares Tr. 41:14–42:2.

440. The reputational harm caused by the Safety Grades is ongoing. Mr. Cazares testified that he receives "between four and five" complaints each week from patients and physicians—particularly after circulation of the viral TikTok video—that patients were reluctant to undergo procedures at Palm Beach Gardens because of the failing Safety Grade. Cazares Tr. 31:21–32:10; *see also id.* 35:12–36:1, 56:5–57:2, 89:14–21 (testifying "patients, community members, [and] governing board members voic[ed] complaints about the hospital's low safety score"). Further, Mr. Cazares and Palm Beach Gardens have been required to significantly increase outreach to the community to counteract the reputational damage caused by the Safety Grades.

**4. *St. Mary's Medical Center***

441. Failing Safety Grades caused reputational and business harm to St. Mary's Medical Center.

442. CEO Cynthia McCauley testified that the hospital experienced a decline in outpatient therapy, "elective outpatient surgeries," and "emergency department" volume since the fall of 2024, which she "attribute[s]" to "the Leapfrog [G]rade." McCauley Tr. 230:22–231:15.

443. Ms. McCauley further testified that a community member was "nervous that his wife was brought to St. Mary's because of what he ha[d] heard" about the Safety Grade and that the "reputation that's been developed because of the Leapfrog [G]rade has resulted in patients not selecting St. Mary's . . . ." McCauley Tr. 231:13–25.

444. As Ms. McCauley explained, prior to the Fall 2024 Safety Grade, St. Mary's had been growing its patient volume, but since the Safety Grade was issued, the hospital has experienced a "degradation in elective volume." McCauley Tr. 233:2–5.

445. Further, as Ms. McCauley testified, St. Mary's pediatrics emergency volumes are down significantly, even as transfers to St. Mary's from other hospitals' pediatric emergency patients are up. The top transferring hospital is Jupiter Medical Center.

446. Ms. McCauley further testified that the TikTok video is having a "spillover effect" on St Mary's reputation: It has been shared with her many times, even though it does not mention St. Mary's.

447. Many of Ms. McCauley's board members, most of whom are uncompensated members of the local community, expressed their own concern and concern from their own contacts, about the Safety Grades.

**5. *West Boca Medical Center***

448. Failing Safety Grades caused reputational and business harm to West Boca.

449. CEO Mr. Jerad Hanlon testified that the hospital's "goodwill" was "tarnished" by the failing Safety Grade. Hanlon Tr. 78:2–14.

450. This reputational harm has translated to real declines in patient volume. Mr. Hanlon testified that emergency room visits decreased by approximately 17 percent between 2024 and 2025. Hanlon Tr. 35:12–17.

451. Mr. Hanlon described an incident in which a patient in the emergency department who needed surgery elected to leave the hospital "against medical advice" to seek care elsewhere after "vocaliz[ing]" concern about West Boca's Safety Grade. Hanlon Tr. 73:1–20.

452. The patient had an open fracture, which is an injury in which a broken bone has punctured the skin, leaving the bone exposed to the elements. The patient left because his daughter had "read" about the Safety Grade and believed West Boca was not a safe place for her father to receive treatment. The patient was advised not to leave because his injury was dangerous and a serious infection risk. Even though the patient had already checked in and was in queue to be treated, he chose to leave and drive to another hospital several miles away with his broken bone exposed to the air.

453. West Boca reportedly lost another patient, who "bypassed" West Boca for a competing facility in the area because she "care[s] about [L]eapfrog" Safety Grades. PX-393.0.

454. West Boca also received a similar letter to the one that Delray Medical Center received from insurer Humana Military, which expressed concern about the hospital's Leapfrog "safety grade of D or below" and urged "improvement" in the quality of the West Boca's care. PX-464.0.

455. Mr. Hanlon testified that responding to the consequences of the failing Safety Grades "required a lot of expense, resources and time," as the hospital was forced to explain

Leapfrog's Safety Grades to stakeholders, including board members, physicians, staff, and the community at large. Hanlon Tr. 78:2–14.

456. These injuries started after Leapfrog issued its Fall 2024 Safety Grade, but accelerated after the TikTok video discussed above went viral. Community members on West Boca's board, including Chief Neil Niemczyk of the Battalion 2 EMS, expressed their own and their contacts' (including EMS paramedics') concern over the Safety Grades. Hanlon Tr. 75:7–17.

**D. The Damage Is So Pronounced the Community Hospitals Are Forced To Consider Participating in Leapfrog's Survey**

457. The extent of community concern and reputational impact led the Community Hospitals to consider resuming participation in the Survey.

458. Ricardo Ramirez, the Chief Nursing Officer of the Palm Beach Health Network, stated in an internal email that it is "worth it to participate" in the Survey simply "to avoid the negative PR." PX-360.0 at -090. He explained that CEO of Good Samaritan Ms. Montgomery was "getting calls from surgeons because some of their patients don't want to go to [Good Samaritan] because of [L]eapfrog." *Id.*

459. The Community Hospitals felt compelled to resume participation in Leapfrog's Survey by the weight of Leapfrog's influence on their reputation: "The scoring system now penalizes hospitals for not participating. We can expect to be an F for the next reporting period due to the change," PX-334.0 at -132; "As much as I dislike LF, I no longer think we can elect to not report," PX-374.0; "Ricky [Ramirez, PBHN Chief Nursing Officer] shared that we will probably start submitting to Leapfrog again. SO, their tactic worked," PX-369.0; "I really don't like Leapfrog and I don't want to chase a letter grade, but is it worth re-visiting though from a PR perspective," DX-637 at -435; "If we would like to participate in the next survey, are we able? . . . Because we aren't participating, we default to imputed scoring. This takes [St. Mary's Medical Center] from 100 points in each of the categories below to limited achievement scores," DX-606 at -842. Rather than capitulate to Leapfrog's coercive tactics, the Community Hospitals decided to bring this lawsuit to fight back against Leapfrog's improper pressure tactics and misleading Safety Grades.

## PROPOSED CONCLUSIONS OF LAW

1. Having made these findings of fact, the Court now turns to the conclusions of law necessary to resolve this case. As explained below, the facts support a finding that Leapfrog's conduct—including the methodology for the Safety Grades, the Safety Grades themselves, and other actions—satisfy the legal standard for unfair and deceptive conduct under FDUTPA.

2. The Community Hospitals brought this case on the premise that Leapfrog's Safety Grades, which Leapfrog presents as neutral and science-based assessments of hospital safety, in fact are the product of a deceptive, unfair, and profit-driven methodology whereby Leapfrog arbitrarily assigns low scores and, consequently, poor Safety Grades to hospitals that do not participate in Leapfrog's burdensome Survey. The evidence adduced at trial confirms that central thesis. The Community Hospitals established that Leapfrog's methodology is fundamentally flawed—that it departs from guiding principles for assessing hospital safety, penalizes nonparticipating hospitals, fails to reliably predict patient outcomes, and harmfully distorts patient choice. Leapfrog has attempted to paper over these foundational problems with further misrepresentations. As found above, the Community Hospitals showed that Leapfrog publicly asserts, for example, that its Safety Grades are not affected by a hospitals' participation in the Survey, that Leapfrog does not grade hospitals for which it lacks sufficient data, and that Leapfrog's operative methodology was peer-reviewed and approved by Leapfrog's so-called "Expert Panel." But none of these assertions is true. Leapfrog urges the public to always rely on its Safety Grades when selecting a hospital, even though Leapfrog's personnel themselves admitted they had no data backing the low scores they arbitrarily assigned to nonparticipating hospitals. What is more, Leapfrog imposed its coercive grading methodology—what one hospital termed "marketing blackmail"—to enhance its own revenues. Because Leapfrog's Survey data are more valuable when participation in the Survey is high, Leapfrog adopted its new penalty as "a simple business decision" to create a "major incentive" for participation. This type of punitive and deceptive conduct represents a textbook violation of FDUTPA. Leapfrog's conduct in this litigation only further demonstrates its continued effort to hide the ball. Leapfrog has recently begun to alter its website, including to change or delete certain of the statements at issue in this case—despite earlier contending that some of those same statements *dispelled* any concerns about consumer deception. In their place, Leapfrog has in several instances substituted new statements that only further mislead consumers. Leapfrog's eleventh-hour manipulation of its website

underscores why decisive relief is needed now.

3. This Court finds that the Community Hospitals have met their burden of proving their case by a preponderance of the evidence, and that Leapfrog's contrary defenses are meritless. Accordingly, the Court grants judgment to the Community Hospitals on their FDUTPA claim and awards injunctive and declaratory relief, as well as attorneys' fees, as described below.

## I. THIS COURT HAS JURISDICTION OVER THIS ACTION

4. This Court has a duty to assure itself of its subject-matter jurisdiction. *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409–10 (11th Cir. 1999). Leapfrog asserts various objections to jurisdiction. The Court concludes that the Community Hospitals have proven by a preponderance of the evidence that they have standing to seek injunctive and declaratory relief and that the requirements of diversity jurisdiction are satisfied. The Court likewise concludes that it has personal jurisdiction over Leapfrog for purposes of this action. The Court accordingly rejects Leapfrog's jurisdictional arguments.

### A. The Community Hospitals Have Article III Standing

5. Plaintiffs asserting standing to seek prospective relief must demonstrate "a real and immediate … threat of future injury" that is concrete and particularized, traceable to the defendant's conduct, and redressable by the remedy sought. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328, 1329 (11th Cir. 2013); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009). Each element is satisfied here.

6. *First*, the Community Hospitals have established not just the real and immediate threat of future injury-in-fact that is concrete and particularized to each Community Hospital, but also *ongoing* injury. For the reasons explained below, *see infra* ¶¶ 64–86, the Community Hospitals have established ongoing reputational harms, operational disruption, diversion of resources, and the loss of customers. All of these forms of harm are well-recognized injuries-in-fact. *See TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) (listing qualified concrete injuries such as monetary harms and reputational harms); *Common Cause/Georgia*, 554 F.3d at 1350 (stating "effect on the operations of organizations" was a concrete injury); *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441 (11th Cir. 1991) ("[L]oss of customers and goodwill is an 'irreparable' injury."). They are also all concrete and particularized to each individual Community Hospital, as discussed below with respect to the "aggrievement" requirement. *See infra* ¶¶ 64–86. And none is speculative. To the contrary, the Community Hospitals have shown here-and-now injuries likely

to continue for as long as Leapfrog continues to grade the Community Hospitals pursuant to its deceptive and its unfair Fall 2024 Safety Grade methodology.

7. *Second*, the Community Hospitals have established that their ongoing and impending future injuries are traceable to Leapfrog's deceptive and unfair conduct. The Community Hospitals have shown direct links between Leapfrog's misleading Safety Grades and the injuries the Community Hospitals are experiencing. For example, the Safety Grades caused insurer Humana to write a letter to two Community Hospitals urging them to address purportedly failing safety performance based on the false assumption that Leapfrog's Safety Grades reflected the Community Hospitals' actual safety conditions. *See supra* ¶¶ 422, 454. The Community Hospitals also diverted resources to address complaints arising as a direct result of Leapfrog's Safety Grades. *See supra* ¶¶ 424, 434, 440, 443, 455. And the Community Hospitals experienced declines in admissions in numerous categories of care, the timing of which closely corresponded to the release of Leapfrog's Safety Grades under the Fall 2024 Safety Grade Methodology. *See supra* ¶¶ 414, 444, 450. Harms caused by the release of Leapfrog's Safety Grades are readily traceable to Leapfrog.

8. Leapfrog's argument that the Community Hospitals could have improved their own Safety Grades by participating in Leapfrog's Survey, and thus could have purportedly averted their injuries through self-help, does not defeat traceability. The Supreme Court has "never recognized a rule of this kind under Article III." *FEC v. Cruz*, 596 U.S. 289, 297 (2022). "To the contrary," the Supreme Court has "made clear that an injury resulting from the application or threatened application of an unlawful [behavior] remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *Id.* Thus, for example, a plaintiff who "subjected himself to discrimination" still had standing to sue as to that discriminatory conduct. *Id.* (citing *Evers v. Dwyer*, 358 U.S. 202, 204 (1958) (per curiam)). The conduct alleged was unlawful and the injury real. *Evers*, 358 U.S. at 204. So too here. Even if the Community Hospitals *had* willingly incurred the reputational harms resulting from Leapfrog's conduct, they still could sue. And, in fact, the case for standing here is even stronger since the Community Hospitals did *not* willingly incur their own injuries. Leapfrog's argument that hospitals should be required to submit to a Survey that those same hospitals contend is unlawfully coercive is incoherent. Standing is not defeated simply because a plaintiff could "submit to the very [act]" that "he complains" is coercive. *Williams v. Albemarle City Bd. of Educ.*, 508 F.2d 1242, 1244 (4th Cir. 1974).

9. *Third*, an injunction would redress the Community Hospitals' injuries. As discussed below, *see infra* ¶¶ 135–44, the Community Hospitals' injuries flow directly from Leapfrog's inclusion of the Community Hospitals in Leapfrog's Safety Grades. Enjoining Leapfrog from continuing to grade the Community Hospitals under its Fall 2024 Safety Grade methodology, and requiring Leapfrog to retract prior deceptive and unfair Safety Grades issued pursuant to that methodology, would directly redress the Community Hospitals' demonstrated injuries-in-fact. Thus, the Community Hospitals have established Article III standing by a preponderance of the evidence.

10. Moreover, the Court notes that Leapfrog's last-minute revisions to its website, *see supra* ¶¶ 347–59, do not affect this Court's jurisdiction or present any concern as to mootness. This Court has jurisdiction over the overall case or controversy, *see* U.S. Const. art. III, § 2, not individual misrepresentations. While Leapfrog appears to have altered a handful of the statements the Community Hospitals identified in their briefing in this litigation, *see supra* ¶¶ 347–59, the core issues underlying this suit remain (and Leapfrog's alterations and deletions if anything only exacerbate, rather than abate, the damage, *see id.*). Leapfrog continues to grade nonparticipating hospitals despite lacking essential information about the hospitals, and it continues to use a coercive and arbitrary methodology to boost participation in its Survey. Because Leapfrog has refused to cease that conduct, this case remains live.

11. Moreover, jurisdiction still lies even as to Leapfrog's withdrawn misrepresentations, which Leapfrog stipulated and judicially admitted to be present on its website. *See* ECF 87 ¶ 47 (participation does not affect Safety Grades); ECF 103 ¶ 47 (same); ECF 87 ¶ 10 (twice as likely to die at a lower graded hospital); ECF 103 ¶ 47 (same); ECF 43 ¶ 49 (purported use of "other sources of data"); ECF 129 ¶¶ 63–64 (admitting presence of deleted and then reinstated footnote). These factual stipulations and judicial admissions are "formal concessions" that are "binding" on Leapfrog and "conclusive" in this litigation, even when assessing jurisdictional issues like mootness. *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 677 (2010); *Hill v. FTC*, 124 F.2d 104, 106 (5th Cir. 1941) ("A fact admitted by [an] answer is no longer a fact in issue" and is "beyond the power of evidence to controvert"); *see also Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 905 (11th Cir. 1997) ("[P]arties may not stipulate to jurisdiction, but they may stipulate to facts that bear on [the] jurisdictional inquiry.") (emphasis omitted).

12. The Court also finds that, in any event, Leapfrog's altered misrepresentations are easily capable of repetition—as shown through Leapfrog's continued modification of key statements on its website (without informing the Court or the Community Hospitals) throughout this litigation and on the eve of trial. Because Leapfrog is readily capable of strategically withdrawing and then reinstating these representations, jurisdiction continues to lie as to even withdrawn, deleted, or revised misstatements on Leapfrog's website.

**B. The Requirements of Diversity Jurisdiction Are Satisfied**

13. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, the diversity jurisdiction statute.

14. As pertinent here, federal courts have diversity jurisdiction when the parties are citizens of different states and the amount in controversy at the time of filing "exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a); *see PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1306 (11th Cir. 2016) (explaining that the amount in controversy when an action is first initiated is controlling for purposes of diversity jurisdiction). Both requirements are met.

15. *First*, there is no dispute that the Community Hospitals and Leapfrog are completely diverse. For diversity jurisdiction, a corporation is a citizen of the state where it has its principal place of business and of every state in which it is incorporated. 28 U.S.C. § 1332(c)(2). Here, the Community Hospitals are all citizens of Florida, while Leapfrog is a citizen of Washington, D.C. *See supra* ¶¶ 1, 8. Thus, the parties are completely diverse.

16. *Second*, the amount-in-controversy requirement is met. The amount in controversy is "determined at the time of filing the complaint." *PTA-FLA, Inc.*, 844 F.3d at 1306. Even where the amount in controversy subsequently falls below $75,000, whether "'by stipulation, by affidavit, or by amendment of his pleadings,'" "that decrease 'does not deprive the district court of jurisdiction.'" *Id.* (quoting *St. Paul Mercury Indemn. Co. v. Red Cab. Co.*, 303 U.S. 283, 292 (1938)). Here, Leapfrog has *stipulated* that the amount-in-controversy requirement was satisfied when the Community hospitals filed this case, ECF 129 ¶ 168, and the Court now independently agrees that the requirement was satisfied because (i) the Community Hospitals had plausibly pleaded economic losses greater than $75,000, and (ii) the value of the Community Hospitals' requested injunctive relief also exceeds $75,000.

17. Leapfrog's contention that the Community Hospitals subsequently failed to adduce testimony or evidence substantiating a $75,000 loss is both legally irrelevant and factually false.

As noted above, the amount in controversy when the complaint is *first filed* is what controls—not whether a plaintiff ultimately proves an amount in controversy in excess of $75,000. *See PTA-FLA, Inc.*., 844 F.3d at 1306. The Community Hospitals' subsequent evidence of economic harm therefore is not the controlling inquiry for jurisdictional purposes.

18. In any event, the Community Hospitals' trial evidence also establishes that the amount in controversy remains well over $75,000. While the Community Hospitals dropped their damages claim, the economic value of injunctive relief also suffices to prove the amount in controversy, *see Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977), 204 F.3d 1069, 1077 (11th Cir. 2000), and courts are permitted to make "reasonable deductions, reasonable inferences, and other reasonable extrapolations" from the evidence, *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 754 (11th Cir. 2010). Here, the evidence shows that the Community Hospitals typically earn around $2 billion in net revenue per year, PX 521.0, and $75,000 would amount to only about .004% of that revenue. It is a reasonable inference that the Community Hospitals suffered—and will continue to suffer—economic losses greater than that amount from the ongoing loss of patients and resource diversion. It is a more-than-reasonable inference that mitigating that ongoing harm through injunctive relief would save at least $75,000 in continuing future losses.

19. Thus, the Court has subject-matter jurisdiction pursuant to the diversity-jurisdiction statute, 28 U.S.C. § 1332, to enter final judgment.

**C. The Court Has Personal Jurisdiction Over Leapfrog**

20. This Court also has personal jurisdiction over Leapfrog. This Court previously determined that it had personal jurisdiction over Leapfrog, ECF 41 at 6–7, and the evidence adduced at trial only confirms that conclusion.

21. Federal courts "sitting in diversity" must undertake "a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). When, as here, "a forum seeks to assert specific jurisdiction over an out-of-state defendant," the question is "whether the defendant purposefully established 'minimum contacts in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 474 (1985). These criteria are satisfied with respect to Leapfrog.

22. *First*, Florida's long-arm statute is satisfied. Under that provision, jurisdiction exists where the defendant is "[o]perating, conducting, engaging in, or carrying on a business . . . in this state," or where the defendant "[c]ommit[s] a tortious act within this state." Fla. Stat. § 48.193(1)(a)(1)–(2). The latter prong extends to claims that a Florida resident suffered injury from violations of FDUTPA. *See Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 585 (Fla. 2000) (holding that violation of FDUTPA is a tortious act for purposes of long-arm statute); *see also Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999) (applying precedent that the long-arm statute also extends "to defendants committing tortious acts outside the state that cause injury in Florida"). Both prongs are satisfied here. Leapfrog admits that it operates in Florida trade or commerce, ECF 129 ¶ 174; *infra* ¶¶ 112–13, and, as discussed throughout, Leapfrog committed tortious acts in this State by promulgating its deceptive and unfair Safety Grades and associated representations throughout Florida, in violation of FDUTPA.

23. *Second*, for the same reasons, the constitutional "minimum contacts" requirement is also established. The Community Hospitals have proven through a preponderance of the evidence that Leapfrog purposely availed itself of the forum State—Florida—in multiple ways, such as by soliciting data from Florida hospitals, marketing itself and its Safety Grades throughout Florida media, and communicating with consumers in Florida. *Supra* ¶¶ 23, 46, 393, 402. Indeed, Leapfrog's CEO, Leah Binder, has published two op-eds in *The Palm Beach Post* criticizing the Community Hospitals. PX-461.0; Leah Binder, Opinion, *What Palm Beach Health Network isn't saying about Leapfrog*, The Palm Beach Post (Dec. 2, 2025, at 5:06 ET), https://www.palmbeachpost.com/story/opinion/columns/guest/2025/12/02/leapfrog-rating-palm-beach-health-network/87474548007/. The first appeared only one business day after Leapfrog filed its motion to dismiss on personal-jurisdiction grounds, belying any argument against a finding of minimum contacts. *See* PX-461.0.[25] As a result of these and other media efforts, Leapfrog's Safety Grades—as Leapfrog's own internal reports demonstrate—received more media coverage in Florida than in any other state in the nation. *See supra* ¶ 402. Thus, this Court has specific personal jurisdiction over Leapfrog.

[25] In that op-ed, Ms. Binder falsely implied that one of the Community Hospitals was unclean and performed inadequate handwashing, *see* PX-461.0 at -083—continuing to propagate the false notion that failing scores for the Four Measures like Hand Hygiene for nonparticipating hospitals reflects performance even where Leapfrog admittedly has no data on performance at all. *See supra* ¶¶ 234, 302, 305.

## II. THE COMMUNITY HOSPITALS HAVE ESTABLISHED THAT LEAPFROG VIOLATED FDUTPA

24. FDUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The test is disjunctive, and a litigant may satisfy FDUTPA's first element by demonstrating *either* that a practice is deceptive *or* unfair. In a case for injunctive or declaratory relief, a plaintiff must next satisfy FDTUPA's second element by showing that it is "aggrieved by" the deceptive or unfair practice. Fla. Stat. 501.211(1); *see also SMS Audio, LLC v. Belson*, 2017 WL 1533941, at *4 n.6 (S.D. Fla. Mar. 9, 2017) (Middlebrooks, J.) (citing *Caribbean Cruise Line, Inc.*, 169 So. 3d at 166–67). No proof of damages is required. *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 172 (Fla. 1st DCA 2015) (aggrieved party "'may obtain injunctive relief'" under FDUTPA "'regardless of whether [it] can recover 'actual damages'"). The Community Hospitals must establish their FDUTPA claim by a preponderance of the evidence. *Marco Island Cable*, 312 F. App'x at 213.

25. The Community Hospitals brought this case asserting that Leapfrog's arbitrarily assigned, so-called "Safety Grades" and associated representations about how those Safety Grades are calculated, coupled with Leapfrog's reputation-damaging penalty for hospitals that do not participate in its revenue-generating Survey, constitute unfair and deceptive acts or practices under FDUTPA. The evidence presented over the course of the trial in this case has amply confirmed those charges. The evidence establishes that Leapfrog willfully deceived the public in adopting its "imputation" methodology in which nonparticipating hospitals were automatically assigned the lowest possible scores on key safety measures, thus reducing their overall Safety Grades, even though Leapfrog knew its methodology was "arbitrar[y]," "random," not supported by actual data, and not the product of any peer review. The evidence further establishes that Leapfrog adopted this punitive strategy as a "simple business decision" to create a "major incentive" to respond to Leapfrog's Survey, thereby giving Leapfrog more data that it can monetize. Leapfrog's breach of the public trust harmed patients, physicians, employers, at least one insurer, and the Community Hospitals.

26. For those reasons, and as further explained below, this Court concludes that the Community Hospitals have met their burden to demonstrate by a preponderance of the evidence that Leapfrog's Safety Grades, Safety Grade methodology, and associated representations and practices are deceptive and unfair under FDUTPA. They have further demonstrated that they are

aggrieved by Leapfrog's conduct—suffering damage to their reputations and operations. Accordingly, the Court finds that the Community Hospitals have established their FDUTPA claim against Leapfrog.

**D. Leapfrog's "Safety Grades," Safety Grade Methodology, and Surrounding Misrepresentations Are Deceptive Under FDUTPA**

27. The Community Hospitals have proven by a preponderance of the evidence that Leapfrog's Safety Grades, Safety Grade methodology, and surrounding misrepresentations are "deceptive … practices" under FDUTPA. Fla. Stat. § 501.204(1).

28. "Under Florida law," a practice is deceptive when it is "likely to mislead a consumer acting reasonably in the circumstances." *Waste Pro USA*, 282 So. 3d at 917 (internal quotation marks, brackets, and emphasis omitted); *see Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–84 (11th Cir. 2016) ("To satisfy the first element, the plaintiff must show that the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.") (citation modified). Deception is "construed liberally." Fla. Stat. § 501.202. It therefore encompasses not only "outright false statements" but also "omissions," *Performance Orthopaedics*, 278 F. Supp. 3d at 1327, and representations that convey a misleading "net impression" to consumers, *Zamber v. Am. Airlines, Inc.*, 282 F. Supp. 3d 1289, 1299 (S.D. Fla. 2017).

29. The Community Hospitals have demonstrated multiple deceptive practices relating to Leapfrog's Safety Grades and Safety Grade methodology. This scheme of deception started with Leapfrog's adoption of the Fall 2024 Safety Grade methodology, and it continues to the present day—as illustrated by the late-breaking, surreptitious changes that Leapfrog made to its website, which have only compounded the deception. This deception, moreover, comes from the top. It stems from decisions made by Leapfrog's leadership, including its desire to drive up revenues by coercing participation in Leapfrog's Survey.

30. *First*, Leapfrog represents that the "Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey." *Supra* ¶ 275. It is undisputed, however, that Leapfrog assigns the lowest possible scores (*i.e.*, "Limited Achievement") on the Four Measures—which comprise over *30%* of a hospital's overall total Safety Grade, *supra* ¶ 321—for hospitals that decline to complete the Survey, *supra* ¶ 279. Indeed, Leapfrog conceded in its briefing that a hospital's "Safety Grade may feel negative effects" from a decision not to complete the Survey. ECF 102 at 9. A reasonable consumer would therefore be misled by Leapfrog's representation that participation is "not" reflected in a Safety Grade. *Supra*

¶ 279. In reality, nonparticipation triggers the automatic assignment of the lowest possible scores on several measures, which concededly can have a "negative effect[t]" on a hospital's Safety Grade. ECF 102 at 9. Leapfrog recently changed this statement on its website to assert that "Reporting to the Leapfrog Hospital Survey doesn't automatically improve a hospital's Safety Grade." *Supra* ¶ 356. This new half-truth is also misleading. As compared to the but-for world where a hospital does not, submitting Leapfrog's Survey clearly *does* improve a hospital's Safety Grade. Moreover, a reasonable consumer could view Leapfrog's statement to suggest that the Survey does not *affect* a hospital's Safety Grade, a false impression Leapfrog's lie of omission invites.

31. Leapfrog's pretextual responses are unpersuasive. Leapfrog principally argues that its representation regarding the effect of Survey participation is not deceptive because "participation does not *necessarily* affect a hospital's grade" in absolutely all instances or because "participation does not, *per se*, affect Safety Grades." ECF 102 at 8–9 (emphases added). But Leapfrog's public statements regarding the Safety Grade are hardly so circumspect. Leapfrog announced that hospitals' "Safety Grade[s]" do "not" "reflec[t]" "whether they complete the Leapfrog Hospital Survey." *Supra* ¶ 275. And it continues to claim that Survey participation does not improve hospital Safety Grades. *Supra* ¶ 356. Leapfrog also claims it had a good "reason" for adopting a methodology that assigns the lowest scores to nonparticipating hospitals. ECF 102 at 7. Even if that were true, the subjective internal reason that purportedly motivated Leapfrog to rig its methodology is irrelevant to "how a reasonable consumer would interpret" Leapfrog's deceptive public representations. *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000). In sum, Leapfrog's representation that its Safety Grades do *not* reflect Survey participation is deceptive.

32. *Second*, and relatedly, the "About the Grade" page of Leapfrog's website represents that the Safety Grades are calculated using Survey responses and CMS data where available as well as "information from other supplemental data sources." *Supra* ¶ 292. Leapfrog similarly represents in its "Scoring Methodology" document that it uses "secondary data" for the Safety Grades. *Supra* ¶ 293. But those representations are false and misleading. The evidence, including testimony from multiple Leapfrog witnesses, shows that Leapfrog's Fall 2024 Safety Grade methodology—its current methodology—does not use any "supplemental data sources" for the Four Measures for nonparticipating hospitals. *Supra* ¶ 301. Indeed, Leapfrog lacks any factual

basis for assigning the lowest possible scores to nonparticipating hospitals for the Four Measures. *Supra* ¶ 302. The notion that Leapfrog uses *any* actual data from nonparticipating hospitals for the Four Measures—over 30% of the Safety Grade for those hospitals—is thus deceptive.

33. *Third*, Leapfrog's Safety Grade methodology is itself inherently deceptive. The record establishes that the Safety Grade methodology adopted in Fall 2024 "penal[izes]" nonparticipating hospitals by "arbitrarily assign[ing]" them failing scores, *Supra* ¶ 183, in an effort to compel them to complete a burdensome, 350+ page Survey, *supra* ¶ 32, that is tied to Leapfrog's revenues, *supra* ¶¶ 93–103, and requires hospitals to sign over data rights for Leapfrog to use "in a commercial manner for profit," *supra* ¶ 34, all while Leapfrog assures the public that nonparticipation does "not" impact Safety Grades, *supra* ¶¶ 274–85—a scheme that at least one third-party hospital described as "marketing blackmail," *supra* ¶ 200.

34. Dr. Nicholson, the Community Hospitals' qualified expert in health economics, confirmed the deceptiveness of Leapfrog's Safety Grade methodology. He testified that Leapfrog's Safety Grade methodology departs from guiding principles for measuring hospital quality, systematically penalizes nonparticipants, fails to reliably predict patient outcomes, and distorts patient choices in a harmful manner. *Supra* ¶¶ 210–28. The methodology lacks standardization because it treats hospitals that do not participate in Leapfrog's Survey differently from hospitals that do participate in the Survey. *Supra* ¶ 212. For example, for hospitals that do not participate and do not have historical data from the last two rounds of Safety Grades, Leapfrog automatically assigns those hospitals the lowest possible scores on the Four Measures. *Supra* ¶ 71. The methodology caps those nonparticipating hospitals at a total of 60 out of 400 possible points on the Four Measures, even though the majority of hospitals receives maximum points on those measures. *Supra* ¶¶ 216–17. In addition, the methodology fails to adhere to statistical principles governing missing data. Statistics literature has found that any statistical analysis is likely biased when more than 10% of the data are missing. *Supra* ¶¶ 216–20. Yet Leapfrog assigns a Safety Grade even when it has no data from a hospital for the Four Measures, which account for over 30% of the overall Safety Grade. *Supra* ¶ 321. Leapfrog also assigns Safety Grades even though approximately 23% of hospitals do not participate in the Survey and thus report no data to Leapfrog. *Supra* ¶ 45. Moreover, Leapfrog's Safety Grade methodology flouts auditing best practices because Leapfrog audits very few hospitals—only a handful each year. *Supra* ¶¶ 74, 212.

35. The upshot of these methodological flaws, as Dr. Nicholson persuasively

explained, is a methodology that penalizes nonparticipating hospitals and has no connection to actual safety performance. Since the Fall 2024 methodology change, no nonparticipating hospital with an intensive-care unit that lacks historical data from the last two rounds of Safety Grades has received an "A" Safety Grade. *Supra* ¶ 219. At the same time, no participating hospital has received "Limited Achievement" scores on all of the Four Measures—meaning that Leapfrog treats nonparticipating hospitals worse than even the worst performing participating hospital. *Supra* ¶ 220. In short, Leapfrog's Safety Grade methodology is incapable of reliably measuring hospital safety and thus inherently apt to deceive reasonable consumers who expect the methodology to be reliable.

36. Additional evidence confirms that the methodology is deceptive. For example, in commenting on the Fall 2024 Safety Grade methodology, at least one hospital system (Allina Health) warned that the public "will not understand nor dig into the methodology." *Supra* ¶ 172. One of Leapfrog's own advisors, Dr. Romano, recognized that an alternative methodology "would yield more accurate imputations," whereas the Safety Grade methodology that Leapfrog adopted would merely "achieve [the] strategic objective of penalizing nonparticipants." *Supra* ¶ 161.

37. *Fourth*, Leapfrog represents that "[h]ospitals missing more than six process measures . . . are not graded," since "[a] hospital must have enough safety data available for our experts to issue [it] a letter grade." *Supra* ¶ 299. The evidence at trial revealed, however, that Leapfrog issues Safety Grades for nonparticipating hospitals despite lacking data for *seven* measures—one more than its asserted cut-off. *Id.* The data analyst responsible for the Safety Grade program, Alexandra Campione, acknowledged that "Leapfrog has no data for . . . *seven* measures if a hospital does not participate." *Supra* ¶ 305. The Senior Vice President of Health Care Ratings, Missy Danforth, recognized the same. *Supra* ¶¶ 305, 311 (nonparticipating hospitals have "seven process measures missing"). Indeed, Leapfrog admits in its Answer that when "a hospital does not participate," Leapfrog "abandons *three* measures" and uses "its 'imputation model'" for "*four* measures"—and its "imputation model is how it assigns a value for a measure when it *lacks any data pertaining to it*." ECF 43 ¶¶ 49–50 (emphases added). *See Hill v. FTC*, 124 F.2d 104, 106 (5th Cir. 1941) ("A fact admitted by answer" is "beyond the need of evidence to prove" and "beyond the power of evidence to controvert"). Because Leapfrog grades nonparticipating hospitals that are missing *seven* measures, a reasonable consumer would be misled by Leapfrog's representation that hospitals missing more than "six" measures are "not graded." *Supra* ¶¶ 314–

15.

38. Leapfrog's responses are again unpersuasive. Leapfrog argues it is "only missing data for 3 of 7 process measures" because its "imputation model" assigns values for the other "four." ECF 102 at 11. Leapfrog has admitted, however, that its "imputation model" "assigns a value for a measure when [Leapfrog] lacks *any data* pertaining to it." ECF 43 ¶ 50 (emphasis added); *see also supra* ¶¶ 310, 312 (testimony from Leapfrog's science advisor, Dr. Matthew Austin, and Expert Panel member Dr. Patrick Romano confirming that imputed values are "based on a lack of data" and that Leapfrog lacks "any information" about whether those values are "accura[te]"). By its own admission, Leapfrog is "missing data for 3" measures, ECF 102 at 11, and "lacks any data" for the remaining Four Measures, ECF 43 ¶ 50. In short, Leapfrog is missing data on *seven* measures for the nonparticipating hospitals it grades, and none of Leapfrog's counterarguments rebuts that foundational deception. *Supra* ¶¶ 305, 307. By its own account, Leapfrog should not grade nonparticipating hospitals as a result.

39. *Fifth*, in an effort to give its arbitrary Safety Grade methodology a veneer of scientific respectability, Leapfrog represents to the public on its website that the Safety Grade methodology is "peer-reviewed." *Supra* ¶ 316. The record is clear, however, that the current Safety Grade methodology has not been peer-reviewed. Leapfrog also claims that its methodology change was recommended by its Expert Panel, but its panel did not approve it. At no point during the Expert Panel Meeting did Leapfrog present, discuss, or seek approval of the Safety Grade methodology that Leapfrog ultimately adopted in Fall 2024—in which nonparticipating hospitals are automatically assigned the lowest possible scores on the Four Measures—nor did any member of the Expert Panel mention such a methodology. *Supra* ¶¶ 327–30. And Leapfrog's science advisor, Dr. Austin, conceded that the Fall 2024 Safety Grade methodology is not "peer-reviewed." *Supra* ¶ 318–20. Indeed, Leapfrog itself does not dispute Dr. Austin's "conce[ssion] that the imputation methodology is not peer reviewed." ECF 102 at 11. Instead, Leapfrog's own staff decided to punish nonparticipating hospitals. A reasonable consumer would thus be misled by Leapfrog's representations that its Safety Grade methodology is peer-reviewed and that its Expert Panel recommended the methodology. That deception is particularly problematic in this context—as Dr. Berger testified, healthcare is a "credence good," *i.e.*, a good or service whose quality can be difficult for consumers to reliably assess on their own, without the benefits of experts. *Supra* ¶ 384. Consumers are thus apt to be especially reliant on claims that hospital-quality ratings are

backed by white-coat experts—yet Leapfrog has deceived consumers in precisely this respect.

40. Leapfrog provides no convincing response. Leapfrog contends that the aspects of its Safety Grade methodology that derive from past iterations of the methodology are peer-reviewed. But that is no defense because the "imputation" component of the Fall 2024 Safety Grade methodology being challenged here—the component that automatically assigns nonparticipating hospitals the lowest possible scores on the Four Measures—is not peer-reviewed. And that component of the methodology is critical because it accounts for over 30% of the overall Safety Grade, after the weights are redistributed. *Supra* ¶ 321. Leapfrog also argues that its website "does not say the *current* Leapfrog Hospital Safety Grade methodology is peer reviewed." ECF 102 at 11 (emphasis added) (internal quotation marks omitted). But the website states that the "Safety Grade *uses*"—present tense—"a public, peer-reviewed methodology." *Supra* ¶ 316 (emphasis added). And a reasonable reader could not read it otherwise. Leapfrog has presented no justification for claiming that its current, operative methodology is peer-reviewed when Leapfrog now acknowledges that statement to be false. Leapfrog's representation that its Safety Grade methodology is peer-reviewed is thus deceptive.

41. *Sixth*, Leapfrog's website as a whole is deceptive in how it represents the Safety Grades and Safety Grade methodology. As an initial matter, unrebutted evidence—testimony from Dr. Berger and Leapfrog's own witness, Ms. Danforth—shows there is only one location across Leapfrog's entire consumer-facing website that purports to disclose Leapfrog's Safety Grade methodology: the 28-page "Scoring Methodology" PDF that is not linked directly from the hospitals' Safety Grade webpages. *Supra* ¶¶ 332–33. As Dr. Berger explained, navigating to this Scoring Methodology document is exceedingly difficult and requires multiple navigation steps. *Supra* ¶¶ 334–38. As Dr. Berger further testified, Leapfrog's Google Analytics data demonstrate that only 3% of all visitors to the Community Hospitals' Safety Grades during the relevant time period accessed the document. *Supra* ¶ 340. That percentage would have included attorneys and experts from this case and therefore likely overestimates the number of consumers who accessed the document. *Id.* It is also likely that an even smaller percentage of visitors scrolled to the page of the document that describes the imputation component of the Safety Grade methodology. *Supra* ¶ 341. In addition, testimony from multiple of Leapfrog's own witnesses—including Ms. Binder, Ms. Danforth, and Mr. Vredenburgh—confirm that the Scoring Methodology document is difficult to comprehend and is not understandable to lay consumers. *Supra* ¶ 343. The document itself is

also deceptive. *See supra* ¶¶ 344–45; *infra* ¶ CoL 44.

42. Even beyond this absence of any accessible, understandable disclosure about its Safety Grades and Safety Grade methodology, Leapfrog makes numerous affirmatively misleading representations about those subjects. For example, Leapfrog represents, through its "gas gauge" graphics on hospitals' Safety Grade webpages, that a nonparticipating "Hospital Performs … Worse Than Average" on the Four Measures. *Supra* ¶¶ 246, 251. But the Four Measures are based solely on imputation, *supra* ¶ 251, and Leapfrog has no underlying data about how a nonparticipating hospital performs on the Four Measures relative to other hospitals, *supra* ¶ 302. A reasonable consumer would therefore be misled by Leapfrog's representation that a nonparticipating hospital's performance on the Four Measures is "Worse Than Average." In reality, Leapfrog does not know whether a nonparticipating hospital's performance is actually worse than average on the Four Measures, since it has no underlying performance data from nonparticipating hospitals for those measures. And Leapfrog's use of misleading gas-gauge graphics depicting red-zone scores is especially problematic because, as Dr. Berger testified, those graphics are a classic example of "evaluative" categories or labels—i.e., forms of information presentation that seek to illustrate how information should be evaluated or judged. *Supra* ¶ 248. These forms of presentation increase the influence that the information has on consumers' perceptions, *id.*, so Leapfrog's use of misleading gas-gauge graphics compounds the deception.

43. Leapfrog's footnoted disclaimers on the gas-gauge webpages are misleading as well. One footnote notes that a "hospital was asked to provide this information to the public, but did not," and another footnote notes that a "score was assigned to reflect the lack of information available." *Supra* ¶¶ 255–56. Because these disclaimers fail to explain how a "score was assigned"—*i.e.*, by imputing the lowest possible scores to nonparticipating hospitals based on no data—they do not dispel the misleading impression that the gas gauges reflect real-world performance. *See supra* ¶ 258. That is especially true given the existence of a *third* disclaimer on these webpages, which asserts that Leapfrog scores "hospital[s] [on their] overall performance in keeping patients safe," *supra* ¶ 276—thereby reinforcing the erroneous impression that the gas gauges are based on actual performance. Leapfrog suggests that the gas gauges are not deceptive because the scores that Leapfrog assigns to nonparticipating hospitals on the Four Measures are the lowest possible and are thus, definitionally, below average. But the gas gauges do not state that nonparticipating hospitals were assigned "a score that is comparatively a 'worse than average'

score" relative merely to other imputation-based scores. Instead, the gas gauges represent that a nonparticipating "Hospital Performs … Worse Than Average" on the Four Measures *in the real world*, even though Leapfrog has no data about how that hospital's real-world performance on those measures compares to other hospitals. *See supra* ¶ 251. This representation is therefore deceptive as well.

44. Leapfrog has suggested that its website representations are not deceptive because of its Scoring Methodology document. That is not true. And, in fact, that document is itself deceptive. *See supra* ¶¶ 344–45. Nowhere does Leapfrog explain it is punishing nonparticipating hospitals. As noted above, the Scoring Methodology document misleadingly represents that Leapfrog uses "secondary data" in calculating the Safety Grades, even though Leapfrog in fact does not use any actual data for the Four Measures when calculating Safety Grades for nonparticipating hospitals. *Supra* ¶ 302. The Scoring Methodology document thus only adds to Leapfrog's deception—and at minimum at least fails to cure it. An "additional disclosur[e]" cannot render representations nondeceptive if reasonable consumers would have viewed the representations "without scrutinizing" or understanding the disclosure. *Bohlke*, 2015 WL 249418, at *9. Here the record shows that the Scoring Methodology document is difficult to access; is, in fact, accessed by only a very small percentage of consumers; and is very difficult to understand. *See supra* ¶¶ 331–46. Accordingly, Leapfrog's Scoring Methodology document cannot shield it from liability.

45. *Seventh*, after this case was filed, Leapfrog altered its website in numerous respects. Leapfrog did not alert the Court to these changes and instead litigated the case on the assumption that the representations discussed above remained operative. *Supra* ¶¶ 347–59. In any event, the Court concludes that Leapfrog's modified statements are also deceptive and indeed deepen Leapfrog's deception. At minimum, these edits squarely "impeac[h]" Leapfrog's "superlative" assessment of its pre-litigation disclosures—showing that Leapfrog in fact was not exhibiting the transparency it claimed. *Wood v. Morbark Indus., Inc.*, 70 F.3d 1201, 1208 (11th Cir. 1995).

46. For example, Leapfrog altered its "FAQ" page to remove the statement that a "Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Hospital Survey." *Supra* ¶¶ 356–57. The page now states that "[r]eporting to the Leapfrog Hospital Survey doesn't automatically improve a hospital's Safety Grade"—which still deceptively omits the critical fact that nonparticipation harms Safety Grades. *Supra* ¶ 357.

47. The FAQ page also no longer states that "if a hospital does not report to the Leapfrog Hospital Survey, other sources of data are used to calculate a grade." *Supra* ¶¶ 351–52. Instead, it represents that "[m]ost of the data used to calculate the Grade comes from the Centers for Medicare and Medicaid Services (CMS), the federal agency that runs Medicare. If a hospital voluntarily reports to the Leapfrog Hospital Survey, some of that data is used to calculate a Safety Grade." *Supra* ¶ 351. Again, however, this text does not disclose that Leapfrog simply assigns low scores to nonparticipants based on no data.

48. Leapfrog also deleted the statement "If a hospital does not report to the Leapfrog Hospital Survey, other sources of data are used to calculate a Grade" from its "Frequently Asked Questions About The Leapfrog Hospital Safety Grade" webpage. That webpage now represents instead that "[m]ost of the data used to calculate the Grade comes from the Centers for Medicare and Medicaid Services (CMS), the federal agency that runs Medicare. If a hospital voluntarily reports to the Leapfrog Hospital Survey, some of that data is used to calculate a Safety Grade." *Supra* ¶ 351. Critically, however, Leapfrog continues to fail to disclose that it arbitrarily assigns the lowest scores to nonparticipating hospitals, all without reference to external data sources.

49. Most notably, Leapfrog recently deleted (and then days later restored) the footnote stating "*The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available." *See* PX-033.5; PX-033.6. Leapfrog has continually invoked this footnote as core to its defense—arguing the language in the footnote constituted a disclosure that cured any deception. *See, e.g.*, ECF 39 at 9, 16; ECF 99 at 4. Leapfrog failed to inform the Court or the Community Hospitals of this deletion or provide an explanation for the deletion and subsequent reinstatement. Indeed, it appears that Leapfrog reinstated the footnote only after counsel for the Community Hospitals served Request for Production and trial subpoena seeking evidence regarding the deletion.

50. For these reasons, the Court concludes that the Community Hospitals have proven by a preponderance of the evidence that Leapfrog has engaged in multiple deceptive practices relating to its Safety Grades and Safety Grade methodology, each of which is likely to mislead reasonable consumers. Leapfrog's representations are not just false and misleading—they form an integral part of a hospital grading scheme that is deceptive at its core. To convince consumers to trust it with life-and-death decisions, Leapfrog falsely conveys that this scheme is trustworthy, safety-based, and backed by experts. All the while, Leapfrog actively deceives consumers about

how its Safety Grade methodology works and secretly punishes nonparticipating hospitals to pad its bottom line. Leapfrog's entire Safety Grade scheme—not just individual statements about that scheme—is thus deceptive under FDUTPA.

**E. Leapfrog's Safety Grades, Safety Grade Methodology, and Associated Coercive Practices Are Unfair Under FDUTPA**

51. While the Community Hospitals need not also prove that Leapfrog's conduct is "unfair," given that FDUTPA's test is disjunctive, the Court nonetheless also finds that the Community Hospitals have also proven by a preponderance of the evidence that Leapfrog's Safety Grades, Safety Grade methodology, and associated punitive conduct are "unfair . . . practices" under FDUTPA. Fla. Stat. § 501.204(1).

52. As noted, the record establishes that Leapfrog's Fall 2024 Safety Grade methodology "penal[izes]" nonparticipating hospitals by "arbitrarily assign[ing]" them failing scores, *supra* ¶¶ 183, 202, in an effort to compel them to complete a burdensome, 350+ page Survey, *supra* ¶ 32, that is tied to Leapfrog's revenues, *supra* ¶¶ 93–103, and requires hospitals to sign over data rights for Leapfrog to use "in a commercial manner for profit," *supra* ¶ 79, all while Leapfrog assures the public that nonparticipation does "not" impact Safety Grades (or, now, that participation does not improve Safety Grades), *supra* ¶¶ 274–85—a scheme that at least one third-party hospital described as "marketing blackmail," *supra* ¶ 200. Against this, Leapfrog has failed to identify sufficient record support for its assertion that the imputation methodology was not intended to "punish." ECF 102 at 10. And its reliance on Ms. Campione's deposition testimony purportedly "clarif[ying]" her admission regarding the arbitrariness does not contradict and cannot overcome her contemporaneous, internal statement that Leapfrog was "arbitrarily assigning [hospitals] the points associated with the bottom scoring category ('limited achievement')," since the "data" they were imputing to nonparticipants was "random." *Supra* ¶¶ 181–83.

53. On those facts, the Community Hospitals have demonstrated that Leapfrog's Safety Grades, Safety Grade methodology, and associated conduct are "unfair" practices under the first applicable test, which looks to whether conduct "'offends established public policy'" and "is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). This definition, which was adopted from the Federal Trade Commission's ("FTC") 1964 policy statement and has been embraced by the Florida Supreme Court, is the "latest statement of state law by the state supreme court," *World Harvest*

*Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009), and therefore controls.

54. *First*, these practices evince the kind of "deceptive and bullying conduct" that offends Florida public policy, *Marco Island Cable*, 312 F. App'x at 214, for all the reasons stated above in connection with the "deceptive" prong of FDUTPA.

55. *Second*, these practices qualify, at minimum, as "oppressive" or "unscrupulous." *Marrache*, 17 F.4th at 1098. They are oppressive because the record shows that Leapfrog uses the threat of arbitrarily assigned Safety Grades to coerce participation in the Survey among hospitals that are unwilling or unable to endure what one third-party hospital described as "blackmail[-]like reputational hits" from nonparticipation. *Supra* ¶ 200. The Survey is thus effectively involuntary. And these same practices are unscrupulous because the record shows that Leapfrog is not forthcoming to the public about how it calculates its Safety Grades or what they represent. *See supra* ¶¶ 229–346.

56. That this conduct is "unfair" under the 1964 approach accords with the vast body of law applying the FTC Act, which FDUTPA tracks. *See Millennium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.*, 761 So. 2d 1256, 1260 (Fla. 3d DCA 2000). The FTC has long held that "deceptive practices are always unfair." *Figgie Int'l, Inc.*, 107 F.T.C. at 373 n.5. And the Eleventh Circuit has embraced the same logic. *See Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1172 (11th Cir. 1985) ("An act or practice is … unfair … if it has the tendency or capacity to deceive.").

57. For all these reasons, Leapfrog's misleading conduct is "unfair" under the 1964 definition.

58. The Community Hospitals have likewise demonstrated that Leapfrog's Safety Grades, Safety Grade methodology, and associated conduct are "unfair" under the second applicable test, which stems from the FTC's subsequent 1980 policy statement. Under that newer definition, a practice is "unfair" when it inflicts "a consumer injury" that is "(1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) … one that consumers could not reasonably have avoided." *SMS Audio, LLC*, 2017 WL 11631378, at *3.

59. *First*, the record establishes that Leapfrog's conduct has inflicted a "consumer injury," *SMS Audio*, 2017 WL 11631378, at *3, upon patients deceived into canceling procedures and switching hospitals, physicians deceived into signing up with competitors, employers that

purchase hospital services and are likewise deceived into contracting with competitors, an insurer deceived into believing the Community Hospitals are unsafe (prompting a letter-writing campaign urging the Hospitals to improve safety performance), and the Community Hospitals themselves, as they have had to expend substantial resources explaining the deceptiveness of Leapfrog's Safety Grades and work to rehabilitate the Community Hospitals' reputations. *See supra* ¶¶ 409–56.

60. *Second*, those injuries are "substantial" rather than "trivial" or "speculative." *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1101 (Fla. 3d DCA 2014). These are serious injuries affecting matters of life-and-death. And the 1980 FTC policy statement itself recognizes that "withhol[ding] … performance data" to leave consumers "with insufficient information for informed comparisons" is "properly banned as an unfair practice." *Id.* at 1102.

61. *Third*, the injuries are "not outweighed by any countervailing benefits to consumers" that are produced by Leapfrog's alleged unfair practices—namely, its practices of arbitrarily assigning failing scores to nonparticipating hospitals while representing to the public that nonparticipation does not impact hospital Safety Grades. There is "no countervailing benefi[t]" to "intimidating, threatening, and coercing consumers," *FTC v. World Patent Mktg., Inc.*, 2017 WL 3508639, at *16 (S.D. Fla. Aug. 16, 2017), and "'[c]onsumer deception, by its very nature, is against the public interest,'" *Osmose, Inc. v. Viance, LLC*, 2009 WL 10665750, at *10 (N.D. Ga. Mar. 20, 2009) (citation omitted). Leapfrog suggests that its allegedly coercive practices produce a benefit by driving increased participation in its Survey, which, in turn, "improve[s] patient safety" and "access to hospital's [sic] patient safety data." ECF 99 at 14. But Leapfrog does not audit virtually any of the data it receives to assess whether safety is *actually* improving or whether hospitals are simply *reporting* better outcomes. *Supra* ¶ 74. This putative benefit is thus too speculative and unsupported to outweigh the clear consumer injuries in this record.

62. *Fourth*, the record does not indicate that consumers could "reasonably have avoided" these injuries. *SMS Audio*, 2017 WL 11631378, at *3. Hospitals could not have reasonably avoided the Survey, since Leapfrog imposes a "penalty" for nonparticipation, *supra* ¶¶ 196, 202, and runs sophisticated media operations to publicize its Safety Grades and "hurt" nonparticipants like the Community Hospitals, *supra* ¶ 394. Nor could patients, given Leapfrog's deceptive practices, *see supra* ¶¶ 273–330, and media campaigns, *supra* ¶¶ 386–408. Leapfrog points to some disclaimers found on its website, but those disclaimers are irrelevant because they fail to explain how Leapfrog actually calculates its Safety Grades (*i.e.*, through a punitive

"imputation" methodology that simply assigns low scores due to nonparticipation). Even if the disclaimers were relevant, there is no evidence that consumers read or understood them. For these reasons, the Court finds that Leapfrog's misleading conduct is also "unfair" under the 1980 approach.

63. In sum, the Court finds that the Community Hospitals have established that Leapfrog has engaged in "unfair" practices relating to its "Safety Grades" and associated coercive conduct, regardless of whether one applies the 1964 definition or 1980 definition of "unfair."

**F. The Community Hospitals Are Aggrieved by Leapfrog's Unlawful Practices**

64. The Court concludes that the Community Hospitals have proven by a preponderance of the evidence that they satisfy FDUTPA's capacious "aggrievement" requirement.

65. "[A]ggrieved" under FDUTPA is "expansive," requires merely some "specific … grievance," and, for injunctions and corresponding declaratory judgments, does not require showing economic harm. *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 172–73 (Fla. 1st DCA 2015). A plaintiff seeking injunctive and declaratory relief need only show an identifiable, non-speculative injury, *id.* at 173, which may include reputational harm and damage to "goodwill," ECF 41 at 8; *see also Wyndham Vacation Resorts, Inc.*, 123 So. 3d at 1152 ; operational disruption, *Common Cause/Georgia*, 554 F.3d at 1350; and "consumer confusion" regarding the "quality of service," *Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC*, 2020 WL 6700449, at *4 (S.D. Fla. Oct. 20, 2020). Thus, the inquiry concerns whether Leapfrog's deception has caused, and continues to cause, actual or threatened injury to the Community Hospitals' goodwill and operations. The evidence shows that the Community Hospitals are aggrieved by Leapfrog's conduct.

66. Indeed, Leapfrog purposefully seeks to influence consumer choice and affect the reputation of graded hospitals. *See supra* ¶¶ 381–85. Thus, the Court is not persuaded by Leapfrog's arguments that the Safety Grades have no meaningful impact on consumers. Leapfrog undertook a coordinated media campaign which resulted in numerous media articles—772 in Fall 2024 and 774 in Spring 2025—touting the Community Hospitals' poor Safety Grades and asserting that they are a safety risk. *See, e.g.*, *supra* ¶ 389; PX-359.0 ("Tenet Gets an F" article in December 2024); PX-358.0 ("Tenet Hospitals at Bottom of Local Safety Grades" article). The Safety Grades are designed to influence consumer choice, with Leapfrog encouraging consumers to "always" use

the Safety Grade when deciding which hospital to visit. *See supra* ¶ 48. And the negative coverage of the Community Hospitals in particular is ongoing and intentional. Leapfrog engaged in a coordinated media outreach campaign designed not to promote patient safety, but "to hurt Tenet [Healthcare]," the Community Hospitals' parent company. *Supra* ¶ 394. Leapfrog's CEO made it a goal to have one "negative" story "at minimum every three days about Tenet or one of the plaintiff hospitals." *Id.* The media coverage continued with a viral TikTok video, which called four of the Community Hospitals the "Worst Hospitals in Florida" and received over one million views, including by many Florida community members who referenced the video in conversations with the Community Hospital CEOs. *Supra* ¶ 404. The Court also finds it noteworthy that there was more media coverage of the Safety Grades in Florida than in any other state, in large part because of Leapfrog's targeted media efforts in Florida.

67. As Mr. Chakurda explained, widely publicized failing Safety Grades are powerful reputational signals that have a meaningful negative effect on how hospitals are viewed by patients, physicians, and other stakeholders. He testified that Leapfrog's coordinated media campaign against the Community Hospitals made their "D" and "F" Safety Grades especially salient, exacerbating the reputational harm of those Safety Grades and requiring the hospitals to engage in damage-control. *See* PX-946.0 ¶¶ 31–52; *see also supra* ¶¶ 223, 248, 252.

68. Dr. Berger testified that failing Safety Grades likely have negative long-term effects on consumers' perceptions because negative impressions can be hard to overcome, especially when compared to positive impressions. Further, future issuance of failing Safety Grades may exacerbate the problem, because repeated information can be perceived as more true. PX-945.0 ¶¶ 55–59.

69. Dr. Nicholson testified that academic studies, including an article in *Health Affairs*, demonstrate that negative hospital ratings can significantly damage a hospital's reputation. This reputational harm affects hospital operations, including fundraising (for non-profit hospitals) and recruitment. PX-937.0 ¶ 38. Consistent with these risks, Dr. Nicholson noted that hospital CEOs have identified recruiting challenges and a decline in patient visits following negative grading cycles. PX-937.0 ¶ 38; Nicholson Tr. 187:3–18.

70. The discrete harms ensuing from this coordinated campaign were borne out by multiple categories of concrete evidence in this case.

71. *First*, each Community Hospital CEO testified to the identifiable, non-speculative

injuries their hospital has suffered as a result of its Leapfrog Safety Grade.

72. Heather Havericak, CEO of Delray Medical Center, testified that beginning in late November 2024—when Delray received its failing Leapfrog Safety Grade—she began to hear from at least one patient a day, Monday through Friday, who "had apprehension and anxiety about coming to Delray" because of the Safety Grade. *Supra* ¶ 424. She explained that since the issuance of the Leapfrog Safety Grades, patients have "lesser confidence" in Delray and have expressed that they were "scared to come" to the hospital "because of that Leapfrog score that we see." *Supra* ¶ 412. Havericak personally spoke with three patients who cancelled their joint-replacement surgeries because they were worried about Delray's quality after seeing its failing Safety Grade, one of whom refused to come to Delray even after Havericak explained to him that the Leapfrog Safety Grade was not an accurate representation of the hospital's quality. *Supra* ¶ 417–19. Other community members have also expressed apprehension, with one saying, "You have our, one of our only trauma centers in the community, and it makes me nervous to have to go there with that Leapfrog score." *Supra* ¶ 421. Delray also experienced "a significant dip in admissions in the month of august" as a result of the "viral" TikTok video that "certainly targeted" the Palm Beach Health Network. *Supra* ¶ 414.

73. Sheri Montgomery, CEO of Good Samaritan, noted similar effects on her hospital. "Many" people complained to her about the failing Safety Grade, including the "governing board, physicians," and "people in the community." *Supra* ¶ 431. She expressed that there was a noticeable difference between the public response to the Leapfrog Safety Grade, a "failing red F"—a particularly evocative signal—and other hospital ratings, such as the CMS star ratings. *Supra* ¶ 426. Good Samaritan went down 5 percent in admissions and observation cases, and 2 percent in emergency room visits, as compared to the preceding year. *Id.*

74. Montgomery testified to three specific examples of patients who did not want to be treated at Good Samaritan and cancelled their surgeries, citing the Leapfrog Safety Grades. *Supra* ¶ 429–430. A Good Samaritan board member called the Safety Grade "scary and unacceptable" and another board member stated that "it's hard to recruit" new board members because of the "F" Safety Grade. *Supra* ¶ 431; *see also* PX-359.0 (Good Samaritan board member forwarding a news article titled "Tenet Gets an F" to Montgomery and noting that "it's hard to recruit right now when this story appeared this morning"). Montgomery also testified that "the Leapfrog rating has prompted [] physicians to get on staff at [competitor] Jupiter Medical Center because their patients

are complaining to them that we are an F." *Supra* ¶ 427. Indeed, three or four of the hospital's top orthopedic surgeons have obtained privileges at Jupiter Medical Center, *supra* ¶ 427, and one surgeon "had to reschedule a surgery and go to Jupiter Medical because a patient refused" to go to Good Samaritan because of the "F" Safety Grade, *supra* ¶ 428.

75. Montgomery also testified that she received a letter just last month, which included a print-out of a newspaper clipping of a Jupiter op-ed advertising its Leapfrog "A" Safety Grade and stating that "'Sam Needs to Learn from … Jupiter Medical" and calling her staff "Despicable." *See supra* ¶ 433. This disturbing communication evidences that consumers are aware of the Leapfrog Safety Grades, believe they reflect hospitals' actual safety, and have a negative impression of Good Samaritan due to its Safety Grade. The letter demonstrates the current harm that Leapfrog has inflicted on the Community Hospitals, as the Safety Grades have caused consumers in the area to believe that hospitals with lower Leapfrog Safety Grades, like the Community Hospitals, are inferior to Jupiter Medical Center. The Court finds this specific evidence of harm to the Hospitals' good will to constitute evidence of aggrievement. *Accord* ECF 41 at 8.

76. Erik Cazares, CEO of Palm Beach Gardens Medical Center, likewise testified that "[a]s soon as the F came out, we started getting complaints and concerns from" physicians, patients, community members, and board members, "which didn't exist" before. *Supra* ¶ 436. Cazares personally spoke to one cardiac patient who did not want to come to Palm Beach Gardens and cited Leapfrog as "the main reason" *Supra* ¶ 437. Two members of the hospital's governing board, including one physician, also complained to Cazares that the hospital "received an F on patient safety," a "low rating" because the hospital "did not participate in Leapfrog['s Survey] at that time." *Supra* ¶ 374. The complaints escalated after the viral TikTok video, triggering complaints to affiliated physicians, to Cazares himself, and via Google reviews, *supra* ¶ 440, together averaging roughly 4 to 5 complaints per week, *supra* ¶ 440.

77. Cynthia McCauley, CEO of St. Mary's Medical Center, recounted similar adverse effects on her hospital. There has been a decline in outpatient pediatrician physical therapy, in elective outpatient surgeries, and in patient volume in the emergency department. *Supra* ¶ 442. McCauley "attribute[d]" these declines "to the Leapfrog grade" and noted the case of one recent patient who was "nervous that his wife was brought to St. Mary's because of what he has heard." *Supra* ¶ 443. She explained that the poor reputation that has "been developed because of the

Leapfrog grade has resulted in patients not selecting St. Mary's." *Supra* ¶ 443.

78. Finally, Jerad Hanlon, CEO of West Boca Medical Center, affirmed that his hospital has been plagued by the same issues based on its poor Leapfrog Safety Grade. ER visits are down approximately 17 percent between 2024 and 2025. Hanlon Tr. 35:12–17. And numerous patients have voiced concerns, including one who left against medical advice to go to another facility and said that her decision to do so "was because [of] the Leapfrog rating that she had seen." *Supra* ¶ 451. Patients also talked to their physicians about the Safety Grade, and several board members talked to Hanlon about concerns they themselves had about the Safety Grade based in part on conversations with patients. *Supra* ¶ 455. Physicians additionally saw the TikTok video referencing the "F" Safety Grade, and asked Hanlon if it was true. *Supra* ¶ 456. The Leapfrog Safety Grade "tarnished" the hospital's reputation, and Hanlon explained that it has required substantial money and resources to accurately explain the situation to the board members, medical staff, and the community. *Supra* ¶¶ 449, 455.

79. The testimony by each Community Hospital CEO thus shows that each Community Hospital suffered identifiable reputational and operational harms, making them aggrieved by Leapfrog's actions. *Wyndham Vacation Resorts, Inc.*, 123 So. 3d at 1151.

80. *Second*, Delray and West Boca also have shown aggrievement because two hospitals received letters from an insurer expressing concern over the Safety Grades. The insurer, Humana, was deceived into believing that the Community Hospitals are unsafe, prompting it to send concerned letters. *Supra* ¶¶ 422, 454. The letter from Humana to Delray, for example, implored the hospital to address "performance on safety measures." PX-465.0. A similar letter was sent to West Boca. PX-464.0. The Humana letters show that the hospitals were aggrieved, as this "specific" reputational harm was caused by the issuance of the Leapfrog Safety Grades. *Ahearn*, 180 So. 3d at 173.

81. *Third*, Leapfrog's own witnesses admit that failing Safety Grades damage a hospital's reputation and market position. Leapfrog's CEO conceded that an "F" Safety Grade "could negatively impact" a hospital's reputation. *Supra* ¶ 383. Ms. Danforth, Leapfrog's senior vice president for healthcare ratings, agreed that an "F" Safety Grade can "damage a hospital's reputation" and make it "more difficult … to repair." *Id.* Leapfrog's Director of Licensing Programs, Kushagra Banerjee, confirmed that publicity surrounding "D or F" Safety Grades "lessens or hurts [hospitals'] competitive edge," and stated the Safety Grades were designed to

"help make hospitals accountable." *Id.* Dr. Romano, a member of Leapfrog's Expert Panel, testified that a failing Safety Grade "could … harm the hospital's reputation" and lead to "canceled appointments." *Id.* And Dr. Austin, a Leapfrog science advisor, admitted that physicians "would not want to work at an 'F' hospital." *Id.* These admissions—from Leapfrog's own leadership and expert advisors—further support the Court's conclusion that the Leapfrog Safety Grades injured the Community Hospitals. Indeed, as Leapfrog internally admitted, one of its *goals* was to "hurt Tenet" through further proliferation of the Safety Grades. *Supra* ¶ 394.

82. Leapfrog argues that the Community Hospitals are not aggrieved for multiple reasons: the evidence of aggrievement is hearsay; the Community Hospitals' overall revenue increased; and other factors contributed to the Community Hospitals' negative reputations. The Court is not persuaded by any of these arguments.

83. *First*, the Community Hospitals' proffered evidence of aggrievement is not hearsay. "An out-of-court statement is not hearsay, and may be admitted into evidence, if it is offered for some purpose other than to prove the truth of the matter asserted." *United States v. Cochran*, 682 F. App'x 828, 835 (11th Cir. 2017) (citing Fed. R. Evid. 801(c)(2)). As the Eleventh Circuit has recognized, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." *United States v. Mateos*, 623 F.3d 1350, 1364 (11th Cir. 2010) (quoting Fed. R. Evid. 801(c), Advisory Committee's Note). The letters from Humana and an email from a Good Samaritan board member expressing concerns about the Leapfrog Safety Grades, *supra* ¶¶ 422, 431, 454, are being offered not for the truth of what was asserted in those exchanges but rather to show that the Safety Grades caused people in the community to have concerns about the quality of the Community Hospitals. The significance of those letters "lies solely in the fact that [they] w[ere]" written, Fed. R. Evid. 801(c), Advisory Committee's Note, and not that what they assert is true. So too with the TikTok video noting the precise Safety Grades certain Community Hospitals were assigned, *supra* ¶ 404, which clearly is not being used to show that the Community Hospitals in fact are the "worst" or need to improve. So too with patient complaints reported directly to the Community Hospitals' CEOs (and to those CEOs via physicians). *See supra* ¶¶ 412, 420, 427, 431, 438, 443. This evidence instead shows confusion and reputational harm, as well as the actions the Community Hospitals were forced to take in response to such complaints. Accordingly, the patient complaints are offered to show the "effect on the listener"—*i.e.*, how those statements "affected the course

of" the actions of personnel at the Community Hospitals. *United States v. Starr*, 159 F.4th 901, 909 (11th Cir. 2025). And a statement used for that purpose "isn't hearsay." *Id.* Jupiter Hospital's efforts to market itself as the only "A"-graded hospital in the area, directly touting its positive Safety Grade in comparison to the failing Safety Grades received by the Community Hospitals, also does not go to the truth of the matter asserted. *Supra* ¶¶ 432–33. The Court thus concludes that these pieces of evidence are admissible non-hearsay and that they all show evidence of aggrievement.

84. *Second*, Leapfrog's claim that the Community Hospitals were not harmed because certain overall metrics remained positive is legally irrelevant. That a plaintiff may have "generated a net profit … does not demonstrate that [it] suffered no harm." *Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, 2024 WL 5703196, at *11 (M.D. Fla. Aug. 14, 2024); *accord Pals Grp. v. Quiskeya Trading Corp.*, 2017 WL 5598721, at *4 (S.D. Fla. Nov. 20, 2017). Merely because revenue increased does not mean that the Community Hospitals were not harmed; revenue may have increased by even more if the failing Leapfrog Safety Grades had not misled consumers. *See supra* CoL ¶ 18. And the evidence shows that is likely the case: The Community Hospital CEOs testified to declines in certain categories of services, *see supra* ¶¶ 415, 426, 445, 450, indicating that revenue would have been higher without the Leapfrog Safety Grades causing those decreases.

85. *Third*, whether an independent organization (such as CMS with its star ratings) "also contributed" to these injuries "is beside the point," since "proximate cause" does not require showing that Leapfrog was the "*sole* cause" of the Community Hospitals' injuries. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994) (emphasis added). The "aggrieved" standard applicable to FDUTPA claims for injunctive and declaratory relief affords [such] relief for a larger class of plaintiffs than those who seek actual damages, and it encompasses anyone whose "rights have been, are being, or will be adversely affected." *Bluegreen Vacations Unlimited, Inc. v. Timeshare Termination Team, LLC*, 2023 WL 4105529, at *8 (S.D. Fla. June 21, 2023). The statements of the hospital CEOs, which show the temporal proximity between the issuance of the Safety Grades and the resulting harms, make it clear that the Safety Grades "adversely affected" the Community Hospitals, regardless of their other ratings. *Id.* That is sufficient—the Community Hospitals do not have to show that Leapfrog's actions were the *sole* cause of their harm, nor do they have to specify a specific quantum of harm attributable to Leapfrog.

86. As a result of the foregoing evidence, the Court concludes that the Community Hospitals are aggrieved by Leapfrog's actions. The testimony of the Community Hospitals' CEOs, the existence of the Humana insurance letters, and the admissions of Leapfrog's own witnesses show that the issuance of the failing Safety Grades caused identifiable reputational and operational harm to the Community Hospitals. And the temporal proximity of these harms to the promulgation of the Safety Grades reinforces that Leapfrog's actions were a proximate cause of the harm.

**G. The Community Hospitals Need Not Prove That Individual Consumers Actually Relied on, or Were Injured by, Leapfrog's Conduct**

87. The Court concludes that, under FDUTPA, the Community Hospitals need not identify specific individual consumers that actually relied on or were injured by Leapfrog's conduct. Rather, to obtain prospective injunctive and declaratory relief, the Community Hospitals must show that Leapfrog's conduct is *likely* to injure consumers. This conclusion follows from well-established precedent, as well as FDUTPA's text and purposes.

88. As courts have recognized, FDUTPA does not require a showing that individual consumers "actually relied" on an "illegal misrepresentation." *Carriulo v. Gen. Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016); *accord Turner Greenberg Assocs., Inc. v. Pathman*, 885 So. 2d 1004, 1009 (Fla. 4th DCA 2004) ("[A] demonstration of reliance by an individual consumer is not necessary in the context of FDUTPA."). Instead, courts ask whether "there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc.*, 842 So. 2d at 777 (quotation marks altered). "A likelihood of consumer confusion is a sufficient basis for injunctive relief under FDUTPA." *Ghostbed, Inc. v. Casper Sleep, Inc.*, 2016 WL 4145909, at *3 (S.D. Fla. July 19, 2016).

89. That accords with the FTC Act, which FDUTPA tracks, and FDUTPA's text, which authorizes courts to enjoin practices "*likely* to violate" the law—not just already-consummated violations. Fla. Stat. § 501.211(1) (emphasis added). The text of FDUTPA expressly notes that, "in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act." *Id.* § 501.204(2); *see also id.* § 501.203(3)(b) (noting that a violation of FDUTPA may be based on "[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission"). And FTC caselaw explains that plaintiffs do not need to prove actual consumer harm to establish their claims. *See FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1282 (S.D. Fla. 2019) ("[T]he FTC need only show that the representation

had 'a tendency to deceive,' as 'proof of actual consumer deception is unnecessary.'") (quoting *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1274 (M.D. Fla. 2016)); *FTC v. Vylah Tec LLC*, 2018 WL 3656474, at *7 (M.D. Fla. Aug. 2, 2018) ("[I]t is not necessary for the FTC to show actual reliance by each individual consumer.").

90. The Florida Supreme Court, the "true and final arbiter" of Florida law, *In re Cassell*, 688 F.3d 1291, 1292 (11th Cir. 2012), confirms this view. In *PNR, Inc.*, 842 So. 2d at 777, the Florida Supreme Court expressly endorsed the legal standard set out in *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*, 761 So. 2d 1256 (Fla. 3d DCA 2000). *Millennium Communications*, in turn, made clear that FDUTPA's standard is the "Federal Trade Commission standard for deceptive advertising," which merely requires "probable, not possible, deception," and "deceptions that are *likely* to cause injury to a reasonable relying consumer." *Id.* at 1263 (emphasis added).

91. The Court rejects Leapfrog's counterarguments.

92. *First*, Leapfrog contends that the "likely to violate" language in FDUTPA's text is a standard for proving *aggrievement* to the plaintiff, and thus does not speak to the purported independent requirement of identifying specific, actually injured consumers. Leapfrog's argument rests on a misreading of FDUTPA's text. The relevant portion of the statute says that *if* a prospective plaintiff is aggrieved, that plaintiff may bring a claim to enjoin a person who is "*likely* to violate" the statute. Fla. Stat. § 501.211(1) (emphasis added). In other words, the "likely to violate" standard is not a method for proving aggrievement; it presupposes that the plaintiff has established aggrievement and then explains the range of the defendant's conduct—past, present, and future—the court may enjoin. The ability to enjoin future conduct necessarily demonstrates that a plaintiff need not specifically identify *past* injuries inflicted upon consumers. Moreover, FDUTPA's "likely to violate" language would be meaningless if plaintiffs were required to show that individual consumers already had actually relied on, and been injured by, a deceptive representation; the violation by then would be consummated, not merely "likely." Leapfrog's contrary reading does not make practical sense and would neuter FDUTPA's "remedial" scheme designed "to protect consumers." *Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA 2005). Indeed, Leapfrog's reading would prevent courts from enjoining new misrepresentations, no matter how harmful, until an individual consumer actually suffered an injury. The Florida Legislature did not draft the statute to contain such a loophole.

93. *Second*, Leapfrog argues that the FTC's "likely to injure" standard goes to whether the conduct is deceptive, rather than to the requirements for showing consumer harm. But this reading cannot be squared with the FTC case law, which consistently says that "proof of actual consumer deception is unnecessary." *Pointbreak Media, LLC*, 376 F. Supp. 3d at 1282. The "likely to injure" standard under well-established FTC caselaw would be surplusage if, to obtain an injunction, the plaintiff then had to demonstrate that specific consumers in fact were injured.

94. *Third*, Leapfrog's proffered cases are unpersuasive. The principal case Leapfrog relies on is *Novo Nordisk, Inc. v. Brooksville Pharmaceuticals, Inc.*, 785 F. Supp. 3d 1123 (M.D. Fla. 2025), but that decision is unavailing. The decision's FDUTPA analysis is vacated "dicta," *Novo Nordisk, Inc. v. Brooksville Pharms., Inc.*, 2025 WL 2306505, at *2, *4 (M.D. Fla. June 30, 2025), and the Eleventh Circuit has explained that vacated decisions "are officially gone" and "have no legal effect whatever," *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002). Regardless, the Court finds *Novo Nordisk* inapposite. There, Novo Nordisk (the maker of a brand-name drug) sued Brooksville (the maker of a generic version) on the theory that the generic was impure—even though sales of the generic were FDA-authorized and the purported "impurities" in the generic were "within Novo Nordisk's own drug product specifications." *Novo Nordisk, Inc.*, 785 F. Supp. 3d at 1129, 1131. Novo Nordisk's claim thus hinged entirely on the "hypothetical possibility of some future injury to Florida consumers based on [the] impurities," *id.* at 1146—not a practice inflicting deception upon consumers in the here-and-now. The fact pattern in *Novo Nordisk* is thus different from Leapfrog's *ongoing* deception of consumers.

95. Leapfrog's other cases are similarly not supportive of its position. *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 861 (11th Cir. 2023), for example, states that liability turns on whether there were "deceptive or unfair actions in the conduct of trade or commerce that injured *or were likely to injure* consumers." *Id.* (emphasis added). That accords with the Eleventh Circuit's recognition that FDUTPA liability does "not" hinge on whether consumers "actually relied on the illegal misrepresentation." *Carriuolo*, 823 F.3d at 986. Next, *Caribbean Cruise Line, Inc. v. Better Business Bureau*, 169 So. 3d 164 (Fla. 4th DCA 2015), says plaintiffs must show "an injury or detriment to consumers," but does not purport to require individualized reliance or harm (beyond the deception itself). *Id.* at 169. Indeed, *Caribbean Cruise Line* cited *PNR* for the controlling standard, *id.*, and the test *PNR* adopted asks whether deception is likely to cause injury to consumers, *PNR, Inc.*, 842 So. 2d at 777 (citing *Millennium Commc'ns & Fulfillment, Inc.*, 761

So. 2d at 1263). And *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207 (Fla. 4th DCA 2019), did not (and had no reason to) examine whether individualized actual reliance and harm are required because it simply found "no evidence" of "any misrepresentations." *Id.* at 214. None of Leapfrog's cases say that only actual, already-consummated injuries to individual consumers suffice.

96. Similarly inapposite is *Harrod v. Express Scripts, Inc.*, 2019 WL 8273650 (M.D. Fla. Aug. 16, 2019), which said that proof of loss was required in a case for *damages*, *id.* at *5, but the Community Hospitals do not seek damages here, *see* ECF 74. *CMR Construction & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, at *5 (11th Cir. July 29, 2022), and *State Farm Mutual Automobile Insurance Company v. At Home Auto Glass LLC*, 2024 WL 4349246, at *5 (M.D. Fla. Sept. 30, 2024), also do not purport to hold that individualized evidence of *past* reliance and harm (as opposed to likely future injury) is required for injunctive relief. The claims in those cases failed because the plaintiffs alleged only that *they* (a roofing company and an insurer, respectively) were "consumers," but failed to show that they in fact consumed roofing and insurance services.

97. The Court thus concludes that the Community Hospitals need only show a likelihood of consumer harm and need not identify actual consumers who were harmed by Leapfrog's conduct.

**H. In Any Event, the Community Hospitals Established Consumer Harm**

98. Leapfrog's consumer harm argument also fails on its own terms, as the Court concludes that the Community Hospitals have established consumer harm.

99. FDUTPA protects "consumers," a term that broadly includes any "individual," "business," "corporation," "or any other group or combination," Fla. Stat. § 501.203(7), at least when those entities are not themselves the "provider" of the challenged service (here, the Safety Grades), *CMR Construction & Roofing, LLC*, 2022 WL 3012298, at *5. Under this standard, the Community Hospitals have established harm to multiple categories of consumers.

100. *First*, patients were deceived into switching hospitals or declining procedures based on Leapfrog's Safety Grades. For example, one cardiac patient refused treatment at Palm Beach Gardens (despite its leading cardiac care) based on the Safety Grades. *See supra* ¶ 437. In another instance, a patient with an open fracture declined care against medical advice at West Boca and left with his bone exposed to the air for treatment at another facility based on the Safety Grades. *See supra* ¶ 452. Aside from these dramatic instances of consumer harm, the Community

Hospitals' CEOs consistently and more broadly testified to declining admissions in several categories of care shortly after Leapfrog disseminated the Safety Grades throughout Florida. *See supra* ¶¶ 414, 415, 426. That "temporal" proximity itself is "'powerful evidence'" of causation. *In re Stand 'N Seal*, 623 F. Supp. 2d, 1355, 1374 (N.D. Ga. 2009). Leapfrog itself tells patients that they should "always" consider the Safety Grades when deciding where to get medical care, and its promotional materials tout a story of a patient who drove 400 miles to reach an "A" hospital after seeing that "the hospitals closest to him did not perform well" on Leapfrog's Safety Grades. *Supra* ¶ 52. The Community Hospitals also put on evidence that "patients" were "complaining" about the Hospitals' low Safety Grades. *Supra* ¶¶ 427, 431, 440. Those patient complaints are not offered for "the truth of the matter asserted," Fed. R. Evid. 801(c)(2) (*i.e.*, that the Community Hospitals in fact are unsafe), but instead show that Leapfrog deceived consumers into believing the Community Hospitals are unsafe. Thus, those patient complaints "are not hearsay." *Lincare Holdings Inc. v. Doxo, Inc.*, 2024 WL 865881, at *2 (M.D. Fla. Feb. 29, 2024) (collecting cases).

101. And Leapfrog's assertion that the Community Hospitals must also show that those patients suffered "adverse health outcomes" at competitor institutions is false. ECF 99 at 9. FDUTPA does not require evidence of adverse medical outcomes at competitors; deception of the public is itself the harm under FDUTPA. Deceiving consumers into using a service violates FDUTPA even when consumers ultimately "were happy with" the service. *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 702 (Fla. 3d DCA 2000). Indeed, Leapfrog's own caselaw citations prove the point. In its briefs, Leapfrog argued that "'[c]onsumer harm' for purposes of a FDUTPA claim parallels consumer harm under the Sherman Act, which requires 'specific damage done to consumers in the market.'" ECF 99 (citing *State Farm Mut. Auto Ins. Co. v. At Home Auto Glass LLC*, 2024 WL 4349246, at *12–13 (M.D. Fla. Sept. 30, 2024)); *accord* ECF 102 at 6. But "specific damage" is inflicted on consumers under the Sherman Act whenever a defendant distorts the market with deceptive representations—*regardless* whether consumers also suffered some ensuing, independent injury such as paying higher prices. The Supreme Court recognized this key point in *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 461–62 (1986), writing, "A concerted and effective effort to withhold (or make more costly) information desired by consumers for the purpose of determining whether a particular purchase is cost justified is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices or, as here, the purchase of higher

priced services, than would occur in its absence." So too with Leapfrog: the company's distortion of patient choice with its deceptive Safety Grades alone suffices for a FDUTPA violation, regardless of whether that distortion later resulted in higher prices or physical injuries to patients.

102. *Second*, physicians were also harmed, as they chose to sign up with competitors after the Safety Grades were released. *Supra* ¶ 427. For example, the fact that physicians felt the need to get on staff at Jupiter Medical Center due to patient complaints about the Community Hospitals' Safety Grades is a non-speculative, identifiable injury.

103. *Third*, prominent insurer Humana was deceived into believing the Community Hospitals are unsafe, and thus sent letters to two of the Community Hospitals imploring them to address their "performance on safety measures." *Supra* ¶¶ 422, 454. Those letters likewise are not offered for the truth of the statements therein (that Delray and West Boca in fact need to address purportedly failing safety performance), but to show that Leapfrog deceived Humana into believing the Community Hospitals are unsafe. Humana relied on the misrepresentations in the Safety Grades in sending the letters, evidencing direct and concrete harm.

104. *Fourth*, employers are also consumers of the Leapfrog Safety Grades and the Community Hospitals have established that employers are harmed by the Safety Grades. And Leapfrog admits as much as well. Employers purchase healthcare on behalf of consumers, and Dr. Romano explained that Leapfrog expects employers to consider the Leapfrog Safety Grades when making purchasing decisions. *Supra* ¶ 392. And Dr. van Caulil testified that Regional Leaders distribute the Safety Grades to local employers and aim to steer them towards contracting with higher graded hospitals. *Id.* The fact that employers are deceived into making decisions based on inaccurate Safety Grades is evidence of specific, concrete harm.

105. *Finally*, the Community Hospitals are themselves injured consumers of Leapfrog's Safety Grades. They are a "business" or "group" who are not the provider of the Safety Grades. Fla. Stat. § 501.203(7). Indeed, Leapfrog itself argues that hospitals likewise consume its products, asserting that hospitals, including the Community Hospitals, use its Survey. That the Community Hospitals were not themselves deceived about their own quality of care is irrelevant, since "subjective reliance" is not required under FDUTPA. *Webber v. Esquire Deposition Servs., LLC*, 439 F. App'x 849, 851 (11th Cir. 2011) (per curiam). The Community Hospitals' CEOs have had to spend the equivalent of multiple full weeks of work explaining the deceptiveness of the Leapfrog Safety Grades and working to rehabilitate the Hospitals' reputations in the community. The

Community Hospitals were undoubtedly harmed by the issuance of the Safety Grades, regardless of whether or not they were deceived.

106. The Community Hospitals have established by a preponderance of the evidence that Leapfrog's Safety Grades cause harm to patients, physicians, third parties, and the Community Hospitals themselves. The Court thus concludes that they have satisfied any consumer harm element of FDUTPA.

**I. Evidence Regarding the Community Hospitals' Clinical Performance Is Not Relevant to Leapfrog's Deceptive and Unfair Grading Methodology or the Hospitals' Aggrievement**

107. At trial, Leapfrog attempted to introduce dozens of documents and elicit testimony from witnesses regarding what it argued was the Community Hospitals' purportedly inadequate quality and safety performance—including internal hospital documents and irrelevant ratings from non-parties such as CMS and the Mayo Clinic. Leapfrog did not factor *any* of these documents or their underlying facts into its Safety Grade methodology—let alone before it assigned the Community Hospitals "D" and "F" Safety Grades. The Court concludes that evidence regarding the Community Hospitals' clinical performance is inadmissible. The Community Hospitals objected to this evidence as irrelevant (Rules 401 and 402) and also contend it would cause undue delay and waste of time (Rule 403). The Court agrees and concludes that evidence regarding the Community Hospitals' clinical performance is inadmissible.

108. Evidence about the Community Hospitals' clinical performance is irrelevant to the Community Hospitals' FDUTPA cause of action and does not pertain to any of Leapfrog's asserted affirmative defenses. Even assuming for sake of argument that the Community Hospitals perform poorly on patient safety (and the Court does not find they do), any poor performance would not bear on their FDUTPA claim for injunctive and declaratory relief.

109. As described above, the Court concludes that Leapfrog's conduct is both deceptive and unfair; the Community Hospitals accordingly satisfy FDUTPA's first element. Leapfrog misleads consumers into believing that its Safety Grades are the result of a data-driven methodology and are not affected by a hospital's decision to participate in its Survey, when the opposite is true. This misinformation harms, for example, patients seeking to make informed and intelligent healthcare decisions, doctors and nurses choosing where to work, and insurance companies and employers deciding with whom to contract. Leapfrog's misstatements and false insinuations about its Safety Grades and its underlying methodology affect those determinations

and improperly skew consumer choices. Thus, Leapfrog's deceptive and unfair conduct makes it liable under FDUTPA regardless of the actual performance of the Community Hospitals.

110. As described above, the Court finds that each of the Community Hospitals are aggrieved by Leapfrog's deceptive and unfair conduct, satisfying the second applicable FDUTPA element here. Leapfrog's conduct has injured the reputations of the Community Hospitals, and evidence pertaining to their clinical performance cannot negate their resulting aggrievement. In response, Leapfrog appears to rely on the following reasoning: The Community Hospitals allegedly perform poorly on safety and therefore cannot suffer any additional reputational harm attributable to Leapfrog's deception. That reasoning fails for at least two independent reasons.

111. *First*, even assuming for sake of argument that the Community Hospitals perform poorly on safety (and the Court does not find that they do), it does not follow that the Community Hospitals are not aggrieved by Leapfrog's deception. Nothing in FDUTPA requires a plaintiff to prove that a defendant's deception was the *sole* cause of its aggrievement. *See* Fla. Stat. § 501.211(1) (authorizing declaratory and injunctive relief for "anyone aggrieved by a violation of this part"). The causation standard for tort-like injuries is generally proximate causation, and under that standard, "[i]f the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that [it] will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present." *Cox*, 17 F.3d at 1399 (quoting W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 41, at 268 (5th ed. 1984)); *see also Engelbrecht v. JP Morgan Chase Bank, N.A.*, 2012 WL 10423236, at *3 (C.D. Cal. Feb. 23, 2012) ("Plaintiff 'need not … show that the action sought to be enjoined is the exclusive cause of the injury' in order to obtain injunctive relief.") (quoting *M.R. v. Dreyfus*, 663 F.3d 1100, 1110 (9th Cir. 2011)). Thus, even if the Community Hospitals' reputations were attributable in part to their own performance or other ratings from non-party entities, that could not immunize Leapfrog for the harm *its own* deceptive conduct generated.

112. *Second*, Leapfrog's reasoning is contradicted by the evidence. The Community Hospitals have marshalled extensive evidence showing that Leapfrog inflicted genuine and substantial reputational and competitive injuries on the Community Hospitals. *See supra* Pt. VIII. In particular, the CEOs of all the Community Hospitals have offered unrebutted testimony that their failing Safety Grades cause patients to cancel procedures, drive physicians away, and erode community confidence, thereby damaging their reputation and operations. The evidence includes

specific examples of consumers *citing the Safety Grades* as the basis for their decision-making. Any purported evidence of the Community Hospitals' poor performance could not negate this reputational harm directly attributable to Leapfrog. Leapfrog's evidence is accordingly irrelevant and inadmissible under Rules 401 and 402, and is also inadmissible under Rule 403 because any probative value is far outweighed by the danger of undue delay and waste of time.

**J. Leapfrog's Conduct Occurs in Florida Trade or Commerce**

113. Lastly, the Community Hospitals have proven by a preponderance of the evidence that Leapfrog's conduct occurs in "trade or commerce" in Florida. Fla. Stat. § 501.204(1). Leapfrog does not dispute that it operates in Florida "trade or commerce," *id.* § 501.204(1), and has stipulated to this effect. ECF 129 ¶ 174.

114. That concession is well-supported by the record. Under FDUTPA, "trade or commerce" includes "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service," and encompasses "not-for-profit … activity." Fla. Stat. § 501.203(8). That definition easily encompasses Leapfrog's efforts to promote its Safety Grades throughout this State.

**III. LEAPFROG'S AFFIRMATIVE DEFENSES FAIL**

115. The Court also rejects Leapfrog's three affirmative defenses: its alleged "good faith conduct," the avoidance-of-consequences doctrine, and anti-SLAPP. *See* ECF at 47–49. "An affirmative defense is an assertion of facts or law by the defendant that, if true, would avoid the action . . ." *Custer Med. Ctr. v. United Auto. Ins. Co.*, 62 So.3d 1086, 1096 (Fla. 2010). As such, "[t]he defendant has the burden of proving an affirmative defense." *Id.* The Court finds that Leapfrog failed to meet its burden of proving any of these defenses, as each fails as a matter of law and fact.

**A. Leapfrog's "Good Faith" Defense Is Meritless**

116. Leapfrog asserts its purported "good faith conduct" as an affirmative defense barring the Community Hospitals' claims. PX-005.0 at 48. As support for this defense, Leapfrog claims to have "transparently publishe[d]" its Fall 2024 Safety Grade methodology after that methodology was "approved by [Leapfrog's] expert safety grade panel." *Id.* at 48–49. Leapfrog also allegedly took steps to ensure that "consumers comprehen[d]" its "consumer facing website." *Id.* at 49. The Court concludes that this affirmative defense fails because Leapfrog forfeited it, because "good faith" is no defense under FDUTPA and, in any event, Leapfrog has failed to prove

that it acted in good faith.

117. As an initial matter, Leapfrog abandoned its good-faith defense at the summary judgment stage. After the Community Hospitals moved for summary judgment on, *inter alia*, Leapfrog's good-faith defense, *see* ECF 86 at 19, Leapfrog failed to respond to that argument, *see generally* ECF 99. Therefore, Leapfrog forfeited the defense. *See Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) ("[A] ground not pressed in the district court in opposition to a motion for summary judgment is to be treated by the district court as abandoned.").

118. As explained above, to obtain injunctive or declaratory relief under FDUTPA, the Community Hospitals must show that (1) Leapfrog engaged in a deceptive or unfair act or practice, and (2) they are "'aggrieved' by the deceptive" or unfair "act or practice." *SMS Audio, LLC*, 2017 WL 1533941, at *4 n.6 (citing *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 166–67 (Fla. 4th DCA 2015)). FDUTPA contains "*objective* elements" and thus does not impose an intent requirement. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985–86 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008)). Because "the Florida Legislature . . . knows how to provide a good faith defense when it wants to," *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1233 (S.D. Fla. 2021), and did not in FDUTPA, a defendant cannot defeat a FDUTPA claim "by showing that he acted in good faith," *FTC v. USA Fin., LLC*, 415 F. App'x 970, 974 n.2 (11th Cir. 2011) (FTC Act); *see also In re Schurtenberger*, 2014 WL 92828, at *5 (Bankr. S.D. Fla. Jan. 9, 2014) (same holding directly under FDUTPA). Accordingly, Leapfrog's "good-faith" defense fails as a matter of law.

119. Moreover, even if "good faith" were a valid defense to a FDUTPA claim, the Court would find the defense unsatisfied under the facts here. Again, Leapfrog asserts that it acted in good faith because it "consult[ed] with . . . a[n] . . . expert panel" on the Fall 2024 Safety Grade methodology. PX-005.0 at 48. But Leapfrog never actually presented the methodology it ultimately adopted to its Expert Panel, as Dr. Romano and Dr. Austin both admit. *Supra* ¶¶ 328, 329. More broadly, Leapfrog's witnesses admitted that Leapfrog's punitive scores were "arbitrar[y]" and "random," that Leapfrog had "no data" to know how nonparticipants "would perform" on the Four Measures, and that Leapfrog shifted to its new methodology as a "simple business decision" and a "major incentive" to boost Survey participation, since Leapfrog's "data are not valuable if participation is low." *Supra* ¶¶ 181, 183, 201–02, 305. Leapfrog's lack of good

faith was compounded when it, on the eve of trial, surreptitiously deleted the footnote disclosure that (inadequate as it was) formed the core of Leapfrog's defense, and only restored the footnote *after* the Community Hospitals inquired about its absence. *See supra* ¶¶ 45–49.

120. These facts defeat any notion that Leapfrog acted in good faith when it issued the Community Hospitals' Safety Grades pursuant to its Fall 2024 Safety Grade methodology. If anything, the record indicates that Leapfrog intentionally deceives consumers regarding the accuracy of, and the punitive motivations underlying, its Safety Grade methodology. *See supra* ¶¶ 45–49, 349. Thus, its actions did not evidence good faith.

**B. Leapfrog's "Avoidance of Consequences" Argument Is Irrelevant to Injunctive and Declaratory Relief**

121. In its second affirmative defense, Leapfrog contends that the "doctrine of avoidable consequences" defeats the Community Hospitals' claims. PX-005.0 at 48. Specifically, Leapfrog alleges that the Community Hospitals' failing Safety Grades reflect their "own misconduct" and that the Community Hospitals have therefore "failed to mitigate [their] damages." *Id.* The Court determines that Leapfrog's reliance on the "avoidable-consequences" doctrine is misplaced. And, in any event, the defense fails on its own terms.

122. Under Florida law, the "avoidable consequences" doctrine is synonymous with the principle of "mitigation of damages." *Rubinstein v. Yehuda*, 38 F.4th 982, 1000 (11th Cir. 2022) (citing *Parker v. Montgomery*, 529 So. 2d 1145, 1147 (Fla. 1st DCA 1988)). The avoidable-consequences doctrine thus prevents recovery of "damages" that an injured party "could have reasonably avoided." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009) (emphasis and citation omitted). In cases alleging damages, the defendant bears the "burden to prove" that the plaintiff failed to use "reasonable diligence to mitigate damages" and that the plaintiff's own conduct "increased the plaintiff's harm." 25 C.J.S. Damages § 172.

123. As "a rule of damages," the doctrine is irrelevant to a "defendant's liability" and merely limits the amount of damages an injured party may recover. *Farley v. Magnum Marine Corp., N.V.*, 1995 WL 795711, at *4 (S.D. Fla. June 9, 1995). Accordingly, "for failure to mitigate to be a viable defense, the complaint must allege some form of damages." *Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, 2014 WL 3950897, at *6 (S.D.N.Y. Aug. 13, 2014). This defense is thus "inapplicable" where the plaintiff is "not seeking damages." *Armstrong v. U.S. Bank Nat'l Ass'n*, 729 F. Supp. 3d 1291, 1307 (M.D. Fla. 2024).

124. The avoidable-consequences doctrine "does not apply" here because the

Community Hospitals "are not seeking to recover money damages." *Armstrong*, 729 F. Supp. 3d at 1308. Rather, the Community Hospitals seek a permanent injunction and declaratory relief. ECF 74 (Amended Complaint) at ¶¶ 102, 104, 109, 110. Leapfrog's "avoidable-consequences" defense is therefore legally irrelevant. *See Erickson Beamon Ltd.*, 2014 WL 3950897, at *6.

125. Even if this defense did apply, Leapfrog has not met its burden to demonstrate that the Community Hospitals failed to take reasonable steps to reduce their injuries. The undisputed record shows that the Community Hospitals acted reasonably to mitigate reputational harm. Their CEOs publicly explained the falsity of the Safety Grades, highlighted verified safety awards, and devoted significant time and expense to reassuring physicians and the community. *Supra* ¶¶ 1–7, 373–76, 410–456. Those efforts satisfy the low standard of reasonableness required to show mitigation. *See Toucan Partners, LLC v. Hernando Cnty.*, 571 F. App'x 737, 743 (11th Cir. 2014) (plaintiffs must "do no more than is reasonable under the circumstances"). The Community Hospitals were not required to employ "Herculean efforts" to combat the harm caused by Leapfrog's deception. *Sys. Components Corp.*, 14 So. 3d at 982. Finally, FDUTPA forbids coercive or "bullying conduct" to induce participation. *See Marco Island Cable*, 312 F. App'x at 214. Leapfrog cannot convert its own pressure tactics into a defense.

126. The avoidable-consequences doctrine does not apply in this action, in which the Community Hospitals seek only injunctive and declaratory relief, and Leapfrog failed to prove that the Community Hospitals have behaved unreasonably. For these reasons, Leapfrog's "avoidable consequences" defense does not bar entry of judgment in favor of the Community Hospitals.

**C. Leapfrog's Anti-SLAPP Defense Is Procedurally Improper and Meritless**

127. Leapfrog's third affirmative defense—anti-SLAPP—also fails on both the law and the facts. At the outset, this Court notes that it already determined at the motion-to-dismiss stage that this case does not implicate Leapfrog's asserted First Amendment rights, given that Leapfrog has no constitutional right to "mislead consumers" "about its methodology." ECF 41 at 6; *accord Caribbean Cruise Line, Inc.*, 169 So. 3d at 167 (false "representations" about "the methods [a company] employs in conducting its own business" are not protected). None of the evidence or arguments Leapfrog subsequently introduced alters that fundamental conclusion. Thus, because Leapfrog's anti-SLAPP defense in substance is merely a repurposed First Amendment defense, the Court rejects it.

128. As a threshold matter, Leapfrog's anti-SLAPP so-called "affirmative defense" is

procedurally foreclosed. As courts have recognized, anti-SLAPP is "not an affirmative defense" but rather a procedural mechanism to seek early resolution of a claim. *Wyndham Vacation Ownership, Inc. v. Square One Dev. Grp., Inc.*, 2022 WL 21374382, at *4 (M.D. Fla. Feb. 2, 2022) (striking anti-SLAPP "affirmative defense"). Anti-SLAPP therefore was not properly asserted as an "affirmative defense" in Leapfrog's Answer.

129. In any event, the Court concludes that Leapfrog's anti-SLAPP defense is meritless. To prevail on an anti-SLAPP defense, the defendant must establish that the plaintiff's claims are "[1] without merit and [2] primarily because such person or entity has exercised [3] the constitutional right of free speech in connection with a public issue." Fla. Stat. § 768.295(3). Here, Leapfrog failed to establish *any* of these elements at trial.

130. *First*, this suit is not "without merit," Fla. Stat. § 768.295(3), because it is the Community Hospitals that in fact prevail on the merits.

131. *Second*, Leapfrog failed to adduce evidence—much less prove—that the Community Hospitals filed this suit "primarily" to retaliate against Leapfrog's exercise of purported constitutional rights. Fla. Stat. § 768.295(3). To the contrary, the evidence at trial established that the Community Hospitals filed this suit to counter the reputational and operational injuries that Leapfrog's unlawful conduct inflicted. Leapfrog thus failed to demonstrate that the Community Hospitals "primarily" had an impermissible purpose in bringing suit.

132. *Third*, this case does not implicate Leapfrog's asserted "right of free speech." Fla. Stat. § 768.295(3), as the Court noted above.

133. In response, Leapfrog contends that its deceptive and unfair conduct implicates the First Amendment because its misrepresentations purportedly implicate "matters of public concern." ECF 99 at 19. That argument misses the mark. Even if the First Amendment applied here—a proposition this Court already rejected—addressing matters of purported "public concern" does not bar liability but would simply require clear evidence that Leapfrog knew its representations are "false" or that Leapfrog "reckless[ly] disregarded" the risk of falsity. *Hunt v. Liberty Lobby*, 720 F.2d 631, 642 (11th Cir. 1983); *see id.* at 645–46 (publisher "knowingly chose language" open to false interpretation, despite "sufficient time" to confirm assertion's accuracy). Here, the Community Hospitals demonstrated by clear and convincing evidence at trial that Leapfrog's personnel *admittedly* knew that the Fall 2024 Safety Grade methodology is "arbitrar[y], "random," a "penalty" to enhance Survey participation, not peer reviewed, and not based on any

underlying data—readily establishing knowledge of falsity. ECF 87 ¶¶ 34, 38; ECF 116 ¶ 29. Thus, even assuming for the sake of argument that Leapfrog's constitutional rights *are* implicated here, the Court nonetheless finds no constitutional bar to entering relief for the Community Hospitals.

134. The Court also rejects Leapfrog's argument that relief to the Community Hospitals would impose a purported "prior restraint." ECF 99 at 19. There is no constitutional prohibition on restricting future speech already adjudicated to be unlawful. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973); *Lucero v. Trosch*, 121 F.3d 591, 601 (11th Cir. 1997). Thus, prohibiting Leapfrog from continuing to grade the Community Hospitals pursuant to what is now adjudicated to be a deceptive and unfair methodology in violation of FDUTPA imposes no "prior restraint."

## IV. INJUNCTIVE AND DECLARATORY RELIEF ARE APPROPRIATE

### A. All Permanent Injunction Factors Are Satisfied

135. The Community Hospitals are entitled to a permanent injunction.

136. A permanent injunction requires (1) actual success on the merits, (2) irreparable injury, (3) a balance of equities favoring the movant, and (4) consistency with the public interest. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004). Where these elements are established, a court should issue an injunction broad enough to "provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Each element for injunctive relief is satisfied here.

137. *First*, for the reasons explained above, the record shows that Leapfrog engaged in deceptive and unfair acts or practices and that the Community Hospitals are aggrieved by those acts or practices. *See supra* II.A–C. The Community Hospitals have accordingly established actual success on the merits of their FDUTPA claim.

138. *Second*, the Community Hospitals have demonstrated an irreparable injury. An "irreparable" injury is one that "cannot be undone through monetary remedies." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (quoting *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983)). The "loss of customers and goodwill" have long been considered "irreparable." *Id.* Thus, courts applying FDUPTA agree that harm to a plaintiff's "goodwill" caused by "consumer confusion" constitutes an irreparable injury. *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. Dist. Ct. App. 2012); *accord*

*Bluegreen Vacations Unlimited, Inc. v. Timeshare Laws. P.A.*, 2023 WL 4079381, at *2 (S.D. Fla. June 20, 2023) (holding that "a loss of customers" and "consumer confusion generally" demonstrated "irreparable harm" under FDUTPA).

139. The Community Hospitals continue to suffer irreparable harm to reputation and goodwill. Indeed, the Court has already explained that the injuries to the Community Hospitals reputations due to Leapfrog's unfair and deceptive conduct would satisfy FDUTPA. *See* ECF 41 at 7– 8. Moreover, the Community Hospitals' injuries will only continue to compound if the Community Hospitals continue to be subject to Leapfrog's deceptive Safety Grades. As the Community Hospitals' expert, Dr. Berger, persuasively explained, consumers tend to better remember negative information, especially when it is repeated over time. *See supra* ¶ 384. Thus, the Community Hospitals' reputational injuries are not only irreparable, *Ferrero*, 923 F.2d at 1449, but will continue to grow worse over time without prompt judicial relief.

140. *Third*, the equities also favor relief. Leapfrog will suffer no legitimate harm from being ordered to stop grading the Community Hospitals in its Safety Grade and to remove the Community Hospitals' existing Safety Grades from its website and similar materials. A defendant "ha[s] no lawful interest in continuing a scam." *FTC v. E.M. Sys. & Servs., LLC*, 2015 WL 13709807, at *3 (M.D. Fla. June 17, 2015). By contrast, the Community Hospitals "fac[e] a risk of mistake and deception to its customers" should Leapfrog be allowed to continue issuing its false Safety Grades for the Community Hospitals. *Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC*, 2020 WL 6700449, at *6 (S.D. Fla. Oct. 20, 2020). The harm suffered by the Community Hospitals without an injunction therefore easily outweighs the nonexistent harm facing Leapfrog if the Court enters an injunction.

141. *Finally*, the public interest strongly supports an injunction. The Florida Legislature enacted FDUTPA "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Wyndham Vacation Resorts*, 123 So. 3d at 1151 (quoting Fla. Stat. Ann. § 501.202(2)). Leapfrog's fabricated Fall 2024 "imputation" methodology distorts life-and-death medical decisions and undermines public trust in genuine safety data—precisely the type of consumer deception FDUTPA forbids. *See Popular Bank of Fla. v. Banco Popular de P.R.*, 9 F. Supp. 2d 1347, 1364 (S.D. Fla. 1998) (noting the "strong public interest in preventing the deception of consumers"). Issuing the requested injunction will therefore

serve the public interest and address the very harm the Florida Legislature targeted by "prevent[ing] consumer confusion." *Colonial Van Lines*, 2020 WL 6700449, at *6.

142. Accordingly, the Court grants the Community Hospitals' request for a permanent injunction (a) barring Leapfrog from grading the Community Hospitals in its Safety Grades, (b) compelling Leapfrog to remove Safety Grades previously assigned to the Community Hospitals from all of Leapfrog's websites or similar materials within 5 business days of judgment, and (c) compelling Leapfrog to take all reasonable and diligent efforts to ensure that entities licensing its Safety Grades to the Community Hospitals remove such Safety Grades from their materials within 30 days of judgment, with Leapfrog to file a declaration documenting the reasonable and diligent efforts it has undertaken within 45 days of judgment.

143. This remedy is necessary to afford the Community Hospitals "complete relief." *Califano*, 442 U.S. at 702. As Dr. Nicholson showed, Leapfrog's Safety Grade Methodology is biased to its core. The entire methodology is flawed, violates foundational principles of hospital quality ratings, and is designed to effectively blackmail nonparticipating hospitals to devote resources to giving Leapfrog free data against their will to avoid worse ratings. *Supra* ¶ 212. A narrower injunction, such as one merely requiring "additional disclosures," would not remedy the Community Hospitals' ongoing reputational harms because reasonable consumers are unlikely to "scrutinize[e]" or understand such disclosures. *Bohlke*, 2015 WL 249418, at *9. In fact, left to its own devices, Leapfrog has altered its website to include just those types of still-deceptive disclosure. The record is devoid of any evidence that consumers who access the 28-page document disclosing Leapfrog's methodology are able to understand it—and in fact, Leapfrog has conceded multiple times over that document is *not* accessible to consumers, *see supra* ¶ 343. Moreover, the remedy the Court now imposes is consistent with Leapfrog's *own policies and public statements* providing that hospitals missing data for six or more measures should not be graded. *Supra* ¶ 299. Accordingly, the factual record demonstrates that an order requiring Leapfrog to stop grading the Community Hospitals and to remove the Community Hospitals' existing grades is the only appropriate remedy. *Cf. Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1343, 1347 (11th Cir. 2008) (recognizing that an "equitable remedy" that is awarded under the proper legal standards and procedures and is "'base[d] . . . upon findings of fact'" will not be overturned unless those factual findings are "'clearly erroneous'").

144. The Court thus grants judgment for the Community Hospitals on Count I.

**B. A Declaration Is Also Warranted**

145. The Court also concludes that the Community Hospitals are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201.

146. The Declaratory Judgment Act grants federal courts the authority to enter a judgment that declares "the rights and other legal relations of any interested party" in any "case of actual controversy within [the court's] jurisdiction." 28 U.S.C. § 2201(a). A declaratory judgment "is an all-purpose remedy designed to permit an adjudication whenever the court has jurisdiction, there is an actual case or controversy[,] and an adjudication would serve a useful purpose." *Allstate Ins. Co. v. Emp'rs Liab. Assurance Corp.*, 445 F.2d 1278, 1280 (5th Cir. 1971); *see also Liberty Mut. Fire Ins. Co. v. S.-Owners Ins. Co.*, 2019 WL 2103472, at *2 (S.D. Fla. Feb. 8, 2019) (Middlebrooks, J.) ("'all-purpose remedy'"). "[A] declaratory judgment serves to clarify the legal relations" between the parties. *Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC*, 783 F. Supp. 2d 1214, 1216 (S.D. Fla. 2011).

147. The requirements for declaratory relief are satisfied here. For the reasons explained above, an actual controversy exists with respect to the parties' rights and obligations, and this action is within the Court's jurisdiction. *See supra* CoL ¶¶ 4–23. Moreover, declaratory relief would serve a useful purpose because it would clarify the legal relations of the parties under FDUTPA and ensure that the public receives truthful, data-based information going forward. *See supra* CoL ¶¶ 135–36.

148. The Court grants judgment for the Community Hospitals on Count II and now declares that Leapfrog's Safety Grades are deceptive and unfair and therefore violate FDUTPA.

**V. THE COMMUNITY HOSPITALS ARE ENTITLED TO ATTORNEYS' FEES**

149. Finally, the Court concludes that the Community Hospitals are entitled to attorneys' fees and costs as prevailing parties under FDUTPA, in a sum to be determined later.

150. "Once a trial court has determined that a party is a prevailing party under FDUTPA, it then has discretion to award attorney's fees and costs after considering various equitable factors, including (1) the scope and history of the litigation; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing party would deter others from acting in similar circumstances; (4) the merits of the respective positions—including the degree of the opposing party's culpability or bad faith; (5) whether the claim brought was not in subjective bad faith but frivolous, unreasonable, [or] groundless; (6) whether the defense raised a defense

mainly to frustrate or stall; (7) whether the claim brought was to resolve a significant legal question under FDUTPA law." *Chow v. Chak Yam Chau*, 640 F. App'x 834, 838–39 (11th Cir. 2015) (citing *Humane Soc'y of Broward Cnty., Inc. v. Fla. Humane Soc'y*, 951 So. 2d 966, 971–72 (Fla. 4th DCA 2007)). Here, these factors strongly counsel in favor of awarding fees and costs to the Community Hospitals.

151. *First*, the scope and history of this litigation favor awarding fees. When evaluating this factor, courts consider whether the case progressed to later-stage proceedings and involved significant motions practice, whether the FDUTPA claim was an important element of the case, and whether the conduct of the losing party was unreasonable. *See, e.g.*, *Temurian v. Piccolo*, 2021 WL 1121003, at *3, *5 (S.D. Fla. Mar. 24, 2021); *Democratic Republic of Congo v. Air Cap. Grp.*, 2016 WL 11739606, at *5, *report and recommendation adopted*, 2016 WL 11739605 (S.D. Fla. Sept. 29, 2016); *Chow*, 640 F. App'x at 843. Each of these inquiries supports the award of fees. This case featured two complaints, a motion to dismiss, discovery disputes, cross-motions for summary judgment, and evidentiary pretrial motions. FDUTPA formed the core of the action—all occurring at breakneck, expedited speed. But despite the expedited nature of this case, Leapfrog engaged in unreasonable conduct on numerous occasions throughout the discovery process that needlessly increased the work necessary for the Community Hospitals to adequately present the case to this Court and to protect their rights.

152. For example, Leapfrog produced over one million documents to the Community Hospitals admittedly without conducting the responsiveness review the parties had previously agreed to in this case's ESI Protocol, ECF 38 § 16(a). As a result, Leapfrog produced thousands of irrelevant "junk" documents—for example, over 21,000 image documents predominantly of logos and icons; over 1,000 documents with technical issue slipsheets; and several thousands of documents sent from automated or mass emails. Leapfrog also produced over a hundred thousand documents from outside the requested timeframe. This deficient, overbroad production massively increased the Community Hospitals' time and expense, requiring substantial attorney hours to conduct and supervise the responsiveness review Leapfrog failed to undertake.

153. Leapfrog also engaged in unjustified delay with respect to the defensive-discovery substantial-completion deadline. The parties filed a joint discovery plan on June 13 and set a substantial-completion deadline of July 24, with an agreed response time of fourteen days after requests to send documents. Yet despite the expedited nature of this action and fast-approaching

trial date, Leapfrog did not serve its discovery requests until July 11—leaving the Community Hospitals with less than the agreed-upon fourteen-day response time prior to the substantial-completion deadline. Leapfrog's belated discovery requests required the Community Hospitals to begin production preparations *before receiving Leapfrog's requests* in light of the expedited discovery schedule in this case, only to be forced to partially redo that work after receiving Leapfrog's requests, thus increasing costs. Leapfrog also baselessly argued that it could disregard the agreed-upon substantial-completion deadline because the deadline was not Court-ordered, requiring the Community Hospitals to invest yet further attorney hours to marshal arguments in opposition to Leapfrog's frivolous position. ECF 55-28.

154. Leapfrog also wasted the Community Hospitals' time and resources when preparing its privilege log. Although Leapfrog's privilege log was due on August 8 under the Local Rules, Leapfrog did not serve the log until over a month later, on September 19. In response to the Community Hospitals' repeated communications about the delay, Leapfrog claimed that preparing the privilege log was highly time consuming and that any assertion by the Community Hospitals that Leapfrog was over-tagging documents as privileged was made in bad faith. Leapfrog eventually produced a patently deficient privilege log that lacked basic information needed to evaluate privilege claims and was riddled with other errors. For example, as the Community Hospitals contemporaneously pointed out, the privilege log lacked privilege descriptions, improperly asserted privilege over business communications, failed to clearly identify attorneys, contained missing or incomplete metadata, failed to produce entries logged as redacted, and asserted privilege over communications with third parties despite the lack of an agency relationship or any other basis to assert privilege. Indeed, Leapfrog's counsel admitted that the documents were placed on the privilege log because of purported relevance concerns, rather than privilege. After the Community Hospitals pressed Leapfrog to produce an amended privilege log, Leapfrog's second attempt changed numerous privilege calls—"downgrad[ing]" documents "based on content, responsiveness, [and] further privilege review," despite Leapfrog's assertion that its supposedly careful preparation of the privilege log was responsible for the substantial delay in initially producing it.

155. Leapfrog's extreme delay throughout the pre-trial process and refusal to respond to the Community Hospitals' communications also inflated the Community Hospitals' costs by requiring them to preemptively prepare briefs to seek court orders holding Leapfrog to its

discovery obligations (before Leapfrog ultimately backed down, mooting those briefs). For example, the Community Hospitals were forced to prepare ultimately unfiled briefs that would have (1) asked the Court to order Leapfrog to comply with the substantial-completion deadline; (2) sought to compel a bench trial (after Leapfrog baselessly delayed in agreeing to one, even though the Community Hospitals were solely pursuing equitable claims after their Amended Complaint); and (3) moved to compel Leapfrog to correct its deficient interrogatory responses, which improperly claimed to respond through forthcoming documents, even though Rule 33(d) requires the attachment of any document purportedly responsive to the interrogatory request. Preemptively preparing these briefs was reasonable and necessary given the highly expedited discovery schedule in this case.

156. *Second*, Leapfrog would be able to pay an award of attorneys' fees. In 2022, Leapfrog's total revenue was over $7 million. PX-823.0 at 9. In 2024, it was over $8 million. ECF 87 ¶ 2. And between 2019 and 2023, Leapfrog paid over $3 million in salary and benefits to its CEO alone. PX-819.0–823.0. Moreover, the Community Hospitals elected to waive any claim for damages, and thus attorneys' fees and costs are the only forms of monetary payment for which Leapfrog will be liable—meaning there is no need to offset evidence of Leapfrog's ability to pay by other obligations imposed in this action. Accordingly, the Court finds that Leapfrog is able to pay.

157. *Third*, awarding fees and costs would deter similar wrongful conduct by both creating a monetary disincentive to future FDUTPA violations and creating a monetary incentive for bringing future meritorious FDUTPA actions. Here, the Community Hospitals sought and received merely an injunction and declaration, not damages, and thus those remedies standing alone may not sufficiently deter future entities similarly situated to Leapfrog from engaging in FDUTPA violations. Awarding attorneys' fees to the Community Hospitals would send a needed message of deterrence, and it would also encourage other potential plaintiffs to enforce FDUTPA against similarly deceptive and unfair practices.

158. *Fourth*, Leapfrog is highly culpable for the violations here. Leapfrog postures as a neutral broker of credible information about healthcare—which Leapfrog itself recognizes can be a matter of life or death. Despite the gravity of those circumstances, the evidence adduced at trial demonstrated that Leapfrog systematically deceived the public about its Safety Grades and associated methodology; for example, misrepresenting that its Safety Grades were based on real

data rather than arbitrary and coercive metrics, that its operative methodology is peer-reviewed by its Expert Panel, and that patients supposedly are "twice as likely to die" at hospitals receiving D or F Safety Grades, even though Leapfrog has no information to substantiate that assertion. What is more, the evidence shows that Leapfrog was *aware* that these representations were false, since Leapfrog knew it had no data to back them. And the evidence showed that Leapfrog specifically altered its Safety Grade methodology in a conscious bid to enhance Survey participation—which is the economic lifeblood of Leapfrog's revenues. Indeed, as one hospital pointed out to Leapfrog, the company engages in "marketing blackmail." *Supra* ¶ 200. And once this suit was filed, Leapfrog only doubled down on its expressed desire to "hurt Tenet," *supra* ¶ 394, the Community Hospitals' parent company. Leapfrog CEO Binder used funds from a grant to run ads displaying the Community Hospitals' failing Safety Grades any time internet users searched the Community Hospitals, *see supra* ¶¶ 397, 398, a tactic one of Leapfrog's own staff likened to a "[D]isney villain," *supra* ¶¶ 380, 397. Binder also ran op-ed hit pieces in local media outlets further highlighting the Community Hospitals' failing Safety Grades, falsely insinuating that the Community Hospitals are dirty and unsafe and besmirching the Community Hospitals' staff—even after the Community Hospitals' public filings in this case had already shown that Leapfrog's own staff knew it had no factual basis for these claims. *See supra* CoL ¶ 23 n.25. Leapfrog's high degree of culpability and abuse of consumer trust in the life-and-death healthcare context supports awarding attorneys' fees.

159. *Fifth*, the Community Hospitals' claim is meritorious and was brought in good faith. Thus, the claim is not frivolous and fees are appropriate. *See Bluegreen Vacations Unlimited, Inc.*, 2024 WL 3738890 at *9.

160. *Sixth*, Leapfrog raised numerous baseless arguments throughout this litigation that had the apparent purpose of frustration or delay. In addition to the discovery misconduct described above, Leapfrog also maintained unreasonable positions in the following respects:

a. As an overarching matter, Leapfrog has repeatedly and unjustifiably attempted to use this litigation as a means to—in its own words—"hurt Tenet." *Supra* ¶ 394. In particular, Leapfrog has taken every opportunity to attack the Community Hospitals' quality of care, a subject entirely irrelevant to *Leapfrog's* Safety Grade methodology at issue in this action. Leapfrog sought extensive and irrelevant discovery regarding the safety performance of each of

the Community Hospitals, forcing the Community Hospitals to move for a protective order. ECF 55. And Leapfrog has continued to press the point—seeking to introduce trial exhibits and testimony on the subject. Leapfrog's efforts to attack the Community Hospitals with a mini-trial regarding their quality of care has needlessly expanded the scope of this litigation.

b. In its motion to dismiss, Leapfrog contended that the Court has no personal jurisdiction over Leapfrog because Leapfrog lacks sufficient minimum contacts with Florida. ECF 39 at 16–18. Yet *one business day* after Leapfrog filed its motion, Leapfrog's CEO, Leah Binder, published an op-ed in *The Palm Beach Post* further criticizing the Community Hospitals. *See* ECF 40 at 2.

c. Leapfrog's witness, Michael Vredenburgh, extemporaneously withdrew one of his opinions (that Google Analytics data purportedly shows high user engagement with full pages of Leapfrog's website, including alleged disclosures) in his deposition, after admitting that he had no factual basis for the opinion, which was based on "an important mistake" and misinterpretation of the data. Vredenburgh Tr. 302:15–303:6. Mr. Vredenburgh also conceded to flagrant Rule 26 disclosure violations—and that Leapfrog's counsel had not advised him on his compliance with that rule or even commented on his report. ECF 96 at 9–10.

d. In Leapfrog's opposition to the Community Hospitals' motion to exclude Leapfrog witnesses, Leapfrog falsely stated that the Community Hospitals delayed discovery on certain issues until a week before the deposition of one of Leapfrog's experts, Dr. Anthony Harris, thereby precluding the expert from analyzing the discovery in time. ECF 111 at 14. The record shows, however, that the Community Hospitals produced the relevant discovery *a full month* before the deposition and two weeks before the expert tendered his report. ECF 121 at 18.

e. As noted above, Leapfrog's motion for summary judgment initially disputed that the amount-in-controversy requirement was unsatisfied. *See supra* CoL ¶ 17. After the Community Hospitals were forced to respond to this argument,

*see* ECF 115 at 18–19, Leapfrog's reply brief simply ignored it, *see generally* ECF 124, and Leapfrog then *stipulated* before trial that the amount-in-controversy requirement is satisfied, *see supra* CoL ¶ 16.

f. Similarly, after the Community Hospitals were forced to expend resources seeking summary judgment on the "good faith" affirmative defense asserted in Leapfrog's Amended Answer, *see* ECF 86 at 19, Leapfrog simply declined to respond and abandoned the defense in its opposition brief, *see generally* ECF 102.

g. Leapfrog also asserted a baseless "avoidable consequences" affirmative defense. PX-005.0 at 47. After the Community Hospitals pointed out at summary judgment that the defense pertains to damages, which the Community Hospitals do not seek, ECF 86 at 18-19, Leapfrog responded by citing a case purportedly showing the defense's relevance, ECF 102 at 18, yet on examination that case entirely concerns damages, ECF 107 at 10.

h. On the eve of trial—and without informing the Court—Leapfrog strategically altered several of the challenged aspects of its website by deleting or modifying prior misrepresentations and substituting in new (but similarly misleading and incomplete) misrepresentations. *See supra* ¶ 45–49. Because Leapfrog failed to inform the Court or the Community Hospitals of these changes, the Community Hospitals were forced to expend time and resources tracking changes in Leapfrog's website. Leapfrog's unannounced changes to several of the representations at issue on the eve of trial strongly suggests gamesmanship on Leapfrog's part.

i. Leapfrog in particular deleted the red-bolded footnote "disclaimer" on the Community Hospitals' gas gauge pages, despite repeatedly asserting throughout this litigation that the footnote was core to Leapfrog's defense and dispelled any concerns about consumer deception. *See supra* ¶ 349. After the Community Hospitals served a Request for Production and trial subpoena about the website changes, Leapfrog suddenly reinstated the footnote without explanation as to why it had temporarily deleted that supposedly crucial language. *See supra* ¶¶ 5, 256.

161. In sum, the Community Hospitals were forced to expend significant time and resources responding to these plainly groundless arguments. Altogether, this record of dilatory tactics, false factual assertions, and baseless legal arguments strongly supports the imposition of a fee award.

162. *Seventh*, this case was not brought to resolve a significant legal question under FDUTPA, and in fact involved a straightforward and core application of the statute. When, as here, a claim was not brought to resolve a significant legal question, this factor does not weigh against fees, but is neutral. *See Healthcare Res. Mgmt. Grp., LLC v. EcoNatura All Healthy World, LLC*, 2022 WL 1537757, at *10 (S.D. Fla. May 12, 2022).

163. In sum, the Court concludes that the relevant factors, weighed as a whole, decisively show that the Community Hospitals are entitled to attorneys' fees in an amount to be determined upon a later review of evidence related to fees and costs.

Dated: January 5, 2026

Respectfully submitted,

By: */s/ Jeffrey Marcus*

Jeffrey Marcus, Bar # 310890
Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
MARCUS RASHBAUM PINEIRO & MEYERS LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305) 400-4268
jmarcus@mrpfirm.com
mpineiro@mrpfirm.com
drashbaum@mrpfirm.com

Jeffrey Neiman, Bar # 544469
Brandon S. Floch, Bar # 125218
NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue
Suite 805
Fort Lauderdale, FL 33394
(954) 462-1200
jneiman@nmfalawfirm.com
bfloch@nmfalawfirm.com

By: */s/ Mary Beth Maloney*

Mary Beth Maloney (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
mmaloney@gibsondunn.com
lcrain@gibsondunn.com

Daniel P. Chung (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Christine M. Buzzard (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
dchung@gibsondunn.com
hwalker@gibsondunn.com
cbuzzard@gibsondunn.com

Betty X. Yang (*pro hac vice*)
Scott K. Hvidt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
byang@gibsondunn.com
shvidt@gibsondunn.com

*Attorneys for the Community Hospitals*

# TAB 189-28

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 3 |
| Total Messages: 41 | Date Range: 4/12/2024 |

### Outline of Conversations

**D034UC6RZUN** • 41 messages on 4/12/2024 • Alex Campione <acampione@leapfrog-group.org> • Slackbot (Bot) • missy <mdanforth@leapfroggroup.org>

JX-011.0

**Messages in chronological order** (times are shown in GMT -04:00)

**D034UC6RZUN**

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 11:02 AM
what type of media interviews do you want to take for SG?

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 11:02 AM
none? or trade? cura is asking

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 11:04 AM
just any that you/katie/leah can't do

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 11:04 AM
so i would be backup
👍 1 • Alex Campione <acampione@leapfrog-group.org>

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 11:04 AM
or topics you aren't comfortable with
👍 1 • Alex Campione <acampione@leapfrog-group.org>

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 11:06 AM
okay great i let them know

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 2:24 PM
i can only be on the phone during the SG panel call - do you think that will be an issue

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 2:26 PM
I don't think so. matt will be leading and is making the case for the imputation change. I'm assuming he brushed up on the new measures

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 2:28 PM
ok

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 2:28 PM
and i know the slides

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 2:29 PM
and will be able to see them
👍 1 • Alex Campione <acampione@leapfrog-group.org>

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 3:03 PM
i love your top!!!

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 3:23 PM
Thank you!

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:42 PM
Sarah Ans Peter sold this for us

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:42 PM
I wish Patrick was on this call

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:42 PM
Arjun too!!

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:42 PM
Pushing the bottom 25% idea
‼ 1 • Alex Campione <acampione@leapfrog-group.org>

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 4:42 PM
yes very different reactions

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:42 PM
I secretly love that!!!!

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 4:42 PM
i think you convinced patrick at the end tho

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:43 PM
lol we'll see

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:43 PM
He said 1000 hours

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:43 PM
I hope he keeps that to himself

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 4:43 PM
honestly this meeting has me second guessing the step 2 imputation at all!

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 4:44 PM
the mean is so high for cpoe and bcma

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:44 PM
I know but I hope hope hope it goes down for BCBS this year
👍 1 • Alex Campione <acampione@leapfrog-group.org>

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 4:44 PM
BCMA

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 4:45 PM
if we made step 1 just the previous survey, it would atleast make the lapse in survey participation short term and they cant fall back on step 2

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 5:00 PM
Oh so like step 1 or 0?

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 5:03 PM
the step 2 means are so high. what if we used step 1 (limited to only say 2 round), then assigned them to the bottom performance category

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 5:03 PM
That would be drastic but let's talk about it lol
👍 1 • Alex Campione <acampione@leapfrog-group.org>

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 5:05 PM
it would be drastic. im just afraid we're going to keep running into this problem of the step 2 means creeping up! we have to assume at some point that hospitals not reporting likely have poor or lapse in performance

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 5:06 PM
honestly we didnt have very much pushback when we did the CMS cost report for step 2 imputation, so thats what im basing it on

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 5:06 PM
so to peter's point- we would just have to very carefully push our justification and messaging

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 5:07 PM
Well let's think about it

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 5:07 PM
I'm open

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 5:07 PM
sounds good. overall everyone was so amenable in the last meeting

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 5:07 PM
I am just recovered from the nursing death threats why not 🤣 🤣
😂 1 • Alex Campione <acampione@leapfrog-group.org>

M **missy <mdanforth@leapfroggroup.org>** 4/12/2024, 5:08 PM
Have a great weekend

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 5:08 PM
i honestly think this might somehow be less controversial haha

A **Alex Campione <acampione@leapfrog-group.org>** 4/12/2024, 5:08 PM
you too!

# TAB 189-55

Message

**From:** Alexandra Campione [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D66D320700BE4B4985D929853FF80E30-ACAMPIONE]
**Sent:** 5/15/2024 2:06:20 PM
**To:** Patrick Romano [psromano@ucdavis.edu]
**Subject:** RE: Leapfrog: Proposed Text for Imputation Change

Patrick,

Thanks for your feedback. I completely agree.

Alex

**From:** Patrick Romano <psromano@ucdavis.edu>
**Sent:** Tuesday, May 14, 2024 10:52 PM
**To:** Matt Austin <jausti17@jhmi.edu>
**Cc:** Missy Danforth <mdanforth@leapfrog-group.org>; Alexandra Campione <ACampione@leapfrog-group.org>
**Subject:** RE: Leapfrog: Proposed Text for Imputation Change

External Email - Use Caution

Thank you for sharing.

I like the simpler and more direct approach here – if the goal is to penalize nonparticipants, you might as well do so in a clear and unmistakable manner, while allowing for hospitals to manage their burden and jump back on the wagon after a year. This approach is certainly much easier to implement and more straightforward that the step 2 imputation that you folks originally proposed, in that the consequences of nonresponse will become readily apparent.

I corrected a couple of typos in Peter's edits and suggested a rephrasing of one sentence.

As I mentioned earlier, your step 2b proposal would have led to lower imputed estimates, but NOT more ACCURATE imputation. I find no reason to believe – and you didn't present any evidence to suggest – that a hospital's unreported data from the current year is better approximated by its cohort mean from the first year of reporting than by its current cohort mean. The underlying hypothesis behind your proposed step 2b approach was that hospitals stop reporting because their true performance deteriorated, relative to their cohort. My hypothesis, by comparison, was that most hospitals stop reporting because it is too burdensome, and because they only find market value in an A grade, which proves impossible to attain or maintain. If my hypothesis is correct, then the current step 2 approach (current cohort mean) would yield more accurate imputations... but it doesn't achieve your strategic objective of penalizing nonparticipants. In other words, I wasn't keen on a backdoor approach to penalizing nonparticipation... if you want to penalize nonparticipants, then don't pretend that you are imputing missing values in a statistically optimal way. Just be honest about your goal.

Patrick S. Romano, MD MPH FAAP FACP
Professor of Medicine and Pediatrics, UC Davis Division of General Medicine
Co-Editor in Chief, AHRQ *Patient Safety Network* (PSNet and WebM&M)
4150 V Street, PSSB Suite 2400
Sacramento, CA 95817
Telephone: (916) 734-7005 or -7237
E-mail: psromano@ucdavis.edu
Website: https://health.ucdavis.edu/team/pediatrics/122/patrick-romano---internal-medicine---pediatrics-general-sacramento

EXHIBIT CAMPIONE 13 CH 9/12/25

EXHIBIT Romano 16

DEPOSITION EXHIBIT DANFORTH 18 9/18/25 CLS

LEAPFROG01081490

JX-022.3

**From:** Matt Austin <jausti17@jhmi.edu>
**Sent:** Tuesday, May 14, 2024 1:03 PM
**To:** Patrick Romano <psromano@ucdavis.edu>
**Cc:** Missy Danforth <mdanforth@leapfrog-group.org>; Alexandra Campione <ACampione@leapfrog-group.org>
**Subject:** RE: Leapfrog: Proposed Text for Imputation Change

Patrick,
If helpful to your review, Peter offered some suggested edits to clarify the concept of "imputation".
Thanks for any feedback you may have on this communication to hospitals.

Best,
Matt

**From:** Matt Austin
**Sent:** Tuesday, May 7, 2024 1:24 PM
**To:** Patrick Romano <psromano@ucdavis.edu>
**Cc:** Missy Danforth <mdanforth@leapfrog-group.org>; Alexandra Campione <ACampione@leapfrog-group.org>
**Subject:** Leapfrog: Proposed Text for Imputation Change

Patrick,

Since our conversation with you a couple of weeks ago about changing the imputation approach used in Leapfrog's Hospital Safety Grade, we met with the broader expert panel to hear their input, and have drafted the attached language to share with hospitals about the proposed changes.

In the attached, I believe you'll see that we have found a path forward that still uses a hospital's unique historical data when available (although for a shortened period of time) and when historical data are not available, creates an incentive for hospitals to share information about their patient safety practices.

We very much value your perspective and expertise, so we'd appreciate hearing any concerns you might have with the proposed.

Best,
Matt

**CONFIDENTIALITY NOTICE** This e-mail communication and any attachments are for the sole use of the intended recipient and may contain information that is confidential and privileged under state and federal privacy laws. If you received this e-mail in error, be aware that any unauthorized use, disclosure, copying, or distribution is strictly prohibited. If you received this e-mail in error, please contact the sender immediately and destroy/delete all copies of this message.

# TAB 189-84

Message

**From:** Paulina Litter [PLitter@leapfrog-group.org]
**Sent:** 6/18/2024 12:55:38 PM
**To:** Alexandra Campione [ACampione@leapfrog-group.org]
**Subject:** RE: New imputation denotation

I think that works really well!

**Paulina Litter** *(she/her/hers)*
Senior Specialist, Operations and Special Projects
(202) 868-4775
1775 K St. NW, Suite 400
Washington, DC 20006




LeapfrogGroup.org | HospitalSafetyGrade.org | Twitter | **Donate**

*Confidentiality Notice: This email is intended only for the individual(s) named above. It may contain information that is privileged, confidential, or otherwise protected from use. If you are not the intended recipient, you are hereby informed that any review, disclosure, copying, or dissemination of this transmission, or taking of any action in reliance on its contents, is strictly prohibited. If you have received this transmission in error, please reply to the sender listed above immediately and permanently delete this message. Thank you for your cooperation.*

**From:** Alexandra Campione <ACampione@leapfrog-group.org>
**Sent:** Tuesday, June 18, 2024 12:30 PM
**To:** Paulina Litter <PLitter@leapfrog-group.org>
**Subject:** RE: New imputation denotation

Actually, it should be "assigned", not "calculated". See below.
This hospital declined to report data for this measure, so a score was assigned using an imputation model approved by patient safety experts.

**From:** Alexandra Campione
**Sent:** Tuesday, June 18, 2024 12:29 PM
**To:** Paulina Litter <PLitter@leapfrog-group.org>
**Subject:** RE: New imputation denotation

Okay, great. It's working for me too. Thanks for doing this, but we can't say "external data sources" because we're arbitrarily assigning them the points associated with the bottom scoring category ("limited achievement") or old data from the previous Survey (internal data source).

Leah wanted us to make it sound like the expert panel approved it and the assigning of these points was legitimate. What about this: This hospital declined to report data for this measure, so a score was calculated using an imputation model approved by patient safety experts.

I think linking to the methodology would be neat, but I don't think Leah or Missy cared to do so. We could ask.

JX-031.0

**From:** Paulina Litter <PLitter@leapfrog-group.org>
**Sent:** Tuesday, June 18, 2024 11:42 AM
**To:** Alexandra Campione <ACampione@leapfrog-group.org>
**Subject:** RE: New imputation denotation

Yeah, I just did it and got the stage version so everything is working as it should on my end.

A few thoughts on the language:

- This hospital declined to report data for this measure, so a score was calculated with external data sources using an imputation model.
- This hospital declined to report data directly to Leapfrog for this measure, so a score was calculated using external data sources based on an imputation model.
- This hospital declined to report data for this measure, so a score was calculated using an imputation model. For more information, see the Spring 2024 Safety Grade Scoring Methodology.
- This hospital declined to report data for this measure, so a score was calculated with external data sources using an imputation model. For more information, see the Spring 2024 Safety Grade Scoring Methodology.
- This hospital declined to report data directly to Leapfrog to this measure, so a score was calculated using external data sources based on an imputation model. For more information, see the Spring 2024 Safety Grade Scoring Methodology.

Let me know what you think of the above options.

**Paulina Litter** *(she/her/hers)*
Senior Specialist, Operations and Special Projects
(202) 868-4775
1775 K St. NW, Suite 400
Washington, DC 20006




LeapfrogGroup.org | HospitalSafetyGrade.org | Twitter | **Donate**

*Confidentiality Notice: This email is intended only for the individual(s) named above. It may contain information that is privileged, confidential, or otherwise protected from use. If you are not the intended recipient, you are hereby informed that any review, disclosure, copying, or dissemination of this transmission, or taking of any action in reliance on its contents, is strictly prohibited. If you have received this transmission in error, please reply to the sender listed above immediately and permanently delete this message. Thank you for your cooperation.*

**From:** Alexandra Campione <ACampione@leapfrog-group.org>
**Sent:** Tuesday, June 18, 2024 11:29 AM
**To:** Paulina Litter <PLitter@leapfrog-group.org>
**Subject:** Re: New imputation denotation

Yes, but are you able to see the change on his link? I followed all the instructions and I'm going to try again later today. I've just been out and am catching up on stuff.

That was the language Missy wanted but Leah wants something else that makes it sound like the data we imputed wasn't random, so lmk if you have any ideas.

I will respond to him later today once I'm sure it doesn't display on stage for me, and I come up with new phrasing. Otherwise, his mockup looks right.

**Alexandra Campione, MPH** *(she/her/hers)*
Program Analyst, Health Care Ratings
The Leapfrog Group
1775 K St. NW, Suite 400
Washington, DC 20009

LeapfrogGroup.org | HospitalSafetyGrade.org | Twitter | Donate

*Confidentiality Notice: This email is intended only for the individual(s) named above. It may contain information that is privileged, confidential, or otherwise protected from use. If you are not the intended recipient, you are hereby informed that any review, disclosure, copying, or dissemination of this transmission, or taking of any action in reliance on its contents, is strictly prohibited. If you have received this transmission in error, please reply to the sender listed above immediately and permanently delete this message. Thank you for your cooperation.*

**From:** Paulina Litter <PLitter@leapfrog-group.org>
**Sent:** Tuesday, June 18, 2024 11:26:09 AM
**To:** Alexandra Campione <ACampione@leapfrog-group.org>
**Subject:** FW: New imputation denotation

Does this work for you? My only callout is the language seems a bit off to me as a layperson to know what imputed means. Maybe we can change it to say "so a score was calculated using imputation for the measure" would that work?

**Paulina Litter** *(she/her/hers)*
Senior Specialist, Operations and Special Projects
(202) 868-4775
1775 K St. NW, Suite 400
Washington, DC 20006




LeapfrogGroup.org | HospitalSafetyGrade.org | Twitter | Donate

*Confidentiality Notice: This email is intended only for the individual(s) named above. It may contain information that is privileged, confidential, or otherwise protected from use. If you are not the intended recipient, you are hereby informed that any review, disclosure, copying, or dissemination of this transmission, or taking of any action in reliance on its contents, is strictly prohibited. If you have received this transmission in error, please reply to the sender listed above immediately and permanently delete this message. Thank you for your cooperation.*

**From:** Devon Weller <dweller@atlasworks.com>
**Sent:** Friday, June 14, 2024 12:01 PM
**To:** Alexandra Campione <ACampione@leapfrog-group.org>
**Cc:** Paulina Litter <PLitter@leapfrog-group.org>; jeff <jeff@ravencreative.com>
**Subject:** Re: New imputation denotation

External Email - Use Caution

Great. That makes it easier since we will not have to re-import any new data.

I implemented this in a staged version of the database.

To preview the staged version, please do the following:

1. Open a new **Incognito window** in Chrome.
2. Visit this URL in the new **Incognito window**:
https://www.hospitalsafetygrade.org/?dbver=20240601STAGE
3. Then do a search for a hospital (e.g. Mizell Memorial Hospital) and visit the hospital details page.




If you accidentally enable the staged preview not in an Incognito window, you will need to clear cookies for the site to return to normal. You will know if you are seeing the staged version if you see something like this in the top right of the page:




LEAPFROG00427866

Please review this when you get a chance. If all looks good, I will copy this change to the live database to make this live.

- Devon

On Tue, Jun 4, 2024 at 2:11 PM Alexandra Campione <ACampione@leapfrog-group.org> wrote:

Hi Devon,

I am so silly. We don't need extra columns!

The asterisks should appear anytime the measure's data source= "Imputation Model Applied".

This would only apply to the following columns:

- CPOE (Data Source) and CPOE (Hospital Score)
- BCMA (Data Source) and BCMA (Hospital Score)
- ICU Physician Staffing (Data Source) and ICU Physician Staffing (Hospital Score)
- Hand Hygiene (Data Source) and Hand Hygiene (Hospital Score)

Example: if *CPOE (Data Source)*= "Imputation Model Applied", then *This Hospital's Score*= *CPOE (Hospital Score) & "*"*.

Please let me know if you have any questions. Attached is an example file to visualize.

Best,
Alex

---

**From:** Paulina Litter <PLitter@leapfrog-group.org>
**Sent:** Thursday, May 30, 2024 11:05 AM
**To:** devon@atlasworks.com
**Cc:** Alexandra Campione <ACampione@leapfrog-group.org>
**Subject:** FW: New imputation denotation

Hi Devon,

Here is the information for the safety grade update. Thank you for all of your help!

Paulina Litter *(she/her/hers)*
Senior Specialist, Operations and Special Projects
(202) 868-4775
1775 K St. NW, Suite 400
Washington, DC 20006




LeapfrogGroup.org | HospitalSafetyGrade.org | Twitter | Donate

*Confidentiality Notice: This email is intended only for the individual(s) named above. It may contain information that is privileged, confidential, or otherwise protected from use. If you are not the intended recipient, you are hereby informed that any review, disclosure, copying, or dissemination of this transmission, or taking of any action in reliance on its contents, is strictly prohibited. If you have received this transmission in error, please reply to the sender listed above immediately and permanently delete this message. Thank you for your cooperation.*

**From:** Alexandra Campione <ACampione@leapfrog-group.org>
**Sent:** Wednesday, May 29, 2024 4:45 PM
**To:** Paulina Litter <PLitter@leapfrog-group.org>
**Subject:** RE: New imputation denotation

Here's the final mockup and description. Thanks again!

We would like to add a third item to the "Notes and Definitions" at the bottom and an optional asterisk to 4 measures' scores (CPOE, BCMA, IPS, and Hand Hygiene). The data file would denote whether the asterisk should be present either with 4 additional columns or include the asterisk in the original data columns. The latter would be similar to the data review website, but I am guessing it wouldn't work since the numeric values are used to determine the gas gauge direction.



## CERTIFICATE OF SERVICE

I certify that on November 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by that system.

Dated: November 20, 2026

GIBSON, DUNN & CRUTCHER LLP

By: *\/s/ Jeffrey B. Wall*
Jeffrey B. Wall

*Counsel for Plaintiffs-Appellees*
*The Community Hospitals*